IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| WASHINGTON MUTUAL, INC., et al. ) | |
| ) | Case No. 08-12229 (MFW) |
| ) | (Jointly Administered) |
| Debtors. ) | **Related Docket Item 74** |
| ) | **Objection Deadline: October 20, 2008** |

## OBJECTION OF THE WMB NOTEHOLDER GROUP TO MOTION OF DEBTORS PURSUANT TO SECTIONS 105(a), 361, 362 AND 542(b) OF BANKRUPTCY CODE SEEKING APPROVAL OF A STIPULATION AND AGREEMENT CONCERNING DEPOSIT ACCOUNTS AT JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

No bank would ever let someone walk up to a teller window and withdraw even one dollar from an account without confirming that the account was actually established and that the account actually belonged to the customer. Yet the Debtors propose, on shortened notice, to withdraw approximately $4.4 billion from Accounts (defined below) as to which they cannot locate, with limited exceptions, "any deposit account agreements establishing the Accounts, any other agreements regarding the maintenance of or withdrawals from the Accounts or any signature cards or other specification of any authorized signatories with respect to the Accounts." And, pursuant to the Motion of Debtors Pursuant to Sections 105(a), 361, 362 and 542(b) of the Bankruptcy Code Seeking Approval of a Stipulation and Agreement Concerning Deposit Accounts at JPMorgan Chase Bank, National Association [D.I. 74] (the "Motion to Approve"), they propose to do this free and clear of all potential rights and interests in the Accounts save those of the bank where the Accounts are currently maintained.

The WMB Noteholder Group,[1] by and through its undersigned counsel,[2] hereby objects to the Motion to Approve because it will irreparably harm the potential rights and interests of the WMB Group Participants in the Accounts before those rights and interests can be investigated and pursued.

## BACKGROUND

1.  WMB, a federal savings and loan association that is a subsidiary of the debtor Washington Mutual, Inc. ("WMI"), was placed into receivership (the "Receivership") by the Office of Thrift Supervision (the "OTS") on September 25, 2008.[3] Although it has been termed the largest thrift "failure" in United States history, WMB had capital in excess of the regulatory

---

[1] The participants ("the WMB Group Participants") in the WMB Noteholder Group include more than 30 insurance companies, institutional fund managers, investment banks and private investment funds who are the legal or beneficial holders of, or have control or discretionary investment authority with respect to, approximately $2 billion in aggregate principal amount outstanding of Senior Notes and Subordinated Notes issued by Washington Mutual Bank ("WMB"). The WMB Noteholder Group is still in the formation process and counsel is still in the process of obtaining the precise legal name of each WMB Group Participant and/or its relevant affiliates, funds and/or managed accounts. At the hearing on the Motion to Approve, counsel will identify the current WMB Group Participants.
   The WMB Group Participants participate in the WMB Noteholder Group as a matter of convenience and fee sharing only and each WMB Group Participant does not act for, or purport to represent or speak on behalf of, any other WMB Group Participant or any other holder of WMB Senior or Subordinated Notes. WMB Group Participants are free to join or drop out of the WMB Noteholder Group at any time, and, accordingly, counsel will provide an update as to the WMB Group Participants from time to time.

[2] The sole client of counsel is the WMB Noteholder Group as a whole, and counsel does not purport to represent individual WMB Group Participants in any manner other than in respect of the expression of their consensus views through the vehicle of the WMB Noteholder Group.

[3] The WMB Noteholder Group has standing to raise this objection because they are parties in interest with a practical and economic stake in the outcome of these proceedings. Secondarily, the WMB Noteholder Group has standing because the holders of the Notes constitute the largest constituency in the Receivership, entitling them to the bulk of distributions from the Receivership including any amounts owed to the Receivership by the Debtors.

standards for "well capitalized" institutions and was unquestionably solvent on a fair valuation basis when the OTS pulled the plug. Even more remarkably, WMI had access to very substantial capital at the time and yet it stood idly by when WMB experienced tightening liquidity. Without WMI's assistance, the OTS was apparently concerned that WMB depositors might not be totally protected if liquidity tightened further, leading to the sudden initiation of the Receivership in order to minimize the possibility that the Federal Deposit Insurance Corporation (the "FDIC") would be required to cover the insured portion of customer deposits.

