## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------- x

| | |
|---|---|
| In re: | : **Chapter 11** |
| | : |
| | : **Case No. 08-12229 (MFW)** |
| | : **(Jointly Administered)** |
| **WASHINGTON MUTUAL, INC., et al.,** | : **RE: Docket No. 1444** |
| | : |
| **Debtors.** | : Hearing Date: August 24, 2009 at 11:30 a.m.  (ET) |
| | : |

------------------------------------------------------------- x

### OBJECTION BY THE WASHINGTON MUTUAL, INC. NOTEHOLDERS GROUP TO THE MOTION OF JPMORGAN CHASE BANK, N.A. TO COMPEL THE WASHINGTON MUTUAL, INC. NOTEHOLDERS GROUP TO COMPLY WITH FEDERAL RULE OF BANKRUPTCY PROCEDURE 2019

TO THE HONORABLE MARY F. WALRATH,
UNITED STATES BANKRUPTCY JUDGE:

The Washington Mutual, Inc. Noteholders Group (the "Noteholders," and each participant, a "Noteholder") hereby files its objection (the "Objection") to the Motion to Compel the Washington Mutual, Inc. Noteholders Group to Comply with Federal Rule of Bankruptcy Procedure 2019 (the "2019 Motion") [Docket[1] No. 1444] filed by JPMorgan Chase Bank, National Association ("JPM").

### I.        PRELIMINARY STATEMENT

1.        Nearly one year after the commencement of these chapter 11 cases (and approximately 10 months after White & Case LLP disclosed the identities of its clients and the amount of their aggregate holdings), in the 2019 Motion, JPM now asks

---

[1]        Unless otherwise noted, all docket numbers herein refer to the docket in the chapter 11 cases (as defined below) before this Court.

WM1A 934489v1 08/19/09

the Court to order each of the Noteholders to disclose, among other things, the details of every transaction it has engaged in regarding claims against or equity interests in WMI. This information is highly sensitive and proprietary, and it would in most cases be burdensome to produce. Its disclosure would disadvantage the Noteholders vis-à-vis their competitors and counterparties in the market who have no obligation to make such disclosures.

2.     Against this risk of harm to the Noteholders, JPM has failed to identify any benefit to the estate or the Court from the disclosure sought in the 2019 Motion. The information is entirely irrelevant to any issue or matter before the Court; case law has made clear that the price paid for a claim generally has no impact on the rights to which that claim is entitled in a bankruptcy case. If an action or matter is subsequently commenced that makes such information relevant, it would no doubt be made the subject of discovery and could be properly addressed in that context.

3.     Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") is inapplicable to the Noteholders. By its terms, the rule applies only to an entity or committee that purports to represent the interests of multiple parties in a case. The Noteholders have made clear that they do not purport to represent anyone; rather, they are simply a loose affiliation of creditors who, in the interest of efficiency, are sharing the cost of advisory services in connection with the case. The Noteholders do not speak for, have no ability to bind, and owe no duties to, anyone who is not a Noteholder. Perhaps as importantly, the Noteholders don't even have the right to speak for or bind any individual Noteholder absent its individual consent. Each Noteholder acts

in its own right and on its own behalf; issues are discussed and negotiated with focus and intensity and ultimately agreed among the Noteholders before a position is formally put forth.

4. Obviously, if each Noteholder went out and hired separate counsel and financial advisors, there would be no intrusive Bankruptcy Rule 2019 obligation. The consequence would be thirty law firms appearing and filing pleadings; thirty law firms duplicating diligence and legal analysis; thirty financial advisory firms duplicating financial diligence and developing models. Clearly, the Rules should not be construed to promote such wasteful inefficiency, the request of JPM notwithstanding.

5. Viewed from this perspective, the 2019 Motion is revealed for what it truly is: a misplaced attempt by JPM to gain a tactical advantage at a critical stage of the case. Knowing the sensitivity creditors generally have with respect to the disclosure of claims trading information, JPM seeks to destabilize the Noteholders by purporting to demand compliance with Bankruptcy Rule 2019 as the case enters a stage where the substantive disputes between JPM and the estate's other stakeholders will be resolved through settlement or litigation.

6. For the foregoing reasons and as set forth in more detail below, the 2019 Motion should be denied.

## II.    BACKGROUND

7. Various entities, which hold or advise funds who hold, debt of Washington Mutual, Inc. ("WMI"), began discussing the potential implications and consequences of WMI's bankruptcy immediately following the commencement of these

chapter 11 cases. Shortly thereafter, they retained White & Case LLP ("White & Case") as lead counsel, Bayard, P.A. ("Bayard") as Delaware counsel and Kasowitz Benson Torres & Friedman LLP ("Kasowitz") as special litigation and conflicts counsel. The Bayard Firm was subsequently replaced by Fox Rothschild LLP ("Fox Rothschild"). White & Case appeared on behalf of the Noteholders at the first day hearing held on October 3, 2008.

8.      White & Case filed both a Notice of Appearance and Request for Service of Papers (the "White & Case Appearance") [Docket No. 101] and a Verified Statement of White & Case LLP Pursuant to Bankruptcy Rule 2019 (the "Disclosure") [Docket No. 102] with this Court on October 20, 2008.

9.      In the Disclosure, White & Case identified the Noteholders, the aggregate amount of their holdings, and the fact that each Noteholder "makes its own decisions as to how it wishes to proceed and does not speak for, or on behalf of, any other creditor, including the other [Noteholders] . . . in their individual capacities." (Disclosure ¶ 3.)

10.     Also in the Disclosure, White & Case explained that the identities of the Noteholders were expected to change from time to time (Disclosure ¶ 3), which—in addition to purchases or dispositions of claims—explains how and why the aggregate amount of claims has fluctuated (or "swelled" as JPM has described it). (2019 Motion n. 1, ¶ 12.)

