## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------x
                                      :

| | |
|---|---|
| **In re** : | **Chapter 11** |
| : | |
| **WASHINGTON MUTUAL, INC., et al.,**[1] : | **Case No. 08-12229 (MFW)** |
| : | **(Jointly Administered)** |
| : | |
| **Debtors.** : | Re: Docket Nos. 1023, 1084, |
| : | 1100, 1129, 1363, 1713 |

----------------------------------------------------------x

### DEBTORS' MEMORANDUM OF LAW
### IN FURTHER SUPPORT OF THEIR MOTION FOR AN ORDER
### PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE
### AUTHORIZING BUT NOT DIRECTING (I) WASHINGTON MUTUAL, INC.
### TO EXERCISE ITS OWNERSHIP RIGHTS OVER CERTAIN TRUST ASSETS,
### (II) DISTRIBUTION OF TRUST ASSETS, AND (III) TERMINATION OF THE TRUSTS

Mark D. Collins (No. 2981)
Chun I. Jang (No. 4790)
Andrew C. Irgens (No. 5193)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS TO THE DEBTORS
AND DEBTORS IN POSSESSION

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98101.

C:\NRPORTBL\US_ACTIVE\SIMPSONG\43179975_6.DOC

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

PROCEDURAL POSTURE ..................................................................................... 3

STATEMENT OF FACTS ........................................................................................ 4

THERE IS NO BASIS TO IMPOSE A CONSTRUCTIVE TRUST ON THE TRUSTS'
    ASSETS .......................................................................................................... 16

    I.       FEDERAL LAW PREEMPTS PARTICIPANTS' CONSTRUCTIVE
           TRUST CLAIMS ............................................................................. 17

    II.      A CONSTRUCTIVE TRUST IS NOT WARRANTED BECAUSE WMI
           DID NOT ENGAGE IN FRAUD OR UNCONSCIONABLE CONDUCT ....... 19

           A.     WMI Was Not Obligated to Amend the Plans to Provide for a
                 409A Accelerated Payment Election ...................................... 20

           B.     WMI Acted Reasonably and in the Best Interests of All Plan
                 Participants By Refusing to Pay Unscheduled Withdrawals at a
                 Five Percent "Haircut" ........................................................... 21

           C.     Participants Knew or Should Have Known About the Unscheduled
                 Withdrawal Provision ............................................................ 24

CONCLUSION ....................................................................................................... 26

**FEDERAL CASES**

Aetna Health Inc. v. Davila,
    542 U.S. 200 (2004) ..................................................................................................18

Goldberg v. N.J. Lawyers' Fund for Client Prot.,
    932 F.2d 273 (3d Cir. 1991) .....................................................................................19

IT Group, Inc. v. Bookspan (In re IT Group, Inc.),
    305 B.R. 402 (Bankr. D. Del. 2004), aff'd 323 B.R. 578 (D. Del. 2005), aff'd, 448 F.3d
    661 (3rd Cir. 2006) ...................................................................................................17

LaSalle Nat'l Bank v. Perelman,
    82 F. Supp. 2d 279 (D. Del. 2000) ...........................................................................22

In re Leedy Mortgage Co., Inc.,
    111 B.R. 488 (Bankr. E.D. Pa. 1990) ......................................................................19

Silicon Graphics, Inc. v. Merrill Lynch Trust Co. of Cal. (In re Silicon Graphics, Inc.),
    363 B.R. 690 (Bankr. S.D.N.Y. 2007) ....................................................................17

Superintendent of Ins. for the State of N.Y. v. Ochs (In re First Cent. Fin. Corp.),
    377 F.3d 209 (2d Cir. 2004) .....................................................................................18

**STATE CASES**

Adams v. Jankouskas,
    452 A.2d 148 (Del. 1982) .........................................................................................19

Bird's Constr. Corp v. Milton Equestrian Ctr.,
    No. 1980-S, 2001 WL 1528956 (Del. Ch. Nov. 16, 2001) ......................................23

Fenwick v. Merrill Lynch & Co., Inc.,
    2009 WL 995760 (D. Conn. Apr. 9, 2009) ..............................................................18

Hogg v. Walker,

# TABLE OF AUTHORITIES

**Page**

622 A.2d 648 (Del. 1993) ........................................................................27

Kuroda v. SPJS Holdings, L.L.C.,
    971 A.2d 872 (Del. Ch. 2009)..............................................................23

McZeal v. S. Consumers Coop., Inc.,
    2009 WL. 1307943 (W.D. La. May 7, 2009)..................................18

Palese v. Del. State Lottery Office,
    Civ.-A No. 1546-N, 2006 WL. 1875915 (Del. Ch. June 29, 2006),
    aff'd 913 A.2d 570 (Del. 2006) ..........................................................20

Pike v. Commodore Motel Corp.,
    1986 WL. 13007 (Del. Ch. Nov. 14, 1986) ....................................20

Taylor v. Jones,
    No. Civ. A. 1498-K, 2006 WL. 1510437 (Del. Ch. May 25, 2006) ...............................27

Teachers' Retirement Sys. of La. v. Aidinoff,
    900 A.2d 654 (Del. Ch. 2006)........................................................23, 27

## FEDERAL STATUTES

26 U.S.C. § 409A...................................................................................9

29 U.S.C. §§ 1131-1145 ...........................................................5, 17, 18

ERISA § 502(a)..................................................................................18

ERISA §§ 514(a), (c)(1) ......................................................................17

## FEDERAL REGULATIONS

I.R.C. § 83(a)(2)..................................................................................13

IRC Section 409A, Preamble § XI(C) ............................................10

iii

# TABLE OF AUTHORITIES

**Page**

IRC Section 409A, Preamble § XII(A)............................................................................10

IRS Notice 2005-1 .........................................................................................................10

IRS Notice 2006-79, § 3.01(B)(1.02) .................................................................9, 10, 20

Rev. Proc. 71-19, 1971-1 C.B. 698, § 3(2) ..........................................................13, 14

Rev. Proc. 92-65, 1992-2 C.B. 428 § 3(d) ...................................................................13

Rev. Rul. 60-31, 1960-1 C.B. 174 ................................................................................13

Treas. Reg. § 1.409A-2(b) ..............................................................................................9

Treas. Reg. § 1.409A-6(a)(1)(i) ....................................................................................10

Treas. Reg. § 1.409A-6(a)(4) ........................................................................................10

Treas. Reg. § 1.451-2(a) ................................................................................................13

Treas. Reg. § 1.83-3(c),(e) ............................................................................................13

RLF1-3446230-1

Washington Mutual, Inc. ("WMI") and WMI Investment Corp., as debtors and debtors in possession (together, the "Debtors"), hereby submit this Memorandum of Law in Further Support of the Motion of Debtors for an Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing But Not Directing (I) Washington Mutual, Inc. to Exercise its Ownership Rights Over Certain Trust Assets, (II) Distribution of Trust Assets, and (III) Termination of the Trusts, dated May 15, 2009 [D.I. 1023] (the "Motion," a copy of which is included in the Appendix filed contemporaneously herewith ("App.") at Tab B).[2]

