## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re

WASHINGTON MUTUAL, INC., *et al.*,[1]

          Debtors.

------------------------------------------------------- x

: Chapter 11

: Case No. 08-12229 (MFW)

: Jointly Administered

: **Re: Docket No. 1834**

## DEBTORS' OBJECTION TO MOTION OF THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR WASHINGTON MUTUAL BANK, FOR AN ORDER MODIFYING THE AUTOMATIC STAY

Washington Mutual, Inc. ("WMI") and WMI Investment Corp., as debtors and debtors in possession (collectively, the "Debtors"), respectfully submit this objection to the *Motion of the Federal Deposit Insurance Corporation* (the "FDIC"), *as Receiver for Washington Mutual Bank, for an Order Modifying the Automatic Stay* (the "Motion") (Docket No. 1834), dated November 4, 2009.

## PRELIMINARY STATEMENT[2]

1. A year into the Debtors' chapter 11 bankruptcy cases, five months into turnover litigation, and two weeks after argument on the Debtors' motion for summary judgment with respect to $4 billion in deposits formerly held at the Debtors' banking subsidiaries (the "Deposits"), the FDIC now seeks to reverse course and invoke Section 9.5 of the P&A Agreement ("Section 9.5"). In doing so, the FDIC attempts to position itself to exercise

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395). The Debtors continue to share their principal offices with the employees of JPMorgan Chase located at 1301 Second Avenue, Seattle, Washington 98101.

[2] Capitalized terms not defined in the preliminary statement shall have the meanings ascribed to them below.

purported setoff rights and further thwart, hinder, and delay the Debtors' efforts to finally recover their liquid assets for the benefit of their chapter 11 estates. By definition, the Motion concedes two points that the FDIC has previously refused to admit: (a) the Deposits are in fact deposits and therefore no material issues of fact exist as to their ownership; and (b) that mutuality of claims, necessary to support a claim of setoff against the Deposits, presently does not exist.

2.      The Motion must fail because the FDIC cannot show the requisite justification for stay relief. That is because if the stay were lifted, the FDIC has zero probability of success on the merits, the Debtors' estates would be prejudiced significantly, and the balance of hardships weighs heavily in favor of the Debtors given that the FDIC will not be harmed in any way if the stay remains in effect.

3.      With regard to the FDIC's probability of success on the merits, pursuant to section 553 of the Bankruptcy Code, Congress codified century-old case law holding that a depository institution cannot offset a debtor's deposits against its claims against the debtor, if those deposits were procured "with a view to its use for the purpose of set-off, [or] with knowledge or notice that the bankrupt was insolvent or had committed an act of bankruptcy." *N.Y. County Nat'l Bank v. Massey*, 192 U.S. 138, 145 (1904). The FDIC's post-petition attempt to establish mutuality by acquiring a debt with the (repeatedly) expressed intent to setoff against that debt is therefore prohibited. Because it cannot get around this prohibition, the FDIC ignores the current lack of mutuality, stating that it seeks to "preserve the status quo." That is misleading. In reality, assuming *arguendo* the FDIC has allowable claims against the Debtors' estates, the FDIC seeks to manufacture mutuality, pursuant to its agreement with JPMorgan Chase Bank, N.A. ("JPMC"), so that it may be preferred over all of the Debtors' other creditors.

Such a collusive scheme between two non-debtor parties is forbidden in bankruptcy. 11 U.S.C. § 553(a). Moreover, the Motion ignores that 85% of the Debtors' Deposits were never, in any way, touched by the receivership. Those Deposits were at WMB fsb, and were therefore never the subject of the P&A Agreement, and thus Section 9.5 cannot have any application to those Deposits whatsoever.

4. Granting the relief sought by the FDIC will result in significant prejudice to the Debtors' estates. If allowed to setoff, some portion of the Deposits will inure to the benefit of the FDIC (assuming it has any allowable claims) to the detriment of each of the Debtors' legitimate creditors. Setoff aside, the Debtors have sought the return of the Deposits throughout the Debtors' entire stay in chapter 11 – more than a year. Initially, the Debtors engaged in negotiation, and for the past five months, litigation with JPMC. This has come at a great expense to the Debtors' estates. During this time, the FDIC, which has opposed the Debtors' turnover efforts, continuously represented to the Court that it had no intention of "interfer[ing] with the administration of this bankruptcy case." (*See* **Exhibit A**, Tr. 6/24/09 at 44.) The FDIC has suddenly changed its course, now asking this Court for permission to effectively moot everything that has occurred over the last year and start anew.

5. By contrast, refusing to modify the stay will not prejudice the FDIC at all. The FDIC concedes repeatedly that setoff is its sole reason for seeking transfer of the Deposits. However, under the circumstances, the FDIC is prohibited by congressional mandate from setting off against the Deposits. Thus, continued application of the automatic stay will not harm the FDIC in any way.

6. Therefore, the balance of hardships weighs heavily in favor of the Debtors given the amount of the Deposits, the cost of further delay and litigation, and the pressing need to craft

a chapter 11 plan. The Third Circuit has stated that the automatic stay exists to "'prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'" *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991) (quoting *Ass'n of St. Croiz Condo. Owners v. St. Croix Hotel Corp.*, 672 F.2d 446, 448 (3d Cir. 1982)). If granted, the Motion would result in each and every one of these improper consequences and should, therefore, be swiftly denied with prejudice.

## RELEVANT FACTUAL BACKGROUND

7.     On September 25, 2008, the Director of the Office of Thrift Supervision placed Washington Mutual Bank ("WMB") into receivership and appointed the FDIC as receiver. On the same day, the FDIC sold substantially all of WMB's assets, including the stock of its subsidiary bank, Washington Mutual Bank fsb ("WMB fsb"), to JPMC for $1.88 billion (the "P&A Transaction"), pursuant to the Purchase and Assumption Agreement, Whole Bank, dated September 25, 2008 (the "P&A Agreement"). Subsequently, JPMC merged WMB fsb into its own banking operations.

