IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
                                                              :   Chapter 11

In re                                                          : 
                                                         :   Case No. 08-12229 (MFW)

WASHINGTON MUTUAL, INC., *et al.*,[1]     :
                                                         :   Jointly Administered

                        Debtors.                  : 
                                                         :   **Hearing Date: January 4, 2010 at 3:00 pm**
                                                         :   **Obj. Deadline: December 22, 2009 at 4:00 pm**
------------------------------------------------------- x

## DEBTORS' MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AND LOCAL BANKRUPTCY RULE 2004-1 DIRECTING THE EXAMINATION OF WITNESSES AND PRODUCTION OF DOCUMENTS FROM KNOWLEDGEABLE PARTIES

Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment," and with WMI, "Debtors"), through their undersigned counsel, hereby file this motion (the "Motion") pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 2004-1 of the United States Bankruptcy Court for the District of Delaware seeking the entry of an order directing the production of documents and examination of witnesses most knowledgeable about the subjects in the attached document requests (the "Requested Examination") from regulatory entities, rating agencies, former WaMu suitors, banks, and professionals in connection with Debtors' investigation of certain pre-petition conduct that may unearth estate claims (the "Knowledgeable Parties"),[2] and respectfully represent:

---

[1]     The Debtors in these chapter 11 cases (the "Chapter 11 Cases") and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395).

[2]     Debtors seek the Rule 2004 examination of the following Knowledgeable Parties: The Federal Deposit Insurance Corporation, in its capacity as receiver for WMB and in its corporate capacity, ("FDIC"), the Office of Thrift Supervision ("OTS"), the Office of the Comptroller of

# PRELIMINARY STATEMENT

1. On June 24, 2009, pursuant to Bankruptcy Rule 2004, this Court granted Debtors' motion for an order directing the examination of JPMC to investigate potentially valuable estate claims sounding in business tort and tortious interference. *See* June 24, 2009 Order (the "June 24 Order) and June 24, 2009 Opinion (the "June 24 Opinion," together, with the June 24 Order, **Exhibit 1**). Since that time, Debtors have received and reviewed documents that JPMC produced pursuant to the June 24 Order. Certain of the documents in the JPMC productions highlight the need to expand to third parties the investigation this Court authorized concerning "JPM[C]'s alleged malfeasance prior to the seizure and sale of WMB." *See* June 24 Opinion, **Exhibit 1** at 17 & n.14. For example, with respect to Debtors' investigation into JPMC's efforts to interfere with a potential sale of WaMu, an internal JPMC email from June 2008 reports on a meeting between JPMC CEO Jamie Dimon and Banco Santander Chairman Emilio Botin in which Botin indicated that Santander was interested in acquiring WaMu. When Botin asked why JPMC did not buy WaMu in March 2008, Dimon responded that WaMu's "potential losses are higher than TPG is estimating." The e-mail further noted that "[i]t is important to have an open dialogue with [Santander], as Santander would not pursue any . . . of these opportunities if JPMorgan were to do the same." JPM_EX00004075, **Exhibit 2**. In light of such documents

---

the Currency ("OCC"), the Board of Governors of the Federal Reserve System ("Federal Reserve"), the U.S. Department of the Treasury ("Treasury Department"), the U.S. Securities and Exchange Commission ("SEC"), and former U.S. Treasury Secretary Henry M. Paulson, Jr ("Paulson") (collectively, the "Regulators"); Moody's Investors Service ("Moody's"), and Standard and Poor's Corporation ("S&P") (collectively, the "Rating Agencies"); Banco Santander, S.A. ("Banco Santander"), Toronto-Dominion Bank ("Toronto-Dominion"), TD Bank, N.A. ("TD Bank"), and Wells Fargo, N.A. ("Wells Fargo") (collectively, the "WaMu Suitors"); Federal Home Loan Bank-San Francisco ("FHLB-SF"); Federal Home Loan Bank-Seattle ("FHLB-Seattle"); The Goldman Sachs Group, Inc. ("Goldman Sachs") (collectively, the "Banks"); PricewaterhouseCoopers ("PwC"), Equale & Associates ("Equale"), Richard F. Holt ("Holt"), David Horne, LLC ("Horne") (collectively, the "JPMC Professionals").

demonstrating Debtors' need for discovery from certain third parties, Debtors respectfully request that the Court order the Rule 2004 examination of the Regulators, Rating Agencies, WaMu Suitors, Banks, and JPMC Professionals (collectively, the "Knowledgeable Parties").[3]

