UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
                                                               :
*In re*                                                        :    Chapter 11
                                                               :
WASHINGTON MUTUAL, INC., et al.,[1]                            :    Case No. 08-12229 (MFW)
                                                               :    (Jointly Administered)
                                                               :
        Debtors.                                               :    Hearing Date: January 28, 2010 at 4:00 p.m.
                                                               :    Objection Deadline: January 21, 2010 at 4:00 p.m.
---------------------------------------------------------------x

## MOTION OF WASHINGTON MUTUAL, INC. AND WMI INVESTMENT CORP. FOR AN ORDER (A) DISBANDING THE OFFICIAL COMMITTEE OF EQUITY HOLDERS APPOINTED BY THE UNITED STATES TRUSTEE OR (B) LIMITING THE FEES AND EXPENSES WHICH MAY BE INCURRED BY SUCH COMMITTEE

Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment"), as debtors and debtors in possession (the "Debtors"), as and for their motion (the "Motion"), pursuant to sections 105(a) and 1102(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2020 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order disbanding the official committee of equity holders (the "Equity Committee") appointed by the United States Trustee for the District of Delaware (the "US Trustee") on January 11, 2009, or, in the alternative, limiting the fees and expenses which may be incurred by the Equity Committee, respectfully represent as follows:

### Preliminary Statement

1.  For over a year, the Debtors have been providing the US Trustee with information regarding the Debtors' assets and liabilities, litigation between the Debtors and

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98101.

JPMorgan Chase Bank, N.A. ("JPMorgan"), litigation between JPMorgan and third parties who have been asserting derivative claims on behalf of the Debtors' estates and litigation between the Debtors and the Federal Deposit Insurance Corporation ("FDIC"). Likewise, in accordance with applicable rules, the Debtors have filed and provided to the US Trustee monthly operating reports evidencing the Debtors' estimates as to their assets and liabilities. Based upon such reportings, the Debtors are baffled as to why the US Trustee, at this late date, would choose to saddle these estates with another committee and, presumably, professionals that will needlessly incur significant fees and expenses.

2. By all measures, the Debtors are insolvent – a conclusion supported by all known facts and submissions to date in these chapter 11 cases. Indeed, this conclusion is confirmed by the public markets. The Debtors' junior subordinated debentures are trading, as of January 8, 2010, at approximately 50 cents on the dollar – a steep discount to par value. In addition, WMI's common stock trades at approximately 19 cents per share, indicating the market's assessment that equity will not receive any distribution. In short, WMI's equity holders are unlikely to receive any recovery and, therefore, have little, if any, economic interest in these chapter 11 cases.

3. Additionally, besides the significant and needless expenditure of the Debtors' assets, the appointment of the Equity Committee will interrupt the administration of these estates to the detriment of those with an actual economic interest. Not only will time be lost while the Equity Committee's sure-to-be retained professionals get up to speed, but the sudden addition of another official committee to the complex litigations and negotiations that have been ongoing could imperil the Debtors' efforts to reach a global resolution with all parties and timely make distributions to creditors. Indeed, almost sixteen (16) months into these chapter

11 cases, it is both unfair and unnecessary to foist the expense of an Equity Committee, including their retention of legal counsel and financial advisors, on the Debtors, and, ultimately, the Debtors' unsecured creditors – the true parties in interest. To the extent equity holders have any economic interest in these cases, such interests are already being adequately represented in these chapter 11 cases by the Debtors and the Official Committee of Unsecured Creditors appointed in these cases (the "Creditors' Committee").

4.  Of course, no one has attempted to stop any equity interest holder from acting independently and participating in these chapter 11 cases. But, to date, no equity interest holder has taken any action, other than, upon information and belief, postings on electronic blogs about the activities of the FDIC and JPMorgan in connection with the pre-Commencement Date seizure and sale of Washington Mutual Bank ("WMB"). However, if an equity interest holder were to participate in these cases, *and* provide value to the Debtors' chapter 11 cases, the Bankruptcy Code affords them an opportunity to be reimbursed on account of their substantial contribution, regardless of whether such contribution is made under the auspices of a formal committee.

5.  In the event, however, that the Court determines not to disband the Equity Committee, the Debtors alternatively request that the Court establish a cap on the amount of the Equity Committee's fees and expenses for which the Debtors will be liable. Such a cap will ensure the Equity Committee's ability to fully participate in these cases, while also focusing the Equity Committee so that it does not duplicate efforts and pursues only those matters on which the interests of equity holders truly diverge from those of the unsecured creditors.

