# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | Case No. 08-12229 (MFW) |
| WASHINGTON MUTUAL, INC., *et al.*,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | **Related Docket No. 2132** |
| | ) | |

## STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF WASHINGTON MUTUAL, INC., *ET AL.* IN SUPPORT OF DISBANDING THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Washington Mutual, Inc. ("WMI"), *et al.* (collectively, the "Debtors"), by and through its undersigned co-counsel, submits this statement (the "Statement") in support of disbanding the Official Committee of Equity Security Holders (the "Equity Committee") that was appointed by the United States Trustee [*see* Docket No. 2130], on the grounds set forth herein.

## Preliminary Statement

1. In the view of the Creditors' Committee, this Court must consider two major points regarding the relief requested by the Debtors' motion to disband the Equity Committee [Docket No. 2132] (the "Motion"). First, there is no need for an Equity Committee because the interests of equity holders are already adequately represented. Unlike cases in which the debtor has ongoing business operations that may be subject to valuation disputes – regarding the appropriateness of management's projections, the valuation methodologies, etc. – this is a case in which the value of the estates will be the product of multiple litigations. At the end of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Washington Mutual, Inc. (3725) and WMI Investment Corporation (5395). The Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98101.

day, the numbers will be what they will be. And unless the recoveries from the litigations are large enough to pay all creditors in full – with interest as applicable – there simply will be nothing left for equity holders, whether preferred equity or common equity. Meanwhile, the interest of maximizing the estates is already being pursued vigorously by the Debtors, the Creditors' Committee, and their respective professionals. There is nothing for the Equity Committee to add.

2. Second, placing yet another party at the negotiation table will produce unnecessary cost and delay to these cases, which are already nearly 16 months old. Not only would there be direct costs incurred by Equity Committee professionals, but potentially even more substantial would be the indirect costs – such as overall administrative expense and interest incurred – due to the delay that an Equity Committee is likely to cause. Meanwhile, these costs, if funded and incurred by the estates, will necessarily be borne by unsecured creditors due to a further diminishment in the size of the estates.

3. Accordingly, the Creditors' Committee supports disbanding the Equity Committee. If, however, the Court chooses not to disband the Equity Committee, the Creditors' Committee requests that the Court place an appropriate cap, or other restrictions or conditions, on the estates' reimbursement of Equity Committee expenses, as discussed further below.

**Relevant Factual Background**

4. The Court is well aware of the facts surrounding these chapter 11 cases. Of particular importance to this Motion is the fact that the Debtors do not have ongoing operating businesses at this time. The Debtors' most significant assets include its common stock interest in its former operating subsidiary, Washington Mutual Bank ("WMB"); more than $4 billion of cash on deposit (the "Deposits"), presently being held at JPMorgan Chase Bank, N.A.

("JPMC"); tax refunds; and the value of certain ongoing and potential litigations (the "Litigations"). The principal sources of recovery for creditors will, in all likelihood, be derived from or be contingent upon the outcome of the Litigations. In fact, even the Debtors' recovery of the Deposits is dependent in part upon the outcome of the adversary proceeding initiated by the Debtors seeking turnover of the Deposits.[2] Most other assets of significant value – including approximately $4.0 billion of certain trust preferred securities; tax refunds; fraudulently transferred assets; certain "goodwill" litigation proceeds; investments; and other assets – are also ultimately dependent upon the outcome of the adversary proceeding initiated by JPMC in the Bankruptcy Court[3] or upon the litigation filed by the Debtors in the District Court for the District of Columbia seeking recovery of certain assets from the FDIC as receiver for WMB.[4] Thus, the Litigations are the centerpiece of these chapter 11 cases. The Debtors and the Creditors' Committee have been actively and purposefully prosecuting the Litigations for the purpose of obtaining the maximum recovery possible for the Debtors' estates.

