> **PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS YOUR CLAIMS**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **WASHINGTON MUTUAL, INC., et al.,** | **Case No. 08-12229 (MFW)** |
| **Debtors.** | **Jointly Administered** |
| | Hearing Date: March 4, 2010 at 10:30 a.m. (ET)<br>Objection Deadline: February 5, 2010 at 4:00 p.m. (ET) |

## DEBTORS' TWENTIETH (20th) OMNIBUS (SUBSTANTIVE) OBJECTION TO CLAIMS

Mark D. Collins (No. 2981)
Chun I. Jang (No. 4790)
Andrew C. Irgens (No. 5193)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS TO THE DEBTORS AND DEBTORS IN POSSESSION

I.     PRELIMINARY STATEMENT ........................................................................ 1

II.    PROCEDURAL BACKGROUND................................................................... 4

       A.    Relevant Parties ................................................................................. 4

       B.    WMB's Receivership........................................................................... 5

       C.    The Debtors' Commencement Of The Chapter 11 Cases................... 5

       D.    Claims Asserted By The FDIC .......................................................... 6

       E.    The FDIC's Disallowance Of The Debtors' Proof Of Claim ............... 6

       F.    Debtors' Lawsuit Against The FDIC.................................................. 7

       G.    The Bondholders' Proofs Of Claim ................................................... 8

III.   FACTUAL BACKGROUND........................................................................ 8

       A.    Corporate History And Organizational Structure ............................. 8

       B.    WMB's Receivership........................................................................... 9

       C.    OTS' Regulatory Oversight Of WMI And WMB ............................... 9

       D.    The Bondholders' Purchase Of Securities From WMB .................... 11

IV.    ARGUMENT................................................................................................ 13

       A.    Most Of The Claims Should Be Disallowed Because The Bondholders
             Lack Standing ................................................................................... 13

             1.    The FDIC Has Exclusive Standing To Assert Claims That Allege
                   Generalized Harm To WMB................................................... 13

             2.    Other Courts' Treatment Of The Specific Claims Asserted By The
                   Bondholders Demonstrates That They Are Derivative............ 18

                   a.    Corporate Veil-Piercing And Substantive Consolidation............18

                   b.    Misrepresentations And Material Omissions.......................20

                   c.    Mismanagement And Breach Of Fiduciary Duties.................21

             3.    The Bondholders Have Failed To Establish That They Have
                   Standing To Assert Derivative Claims .................................... 22

       B.    The Bondholders' Proofs of Claim Fail To State Plausible Claims On
             Which Relief Can Be Granted And Should Be Expunged ................. 24

       C.    The Bondholders' Disregard Of Corporate Form Claims Should Be
             Expunged Because They Fail To Allege Plausible Claims For Relief And
             Are Undermined By Compelling Evidence ....................................... 26

1. The Claims Fail To Allege A Plausible Claim For Relief Under
The Doctrines Of Corporate Disregard And Alter Ego ............................ 26

    a. There Is No Plausible Claim Alleged Under The Doctrine
Of Alter Ego..................................................................30

        (i) The Marathon Credit Claimants' Allegations
Regarding WMI's Domination And Control Of
WMB Are Insufficient......................................................30

        (ii) The Allegations Regarding Fraud On The Marathon
Credit Claimants Are Insufficient............................33

    b. There Is No Plausible Claim Alleged Under
The Doctrine Of Corporate Disregard................................35

2. Compelling Evidence Undermines The Bondholders' Veil-Piercing
Claims ................................................................................................ .36

    a. OTS' Regulation And Oversight Of WMB and WMI
Undermine The Claim That WMI Dominated
And Controlled WMB...................................................36

    b. The Marathon Credit Claimants Have No Basis To Allege
That Documentation Is Missing Regarding WMI's Deposit
Account....................................................................37

    c. The Bondholders Have No Basis To Allege Payments Were
Improperly Made By WMI Or WMB On Behalf Of Each
Other, Or That There Was "Confusion" Regarding
Payments To Third Parties.............................................38

D. The Marathon Credit Claimants' Substantive Consolidation Claims
Should Be Dismissed Because The Doctrine Is Inapplicable And The
Claims Fail To Allege Plausible Claims For Relief............................................. 39

    1. Substantive Consolidation Is Inapplicable Because WMB Is In
Receivership................................................................................................ 39

    2. The Marathon Credit Claimants' Claims Fail Because They Do
Not State Plausible Claims For Substantive Consolidation...................... 41

        a. The Claims Fail To Allege Any Facts Pertaining To
WMI's And WMB's Pre-Petition Conduct...........................42

        b. The Marathon Credit Claimants' Claims Fail To Allege
Sufficient Facts That WMI's And WMB's Assets And
Liabilities Are Hopelessly Scrambled And Commingled
Such That It Is Impossible To Separate Them Resulting In

        Harm To All Creditors.................................................42

E.    The Bondholders Cannot Maintain A Claim For Fraudulent Transfer................ 44

    1.    The Dividends Were Not Fraudulent Transfers....................................... 46

        a.    Actual Fraudulent Transfer Claims Fail Because The Dividends Were Not Made With Actual Intent To Hinder, Delay Or Defraud Creditors Of WMB.............................46

    2.    WMB Was Not Insolvent At The Time Of The Dividends..................... 49

    3.    The Deposit Transfer Was Not A Fraudulent Transfer .......................... 50

        a.    The Deposit Transfer Is Not Avoidable Under Fraudulent Transfer Law.................................................................50

        b.    To The Extent The Deposit Transfer Consisted Of "Capital," WMB Received Reasonably Equivalent Value.........55

F.    The Bondholders Have Failed To State An Actionable Misrepresentation Claim Under Any Securities Or Common Law Fraud Theory ........................... 58

    1.    The Elements Of Securities Fraud .......................................... 58

    2.    The Bondholders Have Not Satisfied The Heightened Pleading Standard Applicable To Securities Fraud Claims.................................. 61

G.    The Bondholders Fail To State A Plausible Claim That WMI Or Its Directors And Officers Breached Fiduciary Duties............................................ 66

    1.    WMI Did Not Owe Any Fiduciary Duties To WMB Or Its Creditors As A Matter Of Law .............................................. 67

    2.    The Bondholders Have Failed To Allege A Plausible Claim That WMI Breached Any Fiduciary Duties ..................................... 69

V.    RESERVATION OF RIGHTS ......................................................... 69

VI.    CONCLUSION................................................................... 69

**FEDERAL CASES**

*900 Capital Services, Inc. v. Cloud (In re Cloud)*, No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000) ...............................................................................25

*Adato v. Kagan*, 599 F.2d 1111 (2d Cir. 1979)....................................................17

*In re Aetna, Inc. Sec. Litig.*, 2009 WL 1619636 (E.D. Pa. June 9, 2009)......................................60

*Akzona, Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227 (D. Del. 1984)....................27

*Alberto v. Diversified Group, Inc.*, 55 F.3d 201 (5th Cir. 1995) .....................................32

*In re Allegheny International, Inc.*, 954 F.2d 167 (3d Cir. 1992)..................................36

*In re Alpharma Inc. Sec. Litigation*, 372 F.3d 137 (3d Cir. 2004) ...........................64, 65

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................25, 26

*Aviall, Inc. v. Ryder System, Inc.*, 913 F. Supp. 826 (S.D.N.Y. 1996), aff'd, 110 F.3d 892
    (2d Cir. 1997) .......................................................................................................68

*Balko v. Carnegie Finance Group, Inc. (In re Balko)*, 348 B.R. 684 (Bankr. W.D. Pa.
    2006).......................................................................................................................58

*Bell Atl. v. Twombly*, 550 U.S. 544 (2007) .................................................................45

*Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164
    (3d Cir. 2002)........................................................................................................14

*Boland v. Engle*, 113 F.3d 706 (7th Cir. 1997)..........................................................19

*Branch v. Federal Deposit Insurance Corp.*,
    825 F. Supp. 384 (D. Mass. 1993) ............................................................... *passim*

*Brandenburg v. Seidel*, 859 F.2d 1179 (4th Cir. 1988)...............................................21

*Brazlin v. W. Sav. & Loan Association*, Civ. No. 91-0078-PHX-SMM, 1994 WL. 374286
    (D. Ariz. Jan. 28, 1994) ........................................................................................17

*Brown v. General Electric Capital Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229 (Bankr.
    D. Del. 2003) .....................................................................................................33, 34

*CBS, Inc. v. Folks (In re Folks)*, 211 B.R. 378 (B.A.P. 9th Cir. 1997) ........................19

*C.W. Sommer & Co. v. Rockefeller (In re Rockefeller Ctr. Properties, Inc. Sec.
    Litigation)*, 311 F.3d 198 (3d Cir. 2002).............................................................59, 62

*Cal. Public Employees Retirement System v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004)...........60

*In re CareerCom Corp.*, 215 B.R. 674 (Bankr. M.S. Pa. 1997) ...................................54

*In re Colonial Realty Co.*, 980 F.2d 125 (2d Cir. 1992)...............................................45

*Commodity Futures Trading Commission v. Eustace*, Civ. Action No. 05-297, 2008 WL.
    471574 (E.D. Pa. Feb. 19, 2008) ......................................................................39-41

*Commodore Int'l Ltd. v. Gould (In re Commodore Int'l, Ltd.)*, 253 B.R. 336 (S.D.N.Y.
    2000).......................................................................................................................15

*Courtney v. Halleran*, 485 F.3d 942 (7th Cir. 2007) .............................................14, 16, 17, 23

*In re Cray Inc. Derivative Litigation*, 431 F. Supp. 2d 1114 (W.D. Wash. 2006) .......................19

*De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65 (2d Cir. 1996)..............................28

*In re Digital Island Sec. Litigation*, 223 F. Supp. 2d 546 (D. Del. 2002), aff'd, 357 F.3d
    322 (3d Cir. 2004) ..................................................................................................59

*Doe v. Unocal Corp.*, 248 F.3d 915 (9th Cir. 2001).....................................................32

*Downriver Community Federal Credit Union v. Penn Square Bank*, 879 F.2d 754 (10th
    Cir. 1989).............................................................................................. *passim*

*Duke Energy Trading & Mktg. L.L.C. v. Enron Corp. (In re Enron Corp.)*, No. 01 B
    16034 (AJG), 2003 Bankr. LEXIS 330 (Bankr. S.D.N.Y. Apr. 17, 2003) ................19

*In re Erin Food Services, Inc.*, 980 F.2d 792 (1st Cir. 1992)........................................54

*Federal Deposit Insurance Corp. v. Ernst & Young LLP*, 374 F.3d 579 (7th Cir. 2004) ............14

*In re Fedders N. America, Inc.*, 405 B.R. 527 (Bankr. D. Del. 2009)...........................49

*First National Bank v. Colby*, 88 U.S. 609 (1875) ......................................................14

*Fla. State Board of Admin. v. Green Tree Finance Corp.*, 270 F.3d 645 (8th Cir. 2001)...........62

*Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736
 (S.D.N.Y. 2008) ...................................................................................................24, 27
*Fletcher v. Atex Inc.*, 68 F.3d 1451 (2d Cir. 1995).......................................................32
*Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.)*, 432 F.2d
 1060 (2d Cir. 1970) ...................................................................................................41
*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009).....................................25, 26
*Giuliano v. U.S. Nursing Corp. (In re Lexington Healthcare Group, Inc.)*, 339 B.R. 570
 (Bankr. D. Del. 2006)................................................................................................59
*Hamid v. Price Waterhouse*, 51 F.3d 1411 (9th Cir. 1995)...............................16, 17, 18, 21, 23
*Hartman v. Blinder*, 687 F. Supp. 938 (D.N.J. 1987)...................................................65
*Hindes v. Federal Deposit Insurance Corp.*, 137 F.3d 148 (3d Cir. 1998) .............22, 23
*In re Holmes Environmental, Inc.*, 287 B.R. 363 (Bankr. E.D. Va. 2002) ...................54
*Household Reins. Co., Ltd. v. Travelers Ins. Co.*, No. 91 C 1308, 1992 WL 22220 (N.D.
 Ill. Jan. 31, 1992)......................................................................................................68
*In re IKON Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002)...................................64
*Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009)..................61
*In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007) ...............................66
*In re Interbank Funding Corp. Sec. Litig.*, 2009 WL 3714904 (D.D.C. Nov. 6, 2009) ...............66
*In re Jones Truck Lines, Inc.*, 130 F.3d 323 (8th Cir. 1997).........................................54
*Joseph v. Madray (In re Brun)*, 360 B.R. 669 (Bankr. C.D. Cal. 2007).......................53
*In re Kincaid*, 388 B.R. 610 (Bankr. E.D. Pa. 2008) ...................................................24
*Klein v. Tabatchnick*, 610 F.2d 1043 (2d Cir. 1979) ....................................................57
*LaSalle National Bank v. Perelman*, 82 F. Supp. 2d 279 (D. Del. 2000).....................35
*In re Longhorn Sec. Litig.*, 573 F. Supp. 255 (W.D. Okla. 1983) ................................14
*MCorp Finance, Inc. v. Board of Governors of the Federal Reserve System*, 900 F.2d 852
 (5th Cir. 1990), *rev'd on other grounds*, 502 U.S. 32 (1991)....................................56
*Maddox v. Robertson (In re Prejean)*, 994 F.2d 706 (9th Cir. 1993) ............................50
*Marion v. TDI Inc.*, 2010 WL 6189 (3d Cir. Jan. 4, 2010)...........................................65
*MC Asset Recovery LLC v. The Southern Co.*, 1:06-C 2006 WL. 5112612 (N.D. Ga. Dec.
 11, 2006).....................................................................................................................68
*McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101 (JFB)(WDW), 2009 WL 3150430
 (E.D.N.Y. Sept. 29, 2009).....................................................................................28, 29
*McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007) .....................................58
*McVeigh v. Unumprovident Corp.*, 300 F. Supp. 2d 731 (W.D. Wis. 2002).................32
*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006) .................60
*In re Micro Innovations Corp.*, 185 F.3d 329 (5th Cir. 1999).......................................54
*Miller v. Greenwich Capital Finance Products, Inc. (In re America Business Finance
 Services, Inc.)*, 362 B.R. 135 (Bankr. D. Del. 2007)................................................63
*Neuger v. United States (In re Tenna Corp.)*, 801 F.2d 819 (6th Cir. 1986).................54
*O'Melveny & Myers v. Federal Deposit Insurance Corp.*, 512 U.S. 79 (1994) ............14
*O'Neil v. Jones (In re Jones)*, 403 B.R. 228 (Bankr. D. Conn. 2009) ..........................53
*OODC, LLC v. U.S. Bank National Association (In re OODC)*, 321 B.R. 128 (Bankr. D.
 Del. 2005)............................................................................................................18, 19

*Official Committee of Unsecured Creditors v. Action Industrial, Inc. (In re Phar-Mor
Inc. Sec. Litigation)*, 185 B.R. 497 (W.D. Pa. 1995), *aff'd sub nom Coopers &
Lybrand v. Shapira*, 101 F.3d 689 (3d Cir. 1996) ................................................57

*Official Employment-Related Issues Comm. v. Arnold (In re Enron Corp.)*, Bankr. No.
01-16034-AJG, Adv. Nos. 03-3522, 03-3721, 2005 WL. 6237551 (Bankr. S.D. Tex.
Dec. 9, 2005) ........................................................................................................50, 51

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ............................................................59

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005)................................................ *passim*

*PHP Liquidating, LLC v. Robbins*, 291 B.R. 592 (D. Del. 2003) ................................47

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)...............................................44

*In re Party City Sec. Litigation*, 147 F. Supp. 2d 282 (D.N.J. 2001).......................58, 59

*Peterson v. Trailways, Inc.*, 555 F. Supp. 827 (D. Colo. 1983).....................................32

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 233 F.R.D. 143
(D. Del. 2005)..............................................................................................................27

*Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996) .....................................21

*In re Refco Inc.*, 505 F.3d 109 (2d Cir. 2007)...............................................................45

*Resolution Trust Corp. v. Bonner*, Civ. Act. No. H-92-430, 1993 WL 414679 (S.D. Tex.
June 3, 1993) ...............................................................................................................68

*Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir. 1981) .................57

*Simon v. ASIMCO Techs., Inc. (In re America Camshaft Specialties, Inc.)*, 410 B.R. 765
(Bankr. E.D. Mich. 2009).........................................................................................43, 44

*In re Stauder*, 396 B.R. 609 (Bankr. M.D. Pa. 2008)..................................................24

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008)...............58

*Suess v. United States*, 33 Fed. Cl. 89 (Fed. Cl. 1995) ............................................22, 23

*In re Sunrise Sec. Litigation*, 916 F.2d 874 (3d Cir. 1990).......................................17, 21

*Sun Trust Bank v. Sun International Hotels Ltd.*, 184 F. Supp. 2d 1246 (S.D. Fla. 2001)............28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).........................60, 61

*This End Up Furniture Co. v. Kemeny (In re TEU Holdings, Inc.)*, 287 B.R. 26 (Bankr.
D. Del. 2002) ..............................................................................................................67

*Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521 (D. Del. 2008)...................................34

*Trustees of National Elevator Industrial Pension, Health Benefit and Education Funds v.
Lutyk*, 332 F.3d 188 (3d Cir. 2003)..........................................................................34

*Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d
515 (2d Cir. 1988) .....................................................................................................41

*United States v. Bestfoods*, 524 U.S. 51 (1998)...........................................................27

*United States v. Carey (In re Wade Cook Finance Corp.)*, 375 B.R. 580 (B.A.P. 9th Cir.
2007)....................................................................................................26, 27, 34, 35

*United States v. Townley*, 181 Fed. Appx. 630, 631 (9th Cir. 2006)...........................46

*Upjohn Co. v. Syntro Corp.*, Civ. A. No. 89-107-JJF, 1990 WL. 79232 (D. Del. Mar. 9,
1990)............................................................................................................................31

*Vernon v. Federal Deposit Insurance Corp.*, 981 F.2d 1230 (11th Cir. 1993)..............14

*Wash. Mut., Inc. v. Fed. Deposit Ins. Corp.*, Civ. A. No. 09-533 (RMC), 2009 WL.
3273880 (D.D.C. Oct. 13, 2009) ...............................................................................5, 7

*Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 902 (W.D. Ky. 2007) ........................68

*Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007)................................................... 60-62

*Youkelsone v. Wash. Mutual, Inc. (In re Wash. Mutual, Inc.)*, 418 B.R. 107 (Bankr. D.
Del. 2009) ...........................................................................................................26, 28, 30, 34

**STATE CASES**

*Agostino v. Hicks*, 845 A.2d 1110 (Del. Ch. 2004) ...............................................................15, 23

*Anadarko Petro. Corp. v. Panhandle E. Corp.*, 545 A.2d 1171 (Del. 1988)........................67, 68

*Chase Manhattan Mortg. Corp. v. Advanta Corp., No. Civ.A. 01-507 (KAJ)*, 2004 WL.
422681 (D. Del. Mar. 24, 2004)......................................................................................58

*Eagle Pac. Insurance Co. v. Christensen Motor Yacht Corp.*, 934 P.2d 715 (Wash. Ct.
App. 1997), aff'd, 959 P.2d 1052 (Wash. 1998)................................................................19, 27

*In re F5 Networks, Inc. Derivative Litigation*, 207 P.3d 433 (Wash. 2009)..................................19

*Grace Brothers, Ltd. v. Uniholding Corp., No. Civ.A. 17612*, 2000 WL. 982401 (Del. Ch.
July 12, 2000)..................................................................................................................67

*Hurst v. General Dynamics Corp.*, 583 A.2d 1334 (Del. Ch. 1990) .............................................67

*Iotex Commc'ns, Inc. v. Defries*, Civ. Act. No. 15817, 1998 WL 914265 (Del. Ch. Dec.
21, 1998).........................................................................................................................69

*J. Royal Parker Assoc., Inc. v. Parco Brown & Root, Inc.*, Civ. Act. No. 7013, 1984 WL
8255 (Del. Ch. Nov. 30, 1984) ........................................................................................69

*McDermott Inc. v. Lewis*, 531 A.2d 206 (Del. 1987)...................................................................67

*Minton v. Ralston Purina Co.*, 47 P.3d 556 (Wash. 2002) .....................................................27, 31

*Moses Lake Construction Co., Inc. v. Johnson*, Nos. 23587-4-III, 23588-2-III, 2006 WL.
2147602 (Wash. Ct. App. July 27, 2006)..........................................................................31

*Norhawk Investments, Inc. v. Subway Sandwich Shops, Inc.*, 811 P.2d 221 (Wash. Ct.
App. 1991)......................................................................................................................34

