UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
:
*In re* : **Chapter 11**
:
**WASHINGTON MUTUAL, INC., et al.,**[1] : Case No. 08-12229 (MFW)
: (Jointly Administered)
:
**Debtors.** : Re: Docket Nos. 2132, 2185, 2186, 2198
:
---------------------------------------------------------------x

## REPLY OF WASHINGTON MUTUAL, INC. AND WMI INVESTMENT CORP. IN FURTHER SUPPORT OF MOTION FOR AN ORDER (A) DISBANDING THE OFFICIAL COMMITTEE OF EQUITY HOLDERS APPOINTED BY THE US TRUSTEE OR (B) LIMITING THE FEES AND EXPENSES WHICH MAY BE INCURRED BY SUCH COMMITTEE

Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment"), as debtors and debtors in possession (the "Debtors"), hereby submit this reply (the "Reply") in further support of their motion (the "Motion")[2] for an order disbanding the Equity Committee and in response to the objections (the "Objections") filed by (i) the Equity Committee, (ii) Black Horse Capital Management LLC ("Black Horse"), and (iii) the United States Trustee for the District of Delaware (the "US Trustee") (collectively, the "Objecting Parties") and respectfully represent as follows:

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98101.

[2] Capitalized terms used, but not defined, herein shall have the meanings ascribed to such terms in the Motion.

**Reply**

1. For all its rhetoric, the Equity Committee's Objection can be easily distilled: if the various litigations commenced by the Debtors were commenced "in good faith," then the magnitude of claims asserted in those litigations should ensure that equity holders will receive billions of dollars in recovery. But, in doing so, the Equity Committee has chosen to put blinders on and selectively acknowledge the financial realities of these chapter 11 cases.

2. First, it is beyond peradventure that the Debtors have commenced and, by their procedural successes, have prosecuted each of the litigations in good faith. Indeed, that the Debtors have asserted over $20 billion of possible claims against JPMorgan and the FDIC is illustrative of the fact that the Debtors are discharging their fiduciary duties to these estates and seeking to maximize the estates' assets for the benefit of *all* stakeholders – creditors and equity interest holders alike. Further, that the Debtors have succeeded in withstanding numerous and repetitive motions to dismiss, motions to stay proceedings, motions to transfer proceedings and have argued a motion for summary judgment, all in an effort to reclaim their deposits and prosecute their other claims, evidences that the Debtors are vigorously defending and pursuing each and every claim.

3. But, such steps cannot be confused with ultimate success on the merits. As the Debtors and the other parties to the litigations (both original and by intervention) have claimed, there are many years of discovery and litigation ahead, not including the numerous years in the appellate courts that will surely follow. There are intricate legal theories and factual questions to be unwound and answered. While the Debtors hope for and anticipate ultimate success, there are no givens in these litigations. So, to argue that because the Debtors have asserted over $20 billion in claims against other parties, but have scheduled liabilities of only

approximately $8 billion, equity will see a recovery is naive. Such an argument, at best, blatantly ignores reality. At worst, it uses incompatible data in an effort to mislead this Court.

4. The economics of these cases are more complex than the Equity Committee intimates. If one wants to wave the $20 billion number in front of this Court, one needs to keep in mind the more than $50 billion in unsecured claims filed against the Debtors' chapter 11 estates, plus unknown amounts of unliquidated claims. Thus, even using the Equity Committee's math, the Debtors are insolvent by many billions of dollars. So, while the Debtors would be ecstatic to provide a recovery for equity security holders, any such distribution is extremely remote, if that.

5. Lastly, the Equity Committee has failed to establish that it is necessary to ensure shareholders' adequate representation. The Equity Committee has not alleged, because it cannot, that the Debtors have, in any way, failed to seek to maximize the recovery of these estates. Indeed, as noted above, the Debtors have zealously prosecuted the various litigation claims. The Equity Committee implicitly agrees, since its main concern is not with the Debtors' prosecution of the litigation claims. Rather, it fears that the Debtors will settle such claims at an amount that would preclude a recovery for equity holders. So, realistically, the only thing that the Equity Committee would be interested in doing, at the appropriate time, would be to challenge such settlement as outside the "range of reasonableness." With such a limited function, the Equity Committee is simply not necessary at this juncture.

