**PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS YOUR CLAIMS**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **WASHINGTON MUTUAL, INC., et al.,** | **Case No. 08-12229 (MFW)** |
| **Debtors.** | **Jointly Administered** |
| | **Hearing Date: March 4, 2010 at 11:30 a.m. (ET)**<br>**Objection Deadline: February 19, 2010 at 4:00 p.m. (ET)** |

## DEBTORS' CORRECTED TWENTIETH (20TH) OMNIBUS (SUBSTANTIVE) OBJECTION TO CLAIMS

Mark D. Collins (No. 2981)
Chun I. Jung (No. 4790)
Andrew C. Irgens (No. 5193)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-- and –

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS TO THE DEBTORS AND DEBTORS IN POSSESSION

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ........................................................................... 1
II.  PROCEDURAL BACKGROUND.................................................................... 4
    A.  Relevant Parties ........................................................................... 4
    B.  WMB's Receivership.................................................................... 5
    C.  The Debtors' Commencement Of The Chapter 11 Cases...................... 5
    D.  Claims Asserted By The FDIC ...................................................... 6
    E.  The FDIC's Disallowance Of The Debtors' Proof Of Claim ............... 6
    F.  Debtors' Lawsuit Against The FDIC .............................................. 7
    G.  The Bondholders' Proofs Of Claim ................................................ 8
III.  FACTUAL BACKGROUND........................................................................ 8
    A.  Corporate History And Organizational Structure ............................... 8
    B.  WMB's Receivership.................................................................... 9
    C.  OTS' Regulatory Oversight Of WMI And WMB ............................. 9
    D.  The Bondholders' Purchase Of Securities From WMB ..................... 11
IV.  ARGUMENT............................................................................................ 13
    A.  Most Of The Claims Should Be Disallowed Because The Bondholders
        Lack Standing ............................................................................ 13
        1.  The FDIC Has Exclusive Standing To Assert Claims That Allege
            Generalized Harm To WMB...................................................... 13
        2.  Other Courts' Treatment Of The Specific Claims Asserted By The
            Bondholders Demonstrates That They Are Derivative............................ 18
            a.  Corporate Veil-Piercing And Substantive Consolidation...........18
            b.  Misrepresentations And Material Omissions.........................20
            c.  Mismanagement And Breach Of Fiduciary Duties.................21
        3.  The Bondholders Have Failed To Establish That They Have
            Standing To Assert Derivative Claims .................................... 22
    B.  The Bondholders' Proofs of Claim Fail To State Plausible Claims On
        Which Relief Can Be Granted And Should Be Expunged ................... 24
    C.  The Bondholders' Disregard Of Corporate Form Claims Should Be
        Expunged Because They Fail To Allege Plausible Claims For Relief And
        Are Undermined By Compelling Evidence ....................................... 26
        1.  The Claims Fail To Allege A Plausible Claim For Relief Under
            The Doctrines Of Corporate Disregard And Alter Ego ........................ 26

# TABLE OF CONTENTS

a. There Is No Plausible Claim Alleged Under The Doctrine Of Alter Ego................................................................30

    (i) The Marathon Credit Claimants' Allegations Regarding WMI's Domination And Control Of WMB Are Insufficient......................................30

    (ii) The Allegations Regarding Fraud On The Marathon Credit Claimants Are Insufficient............................33

b. There Is No Plausible Claim Alleged Under The Doctrine Of Corporate Disregard................................35

2. Compelling Evidence Undermines The Bondholders' Veil-Piercing Claims .................................................................................36

a. OTS' Regulation And Oversight Of WMB and WMI Undermine The Claim That WMI Dominated And Controlled WMB................................................36

b. The Marathon Credit Claimants Have No Basis To Allege That Documentation Is Missing Regarding WMI's Deposit Account................................................................37

c. The Bondholders Have No Basis To Allege Payments Were Improperly Made By WMI Or WMB On Behalf Of Each Other, Or That There Was "Confusion" Regarding Payments To Third Parties................................38

D. The Marathon Credit Claimants' Substantive Consolidation Claims Should Be Dismissed Because The Doctrine Is Inapplicable And The Claims Fail To Allege Plausible Claims For Relief.............................................39

1. Substantive Consolidation Is Inapplicable Because WMB Is In Receivership.................................................................................39

2. The Marathon Credit Claimants' Claims Fail Because They Do Not State Plausible Claims For Substantive Consolidation.....................41

a. The Claims Fail To Allege Any Facts Pertaining To WMI's And WMB's Pre-Petition Conduct............................42

b. The Marathon Credit Claimants' Claims Fail To Allege Sufficient Facts That WMI's And WMB's Assets And Liabilities Are Hopelessly Scrambled And Commingled Such That It Is Impossible To Separate Them Resulting In Harm To All Creditors................................42

E. The Bondholders Cannot Maintain A Claim For Fraudulent Transfer................44

**TABLE OF CONTENTS**

1.   The Dividends Were Not Fraudulent Transfers ........................................ 46

    a.   Actual Fraudulent Transfer Claims Fail Because The Dividends Were Not Made With Actual Intent To Hinder, Delay Or Defraud Creditors Of WMB .............................. 46

2.   WMB Was Not Insolvent At The Time Of The Dividends ..................... 49

3.   The Deposit Transfer Was Not A Fraudulent Transfer ........................... 50

    a.   The Deposit Transfer Is Not Avoidable Under Fraudulent Transfer Law ................................................................. 50

    b.   To The Extent The Deposit Transfer Consisted Of "Capital," WMB Received Reasonably Equivalent Value ......... 55

F.   The Bondholders Have Failed To State An Actionable Misrepresentation Claim Under Any Securities Or Common Law Fraud Theory ............................ 58

1.   The Elements Of Securities Fraud ............................................................. 58

2.   The Bondholders Have Not Satisfied The Heightened Pleading Standard Applicable To Securities Fraud Claims .................................... 61

G.   The Bondholders Fail To State A Plausible Claim That WMI Or Its Directors And Officers Breached Fiduciary Duties ............................................ 66

1.   WMI Did Not Owe Any Fiduciary Duties To WMB Or Its Creditors As A Matter Of Law ................................................................. 67

2.   The Bondholders Have Failed To Allege A Plausible Claim That WMI Breached Any Fiduciary Duties ..................................................... 69

V.   RESERVATION OF RIGHTS ......................................................................... 69

VI.   NOTICE ............................................................................................................ 69

VII.   SEPARATE CONTESTED MATTERS ........................................................... 70

VIII.   STATEMENT OF COMPLIANCE WITH LOCAL RULE 3007-1 ....................... 70

IX.   NO PREVIOUS REQUEST ............................................................................. 70

X.   CONCLUSION ................................................................................................. 71

## FEDERAL CASES

*900 Capital Services, Inc. v. Cloud (In re Cloud)*, No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000) ....................................................................................................25

*Adato v. Kagan*, 599 F.2d 1111 (2d Cir. 1979)..............................................................17

*In re Aetna, Inc. Sec. Litig.*, 2009 WL 1619636 (E.D. Pa. June 9, 2009).....................60

*Akzona, Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227 (D. Del. 1984)....................27

*Alberto v. Diversified Group, Inc.*, 55 F.3d 201 (5th Cir. 1995) ...................................32

*In re Allegheny International, Inc.*, 954 F.2d 167 (3d Cir. 1992)...................................36

*In re Alpharma Inc. Sec. Litigation*, 372 F.3d 137 (3d Cir. 2004) ...........................64, 65

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................25, 26

*Aviall, Inc. v. Ryder System, Inc.*, 913 F. Supp. 826 (S.D.N.Y. 1996), aff'd, 110 F.3d 892 (2d Cir. 1997) .....................................................................................................68

*Balko v. Carnegie Finance Group, Inc. (In re Balko)*, 348 B.R. 684 (Bankr. W.D. Pa. 2006)...............................................................................................................58

*Bell Atl. v. Twombly*, 550 U.S. 544 (2007) ...................................................................45

*Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164 (3d Cir. 2002) .................................................................................................14

*Boland v. Engle*, 113 F.3d 706 (7th Cir. 1997).............................................................19

*Branch v. Federal Deposit Insurance Corp.*, 825 F. Supp. 384 (D. Mass. 1993)....................................................................... *passim*

*Brandenburg v. Seidel*, 859 F.2d 1179 (4th Cir. 1988)..................................................21

*Brazlin v. W. Sav. & Loan Association*, Civ. No. 91-0078-PHX-SMM, 1994 WL. 374286 (D. Ariz. Jan. 28, 1994) .........................................................................................17

*Brown v. General Electric Capital Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229 (Bankr. D. Del. 2003) ........................................................................................................33, 34

*CBS, Inc. v. Folks (In re Folks)*, 211 B.R. 378 (B.A.P. 9th Cir. 1997) .........................19

*C.W. Sommer & Co. v. Rockefeller (In re Rockefeller Ctr. Properties, Inc. Sec. Litigation)*, 311 F.3d 198 (3d Cir. 2002)..........................................................59, 62

*Cal. Public Employees Retirement System v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004)...........60

*In re CareerCom Corp.*, 215 B.R. 674 (Bankr. M.S. Pa. 1997) .....................................54

*In re Colonial Realty Co.*, 980 F.2d 125 (2d Cir. 1992) ................................................45

*Commodity Futures Trading Commission v. Eustace*, Civ. Action No. 05-297, 2008 WL. 471574 (E.D. Pa. Feb. 19, 2008)...................................................................... 39-41

*Commodore Int'l Ltd. v. Gould (In re Commodore Int'l, Ltd.)*, 253 B.R. 336 (S.D.N.Y. 2000).................................................................................................................15

*Courtney v. Halleran*, 485 F.3d 942 (7th Cir. 2007) .............................................14, 16, 17, 23

*In re Cray Inc. Derivative Litigation*, 431 F. Supp. 2d 1114 (W.D. Wash. 2006) ........19

*De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65 (2d Cir. 1996)..............................28

*In re Digital Island Sec. Litigation*, 223 F. Supp. 2d 546 (D. Del. 2002), aff'd, 357 F.3d 322 (3d Cir. 2004) ...................................................................................................59

# TABLE OF AUTHORITIES

Page(s)

*Doe v. Unocal Corp.*, 248 F.3d 915 (9th Cir. 2001) ........................................................32

*Downriver Community Federal Credit Union v. Penn Square Bank*, 879 F.2d 754 (10th Cir. 1989) ........................................................................................................ *passim*

*Duke Energy Trading & Mktg. L.L.C. v. Enron Corp. (In re Enron Corp.)*, No. 01 B 16034 (AJG), 2003 Bankr. LEXIS 330 (Bankr. S.D.N.Y. Apr. 17, 2003) ...........................19

