(b)     WMB and WMI "filed consolidated tax returns;"

(c)     WMI and WMB "were run together on the same information and accounting systems;"

(d)     WMB "managed all payroll, including payroll for WMI's employees;"

(e)     "The pension plan that cover[ed] the vast majority of Bank employees was sponsored by WMI;"

(f)     "[P]ublished reports indicate" that WMI cannot "locate any documentation establishing" deposit accounts it has with WMB;

(g)     "There is confusion as to which entity did business with which vendor;" and

(h)     "Payments were apparently made" by one entity "on behalf of another entity." Claims 3710, 3711 ¶8.

These examples describe generally accepted business practices between corporate parents and their subsidiaries and the Marathon Credit Claimants seriously mischaracterize the legal consequences of these acts. Likewise, they do not suggest excessive domination and control, and are insufficient to establish that WMI and WMB defrauded others.

58.     Contrary to the Marathon Credit Claimants' allegations, overlapping directors and joint meetings of boards of directors are considered part of a "normal, legitimate parent-subsidiary relationship." Upjohn Co. v. Syntro Corp., Civ. A. No. 89-107-JJF, 1990 WL 79232, at *5 (D. Del. Mar. 9, 1990). "[T]he mere fact that corporations share officers, employees, a physical site, and common ownership of stock is insufficient to justify disregarding the separate corporate identities." Moses Lake Constr. Co., Inc. v. Johnson, Nos. 23587-4-III, 23588-2-III, 2006 WL 2147602, at *6 (Wash. Ct. App. July 27, 2006); see also, Minton, 47 P.3d at 563 ("mere ownership of stock, the same officers, employees, etc., does not justify disregarding the separate corporate identities unless fraud is being worked upon a third person.") (citations and internal quotation marks omitted). In fact, Washington courts have refused to imply an overt

intent to disregard the corporate form from the presence of common directors, shareholders or a common business address. One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs., Inc., 30 P.3d 504, 514 (Wash. Ct. App. 2001), rev'd in part on other grounds, 61 P.3d 1094 (Wash. 2002).[20]

59.     Similarly, the Marathon Credit Claimants' allegations regarding WMI's and WMB's joint accounting procedures simply identify recognized business practices. Specifically, the filing of consolidated tax returns is neither improper nor unjust; it is expressly permitted by the Internal Revenue Code. Alberto v. Diversified Group, Inc., 55 F.3d 201, 207 (5th Cir. 1995) (applying Delaware law). Here, WMI as the common parent or "key" filing corporation filed consolidated federal income tax returns and certain state combined, consolidated, and unitary tax returns. In connection therewith, WMI, WMB and certain other affiliates entered into a Tax Sharing Agreement, pursuant to which WMB's tax payment obligations to WMI would be determined on a separate company basis, and where WMB would have been entitled to a refund on a separate company basis, WMB would be owed that amount by WMI (irrespective of the amount of actual taxes paid by WMI to taxing authorities, or tax refunds received by WMI from taxing authorities, with respect to the group's tax liability). See Declaration of Curt Brouwer, dated January 22, 2010, attached hereto as Exhibit 4, ¶ 10. A parent corporation's use of a cash management system also is common, and courts generally decline to rely on this fact as a basis for alter ego liability. Fletcher v. Atex Inc., 68 F.3d 1451, 1459 (2d Cir. 1995) (citing cases).

---

[20] See also Doe v. Unocal Corp., 248 F.3d 915, 927 (9th Cir. 2001) (rejecting plaintiff's argument that overlapping directors and officers was a basis for alter ego liability because, "[a] parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego"); McVeigh v. Unumprovident Corp., 300 F. Supp. 2d 731, 741 (W.D. Wis. 2002) ("Courts agree that complete stock ownership and even substantial overlap of officers and directors between a parent and its subsidiary are insufficient to establish that one is the mere instrumentality of the other.").

Cash management systems are indicative of administrative efficiency, and not equivalent to the intermingling of funds. Id. Moreover, WMB's alleged managing of payroll and WMI's sponsoring of the pension plan fail to establish domination and control sufficient to warrant veil-piercing. Courts have declined to pierce the corporate veil based on similar common payroll funding activities. See Peterson v. Trailways, Inc., 555 F. Supp. 827, 832-33 (D. Colo. 1983).

60. As to the allegation that WMI purportedly cannot locate documentation establishing "deposit accounts," this allegation also is insufficient to demonstrate "domination and control" by WMI. The allegation is squarely contradicted by evidence, as discussed in Section IV.C.2. In any event, there is no allegation that lack of documentation regarding the "deposit accounts" has caused any fraud or injustice. The allegation that there is "confusion" as to which entity did business with which vendor also is conclusory and insufficient to show improper domination. It also is not alleged to be related to any purported injustice.[21] Likewise, the allegation that "payments were apparently made by WMI" on behalf of another entity is conclusory and insufficient to demonstrate domination and control or any injustice or fraud. And, as discussed in further detail below, Section IV.C.2.d., these allegations are contradicted by evidence that payments made by WMB with respect to the accounts payable of WMI were pursuant to an Administrative Services Agreement and reconciliation process, by which WMI or WMB, as the case may be, were reimbursed for all such expenditures. See Declaration of Doreen Logan, dated January 19, 2010, attached hereto as Exhibit 5 ("Logan Decl."), ¶4-9. Moreover, given the precise, detailed language of the Offering Circular, it is clear that there was

---

[21] See Snohomish Sch. Dist. No. 201 v. Sportec Int'l, No. 35086-2-I, 1996 Wash. App. LEXIS 689, at *20 (Wash. Ct. App. Dec. 2, 1996) (plaintiff's confusion about which entity was responsible for warranty work under a construction contract was not sufficient to justify application of corporate disregard); Brown v. Gen. Elec. Capital Corp. (In re Foxmeyer Corp.), 290 B.R. 229, 240 (Bankr. D. Del. 2003) (evidence that the creditors were confused about which entity they could look to for payment was insufficient to justify piercing the corporate veil).

no "confusion" on the part of the Marathon Credit Claimants as to which entity they were dealing with in connection with the WMB Notes. See Section III.E.

### (ii) The Allegations Regarding Fraud On The Marathon Credit Claimants Are Insufficient.

61. The Claims further failed to allege plausible allegations that treatment of WMB and WMI as separate entities would perpetrate a fraud on the Marathon Credit Claimants. See Youkelsone, 418 B.R. 107, at 115-16 (holding that absent non-conclusory statements showing an injustice or fraud was worked on third parties, complaint did not state a plausible claim for relief that WMI is liable for any misconduct of WMB). There are no allegations that any alleged payments made by WMI, WMB or WMBfsb on behalf of another entity were improper, or that they caused harm to the Marathon Credit Claimants. Likewise, there are no allegations that WMB's management of payroll or WMI's funding of pension plans violated a duty or caused an injustice on third parties. Merely alleging that two corporations are "intimately related in carrying on their business for the purpose of mutual benefit is not enough to characterize a corporation as the alter ego of the other corporation." Wade Cook, 375 B.R. at 599.

62. The allegation that WMI undercapitalized WMB similarly is insufficient to satisfy the fraud requirement. Under Washington law, the corporate form should not be disregarded solely because a corporation's assets are insufficient to discharge its obligations. Norhawk Invs., Inc. v. Subway Sandwich Shops, Inc., 811 P.2d 221, 223 (Wash. Ct. App. 1991). The proper inquiry regarding capitalization is whether the corporation was established or used to defraud its creditors or some other improper purpose, and not whether there is a shortage of capital. Trs. of Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk, 332 F.3d 188, 197 (3d Cir. 2003). The scope of this inquiry is typically limited to whether the initial capitalization at the time of organization was adequate. See, e.g., In re Foxmeyer Corp., 290 B.R. at 244 (noting

that undercapitalization was "only relevant from a veil-piercing standpoint if such subsidiary was inadequately capitalized and/or insolvent from its inception or such adverse status was subsequently caused by acts of the subsidiary's parent").[22] Under this standard, a corporation that was adequately capitalized, but subsequently suffers financial reverses, is not undercapitalized. See WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS at § 41.33 (2009). The Bondholders assert no allegations to the contrary here.

63. The Marathon Credit Claimants' allegations fail to adequately assert that WMI dominated WMB in a way that would cause an injustice or fraud on the Bondholders if their separate status were not recognized. Wade Cook, 375 B.R. at 599.[23] Accordingly, the claims fail to state a plausible theory of liability based on the alter ego doctrine.

### b. There Is No Plausible Claim Alleged Under The Doctrine Of Corporate Disregard.

64. The focus of the inquiry under a theory of corporate disregard is whether the corporate form was used for intentional misconduct or fraud that caused injury to another. See Wade Cook, 375 B.R. at 598 n.22. The Claims fail to plead a plausible theory as to how WMB and WMI abused their corporate forms to perpetrate a fraud on the Bondholders. See Section

---

[22] See also Trevino v. Merscorp, Inc., 583 F. Supp. 2d 521, 529-530 (D. Del. 2008) ("Assuming arguendo that Plaintiffs have adequately pled undercapitalization. . . .'[a] shortage of capital, as with all the factors of the alter ego doctrine, is not per se a reason to pierce the corporate veil . . . . Rather, the inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was *established* to defraud its creditors....") (emphasis added).

[23] Absent a showing of fraud or injustice, courts have refused to pierce the corporate veil, even where – unlike here – the plaintiff proved that the parent company diverted corporate assets. For example, in LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 289 (D. Del. 2000), the holders of indentures issued by a subsidiary's holding company attempted to pierce the veil and recover against the parent company when proceeds from the notes were used to pay dividends to the parent. The court refused to pierce the veil, ruling that the plaintiff had failed to demonstrate any fraud or similar injustice by the officers. Id. at 295. It also determined that the holding company had followed corporate formalities by verifying that the dividends were proper, through the use of an independent accounting firm, and by making public disclosures concerning the use of the proceeds from the sale of the notes. Id. at 296.

IV.B.2.a.2. They also have failed to assert a plausible claim under the doctrine of corporate disregard. Since the Claims are insufficient under both the alter ego and corporate disregard doctrines, they must be disallowed.

