**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------- x
                                              :       **Chapter 11 Cases**

In re :                                    :

                                              :       **Case No. 08-12229 (MFW)**

**WASHINGTON MUTUAL, INC., et. al.,**     :

                                              :       **Jointly Administered**

       **DEBTORS**                             :

                                              :
------------------------------------------------------------- x


**THE WMB NOTEHOLDERS' RESPONSE AND**
**OPPOSITION TO THE LEGAL ISSUES SET FORTH IN**
**DEBTORS' CORRECTED TWENTIETH (20TH)**
**OMNIBUS (SUBSTANTIVE) OBJECTION TO CLAIMS**

Andrew C. Kassner (DE Bar # 4507)      Jay W. Eisenhofer (DE Bar # 2864)
David D. Primack (DE Bar # 4449)        Geoffrey C. Jarvis (DE Bar # 4064)
DRINKER BIDDLE & REATH LLP      Christine M. Mackintosh (DE Bar # 5585)
1100 N. Market Street, Suite 1000       GRANT & EISENHOFER P.A.
Wilmington, DE 19801-1254           1201 N. Market Street, Suite 2100
302.467.4200                             Wilmington, DE 19801
302.467.4201 (facsimile)             302.622.7000
andrew.kassner@dbr.com          302.622.7100  (facsimile)
david.primack @dbr.com           jeisenhofer@gelaw.com
                                      gjarvis@gelaw.com
                                      cmackintosh@gelaw.com


Counsel For The WMB Noteholders

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ...........................................................................................1

BACKGROUND ..............................................................................................3

    The WaMu Bank Notes ......................................................................... 3

    The WaMu Bank Receivership.............................................................. 4

    The WMI Bankruptcy Case .................................................................. 4

    The WMB Noteholder Group's Proof Of Claim .................................. 4

    The Multi-District Litigation Pending Before The United States District Court.... 6

    The Objection To Claim ....................................................................... 8

RESPONSE......................................................................................................8

I.     THE PLEADING STANDARDS UNDER FEDERAL RULES OF CIVIL
       PROCEDURE 8/9 AND THE PSLRA DO NOT APPLY TO PROOFS
       OF CLAIM........................................................................................9

       A.     A PROOF OF CLAIM IS NOT REQUIRED TO MEET THE SAME
              PLEADING STANDARDS AS A COMPLAINT ....................................9

       B.     UNDER THE LIBERAL STANDARD SET FORTH IN FEDERAL RULE OF
              BANKRUPTCY PROCEDURE 3001, THE MISREPRESENTATION CLAIM
              CLEARLY IS SUFFICIENT ...........................................................10

       C.     THE DISMISSAL OF THE MISREPRESENTATION CLAIM AS SOUGHT
              BY WMI IS NOT AN APPROPRIATE REMEDY FOR A PRESUMPTIVELY
              VALID CLAIM............................................................................12

II.    THERE IS A SUFFICIENT FACTUAL BASIS TO UPHOLD FEDERAL
       SECURITIES LAW FRAUD CLAIMS AGAINST WMI UNDER BOTH
       FEDERAL RULE OF CIVIL PROCEDURE 9(b) AND THE PSLRA ...............15

       A.     FACTUAL BASIS FOR THE MISREPRESENTATION CLAIMS AGAINST
              WMI....................................................................................15

           1.     WMI's Fraudulent Scheme..........................................15

           2.     WMI's False And Misleading Public Statements..........................17

           3.     WMB's False And Misleading Offering Documents ...................21

4. The Truth About WaMu Begins To Emerge ...................................22

B. THE WMB NOTEHOLDERS HAVE STATED AN ACTIONABLE CLAIM
FOR MISREPRESENTATION ...........................................................24

1. The WMB Noteholders State Securities Act Claims.....................25

2. The WMB Noteholders State Exchange Act Claims.....................30

a. False Statements.................................................................30

b. Scienter ..............................................................................31

c. Loss Causation ...................................................................35

3. The WMB Noteholders State Misrepresentation Claims On
Behalf Of Those Members Who Continued To Hold WaMu
Securities In Reliance On WMI's False Statements.....................37

III. THE WMB NOTEHOLDERS HAVE STANDING TO ASSERT
DIRECT CLAIMS FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS.............................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*900 Capital Services, Inc. v. Cloud (In re Cloud)*,
    2000 WL 634637 (5th Cir. May 4, 2000) ..................................................................14

*In re Allegheny Int'l, Inc.*,
    954 F.2d 167 (3d Cir. 1992)...................................................................................12, 13

*In re Atlantic Fin. Mgmt., Inc.*,
    784 F.2d 29 (1st Cir. 1986)........................................................................................29

*Borelli v. City of Reading*,
    532 F.2d 950 (3d Cir 1976)........................................................................................14

*Casella v. Webb*,
    883 F.2d 805 (9th Cir. 1989) .....................................................................................26

*In re Cluff*,
    313 B.R. 323 (Bankr. D. Utah 2004) .................................................................11, 13

*Downriver Cmty Fed. Credit Union v. Penn Square Bank Through Fed. Dep. Ins.
Corp.*, 879 F.2d 754 (10th Cir. 1989) .......................................................................40

*Flake v. Alper Holdings, Inc. (In re Alper Holdings USA, Inc.)*,
    398 B.R. 736 (S.D.N.Y. 2008)...................................................................................14

*In re Fuwei Films Sec. Litig.*,
    634 F. Supp. 2d 419 (S.D.N.Y. 2009)........................................................................29

*Go2Net, Inc. v. Freeyellow.com, Inc.*,
    109 P.3d 875 (Wash. App. Div. 2005).......................................................................38

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)............................................................................................25, 26

*Howard v. Haddad*,
    916 F.2d 167 (4th Cir. 1990) ...............................................................................39, 40

*In re Kincaid*,
    388 B.R. 610 (Bankr. E.D. Pa. 2008) .......................................................................14

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)......................................................................................35

*LTV Corp. v. Gulf States Steel, Inc.*,
    969 F.2d 1050 (D.C. Cir. 1992).................................................................................10

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ................................................................28

*In re Maxwell Newspapers, Inc.*,
    151 B.R. 63 (Bankr. S.D.N.Y. 1993) .....................................................13

*Moore v. Kulicke & Soffa Indus., Inc.*,
    318 F.3d 561 (3d Cir. 2003).....................................................................13

*In re O'Malley,*
    252 B.R. 451 (Bankr. N.D. Ill. 1999) .......................................................9

*Paul Mason & Assocs., Inc. v. Charlton (In re Charlton),*
    No. 04-30011, 2005 Bankr. LEXIS 444 (Bankr. S.D. Fla. Jan. 24, 2005) .................10

*In re Rimstat Ltd.*,
    233 B.R. 345 (Bankr. N.D. Ind. 1998) ....................................................13

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004).....................................................................26

*In re Shank,*
    315 B.R. 799 (Bankr. N.D. Ga. 2004) .....................................................13

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ..............................................................25, 26

*Suez Equity Investors, L.P. v. Toronto Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001).......................................................................34

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008).....................................................................34

*In re Thompson,*
    260 B.R. 484 (Bankr. W.D. Mo. 2001)....................................................11

*In re Today's Destiny, Inc.*,
    No. 05-90080, 2008 WL 5479109 (Bankr. S.D. Tex. Nov. 26, 2008) .............9, 11, 12

*In re Trails End Lodge, Inc.*,
    51 B.R. 209 (Bankr. Vt. 1985)..................................................................10

*In re Vivendi Universal S.A. Sec. Litig.*,
    No. 02 Civ. 5571(RJH)(HBP), 2009 WL 1066254 (S.D.N.Y. Apr. 21, 2009)...........35

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
    259 F.R.D. 490 (W.D. Wash. 2009) ................................................6, 27, 28

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
   Nos. 2:08-md-1919 MJP, C08-387 MJP, 2009 WL 3517630 (W.D. Wash.
   Oct. 27, 2009) ...................................................................................... passim

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ...............................................................26

STATUTES

11 U.S.C. § 101(5)(A)...............................................................................10

11 U.S.C. § 502(c) ..............................................................................8, 14

15 U.S.C. § 77k(a) ...................................................................................25

15 U.S.C.A. § 77o ....................................................................................29

RCW 21.20.430(1)...................................................................................38

The WMB Noteholders[1] hereby file their response and opposition (the "Response") to the Debtors' Corrected Twentieth (20th) Omnibus (Substantive) Objection To Claims (the "Objection," Docket No. 2326) filed by Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment" and collectively with WMI, the "Debtors"). The facts and any evidentiary issues raised by the Objection will be addressed at a later date pursuant to a schedule to be negotiated by the parties and approved by the Court. In support of this Response to the Objection, the WMB Noteholders respectfully represent as follows:

## INTRODUCTION

The WMB Noteholder Group filed a proof of claim (the "Proof of Claim")[2] against debtor WMI alleging, *inter alia*, that they were induced to purchase or retain bonds issued by WMI subsidiary Washington Mutual Bank ("WaMu Bank" or "WMB")[3] based on false representations made by WMI that caused the prices of their WaMu Bank bonds to be artificially inflated.[4] The WMB Noteholders have retained separate counsel

---

[1] The WMB Noteholders include Thrivent Financial for Lutherans, AEGON USA Investment Management, LLC (AEGON Life Insurance (Taiwan) and Transamerica Financial Life Insurance Company), PPM America, Inc. (Prudential Assurance Company, Ltd., JNL VA High Yield Bond Fund, Jackson National Life Insurance Company of New York, and Jackson National Life Insurance Company), New York Life Investment Management LLC, Legal & General Investment Management (Legal & General Investment Management America), The Northwestern Mutual Life Insurance Co. (Northwestern Mutual Life Insurance Co., Northwestern Long Term Care Insurance Company, Northwestern Mutual Series Fund, Inc. and its Select Bond Portfolio, and Northwestern Mutual Series Fund, Inc. and its Balanced Portfolio), ING Direct NV, Sucursal en España, and their affiliates, who are the legal or beneficial holders of, or have control or discretionary investment authority with respect to, in excess of $600 million in aggregate principal amount outstanding of Senior Notes and Subordinated Notes issued by Washington Mutual Bank.

