# EXHIBIT A

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

IN RE WASHINGTON MUTUAL, INC.
SECURITIES LITIGATION

This Document Relates to:  ALL ACTIONS

No. 2:08-md-1919 MJP
Lead Case No. C08-387 MJP

CLASS ACTION COMPLAINT

JURY DEMAND

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

TABLE OF CONTENTS

I.    OVERVIEW OF THE ACTION ......................................................................2

II.   THE PARTIES...........................................................................................5

      1.    Plaintiffs .....................................................................................5

            Lead Plaintiff .............................................................................5

            Additional Named Plaintiffs ........................................................6

      2.    The Exchange Act Defendants......................................................7

            Washington Mutual....................................................................7

            The Officer Defendants...............................................................8

            The Controller Defendants.........................................................10

            The Audit Committee and Finance Committee Defendants .....................10

      3.    Relevant Non-Parties .................................................................12

            First American Corporation .........................................................12

            Lenders Services Inc. ..................................................................12

III.  CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ...................13

      FIRST CLAIM FOR RELIEF ..................................................................13

      A.    Defendant Killinger's False And Misleading Statements......................14

            1.    Killinger's Statements Regarding WaMu's Risk Management.................14

                  a.    Killinger's Statements Regarding WaMu's Risk
                        Management Were False and Misleading......................17

                  b.    Killinger Acted With Scienter In Making False And
                        Misleading Statements Regarding WaMu's Risk
                        Management...........................................................22

            2.    Killinger's Statements Regarding The Appraisals For WaMu's
                  Loans................................................................................29

                  a.    Killinger's Statements Regarding The Appraisals For
                        WaMu's Loans Were False and Misleading..................32

b. Killinger Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Appraisals ...............51

3. Killinger's Statements Regarding The Underwriting Of WaMu's Loans.........................................................................53

a. Killinger's Statements Regarding The Underwriting Of WaMu's Loans Were False and Misleading.................................59

b. Killinger Acted With Scienter In Making False and Misleading Statements Regarding The Underwriting Of WaMu's Loans................................................................79

4. Killinger's Statements Regarding WaMu's Financial Results And Internal Controls ...............................................................87

a. Killinger's Statements Regarding WaMu's Financial Results And Internal Controls Were False and Misleading..........95

b. Killinger Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Financial Results And Internal Controls.......................................115

B. Defendant Casey's False And Misleading Statements .......................121

1. Casey's Statements Regarding WaMu's Risk Management ..................121

a. Casey's Statements Regarding WaMu's Risk Management Were False and Misleading.........................................123

b. Casey Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Risk Management...................................................................123

2. Casey's Statements Regarding WaMu's Appraisals...............................125

a. Casey's Statements Regarding WaMu's Appraisals Were False and Misleading .......................................126

b. Casey Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Appraisals .............126

3. Casey's Statements Regarding The Underwriting Of WaMu's Loans.........................................................................128

a. Casey's Statements Regarding The Underwriting Of WaMu's Loans Were False and Misleading................130

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page ii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

          b.    Casey Acted With Scienter In Making False and
Misleading Statements Regarding The Underwriting Of
WaMu's Loans...........................................................................130

    4.    Casey's Statements Regarding WaMu's Financial Results And
Internal Controls ...............................................................................130

          a.    Casey's Statements Regarding WaMu's Financial Results
and Internal Controls Were False and Misleading.....................135

          b.    Casey Acted With Scienter In Making False and
Misleading Statements Regarding WaMu's Financial
Results And Internal Controls....................................................135

C.    Defendant Rotella's False And Misleading Statements........................137

    1.    Rotella's Statements Regarding WaMu's Risk Management.................137

          a.    Rotella's Statements Regarding WaMu's Risk Management
Were False and Misleading.......................................................139

          b.    Rotella Acted With Scienter In Making False and
Misleading Statements Regarding WaMu's Risk
Management...............................................................................139

    2.    Rotella's Statements Regarding WaMu's Appraisals............................141

          a.    Rotella's Statements Regarding WaMu's Appraisals Were
False and Misleading .................................................................142

          b.    Rotella Acted With Scienter In Making False and
Misleading Statements Regarding WaMu's Appraisals .............142

    3.    Rotella's Statements Regarding The Underwriting Of WaMu's
Loans...................................................................................................143

          a.    Rotella's Statements Regarding  The Underwriting Of
WaMu's Loans  Were False and Misleading..............................144

          b.    Rotella Acted With Scienter In Making  False and
Misleading Statements Regarding  The Underwriting Of
WaMu's Loans...........................................................................144

    4.    Rotella's Statements Regarding WaMu's Financial Results .................145

          a.    Rotella's Statements Regarding WaMu's Financial Results
Were False and Misleading........................................................146

Lead Plaintiff's                                     Bernstein Litowitz Berger & Grossmann LLP
Amended Consolidated Securities Complaint          1285 Avenue of the Americas
No. 2:08-MD-1919 MJP                          New York, NY  10019
Page iii                                           (212) 554-1400

b.    Rotella Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Financial Results ....................................................................146

D.    Defendant Cathcart's False And Misleading Statements.....................................147

    1.    Cathcart's Statements Regarding WaMu's Risk Management...............147

        a.    Cathcart's Statements Regarding WaMu's Risk Management Were False and Misleading....................................148

        b.    Cathcart Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Risk Management....................................................................148

    2.    Cathcart's Statement Regarding WaMu's Appraisals .........................151

        a.    Cathcart's Statement Regarding WaMu's Appraisals Was False and Misleading ....................................151

        b.    Cathcart Acted With Scienter In Making A False and Misleading Statement Regarding WaMu's Appraisals..............151

    3.    Cathcart's Statements Regarding The Underwriting Of WaMu's Loans....................................................................152

        a.    Cathcart's Statements Regarding The Underwriting Of WaMu's Loans Were False and Misleading..............................152

        b.    Cathcart Acted With Scienter In Making False and Misleading Statements Regarding The Underwriting Of WaMu's Loans........................................152

E.    Defendant Schneider's False and Misleading Statements ..................................154

    1.    Schneider's Statements Regarding WaMu's Risk Management ...........154

        a.    Schneider's Statements Regarding WaMu's Risk Management Were False and Misleading....................................154

        b.    Schneider Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Risk Management....................................................................154

    2.    Schneider's Statements Regarding The Underwriting Of WaMu's Loans....................................................................156

        a.    Schneider's Statements Regarding The Underwriting Of WaMu's Loans Were False and Misleading..............................157

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page iv

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

|  |  | b. | Schneider Acted With Scienter In Making False and Misleading Statements Regarding The Underwriting Of WaMu's Loans | 157 |

b. Schneider Acted With Scienter In Making False and Misleading Statements Regarding The Underwriting Of WaMu's Loans ...................................................................157

3. Schneider's Statements Regarding WaMu's Financial Results ..............158

a. Schneider's Statements Regarding WaMu's Financial Results Were False and Misleading .............................158

b. Schneider Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Financial Results .................................................................................159

F. Fraud Allegations Pertaining To All Officer Defendants ...................160

G. The Officer Defendants' False And Misleading Statements Were Material To Investors ........................................................................................161

H. The Truth About WaMu's Financial Condition Begins To Emerge...................167

I. Loss Causation .................................................................................193

J. Presumption Of Reliance .................................................................197

K. Inapplicability Of The Statutory Safe Harbor .................................198

SECOND CLAIM FOR RELIEF ...............................................................199

THIRD CLAIM FOR RELIEF ...................................................................203

The Audit Committee .........................................................................204

The Finance Committee ......................................................................205

IV. CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT ..............................208

A. Securities Act Defendants ...............................................................210

1. The Washington Mutual Defendants ........................................211

2. The Auditor Defendant .............................................................215

3. The Underwriter Defendants......................................................215

B. Background ......................................................................................220

1. WaMu Curbed Risk Management Efforts In Furtherance Of Increasing Loan Volume .........................................................221

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page v

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

| | | | |
|---|---|---|---|
| | 2. | The Company Caused Appraisal Values For Its Loans To Be Inflated | 223 |
| | 3. | WaMu Adopted Deficient Underwriting Standards | 227 |
| | 4. | The Company's Financial Results Were Not Stated In Compliance With GAAP | 229 |
| | 5. | Deloitte Failed To Audit WaMu In Accordance With GAAS | 231 |
| C. | | The August 2006 Offering And The September 2006 Offering | 235 |
| | 1. | The August 2006 Offering Documents And September 2006 Offering Documents Misstated The Company's Lending Practices | 237 |
| | 2. | The August 2006 Offering Documents And September 2006 Offering Documents Contained Untrue Financial Results | 238 |
| | 3. | The August 2006 Offering Documents And September 2006 Offering Documents Contained Untrue Statements Regarding The Effectiveness Of WaMu's Internal Controls | 241 |
| D. | | The October 2007 Offering | 243 |
| | 1. | The October 2007 Offering Documents Misstated The Company's Lending Practices | 244 |
| | 2. | The October 2007 Offering Documents Contained Untrue Financial Results | 245 |
| | 3. | The October 2007 Offering Documents Contained Untrue Statements Regarding The Effectiveness Of WaMu's Internal Controls | 248 |
| | 4. | The October 2007 Offering Documents Contained Material Omissions Regarding The NYAG Complaint | 249 |
| E. | | The December 2007 Offering | 250 |
| | 1. | The December 2007 Offering Documents Misstated The Company's Lending Practices | 251 |
| | 2. | The December 2007 Offering Documents Contained Untrue Financial Results | 252 |
| | 3. | The December 2007 Offering Documents Contained Untrue Statements Regarding The Effectiveness Of WaMu's Internal Controls | 254 |

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page vi

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

FOURTH CLAIM FOR RELIEF ........................................................255

FIFTH CLAIM FOR RELIEF ...........................................................259

V.      JURISDICTION AND VENUE ...................................................263

VI.     CLASS ACTION ALLEGATIONS ...............................................264

VII.    PRAYER FOR RELIEF ............................................................266

VIII.   DEMAND FOR JURY TRIAL ....................................................267

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page vii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Lead Plaintiff, Ontario Teachers' Pension Plan Board ("Ontario Teachers"), on behalf of itself and all others similarly situated, by its undersigned attorneys, alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the investigation of counsel.

## I. OVERVIEW OF THE ACTION

1.      Plaintiffs bring this action on behalf of a putative class of persons and/or entities who purchased or otherwise acquired securities issued by Washington Mutual, Inc. ("WaMu" or "the Company") between October 19, 2005 and July 23, 2008 (the "Class Period"). Beginning in 2005, the Officer Defendants (defined in ¶2 below) sought to drive up WaMu's mortgage loan volume to make WaMu a nationwide lender on par with the large Wall Street banks. In furtherance of this goal, WaMu engaged in four related types of improper activity during the Class Period: (1) deliberate and secret efforts to decrease the efficacy of WaMu's risk management policies; (2) corruption of WaMu's appraisal process; (3) abandonment of appropriate underwriting standards for WaMu loans; and (4) misrepresentation of WaMu's financial results.

2.      The Officer Defendants that led WaMu in these improper activities were: Kerry K. Killinger, former Chief Executive Officer ("CEO"); Thomas W. Casey, former Chief Financial Officer ("CFO"); Stephen J. Rotella, former President and Chief Operating Officer; Ronald J. Cathcart, former Executive Vice President and Chief Enterprise Risk Officer; and David C. Schneider, former Executive Vice President and President of WaMu's Home Loans group.

3.      WaMu, led by the Officer Defendants, secretly minimized the effectiveness of WaMu's risk management group during the Class Period by relegating the group to a "customer service" role and adopting policies designed to encourage loan volume over credit risk management. Without effective policies for regulation, WaMu's risk management teams were

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 2

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

unable to prevent the practice of irresponsible, volume-driven home lending and failed to function as an independent check against credit risk, allowing the Company to engage in improper underwriting practices and appraisal corruption. WaMu increasingly engaged in high risk lending, and actively encouraged its loan sales staff to originate greater volumes of risky loans.

4.　　WaMu improperly pressured appraisers and used only hand-picked and pre-approved appraisers to ensure inflated appraisal values for its home loans. Inflated appraisals allowed WaMu to originate loans that had artificially low loan-to-value ("LTV") ratios, creating the illusion of lower credit risk. The Company publicly presented its low LTV ratios as an example of its protection against potential loss.

5.　　WaMu also loosened its underwriting standards in an effort to increase the volume of its lending operations and profit margins. These less-restrictive standards, which resulted in increased credit risk, were applied to WaMu's prime and subprime lending practices. Confidential witnesses from many different positions and numerous locations within the Company corroborate the use of deficient standards and underwriting practices, such as granting loans to borrowers with low Fair Isaac Credit Organization ("FICO") credit scores, failing to request documentation or other verification of a borrower's stated income, and underwriting adjustable rate mortgages ("ARMs") to an introductory "teaser" rate instead of the fully-indexed rate. In particular, WaMu's Option ARM loan, classified by WaMu as a prime loan, has a variable interest rate that is periodically adjusted over the term of the loan; when underwritten improperly, the Option ARM presents a high credit risk because of the potential for negative amortization and default. WaMu's underwriting standards for its subprime lending also became nearly nonexistent as underwriters were encouraged to allow exceptions to increasingly permissive standards.

6.　　WaMu was required to maintain, report, and periodically adjust a reserve amount for probable losses resulting from borrowers defaulting on their obligations to make monthly

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 3

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

mortgage payments or when it was probable that borrowers would do so (the "Allowance for Loan and Lease Losses" or the "Allowance"). Generally accepted accounting principles ("GAAP") and Securities and Exchange Commission ("SEC") regulations required WaMu to increase the Company's provisioning for its Allowance in a manner commensurate with the decreasing quality of its home mortgage products. Instead, WaMu under-reserved for its credit risk, thereby concealing its true financial state in violation of GAAP and SEC regulations. Senior management was informed that the Company's Loan Performance Risk Model ("LPRM"), which was used to determine provisions for the Allowance, failed to take into account important credit risks, such as the potential for negative amortization posed by WaMu's Option ARM loans and the increased credit risk inherent in WaMu's less-restrictive underwriting standards and distorted LTV ratios. Because the Allowance was directly linked to WaMu's net income and earnings per share, among other reasons, WaMu misstated its financial results by under-provisioning the Allowance and reporting artificially inflated net income in each quarter during the Class Period.

7. The improper activities described in detail herein have led to several governmental investigations of WaMu, including an investigation by the New York Attorney General (the "NYAG") of WaMu's appraisal inflation that resulted in the filing of a lawsuit against one of WaMu's third-party appraisal companies (the "NYAG Complaint"); an investigation by the SEC into WaMu's lending and accounting practices; an investigation by the Office of Thrift Supervision (the "OTS"), WaMu's former banking regulator; and a grand jury investigation by the United States Attorney's Office for the Western District of Washington, which has assembled a WaMu-specific task force that includes the Federal Bureau of Investigation ("FBI"), the Federal Deposit Insurance Corp. ("FDIC"), the Office of Inspector General, the SEC, and the Internal Revenue Service Criminal Investigations. That investigation reportedly includes the use of information provided by Plaintiffs and obtained by Lead Counsel in the course of the investigation described herein.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 4

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

8.     This Amended Complaint contains two sets of claims.  The first set of claims arises from allegations of securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against the Officer Defendants, who made materially false and misleading statements that caused the prices of WaMu securities to be artificially inflated over the course of the Class Period.  Lead Plaintiff also asserts control-person claims under Section 20(a) of the Exchange Act.  Although claims against WaMu are stayed by WaMu's bankruptcy, the claims evidence primary violations by WaMu for which the control persons are liable.  A chart identifying the parties named under each Exchange Act claim is attached as Appendix A.

9.     The second set of claims arises under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") against those Defendants who are alleged to be statutorily liable under a theory of strict liability and/or negligence for materially untrue statements and misleading omissions made in connection with the Registration Statement and Offering Documents (defined below at ¶677) for a series of securities offerings WaMu conducted between August 2006 and December 2007 (the "Offerings").  Through those Offerings, WaMu raised a total of $4.8 billion.  Lead Plaintiff also asserts control-person claims under Section 15 of the Securities Act.  The control persons are liable for (without limitation) WaMu's violations of the Securities Act.  Because the claims related to each Offering are based on similar filings, the claims are identical or substantially similar for each Offering. The claims arising under the Securities Act are addressed in Section IV of the Complaint.  A chart identifying the parties named under each Securities Act claim is attached as Appendix B.

## II.     THE PARTIES

### 1.     Plaintiffs

#### Lead Plaintiff

10.     Lead Plaintiff Ontario Teachers is the largest single-profession pension plan in Canada.  Ontario Teachers invests the pension plan's assets and administers the pensions of

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 5

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

approximately 284,000 active and retired teachers in Ontario. As of December 31, 2008, Ontario Teachers held more than C$87 billion (approximately US$71 billion) in net assets. Ontario Teachers purchased 5,484,937 shares of Washington Mutual common stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered damages as the result of the violations of the federal securities laws alleged herein.

## Additional Named Plaintiffs

11. Plaintiff Pompano Beach Police and Firefighters' Retirement System ("Pompano Beach") has been in existence since 1972, managing the pension funds for its members pursuant to the City of Pompano Beach, Florida Charter. As of September 30, 2008, Pompano Beach held total plan assets of over $165 million. Pompano Beach purchased WaMu's Floating Rate Notes (defined below at ¶677) on and/or traceable to the Offering that was announced on August 21, 2006 and conducted on behalf of WaMu on or about August 24, 2006. Pompano Beach suffered damages as a result of the federal securities law violations alleged herein.

12. Plaintiff Harlan Seymour ("Seymour") is an individual investor in WaMu securities. Seymour purchased WaMu's Series K Stock (defined below at ¶677) traceable to the Offering that was announced on September 11, 2006 and conducted on behalf of WaMu on or about September 18, 2006. Seymour suffered damages as a result of the federal securities law violations alleged herein.

13. Plaintiff Brockton Contributory Retirement System ("Brockton") is one of 106 contributory retirement systems for public employees within the Commonwealth of Massachusetts. Brockton purchased WaMu's 7.250% Notes (defined below at ¶677) on the Offering that was announced on October 25, 2007 and conducted on behalf of WaMu on or about October 29, 2007. Brockton suffered damages as a result of the federal securities law violations alleged herein.

14. Plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit P&F") is a public pension fund for the benefit of the active and retired police officers and firefighters of

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 6

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

the City of Detroit, Michigan.  Detroit P&F purchased WaMu's 7.75% Series R Stock (defined below at ¶677) on the Offering that was announced on December 10, 2007 and conducted on behalf of WaMu on or about December 17, 2007.  Detroit P&F suffered damages as a result of the federal securities law violations alleged herein.

15.    Lead Plaintiff, Plaintiff Pompano Beach, Plaintiff Seymour, Plaintiff Brockton, and Plaintiff Detroit P&F are collectively referred to as "Plaintiffs."

## 2.    The Exchange Act Defendants[1]

### Washington Mutual

16.    WaMu was a Washington corporation, with its executive and business segment headquarters located at 1301 Second Avenue, Seattle, Washington 98101.  At all relevant times, WaMu was a savings and loan holding company with two banking subsidiaries and numerous nonbank subsidiaries.  As a savings and loan holding company, WaMu (including its banking subsidiaries) was subject to regulation by the OTS.  WaMu was founded in 1889 and, before its bankruptcy, was the largest savings and loan association in the country.

17.    WaMu's Home Loans Group, a highly-relevant division to this Action, performed four primary activities: (1) the origination and servicing of home loans; (2) the fulfillment and servicing of home equity loans and lines of credit; (3) managing the Company's capital market operations, which included the buying and selling of all types of real estate secured loans in the secondary market; and (4) holding the Company's held-for-investment portfolio of home loans, home equity loans and home equity lines of credit made through the Company's subprime mortgage channel.

18.    In addition to originating prime loans, WaMu originated, purchased, and held for investment home loans and home equity loans issued to subprime borrowers.  WaMu originated subprime loans through its subprime division, known as "Long Beach Mortgage" ("LBM") until

---

[1]  Defendants named in the Securities Act claims are set forth in Section IV below.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 7

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

January 1, 2006 and known thereafter as the Company's "specialty mortgage lending" channel, or purchased such loans from lenders who were generally recognized as subprime lenders. As of December 31, 2007, WaMu's subprime mortgage channel loans held for investment totaled $18.62 billion, including $2.53 billion of home equity loans.

19. During the Class Period, residential mortgage lending was WaMu's primary business driver and the source of 70% of WaMu's net interest income. In 2005, WaMu publicly announced an ambitious five-year plan for the Company. According to a February 28, 2005 press release, WaMu's plan called for "[t]ransforming the company's mortgage business and maintaining a leading national position in mortgage lending."

20. On September 25, 2008, Washington Mutual's bank subsidiary, Washington Mutual Bank, was seized by the OTS, placed into receivership by the FDIC, and its assets were sold to JPMorgan Chase Bank. On September 26, 2008, Washington Mutual filed for Chapter 11 bankruptcy. As a result of its bankruptcy, this action is stayed as against WaMu.

### The Officer Defendants

21. Defendant Kerry K. Killinger ("Killinger") served as the Company's CEO from 1990 to September 2008, and as a member of the Company's Board of Directors (the "Board") beginning in 1988. Killinger also served as the Company's President from 1988 through 2004, and as Chairman of the Board from 1991 until June 30, 2008, when the Board removed him from that position. In addition, Killinger served as a member of the Company's Executive Committee since its creation in 1990, and as Chair of the Corporate Development Committee since its creation in 1997. Killinger joined the Company in 1982. From 2005 through 2007, Killinger received over $33 million in total compensation, including at least $7 million in bonus compensation. ***In 2005, Killinger hired and promoted Defendants Rotella, Cathcart, and Schneider to assist Killinger in the effort to move WaMu into a "leading national position."*** On September 8, 2008, WaMu fired Killinger.

22. Defendant Thomas W. Casey ("Casey") served as Executive Vice President and

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 8

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

CFO of WaMu from October 2002 through October 11, 2008. Casey also served as a member of the Executive Committee since 2002, overseeing the Company's corporate finance, strategic planning and investor relations functions. From 2005 through 2007, Casey received over $11 million in total compensation, including at least $3 million in bonus compensation.

23. Defendant Stephen J. Rotella ("Rotella") served as WaMu's President and Chief Operating Officer from January of 2005 until his resignation on October 3, 2008. In this position, Rotella was responsible for overseeing the Company's retail banking, home loans, credit card, and commercial lines of business, as well as the Company's technology group and day-to-day administration. Rotella also served on the Executive Committee since joining the Company in 2005 and, from March 2005 to August 2005, he served as the Acting Head of the Home Loans Group. From 2005 through 2007, Rotella received over $29.7 million in total compensation, including at least $6.9 million in bonus compensation.

24. Defendant Ronald J. Cathcart ("Cathcart") served as Executive Vice President and Chief Enterprise Risk Officer of WaMu from December 2005 until April 2008. In this position, Cathcart was responsible for overseeing the credit, market, operational, and compliance risk functions for the Company. Cathcart also served as a member of the Executive Committee from December 2005 to April 2008. During 2007, Cathcart received at least $1.9 million in compensation.

25. Defendant David C. Schneider ("Schneider") served as Executive Vice President and President of Home Loans from August 2005 until late 2008, when he was hired by J.P. Morgan as head of the retail banking WaMu segment. Schneider was responsible for overseeing all aspects of the Company's home lending operations, with responsibility for the group's overall business strategy and its production and servicing channels. Schneider also served as a member of the Executive Committee from August 2005 until WaMu's bankruptcy. During 2005, Schneider received $2.3 million in total compensation, including at least $492,000 in bonus compensation.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 9

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

## The Controller Defendants

26.     Defendant John F. Woods ("Woods") served as Senior Vice President and Controller for WaMu from December 2005 until March 2007.  In this position, Woods managed WaMu's Corporate Accounting and Financial Reporting divisions and served as the Company's principal accounting officer.  In March 2007, Woods became the Chief Financial Officer of WaMu's Home Loans Group.

27.     Defendant Melissa J. Ballenger ("Ballenger") joined WaMu in August 2006 as Senior Vice President and Assistant Controller.  Ballenger became Controller in March 2007, serving as the Company's principal accounting officer until October 11, 2008.

28.     Defendants Woods and Ballenger are referred to herein collectively as the "Controller Defendants."

## The Audit Committee and Finance Committee Defendants

29.     Defendant Anne V. Farrell ("Farrell") served as a director of the Company from 1994 through April 2008.  During her tenure as a director, Farrell served on several committees, including the Finance Committee (2004-2008); the Governance Committee (1997-2004 and 2006-2008); and the Corporate Relations Committee (1997-2008, Chair 1997-2006).

30.     Defendant Stephen E. Frank ("Frank") has served as a director of the Company since 1997, and since July 1, 2008, as Chairman of the Board.  During his tenure as a director, Frank has served on several committees, including the Audit Committee (1997-present, Vice Chair 2001-2004, and Chair 2004-present); the Finance Committee (2001-present); the Human Resources Committee (2002-present); and the Corporate Development Committee (2002-present).

31.     Defendant Thomas C. Leppert ("Leppert") has served as a director of the Company since September 2005.  During his tenure as a director, Leppert has served on several committees, including the Audit Committee (2005-present); the Governance Committee (2005-

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 10

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

present, Chair 2008-present); and the Corporate Relations Committee (2005-present, Chair 2007-2008).

32.      Defendant Charles M. Lillis ("Lillis") served as a director of the Company from June 2005 until May 19, 2009. During his tenure as a director, Lillis served on several committees, including the Finance Committee (2005-2009); the Human Resources Committee (2005-2009); and the Corporate Development Committee (2005-2009).

33.      Defendant Phillip D. Matthews ("Matthews") has served as a director of the Company since 1998. During his tenure as a director, Matthews has served on several committees, including the Audit Committee (2001-2007); the Finance Committee (2001-2004); the Governance Committee (1998-present); the Human Resources Committee (2004-present); and the Corporate Development Committee (2006-present).

34.      Defendant Regina Montoya ("Montoya") has served as a director of the Company since April 2006. During her tenure as a director, Montoya has served on the Finance Committee (2006-present) and the Corporate Relations Committee (2006-present, Chair 2008-present).

35.      Defendant Michael K. Murphy ("Murphy") has served as a director of the Company since 1985. During his tenure as a director, Murphy has served on several committees, including, among others, the Audit Committee (2004-present); the Finance Committee (2001-present, Chair 2001-2004); and the Corporate Relations Committee (2000-present).

36.      Defendant Margaret Osmer-McQuade ("Osmer-McQuade") has served as a director of the Company since 2002. During her tenure as a director, Osmer-McQuade has served on several committees, including, among others, the Finance Committee (2002-present); the Governance Committee (2002-present); and the Human Resources Committee (2005-present).

37.      Defendant Mary E. Pugh ("Pugh") served as a director of WaMu from 1999 until April 2008. During her tenure as a director, Pugh served on several committees, including the Finance Committee (2001-2008, Chair 2004-2008) and the Corporate Relations Committee

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 11

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

(2000-2008).

38.     Defendant William G. Reed, Jr. ("Reed") has served as a director of the Company since 1970.  During his tenure as a director, Reed has served on several committees, including the Audit Committee (from at least 1996-present); the Finance Committee (2004-present); and the Governance Committee (from at least 1996-present, Chair from at least 1996-2008).  Reed has also served as a director for WaMu subsidiary, Washington Mutual Bank.

39.     Defendant Orin C. Smith ("Smith") has served as a director of the Company since July 2005.  During his tenure as a director, Smith has served on the Audit Committee (2005-present); the Governance Committee (2005-present); and the Finance Committee (Chair 2008-present).

### 3.     Relevant Non-Parties

### First American Corporation

40.     At all times relevant to this Complaint, First American eAppraiseIT ("eAppraiseIT"), a Delaware corporation, was a wholly-owned subsidiary of First American Corporation ("First American").  eAppraiseIT is a provider of real estate valuation products and services.

41.     On November 1, 2007, the State of New York filed the NYAG Complaint against First American and eAppraiseIT, alleging that WaMu had handpicked appraisers and otherwise manipulated the appraisal process through eAppraiseIT to increase values in appraisal reports related to WaMu loans.  According to the NYAG Complaint, eAppraiseIT conducted more than 260,000 appraisals for WaMu, receiving over $50 million from WaMu.

### Lenders Services Inc.

42.     Lenders Services Inc. ("LSI") provides appraisal, title, and closing services to residential mortgage originators and is a competitor of eAppraiseIT.  As explained in detail herein, starting in mid-2006, like eAppraiseIT, LSI provided significant appraisal services to WaMu.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 12

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

## III. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Defendants Killinger, Casey, Rotella, Cathcart, Schneider, and WaMu)**

43.     The Officer Defendants and WaMu[2] violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of WaMu securities during the Class Period.

44.     Throughout the Class Period, these Defendants made numerous false and misleading statements regarding the nature of WaMu's practices and its performance.   The Officer Defendants' numerous materially false and misleading statements and omissions are set forth below, first grouped by Defendant, then by subject matter and finally, within each subject matter, in chronological order.  As set forth after each section of false and misleading statements and omissions, these statements were made with knowledge and/or reckless disregard for the false and misleading nature of those statements.  As senior officers of WaMu who worked closely together, the Officer Defendants undoubtedly met and discussed the information available to each individual Officer Defendant; for example, as discussed below at ¶¶82-83, the Officer Defendants all met at monthly Enterprise Risk Meetings to discuss WaMu's risk exposure.

45.     There is substantial overlap in the subject matter of these false statements, such that the facts supporting the falsity of one type of statement may also appropriately support the falsity of statements listed elsewhere.  Such statements will appear again in each section or be

---

[2] Although stayed by WaMu's bankruptcy, primary violations by WaMu are included in connection with the control persons' liability for such claims.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 13

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

cross-referenced by paragraph number, as appropriate, in order to make clear the allegations supporting the statement's falsity and the Defendant's scienter for each statement.

### A. Defendant Killinger's False And Misleading Statements

#### 1. Killinger's Statements Regarding WaMu's Risk Management

46. During the Class Period, Killinger publicly made numerous false and misleading statements regarding WaMu's risk management and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so. These statements were false and misleading because, as discussed in detail below at ¶¶62-74, during the Class Period WaMu had undermined its risk management efforts in order to increase loan volume.

47. On or about November 7, 2005, the Company filed with the SEC a Form 10-Q for the period ended September 30, 2005 (the "Third Quarter 2005 Form 10-Q"). Killinger certified the accuracy of the information in the Third Quarter 2005 Form 10-Q. The Third Quarter 2005 Form 10-Q contained a description of the Company's risk management efforts as follows:

> Enterprise Risk Management works with the lines of business to establish **appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance**. Significant risk management policies approved by the relevant management committees are also reviewed and approved by the Board, Audit, and Finance Committees. Enterprise Risk Management also provides **objective oversight of risk elements inherent in the Company's business activities and practices** and oversees compliance with laws and regulations, and reports periodically to the Board of Directors.[3]

48. On November 15, 2005, WaMu hosted an Investor Day Conference in New York. At the conference, Killinger stated:

> **On credit risk. We have excellent processes, policies, underwritings, standards and reserving methodologies in place and they have served us very well for quite some time**. . . . Now you have heard my conservative voice on the housing market for several quarters now. We were concerned that housing prices appeared over extended in many markets around the country and we felt that the housing

---

[3] Throughout this Complaint, emphasis is added unless otherwise noted.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 14

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

market was likely to cool. ***To prepare for this possibility we elected to selectively reduce credit risk this year***. . . .

Now these actions may have limited near term profitability but they help protect us from a softer housing market if that were to occur.

49. At the same conference, Killinger emphasized the Company's ongoing risk management efforts, stating "I think proper credit management does not wait until there is a major problem and then say what do I do, running around with my – like my head's cut off. . . . And so I think good credit management is all about what do you before the problem is there[.]"

50. On January 18, 2006, WaMu issued a press release announcing its financial results for the quarter and year ended December 31, 2005. In the press release, Killinger commented on the Company's favorable financial results, stating: "Despite the challenging environment, especially in the home loans business, we delivered solid performance . . . . ***our risk management efforts are on track***[.]"

51. On May 18, 2006, Killinger attended the Lehman Brothers Ninth Annual Financial Services Conference. At the conference, Killinger addressed credit management, stating "The next target is on the credit front. . . . Certainly we can come back in the Q&A if you want to talk more about credit; but credit for us is [in] excellent shape, and ***I feel very comfortable with where we are from management of that credit as well as the reserving***." Killinger further stated, "So I would say this is a point in the [housing] cycle in which you control what you can; you get the ship in good shape[.]"

52. On June 1, 2006, Killinger attended the Sanford C. Bernstein & Co. Strategic Decisions Conference. In response to a question regarding negative amortization and credit quality, Killinger declared that he had been "a resident bear" on housing from "over a year" before, stating that the Company began to take "more conservative actions at that time" and touting the Company's "defensive actions" taken in response to Killinger's concerns about "speculative activity" in the market.

53. The Company held its annual Investor Day conference on September 6 and 7,

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 15

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

2006. At the conference, Killinger stated, "For WaMu, a slowdown in housing will no doubt lead to higher delinquencies and credit cost, and again, we factor that into our planning. However, as I alluded to earlier, we began planning for this quite some time ago, took a number of defensive actions. And so, I believe that we are very well positioned, regardless of what happens in the housing market."

54. On October 18, 2006, during the Company's earnings call with investors to discuss the third quarter of 2006 results, Killinger emphasized that WaMu was prepared for a slowing housing market: "The housing market is clearly weakening with the pace of housing price appreciation slowing in most regions of the country. . . . [H]owever, we began preparing for this possibility quite *some time ago and took defensive actions to strengthen our portfolio*. So we believe we are well prepared to weather the more difficult credit environment."

55. On December 13, 2006, Killinger attended a Goldman Sachs Financial Services CEO Conference, where he once again stressed the Company's preparation for changes in the housing environment, stating that, "On the credit front, we're in very good shape[.]" Killinger continued:

> Clearly our credit performance has been outstanding over the last several years. This is in part because *we started preparing some time ago for a more difficult credit environment. If anything, I can be accused of being too conservative.* And perhaps we could have maximized our profitability even more by taking on more credit risk through this period of very benign credit. But we want to stay ahead of the curve, be a little more conservative.

56. On January 17, 2007, WaMu issued a press release announcing its financial results for the quarter and year ended December 31, 2006. In the press release, Killinger stated that the Company's "outlook for 2007 reflects the strategic actions we took in 2006 to prepare the company for the future. Those *decisive actions have positioned us well to deliver stronger operating performance in 2007*."

57. On or about March 1, 2007, WaMu filed with the SEC a Form 10-K for the fourth quarter and fiscal year ended December 31, 2006 (the "2006 Form 10-K"). Killinger signed the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 16

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

2006 Form 10-K. In the 2006 Form 10-K, WaMu touted the Company's underwriting standards for its Option ARM portfolio, claiming that "[t]he Company actively manages the credit risk inherent in its Option ARM portfolio primarily by **ensuring compliance** with its underwriting standards, monitoring loan performance **and conducting risk modeling procedures**."

58.     In its 2006 Form 10-K, the Company announced improved credit risk management practices, stating: "In 2006, the Finance Committee of the Board of Directors approved a **set of credit risk concentration limits**. These limits facilitate **a more rigorous and quantitative framework** that better enables the credit risk management function to proactively manage credit risk."

59.     The 2006 Form 10-K also emphasized the Company's underwriting practices for its subprime mortgages, stating: "As part of Long Beach Mortgage's underwriting process, loan application and appraisal packages are reviewed to **ensure conformity** with the Company's stated credit guidelines. . . . Similarly, all purchases from Subprime Lenders must satisfy the Company's stated credit guidelines."

60.     On September 10, 2007, Defendants Killinger and Casey attended the Lehman Brothers 5th Annual Financial Services Conference, where Killinger continued to falsely assure investors that beginning "over two years" earlier, the Company had begun taking "proactive steps" to prepare for a decline in housing prices.

61.     In addition, Killinger also participated in numerous earnings calls and conferences where materially false and misleading statements were made to the investing public by the other Officer Defendants, noted below at ¶¶358, 360, 361, 363, 431, 432, 433, 473, 502. Killinger failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶75-94) of the false nature of such statements.

> **a.     Killinger's Statements Regarding WaMu's Risk Management Were False and Misleading**

62.     Killinger's statements at ¶¶47-61 regarding WaMu's risk management efforts

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 17

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

were false and misleading because, rather than maintaining strong risk management and preparing for a housing slowdown as Killinger claimed, beginning before Killinger's first statement on November 7, 2005, WaMu had in fact weakened its risk management practices in order to increase loan volume. In addition to the facts discussed below, these efforts aimed at increasing WaMu's loan volume also included the inflation of appraisal values (¶¶105-161), deliberate lowering of underwriting standards (discussed below at ¶¶191-239), and the abandonment of appropriate accounting and reserving for the credit losses inherent in WaMu's risky loans (¶¶292-336).

63.    Contrary to Killinger's statements above, in the fall of 2005 and earlier, WaMu and the Officer Defendants, including Killinger, made a deliberate and concerted effort to shift the Company's risk management focus from being a "regulatory burden" to a sales-supporting, "customer service" role. This effort continued throughout the Class Period.

64.    Starting in late 2005, WaMu's risk management operations were purposefully rolled back to such a degree that WaMu's risk management systems and personnel could no longer effectively protect the Company's investors from the increased risks that WaMu and the Officer Defendants began to take on no later than the start of the Class Period. Confidential Witness 1,[4] Due Diligence Director in the Transaction Management Group in Anaheim and Fullerton, California, reported that senior management in Seattle abandoned "the basic tenets of underwriting and risk." Several other former WaMu employees reported a Company-wide shift in focus from strong credit management to a more "aggressive" posture toward taking on additional risk.

65.    CW 17 served as a Senior Vice President of WaMu's Enterprise Risk Management group from August 2001 until he resigned in September 2006. CW 17 managed a team at WaMu of approximately 35 quantitative analysts involved in various risk management functions,

---

[4] Additional relevant details regarding Confidential Witnesses, or "CWs," are identified in Appendix C.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 18

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

including compliance, performance measurement, quantitative analysis and risk reporting, and model validation. CW 17's group had overall responsibility for establishing risk management policies, corporate governance and reporting frameworks. CW 17 explained that until WaMu began to cause its risk management policies and practices to deteriorate in late 2005, he was responsible for "enhancing the Company's quantitative modeling capabilities." *CW 17 explained that his group's original purpose was to establish and maintain "a high-level of quantitative analysis through the institution" but those efforts were "undermined when [one of Killinger's cohorts, Defendant] Cathcart took over the group."* CW 17 stated that as the Company took on higher risk activities, the risk guidelines established by his group "specifically quantified the increased level of risk that the Company was undertaking." However, according to CW 17, *under the new structure implemented by Defendant Cathcart, the role of WaMu's risk management segment was supposed to be "advisory" only, meaning that warnings from Risk Management were "very much ignored" under Cathcart's leadership.*

66.     Similarly, CW 18, a Vice President in WaMu's Commercial Risk Department from April 2003 until June 2006, witnessed WaMu's systematic marginalization of the role and authority of WaMu's Risk Management. CW 18 reported that in the fourth quarter of 2005, several of WaMu's credit risk managers from around the country were flown into Seattle to attend a special meeting of WaMu's credit risk management. This meeting, which was held at the Washington Mutual Leadership Center, was headed by then-Chief Enterprise Risk Officer James A. Vanasek. *Vanasek informed the Company's credit risk managers that WaMu's senior management (which CW 18 understood to include the Officer Defendants) had concluded that the Company planned to be more "aggressive" in its lending and provisioning practices.* According to CW 18, WaMu's risk managers were told that they were expected to cooperate with the Company's efforts to "push the envelope." Shortly after delivering news of WaMu's new policy to WaMu's senior risk managers, Vanasek – who CW 18 described as WaMu's "incarnate risk management policy" while he was at WaMu – left the Company, and Defendant Cathcart

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 19

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

assumed his role.

67. The Officer Defendants' decision to marginalize WaMu's risk management function is also documented in an internal, non-public WaMu memorandum, obtained through Lead Plaintiff's investigation, dated October 31, 2005 (the "October 31, 2005 Memo"). The October 31, 2005 Memo was authored by Melissa Martinez, WaMu's Chief Compliance and Risk Oversight Officer at the time, and apparently was circulated to all of WaMu's risk management personnel (including members of senior management). CW 18 recalled receiving this memo and confirmed that the October 31, 2005 Memo was circulated to other risk managers at WaMu, who understood the memo to reflect Company policy that WaMu employees were required to follow.

68. The October 31, 2005 Memo explicitly states that WaMu's risk management functions were being guided through a "cultural change" and a "behavioral change internally." ***Significantly, the October 31, 2005 Memo announced that, moving forward, risk management at WaMu must occupy a "customer service"-type function, rather than impose a "regulatory burden" on other Company segments.*** According to CW 18, the October 31, 2005 Memo was intended to signal to WaMu's risk managers that they should "lay off" of those at WaMu who brought in revenue. Moreover, CW 18 stated that the message was heard clearly by WaMu's risk managers, who felt compelled by WaMu to become less vigilant about acting to identify and control risk at the Company.

69. CW 17 confirmed that, with efforts that began in late 2005 and that were largely spearheaded by Cathcart, WaMu "diverted from its original mandate" to guard against risk. For example, CW 17 explained that ***Cathcart managed "a specific initiative to move the risk management functions down into [WaMu's] business units,"*** which, for example, led to the establishment of a risk management group within WaMu's Home Loans Group. CW 17 explained that this development led to unqualified individuals heading various risk management functions at WaMu, and that this practice "undermined the entire purpose of the Enterprise Risk

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 20

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Management initiated [prior to late 2005] by William Longbrake and Jim Vanasek to adequately manage risk within the organization."

70. The reporting structure put in place by the Officer Defendants further undermined risk management within the Company. CW 20, who was a Division Finance Officer and Senior Manager of Internal Controls with WaMu from 2002 until December 2007, confirmed that at WaMu, in each division, the credit risk officers reported to the President of that group. In WaMu's Home Loans segment, Credit Risk Officer Cheryl Feltgen reported directly to Defendant Schneider, President of the Home Loans Group. Thus, according to CW 20, *Schneider had extensive control over risk management within the Home Loans Group. CW 20 attributed this structure to Defendant Rotella's efforts to restructure credit risk reporting. CW 18 similarly lamented that Rotella was charged with managing both loan production and risk management in his role as WaMu's President and COO.* CW 18 explained that at most banks, credit risk officers report directly to the board of directors, rather than giving control over the Company's profits and for the Company's risk management to the same person, which presented a clear and irreconcilable conflict in CW 18's view.

71. CW 19, former Senior Vice President, Compliance Manager, from 1997 through 2007, attributed the decline in credit risk management to Defendant Cathcart's assumption of the role of Chief Risk Officer. CW 19 explained that while Cathcart had previous professional experience in interest-rate risk management, he had little or no experience in overall compliance risk. According to CW 19, Cathcart had no understanding of overall compliance risk, "did not want to learn it, and generally did not care for it." CW 19 recalled that Cathcart was very focused on analytics and essentially unwound any progress that Vanasek had made by, among other things, cutting staff that managed compliance issues.

72. CW 21, a Vice President and Senior Market Risk Manager from 2005 through 2006, reported that although WaMu was attempting in 2005 to establish a presence in mortgage securitizations among the larger Wall Street banks, WaMu did not yet possess the necessary

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 21

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

sophisticated risk management systems. CW 21 reported that, unlike more standard risk management systems maintained by other large institutions that are deliberately independent, at WaMu the overall risk management model was deliberately set up to be a more "cooperative" model between those who managed risk and the business units themselves whose primary concern was to generate business. According to CW 21, under the "more cooperative model" established by WaMu, risk management served a more informative, less regulatory function, such that the underlying goal was simply to "find a way to get things done." The trade-off at WaMu was clearly in favor of generating business.

73. Hidden, risk-inducing changes took place throughout the Company's risk management structure. CW 5 was a Vice President and Senior Credit Quality Manager from 2005 until February 2008 and a Senior Credit Risk Manager from April 2004 through March 2005. The Credit Risk program existed at WaMu from the spring of 2004 through the spring of 2005 during which time, CW 5's group of Credit Risk Analysts analyzed proposed exceptions to the underwriting guidelines for WaMu's more complex and high-risk loans.

74. The Credit Risk program reported to Mark Hillis, at the time WaMu's Retail and Home Loans Chief Credit Officer, while underwriters reported to Mark Brown, National Underwriting Manager. According to CW 5, the Credit Risk program was beneficial because it helped to separate the exception process on high-risk loans from the constant pressure on underwriters to close loans by whatever means. Thus, members of the Credit Risk team had the time to focus on answering why an exception could or could not be made, as opposed to being overwhelmed by the customer service mandate under which WaMu's underwriters were forced to operate. This program was abandoned in the spring of 2005.

**b. Killinger Acted With Scienter In Making False And Misleading Statements Regarding WaMu's Risk Management**

75. At the time of making his statements regarding WaMu's risk management (and standing by while others made misstatements in his presence), Killinger was aware of facts, or

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 22

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

was deliberately reckless in disregarding facts, that belied these statements and the omission of which facts made those statements misleading. In addition to the facts set forth above which show the falsity of Killinger's statements (and thus also show his scienter in making those statements), the facts below support a strong inference of Killinger's scienter. As CEO of WaMu, which derived the majority of its income from residential lending, Killinger had the authority and responsibility to set Company policies, received and had access to numerous reports describing WaMu's risk exposure (including from its underwriting, appraisal, and accounting practices, as described below at, *e.g.*, ¶¶164, 247-264) and frequently met with other senior executives to discuss those reports (*e.g.*, ¶¶80-87, 246).

76. Killinger was on notice from a senior and credible source of the deficiencies in WaMu's risk management. For example, in a National Public Radio interview taped after the Class Period and after WaMu declared bankruptcy, William Longbrake, a former senior WaMu executive, stated that he informed WaMu management repeatedly, starting well before the Class Period, that the Bank was taking on too much risk.[5] Until shortly before WaMu's bankruptcy in 2008, Longbrake was Vice Chairman of Enterprise Risk Management. He also served as WaMu's CFO until 2002. Longbrake joined WaMu in 1982 as Executive Vice President and CFO on the same day that Killinger joined WaMu. According to this interview, former WaMu Board members confirmed that Longbrake repeatedly warned the Board (including Board Chairman Killinger) that the housing market was becoming too risky and WaMu should limit its exposure. But neither the Board nor senior management heeded Longbrake's warnings.

77. Similarly, in a March 27, 2008 letter to shareholders, large WaMu investor CtW Investment Group reported on a meeting it had held with WaMu's Board and WaMu senior management, where Board members admitted that Longbrake had warned of a severe housing downturn and against WaMu's overexposure.

---

[5] The interview can be found at www.npr.org/templates/story/story.php?storyID=95357008.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 23

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

78. CW 17 (described at ¶65) explained that WaMu regularly compiled "Risk Reports" that "could be generated on a daily basis," and that the purpose of WaMu's Risk Reports was to verify that the Company as a whole was within guidelines ultimately established by WaMu's Board of Directors. According to CW 17, *WaMu's Risk Reports* were distributed "probably on a weekly basis" to all of WaMu's "C-level executives, including WaMu's President [Rotella], WaMu's Chief Risk Officer [Cathcart] and WaMu's CFO [Casey]," and were similarly *provided to WaMu's Board of Directors on a quarterly basis*. These *Risk Reports "specifically quantified the fact that the Company was exceeding certain risk parameters as dictated by [WaMu's] risk guidelines*." Indeed, CW 17 stated that "the quantitative risk metrics pertaining to the loan portfolios fell out of the designated ranges on various occasions," but WaMu's senior management and the Board – including Killinger, Casey, Rotella, and Cathcart – chose to "simply ignore" those clear and direct warnings.

79. In addition to the Risk Reports, CW 17 stated that in 2006, he specifically raised with Casey and Cathcart that the way in which WaMu's Home Loans Group was analyzing its subprime portfolio for risk was "just stupid," as such analyses "violated the specific policies outlined by [WaMu's Risk Management] group." However, when CW 17 raised these issues directly with WaMu's senior management, his pleas for corrective action were "simply overruled" by Casey and Cathcart. Because his efforts to implement adequate risk controls were rebuffed by the highest level executives at WaMu, CW 17 explained that "there was nothing that he could do about it."

80. As reported by CW 79, Killinger was intimately involved in analyzing WaMu's loan performance and was well-informed about numerous other facts concerning WaMu's business risks and risk management. CW 79 was employed at WaMu as a Senior Operations Excellence professional from October 2002 until December 2007. From July 2006 through December 2006, CW 79 reported directly to Defendant Cathcart in WaMu's Enterprise Risk Management Group.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 24

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

81.     From July until early September 2006, CW 79 was "100% devoted" to assisting Killinger, Cathcart, and the other Officer Defendants in preparing for WaMu's 2006 Investor Day.   During this period, CW 79 regularly attended meetings among Defendants Killinger, Casey, Rotella, Cathcart, and Schneider, all discussing information that they knew about the Company's financial health, risk exposure, and to what degree to present information about those topics to investors.   One of CW 79's most important responsibilities was to ensure that all relevant information was available to Killinger and the other Officer Defendants.

82.     According to CW 79, **Killinger attended a monthly Enterprise Risk (or "Executive Risk") Committee meeting,** which was chaired by Cathcart and for which CW 79 served as the secretary during the time CW 79 worked for Cathcart.   The attendees of this meeting also included Defendants Casey, Rotella, and Schneider, as well as each business unit's President, Chief Financial Officer, and Chief Risk Officer.   CW 79 described these meetings as **"a forum where all aspects of risk across the bank were discussed, including credit, market and operational risk."**   Because the Enterprise Risk Committee was "formally sanctioned" by WaMu's Board of Directors, CW 79 recalled that its meetings were typically held in WaMu's main boardroom.

83.     At these monthly meetings, **CW 79 explained that Killinger and the other Officer Defendants engaged in detailed discussions regarding the Company' risk exposure**, specifically focused on the allocation of risk to each WaMu business unit's product lines.   CW 79 further explained that, in preparation for such meetings, the business units would have previously provided to other executive committees of the Board their financial forecasts or projections, and that during the meetings of the Executive Risk Committee these financial forecasts were reviewed in detail for the purpose of allocating risk across the Company.   CW 79 cited as examples of this intensive review the Executive Risk Committee's acknowledgement of particularly high risk in its loan portfolio relating to specific geographic regions, such as California, and the Executive Risk Committee's discussion of minimum FICO scores for

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 25

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

WaMu's particular loan products.

84.    Further, more informal meetings among Killinger and the other Officer Defendants – convened specifically to prepare for the 2006 Investor Day – occurred regularly from July to September 2006.  CW 79 recalled that the focus for the 2006 Investor Day presentation was on the Company's risk profile because of heightened media scrutiny on a possible increase in WaMu loan defaults.  CW 79 stated that in preparing for that presentation, Killinger, Cathcart, Rotella, and Casey discussed on numerous occasions the default rates within the Company's loan portfolios, and in particular WaMu's Option ARM and subprime loans, in the meetings that CW 79 attended.  According to CW 79, at these meetings, Killinger and the other Officer Defendants discussed detailed information regarding levels of delinquencies concerning WaMu's specific loan product types.  CW 79 stated that Killinger, Cathcart, Rotella, and Casey discussed deterioration in the mortgage industry in general and the problems with WaMu's own portfolios in particular, adding that the Officer Defendants' objective for their public statements was to mitigate perceived problems with the Company's loans by highlighting the fact that subprime lending represented a relatively small percentage of WaMu's overall loan portfolio and overall bank assets.

85.    As a result of these discussions, according to CW 79, Killinger and the other Officer Defendants decided to focus their discussion on "the weakening state of the housing market because 'they saw what was coming.'"  In addition, according to CW 79, the Officer Defendants discussed the need to avoid making any statements that might give rise to liability under the federal securities laws.  After responses to anticipated questions were agreed upon by the Officer Defendants, the final meetings held in Cathcart's office, involving Killinger, Cathcart, Rotella, and Casey, were all primarily focused on addressing who of the four would answer different types of questions that might arise from Cathcart's presentation.

86.    CW 79 stated that as a result of the analysis conducted in preparation for Investor Day 2006, Killinger reached the conclusion that he wanted to deemphasize the importance of

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 26

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

subprime to WaMu going forward, which he discussed during the Executive Risk Committee meetings attended by CW 79.

87. ***CW 79 specifically noted that Defendant Schneider would not have been able to adjust the Company's lending practices as they related to risk without the knowledge and consent of Killinger, Cathcart, Casey, and Rotella.*** In other words, Killinger, Cathcart, Casey and Rotella as well as Schneider were knowledgeable about and involved in establishing and approving the Company's lending policies and guidelines.

88. ***Killinger also received written reports summarizing WaMu's actual risk exposure***. CW 78 served as an Assistant Vice President in the Risk Analytics Group at WaMu from January 2006 until January 2008. The Risk Analytics group conducted credit risk analyses on the various portfolios managed by the separate business units at WaMu, including home loans, commercial loans and credit card portfolios, including financial results, delinquency and loss trends, performance drivers and correlation analysis pertaining to economic trends. The Risk Analytics Group consisted of approximately twenty-five professionals and was headed by Tim Bates, Vice President and the head of Credit Information Strategy and Systems, who reported directly to Hugh Boyle, Chief Risk Officer, who, in turn, reported to Defendant Cathcart. The Risk Analytics Group gathered data from the Company's Fidelity MSP system, the primary information system concerning WaMu's portfolio of home loans, and compiled such information into WaMu's Enterprise Data warehouse, a database maintained by the Enterprise Risk group. The Risk Analytics Group was then responsible for analysis of the data to identify relevant trends affecting the Company as a whole.

89. The Risk Analytics Group focused mostly on WaMu's "held for investment" portfolio, although CW 78 recalled that the Risk Analytics Group did conduct a significant amount of analysis on Option ARM loans overall, including securitizations "when it started to become a big deal." One of the most important issues during CW 78's tenure concerned the issue of negative amortization in WaMu's Option ARM loans. In addition, CW 78 reported that

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 27

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

the Risk Analytics Group identified noticeable trends in defaults, in particular with Option ARM products and with Alt-A "no doc" loans in general. "Once real estate valuations started to turn in 2006," there was a "significant focus on defaults as they pertained to specific geographic areas."

90.     *CW 78 stated that her group compiled a monthly written report called the "Credit Risk Review" that was distributed to all of the business groups, including Defendants Schneider and Cathcart.* CW 78 stated that the Credit Risk Review Reports produced by her team focused on, among other things, WaMu's "riskier products," including Option ARM loans. These reports occasionally focused on WaMu's loan portfolio at the loan level, examining issues like LTV, FICO scores, "no-doc" versus full loan documentation, and other loan characteristics, adding that such analysis frequently was performed concerning WaMu's negative amortization (including Option ARM) loans.

91.     *According to CW 78, the Risk Analytics Group also compiled a "Credit Highlights Report," an abridged version of the more detailed Credit Risk Review report, which was compiled specifically for WaMu's Board of Directors, including Killinger as Board Chairman.*

92.     CW 59 served at WaMu beginning in 2001 and acted as a Senior Risk Analyst in the Risk Analytics Group at WaMu from April 2007 until June 2008. CW 59 corroborated CW 78's observations regarding the Risk Analytics Group at WaMu, reporting that, in general, the Risk Analytics Group conducted credit risk analyses on the various portfolios managed by the separate business units at WaMu, including home loans, commercial loans and credit card portfolios, including analyses of financial results, delinquency and loss trends, performance drivers and correlation analysis pertaining to economic trends. CW 59 explained that the status of WaMu's Option ARM loans was the most notable issue that was consistently discussed in WaMu internal management meetings, including the fact that there were trends being observed by WaMu insiders of increasing default rates of Option ARM loans originated in 2006.

93.     In addition to these reports, according to CW 18, Vice President, Commercial

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 28

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Risk from 2003 until 2006, **_WaMu's risk management group would regularly audit the company's underwriting guidelines and those audit reports would be submitted to the Company's Chief Enterprise Risk Officer, Cathcart._** Those audit reports would review all aspects of WaMu's underwriting guidelines for risk. It was CW 18's understanding that **_Cathcart was then responsible for reporting the results of those internal audits concerning WaMu's underwriting guidelines to the other Officer Defendants and to WaMu's Board._**

94. Furthermore, as reported in the _Seattle Times_ article discussing Defendant Rotella's role in undermining risk management at WaMu (discussed below in detail at ¶¶439-440), "Several former executives say they told Killinger about their issues with Rotella, but that the CEO's instinct to avoid conflict kept him from doing anything. When Killinger heard criticism about his No. 2, 'it was always, "Steve's a good guy."'" said one former executive."

## 2. Killinger's Statements Regarding The Appraisals For WaMu's Loans

95. During the Class Period, Killinger publicly made numerous false and misleading statements regarding WaMu's appraisals and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so. These statements were false and misleading because, as discussed in detail below at ¶¶105-161, during the Class Period WaMu pressured its appraisers to inflate appraisal values, rendering misleadingly low LTV ratios and false impressions of the credit quality of WaMu's loans.

96. On or about March 15, 2006, WaMu filed with the SEC a Form 10-K for the fourth quarter and fiscal year ended December 31, 2005. On August 9, 2006, the Company filed a Form 10-K/A with the SEC for the fourth quarter and fiscal year ended December 31, 2005 (together, the "2005 Form 10-K"). Killinger signed both filings of the 2005 Form 10-K. Throughout the 2005 Form 10-K, WaMu repeatedly underscored that loan-to-value ratios were a "**_key determinant of future performance_**," stating:

> Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 29

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

mortgage insurance or government guarantees ***expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination*** . . . . ***This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure***.

As of December 31, 2005, WaMu claimed that home loans with this increased credit risk profile amounted to $9.01 billion, and home equity loans with this increased credit risk profile amounted to $12.3 billion of the Company's $229.6 billion of loans held in portfolio. According to the Company's 2005 Form 10-K, "Substantially all of these loans were made to subprime borrowers, including $6.91 billion of purchased subprime loans. Total home loans with these features accounted for 10% of the Company's home loan volume in 2005." Further, the 2005 Form 10-K stated that regarding the Company's Option ARM loans, "***current loan-to-value ratios have generally improved – in many cases offsetting the credit risk associated with negative amortization that may have resulted from the borrower's use of the minimum payment option***."

97.     On June 1, 2006, Killinger attended the Sanford C. Bernstein & Co. Strategic Decisions Conference. There Killinger downplayed concerns about negative amortization, stating, "in our existing portfolio of option ARMs, our average FICO score is about a 710 and our loan to value at originations was 71%. And based on today's market price we estimate that the loan to value of the portfolio is about 57%."

98.     Killinger attended the Company's annual Investor Day conference, held on September 6 and 7, 2006. At the Investor Day, analysts questioned the Officer Defendants regarding the Company's decision to use third-party appraisers. An unnamed WaMu representative claimed that the decision would give WaMu "better quality" in its appraisals, and Killinger stated, "***there's a very strong governance process over those external appraisers***."

99.     On November 16, 2006, Killinger attended a Merrill Lynch Banking & Financial Services Conference. At that conference, Killinger emphasized, "I'm telling you from our 20 – over 20 years' experience in the option ARM product that [negative amortization] is – has not

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 30

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

historically been a significant factor for us and we're very comfortable, again, where we are with our loan-to-value."

100. On January 30, 2007, Killinger attended the Citigroup 2007 Financial Services Conference. At the conference, Killinger explicitly attributed the purportedly high credit quality of WaMu's Option ARM loans to the low LTV ratios associated with those loan portfolios:

> [O]ur option arm portfolio, that quality is very good as characterized by the . . . loan-to-value at origination of 71%. . . . [W]e continue to be comfortable with the overall risk profile of the balance sheet subprime portfolio, which has…a 78% loan-to-value at origination and estimated current loan-to-value of only 66%. . . . [O]ur home equity portfolio . . . [has] a combined loan-to-value of only 70%.

101. On or about March 1, 2007, WaMu filed with the SEC its 2006 Form 10-K, which Killinger signed. The 2006 Form 10-K repeatedly emphasized that loan-to-value ratios were a "***key determinant of future performance***," repeating the statements made in the 2005 Form 10-K related above in ¶96 above. The Company again assured investors that because credit risk was reduced when home loans had loan-to-value ratios of less than eighty percent, the Company closely monitored its home loans with loan-to-value ratios of greater than eighty percent.

102. On or about May 10, 2007, the Company filed with the SEC a Form 10-Q for the quarter ended March 31, 2007 (the "First Quarter 2007 Form 10-Q"). The First Quarter 2007 Form 10-Q again reiterated WaMu's stated belief that "loan-to-value ratios are one of the two key determinants in determining future loan performance."

103. On September 10, 2007, Killinger and Casey attended the Lehman Brothers 5th Annual Financial Services Conference. At this conference, Killinger touted, among other things, the Company's purportedly low LTV ratios in its home loan portfolio noting that, in the Company's Jumbo Option ARM loans and 5/1 Jumbo Hybrid loans, "***the credit quality in these loans is good. . . . Loan originations . . . had a loan-to-value rate of only 70%***."

104. In addition, Killinger also participated in a number of earnings calls and conferences where materially false and misleading statements relating to WaMu's appraisals were made to the investing public by the other Officer Defendants, noted below at ¶¶376, 379.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 31

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Killinger failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below) of the false nature of such statements.

**a.**      **Killinger's Statements Regarding The Appraisals For WaMu's Loans Were False And Misleading**

105.      Killinger's statements regarding the appraisals for WaMu's loans, including those statements regarding the importance of LTV ratios to credit quality, were materially false and misleading. While Killinger acknowledged the critical importance of LTV ratios to assessing WaMu's credit quality, ***Killinger failed to disclose that these reported LTV ratios were the product of a corrupt appraisal process***. In fact, during the Class Period, WaMu inappropriately, secretly, and broadly manipulated real estate appraisals. WaMu's undisclosed appraisal inflation practices involved, among other things: (1) exertion of intense pressure by WaMu personnel – including loan production (*i.e.*, sales) personnel – on appraisers to "hit" higher appraisal values; (2) WaMu's refusal to use appraisers other than those whom WaMu sales personnel hand-picked for so-called "preferred" appraiser lists; (3) WaMu policies designed to force appraisers to capitulate to WaMu's requests to raise appraisal values; and (4) WaMu's systematic misuse of requests for reconsideration of value (so-called "ROVs") when independent appraisals did not "hit" values desired by WaMu. These improper practices were pervasive during the Class Period and were undisclosed to investors.

106.      Defendants' hidden appraisal practices caused WaMu to originate loans that had artificially low (*i.e.*, favorable) LTV ratios and loans that otherwise never would have been approved at all.

107.      Certain of the conduct alleged below gave rise to the complaint filed by the New York Attorney General on November 1, 2007 (defined above as the "NYAG Complaint").[6] Although the NYAG Complaint named only First American and eAppraiseIT as defendants, the

---

[6] The NYAG Complaint is available at:
  http://www.oag.state.ny.us/media_center/2007/nov/EA%20Complaint.pdf.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 32

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

New York Attorney General's office made clear that: "Washington Mutual has not yet been sued [by the New York Attorney General's office] because of questions over federal jurisdiction." *See* "New York Widens Inquiry on Mortgages," *New York Times*, Nov. 8, 2007. On November 7, 2007, New York Attorney General Cuomo broadened his attack on the Company by announcing the expansion of his investigation into WaMu's fraudulent appraisal practices to include an examination of the loans that WaMu sold to Fannie Mae and Freddie Mac, the nation's two biggest providers of mortgage financing. Specifically, Attorney General Cuomo stated:

> The integrity of our mortgage system depends on independent appraisers. ***Washington Mutual compromised the fairness of this system by illegally pressuring appraisers to provide inflated values.*** Every company that buys loans from Washington Mutual must be sure that the loans they purchased are not corrupted by ***this systemic fraud***.

108. WaMu's secret policies and practices of inappropriate appraisal manipulation were deliberate, institutionalized, and widespread, rendering Killinger's statements regarding appraisals and LTV values materially false and misleading.

      **(1)**      Even Before Completely Outsourcing the Appraisals Of WaMu Loans, Defendants Secretly Caused Appraisals Relating to WaMu Loans to be Improperly Inflated

109. Killinger's statements at ¶¶96-104 above, from the beginning of the Class Period through July 2006, were false and misleading. During this time, WaMu's appraisers, including its in-house appraisers and independent contractors, regularly inflated the values of WaMu's appraisals. WaMu's in-house appraisal functions raised concerns among federal regulators because banks and other lending institutions that both originated loans and issued appraisals for the same loans suffered from conflicts of interest concerning appraisal values. Indeed, the evidence below confirms that WaMu systematically manipulated the appraisal process to increase appraisal values from at least the start of the Class Period.

110. WaMu secretly and systematically exerted pressure on appraisers to increase appraisal values for the purpose of "hitting" values unsupported by the true market value of the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 33

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

real estate in question. CW 24 was a Senior Appraisal Coordinator with WaMu from 2002 until October 2006. As a Senior Appraisal Coordinator, CW 24 served as a liaison between WaMu loan officer/brokers (*i.e.*, loan production personnel) and WaMu appraisers. CW 24 explained that, from 2005 through October 2006, WaMu significantly increased pressure on its appraisers to exaggerate appraisal values. During this time, CW 24 stated that when she called appraisers in the normal course of business, the appraisers frequently complained about being pressured by WaMu loan production personnel to use additional comparable property values (or "comps") or find other ways to increase appraisal values. This happened despite the fact that it was unlawful for loan production staff to contact appraisers directly. CW 24 stated that the push by WaMu to inflate appraisals was a constant problem from 2005 through October 2006 when she left. Both in-house and outside appraisers working for WaMu regularly complained to CW 24 about WaMu requiring "a certain value" to make loans "work."

111. Other employees agreed that, from at least the beginning of the Class Period, WaMu pressured loan origination staff and appraisers to boost appraisal values. For example, CW 25, a loan consultant at WaMu Home Loans in Maryland from September 2003 until November 2005, described the appraisal process at WaMu as "corrupt" and "dysfunctional." CW 25 stated that WaMu loan officers could request specific appraisers – in fact, CW 25 reported that appraisers received kickbacks from loan consultants to "hit" appraisal values. Similarly, CW 26, a Loan Coordinator with the Jacksonville, Florida WaMu offices from July 2005 through September 2007, stated that management was always "on top of" loan coordinators such as herself to "make loans go through," and specifically that the pressure from management caused WaMu loan consultants to "work with appraisers to try to make loans go through." For example, if a first appraisal resulted in an LTV ratio above 80%, WaMu loan consultants would try to get an appraiser to increase the appraisal value to reduce the LTV ratio below 80%.

112. As explained by CW 24, appraisal inflation occurred through the widespread use of requests for "reconsideration of value" ("ROVs") on appraisals that had been completed and

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 34

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

by loan production staff directly contacting appraisers to pressure them to increase appraisal values. According to CW 24, and corroborated by other WaMu employees including CW 25, "ROVs were done constantly" by WaMu to try to increase appraisal values during the Class Period. In fact, when comparing an equal number of loans that were processed in CW 24's WaMu offices, the number of ROVs for WaMu in-house appraisals doubled or tripled starting in 2005 compared with ROVs requested from 2002 through 2004. As a result, CW 24 explained that WaMu assigned additional staff to deal with increasing ROVs. CW 24 stated that, around 80% of the time when an ROV was requested by WaMu, the appraisal value was increased.

113. CW 29 worked as an underwriter with WaMu from 2002 through 2006 in Portland, Oregon. As an underwriter, CW 29 recalled "seeing numerous questionable appraisals for WaMu's loans." However, CW 29 stated that WaMu supervisors would "get upset with underwriters for looking at the appraisals" and "independently raising any issues with the appraisal values." As a result, CW 29 explained, "if a loan application did not already note that there was a problem with the appraisal value, then underwriters were not supposed to acknowledge it." Rather, underwriters were told "do not look at that – the appraiser said it was okay." As a result, CW 29 reported that, "across the board," appraisal values were high at WaMu. CW 29 stated that, "We were amazed as underwriters."

114. In fact, according to CW 23, a Regional Manager in WaMu's Appraisal Department from 1999 until September 2006 before leaving for eAppraiseIT, WaMu had a long-standing policy that appraisal managers could review appraisals and increase the value if they disagreed with values reflected in initial appraisals. CW 28, an Appraisal Field Manager from November 2003 until September 2006, confirmed that this was the case.

115. CW 23 believes "that the [New York Attorney General's] suit is backwards" because WaMu's appraisal practices were improper and largely responsible for the misconduct alleged in the NYAG Complaint. CW 23 indicated that WaMu's senior management was aware of WaMu's dubious practices, and in many cases directed them. As CW 23 put it, ***"The Sales***

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 35

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*Department has a voice in Washington Mutual because they generate the income – the Sales Department drove Washington Mutual."* CW 23 maintained that many of the same undisclosed problems escalated in degree, if not kind, once WaMu outsourced its appraisals.

**(2)** Appraisal Inflation Escalated After
WaMu Outsourced Its Appraisals

116. Killinger's statements in ¶¶98-104 were also false and misleading because, after WaMu outsourced the vast majority of its appraisal work in July 2006 to eAppraiseIT and LSI, the practices of inflating appraisal values continued unabated. As described below, along with continuing the practices designed to increase appraisal values before the outsourcing, WaMu required eAppraiseIT and LSI to use a pre-selected list of appraisers that was created and continually vetted by WaMu sales personnel.

117. The appraisal process at WaMu that began in July 2006 appeared to function as follows. Either eAppraiseIT or LSI would receive an appraisal order from WaMu. eAppraiseIT or LSI would then independently select an independent appraiser, provide the necessary information to the appraiser, and then, once the appraisal was complete, report the impartial results to WaMu. However, from the very initiation of outsourcing its appraisal work, WaMu corrupted the appraisal process by persisting in practices designed to increase appraisal values whenever necessary to produce more WaMu loans.

118. The pressure on WaMu's appraisers continued and even increased after WaMu outsourced its appraisals. CW 10, a Loan Coordinator/Mortgage Processor for WaMu in Jacksonville, Florida from March 2007 until December 2007, reported on the influence WaMu exerted over its outside appraisers, stating that everyone at WaMu was under constant pressure from upper management to "hit numbers." That pressure to "push, push, push" was widely understood to mean that WaMu employees needed to do "whatever it took to get loans closed," according to CW 10.

119. Senior managers in CW 10's WaMu branch had meetings with eAppraiseIT and

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 36

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

LSI two or three times during CW 10's tenure with the Company. These managers wanted to meet with the outside appraisers because, according to CW 10, the outside "appraisals were coming out too low." CW 10 believes that there were meetings of this sort at least in June or July of 2007, and again in October 2007. One of CW 10's managers reported on these meetings during morning or afternoon "huddles." This manager told CW 10 and other WaMu employees that ***WaMu management had met with eAppraiseIT and LSI to demand less resistance against WaMu's efforts to obtain higher appraisal values and that eAppraiseIT and LSI were going to "do everything possible within reason to accommodate [WaMu's] needs in terms of the appraised values."***

120. CW 36 worked in eAppraiseIT's Appraisal Management Department from October 2006 to August 2007. CW 36 explained that "WaMu was eAppraiseIT's biggest client, and the appraisers on WaMu's preferred list got all of its work." Indeed, eAppraiseIT alone performed at least 260,000 appraisals for WaMu at a cost of $50 million during the Class Period. Similarly, according to CW 39, a member of LSI's appraisal management team for WaMu from August 2006 through February 2007, WaMu was LSI's largest client.

121. According to CW 36, eAppraiseIT management discussed how some of WaMu's demands on eAppraiseIT were unethical. CW 36 reported to Sue Ramey, eAppraiseIT's appraisal management supervisor. CW 36 stated that Ramey and her boss said that they did not approve of WaMu's appraisal demands and that eAppraiseIT needed to "push back" on WaMu. However, according to CW 36, Ramey was not in a position to do so. CW 36 and other eAppraiseIT employees believe that eAppraiseIT was willing to acquiesce to WaMu's demands because WaMu was eAppraiseIT's biggest client.

122. Further corroborating evidence of high-level communications between WaMu management and eAppraiseIT management, in which WaMu used its position as eAppraiseIT's largest client to obtain higher appraisal values, was revealed in the NYAG Complaint. This evidence is discussed below at ¶¶150-160.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 37

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

123. WaMu placed inappropriate pressure directly on the third-party appraisers by, among other things, improperly indicating the value WaMu desired in the initial appraisal order, by contacting the appraisers directly in order to pressure them to increase values, and threatening the appraisers' jobs if they did not render requested values.

124. CW 27, who worked as a staff and production appraiser for WaMu from 1997 to 1999 and an independent contractor when WaMu outsourced its appraisals, reported that while conducting appraisals on behalf of WaMu through eAppraiseIT, he was often contacted directly by WaMu loan production staff. Similarly, WaMu loan production employees often inappropriately contacted CW 23 (the former Regional Manager in WaMu's Appraisal Department) directly, because, according to CW 23, "everyone at WaMu knew [him]." CW 23 stated that it was improper to handle things in this manner, but that "it was just how things worked." CW 42, who worked in Customer Relations at LSI during 2007, confirmed that LSI had repeated problems with WaMu sales personnel's direct contact with appraisers. CW 39 (described at ¶120) agreed that WaMu frequently attempted to steer appraisal values upward through WaMu loan officers contacting LSI appraisers directly. CW 39 remarked that although WaMu loan officers contacting LSI was "illegal," it happened frequently.

125. Although CW 23 (described at ¶114) was supposed to be the "gatekeeper to the appraisers," appraisers still received calls directly from WaMu loan officers. CW 23 explained that while he tried to discourage this contact, the appraisers were so worried about their jobs that they generally did not refuse to talk to loan officers. Similarly, according to CW 31, who was recruited by WaMu as a staff appraiser in June 2003 and then worked through eAppraiseIT as a WaMu preferred appraiser from February 2004 until November 2007, although WaMu loan officers were not supposed to contact appraisers directly, they nonetheless would frequently call or email eAppraiseIT appraisers, including CW 31, after receiving a copy of an appraisal. CW 31 explained that if WaMu did not believe that an appraised value was high enough for a loan to go through, CW 31 would get a call from either an employee at eAppraiseIT or sometimes the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 38

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

WaMu loan officer, asking if CW 31 "could help them out with value."

126. CW 31 reported that WaMu had a practice of noting the value it wanted for a home on its initial appraisal request. CW 31 stated that for WaMu, "it was all about LTV," and therefore *WaMu dictated appraisal values that it needed to satisfy the LTV ratios it desired* – typically, LTV values below 80%. CW 31 explained that if WaMu needed an 80% LTV, and the borrower needed a $364,000 loan, then WaMu required an appraisal reflecting a value of at least $455,000, irrespective of the market value of the real estate in question. CW 10 (described at ¶118) agreed that the usual practice at WaMu was to indicate the estimated value of how much the home in question was "worth." In fact, CW 10's managers, who knew the appraisal values that would be needed to close particular loans, would often direct CW 10 to include proposed appraisal values sufficient to close the loan.

127. In addition to these pressure tactics, WaMu improperly and secretly utilized a "preferred appraisers" list to cherry-pick the appraisers who were most likely to render inflated home values for WaMu's loans.

128. Once he joined eAppraiseIT, CW 23 was the Area Manager for Southern California and reported to Peter Gailitis, eAppraiseIT's nationwide Chief Appraiser. According to CW 23, during the initiation of WaMu's outsourcing, WaMu informed eAppraiseIT that eAppraiseIT had to use WaMu's panel of appraisers. The appraiser panel became a source of contention between the two companies. CW 23 recounted that eAppraiseIT initially opposed WaMu dictating which appraisers eAppraiseIT could assign, but WaMu insisted that eAppraiseIT use WaMu's selected appraisers. According to CW 23, eAppraiseIT and LSI received the same preferred appraiser lists from WaMu.

129. CW 23 recalled that the list of appraisers who could handle WaMu appraisals was ultimately called the "preferred list," but the name changed several times. eAppraiseIT was concerned about many aspects of WaMu's "preferred" list of appraisers, including the list's very name. CW 23 stated that eAppraiseIT worried about the perceptions of "preferred" over regular

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 39

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

appraisers and the resulting possibility of litigation. For this reason, CW 23 stated that, at various times, WaMu's list was referred to as "preferred," "proven," and "approved." CW 23 recalled that as time went on, WaMu and eAppraiseIT worked together "to make the list sound more and more generic." CW 23's recollection regarding the controversy over the name of the preferred appraisers list is corroborated by documents obtained by the NYAG and discussed below at ¶160.

130. CW 23 revealed that the original list of appraisers that WaMu provided to eAppraiseIT was created with the WaMu Sales Department's input and approval, freely adding appraisers known to "hit value, do favors, etc." In addition, WaMu instructed eAppraiseIT that eAppraiseIT could not use its own staff appraisers for WaMu appraisals. To address this, eAppraiseIT hired numerous former WaMu in-house staff appraisers. WaMu and eAppraiseIT disagreed regarding the makeup of the list, and eAppraiseIT eventually informed WaMu that WaMu's list was flawed and that many of the listed appraisers needed to be removed. Nevertheless, the first list "had remained in effect for about six months."

131. During the first six months that WaMu and eAppraiseIT worked together, according to CW 23, the Appraisal Management Department at eAppraiseIT would regularly receive phone calls from WaMu instructing eAppraiseIT to add or remove appraisers from WaMu's list. According to CW 23, anyone at WaMu who had eAppraiseIT's phone number could call and order a change to the list – it was "wide open." Particularly during the first six months when WaMu's list of appraisers was "wide open" to its loan production personnel, **"*appraisers were being removed for not hitting value*."** CW 36 agreed that WaMu could remove appraisers from any of its preferred lists at its whim, and that ***every week WaMu would send eAppraiseIT a list of appraisers to add and appraisers to remove.*** According to CW 36, "WaMu did not provide reasons for the changes; the Company merely stated who it was willing to work with." CW 23 said that there was definitely an implication that if appraisers did not meet "WaMu's standard," they would be removed from WaMu's list and would not receive work.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 40

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

According to CW 23, it was common knowledge among appraisers who performed work for WaMu that if they were on WaMu's preferred list, they were "still in business." However, if they were cut, they would need to find work elsewhere.

132. According to CW 23, after the first six months of WaMu outsourcing appraisals to eAppraiseIT (or approximately January 2007), WaMu created a second list with rules about how appraisers could be added and removed from WaMu's list. However, WaMu's second list was still improper as it *again* received input and approval from WaMu's Sales Department, although this time only by WaMu regional managers and above. WaMu loan officers only had to pass their requests on to their regional managers to add or remove appraisers on WaMu's "preferred" appraiser list. WaMu regional managers had the authority to add or remove an appraiser from the list by phone, which they could do at least once a month.

133. Other employees agreed that the "preferred appraiser" lists were inappropriately used to pressure appraisers into inflating home values. CW 40, who worked at LSI as a Customer Service Representative and reviewer during 2007 through 2008, confirmed that LSI appraisals for WaMu were accomplished by using appraisers from a "preferred list" dictated by WaMu, and that only certain appraisers were to be used in specific areas. In fact, CW 40 stated that LSI was occasionally forced by WaMu to pay an appraiser more because WaMu did not want LSI to use the appraiser that was in the area. For example, CW 40 stated that WaMu would insist on using a "preferred" appraiser twenty miles from a property, as opposed to a licensed appraiser who was not on WaMu's list but who was located "right down the street" from the property to be appraised. Similarly, CW 42, who worked at LSI during 2007 in Customer Relations, confirmed that WaMu required LSI to use only "preferred appraisers," the list of which was dictated by and amended upon specific requests (sometimes one name at a time) by WaMu.

134. According to CW 23, many of WaMu's loan officers were very unhappy when WaMu decided to outsource its appraisal function because they were unsure whether they could

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 41

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

continue to drive through loans as they had with WaMu's in-house appraisers. Some WaMu loan officers threatened to quit unless they were offered "sweetheart deals" or WaMu assured them that they could continue with business as usual. In response, CW 23 stated that WaMu's high-producing loan consultants were placed on a favored list and received preferential treatment with respect to appraisals.

135. According to CW 39 (described at ¶120), WaMu loan officers requested to work with specific appraisers because "they knew each other." *CW 39 characterized WaMu's efforts to dictate the specific appraisers to be used as "illegal," and as a practice that LSI would acknowledge* but re-construe as a "recommendation" from WaMu. CW 39 stated that when WaMu made such a demand, he typically would use the appraiser "recommended" by WaMu.

136. WaMu continued to utilize ROVs as one of its primary tools to improperly increase appraisal values. In fact, CW 24 (described at ¶110) stated that when WaMu began to outsource its appraisals to eAppraiseIT and LSI, the amount of ROVs requested by WaMu loan production increased by at least three or four times the levels experienced before the start of the Class Period. CW 24 attributed this sharp increase to the fact that WaMu was not initially able to "wheel and deal" quite as easily with outside appraisals staff as it had with its in-house appraisers, and therefore sometimes had to use the appearance of more formal channels to influence appraisers to inflate value.

137. CW 9, a Senior Loan Coordinator for WaMu's Home Loan Center in Bethel Park, Pennsylvania from February 1998 until September 2007, concurred that beginning around September 2006, "loan officers were submitting more ROVs" and that loan and appraisal values were higher than they had been. CW 9 stated that during this time, "the loans and the values were all high – I just thought that 'maybe this is the way things are done now.'"

138. CW 10 (described at ¶118) remarked that sometimes the value needed for WaMu loans to close "would be there and sometimes it wasn't." CW 10 estimated that 90% of the time, CW 10 would need to submit an ROV along with some additional information – like added

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 42

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

comps or "anything to try to help to get the value you needed it to be." According to CW 10, the appraisal value would be increased after an ROV request. CW 31 explained that a significant number of eAppraiseIT appraisers "were simply coming in at the estimated value to avoid getting an ROV."

139.    CW 23 agreed that WaMu's ROV process was problematic. According to CW 23, in theory, WaMu was only supposed to have one opportunity for an ROV: if WaMu disagreed with an appraisal value, it was supposed to explain to eAppraiseIT why and provide necessary additional data for eAppraiseIT to research. CW 23 stated that 60% to 70% of the ROVs that he received from WaMu were frivolous, such as that the property "is better than you said it was." Nevertheless, CW 23 explained that additional ROVs – even ROVs that had no new information – would be requested until WaMu was satisfied. Similarly, CW 27 (described at ¶124) reported that when CW 27 refused to increase an appraisal value in response to an ROV, WaMu would sometimes send another ROV with more comps. On several occasions, WaMu sent multiple ROVs on the same appraisal. CW 27 said that most of the time the ROVs WaMu submitted were a waste of time and "a bunch of baloney."

140.    Initially, when WaMu's appraisal outsourcing started, CW 23 stated that he was receiving quite a few ROVs from WaMu – over 100 a day just for Southern California – which he described as "chaotic." Every ROV from CW 23's area had to go through him, and CW 23 explained that at one point he was therefore focused only on ROVs. CW 35, who served as an eAppraiseIT Customer Service Representative and an eAppraiseIT Account Manager for WaMu, reported that eAppraiseIT received 100-200 ROVs a day, if not more, from WaMu. CW 35 personally handled 15-20 ROVs each day for WaMu. Typically, CW 35 recalled, if an ROV on an appraisal that had been done by a non-preferred appraiser was then sent to a WaMu preferred appraiser, the value increased.

141.    CW 36 (described at ¶120), who was reassigned to handle WaMu ROVs in his last month with eAppraiseIT, recalled that appraisers often complained to CW 36 about ROVs they

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 43

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

received. In some instances, CW 36 stated, the appraisers had already received multiple ROVs because they were not "coming in at the right value," and the appraisers felt that WaMu would continue to rebut them until they agreed to increase the value.

142. CW 34, who was a real estate appraiser for eAppraiseIT from June 2006 to December 2007, reported that ultimately WaMu cut her off from doing appraisals because she refused to increase appraisal values in response to WaMu ROVs. Specifically, on several occasions, WaMu demanded to know why CW 34 did not use certain comps and supplied different comps for CW 34 to use. CW 34 refused to use those comps either because they were outside of the relevant geographic area or because they were too old to be relevant. For example, some of the comps provided to CW 34 by WaMu were over a year old, dating back to when home values were higher, or were within a wealthier neighborhood. According to CW 34, concerning ROVs, WaMu typically urged an increase in value of at least $20,000-$25,000 for homes that CW 34 appraised in the $500,000 range.

143. CW 40 (described at ¶133) explained that WaMu representatives were often unhappy when appraisers used comps at values lower than WaMu desired. Under such circumstances, CW 40 was instructed by LSI Client Services to call the appraiser and instruct him to look for "better" comps. According to CW 40, sometimes the appraisers refused, stating that they had "already used the best comps and that there were no other good comps out there." In these cases, an LSI supervisor contacted the appraisers and informed them that they had to find additional comps reflecting higher values or they would not get paid.

144. CW 40 also stated that he received approximately 5-10 ROVs per week from WaMu, and that this number may have been understated, because ROVs were often reclassified at LSI so that it would not appear that WaMu was asking for multiple ROVs. However, even with this adjustment, CW 40 stated that he received WaMu ROV requests on the same appraisals as many as three times. CW 42 (described at ¶124) recalled that, in response to an ROV request, if the original appraiser did not change the value to a higher value acceptable to WaMu, then the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 44

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

appraisal could be sent to a different appraiser in an attempt to achieve a higher value.

145.    eAppraiseIT's and LSI's appraisers were forced to justify, in detail and in writing, all reasons why they would decline to increase appraisal values. CW 27 explained that if appraisers did not increase appraisal value in response to an ROV from WaMu, WaMu required the appraiser to provide detailed explanations about why he ***did not*** change the value. CW 27 stated that, for example, if he had been provided with seven new comps with a WaMu ROV, he was required to comment on each of them, explaining why he would not use each comp. In contrast, no explanations were necessary when the initial appraisal value was ***changed*** in response to an ROV. CW 31 recalled that if he did not agree to the appraisal value WaMu wanted, CW 31 would be required to review the appraisal and "see if he was able to change the value." If he did not increase the appraisal value in response to an ROV, WaMu would require him to provide additional information and do extra work to defend his original value. CW 31 stated that because of WaMu's onerous policy, many appraisers would simply increase value rather than deal with the additional work. Moreover, when CW 31 refused to increase the appraisal value for WaMu, he often received a phone call from WaMu or CW 23 (described at ¶114) indicating that the ROV request had been escalated to more senior management. CW 42 agreed that if an appraiser refused to increase an appraisal value, the appraiser would have to provide very good documentation justifying this refusal and submit a letter explaining his reasoning. Similarly, according to CW 40, appraisers were required to provide "elaborate details" about anything that they found to lower the value of a WaMu appraisal, although no such requirements were imposed to ***increase*** the value of an appraisal. Thus, most of the time, the appraisers simply agreed to increase appraisal values.

146.    In fact, according to CW 42, appraisers hired on behalf of WaMu routinely acceded to increases in value of at least $5,000-10,000 when pressured by WaMu. CW 42 also observed that there were "ways around a lot of different things out there" that could be used to create much larger increases in appraisal values as well.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 45

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

147.   CW 31 (described at ¶125) reported that *if a WaMu loan officer complained strongly about an appraiser not cooperating with the Company, the appraisers knew that they would not receive further work from WaMu.*  CW 31 explained that he lost business because he was "trying to do the right thing."   Specifically, CW 31 stated that WaMu curtailed CW 31's workload because CW 31 refused to "change value" on several appraisals.     Similarly, against repeated WaMu requests, CW 34 often refused to change appraisal values.  After a few outright refusals by CW 34 to change value on the basis of WaMu's inappropriate comps, WaMu completely cut off CW 34 from WaMu business.   CW 31 explained that one central unspoken rule was crystal clear to appraisers: "when an appraiser's business was cut off, you knew it was because you were not playing their game."

148.   CW 23 noted that in 2006 and 2007, home values were typically declining.  According to CW 23, if an appraiser marked "declining" on an appraisal report (noting the fact that market values for other homes in the area were declining), then the underwriter for that loan was supposed to automatically "cut" the maximum LTV allowed for the loan by 5% (*e.g.,* from an allowed LTV ratio of 80% to 75%) — a change "that would kill the loan."  According to CW 23, many appraisers were intimidated by WaMu into marking "stable" on appraisals even when they knew the value to be declining and that "declining" was the appropriate designation.  CW 23 stated that "a lot of appraisers were gun-shy because WaMu was blackballing appraisers, fees were being cut, and a lot of people were not getting work."

149.   According to CW 31, around May or June of 2007, eAppraiseIT "got nervous and sent out blanket emails to appraisers saying 'Please contact us if a loan officer ever contacts you; they are not allowed to contact you,' but the damage was already done."  CW 31 believed that eAppraiseIT started sending such emails to "cover their tracks" in the face of the New York Attorney General's office's investigation.  CW 31 stated, however, that such emails "came out too late, because the loans with inflated appraisal values had already gone through."

**(3)** Documents Obtained by the New York
Attorney General and the Allegations of the
NYAG Complaint Further Confirm That
Senior WaMu Management Directed
WaMu's Wrongful Appraisal Practices

150.    The NYAG Complaint is consistent with the factual allegations above.  Internal, non-public documents quoted in connection with the NYAG Complaint that offer additional, corroborating evidence of the appraisal manipulation alleged herein are set forth below.

151.    The NYAG Complaint was, according to New York Attorney General Andrew Cuomo, filed only after "investigators had spent nine months interviewing hundreds of mortgage industry executives and poring over millions of documents obtained through subpoenas."  The NYAG Complaint alleges that, contemporaneous with WaMu outsourcing its appraisal business to eAppraiseIT and LSI, WaMu's loan production staff often complained that the appraisal values provided by eAppraiseIT appraisers were not as high as WaMu wanted, and as a result WaMu acted to increase appraisal values through improper means.

152.    On August 9, 2006, eAppraiseIT's President communicated to WaMu executives that "[w]e need to address the ROV issue . . . . Many lenders in today's environment . . . have no ROV issue. The value is the value. I don't know if WaMu production will go for that . . . . The WaMu internal staff we are speaking with admonish us to be certain we solve the ROV issue quickly or we will all be in for some pretty rough seas."

153.    Only one week later, on August 15, 2006, eAppraiseIT's Executive Vice President advised eAppraiseIT's President in writing that WaMu's loan officers would often pressure WaMu's internal appraisal field managers for an "extra few thousand," or "tell[] them specifically what they needed," or would "ask for several ROVs on the same property."

154.    By email dated September 29, 2006, a WaMu executive wrote to eAppraiseIT's senior executives to define eAppraiseIT personnel's responsibilities as to ROVs and value disputes:

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 47

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

> . . . the four appraisers/reviewers would be directly involved in escalations dealing with: ROVs, Valuation issues where the purchase price and appraised value differ with no reconciliations/justifications by the appraiser, Value cuts which we continue to receive from your third party reviewers (Wholesale), ***proactively making a decision to override and correct the third party appraiser's value or reviewer's value cut***, when considered appropriate and supported . . . .

(Emphasis in NYAG Complaint.)     According to the NYAG Complaint, the "four appraisers/reviewers" were former WaMu employees that WaMu had pushed eAppraiseIT to hire in supervisory positions.

155.     According to the NYAG Complaint, in February 2007, WaMu directed eAppraiseIT to stop using eAppraiseIT's usual panels of staff and fee appraisers to perform WaMu appraisals. Instead, according to the NYAG Complaint, WaMu demanded that eAppraiseIT use a "proven panel" of appraisers selected by WaMu loan origination staff, who were chosen because they provided high values.  During this time a WaMu Vice President in the Appraisal Oversight group explained, in an email to eAppraiseIT about an ROV for a "low value," that "[t]his is an example of the issue that has caused sales pushing for a 'proven appraiser' process."

156.     According to the NYAG Complaint, in February 2007, eAppraiseIT "simply capitulated to WaMu's demands."  In an email on February 22, 2007, eAppraiseIT's President told senior executives at First American "***we have agreed to roll over and just do it***."  According to the NYAG Complaint, eAppraiseIT's President explained that "we were willing to live with the change if [WaMu] would back us up with the appraisers and tell them that simply because they are rated as Gold Preferred does not mean that they can grab all the fees. [WaMu] agreed." eAppraiseIT's President wrote about steps necessary to implement WaMu's plan and also WaMu's desire to "stop the noise" surrounding WaMu's need to increase appraisal values that led to the changes:

> [eAppraiseIT] should have Wamu write the introduction letters to their appraisers, set the stage and let us do our magic . . . . I assured her the noise from retail will stop . . . . She brought up the fact that Wamu knows this means little money to no

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 48

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

money for [eAppraiseIT] and LSI and [WaMu] will fix that in the near future. But for now they need to stop the noise or none of us will be around. I believe her.

157.    By an email dated February 22, 2007, eAppraiseIT's President explained to senior executives at First American WaMu's motives for demanding a "proven panel" of appraisers:

We had a joint call with Wamu and LSI today. The attached document outlines the new appraiser assigning process. In short, we will now assign all Wamu's work to Wamu's "Proven Appraisers" . . . . We will pay their appraisers whatever they demand. ***Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value, negating a need for an ROV.***

(Emphasis in NYAG Complaint.)

158.    According to the NYAG Complaint, in an email dated March 1, 2007, eAppraiseIT's President told WaMu executives:

Recently, we have been notified that Lending would like us to use more of their "Proven Appraisers" versus appraisers off our pre-selected appraiser panel. It seems the amount of Reconsideration of Value (ROV) requests associated with our appraisers far exceeds those initiated when a WaMu proven appraiser completes a file. Said differently, ***Wamu proven appraisers bring the value in a greater majority of the time*** with minimal involvement of the vendor, sales and Appraisal Oversight. ***I am fine with that, of course, and will happily assign Wamu orders to Wamu proven appraisers instead of eAppraiseIT's approved panel appraiser whenever possible.***

(Emphasis in NYAG Complaint.)

159.    In addition, according to the NYAG Complaint, on April 4, 2007, eAppraiseIT's Executive Vice President wrote an email to senior eAppraiseIT executives regarding eAppraiseIT's legal liability for using WaMu's "proven list." The eAppraiseIT EVP explained that appraiser independence is chiefly:

the lender's responsibility since the OCC [Office of the Comptroller of the Currency]/OTS only pertain to lenders. However, we as an AMC need to retain our independence from the lender or it will look like collusion. Imagine a simple mortgage broker saying he will give us the work if we use his "proven" appraiser. We say no. This is very similar to that except they are very big. . . .

So the push back to WAMU needs to be (assuming we want to do this some day), eAppraiseIT needs to choose the appraisers, not WAMU. Where it gets really

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 49

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

clear that eAppraiseIT is NOT choosing is the proven idea because they always go first and MUST be selected unless there is a specific reason why not. *eAppraiseIT is clearly being directed who to select. The reasoning that there are fewer ROVs is bogus for many reasons including the most obvious – the proven appraisers bring in the values.*

Fun, eh??

(Emphasis in NYAG Complaint).

160.    Furthermore, according to the NYAG Complaint, on May 29, 2007, eAppraiseIT's Executive Vice President communicated the problems in the eAppraiseIT/WaMu relationship in a letter to a WaMu senior executive as follows:

In the first quarter of 2007, the sales group of WAMU began to insist they choose the appraisers mostly due to their concerns about 'low values.' eAppraiseIT encouraged WAMU to resist these pressures if possible. However, WAMU decided to go with what came to be called the "proven" list of appraisers recommended by sales. . . .

The use of the "proven panel is challenging for eAppraiseIT in two ways: A. Financially – The proven panel is paid a minimal [sic] of 20% more than the eAppraiseIT panel. B. Risk Management – the possibility of collusion between the loan officers and appraisers is increased when eAppraiseIT does not control the selection. In addition, eAppraiseIT is concerned with any possible lender pressure or perception of lender pressure when the only way to get on the WAMU "proven" panel is through the loan officer.

According to the NYAG Complaint, despite the "possibility of collusion" raised by eAppraiseIT, the only change made in response to the message quoted above was that on June 7, 2007, a WaMu executive directed eAppraiseIT to change the name of the Proven List for the following reasons: "*Name change* from 'proven appraiser' and/or use of the moniker 'PAL' list is discontinued, *under direction of the WaMu legal department*. We are utilizing a more generic term acceptable w/in regulatory guidelines and industry standards." Thereafter, according to the NYAG Complaint, the Proven Appraiser Panel was simply renamed the "WaMu Select" panel.

**(4)**    Expert Analysis of Relevant Housing Data Also Evidences WaMu's Improper Appraisal Inflation During the Class Period

161.    Lead Plaintiff's investigation of WaMu's lending practices includes the analysis of

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 50

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

vast amounts of raw data collected about WaMu and other lenders that reveals WaMu's lending practices compared to those of its peer mortgage lending companies. This data revealed that, on a nationwide basis and compared to WaMu's peers, WaMu refused loans based upon "insufficient collateral" (*i.e.*, a low appraisal), much less than its peers. For example, in 2005, WaMu refused loans on this basis for 6.52% of its mortgage denials, while its peer companies denied loans on this basis for 22.43%; similarly, in 2006, the percentage denied were 6.18% (WaMu) versus 21.04% (peers) and in 2007, 12.68% (WaMu) versus 25.55% (peers). A full explanation of the robust analysis performed can be found at Appendix D. Consistent with the other facts discussed above, this analysis (based on raw data from WaMu and its peers) shows that WaMu was obtaining more favorable appraisals consistently and on a nationwide basis, and was thus less constrained in offering large volumes of loans, when compared with WaMu's peers during the Class Period.

### b. Killinger Acted With Scienter In Making False And Misleading Statements Regarding WaMu's Appraisals

162. Killinger knew, or was reckless in disregarding, the facts above that rendered his statements regarding LTV values and WaMu's appraisal process false and misleading at the time he made them. In addition to the facts set forth above which show the falsity of Killinger's statements (and thus also show his scienter in making those statements), numerous additional facts support a strong inference of Killinger's scienter.

163. LTV values were extremely important to WaMu's credibility as a lender, and Killinger focused on them repeatedly during communications with investors. ¶¶96, 97, 99, 100, 101. In many of the Company's regulatory filings during the Class Period, LTV values were touted as one of two "key determinants" of credit quality.

164. The detailed allegations of the NYAG Complaint, including the internal WaMu and eAppraiseIT documents quoted in the NYAG Complaint, demonstrate that Killinger knew or recklessly disregarded WaMu's widespread and blatant appraisal manipulation. As demonstrated

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 51

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

by the communications produced in the NYAG Complaint (¶¶152-160) and the reports from former employees (*e.g.*, ¶115), WaMu's pressure on its third party appraisers to maintain these low LTV ratios was discussed at extremely senior levels of the Company. For example, CW 10 (described at ¶118) reported that WaMu management met with eAppraiseIT and LSI to demand less resistance to WaMu's requests for increases in appraisal values. CW 23 (described at ¶¶114, 128), stated that it was his understanding that there was direct communication between eAppraiseIT and the head of WaMu's Mortgage Division regarding the problems created by WaMu's "preferred list." In sum, former employees report that WaMu's senior management was aware of WaMu's appraisal practices, and in many cases directed them.

165. Extensive federal regulations governed appraisal practices, which required Killinger and the other Officer Defendants to focus on appraisals and whether they were conducted independently. For example, provisions in the Code of Federal Regulations that regulated WaMu's conduct state, among other things, that an in-house or "staff" appraiser at a lending institution "***must be independent of the lending, investment, and collection functions. . . .***" 12 C.F.R. § 564.5(a). In fact, WaMu's regulator, the OTS, sent Killinger a letter placing him (and other WaMu senior management) on notice of their obligations to ensure that WaMu conducted fair and accurate appraisals. Specifically, the "2005 OTS Letter" stated:

> ***Savings associations' board of directors and management should review the [2005 Interagency Appraisal Guidelines]*** in conjunction with the OTS appraisal regulations, the Interagency Appraisal and Evaluation Guidelines (October 1994), and the Interagency Statement on Independent Appraisal and Evaluation Functions (October 2003). ***Internal policies and procedures should ensure that, among other considerations, the savings association's appraisal and evaluation function is safeguarded from internal influence and interference from the loan production staff.***

The Interagency Appraisal and Evaluation Guidelines (October 1994), which are specifically referenced in the 2005 OTS Letter, state in a section titled "Independence of the Appraisal and Evaluation Function," that: "Because the appraisal and evaluation process is an integral component of the credit underwriting process, it should be isolated from influence by the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 52

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

institution's loan production process."  Thus, Killinger clearly knew of his responsibilities to ensure an independent and unbiased appraisal process for WaMu's loans.

166.    As a result of these regulations, senior management, including Killinger, were required by law to monitor, and if necessary correct, appraisal policies and practices that relate to the underwriting process.

167.    Further, the widespread and serious nature of the violations of WaMu's stated appraisal policies supports an inference of Killinger's scienter.  WaMu's pressure on appraisers and the violations of its stated appraisal policies resulted in the widespread and consistent practice of appraisal inflation.  ¶161.  The consistent and nationwide nature of these violations supports the strong inference that this was a top-down scheme to increase loan volume.  Killinger was directly responsible for WaMu's Company-wide culture of loan volume over quality.  To promote this culture, "senior management" issued directives to degrade underwriting and appraisal procedures.  *E.g.*, ¶¶66, 115, 242.  Former employees who were with the Company for years, even decades, confirm drastic, Company-wide deviations from responsible lending practices during the Class Period.  *E.g.*, ¶¶213-223.  WaMu deliberately put into place a structure to make it more difficult and time-consuming for its third-party appraisers to decline WaMu's requests for increased valuations.  *E.g.,* ¶145.

168.    In addition to the allegations above regarding Killinger's knowledge regarding WaMu's appraisal inflation, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Killinger's scienter.

### 3.    Killinger's Statements Regarding The Underwriting Of WaMu's Loans

169.    During the Class Period, Killinger publicly made numerous false and misleading statements regarding the underwriting of WaMu's loans and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so.  These statements were false and misleading because, as discussed in detail

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 53

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

below at ¶¶192-239, during the Class Period WaMu had radically loosened its underwriting standards in order to increase loan volume.

170. On October 19, 2005, WaMu held an earnings call with investors to discuss its third quarter results. On that call, Killinger declared, "Looking ahead we believe we can effectively manage our credit quality by continuing to be disciplined and vigilant in our underwriting standards, our portfolio management, and our reserving methodology."

171. On November 15, 2005, WaMu hosted an Investor Day Conference in New York. At that conference, Killinger highlighted the Company's underwriting and reserving methodologies, stating:

> ***On credit risk. We have excellent processes, policies, underwritings, standards and reserving methodologies in place and they have served us very well for quite some time***. . . . Now you have heard my conservative voice on the housing market for several quarters now. We were concerned that housing prices appeared over extended in many markets around the country and we felt that the housing market was likely to cool. ***To prepare for this possibility we elected to selectively reduce credit risk this year***. . . .
>
> Now these actions may have limited near term profitability but they help protect us from a softer housing market if that were to occur.

172. At that November 15, 2005 conference, Killinger was present and did not correct Craig Chapman, President of the Commercial Group, the division of the Company that housed Long Beach Mortgage before 2006, when Chapman addressed WaMu's "prudent" growth in the subprime area and "disciplined" subprime operations, stating: "***we allow no rate exceptions in the process***. Our pricing is controlled centrally. It's distributed through the network. There is process in place and triggers so that no loans can – there are no rate exceptions, I mean, on loans." Chapman also stressed that, with respect to the Company's adjustable-rate mortgages, "***we underwrite these loans at a fully indexed rate***. Even our [interest-only] loans are underwritten on 30-year amortizing and not at any introductory rates or just interest only rates."

173. On January 18, 2006, the Company held an earnings call with investors to discuss its fourth quarter and full year 2005 results. During the call, Killinger noted that the Company

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 54

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

"continue[s] to experience very good credit performance."

174.    On or about March 15, 2006, WaMu filed its 2005 Form 10-K, which Killinger signed as CEO.  In the 2005 Form 10-K, WaMu emphasized the Company's underwriting standards, announcing that, "[t]he Company seeks to mitigate the credit risk in this portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime loans."  Similarly, WaMu promoted the quality of the credit risk management of the Company's Option ARM loan portfolio, claiming that, "The Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures."

175.    On April 18, 2006, WaMu issued a press release announcing its financial results for the quarter ended March 31, 2006.  Killinger was also quoted in the press release, but did not correct these misstatements at any time.  In this press release, the Company stated that the "*[l]ower provision reflects continuing strong credit quality*" and "*[s]trong credit quality results in lower provisioning.*"  (Emphasis in original.)

176.    On June 1, 2006, Killinger attended the Sanford C. Bernstein & Co. Strategic Decisions Conference, where he continued to reassure investors of the strong credit quality of the Company's loan portfolio, stating, "*on the credit front, we continue to be in excellent shape.*" Killinger also lauded the Company's experience with ARM loans, stating:

> The other comment I would make is that we have experience of marketing and managing portfolios of adjustable rate loans for well over 20 years; and we have the data about how these loans performed through various parts of the economic cycle and so far the performance has been right in line with expectations and I just haven't seen anything to cause us any particular concerns.

177.    On September 13, 2006, Killinger participated in the Lehman Brothers 4th Annual Conference.  At that conference, Killinger made numerous false and misleading statements concerning the Company's credit portfolio and underwriting, including stating that "*on the credit front, we're in excellent shape,*" which Killinger attributed to the purported fact that "*we have*

1 ***been preparing for a more difficult environment for some time***."

2    178.    On October 18, 2006, the Company held an earnings call with investors to discuss

3 its third quarter of 2006 results.   On the call, Killinger announced, "Despite the challenging

4 environment impacting the mortgage banking industry, we feel good about the proactive steps we

5 have taken.   Our portfolio remains in very good shape and non-performing assets remain very

6 low."  Killinger highlighted the Company's years of experience with the Option ARM product:

> We have more than 20 years experience underwriting and originating option
> ARM loans through many market cycles.   We understand that the best mortgage
> customer is a well-informed borrower and that's why we focus on providing clear,
> understandable disclosures for our customers and ongoing training for our sales
> force. . . . [T]he quality of our option ARM portfolio remains strong.

10    179.    Further, Killinger emphasized that the Company underwrote its Option ARM

11 loans to the fully-indexed rate, stating: "Let me make one clear point. In our underwriting on

12 option ARMs we underwrite to the fully indexed rate, we never underwrite to the teaser rate. And

13 so, again, we don't see this as having a significant impact on the underwriting for us."

14    180.    On November 16, 2006, Killinger attended a Merrill Lynch Banking & Financial

15 Services Conference.   At the conference, Killinger repeatedly attributed the quality of WaMu's

16 Option ARM portfolio to the Company's practice of underwriting the Option ARM loans to their

17 fully amortizing payments.   For example, Killinger stated: "Our option ARM portfolio quality is

18 also very good . . . . This quality reflects the option ARM underwriting which evaluates the

19 borrower's ability to make the loan's fully amortizing payments, even though they are allowed to

20 make a much lower initial payment."

21    181.    On January 17, 2007, WaMu held an earnings call with investors to discuss its

22 fourth quarter and year-end 2006 results.  During this call, Killinger explained:

> As you'll recall I have been pretty pessimistic on the housing market for the last
> couple of years, and really felt that the market was overheated and was likely to
> be slowing at some point, and so both the combination of that and also from a
> strategic standpoint we've been diversifying our mix of businesses . . . . ***We
> tightened underwriting*** . . . .

26    182.    Also on the January 17, 2007 earnings call, Killinger reassured investors that,

although the Company had stated its intention to focus on higher-margin mortgage products in the past, it had promised to do so only in a "prudent manner."

183. On January 30, 2007, Killinger attended the Citigroup 2007 Financial Services Conference. At the conference, Killinger continued to falsely reassure investors that the credit quality of the Company's loan portfolio "continue[d] to be in very good shape," specifically emphasizing the "high quality" of the Company's prime loans, the "very good" quality of the Option ARM portfolio, and the "very high quality" of the home equity portfolio. At the conference, Killinger underscored the Company's "rigorous[] adher[ence] to [its] minimum FICO threshold" in its subprime portfolio. In response to a question regarding the Company's charge-offs in its subprime portfolio, Killinger downplayed the importance of the charge-offs, explaining that the Company's subprime portfolio had been decreasing in size and claiming that "when you're not originating new ones at the same level and are letting the portfolio run up, you get a natural increase in [charge offs]."

184. On or about March 1, 2007, WaMu filed with the SEC its 2006 Form 10-K, which Killinger signed. In the 2006 Form 10-K, WaMu touted the Company's underwriting standards for its Option ARM portfolio, claiming that, "[t]he Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures." The Company went on to claim that, beginning in mid-December 2005, the Company's underwriting process for its Option ARM portfolio involved calculating the applicant's debt-to-income ratio using only the fully-indexed rate, rather than an undefined "administratively set rate" used in 2004 and 2005.

185. The 2006 Form 10-K emphasized that the Company's underwriting practices for its subprime mortgages were sound, stating: "As part of Long Beach Mortgage's underwriting process, loan application and appraisal packages are reviewed to ensure conformity with the Company's stated credit guidelines. . . . Similarly, all purchases from Subprime Lenders must

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 57

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

satisfy the Company's stated credit guidelines."

186.    On April 17, 2007, the Company held an earnings call with investors to discuss its first quarter of 2007 results.  On the call, Killinger stressed the positive performance of the Company's prime portfolio, claiming that the Company was "seeing encouraging signs with the improvement in the prime business that we saw in the first quarter, and with the steps that we've taken into the subprime area of increasing pricing, *improving underwriting*, that we are starting to see that show up in the way of early signs of credit on the 2007 production looks much better than '06, so that's encouraging."  Killinger went on to observe,

> I would view the first quarter of having been profitable for our prime part of the business. It was offset[,] more than offset[,] by the losses in the subprime area, and as the subprime area comes back to more of a normalcy, I think that we can certainly expect the home loan unit to get back to profitability and the current expectation for us is later in the year, rather than getting specific on one quarter or the other.

187.    On April 17, 2007, WaMu held its annual shareholders' meeting in Seattle.  At the shareholders meeting, Killinger announced that the Company had *"tightened credit guidelines*," and that the Company was seeing "firming" in underwriting for subprime loans.  Going forward, Killinger promised investors that WaMu would "*carefully manage our credit*."    Killinger attributed the Company's credit problems to industry-wide problems, stating, "the softening housing market, a flat yield curve, aggressive credit competition, drove a rapid increase in subprime loan delinquencies[.]"

188.    On July 18, 2007, WaMu held an earnings call with investors to discuss its second quarter of 2007 results.  On the call, Killinger stated "You know it's been over two years since we first began talking to you about housing prices becoming inflated and the high risk of a slow down in housing with price declines in some parts of the country.  As a result, we started to take actions to minimize our exposure, including *tightening our underwriting*[.]"  On the earnings call, Killinger also stated:

> From my point of view, I think too much money, and some would say just irrational money, did flood the mortgage market, particularly in the subprime area

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 58

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

over the last two years, and I think this caused underwriting standards to decline, credit spreads to narrow, volumes to surge, and now not unexpectedly delinquencies and losses to sore. This was a real concern of ours, and where we took a lot of defensive **actions beginning about two years ago, like tightening underwriting**, selling off our '04 and '05 residuals, delayed our plans to grow the subprime portfolio . . . .

I think now what we're seeing is, some underwriting discipline starting to return, credit spreads are widening, and marginal players are leaving the industry. And I that think [sic] this gives us an opportunity to gradually increase our loan portfolios, with much improved risk adjusted returns. So I think – I do think we're watching the subprime area very carefully. We think the industry has a lot more to go in terms of tightening underwriting to be appropriate for today's underwriting environment. **That's why I mentioned the initiatives that we have taken to help lead the industry to what we think is much more prudent and appropriate underwriting standards at this point in the cycle**. In assuming we start to see credit quality improve because of these underwriting initiatives, and if we see credit spreads widen and good opportunities to take assets in our portfolio, we would like to start accelerating the – the growth of our balance sheet again.

189.    On September 10, 2007, Killinger and Casey attended the Lehman Brothers 5th Annual Financial Services Conference, where Killinger stated that the Company had undergone "a series of major underwriting changes in our home loans lending guidelines" in order to improve loan performance.  Killinger also touted the "attractive" returns seen on Option ARM loans and other adjustable-rate mortgages, noting that "the credit quality in these loans is good."

190.    In addition, Killinger also participated in numerous earnings calls and conferences where materially false and misleading statements relating to the underwriting of WaMu's loans were made to the investing public by the other Officer Defendants, noted below at ¶¶390, 391, 392, 394, 451, 454, 492, 513, 514.  Killinger failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below) of the false nature of such  statements.

a.    **Killinger's Statements Regarding The Underwriting Of WaMu's Loans Were False And Misleading**

191.    Killinger's statements regarding underwriting were false and misleading because, in fact, WaMu abandoned appropriate and asserted underwriting standards in favor of

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 59

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

underwriting policies designed to allow WaMu to increase the volume of loans it could originate and therefore inflate the Company's earnings. Killinger's above statements (and the statements for which he is responsible) regarding WaMu's underwriting at ¶¶170-190 were false and omitted the material information that WaMu had radically loosened its underwriting standards. Further, the above claims that WaMu underwrote its Option ARM loans to the "fully-indexed" rate (at ¶¶172, 179, 184) rather than the teaser rate were false when made. *See* ¶¶225-226.

**(1)** WaMu's Move Away From Safer Loans To Risky, Nontraditional Loan Products

192. In order to maximize the Company's loan volume, WaMu strayed from traditional, high-quality, and fixed-rate lending to instead promote numerous types of nontraditional, risky loans. Principal among WaMu's exotic loans were its *Option ARM* loans, a form of *adjustable rate mortgage* ("ARM") loans (a loan where, instead of a fixed rate of interest, the interest rate is periodically adjusted over the term of the loan). *Option ARM* loans were unique among ARM loans in that they gave the borrower the option each month to make either a full, interest-only, or a "minimum payment." Option ARMs were WaMu's self-proclaimed "flagship product" and made up the majority of WaMu's "prime" mortgage originations during the Class Period, as well as the majority of the loans in WaMu's "held-for-investment" portfolio of loans. Chart 1 below illustrates that throughout the Class Period, Option ARM loans **always** made up more than fifty percent of WaMu's held-for-investment loan portfolio.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 60

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400



**Chart 1: Option ARM Loans as a Proportion of WaMu's Single-family "Prime" Residential Portfolio**

($ billions)
- All Other Loans
- Option ARM Loans

Option ARM Loans values: $67.9, $71.2, $71.2, $69.2, $67.1, $63.6, $58.1, $53.5, $57.9, $58.9, $55.8, $52.9

All Other Loans values: $44.0, $42.9, $52.6, $56.0, $54.0, $35.9, $35.4, $35.0, $48.0, $51.5, $52.6, $52.1

Quarters: 3Q'05, 4Q'05, 1Q'6, 2Q'06, 3Q'06, 4Q'06, 1Q'07, 2Q'07, 3Q'07, 4Q'07, 1Q'08, 2Q'08

193.   WaMu's Option ARM minimum payment option is based on the interest rate charged during the introductory period, and is generally significantly lower than the loan's fully-indexed payment rate.  If an Option ARM borrower continues to make only a minimum monthly payment after the introductory period ends, his or her payments may not even be sufficient to cover the interest accrued on his or her loan.  This results in "negative amortization" of the Option ARM loan as unpaid interest is deferred and added to the loan's principal balance.

194.   WaMu booked negative amortization amounts on its Option ARM loans as deferred interest earnings on its income statement, thereby reporting non-cash income created solely from a borrower's failure to pay full interest.  As a result, explained CW 4, a former account executive for LBM in New Jersey from April 2003 to September 2007, Option ARM loans were known internally at WaMu as "the portfolio product" because WaMu could keep its Option ARM mortgages in-house and record the deferred interest from them as income.  During the Class Period, the unpaid Option ARM principal balance, which was recorded by WaMu as

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 61

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

non-cash income, rose from $76 million in the third quarter of 2005 to $1.7 ***billion*** in the fourth quarter of 2007.

195.    These loans, with the inherently risky features of negative amortization and potential payment shock when the interest rates automatically adjusted, were made all the more dangerous by sales and underwriting at WaMu that did not ensure that borrowers knew of the complex nature of the loan or had sufficient income and assets to pay the loan at the fully-indexed rate (discussed further below at ¶¶213-226).   Indeed, CW 47, who worked at WaMu from 1997 to February 2008 and served as a Credit Quality Manager and an Area Underwriting Manager, recalled a 2003 conversation with Mark Hillis, WaMu's former Retail and Home Loans Chief Credit Officer, in which Hillis predicted that ***within five years, 85% of WaMu's Option ARM borrowers would not be able to afford their mortgages***.   However, because these loans were WaMu's "flagship product" and provided WaMu with huge, short-term profit margins to the Company, according to CW 47, the Company was actually willing to make greater exceptions to the minimum FICO score for Option ARM products than for other loans.  CW 47 stated that until the summer of 2007, a borrower could receive a low-documentation Option ARM loan from WaMu with a 620 FICO score – which was far below the industry norm of 660 for a "prime" borrower.

196.    WaMu also offered other exotic and risky loans during the Class Period, including:

- *"Stated-income," "no-doc"* and *"low-doc"* loans (mortgages in which the borrower is required only to provide limited documentation verifying his or her income and/or other borrower representations), which were often called "liar loans" within the Company.  When these loans were extended to borrowers with purportedly good credit who simply did not wish to offer documentation, WaMu referred to them as "*Alt-A*" loans;

- "*100% LTV*" loans (loans that did not require any down payment) and "*80/20*"

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 62

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

loans (where the buyer took out two loans, one for the 80% of the purchase price and another for 20% of the purchase price, to avoid requiring the borrowers to obtain private mortgage insurance ("PMI"));

- "*Hybrid ARMs*" (where the initial interest rate is fixed for some period of time, usually two to five years, and then "floats," or changes according to an established banking index, thereafter);

- *Home equity lines of credit ("HELOCs")* (which allowed homeowners to leverage existing equity in their homes by borrowing money either through a first or second lien loan or line of credit) and *WaMu mortgage plus*™ loans (introduced in April 2007, which combined a first mortgage and HELOC into a single loan, among other features);

- *Interest-only ("IO")* loans (which required borrowers to pay only enough to cover the amount of interest accrued in the previous month, until after a predetermined period of time, the payment is reset to allow the loan to fully-amortize over its remaining life).

197. WaMu extended *subprime* mortgage loans, which are mortgages that are offered to less creditworthy borrowers, and, like the various non-traditional ARM products described herein, typically could not be sold to government sponsored entities ("GSEs") such as Fannie Mae and Freddie Mac. Subprime lending is risky for lenders due to the frequently poor credit histories of subprime borrowers, and the higher interest rates that typically are charged for such loans. According to CW 66, who served as an LBM Senior Underwriter in the Chicago area from 2004 through September 2007, WaMu sold subprime loans with interest-only and negative amortization features, increasing the riskiness of these loans.

198. Although the Officer Defendants claimed that WaMu issued these loans only to borrowers that WaMu deemed qualified after "rigorous" underwriting for each of these exotic loan products, WaMu's underwriting standards were dangerously lax, as alleged in ¶¶199-239.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 63

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

**(2)** WaMu Aggressively Pushed Risky Loans on Borrowers

199.    In order to generate a greater volume of risky loan products, the Officer Defendants financially rewarded loan origination personnel for closing higher-risk loans and instituted minimum loan sales quotas.  WaMu's employees, accordingly, targeted more and more borrowers who were less able to afford the loan payments they would have to make, and many of whom had no realistic ability to meet the obligations incident to the loans they were sold.

200.    CW 5 (described at ¶73), explained with regard to WaMu's loans, "[t]he more you slammed out, the more you made."  Similarly, CW 6, a Senior Loan Consultant with WaMu from 2005 to 2007, observed that sometimes loan originators were surprised by the loans they could get approved.  However, as a loan officer, if CW 6 could personally earn $2,000 - $3,000 by closing a loan, then CW 6's only concern was getting the loan approved.  According to CW 6: "Once you get paid, you don't care what happens."  CW 9 (described at ¶137) felt that WaMu employees were "greedy" and that the borrowers suffered as a result.  CW 9 concluded, "[w]e could never figure it out why people came to us [for loans]."

201.    In a November 2, 2008 *New York Times* article titled "Was There a Loan It Didn't Like?," former WaMu Senior Mortgage Underwriter Keysha Cooper, who started at WaMu in 2003 and left in 2007, explained that "***[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify.*** Instead, it was how many loans did you guys close and fund?"  According to the article, "[i]n February 2007, . . . the pressure became intense. WaMu executives told employees they were not making enough loans and had to get their numbers up . . . ."  Ms. Cooper concluded, "I swear 60 percent of the loans I approved I was made to. . . .  If I could get everyone's name, I would write them apology letters."

202.    Other former employees agreed that the primary factor driving WaMu's mortgage lending practices was to produce as much volume as possible.  CW 7, who was a Closing Loan

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 64

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Coordinator at WaMu in Bethel Park, Pennsylvania, from 2003 until July 2007, explained that WaMu's priority regarding loans was "always quantity rather than quality," and her branch closed an "insane" number of loans every day. WaMu loan personnel could meet these volume expectations only because "[i]f you flew by the seat of your pants and didn't look at everything, you could get it done." CW 7 observed that the branch goal was "hitting certain numbers every month." WaMu rewarded high-performing loan officers with "fabulous vacations" if they made their numbers. CW 7 noted, "It was all about sell, sell, sell."

203.   Similarly, according to CW 10 (described at ¶118), there was a Company-wide culture that required WaMu employees to do "whatever it took to get loans closed." WaMu managers would constantly press WaMu underwriters and salespeople to "push, push, push" to close loans. CW 9 (described at ¶137) stated that "*WaMu's top priority was to get as many loans closed as quickly as they could close and not worry – they just wanted the volume, and it didn't seem to matter how they got it . . . . Everybody just wanted their chunk of the money*." Not only did loan coordinators receive bonuses for loans they closed, but also CW 9 understood that if loan officers did not meet their quotas, WaMu fired them.

204.   Loan originators were also paid more for originating loans that carried higher profit margins for the Company and had commensurately higher credit risk. For example, CW 8, a Senior Loan Consultant with WaMu at Riverside, California, from 2005 through December 2007, reported that "every year [WaMu] came out with a new commission outline and [WaMu's] extra commissions for teaser rate loans." Further, according to CW 8, occasionally WaMu would send out emails to loan originators about commission "specials." One of WaMu's "specials," CW 8 recalls, was to give loan originators extra commissions for Option ARM loans. In addition, *WaMu paid additional commissions for non-conforming loans*. According to CW 8, at WaMu "[i]t's not about what's best for the client; it's about what's best for the Company." According to CW 13, a Sales Manager with WaMu for twenty years until October 2006, WaMu managers also received increases in their bonuses if their group closed a certain percentage of

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 65

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Option ARM loans.

205.    CW 12, a former Loan Consultant for WaMu in Riverside, California, reported that because of WaMu's additional incentive compensation, WaMu salespeople undertook particularly aggressive tactics to sell Option ARM loans.  As CW 49, who served as a Senior Underwriter with WaMu through a private mortgage insurance company, put it, "WaMu's biggest things are ARMs – they push those things like cotton candy."  According to CW 12, "most borrowers" who came to WaMu "wanted the fixed rate loans."  Thus, selling Option ARM loans required "pushing" them, which was done in a "nasty" way.  ***WaMu loan officers would fail to educate the borrower, so that Option ARM loan borrowers "would think they were paying the fully-indexed rate, when they were only paying a portion of the interest" because the loan consultants did not explain the programs thoroughly***.  WaMu loan consultants were under "a lot of pressure" from their managers to promote and sell Option ARM loans.  CW 12 originated only "one or two" Option ARM loans because CW 12 was so morally opposed to these "risky" loans.  As a result, CW 12 was frequently reprimanded by CW 12's managers at WaMu.

206.    CW 14 was an employee at WaMu from 1993 to 2006 and was a "Senior Trainer" from 2000-2004, training employees on processing, closing, underwriting, leadership, products, and pricing.  According to CW 14, Option ARM loans were suitable only for rental, non-owner occupied properties or for "savvy investment people who play the stock market."  However, many of the WaMu sales people in CW 14's class did not understand the concept of negative amortization and could not explain it to borrowers.

207.    Indeed, an internal WaMu presentation on Option ARM loans shows that WaMu focused on unsophisticated borrowers for its high-risk Option ARM loans.  The internal WaMu presentation states that appropriate "Option ARM Candidates" are:

- Savvy Investors
- ***First Time Home Buyers***
- High Income Earners
- ***Self Employed Borrowers***

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 66

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

- ***Retired Borrowers***
- Real Estate Agents

The next page of the same presentation further explained that WaMu's target borrowers were of:

- ***All Ages***
- ***Any Social Status***
- ***All Economic Levels***

In other words, WaMu pushed its Option ARM loans on borrowers regardless of their sophistication, income level, or financial stability.

208. WaMu's LBM employees were also compensated for increasing loan volume, not for decreasing or even considering credit risk. CW 15 was a First Vice President in the Capital Markets Group and Director of Investor Relations at WaMu Capital Corp. in New York, New York, from October 2004 until December 2007. As a senior management level employee, CW 15 had close interaction with Defendant Schneider and other senior executives within the Home Loans Group. According to CW 15, WaMu compensated the account executives and the underwriters at WaMu's LBM based on the volume of loans that they brought in and closed, with no consideration in their compensation structure relating to the quality of those loans.

**(3)** WaMu Inappropriately Incentivized Its Underwriters To Approve Loans By Basing Their Compensation On Loan Volume Without Regard To Loan Quality

209. WaMu financially incentivized its underwriters, who supposedly served as the Company's "gatekeepers" of loan credit quality, to approve an enormous volume of loans without regard to loan quality.

210. CW 69, a Senior Underwriter with WaMu in Livermore, California, from 2003 through September 2007, confirmed that loan underwriters received commissions based upon volume of loans underwritten and closed. CW 15 (described at ¶208) confirmed that underwriters were compensated on the volume of loans brought in and closed, with no consideration given to the quality of the loans.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 67

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

211. According to CW 5 (described at ¶73), underwriters were required to underwrite a minimum of nine loans a day, and any loans underwritten in excess of that number provided for bonus payments. Indeed, certain senior underwriters earned in excess of $100,000 annually because of these bonuses; some underwriters received monthly bonus payments of $5,000 for underwriting a high volume of loans.

212. Notwithstanding underwriters' exorbitant volume-based bonuses, according to CW 47 (described at ¶195), WaMu's senior management believed that if underwriters knew about underwriting problems that led to problem loans, WaMu's underwriters would "by nature" have tightened up WaMu's lending standards. Thus, WaMu refused to provide loan delinquency data to its underwriters.

> **(4)** WaMu's Underwriting Standards for Its
> Loans Were Irresponsibly Permissive
> Throughout The Class Period

213. Highly experienced mortgage underwriters who worked at WaMu during the Class Period were shocked by how lenient WaMu was in its lending. CW 48 was a Senior Underwriter in the Washington Mutual Wholesale loan fulfillment center in Lake Success, New York, from June 2005 through February 2008. CW 48 had twenty-plus years of experience underwriting home loans. When CW 48 arrived at WaMu, CW 48 was stunned to find that WaMu's supposedly "A paper" (*i.e.*, prime loans) consisted of loans made to borrowers with credit scores in the 500s, high LTV ratios, and Option ARM loans. CW 48 reported that there was "only so much you could do" with the loans she underwrote, because they met WaMu's lenient underwriting guidelines and CW 48 did not want to discriminate among borrowers by denying loans to some borrowers who met WaMu's loose guidelines merely because CW 48 did not think that borrower could actually repay the loan that WaMu had sold.

214. Similarly, CW 49 was appalled by the lenient standards in place at WaMu. CW 49 served as a Senior Underwriter with WaMu through a private mortgage insurance company for most of 2007. CW 49 reported that WaMu's reputation in the mortgage industry was that "if

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 68

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

you had a pulse, WaMu would give you a loan." CW 49 stated that the underwriting guidelines at WaMu "changed every minute. . . . You would literally be getting an email every second that the guidelines changed or would have a pissed off account executive at your desk asking why the loan can't go through." Often, CW 49 reported, loans would be taken away from her to be approved by another underwriter who was not as conscientious. CW 49 often saw active or approved loans in the system that CW 49 had refused to underwrite and were ultimately signed off on by someone else. According to CW 49, "They would give it to one of their 'lead underwriters' to approve."

215. Before the loan came to CW 49's desk, it could be automatically underwritten through a computer program, modeled after Fannie Mae's "Desktop Underwriter" ("DU") program. Loans that could be underwritten using the DU system could be approved by a loan processor without any involvement from an underwriter. CW 49 recalled that regularly, if a loan was rejected by the computer, the loan consultant would repeatedly re-enter the loan's information, changing the information a little each time, "tweak[ing] the system."

216. CW 9 (described at ¶137) recalled, "I saw underwriting managers and other managers waive a lot [of supposed underwriting rules]." According to CW 9, "[o]nce a week you'd go in with your manager, [and he'd say] 'why didn't this loan close, why didn't that one close?'" CW 9 said *the pressure "was coming from the very top, the managers had to listen to the head manager, who had to listen to corporate*." CW 9 added, "I almost had a nervous breakdown." According to CW 9, the underwriting procedures progressively loosened and "got really bad in 2006." *WaMu's "top priority was to get as many loans closed as quickly as they could close and not worry – they just wanted the volume, and it didn't seem to matter how they got it."*

217. Notwithstanding the fact that, according to regulatory agencies including the FDIC and the OTS, "prime" loans should have been available only to borrowers with FICO scores of 660 or above, WaMu regularly made loans to borrowers with FICO scores well below

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 69

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

this standard. A WaMu training document for subprime loan production employees, entitled "Specialty Lending UW [Underwriter] HLCA [Home Loans Credit Authority] Training," revised September 26, 2007, makes clear that, regardless of a borrowers' credit history or actual potential to repay a loan, if the borrower WaMu targeted for one of its "prime" loans had a FICO score over 619, that borrower was considered a "prime" borrower.

218. In one stunning example of how WaMu abused the watered-down "standard" above, the Company instructed in an internal WaMu document to its underwriters during the Class Period that if a borrower applied for a "5/1 Amortizing ARM" and the borrower had a bankruptcy "less than 4 years ago," but had a FICO score of 621, WaMu would consider that borrower prime. In fact, CW 46, a Loan Consultant for WaMu in New York from 2003 to 2006, stated that during the Class Period, borrowers with credit scores as low as 540 (well below any accepted prime threshold) were approved for "prime" loans.

219. Various witnesses with direct experience in WaMu's underwriting operations have explained that during the Class Period, exceptions to WaMu's already low prime underwriting guidelines were the rule.

220. As observed by CW 2, who worked for WaMu from 1995 through 2008, most recently as Assistant Vice President Credit Level 3, Underwriting Supervisor, no exception to the underwriting guidelines was needed for many questionable loans, because WaMu's "guidelines were so generous." However, for those loans that did not fit within the loose guidelines of WaMu's underwriting standards, exceptions were encouraged and readily available. CW 51, a Senior Underwriter at the WaMu home loan center in Lake Success, New York from 2007 to 2008, agreed, stating that guideline exceptions were "part of the norm . . . it was so commonplace to go outside of the guidelines." ***Underwriting exceptions that were sent to management for approval "were always approved, so it was just business as usual and something that they were comfortable with."*** CW 5, a Senior Credit Quality Manager, explained that WaMu encouraged loan consultants to obtain exceptions to the underwriting

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 70

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

guidelines whenever necessary to close more loans.  CW 53, a Senior Loan Processor at WaMu in Pittsburgh from 2004 through 2006 and again in 2007, agreed that WaMu's loans were exception-ridden: "You could pretty much get an exception on any loan you wanted to."

221.    As a Negotiated Transaction Manager, CW 47 (described at ¶195) was one of four senior underwriters with the Company charged with approving exceptions to WaMu underwriting guidelines for loans greater than $3 million and exceptions beyond those that WaMu underwriting managers were allowed to make.  CW 47 stated that she and others in her position at WaMu were required to make numerous exceptions to WaMu's stated underwriting guidelines.  Indeed, CW 47 stated that the Negotiated Transaction Managers would be under a great deal of pressure to approve certain loans, especially where loan consultants had "important relationships."  Those loans for which CW 47 and the other Negotiated Transaction Managers refused to make exceptions, even after being pressured, were referred up WaMu's chain of command to Mark Brown, National Underwriting Manager, or Cheryl Feltgen, Division Executive Chief Risk Officer, for approval where the loans would readily be approved.

222.    According to CW 29 (described at ¶113), ***even when "borrowers were simply not qualified," WaMu's loose underwriting guidelines allowed borrowers to meet stated-income loan guidelines because of their credit scores.***  For example, CW 29 recalled multiple times where underwriters wanted to lower the stated income on the loan application, based on an evaluation of the borrower's actual circumstances, but WaMu would not allow such revisions.  CW 29 said that stated income loans were commonly referred to at WaMu as "lie-to-me loans."  Indeed, CW 29 reported that, over underwriter objections, the Company began to accept a job description in lieu of proof of employment for stated-income loans.  CW 29 recalled that the borrower's job description did not even have to be produced by the borrower's employer or have to be on their employer's letterhead:  "it was sufficient to print out a job description found online."

223.    Even the "conforming," supposedly standard prime loans that WaMu sold to

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 71

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

GSEs had substantial defects as a result of WaMu's overly permissive underwriting. For example, through its investigation, Lead Plaintiff obtained a non-public report entitled "Loan Disposition Summary" for a December 2005 pool of "conforming" WaMu loans sold to Freddie Mac. These summaries indicated that for the $145 million pool of ostensibly conforming WaMu loans, over one-third of the loans were rated 2W, or had "material exceptions waived." These exceptions related directly to the credit-worthiness of the borrower, with large categories of exceptions relating, *inter alia*, to appraisals, income, assets, and credit history.

(5)     WaMu's Option ARM Underwriting Was
Dangerously Deficient

224.     Killinger's statements (and those statements for which he is responsible) at ¶¶172, 179, 184 were false and misleading when made, because WaMu did not underwrite its Option ARM loans to the fully-indexed rate.

225.     CW 60, a Retail Loan Consultant with WaMu from 2002 through 2007, reported that throughout the Class Period *until late 2007, WaMu had underwritten its Option ARM loans to ensure only that the borrower could make monthly payments at the "teaser" rate*. When, in late 2007, the Company changed its guidelines to finally require its underwriters to underwrite the loans to the fully-indexed rate, it was a major change for the underwriters. CW 60 observed that "At the time the loans started falling out of favor, they started underwriting based on the index rate and it just snowballed from there." CW 61, a WaMu Retail Loan Consultant in Kensington, Maryland from 2001 through December 2007, confirmed that WaMu underwrote Option ARM loans to the teaser rate, rather than the fully-indexed rate. In 2007, according to CW 61, WaMu's new guidelines resulted in fewer borrowers being able to qualify for Option ARM loans based on the fully-indexed rate. Similarly, CW 62, a Senior Underwriter at WaMu's Lake Success, New York branch from June 2005 until February 2008, and CW 12 (described at ¶205) also confirmed that WaMu underwrote its Option ARM loans to the "teaser" rate, rather than the fully-indexed rate.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 72

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

226. Witnesses in other divisions of WaMu also have confirmed that WaMu underwrote its Option ARM loans to their "teaser" rates, at least until August 2007. According to CW 1, a Due Diligence Director in the WaMu Transaction Management group in Anaheim and subsequently Fullerton, California, who spent over 17 years with WaMu from 1991 until 2008, WaMu required loans that it purchased from third parties to conform with underwriting guidelines that WaMu applied to the loans that it originated. Thus, WaMu periodically updated its "Bulk Seller Guide" to conform to WaMu's own underwriting requirements. WaMu's "Mortgage Securities Corp. Seller Guide Update – Announcement Concerning Qualifying Rate and Qualifying Payment for Hybrid ARM, IO, and Option ARM Products" indicates that, effective August 1, 2007, WaMu Option ARM loan underwriting shifted to require qualification for such loans only at the fully-indexed rate.

**(6)** WaMu Also Secretly Implemented Dangerously Permissive Underwriting Practices for Its Subprime Lending

227. Throughout the Class Period, WaMu made loans to "subprime" borrowers through its subprime channel, LBM. Just as in the Company's prime lending, the Company covertly instituted extremely loose subprime lending guidelines so that WaMu employees could push through subprime loans.

228. CW 64, a longtime employee of LBM, noted a shift in underwriting philosophy in 2005 toward increasing loan volume at all costs. CW 64 was an Account Executive for LBM in New Jersey from 1998 until October 2007. When CW 64 first joined the subprime business, LBM relied on "common sense underwriting" and was not exclusively focused on credit scores. CW 64 noted the change away from a "know your borrower" focus beginning in the 2005 timeframe, with LBM relying more on credit score and less on common sense. The borrower needed to produce less and less documentation and FICO scores became more important than verifying income for WaMu. In response, "volume really went through the roof."

229. LBM met WaMu's needs by pushing through every loan it could close, through

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 73

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

whatever means necessary. CW 65, a Senior Underwriter for LBM in Dallas, Texas, from 2004 through April 2007, reported that on occasion CW 65 would express concerns to her manager over funding some of the loans underwritten, but the manager's "direction from corporate" was simply to fund loans. CW 65 said that LBM's underwriting guidelines became "ridiculously" loose toward the end of 2005.

230. CW 65 also reported that at month-end team meetings, it was often discussed that the Company was trying to increase volume by loosening guidelines and getting more "borrowers to fit." *Once per quarter, either Killinger or Rotella would issue internal e-mails and pre-recorded statements detailing the structure of the guidelines and explaining that the company was changing the guidelines in an attempt to increase volume*.

231. CW 65 recalled that some of the "crazier" programs at WaMu's LBM included stated-income W-2 wage earners, a program that started in 2005. Stated-income programs, to the extent that lenders accepted them, were traditionally reserved for self-employed borrowers with significant assets. At LBM, these "liar's loans" were common, even for those borrowers who were not self-employed. LBM would also accept 100% financing, stated-income borrowers with FICO scores as low as 500. CW 65 also questioned the self-employed borrower "three letters of reference" program, where a borrower only had to submit three letters of reference from anyone for whom they supposedly worked. CW 65 said no attempt was made to verify the information in the letters. CW 65 related that some of the accepted letters were laughable, including statements such as: "So-and-so cuts my lawn and does a good job." At LBM, FICO scores ranged from 500-620, but CW 65 said that if LBM salespeople had a borrower with a 620, they were "hooping and hollering" about having a borrower with good credit.

232. CW 65 also relayed that borrowers could get a loan with no established FICO score merely by providing "three alternative trade lines." An "alternative trade line" was anything that did not appear on the borrower's credit report, including documentation of car insurance payments, verification of rent paid, or a note from a person claiming the borrower had

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 74

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

repaid a personal debt. CW 65 said that LBM originated "a significant amount" of these types of problematic loans. CW 65 commented, "It was just a disaster." Furthermore, CW 65 said that these loans made up the majority of first payment defaults ("FPDs") in the end of 2006. CW 65 was extremely knowledgeable about the causes of FPDs at LBM because CW 65 was a member of an "FPD task force" commissioned to audit FPDs and determine "what went wrong."

233. During CW 75's time as an underwriter at WaMu's subprime division in Plantation, Florida in 2006, most of the loans she underwrote were stated-income loans, with only a "VOE," or verification of employer, required. CW 75 recalled, "It could be from their mother; we wouldn't know on our end. It's a stated deal and we couldn't ask for more documents even though [we felt it necessary]. It became a joke."

234. CW 68 was a Wholesale Mortgage Underwriter at the LBM loan processing center located in Lake Oswego, Oregon from August 2005 until December 2006. CW 68 first joined Washington Mutual in Lake Oswego in 2003 as a Senior Credit Analyst and subsequently joined the operations of LBM in 2004 as a Senior Loan Coordinator, ultimately becoming a Wholesale Mortgage Underwriter. CW 68 said that at LBM *there was always a sense of "working the underwriting guidelines" to close loans, rather than to mitigate the Company's credit risk*. CW 68 said that there was simply an environment in the loan processing center to "approve, approve, approve" and that any exception that was needed to approve a loan was not only done, but was "sought after." CW 68 felt that the Company consistently pressured its underwriters to "find a way to make it work." CW 68 estimated that perhaps only 1% of all loans submitted were actually rejected.

235. According to CW 66 (described at ¶197), even the few loans that LBM underwriters refused to approve were regularly pushed through by WaMu's LBM management by granting exceptions to the guidelines. According to CW 66, "There were so many exceptions." LBM allowed LTV ratio exceptions, and the "rate exceptions were ridiculous." Contrary to Craig Chapman's statement at ¶172 (witnessed and acquiesced to by Killinger),

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 75

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

according to CW 66, WaMu allowed even the salespeople to give interest-rate exceptions to borrowers to push loans through.

236.     Numerous other LBM employees agreed that exceptions to LBM's guidelines were common. CW 69 (described at ¶210) said that if LBM's competitors could not approve a loan, it was known to send the loan to LBM and they would make an exception to get the loan through. **CW 69 said that guidelines were "loose to the point of disbelief."** LBM accepted 500 FICO scores with bankruptcies. CW 69 described LBM's lending approach as follows: "If [potential borrowers] were breathing and had a heart beat, you could probably get the loan done."

237.     According to CW 68, CW 68's colleagues at LBM were very disappointed about the decisions that were being made by WaMu about loan quality, but they were resigned to simply "keep their heads down." According to CW 66 (described at ¶197), several WaMu employees contacted corporate headquarters about dubious practices involving underwriting exceptions, including issuing loans to unqualified borrowers. CW 66 stated, "[w]e did a lot of underhanded stuff." Every underwriter that CW 66 knew who had a problem with LBM over a negative decision made on a file was written up, not because they made a bad decision but rather because Sales did not like their decision. CW 66 said: "Basically Sales is what ran Long Beach Mortgage, it wasn't the Operations part."

(7)     Expert Analysis of Relevant Data Further Establishes that WaMu's Underwriting Standards Throughout the Class Period Were Deficient

238.     Analysis by experts in the field of banking regulation and mortgage finance examined the average loan amount to income levels of approved loan applications by WaMu, compared with its mortgage lending peers. Chart 2, below, shows that WaMu's loans reflected much higher "loan to income" ratios than its peers. Loan to income is a significant measure of credit risk, as borrowers who incur debt that is relatively high compared to their income levels

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 76

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1  have an increased risk of defaulting on their loans.  This analysis further confirms that the

2  deterioration in underwriting standards at WaMu was nationwide in scope and material in its

3  effects.  The methodology for this analysis is largely the same as that used to produce the

4  analysis of loan application denials, discussed above at ¶161.

5       239.    As shown below in Chart 2, WaMu lent more money to borrowers (compared

6  with the income of those borrowers) than any of its peers for 2005 and 2006.  For example, in

7  2006, for a borrower that earned $100,000 per year, WaMu would lend $286,000 on average,

8  whereas its next highest-lending peer in that year, IndyMac Bank, was willing to lend to that

9  same borrower only $275,000.  In 2007, WaMu was surpassed in its aggressive lending only by

10  IndyMac Bank (which filed for bankruptcy before WaMu).

**Chart 2: Average Annual Residential Loan Amount to Borrower Income for WaMu and Its Peer Group**

| | Calendar Year 2005 | Calendar Year 2006 | Calendar Year 2007 |
|---|---|---|---|
| WaMu | 2.93 | 2.86 | 2.82 |
| CW | 2.60 | 2.55 | 2.61 |
| WF | 2.57 | 2.48 | 2.47 |
| BofA | 2.39 | 2.48 | 2.58 |
| JPM | 2.39 | 2.51 | 2.47 |
| NCITY | 2.67 | 2.54 | 2.57 |
| SUN | 2.51 | 2.51 | 2.67 |
| CITI | 2.59 | 2.61 | 2.65 |
| INDY | 2.75 | 2.75 | 2.96 |
| 1stH | 2.59 | 2.62 | DATA NOT AVAILABLE |
| ABN | 2.54 | 2.53 | DATA NOT AVAILABLE |
| GMAC | 2.56 | 2.48 | DATA NOT AVAILABLE |
| LEH | 2.31 | 2.36 | DATA NOT AVAILABLE |

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 78

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

## b. Killinger Acted With Scienter In Making False and Misleading Statements Regarding The Underwriting Of WaMu's Loans

240. Killinger acted with scienter in making the statements in ¶¶170-190 above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements and those statements made by others in his presence. In addition to the facts above which show the falsity of Killinger's statements (and thus also show his scienter in making those statements), numerous additional facts support a strong inference of Killinger's scienter.

241. First, as discussed above at ¶¶76-94, Killinger had numerous face-to-face meetings and directly received reports that detailed WaMu's risk exposure resulting from the Company's lending standards. Second, WaMu's underwriting guidelines were made and modified at the highest levels of WaMu, through a "regimented" process, of which Killinger certainly was aware. Third, Killinger also received and had access to additional regular and special reports concerning WaMu's lending practices and loan performance from across the Company.

242. Because WaMu's underwriting guidelines directly affected the value and credit quality of WaMu's loans – and therefore were fundamental to WaMu's overall financial condition – WaMu's senior management, including Killinger, closely monitored and managed WaMu's prime and subprime home lending underwriting guidelines and operations. CW 65 (described at ¶229) explained that *Killinger or Rotella issued internal emails and pre-recorded statements once per quarter detailing the structure of the guidelines and explaining that the company was changing the guidelines in an attempt to increase volume*. Additionally, *CW 79*, who worked directly for Defendant Cathcart and assisted the Officer Defendants in their preparation for WaMu's 2006 Investor Day, *explained that Defendant Schneider could not have adjusted WaMu's lending practices as they related to risk without the knowledge and consent of the other Officer Defendants, including Killinger*. Thus, Killinger was knowledgeable about and involved in establishing and approving the Company's lending policies and guidelines.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 79

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

243. CW 88 was a Vice President and Manager of the Policies & Procedures Administration Group from 2003 through March 2007. CW 88's group's primary function was maintaining the central repository for Washington Mutual's Conventional Underwriting Guidelines ("CUG") and Product Pricing Guidelines ("PPG"). CW 88's role and responsibilities were Company-wide.

244. According to CW 88, WaMu's Credit Policy Review Group, headed by Michelle Joans, WaMu's Vice President of Credit Policy, set forth the underwriting guidelines in the CUG. ***CW 88 described WaMu's process for making any change to its underwriting guidelines as "regimented" and dependent upon review and approval from WaMu senior management***. Specifically, for any change to be made to WaMu's CUGs, a "Communication Request" would be submitted to CW 88's group. According to CW 88, any Communication Requests concerning WaMu's underwriting guidelines required at least a Senior Vice President's review and signature.

245. Once a "Communication Request" regarding WaMu's underwriting guidelines was received with requisite senior-level sign off, a document was created that compared the original guideline with the requested changes, which was reviewed by at least one member of each of the following groups: the Credit Policy Committee, a management committee that directly reported to the Audit Committee of WaMu's Board, the Legal Department, and WaMu's Compliance Department. CW 88 explained that proposed underwriting guideline changes were then discussed in conference calls in which members of each of these groups would present their positions. According to CW 88, WaMu's underwriting guidelines could be changed only if the proposed changes to WaMu's underwriting guidelines received the management-level approval set forth above, but CW 88 also stated that WaMu's loan production management frequently "pushed" for changes in WaMu's underwriting guidelines during such conference calls and were effective in overriding concerns raised by WaMu's legal, compliance or credit departments.

246. Beginning in 2005, according to CW 83, who was a Senior Default Foreclosure Loan Specialist with WaMu's LBM in California from 2002 to September 2006, WaMu held

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 80

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

meetings monthly to discuss new products and to "go over the numbers from the prior month." Additionally, according to CW 83, "Town Hall Meetings" with WaMu corporate executives, including Killinger, were held every three to six months. Before the start of the Class Period, according to CW 83, members of corporate management would merely congratulate the foreclosure department on the department's efforts to reduce delinquencies. However, according to CW 83, by late in 2005 these meetings took on a new tone: WaMu corporate executives would update WaMu employees on the state of defaults and reassure them that the Company was "not going anywhere." According to CW 83, corporate headquarters also sent emails, reiterating that despite increased loan defaults, the Company was "not going anywhere."

247. In addition, *data regarding the implementation of these guidelines and the results of WaMu's lax underwriting were carefully tracked and were widely available to WaMu management across the Company*. The Company separately tracked and monitored all exceptions made to the underwriting guidelines. CW 86, underwriting manager for WaMu/LBM in Englewood, Colorado from May 2007 to February 2008 and underwriter from May 2005 to May 2007, explained that whenever exceptions were made to WaMu's underwriting guidelines, an exception approval sheet would be signed and placed in a file. According to CW 86, exceptions were documented in two different systems, WaMu's loan origination system ("LOS") and in a database of loans that contained comments on the loan. *According to CW 86, WaMu's management could "pull up reports on anything" using the system that tracked underwriting exceptions.*

248. CW 69 (described at ¶210) corroborated CW 86's account. *According to CW 69, WaMu's corporate management in Seattle had a system for tracking exceptions to underwriting guidelines that it reviewed and shared with WaMu's senior management.* According to CW 69, during the Class Period WaMu's underwriting exception reports were very detailed and included the borrower's FICO score, loan amount, the exception that was being requested, "compensating factors" to supposedly "justify" the exception, and the percentage of

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 81

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

underwriting exceptions per geographic or sales region. According to CW 69, both WaMu Loan Fulfillment Center ("LFC") managers and WaMu's corporate managers in Seattle regularly received these exception reports.

249. CW 58, the Assistant Vice President, Credit Due Diligence for WaMu Capital Markets from 2005 to January 2007, recalled that ***WaMu's senior management received a report entitled the "PURT report," which broke down all loans rejected by branch and detailed the reason why the loans had been rejected.*** CW 58 said that the PURT report was updated weekly and "went to the upper management." CW 58 participated in monthly national conference calls and voiced concerns to WaMu management, including Mark Brown, National Underwriting Manager, about the types of loans that WaMu was originating. CW 58 said that during the last six months of CW 58's tenure with the Company, CW 58 was very vocal about her concerns over the types of loans that WaMu was originating.

250. CW 15 (described at ¶208) was in charge of Investor Relations, where CW 15 was responsible for working with the various investors in the securitized subprime products being structured and issued by WaMu's capital markets division. CW 15 was a senior management level employee who had close interaction with, among other senior Home Loans executives, Defendant Schneider. CW 15 stated that loan defaults "were always well monitored at WaMu" and, within the Company, "everyone was aware of the negative trends that started to appear in 2005." CW 15 recalled that WaMu's "loan servicing area was doing a good job tracking the defaults that were taking place." CW 15 stated that WaMu's management knew about, but never acknowledged, the negative trends that were being witnessed concerning first payment defaults on WaMu's loans.

251. CW 84 reported that the Company's Fidelity MSP system was the primary resource that tracked all aspects of the loans being processed by WaMu. CW 84 spent almost twenty years at WaMu, most recently serving as a Senior Accountant in Vernon Hills, Illinois from April 2006 until February 2008. CW 84 explained that the Fidelity MSP system was set up

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 82

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

to conduct queries with respect to any relevant aspects pertaining to the loans. Specifically, CW 84 explained that the system allowed a user to generate any number of different reports based on any specific characteristic pertaining to the product type (*e.g.*, fixed rate, adjustable rate, ARM), specific information pertaining to the loan and the borrower (*e.g.*, FICO scores, LTV, loan purpose, appraised value), and information pertaining to the loan status (*e.g.*, defaults, principal outstanding). CW 84 commented that ***the information, through Fidelity MSP, was readily available to those in senior management and accounting and that the many negative trends that were starting to take place were well-known***.

252. Similarly, CW 85, who served as a Staff Accountant in Home Loans Accounting at WaMu in Vernon Hills, Illinois from April 2006 until February 2008, reported that the accounting groups of the Company relied upon the Fidelity MSP system. Specifically, CW 85 formed part of the "real estate owned" ("REO") accounting group, a group of five individuals that handled the reconciliation of accounts pertaining to mortgage loans that had gone into foreclosure.

253. CW 85 recalled that the REO group maintained a separate database of information generated from information feeds from WaMu's Fidelity MSP system operated within the Home Loans Group, explaining that any number of specific reports could be generated through the Fidelity MSP system to identify various characteristics of defaulted or foreclosed loans. CW 85 further explained that the REO database provided specific data pertaining to the foreclosed loans, such as various loan types (i.e., Option ARM, conforming, Alt-A, subprime) and various loan characteristics including specific details pertaining to the borrower. CW 85 explained that on a monthly basis, the REO group prepared extremely detailed "Loan Loss Severity Reports" pertaining to foreclosures and including quantitative analyses of WaMu's foreclosures. CW 85 jokingly added that reports were not even necessary to recognize the increase of subprime loans that were being foreclosed and processed through REO during CW 85's tenure.

254. CW 67 served as a Quality Assurance Manager in the LBM Loan Fulfillment

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 83

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Center ("LFC") in Dallas, Texas from November 2005 until his termination in August 2007. CW 67 explained that the Quality Assurance group in Dallas performed a monthly audit on a random selection of subprime loans from the various loan origination centers around the country. This analysis was not focused on loan-specific issues, but instead concerned Company-wide trends within these "events" that might suggest necessary changes in WaMu's underwriting guidelines, compliance standards, or other systems. The group attempted to determine the cause of these events so that it could be addressed from an operational standpoint.

255. CW 67 observed that, despite the extensive analysis that the group performed to determine the root causes for Company-wide loan problems, WaMu ignored the results of that analysis. CW 67's group continued to identify the same problematic trends again and again without the Company taking any steps to address the causes. According to CW 67, although WaMu was "going through the motions" to present a façade of legitimate quality control, in reality there was nothing but a "free for all to approve loans by the thousands."

256. CW 81 served as a Staff Accountant in WaMu's Home Loans Group in Vernon Hills, Illinois from May 2006 until May 2008. CW 81 was involved in various accounting functions within the group, including the allocation of mortgage loans between "held for sale and "held for investment." Part of CW 81's responsibilities included managing accounting adjustments pertaining to non-accrual loans. As part of this responsibility, CW 81 was involved in the generation and analysis of monthly, quarterly and yearly reports for specific loan types, including (i) Adjustable Rate loans, (ii) Interest Only loans, (iii) Fixed Rate loans and (iv) Hybrid loans. Partly as a result of this regular reporting, CW 81 recalled that WaMu senior management, including Defendant Schneider, were "always aware" of what was occurring with respect to the overall loan portfolio.

257. **CW 54, a Credit Risk Supervisor who performed monthly audits on the Company's "prime loans," reported that the results of the group's analysis were provided to John Truong in Seattle, who was then responsible for integrating such information into**

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 84

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

***management reports that were specifically provided to WaMu's most senior management.*** CW 54 stated that the information regarding loan performance certainly reached senior management, including Schneider.

258. The Officer Defendants also closely monitored LBM's loan performance throughout the Class Period. CW 63, who served as National Underwriting Manager of LBM beginning in September 2006 and was a Regional Operations Manager for LBM prior to that position, participated in LBM's working level credit policy committee, which transmitted weekly recommendations on methods to reduce first payment defaults ("FPDs") to the Executive Credit Policy Committee, which included Defendant Schneider and Cheryl Feltgen, Division Executive Chief Credit Risk Officer, among other senior management. LBM's lax underwriting had resulted in increasing defaults and delinquencies, including FPDs and early payment defaults ("EPDs"). FPDs were defaults that occurred before the borrower made even one monthly payment. EPDs were typically loans in which the borrower may have made one or two monthly payments but then failed to continue making their monthly payments.

259. CW 63 explained that the working level credit policy committee's recommendations were communicated to WaMu's Executive Risk Committee (defined above at ¶82) by Alex Park, Senior Vice President, Senior Credit Officer - Subprime. CW 63 stated that the weekly written recommendations included three sales and revenue items: (1) impact upon production; (2) estimate of benefits in reducing FPDs; and (3) effect upon competition. The weekly document for the Executive Risk Committee's review was prepared by Alex Park and Denise McCrainey, Credit Policy Administrator. Likewise, communications from the executive level to the working level policy committee were transmitted through McCrainey.

260. According to CW 82, an employee of LBM from 2001 until October 2006, serving as an underwriter and later becoming a Quality Assurance Manager, WaMu regularly received reports from a group of WaMu employees dedicated to reviewing a percentage (typically around 20%) of LBM's loans to monitor LBM's loan underwriting, which he

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 85

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

forwarded to LBM's Loan Servicing Center managers. The reports listed findings on specific loan files, such as "stated income: not reasonable." The LBM managers receiving the reports through CW 82 had a certain number of days to go through the loan files in question and respond to the findings in the reports. According to CW 82, WaMu corporate headquarters received these reports as well. CW 82's quality assurance group had to respond to the WaMu unit concerning these reports, which in return had to respond to corporate. If CW 82 did not respond promptly, his boss would call and "give [him] hell."

261. According to CW 83, who was a Senior Default Foreclosure Loan Specialist with LBM in Chatsworth, California from 2002 to September 2006, *WaMu senior management had complete and constant access to information regarding the rising levels of defaulting LBM loans*. According to CW 83, her department received statistics every month that showed the number of FPDs from the prior month. According to CW 83, the numbers were consistently decreasing until 2005 when defaults jumped. CW 83 said that at one point the defaults were at 5-6% but eventually increased to 14%. They seemed to "jump all at once – at the end of 2004, they were at 6-7% and, although they may have increased slightly, did not go over 9%." Starting in 2005, according to CW 83, FPDs just "seemed to go up and up."

262. In early to mid 2007, WaMu assigned CW 69 (described at ¶210) to a specific project to track FPDs at WaMu. A WaMu LFC manager asked CW 69 to present the data he collected through graphs, percentages, and pie charts so that it could be presented to WaMu senior management, including WaMu Vice Presidents, Regional Managers, and the LFC manager. WaMu corporate management provided the raw data needed for the project. Until this point, CW 69 had not seen any FPD or EPD reports. These reports showed which types of loans were not performing well. According to these reports, the biggest problems at CW 69's LFC were higher LTVs and lower FICO scores, stated income products, and the use of bank statements for calculating income. CW 69 stated that it was recognized that FPDs and EPDs were the result of poor underwriting standards: for example, the Company would take twelve

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 86

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

months of personal bank statements and divide the deposits by twelve to arrive at the borrower's income; similarly, for limited documentation loans, the Company would look at six months' worth of bank statements and divide by six to arrive at the borrower's supposed income.

263.    Similarly, the Company tracked all information related to loan delinquencies. CW 87 spent over 20 years with WaMu or its predecessor banks, most recently serving as a Default Specialist in Vernon Hills, Illinois from August 2003 until August 2007.  As a Default Specialist, CW 87 was involved in working with borrowers to try to avoid foreclosures and to dispose of the properties held by WaMu as the result of foreclosures.  CW 87 recalled that most of the loans that CW 87's group worked with as default specialists were loans underwritten by WaMu itself, and were not loans underwritten by LBM or purchased from third-party lenders.

264.    CW 87 recalled receiving reports from WaMu's loan servicing operations in Jacksonville, Florida summarizing the loans that had gone into default, adding that there were clearly increasing levels of defaults and foreclosures beginning in mid-2005.  CW 87 said that, among CW 87's colleagues at WaMu, it was hardly a secret that the levels of loan defaults at WaMu were increasing during the Class Period, stating that at the Company, "everyone knew it."

265.    In addition to the allegations above regarding Killinger's knowledge regarding the true nature of WaMu's underwriting and loan quality, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Killinger's scienter.

### 4.    Killinger's Statements Regarding WaMu's Financial Results And Internal Controls

266.    During the Class Period, Killinger publicly made numerous false and misleading statements regarding WaMu's financial results and internal controls and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so.  These statements were false and misleading because, as discussed in detail below at ¶¶292-336, during the Class Period the Officer Defendants had caused WaMu to under-reserve for credit losses and to report financial statements that were not

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 87

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

in compliance with GAAP – and to also misrepresent the adequacy of WaMu's internal controls.

267.    On October 19, 2005, WaMu issued a press release announcing its financial results for the quarter ended September 30, 2005.  In this press release, WaMu reported that, for the third quarter of 2005, the Company had net income of $821 million, or $0.92 per diluted share, and total assets of $333.6 billion. In this press release, the Company also reported that its provision for loan and lease losses was $52 million, compared to $56 million in the fourth quarter of 2005, bringing the Company's total Allowance to $1.26 billion.  The Company noted that the provision consisted of: (i) $37 million that was a one-time special provision related to Hurricane Katrina, and (ii) $15 million related to the Company's ongoing risk management practices.  Killinger was quoted in this press release, but did not correct these misstatements above at any time.

268.    On or about November 7, 2005, the Company filed with the SEC a Form 10-Q for the period ended September 30, 2005.  The Third Quarter 2005 Form 10-Q included a signed certification by Killinger stating, in pertinent part:

> I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;
>
> Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

269.    Further, the Third Quarter 2005 Form 10-Q contained Killinger's certification that WaMu had designed, established, and maintained an effective system of internal controls over the Company's financial reporting that is "effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities and Exchange Act of 1934."

270.    On November 15, 2005, WaMu hosted an Investor Day Conference in New York.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 88

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

At that conference, Killinger stated:

> On credit risk. We have excellent processes, policies, underwritings, standards and **reserving methodologies** in place and they have served us very well for quite some time. . . .

> Now these actions may have limited near term profitability but they help protect us from a softer housing market if that were to occur.

271.    On January 18, 2006, WaMu issued a press release announcing its financial results for the quarter and year ended December 31, 2005.  WaMu reported that, for the fourth quarter of 2005, the Company's net income was $865 million, or $0.85 per diluted share, an increase of 12 percent on a per share basis from the fourth quarter of 2004 and, for the full year 2005, the Company's reported net income was $3.43 billion, or $3.73 per diluted share, an increase of 14% from 2004.  Killinger was quoted in this press release, but did not correct these misstatements at any time.

272.    On or about March 15, 2006, WaMu filed with the SEC its 2005 Form 10-K.  The 2005 Form 10-K reported the financial results that the Company announced on January 18.  Killinger signed a certification attesting to the accuracy of the information contained in the 2005 Form 10-K.  This attestation was substantially in the same form set forth in ¶268 above.  In the 2005 Form 10-K, the Company reported a full-year provision for loan and lease losses of $316 million in 2005, compared with a provision of $209 million in 2004.  According to the 2005 Form 10-K, this higher provision included $195 million that was related to the Company's acquisition of new credit card operations in the fourth quarter.  The remaining provision related to the Company's ongoing risk management efforts was $121 million.  The Company also reported total assets as of December 31, 2005, of $343.6 billion.  The 2005 Form 10-K stated that "[t]he Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ('GAAP')."

273.    Further, the 2005 Form 10-K contained Killinger's certification that WaMu had designed, established, and maintained an effective system of internal controls over the Company's financial reporting.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 89

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

274. On April 18, 2006, WaMu issued a press release announcing its financial results for the quarter ended March 31, 2006. In this press release, WaMu reported that, for the first quarter of 2006, the Company had net income of $985 million, or $0.98 per diluted share, and total assets of $348.7 billion. In this press release, the Company also reported that its provision for loan and lease losses was $82 million, compared to $217 million in the fourth quarter of 2005. Specifically, the Company stated that the "*[l]ower provision reflects continuing strong credit quality*" and "*[s]trong credit quality results in lower provisioning.*" (Emphasis in original.) Killinger was quoted in this press release, but did not correct these misstatements at any time.

275. On or about May 10, 2006, the Company filed with the SEC a Form 10-Q for the period ended March 31, 2006 (the "First Quarter 2006 Form 10-Q"), reporting the financial results as announced on April 18. Killinger signed a certification attesting to the accuracy of the information contained in the First Quarter 2006 Form 10-Q. This certification was in substantially the form set forth in ¶268 above. The First Quarter 2006 Form 10-Q also contained a certification by Killinger confirming that "[t]here have not been any changes in the Company's internal control over financial reporting during the first quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

276. On May 18, 2006, Killinger attended the Lehman Brothers Ninth Annual Financial Services Conference. At the conference, Killinger responded to concerns about credit, stating "[C]redit for us is [in] excellent shape, and *I feel very comfortable with where we are from management of that credit as well as the reserving*."

277. On July 19, 2006, WaMu issued a press release announcing its financial results for the quarter ended June 30, 2006. In this press release, WaMu reported that, for the second quarter of 2006, the Company had net income of $767 million, or $0.79 per diluted share, and total assets of $350.7 billion. In this press release, the Company also reported that its provision

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 90

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

for loan and lease losses was $224 million, compared to $82 million in the first quarter of 2006. The Company explained that this heightened provision was primarily the result of the Company's new credit card business and attributed the remainder to "a modest increase in the level of charge-offs, as well as incremental loan growth." The allocated provision for the Retail Banking Group and the Home Loans Group, which held the prime residential portfolio and the subprime portfolio, respectively, totaled only $38 million, compared with the $417 million provision allocated to the Card Services Group. Killinger was quoted in this press release, but did not correct these misstatements at any time.

278. On or about August 9, 2006, the Company filed with the SEC a Form 10-Q for the quarter ended June 31, 2006 (the "Second Quarter 2006 Form 10-Q"), reporting the financial results as announced on July 19. Killinger signed a certification attesting to the accuracy of the information contained in the Second Quarter 2006 Form 10-Q. This certification was in substantially the form set forth in ¶268 above. The Second Quarter 2006 Form 10-Q also contained a certification by Killinger confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶269 above.

279. On September 13, 2006, Killinger participated in the Lehman Brothers 4th Annual Conference. At the conference, Killinger emphasized that the Company had "started to prepare for a slowing period" by taking a number of steps to unload high-risk assets, "*as well as having appropriate level of reserving*."

280. On October 18, 2006, WaMu issued a press release announcing its financial results for the quarter ended September 30, 2006. In this press release, WaMu reported that, for the third quarter of 2006, the Company had net income of $748 million, or $0.77 per diluted share, and total assets of $348.9 billion. In this press release, the Company also reported that its provision for loan and lease losses was $166 million, compared to $224 million in the second quarter of 2006. The Company emphasized that "Credit exposure continues to be proactively managed," and the "Company conservatively manages [its] balance sheet." Killinger was quoted

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 91

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

in this press release, but did not correct these misstatements at any time.

281.    On November 9, 2006, WaMu filed with the SEC a Form 10-Q for the quarter ended September 30, 2006 (the "Third Quarter 2006 Form 10-Q").    Killinger signed a certification attesting to the accuracy of the information contained in the Third Quarter 2006 Form 10-Q and the adequacy of the Company's internal controls.    These certifications were in substantially the form set forth in ¶¶268-269 above.

282.    On December 13, 2006, Killinger attended a Goldman Sachs Financial Services CEO Conference where Killinger further claimed to consider relevant data regarding loan delinquencies and defaults, as well as the general mortgage environment, when provisioning for loan losses: "On the credit provisioning assumptions, we have assumed in our models all of the data that we see so far, which is an assumption of a slowing economy and increasing delinquencies in most categories, especially in things like sub-prime and in some of the other mortgage products."    In response to specific inquiries regarding the Company's loan loss provisioning, Killinger again stated:

> **When we do our reserving**, I will tell you that **we factor in the existing book of business**; what the current delinquencies are; we make assumptions about housing price declines and the economy; **and we develop models about what we think is going to happen to delinquencies, ultimate charge-offs**. And those things are, clearly, rising right now. And then we back that into what's the appropriate amount of embedded losses in that portfolio, and that determines our reserving. We do that every quarter.

283.    On January 17, 2007, WaMu issued a press release announcing its financial results for the quarter and year ended December 31, 2006.    In this press release, WaMu reported that, for the fourth quarter of 2006, the Company had net income of $1.06 billion, or $1.10 per diluted share, compared with net income of $865 million, or $0.85 per diluted share, in the fourth quarter of 2005.  For the full year 2006, the Company's reported net income was $3.56 billion, or $3.64 per diluted share, compared with a net income of $3.43 billion, or $3.73 per diluted share, in 2005.  The Company reported total assets as of December 31, 2006, of $346.3 billion.  WaMu also reported that its provision for loan and lease losses for the fourth quarter of 2006 was $344

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 92

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

million, $95 million of which the Company attributed to the Company's on-balance sheet credit card receivables. The full-year 2006 loan loss provision was $816 million, an increase of $500 million over the 2005 provision that the Company stated in its earnings release was "primarily due to the addition of the company's credit card business acquired Oct. 1, 2005." Killinger was quoted in this press release, but did not correct these misstatements at any time.

284.    On or about March 1, 2007, WaMu filed with the SEC a Form 10-K for the fourth quarter and fiscal year ended December 31, 2006 (the "2006 Form 10-K"), reporting the financial results announced on January 17. Killinger signed a certification attesting to the accuracy of the information contained in the 2006 Form 10-K. This certification was in substantially the form set forth in ¶268 above. The Company also reported a full-year provision for loan and lease losses of $816 million in 2006, compared with a provision of $316 million in 2005. According to the 2006 Form 10-K, this higher provision was "substantially the result of the Company's entry into credit card lending that resulted from the Providian acquisition and the ensuing growth in the on-balance sheet credit card portfolio, which accelerated during the fourth quarter of 2006." The Company announced total assets of $346.3 billion.

285.    The 2006 Form 10-K also contained a certification by Killinger confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶269 above.

286.    On April 17, 2007, WaMu issued a press release announcing its financial results for the quarter ended March 31, 2007. In this press release, WaMu reported that, for the first quarter of 2007, the Company had net income of $784 million, or $0.86 per diluted share and total assets of $319.9 billion. The Company also reported that its provision for loan and lease losses was $234 million, down from $344 million in the fourth quarter of 2006. Killinger was quoted in this press release, but did not correct these misstatements at any time.

287.    On or about May 10, 2007, the Company filed with the SEC its First Quarter 2007 Form 10-Q, reporting the financial results announced on April 17. Killinger signed a

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 93

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

certification attesting to the accuracy of the information contained in the First Quarter 2007 Form 10-Q. This certification was in substantially the form set forth in ¶268 above. The First Quarter 2007 Form 10-Q also contained a certification by Killinger confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶269 above.

288. On July 18, 2007, WaMu issued a press release announcing its financial results for the quarter ending June 30, 2007. In this press release, WaMu reported that, for the second quarter of 2007, the Company had net income of $830 million, or $0.92 per diluted share, and total assets of $312.2 billion. The Company also reported that its provision for loan and lease losses was $372 million, up from $234 million in the second quarter of 2007. Killinger was quoted in this press release, but did not correct these misstatements at any time.

289. On or about August 9, 2007, the Company filed with the SEC a Form 10-Q for the quarter ended June 30, 2007 (the "Second Quarter 2007 Form 10-Q"). Killinger signed a certification attesting to the accuracy of the information contained in the Second Quarter 2007 Form 10-Q. This certification was in substantially the form set forth in ¶268 above. The Second Quarter 2007 Form 10-Q also contained a certification by Killinger confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶269 above.

290. On October 5, 2007, WaMu issued a press release pre-announcing the Company's third quarter of 2007 results. In this press release, WaMu disclosed that the Company's net income for the quarter would decline by approximately 75% from the same quarter during the prior year, and blamed this decline on "a weakening housing market and disruptions in the secondary market." The press release further explained that one of the primary reasons for the Company's earnings decline was that the Company's loan loss provision for the third quarter was expected to increase to approximately $975 million due to "ongoing weakness in the housing market, primarily as it affects subprime and home equity loans, as well as growth in the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 94

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

company's loan portfolio." Killinger assured investors that the Company was financially stable, stating: "The company continues to have the liquidity and capital necessary to grow the company's businesses and support its current dividend, as it continues to execute its long-term strategic plans."

291. In addition, Killinger also participated in numerous earnings calls and conferences where materially false and misleading statements relating to WaMu's financial results were made to the investing public by the other Officer Defendants, noted below at ¶¶405, 408, 411, 413, 414, 524. Killinger failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶337-355) of the false nature of such statements.

        **a.**    **Killinger's Statements Regarding WaMu's Financial Results And Internal Controls Were False and Misleading**

292. Killinger's statements above in ¶¶267-291 reporting WaMu's financial results and regarding the quality of WaMu's reserving for credit losses (and those statements by other Officer Defendants for which he is responsible) were materially false and misleading, because WaMu did not account for its loans in accordance with GAAP and SEC regulations. Specifically, throughout the Class Period, WaMu understated its Allowance for Loan and Lease Losses (defined above as the "Allowance"), which resulted in materially overstated reported net income, assets, and earnings per share.

293. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices. The SEC has the statutory authority to promulgate GAAP for public companies, and delegated that authority during the Class Period to the Financial Accounting Standards Board ("FASB"). As set forth in SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures. SEC Regulation S-X (17 C.F.R. § 210.10-01(a)(5)) also requires

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 95

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

that interim financial statements (WaMu's Forms 10-Q) comply with GAAP.

294. WaMu's reserve for incurred credit losses, the Allowance, was reported on the Company's balance sheet as a reduction to assets. As loans were "charged off" as losses against the Allowance, the Allowance was reduced. In order to properly account for the worsening credit quality of its loan portfolio, WaMu was required under GAAP to record periodic provisions (which WaMu referred to as its "provisions for loan and lease losses" or its "provision for loan losses") to increase the Allowance to reflect its estimate of incurred or probable credit losses. Under GAAP, a provision for loan and lease losses is recorded as an expense, which reduces pre-tax earnings on a dollar-for-dollar basis.

**(1)** **GAAP and Other Governing Accounting Standards That WaMu Claimed to Follow Established Clear Rules Concerning How WaMu Should Have Reserved for Loan Losses**

295. WaMu repeatedly represented that it accounted for its Allowance for its loan portfolio in accordance with GAAP, and, in particular, Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" ("SFAS 5"). SFAS 5, which was issued over thirty years ago and has been applicable to every annual and interim financial statement every public company has issued for every fiscal year beginning after July 1, 1978, states:

An estimated loss for loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:

a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b. The amount of loss can be reasonably estimated.

(Emphasis in original.)

296. In the context of lending, Statement of Financial Accounting Standards No. 114, "Accounting By Creditors for Impairment of a Loan" ("SFAS 114"), which was issued in May

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 96

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1993 – over fifteen years ago – provides a definition of "impairment" for individual loans under GAAP that is also instructive for pooled loans: "A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement."

297.    Further, the American Institute of Certified Public Accountants' (AICPA) *Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies* (the "AICPA Guide"), which was originally issued in 2004 and updated in 2007, instructs that although SFAS 5 indicates that losses should be recognized only once the events causing the losses have occurred, there is an important caveat flowing from that rule: "***if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the <u>date of loan origination</u>***."

298.    The SEC staff also provides direct guidance on the proper accounting for loan losses. SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and Documentation Issues" ("SAB 102"), which was issued in July 2001, also several years ***before*** the Officer Defendants' improper activities at issue here, states in pertinent part: "***It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process***." Therefore, pursuant to SAB 102, a loan loss allowance methodology generally should "***[c]onsider all known relevant internal and external factors that may affect loan collectability*** . . . [and] be based on current and reliable data[.]"

299.    SAB 102 provides that "[f]actors that should be considered in developing loss measurements" include:

1.    Levels of and trends in delinquencies and impaired loans;
2.    Levels of and trends in charge-offs and recoveries;
3.    Trends in volume and terms of loans;
4.    Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 97

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Experience, ability, and depth of lending management and other relevant staff;

6.    National and local economic conditions;

7.    Industry conditions; and

8.    Effect of changes in credit concentrations.

300.    SAB 102 further states that "[f]or many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements. Therefore, the staff believes it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses." Thus, in addition to evaluating loans for impairment at origination, lenders are expected to reevaluate their reserving methodology, and therefore their loans or loan portfolios for impairment, every financial reporting period thereafter.

301.    The SEC also released SEC Financial Reporting Release ("FRR") 28 §401.9 ("FRR 28"), "Accounting for Loan Losses by Registrants Engaged in Lending Activities," in December 1986 – over twenty years ago (and approximately 15 years before SAB 102 was issued). FRR 28 remains in effect and states, in pertinent part, that "[b]ecause the allowance [for loan and lease losses] and the related provision are *key elements of financial statements of registrants engaged in lending activities, it is critical that those judgments be exercised in a disciplined manner that is based on and reflective of adequate detailed analysis of the loan portfolio*."

302.    In addition to the foregoing standards, according to the AICPA Guide, § 9.17:

Loan evaluations by management (and tests of such by independent accountants to the extent they are performed as part of the engagement) should avoid the following:

*Collateral myopia.* This is the failure to see beyond collateral values to a financial weakness in the borrower. . . .

*Inadequate collateral appraisals.* This is the failure to critically review appraisals to understand the methods employed, assumptions made, and limitations inherent in the appraisal process, including undue reliance on management appraisals.

303.    According to the Company's 2006 Form 10-K, WaMu supposedly generally

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 98

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

evaluated for impairment its loans held in portfolio on a collective basis "using statistical forecasting models that estimate default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loan loss data." Based on this statistical modeling, the Company represented, WaMu allocated a certain percentage of its provision for loan losses to its different loan product categories (*e.g.*, home loans, credit card loans, commercial loans).

304.    Additionally, the allocated portion of WaMu's Allowance was supplemented by an unallocated allowance, which, according to WaMu, was supposedly based upon several factors, including "national and local economic trends and conditions, industry conditions within portfolio segments, recent loan portfolio performance, loan growth and concentrations, changes in underwriting criteria, and the regulatory and public policy environment."

**(2)    WaMu and the Officer Defendants Disregarded Governing Accounting Rules and Standards**

305.    Rather than follow appropriate accounting standards for its Allowance, the Company failed to apply even the most rudimentary of GAAP's provisions or to follow the SEC's guidance, as explained in SAB 102 and by the agencies through their guidance. Indeed, the Company repeatedly failed to increase its provisioning of its Allowance in light of "levels of and trends in delinquencies and impaired loans . . . trends in volume and terms of loans . . . . [and] effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices," as it was required to do (¶299 quoting SAB 102).

306.    As the Officer Defendants knew, during the Class Period, WaMu had, among other things: (1) relegated its credit risk management to an optional, "consultative" role, rather than the gate-keeping function it was supposed to provide (¶¶62-74); (2) pressured appraisers (initially its in-house appraisers and then its outside appraisers) to inflate the appraisal value of the underlying collateral of its loans (¶¶105-161); and (3) significantly loosened its underwriting standards (¶¶191-239). Because of these facts, which were known to the Officer Defendants (but

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 99

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

concealed from the investing public), the Officer Defendants were required under GAAP and SEC guidelines to increase the Company's provisioning for its Allowance in a manner commensurate with the decreasing credit quality of WaMu's home mortgage products. Instead, the Officer Defendants, in order to conceal their activities and inflate the Company's reported net income, maintained the Company's provisioning at a level only appropriate for a loan portfolio made up of loans unimpaired by the practices and problems detailed above.

307. In violation of SFAS 5, SFAS 114, SAB 102 and the AICPA Guide, the Company did not factor in the "effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices" (¶299 quoting SAB 102) when provisioning for its Allowance. Rather, the Officer Defendants ignored underwriting quality and the quality of the underlying collateral for its loans. As shown in Chart 3 below, this resulted in a shocking increase of the Company's provisioning levels in the third and fourth quarters of 2007 and beyond:

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 100

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400



As Chart 3 indicates, the Company's Allowance was suppressed during most of the Class Period (after taking into account the increase during the fourth quarter of 2005 associated with the Company's acquisition of Providian, a large credit card company) until the truth about the Company began to emerge. The financial metrics that Killinger announced at ¶¶267, 271, 272, 275, 277, 278, 280, 281, 283, 284, 286, 287, 288, 289, 290 created the appearance that WaMu's loan portfolio was healthy and that WaMu's provision for loan and lease losses was appropriately calculated to replenish the Allowance as loan charge-offs depleted the Allowance. In the third quarter of 2007, the Company could no longer continue to hide the impairment of the loans it held and had no choice but to finally begin to increase its Allowance.

308. Further, as discussed in detail below, as early as *September 2005*, WaMu's Loan Performance Risk Model (the "LPRM") – the "fundamental" model whereby the Company calculated the appropriate provision for the Allowance – *did not account for and did not accurately predict the financial impact of recognized material risk factors concerning WaMu's*

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 101

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

**loan portfolio.** However, as explained below, the Officer Defendants did not disclose or act to finally correct these issues for at least **nine months** after the problems with the LPRM were fully documented and reported internally at WaMu. In addition, the Officer Defendants did not appropriately adjust WaMu's LPRM periodically to take into account the actual, undisclosed deteriorating performance of the Company's loan portfolio during the Class Period, as they should have.

**(3)** The Officer Defendants Knowingly Failed to Appropriately Account for the Company's Option ARM Loans In Provisioning for WaMu's Allowance

309. An internal, non-public document obtained through Lead Plaintiff's investigation reveals that, as of September 2005, the Officer Defendants were aware that the Company was not accurately assessing the risk of the Company's Option ARM loans. This document was dated September 2005 and entitled "Corporate Risk Oversight Report: Allowance for Loan & Lease Losses Methodology of Washington Mutual Bank" (the "CRO Report").

310. The CRO Report states that the "goal of the [Allowance] team is to forecast **expected losses over the upcoming four years**[.]" (Emphasis in original.) The CRO Report details many alarming deficiencies concerning WaMu's Allowance **methodology and other management and operational issues**. With regard to the Allowance, the CRO Report revealed that WaMu's loss model was materially deficient:

> **The predictive performance of Loan Performance Risk Model (LPRM) is untested on products with the potential to negatively amortize. Given recent production and interest rate trends, negative amortization is a major and growing risk factor in our portfolio.**

311. In other words, WaMu's LPRM, the model upon which the Company estimated the credit losses for the loans in its portfolio and based its Allowance, did not account for the performance of the Company's Option ARM loans, which the Company knew to be generally high-risk loans often made to unsophisticated borrowers.

312. In response to the CRO Report, on November 1, 2005, WaMu management

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 102

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

submitted a written "Review Response" from Joe Mattey, Senior Vice President of Portfolio, to "Corporate Risk Oversight," with a carbon copy to James Vanasek, Chief Enterprise Risk Officer; Hugh Boyle, Chief Risk Officer; and Melissa Martinez, Chief Risk Oversight Officer and Chief Compliance Officer (the "CRO Report Response"). The CRO Report Response was marked "Confidential – Internal Use Only" on each page by WaMu.

313. Concerning the significant defects identified in WaMu's LPRM, the CRO Report Response admitted that:

> [T]he documentation of the validation of LPRM did not provide a specific analysis of the ability of LPRM to reflect the higher risks of potentially negatively amortizing loans as distinct from loans without such potential. And, that documentation did not specifically analyze the ability of this model to reflect how losses might increase on Option ARM and Flex loans as interest rates increase.

314. To respond to this known hazard, the CRO Report Response prepared by WaMu's management simply stated that the LPRM would be "enhanced," with a target completion date of *June 30, 2006 – a full nine months after the Allowance methodology deficiencies were identified and documented in writing in the CRO Report*.

315. Notwithstanding the fact that WaMu did not have a functioning model in place to evaluate the Company's risk of loss from loans with the potential to negatively amortize (*e.g.*, WaMu's Option ARM loans), the Company maintained and, through the use of bonus incentives to its sales staff, even increased the proportion of Option ARM loans in its home loan portfolio without adjusting its Allowance appropriately. As noted above in ¶192, Chart 1, Option ARM loans dominated WaMu's single-family residential portfolio from the fourth quarter of 2005 throughout the Class Period.

316. Indeed, growing rates of negative amortization on the Company's Option ARM loans alone should have required the Officer Defendants, at a minimum, to materially increase the Allowance, even if only through the unallocated portion of the Allowance, during the Class Period, especially given the increased risks admittedly related thereto by WaMu. During the Class Period, as the Officer Defendants knew, many borrowers were only making the minimum

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 103

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

payments on Option ARMs, meaning that they were not even paying the then currently due interest. In fact, the number of WaMu's Option ARM borrowers who were paying less than the amount necessary to pay currently due interest and principal of their loans increased steadily during the Class Period. Between 2004 and 2007, WaMu's Option ARM borrowers in negative amortization as a percentage of the total value of Option ARM loans in WaMu's portfolio increased from 25% to almost 70%.

317. The enormous accumulated negative amortization on these loans was a red flag that those loans were trending towards delinquency and default. Moreover, as soon as WaMu's Option ARM borrowers reached the specified, pre-set negative amortization caps, which would force them to start fully repaying the loan, those borrowers, who then owed substantially more than they had initially borrowed, were at even greater risk of failing to make their loan payments.

318. However, WaMu and the Officer Defendants did not appropriately address the dangerous nature of WaMu's Option ARM loans when determining and allocating the Company's Allowance. WaMu's Option ARM loans performed much more similarly to the Company's subprime portfolio than to standard prime loans. For example, between 2006 and 2007, the percentage increases in net charge-offs in the Company's prime loans (including Option ARM loans) and the Company's subprime loans were 420% and 432%, respectively. However, rather than provisioning for Option ARM loans at a rate similar to that for the Company's subprime portfolio, the Officer Defendants evaluated them for impairment as part of their prime Home Loans portfolio and provisioned for Option ARM loans at a much lower rate.

319. Likewise, although the risky Option ARM loans comprised over half of the Company's prime loan portfolio throughout the Class Period, the Allowance allocated to the prime loan portfolio was disproportionately low. As illustrated in Chart 4 below, in 2007, WaMu's Allowance allocated to the entire home loans category was $322 million, or 0.29% of the value of the prime loan category. This percentage contrasts sharply with the allocated Allowance for the subprime channel, which, while inadequate, was $643 million, or 3.45% of the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 104

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

value of the subprime loan category in 2007.



Chart 4: WaMu's Allocated Allowance
as a Percentage of Loan Portfolio

              **(4)**       The Deteriorating Quality of WaMu's Loans
                               Also Indicates That WaMu's Allowance For
                               Loan & Lease Losses Was Materially
                               Understated Throughout the Class Period

320.    In violation of SAB 102, the Officer Defendants did not adequately consider the

Company's "levels of and trends in delinquencies and impaired loans" in provisioning for loan

losses.   The quality of the Company's loan portfolio was steadily worsening over time.   In

addition to the significant number of Option ARM borrowers who had not defaulted, but were in

negative amortization (¶316), the deteriorating quality of WaMu's loans is illustrated by the

rising number of "nonaccrual loans," or home mortgage loans that were over ninety days past

due on payments.   Instead of increasing the Allowance to properly account for the rapidly

deteriorating quality of WaMu's loan portfolio, beginning in the third quarter of 2005, the Officer

Defendants actually ***decreased*** the Allowance relative to the number of nonaccrual loans that

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 105

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

were accumulating in the Company's portfolio. This contrast is illustrated in Chart 5, below. While the third and fourth quarters of 2005 show an increase of the Allowance as a percentage of nonaccrual loans, during those two quarters the Company experienced one-time events, unrelated to WaMu's loosened underwriting standards and overstated appraisals, that increased WaMu's provisioning for those two quarters. Specifically, in the third quarter of 2005, $37 million of the $52 million provision, or over 70%, consisted of Hurricane Katrina-related costs. Similarly, in the fourth quarter of 2005, the Company accounted for the acquisition of Providian, a credit card company, by increasing the provision dramatically; that quarter, $195 million, or over 60%, of the $316 million provision related to that acquisition. While the Providian acquisition may have continued to influence the provisioning of reserves in early 2006, the effect was *de minimis* compared to the substantial additional provision in the fourth quarter of 2005.



Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 106

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

321. In further violation of SAB 102, the Officer Defendants did not appropriately consider the Company's "levels of and trends in charge-offs and recoveries" in provisioning for the Allowance. **WaMu's LPRM**, the Company's fundamental model for calculating the appropriate level at which to provision the Allowance, in addition to its other defects that were known to WaMu and the Officer Defendants that were set forth in the CRO Report, **was not calibrated to reflect actual loan performance**. CW 78 (described at ¶88) discovered this fact during the summer of 2007 when working on a project analyzing the credit parameters of new loans that were considered to be the highest risk loans.

322. In connection with that research, CW 78's analyst team decided to use WaMu's LPRM, which, as CW 78 recalled, was a "key tool" in calculating the Allowance's requirements. In CW 78's project, this analysis was then correlated with actual performance data for different groups of loans over comparable periods. The goal of the exercise was to examine expected losses for these riskiest of loans.

323. However, CW 78 explained that when the analyst team performed regression analyses of the data using the LPRM as a predictive tool, the LPRM clearly "showed a level of 'charge-offs' that was lower than the actual historical data." According to CW 78, the LPRM consistently understated loan delinquency when held up to WaMu's actual empirical data. When CW 78 questioned why the LPRM consistently produced such problematic results, CW 78 was informed that **the LPRM had not been calibrated for almost eighteen months to reflect actual loan performance data**.

324. The consequences of this failure were devastating. During the Class Period, in addition to the increases in nonaccrual loans, the Company's charge offs and foreclosed assets also steadily increased. For example, net charge-offs in home mortgage loans increased from $36 million in the third quarter of 2005, to $166 million as of June 30, 2007, and then to $1.97 billion in the second quarter of 2008. Similarly, foreclosed assets increased from $256 million in the third quarter of 2005, to $330 million as of June 30, 2007, and then to $1.156 billion in the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 107

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

second quarter of 2008. Furthermore, both first payment defaults (defined above as "FPDs") and early payment defaults (defined above as "EPDs") were a growing and alarming problem for the Company throughout the Class Period. The LPRM, the Company's fundamental model for calculating the appropriate levels at which to provision the Allowance, simply failed to take into account all loan performance data from the winter of 2005 onward – precisely when the loans broadly began to fail.

**(5)** The Company's GAAP Violations Resulted
In Materially Misstated Financial Statements

325.    In addition to the trends evident in the rising rate of nonaccrual loans, net charge-offs, and negative amortization from quarter to quarter, the Officer Defendants were aware that the credit quality of the remainder of WaMu's loan portfolio was rapidly deteriorating as a result of, among other things, the Company's loosened underwriting standards and the use of inflated appraisals in the credit review process. The insufficiency of the Officer Defendants' provisioning for loan losses was partially disclosed in the third quarter of 2007, when the Company suddenly announced guidance for its fourth quarter loan loss provision of $1.1-$1.3 billion. The actual loan loss provision for the fourth quarter of 2007, as announced by the Company on January 17, 2008, was over $1.5 billion – a quarterly provision greater than the *2007 full-year* provision publicly projected by the Company at the beginning of that year.

326.    According to an analysis of publicly available information, the amount by which the Officer Defendants under-provisioned the Company's Allowance during the Class Period was massive. In each of the six quarters prior to the Class Period, the Company maintained its Allowance at no less than 81.58% of the Company's total nonaccrual real estate loans. During the Class Period, the Officer Defendants drastically reduced the Company's Allowance as a percentage of nonaccrual loans to a low of 41.27%. Because the Officer Defendants caused the Company to weaken its underwriting guidelines, the Allowance as a percentage of nonaccrual loans should have been increased, rather than reduced, during the Class Period. Even assuming

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 108

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

the proper Allowance level as a percentage of delinquencies during the Class Period was the historic low of 81.58% in the first quarter of 2005 (although it should have been higher because the Company had substantially deviated from its underwriting standards and engaged in improper appraisal practices during the Class Period), the amount of the Allowance understatement – and corresponding manipulation of publicly reported income – is set forth in Chart 6 below.

| Chart 6: Minimum Amount By Quarter By Which WaMu's Allowance Was Under-Provisioned ||
|---|---|
| Quarter | Deficiency (Overage) |
| Q1'06 | $90,000,000 |
| Q2'06 | $60,000,000 |
| Q3'06 | $241,000,000 |
| Q4'06 | $171,000,000 |
| Q1'07 | $398,000,000 |
| Q2'07 | $472,000,000 |
| Q3'07 | $733,000,000 |
| Q4'07 | $579,000,000 |
| Q1'08 | ($755,000,000) |
| Q2'08 | ($2,219,000,000) |

Chart 6 indicates that, under this conservative analysis, the Company actually over provisioned in the first and second quarter of 2008. This results from the Company's increasingly massive "catch up" provisions beginning in the third quarter of 2007. If the Company had been provisioning at appropriate levels throughout the Class Period, such as maintaining its Allowance at or above 81.58% of nonaccrual loans throughout the Class Period, then the Allowance would have already been at a more appropriate level to address the Company's ongoing losses, and the Company would not have had to suddenly and dramatically increase its Allowance.

327. As discussed above in ¶267, during the third and fourth quarters of 2005, the Company reported special one-time events (Hurricane Katrina-related costs and the acquisition of the Company's credit card operations, respectively) that make it impossible to determine, from

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 109

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

publicly available information, how much the Officer Defendants were actually under-provisioning the Allowance for those two quarters. However, as the Officer Defendants' misconduct with regard to its risk management, underwriting, and appraisal practices began in the third quarter of 2005, upon information and belief, the Allowance was materially understated for the third and fourth quarter of 2005, as well.

328. As indicated by Chart 7 above, the Officer Defendants understated the Company's Allowance by tens or hundreds of millions of dollars in each quarter and billions of dollars in total. The understatement of the Allowance had a dollar-for-dollar impact on the Company's reported pre-tax income during the Class Period. (The effect on net income would be reduced by the Company's effective tax rate.) Thus, Killinger's statements at ¶¶267, 271, 272, 275, 277, 278, 280, 281, 283, 284, 286, 287, 288, 289, 290 were calculated in violation of GAAP and were materially false and misleading when made.

329. As a result of the Officer Defendants' manipulation of the Company's Allowance, WaMu reported artificially inflated net income in each quarter during the Class Period. Chart 7 shows the net effect, by quarter, of the Officer Defendants' minimum manipulation of the provision for loan and lease losses on the Company's publicly reported net income. The manipulation of the Company's reserves is shown on a non-cumulative basis for each quarter (*i.e.*, the understatement in a particular quarter is not included in subsequent quarters.) Because the Officer Defendants had caused the Company to diminish its underwriting standards and to inflate appraisals during the Class Period, WaMu should have increased its reserves during the Class Period to take into account the lower credit quality of its home loan portfolio. Thus, the table sets forth an extremely conservative analysis of the overstatement of the Company's net income manipulation based on the extremely conservative assumptions set forth in ¶326.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 110

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

| Chart 7: Estimated Effect of The Officer Defendants' Allowance Manipulation On Net Income* | | | | |
|---|---|---|---|---|
| Reporting Period | Net Income Reported | Minimum Allowance Understatement | Effect on Net Income | % Difference |
| 1Q'06 | $985,000,000 | ($90,000,000) | ($33,000,000) | 3% |
| 2Q'06 | $767,000,000 | ($60,000,000) | ($49,000,000) | 6% |
| 3Q'06 | $748,000,000 | ($241,000,000) | ($157,000,000) | 21% |
| 4Q'06 | $1,058,000,000 | ($171,000,000) | ($110,000,000) | 10% |
| 1Q'07 | $784,000,000 | ($398,000,000) | ($164,000,000) | 21% |
| 2Q'07 | $830,000,000 | ($472,000,000) | ($265,000,000) | 32% |
| 3Q'07 | $186,000,000 | ($733,000,000) | ($592,000,000) | 318% |
| 4Q'07 | ($1,867,000,000) | ($579,000,000) | ($291,000,000) | 16% |
| *Quarterly effective tax rate calculated from annual tax rates disclosed in the Company's Form 10-K for year ended December 31, 2007. | | | | |

330.    Sharon Sabba Fierstein, a Certified Public Accountant with over twenty years of accounting experience (including significant mortgage financing and audit management experience), has been retained by Lead Counsel in connection with Lead Plaintiff's investigation to evaluate WaMu's accounting practices.  Ms. Fierstein's opinion concerning WaMu's accounting practices is attached as Appendix E (the "Fierstein Declaration").  As explained in the Fierstein Declaration, for nearly ten years, Ms. Fierstein served as the Executive Vice President, Treasurer and Chief Financial Officer of a mortgage banking company.  Prior to that, Ms. Fierstein was an Audit Manager for Deloitte Haskins & Sells (a predecessor of Deloitte & Touche LLP), which included a two-year special assignment where she served as Secretary to the International Auditing Practices Committee for the International Federation of Accountants.  In that position, Ms. Fierstein contributed to the design and drafting of International Auditing Guidelines and other technical papers.  Additionally, Ms. Fierstein is currently the President of the New York State Society of CPAs and serves as a New York State delegate to the American Institute of CPAs. Ms. Fierstein's Curriculum Vitae is attached to Appendix E.  Having analyzed various publicly available information concerning WaMu and having reviewed the information in

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 111

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

this Complaint (including the internal WaMu documents referred to in this Complaint), as set forth in greater detail in her Declaration, it is Ms. Fierstein's opinion that WaMu materially under-provisioned its Allowance during the Class Period in a manner that is inconsistent with GAAP and SEC guidelines, and that WaMu lacked adequate internal controls during the Class Period.

**(6)** Killinger's Statements Regarding WaMu's
Internal Controls Were False and Misleading

331.    Killinger's certifications of internal controls over financial reporting (¶¶269, 273, 275, 278, 281, 285, 287, 289) were materially false and misleading.  First, the Company's purported control environment failed to ensure that the financial statements issued during the Class Period were reliable or in compliance with applicable laws.  Rather, the Officer Defendants focused on increasing loan volume origination without regard to the quality of such loans in an effort to reach aggressive market share goals (as described above at ¶¶192-239) without taking the steps required under GAAP and SEC guidelines to account properly for their activities.  The control environment shaped by the Officer Defendants – including its sidelining of WaMu's Risk Management segment – resulted in ineffective internal controls with respect to the Company's financial reporting process and allowed the Officer Defendants to misstate materially the Company's financial statements.

332.    Further, WaMu's ineffective internal controls over financial reporting allowed the Company to ignore the growing trends of delinquent loans when modeling for its Allowance. The CRO Report (¶¶309-314) detailed a number of other ways, beyond WaMu's failure to address the fundamental aspects of Option ARM loans in its Allowance methodology (and specifically, in the Company's LPRM), that WaMu's Allowance methodology and other controls critical to WaMu's financial reporting were dangerously unsound well into the Class Period. Many of these issues relate directly to senior management's oversight of the Allowance methodology.  Although designated by the CRO Report as matters requiring "[u]rgent

management attention and aggressive corrective actions" and "prompt attention," the Company did not propose to address many of the fundamental defects addressed in the CRO Report until the end of March 2006 – *at the earliest*.

333. For example, the CRO Report observed that:

The LPRM does not adequately account for justification for the unallocated allowance. Specific limitations noted in Q2 2005 for LPRM include:

- ***payment shock to Flex and Option ARM borrowers*** if Fed Funds Rate continues to increase

- ***negative amortization potential of Home Loans portfolio***

- the increasing concentration of speculative buyers in the housing market

- decreasing portfolio collateral improvements through a shift in borrower behavior from loans emphasizing debt amortization to one of managing payment terms and cash flow

- Regulator-imposed constraints on more exotic loan products which could reduce liquidity in the housing market.

As noted above, the unallocated portion of WaMu's Allowance was based upon factors including "national and local economic trends and conditions, industry conditions within portfolio segments, recent loan portfolio performance, loan growth and concentrations, changes in underwriting criteria, and the regulatory and public policy environment." WaMu's failure to document justifications for the unallocated portion of the Company's Allowance, the CRO Report suggested, increased "improper use of the models, or incomplete assessment of the unallocated portion[.]"

334. Further, the CRO Report stated under the subject of "Management Oversight & Reporting" that the groups responsible for maintaining internal controls lacked even adequate guidelines to accomplish their oversight functions:

The Credit Reserves Committee has been established for the purpose of providing oversight of the reserve and provisioning methodologies, models, assumptions, and more, yet guidelines detailing how this is to be accomplished are not available.

Furthermore, the Loss Modeling Working Group, responsible for providing

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 113

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

reports and analysis to aid the Committee in determining the adequacy of the [Allowance], lacks formal guidelines for this process.

335. In addition, the CRO Report went on to provide "additional detail" regarding this failure, explaining that WaMu's internal control failures meant that in addition to lacking effective guidelines, WaMu's Credit Reserves Committee was not being provided with sufficient information to discharge its duties – which jeopardized compliance with GAAP and interagency guidance:

> Failure to provide the Committee with specific information and data (including adjustments, assumptions, changes/adjustments in methodology, etc.) and comparison over an extended period of time (not only quarter-to-quarter) could result in decisions without adequate analysis, or decisions based on quarterly minutiae rather than long-term trends and performance. The process of determining reserve adequacy would also be adversely impacted if the Committee does not include representatives with significant and specific knowledge of each of the portfolios reviewed.

> The Committee should be provided with information that is robust enough, covering a prolonged period of time, to ensure that all the risks have been surfaced and thoroughly vetted in determining the adequacy of reserves for the bank and individual loan portfolios. The information must include the underlying assumptions made throughout the process, allowing management to regularly challenge and adjust the assumptions to reflect changes in the portfolios' risk characteristics. A method should be included to track any changes made from period to period and historically, preventing significant deviation from the expected evolution of the process. Furthermore, the standards and guidelines should ensure that the Committee consists of appropriate subject matter expertise relative to each of the business models or portfolios being reviewed*. **This would help comply with Interagency Guidance which calls for verification and review for GAAP conformance and supervisory guidance by a party independent from the [Allowance] estimation process.***

The CRO Report therefore "strongly" recommended that the Company take steps toward addressing these glaring inadequacies by establishing "formal standards and guidelines" for the Credit Reserves Committee and the Loss Modeling Working Group, including "what types of reporting and analyses [are] necessary for sufficiently determining the adequacy of the reserves." The CRO Report emphasized that such guidelines are "essential in providing transparency in the [Allowance] process, both internally and externally." Shockingly, the CRO Report Response prepared on behalf of WaMu's management proposed to respond to the issues related to

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 114

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

"Management Oversight & Reporting" by March 31, 2006. Yet, WaMu and the Officer Defendants never revealed these fundamental failures of internal controls to the investing public.

336. Because of management's failure to maintain effective internal controls over financial reporting, as discussed above at ¶¶305-329, WaMu and the Officer Defendants were able to conceal the deteriorating condition of WaMu's loan portfolio from the investing public by not provisioning for its Allowance in a manner appropriate for such a poor-quality loan portfolio and to materially misstate the Company's assets and earnings.

### b. Killinger Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Financial Results And Internal Controls

337. Killinger knew, or was reckless in disregarding, the above facts that rendered his statements regarding WaMu's financial results and the quality of its reserving false and misleading at the time he made them. In addition to the facts set forth above which show the falsity of Killinger's statements (and thus also show his scienter in making those statements), the facts below support a strong inference of Killinger's scienter.

338. As noted above at ¶83, according to CW 79, before each monthly Risk Management Committee meeting (which was attended by Killinger, Casey, Rotella, Schneider, and Cathcart), WaMu's different business units provided financial forecasts or projections that were reviewed in detail by the Executive Risk Committee.

339. The CRO Report was created for and circulated among senior WaMu management. Furthermore, according to its terms, it was to be "presented to management in writing" and management was required to "provide a written response."

340. According to Casey's claims at ¶372, management reviewed the Allowance in light of "loss factors and the performance of the underlying portfolio" and management monitored trends in the housing market and in nonperforming assets "very closely." Although these statements gave the misleading impression that management then set the Allowance in light of these factors (which, as described above, it did not), these statements are admissions of

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 115

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

knowledge that WaMu management was aware of the facts above. In fact, this information and the reports on loan performance described above at ¶¶247-264, in combination with the stable levels of the Allowance throughout the Class Period, were "red flags" to Killinger that the Allowance was understated.

341. The Allowance was a critical metric to investors, the importance of which WaMu's regulators emphasized. For example, the "Expanded Guidance for Subprime Lending Programs," issued by WaMu's regulators in 2001, provided guidance specific to reserving for subprime loans and placed the responsibility for ensuring the soundness of WaMu's reserves squarely on Killinger and the other Officer Defendants:

> The [Allowance] required for subprime loans should be sufficient to absorb at least all estimated credit losses on outstanding balances over the current operating cycle, typically 12 months. ***The board of directors and management are expected to ensure that the institution's process for determining an adequate level for the [Allowance] is based on a comprehensive and adequately documented analysis of all significant factors. The consideration of factors should include historical loss experience, ratio analysis, peer group analysis, and other quantitative analysis, as a basis for the reasonableness of the [Allowance].*** To the extent that the historical net charge-off rate is used to estimate expected credit losses, it should be adjusted for changes in trends, conditions, and other relevant factors, including business volume, underwriting, risk selection, account management practices, and current economic or business conditions that may alter such experience. ***The allowance should represent a prudent, conservative estimate of losses that allows a reasonable margin for imprecision.***

342. In fact, it was one of six "earnings drivers" discussed by senior WaMu management, including Killinger, in earnings conference calls each quarter.

343. The massive understatement each quarter and its effect on net income and other financial metrics were significant, further supporting the inference that Killinger knew, or should have known, about the misstatement of the Allowance.

344. Killinger signed Sarbanes-Oxley certifications each quarter of the Class Period

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 116

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

that he had ensured that the Company had instituted and maintained an effective system of internal controls over financial reporting.

345. Further, the facts alleged above regarding Killinger's scienter with regard to WaMu's risk management (¶¶75-94), appraisals (¶¶162-168), and underwriting (¶¶240-265) also support an inference of Killinger's knowledge with regard to WaMu's financial reporting, as each of these aspects were key to the appropriate accounting for WaMu's loans. In addition to the allegations above regarding Killinger's knowledge regarding the true nature of WaMu's financial situation, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Killinger's scienter.

346. Killinger also had both motive and opportunity to misstate WaMu's financial statements, as he had a tremendous stake in driving WaMu to meet certain financial benchmarks during the Class Period. Killinger's annual bonus was dependent on WaMu meeting certain goals and objectives. According to WaMu's proxy statements from the years 2005 through 2007, Killinger's incentive-based pay was based largely– 75%, 85% and 90% for fiscal years 2005, 2006 and 2007, respectively – on achieving certain financial performance measures, including, among others: (a) increasing WaMu's earnings per share; (b) decreasing WaMu's non-interest expense; and (c) increasing WaMu's non-interest income (for 2007 only). In 2005, 2006, and 2007, respectively, Killinger received $3,555,000, $4,074,000, and $1,189,900 over and above his salary by maximizing these metrics. Although Killinger did not accept the 2007 cash bonus of $1,189,900 he was entitled to under the 2007 EPS, 2007 NIE and 2007 NII performance measures set in the 2007 Compensation 8-K, the foregone bonus was still counted toward Killinger's post-retirement benefits.

347. Moreover, at least partly as a result of the bonus awards received during the Class Period, Killinger reaped significant overall compensation for each of the years during the Class Period. For 2005, 2006, and 2007, Killinger was paid $13,719,571, $14,245,859, and $5,250,770, respectively. Killinger and the other Officer Defendants attempted to continue this

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 117

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

pattern of windfalls even after investors began to learn of their scheme — on March 3, 2008, the Company announced that the 2008 bonus targets and performance measures for the Company's executives would exclude loan loss provisions and foreclosure expenses from the calculation of executive bonuses.

348. Further evidence of Killinger's motive to drive up WaMu's stock price is found in Killinger's unusual Class Period stock sales. These sales were unusual as measured by (1) the amount and percentage of shares sold, (2) comparison with Killinger's own prior trading history and that of other insiders, and (3) the timing of the sales. Such sales therefore provide strong evidence of scienter.

349. Analysis of the trading by insiders during the Class Period and during the equal-length period immediately preceding the Class Period, beginning January 13, 2003 and ending October 17, 2005 (the "Control Period"), demonstrates that the amount of shares Killinger sold during the Class Period was extraordinarily large, and at a relatively high price. During the Class Period, Killinger sold 301,688 shares of WaMu stock, for a total of $13,102,027 at an average share price of $43.43 a share. Sales by Killinger during the Class Period were extraordinary when compared to his own prior selling activity. Killinger's sales increased more than 226% during the Class Period, from approximately $4 million during the Control Period to more than $13.1 million during the Class Period. *See* Appendix F. The contrast between Killinger's sales during the Control Period and the Class Period is equally striking when measured in shares sold, rather than dollars. By this measure, Killinger increased his sales by 230% in the Class Period, compared to the Control Period. *See* Appendix F.

350. The increase in Killinger's selling is even more striking when compared to the sales pattern of other WaMu employees, who lacked Killinger's knowledge of the Company's true finances and operational condition. As a group, WaMu employees that are not named as defendants under Lead Plaintiff's claim for violations of Section 10(b) of the Exchange Act (i.e., securities fraud) sold shares worth $35.8 million during the Class Period, ***a decrease of 50%***

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 118

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

compared with the Control Period. By contrast, as noted above, Killinger increased his selling more than 225%, to more than $13.1 million. *See* Appendix F. Similarly, on the basis of the number of shares sold, while Killinger's sales increased 230%, non-Defendants' sales, collectively, actually decreased by half. *See* Appendix F.

351. Killinger's 10b5-1 Trading Plan and trading patterns further demonstrate the suspicious nature of his selling. In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade. Killinger instituted a 10b5-1 Trading Plan on or around February 6, 2006, approximately four months after the start of the Class Period and after Killinger was aware of inside information concerning WaMu's true, deteriorating financial condition. Killinger's first 10b5-1 Trading Plan allowed him to sell up to 150,000 WaMu shares. Killinger executed three sales of approximately 50,000 shares each in three separate installments pursuant to his first 10b5-1 Trading Plan. Once Killinger completed those sales, he initiated a second 10b5-1 Trading Plan in October 2006 in order to double his insider sales, with another three installments of sales of around 50,000 WaMu shares each, for a grand total of over 300,000 shares sold.

352. The pattern of Killinger's suspicious sales is reflected in the chart below, which also shows WaMu's common stock price at the time of Killinger's sales:

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 119

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400



As illustrated by Chart 8, above, Killinger suspiciously instituted his 10b5-1 Plans around four months after the start of the Class Period and concluded his 10b5-1 plans in May 2007, shortly before WaMu's stock price began to plummet when the market began to learn of WaMu's true financial condition starting with WaMu's surprise October 17, 2007 announcement that it would be increasing its reserves. Moreover, Killinger concluded his stock sales before the NYAG Complaint was filed concerning WaMu's unlawful appraisal practices, but suspiciously during the course of the New York Attorney General's investigation into such improper appraisal practices. Indeed, the NYAG Complaint was filed after the Attorney General's office conduct a nine-month investigation. Accordingly, Killinger was able to sell his WaMu shares at prices that reflected artificial inflation in WaMu's stock price due to the fraud that Killinger and the other Officer Defendants orchestrated.

353. Killinger's high rate of sales during the Class Period is particularly suspicious

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 120

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

because it occurred while WaMu was repurchasing significant amounts of its own shares from the market. WaMu's first stock buyback program – for up to $100 million in WaMu stock – was adopted on October 18, 2005 (the "2005 Buyback Program"). Shortly thereafter, Killinger instituted the first of his 10b5-1 trading plans on February 7, 2006. Over the next few months, Killinger sold 150,000 shares of WaMu stock in 50,000 share increments during the 2005 Stock Buyback Program, for total profits of $6,648,247.

354. On July 18, 2006, WaMu announced a second buyback of approximately $150 million in stock. Thereafter Killinger renewed his 10b5-1 trading plan for an additional 150,000 shares of WaMu stock. Killinger's sales under his 10b5-1 Trading Plans continued during this period for an additional 150,000 shares at a profit of $6,453,780.

355. The immediate consequence of the buybacks was to support the Company's share price, and the ultimate effect was to secure large profits on Killinger's own sales during the Class Period, while the Company, and through it, the Class, suffered massive losses on the shares WaMu repurchased.

*     *     *

356. In addition to these false and misleading statements, starting October 17, 2007 Killinger persisted in making similarly false and misleading statements even though the truth about the fraud at WaMu was slowly beginning to emerge. These statements are discussed below at ¶¶560, 568-569, 585, 590, 609.

**B.    Defendant Casey's False And Misleading Statements**

    **1.    Casey's Statements Regarding WaMu's Risk Management**

357. During the Class Period, Casey publicly made numerous false and misleading statements regarding WaMu's risk management and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 121

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

358.    On October 19, 2005, WaMu held an earnings call with investors to discuss its third quarter results.  On the October 19, 2005 earnings call, Casey claimed, "Our credit performance continues [to be] very good . . . We continue to proactively manage our credit risk, and are taking steps now to reduce potential future exposure."

359.    On or about November 7, 2005, the Company filed with the SEC its Third Quarter 2005 Form 10-Q, which was signed by Casey and contained the misstatements noted at ¶47 above.

360.    On January 18, 2006, the Company held an earnings call with investors to discuss its fourth quarter and full year 2005 results.  On the call, Casey stated that "[o]ur credit quality continued to be strong for most of 2005, but *we continued to proactively manage our portfolio to minimize credit risk* understanding that a more difficult environment may be ahead of us."

361.    On April 18, 2006, the Company held the annual shareholders meeting where Casey told shareholders that, "Lastly, *our risk management strategy continues to [be] effective* and our credit quality remains strong*."*

362.    On or about March 1, 2007, WaMu filed with the SEC its 2006 Form 10-K, which Casey signed.  The 2006 Form 10-K contained a number of misstatements regarding the Company's risk management as noted at ¶¶57-59 above.

363.    On April 17, 2007, WaMu held its annual shareholders' meeting in Seattle.  At the shareholders meeting, Casey reassured investors that the Company was being "very disciplined" in growing the Company's balance sheet and was monitoring trends in the housing market and in nonperforming assets "very closely" and would "continue to take proactive steps *to effectively manage our risks*."

364.    In addition, Casey also participated in numerous earnings calls and conferences where materially false and misleading statements relating to WaMu's risk management were made to the investing public by the other Officer Defendants, noted at ¶¶48-49, 53-54, 60, 431-433, 473, 502.  Casey failed to correct these false and misleading statements that were made in

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 122

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

his presence despite his knowledge (as discussed below at ¶¶366-374) of the statements' falsehood.

### a. Casey's Statements Regarding WaMu's Risk Management Were False and Misleading

365. For the reasons stated above at ¶¶62-74, Casey's statements regarding risk management at WaMu were materially false and misleading and omitted information necessary to make them not misleading.

### b. Casey Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Risk Management

366. At the time of making his statements regarding WaMu's risk management (and standing by while others made misstatements), Casey was aware of facts, or deliberately reckless in disregarding facts, that belied these statements and whose omission made those statements misleading. In addition to the facts set forth above which show the falsity of Casey's statements (and thus also show his scienter in making those statements), the facts below support a strong inference of Casey's scienter.

367. In addition to CW 17's report demonstrating the falsity of the Officer Defendants' statements regarding risk management (¶69), as discussed more fully above (¶¶78-79), CW 17 (described at ¶65) reported that ***WaMu's "Risk Reports" were distributed weekly to Defendants Casey, Rotella, and Cathcart.*** CW 17 explained that these Risk Reports "specifically quantified the fact that the Company was exceeding certain risk parameters as dictated by [WaMu's] risk guidelines." According to CW 17, WaMu's senior management – including Casey, Rotella, and Cathcart – chose to "simply ignore" those clear and direct warnings. In 2006, CW 17 raised with Casey and Cathcart his concerns about the way in which WaMu's Home Loans Group was analyzing its subprime portfolio for risk, but these concerns were "simply overruled" by Casey and Cathcart.

368. ***CW 80 reported similar face-to-face interactions with Casey, in which Casey***

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 123

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*was directly informed that the Company's risk management and accounting standards had dangerously deteriorated, with material effects on the Company's financial statements.* CW 80 was a Senior Vice President for Accounting Policy at WaMu from June 2006 until November 2007. CW 80 came to WaMu with twenty years of experience in the lending field, including senior positions at some of WaMu's direct competitors in the home lending business and after serving as a safety and soundness examiner at the Federal Reserve Board in Washington, D.C. CW 80 is currently employed at a federal housing regulatory agency.

369.     CW 80 believed that many of WaMu's accounting policies and practices were improper, including those related to the Company's compliance with GAAP, and SFAS in particular, and noted that his relationship with Casey "progressively worsened due to disputes over accounting policy."

370.     CW 80 had significant interaction with Defendant Cathcart and the Enterprise Risk Group Cathcart headed and with WaMu's Chief Financial Officer, Casey. CW 80 explained that WaMu's risk management function lacked independence, specifically because "Casey appeared to exert greater influence over the loan loss process as opposed to it being independently managed." Moreover, CW 80 believed that WaMu's "reserving process was diminished as the finance function exerted greater control," and marginalized those who were qualified to analyze and calculate WaMu's reserves.

371.     As discussed further above at ¶¶80-87, in (at a minimum) 2006, *Casey attended monthly Risk Management Committee Meetings led by Cathcart, where "all aspects of risk across the bank were discussed, including credit, market and operational risk."*

372.     Casey publicly claimed that "we do review our provision throughout the year and our [Allowance] every single quarter . . . . We continue to look at all of our loss factors and the performance of the underlying portfolio and continually make adjustments." Furthermore, Casey publicly claimed that WaMu was monitoring trends in the housing market and in nonperforming assets "very closely."

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 124

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

373. CW 79 (described at ¶80) specifically noted that Defendant Schneider would not have been able to adjust the Company's lending practices as they related to risk without the knowledge and consent of Casey, Killinger, Cathcart, and Rotella. In other words, Casey, Killinger, Cathcart, and Rotella as well as Schneider were knowledgeable about and involved in establishing and approving the Company's lending policies and guidelines.

374. In addition to the direct evidence of Casey's knowledge and the information available to Casey, Casey's extensive industry experience before joining WaMu strongly supports an inference of Casey's scienter. Among other jobs, Casey, from 1997 until he joined WaMu, served as Vice President of the General Electric Company and Senior Vice President and Chief Financial Officer of GE Insurance. Before joining GE, Casey worked for Coopers & Lybrand from 1984 until 1990 as an audit supervisor focusing on the financial services industry. Casey holds a bachelor's degree in accounting.

### 2. Casey's Statements Regarding WaMu's Appraisals

375. During the Class Period, Casey publicly made numerous false and misleading statements regarding WaMu's appraisals and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so.

376. On October 19, 2005, WaMu held an earnings call with investors to discuss its third quarter results. On the call, Casey reassured investors that the overwhelming majority of the Company's Option ARM portfolio had LTV ratios below 80%. He noted that, despite an increase in negative amortization in the Company's Option ARM portfolio, "only about 8% of current portfolio of option ARMs had [LTV ratios] at origination in excess of 80%. Less than 2% of the portfolio had LTV [ratios] at origination above 90%."

377. On or about March 15, 2006, WaMu filed its 2005 Form 10-K, which Casey signed as CFO. The 2005 Form 10-K contained a number of misstatements regarding the Company's appraisal inflation, as described at ¶96.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 125

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

378.    On or about March 1, 2007, WaMu filed with the SEC its 2006 Form 10-K, which Casey signed.   The 2006 Form 10-K contained a number of misstatements regarding the Company's appraisal inflation, as described at ¶101.

379.    On July 18, 2007, WaMu held an earnings call with investors to discuss its second quarter of 2007 results.  On this call, Casey stated, "While we anticipate that we will see higher [nonperforming assets] across all of our home loan portfolios, ***we expect losses in the prime loans to be much lower due to the lower LTVs and high FICO profile of our prime portfolio***." On the call, Casey again emphasized the quality of the Company's Option ARM portfolio, stating, "There's really – we feel very good about our option ARM portfolio and how it has performed. It's a very high FICO and low LTV portfolio."

380.    In addition, Casey also participated in numerous earnings calls and conferences where materially false and misleading statements relating to WaMu's appraisals were made to the investing public by the other Officer Defendants, as described at ¶¶98, 100, 103, Casey failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶382-387) of the statements' falsehood.

**a.      Casey's Statements Regarding WaMu's Appraisals Were False and Misleading**

381.    For the reasons stated above at ¶¶105-161, Casey's statements regarding appraisals at WaMu were materially false and misleading and omitted information necessary to make them not misleading.

**b.      Casey Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Appraisals**

382.    Casey acted with scienter in making the statements above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements and those statements made by other Officer Defendants in his presence that he did not correct.  In addition to the facts set forth above which show the falsity of Casey's statements (and thus also show his

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 126

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

scienter in making those statements), the facts below support a strong inference of Casey's scienter.

383. LTV values were extremely important to WaMu's credibility as a lender and Casey focused on them repeatedly during communications with investors. ¶¶376-379. In the Company's regulatory filings, LTV values were touted as one of two "key determinants" of credit quality.

384. Furthermore, the detailed allegations of the NYAG Complaint, including the internal WaMu and eAppraiseIT documents quoted in the NYAG Complaint, demonstrate that Casey knew or recklessly disregarded WaMu's blatant appraisal interference. As demonstrated by the communications quoted in the NYAG Complaint (¶¶152-160) and the reports from former employees identified in Lead Plaintiff's investigation (¶¶109-149), WaMu's pressure on its third-party appraisers to maintain low LTV ratios was discussed at extremely senior levels of the Company. For example, CW 10 (described at ¶118) reported that WaMu management met with eAppraiseIT and LSI to demand less resistance to WaMu's requests for increases in appraisal values. CW 23 (described at ¶114) stated that it was his understanding that there was direct communication between eAppraiseIT and the head of WaMu's Mortgage Division regarding the problems created by WaMu's "preferred list." In sum, former employees report that WaMu's senior management was aware of WaMu's improper appraisal practices, and in many cases directed them.

385. As discussed above at ¶165, extensive federal regulations governed appraisal practices, which required the Officer Defendants to focus on appraisals and whether they were conducted independently. As a result of these regulations, senior management, including Casey, were required to monitor, and if necessary correct, appraisal policies and practices that related to the underwriting process.

386. Further, the widespread and serious nature of the violations of WaMu's stated appraisal policies supports an inference of Casey's scienter. WaMu's pressure on appraisers and

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 127

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

the violations of its stated appraisal policies resulted in widespread and consistent appraisal inflation, which was unique to WaMu among its peers.  ¶161.  The consistent and nationwide nature of these violations supports the inference that this was a top-down scheme to increase loan volume.

387.    In addition to the allegations above regarding Casey's knowledge regarding WaMu's appraisal inflation, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Casey's scienter.

### 3.    Casey's Statements Regarding The Underwriting Of WaMu's Loans

388.    During the Class Period, Casey publicly made numerous false and misleading statements regarding the underwriting of WaMu's loans and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so.

389.    On or about March 15, 2006, WaMu filed its 2005 Form 10-K, which Casey signed.  The 2005 Form 10-K contained a number of misstatements regarding the Company's underwriting, as described at ¶174 above.

390.    On April 18, 2006, the Company held an earnings call with investors to discuss its first quarter of 2006 results.  When analysts asked about the rising trend of required repurchases in by WaMu of its securitized subprime loans, Casey discounted the existence of any such trend, claiming, "it's actually trending down.  I think the – what we saw in the fourth quarter was a little spike.  We have taken necessary actions to reduce that kind of exposure, and we feel very good about where we are right now.  We don't see that kind of trend continuing."  Further, Casey stated, "Turning to credit, we are pleased with the ongoing strong credit performance of our portfolio.  The economy remains strong, and the quality of our portfolio continues to be fairly stable, with only a slight increase in non-performing assets."  In explaining the Company's earnings driver guidance, Casey stated, "***Credit quality continues to surpass our expectations***.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 128

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Given the good credit quality and provision level of this quarter, we are revising our credit provision outlook downward to $650 to $750 million."

391.　On April 18, 2006, the Company held the annual shareholders meeting, where Casey continued to assure shareholders of the strength of the Company's loan portfolio, announcing, "Our credit provision was below our original expectation, reflecting our disciplined credit underwriting and a favorable credit environment."

392.　On July 19, 2006, the Company held an earnings call with investors to discuss its second quarter of 2006 results.　On the call, Casey touted the "***strong ongoing stability and strength of the [loan] portfolio***," announcing that "[*c*]*redit quality continues to be strong*" and that "Option ARMs continue to be a good, strong leader for us."

393.　On or about March 1, 2007, WaMu filed with the SEC its 2006 Form 10-K, which Casey signed.　The 2006 Form 10-K contained a number of misstatements regarding the Company's underwriting and loan quality, as described at ¶¶184-185 above.

394.　On April 17, 2007, the Company held an earnings call with investors to discuss its first quarter of 2007 results.　On the call, Casey again highlighted the improved standards supposedly imposed on the Company's subprime channel, stating, "With regard to pricing and underwriting standards in the subprime area, as Kerry [Killinger] mentioned, we've been working on this for quite some time. We've reduced our volume significantly and in the first quarter, we have significantly increased our pricing and ***decreased our risk profile that we're willing to underwrite to***, and so we think all those factors taken together will make this business a little more profitable. ***We are being selective with our underwriting.***"

395.　In addition, Casey also participated in numerous earnings calls and conferences where the other Officer Defendants made materially false and misleading statements to the investing public relating to the underwriting of WaMu's loans, as described at ¶¶170-173, 178-179, 181-183, 186-189, 451, 454, 492, 513.　Casey failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶397-

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 129

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

400) of the statements' falsehood.

### a. Casey's Statements Regarding The Underwriting Of WaMu's Loans Were False and Misleading

396. For the reasons stated above at ¶¶192-239, Casey's statements regarding underwriting at WaMu were materially false and misleading and omitted information necessary to make them not misleading.

### b. Casey Acted With Scienter In Making False and Misleading Statements Regarding The Underwriting Of WaMu's Loans

397. Casey acted with scienter in making the statements above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements and those statements made by others in his presence that he did not correct. In addition to the facts set forth above which show the falsity of Casey's statements (and thus also show his scienter in making those statements), the facts below support a strong inference of Casey's scienter.

398. According to CW 79 (described at ¶80), who worked directly for Cathcart and assisted the Officer Defendants in their preparation for WaMu's 2006 Investor Day, Defendant Schneider could not have adjusted WaMu's lending practices as they related to risk without the knowledge and consent of the other Officer Defendants. Thus, Casey was knowledgeable about and involved in establishing and approving the Company's lending policies and guidelines.

399. Furthermore, the "regimented" process of establishing WaMu's underwriting guidelines and the numerous reports summarizing the effects of WaMu's loosened underwriting guidelines (discussed above at ¶¶243-264) further support an inference of Casey's scienter.

400. Further, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Casey's scienter.

### 4. Casey's Statements Regarding WaMu's Financial Results And Internal Controls

401. During the Class Period, Casey publicly made numerous false and misleading statements regarding WaMu's financial results and internal controls and declined to correct

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 130

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so.

402. On or about November 7, 2005, the Company filed with the SEC the Third Quarter 2005 Form 10-Q, which was signed by Casey. The Third Quarter 2005 10-Q repeated the financial results set forth in the Company's October 19, 2005 press release and earnings conference call (¶267). The Third Quarter 2005 Form 10-Q also stated that "[t]he Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ('GAAP')."

403. The Third Quarter 2005 Form 10-Q included signed certifications by Casey, in the same form as Killinger's certifications at ¶¶267-268, certifying the accuracy of WaMu's reported financial information and the soundness of the Company's internal controls.

404. On or about March 15, 2006, WaMu filed with the SEC the 2005 Form 10-K, which Casey signed. The 2005 Form 10-K contained a number of misstatements regarding the Company's financial reporting as noted at ¶272 above. Further, the 2005 Form 10-K contained Casey's certification that WaMu had designed, established, and maintained an effective system of internal controls over the Company's financial reporting.

405. On April 18, 2006, the Company held the annual shareholders meeting where Casey continued to assure shareholders of the strength of the Company's loan portfolio, announcing, "Our credit provision was below our original expectation, reflecting our disciplined credit underwriting and a favorable credit environment."

406. On or about May 10, 2006, the Company filed with the SEC the First Quarter 2006 Form 10-Q, which was signed by Casey. The First Quarter 2006 10-Q repeated the financial results set forth in the Company's April 18, 2006 press release and earnings conference call (¶275). The First Quarter 2006 Form 10-Q also stated that the Company's financial reporting and accounting policies conformed to GAAP. Casey signed certifications in substantially the form set forth in ¶268 above attesting to the accuracy of the information

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 131

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

contained in the First Quarter 2006 Form 10-Q. The First Quarter 2006 Form 10-Q also stated that "[t]here have not been any changes in the Company's internal control over financial reporting during the first quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

407. On or about August 9, 2006, the Company filed with the SEC its Second Quarter 2006 Form 10-Q, which was signed by Casey. The Second Quarter 2006 10-Q repeated the financial results set forth in the Company's July 19, 2006 press release and earnings conference call (¶277). The Second Quarter 2006 Form 10-Q also stated that the Company's financial reporting and accounting policies conformed to GAAP. Casey signed certifications substantially the form set forth in ¶268 above attesting to the accuracy of the information contained in the Second Quarter 2006 Form 10-Q. The Second Quarter 2006 also contained a statement confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶406 above.

408. On October 18, 2006, the Company held an earnings call with investors to discuss its third quarter of 2006 results. During the call, Casey stressed, "We do reviews of our provision throughout the year and our [Allowance for Loan and Lease Losses] every single quarter and this quarter was no different from any other quarter. We continue to look at all of our loss factors and the performance of [the] underlying portfolio and continually make adjustments."

409. On November 9, 2006, WaMu filed with the SEC its Third Quarter 2006 Form 10-Q, which was signed by Casey. The Third Quarter 2006 10-Q repeated the financial results set forth in the Company's October 18, 2006 press release and earnings conference call (¶280). The Third Quarter 2006 Form 10-Q also stated that the Company's financial reporting and accounting policies conformed to GAAP. Casey signed a certification in substantially the form set forth in ¶268 above attesting to the accuracy of the information contained in the Third Quarter 2006 Form 10-Q. The Third Quarter 2006 Form 10-Q also contained a statement confirming the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 132

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶406 above.

410.    On or about March 1, 2007, WaMu filed with the SEC the 2006 Form 10-K, which Casey signed.  The 2006 Form 10-K contained a number of misstatements regarding the Company's financial reporting as described at ¶284 above.  Casey signed certifications in substantially the form set forth in ¶268 above attesting to the accuracy of the information contained in the 2006 10-K.  The 2006 Form 10-K also contained a certification by Casey confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶406 above.

411.    On April 17, 2007, WaMu held its annual shareholders' meeting in Seattle.  At the shareholders meeting, Casey reassured investors that the Company was being "very disciplined" in growing the Company's balance sheet and was monitoring trends in the housing market and in nonperforming assets "very closely."

412.    On or about May 10, 2007, the Company filed with the SEC the First Quarter 2007 Form 10-Q, which was signed by Casey.  The First Quarter 2007 Form 10-Q repeated the financial results set forth in the Company's April 17, 2007 press release and earnings conference call (¶286).  The First Quarter 2007 Form 10-Q also stated that the Company's financial reporting and accounting policies conformed to GAAP.  Casey signed certifications in substantially the form set forth in ¶268 above attesting to the accuracy of the information contained in the First Quarter 2007 Form 10-Q.  The First Quarter 2007 Form 10–Q also contained a statement confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶406 above.

413.    On July 18, 2007, WaMu held an earnings call with investors to discuss its second quarter of 2007 results.  On this call, Casey reiterated the quality of the Company's provisioning for credit losses, stating:

Keep in mind that the provision is a – has been building for quite some time, we

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 133

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

have been providing above charge-offs for the last five quarters. This is not something that immediately is reflected. We are actually looking at this over quite some time so we have been building for this. We are trying to give some perspective that we expect charge-offs to continue. But keep in mind that our provision models and our reserving model take[s] into account all of this information. One other thing to keep in mind is that the balance sheet did not grow this quarter, in fact loans were down, which is also contributing to that provision level. And then finally, I just point you to the allowance as a percentage of total assets in the health for investment portfolio, it actually went up from 71 basis points to 73.

414. Casey again emphasized the Company's planning in the same call, stating, "I'm trying to give you an indication that we do factor in this deterioration of these ratios into our provisioning and reserving guidance that we have given you," and, later:

[W]e're trying to anticipate and project provisions well before we actually see the actual escalation like we're seeing now. These reserve models are capturing lots of different factors. The current delinquencies and [mortgage portfolio analysis systems], you must keep in mind that they go 30-day delinquency and 60-[day] delinquency, we are already picking them up in our models, so that early stage delinquency information has already been picked up, and that's why you're seeing the reserves of those charge-offs in the previous quarters.

So when you actually see the higher charge-off, what you are starting to see is just the evolution of that maturity of that delinquency rate that we're putting into our models. *And that's why we provisioned above charge-offs in the past, because the charge-off hadn't come yet, yet we anticipated it.* So there's – it's – I think it's incorrect to be thinking that charge-offs and provisions should be linked. There's a lot more factors that come into and it's built over a longer period of time based on early indicators of loss as opposed to the ultimate charge-off which is sometimes 180 days after we're seeing the early stage delinquency."

415. On or about August 9, 2007, the Company filed with the SEC the Second Quarter 2007 Form 10-Q, which was signed by Casey. The Second Quarter 2007 Form 10-Q repeated the financial results set forth in the Company's July 18, 2007 press release and earnings conference call (¶288). The Second Quarter 2007 Form 10-Q also stated that "[t]he Company's financial reporting and accounting policies conformed to GAAP. Casey signed certifications in substantially the form set forth in ¶268 above attesting to the accuracy of the information contained in the Second Quarter 2007 Form 10-Q. The Second Quarter 2007 Form 10–Q also contained a statement confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶406 above.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 134

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

416. In addition, Casey also participated in numerous earnings calls and conferences where materially false and misleading statements related to WaMu's financial results were made to the investing public by the other Officer Defendants, noted at ¶¶270, 524. Casey failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶418-426) of the statements' falsehood.

### a. Casey's Statements Regarding WaMu's Financial Results and Internal Controls Were False and Misleading

417. For the reasons stated above at ¶¶292-336, Casey's statements regarding WaMu's financial results, reserving, and internal controls were materially false and misleading and omitted information necessary to make them not misleading.

### b. Casey Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Financial Results And Internal Controls

418. Casey acted with scienter in making the statements above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements and those statements made by the Officer Defendants in his presence that he did not correct. In addition to the facts set forth above which show the falsity of Casey's statements (and thus also show his scienter in making those statements), the facts below support a strong inference of Casey's scienter.

419. As CFO, Casey was responsible for the Company's financial reporting. Further, as noted above at ¶408, on October 18, 2006, Casey publicly claimed that "we do reviews of our provision throughout the year and our [Allowance] every single quarter . . . . We continue to look at all of our loss factors and the performance of underlying portfolio and continually make adjustments." Furthermore, Casey publicly claimed to be monitoring trends in the housing market and in nonperforming assets "very closely."

420. In addition, as discussed above at ¶¶368-370, CW 80, Senior Vice President for Accounting Policy, reported face-to-face interactions with Casey where CW 80 directly informed

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 135

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Casey that the Company's risk management and accounting standards had dangerously deteriorated, with material effects on the Company's financial statements. CW 80 informed Casey that many of WaMu's accounting policies and practices were improper, including those related to the Company's compliance with GAAP, and SFAS 5 in particular, and noted that his relationship with Casey "progressively worsened due to disputes over accounting policy." Further, CW 80 explained that "Casey appeared to exert greater influence over the loan loss process as opposed to it being independently managed." Moreover, CW 80 believed that WaMu's "reserving process was diminished as the finance function exerted greater control," and marginalized those who were qualified to analyze and calculate WaMu's reserves.

421. As noted above at ¶83, according to CW 79, before each monthly Risk Management Committee meeting (which were attended by Casey, Killinger, Rotella, Schneider, and Cathcart), WaMu's different business units provided financial forecasts or projections that were reviewed in detail by the Executive Risk Committee.

422. The CRO Report was created for and circulated among senior WaMu management. ¶¶309-314.

423. The materiality of the Allowance and the understatement, discussed at ¶¶326-329, 341, 550-551, further supports a strong inference of Casey's scienter. As noted at ¶¶326-328, the massive understatement of the Allowance each quarter and its effect on net income and other financial metrics were significant, further supporting the inference that Casey knew, or should have known, about the understatement.

424. Casey signed Sarbanes-Oxley certifications each quarter of the Class Period that he had ensured that the Company had instituted and maintained an effective system of internal controls over financial reporting.

425. Casey also had both motive and opportunity to misstate WaMu's financial statements, as he had a tremendous stake in driving WaMu to meet certain financial benchmarks during the Class Period. Casey's annual bonus was dependent on WaMu meeting certain goals

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 136

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

and objectives, as discussed above at ¶346. In 2005, 2006, and 2007, Casey received $1,303,548, $1,356,060, and $391,200, respectively, over and above his salary by maximizing these metrics. Moreover, partly as a result of the bonus awards he received during the Class Period, Casey reaped significant overall compensation for each of the years during the Class Period. For 2005, 2006, and 2007, Casey received $4,368,422, $4,565,581, and $2,440,646, respectively.

426. Further, the facts alleged above regarding Casey's scienter with regard to WaMu's risk management (¶¶367-374), appraisals (¶¶383-387), and underwriting (¶¶398-400) also support an inference of Casey's scienter with regard to WaMu's financial reporting, as each of these aspects were key to the appropriate accounting for WaMu's loans. In addition to the allegations above regarding Casey's scienter regarding the true nature of WaMu's financial situation, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Casey's scienter.

*     *     *

427. In addition to these false and misleading statements, starting October 17, 2007 Casey persisted in making and/or refusing to correct similarly false and misleading statements even though the truth about the fraud at WaMu was slowly beginning to emerge. These statements are discussed below at ¶¶560, 568, 590, 609.

### C. Defendant Rotella's False And Misleading Statements

#### 1. Rotella's Statements Regarding WaMu's Risk Management

428. During the Class Period, Rotella publicly made numerous false and misleading statements regarding WaMu's risk management and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so.

429. On January 31, 2006, Rotella attended the Citigroup Financial Services

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 137

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Conference. At this conference, Rotella touted the Company's risk management activities and stated that "[o]n the credit side, you can see we had a pretty good year. We feel like we are in good shape." In particular, Rotella assured investors that with regard to the Company's "pretty substantial balance sheet of option ARM products," the Company had evaluated the credit risk appropriately and "feel[s] pretty good about the credit risk."

430. On May 9, 2006, Rotella attended the D.A. Davidson & Co. Financial Services Conference. At this conference, Rotella explained that despite the slowing housing market, the Company had seen "little evidence of any real deterioration in the consumer," but that the Company was closely monitoring the credit quality of the Company's loan portfolio through its enterprise risk management group, which gave an "independent view of how [the Company was] doing on credit risk."

431. All of the Officer Defendants attended the Company's annual Investor Day conference, held on September 6 and 7, 2006. At the conference, Rotella, stressing his own personal experience through many housing cycles, announced that although it was a challenging mortgage environment, the Officer Defendants "[felt] good about the fact that we've been aggressive in controlling what we can control. Frankly, we've been ahead of the market in my perspective."

432. On April 17, 2007, the Company held an earnings call with investors to discuss its first quarter of 2007 results. On the call, Rotella stated, "we have absolutely no plans to shut down our subprime channel. ***We have, as you've heard, since the beginning of last year been tightening credit in that part of our business***. You heard the volume numbers were down 51% year on year and volume and we feel pretty good about the credit box we're playing in right now, but we're cautious as the market goes through this rationalization."

433. At the annual shareholders meeting on April 17, 2007, Rotella stated that the Company was "tighten[ing] credit" in the subprime sector.

434. In addition, Rotella also participated in numerous earnings calls and conferences

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 138

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

where materially false and misleading statements relating to WaMu's risk management were made to the investing public by the other Officer Defendants, noted at ¶¶48, 49, 53-54, 358, 360-361, 363, 473, 502. Rotella failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶436-443) of the false nature of such statements.

### a. Rotella's Statements Regarding WaMu's Risk Management Were False and Misleading

435. For the reasons stated above at ¶¶62-74, Rotella's statements regarding risk management at WaMu were materially false and misleading and omitted information necessary to make them not misleading.

### b. Rotella Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Risk Management

436. Rotella acted with scienter in making the statements above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements and those statements made by the Officer Defendants in his presence that he did not correct. In addition to the facts set forth above which show the falsity of Rotella's statements (and thus also show his scienter in making those statements), the facts below support a strong inference of Rotella's scienter.

437. As discussed above at ¶70, Rotella led the efforts to de-centralize WaMu's risk management, an effort that several former employees cited as a central cause of WaMu's failures of risk management.

438. CW 18, a Vice President in WaMu's Commercial Risk Department from April 2003 until June 2006, raised his concerns about WaMu's degeneration in risk management (discussed above at ¶66) repeatedly, and even went so far as to write to Rotella in early 2006 about his serious concerns about WaMu's increasingly lax and inappropriate risk policies. Rotella acknowledged receiving CW 18's written concerns, but the only consequence to his

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 139

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

whistle-blowing that CW 18 observed was that WaMu fired him in June 2006.

439. In a *Seattle Times* article titled "WaMu's No. 2 faulted by some for wrong priorities," published after the end of the Class Period, former WaMu insiders attributed many of the failures of WaMu's risk management to Rotella. According to the article, Rotella "pushed for more mortgages, including subprime and other risky loans, and ignored warnings from colleagues who said the company needed to be more careful in its lending." The article went on to quote a "longtime executive who took part in such conversations," stating "'When some of us would say, 'Stop the focus on mortgage lending,' he'd shoot it down.'"

440. The article also corroborated those former employees cited herein who attributed WaMu's structural failures in risk management to Rotella, stating that after Rotella joined the Company:

> [P]eople in its credit-risk department, which controls how tight or loose lending standards are, thought WaMu's mortgage business focused too much on driving sales and not enough on limiting risks, said two former executives.

> They had just begun to overhaul that area, adding more controls to the appraisal process, improving loan underwriting standards and creating more realistic mortgage pricing. Within weeks of his arrival, Rotella halted that overhaul. "It was abandoned," said one executive. "The part that was supposed to reverse risk was reversed."

> According to yet another longtime executive, Rotella became involved more than most top bank executives when the mortgage sales staff complained about applications that were declined.

> More than once, Rotella pressured credit officers to reverse their decisions, this executive said. "Steve Rotella created a culture of fear."

> While Rotella pushed for sales, former executives said, the credit-risk department that was supposed to balance that impulse was in disarray.

> \*      \*      \*

> According to another former executive, Rotella hassled the bank's internal reviewers, whose job was to make sure WaMu followed its own policies on lending, deposit accounts and other matters, and to report problems to top executives and the board.

> "Most presidents say thanks for bringing this to my attention, we're going to fix this fast," he said.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 140

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

With Rotella, "these people had to have a very thick skin. He would say, 'You need to be better qualified, you're wrong.'"

441. In addition to CW 17's report demonstrating the falsity of the Officer Defendants' statements regarding risk management (¶69), as discussed more fully above (¶¶78-79), CW 17 reported that WaMu's "Risk Reports" were distributed weekly to Rotella, Casey, and Cathcart. CW 17 explained that these Risk Reports "specifically quantified the fact that the Company was exceeding certain risk parameters as dictated by [WaMu's] risk guidelines." According to CW 17, WaMu's senior management – including Rotella, Casey and Cathcart – chose to "simply ignore" those clear and direct warnings.

442. In addition to the meetings between the Officer Defendants in which Rotella specifically discussed WaMu's risk exposure (as reported by CW 79 and discussed at ¶¶81-85) CW 79 specifically noted that Defendant Schneider would not have been able to adjust the Company's lending practices as they related to risk without the knowledge and consent of Rotella, Killinger, Cathcart, and Casey. In other words, Rotella, Killinger, Cathcart, and Casey as well as Schneider were knowledgeable about and involved in establishing and approving the Company's lending policies and guidelines.

443. In addition to the direct evidence of Rotella's knowledge and the information available to Rotella, Rotella's extensive industry experience before joining WaMu strongly supports an inference of Rotella's scienter. Among other positions, Rotella served as a member of the JP Morgan Chase executive committee, Chief Executive Officer of Chase Home Finance, and Executive Vice President of JP Morgan Chase. In these positions, Rotella was responsible for JP Morgan Chase's residential lending and also oversaw related capital markets, portfolio management, marketing, credit, human resources, finance and legal activities. Rotella holds a bachelor's degree in economics and a Master's of Business Administration in finance.

### 2. Rotella's Statements Regarding WaMu's Appraisals

444. During the Class Period, Rotella publicly made numerous false and misleading

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 141

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

statements regarding WaMu's appraisals and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so.

445.    On May 9, 2006, Rotella attended the D.A. Davidson & Co. Financial Services Conference.   At the conference, Rotella touted the Company's cushion "of protection against losses going forward" in its loan portfolio provided by the portfolio's purportedly low LTV ratios.

446.    In addition, Rotella also participated in numerous earnings calls and conferences where materially false and misleading statements related to WaMu's appraisals were made to the investing public by the other Officer Defendants, noted at ¶¶98, 376, 379.   Rotella failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶448-449) of the false nature of such statements.

**a.    Rotella's Statements Regarding WaMu's<br>Appraisals Were False and Misleading**

447.    For the reasons stated above at ¶¶105-161, Rotella's statements regarding appraisals at WaMu were materially false and misleading and omitted information necessary to make them not misleading.

**b.    Rotella Acted With Scienter In Making<br>False and Misleading Statements<br>Regarding WaMu's Appraisals**

448.    Rotella acted with scienter in making the statements above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements and those statements made by the other Officer Defendants in his presence that he did not correct.   In addition to the facts set forth above which show the falsity of Rotella's statements (and thus also show his scienter in making those statements), the facts as described at ¶¶383-386 support a strong inference of Rotella's scienter.

449.    In addition to the allegations above regarding Rotella's knowledge regarding WaMu's appraisal inflation, the facts alleged at ¶19 regarding the importance of residential

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 142

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

lending to WaMu also support a strong inference of Rotella's scienter.

### 3. Rotella's Statements Regarding The Underwriting Of WaMu's Loans

450.    During the Class Period, Rotella publicly made numerous false and misleading statements regarding the underwriting of WaMu's loans and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so.

451.    On January 18, 2006, the Company held an earnings call with investors to discuss the fourth quarter and full year 2005 results.  Rotella addressed WaMu's credit management practices on a loan-specific basis, stressing that for the Company's Option ARM loans: "***an important fact is we underwrite every loan at the fully indexed rate.  And so that's an important thing to note from a credit perspective***."

452.    On January 31, 2006, Rotella attended the Citigroup Financial Services Conference.  When investors questioned him about the Company's exposure to "exotic" loans and asked how the Company mitigated its exposure to these loans, Rotella responded that "[t]he credit quality on those products has been quite good," and that the Company does a "good job of trying to fit the right customer to that mortgage[.]"

453.    On May 9, 2006, Rotella attended the D.A. Davidson & Co. Financial Services Conference.  At the conference, Rotella continued to reassure investors of the Company's strong credit quality, saying that non-performing assets were at a "terrific" level and that the Company was "prudent in [its] credit extension[.]"

454.    On July 19, 2006, the Company held an earnings call with investors to discuss the second quarter of 2006 results.  On the call, Rotella agreed that, with regard to the subprime portfolio, Defendants "[felt] like we've got the right pricing and the ***right credit profile in the marketplace***," while Option ARMs "continue[d] to be [the Company's] flagship product."  In response to specific inquiries regarding deterioration in the credit quality of the subprime

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 143

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

portfolio, Rotella downplayed any degradation in credit quality and noted the Company's careful monitoring of its loan portfolio, replying:

> Generally, we think the consumer is healthy. . . . And we fell [sic] pretty good about that as the quarters have developed. So we don't see anything significant happening in the sector. . . . With that said, we're being quite careful and making any changes we need to make in our credit policies as we move forward, but our sense of things are – things are in pretty good shape.

455.     In addition, Rotella also participated in numerous earnings calls and conferences where materially false and misleading statements related to the underwriting of WaMu's loans were made to the investing public by the other Officer Defendants, noted at ¶¶170-173, 178-179, 181-182, 186-188, 390-392, 394, 492, 513.  Rotella failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶457-462) of the false nature of such statements.

                    **a.     Rotella's Statements Regarding
                            The Underwriting Of WaMu's Loans
                            Were False and Misleading**

456.     For the reasons stated above at ¶¶191-239, Rotella's statements regarding underwriting at WaMu were materially false and misleading and omitted information necessary to make them not misleading.

                    **b.     Rotella Acted With Scienter In Making
                            False and Misleading Statements Regarding
                            The Underwriting Of WaMu's Loans**

457.     Rotella acted with scienter in making the statements above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements and those statements made by others in his presence that he did not correct.  In addition to the facts set forth above which show the falsity of Rotella's statements (and thus also show his scienter in making those statements), the facts below support a strong inference of Rotella's scienter.

458.     According to CW 79, who worked directly for Cathcart and assisted the Officer Defendants in their preparation for WaMu's 2006 Investor Day, Defendant Schneider could not have adjusted WaMu's lending practices as they related to risk without the knowledge and

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 144

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

consent of the other Officer Defendants, including Rotella. Thus, the Officer Defendants were knowledgeable about and involved in establishing and approving the Company's lending policies and guidelines.

459. CW 65 (described at ¶229) reported that either Rotella or Killinger issued internal emails and pre-recorded statements once per quarter detailing the structure of the guidelines and explaining that the Company was changing the guidelines in an attempt to increase volume.

460. CW 18 (described at ¶66) also reported that decisions regarding measures of compensation came from "the top," and would be determined at the Executive Vice President Level, at a minimum. According to CW 18, Rotella certainly was aware of, if not taking an active role in, decisions made to compensate WaMu employees based on loan volume without regard to credit quality.

461. Furthermore, the "regimented" process of establishing the underwriting guidelines and the numerous reports summarizing the effects of WaMu's loosened underwriting guidelines (discussed above at ¶¶243-264) further support an inference of Rotella's scienter.

462. In addition to the allegations above regarding Rotella's knowledge regarding the true nature of WaMu's underwriting and loan quality, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Rotella's scienter.

### 4. Rotella's Statements Regarding WaMu's Financial Results

463. During the Class Period, Rotella participated in several earnings calls and conferences where materially false and misleading statements related to WaMu's financial results were made to the investing public by the other Officer Defendants, noted at ¶¶270, 405, 408, 411, 413-414, 524. Rotella failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶465-470) of the false nature of such statements.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 145

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

### a. Rotella's Statements Regarding WaMu's Financial Results Were False and Misleading

464. For the reasons stated above at ¶¶292-336, the statements regarding WaMu's financial results for which Rotella is responsible were materially false and misleading and omitted information necessary to make them not misleading.

### b. Rotella Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Financial Results

465. Rotella acted with scienter in failing to correct the statements noted above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements and those statements made by the other Officer Defendants in his presence that he did not correct. In addition to the facts set forth above which show the falsity of Rotella's statements (and thus also show his scienter in making those statements), the facts below support a strong inference of Rotella's scienter.

466. As noted above at ¶83, according to CW 79, before each monthly Risk Management Committee meeting (which were attended by Rotella, Killinger, Casey, Schneider, and Cathcart), WaMu's different business units provided financial forecasts or projections that were reviewed in detail by the Executive Risk Committee.

467. The CRO Report was created for and circulated among senior WaMu management. ¶¶309-314.

468. The materiality of the Allowance and the understatement, discussed at ¶¶326-329, 341, 550-551, further supports a strong inference of Rotella's scienter. As noted at ¶¶326-329, the massive understatement of the Allowance each quarter and its effect on net income and other financial metrics were significant, further supporting the inference that Rotella knew, or should have know, about the understatement.

469. Further, the facts alleged above regarding Rotella's scienter with regard to WaMu's risk management (¶¶436-443), appraisals (¶¶448-449), and underwriting (¶¶457-462),

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 146

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

also support an inference of Rotella's knowledge with regard to WaMu's financial reporting, as each of these aspects were key to the appropriate accounting for WaMu's loans. In addition to the allegations above regarding Rotella's knowledge regarding the true nature of WaMu's financial situation, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Rotella's scienter.

470. Rotella also had both motive and opportunity to misstate WaMu's financial statements, as he had a tremendous stake in driving WaMu to meet certain financial benchmarks during the Class Period. Rotella's annual bonus was dependent on WaMu meeting certain goals and objectives, as discussed above at ¶¶346-347. In 2005, 2006, and 2007, Rotella received $2,896,057, $3,142,800, and $912,800, respectively, over and above his salary. Moreover, partly as a result of the bonus awards received during the Class Period, Rotella reaped significant overall compensation for each of the years during the Class Period. For 2005 Rotella received $2,340,607. Rotella's compensation information for 2006 and 2007 was not disclosed.

*   *   *

471. In addition to these false and misleading statements, starting October 17, 2007 Rotella persisted in making and/or refusing to correct similarly false and misleading statements even though the truth about the fraud at WaMu was slowly beginning to emerge. These statements are discussed below at ¶¶560, 568, 569, 590.

**D.    Defendant Cathcart's False And Misleading Statements**

**1.    Cathcart's Statements Regarding WaMu's Risk Management**

472. During the Class Period, Cathcart publicly made false and misleading statements regarding WaMu's risk management and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so.

473. All of the Officer Defendants attended the Company's annual Investor Day conference, held on September 6 and 7, 2006. At the conference, Cathcart discounted negative

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 147

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

amortization's impact on the Company's risk exposure due to WaMu's effective underwriting, explaining that, "Even after maximum negative amortization and with no home price appreciation, the portfolio should remain well secured and the borrower should have sufficient equity to refinance, should they choose to do so." In an in-depth presentation regarding the Company's purportedly thorough risk management, Cathcart noted, "we have been watching our credit profile diligently for the last two years, and we've been making strategic choices to prepare for the environment we currently find ourselves in."

474. In addition, Cathcart also participated in numerous earnings calls and conferences where materially false and misleading statements relating to WaMu's risk management were made to the investing public by the other Officer Defendants, noted at ¶¶53, 431. Cathcart failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶476-487) of the false nature of such statements.

### a. Cathcart's Statements Regarding WaMu's Risk Management Were False and Misleading

475. For the reasons stated above at ¶¶62-74, Cathcart's statements regarding risk management at WaMu were materially false and misleading and omitted information necessary to make them not misleading.

### b. Cathcart Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Risk Management

476. Cathcart acted with scienter in making the statements above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements and those statements made by other Officer Defendants in his presence that he did not correct. In addition to the facts set forth above which show the falsity of Cathcart's statements (and thus also show his scienter in making those statements), the facts below support a strong inference of Cathcart's scienter.

477. Cathcart, as Chief Enterprise Risk Officer, was responsible for monitoring the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 148

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Company's risk exposure and for helping to set the Company's policies regarding risk. In fact, as discussed in more detail above at ¶¶80-83, CW 79 reported that Cathcart chaired monthly meetings in WaMu's Boardroom that included all of the Officer Defendants, as well as the Presidents and Chief Risk Officers of each business group. ***At these monthly meetings, Cathcart discussed in detail WaMu's risk exposure***. *See also* ¶¶84-85 (describing further informal meetings in which Cathcart took part).

478. As discussed further above at ¶¶368-370 and 420, CW 80, Senior Vice President and head of accounting policy, who had significant interaction with Cathcart and the Enterprise Risk Group Cathcart headed, noted significant failings in WaMu's risk management.

479. As discussed further above at ¶¶65, 69, and 78-79, CW 17 confirmed that, with efforts that began in late 2005 and that were largely spearheaded by Cathcart, WaMu "diverted from its original mandate" to guard against risk. For example, CW 17 explained that Cathcart managed the restructuring of risk management that "undermined the entire purpose of the Enterprise Risk Management initiative initiated by William Longbrake and Jim Vanasek [prior to late 2005] to adequately manage risk within the organization." CW 17 also reported that various Risk Reports were delivered to Defendants Cathcart, Rotella, and Casey during 2006 that "specifically quantified the fact that the Company was exceeding certain risk parameters as dictated by [WaMu's] risk guidelines," which Cathcart "simply ignore[d]."

480. CW 17 also reported that in 2006, he specifically raised with Cathcart and Casey that the way in which WaMu's Home Loans Group was analyzing its subprime portfolio for risk was "just stupid," as such analyses "specifically violated the specific policies outlined by [WaMu's Risk Management] group." CW 17's pleas for corrective action were "simply overruled" by Cathcart and Casey.

481. As also discussed above at ¶71, CW 19 attributed the decline in credit risk management to Cathcart's assumption of the role of Chief Risk Officer. According to CW 19, Cathcart had no understanding of overall compliance risk, "did not want to learn it, and generally

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 149

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

did not care for it." Specifically, ***CW 19 recalled weekly staff meetings with the various compliance divisions where Gregory Imm, Senior Compliance Officer from the Home Loans Group, would "be very vocal" with Cathcart and Schneider about issues within the Home Loans Group concerning compliance and credit risk deficiencies.***

482.    CW 19 believed that WaMu's "current predicament" is the result of "internal issues within WaMu" that "involve the lack of risk management" and disregard for known problems, for which CW 19 attributes responsibility directly to Cathcart.

483.    As discussed further above at ¶90, Cathcart received the monthly "Credit Risk Review" reports produced by the Risk Analytics Group, which detailed WaMu's risk exposure from its risky products.

484.    As described above at ¶93, CW 18 reported that Cathcart received regular audits of the Company's underwriting guidelines performed by the risk management group.  It was Cathcart's responsibility to report the results of these audits to the other Officer Defendants and to WaMu's Board.  *See also* ¶92 (report from CW 59 regarding the responsibilities of the Risk Analytics Group that prepared reports for Cathcart).

485.    In addition to the meetings between the Officer Defendants in which Cathcart specifically discussed WaMu's risk exposure (as reported by CW 79 and discussed at ¶¶81-85), CW 79 specifically noted that Defendant Schneider would not have been able to adjust the Company's lending practices as they related to risk without the knowledge and consent of Cathcart, Killinger, Casey, and Rotella.  In other words, Cathcart, Killinger, Casey and Rotella as well as Schneider were knowledgeable and involved in establishing and approving the Company's lending policies and guidelines.

486.    Further, Cathcart joined WaMu just as the CRO Report was provided to his predecessor, as discussed at ¶¶309-314, 332-335.  Thus, one of the first issues with which Cathcart was confronted was the Company's dangerous under-reserving for its credit risk.

487.    In addition to the direct evidence of Cathcart's knowledge and the information

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 150

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

available to Cathcart, Cathcart's extensive industry experience before joining WaMu strongly supports an inference of Cathcart's scienter. He was Executive Vice President of Retail Risk Management for Canadian Imperial Bank of Commerce from 2002 to 2005, and before that he served in a variety of senior risk management positions at Bank One.

### 2. Cathcart's Statement Regarding WaMu's Appraisals

488. Cathcart was present at the Company's annual Investor Day conference, held on September 6 and 7, 2006, when Killinger made the materially false and misleading statement to the investing public related to WaMu's appraisals noted at ¶98. Cathcart failed to correct this false and misleading statement that was made in his presence despite his knowledge (as discussed below at ¶¶490-491) of the false nature of the statement.

### a. Cathcart's Statement Regarding WaMu's Appraisals Was False and Misleading

489. For the reasons stated above at ¶¶105-161, the statement regarding appraisals at WaMu for which Cathcart was responsible was materially false and misleading and omitted information necessary to make it not misleading.

### b. Cathcart Acted With Scienter In Making A False and Misleading Statement Regarding WaMu's Appraisals

490. Cathcart acted with scienter in failing to correct the statement above, as he was aware (or deliberately reckless in not being aware) of facts that belied the statement made by Killinger in his presence that he did not correct. In addition to the facts set forth above which show the falsity of the statement (and thus also show Cathcart's scienter in failing to correct the statement), the facts as described at ¶¶383-386 support a strong inference of Cathcart's scienter.

491. In addition to the allegations above regarding Cathcart's knowledge regarding WaMu's appraisal inflation, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Cathcart's scienter.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 151

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

### 3. Cathcart's Statements Regarding The Underwriting Of WaMu's Loans

492. All of the Officer Defendants attended the Company's annual Investor Day conference, held on September 6 and 7, 2006. Regarding the Company's Option ARM portfolio, Cathcart noted that, "At origination, WaMu focuses on an effective underwriting process and borrower disclosures[.]" Hence, "[w]ith respect to the borrower, the portfolio quality is very sound." Cathcart concluded that, for Option ARM borrowers, "WaMu controls the underwriting, so we have the opportunity to evaluate the borrower at the time of origination. Overall, we are comfortable with this portfolio."

#### a. Cathcart's Statements Regarding The Underwriting Of WaMu's Loans Were False and Misleading

493. For the reasons stated above at ¶¶191-239, Cathcart's statements regarding underwriting at WaMu were materially false and misleading and omitted information necessary to make them not misleading.

#### b. Cathcart Acted With Scienter In Making False and Misleading Statements Regarding The Underwriting Of WaMu's Loans

494. Cathcart acted with scienter in making the statements above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements. In addition to the facts set forth above which show the falsity of Cathcart's statements (and thus also show his scienter in making those statements), the facts below support a strong inference of Cathcart's scienter.

495. According to CW 79, who worked directly for Cathcart and assisted the Officer Defendants in their preparation for WaMu's 2006 Investor Day, Defendant Schneider could not have adjusted WaMu's lending practices as they related to risk without the knowledge and consent of the other Officer Defendants. Thus, the Officer Defendants were knowledgeable and involved in establishing and approving the Company's lending policies and guidelines.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 152

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

496. In addition, according to CW 18, WaMu's risk management group regularly audited the company's underwriting guidelines and those audit reports were submitted to the Company's Chief Enterprise Risk Officer, Cathcart. Those audit reports reviewed all aspects of WaMu's underwriting guidelines for risk. It was CW 18's understanding that Cathcart was then responsible for reporting the results of those internal audits concerning WaMu's underwriting guidelines to the Officer Defendants and to WaMu's Board.

497. Furthermore, the "regimented" process of establishing the underwriting guidelines and the numerous reports summarizing the effects of WaMu's loosened underwriting guidelines discussed above at ¶¶243-264) further support an inference of Cathcart's scienter.

498. In addition to the allegations above regarding Cathcart's knowledge regarding the true nature of WaMu's underwriting and loan quality, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Cathcart's scienter.

499. Cathcart also had both motive and opportunity to perpetrate fraud, as he had a tremendous stake in driving WaMu to meet certain financial benchmarks during the Class Period. Cathcart's annual bonus was dependent on WaMu meeting certain goals and objectives, as discussed above at ¶¶346-347. In 2007, Cathcart received $153,220 over and above his salary by maximizing these metrics. For 2006, Cathcart's bonus information was not disclosed. Moreover, partly as a result of the bonus awards received during the Class Period, Cathcart reaped significant overall compensation for each of the years during the Class Period. For 2007, Cathcart received $1,961,984. Cathcart's compensation information for 2006 was not disclosed.

*     *     *

500. In addition to these false and misleading statements, starting October 17, 2007 Cathcart persisted in making and/or refusing to correct similarly false and misleading statements even though the truth about the fraud at WaMu was slowly beginning to emerge. These statements are discussed below at ¶¶568-569.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 153

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

**E.** **Defendant Schneider's False and Misleading Statements**

**1.** **Schneider's Statements Regarding WaMu's Risk Management**

501. During the Class Period, Schneider publicly made false and misleading statements regarding WaMu's risk management and declined to correct similar false and misleading statements made in his presence by other WaMu executives, notwithstanding his ability to do so.

502. On November 15, 2005, WaMu hosted an Investor Day Conference in New York. At that conference, Schneider announced: "In addition, ***we've maintained effective risk management processes***. This is clearly a top priority for us. We've invested a significant amount in terms of talent and technology in building risk management[.]"

503. In addition, Schneider was also present at the Investor Day Conference where materially false and misleading statements relating to WaMu's risk management were made to the investing public by the Defendant Killinger, noted at ¶¶48-49. Schneider failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶505-511) of the false nature of such statements.

**a.** **Schneider's Statements Regarding WaMu's Risk Management Were False and Misleading**

504. For the reasons stated above at ¶¶62-74, Schneider's statements regarding risk management at WaMu were materially false and misleading and omitted information necessary to make them not misleading.

**b.** **Schneider Acted With Scienter In Making False and Misleading Statements Regarding WaMu's Risk Management**

505. Schneider acted with scienter in making the statements above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statement and those statements made by other Officer Defendants in his presence that he did not correct. In addition to the facts set forth above which show the falsity of Schneider's statement (and thus also show his scienter in making the statements), the facts below support a strong inference of Schneider's

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 154

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

scurer.

506.    As discussed above at ¶70, CW 20, Division Finance Officer and Senior Manager of Internal Controls with WaMu from 2002 until December 2007, reported that *as President of the Home Loans group, Schneider had extensive control over risk management within that sector.*

507.    CW 19 (described at ¶71) reported that there were weekly divisional meetings where both the senior compliance and credit risk officers met with the operational heads.  In the case of WaMu's Home Loans segment, *CW 19 explained that Schneider held weekly meetings where* Mark Hillis, Senior Credit Risk Manager, and Gregory Imm, Senior Compliance Officer from the Home Loans Group, *routinely reported on any compliance and credit risk deficiencies.*

508.    As discussed further above at ¶90, according to CW 78, Schneider received the monthly "Credit Risk Review" reports produced by the Risk Analytics Group, which detailed WaMu's risk exposure from its risky products.  *See also* ¶92 (report from CW 59 regarding the responsibilities of the Risk Analytics Group).

509.    According to CW 63 (described at ¶258), Schneider was particularly focused on preserving LBM's growth.  This was because, CW 63 observed, LBM was considered by the Officer Defendants to be the "golden child" of WaMu; although it did not account for the preponderance of WaMu's overall earnings, it had a much higher growth rate and higher growth potential than WaMu's other divisions.

510.    In addition to the meetings between the Officer Defendants in which Schneider specifically discussed WaMu's risk exposure (as reported by CW 79 and discussed at ¶¶81-85), CW 79 (described at ¶80) specifically noted that Schneider adjusted the Company's lending practices as they related to risk.  Thus, Schneider was knowledgeable about and involved in establishing and approving the Company's lending policies and guidelines.

511.    In addition to the direct evidence of Schneider's knowledge and the information

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 155

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

available to Schneider, Schneider's extensive industry experience before joining WaMu strongly supports an inference of Schneider's scienter. Among other jobs in the lending and financial services industries, he served as President and Chief Operating Officer of CitiMortgage, Inc. from 2001 to 2005, and was Executive Vice President of Retail Banking for Old Kent Financial Corporation from 1997 to 2001. Schneider holds a bachelor's degree in accounting and a Master of Business Administration degree, and he is also a licensed CPA.

### 2. Schneider's Statements Regarding The Underwriting Of WaMu's Loans

512. During the Class Period, Schneider publicly made false and misleading statements regarding WaMu's underwriting and loan quality.

513. On November 15, 2005, WaMu hosted an Investor Day Conference in New York. At that conference, Schneider said, "[w]e've done a few things to improve our margins [for Option ARM loans] . . . . Those combined with some tightening of underwriting guidelines primarily around the investor property will ensure that we can generate higher margins and receive the required returns on the product."

514. Further, at the 2006 Investor Day conference on September 6, 2006, Schneider stated:

> On subprime, we have seen, as others have seen, some early payment default and repurchase activity. We saw most of that occur for us in late '05, Q4 '05, and first quarter of '06. We reserved for it appropriately and we have also, in second quarter of '06, *tightened up a number of our underwriting guidelines*, and you can see that in our numbers.
>
> In fact, we think we've lost probably a percentage or so of market share over the past year as a result of tightening some of the credit guidelines in our subprime business. And we think that was the prudent thing to do and actually we think we're ahead of many of our competitors here

515. In addition, Schneider was also present at the Investor Day Conference where materially false and misleading statements relating to the underwriting of WaMu's loans were made to the investing public by Defendant Killinger and Craig Chapman, noted at ¶¶171-172.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 156

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Schneider failed to correct these false and misleading statements that were made in his presence despite his knowledge (as discussed below at ¶¶517-522) of the false nature of such statements.

### a. Schneider's Statements Regarding The Underwriting Of WaMu's Loans Were False and Misleading

516. For the reasons stated above at ¶¶191-239, Schneider's statements regarding underwriting at WaMu were materially false and misleading and omitted information necessary to make them not misleading.

### b. Schneider Acted With Scienter In Making False and Misleading Statements Regarding The Underwriting Of WaMu's Loans

517. Schneider acted with scienter in making the statements above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements. In addition to the facts set forth above which show the falsity of Schneider's statements (and thus also show his scienter in making these statements), the facts below support a strong inference of Schneider's scienter.

518. According to CW 79 (described at ¶80), who worked directly for Defendant Cathcart and assisted the Officer Defendants in their preparation for WaMu's 2006 Investor Day, Schneider adjusted WaMu's lending practices as they related to risk.

519. Further, Schneider also was responsible for any changes made to the underwriting guidelines at LBM. CW 89 was a First Vice President and Operations Manager with responsibilities for LBM nationwide from 2006-2007. From 2005-2006, CW 89 was the Regional Operations Manager responsible for the California market. According to CW 89, all changes to the underwriting guidelines of LBM were made by LBM's Credit Policy Committee. According to CW 63, who served as National Underwriting Manager of LBM beginning in September 2006 and was a Regional Operations Manager for LBM before holding that position, the Credit Policy Committee at LBM reported weekly to the WaMu Executive Credit Policy Committee, which included Schneider.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 157

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

520.     As noted above at ¶256, CW 81, who served as a Staff Accountant in WaMu's Home Loans Group in Vernon Hills, Illinois from May 2006 until May 2008, reported that Schneider was "always aware" of what was occurring with respect to the overall loan portfolio.

521.     Furthermore, the "regimented" process of establishing the underwriting guidelines and the numerous reports summarizing the effects of WaMu's loosened underwriting guidelines (discussed above at ¶¶243-264) further support an inference of Schneider's scienter.

522.     In addition to the allegations above regarding Schneider's knowledge regarding the true nature of WaMu's underwriting and loan quality, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Schneider's scienter.

### 3.     Schneider's Statements Regarding WaMu's Financial Results

523.     During the Class Period, Schneider publicly made false and misleading statements regarding WaMu's financial results.

524.     On November 15, 2005, WaMu hosted an Investor Day Conference in New York. At that conference, Schneider stated: "On subprime, we have seen, as others have seen, some early payment default and repurchase activity.  We saw most of that occur for us in late '05, Q4 '05, and first quarter of '06.  We ***reserved for it appropriately***[.]"

525.     In addition, Schneider was also present at the Investor Day Conference where the materially false and misleading statement relating to WaMu's financial results was made to the investing public by the Defendant Killinger, noted at ¶270.  Schneider failed to correct this false and misleading statement that was made in his presence despite his knowledge (as discussed below at ¶¶527-532) of the false nature of such statement.

### a.     Schneider's Statements Regarding WaMu's Financial Results Were False and Misleading

526.     For the reasons stated above at ¶¶292-336, Schneider's statements regarding WaMu's financial accounting were materially false and misleading and omitted information

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 158

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

necessary to make them not misleading.

**b.**    **Schneider Acted With Scienter In Making**
**False and Misleading Statements**
**Regarding WaMu's Financial Results**

527.    Schneider acted with scienter in making the statements above, as he was aware (or deliberately reckless in not being aware) of facts that belied his public statements. In addition to the facts set forth above which show the falsity of Schneider's statements (and thus also show his scienter in making those statements), the facts below support a strong inference of Schneider's scienter.

528.    As noted above at ¶83, according to CW 79, before each monthly Risk Management Committee meeting (which were attended by Schneider, Killinger, Casey, Rotella, and Cathcart), WaMu's different business units provided financial forecasts or projections that were reviewed in detail by the Executive Risk Committee.

529.    The CRO Report was created for and circulated among senior WaMu management. ¶¶309-314.

530.    The materiality of the Allowance and the understatement, discussed at ¶¶326-329, 341, and 550-551, further supports a strong inference of Schneider's scienter. As noted at ¶¶326-328, the massive understatement of the Allowance each quarter and its significant effect on net income and other financial metrics was significant, further supporting the inference that Schneider knew, or should have known, about the understatement.

531.    Further, the facts alleged above regarding Schneider's scienter with regard to WaMu's risk management (¶¶505-511) and underwriting (¶¶517-522), also support an inference of Schneider's knowledge with regard to WaMu's financial reporting, as each of these aspects were key to the appropriate accounting for WaMu's loans. In addition to the allegations above regarding Schneider's knowledge regarding the true nature of WaMu's financial situation, the facts alleged at ¶19 regarding the importance of residential lending to WaMu also support a strong inference of Schneider's scienter.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 159

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

532.    Schneider also had both motive and opportunity to perpetrate fraud, as he had a tremendous stake in driving WaMu to meet certain financial benchmarks during the Class Period. Schneider's annual bonus was dependent on WaMu meeting certain goals and objectives, as discussed above at ¶346-347.  In 2005, Schneider received $492,914 over and above his salary by maximizing these metrics.  For 2006 and 2007, Schneider's bonus information was not disclosed.  Moreover, partly as a result of the bonus awards received during the Class Period, Schneider reaped significant overall compensation for each of the years during the Class Period. For 2005, Schneider received $2,340,607.  Schneider's compensation information for 2006 and 2007 was not disclosed.

*     *     *

533.    In addition to the false and misleading statements above, starting October 17, 2007 Schneider persisted in making and/or refusing to correct similarly false and misleading statements even though the truth about the fraud at WaMu was slowly beginning to emerge. These statements are discussed below at ¶¶568, 569.

### F.    Fraud Allegations Pertaining To All Officer Defendants

534.    The Officer Defendants, individually and in concert with the other Officer Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, WaMu's loan origination practices and financial results; (ii)    artificially inflate and maintain the market price of WaMu securities; and (iii) cause

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 160

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Plaintiffs and other members of the Class to purchase WaMu securities at artificially inflated prices.

535. The Officer Defendants, as senior executives of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority, the Officer Defendants were able to and did control the content of the public statements disseminated by WaMu. The Officer Defendants had direct involvement in the daily business of the Company and participated in the preparation and dissemination of WaMu's false and misleading statements.

536. The materiality of the Officer Defendants' misstatements are addressed at ¶¶539-556.

537. Plaintiffs and the Class would not have purchased WaMu securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by the Officer Defendants' misleading statements. Allegations related to the Class's reliance on the Officer Defendants' statements are set forth at ¶¶638-641.

538. Plaintiffs and the Class have suffered damages in that they paid artificially inflated prices for WaMu securities. As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of WaMu securities during the Class Period. Allegations related to the damages suffered by the Class as a result of the Officer Defendants' false and misleading statements are set forth at ¶¶557-637.

### G. The Officer Defendants' False And Misleading Statements Were Material To Investors

539. WaMu's risk management, underwriting, and appraisals were focused on and discussed by the Officer Defendants because the credit quality of WaMu's loans was indisputably material to its business and to investors.

540. For example, in addition to the regulations noted above at ¶165 governing

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 161

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

WaMu's appraisals, further extensive federal regulations governed WaMu's appraisals, indicating their central role to the bank as a lending institution and their importance to investors. According to federal regulations in effect throughout the Class Period (and through the present time), an appraisal must be "a written statement *independently and impartially* prepared by a qualified appraiser setting forth an opinion as to the market value of an adequately described property as of a specific date(s), supported by the presentation and analysis of relevant market information." 12 C.F.R § 564.2.

541.  Under the minimum appraisal standards set forth in 12 C.F.R. §564.4, all appraisals in regulated transactions must conform with Uniform Standards of Professional Appraisal Practice ("USPAP") unless other principles require stricter standards. USPAP guidelines emphasize that *the objectives of the client must never affect the appraiser's independence or objectivity*. *See* USPAP, Statement on Appraisal Standards No. 9 (SMT-9) (2005), available at http://www.coylelynch.com/USPAP%202005.pdf.

542.  Prior to hiring eAppraiseIT and LSI to conduct appraisals on its behalf, WaMu maintained its own department of in-house staff appraisers. Provisions in the Code of Federal Regulations that regulated WaMu's conduct in its capacity as a participant in such federally regulated transactions emphasize, among other things, that an in-house or "staff" appraiser at a lending institution "*must be independent of the lending, investment, and collection functions. . . . .*" 12 C.F.R. § 564.5(a).

543.  Specifically, federal regulations applicable to WaMu throughout the Class Period required the Officer Defendants (among other senior executives and directors) to:

- *Develop* written *appraisal policies,* subject to formal adoption by WaMu's board of directors, *to "ensure that adequate appraisals are obtained and proper appraisal procedures are followed consistent with the requirements of [federal regulations]"*;

- *Develop and adopt guidelines and institute procedures pertaining to the hiring*

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 162

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*of* appraisers **to perform appraisal services for WaMu consistent with the requirements of federal regulations.** Such guidelines were to "set forth specific factors to be considered by management" in connection with hiring appraisers to perform services for WaMu; and

- **"[R]eview** on **an annual basis the performance of all approved appraisers used within the preceding 12-month period for compliance** with (i) the savings association's appraisal policies and procedures; and (ii) the reasonableness of the value estimates reported."

12 C.F.R. § 564.8(c).

544.    The Interagency Statement on Independent Appraisal and Evaluation Functions (October 2003) that is directly referenced in the 2005 Interagency Appraisal Guidelines, in a section entitled "Appraisal and Evaluation Compliance Reviews," warns that:

> An institution's appraisal and evaluation program must maintain effective internal controls that promote compliance with program standards and the agencies' appraisal regulations and Guidelines. Internal controls should, among other criteria, confirm that appraisals and evaluations are reviewed by qualified and adequately trained individuals **who are not involved in the loan production processes.**

545.    The Interagency Appraisal and Evaluation Guidelines (October 1994) that are specifically referenced in the 2005 OTS Cover Letter, state in a section titled "Independence of the Appraisal and Evaluation Function," that:  "Because the appraisal and evaluation process is an ***integral component*** of the credit underwriting process, it should be isolated from influence by the institution's loan production process."

546.    After WaMu's appraisal fraud came partially to light through the NYAG Complaint, analysts noted how material this information could be for investors—specifically, on November 2, 2007, *Market Watch* published an article stating that the NYAG Complaint "could create big problems" and "raises an issue of considerable risk to Washington Mutual."  The article further stated that, "[i]n a worst-case scenario – in which inflated appraisals were systemic

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 163

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

throughout WaMu – the lender might need to set aside an extra $2.1 billion, or $1.57 per share, of reserves."

547. Similar to the above regulations governing appraisals, the FDIC issued specific warnings to mortgage lenders regarding the underwriting for subprime loans as early as 1993 and extending throughout the Class Period. For example, in 1999, the Office of the Comptroller of the Currency, the Federal Reserve Board, the FDIC, and the OTS (the "Agencies") jointly issued the Interagency Guidance on Subprime Lending, which gave extensive guidance to subprime lenders regarding risk management and appropriate credit loss reserving. The guidance noted, "*If the risks associated with this activity are not properly controlled, the agencies consider subprime lending a high-risk activity that is unsafe and unsound.*" As discussed at ¶¶238-239, WaMu's lax underwriting was Company- and nation-wide as measured by the loan to income ratios of its borrowers relative to its peers.

548. Furthermore, the Officer Defendants' repeated and false claim that WaMu underwrote its Option ARM loans to the "fully-indexed" rate, rather than the "teaser" rate. (*e.g.*, ¶¶172, 179, 184, 451) was material. This claim was particularly crucial to investors, as Defendants knew, because the monthly payment for borrowers at the fully-indexed rate could be a dramatically higher burden than the monthly payment at the initial, teaser rate. If the loan was underwritten only to ensure that the borrower was able to afford the monthly payment at the teaser rate, rather than the fully-indexed rate, then the financial shock of the reset could easily force the borrower into default, causing credit losses to WaMu.

549. This credit risk was exacerbated by the fact that WaMu's Option ARM loans provided borrowers with the option to make only a "minimum payment" of an amount less than the currently due interest, not including the principal due, and to negatively amortize some part of the accruing interest, *i.e.*, add it to the principal of the loan. However, once the negatively amortized interest, together with the principal, reached 125% of the amount of the original loan (or 110% for part of the Class Period), the loan would be "recast" at a much higher interest rate

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 164

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

and then amortize over the remaining term of the loan. Thus, after the recasting event, the borrower would be required to repay the original loan balance, in addition to all interest deferred, at a higher interest rate. Thus, underwriting these loans to the teaser rate would lead to an even greater number of Option ARM borrowers sinking into negative amortization - an admitted and significant risk to WaMu.

550. Furthermore, the Allowance was similarly key to investors, both because of its direct, dollar for dollar, impact on WaMu's reported net income and because of its significance for the credit quality of WaMu's loans. As described in a December 2006 "Interagency Policy Statement on the Allowance for Loan and Lease Losses," issued jointly by the Agencies:

> The [Allowance] represents one of the most significant estimates in an institution's financial statements and regulatory reports. Therefore, each financial institution has a responsibility for ensuring that controls are in place to consistently determine the [Allowance] in accordance with GAAP, the institution's stated policies and procedures, and relevant supervisory guidance.

551. Moreover, the Allowance was one of six "earnings drivers" that the Company discussed each quarter, and the quality of WaMu's reserving was repeatedly highlighted for investors in Defendants' statements. *See*, *e.g.*, ¶¶48, 51, 170, 413-414.

552. Similarly, management's assessment of internal controls over financial reporting was a critical statement for investors because it provided (false) assurance that the Company's financial statements were reliable and in compliance with GAAP and applicable laws.

553. Market reaction further confirms the materiality of the Officer Defendants' false and misleading statements, and analysts often noted the Officer Defendants' false and misleading statements in their favorable responses to WaMu's announcements. For example, analysts responded favorably to the Company's third quarter of 2005 earnings announcement. In a D.A. Davidson & Co. report dated October 20, 2005, analyst Jim Bradshaw remarked that although the Company faced margin pressure, it "maintain[ed] decent year-over-year growth by controlling costs and growing the balance sheet while enjoying strong credit quality." Bradshaw also commented that "credit quality remains very good." Similarly, in response to WaMu's

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 165

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

announcements regarding full-year 2005 results, in a D.A. Davidson & Co. report dated January 19, 2006, Jim Bradshaw reported that although in the fourth quarter of 2005 the Company's earnings per share missed analysts' consensus estimates, the Company's guidance for the 2006 loan loss provision indicated sound underlying credit quality. As the report noted, "Higher operating costs and lower-than-expected revenue related to mortgage banking operations drove EPS below our expectations. This was partially offset by superior credit quality."

554. In addition, a Citigroup report dated April 18, 2006, noted that in response to the Company's first quarter of 2006 results, "*[t]he main source of strength was in credit* . . . . While management tweaked guidance to reflect changing market conditions – incl[uding] a lower for longer NIM [net interest margin] and higher MSR hedging cost, *improved credit* and expense management should offset . . . . [O]ur full year EPS estimates are unchanged."

555. In response to WaMu's announcements regarding full-year 2006 results (¶283), although all analysts noted the difficult mortgage environment in which the Company operated, the Officer Defendants' reassurances that the Company had prepared for these negative events by tightening underwriting practices were well-received. For example, Erin Swanson of Morningstar observed that "all is not smooth sailing" given the "softening" in the industry; however, "[t]hat said, we think WaMu's management team anticipated this slowdown and began taking steps to position its balance sheet for tougher times. During 2006, WaMu sold all of its subprime mortgage originations, tightened its underwriting, and reduced its subprime portfolio by $2.4 billion." Swanson raised the fair value estimate of WaMu by $5 a share. Indeed, the Company's stock price demonstrated this favorable reaction, rising from a close of $44.06 on January 16, 2007, to close at $45.35 on January 24, 2007, an increase of almost 3%. Similarly, the Company's stock price jumped at the Company's first quarter of 2007 earnings release, rising from a close of $40.73 on April 16, 2007, to close at $42.77 on April 20, 2007, an increase of 5%.

556. Finally, after Killinger appeared at an investor conference on September 10, 2007

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 166

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

and falsely assured investors that the Company was financially sound and that market conditions were to blame for the Company's third quarter performance, WaMu's stock price responded favorably. The stock price rose from $35.06 per share on October 5, 2007 to $35.61 per share on October 8, 2007 and remained in the $35 per share range for the remainder of the week.

## H.    The Truth About WaMu's Financial Condition Begins To Emerge

557.    After the close of trading on October 17, 2007, less than two weeks after Killinger assured the market about the Company's financial health and outlook, WaMu disclosed that, contrary to the "improved fourth quarter" described in the October 5 press release, the Company in fact expected its loan loss provision to grow to as much as ***$1.3 billion*** in the fourth quarter of 2007. Specifically, during a conference call that day, Casey revealed that the Company's best estimate for the full year 2007 provision was "between $2.7 and $2.9 billion," which Killinger explained resulted in a fourth quarter of 2007 loan loss provision of "$1.1 billion to $1.3 billion." Moreover, in a press release issued that same day, the Company disclosed that, for the first time in 48 consecutive quarters or 12 years, WaMu was not increasing its stock dividend. During the conference call and in the press release, WaMu also announced that its nonperforming assets increased to $5.5 billion, or to 1.65% of the assets held at quarter end, as compared to $4.0 billion and 1.29% in the prior quarter. Further, the Company reported $4.6 billion in nonaccrual loans and a total Allowance of $1.9 billion, as compared to the prior quarter when the Company reported $3.3 billion in nonaccrual loans and a total Allowance of $1.6 billion.

558.    In response, numerous analysts downgraded their ratings of WaMu, citing concerns over the Company's ability to maintain its dividend and the Company's projections for an increased loan loss provision in the fourth quarter. For example, on October 18, 2007, Punk Ziegel & Company issued a report lowering its rating of WaMu from "Buy" to "Sell," explaining: "This extreme move is being taken because [we] do not believe that the Company will be allowed to maintain its dividend and because there is no visibility as to when the company's loan loss issues will dissipate…While these numbers are troubling, of greater concern

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 167

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

is the expectation that the loan losses in the fourth quarter will exceed those of the third quarter." Similarly, in an October 18, 2007 report, HSBC Global Research lowered its recommendation to "Neutral" from "Overweight," citing management's guidance of a "Q4 loan loss provision of USD1.1bn to USD1.3bn," and stating that it "is likely to go a long way toward wiping out Q4 earnings. We have to admit that a 75% increase, USD1.2 bn, in the full year loan loss provision estimate from July to October is disconcerting." Friedman, Billings, Ramsey & Co., Inc. ("FBR") also issued a report on October 18, 2007, downgrading WaMu to "Underperform" from "Market Perform." In doing so, FBR stated: "We believe [WaMu's] new provision guidance, which now ranges from $2.7B-2.9B, will result in the market beginning to factor in a dividend cut in the next few quarters, which would put downward pressure on the stock. Due to the increase in provision guidance, we are reducing our FY07 EPS estimate to $2.35 from $2.48 and our FY08 EPS estimate to $2.00 from $3.05."

559. The Company's disclosures caused WaMu's common stock to plummet, declining almost 8% from a closing price of $33.07 per share on October 17, 2007 to a closing price of $30.52 per share on October 18, 2007, on heavy reported trading volume of 36,476,764 shares – more than *six times greater* than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before this first partial disclosure). The price of WaMu stock continued to trend downward, declining almost another 5% to close at $29.09 per share on October 19, 2007, on significant reported trading volume of 31,543,300 shares. This disclosure resulted in a two day market capitalization loss of nearly *$4 billion*.

560. Defendants prevented an even steeper decline, however, by Killinger falsely blaming the Company's performance on "weakening in the housing market" and assuring investors that the Company was financially strong with "appropriate capital and sources of liquidity," while Casey attributed the performance to "capital markets disruption." Rotella was present at the time Killinger and Casey made these false and misleading statements, but did not

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 168

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

correct them at any time. Defendants further mitigated the impact of WaMu's October 17 disclosures by misrepresenting the amount of the provision that WaMu was required to record under GAAP by minimizing the full extent of the Company's loss exposure resulting from the Company's lending practices. As set forth above at ¶¶325-329, this increased provision was grossly insufficient, both in terms of adequately provisioning for the third quarter of 2007 as well as in redressing the cumulative understatement of the Company's Allowance throughout the Class Period. Accordingly, the Company's October 17 press release and earnings call were materially false and misleading, and only partially disclosed the Company's true condition.

561. Only two weeks after the Company successfully concealed the truth about its lending practices by blaming its performance on secondary market disruption, investors were shocked by revelations about WaMu's improper manipulation of appraisal values. Specifically, on November 1, 2007, New York Attorney General Cuomo filed a lawsuit against First American and its subsidiary eAppraiseIT alleging that WaMu pressured these companies into fraudulently inflating the appraisals used in WaMu's loan origination process (defined above as the "NYAG Complaint").

562. In response to the allegations of appraisal inflation, the price of WaMu stock dropped $2.13 per share, or almost 8%, from a closing price of $27.88 per share on October 31, 2007 to a closing price of $25.75 per share on November 1, 2007, on heavy reported trading volume of 33,179,008 shares – *5.7 times greater* than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

563. The Company attempted to mitigate the impact of the disclosures contained in the NYAG Complaint by issuing a broad-based denial, falsely asserting that it did not have any motivation to manipulate appraisal values. In a press release issued on November 1, the Company stated: "We have absolutely no incentive to have appraisers inflate home values. In fact, inflated appraisals are contrary to our interests. We use third-party appraisal companies to make sure that appraisals are objective and accurate." The Company also announced that it was

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 169

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

suspending its relationship with eAppraiseIT.

564.    Notwithstanding the Company's denials, the Company's stock price continued to decline as analysts sought to quantify the severity of the allegations in the NYAG Complaint. For example, on November 2, 2007, *Market Watch* published an article quoting Frederick Cannon, an analyst with Keefe Bruyette & Woods, questioning WaMu's assertion that it had no incentive to inflate appraisal values and stating that the NYAG Complaint "could create big problems" and "raises an issue of considerable risk to Washington Mutual." Cannon further stated that, "[i]n a worst-case scenario – in which inflated appraisals were systemic throughout WaMu – the lender might need to set aside an extra $2.1 billion, or $1.57 per share, of reserves." Among other things, this analysis underscores the enormous significance (and obvious materiality) of WaMu's practice of inflating appraisals to its financial condition. Moreover, on this same day, WaMu's regulatory agency, the OTS, disclosed that it was "actively looking into" the allegations of appraisal manipulation at WaMu. On this news, WaMu's stock price dropped $1.94 per share, or 7.5%, to close at $23.81 per share on November 2, 2007, on significant reported trading volume of 31,041,898 shares – more than ***five times greater*** than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure. Moreover, this disclosure of WaMu's appraisal manipulations caused WaMu's stock price to drop to its lowest closing price since September 2000 and resulted in a two-day market capitalization loss of more than ***$3 billion***.

565.    On November 7, 2007, Attorney General Cuomo broadened his attack on the Company by announcing the expansion of his investigation into WaMu's fraudulent appraisal practices to include an examination of the loans that WaMu sold to Fannie Mae and Freddie Mac, the nation's two biggest providers of mortgage financing. Specifically, Attorney General Cuomo stated:

> The integrity of our mortgage system depends on independent appraisers. ***Washington Mutual compromised the fairness of this system by illegally pressuring appraisers to provide inflated values.*** Every company that buys loans

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 170

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

from Washington Mutual must be sure that the loans they purchased are not corrupted by this **systemic fraud**.

Attorney General Cuomo further disclosed that his office had subpoenaed Fannie Mae and Freddie Mac, seeking information on the mortgage loans that Fannie Mae and Freddie Mac had purchased from WaMu, among other banks, and that Fannie Mae and Freddie Mac agreed to his demand that they "retain an Independent Examiner, subject to the Attorney General's approval, to conduct a total review of all Washington Mutual . . . appraisals and mortgages purchased by the companies."

566. That same day, WaMu announced that the Company's loan loss provision could exceed $1.3 billion in the first quarter of 2008. Specifically, at WaMu's 2007 Annual Investor Day Conference on November 7, 2007, in which Killinger, Casey, Rotella, Cathcart, and Schneider all participated, the Company disclosed that it expected the "first quarter 2008 provision to be similar or slightly higher than" the $1.1 billion to $1.3 billion range of the Company's fourth quarter of 2007 loan loss provision. The Company also revealed that nonperforming assets and charge-offs in the Company's single-family residential portfolio increased and that "roll rates into 60 and 90 day delinquencies are much higher, as fewer borrowers have the ability to refinance or quick sale their way out of trouble."

567. These revelations by Attorney General Cuomo and the Company caused WaMu stock to drop **more than 17%**, to close at $20.04 on November 7, resulting in a single day market capitalization loss of **more than $3.5 billion**. Moreover, the reported trading volume on this news was unusually heavy, involving 68,642,699 shares – almost **twelve times greater** than the average trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

568. Defendants again succeeded, however, in mitigating the impact of these disclosures by Killinger falsely blaming the "downturn of the housing market and capital market disruptions" for the Company's financial performance, while Cathcart assured investors of the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 171

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Company's stability and the "stronger credit quality" of the Company's single-family residential portfolio. Defendants continued to deny any manipulation of appraisal values for loans originated by WaMu.

569. For example, speaking at the Investor Day Conference, Killinger emphasized that "[t]he key point here is that since the [single family residential] portfolio has stronger credit quality and lower LTVs, we expect these nonperforming loans will lead to significantly lower net charge offs than the subprime mortgage channel and home equity portfolios." Killinger also added that "our risk is contained [and] our underwriting is sound." Similarly, Schneider pointed out that, because of the Company's "prudent underwriting standards as well as tighter guidelines for markets where we have concerns about house prices," the Company had "a 17 percentage point reduction in loans with LTVs higher than 80." WaMu also defended its appraisal practices and claimed, at the conference as well as in a press release issued that same day, that the appraisals performed by eAppraiseIT were subject to strict quality control programs, were required to be "prepared in compliance with the Uniform Standards of Professional Appraisal Practice" and were required to be "prepared without fraud or negligence." These misstatements and false denials succeeded in concealing from investors the full extent of the Company's loss exposure arising from WaMu's undisclosed and improper lending practices and deficient risk management.

570. Nonetheless, analysts lowered their earnings estimates citing the Company's uncertain legal and financial situation. For example, in a November 7 report titled "Cutting Estimates on More Uncertain Outlook," Fox-Pitt Kelton Cochran Caronia Waller ("Fox-Pitt") stated: "WM's investor day highlighted the uncertainties facing the company on a variety of fronts – credit, margin, market improvement and legal/regulatory." Similarly, in a November 7 report, Bear Stearns lowered its 2008 EPS estimates for WaMu, noting: "We also believe that today's statements by New York Attorney General Andrew Cuomo that Fannie Mae and Freddie Mac have agreed to hire examiners to look through loans they purchased from WaMu for

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 172

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

potentially inflated or otherwise fraudulent appraisals signals an increased level of legal and regulatory risk for WaMu."

571. Analysts continued to voice concern over WaMu's uncertain legal and financial predicament on November 8, 2007. For instance, on this date, Merrill Lynch issued a report, observing that "[a]nother shoe drops on WM" and stating: "Concern over rising cyclical credit costs is being compounded by recent news alleging WM of participating in or being victim of appraisal fraud. If true, the potential for further losses would add significant risk to the earnings outlook for WaMu and possibly its capital adequacy. The crux of the problem is quite simple and possibly pervasive." Regarding the effect of inflated appraisals on the Company's balance sheet, Merrill Lynch commented, "[r]ough estimates suggest that WM could witness after-tax losses of $1.05-$1.70 [per share], possibly as high as $3.80 in a worse case scenario, resulting from the possible forced repurchase of loans underwritten with faulty appraisals." The report explained, "*[l]osses on loans with fraudulent appraisals would likely be higher than normal, given the defective nature of the loan*. Assuming most appraisal fraud events would likely arise in weak housing markets, the related incidence of loss would likely be higher as well." Merrill Lynch further added: "This injects significant uncertainty into the WM story, one which could potentially have meaningful downside to both WaMu's earnings and reputation, in our view." Bear Stearns also issued a report on November 8, 2007, stating: "We found WaMu's disclosure of the increases in 'roll rates,' or the percentage of borrowers who move from one month delinquent to two and three months delinquent, rather alarming." Significantly, the increase that Bear Stearns found so "alarming" was the materialization of the Company's undisclosed and improper lending practices.

572. The market's response to the news release on November 7 caused WaMu's stock price to decline another 3%, dropping from a close of $20.04 per share on November 7 to close at $19.39 per share on November 8, on heavy reported trading volume of 55,602,134 shares – *11.8 times greater* than the average daily trading volume of WaMu common stock during the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 173

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Class Period before the Company's first partial disclosure.

573.    On November 9, 2007, the Company filed with the SEC a Form 10-Q for the quarter ended September 30, 2007 (the "Third Quarter 2007 Form 10-Q"), which was signed by Casey and Ballenger and included certifications by Killinger and Casey.  The Third Quarter 2007 Form 10-Q repeated the financial results set forth in the Company's October 17, 2007 press release, including that the Company's provision for loan and lease losses was $967 million for the quarter and that the Company was not increasing its quarterly dividend.  The Third Quarter 2007 Form 10-Q continued to conceal the Company's improper lending and accounting practices and deficient risk management.  It also failed to disclose the true extent of the Company's loss exposure.

574.    On November 21, 2007, Moody's Investors Service downgraded the ratings of 34 tranches on seven Alt-A deals issued by WaMu in 2006 and late 2005, and placed under review for possible downgrade another 8 tranches from these same deals.  Moody's negative rating actions were taken because of higher than anticipated rates of delinquency, foreclosure and real estate owned ("REO") property in the underlying collateral relative to credit levels.  On this news, WaMu's stock fell almost 4%, from a closing price of $17.99 per share on November 20, 2007 to a closing price of $17.34 per share on November 21, 2007, on reported trading volume of 23,448,628 shares – more than *four times greater* than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

575.    On December 10, 2007, after the close of market, WaMu issued a press release that once again contradicted its prior assurances to investors.  Specifically, the Company announced that it was slashing its quarterly dividend from $0.56 per share to just $0.15 per share and increasing its loan loss provision guidance for the fourth quarter of 2007 and first quarter of 2008.  The Company also announced a major "resizing" of its homes loans business and a $2.5 billion offering of convertible preferred stock, and that it would take a $1.6 billion after-tax charge against goodwill associated with its home loans business during the fourth quarter of

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 174

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

2007.

576. With respect to its increased loan loss provision guidance, the Company disclosed that it expected its fourth quarter of 2007 provision to be $1.5 to $1.6 billion, more than 25% higher than the $1.1 to $1.3 billion guidance the Company had given one month earlier. The Company also announced that it expected that its first quarter of 2008 loan loss provision would be "in the range of $1.8 to $2.0 billion" and that its loan loss provision for each quarter of 2008 would be similar, if not higher, than the expected first quarter of 2008 provision. The Company was therefore projecting a full year 2008 loan loss provision of approximately $7.2 to $8.0 billion, more than double the estimated $3.1 to $3.2 billion loan loss provision it expected to record for 2007, and almost **ten times** the $816 million loan loss provision the Company recorded for 2006.

577. In terms of its "resizing" of its home loans business, the Company disclosed that it planned, among other drastic actions, to discontinue any remaining lending through its subprime mortgage channel, close approximately 190 of its 336 home loan centers and sales offices, eliminate about 22% of its Home Loans staff, and close WaMu Capital Corp., its institutional broker-dealer business. These actions highlight the substantial and material impact that the Company's improper lending practices had on the Company's financial and operational condition. As a result of the Company's enormous (and not fully disclosed) loss exposure due to the Company's fraudulent lending practices and deficient risk management efforts, WaMu was forced virtually to shut down its home lending business. By taking such drastic measures, WaMu was implicitly acknowledging that the growth and profitability that the Company had experienced in its lending operations were dependent, at least in part, on the Company's fraudulent lending practices, including the issuance of high-risk loans to unqualified borrowers and the manipulation of appraisals.

578. In response to these disclosures, the Company's stock fell over $2.46 per share, or more than 12%, from a close of $19.88 per share on December 10 to close at $17.42 per share on

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 175

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

December 11, 2007 on enormous reported trading volume of 152,826, 497 shares – more than **26 times greater** than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

579. The Company's December 10 announcements further unnerved analysts who raised more questions and concern over the Company's earnings prospects and loss exposure. For instance, that same day Moody's cut WaMu's rating two notches from A3 to Baa2, the second lowest investment grade, questioning whether WaMu could return to profitability before 2010 and noting "its view that credit losses from WaMu's mortgage operations will be noticeably higher than previously estimated." Also on December 10, Fitch Ratings downgraded WaMu from "A" to "A-," citing "worsening asset quality." Citigroup Global Markets issued a report on December 11, cutting its 2007, 2008 and 2009 earnings estimates for WaMu and noting that: "While we expected some of these measures would be needed, the magnitudes are generally worse." Similarly, D.A. Davidson & Co. issued a report on December 11, noting that: "On the surprise front: WM once more guided credit costs higher" and that the Company's latest disclosure "essentially wipes out EPS for both" 2007 and 2008.

580. A December 11 report issued by Morgan Stanley Research also lowered the Company's earnings outlook, stating that: "WaMu's moves to strengthen capital and reserves strikes us as a positive, although the magnitude of the new loss guidance for 2008 is disconcerting." Stifel Nicolaus also issued a report on December 11, revising its earnings projections downward and stating that: "We were not surprised WaMu cut the dividend and announced a capital raise…The magnitude of the [dividend] cut, however, was somewhat more than we had expected." The Stifel Nicolaus report further added:

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 176

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

That WaMu would have to increase provisions was also not surprising. What was unclear was the timing, and one big question remaining is just how much pain is WaMu pulling forward with its projected ~$3.5B provision in the next two quarters? We believe the answer is 'Not all of it.' We estimate lifetime losses remaining on the current mortgage portfolio at ~$7.7B, suggesting the higher 4Q07 and 1Q08 provisions are a good start, but not the end of the pain.

581. Moreover, some analysts began to speculate that, contrary to the Company's repeated statements, WaMu's increasing losses might be the result of poor underwriting by the Company. Specifically, Fox-Pitt issued a report on December 11, 2007, downgrading the Company to "In Line from Outperform." In doing so, the report stated that "the size of [WaMu]'s expected credit losses is now far larger than we had expected" and noted that WaMu could also be "suffering from poor underwriting quality."

582. Similarly, in a report issued that same day, Morgan Stanley questioned the Company's evaluation of its credit risk, because "the rapid deterioration in the housing environment and *questions about WaMu's loan products, geographic concentration, and underwriting make it difficult to bracket the downside*." Further, the NYAG Complaint continued to resonate as a danger to WaMu's future financial prospects, as noted in a December 11 Citigroup Global Markets report, which changed its rating from Hold to Sell "based on the rapid increase in provisioning which dampens future growth prospects as well as future increased uncertainty with regard to the NY attorney general's appraisal inquiry."

583. Other analysts noted the Company's dangerous concentrations in risky loan products, such as a Credit Suisse report issued on December 14, 2007 that observed, "Higher than expected losses are driven by deterioration in its subprime, home equity, option ARM and credit card portfolios." Analysts also began to voice concerns over WaMu's credibility, as the Credit Suisse report commented: "As a result of numerous upward revisions to management's credit expectations in the past couple of months, we believe management's credibility is questionable."

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 177

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

584.     As analysts continued to report on the Company's December 10 disclosure over the following days, WaMu's stock price dropped even lower, falling to a low of $15.59 per share by December 13, 2007, for a total drop of more than 22%, resulting in a three-day market capitalization loss of approximately *$3.7 billion*.

585.     Notwithstanding the partial disclosure of the Company's true condition, the Company's December 10 press release was a materially false and misleading statement because it continued to conceal the Company's improper lending practices and the full extent of the loss exposure confronting the Company.  In fact, the Company's true loan loss provision was far more significant than the Company was willing to disclose at that point.  Killinger was quoted in the December 10 press release, but did not correct it at any time.

586.     On December 21, 2007, before the open of the market, *The Wall Street Journal* reported that the SEC had launched an inquiry into the Company's mortgage lending practices. According to *The Wall Street Journal,* the SEC was focused on whether "the company properly accounted for its loans in financial disclosures to investors of the company."  WaMu confirmed the SEC's inquiry, but once again attempted to diminish the impact of this revelation by issuing a statement denying any wrongdoing: "After spending a month and a half investigating these allegations, we can say with confidence that there has been no systematic effort by WaMu to inflate home appraisals."  Despite the Company's mitigation efforts, following this news, shares of WaMu stock dropped as low as $13.76 per share in mid-day trading on December 21, 2007, and closed at $14.10 per share, on significant reported trading volume of 39,575,807 shares. News of the SEC's inquiry resulted in a one-day decline of almost 4%, topping off a 28% drop in price since the beginning of the month.

587.     On January 17, 2008, Gradient Analytics ("Gradient") issued a report, analyzing impairment risk at fifteen publicly traded lenders, including Washington Mutual.  In this report, Gradient stated that, as a result of its analysis, it continued to believe that WaMu was "the most at-risk firm among large capitalization lenders."    Gradient further reported that "in our

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 178

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

estimation, WaMu's prior loan loss provisions have been insufficient to establish a reserve that fully accounts for the level of nonperforming loans" and that if WaMu "were to establish a reserve that reflects the likelihood that nonperforming loans will continue to increase for at least the next year," WaMu could have to record an impairment charge of "as much as $15.3 billion."

588. In response to this disclosure, the Company's stock fell 7%, from a closing price of $13.39 per share on January 16, 2008 to closing price of $12.46 per share on January 17, 2008, on significant reported trading volume of 47,279,787 shares.

589. After the close of the market on January 17, 2008, the Company announced its first annual loss since 1994 and its first quarterly loss since 1997. Specifically, the Company issued a press release that evening reporting its earnings for the quarter and year ended December 31, 2007, which included a net loss of $1.87 billion, or $2.19 per share, for the fourth quarter of 2007, and a net loss of $67 million, or $0.12, for the full year 2007. The press release also confirmed the Company's prior announcement of a paltry dividend of $0.15 per share and that the Company's loan loss provision for the quarter was $1.53 billion, within the $1.5 to $1.6 billion guidance provided by management in December. The Company also announced that its Allowance was $2.57 billion at year-end.

590. That same evening, the Company held a conference call to discuss its fourth quarter and year-end 2007 financial results. Killinger, Casey and Rotella participated in the call. In discussing the Company's financial results, Killinger again blamed the Company's financial performance on the market "turmoil" and Casey cited "unprecedented challenges in the mortgage and credit markets," and not the Company's improper lending and accounting practices and deficient risk management. Indeed, the Company's January 17 disclosures, which only partially revealed the Company's true financial condition, continued to conceal the full magnitude of the Company's loss exposure and the full size of the Company's loan loss provision that was yet to be recorded.

591. Analysts responded to WaMu's earnings release cautiously, somewhat relieved

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 179

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

that the financial results were consistent with the Company's recent guidance, but still concerned about the Company's remaining loss exposure. For example, on January 17, 2008, Fox-Pitt issued a report titled, "A Sigh Of Relief" which, while cutting 2008 earnings estimates to a loss of $1.49 per share from $1.19 per share, positively noted that "management did not change its estimate of provision costs for '08" and "we are comfortable that '08 will represent the peak in credit provision costs." Similarly, Credit Suisse issued an analyst report on January 18, lowering its 2008 earnings per share estimate and noting that "[w]e remain cautious on WaMu shares." Credit Suisse also stated that: "Credit quality deterioration exhibited few signs of abating in Q4 with [nonperforming assets] up 30% sequentially and 154% year over year. This was well above our expectations."

592.    Similarly, on January 18, 2008, Citigroup Global Markets issued a report lowering its earnings estimates for 2008 and 2009 and noting: "We remain cautious on WM's shares during this period of elevated credit cost & business uncertainty." Citigroup further stated that: "We think WM has effectively boxed its mortgage and credit market related risk exposure, helping contain potential future charges and loss levels. Nevertheless, its exposures remain sizeable and will likely continue to dampen earnings and profitability." In noting that WaMu's shares were trading below tangible book value, a Punk Ziegel & Company report issued on January 22 observed, "The stock sells where it does because most investors feel confident that the company will be forced to take additional significant write-offs against its holdings of sub-prime and negative amortization loans." Similarly, a report by Merrill Lynch, issued on January 23, stated that, "the credit problems inherent in [WaMu's] . . . balance sheet[] are likely to forestall a near-term recovery or acquisition."

593.    On February 29, 2008, the Company filed with the SEC its Form 10-K for the year ended December 31, 2007, which was signed by, among others, Killinger, Casey and Ballenger and included certifications by Killinger and Casey. On May 22, 2008, the Company filed with the SEC its Form 10-K/A for the year ended December 31, 2007, also signed by Casey

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 180

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

and including certifications by Killinger and Casey (together, these filings are collectively referred to as the "2007 Form 10-K"). The 2007 Form 10-K repeated the financial results set forth in the Company's January 17 press release. Most significantly, the 2007 Form 10-K continued to conceal the Company's improper lending and accounting practices and deficient risk management practices as well as the true extent of the Company's loss exposure.

594. On March 3, 2008, Fitch Ratings downgraded $2.3 billion worth of WaMu mortgage pass-through certificates backed by first lien subprime mortgages originated by WaMu. Fitch based its downgrade on "the deteriorating performance of [WaMu's mortgage] pools from 2007, 2006 and late 2005 with regard to continued poor loan performance and home price weakness." On this news, WaMu's stock price fell $1.15, or more than 7.7%, from an opening price of $14.80 per share on March 3 to a closing price of $13.65 per share on March 3, on substantial reported trading volume of 48,349,043 shares – more than *eight times greater* than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

595. On March 6, 2008, Standard & Poor's downgraded the Company's long-term credit rating to "BBB" from "BBB+" because of credit concerns. Similarly, Dominion Bond Rating Service Limited ("DBRS") downgraded all long-term debt ratings of WaMu and its subsidiaries to BBB (high) from A (low) citing concerns that "credit losses in the Company's residential mortgage portfolio will continue to increase at an accelerated pace given the fact that WaMu's portfolio has significant exposure to high loan-to-value second mortgages and to the regions that have experienced the most significant depreciation in house prices (such as California and Florida)." At the same time, DBRS also lowered its short-term debt ratings of WaMu from R-2 (high) to R-1 (low). In lowering the Company's debt ratings, DBRS noted that the "trend on all ratings remains Negative." Following this news, the Company's stock price plunged 8% from a closing price of $12.80 per share on March 5, 2008 to a closing price of $11.76 per share on March 6, 2008, on significant reported trading volume of 53,366,618 shares

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 181

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

– more than **nine times greater** than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

596. On March 7, 2008, *The Wall Street Journal* reported that WaMu was approaching private-equity funds, sovereign-wealth funds, and other investors about possible cash infusions. On that same day, Merrill Lynch stated in a report that it expected the Company to report losses of as much as $11.2 billion through 2009 as more borrowers defaulted on home loans. On this news, the Company's stock price fell another 9%, dropping to a close of $10.71 per share on March 7, on massive reported trading volume of 110,506,154 shares – almost **nineteen times greater** than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure)

597. After the close of the market on March 7, 2008, Fitch Ratings lowered its ratings on the Company, citing "a variety of internal and external sources" who predicted that WaMu's first quarter of 2008 earnings, would show "rapid deterioration" in its home equity loans portfolio. In addition, Fitch pointed out that "[a]pproximately 37% of WM's total loan portfolio comprises residential mortgage and home equity loans in California," a state where properties "appear to be deteriorating at a faster pace than those in more stable markets." WaMu's stock price fell more than 6% on this news to close at $10.04 per share on March 10, on reported trading volume of 73,738,572 shares –**12.6 times greater** than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

598. On March 14, 2008, WaMu's stock price dropped almost 13%, on significant reported trading volume of 84,670,239 shares, after Moody's downgraded the Company's senior unsecured debt rating from Baa2 to Baa3, one level above junk status. In lowering its rating, Moody's explained that it "believes that remaining lifetime losses on [WaMu's residential mortgage loan] portfolio will be higher than previously expected" and that "WaMu's required provisioning is likely to be greater than $12 billion and that full year 2008 net losses could

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 182

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

eliminate the company's approximately $6 billion capital cushion above regulatory well capitalized minimums." Moody's also placed a negative outlook on all WaMu entities.

599. On March 17, 2008, WaMu's stock price fell further as investors continued to respond to Moody's March 14 downgrade and became concerned about the Company not having any viable buyout prospects in the wake of JP Morgan Chase & Co.'s purchase of Bear Stearns Cos. Indeed, as reported by *Bloomberg News* on March 17, before the open of the market, "shares of Washington Mutual are dropping in premarket trading, as the sale of Bear Stearns Cos. and a downgrade from Moody's Investors Service pressure the savings and loan stock." Later that day, *Bloomberg News* further reported that WaMu "fell to its lowest since 1995 on waning prospects for takeover" as JP Morgan's "$240 million purchase of Bear Stearns Cos. removed one of the largest potential buyers from the market." As a result of this news, WaMu's stock price dropped almost 13%, falling from a close of $10.59 per share on March 14 to close at $9.24 per share on March 17. This disclosure also sparked massive reported trading volume, involving more than 109,266,368 shares – ***18.7 times greater*** than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

600. On March 27, 2008, Lehman Brothers issued a report setting forth revised estimates for the Company's 2008 financial results, including an earnings loss of $2.84 per share and a loan loss provision increase to $10 billion. The report also estimated that the Company would need to set aside $5 billion in 2009 for loan losses, and would incur $6 billion in charge-offs in 2008 and $7 billion in charge-offs in 2009. On this news, WaMu's stock price dropped more than 8% on reported trading volume of 44,246,517 shares – ***7.6 times greater*** than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

601. Thereafter, on April 4, 2008, Keefe Bruyette & Woods issued a report more than doubling its 2008 estimated loss for WaMu to $3.15 per share from $1.45 per share. This report also noted that mortgage and other credit losses may keep WaMu from turning an annual profit

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 183

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

before 2010. Following these downward earnings revisions, WaMu stock fell 12%, to close at $10.17 per share on April 4, on significant reported trading volume of 67,901,502 shares – **_11.6 times greater_** than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

602. On April 7, 2008, reports circulated that a group led by private equity firm TPG Capital was close to a deal to invest $5 billion in WaMu, an investment that was viewed as necessary in order for WaMu to alleviate its pressing capital requirements. After the close of the market on April 7, additional reports circulated, stating that, in connection with this deal, WaMu was exiting its wholesale lending business.

603. On April 8, 2008, the Company announced its disappointing first quarter of 2008 results, including that the Company suffered a net loss of $1.1 billion, or $1.40 per share, and that the quarterly dividend was reduced from $0.15 to $0.01. The Company also disclosed that the loan loss provision increased to $3.5 billion, almost double what the Company stated it would be on December 10, 2007. On this same day, the Company also stated that it was closing all 186 of its stand-alone home loan offices nationwide and eliminating approximately 3,000 jobs as part of the closings. The Company also officially announced that it would raise $7 billion in capital through a direct sale of equity securities to an investment vehicle managed by TPG Capital. While this news provided additional insight into the Company's financial condition, it nonetheless continued to understate the size of the Company's loss exposure and the reasons why the Company was in this precarious financial position, including its need to accept $7 billion in a deal that was described by *The Wall Street Journal* as "punitive" as it could result in the Company nearly doubling its shares outstanding, a massive dilution for existing shareholders.

604. On this news, WaMu's stock price dropped 10%, to close at $11.81 per share on April 8, 2008, on massive reported trading volume of 180,896,539 shares – more than **_32 times greater_** than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure. Indeed, even though the market viewed WaMu's

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 184

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

capital infusion as an overall positive, the market found the Company's first quarter financial results to be worrisome and indicative of increased loss exposure. For example, Citigroup Global Markets issued a report on April 8, observing that:

> The ultimate success of this new investment in WM will be determined over time as the current credit crisis unfolds. Since the magnitude of the mortgage-related losses remain unknown (Moody's recently estimated 'base-case' cumulative losses of $12 billion) and visibility remains poor, we believe that earnings growth and profitability will likely remain under pressure through the end of 2009.

Similarly, on this same date, Merrill Lynch issued a report, upgrading the stock to "Neutral" and noting that: "Losses will likely be elevated for next few years, suggesting further financial stress cannot be ruled out. However, the current capital injection should allow enough cushion to prevent further shortfalls."

605. The market price of WaMu's common stock continued to decline as analysts voiced concern over WaMu's financial outlook. For example, on April 9, 2008, Stifel Nicolaus issued a report, stating:

> The key question is whether the worst is now behind the company. With the capital infusion and [management] actions, liquidity risk has certainly been reduced and WaMu should survive. However, we remain concerned that mortgage losses are just beginning and we believe it will be difficult for the company to return to profitability. Our new 2008 and 2009 estimates are [a loss of $1.90] and $0.15, respectively.
>
> *       *       *
>
> With significant uncertainty in the outlook and very little to be optimistic about in our view, we maintain our Hold rating on the shares.

606. Similarly on April 11, 2008, Goldman Sachs issued a report, recommending that its clients short-sell WaMu stock because it estimated that WaMu has "$17 to $23 billion of embedded losses in its current book of business" and forecasted a "$14b provision charge in 2008." Goldman Sachs further estimated that WaMu may lose $3.30 per share in 2008. On this

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 185

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

news, WaMu's stock fell more than 4%, from a closing price of $11.42 per share on April 10 to a closing price of $10.95 per share on April 11, on heavy reported trading of 55,243,132 shares – more than **9 times greater** than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

607.    In a report issued on April 16, 2008, Chris Brendler of Stifel Nicolaus questioned the Company's ability to return to profitability, observing, "as [management] struggles to right the sinking ship, we are increasingly questioning the value of [WaMu]'s remaining franchise. *The home loan business is broken, the loan portfolio is a disaster*. . . ."

608.    On April 29, 2008, WaMu announced that Cathcart left the Company.

609.    On May 12, 2008, WaMu filed with the SEC its Form 10-Q for the quarter ended March 31, 2008 (the "First Quarter 2008 Form 10-Q"), which was signed by Casey and Ballenger and included certifications by Killinger and Casey. The First Quarter 2008 Form 10-Q repeated the financial results set forth in the Company's April 8, 2008 press release. The First Quarter 2008 Form 10-Q continued to conceal the Company's improper lending and accounting practices and deficient risk management, as well as the true extent of the Company's loss exposure.

610.    On June 2, 2008, WaMu announced that, effective July 1, 2008, the Company was stripping Killinger of his title of Chairman of the Board, and that Director Defendant Stephen Frank would replace him in the position of Chairman.

611.    On June 9, 2008, the market gained a much fuller understanding of the magnitude and severity of the loss exposure facing WaMu. On this date, UBS Investment Research published a detailed analyst report, concluding, after an "extensive credit analysis of WM's balance sheet," that cumulative losses on WaMu's mortgage portfolio would likely total close to $21.7 billion through 2011, between 12.5% to 44% greater than the loss guidance of $12 to $19 billion that the Company provided to the market in April 2008. Moreover, with respect to its $21.7 billion loss estimate, UBS observed that it might still be too low, stating: "The attributes

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 186

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

of WM's remaining loan portfolio and broader economic weakening mean our bias is that losses could be worse than our projection." This report also estimated that WaMu would record $24.2-$24.7 billion in incremental loan loss provisions between 2008 and 2010. This report also concluded that WaMu would endure losses of $4.45 per share in 2008 and of $1.60 per share in 2009.

612. On this news, the market price of WaMu common stock plummeted from its close of $7.53 per share on June 6, 2008 to $6.25 per share on June 9, 2008, a one day drop of 17%, on huge reported trading of 130,204,161 shares – ***more than 22 times greater*** than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

613. Similarly, on June 24, 2008, Lehman Brothers issued a report predicting that WaMu would suffer mortgage losses in excess of the Company's April 2008 loss guidance of $12 to $19 billion over the next 3 to 4 years. Specifically, Lehman Brothers' report estimated that WaMu's "lifetime real estate mortgage losses will be in the $21 billion to $28 billion range." On this news, the market price for WaMu's common stock dropped almost 3%, from a closing price of $5.96 per share on June 23, 2008 to a closing price of $5.80 per share on June 24, 2008, on substantial reported trading volume of 50,637,751 shares – ***8.7 times greater*** than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

614. On July 14, 2008, Lehman Brothers issued another analyst report, further confirming its estimate of $21 billion to $28 billion for WaMu's lifetime real estate mortgage losses and predicting that "WM will take a $4B provision in the 2Q08, building reserves to $6.9B, producing another large loss for the quarter." Moreover, the report estimated that WaMu would report a loss of $1.48 per share in the second quarter because: "As Washington Mutual builds reserves to cover these losses, it should remain unprofitable until credit costs normalize" around the second half of 2009. Significantly, on July 14, 2008, *Bloomberg News* reported on

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 187

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

this analyst report, observing that Lehman Brothers' earnings forecast was more dire than other analysts' forecasts because, according to poll of 13 analysts, "the average estimate is for a loss of 92 cents a share."

615. On that same day, Ladenburg Thalmann analyst Richard Bove issued a report, questioning WaMu's financial viability and ability to stay afloat. In particular, Bove reported that WaMu was on the edge of "the danger zone." With this further news concerning the magnitude of the Company's loss exposure, and its implications for WaMu's financial condition, the market price of WaMu's common stock plummeted 35%, from a closing price of $4.95 per share on July 11, 2008 to $3.23 per share on July 14, 2008 (the next trading day), on record reported trading volume of 210,678,306 shares – *more than 36 times greater* than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure.

616. After the close of the market on July 14, 2008, in an attempt to mitigate any further drops in the price of its common stock – which could have dire consequences for the thrift's survival – WaMu issued a press release, claiming that the Company was sufficiently capitalized and had excess liquidity of more than $40 billion. The Company's mitigation efforts were successful. As a result of this press release, the market price of WaMu's stock rebounded, rising to $5.92 per share in the days following this announcement. This was a false and misleading disclosure because the Company failed to disclose its improper lending and accounting practices and deficient risk management, as well as the true extent of the Company's loss exposure.

617. After the market closed on July 22, 2008 and less than ten days after WaMu misleadingly calmed concerns about the Company's financial strength, WaMu once again shocked the market. Specifically, WaMu announced its second quarter of 2008 financial results, including that the Company suffered a net loss of $3.3 billion, more than double the Company's first quarter of 2008 net loss of $1.14 billion, driven by a significant increase in its loan loss

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 188

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

reserves. On a diluted per share basis, the Company reported a loss of $3.34 per share (excluding a one-time earnings reduction related to the Company's issuance of capital in connection with the TPG deal). The Company further announced that it increased its loan loss reserves by $3.74 billion to $8.46 billion and that it took a $5.9 billion loan loss provision in the quarter, an increase of 40% from the $3.5 billion provision that the Company recorded in the first quarter of 2008. In explaining its increased loan loss provision, the Company stated that "approximately one third of the second quarter provision for loan losses related to significant changes in key assumptions the company used to estimate incurred losses in its loan portfolio." Specifically, the Company shortened the time period used to evaluate defaults for its prime mortgage portfolio to one year from three years "to reflect the evolving risk profile of the loan portfolio and adjusted its severity assumptions for all single family mortgages to reflect the continuing decline in home prices."

618. In addition, WaMu announced that its unpaid mortgages, foreclosed homes and other nonperforming assets continued to increase during the second quarter. For example, WaMu stated that its net charge-offs rose to $2.17 billion from $1.37 billion in the prior quarter and nonperforming assets increased $2 billion, representing 3.62% of total assets compared with 2.87% at the end of the prior quarter. WaMu also announced that it expected cumulative losses in its residential mortgage portfolio to total $19 billion, the high end of its previous guidance, and that 2008 would be the peak year for provisioning.

619. Also on July 22, WaMu held a conference call to discuss the Company's second quarter of 2008 financial results. Defendants Killinger, Casey, and Rotella participated in the call along with WaMu's new Chief Enterprise Risk Officer John McMurray (who had replaced Cathcart). During the call, Killinger, Casey and McMurray reviewed the results set forth in the Company's press release. They also explained that, in 2008, the Company's Option ARM loans experienced the fastest rise in delinquency rates and that they expected "other prime loans, which are mostly five and seven year hybrids, to follow Option ARMs closely." According to

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 189

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

McMurray, home equity loans and subprime mortgages had experienced high delinquency rates during the late 2006 to late 2007 time period. Moreover, during the call, the Company announced that it "significantly reduced our production of new mortgages and tightened our underwriting standards against our loan portfolio." Similarly, the Company also announced it had "[eliminated] negatively amortizing products including the Option ARM from our product line."

620. The market reacted swiftly to this news, driving down WaMu's stock price 20% from a closing price of $5.82 per share on July 22, 2008 to a closing price of $4.65 per share on July 23, 2008, on massive reported trading volume of 208,124,873 shares – *more than 35 times greater* than the average daily trading volume of WaMu common stock during the Class Period before the Company's first partial disclosure. Also, DBRS Limited and Standard & Poor's downgraded WaMu's ratings. Moody's placed WaMu and its bank subsidiary on review for a downgrade to junk status. Piper Jaffray downgraded WaMu to "Sell," and Merrill Lynch cut the Company's rating to "Underperform." Similarly, during an interview on the Nightly Business Report, Ladenburg Thalmann analyst Richard Bove described WaMu's position as follows:

> It's in very bad shape…[W]hen you take a look at its non-performing assets, they went up by $2 billion in the quarter. So despite the fact that they wrote off $2 billion in bad loans, they actually still increased the non-performing assets by $2 billion, which means that the non-performing assets are growing at a faster pace than they can write them off. That is not a good sign.

621. With the Company's release of its second quarter of 2008 financial results, the market gained a much greater understanding of the Company's loss exposure and financial condition. As a result, at least in part, of the disclosures set forth above, from October 17, 2007 until July 23, 2008, as the magnitude and severity of the Company's loss exposure caused by its improper lending and accounting practices and deficient risk management was revealed piecemeal to the investing public, the Company's stock price dropped from $33.07 per share to $4.65 per share, a decline of more than 85%.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 190

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

622.     The price of WaMu's other securities also fell as a result, at least in part, of the disclosures of the Company's improper lending practices, poor quality loans and loss exposure. For example, on November 1, 2007, when Attorney General Cuomo filed the NYAG Complaint, alleging that WaMu had engaged in unlawful appraisal practices (as set forth above), the market price of WaMu's depositary shares representing 1/40,000[th] interest in a share of Series K Perpetual Non-Cumulative floating rate preferred stock (the "Series K Stock") fell 7%, from $21.64 per share on October 31, 2007 to $20.10 per share on November 1, and dropped another 6.5% to $18.81 per share on November 2, 2007 as analysts tried to quantify the severity of the allegations. WaMu's debt securities also dropped, on average, 1% on this news. Similarly, on November 7, 2007, when Attorney General Cuomo announced the expansion of his investigation of WaMu's appraisal practices and the Company announced that its loan loss provision could exceed $1.8 billion in the first quarter of 2008 (as set forth above), WaMu's Series K Stock fell almost 8%, from $18.30 per share on November 6, 2007 to close at $16.88 per share on November 7, 2007, and dropped another 2% to close at $16.57 per share on November 8, 2007. WaMu's debt securities also dropped, on average, 2% on this news. Additionally, on March 6, 2008, when numerous rating agencies downgraded WaMu because of credit concerns (as set forth above), WaMu's Series K Stock dropped 5%, its shares of 7.75% Series R Non-Cumulative Perpetual Convertible Preferred Stock (the "Series R Stock") dropped 7%, and its debt securities dropped, on average, 2.8%. In another example, on July 14, 2008, when analysts predicted that WaMu would suffer lifetime real estate mortgage losses between $21 billion and $28 billion and seriously questioned the Company's viability as a result of these losses (as set forth above), WaMu's Series K Stock dropped 36%, its Series R Stock dropped 24%, and its debt securities dropped, on average, 8%.

623.     Thus, as the truth about the consequences of WaMu's improper lending and accounting practices and loss exposure was revealed to the market, the market price of WaMu's securities declined substantially. For example, the market price of the Series K Stock declined

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 191

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

68%, from $23.49 per share on October 17, 2007 to $7.53 per share on July 23, 2008. The market price of WaMu's Series R Stock fell 51%, from $991.25 per share on December 12, 2007 (first available pricing data for this security) to $485.98 per share on July 23, 2008. The market price of WaMu's 5.5% notes due August 24, 2011 also dropped, declining almost 21%, from $100.79 per note on October 18, 2007 to $80.00 per note on July 23, 2008. Similarly, the market price of WaMu's 7.25% notes due November 1, 2017 dropped almost 28%, from $99.41 per note on October 29, 2007 to $71.99 per note on July 23, 2008. The market price of WaMu's 7.250% Notes also declined during the Class Period.

624. The market continued to learn more precisely how dire WaMu's financial condition was after the filing of the initial Complaint. For example, after the market closed on September 9, 2008, Standard & Poor's changed its ratings outlook for WaMu from neutral to negative, stating that there was a greater likelihood the Company could be cut to junk status over the next two years. During trading on September 10, 2008, WaMu's stock price fell nearly 30 percent, from $3.30 per share to $2.32. WaMu's preferred stock and bond prices also fell substantially (*e.g.*, the price of the Series R Stock fell from $290 per share to $157). This event and associated price declines in WaMu's securities represent a further realization of the risks WaMu continued to conceal from the market regarding its appraisal and underwriting practices.

625. Likewise, two weeks later – on September 23, 2008 and September 24, 2008 – both Moody's and Standard & Poor's cut their ratings for WaMu. Moody's lowered WaMu's rating to "E", the lowest possible rating, and stated that WaMu had insufficient capital to absorb its mortgage losses. Standard & Poor's cut WaMu's rating deep into junk status. Over this two-day period, WaMu's common stock fell from $3.33 to $2.26, and the price of the Series R Stock fell from $226.75 to $125.99. WaMu's bond prices also fell substantially. For example, the market price of the 7.250% Notes (defined below at ¶677) fell from $42.00 to $15.10 per $100 of par value, a decline of nearly 65%.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 192

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

626.    Finally, just two days later, on September 26, 2008, the federal government seized WaMu and named the FDIC as receiver.  WaMu's seizure represented the largest bank failure in U.S. history and finally revealed to the market that its massive losses – a foreseeable consequence of the wrongdoing in which it had engaged – were enough to bankrupt the Company and essentially wipe out its equity holders.  On the date of the seizure, WaMu's common stock price fell over 90%, from $1.69 to $0.16 per share.  The prices of both the Series K Stock (defined below at ¶677) and the Series R Stock also fell over 95%.

627.    These post-filing events demonstrate that the truth about WaMu's concealed risks was not fully revealed until September 26, 2008.

## I.    Loss Causation

628.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  Throughout the Class Period, the market prices of WaMu securities were inflated by the material omissions and materially false and misleading statements made by the Company and the Officer Defendants, identified above, and, as a result, Plaintiffs and the Class purchased WaMu securities at artificially inflated prices.  When the truth about WaMu was revealed to the market, the price of WaMu's securities declined in response, as the artificial inflation caused by WaMu's and the Officer Defendants' material omissions and false and misleading statements was removed from the price of WaMu's securities, thereby causing substantial damage to Plaintiffs and other members of the Class.

629.    Indeed, during the Class Period, WaMu common stock traded as high as $46.48 per share on June 1, 2006, and closed at $35.20 per share just days before the Company's October 17, 2007 conference call and press release, when the first partial disclosures about WaMu's true condition were made. Over the next eight and a half months, in response to additional partial disclosures that revealed more about the Company's true financial condition, the market reacted, and WaMu's stock price partially corrected as WaMu's stock price was significantly driven downward.   The Officer Defendants mitigated the impact of those

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 193

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

disclosures and prevented the full truth about WaMu from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market. As the market gained a more complete understanding of the magnitude of the loss exposure facing WaMu and the implications for WaMu's financial condition, the price of WaMu's common stock plummeted to $4.65 per share on July 23, 2008. As a result, at least in part, of the truth emerging about the Company's improper lending practices, poor quality loans, and loss exposure, the market price of WaMu common stock fell more than $28 per share, from $33.07 per share on October 17, 2007 to $4.65 per share on July 23, 2008. The price of WaMu's other equity and debt securities also fell, at least in part, as a result of the disclosures of the Company's improper lending practices, poor quality loans, and loss exposure.

630. The specific dates of the adverse disclosures and the corresponding declines in the price of WaMu securities are set forth above in Section III.H above.

631. It was entirely foreseeable to the Officer Defendants that concealing the Company's improper lending and accounting practices would artificially inflate the price of WaMu securities. It was similarly foreseeable to the Officer Defendants that the ultimate revelation of that misconduct, and of the Company's true condition, would cause the price of WaMu securities to drop significantly as the inflation caused by their misstatements was corrected. Accordingly, the conduct of the Company and the Officer Defendants, as alleged herein, proximately caused foreseeable damages to Plaintiffs and members of the Class.

632. Specifically, the misleading omissions and statements detailed above falsely assured investors, among other things, that WaMu employed "***prudent***," "***conservative,***" "***disciplined***" and "***tightened underwriting standards***" ; that WaMu had "***strong credit quality***" and an "***effective***" "***risk management strategy***"; an "***appropriate level of reserving***" and ***designed, established and maintained an effective system of internal controls***. Those statements were materially false and misleading due to the Company's undisclosed origination of high-risk loans, improper appraisal and lending practices, use of dangerously lax underwriting

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 194

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

standards, deficient credit risk management, inadequate provisioning for loan losses, failure to maintain effective internal controls, and failure to report its financial statements in accordance with GAAP during the Class Period.

633. The Officer Defendants' material omissions and materially false and misleading statements caused the market to believe that the Company's loss exposure was contained and properly managed; caused the Company's financial reporting to be in violation of GAAP; and conveyed the impression that the Company was financially stronger and more profitable than it actually was. The prices of WaMu's securities during the Class Period were affected by those omissions and false statements, and were artificially inflated as a result thereof. Thus, the precipitous declines in the value of WaMu's securities purchased by the Class were a direct, foreseeable and proximate result of the partial disclosures of WaMu's true condition and of the July 22, 2008 disclosure, which more fully revealed the magnitude of the Company's loss exposure and true financial condition.

634. Moreover, the fact that WaMu's unlawful appraisal and improper lending practices, deficient risk management, and inadequate provisioning for loan loss reserves triggered investigations by the New York Attorney General, the SEC and the OTS was also an entirely foreseeable consequence of the misconduct complained of herein.

635. Although not necessary because of the detailed facts set forth above concerning loss causation, as further indicia of the adequacy of loss causation as pled by Lead Plaintiff, Lead Counsel has obtained an expert opinion and analysis from an experienced loss causation expert regarding this matter. Chad Coffman is an expert on loss causation in the securities class action context, economic damages and securities valuation. He has been retained by Lead Counsel in connection with Lead Plaintiff's investigation to evaluate the economic impact of WaMu's allegedly false statements to the investing public on the market price of WaMu's securities, including the causal linkage between the revelation of the truth about WaMu and the economic harm suffered by WaMu investors by the decline in the price of those securities. Mr. Coffman's

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 195

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

opinion concerning these issues is attached hereto as Appendix G (the "Coffman Declaration").

636. As explained in the Coffman Declaration, Mr. Coffman is the President and a founder of Winnemac Consulting, LLC ("Winnemac"), a firm specializing in the application of economics, finance, statistics, technology, securities valuation, and accounting principles in the areas of securities fraud damages, valuation, labor discrimination, antitrust, intellectual property and securities trading practices. Prior to founding Winnemac in March 2008, Mr. Coffman was a Principal at Chicago Partners, LLC. Mr. Coffman spent twelve years at Chicago Partners, and was responsible for conducting and managing large and complex litigation consulting matters across a wide variety of disciplines, including securities valuation and damages, labor discrimination and anti-trust. Mr. Coffman has conducted loss causation and damages analyses for numerous securities actions arising under Section 10(b) of the Exchange Act and Section 11 of the Securities Act, including for some of the largest securities actions in history, such as the *Enron*, *WorldCom*, *Parmalat* and *Tyco* securities class actions. Mr. Coffman has also been engaged numerous times as a valuation expert both in and out of the securities litigation context, on behalf of plaintiffs, defendants, and director and officer insurance policy carriers. Mr. Coffman has also worked for prominent mediator and former Judge, the Honorable Daniel Weinstein (Ret.), providing neutral expert analysis and input in securities litigation and other matters. Mr. Coffman holds a Bachelor of Arts, *magna cum laude,* in economics from Knox College and a Masters in Public Policy from the University of Chicago.

637. As explained in the Coffman Declaration, based upon his review of publicly available information concerning WaMu and the allegations in the Complaint (including the disclosures and analyst reports set forth in Section III.H), it is Mr. Coffman's expert opinion that Lead Plaintiff has (i) set forth a coherent economic theory of how and why the alleged misconduct caused the market prices of WaMu securities to be inflated; and (ii) provided a specific, logical and economically coherent theory of the causal linkage between the disclosures of the truth about WaMu, the resultant declines in the market prices of WaMu securities, and the

Lead Plaintiff's      Bernstein Litowitz Berger & Grossmann LLP
Amended Consolidated Securities Complaint      1285 Avenue of the Americas
No. 2:08-MD-1919 MJP      New York, NY 10019
Page 196      (212) 554-1400

losses incurred by Plaintiffs and the Class.

## J. Presumption Of Reliance

638. Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

639. In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for WaMu securities was open, efficient and well developed for the following reasons, among others:

(a) WaMu's common and preferred stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) The average daily trading volume for WaMu common stock during the Class Period was 18,076,772 shares;

(c) WaMu's debt securities, such as its notes and bonds, were actively traded on multiple exchanges and the Over the Counter Market, all highly efficient markets;

(d) WaMu's securities, including its debt securities, were rated by Moody's, Standard & Poor's, and Fitch Ratings;

(e) WaMu was extensively followed by numerous securities analysts employed by firms including Bear Stearns & Co. Inc.; Citigroup, Inc.; Credit Suisse; D.A. Davidson & Co.; Fox-Pitt Kelton Cochran Caronia Waller; Freidman, Billings, Ramsey & Co., Inc.; Lehman Brothers; Merrill Lynch, Pierce, Fenner & Smith Inc.; Morningstar, Inc.; Punk Ziegel & Company; and Keefe, Bruyette & Woods, among others, who wrote reports about the Company and the value of its securities that entered the public marketplace;

(f) WaMu regularly communicated with public investors through established market communication mechanisms, including through regular press releases, which were

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 197

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

carried by national and international news wires, and through other public disclosures, such as conferences with investors and the financial press;

(g) As a public company, WaMu filed periodic public reports with the SEC;

(h) WaMu met the SEC's requirements to register debt and equity securities filed on Form S-3 and, in fact, filed a Form S-3 in connection with the Offerings, among other SEC filings, as set forth in Section IV, below;

(i) There was substantial and regular pricing available for WaMu's securities. In addition to there being significant pricing data available for WaMu's debt securities that traded on exchanges, there was also substantial pricing date available for WaMu's debt securities that traded on the Over the Counter Market. Specifically, there was an average of greater than ten pricing sources for those securities that did not trade on any exchange.

640. As a result of the foregoing, the market for WaMu securities promptly digested current information regarding WaMu from all publicly available sources and reflected such information in the price of WaMu's securities. Under these circumstances, purchasers of WaMu securities during the Class Period suffered similar injuries through their purchase of WaMu securities at artificially inflated prices, and a presumption of reliance applies.

**K.    Inapplicability Of The Statutory Safe Harbor**

641. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 198

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

to apply to any forward-looking statements pleaded herein, the Officer Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and the Officer Defendants failed to update those statements that later became inaccurate.

## SECOND CLAIM FOR RELIEF
### For Violations Of Section 20(a) Of The Exchange Act
**(Against Defendants Killinger, Casey, Cathcart, Rotella, Schneider, Woods, and Ballenger)**

642. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

643. This Count is asserted against Killinger, Casey, Cathcart, Rotella, Schneider, Woods, and Ballenger for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

644. Including through the statements of its senior executives (noted above at ¶¶47-61, 96-104, 170-190, 267-291, 358-364, 376-380, 389-395, 402-416, 429-434, 445-446, 451-455, 463, 473-474, 488, 492, 502-503, 513-514, 524), WaMu committed a primary violation of the federal securities laws, by means of its knowing and/or reckless dissemination of materially false and misleading statements and omissions throughout the Class Period. Further, several of these statements (¶¶47, 50, 56-57, 96, 174-175, 184, 267-268, 271-273, 274-275, 277-278. 280-281, 283-285, 286-287, 288-289, 290) were the Company's own regulatory filings or press releases where the Company formally issued false and misleading statements to investors.

645. During their tenures as officers and/or directors of WaMu, each of these Defendants was a controlling person of WaMu within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of WaMu, these Defendants had the power and authority to cause WaMu to engage in the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 199

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

wrongful conduct complained of herein. As set forth in detail, above, the Defendants named in this Count were able to and did exert control, directly and indirectly, over WaMu, including the content of the public statements made by WaMu during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

646. In their capacities as senior corporate officers of the Company, and as more fully described above, Killinger, Casey, Cathcart, Rotella and Schneider had direct involvement in the day-to-day operations of the Company and in WaMu's financial reporting and accounting functions. Each of these Defendants was also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by WaMu during the Class Period. Further, as detailed above, Killinger, Casey, Cathcart, Rotella, and Schneider had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC.

647. Killinger served as WaMu's Chairman of the Board from 1991 until June 30, 2008. In addition, Killinger served as WaMu's CEO from 1990 until after the Class Period and as President from 1988 through 2004. In this dual capacity as the senior manager of the Company and as the head of the Board, Killinger had ultimate control over the actions of WaMu.

648. According to WaMu's Forms 10-K for 2005 through 2007, Killinger "established the Executive Committee in 1990 to facilitate and coordinate decision making and communication among the most senior executive officers of the Company who, as a committee, determine the Company's strategic direction." Killinger, Casey, Rotella and Schneider participated as members of the Executive Committee throughout the Class Period. Cathcart was a member of the Committee from December 2005 until April 2008. As alleged in detail in Sections III.A-F, above, these Defendants controlled and managed WaMu's policies, practices and overall business.

649. Furthermore, Killinger, Casey, Cathcart, Rotella and Schneider all received

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 200

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

various written and oral reports from different divisions of the Company on a routine basis. The Officer Defendants' knowledge of and participation in the Company's affairs through the various reports they received and/or had access to are described in Sections III.A.1.b; III.A.2.b; III.A.3.b; III.A.4.b; III.B.1.b; III.B.2.b; III.B.3.b; III.B.4.b; III.C.1.b; III.C.2.b; III.C.3.b; III.C.4.b; III.D.1.b; III.D.2.b; III.D.3.b; III.E.1.b; III.E.2.b; and III.E.3.b, above.

650. Woods served as WaMu's Controller and principal accounting officer from December 2005 until March 2007. Ballenger served as the Company's Controller and principal accounting officer from March 2007 until after the Class Period. In the position of Controller, Woods and Ballenger had direct involvement in the day-to-day operations of the Company and in WaMu's financial reporting and accounting functions.

651. CW 80 served as a Senior Vice President for WaMu's Accounting Policy group from June 2006 to November 2007. In this position, CW 80 reported directly to Woods and then to Ballenger. According to CW 80, Woods and Ballenger were responsible for reviewing and setting WaMu's accounting policies. In addition, according to CW 80, Woods and Ballenger participated in regular meetings with other senior WaMu managers (including Casey and Cathcart) concerning WaMu's accounting policies and practices, including WaMu's Allowance. Ballenger and Woods also controlled the contents of and had direct involvement in the presentation and/or manipulation of the false financial reports included within the Company's filings with the SEC. This is evidenced by the fact that these Defendants signed many of the false financial statements at issue herein. For example, Woods signed the Company's Forms 10-K for the years ended December 31, 2005 and December 31, 2006 and Forms 10-Q for the quarters ended March 31, 2006, June 30, 2006 and September 30, 2006. Similarly, Ballenger signed the Company's Form 10-K for the year ended December 31, 2007 and the Forms 10-Q for the quarters ended March 31, 2007, June 30, 2007 and September 30, 2007. Thus, Ballenger and Woods controlled the Company's accounting practices and were directly involved in the preparation and dissemination of the Company's financial results, including the materially false

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 201

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1 and misleading statements contained therein.

2 652. By reason of their positions as officers of WaMu, and more specifically as controlling officers – as can be seen by their corresponding ability to influence and control WaMu – each of these Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions, these Defendants had access to adverse non-public financial information about the Company and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same. Moreover, each of the Defendants was also involved in providing false information and certifying and/or approving the false financial statements disseminated by WaMu during the Class Period. Each of these Defendants was provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected, but did not do so.

653. As set forth above, WaMu violated Section 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of WaMu and as a result of their own aforementioned conduct, the Defendants named in this Count are liable pursuant to Section 20(a) of the Exchange Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired WaMu securities. Moreover, as detailed above, during the respective times these Defendants served as officers of WaMu, each of these Defendants is culpable for the material misstatements and omissions made by WaMu, including such misstatements in the Company press releases, Forms 10-K, Forms 10-Q, Offering Documents and Registration Statement.

654. As a direct and proximate result of these Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 202

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

WaMu securities.

**THIRD CLAIM FOR RELIEF**
**For Violations of Section 20(a) of The Exchange Act**
**(Against Audit Committee and Finance Committee Defendants)**

655.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

656.     This Count is asserted against the members of the Audit Committee and Finance Committee for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

657.     During their tenure as directors of WaMu, each of these Defendants was a controlling person of WaMu within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as directors and Finance Committee members and/or Audit Committee members of WaMu, these Defendants had the power and authority to cause WaMu and the Officer Defendants to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by WaMu during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

658.     WaMu maintains both an Audit Committee and a Finance Committee, each composed of certain Board members, that reports to WaMu's full Board of Directors.  As detailed in Section II above, at some time during the Class Period, Frank, Leppert, Matthews, Murphy, Reed and Smith (the "Audit Committee Defendants") each participated as a member of the Audit Committee.  As detailed in Section II above, at some time during the Class Period, Farrell, Frank, Lillis, Montoya, Murphy, Osmer-McQuade, Pugh, Reed and Smith (the "Finance Committee Defendants") each participated as a member of the Finance Committee.

659.     According to WaMu's Forms 10-K for 2006 and 2007, the "Board of Directors, assisted by the Audit and Finance Committees on certain delegated matters, oversees the Company's monitoring and controlling of significant risk exposures, including the Company's

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 203

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

policies governing risk management."

660.   As set forth below, each of these Defendants had the power to control and/or influence the particular practices and conduct giving rise to the securities violations alleged herein, and exercised the same.  In their capacities as directors of WaMu, during their tenure these Defendants each signed certain of the Company's filings, including the Company's Forms 10-K for the years ended December 31, 2005 through December 31, 2006, the Offering Documents (as defined below in ¶677) and/or the Registration Statements (as defined below in ¶677), and therefore had the power and authority to control the statements made in such filings. As a result, these Defendants, as a group and individually, were controlling persons within the meaning of Section 20(a) of the Exchange Act.

## The Audit Committee

661.   According to WaMu's Proxy Statements for 2005 through 2008, the Audit Committee performed the following functions: (1) assisted with the oversight of the integrity of the Company's financial reporting process and financial statements and systems of internal controls; (2) assisted with the oversight of the Company's compliance with legal and regulatory requirements; (3) selected and retained the independent auditor, and reviewed its qualifications, independence and performance; (4) selected the general auditor, and assisted with the oversight of the performance of the Company's internal audit function; and (5) approved and monitored the administration of policies addressing management of operational risk.

662.   According to the Audit Committee Charter available on the Company's website, the Audit Committee shall meet with management and the independent auditor to review and discuss the quarterly report on Form 10-Q and the annual report on Form 10-K, including:

> the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations," the annual financial statements and the report of the independent auditor thereon, and significant issues encountered in the course of the audit work, including: restrictions on the scope of activities; recommended adjustments arising from the audit; *the adequacy of internal controls over financial reporting, including any special steps adopted in response to any significant deficiencies or material weaknesses in the design*

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 204

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*or operation of internal controls over financial reporting* identified during the course of the annual audit and the adequacy of disclosures about changes in internal controls over financial reporting; access to required information; the adequacy of the disclosure of off-balance sheet transactions, arrangements, obligations and relationships in reports filed with the SEC; and the appropriateness of the presentation of any pro forma financial information included in any report filed with the SEC.

663.    In addition, the Audit Committee Charter states that with regard to legal compliance/enterprise risk, the Committee shall, among other things:

Consult with the Company's chief legal officer and chief enterprise risk officer concerning legal and regulatory matters that may have a significant impact on the Company's financial statements, compliance policies or programs. . . .

Have such meetings with management as the Committee deems appropriate to discuss significant risk exposures facing the Company and to discuss the steps that management has taken to monitor and control such exposures, including the Company's guidelines and policies governing risk assessment and risk management.

664.    According to WaMu's Forms 10-K for 2005 through 2007, the Audit Committee also approves the Operational Risk Management Policy, which "establishes the Company's operational risk framework and defines the roles and responsibilities for the management of operational risk."

665.    As a result of their positions as Audit Committee members, over and above their positions as Board members, each of the Audit Committee Defendants is liable as a control person of WaMu within the meaning of Section 20(a) of the Exchange Act.

### The Finance Committee

666.    According to WaMu's Proxy Statements for 2005 through 2008, the Finance Committee performed the following functions: (1) monitored investments and dispositions of loans and financial instruments, and significant purchases and dispositions of real property acquired by the Company (excluding the Company's premises or other real property acquired for use by the Company); (2) approved and monitored the administration of policies addressing the Company's allocation of capital and the Company's management of market and credit risk; (3) monitored the development and implementation of strategies that guide the Company's financial

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 205

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

management activities; and (4) reviewed and made recommendations with respect to the payment of dividends, the issuance and repurchase of equity, and the issuance and retirement of debt.

667.    WaMu's Finance Committee Charter, available on the Company's website, further describes the duties of the Committee as including, among other things, the duty to:

> Monitor the development and implementation of strategies that guide the Company's financial management activities, including capital, funds, liquidity, interest rate risk and credit risk management. . . .

> Monitor aspects of financial activities of the Company's key subsidiaries that are material to the Company's business and its return on its investment in these subsidiaries.

668.    WaMu's Forms 10-K for 2005 through 2007 state that the Finance Committee has oversight over the framework for the Company's credit risk management activities.  In fact, in its 2006 Form 10-K, WaMu states that "[i]n 2006, the Finance Committee…approved a set of credit risk concentration limits."  In addition, the Finance Committee oversees the administration of the Company's policy on asset/liability management.

669.    According to a March 27, 2008 shareholder letter by the CtW Investment Group ("CtW"), CtW met with members of the WaMu Board and senior management in early 2008 before the Company's April 15 Annual Meeting.  CtW states that Company representatives:

> pointed out that Finance Committee meetings had been restructured in 2005 to increase focus on matters of significant concern and reduce time devoted to routine matters; *that the Committee had been receiving reports on the housing market regularly since 2005*; that management had incorporated an assumption of zero house price appreciation for 2006 and 2007; *and that the Committee had heard from outside experts, such as BlackRock, Standard & Poors, and Goldman Sachs, on various matters, including mortgage servicing rights and credit losses*.

670.    In response to the CtW letter, WaMu filed a Schedule 14A on April 3, 2008 stating that "*our entire board are and have been actively engaged in formulating and overseeing management's implementation of risk management policies*."

671.    As a result of their positions as Finance Committee members, over and above

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 206

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

their positions as Board members, each of the Finance Committee Defendants is liable as a control person of WaMu within the meaning of Section 20(a) of the Exchange Act.

672. By reason of their positions as directors of WaMu, and more specifically as members of the Audit Committee and/or the Finance Committee, each of the Audit Committee and Finance Committee Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions, these Defendants had access to adverse non-public financial information about the Company including, among others things, its risk management, and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

673. As set forth above, WaMu and the Officer Defendants violated Section 10(b) of the Exchange Act by their acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of WaMu and as a result of their own aforementioned conduct, the members of the Audit Committee and Finance Committee are liable pursuant to Section 20(a) of the Exchange Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired WaMu securities during the Class Period. Moreover, as detailed above, during the respective times these Defendants served as directors of WaMu, each of these Defendants is liable for the material misstatements and omissions made by WaMu, including such misstatements in the Company's press releases, Forms 10-K, Forms 10-Q, Offering Documents and Registration Statement and during investor conferences and conference calls.

674. As a direct and proximate result of these Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of WaMu securities.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 207

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

## IV.    CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT

675.    In the allegations and claims set forth in this part of the Complaint, Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class (as defined in ¶870, except that Plaintiffs explicitly disclaim subpart [e] of ¶875 from these Securities Act allegations).  Plaintiffs' Securities Act claims are not based on any allegations of knowing or reckless misconduct on behalf of the Defendants named in the first through third Claims for Relief.  Plaintiffs' Securities Act claims do not allege, and do not sound in, fraud, and Plaintiffs specifically disclaim any reference to or reliance upon allegations of fraud in these non-fraud claims under the Securities Act.  To avoid an (unfounded) argument by Defendants that the claims below somehow "sound in fraud," it is necessary to state or summarize certain facts also stated above.

676.    This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years after each of the four offerings described herein.

677.    Specifically, the Securities Act Defendants (set forth below) conducted four securities offerings on behalf of WaMu during the Class Period (referred to collectively as the "Offerings"), through which the Company raised approximately *$4.8 billion*.  The Offerings were conducted pursuant to a prospectus and shelf registration statement, filed with the SEC on Form S-3AR on January 9, 2006 (the "Registration Statement").  As set forth in the Registration Statement, the Company could issue debt securities, preferred stock, and depositary shares through the issuance of a prospectus supplement without filing a new registration statement for each offering.  The Offerings at issue are as follows:

- The August 2006 Offering:  On or about August 24, 2006, WaMu conducted a public offering of approximately *$900 million* of notes, including $500 million of floating rate notes due August 24, 2009 (the "Floating Rate Notes") and $400 million of

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 208

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

5.50% notes due August 24, 2011 (the "5.50% Notes"). The August 2006 Offering was marketed and sold to the public through the materially false Registration Statement and prospectus supplements dated August 21, 2006, and filed with the SEC on Forms 424B2 on August 21, 2006 and August 22, 2006, respectively, and on Form 424B5 on August 23, 2006 (the "August 2006 Prospectus," together with the Registration Statement, the "August 2006 Offering Documents"). In connection with this Offering, WaMu raised approximately $897.85 million before expenses.

- The September 2006 Offering: On or about September 18, 2006, WaMu conducted a public offering of 20,000,000 depositary shares, with each depositary share representing 1/40,000th interest in a share of Series K perpetual non-cumulative floating rate preferred stock (defined above as the "Series K Stock") for a maximum aggregate offering price of **$500 million**. The September 2006 Offering was marketed and sold to the public through the materially false Registration Statement and prospectus supplements dated September 11, 2006, and filed with the SEC on Form 424B2 and Form 424B5 on September 11, 2006 and September 13, 2006, respectively (the "September 2006 Prospectus," together with the Registration Statement, the "September 2006 Offering Documents"). The Series K Stock is listed on the NYSE under the symbol "Wm PrK." In connection with this public Offering, WaMu raised approximately $495.2 million before expenses.

- The October 2007 Offering: On or about October 25, 2007, WaMu announced a public offering of **$500 million** of 7.250% subordinated notes due November 1, 2017 (defined above as the "7.250% Notes"). The October 2007 Offering was marketed and sold to the public through the materially false Registration Statement and prospectus supplements dated October 25, 2007, and filed with the SEC on Form 424B2 and Form 424B5 on October 25, 2007 and October 29, 2007, respectively (the "October 2007 Prospectus," together with the Registration Statement, the "October

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 209

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

2007 Offering Documents").  In connection with this Offering, WaMu raised approximately $494.39 million before expenses.

- The December 2007 Offering:  On or about December 17, 2007, WaMu conducted a public offering of 3,000,000 shares of 7.75% Series R Non-Cumulative Perpetual Convertible Preferred Stock (the "Series R Stock"), for a maximum aggregate offering amount of *$3.0 billion*.  The December 2007 Offering was marketed and sold to the public through the materially false Registration Statement and prospectus supplements dated December 10, 2007 and December 11, 2007, and filed with the SEC on Form 424B5 on December 11, 2007 and December 13, 2007 (the "December 2007 Prospectus," together with the Registration Statement, the "December 2007 Offering Documents").  The Series R Stock is listed on the NYSE under the symbol "Wm PrR."  In connection with this Offering, WaMu raised approximately $2.9 billion after expenses.

The Registration Statement, the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents, and the December 2007 Offering Documents are collectively referred to herein as the "Offering Documents."

678.  As discussed in more detail below, the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

### A.  Securities Act Defendants

679.  The Securities Act claims are asserted against all signatories to the Offering Documents, all members of WaMu's Board of Directors at the time of the filing of the materially untrue Offering Documents, the Underwriter Defendants (defined below), Deloitte & Touche LLP ("Deloitte"), WaMu's outside auditor during the Class Period, and those officers who were controlling persons of WaMu (and against WaMu for its primary violations for which the control persons are liable).  Each of these Defendants is statutorily liable under Sections 11, 12 and/or 15

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 210

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

of the Securities Act for the materially untrue statements contained in WaMu's Offering Documents, including WaMu's materially false and misleading financial statements incorporated therein.

### 1.    The Washington Mutual Defendants

680.    *Washington Mutual*:  WaMu was the issuer of the Floating Rate Notes, the 5.50% Notes, the Series K Stock, the 7.250% Notes, and the Series R Stock offered pursuant to the Offerings.

681.    *Kerry K. Killinger*:  As set forth above in ¶21, Killinger  served as the Company's CEO from 1990 to September 2008, and as a member of the Company's Board beginning in 1988, including as Chairman of the Board from 1991 until June 30, 2008.  Killinger signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents.  Killinger was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents, and the December 2007 Offering Documents.

682.    *Thomas W. Casey*:  As set forth above in ¶22, Casey  served as Executive Vice President and Chief Financial Officer of WaMu from October 2002 through October 11, 2008.  Casey signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents.

683.    *John F. Woods*:  As set forth above in ¶26, Woods served as Senior Vice President and Controller for Washington Mutual from December 2005 until mid-2007.  Woods signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents.

684.    *Melissa J. Ballenger*:  As set forth above in ¶27, Ballenger served as Senior Vice President and Assistant Controller and later as Controller at WaMu.  Ballenger signed the Company's Forms 10-Q for the quarters ended March 31, 2007 and June 30, 2007 which were incorporated by reference into the October 2007 Offering Documents and the December 2007

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 211

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Offering Documents.  Ballenger also signed the Company's Form 10-Q for the quarter ended September 30, 2007, which was incorporated into the December 2007 Offering Documents.

685.    *Anne V. Farrell*:  As set forth above in ¶29, Farrell served as a director of the Company from 1994 through April 2008.  Farrell signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents.  Farrell was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

686.    *Stephen E. Frank*:  As set forth above in ¶30, Frank has served as a director of the Company since 1997, and since July 1, 2008, Chairman of the Board.  Frank signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents.  Frank was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

687.    *Thomas C. Leppert*:  As set forth above in ¶31, Leppert has served as a director of the Company since September 2005.  Leppert signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents.  Leppert was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

688.    *Charles M. Lillis*:  As set forth above in ¶32, Lillis  served as a director of the Company from June 2005 until May 19, 2009.  Lillis signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents.  Lillis was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 212

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

689. *Phillip D. Matthews*: As set forth above in ¶33, Matthews has served as a director of the Company since 1998. Matthews signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents. Matthews was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

690. *Regina Montoya*: As set forth above in ¶34, Montoya has served as a director of the Company since April 2006. Montoya was a member of the Board at the time of the filing of the August 2006 Prospectus, the September 2006 Prospectus, the October 2007 Prospectus and the December 2007 Prospectus. Montoya also signed the Company's Form 10-K for the year ended December 31, 2006, which constituted a post-effective amendment to the Registration Statement as a matter of law and was expressly incorporated by reference into the October 2007 Offering Documents and the December 2007 Offering Documents.

691. *Michael K. Murphy*: As set forth above in ¶35, Murphy has served as a director of the Company since 1985. Murphy signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents. Murphy was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

692. *Margaret Osmer-McQuade:* As set forth above in ¶36, Osmer-McQuade has served as a director of the Company since 2002. Osmer-McQuade signed the Company's Registration Statement, which constituted a post-effective amendment to the Registration Statement as a matter of law and was then incorporated into each of the Offering Documents. Osmer-McQuade was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 213

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

693. *Mary E. Pugh:* As set forth above in ¶37, Pugh served as a director of WaMu from 1999 until April 2008. Pugh signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents. Pugh was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

694. *William G. Reed, Jr.:* As set forth above in ¶38, Reed has served as a director of the Company since 1970. Reed signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents. Reed was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

695. *Orin C. Smith*: As set forth above in ¶39, Smith has served as a director of the Company since July 2005. Smith signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents. Reed was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

696. *James H. Stever:* Stever has served as a director of the Company since 1991. Stever signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents. Stever was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

697. *Willis B. Wood, Jr.*: Wood served as a director of the Company from 1997 through April of 2006. Wood signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents. Willis also signed the 2005 Form 10-K, which was incorporated into the August 2006 Offering Documents and the September 2006 Offering Documents.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 214

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

## 2. The Auditor Defendant

698. Deloitte has served as WaMu's outside auditor since at least 1997. Deloitte issued unqualified opinions on the Company's financial statements and management's assessment of internal controls throughout the Class Period and, of particular relevance to the Securities Act claims, for the full years 2005 and 2006. On January 3, 2006, Deloitte consented to the incorporation by reference in the Registration Statement of its auditor report dated March 7, 2005 relating to WaMu's consolidated financial statements for the year ended December 31, 2004. Moreover, Deloitte consented to the incorporation by reference into the August 2006 Prospectus and the September 2006 Prospectus of its unqualified auditor's report, dated March 8, 2006, for the year ended December 31, 2005. Specifically, under the caption "Experts" in each of these Prospectuses, WaMu stated that the financial statements set forth in the 2005 Form 10-K were "incorporated herein by reference, and have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing." Similarly, Deloitte consented to the incorporation by reference into the October 2007 Prospectus and the December 2007 Prospectus of its unqualified auditor's report, dated February 26, 2007, for the year ended December 31, 2006. In each of these Prospectuses, WaMu stated that the financial statements set forth in the 2006 Form 10-K were "incorporated herein by reference, and have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing." Deloitte maintains its national headquarters at 1633 Broadway, New York, New York 10019.

## 3. The Underwriter Defendants

699. *Goldman, Sachs & Co.* ("Goldman Sachs") is an investment bank and acted as underwriter and joint book-running manager for the August 2006 Offering, underwriter and joint bookrunner for the September 2006 Offering, and underwriter and joint book-running manager for the December 2007 Offering. Pursuant to the Offering Documents, Goldman Sachs sold and distributed $176 million of the 5.50% Notes, $220 million of the Floating Rate Notes, 3,700,000

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 215

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

shares of the Series K Stock, and 300,000 shares of the Series R Stock to the investing public. Goldman Sachs was paid at least $10.2 million for its underwriting services in connection with the Offerings. Goldman Sachs' headquarters are located at 85 Broad Street, New York, New York 10004.

700. *Morgan Stanley & Co. Incorporated* ("Morgan Stanley") is an investment bank and acted as underwriter and joint book-running manager for the August 2006 Offering, underwriter and joint bookrunner for the September 2006 Offering, underwriter and joint book-running manager for the October 2007 Offering, and underwriter and joint book-running manager for the December 2007 Offering. Pursuant to the Offering Documents, Morgan Stanley sold and distributed $176 million of the 5.50% notes, $220 million of the Floating Rate Notes, $112.5 million of the 7.250% Notes, 3,700,000 shares of the Series K Stock, and 990,000 shares of the Series R Stock to the investing public. Morgan Stanley was paid at least $31.2 million for its underwriting services in connection with the Offerings. Morgan Stanley's headquarters are located at 1585 Broadway, New York, New York 10036.

701. *Credit Suisse Securities (USA) LLC* ("Credit Suisse") is an investment bank and acted as underwriter and joint book-running manager for the August 2006 Offering, underwriter and co-manager for the September 2006 Offering, underwriter and joint book-running manager for the October 2007 Offering, and underwriter and joint book-running manager for the December 2007 Offering. Pursuant to the Offering Documents, Credit Suisse sold and distributed $16 million of the 5.50% Notes, $20 million of the Floating Rate Notes, $112.5 million of the 7.250% Notes, 500,000 shares of the Series K Stock, and 300,000 shares of the Series R Stock to the investing public. Credit Suisse was paid at least $9.4 million for its underwriting services in connection with the Offerings. Credit Suisse's headquarters are located at 11 Madison Avenue, New York, New York 10010.

702. *Deutsche Bank Securities Inc.* ("Deutsche Bank") is an investment bank and acted as underwriter and joint book-running manager for the August 2006 Offering and underwriter for

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 216

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

the December 2007 Offering. Pursuant to the Offering Documents, Deutsche Bank sold and distributed $16 million of the 5.50% Notes, $20 million of the Floating Rate Notes, and 60,000 shares of the Series R Stock to the investing public. Deutsche Bank was paid at least $1.8 million for its underwriting services in connection with the Offerings. Deutsche Bank's United States headquarters are located at 60 Wall Street, New York, New York 10005.

703. *Lehman Brothers Inc.* ("Lehman Brothers") is an investment bank and acted as underwriter and joint book-running manager for the August 2006 Offering, underwriter and joint bookrunner for the September 2006 Offering, underwriter and joint book-running manager for the October 2007 Offering, and underwriter and joint book-running manager for the December 2007 Offering. Pursuant to the Offering Documents, Lehman Brothers sold and distributed $16 million of the 5.50% Notes, $20 million of the Floating Rate Notes, $112.5 million of the 7.250% Notes, 3,700,000 shares of the Series K Stock, and 990,000 shares of the Series R Stock to the investing public. Lehman Brothers was paid at least $30.8 million for its underwriting services in connection with the Offerings. Due to Lehman Brothers' bankruptcy declared on September 15, 2008, these claims are currently stayed as against Lehman Brothers. Lehman Brothers' headquarters were located at 745 Seventh Avenue, New York, New York 10019.

704. *UBS Securities LLC* ("UBS") is an investment bank and acted as underwriter, sole structuring advisor and joint bookrunner for the September 2006 Offering and underwriter for the December 2007 Offering. Pursuant to the Offering Documents, UBS sold and distributed 7,400,000 shares of the Series K Stock and 60,000 shares of the Series R Stock to the investing public. UBS was paid at least $3.2 million for its underwriting services in connection with the Offerings. UBS' United States headquarters are located at 677 Washington Boulevard, Stamford, Connecticut 06901.

705. *Banc of America Securities LLC* ("Banc of America") is an investment bank and acted as underwriter and co-manager for the September 2006 Offering. Pursuant to the Offering Documents, Banc of America sold and distributed 500,000 shares of the Series K Stock to the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 217

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

investing public.  Banc of America was paid at least $100,000 for its underwriting services in connection with the September 2006 Offering.  Banc of America's headquarters are located at 9 West 57th Street, New York, New York 10019.

706.  *J.P. Morgan Securities Inc.* ("J.P. Morgan") is an investment bank and acted as underwriter and co-manager for the September 2006 Offering and underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, J.P. Morgan sold and distributed 500,000 shares of the Series K Stock and 60,000 shares of the Series R Stock to the investing public.  J.P. Morgan was paid at least $1.9 million for its underwriting services in connection with the Offerings.  J.P. Morgan's headquarters are located at 270 Park Avenue, New York, New York 10017.

707.  *Barclays Capital Inc.* ("Barclays") is an investment bank and acted as underwriter and joint book-running manager for the October 2007 Offering and underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, Barclays sold and distributed $112.5 million of the 7.250% Notes and 60,000 shares of the Series R Stock to the investing public.  Barclays was paid at least $2.1 million for its underwriting services in connection with the October 2007 Offering.  Barclays' United States headquarters are located at 200 Park Avenue, New York, New York 10166.

708.  *Keefe, Bruyette & Woods, Inc.* ("Keefe, Bruyette") is an investment bank and acted as underwriter and co-manager for the October 2007 Offering and underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, Keefe, Bruyette sold and distributed $25 million of the 7.250% Notes and 12,000 shares of the Series R Stock to the investing public.  Keefe, Bruyette was paid at least $435,000 for its underwriting services in connection with the Offerings.  Keefe, Bruyette's headquarters are located at 787 Seventh Avenue, New York, New York 10019.

709.  *Cabrera Capital Markets*, *LLC* ("Cabrera Capital") is an investment bank and acted as underwriter and co-manager for the October 2007 Offering and underwriter for the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 218

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

December 2007 Offering. Pursuant to the Offering Documents, Cabrera Capital sold and distributed $12.5 million of the 7.250% Notes and 12,000 shares of the Series R Stock to the investing public. Cabrera Capital was paid at least $397,500 for its underwriting services in connection with the Offerings. Cabrera Capital's headquarters are located at 10 South La Salle Street, Suite 1050, Chicago, Illinois 60603.

710. *The Williams Capital Group, L.P.* ("Williams Capital") is an investment bank and acted as underwriter and co-manager for the October 2007 Offering and underwriter for the December 2007 Offering. Pursuant to the Offering Documents, Williams Capital sold and distributed $12.5 million of the 7.250% Notes and 12,000 shares of the Series R Stock to the investing public. Williams Capital was paid at least $397,500 for its underwriting services in connection with the Offerings. Williams Capital's headquarters are located at 650 Fifth Avenue, 11th Floor, New York, New York 10019.

711. *Citigroup Global Markets, Inc.* ("Citigroup") is an investment bank and acted as underwriter for the December 2007 Offering. Pursuant to the Offering Documents, Citigroup sold and distributed 60,000 shares of the Series R Stock to the investing public. Citigroup was paid at least $1.8 million for its underwriting services in connection with the December 2007 Offering. Citigroup's headquarters are located at 388 Greenwich St., New York, New York 10013.

712. *Greenwich Capital Markets, Inc.* ("Greenwich"), also referred to as RBS Greenwich Capital in the December 2007 Offering Documents, acted as an underwriter for the December 2007 Offering. Greenwich sold and distributed 60,000 shares of the Series R Stock to the investing public. Greenwich was paid at least $1.8 million for its underwriting services in connection with the December 2007 Offering. Greenwich's headquarters are located at 1101 30th Street, NW, Suite 500, Washington, DC 20007.

713. *BNY Capital Markets, Inc.* ("BNY") is an investment bank and acted as underwriter for the December 2007 Offering. Pursuant to the Offering Documents, BNY sold

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 219

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

and distributed 12,000 shares of the Series R Stock to the investing public. BNY was paid at least $360,000 for its underwriting services in connection with the December 2007 Offering. BNY's headquarters are located at One Wall Street, 18th Floor, New York, New York 10286.

714. *Samuel A. Ramirez & Company, Inc.* ("Ramirez & Co.") is an investment bank and acted as underwriter for the December 2007 Offering. Pursuant to the Offering Documents, Ramirez & Co. sold and distributed 12,000 shares of the Series R Stock to the investing public. Ramirez & Co. was paid at least $360,000 for its underwriting services in connection with the December 2007 Offering. Ramirez & Co.'s headquarters are located at 61 Broadway, 29th Floor, New York, New York 10006.

**B. Background**

715. WaMu provided financing to homeowners in the form of home mortgages and "second-lien" products such as home equity loans and home equity lines of credit. These loans were either held by WaMu for investment ("in portfolio") or sold to investors in whole loan sales or securitizations.

716. The quality of the loans originated by WaMu, and in particular the risk level of WaMu's loans, was crucial to determining, among other things, the value of the loans on the Company's balance sheet and the extent of the loss exposure facing the Company for such loans. The Company was required under generally accepted accounting principles (defined above as "GAAP") to evaluate on a regular basis the quality of the loans in its portfolio as part of the financial statement preparation process. If the Company determined that the loans were impaired for any reason, including because of credit risk, it was required to increase, or "provision," its Allowance for Loan and Lease Losses (defined above as the "Allowance") as a reserve against incurred and probable future losses inherent in the Company's loans held in portfolio. However, as set forth below, WaMu failed to properly provision against the Company's incurred and probable losses because it did not take into account the Company's ineffective risk management, unreliable appraisal practices, high-risk loan products, and deteriorating underwriting practices.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 220

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

717.     Indeed, in 2005, the Company embarked on a systemic change in practices and policies whereby WaMu emphasized growing loan volume (and thus profits) over loan quality and balanced, prudent growth.  This change was manifested in several ways, including: (1) relegating the Company's risk management efforts to focus on supporting the loan production staff, rather than acting as a gatekeeper for loan quality and a protector against loan losses; (2) forcing both in-house and third-party appraisers to inflate appraisal values; (3) originating greater volumes of exotic and high-risk loans; and (4) loosening the Company's underwriting standards. As explained below in greater detail, each of these actions was taken to allow WaMu to close ever-greater volumes of loans and to make the Company appear more profitable than it was.

718.     As a result of WaMu's drive towards growth, the risks inherent in the Company's loan portfolio were dramatically heightened.  However, as discussed below, the Company did not provision the Allowance at the levels necessary to match these heightened risks.  This failure resulted in the Company's financial statements being materially misstated.  In particular, since provisions for the Company's Allowance reduced the Company's pre-tax income on a dollar-for-dollar basis, the Company's failure to properly provision its Allowance caused the Company's net income and earnings per share to be overstated.  As set forth below, the misstatement of these financial results was material.

### 1.     WaMu Curbed Risk Management Efforts In Furtherance Of Increasing Loan Volume

719.     Effective risk management efforts were necessary to ensure that the Company originated loans that were not susceptible to a high degree of losses.  However, the Company relegated its risk management personnel to a secondary "support" role to loan production, rather than as a primary safeguard against unsafe lending that would cause the Company to incur greater losses.  By doing so, WaMu removed controls against extremely risky lending practices. Moreover, rather than have risk management personnel report directly to the Board of Directors or an independent executive officer, WaMu placed Schneider in charge of *both* the Company's

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 221

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Home Loans' risk management operations and the Company's Home Loans' lending operations (*i.e.*, sales).

720.     Additionally, the Company's ineffective risk management approach allowed management to misuse the Loan Performance Risk Model (defined above as the "LPRM"), the key model used by the Company to predict losses, which provided the main input as to the amount by which to provision the Allowance.  The LPRM used by WaMu during the Class Period failed to accurately predict losses in at least two important ways.

721.     First, as indicated by an internal report dated September 2005 and entitled "Corporate Risk Oversight Report: Allowance of Loan & Lease Losses Methodology of Washington Mutual Bank" (defined above as the "CRO Report"), the LPRM did not appropriately analyze for risk of losses in the Company's Option ARM loans, or other loans with the potential for "negative amortization."  By way of background, WaMu's Option ARM loans allowed the borrower to choose to pay less than the total accrued interest and principal on a loan each month.  If the borrower chose a lesser payment, then the difference between the lesser payment and the total due would be added to the principal balance of the loan, thus "negatively amortizing."  This had a material impact on the Company's evaluation of risk for losses on its loans, because Option ARM loans comprised over half the Company's prime loan portfolio, and, due to the optional payment structure, were high-risk loan products.

722.     Second, according to CW 78 (described at ¶88), as of summer 2007, the LPRM had not been calibrated to reflect actual loan performance data for over ***eighteen months***.  This had the material effect that, in modeling for losses on its loans, the Company was not taking into account the actual deterioration that the Company's loan portfolio experienced over the course of 2006 and 2007, which, as a result of the Company's appraisal and underwriting practices, was significant during this time.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 222

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

## 2. The Company Caused Appraisal Values For Its Loans To Be Inflated

723. Beginning in 2005, the Company pressured its in-house appraisers to inflate the home values for loan applications submitted to the Company. In mid-2006, the Company started outsourcing its appraisals to two supposedly independent third-party appraisal companies, First American Corporation through its subsidiary, eAppraiseIT, and Lenders Services Inc. (defined above as "LSI"). Despite this change to using third-party appraisers, the Company continued to exert pressure to inflate appraisal values.

724. These inflated appraisals allowed the Company to claim lower loan-to-value (defined above as "LTV") ratios; *i.e.*, the loan amount was lower relative to the appraised value of the collateral for the loan. This also had the effect of creating the illusion that the homeowner's equity in the collateral was greater than it was. Generally, the greater the homeowner's equity, the lower the risk associated with that loan. Conversely, the lower the homeowner's equity, the higher the risk associated with that loan. Thus, the value of the appraisal in the loan file is critical to determining the LTV ratio and the associated risk of default on the loan.

725. In its Form 10-K for 2006 and in substantially similar language in its Form 10-K for 2005, WaMu acknowledged that the lower the equity a homeowner has in his or her home, the greater the risk of the borrower defaulting:

> Home equity loans and lines of credit with combined loan-to-value ratios of greater than 80 percent also expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of risk is higher when borrowers have less equity in their homes.

726. WaMu also acknowledged that it used LTV ratios to determine the default risk of loans held in portfolio. Because loans with high LTV ratios carry a greater risk of nonperformance, the Company must provision at higher rates for the Allowance.

727. Former WaMu and eAppraiseIT employees confirm WaMu's improper appraisal

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 223

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

practices. Indeed, as former appraisers of WaMu have reported, inflation of appraisal values was commonplace at WaMu beginning in 2005. CW 24, a former WaMu employee who spent four years working as a Senior Appraisal Coordinator, recalled that starting in 2005, WaMu began to significantly increase pressure on appraisers to exaggerate appraisal values. Specifically, as a Senior Appraisal Coordinator, CW 24 served as a liaison between WaMu loan officer/brokers (*i.e.*, loan production staff) and WaMu appraisers and, in this position, received regular complaints from both in-house and outside appraisers about WaMu requiring "a certain value" to make loans "work." Indeed, CW 24 explained that the push by WaMu to inflate appraisals was a constant problem throughout the Class Period.

728. Similarly, CW 25, who was a loan consultant at Washington Mutual Home Loans in Maryland from September 2003 until November 2005, recalled that when a WaMu loan officer brought in a loan application, typically the WaMu loan officer was able to request a specific appraiser. CW 25 explained that in the event that a loan officer was provided an appraisal value that the loan officer found unacceptable, the loan officer could request a "reconsideration of value" (defined above as "ROV") in which the loan officer could provide a different set of comparables to a WaMu "master appraiser" to reevaluate the property. CW 25 stated that WaMu loan officers regularly put a great deal of pressure on the loan coordinators and demanded that initial appraisal values be reevaluated if unacceptable to them.

729. CW 25 recalled that, at WaMu, in-house appraisers received kickbacks from loan consultants to "hit" value on appraisals. Despite CW 25's complaints to management about the appraisal process at WaMu, WaMu management did nothing to change the situation. Indeed, CW 25's job was threatened on many occasions in response to CW 25's complaints of appraisal corruption.

730. CW 31, who was a contract appraiser with eAppraiseIT after leaving WaMu as an in-house appraiser, also confirmed that WaMu pressured appraisers to inflate appraisal values. Specifically, CW 31 stated that WaMu dictated appraisal values that it needed to satisfy the LTV

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 224

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

ratios it desired. CW 31 explained that WaMu pressured the third-party appraisers by (i) badgering them to meet the Company's desired appraisal values, and (ii) ceasing to hire appraisers who did not bring in the inflated appraisal values that WaMu desired.

731. WaMu's improper appraisal practices have been further confirmed by New York State Attorney General Andrew Cuomo. Specifically, on November 1, 2007, Attorney General Cuomo filed a complaint against First American Corporation and eAppraiseIT (defined above as the "NYAG Complaint"), which details how WaMu pressured appraisers to inflate appraisal values. The NYAG Complaint was filed after "investigators had spent nine months interviewing hundreds of mortgage industry executives and poring over millions of documents obtained through subpoenas," according to a November 2, 2007 *New York Times* article.

732. Indeed, the NYAG Complaint alleges, on the basis of numerous internal emails, including emails between WaMu and eAppraiseIT, that WaMu executives pressured eAppraiseIT to increase the appraised value of homes and that eAppraiseIT improperly allowed WaMu's loan production staff to hand-pick appraisers who brought in appraisal values high enough to permit WaMu's loans to close. Additionally, the NYAG Complaint alleges that WaMu repeatedly pressured eAppraiseIT appraisers to change appraisal values that were too low to permit loans to close.

733. As with eAppraiseIT, WaMu also inflated appraisal values through LSI, another purportedly independent appraisal service company. For example, according to CW 39, a member of LSI's appraisal team management for WaMu from August 2006 through February 2007, LSI was forced to give priority to appraisers from a WaMu "preferred appraiser" list for its appraisals. CW 39 recalled that WaMu often pressured LSI appraisers to raise appraisal values by frequently submitting ROVs, by contacting appraisers directly, and by WaMu loan officers requesting to work with specific appraisers because "they knew each other."

734. According to CW 39, the practice of WaMu loan officers contacting LSI appraisers directly, which CW 39 described as "illegal," occurred frequently. CW 39 also

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 225

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

believed that WaMu's efforts to dictate which specific LSI appraisers should be used for WaMu loans was "illegal." According to CW 39, LSI acknowledged the impropriety of the practice, but re-construed it as a "recommendation" from WaMu.

735. Indeed, WaMu's appraisal practices were inconsistent with federal regulations and guidelines that govern such conduct. On March 22, 2005, federal regulators – including the OTS, which regulates WaMu – published guidance on appraisals directly applicable to WaMu, entitled "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions" (defined above as the "2005 Interagency Appraisal Guidelines"). The 2005 Interagency Appraisal Guidelines, which apply to "all real-estate-related financial transactions," mandate, among other things, that:

- Loan production staff should not select appraisers.

- Loan production staff should not be involved in developing or maintaining lists of appraisers, and that any such list of appraisers should be the subject of periodic evaluation to maintain independence.

- Upon engaging an appraiser, "information provided by the regulated institution should not unduly influence the appraiser or in any way suggest the property's value."

- Prior to making a final credit decision, "regulated institutions should perform a compliance review on all appraisals to confirm that they comply with the minimum appraisal standards. . . ."

Thus, WaMu's appraisal practices did not conform to the governing regulations and guidelines.

736. WaMu's practice of inducing both in-house and third-party appraisers to overvalue the real estate underlying WaMu loans caused an increased and material risk of loss for loans held in the Company's portfolio.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 226

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

### 3. WaMu Adopted Deficient Underwriting Standards

737. Throughout the Class Period, WaMu further increased the Company's loss exposure and the poor quality of the loans held in the Company's portfolio by loosening its underwriting standards in order to close more loans. Contrary to WaMu's statements in its SEC filings, discussed below, the Company instituted extremely loose underwriting guidelines for increasingly risky loan products and routinely allowed exceptions to those already loosened standards to generate greater loan volume. Further, WaMu incentivized its salespeople, underwriters, and management to close a higher volume of loans, with increased bonuses for the more exotic, high-risk loans and without any regard for the credit quality of the loans originated.

738. Numerous former WaMu employees describe how, during the Class Period, WaMu was focused on generating ever-increasing volumes of high-risk loans, repeatedly stressed quantity without regard to quality, and abandoned prudent underwriting practices to accomplish these goals. For example, CW 2, who worked at WaMu from 1995 until 2008, most recently as an Underwriting Supervisor from 2005 until 2008, explained that no exception to WaMu's underwriting guidelines was needed for many risky loans, because WaMu's "guidelines were so generous." Moreover, CW 2 added that for those loans that did not fit within the loose guidelines of WaMu's underwriting standards, exceptions to WaMu's already loose guidelines were always readily available. CW 51, a Senior Underwriter at the WaMu home loan center in Lake Success, New York from 2007 to 2008, agreed that guideline exceptions were "part of the norm . . . [I]t was so commonplace to go outside of the guidelines." Even when exceptions were sent to management for approval, CW 51 observed that the exceptions "were always approved, so it was just business as usual and something that they were comfortable with."

739. CW 52, an underwriting Team Manager with WaMu from 2004 through 2007 in Anaheim, California, estimated that exceptions to the underwriting guidelines occurred 30-40% of the time. According to CW 52, the types of exceptions "varied so much," from "accepting

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 227

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

certain income documentation – or lack thereof – to credit score exceptions . . . [T]here [were] tons of exceptions."

740. CW 66, a Senior Underwriter at WaMu's subprime-lending subsidiary, Long Beach Mortgage (defined above as "LBM") from 2004 through September 2007, explained that LBM also utilized loose and exception-ridden underwriting guidelines. CW 66 stated that there were significant flaws in LBM's underwriting procedures and described the culture of LBM as "just do it." Indeed, CW 66 explained, "There were really no restrictions to approve a loan," and some "really bad loans" went through the office. The attitude at WaMu was "push, push, push."

741. WaMu's lenient lending environment was particularly dangerous in underwriting for the Company's high-risk Option ARM and Alt-A loans. As described above, Option ARM loans are adjustable-rate mortgage loans that give the borrower the option each month to make a fully-amortizing, interest-only or minimum payment, and to amortize any unpaid interest onto the principal of the loan. WaMu offered a low "teaser" rate for an introductory period of the loan, which automatically adjusted to a much higher rate, known as the "fully indexed" rate, after a set period of time, or after a certain amount of unpaid interest had been amortized onto the principal. Contrary to its repeated public representations, the Company underwrote these loans to the "teaser" rate rather than the fully indexed rate, greatly increasing the chance that once loan payments were required at the fully indexed rate, the loans would default.

742. CW 62, a senior underwriter at WaMu's Lake Success, New York office from June 2005 until February 2008, confirmed that during the Class Period, WaMu underwrote Option ARM loans to the teaser rate, rather than the fully indexed rate.

743. Indeed, a document published by WaMu's loan securitization channel entitled "Mortgage Securities Corp. Seller Guide Update – Announcement Concerning Qualifying Rate and Qualifying Payment for Hybrid ARM, IO, and Option ARM Products" confirms that WaMu allowed Option ARM loans to be underwritten to their "teaser" rate until August 2007.

744. Further, WaMu compensated its employees, including its underwriters, based on

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 228

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

the number of loans that the employees closed, without regard to the credit quality of those loans. According to CW 5, who served as a WaMu Senior Credit Quality Manager from March 2005 until February 2008, after having served as a WaMu Senior Underwriter from 2003 through 2004, underwriters received large bonuses based upon the number of loans they had underwritten. According to CW 5, underwriters were required to underwrite a minimum of nine loans a day, and any loans underwritten in excess of that number provided for bonus payments. Indeed, certain senior underwriters earned in excess of $100,000 annually because of these bonuses.

745. In fact, according to CW 47, a Negotiated Transaction Manager and long-time employee of WaMu who left in February 2008 after twenty-four years with the Company, WaMu was so focused on incentivizing underwriters to close a greater volume of loans that loan delinquency data was not provided to underwriters. According to CW 47, WaMu's senior management believed that if underwriters knew which underwriting problems led to greater delinquencies and defaults, WaMu's underwriters would "by nature" tighten up WaMu's lending standards.

### 4. The Company's Financial Results Were Not Stated In Compliance With GAAP

746. The Company failed to properly account for the material increases in risk associated with its lending practices. As set forth above, during the Class Period, WaMu had, among other things, (1) discontinued effective risk management practices; (2) pressured its appraisers to inflate the appraisal values for the collateral underlying its loans; (3) significantly loosened its underwriting guidelines; (4) encouraged wholesale exceptions to those guidelines through explicit emphasis on loan quantity over quality; and (5) compensated its employees based upon loan volume without regard to loan quality. By not taking these high-risk practices into consideration when accounting for the Company's incurred and probable loan losses, WaMu violated GAAP.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 229

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

747. Specifically, the Company violated Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" (defined above as "SFAS 5"). SFAS 5, a fundamental GAAP principle that was issued over thirty years ago, states that:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if ***both*** of the following conditions are met:
>
> a.      Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.      The amount of loss can be reasonably estimated.

(Emphasis in original.)

748. The SEC provides further guidance on the proper accounting for credit risk and loan losses. SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and Documentation Issues" (defined above as "SAB 102"), which was issued in July 2001, states in pertinent part: "It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process . . . . A registrant's loan loss allowance methodology generally should . . . [c]onsider all known relevant internal and external factors that may affect loan collectability . . . [and] be based on current and reliable data. . . ."

749. In violation of GAAP and SEC guidelines, WaMu failed to take into account the undisclosed, poor quality, and high-risk nature of the Company's loan portfolio as well as all known internal factors that would affect loan collectability, including the Company's dubious underwriting and appraisal activities, when provisioning its Allowance.

750. Indeed, an internal document obtained through Lead Plaintiff's investigation shows that until as late as June 30, 2006, and possibly later, the Company had no method for determining the losses incurred in its Option ARM loans and thus appropriately provisioning for such losses. Specifically, the CRO Report explicitly states that the Company's fundamental

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 230

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

model for evaluating losses, known as the "LPRM," "is untested on products with the potential to negatively amortize."  Because Option ARM loans constituted well over half the Company's loan portfolio during the Class Period and, because of their structure, are high-risk products, this failure to account for negative amortization had enormous negative impact on the Company's financial statements.

751.    Further, WaMu, through the LPRM, did not account for deteriorating loan performance during the Class Period at all.  As CW 78 (described at ¶88) reported, in the summer of 2007, a WaMu analyst who worked in calibrating the LPRM to calculate losses inherent in WaMu's loan portfolio, and thus how much to provision the Allowance, informed CW 78 that the LPRM had not been calibrated to reflect actual loan performance for eighteen months.  Defaults, delinquencies, and foreclosures, all of which rose steadily during the Class Period, were thus not considered at all when provisioning the Allowance.

752.    These failures to account for negative amortization and for deteriorating loan performance exacerbated the already deficient and improper accounting for the Company's loan portfolio.  Defendants' improper risk management, underwriting, and appraisal practices during the Class Period (1) caused the Company's Allowance and loan loss provisions to be materially understated during the Class Period; (2) caused WaMu to report financial results that were in violation of GAAP; (3) caused certain of the Company's reported financial information, including net income, earnings per share, and assets, to be materially overstated throughout the Class Period; and (4) rendered Defendants' statements about the adequacy of the Company's internal controls, incorporated by reference into the Offering Materials, materially false and misleading.

### 5.    Deloitte Failed To Audit WaMu In Accordance With GAAS

753.    In addition to WaMu's false representations regarding the Company's compliance with GAAP, Deloitte also falsely represented that the Company's financial results were presented

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 231

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

in compliance with GAAP. Specifically, in certifying WaMu's 2005 and 2006 financial statements, Deloitte falsely represented that those financial statements were prepared in accordance with GAAP and that Deloitte's audits were conducted in accordance with Generally Accepted Auditing Standards ("GAAS").[7] When an auditor represents that a company's financial statements conform in all material respects with GAAP, the auditor "indicates [his] belief that the financial statements taken as a whole are not materially misstated." AU § 312.[8] Indeed, "[f]inancial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with [GAAP]." AU § 312.

754. Deloitte's statements were untrue because its audits did not conform to GAAS and, therefore, Deloitte had no reasonable basis to represent that WaMu's financial statements fairly presented the Company's financial position and results of operations in conformity with GAAP. In issuing unqualified audit opinions on WaMu's financial statements, Deloitte failed to comply with the professional standards dictated by GAAS.

755. GAAS General Standard No. 3 requires an auditor to exercise due professional care in the performance of the audit and preparation of the report. AU § 150.02. Deloitte violated General Standard No. 3 by, among other things, disregarding (i) the improper pressure

---

[7] The Public Company Accounting Oversight Board ("PCAOB"), established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, Generally Accepted Auditing Standards, and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. All references to GAAS hereinafter include the standards of the PCAOB.

[8] GAAS includes Statements on Auditing Standards ("SAS") issued by the Auditing Standards Board of the American Institute of Certified Public Accountants ("AICPA"), which are codified in *AICPA Professional Standards* under the prefix "AU."

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 232

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

WaMu exerted on its in-house and third party appraisers to inflate appraisal values to close more loans; (ii) the Company's abandonment of, and deviation from, its underwriting guidelines to originate ever-increasing volumes of loans; and (iii) the Company's relegation of its credit risk management to a secondary role, all of which reduced the quality of loans in WaMu's portfolio, significantly increased WaMu's loss exposure, and necessitated the establishment of a much higher Allowance and provisions for loan losses. ***Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that the Company's Allowance and provisions for loan losses were insufficient and, consequently, the Company had overstated its net income, earnings per share, and the value of its assets in violation of GAAP***.

756.    GAAS Standard of Fieldwork No. 1 requires an auditor to plan the audit, which "involves developing an overall strategy for the expected conduct and scope of the audit."  AU § 311.03.  This requires understanding the entity's business sufficiently to identify areas of risk. AU §311.06.  Deloitte violated Standard of Fieldwork No. 1 by, among other things, failing to plan and conduct an audit that would include identifying and assessing WaMu's areas of risk, specifically, the quality of its loan originations and lending practices, and the performance of its loans, including rates of delinquencies and foreclosures and levels of nonperforming assets and negative amortization. ***Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that the Company was originating high-risk loans in violation of its underwriting guidelines, that the Company was inflating appraisal values, and that those loans were frequently and increasingly experiencing delinquencies and foreclosures.  Deloitte would have also uncovered that WaMu was experiencing increasing levels of nonperforming assets and negative amortization***.

757.    GAAS Standard of Fieldwork No. 2 requires that an auditor have a sufficient understanding of the company's internal controls to properly plan the audit, assess audit risk, and determine the nature, timing, and extent of the tests performed.    Further, while it is management's responsibility to establish and maintain internal controls, AU § 110.03, the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 233

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

independent auditor is responsible for auditing and rendering an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting. PCAOB Auditing Standards ("AS") No. 2, An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of the Financial Statements, ¶4.

758. Deloitte violated Standard of Fieldwork No. 2 and the requirements of AS No. 2 by disregarding the fact that WaMu routinely violated its underwriting guidelines and pressured appraisers to inflate appraisal values. GAAS, specifically, the AICPA Audit & Accounting Guide for Depository and Lending Institutions, Ch. 8, ¶142, required that Deloitte review loan origination files to determine the Company's compliance with its underwriting guidelines. In addition, Deloitte violated Standard of Fieldwork No. 2 because it disregarded that WaMu's loss modeling methodology did not (i) appropriately analyze and capture the risk of losses in the Company's Option ARM loans or other loans with the potential to negatively amortize and (ii) take into account the actual deterioration that was experienced in the Company's loan portfolio during the course of 2006 and 2007. ***Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that WaMu's internal controls over financial reporting were so ineffective that the Company's financial statements were not fairly presented in accordance with GAAP***.

759. GAAS Standards of Fieldwork Nos. 2 and 3 require that an independent auditor obtain, through inspection, observation, inquiries and confirmations, competent, sufficient evidential matter to afford a reasonable basis for its opinion. AU § 150.02. Deloitte violated Standard of Fieldwork Nos. 2 and 3 by, among other things, failing to obtain evidence that WaMu had adequately provisioned for its substantial loss exposure that resulted from the Company's improper underwriting and appraisal practices and ineffective risk management. ***Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that WaMu's reported Allowance and provisions were insufficient and that the Company had failed to account for the high-risk, low-quality loans it issued, in violation of***

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 234

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*GAAP.*

760.   GAAS also requires an auditor to evaluate "the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole," AU § 342.04, thus requiring Deloitte to review the assumptions and estimates concerning, among other things, the risks of default, delinquency, and foreclosure attendant to WaMu's high-risk loan originations.   Deloitte violated this duty by, among other things, disregarding WaMu's failure to take into account its aggressive origination practices and accompanying increase in the Company's risk of default, delinquency, and foreclosures.   ***Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have reached was that the estimates underlying WaMu's accounting were unreasonable.***

761.   Standard of Reporting No. 4 requires an auditor to express an opinion on the financial statements of a company taken as a whole, or to state that an opinion cannot be expressed. AU § 150.02.   As a result of Deloitte's violations of GAAS set forth above, it also violated the Standard of Reporting No. 4 because Deloitte had an insufficient basis to express an unqualified opinion on its 2005 and 2006 audits of WaMu.   Accordingly, as set forth below, Deloitte's public statements concerning those audits were untrue and contained omissions of material facts.

### C.   The August 2006 Offering And The September 2006 Offering

762.   On or about August 24 2006, WaMu conducted the August 2006 Offering, consisting of the Floating Rate Notes and the 5.50% Notes.   The Company raised $897.85 million in capital from this offering, which it used for general corporate purposes, including providing funding to its subsidiaries and repurchasing shares of the Company's stock.

763.   The August 2006 Offering was conducted pursuant to the August 2006 Offering Documents, which incorporated by express reference several of WaMu's public filings, including its Form 10-K/A for the fiscal year ended December 31, 2005 (the "2005 Form 10-K"), which was audited by Deloitte and certified as being in conformance with GAAP, and its Forms 10-Q

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 235

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

for the quarters ended March 31, 2006 (the "First Quarter 2006 Form 10-Q") and June 30, 2006 (the "Second Quarter 2006 Form 10-Q"). The 2005 Form 10-K was signed by Defendants Killinger, Casey, Farrell, Woods, Frank, Pugh, Leppert, Reed, Lillis, Smith, Matthews, Stever, Murphy, Wood, and Osmer-McQuade. The un-amended First Quarter 2006 Form 10-Q and the Second Quarter 2006 Form 10-Q were signed by Defendants Casey and Woods. The Form 10-Q/A for the first quarter of 2006 was signed by Defendant Casey alone.

764. As noted above, Goldman Sachs, Morgan Stanley, Credit Suisse, Deutsche Bank, and Lehman Brothers served as joint book-running managers for the August 2006 Offering.

765. Additionally, on or about September 18, 2006, WaMu conducted the September 2006 Offering of the Series K Stock. The Company raised $495.2 million in capital from this offering, which it used for general corporate purposes, including, among other things, repurchasing shares of the Company's stock.

766. The September 2006 Offering was conducted pursuant to the September 2006 Offering Documents, which incorporated by express reference several of WaMu's filings made after the date of the Registration Statement pursuant to Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act, including its 2005 Form 10-K, which was audited by Deloitte and certified as being in conformance with GAAP, and its First Quarter 2006 Form 10-Q and Second Quarter 2006 Form 10-Q.

767. As noted above, UBS, Goldman Sachs, Lehman Brothers, and Morgan Stanley served as joint book-running managers for the September 2006 Offering. Banc of America, Credit Suisse, and J.P. Morgan served as co-managers for the September 2006 Offering.

768. WaMu made numerous material misstatements and omissions in the August 2006 Offering Documents and the September 2006 Offering Documents regarding its financial results, compliance with GAAP, credit risk management, and underwriting and appraisal practices. These statements misinformed investors in the August 2006 and September 2006 Offerings regarding the soundness of the Company's evaluation of the risk of its loan portfolios, which had

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 236

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

grave implications for the reliability of its financial statements, and rendered the August 2006 Offering Documents and the September 2006 Offering Documents materially untrue and misleading.

### 1. The August 2006 Offering Documents And September 2006 Offering Documents Misstated The Company's Lending Practices

769. To start, the August 2006 Offering Documents and September 2006 Offering Documents misstated the Company's lending practices. Specifically, with regard to the Company's underwriting of loans, the 2005 Form 10-K stated that "[t]he Company seeks to mitigate the credit risk in this portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime loans." The 2005 Form 10-K further represented that: "The Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures."

770. In addition, in discussing its lending operations in the 2005 Form 10-K, WaMu repeatedly stated that LTV ratios were a "key determinant of future performance," stating:

> Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. . . . This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure.

771. The Company's statements in the 2005 Form 10-K, which were incorporated into the August 2006 Offering Documents and the September 2006 Offering Documents, regarding its risk management, underwriting, and appraisal practices were materially false and misleading because the Company was, in fact, lowering its underwriting standards and issuing loans that were increasingly unlikely to be repaid. The Company did not comply with its underwriting standards, underwrote high-risk loans to borrowers who were not able to repay such loans, and made exceptions to its underwriting guidelines as a matter of course. Indeed, the Company

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 237

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

omitted from the August 2006 Offering Documents and the September 2006 Offering Documents the key facts that, during the third quarter of 2005, the Company had loosened underwriting standards and increased its exceptions to those underwriting standards in order to increase loan volume. In addition, the Company did not adequately manage its risk. As set forth above, starting in 2005, WaMu relegated its risk management to a secondary "support" role. WaMu also had deficient risk management in that its loan loss modeling methodology did not appropriately analyze or capture the Company's Option ARM loans and did not reflect the actual loan deterioration that the Company experienced during 2006.

772. Moreover, the statements in the Company's 2005 Form 10-K regarding its use of LTV ratios in its underwriting as "key determinants of future performance" were false and misleading because the Company was systematically inflating the appraisal values of the real estate collateral underlying its loans, which materially distorted the LTV ratios for the Company's home loans. Thus, the LTV ratios that the Company relied on were misstated and, as such, were not accurate "determinants of future performance." Moreover, the Company failed to disclose its widespread practice of pressuring both in-house appraisers and third party appraisers to overstate appraisal values so that the Company could close more loans. The omission of the Company's improper appraisal practices from the August 2006 Offering Documents and the September 2006 Offering Documents rendered these Offering Documents materially misleading.

### 2. The August 2006 Offering Documents And September 2006 Offering Documents Contained Untrue Financial Results

773. The August 2006 Offering Documents and September 2006 Offering Documents also contained materially misstated financial results for WaMu for 2005 and the first half of 2006. These included material understatements of the Company's Allowance and provision for loan losses and material overstatements of the Company's net income, earnings per share, and assets that resulted directly from the Company's undisclosed lending practices and deterioration in the quality of WaMu's loans.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 238

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

774. In the 2005 Form 10-K, WaMu reported that for the full year 2005, the Company's net income was $3.43 billion, or $3.73 per diluted share. The Company also reported a full-year provision for loan and lease losses of $316 million and total assets as of December 31, 2005, of $343.6 billion.

775. The August 2006 and September 2006 Offering Documents also incorporated by express reference the First Quarter 2006 Form 10-Q and Second Quarter 2006 Form 10-Q. The Company's First Quarter 2006 Form 10-Q reported net income of $985 million, diluted earnings per common share of $0.98, an Allowance of $1.6 billion, and assets of $348.6 billion. The Company's Second Quarter 2006 Form 10-Q reported net income of $767 million, diluted earnings per common share of $0.79, an Allowance of $1.7 billion, and assets of $350.9 billion.

776. In addition, the 2005 Form 10-K, the First Quarter 2006 Form 10-Q, and the Second Quarter 2006 Form 10-Q falsely certified that: "The Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ('GAAP')."

777. These statements concerning the Company's financial results and compliance with GAAP were materially untrue and misleading. Specifically, the Company's reported financial results in the August 2006 Offering Documents and the September 2006 Offering Documents misrepresented the value of the Company's net income, earnings per share, Allowance, provision for loan and lease losses, and assets because the Company failed to properly account for the increased risks of default that accompanied the Company's departure from its lending standards, including its improper appraisal and underwriting practices. The Company, in loosening its underwriting guidelines and inflating the value of the appraisals underlying its loan portfolio, materially understated its Allowance, and materially inflated the Company's reported earnings and net income.

778. Further, the Company failed to disclose the material fact that well into 2006 WaMu's key model for calculating the appropriate provisions for the Allowance, the LPRM, was

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 239

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

not designed or able to account properly for losses on Option ARM loans, and thus the Company's evaluation of incurred and probable loan losses was materially understated. Furthermore, GAAP and applicable guidance required WaMu to evaluate its loan portfolio for impairment at the origination of its loans and quarterly thereafter. WaMu omitted from the August 2006 Offering Documents and the September 2006 Offering Documents the material fact that the LPRM did not take into account the ongoing deteriorating loan quality of the Company's loan portfolio in calculating incurred and probable losses.

779. Thus, the Company's certification of these financial statements as being presented in conformity with GAAP was also false and misleading.

780. Deloitte, WaMu's auditor, also issued a materially untrue and misleading report in connection with the Company's 2005 financial statements. Specifically, Deloitte audited the Company's year-end 2005 financial statements contained in the 2005 Form 10-K and issued an unqualified auditor's report on WaMu's consolidated statement of financial condition as of December 31, 2005, and the related consolidated statements of income, stockholders' equity and comprehensive income, and of cash flows for the year ended December 31, 2005.

781. Deloitte's auditor's report, dated March 8, 2006, stated in pertinent part:

We have audited the accompanying consolidated statements of financial condition of Washington Mutual, Inc. and subsidiaries (the "Company") as of December 31, 2005 and 2004, and the related consolidated statements of income, stockholders' equity and comprehensive income, and of cash flows for each of the three years in the period ended December 31, 2005.

\*       \*       \*

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2005 and 2004, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America.

782. Deloitte's unqualified auditor's report was incorporated into the August 2006 Offering Documents and September 2006 Offering Documents. Specifically, the August 2006

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 240

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Offering Documents and the September 2006 Offering Documents incorporated by reference Deloitte's report, stating that it was "so incorporated in reliance upon the reports of [Deloitte] given upon their authority as experts in accounting and auditing."

783.    Deloitte's unqualified auditor's report, as included in the 2005 Form 10-K, was materially untrue and misleading because, as explained above, the Company's consolidated financial statements did not fairly present the Company's financial condition and were not prepared in accordance with GAAP.  Moreover, in certifying WaMu's 2005 financial statements, Deloitte falsely represented that its audits were conducted in accordance with GAAS.

> ### 3.    The August 2006 Offering Documents And September 2006 Offering Documents Contained Untrue Statements Regarding The Effectiveness Of WaMu's Internal Controls

784.    The August 2006 Offering Documents and September 2006 Offering Documents also contained materially untrue and misleading statements regarding the effectiveness of WaMu's internal controls over financial reporting.  Specifically, in the Company's 2005 Form 10-K, management reported on the effectiveness of WaMu's internal controls.  In this report, which falsely concluded that the Company maintained effective internal controls over financial reporting, the Company stated:

> Management assessed the effectiveness of the Company's internal control over financial reporting, including safeguarding of assets as of December 31, 2005. . . . Based on this assessment, management believes that, as of December 31, 2005, the Company maintained effective internal control over financial reporting, including safeguarding of assets.

785.    The First Quarter 2006 Form 10-Q and the Second Quarter 2006 Form 10-Q also included materially untrue statements regarding the effectiveness of WaMu's internal controls. For example, in the First Quarter 2006 Form 10-Q, the Company falsely represented that WaMu maintained effective internal controls over financial reporting, stating:

> Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant, and

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 241

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. There have not been any changes in the Company's internal control over financial reporting during the first quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

The Company made the same representation, using substantially similar language, in the Second Quarter 2006 Form 10-Q.

786. The Company's statements certifying WaMu's internal controls were false and misleading because the Company's extremely loose underwriting and its practice of artificially inflating appraisal values demonstrate that the Company's internal controls were materially deficient. Contrary to these repeated internal control certifications, the Company was operating without adequate controls in place to ensure compliance with the Company's underwriting and appraisal standards. Further, WaMu was operating without policies and appropriate methodology in place to ensure the soundness of its valuation of its assets and its Allowance, which, as set forth above, was materially understated at the time of the August 2006 and September 2006 Offerings and during the Class Period. These failures demonstrate serious deficiencies in the Company's internal controls and contributed to materially distorting the Company's reporting of financial data.

787. In addition, the 2005 Form 10-K also included an unqualified auditor's report by Defendant Deloitte opining on the effectiveness of WaMu's internal control over financial reporting. This report, dated March 8, 2006, stated as follows:

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that Washington Mutual, Inc. and subsidiaries (the "Company") maintained effective internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. . . .

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"). . . . Our audit included obtaining an understanding of internal control over financial reporting, evaluating

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 242

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

*     *     *

In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

788.    Deloitte's report on WaMu's internal controls was likewise materially false and misleading.  For the reasons explained herein, the Company's internal controls were materially deficient and Deloitte did not audit the internal controls in accordance with the PCAOB's standards.

### D.    The October 2007 Offering

789.    On or about October 25, 2007, WaMu announced the October 2007 Offering, an Offering consisting of the 7.250% Notes.  The Company raised $494.39 million in capital from this Offering, which it used for general corporate purposes, including providing funding for subsidiaries.

790.    The October 2007 Offering Documents incorporated by reference several of WaMu's public filings, including its Form 10-K for the fiscal year ended December 31, 2006 (the "2006 Form 10-K"), which was audited by Deloitte and certified as in conformance with GAAP, and its Forms 10-Q for the quarters ended March 31, 2007 (the "First Quarter 2007 Form 10-Q") and June 30, 2007 (the "Second Quarter 2007 Form 10-Q").  The 2006 Form 10-K was signed by Killinger, Casey, Farrell, Woods, Frank, Montoya, Pugh, Leppert, Reed, Lillis, Smith, Matthews, Stever, Murphy, and Osmer-McQuade.  The First Quarter 2007 Form 10-Q and the Second

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 243

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Quarter 2007 Form 10-Q were signed by Casey and Ballenger.

791. As noted above, Barclays, Credit Suisse, Lehman Brothers, and Morgan Stanley served as joint book-running managers for the October 2007 Offering. Keefe, Bruyette; Cabrera Capital; and Williams Capital served as co-managers for the October 2007 Offering.

792. WaMu made numerous material misstatements and omissions in the October 2007 Documents regarding its financial results, compliance with GAAP, credit risk management, and underwriting and appraisal practices. These statements misinformed investors in the October 2007 Offering regarding the soundness of the Company's evaluation of the risk of its loan portfolios, which had grave implications for the reliability of its financial statements, and rendered the October 2007 Offering Documents materially untrue and misleading.

### 1. The October 2007 Offering Documents Misstated The Company's Lending Practices

793. In the 2006 Form 10-K, the Company again claimed to mitigate risk in its high-risk Option ARM and subprime lending in substantially the same language used in the 2005 Form 10-K, discussed above in ¶¶769-770. Further, the Company went on to claim that,

> In the underwriting of loans, one of many factors the Company considers when deciding whether to approve or decline a loan is the applicant's debt-to-income ratio. The Company's underwriting process for Option ARM loans has historically involved calculating an applicant's debt-to-income ratio using an administratively set interest rate. Prior to 2004, the administratively set rate approximated the then-prevailing fully-indexed rate. . . . The administratively set rate was adjusted upward in October 2005 and, beginning in mid-December 2005, was replaced with a fully-indexed rate that adjusts monthly for changes in the index rate.

794. Additionally, the 2006 Form 10-K again repeated the Company's claim that loan-to-value ratios were a "key determinant of future performance" that the Company used to predict losses, in substantially the same language as that used in the 2005 Form 10-K.

795. The Company's statements in the 2006 Form 10-K, which were incorporated into the October 2007 Offering Documents, regarding its risk management, underwriting, and appraisal practices were materially false and misleading because the Company was, in fact,

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 244

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

lowering its underwriting standards and issuing loans that were increasingly unlikely to be repaid. The Company did not comply with its underwriting standards and did not actively manage its risk. The Company underwrote high-risk loans to borrowers who were not able to repay such loans and made exceptions to its underwriting guidelines as a matter of course. Indeed, the Company omitted from the October 2007 Documents the key facts that, during the third quarter of 2005, the Company loosened underwriting standards and increased its exceptions to those underwriting standards in order to increase loan volume. In addition, the Company did not adequately manage its risk. As set forth above, starting in 2005, WaMu relegated its risk management to a secondary "support" role. WaMu also had deficient risk management in that its loan loss modeling methodology did not appropriately analyze or capture the Company's Option ARM loans and did not reflect the actual loan deterioration that the Company experienced during 2006 and 2007.

796. Moreover, the statements in the Company's 2006 Form 10-K regarding its use of LTV ratios in its underwriting as "key determinants of future performance" were false and misleading because the Company was systematically inflating the appraisal values of the real estate collateral underlying its loans, which materially distorted the LTV ratios for the Company's home loans. Thus, the LTV ratios that the Company relied on were misstated and, as such, were not accurate "determinants of future performance." Moreover, the Company failed to disclose its widespread practice of pressuring, both in-house appraisers and third party appraisers to overstate appraisal values so that the Company could close more loans. The omission of the Company's improper appraisal practices from the October 2007 Offering Documents rendered these Offering Documents materially misleading.

### 2. The October 2007 Offering Documents Contained Untrue Financial Results

797. As noted above, the October 2007 Offering Documents incorporated by reference the Company's 2006 Form 10-K, as well as the First Quarter 2007 Form 10-Q and the Second

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 245

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Quarter 2007 Form 10-Q. The 2006 Form 10-K reported net income of $3.56 billion, or $3.64 per diluted share. In this filing, the Company also reported total assets as of December 31, 2006, of $346.3 billion and that its provision for loan and lease losses for 2006 was $816 million.

798. Further, as noted above, the October 2007 Offering Documents incorporated by reference the First Quarter 2007 Form 10-Q and the Second Quarter 2007 Form 10-Q. The Company's First Quarter 2007 Form 10-Q reported assets of $320.0 billion, net income of $784 million, diluted earnings per common share of $.86, and an Allowance of $1.5 billion. The Company's Second Quarter 2007 Form 10-Q reported assets of $312.2 billion, net income of $830 million, diluted earnings per common share of $.92, and an Allowance of $1.6 billion.

799. In addition, the 2006 Form 10-K, the First Quarter 2007 Form 10-Q, and the Second Quarter 2007 Form 10-Q each falsely certified that the Company's financial statements conformed with GAAP, in substantially the same language as that in ¶776 above.

800. In addition to the Company's SEC filings incorporated by reference into the October 2007 Offering Documents, the Company disclosed in the October 2007 Offering Prospectus that the Company's financial condition was dramatically weakened for the quarter ended September 30, 2007. The Company blamed its financial condition on several elements, including "adverse developments in the mortgage lending business (and in the housing market more generally) and related volatility and liquidity constraints in the capital markets since June 30, 2007."

801. These statements concerning the Company's financial results and compliance with GAAP were materially untrue and misleading. In reality, the Company's reported financial results in the October 2007 Offering Documents misrepresented the value of the Company's net income, earnings per share, Allowance, provision for loan and lease losses, and assets because the Company failed to properly account for the increased risks of default that accompanied the Company's departure from its lending standards, including its improper appraisal and underwriting practices. The Company, in loosening its underwriting guidelines and inflating the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 246

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

value of the appraisals underlying its loan portfolio, materially understated its Allowance and materially inflated the Company's reported earnings and net income. Specifically, in 2006 the Company under-provisioned the Company's Allowance by at least $562 million, or over 40%. This GAAP violation had the effect of overstating the Company's reported net income for full year 2006 by at least $349 million, or 10%. The Company's diluted earnings per share were overstated by at least $0.35 for the full year 2006.

802. Further, for the first quarter of 2007, WaMu under-provisioned the Company's loss reserves by at least $398 million, or 63%, and overstated the Company's reported net income by at least $164 million, or 21%. The Company's diluted earnings per share were overstated by at least $0.18 for the first quarter of 2007. In the second quarter of 2007, WaMu under-provisioned the Company's loss reserves by at least $472 million, or 56%, and overstated the Company's reported net income by at least $265 million, or 32%. The Company's diluted earnings per share were overstated by at least $0.30 for the second quarter of 2007.

803. Further, the Company failed to disclose the material fact that well into 2006 WaMu's key model for calculating the appropriate provisions for the Allowance, the LPRM, was not designed or able to account properly for losses on Option ARM loans, and thus the Company's evaluation of incurred and probable loan losses was materially understated. Furthermore, GAAP and applicable guidance required WaMu to evaluate its loan portfolio for impairment at the origination of its loans and quarterly thereafter. WaMu also omitted from the October 2007 Offering Documents the material fact that the LPRM did not take into account the ongoing deteriorating loan quality of the Company's loan portfolio in calculating incurred and probable losses.

804. The Company's statements attributing its losses to a market-wide upheaval were also materially false and misleading. At no point in the October 2007 Offering Documents did the Company discuss how its deteriorated underwriting standards and its inflated appraisals undermined its financial condition, caused its losses, and caused its Allowance to be materially

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 247

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

understated.

805.    Thus, the Company's certification of these financial statements as being presented in conformity with GAAP was also false and misleading.

806.    Defendant Deloitte issued a materially untrue and misleading unqualified auditor's report, dated February 26, 2007, in connection with the Company's 2006 financial statements.    This report, which was included in to the Company's 2006 Form 10-K and incorporated by reference in the October 2007 Offering Documents, contained the same or substantially similar language as that included in Defendant Deloitte's unqualified auditor's opinion included in the Company's 2005 Form 10-K and quoted above in ¶781.

807.    Deloitte's unqualified auditor's report was incorporated into the October 2007 Offering Documents.    Specifically, the October 2007 Offering Documents incorporated by reference Deloitte's report, stating that it was "so incorporated in reliance upon the report of [Deloitte] given upon their authority as experts in accounting and auditing."

808.    Deloitte's unqualified auditor's report, as included in the 2006 Form 10-K, was materially untrue and misleading because, as explained above, the Company's consolidated financial statements did not fairly present the Company's financial condition and were not prepared in accordance with GAAP.    Moreover, in certifying WaMu's 2006 financial statements, Deloitte falsely represented that its audits were conducted in accordance with GAAS.

### 3.    The October 2007 Offering Documents Contained Untrue Statements Regarding The Effectiveness Of WaMu's Internal Controls

809.    The October 2007 Offering Documents also contained materially untrue and misleading statements regarding the effectiveness of WaMu's internal controls over financial reporting.    Specifically, in the Company's 2006 Form 10-K, management reported on the effectiveness of WaMu's internal controls.    In the same or substantially similar language as that stated in the 2005 Form 10-K, reported above at ¶784, the Company certified that it had created and maintained a system of effective internal controls over financial reporting.

810. The First Quarter 2007 Form 10-Q and the Second Quarter 2007 Form 10-Q, which were also incorporated by reference into the October 2007 Offering Documents, also included materially untrue certifications regarding the effectiveness of WaMu's internal controls in substantially the same language as that found in ¶785 above.

811. The 2006 Form 10-K included an unqualified auditor's report by Deloitte, opining on the effectiveness of WaMu's internal control over financial reporting. This report, dated February 26, 2007, stated in language the same or substantially similar to that in ¶787 above, that WaMu had maintained effective internal controls over financial reporting as of December 31, 2006.

812. The Company's statements certifying WaMu's internal controls were false and misleading because the Company's extremely loose underwriting and its practice of artificially inflating appraisal values demonstrate that the Company's internal controls were materially deficient. Contrary to these repeated internal control certifications, the Company was operating without adequate controls in place to ensure compliance with the Company's underwriting and appraisal standards. Further, WaMu was operating without policies and appropriate methodology in place to ensure the soundness of its valuation of its assets and its Allowance, which, as set forth above, was materially understated at the time of the October 2007 Offering and during the Class Period. These failures demonstrate serious deficiencies in the Company's internal controls and contributed to materially distorting the Company's reporting of financial data.

813. Further, Deloitte's report on WaMu's internal controls was likewise materially false and misleading. For the reasons explained herein, the Company's internal controls were materially deficient, and Deloitte did not audit WaMu's internal controls in accordance with the PCAOB's standards.

### 4. The October 2007 Offering Documents Contained Material Omissions Regarding The NYAG Complaint

814. The October 2007 Offering was announced on October 25, 2007, six days before

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 249

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Attorney General Cuomo filed the bombshell complaint alleging collusion between WaMu and its third-party appraisers. Upon the disclosure of the Attorney General's allegations, the price of WaMu common stock dropped from a close of $27.88 per share on October 31, 2007 to a closing price of $23.81 per share on November 2, 2007, a drop of $4.07, or almost 15%. The price of the 7.250% Notes (as well as WaMu's other securities discussed herein) also dropped from the disclosure of this news. The Company never disclosed that the imminent filing of the NYAG Complaint would expose its collusion with its third-party appraisers, an explosive fact of which, on information and belief, the Company was aware. The Attorney General's allegations and the effect WaMu's dubious appraisal practices were certain to have on the market for WaMu securities were material facts that should have been disclosed to investors.

### E.    The December 2007 Offering

815.    On or about December 17, 2007, WaMu conducted the December 2007 Offering, an offering consisting of the Series R Stock.   The Company raised $2.9 billion in capital from this secondary offering. The Company intended to contribute up to $1 billion of the proceeds from the December 2007 Offering to Washington Mutual Bank, WaMu's principal bank subsidiary, as additional capital, and retain the remainder for general corporate purposes.

816.    The December 2007 Offering Documents incorporated by reference several of WaMu's public filings, including the 2006 Form 10-K, which was audited by Deloitte and certified as in conformance with GAAP, and its Forms 10-Q for the quarters ended March 31, 2007 (the "First Quarter 2007 Form 10-Q"), June 30, 2007 (the "Second Quarter 2007 Form 10-Q"), and September 30, 2007 (the "Third Quarter 2007 Form 10-Q").   The December 2007 Offering also incorporated several of the Company's Current Reports filed on Form 8-K, including the Current Report for December 10, 2007.  As noted above, the 2006 Form 10-K was signed by Defendants Killinger, Casey, Farrell, Woods, Frank, Montoya, Pugh, Leppert, Reed, Lillis, Smith, Matthews, Stever, Murphy, and Osmer-McQuade.  The First Quarter 2007 Form 10-Q, the Second Quarter 2007 Form 10-Q, and the Third Quarter 2007 Form 10-Q were signed

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 250

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

by Defendants Casey and Ballenger.

817. As noted above, Lehman Brothers and Morgan Stanley acted as representatives of the underwriters, and, together with Credit Suisse and Goldman Sachs, served as joint book-running managers for the December 2007 Offering.

818. The December 2007 Offering Documents contained numerous false and misleading statements related to the Company's underwriting practices and financial statements. As noted above, the December 2007 Offering Documents incorporated by reference the 2006 Form 10-K, as well as the First Quarter 2007 Form 10-Q, the Second Quarter Form 10-Q, and the Third Quarter 2007 Form 10-Q. Each of these filings contained false and misleading statements. Additionally, the December 2007 Prospectus was rife with false and misleading statements regarding the Company's underwriting practices and the causes of the Company's losses. In each of these documents, the Company omitted numerous key facts that were necessary to make statements in the December 2007 Offering Documents not misleading.

### 1. The December 2007 Offering Documents Misstated The Company's Lending Practices

819. The statements in the Company's 2006 Form 10-K falsely described the Company's risk management and underwriting practices, as discussed in ¶¶793-796 above.

820. The Company also discussed its Option ARM loans and specifically referred investors to "Management's Discussion and Analysis of Financial Condition and Results of Operations – Credit Risk Management" in the 2006 Form 10-K. The referenced portion states, in pertinent part:

> In 2006, the Finance Committee of the Board of Directors approved a set of credit risk concentration limits. These limits facilitate a more rigorous and quantitative framework that better enables the credit risk management function to proactively manage credit risk.

821. The Company's statements in the 2006 Form 10-K, which were incorporated into the December 2007 Offering Documents, regarding its risk management and underwriting were materially false and misleading because the Company was, in fact, lowering its underwriting

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 251

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

standards and issuing loans that were increasingly unlikely to be repaid. The Company did not comply with its underwriting standards and did not actively manage its risk. The Company underwrote high-risk loans to borrowers who were not able to repay such loans and made exceptions to its underwriting guidelines as a matter of course. Indeed, the Company omitted from the December 2007 Offering Documents the key facts that, during the third quarter of 2005, the Company loosened underwriting standards and increased its exceptions to those underwriting standards in order to increase loan volume. The Company also omitted to state that it had relegated its credit risk management function to a secondary "support" role and that its loan loss methodology did not appropriately analyze the actual deterioration of the Company's loan quality at least until summer 2007.

### 2. The December 2007 Offering Documents Contained Untrue Financial Results

822. As discussed above in ¶¶797, 799, 801, 803, 806, 808, in its 2006 Form 10-K WaMu and Defendant Deloitte made repeated false and misleading statements regarding the Company's financial condition, including misstating the Company's Allowance, thus inflating net income and total assets. The financial statements reported in the First Quarter 2007 Form 10-Q and the Second Quarter Form 10-Q were similarly misstated.

823. Additionally, the Third Quarter 2007 Form 10-Q, which was also incorporated into the December 2007 Offering Documents, reported assets of $330.1 billion, net income of $186 million, diluted earnings per common share of $0.20, a provision for loan and lease losses of $967 million, and an Allowance of $1.9 billion.

824. The December 2007 Prospectus contained numerous false and misleading statements regarding the Company's financial condition and the causes for the losses the Company suffered in the fourth quarter of 2007. The Company attributed its "challenges" to "continuing disruptions in the mortgage and capital markets" and "[c]ontinued deterioration in the mortgage markets and declining housing prices . . . ." Further, under "Risk Factors," WaMu

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 252

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

stated that the Company's liquidity may be affected by "circumstances beyond [the Company's] control." The circumstances that were supposedly beyond the Company's control included "significant volatility in the subprime secondary mortgage market." Further, the Company stated that:

> ***Economic conditions that negatively affect housing prices and the job market have resulted, and may continue to result, in a deterioration in credit quality of our loan portfolios, and such deterioration in credit quality has had, and could continue to have, a negative impact on our business.*** (Emphasis in original.)

825. These statements concerning the Company's financial results and compliance with GAAP were materially untrue and misleading. Specifically, the Company's reported financial results in the December 2007 Offering Documents misrepresented the value of the Company's net income, earnings per share, Allowance, provision for loan and lease losses, and assets because the Company failed to properly account for the increased risks of default that accompanied the Company's departure from its lending standards, including its improper underwriting practices. The Company failed to disclose that, in loosening its underwriting guidelines, WaMu materially understated its Allowance and materially inflated the Company's reported earnings and net income. As discussed above at ¶¶746-752, these practices resulted in the Company's reported net income, assets, and diluted earnings per share being overstated for full-year 2006, first quarter of 2007 and second quarter of 2007. Additionally, the financial statements reported for the third quarter of 2007 were similarly misstated.

826. Further, the Company's statements in the December 2007 Prospectus, attributing WaMu's losses to a market-wide upheaval, were also materially false and misleading. At no point in the December 2007 Offering Documents did the Company discuss how its deteriorated underwriting standards materially undermined its financial condition, caused its losses, and caused its Allowance to be materially understated.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 253

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

### 3. The December 2007 Offering Documents Contained Untrue Statements Regarding The Effectiveness Of WaMu's Internal Controls

827. The December 2007 Offering Documents contained the same materially untrue and misleading statements regarding the effectiveness of WaMu's internal controls over financial reporting as did the October 2007 Offering Documents, discussed above at ¶¶809-813. Specifically, the Company's 2006 Form 10-K, First Quarter 2007 Form 10-Q and Second Quarter 2007 Form 10-Q, which were also incorporated by reference into the December 2007 Offering Documents, all contained materially untrue certifications regarding the effectiveness of WaMu's internal controls as discussed in ¶¶809-813 above. Similarly, the Third Quarter 2006 Form 10-Q contained the same or substantially similar certification of internal controls.

828. As discussed above, the 2006 Form 10-K included an unqualified auditor's report by Deloitte, opining on the effectiveness of WaMu's internal control over financial reporting.

829. The Company's statements certifying WaMu's internal controls were false and misleading because the Company's extremely loose underwriting demonstrates that the Company's internal controls were materially deficient. Contrary to these repeated internal control certifications, the Company was operating without adequate controls in place to ensure compliance with the Company's underwriting standards. Further, WaMu was operating without policies and appropriate methodology in place to ensure the soundness of its valuation of its assets and its Allowance, which, as set forth above, was materially understated at the time of the December 2007 Offering and during the Class Period. These failures demonstrate serious deficiencies in the Company's internal controls and contributed to materially distorting the Company's reporting of financial data.

830. Further, Deloitte's report on WaMu's internal controls was likewise materially false and misleading. For the reasons explained herein, the Company's internal controls were materially deficient, and Deloitte did not audit WaMu's internal controls in accordance with the PCAOB's standards.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 254

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

**FOURTH CLAIM FOR RELIEF**
**For Violations of Section 11 of the Securities Act In Connection With**
**The Offerings Against Defendants WaMu; Killinger; Casey; Woods; Farrell; Frank;**
**Leppert; Lillis; Matthews; Montoya; Murphy; Osmer-McQuade; Pugh; Reed; Smith;**
**Stever; Wood; Deloitte; Goldman Sachs; Morgan Stanley; Credit Suisse; Deutsche Bank;**
**Lehman Brothers; UBS; Banc of America; J.P. Morgan; Barclays; Keefe, Bruyette;**
**Cabrera Capital; Williams Capital; Citigroup; Greenwich; BNY; and Ramirez & Co.**
**(the "Section 11 Defendants")**

831.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.  Defendants' liability under this Claim for Relief is predicated on the participation of each Defendant in conducting the Offerings pursuant to the Registration Statement, which contained untrue statements and omissions of material fact.  This Claim for Relief does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

832.    This claim is brought pursuant to Section 11 of the Securities Act against the Section 11 Defendants, on behalf of members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the Offerings and were damaged by the acts alleged herein.  This claim is based solely in strict liability and negligence.

833.    Defendant WaMu was the issuer, within the meaning of Section 11 of the Securities Act, pursuant to the Offering Documents, including the Registration Statement, (defined in ¶677, above) of the registered securities set forth below.

834.    As discussed above, in August 2006, WaMu issued and sold to investors $500 million of floating rate notes due August 24, 2009, and $400 million of 5.50% Notes due August 24, 2011.  Defendants Goldman Sachs, Morgan Stanley, Credit Suisse, Deutsche Bank, and Lehman Brothers were statutory underwriters for these registered securities, as admitted in the August 2006 Offering Documents.

835.    As discussed above, in September 2006, WaMu issued and sold to investors $500

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 255

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

million of depositary shares, each representing a 1/40,000th interest in a share of Series K Perpetual Non-Cumulative Floating Rate Stock. Defendants UBS, Goldman Sachs, Morgan Stanley, Credit Suisse, J.P. Morgan, Banc of America, and Lehman Brothers were statutory underwriters for these registered depositary shares, as admitted in the September 2006 Offering Documents.

836. As discussed above, in October 2007, WaMu issued and sold to investors $500 million of 7.250% subordinated notes due November 1, 2017. Defendants Barclays; Credit Suisse; Lehman Brothers; Morgan Stanley; Keefe, Bruyette; Cabrera Capital; and Williams Capital were statutory underwriters for these registered securities, as admitted in the October 2007 Offering Documents.

837. As discussed above, in December 2007, WaMu issued and sold to investors $3 billion of the Series R Stock. Defendants Lehman Brothers; Morgan Stanley; Credit Suisse; Goldman Sachs; Barclays; Citigroup; Deutsche Bank; J.P. Morgan; Greenwich; UBS; BNY; Cabrera Capital; Keefe, Bruyette; Ramirez & Co.; and Williams Capital were statutory underwriters for the registered securities, as admitted in the December 2007 Offering Documents.

838. Defendants Killinger, Casey, Woods, Farrell, Frank, Leppert, Lillis, Matthews, Murphy, Osmer-McQuade, Pugh, Reed, Smith, Stever, and Wood each signed the Registration Statement, which was then updated and incorporated into the Offering Documents, as a senior officer and/or director of WaMu within the meaning of Section 11 of the Securities Act. Defendant Montoya was a director at WaMu at the time of the filing of the Offering Documents.

839. Deloitte consented to the incorporation of its unqualified auditor's reports regarding WaMu's financial statements into the Offering Documents, including the Registration Statement. Specifically, Deloitte consented to the incorporation into the August 2006 Offering Documents and the September 2006 Offering Documents of its unqualified auditor's report on WaMu's financial statements included in the Company's 2005 Form 10-K. Deloitte consented to

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 256

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

the incorporation into the October 2007 Offering Documents and the December 2007 Offering Documents of its unqualified auditor's report on WaMu's financial statements included in the Company's 2006 Form 10-K. As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Offering Documents included, but were not limited to, the facts that: (i) the financial statements that Deloitte certified as being presented in conformity with GAAP were not presented in conformity with GAAP, and (ii) Deloitte's audits, which it attested were conducted in accordance with GAAS, were not conducted in accordance with GAAS.

840. The registered securities described in this Count were issued and sold pursuant to the Offering Documents. All purchases of the registered securities after the issuance of the August 2006 Offering Documents are traceable to the August 2006 Offering Documents. All purchases of the registered securities after the issuance of the September 2006 Offering Documents are traceable to the September 2006 Offering Documents. All purchases of the registered securities after the issuance of the October 2007 Offering Documents are traceable to the October 2007 Offering Documents. All purchases of the registered securities after the issuance of the December 2007 Offering Documents are traceable to the December 2007 Offering Documents.

841. The Offering Documents, including the Registration Statement, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. Plaintiffs acquired these securities relying upon the statements in the Registration Statement (as updated by the Offering Documents) shown above to be untrue and/or relying upon the Registration Statements (as updated by the Offering Documents) and not knowing the omitted material facts set forth above.

842. Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Plaintiffs' Securities Act claims, as set forth

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 257

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

above.

843.    In connection with offering the registered securities to the public and the sale of those securities, the Section 11 Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

844.    As the issuer of the registered securities, although claims against it are currently stayed due to its bankruptcy, WaMu is strictly liable for the untrue statements of material fact and material omissions described herein.

845.    None of the other Section 11 Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.   Due diligence is a critical component of the issuing and underwriting process.   Directors, officers, and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information.   Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process.   At a minimum, due diligence for every public offering should involve: interviews of upper and mid-level management; a review of the auditor's management letters and a review of items identified there;  a review of the company's SEC filings (particularly those incorporated by reference); a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present;  a review of the company's internal controls; a review of negative facts and concerns within each Underwriter's organization and within the syndicate of Underwriters; and a review of critical non-public documents forming the basis for the company's earnings.   Red flags uncovered through this process must be investigated.  Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer. ***Had the non-issuer Section 11 Defendants exercised***

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 258

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*reasonable care, they would have known of the material misstatements and omissions alleged*

*herein.*

846.    Class members did not know, nor in the exercise of reasonable diligence could have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

847.    As a direct and proximate result of Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of the Floating Rate Notes and the 5.50% Notes pursuant to the August 2006 Offering Documents, the Series K Stock pursuant to the September 2006 Offering Documents, the 7.250% Notes pursuant to the October 2007 Offering Documents and/or the Series R Stock pursuant to the December 2007 Offering Documents.  By reason of the conduct alleged herein, each Section 11 Defendant violated Section 11 of the Securities Act.

848.    By reason of the foregoing, the Section 11 Defendants are liable to the members of the Class who acquired registered securities pursuant to or traceable to the Offering Documents.

849.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the Offering Documents.

## FIFTH CLAIM FOR RELIEF
**For Violations of Section 12(a)(2) of the Securities Act In Connection With The Offerings Against Defendant WaMu and Defendants Goldman Sachs; Morgan Stanley; Credit Suisse; Deutsche Bank; Lehman Brothers; UBS; Banc of America; J.P. Morgan; Barclays; Keefe, Bruyette; Cabrera Capital; Williams Capital; Citigroup; Greenwich; BNY; and Ramirez & Co (the "Underwriter Defendants")**

850.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein. For the purposes of this Count, Plaintiffs assert only strict liability and negligence claims, and expressly exclude from this count any allegations of fraud or reckless or intentional misconduct.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 259

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

851.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77k, against Defendant WaMu, as well as the Underwriter Defendants, on behalf of members of the Class who purchased or otherwise acquired WaMu securities pursuant and/or traceable to the Offering Documents, including the August 2006 Prospectus, the September 2006 Prospectus, the October 2007 Prospectus and the December 2007 Prospectus, and were damaged by acts alleged herein.

852.     By means of the Offering Documents, including the August 2006 Prospectus, the September 2006 Prospectus, the October 2007 Prospectus and the December 2007 Prospectus, and by using the means and instruments of transportation and communication in interstate commerce and of the mails, Defendant WaMu and the Underwriter Defendants, through public offerings, solicited and sold WaMu securities to members of the Class.

853.     The Offering Documents, including the August 2006 Prospectus, the September 2006 Prospectus, the October 2007 Prospectus and the December 2007 Prospectus, were materially misstated, omitted to state facts necessary to make the statements made not misleading, and concealed or failed to adequately disclose material facts as alleged herein.

854.     None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents, including the August 2006 Prospectus, the September 2006 Prospectus, the October 2007 Prospectus and the December 2007 Prospectus, were accurate and complete in all material respects.   Had they exercised reasonable care, these Defendants would have known of the material misstatements and omissions alleged herein.

855.     Members of the Class purchased WaMu securities by means of the materially misstated Offering Documents.   At the time they purchased shares in the Offerings, no member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in and omissions from the Offering Documents, including the August 2006 Prospectus, the September 2006 Prospectus, the October 2007 Prospectus and the December

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 260

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

2007 Prospectus.

856.     By virtue of the conduct alleged herein, WaMu and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

857.     Accordingly, members of the Class who purchased or otherwise acquired WaMu securities have a right to rescind and recover the consideration paid for their securities and hereby elect to rescind and tender their securities to WaMu and the Underwriter Defendants. Members of the Class who have sold their WaMu securities issued in the Offerings are entitled to recissory damages.

858.     This claim is brought within one year after the discovery of the misstatements and omissions contained in the Offering Documents and within three years after the Offerings.

<u>SIXTH CLAIM FOR RELIEF</u>
**For Violations of Section 15 of the Securities Act In Connection With
The Offerings Against Defendants Killinger, Casey, Woods, Ballenger, Farrell, Frank,
Leppert, Lillis, Matthews, Montoya, Murphy, Osmer-McQuade, Pugh, Reed, Smith,
Stever, and Wood (the "Section 15 Defendants")**

859.     Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein, and expressly exclude from this Count any allegations of fraud or intentional misconduct.

860.     This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the Section 15 Defendants on behalf of members of the Class who purchased or otherwise acquired WaMu securities pursuant and/or traceable to the Offering Documents and were damaged by acts alleged herein.  For the purposes of this Count, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any allegations of fraud or intentional misconduct.

861.     At all relevant times, the Section 15 Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  As set forth herein, because of their positions in the Company and/or their stock ownership, and/or because of their positions on the WaMu Board, the Section 15 Defendants had the requisite power to directly or indirectly

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 261

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

control or influence the specific corporate policy that resulted in the unlawful acts and conduct alleged herein.

862. Specifically, Defendants Killinger, Casey, Woods and Ballenger each served as an executive officer of WaMu. Defendant Killinger served as WaMu's Chief Executive Officer and Chairman of its Board; Casey served as its Chief Financial Officer; Defendant Woods served as its Senior Vice President and Controller; and Defendant Ballenger served as Senior Vice President and Assistant Controller and Controller. As such, at all times relevant, Defendants Killinger, Casey, Woods and Ballenger each participated in the operation and management of the Company, conducted and participated, directly and indirectly, in WaMu's business affairs and mortgage-lending operations. These Defendants also participated in the preparation and dissemination of the Offering Documents, certain of the financial statements incorporated by reference therein and/or otherwise participated in the process necessary to conduct the Offerings. Because of their positions of control and authority as senior officers of WaMu, each of these Defendants was able to, and did, control the contents of certain or all the Offering Documents and the financial statements incorporated by reference therein, which contained materially false financial information.

863. Similarly, at all times relevant, Defendants Farrell, Frank, Leppert, Lillis, Matthews, Montoya, Murphy, Osmer-McQuade, Pugh, Reed, Smith, Stever, and Wood served as Directors on WaMu's Board at the time the Offerings were conducted and/or at the time that the Registration Statement was signed. As directors of a publicly owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to WaMu's financial condition and results of operations. These Defendants each signed the Registration Statement; signed the 2005 Form 10-K which was incorporated by reference into the August 2006 Offering Documents and the September 2006 Offering Documents; signed the 2006 Form 10-K which was incorporated by reference into the October 2007 Offering Documents and the December 2007 Offering Documents; and/or were Directors at the time the Offerings were conducted, the

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 262

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Offering Documents were disseminated to the investing public and the Registration Statement became effective. Thus, these Defendants controlled the contents and dissemination of the Offering Documents.

864. By reason of the aforementioned conduct and by virtue of their positions as controlling persons of WaMu, each of the Defendants named in this Count is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired WaMu securities pursuant to or traceable to the Offering Documents. As a direct and proximate result of the conduct of these Defendants, members of the Class suffered damages in connection with their purchase or acquisition of the securities.

## V. JURISDICTION AND VENUE

865. The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77*l* and 77o); and under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

866. This Court has jurisdiction pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. §§ 1331 and 1337.

867. Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. § 1391(b) and (c). Many of the acts and transactions constituting the violations of the law alleged herein occurred in this District. In addition, WaMu maintained its corporate headquarters and principal executive offices in this District throughout the Class Period.

868. Venue is also proper in this District pursuant to the Transfer Order by the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel"), dated February 21, 2008, whereby the MDL Panel transferred all securities, derivative, and ERISA actions related to "factual questions arising from alleged misrepresentations or omissions concerning WaMu's

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 263

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

financial condition" to this District for pre-trial purposes.

869.    In connection with the acts and conduct alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## VI.    CLASS ACTION ALLEGATIONS

870.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and/or entities who purchased or otherwise acquired securities issued by WaMu and its subsidiaries and that traded on an efficient market,[9] during the period from October 19, 2005 through July 23, 2008 (as defined above the "Class Period"), and were damaged thereby (the "Class").  Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of WaMu, the Auditor Defendant, or any of the Underwriter Defendants during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; (vi) TPG Capital and other purchasers of the equity securities issued by WaMu in connection with the $7 billion capital issuance pursuant to the agreements entered into by and among TPG Capital and WaMu and other investors, announced by the Company on April 8, 2008 (the "TPG Deal"), to the extent that such purchasers exercised distinct rights and diligence opportunities afforded them in connection with the TPG Deal; and (vii) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

871.    The Class is so numerous that joinder of all Class members is impracticable.  The

_____

[9]  This excludes, for instance: (i) purchasers of certificates of deposit offered by WaMu or its subsidiaries; and (ii) purchasers of pass-through securities that are not general obligations of WaMu.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 264

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, WaMu's common stock was actively traded on the NYSE, which is an efficient market. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be determined through appropriate discovery, Lead Plaintiff believes that Class members number in at least the hundreds of thousands.

872. The claims of Plaintiffs are typical of the claims of other Class members. Plaintiffs and all Class members acquired their WaMu securities on the open market or pursuant to the Offerings and sustained damages as a result of Defendants' conduct alleged herein in violation of the federal securities laws.

873. Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the Class.

874. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

875. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members. Such common questions of law and fact, include, among others:

        (a)     Whether Defendants violated the federal securities laws;

        (b)     Whether documents, press releases and public statements made by the Defendants during the Class Period concerning the Company's financial and operational position, including statements concerning the Company's financial results, contained misstatements of material fact or omitted to

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 265

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    Whether WaMu's SEC filings issued during the Class Period which contained financial information (*i.e.*, its Forms 10-K, 10-Q, 8-K, and S-3) contained untrue or materially misleading statements;

(d)    Whether the market prices of WaMu securities during the Class Period were artificially inflated due to the material misrepresentations complained of herein;

(e)    Whether with regard to claims under the Exchange Act, certain of the Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)    Whether the Offering Documents (as defined below) contained material misstatements or omitted to state material information; and

(g)    Whether Class members have sustained damages and, if so, the appropriate measure thereof.

876.    Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

877.    The names and addresses of record owners of WaMu securities purchased during the Class Period and on or traceable to the Offerings are available from records maintained by WaMu or its transfer agent. Notice may be provided to such record owners via first class mail, using techniques and a form of notice similar to that customarily used in securities class actions.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Declaring and determining that the Defendants violated the federal securities laws as

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 266

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

charged above;

C. Awarding Plaintiffs and the Class compensatory damages;

D. As to the claims set forth under the Securities Act (Sections 11, 12(a)(2) and/or 15), awarding rescission or a statutory measure of damages;

E. Awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

F. Awarding such other relief for the benefit of the Class as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Lead Plaintiff's
Amended Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 267

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Dated: June 15, 2009                     Respectfully submitted,

                                         BERNSTEIN LITOWITZ BERGER &
                                            GROSSMANN LLP

                                         By: /s/ Chad Johnson
                                         Chad Johnson (*pro hac vice*)
                                         Hannah Ross (*pro hac vice*)
                                         Jerald Bien-Willner (*pro hac vice*)
                                         Katherine M. Sinderson (*pro hac vice*)
                                         1285 Avenue of the Americas
                                         New York, New York  10019
                                         Tel:    (212) 554-1400
                                         Fax:    (212) 554-1444
                                         Email:  chad@blbglaw.com
                                                 hannah@blbglaw.com
                                                 jerryb@blbglaw.com
                                                 katherine@blbglaw.com

                                         ***Counsel for Lead Plaintiff***
                                         ***Ontario Teachers' Pension Plan Board***
                                         ***and Lead Counsel for the Class***

                                         BYRNES & KELLER LLP
                                         Bradley S. Keller, WSBA# 10665
                                         Jofrey M. McWilliam, WSBA# 28441
                                         1000 Second Avenue, Suite 3800
                                         Seattle, Washington  98104
                                         Tel:    (206) 622-2000
                                         Fax:    (206) 622-2522
                                         Email:  bkeller@byrneskeller.com
                                                 jmcwilliam@byrneskeller.com

                                         ***Liaison Counsel for the Class***

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

In Ha Jang, Legal Counsel, Investments for the Ontario Teachers' Pension Plan Board ("Ontario Teachers") declares:

1. I have reviewed the complaint and authorized its filing on behalf of Ontario Teachers and the Class;

2. Ontario Teachers did not purchase any security that is the subject of this action at the direction of its counsel or to participate in this private action;

3. Ontario Teachers will continue to serve as the Lead Plaintiff and to serve as a representative on behalf of the Class, including by providing testimony at deposition and trial, if necessary;

4. Ontario Teachers' transactions in Washington Mutual, Inc. common stock during the Class Period are set forth in the chart attached hereto.

5. Ontario Teachers is currently serving as lead Plaintiff in In re Bristol-Myers Securities Litigation, which was filed during the three years preceding the date of this Certification.

6. Ontario Teachers served as Lead Plaintiff in In re Williams Companies Securities Litigation, which was filed in 2002, but Ontario Teachers moved to be appointed Lead Plaintiff in the action in 2004 pursuant to an order by the court seeking a new lead Plaintiff. The action has been fully settled.

7. Ontario Teachers had sought to serve, but ultimately did not serve, as a Lead Plaintiff or representative party in the In re American International Group, Inc. Securities 2008 Litigation and the New Orleans Employees Retirement System v. UBS AG, et. al. litigation, both of which occurred during the three-year period preceding the date of this Certification.

8. Ontario Teachers will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 12th day of June, 2009.

In Ha Jang
Legal Counsel, Investments
Ontario Teachers' Pension Plan Board

**Ontario Teachers' Pension Plan Board**
**Transactions in Washington Mutual, Inc. Common Stock**
Class Period 10/19/05 - 7/23/08

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 12/15/05 | 10,800 | 44.2086 |
| Purchase | 02/09/06 | 11,000 | 42.2785 |
| Purchase | 04/07/06 | 25,400 | 44.0321 |
| Purchase | 04/20/06 | 26,400 | 45.0179 |
| Purchase | 05/11/06 | 8,600 | 46.1055 |
| Purchase | 06/08/06 | 7,300 | 45.2422 |
| Purchase | 01/22/07 | 6,833 | 45.0400 |
| Purchase | 08/27/07 | 173,590 | 36.7025 |
| Purchase | 08/28/07 | 125,980 | 35.8150 |
| Purchase | 08/29/07 | 51,430 | 36.0202 |
| Purchase | 09/06/07 | 152,900 | 35.7301 |
| Purchase | 10/05/07 | 70,668 | 35.8958 |
| Purchase | 10/08/07 | 79,832 | 35.8530 |
| Purchase | 10/17/07 | 99,959 | 32.7292 |
| Purchase | 10/18/07 | 66,741 | 30.5293 |
| Purchase | 10/31/07 | 175,390 | 27.8791 |
| Purchase | 11/01/07 | 296,210 | 25.7810 |
| Purchase | 11/27/07 | 178,776 | 17.3067 |
| Purchase | 11/28/07 | 161,685 | 18.1344 |
| Purchase | 11/29/07 | 105,839 | 17.7301 |
| Purchase | 12/11/07 | 1,022,800 | 17.8141 |
| Purchase | 04/08/08 | 2,626,804 | 8.7500 |
| | | | |
| Sale | 04/07/06 | (10,500) | 44.0330 |
| Sale | 04/20/06 | (10,900) | 45.0176 |
| Sale | 05/11/06 | (20,700) | 46.0998 |
| Sale | 07/21/06 | (18,300) | 45.7138 |
| Sale | 07/26/06 | (3,400) | 45.6956 |
| Sale | 09/29/06 | (7,700) | 43.4000 |
| Sale | 10/30/06 | (333,850) | 42.2344 |
| Sale | 10/31/06 | (325,000) | 42.2500 |
| Sale | 11/01/06 | (75,000) | 42.4562 |
| Sale | 04/24/07 | (9,000) | 41.4128 |
| Sale | 06/07/07 | (9,000) | 43.1683 |

# CERTIFICATION PURSUANT TO
# THE FEDERAL SECURITIES LAWS

I, Paul O'Connell, on behalf of Pompano Beach Police and Firefighters' Retirement System, hereby certify that:

1. I am the Chairman of Pompano Beach Police and Firefighters' Retirement System. I have reviewed the complaint and have authorized Bernstein Litowitz Berger & Grossmann LLP, counsel for Lead Plaintiff, Ontario Teachers' Pension Plan Board, to file the complaint, which identifies Pompano Beach Police and Firefighters' Retirement System as an additional plaintiff in this action.

2. Pompano Beach Police and Firefighters' Retirement System did not purchase the security that is the subject of its participation in this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Pompano Beach Police and Firefighters' Retirement System is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Pompano Beach Police and Firefighters' Retirement System's transactions in the Washington Mutual, Inc. security that is the subject of its participation in this action are set forth in the chart attached hereto.

5. Pompano Beach Police and Firefighters' Retirement System has sought to serve as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Ellen Rosenthal Brodsky, et al. v. Yahoo! Inc., et al.*, Case No. 07-cv-3125 (C.D. Cal.).

6. Pompano Beach Police and Firefighters' Retirement System will not accept any payment for serving as a representative party on behalf of the Class beyond Pompano Beach Police and Firefighters' Retirement System's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 15th day of June, 2009.

Paul O'Connell
Chairman, Board of Trustees
Pompano Beach Police and Firefighters'
Retirement System

**Pompano Beach Police and Firefighters' Retirement System**
**Transactions in Washington Mutual, Inc. Floating Rate Notes due August 24, 2009**
**(Cusip #939322AW3)**
Class Period 10/19/05 - 7/23/08

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 01/12/07 | 210,000 | 100.0730 |
| Sale | 11/27/07 | (145,000) | 91.2430 |
| Sale | 07/22/08 | (13,000) | 84.5000 |

# CERTIFICATION PURSUANT TO
# THE FEDERAL SECURITIES LAWS

I, Harlan Seymour, hereby certify that:

1. I have reviewed the complaint filed in this matter and have authorized Bernstein Litowitz Berger & Grossmann LLP, counsel for Lead Plaintiff, Ontario Teachers' Pension Plan Board, to file the complaint, which identifies me as an additional plaintiff in this action.

2. I did not purchase the security that is the subject of my participation in this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. My transactions in the Washington Mutual, Inc. security that is the subject of my participation in this action are set forth in the chart attached hereto.

5. I have sought to serve as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: None.

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond the pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of June, 2009.

Harlan Seymour

**Harlan Seymour**
**Transactions in Washington Mutual, Inc. Series K Preferred Stock**
Class Period 10/19/05 - 7/23/08

| Transaction | Date | Shares | Price |
|-------------|----------|--------|--------|
| Purchase | 07/15/08 | 800 | 6.0000 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Harold P. Hanna, Jr., on behalf of Brockton Contributory Retirement System, hereby certify that:

1. I am the Executive Director of Brockton Contributory Retirement System. I have reviewed the complaint filed in this matter and through our counsel Saxena White PA have authorized Bernstein Litowitz Berger & Grossmann LLP, counsel for Lead Plaintiff, Ontario Teachers' Pension Plan Board, to file the complaint, which identifies Brockton Contributory Retirement System as an additional plaintiff in this action.

2. Brockton Contributory Retirement System did not purchase the security that is the subject of its participation in this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Brockton Contributory Retirement System is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Brockton Contributory Retirement System's transactions in the Washington Mutual, Inc. security that is the subject of its participation in this action are set forth in the chart attached hereto.

5. Brockton Contributory Retirement System has sought to serve as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *The Shaw Group, Inc Securities Litigation (1:06-cv-08245-CM-MHD; Southern District of New York)*

   *Accredited Home Lenders Holding Co. Securities Litigation (3:07-cv-00488-H-CAB; Southern District of California)*

   *Navistar International, Inc. Securities Litigation (1:08-cv-00107; Northern District of Illinois)*

   *Lehman Brothers Equity/Debt Securities Litigation (08-CV-5523-LAK; Southern District of New York)*

   *Colonial Bancgroup, Inc. Securities Litigation (2:09-cv-00104-MHT-WC; Middle District of Alabama)*

6. Brockton Contributory Retirement System will not accept any payment for serving as a representative party on behalf of the Class beyond Brockton Contributory Retirement System's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of June, 2009.

Harold P. Hanna, Jr.
Executive Director
*Brockton Contributory Retirement System*

Brockton Contributory Retirement System
Transactions in Washington Mutual, Inc. 7.25% Subordinated Notes due Nov. 1, 2017
(Cusip #939322AY9)
Class Period 10/19/05 - 7/23/08

| Transaction | Date | Par Value | Price |
|-------------|----------|-----------|----------|
| Purchase | 10/29/07 | 45,000 | 98.8350 |
| Purchase | 10/29/07 | 20,000 | 98.8690 |
| Purchase | 10/29/07 | 30,000 | 98.9460 |
| Purchase | 10/31/07 | 30,000 | 98.4410 |
| Purchase | 10/31/07 | 30,000 | 98.6200 |
| Purchase | 11/01/07 | 30,000 | 98.2900 |

# CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Ronald Zajac, on behalf of the Police and Fire Retirement System of the City of Detroit, hereby certify that:

1. I am General Counsel for the Police and Fire Retirement System of the City of Detroit. I have reviewed the complaint and, with authority from the Board of Trustees of the Police and Fire Retirement System of the City of Detroit, I have authorized Bernstein Litowitz Berger & Grossmann LLP, counsel for Lead Plaintiff, Ontario Teachers' Pension Plan Board, to file the complaint, which identifies the Police and Fire Retirement System of the City of Detroit as an additional plaintiff in this action.

2. Police and Fire Retirement System of the City of Detroit did not purchase the security that is the subject of its participation in this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Police and Fire Retirement System of the City of Detroit is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Police and Fire Retirement System of the City of Detroit's transactions in the Washington Mutual, Inc. security that is the subject of its participation in this action are set forth in the chart attached hereto.

5. Police and Fire Retirement System of the City of Detroit has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *In re KLA-Tencor Corp. Securities Litigation*, Case No. 06-cv-4065 (N.D. Cal.)
   *Police and Fire Retirement System of the City of Detroit v. Safenet, Inc., et al.*, Case No. 06-cv-5797 (S.D.N.Y.)
   *In re Marvell Technology Group, Ltd. Securities Litigation*, Case No. 06-cv-6286 (N.D. Cal.)
   *In re WSB Financial Group Securities Litigation*, Case No. 07-cv-1747 (W.D. Wash.)
   *In re SiRF Technology Holdings, Inc. Securities Litigation*, Case No. 08-cv-856 (N.D. Cal.)

6. Police and Fire Retirement System of the City of Detroit has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

1

*In re Aetna, Inc. Securities Litigation,* Case No. 07-cv-4451 (E.D. Pa.)
*In re Verifone Holdings, Inc. Securities Litigation,* Case No. 07-cv-6140 (N.D. Cal.)
*In re UBS AG Securities Litigation,* Case No. 07-cv-11225 (S.D.N.Y.)
*In re Societe Generale Securities Litigation,* Case No. 08-cv-2495 (S.D.N.Y.)
*In re Gildan Activewear Inc. Securities Litigation.* Case No. 08-cv-5048 (S.D.N.Y.)
*New Orleans Employees Retirement System v. UBS AG, et. al.,* Case No. 09-cv-893 (S.D.N.Y.)
*Police and Fire Retirement System of the City of Detroit et al v. Indymac MBS, Inc. et al*
Case No 09-cv-4583 (S.D.N.Y.)

7. Police and Fire Retirement System of the City of Detroit has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three year period preceding the date of this Certification and is currently pending:

  *City of Roseville Employees' Retirement System v. Horizon Lines, Inc., et al.,* Case No. 08-969 (D. Del.)

8. Police and Fire Retirement System of the City of Detroit sought to serve as a lead plaintiff and representative party in *Southeastern Pennsylvania Transportation Authority v. Lehman Brothers Holdings, Inc., et al.,* Case No. 08-cv-2431 (N.D. Ill.), but withdrew its motion in favor of competing movants who were subsequently appointed Lead Plaintiff. Police and Fire Retirement System of the City of Detroit is now serving as a named plaintiff and proposed representative party in the amended complaint in *In re Lehman Brothers Equity/Debt Securities Litigation,* Case No. 08-cv-5523 (S.D.N.Y.). These actions were filed during the three-year period preceding the date of this Certification.

9. Police and Fire Retirement System of the City of Detroit will not accept any payment for serving as a representative party on behalf of the Class beyond Police and Fire Retirement System of the City of Detroit's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of June, 2009.

Ronald Zajac
General Counsel
*Police and Fire Retirement System of the City of Detroit*

2

**Police & Fire Retirement System of the City of Detroit**
**Transactions in Washington Mutual, Inc. 7.75% Series R Preferred Stock**
**(Cusip #939322814)**
Class Period 10/19/05 - 7/23/08

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 12/17/07 | 362 | 1,000.00 |
| Purchase | 12/17/07 | 214 | 1,042.50 |
| Purchase | 12/17/07 | 215 | 1,071.88 |
| | | | |
| Sale | 12/20/07 | (97) | 983.75 |
| Sale | 12/27/07 | (96) | 889.30 |
| Sale | 01/04/08 | (158) | 872.40 |
| Sale | 01/04/08 | (90) | 863.20 |
| Sale | 01/07/08 | (210) | 880.08 |
| Sale | 01/14/08 | (140) | 723.27 |

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses on the Court's Electronic Mail Notice list.

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

By: /s/ Chad Johnson
Chad Johnson (*pro hac vice*)
Hannah Ross (*pro hac vice*)
Jerald Bien-Willner (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
Email: chad@blbglaw.com
         hannah@blbglaw.com
         jerryb@blbglaw.com
         katherine@blbglaw.com

***Counsel for Lead Plaintiff***
***Ontario Teachers' Pension Plan Board***
***and Lead Counsel for the Class***
BYRNES & KELLER LLP
Bradley S. Keller, WSBA# 10665
Jofrey M. McWilliam, WSBA# 28441
1000 Second Avenue, Suite 3800
Seattle, Washington 98104
Tel:    (206) 622-2000
Fax:    (206) 622-2522
Email: bkeller@byrneskeller.com
         jmcwilliam@byrneskeller.com

***Liaison Counsel for the Class***

Lead Plaintiff's
Amended Consolidated Securities Complaint
No: 2:08-md-1919 MJP

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400