# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| *In re* | : | Chapter 11 |
|  | : |  |
| WASHINGTON MUTUAL, INC., *et al.*,[1] | : | Case No. 08-12229 (MFW) |
| *Debtors.* | : | Jointly Administered |
|  | : |  |
|  | : | **Related to Docket No. 2205** |

## THE BANK BONDHOLDERS' PRELIMINARY RESPONSE TO THE LEGAL ISSUES SET FORTH IN DEBTORS' TWENTIETH (20TH) OMNIBUS (SUBSTANTIVE) OBJECTION TO CLAIMS

Dated: March 5, 2010

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
Alan J. Kornfeld
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705
Telephone: (302).652.4100
Facsimile: (302).652.4400

WILMER CUTLER PICKERING HALE & DORR LLP
Philip D. Anker (367957)
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

WILMER CUTLER PICKERING HALE & DORR LLP
Russell J. Bruemmer (289074)
Nancy L. Manzer (421144)
Gianna Ravenscroft (487712)
Lisa Ewart (497290)
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395).

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 8

    A.    The Bank Bondholders' Claims ........................................................................ 9

    B.    Related Proceedings ........................................................................................ 10

    C.    Debtors' Objection .......................................................................................... 12

ARGUMENT ..................................................................................................................... 144

    I.    The Bank Bondholders' Claims Should Not Be Dismissed for Lack of Standing. 15

        A.    The Bank Bondholders Have Standing to Bring Direct Claims Against the Debtors. ........................................................................................................ 16

            1.    The Bank Bondholders Have Direct Claims Against the Debtors..... 16

            2.    Debtors' Cases Do Not Suggest That These Direct Claims Are In Fact Derivative. ............................................................................... 20

                a.    Misrepresentations and Material Omissions .............................. 20

                b.    Corporate Disregard and Substantive Consolidation ................. 21

        B.    That the FDIC May Have Also Asserted Some of the Other Claims Does Not Warrant Dismissal of the Bank Bondholders' Claims. ....................... 24

    II.    The Bank Bondholders' Proofs of Claim State Plausible Claims and Meet the Applicable "Pleading" Standards. .......................................................................... 30

        A.    Federal Rule of Bankruptcy Procedure 3001 Applies, and The Bank Bondholders' Proofs of Claim Comply With That Rule. ......................... 32

            1.    As A Matter of Practice and of Law, Rule 3001 Governs Pleading Requirements for Proofs of Claim, and Proofs of Claim Are Not Held to the Same Pleading Standards As a Complaint Filed in an Adversary Proceeding. .................................................... 32

            2.    The Bank Bondholders' Challenged Claims Comply With Rule 3001, And Even If They Did Not, Dismissal of the Claims Would Be Inappropriate. ................................................................... 34

B.    Even If the Federal Rules of Civil Procedure Applied, Dismissal of the Claims Without any Discovery or an Evidentiary Hearing Would Be Inappropriate. ..............................................................................................37

    1.    The Bank Bondholders' Proofs of Claim Satisfy the Pleading Requirements Set Forth in the Federal Rules of Civil Procedure. .....38

    2.    Dismissal Before The Bank Bondholders Have Had An Opportunity To Take Any Discovery at All Would Be Especially Inappropriate. .................................................................40

    3.    Dismissal Without Giving Bank Bondholders An Opportunity to Amend Their Proofs of Claim Would Also Be Inappropriate. ..........43

C.    The Challenged Claims Are More Than Adequately Set Forth in the Proofs of Claim. ......................................................................................44

    1.    Piercing the Corporate Veil, Corporate Disregard and Alter Ego .....44

    2.    Substantive Consolidation .................................................................54

    3.    Fraudulent Transfer...........................................................................59

    4.    Misrepresentations and Material Omissions......................................65

    5.    Mismanagement, and Breach of Fiduciary and Other Duties............73

CONCLUSION..............................................................................................................77

# TABLE OF AUTHORITIES

## CASES

*900 Capital Servs., Inc. v. Cloud (In re Cloud),*
 No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000)...................................37

*Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc.,*
 525 F.3d 8 (D.C. Cir. 2008) ...............................................................................39

*Alberto v. Diversified Group,*
 55 F.3d 201 (5th Cir. 1995) ...............................................................................54

*Allied Sheet Metal Fabricators, Inc. v. Peoples Nat'l Bank of Wash.,*
 10 Wash. App. 530, 518 P.2d 734 (Wash. App. 1974)......................................65

*Amatex Corp. v. Aetna Casualty & Surety Co. (In re Amatex Corp.,*
 107 B.R. 856 (E.D. Pa. 1989), *aff'd,* 908 F.2d 961 (3d Cir. 1990) ...................34

*Ashcroft v. Iqbal,*
 129 S. Ct. 1937 (2009)..................................................................31, 38, 39, 40

*Associated Oil Co. v. Seiberling Rubber Co.,*
 172 Wash. 204 (1933)..........................................................................................45

*Basic Inc. v. Levinson,*
 485 U.S. 224 (1988).............................................................................................71

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007)......................................................................31, 38, 39, 61

*Borelli v. City of Reading,*
 532 F.2d 950 (3d Cir. 1976)................................................................................43

*Caplin v. Marine Midland Grace Trust Co.,*
 406 U.S. 416 (1972).............................................................................................16

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986).............................................................................................42

*Chemical Bank New York Trust Company v. Kheel,*
 369 F.2d 845 (2d Cir. 1966)................................................................................56

*Clinton v. City of New York,*
 524 U.S. 417 (1998).............................................................................................28

*Conner v. First Nat'l Bank of Sedro-Woodley*,
    113 Wash. 662 (Wash. 1921)...........................................................................65

*Courtney v. Halleran*,
    485 F.3d 942 (7th Cir. 2007) ..................................................................18, 19

*Doe v. Abington Friends Sch.*,
    480 F.3d 252 (3d Cir. 2007)...........................................................................42

*Donsco, Inc. v. Casper Corp.*,
    587 F.2d 602 (3d Cir. 1978)...........................................................................74

*Dove-Nation v. eCast Settlement Corp. (In re Dove-Nation)*,
    318 B.R. 147 (B.A.P. 8th Cir. 2004)..............................................................36

*Downriver Cmty. Fed. Credit Union v. Penn Square Bank*,
    879 F.2d 754 (10th Cir. 1989) ......................................................................18

*Duke Energy Trading & Mktg., L.L.C. v. Enron Corp. (In re Enron Corp.)*,
    No. 02-3609, 2003 Bankr. LEXIS 330 (Bankr. S.D.N.Y. Apr. 17, 2003).........23

*Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.*,
    934 P.2d 715 (Wash. Ct. App. 1997), *aff'd*, 959 P.2d 1052 (Wash. 1998)..................23, 46

*Erickson v. Pardus*,
    551 U.S. 89 (2007)..................................................................................39, 61

*Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*,
    398 B.R. 736 (S.D.N.Y. 2008)........................................................................37

*Fletcher v. Atex, Inc.*,
    68 F.3d 1451 (2d Cir. 1995)..........................................................................54

*Grayson v. Mayview State Hosp.*,
    293 F.3d 103 (3d Cir. 2002)..........................................................................43

*Hamid v. Price Waterhouse*,
    51 F.3d 1411 (9th Cir. 1995) ..................................................................18, 19

*Hayes v. Gross*,
    982 F.2d 104 (3d Cir. 1992)................................................17, 19, 20, 29

*Hellstrom v. U.S. Dep't of Veterans Affairs*,
    201 F.3d 94 (2d Cir. 2000)............................................................................42

*In re 1438 Meridian Place, N.W., Inc.*,

15 B.R. 89 (Bankr. D.D.C. 1981) .................................................................57

*In re Adelphia Comm'cns Corp.*,
  365 B.R. 24 (Bankr. S.D.N.Y. 2007) ...............................................................17

*In re Allegheny Int'l, Inc.*,
  954 F.2d 167 (3d Cir. 1992)..................................................................33, 34

*In re Alpharma Sec. Litig.*,
  372 F.3d 137 (3d Cir. 2004)...................................................................70

*In re Amatex Corp.*,
  755 F.2d 1034 (3d Cir. 1985)...................................................................28

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)...................................................................72

*In re Caldor Corp.*,
  303 F.3d 161 (2d Cir. 2002)...................................................................29

*In re Cluff*,
  313 B.R. 323 (Bankr. D. Utah 2004), *aff'd* 2006 WL 2820005 (D. Utah Sept. 29,
  2006) ......................................................................................35, 37

*In re Commodity Futures Trading Comm'n v. Eustace*,
  No. 05-civ-2973, 2008 WL 471574 (E.D. Pa. Feb. 19, 2008)............................................55

*In re Continental Vending Mach. Corp.*,
  517 F.2d 997 (2d Cir. 1975)...................................................................56

*In re Crabtree*,
  39 B.R. 718 (Bankr. E.D. Tenn. 1984) ............................................................57

*In re Fedders N. AM. Inc.*,
  405 B.R. 527 (Bankr. D. Del. 2009) .............................................................63

*In re Hartman*,
  No. 09-20910, 2009 WL 4043096 (Bankr. D. N.J. Nov. 20, 2009) ...................................36

*In re Heath*,
  331 B.R. 424 (B.A.P. 9th Cir. 2005)........................................................35, 36

*In re Kincaid*,
  388 B.R. 610 (Bankr. E.D. Pa. 2008) .............................................................35

*In re Longhorn Sec. Litig.*,

DOCS_DE:158100.1

573 F. Supp. 255 (W.D. Okla. 1983) ..............................................................................18

*In re Marin Motor Oil*,
    689 F.2d 445 (3d Cir. 1982)..............................................................................29

*In re Metro. Sec. Litig.*,
    532 F. Supp. 2d 1260 (E.D. Wash. 2007) ..........................................................72

*In re Musicland Holding Corp.*,
    398 B.R. 761 (Bankr. S.D.N.Y. 2008) ...............................................................74

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005).........................................................23, 55, 56, 57, 58

*In re Ozark Restaurant Equip. Co.*,
    *816 F.2d* 1222 (8th Cir. 1987) .........................................................................22

*In re Parkway Calabasas Ltd.*,
    89 B.R. 832 (Bankr. C.D. Cal. 1988), *aff'd*, 949 F.2d 1058 (9th Cir. 1991) ....................56

*In re Rimsat, Ltd.*,
    223 B.R. 345 (Bankr. N.D. Ind. 1998).........................................................33, 44

*In re Rockefeller Ctr. Props. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002)..............................................................................63

*In re Scott Acquisition*,
    344 B.R. 283 (Bankr. D. Del. 2006) ..................................................................74

*In re Steury*,
    94 B.R. 553 (Bankr. N.D. Ind. 1988)..................................................................56

*In re Sunrise Sec. Litig.*,
    916 F.2d 874 (3d Cir. 1990)..................................................................18, 19, 27

