"conform substantially to the appropriate Official Form" and "be executed by the creditor or the creditor's authorized agent." *See* Fed. R. Bankr. P. 3001(a), (b). The "appropriate" Official Form is Official Form 10, which instructs with respect to the request for "Basis for Claim" that the claimant simply:

> State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

Official Form 10 (12/08), Instructions.

It is this Official Form 10—which "evidence[s] an intent for a single word or, at most, a single sentence description of the claim," *In re Today's Destiny, Inc.*, 2008 WL 5479109 at *7— and Rule 3001, not Rule 7008 or 7009, that govern the requirements for a proof of claim. And under Rule 3001, a claim is sufficient so long as it alleges facts sufficient to support a legal liability to the claimant and provides objecting parties with sufficient information to understand the nature of the claim. *In re Today's Destiny, Inc.*, 2008 WL 5479109 at *7; *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992) ("a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward."); *LTV Corp. v. Gulf States Steel, Inc.*, 969 F.2d 1050, 1058 (D.C. Cir. 1992) ("Proofs of claim are not intended to be elaborately detailed documents. As one bankruptcy court has explained, '[a] proof of claim for an unsecured creditor requires little more than a listing of name, address, amount of claim (or a listing as 'unliquidated' or 'contingent'), and a signature.'"); *In re Rimsat, Ltd.*, 223 B.R. 345, 348 (Bankr. N.D. Ind. 1998) (recognizing that "a proof of claim is not subject to the same rules of pleading that govern the pleadings filed in an adversary proceeding or other civil litigation," but "it would seem that Rule 3001(a)'s definition of a proof of claim as 'a written

33

statement setting forth a creditor's claim' contemplates that the creditor provide some kind of factual context for the origin of debtor's liability to it").

   2.   The Bank Bondholders' Challenged Claims Comply With Rule 3001, And Even If They Did Not, Dismissal of the Claims Would Be Inappropriate.

Here, the Bank Bondholders' Challenged Claims more than meet the standard set forth in Federal Rule of Bankruptcy Procedure 3001. Indeed, even though such an attachment is not a requirement of Rule 3001 or Official Form 10, the Bank Bondholders went well beyond this minimal pleading requirement for a proof of claim and attached 15 single-spaced pages outlining the legal bases for each Claim and the relevant facts known to the Bank Bondholders at this preliminary stage—a stage at which they have had no discovery to further support these Claims. From the detailed Proofs of Claim, the Debtors obviously have sufficient information to understand and evaluate the nature of the Challenged Claims. "Notice pleading," which is all Bankruptcy Rules 3001 and 3002 require, has been more than satisfied; as their detailed 71-page Objection makes clear, the Debtors know full well the Claims asserted by the Bank Bondholders against them. Accordingly, pursuant to Rule 3001(f), the Bank Bondholders' Claims are prima facie valid. *See* Rule 3001(f) (noting that if the proof of claim is executed and filed in accordance with Rule 3001, it shall "constitute 'prima facie evidence of the validity and amount of the claim'"); *Amatex Corp. v. Aetna Casualty & Surety Co. (In re Amatex Corp.), et al.*, 107 B.R. 856, 870 (E.D. Pa. 1989), *aff'd*, 908 F.2d 961 (3d Cir. 1990); *In re Wall to Wall Sound & Video, Inc.*, 151 B.R. 700, 701 (Bankr. E.D. Pa. 1993).[15]

---

[15]   In an effort to confuse the issues before this Court at this early stage in the proceedings, the Debtors argue in a footnote that the Bank Bondholders' claims are not prima facie valid because the Bank Bondholders did not attach to their Proofs of Claim "any documentation regarding the WMB Notes as required by Rule 3001(c)." Obj. at 24 n.17. As an initial, procedural matter, whether or not a proof of claim is prima facie valid goes to the question of whose burden it is in the first instance to present evidence with respect to the claim. *See In re Allegheny Int'l, Inc.*, 954 F.2d at 173-74. Here, where the Debtors are at this time challenging only the legal sufficiency of the Claims, which party will have the initial burden of proof is irrelevant. And if the Debtors are correct and the Bank Bondholders have the burden of proof, the Bank Bondholders are entitled to the opportunity to take discovery and rebut any evidence and assertions made by the Debtors. *Allegheny Int'l*, 954 F.2d at 174; *Wall to Wall Sound*, 151 B.R. at 701.

34

But, even if the Proofs of Claim did not satisfy Rule 3001, summary dismissal of the Challenged Claims would be inappropriate. The Debtors urge this Court to dismiss the Bank Bondholders' Proofs of Claim under "11 U.S.C. § 502(c)"[16] because, according to the Debtors, the Bank Bondholders' Proofs of Claim fail to comply with Federal Rules of Civil Procedure 7008 and 7009 and do not state plausible claims. Obj. at 24-25 ("Dismissal of a proof of claim under 11 U.S.C. § 502(c) is equivalent to dismissing a claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted."). But, under Section 502 of the Bankruptcy Code, a bankruptcy court cannot disallow a claim for failing to meet sufficient pleading standards under Rule 3001, much less the stricter standards outlined in Rules 7008 and 7009. Instead, in situations where a Proof of Claim fails to comply with Rule 3001, the claim is not automatically disallowed; rather, at any evidentiary hearing on the claim, it is deprived of the prima facie validity which it could otherwise have obtained. *In re Cluff*, 313 B.R. at 331 ("Bankruptcy Rule 3001 does not provide substantive grounds for disallowance; it merely determines which party will have the burden of proof."); *In re Kincaid*, 388 B.R. 610, 613 (Bankr. E.D. Pa. 2008); *In re Heath*, 331 B.R. 424, 427 (BAP 9th Cir. 2005) (noting that "where the proof of claim does not adhere to the requirements of Rule 3001 by providing the facts and

---

The Debtors' argument fares no better on the substance. As the Debtors' themselves acknowledge "[t]he FDIC has recognized the Bondholders' claims as 'legitimate' liabilities of the Receivership and notified the Bondholders that the FDIC would issue receivership certificates." Obj. at 2. Thus, there is no question that the Bank Bondholders have legitimate claims on their Senior Notes; the only issue is whether WMI, and not merely WMB, faces liability in connection with those instruments. And, on that issue, the Debtors misconstrue the requirements of Rule 3001(c), which, by its terms, applies only "when a claim . . . is based on a writing." Here, no attachments are necessary because the theories for holding WMI liable on the Challenged Claims—Piercing the Corporate Veil, Substantive Consolidation, Fraudulent Transfer, Misrepresentation and Material Omissions, and Mismanagement /Breach of Fiduciary Duty and the like—are not "based on a writing" as that term is understood under the Rules. *See In re Cluff*, 313 B.R. 323, 332 (Bankr. D. Utah 2004) ("Unsecured claims can arise as a result of, among other things, a debtor's obligations created by statute, by operation of tort law, or by contract law. . . . The issue is which of these potential reasons for claims are included in that group of claims that is "based on a writing," for if the unsecured claim is not based on a writing, no documentation is required to achieve prima facie status."), *aff'd* 2006 WL 2820005 (D. Utah Sept. 29, 2006). The Challenged Claims are not contract claims; they are claims created by statute or tort law, and thus no documentation is required to achieve prima facie validity. *Id.* at 332.

[16]     The Bank Bondholders assume that the Debtors meant to reference 11 U.S.C. § 502(b)—which outlines the situations when a bankruptcy court can disallow a proof of claim—and not 11 U.S.C. § 502(c)—which deals with the estimation of claims.

documents necessary to support the claim, it is not entitled to the presumption of prima facie validity") (internal quotation omitted); *see also supra* note 15.

This outcome flows directly from the plain language of the Bankruptcy Code. Section 502 specifies that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects" and that, "if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim . . . and *shall allow* such claim in such amount, except" in the circumstances specified in subsections (1)-(9). 11 U.S.C. § 502(b) (emphasis added). The Supreme Court has held that Section 502(b) means what it says—that a proof of claim must be allowed unless one of the bases for potential disallowance set forth in the subparts to that section applies. *Travelers Cas. and Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 452-53 (2007). Conspicuously absent from those subsections is any provision authorizing the disallowance of a proof of claim for failure to comply with Federal Rules of Bankruptcy Procedure 3001, let alone for failure to comply with Rule 7008 or 7009, applicable to adversary proceedings, not proofs of claim. *See* 11 U.S.C. § 502(b).

Accordingly, it would be inappropriate for courts to disallow proofs of claim for failing to comply with Rule 3001. *See In re Hartman*, No. 09-20910, 2009 WL 4043096, *3 (Bankr. D. N.J. Nov. 20, 2009) ("[B]ankruptcy courts are bound by the plain meaning of the Bankruptcy Code, there is no discretion to disallow a claim for any reason other than those stated in § 502."); *In re Heath*, 331 B.R. at 435 (noting that "[n]oncompliance with Rule 3001(c) is not one of the statutory grounds for disallowance" and declining to disallow creditor's claim on that ground); *Dove-Nation v. eCast Settlement Corp. (In re Dove-Nation)*, 318 B.R. 147, 150-51 (BAP 8th Cir. 2004) ("Section 502(b) sets forth the sole grounds for objecting to a claim and directs the court

to allow the claim unless one of the exceptions applies" and "[t]he rules are designed to supplement the statute, not replace it.") (citing 28 U.S.C. § 2075); *In re Cluff*, 313 B.R. at 331-340. Indeed, the Debtors do not cite a single case in which a bankruptcy court disallowed a proof of claim for failing to satisfy Rule 3001 (or Rules 7008 or 7009).[17]

Thus, even if the Debtors could credibly argue that the Proofs of Claim do not comply with Rule 3001—and, for the reasons discussed above, they cannot—there would be no basis in law for the Debtors' request that the Bank Bondholders' Challenged Claims be summarily dismissed because they supposedly do not satisfy the procedural standards for a proof of claim set forth in the Bankruptcy Rules.

**B.      Even If the Federal Rules of Civil Procedure Applied, Dismissal of the Claims Without any Discovery or an Evidentiary Hearing Would Be Inappropriate.**

As noted above, the Bank Bondholders' Proofs of Claim should be judged by the standards set forth in Rule 3001. That is the Rule that applied at the time the Bank Bondholders filed their Proofs of Claim. The Federal Rules of Civil Procedure governing pleadings are not implicated, if at all, until the debtor or another party in interest files an objection to a proof of claim; at that point, and only at that point, is a contested matter initiated. *See* Committee Notes Rule 3001; Committee Notes Rule 9014 (noting "the filing of an objection to a proof of claim . . . creates a dispute which is a contested matter."); *Stauder v. eCast Settlement Corp. (In re Stauder)*, 396 B.R. 609, 610 (M.D. Pa. 2008). Now that a contested matter has been initiated, this Court can decide to apply the Federal Rules of Civil Procedure, including the pleading

---

[17]      The Debtors merely cite two cases for the proposition that it can be appropriate to apply Rule 12(b)(6) to a proof of claim. *See* Obj. at 25 (citing *Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736 (S.D.N.Y. 2008), and *900 Capital Servs., Inc. v. Cloud (In re Cloud)*, No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000)). Those cases are readily distinguishable. In *Flake*, the parties agreed that "dismissing a proof of claim pursuant to 11 U.S.C. § 502(c) is equivalent to dismissing a claim under Fed.R.Civ.P. 12(b)(6)." *Flake*, 398 B.R. at 748. Here, the Bank Bondholders do not so agree, and the Debtors have acknowledged that if there is to be an estimation of the Bank Bondholders' Challenged Claims, the Debtors will need to file a request for such relief and the matter will need to be considered at a subsequent date. Feb. 17 Anker Email, Manzer Decl. Ex. 21. And in *Cloud*, the court found that the would-be creditor did not have a claim against the debtor, not that its proof of claim failed to comply with the standards of Rules 3001, 7008 or 7009. *Cloud*, 2000 WL 634637, at * 3.

