# EXHIBIT 6

| UNITED STATES BANKRUPTCY COURT | District of Delaware | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:<br>Washington Mutual, Inc. | Case Number:<br>08-12229 (MFW) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Marathon Credit Opportunity Master Fund, Ltd. and the other creditors on the Attachment hereto | ☑ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent:<br>Marathon Credit Opportunity Master Fund, Ltd., and other Washington Mutual Bondholders<br>c/o Philip D. Anker, Esq., Wilmer Cutler Pickering Hale and Dorr LLP<br>399 Park Avenue<br>New York, NY 10022<br>Telephone number:<br>(212) 230-8890 | Court Claim Number: 3071<br>*(If known)*<br><br>Filed on: 03/31/2009 |
| Name and address where payment should be sent (if different from above):<br><br>COPY<br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| 1. **Amount of Claim as of Date Case Filed:** $ Approximately $1,800,000,000 plus interest thereon and all other amounts described in the Attachment. | 5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.** |
|---|---|

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

| 2. **Basis for Claim:** See Attachment<br>(See instruction #2 on reverse side.) |
|---|

3. **Last four digits of any number by which creditor identifies debtor:** _____

    3a. **Debtor may have scheduled account as:** _____
       (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate ☐ Motor Vehicle ☑ Other
Describe: See Attachment

**Value of Property:**$_____ **Annual Interest Rate**_____%

**Amount of arrearage and other charges as of time case filed included in secured claim,**

**if any:** $_____ **Basis for perfection:** _____

**Amount of Secured Claim:** $_____ **Amount Unsecured:** $_____

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☑ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(9).

**Amount entitled to priority:**

$ See Attachment

6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date:<br>06/01/2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*/s/ Philip D. Anker*<br>Philip D. Anker, Attorney in Fact | RECEIVED<br>JUN 02 2009<br>KURTZMANCARSONCONSULTANTS |
|---|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**Attachment to Amended Proof of Claim of Bank Bondholders**
Washington Mutual, Inc.
Case No.: 08-12229 (MFW)

## The Claimants

1.  This Amended Proof of Claim is submitted by the entities specified below (collectively, the "Bank Bondholders"),[1] which currently hold, in the aggregate, approximately $1.8 billion in principal amount outstanding of Senior Notes (the "Senior Notes") issued by Washington Mutual Bank, Henderson, Nevada, a federally chartered savings association (the "Bank" or "WMB"). The amount of the claims asserted in this Amended Proof of Claim (the "Bank Bondholder Claims") includes the full principal balance of the Senior Notes held or to be acquired by the Bank Bondholders, plus all unpaid interest and all other amounts due on the Senior Notes held by the Bank Bondholders, and any and all other amounts payable or recoverable by or from the debtor, Washington Mutual, Inc. (the "Debtor" or "WMI").[2] This Amended Proof of Claim is submitted pursuant to 11 U.S.C. § 501 and Rule 3001 of the Federal Rules of Bankruptcy Procedure. This Amended Proof of Claim amends and replaces Proof of Claim No. 3071.

2.  Because the Bank Bondholders have suffered direct injury, the Bank Bondholders have standing to bring the Bank Bondholder Claims. Alternatively, the Bank Bondholders have standing to assert the Bank Bondholder Claims, derivatively, on behalf of the Bank. *See, e.g., Hindes v. FDIC*, 137 F.3d 148, 171 (3d Cir. 1998); *Branch v. FDIC*, 825 F. Supp. 384, 404-05 (D. Mass. 1993); *Suess v. United States*, 33 Fed. Cl. 89, 96-97 (Fed. Cl. 1995).

## Background

3.  WMI was a holding company that owned the Bank and, through the Bank, its subsidiary, Washington Mutual Bank fsb, Park City, Utah ("WMBfsb"). WMI was the Bank's

---

[1]     The Bank Bondholders are Altma Fund Sicav P.L.C. In Respect Of Russell Sub-Fund; Anchorage Capital Master Offshore, Ltd.; Bank of Scotland plc; Cetus Capital, LLC; Corporate Debt Opportunities Fund, Ltd.; Fir Tree Capital Opportunity Master Fund, L.P.; Fir Tree Mortgage Opportunity Master Fund, L.P.; Fir Tree Value Master Fund, L.P.; HFR ED Select Fund IV Master Trust; Juggernaut Fund, L.P.; Lyxor/York Fund Limited; Marathon Credit Opportunity Master Fund, Ltd.; Marathon Credit Master Fund, Ltd.; Marathon Special Opportunity Master Fund, Ltd; Permal York Ltd.; Quintessence Fund L.P.; QVT Fund LP; Silver Point Capital Fund, LP; Silver Point Capital Offshore Fund, Ltd.; The Governor and Company of the Bank of Ireland; The Várde Fund, L.P.; The Várde Fund VI-A, L.P.; The Várde Fund VII-B, L.P.; The Várde Fund VIII, L.P.; The Várde Fund IX, L.P.; The Várde Fund IX-A, L.P.; Várde Investment Partners (Offshore), Ltd.; Várde Investment Partners, L.P.; Windmill Master Fund LP.; York Capital Management, L.P.; York Credit Opportunities Fund, L.P.; York Credit Opportunities Master Fund, L.P.; York Investment Master Fund, L.P.; York Select, L.P.; and York Select Master Fund, L.P.

    These individual Bank Bondholders are together filing this Amended Proof of Claim as a matter of convenience and fee-sharing only. No Bank Bondholder acts for, or purports to represent or speak on behalf of, any other Bank Bondholder or any other holder of WMB Senior Notes.

[2]     Based on information presently available to the Bank Bondholders, certain purported deposits and assets at issue may be claimed to be the property of either WMI or WMI Investment Corp. Accordingly, the Bank Bondholders have filed a proof of claim in the bankruptcy cases of both WMI and WMI Investment Corp. As set forth in the text of this Amended Proof of Claim, the Bank Bondholders do so without conceding that any such purported deposits or other assets, in fact, belong to either WMI Investment Corp. or WMI, rather than to WMB.

holding company for purposes of applicable laws and regulations governing such holding companies. WMI Investment Corp. is an affiliate of WMI and a debtor whose bankruptcy case is jointly administered under WMI's Bankruptcy Case Number.

4.  On September 25, 2008, the Bank was closed by the Office of Thrift Supervision ("OTS"), and the Federal Deposit Insurance Corporation ("FDIC") was appointed as the receiver of the Bank.

5.  Immediately after its appointment as Receiver, the FDIC sold substantially all of the assets of WMB, including the stock of WMBfsb, to JPMorgan Chase Bank ("JPM") pursuant to the Purchase and Assumption Agreement, dated as of September 25, 2008.

6.  The following day, on September 26, 2008, the Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. § 101, *et seq.*) (the "Bankruptcy Code"). This Amended Proof of Claim is submitted in Case Nos. 08-12229 (MFW) and 08-12228 (MFW), currently pending in the United States Bankruptcy Court of the District of Delaware.

