## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| *In re* | : | **Chapter 11** |
|  | : |  |
| **WASHINGTON MUTUAL, INC., et al.,**[1] | : | **Case No. 08-12229 (MFW)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |
|  | : | **Hearing Date: April 21, 2010 at 11:30 a.m. (ET)** |
|  | : | **Objection Deadline: March 29, 2010 at 4:00 p.m. (ET)** |

-------------------------------------------------------------x

## DEBTOR'S TWENTY-SEVENTH OMNIBUS
## (SUBSTANTIVE) OBJECTION TO CLAIMS
### (CLAIM NOS. 2889, 2890, 2891, 2893, 2894, 2896, 2897, 2898 AND 2900)

Washington Mutual, Inc. ("WMI" or the "Debtor"), as debtor and debtor in

possession, pursuant to section 502 of title 11 of the United States Code (the "Bankruptcy

Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

hereby submits this objection (the "Objection") to proof of claim number 2889 ("Claim 2889")

filed by Shimera Jones ("Jones"); claim number 2890 ("Claim 2890") filed by Osualdo Caban

("Caban"); claim number 2891 ("Claim 2891") filed by Frances D. Arriaga ("Arriaga"); claim

number 2893 ("Claim 2893") filed by Eddie Lopez ("Lopez"); claim number 2894 ("Claim

2894") filed by Felix Martinez ("F. Martinez"); claim number 2897 ("Claim 2897") filed by

Ruben Alvarez ("Alvarez"); claim number 2898 ("Claim 2898") filed by V. Martinez ("V.

Martinez"); claim number 2896 ("Claim 2896") filed on behalf of a purported class (the "Lopez

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98101.

Class"); and claim number 2900 ("Claim 2900") (collectively with Claim 2889, Claim 2890,

Claim 2891, Claim 2893, Claim 2894, Claim 2896, Claim 2897, and Claim 2898, the "Claims")

for attorney's fees, filed by Roddy Klein & Ryan ("Roddy Klein & Ryan") (collectively with

Jones, Caban, Arriaga, Lopez, F. Martinez, the Lopez Class, Alvarez, and V. Martinez,

"Claimants"), and respectfully represents as follows:

## Preliminary Statement

1.      In recent years, the U.S. housing market was crippled as volatility

engulfed entire sectors of the U.S. and global economies. The causes behind the recent

economic volatility are varied but include precipitous declines in housing prices, a corresponding

decline in commercial real estate prices, rising unemployment, declines in commercial retailing,

and the contraction of global securities markets and financial sector balance sheets. Ultimately,

the global recession resulted in the bankruptcy or closure of some of the largest financial

institutions in the country, including the seizure of Washington Mutual Bank ("WMB"), which,

in turn, precipitated the filing of WMI's bankruptcy proceedings.

2.      Against the backdrop of the housing market collapse, Jones, Caban,

Arriaga, Lopez, F. Martinez, Alvarez, and V. Martinez (collectively, the "Prepetition Plaintiffs")

filed an action, styled Lopez et al. v. Long Beach Mortgage Co. et al., NO. 08-10279 (D. Mass.)

in the United States District Court for the District of Massachusetts (the "Prepetition Class

Action"), in which they alleged that Long Beach Mortgage Company ("Long Beach"), WMB,

and WMI violated the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. ("ECOA") and the

Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA"), by creating and maintaining a

discriminatory pricing scheme that resulted in higher cost home mortgage loans for minority

borrowers as compared to non-minority borrowers. Once WMI entered chapter 11, Claimants

filed the Claims based on the Prepetition Class Action. The Claims are wholly without merit and, therefore, should be disallowed in their entirety.

3. As a preliminary matter, the allegations in the Claims are completely unrelated to WMI. The vast majority of Claimants' allegations relate to other, non-debtor entities including WMB and Long Beach. Most of the allegations improperly attempt to lump WMI, WMB, and Long Beach together through the general defined term "Defendants," in an apparent attempt to rope in WMI for purported misconduct on the part of WMB or Long Beach. WMI, a former savings and loan holding company (as defined by federal law), was not involved in the day-to-day activities of WMB or Long Beach; did not originate or service any of the mortgage loans at issue in the Claims (see Declaration of Charles Edward Smith Pursuant to Local Rule 3007-1 in Support of Debtors' Twenty-Seventh Omnibus (Substantive) Objection to Claims (Claim Nos. 2889, 2890, 2891, 2893, 2894, 2896, 2897, 2898 and 2900), dated March 3, 2010 ("Smith Decl.") ¶ 5[2]; see also Compl. ¶ 118); and was not involved in determining the terms and conditions for these loans. Smith Decl. ¶ 8. Accordingly, Claimants lack any injury attributable to WMI, and therefore lack standing to sue WMI for the alleged misconduct underlying the Claims.

4. Moreover, it is a matter of public record and part of the record of these bankruptcy cases that WMI no longer owns the banking operations of WMB. The Federal Deposit Insurance Corporation ("FDIC") was appointed receiver of WMB and sold substantially all of WMB's assets to JPMorgan Chase Bank, N.A. ("JPMC") pursuant to that certain Purchase and Assumption Agreement, Whole Bank, dated September 25, 2008 ("P&A Agreement").

---

[2] A copy of the Smith Decl. is attached hereto as Ex. B.

5. Furthermore, Claimants have not sufficiently alleged any theory of liability under which they can hold WMI liable for the acts of WMB and/or Long Beach, or for the acts of non-party mortgage brokers. And, even assuming they had adequately alleged such a theory, Claimants have failed to state a cognizable claim under the applicable statutes WMI is alleged to have violated. The Claims do not state a cognizable policy upon which the disparate impact claims may be based, the allegations of disparate impact in the Claims are insufficient to establish a violation under either the ECOA or FHA, and WMI is not a proper defendant under either the ECOA or FHA causes of action. Moreover, certain of the Claimants are barred from pursuing their causes of action because their claims are time barred under the applicable statutes of limitations under the ECOA and FHA.

6. To the extent the Claims are not otherwise disallowed, they cannot, in any event, survive as class claims. The class allegations in the Claims should be stricken and expunged because there is no legal basis by which to hold WMI responsible for the alleged misconduct, and because the discriminatory practices allegations are not susceptible to a class adjudication. There is therefore no basis upon which to certify the putative class sought by Claimants. Moreover, the Court should exercise its discretion to find the class allegations should be disallowed given that class litigation would unduly delay WMI's chapter 11 case.

7. To the extent the Claims are not otherwise disallowed, the Court should, in the alternative, join as necessary parties the non-party mortgage brokers whom the Claimants allege were involved in the allegedly discriminatory practices, in order to proceed with this action.

## Jurisdiction

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.
§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper
before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

9.      On September 26, 2008 (the "Commencement Date"), WMI and  WMI
Investment Corp. (the "Debtors") each commenced in this Court a voluntary case pursuant to
chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their
businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and
1108 of the Bankruptcy Code.  On October 3, 2008, the Court entered an order, pursuant to
Bankruptcy Rule 1015(b), authorizing the joint administration of the Debtors' chapter 11 cases.

## WMI's Business

10.      WMI, a holding company incorporated in the State of Washington, is the
direct parent of WMI Investment, which served as an investment vehicle for WMI and holds a
variety of securities.  WMI Investment is incorporated in the State of Delaware.

11.      Prior to the Commencement Date, WMI operated as a savings and loan
holding company that owned Washington Mutual Bank ("WMB") and, indirectly, such bank's
subsidiaries, including Washington Mutual Bank fsb ("WMBfsb").  WMI still owns all of the
outstanding stock of WMB, and WMI also has certain non-banking, non-debtor subsidiaries (the
"Non-debtor Subsidiaries").  Like all savings and loan holding companies, WMI was subject to
regulation by the Office of Thrift Supervision (the "OTS").  WMB and WMBfsb, in turn, like all
depository institutions with federal thrift charters, were subject to regulation and examination by

the OTS. In addition, WMI's banking and nonbanking subsidiaries were overseen by various federal and state authorities, including the Federal Deposit Insurance Corporation ("FDIC").

12. WMI also directly owned Long Beach until 2006. (Smith Decl. ¶ 6). In March 2006, Long Beach became a subsidiary of WMB, and in July 2006, Long Beach was merged with and into WMB, and WMB became the successor-in-interest to Long Beach, including its assets and liabilities. Id.

13. On September 25, 2008, the Director of the OTS, by order number 2008-36, appointed the FDIC as receiver for WMB and advised that the receiver was immediately taking possession of WMB (the "Receivership"). Immediately after its appointment as receiver, the FDIC purportedly sold substantially all the assets of WMB, including the stock of WMBfsb, to JPMorgan Chase Bank, National Association ("JPMorgan Chase") pursuant to that certain Purchase and Assumption Agreement, Whole Bank, dated September 25, 2008 (the "Purchase Agreement").

14. WMI's assets include its common stock interest in WMB, its interest in its non-banking subsidiaries, and more than $4 billion of cash that WMI and its non-banking subsidiaries (including WMI Investment) had on deposit at WMB and WMBfsb immediately prior to the time the FDIC was appointed as receiver.

### The Bar Date and Schedules

15. On December 19, 2008, Debtors filed with the Court their schedules of assets and liabilities. On January 27, 2009, and February 24, 2009, WMI filed with the Court its first and second, respectively, amended schedule of assets and liabilities (collectively, the "Schedules").

16.     By order, dated January 30, 2009 (the "Bar Date Order"), the Court established March 31, 2009 (the "Bar Date") as the deadline for filing proofs of claim against the Debtors in these chapter 11 cases. Pursuant to the Bar Date Order, each creditor, subject to certain limited exceptions, was required to file a proof of claim on or before the Bar Date.

