**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------x

| | : | Chapter 11 |
|---|---|---|
| In re | : | |
| | : | Case No. 08-12229 (MFW) |
| WASHINGTON MUTUAL, INC., *et al.*,[1] | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | Hearing Date: April 6, 2010 at 2:00 p.m. |

----------------------------------------------------------x

**DEBTORS' SUPPLEMENTAL REPLY REGARDING
FRAUDULENT TRANSFER CLAIMS TO THE PRELIMINARY
RESPONSES TO THE LEGAL ISSUES SET FORTH IN DEBTORS'
TWENTIETH OMNIBUS (SUBSTANTIVE) OBJECTION TO CLAIMS**

Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment"), as

debtors and debtors in possession (collectively, the "Debtors") file this reply to the Marathon

Credit Claimants' and WMB Noteholders' (collectively, the "Bank Bondholders") preliminary

response ("Opposition") to Debtors' Twentieth Omnibus (Substantive) Objection ("Objection")

to proof of claims numbers 3710, 3711 and 2480 (collectively, the "Claims"), with respect to the

fraudulent transfer claims asserted therein, and represent as follows:

**PRELIMINARY STATEMENT**[2]

1.     The Bank Bondholders' Actual Fraudulent Transfer Claims should be dismissed

for failure to plead with the requisite particularity notwithstanding the Bank Bondholders' efforts

to bolster their insufficient pleading in their proof of claim through their Opposition.  In fact, the

---

[1]     Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax
identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395).
The Debtors' principal offices are located at 925 Fourth Avenue, Seattle, Washington 98104.

[2]     This reply concerns only the fraudulent transfer claims asserted by the Bondholders.  The Debtors
have filed a separate reply with respect to the other claims referenced in the Opposition.  Capitalized
terms not defined herein shall have the meanings ascribed them in the Objection.

Bank Bondholders' assertions are so deficient they fail under any pleading standard.

2.     With respect to the Insider Preference Claim regarding the withdrawal of the Debtors' Deposits, this claim too should be dismissed because the Bank Bondholders, as general unsecured creditors of WMB, could never have expected to recover from the Debtors' Deposits given FIRREA's statutory "depositor preference." As discussed herein, each of the Bank Bondholders' arguments as to why this statutory priority supposedly would not apply is meritless. Significantly, over the course of complex and long-standing litigation between the Debtors and the FDIC, the FDIC has never asserted the Bank Bondholders' frivolous position that the Debtors would not be entitled to depositor priority. Moreover, even assuming *arguendo* that the federal "depositor preference" were inapplicable, this claim fails because the Bank Bondholders were not prejudiced through any depletion of WMB's assets. Fraudulent transfer law has no application where there is no depletion of assets available to satisfy the aggrieved creditors. The Court may and should consider these facts, notwithstanding the Bank Bondholders' objections, because they are a matter of public record and have been endorsed by the Bank Bondholders themselves.

3.     Separately, at this critical point in the Debtors' bankruptcy cases, the Bank Bondholders are attempting to assert "new" fraudulent transfer claims in their Opposition. Like the Actual Fraudulent Transfer Claims asserted in the proof of claim, the "new claims" should be dismissed for insufficiency of pleading, but also because they are asserted nearly one year after the passage of the Bar Date without any possible showing of excusable neglect and without even a motion seeking to amend their proof of claim.

4.     For all of the reasons discussed herein, the Bank Bondholders' claims should be dismissed.

## BACKGROUND

5.    In their proof of claim, the Marathon Credit Claimants asserted fraudulent transfer claims under three theories of fraudulent transfer law with respect to two different categories of transactions: (i) dividends paid by WMB in September 2007 and earlier (the "Dividends"); and (ii) WMI's withdrawal of funds held on deposit with WMB and WMI's re-deposit of those funds into WMBfsb (the "Deposit Transfer").[3]

6.    In their Opposition, for the very first time, the Marathon Credit Claimants reference a "new" Actual Fraudulent Transfer Claim in connection with a tax reimbursement payment allegedly made by WMB to WMI for amounts WMI advanced to taxing agencies for WMB's benefit (the "Tax Reimbursement"). The Marathon Credit Claimants also now purport to assert an Actual Fraudulent Transfer Claim in connection with the Deposit Transfer.

7.    The Marathon Credit Claimants' fraudulent transfer claims, as now asserted, are summarized in the following chart:

| Transaction:<br><br>Fraudulent Transfer Theory | Dividends | Deposit Transfer | Tax Reimbursement |
|---|---|---|---|
| Actual Fraudulent Transfer | Proof of Claim | Opposition | Opposition |
| Insider Preference | -- | Proof of Claim | -- |
| Constructive Fraudulent Transfer | Proof of Claim | Proof of Claim | -- |

---

[3]    As discussed in the Objection at 45, n.28, the WMB Noteholders do not assert fraudulent transfer claims on behalf of themselves, relying instead on claims purported belonging to WMB. *See* Claim 2480 at 8 ("WMB may have claims against WMI for [fraudulent] transfers.") The WMB Noteholders do not have standing to assert a claim on behalf of WMB. *See In re Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("To the extent that the rights of a party in interest are asserted, those rights must be asserted by the party in interest, not someone else."). To the extent the WMB Noteholders claim to assert a fraudulent transfer claim, it should be expunged on this basis.

