# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | |
| WASHINGTON MUTUAL, INC., *et al.*,[1] | Chapter 11 |
| Debtors. | Case No. 08-12229 (MFW) |
| | Jointly Administered<br>**Hearing Date: May 5, 2010 at 10:30 a.m.**<br>**(Requested)**<br>**Objection Deadline: TBD** |

## MOTION AND SUPPORTING MEMORANDUM OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR THE APPOINTMENT OF AN EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE

The Official Committee of Equity Security Holders (the "Equity Committee") of Washington Mutual, Inc. ("WMI" and, together with its chapter 11 debtor-affiliate, WMI Investment Corp., the "Debtors") moves the Court for appointment of an examiner pursuant to Section 1104(c) of the bankruptcy code.

### I.
### PRELIMINARY STATEMENT

Section 1104(c) of the bankruptcy code provides that in a case such as this one, with liquidated, unsecured debts exceeding $5,000,000, the Court "shall" appoint an examiner on the motion of any party in interest or the U.S. Trustee. 11 U.S.C. § 1104(c). Even if that mandatory standard did not exist, appointment of an examiner would still be in the best interests of the estate, particularly at this pivotal juncture in the course of the bankruptcy case.

Following commencement of this Chapter 11 proceeding, the Debtors themselves identified and asserted a variety of legal claims against JPMorgan Chase ("JPMC"), the

---

[1] Debtors in these Chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395). The Debtors are located at 925 Fourth Avenue, Suite 2500, Seattle, Washington 98104.

1

Federal Deposit Insurance Corporation ("FDIC"), and others that, if successful, would add many billions of dollars of value to the estate. As recently as December 2009, and continuing through a hearing in this Court on January 28, 2010, the Debtors represented that they needed an extensive array of additional information from third parties through Rule 2004 in order to fully identify and assess the strength and worth of claims already asserted and also other potential claims.

And yet, although the Debtors have not obtained the information they told the Court they vitally needed, either through Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004") or through discovery in pending litigation, they have recently proposed a Plan of Reorganization constructed around a proposed "Global Settlement Agreement" – still being negotiated – that in its current form would compromise and release known and unknown claims against JPMC, the FDIC, and others, without the benefit of further investigation.

While the Debtors rush forward in an effort to finish and implement that settlement, additional information highly relevant to the collapse of WMI and the seizure and sale of Washington Mutual Bank ("WMB") continues to become available with each passing week, including material information disclosed by the Senate Permanent Subcommittee on Investigations and the Inspectors General of the Treasury Department and the FDIC as recently as April 13 and 16, 2010.

In light of the Debtors' dramatic change of course over recent months and continuing disclosures of material information highly relevant to the collapse of WMI and to how and why WMB was seized and sold, now is the time for the kind of independent, disinterested, objective evaluation for which appointment of an examiner was designed.

2

## II.
## JURISDICTION AND VENUE

The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core bankruptcy proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.
## BACKGROUND

Prior to commencing this Chapter 11 case, WMI was a savings and loan holding company that owned WMB and indirectly WMB's subsidiaries, including Washington Mutual Bank fsb ("FSB"). (DS 1)[2] It was the largest savings and loan holding company in the country, and WMB and its subsidiaries collectively constituted the seventh largest U.S.-based bank. (DS 22)

On September 25, 2008, the Office of Thrift Supervision (the "OTS") ordered the closure of WMB and appointed the FDIC as receiver for WMB. (DS 2) Immediately after its appointment as receiver, the FDIC took possession of WMB's assets and sold substantially all of them to JPMC for $1.88 billion and the assumption of WMB's deposit liabilities. (DS 2) That precipitated this bankruptcy. (DS 29)

Before those dramatic actions by the OTS and FDIC, WMI's financial condition had been adversely affected by significant disruptions during 2007 and 2008 in the U.S. residential mortgage market. (DS 28) And yet, WMI had weathered the storm, due in part to completion in April 2008 of a significant recapitalization that resulted in a $7.2 billion capital infusion by institutional investors. (DS 28) Moreover, although the OTS lowered WMB's supervisory rating in a way that made it ineligible to receive primary credit from the Federal Reserve Board's Discount Window, WMB was able to receive

---

[2] Except as otherwise noted, parenthetical citations in this memorandum with the "DS" prefix refer to the Debtor's proposed Disclosure Statement for the Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (Docket #2623), filed in this case on March 26, 2010.

secondary credit from the Discount Window of the Federal Reserve Bank of San Francisco, and was able to maintain borrowings up to the time of its seizure. (DS 29) Nevertheless, speculation began to circulate in the market that WMI's and WMB's operations and capital positions were unstable, and in the ten days prior to the FDIC receivership, WMB experienced significant deposit withdrawals of more than $16.7 billion. (DS 29)

During this ongoing process, WMI pursued a merger or sale transaction with another financial institution and investigated other strategic alternatives intended to increase WMI's capital and liquidity levels. (DS 29) WMI was continuing to pursue those alternatives when the OTS stepped in and appointed the FDIC as receiver for WMB.

In a nutshell, those are the events, as described by the Debtor in its proposed Disclosure Statement, that led to this bankruptcy. But a multitude of serious questions existed at the commencement date about how and why WMI failed, about the events that led to intervention by the OTS and the FDIC, about the events and communications that led to the sale of WMB's assets to JPMC, and about the role of JPMC and other third parties in the seizure of WMB and the immediate sale of its assets – and those questions remain unanswered today. In fact, today, the list of unanswered questions has grown longer as a result of the Debtors' negotiation of a proposed "Global Settlement Agreement" that is the cornerstone of its recently proposed Plan of Reorganization (Docket # 2622).[3] That settlement includes a complete release of claims against JPMC and the FDIC by the Debtors and by all of the Debtors' creditors and equity interest holders, and provides for cash payments to JPMC that in effect would reimburse it for the

---

[3] A copy of a draft of the settlement agreement is Exhibit I to the Debtors' proposed Disclosure Statement (*see* fn. 2 *supra*). The settlement agreement has not been approved by all parties to it and has not been executed.

money it paid to purchase WMB's assets in the first place.

