**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-------------------------------------------------------------x
                                                    :
*In re*                                             :       **Chapter 11**
                                                    :
**WASHINGTON MUTUAL, INC., et al.,**[1]             :       **Case No. 08-12229 (MFW)**
                                                    :
        **Debtors.**                                :       **(Jointly Administered)**
                                                    :
                                                    :       **Re: Docket No. 3579**
-------------------------------------------------------------x

**DEBTORS' OBJECTION TO MOTION**
**AND SUPPORTING MEMORANDUM OF THE OFFICIAL**
**COMMITTEE OF EQUITY SECURITY HOLDERS FOR THE APPOINTMENT**
**OF AN EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE**

Washington Mutual, Inc. ("WMI") and WMI Investment Corp., as debtors and

debtors in possession (collectively, the "Debtors"), as and for their objection to the motion, dated

April 26, 2010 [Docket No. 3579] (the "Motion"), of the Official Committee of Equity Security

Holders (the "Equity Committee") for appointment of an examiner pursuant to section 1104(c) of

title 11 of the United States Code (the "Bankruptcy Code"), respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.      The Motion is a desperate attempt by the Equity Committee to throw any

and every allegation against the wall in the hope that something will stick. Its intent is disruption

and delay, not investigation or illumination. The transparent motive for the belated request to

appoint an examiner is to derail nineteen (19) months of work in these chapter 11 cases on the

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 925 Fourth Avenue, Suite 2500, Seattle, Washington 98104.

off chance that the prospect of delay will cause the parties with the real economic stake in these cases – creditors – to throw something to or "pay off" holders of equity interests.

2.      The circumstances leading to the federal takeover and immediate sale of Washington Mutual Bank ("WMB"), precipitating these chapter 11 cases, are well known. These events already are among the most heavily investigated of any financial failure in history. The entities and agencies that have investigated these matters, or have authority to do so, are legion and include the Debtors themselves, the official committee of unsecured creditors (the "Creditors' Committee"), the Equity Committee, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Department of Labor, the Department of Justice, the Federal Bureau of Investigation, the Internal Revenue Service, the Securities and Exchange Commission , the United States Attorney for the Western District of Washington, the Attorney General of the State of New York, numerous class action law firms pursuing claims on behalf of shareholders, and the United States Congress.  The Equity Committee now asks the Court to appoint one more. No further investigation is "appropriate" and no examiner is required or warranted under section 1104(c) of the Bankruptcy Code.

3.      From the outset of these chapter 11 cases, the Debtors recognized that they hold certain claims and causes of action against third parties, and needed to conduct appropriate investigations to evaluate others.  Almost immediately, the Debtors – with the assistance of their bankruptcy counsel, financial advisor, and the Creditors' Committee – began pursuing certain identified causes of action and examining other potential, undeveloped claims.  Subsequently, the Debtors hired special litigation and conflicts counsel to represent the Debtors with respect to certain of such matters, to ensure that no conflict of interest would preclude or restrain the vigor with which the Debtors would pursue such claims.  And, all along the way, the Debtors

consulted with the Creditors' Committee and their professionals, and provided them with access to the information and discovery received. When the Equity Committee was appointed, the Debtors likewise met and consulted with the Equity Committee's counsel and shared analyses and discovery.

4. These efforts have been lengthy, time consuming, expensive and, notwithstanding the Debtors' recent decision to compromise and settle such claims, remain ongoing. Yet, in another attempt to sidetrack the Debtors' attention, cause delay and additional expense, and extract value for equity holders from an insolvent estate, the Equity Committee filed the Motion, seeking appointment of an examiner to investigate a laundry list of issues and questions already under thorough examination by the Debtors, Creditors' Committee, and others. Even a cursory review of the Motion reveals that its purpose and effect is to interfere with these proceedings and impose a "third opinion" not contemplated by the Bankruptcy Code on the reasonableness of the proposed settlement embodied in the Debtors' recently filed plan of reorganization.

5. The Debtors have acted in accord with their fiduciary duties and, after a thorough examination and analysis of the relevant factual and legal issues, have decided, in conjunction with the Creditors' Committee, to take the road that they deem best serves those duties and settle. The Motion does not allege any postpetition fraud, wrongdoing, mismanagement or misconduct by the Debtors in carrying out their duties as estate fiduciaries. Instead, it merely states that, because the Debtors have decided to settle certain existing and potential claims and causes of action, the Court should appoint an examiner to investigate such claims. What the Equity Committee seeks is to saddle the Debtors' estates with millions of dollars in the fees and expenses of yet another party and its professionals to evaluate the

reasonableness of the proposed settlement – a task that the various constituencies involved in these cases, including the Equity Committee, should undertake, and one that ultimately will be decided by the Court. This is not an "appropriate" investigation under section 1104(c) and will provide no benefit to these estates. All it will do is needlessly drain the Debtors' already limited resources, to the detriment of all creditors.

6.      Most importantly, when the proposed settlement is finalized and its prosecution placed squarely before the Court, it will be tested by the customary chapter 11 processes. In that regard, the Equity Committee will have a full opportunity to test the settlement under well-settled standards governing court approval of compromises and, additionally, pursuant to section 1129 of the Bankruptcy Code. The Equity Committee and its professionals will have all discovery mechanisms available. Conversely, if the settlement does not come to final fruition or is not approved by the Court, the Debtors will continue to pursue their claims aggressively. Either way, there are no grounds for appointment of an examiner. Given the work undertaken by the Debtors, the Creditors' Committee, and other parties, there is no benefit or basis – in the Bankruptcy Code or elsewhere – to have an examiner serve this role.

## BACKGROUND

### General Background

7.      On September 26, 2008 (the "Commencement Date"), each of the Debtors commenced with this Court a voluntary case pursuant to chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On October 3, 2008, the Court entered an order, pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the joint administration of the Debtors' chapter 11 cases.

8.      On October 15, 2008, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Creditors' Committee. On January 11, 2010, the U.S. Trustee appointed the Equity Committee.

