## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
                                    :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| WASHINGTON MUTUAL, INC., et al., | : | Case Nos. 08-12229 (MFW) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | **Hearing Date: May 5, 2010, 10:30 a.m.** |
| | : | **Re: Docket No. 3579** |

---------------------------------------------------------- x

### OBJECTION BY THE WASHINGTON MUTUAL INC. NOTEHOLDERS GROUP TO THE MOTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR AN APPOINTMENT OF AN EXAMINER PURSUANT TO SECTION 1104(c) OF THE BANKRUPTCY CODE

The Washington Mutual, Inc. Noteholders Group (the "WMI Noteholders"), whose members hold in the aggregate approximately $2.3 billion in face amount of outstanding debt securities issued by Washington Mutual, Inc. ("WMI," and collectively with WMI Investment Corp., the "Debtors"), hereby files this objection (the "Objection") to the motion for the appointment of an examiner pursuant to section 1104(c) of title 11 of the United States Code (the "Examiner Motion") filed by the official committee of equity security holders (the "Equity Committee"). In opposition to the Examiner Motion, the WMI Noteholders respectfully represent as follows:

### PRELIMINARY STATEMENT

1.    The over-arching strategy of the Equity Committee has now been made clear (if it was ever in doubt): threaten to commandeer the case by installing a hand-picked board for WMI, and then either extract a payoff from the senior stakeholders who would otherwise be compelled to fund (and whose rightful recoveries would be delayed by) the anticipated cavalcade



of home run litigation, or, failing that, follow through on the threat and take as many swings for the fences as possible before "strike three" is called. Viewed from this perspective, the Examiner Motion is revealed as a litigation tactic designed to preserve the status quo while the Equity Committee's strategy is in play. The requested relief, if granted, would serve no legitimate purpose and would saddle the estates with additional unnecessary costs and delays.

2. The Equity Committee's argument that it needs a "thorough, independent and objective assessment of the transactions and events that were the foundation for the released claims" is simply not credible. (Examiner Motion at 22) The Equity Committee has failed to articulate any reason why an examiner is necessary to perform an investigation that the Equity Committee itself has the power and resources to pursue. Indeed, section 1103(c)(2) specifically vests the Equity Committee with the authority to "investigate the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of the plan." 11 U.S.C. §1103(c)(2) (emphasis added). Moreover, there is no precedent for the notion that anytime a party is dissatisfied with a potential settlement or resolution in a bankruptcy case, its available remedies include the automatic right to an examiner to advance the disappointed party's opposition. Such a result would seemingly contradict the fundamental bankruptcy policies of promoting settlements and efficient administration.

3. Against this backdrop, the WMI Noteholders dispute that the appointment of an examiner under section 1104(c)(2) of the Bankruptcy Code is mandatory; instead, we believe the better view is that the appointment of an examiner is subject to a court finding of appropriateness. The Equity Committee cannot and does not provide any evidence to support the conclusion that there is an appropriate investigation for an examiner to conduct. Notably, in

2

support of its request, the Equity Committee makes nothing more than conclusory allegations regarding the quality and scope of the Debtors' and the Creditors' Committee's investigations of potential claims of the Debtors against the Federal Deposit Insurance Corporation ("FDIC") and JPMorgan Chase ("JPMC"). However, the propriety of (and negotiations surrounding) the purported Global Settlement (defined below), if it ever matures into a truly actionable arrangement, presents classic settlement disputes with respect to which equity holders, by and through the Equity Committee, will have an opportunity to be heard and also to seek discovery. The prospect of such disputes, however, does not present the requisite cause for this Court to appoint an examiner.

