# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

| | |
|---|---|
| In re: | Chapter 11 |
| WASHINGTON MUTUAL, INC., et al., | Case Nos. 08-12229 (MFW) |
| Debtors. | Jointly Administered |
| | **Objection Deadline: May 27, 2010 at 4:00 p.m.** |
| | **Hearing Date: June 3, 2010 at 10:30 a.m.** |

------------------------------------------------------- X

## MOTION OF THE WASHINGTON MUTUAL, INC. NOTEHOLDERS GROUP FOR AN ORDER UNDER 11 U.S.C. § 1112(b) CONVERTING THE DEBTORS' CASES TO CHAPTER 7 OR, IN THE ALTERNATIVE, FOR AN ORDER UNDER 11 U.S.C. § 1104(a) APPOINTING A TRUSTEE TO ADMINISTER THE DEBTORS' ESTATES

The Washington Mutual, Inc. Noteholders Group (the "WMI Noteholders"), whose members hold in the aggregate approximately $2.3 billion in face amount of outstanding debt securities issued by Washington Mutual, Inc. ("WMI," and collectively with WMI Investment Corp., the "Debtors"), hereby files this motion for an order, pursuant to 11 U.S.C. § 1112(b), converting these chapter 11 cases to chapter 7, or, in the alternative, for an order pursuant 11 U.S.C. § 1104(a), appointing a chapter 11 trustee (the "Motion"). In support of the Motion, the WMI Noteholders respectfully state as follows:

### PRELIMINARY STATEMENT

1.     This case has never been, and is not now, a reorganization under any conventional meaning of the word. The primary operating businesses of the Debtors—Washington Mutual Bank ("WMB") and its banking subsidiaries—were stripped away by the FDIC prior to the Debtors' filing for chapter 11 relief on September 26, 2008. From its inception, this case has

1

thus been mainly about the resolution of disputes regarding (1) the Debtors' entitlement to certain cash assets, namely their bank deposits and tax refunds; and (2) claims asserted by JPMorgan Chase, National Association ("JPMC"), the FDIC, and certain holders of bonds issued by WMB (the "Bank Bondholders").

2.        As such, the key administrative question has been from day one and remains today:

- Who should serve as the estate fiduciary to resolve the forgoing disputes and distribute the estate's assets, which are largely cash, to the legitimate stakeholders?

- Stated differently, who will be best positioned to protect the interests of stakeholders and resolve the estate in a fashion that is most consistent with the Bankruptcy Code's mandate of administrative efficiency?

3.        As the Court is well aware, the Bankruptcy Code provides three potential answers: the debtor in possession; a chapter 11 trustee; or a chapter 7 trustee. B ased on a cursory review, the apparent answer provided by other cases filed under chapter 11 is that the debtor in possession typically orchestrates the estate's liquidation even when there is no remaining business to reorganize. This "answer," however, is really more in the nature of a default than an answer, for it is rare that the courts have been asked to actually consider and weigh the merits of the alternatives. Here, the WMI Noteholders believe that the circumstances require a considered approach, not just the untested default result, and that upon a reasoned consideration of the pros and cons, a chapter 7 trustee would now be best positioned to resolve the disputed issues and make distributions to stakeholders in an efficient and timely fashion.

2

4.     For 18 months, this liquidation has been presided over by the debtor in possession. However, the debtor in possession here has been one in name only; upon the commencement of these cases, the Debtors had only one temporary employee and didn't even have access to, or knowledge of, their own business records.   What the Debtors did have though, was an already growing cadre of advisors.   Indeed, from the beginning, the WMI Noteholders have expressed concerns to the Court about the prospects and potential consequences of a synthetic debtor comprised of a virtual army of expensive, but unsupervised, professionals.   No relief was sought, however, based on (a) the informal understanding that great deference would be shown to the views of the estates' legitimate stakeholders, (b) representations that the retained estate professionals were quickly gaining a working knowledge of the issues, and (c) the hope that these cases could be concluded in an efficient and expeditious fashion.

5.     Unfortunately, 18 months later, it now appears that the WMI Noteholders' concerns have been largely realized and that our hopes have been dashed.   Millions of dollars of stakeholder money has been spent and, unless a global resolution suddenly takes shape, little, if any, benefit has been achieved.   Instead of an expeditious resolution, these cases are on the verge of unraveling and creditors are facing the prospect of ongoing protracted delays in obtaining recoveries:

- Exclusivity is about to terminate making the filing of multiple plans almost a certainty.

