**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| _____ | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 08-12229 (MFW) |
| WASHINGTON MUTUAL, INC., *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors | ) | |
| | ) | Related to Docket No. 2623 |
| _____ | ) | Hearing Date: May 19, 2010 @ 11:30 a.m. |

**OBJECTION OF THE CONSORTIUM OF TRUST PREFERRED
SECURITY HOLDERS TO DEBTORS' MOTION FOR APPROVAL OF
DISCLOSURE STATEMENT FOR THE JOINT PLAN OF AFFILIATED DEBTORS
PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

The consortium of holders of interests subject to treatment under Class 18 of the Plan (as defined herein) (the "TPS Consortium"[1]), by and through its undersigned counsel, hereby files this objection (the "Objection") to the Debtors' Motion (the "Motion") for an Order, Pursuant to Sections 105, 502, 1125, 1126 and 1128 of the Bankruptcy Code and Bankruptcy Rules 2002, 3003, 3017, 3018 and 3020, (i) Approving the Proposed Disclosure Statement (the "Disclosure Statement") [Docket No. 2623] and the Form and Manner of the Notice of the Disclosure Statement Hearing, (ii) Establishing Solicitation and Voting Procedures, (iii) Scheduling a Confirmation Hearing, and (iv) Establishing Notice and Objection Procedures for Confirmation

---

[1]	The TPS Consortium is made up of holders of interests (as set forth more fully in the group's Rule 2019 statement [Docket No. 3546], as such may be amended) proposed by the Debtors to be treated under Class 18 of the Plan -- described in the Plan and Disclosure Statement as the "REIT Series."  As is discussed in greater detail below, the REIT Series securities were purportedly exchanged, prior to the Petition Date, for certain Trust Preferred Securities issued by former affiliates of non-Debtor Washington Mutual Bank.

of the Debtors' Joint Plan (the "Plan") [Docket No. 2622].[2] In support of this Objection, the TPS Consortium respectfully represents as follows:

## PRELIMINARY STATEMENT

1.  These Cases were precipitated by the sudden government seizure and sale of the Debtors' banking operations (through non-Debtor subsidiary Washington Mutual Bank) -- representing the largest thrift failure in history -- for what many viewed (and continue to view) to be, and in fact was, a pittance compared to the value of the seized assets and operations. Indeed, against a purchase price of approximately $1.8 billion, it would appear that the purchaser, JP Morgan Chase Bank, National Association ("JPMC"), came away from the transaction with value far in excess of that price.

2.  Thereafter, the first sixteen months of these Cases were marked by the commencement, in various fora and by various parties, of litigation aimed at sorting through the debris from that collapse, seizure and sale. In addition to the numerous actions to which the Debtors were direct parties, there were also commenced, among other actions: (a) a third party suit alleging serious wrongdoing by JPMC (with the potential complicity of certain governmental agencies); and (b) an extensive Congressional investigation into the causes of WMB's collapse, the results of which have just recently been released. And, in connection with the various actions (which could have represented many billions of dollars in value), the Debtors initially postured, engaged in motion practice, and represented to the Court and stakeholders that they were vigorously pursuing rights and claims against third parties -- all under the auspices of returning to the estates significant value for the benefit of stakeholders.

---

[2] Capitalized terms not otherwise defined herein shall bear the meanings ascribed thereto in the Plan and/or Disclosure Statement, as applicable.

3.	A key controversy raised in multiple actions involved ownership of the Trust Preferred Securities, which could represent upwards of a $4 billion value swing.  This controversy involves: (a) secret side letters between WMI and the OTS; (b) alleged significant, undisclosed fraud at WMI and WMB at the time the Trust Preferred Securities were sold and resold in the marketplace; (c)  the post-collapse purported occurrence of a conditional exchange, which may not have been consummated and which otherwise may not be enforceable for a variety of reasons; and (d) the purported assignment of the Trust Preferred Securities from WMI to WMB after the assets and operations of WMB already had been seized and sold to JPMC.  Significant questions as to the actual ownership of the Trust Preferred Securities remain unanswered, as the Debtors concede in their own descriptions of the status of the purported conditional exchange and the subsequent purported "down streaming" of the Trust Preferred Securities to the WMB shell following the seizure and sale of WMB's assets and operations to JPMC.  But, what appears to be clear is that the Debtors and senior creditors of the WMI estates had a significant incentive to: (a) ignore the issue of whether the conditional exchange (purportedly bringing the Trust Preferred Securities into the WMI estate) had occurred; and (b) trade away the Trust Preferred Securities to JPMC in exchange for cash (cash to which, according to the Debtors' prior actions in connection with  these cases, the WMI estate was already entitled).

4.	Upon information and belief, neither the issues surrounding ownership of the Trust Preferred Securities, nor any of the other most significant claims and causes of action, were ever adjudicated or have even progressed to the point of meaningful (or, in some cases, any) discovery.  Nonetheless, in March 2010, the Debtors announced a prospective "settlement" of the

myriad claims and causes of action that had been the focal point of these cases, which settlement was later memorialized in the Plan.[3] That agreement, purportedly based on the Debtors' business judgment, would settle away potentially many billions of dollars in claims and actions of the Debtors' estates. Next, the Plan would purport to effectuate the various exchanges and assignments necessary to deliver the Trust Preferred Securities to JPMC, which transactions apparently were not closed prior to the commencement of these Cases. The Plan also seeks to compromise, without consent, the rights and claims of non-Debtors against other non-Debtors (including, importantly, claims against JPMC and others involved in the seizure and sale of WMB and against parties involved in the initial issuance and sale of the Trust Preferred Securities). Finally, under the Plan, insiders, JPMC and others would be afforded broad releases and exculpations, thereby putting the finishing touches on a whitewashing of the largest thrift failure in history, leaving significant portions of the Debtors' stakeholders with minimal or no recovery.

