# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WASHINGTON MUTUAL, INC., et al., | Case No. 08-12229 (MFW) |
| Debtors. | Jointly Administered |
| | **Hearing Date: May 19, 2010 at 11:30 a.m.**<br>**Objection Deadline: May 13, 2010 at 4:00 p.m.** |

## BROADBILL INVESTMENT CORP.'S OBJECTION TO DEBTORS' MOTION FOR ORDER APPROVING PROPOSED DISCLOSURE STATEMENT AND GRANTING RELATED RELIEF

TO: THE HONORABLE MARY F. WALRATH,
UNITED STATES BANKRUPTCY JUDGE

Broadbill Investment Corp. ("Broadbill"), for its Objection (the "Objection") to Debtors' Motion [Docket No. 3568] for Order Approving Proposed Disclosure Statement in respect of Proposed Joint Plan and Granting Related Relief, respectfully represents:

## PRELIMINARY STATEMENT

1. Broadbill owns Litigation Tracking Warrants ("LTWs") relating to the Anchor Litigation (defined below). On April 12, 2010, Broadbill commenced an adversary proceeding before this Court against Debtor, Washington Mutual, Inc. ("WMI"), *Broadbill v. WMI*, Adv. Pro. No. 10-50911 (MFW) (the "Declaratory Judgment Action"), in which, among other things, Broadbill sought a judgment declaring that: (a) the sale and transfer of control over, and the recovery from, the Anchor Litigation to JPMorgan Chase Bank, N.A. ("JPMorgan") constitutes a breach and default under Section 6.3 of the Amended Agreement (as defined below) which gives rise to a claim in favor of holders of LTWs; (b) if WMI's existing common stock is to be

NYC:211964.6

extinguished or cancelled under the Proposed Plan, Section 4.4 of the Amended Agreement mandates that holders of LTWs have claims against WMI in the amount of the net proceeds of the Anchor Litigation; (c) the LTWs do not constitute either stock warrants, equity securities or equity interests in WMI; and (d) the LTWs represent the "right to payment" of value (not necessarily by issuance of WMI common stock) and are "claims" against WMI's estate.

2. As described in the Declaratory Judgment Action, holders of LTWs have claims against WMI. The terms of the LTWs and the governing Amended Agreement make clear that the LTWs were never intended to be, and are not, equity interests. The LTWs do not have the characteristics of "stock warrants" or other equity securities. The LTWs were mechanisms through which the proceeds of the Anchor Litigation could be conveyed to Dime Bancorp stockholders (the original recipients of the LTWs).

3. Under the Debtors' proposed plan of reorganization, dated March 26, 2010 (the "Proposed Plan"), LTWs are separately classified in Class 20, denominated as "Dime Warrants" and treated as "equity interests." Section 24.1 of the Proposed Plan provides that LTWs would be cancelled and would receive no distribution under the Proposed Plan. Under Section 30.3 of the Proposed Plan, entities in Class 20 are not entitled to vote to accept or reject the Proposed Plan, nor does the Proposed Plan provide for a "claims reserve" for the LTWs pending resolution of such claims (and the Declaratory Judgment Action).

4. The Debtors' proposed disclosure statement with respect to the Proposed Plan (the "Proposed Disclosure Statement") must be amended because all parties-in-interest voting on the Proposed Plan are entitled to know the potential impediments and/or alternative recoveries contemplated by the Proposed Plan with respect to the LTWs. This is an essential element of

"adequate information," which must be contained in the Proposed Disclosure Statement. To illustrate specifically the issue, assume Broadbill is correct and holders of LTWs are creditors of the Debtors. The Proposed Disclosure Statement, in its present form, fails to address, among other things: (a) how the Debtors will reserve for, and pay, the distributions on account of the LTWs' claims; (b) how such reserve and payment would impact other classes of creditors under the Proposed Plan; (c) why the LTWs are not being permitted to vote on the Proposed Plan; (d) why the LTWs are separately classified from other creditors; and (e) how the cram down provisions can successfully be applied against the LTWs when holders of preferred equity securities may receive a distribution under the Proposed Plan.[1]