2.  At the time of the Receivership, WMB had outstanding approximately $7 billion in Senior Notes and approximately $7 billion in Subordinated Notes (together, the "Notes").[4] On the same day as the initiation of the Receivership, the FDIC, in its capacity as statutory receiver (the "Receiver"), entered into a purchase and assumption contract with JPMorgan Chase Bank, National Association ("JPMorgan Chase"), whereby JPMorgan Chase acquired substantially all of the assets of WMB, including the stock of its subsidiary, Washington Mutual Bank fsb ("WMBfsb"), and assumed substantially all of the liabilities of WMB (the "P&A Agreement"). "Substantially all" of the liabilities, that is, except for the Notes. As a result, what had been highly-rated debt securities of a leading thrift that was solvent on both a regulatory and a fair value basis were stripped of all sources of repayment other than (i) the $1.9 billion purchase price paid by JPMorgan Chase, (ii) the entitlement to a likely substantial tax refund at the conclusion of WMB's tax year (and potentially other tax assets and claims), (iii) potential claims

---

[4] Because there are no public "schedules of assets and liabilities" available at the commencement of a Receivership and there are no indenture trustees for the more than 280 issuances of Senior and Subordinated Notes made by WMB over the years, the precise amount of Notes outstanding is just one of the many questions about WMB that remain to be answered. The numbers referenced herein are sourced from the WMI 2007 10-K, available at http://www.sec.gov/Archives/edgar/data/933136/000104746908002083/a2182890z10-k.htm, minus estimated maturities after the 10-K.

and causes of action in respect of the events leading up to the Receivership, and (iv) potential rights and interests in respect of the Accounts.

3. According to the Motion to Approve (at ¶ 8), among the liabilities assumed by JPMorgan Chase were various deposit accounts (the "Accounts") with WMB and WMBfsb in excess of $4.4 billion (and possibly in excess of $5 billion).[5] It is those Accounts that are the subject of the Motion to Approve and of this Objection.

4. Specifically, on shortened notice, the Debtors seek this Court's approval of a Stipulation by and Between Debtors and JPMorgan Chase Bank, N.A. Concerning Certain Accounts (the "Stipulation") that would declare that the Accounts conclusively belong to the Debtors and would require JPMorgan Chase to transfer the funds in the Accounts (the "Funds") to the Debtors "as the Debtors, in their sole and absolute discretion, may direct." Stipulation at ¶ 2. While the Stipulation preserves any rights that JPMorgan Chase may have in the Funds, there is no protection at all for the potential rights of all other parties in the Funds, including the Receiver, the holders of the Notes, and any and all other creditors of the Receivership. Not only that, no rights are preserved in respect of the Task Force created by the United States Attorney's Office for the Western District of Washington (WMB is headquartered in Seattle), which is working with the FBI, the SEC, the IRS and the FDIC, to investigate the circumstances leading to the closure of WMB. See Statement by United States Attorney Jeffrey C. Sullivan Regarding Washington Mutual (Oct. 15, 2008), available at

---

[5] A bank account is an asset of the depositor and a liability of the bank where the account is maintained. By assuming all of the accounts of WMB and acquiring the stock of WMBfsb, JPMorgan Chase is liable for the stated amount of the Accounts. In the Motion to Approve, WMI asserts that it is the sole person to whom JPMorgan Chase is liable in respect of the Accounts.

4

http://www.usdoj.gov/usao/waw/press/2008/oct/washingtonmutual.html. That investigation could conceivably lead to recoveries under the "fair funds provisions" for holders of the Notes and other parties. In addition, even as to the preserved rights of JPMorgan Chase, the Stipulation appears to contemplate that the Debtors will have full control of and access to the Funds to pay the administrative expenses of the Debtors and any other Court-approved obligations.