11.     On November 6, 2008, Kasowitz also filed a Notice of Appearance and Request for Papers (the "Kasowitz Appearance") [Docket No. 247] with this Court.

4

12.     In March of 2009, certain of the Noteholders participated in negotiations with JPM, the FDIC, the Debtors, the Official Committee of Unsecured Creditors (the "Official Committee") and other noteholders represented by Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") in hopes of reaching a global settlement of the disputed issues in these chapter 11 cases. As a condition to participation in those negotiations, the participating Noteholders were required to execute limited confidentiality agreements, which in effect precluded them from trading in WMI's securities or required them to establish and observe internal screening procedures during the term of the confidentiality agreement. During these negotiations, JPM commenced an adversary proceeding against the Debtors; no advance notice was provided to the Debtors, the Official Committee or the Noteholders. JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc., Adv. Case No. 09-50551 (Bankr. D. Del.) [Docket No. 807]. The filing of the adversary proceeding effectively ended the negotiations. Nevertheless, at no time during the negotiations did JPM express any interest in any of the information now sought through the 2019 Motion.

13.     Contemporaneously with this Objection, White & Case, Kasowitz, and Fox Rothschild have filed and served supplemental Rule 2019 disclosures (the "Supplemental Disclosures"), which show that at present the Noteholders include thirty entities holding in the aggregate $3.26 billion of WMI's outstanding debt securities.

WM1A 934489v1 08/19/09

# V.  **OBJECTION**

**A.  RULE 2019(a) DOES NOT APPLY TO THE NOTEHOLDERS BECAUSE THE NOTEHOLDERS ARE NOT AN "ENTITY OR COMMITTEE" AS USED IN THE RULE.**

14.  Rule 2019 applies to an "<u>entity</u> or <u>committee</u> representing more than one creditor or equity security holder" other than an official committee appointed in a chapter 11 case.  The Noteholders simply are not an "entity or committee" within the meaning of the Rule because they do not purport to represent any class of stakeholders nor have they been delegated any authority to perform any particular duty in these Chapter 11 Cases; in fact the Noteholders have expressly stated that they do "not speak for, or on behalf of, any other creditor."  Accordingly, Rule 2019 does not apply to the Noteholders.

15.  The history of Rule 2019, and its predecessors, demonstrates that neither the Rule nor its use of the word "committee" was intended to encompass individuals that decide to share the fees of a single advisor while still making individual decisions.  Instead, the word "committee," together with its qualifier, "representing more than one creditor or equity security holder," refers to a body that purports to speak on behalf of an entire class or broader group of stakeholders in a fiduciary capacity with the power to bind the stakeholders that are members of such a committee.  In fact, the Rule's predecessor was promulgated to address perceived abuses perpetrated by certain self-proclaimed fiduciaries in reorganization cases in the 1930s.  There, "protective committees" often acted in the interests of "persons with small means [that] held bonds in quite small amounts."  <u>In re Rosenbaum Grain Co.</u>, 13 F. Supp. 600 (N.D. Ill. 1935).

6

16. "Protective committees" were privately formed committees organized by insiders and generally dominated by the debtor, its investment bank or institutional investors. <u>See</u> SEC Report (as defined in footnote 2) at 586 (attached as Exhibit A); Tabb, Charles J., <u>The History of the Bankruptcy Laws in the U.S.</u>, 3 Am. Bankr. Inst. L. Rev. 5, 30 (1995) (attached as Exhibit B). Those insiders would solicit smaller investors to enter into "deposit agreements" (or similar agreements), which required the smaller investors to deposit their securities with and granted control over those securities to the protective committee. <u>Id.</u> This allowed the "committee" to negotiate on behalf of and bind the smaller investors without having to consult with them.

17. Scandals ensued when these fiduciaries acted in their own self interest rather than in the interests of those they purported to represent. <u>In re Rosenbaum Grain Co.</u>, 13 F. Supp. at 600-01. Courts were often "in the dark as to the method of the organization of the committee[s]" and were "forced to rely on the statements of the interested parties" when determining the "real merits of a plan of reorganization" and could "very easily be misled and confirm a plan which should have been rejected." <u>Id.</u> at 601.

18. The Securities & Exchange Commission reviewed the practices of protective committees and issued a report[2] that highlighted the harms that resulted when parties in charge of the protective committees sat in conflict with the beneficiaries they

---

[2] <u>See</u> Sec. & Exch. Comm., Study & Investigation of the Work, Activities, Personnel and Functions of Protective & Reorganization Committees, Conclusions and Recommendations at 897 (1937) ("<u>SEC Report</u>") (excerpts of which are attached hereto as Exhibit A).

purported to represent. The report concluded that it was "essential that renewed emphasis be given to the fact that representatives of security holders in reorganization occupy a fiduciary position. It is intolerable that they or their lawyers should possess dual or multiple interests." SEC Report at 897; <u>see</u> <u>also</u> <u>In re Phila. & Reading Coal & Iron Co.</u>, 105 F.2d 358, 359 (3d Cir. 1939) ("In too many of those proceedings it had appeared that unqualified and unrepresentative committees sought and obtained the right to represent defenseless security holders while actually working in the interests of the debtor or other adverse parties.").

19. These abuses by protective committees purporting to act as fiduciaries to other claimholders motivated the promulgation of Rule 2019's. <u>See</u> Bankruptcy Act of 1935, § 77(p) 11 U.S.C. § 205(p) (repealed 1978); Section 211 of Chapter X, 52 Stat. 895; Chapter X Rule 10-211; <u>see</u> <u>also</u> Fed. Rule. Bankr. P. 2019, Adv. Comm. Note ("[Rule 2019] is derived from §§ 209-231 of the [Bankruptcy] Act and former Chapter X Rule 10-211"). "The language of Rule 2019 is substantially the same as that of its predecessor." 9 Collier on Bankruptcy ¶ 2019.RH (Alan N. Resnick & Henry J. Sommers eds., 15th ed. rev.).