## PRELIMINARY STATEMENT

The Participants claim that, in October/November 2007, they became concerned about WMI's financial condition and, consequently, sought to immediately "cash out" their accrued balances under certain HFA nonqualified deferred compensation Plans inherited by WMI. At the time, WMI had not yet decided whether, pursuant to certain newly-enacted, permissive Internal Revenue Service (the "IRS") rules, to permit one-time accelerated distributions under all of its deferred compensation plans. Moreover, although, at the time, there was a Plan provision in place that may have permitted early withdrawal of funds, WMI had serious concerns that enforcing such a provision would directly contradict the underlying purpose and rules governing nonqualified deferred compensation plans, resulting in significant, negative tax consequences for all of the participants in such Plans. Accordingly, WMI declined to permit any such distribution. Now, the Participants seek access to such funds by

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion and the Debtors' Response (as defined herein).
C:\NRPORTBL\US_ACTIVE\SIMPSONG\43179975_6.DOC

requesting that the Court impress a constructive trust on, as stipulated by the Participants, "rabbi" Trust assets set aside in connection with the Plans.

The Participants' claim for a constructive trust is a state law remedy that is unavailable as a matter of law – it is preempted by ERISA and disfavored in bankruptcy. Moreover, even if the Court could, pursuant to applicable law, entertain the Participants' request for a constructive trust, the Participants have failed to prove a viable underlying cause of action against WMI that warrants imposition of this equitable remedy. WMI acted reasonably, with justification, and in good faith when it refused to permit accelerated distributions. By their limited and scripted testimony, the Participants cannot demonstrate that WMI engaged in conduct that rises to the level of egregiousness required for imposition of a constructive trust.

Furthermore, the Participants' testimony that they were unaware of their rights under the deferred compensation Plans in which they participated (and to which they contributed significant funds) is simply not credible. These are educated, highly compensated individuals, some of whom were employed in senior positions. It is incomprehensible that they did not read the Plan outlines and summaries that were provided to them upon enrollment, to understand the benefits provided thereunder.

The bottom line is that the Participants are trying to get paid ahead of the Debtors' other creditors. The Court should not endorse this. The Plans at issue here are unfunded. Pursuant to the explicit terms of these Plans, the Participants have general, unsecured claims thereunder. The Participants do not have a claim to the Trusts' assets, which assets are, by the terms of the Plans and Trust Agreements, subject to the claims of all of WMI's unsecured creditors.

While the Debtors are sympathetic to the Participants who, like many of the Debtors' other creditors, may not be fully compensated for their prepetition claims, the Debtors have a fiduciary duty to *all* parties in interest and must act in the best interest of *all* creditors. These former employees were not entitled to accelerated payment of their deferred compensation prior to the commencement of these chapter 11 cases, and they certainly are not entitled to payment in full of such funds now.[3] Liquidation of the Trusts' assets will not leave the Participants without remedy – to the extent that they are valid, they may still maintain their claims against WMI, to be satisfied in accordance with whatever distribution is provided to unsecured creditors pursuant to a chapter 11 plan.

## PROCEDURAL POSTURE

On May 15, 2009, the Debtors filed the Motion seeking authorization to exercise ownership rights over and distribute certain assets owned by WMI held in "rabbi" Trusts that WMI established in connection with certain nonqualified deferred compensation and nonqualified retirement Plans.

On June 12, 2009, the Participants – Geoffrey G. Olsen, Kari Noomen, Donald T. Cook,[4] Kevin J. McDonough, and Dottie Jensen – filed the Participants' Objection to the Motion [D.I. 1129] (App. Tab C) arguing that (i) the Trusts' assets are not property of the estate and (ii) the Court should impose a constructive trust on the Trusts' assets for the Participants' benefit.[5]

---

[3] Notably, had WMI completed its analysis prior to the Commencement Date and granted distributions to the Participants, if such payments had been made within ninety (90) days prior to the Commencement Date, they likely would have been subject to avoidance as preferences.

[4] Mr. Cook did not testify at the Hearing (as defined herein) and did not present any evidence in support of his claim. In addition, he has not filed a proof of claim against either of the Debtors.

[5] Although certain other former employees filed objections to the Motion, they did not appear at the Hearing, and this Memorandum of Law focuses only on issues raised by the Participants' Objection.

On July 22, 2009, the Debtors filed an omnibus response to all objections to the Motion, including the Participants' Objection, asserting, among other things, that (i) pursuant to the terms of the Plans and Trust Agreements, the Trusts are "rabbi" trusts, the assets of which are property of WMI's chapter 11 estate, (ii) ERISA preempts the Participants' state law constructive trust claims, (iii) the Trusts' assets should not be placed in a constructive trust because there is no legal basis for doing so and constructive trusts are disfavored in bankruptcy, and (iv) the Motion is not procedurally defective [D.I. 1363] (the "Response"). (App. Tab D.)

On September 25, 2009, the Court held a hearing (the "Hearing") to consider, among other matters, the Motion. At the outset of the Hearing, the Participants (through their counsel) stipulated on the record that the Trusts at issue in the Motion are grantor or "rabbi" trusts. (Hr'g Tr. 71:25-72:2, Sept. 25, 2009, App. Tab E at A-491 to A-492.) After hearing testimony from the Participants as well as the Debtors' witness, Kraig Klinkhammer, the Court instructed the parties to submit supplemental pleadings addressing whether the Participants are entitled to a constructive trust. (Id. 155:21-23, App. Tab E at A-575.)

## STATEMENT OF FACTS

### The HFA Deferred Compensation Plans

Beginning in 1989, HFA established certain unfunded, nonqualified deferred compensation and nonqualified retirement Plans for select members of management or highly compensated employees, and, in connection therewith, set aside funds in certain grantor or "rabbi" Trusts. In 1998, WMI purchased HFA, pursuant to which, among other things, WMI obtained ownership of these Trusts and became

obligated to make payments under the Plans related thereto. Specifically, WMI inherited nine (9) Trusts from HFA, and assumed liabilities arising under ten (10) related Plans,[6] including seven (7) nonqualified deferred compensation Plans (the "HFA Deferred Compensation Plans")[7] and three (3) nonqualified retirement Plans. (See id. 74:24-75:5, App. Tab E at A-494 to A-495.) The Participants are enrolled in one or more of the following HFA Deferred Compensation Plans: (i) the Capital Accumulation Plan; (ii) the 1989 Contingent Deferred Compensation Plan of H. F. Ahmanson & Company; (iii) the Loan Consultant Capital Accumulation Plan of H. F. Ahmanson & Company; and (iv) the Loan Agents' Elective Deferred Compensation Plan of H. F. Ahmanson & Company. (Declaration of Laura M. Malafronte in Connection with Debtors' Motion, dated October 13, 2009, filed contemporaneously herewith (the "Malafronte Decl.") ¶ 11; Hr'g Tr. 81:9-13, 98:21-23, 125:2-3, 137:9-11, App. Tab E at A-501, A-518, A-545, A-557.)