8.     On September 26, 2008, (the "Petition Date"), the Debtors commenced voluntary cases pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

9.     On October 14, 2008, the Debtors entered into a stipulation (the "Account Stipulation") with JPMC pursuant to which JPMC agreed with the Debtors that the Deposits were deposit accounts of the Debtors. Therein, subject to this Court's approval of the Account Stipulation, JPMC had agreed to transfer the Deposits "as the Debtors, in their sole and absolute discretion, may direct." The parties contemplated that the Deposits – currently the largest of the

Debtors' estates' assets – were to be the cornerstone of a successful chapter 11 plan and would be used to pay administrative expenses and fund distributions to creditors pursuant to a chapter 11 plan. On January 26, 2009, the Debtors were forced to withdraw their motion seeking the Court's approval of the Account Stipulation when JPMC would not agree to a form of order approving the Account Stipulation.[3]

### A. The D.C. Action

10.     As required by section 11(d) of the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d), the FDIC set December 30, 2008, as the last day to file claims against WMB. The Debtors, in order to preserve their rights, timely filed proofs of claim with the FDIC in connection with WMB's receivership.

11.     On January 23, 2009, the FDIC disallowed the Debtors' claims in a one-page Notice of Disallowance, partly on the basis that the Debtors "appear to assert claims against a third party." In order to avoid forfeiting rights with respect to WMB, the Debtors filed a Complaint in the District Court for the District of Columbia on March 20, 2009, challenging the FDIC's disallowance of claims.[4] Included in the Debtors' claims is a protective claim for the Deposits and several causes of action authorized under the Bankruptcy Code's avoidance powers and under state law for monetary relief pursuant to the fraudulent or preferential transfer of more than $10 billion in the Debtors' assets to WMB prior to the commencement of the Debtors' chapter 11 cases (the "Avoidance Actions"). On June 11, 2009, the FDIC filed an answer and counterclaims asserting claims against the Debtors. Each of the FDIC's claims was already

---

[3]     In mid-October 2008, JPMC asserted that it had concerns over the terms of the proposed order and a reservation of rights submitted by the FDIC. The parties continued to try to address JPMC's concerns for several months and ultimately JPMC formally withdraw from the Account Stipulation.

[4]     *WMI and WMI Investment v. FDIC*, No. 09-00533 (D.D.C.), (the "DC Action").

asserted against the Debtors via a proof of claim filed in the Bankruptcy Court on March 30, 2009.

### B. JPMC Adversary Proceeding

12. On March 24, 2009, JPMC filed an action against the Debtors, asserting claims to assorted assets that JPMC allegedly purchased pursuant to the P&A Agreement.[5] On May 29, 2009, the Debtors filed an answer and counterclaims for assets that the Debtors contend are rightfully theirs and therefore were not transferred to JPMC under the P&A Agreement. JPMC filed a motion to dismiss, which was denied by the Bankruptcy Court on August 24, 2009.

### C. The Debtors' Turnover Action

13. On April 27, 2009, the Debtors filed an action against JPMC seeking to recover their Deposits, expressly assumed by JPMC under the P&A Agreement yet wrongfully withheld.[6] The *Motion of Defendant JPMorgan Chase Bank, National Association to Dismiss Adversary Proceeding* (Adv. No. 09-50934, Docket No. 8) was denied on June 24, 2009. The Bankruptcy Court found that the Debtors' complaint and accompanying exhibits describe a mature debt owed by JPMC to the Debtors, without any indication of a genuine dispute as to "the title to the . . . deposit accounts." (*See* **Exhibit A**, Tr. 6/24/09 at 117.) On October 22, 2009 (the "SJ Hearing"), the Debtors, the FDIC, JPMC, and a group of bondholders holding WMB debt securities (the "Bank Bondholders") presented argument in connection with the *Motion of Plaintiffs Washington Mutual, Inc. and WMI Investment Corp. for Summary Judgment* (the "SJ

---

[5] *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc. et al.*, Adv. Proc. No. 09-50551 (MFW) (the "JPMC Adversary Proceeding").

[6] *Washington Mutual, Inc. et al.* v. *JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW) (the "Turnover Action," and with the JPMC Adversary Proceeding, the "Adversary Proceedings").

Motion") (Adv. No. 09-50934, Docket No. 8). The Bankruptcy Court has taken the matter under advisement.

14. At the SJ Hearing, the FDIC notified the Court that, if the Court "concludes that JPMorgan setoff rights somehow do not preclude turnover here, then the FDIC Receiver is prepared promptly to exercise its Section 9.5 rights and to direct JPMorgan to return the account balances to the FDIC Receiver." (*See* **Exhibit B**, Tr. 10/22/09 at 62:6.) The FDIC chose not to await the Court's ruling to file this Motion.

## ARGUMENT

15. The automatic stay is "'one of the most fundamental debtor protections provided by the bankruptcy laws.'" *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986) (quoting S. Rep. No, 95-989, p. 54 (1978); H.R. Rep. No. 95-595, p. 340 (1977); *accord In re W.R. Grace & Co.*, No. 01-01139 (JFK), 2007 WL 1129170, at *2 (Bankr. D. Del. Apr. 13, 2007). The filing of a bankruptcy petition operates as a stay "applicable to all entities" of, *inter alia*, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3); *see also In re Cont'l Airlines*, 134 F.3d 536, 539 n.5 (3d Cir. 1998) (The automatic stay is "an injunction that arises by operation of law immediately upon the commencement of the bankruptcy case.") (quotation omitted).

16. As a threshold matter, the automatic stay is indisputably applicable to the FDIC's attempts to exert control over the Debtors' Deposits.[7] *See Gross v. Bell Sav. Bank PA SA*, 974

---

[7]  FDIC has acknowledged that any exercise would be an attempt to exercise control over property of the estates and would interfere with this Court's administration of Debtors' estates. *See* **Exhibit A**, Tr. 6/24/09 at 44 (FDIC Counsel: "We have not asserted that 9.5 right. Because we do not want to interfere with the administration of this bankruptcy case.").