2. Documents produced by JPMC pursuant to the June 24 Opinion and Order suggest that the Knowledgeable Parties had dealings and communications with the Debtors and/or JPMC in the period leading up to the seizure and sale of WMB (and afterwards) on subjects directly relevant to the business tort claims this Court has authorized the Debtors to investigate.[4] The Knowledgeable Parties are likely to have information currently unobtainable by Debtors relevant to potential estate claims sounding in business tort and tortious interference against JPMC, including information relevant to allegations made in *American National Insurance Co., et al. v. FDIC*, No. 1:09-cv-01743 (D.D.C.) (the "*American National* Action"),[5] that JPMC (i) engaged in sham negotiations designed to elicit confidential information from WMI, (ii) misused and publicly leaked this confidential information, in violation of a confidentiality agreement, to gain an unfair advantage in obtaining WMB's long-coveted assets at a "fire sale" price, and (iii) misused access to government regulators to acquire confidential information about contemplated government supervisory action directed at Washington Mutual as part of an effort to "bargain and work with federal regulators for the seizure and sale of

---

[3] During the meet and confer process required by Local Rule 2004.1 of the United States Bankruptcy Court for the District of Delaware, a number of third parties falling within these categories agreed to voluntarily produce documents responsive to Debtors' Rule 2004 requests. This motion is solely directed at those parties with whom Debtors were unable to proceed consensually.

[4] Capitalized terms not defined herein have the meaning set forth in the Motion for Rule 2004 Examination of JPMC.

[5] This action was referred to as "the Texas Action" in the Motion for Rule 2004 Examination of JPMC. On September 9, 2009, the District Court for the Southern District of Texas transferred the action to the District of Columbia.

Washington Mutual's assets." *See American National* Complaint ¶ 32, **Exhibit 3**. As with the Rule 2004 Examination of JPMC, the Rule 2004 Examination of the Knowledgeable Parties will enable the Debtors – as estate fiduciaries – to determine the validity and ownership of these potentially significant claims. To the extent the Requested Examination demonstrates that the Debtors have viable claims against JPMC, such claims are assets of the Debtors' chapter 11 bankruptcy estates and, thus, any recovery resulting from the assertion of these claims will inure to the benefit of the Debtors and their creditors.

3. The Requested Examination involves an investigation into the same set of allegations that formed the basis for the Rule 2004 Examination of JPMC. Therefore, as the Court already determined with respect to the Rule 2004 Examination of JPMC, the discovery sought herein is appropriate and necessary and is unrelated to any proceedings currently pending between JPMC and the Debtors. Furthermore, the Requested Examination is not duplicative of discovery taking place in the JPMC Adversary Action and the Turnover Action.

## JURISDICTION AND VENUE

4. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (O). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The predicates for the requested relief are Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1.

## FACTUAL AND PROCEDURAL BACKGROUND

6. On September 26, 2008 (the "Petition Date"), the Debtors filed petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). WMI and WMI Investment are debtors in the jointly-administered Chapter 11 Cases

and are operating as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. On March 24, 2009, JPMC filed the JPMC Adversary Proceeding concerning the ownership of certain assets that JPMC alleges to have acquired from the Federal Deposit Insurance Corporation ("FDIC").

8. On April 27, 2009, the Debtors commenced a separate adversary proceeding against JPMC captioned *Washington Mutual, Inc. et al. v. JPMorgan Chase Bank, N.A.*, Adv. No. 09-50934, seeking the turnover of over $4 billion in deposit liabilities that JPMC owes the Debtors but has refused to pay (the "Turnover Action").

9. Pursuant to the June 24 Order, on July 2, 2009, Debtors served JPMC with the Subpoena for Rule 2004 Examination requesting production of documents responsive to narrowed and tailored document requests limited to discovery into the potential business torts claims (the "Debtors' Rule 2004 Subpoena", **Exhibit 4**). On July 20, 2009, JPMC sent responses and objections to Debtors' Rule 2004 Requests.

10. In August 2009, Debtors and JPMC held a series of meet and confer sessions concerning Debtors' Rule 2004 Requests. JPMC agreed to begin producing documents responsive to Debtors' Rule 2004 Requests on a rolling basis beginning on August 26, 2009, and to make a good faith effort to complete its production of documents by September 25, 2009.