## Jurisdiction

6. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background[2]

7. On September 26, 2008 (the "Commencement Date"), each of the Debtors commenced with this Court a voluntary case pursuant to chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On October 3, 2008, the Court entered an order, pursuant to Bankruptcy Rule 1015(b), authorizing the joint administration of the Debtors' chapter 11 cases.

## State of the Chapter 11 Cases

8. As of the date hereof, the Debtors' chapter 11 cases have been pending for almost sixteen (16) months. In that time, the Debtors and other parties in interest have, among other things, continued to evaluate the Debtors' assets for distribution to creditors and (ii) made significant headway on a number of complex legal issues and related litigations. In addition, March 31, 2009 (the "Bar Date") was established as the deadline by which all claimants were required to file proofs of claim. Since the establishment of the Bar Date, the Debtors have been actively engaged in the claims reconciliation process and, to date, have filed nineteen (19) omnibus claims objections and expunged or secured the withdrawal of approximately 900 proofs of claim. On a parallel track, the Debtors, the Creditors' Committee and other significant parties

---

[2] In addition to the information set forth herein, for additional factual support, the Debtors rely upon the Declaration of Stewart M. Landefeld in Support of the Debtors' Chapter 11 Petitions and First-Day Motions, filed on October 2, 2008 (Dkt. No. 13).

in interest have engaged in extensive negotiations with the FDIC and JPMorgan in an attempt to reach a global resolution to the many disputed issues between the parties that would facilitate a timely distribution to creditors.

Overview of Litigation with the FDIC and JPMorgan

9. As this Court is aware, WMI, the FDIC and JPMorgan are in the midst of complex litigation regarding, among other issues, each party's claims with respect to the ownership of various assets, including in excess of $4 billion of cash that WMI and its non-banking subsidiaries had on deposit at WMB and Washington Mutual Bank fsb immediately prior to the time the FDIC was appointed as receiver for WMB (the "Deposit Funds"). The following is a summary of the pending litigation:

A. The D.C. Action

10. On December 30, 2008, the Debtors filed a proof of claim against the FDIC, as receiver of WMB, pursuant to the receivership procedures set forth in section 11 of the Federal Deposit Insurance Act (12 U.S.C. § 1821). The Debtors' proof of claim requested, among other things, compensation for the Debtors' assets (or the return of such assets as a preference or fraudulent transfer) which were wrongfully transferred or claimed by the FDIC and/or JPMorgan, and for other money owed by WMB to the Debtors. By letter, dated January 23, 2009, the FDIC notified the Debtors that the FDIC had disallowed the Debtors' proof of claim in its entirety. The FDIC's letter also notified the Debtors of their right to challenge the disallowance of their claim by commencing a lawsuit within sixty (60) days of the notice of disallowance.

11. Consistent therewith, on March 20, 2009, the Debtors filed a complaint against the FDIC (both in its capacity as WMB's receiver and in its corporate capacity) in the United States District Court for the District of Columbia (the "D.C. Court"), Case No. 09-cv-

00533 (RMC) (the "D.C. Action"), seeking to recover the value of each of the claims set forth in the Debtors' proof of claim, including, inter alia, claims for the value of approximately $6.5 billion in capital contributions, $4 billion in preferred securities, and $3 billion in tax refunds. The Debtors also asserted a protective claim with respect to the Deposit Funds.

12. By motions, dated June 11, 2009 and June 15, 2009, the FDIC, in its capacity as receiver and in its corporate capacity, respectively, sought to dismiss the D.C. Action, which motions were opposed by the Debtors. Contemporaneously with their motions to dismiss, the FDIC filed an answer to the Debtors' complaint, as amended, and counterclaims against the Debtors. Thereafter, by motion, dated July 27, 2009, the Debtors moved to dismiss the amended counterclaims asserted by the FDIC and to stay the remainder of the D.C. Action, in its entirety, in favor of the pending proceedings in this Court (the "Debtors' Motion to Dismiss"). The FDIC and JPMorgan both opposed the Debtors' Motion to Dismiss. JPMorgan and certain holders of senior notes issued by WMB (the "Bank Bondholders") have been permitted to intervene in the D.C. Action. By motion, dated October 16, 2009, the Creditors' Committee moved to intervene as a plaintiff in the D.C. Action, which motion has been opposed by the Bank Bondholders, JPMorgan and the FDIC. In addition, on October 26, 2009, the Debtors moved to dismiss the counterclaims asserted against the Debtors by JPMorgan. By order, dated January 7, 2010, the D.C. Court (i) denied the Debtors' motion to dismiss the FDIC's amended counterclaims without prejudice, (ii) denied the FDIC's motions to dismiss, without prejudice, and (iii) granted the Debtors' motion to stay the D.C. Action in its entirety in order to permit the JPMorgan Adversary Proceeding and the Turnover Action, each as defined below, to be determined by this Court.