5. Creditors have filed a large number of claims against the Debtors' estates. Prior to the January 30, 2009 claims bar date, more than $161.0 billion in liquidated claims and an unknown, but not insubstantial, amount of unliquidated claims were filed against the Debtors' estates. Claims for WMI's prepetition funded debt obligations exceed $6.5 billion. The Debtors and the Creditors' Committee are actively seeking to determine the merits of these claims and have been actively using the claims objections process to expunge claims determined not to be legitimate. Nevertheless, in order for holders of equity security interests (including preferred and

---

[2] *Washington Mut. Inc., et al. v. JPMorgan Chase Bank, N.A.*, Case No. 08-12229, Adv. Proc. No. 09-50934.

[3] *Washington Mut. Inc., et al. v. JPMorgan Chase Bank, N.A.*, Case No. 08-12229, Adv. Proc. No. 09-50551.

[4] *Washington Mut., Inc. v. FDIC*, No. 1:09-cv-00533(RMC) (D.D.C. 2009)

common stock) to achieve any recovery from these chapter 11 cases, the value of the Litigation and other miscellaneous assets must exceed not only the more than $6.5 billion in funded debt claims, but also any other claims allowed.

I.  **Equity Holders Are Adequately Represented**

6.  The Creditors' Committee believes that the interests of equity holders are adequately represented without the expense of an Equity Committee. Section 1102(a)(2) of the Bankruptcy Code provides that "on request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders <u>if necessary to assure adequate representation</u> of creditors or equity security holders." 11 U.S.C. § 1102(a)(2) (emphasis added).[5] "'[T]he statutory focus of § 1102(a)(2) is not whether the equity holders are "exclusively" represented, but whether they are "adequately" represented.'" *In re Spansion, Inc.*, No. 09-10690 (KJC), 2009 WL 4906565, *8 (Bankr. D. Del. Dec. 18, 2009) (quoting *Victor v. Edison Bros. Stores (In re Edison Bros. Stores, Inc.)*, 1996 WL 534853, *4 (D. Del. September 17, 1996)); *see also In re Leap Wireless Int'l, Inc.*, 295 B.R. 135, 140 (Bankr. S.D.N.Y. 2002) (same).

7.  "Factors related to the issue of 'adequate representation' include the role of the board and management acting on behalf of shareholders, the role of a creditors committee, [and] the sophistication of shareholders and their ability to retain counsel . . . ." *In re Ampex Corp.*, No. 08-11094, 2008 WL 2051128, *1 (Bankr. S.D.N.Y. May 14, 2008). These factors do not support the existence of an Equity Committee in these chapter 11 cases.

---

[5] Although the Office of the United States Trustee may determine, in its discretion, whether to appoint an official committee of equity holders, a bankruptcy court is entitled to review the decision *de novo*. 7 COLLIER ON BANKRUPTCY ¶ 1102.07[1] (15th ed. rev. 2008) (citing *In re Texaco, Inc.*, 79 B.R. 560 (Bankr. S.D.N.Y. 1987)); *see, e.g., In re Oneida Ltd.*, No. 06-10489, 2006 WL 1288576, at *1 (Bankr. S.D.N.Y. May 4, 2006).

### A. Equity Holders Are Represented by the Debtors and Their Board of Directors

8. It is clear that the Debtors and WMI's board of directors have fiduciary duties to represent the interests of both preferred and common equity holders. *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 807 F.2d 60, 64-65 (2d Cir. 1986). Although the WMI board of directors does not represent equity interests exclusively, it has fiduciary duties to continue representing equity interests. In addition to the WMI board of directors, the Debtors and their professionals continue to actively participate in these chapter 11 cases for the benefit of all stakeholders, including holders of equity interests.