*One Pac. Towers Homeowners' Association v. HAL Real Estate Investments, Inc.*, 30
P.3d 504 (Wash. Ct. App. 2001), rev'd in part on other grounds, 61 P.3d 1094
(Wash. 2002) ..............................................................................................................31, 32

*Pfeffer v. Redstone*, 965 A.2d 676 (Del. 2009)............................................................................69

*Rainier National Bank v. McCracken*, 26 Wash. App. 498 (Wash. Ct. App. 1980) ....................52

*Rosenmiller v. Bordes*, 607 A.2d 465 (Del. Ch. 1991)................................................................26

*Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007)..........................................................................19

*Sedwick v. Gwinn*, 873 P.2d 528 (Wash. Ct. App. 1994) ............................................................46

*Shaev v. Wyly*, C.A. No. 15559-NC, 1998 WL. 13858 (Del. Ch., Jan. 6, 1998) ..........................67

*Snohomish Sch. District No. 201 v. Sportec International*, No. 35086-2-I, 1996 Wash.
App. LEXIS 689 (Wash. Ct. App. Dec. 2, 1996)................................................................33

*Superior Portland Cement, Inc. v. Pac. Coast Cement Co.*, 205 P.2d 597 (Wash. 1949)............26

*Thompson v. Hanson*, 219 P.3d 659 (Wash. 2009)................................................................. 52-54

*Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch.
2006), aff'd sub nom Trenwick Am. Litig. Trust v. Billett, 931 A.2d 438 (Del. 2007) ..........67

# TABLE OF AUTHORITIES
## (continued)

*Worthington v. Low Cost Drugs, Inc.*, No. 18102-2-III, 2000 WL. 199004 (Wash. Ct. App. Feb. 15, 2000).................................................................................................47

## DOCKETED CASES

*JPMorgan Chase Bank, N.A. v. Wash. Mut., Inc.*, Adv. Proc. No. 09-50551 (MFW) (Bankr. D. Del. filed Mar. 24, 2009)............................................................................6

*Wash. Mutual, Inc. v. Federal Deposit Insurance Corp.*, Case No. 1:09-cv-00533 (RMC) (D.D.C. filed Mar. 20, 2009)..........................................................................3, 7

*Wash. Mut. Inc. v. JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW) (Bankr. D. Del. filed Apr. 27, 2009) ..................................................................6

*Wash. Mut. Inc. v. JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW) [Docket #14]..................................................................................................56

*Washington Mut. Inc., et al. v. JPMorgan Chase Bank, N.A.*, Case No. 08-12229, Adv. Proc. No. 09-50934 [Docket #16] ..................................................................38

*In re Washington Mut., Inc., Sec. Litig.*, No. 2:08-md-01919 (MJP) (W.D. Wash. filed Feb. 21, 2008)..................................................................................................63

## FEDERAL STATUTES

11 U.S.C. § 109.................................................................................................................41
11 U.S.C. § 502(c)............................................................................................................24
11 U.S.C. § 547(b)............................................................................................................54
11 U.S.C. § 548(d)............................................................................................................50
12 U.S.C. § 1468(a) ...........................................................................................................9
12 U.S.C. § 1818(b).........................................................................................................56
12 U.S.C. § 1821(d)....................................................................................................*passim*
12 U.S.C. §§ 1841(c)........................................................................................................56
12 U.S.C. §§ 1841(j).........................................................................................................56
12 U.S.C. § 371c............................................................................................................9, 37
15 U.S.C. § 78u-4(b)............................................................................................60, 62, 64
Fed. R. Bankr. P. 3001(c).................................................................................................24
Fed. R. Bankr. P. 3001(f).................................................................................................24
Fed. R. Bankr. P. 7012.....................................................................................................25
Fed. R. Bankr. P. 9014.....................................................................................................25
Fed. R. Civ. P. 9(b) .....................................................................................................*passim*
Fed. R. Civ. P. 12(b)(6)......................................................................................24, 25, 60
12 C.F.R. Part 223..........................................................................................................9, 37
12 C.F.R. 552.5(b)............................................................................................................26
12 CFR Part 563, Subpart E......................................................................................47, 48
12 C.F.R. 563.140 et. seq............................................................................................10, 37
12 C.F.R. §563.144...........................................................................................................47
12 C.F.R. § 563.41.........................................................................................................9, 37

## TABLE OF AUTHORITIES
### (continued)

Page(s)

12 C.F.R. Part 567.................................................................................................10, 37
Policy Statement on the Responsibility of Bank Holding Company's to Act as Sources of
    Strength to Their Subsidiary Bank, 52 Fed. Reg. 15707 (Apr. 30, 1987)..............................56
Pub. L. No. 101-73, 103 Stat. 183 (1989)...................................................................13

## STATE STATUTES

Wash. Rev. Code § 19.40.011(2)...............................................................................52
Wash. Rev. Code § 19.40.031(a)...............................................................................50
Wash. Rev. Code § 19.40.041(a)..............................................................44, 46, 49, 50
Wash. Rev. Code § 19.40.041(b)...............................................................................47
Wash. Rev. Code § 19.40.051(a)..................................................................44, 49, 50
Wash. Rev. Code § 19.40.051(b)..................................................................45, 51, 54
Wash. Rev. Code § 19.40.081(f).......................................................................54, 55

## MISCELLANEOUS

9 Collier on Bankruptcy ¶3001.09 (2007) ...................................................................24
DAVID A. DREXLER ET AL., DEL. CORP. LAW AND PRACTICE § 15.11 (2009) ...............................67
OTS HOLDING COMPANY HANDBOOK...........................................................................10
Uniform Fraudulent Transfer Act § 1 cmt. n.2 (1984) ..................................................53
WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 41.33
(2009)...................................................................................................................35

> **PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS YOUR CLAIMS**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **WASHINGTON MUTUAL, INC., et al.,** | **Case No. 08-12229 (MFW)** |
| **Debtors.** | **Jointly Administered** |
| | **Hearing Date: March 4, 2010 at 10:30 a.m. (ET)**<br>**Obj. Deadline: February 5, 2010 at 4:00 p.m. (ET)** |

### DEBTORS' TWENTIETH OMNIBUS
### (SUBSTANTIVE) OBJECTION TO CLAIMS

Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment"), as debtors and debtors in possession (collectively, the "Debtors"), in accordance with section 502 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), hereby object (the "Objection") to the proofs of claim (collectively, the "Claims"), a schedule of which is attached as "Exhibit A" to the proposed order, attached hereto as Exhibit "1," filed by certain holders of indebtedness of Washington Mutual Bank ("WMB"), and represent as follows:

### I.     PRELIMINARY STATEMENT

1.     In late 2005, WMB, a federally chartered savings association, established a Global Note Program that provided for the issuance of up to $22 billion in debt financing through Senior Global Notes and Subordinated Global Notes (collectively, the "WMB Notes"). The WMB Notes offered under the Global Note Program were offered only to institutional investors that were accredited investors under the federal securities laws. The Offering Circular

related to WMB's Global Note Program repeatedly and clearly stated that all obligations created by the WMB Notes were obligations of WMB and not WMI, its parent corporation. Specifically, the Global Note Offering Circular clearly stated:

> Each Note issued by [WMB] will be an obligation solely of the Issuer and will not be an obligation of, or otherwise guaranteed by, Washington Mutual, Inc. ("WMI"), the ultimate parent corporation of [WMB], or any affiliate of WMI ... The Notes are unsecured and uninsured direct general obligations of [WMB].

Thereafter, two groups of sophisticated investors, referred to herein as the WMB Noteholders and the Marathon Credit Claimants (collectively, the "Bondholders"),[1] fully apprised of the risks, acquired WMB Notes with a face value of several billion dollars. These seasoned investors are among the nation's leading insurance companies, institutional fund managers and investment banks.

2.      On September 25, 2008, the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for WMB (the "Receivership"), and immediately sold substantially all of the assets of WMB to JPMorgan Chase Bank, N.A. ("JPMC"). As creditors of WMB, and as required by applicable law, the Bondholders filed proofs of claims with the FDIC relating to their interests in the WMB Notes. The FDIC has recognized the Bondholders' claims as "legitimate" liabilities of the Receivership and notified the Bondholders that the FDIC would issue receivership certificates on account of such claims.

3.      To protect their assets for their legitimate creditors, on September 26, 2008 (the "Commencement Date"), the Debtors each filed a voluntary case pursuant to chapter 11 of the

---

[1] Additional proofs of claim have been filed, timely or otherwise, against the Debtors and their chapter 11 estates by holders of funded indebtedness against WMB (collectively, "Other Bondholder Claims"). This Objection is made without prejudice or limitation to the Debtors' right to object on any grounds to the Other Bondholder Claims.

Bankruptcy Code. Thereafter, this Court established a bar date for the filing of proofs of claim against the Debtors and their chapter 11 estates.

4. Fearing that the proceeds of the sale of WMB's assets to JPMC would be insufficient to satisfy their claims, or generally unhappy with the projected recovery on the WMB Notes from the Receivership, the Bondholders have filed a host of meritless claims against the Debtors alleging that each of the Debtors is somehow responsible for WMB's obligations under the WMB Notes. By the Claims, the Bondholders seek payment of allegedly outstanding amounts due on the WMB Notes. Recognizing the absence of any relationship between themselves and the Debtors, the Claims implore this Court to take drastic and extraordinary measures to ignore the corporate form of these longstanding entities and to consolidate the assets and liabilities of the Debtors' estates with those of the Receivership. The Bondholders further request this Court to usurp the role and authority of the FDIC as WMB's receiver through substantive consolidation.

5. This Court should reject the Bondholders' overreaching and disallow the Claims in their entirety. As a threshold matter, the Bondholders simply have no legal right to bring their claims. See Section IV.A. Most of the Claims allege generalized harm to all of WMB's creditors, and the Bondholders lack standing to assert them. To the extent that such claims or causes of actions exist, only the FDIC has standing to bring them. In fact, several of the Bondholders' claims are duplicative of pending claims filed by the FDIC or asserted in the context of Wash. Mut., Inc. v. FDIC, Case No. 1:09-cv-00533 (RMC) (D.D.C. filed Mar. 20, 2009) (the "DC Action") (see infra Para. 16 for further discussion).

6.     Aside from the Bondholders' lack of standing, the Claims themselves are legally

insufficient. Most of the Claims should be dismissed because they fail to state plausible claims

on which relief can be granted. See Section IV.B.

7.     By filing the Claims, the Bondholders – who are creditors only of WMB – seek

to deplete the assets of WMI's estate to the detriment of WMI's rightful creditors. This Court

should not penalize WMI's creditors by permitting the Bondholders to litigate baseless

grievances in these Chapter 11 cases. Summary dismissal of the Claims is warranted and

appropriate.

## II.     PROCEDURAL BACKGROUND.

### A.     Relevant Parties.

8.     Before the Receivership and the seizure of WMB, WMI was a savings and loan

holding company and WMB was a federally chartered savings association that was chartered and

operating under the United States Home Owners' Loan Act.. WMB was placed into receivership

on September 25, 2008. WMI Investment, a subsidiary of WMI, served as an investment vehicle

for WMI. Washington Mutual Bank fsb ("WMBfsb") was a subsidiary of WMB.

9.     The Bondholders are sophisticated, institutional investors, including insurance

companies, institutional fund managers, investment banks and private investment funds.[2] They

---

[2] Although the Bondholders have not filed a revised verified statement pursuant to Bankruptcy Rule 2019 and this Court's ruling of December 2, 2009 requiring detailed disclosure of the Bondholders' holdings, including purchase prices, based upon a review of the Claims, the Marathon Credit Claimants include: Altma Fund Sicav P.L.C. In Respect Of Russell Sub-Fund; Anchorage Capital Master Offshore, Ltd.; Bank of Scotland plc; Cetus Capital, LLC; Corporate Debt Opportunities Fund, Ltd.; Fir Tree Capital Opportunity Master Fund, L.P.; Fir Tree Mortgage Opportunity Master Fund, L.P.; Fir Tree Value Master Fund, L.P.; HFR ED Select Fund IV Master Trust; Juggernaut Fund, L.P.; Lyxor/York Fund Limited; Marathon Credit Opportunity Master Fund, Ltd.; Permal York Ltd.; Quintessence Fund L.P.; QVT Fund LP; Silver Point Capital Fund, L.P.; Silver Point Capital Offshore Fund, Ltd.; The Governor and Company of the Bank of Ireland; The Värde Fund, L.P.; The Värde Fund VI-A, L.P.; The Värde Fund VII-B, L.P.; The Värde Fund VIII, L.P.; The Värde Fund IX, L.P.; The Värde Fund IX-A, L.P.; Värde Investment Partners (Offshore), Ltd.; Värde Investment Partners, L.P.; Windmill Master Fund, L.P.; York Capital Management, L.P.; York Credit Opportunities Fund, L.P.; York Credit Opportunities Master

are the alleged legal or beneficial holders of approximately $3.7 billion in principal amount outstanding of Senior Notes and Subordinated Notes issued by WMB during the Global Note Program that was established in 2005.

**B.      WMB's Receivership.**

10.      On September 25, 2008, the Director of the OTS, by order number 2008-36, appointed the FDIC as receiver for WMB, and advised that the receiver was immediately taking possession of WMB. Upon or even before its appointment as receiver, the FDIC entered into a transaction to sell (the "Sale") substantially all of the assets of WMB, including the stock of WMBfsb, to JPMC pursuant to that certain Purchase and Assumption Agreement, Whole Bank, dated September 25, 2008 (as amended, modified, or supplemented, the "P&A Agreement").[3] Pursuant to the P&A Agreement, JPMC assumed all of WMB's deposit liabilities and, shortly thereafter, all of WMBfsb's deposit liabilities through merger. Pending before the Court is the Debtors' summary judgment motion filed in adversary proceeding number 09-50934, seeking to recover approximately $4 billion in deposit liabilities owed the Debtors that were assumed by JPMC pursuant to the P&A Agreement.

11.      In the Receivership, the Bondholders filed proofs of claim relating to the WMB Notes. The FDIC recognized that the WMB Notes are "legitimate liability[ies] of the receivership" and notified the Bondholders that the FDIC would issue receivership certificates for their claims. See Wash. Mut., Inc. v. FDIC, Civ. A. No. 09-533 (RMC), 2009 WL 3273880, at *1, Ex. 1 (D.D.C. Oct. 13, 2009).

---

Fund, L.P.; York Investment Master Fund, L.P.; York Select, L.P.; and York Select Master Fund, L.P. (Claims 3710, 3711 ¶1 n.1). The WMB Noteholders include more than thirty-five insurance companies, institutional fund managers, investment banks and private investment funds. (Claim 2480 n.1).

[3] See http://www.fdic.gov/about/freedom/popular.html.

## C. The Debtors' Commencement Of The Chapter 11 Cases.

12. On the Commencement Date, each of the Debtors commenced a voluntary case pursuant to chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On October 3, 2008, the Court entered an order, pursuant to Bankruptcy Rule 1015(b), authorizing the joint administration of the Debtors' chapter 11 cases. On October 15, 2008, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").

## D. Claims Asserted By The FDIC.

13. On March 30, 2009, the FDIC, as receiver, filed a proof of claim (the "FDIC Claim") against the Debtors on behalf of the Receivership and all WMB creditors. See Claim 2140. The FDIC Claim seeks assets purportedly due to WMB, including (1) a series of trust preferred securities, (2) certain tax refunds and losses, (3) deposit accounts, (4) capital maintenance obligations, (5) alleged fraudulently transferred dividends, (6) proceeds from certain litigations, and (7) other insurance proceeds. Id. In most respects, the Claims are substantively identical to those asserted by the FDIC in the FDIC Claim. See Claims 3710, 3711 and 2480.

14. The FDIC also is a party to two adversary proceedings in the Bankruptcy Court. First, the FDIC is an interpleader defendant in an action initiated by JPMC against the Debtors on March 24, 2009. In that proceeding, JPMC seeks a declaration that it owns certain assets that it contends were acquired in the Sale. See JPMorgan Chase Bank, N.A. v. Wash. Mut., Inc., Adv. Proc. No. 09-50551 (MFW) (Bankr. D. Del. filed Mar. 24, 2009). Second, on June 24, 2009, the FDIC was granted permission to intervene in an action filed by the Debtors against JPMC seeking recovery of $4 billion in deposits that JPMC holds as successor to WMB and

WMBfsb.  See Wash. Mut. Inc. v. JPMorgan Chase Bank, N.A., Adv. Proc. No. 09-50934

(MFW) (Bankr. D. Del. filed Apr. 27, 2009) (the "Turnover Action").

      **E.**      **The FDIC's Disallowance Of The Debtors' Proof Of Claim.**

      15.      On December 30, 2008, the Debtors filed a proof of claim against the

Receivership. The proof of claim includes a series of claims asserting that WMB was indebted

to WMI for (1) inter-company loans, (2) inter-company receivables, (3) payments under a tax

sharing agreement, (4) return of capital contributions, (5) an interest in trust preferred securities,

(6) various preference claims, (7) vendor contract claims, (8) subrogation claims, (9) deposit

claims, (10) improper asset sales, (11) administrative claims, (12) indemnification claims, and

(13) employee/employer related cost and insurance claims. On January 23, 2009, the FDIC

summarily disallowed the Debtors' claims.

      **F.**      **Debtors' Lawsuit Against The FDIC.**

      16.      On March 20, 2009, in accordance with 12 U.S.C. § 1821(d)(6)(A), the Debtors

filed the DC Action, which since has been stayed pending the resolution of the WMI bankruptcy

proceedings. Wash. Mut., Inc. v. FDIC, No. 09-553 (RMC), 2009 WL 3273880, at *3 (D.D.C.

Oct. 13, 2009). The complaint alleges five counts for (1) determination of the Debtors' proof of

claim against the Receivership, (2) dissipation of WMI's assets, (3) taking of the Debtors'

property without just compensation, (4) conversion of the Debtors' property, and (5) declaration

that the FDIC-Receiver's disallowance of the Debtors' proof of claim was void.

      17.      In the DC Action, the FDIC has filed counterclaims claiming that, as receiver of

WMB, it was entitled to the various assets it had previously identified in the FDIC Claim against

WMI. On June 2, 2009, the Bondholders moved to intervene in the DC action brought by the

Debtors against the FDIC. On October 13, 2009, the District Court granted the Bondholders'

motion. See Wash. Mut., Inc., et al. v. Fed. Deposit Ins. Corp., Case No. 1:09-cv-00533 (RMC)

(D.D.C. filed Mar. 20, 2009). The District Court allowed the motion to intervene, with caution, so the Bondholders could be heard as to their defenses to the Debtors' claims against the Receivership. Id. at *4.

**G.      The Bondholders' Proofs Of Claim.**

18.      On March 31, 2009, the Marathon Credit Claimants filed two proofs of claim, which they amended on June 1, 2009. See Claims 3710, 3711. Claim 3710 was filed against WMI Investment; Claim 3711 was filed against WMI. Claims 3710 and 3711 are essentially identical, and assert claims for (1) corporate veil-piercing, alter ego and similar principles, (2) substantive consolidation, (3) improper claim to purported deposits, (4) undercapitalization of, failure to support, and looting of the bank, (5) misrepresentations and omissions under the applicable securities laws, (6) conditional exchange of REIT trust preferred securities, (7) tax refunds and losses, (8) mismanagement and breach of fiduciary and other duties, (9) claim for goodwill litigation award, and (10) fraudulent transfer.[4] On March 27, 2009, the WMB Noteholders filed their proof of claim against WMI in this Court. See Claim 2480. Claim 2480 asserts substantially the same claims as the Marathon Credit Claimants, but does not assert claims for corporate veil-piercing and substantive consolidation.

---

[4] The Marathon Credit Claimants generally assert that funded debt claims of WMI are contractually subordinated to their Claims. See Claims 3710, 3711, ¶7. There is no basis for either contractual or procedural subordination. The Marathon Credit Claimants do not identify any language in the indentures governing WMI funded debt whereby purchasers of WMI agreed to be subordinated to their claims. Similarly, the Marathon Credit Claimants allege without support that they should benefit from procedural subordination of the WMI claims.

### III. FACTUAL BACKGROUND

**A. Corporate History And Organizational Structure.**

19.     WMI's history dates back to 1889, when its predecessor was formed to help

Seattle residents obtain funds to rebuild their homes damaged by "The Great Seattle Fire."[5]

Landefeld Decl. ¶6.  Following decades of continued growth and diversification, WMI's

predecessor became a capital stock savings bank, and subsequently one of the nation's leading

banks in originating mortgages.  Id. ¶ 7.