6. In sum, by opposing the formation of the Equity Committee, the Debtors are in no way attempting to deprive equity holders of distributions to which they are rightfully entitled, but instead are merely acknowledging the economic reality of these chapter 11 cases. The Debtors continue to work to maximize the assets of these estates for the benefit of all

stakeholders, including shareholders. But, at this time, the likelihood of a recovery for equity is simply too distant to warrant the expense of the Equity Committee.

7. Black Horse and the US Trustee also filed Objections to the Motion. Neither party presents any arguments that are of sufficient force to warrant the continuation of the Equity Committee. Black Horse also requests that this Court reconstitute the Equity Committee such that its membership is comprised solely of preferred stockholders. As the Debtors do not see the basis for any additional committee, the Debtors reserve their rights to discuss the composition thereof at the appropriate time.

I. **The Court Should Employ a *de novo* Standard of Review**

8. In considering the Motion, the Equity Committee and the US Trustee urge this Court to employ an abuse of discretion standard of review rather than the appropriate *de novo* standard of review that should be employed when determining to disband the Equity Committee and overturn the US Trustee's initial (rather tertiary) decision. Similarly, the Equity Committee and the US Trustee challenge the Debtors for their citation of cases, and, in so doing, cite cases that are, for the most part, inapposite. For example, the Equity Committee refers to cases for the proposition that bankruptcy courts are without power to review decisions of the US Trustee. *See* Equity Committee Objection at ¶ 15. But, in each of the cases cited by the Equity Committee, none of which are from this jurisdiction, the court did not hold that bankruptcy courts are without authority to review *any* decision of the US Trustee, only that bankruptcy courts may not override the administrative function of the US Trustee by appointing or deleting *individual members* to or from a committee. *See In re Dow Corning Corp.*, 212 B.R. 258 (E.D. Mich 1997) (analyzing appointment of party to the official committee of unsecured creditors); *In re Wheeler Tech., Inc.*, 139 B.R. 235 (Bankr. 9th Cir. 1992) (considering creditor's appeal of

removal from unsecured creditors' committee); *In re America West Airlines*, 142 B.R. 901 (Bankr. D. Ariz. 1992) (addressing former official unsecured creditors' committee member's request for reappointment). The appointment of individual members of the Equity Committee is not at issue here. Whether the Equity Committee is needed at all is the question. And, for the Court to rule on that question, it must squarely confront the statutory requirements of section 1102(a)(2) and consider the adequacy of representation – a decision even some of the courts cited by the Equity Committee acknowledge is within the purview of a bankruptcy court's jurisdiction. *In re Drexel Burnham Lambert Group, Inc.*, 118 B.R. 209, 211 (Bankr. S.D.N.Y. 1990) (where the court held it had no authority with respect to the appointment of the individual members to a committee, but specifically noted that "the one issue the Court is directed to consider by section 1102(a) [is the] necessity to assure adequacy of representation.")

9. The Equity Committee, however, goes on to acknowledge that courts in this jurisdiction have not followed the very cases they cite, but have, instead, expressly held that bankruptcy courts do retain review powers over actions taken by the US Trustee, *including* over the decision to appoint individual members. *See In re Columbia Gas System, Inc.*, 133 B.R. 174, 176 (Bankr. D. Del. 1991). The court in *Columbia Gas* employed an abuse of discretion standard of review, but was considering the motion of an individual creditor for an order directing the US Trustee to appoint it to the debtor's **creditors' committee.** *Id.* at 175. The court did not address, as is at issue here, the standard to be used in deciding whether an additional committee is necessary for the adequate representation of equity. Thus, *Columbia Gas* is noteworthy soley because it undermines the Equity Committee's own argument that courts cannot review actions taken by the US Trustee. *Columbia Gas* is, however, far from conclusive as to the standard of review to be employed here. *Columbia Gas* dealt with an administrative act

taken by the US Trustee – the appointment (or non-appointment) of a specific creditor to the creditor's committee. Here, by contrast, to decide whether the Equity Committee should be disbanded, this Court must weigh in on the *legal conclusion* as to whether the Equity Committee is necessary for the adequate representation of equity security holders. As further explained below, this type of legal conclusion is subject to a *de novo* review.[3]