*In re Erin Food Services, Inc.*, 980 F.2d 792 (1st Cir. 1992) ..........................................54

*Federal Deposit Insurance Corp. v. Ernst & Young LLP*, 374 F.3d 579 (7th Cir. 2004) ..............14

*In re Fedders N. America, Inc.*, 405 B.R. 527 (Bankr. D. Del. 2009) ..............................49

*First National Bank v. Colby*, 88 U.S. 609 (1875) ..........................................................14

*Fla. State Board of Admin. v. Green Tree Finance Corp.*, 270 F.3d 645 (8th Cir. 2001) ............62

*Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736 (S.D.N.Y. 2008) .....................................................................................................24, 27

*Fletcher v. Atex Inc.*, 68 F.3d 1451 (2d Cir. 1995) ..........................................................32

*Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.)*, 432 F.2d 1060 (2d Cir. 1970) ........................................................................................................41

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ...........................................25, 26

*Giuliano v. U.S. Nursing Corp. (In re Lexington Healthcare Group, Inc.)*, 339 B.R. 570 (Bankr. D. Del. 2006) ..................................................................................................59

*Hamid v. Price Waterhouse*, 51 F.3d 1411 (9th Cir. 1995) ...........................16, 17, 18, 21, 23

*Hartman v. Blinder*, 687 F. Supp. 938 (D.N.J. 1987)......................................................65

*Hindes v. Federal Deposit Insurance Corp.*, 137 F.3d 148 (3d Cir. 1998) ......................22, 23

*In re Holmes Environmental, Inc.*, 287 B.R. 363 (Bankr. E.D. Va. 2002) .......................54

*Household Reins. Co., Ltd. v. Travelers Ins. Co.*, No. 91 C 1308, 1992 WL 22220 (N.D. Ill. Jan. 31, 1992) .........................................................................................................68

*In re IKON Office Solutions, Inc.*, 277 F.3d 658 (3d Cir. 2002)......................................64

*Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) ....................61

*In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007) ..................................66

*In re Interbank Funding Corp. Sec. Litig.*, 2009 WL 3714904 (D.D.C. Nov. 6, 2009) ...............66

*In re Jones Truck Lines, Inc.*, 130 F.3d 323 (8th Cir. 1997)...........................................54

*Joseph v. Madray (In re Brun)*, 360 B.R. 669 (Bankr. C.D. Cal. 2007)...........................53

*In re Kincaid*, 388 B.R. 610 (Bankr. E.D. Pa. 2008) ......................................................24

*Klein v. Tabatchnick*, 610 F.2d 1043 (2d Cir. 1979) .......................................................57

*LaSalle National Bank v. Perelman*, 82 F. Supp. 2d 279 (D. Del. 2000) .......................35

*In re Longhorn Sec. Litig.*, 573 F. Supp. 255 (W.D. Okla. 1983) ..................................14

*MCorp Finance, Inc. v. Board of Governors of the Federal Reserve System*, 900 F.2d 852 (5th Cir. 1990), *rev'd on other grounds*, 502 U.S. 32 (1991)...........................................56

*Maddox v. Robertson (In re Prejean)*, 994 F.2d 706 (9th Cir. 1993) ..............................50

*Marion v. TDI Inc.*, 2010 WL 6189 (3d Cir. Jan. 4, 2010)..............................................65

*MC Asset Recovery LLC v. The Southern Co.*, 1:06-C 2006 WL. 5112612 (N.D. Ga. Dec. 11, 2006)......................................................................................................................68

*McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101 (JFB)(WDW), 2009 WL 3150430 (E.D.N.Y. Sept. 29, 2009) ........................................................................................28, 29

*McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007) ........................................58

*McVeigh v. Unumprovident Corp.*, 300 F. Supp. 2d 731 (W.D. Wis. 2002).....................32

# TABLE OF AUTHORITIES

**Page(s)**

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006) ..................................60

*In re Micro Innovations Corp.*, 185 F.3d 329 (5th Cir. 1999)......................................................54

*Miller v. Greenwich Capital Finance Products, Inc. (In re America Business Finance
    Services, Inc.)*, 362 B.R. 135 (Bankr. D. Del. 2007)...............................................................63

*Neuger v. United States (In re Tenna Corp.)*, 801 F.2d 819 (6th Cir. 1986)................................54

*O'Melveny & Myers v. Federal Deposit Insurance Corp.*, 512 U.S. 79 (1994) ...........................14

*O'Neil v. Jones (In re Jones)*, 403 B.R. 228 (Bankr. D. Conn. 2009) ..........................................53

*OODC, LLC v. U.S. Bank National Association (In re OODC)*, 321 B.R. 128 (Bankr. D.
    Del. 2005)..........................................................................................................................18, 19

*Official Committee of Unsecured Creditors v. Action Industrial, Inc. (In re Phar-Mor
    Inc. Sec. Litigation)*, 185 B.R. 497 (W.D. Pa. 1995), *aff'd sub nom Coopers &
    Lybrand v. Shapira*, 101 F.3d 689 (3d Cir. 1996)................................................................57

*Official Employment-Related Issues Comm. v. Arnold (In re Enron Corp.)*, Bankr. No.
    01-16034-AJG, Adv. Nos. 03-3522, 03-3721, 2005 WL. 6237551 (Bankr. S.D. Tex.
    Dec. 9, 2005) ....................................................................................................................50, 51

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ............................................................................59

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005)................................................................*passim*

*PHP Liquidating, LLC v. Robbins*, 291 B.R. 592 (D. Del. 2003) ................................................47

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)...............................................................44

*In re Party City Sec. Litigation*, 147 F. Supp. 2d 282 (D.N.J. 2001).....................................58, 59

*Peterson v. Trailways, Inc.*, 555 F. Supp. 827 (D. Colo. 1983).....................................................32

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 233 F.R.D. 143
    (D. Del. 2005).........................................................................................................................27

*Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996) .....................................................21

*In re Refco Inc.*, 505 F.3d 109 (2d Cir. 2007)...............................................................................45

*Resolution Trust Corp. v. Bonner*, Civ. Act. No. H-92-430, 1993 WL 414679 (S.D. Tex.
    June 3, 1993) ..........................................................................................................................68

*Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir. 1981) ..................................57

*Simon v. ASIMCO Techs., Inc. (In re America Camshaft Specialties, Inc.)*, 410 B.R. 765
    (Bankr. E.D. Mich. 2009).................................................................................................43, 44

*In re Stauder*, 396 B.R. 609 (Bankr. M.D. Pa. 2008) ..................................................................24

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) ...............58

*Suess v. United States*, 33 Fed. Cl. 89 (Fed. Cl. 1995) ............................................................22, 23

*In re Sunrise Sec. Litigation*, 916 F.2d 874 (3d Cir. 1990)......................................................17, 21

*Sun Trust Bank v. Sun International Hotels Ltd.*, 184 F. Supp. 2d 1246 (S.D. Fla. 2001)............28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .........................................60, 61

*This End Up Furniture Co. v. Kemeny (In re TEU Holdings, Inc.)*, 287 B.R. 26 (Bankr.
    D. Del. 2002)..........................................................................................................................67

*Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521 (D. Del. 2008).....................................................34

*Trustees of National Elevator Industrial Pension, Health Benefit and Education Funds v.
    Lutyk*, 332 F.3d 188 (3d Cir. 2003) ......................................................................................34

*Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d
    515 (2d Cir. 1988) .................................................................................................................41

*United States v. Bestfoods*, 524 U.S. 51 (1998) ...........................................................................27

# TABLE OF AUTHORITIES

Page(s)

*United States v. Carey (In re Wade Cook Finance Corp.)*, 375 B.R. 580 (B.A.P. 9th Cir. 2007)..................................................................................................................26, 27, 34, 35

*United States v. Townley*, 181 Fed. Appx. 630, 631 (9th Cir. 2006)..............................................46

*Upjohn Co. v. Syntro Corp.*, Civ. A. No. 89-107-JJF, 1990 WL. 79232 (D. Del. Mar. 9, 1990)..................................................................................................................................31

*Vernon v. Federal Deposit Insurance Corp.*, 981 F.2d 1230 (11th Cir. 1993)......................14

*Wash. Mut., Inc. v. Fed. Deposit Ins. Corp.*, Civ. A. No. 09-533 (RMC), 2009 WL. 3273880 (D.D.C. Oct. 13, 2009) ...........................................................................................5, 7

*Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 902 (W.D. Ky. 2007)........................68

*Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007)...................................................... 60-62

*Youkelsone v. Wash. Mutual, Inc. (In re Wash. Mutual, Inc.)*, 418 B.R. 107 (Bankr. D. Del. 2009)..................................................................................................................26, 28, 30, 34

## STATE CASES

*Agostino v. Hicks*, 845 A.2d 1110 (Del. Ch. 2004) ...............................................................15, 23

*Anadarko Petro. Corp. v. Panhandle E. Corp.*, 545 A.2d 1171 (Del. 1988).........................67, 68

*Chase Manhattan Mortg. Corp. v. Advanta Corp.*, No. Civ.A. 01-507 (KAJ), 2004 WL. 422681 (D. Del. Mar. 24, 2004)......................................................................................58

*Eagle Pac. Insurance Co. v. Christensen Motor Yacht Corp.*, 934 P.2d 715 (Wash. Ct. App. 1997), aff'd, 959 P.2d 1052 (Wash. 1998)...............................................................19, 27

*In re F5 Networks, Inc. Derivative Litigation*, 207 P.3d 433 (Wash. 2009).................................19

*Grace Brothers, Ltd. v. Uniholding Corp., No. Civ.A. 17612, 2000 WL. 982401 (Del. Ch. July 12, 2000)........................................................................................................................67

*Hurst v. General Dynamics Corp.*, 583 A.2d 1334 (Del. Ch. 1990) ............................................67

*Iotex Commc'ns, Inc. v. Defries*, Civ. Act. No. 15817, 1998 WL 914265 (Del. Ch. Dec. 21, 1998)......................................................................................................................................69

*J. Royal Parker Assoc., Inc. v. Parco Brown & Root, Inc.*, Civ. Act. No. 7013, 1984 WL 8255 (Del. Ch. Nov. 30, 1984).............................................................................................69

*McDermott Inc. v. Lewis*, 531 A.2d 206 (Del. 1987)....................................................................67

*Minton v. Ralston Purina Co.*, 47 P.3d 556 (Wash. 2002) .....................................................27, 31

*Moses Lake Construction Co., Inc. v. Johnson*, Nos. 23587-4-III, 23588-2-III, 2006 WL. 2147602 (Wash. Ct. App. July 27, 2006)...............................................................................31