### 2. Compelling Evidence Undermines The Bondholders' Veil-Piercing Claims.

#### a. OTS' Regulation And Oversight Of WMB And WMI Undermine The Claim That WMI Dominated And Controlled WMB.

65.     Even if the Court declines to dismiss the Claims based on standing and/or pleading deficiencies, there nevertheless is compelling evidence negating the *prima facie* validity of the Claims. See In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992). WMI and WMB were subject to pervasive regulation, which undermines the bald assertion that WMI dominated and controlled WMB. This comprehensive regulatory scheme specifically encompasses the WMI-WMB relationship. OTS regularly reviewed the depository institution's corporate separateness, looking specifically at transactions between parent and subsidiary corporations. Section 310.4 of the OTS Examination Handbook for thrifts directs federal examiners to "[e]nsure that the association maintains a corporate existence that is separate from its affiliates, subsidiaries, holding company, and sister banks."[24] Section 710.8 of the OTS Holding Company Handbook further requires federal examiners to review the "Financial Independence of the Thrift Subsidiary."[25] The examination of financial independence is directly applicable to veil-piercing determinations. The OTS examinations consider whether the thrift's management consistently acts in a manner beholden to the holding company, or if the thrift is "basically a 'shell.'" Id. at Section 710.9.

---

[24] See http://files.ots.treas.gov/422110.pdf.

[25] See http://files.ots.treas.gov/4210022.pdf.

66.     To confirm that WMB was not subject to improper control by WMI, the OTS

monitored inter-affiliate transactions ensuring they were consistent with strict statutory

proscriptions.  See 12 U.S.C. § 371c (2009); 12 C.F.R. Part 223 (2009).[26]  This framework

protected WMB by regulating transactions between WMI and WMB.  Specifically, the

regulations governing intercompany transactions protected WMB by:

- Placing quantitative limitations on intercompany credit transactions to ensure that, in the aggregate, such intercompany transactions did not exceed 20 percent of bank capital and surplus or 10 percent with respect to any single bank affiliate;

- Requiring all extensions of credit from the bank to a parent (within the aggregate limits permitted) be fully collateralized for the protection of the bank;

- Prohibiting sales of substandard assets to the bank; and

- Mandating inter-affiliate service agreements be based on arm's-length relationships.

In addition, federal law also subjected WMB to pervasive capital adequacy rules and limitations

on dividend and other capital distributions by WMB.  See 12 C.F.R. Part 567 (2009); 12 C.F.R.

563.140, et seq (2009).  In light of the OTS' careful oversight of WMI and WMB, the claim that

WMI dominated and controlled WMB is baseless.

### b.     The Marathon Credit Claimants Have No Basis To Allege That Documentation Is Missing Regarding WMI's Deposit Account.

67.     The Marathon Credit Claimants allege that "WMI purports to have deposit

accounts with WMB, yet published reports indicate neither JPMC nor WMI can locate any

documentation establishing most of these accounts."  Claims 3710, 3711 ¶8.  This allegation fails

to identify any documents purportedly missing, and in fact there are none.  Indeed, the Debtors

---

[26] These rules are applicable to federal thrift institutions.  See 12 C.F.R. § 563.41 (2009); Section 11(a) of the Home Owners Loan Act, codified at 12 U.S.C. 1468(a) (1994).

addressed this issue previously through the sworn testimony of Doreen Logan, a former First Vice President and transaction manager in WMB's Treasury Department, which WMI submitted to this Court in the Turnover Action.[27]  Ms. Logan played a central role in transactions related to the deposit accounts, and she explains that WMI's deposit accounts were properly recorded and documented.  As Ms. Logan reports:

(1)    The Debtors had cash on deposit, in a total of six demand deposit accounts with WMB and WMBfsb, in excess of $3.8 billion as of September 25, 2008;

(2)    Each of these deposit accounts was established and maintained in accordance with internal policies and procedures governing intra-corporate deposit accounts;

(3)    Each account was accounted for in the books and records of WMB or WMBfsb as a demand deposit account; and

(4)    Transfers of funds from WMI's primary checking account at WMB to a newly-established checking account at WMBfsb were properly accounted for in "New Account Request Forms" and the transaction was properly reflected in the Account Statements for the relevant accounts.

Logan Aff. at ¶¶4, 10-26.  Thus, the WMI deposit accounts were properly documented, which demonstrates that the veil-piercing claims are baseless.

**c.    The Bondholders Have No Basis To Allege Payments Were Improperly Made By WMI Or WMB On Behalf Of Each Other, Or That There Was "Confusion" Regarding Payments To Third Parties.**

68.    The allegations that "[t]here is confusion as to which entity did business with which vendor" and that "payments were apparently made" by one entity "on behalf of another entity," are not only insufficient to establish a claim for veil-piercing, they also are directly contradicted by evidence.  Claims 3710, 3711 ¶8.  WMI and WMB operated pursuant to an Administrative Services Agreement, which provided that WMB was the entity that made

---

[27] See Aff. of Doreen Logan, dated May 19, 2009, <u>Wash. Mut. Inc. v. JPMorgan Chase Bank, N.A.</u>, Case No. 08-12229, Adv. Proc. No. 09-50934 [Docket #16], at pp. A-2-A-95 ("Logan Aff.").

payments to vendors, including for payroll and account payable services, on behalf of various affiliated Washington Mutual entities including WMI, no matter which entity was the legally obligated party pursuant to a contract. See Logan Decl. ¶5. The entities for whom payments were made were charged systematically for these payments through inter-company general ledger accounts. Id. WMB directly charged the respective affiliated entities, including WMI, for any services that WMB paid on behalf of such entity. Id. The respective affiliated entities, including WMI, then reimbursed WMB for any payments WMB had made on their behalf. Id. at ¶6. The reimbursements to/from WMB were processed by WMB's Inter-Company Accounting group and WMB's Cash Management/Treasury group was advised of the payment. Id. at ¶7. On at least a monthly basis, all inter-company accounts were reconciled and WMB was reimbursed for any payments it had made. Id. at ¶8. Because the payments made by WMB on behalf of other affiliated entities, including alleged payments to certain vendors, were properly accounted for pursuant to inter-company agreements and were reconciled and settled regularly, they cannot serve as a basis for piercing the corporate veil.

    **D.    The Marathon Credit Claimants' Substantive Consolidation Claims Should Be Dismissed Because The Doctrine Is Inapplicable And The Claims Fail To Allege Plausible Claims For Relief.**

        **1.    Substantive Consolidation Is Inapplicable Because WMB Is In Receivership.**

69.    Substantive consolidation, a construct of federal common law, treats separate legal entities as if they were merged into a single survivor with consolidated assets and liabilities. In re Owens Corning, 419 F.3d at 205. As a result, the claims of creditors against separate debtors are morphed into claims against the consolidated survivor. Id. The remedy of substantive consolidation is inapplicable here because the Marathon Credit Claimants request that the Court consolidate the Debtors with WMB, an entity in receivership.

70.     The doctrine of substantive consolidation does not apply where the non-debtor is in receivership. See Commodity Futures Trading Comm'n v. Eustace, Civ. Action No. 05-297, 2008 WL 471574 (E.D. Pa. Feb. 19, 2008). The district court's recent opinion in Eustace is instructive on this issue. In Eustace, the Commodity Futures Trading Commission brought an action against an individual and an asset management company for fraud, and sought the appointment of an equity receiver. Id. at 1. The district court appointed an equity receiver for the asset management company and its affiliates. Id. A related action was later commenced by investors in the Cayman Islands where the funds were located, and a Cayman Islands court appointed joint liquidators to liquidate the funds. Id. A dispute subsequently arose between the joint liquidators and the receiver regarding the distribution of the funds. The joint liquidators argued that the district court should apply the doctrine of substantive consolidation as articulated in Owens Corning. Id. at *4-5.

71.     The district court rejected the joint liquidators' argument, holding that substantive consolidation applied to bankruptcy proceedings, and that the district court sitting as the receivership court did not exercise bankruptcy powers. Id. at *6. Moreover, the district court emphasized that "the role of the court-appointed equity receiver in this case to be very relevant and unique." Id. The district court noted that in Owens Corning, a group of creditors attempted to use substantive consolidation to deprive another group of creditors of their rights. Id. In contrast, the district court stressed that a receiver already had been appointed to represent the interests of all creditors, thereby implying that substantive consolidation was inappropriate given the role of the receiver. Id.

72.     Substantive consolidation is particularly inappropriate in the unique circumstances presented here. First, the Marathon Credit Claimants have failed to bring an

action, whether in the form of litigation against the FDIC, or institution of an adversary proceeding in this Court to pursue this far-fetched theory. Second, Congress has specifically excluded insured depository institutions such as WMB from being debtors under the Bankruptcy Code. See 11 U.S.C. § 109 (2009). As a result, the FDIC, like the receiver in Eustace, has been appointed to marshal WMB's assets and distribute them to WMB's creditors. See Branch, 825 F. Supp. at 391. If this Court were to order substantive consolidation, it would impermissibly interfere with both the authority that Congress has granted the FDIC as WMB's receiver and Congress' determination to exclude entities such as WMB from certain aspects of the Bankruptcy Code.

2.    **The Marathon Credit Claimants' Claims Fail Because They Do Not State Plausible Claims For Substantive Consolidation.**

73.    Even if the doctrine of substantive consolidation applied, and the Debtors assert it does not, this Court nevertheless should dismiss these claims because they fail to allege a plausible claim for relief. To allege a facially plausible claim for substantive consolidation, the Bondholders must allege facts that satisfy the standard articulated by the Third Circuit in Owens Corning. Under Owens Corning, a bankruptcy court will only substantively consolidate a non-debtor entity with a debtor where it is shown that either:

a)    The debtor and the non-debtor entity in their pre-petition conduct disregarded the separateness of their respective entities so significantly as to lead their creditors to treat them as one legal entity; or

b)    That post-petition, the assets and liabilities of the debtor and the non-debtor entity sought to be consolidated are so hopelessly scrambled and commingled that it is impossible to separate them and tell them apart thereby resulting in harm to all creditors.