[2] The WMB Noteholder Group is defined in the Proof of Claim and includes each of the WMB Noteholders.

[3] WaMu Bank and WMI are referred to collectively herein as "WaMu."

[4] As noted in the Proof of Claim, each member of the WMB Noteholder Group filed the Proof of Claim individually as a holder of Notes for their respective separate accounts, funds or institutions only, and as a matter of convenience consolidated their individual proofs of claim into an aggregate proof of claim. In that same fashion, each of the WMB Noteholders is responding to the Objection on an individual basis; this Response is being provided in a consolidated manner as a matter of convenience only.

(Grant & Eisenhofer P.A. and Drinker Biddle & Reath LLP) to proceed against WMI with regard to that portion of their Proof of Claim alleging misrepresentation, as set forth in pages 9-10 of the Proof of Claim (the "Misrepresentation Claim").[5]

The Debtors have objected to the Misrepresentation Claim on two grounds: (1) the Proof of Claim purportedly is not plead in conformity with the pleading requirements applicable to a complaint, an adversary proceeding, or the federal securities laws, and (2) the Claim is purportedly derivative and thus belongs to the Federal Deposit Insurance Corporation (the "FDIC" or "WaMu Receiver") as WaMu Bank's receiver. These objections are meritless, and do not, in any event, justify the dismissal of the Proof of Claim.

The first objection regarding the alleged failure to comply with purportedly applicable pleading standards is in the nature of a Rule 12(b)(6) motion, and is, at best, premature. In essence, the Debtors seek to apply the standards for dismissing a complaint to a proof of claim. However, as set forth below, a proof of claim is not a complaint and the heightened pleading requirements under Federal Rules of Bankruptcy Procedure 7008 and 7009 do not apply to proofs of claim. Rather, a proof of claim need only comply with Federal Rule of Bankruptcy Procedure 3001 and Official Form 10. Moreover, contrary to the Debtors' arguments, if a proof of claim fails to adequately allege underlying facts, the proof of claim merely loses presumptive validity and the burden of proof remains on the claimant to prove its claims. It is not, as the Debtors allege, grounds to dismiss the claim, without first providing the claimant with an opportunity to prove its claims through the evidentiary process. The Debtors' attempt to short circuit this process

---

[5] As to claims other than the Misrepresentation Claim, the WMB Noteholders will continue to be represented by Bracewell & Giuliani LLP.

should not be condoned. Further, the factual bases for the Misrepresentation Claim have been found to state valid claims under the federal securities laws in a sister court against officers and directors of WMI,[6] showing that the WMB Noteholders could adequately plead their Misrepresentation Claim under the federal securities laws were such standards applicable.

The second objection, that defrauded bondholders' claims are derivative and not direct, also must fail because the measure of the WMB Noteholders' damages is based on the difference between the price they paid for their WaMu Bank Notes and the value of these securities. It is not based upon some compensable injury to WaMu Bank itself. Thus, the Misrepresentation Claim is plainly direct, not derivative.

The WMB Noteholders have met the requirements for filing a proof of claim and has stated a valid direct claim with respect to the Misrepresentation Claim. Accordingly, the Objection should be denied.

## BACKGROUND

The WaMu Bank Notes

1.	WaMu Bank, a subsidiary of WMI, had outstanding approximately $6.1 billion in Senior Notes and approximately $7.6 billion in Subordinated Notes (together, the "Notes") issued under a global note program without an indenture trustee or other centralized agent representing the interests of the holders of the Notes generally. Mellon Trust of New England acted as "Paying Agent" for the Noteholders.

2.	Collectively, the WMB Noteholders hold approximately $166 million in Senior Notes and approximately $445 million in Subordinated Notes.

---

[6] As set forth below, neither WMI nor WaMu Bank are defendants in this related action, but their officers and directors have been named as defendants in that action and the court has found that plaintiffs in that action have stated securities fraud claims against these officers and directors.

The WaMu Bank Receivership

3.      On or about September 25, 2008, the Office of Thrift Supervision (the "OTS") closed WaMu Bank and appointed the FDIC as receiver of WaMu Bank (the "WMB Receivership Estate").

The WMI Bankruptcy Case

4.      On September 26, 2008, the Debtors each filed a voluntary case pursuant to Chapter 11 of the Bankruptcy Code.

The WMB Noteholder Group's Proof Of Claim

5.      On or about March 27, 2009, the WMB Noteholder Group timely filed the Proof of Claim.  The Proof of Claim asserts various claims against the Debtors (1) relating to WMI's expected tax refund, certain litigation judgments related to certain "goodwill litigation," disputed deposits currently held by JP Morgan Chase Bank, National Association, claims based upon WMI's potential regulatory violations, fraudulent transfers, and breach of fiduciary duty and other torts (collectively, the "General Claims"); and (2) relating to misrepresentations WMI made to the WMB Noteholder Group in violation of federal and applicable state securities law and applicable statutory and common law fraud provisions (as noted above, the "Misrepresentation Claim").

6.      The Misrepresentation Claim is based upon misrepresentations made by WMI and its officers and directors regarding the overall financial condition of WMI and its subsidiaries.  These misrepresentations induced the WMB Noteholders to purchase and/or hold Notes issued by WaMu Bank (WMI's largest subsidiary, representing a substantial percent of the overall value of WMI).  As a result of the misrepresentations by WMI, the WMB Noteholders purchased and/or retained Notes at artificially inflated

prices and collectively lost well in excess of $400 million when the fraudulent nature of those statements was revealed in 2007 and 2008. As an example of the class of false statements that defrauded the WMB Noteholders, the Proof of Claim specifically identifies representations that WMI would act as a "source of strength" to WaMu Bank (and, ultimately, to the WMB Noteholders who held WaMu Bank Notes). These representations were false because WaMu Bank was so impaired as a result of improper loan underwriting, fraudulent appraisals, failure to take adequate provisions for doubtful loans, and a host of other actions that WMI well-knew, from at least late 2005, that it could not possibly act as a source of financial strength to its materially impaired subsidiary.

7.  In addition to the false statements regarding WMI's purported ability to provide financial support to WaMu Bank, WMI made dozens, if not hundreds, of false statements regarding the operations, assets and accounting of WaMu Bank that were intended to and did induce the WMB Noteholders to purchase or hold WaMu Bank Notes. These statements were intended to falsely portray WMI and its subsidiaries (primarily WaMu Bank) as financially sound entities (such that WMI legitimately could financially support WaMu Bank if necessary) when, in actual fact, both WMI and WaMu Bank were substantially impaired. The false statements regarding the assets, accounting, and operations of WaMu Bank, and the factual bases for their falsity, are fully set forth in a proceeding pending in the United States District Court for the Western District of Washington (the "Washington Court") entitled *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.* No. 2:08-md-1919 MJP. A brief procedural history of that case is set forth below (*See infra* ¶¶ 8-11) and the claims in that case, which form a

substantial portion of the misrepresentations that underlie the Misrepresentation Claims herein, are described in detail below. *See infra* ¶¶ 23-44).

The Multi-District Litigation Pending Before The United States District Court

8.      In the wake of the WaMu Bank receivership and the WMI bankruptcy, defrauded investors began filing securities fraud class actions on behalf of purchasers of WaMu's securities, alleging that WaMu had made a number of false and misleading statements concerning its business practices and financial results.[7]  On May 7, 2008, the Washington Court consolidated three related securities class actions as part of a Multi-District Litigation proceeding (the "WaMu Securities Fraud Class Action") against a number of directors and officers of WaMu (collectively, the "Director and Officer Defendants"), a number of investment banks that served as underwriters for WaMu securities (collectively, the "Underwriter Defendants"), and WaMu's outside auditor, Deloitte and Touche LLP ("Deloitte").  While WMI was named as a defendant in each of the three cases that was consolidated, WMI is no longer a party to the WaMu Securities Fraud Class Action in light of its bankruptcy filing.

9.      After the filing of an initial Consolidated Class Action Complaint, the Washington Court issued an opinion in the WaMu Securities Fraud Class Action dismissing certain claims, but with leave to replead. *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,  259 F.R.D. 490 (W.D. Wash. 2009) ("*WaMu I*").

10.      On June 15, 2009, plaintiffs in the WaMu Securities Fraud Class Action filed the Amended Class Action Complaint (the "Securities Complaint").  A true and

---

[7] The Misrepresentation Claim in this proceeding relies upon a relevant period extending until September 25, 2008 (the "Relevant Period"), the date WaMu Bank was placed into receivership.  Prior to that date, the truth about WaMu Bank's financial condition had been concealed from the market, causing the WMB Noteholders to purchase and/or retain securities at artificially inflated prices.

correct copy of the Securities Complaint is attached hereto as Exhibit A, and the Securities Complaint, in its entirety, is incorporated by reference herein. The Securities Complaint asserts fraud-based claims under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and negligence-based claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"). The Misrepresentation Claim is based on the very false statements at issue in the Securities Complaint, but also complains of all false statements made between October 19, 2005 through September 25, 2008, the date on which WaMu Bank was placed into receivership (the "Relevant Period"). By order dated October 27, 2009, the Washington Court denied, in large part,[8] defendants' motions to dismiss the Securities Complaint, finding that the plaintiffs had stated claims under the federal securities laws. *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, Nos. 2:08-md-1919 MJP, C08-387 MJP, 2009 WL 3517630 (W.D. Wash. Oct. 27, 2009) ("*WaMu II*"). A true and correct copy of the decision in *WaMu II* is attached hereto as Exhibit B, and is incorporated by reference herein. In denying defendants' motions to dismiss, the Washington Court ruled that the claims asserted in the Securities Complaint complied with the pleadings standards set forth under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Federal Rule of Civil Procedure 9(b) and other relevant laws.