*In re Today's Destiny, Inc.*,
    No. 05-90080, 2008 WL 5479109 (Bankr. S.D. Tex. Nov. 26, 2008) .......................32, 33

*In re Wade Cook Fin. Corp.*,
    375 B.R. 580 (B.A.P. 9th Cir. 2007)...................................................................54

*In re Wall to Wall Sound & Video, Inc.*,
    151 B.R. 700 (Bankr. E.D. Pa. 1993) ................................................................34

*In re Washington Mut., Inc.*,
    408 B.R. 45 (Bankr. D. Del. 2009) ....................................................................42

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.,*
  No. 08-1919, 2009 WL 3517630 (W.D. Wa. Oct. 27, 2009) ...........................................66

*J.I. Case Credit Corp. v. Stark,*
  64 Wash. 2d 470 (1964)................................................................................................45

*Kueckelhan v. Fed. Old Line Ins. Co.,*
  69 Wash.2d 392 (1966)................................................................................................45

*Landy v. FDIC,*
  486 F.2d 139 (3d Cir. 1973).........................................................................................27

*Lang v. Hougan,*
  150 P.3d 622 (Wash. Ct. App. 2007)...........................................................................23

*LTV Corp. v. Gulf States Steel, Inc.,*
  969 F.2d 1050 (D.C. Cir. 1992)....................................................................................33

*McAnaney v. Astoria Fin. Corp.,*
  No. 04-CV-1101, 2009 WL 3150430 (E.D.N.Y. Sept. 29. 2009) ................................54

*McConnell v. FEC,*
  540 U.S. 93 (2003)........................................................................................................28

*McCormick v. Dunn & Black, P.S.,*
  167 P.3d 610 (Wash. Ct. App. 2007)...........................................................................23

*McVeigh v. UnumProvident Corp.,*
  300 F. Supp. 2d 731 (W.D. Wis. 2002) ........................................................................54

*Meisel v. M & N Modern Hydraulic Press Co.,*
  97 Wash. 2d 403 (1982)...............................................................................................53

*Minton v. Ralston Purina Co.,*
  47 P.3d 556 (Wash. 2002).............................................................................................54

*Morgan Bros. v. Haskell Corp.,*
  24 Wash. App. 773 (1979)............................................................................................45

*My Bread Baking Co. v. Cumberland Farms, Inc.,*
  353 Mass. 614, 233 N.E.2d 748 (1968) ........................................................................45

*Norhawk Invs., Inc., v. Subway Sandwich Shops, Inc.,*
  811 P.2d 221 (Wash. Ct. App. 1991)...........................................................................50

DOCS_DE:158100.1

*One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs.*,
  30 P.3d 504 (Wash. Ct. App. 2001) ................................................................45, 54

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) ................................................................66, 69, 71

*PHP Liquidating, LLC v. Robbins*,
  291 B.R. 592 (D. Del. 2003) ................................................................62

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
  998 F.2d 1192 (3d Cir. 1993) ................................................................41

*Pereira v. Farace*,
  413 F.3d 330 (2d Cir. 2005) ................................................................17

*Platt v. Bradner Co.*,
  131 Wash. 573 (1924) ................................................................45

*Riley v. Simmons*,
  45 F.3d 764 (3d Cir. 1995) ................................................................17

*Rose v. Bartle*,
  871 F.2d 331 (3d Cir. 1989) ................................................................41

*Rosener v. Majestic Mgmt. (In re OODC, LLC)*,
  321 B.R. 128 (Bankr. D. Del. 2005) ................................................................22

*Sampsell v. Imperial Paper & Color Corp.*,
  313 U.S. 215 (1941) ................................................................57

*Sedwick v. Gwinn*,
  873 P.2d 528 (Wash. Ct. App. 1994) ................................................................62

*Simon v. ASIMCO Techs., Inc. (In re Am. Camshaft Specialties, Inc.)*,
  410 B.R. 765 (Bankr. E.D. Mich. 2009) ................................................................59

*Sound Infiniti, Inc. ex rel. Pisheyar v. Snyder*,
  186 P.3d 1107 (Wash. Ct. App. 2008) ................................................................22

*Soviero v. Franklin Nat'l Bank*,
  328 F.2d 446 (2d Cir. 1964) ................................................................57

*Stauder v. eCast Settlement Corp. (In re Stauder)*,
  396 B.R. 609 (M.D. Pa. 2008) ................................................................37

*Sterling Sav. Bank v. Air Wis. Airlines Corp.*,

492 F. Supp.2d 1256 (E.D. Wash. 2007) .......................................................65

*Stoneridge Inv. Partners, LLC. v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ....................................................................................71

*Travelers Cas. and Sur. Co. of America v. Pacific Gas & Elec. Co.*,
    549 U.S. 443 (2007) ...................................................................................36

*Truckweld Equip. Co. v. Olson*,
    26 Wash. App. 638 (Wash. Ct. App. 1980) .............................................53

*United States v. Townley*,
    181 Fed. Appx. 630 (9th Cir. 2006) ..........................................................62

*Washington Equip. Mfg., Co. v. Concrete Placing Co.*,
    931 P.2d 170 (Wash. Ct. App. 1997) ........................................................22

*Williams v. California 1st Bank*,
    859 F.2d 664 (9th Cir. 1988) ...............................................................17, 22

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007) .......................................................................70

*Worthington v. Low Cost Drugs, Inc.*,
    No. 18102-2-III, 2000 WL 199004 (Wash. Ct. App. Feb. 15, 2000) ...............62

*Youkelsone v. Washington Mut., Inc.*,
    418 B.R. 107 (Bankr. D. Del. 2009) ..........................................22, 45, 46, 50

## RULES AND STATUTES

11 U.S.C. § 105(a) .............................................................................35, 56

11 U.S.C. § 502(b) ............................................................................35, 36

11 U.S.C. § 544 ........................................................................................26

11 U.S.C. § 1109 ..........................................................................6, 28, 29

12 U.S.C. § 1821(d)(2)(A) ..............................................................17, 18

12 U.S.C. § 1821(d)(11) .........................................................................65

12 U.S.C. § 1821(d)(17) .........................................................................26

18 U.S.C. § 1964 .................................................................................................................19

28 U.S.C. § 1334 .................................................................................................................56

28 U.S.C. § 2075 .................................................................................................................36

Fed. R. Bankr. P. 3001 ........................................................4, 31, 32, 33, 34, 35, 36, 37, 66

Fed. R. Bankr. P. 3002 ............................................................................4, 31, 32, 34

Fed. R. Bankr. P. 3007 .........................................................................................................37

Fed. R. Bankr. P. 9014 ...................................................................................................37, 42

Fed. R. Civ. P. 8(a)(2) .....................................................................................................37, 39

Fed. R. Civ. P. 9(b) .................................................................................................63, 65, 69, 73

Fed. R. Civ. P. 12(b)(6) ........................................................................2, 31, 37, 39, 41, 44, 54

Fed. R. Civ. P. 24(a) ............................................................................................................29

Fed. R. Civ. P. 7007 ............................................................................................................44

Fed. R. Civ. P. 7008 ....................................................................32, 33, 35, 36, 37, 38, 44

Fed. R. Civ. P. 7009 ....................................................................32, 33, 35, 37, 38, 44

Fed. R. Civ. P. 7012 ............................................................................................................44

Fed. R. Civ. P. 7024(a)(1) ....................................................................................................29

Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-
73, 103 Stat. 512 .................................................................................................................55

Washington Revised Code § 19.40.041 ..............................................................................25

Washington Revised Code § 19.40.051 ..............................................................................25

## OTHER AUTHORITIES

18 C.J.S. Corporations § 7e .................................................................................................45

Interagency Policy Statement on Income Tax Allocation in a Holding Company
Structure, 63 Fed. Reg. 64757, 64758 (Nov. 23, 1998) .....................................................53

William Meade Fletcher, 10 *Fletcher Cyclopedia of the Law of Corporations* § 4877
(2009) ......................................................................................................................74

DOCS_DE:158100.1

The holders of senior notes (the "Senior Notes") issued by Washington Mutual Bank ("WMB") listed below (the "Bank Bondholders")[2] file this response ("Response") to Debtors' Twentieth Omnibus Objection to Claims ("Objection"). Pursuant to an agreement among the parties, described more fully below, the Bank Bondholders address below only the threshold legal issues raised in the Objection. The numerous disputed facts at issue and any evidentiary matters raised by the Objection will be addressed at a later date pursuant to a schedule to be negotiated by the parties and approved by the Court.

## INTRODUCTION

With their Objection, the Debtors ask this Court to disallow and expunge billions of dollars of claims asserted by holders of the senior notes of WMB (the "Claims"). Although the Bank Bondholders have not been afforded any discovery on these Claims, and many of the same fact-intensive issues that must be resolved to determine the validity of the Claims are also at issue in two adversary proceedings pending before this Court (the "Adversary Proceedings") and in an action in the United States District Court for the District of Columbia (the "DC Action")—

---

[2] This response is filed on behalf of the holders of Senior Notes issued by WMB who filed Amended Proofs of Claim Nos. 3710 and 3711, dated June 1, 2009, in Case Nos. 08-12228 and 08-12229. The Debtors refer to these entities as the "Marathon Credit Claimants" These entities include Anchorage Capital Master Offshore, Ltd.; Bank of Scotland plc; Cetus Capital, LLC; HFR ED Select Fund IV Master Trust; Lyxor/York Fund Limited; Marathon Credit Opportunity Master Fund, Ltd.; Marathon Special Opportunity Master Fund, Ltd.; Permal York Ltd.; Quintessence Fund L.P.; QVT Fund LP; The Värde Fund, L.P.; The Värde Fund VI-A, L.P.; The Värde Fund VII-B, L.P.; The Värde Fund VIII, L.P.; The Värde Fund IX, L.P.; The Värde Fund IX-A, L.P.; Värde Investment Partners (Offshore) Master, L.P.; Värde Investment Partners, L.P.; York Capital Management, L.P.; York Credit Opportunities Fund, L.P.; York Credit Opportunities Master Fund, L.P.; York Investment Master Fund, L.P.; York Select, L.P.; and York Select Master Fund, L.P. This response is also filed on behalf of CVI GVF (Lux) Master S.a.r.l.; Citigroup Global Markets, Inc.; Gruss Global Investors Master Fund, Ltd.; Gruss Global Investors Master Fund (Enhanced), Ltd.; Halcyon Master Fund L.P. c/o Halcyon Offshore Asset Management LLC; King Street Capital, L.P.; King Street Capital Master Fund, Ltd., assignee of King Street Capital, Ltd., and Stone Lion Portfolio L.P., all of which are holders of the senior notes issued by WMB and are among the entities that filed Proof of Claim no. 2480, and which, subsequent to the filing of that proof of claim, retained Wilmer Cutler Pickering Hale and Dorr LLP to represent them with respect to these bankruptcy cases. Subsequent to the filing of the Proofs of Claim referenced above, additional holders of WMB Senior Notes have also retained Wilmer Cutler Pickering Hale and Dorr LLP to represent them in these bankruptcy cases, including GRF Master Fund, L.P. c/o Anchorage Advisors, L.L.C.; PCI Fund, L.L.C. c/o Anchorage Advisors, L.L.C.; Caspian Select Credit Master Fund, Ltd.; Caspian Alpha Long Credit Fund, L.P.; Caspian Capital Partners, LP; D. E. Shaw Laminar Portfolios, L.L.C; Plainfield Special Situations Master Fund II, Limited; Plainfield OC Master Fund II Limited; Plainfield Liquid Strategies Master Fund Limited; Scoggin Capital Management LP II; Solus Alternative Asset Management LP; and Farallon Capital Management, LLC. These additional holders of Senior Notes join in this Response.