37

standards set forth in Rule 8, as made applicable by Bankruptcy Rule 7008. *See* Rule 9014

(adopting Rules 7009, 7017, 7021, 7025, 7026, 7028-7037, 7041, 7042, 7052, 7053-7056, 7064,

7069, and 7071, unless the court "directs otherwise" and stating "[t]he court may at any stage in

a particular matter direct that one or more of the other rules in Part VII shall apply"). But even if

this Court decides to exercise its discretion and apply Rules 7008 to the Bank Bondholders'

Claims, as explained below, dismissal is inappropriate.

    1.    The Bank Bondholders' Proofs of Claim Satisfy the Pleading Requirements Set
Forth in the Federal Rules of Civil Procedure.

The Debtors urge the Bankruptcy Court to apply Bankruptcy Rule 7008 to the Bank

Bondholders' Challenged Claims, and argue that, under the pleading standard of that Rule, the

Challenged Claims fail and should be dismissed. On the contrary, even if Rule 7008 were

applicable, the Proofs of Claim more than satisfy the pleading standard set forth in Rule 7008

(and, with respect to matters of fraud to which it might be applicable, Rule 7009).

In their objection, Debtors make much of the Supreme Court's recent holdings in

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007),

and suggest that a new and strict regime applies under which Bank Bondholders' *Proofs of*

*Claim* must be judged. *See* Obj. at 24-25. But, even if *Iqbal* and *Twombly* apply to proofs of

claim in bankruptcy—and, for the reasons discussed above, they do not—the Debtors talk out of

both sides of their mouth. As the Debtors have acknowledged in the related D.C. Action (a

lawsuit unquestionably governed by the Federal Rules of Civil Procedure), the Supreme Court's

recent decisions "leave[s] the long-standing fundamentals of notice pleading intact." *See*

Plaintiffs' Consolidated Response to (I) The Partial Motion to Dismiss of Defendant Federal

Deposit Insurance Corporation, As Receiver for Washington Mutual Bank, and (II) The Motion

to Dismiss of Defendant Federal Deposit Insurance Corporation, Acting [In] Its Corporate

38

Capacity, Case No. 09-00533, July 16, 2009, at 43 (D. D.C.) ("Debtors' Opposition in D.C. Action") (quoting *Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008)), Manzer Decl. Ex. 22.

Under notice pleading, even a complaint only must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As the Supreme Court has stated, "the pleading standard Rule 8 announces does not require 'detailed factual allegations.'" *Iqbal*, 129 S.Ct. at 1949. Instead, to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff is required only to "state a claim to relief that is plausible on its face." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement'"; it requires merely "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotations omitted). Moreover, in making the plausibility determination, a court must assume that "all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555.

The Debtors agree: "Federal Rule of Civil Procedure 8(a)(2) requires Plaintiffs only to *allege* facts that plausibly suggest a right to relief," and the court is "required to accept as true [plaintiff's] factual allegation[s]." Debtors' Opposition in D.C. Action at 8 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) and *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)) (emphasis in original), Manzer Decl. Ex. 22. Indeed, according to the Debtors, all that is required to satisfy the pleading standard for even a complaint is "enough to give a defendant 'fair notice of the claims against him.'" *Id.* at 43 (quoting *Aktieselskabet AF 21. November 2001*, 525 F.3d at 15-16). Here, as described in more detail below, each of the Challenged Claims easily

meets the liberal standard articulated by the Supreme Court and the Debtors alike. The Claims stated are plausible, stating much more "than a sheer possibility that a defendant [in this case, WMI] acted unlawfully," *Iqbal*, 129 S.Ct. at 1949, and most certainly contain "enough" information to give the Debtors "'fair notice of the claims against [them].'" *See* Debtors' Opposition in D.C. Action at 43, Manzer Decl. Ex. 22.

2.  Dismissal Before The Bank Bondholders Have Had An Opportunity To Take Any Discovery at All Would Be Especially Inappropriate.

The Debtors' request for a summary dismissal of the Challenged Claims is all the more inappropriate given the Debtors' own positions with respect to the related litigation pending in this Court and in District Court in the District of Columbia. In the Adversary Proceedings and the D.C. Action, the Debtors have acknowledged that "there are many years of discovery and litigation ahead, not including the numerous years in the appellate courts that will surely follow. There are intricate legal theories and factual questions to be unwound and answered." Reply in Support of Motion to Disband Equity Committee, Dkt. No. 2223, at 2. As noted, the Debtors have opposed all motions to dismiss their affirmative claims, stating that their own pleadings— even though they are less, not more, detailed than the Bank Bondholders' Proofs of Claim[18]—are more than adequate and that they are entitled to discovery as well as a trial or other evidentiary hearing. Yet, as to the Bank Bondholders' Challenged Claims, the Debtors argue that the appropriate resolution is so straightforward that there is no need for any discovery or presentation of evidence at all.

In addition to the double-standard the Debtors seek to apply, their arguments for why the Bank Bondholders' Challenged Claims supposedly fail as a matter of law undermines their own

---

[18]    The Debtors' complaint in the DC Action, for example, is a mere 28-pages, double spaced. It asserts many claims in a paragraph or two, which do little more than parrot the substantive elements of the legal claim, if the Debtors even go that far. *See* WMI Compl., Manzer Decl. Ex. 9. For example, in their constructive fraudulent transfer claim—which seeks the recovery of some $6.5 billion—the Debtors merely assert that "WMI or WMB *may* have been insolvent at the time that the Capital Contributions were made." *Id.* at ¶ 26.

contentions. Although the Debtors purport to apply Rule 12(b)(6) to argue for dismissal of the Bank Bondholders' Challenged Claims on the face of the Proofs of Claim, they attempt to refute the factual allegations asserted by the Bank Bondholders with factual assertions of their own. *See, e.g.*, Objection at 33 (arguing that allegations in Proofs of Claim are contradicted by evidence and citing to affidavit of Doreen Logan); 36-37 (relying on alleged facts regarding OTS oversight); 37-38 (relying on affidavit of Doreen Logan to argue that veil piercing claims "are baseless"); 38-39 (relying on affidavit of Doreen Logan to refute allegations regarding improper payments); 44-45 (relying on unsubstantiated allegations regarding insolvency and reasonably equivalent value); 47-48 (relying on affidavit of Doreen Logan and other documents to refute allegations of fraudulent intent); 50-51 (relying on affidavit of Doreen Logan with respect to circumstances regarding transfer of $4 billion from WMB to WMBfsb).

To the extent this Court treats the Debtors' Objection (as the Debtors themselves request) as a motion to dismiss, it would be inappropriate for the Court to consider any such disputed evidence at this stage. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). On the contrary, if the Court were inclined to consider this evidence, then the proper course would be to convert the motion to one for summary judgment. And, before converting a motion to dismiss into a motion for summary judgment, the parties must receive adequate notice and be given an opportunity to develop through discovery and submit evidence. *See Rose v. Bartle*, 871 F.2d 331, 342 (3d Cir. 1989) ("We have held that it is reversible error for a district court to convert a motion under Rule 12(b)(6) ... into a motion for summary judgment unless the court provides notice of its intention to convert ... and allows an opportunity to submit materials admissible.").

Given the absence of any meaningful opportunity for discovery, summary judgment would be wholly unwarranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (nonmovant must have been given an "adequate time for discovery" before summary judgment can be granted); *Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007) (a court is "obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery"); *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery").

In short, having raised and relied on disputed allegations of fact, the Debtors can hardly argue that the Bank Bondholders are not entitled to any discovery and to present any evidence of their own. The Debtors' fact-intensive arguments cut the legs out from under their own legal position.

Indeed, as the Debtors correctly note, the filing of an Objection creates a contested matter. Obj. at 25. Accordingly, unless the Court directs otherwise, the Federal Rules of Bankruptcy Procedure governing discovery in adversary proceedings apply. *See* Fed. R. Bankr. P. 9014; *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (noting that "the discovery rules apply both in adversary proceedings and contested matters"). Thus, the Federal Rules contemplate that, in a contested matter, the parties will be afforded a fair opportunity for discovery. Here, the Bank Bondholders sought discovery in the Adversary Proceedings, but the Debtors refused to produce a single document until a scheduling order was finalized, something that still has not happened. In addition, within approximately two weeks of receiving the Debtors' Objection to their Proof of Claim, the Bank Bondholders served document requests, interrogatories, and notices of depositions in this contested matter. The Bank Bondholders have

42

not yet received responses to that discovery. Just as the Debtors assert that they are entitled to discovery and an evidentiary hearing in the Adversary Proceedings and the D.C. Action on the Debtors' affirmative claims, so too the Bank Bondholders are entitled to discovery and a fair opportunity to present their case on their Challenged Claims. Summary dismissal of those Claims would be inappropriate.

3.    Dismissal Without Giving Bank Bondholders An Opportunity to Amend Their Proofs of Claim Would Also Be Inappropriate.

One last point warrants brief mention before the Bank Bondholders briefly address each of the Challenged Claims: Even if the Court were to determine that the pleading standards for complaints under the Federal Rules of Civil Procedure applied, and even if it were also to conclude that the Proofs of Claim did not meet those standards, the Debtors would not be entitled to the summary disallowance of the Challenged Claims that they seek. In adversary proceedings and lawsuits in district court, it is virtually unheard of for a plaintiff's initial complaint to be dismissed *with prejudice*, at least where, as here, the principal argument for dismissal is that the complaint fails adequately to plead sufficient facts to make a claim plausible. Instead, the norm is for the plaintiff to be given leave to replead. *See, e.g., Borelli v. City of Reading*, 532 F.2d 950, 951 n.1 (3d Cir. 1976) (in granting a motion to dismiss for failure to state a claim, courts should give plaintiffs the option to amend); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) ("When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile.").

The same principle applies with even greater force when considering a proof of claim in a bankruptcy proceeding as to which Rule 12(b)(6) does not even apply. *See In re Rimsat, Ltd.*, 223 B.R. at 347 n.3 (recognizing that a proof of claim is not a pleading as described in

43

Bankruptcy Rule 7007, but finding that it is within the bankruptcy court's discretion to grant

Trustee's motion for more definite statement under 12(e) and allowing creditor to amend proof

of claim). Thus, even if the Court were to determine that the Bank Bondholders' Proofs of

Claim did not satisfy whatever pleading standards it considered applicable, basic fairness dictates

that the Bank Bondholders should, at a minimum, be given an opportunity to conform the Proofs

of Claim to those pleadings requirements. That approach is consistent with both the rules and

typical practice with respect to proofs of claim and the Bank Bondholders' expectations at the

time that they filed their Claims. *See* Instruction Form 10 (noting, for a proof of claim, that the

creditor "may be required to provide additional disclosure if the trustee or another party in

interest files an objection to [the creditor's] claim").