## The Bank Bondholder Claims

7.  The Debtor is liable to the Bank Bondholders for the full principal balance of the Senior Notes held by such Bank Bondholders, together with all unpaid interest and all other amounts due thereon, and all other amounts payable or recoverable by or from the Debtor, including without limitation on the bases specified below. The Bank Bondholder Claims asserted in this Amended Proof of Claim are, subject to the caveats set forth in this paragraph and elsewhere in this Amended Proof of Claim, general unsecured claims. However, as a matter of structural seniority and under applicable law, the Bank Bondholders and other holders of the Senior Notes issued by the Bank are entitled to payment in full ahead of any payment on any and all senior or unsecured notes issued by the Debtor. In addition, while the Bank Bondholders dispute that the Debtor or its estate has any valid claims against the Bank Bondholders or the Bank (or its estate in receivership), to the extent any such claims are allowed, the Bank Bondholder Claims are secured by right of setoff under Sections 506(a) and 553 of the Bankruptcy Code. Moreover, to the extent that any of the claims asserted herein arise out of actions taken or benefits obtained by WMI and its bankruptcy estate post-petition, such as—by way of example only—through the post-petition filing by WMI of tax returns and the post-petition obtaining of tax refunds attributable to WMB's operations, activities, and losses, the claims asserted herein are entitled to administrative priority under Sections 503(b) and 507(a)(2) of the Bankruptcy Code. Finally, the assertion of creditor claims in this Amended Proof of Claim is wholly without prejudice to the right of the Bank receivership estate or the Bank Bondholders to assert that any or all cash or other property in the possession of WMI is, in fact, the property of the Bank and to recover such cash or other property.

8. <u>Corporate Veil Piercing, Alter Ego and Similar Principles.</u>

Although the Senior Notes were issued by the Bank, the Debtor is liable for repayment of all amounts due on those instruments under principles of veil piercing, alter ego, mere instrumentality, domination, and the like. While these bankruptcy cases and the Bank's receivership proceeding are still in the early stages and the Bank Bondholders have not yet been able to take discovery, it is evident that WMI, a holding company, was the alter ego of the Bank, that the Bank was the mere instrumentality of WMI, and that WMI and the Bank shared a common identity. The Bank's corporate veil should be pierced, such that the Debtor is liable on the Senior Notes.

Based upon the documentation available to date to the Bank Bondholders, it is clear that WMI dominated not only the Bank's finances, but also its business practices, and defrauded the Bank and its creditors, including the Bank Bondholders. WMI was supposed to act as a "source of strength" for the Bank; it did not. Rather, WMI undercapitalized the Bank and siphoned billions of dollars from the Bank, while making repeated misstatements regarding the financial health of the Bank, thereby defrauding the creditors of the Bank, including the Bank Bondholders. WMI was the contract party for the Bank in many third-party contractual arrangements, and WMI operated a consolidated cash management system with the Bank, largely obliterating any distinction of financial activity, asset ownership, and liability responsibility. WMI's control over the Bank was so complete as to warrant piercing the corporate veil and allowing the Bank Bondholder Claims to run directly against WMI.

The following are just a few examples—taken without the benefit of any discovery—of WMI's domination of the Bank, the lack of any meaningful distinction between WMI and the Bank in their operations and finances, and the defrauding by WMI of the Bank and its creditors:

- WMI purports to have deposit accounts with WMB, yet published reports indicate that neither JPM nor WMI can locate any documentation establishing most of those accounts. (Motion of the Debtors Seeking Approval of Stipulation and Agreement Concerning Deposit Accounts at JPMorgan Chase Bank, N.A., Ex. A., Stipulation, Docket No. 74; FDIC's Statement, Response and Limited Objection, Docket No. 104, at ¶¶ 8-9;).[3]

- There is confusion as to which entity did business with which vendor. (Oct. 30, 2008 Section 341 Meeting Tr. at 73-74). Indeed, at the Section 341 meeting in this case, one group of creditors indicated that it believed it was a creditor of the Bank but that group had been listed as a creditor of WMI on WMI's Schedules of Assets and Liabilities. (Oct. 30, 2008 Section 341 Meeting Tr. at 106). Although the vast majority of services provided by trade creditors were allegedly being provided to the Bank, generally trade creditors had contracts with WMI. (Jan. 8, 2009 Section 341 Mtg. Tr. at 94-95).

---

[3] Unless otherwise indicated, all citations are to the docket of WMI's bankruptcy case, No. 08-12229.

- Payments were apparently made by WMI, WMB, or WMBfsb on behalf of another entity. In fact, according to WMI itself, its liabilities to its unsecured, nonpriority creditors are "largely derived" from the information provided by representatives of WMB and JPM. (Second Amended Schedule of Assets and Liabilities for WMI, Feb. 24, 2009, Docket No. 709, at 2-3, 6).

- The Bank and WMI filed consolidated tax returns. The tax relationship between the Bank and WMI has been characterized as "complicated" by the president of WMI and remained unresolved at the time of the Section 341 Meeting for WMI. (Jan. 8, 2009 Section 341 Mtg. Tr. at 99). WMI served as the accountant for the consolidated returns for WMI and the Bank. (Oct. 30, 2008 Section 341 Meeting Tr. at 52-53).

- Historically, WMI and the Bank were run together on the same information and accounting systems. JPM, which purchased most of the assets of WMB (but which did not purchase any claims of WMB against its shareholder, WMI), has stated that under the consolidated cash management system of WMI and its affiliates and subsidiaries, "external receipts and payments were accounted for on a consolidated basis and internal receipts or payments were done in whole or in part by book or journal entry as 'due to/from' accounts on the general ledger or other books of account." (JPM Complaint, *JPMorgan Chase Bank, Nat'l Ass'n v. Washington Mutual, Inc.*, Adv. Proc. No. 09-50551, at ¶ 37). Representatives from WMI have indicated that there had been "great difficult[y]" in separating out the organizations. (Oct. 30, 2008 Section 341 Meeting Tr. at 69).

- JPM has also stated that prior to WMB's receivership, "WMI and WMB had identical and overlapping directors and held joint meetings of the Boards of Directors of both entities on a combined basis, resulting in effect in a single Board of Directors with identical directors that met on the same topics at the same time and made decisions for both entities collectively." (JPM Complaint, *JPMorgan Chase Bank, Nat'l Ass'n v. Washington Mutual, Inc.*, Adv. Proc. No. 09-50551, at ¶ 36).

- Prior to the commencement of the Bank receivership, the Bank managed all payroll, including payroll for WMI's employees. (Oct. 30, 2008 Section 341 Mtg. Tr. at 102-03).

- The pension plan that covers the vast majority of Bank employees was sponsored by WMI, even though the vast majority of the affected employees were employed by the Bank. (Jan. 28, 2009 Section 341 Mtg. Tr. at 110).

9.  Substantive Consolidation.

WMI's domination of WMB and its intertwining of WMB's assets and liabilities with its own appear so substantial as to warrant substantive consolidation, at least to the extent that the assets of the Debtor and its estate should be made available to satisfy the claims of the Bank's creditors, including the Bank Bondholders. Accordingly, the Bank Bondholders may assert a direct claim against the Debtor's bankruptcy estate.

Based upon the documentation presently available the Bank Bondholders, the Bank's and WMI's affairs, assets, and liabilities appear to be hopelessly intertwined, such that any segregation of those assets and liabilities would be arbitrary and harmful to all creditors. In addition to those facts set forth in paragraph 8 above, the following—again, all of which have been uncovered without any formal discovery—are indicative of WMI's entanglement of its own identity with that of the Bank:

- In a pleading recently filed with the Bankruptcy Court, JPM has made clear that "[e]ven after nearly four months of concerted effort, beyond the day-to-day banking operations, there has been little tangible progress in separating WMB from its former parent beyond identifying the larger issues between the parties." (JPM Objection to Bar Date, Docket No. 578, at 2). WMI's President also has indicated that JPM still needs to clarify, to the extent possible, which assets are WMI's and which are WMB's. (Jan. 8, 2009 Section 341 Mtg. Tr. at 108-09).