17.     In accordance with the Bar Date Order, Kurtzman Carson Consultants, LLC ("KCC"), the Debtors' court-appointed claims and noticing agent, mailed notices of the Bar Date and proof of claim forms to, among others, all of the Debtors' creditors and other known holders of claims as of the Commencement Date. Notice of the Bar Date also was published once in *The New York Times (National Edition), The Wall Street Journal, The Seattle Times*, and *The Seattle Post-Intelligencer*.

### Proofs of Claim

18.     Over 3,750 proofs of claim have been filed in these chapter 11 cases. The Debtors are in the process of reviewing and reconciling the filed proofs of claim. As of February 28, 2010, a total of 1,096 claims have been withdrawn or disallowed.

19.     As part of their ongoing review, the Debtors have reviewed the Claims and have concluded that they are appropriately objected to on the basis set forth below.

### Claimants' Allegations

20.     Pursuant to this Objection, the Debtors seek to disallow the Claims in their entirety.

### A.     General Allegations in the Prepetition Class Action Complaint

21.     On February 15, 2008, the Prepetition Plaintiffs filed the Prepetition Class Action in the United States District Court for the District of Massachusetts against Long Beach, WMB and WMI (collectively defined as the "Defendants"), individually and on behalf of all other similarly situated individuals. Prepetition Plaintiffs alleged that the "Defendants" violated

the ECOA, 15 U.S.C. § 1691 *et seq.* and the FHA, 42 U.S.C. § 3601 *et seq.* by creating and maintaining a discriminatory pricing scheme that resulted in higher cost home mortgage loans for minority borrowers as compared to non-minority borrowers, and Prepetition Plaintiffs sought equitable relief and disgorgement, actual and punitive damages and/or restitution. See Ex. A.[3]

22.     Prepetition Plaintiffs generally allege that "Defendants have established a specific, identifiable and uniform credit pricing system, a component of which . . . authorizes unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate. . . . These subjective, additional finance charges have a widespread discriminatory impact on minority applicants for home mortgage loans." Compl. ¶ 2.

23.     As alleged, after a customer provides Long Beach with credit information, "Long Beach computes a financing rate through an objective credit analysis that, in general, discerns the creditworthiness of the customer." Compl. ¶ 72. These credit analyses allegedly consider a number of risk-related variables of creditworthiness, including credit histories, debt ratio, bankruptcies, prior foreclosures, etc. Compl. ¶ 73. Prepetition Plaintiffs allege that based on these risk-related variables and resulting mortgage score, "Long Beach derives a risk-based financing rate at which it would provide a home mortgage, often called the 'Par Rate.'" Compl. ¶ 74.

24.     Prepetition Plaintiffs allege further that, after "Defendants' initial analysis applies objective criteria to calculate this risk-related interest rate, Defendants' Discretionary Pricing Policy authorizes their loan officers, brokers and correspondent lenders to mark up that rate later and also impose additional non-risk-based charges, including yield spread premiums,

---

[3] All references herein to "Complaint" or "Compl." shall be to the First Amended Class Action Complaint attached hereto as Ex. A, which serves as the underlying basis for the Claims.

and other discretionary fees."[4] Compl. ¶ 75. Prepetition Plaintiffs allege that "Defendants" regularly communicate information about these additional fees to their loan officers, brokers and correspondent lenders via 'rate sheets' and other communications. <u>Id.</u>

25. In particular, Prepetition Plaintiffs allege that "Defendants give their loan officers, authorized mortgage brokers and/or correspondent lenders discretion to impose yield spread premiums and other subjective fees on borrowers." Compl. ¶ 76. When borrowers pay these yield spread premiums, "Defendants" allegedly "share in additional income generated by the premium because the yield spread premium-affected borrower is locked into a higher interest rate going forward on their loan than they would be if they had been placed in a par rate loan without a yield spread premium." Compl. ¶ 76. Prepetition Plaintiffs allege that "Defendants' borrowers pay yield spread premiums and other discretionary fees that inflate their finance charges not knowing that a portion of their finance charges are non-risk-related." Compl. ¶77.

26. Prepetition Plaintiffs further allege that "Defendants' Pricing Policy, by design, causes persons with identical or similar credit scores to pay different amounts for the cost of credit." Compl. ¶ 80. Such a policy allegedly "has a disproportionately adverse effect on minorities compared to similarly situated whites in that minorities pay disparately more discretionary charges (both in frequency and amount) than similarly situated whites." Compl. ¶ 81. Prepetition Plaintiffs further allege that the "disparate impact suffered by minorities is a direct result of the Defendants' Discretionary Pricing Policy in that the Defendants designed, disseminated, controlled, implemented and profited from the Discretionary Pricing Policy creating the disparate impact." Compl. ¶ 83.

---

[4] The term "Discretionary Pricing Policy" was apparently created by Prepetition Plaintiffs' counsel for the purposes of this and other litigations.

**B.** **The Prepetition Class Action Complaint Contains Only General Allegations As To WMI**

27.     The vast majority of allegations in the Claims improperly lump "Defendants" together, or refer simply to WMB or Long Beach individually, without mentioning WMI.  With respect to WMI, Prepetition Plaintiffs do not allege that WMI itself originated or serviced <u>any</u> mortgage loans.  Indeed, Prepetition Plaintiffs' allegations state that they each purchased residences in transactions financed by Long Beach or WMB.  Compl. ¶¶ 92, 103, 118, 132, 145.  With respect to WMI, Prepetition Plaintiffs allege only that "Long Beach's loans are priced based on the Defendants' policies" and conclusorily claim that WMI "in the ordinary course of its business, regularly participates in credit decisions made by Long Beach, including setting the terms of credit available in transactions originated by Long Beach."  Compl.  ¶¶ 64-65.  In fact, WMI did not regularly participate in credit decisions made by Long Beach or WMB, including the setting of terms of or credit for individual loans such as the Prepetition Plaintiffs' loans at issue.  Smith Decl. ¶ 8.

28.     Prepetition Plaintiffs further allege that WMI, WMB and Long Beach "jointly established the Discretionary Pricing Policy at issue in this case."  <u>Id.</u>  Claimants allege that WMI "participated in the decisions to grant credit to the Plaintiffs including, without limitation, by making the Discretionary Pricing Policy applicable to its loans."  Compl. ¶ 66.  Each of the Prepetition Plaintiffs allege that WMI, WMB, and Long Beach "participated in the decision to grant credit to [Prepetition Plaintiffs], including the rates and terms on which credit would be granted."  Compl. ¶¶ 96, 110, 122, 137, and 152.

## C. The Named Prepetition Plaintiffs' Allegations

### 1. *Claimant Jones' Individual Allegations*

29. On or about March 26, 2009, Jones filed Claim 2889 based on the allegations in the Prepetition Class Action, seeking damages for the class of disgorgement and the lesser of $500,000 or 1% of net worth,[5] and attorneys' fees.

30. In Claim 2889, Jones alleges that she is a resident of Chicago, Illinois, and a gainfully employed minority homeowner. Compl. ¶ 118. On December 22, 2005, she purchased a residence in Chicago, allegedly financed by Long Beach, through a loan broker known as Hammer Financial. Id. She further alleges that, according to the HUD-One Settlement Statement provided in connection with her Long Beach loan, she paid $7,498.83 in settlement charges in connection with the Loan, including a $250 document preparation fee and a $549.00 underwriting fee to Long Beach, and a mortgage broker fee to Hammer Financial in the amount of $2098.33. Id. at ¶ 120. Jones, like each of the other Prepetition Plaintiffs, then makes several conclusory allegations that "Defendants" "[b]y various means and through their policies, participated in the decision to grant credit to Ms. Jones, including the rates and terms on which credit would be granted"; that "[o]n information and belief, Ms. Jones was subject to the Defendants' Discretionary Pricing Policy at the time of closing"; and that "[o]n information and belief, Ms. Jones was charged a disproportionately greater amount in non-risk-related credit charges than similarly situated white persons." Id. at ¶¶ 122, 123, 129.

---

[5] To the extent the Debtors are insolvent and do not anticipate having any funds to distribute to equity-holders – a conclusion supported by all known facts and submissions to date in these chapter 11 cases -- and the Prepetition Plaintiffs are seeking to recover 1% of the net worth of the Debtors, then any such recovery would be zero.

2.    ***Claimants Caban and Arriaga's Individual Allegations***

31.    On or about March 26, 2009, Caban filed Claim 2890 based on the allegations in the Prepetition Class Action, seeking damages for the class of disgorgement and the lesser of $500,000 or 1% of net worth, and attorneys' fees.

32.    On or about March 26, 2009, Arriaga filed Claim 2891 based on the allegations in the Prepetition Class Action, seeking damages for the class of disgorgement and the lesser of $500,000 or 1% of net worth, and attorneys' fees.

33.    In Claim 2890 and Claim 2891, Caban and Arriaga allege that they reside together in Brockton, Massachusetts and are minority homeowners. Compl. ¶ 102. On or about June 17, 2003, Arriaga and Caban purchased a residence in Brockton, allegedly financed by Long Beach, through a loan broker known as CFS Mortgage. Id. at 102-03. Arriaga and Caban further allege that, according to the HUD-One Settlement Statement provided in connection with their Long Beach loan, they paid $7,192.82 in settlement charges in connection with the Loan, including a $2,104.00 fee to CFS Mortgage, paid outside of closing, a loan origination fee to CFS Mortgage in the amount of $4,208.00, a $250 processing fee to CFS Mortgage, and a $200.00 document preparation fee to Long Beach. Id. at ¶ 105. Arriaga and Caban allege that the $2,104.00 fee paid outside of closing "bears the characteristics of a yield spread premium, which represents additional commission based on a marked up rate." Compl. ¶ 106.