8.     For purposes of the April 6, 2010 hearing, the Debtors are seeking to dismiss and disallow the Actual Fraudulent Transfer Claims and the Insider Preference Claims.[4] *See* Feb. 12 Rosen Email, Manzer Decl. Ex. 1 ("The Motion to Dismiss aspect shall, with respect to the Standing Issue, relate to all claims but for the fraudulent transfer claims and, with respect to the Failure to State a Claim Issue, all claims *but for the constructive fraudulent transfer claims*.") (emphasis added).

## ARGUMENT

### A.     The Actual Fraudulent Transfer Claims Are Insufficiently Pled

9.     Concerning the Actual Fraudulent Transfer Claims, there is an absolute dearth of facts pled in the Marathon Credit Claimants' proof of claim that evince any fraudulent intent, let alone satisfy the heightened pleading requirement of factual particularity required for allegations of fraud. For this reason, they should be dismissed.

10.     As stated in the Objection, with respect to Actual Fraudulent Transfer Claims, it is well-settled that Fed. R. Civ. P. 9(b) ("Rule 9(b)") applies, requiring that such claims be pled with particularity. Objection at ¶ 82; *see also Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.)*, 340 B.R. 1, 38-39 (Bankr. E.D.N.Y. 2006) ("Factual allegations supporting claims of intentional fraudulent transfer are scrutinized pursuant to F.R.C.P. 9(b)"); *OHC Liquidation*

---

[4]     The Marathon Credit Claimants incorrectly state that the Debtors are only seeking dismissal of the Actual Fraudulent Transfer Claims at this stage. However, both the agreement reached among the parties and the fact that the Marathon Credit Claimants devoted several pages of briefing in the Opposition to the Insider Preference Claim prove otherwise. *See* Opposition at 63-65.

In this pleading, the Debtors do not address the Marathon Credit Claimants Constructive Fraudulent Transfer Claims. *See* Objection ¶¶86-88. However, it bears noting to the Court that even if the Marathon Credit Claimants were successful in proving insolvency for such "upstream" avoidance claims, it would only ensure that the $6.5 billion in "downstream" capital contributions WMI made subsequent to the Dividends would similarly be avoidable vis-à-vis WMB. The Debtors' claims would, at the very least, setoff any Constructive Fraudulent Transfer Claims regarding the Dividends that the Marathon Credit Claimants might prove. Thus, from a practical perspective, the assertion of these claims can never benefit the Bank Bondholders given the equitable remedy provisions of the UFTA.

*Trust v. Nucor Corp. (In re Oakwood Homes Corp.)*, 325 B.R. 696, 698 (Bankr. D. Del. 2005) ("There is no question that Rule 9(b) applies to adversary proceedings in bankruptcy which include a claim for relief under 544 or 548, whether it is based upon actual or constructive fraud."); Pardo v. Gonzaba (In re APF Co.), 308 B.R. 183, 188 (Bankr. D. Del. 2004) (same). "Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Sec. Lit.*, 114 F.3d 1410, 1418 (3d Cir.1997).[5]

### 1. The Actual Fraudulent Transfer Claim Concerning The Dividends Should Be Dismissed

11. With respect to the Dividends, the Marathon Credit Claimants plead little else than their occurrence (ironically through reference to publicly-filed financial statements). *See* Claim 3071 at n. 4-6. In their Opposition, however, the Marathon Credit Claimants argue that "the surrounding circumstances are compelling." Opposition at 62. But all the Marathon Credit Claimants point to is the fact that WMB was placed in receivership "a few years" after the Dividends were paid and that the Dividends were made to "its own parent, an insider." Opposition at 62. That is not pleading fraud (or any other cognizable claim). That is simply reciting the unremarkable fact that the Dividends were issued to WMB's shareholder, a trait

---

[5]     The Marathon Credit Claimants do not dispute that Rule 9(b) applies, but cite *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215-16 (3d Cir. 2002) for the proposition that in certain instances, "when the defendant retains control over the flow of information," courts have relaxed "the rigid requirements of Rule 9(b)." Opposition at 63, n.28. Significantly, even assuming *Rockefeller* endorsed such a standard, the court did apply the heightened pleading requirements of Rule 9(b), finding that the plaintiffs "failed to support their claims of fraud with the factual particularity required by Rule 9(b)." *Id.* at 223. Moreover, the Third Circuit was concerned about "certain instances" where "sophisticated defrauders" may "successfully conceal the details of their fraud." *Id.* at 216. Here, there have been no allegations that WMI has concealed anything and, moreover, as this Court is aware, WMI functions with a skeleton staff of employees and most of WMI's books and records were transferred to JPMC pursuant to the sale of WMB's assets.

shared, by definition, with each and every dividend ever paid. Accordingly, this allegation cannot even be deemed to constitute a lone "badge" of fraud. Even if it were, courts agree that the existence of one, or even several, badges of fraud is insufficient circumstantial evidence as a matter of law. *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005); *In re Zeigler*, 320 B.R. 362, 378 (Bankr. N.D. Ill. 2005) (finding that despite the presence of six badges of fraud, "an insufficient number of the badges exists to give rise to an inference that the [debtors] actually intended to hinder, delay or defraud their creditors"); *see also Oakwood Homes*, 325 B.R. at 699 (holding that "merely identifying the allegedly fraudulent transfers" fails to establish the fraudulent nature of alleged transfers). Moreover, the fact that WMI was paid the Dividends by its wholly-owned subsidiary, allegedly "involuntarily," is also irrelevant as it only reflects the inherent nature of every parent-subsidiary relationship. *See, e.g., ASARCO LLC v. Americas Mining Corp.,* 396 BR 278, 414 (S.D. Tex. 2008) ("As a general rule, a parent does not owe a fiduciary duty to its wholly owned subsidiary.").