The Debtors are fervent proponents of the settlement, and are now anxious to have it approved and to shut down permanently all of the legal proceedings that the Debtors themselves had instituted or joined in a supposed effort to get to the bottom of the questions identified above and to recover value for their legal claims. In fact, the Debtors' principal talking points in favor of the settlement are avoidance of the expense and time necessary to resolve issues presented in that pending litigation, and "the corresponding disruption to their efforts to make distributions for the benefit of their creditors." (DS 7)

However, the Debtors themselves have recognized the importance of the questions surrounding the seizure and sale of WMB's assets and the failure of WMI as the nation's largest savings and loan holding company, as well as the importance of answering those questions and fully identifying and assessing the value of the related legal claims that the Debtors own. And as the Debtors themselves recognize in their proposed Disclosure Statement, they are not the only ones who feel that way.

The Debtor's proposed Disclosure Statement (*see* fn. 1) identifies and summarizes the subject matter of the principal litigation spawned by the seizure of WMB and the collapse of WMI – almost all of which would come to an end under the Debtors' Settlement and Plan. A review of those proceedings and recent developments in this bankruptcy case demonstrates that the time has come for appointment of an examiner.

**1.**    The D.C. Action

On December 30, 2008, the Debtors filed a proof of claim against the FDIC Receiver seeking compensation for the Debtors' equity interest in WMB, recognition of WMI's interest in WMI assets claimed by the FDIC, allowance of a protective claim for payment of the Debtors' deposits, payment of amounts owed to WMI by WMB, and the

5

avoidance of certain transfers made by WMI to WMB as a preference or fraudulent transfer. (DS 3) (From December 2007 to September 2008, WMI made capital contributions to WMB amounting to $6.5 billion.) The FDIC summarily rejected those claims, and in March 2009 the Debtors filed a complaint against the FDIC in the U.S. District Court for the District of Columbia.

Significantly, the Debtors alleged "that the FDIC sold WMB's assets for less than they were worth, and as a result, the FDIC breached its statutory duty under the Federal Deposit Insurance Act to maximize the net present value of WMB's assets." (DS 3) The Debtors also alleged that the FDIC's actions constituted a taking of the Debtors' property without just compensation in violation of the Fifth Amendment to the U.S. Constitution and a conversion of the Debtors' property in violation of the Federal Tort Claims Act. (DS 3) JPMC was allowed to intervene in that suit.

On January 7, 2010, the D.C. District Court stayed the D.C. Action at the Debtors' request, in favor of pending adversary proceedings in this Court – but at the same time denied the FDIC's motion to dismiss the suit. (DS 3-4) The D.C. Action would be dismissed with prejudice under the terms of the Debtors' proposed settlement. It is not apparent that any discovery occurred in the DC Action before the court stayed it.

2.    The JPMC Adversary Litigation

In March 2009, JPMC filed an adversary complaint in this Court against the Debtors and FDIC, seeking a declaratory judgment with respect to the ownership of disputed assets and interests that JPMC contends it acquired in the FDIC's auction sale of WMB. (DS 4) In May 2009, the Debtors filed counterclaims against JPMC, claiming ownership of disputed assets and seeking avoidance of prepetition transfers of assets to WMB, and subsequently to JPMC.

This Court denied JPMC's subsequent motion to dismiss the Debtors'

6

counterclaims, and JPMC appealed that decision to the District Court (DS 4), where it is now pending but recently has been stayed as a result of the pending proposed settlement. If approved, the proposed settlement would result in the dismissal of the Debtors' counterclaims with prejudice.

In its counterclaims, the Debtors asserted a right to anticipated federal and state tax refunds in the approximate amount of $5.4 to $5.8 billion. (DS 9) Under the proposed settlement, 70% of initial tax refunds, estimated at $2.7 to $3.0 billion, would be paid to JPMC, and almost 60% of additional tax refunds, estimated at $2.7 to $2.8 billion, would be allocated to the FDIC receiver. (DS 9)

Also at issue in the JPMC Adversary Litigation is a dispute over ownership of certain trust preferred securities with a liquidation preference of approximately $4 billion (backed by a $4 billion mortgage collateral pool). (DS 5) On September 25, 2008, employees of WMI and WMB executed an agreement purporting to assign ownership of those securities to WMB. In its counterclaims in the adversary suit, the Debtors assert that the transfer was ineffective or constituted a fraudulent transfer or voidable preference. (DS 6) The Debtors alleged that JPMC, as the subsequent recipient of those securities via the FDIC sale of WMB assets, was liable to WMI's estate because it knew or should have known of the financial condition of both WMI and WMB at the time of the transfer – and thus was not a good faith purchaser. (DS 6) Under the proposed settlement, JPMC will become the undisputed owner of those securities. (DS 10)

### 3. The Turnover Action

In April 2009, the Debtors filed a complaint against JPMC in this Court seeking turnover of approximately $4 billion of the Debtors' funds in disputed accounts at WMB. JPMC spuriously asserted in response that the funds on deposit in those accounts might be capital contributions rather than deposit liabilities. (DS 6) This Court denied JPMC's

7

motion to dismiss the turnover action. (DS 7)  The Debtors' motion for summary judgment in the turnover action was argued in October 2009, and the matter is *sub judice*. (DS 7)  Under the proposed settlement, nearly all of the funds in the disputed accounts would be paid over to the Debtors. (DS 9)

    **4.**    <u>The American National Action</u>

In February 2009, various insurance companies that hold bonds issued by WMB and WMI filed suit against JPMC in state district court in Galveston County, Texas. "Specifically, the plaintiffs asserted that there was a premeditated plan by JPMC designed to damage WMB and FSB, and thereby enable JPMC to acquire WMI's banking operations at a 'fire sale' price." (DS 34)  The allegations in the complaint raised disturbing questions about the extent to which JPMC had been working with the FDIC behind the scenes for weeks before the seizure of WMB, and had withdrawn from negotiations for the purchase of WMB after concluding that government seizure of WMB would happen and that it could then acquire the assets more cheaply.