9.      Prior to the Commencement Date, WMI operated as a savings and loan holding company that owned WMB and, indirectly, such bank's subsidiaries, including Washington Mutual Bank fsb ("WMBfsb"). WMI still owns all of the outstanding stock of WMB, and WMI also has certain non-banking, non-debtor subsidiaries. Like all savings and loan holding companies, WMI was subject to regulation by the Office of Thrift Supervision (the "OTS"). WMB and WMBfsb, in turn, like all depository institutions with federal thrift charters, were subject to regulation and examination by the OTS. In addition, WMI's banking and nonbanking subsidiaries were overseen by various federal and state authorities, including the Federal Deposit Insurance Corporation ("FDIC").

10.      On September 25, 2008, the Director of the OTS, by order number 2008-36, appointed the FDIC as receiver for WMB and advised that the receiver was immediately taking possession of WMB (the "Receivership"). Immediately after its appointment as receiver, the FDIC purportedly sold substantially all the assets of WMB to JPMorgan Chase Bank, National Association ("JPMC"), pursuant to that certain Purchase and Assumption Agreement, Whole Bank, dated as of September 25, 2008 (the "Purchase and Assumption Agreement").

11.      In the wake of the Receivership, the sale of WMB's assets to JPMC, and the commencement of these chapter 11 cases, a multitude of disputes arose among the Debtors, JPMC, and the FDIC. In connection therewith, as set forth in more detail below, the Debtors and

their professionals immediately undertook investigations of such issues, in certain circumstances resulting in the commencement of lawsuits and/or pursuit of discovery or examinations.

**Debtors' Analysis and Pursuit of Claims Against the FDIC**

12.     Immediately after institution of the Receivership, the Debtors, in consultation with their attorneys and WMI's Board of Directors, as well as the Creditors' Committee, considered whether to challenge, pursuant to 12 U.S.C. § 1464(d)(2)(B), the OTS order seizing WMB and appointing the FDIC as receiver.  This lawsuit would have had to have been commenced within thirty (30) days of the seizure.  Based upon careful analysis of many factors, including, without limitation, the legal and practical implications of the lawsuit, its attendant risks and costs, and the limited benefit to be derived from instituting the litigation, the Debtors ultimately determined that it was not in the best interests of their estate to pursue this action.  The Debtors did, however, decide to pursue certain other claims and causes of action.

13.     After a careful review of the Debtors' rights with respect to WMB and the Receivership, the Debtors determined that they hold certain claims against WMB.  On December 30, 2008, the Debtors filed a proof of claim against the FDIC in the Receivership requesting, among other things, (i) compensation for the Debtors' equity interest in WMB, (ii) recognition of WMI's ownership interest in certain WMI assets claimed by the FDIC, (iii) allowance of a protective claim for payment of the Debtors' deposits, (iv) payment of amounts owed to WMI by WMB, and (v) the avoidance of certain transfers made by WMI to WMB as a preference or fraudulent transfer (the "Debtors' FDIC Claims").  On January 23, 2009, the FDIC summarily disallowed the Debtors' FDIC Claims in their entirety and notified the Debtors that any challenge to the disallowance should be made by commencing a lawsuit within sixty (60) days of the notice of disallowance.

14.     Accordingly, on March 20, 2009, the Debtors commenced litigation against the FDIC, styled Washington Mutual, Inc. and WMI Investment Corp. v. FDIC, Case No. 09-00533 (the "WMI Action"), in the United States District Court for the District of Columbia (the "D.C. District Court"). The Debtors' complaint alleges, among other things, that the FDIC breached its statutory duty under the Federal Deposit Insurance Act to maximize the net present value of WMB's assets and that the FDIC's failure to compensate the Debtors for what they would have received in a straight liquidation of WMB constituted (i) a taking of property without just compensation in violation of the Fifth Amendment of the U.S. Constitution and (ii) a conversion of the Debtors' property in violation of the Federal Tort Claims Act. The D.C. District Court permitted JPMC and certain WMB bondholders to intervene in the WMI Action. The Creditors' Committee moved to intervene as well, but the D.C. District Court has not yet ruled on this motion.

15.     By motions, dated June 11, 2009 and June 15, 2009, the FDIC filed motions to dismiss the WMI Action and also filed counterclaims against the Debtors. The Debtors opposed the motions to dismiss and, thereafter, moved to (i) dismiss the counterclaims and (ii) stay the WMI Action, in favor of then-pending adversary proceedings in this Court. On January 7, 2010, the D.C. District Court granted the Debtors' request to stay the WMI Action. Upon staying the case, the D.C. District Court denied the FDIC's motion to dismiss, but the Equity Committee incorrectly implies that this decision was on the merits and therefore constitutes judicial approval of the causes of action alleged in the complaint. (Motion 6.) In fact, the D.C. District Court simply denied the motion to dismiss without prejudice to renewal. While the Debtors do believe their claims have merit, the reality is that they would still face substantial legal challenges by the FDIC if they were to proceed to judgment.

**Debtors' Analysis and Pursuit of Claims Against JPMC**

16.     On March 24, 2009, JPMC commenced an adversary proceeding in this Court against the Debtors, captioned, <u>JPMC Bank, N.A. v. Washington Mutual, Inc.</u>, Adv. Proc. No. 09-50551 (MFW) (Bankr. D. Del) (the "<u>JPMC Adversary Proceeding</u>"). Recognizing that they needed separate counsel to represent them in this proceeding, the Debtors engaged in a competitive "pitch process" in which several law firms participated, including Quinn Emanuel Urquhart & Sullivan, LLP ("<u>Quinn Emanuel</u>") and Susman Godfrey LLP ("<u>Susman Godfrey</u>"). After obtaining the consent and approval of the Creditors' Committee, the Debtors selected Quinn Emanuel to serve as the Debtors' special litigation and conflicts counsel. In large part, Quinn Emanuel was retained to represent the Debtors in litigation against JPMC, and other parties, because it has both the requisite expertise and capabilities, while at the same time possessing no conflict of interest that would preclude or restrain the vigor with which it was to pursue these claims. In fact, Quinn Emanuel has been adverse to JPMC on previous occasions.