4. Further, in arguing that an independent investigation of the Debtors' claims against the FDIC and JPMC is necessary, the Equity Committee conveniently ignores the Debtors and Creditors' Committee's eighteen-month investigations of such claims. Indeed, after months of heated litigation, including extensive investigation of such claims and intense negotiations, the Debtors and the Creditors' Committee, separately and in their roles as fiduciaries, have determined that the Global Settlement (if it can be finalized) would be appropriate and in the best interest of the Debtors' estates. The Equity Committee's proposed role for an examiner is duplicative of these efforts and would only result in unnecessarily increased expenses to the Debtors' estates for the sole benefit of the Debtors' shareholders.

5. Simply put, the appointment of an examiner would serve no legitimate purpose. Indeed, it serves no purpose other than to further the Equity Committee's efforts to sidetrack and delay the Debtors' cases to the detriment of creditors as a whole. The Equity Committee has not and cannot demonstrate that appointment of an examiner would be at all appropriate in these cases, and thus the Examiner Motion should be denied in its entirety.

3

6.     Concurrently herewith, the WMI Noteholders have also filed a motion for an order, pursuant to section 1112(b) of the Bankruptcy Code, converting the Debtors' chapter 11 cases to chapter 7, or, in the alternative, for an order, pursuant to section 1104(a) of the Bankruptcy Code, appointing a trustee to administer the Debtors' estates (the "Conversion Motion"). Granting the relief sought in the Conversion Motion would result in the appointment of an independent estate fiduciary and would render relief under the Examiner Motion moot. Accordingly, the WMI Noteholders submit that any hearing on the Equity Committee's request for an examiner should be delayed until after such time as the Court has considered and ruled on the merits of the Conversion Motion.

## BACK GROUND

### A.     Procedural Background

7.     WMI is a holding company incorporated in the State of Washington. WMI is the direct parent of WMI Investment Corp., a Delaware corporation.

8.     On September 26, 2008 (the "Commencement Date"), each of the Debtors commenced a voluntary case pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") by filing a petition for relief in the United States Bankruptcy Court for the District of Delaware (the "Court").

9.     On October 15, 2008, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee"). On January 11, 2010, the U.S. Trustee formed the Equity Committee.

### B.     Events Leading to the Commencement of the Cases

10.     Prior to the Commencement Date, WMI was a savings and loan holding company that owned Washington Mutual Bank ("WMB") and, indirectly, WMB's subsidiaries, including Washington Mutual Bank fsb ("FSB"). Like all savings and loan holding companies,

4



prior to the Commencement Date, WMI and its banking subsidiaries were subject to regulation and examination by the Office of Thrift Supervision ("OTS"). In addition, WMI's banking and non-banking subsidiaries were overseen by various federal and state authorities, including the FDIC.

11. On September 25, 2008, the OTS closed WMB, appointed the FDIC as receiver for WMB (the "FDIC Receiver") and advised that the FDIC Receiver was immediately taking possession of WMB's assets (the "Receivership"). Immediately after its appointment as receiver, the FDIC sold substantially all the assets of WMB, including the stock of FSB, to JPMC pursuant to that certain Purchase and Assumption Agreement, effective September 25, 2008 (the "Purchase and Assumption Agreement") in exchange for payment of $1.88 billion in cash and the assumption of all of WMB's deposit liabilities, including approximately $4 billion of deposit liabilities (the "Deposits") owed to the Debtors. Shortly thereafter, JPMC assumed all of FSB's deposit liabilities by merging FSB with its own banking operations.

12. As a result of the OTS seizure of WMB, the Debtors have no material operations or going concern value.

## C. The Settlement Negotiations

13. Since the Commencement Date, and as a result of actions taken in the chapter 11 cases and the Receivership, significant litigation has been commenced and pursued by and among the Debtors, JPMC, the FDIC and others. Among other things, the Debtors filed a claim against the FDIC Receiver for payment of the Deposits and avoidance of certain transfers as preferences or fraudulent transfers, and commenced an action in the United States District for the District of Columbia (the "D.C. Court") when that proof of claim was rejected by the FDIC. The Debtors have also filed a turnover action in this Court seeking payment of the Deposits. In

5

March of 2009, JPMC filed an adversary proceeding in this Court seeking declaratory relief concerning the Deposits, and the Debtors filed counterclaims against JPMC, claiming ownership of the Deposits and seeking avoidance of prepetition transfers. The Debtors also sought extensive discovery pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure from JPMC and the FDIC. Additionally, other parties, such as the Creditors' Committee, have intervened in such litigations, asserting rights or interests in the disputes and corresponding assets.