- The FDIC is threatening to abandon the settlement it previously agreed on the record to support.

- The Bank Bondholders, who hold no legal claims against the estate (and thus

3

have no downside from its dissipation), are engaged in a scorched earth litigation strategy.

- The Debtors are holding up further efforts toward progress by insisting that any ultimate deal include releases for insiders who are providing no value to the estate or its creditors.

- And, the Equity Committee has sought to increase the delay and cost to the process by adding yet another layer of administration—an examiner to re-investigate estate claims against JPMC and the FDIC.

6. Making matters materially worse, the Equity Committee and its members are also engaged in litigation in this Court and in state court in Washington, to conduct a shareholder meeting for the express purpose of electing a new slate of directors; one that would undoubtedly serve as an instrumentality of out-of-the-money shareholders and which would make a mockery of the notion that the debtor in possession is to serve as a fiduciary for all legitimate stakeholder interests. Indeed, if successful, replacement of the board by the shareholders would likely result in the indefinite delay, and ultimate diminution, of legitimate creditor recoveries flowing from the newly constituted board's likely instruction to its lawyers and advisors to swing for the fences in litigation with JPMC and the FDIC. Onl y through the success of such long-shot tactics, executed at the expense of creditors, is there even a remote chance of recovery to shareholders. Thus, permitting shareholders to select the new estate fiduciary diminishes or eliminates the possibility of settlement and effectively guarantees protracted litigation of the many material and complicated disputes now before this Court and others. Any other outcome would defeat the objective of shareholders in seeking to replace the board in the first place.

4

However, permitting shareholders to select a new estate fiduciary in a case such as this one tramples the rights granted to creditors by Congress under sections 702 and 1104 of the Bankruptcy Code. Under such circumstances, continuance of the debtor in possession serves no legitimate purpose.

7.    That leaves the choice as between a trustee under chapter 7 or chapter 11. In that regard, what quickly becomes abundantly clear is that there is simply no need for, or benefit from, a chapter 11 plan process, particularly one involving multiple competing plans. Not only is there nothing to reorganize, but there is no reason to expend the time and resources fighting over the terms of multiple plans when chapter 7 provides a perfectly adequate statutory waterfall for the distribution of the Debtors' largely cash assets and Bankruptcy Rule 9019 remains available for the approval of settlements to the extent any can be achieved along the way.

8.    All things considered, conversion provides the estate and its stakeholders with multiple tangible benefits:

- It eliminates the largely-ineffectual synthetic debtor in possession and all of its attendant costs;

- It eliminates the cost, delay and complexity of a multiple plan process;

- It eliminates the risk of protracted litigation as out-of-the-money shareholders try to orchestrate a take-over of the debtor in possession in the hopes of extracting a recovery to which they are not entitled; and

- It provides a truly independent fiduciary—who can be selected by the stakeholders through a simple statutorily-mandated democratic process—to resolve disputes and distribute the proceeds of the estate.

5

9.	For all of the foregoing reasons, and as more fully explained below, the Court should immediately convert this case to chapter 7, or alternatively, direct the appointment of a chapter 11 trustee.

## BACKGROUND

### A.	Procedural Background

10.	WMI is a holding company incorporated in the State of Washington; it is the direct parent of the other Debtor, WMI Investment Corp., a Delaware corporation.

11.	On September 26, 2008 (the "Commencement Date"), each of the Debtors commenced a voluntary case pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") by filing a petition for relief in the United States Bankruptcy Court for the District of Delaware (the "Court").

12.	On October 15, 2008, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee").	On January 11, 2010, the U.S. Trustee formed the Equity Committee.

### B.	Events Leading to the Commencement of the Case

13.	Prior to the Commencement Date, WMI was a savings and loan holding company that owned Washington Mutual Bank ("WMB") and, indirectly, WMB's subsidiaries, including Washington Mutual Bank fsb ("FSB").	Like all savings and loan holding companies, prior to the Commencement Date, WMI and its banking subsidiaries were subject to regulation and examination by the Office of Thrift Supervision ("OTS").	In addition, WMI's banking and non-banking subsidiaries were overseen by various federal and state authorities, including the FDIC.