5.      But, the Disclosure Statement fails to explain why, after spending nearly a year and a half in chapter 11 and incurring significant professional fees, the Debtors suddenly chose to throw up their hands and abandon the effort to maximize stakeholder recoveries. The Disclosure Statement fails to explain what factors the Debtors considered before agreeing to compromise potentially valuable rights of the estates and, importantly, critical rights of non-Debtors against other non-Debtors. As such, the Disclosure Statement fails its primary purpose -- providing stakeholders with adequate information to consider the Plan and the compromises set forth therein. And, notwithstanding the Debtors' anticipated invocation of the "business judgment"

---

[3]      The TPS Consortium understands that one proposed party to the settlement, the FDIC, did not sign off on the Plan.

rule to gloss over the deficiencies of their disclosure and the proposed settlement, stakeholders are not required to "take the Debtors' word for it." Rather, under Bankruptcy Code Section 1125 and applicable case law, the Court and stakeholders are entitled to receive, in connection with the solicitation of stakeholder votes, an explanation of the Debtors' surrender -- information critical to an informed assessment of the Plan.

6. In particular, in order for stakeholders to make an informed decision as to whether to support or oppose confirmation of the Plan, the Debtors must provide at least the following:

- Disclosure regarding the current "ownership" of the Trust Preferred Securities.

- Disclosure regarding the current status (balances, performance, etc.) of the asset trusts underlying the Trust Preferred Securities, including whether dividend payments have been made during the pendency of these cases.

- Disclosure regarding what information and factors the Debtors considered before deciding to "settle" billions of dollars in estate claims and causes of action.

- Disclosure regarding what information and factors the Debtors considered before attempting to force the non-consensual "settlement" of billions of dollars in potential claims and causes of action held by third parties (including the members of the TPS Consortium).

- Disclosure regarding the identity of the parties who are purported to have negotiated the "settlement" on behalf of Class 18, including the origin of the $50 million payment from JPMC to members of Class 18 under the Plan; the apparent purpose of which is to "purchase" a release of claims against JPMC and others.

- Disclosure regarding how counsel for the Debtors and other case fiduciaries addressed conflicts of interest with respect to JPMC and others in negotiating a settlement that: (i) delivers significant additional value to JPMC; (ii) releases potentially valuable estate claims and causes of action against JPMC and others; and (iii) would release involuntarily valuable third party claims against JPMC and others.

- Disclosure regarding the estimated value to be delivered to classes alleged to be senior to Class 18 under the Plan, in particular holders of the PIERS interests.

---

- Disclosure regarding the value of the estate claims and causes of action that are to be compromised and/or retained by the reorganized Debtors.

- Disclosure regarding the estates' rights to billions of dollars in tax refunds, and what was considered before deciding to deliver the majority of those tax refunds to JPMC.

- Disclosure regarding the management and operation of the Liquidating Trust.

- A liquidation analysis by which stakeholders can gauge whether they are better off under the Plan or under a Chapter 7 liquidation.

7.      In addition to the significant deficiencies with the Disclosure Statement, the Plan described by the Disclosure Statement is unconfirmable on its face, and the estates should not be burdened with the expense of solicitation thereof.  By way of example,[4] the Plan purports to impose non-consensual releases of claims held by members of Class 18 against numerous non-Debtor parties, including JPMC, the Debtors' officers and directors, and third parties involved in the issuance of the Trust Preferred Securities.  The TPS Consortium believes the to-be-released claims have significant potential value, and forcible release of such claims would be violative of settled law in this Circuit and District, including this Court's decision in In re Coram Healthcare, 315 B.R. 321 (Bankr. D. Del. 2004).  Upon information and belief, JPMC (who, under the Plan, is to provide a token recovery (a little more than a penny on the dollar) to Class 18 to purchase the above-release) is not willing to perform under the proposed settlement agreement unless it is granted "global peace" for itself in the form of broad releases.  Given the extent to which JPMC has arrogated itself to the Plan process, if JPMC refuses to go forward, the Plan cannot be

_____

[4]      As discussed herein, the TPS Consortium believes the Plan suffers from other, fatal defects, each of which militates against expending estates assets and resources on solicitation.

consummated. As such, as a matter of law and/or fact, the Plan is incapable of confirmation and solicitation should not be allowed.

## BACKGROUND

**A.       The Trust Preferred Securities.**

8.       Beginning in March 2006 and continuing through October 2007, Debtor WMI and WMB raised approximately four billion dollars in capital with the issuance, through subsidiaries, of what have been referred to as the "Trust Preferred Securities."[5]

9.       In simplified terms, these Trust Preferred Securities were structured as follows:

    a.  WMB contributed certain collateralized home equity loans and other loans to non-Debtor Washington Mutual Preferred Funding, LLC ("WMPF"), in exchange for 100% of the common equity of WMPF.

    b.  WMPF then contributed such loans (upon information and belief, having an initial aggregate value of approximately $13.5 billion) to dedicated asset trusts, of which WMPF was the sole beneficiary.

    c.  WMPF then issued preferred shares, having an aggregate liquidation preference of $4 billion, to two special purpose entities, WaMu Cayman and WaMu Delaware (each, an "SPE").

    d.  The SPEs then issued preferred interests of their own (i.e., the Trust Preferred Securities) to investors in exchange for $4 billion.

    e.  That $4 billion from investors was funneled up to WMB for its corporate uses, leaving the investors holding the Trust Preferred Securities and an entitlement to specified periodic payments (with, ultimately, a $4 billion liquidation preference against the value of the loans in the asset trusts).

---

[5]       Each of the TPS Consortium members is a purchaser of such securities or the successor of a purchaser of such securities.

10.     An unusual, but disclosed, feature of the Trust Preferred Securities was that upon the occurrence of certain events (primarily tied to the financial condition of WMB), the Trust Preferred Securities were subject to a "conditional exchange" whereby investors could be issued preferred interests in WMI in exchange for their Trust Preferred Securities holdings.[6]  As a result, upon the effectuation of a conditional exchange, the investors would hold preferred interests in WMI (i.e., the REIT Series), with WMI then holding the Trust Preferred Securities (leaving the investors with a continuing, albeit indirect, entitlement to the value of the asset trusts).

11.     An even more troubling and shocking aspect of the Trust Preferred Securities' issuance, and, critically, one that it appears was not disclosed until after the collapse of WMB, was a series of secret side letters related to the Trust Preferred Securities.  More specifically, in connection with each of the individual issuances of the Trust Preferred Securities by WMPF, WMI sent an undisclosed letter to the Office of Thrift Supervision (the "OTS"), committing, upon the occurrence of a conditional exchange event, to downstream immediately the newly-obtained Trust Preferred Securities to WMB.  It appears these secret side letters were not revealed to the initial investors, the marketplace, or to secondary purchasers of the Trust Preferred Securities until some time after September 25, 2008.