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. The Anchor Litigation

5. Between 1982 and 1985, Anchor Savings Bank FSB ("Anchor FSB") acquired eight failing savings and loan institutions, the deposits of which were insured by the Federal Savings and Loan Insurance Corporation (the "FSLIC"). In acquiring such institutions, Anchor FSB assumed liabilities determined to exceed the assets it acquired by over $650 million in the aggregate. The difference between the fair values of the assets acquired and the liabilities assumed in such transactions was recorded on Anchor FSB's books as "goodwill." At the time

---

[1] Additionally, although Broadbill well understands that courts generally do not, and it is this Court's policy not to, address confirmation objections at a hearing to consider the adequacy of a Proposed Disclosure Statement, in the present case, the Proposed Disclosure Statement cannot be approved because the Proposed Plan is inherently unconfirmable with respect to Broadbill and other holders of LTWs. The Proposed Plan provides for a distribution to holders of WMI preferred equity securities, [Proposed Plan, Section 23.1], while LTW holders receive nothing on account of their claims. [Proposed Plan, Section 24.1]. Such a distribution would violate the "absolute priority rule," which mandates that no equity holder receive a distribution under a plan of reorganization unless and until all creditors are paid in full.

NYC:211964.6

of these acquisitions, the FSLIC had agreed that Anchor FSB, among other things, could include such "goodwill" in its regulatory capital.

6. When the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") was enacted, Anchor FSB still had over $500 million of regulatory capital from supervisory acquisitions on its books, including the "goodwill" described in paragraph 10 above. FIRREA, however, required the remaining supervisory goodwill to be eliminated immediately for purposes of calculating tangible capital and to be phased out through December 31, 1994 for other regulatory capital purposes. The elimination of the supervisory goodwill and other components of regulatory capital damaged Anchor FSB by creating severe limitations on its activities and requiring the sale of valuable assets under liquidation-like circumstances

7. On January 13, 1995, Anchor FSB filed a lawsuit (the "Anchor Litigation") against the United States government in the United States Court of Federal Claims (captioned *Anchor Savings Bank FSB v. United States*, No. 95-39C), alleging breach of contract and taking of property without compensation in contravention of the Fifth Amendment to the United States Constitution. Shortly after the Anchor Litigation was commenced, Dime Bancorp ("Dime") acquired Anchor Bancorp ("Anchor") and The Dime Savings Bank of New York, FSB ("Dime FSB") acquired Anchor FSB. In connection therewith, the Anchor Litigation was transferred to Dime FSB. On January 4, 2002, Dime FSB merged into WMB and WMB assumed Dime FSB's rights under the Anchor Litigation, and WMI assumed Dime's obligations under the LTWs and the Original Agreement (as defined below).

8. On March 14, 2008, the U.S. Court of Federal Claims issued an order and findings that Anchor was entitled to damages for the lost profits and awarded additional

damages. The Court's order and findings concluded that Anchor FSB had incurred recoverable damages in the amount of approximately $382 million, plus an undetermined amount for a gross-up of Anchor FSB's tax liabilities. On July 16, 2008, the Court reduced the judgment to approximately $356 million. On March 10, 2010, the Federal Circuit Court of Appeals affirmed the judgment of approximately $356 million, and also remanded the case to the Court of Federal Claims for further determination of whether that court had made a calculation error and should increase the damage award by as much as an additional $63 million. It is clear that there will be a significant and imminent recovery from the Anchor Litigation.