## **OBJECTION**

5. What emergency can possibly exist that would justify, on shortened notice, the payment of more than $4.4 billion in Funds to the Debtors, free and clear of all potential claims and interests other than those of JPMorgan Chase? The Debtors' Motion to Approve should be denied because the Stipulation prematurely and categorically determines that the Debtors lay sole claim to the Funds and can spend them freely, without the benefit of complete due diligence and consideration of the potential rights and claims of numerous other parties in interest, including the WMB Group Participants.

6. Regardless of whether, at the end of the day, it is the Debtors, the WMB Group Participants, or any other party who will be able to establish rightful claims to the Funds, we are only at the beginning of the day and the Debtors simply cannot assert with any degree of certainty that they hold the only, or even the primary, interest in the Funds. From the perspective of the WMB Noteholder Group, the Funds could prove to be the single largest asset of the Receivership in a situation where, even assuming 100% of the Funds are eventually turned over to the Receiver, the holders of billions of dollars of Notes in a regulated, solvent thrift will still receive only a fraction of their claims. The Debtors, however, throwing all caution and prudence

to the wind, press on with the hope of securing all of the Funds for themselves before other parties have time to catch up.

7.     Simply put, the Debtors' request is premature and will cause potentially irreparable harm and prejudice to the holders of the Notes, including the WMB Group Participants. Conversely, the Debtors will not be harmed by a preservation of the status quo as they have no possible emergency need to establish their purported interest in the Funds. The Debtors cannot pay their unsecured creditors prior to confirmation of a plan and they have substantial other resources to fund the administrative expenses of the Chapter 11 estates in the interim.

**I. "The Fog": Too Many Questions Abound to Permit Approval of the Stipulation**

    A. Account Ownership

8.     The Debtors admit in the Motion to Approve that there is a "fog of uncertainty surrounding the Deposits" and that approval of the Stipulation "will bring to conclusion recovery of the Debtors' largest assets without delay or costly litigation." Motion to Approve at ¶ 17. But surely this puts the $4.4 billion cart before the horse. In fact, there will very likely be substantial litigation over the Funds and the desire of the Debtors to avoid the costs of that litigation cannot possibly trump the interests of the other parties potentially asserting an interest in the Funds.

9.     Even the Debtors themselves concede that, with a few limited exceptions, no one has yet been able even to locate "any deposit account agreements establishing the Accounts, any other agreements regarding the maintenance of or withdrawals from the Accounts or any signature cards or other specification of any authorized signatories with respect to the Accounts."

Stipulation at 2. Further, "[t]he aggregate amounts described in the Stipulation and herein are based on information provided by JPMorgan Chase and are subject to further review by the Debtors." Motion to Approve at ¶ 8, n.2. Without solid documentation as to the status of the Accounts, the Debtors entered into the Stipulation and asked the Court to approve it on shortened notice. If the Debtors are uncertain even as to how much money is in the Accounts, they cannot possibly be certain as to whom the Accounts rightfully belong.

10. If the Court approves the Stipulation and the Funds are later found to rightfully belong to another entity, that entity may have no recourse to recover the full value of its assets. Too many questions abound to permit approval of the Stipulation, which, as drafted, would determine a question of upmost importance to the Debtors and the WMB Noteholder Group while causing irreparable harm in the process. Moreover, a categorical determination of the entitlement to the Funds, without due process and proper due diligence, would turn on its head the very paradigm under which United States banking institutions operate. See infra, Part II (discussing the public policy concerns of the bank investment industry).