20. The Noteholders bear none of the characteristics of the protective committees whose abuses Rule 2019 was meant to address. There are no insiders of the Debtors whose conflicting interests need to be exposed. The Noteholders (and most modern ad hoc groups generally) cannot bind other investors because they do not exercise exclusive control over securities through the use of deposit agreements. The Noteholders have made clear that they do not purport to represent anyone; rather, they are

8

simply a loose affiliation of WMI creditors who, in the interest of efficiency, are sharing the cost of advisory services in connection with the case. The Noteholders do not speak for, have no ability to bind and owe no duties to anyone who is not a Noteholder. Perhaps as importantly, the Noteholders don't even have the right to speak for or bind individual Noteholders absent their individual consent. Each Noteholder acts in its own right and on its own behalf; issues are discussed and negotiated among the individual Noteholders, who often hold competing views about certain issues, and ultimately agreed to before a position is formally taken by the Noteholders. As such, the potential for abuse that Rule 2019 was meant to expose is not present in the Noteholders. Thus, Rule 2019 does not apply to them.

21. Recently, in the chapter 11 cases of Scotia Development LLC, et al., the bankruptcy court recognized this limitation on Rule 2019's application when it determined that an ad hoc noteholder group was "not a 'committee' within the meaning of Rule 2019." In re Scotia Develop. LLC, Case No. 07-20027, Order (Bankr. S.D. Tex. April 18, 2007) (Scotia Docket No. 659) (attached as Exhibit C)[3] (finding that the Ad Hoc Group of Timber Noteholders (the "Scotia Noteholders Group") was not required to disclose information pursuant to Rule 2019(a)(4) that the debtors sought to compel); see also Scotia Hr'g Tr. 4:18-5:4, Apr. 17, 2007 (J. Schmidt) (Exhibit H).

---

[3]     Additionally, the motion to compel the ad hoc group to comply with Rule 2019(a) [Scotia Docket 492], the ad hoc group's objection to that motion  [Scotia Docket 599], and the brief of amici curiae SIFMA and the LSTA [Scotia Docket 610] from the Scotia case are also attached hereto as Exhibits D, E, and F respectively.  The transcripts for the hearings concerning these issues on April 10, 2007 [Scotia Docket 695], April 17, 2007 [Scotia Docket 696], and May 22, 2007 [Scotia Docket 885] are also attached hereto as Exhibits G, H, and I respectively.

9

22.     When presented with arguments that were substantially similar to those presented by JPM here, the Scotia court took a "practical" approach and found that the Scotia Noteholders Group was "a bunch of creditors" represented by one law firm; therefore the group was not a "committee." Scotia Hr'g Tr. 4:25-5:2, Apr. 17, 2007 (J. Schmidt) (Exhibit H). During the hearing, the court stated that Rule 2019 was only applicable to a group of creditors where "you have some sort of fiduciary responsibility to people that you're not actually representing" because those other individuals would have a right to know about a group that was "purporting to represent" them. Scotia Hr'g Tr. 74:22-25, Apr. 10, 2007 (J. Schmidt) (Exhibit G).[4]

23.     Notably, in Scotia, the Securities Industry and Financial Markets Association ("SIFMA") and the Loan Syndication and Trading Association ("LSTA") submitted a joint amicus brief urging the court not to require the demanded disclosures. In their amicus brief, in addition to arguing that the Scotia Noteholders Group was not a "committee" or representing other creditors and never intended to be subject to Rule 2019, the LSTA and SIFMA note that forcing disclosure of the type requested by the debtors in Scotia and by JPM in these chapter 11 cases "will (a) prevent involvement by sophisticated parties that have frequently made positive contributions and offered valuable input in reorganizations and (b) negatively impact the markets that create liquidity in a debtor's securities by hampering the ability of parties to manage their

---

[4]     J.P. Morgan Securities Inc., an affiliate of JPM, was a member of the Scotia Noteholders Group that convinced the court that Rule 2019 did not apply to such a collection of individual creditors with no fiduciary obligations to other claimants. See the Scotia Noteholders Group's Objection, at n. 1 (attached as Exhibit E).

exposures by liquidating their claims and avoiding the delay and uncertainty of a bankruptcy case." SIFMA & LSTA Amici Brief, at ¶ 2 (Exhibit F). This further consideration of the effect on the reorganization process was an important factor in the court's conclusion that the Scotia Noteholders Group was not a "committee" and thus not subject to Rule 2019(a). Scotia Hr'g Tr. 19:13-16, May 22, 2007 (J. Schmidt) (Exhibit I).

24. In support of the 2019 Motion, JPM cites to certain decisions in Northwest Airlines Corp., which the Scotia court declined to follow on the facts before it. See In re Northwest Airlines Corp., 363 B.R. 701 (Bankr. S.D.N.Y. 2007) ("Northwest I"); see also In re Northwest Airlines Corp, 363 B.R. 704 (Bankr. S.D.N.Y. 2007) ("Northwest II"). Although the Noteholders submit that Northwest was decided incorrectly, the Noteholders further note that Northwest is distinguishable in several respects from the instant situation.[5]