The HFA Deferred Compensation Plans are unfunded, "top-hat" plans (see Resp. ¶¶ 11-14, 21, App. Tab D at A-319 to A-322, A-325 to A-326; Hr'g Tr. 77:19, App. Tab E at A-497) created to "provide opportunities for a select group of management or highly compensated employees . . . to accumulate supplemental funds for retirement, special needs prior to retirement or death." (Capital Accumulation Plan 1, App. Tab F at

---

[6] The Trusts are listed in paragraph 7 of the Motion (App. Tab B at A-85 to A-86) and the related Plans are listed in the Appendix Tab L at A-616. In addition, WMI inherited liabilities related to certain other HFA employee benefit plans that are not related to the Trusts and, therefore, are not the subject of the Motion or this Memorandum of Law.

[7] The HFA Deferred Compensation Plans include: (i) the 1989 Contingent Deferred Compensation Plan of H. F. Ahmanson & Company; (ii) the Capital Accumulation Plan, (iii) the Elective Deferred Compensation Plan of H. F. Ahmanson & Company; (iv) the Loan Consultant Capital Accumulation Plan of H. F. Ahmanson & Company; (v) the Loan Agents' Elective Deferred Compensation Plan of H. F. Ahmanson & Company; (vi) the Outside Directors' Capital Accumulation Plan of H. F. Ahmanson & Company (the "ODCAP"); and (vii) the Outside Directors' Elective Deferred Compensation Plan of H. F. Ahmanson & Company (the "ODEDCP").

A-580.)[8]  As such, the HFA Deferred Compensation Plans are governed by ERISA's administrative and enforcement provisions embodied in 29 U.S.C. §§ 1131-1145. (Resp. ¶ 21, App. Tab D at A-325.)  As described in further detail in the Response, all benefits under the HFA Deferred Compensation Plans are unsecured claims, to be paid from the employer's general assets.  Pursuant to the explicit terms of the HFA Deferred Compensation Plans and related Trust Agreements, the Trusts' assets are subject to the claims of the employer's general unsecured creditors.  The Participants do not have any ownership interest in the Trust assets.  (See id. ¶¶ 12-14, App. Tab D at A-319 to A-322.)

The Board of Directors appointed a Committee to administer each HFA Deferred Compensation Plan.  Pursuant to Section 2.2 of the HFA Deferred Compensation Plans, the Committee is "charged with the administration of [the] Plan and shall decide all questions arising in the administration, interpretation and application of the Plan, including all questions of distributions, except as such may be expressly reserved . . . to the Board." (Capital Accumulation Plan § 2.2, App. Tab F at A-586 to A-587.)  Specifically, "all matters involving interpretation of the Plan shall be determined by the Committee, and settlement of claims shall be determined by the Committee in accordance with" ERISA Section 503 claims procedures.  (Id. § 2.3, App. Tab F at A-587.)[9]  "The decision of the Committee shall be conclusive and binding on all parties, providing that the Committee has acted in good faith and in accordance with the provisions of [the] Plan."  (Id. § 2.2, App. Tab F at A-586 to A-587.)

---

[8] Consistent with the Response, all citations herein to the Plans are to the Capital Accumulation Plan, which was admitted into evidence at the Hearing as Debtors' exhibit 1.
[9] The ODCAP and the ODEDCP do not specifically reference ERISA section 503.

The HFA Deferred Compensation Plans generally provide for distribution of benefits upon the earlier of a date selected by the participant when making the deferral election (but not sooner than 7 or 10 years, as applicable, following the start of the deferral period), retirement, termination, financial hardship, disability, or death. (Id. Art. V, App. Tab F at A-591.) In addition, prior to being amended in December 2008 (as described in further detail below), each HFA Deferred Compensation Plan contained a provision similar to Section 5.9(b) in the Capital Accumulation Plan, which provided that a participant could elect to receive a lump sum distribution of such participant's deferred compensation at any time, subject to a five percent (5%) penalty, or "haircut" (ten percent (10%) prior to a change in control) (an "Unscheduled Withdrawal"). (Id. § 5.9(b), App. Tab F at A-594 to A-595; Declaration of Robbyn W. Dewar in Connection with Debtors' Motion, dated October 9, 2009, filed contemporaneously herewith (the "Dewar Decl.") ¶ 6.)

Plan Documents

Since 1988, Mullin Consulting, Inc. ("Mullin"), and later Mullin TBG Insurance Agency Services, LLC ("MullinTBG"),[10] has served as the plan record keeper with respect to, among other things, the HFA Deferred Compensation Plans. (Malafronte Decl. ¶ 4.) In connection therewith, and consistent with customary business practices, Mullin/MullinTBG (i) provided participant enrollment support, including, among other things, preparing and mailing to eligible employees enrollment packages, holding informational meetings, and processing enrollment forms, (ii) communicated information prepared or approved by the employer on the plans' structures and benefits to

---

[10] In May 2006, Mullin entered into a joint venture with TBG Insurance Services Corporation and began doing business as Mullin TBG Insurance Agency Services, LLC. (Malafronte Decl. ¶ 3.)

participating employees, (iii) offered (and still offers) ongoing support to enrolled

employees, including providing plan materials and account statements, and answering

benefits questions, and (iv) performs administrative services on behalf of the employer,

including record keeping of participants, account balances, and plan distributions. (Id.

¶¶ 5, 6.)

   For example, pursuant to procedures established in connection with the

Capital Accumulation Plan (the "HFA Procedures"), Mullin was responsible for

preparing and mailing enrollment packages to eligible employees with a cover letter

announcing enrollment meetings. (Id. ¶ 6, Ex. B.) These enrollment packages would

have included: (i) a cover memorandum from Merrill S. Wall (from HFA); (ii) a copy of

the Capital Accumulation Plan brochure, which contains a summary of the key terms of

the plan, including, among other things, disclosure of payment provisions (including the

Unscheduled Withdrawal) and participants' ability to receive a copy of the full plan

document; (iii) a form entitled "Capital Accumulation Plan Outline," which similarly

discloses key provisions of the plan (included the Unscheduled Withdrawal); and (iv) an

election form. (Id. ¶¶ 6, 7, 8.) Mullin mailed enrolling employees similar brochures for

other HFA Deferred Compensation Plans as well. (Id. ¶ 9; see also Dewar Decl. ¶ 7

(noting that participating employees were entitled to receive from their employer or the

plan record keeper copies of relevant HFA Deferred Compensation Plan documents upon

enrollment and copies of material amendments to such plans as applicable).)

   Based upon the foregoing procedures, in addition to documents pulled

from Mullin/MullinTBG's business records and the record with respect to the Motion

evidencing mailing and receipt of certain plan enrollment documents (as described in

further detail below), the Participants received copies of relevant HFA Deferred

Compensation Plan documents that disclosed their rights pursuant to such arrangements.