F.2d 403, 407 (3d Cir. 1992) (noting that injunctive relief, such as bankruptcy's automatic stay, "is appropriate [with respect to the FDIC's attempt to claw back deposits pursuant to provision in purchase and assumption agreement] where that remedy is imposed by statute, automatically and by operation of law, without any action by a court"); *In re Colonial Realty Co.*, 980 F.2d 125, 137 (2d Cir. 1992) ("We accordingly conclude that the § 1821(j) ban upon '*court . . . action . . . to restrain or affect the exercise of powers or functions of the [the FDIC] as a conservator or a receiver*' does not inhibit the operation of [bankruptcy's] automatic *statutory* stay.") (emphasis in original); *see also In re Lane,* 136 B.R. 319, 320-21 (D. Mass. 1992) (RTC has no power to foreclose on an asset when a bankruptcy stay is in effect; rejecting the FDIC's position that it holds "a power that overrides both substantive and procedural law governing bankruptcy proceedings, simply because enforcement of those bodies of law places some constraints on FDIC 's power to foreclose" upon assets in which it has interests as successor to a failed bank). In short, the automatic stay exists to shield the Debtors from actions precisely like the ones contemplated by the FDIC which are obviously designed to exert control over the Debtors' liquid resources and interfere with the orderly administration of the Debtors' estates.

17.     As the FDIC acknowledges, a three-factor test applies to determine whether "cause" exists to lift the stay: (i) whether any prejudice results to the estate or debtor from lifting the stay; (ii) the probability of a movant's success on the merits; and (iii) the balance of hardships between the parties. *See, e.g., W.R. Grace*, 2007 WL 1129170, at *2. For purposes of the third factor, the FDIC must establish that "the balance of hardships from not obtaining relief tips significantly in [its] favor." *RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006) (internal quotations omitted); *see also W.R. Grace*, 2007 WL 1129170, at *3 (the party seeking relief from automatic stay bears "the heavy and possibly insurmountable burden of

proving that the balance of hardships tips significantly in favor of granting relief") (quotation omitted). Failure by the FDIC to carry its burden alone "requires a denial of the requested relief." *Id.*; *see also, e.g., In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990) ("If the movant fails to make an initial showing of cause… the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection."). As discussed below, the FDIC has failed to meet its burden with respect to any of the pertinent factors, and, as such, the Motion must be denied, leaving the property of the Debtors' estates intact.

## II.    THE FDIC CANNOT SUCCEED ON THE MERITS

18.    The FDIC's only stated "cause" for seeking stay modification is to protect purported setoff rights. *See, e.g.,* Motion at 3 ("[The FDIC] therefore brings this motion to protect and preserve its setoff rights in the [Deposits] until the litigation among the parties has concluded and the amount of and extent of [the FDIC's] claims against WMI and setoff rights have been determined."); Motion at ¶ 16 ("Once returned, the [Deposits] … will be held … at a Federal Home Loan Bank until the pending litigation among the parties has been resolved and the scope of [the FDIC's] setoff rights has been determined."); Motion at ¶ 17 ("The relief requested is necessary to preserve [the FDIC's] setoff rights . . . ."); Motion at ¶ 22 ("Section 9.5 … provides [the FDIC] the ability to direct the return of assumed deposit balances from the assuming bank under that agreement to protect [setoff] rights."); Motion at ¶ 25 ("[the FDIC] is entitled to protect these nonbankruptcy setoff rights . . . . Section 9.5 of the P&A Agreement provides [the FDIC] the contractual right to do so . . . . "); Motion at ¶ 27 ("Once the [Deposits] are in [the FDIC's] possession, the criteria for setoff under section 553 will be satisfied."); Motion at ¶ 34 ("[the FDIC's] rights under section 9.5 of the P&A Agreement are clear, and the exercise of those rights with respect to the [Deposits] is necessary to protect its legitimate setoff

rights under nonbankruptcy law.").[8]   However, the FDIC's scheme to exert control over the

Debtors' property so that the FDIC may protect its purported right to foreclose on such property

for its own benefit is specifically prohibited by the Bankruptcy Code section barring such

preferential transfers.   Moreover, with respect to the lion's share of the Deposits, the FDIC is

independently foreclosed from exercising Section 9.5 because that provision, on its face, is

applicable only to Deposits that were held at WMB, passed through receivership, and were

assumed by JPMC pursuant to the P&A Agreement.   Because 85% of the Deposits were on

deposit at WMB fsb, and not WMB – the bank in receivership – Section 9.5, by its terms, is

inapplicable to such Deposits.

---

[8]   *See also* **Exhibit B**, Tr. 10/22/09 at 60-61 ("Under 12 U.S.C. Section 1822(d) . . . the
FDIC has a statutory right of setoff against the insured deposits of any depositor in a
failed bank as made, [']as may be required to provide for the payment of any liability,[']
of that depositor to the failed bank or its Receiver.  Section 9.5 of the P&A Agreement . .
. is intended to protect the FDIC-Receiver's rights under Section 1822(d) among other
things."); *See* **Exhibit B** Tr. 10/22/09 at 61-62 ("we'll take the accounts back and we'll
litigate about the setoff at that point."); the *Memorandum of Law of Cross-Claim
Defendant Federal Deposit Insurance Corporation, as Receiver, in Opposition to
Plaintiffs' Motion for Summary Judgment* ("FDIC Opposition to SJ Motion") (Adv. No.
09-50934, Docket No. 97) at 3 ("Whether or not JPMC is permitted to exercise [setoff]
rights, the FDIC-Receiver has its own setoff rights, and section 9.5 of the Purchase &
Assumption Agreement, Whole Bank, dated as of September 25, 2008 between JPMC
and the FDIC-Receiver. provides the FDIC-Receiver the right to direct JPMC to withhold
the funds and deliver them to the FDIC-Receiver to prevent this sort of setoff shell
game."); FDIC Opposition to SJ Motion at 14 ("the FDIC-Receiver expressly retained the
right in [Section 9.5 of] the P&A Agreement to direct JPMC to withhold all or any
portion of any deposit balance and to return all or any portion of such deposit balance to
the FDIC-Receiver.").

**A. The Bankruptcy Code Prohibits The FDIC From Exercising Purported Setoff Rights**

19. Assuming *arguendo* the FDIC has valid setoff rights under applicable nonbankruptcy law,[9] the Bankruptcy Code imposes further requirements and limitations upon such purported rights as set forth in section 553. *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009); *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006). These statutory restrictions foreclose the setoff the FDIC seeks to accomplish.