11. On August 26, 2009, JPMC made its first production in response to Debtors' Rule 2004 Requests; JPMC made subsequent productions on September 8, 2009, and September 25, 2009 (the "JPMC Rule 2004 Discovery").

### A. THE *AMERICAN NATIONAL* ACTION AND JPMC RULE 2004 DISCOVERY DEMONSTRATE THAT THE KNOWLEDGEABLE PARTIES LIKELY HAVE RELEVANT INFORMATION CONCERNING POTENTIAL VALUABLE ESTATE CLAIMS

12. The Debtors' Rule 2004 Requests to JPMC sought information concerning a number of serious and detailed allegations from the *American National* Complaint concerning JPMC misconduct prior to the OTS closure of WMB. Key aspects of this alleged misconduct include (i) entering into false negotiations with WMI under the guise of a good-faith bidder in 2008; (ii) gaining access to WMI's and its subsidiaries' confidential and proprietary information pursuant to a confidentiality agreement with WMI (the "Confidentiality Agreement"); (iii) disclosing confidential information, in violation of the Confidentiality Agreement, to government regulators, rating agencies, media, and investors in an effort to harm WMI by driving down WMI's credit rating and stock price, and (iv) misusing confidential information as part of a lobbying effort to convince federal regulators to seize and sell off Washington Mutual's assets at a fire-sale price that JPMC would be strategically positioned to take advantage of. The *American National* Complaint and JPMC's Rule 2004 Discovery suggest that the Knowledgeable Parties had dealings and communications with the Debtors and/or JPMC concerning Washington Mutual prior to (and after) the seizure and sale of WMB with respect to these topics, and therefore likely have information relevant to potential estate claims arising from JPMC's pre-seizure misconduct.

#### (a) The Regulators

13. A recent investigative news report indicates that regulators may have "acted precipitously in seizing a bank that could have survived, and in the process wiped out billions of dollars of wealth with widespread personal consequences." Kristen Grind, *The Washington Mutual Decision*, Puget Sound Business Journal, Dec. 4. 2009, **Exhibit 5**. According to a senior federal official, regulators "'pulled the trigger too soon'" and "'[s]omeone needs to take a serious look at this because [the bank was not] illiquid.'" *Id.*

14. The OTS was Washington Mutual's primary regulator and was in communication with WMI from December 2007 through September 2008 concerning regulatory issues. OTS was ultimately responsible for closing WMB and appointing the FDIC as receiver. The FDIC was in communication with WMI concerning regulatory issues and established the bid process for WMB. Washington Mutual was subject to OCC and Federal Reserve regulations, and JPMC's Rule 2004 discovery indicates that JPMC was in communication with the OCC and Federal Reserve concerning JPMC's potential acquisition of Washington Mutual. The U.S. Department of the Treasury was concerned with Washington Mutual's affairs, as reflected in a news report that JPMC CEO Jamie Dimon had communications in July 2008 with then-U.S. Treasury Secretary Henry Paulson regarding Washington Mutual. *American National* Complaint ¶ 45, **Exhibit 3**. Furthermore, a September 19, 2008, JPMC slide presentation about the potential acquisition of Washington Mutual notes that among the "Issues and considerations" is the "Impact of Paulson RTC-like structure." JPM_EX00012957, **Exhibit 6**. The SEC also served an oversight role over Debtors given Debtors' publicly traded equity and debt securities. In a September 18, 2008 emergency order, the SEC prohibited the short sale of the securities of WMI and certain other financial institutions, reasoning that "recent sudden declines in the prices of a wide range of securities . . . can give rise to questions about the underlying financial condition of an issuer, which in turn can create a crisis of confidence, without a fundamental underlying basis." *See* Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments, dated September 18, 2008, **Exhibit 7**.

15. The *American National* Complaint alleges that as part of its scheme to acquire Washington Mutual, JPMC "gathered non-public information" about Washington Mutual from