B. <u>The Adversary Proceedings</u>

13. On March 24, 2009, and notwithstanding pending negotiations between the Debtors and JPMorgan to resolve outstanding issues, JPMorgan commenced an adversary proceeding against the Debtors and the FDIC (Adv. Proc. No. 09-50551 (MFW)) in this Court seeking a declaratory judgment with respect to the ownership of disputed assets (the "<u>JPMorgan Adversary Proceeding</u>"). On May 29, 2009, the Debtors filed an answer to JPMorgan's complaint and asserted various counterclaims against JPMorgan. By motion, dated June 18, 2009, JPMorgan sought to dismiss the counterclaims asserted by the Debtors. By order, dated September 14, 2009, the Court denied JPMorgan's motion to dismiss the Debtors' counterclaims.

14. On April 27, 2009, the Debtors commenced an adversary proceeding (Adv. Proc. No. 09-50934 (MFW)) in the Bankruptcy Court (the "<u>Turnover Action</u>") demanding that JPMorgan turn over the Deposit Funds. JPMorgan filed a motion to dismiss the Turnover Action, or, in the alternative to consolidate the Turnover Action with the JPMorgan Adversary Proceeding, which motion was opposed by the Debtors. JPMorgan also filed a motion to stay the Turnover Action and the JPMorgan Adversary Proceeding in order to allow JPMorgan, the FDIC, and the Debtors to resolve their claims in the D.C. Action. At a hearing held before this Court on June 24, 2009, both of JPMorgan's motions were denied. Likewise, this Court denied a motion made by the FDIC to stay the Turnover Action and the JPMorgan Adversary while the D.C. Action is prosecuted. On May 19, 2009, the Debtors filed a motion for summary judgment on the claims asserted in the Turnover Action, which motion was opposed by JPMorgan. On October 26, 2009, the Court heard oral argument with respect to the Debtors' summary judgment motion in the Turnover Action. The matter remains *sub judice*.

C.  The American National Action and Related 2004 Motion

15. On or about February 16, 2009, various insurance company plaintiffs, including American National Insurance Company, filed suit in the 122nd District Court of Galveston County, Texas (Cause No. 09-CV-0199) (the "American National Action"). In their complaint, the plaintiffs asserted various causes of action against JPMorgan relating to JPMorgan's alleged misconduct in connection with its acquisition of WMB's assets. Specifically, the plaintiffs asserts that there was a premeditated plan by JPMorgan designed to damage WMB and WMBfsb, and thereby enable JPMorgan to acquire WMB's assets at a "fire sale" price. The causes of action asserted by the plaintiffs include various theories of business tort and tortuous interference. Subsequent to the filing of the American National Action, JPMorgan and the FDIC removed the action to the United States District Court for the Southern District of Texas (Case No. 09-00044). Upon the motion of the FDIC, by order, dated September 9, 2009, the United States District Court for the Southern District of Texas then transferred the American National Action to the United States District Court for the District of Columbia, where it is currently pending (Case No. 09-cv-01743 (RMC)).

16. To further explore, among other things, the allegations asserted in the American National Action, on May 1, 2009, the Debtors filed a motion (the "2004 Motion") [Dkt. No. 974], pursuant to Bankruptcy Rule 2004, seeking entry of an order directing the examination of JPMorgan. Notwithstanding JPMorgan's opposition to the 2004 Motion, by Opinion and Order, dated June 24, 2009, this Court granted the 2004 Motion [Dkt. Nos. 1219, 1220]. JPMorgan's subsequently filed motion for reconsideration of this Court's Opinion and Order was denied. Thereafter, JPMorgan began producing documents to the Debtors for their review.