### B. The Interests of the Creditors' Committee Align Closely With the Interests of Equity Holders

9. Sometimes, an official committee of equity holders may be appropriate where the reorganization involves issues that pit the interests of creditors <u>against</u> the interests of stockholders. *See In re Pilgrim's Pride Corp.*, 407 B.R. 211, 218 (Bankr. N.D. Tex. 2009); 7 COLLIER ON BANKRUPTCY, ¶ 1102.03[2][b] (15th ed. rev. 2008). In these chapter 11 cases, however, the interests of the Creditors' Committee are substantially aligned with the equity holders. *See In re Ampex Corp.*, 2008 WL 2051128 at *2 (denying a motion for the appointment of an official equity committee because, among other reasons, the interests of the creditors' committee and debtors were aligned in seeking to maximize the estate and ascertain the *bona fides* of the debtors' obligations in order to maximize recoveries generally).

10. In this case, there is a strong alignment between the interests of the Creditors' Committee, the Debtors, and equity holders. This case presents a sharp contrast to going concern reorganizations like *In re Pilgrim's Pride Corp.*, in which the interests of the debtors' board of directors and creditors' committee clearly were not aligned. 407 B.R. 211, 218-19 (Bankr. N.D. Tex. 2009). In *Pilgrim's Pride*, the debtors' board of directors and creditors'

5

#12024908 v1

committee were soon to be faced with the choice between maximizing the value of a going concern or quickly liquidating for the benefit of creditors. *Id.*

11. In the Debtors' cases, however, equity interests will recover value only if the proceeds from the Litigations exceed the significant amount of the allowed claims against the Debtors' estates. With respect to both the Litigations and the claims, everything that can be done to maximize the Litigations and minimize the claims already is being done by the Debtors and the Creditors' Committee. As noted above, the Debtors' principal assets are subject to the Litigations, and the Litigations are being actively pursued by the Debtors and the Creditors' Committee. The Debtors and the Creditors' Committee also are pursuing claims objections to ascertain the merits of the claims filed against the Debtors' estates. The Debtors have no operations at this time and no going concern value to maximize. Because the Litigations, and not an operating business, will determine whether equity holders will be entitled to a recovery, it is unlikely that there will be disputes between creditors and equity holders about valuation methodology or cash flow. Both the Debtors and the Creditors' Committee have every incentive to continue aggressively pursuing the Litigations and settlement discussions and continue to ascertain the merits of all claims against the estates. The interests of the Creditors' Committee and equity holders thus have been – and are likely to continue to be – closely aligned and, therefore, equity interests are adequately represented. *In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 222 (Bankr. S.D.N.Y. 2002) (holding that an equity committee was unnecessary because, among other reasons, the interests of the debtors and the equity holders in maximizing the estate and challenging claims were closely aligned).

## II. An Official Equity Committee Will Create Unnecessary Delay and Cost

12. The Creditors' Committee is concerned about adding the burden of funding yet more groups of professionals to the estate. In determining whether the appointment

6
#12024908 v1

of an additional official committee is appropriate under section 1102 of the Bankruptcy Code, the Court should consider "whether the cost of an additional committee <u>significantly</u> outweighs the concern for adequate representation." *In re Spansion, Inc.*, 2009 WL 4906565, *2 (emphasis added) (citing *In re Williams Commc'n Group, Inc.*, 281 B.R. at 220). In all, the Debtors employ at least 19 professional firms including attorneys, financial advisors, restructuring and turnaround professionals, consultants, accountants, and investment bankers. Between the Debtors and the Creditors' Committee, there are six estate-retained law firms focused on the Litigations. "The appointment of an equity committee raises cost concerns since such appointments are 'closely followed by applications to retain attorneys and accountants.'" *In re Williams Commc'n Group, Inc.*, 281 B.R. at 220 (quoting *In re Saxon Indus., Inc.*, 39 B.R. 945, 947 (Bankr. S.D.N.Y. 1984)). The cost of the new Equity Committee is likely to be substantial and will be reflected not only in additional fees for Equity Committee professionals but also in additional expenditures by the Debtors' other professionals, who will be required to spend additional and duplicative time to educate the newly formed Equity Committee's professionals about the past 16 months of litigation and negotiation.