20.     In 1994, WMI was formed as a savings and loan holding company under the laws

of the State of Washington.  Id. ¶¶1, 8, 9.  It was the ultimate parent of WMB.

**B. WMB's Receivership.**

21.     On September 23, 2008, WMI informed the OTS, the FDIC and the Board of

Governors of the Federal Reserve System of strategic alternatives under consideration to enhance

WMB's capital and liquidity levels, including, among other things, (1) debt for equity swaps,

(2) equity for equity swaps, and (3) divestiture plans.  Id. ¶25.  However, on September 25, 2008,

the OTS initiated the Receivership, and the FDIC purportedly sold substantially all of the assets

of WMB to JPMC pursuant to the P&A Agreement.  Id.

**C. OTS' Regulatory Oversight Of WMI And WMB.**

22.     WMI, WMB and WMBfsb were subject to pervasive regulation by the OTS

before the Receivership and the Commencement Date.  Landefeld Decl. ¶9.  For instance, federal

law regulates all inter-affiliate transactions between related entities such as WMI and WMB to

ensure that they are consistent with sound banking policy and are conducted at arm's length.  See

12 U.S.C. § 371c (2009); 12 C.F.R. Part 223 (2010); 12 C.F.R. § 563.41 (2009).  The OTS also

---

[5] See Declaration of Stewart M. Landefeld in Support of the Debtor's Chapter 11 Petitions and First-Day
Motions 1 (hereinafter "Landefeld Decl.").  A copy of the declaration is attached as Exhibit 2.

was authorized to impose any additional restrictions it deemed necessary on transactions between a savings association and any affiliate. See 12 U.S.C. § 1468(a)(4) (2009). Extensions of credit from WMB to WMI were required to be fully collateralized to protect WMB. Moreover, inter-affiliate service agreements between WMI and WMB were required to be negotiated at arm's length to ensure that WMB paid no more than fair value for services it received and was paid fair value for any services it performed. 12 U.S.C. § 371c (2009); 12 C.F.R. Part 223 (2009); 12 C.F.R. § 563.41 (2009). In addition, federal regulations imposed extensive capital adequacy requirements on WMB. 12 C.F.R. Part 567 (2009). As discussed infra Section IV.C.2.a., OTS regulations even restricted dividend or other capital distributions made by WMB to WMI. 12 C.F.R. 563.140 et. seq. (2009).

23. The scope of the federal oversight of WMB and WMI is evident in the OTS' handbooks for on-site examinations of federal thrifts and their holding companies. Section 310.4 of the OTS Examination Handbook for Thrifts instructs examiners to "[e]nsure that the [savings] association [such as WMB] maintains a corporate existence that is separate from its affiliates, subsidiaries, holding company, and sister banks."[6] OTS Examination Handbook for Thrifts at Section 310.4. Similarly, the OTS Holding Company Handbook for savings association holding companies, such as WMI, requires its examiners to analyze specific facts relating to the operational independence of the thrift subsidiary. Federal examiners thus were required to consider, among other things, the following:

- Whether WMB's management "acted in a manner that was beholden" to WMI;

- Whether WMB's operational systems were dependent on WMI;

---

[6] See http://files.ots.treas.gov/422110.pdf

- Whether WMI performed "most, if not all, key functions" of WMB such as "risk management, underwriting, investment advice, trading, and other banking or lending functions;"

- Whether WMB was merely a "shell" of WMI or whether WMB had a "distinct management team;"

- Whether WMB's audit functions were separate and distinct from WMI's audit department;

- Whether there was "significant or abusive intercompany or insider transactions" such as "loans, asset purchases sales, or service contracts;"

- Whether WMB was dependent on WMI for access to capital; and

- Whether WMB's assets were derived exclusively from WMI.

OTS Holding Company Handbook at Section 710.9 to 710.10.[7]

### D.     The Bondholders' Purchase Of Securities From WMB.

24.     On December 21, 2005, WMB established the Global Note Program that provided for the issuance of up to $22 billion in debt financing through the issuance of Senior Global Notes and Subordinated Global Notes, or both, from time to time.[8] The WMB Notes were offered "only to institutional investors that are 'accredited investors' ("Institutional Accredited Investors") within the meaning of Rule 501(a) under the United States Securities Act of 1933." Ex. 3 at 1. Under Rule 501(a), an "Accredited Investor" includes, among others, the following: banks, savings and loan associations, brokers or dealers registered under section 15 of the Securities Exchange Act of 1934, insurance companies and investment companies. The Offering Circular further stated:

> The Notes are exempt from registration with the Commission pursuant to an exemption contained in Section 3(a)(5) of the Securities Act. The Notes are being offered and sold pursuant to

---

[7] See http://files.ots.treas.gov/4210022.pdf

[8] See WMB's December 21, 2005 Offering Circular for Senior and Subordinated Global Notes (the "Offering Circular"). A copy of the Offering Circular is attached as Exhibit 3.

> an abbreviated registration procedure permitted by an OTS
> interpretive letter under the Securities Offering Regulations of the
> OTS. See Ex. 3 at ii.

The WMB Notes were offered through distribution agents, including Barclays Capital, Citigroup,

Credit Suisse First Boston, Deutsche Bank Securities, JPMC, Goldman, Sachs & Co., Lehman

Brothers, Morgan Stanley, Merrill Lynch & Co. and UBS Investment Bank. See Ex. 3 at 1.

     25.     The Offering Circular repeatedly stated that all obligations created by the WMB

Notes were obligations of WMB and not of any other party, including WMI. The third

paragraph of the Offering Circular clearly stated:

> Each Note issued by the Issuer will be an obligation solely of the
> Issuer and will not be an obligation of, or otherwise guaranteed by,
> Washington Mutual, Inc. ("WMI"), the ultimate parent corporation
> of the Issuer, or any affiliate of WMI. . . .The Notes are unsecured
> and uninsured direct general obligations of the Issuer.

Ex. 3 at 1 (emphasis added). Furthermore, the "Description of Notes" section provided that

"[e]ach Note will be a direct, unconditional and unsecured obligation of the Issuer and will not

be an obligation of, or guaranteed by, WMI or any other affiliate of WMI." Ex. 3 at 14. In

addition, the "Ranking" section stated that each type of note is an "unsecured and uninsured

direct obligation of the Issuer and will not be an obligation of, or guaranteed by WMI, or any

other affiliate of WMI." Ex. 3 at 16.

     26.     The Offering Circular disclosed to investors the priority their claims would have

in the event of liquidation or resolution of the Issuer, WMB, as follows:

> The Senior Notes rank *pari passu* with all other senior unsecured
> indebtedness of the Issuer, except deposit liabilities and other
> obligations that are subject to any priority or preference. In the
> event of liquidation or resolution of the Issuer by any receiver, the
> holders of deposits (including the FDIC as subrogee of insured
> depositors), the holders of certain other claims entitled to a priority
> or preference (including certain claims for administrative
> expenses) and the holders of secured obligations will be afforded
> priority in payment over the claims of the holders of the Senior

> Notes and the holders of other general obligations of the Issuer.
> The obligations evidenced by the Subordinated Notes are
> subordinated to all unsubordinated indebtedness and other
> obligations of the Issuer, including deposits and unsubordinated
> notes (including the Senior notes). In an insolvency of the Issuer,
> the holders of the Subordinated Notes could receive significantly
> less, if anything, than the holders of unsubordinated obligations,
> including the deposits and unsubordinated notes (including the
> Senior Notes) of the Issuer.

Ex. 3 at 16 (emphases added).[9]  By investing in the WMB Notes, the Bondholders agreed that

they would be creditors of WMB, not WMI.  Ex. 3 at 16.  They also agreed that their claims

would be subordinated to (1) WMB depositors, (2) creditors with claims-based obligations

subject to priority or preference, and (3) creditors with secured obligations.  Ex. 3 at 16.

## IV.    ARGUMENT

A.    **Most Of The Claims Should Be Disallowed Because The Bondholders Lack
       Standing.**

   1.    **The FDIC Has Exclusive Standing To Assert Claims That Allege
          Generalized Harm To WMB.**

27.     This Court should disallow virtually all of the Bondholders' Claims because only

the FDIC, and not the Bondholders, has standing to assert them.[10]  In fact, as discussed infra

Paragraph 31, the FDIC, in this case as well as in the DC Action, is pursuing virtually all of the

Bondholders' claims.  Each of the Claims assert generalized harm to WMB and, in turn, to all of

WMB's creditors; they do not aver particularized harm to the Bondholders.

28.     The FDIC's exclusive right to bring the claims is based on the powers and duties

that Congress delegated to it under the Financial Institutions Reform Recovery and Enforcement

Act ("FIRREA").  Pub. L. No. 101-73, 103 Stat. 183 (1989) (codified at scattered sections of

---

[9] The Offering Circular emphasized the ranking of the senior and subordinated notes several times
throughout the circular.  Ex. 3 at 14, 16.

[10] The FDIC does not have standing to assert the fraudulent transfer claim asserted by the Bondholders
here.

inter alia, 12 & 15 U.S.C.); Section 1821(d)(2)(A)(i) of FIRREA provides that the FDIC, when appointed as a receiver, succeeds to "all rights, titles, powers, and privileges of the insured depository institution . . . with respect to the institution and the assets of the institution." In effect, the FDIC stepped into the shoes of WMB when it was appointed as WMB's receiver. See O'Melveny & Myers v. FDIC, 512 U.S. 79, 86-87 (1994). The FDIC took possession of WMB's assets and liabilities and assumed responsibility for resolving claims on its behalf. See Vernon v. FDIC, 981 F.2d 1230, 1233-34 (11th Cir. 1993). The FDIC is responsible for "marshalling the insolvent bank's assets and distributing them to the insolvent bank's creditors and shareholders." Branch v. FDIC, 825 F. Supp. 384, 391 (D. Mass. 1993).

29.    Claims that are shared by all of WMB's creditors belong to the Receivership, and the FDIC has exclusive standing to assert them. Courtney v. Halleran, 485 F.3d 942, 950 (7th Cir. 2007); see also In re Longhorn Sec. Litig., 573 F. Supp. 255, 272 (W.D. Okla. 1983) ("As a general rule, wrongs committed by a bank's officers and directors that injure all depositors and creditors alike create a liability which is an asset of the bank itself and for which only the bank or its receiver may recover."). The FDIC's role as WMB's Receiver is similar to that of a bankruptcy trustee (although not with the same powers), who has exclusive standing to bring claims that are common to all creditors to prevent individual creditors from pursuing assets that should be distributed equally to all creditors.[11] The statutory policy governing insolvent banks protects creditors by ensuring that the pursuit of claims that are common to all creditors does not devolve into a "race of diligence" among creditors or make a "mockery" of the equality

---

[11] As in an FDIC receivership, "once a company or individual files for bankruptcy, creditors lack standing to assert claims that are 'property of the estate.'" Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 169 (3d Cir. 2002). Federal courts have recognized the similarity between the roles of the FDIC as receiver and a bankruptcy trustee as administrator of an estate. FDIC v. Ernst & Young LLP, 374 F.3d 579, 581 (7th Cir. 2004) ("FDIC-Receiver acquires the assets and legal interest of the failed bank and proceeds much as a trustee in bankruptcy.").

promised to creditors under federal law. See <u>Downriver Cmty. Fed. Credit Union v. Penn Square Bank</u>, 879 F.2d 754, 764 (10th Cir. 1989) (quoting <u>First Nat'l Bank v. Colby</u>, 88 U.S. 609, 614 (1875)).

30.     The Bondholders assert five claims that also are being pursued by the FDIC against WMI. In the FDIC Claim against WMI in this case (Claim 2140), the FDIC asserts claims for (1) undercapitalization, (2) tax payments, (3) fraudulent transfer, (4) trust preferred securities, (5) deposit accounts and (6) proceeds of the goodwill litigations. See Claim 2140. Additionally, in the DC Action, the FDIC brought counterclaims against the Debtors for the same claims. Here, the Bondholders also have brought duplicative claims for (1) improper claim to purported deposits, (2) undercapitalization of, failure to support, and looting of the bank, (3) conditional exchange of REIT trust preferred securities, (4) tax refunds and losses, and (5) proceeds of the goodwill litigations. Because the FDIC currently is pursuing these claims, the Bondholders lack standing to assert them. See <u>Agostino v. Hicks</u>, 845 A.2d 1110, 1116 (Del. Ch. 2004) (derivative action may not be pursued if corporation is willing and able to assert the suit on its own behalf); <u>cf. Commodore Int'l Ltd. v. Gould (In re Commodore Int'l, Ltd.)</u>, 253 B.R. 336, 339 (S.D.N.Y. 2000) (creditors committees "right [to bring a derivative suit] does not arise, however, when the debtor in possession is already pursuing the same claims.")

31.     The Marathon Credit Claimants are creditors of the receivership estate of WMB, which is in receivership. The Marathon Credit Claimants allegedly hold approximately $1.8 billion in principal amount outstanding of Senior Notes issued by WMB. Claims 3710, 3711 ¶1. The WMB Noteholders claim to hold approximately $1.1 billion in principal amount outstanding of Senior Notes and approximately $0.8 billion in principal amount outstanding of Subordinated Notes issued by WMB. Claim 2480 ¶3. The WMB Noteholders expressly state that their claims

are based on amounts that may be due to WMB by WMI. Claim 2480. Similarly, the Marathon

Credit Claimants acknowledge that they are bringing their claims derivatively on behalf of

WMB. Claims 3710, 3711 ¶2. Neither the Marathon Credit Claimants nor the WMB

Noteholders claim that they had privity of contract with either of the Debtors.

32.     The claims asserted by both the WMB Noteholders and the Marathon Credit

Claimants are common to all of WMB's creditors. In fact, while the Marathon Credit Claimants

claim that they "suffered direct injury" due to WMI's conduct, they concede that they are

bringing their claims "derivatively, on behalf of the Bank." See Claims 3710, 3711 ¶2. Where,

as here, creditors of an insolvent bank assert claims against a third-party and the alleged injury

was suffered equally by all creditors, those claims are derivative claims as opposed to individual

or direct claims. Hamid v. Price Waterhouse, 51 F.3d 1411, 1420 (9th Cir. 1995).

33.     Decisions of the Court of Appeals for the Seventh and Ninth Circuits involving

the dismissal of derivative claims of creditors of insolvent banks for lack of standing are

instructive. See Courtney, 485 F.3d at 950; Hamid, 51 F.3d at 1420. In Courtney, creditors of

an insolvent bank brought a class-action against the bank's owners, officers, directors and

accountants alleging that they violated the federal Racketeer Influenced and Corrupt

Organizations Act ("RICO") and committed other tortious conduct. Courtney, 485 F.3d at 943.

The creditors accused the defendants of withdrawing excessive amounts of money from the

bank, paying themselves large dividends, accepting large loans with no intention of repaying

them and making misrepresentations to creditors regarding the health of the bank. Id. at 944-45.

The Seventh Circuit upheld the district court's dismissal of the complaint on the ground that the

plaintiffs lacked standing. Id. at 950. The Seventh Circuit held that the creditors' RICO claims

were derivative, and could be brought only by the FDIC. Id. The court reasoned that the injuries from the alleged misrepresentations and looting were suffered by all creditors equally. Id.

34.     In Hamid, depositors of an insolvent bank brought an action against bank affiliates and insiders for illegally acquiring banks in the United States, causing deposits to be misused and misappropriated, and misrepresenting facts about the bank to regulators, which delayed its closing. Hamid, 51 F.3d at 1414. The Ninth Circuit affirmed the district court's dismissal of the complaint for lack of standing. Id. at 1421. Analogizing to a derivative action against a corporation, the court concluded that only the bank could assert such claims. Id. at 1420. It noted that when a creditor suffers injury that is independent of the firm's fate, his injury is direct and he may pursue his own remedy. Id. Otherwise, the court observed, the injury is derivative and the creditor must take his 'place in line' as a creditor in the bankruptcy action." Id. at 1420.[12]

35.     Like the creditors in Courtney and Hamid, the Bondholders allege that WMI looted WMB, made misrepresentations about the health of the bank and stole assets that could have been used to repay creditors, including the Bondholders. While the Debtors assert these claims are false, they nonetheless are classic derivative claims. To have standing to assert these claims, the Bondholders must demonstrate particularized injury to themselves. See, e.g., Adato v. Kagan, 599 F.2d 1111, 1117 (2d Cir. 1979) (holding that individual creditors can sue only if

---

[12] See also In re Sunrise Sec. Litig., 916 F.2d 874, 880 (3d Cir. 1990) (holding that creditors of a failed bank lacked standing to assert RICO claims against the bank's former officers and directors where "the gravamen of the complaint is injury primarily to the corporation or to the shareholders generally"); Downriver, 879 F.2d at 764 ("Any remedy for fraudulent representations that affects, or potentially affects, all creditors belongs to the receiver, who asserts such claims for the benefit of all creditors."); Brazlin v. W. Sav. & Loan Ass'n, Civ. No. 91-0078-PHX-SMM, 1994 WL 374286, at *4 (D. Ariz. Jan. 28, 1994) (holding that claims by noteholders of a failed bank to redress injuries against the bank and similarly-situated noteholders, as well as the plaintiff noteholders, were derivative and subject to the same legal principles governing shareholder derivative actions).

they have suffered a wrong that is "distinctly theirs and not common to all"). Yet, the Bondholders fail to assert how they were directly injured and submitted no evidence showing direct injury. Instead, they allege that "WMI dominated not only the Bank's finances, but also its business practices, and defrauded the Bank and its creditors, <u>including</u> the Bank Bondholders." Claims 3710, 3711 ¶8 (emphasis added). Although the Debtors contend that the Claims fail as a matter of law, it must be observed that allowing the Bondholders to pursue the Claims would give them the opportunity to "jump ahead of other creditors in priority and obtain greater shares of the failed bank's assets." <u>Hamid</u>, 51 F.3d at 1420.

> ## 2. Other Courts' Treatment Of The Specific Claims Asserted By The Bondholders Demonstrates That They Are Derivative.

36.    In addition to the Bondholders' claims being defective because they fail to allege particularized injury to themselves, courts have considered many of the types of claims asserted by the Bondholders and determined that such claims are derivative claims.

> ### a. Corporate Veil-Piercing And Substantive Consolidation.

37.    The Marathon Credit Claimants' corporate veil-piercing and substantive consolidation claims are derivative; they assert no particularized injury that is unique to the Marathon Credit Claimants.[13] As to the veil-piercing claim, the Marathon Credit Claimants merely assert that WMI was WMB's alter ego and that the two entities shared a common identity. Claims 3710, 3711 ¶8. However, these claims fail to allege that this relationship affected the Marathon Credit Claimants in a unique way. Rather, the claims refer generally to the purported impact on WMB and its creditors. This is a standard derivative claim that can be brought only by the FDIC, which is consistent with this Court's approach to veil-piercing claims

---

[13] Even if standing is somehow established, these claims also fail on the merits, which is discussed in Section IV.C-D.

common to all creditors in bankruptcies. See, e.g., OODC, LLC v. U.S. Bank Nat'l Ass'n (In re OODC), 321 B.R. 128, 136-37 (Bankr. D. Del. 2005) (holding that only the bankruptcy trustee has standing to assert veil-piercing claims common to all creditors and permissible under state law).[14]

38.     The substantive consolidation claims, which are closely aligned with the veil-piercing claims, also should be disallowed because they are derivative claims. Substantive consolidation is an "extreme" remedy, that "should be rare and, in any event, one of last resort." In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005). See also Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp., 934 P.2d 715, 721 (Wash. Ct. App. 1997), aff'd, 959 P.2d 1052 (Wash. 1998). Substantive consolidation is used so sparingly because a bankruptcy court can only order substantive consolidation when it is in the interest of all creditors, not just the entity seeking consolidation, and here, neither entity is seeking such consolidation. See Owens Corning, 419 F.3d at 211, 214.