10. The cases cited by the US Trustee are equally irrelevant. Indeed, one case the US Trustee cites for the proposition that courts should employ an abuse of discretion standard of review involves a *district court's* review of a bankruptcy court's findings, ***not*** a bankruptcy court's review of a US Trustee's actions. *See Victor v. Edison Bros. Stores, Inc. (In re Edison Bros. Stores, Inc.)*, No. 96-177, 1996 WL 534853 (D. Del. Sept. 17, 1996) (applying an abuse of discretion standard to a *bankruptcy court's* denial of a motion to appoint an equity committee pursuant to section 1102(a)(2) of the Bankruptcy Code). The other case cited by the US Trustee for the same proposition, *In re Doehler-Jarvis, Inc.*, No. 97-953, 1997 WL 827396, at *2 (D. Del. Oct. 7, 1997), involves not the appointment of an equity committee, but again, the

---

[3] The only case arguably on point cited by the Equity Committee is *In re New Life Fellowship, Inc.*, 202 B.R. 994 (Bankr. W.D. Ok. 1996). In *New Life*, the bankruptcy court held that it was without the authority to review decisions made by the US Trustee pursuant to section 1102(a)(1) of the Bankruptcy Code. *Id.* If followed by this Court, *New Life* would, the Debtors concede, prevent a review of the US Trustee's decision to appoint the Equity Committee. But *New Life* is but one case and should not be followed as far more cases have held that courts do retain review rights over decisions made by the US Trustee, including the *Columbia Gas* decision cited by the Equity Committee and discussed above. *See Columbia Gas*, 133 B.R. at 176; *see also Bodenstein v. Lentz (In re Mercury Fin. Co.)*, 240 B.R. 270, 277 (N.D. Ill. 1999) (rejecting the minority view and finding that the court had authority to review the trustee's committee appointment decisions; explaining that "[a]ny other reading of [section] 1102 would give the Trustee absolute immunity with respect to committee appointments"); *Masters, Mates & Pilots Plans v. Lykes Bros. Steamship Co., Inc. (In re Lykes Bros. Steamship Co., Inc.)*, 200 B.R. 933, 940 (M.D.Fla.1996) (finding that "Congress did not intend that the Trustee would have unbridled discretion over the appointment of creditor committees. If this were the case, there would be no forum available to a party who disagreed with the U.S. Trustee's appointments.") (citation omitted); *In re Barney's Inc.*, 197 B.R. 431, 439 (Bankr. S.D.N.Y. 1996) (recognizing that "most courts hold that upon timely application, the bankruptcy court can review the US Trustee's decisions regarding the size and/or composition of an official committee").

motion of an individual creditor to be appointed to the unsecured creditors committee, which is factually distinguishable from the case at bar. The remaining cases cited by the US Trustee merely lend support for the non-controversial standards to be used when a court is employing an abuse of discretion standard of review. *See In re Pierce*, 237 B.R. 748, 754 (Bankr. E.D. Cal. 1999); *In Barney's, Inc.*, 197 B.R. 431, 439 (Bankr. S.D.N.Y. 1996).