*Norhawk Investments, Inc. v. Subway Sandwich Shops, Inc.*, 811 P.2d 221 (Wash. Ct. App. 1991)................................................................................................................................34

*One Pac. Towers Homeowners' Association v. HAL Real Estate Investments, Inc.*, 30 P.3d 504 (Wash. Ct. App. 2001), rev'd in part on other grounds, 61 P.3d 1094 (Wash. 2002) ......................................................................................................................31, 32

*Pfeffer v. Redstone*, 965 A.2d 676 (Del. 2009)............................................................................69

*Rainier National Bank v. McCracken*, 26 Wash. App. 498 (Wash. Ct. App. 1980) ....................52

*Rosenmiller v. Bordes*, 607 A.2d 465 (Del. Ch. 1991).................................................................26

*Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007)...........................................................................19

*Sedwick v. Gwinn*, 873 P.2d 528 (Wash. Ct. App. 1994) .........................................................46

*Shaev v. Wyly*, C.A. No. 15559-NC, 1998 WL. 13858 (Del. Ch., Jan. 6, 1998) ..........................67

# TABLE OF AUTHORITIES

**Page(s)**

*Snohomish Sch. District No. 201 v. Sportec International*, No. 35086-2-I, 1996 Wash.
 App. LEXIS 689 (Wash. Ct. App. Dec. 2, 1996).................................................................33
*Superior Portland Cement, Inc. v. Pac. Coast Cement Co.*, 205 P.2d 597 (Wash. 1949)............26
*Thompson v. Hanson*, 219 P.3d 659 (Wash. 2009)...................................................... 52-54
*Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch.
 2006), *aff'd sub nom Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007)...........67
*Worthington v. Low Cost Drugs, Inc.*, No. 18102-2-III, 2000 WL. 199004 (Wash. Ct.
 App. Feb. 15, 2000)..........................................................................................47

## DOCKETED CASES

*JPMorgan Chase Bank, N.A. v. Wash. Mut., Inc.*, Adv. Proc. No. 09-50551 (MFW)
 (Bankr. D. Del. filed Mar. 24, 2009)....................................................................6
*Wash. Mutual, Inc. v. Federal Deposit Insurance Corp.*, Case No. 1:09-cv-00533 (RMC)
 (D.D.C. filed Mar. 20, 2009)...........................................................................3, 7
*Wash. Mut. Inc. v. JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW)
 (Bankr. D. Del. filed Apr. 27, 2009) ....................................................................6
*Wash. Mut. Inc. v. JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW)
 [Docket #14]..................................................................................................56
*Washington Mut. Inc., et al. v. JPMorgan Chase Bank, N.A.*, Case No. 08-12229, Adv.
 Proc. No. 09-50934 [Docket #16] .......................................................................38
*In re Washington Mut., Inc., Sec. Litig.*, No. 2:08-md-01919 (MJP) (W.D. Wash. filed
 Feb. 21, 2008)...............................................................................................63

## FEDERAL STATUTES

11 U.S.C. § 109.................................................................................................41
11 U.S.C. § 502(c).............................................................................................24
11 U.S.C. § 547(b).............................................................................................54
11 U.S.C. § 548(d).............................................................................................50
12 U.S.C. § 1468(a) ..............................................................................................9
12 U.S.C. § 1818(b)...........................................................................................56
12 U.S.C. § 1821(d).......................................................................................*passim*
12 U.S.C. §§ 1841(c)..........................................................................................56
12 U.S.C. §§ 1841(j)..........................................................................................56
12 U.S.C. § 371c............................................................................................9, 37
15 U.S.C. § 78u-4(b)..................................................................................60, 62, 64
Fed. R. Bankr. P. 3001(c)...................................................................................24
Fed. R. Bankr. P. 3001(f)...................................................................................24
Fed. R. Bankr. P. 7012......................................................................................25
Fed. R. Bankr. P. 9014......................................................................................25
Fed. R. Civ. P. 9(b) ......................................................................................*passim*
Fed. R. Civ. P. 12(b)(6)..........................................................................24, 25, 60
12 C.F.R. Part 223.........................................................................................9, 37

# TABLE OF AUTHORITIES

**Page(s)**

12 C.F.R. 552.5(b) ...................................................................................................26

12 CFR Part 563, Subpart E........................................................................47, 48

12 C.F.R. 563.140 et. seq ....................................................................................10, 37

12 C.F.R. §563.144 ..................................................................................................47

12 C.F.R. § 563.41 ..............................................................................................9, 37

12 C.F.R. Part 567....................................................................................................10, 37

Policy Statement on the Responsibility of Bank Holding Company's to Act as Sources of Strength to Their Subsidiary Bank, 52 Fed. Reg. 15707 (Apr. 30, 1987)..............56

Pub. L. No. 101-73, 103 Stat. 183 (1989)...................................................................13

## STATE STATUTES

Wash. Rev. Code § 19.40.011(2)...............................................................................52

Wash. Rev. Code § 19.40.031(a) ...............................................................................50

Wash. Rev. Code § 19.40.041(a) .............................................................44, 46, 49, 50

Wash. Rev. Code § 19.40.041(b)...............................................................................47

Wash. Rev. Code § 19.40.051(a) .............................................................44, 49, 50

Wash. Rev. Code § 19.40.051(b)...............................................................45, 51,54

Wash. Rev. Code § 19.40.081(f)...............................................................................54, 55

## MISCELLANEOUS

9 Collier on Bankruptcy ¶3001.09 (2007) ...............................................................24

DAVID A. DREXLER ET AL., DEL. CORP. LAW AND PRACTICE § 15.11 (2009) ..............67

OTS HOLDING COMPANY HANDBOOK.........................................................................10

Uniform Fraudulent Transfer Act § 1 cmt. n.2 (1984) ...............................................53

WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 41.33 (2009)...............................................................................................................35

PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS
HERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS YOUR CLAIMS

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **WASHINGTON MUTUAL, INC., et al.,** | **Case No. 08-12229 (MFW)** |
| **Debtors.** | **Jointly Administered** |
| | Hearing Date: March 4, 2010 at 11:30 a.m. (ET)<br>Objection Deadline: February 19, 2010 at 4:00 p.m.<br>(ET) |

**DEBTORS' TWENTIETH (20th) OMNIBUS**
**(SUBSTANTIVE) OBJECTION TO CLAIMS**

Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment"), as

debtors and debtors in possession (collectively, the "Debtors"), in accordance with section 502 of

title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rule 3007 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), hereby object to the proofs of

claim (collectively, the "Claims"), a schedule of which is attached as "Exhibit A" to the

proposed order, attached hereto as Exhibit "1," filed by certain holders of indebtedness of

Washington Mutual Bank ("WMB"), and represent as follows:

## I.    PRELIMINARY STATEMENT

1.      In late 2005, WMB, a federally chartered savings association, established a

Global Note Program that provided for the issuance of up to $22 billion in debt financing

through  Senior Global Notes and Subordinated Global Notes (collectively, the "WMB Notes").

The WMB Notes offered under the Global Note Program were offered only to institutional

investors that were accredited investors under the federal securities laws. The Offering Circular related to WMB's Global Note Program repeatedly and clearly stated that all obligations created by the WMB Notes were obligations of WMB and not WMI, its parent corporation. Specifically, the Global Note Offering Circular clearly stated:

> Each Note issued by [WMB] will be an obligation solely of the Issuer and will not be an obligation of, or otherwise guaranteed by, Washington Mutual, Inc. ("WMI"), the ultimate parent corporation of [WMB], or any affiliate of WMI ... The Notes are unsecured and uninsured direct general obligations of [WMB].

Thereafter, two groups of sophisticated investors, referred to herein as the WMB Noteholders and the Marathon Credit Claimants (collectively, the "Bondholders"),[1] fully apprised of the risks, acquired WMB Notes with a face value of several billion dollars. These seasoned investors are among the nation's leading insurance companies, institutional fund managers and investment banks.

2.      On September 25, 2008, the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for WMB (the "Receivership"), and immediately sold substantially all of the assets of WMB to JPMorgan Chase Bank, N.A. ("JPMC"). As creditors of WMB, and as required by applicable law, the Bondholders filed proofs of claims with the FDIC relating to their interests in the WMB Notes. The FDIC has recognized the Bondholders' claims as "legitimate" liabilities of the Receivership and notified the Bondholders that the FDIC would issue receivership certificates on account of such claims.

3.      To protect their assets for their legitimate creditors, on September 26, 2008 (the "Commencement Date"), the Debtors each filed a voluntary case pursuant to chapter 11 of the

---

[1] Additional proofs of claim have been filed, timely or otherwise, against the Debtors and their chapter 11 estates by holders of funded indebtedness against WMB (collectively, "Other Bondholder Claims"). This Objection is made without prejudice or limitation to the Debtors' right to object on any grounds to the Other Bondholder Claims.

Bankruptcy Code.  Thereafter, this Court established a bar date for the filing of proofs of claim against the Debtors and their chapter 11 estates.

4.      Fearing that the proceeds of the sale of WMB's assets to JPMC would be insufficient to satisfy their claims, or generally unhappy with the projected recovery on the WMB Notes from the Receivership, the Bondholders have filed a host of meritless claims against the Debtors alleging that each of the Debtors is somehow responsible for WMB's obligations under the WMB Notes.  By the Claims, the Bondholders seek payment of allegedly outstanding amounts due on the WMB Notes.  Recognizing the absence of any relationship between themselves and the Debtors, the Claims implore this Court to take drastic and extraordinary measures to ignore the corporate form of these longstanding entities and to consolidate the assets and liabilities of the Debtors' estates with those of the Receivership.  The Bondholders further request this Court to usurp the role and authority of the FDIC as WMB's receiver through substantive consolidation.

5.      This Court should reject the Bondholders' overreaching and disallow the Claims in their entirety.  As a threshold matter, the Bondholders simply have no legal right to bring their claims.  See Section IV.A.  Most of the Claims allege generalized harm to all of WMB's creditors, and the Bondholders lack standing to assert them.  To the extent that such claims or causes of actions exist, only the FDIC has standing to bring them.  In fact, several of the Bondholders' claims are duplicative of pending claims filed by the FDIC or asserted in the context of Wash. Mut., Inc. v. FDIC, Case No. 1:09-cv-00533 (RMC) (D.D.C. filed Mar. 20, 2009) (the "DC Action") (see infra Para. 16 for further discussion).

6.     Aside from the Bondholders' lack of standing, the Claims themselves are legally insufficient. Most of the Claims should be dismissed because they fail to state plausible claims on which relief can be granted. See Section IV.B.