In re Owens Corning, 419 F.3d at 211. As a result, and as previously discussed, substantive consolidation is an extraordinary remedy to be implemented sparingly. See, e.g., id. at 208-09; Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515,

518 (2d Cir. 1988); Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.), 432 F.2d 1060, 1062-63 (2d Cir. 1970). Since substantive consolidation is extreme and imprecise, it is viewed as a rough justice remedy that should be utilized as a last resort. In re Owens Corning, 419 F.3d at 211. As demonstrated below, the Marathon Credit Claimants' claims fail to satisfy either prong of the Owens Corning standard.

        **a.**      **The Claims Fail To Allege Any Facts Pertaining To WMI's And WMB's Pre-Petition Conduct.**

74. The Marathon Credit Claimants' substantive consolidation claims focus exclusively on *post-petition* conduct of the Debtors as opposed to *pre-petition* conduct. See Claims 3710, 3711 ¶9. The claims also fail to allege that the Marathon Credit Claimants actually and reasonably relied on any *pre-petition* conduct. In re Owens Corning, 419 F.3d at 212 ("[p]roponents who are creditors must also show that, in their prepetition course of dealing, they *actually and reasonably relied* on debtors' supposed unity") (emphasis added). Accordingly, the Claims do not satisfy the first prong of the Owens Corning test.

        **b.**      **The Marathon Credit Claimants' Claims Fail To Allege Sufficient Facts That WMI's And WMB's Assets And Liabilities Are Hopelessly Scrambled And Commingled Such That It Is Impossible To Separate Them Resulting In Harm To All Creditors.**

75. The Claims attempt to assert that, post-petition, the assets and liabilities of WMI and WMB are so hopelessly scrambled and commingled that it is impossible to separate them and tell them apart, thereby resulting in harm to all creditors. The Claims contain the following allegations that arguably relate to this issue:

- In a pleading recently filed with the Bankruptcy Court, JPMC has claimed that "[e]ven after nearly four months of concerted effort, beyond the day-to-day banking operations, there has been little tangible progress in separating WMB from its former parent beyond identifying the larger issues between the parties."

- WMI's President allegedly indicated that JPMC still needs to clarify, to the extent possible, which assets are WMI's and which are WMB's.

- JPMC allegedly indicated that its effort to separate WMB from WMI "has been even further complicated by the fact that the books and records of WMB, its parent companies and their respective predecessors in interest were largely maintained on a combined basis by the same personnel."

- WMI's restructuring officer allegedly stated that WMI continues to have a problem "in figuring out what belongs to the Bank and what belongs to the holding company." Claims 3710, 3711 ¶9.

These allegations, which primarily reflect JPMC's dissatisfaction at not having been able to acquire certain assets at the time of the FDIC's liquidation of substantially all of WMB's assets, are legally insufficient.

76.     In a case involving remarkably similar allegations, the bankruptcy court dismissed a substantive consolidation claim on the ground that the allegations did not state a plausible claim for relief. Simon v. ASIMCO Techs., Inc. (In re Am. Camshaft Specialties, Inc.), 410 B.R. 765 (Bankr. E.D. Mich. 2009). In American Camshaft, the trustee's complaint alleged that the debtors and non-debtors (1) made numerous loans to each other and it was difficult, if not impossible, to accurately determine the liabilities between the entities; (2) had combined financial statements; (3) presented financial information collectively to the companies' super board; (4) had common employees, making it difficult to separate each entity's liability for wages; and (5) commingled money, assets and employees making it impossible to segregate their assets and liabilities. Id. at 790. The bankruptcy court held that these allegations were insufficient to show that the debtors' and non-debtors' assets and liabilities were hopelessly scrambled and commingled such that it was impossible to distinguish them. Id. at 790-91. The bankruptcy court reasoned that these allegations, at most, alleged that the trustee could not determine how much the entities owed to each other, which was insufficient under the second prong of the Owens Corning test. Id. at 791.

77.     Here, as in <u>American Camshaft</u>, the Marathon Credit Claimants' allegations merely suggest that JPMC has had difficulty determining which assets are WMB's and WMI's. This clearly does not rise to the requisite level of assets that are "hopelessly scrambled and commingled." <u>Id.</u> The Marathon Credit Claimants further have failed to allege facts showing that substantive consolidation would benefit every creditor. Dismissal of these claims thus is warranted.

**E.     The Bondholders Cannot Maintain A Claim For Fraudulent Transfer.**

78.     The Bondholders' fraudulent transfer claims are based on the Uniform Fraudulent Transfer Act ("UFTA"), codified in Washington by the Revised Code of Washington § 19.40.  In general, a fraudulent transfer occurs where one entity transfers an asset to another entity, with the effect of placing the asset out of the reach of a creditor of the transferring entity, with either the intent to hinder, delay or defraud the creditor or in exchange for less than reasonably equivalent value at a time when the transferring entity was insolvent or rendered insolvent or undercapitalized as a result of the transfer. <u>See</u> <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 240 (3d Cir. 2000).

79.     The Bondholders' alleged fraudulent transfer claims fall into three general categories. First, they allege that certain transfers made by WMB were made with actual intent to hinder, delay, or defraud creditors of WMB (the "Actual Fraudulent Transfer Claims").  WASH REV. CODE § 19.40.041(a)(1). Second, they allege that certain transfers were made by WMB at a time when WMB was insolvent, had unreasonably small assets, or intended to incur debts beyond its ability to pay, without the receipt of "reasonably equivalent value" (the "Constructive Fraudulent Transfer Claims").  WASH REV. CODE §§ 19.40.041(a)(2); 19.40.051(a).  Third, they allege that certain transfers of WMB were made to WMI at a time when WMB was insolvent, on

account of an antecedent debt, and that WMI had reasonable cause to believe that WMB was insolvent (the "Insider Preference Claim"). WASH REV. CODE § 19.40.051(b).[28]

80.     These theories, the Bondholders assert, apply to dividends paid from WMB to an intermediary, and then to WMI and also to WMI's deposits when withdrawn from WMB. However, the Bondholders' claims with respect to the dividends fail because WMB was not insolvent at the time of the issuance (in each instance, before September 2007) and because the Bondholders fail to, and cannot, allege actual fraudulent intent on the part of WMB or WMI. The Bondholders' claims with respect to the withdrawal of WMI deposits from WMB and re-deposit into WMBfsb (the "Deposit Transfer") fail too because reasonably equivalent value was received by WMB (through the satisfaction of the deposit liability owed by WMI) and because the transaction did not harm creditors of WMB given that the transferred funds were subject to

---

[28] The WMB Noteholders also allege that "WMB may have claims against WMI for [fraudulent] transfers." Claim 2480 ¶8. First, as a threshold matter, the WMB Noteholders do not have standing to assert a claim on behalf of WMB. See In re Refco Inc., 505 F.3d 109, 117 (2d Cir. 2007) ("To the extent that the rights of a party in interest are asserted, those rights must be asserted by the party in interest, not someone else."). Second, such speculative allegations are insufficient under Supreme Court law. See Bell Atl. v. Twombly, 550 U.S. 544, 561 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level...."). Third, the statute cited by the WMB Noteholders, 12 U.S.C. § 1821(d)(17)(A) is simply inapplicable to transfers of an interest in WMB's property. The plain language of the statute makes this clear: "The Corporation, as conservator or receiver for any insured depository institution . . . may avoid a transfer of any interest of an institution-affiliated party, or any person who the Corporation or conservator determines is a debtor of the institution, in property, or any obligation incurred by such party or person, that was made within 5 years of the date on which the Corporation or conservator was appointed conservator or receiver if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the insured depository institution, the Corporation or other conservator, or any other appropriate Federal banking agency. 12 U.S.C. § 1821(d)(17)(A) (emphasis added); see, e.g., In re Colonial Realty Co., 980 F.2d 125, 127-28 (2d Cir. 1992) (FDIC seeking to assert section 1821(d)(17)(A) to avoid transfer of insider individual who was a debtor to the failed bank to his wife). Here, the WMB Noteholders muse that claims may exist under this statute for "up streaming of dividends or other distributions by WMB to WMI." Claim 2480 ¶8. In sum, the WMB Noteholders have mistaken both parties to which this statute references and is applicable. First, the statute affords the FDIC, not the WMB Noteholders, with a right of action under certain circumstances. Second, the transferor contemplated by the statute is an "institution-affiliated party" or a "debtor of the institution," not the failed depository institution itself. The WMB Noteholders only vaguely speculate concerning alleged transfers from WMB to WMI. Thus, even if the WMB Noteholders had standing to assert such a claim, which they do not, and even if they had plead the claim sufficiently, the claim fails.

FIRREA's "depositor preference." In each instance, the Bondholders carry the burden of proving that the transfer in question was fraudulent and they fail to do so. <u>Sedwick v. Gwinn</u>, 873 P.2d 528, 531-532 (Wash. Ct. App. 1994).

## 1. The Dividends Were Not Fraudulent Transfers.

### a. Actual Fraudulent Transfer Claims Fail Because The Dividends Were Not Made With Actual Intent to Hinder, Delay or Defraud Creditors of WMB.