---

[8] The Washington Court granted (1) defendants' motions to dismiss the Exchange Act claims with respect to only two of the statements challenged as false and misleading; and (2) defendants' motions to dismiss the Securities Act claims with respect to the plaintiffs' Section 11 and 12(a)(2) claims as to an issuance of 5.50% Notes on the grounds that none of the named plaintiffs had purchased 5.50% Notes, and with respect to the plaintiffs' Section 15 claims as to the dismissed Section 11 and Section 12(a)(2) claim. The WMB Noteholders did not purchase such Notes, so the dismissal of these claims has no impact upon the viability of the Misrepresentation Claim.

<u>The Objection To Claim</u>

11.     On or about February 5, 2010 the Debtors filed the Objection, seeking an order denying and expunging the Proof of Claim "because they fail to state plausible claims on which relief may be granted." Objection at 24. The Objection not only objected to the Proof of Claim but also objected to two proofs of claim (Claim Nos. 3710 and 3711) filed against the Debtors by other noteholders of WMB referred to as the "Marathon Creditor Claimants." The Debtors assert in their Objection that the WMB Noteholders' Claim "asserts substantially the same claims as the Marathon Creditor Claimants, but does not assert claims for corporate veil-piercing and substantive consolidation." *See* Objection at ¶18.

## **RESPONSE**

12.     The Debtors assert that the Misrepresentation Claim set forth in the Proof of Claim should be dismissed, even absent an evidentiary hearing, because it fails to state plausible claims for violation of the federal and state securities laws or common law fraud in that the claims fail to include factual allegations that WMI made any material misrepresentations or omissions or that that they fail to identify any statutes that were violated. Such assertions, which are in the nature of a Rule 12(b)(6) motion are, at best, premature.[9]

---

[9] The Debtors' objection is nothing more than a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See* Objection at 24-25 ("Dismissal of a proof of claim under 11 U.S.C. § 502(c) is the equivalent to dismissing a claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted."). Rule 12(b)(6), however, is inapplicable to these proceedings. Bankruptcy Rule 9014 does not automatically make Fed. R. Civ. P. 12 applicable to contested matters.

## I. THE PLEADING STANDARDS UNDER FEDERAL RULES OF CIVIL PROCEDURE 8/9 AND THE PSLRA DO NOT APPLY TO PROOFS OF CLAIM

### A. A PROOF OF CLAIM IS NOT REQUIRED TO MEET THE SAME PLEADING STANDARDS AS A COMPLAINT

13.     The crux of the Debtors' argument is that the Misrepresentation Claim should be dismissed because the WMB Noteholders have failed to plead the necessary elements for securities fraud claims.  Objection at 58-66.    However, the civil complaint pleading standards, whether it is with respect to notice pleading under Federal Rule of Civil Procedure 8 or pleading fraud under Federal Rule of Civil Procedure 9, simply do not apply to proofs of claim.  *See In re O'Malley,* 252 B.R. 451, 456 (Bankr. N.D. Ill. 1999) ("A claim in a bankruptcy case need not meet the foregoing tests of litigation pleading under the Federal Rules of Civil Procedure.");  *In re Today's Destiny, Inc.*,  No. 05-90080, 2008 WL 5479109, at *7, (Bankr. S.D. Tex. Nov. 26, 2008) (Federal Rule of Bankruptcy Procedure 7009 does not per se apply to a proof of claim).

14.     According to the Debtors, a creditor filing a proof of claim would have to meet all of the pleading standards for a complaint.  Objection at 58-66.  However, "a proof of claim is not a complaint and is not supposed to be."  *In re Today's,* 2008 WL 5479109, at *7 ("Rule 7009 does not per se apply to a proof of claim.  A proof of claim is not a complaint and is not supposed to be.  Rule 3001 is specific in stating that a proof of claim should comply substantially with Official Form 10.  Official Form 10, not Rule 7009, generally governs pleading requirements for a proof of claim.").    Thus, the standards regarding proofs of claim are distinct from those governing complaints in civil cases.

**B.** **UNDER THE LIBERAL STANDARD SET FORTH IN FEDERAL RULE OF BANKRUPTCY PROCEDURE 3001, THE MISREPRESENTATION CLAIM CLEARLY IS SUFFICIENT**

15. A claim is a "right to payment" and "a proof of claim is a written statement setting forth a creditor's claim." 11 U.S.C. § 101(5)(A) and Fed. R. Bankr. P. 3001(a). Federal Rule of Bankruptcy Procedure 3001 governs requirements for a proof of claim. Fed. R. Bankr. P. 3001(a). A proof of claim provides data "to afford the debtor sufficient information to determine intelligently whether to contest a filed claim." *In re Trails End Lodge, Inc.,* 51 B.R. 209, 210 (Bankr. Vt. 1985). "As one bankruptcy court has explained, '[a] proof of claim for an unsecured creditor requires little more than a listing of name, address, amount of claim (or a listing as 'unliquidated' or 'contingent'), and a signature. It should take less than 5 minutes to fill out.'" *LTV Corp. v. Gulf States Steel, Inc*., 969 F.2d 1050, 1058 (D.C. Cir. 1992) (quoting *In re Great W. Cities, Inc*., 88 B.R. 109, 114 (Bankr. N.D. Tex. 1988)); *accord Paul Mason & Assocs., Inc. v. Charlton (In re Charlton)*, No. 04-30011, 2005 Bankr. LEXIS 444, at *9 (Bankr. S.D. Fla. Jan. 24, 2005) ("Proofs of claim, on the other hand, are not intended to be elaborate or detailed.").

16. Federal Rule of Bankruptcy Procedure 3001 is specific in stating that a proof of claim should comply substantially with the appropriate Official Form (*i.e.*, Form 10). As stated by the court in *Today's Destiny*:

> Official Form 10 requires the creditor to include only basic facts as to the identity of the claimant, and the amount, nature, and basis of the claim. The form and accompanying instruction evidence an intent for a single word or, at most, a single sentence description of the claim. For example, line 2 of the proof of claim asks for the "basis of the claim." Line 2 provides a single line for an answer and refers the claimant to instruction #2 on the reverse side of the proof of claim for how to answer the question. Instruction #2 states:
>
> > State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed,

> personal injury/wrongful death, car loan, mortgage note, and credit card.

> Form 10 does not have the space for a claimant to assert a factual predicate in the detail required by Rule 7009. Nor does Form 10 suggest that a claimant should file an attachment in response to Line 2.

*See In re Today's Destiny, Inc*, 2008 WL 5479109, at *7-8. Other than using the Official Form and submitting a writing, there are no specific requirements for documenting unsecured claims. *See In re Thompson*, 260 B.R. 484, 486 (Bankr. W.D. Mo. 2001).

17.    Here, there can be no question that the Misrepresentation Claim complies with Federal Rule of Bankruptcy Procedure 3001 and with Official Form 10.[10] The Misrepresentation Claim gives notice that the WMB Noteholders intend to hold the Debtors liable to the extent "the WMB Noteholder Group have been damaged by WMI for failing to act in accordance with its representations. The claims for damages arises both under the federal and applicable state securities laws and under applicable statutory and common law fraud provisions." Proof of Claim at §32. The fact that the Misrepresentation Claim only sets out one example of the misrepresentations does not mean that the Misrepresentation Claim does not comply with Federal Rule of Bankruptcy Procedure 3001. To the contrary, the Bankruptcy Rules and Official Form do not even *require* examples, but only a general statement of what the claim is based upon such as "personal injury/wrongful death," "goods sold," or "money loaned." *See* Official Form

---

[10] The Debtors argue in footnote 17 that the Proof of Claim should not be considered *prima facia* valid because the "Bondholders have not attached to the Claims and documentation regarding the WMB Notes as required by Rule 3001(c)." Objection at 24 The Debtors misconstrue Rule 3001(c) which applies only "when a claim . . . is based upon a writing." Fed R Bankr. P 3001(c). Here, the Misrepresentation Claim is not a contract claim. Rather it is created by statute and based upon tort law and thus, is not "based upon a writing" as that term is used in Rule 3001. *See In re Cluff*, 313 B.R. 323, 333 (Bankr. D. Utah 2004). Moreover, the Debtors acknowledge in their Objection that the "FDIC has recognized the Bondholders' claims as 'legitimate' liabilities of the Receivership and notified the Bondholders that the FDIC would issue receivership certificates." Objection at 2. It is worth noting that in one breath, the Debtors argue the failure to comply with Rule 3001 requires that a claim be dismissed and expunged, but in another breath argue that the failure to comply with Rule 3001 merely shifts the burden of proof.