proceedings that Debtors have conceded will likely take "many years" to litigate and resolve—the Debtors propose that the Bank Bondholders' Proofs of Claim should be dismissed with no opportunity for the Bank Bondholders to conduct any discovery, to present a shred of evidence, or even to amend or supplement their Claims. The Debtors attempt to justify this draconian treatment of the Bank Bondholders' Claims by arguing (1) that the Bank Bondholders lack standing to assert "most" (but not all) of the Claims, and (2) that the Court may, applying the standard under Federal Rule of Civil Procedure 12(b)(6), dismiss "many" (but again not all) of the Claims, for failure to state a claim on which relief may be granted. Neither of these arguments justifies the summary dismissal of the Bank Bondholders' Proofs of Claim.

First, the Debtors' argument that the Bank Bondholders' Claims should be dismissed because the Bank Bondholders supposedly do not have standing to assert "most" of those Claims fails. Many of the Bank Bondholders' Claims—those based on theories of piercing the corporate veil, alter ego, and misrepresentation, for example—are undeniably direct, not derivative, and Debtors concede that the Bank Bondholders have standing to bring direct claims. Indeed, as Debtors' acknowledge, the Federal Deposit Insurance Corporation ("FDIC"), as receiver of WMB, has not asserted any of these Claims on behalf of the WMB receivership estate (the "Receivership Estate"), and the FDIC does not purport to represent Bank Bondholders with respect to these Claims. As to these direct Claims, therefore, there is no legitimate dispute as to the Bank Bondholders' standing. Moreover, the Debtors themselves assert that "[t]he FDIC does not have standing to assert the fraudulent transfer claims asserted by the [Bank] Bondholders" (Objection at 13 n.10), and they have eschewed any challenge to the Bank Bondholders' standing to assert those Claims.

2

To the extent that there may be legitimate disputes as to whether other Claims asserted by the Bank Bondholders are direct or derivative, and, if derivative, whether the Bank Bondholders nevertheless may bring those Claims, it is premature for the Court to dismiss the Claims before any discovery has been completed and when it still remains unclear whether and to what extent the FDIC will pursue, to final resolution, these Claims. Whether the Claims are direct or derivative, and if they are derivative, whether the Bank Bondholders may have standing to pursue them in accordance with Third Circuit precedent which recognizes the standing of even shareholders (whose rights are subordinate to those of creditors) of a failed bank to pursue derivative claims in certain circumstances, are both fact dependent determinations that turn on all applicable circumstances. At this point in time, the Court simply does not have the information necessary to resolve those issues.

Moreover, there is no reason for the Court to try to make such a premature decision at this time. With respect to those Claims that the FDIC has also asserted against the Debtors—the only Claims as to which there can be any real issue as to Bank Bondholders' standing—the Debtors have filed no objection to the FDIC's standing (or otherwise to those Claims, as asserted by the FDIC). Because there is one party with unchallenged standing to assert the Claims, the Court need not reach the issue of the standing of the Bank Bondholders at this time, and there is no reason for it to do so. Indeed, the Supreme Court has so recognized on several occasions, holding that, where, as here, at least one party has standing to assert the claims at issue, there is no need for the standing of other parties to assert the same claims to be resolved, at least prior to the entry of any final judgment in favor of one or more of the claimants.

The Debtors' second argument in support of dismissing the Claims also fails. The Debtors argue that the Court should dismiss several of the Bank Bondholders' Claims because

they supposedly do not satisfy the pleading rules applicable to a complaint in a civil action or adversary proceeding. But at issue here are proofs of claim, not complaints, and while the Court, now that a contested matter has been commenced by Debtors' objection to the Proofs of Claim, may prospectively apply the Federal Rules of Civil Procedure (as incorporated by the 7000 series of the Federal Rules of Bankruptcy Procedure), the only rules that applied to the Proofs of Claim when they were filed by the Bank Bondholders prior to the commencement of this contested matter were Bankruptcy Rules 3001 and 3002. The Bank Bondholders' Proofs of Claim—which include a 15-page, single-spaced attachment describing the Claims in detail—plainly satisfied those rules, which simply required that the Bank Bondholders briefly describe their Claims.

Indeed, the Proofs of Claim are more than sufficient to state a claim and to allege plausible claims for relief, and thus would satisfy the somewhat more demanding pleading rules set forth in the Federal Rules of Civil Procedure and the Bankruptcy Rules for complaints in adversary proceedings if those rules applied (which they do not). While the Debtors argue to the contrary, they do so either by ignoring the detailed allegations set forth in the Proofs of Claim, or by trying to refute the allegations with unproven factual allegations of their own, many as set forth in the factual declarations they filed in support of the Objection. That alone prevents dismissal of the Bank Bondholders' Proofs at Claim at this preliminary "legal issues only" stage in the proceedings. At the very least, the Bank Bondholders are entitled to discovery (including depositions of the declarants), and thereafter an evidentiary hearing, regarding the disputed facts that the Debtors concede are at issue.

The Debtors will no doubt argue that a quick resolution of the Bank Bondholders' Claims is essential to their ability to propose a plan and move these bankruptcy cases forward. But that assertion rings hollow. Resolution of the Bank Bondholders' Claims is neither necessary to nor

4

particularly helpful to advancing these bankruptcy cases. The Debtors have no continuing operations; they are not reorganizing, but liquidating. The Debtors could have long ago proposed a plain-vanilla liquidating plan that creates a liquidating trust and provides for distribution of whatever recoveries the Debtors' estate may obtain in litigation to whatever creditors are held to have allowed claims, in accordance with those creditors' relative rights of priority. Indeed, in liquidating cases like this one, the litigation of claims—both by and against a debtor's estate—is commonly left as a post-confirmation task. Here, the Debtors admit that resolution of their own affirmative claims will take "many years" (even before any possible appeals are considered),[3] a process they are seemingly in no rush to move forward: They have sought and obtained a stay of the DC Action in which they have asserted claims against the FDIC, and have done nothing (other than move for summary judgment in the turnover action) to move forward the two-pending Adversary Proceedings in which they have asserted claims against J.P. Morgan Chase Bank ("JPMC"). And if the Debtors really have legitimate concerns about setting adequate reserves for disputed claims, such as those of the Bank Bondholders, that issue can be addressed separately if and when the Debtors recover amounts in litigation and are in a position to make a meaningful distribution to their creditors—as the parties have already agreed.[4]

---

[3]     Just last month, the Debtors told this Court that with respect to the litigation of its claims "there are many years of discovery and litigation ahead, not including the numerous years in the appellate courts that will surely follow." *See* Reply of Washington Mutual, Inc. and WMI Investment, Inc. in Further Support of Motion for an Order (A) Disbanding the Official Committee of Equity Holders Appointed by the US Trustee, or (B) Limiting the Fees and Expenses Which May be Incurred by Such Committee, Dkt. No. 2223, Case No. 08-12229, January 25, 2010 (Bankr. D. Del.), at 2.

[4]     In the agreement among the parties putting off to another day any evidentiary hearing on the Bank Bondholders' Claims, the Debtors have reserved the right to seek, prior to the completion of discovery and such an evidentiary hearing, an estimation under Section 502(c) of the Bankruptcy Code of the Bank Bondholders' Claims for purposes of voting or allowance. *See* E-mail from Brian S. Rosen, Feb. 12, 2010 ("Feb. 12 Rosen Email"), Declaration of Nancy L. Manzer ("Manzer Decl.") Ex. 1. The Bank Bondholders have acknowledged that the Debtors have retained the right to seek such relief, while of course preserving any rights, defenses and arguments of their own, including the argument that the Bank Bondholders' Claims are not "contingent" nor "unliquidated" within the meaning of, and hence are not subject to estimation under, Section 502(c). *See* Email from Philip Anker, Feb. 12, 2010 ("Feb. 12 Anker Email"), Manzer Decl. Ex. 2.

DOCS_DE:158100.1

That the Debtors' primary objection to many of the Bank Bondholders' Claims is that the Bank Bondholders allegedly do not have standing to assert some of those Claims because, the Debtors say, the FDIC is asserting the same Claims, further underscores the fallacy in the Debtors' cry that they must resolve the Bank Bondholders' Claims promptly to confirm a plan. The Bank Bondholders disagree with the Debtors' legal arguments that they lack standing to assert any of their Claims, but the Debtors are certainly correct that the FDIC, in its capacity as receiver, has filed its own Claims, Claims that the Debtors recently announced, by their own calculations, were for some $24 billion plus additional, unliquidated amounts.[5] To the extent that the FDIC has asserted the same, or similar, Claims, objecting to the Bondholders' Proofs of Claim will not make the Claims go away, will not obviate the need to resolve the issues raised by the Claims, and will not obviate the possibility that the Claims will need to be paid. Because the Bank Bondholders are parties in interest with a right to be heard in any proceedings regarding the FDIC's Claims, 11 U.S.C. § 1109, objecting to the Bank Bondholders' Proofs of Claim will also not make the Bank Bondholders go away. There is simply no justification to deny the Bank Bondholders a fair opportunity to present their Claims.