## C. The Challenged Claims Are More Than Adequately Set Forth in the Proofs of Claim.

The Debtors urge the Bankruptcy Court to apply Bankruptcy Rules 7008, 7009, and 7012

to the Challenged Claims, arguing that application of these rules requires those Claims'

dismissal. But, even if those rules were applicable, and even without the benefit of discovery or

an opportunity to amend, the Bank Bondholders' Proofs of Claim amply satisfy the pleading

standards set forth in Rules 7008 and 7009. Accordingly, Rule 7012 provides no basis for

dismissal.

1.   Piercing the Corporate Veil, Corporate Disregard and Alter Ego

In their Proofs of Claim, the Bank Bondholders assert that the Debtors are liable for

repayment of all amounts due on the Senior Notes issued by WMB under principles of corporate

veil piercing, corporate disregard, and alter ego. POC ¶ 8. The Debtors counter that these

Claims should be dismissed because they fail to state a plausible claim for relief and are

undermined by compelling evidence. Obj. at 26-39. Neither argument is persuasive.

44

As for the plausibility of the Claims, "[i]t is a well-recognized principle of law that a corporation may not be used as a cloak or disguise to escape corporate liability," and courts may disregard the distinction between a parent corporation and its subsidiary when necessary "to do justice in particular cases." *Kueckelhan v. Fed. Old Line Ins. Co.*, 69 Wash.2d 392, 411 (1966). Indeed, courts can and do ignore separate corporate entities "in order to defeat a fraud, wrong, or injustice" when the rights of third persons are concerned. 18 C.J.S. Corporations § 7e; *see, e.g., Platt v. Bradner Co.*, 131 Wash. 573 (1924); *J.I. Case Credit Corp. v. Stark*, 64 Wash. 2d 470 (1964); *Associated Oil Co. v. Seiberling Rubber Co.*, 172 Wash. 204 (1933); *Morgan Bros. v. Haskell Corp.*, 24 Wash. App. 773 (1979); *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748 (1968).

Under Washington law, courts may pierce the corporate veil and hold a parent corporation liable for the actions of its subsidiary under either the doctrine of corporate disregard or the theory of alter ego. *Youkelsone*, 418 B.R. at 114. The doctrine of corporate disregard allows a court to disregard the corporate form if "(1) the corporate form was intentionally abused through fraud or manipulation to violate or evade a duty owed to another and (2) the corporation's intentional misconduct caused harm to the party seeking relief such that disregard of corporate separateness is necessary." *Id.* The first element requires (at trial) proof of abuse of the corporate form, such as fraud, misrepresentation, or manipulation of the corporation to the stockholder's benefit and the creditor's detriment. *One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs.*, 30 P.3d 504, 514 (Wash. Ct. App. 2001). The second element requires a finding that disregard is necessary to prevent actual harm to the party seeking relief. *Id.* The theory of alter ego applies if "one corporation so dominates and controls another as to make that

other merely an adjunct to it." *Youkelsone*, 418 B.R. at 115. Here, the Bank Bondholders have sufficiently pled piercing the corporate veil under both theories.

With respect to corporate disregard, the Bank Bondholders allege the "exceptional circumstances" that even the Debtors admit can cause courts to disregard the corporate form. *See* Obj. at 27 (citing *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.*, 934 P.2d 715 (Wash. Ct. App. 1997)). Specifically, Bank Bondholders allege:

> WMI undercapitalized the Bank and siphoned billions of dollars from the Bank, while making repeated misstatements regarding the financial health of the Bank, thereby defrauding the creditors of the Bank, including the Bank Bondholders. WMI was the contract party for the Bank in many third-party contractual arrangements, and WMI operated a consolidated cash management system with the Bank, largely obliterating any distinction of financial activity, asset ownership, and liability responsibility. WMI's control over the Bank was so complete as to warrant piercing the corporate veil and allowing the Bank Bondholder Claims to run directly against WMI.

POC ¶ 8.

The misstatements and misrepresentations regarding the financial health of the Bank referenced in these allegations are set out in detail in other parts of the Proofs of Claim. Even before they have obtained any discovery, the Bank Bondholders provide at least 12 different examples of such statements. POC ¶ 13; *see infra* at 67-69. In addition, the Bank Bondholders note WMI's stated commitment to act as a source of strength for WMB, its failure to do so, and WMI's egregious looting of WMB:

- WMI publicly represented that "we always manage ourselves at the holding company to the same kind of standards as if we were a [Federal Reserve] regulated bank holding company." (Statement by Kerry Killinger, CEO, Q3 2006 Washington Mutual Earnings Conference Call, Oct. 18, 2006).

- WMI also publicly disclosed certain capital ratios that would have otherwise remained non-public, explaining that: "The Parent [WMI] is not required by the OTS to report its capital ratios, and as the Parent is not a bank holding company it is not required by the Federal Reserve Board to report its capital ratios. Nevertheless, capital ratios are integral to the Company's capital management process and the provision of such metrics facilitate peer comparisons with Federal Reserve Board-

46

regulated bank holding companies." (Washington Mutual Inc., Annual Report (Form 10-K), at 72 (Feb. 29, 2008)).

- [WMI] inadequately capitalized WMB and looted the Bank. . . . [I]t stripped billions of dollars in purported deposits—which should have been, and properly are viewed as, capital contributions—from the Bank in the year prior to the commencement of the receivership.

- Between the first quarter of 2006 and September 25, 2008, the date the Bank was forced into receivership, more than $6 billion—net of any transfers during that period from WMI to the Bank—was transferred from the Bank to WMI, largely in the form of purported dividends. Indeed, between the first quarter of 2006 and the first half of 2007, the Bank raised approximately $9.5 billion worth of capital through senior and subordinated debt offerings, including through the issuance of the Senior Notes held by the Bank Bondholders; WMI caused the Bank to transfer most of these proceeds to WMI as purported dividends.

- As of the fourth quarter of 2007, WMI reported having $4.9 billion worth of deposits, the vast majority of which was at the Bank. . . . Yet, by the time of the receivership, WMI reported that it held only $0.7 billion at the Bank, while it held approximately $3.7 billion at WMBfsb. . . . . Thus, in the year prior to the commencement of the Bank receivership, WMI caused approximately $4 billion to be withdrawn from the Bank and transferred to WMI (which then apparently re-deposited the funds at WMBfsb).

POC ¶¶ 10, 12.[19]

And there is more. Within weeks, if not days, before WMB was seized and put into liquidation, WMI caused some $922 million to be transferred from WMB to WMI. Specifically, WMI caused $600 million to be transferred from WMB for the benefit of WMI on August 19, 2008, and then another $322 million to be transferred from WMB for the benefit of WMI on September 19, 2008. *See* Declaration of C. Jack Read, dated July 22, 2009, ¶ 13 (filed as part of Appendix in Support of Defendant JPMorgan Chase Bank, National Association's Opposition to

---

[19] The Debtors argue that the "source of strength" doctrine, set forth by the Board of Governors of the Federal Reserve System, never applied to WMI because it was not, technically, a "bank holding company" and that the doctrine does not have the effect of law in any event. Obj. at 55, 56 n.40. The Debtors miss the point. Whether or not WMI would have been required to act as a "source of strength" for WMB had it not publicly represented that it would do so, the fact is that it so represented; in the words of its Chairman, it represented that "we always manage ourselves at the holding company to the same kind of standards as if we were a [Federal Reserve] regulated bank holding company." *See* POC ¶ 12. Having made that representation, WMI cannot simply disavow it now that it is no longer seeking to raise capital and instead is seeking to avoid liability for its own statements.

Plaintiffs' Motion for Summary Judgment), Manzer Decl. Ex. 23. The Debtors claim that those transfers were made in satisfaction of legitimate debts owed by WMB to WMI. Reply Brief in Support of the Motion of Plaintiffs for Summary Judgment, Dkt. No. 163, Case No. 09-50934, Sept. 18, 2009 (Bankr. D. Del.) ("Summary Judgment Reply"), at 23-24. But the Debtors' say-so does not make that assertion true and certainly cannot justify dismissal, before any discovery into the matter, of the Challenged Claims. The timing of the payment of this alleged debt—made shortly before WMB was forced into receivership, even though the debt had supposedly existed for many years—is suspicious enough, as is the fact that WMB evidently did not make the payment "voluntarily," but rather was forced, involuntarily, to make the payment by its parent, WMI, which controlled WMB. The Bank Bondholders are not aware of any promissory note or other documentation evidencing the supposed debt, let alone documentation establishing that the debt arose from a true arms' length transaction that gave value to WMB, that the limitations period for WMI to seek to collect any such debt had not expired, or that WMI was otherwise entitled to collect on the supposed debt. *See* Supplemental Opposition of Defendant JP Morgan Chase Bank, National Association to Plaintiffs' Motion for Summary Judgment, at 5-6. All of these issues require discovery.

The Bank Bondholders allege that all of these forced transfers from WMB to WMI, totaling many billions of dollars, were orchestrated by WMI with the "actual intent to hinder, delay or defraud" WMB and its creditors, POC ¶ 10, at a time when WMB was insolvent or rendered insolvent. POC ¶ 12. WMI took WMB's cash, in massive amounts, displaying a disregard for corporate form, and harming the Bank Bondholders.

The Bank Bondholders also allege that through its complete domination of WMB's finances and business practices, WMI was the alter ego of WMB. POC ¶ 8. The Proofs of

Claim offer a non-exhaustive list of examples—obtained without the benefit of discovery—of

WMI's domination of, and acting as, WMB:

- "WMI undercapitalized [WMB] and siphoned billions of dollars from [WMB], while making repeated misstatements regarding the financial health of WMB";

- "WMI was the contract party for [WMB] in many third-party contractual arrangements";

- "WMI operated a consolidated cash management system with [WMB], largely obliterating any distinction of financial activity, asset ownership, and liability responsibility";

- "WMI purports to have deposit accounts with [WMB], yet published reports indicate that neither JPM nor WMI can locate any documentation establishing most of those accounts";

- "There is confusion as to which entity did business with which vendor; although the vast majority of services provided by trade creditors were allegedly being provided to the Bank, generally trade creditors had contracts with WMI";

- "payments were apparently made by WMI, [WMB], or WMBfsb on behalf of another entity";

- "according to WMI itself, its liability to its unsecured, nonpriority creditors are 'largely derived' from the information provided by representations of [WMB] and JPM";

- "[WMB] and WMI filed consolidated tax returns" and have a self-described "complicated" tax relationship;

- "WMI and [WMB] were run together on the same information and accounting systems";

- Representatives from WMI have indicated that there was "great difficulty" in "separating out the organizations";

- "WMI and [WMB] had identical and overlapping directors and held joint meetings of Board of Directors of both entities on a combined basis, resulting in effect in a single BOD with identical directors that met on the same optics at the same time and made decisions for both entities collectively"; and

- "Prior to commencement of [WMB's] receivership, [WMB] managed all payroll including payroll for WMI's employees."