- JPM has indicated that its effort to separate the Bank from WMI "has been even further complicated by the fact that the books and records of WMB, its parent companies and their respective predecessors in interest were largely maintained on a combined basis by the same personnel." (JPM Objection to Bar Date, Docket No. 578, at 7).

- WMI's restructuring officer has confirmed that WMI continues to have a problem "in figuring out what belongs to the Bank and what belongs to the holding company." (Jan. 8, 2009 Section 341 Mtg. Tr. at 86).

10.    Fraudulent Transfer.

Before the Bank was forced into receivership, the Debtor caused the Bank to transfer billions of dollars in cash and other assets to the Debtor, an insider of the Bank. These transfers are avoidable and recoverable by or for the benefit of creditors of the Bank, including the Bank Bondholders, under applicable law, including without limitation the Uniform Fraudulent Transfer Act in effect in the state of Washington, Washington Revised Code § 19.40.051, et seq., and/or in other jurisdictions. The transfers are avoidable because (a) they were made with actual intent to hinder, delay or defraud a creditor of the Bank, including without limitation the Bank Bondholder (Wash. Rev. Code § 19.40.041(a)(1)); (b) they were made for less than reasonably equivalent value when the Bank was engaged or about to engage in a business for which the remaining assets of the Bank were unreasonably small, and/or when the Bank intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as they came due, including without limitation the Senior Notes (Wash. Rev. Code § 19.40.041(a)(2)); and/or (c) they were made for less than reasonably equivalent value and the Bank was insolvent (or rendered insolvent) or were made to WMI, an insider of the Bank, for an antecedent debt at a time when WMI had reasonable cause to believe the Bank was insolvent (Wash. Rev. Code § 19.40.051). WMI caused these transfers—involving billions of dollars of Bank assets—to be made to itself. The transfers left the Bank unable to continue in business and led to its closure and placement into receivership, damaging all creditors of the Bank, including the Bank Bondholders.

There may also be claims to avoid such fraudulent transfers, and recover the transfers or their value from WMI, under the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d)(17).

The Bank Bondholders have not had the opportunity to take discovery yet and, therefore, have not yet uncovered all the cash and other property WMI caused to be stripped from the Bank and fraudulently transferred to WMI. But, based on the limited information available to the Bank Bondholders to date, the transfers that may be avoided and recovered from WMI and its estate in bankruptcy include without limitation the following:

- Upstreaming of Billions of Dollars in Purported Dividends. Between the first quarter of 2006 and September 25, 2008, the date the Bank was forced into receivership, more than $6 billion—net of any transfers during that period from WMI to the Bank—was transferred from the Bank to WMI, largely in the form of purported dividends.[4] Indeed, between the first quarter of 2006 and the first half of 2007, the Bank raised approximately $9.5 billion worth of capital through senior and subordinated debt offerings, including through the issuance of the Senior Notes held by the Bank Bondholders;[5] WMI caused the Bank to transfer most of these proceeds to WMI as purported dividends.[6] All such dividends, together with any other dividends transferred during at least the four-year period preceding the commencement of the Bank's receivership, may be avoided and recovered from WMI by or for the benefit of the Bank's creditors. The Bank Bondholders assert a claim for the amount of all such dividends.

- Stripping of Billions of Dollars in Purported Deposits. As of the fourth quarter of 2007, WMI reported having $4.9 billion worth of deposits, the vast majority of which was at the Bank. (Washington Mutual Bank, Annual Report (Form 10-K), at 129 (March 21, 2008)). Yet, by the time of the receivership, WMI reported that it held only $0.7 billion at the Bank, while it held approximately $3.7 billion at WMBfsb. (Motion of the Debtors Seeking Approval of Stipulation and Agreement Concerning

---

[4] *See* Washington Mutual Bank, Quarterly Report (Form 10-Q) (May 12, 2006); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Aug. 14, 2006); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Nov. 14, 2006); Washington Mutual Bank, Annual Report (Form 10-K) (April 2, 2007); Washington Mutual Bank, Quarterly Report (Form 10-Q) (May 15, 2007); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Aug. 14, 2007); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Nov. 14, 2007); Washington Mutual Bank, Annual Report (Form 10-K) (March 21, 2008); Washington Mutual Bank, Quarterly Report (Form 10-Q) (May 15, 2008); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Aug. 14, 2008).

[5] *See* Washington Mutual Bank, Annual Report (Form 10-K), at 3 (April 2, 2007); Washington Mutual Bank, Quarterly Report (Form 10-Q), at 34 (Aug. 14, 2007).

[6] *See* Washington Mutual Bank, Quarterly Report (Form 10-Q) (May 12, 2006); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Aug. 14, 2006); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Nov. 14, 2006); Washington Mutual Bank, Annual Report (Form 10-K) (April 2, 2007); Washington Mutual Bank, Quarterly Report (Form 10-Q) (May 15, 2007); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Aug. 14, 2007); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Nov. 14, 2007); Washington Mutual Bank, Annual Report (Form 10-K) (March 21, 2008).

Deposit Accounts at JPMorgan Chase Bank, N.A., Docket No. 74, at ¶ 8). Thus, in the year prior to the commencement of the Bank receivership, WMI caused approximately $4 billion to be withdrawn from the Bank and transferred to WMI (which then apparently re-deposited the funds at WMBfsb). To the extent that the funds so transferred genuinely represented deposits, the transfers of the funds from the Bank constituted transfers of funds of the Bank to an insider of the Bank (WMI, the Bank's parent) for antecedent debt when the Bank was insolvent and when WMI had reasonable cause to believe the Bank was insolvent. To the extent that the funds so transferred are instead properly treated as capital—given WMI's gross undercapitalization of the Bank, its failure to act as a source of strength for the Bank, (as it was required to do under applicable law and as it represented it would do), and the apparent lack of any documentation of any such deposits—the transfers constituted transfers of funds belonging to the Bank for less than reasonably equivalent value when the Bank was insolvent (or when it was rendered insolvent by the transfers), when the Bank was engaged or about to engage in a business for which the remaining assets of the Bank were unreasonably small, and/or when the Bank intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as they came due. In either event, the transfers are avoidable and recoverable from WMI by or for the benefit of the Banks' creditors. The Bank Bondholders assert a claim for the amount of all such purported deposits.

11. <u>Improper Claim to Purported Deposits.</u>

According to WMI's own reports, approximately $4 billion that was supposedly on deposit at WMB was subsequently transferred to WMBfsb by WMI. (Motion of the Debtors Seeking Approval of Stipulation and Agreement Concerning Deposit Accounts at JPMorgan Chase Bank, N.A., Docket No. 74, at ¶ 8). However, JPM "has not discovered any pre-petition deposit account agreements, signature cards or other documentation" evidencing that the funds in question belonged to WMI and were, in fact, held on deposit. (JPM Complaint, *JPMorgan Chase Bank, Nat'l Ass'n v. Washington Mutual, Inc.*, Adv. Proc. No. 09-50551, at ¶ 100; *see id.* at ¶ 95). Even the Debtor has admitted that a "fog of uncertainty" surrounds the purported deposits. (Motion of the Debtors Seeking Approval of Stipulation and Agreement Concerning Deposit Accounts at JPMorgan Chase Bank, N.A., Docket No. 74, at ¶ 17). Moreover, as discussed in paragraph 12 below, it appears that WMI undercapitalized WMB. Consequently, the purported deposits are properly viewed, or should be treated, as capital contributions for which WMB and WMB's receivership estate have sole ownership. To the extent that WMI purports to have exercised or will exercise control or dominion over these funds, it is liable under the law of conversion and similar doctrines. The Bank Bondholders assert a claim for the amount of all such purported deposits.