3.    ***Claimants Lopez and F. Martinez's Individual Allegations***

34.    On or about March 26, 2009, Lopez filed Claim 2893 based on the allegations in the Prepetition Class Action, seeking damages for the class of disgorgement and the lesser of $500,000 or 1% of net worth, and attorneys' fees.

35. On or about March 26, 2009, F. Martinez filed Claim 2894 based on the allegations in the Prepetition Class Action, seeking damages for the class of disgorgement and the lesser of $500,000 or 1% of net worth, and attorneys' fees.

36. In Claim 2893 and Claim 2894, Lopez and F. Martinez allege that they are residents of Massachusetts (Compl. ¶ 88-89) and that Lopez is a minority homeowner. Compl. ¶ 88. On April 28, 2006, Lopez purchased a residence in Brockton, Massachusetts that was financed by Long Beach, through a loan broker known as Centurion Funding Corp. of America ("Centurion"). Id. at 90-92. F. Martinez is Lopez's cousin and co-signed on the Loan. Id. at 89. Lopez and F. Martinez further allege that, according to the HUD-One Settlement Statement provided in connection with their Long Beach loan, they paid $11,653.83 in settlement charges in connection with the Loan, including a mortgage broker fee to Centurion in the amount of $7,012.50; a $400 administration fee, a $500 processing fee, and a $275 application fee to Centurion; and a $250 document preparation fee and a $549.00 underwriting fee to Long Beach. Id. at ¶ 94.

4. ***Claimant Alvarez's Individual Allegations***

37. On or about March 26, 2009, Alvarez filed Claim 2897 based on the allegations in the Prepetition Class Action, seeking damages for the class of disgorgement and the lesser of $500,000 or 1% of net worth, and attorneys' fees.

38. In Claim 2897, Alvarez alleges that he is a resident of Chicago, Illinois and a minority homeowner. Compl. ¶ 131. On September 29, 2006, he allegedly purchased a residence in Chicago that was financed by Long Beach and WMB, as the successor-in-interest of Long Beach, through a loan broker known as American Banc Financial. Id. at 132. He further alleges that according to the HUD-One Settlement Statement provided in connection with his

loan, he paid $8,726.98 in settlement charges in connection with the Loan, including a $250 "Doc Prep" fee and a $549.00 underwriting fee to "WaMu Bank," and a $500 processing fee to American Banc Financial. Id. at ¶ 134. Alvarez further alleges that "the lender" also paid American Banc Financial a "yield spread premium in the amount of $2120.00 representing additional commission based on a marked up rate." Id. at 135.

5.    ***Claimant V. Martinez's Individual Allegations***

39.    On or about March 26, 2009, V. Martinez filed Claim 2898 based on the allegations in the Prepetition Class Action, seeking damages for the class of disgorgement and the lesser of $500,000 or 1% of net worth, and attorneys' fees.

40.    In Claim 2898, V. Martinez alleges that he is a resident of Hyde Park, Massachusetts and a minority homeowner. Compl. ¶ 144  On  or about March 18, 2005, he allegedly purchased a residence in Hyde Park that was financed by Long Beach, through a loan broker known as In Trust Mortgage. Id. at 145. V. Martinez further alleges that according to the HUD-One Settlement Statement provided in connection with his loan, he paid $9,275.54 in settlement charges in connection with the Loan, including a $3,110.00 loan origination fee to In Trust Mortgage, a $500 processing fee to CFS Mortgage, and a $250 document preparation fee and two underwriting fees in the amount of $549.00 and $400.00 to Long Beach. Id. at ¶ 147. Alvarez further alleges that Long Beach paid In Trust Mortgage a "yield spread premium in the amount of $3112.00 representing additional commission based on a marked up rate." Id. at 148.

6.    ***The Class Claim Allegations***

41.    On or about March 26, 2009, Claim 2896 was filed on behalf of the purported class and based on the allegations in the Prepetition Class Action, seeking damages for

the class constituting "disgorgement," "the lesser of $500,000 or 1% of net worth," and attorneys' fees.

42.     In Claim 2896, the Lopez Class alleges that they bring this class action on behalf of themselves "and all minority consumers (the "Class") who obtained home mortgage loan[s] from the Defendants in the United States between January 1, 2001 and the date of judgment . . . and who were subject to the Defendants' Discretionary Pricing Policy pursuant to which they paid discretionary points, fees or interest mark-ups in connection with their loan." Compl. ¶ 177. The Prepetition Plaintiffs further allege that "[a]ll members of the Class have been subject to and affected by Defendants' practice of assessing yield spread premiums and other discretionary fees on mortgage loans." Id. at 181.

### 7.   *Roddy Klein & Ryan's Allegations*

43.     On or about March 26, 2009, the law firm of Roddy Klein & Ryan filed Claim 2900 based on the allegations in the Prepetition Class Action, seeking attorneys' fees of $75,000 to date based on its representation of the Prepetition Plaintiffs in connection with the Prepetition Class Action.

## D.   **The Causes of Action In the Prepetition Class Action**

### 1.   *Prepetition Plaintiffs' ECOA Claim*

44.     In Count One, Prepetition Plaintiffs allege that "Defendants" are liable under the ECOA. While Prepetition Plaintiffs have not sufficiently identified the relevant portions of the statute that "Defendants" purportedly violated, the ECOA states in pertinent part that:

> It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction: (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); (2) because all or part of the applicant's income derives

from any public assistance program; or (3) because the applicant has in good faith exercised any right under this chapter.

15 U.S.C. § 1691(a).

45.    Under the ECOA, a creditor is defined as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e). The term "person" means "a natural person, a corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative, or association." Id. at 1691a(f). Prepetition Plaintiffs allege conclusorily that the "Defendants are creditors as defined in ECOA." Compl. ¶ 187. Despite Prepetition Plaintiffs' claims to the contrary, WMI is not a "creditor" under the ECOA.

### 2.    *Prepetition Plaintiffs' FHA Claim*

46.    In Count Two, Prepetition Plaintiffs allege that Defendants are liable under the FHA. While the Prepetition Plaintiffs have again failed to identify the relevant statutory portions that Defendants purportedly violated, FHA states in pertinent part that:

> It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3605(a). Notably, however, Prepetition Plaintiffs allege only that "[WMB] and/or Long Beach engaged in residential real estate-related transactions with respect to the Plaintiffs, the proposed Class representative herein, and all prospective Class members." Compl. ¶ 194. WMI did not engage in residential real estate transactions with any Prepetition Plaintiff.

## ARGUMENT

## I. THE CLAIMS ARE LEGALLY INSUFFICIENT AND SHOULD BE SUMMARILY DISALLOWED

47. The Prepetition Plaintiffs' Complaint attacks the so-called "Discretionary Pricing Policy" that "Defendants" allegedly maintained. Under the "Discretionary Pricing Policy," "Defendants" allegedly gave mortgage brokers the ability to set the interest rate of a loan above a floor interest rate and thereby earn compensation from the Defendants. Such payments are known as "yield spread premiums" ("YSPs") and are disclosed on HUD-1 filings. Prepetition Plaintiffs claim that this alleged pricing policy has resulted in a disparate impact against minority borrowers such as themselves because allowing brokers to set rates purportedly results in higher rates being charged to minorities. Compl. ¶81.

48. First, Claimants' argument is moot against WMI, given the Claimants' lack of injury and standing to sue WMI for the alleged harmful conduct. There is no allegation that any borrower in this case has a loan from WMI, let alone a loan from WMI with a YSP or any other "discretionary fees." Compl. ¶¶ 92, 103, 118, 132, 145. Simply put, the gravamen of the Complaint does not apply to WMI, and the Claims should be disallowed and expunged as legally insufficient.

49. Second, assuming *arguendo* that the Claimants did have standing, the Court nevertheless should disallow the Claims because they fail to state plausible claims on which relief may be granted. The Prepetition Plaintiffs acknowledge that each of the loans at issue were originated by Long Beach or WMB, not WMI (Compl. ¶¶ 92, 103, 118, 132, 145), and make only the most general and conclusory allegations that WMI "participated" in the decision to grant credit to them and that they were subject to the "Defendants'" so-called Discretionary Pricing Policy. Id. at ¶¶ 122, 123. Claimants have also failed to adequately allege

any other theory of liability under which they could state a claim against WMI. Claimants have further failed to allege any theory under which WMI can be held liable for the alleged discretionary fees imposed by non-party brokers. Claimants have therefore failed to meet the pleading standards set forth by the United States Supreme Court and the Third Circuit and, thus, the Claim must be disallowed. Moreover, the Claims should be disallowed because Claimants have failed to state a cognizable claim under the ECOA or the FHA. The allegations of a discretionary "practice" or "policy" are insufficient to establish the requisite policy to state a disparate impact claim. The allegations of disparate impact underlying the Claims are insufficient to entitle the Claimants to relief under ECOA and FHA as a matter of law. And, WMI is not a proper defendant under either of the applicable statutes.

50. Third, Claims 2889, 2890, 2891, and 2898 should be disallowed because Jones, Caban, Arriaga, and V. Martinez are barred from pursuing their ECOA and FHA claims under the applicable statute of limitations.

51. Fourth, Claims 2893 and 2894 should be disallowed because Lopez and F. Martinez also lack standing in that they have not alleged an injury under the theory of their Complaint.

A.    **Claimants Lack Standing to Assert Any Claims Against WMI**

52. The Complaint alleges that each of the mortgage loans at issue made to the Prepetition Plaintiffs were originated by either Long Beach or WMB. See Compl. ¶¶ 92, 103, 118, 132, 145. Nonetheless, Prepetition Plaintiffs conclusorily assert that "Defendants" – defined by Prepetition Plaintiffs to include WMI – violated the ECOA and FHA in connection with the Long Beach or WMB loans to these plaintiffs. See Compl. ¶¶ 186-198. That assertion however, is inconsistent with the Prepetition Plaintiffs' factual allegation – and the

incontrovertible fact – that WMI is merely a "holding company," and that, as Prepetition

Plaintiffs concede, Long Beach or WMB, not WMI, originated each of the Prepetition Plaintiffs'

loans. Compl. ¶¶ 21, 92, 103, 118, 132, 145. Accordingly, WMI is not a properly-named

defendant in this action, which alleges discrimination in lending. See 15 U.S.C. § 1691(a); 42

U.S.C. § 3605.