12.     Inspection of the Marathon Credit Claimants' proof of claim reveals that it does not describe any fraudulent actors or any specific decisions made with respect to the Dividends. The proof of claim is in fact void of any details of the alleged fraud. More specifically, the Marathon Credit Claimants do not describe, as they must, any scheme to hinder, delay or defraud WMB's creditors with even minimal particularity. Nowhere in the proof of claim lies the fundamental (and requisite) fraudulent transfer allegation that the Dividends were paid to WMI in order to transfer value and make it unavailable for payment to WMB's creditors or that at the time the Dividends were paid, WMB knew that its creditors would not be paid in full. *See Monahan Ford*, 340 B.R. at 38-39 (dismissing fraudulent transfer claim where "complaint merely lists the date and amount of the transfer and does not assert any factual allegations that

these transfers were made in furtherance of the scheme to defraud"); *Actrade*, 337 B.R. at 809 ("intentional fraudulent conveyance claims should be relegated to their proper sphere, i.e., where there is a knowing intent on the part of the defendant to damage creditors"). This sort of pleading fails to "place the defendants on notice of the precise misconduct with which they are charged. . . ." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).[6]

13. The Marathon Credit Claimants attempt to bolster their deficient pleading with irrelevant allegations. First, the Marathon Credit Claimants argue that their proof of claim contains "allegations of control and dominance of WMB by WMI, of the appropriation by WMI of billions in tax benefits, and of misrepresentations by WMI with respect to the financial health of WMB." Opposition at 62-63. These allegations about WMI's supposed control are irrelevant to whether payment of the Dividends by WMB were made with fraudulent intent. *See* Objection at ¶ 82 (listing badges of fraud as enumerated by UFTA); *Monahan Ford,* 340 B.R. at 39 (dismissing fraudulent transfer claims where overall fraudulent scheme of control over debtor was adequately alleged, yet claims were dismissed as they did not allege "that the transfers were made in furtherance of this scheme, or how that was the case"); *Actrade*, 337 B.R. at 810 ("it cannot be assumed that a wrongdoer is part of another fraud merely because of his other bad acts"). Moreover, none of these assertions go to the purported fraudulent intent of WMB, as

---

[6] Even if Rule 9(b) did not apply – and it clearly does – the Marathon Credit Claimants cannot even satisfy the more lenient requirements of Rule 8. Rule 8(a)(2) "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007). But that is exactly what the Marathon Credit Claimants' proof of claim does. The proof of claim simply recites certain provisions of the Uniform Fraudulent Transfer Act followed by conclusory assertions. *See* Claim 3071 at 5-6. It fails to provide sufficient factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

opposed to WMI, in paying dividends to its parent and sole shareholder. *Monahan Ford*, 340 B.R. at 38-39 ("The intent examined is the intent of the transferor, not of the transferee.").

14.    Next, in support of their Actual Fraudulent Transfer Claim, the Marathon Credit Claimants resort to raising a completely unrelated transfer unreferenced in their proof of claim – the Tax Reimbursement.[7] *See* Opposition at 62.    As a threshold matter, because the Tax Reimbursement is not asserted in the proof of claim, by definition, it cannot support the inadequate pleading of the Dividends.    Moreover, much like the irrelevant assertions discussed in the preceding paragraph, an alleged transfer made in August or September 2008 is not evidence of fraudulent intent for the Dividends, each of which, as the Marathon Credit Claimants' proof of claim references, occurred in 2007 or earlier.    *See* Claim 3071 at n. 4-6.    Further, even the JPMC-submitted declaration (cited to by the Marathon Credit Claimants) indicates that the Tax Reimbursement was in satisfaction of "a state tax accounts payable [that] existed on the books of Washington Mutual...."    *See* Opposition at 48 (citing Declaration of C. Jack Read, dated July 22, 2009, ¶¶11-13, Manzer Decl. Ex. 23 (attached to Opposition)).    Whether a payment made in satisfaction of a valid and owing debt may be "fraudulent" under certain circumstances is besides the point, but it is impossible to fathom how such payment can be evidence of actual fraudulent intent with respect to unrelated, prior transfers.    What is clear is that the Tax Reimbursement does not in any way support an assertion that the Dividends were made with actual intent to hinder, delay or defraud WMB's creditors.

15.    Finally, not only do the Marathon Credit Claimants fail to adequately plead their Actual Fraudulent Transfer Claim, but there are also significant facts – pled and endorsed by the

---

[7]        As discussed *infra*, the Marathon Credit Claimants cannot now assert the Tax Reimbursement as a fraudulent transfer in light of the passage of the March 31, 2009 bar date (the "Bar Date") nearly one year ago. *See Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995).