The FDIC intervened in the suit as a defendant and removed it to the U.S. District Court for the Southern District of Texas, which then transferred it to the District Court for the District of Columbia. (DS 34)  On April 13, 2010, that court granted motions by JPMC and the FDIC to dismiss the suit for lack of subject matter jurisdiction and entered a final order dismissing the suit and closing the case. The court did not reach the merits, but rather held that the FDIC was a necessary party to the plaintiffs' claims and that plaintiffs were required to pursue their claims against the FDIC exclusively through an administrative claims process established by Congress in the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 83

(1989).[4] Prior to that dismissal, the Debtors' had proposed that the action would be dismissed on its merits, with prejudice, under the Debtors' proposed Plan of Reorganization.[5]

**5.    The Debtors' Rule 2004 Examination Requests**

As a result of the American National Action, the Debtors filed a motion for Rule 2004 examination on May 1, 2009, seeking an order directing the examination of JPMC.[6] In that motion, the Debtors summarized the allegations in the American National Action and sought the authority to investigate the underlying merit of those claims, as well as other potential estate claims suggested by the American National allegations. The Debtors argued to the Court that the discovery they sought through Rule 2004 was broader than the issues raised in the JPMC Adversary Litigation and the Turnover Action. (May Rule 2004 Motion at 2)

This Court granted the Debtors' motion on June 24, 2009, over JPMC's opposition. (DS 34) In August and September 2009, JPMC began producing documents to the Debtors for their review.[7] There is no indication that the Debtors took any depositions.

As described in the proposed Disclosure Statement, "As a result of the review of certain of the documents produced by JPMC, the Debtors determined that additional fact investigation was necessary." (DS 34) Accordingly, on December 14, 2009, the Debtors

---

[4] *See Am. Nat'l Ins. Co. v. JPMorgan Chase & Co.*, 2010 U.S. Dist. LEXIS 36487, *10-12 (D.D.C. April 13, 2010).

[5] *See* Chapter 11 Plan of Reorganization (Docket # 2622), filed on March 26, 2010, §§ 1.182 (naming this action the "Texas Litigation"), 1.146 (including "Texas Litigation" in "Related Actions"), 2.1 (releasing "Related Actions").

[6] *See* Motion for 2004 Examination of JPMorgan Chase Bank, N.A. (Docket # 974) ("May Rule 2004 Motion").

[7] *See* Debtors' Motion for an Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Examination of Witnesses and Production of Documents from Knowledgeable Parties (Docket # 1997), filed on December 14, 2009 ("Dec. Rule 2004 Motion"), at 5.

{00401011;v1}

moved for authority to conduct a further Rule 2004 examination of witnesses and to request production of documents from various third parties – including the FDIC, the OTS, the U.S. Department of the Treasury, and former U.S. Treasury Secretary Henry M. Paulson, Jr. (DS 34) The Debtors also sought to obtain testimony and documents from rating agencies, banks (including Goldman Sachs, the investment bank that WMI retained in September 2007 to assist it in finding a suitor), and third-party professionals that WMI had at one time used. (Dec. Rule 2004 Motion at 1, n. 2)

In that motion, the Debtors described the contents of certain documents they had obtained pursuant to the first Rule 2004 examination – documents that the Debtors themselves fairly characterized as warranting the need for further investigation from third parties who "are likely to have information currently unobtainable by Debtors relevant to potential estate claims sounding in business tort and tortious interference against JPMC, including information relevant to allegations made in [the American National Case]." (Dec. Rule 2004 Motion at 3)

> The Debtors represented to the Court:
>
> As with the Rule 2004 Examination of JPMC, the Rule 2004 Examination of the Knowledgeable Parties will enable the Debtors – as estate fiduciaries – to determine the validity and ownership of these potentially significant claims. To the extent the Requested Examination demonstrates that the Debtors have viable claims against JPMC, such claims are assets of the Debtors' chapter 11 bankruptcy estates and, thus, any recovery resulting from the assertion of these claims will inure to the benefit of the Debtors and their creditors.

(Dec. Rule 2004 Motion at 4)

It is not necessary to repeat here in detail the information reported by the Debtors as a result of reviewing JPMC documents or the damning conclusions about JPMC, regulators, and other third parties that the Debtors set forth in this 2004 Motion. The Court is already quite familiar with the motion. Suffice it to say that what the Debtors had discovered to that point was disturbing. The Debtors explained in their reply brief:

As detailed in Debtors' Motion, the discovery sought through the Requested Examination concerns possible misconduct by JPMC preceding the seizure and sale of WMB, including gaining access to WMI's confidential information in connection with JPMC's supposed interest in bidding for the company, improperly disclosing such information to third parties to cause market panic and foment a government seizure of the bank, destroying a 119-year-old institution that once had more than $50 billion in market capital.[8]

It was also apparent from the December Rule 2004 motion that the Debtors had not obtained the requested information through discovery in any of the lawsuits referred to above. Indeed, in their reply brief, the Debtors explained that discovery was no longer even available in the DC Action because it had been stayed. (Reply Br. Dec. Rule 2004 Motion at 3)

By order dated February 16, 2010, this Court denied the Debtors' motion on the grounds that the discovery the Debtors sought was not appropriate under the limited scope of the Rule 2004 examination that the Court had previously authorized and that permitting further examination under Rule 2004 would have allowed the Debtors to circumvent the Federal Rules of Civil Procedure applicable in the litigation the Debtors had already commenced against JPMC.[9]

Less than one month later, on March 12, 2010, the Debtors publicly announced the settlement and proposed release of the substantial claims they had told the Court as late as the January 28 hearing on their motion that they vitally needed to investigate further through Rule 2004.

6.    Other Suits and Investigations

As described in the Debtors' proposed Disclosure Statement, consolidated class action suits brought under ERISA and the federal securities laws are proceeding in the U.S. District Court for the Western District of Washington as a result of transfer and

---

[8] *See* Reply of the Debtors to the Objections to Dec. 2004 Motion (Docket # 2212), filed on January 25, 2010 ("Reply Br. Dec. Rule 2004 Motion").

[9] Transcript of Hearing, Jan. 28, 2010 (Docket # 2312), at 88-90.