17.     Thereafter, in the JPMC Adversary Proceeding, the Debtors answered JPMC's complaint and filed eighteen counterclaims seeking (i) to avoid certain preferential and/or constructively fraudulent pre-petition transfers of Debtor assets to JPMC, and (ii) a determination that certain assets were property of the Debtors' estates and were not transferred pursuant to the Purchase and Assumption Agreement.

18.     Separately, on April, 27, 2009, the Debtors commenced an action pursuant to section 542 of the Bankruptcy Code, captioned <u>Washington Mutual, Inc. v. JPMC Bank, N.A.</u>, Adv. Proc. No. 09-50934 (MFW) (Bankr. D. Del) (the "<u>Turnover Action</u>" and, together with the JPMC Adversary Proceeding, the "<u>Adversary Proceedings</u>"). By the Turnover Action, the

Debtors sought to recover approximately $4 billion in deposits assumed and maintained by JPMC (the "Deposits").

19.     With respect to both Adversary Proceedings, the Debtors successfully defended against challenges by JPMC and the FDIC to the Court's jurisdiction to adjudicate such matters and the Court entered orders to this effect on July 6, 2009. Additionally, the Debtors overcame JPMC's motions to dismiss each Adversary Proceeding and the Court entered orders dated July 6, 2009 and September 14, 2009 to that effect with respect to the Turnover Action and the Debtors' counterclaims asserted in the JPMC Adversary Proceeding, respectively.

20.     Subsequently, the Debtors filed a motion for summary judgment in the Turnover Action to recover the Deposits. On October 22, 2009, Quinn Emanuel argued the motion before the Court. Each of JPMC, the FDIC and certain WMB bondholders (collectively, the "Parties") participated in the litigation. The Deposits represent one of the most significant assets of the Debtors' estates. The matter remains sub judice.

21.     With respect to the Adversary Proceedings, discovery requests have been served and, after protracted, multi-party negotiations, the Debtors have successfully negotiated a confidentiality stipulation and substantially negotiated a "Scheduling Order" to govern the production of documents and other aspects of the Adversary Proceedings.

22.     Further, in connection with discovery and data presentation efforts, the Debtors and their advisors have undertaken a collection and review of the documents in their possession (or provided to the Debtors under information access arrangements with JPMC). In this regard, the Debtors and their advisors have collected approximately 7.6 million pages of documents.

23.     Separately, on May 1, 2009, pursuant to Bankruptcy Rule 2004, the Debtors filed a motion seeking authority to conduct examinations to investigate the prepetition activities of JPMC, in order to assess certain potential estate causes of action related to the devaluing of the Debtors' businesses (the "Business Tort Investigation"). The Court entered an order on June 24, 2009 authorizing the Business Tort Investigation.

24.     Since that time, the Debtors have obtained and comprehensively reviewed over 40,274 pages of documents produced by JPMC (the "JPMC Production"). Seeking to expand the Business Tort Investigation, on December 14, 2009, the Debtors filed a supplemental Bankruptcy Rule 2004 application seeking the examination of witnesses and the production of documents from parties other than JPMC (the "Supplemental Rule 2004 Motion"). Although the Court denied that motion, the Debtors were able to obtain and review approximately 37,370 pages of additional documents produced by several third parties, including the OTS, Moody's Investor Service, TPG, Blackstone Group, the OB-C Group, and Citigroup (the "Third-Party Production"). The Debtors have also engaged in extensive negotiations with Sullivan & Cromwell, LLP, the Office of the Comptroller of the Currency (the "OCC"), the Board of Governors of the Federal Reserve System (the "Federal Reserve"), the U.S. Department of the Treasury (the "DOT"), Cerberus Capital Management, L.P., Lehman Brothers, and Morgan Stanley for further documents related to the Business Tort Investigation. Supplementing the Business Tort Investigation, the Debtors also issued information requests pursuant to the Freedom of Information Act to the FDIC, OTS, the Securities Exchange Commission, the DOT, the Federal Reserve and the OCC.

25.     After the appointment of the Equity Committee, Quinn Emanuel met with three of the Equity Committee's attorneys from Venable LLP ("Venable") for several hours.

During the course of the meeting, counsel discussed, inter alia, the claims asserted by and against the Debtors in the Adversary Proceedings and the WMI Action, as well as contemplated by the Business Tort Investigation. On several occasions thereafter, Quinn Emanuel attorneys discussed strategic considerations with Venable attorneys. Moreover, with respect to the Business Tort Investigation, Quinn Emanuel shared with Venable, for the benefit of the Equity Committee, the entirety of the JPMC Production and, to the extent Quinn Emanuel was able to procure the consent of the producing third parties, the Third-Party Production. Moreover, Quinn Emanuel attempted to get consent from third parties to deliver to the Equity Committee the remaining Third-Party Production.

26.     Subsequently, the Equity Committee informed the Debtors that it was terminating its relationship with Venable and retaining the law firm of Dewey & LeBoeuf ("Dewey"). Quinn Emanuel assisted Dewey in obtaining the consent of JPMC and coordinating with Venable in order to facilitate the transfer of the JPMC Production and the Third-Party Production from Venable to Dewey. Thereafter, the Equity Committee changed (or attempted to change) counsel at least two (2) more times, first, to Munger Tolles & Olson LLP and, ultimately, their present counsel, Susman Godfrey.

27.     Since the announcement of the Global Settlement, the Debtors, through Quinn Emanuel, have continued to prepare for the next steps of litigation in the event that the Global Settlement is not finalized.