14.     Some of the foregoing litigation has proceeded to the summary judgment stage, while other actions have been stayed.

15.     On March 12, 2010, at a hearing before the Bankruptcy Court at which the parties anticipated the Court would render a ruling on summary judgment with respect to the Deposits, the Debtors announced on the record that with the support of the Creditors' Committee and certain other parties, they had reached a compromise and settlement (the "Global Settlement") of essentially all disputes with JPMC and the FDIC. Specifically, at such hearing, the Debtors, with the concurrence of JPMC and the FDIC, recited the material terms and conditions of their understanding, which included without limitation, the resolution of ownership of the Deposits, the allocation of disputed assets, the transfer of certain liabilities and the exchange of mutual releases.

16.     Since that time, it has become clear that the purported Global Settlement was illusory and has not, in fact, been agreed to by all of the parties, including in particular the FDIC. Further, it appears that the FDIC's reluctance to agree to the settlement is, at least in part, the result of a protracted lobbying effort by the Bank Bondholders with the FDIC and Congress in an attempt to recover from the property of the estates.

6

17. On March 26, 2010, the Debtors filed their Joint Plan of Reorganization [Docket No. 2622] (the "Plan") and an accompanying disclosure statement [Docket No. 2623] (the "Disclosure Statement"), which was premised on the purported Global Settlement as announced at the March 12 hearing.

18. In the Disclosure Statement, the Debtors explicitly acknowledge that the FDIC had not agreed to the Global Settlement [Disclosure Statement at 1], and that the Plan is not feasible unless and until the FDIC accepts the Global Settlement.

## D. The Equity Committee's Attempt to Hijack This Case

19. On January 11, 2010, the Court appointed the Equity Committee. Rather than attempting to establish the solvency of the estate, the Equity Committee instead began hatching a plot to seize control, and change the direction, of the case by installing a new board of directors. On March 3, 2010, the Equity Committee commenced a lawsuit in this Court against WMI, styled Official Comm. of Equity Security Holders v. Washington Mutual, Inc., Adv. Proc. No. 10-50731 (MFW) seeking to compel a WMI shareholders' meeting. On March 11, 2010, the Equity Committee filed a motion (i) seeking summary judgment in connection with the above complaint or, in the alternative, (ii) requesting entry of an order determining that the automatic stay does not apply to prevent the Equity Committee from seeking to compel a WMI shareholders' meeting in state court in Washington.

20. On April 21, 2010, the Bankruptcy Court held a hearing on the Equity Committee's motion with respect to whether the automatic stay applies to preclude it from seeking a shareholders meeting. At the hearing, the chairman of the Equity Committee, Michael Willingham, admitted that the purpose of the shareholders' meeting would be to nominate and elect new board members. (4/21/2010 Hearing Tr., Michael Willingham, at 52: 15-19) Mr.

7

Willingham also explained that the Equity Committee planned to object to the Plan and the Global Settlement. Id. at 51: 1-9.

21.     At the conclusion of the April 21 hearing, the Court ruled that the automatic stay does not bar equity holders from seeking to force a shareholder meeting or elect a board. The Court also found that the Debtors failed to demonstrate a clear abuse of process by the Equity Committee and therefore no basis existed to enjoin the members of the Equity Committee from exercising their rights under Washington state law.

22.     On or about April 26, 2010, Mr. Willingham and Esopus Creek Value, L.P. commenced a lawsuit against WMI styled Michael Willlingham v. Washington Mutual, Inc., No. 10-2-00854-1 (Wash. Super. Ct., Thornton Cnty. Ct. Apr. 26, 2010), in a Washington state court seeking to compel a WMI shareholders' meeting, presumably for the purpose of electing a new board of directors and replacing management (as he previously testified).