6

14. On September 25, 2008, the OTS closed WMB, appointed the FDIC as receiver for WMB (the "FDIC Receiver") and advised that the FDIC Receiver was immediately taking possession of WMB's assets (the "Receivership"). Immediately after its appointment as receiver, the FDIC sold substantially all the assets of WMB, including the stock of FSB, to JPMC pursuant to that certain Purchase and Assumption Agreement, effective September 25, 2008 (the "Purchase and Assumption Agreement") in exchange for payment of $1.88 billion in cash and the assumption of all of WMB's deposit liabilities, including approximately $4 billion of deposit liabilities (the "Deposits") owed to the Debtors. Shortly thereafter, JPMC assumed all of FSB's deposit liabilities by merging FSB with its own banking operations.

15. As a result of the OTS seizure of WMB, the Debtors have no material operations or going concern value.

## C.     The Disputed Issues and Efforts at Resolution

16. Since the Commencement Date, and as a result of actions taken in the chapter 11 cases and the Receivership, significant litigation has been commenced and pursued by and among the Debtors, JPMC, the FDIC and others, including the Bank Bondholders. Among other things, the Debtors filed a claim against the FDIC Receiver for return of the Deposits and avoidance of certain transfers as preferences or fraudulent transfers, and commenced an action in the United States District for the District of Columbia (the "D.C. Court") when that claim was rejected by the FDIC. The Debtors have also filed a turnover action in this Court seeking return of the Deposits.

17. At the same time, JPMC, the FDIC and the Bank Bondholders have each filed numerous, massive proofs of claim in this case. In March of 2009, JPMC filed an adversary

7

proceeding in this Court seeking declaratory relief concerning the Deposits, and the Debtors filed counterclaims against JPMC, claiming ownership of the Deposits and seeking avoidance of prepetition transfers.

18.     The Debtors also sought extensive discovery pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure from JPMC and the FDIC.

19.     Additionally, other parties, such as the Creditors' Committee and the Bank Bondholders, have intervened in many of the pending actions, asserting rights or interests in the disputes and corresponding assets.

20.     Some of the foregoing litigation has proceeded to the summary judgment stage, while other actions have been stayed.

21.     On March 12, 2010, at a hearing before the Bankruptcy Court at which the parties anticipated the Court would render a ruling on summary judgment with respect to the Deposits, the Debtors announced on the record that, with the support of the Creditors' Committee and certain other parties, they had reached a compromise and settlement of the disputes between the Debtors, JPMC and the FDIC (the "Global Settlement"). Specifically, at such hearing, the Debtors, with the concurrence of JPMC and the FDIC, recited the material terms and conditions of their understanding, which included without limitation, the resolution of ownership of the Deposits, the allocation of disputed assets, the transfer of certain liabilities, and the exchange of mutual releases.

22.     Since that time, it has become clear, however, that the purported Global Settlement was not, in fact, a real deal because it had not been agreed to by all of the parties, including in particular the FDIC.

8

23.     On March 26, 2010, the Debtors filed their Joint Plan of Reorganization [Docket No. 2622] (the "Plan") and an accompanying disclosure statement [Docket No. 2623] (the "Disclosure Statement"), which was premised on the purported Global Settlement as announced at the March 12 hearing.

24.     In the Disclosure Statement, the Debtors explicitly acknowledge that the FDIC had not agreed to the Global Settlement [Disclosure Statement at 1], and the Plan is not feasible unless and until the FDIC accepts the Global Settlement.

## D.     The Equity Committee's Attempt to Hijack this Case

25.     On January 11, 2010, the Court appointed the Equity Committee. Rather than attempting to establish the solvency of the estate (and thus, a legitimate entitlement to value), the Equity Committee instead began hatching a plot to change the direction of the case by installing its own representatives on the board of WMI. On March 3, 2010, the Equity Committee commenced a lawsuit in this Court against WMI, styled Official Comm. of Equity Security Holders v. Washington Mutual, Inc., Adv. Proc. No. 10-50731 (MFW) seeking to compel a WMI shareholders' meeting. On March 11, 2010, the Equity Committee filed a motion (a) seeking summary judgment in connection with the above complaint or, in the alternative, (b) requesting entry of an order determining that the automatic stay does not apply to prevent the Equity Committee from seeking to compel a WMI shareholders' meeting in state court in Washington.