12.     Third parties involved in the structuring and issuance of the Trust Preferred Securities include: (a) Goldman, Sachs & Co.; (b) Citigroup; (c) Credit Suisse; (d) HSBC (e) Morgan Stanley; and (f) UBS Investment Bank.

---

[6]     Events potentially giving rise to a conditional exchange included: (i) WMB becoming undercapitalized under the OTS's "prompt corrective action" regulations; (ii) WMB being placed into conservatorship or receivership; or (iii) the OTS, in its sole discretion, directing such exchange in anticipation of WMB becoming "undercapitalized" in the near term or taking supervisory action that limited payment of dividends, as applicable, by WMB, and in connection therewith, directing such an exchange.

**B.** **Factors Precipitating These Cases.**

13.     Ultimately, these cases were precipitated by the unexpected closure of WMB by the OTS on September 25, 2008 -- making WMB the largest thrift failure in history.  That closure was followed immediately by the FDIC's seizure and sale to JPMC of WMB's assets and operations in exchange for approximately $1.8 billion on September 25, 2008.

14.     On April 13 and 16, 2010, public hearings before the Senate Committee on Homeland Security and Governmental Affairs – Permanent Subcommittee on Investigations (the "Senate Subcommittee") indicated that, in the years leading up to WMB's collapse, there had been an unprecedented break-down in oversight, both within the bank and with respect to the government agencies charged with regulating WMB, potentially resulting in: (a) unchecked reckless business practices at WMB; and (b) massive fraud in WMB's loan underwriting and origination functions.

15.     The alleged fraud involved actions ranging from concealment of significant internal controls issues to actual forgery of loan documentation.  The alleged reckless business practices centered on the Debtors' pursuit of profits at the expense of sound judgment, including through: (a) concentration of WMB's loan origination efforts in high-risk products such as "stated income" or "liar loans" (where applicants' incomes are not verified) and "option ARM loans" (where borrowers are allowed to choose payments not even covering the monthly interest expense, thereby causing the loan balance to grow each month); (b) directing appraisal assignments to firms that would consistently deliver appraisals supporting the requested loan, notwithstanding the actual value of the property; and (c) concentration of origination efforts in certain states (e.g., Florida and California) where property values were known to be appreciating

_____

more quickly than in other parts of the country, thereby disguising the problems that would come to roost when property values leveled off and borrowers found themselves unable to sell the property or afford the mortgage payments.

16.     As WMB was a chartered thrift bank, the OTS was its primary federal regulator. The Senate Subcommittee's hearings and reports, however, also made very clear the failures of the OTS to discharge its duties to investigate and regulate WMB, thereby facilitating the behavior that has been cited as leading to WMB's demise.  OTS, a significant portion of whose operating budget resulted from audit fees charged to WMB, was ridiculed by the Senate Subcommittee for treating WMB as a favored customer rather than a regulated entity.  During the Senate Subcommittee hearings, it was even suggested that criminal liability might attach with respect to the OTS's failed oversight of WMB.

17.     Importantly, from the perspective of investors in the Trust Preferred Securities, public statements by senior officials of WMI and WMB during the period of 2006 through the collapse of WMB now appear to have been inconsistent with the mounting internal risks and problems (of which, upon information and belief, management was well aware).  Plaintiffs in an action currently pending in the District Court for the Western District of Washington have cited to numerous such statements regarding capital adequacy[7] and internal procedures as being misleading and/or fraudulent.

18.     But, notwithstanding misleading statements by management to the contrary, the effects of the alleged fraud, reckless business practices, and incompetent oversight began to

---

[7]     Based on information currently available, it would appear that management statements regarding WMB's capital adequacy may have been premised, at least in part, on giving effect to the fraudulently undisclosed side letters between WMI and the OTS regarding the "down streaming" of the Trust Preferred Securities to WMB.

manifest themselves in the fourth quarter of 2007, when the Debtors suffered quarterly losses of over $1 billion, tied primarily to loan losses and reserve requirements at WMB, as many of the risky loans issued in prior years had to be recognized as non-performing. This was followed by a similar loss in the first quarter of 2008.

19. The Debtors' downward spiral was temporarily abated when, in April 2008, Texas Pacific Group made a $7 billion investment in Debtor WMI. In connection with that investment, the Debtors were forced to agree to severe limitations on their ability to conduct future capital raises. But, even with the $7 billion capital infusion, the toll taken by the fraud, mismanagement and incompetent regulation was unavoidable. Following the failure of competitor IndyMac Bank in July 2008, rumors began to spread in the marketplace that WMB was also on the verge of collapse.[8] And, with approximately 25% of the Federal deposit insurance fund having been consumed by the IndyMac failure, customers grew concerned that the failure of WMB, a much larger institution, would deplete available insurance and leave depositors with significant losses. WMB began to lose deposit assets in mid-2008 as customers moved their funds to institutions perceived to be more sound. Then, following the failure of Lehman Brothers on September 15, 2008, WMB lost approximately $16.7 billion in deposits in a little over a week's time.

**C.    The Collapse Of WMB And Purported Transfers Of The Trust Preferred Securities.**

20. The OTS closed the bank on September 25, 2008, handing it off to the FDIC to be administered in a receivership under Title 12 of the United States Code. The FDIC, which had

---

been in undisclosed discussions with JPMC regarding WMB, quickly sold off WMB's assets to JPMC on that same day in exchange for approximately $1.8 billion.

21. Also on September 25, 2008, WMI issued a press release stating that the conditional exchange of the Trust Preferred Securities had been triggered. On the same day (but, it appears, after the FDIC had sold WMB's assets to JPMC), an employee of WMI apparently executed an assignment agreement purporting to agree to transfer the Trust Preferred Securities from WMI to WMB. By the terms of the Trust Preferred Securities themselves, it appears that the conditional exchange bringing the Trust Preferred Securities into WMI (assuming, _arguendo_, that a valid, enforceable transaction occurred) could not actually have been effective until 8:00 a.m. on the following day, September 26, 2008.