### B. The LTWs

9. On December 22, 2000, Dime distributed LTWs to holders of outstanding shares of its common stock. Approximately 113 million LTWs were issued. As originally issued by Dime, the LTWs entitled LTW holders to receive 85% of the net recovery from the Anchor Litigation, originally payable in the form of Dime common stock. The LTWs were registered under a registration statement dated December 15, 2000 (as amended, the "Registration Statement") and were issued pursuant to an agreement referred to as a Warrant Agreement (the "Original Agreement"), dated as of December 21, 2000, by and among Dime, EquiServe Trust Company, N.A. and EquiServe Limited Partnership (as agents). On January 4, 2002, Dime merged into WMI and WMI assumed Dime's obligations under the LTWs. On March 11, 2003, WMI and Mellon Investor Services LLC entered into the 2003 Amended and Restated Warrant Agreement (the "Amended Agreement" and together with the Original Agreement, individually and collectively, the "Agreements"), which amended and restated the terms of the Original Agreement. The LTW Certificates incorporate the terms and conditions of the Amended Agreement.

NYC:211964.6

### C. The Sale to JPMorgan, the Debtors' Chapter 11 Cases and the Proposed Plan

10. On September 25, 2008, the FDIC was appointed as a receiver for WMB and immediately took possession of WMB's assets. The FDIC promptly sold substantially all the assets of WMB (including the Anchor Litigation (or the recovery therefrom) and control thereof) to JPMorgan Chase Bank, N.A. ("JPMorgan") in exchange for payment of $1.88 billion and the assumption of all of WMB's deposit liabilities.

11. On September 26, 2008, the Debtors each commenced a Chapter 11 case with this Court. On March 26, 2010, the Debtors filed their Joint Chapter 11 Plan (the "Proposed Plan") and their Proposed Disclosure Statement with respect thereto (the "Proposed Disclosure Statement"). Section 24.1 of the Proposed Plan provides that the LTW holders shall receive no distribution under the Proposed Plan and the LTWs shall be deemed to be extinguished and canceled on the Effective Date (as defined in the Proposed Plan). Section 23.1 of the Proposed Plan provides that holders of WMI preferred equity securities shall receive a distribution in the event that all "Claims" are paid in full.

### D. The Declaratory Judgment Action

12. On April 12, 2010, Broadbill commenced the Declaratory Judgment Action. A copy of the complaint in the Declaratory Judgment Action is annexed hereto as Exhibit A. The Declaratory Judgment Action seeks a declaratory judgment that, among other things: (i) the sale of control over the Anchor Litigation and the recovery therefrom to JPMorgan constitutes a breach and default under Section 6.3 of the Amended Agreement; (ii) if WMI's existing common stock is to be extinguished or cancelled, Section 4.4 of the Amended Agreement mandates that the LTW holders have claims against WMI in the amount of the net proceeds of the Anchor

6

Litigation; (iii) the LTWs do not constitute either stock warrants, equity securities or equity interests in WMI; and (iv) the LTWs represent the "right to payment" of value and are "claims" against WMI's estate.

13. WMI has yet to file its answer or otherwise respond to Broadbill's complaint. The answer deadline, originally May 12, 2010, was extended to May 14, 2010 by agreement. A pre-trial conference is scheduled for May 19, 2010.

## ARGUMENT

### A. The Proposed Disclosure Statement Lacks "Adequate Information" and Cannot Be Approved

14. As explained in In re Eastern Maine Elec. Coop., Inc., 125 B.R. 329, 332 (Bankr. D. Maine 1991), the process of evaluating a disclosure statement involves two stages of analysis. First, "[i]f the disclosure statement describes a plan that is so fatally flawed that confirmation is impossible, the court should exercise its discretion to refuse to consider the adequacy of disclosures." Id.[2] Second, assuming that the debtor satisfies this initial hurdle, the court must evaluate whether the disclosure statement contains adequate information based on the facts unique to the case. Id; see also In re Texas Extrusion Corp., 844 F.2d 1142, 1157 (5th Cir. Tex. 1988), cert. denied, 488 U.S. 926 (1988) (explaining that the determination of what is adequate information is subjective and made on a case-by-case basis).