B. Reservation of Rights Against the Accounts

11. In addition to the lack of documentation as to who owns the Accounts, the Debtors have no information as to the rights of other parties with respect to the Accounts. Further, JPMorgan Chase concedes that "it has not had the opportunity to fully evaluate the extent of the rights, if any, [it] may have." Stipulation at 3. Because JPMorgan Chase needs more time to evaluate its rights, it expressly reserved those rights in the Stipulation. Id. at ¶ 3. If the party who now has possession of all of the books and records of WMB cannot make a proper determination as to the Accounts, it would be manifestly unfair to deny all other parties the right

to review the books and records, considering the pre-Receivership conduct of WMI in failing to support WMB and to conduct appropriate discovery into all of the circumstances to determine the extent of their rights in the Accounts. JPMorgan Chase, at least, had the leverage to preserve its rights in exchange for paying the disputed Funds to the Debtors, but nobody else's rights are preserved at all.

**II. Public Policy Dictates That the Motion to Approve Must Be Denied**

12.  WMB, like so many other thrifts and commercial banks, was forced to write down its assets substantially due to the mortgage crisis and the credit crunch. These write-downs led to substantial losses, which in turn led the OTS to initiate a series of regulatory actions beginning in January of 2007, including requiring WMI and WMB to enter into a still-undisclosed memoranda of understanding in early September 2008.[6] All of this begs the questions of (i) whether the so-called Accounts were, in fact, intended as capital injections or liquidity backstops and (ii) even if not expressly intended as such, whether the Accounts should have been used to bolster the capital and liquidity positions of WMB prior to the declaration of receivership. For example, the Motion to Approve notes that one of the assets that JPMorgan Chase bought was the stock of WMBfsb, which was a solvent subsidiary of WMB. Substantial investigation is

---

[6] The OTS reported that, on February 27, 2008, an overall composite downgrade was issued in respect of WMB and the thrift entered into a Board resolution in response to supervisory action. See Office of Thrift Supervision Fact Sheet on Washington Mutual Bank, September 25, 2008, available at http://files.ots.treas.gov/730021.pdf. The OTS also reported that on June 30, 2008, it initiated further discussions with WMI and WMB and, on September 7, 2008, such discussion resulted in the OTS, WMI and WMB entered into Memoranda of Understanding (the "MOU"). The MOU is not yet publicly available and accordingly the obligations, if any, of WMI under the MOU are unknown at this time. On September 18, 2008, the OTS issued an overall ratings downgrade in respect of WMB.

8

required to determine whether, in fact, the Accounts properly belonged to WMB as the parent of WMBfsb, rather than to WMI as the parent of the parent of WMBfsb.

13. In addition, even if it is ultimately determined that the Accounts belong to WMI, it is entirely possible that WMI's pre-Receivership conduct entitles WMB to substantial damages that can be offset against the Funds. As promulgated by the Board of Governors of the Federal Reserve System, Regulation Y[7] establishes that a "bank holding company shall serve as a source of financial and managerial strength to its subsidiary banks and shall not conduct its operations in an unsafe or unsound manner."[8] The policy behind the Federal Reserve Board's "source of strength" doctrine is the underlying safety and soundness of a holding company and its subsidiary financial institutions.

14. While the regulations of the OTS do not explicitly provide for a "source of strength" doctrine comparable to that provided for in Regulation Y, the underlying premise holds true and the requirement is no less sound when applied to savings and loan holding companies and their insured depository subsidiaries. Even without the authority of that same source of strength provision, the OTS bases its enforcement power on the same policy grounds—the safety and soundness of the institutions subject to its authority.

15. A holding company that has the ability and the means to inject much needed capital into a banking subsidiary but refuses to do so is not exercising safe and sound banking practices. In the matter <u>sub judice</u>, the policy behind the "source of strength" doctrine ought to

---

[7] 12 C.F.R. §§ 225.1-177 & 225.200.

[8] <u>Id.</u> at § 225.4(a)(1).

9

apply, and the Debtors owed this obligation to WMB, the WMB Group Participants, and the other holders of the Notes, potentially entitling those parties to billions of dollars in damages.