---

[5] While the rulings in Northwest have no precedential effect in this Court, we note that Chief Judge Carey appeared to rely on Northwest I and Northwest II in ordering that a group of bondholders comply with subdivisions (a)(1), (a)(2) and (a)(3) of Rule 2019. See Hr'g Tr. May 14, 2008, at 41 (the "SCL Transcript") [SCL Docket No. 1890], In re Sea Containers Ltd., Case No. 06-11156 (KJC) (Bankr. D. Del.) (attached as Exhibit O). There, as the Noteholders submit here, the Court noted that it has discretion to determine appropriate relief with respect to a Rule 2019 issue based on the facts and circumstances of the case in which it arises. SCL Hr'g Tr. at 37 (remarks of Carey, J.) ("[U]nder the language of 2019(b) it seems to me that the Court has discretion about whether to impose a sanction or not. So, I guess that's one way of saying yes, I agree with you the facts are important."). There, however, Judge Carey was concerned about arguments that the bondholders were controlling the official committee, on which three of them had previously served along with their indenture trustee, who was the only remaining member. Id. at 39. Those allegations, not made here, implicated the fiduciary relationship of the official committee with the creditors it served. That connection was crucial to Judge Carey's decision. See id. at 41 (remarks of Carey, J.) ("[I]f the dynamics [are as] described in argument . . . I would tend to think that it may be then under these circumstances those who are in this unofficial group might very well have more influence indirectly through the [official] committee which purportedly represents them. So, I don't know, maybe it is relevant."). Perhaps more significant, the Court, in exercising its discretion, looked to the relevancy of the information sought and did not require the bondholders to disclose their trading histories, saying it did not "know what the relevance of it would be. . . . I know it stings the parties who don't have that information . . . so they can disparage [those] who own the debt by saying ah, you picked it up for a song." SCL Hr'g Tr.

25.	In <u>Northwest</u>, an ad hoc group of equity securities holders sought to be recognized as an official committee of equity security holders. Had such recognition been granted, the ad hoc group would have assumed fiduciary duties and been charged with speaking on behalf of all equity securities holders. When the request for official status was denied, the ad hoc committee nonetheless continued to participate actively in the case. No other equity security holders participated meaningfully in the case. From this, the Court concluded that the ad hoc committee should be basing its decisions on the interests of the entire group and not its members' individual holdings, and that its members had thus given up their interest in keeping their holdings confidential. See <u>Northwest II</u>, at 708. Moreover, there was a concern that the ad hoc committee of equity securities holders had divided loyalties as a consequence of having material holdings in other parts of the Northwest capital structure.

26.	In stark contrast, the Noteholders here have not sought official status and have expressly disclaimed any duties to any other stakeholders. Unlike in <u>Northwest</u> where the class of stakeholders in question had no official committee charged with representing its interests, here, there is an official committee of unsecured creditors who is active in the case, exercising fiduciary duties and represented by competent

---

at 44 (emphasis added).

 Interestingly, JPM's affiliate, J.P. Morgan Securities Inc., was a member of the bondholder group that opposed the Rule 2019 relief in <u>Sea Containers</u>. <u>See</u> Obj. of Contrarian Cap. Advs., LLC, J.P. Morgan Secs. Inc., Trilogy Cap. LLC and Varde Inv. Partners, L.P. to Mot. of Off. Comm. of Unsec'd Crs. of Sea Containers Servs. Ltd. for Order Pursuant to Bankr. R. 2019(b) Conditioning the Affiliated Holders of Unsecured Notes Issued by Sea Containers Ltd.'s Ability to Appear and Be Heard on Compliance with Bankr. R. 2019(a) (May 13, 2008) [<u>SCL</u> Docket No. 1760], <u>In re Sea Containers Ltd.</u>, Case No. 06-11156 (KJC) (Bankr. D. Del.) (attached as Exhibit P).

WM1A 934489v1 08/19/09

advisors. In fact, the Noteholders retained counsel and appeared in these chapter 11 cases before the formation of the Official Committee. Had the Noteholders wished to represent the interests of anyone other than themselves, they could have sought official recognition or the individual Noteholders could have sought membership on the official committee. Instead, the Noteholders deliberately determined to not seek official recognition or membership on the Official Committee and instead chose to remain active in the cases expressly in a non-representative, non-fiduciary capacity.

27.     Moreover, the Noteholders are not the only active general unsecured creditors in these cases. While JPM has chosen to ignore the fact, besides the Official Committee, Appaloosa Management L.P. and Centerbridge Partners, L.P., who hold approximately $1.35 billion of WMI's securities, are also actively involved in these cases. See Verified Statement of Fried Frank Pursuant to Rule 2019, at ¶ 2 [Docket No. 526] (the "Fried Frank Disclosure"). Thus, there can be no doubt that the Noteholders do not speak on behalf of any class of stakeholders. Notably, even though the Fried Frank Disclosure is in substantially the same form as the White &Case Disclosure, JPM has not sought any relief with respect to it.

28.     In Northwest, the court determined that just by appearing as a "'committee' of shareholders, the members purport to speak for a group [meaning the class of all shareholders]." Id. at 703. Northwest II provides further insight into the court's reasoning—the court imputed a fiduciary responsibility to the Northwest ad hoc committee even though it had been denied status as an official committee to represent all

equity holders.[6]  The court went on to state that full compliance with Rule 2019 was warranted because the class of all shareholders deserves "the right to know where their champions are coming from."  Northwest II, 363 B.R. at 707.

29.     In this regard, the Noteholders submit that Northwest is flawed in that fiduciary duties cannot be imputed.  The Bankruptcy Code and Rules place no such responsibility on individual creditors that choose to take active roles in a chapter 11 case. Fiduciary duties only arise when imposed by statute, contract, or some special relationship of trust, such as principal and agent.  See generally McMahon v. New Castle Assocs., 532 A.2d 601, 604 (Del. Ch. 1987).  No such special relationship exists or should be imputed to parties simply by virtue of their similar investments in securities.