Furthermore, the Participants could have asked at any time for copies of the HFA

Deferred Compensation Plans and should have been provided with such documents.

(Dewar Decl. ¶ 7.)

Section 409A and the Section 409A Accelerated Payment Election

In October 2004, Congress enacted Internal Revenue Code Section 409A

("Section 409A"), which established new rules applicable to nonqualified deferred

compensation plans. 26 U.S.C. § 409A. Section 409A was designed to eliminate certain

abusive tax avoidance practices. Among other things, pursuant to Section 409A, deferred

compensation plans cannot contain accelerated payment provisions that permit early

withdrawal of deferred funds based solely on a penalty or a "haircut." Id. § 409A(a)(3);

Treas. Reg. § 1.409A-2(b); see also IRS Notice 2007-86, § 3.01(B)(1.01); IRS Notice

2006-79, § 3.01(B)(1.01). (See also Hr'g Tr. 153:11-12, App. Tab E at A-573 ("[The

409A regulations] came out to specifically stop people accelerating their payments.").)

When Section 409A was enacted, many existing nonqualified deferred

compensation plans had not been drafted and/or operated in compliance with the new

statute's requirements. Recognizing this, over the immediately succeeding years, the IRS

and the Treasury Department issued various interim and transitional guidance on the

application of Section 409A to existing nonqualified deferred compensation plans which,

among other things, permitted a deferred compensation plan participant under certain

circumstances to change an existing payment election by accelerating payment of the

deferred compensation to a subsequent tax year, without having to comply with Section

409A's restrictive change of payment election rules (a "409A Accelerated Payment Election"). Specifically, pursuant to IRS Notice 2005-1, issued January 10, 2005, and as described in the Preamble to the Treasury Department's 409A Proposed Regulations issued in September 2005, the IRS adopted a transition rule that permitted, but did not require, employers to amend their nonqualified deferred compensation plans to offer plan participants the option, during 2006, to make a 409A Accelerated Payment Election. IRS Notice 2005-1, Q&A 19(c); Treasury Department Proposed Regulations to IRC Section 409A, Preamble § XI(C). Subsequently, pursuant to IRS Notices 2006-79 and 2007-86, the IRS extended this transition guidance to permit 409A Accelerated Payment Elections in 2007 and 2008. IRS Notice 2007-86, § 3.01(B)(1.02); IRS Notice 2006-79, § 3.01(B)(1.02). In addition, the Preamble to the Treasury Department's 409A Final Regulations provides that the regulations do not restrict otherwise applicable relief. Treasury Department Final Regulations to IRC Section 409A, Preamble § XII(A). Adopting such an amendment, however, would constitute a material amendment to the plan, Treas. Reg. § 1.409A-6(a)(4) ("A modification of a plan is a material modification if a benefit or right existing as of October 3, 2004 is materially enhanced or a new material right or benefit is added, and such material enhancement or addition affects amounts earned and vested before January 1, 2005."), which would render the plan subject to Section 409A, regardless of whether such plan otherwise was "grandfathered" under pre-Section 409A law.[11]

---

[11] A deferred compensation plan is "grandfathered" under the pre-Section 409A regime if the plan's benefits vested prior to 2005 and there has been no material modification to the plan. Treas. Reg. § 1.409A-6(a)(1)(i).

Because the Section 409A rules and regulations were new and still being developed, and were dramatically different from previously applicable law, it was not clear what impact application of Section 409A's rules would have on individual plans. Employers, like WMI, therefore, were careful in making decisions whether to amend plans to permit the 409A Accelerated Payment Election option. (See Dewar Decl. ¶¶ 9, 10.)

Section 409A Review of WMB and WMI Nonqualified Deferred Compensation Plans

In connection with the above-described Section 409A transition guidance, commencing in 2005, WMB and WMI began their review of their more than forty (40) nonqualified deferred compensation and nonqualified retirement plans, including, among others, the HFA Deferred Compensation Plans, to determine whether to amend such plans to permit participants to make 409A Accelerated Payment Elections. (Id. ¶¶ 5, 9.) This review was conducted on behalf of both WMB and WMI by certain members of WMB's Human Resources Department, in conjunction with WMB's in-house legal department, with the advice of outside counsel. (Id. ¶ 9.) All of the companies' plans were prioritized and analyzed on a plan-by-plan basis. (Id.) The process included reviewing each plan's documents, determining whether the plan was "grandfathered," and identifying any potential adverse effect of subjecting such plan to Section 409A. (Id.) Because of the severity of Section 409A's provisions (which included a twenty percent (20%) additional income tax and possible interest and penalties on the amount of the deferred compensation), this was a careful, meticulous review process that required a substantial amount of time and resources and went on for several years, as additional

guidance and regulations from the IRS and the Treasury Department kept changing the interpretation and application of Section 409A. (Id.)

Pursuant to this review, and based upon advice of counsel, WMI determined that the HFA Deferred Compensation Plans were grandfathered and, therefore, not subject to Section 409A, as all amounts deferred under the HFA Deferred Compensation Plans were fully vested prior to Section 409A's enactment and there were no continuing deferrals. (Id. ¶ 10.) Nonetheless, in 2006, WMI amended the HFA Deferred Compensation Plans to offer a 409A Accelerated Payment Election to those participants who (i) were in "pay" status and (ii) had already terminated employment from WMB and its affiliates (including HFA), thereby subjecting these Plans (at least with respect to these particular participants) to Section 409A. (Id.) WMI determined that, because of these individuals' status, the risk of forfeiting grandfathered status and rendering them subject to Section 409A by virtue of this amendment was a non-issue. (Id.) WMI needed more time, however, to analyze the issue with respect to the remaining HFA Deferred Compensation Plan participants since it was not clear what impact application of Section 409A's rules would have on such individuals. (Id.; see also Participants' Ex. 3, App. Tab K at A-615 ("The decision of whether or not the acceleration will be offered for the [Capital Accumulation Plan] is still under review. This decision cannot be taken lightly, especially considering that if we make this option available the plan will become subject to 409A and accordingly lose the grandfathered provisions that potentially offer greater flexibility to the participants in the plan.").) At the time WMI filed its chapter 11 case, WMI had not completed its review of the HFA Deferred Compensation Plans with respect to these remaining participants. (Dewar Decl.

¶ 10.) Accordingly, WMI never offered the other HFA Deferred Compensation Plan participants the opportunity to make a 409A Accelerated Payment Election. (Id.)