20. Claims must be mutual and prepetition in order to setoff against a debtor. *SemCrude*, 399 B.R. at 393; *In re Enron Corp.*, 2003 Bankr. LEXIS 330 (Bankr. S.D.N.Y. Apr. 17, 2003). "[M]utuality is strictly construed against the party seeking setoff." *In re Bennett Funding Group, Inc.*, 212 B.R. 206, 212 (2d Cir. BAP 1997). The FDIC concedes that mutuality of claims does not exist, stating that, upon invocation of Section 9.5, "[the FDIC's] claims against the Debtors *could and would* form the basis for setoff under 11 U.S.C. § 553 against [the Deposits] currently being held by JPMC purportedly in the name of WMI" and that *"[o]nce the [the Deposits] are in [the FDIC's] possession, the criteria for setoff under section 553 will be satisfied."* (Motion at 2, ¶ 27, emphasis added.) This Court too has recognized this plain fact, acknowledging that JPMC (and not the FDIC) has assumed the Deposits, but has not acquired any claims that could potentially be setoff against the Deposits. (*See* **Exhibit B**, Tr. 10/22/09 at

---

[9]   The Debtors do not concede that the FDIC has setoff rights and reserve their rights in this regard. The FDIC's statutory basis for setoff is limited to the "insured" portion of the Deposits only, which under current law means up to $250,000. *See* 12 U.S.C. § 1822(d) ("The Corporation may withhold payment of such portion of the *insured* deposit of any depositor" to cover payment of a liability owed the bank) (emphasis added). FDIC's citation to 12 C.F.R. 370.4(a) does not change this as that regulation pertains to the FDIC's Transaction Account Guarantee Program under which WMB was never a participating institution – the relevant regulations were not promulgated until October 29, 2008 (*see* 73 Fed. Reg. 64179) – over a month after WMB was placed into receivership.

69, "THE COURT: The FDIC has the claims, not the party against whom the Turnover Action has been filed. MR. ANKER: But that's -- THE COURT: There has been no demand to return the deposits.").

21.     This lack of mutuality was designed by the parties to the P&A Agreement which provides that JPMC assumed the Deposits from WMB, but did not take assignment of legacy-WMB claims from the FDIC. *See* P&A Agreement, § 3.5; *see also In re U.S. Aeroteam, Inc.*, 327 B.R. 852, 865 (Bankr. S.D. Ohio 2005) ("an assignment to a third party in a transaction that had previously involved only two parties may destroy mutuality by transforming a mutual obligation into a triangular one"). Thus, the parties to the P&A Agreement, by their own will, have established a triangular construct of claims.[10]

---

[10]    It is hardly remarkable that the P&A Agreement provided for the assumption of the Deposits and the retention of claims against WMI. Courts have routinely interpreted purchase and assumption agreements to provide for such a result. "FIRREA empowers the [FDIC] to organize thrift institutions to 'take over such assets or such liabilities as [the FDIC] may determine to be appropriate'" and courts interpret purchase and assumption agreements based on their plain language. *See Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 247 (D.C. Cir. 1995) (finding plaintiff could not setoff against successor bank because successor bank acquired asset but not liability pursuant to purchase and assumption transaction); *see also Payne v. Sec. Sav. & Loan Assn., F.A.*, 924 F.2d 109, 111-12 (7th Cir. 1991) (interpreting plain language of purchase and assumption agreement governing the transfer of assets to determine which liabilities were expressly assumed); *Vernon v. Resolution Trust Corp.*, 907 F.2d 1101, 1109 (11th Cir. 1990) (same); *Village S. Joint Venture v. FDIC*, 733 F. Supp. 50, 51 n.1 (N.D. Tex. 1990) (statutory predecessor to FDIC, the FSLIC, transferred the assets of failed bank except claims against directors and officers and other specified claims to successor bank in a purchase and assumption transaction). *See also* 12 U.S.C. § 1821(d)(2)(G)(i) ("The [FDIC] may . . . transfer any asset or liability of the institution in default . . . ."). The FDIC should not be heard to complain that it is somehow "inequitable" to apply the clear and controlling legal principles to the P&A Agreement that the FDIC itself crafted. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) ("[A] reasonably competent public official should know the law governing his conduct."); *Adams v. Madison Realty & Dev., Inc.*, 937 F.2d 845, 856 (3d Cir. 1991) (noting how "everyone is presumed to know the law"); *Anderson v. Hershey*, 127 F.2d 884, 887 (6th Cir. 1942) (affirming decision (footnote continued)

22.     The result is that the FDIC (or JPMC) may not setoff against the Deposits because courts have routinely held that triangular setoffs are impermissible in bankruptcy. *See, e.g., In re United Sciences of Am., Inc.*, 893 F.2d 720, 723 (5th Cir. 1990) ("The mutuality requirement is designed to protect against 'triangular' set-off; for example, where the creditor attempts to set off its debt to the debtor with the latter's debt to a third party."); *In re Elcona Homes Corp.*, 863 F.2d 483, 486 (7th Cir. 1988) (holding that the Bankruptcy Code speaks of a "*mutual* debt" and "therefore precludes 'triangular' set offs") (emphasis in original); *Enron Corp.*, 2003 Bankr. LEXIS 330 (dismissing triangular setoff claim asserted by creditor attempting to assert claims that were the property of the debtor).

23.     Now, post-petition, in an undisguised attempt to fabricate mutuality, the FDIC asks this Court for relief in order to invoke Section 9.5 to position itself to setoff its purported claims. (*See* Motion at ¶ 9).[11] However, section 553 of the Bankruptcy Code provides that setoff is precluded where a debt owed the debtor (such as the Deposits) is transferred post-petition "for the purpose of obtaining a right of setoff against the debtor" while the debtor was insolvent. 11 U.S.C. § 553(a)(3). The law is clear that where "deposits are not accepted in the ordinary course of business, *or are procured, accepted, or 'built up' for the real purpose of allowing the bank to obtain a setoff*, the deposits will be considered preferential in effect and the right of setoff is

---

holding receiver of failed bank to terms of a federal law because "[t]he defendant receiver is presumed to know the law and to be aware of the federal statute").