the OCC, OTS, FDIC, and the Federal Reserve. *American National* Complaint at ¶ 40, **Exhibit 3**. Moreover, JPMC's Rule 2004 Discovery indicates that JPMC held meetings with Regulators in 2008 concerning Washington Mutual and made presentations regarding Washington Mutual that included sensitive Washington Mutual information. Prior to JPMC submitting its March 31, 2008 bid to acquire WMI's business, JPMC discussed the potential acquisition with regulators and sought government assistance in a deal. *See, e.g.,* JPM_EX00000851, **Exhibit 8** (JPMC "Project West timetable" noting a 3/28/08 meeting with regulators); JPM_EX00023598, **Exhibit 9** (internal March 30, 2008 JPMC e-mail chain proposing plan for government assistance and noting "[i]t sounds to me like the government is really concerned as they should be about taking losses, so they should like this versus alternative"). After WMI rejected JPMC's March 2008 bid in favor of a $7.2 billion investment from private equity firms, JPMC continued to meet with regulators to discuss a potential acquisition of WaMu. An internal JPMC e-mail chain from July 17, 2008, states that "we may get more color tomorrow with the regulators" concerning WaMu and potential government assistance in a deal. JPM_EX00000322-23, **Exhibit 10**. Attached to the e-mail is a presentation disclosing information on "West's"[6] asset and mortgage portfolios and describing a "Regulatory Relief" option in which JPMC will "[a]sk Fed for relief on DTA [Deferred Tax Assets] or RWA [Risk Weighted Assets] related to the Option ARMs & Subprime portfolios" and notes that JPMC had already "discussed with Fed on prior occasions." JPM_EX00000324-339, **Exhibit 11**. These documents are consistent with allegations that JPMC "misused" its "insider" status and access to regulators to leak confidential WMI information and

---

[6] In certain of its presentations to regulators, ratings agencies, and other third parties, JPMC refers to Washington Mutual as "West." It was likely apparent to all involved that the referenced entity was Washington Mutual.

"wrongfully influence government policy and actions," *American National* Complaint ¶¶ 31-32, 43, giving rise to potential claims sounding in business tort and tortious interference. **Exhibit 3**.

16.  Documents produced by JPMC and news reports also suggest that JPMC, through its access to Regulators, had advance notice of the plans to seize WMB and may have used that knowledge to "obstruct Washington Mutual's efforts to sell itself in a fair bidding process." *See American National* Complaint ¶¶ 32, 98, **Exhibit 3**. For example, in a slide presentation dating back to July 2008, JPMC refers to a potential transaction in which it "acquires West lead thrift subsidiary (WMB) from Receiver" and notes the assets and liabilities it would assume. JPM_EX00005836, **Exhibit 12**. In early September, three weeks before WMB was seized, FDIC officials informed JPMC that "the FDIC was carefully monitoring [WMB] and that a seizure of its assets was likely" and that the FDIC "would want to immediately auction off [WMB's] assets." *See* Heidi N. Moore, *Deal Journal*, Wall St. J., Sept. 30, 2008, at C7, **Exhibit 13**. This is consistent with an internal e-mail on September 11, 2008 in which JPMC executives discussed the structure of a deal involving the FDIC in which JPMC would "acquire assets and liabilities of West's thrift subsidiaries but leave behind senior and unsecured debt with the FDIC ($15.2 bn)." JPM_EX00000319, **Exhibit 14**. On September 12 and 14, 2008, JPMC made presentations providing further detail on a transaction in which JPMC would acquire "West's thrift subsidiaries from Receiver." JPM_EX00000279, 4259, **Exhibit 15**. Moreover, in September 19, 2008 presentations, JPMC indicates that it was "[c]ontacted by FDIC about interest in West" and "[h]ad spoken to FDIC about Bank only in receivership with protection." JPM_EX00012889, 12952, **Exhibit 6**. However, the FDIC did not open up the bid process for WMB until September 23, 2008. *See* JPMC_EX00003647-48, **Exhibit 16**. Discovery is warranted to determine the extent to which JPMC and the Regulators worked together to craft a

deal for JPMC to acquire WMB at a fire-sale price and thereby interfered with WMI's efforts to find an acquirer for all or part of WMI's business.

17. In the days leading up to JPMC's acquisition of WMB from the FDIC, Regulators worked with JPMC to consummate a deal on terms acceptable to JPMC. For example, in a September 22, 2008 e-mail exchange between JPMC Senior Vice President and General Counsel Dan Cooney and FDIC Deputy Director James Wigand, Cooney indicated that WaMu was reluctant to provide JPMC certain financial data and the FDIC offered to try to obtain the information for JPMC. JPM_EX00000077-78, **Exhibit 17**. Additionally, documents made available by the FDIC through the Freedom of Information Act ("FOIA"), indicate that per JPMC's request, the FDIC agreed to "modify the standard indemnification [in the Purchase & Assumption Agreement] to include a limited indemnity in favor of JPMorgan Chase in an amount not to exceed $500 million for any damages JPMorgan Chase may sustain as a result of litigation brought by WMI against JPMorgan Chase for violation of the agreement between WMI and JPMorgan Chase dated March 11, 2008." *See* 9/24/08 Memorandum from James Wigand and Herbert Held to FDIC Board of Directors, at 2; FDIC Board of Directors Resolution Approving P&A Transaction, at 2, 6-7, **Exhibit 18**. Moreover, the OCC coordinated with the FDIC and JPMC on language to be included in the FDIC resolution approving the P&A Transaction in which the FDIC agreed to override certain state banking laws that would otherwise prohibit JPMC from acquiring WMB. JPM_EX00036075-76, **Exhibit 19**.