17. As a result of the review of certain of the documents produced by JPMorgan, the Debtors determined that additional fact investigation is necessary. On December 14, 2009, the Debtors filed a motion, pursuant to Bankruptcy Rule 2004, seeking court authority to conduct additional examinations of witnesses and request the production of documents from various third-parties (the "Third Party 2004 Motion"), including the FDIC, the Office of Thrift Supervision, the U.S. Department of the Treasury, and former U.S. Treasury secretary Henry M. Paulson, Jr., among others. The Third Party 2004 Motion remains pending.

Plan Negotiations

18. As noted above, the Debtors, the Creditors' Committee, JPMorgan, the FDIC, and other significant parties in interest have been, for many months, engaged in arduous negotiations with respect to the settlement of the multitude of outstanding legal disputes and the formulation of a chapter 11 plan. While many issues remain in flux, as further set forth below, the Debtors believe that the addition of the Equity Committee at this juncture in the cases would disrupt, and possibly even derail, the delicate ongoing negotiations between the parties.

**Prior Requests for the Appointment of an Equity Committee**

19. During the course of these chapter 11 cases, periodic requests have been made of the US Trustee to appoint an official equity committee. In connection with such requests, the US Trustee has requested input from the Debtors, the Creditors' Committee and others as to the status of these chapter 11 cases and the propriety of any such appointment. Each time, the Debtors and others advised the US Trustee of their respective positions and pointed out that any appointment would be wasteful and inconsistent with the economics of these chapter 11

cases.[3] Specifically, the Debtors consistently maintained that, unfortunately, equity is "out of the money" and, therefore, an equity committee is unnecessary. Each time, the US Trustee denied the requests. Not once has an equity interest holder requested that the Court overrule the US Trustee's decision.

### Appointment of the Equity Committee

20.     Notwithstanding the repeated assertions that an equity committee was unnecessary, as noted above, on January 11, 2010, the US Trustee appointed the Equity Committee. The initially appointed members of the Equity Committee are (1) Esopus Creek Value, LLC, (2) Kenneth I. Feldman, (3) Saul Sutton, (4) Dorothea Barr, (5) Joyce M. Presnall, (6) Tyson Matthews and (7) Michael Willingham.

### Relief Requested

21.     By this Motion, the Debtors respectfully request that this Court (a) order the US Trustee to disband immediately the recently-appointed Equity Committee or (b) alternatively, if the Court determines not to disband the Equity Committee, limit the Debtors' liability for the fees and expenses of the Equity Committee and its professionals to $250,000 in the aggregate. In considering whether to overturn the US Trustee's decision to appoint the Equity Committee, this Court should employ a *de novo* standard of review. *In re Sharon Steel Corp.*, 100 B.R. 767, 776 (Bankr. E.D. Pa. 1989) ("[T]he decision of the U.S. Trustee with respect to the appointment of additional official committees…is subject to *de novo* review by the Bankruptcy Court in order to determine the adequacy of the representation."); *In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 219-20 (Bankr. S.D.N.Y. 2002); *In re McLean Industries,*

---

[3] Attached hereto as Exhibit A and Exhibit B are letters the Debtors have sent to the US Trustee enumerating the Debtors consistent position that the appointment of an equity committee is unwarranted and inappropriate in these chapter 11 cases.

*Inc.*, 70 B.R. 852, 857-8 (Bankr. S.D.N.Y. 1987); *In re Texaco*, 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987) ("[A]n abuse of discretion standard does not apply with respect to United States Trustee's initial exercise of discretion [to appoint an additional committee] because the concept of adequate representation is a legal issue which must be resolved judicially.").

### Basis for Relief Requested

22. Section 1102(a)(2) of the Bankruptcy Code provides that the court "may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee." 11 U.S.C. § 1102(a)(2). Unlike the appointment of an unsecured creditors' committee, which is mandatory in almost every case, appointment of additional committees is a disfavored remedy that courts consider "extraordinary" and a "rare exception." *See, e.g., In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002) (holding appointment of equity committee not warranted); *In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002) (same).