        13.     In addition to direct costs, the entrance of the Equity Committee almost certainly will be disruptive to the ongoing multi-party negotiations, causing delay and further swelling the overall administrative cost to the estates' creditors. Further delay also will mean the further incurrence of post-petition interest, which makes any recovery to equity holders all the more unlikely. For these reasons, merely limiting the Equity Committee's fees, while helpful, does not address the Creditors' Committee's concerns about cost resulting from the delay that the Equity Committee is likely to cause.

7

#12024908 v1

14. Additionally, the Creditors' Committee notes that the appointment of an equity committee likely will result in an inequitable shifting of expenses onto the estates' creditors. It would be inequitable to compel the estates' creditors to bear the costs of the Equity Committee's professionals.

15. Furthermore, unless there is a full recovery for unsecured creditors, any recovery by equity holders would be a gift to which they would not be entitled. *In re Williams Communications Group, Inc.*, 281 B.R. at 220 (denying the motion to appoint an equity committee because, among other reasons, "neither the debtor nor the creditors should have to bear the expense of negotiating over the terms of what is in essence a gift.") (citing *In re Emons, Indus.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985)). In no way should the existence of an Equity Committee give rise to any obligation for payment of ransom.

### III. Alternatively, If This Court Chooses Not to Disband the Equity Committee, Strict Fee Limitations Should Be Put in Place

16. As demonstrated above, there is no need in these chapter 11 cases for an Equity Committee. If, however, this Court determines not to disband the Equity Committee, the Creditors' Committee urges in the alternative that the Court allow the reimbursement of fees and expenses incurred by the Equity Committee only to the extent that it can be shown that equity is, in fact, entitled to a substantial recovery. To the extent that equity holders, who have not shown that they have a substantial economic interest to protect, wish to participate in these chapter 11 cases, they should not do so at the expense of the estates' creditors. If, after a plan of reorganization is confirmed, there is a substantial recovery for equity and the Equity Committee has made a substantial contribution the Debtors' estates, then the Equity Committee may be compensated under Bankruptcy Code section 503(b). *See In re Ampex Corp.*, 2008 WL 2051128 at *2 (denying the motion to appoint an equity committee but noting "the sophistication of

8

#12024908 v1

shareholders and their ability to retain counsel, and the right of shareholders to be compensated under 11 U.S.C. § 503(b) of the Bankruptcy Code if they effect a 'substantial contribution' in the case).

17. Alternatively, the estates' reimbursement of the fees of the new Equity Committee could be limited to a monthly maximum to be set by this Court, to enable the Equity Committee solely to monitor the proceedings, while preventing duplicative and unnecessary expense. As noted above, any recovery for equity interests is entirely dependent on the resolution of the Litigations and the claims objections, all of which are being actively pursued by the Debtors and the Creditors' Committee. Therefore, the role of the Equity Committee should not go beyond monitoring these processes. This fee cap is not intended to preclude the Equity Committee from spending as much as it wants so long as it is funding the expense from its own collective pocket; but the reimbursement from the estates should be strictly limited unless and until there is recovery to equity security interests after creditors are paid in full.

**[remainder of page intentionally left blank]**

Dated:   January 21, 2010

Respectfully Submitted,

**PEPPER HAMILTON LLP**


By:  /s/ John H. Schanne, II
David B. Stratton (DE No. 960)
John H. Schanne, II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19801
Tel. (302) 777-6500
Fax (302) 421-8390

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Fred S. Hodara (admitted pro hac vice)
Robert A. Johnson (admitted pro hac vice)
One Bryant Park
New York, NY 10036
Tel. (212) 872-1000
Fax (212) 872-1002

Attorneys for the Official Committee of Unsecured Creditors of Washington Mutual, Inc., *et al.*