39.     The substantive consolidation claims asserted here belong to all creditors of WMB; the Marathon Credit Claimants fail to allege an injury in connection with their substantive consolidation claims that is peculiar to them. See Duke Energy Trading & Mktg. L.L.C. v. Enron Corp. (In re Enron Corp.), No. 01-B-16034 (AJG), 2003 Bankr. LEXIS 330, at

---

[14] In bankruptcy cases, the trustee has exclusive standing to assert veil-piercing claims where the applicable state law permits a corporation to pierce its own veil. CBS, Inc. v. Folks (In re Folks), 211 B.R. 378, 384-85 (B.A.P. 9th Cir. 1997). Though there is no case law establishing whether a Washington corporation can pierce its own veil, Washington courts routinely look to Delaware law for guidance. See, e.g., In re F5 Networks, Inc. Derivative Litig., 207 P.3d 433 (Wash. 2009) (applying the Delaware demand futility standard and the reasoning of Ryan v. Gifford, 918 A.2d 341 (Del. Ch. 2007)); In re Cray Inc. Derivative Litig., 431 F. Supp. 2d 1114, 1120 (W.D. Wash. 2006) (concluding that the Washington Supreme Court would likely adopt the substantive demand requirement and "apply a similar, if not the same, exception for futility as that employed in Delaware"); see also Boland v. Engle, 113 F.3d 706, 710-712 (7th Cir. 1997) (noting that in predicting how Washington courts would rule that "Delaware corporate law is undoubtedly persuasive authority," but not necessarily dispositive) (internal quotation omitted)). Delaware law permits a corporation to pierce its own veil, see In re OODC, 321 B.R. at 136, and it is likely that Washington would follow suit.

*11 (Bankr. S.D.N.Y. Apr. 17, 2003) ("Where a claim is generalized, with no particularized injury stemming from it and where the claim may be brought by any creditor, the trustee or debtor-in-possession is the appropriate party to assert the claim and creditors are subject to the outcome of the action brought by the trustee or debtor-in-possession."). Moreover, the Marathon Credit Claimants are seeking to substantively consolidate a debtor with a non-debtor entity that is in a federal receivership but have not even brought an action, whether in the form of litigation against the FDIC, or institution of an adversary proceeding in this court to pursue this far-fetched theory.

<h4 style="text-align:center">b.    Misrepresentations And Material Omissions.</h4>

40.    The Bondholders' misrepresentation claims similarly are derivative and must be disallowed. The Bondholders allege that WMI, its directors and its officers made statements between July 2006 and July 2008 that misled investors regarding WMB's financial condition. See Claims 3710, 3711 ¶13; Claim 2480 ¶¶31-32. The Bondholders list several public statements purportedly made by WMI executives during earnings calls and investor conferences. However, the Bondholders do not plead facts demonstrating that they relied on these statements in making their investment decisions, or that these statements were material or were the cause of their alleged losses, as required to state a claim for violation of the federal securities laws or common law fraud. Nor do the Bondholders allege that the public statements uniquely impacted them. Instead, the Bondholders assert that these alleged misrepresentations and omissions impacted the entire market for Senior Notes. Id. These generalized allegations apply to all possible creditors of WMB, not only the Bondholders. Any claim for misrepresentations or omissions that allegedly affected or potentially affected all creditors belongs to the FDIC. See Downriver, 879 F.2d at 764 ("Any remedy for fraudulent representations that affects, or

potentially affects, all creditors belongs to the receiver, who asserts such claims for the benefit of all creditors.").

### c. Mismanagement And Breach Of Fiduciary Duties.

41.    The Bondholders' claims for alleged mismanagement and breach of fiduciary duties also are derivative in nature and belong to the Receivership. The claims allege that WMI and its directors and officers mismanaged WMB and breached their fiduciary duties both to WMB and to WMB's creditors. Claims 3710, 3711 ¶16; Claim 2480 ¶¶27-30. Though the Marathon Credit Claimants acknowledge that WMI would be liable to all of WMB's creditors and to the Receivership under these theories, they nevertheless seek individual compensation. Claims 3710, 3711 ¶16.

42.    This is precisely the type of claim that the Third Circuit has determined belongs solely to the Receivership. See In re Sunrise Sec. Litig., 916 F.2d at 888-89. In Sunrise, creditors of an insolvent bank asserted RICO claims against bank officials and alleged that they mismanaged bank assets. Id. at 887. The district court dismissed the claims on the ground that the plaintiffs lacked standing because the claims were derivative. The Third Circuit affirmed, holding that the claims were derivative and belonged to the FDIC. Id. at 888. The court reasoned that permitting the plaintiffs to pursue the claims "could disrupt the efforts of FDIC to recover the institution's assets, which were depleted by defendants' mismanagement and wrongdoing, for equitable distribution among all depositors and creditors in accordance with the federal priority scheme." Id. (emphasis in original).[15]

---

[15] See also Brandenburg v. Seidel, 859 F.2d 1179, 1191-92 (4th Cir. 1988) (holding that claims of misfeasance against officers and directors belonged to receivership and that permitting plaintiffs to proceed with their claims would disrupt the receiver's efforts to collect for the "general pool of. . . assets for distribution to the thrift's creditors." Although Brandenburg was later overruled on other grounds by Quackenbush v. Allstate Ins. Co., 517 U.S. 706 (1996), the Supreme Court did not disturb the Brandenburg court's holding on the misfeasance claims.).

43.     As in Sunrise, permitting the Bondholders to proceed with their mismanagement claims, along with all of their other derivative claims, will permit them to "jump ahead of other creditors" and disrupt the FDIC's effort to recover assets belonging to all creditors. Hamid, 51 F.3d at 1420; see also Downriver, 879 F.2d at 764 (recognizing that permitting all depositors to assert generalized claims would "deluge the FDIC with the potentially crushing weight of claims" for alleged acts that affected all depositors similarly). It also would violate federal policy regarding insolvent savings associations by allowing one group of creditors to collect assets owed to all creditors.

### 3.     The Bondholders Have Failed To Establish That They Have Standing To Assert Derivative Claims.

44.     The Marathon Credit Claimants make the conclusory assertion they have standing to assert claims against WMI either directly or on WMB's behalf.[16] Claims 3710, 3711 ¶2. In support of this misplaced assertion, the Marathon Credit Claimants cite, but do not discuss, the following three cases. See Hindes v. FDIC, 137 F.3d 148, 171-72 (3d Cir. 1998); Branch, 825 F. Supp. at 391; Suess v. United States, 33 Fed. Cl. 89, 96-97 (Fed. Cl. 1995). A straightforward reading of these cases discloses that none of them supports the Marathon Credit Claimants' bid for standing.

45.     Hindes is factually distinguishable and inapposite to the Marathon Credit Claimants' claims. In Hindes, the court considered whether shareholders of a failed bank had a private right of action to file a direct claim to enforce the FDIC's statutory duties under 12 U.S.C. § 1821(d)(15). 137 F. 3d at 169. The Hindes court held that the shareholders did not have a private right of action to enforce the FDIC statutory duties, but, *in dicta*, recognized that

---

[16] The WMB Noteholders' proof of claim, Claim 2480, contains no assertion that the WMB Noteholders have standing to assert direct or derivative claims on behalf of WMB. Rather, it is silent on the issue.

shareholders would have a direct claim against the FDIC to enforce the FDIC's duty to distribute surplus funds. Id. at 171. Unlike the shareholders in Hindes, the Marathon Credit Claimants are not asserting a claim against the FDIC to distribute surplus funds. Rather, they seek to assert a derivative claim, not a direct claim, against the shareholders of WMB to reimburse them for the lost value of a bond. Hindes therefore lends no support to the Marathon Credit Claimants' assertion that they have standing.

46.     Similarly, Branch and Suess involve materially different facts that fail to buttress the Marathon Credit Claimants' claim that they have standing. Branch and Suess hold that shareholders of an insolvent bank may bring derivative claims on behalf of the bank but only if the shareholders first make a demand on the FDIC to bring the claims or show that to do so would be futile. Branch, 825 F. Supp. at 405; Suess, 33 Fed. Cl. at 96-97. These cases also require that the shareholder demonstrate that the suit is necessary to protect the interest of creditors. Branch, 825 F. Supp. at 403. Both Branch and Suess involved a unique circumstance – not present here – where the FDIC had a direct conflict of interest affecting the proposed claim. Suess, 33 Fed. Cl. at 96-97 (discussing Branch). In Branch, the plaintiff sought to recover funds that the FDIC had previously transferred to a bank subsidiary to reduce the FDIC's costs in handling the subsidiary's failure. In Suess, the claim would have been filed by the Resolution Trust Company against the OTS, both of which are arms of the Treasury Department. Id. By contrast, here the FDIC faces no conflict of interest in a decision whether to assert claims against WMI. In fact, as noted in Section IV.A.1, the FDIC already is pursuing several of those claims in three separate litigations. Where a receiver is capable of and is pursuing claims, creditors cannot bring derivative suits to assert the same claims. See Agostino, 845 A.2d at 1116.

47.     Furthermore, other courts have not followed <u>Branch</u> and <u>Suess</u>.  For example, the

courts in <u>Hamid</u>, <u>Courtney</u>, and <u>Downriver</u>, upheld the dismissal of derivative claims by

creditors without exception.  <u>Hamid</u>, 51 F.3d at 1420-21; <u>Courtney</u>, 485 F.3d at 950; <u>Downriver</u>,

879 F.2d at 764-65.  In those cases, the creditors were not permitted to bring derivative claims,

demand or not.  Even if derivative claims on behalf of WMB were permitted in the face of a

demand or a showing of futility, the Marathon Credit Claimants have not addressed or satisfied

either requirement.  As such, the claims asserted by the Marathon Credit Claimants are the

property of the Receivership, and only the FDIC has standing to assert them.  Any other outcome

would permit the Marathon Credit Claimants to pursue for themselves potential assets of the

Receivership that belong to all creditors, not just to the Marathon Credit Claimants.

**B.      The Bondholders' Proofs of Claim Fail To State Plausible Claims On Which Relief Can Be Granted And Should Be Expunged.**

48.     Even if the Bondholders have standing, and the Debtors submit they do not, the

Court nevertheless should expunge the Claims because they fail to state plausible claims on

which relief may be granted.[17]  Dismissal of a proof of claim under 11 U.S.C. § 502(c) is

---

[17] The Claims should not be considered *prima facie* valid because the Bondholders failed to attach sufficient documentation to support their claims as required by Fed. R. Bankr. P. 3001(c).  Fed. R. Bankr. P. 3001(c) requires that "[w]hen a claim…is based on a writing, the original or a duplicate shall be filed with the proof of claim…." FED. R. BANKR. P. 3001(c).  A proof of claim that is "executed and filed in accordance with [the Bankruptcy Rules] shall constitute *prima facie* evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f) (emphasis added).  A proof of claim that does not comply with the Bankruptcy Rules, however, has no *prima facie* validity.  See In re Kincaid, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008).  Where a claim is based on a writing and the claimant fails to attach sufficient documentation to support its claim, the claim has no *prima facie* validity.  In re Stauder, 396 B.R. 609, 611 (Bankr. M.D. Pa. 2008) (holding that there was no *prima facie* validity of proof of claim where documentation attached to claims did not meet requirements of Rule 3001(c)).  Absent *prima facie* validity of the claim, the burden for proving the sufficiency of the claim remains with the claimant.  In re Kinkaid, 388 B.R. at 614; 9 Collier on Bankruptcy ¶3001.09 (2007).  Here, all of the Bondholders' claims arise out of their interest in the WMB Notes.  However, the Bondholders have not attached to the Claims any documentation regarding the WMB Notes as required by Rule 3001(c).  The Claims, therefore, have no *prima facie* validity.  Consequently, the burden of proving the validity of their Claims remains with the Bondholders.

equivalent to dismissing a claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted. See Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.), 398 B.R. 736, 748 (S.D.N.Y. 2008) (affirming bankruptcy court's dismissal of proof of claim for failure to state a plausible claim on which relief may be granted). As the Fifth Circuit explained in 900 Capital Servs., Inc. v. Cloud (In re Cloud), No. 99-51109, 2000 WL 634637, at *2 (5th Cir. May 4, 2000), by filing an objection to a proof of claim, the objectors create a contested matter, for which the bankruptcy court may exercise its power under Fed. R. Bankr. P. 9014 and 7012 to apply Rule 12(b)(6) to a contested matter. In Cloud, the Fifth Circuit affirmed the district court's judgment upholding the bankruptcy court's dismissal of a proof of claim for failure to state a plausible claim on which relief can be granted. Id. at *4.

49.     A plaintiff must "plead more than the possibility of relief to survive a motion to dismiss." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). As the Supreme Court recently made clear: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a motion to dismiss. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Rather, "all civil complaints must now set out sufficient factual matter to show that the claim is facially plausible." Fowler, 578 F.3d at 210 (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. Determining whether a complaint is facially plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." Id. at 1950 (citations and internal quotation marks omitted).

50.     In ruling on a motion to dismiss, the Third Circuit has instructed courts to conduct a two-part analysis. "First, the factual and legal elements of a claim should be separated." Fowler, 578 F.3d at 210-211. The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." Id. Second, the court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. (quoting Iqbal, 129 S.Ct. at 1950). None of the Claims meets this standard, which warrants their dismissal.

**C.      The Bondholders' Disregard Of Corporate Form Claims Should Be Expunged Because They Fail To Allege Plausible Claims For Relief And Are Undermined By Compelling Evidence.**

**1.      The Claims Fail To Allege A Plausible Claim For Relief Under The Doctrines Of Corporate Disregard And Alter Ego.**

51.     The Marathon Credit Claimants' claims for piercing the corporate veil are legally insufficient and must be expunged. Under Washington law,[18] parent corporations are generally recognized as distinct legal entities separate from their subsidiaries. United States v. Carey (In re Wade Cook Fin. Corp.), 375 B.R. 580, 598 (B.A.P. 9th Cir. 2007) (applying Washington law). Washington courts apply two theories when considering whether to establish indirect liability against a parent company: alter ego and corporate disregard. Under the alter ego theory, a plaintiff must show that: (1) one corporation "so dominates and controls another as to make that

---

[18] Under Delaware's choice of law rules, a Delaware court must apply the law of the state of incorporation of a company to determine whether the relationship between the corporate entity and its stockholders can give rise to liability of the stockholders for the conduct of the corporate entity. See Youkelsone v. Wash. Mut., Inc. (In re Wash. Mut., Inc.), 418 B.R. 107, 113-14 (Bankr. D. Del. 2009) (applying Washington law to alter ego claims because, in part, WMI was incorporated in Washington) (citing Rosenmiller v. Bordes, 607 A.2d 465, 468 (Del. Ch. 1991)). Moreover, federal regulations permitted WMB to elect to follow corporate governance rules of the laws of the State of Washington. See 12 C.F.R. 552.5(b)(3) (2009). In Article XI of its bylaws, WMB elected that "[t]he corporate governance procedures of the laws of the State of Washington (including but not limited to corporate governance related to the duties of directors) shall apply to the savings bank, provided that such procedures are not inconsistent with applicable Federal statutes and regulations." Accordingly, Washington law applies to the Bondholders' corporate disregard and alter ego claims.

other merely an adjunct to it," Superior Portland Cement, Inc. v. Pac. Coast Cement Co., 205

P.2d 597, 620 (Wash. 1949); Wade Cook, 375 B.R. at 599, and (2) regarding the corporations as

two entities in fact and intent "would work a fraud upon third persons." Wade Cook, 375 B.R. at

599 (citations omitted). Alternatively, under the corporate disregard theory, a plaintiff must

show (1) the corporate form was intentionally abused through fraud or manipulation to violate or

evade a duty owed to another and (2) the corporation's intentional misconduct caused harm to

the party seeking relief such that disregard of corporate separateness is necessary. Id. at 598

n.22. Courts, however, are very reluctant to disregard the corporate form. See Eagle Pac. Ins.

Co., 934 P.2d at 721 ("Disregarding the corporate form or 'piercing the corporate veil,' is an

equitable remedy imposed only in exceptional circumstances."); see also In re Alper Holdings,

USA, Inc., 398 B.R. 736, 757; Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,

233 F.R.D. 143, 145 (D. Del. 2005).

     52.     The Supreme Court has recognized that elements of control or supervision

inherent in every parent-subsidiary relationship do not give rise to veil-piercing liability:

> It is a general principle of corporate law deeply 'ingrained in our
> economic and legal systems' that a parent corporation (so-called
> because of control through ownership of another corporation's
> stock) is not liable for the acts of its subsidiaries. Thus it is
> hornbook law that 'the exercise of the 'control' which stock
> ownership gives to the stockholders. . . .will not create liability
> beyond the assets of the subsidiary. That 'control' includes the
> election of directors, the making of by-laws. . . .and the doing of all
> other acts incident to the legal status of stockholders. . . .

United States v. Bestfoods, 524 U.S. 51, 61-62 (1998) (internal citations and quotations omitted).

Similarly, sole ownership of a subsidiary by a holding company is a common business practice,

and does not justify veil-piercing absent other circumstances. Akzona, Inc. v. E.I. Du Pont De

Nemours & Co., 607 F. Supp. 227, 238 (D. Del. 1984); see also Minton v. Ralston Purina Co., 47

P.3d 556, 563 (Wash. 2002) ("[T]he fact that…Continental held itself out as a subsidiary of

Ralston does not justify disregarding the corporate entity."). "[T]here is nothing inherently improper about corporations creating subsidiaries to perform specific functions. That is what holding companies do" and "[a] contrary finding would 'ignore the historical justification for the corporate enterprise system.'" <u>Sun Trust Bank v. Sun Int'l Hotels Ltd.</u>, 184 F. Supp. 2d 1246, 1269 (S.D. Fla. 2001) (citations omitted).

53.     Two recent cases rejecting similar attempts to pierce the corporate veil and impose liability on bank holding companies support the dismissal of the Claims. In this Court's recent decision in <u>Youkelsone</u>, 418 B.R. 107 at 114-16, involving WMI and WMB, this Court rejected claims similar to those now being asserted. In <u>Youkelsone</u>, this Court applied Washington law in ruling on a motion to dismiss a complaint in which the plaintiff sought to hold WMI liable for alleged conduct committed by WMB under a corporate disregard theory. The Court held that the plaintiffs' bald allegations that WMI "oversaw, managed, controlled and supervised all operations of WMB" and "mere assertion[s] of fraud on the part of a subsidiary" did not state cognizable claims for relief under the doctrines of corporate disregard and alter ego. <u>Id.</u> at 115. The factual allegations in <u>Youkelsone</u> are similar to the Marathon Credit Claimants' general, conclusory allegations. The Court should apply the same rationale as in <u>Youkelsone</u> to expunge the Claims because they fail to allege plausible claims. <u>See also</u> <u>De Jesus v. Sears, Roebuck & Co., Inc.</u>, 87 F.3d 65, 70 (2d Cir. 1996) (affirming district court's dismissal of complaint that was devoid of any specific facts or circumstances that would support veil-piercing theory).

54.     Another recent case rejecting a creditor's similar attempt to pierce the corporate veil and to hold a bank holding company liable for the obligation of its subsidiary further supports dismissal of the Claims. <u>See</u> <u>McAnaney v. Astoria Fin. Corp.</u>, No. 04-CV-1101

(JFB)(WDW), 2009 WL 3150430 (E.D.N.Y. Sept. 29, 2009). In <u>McAnaney</u>, mortgage holders

filed suit against two bank holding companies alleging violations of the Truth in Lending Act,

consumer protection laws, breach of contract, fraud and unjust enrichment. <u>Id.</u> at *1. Plaintiffs

claimed that the bank holding companies' respective subsidiary banks each assessed improper

fees against the mortgage-holders. <u>Id.</u> at *2. Though plaintiffs acknowledged that the bank

holding companies did not originate or service the loans, they nevertheless argued that they

should be liable for the banks' acts because they allegedly controlled their subsidiaries. <u>Id.</u> at *7.

To support their allegations, plaintiffs offered evidence that (1) the bank holding companies had

a controlling interest in the banks, (2) the bank holding companies and the banks consolidated

their financial statements in public filings, and (3) the bank holding companies and banks shared

officers and directors. <u>Id.</u> at *8. Plaintiffs also relied on two press releases issued by the bank

holding companies that discussed the banks' lending activities. <u>Id.</u> at *8 n.13.

     55.    The district court granted the bank holding companies' motion for summary

judgment. The court held that there was no evidence indicating the bank holding companies'

direct involvement, and there was insufficient evidence from which a fact finder could

reasonably conclude that the corporate veil should be pierced under an alter ego theory. <u>Id.</u> at

*8-9. The district court reasoned that the facts simply demonstrated that the bank holding

companies had controlling interests in the subsidiary defendants. <u>Id.</u> The district court further

observed that the facts relied on by the plaintiffs were "commonplace as <u>generally-accepted</u>

<u>corporate form,</u> and are insufficient without more, as a matter of law, to eviscerate the

presumption of corporate separateness." <u>Id.</u> at 8 (emphasis added). As to the press releases, the

district court stated that the press releases did not represent that the bank holding companies

were directly involved in the lending activities, and were not probative as to the bank holding

companies' dominion and control over the banks. Id. at *8 n.13. While McAnaney was decided

on a motion for summary judgment, the district court's holding nevertheless is instructive given

the similarity of the facts in that case to the allegations in the Claims.