11. In contrast to the cases cited by the Equity Committee and the US Trustee, the weight of authority on point, much of which was cited by the Debtors in the Motion, establishes that a *de novo* review is the appropriate standard. *See, e.g., In re Oneida Ltd.*, 2006 WL 1288576, at *1 (Bankr. S.D.N.Y. May 4, 2006); *In re Sharon Steel Corp.*, 100 B.R. 767, 776 (Bankr. E.D. Pa. 1989); *In re Texaco*, 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987). In *Texaco*, the bankruptcy court reviewed a decision by the US Trustee, made pursuant to section 1102(a)(1), to appoint two committees of unsecured creditors. *See Texaco*, 79 B.R. 560 at 565. The court found that two committees were no longer needed and ordered the US Trustee to combine the two committees into one, thereby effectively disbanding one of the committees. *Id.*. In so holding, the court specifically noted that the issue of adequate representation "is determined on a *de novo* basis after the administrative task of appointing committees is performed by the US Trustee." *Id.* at 564. The court went on to hold that "[an] abuse of discretion standard *does not apply* with respect to the Untied States Trustee's initial exercise of discretion because the concept of adequate representation is a legal issue which must be resolved judicially." *Id.*

12. Similarly, the holdings in *In re McLean Indus., Inc.*, 79 B.R. 852 (Bankr. S.D.N.Y. 1987) and *In re Williams Commc'ns Group, Inc.*, 281 B.R. 216 (Bankr. S.D.N.Y. 2002), both cited by the Debtors in the Motion, are equally applicable. Procedurally, those cases dealt with the motion of a creditor to appoint an additional committee pursuant to section

1102(a)(2) of the Bankruptcy Code only after such creditors' requests to the respective US Trustees were denied. The analysis employed by those courts is equally applicable here as there is little reason to differentiate standards of review between a bankruptcy court's review of a US Trustee's decision *not* to appoint an additional committee under section 1102(a)(1) and the review of a US Trustee's decision to appoint one. Both should be *de novo*. Indeed, this was the implicit holding in the *Williams* case. There, the court held that, "[i]f the UST does not appoint an equity committee [pursuant to section 1102(a)(1)], any party in interest may request the court to order such an appointment 'if necessary to assure adequate representation of...equity security holders.' The bankruptcy court reviews the UST's decision [*not to appoint an additional committee*] *de novo*." *Williams Commc'ns*, 281 B.R. at 219-220 (internal citations omitted) (emphasis added). Additionally, in *McLean*, the court reviewed the legislative history behind section 1102 of the Bankruptcy Code. The court noted that part of the reason the US Trustee pilot program was enlarged in 1986 and the discretion to appoint additional committees was entrusted to the trustees was to separate "the administrative duties in bankruptcy from the judicial tasks." *McLean*, 70 B.R. at 856 (citing Pub. L. No. 99-554 §§ 111, 302 (1986)) (internal quotation omitted). The court's holding was predicated on the notion that the US Trustee functions in an administrative capacity and that, accordingly, all legal conclusions, such as what constitutes "adequate representation," must be reviewed *de novo* by the bankruptcy court as the sole juridical entity. *Id.* Consequently, the Debtors submit a *de novo* review is appropriate here.

## II. The Statutory Predicates for the Appointment of an Equity Committee Have *Not* Been Met

13. Section 1102(a)(2) governs whether the Equity Committee should have been appointed. *See Williams*, 281 B.R. at 219 (reviewing the US Trustee's decision not to appoint an additional committee by employing the 1102(a)(2) standards). Section 1102(a)(2)

provides that "the court may order the appointment of additional committees...of equity security holders *if necessary* to assure *adequate representation* . . . of equity security holders." *See* 11 U.S.C. 1102(a)(2) (emphasis added). In the *Exide Technologies* decision, the United States District Court for the District of Delaware stated the appropriate standard as follows:

> [T]he appointment of an official equity committee should be the rare exception and should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningfully distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee.