7.     By filing the Claims, the Bondholders – who are creditors only of WMB – seek to deplete the assets of WMI's estate to the detriment of WMI's rightful creditors. This Court should not penalize WMI's creditors by permitting the Bondholders to litigate baseless grievances in these Chapter 11 cases. Summary dismissal of the Claims is warranted and appropriate.

## II.     PROCEDURAL BACKGROUND.

### A.     Relevant Parties.

8.     Before the Receivership and the seizure of WMB, WMI was a savings and loan holding company and WMB was a federally chartered savings association that was chartered and operating under the United States Home Owners' Loan Act.. WMB was placed into receivership on September 25, 2008. WMI Investment, a subsidiary of WMI, served as an investment vehicle for WMI. Washington Mutual Bank fsb ("WMBfsb") was a subsidiary of WMB.

9.     The Bondholders are sophisticated, institutional investors, including insurance companies, institutional fund managers, investment banks and private investment funds.[2] They

---

[2] Although the Bondholders have not filed a revised verified statement pursuant to Bankruptcy Rule 2019 and this Court's ruling of December 2, 2009 requiring detailed disclosure of the Bondholders' holdings, including purchase prices, based upon a review of the Claims, the Marathon Credit Claimants include: Altma Fund Sicav P.L.C. In Respect Of Russell Sub-Fund; Anchorage Capital Master Offshore, Ltd.; Bank of Scotland plc; Cetus Capital, LLC; Corporate Debt Opportunities Fund, Ltd.; Fir Tree Capital Opportunity Master Fund, L.P.; Fir Tree Mortgage Opportunity Master Fund, L.P.; Fir Tree Value Master Fund, L.P.; HFR ED Select Fund IV Master Trust; Juggernaut Fund, L.P.; Lyxor/York Fund Limited; Marathon Credit Opportunity Master Fund, Ltd.; Permal York Ltd.; Quintessence Fund L.P.; QVT Fund LP; Silver Point Capital Fund, L.P.; Silver Point Capital Offshore Fund, Ltd.; The Governor and Company of the Bank of Ireland; The Värde Fund, L.P.; The Värde Fund VI-A, L.P.; The Värde Fund VII-B, L.P.; The Värde Fund VIII, L.P.; The Värde Fund IX, L.P.; The Värde Fund IX-A, L.P.; Värde Investment Partners (Offshore), Ltd.; Värde Investment Partners, L.P.; Windmill Master Fund, L.P.; York Capital Management, L.P.; York Credit Opportunities Fund, L.P.; York Credit Opportunities Master

are the alleged legal or beneficial holders of approximately $3.7 billion in principal amount outstanding of Senior Notes and Subordinated Notes issued by WMB during the Global Note Program that was established in 2005.

### B. WMB's Receivership.

10.     On September 25, 2008, the Director of the OTS, by order number 2008-36, appointed the FDIC as receiver for WMB, and advised that the receiver was immediately taking possession of WMB.  Upon or even before its appointment as receiver, the FDIC entered into a transaction to sell (the "Sale") substantially all of the assets of WMB, including the stock of WMBfsb, to JPMC pursuant to that certain Purchase and Assumption Agreement, Whole Bank, dated September 25, 2008 (as amended, modified, or supplemented, the "P&A Agreement").[3] Pursuant to the P&A Agreement, JPMC assumed all of WMB's deposit liabilities and, shortly thereafter, all of WMBfsb's deposit liabilities through merger.  Pending before the Court is the Debtors' summary judgment motion filed in adversary proceeding number 09-50934, seeking to recover approximately $4 billion in deposit liabilities owed the Debtors that were assumed by JPMC pursuant to the P&A Agreement.

11.     In the Receivership, the Bondholders filed proofs of claim relating to the WMB Notes.  The FDIC recognized that the WMB Notes are "legitimate liability[ies] of the receivership" and notified the Bondholders that the FDIC would issue receivership certificates for their claims.  See Wash. Mut., Inc. v. FDIC, Civ. A. No. 09-533 (RMC), 2009 WL 3273880, at *1, Ex. 1 (D.D.C. Oct. 13, 2009).

---

Fund, L.P.; York Investment Master Fund, L.P.; York Select, L.P.; and York Select Master Fund, L.P. (Claims 3710, 3711 ¶1 n.1).  The WMB Noteholders include more than thirty-five insurance companies, institutional fund managers, investment banks and private investment funds.  (Claim 2480 n.1).

[3] See http://www.fdic.gov/about/freedom/popular.html.

### C. The Debtors' Commencement Of The Chapter 11 Cases.

12.     On the Commencement Date, each of the Debtors commenced a voluntary case pursuant to chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On October 3, 2008, the Court entered an order, pursuant to Bankruptcy Rule 1015(b), authorizing the joint administration of the Debtors' chapter 11 cases. On October 15, 2008, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").

### D. Claims Asserted By The FDIC.

13.     On March 30, 2009, the FDIC, as receiver, filed a proof of claim (the "FDIC Claim") against the Debtors on behalf of the Receivership and all WMB creditors. See Claim 2140. The FDIC Claim seeks assets purportedly due to WMB, including (1) a series of trust preferred securities, (2) certain tax refunds and losses, (3) deposit accounts, (4) capital maintenance obligations, (5) alleged fraudulently transferred dividends, (6) proceeds from certain litigations, and (7) other insurance proceeds. Id. In most respects, the Claims are substantively identical to those asserted by the FDIC in the FDIC Claim. See Claims 3710, 3711 and 2480.

14.     The FDIC also is a party to two adversary proceedings in the Bankruptcy Court. First, the FDIC is an interpleader defendant in an action initiated by JPMC against the Debtors on March 24, 2009. In that proceeding, JPMC seeks a declaration that it owns certain assets that it contends were acquired in the Sale. See JPMorgan Chase Bank, N.A. v. Wash. Mut., Inc., Adv. Proc. No. 09-50551 (MFW) (Bankr. D. Del. filed Mar. 24, 2009). Second, on June 24, 2009, the FDIC was granted permission to intervene in an action filed by the Debtors against JPMC seeking recovery of $4 billion in deposits that JPMC holds as successor to WMB and

WMBfsb. See Wash. Mut. Inc. v. JPMorgan Chase Bank, N.A., Adv. Proc. No. 09-50934 (MFW) (Bankr. D. Del. filed Apr. 27, 2009) (the "Turnover Action").

### E. The FDIC's Disallowance Of The Debtors' Proof Of Claim.

15.     On December 30, 2008, the Debtors filed a proof of claim against the Receivership. The proof of claim includes a series of claims asserting that WMB was indebted to WMI for (1) inter-company loans, (2) inter-company receivables, (3) payments under a tax sharing agreement, (4) return of capital contributions, (5) an interest in trust preferred securities, (6) various preference claims, (7) vendor contract claims, (8) subrogation claims, (9) deposit claims, (10) improper asset sales, (11) administrative claims, (12) indemnification claims, and (13) employee/employer related cost and insurance claims. On January 23, 2009, the FDIC summarily disallowed the Debtors' claims.

### F. Debtors' Lawsuit Against The FDIC.

16.     On March 20, 2009, in accordance with 12 U.S.C. § 1821(d)(6)(A), the Debtors filed the DC Action, which since has been stayed pending the resolution of the WMI bankruptcy proceedings. Wash. Mut., Inc. v. FDIC, No. 09-553 (RMC), 2009 WL 3273880, at *3 (D.D.C. Oct. 13, 2009). The complaint alleges five counts for (1) determination of the Debtors' proof of claim against the Receivership, (2) dissipation of WMI's assets, (3) taking of the Debtors' property without just compensation, (4) conversion of the Debtors' property, and (5) declaration that the FDIC-Receiver's disallowance of the Debtors' proof of claim was void.

17.     In the DC Action, the FDIC has filed counterclaims claiming that, as receiver of WMB, it was entitled to the various assets it had previously identified in the FDIC Claim against WMI. On June 2, 2009, the Bondholders moved to intervene in the DC action brought by the Debtors against the FDIC. On October 13, 2009, the District Court granted the Bondholders' motion. See Wash. Mut., Inc., et al. v. Fed. Deposit Ins. Corp., Case No. 1:09-cv-00533 (RMC)

(D.D.C. filed Mar. 20, 2009). The District Court allowed the motion to intervene, with caution, so the Bondholders could be heard as to their defenses to the Debtors' claims against the Receivership. Id. at *4.

### G. The Bondholders' Proofs Of Claim.

18. On March 31, 2009, the Marathon Credit Claimants filed two proofs of claim, which they amended on June 1, 2009. See Claims 3710, 3711. Claim 3710 was filed against WMI Investment; Claim 3711 was filed against WMI. Claims 3710 and 3711 are essentially identical, and assert claims for (1) corporate veil-piercing, alter ego and similar principles, (2) substantive consolidation, (3) improper claim to purported deposits, (4) undercapitalization of, failure to support, and looting of the bank, (5) misrepresentations and omissions under the applicable securities laws, (6) conditional exchange of REIT trust preferred securities, (7) tax refunds and losses, (8) mismanagement and breach of fiduciary and other duties, (9) claim for goodwill litigation award, and (10) fraudulent transfer.[4] On March 27, 2009, the WMB Noteholders filed their proof of claim against WMI in this Court. See Claim 2480. Claim 2480 asserts substantially the same claims as the Marathon Credit Claimants, but does not assert claims for corporate veil-piercing and substantive consolidation.

---

[4] The Marathon Credit Claimants generally assert that funded debt claims of WMI are contractually subordinated to their Claims. See Claims 3710, 3711, ¶7. There is no basis for either contractual or procedural subordination. The Marathon Credit Claimants do not identify any language in the indentures governing WMI funded debt whereby purchasers of WMI agreed to be subordinated to their claims. Similarly, the Marathon Credit Claimants allege without support that they should benefit from procedural subordination of the WMI claims.

## III.   FACTUAL BACKGROUND

### A.   Corporate History And Organizational Structure.

19.   WMI's history dates back to 1889, when its predecessor was formed to help
Seattle residents obtain funds to rebuild their homes damaged by "The Great Seattle Fire."[5]
Landefeld Decl. ¶6.  Following decades of continued growth and diversification, WMI's
predecessor became a capital stock savings bank, and subsequently one of the nation's leading
banks in originating mortgages.  Id. ¶ 7.

20.   In 1994, WMI was formed as a savings and loan holding company under the laws
of the State of Washington.  Id. ¶¶1, 8, 9.  It was the ultimate parent of WMB.