81. In September 2007 and at prior times, WMB paid dividends (the "Dividends") to its then-direct parent, New American Capital, Inc. ("NACI").[29] In turn, in certain instances NACI transferred funds (not necessarily in an amount equal to those received by WMB) to WMI. WMB never paid Dividends directly to WMI. Logan Decl. at ¶10. The last Dividend that WMB paid occurred in September 2007 in the amount of $1 billion. <u>Id.</u> From the September 2007 Dividend until WMB was placed into receivership, WMB did not pay any Dividends to NACI or WMI, as the case may be. <u>Id.</u>

82. Pursuant to WASH REV. CODE § 19.40.041(a)(1), the Bondholders assert that the Dividends were made with the "actual intent to hinder, delay or defraud a creditor" of WMB. (Claims 3710, 3711 ¶10; Claim 2480 ¶24.) To prevail on their claims, the Bondholders must provide "<u>clear and satisfactory proof</u>" of such an intent. <u>U.S. v. Townley</u>, 181 Fed. Appx. 630, 631 (9th Cir. 2006) (emphasis added). In determining whether there was actual intent to defraud exists for purposes of satisfying WASH REV. CODE § 19.40.041(a)(1), the court may consider these nonexclusive factors: whether (1) the transfer was to an insider; (2) the debtor retained control over the property transferred; (3) the transfer was disclosed or concealed; (4) before the transfer, the debtor had been threatened with suit; (5) the transfer was of substantially all the

---

[29] NACI ultimately was merged into WMB as of November 1, 2007.

debtor's assets; (6) the debtor absconded; (7) the debtor concealed assets; (8) the debtor did or did not receive reasonably equivalent value for the transfer; (9) the debtor was insolvent or became insolvent soon after the transfer, (10) the debtor incurred a substantial debt shortly before or after the transfer; and (11) the debtor transferred the assets of the business to a lienor who transferred the assets to an insider. Worthington v. Low Cost Drugs, Inc., No. 18102-2-III, 2000 WL 199004, at *4 (Wash. Ct. App. Feb. 15, 2000) (citing WASH. REV. CODE § 19.40.041(b)). Moreover, Fed. R. Civ. P. 9(b), requiring averments of fraud to be plead with particularity, applies to fraudulent transfer claims. PHP Liquidating, LLC v. Robbins, 291 B.R. 592, 602 (D. Del. 2003).

83.    The Bondholders do not allege, because they cannot, that WMB retained control over the Dividends; that the Dividends were concealed;[30] that the Dividends were motivated by litigation; that the Dividends comprised substantially all of WMB's assets; that WMB absconded; that WMB concealed assets; that WMB was insolvent before September 2007 (as more thoroughly discussed below); or that the Dividends were transferred to a lienor. See WASH. REV. CODE § 19.40.041(b). The only factor that the Bondholders could possibly assert is that the Dividends were issued first to an insider, NACI, then to WMI, and that WMB did not receive any tangible consideration in the exchange. However, these are hardly remarkable given the fact that WMB is (or was at one time with respect to NACI) a wholly-owned subsidiary of

---

[30] To the contrary, the Dividends were fully-disclosed in WMI's public filings. See WMI Annual Report (Form 10-k), at 185 (Feb. 29, 2008). A copy of the Form 10-K is attached as Exhibit 6. Moreover, WMB was subject to OTS regulations that limit the ability of savings associations to pay dividends and make other capital distributions and require OTS approval. See 12 C.F.R. Part 563, Subpart E (2009). WMB was required to file an application or notice with the OTS at least 30 days before the proposed payment of all dividends or payment of a proposed capital distribution because it is a subsidiary of a savings and loan holding company. 12 C.F.R. §563.144 (2009). Thus, OTS was notified of the Dividends and approved the issuance of the Dividends.

the transferees and the inherent nature and function of dividends (i.e., to return equity value to shareholders).

84.    Not only is there a dearth of any indication of fraud in the allegations, but there also is clear evidence that there was no fraudulent intent. Over the course of the pertinent period, WMB was current on its obligations to the Bondholders. Logan Decl. at ¶12. Further, as of September 30, 2007, WMB had satisfied all capital adequacy requirements to which it was subject and the OTS categorized WMB as "well-capitalized" under the regulatory framework for prompt corrective action. See WMB Quarterly Report (Form 10-Q), at 25 (Nov. 14, 2007) at 5. Moreover, all of the Dividends were paid only after being approved by the OTS after the OTS gave due consideration to WMB's remaining capital adequacy (i.e. that WMB would satisfy minimum capital adequacy requirements after giving effect to payment of the Dividends), as well as all "relevant information concerning the proposed capital distribution, including the amount, timing, and type of distribution." See 12 CFR Part 563, Subpart E (2009). Significantly, subsequent to the payment of the Dividends, WMI contributed $6.5 billion in capital contributions (the "Capital Contributions") to WMB. Logan Decl. at ¶12. The premise that WMB issued the Dividends to hinder, delay or defraud the Bondholders is irreconcilable with the fact that WMB subsequently received an even greater amount from the ultimate recipient of the Dividends, WMI.

85.    In sum, the Bondholders fail to allege any facts that support plausible claims for relief and assert no evidence whatsoever of actual intent to defraud by WMB or WMI. Rather, all of the evidence surrounding the Dividends points to the contrary, including the fact that the Dividends were issued approximately a year before the P&A Agreement and the Commencement Date, were approved by the OTS, and were followed by an even greater dollar amount of Capital

Contributions from WMI to WMB. Under these circumstances, the Bondholders' naked, conclusory assertions fall far short of providing the Court with "clear and satisfactory proof" of fraudulent intent by WMB or WMI to hinder, delay or defraud any creditor of WMB and fall short of satisfying Rule 9(b)'s requirements. See In re Fedders N. Am., Inc., 405 B.R. 527, 545 (Bankr. D. Del. 2009) (holding plaintiff failed to state a fraudulent transfer claim even under the more lenient requirements of Rule 8 where single badge of fraud was plead – insolvency – and where transaction was not concealed).

### 2. WMB Was Not Insolvent At The Time Of The Dividends.

86.     Notwithstanding the financial condition of WMB in 2008 before the Receivership, as of September 2007 and earlier, WMB was a solvent bank that displayed an ability to pay its debts as they became due. The Bondholders have asserted Constructive Fraudulent Transfer Claims in connection with the Dividends, asserting that WMB did not receive reasonably equivalent value in return. The Bondholders fail to assert any facts that support a finding that WMB was financially distressed at the time of the Dividends. However, to prevail, the Bondholders must prove that WMB was left with unreasonably small assets, intended to incur more debts than it would be able to pay, or was insolvent at the time of the Dividends. WASH. REV. CODE §§ 19.40.041(a)(2); 19.40.051(a). Moreover, during the pertinent period, WMB's financial statements, credit ratings issued by the leading rating agencies, and capital ratios all indicated that none of the foregoing applied to WMB. Therefore, because the Bondholders cannot meet their burden to prove such Constructive Fraudulent Transfer Claims, these claims should be expunged.

87.     As of September 30, 2007, WMB reported to the OTS $27 billion in equity and $18 billion in tangible equity. See WMB Quarterly Report (Form 10-Q), at 2 (Nov. 14, 2007). Further, between June and October 2007, WMB credit ratings were investment grade and stable,

remaining unchanged at A1, A, and A at Moodys, S&P, and Fitch, respectively.[31] Finally, although not necessarily indicative of solvency, from May 2007 to October 2007, even WMB's subordinated bonds traded near or at par with negligible volatility.[32]

88.     In view of the fact that the Bondholders have not alleged any facts that support a plausible claim and have set forth no evidence that WMB was left with unreasonably small assets, or intended to incur more debts that it would be able to pay, or was insolvent at the time of the Dividends coupled with the indicia discussed above concerning the financial condition of WMB at the time of the Dividends, the Bondholders' Constructive Fraudulent Transfer Claims fail to state a claim and should be dismissed.

### 3. The Deposit Transfer Was Not A Fraudulent Transfer.

#### a. The Deposit Transfer Is Not Avoidable Under Fraudulent Transfer Law.

89.     Only the Marathon Credit Claimants assert a claim in connection with the Deposit Transfer. Unlike the Dividends, the Deposit Transfer is indisputably on account of an antecedent debt, i.e., deposit liabilities. The Marathon Credit Claimants concede this point, which forecloses any Constructive Fraudulent Transfer Claims in connection with the Deposits. (Claims 3710, 3711 ¶10.)[33] Thus, the Marathon Credit Claimants are left asserting only an

---

[31] See Bloomberg, WMB Credit Profile - Moody's/S&P/Fitch (Bloomberg Finance L.P., Jan 4, 2010), attached as Exhibit 7.

[32] See Bloomberg, WMB daily bond pricing, 5/30/07 – 10/31/07 (Bloomberg Finance L.P., Jan. 5, 2010), attached as Exhibit 8.

[33] Thus, any Constructive Fraudulent Transfer Claims asserted under § 19.40.041(a)(2)(i), (ii) or § 19.40.051(a) fail, as the Deposit Transfer was for reasonably equivalent value. It is well settled that satisfaction of antecedent debt constitutes reasonably equivalent value. See Maddox v. Robertson (In re Prejean), 994 F.2d 706, 707 n.2 (9th Cir. 1993); WASH. REV. CODE § 19.40.031(a) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."); 11 U.S.C. § 548(d)(2)(A) (2009) (defining "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . .") (emphases added). See also Official Employment-Related Issues Comm. v. Arnold (In re Enron Corp.), Bankr. No. 01-16034-AJG,

Insider Preference Claim, claiming that the "transfer was made to an insider for an antecedent debt, [WMB] was insolvent at that time, and [WMI] had reasonable cause to believe that the debtor was insolvent." WASH REV. CODE § 19.40.051(b).

90.     On or about September 18, 2008, WMI decided to transfer $3.764 billion from its primary checking account, Account 0667 at WMB, to WMBfsb. Logan Aff. at ¶13. This sum represented the majority of the funds in the account. Id. at ¶15. During the attempted transfer, an administrative processing error occurred, and a new account (Account 4218) was opened at WMB instead of at WMBfsb. Id. at ¶20. Due to the error, the funds were transferred to Account 4218 at WMB. Id.

91.     On September 22, 2008, the transaction was corrected retroactively to the date of September 19, 2008. Id. at ¶22. A new account was created at WMBfsb, Account 4234, and the $3.674 billion (the "Deposits") was transferred from WMB Account 4218 to WMBfsb Account 4234 (the "Deposit Transfer"). Id.

92.     Shortly after transferring the Deposits from WMB to WMBfsb, WMBfsb loaned funds in an equal amount to WMB under the Revolving Master Note (the "Master Note"). Id. at ¶41. Established in September 2004, the Master Note was utilized by WMBfsb in the ordinary course to lend substantially all of its excess liquidity to WMB. Both WMB and WMBfsb benefited from this arrangement. This allowed WMBfsb to earn a higher rate of return on its excess capital pursuant to the interest-bearing provisions of the Master Note that paid interest at the one-month LIBOR. Further, loaning the cash to WMB meant that neither WMB nor

---

Adv. Nos. 03-3522, 03-3721, 2005 WL 6237551, at *43 (Bankr. S.D. Tex. Dec. 9, 2005) ("States that have adopted the UFTA interpret it similarly to" the reasonably equivalent value standard under the Bankruptcy Code).