10 at Instruction #2.  Moreover, the Debtors' filing of a seventy-one page objection challenging, *inter alia*, the Noteholders' alleged failure to comply with the federal securities laws (Objection at 58-66) clearly shows the Debtors are more than aware of the basis for the Misrepresentation Claim.   Nothing in Federal Rule of Bankruptcy Procedures 3001 requires (and the Debtors cite to no requirement) that a proof of claim must set forth all factual allegations as required in a complaint or that it must identify specific statutes alleged to have been violated.   Such a requirement would be directly contrary to the intent that filing proofs of claim is to be a speedy and inexpensive process. *See In re Today's Destiny, Inc*,  2008 WL 5479109, at *6 (noting that the procedure for submitting claims "is designed to be speedy and inexpensive") (*citing Heath v. Am. Express Travel Related Servs. Co. (In re Heath),* 331 B.R. 424, 435 (B.A.P. 9th Cir. 2005)).   Under these standards, simply stating "securities law violations" would have been sufficient to state the basis of the claim.   Thus, the Misrepresentation Claim clearly is sufficient.

## C.      THE DISMISSAL OF THE MISREPRESENTATION CLAIM AS SOUGHT BY WMI IS NOT AN APPROPRIATE REMEDY FOR A PRESUMPTIVELY VALID CLAIM

18.      A proof of claim executed and filed in accordance with the rules "shall constitute prima facie evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f); *In re Allegheny Int'l, Inc*., 954 F.2d 167, 173 (3d Cir. 1992).  Unlike with complaints in civil cases, debtors do not seek to dismiss proofs of claim; rather, they merely object to them.  In objecting to proofs of claim that are prima facie valid, the objector bears a stiff burden – namely, the objector must "produce evidence sufficient to negate the prima facie validity of the filed claim" and, in "practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is

essential to the claim's legal sufficiency." *Allegheny,* 954 F.2d at 173. Only if "the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim" does "the burden revert[] to the claimant to prove the validity of the claim by a preponderance of the evidence." *Id. See also Moore v. Kulicke & Soffa Indus., Inc.,* 318 F.3d 561, 566 (3d Cir. 2003) ("A denial [of a claim's validity] . . . will simply shift the burden of production to the defendant [objector] to present evidence that would tend to rebut the plaintiff's [claimant's] case . . . If the [objector] cannot meet its burden of going forward by presenting some evidence, the [claimant] has met its burden of persuasion.").[11]

19. Although the WMB Noteholders submit that they more than adequately alleged facts sufficient to support the Misrepresentation Claim so as to be prima facie valid, if the Proof of Claim is deemed deficient in any respect, it merely would deprive the Proof of Claim of presumptive validity and would require the WMB Noteholders, rather than the Debtors, to initially produce evidence at an evidentiary hearing. Deficiencies do not justify dismissal; they only deprive the claim of a presumption of validity and, in any event, may be cured through later amendments. "The consequence for such a deficiency . . . is not disallowance of the claim but denial of the Rule 3001(f) presumption of validity with, if appropriate, leave to the creditor to amend the claim." *In re Shank,* 315 B.R. 799, 810 (Bankr. N.D. Ga. 2004); *see also In re Cluff,* 313 B.R. at

---

[11] In certain situations where a proof of claim may be based upon allegations of fraud and misconduct, courts have required the claimant to refile the claim in the form of an adversary proceeding in order to bring some procedural regularity to bear on the issues so the matter can move forward to determination. *See, e.g., In re Maxwell Newspapers, Inc.,* 151 B.R. 63, 68 (Bankr. S.D.N.Y. 1993) (Bankruptcy Rule 9014 held to grant discretion to court to direct parties to bring what would otherwise be a contested matter in the form of an adversary proceeding). Other courts have required the claimant to amend its proof of claim to provide a more definite statement under Federal Rule of Bankruptcy Procedure 9012(e). *See In re Rimstat Ltd.,* 233 B.R. 345 (Bankr. N.D. Ind. 1998) (granting request to file more definite statement and requiring creditor to file amended proof of claim). Again, this counsels against outright dismissal of the Misrepresentation Claim.

331 ("Bankruptcy Rule 3001 does not provide substantive grounds for disallowance; it merely determines which party has the burden of proof"); *In re Kincaid*, 388 B.R. 610 (Bankr. E.D. Pa. 2008)..

20. Here, the Debtors seek to take away the WMB Noteholders' right to submit sufficient evidence to support their claims by seeking to summarily dismiss the Misrepresentation Claim because it does not meet the heightened pleading standards required in a complaint. The Debtors fail to cite any cases in which a bankruptcy court disallowed a proof of claim for failing to satisfy Federal Rule of Bankruptcy Procedure 3001.[12] As set forth above, the Proof of Claim clearly meets the standards necessary to assert a prima facie claim.[13]

21. It is no surprise that the Debtors are seeking to improperly use the objection to wipe out the WMB Noteholders' claims rather than have to face these claims, which are similar to the claims set forth in the WaMu Securities Fraud Class Action Litigation against the Debtors' own officers and directors. The Debtors are more

---

[12] The Debtors' reliance on *Flake v. Alper Holdings, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736 (S.D.N.Y. 2008) and *900 Capital Services, Inc. v. Cloud (In re Cloud)*, 2000 WL 634637 (5th Cir. May 4, 2000) are misplaced, as these cases are readily distinguishable. In *Flake*, the parties agreed that "dismissing a proof of claim pursuant to 11 U.S.C. § 502(c) is equivalent to dismissing a claim under Fed.R.Civ.P. 12(b)(6)." *Flake*, 398 B.R. at 748. Here, the WMB Noteholders do not so agree. In *Cloud*, the court found that the would-be creditor did not have a claim against the debtor, not that its proof of claim failed to comply with the standards of Federal Rules of Bankruptcy Procedure 3001, 7008 or 7009. *Cloud*, 2000 WL 634637, at * 3.

[13] The WMB Noteholders are entitled to a fair opportunity to present their case. The application of Federal Rules of Bankruptcy Procedure 7008, 7009 and 7012 at this stage to dismiss the Proof of Claim would prevent the WMB Noteholders from having a fair opportunity to present their case. Thus, if the Court were to determine that the pleading standard for complaints apply and that the Proof of Claim did not meet those standards, the Debtors should not be allowed to summary disallow and expunge the Proof of Claim as they seek. Rather, it is common for the plaintiff in such situations to be given leave to replead. *See e.g. Borelli v. City of Reading*, 532 F.2d 950, 951 n.1 (3d Cir 1976) (in ruling on a motion to dismiss for failure to state a claim, district court judges should give the plaintiff the opportunity to amend within a certain time frame). Such an action is consistent with Rule 9014's requirement that if the court directs that one or more of the other rules of Part VII of the Rules shall apply, "the Court shall give the parties notice of any order issued . . . to afford them a reasonable opportunity to comply with the procedures prescribed by the order. Fed. R. Bank. P. 9014(c)."

than aware of the WaMu Securities Fraud Class Action and of the Washington Court's ruling in that Action. As shown below (*see infra* § II), the facts and allegations contained in the WaMu Securities Fraud Class Action likewise support the WMB Noteholders' Misrepresentation Claim.

## II. THERE IS A SUFFICIENT FACTUAL BASIS TO UPHOLD FEDERAL SECURITIES LAW FRAUD CLAIMS AGAINST WMI UNDER BOTH FEDERAL RULE OF CIVIL PROCEDURE 9(b) AND THE PSLRA

### A. FACTUAL BASIS FOR THE MISREPRESENTATION CLAIMS AGAINST WMI[14]

#### 1. WMI's Fraudulent Scheme

22.     Prior to its bankruptcy filing, WMI was a savings bank holding company that owned WaMu Bank, the United States' largest savings and loan association. Beginning in 2005, WaMu's officers sought to drive up the company's mortgage loan volume to transform the company into a nationwide lender on par with the large Wall Street banks. In pursuit of this goal, WaMu checked prudent lending practices and internal controls at the door, engaging in a number of dangerous business practices that allowed the company to write increasingly more risky loans. These practices included (1) deliberate and secret efforts to decrease the efficacy of WaMu's risk management policies; (2) corruption of WaMu's appraisal process; (3) abandonment of appropriate underwriting standards for WaMu loans; and (4) misrepresentation of WaMu's financial results.

23.     <u>First</u>, WaMu secretly minimized the effectiveness of its risk management group by relegating the group to a "customer service" role and adopting policies designed to encourage loan volume over credit risk management. Without effective policies for

---

[14] All factual allegations set forth herein are based on the allegations contained in the Securities Complaint, not on the personal knowledge of the WMB Noteholders.

regulation, WaMu's risk management teams were unable to prevent the practice of irresponsible, volume-driven home lending and failed to function as an independent check against credit risk, allowing WaMu to engage in improper underwriting practices and appraisal corruption. WaMu increasingly engaged in high risk lending and actively encouraged its loan sales staff to originate greater volumes of risky loans.

24. Second, WaMu improperly pressured appraisers and used only hand-picked and preapproved appraisers to ensure inflated appraisal values for its home loans. Inflated appraisals allowed WaMu to originate loans that had artificially low loan-to-value ("LTV") ratios, creating the illusion of lower credit risk. WaMu publicly presented its low LTV ratios as an example of its protection against potential loss.

25. Third, WaMu loosened its underwriting standards in an effort to increase the volume of its lending operations and profit margins. These less-restrictive standards, which resulted in increased credit risk, were applied to WaMu's prime and subprime lending practices. As a result, deficient standards and underwriting practices – such as granting loans to borrowers with low Fair Isaac Credit Organization ("FICO") credit scores, failing to request documentation or other verification of a borrower's stated income, and underwriting adjustable rate mortgages ("ARMs") to an introductory "teaser" rate instead of the fully-indexed rate – were *de rigueur* at WaMu.