The Debtors' attempt to summarily eliminate the Bank Bondholders' Claims should be recognized for what it is: part of Debtors' larger strategy to use these bankruptcy cases to claim billions of dollars worth of WMB *assets* and, at the same time, to block any claims by which they might be held responsible for any WMB *liabilities*. While the Debtors argue that the Bank Bondholders are "overreaching" in supposedly asking this Court to ignore the corporate forms and that the Bank Bondholders are seeking to deplete the assets of WMI's "rightful" creditors, Debtors' Twentieth Omnibus Objection to Claims ("Obj.") at 3-4, it is in fact Debtors who, both

---

[5]    *See* Tr., Case No. 08-12229, Jan. 28, 2010 (Bankr. D. Del.), at 15 ("Jan. 28 Tr."), Manzer Decl. Ex. 3.

before and after the commencement of these bankruptcy cases, have ignored the corporate forms, and have sought to deplete the assets of WMB (and, after WMB was forced into receivership, the assets of the Receivership Estate) by laying claim to literally billions of dollars in assets that rightfully belong to WMB. In the few years prior to WMB's receivership, WMB's parent, Washington Mutual Inc. ("WMI"), one of the Debtors in these bankruptcy cases, caused WMB to transfer to WMI some $15 billion dollars in cash dividends. Not satisfied with that massive depletion of WMB's assets to the prejudice of the Bank Bondholders, WMI, in the weeks and days prior to the receivership, went further. It credited accounts it held in the name of WMI with almost a billion dollars of WMB money, and, in a transaction on the very eve of the receivership, purported to transfer over $3.5 billion from WMB, which would be placed into receivership just days later, to WMB's more solvent subsidiary, WMBfsb, thereby attempting to destroy WMB's ability to set off that amount against sums owed to it by WMI. Since the filing of these bankruptcy cases and the commencement of the receivership, WMI has added insult to injury, by laying claim to billions more in tax refunds arising from taxes that were paid by WMB, not WMI, and in other assets that rightfully belong to WMB.

These efforts by WMI to claim for itself assets that were and are the property not of WMI—a holding company—but rather of WMB—the operating company—demonstrate the extraordinary circumstances that exist here and the justness, equity, and fairness underlying the Bank Bondholders' Claims. WMI's grab for WMB assets also belies WMI's protestations that WMI maintained a clear and sharp line between WMI and WMB. If that line were so bright, there surely would not be three separate litigations pending, each of which involves disputes over which assets belong to which entity, and Debtors would not be looking, by their own admission,

7

at "many years" of litigation before their claims against the FDIC and JPMC, and the claims of the FDIC and JPMC against the Debtors, are resolved.

For these reasons, as more fully set forth below, the Debtors' Objection to the Bank Bondholders' Proofs of Claim should be denied, and the Court should set a reasonable schedule for discovery and an evidentiary hearing regarding the Claims.

## BACKGROUND

Before it filed for bankruptcy, WMI was a holding company whose principal asset was its stock in WMB, a federally chartered savings association. WMI had no operations of its own. Indeed, in numerous pleadings in these Chapter 11 cases, the Debtors have stated that, with the exception of its disputed claim to a $4 billion deposit and its interests in non-debtor subsidiaries, WMI's only principal asset was its equity interest in WMB. *See, e.g.*, Declaration of Stewart M. Landefeld in Support of the Debtors' Chapter 11 Petitions and First Day Motions, Dkt. No. 13, Case No. 08-12229, Oct. 1, 1998, ¶ 10 (Bankr. D. Del.).

On September 25, 2008, WMB was closed by the Office of Thrift Supervision, and the FDIC was appointed as receiver of WMB. Immediately after its appointment as Receiver, the FDIC sold substantially all of the assets of WMB to JPMC. Pursuant to the Purchase and Assumption Agreement between JPMC and the FDIC (the "Purchase Agreement"), Manzer Decl. Ex. 4, JPMC paid the Receivership Estate $1.9 billion in cash and agreed to assume most of the liabilities of WMB, including WMB's liability to its depositors. But JPMC's assumption of liabilities of WMB did not include WMB's debt to its noteholders, including the holders of the Senior Notes. The following day, on September 26, 2008, WMI and its wholly-owned subsidiary, WMI Investment Corp. ("WMI Investment"), filed petitions for relief under Chapter 11 of the United States Bankruptcy Code in this Court. These events have given rise to multiple

8

related disputes between and among WMI, JPMC, the FDIC, and the creditors of WMI and WMB.

## A.    The Bank Bondholders' Claims

In total, the outstanding principal amount of the Senior Notes is approximately $6.1 billion, more than three times the $1.9 billion that JPMC paid for the assets of WMB that it acquired.[6] The receiver, the FDIC, has recognized the Claims of the Senior Noteholders as a "legitimate liability of the receivership." *See* Declaration of John J. Clarke, Jr. dated June 15, 2009, Manzer Decl. Ex. 5; Obj. at 5.

In these bankruptcy cases, the Court issued an order setting the bar date for claims against the Debtors as March 31, 2009. *See* Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof, Dkt. No. 632, Case No. 08-12229, Jan. 30, 2009 (Bankr. D. Del.). To protect their interests in the Senior Notes and their claims against the Debtors, the Bank Bondholders filed timely proofs of claim in the Debtors' bankruptcy cases, *see* Claim Nos. 3710 and 3711 (the "Proofs of Claim" or "POC"),[7] asserting (among other things) that Debtors are liable for payment of all amounts due on the Senior Notes. *See* Manzer Decl. Exs. 6 and 7. The Proofs of Claim include (among other claims) direct claims based on theories

---

[6]    The Bank Bondholders hold in the aggregate more than $ 2.0 billion in outstanding principal of the Senior Notes. In addition to the Senior Notes, WMB issued more than $7.4 billion in subordinated, junior notes (the "Junior Notes"); JPMC also did not assume liability on those Junior Notes under the Purchase Agreement.

[7]    Proofs of claim were filed by two different groups of holders of the Senior Notes, a group represented by Wilmer Cutler Pickering Hale and Dorr LLP (Claim Nos. 3710 and 3711), and a group represented by Bracewell & Guiliani LLP (Claim No. 2480). Wilmer Cutler Pickering Hale and Dorr LLP now represents several of the holders of Senior Notes who are signatories to Claim No. 2480. Proof of Claim No. 2480 is attached as Manzer Decl. Ex. 8.

The Claims set forth in Proofs of Claim Nos. 3710 and 3711 were originally filed on March 31, 2009; amended Proofs of Claim were filed on June 2, 2009. The amended Proofs of Claim were assigned Claim Nos. 3710 and 3711. Debtors filed a non-substantive objection to the original Proofs of Claim seeking to have them disallowed as duplicative of and superseded by the amended Proofs of Claim. Upon agreement as to the language to be included in the orders preserving the Bank Bondholders' amended Proofs of Claim, the Bank Bondholders did not object to the relief sought by Debtors, and the Court entered orders expunging the original claims. *See* Order Granting Debtors' Seventh Omnibus (Non-Substantive) Objection to Claims, Dkt. No. 1468, Case No. 08-12229 (Bankr. D. Del.) and Order Granting Debtors' Ninth Omnibus (Non-Substantive) Objection to Claims, Dkt. No. 1581, Case No. 08-12229 (Bankr. D. Del.).

9

of, *inter alia*, alter ego, piercing the corporate veil, substantive consolidation, and misrepresentation and material omissions. POC ¶¶ 8, 9, and 13. The Proofs of Claim also include fraudulent transfer, breach of fiduciary duty, mismanagement, undercapitalization, and other claims related to (among other things) the nearly $4 billion in purported deposits allegedly transferred from WMB on the eve of its receivership, the billions of dollars in tax losses that were generated by WMB—not WMI—but in which WMI has nevertheless asserted property interests, and the billions of dollars in purported dividends that WMI caused to be upstreamed from WMB to WMI. POC ¶¶ 10, 11, 15.

## B.    Related Proceedings

The Bank Bondholders' Proofs of Claim do not exist in a vacuum. The assets at issue and the allegations relating to the interactions between WMI and WMB are also at issue in at least three separate judicial proceedings, as well as in the FDIC's Proof of Claim which remains unchallenged by the Debtors:

- DC Action: The Debtors filed their Complaint against the FDIC in the United States District Court for the District of Columbia on March 3, 2009. *See Washington Mutual, Inc., et al., v. Federal Deposit Insurance Corporation*, No.1:09-cv-00533 (D.D.C.). In that DC Action, the Debtors seek the allowance—in many instances, as a priority claim—and payment of many billions of dollars from WMB's Receivership Estate (and from the FDIC in its corporate capacity). Complaint, Dkt. No. 1, Case No. 09-00533, Mar. 20, 2009 (D.D.C), ¶¶ 80-95 ("WMI Compl."), Manzer Decl. Ex. 9; *see also id*. at p. 27, Prayer for Relief ¶¶ 2, 5, 6. Among other claims, the Debtors assert "protective claims" against the Receivership Estate with respect to any purported deposits "in the event FDIC exercises any rights it may have under the Purchase and Assumption Agreement, or otherwise" or if Debtors' alleged rights to the purported deposits are "in any way compromised or modified." *Id*. at ¶¶ 47-50. The Debtors also assert billions of dollars in fraudulent transfer claims, *id*. at ¶¶ 25-28, and the right to billions of dollars in tax refunds, *id*. at ¶22.

- JPMC Adversary. On March 24, 2009, JPMC commenced the JPMC Adversary against Debtors and, with respect to Count 8 ("the Interpleader Count" ) only, the FDIC. Complaint, Dkt. No. 1, Adv. Proc. No. 09-50551 (Bankr. D. Del.) ("JPMC Compl."). In that action, JPMC asserts that various assets claimed by WMI belonged instead to WMB and were transferred to WMI pursuant to the Purchase Agreement.

10

In the Interpleader Count, JPMC recognizes that, if and to the extent any purported deposits represent valid liabilities payable by JPMC, there may be competing claims to the funds, including by the Debtors and the Receivership Estate. *Id*. at ¶ 211 (noting that WMI and the WMB Receivership Estate "have asserted, or may assert, competing claims to any funds that constitute deposit liabilities"). To avoid potential exposure to double liability, JPMC seeks to interplead any funds that constitute valid deposit liabilities. *Id*. at ¶ 212. In response to JPMC's Complaint, the Debtors have filed numerous counterclaims, including claims for the avoidance of some $9 billion in capital contributions the Debtors allegedly made to WMB—ignoring the fact that WMI caused WMB to upstream some $15 billion to WMI as dividends during the relevant period, resulting in a net *outflow* from WMB to WMI of some $6 billion. Debtors' Answer and CounterClaims in Response to the Complaint of JPMorgan Chase Bank, N.A., Dkt. No. 23, Adv. Proc. No. 09-50551, May 29, 2009 (Bankr. D. Del.), at Counterclaims ¶ 93-103; *see* POC ¶ 10.

- Turnover Action. In the Turnover Action, filed by the Debtors on April 27, 2009, the Debtors seek an order requiring JPMC to "turnover" more than $4 billion in purported deposits that the Debtors claim that WMB or its subsidiary, WMBfsb, held on its behalf and that are now held by JPMC. *See* Complaint, Dkt. No. 1, Adv. Proc. No. 09-50934, Apr. 7, 2009 (Bankr. D. Del.). JPMC has filed Counterclaims against the Debtors and Cross-Claims against the FDIC in the Turnover Action seeking a declaratory judgment as to the ownership of various assets and JPMC's rights to recoupment and/or setoff with respect to any liabilities JPMC may have to the Debtors, including deposit liabilities, alleging fraud against WMI with respect to a purported $3.67 billion transfer from WMB to WMBfsb, and interpleading any remaining funds that constitute valid deposit liabilities. In yet another set of related proceedings in these bankruptcy cases, the FDIC has filed a motion for relief from the automatic stay, to the extent necessary, so that it may exercise the rights granted to it under the Purchase Agreement to take back the putative deposits so that, if the Receivership Estate's claims are ultimately determined to be valid, it may exercise rights of setoff against any such deposit liabilities for the benefit of WMB's billions of dollars in unpaid creditors. *See* Motion for Relief from Stay, Dkt. No. 1834, Case No. 08-12229, Nov. 4, 2009 (Bankr. D. Del.).