POC ¶ 8.

The Debtors cherry pick a few of the examples listed by Bank Bondholders and argue that each such example, in and of itself, is insufficient to warrant piercing the corporate veil.[20] Obj. at 30-31. But the Bank Bondholders do not argue that any one factor is enough. Rather, it is the confluence of so many factors—including the intentional misrepresentations regarding the financial health of WMB and WMI's commitment to supporting it—that demonstrates WMI's domination of WMB, its ability to use that domination and control to abuse the corporate form and enrich itself at the expense of Bank Bondholders, and the equity of piercing the corporate veil for the purpose of allowing the Bank Bondholders to assert their Claims for their losses on the Senior Notes directly against WMI.

Given these substantial allegations, the Debtors' reliance on this Court's decision in *Youkelsone* is misplaced. In *Youkelsone*, a mortgagor brought an adversary proceeding against WMI for misconduct allegedly engaged in by WMB. 418 B.R. at 112-113 (noting that the asserted wrongdoing is "solely on the part of WMB").[21] The mortgagor sought to hold WMI liable for the wrongdoing of WMB based on theories of corporate disregard and alter ego. As for the assertion of corporate disregard, this Court acknowledged that "[w]hen the corporate form has been used to defraud third parties, the corporate form may be disregarded to avoid injustice," but disallowed the mortgagor's claim because it was little more than a "mere assertion of fraud

---

[20]    For example, the Debtors contend that undercapitalization is not enough to pierce the corporate veil. In support, the Debtors cite to a case in which the plaintiff conceded no fraud had taken place. *Norhawk Invs., Inc., v. Subway Sandwich Shops, Inc.*, 811 P.2d 221, 223 (Wash. Ct. App. 1991).  Unlike the plaintiffs in *Norhawk*, the Bank Bondholders allege that the undercapitalization was part of a broader fraudulent effort by WMI to loot WMB and enrich itself at the expense of WMB.  POC ¶¶ 8, 10, 12,  13.

[21]    This Court recently granted the Debtors' Nineteenth Omnibus Objection with respect to a few of the claims listed in that Objection. The Court noted: "[Q]uite frankly, there's just not enough evidence to show that there would be fraud or any other activity that would justify piercing the corporate veils on this record." *See* Tr., Case No. 08-12229, Feb. 5, 2010 (Bankr. D. Del.), at 50:15-18, Manzer Decl. Ex. 24.  Here, of course, Debtors are challenging Bank Bondholders' Claims based on the sufficiency of pleading—not based on the sufficiency of the evidence.  At this stage, Bank Bondholders have certainly alleged facts that would be sufficient, if proven, to show "fraud" or "other activity" that would justify piercing the corporate veil.

on the part of the subsidiary"—*i.e.,* WMB. *Id.* at 114-115. As for theories of alter ego, this Court likewise noted that "a court may disregard the corporate form to defeat fraud or injustice to third parties 'if one corporation so dominates and controls another as to make that other merely an adjunct to it," *Id.* at 115, but disallowed the mortgagor's claim because it "merely asserted" that "WMI was the parent corporation of WMB, overseeing, managing, controlling and supervising all operations," *Id.* at 114.

The Bank Bondholders' allegations are qualitatively different. The facts alleged in the Bank Bondholders' Proofs of Claim evidence a complete disregard of the corporate form and a massive blurring of the corporate structure by WMI in an effort to benefit itself at the expense of Bank Bondholders. As laid out in more detail above and in the Proofs of Claim, WMI made numerous misrepresentations to potential purchasers of the Senior Notes regarding the supposed solid financial health of WMB and WMI's willingness to act as a source of strength for WMB. *See supra* pp. 46-47; POC ¶¶ 10, 12, 13. But, instead, WMI siphoned many billions of dollars from WMB to WMI, much of which it accomplished right before WMB was forced into receivership.

The Debtors make much of the fact that the offering materials for the WMB Senior Notes specified that those bonds would be an obligation of WMB, not WMI. Obj. at 12, 33. But that tells only half the story. The Senior Notes were sold on the premise that they would be an obligation of WMB—the operating company—*and that, therefore, they would be structurally senior to any and all notes and other liabilities of WMI*—the holding company. The Debtors could not have been more clear on the point. In their offering materials for each issue of WMI notes, they represented that the WMI *"debt securities will be effectively subordinated to all liabilities, including deposits, of our subsidiaries."* *See, e.g.,* September 21, 2005 Prospectus

51

Supplement to Prospectus dated November 6, 2003, at 8, Manzer Decl. Ex. 25; August 21, 2006 Prospectus Supplement to Prospectus dated January 9, 2006, at 6, Manzer Decl. Ex. 26; October 25, 2007 Prospectus Supplement to Prospectus dated January 9, 2006, at S-1, S-7, Manzer Decl. Ex. 27 (emphasis added). Thus, the holders of WMB Senior Notes were led to believe, by WMI, that they would be paid *ahead* of any WMI noteholders precisely because their notes were issued by WMB, the operating company that was supposed to have all the assets, not by WMI, which was supposed to be a pure holding company owning little more than its equity interest in WMB. They were not told that WMI would take billions upon billions of dollars from WMB, leaving it insolvent. It is those actions by WMI that the Bank Bondholders allege and will undertake, at an evidentiary hearing, to demonstrate piercing of the corporate veil to the extent necessary to hold WMI liable on the WMB Senior Notes.

Indeed, even now, WMI seeks to use WMB as its own personal piggy bank. As the Bank Bondholders note in their Proofs of Claim, WMI has asserted that it is entitled to billions of dollars of tax refunds owed to WMB. POC ¶ 14. These tax refunds resulted from enormous losses experienced by WMB due "in large measure because of WMI's looting from, mismanagement of, and failure adequately to capitalize and act as a source of strength for" WMB. POC ¶ 15. The taxes to be refunded were paid by WMB, not by WMI. In light of these circumstances, WMI does not dispute that, under applicable law, it would normally be WMB, not WMI, that would be entitled to the refunds. Summary Judgment Reply, at 27-31. But WMI argues that a "tax sharing agreement" executed by WMI and WMB before WMB was forced into receivership changes all that—that, effectively, WMB signed away to WMI its property right in the tax refunds, despite a governmental, inter-agency policy statement that prohibits any tax sharing agreement between a holding company and its bank subsidiary that disadvantages the

52

subsidiary. *Id.*; Tax Sharing Agreement, August 31, 1999, at 3 (Ex. A to Declaration of C. Jack

Read) ("Tax Sharing Agreement"), Manzer Decl. Ex. 28; Interagency Policy Statement on

Income Tax Allocation in a Holding Company Structure, 63 Fed. Reg. 64757, 64758 (Nov. 23,

1998), Manzer Decl. Ex. 29. That agreement, upon which WMI bases its entire argument to

billions of dollars in potential refunds, was approved and signed by Kerry Killinger. At the time,

Mr. Killinger was acting as Chairman of the Board of WMI and as President, Chairman and

Chief Executive Officer of WMB. Tax Sharing Agreement, at 3, Manzer Decl. Ex. 28;

Washington Mutual Bank 10-K for the Fiscal Year Ended Dec. 31, 1999, Manzer Decl. Ex. 33.

If WMI's reading of the tax sharing agreement is correct (and the Bank Bondholders dispute that

reading), this is thus just further evidence of the complete blurring of corporate lines by WMI, of

its total control and domination of WMB, and of its management's repeated actions to advantage

WMI and disadvantage WMB.

Here, where the Proofs of Claim contain specific allegations of abuse of the corporate

form that involved "fraud, misrepresentation, or some form of manipulation of the corporation to

the stockholder's benefit and the creditor's detriment," *Truckweld Equip. Co. v. Olson*, 26 Wash.

App. 638, 645 (Wash. Ct. App. 1980), as well as allegations that WMI's intentional

misrepresentations and siphoning of money from WMB to WMI harmed the Bank Bondholders

who are no longer able to recover anywhere near the full amount of their Senior Notes from

WMB, *Meisel v. M & N Modern Hydraulic Press Co.*, 97 Wash. 2d 403, 410 (1982), the Bank

Bondholders have stated a claim for piercing the corporate veil.

Finally, the Debtors devote a significant portion of their Objection to arguing that

"compelling evidence" undermines the Bank Bondholders' Claim for piercing the corporate veil.

Obj. at 36-39. But the presentation of this "evidence"—when the Bank Bondholders have had

no opportunity to depose the witnesses, review the documents, obtain any other discovery or present any evidence of their own—is not consistent with the Court's treatment of the Debtor's Objection as a Rule 12(b)(6) motion to dismiss for failure to state a claim, which is the standard the Debtors purport to apply. Indeed, it is noteworthy that most of the cases cited by the Debtors in support of their argument that the Bank Bondholders have failed to state a claim are not motion to dismiss cases at all, but rather cases decided at summary judgment, after fact and expert discovery has taken place and a meaningful opportunity has been afforded both sides to present evidence.[22] The Bank Bondholders are entitled to take discovery and to present evidence, so that they can prove their allegations. The Debtors' effort to present their side of the story, while denying any real opportunity to the Bank Bondholders to test the Debtors' factual allegations and to present their side, is not only contrary to the standard for a motion to dismiss, but inconsistent with the most basic notions of due process.

2.    Substantive Consolidation

In their Proofs of Claim, the Bank Bondholders ask this Court to exercise its equitable powers to effect a *partial* substantive consolidation of WMI and WMB. Specifically, the Bank Bondholders argue that "WMI's domination of WMB and its intertwining of WMB's assets and liabilities with its own appear so substantial as to warrant substantive consolidation, *at least to the extent that the assets of the Debtor and its estate should be made available to satisfy the claims of the [WMB's] creditors, including Bank Bondholders.*" POC ¶ 9 (emphasis added). The Debtors make two arguments in response: (1) substantive consolidation is inappropriate as a matter of law because WMB is in receivership; and (2) in any event, the Proofs of Claim fail to

---

[22]    *See, e.g., McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101, 2009 WL 3150430, *8-9 (E.D.N.Y. Sept. 29. 2009); *In re Wade Cook Fin. Corp.*, 375 B.R. 580, 598-600 (B.A.P. 9th Cir. 2007); *Minton v. Ralston Purina Co.*, 47 P.3d 556, 563 (Wash. 2002); *Alberto v. Diversified Group*, 55 F.3d 201, 207 (5th Cir. 1995); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459 (2d Cir. 1995); *McVeigh v. UnumProvident Corp.*, 300 F. Supp. 2d 731, 741 (W.D. Wis. 2002); *One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs., Inc.*, 30 P.3d 504, 514 (Wash. Ct. App. 2001).

allege a plausible claim for relief under *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005). Both arguments fail.