12. <u>Undercapitalization of, Failure to Support, and Looting of the Bank.</u>

WMI was a holding company. Under applicable law, it was obligated to maintain and guarantee the appropriate capital levels of the Bank pursuant to applicable capital and liquidity requirements including, but not limited to, the statutory and regulatory provisions set forth in 12 U.S.C. § 1831o, 12 U.S.C. § 1464(s) and 12 C.F.R. § 225.4. In

- 7 -

addition, WMI was obligated to maintain appropriate capital and liquidity levels under enforceable and implied capital maintenance agreements, and internal procedures adopted by WMI for the benefit of the Bank. Indeed, WMI publicly represented that "we always manage ourselves at the holding company to the same kind of standards as if we were a [Federal Reserve] regulated bank holding company." (Statement by Kerry Killinger, CEO, Q3 2006 Washington Mutual Earnings Conference Call, Oct. 18, 2006). As further evidence that it purported to manage itself to the same standards as bank holding companies, WMI also publicly disclosed certain capital ratios that would have otherwise remained non-public, explaining that: "The Parent [WMI] is not required by the OTS to report its capital ratios, and as the Parent is not a bank holding company it is not required by the Federal Reserve Board to report its capital ratios. Nevertheless, capital ratios are integral to the Company's capital management process and the provision of such metrics facilitate peer comparison with Federal Reserve Board-regulated bank holding companies." (Washington Mutual Inc., Annual Report (Form 10-K), at 72 (Feb. 29, 2008)). Under the Federal Reserve's Regulation Y, such a bank holding company must "serve as a source of financial and managerial strength to its subsidiary banks and shall not conduct its operations in an unsafe or unsound manner." 12 C.F.R. § 225.4(a)(1).

WMI did nothing of the kind. It inadequately capitalized WMB and looted the Bank. As described in paragraphs 10 and 11 above, it stripped billions of dollars in purported deposits—which should have been, and properly are viewed as, capital contributions—from the Bank in the year prior to the commencement of the receivership. And, as also discussed in paragraph 10, in the period starting in the first quarter of 2006 continuing through the commencement of the receivership, WMI, on a net basis, took some $6 billion out of the Bank in purported dividends. In short, WMI moved billions of dollars from the Bank that, instead, should have remained at WMB to strengthen its capital base and provide liquidity, as required by law and as WMI represented would occur. Indeed, these transfers, directed by WMI, from the Bank occurred at times during which WMI and its management were assuring public investors, including the Bank Bondholders, that the depositor base at the Bank was stable and that the Bank had access to nearly $50 billion of liquidity, all despite the hidden reality that the Bank's financial condition was severely deteriorating.

Moreover, it appears that WMB's capital and liquidity levels may have been of significant concern to the OTS, as evidenced by a number of supervisory and enforcement measures the OTS took.[7] Based on the information available to them, the Bank Bondholders understand that the OTS issued an overall composite CAMELS downgrade to WMB on February 27, 2008. Also, on or about June 30, 2008, the OTS initiated discussions with WMB and WMB about a Memorandum of Understanding; on September 7, 2008, the OTS, WMI and WMB entered into such a Memorandum of Understanding. On September 18, 2009, the OTS issued an overall CAMELS rating downgrade for WMB. While the rationale for the downgrade in CAMELS ratings and the substance of the Memoranda of Understanding are not public, such actions against institutions like WMB and WMI are often taken to address an insured depository institution's inability to maintain proper levels of capital and liquidity, and holding

---

[7]    OTS Fact Sheet, dated September 25, 2008, *available at* http://files.ots.treas.gov/730021.pdf.

companies are often required to agree to support the institution's efforts to maintain the specified capital levels.

WMI is liable to the Bank Bondholders for all damages caused by its failure to adequately capitalize and to maintain the strength of the Bank, and its looting of the Bank, including all principal, interest and other amounts owed on the Senior Notes. The Bank Bondholders assert a claim for all such damages. To the extent that WMI failed to meet its commitments to maintain WMB's capital and liquidity levels in accordance with relevant statutory and regulatory provisions and OTS enforcement agreements, this claim is or may be entitled to priority claim status under Section 507(a)(9) of the Bankruptcy Code.

There may also be additional claims against the Debtor based on violations of Sections 23A and Section 23B of the Federal Reserve Act ("Sections 23A and 23B"), 12 U.S.C. §§ 371c, 371c-1, and the statute's implementing Regulation W, 12 C.F.R. Part 223. Sections 23A and 23B are in place to ensure that an insured institution and its affiliates, including its holding company, do not engage in transactions that are not on terms and conditions that are consistent with safe and sound banking practices. Transactions between WMB and WMI would have been subject to the general restrictions set forth in Sections 23A and 23B by operation of OTS regulations at 12 C.F.R. § 536.41(b). To the extent that WMI engaged, and caused WMB to engage, in transactions with each other in violation of any of these provisions, WMI is liable for all losses, damages, or other amounts relating thereto. The Bank Bondholders assert a claim for all such losses, damages and other amounts.

13.  Misrepresentations and Material Omissions.

The Bank issued the Senior Notes starting in the first quarter of 2006 and continuing through the first half of 2007. During this time period, and continuing thereafter, WMI made material false and misleading statements, or omitted material facts necessary in order to make the statements made not misleading, regarding the Bank, its operations, and its financial condition. WMI and its officers and employees repeatedly misrepresented that the Bank was doing well financially and that its credit and loan underwriting policies and operations were conservative and minimized risk to investors, including holders of Senior Notes. As WMI knew at the time, those statements were false and misleading. WMI knowingly failed to disclose the true facts. In connection with their purchase of the Senior Notes, the Bank Bondholders (and the market for the Senior Notes) relied on these misrepresentations and material omissions. As a result, the Debtor is liable to the Bank Bondholders for all resulting damages, including without limitation all unpaid principal, interest and other amounts due under the Senior Notes, under the federal securities laws and/or other applicable law.

Based on the information currently available to the Bank Bondholders—all of which has been obtained without the benefit of discovery—the following presents a non-exhaustive list of examples of the misstatements and material omissions made by WMI which caused injury to the Bank Bondholders:

- "As [Kerry Killinger, CEO] said, most of our businesses are doing extremely well despite the difficult interest rate environment." (Statement by Tom Casey, EVP and CFO, Q2 2006 Washington Mutual Inc. Earnings Conference Call, July 19, 2006).

- "On the credit front, we're in very good shape . . . If anything, I can be accused of being too conservative. And perhaps we could have maximized our profitability even more by taking on more credit risk through this period of very benign credit. But we want to stay ahead of the curve, be a little more conservative." (Statement by Kerry Killinger, CEO, at the Goldman Sachs Financial Services CEO Conference, December 13, 2006).

- Washington Mutual's loan portfolio represents "strong underwriting," "conservative lending standards," "rigorous credit standards," and "a disciplined credit culture." (Statements by multiple WMI officers at WMI's annual Investor Day conference, September 6 & 7, 2006).

- Question from Merrill Lynch: "Is there a long-term guidance that we should be thinking about where tangible equity can go for the parent?" Response: "I think what we are finding is as we move more towards a Basel II international capital standard we will certainly take that into consideration and, frankly, we always manage ourselves at the holding company to the same kind of standards as if we were a [Federal Reserve] regulated bank holding company." (Statement by Kerry Killinger, CEO, Q3 2006 Washington Mutual Inc. Earnings Conference Call, Oct. 18, 2006).