          53.    Moreover, Prepetition Plaintiffs fail to allege, other than in the most

conclusory manner, that WMI had any involvement whatsoever in the pricing of the Long Beach

or WMB loans. Rather, Prepetition Plaintiffs point only to the fact that Long Beach and WMB

were subsidiaries of parent holding company WMI, and to the conclusory allegations that (i)

WMI "in the ordinary course of its business, regularly participates in credit decisions made by

Long Beach, including setting the terms of credit available in transactions originated by Long

Beach"; and (ii) "participated in the decisions to grant credit to the Plaintiffs including, without

limitation, by making the Discretionary Pricing Policy applicable to its loans." Compl. ¶¶ 65-66.

These assertions, however, do not attempt to explain how – even if true – such allegations would

render WMI liable for violations of ECOA or the FHA in connection with Long Beach or WMB-

originated mortgages. Accordingly, Claimants have alleged no injury caused by WMI and have

no standing to sue WMI. See Raines v. Byrd, 521 U.S. 811, 818 (1997) ("To meet the standing

requirements of Article III, a plaintiff must allege personal injury *fairly traceable to the*

*defendant's allegedly unlawful conduct* and likely to be redressed by the requested relief")

(internal quotation and citation omitted; emphasis removed from the original and additional

emphasis added); De Jesus v. Potter, 211 Fed. App'x 5, 11 n.4 (1st Cir. 2006) (affirming grant of

summary judgment in favor of defendant and dismissing plaintiff's disparate impact claim where

plaintiff failed to allege that she suffered personal injury that was traceable to the defendant's

allegedly unlawful conduct); Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296-97

(3d Cir. 2003); see also Richardson v. Rush-Presbyterian-St. Luke's Med. Ctr., 2002 WL

461695, at *15 (N.D. Ill. Mar. 26, 2002) aff'd, 63 Fed. App'x 886 (7th Cir. 2003) (dismissing a

Title VII disparate impact claim because the plaintiff failed to show that he, himself, was injured

by the defendants).

**B.      Claimants Have Failed To Allege A Facially Plausible Claim**

        54.    Dismissal of a proof of claim under 11 U.S.C. § 502(c) is equivalent to

dismissing a claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can

be granted. See Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.), 398 B.R.

736, 748 (S.D.N.Y. 2008) (affirming bankruptcy court's dismissal of proof of claim for failure to

state a plausible claim on which relief may be granted). As the Fifth Circuit explained in 900

Capital Servs., Inc. v. Cloud (In re Cloud), No. 99-51109, 2000 WL 634637, at *2 (5th Cir. May

4, 2000), by filing an objection to a proof of claim, the objectors create a contested matter, for

which the bankruptcy court may exercise its power under Fed. R. Bankr. P. 9014 and 7012 to

apply Rule 12(b)(6) to a contested matter. In Cloud, the Fifth Circuit affirmed the district court's

judgment upholding the bankruptcy court's dismissal of a proof of claim for failure to state a

plausible claim on which relief can be granted. Id. at *4. "Threadbare recitals of the elements of

a cause of action, supported by mere conclusory statements" are insufficient to survive a motion

to dismiss. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Rather, "all civil complaints must

now set out sufficient factual matter to show that the claim is facially plausible." Fowler v.

UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotations omitted). Here,

Claimants have not alleged any facts sufficient to show that their claims against WMI for the

purported violations of the ECOA and FHA are plausible.

1. ***Claimants Have Failed To Allege Any Theory By Which WMI Can Be Held
Liable***

55.     Prepetition Plaintiffs admit that the loans at issue were originated solely
by Long Beach or WMB, not by WMI. (Compl. ¶¶ 92, 103, 118, 132, 145). The allegation that
WMI "participated" in the decisions to grant credit to Prepetition Plaintiffs "by making the
Discretionary Pricing Policy applicable to [*their*] loans" is completely conclusory and circular,
given the Prepetition Plaintiffs' admissions that their loans were made by Long Beach and
WMB, and not by WMI. Compl. ¶¶ at 66 (emphasis added). Prepetition Plaintiffs also do not
make any meaningful factual allegations to support their allegations that WMI "participated" in
credit decisions, such as rates and terms set by Long Beach, or that WMI, WMB, and Long
Beach "jointly established the Discretionary Pricing Policy." Compl. ¶¶ 65, 66, 96, 110, 122,
137, 152. Such conclusory statements are unsupported by any evidence and are insufficient to
state a claim against WMI. Prepetition Plaintiffs have also failed to allege any facts in support of
any other theory of liability under which WMI could be held liable for the alleged misconduct of
Long Beach or WMB.

56.     In an almost identical case, brought by the Prepetition Plaintiffs' counsel
on behalf of other plaintiffs against other defendants, the same general allegations were
dismissed against a corporation where the plaintiffs failed to adequately allege that corporation's
liability under the "Discretionary Pricing Policy" theory for mortgages originated by an alleged
affiliate entity. See Steele v. GE Money Bank, et. al., 08-C-1880, 2009 WL 393860, at *7 (N.D.
Ill. Feb. 17, 2009). As in the Claims here, the plaintiffs in Steele alleged that defendants had
engaged in a residential mortgage pricing practice that set rates using objective criteria as well as
subjective factors based on the borrowers' minority status, which caused the plaintiffs to pay
"discretionary fees" including YSPs, resulting in higher costs for their mortgage loans compared

to the average non-minority borrower. Id. at 1-2. The court in Steele dismissed the claims that

contended that defendant GE Money Bank violated the ECOA and FHA by allegedly imposing

such discretionary fees, to the extent that GE Money Bank did not originate and finance the loans

at issue. Id. at 7. The court rejected any theory of liability against GE Money Bank as to loans it

did not originate, even though GE Money Bank was allegedly an affiliate entity of the defendant

that did originate loans at issue. Id.

57.     Moreover, this Court's recent ruling in Youkelsone v. Wash. Mut., Inc.,

418 B.R. 107, 114-15 (Bankr. D. Del. 2009), also supports dismissal of the Claims. In

Youkelsone, this Court applied Washington law in ruling on a motion to dismiss a complaint in

which the plaintiff sought to hold WMI liable for alleged conduct committed by WMB. The

Court held that the plaintiff's bald allegations that WMI "oversaw, managed, controlled and

supervised all operations of WMB" and plaintiff's "mere assertion[s] of fraud on the part of a

subsidiary" did not state cognizable claims for relief under the doctrines of corporate disregard or

alter ego. Id. at 115. The insufficient factual allegations in Youkelsone were more detailed than

the Complaint here, which is utterly devoid of any attempt to establish indirect liability against

WMI for the alleged conduct of WMB or Long Beach. As in Youkelsone, this Court should find

that the allegations fail to create a plausible theory of recovery against WMI, and disallow the

Claim.

58.     This Court's recent ruling in response to the Debtors' Nineteenth Omnibus

(Substantive) Objection disallowing certain wrong party litigation claims, further supports

dismissal of the Claims. On February 5, 2010, this Court found that claims seeking recovery

against WMI for conduct relating to WMB's mortgage business should be disallowed, and that

there was no basis for further discovery to show that WMI and WMB were not two separate

corporate entities. See Transcript of Nineteenth Omnibus (Substantive) Objection Hearing at 50:12-51:19, Feb. 5, 2010, In re Wash. Mut., Inc., Case No. 08-12229 (MFW) (ruling that the wrong party litigation claims were disallowed because "all the facts [] laid out and [were] just not enough to show that WMI is responsible for liability that occurred during the bank's operations."); see also Order Granting Debtors' Nineteenth Omnibus (Substantive) Objection to Claims, dated February 5, 2010 [D.I. 2321]. Because the Claims here likewise fail to show that WMI is responsible for alleged conduct arising out of WMB's or Long Beach's mortgage operations, the Claims should be disallowed.

59.     In another instructive case, McAnaney v. Astoria Financial Corp., No. 04-CV-1101 (JFB)(WDW), 2009 WL 3150430 (E.D.N.Y. Sept. 29, 2009), mortgage-holders filed suit against two bank holding companies alleging violations of the Truth in Lending Act, consumer protection laws, breach of contract, fraud, and unjust enrichment. Plaintiffs claimed that the bank holding companies' respective subsidiary banks assessed improper fees against the mortgage-holders. Though plaintiffs acknowledged that the bank holding companies did not originate or service the loans, they nevertheless argued that the defendant holding companies should be liable for the banks' acts because they allegedly controlled the subsidiaries. Id. at *8. The district court granted the bank holding companies' motion for summary judgment, holding that there was no evidence indicating the bank holding companies' direct involvement, and that there was insufficient evidence from which a fact finder could reasonably conclude that the corporate veil should be pierced. Id. at *9. The district court reasoned that the facts simply demonstrated that the bank holding companies had controlling interests in the subsidiary defendants and that the facts at issue were "insufficient without more, as a matter of law, to eviscerate the presumption of corporate separateness." Id. at *8.