Marathon Credit Claimants – that foreclose any plausible inference of fraudulent intent. First, as asserted in the Objection, the Dividends were publicly disclosed in the Debtors' SEC filings. Ex. 6 to Objection at 185.[8] Additionally, the WMB OTS filings, cited several times in the Marathon Credit Claimants' proof of claim, similarly disclose the Dividends. *See* Claim 3071 at n. 4-6, 8; WMB, Annual Report (Form 10-K) (Mar. 21, 2008) at 66 (reporting Dividends in certified financial statements; the pertinent pages have been attached hereto as **Exhibit A**). Second, these same filings – cited in the proof of claim – reflect the fact that billions of dollars of capital was contributed by WMI to WMB *subsequent* to payment of the Dividends. *Id.* (reporting $1 billion in capital contributions); WMB, Quarterly Report (Form 10-Q) (Aug. 14, 2008) at 3 (reporting $3 billion in capital contributions; the pertinent pages have been attached hereto as **Exhibit B**). Third, as the pertinent OTS regulations indicate, the Dividends were disclosed to, reviewed by, and approved by the OTS. Objection at ¶84 (citing 12 CFR Part 563, Subpart E, a copy of which has been attached hereto as **Exhibit C**).[9] Thus, the Dividends were fully disclosed to the public by WMI, reported to OTS filings by WMB, followed by billions of dollars of downstream capital contributions by WMI, and individually approved by OTS. The concept that such a transparent process, one that was subject to regulatory review and was not objected to, was part of some fraudulent scheme by WMB defies reason, and provides further justification for this Court to dismiss these claims. *See Iqbal*, 129 S. Ct. at 1950 (noting that in determining whether

---

[8]     Judicial notice of SEC filings is appropriate. *See Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (noting that the Court may consider "items subject to judicial notice" and "matters of public record.").

[9]     Not only do the Marathon Credit Claimants cite OTS regulations in their proof of claim, *see* Claim 3071 at ¶ 12, but the Court may take judicial notice of federal regulations. *See In re Loranger Mfg. Corp.*, 324 B.R. 575 (Bankr. W.D. Pa. 2005) (taking judicial notice of Title 12 of the Code of Federal Regulations).

complaints state plausible claims, the reviewing court must "draw on its judicial experience and common sense").

16.     At bottom, the Marathon Credit Claimants' proof of claim, even fortified with the allegations submitted in the Opposition, fails to plead actual fraud under any standard, but certainly does not do so under Rule 9(b)'s heightened requirements, which the Marathon Credit Claimants do not dispute apply. Moreover, the public facts of record – referenced in the proof of claim – foreclose these claims as a matter of law and require their dismissal.

> **2.     The Actual Fraudulent Transfer Claims Concerning The Deposit Transfer And The Tax Reimbursement Should Be Dismissed Because They (i) Are Only Now "Asserted" In Violation Of The Bar Date and (ii) Are Insufficiently Pled**

> *(a) The Claims Are "Asserted" In Violation Of The Bar Date*

17.     The Marathon Credit Claimants' proof of claim did not assert Actual Fraudulent Transfer Claims concerning the Deposit Transfer or the Tax Reimbursement. *See* Claim 3071 at 6-7 (discussing "Stripping Billions of Dollars in Purported Deposits" with respect to an Insider Preference Claim and a Constructive Fraudulent Transfer Claim, but not as an Actual Fraudulent Transfer Claim); Claim 3071 *in toto* (providing no mention or reference to the Tax Reimbursement). In their Opposition, however, the Marathon Credit Claimants argue, disingenuously, that "[p]erhaps recognizing … the indicia of fraudulent intent, the Debtors do not argue that Bank Bondholder [sic] have failed, adequately, to allege such [fraudulent] intent" Opposition at 63. In reality, the reason that the Objection did not contain such argument is that neither claim was asserted. Because these claims have not been pled, they should be discarded.

18.     To the extent the Court is willing to treat the Opposition as purporting to assert these claims, given the passage of the Bar Date nearly one year ago, these claims should be dismissed as untimely. *In re Pigott*, 684 F.2d 239, 242 (3d Cir. 1982) (Deadlines for filing

proofs of claim are to be "strictly construed" to ensure the efficient administration of bankruptcy cases and to provide all parties with finality.). This is particularly true where during this entire period, and even to this date, the Marathon Credit Claimants have not sought to amend their proof of claim[10] nor moved the Court to establish excusable neglect. *See* Fed. R. Bankr. P. 9006(b)(1). Moreover, the Marathon Credit Claimants' tardiness was entirely avoidable and within their control. No new facts were recently discovered. Rather, the Tax Reimbursement was raised by JPMC and the FDIC in four briefs worth of opposition to the Debtors' Motion for Summary Judgment with respect to the Debtors' Deposits more than six months ago.[11] The Marathon Credit Claimants themselves opposed the Debtors' motion for summary judgment and participated in the hearing before this Court when the Tax Reimbursement was again raised by the FDIC. *See* 10/22/09 Tr. at 62:18-23, attached hereto as **Exhibit D**. And with respect to the Deposit Transfer, the fact that the Marathon Credit Claimants have asserted an Insider Preference Claim and a Constructive Fraudulent Transfer Claim in connection with the very same transaction evinces no recent fact discovery.