{00401011;v1}

consolidation orders entered by the Judicial Panel on Multi-District Litigation. (DS 39-40) Former officers and directors of WMI are named as defendants in those suits, and discovery has begun. (DS 39-41)

Under the proposed settlement, WMI's present and former officers and directors and employees will be entitled to a priority recovery for all claims made against a blended insurance program obtained by WMI before bankruptcy, providing (among other things) directors and officers, bankers professional liability, and fiduciary liability insurance. (DS 56)

In addition, in October 2008, the U.S. Attorney for the Western District of Washington, together with other federal authorities including the FBI, the FDIC, the IRS, and the Department of Labor commenced a coordinated investigation into the failure of WMB. (DS 45) The Debtors have reported that WMI "has received several grand jury subpoenas and is producing documents responsive to those subpoenas." (DS 45) The Debtors further report that "[t]he government's investigation is pending and WMI does not know how much longer the investigation will continue or whether any charges will result against WMI or any individuals." (DS 45)

Further, the Debtors have disclosed that the sale of substantially all of the assets of WMB to JPMC has been "a point of interest" to the Financial Fraud Enforcement Task Force established by President Obama on November 17, 2009, by Executive Order No. 13519. (DS 45)

7.  U.S. Senate Investigation and Hearings

Last but not least, the U.S. Senate's Homeland Security and Government Affairs Permanent Subcommittee on Investigations, has recently conducted hearings (on April 13 and April 16, 2010) about the collapse of WMB and has issued two investigative

reports.[10] Among other things, the hearings revealed the existence of disputes between the OTS and the FDIC over the financial condition of WMB and whether regulatory action was necessary. Former OTS director John M. Reich testified that WMB's seizure was not caused by the poor quality of its loans or by deficient capitalization, but by an asserted liquidity crisis prompted by a "run on deposits" at the bank by depositors in the 10-day period preceding OTS intervention.[11] Reich further testified that had the asserted liquidity crisis occurred two weeks later, there would have been no failure because of the FDIC's intervening decision to increase deposit insurance to $250,000 per depositor.

Reich's testimony, confirming that WMB's seizure and sale were not the result of inadequate regulatory capital, underscores the importance of allegations in the American National Action that JPMC helped orchestrate a run on the bank, which became the ostensible precipitating cause of the FDIC receivership, by engineering "a campaign involving adverse media 'leaks,' stock sales, and deposit withdrawals designed to distort the market and regulatory perception of Washington Mutual's financial health."[12]

The Committee investigation also led to the disclosure on April 19 of an e-mail from FDIC Chairman Shelia Blair to Reich dated August 6, 2008, in which she indicated

---

[10] The first report, contained in an April 13, 2009 Memorandum to the Permanent Subcommittee on Investigations, is available here and is also attached hereto as **Exhibit 2**: http://levin.senate.gov/newsroom/supporting/2010/PSI.LevinCoburnmemo.041310.pdf

The second report ("April 16 Subcommittee Report"), contained in an April 16, 2009 Memorandum to the Permanent Subcommittee on Investigations, is available here and is also attached hereto as **Exhibit 3**: http://levin.senate.gov/newsroom/supporting/2010/PSI.LevinCoburnmemo.041610.pdf

[11] *See* April 16, 2010 Statement of John M. Reich, Former Director, Office of Thrift Supervision, regarding Washington Mutual Bank, Before the U.S. Senate Permanent Subcommittee on Investigations United States Senate, available at http://tiny.cc/f0zly and attached hereto as **Exhibit 4**.

[12] *American National Insurance Company v. FDIC*, No. 09-1743, Complaint ¶ 46 (attached as Exhibits 1-3 of Docket #1) (D.D.C. March 25, 2009). As noted previously, this case was recently dismissed on non-merits grounds because Plaintiffs failed to exhaust their administrative remedies against a necessary party, the FDIC. *See Am. Nat'l Ins. Co. v. JPMorgan Chase & Co.*, 2010 U.S. Dist. LEXIS 36487, *10-12 (D.D.C. April 13, 2010). In reaching this decision, the Court did not gainsay any of the factual allegations in the complaint.

{00401011;v1}

that the FDIC intended to make "discrete inquiries" to other banks about buying WMB in the event of an "emergency closing."[13] It is apparent that JPMC was one of those banks. Yet less than two weeks before the failure, Ms. Blair told WMI executives that she would stand aside while they sought a buyer. As the *Wall Street Journal* has reported, "J.P. Morgan lost interest in buying the thrift unless it failed, acknowledging in a slide presentation circulated internally on Sept. 19 that bank officials had been 'contacted by FDIC about interest in' Washington Mutual." *Id.*

In addition, the *Wall Street Journal* reported as follows in the same April 13, 2010 article:

> J.P. Morgan, now the second-largest U.S. bank in assets, unsuccessfully tried to buy Washington Mutual in early 2008. As the thrift's problems deepened, then-Treasury Secretary Henry Paulson told [then-WMI CEO Kerry Killinger] in a July phone call that "you should have sold the company to J.P. Morgan when you had the chance," according to four people familiar with the conversation.

The Senate Subcommittee's findings also identified "a pattern of errors, poor risk management and even fraud at Washington Mutual" relating to the bank's origination of billions in home equity loans with little or no supporting documentation of creditworthiness.[14]

A separate joint report of investigation released on April 16, 2010, by inspectors general of the Treasury Department and the FDIC corroborated many of the Senate Subcommittee's findings.[15] Department of the Treasury Inspector General Eric Thorson testified at the Senate hearings that OTS had identified weaknesses in WMB's relationship with mortgage brokers, with only 14 WMD employees overseeing the

---

[13] *See* Wall Street Journal, "Panel Tries to Unravel WaMu's Failure," April 13, 2010, attached hereto as **Exhibit 5**.

[14] *See* April 16 Subcommittee Report 8-9 (stating Subcommittee's findings), **Exhibit 3**.