**Creditors' Committee Involvement With the Investigation**

28.     The Creditors' Committee, which has been extremely active since its formation, has conducted its own investigations in these cases as well as joined the Debtors in theirs, and has engaged in countless conversations with the Debtors regarding each side's

respective analysis of potential claims and causes of action at issue. As set forth in more detail in the Objection of the Official Committee of Unsecured Creditors of Washington Mutual, Inc. et al. to the Official Committee of Equity Security Holders' Motion for the Appointment of an Examiner, filed concurrently herewith, the Creditors' Committee – with the assistance of its counsel and financial advisor – has (i) examined the Debtors' available assets (including potential causes of action that could be asserted by or on behalf of the Debtors' estates), (ii) analyzed the claims asserted in the WMI Action and the Adversary Proceedings, consulted with the Debtors regarding these claims, and moved to intervene in and participated in these litigations, (iii) reviewed documents produced pursuant to the JPMC Production and the Third-Party Production, and (iv) analyzed the reasonableness of, and engaged in negotiation of, the Global Settlement.

**Third Party Investigations/Oversight**

29.     In October 2008, an inter-governmental task force (the "Government Task Force"), comprised of the Department of Labor, Department of Justice, Federal Bureau of Investigations, FDIC, Internal Revenue Service, and Securities and Exchange Commission (the "SEC"), formed to investigate the failure of WMB. The United States Attorney for the Western District of Washington (the "Wash. USA") heads the Government Task Force. Pursuant to this directive, the Wash. USA launched a criminal investigation and, among other things, served WMI with several grand jury subpoenas seeking documents from a variety of record custodians formerly employed by WMB and/or WMI, as well as documents relating to corporate finance, employee compensation, and home loan operations. In order to assess whether any party is criminally culpable, WMI and its counsel have cooperated with the Wash. USA to respond to these requests, and consistently have apprised the Creditors' Committee of developments with

respect thereto. Additionally, WMI and its counsel have coordinated extensively and at significant expense with JPMC and its counsel in connection with producing responsive materials to the Wash. USA.

30.     On November 1, 2007, the Attorney General of the State of New York ("NYAG") filed a lawsuit styled The People of the State of New York by Andrew Cuomo v. First American Corporation and First American eAppraiseIT, No. 07-406796, in the New York Supreme Court, alleging that WMB conspired with First American eAppraiseIT to falsely increase valuations done by appraisers retained to perform appraisals of real property securing WMB loans. Although neither WMI nor WMB is a defendant in this lawsuit, in connection therewith, both the NYAG and the SEC issued subpoenas to WMB regarding the bank's appraisal practices.

31.     Thereafter, on November 17, 2009, by Executive Order No. 13519, President Obama established the Financial Fraud Enforcement Task Force to investigate and prosecute significant financial crimes and violations. Although WMI has not yet been asked to participate in this investigation, the sale of WMB's assets to JPMC has been the subject of review by this task force.

32.     Furthermore, as discussed in the Motion, the U.S. Senate Permanent Subcommittee on Investigations recently conducted hearings regarding the collapse of WMB and issued related investigative reports. These hearings and reports were conducted and issued publicly. Inspectors general of the U.S. Treasury Department and the FDIC also publicly issued a separate joint report of investigation.

33.     In addition to the foregoing, there are ongoing shareholder class action lawsuits against officers and directors of WMI. Plaintiffs' counsel in these cases is investigating,

and pursuing claims relating to, the conduct that the Equity Committee now wants an examiner to investigate. If the shareholder plaintiffs are successful, holders of equity interests may be able to recover some of their losses.

34.     Finally, as a savings and loan holding company prior to the commencement of these cases, WMI was subject to regulation by the OTS and, because they were depository institutions with federal thrift charters, prior to the Receivership, WMB and WMBfsb were subject to stringent OTS and FDIC regulation. The level of regulatory scrutiny of WMI and WMB makes it inappropriate to appoint an examiner to revisit the circumstances of the takeover of WMB all over again.

**Proposed Settlement and Plan**

35.     On March 26, 2010, the Debtors filed their Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, as may be amended [Docket No. 2622] (the "Plan"), and the disclosure statement related thereto, as may be amended [Docket No. 2623] (the "Disclosure Statement"). The Plan incorporates, and is expressly conditioned upon the compromise and settlement of the disputes among the Debtors, JPMC, the FDIC and certain noteholders (the "Global Settlement"), including, without limitation, the Debtors' FDIC Claims, the WMI Action, the JPMC Adversary Proceeding, and the Turnover Action, and contemplates releases among and for the benefit of these parties. The Debtors intend to seek approval of the Global Settlement in connection with confirmation of the Plan.

**Equity Committee Actions**

36.     Since its formation, the Equity Committee has launched multiple attacks on the Debtors which, if successful, would disrupt these bankruptcy proceedings and, ultimately, force the Debtors to proceed with litigation to pursue claims that represent what the equity

holders perceive as their only hope of recovery, without regard to any cost-benefit analysis. In this regard, on March 3, 2010, the Equity Committee commenced an adversary proceeding, Adversary Proceeding Case No. 10-50731 (the "Equity Committee Adversary Proceeding"), by filing a complaint against the Debtors requesting that WMI be compelled to hold a WMI shareholders' meeting [EC Docket No. 1[2]] (the "Equity Committee Complaint"). Shortly thereafter, on March 11, 2010, the Equity Committee filed The Official Committee of Equity Security Holders' Motion for Summary Judgment, or in the Alternative, for Relief from the Automatic Stay [EC Docket No. 3] (the "Summary Judgment/Stay Relief Motion"), requesting that the Court either grant the relief requested in the Equity Committee Complaint or permit the Equity Committee to pursue such complaint in state court in the State of Washington. On April 7, 2010, the Debtors filed (i) an Answer and Counterclaim to the Equity Committee Complaint [EC Docket No. 8], and (ii) an Opposition to the Summary Judgment/Stay Relief Motion [EC Docket No. 9]. At a hearing held on April 21, 2010, the Court heard argument with respect to the Equity Committee's stay relief request only, and overruled the Debtors' objection to such relief. Pursuant to an Order, dated April 26, 2010, the Court ordered that the automatic stay does not bar the Equity Committee from taking action in Washington state court to seek to compel WMI to hold an annual shareholders' meeting (without expressing any view on the merits of any such potential action) [EC Docket No. 20]. That same day, the Equity Committee initiated an action in the Superior Court of the State of Washington for the County of Thurston.