23.     On that same date, the Equity Committee filed the instant motion for appointment of an examiner, claiming that the Debtors have failed to properly investigate the causes of action referenced above. The Equity Committee also sought, and obtained, an order shortening time and a hearing has been set on the Examiner Motion for May 5, 2010.

24.     By statute, exclusivity expired on or about April 28, 2010, a plan not by then having been confirmed. Further, due to the FDIC's ongoing reluctance to enter into the Global Settlement, it is unclear if and when the Plan can be confirmed. As a result, absent further developments, it is almost a certainty that these estates will incur the expense and burden of a fight over competing plans of reorganization.

8

# ARGUMENT

## I.    Appointment of an Examiner Is Inappropriate in these Cases.

25.     It is not in dispute that certain WMI shareholders are seeking to gain control of the board of directors. Nor is there any dispute that, in the shareholders' best case scenario, it will take them at least three or four months to get a court to order a shareholder meeting, get a meeting scheduled, prepare and circulate proxy materials and have a meeting where new directors can be elected. Thus, the true purpose of the Motion is to hold the Debtors' chapter 11 cases in stasis while the shareholders attempt to wind their way through the process of changing the board. This is not a legitimate purpose for the appointment of an examiner and the Examiner Motion should be denied in its entirety.

### A.    Appointment of an Examiner Is Not Mandatory under Section 1104(c)(2) when the Requested Investigation Is Not Appropriate.

26.     Section 1104(c)(2) of the Bankruptcy Code provides that a court "shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate . . . if . . . the debtor's fixed, liquidated, unsecured debts . . . exceed $5,000,000." 11 U.S.C. § 1104(c)(2).[1] As this Court has recently recognized, there is a split of authority regarding whether appointment of an examiner is mandatory under section 1104(c)(2) if a party in interest can establish the $5 million debt threshold. See In re Spansion, Inc., Case No. 09-10690 (KJC), Adv. Proc. No. 09-52274, 2010 WL 1292837, at *7 (Bankr. D. Del. Apr. 1, 2010) (finding that some courts have acknowledged section 1104 to mandate appointment of an examiner, while other courts have found that the discretionary language of section 1104 affords courts considerable discretion in designing an examiner's role, such that an examiner can be appointed with no duties at all).

---

[1]      Section 1104(c)(2) of the Bankruptcy Code was formerly numbered section 1104(b)(2). The section numbering was changed by the 1994 amendments to the Bankruptcy Code.

9

27.     Despite the use of the term "shall" in section 1104(c), this Court and several other courts have held that section 1104(c)(2) of the Bankruptcy Code affords courts the latitude to refuse appointment of an examiner even where the debtor's fixed, unsecured debts exceed $5 million. See id. at *8 (declining to appoint an examiner where all of the parties had ample opportunity for discovery and appointment of an examiner would result in unnecessary costs to the estate and delays in administration); In re Rutenberg, 158 B.R. 230, 233 (Bankr. M.D. Fla. 1993) (declining to appoint examiner under section 1104(c)(2) even though debtor had fixed, unsecured debts exceeding $5 million because, considering the totality of the circumstances, appointment of an examiner would cause undue delay); In re Shelter Res. Corp., 35 B.R. 304, 305 (Bankr. N.D. Ohio 1983) (declining to appoint examiner under section 1104(c)(2) even though debtor had fixed, unsecured debts exceeding $5 million because, inter alia, appointment of examiner would cause undue delay in administration of case); In re Bradlees Stores, Inc., 209 B.R. 36, 39 (Bankr. S.D.N.Y. 1997) (although stating it was not deciding mandatoriness of section 1104(c)(2), declining appointment of examiner even though debtor had fixed, unsecured debts exceeding $5 million); In re Schepps Food Stores, Inc., 148 B.R. 27 (S.D. Tex. 1992) (same); In re GHR Cos., 43 B.R. 165, 176 (Bankr. D. Mass. 1984) (following Shelter and declining to appoint examiner under section 1104(b)(2) even though debtor had fixed, unsecured debts exceeding $5 million).