26.     On April 21, 2010, the Bankruptcy Court held a hearing on the Equity Committee's motion with respect to whether the automatic stay applies to preclude it from seeking a shareholders meeting. At the hearing, the chairman of the Equity Committee, Michael Willingham, admitted that the purpose of the shareholders' meeting would be to

9

nominate and elect new board members. (4/21/2010 Hearing Tr., Michael Willingham, at 52:15-19) Mr. Willingham also explained that the Equity Committee planned to object to the Plan and the Global Settlement (id. at 51:1-9), making it likely that a new board would implement that objection by simply withdrawing the Plan.

27. At the conclusion of the April 21 hearing, the Court ruled that the automatic stay does not bar equity holders from seeking to force a shareholder meeting or elect a board. The Court also found that the Debtors failed to demonstrate a clear abuse of process by the Equity Committee and therefore no basis existed to enjoin the members of the Equity Committee from exercising their rights under Washington state law.

28. On or about April 26, 2010, Mr. Willingham and Esopus Creek Value, L.P. commenced a lawsuit against WMI styled Michael Willlingham v. Washington Mutual, Inc., No. 10-2-00854-1 (Wash. Super. Ct., Thornton Cnty. Ct. Apr. 26, 2010), in a Washington state court seeking to compel a WMI shareholders' meeting, presumably for the purpose of electing a new board of directors and replacing management (as Mr. Willingham had previously testified).

29. On that same date, the Equity Committee filed a motion for appointment of an examiner (the "Examiner Motion"), claiming that the Debtors have failed to properly investigate the causes of action referenced above. The Equity Committee also sought, and obtained, an order shortening time and a hearing has been set on the Examiner Motion for May 5, 2010.

30. By statute, exclusivity expired on or about April 28, 2010, a plan not having been confirmed. Further, due to the uncertainty regarding the FDIC's position, it is unclear if and when the Plan can be confirmed. As a result, the expense and burden of a fight over competing plans of reorganization is sure to materialize.

10

## JURISDICTION AND STATUTORY PREDICATES

31.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).     Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.     The statutory predicates for the

relief requested herein are §1104(a) and 1112(b) of the Bankruptcy Code.

## RELIEF REQUESTED

32.     The WMI Noteholders seek an order converting this proceeding from a chapter 11

case to one under chapter 7, or alternatively, appointing a chapter 11 trustee to administer the

Debtors' estates.

## ARGUMENT

### A.     The Court Should Convert this Case to One under Chapter 7

33.     This case should be converted to chapter 7.     Section 1112(b)(1) of the

Bankruptcy Code provides that:

> Except as provided in paragraph (2) of this subsection, subsection (c) of
> this section, and 1104(a)(3), on request of a party in interest, and after
> notice of a hearing, absent unusual circumstances specifically identified by
> the court that establish that the requested conversion of dismissal is not in
> the best interests of creditors and the estate, the court shall convert a case
> under this chapter to a case under chapter 7 or dismiss a case under this
> chapter, whichever is in the best interests of creditors if the movement
> establishes cause.

11 U.S.C. § 1112(b).

34.     Although the Bankruptcy Code provides a list of what constitutes "cause," a court

is not limited to the examples of cause found in section 1112(b), and cause may be determined

based on the facts and circumstances of the case.     See In re NuGelt, Inc., 142 B.R. 661, 665,

669 (Bankr. D. Del. 1992).     Indeed, the Historical and Statutory Notes to section 1112 provide

that subsection (b) "gives wide discretion to the court to make an appropriate disposition of the

11

case sua sponte or upon motion of a party in interest, or the court is permitted to convert a reorganization case to a liquidation case or to dismiss the case . . . for cause." See NuGelt, 142 B.R. at 665; S. Rep. No. 95-989 (1978).

35. Among the factors listed by the Bankruptcy Code as constituting "cause" is "substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of reorganization." 11 U.S.C. § 1112(b)(4)(A). The Eighth Circuit Court of Appeals has held that this factor is satisfied where a chapter 11 is no longer operating and has failed to negotiate a confirmable chapter 11 plan with its creditor constituencies. Loop Corp. v. U.S. Tr., 379 F.3d 511, 515 (8th Cir. 2004).