22. The TPS Consortium is investigating whether either the conditional exchange or the assignment of the Trust Preferred Securities from WMI to WMB actually occurred and/or should be given effect. By their own words and actions, the Debtors apparently concede that these transactions were not consummated. For example:

- In their monthly operating reports, the Debtors discuss the conditional exchange as follows:

  > WMI and its advisors currently are assessing a number of legal, accounting and tax issues related to the [Trust Preferred Securities] and the transactions related to the Conditional Exchange. Because of these unresolved issues, WMI has not reflected the Conditional Exchange and/or its attendant transactions on its financial statements, including any possible interest (direct or indirect, contingent or otherwise) in the [Trust Preferred Securities] and the assets, as the case may be, of Washington Mutual Preferred Funding, LLC.

---

[8] As discussed further herein, in the Texas Action, it was alleged that JPMC was responsible for leaking false information to the public, thereby negatively affecting confidence in WMB.

See e.g., Monthly Operating Report for Washington Mutual, Inc., et al. for the Period March 1, 2010 through March 31, 2010, Note 3. [Docket No. 3606].

- Beginning with the monthly operating report issued after announcement of the proposed Global Settlement, the Debtors added the following further description of the state of the conditional exchange in relation to the Plan and proposed settlement:

    Pursuant to the terms of the proposed Settlement Agreement, upon consummation of the Plan, WMI and relevant third parties will complete the Conditional Exchange.

    See Monthly Operating Report for Washington Mutual, Inc., et al. for the Period February 1, 2010 through February 28, 2010, Note 3. [Docket No. 2737].

- In the Global Settlement Agreement (discussed infra) itself, the Debtors recognize that neither the conditional exchange nor the transfer of the Trust Preferred Securities from WMI to WMB was consummated:

    . . . (f) any and all persons and entities shall be authorized and directed to take necessary, proper or advisable actions and all other actions reasonably requested or directed by JPMC to record, reflect, transfer, vest, assign, convey, and maintain, as necessary, that a transfer of the Trust Preferred Securities was made to WMI (and subsequently by WMI to JPMC) and that JPMC is the sole legal, equitable, and beneficial owner of the Trust Preferred Securities as transferee of WMI, including, without limitation, by: (i) causing the applicable trustees, registrars, paying agents, depository, and transfer agents to amend their records (including the securities registers of each Issuing Trust) to reflect a transfer of the Trust Preferred Securities to WMI and then to WMB, and to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities; (ii) causing the trustees and boards of directors of the Issuing Trusts to take all necessary, proper and advisable action to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities; and (iii) amending any agreements, articles, or declarations to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities . . . .

    See Proposed Global Settlement Agreement, § 2.3(f).

**D.      Procedural Background.**

23.     On the heels of the seizure and sale of WMB, the Debtors filed these Cases on September 26, 2008 (the "Petition Date").  To date, the Debtors remain in possession of their assets and continue in control of their operations pursuant to Bankruptcy Code Section 1107.  No trustee or examiner has been appointed, although the Court denied a request for appointment of an examiner by Order dated May 5, 2010 [Docket No. 3663] and a motion for appointment of a trustee (as an alternative to conversion of these cases to Chapter 7) is pending and scheduled to be heard on June 3, 2010.  [Docket No. 3651]

24.     The official committee of unsecured creditors (the "Creditors' Committee") was appointed by the U.S. Trustee on October 15, 2008.  [Docket No. 78].  An official committee of equity security holders (the "Equity Committee") was appointed by the U.S. Trustee on January 11, 2010.  [Docket No. 2130].

25.     On or about March 12, 2010, lead counsel for the Debtors announced in open Court a proposed "global settlement" of myriad actions and litigations, which, to that point, had been a focal point in these Cases.  On March 26, 2010, the Debtors filed the Disclosure Statement and Plan, and then on April 23, 2010, filed the Motion seeking to schedule, among other matters, a confirmation hearing on July 20, 2010.  [Docket No. 3568].[9]

**E.      Material Litigation Related To These Cases.**

26.     Following the Petition Date, there were significant disputes related to the collapse and sale of WMB and the Chapter 11 filings by the Debtors, including disputes over the ownership of the Trust Preferred Securities, disputes regarding the status of approximately $4 billion in deposit accounts at WMB on the date of the seizure and sale, and claims against the

---

[9]     As noted above, upon information and belief, not all parties critical to implementation of the Global Settlement (e.g., the FDIC) have signed off on the agreement.

FDIC for the manner in which the seizure and sale of WMB's assets and operations were conducted (representing potentially many billions of dollars in lost value), and other issues potentially representing billions more in potential value.

27.     These disputes manifested themselves in a number of different pieces of litigation, including:

- **The JPMC Adversary Proceeding** – In March 2009, JPMC sought declaratory judgment that it had full legal title to the beneficial interests in various assets it claimed to have purchased in the wake of WMB's collapse and seizure, including:

    o   The Trust Preferred Securities – valued at upwards of **$4 billion**.

    o   Tax refunds payable to Debtor WMI – upwards of **$5.8 billion**.

    o   Deposit accounts owned by Debtor WMI – upwards of **$4 billion**.

    o   Goodwill litigation proceeds – approximately **$55 million**.

    o   Shares in Visa U.S.A, Inc. – **value currently undisclosed.**

- **The Debtors' Counterclaims in the JPMC Adversary Proceeding** – The Debtors initially opposed JPMC's efforts to obtain estate assets by filing a series of counterclaims in the JPMC Adversary proceeding.  In addition to mirror-image claims to the assets listed above, the Debtors' counterclaims included:

    o   Avoidance and recovery of prior capital contributions from WMI to WMB, which value was transferred to JPMC – estimated at **$6.5 billion**.

    o   Avoidance and recovery of preferential transfers made to or on behalf of WMB during the one-year period prior to the Petition Date – **unliquidated**.

    o   Turnover of intercompany amounts due – approximately **$690 million**.

    o   Seeking a declaration that, under applicable law, the Trust Preferred Securities were never assigned to WMB.

- **The D.C. Action** – In March 2009, the Debtors commenced an action in the District Court for the District of Columbia.  In this action, the Debtors sought appellate review

of previously-filed claims against the WMB receivership estate and damages against the FDIC, including:

- Demanding compensation for the Debtors' equity value in WMB.