15. The primary purpose of a disclosure statement is to give creditors the information necessary for them to decide whether to accept or reject the debtor's plan. Tenn-Fla Partners v.

---

[2] See also In re Filex, Inc., 116 B.R. 37, 41 (Bankr. S.D.N.Y 1990) ("this court will not approve a disclosure statement for an admittedly unconfirmable plan"); In re Beyond.com Corp., 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (explaining that disclosure statement may not be approved when the underlying plan is patently unconfirmable); Cardinal Congregate I, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (explaining that disapproval of a disclosure statement may be appropriate when it describes a plan that is so fatally flawed that the plan cannot be confirmed).

7

First Union Nat'l Bank of Fla., 229 B.R. 720 (W.D. Tenn. 1999); In re Scioto Valley Mortgage Co., 88 B.R. 168 (Bankr. S.D. Ohio 1988). Section 1125(a)(1) obligates a plan proponent to submit a disclosure statement with "adequate information," which is defined as:

> information of the kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the Debtors' books and records that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . .

Approval of a disclosure statement should be denied when it does not contain "adequate information." See Menard Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694, 696 (4th Cir. 1989). "Adequate information" must enable individual creditors to make an informed judgment about the Proposed Plan and must contain "[a]ll factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." In re Microwave Products of America, Inc., 100 B.R. 376, 377 (Bankr. W.D. Tenn. 1989) (internal quotations omitted).

16. The Proposed Disclosure Statement does not adequately describe the LTWs, the Declaratory Judgment Action or the implications if, as Broadbill submits, the LTWs are material claims against WMI. The underlying Proposed Plan is also unconfirmable for the reasons set forth herein.

**B. The LTWs Represent Claims Against, Not Equity Interests In, WMI**

*The Proposed Disclosure Statement Must Disclose That the LTWs Lack Fundamental Characteristics of "Equity Interests"*

17. The LTWs lack fundamental characteristics of "warrants." Among other things, the LTWs are not exercisable into a fixed number of shares for a fixed period of time and the LTWs do not have an exercise price. See Reiss v. Financial Performance Corp., 764 N.E.2d 958,

960 (NY 2001) ("Duly executed stock warrants are contracts entitling the holder to purchase a specified number of shares of stock for a specific price during a designated time period."); See Robert Half International, Inc. v. Franchise Tax Board, 78 Cal.Rptr.2d 453, 454 (Cal. Ct. App. 1998) (citing Marsh's Cal. Corporation Law (3d ed. 1997)) ("A warrant is simply an option to purchase the shares of a corporation at a specified price and for a specified period of time.").

18. The LTWs lack fundamental characteristics of "equity securities." Because the aggregate value of shares issuable pursuant to the LTWs does not change upon a change in value of WMI's common stock, the LTWs do not contain equity risk. The holder of an LTW receives the exact same value from an LTW regardless of the price or value of the underlying shares. For example, if WMI common stock had a value, or a trading price, of $.0001 per share, the LTWs would nonetheless be entitled, in the aggregate, to the full net proceeds of the Anchor Litigation. Furthermore, the holders of LTWs have no voting or other corporate governance rights that are characteristic of equity securities.

19. The LTWs are inextricably tied to the recovery in the Anchor Litigation. In essence, the LTWs are akin to a financial derivative. They represent a contractual right to a payment if and when a certain asset, namely the Anchor Litigation, is monetized. They do not have the characteristics of "stock warrants" or "equity securities" and cannot be treated as such.

***The Proposed Disclosure Statement Must Disclose That the LTWs Were Not Intended to Be Equity Securities.***

20. It is a fundamental tenet of contract law that the terms of a contract must be construed so as to give effect to the intent of the parties as indicated by the language of the contract. *See* Slatt v. Slatt, 488 N.Y.S.2d 645, 646 (1985); Morlee Sales Corp. v. Manufacturers Trust Co., 210 N.Y.S.2d 516, 518 (1961). The Court of Appeals for the Third Circuit has

9

NYC:211964.6

recognized this principle. *See* Sanford Inv. Co., Inc. v. Ahlstrom Machinery Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999) ("A court's purpose in examining a contract is to interpret the intent of the contracting parties, as they objectively manifest it.").