16. In the instant case, WMI raised over $7 billion in capital for the expressed purpose of maintaining the capital of WMB at appropriate levels, through the injection of most of that capital into WMB.[9] The specific language used in WMI's SEC filing is as follows:

> On April 8, 2008, we announced that we had entered into definitive agreements to raise an aggregate of approximately $7 billion through the direct sale of equity securities to affiliates of TPG Capital and to other institutional investors. With the proceeds of this offering, our capital ratios are expected to remain well above our targeted levels during the period of elevated credit costs in our loan portfolios in 2008 and 2009. At the same time, we believe this strengthened capital base will permit us to continue growing our leading national banking franchise.

17. However, despite its stated purpose of maintaining capital levels well above targeted levels and growing its national banking franchise, it now appears that WMI may have deposited a significant portion of those funds into deposit accounts at WMB and WMBfsb for WMI's own account.

18. Additionally, WMI itself reported in its bankruptcy petition $32.9 billion in assets and only $8.2 billion in debt.[10] Not only is this further evidence that WMI should have injected more capital into WMB before the Receivership to stem the depositor run on WMB, it also shows that allowing WMI to receive the Funds would result in a windfall to WMI at the expense of WMB's creditors, including the WMB Group Participants. Failing to enforce a "source of

---

[9] Washington Mutual, Inc., Proxy Statement (Schedule 14A) (May 22, 2008).

[10] Debtor's Voluntary Petition, In re Washington Mutual, Inc., Case 08-12229-MFW (Bankr. Del. Sept. 26, 2008) [D.I. 1].

strength"-type doctrine in the instant situation could also create precedent for future receiverships in which deposit insurance funds are at risk, an outcome that would turn the banking industry on its head. In the alternative, failing to preserve rights in Accounts as against which billions of dollars in damages could be offset would be a gross miscarriage of justice.

**III. Necessary Protections: The Stipulation, as Written, Eviscerates the Rights of Others**

19. In the event the Court decides to grant the Motion to Approve, the Stipulation should not be approved as written. Instead, the Court should require the Debtors to place the Funds in escrow to allow interested parties, including the WMB Noteholder Group, to determine what rights they have in the Funds either by way of ownership, equitable claims, or damage offset rights. By preventing the Debtors from disbursing the Funds, the Court can potentially prevent irreparable harm and ensure that the rightful claims of interested parties are protected from depletion.

20. In response to this Objection, the Debtors will undoubtedly assert that the WMB Noteholder Group's arguments are mere allegations and speculations. But, if anything, this simply proves the point. Far more is unknown than is known at this point. The Debtors themselves don't even know how much is in the Accounts Accounts (they are relying on JPMorgan Chase for dollar amounts, even though JPMorgan cannot yet find most of the paperwork for the Accounts)—and whether the Debtors, the WMB Noteholder Group or anyone else can ultimately turn their allegations into proven facts, they all should be given an equal opportunity to do so and the status quo needs to be preserved in the interim.

WHEREFORE, for the reasons set forth above, WMB Noteholder Group respectfully requests that the Debtors' Motion to Approve be denied. In the alternative, the WMB Noteholder Group respectfully requests that the Stipulation be modified as discussed above prior to approval.

POTTER ANDERSON & CORROON LLP

By: _____
Laurie Selber Silverstein (Bar No. 2396)
Theresa V. Brown-Edwards (Bar No. 4225)
Hercules Plaza, 6th Floor
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
(302) 984-6000

- And -

BRACEWELL & GIULIANI LLP
Evan D. Flaschen
Renée M. Dailey
Mark E. Dendinger
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, Connecticut 06103
(860) 256-8537

- And -

BRACEWELL & GIULIANI LLP
Robert L. Clarke
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
(713) 223-2300

- And -

BRACEWELL & GIULIANI LLP
Sanford M. Brown
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202-2711
(214) 468-3800

- And -

BRACEWELL & GIULIANI LLP
Marc L. Mukasey
1177 Avenue of the Americas, 19th Floor
New York, New York 10036-2714
(212) 508-6100

*Attorneys for the WMB Noteholder Group*

Dated: October 20, 2008