30.     Accordingly, the Noteholders disagree with the court's conclusion in Northwest, because while it acknowledged that Rule 2019 was meant to provide "disclosure of the 'personnel and activities of those acting in a representative capacity,'" it failed to reconcile this with the fact that certain individuals merely participating collectively in a reorganization proceeding act in no such capacity for others just by appearing in the case and having similar holdings of the debtor's securities.  Northwest I,

---

[6]     "[A]ny interest that individual Committee members may have in keeping this information confidential is overridden by the interests that Rule 2019 seeks to protect.  Rule 2019 protects other members of the group--here, the shareholders--and informs them where a committee is coming from by requiring full disclosure of the securities held by members of the committee and the respective purchases and sales.  This Committee contends that it did not take on any fiduciary responsibility to the shareholders as a group when it appeared in these cases.  Assuming, arguendo, for purposes of this motion that the Committee does not act as a fiduciary, Rule 2019 is based on the premise that the other shareholders have a right to information as to Committee member purchases and sales so that they make an informed decision whether this Committee will represent their interests or whether they should consider forming a more broadly-based committee of their own."  Northwest II, 363 B.R. at 709.

363 at 704. Thus, given the intent of Rule 2019 and meaning of "committee" the Northwest court's seemingly broad statements—which reduce to a conclusion that creditors must comply with Rule 2019 simply because they appear through common counsel—are at odds with the purpose and plain meaning of the Rule; thus, that court's reasoning should not be extended beyond those particular circumstances. See Northwest II, 363 B.R. at 708; Scotia Hr'g Tr. 19:18-20, May 22, 2007 (J. Schmidt) (stating with regard to Northwest that the court "just [didn't] think that was what was intended by the statute originally.").

31.     The Noteholders are not a "committee" or other entity subject to Rule 2019 because the Noteholders are not acting on behalf of, nor do they owe fiduciary duties to, any parties in these chapter 11 cases. Rule 2019 was enacted to require disclosure of information from parties purporting to act as representatives for a class, which the Noteholders have explicitly stated that they do not. For these reasons, Rule 2019 is not applicable to the Noteholders. When faced with the same issue in analogous circumstances, the Scotia court came to the same conclusion.

**B.     RULE 2019(b) PROVIDES THE COURT WITH DISCRETION TO DECLINE TO DETERMINE WHETHER RULE 2019(a) HAS BEEN COMPLIED WITH AND WHETHER TO IMPOSE A REMEDY IF IT HAS NOT.**

32.     Under Rule 2019(b), the Court "may (1) determine whether there has been any failure to comply with the provisions of subdivision (a) . . . and, if it so determines, the court may refuse to permit" the non-complying entity to be heard further. Fed. R. Bankr. P. 2019(b)(1) (emphasis added). As such, even if the Court finds that

Rule 2019(a) applies to the Noteholders, it is nonetheless within the Court's discretion to determine whether there has been a failure to comply with that Rule and then whether to require compliance as a prerequisite to further participation in these chapter 11 cases. <u>Cf.</u> <u>In re Mandalay Shores Coop. Housing Assoc., Inc.</u>, 63 B.R. 842, (N.D. Ill. 1986) (affirming bankruptcy court's discretionary decision that attorney's lack of disclosure as to identities of certain claimants that he purported to represent was not a failure to comply with 2019(a)); <u>cf.</u> 11 U.S.C. § 362(d), (e) (providing that "[o]n request of a party in interest and after notice and a hearing, the court <u>shall</u> grant relief from the stay" for cause shown, among other conditions, and requiring hearing to be held within thirty days (emphasis added)); 11 U.S.C. § 1104(a) ("on request of a party in interest or the United States trustee, and after notice and a hearing, the court <u>shall</u> order the appointment of a trustee" for cause shown, among other conditions (emphasis added)).

33.     Rule 2019(b) offers no guidance for the Court's exercise of its discretion in these determinations.  That is, unlike other discretionary determinations allowed under the Bankruptcy Code and Rules, it sets forth no factors to suggest how the Court should rule.  <u>Cf.</u>, <u>e.g.</u>, 11 U.S.C. § 1112 (setting forth conditions under which court may convert or dismiss case).  In the absence of such guidance, the Noteholders submit that the Court should first be mindful of the purposes of Rule 2019, which are not advanced by requiring disclosure.  Second, it should recognize that the balance of the equities clearly favors non-disclosure.

34.     <u>First</u>, the Court should not apply Rule 2019 to produce a result that does not advance its purpose.  <u>Griffin v. Oceanic Contractors</u>, 458 U.S. 564, 571 (1982)

WM1A 934489v1 08/19/09

("[I]n rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling."). As discussed above, Rule 2019 was intended to provide disclosure from committees acting in a representative capacity for a class of claims or interests to ensure that these fiduciaries were not breaching their duties of loyalty to the members of that class. In re I. G. Servs. Ltd., 244 B.R. 377, 389 (Bankr. W.D. Tex. 2000), rev'd on other grounds, 263 B.R. 505 (W.D. Tex. 2000) (finding that it was within the court's discretion to protect party against application of Rule 2019 where it did not serve the purpose of protecting against improper participation in bankruptcy proceedings). The Noteholders are not such a committee and owe no such fiduciary duty. Therefore, no party has any discernible interest in the information that JPM seeks to have disclosed. Indeed, far from advancing any party's understanding of the Noteholders' positions in these chapter 11 cases, the disclosure directed by Rule 2019(a)(4) is irrelevant to any understanding of those positions. It is clearly established that "the price paid for a claim does not affect the amount or of the creditor's claim, or the creditor's voting power" in bankruptcy proceedings. Fairfield Executive Assocs. v. Hyperion Credit Capital Partners, L.P. (In re Fairfield Executive Assocs.), 161 B.R. 595, 602 (D.N.J. 1993) (citing In re Pittsburgh Rys. Co., 159 F.2d 630, 632-33 (3d Cir. 1946) (finding that "discount purchases" of the debtors' securities during its reorganization did not affect the creditors' rights with respect to the full face amount of those claims)).[7] Moreover, as experience in these cases

---

[7]     See also Resurgent Capital Servs. v. Burnett (In re Burnett), 306 B.R. 313, 319 (B.A.P. 9th Cir.

has shown, that information is likely to become outdated and unreliable quickly as the Noteholders' composition and holdings change.