In or around November 2007, WMI decided to amend the WMI Deferred Compensation Plan to permit 409A Accelerated Payment Elections. (Id. ¶ 11.) Even though WMI made this decision with respect to the WMI Deferred Compensation Plan (which is a less complex plan that does not have provisions that would be adversely impacted by Section 409A), WMI was not required to make the same decision with respect to any other of its deferred compensation plans, including the HFA Deferred Compensation Plans. (Id.)[12]

The Constructive Receipt Doctrine

As described in the Response, the purpose of a nonqualified deferred compensation plan is to provide retirement income; to defer receipt of, and, therefore, payment of taxes on, compensation. (Resp. ¶ 11, App. Tab D at A-319.) Pursuant to applicable tax law, for this to work, there must be substantial limitations or restrictions on the participating employees' ability to access their deferred funds. Treas. Reg. § 1.451-2(a). Not only must the plan be unfunded, Treas. Reg. § 1.83-3(e); Rev. Rul. 60-31, 1960-1 CB 174; Rev. Proc. 92-65, 1992-2 CB 428 § 3(d), but, in general, the plan may only permit distributions at a date certain designated at the time of the deferral election, or upon separation of employment, retirement, disability, financial hardship, or death. Rev. Proc. 92-65, 1992-2 CB 428 §§ 3(b), (c).

---

[12] It should be noted that, based upon available books and records, certain of the Participants made the 409A Accelerated Payment Election with respect to the WMI Deferred Compensation Plan and received significant distributions from WMI prior to the commencement of WMI's chapter 11 case. One Participant has a significant balance remaining in the WMI Deferred Compensation Plan. Moreover, pursuant to the Purchase Agreement, JPMorgan Chase assumed all liabilities with respect to the payment of such plan.

The IRS carefully scrutinizes deferred compensation arrangements, not only to confirm that the participating employees are not *actually* receiving the compensation, but also, to confirm that the participants are not in *constructive* receipt of such funds. Treas. Reg. § 1.451-2(a); Rev. Rul 60-31, 1960-1 CB 174; Rev. Proc. 71-19, 1971-1 CB 698 § 3(2). Pursuant to section 83 of the Internal Revenue Code, a taxpayer does not generally recognize taxable income in a given tax year (and, therefore, is not deemed in actual or constructive receipt of such income) if that taxpayer is granted such property subject to a substantial forfeiture condition. I.R.C. § 83(a)(2); Treas. Reg. § 183-3(c). Prior to 2004, in accordance with this law, many deferred compensation plans included "acceleration" provisions that allowed employees to receive lump sum payments of their deferred compensation as long as the employees paid a penalty (commonly referred to as a "haircut"), typically in the amount of ten percent (10%), upon distribution.[13] If a plan contained an acceleration provision with no penalty, or the penalty was determined to be not substantial, the IRS could consider *all* plan participants in "constructive receipt" of their deferred compensation funds (whether or not they had requested or received such amounts) on the theory that they always had access to such funds and, accordingly, the participants would need to include the deferred amounts as income and be subject to taxes on such amounts for the tax year in which such funds were earned. Treas. Reg. § 1.451-2(a); Rev. Proc. 71-19, 1971-1 CB 698, § 3(2). (See also Hr'g Tr. 152:18-153:1, App. Tab E at A-572 to A-573.)

Unscheduled Withdrawals

---

[13] Although never officially sanctioned by the IRS, many plan sponsors interpreted a substantial limitation on the right to receive funds to include a "haircut." See also Treas. Reg. § 1.451-2(a).

As a result of the enactment of Section 409A, WMI determined, based upon advice of counsel, that the Unscheduled Withdrawal provision in the HFA Deferred Compensation Plans violated both Section 409A (if applicable) and the "constructive receipt" doctrine, and put all deferrals and contributions made to the HFA Deferred Compensation Plans at risk. (Dewar Decl. ¶ 12.) Because Section 409A absolutely prohibits plan terms that permit early withdrawal of deferred funds based solely on a "haircut," WMI questioned the legal sufficiency of the 5% penalty in the HFA Deferred Compensation Plans, even if such Plans were grandfathered and not subject to Section 409A. (Id. ¶ 13.) Ultimately, based upon advice of counsel, in or around 2007, WMI determined that this penalty amount was insufficient to protect against all HFA Deferred Compensation Plan participants being deemed in "constructive receipt" of their funds (and, therefore, subject to adverse tax consequences). (Id. ¶ 13, Exhibit A (noting, "Since I don't think that 5% is significant, I think that our counsel will agree that it puts the entire plan at risk with a constructive receipt issue. I will talk to them, but I don't think we will be allowing this option even though the plan is grandfathered.".) Accordingly, to avoid this result, WMI decided to refrain from making any Unscheduled Withdrawal payments in order to protect *all* plan participants. (Id.) WMI did not make payment to *any* participant under *any* haircut provision with respect to *any* deferred compensation plan after the enactment of Section 409A. (Id. ¶ 15; cf. Malafronte Decl. ¶ 12.)

HFA Plan Amendments

In December 2008, WMI sent letters to the participants of the following HFA Deferred Compensation Plans, requesting such participants' consent to an amendment thereof: (i) the Capital Accumulation Plan; (ii) the 1989 Contingent Deferred

Compensation Plan of H.F. Ahmanson & Company; (iii) the Elective Deferred

Compensation Plan of H.F. Ahmanson & Company; (iv) the Outside Directors' Capital

Accumulation Plan of H.F. Ahmanson & Company; and (v) the Outside Directors'

Elective Deferred Compensation Plan of H.F. Ahmanson & Company. WMI determined

that these amendments were required with respect to those "pay status/terminated"

participants who were offered the 409A Accelerated Payment Election option in 2006, in

order to comply with Section 409A, as Section 409A did not require that the plan

documentation be formally amended to take into account the Section 409A provisions

until December 31, 2008. (Id. ¶ 16.) WMI, based upon the advice of counsel,

determined that it was unclear whether the HFA Deferred Compensation Plans needed to

be amended with respect to the remaining participants who were not offered the 409A

Accelerated Payment Election in 2006. (Id.) Therefore, out of an abundance of caution,

and based upon the advice of counsel, WMI decided to amend certain of the HFA

Deferred Compensation Plans in their entirety. (Id.)

## THERE IS NO BASIS TO IMPOSE A
## CONSTRUCTIVE TRUST ON THE TRUSTS' ASSETS

In the face of overwhelming applicable law supporting the relief

requested in the Motion, the Participants have conjured, apparently in concert with one

another, the argument that WMI would be unjustly enriched by its refusal to permit the

Participants to take an accelerated distribution of their accrued HFA Deferred

Compensation Plan balances and, as a result, a constructive trust should be impressed on

the Trusts' assets for their benefit. Unfortunately, not only is the Participants' tale belied

by the facts, but applicable law weighs heavily in support of the Debtors' position that

this remedy is not available.

The Participants allege that, in October/November 2007, they became concerned about WMI's financial condition and contacted the Human Resources Department and requested immediate payment of their HFA Deferred Compensation Plan balances. The Participants testified at the Hearing that WMI denied their requests and that, only after the commencement of WMI's bankruptcy case, did they learn about the Unscheduled Withdrawal provision in the HFA Deferred Compensation Plans. They claim that WMI wrongfully refused to distribute their deferred funds and, therefore, the Court should impose a constructive trust on the Trusts' assets in the Participants' favor.