[11]     It is simply impossible to reconcile the FDIC's position that mutuality would be created pursuant to invocation of Section 9.5 with its continued support of JPMC's putative setoff rights: "Debtors interpretation of Schedule 3.5 is wrong, and the P&A Agreement does not have the effect on JPMC's setoff rights with respect to the [Deposits]." (Motion at 2-3.) FDIC is arguing that both it and JPMC may setoff against the same Deposits with the same set of claims. The law on setoff and basic common sense preclude such a result. Even more perplexing is FDIC's continued advocacy for JPMC's pecuniary interests even where they are clearly adverse to the interests of the Bank Bondholders and other creditors of the WMB receivership.

lost under § 553(a)(3)." *In re Bohlen Enters., Ltd.*, 78 B.R. 556, 560-61 (Bankr. N.D. Iowa 1987) (emphasis added) (examining legislative history of section 553(a)(3) and noting that provision was enacted as a codification of the case law that held that a bank cannot offset the debtor's deposits against its claim against the debtor, unless the deposits have been accepted in good faith in the ordinary course of business) (citing *N.Y. County Nat'l Bank v. Massey*, 192 U.S. 138 (1904)), *aff'd,* 91 B.R. 486 (N.D. Iowa 1987), *rev'd on other grounds*, 859 F.2d 561 (8th Cir. 1988) (emphasis added); *see also Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 557 (2d Cir. 1976) ("The set-off exception does not apply where a deposit is accepted by a bank with an intent to apply it on a pre-existing claim against the depositor."). The appropriate inquiry is whether the purpose for accepting the debt in question was to obtain a setoff for the creditor and to improve the creditor's position among other creditors. *In re S. Indus. Banking Corp.*, 809 F.2d 329, 332 (6th Cir. 1987) (concluding from statements made in court pleadings that bank intended to exercise setoff upon maturity of amounts owed bank investor). There is no dispute that the FDIC seeks to exercise Section 9.5 solely in order to procure the Deposits "for the purpose of obtaining a right of setoff against the Debtor." 11 U.S.C. § 553(a)(3). Both the Motion and the FDIC's statements on the record before this Court concede this point repeatedly.

24.     The Debtors are currently insolvent. The Debtors' financial position subsequent to the loss of their primary operating asset, WMB, is reflected on their schedules filed with this Court which indicate $4.48 billion in assets and $7.83 billion in liabilities. This reality is further bolstered by the presumption of insolvency afforded debtors pursuant to section 553 of the Bankruptcy Code for the 90-day period immediately preceding the petition date *See* 11 U.S.C. § 553(c). It is the setoff applicant's burden to establish otherwise. *In re Balducci Oil Co.*, 33 B.R. 847, 850 (Bankr. D. Colo. 1983). Although the Debtors have asserted claims to certain assets

such as trust preferred securities and prospective tax refunds, both JPMC and the FDIC have asserted claims against the Debtors for more than the total amount of such assets.[12] Further, more than $100 billion in claims have been filed against the Debtors' estates in these chapter 11 cases. While a significant portion of these will not likely be allowed, they are further evidence that the Debtors are currently insolvent and would be at the time of any exercise of Section 9.5. Therefore, invocation of Section 9.5 would consist of a postpetition procurement of a debt of the sort that section 553(a)(3) of the Bankruptcy Code prohibits from forming the basis for any setoff.

25.     At bottom, section 553(a)(3) is intended to prevent a windfall for the benefit of one or more colluding creditor(s) over the debtor and its other creditors. *See Aeroteam,* 327 B.R. 852 at 867 ("The purpose of [section 553(a)(3)] is to prevent a creditor from undertaking a build-up of its setoff rights in order to obtain a preference."); *In re Iowa Oil Co.,* No. C04-1002-LRR, 2004 WL 2326377, at *9 (N.D. Iowa Sept. 30, 2004) (section 553(a)(3) "is intended to eliminate an opportunity for a creditor to engage in some form of manipulation at the expense of other creditors.") (quotation omitted).[13] These equitable underpinnings could never be more

---

[12]   Because the FDIC and JPMC (in multiple forums) have asserted competing claims to both the Trust Preferred Securities and the Debtors' tax refunds, the value of such assets must be discounted for the likelihood that the Debtors will prevail in asserting ownership rights. *See In re Xonics Photochemical, Inc.,* 841 F.2d 198, 199-200 (7th Cir. 1988).

[13]   Related section 553(a)(2), concerning the transfer of claims, is grounded in similar equitable principles. Congress sought to "prohibit trafficking in claims against the debtor in order to effect setoff (which would provide a windfall to both parties to the transfer at the expense of the estate)." *In re Denby Stores, Inc.,* 86 B.R. 768, 779 (Bankr. S.D.N.Y. 1988). Although here the FDIC and JPMC contemplate transferring a "debt," the fact remains that both entities have agreed to terms that threaten to prejudice the Debtors' creditors. Moreover, it bears noting that "Debt" and "Claim" are used interchangeably by Congress. *See Rake v. Wade,* 508 U.S. 464, 474 n.11 (1993) (implying that "debt" and "claim" are synonymous); *In re First Jersey Sec.,* 180 F.3d 504, 510 (3d Cir. 1999) ("As (footnote continued)

applicable than here with respect to the FDIC's desire to transfer the Deposits to attempt to establish mutuality.