18. Together, the *American National* allegations and documents produced by JPMC to date pursuant to Rule 2004 cement the belief that the Regulators are in possession of information that Debtors require to properly assess potential estate claims.

### (b) The Rating Agencies

19. JPMC's Rule 2004 Discovery indicates that JPMC had several meetings and communications with each of the Rating Agencies in April 2008 and September 2008 regarding Washington Mutual. The *American National* Complaint alleges that JPMC misused confidential Washington Mutual information to "drive down WMI's credit rating." *American National* Complaint ¶ 98, **Exhibit 3**. Debtors have cause to investigate further a potential claim that JPMC leaked confidential WMI information to the Rating Agencies in violation of the Confidentiality Agreement.

20. JPMC made presentations to the Rating Agencies concerning Washington Mutual's creditworthiness and sought feedback from the Rating Agencies concerning the potential acquisition of WMB. For example, an April 4, 2008 internal JPMC e-mail attaches a draft presentation to ratings agencies including information about "West's" mortgage portfolio. JPM_EX00005951-60, **Exhibit 20**. Additionally, on September 22, 2008, before the FDIC was appointed receiver for WMB, JPMC scheduled meetings with the rating agencies "to tell them about the FDIC process and that we intend to be a bidder" for WMB and prepared materials for the rating agencies "concerning our credit due diligence [of WaMu] in March and again now." JPM_EX00000074-75, **Exhibit 21**. *See also* JPM_EX00004276-78, **Exhibit 22** (internal JPMC e-mail chain regarding communications with rating agencies); JPM_EX00005173, **Exhibit 23** (9/22/08 internal JPMC e-mail asking for "book . . . used to discuss West w/ the FDIC" so JPMC can "leverage the page from that book that laid out West's loan portfolios, by product, on a managed basis for the rating agency meetings which are scheduled to begin tomorrow").

### (c) WaMu Suitors

21. According to media reports and JPMC's Rule 2004 Discovery, the WaMu Suitors had expressed interest in investing in, merging, or acquiring all or part of Washington Mutual's

business in 2008. JPMC's Rule 2004 Discovery suggests, as the *American National* Complaint alleges, that Debtors may have a claim against JPMC for tortious interference with business expectancy due to JPMC's alleged use of its insider status to "bargain and work with federal regulators for the seizure and sale of Washington Mutual's assets" and thereby prevent Washington Mutual from reaching a (more favorable) deal with one of the WaMu Suitors. *American National* Complaint ¶ 32, **Exhibit 3**. Together, the *American National* Complaint and JPMC's Rule 2004 Discovery further suggest that at the time JPMC was working with federal regulators on a plan in which it would acquire WMB out of receivership, JPMC was aware that several parties may have expressed interest in acquiring WMI's banking business through a bidding process being run by Goldman Sachs and Morgan Stanley on Washington Mutual's behalf. *See id.* ¶ 51, **Exhibit 3** (noting that Washington Mutual hired Goldman Sachs on or about September 12, 2008 "to help find a buyer for Washington Mutual"); JPM_EX00012889, **Exhibit 6** (in a September 19, 2008 presentation to ratings agencies, JPMC acknowledged that WaMu had hired investment banks "to run [an] auction process" for the sale of WaMu, but indicated that it chose to "not participate in auction" because its "[a]pproach is to work directly with the FDIC").