23. The legal standard for the appointment of an equity committee is well established: "Appointment of an equity committee is appropriate only where (i) movants can establish that there is a substantial likelihood that [equity holders] will receive a meaningful distribution in the case, and (ii) equity holders are unable to adequately represent their interests in the case absent appointment of an official committee." *In re Smurfit-Stone Container Corp.*, Case No. 09-10235 (BLS) (Bankr. D. Del. Dec. 10, 2009) (Memorandum Order Denying Motion of Caspian Capital Advisors for an Order Appointing an Official Committee of Equity Security Holders) (the "Smurfit-Stone Decision"). While "adequate representation" is not defined in the Bankruptcy Code, courts have considered, among others, the following factors in determining whether an equity committee should be appointed: (1) the number of shareholders, (2) the size

and complexity of the case, (3) the delay and additional cost that would result if an equity committee were appointed, (4) the likelihood of whether the debtors are insolvent, (5) the timing of the motion relative to the state of the case, and (6) other factors relevant to the adequate representation issue. *See In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 600 (Bankr. D. Del. 1996); *In re Edison Bros. Stores, Inc.*, 1996 U.S. Dist. LEXIS 13768, *11 (D. Del. Sept. 17, 1996) ("[a]s there is no statutory test for adequacy of representation, it must be determined by the facts of the case."); Smurfit-Stone Decision at 1-2. In considering these factors, it is also important to note that the focus of the statute is "not whether the shareholders are exclusively represented, but whether they are adequately represented." *In re Leap Wireless Int'l, Inc.*, 295 B.R. 135, 140 (Bankr. S.D.N.Y. 2002) (internal quotations omitted).

24.     In the context of the appointment of an equity committee, requiring equity holders to show "a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule" is grounded in a simple rationale: if equity holders are not going to receive a distribution under the plan of reorganization or liquidation, there are no equity interests for an official committee to protect. *In re Emons Indus.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985).

25.     Importantly, the plain language of the statute requires that the appointment of an additional committee be "necessary" to assure adequate representation. *See* 11 U.S.C. § 1102(a)(2). Bankruptcy courts have repeatedly refused to appoint committees where other avenues of "adequate representation" were available short of the "extraordinary" step of appointing a new committee. *In re Williams*, 281 B.R. at 222-23 ("[T]he Creditors' Committee has sufficiently aligned or parallel interests with the Shareholders to preclude the need for an additional committee.").

26. Application of these governing legal standards to the facts of these cases makes it clear that the Equity Committee's appointment was unwarranted and, accordingly, the Equity Committee should be disbanded.

I. **WMI's Equity Security Holders are Unlikely to Receive a Meaningful Distribution**

27. At this stage of the case, all indicators point to WMI's insolvency. As evidenced by WMI's most recently filed monthly operating report, dated December 30, 2009 (a copy of which is attached hereto as Exhibit C), as of November 30, 2009, WMI's balance sheet indicated liabilities in excess of assets by approximately $1.3 billion. In addition to this deficit, WMI also has approximately $3.4 billion in preferred stock outstanding, which stock has a liquidation preference over common equity.[4] Thus, even without accounting for the billions of dollars in litigation claims filed against the Debtors, WMI's common equity shareholders must overcome an approximately $4.7 billion to $8.7 billion deficit before receiving any recovery in these cases. Even in a best case scenario for the Debtors, the Debtors do not believe this deficit will be overcome.

28. Additionally, the Debtors' unliquidated and contingent liabilities must be accounted for in the solvency determination. Billions of dollars in claims based on prepetition litigations and other causes of action have been filed against the Debtors. These liabilities are not reflected in the balance sheets filed with the court and have, therefore, yet to be accounted for in the solvency analysis. While the Debtors continue to assess each such claim, the simple

---

[4] The $3.4 billion in preferred stock outstanding assumes that an "Exchange Event," as defined in the governing documents with respect to the REIT Trust Preferred Securities, has occurred but, the documentation giving rise to an additional $4.0 billion in preferred stock has not been completed, a fact which JPMorgan disputes and is being contested as part of the JPMorgan Adversary Proceeding. In the event JPMorgan is correct, $7.4 billion in preferred stock would have a liquidation preference over common equity. For further information, please see Note 1 to the Debtors' Monthly Operating Report, dated December 30, 2009, and attached hereto as Exhibit C.

fact is that these estates face an unsecured claim pool of many billions of dollars which, if allowed, would be paid prior to equity holders. In short, WMI is insolvent, and unlikely to distribute any money to common equity holders.

29. This conclusion is supported by prevailing market indicators, which courts have recognized as the best indicator of a debtor's perceived solvency. *See Statutory Comm. of Unsecured Creditors on behalf of Iridium Operating, LLC v. Motorola, Inc. (In re Iridium Operating, LLC)*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007) (noting market data is the best determinant of a company's solvency). Here, as noted above, WMI's junior subordinated debentures are trading at approximately 50 cents on the dollar – a deep discount to par.[5] In addition, equity (ticker: WAMUQ.PK) is trading at approximately $0.19 per share – a further indicator that the market does not believe shareholders will recover any value on account of such stock.[6]

30. In short, as noted above, by all objective measures, the Debtors appear to be insolvent. In these circumstances, equity holders are simply unable to show "a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule." *Williams*, 281 B.R. at 223. Accordingly, the Equity Committee should be disbanded.