> a. **There Is No Plausible Claim Alleged Under The Doctrine Of Alter Ego.**
>
> (i) **The Marathon Credit Claimants' Allegations Regarding WMI's Domination And Control Of WMB Are Insufficient.**

56. Most of the allegations regarding WMI's domination and control of WMB are

general and conclusory. The Claims generally allege that WMI dominated WMB's finances and

business practices, undercapitalized the bank, defrauded WMB and its creditors, siphoned

billions of dollars from WMB and made misstatements regarding WMB's financial health.[19]

Claims 3710, 3711 ¶8. In addition, they assert that WMI was a contract party for WMB in

several third-party arrangements and that WMI operated a consolidated cash management system

with WMB. Id. Such factual and legal conclusions need not be accepted, and fail to state a

plausible claim to disregard the corporate form under an alter ego theory. See Youkelsone, 410

B.R. at 115.

57. The Marathon Credit Claimants also cite the following examples of WMI's

alleged domination of WMB:

> (a) "WMI and WMB had identical and overlapping directors;"

---

[19] The Marathon Credit Claimants also assert that they "may" have claims resulting from transactions between WMI and its subsidiary financial institutions that allegedly violated Section 23A and Section 23B of the Federal Reserve Act ("FRA"). See Claims 3710, 3711 ¶12. Those sections provide restrictions on transactions of depository institutions with affiliate companies. However, no private right of action is afforded claimants by the FRA. See Branch, 825 F. Supp. at 409 ("Here, the plain language of [section 23A of the FRA] and its enforcement provisions, the legislative scheme, and the supporting legislative history all indicate a lack of Congressional intent to create a cause of action for a bank and or its shareholders against other banks or the FDIC."). Even if the Marathon Credit Claimants alleged such a violation – which they plainly do not – no cause of action exists that they may assert. Therefore the claim should be expunged.

(b)     WMB and WMI "filed consolidated tax returns;"

(c)     WMI and WMB "were run together on the same information and accounting systems;"

(d)     WMB "managed all payroll, including payroll for WMI's employees;"

(e)     "The pension plan that cover[ed] the vast majority of Bank employees was sponsored by WMI;"

(f)     "[P]ublished reports indicate" that WMI cannot "locate any documentation establishing" deposit accounts it has with WMB;

(g)     "There is confusion as to which entity did business with which vendor;" and

(h)     "Payments were apparently made" by one entity "on behalf of another entity."  Claims 3710, 3711 ¶8.

These examples describe generally accepted business practices between corporate parents and their subsidiaries and the Marathon Credit Claimants seriously mischaracterize the legal consequences of these acts.  Likewise, they do not suggest excessive domination and control, and are insufficient to establish that WMI and WMB defrauded others.

58.     Contrary to the Marathon Credit Claimants' allegations, overlapping directors and joint meetings of boards of directors are considered part of a "normal, legitimate parent-subsidiary relationship."  Upjohn Co. v. Syntro Corp., Civ. A. No. 89-107-JJF, 1990 WL 79232, at *5 (D. Del. Mar. 9, 1990).  "[T]he mere fact that corporations share officers, employees, a physical site, and common ownership of stock is insufficient to justify disregarding the separate corporate identities."  Moses Lake Constr. Co., Inc. v. Johnson, Nos. 23587-4-III, 23588-2-III, 2006 WL 2147602, at *6 (Wash. Ct. App. July 27, 2006); see also, Minton, 47 P.3d at 563 ("mere ownership of stock, the same officers, employees, etc., does not justify disregarding the separate corporate identities unless fraud is being worked upon a third person.") (citations and internal quotation marks omitted).  In fact, Washington courts have refused to imply an overt

intent to disregard the corporate form from the presence of common directors, shareholders or a common business address. One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs., Inc., 30 P.3d 504, 514 (Wash. Ct. App. 2001), rev'd in part on other grounds, 61 P.3d 1094 (Wash. 2002).[20]

59.     Similarly, the Marathon Credit Claimants' allegations regarding WMI's and WMB's joint accounting procedures simply identify recognized business practices. Specifically, the filing of consolidated tax returns is neither improper nor unjust; it is expressly permitted by the Internal Revenue Code. Alberto v. Diversified Group, Inc., 55 F.3d 201, 207 (5th Cir. 1995) (applying Delaware law). Here, WMI and WMB were parties to a Tax Sharing Agreement, pursuant to which WMI would receive tax payments from affiliated entities and refunds from taxing authorities, and WMI would then pay amounts due the appropriate entities. See Declaration of Doreen Logan, dated January 19, 2010, attached hereto as Exhibit 4 ("Logan Decl."), ¶10. A parent corporation's use of a cash management system also is common, and courts generally decline to rely on this fact as a basis for alter ego liability. Fletcher v. Atex Inc., 68 F.3d 1451, 1459 (2d Cir. 1995) (citing cases). Cash management systems are indicative of administrative efficiency, and not equivalent to the intermingling of funds. Id. Moreover, WMB's alleged managing of payroll and WMI's sponsoring of the pension plan fail to establish domination and control sufficient to warrant veil-piercing. Courts have declined to pierce the

---

[20] See also Doe v. Unocal Corp., 248 F.3d 915, 927 (9th Cir. 2001) (rejecting plaintiff's argument that overlapping directors and officers was a basis for alter ego liability because, "[a] parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego"); McVeigh v. Unumprovident Corp., 300 F. Supp. 2d 731, 741 (W.D. Wis. 2002) ("Courts agree that complete stock ownership and even substantial overlap of officers and directors between a parent and its subsidiary are insufficient to establish that one is the mere instrumentality of the other.").

corporate veil based on similar common payroll funding activities. See Peterson v. Trailways, Inc., 555 F. Supp. 827, 832-33 (D. Colo. 1983).

60.     As to the allegation that WMI purportedly cannot locate documentation establishing "deposit accounts," this allegation also is insufficient to demonstrate "domination and control" by WMI. The allegation is squarely contradicted by evidence, as discussed in Section IV.C.2. In any event, there is no allegation that lack of documentation regarding the "deposit accounts" has caused any fraud or injustice. The allegation that there is "confusion" as to which entity did business with which vendor also is conclusory and insufficient to show improper domination. It also is not alleged to be related to any purported injustice.[21] Likewise, the allegation that "payments were apparently made by WMI" on behalf of another entity is conclusory and insufficient to demonstrate domination and control or any injustice or fraud. And, as discussed in further detail below, Section IV.C.2.d., these allegations are contradicted by evidence that payments made by WMB with respect to the accounts payable of WMI were pursuant to an Administrative Services Agreement and reconciliation process, by which WMI or WMB, as the case may be, were reimbursed for all such expenditures. See Logan Decl. ¶4-9. Moreover, given the precise, detailed language of the Offering Circular, it is clear that there was no "confusion" on the part of the Marathon Credit Claimants as to which entity they were dealing with in connection with the WMB Notes. See Section III.E.

---

[21] See Snohomish Sch. Dist. No. 201 v. Sportec Int'l, No. 35086-2-I, 1996 Wash. App. LEXIS 689, at *20 (Wash. Ct. App. Dec. 2, 1996) (plaintiff's confusion about which entity was responsible for warranty work under a construction contract was not sufficient to justify application of corporate disregard); Brown v. Gen. Elec. Capital Corp. (In re Foxmeyer Corp.), 290 B.R. 229, 240 (Bankr. D. Del. 2003) (evidence that the creditors were confused about which entity they could look to for payment was insufficient to justify piercing the corporate veil).

        **(ii)**     **The Allegations Regarding Fraud On The Marathon**
                         **Credit Claimants Are Insufficient.**

61.     The Claims further failed to allege plausible allegations that treatment of WMB

and WMI as separate entities would perpetrate a fraud on the Marathon Credit Claimants. See

Youkelsone, 418 B.R. 107, at 115-16 (holding that absent non-conclusory statements showing an

injustice or fraud was worked on third parties, complaint did not state a plausible claim for relief

that WMI is liable for any misconduct of WMB). There are no allegations that any alleged

payments made by WMI, WMB or WMBfsb on behalf of another entity were improper, or that

they caused harm to the Marathon Credit Claimants. Likewise, there are no allegations that

WMB's management of payroll or WMI's funding of pension plans violated a duty or caused an

injustice on third parties. Merely alleging that two corporations are "intimately related in

carrying on their business for the purpose of mutual benefit is not enough to characterize a

corporation as the alter ego of the other corporation." Wade Cook, 375 B.R. at 599.

62.     The allegation that WMI undercapitalized WMB similarly is insufficient to satisfy

the fraud requirement. Under Washington law, the corporate form should not be disregarded

solely because a corporation's assets are insufficient to discharge its obligations. Norhawk Invs.,

Inc. v. Subway Sandwich Shops, Inc., 811 P.2d 221, 223 (Wash. Ct. App. 1991). The proper

inquiry regarding capitalization is whether the corporation was established or used to defraud its

creditors or some other improper purpose, and not whether there is a shortage of capital. Trs. of

Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk, 332 F.3d 188, 197 (3d

Cir. 2003). The scope of this inquiry is typically limited to whether the initial capitalization at

the time of organization was adequate. See, e.g., In re Foxmeyer Corp., 290 B.R. at 244 (noting

that undercapitalization was "only relevant from a veil-piercing standpoint if such subsidiary was

inadequately capitalized and/or insolvent from its inception or such adverse status was

subsequently caused by acts of the subsidiary's parent").[22] Under this standard, a corporation that was adequately capitalized, but subsequently suffers financial reverses, is not undercapitalized. See WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS at § 41.33 (2009). The Bondholders assert no allegations to the contrary here.

63. The Marathon Credit Claimants' allegations fail to adequately assert that WMI dominated WMB in a way that would cause an injustice or fraud on the Bondholders if their separate status were not recognized. Wade Cook, 375 B.R. at 599.[23] Accordingly, the claims fail to state a plausible theory of liability based on the alter ego doctrine.

### b. There Is No Plausible Claim Alleged Under The Doctrine Of Corporate Disregard.

64. The focus of the inquiry under a theory of corporate disregard is whether the corporate form was used for intentional misconduct or fraud that caused injury to another. See Wade Cook, 375 B.R. at 598 n.22. The Claims fail to plead a plausible theory as to how WMB and WMI abused their corporate forms to perpetrate a fraud on the Bondholders. See Section IV.B.2.a.2. They also have failed to assert a plausible claim under the doctrine of corporate

---

[22] See also Trevino v. Merscorp, Inc., 583 F. Supp. 2d 521, 529-530 (D. Del. 2008) ("Assuming arguendo that Plaintiffs have adequately pled undercapitalization. . . .'[a] shortage of capital, as with all the factors of the alter ego doctrine, is not per se a reason to pierce the corporate veil . . . . Rather, the inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was *established* to defraud its creditors....") (emphasis added).

[23] Absent a showing of fraud or injustice, courts have refused to pierce the corporate veil, even where – unlike here – the plaintiff proved that the parent company diverted corporate assets. For example, in LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 289 (D. Del. 2000), the holders of indentures issued by a subsidiary's holding company attempted to pierce the veil and recover against the parent company when proceeds from the notes were used to pay dividends to the parent. The court refused to pierce the veil, ruling that the plaintiff had failed to demonstrate any fraud or similar injustice by the officers. Id. at 295. It also determined that the holding company had followed corporate formalities by verifying that the dividends were proper, through the use of an independent accounting firm, and by making public disclosures concerning the use of the proceeds from the sale of the notes. Id. at 296.

disregard. Since the Claims are insufficient under both the alter ego and corporate disregard doctrines, they must be disallowed.

> **2.** **Compelling Evidence Undermines The Bondholders' Veil-Piercing Claims.**
>
> > **a.** **OTS' Regulation And Oversight Of WMB And WMI Undermine The Claim That WMI Dominated And Controlled WMB.**

65.     Even if the Court declines to dismiss the Claims based on standing and/or pleading deficiencies, there nevertheless is compelling evidence negating the *prima facie* validity of the Claims. See In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992). WMI and WMB were subject to pervasive regulation, which undermines the bald assertion that WMI dominated and controlled WMB. This comprehensive regulatory scheme specifically encompasses the WMI-WMB relationship. OTS regularly reviewed the depository institution's corporate separateness, looking specifically at transactions between parent and subsidiary corporations. Section 310.4 of the OTS Examination Handbook for thrifts directs federal examiners to "[e]nsure that the association maintains a corporate existence that is separate from its affiliates, subsidiaries, holding company, and sister banks."[24] Section 710.8 of the OTS Holding Company Handbook further requires federal examiners to review the "Financial Independence of the Thrift Subsidiary."[25] The examination of financial independence is directly applicable to veil-piercing determinations. The OTS examinations consider whether the thrift's management consistently acts in a manner beholden to the holding company, or if the thrift is "basically a 'shell.'" Id. at Section 710.9.

---

[24] See http://files.ots.treas.gov/422110.pdf.

[25] See http://files.ots.treas.gov/4210022.pdf.

66.     To confirm that WMB was not subject to improper control by WMI, the OTS

monitored inter-affiliate transactions ensuring they were consistent with strict statutory

proscriptions.  See 12 U.S.C. § 371c (2009); 12 C.F.R. Part 223 (2009).[26]  This framework

protected WMB by regulating transactions between WMI and WMB.  Specifically, the

regulations governing intercompany transactions protected WMB by:

- Placing quantitative limitations on intercompany credit transactions to ensure that, in the aggregate, such intercompany transactions did not exceed 20 percent of bank capital and surplus or 10 percent with respect to any single bank affiliate;

- Requiring all extensions of credit from the bank to a parent (within the aggregate limits permitted) be fully collateralized for the protection of the bank;

- Prohibiting sales of substandard assets to the bank; and

- Mandating inter-affiliate service agreements be based on arm's-length relationships.

In addition, federal law also subjected WMB to pervasive capital adequacy rules and limitations

on dividend and other capital distributions by WMB.  See 12 C.F.R. Part 567 (2009); 12 C.F.R.

563.140, et seq (2009).  In light of the OTS' careful oversight of WMI and WMB, the claim that

WMI dominated and controlled WMB is baseless.

### b.     The Marathon Credit Claimants Have No Basis To Allege That Documentation Is Missing Regarding WMI's Deposit Account.

67.     The Marathon Credit Claimants allege that "WMI purports to have deposit

accounts with WMB, yet published reports indicate neither JPMC nor WMI can locate any

documentation establishing most of these accounts."  Claims 3710, 3711 ¶8.  This allegation fails

to identify any documents purportedly missing, and in fact there are none.  Indeed, the Debtors

---

[26] These rules are applicable to federal thrift institutions.  See 12 C.F.R. § 563.41 (2009); Section 11(a) of the Home Owners Loan Act, codified at 12 U.S.C. 1468(a) (1994).

addressed this issue previously through the sworn testimony of Doreen Logan, a former First

Vice President and transaction manager in WMB's Treasury Department, which WMI submitted

to this Court in the Turnover Action.[27]  Ms. Logan played a central role in transactions related to

the deposit accounts, and she explains that WMI's deposit accounts were properly recorded and

documented.  As Ms. Logan reports:

(1)     The Debtors had cash on deposit, in a total of six demand deposit accounts with
        WMB and WMBfsb, in excess of $3.8 billion as of September 25, 2008;

(2)     Each of these deposit accounts was established and maintained in accordance with
        internal policies and procedures governing intra-corporate deposit accounts;

(3)     Each account was accounted for in the books and records of WMB or WMBfsb as
        a demand deposit account; and

(4)     Transfers of funds from WMI's primary checking account at WMB to a newly-
        established checking account at WMBfsb were properly accounted for in "New
        Account Request Forms" and the transaction was properly reflected in the
        Account Statements for the relevant accounts.

Logan Aff. at ¶¶4, 10-26.  Thus, the WMI deposit accounts were properly documented, which

demonstrates that the veil-piercing claims are baseless.

> ### c.  The Bondholders Have No Basis To Allege Payments Were Improperly Made By WMI Or WMB On Behalf Of Each Other, Or That There Was "Confusion" Regarding Payments To Third Parties.

68.     The allegations that "[t]here is confusion as to which entity did business with

which vendor" and that "payments were apparently made" by one entity "on behalf of another

entity," are not only insufficient to establish a claim for veil-piercing, they also are directly

contradicted by evidence.  Claims 3710, 3711 ¶8.  WMI and WMB operated pursuant to an

Administrative Services Agreement, which provided that WMB was the entity that made

---

[27] See Aff. of Doreen Logan, dated May 19, 2009, Wash. Mut. Inc. v. JPMorgan Chase Bank, N.A., Case
No. 08-12229, Adv. Proc. No. 09-50934 [Docket #16], at pp. A-2-A-95 ("Logan Aff.").

payments to vendors, including for payroll and account payable services, on behalf of various affiliated Washington Mutual entities including WMI, no matter which entity was the legally obligated party pursuant to a contract. See Logan Decl. ¶5. The entities for whom payments were made were charged systematically for these payments through inter-company general ledger accounts. Id. WMB directly charged the respective affiliated entities, including WMI, for any services that WMB paid on behalf of such entity. Id. The respective affiliated entities, including WMI, then reimbursed WMB for any payments WMB had made on their behalf. Id. at ¶6. The reimbursements to/from WMB were processed by WMB's Inter-Company Accounting group and WMB's Cash Management/Treasury group was advised of the payment. Id. at ¶7. On at least a monthly basis, all inter-company accounts were reconciled and WMB was reimbursed for any payments it had made. Id. at ¶8. Because the payments made by WMB on behalf of other affiliated entities, including alleged payments to certain vendors, were properly accounted for pursuant to inter-company agreements and were reconciled and settled regularly, they cannot serve as a basis for piercing the corporate veil.

D. **The Marathon Credit Claimants' Substantive Consolidation Claims Should Be Dismissed Because The Doctrine Is Inapplicable And The Claims Fail To Allege Plausible Claims For Relief.**

1. **Substantive Consolidation Is Inapplicable Because WMB Is In Receivership.**

69. Substantive consolidation, a construct of federal common law, treats separate legal entities as if they were merged into a single survivor with consolidated assets and liabilities. In re Owens Corning, 419 F.3d at 205. As a result, the claims of creditors against separate debtors are morphed into claims against the consolidated survivor. Id. The remedy of substantive consolidation is inapplicable here because the Marathon Credit Claimants request that the Court consolidate the Debtors with WMB, an entity in receivership.

70.     The doctrine of substantive consolidation does not apply where the non-debtor is

in receivership. See Commodity Futures Trading Comm'n v. Eustace, Civ. Action No. 05-297,

2008 WL 471574 (E.D. Pa. Feb. 19, 2008). The district court's recent opinion in Eustace is

instructive on this issue. In Eustace, the Commodity Futures Trading Commission brought an

action against an individual and an asset management company for fraud, and sought the

appointment of an equity receiver. Id. at 1. The district court appointed an equity receiver for

the asset management company and its affiliates. Id. A related action was later commenced by

investors in the Cayman Islands where the funds were located, and a Cayman Islands court

appointed joint liquidators to liquidate the funds. Id. A dispute subsequently arose between the

joint liquidators and the receiver regarding the distribution of the funds. The joint liquidators

argued that the district court should apply the doctrine of substantive consolidation as articulated

in Owens Corning. Id. at *4-5.

71.     The district court rejected the joint liquidators' argument, holding that substantive

consolidation applied to bankruptcy proceedings, and that the district court sitting as the

receivership court did not exercise bankruptcy powers. Id. at *6. Moreover, the district court

emphasized that "the role of the court-appointed equity receiver in this case to be very relevant

and unique." Id. The district court noted that in Owens Corning, a group of creditors attempted

to use substantive consolidation to deprive another group of creditors of their rights. Id. In

contrast, the district court stressed that a receiver already had been appointed to represent the

interests of all creditors, thereby implying that substantive consolidation was inappropriate given

the role of the receiver. Id.

72.     Substantive consolidation is particularly inappropriate in the unique

circumstances presented here. First, the Marathon Credit Claimants have failed to bring an

action, whether in the form of litigation against the FDIC, or institution of an adversary proceeding in this Court to pursue this far-fetched theory. Second, Congress has specifically excluded insured depository institutions such as WMB from being debtors under the Bankruptcy Code. See 11 U.S.C. § 109 (2009). As a result, the FDIC, like the receiver in Eustace, has been appointed to marshal WMB's assets and distribute them to WMB's creditors. See Branch, 825 F. Supp. at 391. If this Court were to order substantive consolidation, it would impermissibly interfere with both the authority that Congress has granted the FDIC as WMB's receiver and Congress' determination to exclude entities such as WMB from certain aspects of the Bankruptcy Code.