*Exide Tech. v. Wis. Inv. Bd.*, 2002 U.S. Dist. LEXIS 27212, at *2 (D. Del. Dec. 23, 2002) (internal quotations omitted). The *Exide* court further noted that, "[i]f a debtor appears 'hopelessly insolvent,' the appointment of an official equity committee is generally regarded as unjustified." *Id.* If a debtor is not "hopelessly insolvent," however, courts consider, among others, the following factors in determining whether an additional committee is required to ensure "adequate representation": (1) the number of shareholders, (2) the size and complexity of the case, (3) the delay and additional cost that would result if an equity committee were appointed, (4) the timing of the motion relative to the state of the case, and (5) other factors relevant to the adequate representation issue. *See In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 600 (Bankr. D. Del. 1996); *In re Edison Bros. Stores, Inc.*, 1996 U.S. Dist. LEXIS 13768, *11 (D. Del. Sept. 17, 1996) ("[a]s there is no statutory test for adequacy of representation, it must be determined by the facts of the case."); Smurfit-Stone Decision at 1-2. In considering these factors, it is also important to note that the focus of the statute is "not whether the shareholders are *exclusively* represented, but whether they are *adequately* represented."

*In re Leap Wireless Int'l, Inc.*, 295 B.R. 135, 140 (Bankr. S.D.N.Y. 2002) (internal quotations omitted) (emphasis added).

14. Here, the Equity Committee, the US Trustee and Black Horse all fail to establish the need for an equity committee. As stated in the Motion, the Debtors are "hopelessly insolvent," a fact confirmed by market data. *See Statutory Comm. of Unsecured Creditors on behalf of Iridium Operating, LLC v. Motorola, Inc. (In re Iridium Operating, LLC)*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007) (noting market data is the best determinant of a company's solvency). The Equity Committee points to the trading prices of WMI Series R preferred shares and Series K preferred shares in an attempt to show the market expects equity to recover. *See* Equity Committee Objection at ¶¶ 24. In reality, however, the Equity Committee establishes the Debtors' point. As of January 22, 2010, WMI's Series K preferred shares were trading at $2.28 per share, or at nine percent (9%) of their face value. Similarly, the Series R shares, as of January 22, 2010, were trading at $82.00 per share, or at approximately eight percent (8%) of their face value. The Equity Committee goes on to allege that the market value of WMI's common and preferred shares indicates that there is $500 million in equity value of WMI. *See* Equity Committee Objection at ¶ 12. This, however, is a fallacy. As this Court is well aware, common and preferred shares of bankrupt companies commonly trade at prices above $0 right up until cancellation. Essentially, the positive trading price of the common and preferred shares represents option value, nothing more. Thus, the market data cited by the Equity Committee merely reinforces the reality that the market confirms the Debtors position – equity will likely receive no distribution.

15. The Equity Committee goes on to point to the significant dollar value of the claims asserted against JPMorgan and the FDIC as evidence that equity holders will receive a

recovery. *See* Equity Committee Objection at ¶¶ 25-26. While the Debtors agree that the amount of the claims asserted against JPMorgan and the FDIC is significant, the Equity Committee cleverly attempts to show equity value by comparing this number to the Debtors' approximate $8 billion of scheduled debt. But, as stated above, this comparison is misleading. If the Equity Committee wants to use face amounts, then any appropriate comparison must factor in (1) the relative recovery on the claims asserted against the FDIC receivership and (2) the face amount of claims filed against these estates, all of which would be paid out prior to either preferred or common shareholders. Over $50 billion in unsecured claims have been filed against these estates, after deducting for duplicate and amended claims and claims that have been expunged or withdrawn. This amount, however, does not include the numerous unliquidated claims that have been filed, which could add a significant amount of additional unsecured liabilities against these estates. Viewed against this financial backdrop, the Debtors appear to be hopelessly insolvent.