### B.   WMB's Receivership.

21.   On September 23, 2008, WMI informed the OTS, the FDIC and the Board of
Governors of the Federal Reserve System of strategic alternatives under consideration to enhance
WMB's capital and liquidity levels, including, among other things, (1) debt for equity swaps,
(2) equity for equity swaps, and (3) divestiture plans.  Id. ¶25.  However, on September 25, 2008,
the OTS initiated the Receivership, and the FDIC purportedly sold substantially all of the assets
of WMB to JPMC pursuant to the P&A Agreement.  Id.

### C.   OTS' Regulatory Oversight Of WMI And WMB.

22.   WMI, WMB and WMBfsb were subject to pervasive regulation by the OTS
before the Receivership and the Commencement Date.  Landefeld Decl. ¶9.  For instance, federal
law regulates all inter-affiliate transactions between related entities such as WMI and WMB to
ensure that they are consistent with sound banking policy and are conducted at arm's length.  See
12 U.S.C. § 371c (2009); 12 C.F.R. Part 223 (2010); 12 C.F.R. § 563.41 (2009).  The OTS also

---

[5] See Declaration of Stewart M. Landefeld in Support of the Debtor's Chapter 11 Petitions and First-Day
Motions 1 (hereinafter "Landefeld Decl.").  A copy of the declaration is attached as Exhibit 2.

was authorized to impose any additional restrictions it deemed necessary on transactions between a savings association and any affiliate. See 12 U.S.C. § 1468(a)(4) (2009). Extensions of credit from WMB to WMI were required to be fully collateralized to protect WMB. Moreover, inter-affiliate service agreements between WMI and WMB were required to be negotiated at arm's length to ensure that WMB paid no more than fair value for services it received and was paid fair value for any services it performed. 12 U.S.C. § 371c (2009); 12 C.F.R. Part 223 (2009); 12 C.F.R. § 563.41 (2009). In addition, federal regulations imposed extensive capital adequacy requirements on WMB. 12 C.F.R. Part 567 (2009). As discussed infra Section IV.C.2.a., OTS regulations even restricted dividend or other capital distributions made by WMB to WMI. 12 C.F.R. 563.140 et. seq. (2009).

23.     The scope of the federal oversight of WMB and WMI is evident in the OTS' handbooks for on-site examinations of federal thrifts and their holding companies. Section 310.4 of the OTS Examination Handbook for Thrifts instructs examiners to "[e]nsure that the [savings] association [such as WMB] maintains a corporate existence that is separate from its affiliates, subsidiaries, holding company, and sister banks."[6] OTS Examination Handbook for Thrifts at Section 310.4. Similarly, the OTS Holding Company Handbook for savings association holding companies, such as WMI, requires its examiners to analyze specific facts relating to the operational independence of the thrift subsidiary. Federal examiners thus were required to consider, among other things, the following:

- Whether WMB's management "acted in a manner that was beholden" to WMI;

- Whether WMB's operational systems were dependent on WMI;

_____

[6] See http://files.ots.treas.gov/422110.pdf

- Whether WMI performed "most, if not all, key functions" of WMB such as "risk management, underwriting, investment advice, trading, and other banking or lending functions;"

- Whether WMB was merely a "shell" of WMI or whether WMB had a "distinct management team;"

- Whether WMB's audit functions were separate and distinct from WMI's audit department;

- Whether there was "significant or abusive intercompany or insider transactions" such as "loans, asset purchases sales, or service contracts;"

- Whether WMB was dependent on WMI for access to capital; and

- Whether WMB's assets were derived exclusively from WMI.

OTS Holding Company Handbook at Section 710.9 to 710.10.[7]

### D.  The Bondholders' Purchase Of Securities From WMB.

24.  On December 21, 2005, WMB established the Global Note Program that provided for the issuance of up to $22 billion in debt financing through the issuance of Senior Global Notes and Subordinated Global Notes, or both, from time to time.[8] The WMB Notes were offered "only to institutional investors that are 'accredited investors' ("Institutional Accredited Investors") within the meaning of Rule 501(a) under the United States Securities Act of 1933." Ex. 3 at 1. Under Rule 501(a), an "Accredited Investor" includes, among others, the following: banks, savings and loan associations, brokers or dealers registered under section 15 of the Securities Exchange Act of 1934, insurance companies and investment companies. The Offering Circular further stated:

> The Notes are exempt from registration with the Commission pursuant to an exemption contained in Section 3(a)(5) of the Securities Act. The Notes are being offered and sold pursuant to

---

[7] See http://files.ots.treas.gov/4210022.pdf

[8] See WMB's December 21, 2005 Offering Circular for Senior and Subordinated Global Notes (the "Offering Circular"). A copy of the Offering Circular is attached as Exhibit 3.

an abbreviated registration procedure permitted by an OTS interpretive letter under the Securities Offering Regulations of the OTS. See Ex. 3 at ii.

The WMB Notes were offered through distribution agents, including Barclays Capital, Citigroup, Credit Suisse First Boston, Deutsche Bank Securities, JPMC, Goldman, Sachs & Co., Lehman Brothers, Morgan Stanley, Merrill Lynch & Co. and UBS Investment Bank. See Ex. 3 at 1.

25.     The Offering Circular repeatedly stated that all obligations created by the WMB Notes were obligations of WMB and not of any other party, including WMI. The third paragraph of the Offering Circular clearly stated:

> Each Note issued by the Issuer will be an obligation solely of the Issuer and will not be an obligation of, or otherwise guaranteed by, Washington Mutual, Inc. ("WMI"), the ultimate parent corporation of the Issuer, or any affiliate of WMI. . . .The Notes are unsecured and uninsured direct general obligations of the Issuer.

Ex. 3 at 1 (emphasis added). Furthermore, the "Description of Notes" section provided that "[e]ach Note will be a direct, unconditional and unsecured obligation of the Issuer and will not be an obligation of, or guaranteed by, WMI or any other affiliate of WMI." Ex. 3 at 14. In addition, the "Ranking" section stated that each type of note is an "unsecured and uninsured direct obligation of the Issuer and will not be an obligation of, or guaranteed by WMI, or any other affiliate of WMI." Ex. 3 at 16.

26.     The Offering Circular disclosed to investors the priority their claims would have in the event of liquidation or resolution of the Issuer, WMB, as follows:

> The Senior Notes rank *pari passu* with all other senior unsecured indebtedness of the Issuer, except deposit liabilities and other obligations that are subject to any priority or preference. In the event of liquidation or resolution of the Issuer by any receiver, the holders of deposits (including the FDIC as subrogee of insured depositors), the holders of certain other claims entitled to a priority or preference (including certain claims for administrative expenses) and the holders of secured obligations will be afforded priority in payment over the claims of the holders of the Senior

> Notes and the holders of other general obligations of the Issuer.
> The obligations evidenced by the Subordinated Notes are
> subordinated to all unsubordinated indebtedness and other
> obligations of the Issuer, including deposits and unsubordinated
> notes (including the Senior notes). In an insolvency of the Issuer,
> the holders of the Subordinated Notes could receive significantly
> less, if anything, than the holders of unsubordinated obligations,
> including the deposits and unsubordinated notes (including the
> Senior Notes) of the Issuer.

Ex. 3 at 16 (emphases added).[9] By investing in the WMB Notes, the Bondholders agreed that

they would be creditors of WMB, not WMI. Ex. 3 at 16. They also agreed that their claims

would be subordinated to (1) WMB depositors, (2) creditors with claims-based obligations

subject to priority or preference, and (3) creditors with secured obligations. Ex. 3 at 16.

## IV.   ARGUMENT

### A.   Most Of The Claims Should Be Disallowed Because The Bondholders Lack Standing.

#### 1.   The FDIC Has Exclusive Standing To Assert Claims That Allege Generalized Harm To WMB.

27.     This Court should disallow virtually all of the Bondholders' Claims because only

the FDIC, and not the Bondholders, has standing to assert them.[10] In fact, as discussed infra

Paragraph 31, the FDIC, in this case as well as in the DC Action, is pursuing virtually all of the

Bondholders' claims. Each of the Claims assert generalized harm to WMB and, in turn, to all of

WMB's creditors; they do not aver particularized harm to the Bondholders.

28.     The FDIC's exclusive right to bring the claims is based on the powers and duties

that Congress delegated to it under the Financial Institutions Reform Recovery and Enforcement

Act ("FIRREA"). Pub. L. No. 101-73, 103 Stat. 183 (1989) (codified at scattered sections of

---

[9] The Offering Circular emphasized the ranking of the senior and subordinated notes several times
throughout the circular. Ex. 3 at 14, 16.

[10] The FDIC does not have standing to assert the fraudulent transfer claim asserted by the Bondholders
here.

inter alia, 12 & 15 U.S.C.); Section 1821(d)(2)(A)(i) of FIRREA provides that the FDIC, when appointed as a receiver, succeeds to "all rights, titles, powers, and privileges of the insured depository institution . . . with respect to the institution and the assets of the institution." In effect, the FDIC stepped into the shoes of WMB when it was appointed as WMB's receiver. See O'Melveny & Myers v. FDIC, 512 U.S. 79, 86-87 (1994). The FDIC took possession of WMB's assets and liabilities and assumed responsibility for resolving claims on its behalf. See Vernon v. FDIC, 981 F.2d 1230, 1233-34 (11th Cir. 1993). The FDIC is responsible for "marshalling the insolvent bank's assets and distributing them to the insolvent bank's creditors and shareholders." Branch v. FDIC, 825 F. Supp. 384, 391 (D. Mass. 1993).

29.    Claims that are shared by all of WMB's creditors belong to the Receivership, and the FDIC has exclusive standing to assert them. Courtney v. Halleran, 485 F.3d 942, 950 (7th Cir. 2007); see also In re Longhorn Sec. Litig., 573 F. Supp. 255, 272 (W.D. Okla. 1983) ("As a general rule, wrongs committed by a bank's officers and directors that injure all depositors and creditors alike create a liability which is an asset of the bank itself and for which only the bank or its receiver may recover."). The FDIC's role as WMB's Receiver is similar to that of a bankruptcy trustee (although not with the same powers), who has exclusive standing to bring claims that are common to all creditors to prevent individual creditors from pursuing assets that should be distributed equally to all creditors.[11] The statutory policy governing insolvent banks protects creditors by ensuring that the pursuit of claims that are common to all creditors does not devolve into a "race of diligence" among creditors or make a "mockery" of the equality

---

[11] As in an FDIC receivership, "once a company or individual files for bankruptcy, creditors lack standing to assert claims that are 'property of the estate.'" Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 169 (3d Cir. 2002). Federal courts have recognized the similarity between the roles of the FDIC as receiver and a bankruptcy trustee as administrator of an estate. FDIC v. Ernst & Young LLP, 374 F.3d 579, 581 (7th Cir. 2004) ("FDIC-Receiver acquires the assets and legal interest of the failed bank and proceeds much as a trustee in bankruptcy.").

promised to creditors under federal law. See Downriver Cmty. Fed. Credit Union v. Penn Square Bank, 879 F.2d 754, 764 (10th Cir. 1989) (quoting First Nat'l Bank v. Colby, 88 U.S. 609, 614 (1875)).