WMBfsb had to pay deposit insurance on the funds as they would if the funds were otherwise kept in a demand deposit.

93.     Utilization of the Master Note ensured that WMB's assets were unaffected pursuant to the Deposit Transfer because WMB's cash balance was replenished with Master Note proceeds. On the liability side, WMB's deposit liability (owed WMI) was replaced with an equivalent increase in WMB's liability under the Master Note. More importantly, from a banking perspective, WMB benefited from this arrangement because its liquidity was unaffected given that its cash position remained constant.

94.     Because the Deposit Transfer did not remove value that was otherwise distributable to unsecured creditors, this Insider Preference Claim falls outside the scope and purpose of the UFTA and therefore should be expunged.

95.     The Supreme Court of the State of Washington recently clarified that "the overriding purpose of the UFTA is to provide relief for creditors whose collection on a debt is frustrated by the actions of a debtor to place the putatively satisfying assets beyond the reach of the creditor." Thompson v. Hanson, 219 P.3d 659, 665 (Wash. 2009) (citation omitted and emphasis added). See also Rainier Nat. Bank v. McCracken, 26 Wash. App. 498, 505-06, (Wash. Ct. App. 1980) ("The principle underlying the law of fraudulent conveyances is that the creditor has a claim on the property of his or her debtor, constituting a fund from which the debt should be paid, and that the debtor may not ignore the right or equity of his or her creditors to be paid out of it.") (emphasis added). Consistent with this principle, only "transfers" of "assets" are avoidable under the UFTA. WASH. REV. CODE § 19.40.011(2). The official comments to the UFTA state that it is "appropriate to exclude property interests that are beyond the reach of

unsecured creditors from the definition of 'asset' for the purposes of [the UFTA]." See Uniform Fraudulent Transfer Act § 1 cmt. n.2 (1984).

96.     Based on these controlling principles of law, the Deposit Transfer cannot constitute a fraudulent transfer. FIRREA's "depositor preference" provides that the Deposits are assets beyond the reach of unsecured creditors. 12 U.S.C. § 1821(d)(11) (2009).[34] Pursuant to this priority scheme, bank depositors enjoy legal priority over unsecured creditors of a failed depository institution, such as the Bondholders. Assets that would be used to satisfy depositor claims are therefore "beyond the reach" of unsecured creditors (see Thompson, 219 P.3d at 665) and therefore, outside the scope of the UFTA.[35] Further, as discussed supra, this point was expressly disclosed to the Bondholders in the Offering Circular which provides that "the holders of deposits including the FDIC as subrogee of insured depositors. . .will be afforded priority in payment over the claims of the holders of the Senior Notes and the holders of other general obligations of the Issuer." Ex. 3 at 16.

97.     WMB's Deposit Transfer did not place any "putatively satisfying assets beyond the reach" of the Bondholders. In fact, the assets that were transferred were deposit funds and, thus, were always and forever out of the reach of general unsecured creditors of WMB, including

---

[34] 12 U.S.C. § 1821(d)(11) states, "Depositor preference" provides, in pertinent part: "amounts realized from the liquidation or other resolution of any insured depository institution by any receiver appointed for such institution shall be distributed to pay claims (other than secured claims to the extent of any such security) in the following order of priority: (i) Administrative expenses of the receiver. (ii) Any deposit liability of the institution. (iii) Any other general or senior liability of the institution . . . ." 12 U.S.C. § 1821(d)(11)(A) (2009).

[35] This principle is further evinced by analogy to transfers of property subject to a valid lien. Under the UFTA, only "transfers" of "assets" are avoidable. WASH. REV. CODE § 19.40.011 (2)(i). Given that "property to the extent it is encumbered by a valid lien" is carved out from the definition of "asset," transfers of such property are not avoidable and are beyond the reach of the UFTA. See O'Neil v. Jones (In re Jones), 403 B.R. 228, 235 (Bankr. D. Conn. 2009) ("in order to be a 'Transfer' under the CUFTA, the property that is the subject of the transaction at issue must be an 'Asset'"); Joseph v. Madray (In re Brun), 360 B.R. 669, 674 (Bankr. C.D. Cal. 2007) ("property that is fully encumbered and/or exempt is not voidable as a fraudulent transfer").

the Bondholders, by virtue of the "depositor preference" under the FDI Act. 12 U.S.C. § 1821(d)(11) (2009). That is, even absent the Deposit Transfer, should WMB have been placed into receivership – as it in fact was – these assets would have been paid solely to WMI, the depositor. Id. Alternatively, JPMC would have assumed the Deposits pursuant to the P&A Agreement, yielding the same effect. Either way, the value would have inured solely to WMI.[36] Allowing creditors that could never expect to look to the Deposits for recovery to avoid the transfer of such funds pursuant to the UFTA would contravene the UFTA's purpose. See Thompson, 219 P.3d at 665 ("We construe statutes to effect their purpose and avoid unlikely or absurd results."). Under these circumstances, the Deposit Transfer is not an avoidable transfer that may be redressed by the UFTA as incorporated under Washington law.[37]

---

[36] Although not technically an element of an Insider Preference Claim, section 547(b)(5) of the Bankruptcy Code should be considered. In bankruptcy, a debtor may not avoid a transfer on account of an antecedent debt unless the transfer results in that creditor having received more than it would have received under a hypothetical chapter 7 liquidation. 11 U.S.C. § 547(b)(5) (2009); see, e.g., Neuger v. United States (In re Tenna Corp.), 801 F.2d 819, 822 (6th Cir. 1986). Thus, even if the defendant-creditor does derive a cognizable "benefit," the transfer is avoidable only if it diminishes the fund to which creditors can legally resort for the payment of their debts. In re Erin Food Servs., Inc., 980 F.2d 792, 803 (1st Cir. 1992). Here, for the reasons discussed in the text, WMI would have fared no worse, and the Bondholders no better, had WMB failed and the Deposit Transfer not occurred. Consideration of section 547(b)(5) only further supports the fact that the Deposit Transfer was not the sort of transfer that should be redressed by fraudulent transfer law.

[37] Even assuming arguendo that the Deposit Transfer falls within the scope of the UFTA, Washington Revised Code § 19.40.081(f)(1), which provides that a "transfer is not voidable under [RCW 19.40.051(b)]. . .[t]o the extent the insider gave new value to or for the benefit of the debtor after the transfer was made. . . ." forecloses this Insider Preference Claim. WASH. REV. CODE § 19.40.081 (f)(1). The logic of the "new value" defense is that an otherwise avoidable transfer is not avoidable to the extent that, after the transfer, the creditor gave the debtor "new value" in a form that replenished the debtor. See, e.g., In re Micro Innovations Corp., 185 F.3d 329, 336 (5th Cir. 1999) (emphasis added). New value need not be given to the debtor by the transferor directly and may be given indirectly, or through a third party. In re Jones Truck Lines, Inc., 130 F.3d 323, 327-328 (8th Cir. 1997) (noting that the "for the benefit of" language of section 547(c)(4) "clarify[ies] that three-party exchanges are addressed"); In re Holmes Envtl, Inc., 287 B.R. 363, 386-87 (Bankr. E.D. Va. 2002) ("the new value exception may be satisfied by an indirect transfer of value via a third party to a debtor rather than a direct transfer of value from creditor to debtor."); In re CareerCom Corp., 215 B.R. 674, 677 (Bankr. M.D. Pa. 1997) (recognizing new value was received by subsidiary "regardless of its balance sheet" where funds were paid to parent that could prospectively be used to satisfy subsidiary debt). Here, the deposit with WMBfsb and/or subsequent loan under the Master Note to WMB constituted "new value … for the

### b. To The Extent The Deposit Transfer Consisted Of "Capital," WMB Received Reasonably Equivalent Value.

98.    The Marathon Credit Claimants state alternatively that "[t]o the extent that the funds so transferred are properly treated as capital . . . the transfers constituted transfers of funds belonging to [WMB] for less than reasonably equivalent value." Claims 3710, 3711 ¶10. In support of this baseless assertion, the Marathon Credit Claimants assert that "WMI's gross undercapitalization of [WMB], its failure to act as a source of strength for [WMB], and the apparent lack of any documentation of any such deposits" could somehow have converted the Deposits to "capital." Each of these bases fails to support their assertion that the Deposits might potentially be treated as capital. Moreover even assuming that the Deposits were "capital," the Deposit Transfer resulted in reasonably equivalent value being afforded WMB. Thus, the claim fails.

99.    First, the Deposits could not have been converted to capital as a result of "gross undercapitalization" or a "failure to act as a source of strength" as the Marathon Credit Claimants muse, because WMI did not enter into any agreement to maintain WMB's capital. Further, neither the Home Owners Loan Act nor any of the OTS' regulations state that WMI is required to maintain or contribute to WMB's capital. The so-called "source of strength doctrine" is an asserted obligation articulated by the Board of Governors of the Federal Reserve System (the "Board") that <u>bank holding companies</u> must take actions necessary to support the financial

---

benefit of" WMB. WASH REV. CODE § 19.40.081(f)(1). As discussed <u>supra</u> para. [92-93], after withdrawal, the asset value represented by the withdrawn Deposits was loaned back to WMB by WMfsb constituting "new value" that replenished the debtor, WMB, in the full amount of the Deposit Transfer. Moreover, pursuant to the $3.67 billion loan to WMB under the Master Note, the Bondholders' position <u>vis-à-vis</u> WMB actually improved given that, as discussed above, the Bondholders could not have looked to the Deposits for recovery. Section 19.40.081(f)(1) precludes recovery on account of an Insider Preference Claim where the unsecured creditor body is made whole. In this instance, where the position of the unsecured creditor body is actually improved, application of the "new value" defense is <u>a fortiori</u> and the claim should therefore be dismissed.

position of their subsidiary banks during periods of financial stress.[38]  However, WMI is not a bank holding company and the OTS, unlike the Board, has never articulated a "source of strength" doctrine with respect to federal savings banks (such as WMB) and thrift holding companies (such as WMI).[39]  The "doctrine" simply has no application to WMI or WMB and cannot form the basis for the Marathon Credit Claimants' recharacterization assertion.[40]

100.    The Marathon Credit Claimants' assertion regarding "the apparent lack of documentation for any such deposits" also gets them nowhere.  First, the Debtors have submitted significant documentation to this Court in connection with its summary judgment motion, including account statements, general ledger entries and new account request forms that make clear that the Deposits are funds owned by the Debtors.  See Motion of Plaintiffs Washington Mutual, Inc. and WMI Investment Corp. for Summary Judgment Filed by WMI Investment Corp., Wash. Mut., Inc., Adv. Proc. No. 09-50934, Dkt. No. 14.  Moreover, the lack of any specific deposit account agreements or signature cards is a red herring as there is no requirement

---

[38] See Policy Statement on the Responsibility of Bank Holding Company's to Act as Sources of Strength to Their Subsidiary Bank, 52 Fed. Reg. 15707 (Apr. 30, 1987).