26. Fourth, WaMu was required to maintain, report, and periodically adjust a reserve amount for probable losses resulting from borrowers defaulting on their obligations to make monthly mortgage payments or when it was probable that borrowers would do so (the "Allowance for Loan and Lease Losses" or the "Allowance"). Generally accepted accounting principles ("GAAP") and Securities and Exchange

Commission ("SEC") regulations required WaMu to increase its provisioning for its Allowance in a manner commensurate with the decreasing quality of its home mortgage products. Instead, WaMu under-reserved for its credit risk, thereby concealing its true financial state in violation of GAAP and SEC regulations. Because the Allowance was directly linked to WaMu's net income and earnings per share, WaMu misstated its financial results by under-provisioning the Allowance and reporting artificially inflated net income.

### 2. WMI's False And Misleading Public Statements

27. Through the Relevant Period in which WMI's fraud was ongoing (October 19, 2005 through September 25, 2008), WaMu, acting through its officers and directors, made false statements relating to risk management, appraisals, underwriting, and financial statements and internal controls in filings with the SEC, in press releases, during earnings calls with investors, and at conferences.

28. **Risk Management** -- WaMu's senior executives – including Chairman of the Board and Chief Executive Officer Kerry Killinger ("Killinger"), Executive Vice President and Chief Financial Officer Thomas Casey ("Casey"), President and Chief Operating Officer Stephen Rotella ("Rotella"), Executive Vice President and Chief Enterprise Risk Officer Ronald Cathcart ("Cathcart"), and Executive Vice President and President of Home Loans David Schneider ("Schneider") (collectively, the "WaMu Officers") – made numerous false statements concerning WaMu's risk management practices. *See* ¶¶ 47-48, 50-60[15] (false statements by Killinger); ¶¶ 357-364 (false statements by Casey); ¶¶ 429-433 (false statements by Rotella); ¶ 473 (false statement by

---

[15] All cites herein to "¶ __" are to the Securities Complaint pending in the Washington Court unless otherwise specified.

Cathcart); ¶ 502 (false statement by Schneider). Through these statements, WaMu publicly represented that it maintained "appropriate policies, standards, and limits designed to maintain risk exposures within the Company's risk tolerance" and provided "objective oversight of risk elements inherent in the Company's business activities and practices." ¶ 47. These statements were false and misleading because, as described above, WaMu "had in fact weakened its risk management practices in order to increase loan volume." ¶ 62.

29. **Appraisals** -- The WaMu Officers also made numerous false statements concerning appraisals. *See* ¶¶ 96-103 (false statements by Killinger); ¶¶ 375-380 (false statements by Casey); ¶¶ 445 (false statement by Rotella). WaMu represented that its LTV ratio was a "key determinant of future performance" and that this critical ratio had been kept low to "offset[] the credit risk associated with negative amortization." ¶ 96. Further, WaMu represented that "there's a very strong governance process over those external appraisers." ¶¶ 97-98. These and similar statements concerning WaMu's appraisal process and LTV ratios were false, because WaMu's LTV ratios resulted from a corrupt process that overstated the value of the homes for which WaMu sold loans and permitted WaMu to claim a lower credit risk than was accurate. Specifically, WaMu engaged in an "undisclosed appraisal inflation practice" by which it (1) exerted undue pressure on appraisers to hit target home values, (2) refused to use appraisers who would not capitulate to WaMu's demands to increase appraisal values, and (3) misused the reconsideration on value method when appraisals did not hit the predetermined values WaMu desired. ¶¶ 105, 106-61.

30.    **Underwriting** -- The WaMu Officers made numerous false statements about WaMu's underwriting standards.  *See* ¶¶ 169-189 (false statements by Killinger); ¶¶ 389-95 (false statements by Casey); ¶¶ 451-454 (false statements by Rotella); ¶ 492 (false statement by Cathcart); ¶ 513 (false statement by Schneider).   Through these statements, WaMu publicly represented that its underwriting standards were "excellent" (¶ 171), that WaMu "never underwrite[s] to the teaser rate" in underwriting options on its ARMs (¶ 179), and that WaMu had maintained a "rigorous[] adhere[ence] to [its] minimum FICO threshold" in its subprime portfolio.  ¶ 183.  For example, WaMu Chief Executive Officer Killinger falsely stated the following concerning WaMu's underwriting during a November 15, 2005 Investor Day Conference in New York:

> *On credit risk.  We have excellent processes, policies, underwritings, standards and reserving methodologies in place and they have served us very well for quite some time.* . . . Now you have heard my conservative voice on the housing market for several quarters now.   We were concerned that housing prices appeared over extended in many markets around the country and we felt that the housing market was likely to cool.  *To prepare for this possibility we elected to selectively reduce credit risk this year.* . . Now these actions may have limited near term profitability but they help protect us from a softer housing market if that were to occur.

¶ 171 (emphasis added).

31.    These statements were false, because WaMu had actually lowered its underwriting standards and pressured underwriters to approve loans outside of the guidelines.   ¶¶ 192-223.   In addition, plaintiffs in the WaMu Securities Fraud Class Action introduced expert analysis demonstrating that "WaMu had a much higher loan-to-income ratio than its peers, which 'confirms that the deterioration in the underwriting

standards at WaMu was nationwide in scope and material in its effects.'" *WaMu II* at *8 (quoting ¶ 238).

32.     **Financial Statements and Internal Controls** -- The WaMu Officers made a number of false statements about WaMu's financial statements and internal controls and certified SEC filings containing similar false statements throughout the Relevant Period.   *See* ¶¶ 267-290 (false statements by Killinger); ¶¶ 402-415 (false statements by Casey); ¶ 524 (false statement by Schneider).   For example, in WaMu's Form 10-Q for the period ended September 30, 2005 (the "Third Quarter 2005 Form 10-Q"), WaMu stated:

> Enterprise Risk Management works with the lines of business to establish appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance. Significant risk management policies approved by the relevant management committees are also reviewed and approved by the Board, Audit, and Finance Committees. Enterprise Risk Management also provides objective oversight of risk elements inherent in the Company's business activities and practices and oversees compliance with laws and regulations, and reports periodically to the Board of Directors.

¶ 47.   These statements were false because, as set forth above, WaMu was secretly eroding its own risk management policies to permit it to write increasingly more risky loans.

33.     By repeatedly issuing false statements designed to conceal the true risks inherent in its business practices and to distort its financial results, WaMu was able to keep its securities trading at artificially inflated prices.   The WMB Noteholders relied upon WaMu's false statements in purchasing and/or retaining WaMu Bank Notes at these inflated prices.   When the truth about WaMu was revealed, the WaMu Bank Notes were wiped out, causing the WMB Noteholders to sustain substantial damages.

### 3.    WMB's False And Misleading Offering Documents

34.    While WaMu was secretly engaging in the fraudulent practices described above, WaMu Bank foisted billions of dollars worth of worthless notes on the investing public through securities offerings in 2006 and 2007 (collectively, the "Offerings").  The WMB Noteholders purchased securities issued in these offerings.

35.    The Prospectuses for the Offerings, and the documents incorporated therein by reference ("Offering Documents"), contained actionable misrepresentations concerning three areas of WaMu's lending practices: underwriting standards, internal controls, and reserves for anticipated loan losses (as reflected in WaMu's financial statements).

36.    <u>Underwriting</u> -- The Offering Documents contain statement concerning WaMu's underwriting standards claiming that WaMu ensures compliance with its underwriting standards" to mitigate and manage credit risk.  Such statements were materially false and misleading when made because, as explained above, WaMu was lowering its underwriting standards and issuing loans that were increasingly unlikely to be repaid.  Further, WaMu employed "extremely loose underwriting guidelines" to which it "routinely allowed exceptions" (¶ 737) as "part of the norm" (¶ 738), such that "[t]here were really no restrictions to approve a loan."  ¶ 740.

37.    <u>Internal Controls</u> -- The Offering Documents contain statements that the Company believed it maintained effective internal control over financial reporting.  These statements were false because WaMu's Loan Performance Risk Model ("LPRM"), "the key model used by the Company to predict losses," failed to account for the high credit risk presented by WaMu's Option ARM loans and other loans allowing for negative amortization.  ¶¶ 720-21.  Further, WaMu not only neglected to review the effectiveness

of its internal controls, but also intentionally decreased the effectiveness of WaMu's risk management group during the Relevant Period, assigning risk management personnel a "sales-supporting, 'customer service' role." ¶ 63. In removing controls against risky lending, WaMu allowed a single officer to occupy two roles with conflicting purposes, as the supervisor of both the risk management personnel and the home lending operations. *Id*.

38. **Financial Statements** -- The Offering Documents contained WaMu financial statements that were misstated due to WaMu's under-provisioning its Allowance and overstating its net income and earnings per share. GAAP and SEC guidelines required WaMu to provision for the Allowance at a rate commensurate with its increasing credit risk (¶ 306), yet WaMu failed to account for its practices of appraisal inflation, deficient underwriting, and ineffective internal controls when determining provisions for the Allowance, thereby misstating its financial results.

39. The WMB Noteholders relied upon the offering Documents in purchasing or retaining WaMu Bank Notes at these inflated prices, ultimately causing at least some portion of their losses.

### 4. The Truth About WaMu Begins To Emerge

40. After the close of trading on October 17, 2007, WaMu disclosed that, contrary to an "improved fourth quarter" described in a press release less than two weeks previously, it in fact expected its loan loss provision to grow to as much as $1.3 billion in the fourth quarter of 2007. In a press release issued that same day, WaMu disclosed that, for the first time in *12 years*, it was not increasing its stock dividend.