- FDIC's Proof of Claim. The FDIC filed its Proof of Claim against the Debtors' estate on March 30, 2009. The FDIC alleges claims for undercapitalization, tax payments, fraudulent transfer, trust preferred securities, deposit accounts, intercompany amounts, capital maintenance obligations, proceeds of litigation, and insurance proceeds. FDIC's Proof of Claim ("FDIC POC") ¶¶ B-I, Manzer Decl. Ex. 10. To date, Debtors have not objected to the FDIC's Proof of Claim. The Debtors estimate the dollar amount of the FDIC's Claims, even without consideration of any unliquidated claims, at $24 billion. Jan. 28 Tr. at 15, Manzer Decl. Ex. 3.

Over the objections of the Debtors and the FDIC, the Bank Bondholders were permitted

by this Court to intervene in each of the two Adversary Proceedings, and by the United States

11

District Court for the District of Columbia in the DC Action. *See* Order, Dkt. No. 131, Case No. 09-50934, Aug. 28, 2009 (Bankr. D. Del.); Order, Dkt. No. 145, Case No. 09-50551, Aug. 28, 2009 (Bankr. D. Del.); Order and Memorandum, Dkt. Nos. 70, 71, Case No. 09-533, Oct. 13, 2009 (D.D.C.), Manzer Decl. Ex. 11. The Bank Bondholders have been participating in each Adversary Proceeding (the DC Action has now been stayed), including by serving discovery and participating in negotiations over a scheduling order that would govern the litigation. The Bank Bondholders served discovery requests on the Debtors in the Adversary Proceedings on December 15, 2009. To date, however, the Debtors have declined to produce a single document in response to the requests, but have instead suggested that any production of documents is premature pending the finalization of a scheduling order. *See* Debtors' Objections and Responses to Bank Bondholders' First Set of Document Requests to Washington Mutual, Inc. and WMI Investment Corp., Jan. 14, 2010, at 3 ("Debtors' object to each Request on the ground and to the extent that it calls for production of documents in contravention of the Proposed Scheduling and Discovery Order . . . the Bank Bondholders are entitled to receive productions according to the schedule as provided for in the [Proposed] Scheduling Order"), Manzer Decl. Ex. 12.

## C.    Debtors' Objection

Notwithstanding their refusal to produce any document to date on the ground that litigation of the various competing claims is premature, the Debtors, on January 22, 2010, filed their Objection, seeking an order immediately disallowing and expunging the Bank Bondholders' Proofs of Claim Nos. 3710, 3711, and 2480. The Debtors argue that "*most*"—but not all—of the Bank Bondholders' Claims should be disallowed because the Bank Bondholders supposedly do not have standing to raise those Claims. Obj. at 13. In addition, with respect to some, but

12

again not all, of the Claims, Debtors allege that the Proofs of Claim fail to state a claim upon which relief may be granted.

The Debtors originally noticed the Objection for the omnibus hearing scheduled for March 4, 2010, and designated the response deadline as February 19, 2010.[8] Subsequently, Debtors, the FDIC, the Creditors Committee, the Bank Bondholders, and the Equity Committee agreed to a schedule that provides for responses to the legal issues raised by the Objections (with certain exceptions noted below) to be filed on March 5, 2010, and with a hearing to consider only those legal issues to be scheduled for early April 2010. *See* Feb. 12 Rosen Email, Manzer Decl. Ex. 1; Feb. 12 Anker Email, Manzer Decl. Ex. 2. The Debtors stipulated that the legal issues to be addressed in the initial responses and at the April hearing would not include (1) any argument that the Bank Bondholders' do not have standing to assert their fraudulent transfer claims, and (2) any argument that the Bank Bondholders' Proofs of Claim fail to state a claim for constructive fraudulent transfer. *See* Feb. 12 Rosen Email, Manzer Decl. Ex. 1; Email from Brian Rosen, Feb. 17, 2010 ("Feb. 17 Rosen Email"), Manzer Decl. Ex. 14. Thus, the Bank Bondholders' standing to assert all of their fraudulent transfer claims and the sufficiency of their constructive fraudulent transfer claims is *not* subject to any challenge, at least at this stage.

Following the argument on the legal issues at the April hearing, the parties anticipate that there will be a status conference at which the schedule for discovery on the factual issues will be discussed. *See* Feb. 12 Rosen Email; Feb. 12 Anker Email, Manzer Decl. Exs. 1 and 2, respectively. Although the parties reserved their rights with respect to all discovery matters, the parties agreed that "the parties to the Adversary Proceeding should meet and confer to discuss

---

[8]     The response date printed on the original Objection was February 5, 2010. The Debtors subsequently sent an e-mail stating that this notation was an administrative error and that the correct response date was February 19, 2010. *See* E-mail from Matthew Curro, Jan. 26, 2010, Manzer Decl. Ex. 13.

the integration of the discovery" in those proceedings and in this contested matter—reflecting the parties' recognition that the factual issues relevant to the Objection to the Bank Bondholders' Proofs of Claim, and in the Adversary Proceedings, are related and intertwined. *See* Feb. 12 Rosen Email, Manzer Decl. Ex. 1.

At the same time as Debtors filed their Objection, they also served document requests and interrogatories on the holders of the Senior Notes who filed the proofs of claim addressed in the Objection. *See, e.g.*, Debtors' Request for Production of Documents and Interrogatories Directed to Marathon Creditor Claimants, dated Jan. 22, 2010, Manzer Decl. Ex. 15. The Official Committee of Unsecured Creditors also served document requests and interrogatories. *See, e.g.*, Request by the Official Committee of Unsecured Creditors For Production of Documents and Interrogatories, Directed to Marathon Credit Claimants, dated Feb. 3, 2010, Manzer Decl. Ex. 16. The Bank Bondholders served responses to the Debtors' discovery on February 22, 2010 and are serving responses to the Committee's requests today. *See* Objections and Responses to Debtors' Requests for Production of Documents and Interrogatories Directed to "Marathon Credit Claimants," dated February 22, 2010, Manzer Decl. Ex. 17. The Bank Bondholders all served document requests and interrogatories on Debtors on February 9, 2010. *See* Bank Bondholders' First Set of Document Requests and Interrogatories to Debtors, dated Feb. 9, 2010, Manzer Decl. Ex. 18. On that same day, the Bank Bondholders also served deposition notices, with the depositions to be scheduled once document discovery has taken place. *See* Notices of Deposition, dated Feb. 9, 2010, Manzer Decl. Ex. 19. Thus, the litigation of the hotly disputed factual issues relevant to the Proofs of Claim has just begun.

## ARGUMENT

The Debtors rest their request for an order expunging the Bank Bondholders' Claims (other than the constructive fraudulent transfer claims) without any discovery or the presentation

14

of a single shred of evidence on two grounds: that the Bank Bondholders lack standing because "most" of the Claims they assert are supposedly derivative claims that belong to the WMB Receivership Estate, and that the Bank Bondholders have failed to state a claim upon which relief can be granted. Both arguments fail.

## I. The Bank Bondholders' Claims Should Not Be Dismissed for Lack of Standing.

The Debtors do not dispute that Bank Bondholders have standing to bring direct claims—claims asserting direct injuries to the Bank Bondholders. Yet, while they admit that the Bank Bondholders have standing to assert their fraudulent transfer claims, they make the remarkable argument that the Bank Bondholders lack standing to bring their misrepresentation, material omission, veil piercing, alter ego and substantive consolidation claims—even though those Claims seek to redress direct injuries to the Bank Bondholders, and none of these Claims is being pursued by the FDIC for the Receivership Estate. The Debtors' arguments that the Bank Bondholders do not have standing to assert these Claims fly in the face of settled law.

Other of the Bank Bondholders' Claims have also been asserted by the FDIC as receiver for the WMB Receivership Estate. The Bank Bondholders acknowledge that there may be legitimate questions whether some or all of these Claims are direct or derivative, and if derivative, whether the Bank Bondholders nevertheless have standing to bring such Claims; they also recognize that, to the extent any of these Claims are derivative, any recovery must be paid into the Receivership Estate for the benefit of all WMB creditors and that, of course, there ultimately cannot be a double-recovery on the same Claims, once on the FDIC's Proof of Claim and again on the Bank Bondholders' Proofs of Claim. But which of these additional Claims are direct and which are derivative, and whether the Bank Bondholders may have standing to prosecute even derivative claims, turn on factual matters that are not sufficiently developed—

15

indeed, because there has been no discovery and no presentation of evidence, they have not been developed at all—to allow this Court to make a final determination. And, because there is at least one party that unquestionably has standing to assert these Claims—the FDIC—there is no need for the Court to make that determination at this time; on the contrary, for it to do so now would be premature and contrary to well-established precedent.

### A. The Bank Bondholders Have Standing to Bring Direct Claims Against the Debtors.

#### 1. The Bank Bondholders Have Direct Claims Against the Debtors.

As an initial matter, the Debtors admit that the FDIC is not even pursuing several of the Bank Bondholders' Claims. These Claims include: (1) Corporate Veil Piercing (and related doctrines), (2) Substantive Consolidation, and (3) Misrepresentations and Material Omissions. *See* Obj. at 15. The FDIC not only has not asserted any such Claims, *see* FDIC Proof of Claim §§ B-J (outlining claims against the Debtors), but it has acknowledged that it does not purport to represent the Bank Bondholders with respect to their direct Claims. *See* Tr. Case No. 08-12229 at 128:12-18 (Bankr. D. Del. Aug. 24, 2009) (argument by Mr. Clarke) (acknowledging that Bank Bondholders "have a theory that's a direct theory" and that the FDIC does not represent them with respect to that theory), Manzer Decl. Ex. 20.