The first argument is based on the Debtors' self-created straw man. The Debtors act as if what Bank Bondholders seek is an order effecting a complete substantive consolidation of WMI and WMB, such that all liabilities and all assets of the Debtors and WMB would be combined and the two estates melded into one. Based on this caricature of the Bank Bondholders' Claim, they argue that "[i]f this Court were to order substantive consolidation, it would impermissibly interfere with both the authority that Congress has granted the FDIC as WMB's receiver and Congress' determination to exclude entities such as WMB from certain aspects of the Bankruptcy Code." Obj. at 41. The Debtors' supposed concern for the WMB Receivership Estate and for the jurisdictional limits imposed by Congress on this Court's ability to take actions affecting a bank receivership, is rife with irony; it has been the Debtors that have argued that the jurisdictional bars imposed under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 512 ("FIRREA"), do not preclude this Court from adjudicating its claims to assets belonging to WMB, and it has been the Debtors that have sought and obtained a stay of the DC Action so that the matters in dispute between (among other parties) the Debtors and the FDIC as receiver of the Receivership Estate can be adjudicated in this Court.[23] But, in any event, the Bank Bondholders are simply not seeking the relief the Debtors posit. As the Proofs of Claim make clear, they are merely citing the doctrine of substantive consolidation—along with corporate veil piercing, alter ego and the like—as another

---

[23]     The Debtors cite a single case—*In re Commodity Futures Trading Comm'n v. Eustace*, No. 05-civ-2973, 2008 WL 471574 (E.D. Pa. Feb. 19, 2008)—for their blunderbuss argument that no form of substantive consolidation at all is available as a matter of law because WMB is in receivership. Obj. at 40. That case does not stand for the proposition that the Debtors say it does. In that case, which did not involve a debtor in bankruptcy, the district court determined that it was not exercising bankruptcy powers. Accordingly, substantive consolidation "[was] not at issue in the case." *Id.* at *6.

ground for allowing the holders of the Senior Notes to look, not merely to WMB, but also to WMI, for payment, now that the Debtors have undertaken their efforts to take and control WMB's assets.

Such a *limited, partial* substantive consolidation would not interfere at all with the Receivership Estate—this Court would not be asked to administer any of the assets or liabilities of the Receivership Estate. On the contrary, such narrow, targeted relief—affecting only the assets and liabilities of the Debtors' bankruptcy estates—would indisputably come within this Court's jurisdictional grant, 28 U.S.C. § 1334, and be an appropriate exercise of this Court's broad equitable powers, *see* 11 U.S.C. § 105(a) (granting the bankruptcy court the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title").

As the Third Circuit has observed, substantive consolidation is an equitable remedy used to reach an equitable result. *In re Owens Corning*, 419 F.3d at 197. In applying substantive consolidation, this Court has the equitable power to fashion a remedy "to fit, as closely as possible, the problem being corrected." *In re Parkway Calabasas Ltd.*, 89 B.R. 832, 837 (Bankr. C.D. Cal. 1988) ("The bankruptcy court has the power, in appropriate circumstances, to order less than complete substantive consolidation, or to place conditions on the substantive consolidation."), *aff'd*, 949 F.2d 1058 (9th Cir. 1991); *Chemical Bank New York Trust Company v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966) (noting "equity is not helpless to reach a rough approximation of justice to some rather than deny any to all"). To this end, when appropriate to reach an equitable result, bankruptcy courts have ordered partial consolidation, *see In re Parkway Calabasas*, 89 B.R. at 837; *In re Steury*, 94 B.R. 553, 556 (Bankr. N.D. Ind. 1988); *In re Continental Vending Mach. Corp.*, 517 F.2d 997, 999 (2d Cir. 1975), and have substantively

consolidated (either completely or partially) debtors and non-debtors, *see, e.g., Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941); *Soviero v. Franklin Nat'l Bank*, 328 F.2d 446 (2d Cir. 1964); *In re 1438 Meridian Place, N.W., Inc.*, 15 B.R. 89 (Bankr. D.D.C. 1981); *In re Crabtree*, 39 B.R. 718 (Bankr. E.D. Tenn. 1984).

Here, the Bank Bondholders are asking this Court to do just that: to exercise its unquestionable equitable powers and order partial substantive consolidation of WMI—a debtor—and WMB—a non-debtor—to the limited extent necessary to permit the holders of the Senior Notes to look to WMI (along with WMB) for payment. The equitable remedy that Bank Bondholders seek can be as simple as this Court allowing Bank Bondholders' claim against WMI for the face value of the Senior Notes.

The Debtors next argue that even if substantive consolidation is available, the Bank Bondholders have failed to allege facts sufficient to state a plausible claim. Again, the Debtors' argument misperceives—or intentionally mischaracterizes—the relief the Bank Bondholders seek. The Debtors contend that the Bank Bondholders cannot meet the standard for *complete* substantive consolidation outlined by the Third Circuit in *In re Owens Corning*, 419 F.3d at 211. *Owens Corning* does not provide guidance for the relief that Bank Bondholders seek—*partial* substantive consolidation for a *limited* purpose. Indeed, the question of partial consolidation was not before the Third Circuit, which expressly declined to address the issue in *Owens Corning*. *Id*. at 210 n.16.

But even if *Owens Corning* applied, the Bank Bondholders have stated a plausible claim. *Owens Corning* outlined the following test for complete consolidation: (1) prepetition, the entities disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, *or* (2) postpetition, the entities' assets and liabilities

are so scrambled that separating them is prohibitive and hurts all creditors. *Id*. at 211. Based on the limited evidence available to date—without the benefit of any discovery—the Bank Bondholders' Proofs of Claim plead facts sufficient to meet either standard.

With respect to the first situation—prepetition activities—"[a] prima facie case . . . typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of . . . indistinguishable entity." *In re Owens Corning*, 419 F.3d at 212. The Bank Bondholders allege "WMB's domination of WMB and its intertwining of WMB's assets and liabilities with its own." POC ¶ 9. The Proofs of Claim support that allegation with a list—again, generated without the benefit of any discovery—of several specific facts that are "indicative of WMI's entanglement of its own identity with that of [WMB]," prior to the petition date and continuing thereafter:

- JPM has made clear that "[e]ven after nearly four months of concerted effort, beyond the day-to-day banking operations, there has been little tangible progress in separating WMB from its former parent beyond identifying the larger issues between the parties." (JPM Objection to Bar Date, Docket No. 578, at 2). WMI's President also has indicated that JPM still needs to clarify, to the extent possible, which assets are WMI's and which are WMB's. (Jan. 8, 2009 Section 341 Mtg. Tr. at 108-09).

- JPM has indicated that its effort to separate the Bank from WMI "has been even further complicated by the fact that the books and records of WMB, its parent companies and their respective predecessors in interest were largely maintained on a combined basis by the same personnel." (JPM Objection to Bar Date, Docket No. 578, at 7).

- WMI's restructuring officer has confirmed that WMI continues to have a problem "in figuring out what belongs to the Bank and what belongs to the holding company." (Jan. 8, 2009 Section 341 Mtg. Tr. at 86).

POC ¶ 9. These examples are in addition to those described in Section C.1 above—including the Debtors' taking of billions of dollars of WMB's cash and requiring (in a transaction in which WMI's CEO also purported to act for WMB) WMB to execute a tax sharing agreement that, according to the Debtors, gave away WMB's property rights in additional billions of dollars in

58

tax refunds—that also support piercing the corporate veil. *See supra* at pp. 46-54. All of these

actions by WMI, blurring the lines between itself and WMB and seeking to appropriate for itself

assets of WMB, started pre-petition and have continued post-petition.

Indeed, the very litigation that is at the heart of these bankruptcy cases and the

receivership proceedings illustrates the point. In the Adversary Proceedings, JPMC and the

FDIC assert that various assets— including tax refunds, REIT Preferred securities, deposit

accounts, litigation and subrogation claims, and furniture and fixtures—are or were the property

of WMB. Yet, in the DC Action, the Debtors assert claims with respect to the very same assets.

The Debtors themselves recognize that sorting out the ownership of these assets, and the

competing claims with respect to them, will take "many years of discovery and litigation," as

"[t]here are intricate legal theories and factual questions to be unwound and answered." Reply in

Support of Motion to Disband Equity Committee, Dkt. No. 2223, at 2. [24]

Even if the Debtors could now disavow what they admitted only a few weeks ago, their

argument for dismissal as a matter of law of the Bank Bondholders' Claim for limited

substantive consolidation would fail. The Bank Bondholders have made the requisite allegations

to support the relief they seek. *See, e.g.,* POC ¶9. At this stage in the proceeding, that is all that

matters.

3.    Fraudulent Transfer

In their Proofs of Claim, the Bank Bondholders assert that "[b]efore [WMB] was forced

into receivership, [WMI] caused [WMB] to transfer billions of dollars in cash and other assets to

---

[24]    The Debtors point to one non-binding case—*Simon v. ASIMCO Techs., Inc.* (*In re Am. Camshaft Specialties, Inc.*), 410 B.R. 765 (Bankr. E.D. Mich. 2009)—and state that it controls the outcome here. But that case is irrelevant as it involved complete substantive consolidation. *Id.* at 777 (noting that "Trustee seeks an order providing for substantive consolidation of the four non-debtor corporate defendants and the Debtors."). In addition, *Simon* involved a substantive consolidation claim by the trustee of the jointly administered bankruptcy estates who presumably had access to the debtors' books and records; here, the Bank Bondholders do not have that kind of access, which they will be able to obtain only if and when he Debtors begin to provide discovery.

the Debtor, an insider of the Bank." POC ¶ 10. The Bank Bondholders further allege that these

transfers are avoidable under applicable state fraudulent conveyance law, by creditors of WMB

such as the Bank Bondholders, for the following reasons:

> The transfers are avoidable because (a) they were made with actual intent to
> hinder, delay or defraud a creditor of the Bank, including without limitation the
> Bank Bondholder; (b) they were made for less than reasonably equivalent value
> when the Bank was engaged or about to engage in a business for which the
> remaining assets of the Bank were unreasonably small, and/or when the Bank
> intended to incur, or believed or reasonably should have believed it would incur,
> debts beyond its ability to pay as they came due, including without limitation the
> Senior Notes; and/or (c) they were made for less than reasonably equivalent value
> and the Bank was insolvent (or rendered insolvent) or were made to WMI, an
> insider of the Bank, for an antecedent debt at a time when WMI had reasonable
> cause to believe the Bank was insolvent.

*Id.* The only fraudulent transfer claims that the Debtors are challenging as legally insufficient

are the actual fraudulent transfer claims—those alleged in category (a)—transfers made with

actual intent to hinder, delay or defraud a creditor of WMB. The remaining fraudulent transfer

claims—categories b and c—are for constructive fraudulent transfers and, in accordance with the

agreement of the parties, are not subject to any challenge by the Debtors at issue at this time.[25]

In their Proofs of Claim, the Bank Bondholders, while reserving their right to identify

other avoidable transfers after they have had the opportunity to take discovery, specify two sets

of transfers from WMB to WMI that are subject to recovery from WMI as fraudulent transfers.