- In discussing dividends: "[T]he primary factor with our regulators is the maintaining appropriate levels of capital and of course continuing to operate in a safe and sound manner. All those indications are positive from a regulatory capital standpoint. We are in excellent shape. Again, I think, as you think about dividends, again, it is a whole combination of liquidity, the capital that we have, and as I implied there, relative to regulatory guidelines we are in excellent shape, as well as the earnings outlook for the company." (Statement by Kerry Killinger, CEO, Q3 2007 Washington Mutual Inc. Earnings Conference Call, Oct. 17, 2007).

- "My comments today will focus on four key areas . . . . Third, solid operating revenues and substantial capital cushion above our targeted tangible capital ratio of 5.5% and disciplined expense management across all of our businesses are expected to provide us the financial flexibility to manage through this period of expected elevated credit costs. Fourth, we have sufficient liquidity to fund our business operations." (Statement by Tom Casey, EVP and CFO, Q4 2007 Washington Mutual Inc. Earnings Conference Call, Jan. 17, 2008).

- "We continue to maintain a strong liquidity position in addition to strong tangible capital ratio of 6.67%. At year end we had $3.7 billion of capital in excess of our targeted tangible equity to tangible asset capital ratio of 5.5%. In addition, we exceeded all the well capitalized banking ratios by a meaningful margin. Our funding comes in large part from retail deposits generated in our stores from our core

customers. We have $144 billion in retail deposits, which account for 49% of our total funding. The remaining wholesale funding is diversified with staggered maturity profile. At year end we had approximately $69 billion in available excess liquidity." (Statement by Tom Casey, EVP and CFO, Q4 2007 Washington Mutual Inc. Earnings Conference Call, Jan. 17, 2008).

- "Effective capital management goes hand in hand with maintaining strong liquidity position. We have maintained a very strong liquidity position throughout this period of market stress and we further enhanced that position this past quarter. Retail deposits now comprise 53% of our funding, up from 49% at year end. We have a diversified wholesale funding strategy with staggered maturities and have approximately $50 billion in excess liquidity. Finally, we fund all our business through our banking operations and do not rely on commercial paper. With this issue of common stock liquidity at the holding company is very solid." (Statement by Tom Casey, CFO, Q1 2008 Washington Mutual Inc. Earnings Conference Call, April 15, 2008).

- "I want to begin my remarks today by emphasizing to all of you, that in the face of the unprecedented housing and mortgage market conditions we are experiencing, we are continuing to execute on a comprehensive plan, designed to ensure that have strong capital and liquidity and appropriately sized expense base and a growing profitable retail franchise." (Statement by Kerry Killinger, CEO, Q2 2008 Washington Mutual Inc. Earnings Conference Call, July 22, 2008).

- "[I]t is important to note that our capital position remains significantly in excess of 5.5% targeted level. It's after tangible equity to tangible asset ratio, at the end of the second quarter increased to 7.79% from 6.4% at the end of the first quarter. This is $7 billion above our targeted level. From a regulatory capital perspective our tier 1 risk based ration remained strong at 8.44%, which is 244 basis points above well capitalized. In addition, we continue to focus on maintaining strong levels of liquidity. We ended the second quarter with over $40 billion of readily available liquidity." (Statement by Kerry Killinger, CEO, Q2 2008 Washington Mutual Inc. Earnings Conference Call, July 22, 2008).

- "Now, there seems to be a great deal of speculation whether WaMu will need to raise capital. Let me answer that by walking you through the details of how we expect to manage through this difficult credit environment. First, we currently have substantial capital, plus loan loss reserves sufficient to handle the upper end of our current loss expectation and second, our ongoing pretax and preprovision income, and balance sheet reduction will provide additional cushion for future credit losses. . . . So given our current strong capital, existing reserve through loan losses, ongoing operating earnings and planned balance sheet shrinkage, we are in a strong position to work our way through this difficult credit cycle without the need for additional capital." (Statement by Tom Casey, CFO, Q2 2008 Washington Mutual Inc. Earnings Conference Call, July 22, 2008).

- Question: "[Y]our capital ratios at the subsidiary thrift didn't increase the way the company's did[.] I was wondering if you were planning to increase those?"
  Response: "[W]ith regard to down streaming capital to the bank we continue to monitor that. We did move some down to the bank level as part of the equity rate and we will continue to evaluate that. We will probably put some additional capital down to the bank this quarter. We are maintaining good liquidity at the holding company through 2010 through 2011." (Statement by Tom Casey, CFO, Q2 2008 Washington Mutual Inc. Earnings Conference Call, July 22, 2008).

14. Conditional Exchange of REIT Trust Preferred Securities.

On March 7, 2006, WMI and affiliates closed the sale of a number of classes of trust preferred securities. Upon information and belief, at least some of these issues were so-called "REIT preferred" securities, where assets of the Bank were transferred to a special purpose entity ("SPE"). The SPE in turn issued preferred securities to investors, the proceeds of which (the "Bank Proceeds") were supposed to be used to compensate the Bank for the assets transferred. The Bank Bondholders have obtained to date only limited information about the transactions involving the REIT preferred securities and reserve all rights to supplement, amend and modify this Amended Proof of Claim to assert additional claims relating to those transactions. Based on the information available to date, the Bank Bondholders assert the following claims:

- It appears that WMI caused the Bank to upstream some or all of the Bank Proceeds to WMI as purported dividends.[8] Any such transfer may be avoided and recovered from WMI, under fraudulent transfer or other law, by or on behalf of the Bank's creditors. The Bank Bondholders assert a claim for all such amounts.

- Moreover, upon the occurrence of an "Exchange Event,"[9] and if the OTS so directed, each of the relevant trust preferred securities were to be automatically exchanged for depository shares of WMI preferred stock. On September 25, 2008, the same day that the OTS closed the Bank and the FDIC was appointed receiver, the OTS concluded that an Exchange Event had occurred and directed the conditional exchange. As a result of the conditional exchange, the assets held in the SPE traveled with the trust preferred securities to WMI, were exchanged into WMI preferred stock, and should have been contributed—after the sale to JPM had been completed—down to the Bank from WMI. To the extent they have not been, and/or to the extent that any assets of

---

[8]     See Washington Mutual Bank, Quarterly Report (Form 10-Q) (May 12, 2006); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Aug. 14, 2006); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Nov. 14, 2006); Washington Mutual Bank, Annual Report (Form 10-K) (April 2, 2007); Washington Mutual Bank, Quarterly Report (Form 10-Q) (May 15, 2007); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Aug. 14, 2007); Washington Mutual Bank, Quarterly Report (Form 10-Q) (Nov. 14, 2007); Washington Mutual Bank, Annual Report (Form 10-K) (March 21, 2008).

[9]     Based on publicly available documents that discuss the offering and sale of the relevant trust preferred securities, an "Exchange Event" was defined to mean (a) the Bank becoming "undercapitalized" under the OTS' prompt corrective action regulations; (b) the Bank being placed into conservatorship or receivership; or (c) the OTS, in its sole discretion, directing such exchange in anticipation of the Bank becoming "undercapitalized" in the near term or taking supervisory action that limits the payment of dividends, as applicable, by the Bank, and in connection therewith, directing such an exchange. See Washington Mutual Inc., Current Report (Form 8-K) (March 7, 2006).

the Bank were obtained by the Debtor in connection with the conditional exchange, the Bank Bondholders assert a claim therefor, and for all related amounts and damages. (WMI Monthly Operating Report, Feb. 2, 2009, at note 1).