2.  **_The Prepetition Plaintiffs' Claims Are Not Cognizable Under the ECOA Or the FHA_**

60.    Claimants have also failed to state a cognizable claim against WMI under either the ECOA or FHA.

a.    *Claimants Have Failed to Allege a Cognizable Practice or Policy Upon Which a Disparate Impact Claim May Be Based*

61.    To state a disparate impact claim, plaintiffs must plead facts, *inter alia*: (1) showing the existence of a purported disparate impact on a protected group; (2) identifying a specific practice or policy adopted by a defendant; and (3) showing a causal connection between the specific challenged practice or policy and the alleged disparate impact. See Bennett v. Roberts, 295 F.3d 687, 698 (7th Cir. 2002).  In particular, Prepetition Plaintiffs must "isolat[e] and identify[] the *specific* [] practices that are allegedly responsible for any observed statistical disparities...." EEOC v. Honda of Am., Mfg., Inc., No. 2:06-CV-00233, 2007 WL 1541364, at *4 (S.D. Ohio May 23, 2007) (emphasis in original and internal quotation omitted).  "It is not enough for an employee to point to a generalized policy that leads to a disparate impact; the employee must identify a particular policy." Fulcher v. City of Wichita, 445 F. Supp. 2d 1271, 1276 (D. Kan. 2006) (citing Smith v. City of Jackson, 544 U.S. 228 (2005)).  "Simply gesturing towards the [] process as a whole will not satisfy the requirement that the plaintiff identify a specific [] practice that is the cause of the disparate impact." Kulkarni v. City Univ. of New York, No. 01 Civ 10628, 2002 WL 1315596, at *1 (S.D.N.Y. June 14, 2002) (quoting Byrnie v. Town of Cromwell, Bd. of Educ., 243 F. 3d 93, 111 (2d Cir. 2001)).  See also Lit v. Infinity Broad. Corp., No. 04-3413, 2005 WL 3088364, at *3-4 (E.D. Pa. Nov. 16, 2005) (granting summary judgment to defendant on a disparate impact theory where plaintiff failed to show a nationwide policy or practice by defendant, as opposed to individual actions taken at affiliated

stations). Prepetition Plaintiffs fail to identify a specific practice or policy on the part of WMI, but rather, vaguely contend that borrowers pay YSPs and other "discretionary" fees allegedly imposed in the "discretion" of loan officers, mortgage brokers and/or correspondent lenders. Compl. ¶¶ 76-79. This contention is far too vague and fails to identify a specific practice or policy, as required.

62.     Merely affixing the label "discretionary" or "subjective" to Prepetition Plaintiffs' fees does not meet the requirement to identify a specific policy, because the mere existence of subjectivity is not a specific policy. See Syverson v. Int'l Bus. Machs. Corp., No. C-03-04529 RMW, 2007 WL 2904252, at *2, 6 (N.D. Cal. Oct. 3, 2007) (finding the plaintiffs' asserted policy involving "the subjective use of procedures and criteria for implementing the group termination" was "vague and conclusory" and failed to state a claim).[6] Accordingly, vague assertions that the fees paid by Prepetition Plaintiffs to Long Beach or the respective brokers identified in the Prepetition Plaintiffs' allegations were "discretionary fees" utterly fails to establish a requisite policy.[7]

---

[6] See also Johnson v. Uncle Ben's, Inc., 965 F.2d 1363, 1369 (5th Cir. 1992) (dismissing a disparate impact claim because "an employer's policy of leaving promotion decisions to the unchecked discretion of lower level supervisors should itself raise no inference of discriminatory conduct.") (citing Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 990 (1988)).

[7] Moreover, Federal regulatory guidance indicates that the mere absence of measures preventing alleged discrimination by independent third parties is not a cognizable "policy" for disparate impact purposes. Agencies primarily responsible for enforcing the ECOA and FHA for depository institutions such as WMB (including the OTS), have instructed their specialized fair lending examiners to analyze potential discrimination stemming from the discretion of a lender's employees using a disparate treatment analysis, rather than a disparate impact analysis. Interagency Fair Lending Procedures, at 65-66 (Aug. 19, 2004) ("[A] lender's policies of allowing employees to exercise discretion and to negotiate terms or conditions of credit can better be described as the **absence** of policies or criteria than as a situation in which a policy or criterion generates a disproportionate adverse impact....[E]xaminers should focus on possible disparate **treatment**.") (bolding in original), available at http://www.fdic.gov/consumers/community/fairlend.pdf Pricing discretion by third parties is no different. See Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1533 (7th Cir. 1990) ("Some practices lend themselves to the disparate impact method, others not.").

63.     Furthermore, Prepetition Plaintiffs are in essence asserting that the fees allegedly set by the mortgage brokers are "discretionary" to the extent that "Defendants" took no action to prevent an independent party from charging such fees to that independent party's client. However, having no involvement with the amounts that a third party charges its client does not amount to a practice upon which a disparate impact claim can be based because such an alleged lack of action is the antithesis of a specific policy.[8] The instant allegations are thus unlike the typical employment disparate impact case, which involves an allegedly facially neutral policy that is implemented by employees of the defendant. See, e.g., Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 982 (1988).[9]

    b.     *The Allegations of Disparate Impact Are Legally Insufficient*

64.     Prepetition Plaintiffs' conclusory allegations that Defendants' policies have "disparately impacted" minorities are unsupported by any plausible factual allegations, and are therefore insufficient to entitle Prepetition Plaintiffs to relief under ECOA and the FHA. To sufficiently plead a claim of discrimination through disparate impact, plaintiffs must allege facts showing that the policies at issue caused discriminatory impact on them and other members of the protected class to which they belong in comparison to similarly situated non-minorities. See

---

[8] See Smith v. City of Jackson, 544 U.S. 228, 241 (2005) ("[P]etitioners have done little more than point out that the pay plan at issue is relatively less generous to older workers than to younger workers. They have not identified any specific test, [and]…it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.").

[9] Likewise, courts have been unwilling to allow plaintiffs to premise a disparate impact claim on conduct that is nothing more than allowing market forces to determine appropriate employment compensation. Beard v. Whitley County REMC, 840 F.2d 405, 407 (7th Cir. 1988) (affirming district court finding that defendant's "reliance on the market to set its wage rates is not the sort of policy at which disparate impact analysis is aimed.") (internal quotation omitted); AFSCME v. State of Wash., 770 F.2d 1401, 1406 (9th Cir. 1985) ("A compensation system that is responsive to supply and demand and other market forces is not the type of specific, clearly delineated employment policy contemplated…[and] does not constitute a single practice that suffices to support a claim under disparate impact theory."). Allowing the market between borrowers and mortgage brokers to operate without Defendant's involvement cannot be the basis of a disparate impact claim.

Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656-57 (1989); Watson, 487 U.S. at 994-95; Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir. 1997) ("For the prima facie case, a disparate impact plaintiff must identify and relate specific instances where persons situated similarly 'in all relevant aspects' were treated differently.") (internal quotations omitted). The Prepetition Complaint fails to allege any specific facts showing that the claims are anything more than mere speculation, and fails to make any showing that the terms of the loans WMB or Long Beach made to non-minority borrowers with credit qualifications similar to Prepetition Plaintiffs' qualifications are different in comparison to the terms of Prepetition Plaintiffs' loans. These failures are fatal to the Prepetition Plaintiffs' disparate impact theory. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) (upholding dismissal of the complaint where plaintiffs failed to sufficiently allege that their claims were plausible, not merely possible); Ashcroft v. Iqbal, 129 S. Ct. 1937, 1951-52 (2009) (affirming dismissal of plaintiff's discrimination claim where the complaint did not contain sufficient allegations to "plausibly" suggest defendants' discriminatory intent); see also Alston v. Mass., 661 F. Supp. 2d 117, 124 (D. Mass. 2009) (dismissing plaintiffs' discrimination claims and noting that "[w]hat is clear from Twombly and Iqbal is that a plaintiff cannot get beyond the pleadings stage by simply arguing that the law has been broken without some alleged facts to stand behind his legal claims").

65.     Prepetition Plaintiffs point to HMDA data that purportedly shows that "minority homeowners who borrow from the Defendants are almost 3 times more likely than whites to have received a high-APR loan." Compl. ¶ 67. Yet, Prepetition Plaintiffs appear to rely solely on industry data, not any data that is specific to Defendants collectively, let alone to WMI. Compl. ¶¶ 24-30, 67. As such, that data permits no inference about what Defendants', or WMI's, HMDA data shows. Moreover, the HMDA data cannot support the notion that similarly

situated minority borrowers were treated less favorably. HMDA data does not track borrowers' credit qualifications, such as credit history, credit score, debt-to-income ratio, loan-to-value ration, or property value. See 12 C.F.R. § 203.4 (listing types of data lenders are required to track pursuant to HMDA); see also Boykin v. Bank of Am. Corp., 162 Fed. App'x 837, 839 (11th Cir. 2005) (in the credit discrimination context, a plaintiff must demonstrate as part of his prima facie case that a comparative borrower's credit qualifications and loan details are nearly identical to the plaintiff's). Such information is necessary to isolate similarly situated borrowers.

66.    The other studies cited in the Complaint are also not specific to any of the Defendants or WMI in particular, and permit no inference regarding whether defendants' purported policies have resulted in disparate impact. The one study that is specific to "Washington Mutual" actually describes only loans originated by Long Beach, and merely concludes that more subprime loans were made by Long Beach to minority borrowers than to whites. The study does not purport to compare similarly situated borrowers. See Compl. ¶¶ 50-56. See also Boykin, 162 Fed. App'x at 839; Wards Cove, 490 U.S. at 651-52 (plaintiff did not state a disparate impact claim where proffered statistical comparison of two work forces was between skilled and unskilled workers, and not between similarly situated individuals).

67.    Prepetition Plaintiffs also fail to include specific allegations that show the policies about which they complain are the "but for" cause of the purported discretionary impact. Such allegations are necessary, because there are numerous factors that could have resulted in borrowers being offered subprime loans or YSPs being paid – factors that are distinct from the alleged "policy" at issue here. This omission is fatal. See Wards Cove, 490 U.S. at 657 ("[A] plaintiff must demonstrate that it is the application of a specific or particular employment practice that has *created* the disparate impact under attack.") (emphasis added).