19. Yet, only now, on the eve of the filing of the Debtors' chapter 11 plan incorporating a significant, global trilateral understanding, the Marathon Credit Claimants seek to assert these new claims. Such conduct is a far cry from excusable neglect and should not be countenanced by this Court. *See Hefta v. Official Comm. of Unsecured Creditors (In re Am. Classic Voyages Co.)*, 405 F.3d 127, 134 (3d Cir. 2005) (finding no excusable neglect where

---

[10]   With the exception of an initial amendment regarding group membership.

[11]   *See* Memorandum of Law of FDIC in Opposition to Plaintiffs' Motion for Summary Judgment dated July 24, 2009, at 4 [Turnover Action D.I. 97]; Opposition of JPMC to Plaintiffs' Motion for Summary Judgment dated July 24, 2009, at 35 [Turnover Action D.I. 102]; JPMC Supplemental Opposition dated September 11, 2009, at 5 [Turnover Action D.I. 156]; FDIC Supplemental Opposition dated September 11, 2009, at 2-3 [Turnover Action D.I. 152].

delay was entirely avoidable and within claimant's control and claim was asserted two days after filing of chapter 11 plan).[12]

*(b) The Actual Fraudulent Transfer Claim Regarding The Deposit Transfer Is Insufficiently Pled*

20.     Even assuming the Court were to permit the Opposition to assert an Actual Fraudulent Transfer Claim regarding the Deposit Transfer nearly twelve months after the passage of the Bar Date, the claim still fails.  As discussed *above* regarding the Dividends, the Marathon Credit Claimants fail to plead this claim as an actual fraudulent transfer with Rule 9(b) particularity.  Nowhere is it alleged in the Opposition (given that the claim is not asserted in the proof of claim) that the Deposit Transfer was made to hinder, delay or defraud WMB creditors. Nowhere do the Marathon Credit Claimants allege any decision makers or any specific determinations with respect to WMB's payment of the Debtors' Deposits in spite of WMB's creditors.

21.     Moreover, in view of the fact that the Deposit Transfer was made with the contemplation that funds in an equal amount were to be immediately loaned back to WMB under the Master Note, it is not plausible that the Deposit Transfer was made with the actual intent to hinder, delay or defraud creditors of WMB, because the transaction could not and did not accomplish any of those ends.  As discussed more fully in the Objection and below, the Deposit Transfer did not deplete the WMB estate (and in fact had the opposite effect vis-à-vis WMB's general unsecured creditors).[13]

---

[12]     The Marathon Credit Claimants' "boiler plate" reservation of rights, *see* Claim 3071 at ¶20, cannot save their tardiness.  *See In re Enron Corp.*, 419 F.3d 115, 120, 134 (2d Cir. 2005) (rejecting claimant's late filed claim, notwithstanding reservation of rights provision in timely filed proof of claim where claimant purported to "reserve[] the right to amend, supplement, or otherwise modify . . . at any time").

[13]     *See* Objection ¶93, n.37. Notwithstanding JPMC's previous efforts to cast a negative light upon this transaction, there is absolutely nothing nefarious about a parent company moving a deposit liability

22.     The Marathon Credit Claimants incorrectly assert that the Debtors offer the Court "their own, disputed version of the facts." Opposition at 64. That is not true. The Marathon Credit Claimants themselves incorporated JPMC's assertions that no cash was actually transferred. *See* Marathon Credit Claimants' Statement in Opposition to the Debtors' Summary Judgment Motion at 2 n.6, 3, [Turnover Action D.I. 115] ("Given the substantial factual issues clearly laid out by JPMC and the FDIC in their oppositions, the Bank Bondholders would not anticipate the need to file any additional papers opposing the Debtors' summary judgment motion..."; "the supposed transfer of the deposits from WMB to WMBfsb may well never have occurred . . . "); *see also* JPMC Opposition to Debtors' Motion for Summary Judgment at 17, [Turnover Action D.I. 102] ("No actual funds were transferred to WMB fsb"); Declaration of Paul Stephen, dated July 22, 2009, ¶5 (filed as part of Appendix in Support of JPMC's Opposition to Debtors' Motion for Summary Judgment) ("No actual cash moved from WMB to WMB fsb and the net effect of these general ledger entries made WMB fsb a lender to WMB in precisely the same amount as the deposit liabilities that were transferred from WMB to WMB fsb."). Even had the Marathon Credit Claimants not incorporated JPMC's opposition, the Court may take judicial notice of these public filings. *Buck*, 452 F.3d at 260.