[15] The report ("Inspectors General's Report") is available at http://www.fdicoig.gov/reports10%5C10-002EV.pdf and an excerpt of the report is attached as **Exhibit 6** hereto.

relationship with more than 34,000 third-party brokers.[16] According to the Inspectors General's Report, the Department of Treasury and FDIC intend "at a later date" to "assess FDIC's resolution process for WaMu to determine whether that process complied with applicable laws, regulations, policies and procedures."[17]

In connection with its hearings, the Senate Permanent Subcommittee also released e-mails gathered in its investigation that underscore the importance of investigating the relationship between Goldman Sachs, WMI, and WMB, particularly in light of the SEC's April 16, 2010 commencement of a major civil action against Goldman Sachs for defrauding investors in the sale of subprime residential mortgage-backed securities.[18]

Exhibits released by the Permanent Subcommittee on Investigations include e-mails that evidence extensive business relationships between WMI, WMB, and Goldman Sachs that existed for years prior to the seizure – but also a level of WMI distrust of Goldman that reached to the level of WMI's CEO.[19] In addition, at times during 2008, Goldman Sachs recommended short-selling of WMI shares and may have engaged in short sales of WMI securities for its own account – betting that the company's financial condition would deteriorate.[20] Nevertheless, based on press reports, WMI hired Goldman Sachs in mid-September 2008 to assist it in finding a buyer of WMB or its assets, and Goldman in turn communicated directly with JPMC.[21]

---

[16] *See* April 16, 2010 Statement of the Honorable Eric M. Thorson, Inspector General, Department of the Treasury, regarding Washington Mutual Bank Before the U.S. Senate Permanent Subcommittee on Investigations United States Senate, at 10, available at http://tiny.cc/bnkj2 and attached hereto as **Exhibit 7**.

[17] Inspectors General's Report at 2, **Exhibit 6**.

[18] *See* SEC Litigation Release No. 21489 (Apr. 16, 2010), available at: http://www.sec.gov/litigation/litreleases/2010/lr21489.htm

[19] *See* **Exhibits 8** and 9 hereto.

[20] WSJ Marketbeat, "Goldman: Short WaMu Stock, Buy the Bonds," Apr. 11, 2008 (available at: http://tinyurl.com/2f5ubs5), **Exhibit 10**.

[21] New York Times DealBook, "Washington Mutual Begins Efforts To Sell Itself," Sept. 17, 2008 (available at: http://tinyurl.com/3ncp7b), **Exhibit 11**.

The events summarized above point to the following conclusions that are relevant to this Motion:

- Following commencement of the bankruptcy case, the Debtors themselves identified and asserted a variety of legal claims against JPMC, the FDIC, and others that, if successful, would add many billions of dollars of value to the estate.

- As recently as December 2009 and continuing through a hearing in this Court on January 29, 2010, the Debtors represented that they needed an extensive array of additional information from third parties in order to fully identify and assess the strength and worth of claims already asserted and also other potential claims.

- The Debtors have not obtained the information they told the Court they needed to conduct that investigation.

- Additional information highly relevant to the collapse of WMI and the seizure and sale of WMB continues to become available with each passing week, including material information disclosed by the Senate Permanent Subcommittee on Investigations and the inspectors general of the Department of Treasury and the FDIC.

- The Debtors have recently proposed a Plan of Reorganization constructed around a proposed Global Settlement Agreement that is still being negotiated but that in its current form would compromise and release the multi-billion dollar claims that the Debtors have identified to date, without the benefit of further investigation.

- It is not apparent that the Debtors have conducted any investigation of potential claims against their own officers, directors, and employees, or that they intend to investigate the existence of causes of action against other third parties who may have played material roles in WMI's failure.

### III.
### LEGAL STANDARD FOR THE APPOINTMENT OF AN EXAMINER

A bankruptcy court has the authority to appoint an independent examiner to investigate and identify potential assets of the estate. *See In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (Bkrtcy. S.D.N.Y. 1993). The examiner provides an objective, nonadversarial perspective on relevant transactions and events as guidance for interested parties to subsequently pursue relevant claims. *In re Fibermark, Inc.*, 339 B.R. 321, 325 (Bkrtcy. D. Vt. 2006). Congress provided for the appointment of an examiner in the bankruptcy code as an extra measure of protection for stockholders of public

corporations. *See In re Gilman Services, Inc.*, 46 B.R. 322, 327 (Bkrtcy. D. Mass. 1985) (discussing legislative history of the examiner statute); *In re Loral Space Communications*, 2004 WL 2979785, *4 (S.D.N.Y. 2004) (same).

Section 1104(c) of the bankruptcy code sets out the standard governing appointment of an examiner:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of the plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor if –
>
> (1) such appointment is in the interest of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debtors for goods, services or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c).

In cases such as this one, with unsecured debts exceeding $5,000,000, the statute indicates that the court "shall" appoint an examiner on a motion by an interested party. *Id.* In light of that language, the courts have routinely held that appointment of an examiner is mandatory in such circumstances. *See, e.g., In re Revco D.S., Inc.*, 898 F.2d 498, 500-01 (6th Cir. 1990); *In re Walton*, 398 B.R. 77, 80-83 (Bkrtcy. N.D. Ga. 2008); *In re Vision Development Group of Broward County, LLC*, 2008 W.L. 2676827, *3 (Bkrtcy. S.D. Fla. 2008); *In re UAL Corp.*, 307 B.R. 80, 86 (N.D. Ill. 2004); *Loral*, 2004 WL 2979785 at *5..

The Sixth Circuit's opinion in *Revco* is particularly instructive. Two years before

{00401011;v1}

the debtor filed for bankruptcy, it had been the subject of a leveraged buyout. *Revco*, 898

F.2d at 499. The United States Trustee sought the appointment of an examiner to

investigate the LBO. *Id.* Both the debtor—presumably then controlled by the acquiring

party—and the creditors opposed the appointment of the examiner. *Id.* Although the

Bankruptcy Court denied the U.S. Trustee's motion, the Sixth Circuit reversed and held

that an examiner must be appointed if requested by the U.S. Trustee or any other

interested party. *Id.* at 500-01. As *Revco* suggests, an examiner can play an important

role when the debtor lacks the incentive to conduct a thorough investigation into potential

claims.