37.     Also on April 26, 2010, the Equity Committee filed the Motion. In general, the Motion seeks appointment of an examiner to investigate (i) potential claims and

---

[2] References to "EC Docket No." are to the docket numbers of the court docket for the Equity Committee Adversary Proceeding.

causes of action held by the Debtors against any person or entity arising from the closure and

Receivership of WMB and the sale of WMB's assets to JPMC, (ii) potential claims and causes of

action held by the Debtors against officers, directors and employees for prepetition conduct

related to WMB, (iii) the disputes at issue in the Turnover Action, including related tax issues,

(iv) the proper ownership and value of assets at issue in the JPMC Adversary Proceeding, (v) the

communications and negotiations that led to the Global Settlement and the factors that produced

the Global Settlement and the Debtors' decision to agree to it, (vi) potential fraudulent transfer

and preference claims, (vii) the subjects and proposed information sources identified in the

Debtors' Bankruptcy Rule 2004 motions, (viii) the merit and valuation of claims that would be

released pursuant to the Global Settlement, and (ix) a valuation of the Debtors' postpetition

assets, including those to be conveyed to JPMC and the FDIC pursuant to the Global Settlement.

(See Motion 27-28.) For the reasons set forth below, the Debtors request the Court deny the

Motion.

## OBJECTION

### Appointment of an Examiner Is Not Mandatory Pursuant to Section 1104(c)(2)

38.     Contrary to the Equity Committee's assertion, based upon the plain

language of section 1104(c)(2) of the Bankruptcy Code and recent jurisprudence of this Court

(including two recent bench decisions issued by this Court), it is clear that, even if the debt

threshold in section 1104(c)(2) is met, appointment of an examiner is not mandatory but rather,

is discretionary and justified only when there is evidence demonstrating that an investigation is

truly warranted. See, e.g., U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.),

Case No. 09-10960 (KJC), 2010 WL 1292837, at *8 (Bankr. D. Del. Apr. 1, 2010) (concluding

that appointment of an examiner pursuant to section 1104(c)(2) only is warranted if the Court

finds evidence of conduct that would make an investigation of the debtors appropriate); In re HSH Delaware GP LLC, Case No. 10-10187 (MFW) (Bankr. D. Del. Apr. 23, 2010) (Walrath, J.), Hr'g Tr. 31:18-22 ("I do agree that there is some discretion in 1104(c)(2) that the Court must exercise, not only in determining whether and the amount of the unsecured non-trade debt but also in determining whether, in fact, any investigation is appropriate."); In re Magna Entm't Corp., Case No. 09-10720 (MFW) (Bankr. D. Del. Apr. 20, 2010) (Walrath, J.), Hr'g Tr. 13:4-14:14; 14:22-23 (refusing to appoint an examiner, notwithstanding the fact that the debt threshold had been met); see also In re IdleAire Techs. Corp., Case No. 08-10960 (KG) (Bankr. D. Del. June 13, 2008) (Gross, J.), Hr'g Tr. 45:11-14 ("I don't think that it is mandatory based upon my reading of the legislative history, and just as the parties have pointed out, the language of the statute itself and, particularly, the as appropriate clause."); In re Am. Home Mortgage Holdings, Inc., Case No. 07-11047 (CSS) (Bankr. D. Del. Oct. 31, 2007) (Sontchi, J.), Hr'g Tr. 76:9-16 ("I think the financial criteria are important, and obviously, they're met in this case, but that's only one piece of the puzzle, and the other piece of the puzzle is that there has to be an investigation to perform that's appropriate. . . . I think that's a more nuance approach than sort of saying it is what it is, and if you cry 'examiner' in a crowded case, you get one."); In re SA Telecomms., Inc., Case Nos. 97-2395 through 97-2401 (PJW) (Bankr. D. Del. Mar. 27, 1998) (Walsh, J.), Hr'g Tr. 23:16-18 ("[T]his Court has for years consistently viewed 1104(c)(2) as not being a mandatory provision."); In re Webcraft Techs., Inc., Case No. 93-1210 (HSB) (Bankr. D. Del. Nov. 4, 1993) (Balick, J.), Hr'g Tr. 104:3-19 (stating that appointment of an examiner is not mandatory even where the debt threshold is satisfied); see also In re ACandS, Inc., Case No. 02-12687 (Bankr. D. Del. Dec. 19, 2002) (Newsome, J.), Order [Docket No. 234] (effectively refusing to appoint examiner by ordering that the "examiner is not to perform any task or take up

any duty or in any way perform any work or incur cost to the estate without further order of the Court").[3]

39.     Accordingly, even though the Debtors' unsecured liabilities far exceed the threshold listed in section 1104(c)(2), the Court should only appoint an examiner pursuant to that provision if the Court determines that there is an "appropriate" investigation to be conducted. Alternatively, pursuant to section 1104(c)(1), the Court may only appoint an examiner if doing so is in the best interests of *all* parties in interest.  Given the circumstances of these cases, no additional investigation is warranted or would be beneficial at this time.  To the contrary, it would be highly disruptive, wasteful and harmful to the estate and its creditors.

**Exercising Its Discretion, This Court Should Find that Appointment
of an Examiner Is Not Appropriate Pursuant to Either Section 1104(c)(2) or (c)(1)**

40.     Except with respect to certain documents requested pursuant to the Supplemental Rule 2004 Motion – which related to matters substantially identical to those covered by the Debtors' original Bankruptcy Rule 2004 application, and which supplemental motion the Court denied – all of the issues identified by the Equity Committee as requiring investigation by an examiner already have been thoroughly explored and analyzed by the Debtors and other parties in interest and, therefore, appointment of an examiner to research the same issues would be futile and wasteful.  As set forth in detail above, the Debtors and their professionals, in concert with the Creditors' Committee, have spent thousands of hours reviewing the events that led to the filing of these cases and parties' conduct in connection with such events; identifying potential claims against the FDIC and JPMC; preparing pleadings and other documents necessary to pursue certain of such claims; seeking, conducting, and reviewing

---

[3] Copies of the relevant pages from these hearing transcripts and order are attached hereto as Exhibit C.

discovery in connection with asserted and potential causes of action; and assessing the validity and strength of such claims. The Debtors shared information concerning the foregoing with the Equity Committee upon its formation. In addition, as referenced above, various governmental agencies and other third parties have conducted, and continue to conduct, examinations of the Debtors, WMB, and JPMC, including with respect to many of the same issues that the Debtors themselves have reviewed. In certain circumstances, such as the investigation conducted by the U.S. Senate Permanent Subcommittee on Investigations, the examination has been conducted entirely publicly.