28.     From a statutory construction perspective, the result reached by these courts relies on the statute's language providing that the court "shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate," which clearly contemplates the exercise of discretion. 11 U.S.C. § 1104(c)(2) (emphasis added). It is well settled that where literal interpretation of a statute would lead to an absurd result, courts may

10

look beyond the plain language of the statute. See Grand Light & Supply Co. v. Honeywell, Inc., 771 F.2d 672, 677 (2d Cir. 1985) ("Where the result of a literal interpretation of statutory language is absurd . . . we may look beyond the plain language." (citation omitted)); see also Lamie v. United States Tr., 540 U.S. 526, 534 (2004) ("when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (internal quotation marks omitted)). Courts should not "slavishly and blindly follow § 1104[(c)](2)" if appointment of an examiner would be "needless, costly and non-productive and would impose a grave injustice on all parties." Shelter, 35 B.R. at 305. To require appointment of examiner where no investigation is appropriate certainly would be absurd.

29.     Moreover, the court in Spansion advocated against the appointment of an examiner, with little or no meaningful duties, merely to comply with the "shall" language in the statute. In re Spansion, 2010 WL 1292837, at *8. In that case, Judge Kevin J. Carey found "no sound purpose in appointing an examiner, only to significantly limit the examiner's role when there exists insufficient basis for an investigation." Id. Judge Carey further stated that "[t]o appoint an examiner with no meaningful duties strikes me as a wasteful exercise, a result that could not have been intended by Congress." Id. Certainly, the appointment of an examiner with no duties or responsibilities would be a cumbersome and expensive proposition that would serve only to hinder the efficient administration of the estate.

30.     Indeed, even the court in In re Revco D.S., Inc., 898 F.2d 498 (6th Cir. 1990), the leading case finding that section 1104(c)(2) is mandatory (and on which the Equity Committee relies), apparently recognized the possibility that section 1104(c)(2) may not be mandatory if it is improperly used to delay a case. Specifically, the Revco court stated:

11

The debtors claim that such a construction of the statute invites abuse, and that the trustee or any other party in interest could needlessly prolong a case with last-minute demands for an examiner. That is not the case before us, of course, and we do not decide it except to note that the bankruptcy court retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration.

Id. at 501.

31.     Based upon the above, the better statutory construction of section 1104(c)(2) is that the appointment of an examiner is not "mandatory" simply because the Debtors' unsecured debts exceed $5 million, but rather, that appointment should occur only when the Court, in its discretion, concludes that there is an "appropriate" investigation for an examiner to conduct. As discussed below, the appointment of an examiner in the Debtors' chapter 11 cases is not appropriate and therefore the Examiner Motion should be denied.

### B.     Cause Does Not Exist for Appointment of an Examiner under Section 1104(c)(1).

32.     Under section 1104(c)(1) of the Bankruptcy Code, a court may appoint an examiner if "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(c)(1). Appointment of examiner under section 1104(c)(1) must be in the interests of the estate in general. See In re Sletteland, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("Under [sections 1104(a)(2) and (c)(1) of the Bankruptcy Code], a creditor group, no matter how dominant, cannot justify the appointment of a trustee or examiner simply by alleging that it would be in its interests. It must show that the appointment is in the interests of all those with a stake in the estate").