36. In Loop Corp., the debtor had no operations and its sole remaining assets consisted of cash, litigation claims against its accounting firm and net operating losses. Further, despite prolonged negotiations, the parties had been unable to negotiate a consensual plan of reorganization. The primary dispute was whether the debtor should pursue its litigation claims against its accountants with its remaining cash, or distribute that cash to creditors. Id. at 514. The U.S. Trustee moved to convert the case to a chapter 7 and the bankruptcy court granted the motion. The court of appeals found that the U.S. Trustee had established cause under section 1112(b)(4)(A) because the debtor continued to incur administrative expenses, no longer had an operating business which it could rehabilitate and had failed to confirm a plan. Id. at 516. In affirming the conversion, the Eighth Circuit specifically noted that "[i]n the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow—including that resulting only from administrative expenses—effectively comes straight from the pockets of the creditors."

12

37. The same fact pattern exists here. Not only do the Debtors continue to incur significant administrative expenses in the form of professional fees, such administrative expenses are likely to materially increase if these cases are not converted. Among other things, the Equity Committee has filed a motion for appointment of examiner and has commenced litigation to take control of the estate by changing the board of WMI. Further, exclusivity has terminated and the plan process is now likely to involve substantial litigation over competing plans. Given the fact that the Debtors have no meaningful ongoing income, these costs will be paid directly out of creditors' recoveries. Creditors should not be forced to bear such a burden.

38. In addition, there is no reasonable likelihood of rehabilitation. See Colliers ¶ 1112.04[5][a][ii] (15th Ed. Rev.) (the test for reasonable likelihood of rehabilitation is "whether the debtor's business prospects justify continuance of the reorganization effort"). The Debtors here are, and have been, debtors in possession only in a technical sense. They have no material operations or going concern value and their assets consist mainly of cash and entitlements to cash which can be realized just as effectively in chapter 7 as in chapter 11. They have failed to confirm a plan of reorganization within the exclusive period set forth in section 1121 of the Bankruptcy Code; indeed, absent a sudden resolution that would cause the purported Global Settlement to become a real deal, not only will their current plan be contested, the entire process may well be futile because it is based on an illusory settlement with JPMC and the FDIC that today does not exist. Such circumstances, in the aggregate, should constitute "cause" to convert these cases pursuant to section 1112(b)(4)(A).

39. Cause also exists to convert these cases because of the prospect that the Equity Committee and its members may succeed in their efforts to replace the Debtors' current board of

13

directors with their own nominees. Equity should not be permitted to replace the current debtor in possession with its own "pseudo-trustee." The new management installed by equity will have no greater familiarity with the Debtors than a trustee. Further, new management will not be disinterested and will likely seek to gamble with the creditors' money to obtain recoveries for equity, prompting unnecessary litigation, and resulting in substantial delays in (and the diminution of) recoveries to creditors.

40. Such a result would effectively end-run the right afforded creditors under section 702 and, in the context of a chapter 11 trustee, section 1104(b) of the Bankruptcy Code to elect their fiduciary.

41. Section 1112(b) utilizes a burden-shifting approach. Once cause is established, as it is here, the burden then falls on the debtor to prove that the case should not be converted due to "unusual circumstances." DCNC N.C. I, LLC v. Wachovia Bank, N.A., Nos. 09-3775, 09-3776, 2009 WL 3209728, at * 4 (E.D. Pa. Oct. 5, 2009); In re Ramreddy, Inc., No. 09-15283, 2009 WL 3763988 (Bankr. E.D. Pa. Nov. 9, 2009); In re Gateway Access Solutions, Inc., 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) (conversion of case is mandatory absent a showing of unusual circumstances once cause is established). Although the phrase "unusual circumstances" is not defined in the Bankruptcy Code, courts agree that phrase means "conditions that are not common in a chapter 11." In re Town Dev., LLC, 404 B.R. 140, 147 (Bankr. M.D. La. 2009). No such circumstances exist here. The Debtors have shown that they cannot confirm a plan of reorganization within a reasonable period time. Further, although the numbers are large, this case is, at its core, nothing more than a liquidation of cash and cash expectancies, subject to the

14

resolution of various disputes which can be, litigated or settled under Bankruptcy Rule 9019 without the burden of ongoing chapter 11 administration.