- Demanding recognition of the Debtors' ownership of certain assets claimed by the FDIC.

- Seeking avoidance of the transfer of the Trust Preferred Securities from WMI to WMB, and recovery of the Trust Preferred Securities.

- Demanding compensation for intercompany amounts owed by WMB to the Debtors.

- Seeking damages equal to the difference between the price paid by JPMC for the assets of WMB (approximately $1.8 billion) and the value that could have been received had the FDIC conducted the sale in a more appropriate manner (presumably many billions of dollars or more).

- Seeking damages under the Federal Tort Claims Act for conversion of estate property.

- **The Turnover Action** – In April 2009, the Debtors commenced an adversary proceeding seeking turnover from JPMC of the above-mentioned $4 billion in disputed deposit accounts.

28.     Presumably, in filing the above actions, claims and counterclaims, the Debtors and their professionals believed their positions to be meritorious and consistent with their respective ethical and legal obligations.

F.     **The Debtors' Investigation Of Potential Claims And Causes Of Action.**

29.     Approximately one year ago, based in large part on the allegations against JPMC raised in an action commenced by third parties in Texas state court (the "Texas Action"), the Debtors filed a motion seeking Rule 2004 discovery of JPMC.  [Docket No. 974].  In the Texas Action, stakeholders of WMI and WMB sought the recovery of billions of dollars from JPMC, alleging, among other matters, that:

- JPMC executed a premeditated plan to damage two of Debtor WMI's most valuable assets – WMB and WMB fsb – so as to facilitate a distressed sale of the assets to the detriment of the Debtors' estates.

- JPMC engaged in "sham negotiations" with WMI to elicit confidential information, which information JPMC is alleged to have misused in violation of confidentiality restrictions.

- JPMC leaked false information to news media, which incited the "run" on WMI by depositors that eventually served as the justification for regulators to seize and sell the assets to JPMC.

- JPMC coerced the FDIC and OTS into facilitating the sale of WMB to JPMC at a "fire sale" price, including by dictating the bidding procedures so as to prevent a value-maximizing, competitive process.

- JPMC misused access to government regulators to gain a competitive advantage and wrongfully influence government policy and actions with respect to WMI.

30.    In seeking to investigate JPMC's role in the collapse of WMB, the Debtors' stated that the requested Rule 2004 examination of JPMC would "permit the Debtors – as estate fiduciaries – to determine, in the most efficient manner, the validity of certain potentially significant claims." See Debtors' Response to JPMC Objection, para. 5. [Docket No. 1036]. By Order dated June 24, 2009, the Court authorized the Debtors to engage in such discovery. [Docket No. 1220].

31.    Thereafter, as recently as December 2009, the Debtors sought to expand their investigation of JPMC through Rule 2004 discovery of other parties with knowledge of JPMC's role relative to WMB's collapse, including various regulatory bodies cited in the Texas Action. That request was denied by Order dated February 16, 2010, presumably without prejudice to the Debtors seeking discovery from the various parties in connection with already-pending litigation. [Docket No. 2366].

32.     But, it appears the Debtors have yet to take appropriate steps to seek or obtain formal discovery of the OTS, the FDIC or other parties with potential knowledge of possibly valuable claims and causes of action against JPMC, the OTS, the FDIC or other parties proposed to receive releases under the Plan.  Indeed, based on statements of counsel for the Debtors and the Creditors Committee at the May 5, 2010 omnibus hearing, it would appear that minimal or no discovery has been conducted to date in connection with the various pending actions or potential actions.  In fact, despite the many billions of dollars at stake, it would appear that no substantive depositions have been taken and as few as 70,000 pages of JPMC documents (in total) have been obtained and reviewed by the estate fiduciaries who now advocate so vociferously in favor of the Global Settlement.

**G.     Estate Fiduciaries' Conflicts Of Interest
          Regarding JPMC And Other Released Parties.**

33.     At the May 5, 2010 omnibus hearing, in arguing against the Equity Committee's request for appointment of an examiner, both lead counsel for the Debtors and lead counsel for the Creditors Committee (a party to the Global Settlement Agreement) each stated that an examiner was unnecessary because they had, collectively, expended many thousands of hours reviewing the minimal documents produced by JPMC and analyzing issues related to the Global Settlement (including the release of claims against JPMC and others).  But, lead counsel for the Debtors and the Creditors Committee have each disclosed significant conflicts of interest with respect to JPMC based on those firms' past, current and/or expected future representations of JPMC and/or affiliates of JPMC in other matters.  See Affidavit of Brian Rosen, pp. 7-8 [Docket No. 64]; Affidavit of Fred Hodara, Schedule 2, p. 11 [Docket No. 260].  The Debtors' lead counsel was so conflicted with respect to JPMC that the estates were compelled to retain a

second law firm, Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), to represent them in connection with potential litigation against JPMC. But, it is not clear from the Disclosure Statement that Quinn Emanuel played any substantive role in the negotiations that led to the Global Settlement agreement, including negotiations to resolve claims associated with the Trust Preferred Securities.

34. It also appears that lead counsel for the Debtors may have ongoing client relationships with the OTS and FDIC, each of whom would also be given broad releases from liability under the Plan. See Affidavit of Brian Rosen, p. 7 [Docket No. 64]. And, lead counsel for the Creditors Committee appears to represent the FDIC in other matters as well. See Affidavit of Fred Hodara, Schedule 2, p. 11 [Docket No. 260].

35. Finally, upon information and belief, both lead counsel for the Debtors and lead counsel for the Creditors Committee have ongoing client relationships with parties (and/or affiliates thereof) involved in the issuance and sale of the Trust Preferred Securities, including Goldman, Sachs & Co., Citigroup, Credit Suisse, Morgan Stanley and UBS Investment Bank. Each of these parties are proposed to receive broad releases of claims related to their roles in the issuance and sale of the Trust Preferred Securities (including, presumably, claims related to their failure to uncover or disclose the apparently pervasive fraud at WMI and WMB during the 2006 to 2007 period or the secret side letters between WMI and the OTS concerning the Trust Preferred Securities).