21. When the language of the contract is ambiguous a court should turn to extrinsic evidence of the contracting parties' intent. *See* International Klafter Co. v. Continental Casualty Co., 869 F.2d 96, 100 (2d Cir.1989); Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56, 396 N.E.2d 1029, 1032, 421 N.Y.S.2d 556, 559 (1979). Whether a contract term is ambiguous is a question of law. *See* Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987); Sutton v. East River Savings Bank, 55 N.Y.2d 550, 554, 435 N.E.2d 1075, 1077, 450 N.Y.S.2d 460, 462 (1982). A term is ambiguous when it is "'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *See* Walk-In Medical, 818 F.2d at 263 (quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F.Supp. 987, 994 (S.D.N.Y. 1968)). Conversely, "[c]ontract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *See* Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir.1989) (quoting Breed v. Insurance Co. of North America, 413 N.Y.S.2d 352, 355 (1978)).

22. The Registration Statement plainly states that the intent in issuing, and the principles underlying the issuance of, the LTWs was to pass the value of the net proceeds of the Anchor Litigation to the LTW holders. The Registration Statement, at page 1, specifically states:

"Why are we distributing the LTWs? <u>We are distributing the LTWs in an effort to pass along the potential value of our claim against the government to our existing stockholders</u> . . . " (emphasis added). The Registration Statement also is clear that the LTWs are not stock warrants, equity securities or equity interests. The Registration Statement, at page 5, states: "An investment in the LTWs involves different risks and considerations from an investment in the common stock of a savings and loan holding company such as Dime Bancorp." It is significant that the Risk Factors in the Registration Statement do not mention that the issuer could file for bankruptcy and its common stock would be rendered worthless. The LTWs also do not say they are cancellable if the WMI equity is rendered worthless. The conclusion is inescapable - - the LTWs were never intended to be "stock warrants" or "equity securities."

### *The Proposed Disclosure Statement Must Disclose That Section 6.3 of the Amended Agreement Was Breached Upon the Sale of the Anchor Litigation to JPMorgan.*

23. Section 6.3 of the Amended Agreement requires WMB to retain control over and ownership of the recovery from the Anchor Litigation for the benefit of the LTW holders: "[WMB] will retain sole and exclusive control of the [Anchor] Litigation and will retain 100% of any recovery from the [Anchor] Litigation." Section 6.3 exists to protect the LTW holders from the sale or transfer of the Anchor Litigation which would eliminate or avoid the occurrence of a Trigger and thereby frustrate the intent and purpose of the LTWs and the Agreements.

24. In or about September 2008, the FDIC, in its capacity as receiver for WMB, sold to JPMorgan substantially all of WMB's assets, including control over and any recovery from the Anchor Litigation. Section 6.3 of the Amended Agreement was breached when control over, and any recovery from, the Anchor Litigation was sold to JPMorgan. The LTW holders were

then entitled to receive the value of the net proceeds on account of such sale or transfer to JPMorgan in the form of either (a) shares of WMI common stock in an amount then having a market value that would have enabled the LTW holders to immediately realize payment of such net proceeds (given that at the time of the sale and/or transfer, and to date, there was, and continues to be, an active, liquid and robust $1 billion plus market for WMI common stock) or (b) such other equivalent consideration or value.