35.     Furthermore, the Bankruptcy Code favors broad participation in the reorganization process by all parties in interest.  See 11 U.S.C. § 1109(b);[8] S. Rep. No. 95-989 (1978) as reprinted in 1978 U.S.C.C.A.N. 5787, 5902 (Section 1109 "provides, in unqualified terms, that any creditor, equity security holder, or an indenture trustee shall have the right to be heard as a party in interest.").  To limit the Noteholders' ability to participate collectively would therefore undermine this fundamental right. Cf. In re Szostek, 886 F.2d 1405, 1414 (3d Cir. 1989) ("[C]reditors are obligated to take an active role in protecting their claims."); In re Sweetwater, Inc., 836 F.2d 1263, 1267 (10th Cir. 1988) (same); In re Record Club of America, 38 B.R. 691, 696 (M.D. Pa. 1983) (indicating that the Bankruptcy Code contemplates that concerned creditors will take an

---

2004) ("[A]bsent special circumstances involving fiduciary duties or statutory disabilities, transfers of claims presumptively are to be taken at face value," and therefore "the amount paid by [a post-petition claims purchaser] to purchase the claims is irrelevant, as a matter of law, to the allowance of the claims."), aff'd by, 435 F.3d 971 (9th Cir. 2006); Official, Unsecured Creditors' Committee v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305, 1318 (1st Cir. 1993) ("[V]alid assignment of a debt does not divest the claim of its priority or alter the debtor's obligation to pay the debt; the assignee steps into the shoes of the assignor for the portion of the claim assigned."); In Re Lorraine Castle Apartments Building Corp., 149 F.2d 55, 57-58 (7th Cir. 1945) (The property right of a bondholder is the right to receive from the debtor the entire amount the latter has promised to pay. In the absence of some equitable reason, taking the case out of the ordinary rule, the prices which security holders pay for their securities in no wise affects the measure of their participation in reorganization or their voting power), cert. denied, Lorraine Castle Apartments Building Corporation, Inc., v. Mackiewich, 326 U.S. 728; Mokava Corp. v. Dolan, 147 F.2d 340, 344-45 (2d Cir. 1945) ("Nor is it relevant that Meyer paid 50 or less for the second mortgage bonds he held. To reduce a creditor's participation in the plan to the amount he paid for his bonds (except in unusual circumstances not present here) would be harmfully to reduce the value of such bonds to those who previously owned them."); In re Executive Office Ctrs., Inc., 96 B.R. 642, 649-50 (Bankr. E.D. La. 1988) (highlighting "the rule that absent fraud, the price which a creditor pays for his claim does not affect the measure of his participation in the reorganization of the debtor.").

[8]     "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109(b).

active role in protecting their claims); <u>Scotia</u> Hr'g Tr. 85:15-19, Apr. 10, 2007 (J. Schmidt) ("I think it's important to have groups to be able to represent parties so that we don't have 500 noteholders in here with 500 lawyers. We've got enough lawyers involved already. That's a good thing.") (Exhibit G).

36.     Where, as here, the purpose of Rule 2019 is not advanced by further disclosure and another important policy of the Bankruptcy Code—broad creditor participation—is threatened, the Court should conclude that no further disclosure is necessary and that no remedy is warranted for the failure to make such disclosure.

37.     <u>Second</u>, the balance of the equities here is clear and favors non-disclosure. Neither JPM nor any other party in interest is harmed by the Noteholders' purported failure to comply with Rule 2019(a)—if that Rule even applies to them—and JPM does not allege otherwise. If the Noteholders were required to comply, however, they would face the Hobson's choice between keeping confidential what is vital and protected commercial information and continuing to participate in these chapter 11 cases.

38.     The harm that threatens the Noteholders following disclosure of the trading history required by Rule 2019(a)(4) is real. Trading counterparties could deduce an entity's position and strategy, including how that entity valued or discounted any particular event in these chapter 11 cases and could use that information to price a proposed trade in light of how the resulting position would affect the entity's position, rather than simply charging or offering the price other market participants are willing to bear. This discriminatory pricing would affect the ability of the Noteholders to participate in the market on the same terms as an entity that chose not to participate in

19

these chapter 11 cases and instead to keep the otherwise-disclosable information confidential. The result would be both a distortion of the secondary debt markets and a chill on participation in reorganizations by participants in those markets.

39. By disclosing the amounts of their individual holdings, the dates upon which they acquired such claims, and the amounts paid for such claims, the Noteholders would provide all of their competitors and counterparties with enough information to deduce their investment strategies:

> The effectiveness of these strategies is dependent on the recognition of trends, inefficiencies, and valuations of the market that *have not been recognized* by other investors. Therefore, public disclosure of a hedge fund's investment positions could compromise a fund's ability to execute its own strategy and provide incremental value to its investors. . . . With [such] access, competitors will be better able to reconstruct the unique trading systems developed by the fund that was forced to disclose. In addition, knowledge of a particular long or short position could allow a competitor fund with a significant market presence to trade in a manner that could move the market in a direction adverse to the fund that was forced to disclose.