The Court need not even reach the merits of Participants' argument. The constructive trust remedy is not available. As discussed in the Response and herein, this remedy is preempted by ERISA law and is disfavored in bankruptcy. In addition, where there is an express contract that controls the parties' relationship, a plaintiff cannot recover under a theory of unjust enrichment. (Resp. ¶¶ 20-29, 34, App. Tab D at A-324 to A-330.) Even if the constructive trust remedy were available (which the Debtors do not believe is the case), as described above and in further detail below, WMI's decisions were justified and made in good faith, and Participants' testimony about their purported reliance on WMI's response is not credible.

## I. FEDERAL LAW PREEMPTS PARTICIPANTS' CONSTRUCTIVE TRUST CLAIMS

The Participants' attempt to enforce the terms of the HFA Deferred Compensation Plans by requesting that the Court impose a constructive trust on the funds the Participants allege they were wrongfully denied is preempted by ERISA. Congress intended that ERISA be the *exclusive* enforcement mechanism for employee benefit plans such as the HFA Deferred Compensation Plans. ERISA specifically preempts all state

law claims that relate to employee benefit plans, see ERISA §§ 514(a), (c)(1), 29 U.S.C. §§ 1144(a), (c)(1); IT Group, Inc. v. Bookspan (In re IT Group, Inc.), 305 B.R. 402, 413-14 (Bankr. D. Del. 2004) (dismissing, on ERISA preemption grounds, state law claims brought to recover payment under a top-hat plan), aff'd 323 B.R. 578 (D. Del. 2005), aff'd, 448 F.3d 661 (3rd Cir. 2006), *including state law constructive trust claims* to enforce such plans. See, e.g., Silicon Graphics, Inc. v. Merrill Lynch Trust Co. of Ca. (In re Silicon Graphics, Inc.), 363 B.R. 690, 698 (Bankr. S.D.N.Y. 2007) (holding that a deferred compensation plan participant's claim that California law created a constructive trust with respect to assets set aside in a trust related to such plan was "an attempt to 'supplant' the civil-enforcement-remedy scheme contained in ERISA and [was] pre-empted by ERISA"). (Resp. ¶ 23, App. Tab D at A-327 to A-328.) Moreover, ERISA contains a general, exclusive enforcement provision on which employee benefit plan participants must rely to assert their plan rights. ERISA § 502(a), 29 U.S.C. § 1132(a). Any state law cause of action that conflicts with this federal enforcement scheme is pre-empted. See, e.g., Aetna Health Inc. v. Davila, 542 U.S. 200, 201 (2004). (Resp. ¶ 25, App. Tab D at A-328 to A-329.)[14]

Federal bankruptcy law also, in a sense, preempts state law constructive trust claims. Bankruptcy courts generally are very reluctant to impose constructive trusts

---

[14] Section 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)) provides that "[a] civil action may be brought . . . by a participant [in an employee benefit plan]. . . to obtain . . . appropriate equitable relief (i) to redress [any act or practice which violates any provision of Subchapter I of ERISA or the terms of the plan] or (ii) to enforce any provisions of [Subchapter I of ERISA] or the terms of the plan." Although, arguably, a constructive trust may be a viable remedy pursuant to ERISA section 502(a)(3), it would be inappropriate here because the HFA Deferred Compensation Plans are unfunded. See, e.g., Fenwick v. Merrill Lynch & Co., Inc., No. 3:06cv880, 2009 WL 995760, at *3 (D. Conn. Apr. 9, 2009) (holding that a constructive trust is not a proper remedy pursuant to ERISA section 502 where the underlying plan at issue is an unfunded plan, the participants "made no contributions to it," and the defendants "have not improperly taken an identifiable portion of the beneficiaries' funds"); see also McZeal v. S. Consumers Coop., Inc., No. 05-1080, 2009 WL 1307943, at *12 (W.D. La. May 7, 2009) (denying motion for summary judgment seeking imposition of a constructive trust and equitable lien under ERISA with respect to an unfunded plan).

on debtors' assets because doing so disrupts the priority scheme established by the Bankruptcy Code and conflicts with the underlying purpose of bankruptcy law to ensure equal distribution to creditors. <u>Superintendent of Ins. for the State of N.Y. v. Ochs (In re First Cent. Fin. Corp.)</u>, 377 F.3d 209, 217 (2d Cir. 2004) (noting that constructive trust law "creat[es] a separate allocation mechanism outside the scope of the bankruptcy system . . . [and] 'can wreak . . . havoc with the priority system ordained by the Bankruptcy Code'" and, therefore, "bankruptcy courts are generally reluctant to impose constructive trusts without a substantial reason to do so") (quoting <u>In re Haber Oil Co.</u>, 12 F.3d 426, 436 (5th Cir. 1994)); <u>Goldberg v. N.J. Lawyers' Fund for Client Prot.</u>, 932 F.2d 273, 280 (3d Cir. 1991) ("In general, courts favor a pro rata distribution of funds when such funds are claimed by creditors of like status."); <u>In re Leedy Mortgage Co., Inc.</u>, 111 B.R. 488, 494 (Bankr. E.D. Pa. 1990) ("A finding that a creditor is the beneficiary of a constructive trust and is thereby entitled to special treatment over and above the normal priority to which its claims would be assigned under the Bankruptcy Code makes bankruptcy courts justifiably wary of identifying property of debtors in bankruptcy as held in constructive trusts."). Accordingly, the Participants' constructive trust claims under Delaware state law must be dismissed.

## II.   A CONSTRUCTIVE TRUST IS NOT WARRANTED BECAUSE WMI DID NOT ENGAGE IN FRAUD OR UNCONSCIONABLE CONDUCT

Even if the Court determines the remedy is available to the Participants, a constructive trust is not warranted because WMI did not engage in conduct that would justify a constructive trust. As noted in the Response, a constructive trust is appropriate only where a party breaches the "fundamental principles of justice or equity or good

conscience" and engages in *"fraudulent, unfair or unconscionable conduct"* that causes

such party to be unjustly enriched at the expense of another. (Id. ¶¶ 30, 33 App. Tab D at

A-330 to A-331, A-333 (citing Participants' Obj. ¶ 21 and cases).) The case law is clear

that *"[a]ll instances of constructive trust may be referred to what equity denominates*

*fraud, either actual or constructive."* Adams v. Jankouskas, 452 A.2d 148, 152 (Del.

1982). Participants themselves admit that, in order to prove unjust enrichment, one of the

elements a plaintiff must demonstrate is "the absence of justification." (Participants' Obj.

¶ 23, App. Tab C at A-107.) WMI's good faith, well-reasoned refusal to permit

accelerated payments under the HFA Deferred Compensation Plans in an effort to protect

all plan participants – either pursuant to a 409A Accelerated Payment Election or the

Unscheduled Withdrawal provision – "did not involve conscious wrongdoing, and

therefore, was not fraudulent or unconscionable." Pike v. Commodore Motel Corp., 1986

WL 13007, at *3-4 (Del. Ch. Nov. 14, 1986) (denying plaintiff's request for imposition

of constructive trust where challenged acts on part of defendants constituted a business

judgment and were not motivated by any conscious wrongdoing or breach of a fiduciary

duty); see also Palese v. Del. State Lottery Office, Civ.-A No. 1546-N, 2006 WL

1875915, at *5 (Del. Ch. June 29, 2006), aff'd 913 A.2d 570 (Del. 2006) (finding no

fraudulent or unfair and unconscionable conduct where defendant acted within bounds of

prescribed legal authority and in conformity with governing statute and regulations, and

thus with justification). In fact, it was the better, more prudent course of action.