26. To the extent the FDIC argues that it has somehow contracted around the mutuality requirement or the applicability of section 553(a)'s restrictions, this argument has already been rejected by the Bankruptcy Court for the District of Delaware. In *SemCrude*, Chevron entered into agreements with various debtor-entities for the purchase and sale of oil, gasoline, and propane. *Id.* at 391. Pursuant to netting provisions in those agreements, the parties agreed that in the event of a payment default they would be allowed to setoff amounts owed between the parties and their affiliates. *Id.* at 391. After the debtors filed for bankruptcy, Chevron sought to effect a setoff so that it would not have to pay in full what it owed the debtors. *Id.* 392. Interpreting the plain language of section 553 of the Bankruptcy Code, the court found that "non-mutual debts cannot be transformed into a 'mutual debt' under section 553 simply because a multi-party agreement allows for setoff of non-mutual debts between the parties to the agreement." *Id.* at 398. Additionally, the court held there exists "no exception to the 'mutual debt' requirement in section 553 [that may] be created by private agreement." *Id.* at 399. Finally, the court noted that its holding was consistent with one of the fundamental principles of bankruptcy – fair treatment for creditors – and that a contrary ruling would allow "one creditor . . . [to] unfairly obtain payment from a debtor at the expense of the debtor's other creditors." *Id.*

27. Even if the FDIC were somehow not prohibited from setting off its purported claims against the Deposits (and clearly it is), consideration of the factual circumstances surrounding the FDIC's intended exercise of Section 9.5, its previous litigation positions

---

debt is defined as a liability on a claim, it is coextensive with the definition of a claim . . . ."); *see also* 11 U.S.C. § 101(12) (defining "debt" to mean "liability on a claim").

concerning JPMC's setoff rights, and the fact that the FDIC itself drafted and negotiated the P&A Agreement (each as discussed below in section I.B.), would all militate significantly against allowing the equitable remedy of setoff. *See In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d 54, 57 (3d Cir. 1990) (equitable right of setoff is permissive, not mandatory and cannot be invoked in a case where the general principles of setoff would not justify it); *In re Penn Cent. Transp. Co.*, 486 F.2d 519, 529 (3d Cir. 1973) ("In the absence of a trust relationship, whether to permit a setoff is in the discretion of the district court."); *In re Ionosphere Clubs, Inc.*, 164 B.R. 839, 841 (Bankr. S.D.N.Y. 1994) (setoff scrutinized in light of goals and objectives in Bankruptcy Code). Thus, given the circumstances, assuming *arguendo* section 553(a) of the Bankruptcy Code did not bar the FDIC's contemplated setoff, the Court should then exercise its discretion to bar this form of preferential treatment of a putative creditor.[14]

## B.     Section 9.5 Is Inapplicable To The Lion's Share Of The Deposits

28.     The FDIC contemplates invoking Section 9.5 not just with respect to the Deposits formerly held at WMB, but with respect to the Deposits formerly held at WMB fsb, in an account number ending in 4234 (the "fsb Account"). This is not surprising as per the account statement received from JPMC as of October 14, 2009, the fsb Account contains $3,674,809,737. This represents approximately 85% of the Deposits. Thus, the FDIC chooses to ignore that such

---

[14]     Foreclosed from asserting any purported setoff rights, FDIC may not invoke Section 9.5. In addition to finding that Section 9.5 is enjoined by the automatic stay, the Third Circuit, in a non-bankruptcy context, has recognized that such an exercise is within FDIC's powers only when in furtherance of setoff, unlike the situation here where FDIC would be prohibited from setoff. *See Gross*, 974 F.2d at 408 (3d Cir. 1992) (reversing district court injunction of FDIC based upon finding that FDIC was acting in its powers by withholding deposits from distribution to (non-debtor) depositor "that are necessary to offset depositor liabilities to the bank").

funds were not assumed pursuant to the P&A Agreement and were never touched by WMB's receivership, but were assumed by separate merger with JPMC.

29.     However, the plain language of Section 9.5 is clear that it applies only with respect to "any deposit balance assumed by the Assuming Bank pursuant to [the P&A Agreement]." *See* P&A Agreement at § 9.5. Pursuant to Section 2.1 of the P&A Agreement, JPMC agreed to assume "Deposits" "reflected on the Books and Records of the Failed Bank as of Bank Closing." *Id.* at § 2.1. Of course, the "Failed Bank" is defined to mean WMB, and not WMB fsb. Thus, Section 9.5 is simply inapplicable to the fsb Account and the FDIC has no purported Section 9.5 rights with respect to those Deposits.

30.     Significantly, the FDIC makes no assertion that the books and records of WMB and/or WMB fsb do not reflect that the fsb Account was established and due and owing as the Debtors have asserted in connection with presentment of their SJ Motion. *See In re Rocor Int'l, Inc.*, 352 B.R. 319, 328 (W.D. Okla. 2006) (Deposits "belong to the entity in whose name an account is established"); *In re Amdura Corp.*, 75 F.3d 1447, 1451 (10th Cir. 1996) ("We presume that deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established."). That is because the FDIC cannot. As the Debtors have already established in connection with the SJ Motion, there is no real factual dispute that the fsb Account was established prior to the receivership. Similarly, there is no real question that a putative exercise of Section 9.5 would have no effect upon the large majority of the Deposits – those held in the fsb Account.

31.     Notwithstanding the fact that the plain language of the P&A Agreement does not support the Motion, the FDIC acknowledges this critical point only in a footnote, asserting that the account statements for the fsb Account reflect that the Deposits are held at "Washington

Mutual Bank, FA." This is truly misleading. As the Debtors have established, the transfer of Deposits to WMB fsb occurred in late September. As of September 30, 2008, the first date that an account statement bearing WMB fsb's name would have been issued, WMB fsb was already sold as a going concern to JPMC. JPMC has concealed what date it merged WMB fsb into itself and, therefore, it is unclear whether WMB fsb even existed as an independent entity at that time. In any event, the account statements to which the FDIC refers were issued by JPMC – not the Debtors. The account statements issued by JPMC reflect the name of JPMC and the proper and new account number as reflected on WMB fsb's books and records prior to the merger into JPMC. Assuming WMB fsb even existed as of the issuance of the September 2008 month-end account statements, (and the JPMC label on the account statement implies that it did not), it is not surprising that JPMC did not revise this statement to reflect the name of WMB fsb when JPMC contemplated merging the bank into its own operations shortly.[15]

---

[15] As discussed above, the Debtors have asserted the Avoidance Actions against the FDIC as initial transferees of $6.5 billion in capital contributions and approximately $3.4 billion in preferential transfers, which the Debtors are seeking recovery on account of in the DC Action. Thus, assuming *arguendo* that the FDIC is not barred from effectuating any setoff against the Deposits pursuant to section 553(a)(3) of the Bankruptcy Code, as the recipient of avoidable fraudulent and preferential transfers, the FDIC's claims would be disallowed under section 502(d) of the Bankruptcy Code. 11 U.S.C. § 502(d) ("[T]he court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title."). In turn, section 553(a)(1) provides that setoff is prohibited "to the extent that the claim of such creditor against the debtor is disallowed." This forms yet another basis why the FDIC would be prohibited from setting off against the Deposits if it were to exercise its purported Section 9.5 rights.