22. Moreover, JPMC's Rule 2004 Discovery suggests that JPMC may have leaked confidential Washington Mutual information to the WaMu Suitors in an effort to reduce competition and drive them away from a deal with Washington Mutual. Illustrating JPMC's efforts to interfere with a potential sale of WaMu is the internal JPMC email from June 2008 reporting that when Banco Santander Chairman Botin indicated to JPMC CEO Dimon that Santander was interested in acquiring WaMu, Dimon told Botin that WaMu's "potential losses are higher than TPG is estimating." The e-mail further noted that "[i]t is important to have an

open dialogue with [Santander], as Santander would not pursue any . . . of these opportunities if JPMorgan were to do the same." JPM_EX00004075, **Exhibit 2**. JPMC also took steps to gather information concerning other entities' interest in acquiring WaMu and gauge their likelihood of consummating a deal. *See* JPM_EX00003884, 3886, **Exhibit 24** (6/17/08 slide presentation listing and ranking potential WaMu buyers); JPM_EX00013270, **Exhibit 25** (9/23/08 e-mail noting that "TD still in West process. Any of you think they post?"); JPM_EX00013271-77, **Exhibit 26** (9/23/08 presentation concerning capital structures of Citigroup, Santander, Wells Fargo, and TD Bank, among others); JPM_EX00013146, **Exhibit 27** (internal 9/22/08 JPMC e-mail forwarding article listing Wells Fargo and Banco Santander as among parties interested in acquiring WaMu). Discovery is warranted from the WaMu Suitors to determine the extent to which they were engaged in talks to acquire or invest in WaMu and actions that JPMC may have taken to interfere with a potential deal.

### (d) Banks

23. In 2007 and 2008, WMI retained Goldman Sachs, among other investment banks, to raise capital and/or locate a potential merger partner or acquiror for all or part of WMI's business.[7]

24. In connection with its bid for WMI's business in March 2008, JPMC entered into the Confidentiality Agreement governing its access to Washington Mutual information and prohibiting the disclosure of confidential Washington Mutual information to third parties. *American National* Complaint ¶ 54, **Exhibit 3**.

25. JPMC's Rule 2004 Discovery suggests that JPMC communicated regularly with Goldman Sachs concerning access to and requests for Washington Mutual information. *See, e.g.*

---

[7] The other investment banks agreed to proceed consensually in responding to Debtors' Rule 2004 requests, and therefore the other investment banks are not included in this motion.

13

JPM_EX00002818, 3034-36, **Exhibit 28** (internal JPMC e-mails from March 2008 regarding need to contact Goldman Sachs with respect to requests for information about WaMu). Goldman Sachs therefore likely has information relevant to the allegations in the *American National* Complaint concerning JPMC entering into false negotiations with WMI under the guise of a good-faith bidder, gaining access to WMI's and its subsidiaries' confidential information, and the potential misuse of that information.

26. Further, in September 2008, as part of their efforts to locate a potential merger partner or acquiror for all or part of WMI's business, Goldman Sachs communicated with JPMC and the WaMu suitors to gauge their interest in Washington Mutual. *See, e.g.*, JPM_EX00012889, **Exhibit 6** (slide presentation noting that Goldman Sachs was hired to run an auction process for WaMu). These communications are relevant to potential claims that JPMC tortiously interfered with WMI's efforts to raise capital or locate a buyer for its business and warrant discovery.

27. WMB was a member bank of FHLB-SF and WMBfsb was a member bank of FHLB-Seattle. At various times during 2008, Washington Mutual made loan requests to FHLB-SF and FHLB-Seattle. During the time period prior to the OTS seizure of WMB, it is Debtors' understanding that JPMC communicated with FHLB-SF and FHLB-Seattle regarding Washington Mutual and its loan requests. An internal JPMC e-mail from March 2008 illustrates JPMC was concerned with advances that Washington Mutual had received from FHLB. JPM_EX00014957, **Exhibit 29** ("West has roughly $40B FHLB advances maturing in 2008 and $18B in 2009. . . . Not a deal killer but something to work out if this progresses."). Debtors have cause to investigate a potential claim that JPMC leaked confidential WMI information to

FHLB-SF and FHLB-Seattle in an effort to prevent future loans to Washington Mutual, restrict Washington Mutual's liquidity and drive WMB into receivership.