## II. WMI's Equity Security Holders Already are Adequately Represented

31. Notwithstanding the Debtors' insolvency, the Equity Committee should be disbanded because there is simply no need for a separate official committee – equity holders are currently being "adequately represented" by not only the Debtors and the Creditors' Committee,

---

[5] Attached hereto as Exhibit D is a Bloomberg printout indicating the most recent trading price for these securities.

[6] Attached hereto as Exhibit E is a printout from Google Finance indicating the most recent trading price of WMI's common equity securities.

but also by certain holders of WMI's preferred stock who have been actively involved in these chapter 11 cases and plan negotiations. To the extent the value of the Debtors' assets are in excess of its unsecured liabilities, the preferred stock holders are certainly incentivized to ensure that such value is realized. As such, equity holders are more than "adequately represented."

32. As a starting point, the statutory focus of section 1102(a)(2) of the Bankruptcy Code "is not whether the shareholders are 'exclusively represented, but whether they are 'adequately' represented...." *Edison Bros.*, 1996 U.S. Dist. LEXIS 13768, at *14. To date in these cases, there have been no assertions by any party that the Debtors or the Creditors' Committee are doing anything but discharging their respective fiduciary duties to the estates and the estates' creditors. Indeed, while the interests of equity holders and creditors' committees do not always coincide, in the context of these chapter 11 cases, they have. The Debtors are not operating entities. As such, their solvency prospects rise and fall on the outcome of the litigations with JPMorgan and the FDIC, and the successful prosecution of any additional claims that may be asserted once the 2004 Motion fact investigation is concluded.[7] The Creditors' Committee has been active in all facets of such litigations and has the same goal as the holders of equity interests – to maximize any recovery for the benefit of these estates. The Creditors' Committee similarly has every incentive to minimize the billions of dollars of claims that have been filed against the Debtors. As such, here, the Creditors' Committee is protecting and advancing the interests of equity holders. *See, e.g., In re Williams*, 281 B.R. at 222 (finding that "the Creditors' Committee has sufficiently aligned or parallel interests with Shareholders to preclude the need for an additional committee.").

---

[7] While WMI owns certain non-debtor operating subsidiaries, the magnitude of their operations is such that future income will, under no set of plausible scenarios, be sufficient to render the Debtors solvent.

33.     Furthermore, to the extent any equity holders wish to actively participate in these chapter 11 cases, they are statutorily entitled to do so pursuant to section 1109(b) of the Bankruptcy Code, which allows any party in interest to be heard on any issue in a bankruptcy case. *Id.* at 224. And, to the extent shareholders participate and make a "substantial contribution" to these cases, they are further entitled to seek reimbursement of any costs pursuant to section 503(b)(3)(D) of the Bankruptcy Code. Thus, given the current state of these chapter 11 cases, and the significant work done by the Debtors and the Creditors' Committee to date, equity holders simply cannot establish that a separate equity committee is "necessary" for their adequate representation.

### III.    Other Factors Militate Against the Appointment of an Equity Committee

34.     As noted above, courts also consider other factors in determining whether equity holders are "adequately represented." Each of the following factors also militate against the appointment of the Equity Committee.

#### A.    Timeliness of Appointment

35.     As noted above, the appointment of the Equity Committee comes almost sixteen (16) months into these chapter 11 cases. To fulfill their statutory obligations, the Equity Committee, along with their retained professionals, will need to spend considerable time and effort familiarizing themselves with the complex issues involved in these chapter 11 cases. The attendant delay will almost assuredly be detrimental to the Debtors' efforts to reach a resolution with respect to the ongoing litigations and propose a chapter 11 plan. This delay, and the risks associated therewith to the other parties in interest, simply cannot be justified given the, at best, remote possibility of a recovery for equity in these cases.