### 2. The Marathon Credit Claimants' Claims Fail Because They Do Not State Plausible Claims For Substantive Consolidation.

73. Even if the doctrine of substantive consolidation applied, and the Debtors assert it does not, this Court nevertheless should dismiss these claims because they fail to allege a plausible claim for relief. To allege a facially plausible claim for substantive consolidation, the Bondholders must allege facts that satisfy the standard articulated by the Third Circuit in Owens Corning. Under Owens Corning, a bankruptcy court will only substantively consolidate a non-debtor entity with a debtor where it is shown that either:

a) The debtor and the non-debtor entity in their pre-petition conduct disregarded the separateness of their respective entities so significantly as to lead their creditors to treat them as one legal entity; or

b) That post-petition, the assets and liabilities of the debtor and the non-debtor entity sought to be consolidated are so hopelessly scrambled and commingled that it is impossible to separate them and tell them apart thereby resulting in harm to all creditors.

In re Owens Corning, 419 F.3d at 211. As a result, and as previously discussed, substantive consolidation is an extraordinary remedy to be implemented sparingly. See, e.g., id. at 208-09; Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515,

518 (2d Cir. 1988); Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.), 432 F.2d 1060, 1062-63 (2d Cir. 1970). Since substantive consolidation is extreme and imprecise, it is viewed as a rough justice remedy that should be utilized as a last resort. In re Owens Corning, 419 F.3d at 211. As demonstrated below, the Marathon Credit Claimants' claims fail to satisfy either prong of the Owens Corning standard.

### a. The Claims Fail To Allege Any Facts Pertaining To WMI's And WMB's Pre-Petition Conduct.

74. The Marathon Credit Claimants' substantive consolidation claims focus exclusively on *post-petition* conduct of the Debtors as opposed to *pre-petition* conduct. See Claims 3710, 3711 ¶9. The claims also fail to allege that the Marathon Credit Claimants actually and reasonably relied on any *pre-petition* conduct. In re Owens Corning, 419 F.3d at 212 ("[p]roponents who are creditors must also show that, in their prepetition course of dealing, they *actually and reasonably relied* on debtors' supposed unity") (emphasis added). Accordingly, the Claims do not satisfy the first prong of the Owens Corning test.

### b. The Marathon Credit Claimants' Claims Fail To Allege Sufficient Facts That WMI's And WMB's Assets And Liabilities Are Hopelessly Scrambled And Commingled Such That It Is Impossible To Separate Them Resulting In Harm To All Creditors.

75. The Claims attempt to assert that, post-petition, the assets and liabilities of WMI and WMB are so hopelessly scrambled and commingled that it is impossible to separate them and tell them apart, thereby resulting in harm to all creditors. The Claims contain the following allegations that arguably relate to this issue:

- In a pleading recently filed with the Bankruptcy Court, JPMC has claimed that "[e]ven after nearly four months of concerted effort, beyond the day-to-day banking operations, there has been little tangible progress in separating WMB from its former parent beyond identifying the larger issues between the parties."

- WMI's President allegedly indicated that JPMC still needs to clarify, to the extent possible, which assets are WMI's and which are WMB's.

- JPMC allegedly indicated that its effort to separate WMB from WMI "has been even further complicated by the fact that the books and records of WMB, its parent companies and their respective predecessors in interest were largely maintained on a combined basis by the same personnel."

- WMI's restructuring officer allegedly stated that WMI continues to have a problem "in figuring out what belongs to the Bank and what belongs to the holding company." Claims 3710, 3711 ¶9.

These allegations, which primarily reflect JPMC's dissatisfaction at not having been able to acquire certain assets at the time of the FDIC's liquidation of substantially all of WMB's assets, are legally insufficient.

76.     In a case involving remarkably similar allegations, the bankruptcy court dismissed a substantive consolidation claim on the ground that the allegations did not state a plausible claim for relief. Simon v. ASIMCO Techs., Inc. (In re Am. Camshaft Specialties, Inc.), 410 B.R. 765 (Bankr. E.D. Mich. 2009). In American Camshaft, the trustee's complaint alleged that the debtors and non-debtors (1) made numerous loans to each other and it was difficult, if not impossible, to accurately determine the liabilities between the entities; (2) had combined financial statements; (3) presented financial information collectively to the companies' super board; (4) had common employees, making it difficult to separate each entity's liability for wages; and (5) commingled money, assets and employees making it impossible to segregate their assets and liabilities. Id. at 790. The bankruptcy court held that these allegations were insufficient to show that the debtors' and non-debtors' assets and liabilities were hopelessly scrambled and commingled such that it was impossible to distinguish them. Id. at 790-91. The bankruptcy court reasoned that these allegations, at most, alleged that the trustee could not determine how much the entities owed to each other, which was insufficient under the second prong of the Owens Corning test. Id. at 791.

77.     Here, as in <u>American Camshaft</u>, the Marathon Credit Claimants' allegations merely suggest that JPMC has had difficulty determining which assets are WMB's and WMI's. This clearly does not rise to the requisite level of assets that are "hopelessly scrambled and commingled." <u>Id.</u> The Marathon Credit Claimants further have failed to allege facts showing that substantive consolidation would benefit every creditor. Dismissal of these claims thus is warranted.

**E.      The Bondholders Cannot Maintain A Claim For Fraudulent Transfer.**

78.     The Bondholders' fraudulent transfer claims are based on the Uniform Fraudulent Transfer Act ("UFTA"), codified in Washington by the Revised Code of Washington § 19.40.  In general, a fraudulent transfer occurs where one entity transfers an asset to another entity, with the effect of placing the asset out of the reach of a creditor of the transferring entity, with either the intent to hinder, delay or defraud the creditor or in exchange for less than reasonably equivalent value at a time when the transferring entity was insolvent or rendered insolvent or undercapitalized as a result of the transfer. <u>See</u> <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 240 (3d Cir. 2000).

79.     The Bondholders' alleged fraudulent transfer claims fall into three general categories. First, they allege that certain transfers made by WMB were made with actual intent to hinder, delay, or defraud creditors of WMB (the "Actual Fraudulent Transfer Claims"). WASH. REV. CODE § 19.40.041(a)(1). Second, they allege that certain transfers were made by WMB at a time when WMB was insolvent, had unreasonably small assets, or intended to incur debts beyond its ability to pay, without the receipt of "reasonably equivalent value" (the "Constructive Fraudulent Transfer Claims"). WASH. REV. CODE §§ 19.40.041(a)(2); 19.40.051(a). Third, they allege that certain transfers of WMB were made to WMI at a time when WMB was insolvent, on

account of an antecedent debt, and that WMI had reasonable cause to believe that WMB was insolvent (the "Insider Preference Claim"). WASH REV. CODE § 19.40.051(b).[28]

80.     These theories, the Bondholders assert, apply to dividends paid from WMB to an intermediary, and then to WMI and also to WMI's deposits when withdrawn from WMB. However, the Bondholders' claims with respect to the dividends fail because WMB was not insolvent at the time of the issuance (in each instance, before September 2007) and because the Bondholders fail to, and cannot, allege actual fraudulent intent on the part of WMB or WMI. The Bondholders' claims with respect to the withdrawal of WMI deposits from WMB and re-deposit into WMBfsb (the "Deposit Transfer") fail too because reasonably equivalent value was received by WMB (through the satisfaction of the deposit liability owed by WMI) and because the transaction did not harm creditors of WMB given that the transferred funds were subject to

---

[28] The WMB Noteholders also allege that "WMB may have claims against WMI for [fraudulent] transfers." Claim 2480 ¶8. First, as a threshold matter, the WMB Noteholders do not have standing to assert a claim on behalf of WMB. See In re Refco Inc., 505 F.3d 109, 117 (2d Cir. 2007) ("To the extent that the rights of a party in interest are asserted, those rights must be asserted by the party in interest, not someone else."). Second, such speculative allegations are insufficient under Supreme Court law. See Bell Atl. v. Twombly, 550 U.S. 544, 561 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level...."). Third, the statute cited by the WMB Noteholders, 12 U.S.C. § 1821(d)(17)(A) is simply inapplicable to transfers of an interest in WMB's property. The plain language of the statute makes this clear: "The Corporation, as conservator or receiver for any insured depository institution . . . may avoid a transfer of any interest of an institution-affiliated party, or any person who the Corporation or conservator determines is a debtor of the institution, in property, or any obligation incurred by such party or person, that was made within 5 years of the date on which the Corporation or conservator was appointed conservator or receiver if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the insured depository institution, the Corporation or other conservator, or any other appropriate Federal banking agency. 12 U.S.C. § 1821(d)(17)(A) (emphasis added); see, e.g., In re Colonial Realty Co., 980 F.2d 125, 127-28 (2d Cir. 1992) (FDIC seeking to assert section 1821(d)(17)(A) to avoid transfer of insider individual who was a debtor to the failed bank to his wife). Here, the WMB Noteholders muse that claims may exist under this statute for "up streaming of dividends or other distributions by WMB to WMI." Claim 2480 ¶8. In sum, the WMB Noteholders have mistaken both parties to which this statute references and is applicable. First, the statute affords the FDIC, not the WMB Noteholders, with a right of action under certain circumstances. Second, the transferor contemplated by the statute is an "institution-affiliated party" or a "debtor of the institution," not the failed depository institution itself. The WMB Noteholders only vaguely speculate concerning alleged transfers from WMB to WMI. Thus, even if the WMB Noteholders had standing to assert such a claim, which they do not, and even if they had plead the claim sufficiently, the claim fails.

FIRREA's "depositor preference." In each instance, the Bondholders carry the burden of proving that the transfer in question was fraudulent and they fail to do so. Sedwick v. Gwinn, 873 P.2d 528, 531-532 (Wash. Ct. App. 1994).

### 1. The Dividends Were Not Fraudulent Transfers.

#### a. Actual Fraudulent Transfer Claims Fail Because The Dividends Were Not Made With Actual Intent to Hinder, Delay or Defraud Creditors of WMB.

81. In September 2007 and at prior times, WMB paid dividends (the "Dividends") to its then-direct parent, New American Capital, Inc. ("NACI").[29] In turn, in certain instances NACI transferred funds (not necessarily in an amount equal to those received by WMB) to WMI. WMB never paid Dividends directly to WMI. Logan Decl. at ¶11. The last Dividend that WMB paid occurred in September 2007 in the amount of $1 billion. Id. From the September 2007 Dividend until WMB was placed into receivership, WMB did not pay any Dividends to NACI or WMI, as the case may be. Id.

82. Pursuant to WASH REV. CODE § 19.40.041(a)(1), the Bondholders assert that the Dividends were made with the "actual intent to hinder, delay or defraud a creditor" of WMB. (Claims 3710, 3711 ¶10; Claim 2480 ¶24.) To prevail on their claims, the Bondholders must provide "clear and satisfactory proof" of such an intent. U.S. v. Townley, 181 Fed. Appx. 630, 631 (9th Cir. 2006) (emphasis added). In determining whether there was actual intent to defraud exists for purposes of satisfying WASH REV. CODE § 19.40.041(a)(1), the court may consider these nonexclusive factors: whether (1) the transfer was to an insider; (2) the debtor retained control over the property transferred; (3) the transfer was disclosed or concealed; (4) before the transfer, the debtor had been threatened with suit; (5) the transfer was of substantially all the

---

[29] NACI ultimately was merged into WMB as of November 1, 2007.

debtor's assets; (6) the debtor absconded; (7) the debtor concealed assets; (8) the debtor did or did not receive reasonably equivalent value for the transfer; (9) the debtor was insolvent or became insolvent soon after the transfer, (10) the debtor incurred a substantial debt shortly before or after the transfer; and (11) the debtor transferred the assets of the business to a lienor who transferred the assets to an insider. Worthington v. Low Cost Drugs, Inc., No. 18102-2-III, 2000 WL 199004, at *4 (Wash. Ct. App. Feb. 15, 2000) (citing WASH. REV. CODE § 19.40.041(b)). Moreover, Fed. R. Civ. P. 9(b), requiring averments of fraud to be plead with particularity, applies to fraudulent transfer claims. PHP Liquidating, LLC v. Robbins, 291 B.R. 592, 602 (D. Del. 2003).

83.    The Bondholders do not allege, because they cannot, that WMB retained control over the Dividends; that the Dividends were concealed;[30] that the Dividends were motivated by litigation; that the Dividends comprised substantially all of WMB's assets; that WMB absconded; that WMB concealed assets; that WMB was insolvent before September 2007 (as more thoroughly discussed below); or that the Dividends were transferred to a lienor. See WASH. REV. CODE § 19.40.041(b). The only factor that the Bondholders could possibly assert is that the Dividends were issued first to an insider, NACI, then to WMI, and that WMB did not receive any tangible consideration in the exchange. However, these are hardly remarkable given the fact that WMB is (or was at one time with respect to NACI) a wholly-owned subsidiary of

---

[30] To the contrary, the Dividends were fully-disclosed in WMI's public filings. See WMI Annual Report (Form 10-k), at 185 (May 22, 2008). A copy of the Form 10-K is attached as Exhibit 5. Moreover, WMB was subject to OTS regulations that limit the ability of savings associations to pay dividends and make other capital distributions and require OTS approval. See 12 C.F.R. Part 563, Subpart E (2009). WMB was required to file an application or notice with the OTS at least 30 days before the proposed payment of all dividends or payment of a proposed capital distribution because it is a subsidiary of a savings and loan holding company. 12 C.F.R. §563.144 (2009). Thus, OTS was notified of the Dividends and approved the issuance of the Dividends.

the transferees and the inherent nature and function of dividends (i.e., to return equity value to shareholders).

84.     Not only is there a dearth of any indication of fraud in the allegations, but there also is clear evidence that there was no fraudulent intent. Over the course of the pertinent period, WMB was current on its obligations to the Bondholders. Logan Decl. at ¶13. Further, as of September 30, 2007, WMB had satisfied all capital adequacy requirements to which it was subject and the OTS categorized WMB as "well-capitalized" under the regulatory framework for prompt corrective action. See WMB Quarterly Report (Form 10-Q), at 25 (Nov. 14, 2007) at 5. Moreover, all of the Dividends were paid only after being approved by the OTS after the OTS gave due consideration to WMB's remaining capital adequacy (i.e. that WMB would satisfy minimum capital adequacy requirements after giving effect to payment of the Dividends), as well as all "relevant information concerning the proposed capital distribution, including the amount, timing, and type of distribution." See 12 CFR Part 563, Subpart E (2009). Significantly, subsequent to the payment of the Dividends, WMI contributed $6.5 billion in capital contributions (the "Capital Contributions") to WMB. Logan Decl. at ¶13. The premise that WMB issued the Dividends to hinder, delay or defraud the Bondholders is irreconcilable with the fact that WMB subsequently received an even greater amount from the ultimate recipient of the Dividends, WMI.

85.     In sum, the Bondholders fail to allege any facts that support plausible claims for relief and assert no evidence whatsoever of actual intent to defraud by WMB or WMI. Rather, all of the evidence surrounding the Dividends points to the contrary, including the fact that the Dividends were issued approximately a year before the P&A Agreement and the Commencement Date, were approved by the OTS, and were followed by an even greater dollar amount of Capital

Contributions from WMI to WMB. Under these circumstances, the Bondholders' naked, conclusory assertions fall far short of providing the Court with "clear and satisfactory proof" of fraudulent intent by WMB or WMI to hinder, delay or defraud any creditor of WMB and fall short of satisfying Rule 9(b)'s requirements. See In re Fedders N. Am., Inc., 405 B.R. 527, 545 (Bankr. D. Del. 2009) (holding plaintiff failed to state a fraudulent transfer claim even under the more lenient requirements of Rule 8 where single badge of fraud was plead – insolvency – and where transaction was not concealed).

### 2. WMB Was Not Insolvent At The Time Of The Dividends.

86.     Notwithstanding the financial condition of WMB in 2008 before the Receivership, as of September 2007 and earlier, WMB was a solvent bank that displayed an ability to pay its debts as they became due. The Bondholders have asserted Constructive Fraudulent Transfer Claims in connection with the Dividends, asserting that WMB did not receive reasonably equivalent value in return. The Bondholders fail to assert any facts that support a finding that WMB was financially distressed at the time of the Dividends. However, to prevail, the Bondholders must prove that WMB was left with unreasonably small assets, intended to incur more debts than it would be able to pay, or was insolvent at the time of the Dividends. WASH. REV. CODE §§ 19.40.041(a)(2); 19.40.051(a). Moreover, during the pertinent period, WMB's financial statements, credit ratings issued by the leading rating agencies, and capital ratios all indicated that none of the foregoing applied to WMB. Therefore, because the Bondholders cannot meet their burden to prove such Constructive Fraudulent Transfer Claims, these claims should be expunged.

87.     As of September 30, 2007, WMB reported to the OTS $27 billion in equity and $18 billion in tangible equity. See WMB Quarterly Report (Form 10-Q), at 2 (Nov. 14, 2007). Further, between June and October 2007, WMB credit ratings were investment grade and stable,

remaining unchanged at A1, A, and A at Moodys, S&P, and Fitch, respectively.[31] Finally, although not necessarily indicative of solvency, from May 2007 to October 2007, even WMB's subordinated bonds traded near or at par with negligible volatility.[32]

88.     In view of the fact that the Bondholders have not alleged any facts that support a plausible claim and have set forth no evidence that WMB was left with unreasonably small assets, or intended to incur more debts that it would be able to pay, or was insolvent at the time of the Dividends coupled with the indicia discussed above concerning the financial condition of WMB at the time of the Dividends, the Bondholders' Constructive Fraudulent Transfer Claims fail to state a claim and should be dismissed.

### 3.     The Deposit Transfer Was Not A Fraudulent Transfer.

#### a.     The Deposit Transfer Is Not Avoidable Under Fraudulent Transfer Law.

89.     Only the Marathon Credit Claimants assert a claim in connection with the Deposit Transfer. Unlike the Dividends, the Deposit Transfer is indisputably on account of an antecedent debt, i.e., deposit liabilities. The Marathon Credit Claimants concede this point, which forecloses any Constructive Fraudulent Transfer Claims in connection with the Deposits. (Claims 3710, 3711 ¶10.)[33] Thus, the Marathon Credit Claimants are left asserting only an

---

[31] See Bloomberg, WMB Credit Profile - Moody's/S&P/Fitch (Bloomberg Finance L.P., Jan 4, 2010), attached as Exhibit 6.

[32] See Bloomberg, WMB daily bond pricing, 5/30/07 – 10/31/07 (Bloomberg Finance L.P., Jan. 5, 2010), attached as Exhibit 7.

[33] Thus, any Constructive Fraudulent Transfer Claims asserted under § 19.40.041(a)(2)(i), (ii) or § 19.40.051(a) fail, as the Deposit Transfer was for reasonably equivalent value. It is well settled that satisfaction of antecedent debt constitutes reasonably equivalent value. See Maddox v. Robertson (In re Prejean), 994 F.2d 706, 707 n.2 (9th Cir. 1993); WASH. REV. CODE § 19.40.031(a) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."); 11 U.S.C. § 548(d)(2)(A) (2009) (defining "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . .") (emphases added). See also Official Employment-Related Issues Comm. v. Arnold (In re Enron Corp.), Bankr. No. 01-16034-AJG,

Insider Preference Claim, claiming that the "transfer was made to an insider for an antecedent debt, [WMB] was insolvent at that time, and [WMI] had reasonable cause to believe that the debtor was insolvent." WASH REV. CODE § 19.40.051(b).

90.     On or about September 18, 2008, WMI decided to transfer $3.764 billion from its primary checking account, Account 0667 at WMB, to WMBfsb. Logan Aff. at ¶13. This sum represented the majority of the funds in the account. Id. at ¶15. During the attempted transfer, an administrative processing error occurred, and a new account (Account 4218) was opened at WMB instead of at WMBfsb. Id. at ¶20. Due to the error, the funds were transferred to Account 4218 at WMB. Id.

91.     On September 22, 2008, the transaction was corrected retroactively to the date of September 19, 2008. Id. at ¶22. A new account was created at WMBfsb, Account 4234, and the $3.674 billion (the "Deposits") was transferred from WMB Account 4218 to WMBfsb Account 4234 (the "Deposit Transfer"). Id.