### III. Equity Holders are Adequately Represented

16. Even if the Debtors are not "hopelessly insolvent," the Equity Committee has failed to establish that they are ***necessary*** to ensure the "adequate representation" of equity holders. The Equity Committee's argument as to why they are necessary hinges on the following two arguments: (1) the Creditors' Committee owes its fiduciary duties solely to the unsecured creditors and (2) without the Equity Committee, the Debtors' "management and its board of directors will be under enormous pressure to ignore the interest of equity." Equity Committee Objection at ¶ 31. As to the first point, the Debtors acknowledge that the Creditors' Committee undoubtedly owes its fiduciary duty to the Debtors' unsecured creditors. But, the Equity Committee misses the point. The need for "adequate representation" does not require a separate

committee, with concomitant fiduciary duties, for each group with slightly differing interests. If that were the case, an equity committee would be appointed in every chapter 11 case where the debtor was not "hopelessly insolvent," thereby rendering the language of section 1102(a)(2) superfluous. And, indeed, numerous courts have declined to appoint separate equity committees on the basis that the respective debtors and creditors' committees were adequately representing equity. *See In re Ampex Corp.*, No. 08-11094 (AJG), 2008 WL 2051128, at *2-3 (Bankr. S.D.N.Y. May 14, 2008) (finding that appointment of an equity committee was unnecessary, and that equity holders were adequately represented because, in part, the goal of the debtors was "to maximize value for the estate" and because the creditors committee was "to seek maximum recoveries generally." ); *see also In re Kalvar Microfilm, Inc., et al.*, 159 B.R. 599, 601 (1996) (Bankr. D. Del. 1996) (ruling on preferred shareholders motion to appoint equity committee, and finding "adequate representation of equity interests without an official committee.") So, that the Equity Committee points out the obvious does not establish that they are necessary to ensure adequate representation. The Equity Committee has not alleged, because it cannot, that the Debtors and the Creditors' Committee are doing anything but attempting to maximize the assets of these estates for the benefit of all stakeholders.

17. Similarly, as to the Debtors, the Equity Committee blindly states that the Debtors will be under "enormous pressure" to ignore equity. *See* Equity Committee Objection at ¶ 31. As support, the Equity Committee cites to the legislative history of the 1986 Amendments to the Bankruptcy Code, which placed the administrative task of appointing equity committees in the hands of the US Trustee. However, the Equity Committee gives this Court only a selective quotation. The legislative history provides, in pertinent part, that section 1102 of the Bankruptcy Code exists "to counteract the natural tendency of a debtor in distress to pacify large creditors,

*with whom the debtor would expect to do business*, at the expense of small and scattered public investors." S. Representative. No. 989, 95th Cong. 2d Sess. 10 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5796 (emphasis added). But, in this case, there are no creditors with whom the Debtors will continue to do business and this concern of the Equity Committee is simply unfounded. The Debtors seek to maximize the value of these estates for all stakeholders. The Equity Committee has not disputed this.

18. In addition, as noted above, the Equity Committee has not challenged the Debtors' prosecution of the various litigation claims. Their concern is merely the stated possibility of a settlement of such claims that would leave equity holders with no recovery. As such, there is little for the Equity Committee to do at this juncture other than wait for such settlement to come and then object on the grounds that it is outside the "range of reasonableness." *See In re TSIC, Inc.*, 393 B.R. 71,78-79 (Bankr. D. Del. 2008) (stating that, to approve a settlement, a court need not find that the agreement represents the "best possible compromise." Instead, "the settlement need only be 'above the lowest point in the range of reasonableness.'") (internal citations omitted). Otherwise, any action taken by the Equity Committee would be duplicative of that already being undertaken by the Debtors in connection with the prosecution of the litigation claims. As such, at this juncture, the Equity Committee is simply not necessary to ensure equity's adequate representation.

### IV. The Cost of the Equity Committee Exceeds the Need for One

19. The Equity Committee acknowledges that the cost of an additional committee must be weighed against the need for adequate representation of public shareholders. *See* Equity Committee Objection at ¶ 36 (citing *In re Wang Labs, Inc.*, 149 B.R. 1, 3 (Bankr. D. Mass. 1992)). As noted above, however, the Equity Committee is not necessary in these cases to