30.     The Bondholders assert five claims that also are being pursued by the FDIC against WMI. In the FDIC Claim against WMI in this case (Claim 2140), the FDIC asserts claims for (1) undercapitalization, (2) tax payments, (3) fraudulent transfer, (4) trust preferred securities, (5) deposit accounts and (6) proceeds of the goodwill litigations. See Claim 2140. Additionally, in the DC Action, the FDIC brought counterclaims against the Debtors for the same claims. Here, the Bondholders also have brought duplicative claims for (1) improper claim to purported deposits, (2) undercapitalization of, failure to support, and looting of the bank, (3) conditional exchange of REIT trust preferred securities, (4) tax refunds and losses, and (5) proceeds of the goodwill litigations. Because the FDIC currently is pursuing these claims, the Bondholders lack standing to assert them. See Agostino v. Hicks, 845 A.2d 1110, 1116 (Del. Ch. 2004) (derivative action may not be pursued if corporation is willing and able to assert the suit on its own behalf); cf. Commodore Int'l Ltd. v. Gould (In re Commodore Int'l, Ltd.), 253 B.R. 336, 339 (S.D.N.Y. 2000) (creditors committees "right [to bring a derivative suit] does not arise, however, when the debtor in possession is already pursuing the same claims.")

31.     The Marathon Credit Claimants are creditors of the receivership estate of WMB, which is in receivership. The Marathon Credit Claimants allegedly hold approximately $1.8 billion in principal amount outstanding of Senior Notes issued by WMB. Claims 3710, 3711 ¶1. The WMB Noteholders claim to hold approximately $1.1 billion in principal amount outstanding of Senior Notes and approximately $0.8 billion in principal amount outstanding of Subordinated Notes issued by WMB. Claim 2480 ¶3. The WMB Noteholders expressly state that their claims

are based on amounts that may be due to WMB by WMI. Claim 2480. Similarly, the Marathon Credit Claimants acknowledge that they are bringing their claims derivatively on behalf of WMB. Claims 3710, 3711 ¶2. Neither the Marathon Credit Claimants nor the WMB Noteholders claim that they had privity of contract with either of the Debtors.

32.     The claims asserted by both the WMB Noteholders and the Marathon Credit Claimants are common to all of WMB's creditors. In fact, while the Marathon Credit Claimants claim that they "suffered direct injury" due to WMI's conduct, they concede that they are bringing their claims "derivatively, on behalf of the Bank." See Claims 3710, 3711 ¶2. Where, as here, creditors of an insolvent bank assert claims against a third-party and the alleged injury was suffered equally by all creditors, those claims are derivative claims as opposed to individual or direct claims. Hamid v. Price Waterhouse, 51 F.3d 1411, 1420 (9th Cir. 1995).

33.     Decisions of the Court of Appeals for the Seventh and Ninth Circuits involving the dismissal of derivative claims of creditors of insolvent banks for lack of standing are instructive. See Courtney, 485 F.3d at 950; Hamid, 51 F.3d at 1420. In Courtney, creditors of an insolvent bank brought a class-action against the bank's owners, officers, directors and accountants alleging that they violated the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and committed other tortious conduct. Courtney, 485 F.3d at 943. The creditors accused the defendants of withdrawing excessive amounts of money from the bank, paying themselves large dividends, accepting large loans with no intention of repaying them and making misrepresentations to creditors regarding the health of the bank. Id. at 944-45. The Seventh Circuit upheld the district court's dismissal of the complaint on the ground that the plaintiffs lacked standing. Id. at 950. The Seventh Circuit held that the creditors' RICO claims

were derivative, and could be brought only by the FDIC. Id. The court reasoned that the injuries from the alleged misrepresentations and looting were suffered by all creditors equally. Id.

34.     In Hamid, depositors of an insolvent bank brought an action against bank affiliates and insiders for illegally acquiring banks in the United States, causing deposits to be misused and misappropriated, and misrepresenting facts about the bank to regulators, which delayed its closing. Hamid, 51 F.3d at 1414. The Ninth Circuit affirmed the district court's dismissal of the complaint for lack of standing. Id. at 1421. Analogizing to a derivative action against a corporation, the court concluded that only the bank could assert such claims. Id. at 1420. It noted that when a creditor suffers injury that is independent of the firm's fate, his injury is direct and he may pursue his own remedy. Id. Otherwise, the court observed, the injury is derivative and the creditor must take his 'place in line' as a creditor in the bankruptcy action." Id. at 1420.[12]

35.     Like the creditors in Courtney and Hamid, the Bondholders allege that WMI looted WMB, made misrepresentations about the health of the bank and stole assets that could have been used to repay creditors, including the Bondholders. While the Debtors assert these claims are false, they nonetheless are classic derivative claims. To have standing to assert these claims, the Bondholders must demonstrate particularized injury to themselves. See, e.g., Adato v. Kagan, 599 F.2d 1111, 1117 (2d Cir. 1979) (holding that individual creditors can sue only if

---

[12] See also In re Sunrise Sec. Litig., 916 F.2d 874, 880 (3d Cir. 1990) (holding that creditors of a failed bank lacked standing to assert RICO claims against the bank's former officers and directors where "the gravamen of the complaint is injury primarily to the corporation or to the shareholders generally"); Downriver, 879 F.2d at 764 ("Any remedy for fraudulent representations that affects, or potentially affects, all creditors belongs to the receiver, who asserts such claims for the benefit of all creditors."); Brazlin v. W. Sav. & Loan Ass'n, Civ. No. 91-0078-PHX-SMM, 1994 WL 374286, at *4 (D. Ariz. Jan. 28, 1994) (holding that claims by noteholders of a failed bank to redress injuries against the bank and similarly-situated noteholders, as well as the plaintiff noteholders, were derivative and subject to the same legal principles governing shareholder derivative actions).

they have suffered a wrong that is "distinctly theirs and not common to all"). Yet, the Bondholders fail to assert how they were directly injured and submitted no evidence showing direct injury. Instead, they allege that "WMI dominated not only the Bank's finances, but also its business practices, and defrauded the Bank and its creditors, including the Bank Bondholders." Claims 3710, 3711 ¶8 (emphasis added). Although the Debtors contend that the Claims fail as a matter of law, it must be observed that allowing the Bondholders to pursue the Claims would give them the opportunity to "jump ahead of other creditors in priority and obtain greater shares of the failed bank's assets." Hamid, 51 F.3d at 1420.

### 2. Other Courts' Treatment Of The Specific Claims Asserted By The Bondholders Demonstrates That They Are Derivative.

36.     In addition to the Bondholders' claims being defective because they fail to allege particularized injury to themselves, courts have considered many of the types of claims asserted by the Bondholders and determined that such claims are derivative claims.

#### a.     Corporate Veil-Piercing And Substantive Consolidation.

37.     The Marathon Credit Claimants' corporate veil-piercing and substantive consolidation claims are derivative; they assert no particularized injury that is unique to the Marathon Credit Claimants.[13] As to the veil-piercing claim, the Marathon Credit Claimants merely assert that WMI was WMB's alter ego and that the two entities shared a common identity. Claims 3710, 3711 ¶8. However, these claims fail to allege that this relationship affected the Marathon Credit Claimants in a unique way. Rather, the claims refer generally to the purported impact on WMB and its creditors. This is a standard derivative claim that can be brought only by the FDIC, which is consistent with this Court's approach to veil-piercing claims

---

[13] Even if standing is somehow established, these claims also fail on the merits, which is discussed in Section IV.C-D.

common to all creditors in bankruptcies. See, e.g., OODC, LLC v. U.S. Bank Nat'l Ass'n (In re OODC), 321 B.R. 128, 136-37 (Bankr. D. Del. 2005) (holding that only the bankruptcy trustee has standing to assert veil-piercing claims common to all creditors and permissible under state law).[14]

38.     The substantive consolidation claims, which are closely aligned with the veil-piercing claims, also should be disallowed because they are derivative claims. Substantive consolidation is an "extreme" remedy, that "should be rare and, in any event, one of last resort." In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005). See also Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp., 934 P.2d 715, 721 (Wash. Ct. App. 1997), aff'd, 959 P.2d 1052 (Wash. 1998). Substantive consolidation is used so sparingly because a bankruptcy court can only order substantive consolidation when it is in the interest of all creditors, not just the entity seeking consolidation, and here, neither entity is seeking such consolidation. See Owens Corning, 419 F.3d at 211, 214.

39.     The substantive consolidation claims asserted here belong to all creditors of WMB; the Marathon Credit Claimants fail to allege an injury in connection with their substantive consolidation claims that is peculiar to them. See Duke Energy Trading & Mktg. L.L.C. v. Enron Corp. (In re Enron Corp.), No. 01-B-16034 (AJG), 2003 Bankr. LEXIS 330, at

---

[14] In bankruptcy cases, the trustee has exclusive standing to assert veil-piercing claims where the applicable state law permits a corporation to pierce its own veil. CBS, Inc. v. Folks (In re Folks), 211 B.R. 378, 384-85 (B.A.P. 9th Cir. 1997). Though there is no case law establishing whether a Washington corporation can pierce its own veil, Washington courts routinely look to Delaware law for guidance. See, e.g., In re F5 Networks, Inc. Derivative Litig., 207 P.3d 433 (Wash. 2009) (applying the Delaware demand futility standard and the reasoning of Ryan v. Gifford, 918 A.2d 341 (Del. Ch. 2007)); In re Cray Inc. Derivative Litig., 431 F. Supp. 2d 1114, 1120 (W.D. Wash. 2006) (concluding that the Washington Supreme Court would likely adopt the substantive demand requirement and "apply a similar, if not the same, exception for futility as that employed in Delaware"); see also Boland v. Engle, 113 F.3d 706, 710-712 (7th Cir. 1997) (noting that in predicting how Washington courts would rule that "Delaware corporate law is undoubtedly persuasive authority," but not necessarily dispositive) (internal quotation omitted)). Delaware law permits a corporation to pierce its own veil, see In re OODC, 321 B.R. at 136, and it is likely that Washington would follow suit.