[39] The Bank Holding Company Act (the "BHC Act") does not apply to a federal savings bank such as WMB or a thrift holding company such as WMI.  See 12 U.S.C. §§ 1841(c)(2)(B) and 1841(j) (2009) (exempting savings banks, such as WMB from the BHC Act's scope, and thus entities that control a savings bank).  Rather, WMI qualified as a thrift holding company under the Home Owners Loan Act.

[40] Even if the Board's "source of strength doctrine" were applicable to WMB, which it is not, the doctrine lacks any statutory basis in the BHC Act.  The only U.S. Court of Appeals to have considered whether the "doctrine" gave rise to an obligation of a parent company to contribute capital to its banking subsidiary rejected the proposition on that ground.  MCorp Fin., Inc. v. Bd. of Governors of the Fed. Reserve Sys., 900 F.2d 852, 862 (5th Cir. 1990) ("[W]e conclude that the Board is without authority under the BHCA to require MBank to transfer its funds to its troubled subsidiary bank."), rev'd on other grounds, 502 U.S. 32 (1991).  Further, even if the source of strength doctrine had a statutory basis, it would not apply in this case.  As articulated by the Board, the "doctrine" allows the Board to order a holding company to support its subsidiary bank using the Board's cease and desist authority under 12 U.S.C. § 1818(b) (2009).  See id. at 859.  The Bondholders do not allege that the OTS issued such an order to WMI to contribute capital to WMB before receivership.  Therefore, the Bondholders have no basis to invoke the "source of strength doctrine," or to otherwise assert that WMI was obligated to support WMB's capital.

in law or in the Washington Mutual policy regarding its general ledger, which provides for the establishment of deposit accounts, that such procedures exist. See supra p. 37-38. In any event, there is no basis to support the Marathon Credit Claimants' assertion that the lack of any particular documentation regarding the Debtors' Deposits could possibly have converted the Deposits to some form of capital.

101.   Notwithstanding the foregoing, assuming *arguendo* that the Deposits are somehow found to be "capital," the Marathon Credit Claimants' claim still fails because WMB received reasonably equivalent value in connection with the Deposit Transfer. The so-called "capital" was transferred to WMBfsb.[41] Given that WMBfsb was undeniably WMB's solvent, wholly-owned subsidiary, WMB received value through its equity interests in WMBfsb. See Rubin v. Mfrs. Hanover Trust Co., 661 F.2d 979, 991 (2d Cir. 1981) (holding that if the giving of consideration to a third party confers an economic benefit upon the debtor, then the debtor's net worth has been preserved and creditors have no cause to complain); Klein v. Tabatchnick, 610 F.2d 1043, 1047 (2d Cir. 1979) ("Benefit to a debtor need not be direct; it may come indirectly through benefit to a third person."); Branch, 825 F. Supp. at 399-400 (where a parent is a sole stockholder of a solvent subsidiary, "any benefit received by the subsidiary is also a benefit to the parent"). Thus, if the Deposit were a capital contribution (which it was not), then WMB nevertheless would have received reasonably equivalent value for the Deposit Transfer when the funds were deposited with WMBfsb, an undeniably solvent entity. In light of the receipt of reasonably equivalent value, the Bondholders' claim must fail.

---

[41] It is appropriate to collapse the payment of the deposit liability and the subsequent deposit at WMBfsb given that the "capital" was immediately deposited with WMBfsb and it is undisputed that it was the Debtors' intent to open a deposit account at WMBfsb. See Official Comm. of Unsecured Creditors v. Action Indus., Inc. (In re Phar-Mor Inc. Sec. Litig.), 185 B.R. 497, 503 (W.D. Pa. 1995), aff'd sub nom Coopers & Lybrand v. Shapira, 101 F.3d 689 (3d Cir. 1996) (finding that collapsing of transactions is appropriate in order to consider "the net effect of the integrated transaction upon the debtor").

**F.      The Bondholders Have Failed To State An Actionable Misrepresentation Claim Under Any Securities Or Common Law Fraud Theory.**

102.      The Bondholders' misrepresentation claims also must be dismissed because they fail to state plausible claims for violation of the federal or state securities laws or common law fraud.  Contrary to the applicable pleading requirements (as discussed below), the Claims do not include factual allegations that WMI made any material misrepresentations or omissions.  They also fail to identify any statutes that WMI purportedly violated or any statutes under which they seek relief.

**1.      The Elements Of Securities Fraud.**

103.      To state a valid claim for securities fraud, the Bondholders must allege each of the following elements: (1) a material misrepresentation or omission by defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008); see also McCabe v. Ernst & Young, LLP, 494 F.3d 418, 424 (3d Cir. 2007).[42]  The Bondholders have not adequately pled these elements.  With respect to alleged misstatements, the Bondholders are required to explain, in detail, the reason or reasons why each statement is misleading.  It is inadequate simply to refer "to a series of public statements and then alleg[e], in a general and conclusory manner, that those disclosures were false or misleading."  In re Party City Sec. Litig.,

---

[42] Because the elements of proof and the pleading standard applicable to federal securities fraud claims and common law fraud claims are "virtually identical," the Court's assessment of the sufficiency of the Bondholders' "misrepresentation" allegations can be accomplished by analyzing those allegations within the federal securities fraud framework. Chase Manhattan Mortg. Corp. v. Advanta Corp., No. Civ.A. 01-507 (KAJ), 2004 WL 422681, at *5 n.12 (D. Del. Mar. 4, 2004). See also Balko v. Carnegie Fin. Group, Inc. (In re Balko), 348 B.R. 684, 694 (Bankr. W.D. Pa. 2006) ("While the factors pertaining to [a cause of action for fraud] may be derived from state law principles and jurisprudence, the particularity requirement contained within Rule 9(b) applies equally to common law fraud claims as well").

147 F. Supp. 2d 282, 300 (D.N.J. 2001). The allegations in the Claims are far too generalized to satisfy this standard.

104. Moreover, with respect to alleged omissions, such conduct can give rise to liability only where the defendant had an affirmative duty to disclose the information in question, such as "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000). Accordingly, to the extent the Claims allege that statements made were rendered false or misleading by the omission of material information, they must identify specific statements that were rendered "inaccurate, incomplete or otherwise untruthful" by the alleged non-disclosure. In re Digital Island Sec. Litig., 223 F. Supp. 2d 546, 552 (D. Del. 2002), aff'd, 357 F.3d 322 (3d Cir. 2004). Again, the Bondholders have not met this burden.

105. Federal Rule of Civil Procedure 9(b), which applies with equal force to both federal securities law claims and common law fraud claims, provides that, "[i]n alleging fraud or mistake, a party must state with *particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). Rule 9(b) requires, "at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." C.W. Sommer & Co. v. Rockefeller (In re Rockefeller Ctr. Props., Inc. Sec. Litig.), 311 F.3d 198, 217 (3d Cir. 2002) (citation omitted); see also Giuliano v. U.S. Nursing Corp. (In re Lexington Healthcare Group, Inc.), 339 B.R. 570, 575 (Bankr. D. Del. 2006) (pleading with particularity requires the plaintiff to "identify[] the transfer by date, amount, name of the transferor, and name of the transferee") (citations omitted).[43]

---

[43] The Third Circuit has noted that "unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b). . . ., they may not benefit

106. To strengthen the already high standards for pleading securities fraud, Congress passed the Private Securities Litigation Reform Act ("PSLRA"). See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81-82 (2006). Congress adopted the PSLRA based on the recognition that private securities lawsuits "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007). Consistent with these goals, the PSLRA mandates that "the complaint shall, with respect to each act or omission alleged to violate this [Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (2009). These heightened pleading requirements must be satisfied for each particular defendant. See, e.g., Winer Family Trust v. Queen, 503 F.3d 319, 335-36 (3d Cir. 2007).

107. In Tellabs, the U.S. Supreme Court explained that, in applying the "strong inference" standard, a court must "engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff..., but also competing inferences rationally drawn from the facts alleged." 551 U.S. at 314. The Supreme Court reasoned that "[a]n inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct." Id. However, "[t]o qualify as 'strong' within the intendment of [15 U.S.C. § 78u-4(b)(2),] an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id.; see

---

from inferences flowing from vague or unspecified allegations – inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." Cal. Pub. Employees Ret. Sys. v. Chubb Corp., 394 F.3d 126, 145 (3d Cir. 2004). Further, "[a] securities fraud claim may be dismissed under Rule 9(b) and the PSLRA even if it would survive scrutiny under Rule 12(b)(6). 'Unless [p]laintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations – inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis.'" In re Aetna, Inc. Sec. Litig., 2009 WL 1619636, at *19 (E.D. Pa. June 9, 2009) (citation omitted).

also Winer Family Trust, 503 F.3d at 329 (upholding the district court's dismissal of plaintiffs' Section 10(b) claim for failure to meet the PSLRA's pleading requirements because "[a] reasonable person would not deem the inference of scienter cogent and at least as compelling as any non-culpable inference").