41. Over the course of the year following these announcements, the truth about WaMu's dangerous business practices and its precarious financial condition began

to emerge as WaMu came under fire from a number of regulatory agencies, including (1) the filing of a lawsuit against First American Corporation and its subsidiary eAppraiseIT by New York Attorney General Cuomo on November 1, 2007, alleging that WaMu pressured these companies into fraudulently inflating the appraisals used in WaMu's loan origination process; (2) the announcement by Attorney General Cuomo on November 7, 2007 that he had broadened his attack on WaMu to include an examination of the loans that it sold to Fannie Mae and Freddie Mac, the nation's two biggest providers of mortgage financing; and (3) the announcement on December 21, 2007 that the SEC had launched an inquiry into WaMu's mortgage lending practices, focusing on whether it properly accounted for its loans in financial disclosures to investors.

42. In the wake of these investigations, WaMu continued to report disappointing financial results and was downgraded a number of times by the ratings agencies. After the market closed on September 9, 2008, Standard & Poors changed its ratings outlook for WaMu from neutral to negative, stating that there was a greater likelihood that WaMu could be cut to junk status over the next two years. In response to this downgrade, stock price fell nearly 30 percent on September 10, 2008. Likewise, two weeks later – on September 23, 2008 and September 24, 2008 – both Moody's and Standard & Poor's cut their ratings for WaMu. Moody's lowered WaMu's rating to "E," the lowest possible rating, and stated that WaMu had insufficient capital to absorb its mortgage losses. Standard & Poor's cut WaMu's rating deep into junk status. Over this two day period, WaMu's common stock and Notes fell precipitously, with common stock plunging from $3.33 to $2.26, Series R Stock falling from $226.75 to $125.99, and

7.250% Notes dropping from $42.00 to $15.10 per $100 of par value, a decline of nearly 65%.

43. WaMu's chicanery came to an end on September 26, 2008, when the federal government seized WaMu Bank and appointed the FDIC as its receiver. The seizure of WaMu Bank represented the largest bank failure in U.S. history and finally revealed to the market that its massive losses – a foreseeable consequence of the wrongdoing in which it had engaged – were enough to bankrupt WaMu. Following the collapse of one of its main operating subsidiaries, WMI was forced to file a voluntary petition under Chapter 11 of Title 11 of the United States Code on September 28, 2008. At the time of its bankruptcy filing, WaMu was liable to purchasers of its securities for violations of the federal securities laws.

44. The WMB Noteholders challenge as false and misleading the very statements at issue in the WaMu Securities Fraud Class Action and asserts the same grounds for liability against WaMu – *i.e.*, (1) violations of Section 11 of the Securities Act; and. (2) violations of Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. These claims have already been found to state valid claims under the federal securities laws. Accordingly, the Debtors' objection to the Misrepresentation Claim should be denied.

**B. THE WMB NOTEHOLDERS HAVE STATED AN ACTIONABLE CLAIM FOR MISREPRESENTATION**

45. The Debtors contend that the Misrepresentation Claim must be dismissed because it "fails to state plausible claims for violation of the federal or state securities laws or common law fraud." Objection at 58. The Debtors are wrong.

46.     The WMB Noteholders – like plaintiffs in the WaMu Securities Fraud Class Action – bring two types of claims for violation of the federal securities laws: negligence-based claims for violations of Section 11 of the Securities Act and fraud-based claims for violations of Section 10(b) of the Exchange Act (and Rule 10b-5 promulgated thereunder).  Facts exist sufficient to permit the WMB Noteholders to meet the pleading standards for both types of claims, were such pleading standards applicable.

### 1.     The WMB Noteholders State Securities Act Claims

47.     Facts exist sufficient for the WMB Noteholders to state claims under Section 11 of the Securities Act, were the pleading requirements of the federal securities laws applicable here.

48.     Section 11 of the Securities Act creates a private remedy for any purchaser of a security if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).  "A Section 11 action can be brought only against . . .  the issuer, its directors or partners, underwriters, and accountants who are named as having prepared or certified the registration statement."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 n.13 (1983) (citing 15 U.S.C. § 77k(a)).

49.     "The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment."  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996) (internal quotation marks omitted).  "No scienter [*i.e.*, fraudulent intent] is required for liability under § 11; defendants will be liable for innocent or negligent

material misstatements or omissions." *Id.* (citing *Huddleston*, 459 U.S. 375 at 382). Accordingly, to state a Section 11 claim, a plaintiff "need only show a material misstatement or omission . . . to establish his *prima facie* case," which "places a relatively minimal burden on a plaintiff." *Huddleston*, 459 U.S. at 382. Unlike in Section 10(b) fraud actions under the Exchange Act, neither reliance nor causation are necessary elements of a *prima facie* case under Section 11 of the Securities Act. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421-22 (9th Cir. 1994); *Casella v. Webb*, 883 F.2d 805, 808 n.8 (9th Cir. 1989); *see also Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004).

50. Facts exist that would permit the WMB Noteholders to meet the pleading standard applicable to its Section 11 claim, were the pleading requirements of the federal securities law applicable here. The Offering Documents contain a number of false and misleading statements substantially similar to those set forth at length in the Securities Complaint. *See* Comp. ¶¶ 769-788; 793-814. The Washington Court has ruled that plaintiffs adequately pleaded that the offering documents at issue in the Securities Fraud Class Action – which contain false statements concerning underwriting standards, false statements concerning WaMu's internal controls, and WaMu's financial performance that are substantially similar to those at issue in the Offering Documents – satisfy the requirements of Section 11. With regard to the false statements concerning WaMu's underwriting standards, the Washington Court noted:

> Plaintiffs' allegations sufficiently 'set forth what is false or misleading about [the] statement, and why it is false.' . . . Such disregard of underwriting standards, where the exceptions nearly swallow the rules, is tantamount to abandoning those standards . . . If WaMu's lending environment was fraught with such extreme departure from

> any plausible conception of 'standards,' a statement that the
> Company followed underwriting standards to manage or
> mitigate credit risk would mislead a reasonable investor . . .
> Plaintiffs describe with sufficient particularity the
> misleading nature of the statement and state a Section 11
> claim for relief.

*Wa Mu I*, 259 F.R.D. at 505-06 (citations omitted); *Wa Mu II*, 2009 WL 3517630, at *20,

*21 (plaintiffs "have sufficiently alleged with particularity why the internal controls

statements in the 2006 offering documents [and the December 2007 offering documents]

were false and misleading").

      51.    With regard to the false statements concerning internal controls, the

Washington Court also found that plaintiffs had plead actionable misstatements for

purposes of Section 11 liability:

> Misstatements about the adequacy of internal controls are
> actionable . . . The allegations described above explain
> with particularity why the alleged misrepresentation
> concerning internal controls in WaMu's October 2007
> Offering Documents was both false and misleading. . . .
> WaMu's representation that it continually updated its
> internal controls to maintain their effectiveness is
> specifically contradicted by allegations that the Company
> intentionally decreased the regulatory power of the risk
> management group … and failed to update its systems for
> predicting credit risk. . . . Plaintiffs have stated a claim for
> relief under Section 11 against all Securities Act
> Defendants.

*WaMu I* at 506-07 (citations omitted). *See also WaMu II* at *20, *21 ("Plaintiffs have

sufficiently alleged with particularity why the internal controls statements in the 2006

offering documents [and the December 2007 Offering Documents] were false and

misleading.").

52.     Finally, the Washington Court found that plaintiffs' allegations concerning false financial statements were sufficient  to demonstrate actionable misstatements for purposes of Section 11 liability:

> Plaintiffs meet the Rule 9(b) heightened pleading standard. Plaintiffs quantify the alleged misstatements in the October 2007 Offering Documents.  They assert that WaMu under-provisioned its Allowance by over 40% in 2006, by at least 63% in the first quarter of 2007, and by at least 56% in the second quarter of 2007 . . .  Plaintiffs allege overstatements of net income of at least 10%, 21%, and 32% for those periods, respectively. . . .  In addition, Plaintiffs explain how the loan-related misconduct alleged throughout the Complaint caused the financial misstatements, providing a time-frame of the misconduct. . . . In sum, these allegations adequately identify with particularity 'the circumstances of the alleged fraud' resulting in the financial misstatements. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir.1997).

*WaMu I*  at 507 (citations omitted).  *See also WaMu II* at *19,*21 ("Plaintiffs' allegations [with regard to the 2006 and December 2007 Offering Documents] sufficiently demonstrate with particularity that WaMu's financial statements misrepresented the Company's true financial condition.").

53.     Accordingly, facts exist which would enable the WMB Noteholders to state a *prima facie* case of Section 11 liability under the pleading standards applicable to federal securities claims, were such standards applicable.

54.     That the Washington Court was called upon to make determinations concerning only whether WMI's officers and directors – and not WMI itself – were found to have made false statements is of no moment.  It is well-settled that a corporation is liable for false and misleading statements made by its officers and directors for purposes of the federal securities laws.  *See, e.g., Makor Issues & Rights, Ltd. v. Tellabs Inc.*,  513 F.3d 702, 708 (7th Cir. 2008) ("A corporation is liable for statements by employees who

have apparent authority to make them.") (citing *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 568 (1982); *In re Atlantic Fin. Mgmt., Inc.*, 784 F.2d 29, 31-32 (1st Cir. 1986)).  Accordingly, there are facts sufficient to permit the WMB Noteholders to state valid Securities Act claims were the pleading standards applicable to federal securities claims applicable at bar.

55.     Further, at a minimum, WMI is liable for the false statements made in the Offering Documents for the WMB debt under Section 15 of the Securities Act as the "control" entity for WaMu Bank.  Section 15 of the Securities Act provides:

> *Every person who, by or through stock ownership, agency, or otherwise,* or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, *controls any person liable under [Sections 11 or 12(a)] of this title*, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C.A. § 77o.  The elements of a Section 15 violation are:  "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator."  *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 (S.D.N.Y. 2009).