The Debtors also do not dispute—nor can they—that to the extent the Bank Bondholders have asserted direct Claims against the Debtors, the Bank Bondholders have standing to pursue those Claims. This principle—that claims by creditors who are harmed by the acts of third parties belong to the creditors and not to a trustee or receiver representing the insolvent debtor corporation—has long been recognized. *See, e.g., Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972) (concluding that a reorganization trustee had no standing under the former Bankruptcy Act to assert, on behalf of the holders of the debtor's debentures, claims of

16

misconduct against a third party); *Pereira v. Farace*, 413 F.3d 330, 342 (2d Cir. 2005) ("a

bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's

creditors, but may only assert claims held by the bankrupt corporation itself") (quoting *Shearson*

*Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991)); *Williams v. California 1st*

*Bank*, 859 F.2d 664, 667 (9th Cir. 1988) (trustee has no power to assert general causes of action

on behalf of bankrupt estate's creditors); *In re Adelphia Comm'cns Corp.*, 365 B.R. 24, 67 n.178

(Bankr. S.D.N.Y. 2007) ("[C]laims for harm to public investors or the public generally would

plainly belong to any actual investors or others personally injured, and not to the Debtors or the

Debtors' official committees, suing on the Debtors' behalf.").[9]

  This principle is also reflected in the FDI Act, which makes clear that, while the FDIC as

receiver succeeds to the rights of the failed bank and certain other related parties, it does not have

the statutory authority to pursue claims that belong to general unsecured creditors. *See* 12 U.S.C.

§ 1821(d)(2)(A)(i) (the FDIC "as conservator or receiver, and by operation of law, succeed to—

(i) all rights, titles, powers, and privileges of the insured depository institution, and of any

stockholder, member, accountholder, depositor, officer, or director of such institution with

respect to the institution and the assets of the institution").

  The Debtors nevertheless argue that the Bank Bondholders somehow lack standing to

assert even their direct Claims because other creditors of WMB are supposedly similarly

situated. In support of this argument, Debtors rely on cases stating a "general rule" that "wrongs

committed by a bank's officers or directors that injure all depositors and creditors alike create a

liability which is an asset of the bank itself and for which only the bank or its receiver may

---

[9] *See also Hayes v. Gross*, 982 F.2d 104, 108 (3d Cir. 1992) ("[A]n individual stockholder may sue officers and directors based on an injury distinct from the injury to the corporation and the indirect injury to stockholders generally"); *Riley v. Simmons*, 45 F.3d 764, 774 (3d Cir. 1995) ("individual stockholders may have a distinct and independent cause of action from that of the corporation or other stockholders premised on misrepresentations by officers and directors of a corporation").

recover," *In re Longhorn Sec. Litig.*, 573 F. Supp. 255, 272 (W.D. Okla. 1983), and holding that depositors of a receivership cannot bring certain claims against the officers and directors of the failed bank. *See, e.g., Courtney v. Halleran*, 485 F.3d 942, 950-51 (7th Cir. 2007) (holding that individual bank depositors were not entitled to bring a direct action under RICO); *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1420 (9th Cir. 1995) (depositors do not have standing to bring RICO claim); *In re Sunrise Sec. Litig.*, 916 F.2d 874, 887-88 (3d Cir. 1990) (relying on Florida law and holding that depositors' RICO action was derivative); *Downriver Cmty. Fed. Credit Union v. Penn Square Bank*, 879 F.2d 754, 764 (10th Cir. 1989) (uninsured depositors do not have standing to bring constructive trust claim). These cases are inapposite.

Most of the cases involve "frustrated depositors" seeking to recover against officers or directors of the bank for lost deposits that resulted from the insolvency of the banking institution. *Courtney*, 485 F.3d at 943, 950-51; *see also Hamid*, 51 F.3d at 1414; *In re Sunrise Sec. Litig.*, 916 F.2d at 880; *Downriver Cmty. Fed. Credit Union*, 879 F.2d at 756. But the FDI Act expressly gives the FDIC as receiver of a failed bank, these causes of action; the FDIC "as conservator or receiver, and by operation of law, succeed to—(i) all rights, titles, powers, and privileges of the insured depository institution, and of any ... *depositor* ... with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)). In contrast, as noted, the FDI Act does *not* give the FDIC as receiver standing to assert claims of general unsecured creditors of the failed bank, including claims of the bank's bondholders. Moreover, these cases entailed claims of wrongful conduct causing harm to the bank, injuring the depositors only derivatively. Here, to the contrary, the Bank Bondholders allege direct injury to themselves— injury arising from (among other things) misrepresentations made by WMI to the Bank Bondholders regarding the financial strength of WMB and regarding WMI's commitment to act

18

as a "source of strength" for WMB, and arising from WMI's disregard of the corporate independence of WMB. This conduct directly harmed the Bank Bondholders, who purchased the Senior Notes based on the representations by WMI that it would respect the corporate independence of WMB; that WMI's noteholders and other creditors would be structurally subordinated to the creditors of WMB and that, accordingly, WMB assets would remain available to WMB's creditors; that the tax sharing agreement WMI required WMB to execute would in no way prejudice WMB and its creditors; and that the positive financial information disseminated by WMI to the holders of WMB Senior Notes regarding WMB was true and accurate. WMI's acts—both before and after the bankruptcy case—have directly and negatively affected the value of the WMB Senior Notes. This is not a harm that injured all WMB creditors alike.[10]

This situation is akin to that the Third Circuit faced in *Hayes v. Gross*, 982 F.2d 104, 108 (3d Cir. 1992). In *Hayes*, the Court held that claims of shareholders for fraud were direct and that the shareholders had standing. *Id.* at 107. *Hayes* distinguished *Sunrise* on which the Debtors here rely, noting that "*Sunrise* is based on a distinction we predicted Florida law would draw between derivative and direct claims. Where a corporation has suffered an injury from actionable wrongs committed by its officers and directors, we determined that the remedy under Florida law is a suit on behalf of the corporation." *Id.* at 108-109. Here, as in *Hayes*, the Bank Bondholders allege an injury that is distinct from injury to WMB, injury resulting from their purchase of the Senior Notes in reliance on (*inter alia*) misrepresentations by WMI and its officers. While other entities that purchased the Senior Notes relying on the same misrepresentations may have a similar injury, this injury is not one suffered by all creditors or all

---

[10]    In addition, most of the cases cited by the Debtors involved RICO claims—*Courtney*, *Hamid*, and *Sunrise*—which has its own, demanding standing requirements. *See* 18 U.S.C. § 1964.

other stakeholders in WMB. Indeed, depositors and most trade creditors of WMB have suffered no injury at all, since JPMC has assumed the liabilities owed to them. Purchase Agreement, ¶ 2.1, Manzer Decl. Ex. 4. *See also Hayes*, 982 F.2d at 108-09 (noting that "Plaintiff's claim is based on specific misrepresentations that affected prospective purchasers similarly situated to plaintiff differently from existing stockholders"). To the extent that the misrepresentations caused the holders of Senior Notes to purchase the bonds or to pay more for the bonds than they were worth, WMB was arguably benefited by the misrepresentations. WMB certainly was not injured by them. Thus, those claims cannot belong to WMB or the receivership, and are not derivative.

    2.    <u>Debtors' Cases Do Not Suggest That These Direct Claims Are In Fact Derivative.</u>

Other than relying on this "general rule"—which, for the reasons noted, is inapplicable to the Bank Bondholders' claims—the Debtors cite little support for their argument that the Bank Bondholders cannot assert their direct Claims. As discussed below, the few cases cited by the Debtors to support their assertion that "courts have considered many of the types of claims asserted by the Bondholders and determined that such claims are derivative claims," Obj. at 18, say nothing of the kind.

    a.    *Misrepresentations and Material Omissions*

In light of the Supreme Court's holding in *Caplin* and the cases following it, *see supra* p. 17 & note 9, the Debtors are hard pressed to come up with case law support for their assertion that the Bank Bondholders do not have standing to assert their claims for misrepresentations and material omissions. Lawsuits by investors asserting securities fraud and other claims against directors, officers, accountants, lawyers, and other third parties have been filed following the commencement of many of the largest bankruptcy cases that have ensued in recent years. *See, e.g., In re WorldCom, Inc. Sec. Litig.,* Case No. 02-CV-3288 (S.D.N.Y. 2002), *In re Enron*

20

*Corp.,* Case No. 01-CV-3624 (S.D. Tex. 2001); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,* Case No. 03-MD-01529 (S.D.N.Y. 2003), *In re Global Crossing IPO Sec. Litig.,* Case No. 01-CV-07023 (S.D.N.Y. 2001). Under WMI's theory, the bankruptcy estates of these debtors had exclusive standing to bring these securities fraud claims, and the actions— which often resulted in large settlements or judgments for the classes of investors—proceeded in violation of the automatic stay. Indeed, a similar, putative class action relating to WMI and WMB is currently pending before the United States District Court for the Western District of Washington. *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.,* Lead Case No. 08-1919 (W.D. Wa. filed Feb. 21, 2008). In that case, the plaintiffs assert claims on behalf of purchasers of WMI stock and debt against former officers of WMI, and the District Court has largely denied motions to dismiss the claims. The Debtors have not moved to stay that action, asserting that any of the claims therein (including those brought on behalf of a putative class of WMI investors) is property of WMI's bankruptcy estate for which the Debtors have exclusive standing. That is hardly surprising. Under *Caplin* and its progeny, no such motion would have been viable. Yet the Debtors make precisely that argument here. That argument cannot be reconciled with settled law and settled practice, including the Debtors' own practice with respect to the pending securities litigation against WMI's former offices and directors.

b.     *Corporate Disregard and Substantive Consolidation*

According to the Debtors, case law demonstrates that the Bank Bondholders' claims based on theories of corporate veil piercing, alter ego, and substantive consolidation are derivative, and thus unavailable to the Bank Bondholders. But the cases that the Debtors cite do not establish that proposition. First, the single case that Debtors cite to support the proposition that the Bank Bondholders' veil piercing claims are derivative says only that a trustee for an

21

insolvent company may pursue such a claim if (1) it is a general claim common to all creditors, and (2) the company would be allowed by applicable state law to bring such a claim. *Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 136 (Bankr. D. Del. 2005). In this regard, the Debtors concede that the veil-piercing claims could be brought by the FDIC only if Washington state law allows a corporation to pierce its own veil and that no Washington state court has adopted this position. Obj. at 19 n.14. Although the Debtors blithely assert that Washington courts would look to Delaware law on this point, there is much to suggest otherwise. The Ninth Circuit, agreeing with the Eighth Circuit, has in fact taken the opposite position—that "no trustee, whether a reorganization trustee…or a liquidation trustee[,] has power under … the Code to assert general causes of action, such as [an] alter ego claim, on behalf of the bankrupt estate's creditors." *Williams*, 859 F.2d at 667 (quoting *In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1228 (8th Cir. 1987)). Moreover, Washington law regarding piercing the corporate veil/alter ego is closer to the law of Arkansas that the Eighth Circuit considered in *Ozark* than to Delaware law.[11] Thus, while Washington state courts may on occasion look to Delaware law for guidance on other issues, there is no reason to believe that they would follow it here.[12]

---

[11]     In *Ozark*, the Eighth Circuit explained that, in Arkansas, "the courts have held that '[a] corporate entity is to be disregarded only if the corporate structure is illegally or fraudulently abused to the detriment of a third person.'" 816 F.2d at 1225 (citing *Thomas v. Southside Contractors, Inc.*, 543 S.W.2d 917, 919 (Ark. 1976)). Similarly, Washington law permits a court to disregard the corporate form under an alter ego theory "to defeat fraud or injustice to third parties if one corporation so dominates and controls another as to make that other merely an adjunct to it." *Youkelsone v. Washington Mut.,Inc.*, 418 B.R. 107, 115 (Bankr. D. Del. 2009) (internal quotations omitted). The Eighth Circuit in *Ozark* explained that under Arkansas law, the "… the obligations and liabilities of an action to pierce the corporate veil in Arkansas do not run to the corporation, but to third parties, e.g., creditors of the corporation." 816 F.2d at 1225. As such, Arkansas law does not permit a corporation to pierce its own veil so that the alter ego claim was not property of the company's bankrupt estate and that the trustee did not have standing to bring the alter ego claim. *Id.* at 1225-26. Given the similarities between the Washington and Arkansas standards for establishing alter ego liability, it is likely that Washington would follow Arkansas in determining that a corporation cannot pierce its own corporate veil.