*Purported Dividends.* With respect to the actual fraudulent transfer of purported

dividends, the Bank Bondholders allege "[b]etween the first quarter of 2006 and September 25,

2008, the date the Bank was forced into receivership, more than $6 billion—net of any transfers

during that period from WMI to the Bank—was transferred from the Bank to WMI, largely in

---

[25]    *See* Email Feb. 12 Rosen Email, Manzer Decl. Ex. 1 (noting that "[t]he Motion to Dismiss aspect shall . . .
with respect to the Failure to State a Claim Issue, [relate to] all claims but for the constructive fraudulent transfer
claims").

the form of purported dividends." POC ¶ 10. The Debtors' only argument for the dismissal of this Claim is that the Bank Bondholders supposedly have not adequately pled that the dividends were transferred to WMI with the intent to hinder, delay or defraud one or more creditors of WMB. This argument borders on the frivolous.

First, most of the Debtors' argument as to this Claim has nothing to do with the facts pled by the Bank Bondholders. Instead, the Debtors argue that the Claim must be dismissed because the Bank Bondholders have somehow failed, at this preliminary stage, to *prove* fraud. *See* Obj. at 46 ("Bondholders carry the burden of proving"; "[t]o prevail on their claims, the Bondholders must provide 'clear and satisfactory proof' of such intent"). The Debtors go so far as to assert their own unproven allegations as proof that fraud does not exist. *See id.* at 48 ("WMB was current on its obligations to the Bondholders"; "subsequent to the payment of Dividends, WMI contributed $6.5 billion in capital contributions to WMB"). But, as discussed above, for purposes of the Debtors' motion to dismiss the Challenged Claims, all the factual allegations made by the Bank Bondholders must be treated as true, not false, and the Debtors' contrary allegations are entirely irrelevant. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

For this reason, the cases on which the Debtors rely are inapposite. All but one were decided at summary judgment, after discovery and the presentation of evidence, not based on the pleadings on a motion to dismiss. *See, e.g., U.S. v. Townley*, 181 Fed. Appx. 630 (9th Cir. 2006) (appeal of grant of summary judgment); *Sedwick v. Gwinn*, 873 P.2d 528 (Wash. Ct. App. 1994) (appeal of grant of partial summary judgment); *Worthington v. Low Cost Drugs, Inc.*, No. 18102-2-III, 2000 WL 199004 (Wash. Ct. App. Feb. 15, 2000) (appeal of grant of summary

61

judgment).[26] At this early stage in the proceedings, the Bank Bondholders are not required to provide any proof of fraud; the only hurdle Bank Bondholders face is to plead a claim upon which relief can be granted.

To that end, the Bank Bondholders' Proofs of Claim more than adequately state plausible claims for fraudulent transfer of the purported dividends by alleging (1) that the transfers were made with the intent to hinder, delay or defraud the Bank's creditors, (2) that the transfers were to an insider, and (3) that the transfers left WMB unable to continue in business and led to its closure and placement into receivership.[27] POC ¶ 10. Here, the surrounding circumstances are compelling. Within a few years before WMB's complete failure and liquidation, WMI caused WMB, involuntarily, to transfer to its own parent, an insider, more than $6 billion net of any capital contributions WMI may have made to WMB. Moreover, as discussed below, WMI also caused WMB to make additional substantial transfers to it, including nearly another billion dollars that WMI forced WMB to pay to it within a few weeks of when WMB was forced into receivership. In addition, the Proofs of Claim contain numerous other relevant allegations— allegations of control and dominance of WMB by WMI, of the appropriation by WMI of billions

---

[26]     In the remaining case cited by Debtors on this issue, *PHP Liquidating, LLC v. Robbins*, 291 B.R. 592 (D. Del. 2003), the court granted defendants' motion to dismiss on grounds that plaintiff's complaint was facially deficient because it failed to allege that the plaintiff had received less than reasonably equivalent value for the purported fraudulent transfer. In that case, however, the plaintiffs were not alleging actual fraudulent transfer. *Id.* at 601 n.6. Whether Bank Bondholders state a claim for constructive fraudulent conveyance is not before the Court at this time.

[27]     Although insolvency is not an element of an actual fraudulent transfer claim, it is (as the Debtors acknowledge) one of the factors that courts sometimes consider in determining if actual fraud exists. Obj. at 47. While the Debtors assert that the Bank Bondholders cannot allege that WMB was insolvent before September 2007, when the last of the dividends was paid, the Debtors themselves have alleged that WMB may have been insolvent only a few months later, as early as December 2007. *See* WMI Compl. at ¶ 26, Manzer Decl. Ex. 9. In any event, whether WMB was actually insolvent is an issue of fact, and at this stage, the Bank Bondholders have adequately pled insolvency. Consistent with the Debtors' own position in the D.C. Action, to plead insolvency, all the Bank Bondholders must do is provide "a short and plain statement of the claim showing that the pleader is entitled to relief," enough to give WMI "fair notice of the claims against [it]." Debtors' Opposition in D.C. Action at 43, Manzer Decl. Ex. 22. Indeed, in the Debtors' DC Action, Debtors took the position that their far more qualified statement of insolvency—"if WMI was insolvent at the time any of the Capital Contributions were made, WMI asserts a fraudulent transfer claim" *see* WMI Compl. at ¶ 28, Manzer Decl. Ex. 9—was adequate to state a claim and avoid the FDIC's motion to dismiss. Debtors' Opposition in D.C. Action at 43, Manzer Decl. Ex. 22. Having so asserted, the Debtors cannot have it both ways.

in tax benefits, and of misrepresentations by WMI with respect to the financial health of WMB—that lend further credence to the Bank Bondholders' intentional fraudulent transfer claims.[28] POC ¶¶ 8, 9, 10, 12, 13. Having adequately pled actual fraud, Bank Bondholders' intentional fraudulent transfer claims with respect to the dividends survive.

*Purported Deposits.* The Bank Bondholders also identify as avoidable transfers billions of dollars in alleged deposits withdrawn from WMB by WMI. "In the year prior to the commencement of the Bank receivership, WMI caused approximately $4 billion to be withdrawn from the Bank and transferred to WMI (which then apparently re-deposited the funds at WMBfsb)." POC ¶ 10. In addition, as noted, WMI directed two transfers totaling $922 million from WMB to WMI—one made within a month and the other made within days of when WMB was placed in receivership. *See supra* at p. 47. Perhaps recognizing that the transfer of these massive purported deposits—on the eve of the receivership—drips with the indicia of fraudulent intent, the Debtors do not argue that Bank Bondholder have failed, adequately, to allege such intent. *See* Obj. at 50-58. Instead, they argue that the "deposits" are not avoidable under applicable fraudulent transfer law.

But this argument, like so many of those made by the Debtors, is based not on the factual allegations asserted by the Bank Bondholders in their Proofs of Claim, but on the Debtors' own disputed assertions regarding the nature of the disputed accounts and the facts surrounding the

---

[28]    Citing Rule 9(b) of the Federal Rules of Civil Procedure, the Debtors argue that the Bank Bondholders' have not pled fraud with sufficient specificity. To the extent that the Court should determine to apply that Rule to the Proofs of Claim—and, as discussed previously, the pleading rules for complaints simply do not apply to proofs of claim—the Bank Bondholders have more than adequately described "the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Indeed, the Third Circuit has cautioned that "courts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud'" and that "[w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed." *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). In addition, because defrauders do not broadcast their wrongdoings to the world, "[d]irect evidence of fraudulent intent is often unavailable," and "courts usually rely on circumstantial evidence to infer fraudulent intent." *In re Fedders N. AM. Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009). Moreover, by its terms, Rule 9(b) provides that "intent . . . and other conditions of a person's mind of a person may be alleged generally." Fed. R. Civ. P. 9(b).

transfers. *See* Obj. at 51-53. For example, in response to the Bank Bondholders' allegation that the putative deposits may not have been deposit liabilities at all, but rather capital of WMB, the Debtors simply say this could not be, based on their own, disputed version of the facts. *Id.* at 55. Similarly, the Debtors state that one or more of the transfers of the putative deposit balances did not harm WMB because supposedly WMB's cash balance was "replenished," but, again, that assertion is based entirely on WMI's own, untested version of the facts, not the facts set forth in the Proofs of Claim. The Debtors will have their opportunity to provide their story, but the time for that will be after discovery has occurred and the parties are at an evidentiary hearing. For now, on what the Debtors concede is a motion to dismiss on pure issues of law, none of the Debtors' factual allegations is at all relevant; it is the Bank Bondholders' contrary allegations that must be taken as true. And, given those allegations, there is no basis for dismissal of the Bank Bondholders' intentional fraudulent transfer claims.

The Debtors' only other argument is that, assuming the purported deposits really were deposits, their transfer from WMB did not harm any general unsecured creditors of the bank and therefore should not be avoidable because, had the transfer not occurred, WMI supposedly would have been entitled to a priority claim in the WMB receivership. Obj. at 54. There are at least three fallacies in that argument. First, the Proofs of Claim specifically allege that the putative deposits may not have been deposits at all (an assertion that JPMC has also made, with substantial supporting documentation). POC ¶ 11. Second, while a third-party depositor generally is entitled to priority in right of distribution in a bank receivership, a shareholder of the failed bank, like WMI, is subordinated. *See* 12 U.S.C. § 1821(d)(11). Third, even if the funds at issue represented true deposit liabilities that were not otherwise subject to subordination, WMB could have setoff its own multi-billion claims against WMI against those liabilities and thereby

satisfied WMI's deposit liability claims while retaining all the funds for payment to WMB's general unsecured creditors, including the Bank Bondholders. *See Sterling Sav. Bank v. Air Wis. Airlines Corp.*, 492 F. Supp.2d 1256, 1260-61 (E.D. Wash. 2007); *Conner v. First Nat'l Bank of Sedro-Woodley*, 113 Wash. 662, 665-66 (Wash. 1921); *Allied Sheet Metal Fabricators, Inc. v. Peoples Nat'l Bank of Wash.*, 10 Wash. App. 530, 537, 518 P.2d 734, 739 (Wash. App. 1974) (recognizing right of bank to apply deposit to payment of debt owed by depositor). Thus, the transfers of the deposit balances on the eve of the receivership most assuredly reduced the funds available for distribution to WMB's general unsecured creditors. The Debtors' contrary argument is simply wrong—and certainly inconsistent with the allegations in the Bank Bondholders' Proofs of Claim, which is all that matters for present purposes.

4.  Misrepresentations and Material Omissions

The Debtors allege that the Bank Bondholders have not sufficiently pled the elements of a securities (or other) fraud claim in accordance with the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure. But, even if the standards for pleading a complaint applied to the Proofs of Claim—and, for the reasons discussed above, they do not—the Debtors' argument would fail in face of the allegations in the Proofs of Claim.

At the outset, the Debtors do not argue that purchasers of the WMB Senior Notes would be unable to plead a plausible fraud claim against WMI. As the Debtors acknowledge (*see* Obj. at 63 n.46), there is in fact an action pending in U.S. District Court in Washington brought on behalf of (among others) a putative class of investors in WMI equity and debt against former officers of WMI based, at least in part, on the officers' misrepresentations with respect to WMB that has been held to state plausible claims.[29] *In re Washington Mut., Inc. Sec., Derivative &*

---

[29] The Debtors simply note that the amended complaint in that case—the District Court dismissed the initial complaint, but gave the plaintiffs leave to replead, and then largely sustained the amended complaint—is 260 pages long, and the Bank Bondholders' Proofs of Claim are shorter. Obj. at 63 n.46. But the difference in length between

*ERISA Litig.*, 2009 WL 3517630 (W.D. Wa.).