15.   Tax Refunds and Losses.

WMI and WMB filed consolidated tax returns. The Bank was, by far, WMI's principal operating subsidiary. It generated massive losses, in large measure because of WMI's looting from, mismanagement of, and failure adequately to capitalize and act as a source of strength for, the Bank. These losses generated tax benefits. To the extent those benefits were not transferred by the FDIC to JPM, they are the sole property of and must insure to the benefit of the Bank and its creditors, including the Bank Bondholders, not WMI. Yet, public reports have indicated that WMI intends to assert that it is entitled to a multi-billion dollar tax refund. The Bank Bondholders assert a claim with respect to any and all such tax refunds and benefits that are attributable to WMB's operations, losses, and ultimate sale to JPM. This claim covers any such refunds and benefits arising out of both any already-filed tax returns, and any tax returns to be filed by WMI in the future. The assertion of such a claim is without prejudice to the right of the Bank and its receivership estate to demand the turn-over of any and all such benefits, and all proceeds resulting therefrom, as the property of the Bank which must be held in trust for its creditors.

All Federal and State tax refunds or other benefits that are attributable to WMB's operations, losses and ultimate sale are due and owing to the Bank and its creditors only, not to WMI. A tax refund resulting from offsetting losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member, in this case the Bank. Allowing WMI to retain any refunds arising from a subsidiary's losses simply because the parent and subsidiary chose, for convenience, the procedural device of filing a consolidated return to facilitate their income tax reporting would unjustly enrich the parent, would be contrary to applicable tax law, and would also be a breach of WMI's contractual and fiduciary duties to the Bank.

Provisions in the August 31, 1999 Tax Sharing Agreement entered into by WMI and the Bank, the Bank Holding Company Supervision Manual, and relevant caselaw support the conclusion that the Bank, and not WMI, should retain any tax assets that were not transferred to JPM. Such tax assets are attributable solely to the income and loss of the Bank, and not WMI, and any refunds belong entirely to the Bank.

Accordingly, to the extent that any such refunds are not turned over to the Bank's receivership estate, the Bank Bondholders assert a claim in an amount equal to any and all such refunds and benefits.

16.   Mismanagement, and Breach of Fiduciary and Other Duties.

At all relevant times, the Bank was a wholly-owned subsidiary of WMI. The officers and directors of WMI set the policies for, and directed the operations of, WMB. WMI

dominated the Bank. WMI's officers and directors mismanaged WMB, and looted it, causing it to suffer billions of dollars in losses and requiring the OTS to put the Bank into receivership. WMI and its officers and directors owed fiduciary duties, of care and loyalty, to WMB and its creditors, as WMB became insolvent and/or in the zone of insolvency. WMI and its officers and directors breached those duties. WMI is liable directly to WMB's creditors, including the Bank Bondholders, as well as to the Bank receivership estate, for those breaches (and for those of its officers and directors under principals of respondeat superior, agency and the like). The Bank Bondholders assert a claim for all resulting damages, including without limitation all principal, interest and other amounts owing under the Senior Notes to the Bank Bondholders.

17.    Claim for Goodwill Litigation Awards.

Based on the limited information available to the Bank Bondholders to date, it appears that WMB was the successor in interest to American Savings Bank, F.A. ("American Savings") and to Anchor Savings Bank, FSB ("Anchor Savings"). American Savings and Anchor Savings were plaintiffs in two separate actions brought against the United States by thrifts and thrift holding companies alleging that the government breached certain supervisory merger contracts following the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") (See Am. Savings Bank v. United States, Case No. 92-872 (Fed. Cl.); Anchor Savings Bank, FSB v. United States, Case No. 95-03C (Fed. Cl.); together, the "Goodwill Litigation"). The plaintiffs successfully alleged injury arising out of FIRREA's new capital mandates which prohibited thrifts from counting supervisory goodwill created in merger transactions towards these capital requirements. A partial judgment was entered in favor of the plaintiffs in American Savings Bank v. United States matter, and the court directed the Government to pay WMI $55,028,000. (Dec. 19, 2008 Order, Am. Savings Bank v. United States, Case No. 92-872 (Fed. Cl.)). A determination of damages on remaining claims is still pending in that matter. Similarly, the Government has been ordered to pay $356,454,911 to the plaintiff in the Anchor Savings Bank, FSB v. United States matter. (July 16, 2008 Order, Anchor Savings Bank, FSB v. United States, Case No. 95-03C (Fed. Cl.)).

Because WMB appears to have been the successor entity to American Savings and Anchor Savings, the judgments from these two actions are the rightful property of WMB, not WMI. Alternatively, to the extent such assets were not sold to JPM, the WMB receivership estate and its creditors would have a claim against WMI's bankruptcy estate for the judgments in the Goodwill Litigation. The Bank Bondholders assert a claim with respect to any and all awards arising out of the Goodwill Litigation.

18.    Additional Claims.

The Bank Bondholders also assert any and all additional or different claims that may be asserted by other holders of the Senior Notes. Any Proofs of Claim submitted by any such other holders are incorporated herein by reference.

## Reservation of Rights

19. WMB and its creditors may have additional claims for undetermined amounts based on rights of indemnity or contribution relating to pending securities class actions and other claims to which WMB is or may be a named defendant. In addition, WMB may have rights with respect to insurance policies (and claims against WMI with respect to any such policies) under which WMB and/or WMI are insureds or additional insureds, including without limitation any such policies covering claims against directors, officers, professionals and others who acted for or provided services for WMB or WMI. The Bank Bondholders reserve all such claims and rights.

20. The Bank Bondholders reserve all rights to establish the validity, priority and amount of, and to amend, modify or supplement, this Amended Proof of Claim including, but not limited to, by asserting additional amounts and claims, and to produce all documentary and testimonial evidence and memoranda of law in support thereof in any future proceeding as may be deemed necessary or appropriate.

21. This Amended Proof of Claim shall not be deemed a consent by the Bank Bondholders to having any matters heard by the Bankruptcy Court. Nor shall the Bank Bondholders' submission of this Amended Proof of Claim waive any right of the Bank Bondholders to have final orders in non-core matters entered only after de novo review by a U.S. District Judge, any right to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, or any other rights, claims, actions, defenses, setoffs or recoupments to which the Bank Bondholders are or may be entitled under any agreements, in law or equity, all of which rights, claims, actions, defenses, setoffs and recoupments are expressly reserved.

22. This Amended Proof of Claim is not intended to be, and shall not be construed as: (a) an election of remedies; (b) waiver of any right to the determination or any issue or matter by a jury; (c) a waiver of any defaults; or (d) a waiver or limitation of any rights at law or equity, remedies, claims or interests of the Bank Bondholders.

23. Copies of various documents in support of this Amended Proof of Claim are not attached hereto because they are voluminous and the nature of and the relevant provisions are described herein. Further, a significant portion of such documents should be in the possession of WMI and/or are matters of public record.

# LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1) do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2) prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3) take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 25th day of March 2009.

NATIONAL BANK OF CANADA (GLOBAL) LIMITED

AS INVESTMENT MANAGER OF ALTMA FUND SICAV P.L.C. IN RESPECT OF RUSSELL SUB-FUND

By: _____
Name: Hayden Jones
Title: Managing Director

By: _____
Name: Giorgio Pavesio
Title: Vice-President Middle Office Market Risk

STAMP DUTY: $10.00
AMOUNT PAID: $10.00
RECEIPT NO: 394169
DATE: 2009-03-26
SIGNATURE:

Acknowledged before me on March 26, 2009, by Hayden Jones and by Giorgio Pavesio who say that they hold the above-mentioned titles at the above-mentioned entity and that they are as such authorized to execute this power of attorney on behalf of Altma Fund SICAV p.l.c. in respect of Russell Sub-Fund.