28

68.     The Claims are not saved by conclusory allegations that the "Discretionary Pricing Policy" has a "disproportionately adverse effect…in that minorities pay disparately more discretionary charges (both in frequency and amount) than similarly situated whites." Compl. ¶ 81. Such allegations are devoid of the facts needed to show that similarly situated minorities were treated less favorably. See Papasan v. Allain, 478 U.S. 265, 286 (1986) (refusing to accept allegation regarding deprivation of education where petitioners "[a]llege no actual facts in support of their assertion"). The Claims should therefore be disallowed.

    c.      *WMI Is Not A "Creditor" Or Engaged In "Real Estate Transactions" Within The Meanings Of ECOA Or FHA*

69.     The ECOA states, in relevant part: "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction: (1) on the basis of race, color, religion, national origin, sex or marital status, or age…" 15 U.S.C. § 1691(a). Under the statute, WMI is not a "creditor," which is defined as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e). According to the Prepetition Plaintiffs' own allegations, however, WMI did not extend credit to any of the Prepetition Plaintiffs. As the Prepetition Plaintiffs acknowledge, Long Beach and WMB – not WMI – originated and serviced all of Prepetition Plaintiffs' loans. Compl ¶¶ 92, 103, 118, 132, 145.

70.     Similarly, the FHA states: "It shall be unlawful for any person or other entity whose *business includes engaging in residential real estate-related transactions* to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or

national origin." 42 U.S.C. § 3605(a) (emphasis added). Such "transaction[s]" are defined as: 1) the making or purchasing of loans or providing other financial assistance: (a) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or (b) secured by residential real estate...[or] 2) the selling, brokering, or appraising of residential real property." Id. at § 3605(b). Prepetition Plaintiffs do not allege that WMI has engaged in any "residential real estate-related transaction" with respect to any Prepetition Plaintiff. Under the terms of the Prepetition Plaintiffs' own Complaint, WMI did not make loans or provide other financial assistance to Prepetition Plaintiffs, nor did WMI sell, broker, or appraise real property. For these additional reasons, WMI is not a proper defendant, and the claims against it should be disallowed and expunged.

3. ***Claimants Have Failed to Allege Any Theory Under Which WMI Can Be Held Liable for the Acts of Non-Party Brokers***

71. Not only have Claimants failed to allege any theory of liability by which WMI can be held liable for the acts of WMB or Long Beach, they also have failed to allege any theory of liability under which WMI can be held liable for the acts of the various *non-party* brokers, whom Prepetition Plaintiffs each allege brokered the loans at issue. Compl. ¶¶ 91, 102, 118, 132, 145. Prepetition Plaintiffs attempt to hold Defendants liable for the acts of these non-party brokers under the theory the non-party brokers were acting as "agents" of "Defendants." Compl. ¶ 82. Such an attempt is unavailing, due to Prepetition Plaintiffs' failure to allege facts upon which an agency relationship may be found. See Brown v. Interbay Funding LLC, Civ. No. 04-617-SLR, 2004 WL 2579596, at *3 (D. Del. Nov. 8, 2004) (dismissing ECOA, FHA, and other claims against lender where such claims depended on agency relationship between lender and appraisal company, where lender did not control appraisal company, and therefore no agency relationship existed); Tribett v. BNC Mortgage, Inc., No. 07 C 2089, 2008 WL 162755, at *4

(N.D. Ill. Jan. 17, 2008) (dismissing claims against lender based on agency theory where plaintiff failed to plead sufficient facts to create an inference of an agency relationship between lender and mortgage broker).

72.     It is well established that an agency relationship requires more than simply a business relationship between two or more parties. See id. Instead,

> An agency relationship exists when one undertakes to manage some affairs to be transacted for [and]...on account of...the principal. The test for such agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal. The parties must consent to a principal-agency relationship.

Id. (internal citations and quotations omitted); see also NHI, Inc. v. FleetBoston Fin. Corp., (In re NHI, Inc.) 320 B.R. 563, 570 (Bankr. D. Del. 2005) (finding that complaint failed to allege an agency relationship under Delaware law, which requires that "one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent," where the allegations did not support the conclusion that the principal in any way controlled the alleged agents or that any party expressly or impliedly consented to an agency relationship) (citations omitted); Brown, 2004 WL 2579596, at *3 (dismissing ECOA, FHA, and other claims for failure to show that lender controlled appraiser, notwithstanding that agreement between lender and appraiser placed certain requirements on the appraisal).[10] Here, the Complaint is utterly devoid

---

[10] See also Garczynski, Jr. v. Countrywide Home Loans, Inc., 656 F.Supp.2d 505, 511-12 (E.D. Pa. 2009) (dismissing unfair practices claims against mortgage lender based on acts of mortgage broker where plaintiffs failed to allege facts to support their assertion that the broker acted as an agent for the lender); Morilus v. Countrywide Home Loans, Inc., 651 F.Supp.2d 292, 300-02 (E.D. Pa. 2008) (holding that "[w]hile control is a key factor in determining whether an agency [relationship exists], it must be of such a high degree that the purported agent is deemed to have had almost no independence" and granting summary judgment in favor of mortgage lender even where plaintiff demonstrated that the lender set policies that brokers must follow in order to do business with the lender); Restatement (Third) of Agency § 1.01(2006) ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act").

of any allegations of fact showing that any of the Defendants – much less WMI – agreed that the alleged brokers could act on their behalf, that any of the brokers was subject to Defendants' control, or that any of the brokers consented to act on behalf of Defendants. Instead, Prepetition Plaintiffs allege, without providing any factual support for such allegations, that "Defendants" (i) authorized brokers to fund loans in conformance with the alleged "Discretionary Pricing Policy," (ii) provided brokers with information about their credit policies and procedures, (iii) supplied brokers with loan-related documents and forms, (iv) communicated applicable par rates, (v) authorized YSPs and other discretionary fees via "rate sheets", and (vi) authorized brokers to impose YSPs or other subjective fees on borrowers. See Compl. ¶¶ 59, 69, 70, 71, 75, 76, 79.

73.     These threadbare allegations are insufficient to establish facts upon which an agency relationship may be found. See Steele, 2009 WL 393860, at *5-6 (dismissing portions of the complaint that depended on an agency theory between defendants and the brokers). In this case, as in Steele, "[a]t best, [Claimants'] allegations show that the defendant lenders made loans that involved brokers and provided information to the brokers. They do not support an inference that the defendant lenders had the ability to control the manner and method in which the brokers carried out their work or that the lenders authorized the brokers to affect the lenders' legal relationship[s]." Id. at 6.

74.     Moreover, pursuant to Claimants' own allegations, the "discretionary fees" at issue here were charged at the discretion of the brokers – not Defendants. See e.g., Compl. ¶ 79. Claimants' "Discretionary Pricing Policy" allegations thus directly contradict any conclusion that Defendants controlled the broker's conduct, and that the broker's assented to such control. For these additional reasons, Claimants have failed to state a claim against WMI, and the Claims should be disallowed in their entirety.

## C.    Certain Prepetition Plaintiffs' Claims Are Time-Barred

### 1.    *Claims 2889, 2890, 2891 and 2898 are Barred By The Applicable Two-Year Statute of Limitations*

75.    A two-year statute of limitations applies to claims brought under the FHA and ECOA. 42 U.S.C. § 3613(a)(1)(A) (FHA) ("An aggrieved person may commence a civil action...not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice..."); 15 U.S.C. § 1691e(f) (ECOA) ("No such action shall be brought later than two years from the date of the occurrence of the violation..."). Prepetition Plaintiffs Jones, Caban, Arriaga, and V. Martinez failed to bring their claims within the two-year limitations period. Jones alleges she entered into her loan transaction with Long Beach on December 22, 2005, but did not join the underlying action until May 27, 2008. Compl. ¶ 118. Caban and Arriaga allege that they entered into the loan transactions with Long Beach "on or about June 17, 2003." Compl. ¶ 103. They did not file suit until nearly five years later, on February 15, 2008. V. Martinez alleged that his loan transaction took place March 18, 2005, but also did not join the underlying action until May 27, 2008. Compl. ¶ 145. Claims 2889, 2890, 2891 and 2898 should therefore be expunged as time-barred.

### 2.    *The Discovery Rule Does Not Save These Claims*

76.    Prepetition Plaintiffs Arriaga, Caban, Jones, and V. Martinez allege that they could not have discovered that a violation of the FHA or ECOA occurred at the time they entered into their loan transactions. Compl. ¶ 114, 127, 157, 163. Under the discovery rule, "a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the factual basis for the cause of action." Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002); Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 (3d Cir. 1994). However, numerous courts have held that the discovery rule is inapplicable to ECOA and

FHA claims. See, e.g., Garcia v. Brockway, 526 F.3d 456, 465-66 (9th Cir. 2008) (FHA); Moseke v. Miller & Smith, Inc., 202 F. Supp. 2d 492, 509 (E.D. Va. 2002) (FHA); Claybrooks v. Primus Auto Fin. Sevs. Inc., 363 F. Supp. 2d 969, 976 (M.D. Tenn. 2005) (ECOA); Beard v. Dominion Homes Fin. Servs., Inc., No. 2:06-cv-00137, 2007 WL 2137944, at *2 (S.D. Ohio Jul. 23, 2007) (ECOA). That is because the discovery rule contradicts the express language of both statutes, which states that the limitations period should be measured from the date of the occurrence of the violation, not from its discovery or accrual. See, e.g., Garcia, 526 F.3d at 465; Claybrooks, 363 F. Supp. 2d at 975-77 (discovery rule does not apply to ECOA in light of fact that Congress purposefully modified the statute to "make allowances for the difficulty of plaintiffs' discovering ECOA violations").