23.     Thus, even if the Court were inclined to (i) treat the Actual Fraudulent Transfer Claim regarding the Deposit Transfer as being asserted by the Opposition, and (ii) forgive that the claim was not asserted prior to the Bar Date, *and* (iii) forgive that it is not pled with the requisite particularity, the Actual Fraudulent Transfer Claim regarding the Deposit Transfer

---

from one subsidiary to another, indisputably solvent, subsidiary and having that second subsidiary loan the related cash assets back to the original subsidiary. As discussed in the Objection, this protected the WMB estate and did not damage WMB fsb. Of course, the fact that WMB fsb did not receive bags full of cash from the back of an armored WMB truck "means nothing." *See FDIC v. Fedders Air Conditioning, USA, Inc.*, 35 F.3d 18, 21 (1st Cir. 1994).

should *still* be dismissed because it is simply impossible to draw the reasonable inference that the

Debtors are liable for the misconduct alleged. *Iqbal*, 129 S. Ct. at 1949.

### (c) The Actual Fraudulent Transfer Claim Regarding The Tax Reimbursement Is Insufficiently Pled

24.      Similarly, assuming the Court were to treat the Opposition as asserting an Actual

Fraudulent Transfer Claim regarding the Tax Reimbursement nearly twelve months after the

passage of the Bar Date, the claim still fails because the Marathon Credit Claimants fail to plead

with Rule 9(b) particularity.  The Marathon Credit Claimants allege that "it is suspicious" that

the Tax Reimbursement was made to WMB's parent. *See* Opposition at 48.  But suspicion is not

sufficient under Rule 9(b).  Similarly, the Marathon Credit Claimants offer the Court academic

questions rather than factual assertions. *Id.* (stating that "the Bank Bondholders are not aware of

any promissory note or other documentation evidencing the supposed debt" and wondering

whether a "limitations period for WMI to seek to collect any such debt had expired").  The

Marathon Credit Claimants assert that "these issues require discovery." *Id.*  But the Marathon

Credit Claimants have it backwards; if they cannot sufficiently plead their claims, they are not

entitled to fishing expedition discovery.[14]  At bottom, the Marathon Credit Claimants do not

assert that the Tax Reimbursement was made with the requisite intent to hinder, delay or defraud

WMB's creditors with even minimal particularity.

25.      Thus, even if the Court were to first treat the Actual Fraudulent Transfer Claim

regarding the Tax Reimbursement as being asserted by the Opposition, and second forgive that

---

[14]    Courts have noted how "[t]he purpose of Rule 9(b) is to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Actrade*, 337 B.R. at 801 (citation and quotation marks omitted).  Put differently, Rule 9(b) is intended to "ensure that 'a complaint alleging fraud' is filed 'only after a wrong is reasonably believed to have occurred,' and 'not to find one.'" *See, e.g., Abercrombie v. Andrew College*, 438 F. Supp. 2d 243, 272 (S.D.N.Y. 2006) (quoting *Segal v. Gordon*, 467 F.2d 602, 607-08 (2d Cir. 1972)).

the claim was not asserted prior to the Bar Date, it should still be dismissed for being insufficiently pled with requisite particularity.[15]

## B. The Insider Preference Claim Concerning The Deposit Transfer Should Be Dismissed Because It Fails As A Matter Of Law

26.     The Insider Preference Claim regarding the Deposit Transfer fails as a matter of law.  The Debtors stated in their Objection that the claim must fail because unsecured creditors of WMB, including the Marathon Credit Claimants, were not harmed for two independent reasons.  First, because the funds were subject to FIRREA's depositor preference and thus were never assets to which WMB's general unsecured creditors could look to for recovery.  12 U.S.C. § 1821(d)(11).  Second, because, in any event, the funds were immediately returned to WMB via the Master Note.  See Objection ¶¶92-6.  The following chart illustrates the Deposit Transfer and the Master Note intercompany loan:



27.     The Marathon Credit Claimants advance three flawed responses to the Debtors' first point of objection:  1) elsewhere in their proof of claim, it is alleged that the Deposits may not in fact be deposit liabilities; 2) the Debtors are not entitled to any depositor preference under

---

[15]     In the Response, the Marathon Credit Claimants do not assert the Tax Reimbursement Claim as an Insider Preference Claim.  However, in an abundance of caution, given that the Tax Reimbursement was made by WMB to WMI in satisfaction of an antecedent debt, the Debtors note that the Marathon Credit Claimants fail to allege, *inter alia*, that WMI "had reasonable cause to believe that [WMB] was insolvent" as of the time of the Tax Reimbursement as required under WASH REV. CODE § 19.40.051(b). *See* Response at 47-48, 63-65.  Of course, all of the Debtors' assertions regarding the passage of the Bar Date would also apply with equal force to any such claim.

the terms of 12 U.S.C. § 1821(d)(11); and 3) WMB could have setoff purported claims against the Debtors thus realizing the value of the Deposits to the benefit of the Marathon Credit Claimants. Opposition at 64. Each argument fails for several reasons.

28.     First, to the extent the Marathon Credit Claimants allege that the Deposits are something other than the Debtors' Deposits, they allege that the Deposits may be "instead properly treated as capital" for the purpose of separate claims under a different legal theory – Constructive Fraudulent Transfer Claims. Claims 3710, 3711 ¶10. The Marathon Credit Claimants' argument is self-defeating. If the Deposits are "properly treated as capital," then the Insider Preference Claim fails to state a claim given that the transfer at issue was not made on account of an antecedent debt. *See* Wash. Rev. Code § 19.40.051(b).