Only in exceptional cases have courts contravened the statutory mandate and

declined to appoint an examiner. In a recent decision from this Court, Judge Carey

denied a motion to appoint an examiner based on findings that all parties had had ample

opportunity to conduct discovery into relevant matters; that the issues raised in the

motion seeking appointment of an examiner did not require investigation, but were

typical differences of opinion related to confirmation of a proposed plan; and that the

motion had been filed so late in the process that it would do more harm than good to the

estate. *In re Spansion, Inc.*, 2010 WL 1292837, *8 (Bkrtcy. D. Del. 2010).

Similarly, a party who waited until an investigation had already been conducted at

significant expense to the Debtor waived its right to request an examiner because

repeating the same investigation a second time would be "duplicative, needless, and

wasteful." *In re Bradlees Stores, Inc.*, 209 B.R. 36, 39 (Bkrtcy. S.D.N.Y. 1997); *see also*

*In re Schepps Food Stores, Inc.*, 148 B.R. 27 (S.D. Tex. 1992) (denying a request to

appoint an examiner when the moving party's actions suggested its true motive was

delay, the issues to be investigated were better addressed as objections to the proposed

plan, and a date for the hearing on confirmation of the proposed plan had already been

established).

As discussed below, this case is a far cry from those described above in which courts have declined to appoint an examiner despite the mandatory language in Section 1104(c). To the contrary, it is exactly the kind of case in which appointment of an independent examiner would serve a vital function.

The Court has discretion to determine the scope and duration of the examiner's investigation. *In re Revco*, 898 F.2d at 501. As Section 1104(c) makes clear, the investigation may include a broad range of issues relevant to the debtor's business failure, including allegations of mismanagement, professional negligence, and fraud. 11 U.S.C. § 1104(c); *In re Gilman Services*, 46 B.R. at 327. The examiner's duties should be defined in order to minimize or avoid interference with the ongoing bankruptcy proceedings. *In re Loral Space*, 2004 WL 2979785 at *5. At the same time, as we discuss below, the fact that the reorganization process would be delayed or that an examiner's work would entail significant expense to the estate generally are not valid grounds for refusing to appoint an examiner, and certainly are not valid grounds under the current circumstances of this case.

## IV.
## ARGUMENT

### A.  Appointment of an Examiner Is Necessary and Appropriate

The question presented by this Motion is not whether an examiner should be appointed – the express statutory conditions for an appointment in Section 1104(c) are plainly satisfied, and if the statute is to be applied as written, appointment is mandatory. The question is whether any legitimate grounds exist <u>not</u> to appoint an examiner, assuming the Court retains some narrow band of discretion to decline such an appointment. Beyond that question, the Court must also consider the appropriate scope of the examination, the timetable for its completion, and whether artificial limits should

19

be placed on the estate resources the examiner may use in conducting the assigned work.

On the question whether any legitimate grounds exist not to appoint an examiner, the answer is plainly No. Appointment of an examiner in this case is necessary and wholly appropriate.

### 1.  The Timing of This Motion

This bankruptcy case was prompted by one of the largest bank seizures in U.S. history, followed within hours by the FDIC's announcement of a sale of WMB's assets to JPMC. That striking sequence of events was initially shrouded in mystery, but as time passed following the seizure and sale, information slowly came to light that raised disturbing questions not only about how those actions were orchestrated and by whom, but also about whether the seizure of WMB and the collapse of WMI could and would have been avoided but for the machinations of third parties.

The Debtors themselves initially recognized the critical nature of those questions and the critical importance of answering them if the estate's assets were to be maximized for the benefit of creditors and other interested parties. As described in the Background section of this Motion, the Debtors filed claims and counterclaims in various legal proceedings against JPMC and the FDIC. Moreover, the Debtors sought to use Rule 2004 in an effort to obtain information from third parties – an effort that continued even after it appeared that discovery procedures in pending litigation would become (or had become) available to them.

Yet less than one month after this Court denied the Debtor's most recent effort to use Rule 2004 as an investigative tool, the Debtors announced a settlement (still incomplete) that would provide a broad release of multi-billion dollar claims for the benefit of JPMC and the FDIC – whose very actions were the centerpiece of the Debtors' litigation and investigative efforts. Certainly, the investigative steps that the Debtors

{00401011;v1}

sought to pursue through their December Rule 2004 motion never happened. It also appears clear that after filing that motion the Debtors obtained little, if any, formal discovery through the then-pending litigation (the DC Action, the JPMC Adversary Litigation, and the Turnover Action). It is not apparent that the Debtors have taken any testimony through depositions, either before or after filing their second Rule 2004 motion in December 2009, on the subject of the events that led to the seizure and sale of WMB.

Instead of following through on the investigative efforts that the Debtors themselves had initiated but never completed, or in fact never started, the Debtors instead made the surprise announcement in late March 2010 that all such efforts would come to a halt, that all pending legal actions against JPMC and the FDIC should be dismissed with prejudice through the pending settlement, and that it was more important to distribute money quickly to selected classes of creditors than to finish the task of investigating and valuing the claims they now propose to release.

In light of these dramatic and quite recent course-changes, which were not foreseeable, no legitimate claim could be made that appointment of an examiner should be denied now because it was not sought earlier.

That conclusion is reinforced by even more recent events, namely, the disclosures summarized in the Background section of this memorandum that have come to light through the recent hearings and reports of the Senate Permanent Subcommittee on Investigations and by the equally recent reports of the inspectors general of the OTS and the FDIC. Those developments underscore the need for an examination in this bankruptcy case, not only of the events that led to the seizure and sale of WMB but also of the extent to which legal duties were violated pre-bankruptcy by directors, officers, and employees of WMI – many of whom remain in place to this day – in the management and oversight of WMB, and the extent to which any such breaches give rise to claims that

21

would potentially enhance the value of the estate.

## 2. Impact of An Examiner's Appointment on Plan Confirmation

The Debtors and other interested parties undoubtedly will protest that appointment of an examiner should be refused because it would delay the Debtors' completion of its proposed settlement with JPMC and the FDIC and slow down the Debtors' rush to have it approved and made the centerpiece of a proposed Plan of Reorganization.[22] Any such protest would be without merit.