41.     Appointment of an examiner to conduct an investigation duplicative of these collective efforts merely would constitute an unnecessary drain on the Debtors' resources and, accordingly, is not appropriate. See, e.g., In re Spansion, Inc., 2010 WL 1292837, at *8 (noting that the official creditors committee and various *ad hoc* committees had "vigorously represented" the interests of unsecured creditors, conducted extensive discovery, and investigated the debtors, rendering appointment of an examiner unnecessary);[4] In re HSH Delaware GP LLC, Hr'g Tr. 31:23-32:5 (concluding that appointment of an examiner to conduct an investigation already underway would be a "futile act . . . wasteful of assets of the estate and [would] not serve the creditors and other constituents in the case"); In re Magna Entm't Corp., Hr'g Tr. 14:11-14 ("[S]ince all of the roles that an Examiner would play in this case have already been fulfilled, I find it's a futile act and will not appoint an Examiner."); In re IdleAire Techs. Corp., Hr'g Tr. 46:4-6 (determining that appointment of an examiner would be "inappropriate given the speed with which the case is progressing and the work that's already been done by the

---

[4] The Equity Committee attempts to distinguish the Spansion decision by noting that, in that case, the parties already had conducted discovery, the issues raised in the examiner motion were plan confirmation disputes, and the motion had been filed so late it would cause the estate more harm than benefit. (See Motion 18.) As discussed below, the Debtors believe that each one of these factors is present here.

Committee"); In re Am. Home Mortgage Holdings, Inc., Hr'g Tr. 77:1-21 (refusing to appoint an examiner where the committee was actively involved in the case and governmental entities, including Congress, already were examining the issues in question). As the court noted in Bradlees, where a debtor's professionals engage in a lengthy investigation of potential claims and share the results of their analysis with the creditors' committee and other parties in interest, it does not make sense to then appoint an examiner to repeat such work at significant expense to the debtor. In re Bradlees Stores, Inc., 209 B.R. 36, 39 (Bankr. S.D.N.Y. 1997) ("[T]he [movants] have allowed the entire thirteen-month investigation surrounding the Acquisition to be conducted by the Debtors' professionals, at significant cost to the estates, without seeking the appointment of an independent third party. The appointment of an examiner to conduct a new investigation at this time would be duplicative, needless and wasteful."). Interestingly, the Equity Committee acknowledges that the Debtors and other interested parties already have gathered a significant amount of information about the potential claims and causes of action at issue in these cases, but notes that the examiner would "make full use" of such information. (See Motion 23.) Even so, it will still take time for the examiner and its professionals to review and analyze this information, including engaging in discussions with the Debtors and their professionals, which will result in significant expense to the estate. The Debtors already have discussed the claims involved in the Adversary Proceedings and the WMI Action and shared much of the document production associated with the Business Tort Investigation with the Creditors' Committee and the Equity Committee and have incurred, and will continue to incur, the cost of these entities and their professionals to analyze such information. The Debtors should not be obligated to pay for yet another person and his/her professionals to do the same exact work.

42.     Although, as the Equity Committee points out, there may be additional examinations that the Debtors sought but were not able to obtain with respect to their investigation of potential claims against JPMC, this does not mean that the investigation was incomplete or insufficient to enable the Debtors to make a reasoned decision as to whether to compromise and settle such claims. The Debtors, in conjunction with the Creditors' Committee, assessed the legal strength of all potential causes of action held by the estate and, in the Debtors' business judgment, with support of the Creditors' Committee, determined it would be in the best interests of the estate to settle. Moreover, significant creditor groups were involved with the negotiation of, and agree with, the Global Settlement.

43.     Similarly, the Debtors conducted a thorough cost-benefit analysis and decided there would be no benefit to the estate from investigating and asserting claims against the Debtors' current and former directors and officers with respect to the collapse of WMB. The Creditors' Committee actually conducted an initial investigation of such claims, but similarly determined not to pursue them based upon the committee's own cost-benefit analysis. Because equity holders do not stand to benefit from any recovery on account of such claims if they were pursued, the Equity Committee should not be the party driving that decision. From a practical standpoint, any recovery on account of claims against directors and officers would be limited to available insurance proceeds. Even if there were no restrictions on the Debtors' ability to access such proceeds, the funds available – $250 million in the aggregate, less any advancements already made – would be far from sufficient to bridge the estimated $1.3 billion deficit before preferred shareholders receive a distribution and over $9.6 billion deficit before common equity holders recover. The Equity Committee's suggestion that there needs to be an "independent, objective" person with no "conflicts of interest" to review potential claims of misconduct by the

Debtors' directors and officers is unpersuasive. (Motion 24.) First, the Debtors and the Creditors' Committee owe fiduciary duties to the estate and have acted in accord with those duties, and certainly the Creditors' Committee has no conflict of interest with respect to this issue. Moreover, third parties already are investigating the Debtors' directors and officers, including shareholders who have representation in ongoing stock-drop litigations. See In re Washington Mutual Securities Litigation, Case No. 08-md-1919 MSP (W.D. Wash.); South Ferry LP No 2 v. Killinger, Case No. 04-1599C (W.D. Wash.). Nothing prevents equity holders from continuing to pursue such actions.