33.     Relying on many of the factors discussed above, courts have regularly denied the appointment of an examiner where the court was not convinced that there was an "appropriate" investigation to conduct. For example, in Spansion, distributions under the

12

debtors' plan were partially made through a rights offering which was fully subscribed and the monies were in escrow as of the confirmation hearing. In re Spansion, 2010 WL 1292837 at *4. Prior to the confirmation hearing, an ad hoc committee of convertible note-holders made an alternative equity proposal to the debtors in the form of a rights offering which rights offer was apparently rejected by the debtors. Id. Subsequently, such committee sought, among other things, an order vacating the order approving the disclosure statement and an order appointing an examiner to investigate the debtors' alleged intentional and material misrepresentations in its disclosure statement. Id. at *6. At the time of the motion, the debtors' chapter 11 plan had been solicited and approved by all but one voting class. Id. at *3. In its motion, the committee alleged that the written materials provided by the debtors and their advisors at presentations to prospective lenders and rating agencies, and other public statements, were materially different from the information contained in the disclosure statement, as it allegedly failed to present an "upside case" for the debtors' prospects, failed to attribute value to certain assets, and failed to disclose the debtors' true growth strategy. Id. at *4. The Spansion court rejected the committee's allegations that the debtors obtained approval of the disclosure statement based upon misconduct and intentional misrepresentations and found that the committee's objections are appropriately considered as objections to confirmation, as what the committee was really contesting were the underlying assumptions in the Debtors' enterprise value. Id. at *6. In rejecting the committee's bid to require the appointment of a trustee, the Court noted that "the allegations of bad faith against the Debtors' management for rejecting the [alternative rights offering] provides a classic confirmation dispute, rather than grounds for an investigation by an examiner." Id. at *8. Further, this Court noted that "[a]ppointment of an examiner at this time, based on this record, is neither warranted nor appropriate, and would cause undue cost to the

13

estate, which would be harmful to the Debtors and would delay the administration of this chapter 11 case." Id.

34. In Loral, the debtors' proposed plan of reorganization provided that shareholders would not receive any recovery. In response, a group of shareholders formed an ad hoc committee and sought appointment of an examiner to conduct a valuation of the Debtors. The shareholders alleged that the debtors and the creditors' committee appointed in the case were colluding to artificially depress the valuation of the debtors in order to obtain the hidden value for themselves. In re Loral Space & Commc'ns Ltd., 313 B.R. 577, 580 (Bankr. S.D.N.Y. 2004), rev'd on other grounds, No. 04 Civ. 8645RPP, 2004 WL 2979785 (S.D.N.Y. Dec. 3, 2004).[2] In explaining why the shareholders had not met the standard of section 1104(c)(1) of the Bankruptcy Code, the court stated that

> the Ad Hoc Committee may have a legitimate objection to confirmation of the Debtors' chapter 11 plan, but it is not entitled to the appointment of an examiner under section 1104(c) of the Bankruptcy Code to help it advance that objection.

Id. at 584.

35. In In re Gliatech, Inc., 305 B.R. 832 (Bankr. N.D. Ohio 2004), a creditor ("Riverside") alleged that treatment of another creditor's claim under the plan was based on a settlement that was unfair to Riverside, and thus Riverside asked the court to appoint an examiner to investigate the other creditor's treatment under the plan. Id. at 834-35. In addressing the request, the court first examined section 1104(c)(1) of the Bankruptcy Court:

> As the title suggests, the basic job of an examiner is to examine, not to act as a protagonist in the proceedings. An appointment under § 1104(c)(1) must, therefore, be in the interests of everyone with a stake in the case, including creditors, equity security

---

[2] Although the bankruptcy court in Loral was reversed with regard to its holding that section 1104(c)(2) did not require mandatory appointment of an examiner, its reasoning with regard to appointment of examiner under 1104(c)(1) was undisturbed by the district court.

14

> holders, and other interests of the estate. A single creditor group "cannot justify the appointment of a[n] . . . examiner simply by alleging that it would be in its interests."

Id. at 836 (quoting Sletteland, 260 B.R. at 672). The court then concluded that Riverside had failed to meet the standard for appointment of an examiner under section 1104(c)(1) of the Bankruptcy Code and noted that

> [w]hat Riverside is really saying is that it objects to the proposed plan because it will not receive any distribution and that estate funds should be used to prove that the objection should be sustained. Riverside may have a legitimate objection but, if so, Riverside can investigate the facts that would support such an objection on its own nickel, not that of the other creditors.