42.     In addition, conversion to chapter 7 is preferable to the appointment of a chapter 11 trustee. Once "cause" is established, "the Court must consider whether to … convert the case into one under chapter 7, or appoint a chapter 11 trustee, which ever result is in the best interests of creditors." In re Prods. Int'l Co., 395 B.R. 101, 108 (Bankr. D. Ariz. 2008); In re Incredible Autosales, LLC, No. 06-60855-11, 2007 WL 1100276 (Bankr. D. Mont. Apr. 10, 2007). In order to do so, the court should employ a balancing test and determine which result is appropriate based on the record. In re Prods. Int'l, 395 B.R. at 108. Here the balance of the equities strongly tilts toward the conversion of the case to chapter 7. As noted above, the Debtors have no operations or viable business to be preserved and keeping this case in chapter 11 will, as a result of the statutory termination of exclusivity, likely result in the additional and unnecessary expense of a plan process involving competing plans, whether or not a chapter 11 trustee is appointed. None of this is necessary for the estate to be liquidated in chapter 7, especially in light of the non-operational nature of the Debtors' assets.

43.     Based upon the foregoing, the Court should convert this chapter 11 reorganization into a chapter 7 liquidation.

15

## B. In the Alternative, the Court Should Appoint a Chapter 11 Trustee

### 1. Equity Is Not Entitled to Appoint a Pseudo-Trustee

44. In a chapter 11 case, a debtor, through its management, typically remains in control of its assets as a debtor in possession. This policy is based on the assumption that "current managers are the most knowledgeable about the needs of the business and are best suited to guide the business through a financial crisis." Collier ¶ 1100.06 (15th Ed.); see also Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 577 (3d Cir. 2003) ("existing management is best positioned to rescue a debtor from bankruptcy."); In re Marvel Entm't Group, Inc., 140 F.3d 463, 471 (3d Cir. 1998) (observing "debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization."). In addition, allowing managers to stay in control encourages filings before a business has become "too troubled to be saved." Collier ¶ 1100.06 (15th Ed.).

45. Neither of these policies would be served by allowing the Equity Committee to commandeer this case through its efforts to replace the current debtor in possession. As noted above, a new board of directors will be no more familiar with the Debtors and their assets than a trustee and would be entitled to no deference from the Court. See In re Marvel Entm't, 140 F.3d at 471 ("[t]he Icahn interests took control over Marvel's management six months after the chapter 11 filing. We are not confronted with a debtor who possesses extensive familiarity with the company's operations. It is therefore inappropriate to suggest that the usual presumption should be applied to a Johnny-come-lately debtor-in-possession.").

16

46.     Further, the Bankruptcy Code is clear—the proper mechanism for replacing management is the appointment of a trustee, not the replacement of the debtor in possession by equity.     Indeed, section 1104(a) of the Bankruptcy Code provides a bankruptcy court with wide discretion to appoint a chapter 11 trustee "at any time after the commencement of the case, but before confirmation of a plan" for cause or "if such appointment is in the interests of creditors." Importantly, the Bankruptcy Code provides a mechanism for such a trustee to be selected by the creditors, not equity.     11 U.S.C. §§ 702 and 1104(b) (upon request, a trustee must be elected by creditors holding "allowable, undisputed, fixed, liquidated," unsecured claims).     In this case, by seeking to replace the board of directors, the Equity Committee is attempting to replace the debtor in possession in plain denigration of sections 702 and 1104 of the Bankruptcy Code. Such a result should not be permitted.

47.     Nor does such a result make sense.     Equity will receive no recoveries unless, after years of litigation, the Debtors completely prevail on all of their claims against the FDIC and JPMC.     Under these circumstances, allowing equity to replace the debtor in possession will do nothing more than spur unnecessary litigation run for the benefit of equity, not creditors.

48.     Further, allowing equity to replace the debtor in possession violates core bankruptcy principals.     A debtor in possession must "perform all the functions and duties" of a trustee and is an estate fiduciary.     See 11 U.S.C. § 1107(a).     In a case such as this, where there is no evidence that there is value for equity, the primary fiduciary duty of a debtor in possession runs to creditors and equity should have no right to replace a debtor in possession if it is dissatisfied with its performance.     Such a result would not be fair and equitable.     Indeed, the absolute priority rule provides that junior interests should not receive recoveries until senior

17

creditors have been paid in full. See 11 U.S.C. § 1129(b)(1); In re Armstrong World Indus., 432 F.3d 507 (3d Cir. 2005). A corollary to that rule is that senior creditors should determine who controls the estate. The Equity Committee seeks to turn this concept on its head by having equity choose an entity that is required to maximize value for creditors.