36. It would appear that no estate fiduciary was represented by unconflicted counsel in the negotiations resulting in the Global Settlement (including resolution of claims regarding the Trust Preferred Securities), from which JPMC and others emerged with significant additional

value and/or valuable releases – with JPMC slated to walk away with ownership of the Trust Preferred Securities.

**H.    The Plan's Proposed "Settlement" Of Estate and Third Party Rights.**

37.    The centerpiece of the Plan is the Global Settlement, pursuant to which the Debtors would propose to deliver billions of dollars in additional value to JPMC, including: a) the Trust Preferred Securities; b) approximately $3.6 to $3.8 billion attributable to disputed tax refunds; c) proceeds of certain goodwill litigation, totaling approximately $55 million; d) WMI's shares of Visa, Inc.; e) intellectual property of an unknown value; and f) WMI's ownership interest in certain green energy projects.

38.    In addition to the above direct value proposed to be given to JPMC, the Global Settlement would also grant to JPMC valuable releases.  The proposed broad releases would pertain to estate claims and causes of action (which, in the aggregate, could be worth many billions of dollars).  Through the Global Settlement, the Debtors also seek to walk away from potentially valuable claims against the FDIC, the OTS and others – which claims themselves could be worth billions of dollars.  In addition, the Global Settlement would also seek to compromise the rights and claims of non-Debtors against JPMC and others (the value of which cannot be accurately gauged based on the information currently available).

## ARGUMENT

**A.    The Disclosure Statement Fails To Provide
Stakeholders With Adequate Information, As Required
By Bankruptcy Code Section 1125, And, Must Not Be Approved.**

39.    The Disclosure Statement should not be approved because it contains inadequate information concerning crucial aspects of the Plan, the Global Settlement, and the negotiations

thereof by potentially-conflicted estate fiduciaries, and therefore fails to satisfy the requirements of Bankruptcy Code Section 1125.

40.     The Bankruptcy Code requires a disclosure statement to contain "adequate information," that is, "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan . . ."  11 U.S.C. § 1125(a)(1) and (b); see also Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"), cert. denied, 488 U.S. 967 (1988); In re Scioto Valley Mortgage Co., 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988) ("The disclosure statement was intended by Congress to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization.").  As the legislative history of Bankruptcy Code Section 1125 notes:

> If adequate disclosure is provided to all creditors and stock holders whose rights are to be affected, then they should be able to make an informed judgment of their own rather than having a court or the Securities Exchange Commission inform them in advance whether the proposed plan is a good plan.

House Rep. No. 95-595, 95th Cong., 1st Sess.226-31 (1977).

41.     The provision of adequate information is at the very heart of the reorganization process.  In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  As such, "[a] disclosure statement . . . is evaluated . . . in terms of whether it provides sufficient information to permit enlightened voting by holders of claims or interest."  In re BSL Operating Corp., 57 B.R. 945, 950 (Bankr. S.D.N.Y. 1986).  A court should examine each disclosure

statement individually to discern whether the Bankruptcy Code's "adequate information" requirement is satisfied. See In re Worldcom, Inc., 2003 WL 21498904, *10 (S.D.N.Y. June 30, 2003) ("the approval of a disclosure statement . . . involves a fact specific inquiry into the particular plan to determine whether it possesses 'adequate information' under § 1125") (quoting In re Ionosphere Clubs, 179 B.R. at 29).

42. The principal of adequate disclosure requires, among other things, "information relevant to the risks posed to creditors under the plan." In re Phoenix Petroleum Co., 278 B.R. 385, 393 n.6 (Bankr. E.D. Pa. 2001) (citing In re Metrocraft Pub. Servs., Inc., 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)); see also In re Radco Props., Inc., 2009 WL 612149, *12 (Bankr. E.D. N.C. Mar. 9, 2009) ("Creditors not only rely on the disclosure statement to form their ideas about what sort of distribution or other assets they will receive but also what risks they will face.").

43. Where the centerpiece of a proposed plan is the settlement of numerous, complex disputes, the plan proponent should be required to disclose to stakeholders exactly what is being compromised and the reasons therefore. See e.g., In re PC Liquidation Corp., 383 B.R. 856, 865 (Bankr. E.D.N.Y. 2008) (approving disclosure regarding settlement that "fairly communicated the specifics of the Settlements, including the reasons behind the Settlements and the merits of the potential litigation behind those Settlements."). In this regard, stakeholders should be given facts, rather than just the opinions of those who would seek to implement the settlement. See In re East Redley Corp., 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982) ("opinions without factual support are not proper content of a disclosure statement and do not provide the parties voting on the plan with adequate information" within the meaning of Bankruptcy Code Section 1125).

        1.        **The Disclosure Statement Lacks Adequate Information Regarding The Debtors' Decision To Enter Into The Proposed Global Settlement.**

44.     The Plan is predicated upon the Court's approval of the Global Settlement, which, as discussed above, delivers significant additional value to JPMC and would result in the release of potentially valuable estate claims (numerous of which are the subject of pending litigation) and third party claims against JPMC, the FDIC, the OTS, parties involved in the issuance and sale of the Trust Preferred Securities, insiders of the Debtors, and numerous other parties.

45.     The members of the TPS Consortium are troubled by the fact that, up until fairly recently, the Debtors gave every indication that the claims they had asserted and positions that had been taken in various actions related to these potential claims were meritorious and worth expenditure of the tens of millions of dollars in professional fees rung up by professionals for the various estate fiduciaries.  The Debtors certified as much by the filing of their various pleadings and claims.

46.     Then, suddenly (as it turns out, shortly after the windfall in late 2009 resulting in incremental billions of dollars in tax refunds), the Debtors threw up their hands and announced the Global Settlement, through which the Debtors seek to concede nearly every point of significance.  And now the Debtors ask stakeholders to sign off on this apparent retreat and surrender mentality with only the thinnest of explanations as to why the Debtors suddenly changed course.  In seeking to justify the Global Settlement, the Debtors provide only conclusory, unsubstantiated catch-phrases:

> After months of litigation and careful analysis of the merits of their claims and the claims asserted against them by JPMC, the FDIC Receiver, and FDIC Corporate, among others, the Debtors have concluded that, because of the substantial expense of litigating the issues associated with their claims, the length of time necessary to resolve each of the issues presented in the pending litigation, the complexity and uncertainty involved and the corresponding disruption of their efforts to make distributions for the benefit of their creditors, it

> is in their best interests, and the best interests of their stakeholders, to [enter into the Global Settlement].