25. Alternatively, the receipt of proceeds or value from the sale or transfer of the Anchor Litigation should have been deemed the initial "Trigger" event under the Amended Agreement; otherwise, such sale or transfer would have made the occurrence of a "Trigger" (as defined in the Agreements) an impossibility. Upon receipt of such value for the Anchor Litigation, WMI should have taken the necessary steps to consummate the intent of the Agreements. For instance, in September 2008, WMI could have issued shares of common stock to the LTW holders with a market value, at the time of such issuance, that would have enabled the LTW holders immediately to realize the value, and obtain payment, of such net proceeds. That would have then allowed the LTW holders to receive the benefit of their bargain under the LTWs upon the sale of such shares.

26. As a consequence of the foregoing, the LTW holders are entitled to a claim for damages against WMI resulting from WMI's failure to provide the LTW holders with either (i) the value of the net proceeds received for the sale or transfer of the Anchor Litigation to JPMorgan or (ii) the value of the net proceeds of the Anchor Litigation.

### The Proposed Disclosure Statement Must Disclose That Section 4.4 of the Amended Agreement Requires WMI to Protect the Purchase Rights of LTW Holders.

27. The Proposed Plan, if confirmed, would eliminate and cancel all of WMI's common stock and would make it impossible for WMI to pay to the LTW holders the value of the net proceeds of the Anchor Litigation in WMI common stock. Section 4.4 of the Amended Agreement, however, provides: "If any event occurs as to which the foregoing provisions of this Article IV are not strictly applicable or, if strictly applicable, would not, in the good faith judgment of the Board, fairly and adequately protect the rights of the Holders of the LTWs in accordance with the essential intent and principles of such provisions, then the Board may make, without the consent of the Holders, such adjustments to the terms of this Article IV, in accordance with such essential intent and principles, as will be reasonably necessary, in the good faith opinion of such Board, to protect such purchase rights as aforesaid."

28. Cancellation of WMI's common stock would be an "event" within the meaning of Section 4.4 of the Amended Agreement. WMI and its Board must therefore act to protect the rights of the LTW holders. The "essential intent and principles" referred to in Section 4.4 of the Amended Agreement is for the LTW holders to be paid the net proceeds of the Anchor Litigation. Thus, under Section 4.4 of the Amended Agreement, if WMI's common stock is to be cancelled, WMI and its Board must allow an unsecured claim in WMI's Chapter 11 case in favor of the LTW holders in an amount equal to the net proceeds of the Anchor Litigation. Any attempt by WMI and its Board to evade the intent of the Amended Agreement is a breach of the Board's express duty to the LTW holders as set forth in the Amended Agreement.

29. In short, the LTW holders are not equity security holders of WMI. Rather, LTW holders have a contractual right to a claim against the Debtors for the realized value of the

Anchor Litigation. Thus, the LTW holders are creditors of the Debtors. As such, the Proposed Plan's treatment of the LTW holders as equity security holders is improper. Unless modified, neither the Proposed Disclosure Statement nor the Proposed Plan can be confirmed.

*The Proposed Disclosure Statement Must Disclose the Existence and Impact of the Declaratory Judgment Action on the Confirmability of the Proposed Plan.*

30. The crux of the Declaratory Judgment Action is Broadbill's contention that holders of LTWs have claims against WMI's estate rather than equity interests. If holders of LTWs have claims against WMI, the aggregate amount of unsecured claims against WMI will be materially increased. Further, the resolution of the issues presented in the Declaratory Judgment Action directly affects whether the classification of claims and interests - - and the proposed distributions with respect thereto - - in the Proposed Plan violates the Bankruptcy Code. Thus, the possible ramifications of the Declaratory Judgment Action are directly relevant and of vital importance to parties that will vote on the Proposed Plan. The Proposed Disclosure Statement does not contain any reference whatsoever to the Declaratory Judgment Action.