Letter from SIFMA & LSTA to Peter G. McCabe, Secretary, Comm. on Rules of Practice & Procedure of the Judicial Conf. of the U.S., at pp. 23-24 (November 20, 2007), available at http://www.sifma.org/regulatory/pdf/BankruptcyRule2019Letter.pdf. (attached as Exhibit J).

40. Indeed, foisting that Hobson's choice onto the Noteholders may be just what JPM is after. Given that it has no legitimate use for the information sought— since it is not even a member of the class that would be protected if Rule 2019's purpose were served here—JPM's purpose in forcing the Noteholders to disclose their individual

20

holdings may well be to force individual Noteholders to resign from active participation in these chapter 11 cases and to breed dissension among the Noteholders.  In hopes that some of the Noteholders will choose not to actively participate rather than divulge their trade secrets and proprietary commercial information, JPM may believe that it can reduce the number of voices and parties involved in negotiating settlements and litigating the issues in these chapter 11 cases.  By putting this choice on the Noteholders, JPM may also be trying to gauge the Noteholders' confidence in their position and their assessment of these cases.

41.     Delaware courts have recognized the need to modify the disclosure requirements in Rule 2019 in other contexts.  See London Market Ins. Cos. v. Baron & Budd PC (In re Kaiser Aluminum Corp.), 327 B.R. 554, 559 (D. Del. 2005) (holding that bankruptcy court did not err in entering orders that restricted access to Bankruptcy Rule 2019 information submitted by law firms representing multiple asbestos personal injury claimants in the debtor manufacturers' chapter 11 cases); In re Owens Corning, et al., Case Nos. 00-3837-3854(JFK) (Bankr. D. Del. Oct. 22, 2004)) [Docket 13091] (entering similar orders restricting public dissemination of 2019 information) (attached as Exhibit K).  The Noteholders note also that JPM cites to Wilson v. Valley Electric Membership Corp., 141 B.R. 309, 314 (E.D. La. 1992), where the court used its discretion to modify the requirements of Rule 2019 for an attorney representing a class of claimants because those requirements were impractical given the circumstances.

42.     Given the implications of forcing the Noteholders to make further disclosure beyond the Supplemental Disclosures or barring them from further

participation in these chapter 11 cases if they refuse to do so, and given that such a ruling would impair a policy favoring creditor participation without advancing any other policy, the Court should exercise its discretion to construe what information needs to be disclosed in the chapter 11 cases equitably, favoring a status quo in which no one is harmed over JPM's desire to impair the Noteholders' voices in these chapter 11 cases and their positions in the markets in which they operate.  <u>See</u> Fed. R. Bankr. P. 1001 ("These rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding.").

C.    **REQUIRING DISCLOSURE UNDER RULE 2019(a)(4) WOULD STRIP THE NOTEHOLDERS OF PROTECTIONS TO WHICH THEY ARE ENTITLED UNDER SECTION 107(b) OF THE BANKRUPTCY CODE.**

43.    Even if the Court concludes that Rule 2019(a)(4) applies to the Noteholders, it should not apply that Rule in a manner that contradicts the protections afforded to the Noteholders under section 107(b) of the Bankruptcy Code.  <u>See</u> 28 U.S.C. § 2075 (providing that the Bankruptcy Rules shall not abridge or modify any substantive rights); <u>In re Itel Corp.</u>, 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982) ("The rule-making power of the Supreme Court was extensive under the Bankruptcy Act.  It was the intention of Congress, in enacting the Bankruptcy Code, that this rule-making power be limited and be exercised consistently with the substantive provisions of the Code.").

44.    Section 107(b) of the Bankruptcy Code provides that "the bankruptcy court <u>shall</u> . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information." 11 U.S.C. §107(b)(1) (emphasis

22

added). "Commercial information has been defined as information which would cause 'an unfair advantage to competitors by providing them information as to the commercial operations of the [party].'" <u>Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)</u>, 21 F.3d 24, 27 (2d Cir. 1994). Additionally, "[the] clear and unambiguous usage of 'or' neither equates 'trade secret' with 'commercial information' nor requires the latter to reflect the same level of confidentiality as the former." <u>Id.</u> at 28.

45. The Noteholders' investment strategies are the epitome of the "trade secrets, confidential research, development and commercial information" that not only should be, but are, protected by section 107(b)(1) of the Bankruptcy Code. If compelled to divulge the requested commercial information, the Noteholders' competitors would gain an unfair advantage that would allow them to manipulate the terms upon which the Noteholders could trade and deconstruct the Noteholders' investment strategies.

46. While the relief JPM seeks under Rule 2019(b) is discretionary, the duty of the Court to protect the "trade secrets, confidential research, development and commercial information" of the Noteholders is not—the Court must protect such proprietary information upon the Noteholders' request. 11 U.S.C. §107(b); <u>Orion,</u> 21 F.3d at 27 ("[I]if the information fits any of the specified categories [in section 107(b)(1)], the court is required to protect a requesting interested party and has no discretion to deny the application.") (citations omitted).

47. Where the disclosure of the requested commercial information would cause harm to the Noteholders, that information is protected by section 107(b)(1)

of the Bankruptcy Code.  As there has been no showing of harm from non-disclosure, the Court has no choice but to adhere to the mandate of the Bankruptcy Code and protect the Noteholders from a dubious request for commercial information that has no legitimate use and would provide no benefit in these chapter 11 cases.

**D.  GRANTING JPM's 2019 MOTION WOULD HAVE FAR-REACHING AND DESTRUCTIVE CONSEQUENCES TO THE REORGANIZATION PROCESS BY FURTHER DISLOCATING THE SECONDARY MARKET FOR DISTRESSED DEBT.**

48.  "[I]t is proper to consider the effect that the court's interpretation would have on the markets."  Enron Corp. v. Springfield Assocs., LLC (In re Enron Corp.), 379 B.R. 425, 432(S.D.N.Y. 2007) (discussing the rights of assignees of claims in context of equitable subordination).