### A. WMI Was *Not Obligated* to Amend the Plans to Provide for a 409A Accelerated Payment Election

WMI was not required, by law or contract, to amend the HFA Deferred

Compensation Plans to provide participants with the option to make 409A Accelerated

Payment Elections. The IRS transition rules *permitted, but did not require*, employers to amend their plans to make accelerated distributions available to employees. See IRS Notice 2007-86, § 3.01(B)(1.02) ("[A] plan *may* provide, or be amended to provide, for new payment elections . . . with respect to both the time and form of payment of such amounts and the election or amendment will not be treated as . . . an acceleration of a payment under section 409A(a)(3) . . . ."); IRS Notice 2006-79, § 3.01(B)(1.02) (same). As discussed above, however, doing so necessarily would subject such plans to Section 409A's strict legal regime. See supra p. 11. Because of the potentially severe and somewhat uncertain implications of this, employers, such as WMI, were careful in their decisions regarding whether to offer a 409A Accelerated Payment Election option. See supra pp. 11-13.

WMB and WMI had dozens of nonqualified deferred compensation and retirement plans to review. (Dewar Decl. ¶¶ 5, 9.) Due to the volume of plans, in addition to the confusing and ever-changing nature of Section 409A, the review process was slow and, ultimately, still incomplete when WMI filed its chapter 11 case. (Id. ¶¶ 9, 10.) WMB and WMI, however, acted reasonably and in the interest of all participating employees by taking the time to conduct a careful, thoughtful analysis of whether to amend their plans, and certainly did not purposefully delay review of the HFA Deferred Compensation Plans. This conduct is not actionable. Moreover, even if WMI had completed its analysis of the HFA Deferred Compensation Plans prior to the commencement of WMI's chapter 11 case, it legally could have decided not to amend such plans.

**B.    WMI Acted Reasonably and in the Best
Interests of *All* Plan Participants By Refusing to Pay
Unscheduled Withdrawals at a Five Percent "Haircut"**

Section 409A created a "heightened sensitivity" to constructive receipt

issues, causing many employers, such as WMI, to reassess their nonqualified deferred

compensation and retirement plans, to determine whether the terms of such plans were in

compliance with applicable tax guidelines. See supra p. 15.  In connection therewith,

WMI determined that permitting Unscheduled Withdrawals with a five percent (5%)

haircut pursuant to Section 5.9(b) of the HFA Deferred Compensation Plans may have

caused *all* participants to be deemed in constructive receipt of their deferred

compensation amounts, frustrating the entire purpose of such plans and resulting in

*significant adverse tax consequences* to such employees, even if they did not request a

distribution.  See supra pp. 14-16.  In the aggregate, at the time, there were at least thirty-

nine (39) individuals enrolled in the HFA Deferred Compensation Plans with

approximately over $7 million in accrued balances thereunder.  Suddenly subjecting these

individuals to taxes on such compensation for the years in which the funds were earned

would have caused substantial hardship.  Avoidance of this consequence was reasonable

and prudent.  WMI acted within its contractual authority to interpret and apply the HFA

Deferred Compensation Plans, and make decisions regarding settlement of claims,

pursuant to Sections 2.2 and 2.3 thereof.  See LaSalle Nat'l Bank v. Perelman, 82 F.

Supp. 2d 279, 295 (D. Del. 2000) (refusing to impose a constructive trust where

defendants' conduct was contemplated and disclosed to plaintiff in the underlying

document governing their legal relationship).

Importantly, the Debtors respectfully request that the Court take great caution and fully appreciate the implications of ruling in Participants' favor. If the Court determines that, notwithstanding the potential negative tax consequences to plan participants as a whole, WMI should have honored the Unscheduled Withdrawal provision in Section 5.9(b) of the HFA Deferred Compensation Plans, the Court itself may heighten the possibility of a constructive receipt issue for *all other* HFA Deferred Compensation Plan participants (which would subject them to tax in a prior year without ever receiving the deferred compensation). At the very least, the Court will send a message to plan committees that they do not have authority to interpret the plans they administer, that they should strictly enforce plans' terms no matter what the consequence, and that they should not consider the interests of participants generally when interpreting employee benefit plans. Such action in and of itself could defeat the purpose of the plans with respect to all participating employees.

Even if WMI should have permitted Unscheduled Withdrawals – and WMI submits that, under the circumstances, it was under no such duty – its failure to do so merely amounts to a breach of contract, which still is insufficient to justify imposition of a constructive trust. See Bird's Constr. Corp v. Milton Equestrian Ctr., No. 1980-S, 2001 WL 1528956, at *6 (Del. Ch. Nov. 16, 2001) (dismissing plaintiff's complaint seeking impression of a constructive trust on property plaintiff allegedly improved and expected to co-own with defendant after marriage where promise of marriage and joint ownership of property may have constituted oral contract that was breached but did not constitute "fraudulent, unfair or unconscionable" conduct and thus did not establish "an

enforceable claim to impose a constructive trust in [plaintiff's] favor on the property").[15]
In fact, as discussed in the Response, since the Participants' request for a constructive
trust is based on a claim for unjust enrichment where express contracts control the
parties' relationship, this form of equitable relief is unavailable. See Kuroda v. SPJS
Holdings, L.L.C., 971 A.2d 872, 891 (Del. Ch. 2009); Teachers' Ret. Sys. of La. v.
Aidinoff, 900 A.2d 654, 671 n.24 (Del. Ch. 2006).

---

[15] Indeed, had WMI honored the Unscheduled Withdrawal provision in response to payment requests from
certain participants, and this had resulted in all other plan participants being deemed in constructive receipt
of their funds, this would have destroyed the purpose of the HFA Deferred Compensation Plans, and WMI
may have been liable for breach of contract claims from the other participants who had not requested
distributions.

## C. Participants Knew or Should Have Known About the Unscheduled Withdrawal Provision

Putting aside the fact that the Participants were not entitled to accelerated distribution of their funds, the Participants' testimony regarding their alleged requests for payment is <u>not credible</u>. The Participants claimed that they did not see copies of plan documents and did not know about the Unscheduled Withdrawal provision until December 2008. (<u>See, e.g.</u>, Hr'g Tr. 90:11-16, 104:5-9, 107:9-14, 131:2-7, 141:16-19, App. Tab E at A-510, A-524, A-527, A-551, A-561.) Mr. Olsen, who was a Senior Vice President, Associate General Counsel, Team Lead at WMB, actually asserted that, prior to December 2008, he did not even know that a plan document existed. (<u>Id.</u> 89:4-20, App. Tab E at A-509.) The Participants' statements are directly contradicted by evidence collected by the Debtors as well as evidence provided by the Participants themselves.