### C. The FDIC Acts and Omissions Preclude Invocation of Section 9.5

32. These bankruptcy cases have proceeded for more than a year. As far back as October 2008, the FDIC was involved in the JPMC-created dispute surrounding the Debtors' Deposits.[16] In all this time, the FDIC has not sought this Court's approval to invoke Section 9.5. In fact, it has affirmatively stated throughout that it had no intent to "interfere with the administration of these cases."[17]

33. In this time, the FDIC interposed a limited objection to the Account Stipulation and appeared at the related October 20, 2008 hearing without referencing Section 9.5. The FDIC then affirmatively lent its support to JPMC's specious claim to the Deposits at every chance it had. After the Debtors filed their SJ Motion, setting forth significant evidence that the Deposits were in fact the Debtors' assets, JPMC and the FDIC opposed the motion vigorously. In its papers, the FDIC argued that the "Debtors have failed to demonstrate the absence of any dispute as to the ownership of the funds in the six disputed accounts" and that there was a "significant need for discovery concerning [the Deposits] and the circumstances surrounding numerous transactions at involving those accounts." (FDIC Opp. at 1 and Supp. Opp. at 2 [Turnover Action Dkt. Nos. 97, 152].) As recently as two weeks ago, the FDIC argued to the Court that the FDIC hasn't "had an opportunity to conduct discovery. We don't have all of the data." (*See* **Exhibit B**, Tr. 10/22/09 at 64). ***In an incredible about-face, the FDIC now concedes the***

---

[16]      *See FDIC's Statement, Response and Limited Objection to Motion of Debtors Pursuant to Sections 105(a), 361, 362 and 542(b) of the Bankruptcy Code Seeking Approval of a Stipulation and Agreement Concerning Deposit Accounts at JPMorgan Chase Bank, National Association* (Docket No. 104).

[17]      *Id.* at 2; *See* **Exhibit A**, Tr. 6/24/09 at 44 (FDIC Counsel: "We have not asserted that 9.5 right. Because we do not want to interfere with the administration of this bankruptcy case."); *See* **Exhibit C**, Tr. 10/20/08 at 23 (FDIC Counsel: "But Your Honor, we can't, and we don't want to interfere with the administration of this case ....").

*obvious truth that the Deposits are in fact deposits, but seeks to transfer the funds, not to the*

*Debtors, but to the FDIC to attempt further withholding, delay, and setoff.*

34.     The FDIC not only questioned ownership of the Deposits, but, on numerous occasions, the FDIC has gone on record in support of JPMC's putative right to setoff against the Deposits.  Robert C. Schoppe, the "Receiver in Charge" of WMB's receivership, has asserted that the Debtors' argument that JPMC did not acquire the legacy-WMB claims that JPMC might seek to setoff against the Deposits "is contrary to the FDIC-Receiver's understanding of the provisions of the P&A Agreement that are relied upon by the Debtors."  *See* Exhibit B (the "Schoppe Declaration") to the *Motion for Leave to File Declarations of Daniel P. Cooney and Robert C. Schoppe* (Adv. No. 09-50934, Docket No. 181) at ¶ 2.[18]  This position is not only wrong (because JPMC acquired no legacy-WMB claims),[19] but it also runs directly counter to the FDIC's current stance, seeking to transfer the Deposits in a blatant attempt to establish mutuality and effectuate a setoff for FDIC's own benefit.  By asserting JPMC's putative right to setoff for more than a year, the FDIC evidenced an intent that it would not seek to invoke Section 9.5 – an intent the FDIC also confirmed explicitly.  *See* **Exhibit A**, Tr. 6/24/09 at 44

---

[18]     *See also* FDIC Opposition to SJ Motion at 14 ("Even in the unlikely event that the funds in the disputed accounts were somehow not subject to setoff against claims held by JPMC, those funds still would be subject to setoff against claims held by the FDIC-Receiver."); Schoppe Declaration at ¶ 4 ("Contrary to Debtor's argument, Schedule 3.5 does not limit or divest JPMC of any interest, right, action, claim or judgment (including, but not limited to, claims for setoff or recoupment) that it might assert as a result of its acquisition of assets and certain liabilities pursuant to the P&A Agreement against . . . WMI."); Motion at 2-3 ("To be clear, the Debtors' interpretation of Schedule 3.5 is wrong, and the P&A Agreement does not have the effect on JPMC's setoff rights with respect to the Disputed Deposit Balances that the Debtors have advocated."); Motion at ¶ 15 ("The Debtors contend that JPMC does not have setoff rights with respect to the Disputed Deposit Balances for a variety of reasons.  The FDIC-Receiver does not agree with the Debtors' assertions….").

[19]     *See Debtors' Objection to Motion for Leave to File Declarations of Daniel P. Cooney and Robert C. Schoppe* (Adv. No. 09-50934, Docket No. 186).

21

(FDIC Counsel: "We have not asserted that 9.5 right. Because we do not want to interfere with the administration of this bankruptcy case."). Based upon its conduct, the FDIC has waived any right to invoke Section 9.5. *See Cont'l Airlines*, 134 F.3d at 541 ("We recognize that a right of set-off is preserved under § 553 in a bankruptcy proceeding but we believe that the right must be exercised by the creditor in timely fashion and appropriately asserted in accordance with other provisions of the Bankruptcy Code."); *In re Custom Ctr., Inc.*, 163 B.R. 309, 317 (Bankr. E.D. Tenn. 1994) ("If the creditor does not assert setoff in a timely manner in the bankruptcy case, it may lose the right to setoff under general rules of equity. The court need not identify exactly which rule of equity may bar the setoff. It may be estoppel, laches, waiver, or election."); *In re Apex Int'l Mgmt. Serv., Inc.*, 155 B.R. 591, 596 (Bankr. M.D. Fla. 1993) (holding that IRS was not entitled to setoff against funds debtor received from Air Force where IRS stated its claim was not subject to setoff and two years later proclaimed to be a secured creditor, noting that "[t]he government should not be treated differently than other creditors"; during that interval debtor spent substantial funds pursuing claims against Air Force in reliance upon IRS' assertion that it would not setoff.).