### (e) JPMC Professionals

28. As part of its efforts to acquire Washington Mutual, JPMC retained the services of the JPMC Professionals. PwC provided accounting services to JPMC in conjunction with JPMC's interest in a transaction to acquire WMI's business. *See* JPM_EX00031573, **Exhibit 30** (PwC listed as accountant on Project West Working Group List); *see also* JPM_EX00027993-28020, **Exhibit 31** (7/22/08 e-mail from PwC forwarding to JPMC a WaMu Credit Risk Management presentation). Additionally, on September 18, 2008, five days prior to the FDIC instituting the bid process for WMB, PwC was discussing with JPMC the FDIC's procedures concerning failed banks and various structures of purchase and assumption transactions. JPM_EX000031860-61, **Exhibit 32**. Lobbyist disclosure forms filed with the U.S. Congress indicate that in 2008, Equale, Hohlt, and Horne all lobbied the government on JPMC's behalf concerning financial regulatory issues. *See* **Exhibit 33**.

29. Discovery from the JPMC Professionals is warranted concerning JPMC's disclosure of confidential Washington Mutual information, in violation of the Confidentiality Agreement, to government regulators, rating agencies, media, and investors in an effort to drive down WMI's credit rating and stock price, as well as JPMC's misuse of confidential information as part of a lobbying effort to convince federal regulators to seize and sell off Washington Mutual's assets at a fire-sale price.

### RELIEF REQUESTED

30. Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1, the Debtors seek authorization to obtain the Requested Examination, including production of documents

responsive to the document requests, annexed hereto as **Exhibit A** to the attached order, and oral examination of witnesses most knowledgeable of the subjects described in the document requests, from the Knowledgeable Parties relating to the allegations in the *American National* Action and information provided in JPMC's Rule 2004 Discovery. To obtain this relief, the Debtors seek entry of an order substantially in the form annexed hereto (the "Proposed Order"), and also reserve the right to serve supplemental and additional document requests and seek additional oral examinations that relate to the foregoing.

## REQUESTED EXAMINATION

31. The Debtors need the Requested Examination to further unearth the facts and assess the merits of potentially valuable causes of action against JPMC that would inure to the benefit of their estates. The Requested Examination will assist the Debtors in identifying potential claims of the estates, which are significant and may impact the administration of the estates and formulation of a plan of reorganization. Accordingly, the Debtors must obtain such information in order to properly discharge their duties as debtors-in-possession.

32. The discovery sought herein is tailored to the allegations in the *American National* Action and information gleaned from JPMC's Rule 2004 Discovery. Compliance with the annexed document requests and oral examinations of individuals most knowledgeable about the subjects described in the document requests will not be unduly burdensome to the Knowledgeable Parties, and can be achieved without undue hardship in the time period requested.

33. To facilitate the necessary discovery, the Debtors request that the Court enter the Proposed Order granting the Motion and requiring the Knowledgeable Parties to produce documents responsive to the requests annexed hereto as **Exhibit A** to the Proposed Order, and

make witnesses most knowledgeable about the subjects described in the document requests available for oral examination. The Debtors request that the Court order that such document production be made (or at least substantially completed) on or before the date that is thirty (30) days after entry of the Proposed Order. In addition, the Debtors request the right to provide the Knowledgeable Parties from whom discovery is sought by this Motion with thirty (30) days notice of the proposed oral examinations.

## BASIS FOR RELIEF

34.     Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity." The purpose of a Rule 2004 examination "is to enable the trustee to discover the nature and extent of the bankruptcy estate." June 24 Opinion at 8 (citing *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 708 (Bankr. S.D.N.Y. 1991)); *see also In re Symington*, 209 B.R. 678, 684 (Bankr. D. Md. 1997) (noting that Bankruptcy Rule 2004 "assure[s] the proper administration of bankruptcy estates") (citations omitted). Among the "[l]egtimate goals of Rule 2004 examinations" are "'determining whether wrongdoing has occurred,'" June 24 Opinion, **Exhibit 1**, at 8 (quoting *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002)), and exposing any fraudulent conduct. *Symington*, 209 B.R. at 683-84 (explaining that a "'sweeping general examination' . . . to recover assets and uncover fraudulent conduct is a traditional feature of bankruptcy jurisprudence . . . "and that among the "obvious purposes" of a Rule 2004 examination is "the exposure of fraudulent conduct") (citing 5 Remington on Bankruptcy § 1979 (1953 ed.); *In re Foerst*, 93 F. 190 (S.D.N.Y.1899)).