B. <u>Cost of an Equity Committee</u>

36. Courts also consider "whether the cost of an additional equity committee significantly outweighs the concern for adequate representation." *In re Northwestern Corp.*, Case No. 03-12872, 2004 WL 1077913, at *2 (Bankr. D. Del. May 13, 2004). Here, not only are equity holders already being adequately represented in these chapter 11 cases, but the appointment of the Equity Committee could result in substantial cost to the Debtors' estates. First, the Equity Committee will likely seek to retain, at a minimum, legal counsel and a financial advisory firm. Potentially, however, as is typical in large cases such as these, the Equity Committee may also seek to retain tax advisors and accountants. These professionals will have a steep learning curve, as these cases are already some sixteen (16) months old and involve numerous, complex issues – all of which will significantly impact the recovery for the Debtors' creditors. The cost of getting the Equity Committee's professionals up to speed will, itself, be substantial.[8] And, given the economics of these cases, such costs will be borne entirely by unsecured creditors, as any potential recovery will only be reduced by further administrative expenses.

37. Another potentially more significant cost for the Court to consider is the cost associated with introducing another party to the complex negotiations currently surrounding the multiple litigations involving the Debtors, JPMorgan, and the FDIC, the subject of which is, among other things, the Debtors' ownership of the Deposit Funds. Indeed, in the context of these chapter 11 cases, the Equity Committee will have every incentive to use its Debtor-financed resources to fight any proposed settlement among the parties in an effort to extract value from either the Debtors' unsecured creditors or JPMorgan. The Debtors have spent almost

---

[8] Indeed, for example, as of November 30, 2009, the aggregate amount paid to the attorneys and financial advisors to the Creditors Committee was approximately $12.4 million.

a year litigating with JPMorgan and the FDIC in an effort to maximize the recovery of these estates. And, as noted above, the Creditors' Committee has been actively involved throughout. No one has alleged that either the Debtors or the Creditors' Committee are doing anything but discharging their respective fiduciary duties. As such, in the context of these cases, imposing the costs of an equity committee on the Debtors' estates would be tantamount to requiring the Debtors, and their unsecured creditors, to finance their own extortion.

38. In sum, given the minimal chance equity holders will recover any money on account of their interests, the costs associated with appointing the Equity Committee are simply too great. The Debtors, therefore, respectfully request that the Court order the US Trustee to disband the Equity Committee.

### Limitation on Fees and Expenses

39. While the Debtors continue to maintain that the Equity Committee is not needed in these chapter 11 cases, should the Court decide not to disband the Equity Committee, the Debtors respectfully request that the Court impose a cap on the fees and expenses of the Equity Committee and its professionals for which the Debtors will be liable. The Debtors request that their liability for all fees and expenses incurred by the Equity Committee and its professionals not exceed $250,000 in the aggregate (the "Fee Cap"). Such relief is necessary and appropriate in the context of these cases. Imposition of the Fee Cap will ensure that the Equity Committee pursues only those legitimate goals for which the interests of equity holders truly diverge from those of unsecured creditors. The Fee Cap will further prevent duplicative and unnecessary costs of administering these chapter 11 cases. The Debtors submit, however, that the Fee Cap is more than adequate to ensure that the Equity Committee has sufficient resources to participate fully in these chapter 11 cases.

40. Courts in this jurisdictions have previously imposed fee caps on equity committees. *See, e.g., In re Finova Cap. Corp.*, Case No. 01-0698 (PJW) (Bankr. D. Del. June 16, 2005) (setting a $100,000 cap on fees and expenses of the equity committee, which cap was subsequently raised to $300,000). Accordingly, the Debtors submit that the Fee Cap is appropriate under the circumstances of these chapter 11 cases.

## Notice

41. Notice of this Motion will be provided by first class mail to (a) the US Trustee, (b) counsel to the Creditors' Committee, (c) the Securities and Exchange Commission, (d) proposed counsel to the Equity Committee, and (e) those parties who have formally appeared and requested service in these cases pursuant to Bankruptcy Rule 2002. In light of the nature of the Motion, the Debtors submit that no other or further notice need be given and that the notice provided is sufficient.

## Conclusion

42. For the reasons set forth above, the Debtors respectfully request that the Court (a) enter an order, in substantially the same form as the proposed form of order attached hereto as <u>Exhibit F</u>, directing the US Trustee to disband the Equity Committee and (b) grant the Debtors such other relief as is just.

Dated: Wilmington, Delaware
       January 11, 2010

/s/ Mark D. Collins
Mark D. Collins, Esq. (No. 2981)
Chun I. Jang (No. 4790)
Andrew C. Irgens (No. 5193)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701


-and-

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors and Debtors in Possession*