92.     Shortly after transferring the Deposits from WMB to WMBfsb, WMBfsb loaned funds in an equal amount to WMB under the Revolving Master Note (the "Master Note"). Id. at ¶41. Established in September 2004, the Master Note was utilized by WMBfsb in the ordinary course to lend substantially all of its excess liquidity to WMB. Both WMB and WMBfsb benefited from this arrangement. This allowed WMBfsb to earn a higher rate of return on its excess capital pursuant to the interest-bearing provisions of the Master Note that paid interest at the one-month LIBOR. Further, loaning the cash to WMB meant that neither WMB nor

---

Adv. Nos. 03-3522, 03-3721, 2005 WL 6237551, at *43 (Bankr. S.D. Tex. Dec. 9, 2005) ("States that have adopted the UFTA interpret it similarly to" the reasonably equivalent value standard under the Bankruptcy Code).

WMBfsb had to pay deposit insurance on the funds as they would if the funds were otherwise kept in a demand deposit.

93.     Utilization of the Master Note ensured that WMB's assets were unaffected pursuant to the Deposit Transfer because WMB's cash balance was replenished with Master Note proceeds. On the liability side, WMB's deposit liability (owed WMI) was replaced with an equivalent increase in WMB's liability under the Master Note. More importantly, from a banking perspective, WMB benefited from this arrangement because its liquidity was unaffected given that its cash position remained constant.

94.     Because the Deposit Transfer did not remove value that was otherwise distributable to unsecured creditors, this Insider Preference Claim falls outside the scope and purpose of the UFTA and therefore should be expunged.

95.     The Supreme Court of the State of Washington recently clarified that "the overriding purpose of the UFTA is to provide relief for creditors whose collection on a debt is frustrated by the actions of a debtor to place the putatively satisfying assets beyond the reach of the creditor." Thompson v. Hanson, 219 P.3d 659, 665 (Wash. 2009) (citation omitted and emphasis added). See also Rainier Nat. Bank v. McCracken, 26 Wash. App. 498, 505-06, (Wash. Ct. App. 1980) ("The principle underlying the law of fraudulent conveyances is that the creditor has a claim on the property of his or her debtor, constituting a fund from which the debt should be paid, and that the debtor may not ignore the right or equity of his or her creditors to be paid out of it.") (emphasis added). Consistent with this principle, only "transfers" of "assets" are avoidable under the UFTA. WASH. REV. CODE § 19.40.011(2). The official comments to the UFTA state that it is "appropriate to exclude property interests that are beyond the reach of

unsecured creditors from the definition of 'asset' for the purposes of [the UFTA]." See Uniform Fraudulent Transfer Act § 1 cmt. n.2 (1984).

96.    Based on these controlling principles of law, the Deposit Transfer cannot constitute a fraudulent transfer. FIRREA's "depositor preference" provides that the Deposits are assets beyond the reach of unsecured creditors. 12 U.S.C. § 1821(d)(11) (2009).[34]  Pursuant to this priority scheme, bank depositors enjoy legal priority over unsecured creditors of a failed depository institution, such as the Bondholders. Assets that would be used to satisfy depositor claims are therefore "beyond the reach" of unsecured creditors (see Thompson, 219 P.3d at 665) and therefore, outside the scope of the UFTA.[35]  Further, as discussed supra, this point was expressly disclosed to the Bondholders in the Offering Circular which provides that "the holders of deposits including the FDIC as subrogee of insured depositors. . .will be afforded priority in payment over the claims of the holders of the Senior Notes and the holders of other general obligations of the Issuer." Ex. 3 at 16.

97.    WMB's Deposit Transfer did not place any "putatively satisfying assets beyond the reach" of the Bondholders. In fact, the assets that were transferred were deposit funds and, thus, were always and forever out of the reach of general unsecured creditors of WMB, including

---

[34] 12 U.S.C. § 1821(d)(11) states, "Depositor preference" provides, in pertinent part: "amounts realized from the liquidation or other resolution of any insured depository institution by any receiver appointed for such institution shall be distributed to pay claims (other than secured claims to the extent of any such security) in the following order of priority: (i) Administrative expenses of the receiver. (ii) Any deposit liability of the institution. (iii) Any other general or senior liability of the institution . . . ." 12 U.S.C. § 1821(d)(11)(A) (2009).

[35] This principle is further evinced by analogy to transfers of property subject to a valid lien. Under the UFTA, only "transfers" of "assets" are avoidable. WASH. REV. CODE § 19.40.011 (2)(i). Given that "property to the extent it is encumbered by a valid lien" is carved out from the definition of "asset," transfers of such property are not avoidable and are beyond the reach of the UFTA. See O'Neil v. Jones (In re Jones), 403 B.R. 228, 235 (Bankr. D. Conn. 2009) ("in order to be a 'Transfer' under the CUFTA, the property that is the subject of the transaction at issue must be an 'Asset'"); Joseph v. Madray (In re Brun), 360 B.R. 669, 674 (Bankr. C.D. Cal. 2007) ("property that is fully encumbered and/or exempt is not voidable as a fraudulent transfer").

the Bondholders, by virtue of the "depositor preference" under the FDI Act. 12 U.S.C. §

1821(d)(11) (2009). That is, even absent the Deposit Transfer, should WMB have been placed

into receivership – as it in fact was – these assets would have been paid solely to WMI, the

depositor. Id. Alternatively, JPMC would have assumed the Deposits pursuant to the P&A

Agreement, yielding the same effect. Either way, the value would have inured solely to WMI.[36]

Allowing creditors that could never expect to look to the Deposits for recovery to avoid the

transfer of such funds pursuant to the UFTA would contravene the UFTA's purpose. See

Thompson, 219 P.3d at 665 ("We construe statutes to effect their purpose and avoid unlikely or

absurd results."). Under these circumstances, the Deposit Transfer is not an avoidable transfer

that may be redressed by the UFTA as incorporated under Washington law.[37]

---

[36] Although not technically an element of an Insider Preference Claim, section 547(b)(5) of the Bankruptcy Code should be considered. In bankruptcy, a debtor may not avoid a transfer on account of an antecedent debt unless the transfer results in that creditor having received more than it would have received under a hypothetical chapter 7 liquidation. 11 U.S.C. § 547(b)(5) (2009); see, e.g., Neuger v. United States (In re Tenna Corp.), 801 F.2d 819, 822 (6th Cir. 1986). Thus, even if the defendant-creditor does derive a cognizable "benefit," the transfer is avoidable only if it diminishes the fund to which creditors can legally resort for the payment of their debts. In re Erin Food Servs., Inc., 980 F.2d 792, 803 (1st Cir. 1992). Here, for the reasons discussed in the text, WMI would have fared no worse, and the Bondholders no better, had WMB failed and the Deposit Transfer not occurred. Consideration of section 547(b)(5) only further supports the fact that the Deposit Transfer was not the sort of transfer that should be redressed by fraudulent transfer law.

[37] Even assuming arguendo that the Deposit Transfer falls within the scope of the UFTA, Washington Revised Code § 19.40.081(f)(1), which provides that a "transfer is not voidable under [RCW 19.40.051(b)]. . .[t]o the extent the insider gave new value to or for the benefit of the debtor after the transfer was made. . . ." forecloses this Insider Preference Claim. WASH REV. CODE § 19.40.081 (f)(1). The logic of the "new value" defense is that an otherwise avoidable transfer is not avoidable to the extent that, after the transfer, the creditor gave the debtor "new value" in a form that replenished the debtor. See, e.g., In re Micro Innovations Corp., 185 F.3d 329, 336 (5th Cir. 1999) (emphasis added). New value need not be given to the debtor by the transferor directly and may be given indirectly, or through a third party. In re Jones Truck Lines, Inc., 130 F.3d 323, 327-328 (8th Cir. 1997) (noting that the "for the benefit of" language of section 547(c)(4) "clarify[ies] that three-party exchanges are included"); In re Holmes Envtl, Inc., 287 B.R. 363, 386-87 (Bankr. E.D. Va. 2002) ("the new value exception may be satisfied by an indirect transfer of value via a third party to a debtor rather than a direct transfer of value from creditor to debtor."); In re CareerCom Corp., 215 B.R. 674, 677 (Bankr. M.D. Pa. 1997) (recognizing new value was received by subsidiary "regardless of its balance sheet" where funds were paid to parent that could prospectively be used to satisfy subsidiary debt). Here, the deposit with WMBfsb and/or subsequent loan under the Master Note to WMB constituted "new value ... for the

### b. To The Extent The Deposit Transfer Consisted Of "Capital," WMB Received Reasonably Equivalent Value.

98. The Marathon Credit Claimants state alternatively that "[t]o the extent that the funds so transferred are properly treated as capital . . . the transfers constituted transfers of funds belonging to [WMB] for less than reasonably equivalent value." Claims 3710, 3711 ¶10. In support of this baseless assertion, the Marathon Credit Claimants assert that "WMI's gross undercapitalization of [WMB], its failure to act as a source of strength for [WMB], and the apparent lack of any documentation of any such deposits" could somehow have converted the Deposits to "capital." Each of these bases fails to support their assertion that the Deposits might potentially be treated as capital. Moreover even assuming that the Deposits were "capital," the Deposit Transfer resulted in reasonably equivalent value being afforded WMB. Thus, the claim fails.

99. First, the Deposits could not have been converted to capital as a result of "gross undercapitalization" or a "failure to act as a source of strength" as the Marathon Credit Claimants muse, because WMI did not enter into any agreement to maintain WMB's capital. Further, neither the Home Owners Loan Act nor any of the OTS' regulations state that WMI is required to maintain or contribute to WMB's capital. The so-called "source of strength doctrine" is an asserted obligation articulated by the Board of Governors of the Federal Reserve System (the "Board") that <u>bank holding companies</u> must take actions necessary to support the financial

---

benefit of" WMB. WASH REV. CODE § 19.40.081(f)(1). As discussed <u>supra</u> para. [92-93], after withdrawal, the asset value represented by the withdrawn Deposits was loaned back to WMB by WMfsb constituting "new value" that replenished the debtor, WMB, in the full amount of the Deposit Transfer. Moreover, pursuant to the $3.67 billion loan to WMB under the Master Note, the Bondholders' position <u>vis-à-vis</u> WMB actually improved given that, as discussed above, the Bondholders could not have looked to the Deposits for recovery. Section 19.40.081(f)(1) precludes recovery on account of an Insider Preference Claim where the unsecured creditor body is made whole. In this instance, where the position of the unsecured creditor body is actually improved, application of the "new value" defense is <u>a fortiori</u> and the claim should therefore be dismissed.

position of their subsidiary banks during periods of financial stress.[38]  However, WMI is not a

bank holding company and the OTS, unlike the Board, has never articulated a "source of

strength" doctrine with respect to federal savings banks (such as WMB) and thrift holding

companies (such as WMI).[39]  The "doctrine" simply has no application to WMI or WMB and

cannot form the basis for the Marathon Credit Claimants' recharacterization assertion.[40]

100.    The Marathon Credit Claimants' assertion regarding "the apparent lack of

documentation for any such deposits" also gets them nowhere.  First, the Debtors have submitted

significant documentation to this Court in connection with its summary judgment motion,

including account statements, general ledger entries and new account request forms that make

clear that the Deposits are funds owned by the Debtors.  See Motion of Plaintiffs Washington

Mutual, Inc. and WMI Investment Corp. for Summary Judgment Filed by WMI Investment

Corp., Wash. Mut., Inc., Adv. Proc. No. 09-50934, Dkt. No. 14.  Moreover, the lack of any

specific deposit account agreements or signature cards is a red herring as there is no requirement

---

[38] See Policy Statement on the Responsibility of Bank Holding Company's to Act as Sources of Strength to Their Subsidiary Bank, 52 Fed. Reg. 15707 (Apr. 30, 1987).

[39] The Bank Holding Company Act (the "BHC Act") does not apply to a federal savings bank such as WMB or a thrift holding company such as WMI.  See 12 U.S.C. §§ 1841(c)(2)(B) and 1841(j) (2009) (exempting savings banks, such as WMB from the BHC Act's scope, and thus entities that control a savings bank).  Rather, WMI qualified as a thrift holding company under the Home Owners Loan Act.

[40] Even if the Board's "source of strength doctrine" were applicable to WMB, which it is not, the doctrine lacks any statutory basis in the BHC Act.  The only U.S. Court of Appeals to have considered whether the "doctrine" gave rise to an obligation of a parent company to contribute capital to its banking subsidiary rejected the proposition on that ground.  MCorp Fin., Inc. v. Bd. of Governors of the Fed. Reserve Sys., 900 F.2d 852, 862 (5th Cir. 1990) ("[W]e conclude that the Board is without authority under the BHCA to require MBank to transfer its funds to its troubled subsidiary bank."), rev'd on other grounds, 502 U.S. 32 (1991).  Further, even if the source of strength doctrine had a statutory basis, it would not apply in this case.  As articulated by the Board, the "doctrine" allows the Board to order a holding company to support its subsidiary bank using the Board's cease and desist authority under 12 U.S.C. § 1818(b) (2009).  See id. at 859.  The Bondholders do not allege that the OTS issued such an order to WMI to contribute capital to WMB before receivership.  Therefore, the Bondholders have no basis to invoke the "source of strength doctrine," or to otherwise assert that WMI was obligated to support WMB's capital.

in law or in the Washington Mutual policy regarding its general ledger, which provides for the establishment of deposit accounts, that such procedures exist. See supra p. 37-38. In any event, there is no basis to support the Marathon Credit Claimants' assertion that the lack of any particular documentation regarding the Debtors' Deposits could possibly have converted the Deposits to some form of capital.

101.     Notwithstanding the foregoing, assuming *arguendo* that the Deposits are somehow found to be "capital," the Marathon Credit Claimants' claim still fails because WMB received reasonably equivalent value in connection with the Deposit Transfer. The so-called "capital" was transferred to WMBfsb.[41] Given that WMBfsb was undeniably WMB's solvent, wholly-owned subsidiary, WMB received value through its equity interests in WMBfsb. See Rubin v. Mfrs. Hanover Trust Co., 661 F.2d 979, 991 (2d Cir. 1981) (holding that if the giving of consideration to a third party confers an economic benefit upon the debtor, then the debtor's net worth has been preserved and creditors have no cause to complain); Klein v. Tabatchnick, 610 F.2d 1043, 1047 (2d Cir. 1979) ("Benefit to a debtor need not be direct; it may come indirectly through benefit to a third person."); Branch, 825 F. Supp. at 399-400 (where a parent is a sole stockholder of a solvent subsidiary, "any benefit received by the subsidiary is also a benefit to the parent"). Thus, if the Deposit were a capital contribution (which it was not), then WMB nevertheless would have received reasonably equivalent value for the Deposit Transfer when the funds were deposited with WMBfsb, an undeniably solvent entity. In light of the receipt of reasonably equivalent value, the Bondholders' claim must fail.

---

[41] It is appropriate to collapse the payment of the deposit liability and the subsequent deposit at WMBfsb given that the "capital" was immediately deposited with WMBfsb and it is undisputed that it was the Debtors' intent to open a deposit account at WMBfsb. See Official Comm. of Unsecured Creditors v. Action Indus., Inc. (In re Phar-Mor Inc. Sec. Litig.), 185 B.R. 497, 503 (W.D. Pa. 1995), aff'd sub nom Coopers & Lybrand v. Shapira, 101 F.3d 689 (3d Cir. 1996) (finding that collapsing of transactions is appropriate in order to consider "the net effect of the integrated transaction upon the debtor").

**F.    The Bondholders Have Failed To State An Actionable Misrepresentation Claim Under Any Securities Or Common Law Fraud Theory.**

102.    The Bondholders' misrepresentation claims also must be dismissed because they fail to state plausible claims for violation of the federal or state securities laws or common law fraud.  Contrary to the applicable pleading requirements (as discussed below), the Claims do not include factual allegations that WMI made any material misrepresentations or omissions.  They also fail to identify any statutes that WMI purportedly violated or any statutes under which they seek relief.

**1.    The Elements Of Securities Fraud.**

103.    To state a valid claim for securities fraud, the Bondholders must allege each of the following elements:  (1) a material misrepresentation or omission by defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008); see also McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424 (3d Cir. 2007).[42]  The Bondholders have not adequately pled these elements.  With respect to alleged misstatements, the Bondholders are required to explain, in detail, the reason or reasons why each statement is misleading.  It is inadequate simply to refer "to a series of public statements and then alleg[e], in a general and conclusory manner, that those disclosures were false or misleading."  In re Party City Sec. Litig.,

---

[42] Because the elements of proof and the pleading standard applicable to federal securities fraud claims and common law fraud claims are "virtually identical," the Court's assessment of the sufficiency of the Bondholders' "misrepresentation" allegations can be accomplished by analyzing those allegations within the federal securities fraud framework.  Chase Manhattan Mortg. Corp. v. Advanta Corp., No. Civ.A. 01-507 (KAJ), 2004 WL 422681, at *5 n.12 (D. Del. Mar. 4, 2004). See also Balko v. Carnegie Fin. Group, Inc. (In re Balko), 348 B.R. 684, 694 (Bankr. W.D. Pa. 2006) ("While the factors pertaining to [a cause of action for fraud] may be derived from state law principles and jurisprudence, the particularity requirement contained within Rule 9(b) applies equally to common law fraud claims as well").

147 F. Supp. 2d 282, 300 (D.N.J. 2001). The allegations in the Claims are far too generalized to satisfy this standard.

104.     Moreover, with respect to alleged omissions, such conduct can give rise to liability only where the defendant had an affirmative duty to disclose the information in question, such as "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000). Accordingly, to the extent the Claims allege that statements made were rendered false or misleading by the omission of material information, they must identify specific statements that were rendered "inaccurate, incomplete or otherwise untruthful" by the alleged non-disclosure. In re Digital Island Sec. Litig., 223 F. Supp. 2d 546, 552 (D. Del. 2002), aff'd, 357 F.3d 322 (3d Cir. 2004). Again, the Bondholders have not met this burden.

105.     Federal Rule of Civil Procedure 9(b), which applies with equal force to both federal securities law claims and common law fraud claims, provides that, "[i]n alleging fraud or mistake, a party must state with *particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). Rule 9(b) requires, "at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." C.W. Sommer & Co. v. Rockefeller (In re Rockefeller Ctr. Props., Inc. Sec. Litig.), 311 F.3d 198, 217 (3d Cir. 2002) (citation omitted); see also Giuliano v. U.S. Nursing Corp. (In re Lexington Healthcare Group, Inc.), 339 B.R. 570, 575 (Bankr. D. Del. 2006) (pleading with particularity requires the plaintiff to "identify[] the transfer by date, amount, name of the transferor, and name of the transferee") (citations omitted).[43]

---

[43] The Third Circuit has noted that "unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b). . . ., they may not benefit

106.    To strengthen the already high standards for pleading securities fraud, Congress

passed the Private Securities Litigation Reform Act ("PSLRA").  See Merrill Lynch, Pierce,

Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81-82 (2006).  Congress adopted the PSLRA based

on the recognition that private securities lawsuits "can be employed abusively to impose

substantial costs on companies and individuals whose conduct conforms to the law." Tellabs,

Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007).  Consistent with these goals, the

PSLRA mandates that "the complaint shall, with respect to each act or omission alleged to

violate this [Act], state with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (2009).  These heightened

pleading requirements must be satisfied for each particular defendant.  See, e.g., Winer Family

Trust v. Queen, 503 F.3d 319, 335-36 (3d Cir. 2007).

107.    In Tellabs, the U.S. Supreme Court explained that, in applying the "strong

inference" standard, a court must "engage in a comparative evaluation; it must consider, not only

inferences urged by the plaintiff…, but also competing inferences rationally drawn from the facts

alleged." 551 U.S. at 314.  The Supreme Court reasoned that "[a]n inference of fraudulent intent

may be plausible, yet less cogent than other, nonculpable explanations for the defendant's

conduct." Id.  However, "[t]o qualify as 'strong' within the intendment of [15 U.S.C. § 78u-

4(b)(2),] an inference of scienter must be more than merely plausible or reasonable – it must be

cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id.; see

---

from inferences flowing from vague or unspecified allegations – inferences that may arguably have been
justified under a traditional Rule 12(b)(6) analysis." Cal. Pub. Employees Ret. Sys. v. Chubb Corp., 394
F.3d 126, 145 (3d Cir. 2004).  Further, "[a] securities fraud claim may be dismissed under Rule 9(b) and
the PSLRA even if it would survive scrutiny under Rule 12(b)(6).  'Unless [p]laintiffs in securities fraud
actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule
9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations
– inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis.'" In re
Aetna, Inc. Sec. Litig., 2009 WL 1619636, at *19 (E.D. Pa. June 9, 2009) (citation omitted).