ensure the adequate representation of public shareholders. In a conclusory fashion, the Equity Committee claims that "the cost [of the Equity Committee] is *de minimis* in relation to the potential benefits that may be provided." *See* Equity Committee Objection at ¶ 37. But, this is simply not the case – the costs here could be astronomical. Not only will the Equity Committee be proposing to retain two law firms, but additional retentions may follow. These cases are close to sixteen (16) months old, and involve highly complex issues. Even if the Debtors fully cooperate with the Equity Committee, which they will if the Equity Committee remains, the learning curve for the Equity Committee's professionals will be steep and expensive. The Equity Committee also coyly argues that the Debtors can control the Equity Committee's expenses through the "expedient of sharing existing information and analyses." Equity Committee Objection at ¶ 38. While the Debtors certainly intend to cooperate, this provides little comfort in assuring expenses are kept in check. The Equity Committee will have every incentive to disrupt and delay in order to extract value for its constituents. But the costs of such disruption and delay go beyond just the fees incurred by the Equity Committee – such costs include the related fees and expenses the Debtors and the Creditors' Committee will undoubtedly have to incur to defend against such activity. In sum, the potential costs to these estates, which will be borne by the unsecured creditors, are significant but come with no corresponding benefit.

20. In addition, while the Equity Committee dismisses its significance, the insertion of the Equity Committee at this juncture of the chapter 11 cases could disrupt the negotiations that have been ongoing between the Debtors, JPMorgan and the FDIC. Indeed, such disruption is almost a foregone conclusion as the Equity Committee has every incentive to try and disrupt the process to obtain a "gift" recovery. The Equity Committee rhetorically asks in its objection: "If there is no value [for equity], how can the Equity Committee insist on it and

thereby be disruptive?" Equity Committee Objection at ¶ 34. Assuming the Equity Committee was serious when it posed this question, the answer is obvious – disrupt and delay through unnecessary litigation until the real economic stakeholders decide they would rather "gift" money to equity than continue to litigate with them. This is not a novel concept and has been observed by numerous courts. *See, e.g., In re Spansion, Inc.*, 2009 WL 4906565, at *3 (Bankr. D. Del. Dec. 18, 2009) ("[I]f equity holders have no reasonable prospect of receiving a meaningful distribution, an equity committee could serve no legitimate role in negotiating a plan."); *Williams*, 281 B.R. at 220 ("When a debtor appears to be hopeless insolvent, an equity committee is not generally warranted 'because neither the debtor nor the creditors should have to bear the expense of negotiating over the terms of what is in essence a 'gift.'") (internal citations omitted); *Sharon Steel*, 100 B.R. at 778 (observing that "cases have also recognized that separate committees impose additional administrative expenses on the debtor's estate which adversely affect the debtor's ability to reorganize and that separate teams of professionals rarely contribute to the spirit of compromise that is intended as the guiding star of chapter 11").

**The Costs of the Equity Committee Should be Capped**

21. The Equity Committee makes much of the cap on fees that the Debtors have requested. *See* Equity Committee Objection at ¶¶ 42-44. But here, such a cap is appropriate. Other than conclusory statements, none of the Objecting Parties have identified any concrete reason as to why this Court should conclude that the Debtors and the Creditors' Committee are doing anything but seeking to maximize the value of these estates. Therefore, in the event the Court does allow the appointment of the Equity Committee to stand, the Equity Committee should be allowed to pursue the interests of equity holders only where those interests truly diverge from the Debtors' other stakeholders. In this light, a cap on fees will serve to

US_ACTIVE:\43288481\05\79831.0003                    15

RLF1 3531048v.1

control costs, while allowing equity holders a separate unified voice. If circumstances change, the Equity Committee is entitled to move this Court for an increase in the proposed $250,000 cap.

WHEREFORE, for the reasons set forth above, the Debtors respectfully request that the Court (a) enter an order directing the US Trustee to disband the Equity Committee and (b) grant the Debtors such other relief as is just.

Dated: Wilmington, Delaware
January 25, 2010

Mark D. Collins (No. 2981)
Chun I. Jang (No. 4790)
Andrew C. Irgens (No. 5193)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors and Debtors in Possession*