*11 (Bankr. S.D.N.Y. Apr. 17, 2003) ("Where a claim is generalized, with no particularized injury stemming from it and where the claim may be brought by any creditor, the trustee or debtor-in-possession is the appropriate party to assert the claim and creditors are subject to the outcome of the action brought by the trustee or debtor-in-possession."). Moreover, the Marathon Credit Claimants are seeking to substantively consolidate a debtor with a non-debtor entity that is in a federal receivership but have not even brought an action, whether in the form of litigation against the FDIC, or institution of an adversary proceeding in this court to pursue this far-fetched theory.

### b. Misrepresentations And Material Omissions.

40.     The Bondholders' misrepresentation claims similarly are derivative and must be disallowed. The Bondholders allege that WMI, its directors and its officers made statements between July 2006 and July 2008 that misled investors regarding WMB's financial condition. See Claims 3710, 3711 ¶13; Claim 2480 ¶¶31-32. The Bondholders list several public statements purportedly made by WMI executives during earnings calls and investor conferences. However, the Bondholders do not plead facts demonstrating that they relied on these statements in making their investment decisions, or that these statements were material or were the cause of their alleged losses, as required to state a claim for violation of the federal securities laws or common law fraud. Nor do the Bondholders allege that the public statements uniquely impacted them. Instead, the Bondholders assert that these alleged misrepresentations and omissions impacted the entire market for Senior Notes. Id. These generalized allegations apply to all possible creditors of WMB, not only the Bondholders. Any claim for misrepresentations or omissions that allegedly affected or potentially affected all creditors belongs to the FDIC. See Downriver, 879 F.2d at 764 ("Any remedy for fraudulent representations that affects, or

potentially affects, all creditors belongs to the receiver, who asserts such claims for the benefit of all creditors.").

### c.  Mismanagement And Breach Of Fiduciary Duties.

41.     The Bondholders' claims for alleged mismanagement and breach of fiduciary duties also are derivative in nature and belong to the Receivership. The claims allege that WMI and its directors and officers mismanaged WMB and breached their fiduciary duties both to WMB and to WMB's creditors. Claims 3710, 3711 ¶16; Claim 2480 ¶¶27-30. Though the Marathon Credit Claimants acknowledge that WMI would be liable to all of WMB's creditors and to the Receivership under these theories, they nevertheless seek individual compensation. Claims 3710, 3711 ¶16.

42.     This is precisely the type of claim that the Third Circuit has determined belongs solely to the Receivership. See In re Sunrise Sec. Litig., 916 F.2d at 888-89. In Sunrise, creditors of an insolvent bank asserted RICO claims against bank officials and alleged that they mismanaged bank assets. Id. at 887. The district court dismissed the claims on the ground that the plaintiffs lacked standing because the claims were derivative. The Third Circuit affirmed, holding that the claims were derivative and belonged to the FDIC. Id. at 888. The court reasoned that permitting the plaintiffs to pursue the claims "could disrupt the efforts of FDIC to recover the institution's assets, which were depleted by defendants' mismanagement and wrongdoing, for equitable distribution among all depositors and creditors in accordance with the federal priority scheme." Id. (emphasis in original).[15]

---

[15] See also Brandenburg v. Seidel, 859 F.2d 1179, 1191-92 (4th Cir. 1988) (holding that claims of misfeasance against officers and directors belonged to receivership and that permitting plaintiffs to proceed with their claims would disrupt the receiver's efforts to collect for the "general pool of. . . assets for distribution to the thrift's creditors." Although Brandenburg was later overruled on other grounds by Quackenbush v. Allstate Ins. Co., 517 U.S. 706 (1996), the Supreme Court did not disturb the Brandenburg court's holding on the misfeasance claims.).

43.    As in Sunrise, permitting the Bondholders to proceed with their mismanagement claims, along with all of their other derivative claims, will permit them to "jump ahead of other creditors" and disrupt the FDIC's effort to recover assets belonging to all creditors. Hamid, 51 F.3d at 1420; see also Downriver, 879 F.2d at 764 (recognizing that permitting all depositors to assert generalized claims would "deluge the FDIC with the potentially crushing weight of claims" for alleged acts that affected all depositors similarly). It also would violate federal policy regarding insolvent savings associations by allowing one group of creditors to collect assets owed to all creditors.

### 3.    The Bondholders Have Failed To Establish That They Have Standing To Assert Derivative Claims.

44.    The Marathon Credit Claimants make the conclusory assertion they have standing to assert claims against WMI either directly or on WMB's behalf.[16]  Claims 3710, 3711 ¶2.  In support of this misplaced assertion, the Marathon Credit Claimants cite, but do not discuss, the following three cases. See Hindes v. FDIC, 137 F.3d 148, 171-72 (3d Cir. 1998); Branch, 825 F. Supp. at 391; Suess v. United States, 33 Fed. Cl. 89, 96-97 (Fed. Cl. 1995).  A straightforward reading of these cases discloses that none of them supports the Marathon Credit Claimants' bid for standing.

45.    Hindes is factually distinguishable and inapposite to the Marathon Credit Claimants' claims.  In Hindes, the court considered whether shareholders of a failed bank had a private right of action to file a direct claim to enforce the FDIC's statutory duties under 12 U.S.C. § 1821(d)(15).  137 F. 3d at 169.  The Hindes court held that the shareholders did not have a private right of action to enforce the FDIC statutory duties, but, *in dicta*, recognized that

---

[16] The WMB Noteholders' proof of claim, Claim 2480, contains no assertion that the WMB Noteholders have standing to assert direct or derivative claims on behalf of WMB.  Rather, it is silent on the issue.

shareholders would have a direct claim against the FDIC to enforce the FDIC's duty to distribute

surplus funds. Id. at 171. Unlike the shareholders in Hindes, the Marathon Credit Claimants are

not asserting a claim against the FDIC to distribute surplus funds. Rather, they seek to assert a

derivative claim, not a direct claim, against the shareholders of WMB to reimburse them for the

lost value of a bond. Hindes therefore lends no support to the Marathon Credit Claimants'

assertion that they have standing.

46.     Similarly, Branch and Suess involve materially different facts that fail to buttress

the Marathon Credit Claimants' claim that they have standing. Branch and Suess hold that

shareholders of an insolvent bank may bring derivative claims on behalf of the bank but only if

the shareholders first make a demand on the FDIC to bring the claims or show that to do so

would be futile. Branch, 825 F. Supp. at 405; Suess, 33 Fed. Cl. at 96-97. These cases also

require that the shareholder demonstrate that the suit is necessary to protect the interest of

creditors. Branch, 825 F. Supp. at 403. Both Branch and Suess involved a unique circumstance

– not present here – where the FDIC had a direct conflict of interest affecting the proposed claim.

Suess, 33 Fed. Cl. at 96-97 (discussing Branch). In Branch, the plaintiff sought to recover funds

that the FDIC had previously transferred to a bank subsidiary to reduce the FDIC's costs in

handling the subsidiary's failure. In Suess, the claim would have been filed by the Resolution

Trust Company against the OTS, both of which are arms of the Treasury Department. Id. By

contrast, here the FDIC faces no conflict of interest in a decision whether to assert claims against

WMI. In fact, as noted in Section IV.A.1, the FDIC already is pursuing several of those claims

in three separate litigations. Where a receiver is capable of and is pursuing claims, creditors

cannot bring derivative suits to assert the same claims. See Agostino, 845 A.2d at 1116.

47.     Furthermore, other courts have not followed <u>Branch</u> and <u>Suess</u>. For example, the courts in <u>Hamid, Courtney,</u> and <u>Downriver,</u> upheld the dismissal of derivative claims by creditors without exception. <u>Hamid,</u> 51 F.3d at 1420-21; <u>Courtney,</u> 485 F.3d at 950; <u>Downriver,</u> 879 F.2d at 764-65. In those cases, the creditors were not permitted to bring derivative claims, demand or not. Even if derivative claims on behalf of WMB were permitted in the face of a demand or a showing of futility, the Marathon Credit Claimants have not addressed or satisfied either requirement. As such, the claims asserted by the Marathon Credit Claimants are the property of the Receivership, and only the FDIC has standing to assert them. Any other outcome would permit the Marathon Credit Claimants to pursue for themselves potential assets of the Receivership that belong to all creditors, not just to the Marathon Credit Claimants.

**B.     The Bondholders' Proofs of Claim Fail To State Plausible Claims On Which Relief Can Be Granted And Should Be Expunged.**

48.     Even if the Bondholders have standing, and the Debtors submit they do not, the Court nevertheless should expunge the Claims because they fail to state plausible claims on which relief may be granted.[17] Dismissal of a proof of claim under 11 U.S.C. § 502(c) is

---

[17] The Claims should not be considered *prima facie* valid because the Bondholders failed to attach sufficient documentation to support their claims as required by Fed. R. Bankr. P. 3001(c). Fed. R. Bankr. P. 3001(c) requires that "[w]hen a claim...is based on a writing, the original or a duplicate shall be filed with the proof of claim...." FED. R. BANKR. P. 3001(c). A proof of claim that is "executed and filed in accordance with [the Bankruptcy Rules] shall constitute *prima facie* evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f) (emphasis added). A proof of claim that does not comply with the Bankruptcy Rules, however, has no *prima facie* validity. See In re Kincaid, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008). Where a claim is based on a writing and the claimant fails to attach sufficient documentation to support its claim, the claim has no *prima facie* validity. In re Stauder, 396 B.R. 609, 611 (Bankr. M.D. Pa. 2008) (holding that there was no *prima facie* validity of proof of claim where documentation attached to claims did not meet requirements of Rule 3001(c)). Absent *prima facie* validity of the claim, the burden for proving the sufficiency of the claim remains with the claimant. In re Kinkaid, 388 B.R. at 614; 9 Collier on Bankruptcy ¶3001.09 (2007). Here, all of the Bondholders' claims arise out of their interest in the WMB Notes. However, the Bondholders have not attached to the Claims any documentation regarding the WMB Notes as required by Rule 3001(c). The Claims, therefore, have no *prima facie* validity. Consequently, the burden of proving the validity of their Claims remains with the Bondholders.

equivalent to dismissing a claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted. See Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.), 398 B.R. 736, 748 (S.D.N.Y. 2008) (affirming bankruptcy court's dismissal of proof of claim for failure to state a plausible claim on which relief may be granted). As the Fifth Circuit explained in 900 Capital Servs., Inc. v. Cloud (In re Cloud), No. 99-51109, 2000 WL 634637, at *2 (5th Cir. May 4, 2000), by filing an objection to a proof of claim, the objectors create a contested matter, for which the bankruptcy court may exercise its power under Fed. R. Bankr. P. 9014 and 7012 to apply Rule 12(b)(6) to a contested matter. In Cloud, the Fifth Circuit affirmed the district court's judgment upholding the bankruptcy court's dismissal of a proof of claim for failure to state a plausible claim on which relief can be granted. Id. at *4.