108.    The Third Circuit, interpreting Tellabs, recently clarified the pleading standard for scienter in Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 276 (3d Cir. 2009).  In Avaya, the court observed that "'the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint.'"  Id. at 277 (quoting Tellabs, 551 U.S. at 325).  Accordingly, "'motive and opportunity' may no longer serve as an independent route to scienter."  Id. at 277.

### 2.    The Bondholders Have Not Satisfied The Heightened Pleading Standard Applicable To Securities Fraud Claims.

109.    The Bondholders' "misrepresentation" claims fail to meet the exacting pleading standard applicable to federal securities law claims.  First, the WMB Noteholders' Claim fails to identify with sufficient particularity the statements it alleges were false and misleading.  See Claim 2480 ¶¶31-32.  The sum total of the WMB Noteholders' misrepresentation allegations consists of the following:

> From time to time, WMI publicly represented that it would "manage [itself] at the holding company to the same kind of standards as if we were a [Federal Reserve] regulated bank holding company."  WMI similarly represented in a press release in October 2006 that its reported "total risk-based capital ratio is estimated as if Washington Mutual, Inc. were a bank holding company subject to Federal Reserve Board capital requirements." The import of these and similar statements is that WMI was agreeing to subject itself to the Federal Reserve Board's "source of strength" doctrine, a highly material matter that provided substantial assurance to the WMB Noteholders that WMI funds would have been used to ensure the proper capital maintenance and liquidity at WMB.  Had WMI fulfilled its promises to do so, it would have avoided the Receivership.  It was reasonable for the

WMB Noteholders to rely on these and similar public and clear representations made by WMI and the WMB Noteholders have been damaged by WMI for failing to act in accordance with its representations. The claim for damages arises both under the federal and applicable state securities laws and under applicable statutory and common law fraud provisions.

Id. (footnotes omitted).[44]

110.     Such generic allegations are insufficient to state a claim for fraud because, among other reasons, they fail to specify the role of any particular individual in the alleged misrepresentations. The PSLRA mandates that "[e]ach untrue statement or omission must be set forth with particularity as to 'the defendant' and scienter must be pleaded in regards to 'each act or omission' sufficient to support a strong inference that 'the defendant' acted with the required state of mind." Winer Family Trust, 503 F.3d at 335-36 (quoting 15 U.S.C. § 78u-4(b)(2)); see also In re Rockefeller, 311 F.3d at 224 n.19 (explaining that under the PSLRA, the court "must … disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute") (quoting Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 660 (8th Cir. 2001)). The WMB Noteholders' barebones pleadings do not come close to establishing the requisite element of scienter. On this ground alone, this claim must be expunged.

111.     While the Marathon Credit Claimants' claims include slightly more detail by providing a "non-exhaustive" list of twelve purportedly false and misleading statements and omissions by WMI (see Claims 3710, 3711 ¶13), the claims nonetheless fail to plead the

---

[44] The WMB Noteholders attribute their paltry allegations to a single public statement issued by former CEO Killinger and a company press release issued on the same date as Killinger's statement, October 18, 2006. See Claim 2480 ¶31 n.15, 16. This is not enough to state the "who, what, when, where and how" facts that are required to state a claim for fraud. See In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d at 217.

requisite "who, what, where, when and how," facts that are necessary to avoid dismissal.[45] The

Marathon Credit Claimants allege generally that:

> [S]tarting in the first quarter of 2006 and continuing through the
> first half of 2007 ... and continuing thereafter, WMI made material
> false and misleading statements, or omitted material facts
> necessary in order to make the statements made not misleading,
> regarding the Bank, its operations, and its financial condition.
> WMI and its officers and employees repeatedly misrepresented
> that the Bank was doing well financially and that its credit and loan
> underwriting policies and operations were conservative and
> minimized risk to investors, including holders of Senior Notes. As
> WMI knew at the time, those statements were false and
> misleading. WMI knowingly failed to disclose the true facts.

Id. To bolster their vague allegations, the Marathon Credit Claimants cite a laundry list of

allegedly false and misleading statements and omissions by WMI and/or its executives. See id.

For instance, the Marathon Credit Claimants allege that WMI misled investors when "multiple

WMI officers" stated that "Washington Mutual's loan portfolio represents 'strong underwriting,'

'conservative lending standards,' 'rigorous credit standards,' and 'a disciplined credit culture.'"

Id. The Marathon Credit Claimants also allege that statements issued by WMI's former CEO

and CFO, such as that WMI's "businesses [were] doing extremely well despite the difficult

interest rate environment," and that the Company "maintain[ed] a strong liquidity position" (id.),

were misleading.[46]

---

[45] See, e.g., Miller v. Greenwich Capital Fin. Prods., Inc. (In re Am. Business Fin. Servs., Inc.), 362 B.R. 135, 142-44 (Bankr. D. Del. 2007) (dismissing common law fraud claims for failure to plead with particularity: "The Trustee has not stated who on behalf of the Indenture Trustees made the representations, on what dates these representations were made, or the medium used to make the representations").

[46] The allegations here are distinct from the allegations in the multidistrict litigation currently pending in the U.S. District Court for the Western District of Washington against WMI, certain of its former officers and directors and various underwriters, In re Washington Mut., Inc., Sec. Litig., No. 2:08-md-01919 (MJP) (W.D. Wash. filed Feb. 21, 2008). The amended consolidated class action complaint in the multidistrict litigation contains over 260 pages of factual allegations – far more substance and detail than the few examples of alleged misrepresentations contained in Claims here. Moreover, because the

112. However, the Marathon Credit Claimants have not pled facts sufficient to show the precise role of the individuals who made the alleged false and misleading statements (i.e., former CEO Killinger, former CFO Casey and the other "multiple WMI officers" referenced in the Claims); nor have the Marathon Credit Claimants sufficiently alleged facts that support a strong inference that any particular individual at WMI acted with scienter when making any supposed misrepresentations. The PSLRA requires that where, as here, the Marathon Credit Claimants "may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this [Chapter], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (2009).[47] The Marathon Credit Claimants' vague, conclusory pleadings fail to satisfy this stringent standard.

113. Indeed, the Claims contain no facts that give rise to a strong inference that WMI knowingly or recklessly made false statements to mislead the Bondholders. The Bondholders have not adequately pled scienter against WMI because their Claims do not allege with particularity that any person speaking or making other representations to the securities market on WMI's behalf had the requisite scienter. See In re Alpharma Inc. Sec. Litig., 372 F.3d 137 (3d Cir. 2004).

---

multidistrict litigation is stayed as to WMI as a result of the automatic stay, WMI has not been an active participant in that litigation.

[47] "Scienter" in the context of a Section 10(b) claim is defined as: "'a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care,. . .which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 148 (3d Cir. 2004) (quoting In re IKON Office Solutions, Inc., 277 F.3d 658, 667 (3d Cir. 2002)).

114. The Third Circuit's decision in <u>Alpharma</u> supports dismissal of the misrepresentation claims. In <u>Alpharma</u>, the plaintiffs claimed that the company and four of its executives issued misleading financial results because they failed to disclose that a corporate division in Brazil had engaged in improper accounting practices that, in turn, had inflated the company's overall financial performance. <u>Id.</u> at 140-41. The complaint failed to allege particularized facts establishing that the members of management who prepared the financial statements and made representations to the securities market were aware of the alleged wrongdoing in the Brazilian division. <u>See id.</u> at 149-51. As a result, the Third Circuit upheld the dismissal of all claims even though lower-level managers in Brazil were allegedly aware of the fraudulent scheme. <u>See id.</u> at 149-50. Here, for the same reason the claims were dismissed against the company in <u>Alpharma</u>, the Court should dismiss the claims against WMI: the Claims fail to adequately plead scienter as to any WMI executive who issued any alleged misstatements on behalf of WMI.

115. In addition, the Bondholders' misrepresentation claims fail to plead the remaining elements of a securities fraud claim, namely reliance, loss causation and materiality. In particular, the Bondholders' failure to plead facts sufficient to demonstrate actual reliance, or to establish a presumption of reliance, dooms their Claims. <u>See, e.g.</u>, <u>Marion v. TDI Inc.</u>, 2010 WL 6189, at *10 (3d Cir. Jan. 4, 2010) ("To make out a securities fraud claim under Rule 10b-5, 'a plaintiff must show that ... the plaintiff's reliance on the defendant's misstatement caused him or her injury'") (citations omitted); <u>Hartman v. Blinder</u>, 687 F. Supp. 938 (D.N.J. 1987) ("a 10b-5 claim retains much of its common law flavor. Specifically, like the common law of deceit, it is

necessary for a plaintiff to plead reliance on the defendant's fraudulent conduct").[48]  These

pleading deficiencies independently require dismissal of the misrepresentation claims.

### G. The Bondholders Fail To State A Plausible Claim That WMI Or Its Directors And Officers Breached Fiduciary Duties.

116.  Despite the absence of any relationship, contractual or otherwise, between WMI

and the Bondholders, the Bondholders allege that WMI and its directors and officers owed

fiduciary duties of loyalty and care to WMB and its creditors.  The Bondholders assert that WMI

mismanaged and looted WMB, and breached its fiduciary duties to WMB and its creditors by

"causing [WMB] to suffer billions of dollars in losses and requiring the OTS to put [WMB] into

receivership."  Claims 3710, 3711 ¶16.  The breach of fiduciary duty claims must be dismissed

for two reasons.  First, WMI did not owe any fiduciary duties to WMB or its creditors as a matter

of law.  Second, these claims fail to state plausible causes of action for breach of fiduciary duty.