56.     As set forth above, WaMu Bank violated Section 11 of the Securities Act. WMI, the parent of WaMu Bank, owned all of WaMu Bank's stock and accordingly is a "control person" of WaMu Bank.  Sufficient facts exist to permit the WMB Noteholders to state a claim against WMI pursuant to Section 15.

### 2.    The WMB Noteholders State Exchange Act Claims

57.    Sufficient facts exist to permit the WMB Noteholders to state a claim under Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  To state a claim for securities fraud under Section 10(b) of the Exchange Act, a plaintiff must allege that a defendant (1) made a misstatement or an omission of material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which the plaintiff reasonably relied; and (5) that the plaintiff's reliance was the proximate cause of his or her injury.[16]  Facts exist sufficient to permit the WMB Noteholders to plead each element of their Misrepresentation Claim in accordance with the pleading standards applicable to such claims under the federal securities laws.

### a.    False Statements

58.    First, as set forth above, the WMB Noteholders have identified numerous false and misleading statements in a variety of contexts.  *See supra* ¶¶ 27-44; 50-53.  With respect to the Offering Documents, as noted above, the Washington Court has already found the false statements therein were sufficiently particularized to state a claim under the federal securities laws.  *See supra* ¶¶ 50-52.  In addition to the false statements in the Offering Documents, the Washington Court found that WaMu made false statements relating to risk management, appraisals, underwriting, and financial statements and internal controls in filings with the SEC, in press releases, during earnings calls with investors, and at conferences.  False statements concerning WaMu's risk management practices -- *WaMu II* at *6 (Killinger statements); *11 (Casey statements); *14 (Rotella statements); *16 (Cathcart statement); *17 (Schneider statement); False statements

---

[16] Reliance has been plead by each of the WMB Noteholders in the Proof of Claim.  Accordingly, at this stage, there is no issue as to reliance.  Nor has an issue been raised that the misstatements by WMI were not "in connection with a purchase or sale of a security."

concerning appraisals -- *WaMu II* at *7 (Killinger statements); *12 (Casey statements); *14 (Rotella statement); False statements about WaMu's underwriting standards -- *WaMu II* at *8 (Killinger statements); *12 (Casey statements); *15 (Rotella statements); *16 (Cathcart statement); *17 (Schneider statement); False statements about WaMu's financial statements and internal controls -- *WaMu II* at * 10 (Killinger statements); *13 (Casey statements); *17 (Scheider statement).

59.     Inasmuch as the Washington Court has already ruled plaintiffs' allegations that the WaMu Officers made additional false statements concerning risk management, appraisals, underwriting, and financial statements and internal controls were sufficiently plead to give rise to liability under Section 10(b), the Debtors' assertion that the WMB Noteholders have not sufficiently plead the existence of false statements (Objection at 58-59) is wrong. To the contrary, were the pleadings standards applicable under the federal securities laws at issue here, sufficient facts exist to permit the WMB Noteholders to state a claim.

### b.      Scienter

60.     Sufficient facts also exist to permit the WMB Noteholders to meet the standards for pleading scienter. "Because a § 10(b) claim alleges fraud, Plaintiffs must plead with particularity 'the circumstances constituting the fraud . . . ' Fed. R. Civ. P. 9(b). Additionally, under the Private Securities Litigation Reform Act ('PSLRA'), a plaintiff alleging securities fraud must 'plead with particularity both falsity and scienter.'" *WaMu II*, at *4 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)). "Scienter" is "defined as 'deliberate[ ] reckless[ness] or conscious misconduct.'" *Id.* (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999)). "The facts alleged

in a complaint will give rise to a strong inference of scienter when the inference is 'more than merely plausible or reasonable - it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id*. at *5 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). "In evaluating scienter, the Court must consider the Complaint's allegations holistically, and take note that '[v]ague or ambiguous allegations are now properly considered as a part of a holistic review . . . '" *Id*. (quoting *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)).

61.     Under these standards, sufficient facts plainly exist to permit the WMB Noteholders to plead that WaMu, acting through the WaMu Officers, was reckless making the false statements at issue. The Securities Complaint sets forth detailed allegations demonstrating that each of the WaMu Officers acted with scienter in making the false statements at issue. *See, e.g.*, ¶¶ 75-94, 162-168, 240-265, 337-355 (allegations demonstrating Killinger's scienter); ¶¶ 366-374, 382-387, 397-400, 418-426 (allegations demonstrating Casey's scienter); ¶¶ 436-443, 448-449, 457-462, 465-470 (allegations demonstrating Rotella's scienter); ¶¶ 476-487, 490-491, 494-499; ¶¶ 505-511, 517-522, 527-532 (allegations demonstrating Schneider's scienter). For example, the following facts demonstrate that the WaMu Officers acted with scienter in making false statements about WaMu's risk management program:

- WaMu's Senior Vice Chairman of Enterprise Risk Management ("ERM") complained to WaMu's Board that the company was taking on too much risk. ¶ 76.

- Monthly risk reports were distributed on a quarterly basis to the Board, "specifically quantif[ying] the fact that WaMu was exceeding risk parameters." ¶ 78.

- A Senior Vice President for Accounting Policy from June 2006 until November 2007 told Casey directly that WaMu's "risk management and accounting standards had dangerously

deteriorated, with material effects on the Company's financial statement." ¶ 368-370.

- Rotella was responsible for halting efforts to tighten lending standards within the credit risk department. ¶ 440.

- Rotella received weekly "Risk Reports" that quantified the ways in which WaMu was exceeding risk parameters that it itself dictated. ¶ 441.

62. Similarly, the following facts demonstrate WaMu's scienter with regard to the false statements concerning its appraisals:

- Senior management was aware of demands from eAppraiseIT, an external appraiser that frequently performed work for WaMu, to stop receiving pressure from WaMu to increase appraisal values. ¶ 164.

- Casey knew of the appraisal inflation given the federal regulations requiring him to ensure a proper appraisal process and access to information to satisfy this duty. ¶ 385.

63. The following are among the facts demonstrating WaMu's scienter with regard to the false statements concerning its underwriting standards:

- Confidential witnesses from nearly every level of WaMu throughout the country verified that the company lowered its underwriting standards and systematically granted exceptions to the guidelines that became virtually nonexistent. ¶¶ 195, 197, 200, 202-06, 210, 213-14, 216, 225-26, 228-29.

- WaMu senior management reviewed and approved all changes to the underwriting guidelines and reviewed reports tracking exceptions to the underwriting guidelines. ¶¶ 244-49.

64. That WaMu acted with scienter with regard to the false statements concerning its financial results and internal controls is established by, among others, the following facts:

- Killinger spoke of the importance of the Allowance to WaMu's earnings and there were ample red flags that the Allowance was under-provisioned. ¶¶ 340-343.

- Killinger received a CRO Report, which gave him actual knowledge of the deficiencies in WaMu's internal controls. ¶ 339.

- Casey was directly informed of problems with risk management and attended monthly Risk Management Committee Meetings where financial forecasts were discussed. ¶¶ 420-421.

65.    The Washington Court has found that these allegations, taken as a whole, are sufficient to plead scienter under the applicable standards.  *See, e.g., WaMu II* at *6, 7, 9, 11 (sufficiency of scienter allegations as to Killinger); *11, *12, *13 (sufficiency of scienter allegations at to Casey); *14, *15 (sufficiency of scienter allegations as to Rotella); *16 (sufficiency of scienter allegations as to Cathcart); *17 (sufficiency of scienter allegations as to Schneider).

66.    The WMB Noteholders' Misrepresentation Claim is based on the same scienter allegations at issue in the WaMu Securities Fraud Class Action; as the Washington Court has found such allegations sufficient to give rise to the requisite strong inference of scienter against the WaMu Officers, such allegations are sufficient to give rise to a strong inference of WaMu's own scienter.  *See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("To survive a Rule 12(b)(6) motion under the PSLRA, a plaintiff must only state facts 'giving rise to a strong inference that the defendant acted with the required state of mind.'  When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.") (citations omitted); *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001) (holding that the scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator of § 10(b) and Rule 10b-5).  The Debtors' claim that the WMB Noteholders  "have not adequate pled

scienter," accordingly, is wrong. Opposition at 64. Plainly, were the federal securities laws pleading standards applicable here, sufficient facts exist to permit the WMB Noteholders to state a claim.

### c. Loss Causation

67. Finally, facts sufficient for the WMB Noteholders to adequately plead loss causation plainly exist. "To establish loss causation, a plaintiff must allege . . . that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (internal quotation omitted). "The classic example of a loss-inducing event is a corrective disclosure by the company itself. A corrective disclosure is traditionally an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful and complete version of those statements." *In re Vivendi Universal S.A. Sec. Litig.*, No. 02 Civ. 5571(RJH)(HBP), 2009 WL 1066254, at *10 (S.D.N.Y. Apr. 21, 2009) (citation omitted). Here, the Securities Complaint upon which the Misrepresentation Claim is based pleads the following facts establishing that WaMu's false and misleading statements caused the WMB Noteholders' losses:

- On November 1, 2007, when Attorney General Cuomo filed the NYAG Complaint, alleging that WaMu had engaged in unlawful appraisal practices (as set forth above), the market price of WaMu's debt securities dropped, on average, 1% on this news. (¶ 622).

- On November 7, 2007, when Attorney General Cuomo announced the expansion of his investigation of WaMu's appraisal practices and WaMu announced that its loan loss provision could exceed $1.8 billion in the first quarter of 2008, WaMu's debt securities also dropped, on average, 2% on this news (¶ 622).