[12]     The Debtors' assertion that Washington state courts "routinely" look to Delaware law for guidance is, at best, overstated. *See, e.g., Sound Infiniti, Inc. ex rel. Pisheyar v. Snyder*, 186 P.3d 1107, 1115 (Wash. Ct. App. 2008) (absent a showing of fraud, a dissenting shareholder is limited to the appraisal remedy provided for in the Washington Business Corporation Act and is not entitled to bring separate claims for breach of fiduciary duty, as allowed for by Delaware law, in cases of fundamental corporate change); *Washington Equip. Mfg., Co. v. Concrete Placing Co.*, 931 P.2d 170, 172 (Wash. Ct. App. 1997) (holding that, unlike in Delaware, by registering to do business in Washington and appointing a registered agent, a foreign corporation does not consent to the general

22

The cases Debtors cite as to substantive consolidation are no more determinative on the issue of the Bank Bondholders' standing. None of the cases cited by Debtors involved a claim for substantive consolidation by a creditor whose injuries resulted from misconduct by the parent company. *See* cases cited in Obj. at 19. Moreover, the *Owens-Corning* case considered complete substantive consolidation in the context of a plan of reorganization; as discussed more fully below, that is a far cry from the relief that the Bank Bondholders seek in their Proofs of Claim, which is only that the assets of the Debtors—including those they are seeking to appropriate from WMB—be made available to satisfy the claims of the Bank Bondholders on their Senior Notes. In any event, standing was not at issue in *Owens-Corning*; indeed, the Third Circuit never questioned that creditors may seek substantive consolidation. *In re Owens-Corning*, 419 F.3d 195, 212 (3d Cir. 2005). Standing also was not at issue in the *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.*, 934 P.2d 715, 721 (Wash. Ct. App. 1997), *aff'd*, 959 P.2d 1052 (Wash. 1998), which is significant, since that case involved a claim by a creditor similar to that asserted by the Bank Bondholders. And *Duke Energy Trading & Mktg., L.L.C. v. Enron Corp. (In re Enron Corp.)*, No. 02-3609, 2003 Bankr. LEXIS 330 (Bankr. S.D.N.Y. Apr. 17, 2003), concerned veil piercing, not substantive consolidation, and turned, in any event, on the application of Delaware law permitting a corporation to pierce its own veil, which, as discussed above, is not the law in Washington. *See supra* at p. 22 & note 11.

The fact of the matter is that the FDIC has *not* asserted any of these Claims, all of which seek redress for the direct injury to the Bank Bondholders arising from their unpaid Senior

---

jurisdiction of the Washington courts); *McCormick v. Dunn & Black, P.S.*, 167 P.3d 610, 618-621 (Wash. Ct. App. 2007) (determining whether departing law firm member was entitled to buyout of shares of Washington corporation and his ethical obligations if he remained a shareholder in the corporation after his departure without reference to Delaware law); *Lang v. Hougan*, 150 P.3d 622, 626-27 (Wash. Ct. App. 2007) (deciding whether a Washington corporation's officer/director breached her fiduciary duties by soliciting customers as the corporation was dissolving without reference to Delaware law).

23

Notes. The Debtors' assertion that the FDIC nevertheless has exclusive standing to bring these claims for the Receivership Estate rings hollow.

In short, the Debtors cannot show that any of these Claims—none of which the FDIC has asserted—are anything but direct Claims that the Bank Bondholders have standing to assert on their own behalf.

**B.      That the FDIC May Have Also Asserted Some of the Other Claims Does Not Warrant Dismissal of the Bank Bondholders' Claims.**

The FDIC and the Bank Bondholders both have brought Claims arising out of or relating to (1) WMI's improper claim to purported deposits; (2) WMI's undercapitalization of, failure to support, and looting of WMB; (3) trust preferred securities, and tax refunds and losses, improperly claimed by WMI at the expense of the holders of the Senior Notes issued by WMB; (4) fraudulent transfer; (5) breaches of fiduciary duties; and (6) goodwill litigation awards. Bank Bondholders' POC ¶¶ 10, 11, 12, 14, 15, 16, and 17; FDIC POC ¶¶ B, C, E, F, G, H, K. Except with respect to the fraudulent transfer claims—as to which the Debtors have not challenged the Bank Bondholders' standing—the Debtors summarily state that "[b]ecause the FDIC currently is pursuing these claims, the Bondholders lack standing to assert them." Obj. at 15. But the fact that the FDIC is pursuing the same or similar claims does not necessarily preclude the Bank Bondholders from doing so as well—and it certainly does not mean that their Claims should be dismissed at the outset, before it is even clear that the FDIC will continue to pursue the Claims, before any discovery has occurred, and before any evidence has been presented so that the Court can assess which Claims are direct and which are derivative and, as to any that are derivative, whether under established Third Circuit law, the Bank Bondholders may nevertheless assert them.

24

Although the Debtors are not challenging the Bank Bondholders' standing to assert

Claims for fraudulent transfers, these Claims illustrate the fallacy of Debtors' *ipso facto*

argument that, because the FDIC has asserted the same or similar claims, the Bondholders

cannot. We, therefore, address those Claims briefly here, recognizing that the Debtors concede

that the Bank Bondholders have standing to assert these Claims, notwithstanding that the FDIC

has also asserted its own fraudulent transfer claims.

Here, the Bank Bondholders have asserted claims based on the Uniform Fraudulent

Transfer Act, as adopted by Washington Revised Code § 19.40.041, et seq., under which a

creditor may avoid and recover transfers made with the intent to "hinder, delay or defraud any

creditor or debtor" or made for less than reasonably equivalent value at a time when the debtor's

assets were insufficient in relation to its business or the debtor was unable to pay its debts as they

become due. It is the creditor—not the debtor owing the debt—that has the right to avoid the

transfer. *See* RCW § 19.40.041, § 19.50.051. Pursuant to this statute, the Bank Bondholders

have asserted claims to avoid transfers that WMI caused their account debtor, WMB, to make to

WMI. Based on the limited information they have obtained to date without the benefit of any

discovery, those avoidable transfers include: many billions of dollars in dividends upstreamed

from WMB to WMI in the few years prior to the receivership; billions of dollars of purported

deposit balances transferred, at the direction of WMI, just weeks or days before the receivership

from WMB to WMfsb; and some $922 million that WMI caused WMB to pay to WMI (in

supposed payment of a long-standing, but never previously-collected, debt) again shortly before

WMB was forced into receivership. POC ¶10. Had these transfers not been made, the funds

would have been available for payment on the Senior Notes. Recovery of these transfers will

substantially reduce the Bank Bondholders' losses.

25

The FDIC has also asserted a fraudulent transfer claim against Debtors, seeking to avoid and recover, among other transfers, some or all of the same dividends that are the subject of the Bank Bondholders' claims. FDIC POC ¶ G. Nevertheless, the Debtors themselves assert that "the FDIC does not have standing to assert the fraudulent transfer claim asserted by the Bondholders" Obj at 13 n.10, and therefore do not challenge the Bank Bondholders' standing to assert their fraudulent transfer claims. But whether or not the Debtors are correct that the FDIC lacks standing to assert these Claims, the Bank Bondholders clearly do have standing. Under applicable state law, fraudulent transfer claims belong to the creditor and not the entity or person owing the debt (in this case, WMB). Nothing in the FDI Act purports to change state law or otherwise prevent a creditor of a failed bank from bringing such a cause of action even after the bank is put into receivership. As previously noted, under the FDI Act, the FDIC succeeds to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution," but not to the rights of secured or general unsecured creditors. The FDI Act thus does not appear to have a provision comparable to Section 544 of the Bankruptcy Code that gives the FDIC, as receiver, the rights of a hypothetical judgment lien creditor and the ability to bring state law fraudulent transfer claims that, outside of bankruptcy, would belong exclusively to creditors. *See* 11 U.S.C. § 544.

This analysis demonstrates that simply because the FDIC has asserted a claim—even if it has the right to do so—does not automatically deprive the Bank Bondholders of standing to assert the same or a similar claim. And that conclusion is relevant as well for the rest of the Bank Bondholders' Claims as to which, unlike the fraudulent transfer claims, the Debtors do challenge the Bank Bondholders' standing. Whether and to what extent those Claims are

26

derivative, rather than direct, and whether, even if they are derivative, the FDIC's standing is exclusive, are matters that require careful analysis based on the circumstances and a complete record—a record that does not exist at this time when virtually no discovery in this or either of the Adversary Proceedings has occurred.

Indeed, the Debtors concede that even derivative claims may in certain circumstances be pursued by creditors or even shareholders (whose right to be paid is junior to that of creditors) of a failed bank in receivership. Obj. at 23. *See Landy v. FDIC*, 486 F.2d 139, 148 (3d Cir. 1973); *In re Sunrise Sec. Litig.*, 916 F.2d 874, 879 (3d Cir. 1990). Whether creditors may assert such claims depends on the specific facts at hand, including whether the FDIC can and will pursue the claims. Here, the Bank Bondholders were presented with a unique situation because the alleged wrongdoers—Debtors—are in bankruptcy and all parties—the FDIC and the Bank Bondholders—were required to assert any claims by the bar date in order to avoid waiving those claims. There is no guarantee that the FDIC will continue to pursue those claims in the event the Debtors file objections to the FDIC's Proof of Claim or that Debtors will not challenge its right to do so. Thus, even if the Court were to conclude that any of the Bank Bondholders' Claims are derivative, the Bank Bondholders may now—or in the future—be able to establish their standing to assert the claims. Any decision the Court would now make would be based on incomplete information and be premature. For this reason, any ruling on the Bank Bondholders' standing to bring these Claims should be deferred until, at a minimum, resolution of any objection to the FDIC's claims.