Instead, the Debtors argue that, while the Bank Bondholders could plead a plausible claim, they have not done so—that the actual allegations made by the Bank Bondholders in their Proofs of Claim are inadequate. The Debtors are mistaken. The Bank Bondholders allege: (1) From first quarter 2006 through the first half of 2007, and continuing thereafter, "WMI made material false and misleading statements, or omitted material facts necessary in order to make the statements made not misleading, regarding the Bank, its operations, and its financial condition";[30] (2) "WMI and its officers and employees repeatedly misrepresented that the Bank was doing well financially and that its credit and loan underwriting policies and operations were conservative and minimized risk to investors, including holders of Senior Notes"; (3) "WMI knew at the time" that "those statements were false and misleading" yet "knowingly failed to disclose the true facts"; and (4) "In connection with their purchase of the Senior Notes, the Bank Bondholders (and the market for the Senior Notes) relied on these misrepresentations and material omissions." POC ¶ 13.

While acknowledging that the Bank Bondholders have provided "more detail" than another group of holders of WMB Senior Notes that has asserted a similar claim, *see* Obj. at 62,[31] the Debtors quibble with the Bank Bondholders' allegations, complaining that they fail "to

---

the two sets of papers highlights the difference between proofs of claim and complaints—the former being governed merely by Rule 3001 of the Bankruptcy Code and the later being subject to the more demanding pleadings standards set forth in the Federal Rules of Civil Procedure. And although it does not take 260 pages to plead a claim, the fact that the plaintiffs in the putative class action were able to set forth 260 pages of factual allegations of misrepresentations and material omissions made by WMI's senior officers underscores the seriousness of the matter and the need for discovery and an evidentiary hearing before the Bank Bondholders' Claims are resolved.

[30]    The Debtors argue that the Debtors' failure to disclose material information cannot give rise to liability unless the Debtors had a duty to disclose. But as the case cited by Debtors make clear, a duty to disclose exists when there is an inaccurate, incomplete or misleading prior statement. *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000). Here, the Bank Bondholders allege repeated inaccurate, incomplete or misleading prior statements.

[31]    The Bank Bondholders understand that some of those other holders of Senior Notes may be filing their own response to the Debtors' Objection to which the Court is referred.

show the precise role of the individuals who made the alleged false and misleading statements" and that they do not include the "requisite 'who, what, where, when and how'." *Id.* at 62-63, 64. In fact, the Proofs of Claim do exactly that, providing (among other details) a non-exhaustive list of examples of the misstatements and material omissions made by WMI which caused injury to the Bank Bondholders that sets forth the verbatim statement, the individual or group of individuals making the statement, and the date of the statement:

- "As [Kerry Killinger, CEO] said, most of our businesses are doing extremely well despite the difficult interest rate environment." (Statement by Tom Casey, EVP and CFO, Q2 2006 Washington Mutual Inc. Earnings Conference Call, July 19, 2006).

- "On the credit front, we're in very good shape . . . If anything, I can be accused of being too conservative. And perhaps we could have maximized our profitability even more by taking on more credit risk through this period of very benign credit. But we want to stay ahead of the curve, be a little more conservative." (Statement by Kerry Killinger, CEO, at the Goldman Sachs Financial Services CEO Conference, December 13, 2006).

- Washington Mutual's loan portfolio represents "strong underwriting," "conservative lending standards," "rigorous credit standards," and "a disciplined credit culture." (Statements by multiple WMI officers at WMI's annual Investor Day conference, September 6 & 7, 2006).

- Question from Merrill Lynch: "Is there a long-term guidance that we should be thinking about where tangible equity can go for the parent?" Response: "I think what we are finding is as we move more towards a Basel II international capital standard we will certainly take that into consideration and, frankly, we always manage ourselves at the holding company to the same kind of standards as if we were a [Federal Reserve] regulated bank holding company." (Statement by Kerry Killinger, CEO, Q3 2006 Washington Mutual Inc. Earnings Conference Call, Oct. 18, 2006).

- In discussing dividends: "[T]he primary factor with our regulators is the maintaining appropriate levels of capital and of course continuing to operate in a safe and sound manner. All those indications are positive from a regulatory capital standpoint. We are in excellent shape. Again, I think, as you think about dividends, again, it is a whole combination of liquidity, the capital that we have, and as I implied there, relative to regulatory guidelines we are in excellent shape, as well as the earnings outlook for the company." (Statement by Kerry Killinger, CEO, Q3 2007 Washington Mutual Inc. Earnings Conference Call, Oct. 17, 2007).

- "My comments today will focus on four key areas . . . . Third, solid operating revenues and substantial capital cushion above our targeted tangible capital ratio of 5.5% and disciplined expense management across all of our businesses are expected to provide us the financial flexibility to manage through this period of expected elevated credit costs. Fourth, we have sufficient liquidity to fund our business operations." (Statement by Tom Casey, EVP and CFO, Q4 2007 Washington Mutual Inc. Earnings Conference Call, Jan. 17, 2008).

- "We continue to maintain a strong liquidity position in addition to strong tangible capital ratio of 6.67%. At year end we had $3.7 billion of capital in excess of our targeted tangible equity to tangible asset capital ratio of 5.5%. In addition, we exceeded all the well capitalized banking ratios by a meaningful margin. Our funding comes in large part from retail deposits generated in our stores from our core customers. We have $144 billion in retail deposits, which account for 49% of our total funding. The remaining wholesale funding is diversified with staggered maturity profile. At year end we had approximately $69 billion in available excess liquidity." (Statement by Tom Casey, EVP and CFO, Q4 2007 Washington Mutual Inc. Earnings Conference Call, Jan. 17, 2008).

- "Effective capital management goes hand in hand with maintaining strong liquidity position. We have maintained a very strong liquidity position throughout this period of market stress and we further enhanced that position this past quarter. Retail deposits now comprise 53% of our funding, up from 49% at year end. We have a diversified wholesale funding strategy with staggered maturities and have approximately $50 billion in excess liquidity. Finally, we fund all our business through our banking operations and do not rely on commercial paper. With this issue of common stock liquidity at the holding company is very solid." (Statement by Tom Casey, CFO, Q1 2008 Washington Mutual Inc. Earnings Conference Call, April 15, 2008).

- "I want to begin my remarks today by emphasizing to all of you, that in the face of the unprecedented housing and mortgage market conditions we are experiencing, we are continuing to execute on a comprehensive plan, designed to ensure that have strong capital and liquidity and appropriately sized expense base and a growing profitable retail franchise." (Statement by Kerry Killinger, CEO, Q2 2008 Washington Mutual Inc. Earnings Conference Call, July 22, 2008).

- "[I]t is important to note that our capital position remains significantly in excess of 5.5% targeted level. It's after tangible equity to tangible asset ratio, at the end of the second quarter increased to 7.79% from 6.4% at the end of the first quarter. This is $7 billion above our targeted level. From a regulatory capital perspective our tier 1 risk based ration remained strong at 8.44%, which is 244 basis points above well capitalized. In addition, we continue to focus on maintaining strong levels of liquidity. We ended the second quarter with over $40 billion of readily available liquidity." (Statement by Kerry Killinger, CEO, Q2 2008 Washington Mutual Inc. Earnings Conference Call, July 22, 2008).

68

- "Now, there seems to be a great deal of speculation whether WaMu will need to raise capital. Let me answer that by walking you through the details of how we expect to manage through this difficult credit environment. First, we currently have substantial capital, plus loan loss reserves sufficient to handle the upper end of our current loss expectation and second, our ongoing pretax and preprovision income, and balance sheet reduction will provide additional cushion for future credit losses. . . . So given our current strong capital, existing reserve through loan losses, ongoing operating earnings and planned balance sheet shrinkage, we are in a strong position to work our way through this difficult credit cycle without the need for additional capital." (Statement by Tom Casey, CFO, Q2 2008 Washington Mutual Inc. Earnings Conference Call, July 22, 2008).

- Question: "[Y]our capital ratios at the subsidiary thrift didn't increase the way the company's did[.] I was wondering if you were planning to increase those?" Response: "[W]ith regard to down streaming capital to the bank we continue to monitor that. We did move some down to the bank level as part of the equity rate and we will continue to evaluate that. We will probably put some additional capital down to the bank this quarter. We are maintaining good liquidity at the holding company through 2010 through 2011." (Statement by Tom Casey, CFO, Q2 2008 Washington Mutual Inc. Earnings Conference Call, July 22, 2008).

POC ¶ 13.

These statements—which included assurances that the underwriting policies were conservative and minimized risk to investors—are precisely the types that implicate the securities laws. *See Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) (noting that "if a defendant represents that its lending practices are 'conservative' and that its collateralization is 'adequate,' the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations"). And, to the extent it applies, these detailed allegations easily satisfy the heightened pleading standard of Rule 9(b).

In addition, as noted above, WMI represented that all notes issued by WMI would be structurally subordinated to the WMB Senior Notes—that all WMI debt securities "will be effectively subordinated to all liabilities, including deposits, of our subsidiaries." *See, e.g.*, September 21, 2005 Prospectus Supplement to Prospectus dated November 6, 2003, at 8, Manzer Decl. Ex. 25; August 21, 2006 Prospectus Supplement to Prospectus dated January 9, 2006, at 6,

69

Manzer Decl. Ex. 26; October 25, 2007 Prospectus Supplement to Prospectus dated January 9, 2006, at S-1, S-7, Manzer Decl. Ex. 27. Yet, the entire thrust of the Debtors' litigation position in the Adversary Proceedings and the DC Action is to the contrary—that, by reason of the tax sharing agreement it foisted on WMB, the transfers it required WMB to make, and the other actions it took (or forced WMB to take), it, not WMB, has all the substantial assets and, accordingly, the holders of WMI notes are, effectively, entitled to payment ahead of the WMB noteholders. If that position is sustained, then the representations made by WMI that the WMB noteholders would be structurally senior will have been false and misleading.

As to the element of scienter, the Debtors argue that the Bank Bondholders have failed to allege facts sufficient to support a strong inference that the Debtors acted with the requisite state of mind. To establish scienter, a complaint must simply allege sufficient facts to support an inference that a "reasonable person" would find "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).[32] As Debtors acknowledge, a court must look to the pleading— here the Proofs of Claim—as a whole. The Bank Bondholders' Proofs of Claim include not only the numerous misleading public statements by WMI officers, including Kerry Killinger (CEO) and Tom Casey (EVP and CFO), but also allegations showing WMI's disregard for the corporate separateness of WMB, its domination over WMB, its undercapitalization of the bank, and its looting of billions of dollars of the bank's assets. Viewed against the back drop of WMB's deep insolvency immediately after being placed in receivership and the Debtors' concession that

---

[32] The Debtors' reliance on *In re Alpharma Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004), is misplaced. In that case, the Third Circuit affirmed the dismissal of a complaint because there were inadequate allegations that senior executives of the company who prepared its financial statements were aware of a fraud undertaken by low-level managers in a foreign (Brazil) division. Here, the alleged fraudulent conduct involved the very same senior executives of WMI that made the false and misleading statements, and it all evidently occurred here in the United States, at WMI's corporate offices.