Notary: _____
ASST. REGISTRAR AND AS
SUCH A NOTARY PUBLIC IN
AND FOR BARBADOS

US1DOCS 7106717v1

## LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)     do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)     prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)     take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 30th day of March 2009.

By: _____

Name:   Kevin Ulrich

Title:   Director

Anchorage Capital Master Offshore, Ltd.

Acknowledged before me on March 30 , 2009, by _Kevin Ulrich_ , who says that he or she holds the title of _Director_ of _Anchorage Capital Master Offshore, Ltd._ and is authorized to execute this power of attorney in its behalf.

Anne Marie Kim
Notary Public of New York
My Commission Expires
August 29, 2009

# POWER OF ATTORNEY

BANK OF SCOTLAND PLC (registered number SC327000) having its Registered Office at The Mound, Edinburgh EH1 1YZ ("BoS") hereby appoints Philip D Anker of Wilmer Cutler Pickering Hale and Dorr at 399 Park Avenue, New York, NY 1022 USA, to be its true and lawful attorney (the "Attorney") with full power and authority of BoS in its name to do and perform on behalf of BoS all or any acts, and things lawfully necessary to or desirable to:

1. prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

2. prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

3. take any other action of any type whatsoever in connection with the foregoing which, in the reasonable opinion of such Attorney, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such Attorney on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such Attorney may approve in such Attorney's discretion.

BoS undertakes to ratify whatever the Attorney may do in its name or on its behalf in exercising the powers contained in this Power of Attorney.

This Power of Attorney shall be irrevocable for a period of six months from the date of this Power of Attorney.

The laws of Scotland shall apply to this Power of Attorney and the interpretation thereof and to all acts of the Attorney carried out or purported to be carried out under the terms of this Power of Attorney.

IN WITNESS WHEREOF this Power of Attorney consisting of this and the preceding page has been executed as follows:

SUBSCRIBED for and on behalf of

**BANK OF SCOTLAND PLC**

at ......... London .........

on ......... 25 MARCH 2009 .........

By: .........................................

Truett Tate

Group Executive Director, Wholesale Division

Witnessed by:

LORINDA J LONG
33 OLD BROAD STREET
LONDON
EC2N 1HZ
25.3.09.

## LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)      do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)      prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)      take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 26 th day of March 2009.

By: _____

Name:   Robert E. Davis

Title:   *Managing Director*

Cetus Capital, LLC

Acknowledged before me on March 26, 2009, by Barbara Ferrone, who says that he or she holds the title of Notary of State of Connecticut is and is authorized to execute this power of attorney in its behalf.

_____

**BARBARA J. FERRONE**
**NOTARY PUBLIC**
**STATE OF CONNECTICUT**
My Commission Expires June 30, 2013

# LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)     do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)     prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)     take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 30 th day of March 2009.

By: _____

Name: Louis T. Hanover

*Authorized Signatory*

Corporate Debt Opportunities Fund, Ltd.

Acknowledged before me on March 30, 2009, by Louis T. Hanover who says that he or she holds the title of Authorized of Corp Debt Opport Fd is and is authorized to execute this power of attorney in its behalf.

**N. SANJAY KATHIRITHAMBY**
Notary Public, State of New York
No. 02KA6195318
Qualified in New York County
Commission Expires Oct. 20, 2012

USIDOCS 7106717v1

## LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)    do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)    prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)    take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 25th day of March 2009.

By: _____

Name:  Brian Meyer

Title:  *Authorized Person*

Fir Tree Capital Opportunity Master Fund, L.P.

State of New York )
County of Westchester )

Acknowledged before me on March 25, 2009, by Brian Meyer, who says that he is authorized to execute this power of attorney on behalf of Fir Tree Capital Opportunity Master Fund, L.P.

_____

TRACEY KONECNIK
NOTARY PUBLIC STATE OF NEW YORK
WESTCHESTER COUNTY
LIC. #01KO6044256
COMM. EXP. 7/3/2010

## LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)     do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)     prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)     take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 25 th day of March 2009.

By: _____

Name:  Brian Meyer

Title:  *Authorized Person*

Fir Tree Mortgage Opportunity Master Fund, L.P.

State of New York )
County of Westchester )

Acknowledged before me on March 25, 2009, by Brian Meyer, who says that he is authorized to execute this power of attorney on behalf of Fir Tree Mortgage Opportunity Master Fund, L.P.

_____

TRACEY KONECNIK
NOTARY PUBLIC STATE OF NEW YORK
WESTCHESTER COUNTY
LIC. #01KO6044256
COMM. EXP. 7/3/2010

# LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)     do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)     prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)     take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 25th day of March 2009.

By: _____

Name:   Brian Meyer

Title:   *Authorized Person*

Fir Tree Value Master Fund, L.P.

State of New York )
County of Westchester )

Acknowledged before me on March 25, 2009, by Brian Meyer, who says that he is authorized to execute this power of attorney on behalf of Fir Tree Value Master Fund, L.P.

_____

TRACEY KONECNIK
NOTARY PUBLIC STATE OF NEW YORK
WESTCHESTER COUNTY
LIC. #01KO604256
COMM. EXP. 7/3/2010

## LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)    do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)    prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)    take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 27th day of March 2009.

Juggernaut Fund, L.P.

By: Duquesne Capital Management, L.L.C., as

its Investment Manager

By: _____

Jeffrey S. Werner

Assistant Vice President

Acknowledged before me on March 27, 2009, by Jeffrey S Werner, who says that he holds the title of Assistant Vice President of Duquesne Capital Management, L.L.C., the Investment Manager of Juggernaut Fund, L.P., and is authorized to execute this power of attorney in its behalf.

# LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)     do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)     prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)     take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 16 th day of March 2009.

By: _____

Name:  Louis T. Hanover

*Authorized Signatory*

Marathon Credit Master Fund, Ltd.

Acknowledged before me on March 25, 2009, by Louis T. Hanover who says that he or she holds the title of Authorized of Marathon Credit Master Fund is and is authorized to execute this power of attorney in its behalf.

N. SANJAY KATHIRITHAMBY
Notary Public, State of New York
No. 02KA6195318
Qualified in New York County
Commission Expires Oct. 20, 2012

## LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)     do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)     prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)     take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 25th day of March 2009.

By: _____

Name: Louis T. Hanover

*Authorized Signatory*

Marathon Credit Opportunity Master Fund, Ltd.

Acknowledged before me on March 25, 2009, by Louis T. Hanover, who says that he or she holds the title of Authorized of Marathon Credit Opportunity Master Fund is and is authorized to execute this power of attorney in its behalf. Signing to.

N. SANJAY KATHIRITHAMBY
Notary Public, State of New York
No. 02KA6195318
Qualified in New York County
Commission Expires Oct. 20, 2012

USIDOCS 7106717v1

## LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)     do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)     prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)     take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 24 th day of March 2009.

By: _____

Name:  Louis T. Hanover

*Authorized Signatory*

Marathon Special Opportunity Master Fund, Ltd.


Acknowledged before me on March 24, 2009, by Louis T. Hanover who says that he or she holds the title of Authorized Signatory of Marathon Special Opport Mast fund is and is authorized to execute this power of attorney in its behalf.

_____

N. SANJAY KATHIRITHAMBY
Notary Public, State of New York
No. 02KA6195318
Qualified in New York County
Commission Expires Oct. 20, 2012

## LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)     do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)     prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)     take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 25th day of March 2009.