77. Moreover, even if the discovery rule were applicable to ECOA and FHA claims, it would not apply here. To the extent there are any facts supporting Prepetition Plaintiffs' claims, those facts were capable of detection before the Complaint was filed. The HUD-1 Settlement Statements attached to the Complaint were provided to the Prepetition Plaintiffs in connection with their loans (Compl. ¶¶ 95, 107, 109, 121, 136, 149, 151) and are required to itemize the charges that purportedly serve as the basis for the claims, including any "mortgage broker's fee" and "any other fee or payment received by the mortgage broker from either the lender or the borrower arising from the initial funding transaction, including a...yield spread premium...." 24 C.F.R. § 3500, Appendix B, Sec. 13. In light of those disclosures, the discovery rule should not apply here. See Mills v. Equicredit Corp., 294 F. Supp. 2d 903, 909 (E.D. Mich. 2003) (finding that plaintiffs' discriminatory lending claims under ECOA and FHA, including assertion of disparate impact, were time-barred "because all the terms of the loans were disclosed in the loan documents"), aff'd, 172 Fed. App'x. 652 (6th Cir. 2006).

78. Moreover, the Complaint itself cites data on which the Prepetition Plaintiffs purport to base their discriminatory impact claims, acknowledging that such data has been available since at least 2005. See Compl. ¶¶ 57, 164 (discussing 1996 action by the Department of Justice involving purportedly similar claims); Compl. ¶¶ 27-30 (discussing 2005 HMDA data purporting to show discriminatory impact in the mortgage "industry"). Such allegations contradict any inference that the facts underlying Prepetition Plaintiffs' claims were unavailable to Prepetition Plaintiffs during the limitations period.

3. ***The Doctrine of Fraudulent Concealment Does Not Save These Claims***

79. The doctrine of fraudulent concealment only tolls the statute of limitations "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part." Gonzalez, 284 F.3d at 292 (citations and internal quotations omitted). As discussed, supra, Prepetition Plaintiffs' allegations demonstrate that the factual basis for their claims could have and should have been discovered through reasonable diligence. Moreover, Prepetition Plaintiffs fail to allege the facts giving rise to their claims with the particularity required by Federal Rule of Civil Procedure 9(b), which applies to allegations of fraudulent concealment. See Compl. ¶¶ 161-175; Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

4. ***The Continuing Violation Doctrine Is Inapplicable***

80. The "continuing violation doctrine" is also inapplicable to save Claims 2889, 2890, 2891 and 2898, because the Complaint alleges discrete and independent acts of purported discrimination. See Compl. ¶¶ 190, 196 (alleging that each Prepetition Plaintiff's mortgage broker charged "discretionary" fees that caused each Prepetition Plaintiff to have a loan with a worse term than similarly situated non-minorities). The alleged harm to each

Prepetition Plaintiff thus was complete when each of their individual loans closed, because the contractual terms governing each Prepetition Plaintiff's cost of credit became final. Id. at ¶¶ 97, 113, 125, 140, 155. See Nat'l R. R. Passenger Corp. v. Morgan, 536 U.S. 101, 112-13, 115-17 (2002) (holding that, even if related to other timely acts, the continuing violation doctrine does not apply to untimely discriminatory conduct that amounts to a discrete act or single occurrence, as opposed to the qualitatively different series of repeated acts for hostile work environment).

81.     Where, as here, the alleged statutory violation is divisible into discrete acts, plaintiffs cannot save untimely claims by alleging a company-wide policy. See Davidson v. Am. Online, Inc., 337 F.3d 1179, 1185-86 (10th Cir. 2003) (plaintiff's "assertion that these discrete acts flow from a company-wide or systemic discriminatory practice will not succeed in establishing AOL's liability for acts outside the limitations period"). Claims 2889, 2890, 2891 and 2898 of Jones, Caban, Arriaga, and V. Martinez, respectively, are time-barred.

**D.     Certain Prepetition Plaintiffs Lack Standing**

82.     Prepetition Plaintiffs Lopez and F. Martinez lack standing for the additional reason that they have failed to allege any facts showing that any component of their loan was subject to the so-called "Discretionary Pricing Policy." Lopez and F. Martinez do not identify any finance charges affecting their interest rates that were applied as a result of the alleged Discretionary Pricing Policy. Indeed, their HUD-1 Settlement Statement reveals that no YSP was paid to their broker in their loan transaction. Compl. Ex. 2. This loan document instead shows that they paid the broker fee directly themselves, out of their settlement funds. Id. at line 813. Accordingly, Lopez and F. Martinez cannot claim to have an injury

"fairly...traceable to the challenged action of" WMI. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).[11]

## II. TO THE EXTENT THE CLAIMS ARE NOT OTHERWISE DISALLOWED AND EXPUNGED THEY CANNOT SURVIVE AS A CLASS CLAIM, AND THE COURT SHOULD STRIKE PREPETITION PLAINTIFFS' CLASS CLAIMS WITH RESPECT TO WMI

83. The Prepetition Plaintiffs' class allegations (Compl. ¶¶ 176-185) should be expunged against WMI.[12] Prepetition Plaintiffs specifically seek to certify a class of minority borrowers "who obtained home mortgage loan[s] from the Defendants in the United States" (<u>id.</u> at ¶ 177), but as discussed in Part I.B, <u>supra</u>, there is no legal basis to hold WMI responsible for loans made by Long Beach or WMB. Therefore, there is no basis upon which to certify a class against WMI, and these allegations should be struck pursuant to Fed. R. Civ. P. 12 (f) ("The

---

[11] Because the Prepetition Plaintiffs' and Lopez Class Claims should be disallowed for the reasons discussed, Claim 2900 for attorney's fees should also be disallowed.

[12] To the extent that the Claims are not otherwise disallowed based on the foregoing, and to the extent that Claimants purport to have filed the Claims in a representative capacity, their argument must also be rejected and the Claims must be disallowed because any class action claim filed in this chapter 11 case is improper. <u>See</u> <u>In re Ephedra Prods. Liab. Litig.</u>, 329 B.R. 1 (S.D.N.Y. 2005). Part VII of the Bankruptcy Rules, which includes Bankruptcy Rule 7023 (governing class actions in bankruptcy proceedings), only applies to adversary proceedings. <u>See</u> Fed. R. Bankr. P. 7001. Bankruptcy Rule 9014, however, adopts certain of the rules from Part VII for application in contested matters as well. <u>Bankruptcy Rule 7023 is not among them.</u> <u>See</u> Fed. R. Bankr. P. 9014. Thus, plaintiffs seeking the application of Bankruptcy Rule 7023 (and by implication, Rule 23) to a class proof of claim are required to move pursuant to Bankruptcy Rule 9014 for a court to apply "at any stage in a particular matter . . . one or more of the other rules in Part VII." Fed. R. Bankr. P. 9014; <u>accord</u> <u>In re Ephedra</u>, 329 B.R. at 7 (affirming that the need for a Bankruptcy Rule 9014 motion clearly follows from an attempt to apply Rule 23 to a proof of claim). This Court's decisions in <u>In re Kaiser Group International, Inc.</u>, 278 B.R. 58 (Bankr. D. Del. 2002), and <u>In re United Companies Financial Corp.</u>, 276 B.R. 368 (Bankr. D. Del. 2002), are not to the contrary. In both of those cases, unlike here, the claimants had previously filed a motion to certify the class. <u>See</u> <u>Kaiser Group</u> 278 B.R. at 62; <u>United Cos.</u>, 276 B.R. at 371. Claimants never requested the Court to apply Rule 23 of the Federal Rules of Civil Procedure ("<u>Rule 23</u>") to the Claims, and the Court has not previously issued a discretionary ruling to allow Claimants to file proofs of claims on behalf of others. Claimants made no attempt to advance their class claim in the more than fourteen (14) months of WMI's chapter 11 case. Nor have Claimants filed a motion for class certification in the underlying litigation. It is "simply too late in the administration of this Chapter 11 case to ask the Court to apply Rule 23" to the Claims. <u>In re Ephedra</u>, 329 B.R. at 5. To do so now would "greatly and unduly delay distribution of the estate." <u>Id.</u> at 6. Accordingly, the Claims must be disallowed.

court may strike from a pleading…any redundant, immaterial…matter"); Fed. R. Bankr. P. 7012(b).[13]

      84.     Furthermore, there is no basis to certify the putative class because, as discussed, _supra_ section I.B.2, Prepetition Plaintiffs failed to identify a cognizable "policy" allegedly adopted by WMI resulting in a disparate impact, instead alleging that the fees at issue were imposed at the "discretion" of mortgage brokers. According to Prepetition Plaintiffs' own theory, therefore, in which "Defendants" created discretion on the part of the mortgage brokers, the putative class cannot establish commonality under Federal Rule 23(a). See Bradford v. Sears, Roebuck & Co., 673 F.2d 792, 795-96 (5th Cir. 1982) (finding no commonality established by plaintiffs' conclusory allegations when there was a serious question as to whether one employment scheme was used by the defendant); Wright v. Circuit City Stores, 201 F.R.D. 526, 541 (N.D. Ala. 2001) (finding no identifiable pattern or practice affecting a definable class in common ways, when the claims involved multiple facilities across many states with a group of diverse and differently-situated employees challenging many different policies).[14] For these

---

[13] Moreover, because Prepetition Plaintiffs Lopez and F. Martinez lack standing for the reasons discussed _supra_, section I.D, they are not properly members of the purported class Claimants seek to represent, which, by the definition in the class allegations in the Complaint, includes the individual named Prepetition Plaintiffs "on behalf of themselves and all minority consumers (the "Class") who obtained home mortgage loan [sic] from the Defendants in the United States between January 1, 2001 and the date of judgment in this action (the "Class Period") and who were subject to the Defendants' Discretionary Pricing Policy pursuant to which they paid discretionary points, fees or interest mark-ups in connection with their loan." Compl. ¶ 177. Because the class definition will encompass other purported plaintiffs who, like Lopez and F. Martinez, will similarly lack standing, the class allegations should be stricken.