29.     Second, the Marathon Credit Claimants assert that the Debtors apply 12 U.S.C. § 1821(d)(11) incorrectly. Rather, the Marathon Credit Claimants assert, the Debtors' claims to their Deposits would have been subordinated – not entitled to priority – and therefore payment of the Debtors' Deposits did remove assets that the Marathon Credit Claimants could have recovered from. This argument is frivolous. Under 12 U.S.C. § 1821(d)(11), "[a]ny deposit liability of the institution" receives priority over general unsecured claims. 12 U.S.C. § 1821(d)(11)(A)(ii) (emphasis added)[16]. The section's subordination provision states that "[a]ny obligation to shareholders or members arising *as a result of their status as shareholders or members* (including any depository institution holding company or any shareholder or creditor of such company)" shall be paid only after general unsecured claims are satisfied. 12 U.S.C. § 1821(d)(11)(A)(v) (emphasis added). The plain language of the statute is clear that *all* deposit liabilities enjoy priority, even deposits of a shareholder. The Debtors' deposit claim would have

---

[16]     A copy of 12 U.S.C. § 1821(d)(11) is attached hereto as **Exhibit E**.

arisen as a result of a the Debtors' status as a depositor and not "as a result of their status as shareholders." This plain statutory text ends the argument. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). The Marathon Credit Claimants unsurprisingly cite no case law that contravenes this plain language interpretation, or any legislative history suggesting that Congress intended to treat shareholder deposits differently than non-shareholder deposits. There is simply no question that if JPMC had not assumed the Debtors' Deposits, the Debtors would have qualified for "depositor preference" under Title 12 and would have been paid in full before the Marathon Creditor Claimants.[17]

30.     Third, the Marathon Credit Claimants' setoff argument ignores reality. JPMC assumed all of WMB's deposit liabilities. The Bank Bondholders have repeatedly conceded this fact in filings with this Court. *See* Answer of Bank Bondholders, dated September 21, 2009 at 1 [Turnover Action D.I. 167] ("the Bank Bondholders admit ... subject to the terms of the [P&A Agreement, JPMC] acquired substantially all of the assets of [WMB] in exchange for $1.88 billion in cash and *the assumption of WMB's deposit liabilities*."); Statement of Bank Bondholders in Opposition to (1) Motion of the Federal Deposit Insurance Corporation for an Order Modifying the Automatic Stay and (2) the Debtors' Objection to the Motion, [D.I. 1896] ("the [FDIC] seeks to modify the automatic stay...so that the FDIC may exercise its contractual rights...*to direct JPMC to return to the FDIC [the Deposits]*") (emphasis added). The Marathon Credit Claimants have acknowledged numerous times that JPMC assumed those Deposits. Thus,

---

[17]     It is notable that the FDIC has never alleged otherwise. Rather, the FDIC has pointed to setoff as a putative basis to recover the value of the Debtors' Deposits in the event it were allowed to exercise section 9.5 of the Purchase Agreement. *See* Motion of FDIC for an Order Modifying the Automatic Stay [D.I. 1834]. If 12 U.S.C. § 1821(d)(11)(A)(v) truly operated the way the Marathon Credit Claimants propose, setoff would be superfluous to the FDIC's cause and given the Bankruptcy Code's prohibition on establishing mutuality post-petition, the FDIC would not have articulated setoff as the basis for its stay-relief request. Despite the FDIC's long-pending litigation with the Debtors, it has never been driven to adopt the facially absurd reading of section 1821(d)(11) that is pushed by the Marathon Credit Claimants.

17

any putative right of setoff that FDIC may possess is irrelevant given the actual lack of mutuality vis-à-vis the Debtors.[18]

31.   Next, in response to the Debtors' assertion that the Insider Preference Claim regarding the Deposit Transfer must fail because funds were immediately transferred to WMB via the Master Note, *see* Objection ¶¶92-6, the Marathon Credit Claimants accuse the Debtors of improperly "provid[ing] their story" for purposes of a motion to dismiss. Opposition at 64. But as discussed above, the Court may take judicial notice of assertions advanced or incorporated by the Marathon Credit Claimants in their pleadings that the estate was not depleted.

32.   Thus, for two reasons the Deposit Transfer did not harm WMB's general unsecured creditors:  (i) Title 12's depositor preference provides that such assets were *never* available to WMB's general unsecured creditors and (ii) any transferred value was counterbalanced by an immediate transfer of equal value to WMB through the Master Note. These facts, which have been acknowledged by the Marathon Credit Claimants, require dismissal of the Insider Preference Claim. *See, e.g., Melamed v. Lake Cty. Nat'l Bank*, 727 F.2d 1399, 1402 (6th Cir. 1984) (dismissing fraudulent transfer claim because plaintiff failed to establish "diminution of the debtor's assets available to creditors"); *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 196-99 (S.D.N.Y. 2002) (dismissing fraudulent transfer complaint when "by operation of federal law, [the transferred] funds were never available to satisfy" general creditor claims); *see also Freitag v. McGhie*, 133 Wn. 2d 816, 821 (1997) (adopting an approach of

---

[18]       *See In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009).  Each of the cases cited by the Marathon Credit Claimants in their Opposition confirm this unremarkable point even absent bankruptcy.  *Sterling Savings Bank v. Air Wisconsin Airlines Corp.*, 492 F. Supp. 2d 1256, 1261 (E.D. Wash. 2007) ("In such instances, the depositor and the bank are *mutually* indebted."); *Conner v. First Natl. Bank of Sedro-Woolley*, 113 Wash. 662, 194 P. 562 (1921) ("as a general rule that when a depositor is indebted to a bank, and the *debts are mutual – that is, between the same parties....*"); *Allied Sheet Metal Fabricators, Inc. v. Peoples Natl. Bank*, 10 Wn. App. 530, (Ct. App. 1974) (reciting same general rule) (emphasis added).