In the first place, the proposed settlement is not yet complete. In a motion filed by the Debtors on April 23, 2010, for approval of their proposed Disclosure Statement and for establishment of a schedule leading to a July 20 plan confirmation hearing, the Debtors disclosed that "[w]hile the provisions of the proposed settlement agreement have been agreed to by WMI, JPMorgan Chase and significant creditor groups of WMI, as of this date, the FDIC has some remaining concerns." (Debtors' DS Motion at 4-5) Although the Debtors continue to express "hope" that an agreement will be obtained "in the near future," it is not a reality as of today. (Debtors' DS Motion at 5)

But even if the settlement agreement had already been finalized and executed, that would not provide a legitimate basis for denying appointment of an examiner at this juncture. Whether the settlement should or should not be approved, it is unquestionably of paramount significance in this bankruptcy. It is the centerpiece of the Debtors' proposed Plan of Reorganization, and it disposes of the estates' most valuable remaining assets – its legal claims against the FDIC and JPMC. Final consideration of the settlement should be based upon a thorough, independent, and objective assessment of the transactions and events that were the foundation for the released claims. If an

---

[22] On April 23, 2010, the Debtors filed a motion seeking approval of its proposed Disclosure Statement and establishment of a schedule leading to a plan confirmation hearing on July 20, 2010 ("Debtors' DS Motion"). (Docket # 3568)

{00401011;v1}

examination of such issues does not occur now, it will never occur.

To be sure, appointment of an examiner would necessitate a delay in the Debtors'
recently proposed (April 23, 2010) schedule leading to a plan confirmation hearing. That
alone is not a reason to dispense with an examination, particularly under the
circumstances described in this Motion. Instead, it is a factor to be considered by the
Court in determining the amount of time to be allowed for the examiner to complete the
assigned work.

### 3. Other Potential Objections Based on Cost

The Debtors and other interested parties may argue that appointment of an
examiner should be refused because it duplicates efforts already undertaken and wastes
estate resources. Such arguments would be unpersuasive as a basis for denying
appointment of an examiner altogether.

First, the Court may (and should) order the examiner to make full use of
information already gathered by the Debtors and by third parties, and provide the
examiner authority to obtain such information quickly. No one will argue that the
examiner should reinvent the wheel in gathering relevant information. To the extent
information has already been assembled by the Debtors from sources outside WMI
through formal or informal means, the examiner should have access to that information
immediately. The other legal proceedings and investigations summarized in the
Background section of this memorandum provide additional sources of relevant
information upon which the examiner may draw at the outset, to avoid duplication of
effort and to enhance the examination's efficiency.

Second, it is apparent that the Debtors have not conducted a complete
investigation of the factual basis for the claims they propose to release, or of other
potential claims related to the economic misfortunes of WMB and its eventual seizure

and sale by the government. By definition, the examiner will not be duplicating efforts by taking steps to gather and assess relevant information that the Debtors have been either unable or unwilling to collect and assess – and that the Debtors never will assemble and analyze if they have their way.

Third, the examiner would bring something vital to the table that the Debtors cannot bring: An independent, objective assessment by a person who was not a participant in the events that led to WMI's collapse and has no personal interests stemming from that participation that could create conflicts of interest. That is particularly important with respect to the examination of potential claims of misconduct by the Debtors' own management and members of their corporate boards. It is additionally important with respect to an examination of the events and negotiations that led to the pending settlement and the Debtors' abrupt reversal of course over the last few months.

Fourth, and finally, compared to the magnitude of the claims that the proposed settlement would release, and the financial consequences to the estate of the settlement's terms, the estate resources needed to fund an appropriate examination under Section 1104(c) would be modest, and certainly money worth spending. That is not to say that the cost will be insignificant in absolute terms, but the Court has ample authority to supervise the process in a manner designed to reasonably control that cost, while ensuring that the important purposes of an independent examination are safeguarded. That the examination will be expensive is no basis for refusing to allow it altogether.

### 4. Relationship of This Motion To Legal Actions Designed to Compel a WMI Shareholders Meeting

On April 20, 2010, the Court heard argument on the Equity Committee's motion for a determination that the automatic stay does not preclude the filing of a shareholder suit for an order compelling WMI to hold a meeting of shareholders, and the Court held

24

that such a suit may proceed. The Equity Committee understands that shareholders in Washington state court will file (or have filed) that suit today.

That state court action and the instant Motion for appointment of an examiner are not alternatives to each other. For the following reasons, commencement of the state court suit in no way detracts from the need for prompt appointment of an examiner in this bankruptcy case.

First, the Debtors have announced their intention to oppose the state court suit vigorously and to return to this Court for an order enjoining that suit from proceeding. At a minimum, it can be anticipated that the Debtors will do their best to delay its course, while at the same time pushing in this Court for rapid approval of the global settlement and confirmation of the plan that incorporates it.

Second, even if the state court suit is successful despite the efforts of the Debtors (and undoubtedly other interested parties) to derail it, there is no absolute assurance that shareholders will vote to elect a new board of directors. Even if a new board is elected, significant time may elapse prior to that election during which an examiner could and should begin its investigation.

Third – and most important – even if the suit is successful and even if it results in the election of a new slate of directors, that would not moot the need for appointment of an examiner. An objective, independent investigation and analysis of potential claims by a person reporting directly to this Court and to all interested parties would still be vital. A new board of directors would need such a report as an integral part of any new decision process regarding the pursuit or settlement of the Debtors' causes of action. And the sooner an independent examination begins under Section 1104(c), the sooner it will be completed. If such an appointment is deferred and either the state court suit is unsuccessful or a shareholders meeting does not result in the election of a new board,

appointment of an examiner at that point would simply result in more delay in the ultimate resolution of this bankruptcy.