44.     It is hard to imagine that the Equity Committee – which only had one meeting with the Debtors prior to substituting counsel three times and whose financial advisor just signed a confidentiality agreement with the Debtors last week – has had a sufficient amount of time even to have reached the conclusion that an examiner is warranted. If, however, the Equity Committee nonetheless doubts the integrity or thoroughness of the work conducted by the Debtors and other parties, the Equity Committee may (i) exercise its authority, pursuant to section 1103(c) of the Bankruptcy Code, to pursue its own investigation, as it has or should have been doing with respect to the Business Tort Investigation, (ii) intervene in any of the ongoing litigations (as it has done in these cases) and seek discovery in connection therewith, or (iii) request authority to conduct one or more examinations pursuant to Bankruptcy Rule 2004. See Winston Indus., Inc. v. Lancer Homes, Inc. (In re Shelter Res. Corp.), 35 B.R. 304, 305 (Bankr. N.D. Ohio 1983) ("There is currently in place a Debenture Holders' Committee with powers under section 1103(c) of the Bankruptcy Code to carry on, if necessary, an investigation as may be appropriate. The appointment of an examiner under these circumstances, with the possibility of duplicated effort, is not in the spirit of economy of administration in the handling of

bankruptcy estates."). And, of course, all of this work could be done at no expense to the Equity Committee.

45.     The real intent behind the Motion is the Equity Committee's desire to derail the Global Settlement. Aside from public statements made by members of the Equity Committee and its counsel in this regard (and in advance of having any significant involvement in these proceedings), see Official Committee of Equity Security Holders of Washington Mutual, Inc. Deliver Statement Regarding Proposed Agreement, PRNewswire (Mar. 17, 2010) ("The Committee . . . does not support, the Proposed Agreement . . . . At this time, the Committee intends to object to the Proposed Agreement.")[5]; Hr'g Tr. 45:8-15, Apr. 21, 2010 (Susman, S., Counsel for the Equity Committee) ("And I don't mean to suggest, Your Honor, that the proposed settlement, which certainly isn't an executed agreement yet, isn't of serious concern to the equity committee. It is. And that underscores the reasons why the equity committee believes it is imperative to have an opportunity for new corporate governance for the debtors. The legal claims of the debtors that would be released through settlement are among the debtors' most valuable assets."); 48:5 (Willingham, M., Chairman of the Equity Committee) ("I don't like the settlement the way it looks now . . . ."); 51:4-6 (Willingham, M.) (answering question regarding the equity committee's position with respect to the proposed settlement by stating, "I think it would be a safe characterization to say that we were not 100 percent in favor of the settlement or the plan"); 51:8-9 (Willingham, M.) ("I think I can speak for the committee that we disagree with both [the settlement and the plan]."), this is evident by the timing of the filing of the Motion and based upon a casual review of the issues the Equity Committee wants an examiner to investigate.

---

[5] Available at http://www.prnewswire.com/news-releases/official-committee-of-equity-security-holders-of-washington-mutual-inc-deliver-statement-regarding-proposed-settlement-88237597.html.

(See, e.g., Motion 28 (requesting that an examiner be directed to investigate "[t]he communications and negotiations that led to the Debtors' proposed 'Global Settlement' and the factors that produced the settlement and the Debtors' decision to agree to and support its terms").) The purpose of an examiner, however, is not to investigate facts to support a plan objection. See In re Gliatech, Inc., 305 B.R. 832, 836 (Bankr. N.D. Ohio 2004) (refusing to appoint an examiner where it was clear that the movant – an out-of-the money equity holder – merely sought evidence to substantiate its objection to a settlement embodied in the debtors' plan). "Classic confirmation disputes" do not serve as grounds for appointment of examiners. See In re Spansion, Inc., 2010 WL 1292837, at *8.

46.     The Debtors and the Creditors' Committee – each of which are fiduciaries incentivized and legally obligated to maximize value for all stakeholders – have concluded that the proposed settlement is in the best interests of the estate. When the Global Settlement is finalized and brought before the Court for approval, it will be subject to review by all parties in interest, including the Equity Committee, pursuant to the Plan objection process, during which the Equity Committee will have the opportunity to take discovery, file pleadings, and argue in this Court, all at the expense of the Debtors' estates. It is in that forum that parties may question the reasonableness of the Global Settlement. Indeed, this Court has acknowledged that, in analyzing the merits of a proposed course of action, it is more effective to permit parties in interest to litigate the issue than to appoint a third party examiner to investigate and render a report. See In re SA Telecomms., Inc., Hr'g Tr. 81:7-15 ("I take a different approach from the U.S. Trustee's position. He claims we need someone independent who will look at the facts without bias and report accordingly. . . . I think it's equally effective, if not more effective, to have the fighting parties look at the facts and take their positions . . . .") Appointing an examiner

to make a determination on the reasonableness of the Global Settlement not only will replace

advocacy by the real parties in interest, but also would be a particularly inappropriate intrusion

on the Court's role. The appointment of a "neutral" party to opine on the legal or factual merits

of the disputes to be resolved pursuant to the Global Settlement would, in essence, arrogate the

examiner above the judiciary. The Court should reject this unprecedented usurpation of its place

as the ultimate decision maker.[6]

47.     On the other hand, if the proposed settlement is not consummated (e.g.,

the Court does not approve it), then the Debtors will immediately continue their litigation efforts,

aggressively pursuing claims asserted in the various pending litigations. If this is the case, an

examiner certainly is not warranted because it is the existence of the proposed Global Settlement

that serves as the basis for the Equity Committee's Motion.

48.     Appointment of an examiner is not justified pursuant to section

1104(c)(1). Based upon the language of section 1104(c)(1), which provides that the Court may

appoint an examiner if "such appointment is in the interests of creditors, any equity security

holders, and other interests of the estate," the appointment of an examiner pursuant to this

provision clearly is discretionary. 11 U.S.C. § 1104(c)(1). In order to justify appointment of an

examiner under this provision, "the protection must be needed, and the costs and expenses must

not be disproportionately high." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. (1977), U.S. Code

Cong. & Admin. News 1978, p. 5787, 6359; In re Table Talk, Inc., 22 B.R. 706, 713-14 (Bankr.