Id.

36.    The facts of Spansion, Loral and Gliatech are very similar to those in the present case in that the movants' requests for an examiner all occurred at a late stage in the case and were essentially litigation tactics, and the requested appointment of an examiner was not designed to benefit the interests of the estate and its stakeholders in general, but rather solely to advance the interests of the moving party. Here, it is obvious that the intent of the Equity Committee is to simply hold these cases in stasis—with the fringe benefit of having an examiner conduct an "investigation" that is in reality the case the Equity Committee would otherwise have to attempt to develop on its own in order to advance an argument that equity is entitled to a recovery—while the shareholders pursue their true objective of commandeering control of the case by changing the board of directors. The Equity Committee has failed to articulate any legitimate reason why the Equity Committee itself under section 1103(c) could not investigate the matters it has outlined for the proposed examiner's investigation. Such an abuse of the bankruptcy process is neither appropriate nor mandated under section 1104(c)(2) of the Bankruptcy Code. From a precedential perspective, appointment of an examiner here would

15

stand for the proposition that any time a party doesn't like the way things are headed, they can impose delay and cost by requiring the appointment of an examiner (rather than having their objection rise or fall on the merits).

37.     Further, like the movants in Spansion, Loral and Gliatech, the Equity Committee is seeking to have the estate pay for an investigation that would provide no benefit to the interests of creditors of the Debtors' estates; to the contrary, the investigation sought by the Equity Committee would potentially deplete—rather than augment—the Debtors' estates for the benefit of the shareholders alone and to the detriment of creditors. Additionally, the main concerns raised by the Equity Committee, i.e., the releases contained in the Global Settlement incorporated into the Plan, are more properly raised as objections to confirmation of the Plan. Put simply, the Equity Committee has not and cannot meet the standard of section 1104(c)(1) of the Bankruptcy Code, and the Examiner Motion should be denied.

## II.     Conversion of the Debtors Cases to Cases under Chapter 7 of the Bankruptcy Code or the Appointment of a Trustee Will Render the Examiner Motion Moot

38.     Any hearing on the Examiner Motion should be delayed until after such time that the Court has considered and ruled on the merits of the Conversion Motion because the Examiner Motion would be rendered moot by either section 701 of the Bankruptcy Code, upon a determination by the Court that the cases should be a chapter 7 liquidation, or in the alternative, under section 1104(c) of the Bankruptcy Code, upon a determination that a trustee should be appointed in the Debtors' chapter 11 cases. Specifically, the Bankruptcy Code does not authorize the appointment of examiners in cases under chapter 7 and section 1104(c) only permits the appointment of an examiner when a trustee has not yet been appointed. Accordingly, failure to carry the hearing on the Examiner Motion will only result in significant increased costs

16

being borne by the Debtors' estates through potentially duplicative efforts without a corresponding benefit.

> 39.     Section 1104(c) provides, in relevant part:
>
>> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor.

11 U.S.C. § 1104(c) (emphasis added).

> 40.     The appointment of an examiner is authorized only in cases under chapter 11 and is not contemplated by chapter 7 of the Bankruptcy Code. See 11 U.S.C. § 1104. By section 1104(c)'s plain language, once a chapter 11 trustee has been appointed, a bankruptcy court no longer has authority to appoint an examiner. See In re Phila. & Reading Coal & Iron Co., 105 F.2d 354, 355 (3d Cir. 1939) (chapter 11 "does not contemplate the appointment of both officials in the same proceeding"); see also United States v. J. Baxter Schilling (In re Big Rivers Elec. Corp.), 355 F.3d 415, 430 (6th Cir. 2004) ("the [Bankruptcy] Code prohibits the use of an examiner when a trustee has already been appointed"); Norris Square Civic Assoc. v. St. Mary Hospital (In re St. Mary Hospital), 86 B.R. 393, 397 (Bankr. E.D. Pa. 1988). The Bankruptcy Code provides for such a prohibition because the duties of a trustee are broad and necessarily subsume the duties of an appointed examiner. See also 11 U.S.C. § 1106(b) (setting forth the examiner's duties which essentially are a subset of a trustee's duties). Accordingly, in the event that the Court rules favorably on the Conversion Motion, whether by conversion of the cases to