49. Finally, it is well established that a "debtor in possession is bound by a duty of loyalty that includes an obligation to refrain from self dealing, to avoid conflicts of interests and the appearance of impropriety." In re Coram Healthcare Corp. Inc., 271 B.R. 228, 235 (Bankr. D. Del. 2001) (emphasis added). At the very least, permitting the Equity Committee to hand pick the Debtors' management creates an apparent conflict of interest for the new board members and management of the Debtors, which violates the well settled rule that bankruptcy proceedings must not only be fair, but they must appear fair. Knapp v. Seligson (In re Ira Haupt & Co.), 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right."); see also In re Venture Link Holdings, Inc., 299 B.R. 420, 423 (Bankr. N.D. Tex. 2003) ("The bankruptcy process must be fair and appear fair.").

50. Simply put, it is fundamentally unfair for an out of the money constituency to control the Debtors' assets, especially where those assets consist mainly of cash that can be efficiently distributed by an independent trustee.

## 2. Appointment of a Trustee Is in the Best Interests of Creditors

51. "Cause" also exists to appoint a trustee because it is in the "best interests of creditors." The "best interest" standard provides for the appointment of a trustee if, after a generalized analysis, the benefits to the estate resulting from the appointment of a trustee would outweigh the harm (*i.e.* increased costs). See In re Ionosphere Clubs, Inc., 113 B.R. 164, 168

18

(Bankr. S.D.N.Y. 1990); see also In re William H. Vaughn & Co., Inc., 40 B.R. 524, 526 (Bankr. Pa. 1984).

52.     Absent conversion, appointing a chapter 11 trustee will provide significant benefits to the estate.[1]     The WMI Noteholders will vigorously oppose the Equity Committee's attempt to take over the Debtors.     Appointing a trustee will avoid this litigation—all of which will be paid for by the estate.     Further, the Equity Committee has filed the Examiner Motion which threatens to delay the case and exact substantial costs.     Appointing a trustee obviates the need for an examiner.     In addition, the costs are few.     The Debtors have no ongoing operations that management is needed to oversee, and the claims brought by the estate against the FDIC and JPMC are not in an advanced procedural posture.     A trustee should readily be able to pursue any estate litigation without substantial disruption, especially in light of the apparent failure of the settlement process, and will do so for the benefit of the estate, not for the benefit of equity.

---

[1] The WMI Noteholders believe that conversion of this case to one under chapter 7 is preferable to the appointment of a chapter 11 trustee. Among other things, there is no ongoing business and funding an expensive plan process potentially involving multiple plans makes no sense in a case such as this where the Debtors' assets consist of litigation claims and entitlements. Notwithstanding the foregoing, if the Court does not convert the case (which it should), appointing a disinterested chapter 11 trustee is in the best interests of the estate and its creditors because, among other things, it obviates the need for an examiner, prevents litigation with the Equity Committee over control of the Debtors and assures that these cases will not be run for the benefit of out of the money equity.

19

WHEREFORE, the WMI Noteholders respectfully requests that this Court enter an Order, pursuant to 11 U.S.C. § 1112(b), converting Debtors' chapter 11 reorganization into a chapter 7 liquidation. In the alternative, the WMI Noteholders respectfully request that this Court enter an Order, pursuant 11 U.S.C. § 1104(a) appointing a trustee to administer the Debtors' Estates.

Dated: May 4, 2010
Wilmington, Delaware

FOX ROTHSCHILD LLP

By: _____
Jeffrey M. Schlerf, Esq. (No. 3047)
Eric M. Sutty, Esq. (No. 4007)
Citizens Bank Center
919 North Market Street, Suite 1600
Wilmington Delaware 19801
Telephone: (302) 654-7444

-and-

WHITE & CASE LLP
Thomas E Lauria
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744

Gerard Uzzi
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

20

Of Counsel:
KASOWITZ BENSON TORRES & FRIEDMAN LLP
David S. Rosner
Paul M. O'Connor III
Adam L. Shiff
Seth A. Moskowitz
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700

Attorneys for the Washington Mutual, Inc. Noteholders
Group

21