Disclosure Statement, p. 7.

> The Debtors, in the exercise of their business judgment, have determined that the benefits of settling with the JPMC Entities, the FDIC Receiver, the FDIC Corporate, and other parities to the Proposed Global Settlement Agreement, far outweigh any gains that may be achieved by continuing litigation with such parties, particularly in light of the expense of litigation and the risks and uncertainties associated therewith.

Disclosure Statement, p. 8.

47.     As the Debtors are seeking cover for themselves, through the Plan process, to walk away from potential billions in recoveries on claims previously asserted, stakeholders being asked to bless the transaction deserve to know: (a) the state of the various litigations and the amount of discovery conducted in each; (b) exactly what was involved in the Debtors' "careful analysis" of their claims and claims asserted against them; (c) what other potential claims the Debtors uncovered through their limited Rule 2004 discovery; (d) how much the Debtors estimate it would cost to litigate the claims at issue; (e) how long it would take to litigate the claims at issue; and (f) the total value of the claims and other assets sought to be compromised through the Global Settlement.

48.     Stakeholders, especially those proposed to be treated in Class 18, should also be informed as to exactly what the Debtors considered before acquiescing to a proposed release of stakeholder claims against non-Debtors.  Additionally, the Debtors should disclose the origin of the proposed $50 million payment from JPMC to Class 18, as none of the Debtors, nor the other parties with whom the TPS Consortium has spoken have been able to explain the genesis or the

negotiating history of this feature of the Global Settlement – the clear purpose of which is to attempt to justify the non-consensual third party releases.

49.     Stakeholders should also be provided with disclosure regarding other aspects of the Global Settlement, including: (a) the value of WMI Investment's indirect membership interest in JPMC Wind Investment Portfolio LLC; (b) the value of the Visa Shares; (c) the value of the Visa Agreement; (d) the estimated amount of the various liabilities purported to be assumed by JPMC, including information regarding any pre-existing obligations of JPMC with respect to those liabilities; (e) the value of the various insurance polices and benefit plans to be delivered to JPMC; (f) the estimated amount of any obligations or claims purported to be forgiven or waived by JPMC under the Global Settlement; and (g) the estimated amount of total Plan distributions purported to be funded by JPMC.

> **2.     The Disclosure Statement Lacks Adequate Information Regarding The Conflicts Of Interests Under Which Counsel For Estate Fiduciaries Have Been Operating, And How Those Conflicts Of Interest Were Accounted For In The Negotiation Of The Global Settlement.**

50.     Lead counsel for the Debtors and lead counsel for the Creditors Committee (a signatory to the Global Settlement) have in recent weeks been very vocal in their efforts to convince the Court that they have diligently discharged their duties, as estate fiduciaries, in considering the Global Settlement.  But, it appears each has been operating under potentially disabling conflicts of interest with respect to other settlement parties and parties proposed to receive releases under the Plan and/or Global Settlement, including at least: (a) JPMC; (b) the FDIC; (c) the OTS; (d) Goldman, Sachs & Co.; (e) Citigroup; (f) Credit Suisse; (g) Morgan Stanley; and (h) UBS Investment Bank.

51.     As the foregoing parties are to be granted significant benefits and/or value under the Global Settlement, stakeholders should be informed about the conflicts of interest and what steps, if any, were taken to remedy those conflicts in the negotiations of the proposed deal.

**3.     The Disclosure Statement Lacks Adequate Information Regarding The True, Current Ownership Of The Trust Preferred Securities.**

52.     Throughout these cases, significant issues regarding the true ownership of the Trust Preferred Securities have been raised by multiple parties.  And, the Debtors have, since the beginning of these cases, conceded that the purported conditional exchange by which such securities were alleged to have been brought into the WMI estate was never consummated.  Yet, through the Global Settlement, the Debtors would seek to have, first, the conditional exchange effected and, second, the subsequent transfer of this $4 billion in value over to JPMC.

53.     Upon information and belief, ownership of the Trust Preferred Securities may still reside in the hands of investors.  In the event it is determined that such is the case, the Trust Preferred Securities would not be part of the Debtors' estates, nor assets to which either WMB or JPMC legitimately can claim ownership, nor assets JPMC could acquire through the Plan.  And, stakeholders proposed to be treated in Class 18 (who would constitute the current investors in whose hands the Trust Preferred Securities remain) should be provided full disclosure of their potential ownership interests in the Trust Preferred Securities as well as the attempted arrogation to those interests by the Debtors and JPMC under the Plan.

**4.     The Disclosure Statement Is Defective in Other Material Respects.**

54.     In addition to the foregoing, the Disclosure Statement is also defective, inter alia, in the following respects:

- The Disclosure Statement does not currently include a liquidation analysis.

- The Disclosure Statement fails to provide an estimate of the total professional fees proposed to be paid under the Plan (both of estate fiduciaries and of settlement parties whose professional fees the Debtors propose to pay).

- The descriptions in the Disclosure Statement (and accompanying proposed ballots for Class 18) of the ability (if any) to opt out of granting third party releases appear to be at odds with the corresponding provisions of the Plan (which seem to indicate there is no "opt out" option). If, in fact, there is an ability to opt out of releases, stakeholders, particularly those in Class 18, should be provided adequate information as to the rights and claims the Plan would have them release and clarification as to how such opt out rights may be exercised.

- The Disclosure Statement fails to provide adequate information regarding the stock JPMC may elect to deliver to Class 18 in lieu of cash.

**B.     The Disclosure Statement Should Not Be Approved Absent Correction Of Critical Defects That Render The Plan Not Confirmable As A Matter Of Law.**

55.     There is ample authority for the Court to consider fundamental legal objections to confirmation at this point in the proceedings. See, e.g., In re Quigley Co., 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the [motion] to approve the disclosure statement must be denied, as solicitation of the vote would be futile.") (internal citations omitted); In re Filex, Inc., 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) ("A court approval of a disclosure statement for a plan which will not, nor can not, be confirmed by the Bankruptcy Court is a misleading and artificial charade which should not bear the imprimatur of the court."); In re Felicity Assocs., Inc., 197 B.R. 12, 14 (Bankr. D. R.I. 1996) ("It has become standard Chapter 11 practice that when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face."); In re Curtis Center Ltd. P'ship., 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996) ("[T]he Court notes its agreement

with the proposition that a disclosure statement should be disapproved where the plan it describes is patently unconfirmable").