C. **The Court Should Not Approve a Disclosure Statement for a Plan That Violates Section 1129(b) of the Bankruptcy Code**

31. If a Chapter 11 plan on its face is not confirmable as a matter of law, a court should not approve a disclosure statement with respect thereto. Although the hearing on approval of a disclosure statement is not a substitute for a hearing on plan confirmation, a disclosure statement should not be approved where a plan is not capable of being confirmed. Indeed, the bankruptcy court's approval of a disclosure statement is an early step in the confirmation process, followed by time-consuming and expensive solicitation procedures and

14

NYC:211964.6

confirmation hearings. This rule has been applied in many jurisdictions (including the Third Circuit).[3]

32. Section 1129(b) of the Bankruptcy Code allows a plan to be confirmed notwithstanding the failure of all impaired classes of claims to vote in favor of a plan under what is commonly known as "cram-down." In order to cram-down a dissenting class, however, a plan must be "fair and equitable" to the dissenting classes. *Id.* The Proposed Plan is not fair and equitable with regard to the LTW Claims and thus the requirements for cram-down are not met. The "fair and equitable" requirement includes the "absolute priority rule," under which no junior class of claims or interests may retain any property (including their interests) under a plan unless all senior classes are paid in full.[4]

33. Under the Proposed Plan, holders of Class 19 Preferred Equity Interests will receive "their Pro Rata Share of Liquidating Trust Interests, to be shared, pari passu, with holders of the REIT Series," in the event that "all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims are paid in full (including with respect to Allowed Subordinated

---

[3] *See, e.g.*, In re John Hancock Mut. Life Ins. co. v. Rte. 37 Bus. Park Assoc's., 987 F.2d 154, 159 (3d Cir. 1993); In re Criimi Mae, Inc., 251 B.R. 796, 799 (Bankr. D. Md. 2000); In re Main Street AC, Inc., 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994); In re 266 Washington Assocs, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bnkr. N.D.N.Y. 1988); In re S.E.T. Income Properties, III, 83 B.R. 791, 792 (Bnkr. N.D. Okla. 1988); In re Pecht, 57 B.R. 137 (Bnkr. E.D. Va. 1986).

[4] First State Operating Company v. Holbrook (In re Lotspeich), 328 B.R. 209, 220 (BAP 10th Cir. 2005); *See, e.g.*, In re Coltex Loop Cent. Three Partners, L.P., 138 F.3d 39, 42 (2d Cir. 1998) (finding that a fair and equitable plan must provide that "the holders of any claim or interest that is junior to the claims of [the unsecured creditor] class will not receive or retain [property] under the plan"); In re Johnston, 21 F.3d 323, 329 (9th Cir. 1994); In re Justice, 972 F.2d 951, 954 (8th Cir. 1992).

In particular, section 1129(b)(2)(B) of the Bankruptcy Code provides that the condition that a plan be "fair and equitable" with respect to a class of unsecured claims includes the requirement that either "(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the amount of such claims; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."

15

Claims)." [Proposed Plan, Section 23.1, Page 39]. The Debtors have attempted to classify the LTWs as "Equity Interests." *See* Proposed Plan, Section 24.1, Page 39. Accordingly, as noted above, the Proposed Plan provides that holders of LTWs, which are claims, not equity interests, will receive no distributions whatsoever (and are classified as being junior to the Class 19 Preferred Equity Interests). The Proposed Plan therefore violates Section 1129(b) of the Bankruptcy Code and the Proposed Disclosure Statement should not be approved.

WHEREFORE, Broadbill respectfully requests that this Court (i) deny the Debtors' motion for an Order approving the Proposed Disclosure Statement and (ii) grant such other and further relief as this Court deems just and proper.

Dated: May 13, 2010

COZEN O'CONNOR

_____
Mark E. Felger (No. 3919)
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Tel: (302) 295-2000
Fax: (302) 295-2013

- and -

ANDREWS KURTH LLP
Paul N. Silverstein (*admitted pro hac vice*)
J. Wiley George (*admitted pro hac vice*)
Jonathan I. Levine (*admitted pro hac vice*)
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 850-2800
Facsimile: (212) 850-2929

*Counsel to Broadbill Investment Corp.*