49.  In the Scotia hearing, the attorney for SIFMA and the LSTA brought to the court's attention that after the Northwest I decision, members of the Northwest ad hoc committee dropped out and the value of the equity dropped over 50%. Scotia Hr'g Tr. 82:21-83:6, Apr. 10, 2007 (SIFMA & LSTA) (Exhibit G).  In further explaining its decision in Scotia, the court stated that an important factor in its decision was the "impact it might have on the trading of claims and the distressed claims market." Scotia Hr'g Tr. 19:13-16, May 22, 2007 (J. Schmidt) (Exhibit I).

50.  Aside from the chilling effect that this could have in the secondary market for WMI's securities, if creditors such as the Noteholders were required to make such disclosures in all chapter 11 cases, the effect on such markets could be catastrophic because firms such as the Noteholders may become unwilling to participate in the

secondary market for distressed debt for companies under bankruptcy protection.  The secondary market for distressed securities plays an important and salutary role in the economy and the reorganization process.  See, e.g., Elliot Assocs., L.P. v. Banco de la Nacion, 194 F.3d 363, 380 (2d Cir. 1999) (explaining how a vibrant market for secondary purchases of debt reduces the costs of credit on an ex ante basis and why judicial rulings impairing that market would have significant and adverse long-term effects, including higher borrowing costs for entities with poor credit ratings and increased incidents of default); Goldschmid, Paul M., More Phoenix than Vulture: The Case for Distressed Investor Presence in the Bankruptcy Reorganization Process, 2005 Columb. Bus. L. Rev. 191, 215 (2005) ("By reducing the time spent in bankruptcy, distressed debt investors are helping mitigate the tremendous transaction costs that usually accompany a Chapter 11 proceeding.") (attached as Exhibit L); Amici Brief of the LSTA & SIFMA, In re Musicland Holdings, Corp., Case No. 06-100064, at 3-5 (Bankr. S.D.N.Y. Aug. 7, 2007) (Musicland Docket No. 1687) (discussing the harms to the secondary market and reorganization process if distressed debt investors were required to comply with Rule 2019(a)(4) whenever certain individual investors sought to act collectively in a chapter 11 case) (attached as Exhibit M).

51.     Private investment firms, such as the Noteholders, bring significant benefits to the reorganization process by offering more competitive financing and increasing the liquidity in the debt markets.[9]   When faced with choosing between

---

[9]     See Geithner, Timothy F., "Hedge Funds and Derivatives and Their Implications for the Financial

divulging trade secrets and proprietary information and participating in bankruptcy proceedings and the market for distressed debt, many private investment institutions will choose to protect their overall investment strategies and anonymity in the market for the reasons discussed above. <u>Scotia</u> Hr'g Tr. 68:19-23, Apr. 10, 2007 (attorney for SIFMA & LSTA) ("[T]the fear is that at the end of the day, being required to disclose confidential and proprietary information will lead people to the rational business decision of not buying or selling securities of a distressed company, and not participating in Chapter 11 cases.") (Exhibit G). This will create a void in the secondary market for distressed debt and claims trading.

52. Given our current economic environment, where most financial institutions are presently experiencing liquidity concerns, if not crises, it would be dangerous and unsound for this Court to set a precedent that could further exacerbate such dislocation by causing private investment firms to refrain from providing needed liquidity in the market because they are afraid of having to chose between exposing their investment strategies and being unable to protect their investments when companies file for chapter 11 protection. <u>See</u>, <u>e.g.</u>, <u>Elliot Assocs.</u>, 194 F.3d at 380.

53. In sum, JPM is seeking solely for its own benefit to have the Court impose a Rule on the Noteholders that does not apply to them; that fails to advance the purpose of the Rule to be enforced while impairing a different, important bankruptcy

---

System," Remarks at the Distinguished Lecture 2006, sponsored by the Hong Kong Monetary Authority and Hong Kong Association of Banks, Hong Kong (Sept. 15, 2006) (transcript available at www.newyorkfed.org/newsevents/speeches/2006/gei060914.html) (a copy of which is attached as Exhibit N).

policy; that harms the Noteholders while advancing no legitimate interest of another party; that runs counter to protections that the Noteholders are entitled to under the Bankruptcy Code; and that threatens broader market dislocation. The Court should join with the join with the <u>Scotia</u> court and decline this invitation.

## VI.    <u>CONCLUSION</u>

WHEREFORE, based on the foregoing, the Noteholders respectfully request that the Court deny the 2019 Motion, and find that, given the Supplemental Disclosures, no further disclosure by the Noteholders or their counsel is required.

Dated:  August 19, 2009
       Wilmington, Delaware

FOX ROTHSCHILD LLP

By:       /s/ Jeffrey M. Schlerf
     Jeffrey M. Schlerf, Esquire  (No. 3047)
     Seth A. Niederman, Esquire (No. 4588)
     Citizens Bank Center
     919 North Market Street, Suite 1600
     Wilmington Delaware 19801
     Telephone: (302) 654-7444

     -and-

     WHITE & CASE LLP
     Thomas E Lauria
     Wachovia Financial Center
     200 South Biscayne Boulevard
     Suite 4900
     Miami, FL 33131
     Telephone: (305) 371-2700
     Facsimile: (305) 358-5744

     -and-

Of Counsel:

KASOWITZ BENSON TORRES &
FRIEDMAN LLP
David S. Rosner
Paul M. O'Connor III
Adam L. Shiff
Seth A. Moskowitz
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700

Attorneys for the Washington Mutual, Inc.
Noteholders Group

WM1A 934489v1 08/19/09