- Pursuant to the HFA Procedures (<u>see</u> Malafronte Decl. Ex. B), employees eligible to participate in the Capital Accumulation Plan were mailed enrollment packages that contained, among other things, a plan outline, brochure, and election form. (<u>Id.</u> ¶ 6.)

- The Capital Accumulation Plan brochure contained a summary of the main terms of the plan, including, among other things, disclosure of the Unscheduled Withdrawal provision and the employees' ability to receive a copy of the Capital Accumulation Plan document. (<u>Id.</u> ¶ 8, Ex. D at 11, 13.)

- The Capital Accumulation Plan brochure package also contained a form entitled "Capital Accumulation Plan Outline," which also disclosed the Unscheduled Withdrawal provision. (<u>Id.</u> ¶ 8, Ex. D.)

- Mullin sent a letter to Mr. Olsen on February 20, 1998, enclosing a Capital Accumulation Plan enrollment package (as described above) (the "<u>Pombar Letter</u>"). (<u>Id.</u> ¶ 10.a, Ex. F.)

- Mullin internally documented mailing the Pombar Letter to Mr. Olsen. (<u>Id.</u> ¶ 10.a, Ex. G.)

- Mr. Olsen sent Mullin a letter on February 28, 1998 acknowledging receipt of the Pombar Letter and enclosing Capital Accumulation Plan

participation election forms (the "Olsen Receipt Letter"). (Id. ¶ 10.b, Ex. H.)

- Mr. Olsen attached to his proof of claim filed against WMI, among other things, copies of (i) the Pombar Letter, (ii) the Capital Accumulation Plan Outline, and (iii) the Olsen Receipt Letter. (Proof of Claim #1871, App. Tab A.)

- Employees eligible to participate in the Loan Consultants' Capital Accumulation Plan were sent enrollment packages similar to the one described above for the Capital Accumulation Plan. (Malafronte Decl. ¶ 9, Ex. E.)

- On November 29, 1994, Ms. Jensen signed a 1995 Bonus Deferral Unit Participation Agreement in connection with the H.F. Ahmanson & Company Elective Deferred Compensation Plan, which agreement stated, "By signing this Participation Agreement, I elect to participate in the Plan and acknowledge receipt of materials containing a summary of the Plan and consequences of Plan participation." (Id. ¶ 9.c, Ex. I.)

- On December 1, 1992, Ms. Noomen signed a 1993 Commission Deferral Unit Participation Agreement in connection with the H.F. Ahmanson & Company Loan Consultants' Elective Deferred Compensation Plan, which stated, "By signing this Participation Agreement, I elect to participate in the Plan and acknowledge receipt of materials containing a summary of the Plan and consequences of Plan participation." (Id. ¶ 9.d, Ex. J.)

- The Participants admitted that Mullin/MullinTBG or other "employer representatives" periodically provided employees with, among other things, plan outlines and summaries. (Obj. ¶ 9.a, App. Tab C at A-102 to A-103.)

- The Participants attached to their objection copies of the Loan Agents' Elective Deferred Compensation Plan and Loan Consultant Capital Accumulation Plan with fax markings at the header of each of the pages that suggest that such documents were faxed to Kari Noomen on **January 23, 2007**. (Id. Ex. B, App. Tab C at A-153 to A-232.)

- The Participants attached to their objection copies of outlines for the Loan Consultants' Elective Deferred Compensation Plan and the Loan Consultants' Capital Accumulation Plan, each of which specifically disclosed the Unscheduled Withdrawal provision. (Id. Ex. D, App. Tab C at A-304 to A-305.) Notably, the fax markings at the top of these outlines also suggest that these documents were sent to Kari Noomen on **January 23, 2007**. (Id.)

Based upon the foregoing, it is clear that the Participants had copies of the relevant HFA Deferred Compensation Plan documents and knew or should have known the contents thereof long prior to December 2008. It is inconceivable that the Participants – who were highly compensated employees, working in senior positions, deferring significant portions of their compensation to the plans[16] – would have these documents, as well as the ability to obtain replacement copies at any time (see Dewar Decl. ¶ 7),[17] but not read them. The Participants' testimony cannot be trusted.

## CONCLUSION

The Participants' request for a constructive trust constitutes an end-run around the true nature of the HFA Deferred Compensation Plans and Trusts, as well as controlling ERISA and bankruptcy law, in an attempt to get paid ahead of the Debtors' other creditors. The HFA Deferred Compensation Plans are unfunded. Claims thereunder are merely unsecured liabilities to be paid from the employer's general assets, not from the Trusts' assets, which are property of the estate. To avoid this result, however, the Participants have attempted to create a claim to the Trusts' assets by requesting that the Court impose a constructive trust for their benefit. The Participants completely ignore the fact that their state law claims are preempted by federal law and, instead, have offered the Court an unpersuasive story based upon unreliable testimony. Even if the remedy were not preempted by ERISA, the Participants' failure to proffer any evidence of fraud or other unconscionable conduct by WMI precludes imposition of a constructive trust, as recourse to such equitable remedy depends on the viability of the

---

[16] According to Ms. Noomen, her aggregate current balance under two of these plans is approximately $1.8 million. (See, e.g., Hr'g Tr. 107:20, App. Tab E at A-527.)

[17] Ms. Noomen complained that she did not receive any written description of the plan terms from WMB, but then admitted that she never asked for it. (Hr'g Tr. 123:17-18, App. Tab E at A-543.)

underlying cause of action.  See Hogg v. Walker, 622 A.2d 648, 652 (Del. 1993) (stating a constructive trust "is an equitable remedy of great flexibility and generality, and is viewed as 'a remedial [and] not a substantive' institution.") (citations omitted); Teachers' Ret. Sys. of La., 900 A.2d at 670 & n.22 ("[T[his court cannot impose the remedy of a constructive trust against a party unless that party is properly subject to an order of relief under a recognized cause of action."); cf. Taylor v. Jones, No. Civ. A. 1498-K, 2006 WL 1510437, at *3 n. 9 (Del. Ch. May 25, 2006) ("[A] resulting trust is not a trust at all . . . ; it is a form of equitable remedy.") (citations and quotation marks omitted).  WMI, acting in a prudent and reasonable manner, based on substantial justification and with the best interests of *all* participants in mind, could not permit accelerated payment of balances accrued under the HFA Deferred Compensation Plans, either pursuant to a 409A Accelerated Payment Election or the Unscheduled Withdrawal provision in Section 5.9(b).  The Participants' Objection is without merit and should be overruled.

Dated: Wilmington, Delaware
October 13, 2009

_____
Mark D. Collins, Esq. (No. 2981)
Chun I. Jang (No. 4790)
Andrew C. Irgens (No. 5193)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors and Debtors in Possession*