35.     Moreover, the Debtors have negotiated with JPMC for more than a year and pursued JPMC through litigation for more than five months in reliance upon the FDIC's actions, all at great expense to the Debtors' estates. Against this backdrop, the FDIC's newly-minted threat to reverse course and do what it said it would not do – on the eve of this Court's impending decision on the SJ Motion concerning the Deposits – is unseemly gamesmanship and the FDIC should be stopped from attempting to moot the events of the past year. *See In re Calore Exp. Co.*, 288 F.3d 22, 39 (1st Cir. 2002) ("When . . . another party to the proceedings has relied on the waiver to its detriment, the court may invoke estoppel and rule that the waiver

has become irrevocable); *In re Metro. Int'l, Inc.*, 616 F.2d 83, 86 (3d Cir. 1980) (holding that creditor had expressly waived its setoff rights based upon statements to receiver and the court and that to the extent "receiver detrimentally rel[ied] upon the waiver," rescission would be stopped).

## III. THE DEBTORS' ESTATES WILL BE SEVERELY PREJUDICED AND THE BALANCE OF HARDSHIPS TILTS HEAVILY IN FAVOR OF THE DEBTORS

36. As discussed above, the Deposits have been wrongfully withheld by JPMC for more than a year. After assisting JPMC to this end, and sensing the ultimate turnover of the Deposits to the Debtors, not only does the FDIC seek to further prejudice the Debtors by extending this deprivation through the transfer of the Deposits to the FDIC, but, despite the clear prohibition against such a setoff in section 553 of the Bankruptcy Code, the FDIC contemplates doing so in order to pay itself in full on account of purported claims against the Debtors' estates. If allowed to do so, the value of the Deposits would not be shared among all of the Debtors' legitimate creditors. Rather, a portion of the value of the Deposits would be allocated only to the FDIC (assuming it held allowable claims). The prejudice to the Debtors' estates and their creditors is obvious and the stay should therefore remain in full force and effect.

37. Moreover, if allowed to transfer the Deposits from JPMC to the FDIC, the FDIC will have erased the progress the Debtors have made to date over the course of the Turnover Action. This is an action in which the FDIC has participated meaningfully through submitting numerous briefs, attending the deposition of the Debtors' key affiant, and presenting oral argument. If allowed to invoke Section 9.5 at this late stage, the estate expenses incurred to date will be put to waste, leaving the Debtors to proceed as appropriate against the FDIC.

38. The further delay imposed on the Debtors threatens to derail the Debtors' chapter 11 cases. The $4 billion in Deposits are significant estate assets critical to the Debtors chapter 11

process. The recent amendments to the Bankruptcy Code impose a hard deadline of March 10, 2010 on the Debtors' exclusive period to file a chapter 11 plan. If the Debtors recover the Deposits from JPMC, they will be well-positioned to file a plan in advance of their exclusivity deadline. Without the Deposits, however, the Debtors will not be able to construct a viable plan beneficial to their creditors.

39. On the other hand, if the stay remains extant, the FDIC will not be prejudiced at all. Even if the Deposits were transferred, the FDIC will be prohibited from setting off against the Debtors' Deposits by operation of the Bankruptcy Code. Thus, the FDIC loses nothing if enjoined from invoking Section 9.5 as it has no basis to convert the Debtors' Deposits nor pay itself on account of claims asserted against the Debtors.[20] The FDIC therefore cannot overcome the significant burden of proving that the balance of hardships tips significantly in its favor and the Motion should be denied with prejudice. *W.R. Grace*, 2007 WL 1129170, at *3.

---

[20] For the very same reason, FDIC's assertion that cause to lift the stay exists because its purported setoff rights require adequate protection is wrong. (Motion at ¶ 19.) In certain instances, courts may treat creditors asserting setoff rights against debtors as secured creditors who may be afforded adequate protection. *See, e.g., Lee v. Schweiker*, 739 F.2d 870, 874 (3d Cir. 1984). However, such a claimant will be considered a secured creditor only to the extent its claim "is subject to setoff under section 553 of [the Bankruptcy Code] or to the extent of the amount subject to setoff. . . . " 11 U.S.C. § 506(a); *see also In re New York City Shoes, Inc.*, 78 B.R. 426, 433 (Bankr. E.D. Pa. 1987) (finding adequate protection not applicable to funds which bank was prohibited from setting off per section 553(a)); *In re Gehrke*, 158 B.R. 465, 469 (Bankr. N.D. Iowa 1993) (holding that only "[o]nce established, the right to setoff is treated as an allowed secured claim under 11 U.S.C. § 506(a)"). Here, section 553 expressly prohibits the FDIC from setting off against the Deposits at all and thus FDIC is not a secured creditor and is not entitled to adequate protection.

## CONCLUSION

For all of the reasons discussed above, the Court should reject the Motion in its entirety

and instruct the FDIC that any actions taken to exert control over the Deposits will be found to

be in willful violation of the automatic stay.

Dated: November 11, 2009
      Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

    */s/ Andrew C. Irgens*
Mark D. Collins (No. 2981)
Chun I. Jang (No. 4790)
Lee E. Kaufman (No. 4877)
Andrew C. Irgens (No. 5193)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys to the Debtors*
*and Debtors in Possession*

**ELLIOTT GREENLEAF**

Rafael X. Zahralddin-Aravena (No. 4166)
Neil R. Lapinski (No. 3645)
Shelley A. Kinsella (No. 4023)
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399

-and-

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
Peter E. Calamari
Michael B. Carlinsky
Susheel Kirpalani
David Elsberg
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Special Litigation and Conflicts Co-Counsel*
*to the Debtors and Debtors in Possession*