35.     Rule 2004 grants debtors "broad rights of examination of a third-party's records." *Snyder v. Society Bank*, 181 B.R. 40, 41 (S.D.Tex. 1994) (citing *Cameron v. United States*, 231

U.S. 710, 716 (1914)); *see also In re Cousins Barricades & Metal Prods, Inc.*, No. Civ. A. 99-2035, 2000 WL 245860, *3 (E.D.La. Mar 2, 2000). Emphasizing the broad purpose of Rule 2004, courts permit the examination of any third party that has "knowledge of the debtor's affairs," *In re Ecam Publ'ns*, 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991), or who can be shown to have had dealings with the debtor, *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993), *aff'd,* 17 F.3d 600 (2d Cir. 1994). *See* Bankruptcy Rule 2004(b) (noting that Rule 2004 examination may concern "any matter which may affect the administration of the debtor's estate"). Accordingly, because the Knowledgeable Parties had dealings with the Debtors or have information relevant to potential valuable estate claims based on JPMC's alleged wrongdoings, they are subject to examination under Bankruptcy Rule 2004.

36. Rule 2004 discovery is appropriate here because the Requested Examination to investigate potential business tort claims against JPMC is unrelated to any of the pending proceedings between WMI and JPMC. *See* June 24 Opinion, **Exhibit 1**, at 14. Furthermore, the Knowledgeable Parties are not a party to those proceedings. As the Court held in the June 24 Opinion, "'even after the trustee has commenced adversary proceeding(s), the trustee may conduct Rule 2004 examinations of entities who are not parties to or are not affected by the pending adversary proceedings.'" *Id.* at 11 (quoting *In re Buick*, 174 B.R. 299, 305 (D. Colo. 1994)).

37. As with Debtors' Rule 2004 Requests to JPMC, each of the proposed document requests properly seeks documents relating to Debtors' "acts, conduct, or property," or their "liabilities and financial condition", and/or "any other matter which may affect the administration" of their estates. Fed. R. Bankr. P. 2004. Consequently, the Requested

Examination sought by the Debtors is clearly within the scope of a Bankruptcy Rule 2004 examination.

## **CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 2004-1**

38. Counsel for the Debtors have discussed with each of the Knowledgeable Parties and/or their counsel whether each of the Knowledgeable Parties would agree to voluntarily produce documents and make witnesses available consistent with this Motion. As of the time of filing this Motion, Debtors and each of the Knowledgeable Parties have not been able to arrange for a mutually agreeable date, time, place and scope of an examination or production. In order to prevent unnecessary delay arising from disputes concerning, among other things, the entitlement to the information requested and claims of confidentiality, the Debtors seek to put this Motion on for a hearing and thereby ensure a fair and expeditious resolution hereof. Prior to the hearing on this Motion, the Debtors will continue discussing the relief sought herein and attempt to resolve any legitimate objections raised by any of the Knowledgeable Parties.

39. Accordingly, the Debtors seek the authority of this Court to conduct an examination under Bankruptcy Rule 2004 and Local Rule 2004-1 that includes the production by the Knowledgeable Parties of all documents responsive to the requests annexed hereto as **Exhibit A** to the Proposed Order, as well as related oral examinations of witnesses most knowledgeable about the subjects described in the document requests.

40. No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: December 14, 2009  
      Wilmington, Delaware

ELLIOTT GREENLEAF

Rafael X. Zahraldín-Aravena (DE Bar No. 4166)  
Neil R. Lapinski (DE Bar No. 3645)  
Shelley A. Kinsella (DE Bar No. 4023)  
1105 North Market Street, Suite 1700  
Wilmington, Delaware 19801  
Telephone: (302) 384-9400  
Facsimile: (302) 384-9399  
Email: rxza@elliottgreenleaf.com  
Email: nrl@elliottgreenleaf.com  
Email: sak@elliottgreenleaf.com

-and-

QUINN EMANUEL URQUHART  
OLIVER & HEDGES, LLP  
Peter E. Calamari  
Michael B. Carlinsky  
Susheel Kirpalani  
David Elsberg  
51 Madison Avenue  
New York, New York 10010  
Telephone: (212) 849-7000  
Facsimile: (212) 849-7100  
Email: petercalamari@quinnemanuel.com  
Email: michaelcarlinsky@quinnemanuel.com  
Email: susheelkirpalani@quinnemanuel.com  
Email: davidelsberg@quinnemanuel.com

Erica P. Taggart  
865 S. Figueroa Street, 10th Floor  
Los Angeles, California 90017  
Telephone: (213) 443-3000  
Facsimile: (213) 443-3100  
Email: ericataggart@quinnemanuel.com

*Special Litigation and Conflicts Co-Counsel to Washington Mutual, Inc. and WMI Investment Corp.*