<u>also</u> <u>Winer Family Trust</u>, 503 F.3d at 329 (upholding the district court's dismissal of plaintiffs'

Section 10(b) claim for failure to meet the PSLRA's pleading requirements because "[a]

reasonable person would not deem the inference of scienter cogent and at least as compelling as

any non-culpable inference").

108.    The Third Circuit, interpreting Tellabs, recently clarified the pleading standard for

scienter in <u>Institutional Investors Group v. Avaya, Inc.</u>, 564 F.3d 242, 276 (3d Cir. 2009).  In

Avaya, the court observed that "'the significance that can be ascribed to an allegation of motive,

or lack thereof, depends on the entirety of the complaint.'" <u>Id.</u> at 277 (quoting <u>Tellabs</u>, 551 U.S.

at 325).  Accordingly, "'motive and opportunity' may no longer serve as an independent route to

scienter." <u>Id.</u> at 277.

### 2.    The Bondholders Have Not Satisfied The Heightened Pleading Standard Applicable To Securities Fraud Claims.

109.    The Bondholders' "misrepresentation" claims fail to meet the exacting pleading

standard applicable to federal securities law claims.  First, the WMB Noteholders' Claim fails to

identify with sufficient particularity the statements it alleges were false and misleading.  <u>See</u>

Claim 2480 ¶¶31-32.  The sum total of the WMB Noteholders' misrepresentation allegations

consists of the following:

> From time to time, WMI publicly represented that it would
> "manage [itself] at the holding company to the same kind of
> standards as if we were a [Federal Reserve] regulated bank holding
> company."  WMI similarly represented in a press release in
> October 2006 that its reported "total risk-based capital ratio is
> estimated as if Washington Mutual, Inc. were a bank holding
> company subject to Federal Reserve Board capital requirements."
> The import of these and similar statements is that WMI was
> agreeing to subject itself to the Federal Reserve Board's "source of
> strength" doctrine, a highly material matter that provided
> substantial assurance to the WMB Noteholders that WMI funds
> would have been used to ensure the proper capital maintenance and
> liquidity at WMB.  Had WMI fulfilled its promises to do so, it
> would have avoided the Receivership.  It was reasonable for the

WMB Noteholders to rely on these and similar public and clear representations made by WMI and the WMB Noteholders have been damaged by WMI for failing to act in accordance with its representations. The claim for damages arises both under the federal and applicable state securities laws and under applicable statutory and common law fraud provisions.

Id. (footnotes omitted).[44]

110.    Such generic allegations are insufficient to state a claim for fraud because, among other reasons, they fail to specify the role of any particular individual in the alleged misrepresentations. The PSLRA mandates that "[e]ach untrue statement or omission must be set forth with particularity as to 'the defendant' and scienter must be pleaded in regards to 'each act or omission' sufficient to support a strong inference that 'the defendant' acted with the required state of mind." Winer Family Trust, 503 F.3d at 335-36 (quoting 15 U.S.C. § 78u-4(b)(2)); see also In re Rockefeller, 311 F.3d at 224 n.19 (explaining that under the PSLRA, the court "must … disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute") (quoting Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 660 (8th Cir. 2001)). The WMB Noteholders' barebones pleadings do not come close to establishing the requisite element of scienter. On this ground alone, this claim must be expunged.

111.    While the Marathon Credit Claimants' claims include slightly more detail by providing a "non-exhaustive" list of twelve purportedly false and misleading statements and omissions by WMI (see Claims 3710, 3711 ¶13), the claims nonetheless fail to plead the

---

[44] The WMB Noteholders attribute their paltry allegations to a single public statement issued by former CEO Killinger and a company press release issued on the same date as Killinger's statement, October 18, 2006. See Claim 2480 ¶31 n.15, 16. This is not enough to state the "who, what, when, where and how" facts that are required to state a claim for fraud. See In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d at 217.

requisite "who, what, where, when and how," facts that are necessary to avoid dismissal.[45] The

Marathon Credit Claimants allege generally that:

> [S]tarting in the first quarter of 2006 and continuing through the
> first half of 2007 ... and continuing thereafter, WMI made material
> false and misleading statements, or omitted material facts
> necessary in order to make the statements made not misleading,
> regarding the Bank, its operations, and its financial condition.
> WMI and its officers and employees repeatedly misrepresented
> that the Bank was doing well financially and that its credit and loan
> underwriting policies and operations were conservative and
> minimized risk to investors, including holders of Senior Notes. As
> WMI knew at the time, those statements were false and
> misleading. WMI knowingly failed to disclose the true facts.

Id. To bolster their vague allegations, the Marathon Credit Claimants cite a laundry list of

allegedly false and misleading statements and omissions by WMI and/or its executives. See id.

For instance, the Marathon Credit Claimants allege that WMI misled investors when "multiple

WMI officers" stated that "Washington Mutual's loan portfolio represents 'strong underwriting,'

'conservative lending standards,' 'rigorous credit standards,' and 'a disciplined credit culture.'"

Id. The Marathon Credit Claimants also allege that statements issued by WMI's former CEO

and CFO, such as that WMI's "businesses [were] doing extremely well despite the difficult

interest rate environment," and that the Company "maintain[ed] a strong liquidity position" (id.),

were misleading.[46]

---

[45] See, e.g., Miller v. Greenwich Capital Fin. Prods., Inc. (In re Am. Business Fin. Servs., Inc.), 362 B.R. 135, 142-44 (Bankr. D. Del. 2007) (dismissing common law fraud claims for failure to plead with particularity: "The Trustee has not stated who on behalf of the Indenture Trustees made the representations, on what dates these representations were made, or the medium used to make the representations").

[46] The allegations here are distinct from the allegations in the multidistrict litigation currently pending in the U.S. District Court for the Western District of Washington against WMI, certain of its former officers and directors and various underwriters, In re Washington Mut., Inc., Sec. Litig., No. 2:08-md-01919 (MJP) (W.D. Wash. filed Feb. 21, 2008). The amended consolidated class action complaint in the multidistrict litigation contains over 260 pages of factual allegations – far more substance and detail than the few examples of alleged misrepresentations contained in Claims here. Moreover, because the

112.     However, the Marathon Credit Claimants have not pled facts sufficient to show the precise role of the individuals who made the alleged false and misleading statements (i.e., former CEO Killinger, former CFO Casey and the other "multiple WMI officers" referenced in the Claims); nor have the Marathon Credit Claimants sufficiently alleged facts that support a strong inference that any particular individual at WMI acted with scienter when making any supposed misrepresentations. The PSLRA requires that where, as here, the Marathon Credit Claimants "may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this [Chapter], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (2009).[47] The Marathon Credit Claimants' vague, conclusory pleadings fail to satisfy this stringent standard.

113.     Indeed, the Claims contain no facts that give rise to a strong inference that WMI knowingly or recklessly made false statements to mislead the Bondholders. The Bondholders have not adequately pled scienter against WMI because their Claims do not allege with particularity that any person speaking or making other representations to the securities market on WMI's behalf had the requisite scienter. See In re Alpharma Inc. Sec. Litig., 372 F.3d 137 (3d Cir. 2004).

---

multidistrict litigation is stayed as to WMI as a result of the automatic stay, WMI has not been an active participant in that litigation.

[47] "Scienter" in the context of a Section 10(b) claim is defined as: "'a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care,. . .which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 148 (3d Cir. 2004) (quoting In re IKON Office Solutions, Inc., 277 F.3d 658, 667 (3d Cir. 2002)).

114.    The Third Circuit's decision in <u>Alpharma</u> supports dismissal of the

misrepresentation claims.  In <u>Alpharma,</u> the plaintiffs claimed that the company and four of its

executives issued misleading financial results because they failed to disclose that a corporate

division in Brazil had engaged in improper accounting practices that, in turn, had inflated the

company's overall financial performance.  <u>Id.</u> at 140-41.  The complaint failed to allege

particularized facts establishing that the members of management who prepared the financial

statements and made representations to the securities market were aware of the alleged

wrongdoing in the Brazilian division.  <u>See id.</u> at 149-51.  As a result, the Third Circuit upheld the

dismissal of all claims even though lower-level managers in Brazil were allegedly aware of the

fraudulent scheme.  <u>See id.</u> at 149-50.  Here, for the same reason the claims were dismissed

against the company in <u>Alpharma,</u> the Court should dismiss the claims against WMI:  the Claims

fail to adequately plead scienter as to any WMI executive who issued any alleged misstatements

on behalf of WMI.

115.    In addition, the Bondholders' misrepresentation claims fail to plead the remaining

elements of a securities fraud claim, namely reliance, loss causation and materiality.  In

particular, the Bondholders' failure to plead facts sufficient to demonstrate actual reliance, or to

establish a presumption of reliance, dooms their Claims.  <u>See, e.g., Marion v. TDI Inc.,</u> 2010 WL

6189, at *10 (3d Cir. Jan. 4, 2010) ("To make out a securities fraud claim under Rule 10b-5, 'a

plaintiff must show that ... the plaintiff's reliance on the defendant's misstatement caused him or

her injury'") (citations omitted); <u>Hartman v. Blinder,</u> 687 F. Supp. 938 (D.N.J. 1987) ("a 10b-5

claim retains much of its common law flavor.  Specifically, like the common law of deceit, it is

necessary for a plaintiff to plead reliance on the defendant's fraudulent conduct").[48] These

pleading deficiencies independently require dismissal of the misrepresentation claims.

### G. The Bondholders Fail To State A Plausible Claim That WMI Or Its Directors And Officers Breached Fiduciary Duties.

116. Despite the absence of any relationship, contractual or otherwise, between WMI

and the Bondholders, the Bondholders allege that WMI and its directors and officers owed

fiduciary duties of loyalty and care to WMB and its creditors. The Bondholders assert that WMI

mismanaged and looted WMB, and breached its fiduciary duties to WMB and its creditors by

"causing [WMB] to suffer billions of dollars in losses and requiring the OTS to put [WMB] into

receivership." Claims 3710, 3711 ¶16. The breach of fiduciary duty claims must be dismissed

for two reasons. First, WMI did not owe any fiduciary duties to WMB or its creditors as a matter

of law. Second, these claims fail to state plausible causes of action for breach of fiduciary duty.

---

[48] "[R]eliance may be established in either of two ways: by showing individualized reliance (sometimes referred to as 'actual' or common law reliance) on the material in question, or by showing facts which justify the presumption of reliance. To prove actual reliance, a securities plaintiff must assert facts showing that the disclosure materials the plaintiff read contained a material misrepresentation or failed to disclose a material fact upon which they relied." In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 316 (D.N.J. 2007) (citations omitted); see also id. at 318 (stating that "[s]ince the Complaint does not contain 'enough [factual] heft' to amount to 'allegations plausibly suggesting (not merely consistent with)' Plaintiffs' conclusions with respect to the reliance element, and this Court should not credit Plaintiffs' bald assertions and mere conclusions as facts, Plaintiffs' Complaint will be dismissed for failure to allege facts satisfying the transactional causation requirement") (citations omitted); In re Interbank Funding Corp. Sec. Litig., 2009 WL 3714904, at *4-6 (D.D.C. Nov. 6, 2009) (holding that, absent particularized allegations of direct reliance on alleged misrepresentations, a plaintiff must show she is entitled to a presumption of reliance in order to state a claim for securities fraud, and that such presumption cannot be established where, as here, the case involves a mix of alleged misstatements and omissions: "plaintiffs easily could have alleged that they directly relied on [the] assertions in deciding whether to buy, sell, or hold their ... securities. They chose not to. ... Indeed, it would be contrary to [controlling precedent] and basic tort principles to award a presumption of reliance in a case where plaintiffs could, but do not, allege actual reliance") (emphasis in original). Moreover, to the extent that a Bondholder acquired its bond after the seizure of WMB by the FDIC and commencement of WMI's chapter 11 case, it would be difficult to see how the Bondholder could assert reliance on these statements.

### 1. WMI Did Not Owe Any Fiduciary Duties To WMB Or Its Creditors As A Matter Of Law.

117. Breach of fiduciary duty claims are generally governed by the law of a debtor's state of incorporation, which is Washington in this case. This End Up Furniture Co. v. Kemeny (In re TEU Holdings, Inc.), 287 B.R. 26, 32 (Bankr. D. Del. 2002); Hurst v. Gen. Dynamics Corp., 583 A.2d 1334, 1339 (Del. Ch. 1990); McDermott Inc. v. Lewis, 531 A.2d 206, 215 (Del. 1987). Here, as there is no Washington case law specifically addressing whether a parent corporation owes a fiduciary duty to its wholly-owned subsidiary or its creditors, Washington courts would (as is the routine) look to Delaware law for guidance on matters involving corporate law. Supra n.14.

118. Under Delaware law, a parent corporation does not owe fiduciary duties to its wholly-owned subsidiaries or to their creditors. Anadarko Petro. Corp. v. Panhandle E. Corp., 545 A.2D 1171, 1174 (Del. 1988); Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 191 (Del. Ch. 2006), aff'd sub nom Trenwick Am. Litig. Trust v. Billett, 931 A.2d 438 (Del. 2007).[49] No such duty exists between the parent and the subsidiary because:

> [i]t is by no means a novel concept of corporate law that a wholly-owned subsidiary functions to benefit its parent. To the extent that members of the parent board are on the subsidiary board or have knowledge of proposed action at the subsidiary level that is detrimental to the parent, they have a fiduciary duty. . . .to act in the best interests of the parent and its stockholders.

Grace Bros., Ltd. v. Uniholding Corp., No. Civ.A. 17612, 2000 WL 982401, at *12 (Del. Ch. July 12, 2000).

---

[49] See also Shaev v. Wyly, C.A. No. 15559-NC, 1998 WL 13858, at *2 (Del. Ch., Jan. 6, 1998) ("a parent does not owe a fiduciary duty to its wholly-owned subsidiary"); DAVID A. DREXLER ET AL., DEL. CORP. LAW AND PRACTICE § 15.11 (2009) ("Although it is said in general terms that a parent corporation owes a fiduciary obligation to its subsidiaries, this obligation does not arise as such unless the subsidiary has minority stockholders. Where a parent corporation owns all of a subsidiary's outstanding shares, intracorporate dealings will not be tested by fiduciary standards.").

119.    Other jurisdictions similarly recognize that "the weight of authority holds that a

parent corporation owes no fiduciary duties to its wholly-owned subsidiary." Westlake Vinyls,

Inc. v. Goodrich Corp., 518 F. Supp. 2d 902, 917 (W.D. Ky. 2007) (holding that a fiduciary

relationship was not created between a parent corporation and wholly-owned subsidiary when

the parent formed the subsidiary to divest itself from assets and/or liabilities). See also MC

Asset Recovery LLC v. The Southern Co., 1:06-CV-0417-BBM, 2006 WL 5112612, at *7 (N.D.

Ga. Dec. 11, 2006) (citing Anadarko and granting the parent corporation's summary judgment

motion because the wholly-owned subsidiary's claim for breach of fiduciary duty failed as a

matter of law); Aviall, Inc. v. Ryder Sys., Inc., 913 F. Supp. 826, 832 (S.D.N.Y. 1996), aff'd,

110 F.3d 892 (2d Cir. 1997) (holding that the parent corporation was "under no obligation" to

provide its wholly-owned subsidiary "with independent representation during the spin-off

process" because "those who operate the parent company owe no fiduciary duties to the wholly

owned subsidiary"); Resolution Trust Corp. v. Bonner, Civ. Act. No. H-92-430, 1993 WL

414679, at *2-3 (S.D. Tex. June 3, 1993) (dismissing the plaintiff-subsidiary's cause of action

for breach of fiduciary duty against the defendants, the parent corporation and its successor in

interest, because "a parent corporation owes no duties to its wholly-owned subsidiary");

Household Reins. Co., Ltd. v. Travelers Ins. Co., No. 91 C 1308, 1992 WL 22220, at *3 (N.D.

Ill. Jan. 31, 1992) (recognizing that if Minnesota law applied, the subsidiary would still be

unable to state a claim for breach of fiduciary duty because under Minnesota law, "a 100%

shareholder does not owe a fiduciary duty to the wholly owned corporation").

120.    Based on well-settled law, WMI owed fiduciary duties only to WMI, and not to

its wholly-owned subsidiary WMB or WMB's creditors. As a result, the Bondholders' breach of

fiduciary duties claims fail as a matter of law.

### 2. The Bondholders Have Failed To Allege A Plausible Claim That WMI Breached Any Fiduciary Duties.

121. The Bondholders' claims also should be dismissed because they fail to allege a plausible claim for breach of fiduciary duty by WMI. The Bondholders fail to assert any factual allegations to support their claim that WMI's directors and officers owed WMB and its creditors any fiduciary duties. The Bondholders' claims assert nothing more than unsupported, conclusory allegations that such alleged duties were breached. See Iotex Commc'ns, Inc. v. Defries, Civ. Act. No. 15817, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998) ("Speculative conclusions unsupported by fact do not allege breaches of fiduciary duty."); Pfeffer v. Redstone, 965 A.2d 676, 685 (Del. 2009) (affirming the lower court's decision granting the defendants' motion to dismiss because "conclusory allegations need not be treated as true" and the plaintiff failed to plead the defendants' alleged misstatements were material in breach of the fiduciary duty of disclosure); J. Royal Parker Assoc., Inc. v. Parco Brown & Root, Inc., Civ. Act. No. 7013, 1984 WL 8255, at *3 (Del. Ch. Nov. 30, 1984) (dismissing the plaintiff's complaint, which included a claim for breach of fiduciary duty, because the plaintiff did not allege facts to support the claim and "legal conclusions and unsupported factual conclusions are not deemed admitted"). Accordingly, dismissal of the Bondholders' claims for breach of fiduciary duty is warranted.

## V. RESERVATION OF RIGHTS.

122. Debtors reserve all of their rights to further object to the validity and amount of the Disputed Claims including, without limitation, their right to seek subordination of all claims.

## VI. Notice

123. No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Objection has been provided to: (i) the United States Trustee for the District of Delaware, (ii) counsel for the Creditors' Committee, (iii) those parties entitled to receive notice in these

chapter 11 cases pursuant to Bankruptcy Rule 2002 and (iv) each holder of a claim objected to herein. In light of the nature of the relief requested, WMI submits that no other or further notice need be provided.

124. Pursuant to Bankruptcy Rule 3007, the Debtors have provided all claimants affected by this Objection with at least thirty (30) days' notice of the hearing to consider the Objection.

## VII. Separate Contested Matters

125. To the extent that a response is filed regarding any of the Bondholders' Claims listed in the Objection and the Debtors are unable to resolve the response, each such Claim, and the objection by the Debtors to each such Claim asserted herein, shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014. Any order entered by the Court regarding an objection asserted in the Objection shall be deemed a separate order with respect to each of the Claims.

## VIII. Statement of Compliance with Local Rule 3007-1

126. The undersigned representative of Richards, Layton & Finger, P.A. certifies that he has reviewed the requirements of Local Rule 3007-1 and that the Nineteenth Omnibus Objection substantially complies with that Local Rule. To the extent that the Nineteenth Omnibus Objection does not comply in all respects with the requirements of Local Rule 3007-1, Richards, Layton & Finger, P.A. believes such deviations are not material and respectfully requests that any such requirement be waived.

## IX. No Previous Request

127. No previous request for the relief sought herein has been made to this or any other Court.

128.

## X.    CONCLUSION.

129.    For these reasons, Debtors respectfully request the Court enter an order, in

substantially the same form as the proposed order attached hereto as Exhibit "1," denying and

expunging the Claims and granting such other and further relief as is just and proper.

Dated:  January 22, 2010

Mark D. Collins (No. 2981)
Chun I. Jang (No. 4790)
Andrew C. Irgens (No. 5193)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

– and –

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

-- and --

Thomas C. Frongillo, Esq.
Patrick J. O'Toole, Jr., Esq.
WEIL, GOTSHAL & MANGES LLP
100 Federal Street, Floor 34
Boston, Massachusetts 02110
Telephone: (617) 772-8300
Facsimile: (617) 772-8333
        Peter E. Calamari, Esq.
        Michael B. Carlinsky, Esq.
        Susheel Kirpalani, Esq.

- and -

David Elsberg, Esq.
Benjamin Finestone, Esq.
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 8489-7100


Attorneys for Washington Mutual, Inc. and WMI
Investment Corp.