49. A plaintiff must "plead more than the possibility of relief to survive a motion to dismiss." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). As the Supreme Court recently made clear: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a motion to dismiss. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Rather, "all civil complaints must now set out sufficient factual matter to show that the claim is facially plausible." Fowler, 578 F.3d at 210 (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. Determining whether a complaint is facially plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." Id. at 1950 (citations and internal quotation marks omitted).

50.     In ruling on a motion to dismiss, the Third Circuit has instructed courts to conduct a two-part analysis. "First, the factual and legal elements of a claim should be separated." Fowler, 578 F.3d at 210-211. The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." Id. Second, the court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. (quoting Iqbal, 129 S.Ct. at 1950). None of the Claims meets this standard, which warrants their dismissal.

### C.     The Bondholders' Disregard Of Corporate Form Claims Should Be Expunged Because They Fail To Allege Plausible Claims For Relief And Are Undermined By Compelling Evidence.

#### 1.     The Claims Fail To Allege A Plausible Claim For Relief Under The Doctrines Of Corporate Disregard And Alter Ego.

51.     The Marathon Credit Claimants' claims for piercing the corporate veil are legally insufficient and must be expunged. Under Washington law,[18] parent corporations are generally recognized as distinct legal entities separate from their subsidiaries. United States v. Carey (In re Wade Cook Fin. Corp.), 375 B.R. 580, 598 (B.A.P. 9th Cir. 2007) (applying Washington law). Washington courts apply two theories when considering whether to establish indirect liability against a parent company: alter ego and corporate disregard. Under the alter ego theory, a plaintiff must show that: (1) one corporation "so dominates and controls another as to make that

---

[18] Under Delaware's choice of law rules, a Delaware court must apply the law of the state of incorporation of a company to determine whether the relationship between the corporate entity and its stockholders can give rise to liability of the stockholders for the conduct of the corporate entity. See Youkelsone v. Wash. Mut., Inc. (In re Wash. Mut., Inc.), 418 B.R. 107, 113-14 (Bankr. D. Del. 2009) (applying Washington law to alter ego claims because, in part, WMI was incorporated in Washington) (citing Rosenmiller v. Bordes, 607 A.2d 465, 468 (Del. Ch. 1991)). Moreover, federal regulations permitted WMB to elect to follow corporate governance rules of the laws of the State of Washington. See 12 C.F.R. 552.5(b)(3) (2009). In Article XI of its bylaws, WMB elected that "[t]he corporate governance procedures of the laws of the State of Washington (including but not limited to corporate governance related to the duties of directors) shall apply to the savings bank, provided that such procedures are not inconsistent with applicable Federal statutes and regulations." Accordingly, Washington law applies to the Bondholders' corporate disregard and alter ego claims.

other merely an adjunct to it," Superior Portland Cement, Inc. v. Pac. Coast Cement Co., 205

P.2d 597, 620 (Wash. 1949); Wade Cook, 375 B.R. at 599, and (2) regarding the corporations as

two entities in fact and intent "would work a fraud upon third persons." Wade Cook, 375 B.R. at

599 (citations omitted). Alternatively, under the corporate disregard theory, a plaintiff must

show (1) the corporate form was intentionally abused through fraud or manipulation to violate or

evade a duty owed to another and (2) the corporation's intentional misconduct caused harm to

the party seeking relief such that disregard of corporate separateness is necessary. Id. at 598

n.22. Courts, however, are very reluctant to disregard the corporate form. See Eagle Pac. Ins.

Co., 934 P.2d at 721 ("Disregarding the corporate form or 'piercing the corporate veil,' is an

equitable remedy imposed only in exceptional circumstances."); see also In re Alper Holdings,

USA, Inc., 398 B.R. 736, 757; Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,

233 F.R.D. 143, 145 (D. Del. 2005).

52.     The Supreme Court has recognized that elements of control or supervision

inherent in every parent-subsidiary relationship do not give rise to veil-piercing liability:

> It is a general principle of corporate law deeply 'ingrained in our
> economic and legal systems' that a parent corporation (so-called
> because of control through ownership of another corporation's
> stock) is not liable for the acts of its subsidiaries. Thus it is
> hornbook law that 'the exercise of the 'control' which stock
> ownership gives to the stockholders. . . .will not create liability
> beyond the assets of the subsidiary. That 'control' includes the
> election of directors, the making of by-laws. . . .and the doing of all
> other acts incident to the legal status of stockholders. . . .

United States v. Bestfoods, 524 U.S. 51, 61-62 (1998) (internal citations and quotations omitted).

Similarly, sole ownership of a subsidiary by a holding company is a common business practice,

and does not justify veil-piercing absent other circumstances. Akzona, Inc. v. E.I. Du Pont De

Nemours & Co., 607 F. Supp. 227, 238 (D. Del. 1984); see also Minton v. Ralston Purina Co., 47

P.3d 556, 563 (Wash. 2002) ("[T]he fact that...Continental held itself out as a subsidiary of

Ralston does not justify disregarding the corporate entity."). "[T]here is nothing inherently improper about corporations creating subsidiaries to perform specific functions. That is what holding companies do" and "[a] contrary finding would 'ignore the historical justification for the corporate enterprise system.'" Sun Trust Bank v. Sun Int'l Hotels Ltd., 184 F. Supp. 2d 1246, 1269 (S.D. Fla. 2001) (citations omitted).

53.     Two recent cases rejecting similar attempts to pierce the corporate veil and impose liability on bank holding companies support the dismissal of the Claims. In this Court's recent decision in Youkelsone, 418 B.R. 107 at 114-16, involving WMI and WMB, this Court rejected claims similar to those now being asserted. In Youkelsone, this Court applied Washington law in ruling on a motion to dismiss a complaint in which the plaintiff sought to hold WMI liable for alleged conduct committed by WMB under a corporate disregard theory. The Court held that the plaintiffs' bald allegations that WMI "oversaw, managed, controlled and supervised all operations of WMB" and "mere assertion[s] of fraud on the part of a subsidiary" did not state cognizable claims for relief under the doctrines of corporate disregard and alter ego. Id. at 115. The factual allegations in Youkelsone are similar to the Marathon Credit Claimants' general, conclusory allegations. The Court should apply the same rationale as in Youkelsone to expunge the Claims because they fail to allege plausible claims. See also De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir. 1996) (affirming district court's dismissal of complaint that was devoid of any specific facts or circumstances that would support veil-piercing theory).

54.     Another recent case rejecting a creditor's similar attempt to pierce the corporate veil and to hold a bank holding company liable for the obligation of its subsidiary further supports dismissal of the Claims. See McAnaney v. Astoria Fin. Corp., No. 04-CV-1101

(JFB)(WDW), 2009 WL 3150430 (E.D.N.Y. Sept. 29, 2009). In <u>McAnaney</u>, mortgage holders filed suit against two bank holding companies alleging violations of the Truth in Lending Act, consumer protection laws, breach of contract, fraud and unjust enrichment. <u>Id.</u> at *1. Plaintiffs claimed that the bank holding companies' respective subsidiary banks each assessed improper fees against the mortgage-holders. <u>Id.</u> at *2. Though plaintiffs acknowledged that the bank holding companies did not originate or service the loans, they nevertheless argued that they should be liable for the banks' acts because they allegedly controlled their subsidiaries. <u>Id.</u> at *7. To support their allegations, plaintiffs offered evidence that (1) the bank holding companies had a controlling interest in the banks, (2) the bank holding companies and the banks consolidated their financial statements in public filings, and (3) the bank holding companies and banks shared officers and directors. <u>Id.</u> at *8. Plaintiffs also relied on two press releases issued by the bank holding companies that discussed the banks' lending activities. <u>Id.</u> at *8 n.13.

55.     The district court granted the bank holding companies' motion for summary judgment. The court held that there was no evidence indicating the bank holding companies' direct involvement, and there was insufficient evidence from which a fact finder could reasonably conclude that the corporate veil should be pierced under an alter ego theory. <u>Id.</u> at *8-9. The district court reasoned that the facts simply demonstrated that the bank holding companies had controlling interests in the subsidiary defendants. <u>Id.</u> The district court further observed that the facts relied on by the plaintiffs were "commonplace as <u>generally-accepted corporate form,</u> and are insufficient without more, as a matter of law, to eviscerate the presumption of corporate separateness." <u>Id.</u> at 8 (emphasis added). As to the press releases, the district court stated that the press releases did not represent that the bank holding companies were directly involved in the lending activities, and were not probative as to the bank holding

companies' dominion and control over the banks. Id. at *8 n.13. While McAnaney was decided on a motion for summary judgment, the district court's holding nevertheless is instructive given the similarity of the facts in that case to the allegations in the Claims.

<blockquote>

**a.  There Is No Plausible Claim Alleged Under The Doctrine Of Alter Ego.**

**(i)  The Marathon Credit Claimants' Allegations Regarding WMI's Domination And Control Of WMB Are Insufficient.**

</blockquote>

56.     Most of the allegations regarding WMI's domination and control of WMB are general and conclusory.  The Claims generally allege that WMI dominated WMB's finances and business practices, undercapitalized the bank, defrauded WMB and its creditors, siphoned billions of dollars from WMB and made misstatements regarding WMB's financial health.[19] Claims 3710, 3711 ¶8.  In addition, they assert that WMI was a contract party for WMB in several third-party arrangements and that WMI operated a consolidated cash management system with WMB.  Id.  Such factual and legal conclusions need not be accepted, and fail to state a plausible claim to disregard the corporate form under an alter ego theory.  See Youkelsone, 410 B.R. at 115.

57.     The Marathon Credit Claimants also cite the following examples of WMI's alleged domination of WMB:

(a)     "WMI and WMB had identical and overlapping directors;"

---

[19] The Marathon Credit Claimants also assert that they "may" have claims resulting from transactions between WMI and its subsidiary financial institutions that allegedly violated Section 23A and Section 23B of the Federal Reserve Act ("FRA").  See Claims 3710, 3711 ¶12.  Those sections provide restrictions on transactions of depository institutions with affiliate companies.  However, no private right of action is afforded claimants by the FRA.  See Branch, 825 F. Supp. at 409 ("Here, the plain language of [section 23A of the FRA] and its enforcement provisions, the legislative scheme, and the supporting legislative history all indicate a lack of Congressional intent to create a cause of action for a bank and or its shareholders against other banks or the FDIC.").  Even if the Marathon Credit Claimants alleged such a violation – which they plainly do not – no cause of action exists that they may assert.  Therefore the claim should be expunged.