---

[48] "[R]eliance may be established in either of two ways: by showing individualized reliance (sometimes referred to as 'actual' or common law reliance) on the material in question, or by showing facts which justify the presumption of reliance.  To prove actual reliance, a securities plaintiff must assert facts showing that the disclosure materials the plaintiff read contained a material misrepresentation or failed to disclose a material fact upon which they relied."  In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 316 (D.N.J. 2007) (citations omitted); see also id. at 318 (stating that "[s]ince the Complaint does not contain 'enough [factual] heft' to amount to 'allegations plausibly suggesting (not merely consistent with)' Plaintiffs' conclusions with respect to the reliance element, and this Court should not credit Plaintiffs' bald assertions and mere conclusions as facts, Plaintiffs' Complaint will be dismissed for failure to allege facts satisfying the transactional causation requirement") (citations omitted); In re Interbank Funding Corp. Sec. Litig., 2009 WL 3714904, at *4-6 (D.D.C. Nov. 6, 2009) (holding that, absent particularized allegations of direct reliance on alleged misrepresentations, a plaintiff must show she is entitled to a presumption of reliance in order to state a claim for securities fraud, and that such presumption cannot be established where, as here, the case involves a mix of alleged misstatements and omissions: "plaintiffs easily could have alleged that they directly relied on [the] assertions in deciding whether to buy, sell, or hold their ... securities. They chose not to. ... Indeed, it would be contrary to [controlling precedent] and basic tort principles to award a presumption of reliance in a case where plaintiffs could, but do not, allege actual reliance") (emphasis in original).  Moreover, to the extent that a Bondholder acquired its bond after the seizure of WMB by the FDIC and commencement of WMI's chapter 11 case, it would be difficult to see how the Bondholder could assert reliance on these statements.

**1.  WMI Did Not Owe Any Fiduciary Duties To WMB Or Its Creditors As A Matter Of Law.**

117.  Breach of fiduciary duty claims are generally governed by the law of a debtor's state of incorporation, which is Washington in this case.  This End Up Furniture Co. v. Kemeny (In re TEU Holdings, Inc.), 287 B.R. 26, 32 (Bankr. D. Del. 2002); Hurst v. Gen. Dynamics Corp., 583 A.2d 1334, 1339 (Del. Ch. 1990); McDermott Inc. v. Lewis, 531 A.2d 206, 215 (Del. 1987).  Here, as there is no Washington case law specifically addressing whether a parent corporation owes a fiduciary duty to its wholly-owned subsidiary or its creditors, Washington courts would (as is the routine) look to Delaware law for guidance on matters involving corporate law.  Supra n.14.

118.  Under Delaware law, a parent corporation does not owe fiduciary duties to its wholly-owned subsidiaries or to their creditors.  Anadarko Petro. Corp. v. Panhandle E. Corp., 545 A.2D 1171, 1174 (Del. 1988); Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 191 (Del. Ch. 2006), aff'd sub nom Trenwick Am. Litig. Trust v. Billett, 931 A.2d 438 (Del. 2007).[49]  No such duty exists between the parent and the subsidiary because:

> [i]t is by no means a novel concept of corporate law that a wholly-owned subsidiary functions to benefit its parent.  To the extent that members of the parent board are on the subsidiary board or have knowledge of proposed action at the subsidiary level that is detrimental to the parent, they have a fiduciary duty. . . .to act in the best interests of the parent and its stockholders.

Grace Bros., Ltd. v. Uniholding Corp., No. Civ.A. 17612, 2000 WL 982401, at *12 (Del. Ch. July 12, 2000).

---

[49] See also Shaev v. Wyly, C.A. No. 15559-NC, 1998 WL 13858, at *2  (Del. Ch., Jan. 6, 1998) ("a parent does not owe a fiduciary duty to its wholly-owned subsidiary"); DAVID A. DREXLER ET AL., DEL. CORP. LAW AND PRACTICE § 15.11 (2009) ("Although it is said in general terms that a parent corporation owes a fiduciary obligation to its subsidiaries, this obligation does not arise as such unless the subsidiary has minority stockholders.  Where a parent corporation owns all of a subsidiary's outstanding shares, intracorporate dealings will not be tested by fiduciary standards.").

119.     Other jurisdictions similarly recognize that "the weight of authority holds that a parent corporation owes no fiduciary duties to its wholly-owned subsidiary." Westlake Vinyls, Inc. v. Goodrich Corp., 518 F. Supp. 2d 902, 917 (W.D. Ky. 2007) (holding that a fiduciary relationship was not created between a parent corporation and wholly-owned subsidiary when the parent formed the subsidiary to divest itself from assets and/or liabilities). See also MC Asset Recovery LLC v. The Southern Co., 1:06-CV-0417-BBM, 2006 WL 5112612, at *7 (N.D. Ga. Dec. 11, 2006) (citing Anadarko and granting the parent corporation's summary judgment motion because the wholly-owned subsidiary's claim for breach of fiduciary duty failed as a matter of law); Aviall, Inc. v. Ryder Sys., Inc., 913 F. Supp. 826, 832 (S.D.N.Y. 1996), aff'd, 110 F.3d 892 (2d Cir. 1997) (holding that the parent corporation was "under no obligation" to provide its wholly-owned subsidiary "with independent representation during the spin-off process" because "those who operate the parent company owe no fiduciary duties to the wholly owned subsidiary"); Resolution Trust Corp. v. Bonner, Civ. Act. No. H-92-430, 1993 WL 414679, at *2-3 (S.D. Tex. June 3, 1993) (dismissing the plaintiff-subsidiary's cause of action for breach of fiduciary duty against the defendants, the parent corporation and its successor in interest, because "a parent corporation owes no duties to its wholly-owned subsidiary"); Household Reins. Co., Ltd. v. Travelers Ins. Co., No. 91 C 1308, 1992 WL 22220, at *3 (N.D. Ill. Jan. 31, 1992) (recognizing that if Minnesota law applied, the subsidiary would still be unable to state a claim for breach of fiduciary duty because under Minnesota law, "a 100% shareholder does not owe a fiduciary duty to the wholly owned corporation").

120.     Based on well-settled law, WMI owed fiduciary duties only to WMI, and not to its wholly-owned subsidiary WMB or WMB's creditors. As a result, the Bondholders' breach of fiduciary duties claims fail as a matter of law.

### 2. The Bondholders Have Failed To Allege A Plausible Claim That WMI Breached Any Fiduciary Duties.

121. The Bondholders' claims also should be dismissed because they fail to allege a plausible claim for breach of fiduciary duty by WMI. The Bondholders fail to assert any factual allegations to support their claim that WMI's directors and officers owed WMB and its creditors any fiduciary duties. The Bondholders' claims assert nothing more than unsupported, conclusory allegations that such alleged duties were breached. See Iotex Commc'ns, Inc. v. Defries, Civ. Act. No. 15817, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998) ("Speculative conclusions unsupported by fact do not allege breaches of fiduciary duty."); Pfeffer v. Redstone, 965 A.2d 676, 685 (Del. 2009) (affirming the lower court's decision granting the defendants' motion to dismiss because "conclusory allegations need not be treated as true" and the plaintiff failed to plead the defendants' alleged misstatements were material in breach of the fiduciary duty of disclosure); J. Royal Parker Assoc., Inc. v. Parco Brown & Root, Inc., Civ. Act. No. 7013, 1984 WL 8255, at *3 (Del. Ch. Nov. 30, 1984) (dismissing the plaintiff's complaint, which included a claim for breach of fiduciary duty, because the plaintiff did not allege facts to support the claim and "legal conclusions and unsupported factual conclusions are not deemed admitted"). Accordingly, dismissal of the Bondholders' claims for breach of fiduciary duty is warranted.

### V. RESERVATION OF RIGHTS.

122. Debtors reserve all of their rights to further object to the validity and amount of the Disputed Claims including, without limitation, their right to seek subordination of all claims.

### VI. NOTICE

123. No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Objection has been provided to: (i) the United States Trustee for the District of Delaware, (ii) counsel for the Creditors' Committee, (iii) those parties entitled to receive notice in these

chapter 11 cases pursuant to Bankruptcy Rule 2002 and (iv) each holder of a claim objected to herein. In light of the nature of the relief requested, WMI submits that no other or further notice need be provided.

124. Pursuant to Bankruptcy Rule 3007, the Debtors have provided all claimants affected by this Objection with at least thirty (30) days' notice of the hearing to consider the Objection.

## VII. SEPARATE CONTESTED MATTERS

125. To the extent that a response is filed regarding any of the Bondholders' Claims listed in the Objection and the Debtors are unable to resolve the response, each such Claim, and the objection by the Debtors to each such Claim asserted herein, shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014. Any order entered by the Court regarding an objection asserted in the Objection shall be deemed a separate order with respect to each of the Claims.

## VIII. STATEMENT OF COMPLIANCE WITH LOCAL RULE 3007-1

126. The undersigned representative of Richards, Layton & Finger, P.A. certifies that he has reviewed the requirements of Local Rule 3007-1 and that the Nineteenth Omnibus Objection substantially complies with that Local Rule. To the extent that the Nineteenth Omnibus Objection does not comply in all respects with the requirements of Local Rule 3007-1, Richards, Layton & Finger, P.A. believes such deviations are not material and respectfully requests that any such requirement be waived.

## IX. NO PREVIOUS REQUEST

127. No previous request for the relief sought herein has been made to this or any other Court.

## X.    CONCLUSION.

128.    For these reasons, Debtors respectfully request the Court enter an order, in substantially the same form as the proposed order attached hereto as Exhibit "1," denying and expunging the Claims and granting such other and further relief as is just and proper.

Dated:  February 5, 2010

Mark D. Collins (No. 2981)
Chun I. Jang (No. 4790)
Andrew C. Irgens (No. 5193)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-- and --

Marcia L. Goldstein, Esq/
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

-- and --

Thomas C. Frongillo, Esq.
Patrick J. O'Toole, Jr., Esq.
WEIL, GOTSHAL & MANGES LLP
100 Federal Street, Floor 34
Boston, Massachusetts 02110
Telephone: (617) 772-8300
Facsimile: (617) 772-8333

-- and --

Peter E. Calamari, Esq.
Michael B. Carlinsky, Esq.
Susheel Kirpalani, Esq.
David Elsberg, Esq.
Benjamin Finestone, Esq.
QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 8489-7100

Attorneys for Washington Mutual, Inc. and WMI
Investment Corp.

US_ACTIVE:\43266113\15\79831.0003
RLF1 3536066V.1