- On March 6, 2008, when numerous rating agencies downgraded WaMu because of credit concerns, WaMu's debt securities dropped, on average, 2.8%. (¶ 622).

- On July 14, 2008, when analysts predicted that WaMu would suffer lifetime real estate mortgage losses between $21 billion and $28 billion and seriously questioned the company's viability as a result of these losses, its debt securities dropped, on average, 8% (¶ 622).

- As the truth about the consequences of WaMu's improper lending and accounting practices and loss exposure was revealed to the market, the market price of WaMu's debt securities declined substantially. (¶ 623).

- Similarly, the market price for WaMu debt securities dropped almost 28% on October 29, 2007 (¶ 623).

- On September 23, 2008 and September 24, 2008, both Moody's and Standard & Poor's cut their ratings for WaMu. Moody's lowered WaMu's rating to "E", the lowest possible rating,[17] and stated that WaMu had insufficient capital to absorb its mortgage losses. Standard & Poor's cut WaMu's rating deep into junk status. Over this two day period, WaMu's bond prices fell substantially. (¶ 625).

68.     In addition to the allegations set forth in the Securities Complaint, Lead Counsel in the WaMu Securities Fraud Class Action submitted to the Washington Court an expert opinion and analysis from an experienced loss causation expert, Chad Coffman, regarding this matter. ¶ 635. Mr. Coffman has conducted loss causation and damages analyses for numerous securities actions arising under Section 10(b) of the Exchange Act and Section 11 of the Securities Act, including for some of the largest securities actions in history, such as the Enron, WorldCom, Parmalat and Tyco securities class actions. ¶ 636.

---

[17] This "E" rating is a financial strength rating, not a long-term obligation rating to which the terms investment/speculative grade apply.

69.     As explained in the Coffman Declaration, based upon his review of publicly available information concerning WaMu and the allegations in the Securities Complaint, it is Mr. Coffman's expert opinion that the Securities Complaint (i) sets forth a coherent economic theory of how and why the alleged misconduct caused the market prices of WaMu securities to be inflated and (ii) provides a specific, logical and economically coherent theory of the causal linkage between the disclosures of the truth about WaMu, the resultant declines in the market prices of WaMu securities, and the losses incurred by Plaintiffs and the Class.   ¶ 637.   A true and correct copy of the Coffman Declaration is attached hereto as Exhibit C, and is incorporated by reference herein.

70.     Accordingly, were the WMB Noteholders required to meet the standards for pleading loss causation under the federal securities laws, sufficient facts exist to permit them to meet this burden.

### 3.     The WMB Noteholders State Misrepresentation Claims On Behalf Of Those Members Who Continued To Hold WaMu Securities In Reliance On WMI's False Statements

71.     In addition to the foregoing claims under the federal securities laws, the WMB Noteholders assert claims on behalf of those of its members who continued to hold, rather than to sell, securities issued by WaMu Bank in reliance on the false statements challenged in the WaMu Securities Class Action.  These false and misleading statements served to deceive holders of WaMu Bank securities concerning WaMu's financial condition, its internal controls, its underwriting standards, and its appraisal process.  Had the WMB Noteholders known the truth about WaMu's weak financial condition and about its dangerous business practices, they would have sold, rather than

continued to hold, their WaMu Bank securities, thereby avoiding a substantial portion of the damages they sustained when the truth was revealed.

72.     Under the Securities Act of Washington, RCW 21.20, a buyer who purchased a security that he still holds based on a false statement is entitled to rescission of the transaction and an award of interest and attorneys' fees, less any income the buyer derived from possession of the securities. RCW 21.20.430(1); *Go2Net, Inc. v. Freeyellow.com, Inc.*, 109 P.3d 875, 877 (Wash. App. Div. 2005) (citing *Kittilson v. Ford*, 595 P.2d 944 (Wash. App. Div. 1979), *aff'd*, 608 P.2d 264 (Wash. 1980)). Critically, the Washington Appellate Division has ruled that equitable defenses are inapplicable to a claim under the Act:

> We are persuaded that the better rule is to bar the defenses of estoppel and waiver in an action alleging violation of a securities regulation. The flexibility of such defenses is inconsistent with our Act's foremost objective of protecting investors. The statute provides the clean and surgical remedy of rescission as the sole recourse for an investor who proves a violation. It would upset the balance struck by the statute to allow fact finders to evaluate the investor's conduct on a case-by-case basis to determine whether it excuses the violation. We hold that equitable defenses are not available in an action under the Securities Act of Washington.

*Go2Net*, 109 P.3d at 881. Having established that false statements induced them to purchase their WaMu Bank securities, those WMB Noteholders who still hold such securities are entitled to rescission under the Securities Act of Washington.

III.     **THE WMB NOTEHOLDERS HAVE STANDING TO ASSERT DIRECT CLAIMS FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

73.     In a last-ditch effort to secure dismissal of the WMB Noteholders' Misrepresentation Claim, the Debtors halfheartedly argue that "[a]ny claim for misrepresentation or omission that *allegedly affected or potentially affected **all** creditors*

belongs to the FDIC." Objection at 20 (emphasis added). First and foremost, the facts giving rise to the Misrepresentation Claim are not alleged to have affected "all" WaMu creditors; this claim may be asserted only by those WaMu creditors who purchased or continued to hold WaMu Bank securities at prices that were artificially inflated due to WaMu's false statements. Plainly, trade creditors, depositors, and others WaMu creditors who are not alleged to have purchased WaMu Bank securities would not have similar misrepresentation claims. For this reason alone, the Debtors' contention that the facts giving rise to the Misrepresentation Claim affected "all" WaMu creditors equally is just wrong.

74. Second, it is well-settled that a claim that an investor purchased a security pursuant to a false statement is direct, rather than derivative, in nature. *Howard v. Haddad*, 916 F.2d 167 (4th Cir. 1990) is instructive. In *Howard*, plaintiff filed a Section 10(b) claim against officers of an insolvent bank, alleging that these defendants "induced him to purchase a large block of shares in the Bank without disclosing the precarious financial condition of the institution." *Id.* at 168. The FDIC, as liquidator of the bank, moved to dismiss on the grounds that Howard's claims were derivative, not direct, in nature "because they involve an injury common to all shareholders arising out of the worthlessness of the stock." *Id.* at 169. The court disagreed, noting:

> A derivative action is one 'in which the right claimed by the shareholder is one the corporation could itself have enforced in court.' . . . *In other words, an action is derivative if it seeks damages arising from an injury to the corporation*. Each shareholder of the Bank may well have a valid cause of action against the directors for the decline in the stock's value, and such action would clearly be derivative. However, the FDIC mistakenly and persistently characterizes Howard's claims as also premised on corporate mismanagement. The reasons for the alleged

worthlessness of the stocks purchased by Howard in September and October 1986 are essentially irrelevant to his claims. What is essential is his allegation that the defendants knew of the lack of value, yet fraudulently represented to Howard that the bank was in fine shape. Generally speaking, *the measure of Howard's damages, should he prevail on his Rule 10b-5 claim, is the difference between what he paid and what the stock was worth on the day he paid it. . . . There is no compensable injury to the corporation in this situation, and Howard's claims cannot be said to derive from any claim also possessed by other shareholders. The mere fact that Howard and the FDIC are pursuing the same source of assets does not transform Howard's action to a derivative one.*

*Id.* at 169-70 (emphasis added) (citations omitted). Like the plaintiff in *Howard*, the members of the WMB Noteholders assert that they personally were induced to pay too much for their WaMu Bank Notes based on the WaMu Officers' false statements, not that WaMu Bank *as an entity* was harmed by these statements. The Misrepresentation Claim is plainly direct, not derivative.

75. Finally, the sole decision the Debtors cite for their assertion that the Misrepresentation Claim is derivative – *Downriver Community Federal Credit Union v. Penn Square Bank Through Federal Deposit Insurance Corporation*, 879 F.2d 754 (10th Cir. 1989) – is wholly inapposite. In *Downriver*, depositors of an insolvent bank sought the imposition of a constructive trust on the bank's assets under an Oklahoma state law that would have allowed each depositor to recover the full amount of his deposits, rather than the pro rata share it would receive under the National Bank Act, 12 U.S.C. § 194. The court refused to grant such preferential treatment to the plaintiffs, finding that the National Bank Act required that all depositors of an insolvent bank be treated equally. *Downriver* did not even involve a federal securities fraud claim, let alone rule that a

misrepresentation claims against a bankrupt entity is, as a matter of law, a derivative claim.  Objection at 20-21.

WHEREFORE, for all the above reasons, the WMB Noteholders requests that the Court enter an order (i) overruling the Objection; and (ii) granting such other and further relief as is just and equitable.

Dated:  March 5, 2010

| | |
|---|---|
| /s/  Andrew C. Kassner<br>Andrew C. Kassner (DE Bar # 4507)<br>David D. Primack (DE Bar # 4449)<br>DRINKER BIDDLE & REATH LLP<br>1100 N. Market Street, Suite 1000<br>Wilmington, DE 19801-1254<br>302.467.4200<br>302.467.4201 (facsimile)<br>andrew.kassner@dbr.com<br>david.primack @dbr.com | Jay W. Eisenhofer (DE Bar # 2864)<br>Geoffrey C. Jarvis (DE Bar # 4064)<br>Christine M. Mackintosh (DE Bar # 5585)<br>GRANT & EISENHOFER P.A.<br>1201 N. Market Street, Suite 2100<br>Wilmington, DE 19801<br>302.622.7000<br>302.622.7100  (facsimile)<br>jeisenhofer@gelaw.com<br>gjarvis@gelaw.com<br>cmackintosh@gelaw.com |