This is particularly so since, with the exception of the fraudulent transfer claims, the Debtors have not challenged the FDIC's standing on all the same Claims on which the Debtors dispute the Bank Bondholders' standing. Because the FDIC's standing to assert all the claims

other than the fraudulent transfer claims is unchallenged, there is no need for the Court to reach

the issue of the Bank Bondholders' standing at this time. *See, e.g., McConnell v. FEC*, 540 U.S.

93, 233 (2003) ("Because both the City of New York and the health care appellees have

standing, we need not consider whether the appellee unions also have standing to sue."); *Clinton*

*v. City of New York*, 524 U.S. 417, 431 n.19 (1998) ("It is clear, however, that the Federal

Election Commission (FEC) has standing, and therefore we need not address the standing of the

intervenor-defendants, whose position here is identical to the FEC's.") And because many of the

same issues are presented in the two Adversary Proceedings pending before this Court and by the

FDIC's Proof of Claim, there is no practical reason for the Court to do so. In the Adversary

Proceedings and in any contested matter relating to the FDIC's claim, the myriad factual issues

underlying the claims will be the subject of discovery and further litigation before this Court.

This is true regardless of any decision that this Court may make now with respect to the standing

of the Bank Bondholders to pursue their Claims. To the extent that there is such discovery and

litigation, the Bank Bondholders, as parties in interest, will have the right to participate in that

discovery and litigation, just as the Creditors Committee—made up mostly of WMI

Noteholders—has sought to participate, including by serving discovery, in connection with the

Debtors' Objection.[13] Thus, even if the Court could do so on the present, incomplete record (and

---

[13]     As creditors of the Debtors' estates—even the Debtors concede that the Bank Bondholders have standing to assert some of their Claims and that some of those Claims are legally sufficient—the Bank Bondholders are parties in interest. Pursuant to Section 1109 of the Bankruptcy Code, they "may raise and may appear and be heard on any issue in a case under [this] chapter." 11 U.S.C. § 1109. As the Second Circuit (following Third Circuit law) has explained:

> While the bankruptcy rules 'distinguish ... between different types of litigated matters [that arise during the pendency of a bankruptcy case] and divide them into contested matters and adversary proceedings,' the plain text of § 1109(b) does not distinguish between issues that occur in these different types of proceedings within a Chapter 11 case. We hold, therefore, that the phrase "any issue in a case" plainly grants a right to raise, appear and be heard on *any issue* regardless whether it arises in a contested matter or an adversary proceeding.

it cannot), resolving the Bank Bondholders' standing to assert each of its supposedly derivative claims would, as a practical matter, accomplish nothing.

In this regard, the Debtors' argument that allowing the Bank Bondholders to pursue what the Debtors assert are derivative claims will allow the Bank Bondholders to "jump ahead of other creditors in priority" and obtain a larger share of the Receivership Estate's assets, *see* Objection at 18, is rich. It is ironic, to say the least, that the Debtors, who have done everything they can to deplete the assets of the Receivership Estate, now express concern for that estate. But that feigned solicitude is directed to a strawman fabricated by the Debtors, not to any position actually taken by the Bank Bondholders. To the extent any of the Claims they are pursuing are in fact derivative, the Bank Bondholders are, of course, neither seeking nor expecting to jump ahead of other senior, unpaid creditors of the Receivership Estate or to obtain a double recovery; instead, the Bank Bondholders are simply trying to preserve any such Claims and to make sure that they are in fact pursued for the benefit of all WMB creditors, to be distributed in accordance with the applicable priorities under the FDI Act. And, even if a double recovery were possible, the Third Circuit recognized in *Hayes* that such a possibility is no reason to dismiss a claim at the outset of a proceeding, but rather is a matter that the Court can and should evaluate on a fully developed record at the appropriate time. *See* 982 F.2d at 109 ("[I]t may be that [Plaintiff] will attempt to recover compensation to which the corporation is justly entitled. If so, the district court will be required to evaluate the prospect of double recovery in the specific fact context presented by plaintiff's case on damages.").

---

*In re Caldor Corp.,* 303 F.3d 161, 169 (2d Cir. 2002); *see also In re Marin Motor Oil,* 689 F.2d 445, 451 (3d Cir. 1982). Here, this Court previously determined that the Bank Bondholders were creditors of the Debtors and could intervene as of right under 11 U.S.C. § 1109 and Rule 7024(a)(1) in the Adversary Proceedings. Order, Case Nos. 09-50934, 09-50551, Aug. 28, 2009 (Bankr. D. Del.); *see also In re Amatex Corp.,* 755 F.2d 1034, 1042 (3d Cir. 1985). The District Court in the D.C. Action likewise determined that the Bank Bondholders should be allowed to intervene in that case pursuant to Rule 24(a)(2)—intervention as of right—or Rule 24(b)—permissive intervention. *See* Order and Memorandum, Dkt. Nos. 70, 71, Case No. 09-533, Oct. 13, 2009 (D.D.C.), Manzer Decl. Ex. 11.

This Court certainly has the means—either through procedural orders (such as the consolidation of claims) or powers such as *remittitur*—to avoid any double recovery when it enters judgment. At this incipient stage in the proceedings, however, it would be premature to dismiss any Claims because Debtors have raised the mere specter of such a double recovery.

For all these reasons, the Debtors' objection to the Bank Bondholders' standing to assert some of the Bank Bondholders' Claims should be denied.

## II. The Bank Bondholders' Proofs of Claim State Plausible Claims and Meet the Applicable "Pleading" Standards.

The Debtors do not seriously challenge the legal sufficiency of any of the following Claims included in Bank Bondholders' Proofs of Claim: (1) Improper Claim by WMI to Purported Deposits; (2) Undercapitalization of, Failure to Support, and Looting of the Bank; (3) Conditional Exchange of REIT Trust Preferred Securities; (4) Tax Refunds and Losses; and (5) Claim for Goodwill Litigation Awards. POC ¶¶ 11, 12,14, 15, and 17. Other than the unsupported, boilerplate statement that the Court should "expunge the Claims because they fail to state plausible claims on which relief may be granted," Obj. at 24, the Objection does not make any argument about these particular Claims. Although (by subsequent email) Debtors' counsel has suggested that Debtors believe they have challenged the sufficiency of these Claims, Feb. 17 Rosen Emails, Manzer Decl., Ex. 14A and 14B, the Bank Bondholders cannot be expected to guess as to the particulars of, and be required to respond to, an argument that the Debtors have nowhere set forth. Accordingly, as the Bank Bondholders told the Debtors would be the case, *see* Email from Philip Anker, Feb. 17, 2010, Manzer Decl. Ex. 21, they do not

30

address here the Debtors' non-existent challenges.[14]  In addition, per the agreement between and

among the parties, the Debtors are not challenging the sufficiency of the Proofs of Claim with

respect to the Bank Bondholders' constructive fraudulent transfer claims, *see* Feb. 12 Rosen

Email, Manzer Decl. Ex. 1; thus, the Bank Bondholders do not address those Claims here either.

There are thus only five Claims that the Debtors challenge on the merits: (1) Corporate

Veil Piercing; (2) Substantive Consolidation; (3) Actual Fraudulent Transfer; (4)

Misrepresentations and Material Omissions; and (5) Mismanagement and Breach of Fiduciary

Duties (collectively "Challenged Claims").  POC ¶¶ 8, 9, 10, 13, and 16.  With respect to these

five Claims, the Debtors argue that this Court should apply the same pleading standards to the

Bank Bondholders' Proofs of Claim that this Court would apply to a complaint filed in an

adversary proceeding and that, under such pleading standards, the Bank Bondholders' Claims

should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  Indeed,

Debtors spend much of their Objection arguing why the Challenged Claims do not meet the

pleading standards for a complaint in federal court recently announced by the Supreme Court in

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

At the outset, while the Bank Bondholders' Claims do satisfy those pleading standards,

the Debtors' argument fails for a more basic reason:  The standards for pleading a complaint in

an adversary proceeding (or lawsuit in district court) simply do not apply to proofs of claim.

Until the Debtors filed their Objection, the only standards that governed the Bank Bondholders'

Proofs of Claim were those set forth in Bankruptcy Rules 3001 and 3002, and those standards

---

[14]  To the extent that the Debtors attempt—in their reply brief, at oral argument, or otherwise—to make arguments relating to the sufficiency of these Claims, the Bank Bondholders should be given an opportunity to respond.  In any event, as Debtors recognize, Obj. at 16, the FDIC is also pursuing similar claims in its Proof of Claim to which Debtors have not objected.  Thus, any efforts by Debtors at this stage to seek the disallowance of these Claims is doubly inappropriate; the Debtors have failed to give both the Bank Bondholders or the FDIC fair notice of their contentions and a meaningful opportunity to respond.

DOCS_DE:158100.1

were and are unquestionably satisfied. If now that Debtor has commenced a contested matter by filing the Objection, this Court decides to exercise its discretion to apply the stricter pleading requirements of Rule 7008 and 7009, and if it were of the view that the Proofs of Claim do not satisfy those standards (and, for the reasons noted below, they do), it should at the very least afford the Bank Bondholders a chance to amend their Claims or to submit a more definite statement to conform to those requirements before the Court gives any consideration to dismissal. That course would be consistent with both the rules and practice applicable to both proofs of claim and complaints in bankruptcy and district court. But it would also delay even more the resolution of the myriad factual disputes at issue in all the related matters; more time would be required for pleading and briefing thereon. The Proofs of Claim set forth the Bank Bondholders' Claim in considerable detail, and the Debtors know full well what those (and the FDIC's) Claims are. The better course, therefore, is simply for the Court to direct the parties to proceed expeditiously with discovery so that all the litigation can be resolved as soon as possible.

**A.     Federal Rule of Bankruptcy Procedure 3001 Applies, and Bank Bondholders'
Proofs of Claim Comply With That Rule.**

1.     As A Matter of Practice and of Law, Rule 3001 Governs Pleading Requirements for Proofs of Claim, and Proofs of Claim Are Not Held to the Same Pleading Standards As a Complaint Filed in an Adversary Proceeding.

"A proof of claim is not a complaint and is not supposed to be." *In re Today's Destiny, Inc.*, No. 05-90080, 2008 WL 5479109, *7 (Bankr. S.D. Tex. Nov. 26, 2008). Unlike adversary proceedings where the content and filing of a complaint are governed by rules that incorporate the appropriate Federal Rule of Civil Procedure, the form, content, and filing of a proof of claim are governed by Federal Rules of Bankruptcy Procedure 3001 and 3002. *See* Fed. R. Bankr. P. 3001 (titled "Proof of Claim") and 3002 (titled "Filing of Proof of Claim or Interest"). Under Rule 3001, "[a] proof of claim is a written statement setting forth a creditor's claim" that must

32