WMB may have been insolvent as early as December 2007, *see* WMI Compl. ¶ 26, Manzer Decl. Ex. 9, the Bank Bondholders have plead sufficient facts to create an inference that WMI and its officers acted with the requisite state of mind in making the misrepresentations and material omissions detailed in the Proofs of Claim. POC ¶ 14.

The Debtors also allege that Bank Bondholders fail adequately to plead reliance and causation. With respect to reliance, the Bank Bondholders allege that they—and the market for the Senior Notes—relied on the misrepresentations and material omissions made by WMI in purchasing the Senior Notes. POC ¶ 13. These allegations give rise to a presumption of reliance. As the Debtor recognize, a rebuttable presumption of reliance exists where an omission of material facts is made by a defendant with a duty to disclose. Obj. at 66, n. 48. Here, as explained above, the Debtors' misrepresentations to the public market gave rise to a duty on WMI's part to disclose accurate information in order to correct those misstatements. *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000). In addition, the allegations are sufficient to raise the rebuttable presumption of reliance recognized through the fraud-on-the-market doctrine. As explained by the Supreme Court, under the fraud-on-the-market doctrine, "reliance is presumed when the statements at issue become public. The public information is reflected in the market price, so it can be assumed that an investor who buys or sells stock . . . relies upon the statement." *Stoneridge Inv. Partners, LLC. v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) (explaining that reliance of plaintiffs on the integrity of the market is presumed in cases where materially misleading information is disseminated publicly into a well developed securities market).[33] Here, as alleged in the Bank

---

[33]    Washington State law also recognizes reliance on the market as a valid theory:

Bondholders' Proofs of Claim, the market for Senior Notes relied on WMI's misrepresentations and omissions regarding WMB's underwriting practices and financial health, and WMI's support for WMB. POC ¶ 13.

As to the remaining elements of economic loss and loss causation, the Bank Bondholders have adequately alleged that, because of WMI's misrepresentations and omissions, the Bank Bondholders have suffered substantial losses on the Senior Notes. POC ¶ 13. Those losses arose as a direct result of WMI's failure to adequately capitalize and support WMB—as it indicated in its public statements it was doing—and its taking of billions of dollars of assets of WMB, all the while making misleading statements as to the strength of WMB's finances.

The Bank Bondholders' Proofs of Claim thus satisfy the heightened pleading standards that Rule 9(b) establishes for allegations of securities fraud, even if (contrary to the law cited above) those standards apply to the Proofs of Claim. To the extent there is any doubt, the Court should take into account the Third Circuit's admonition that "courts should be sensitive to the fact that application of [Rule 9(b)] prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud. Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) (internal quotations and citations omitted). As explained in the Bank Bondholders' Proofs of Claim, the material misrepresentations and omissions committed by

---

In order to state a cause of action under WSSA [Washington State Securities Act], a plaintiff must allege that he or she relied on the misrepresentations at issue. Where, as here, reliance is not expressly alleged in the complaint, reliance may nevertheless be presumed in several circumstances: 1) when the case is "primarily a case of omissions," 2) when there is "reliance on the market," 3) when the securities are "unmarketable but for the misrepresentation," and 4) based upon common sense. If the Plaintiffs allege facts indicating that any one of these circumstances existed in the present case, their failure to allege reliance does not require dismissal of the complaint.

*In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1301-1302 (E.D. Wash. 2007) (citations omitted).

WMI concerned information within the Debtor's exclusive control, including information about WMB's financial condition and credit and loan underwriting operations. POC ¶ 13.

Finally, if the Court nevertheless determines that the standards of Rule 9(b) apply and have not been met, then, consistent with Third Circuit practice, the Court should allow the Bank Bondholders leave to amend their Proofs of Claim. *See In re Burlington Coat Factory*, 114 F.3d at 1435 (explaining that where a pleading is dismissed on Rule 9(b) grounds, a court should ordinarily grant leave to amend).

5.     <u>Mismanagement, and Breach of Fiduciary and Other Duties</u>

Finally, the Debtors argue that the Bank Bondholders' breach of fiduciary duty and related claims must be dismissed because (1) WMI and its officers and directors did not owe any fiduciary duties to WMB and (2) the Claims are not plausible. These arguments fail as well.

On the duty question, the Debtors again set up a straw man and knock it down. They note that, in general, a parent corporation does not owe fiduciary duties to its wholly-owned subsidiaries. But the Debtors ignore the fact that WMI and WMB had virtually the same leadership and that WMB was rendered insolvent by the breaches and mismanagement committed by that leadership. *See* POC ¶ 8 ("WMI and WMB had identical and overlapping directors and held joint meetings of the Board of Directors of both entities on a combined basis, resulting in effect in a single Board of Directors with identical directors that met on the same topics at the same time and made the same decisions"). The very same persons who ran WMI— its senior officers—also ran WMB. For example, Kerry Killinger served as Chief Executive Officer and Chairman of WMI and WMB, and Thomas Casey served as Chief Financial Officer and Executive Vice President for both WMI and WMB. *See, e.g.*, Certification of the Chief Executive Officer and the Certification of the Chief Financial Offer, attached as Exhibits to Washington Mutual Bank, Form 10-K for the Fiscal Year Ended December 31, 2007, Manzer

73

Decl. Ex. 31; Certification of the Chief Executive Officer and the Certification of the Chief

Financial Offer, attached as Exhibits to Washington Mutual Inc, Form 10-K for the Fiscal Year

Ended December 31, 2007, Manzer Decl. Ex. 32; Tax Sharing Agreement, at 3, Manzer Decl.

Ex. 29. Thus, Mr. Killinger and other senior WMI officials owed fiduciary duties, not merely to

WMI, but also to WMB, because they were also officers (or directors) of WMB.

This matters because officers and directors of a wholly-owned subsidiary owe a fiduciary

duty to the subsidiary and to the subsidiary's creditors when that subsidiary is insolvent or in the

zone of insolvency. *In re Musicland Holding Corp.*, 398 B.R. 761, 786 (Bankr. S.D.N.Y. 2008)

("[O]nce the subsidiary enters the zone of insolvency, the directors (and officers) owe their

fiduciary duties to the entire community of interests, including the creditors."); *In re Scott*

*Acquisition*, 344 B.R. 283, 290 (Bankr. D. Del. 2006) ("A more natural reading of Delaware law

is that upon insolvency directors of a wholly-owned subsidiary owe fiduciary duties to the

subsidiary and its creditors."). Indeed, "[t]here is no basis for the principle ... that the directors

of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its

parent corporation." *In re Scott Acquisition*, 344 B.R. at 288. And, because the WMB officers

were senior officers of WMI—and were favoring WMI's interests over WMB's when they

enabled WMI to loot WMB—WMI is liable for their breaches of their fiduciary duties to WMB

and its creditors under black-letter principles of agency and respondeat superior. *See, e.g.,*

William Meade Fletcher, 10 *Fletcher Cyclopedia of the Law of Corporations* § 4877 (2009)

(noting that "[c]orporations can commit almost any kind of a tort that individuals can commit,

and are liable for the acts of their agents and servants in the same degree as natural persons are

liable for the acts of their servants and agents"); *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606

(3d Cir. 1978) (noting "[t]he fact that an officer is acting for a corporation also may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior").

As for Debtors' second argument regarding the plausibility of the Bank Bondholders' Claims, far from consisting "[s]peculative conclusions" or "conclusory allegations," *see* Obj. at 69, the Bank Bondholders' Proofs of Claim contain detailed allegations about the breaches and mismanagement committed by WMI and its officers and directors. For example, the Proofs of Claim allege that WMI had an "obligat[ion] to maintain and guarantee the appropriate capital levels" of WMB; that WMI made public representations (made by WMI's CEO Kerry Killinger) acknowledging this obligation; and that, indeed, it publicly disclosed that it would serve as a source of strength for WMB. POC ¶ 12. But, as the Proofs of Claim also make clear, WMI did nothing of the kind; instead, WMI "inadequately capitalized WMB and looted the Bank." POC ¶ 12. Among other such steps, WMI "stripped billions of dollars in purported deposits—which should have been, and properly are viewed as, capital contributions—from the Bank in the year prior to the commencement of the receivership. And . . . in the period starting in the first quarter of 2006 continuing through the commencement of the receivership, WMI, on a net basis, took some $6 billion out of the Bank in purported dividends." POC ¶ 12; *see also* POC ¶ 10, 11. These actions were taken by WMI when WMB was insolvent or rendered insolvent by WMI's actions. POC ¶ 10.

The Bank Bondholders' Proofs of Claim further allege that at the same time that WMI and its officers and directors were looting and undercapitalizing WMB, they "were assuring public investors, including the Bank Bondholders, that the depositor base at the Bank was stable and that the Bank had access to nearly $50 billion of liquidity, all despite the hidden reality that the Bank's financial condition was severely deteriorating." POC ¶ 12. As discussed above, the

75

Proofs of Claim contain a non-exhaustive list of 12 such examples of misrepresentation. POC ¶ 13.

In addition, the actions of WMI's senior officers (who also, as noted, acted at the same time as officers of WMB) have exposed WMB to massive losses. For example, Deutsche Bank National Trust Company, as trustee for some 159 mortgage-securitization trusts, has asserted a claim against the Receivership Estate for approximately $6-10 billion, alleging breaches of representations and warranties, and other "abuses in WAMU's loan origination procedures" with respect to the underwriting standards and servicing of the Washington Mutual mortgage loans included in those trusts. Deutsche Bank's complaint, proof of claim and the exhibits thereto assert that those mortgage origination standards were lax to non-existent and that it was the most senior management of WMI that developed, oversaw, and implemented those "standards." *See* Complaint Ex. 1, Attachment A to Proof of Claim ¶ 9, *Deutsche National Bank Trust v. FDIC*, Case No. 09-01656 (D. D.C. Aug. 26, 2009), Manzer Decl. Ex. 33. While all defenses to this claim are of course fully preserved, the fact is that the actions of WMI and its senior officers have exposed WMB, the Receivership Estate and the Bank Bondholders to the possibility of massive losses.

In short, the Proofs of Claim contain allegations, made before the benefit of any discovery, that are more than sufficient to state a plausible claim for breach of fiduciary duty and mismanagement.

76

## CONCLUSION

For the reasons stated above, the Debtors' Objection to the Bank Bondholders' Proofs of

Claim for lack of standing and failure to state a claim should be disallowed and an appropriate

scheduling order should be entered, so that the parties can proceed to discovery and, ultimately,

an evidentiary hearing on the merits of the Claims set forth in the Bank Bondholders' Proofs of

Claim.

Dated: March 5, 2010

By their Attorneys,
PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)
Alan J. Kornfeld
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705
Telephone: (302).652.4100
Facsimile: (302).652.4400

Philip D. Anker (367957)
WILMER CUTLER PICKERING HALE &
DORR LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Russell J. Bruemmer (289074)
Nancy L. Manzer (421144)
Gianna Ravenscroft (487712)
Lisa Ewart (497290)
WILMER CUTLER PICKERING HALE &
DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000