Quintessence Fund L.P.,

By it general partner, QVT Associates GP LLC

By: _____

Name:  Nicholas Brumm

Title:  *Managing Member*

Patrick J. Dillon

**PATRICK J. DILLON**
Notary Public, State of New York
ID No. 01DI6168877
Qualified in Westchester County
Certificate Filed in New York County
Commission Expires 06/16/2011

Acknowledged before me on March 25, 2009, by Nicholas Brumm, who says that he holds the title of Managing Member of QVT Associates GP LLC, the general partner of Quintessence Fund L.P. is and is authorized to execute this power of attorney in its behalf.

# LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)    do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)    prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)    take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 25th day of March 2009.

QVT Fund LP,

By it general partner, QVT Associates GP LLC

By: _____

Name:  Nicholas Brumm

Title:  *Managing Member*

*Patrick J. Dillon*
**PATRICK J. DILLON**
Notary Public, State of New York
ID No. 01DI6168877
Qualified in Westchester County
Certificate Filed in New York County
Commission Expires 06/18/2011

Acknowledged before me on March 25, 2009, by Nicholas Brumm, who says that he holds the title of Managing Member of QVT Associates GP LLC, the general partner of QVT Fund LP is and is authorized to execute this power of attorney in its behalf.

USIDOCS 7106651v1

# LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)     do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)     prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)     take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 30th day of March 2009.

By: _Edward A Mule_ _____

Name: Ed Mule

Title: CEO of Silver Point Capital, LP investment manager of Silver Point Capital Fund, LP and Silver Point Capital Offshore Fund, Ltd.

Acknowledged before me on March 30, 2009, by Ed Mule, who says that he or she holds the title of CEO of Silverpoint Capital LP and is authorized to execute this power of attorney in its behalf.

_Brian A Jarmain_

Brian A Jarmain
Notary Public-Connecticut
My Commission Expires
April 30, 2012

## LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)    do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)    prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)    take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 25th day of March 2009.

GM 9/09

THE SEAL OF                                                    )
THE GOVERNOR AND COMPANY OF                   )
THE BANK OF IRELAND                                     )

was affixed hereto by the authority of the Directors      )

Secretary - Jeremy Crean

Marie Somers, Bank Assistant
Bank of Ireland, Lr. Baggot St., Dublin 2

USLDOCS 7105681v1

# LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1)     do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW)) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2)     prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3)     take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 31st day of March 2009.

By: _____

Name:   Adam J. Semler

Title:   CFO of York Capital Management ✳

✳ On behalf of the following entities:

York Capital Management, L.P.
York Select, L.P.
York Credit Opportunities Fund, L.P.
York Select Master Fund, L.P.
York Investment Master Fund, L.P.

York Credit Opportunities Master Fund, L.P.
Permal York Ltd.
Lyxor/York Fund Limited
HFR EA Select Fund IV Master Trust

Acknowledged before me on March 31, 2009, by Adam J. Semler, who says that he or she holds the title of CFO of York Capital Management and is authorized to execute this power of attorney in its behalf.

LISA M. URBAN
Notary Public, State of New York
No. 01UR6052245
Qualified in New York County
Commission Expires 12/11/10

# LIMITED POWER OF ATTORNEY

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

(1) do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

(2) prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

(3) take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 26th day of March 2009.

Windmill Master Fund, LP

By: _Joseph W. Haleski_

Name: Joseph W. Haleski

Title: *Vice President, Duquesne Holdings, L.L.C.*

*General Partner*

Acknowledged before me on March 26th, 2009, by Joseph W. Haleski, who says that he holds the title of Vice President of the General Partner of Windmill Master Fund, LP and is authorized to execute this power of attorney in its behalf.

Witness: _Lauren Mort_

**LIMITED POWER OF ATTORNEY**

Know all by these presents, that the undersigned hereby makes, constitutes and appoints Philip D. Anker of Wilmer Cutler Pickering Hale and Dorr LLP as the undersigned's true and lawful attorney-in-fact with full power and authority as hereinafter described to:

 (1) do and perform any and all acts for and on behalf of the undersigned which may be necessary or desirable to prepare, complete and execute one or more proofs of claim to be filed in the bankruptcy proceedings of Washington Mutual, Inc. (Case No. 08-12229 (MFW) pending in the United States Bankruptcy Court for the District of Delaware) or the bankruptcy proceedings of any of its affiliates;

 (2) prepare, complete and execute any amendment or amendments thereto, and timely deliver and file such proofs of claim with the appropriate court or claims agent;

 (3) take any other action of any type whatsoever in connection with the foregoing which, in the opinion of such attorney-in-fact, may be of benefit to, in the best interest of, or legally required by, the undersigned, it being understood that the documents executed by such attorney-in-fact on behalf of the undersigned pursuant to this Power of Attorney shall be in such form and shall contain such terms and conditions as such attorney-in-fact may approve in such attorney-in-fact's discretion.

This Power of Attorney shall remain in full force and effect until revoked by the undersigned in a signed writing delivered to the foregoing attorneys-in-fact.

IN WITNESS WHEREOF, the undersigned has caused this Power of Attorney to be executed as of this 1st day of June 2009.

| | |
|---|---|
| **THE VÄRDE FUND, L.P.**<br>By Värde Partners, L.P., Its General Partner<br>By Värde Partners, Inc., Its General Partner<br><br>By:<br>Name: David A. Marple<br>Title: Secretary | **THE VÄRDE FUND VI-A, L.P.**<br>By Värde Investment Partners G.P., LLC, Its General Partner<br>By Värde Partners, L.P., Its Managing Member<br>By Värde Partners, Inc., Its General Partner<br><br>By:<br>Name: David A. Marple<br>Title: Secretary |
| **THE VÄRDE FUND VII-B, L.P.**<br>By Värde Investment Partners G.P., LLC, Its General Partner<br>By Värde Partners, L.P., Its Managing Member<br>By Värde Partners, Inc., Its General Partner<br><br>By:<br>Name: David A. Marple<br>Title: Secretary | **THE VÄRDE FUND VIII, L.P.**<br>By Värde Fund VIII G.P., LLC, Its General Partner<br>By Värde Partners, L.P., Its Managing Member<br>By Värde Partners, Inc., Its General Partner<br><br>By:<br>Name: David A. Marple<br>Title: Secretary |
| **THE VÄRDE FUND IX, L.P.**<br>By Värde Fund IX G.P., LLC, Its General Partner<br>By Värde Partners, L.P., Its Managing Member<br>By Värde Partners, Inc., Its General Partner<br><br>By:<br>Name: David A. Marple<br>Title: Secretary | **THE VÄRDE FUND IX-A, L.P.**<br>By Värde Fund IX G.P., LLC, Its General Partner<br>By Värde Partners, L.P., Its Managing Member<br>By Värde Partners, Inc., Its General Partner<br><br>By:<br>Name: David A. Marple<br>Title: Secretary |

| VÄRDE INVESTMENT PARTNERS, L.P. | VÄRDE INVESTMENT PARTNERS |
|---|---|
| By Värde Investment Partners G.P., LLC, Its General Partner | (OFFSHORE), LTD. |
| By Värde Partners, L.P., Its Managing Member | |
| By Värde Partners, Inc., Its General Partner | By: _____ |
| | Name: David A. Marple |
| | Title: Secretary |
| By: _____ | |
| Name: David A. Marple | |
| Title: Secretary | |

Acknowledged before me on June 1, 2009, by David A. Marple, who says that he holds the title of Secretary of Värde Partners, Inc. and Värde Investment Partners (Offshore), Ltd, and is authorized to execute this power of attorney in their behalf.

Notary Public

KATHLEEN C RICKE
Notary Public
Minnesota
My Comm. Expires Jan 31, 2010