[14] See also Allen v. City of Chicago, 828 F.Supp. 543, 552 (N.D. Ill.1993) (finding no commonality with respect to claims of disproportionate impact when there was no general policy or practice, but only a series of individualized claims); Zachery v. Texaco Exploration & Prod., Inc., 185 F.R.D. 230, 238-39 (W.D. Tex. 1999) (finding that decentralized organization led to too many different systems to make out commonality); Appleton v. Deloitte & Touche LLP, 168 F.R.D. 221, 231-32 (M.D.Tenn. 1996) (finding insufficient evidence to support plaintiffs' assertions of uniform criteria set by national personnel office as to all types of employees). As also noted _supra_, section I.B.2, theories of pricing discretion by third parties are more properly analyzed as disparate _treatment_ claims than as disparate _impact_ claims. Courts have routinely found that putative classes are unable to find common questions of law or fact where the

reasons, the class allegations in the Claims should be struck with respect to WMI if the Claims

are not otherwise disallowed as to WMI.[15]

## III. IN THE ALTERNATIVE, THE COURT SHOULD JOIN THE MORTGAGE BROKERS AS NECESSARY PARTIES

85.     In the event that the Claims are not disallowed, WMI alternatively moves

the Court, pursuant to Federal Rules 12(b)(7) and 19 and Bankruptcy Rules 7012 and 7019, to

join the mortgage brokers involved in the allegedly discriminatory practices as necessary parties

to this action. Federal Rule 12(b)(7) provides that a "party may assert the following defenses by

motion: . . . failure to join a party under Rule 19." Under Federal Rule 19(a)(1), a party is

necessary and should be joined, if feasible, if:

(A)     in that person's absence, the court cannot accord complete relief among existing parties; or

(B)     that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i)     as a practical matter impair or impede the person's ability to protect the interest; or

(ii)     leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

See also Fed. R. Bankr. P. 7012, 7019 (incorporating Federal Rules 12(b)(7) and 19 into

adversary proceedings). Pursuant to Bankruptcy Rule 9014, this Court may direct that Rule 7019

apply here, and should do so because, as discussed below, the non-party brokers at issue in the

---

class allegations involve highly individualized discriminatory treatment claims. See Abrams v. Kelsey-Seybold Med. Group, Inc., 178 F.R.D. 116, 131-32 (S.D. Tex. 1997) (holding that plaintiffs' disparate impact claims based on a practice that depended on an employer's discretion must be treated as disparate treatment claims, which require proof of discriminatory intent, and therefore were not amenable to class certification); Reyes v. Walt Disney World Co., 176 F.R.D. 654, 658 (M.D. Fla. 1998); Zapata v. IBP, Inc., 167 F.R.D. 147 (D.Kan. 1996).

[15] WMI reserves its right to assert all later defenses or objections to the Claims as, *inter alia*, as legally insufficient to satisfy any of Federal Rule 23's requirements for the certification of a class action.

Claims are necessary parties to this action. Fed. R. Bankr. P. 9014; see also In re Kang Jin Hwang, 396 B.R. 757, 771 (Bankr. C.D. Cal. 2008) (applying Rule 7019 to motion for relief from automatic stay); In re Gennette, No. 95-10066, 1995 WL 547808, at *5 (Bankr. D. Vt. Sept. 15, 1995) (applying Rule 7019 to creditor's objection to plan confirmation and ordering debtors to join third party co-owners in any future proceedings); In re Hofmeister, No. 93-30849-7, 1994 Bankr. LEXIS 1590, at *2 (Bankr. W.D. Wis. Sept. 27, 1994) (delaying ruling on trustee's objection to proof of claim in order to join debtors as indispensable parties, since "the trustee advanced a position which may lead to future litigation with the [debtors] and the possibility of inconsistent outcomes in disputes arising from a single set of facts.").

86.    In this case, the mortgage brokers are necessary parties because "disposing of the action in [their] absence may as a practical matter impair or impede [their] ability to protect [their] interest[s]." Fed. R. Civ. P. 19(a)(1)(B)(i). See Shiloh Indus., Inc. v. Rouge Indus., Inc. (In re Rouge Indus., Inc.), 326 B.R. 55, 59 (Bankr. D. Del. 2005) (ordering joinder of necessary party who claimed an interest related to the subject of the action, and disposition of the action in that party's absence would impede his ability to protect that interest); Glades Pharms., LLC v. Call, Inc., Civ. No. 04-4259, 2005 WL 563726, at *3 (E.D. Pa. Mar. 9, 2005) (holding that plaintiff's former employee was a necessary party where plaintiff had alleged a conspiracy between its former employee and defendant and resolution of the claims against defendant would necessarily involve a determination about the legality of the former employee's actions); Mora v. McDonald's Corp., No. 96 C 5957, 1997 WL 102546, at *6 (N.D. Ill. Mar. 6, 1997) ("Rule 19 requires us to look beyond whether a non-party would technically be bound and to consider whether the judgment would 'as a practical matter' impair the non-party's interest.") (internal citations omitted).

87.     Here, the absent mortgage brokers have legal rights and obligations that could be directly impacted by a judgment in this case. The "policy" underlying Claimants' action is one "authorizing" the mortgage brokers to charge their customers what they want. Compl. ¶75. Thus, if Claimants were to succeed on their causes of action, the brokers' conduct may (whether expressly or implicitly) be found to be in violation of the ECOA and FHA, and such a judgment could affect both their extant contracts and their ability to collect "discretionary fees" in the future.

88.     Furthermore, the Complaint explicitly requests relief directed at changing the broker's conduct. See Compl. Prayer for Relief ¶ c (requesting that the Court "[g]rant a permanent or final injunction . . . enjoining the Defendants, and the Defendants' *agents* . . . from . . . further use of the Discretionary Pricing Policy or any other non-risk-related discretionary pricing policy employed by the Defendants") (emphasis added); ¶ d (requesting that the Court "[o]rder the Defendants . . . to adopt and enforce a policy that requires appropriate training of the Defendants employees and its *brokers*") (emphasis added). It is therefore indisputable that, "as a practical matter," disposing of this action without the mortgage brokers may impair their interests. See Fed. R. Civ. P. 19(a)(1)(B)(i); Hashop v. Fed. Home Loan Mortgage Corp., 171 F.R.D. 208, 211 (N.D. Ill. 1997).

89.     In addition, complete relief cannot be accorded in the absence of the mortgage brokers. See Fed. R. Civ. P. 19(a)(1)(A)[16]. Here, Claimants had direct contact with

---

[16] See also Hashop, 171 F.R.D. at 211. In Hashop, the court dismissed a putative class action against a mortgage lender, in which the plaintiffs challenged allegedly excessive escrow payments charged by mortgage loan servicers, where the plaintiffs failed to join the loan servicers and complete relief could not be accorded where "the party who maintains the practical control over the actions at issue is not a party to the suit." Id. The court further noted that "[t]his is particularly true where plaintiffs seek to impose liability on a party not for its own positive acts but for the positive acts of another not joined in the suit." Id.

the absent mortgage brokers, not WMI, and are directly challenging fees imposed by, and directly or indirectly paid to, the mortgage brokers. See e.g., Compl. ¶ 91. Thus, the mortgage brokers "maintain practical control" over the conduct at issue in the Complaint and are indispensable to this suit.

90. In the nearly identical case Steele, the Court found that, because the plaintiffs' complaint was based on the existence of an interrelationship between the defendant lenders and the non-party brokers and actions taken by the brokers allegedly at the direction of the defendants, and because injunctive relief sought would impact the brokers' legal rights, they were necessary parties, and must be joined for the plaintiffs to proceed with their action. Steele, 2009 WL 393860, at *8-9.

91. Likewise, here the brokers are necessary parties to the Prepetition Plaintiffs' claims and should have been joined. Accordingly, the Court should order Claimants to join the brokers, or face dismissal under Federal Rules 12(b)(7) and 19 and Bankruptcy Rules 7012 and 7019.

### Reservation of Rights

92. To the extent the relief requested herein is not granted, the Debtors reserve the right to object to the Claims on any other ground.

### Notice

93. No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Objection has been provided to: (i) the U.S. Trustee, (ii) counsel for the Creditors' Committee, (iii) counsel for the Equity committee, (iv) the Claimants, and (v) those parties entitled to receive notice in these chapter 11 cases, pursuant to Bankruptcy Rule 2002. In light

of the nature of the relief requested, WMI submits that no other or further notice need be provided.

94.     Pursuant to Bankruptcy Rule 3007, the Debtors have provided the Claimant with at least thirty days notice of the hearing to consider the Objection.

## Statement of Compliance with Local Rule 3007-1

95.     The undersigned representative of Richards, Layton & Finger, P.A. certifies that he has reviewed the requirements of Local Rule 3007-1 and that the Objection substantially complies with that Local Rule. To the extent that the Objection does not comply in all respects with the requirements of Local Rule 3007-1, Richards, Layton & Finger, P.A. believes such deviations are not material and respectfully requests that any such requirement be waived.

## No Previous Request

96.     No previous request for the relief sought herein has been made by WMI to this or any other court.

WHEREFORE the Debtors respectfully request the Court enter an order, substantially in the form attached hereto as Ex. C, granting the relief requested herein and such other and further relief as is just and proper.

Dated: March 15, 2010
Wilmington, Delaware

_____
Mark D. Collins (No. 2981)
Chun I. Jang (No. 4790)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS TO THE DEBTORS
AND DEBTORS IN POSSESSION