"[c]ommon sense and the statutory purpose" with respect to interpreting UFTA and noting that prejudice to creditors is the driving trait of fraudulent transfer claims); *Davis v. Nielson*, 9 Wn. App. 864, 871 (Wash. Ct. App. 1973) ("prejudice to a plaintiff is essential to relief under the act. The creditor must show injury from the conveyance before a complaint is appropriate.") (internal citation omitted).[19]

33.     Moreover, as discussed in the Objection, this fundamental point of fraudulent transfer law applies *a fortiori* here where the effect of the Deposit Transfer was more than asset-neutral and actually benefitted the Marathon Credit Claimants. It replaced a liability subject to a depositor preference that had priority over general unsecured creditors with an intercompany payable to WMB fsb that general unsecured creditors could expect to share *pari passu*. *See* Objection at 55, n.37. Thus, even if this Court were somehow inclined to recognize the Deposit Transfer as an Insider Preference Claim, the UFTA provides for equitable adjustments "as the equities may require." See WASH REV. CODE § 19.40.081(c);[20] *see also Bakst v. Wetzel (In re Kingsley)*, 2007 Bankr. LEXIS 1755, *17-19 (Bankr. S.D. Fla. May 17, 2007), *aff'd*, 518 F.3d 874 (11th Cir. 2008) (finding that under both section 550 of the Bankruptcy Code and the UFTA, the trustee "may not recover sums that were repaid to the Debtors"). Bankruptcy courts have also utilized their equitable powers to ensure plaintiffs asserting fraudulent transfer claims do not receive a windfall. *See e.g., Dobin v. Presidential Fin. Corp. (In re Cybridge Corp.)*, 304 B.R. 681, 692 (Bankr. D.N.J. 2004) (awarding equitable credit in an avoidance action due to the lack

---

[19]     Moreover, the UFTA's "new value" defense precludes the Marathon Credit Claimants' claim. Specifically, a "transfer is not voidable under [RCW 19.40.051(b)] . . . [t]o the extent the insider gave new value to or for the benefit of the debtor after the transfer was made...." WASH REV. CODE § 19.40.081 (f)(1). *See* Objection at 54, n.37.

[20]     WASH REV. CODE § 19.40.081(c) provides: "If the judgment under subsection (b) of this section is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment *as the equities may require*." (emphasis added).

of harm to the estate, with the result of a "net recovery of zero"), *aff'd*, 312 B.R. 262 (D.N.J. 2004); *Bakst v. Sawran (In re Sawran)*, 359 B.R. 348, 354 (Bankr. S.D. Fla. 2007) (exercising section 105(a) equitable powers to issue "equitable credit ... to prevent [plaintiff] from receiving a windfall" where transferee had subsequently "disbursed the money to the Debtor"). Such an equitable adjustment would be especially appropriate here given the anomalous posture of the Marathon Credit Claimants who assert their windfall-seeking claim to redress a transaction that actually improved their position.

34. In conclusion, whether this Court views the Deposit Transfer as the Debtors do (*i.e.*, either as a payment to a priority depositor from funds that were never available to general unsecured creditors *or* as a payment to WMI and re-deposit at WMB fsb, immediately followed by a loan to WMB for an equal amount via the Master Note), or as the Marathon Credit Claimants have asserted to this Court previously (*i.e.*, as the absence of any transfer at all), it is clear that the Deposit Transfer does not constitute a fraudulent transfer and the Insider Preference Claim should be dismissed.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order disallowing the Claims, and granting Debtors such other and further relief as is just and proper.

Dated: March 26, 2010
Wilmington, Delaware

**ELLIOTT GREENLEAF**

Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Neil R. Lapinski (DE Bar No. 3645)
Shelley A. Kinsella (DE Bar No. 4023)
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399

Email: rxza@elliottgreenleaf.com
Email: nrl@elliottgreenleaf.com
Email: sak@elliottgreenleaf.com

- and -

Peter E. Calamari, Esq.
Michael B. Carlinsky, Esq.
Susheel Kirpalani, Esq.
David Elsberg, Esq.
Benjamin I. Finestone, Esq.
QUINN EMANUEL URQUHART &SULLIVAN, LLP
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 8489-7100

- and -

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

- and -

Thomas C. Frongillo, Esq.
Patrick J. O'Toole, Jr., Esq.
WEIL, GOTSHAL & MANGES LLP
100 Federal Street, Floor 34
Boston, Massachusetts 02110
Telephone: (617) 772-8300
Facsimile: (617) 772-8333

*Attorneys for Washington Mutual, Inc. and WMI Investment Corp.*