## B. The Proposed Scope of Examination

The Equity Committee proposes that the examiner be empowered and directed to investigate the following matters:

1. The extent to which there are potential claims and causes of action held by the Debtors' estates against any person or entity, and the merit and value of those claims, arising from circumstances leading to the OTS's closure of WMB and appointment of FDIC as receiver and the FDIC's sale of WMB assets to JPMC, including:

    A. WMI's negotiations with JPMC and other potential investors or merger/acquisition partners during 2008;

    B. Discussions between JPMC, the FDIC, the OTS, other officials at the Department of the Treasury, the SEC, and any other government agencies during 2008 concerning WMB or WMI;

    C. Any actions by JPMC (including but not limited to direct or indirect communications to the media and securities transactions) that could have had the effect of damaging market or government agency perceptions of WMB or WMI's financial health, capital adequacy, or liquidity;

    D. JPMC's communications about WMB or WMI with other actual or potential WMI investors or merger/acquisition partners or investment advisors (including Goldman Sachs) during 2008;

    E. JPMC's decision to withdraw from discussions with WMI about a merger or acquisition;

    F. WMB's financial condition during 2008 and its ability to satisfy regulatory requirements regarding capital and liquidity up to the time of seizure,

26

including how WMB's condition compared to that of other banks that were not seized and placed into an FDIC receivership;

G.     The causes of the "run on the bank" experienced by WMB in the two-week period preceding OTS closure, including the extent to which institutional deposits, brokered deposits, or deposits under the control of governmental or quasi-governmental agencies were withdrawn;

H.     The extent to which JPMC obtained confidential information from WMB or WMI during 2008, how it obtained such information, and how it used such information;

J.     The decisions of OTS and FDIC regarding the seizure of WMB and the sale of WMB assets, the bases for those decisions, the communications of OTS and FDIC with other government or private personnel about those decisions in advance of making and acting on them, and whether the FDIC's sale of WMB's assets satisfied its statutory obligations;

K.     Specific identification and valuation of WMB assets conveyed by the FDIC to JPMC;

L.     The actions and communications of third-party professionals retained by WMI during 2007 and 2008 in its efforts to find additional investment capital and/or merger/acquisition partners;

M.     The nature of the business relationships between WMI, WMB, and Goldman Sachs during 2007 and 2008, Goldman's communications with JPMC and other potential acquirers of WMB or its assets, and Goldman's proprietary trading activities in the securities of WMI during 2008.

N.     To the extent not identified above, the allegations set forth in the complaint filed in the American National Action and the D.C. Action.

27

2.     The extent to which there are potential claims and causes of action held by the Debtors' estates arising from breach of fiduciary duty or other legal duties by WMI officers, directors, and employees in their supervision or direction of WMB investment in subprime residential mortgages during 2007 and 2008, or in other actions and events that led to WMB's seizure and sale in September 2008;

3.     The disputes at issue in the Turnover Action, including the existence and valuation of WMI tax attributes (principally its NOLs) and the meaning and impact of the Tax Sharing Agreement on the disputes;

4.     The proper ownership, valuation, and asset affiliation of the trust preferred securities at issue in the JPMC Adversary Litigation and the proper ownership of all other assets that are the subject of claims and counterclaims in that adversary proceeding;

5.     The communications and negotiations that led to the Debtors' proposed "Global Settlement" and the factors that produced the settlement and the Debtors' decision to agree to and support its terms;

6.     Potential claims belonging to the Debtors for fraudulent conveyance or for the recovery of preferential transfers, including but not limited to any such claims that arise from WMI's capital contributions to WMB;

7.     To the extent not encompassed in preceding topics, the subjects and proposed information sources identified in the Debtors' May and December Rule 2004 motions;

8.     To the extent not addressed in the preceding topics, the merit and valuation of the claims of any parties that would be released under the proposed Global Settlement;

9.     The identification, nature, and valuation of assets held by the Debtors post-bankruptcy, including assets that would be conveyed to JPMC and the FDIC under

the proposed Global Settlement Agreement.

## C.     Proposed Timetable for the Examiner's Investigation

The Equity Committee asks that the Court direct the U.S. Trustee to appoint an examiner pursuant to Section 1104(c)(1) with all deliberate speed, and to require that the examiner, within ten (10) days of that appointment, propose a work and expense plan that includes a good-faith estimate of the fees and expenses of the examiner and the examiner's proposed professionals for conducting the investigation. The Court may then hold a status conference to consider the work and expense plan and any responses thereto, and to order further relief as appropriate to aid the examiner in the performance of the examiner's duties and/or to accommodate the needs of the estate. However, the examiner should be authorized and directed to commence the investigation as promptly as reasonably possible following the appointment.

The Equity Committee further recommends that the examiner be directed to prepare and file a report as required by 11 U.S.C. § 1106(a)(4) within <u>150 days</u> following the examiner's appointment, unless such time is extended by order of this Court upon the examiner's application.

The Equity Committee proposes other terms and conditions relating to the examiner's appointment, powers, and investigation in the proposed Order filed as **<u>Exhibit 1</u>** to this Motion, which is incorporated in the Motion by this reference.

## V.
## CONCLUSION

WHEREFORE, for the reasons explained in this Motion, the Equity Committee requests that the Court enter an order, substantially in the form attached hereto as **<u>Exhibit 1</u>**, appointing an examiner pursuant to Section 1104(c) of the Bankruptcy Code, and for such other and further relief as to which the Equity Committee may be entitled.

{00401011;v1}

Dated: April 26, 2010

**ASHBY & GEDDES, P.A.**

_[signature]_

William P. Bowden (DE Bar No. 2553)
Gregory A. Taylor (DE Bar No. 4008)
Stacy L. Newman (DE Bar No. 5044)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
Facsimile : (302) 654-2067
E-mail:   wbowden@ashby-geddes.com
              gtaylor@ashby-geddes.com
              snewman@ashby-geddes.com

_Delaware Counsel to the Official Committee of
Equity Security Holders of Washington Mutual,
Inc., et al._

-and-

**SUSMAN GODFREY, L.L.P.**
Stephen D. Susman (NY Bar No. 3041712)
Seth D. Ard (NY Bar No. 4773982)
654 Madison Avenue, 5th Floor
New York, NY 10065
E-mail:
ssusman@susmangodfrey.com
sard@susmangodfrey.com

Parker C. Folse, III (WA Bar No. 24895)
Edgar Sargent (WA Bar No. 28283)
Justin A. Nelson (WA Bar No. 31864)
1201 Third Ave., Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
E-mail:
pfolse@susmangodfrey.com
esargent@susmangodfrey.com
jnelson@susmangodfrey.com

_Proposed Co-Counsel for the Official Committee of
Equity Security Holders of Washington Mutual,
Inc., et al._

{00401011;v1}