D. Mass. 1982) ("I cannot see how it is in the best interests of creditors to place another

functionary in this case when no one has satisfactorily explained what an examiner could do that

---

[6] At least one court has issued an order specifically stating that this is not an appropriate role for an examiner. See, e.g., In re Lyondell Chemical Co., Case No. 09-10023 (Bankr. S.D.N.Y. Oct. 28, 2009) (J. Gerber) [Docket No. 3148] ("[T]he examiner shall not investigate on or report on the Debtors' business judgment or merits of any party's plan proposals . . .") (a copy of which is attached hereto as Exhibit B).

present functionaries could not do. The legislative history clearly states the standard: the protection must be needed and the costs must not be disproportionately high."). As set forth above, the Debtors submit there is no need for an examiner and no justification for the significant costs resulting from appointment of one. Moreover, the Equity Committee cannot demonstrate, as required by section 1104(c)(1), that appointment of an examiner will benefit *all* interests of the estate. See In re Sletteland, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("[A] creditor group, no matter how dominant, cannot justify the appointment of a trustee or examiner simply by alleging that it would be in its interests. It must show that the appointment is in the interests of all those with a stake in the estate.").

49.     Many of the Debtors' creditor constituencies, including the Creditors' Committee, oppose appointment of an examiner in these cases and support the Global Settlement and Plan. Furthermore, given the fact that multiple governmental entities, including Congress, the Wash. USA, the FDIC, and the OTS, have investigated (or are investigating) the Debtors, WMB, and JPMC, no public interest would be served by appointing an examiner to replicate these efforts. Indeed, the appointment of an examiner might compromise certain of these pending investigations. The Equity Committee does not represent the true economic stakeholders in these cases. Equity holders in these cases are out of the money and have nothing to lose from not settling claims and "swinging for the fences" in the hope of forcing a recovery. Therefore, it is of no concern to the Equity Committee whether their desired actions put at risk significant value represented by the Global Settlement. Moreover, it is easy for the Equity Committee to claim that the costs of an examiner is "certainly money worth spending" (Motion 24), when such costs will in fact be borne by the creditors whose distributions will be reduced dollar-for-dollar by the expenses of an examiner. It is clear that appointment of an examiner to

further the Equity Committee's litigation tactics and efforts to oppose the Plan would serve only equity holders' parochial interests and, therefore, is not appropriate. See In re Gliatech, Inc., 305 B.R. at 836 (denying appointment of an examiner where doing so would benefit only the equity holder who sought the appointment).

**If an Examiner Were Appointed, Its Role Should Be Severely Limited**

50.     It is well-settled that "the bankruptcy court retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration." In re Revco D.S., Inc., 898 F.2d 498, 501 (6th Cir. 1990); see also In re Loral Space & Comm'ns, Ltd., 2004 WL 2979785, at *5 (S.D.N.Y. Dec. 23, 2004) (noting that because "it is the court's duty to fashion the role of an examiner to avoid substantial interference with the ongoing bankruptcy proceedings . . . the Bankruptcy Court may exercise its discretion to limit the scope of the examiner's investigation and the compensation and expenses available to the examiner"); In re Schepps Food Stores, Inc., 148 B.R. 27, 30 (S.D. Tex. 1992) ("While the statute states that the court may appoint an examiner any time before the plan is confirmed, a creditor cannot use the provision to disrupt the proceedings."). As the statute itself makes clear, any examiner-conducted investigation must be "appropriate." 11 U.S.C. § 1104(c). Thus, if this Court were to determine that it is appropriate to appoint an examiner, the examiner's role and timeline should be narrowly tailored and designed to avoid interference with the ongoing bankruptcy proceedings. Loral Space, 2004 WL 2979785, at *5.

51.     With respect to scope of investigation, several of the areas the Equity Committee would like to see investigated overlap with the scope of the investigation that the Debtors sought Court-authority to conduct pursuant to its Supplemental Rule 2004 Motion. (See Motion 26-27 (proposing to investigate "[d]iscussions between JPMC, the FDIC, the OTS, other

officials at the Department of Treasury, the SEC, and any other government agencies during 2008 concerning WMB or WMI . . . [and] [t]he decisions of OTS and FDIC regarding the seizure and the sale of WMB assets, the bases for those decisions, the communications of OTS and FDIC with other governmental or private personnel about those decisions in advance of making and acting on them, and whether the FDIC's sale of WMB's assets satisfied its statutory obligations"). Although the Debtors have received and reviewed the Third-Party Production, if an examiner were to investigate third parties further, as referenced above, at least the scope would not be entirely duplicative of the already-conducted Business Tort Investigation.

52. In any event, it is critical that, to the extent the Court is inclined to appoint an examiner, the Court should tailor the timeline for the examiner's investigation and issuance of a report to avoid substantial interruption of the Plan confirmation process. The Equity Committee has suggested 150 days for issuance of a report – no doubt with an eye towards derailing confirmation of the Plan. However, the parties have made substantial progress in these cases, reaching the Global Settlement on the heels of fourteen months of contentious litigation. With the Disclosure Statement and Plan on file, the Court should take steps to ensure that any examination of the estate not sacrifice this progress. The most appropriate way to accomplish this would be to establish a dual-track construct and limit the time by which an examiner's report would be issued to 60 days so as not to interfere with the Plan confirmation process. See, e.g., In re Tribune Co., Case No. 08-13141 (Bankr. D. Del. Apr. 20, 2010) (J. Carey ) Order [Docket No. 4120] at ¶ 5 (a copy of which is attached as Exhibit A) (limiting examiner investigation to less than three months where plan and disclosure statement were already on file). If the Court were compelled to appoint an examiner, by fashioning relief as discussed herein and as implemented

in Tribune, the potential cost and harm to the parties in interest in the Debtors' bankruptcy cases would be mitigated.

53.    Based upon the foregoing, the Debtors submit that there is no basis on which the Court should appoint an examiner but, if it does, the examiner's role should be strictly limited.

WHEREFORE the Debtors respectfully request that the Court deny the Motion and grant such other and further relief as it deems just and proper.

Dated: Wilmington, Delaware
       May 4, 2010

By: _____
Mark D. Collins (No. 2981)
Chun I. Jang (No. 4790)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

– and –

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for the Debtors and Debtors In Possession