17

cases under chapter 7 or by the appointment of a trustee prior to appointing an examiner, the Equity Committee's requested relief will be unavailable as a matter of law.

41.     If the Court appoints an examiner prior to considering the Conversion Motion, but later determines to have a trustee appointed to replace the Debtors' current management, the Debtors' estates will incur an additional unnecessary layer of cost as under section 321(d) of the Bankruptcy Code an examiner appointed in a bankruptcy case may not later serve as a trustee in such bankruptcy case. 11 U.S.C. § 321(d) ("A person that has served as an examiner in a case may not serve as trustee in the case."). In such a scenario, the U.S. Trustee would be required to appoint a person other than the appointed examiner to take on the role of trustee, likely resulting in a significant duplication of work and costs. Such a result is simply inefficient and a waste of the Debtors' resources as well as judicial resources.

42.     As discussed above and as outlined in the Conversion Motion, the WMI Noteholders object to the Examiner Motion as ample cause exists to convert the Debtors' chapter 11 reorganization into a chapter 7 liquidation, or in the alternative, for the appointment of a trustee. The WMI Noteholders submit that any hearing on the Examiner Motion should thus be delayed until after such time that the Conversion Motion is heard by the Court because (i) the Debtors' estates will accrue significant unnecessary costs if an examiner is appointed and a trustee (chapter 7 or chapter 11) is subsequently appointed at a later date and (ii) there is a strong likelihood that if the hearing on the Examiner Motion is simply delayed until the Conversion Motion is heard, the Examiner Motion will be rendered moot by the conversion of the cases or the appointment of a trustee. Alternatively, the WMI Noteholders submit that if the Court is not willing to delay the hearing on the Examiner Motion until such time that the Conversion Motion is heard, then the Conversion Motion should be heard by the Court simultaneously with the

18

Examiner Motion. See In re Phila. & Reading Coal, 105 F.2d at 356 (noting that it is "obviously desirable that both applications [for the appointment of a trustee and examiner] should be considered together").

## RESERVATION OF RIGHTS

43. The WMI Noteholders reserve their rights to supplement and amend this Objection, seek discovery with respect to the same, and introduce evidence at any hearing relating to this Objection or to consider the Examiner Motion, all without in any way limiting any other rights of the WMI Noteholders to further object to the Examiner Motion on any grounds as may be appropriate. Further, the WMI Noteholders reserve the right to join in or respond to any objection made by any person relating to Examiner Motion.

## CONCLUSION

For the foregoing reasons, the WMI Noteholders respectfully request that the Court enter an order denying the Examiner Motion and granting the WMI Noteholders further relief as the Court deems appropriate.

Dated: May 4, 2010
Wilmington, Delaware

FOX ROTHSCHILD LLP

By: _____
Jeffrey M. Schlerf, Esq. (No. 3047)
Eric M. Sutty, Esq. (No. 4007)
Citizens Bank Center
919 North Market Street, Suite 1600
Wilmington Delaware 19801
Telephone: (302) 654-7444

-and-

19

WHITE & CASE LLP
Thomas E Lauria
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744

Of Counsel:
KASOWITZ BENSON TORRES & FRIEDMAN LLP
David S. Rosner
Paul M. O'Connor III
Adam L. Shiff
Seth A. Moskowitz
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700

Attorneys for the Washington Mutual, Inc.
Noteholders Group

WM1A 952858v1 05/04/10