56. In this case, certain features of the Plan render it unconfirmable and therefore require that the Disclosure Statement not be approved absent correction. Specifically, the Plan is unconfirmable because, among other things: (a) the Plan is premised upon the nonconsensual release of third party claims, a concept this Court and other courts have rejected; and (b) the Plan is premised upon the "sale" of property that may not belong to the estates.

### 1.    The Plan Cannot Be Confirmed To The Extent It Involves The Non-Consensual Release Of Non-Debtor Claims Against Other Non-Debtors.

57. As this Court correctly noted in In re Coram Healthcare, 315 B.R. 321, 335-37 (Bankr. D. Del. 2004), the Bankruptcy Code does not provide bankruptcy courts with the jurisdiction or power to compel the release of claims by non-Debtors against other non-Debtors. Yet, Sections 42.3, 42.4, 42.6, 42.7, 42.8, 42.9 and 42.10 of the Plan would purport to compel the release by stakeholders of claims against third parties, including JPMC, the FDIC, the OTS, parties involved in the issuance and sale of the Trust Preferred Securities, and myriad other parties.

58. These compelled release provisions are violative of existing law, and cannot be approved. Upon information and belief, the Global Settlement is contingent on the granting of such releases. As such, the failure of the proposed releases renders the Plan unconfirmable.

### 2.    The Plan Cannot Be Confirmed To The Extent

**Consummation Depends On Transfer Of Non-Estate**
**Assets Or Value, Such As The Trust Preferred Securities.**

59.     One of the key components of the Global Settlement is the transfer of the Trust

Preferred Securities from their current owners to JPMC.  As noted above, significant questions

exist as to the status of the "conditional exchange" transaction by which the Trust Preferred

Securities might have been brought into the WMI estate.  To the extent the conditional exchange

was not effectuated (as the Debtors appear to concede) or, alternatively, should not be given

effect, the actual true owners of the Trust Preferred Securities are the non-Debtor investors who

purchased them, either originally or in the secondary market, and who currently hold such

interests.  By asking this Court to tear the Trust Preferred Securities from the hands of their

current owners, the Debtors would ask this Court to exceed the jurisdiction and authority granted

it by Congress.

60.     As such, unless and until the ownership and appropriate status of the Trust

Preferred Securities is adjudicated, any Plan resting on the transfer of those interests to JPMC

cannot be confirmed and solicitation should not be allowed.

## TPS CONSORTIUM LETTER

61.     In some cases, certain aspects of disclosure statement objections may be resolved

by permitting the objector to separately state its view of the proposed plan.  Accordingly,

notwithstanding the legal defects in the Plan, should the Court nonetheless approve the

Disclosure Statement for solicitation, the TPS Consortium respectfully requests that it be

permitted to provide a letter enclosure to the Disclosure Statement reflecting the TPS

Consortium's views as described herein, including the right to make a recommendation to vote

against acceptance of the Plan.  See In re Motor Coach Industries, Inc. (Bankr. D. Del. 2008,

Case No. 08-12136) (Transcript of Hearing dated December 17, 2008, pp. 44:7 – 46:21 (allowing creditors' committee to include in solicitation package a letter outlining the committee's issues with the proposed plan); In re Tucker Freight Lines, Inc., 62 B.R. 213, 215, 215 n.1 (Bankr. W.D. Mich. 1986) (the bankruptcy court permitted a creditors' committee objecting to a disclosure statement to include in the ballot package a letter recommending that creditors vote against acceptance of the plan); In re Federated Department Stores, Inc., 1992 Bankr. LEXIS 392, *7 (Bankr. S.D. Ohio Jan. 10, 1992) (where solicitation packages included a letter from the appropriate creditors' committee recommending a vote in favor of the plan).

**RESERVATION OF RIGHTS**

62.     The TPS Consortium expressly reserves all of its rights to object to the Plan and/or the Disclosure Statement on any grounds whatsoever, including by joining in the objections of other parties, regardless of whether those grounds are addressed herein.

**CONCLUSION**

63.     As noted herein, the Disclosure Statement fails to provide stakeholders with "adequate information" (within the meaning of Bankruptcy Code Section 1125) to evaluate the Plan and, in some instances, may provide misinformation regarding the circumstances and effects of the Plan and Global Settlement.  The plan process is dependent on the provision to parties in interest of full and accurate disclosure.  As the Disclosure Statement fails in this regard, it should not be approved.

64.     Further, the Plan described by the Disclosure Statement is unconfirmable on its face, and the estates should not be burdened with the expenditure of time and resources associated with solicitation thereof.  Rather, the Debtors should be instructed to engage in fair

and inclusive plan negotiations with all of their stakeholders (including the TPS Consortium) rather than catering to the interests of select preferred parties and insiders.

WHEREFORE, the TPS Consortium respectfully requests that the Court: (a) deny the Motion, and (b) grant such other and further relief as it deems just and proper.

Dated: Wilmington, Delaware
      May 11, 2010                         Respectfully submitted,

**CAMPBELL & LEVINE LLC**

*/s/Kathleen Campbell Davis*
Marla Rosoff Eskin, Esq. (DE 2989)
Bernard G. Conaway, Esq. (DE 2856)
Kathleen Campbell Davis, Esq. (DE 4229)
800 North King Street, Suite 300
Wilmington, DE 19809
(302) 426-1900
(302) 426-9947 (fax)
meskin@camlev.com
kdavis@camlev.com
bconaway@camlev.com

– and –

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Sigmund Wissnner-Gross, Esq.
Seven Times Square
New York, NY 10036
(212) 209-4800
(212) 209-4801 (fax)

– and –

Jeremy B. Coffey, Esq.
Daniel J. Brown, Esq.
One Financial Center
Boston, MA 02111
(617) 856-8200
(617) 856-8201 (fax)

*Counsel for the TPS Consortium*