IN THE UNITED STATES BANKRUPTY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WASHINGTON MUTUAL, INC. *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-12229 (MFW)<br><br>(Jointly Administered)<br><br>Re: Docket Nos. 3568 and 2623<br><br>**Hearing Date: May 19, 2010 at 11:30 a.m.**<br>**Objection Deadline: May 13, 2010 at 4:00 p.m.** |

**LEAD PLAINTIFF'S OBJECTION (A) TO DISCLOSURE
STATEMENT FOR THE JOINT PLAN OF AFFILIATED
DEBTORS PURSUANT TO CHAPTER 11 OF THE UNITED
STATES BANKRUPTCY CODE AND (B) TO THE SUPPORTING
MOTION TO APPROVE THE DISCLOSURE STATEMENT AND
PROPOSED SOLICITATION AND VOTING PROCEDURES**

Lead Plaintiff, Ontario Teachers' Pension Plan Board, in the consolidated putative securities class action entitled *In re Washington Mutual Securities Litigation*, Case No. C08-387 (MJP) (W.D. Wash.) (the "Securities Litigation"), on behalf of the putative securities class (the "Securities Class") of all persons who purchased or otherwise acquired certain debt and equity securities issued by Washington Mutual, Inc. ("WMI"), one of the Debtors[1] herein, between October 19, 2005 and July 23, 2008 (the "Class Period"), hereby submits this objection (the "Objection") (i) to the Disclosure Statement for the Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement"), and, (ii) to the proposed solicitation and voting procedures (the "Solicitation and Voting Procedures"), and states the following:

---

[1] Capitalized terms shall have the meanings ascribed to them in the Disclosure Statement unless defined otherwise herein.

22244/2
05/13/2010 14365218.1

## BACKGROUND

1. On September 26, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2. Prior to the Petition Date, several putative securities class actions were pending alleging violations of federal securities laws against WMI and certain of its current and former officers and directors, underwriters and auditor (collectively, the "Non-Debtor Defendants") in the United States District Court for the Western District of Washington (the "District Court").

3. By order dated May 7, 2008, the District Court (i) consolidated the putative class actions, together with any subsequently-filed actions arising out of the same facts, into the Securities Litigation, and (ii) appointed Lead Plaintiff. The Securities Litigation was further consolidated with pending ERISA and derivative cases under the MDL case number 2:08-md-1919 (MJP) (D. Wash).

4. On or about August 5, 2008, Lead Plaintiff filed a Consolidated Class Action Complaint (the "Consolidated Complaint") asserting violations by WMI and the Non-Debtor Defendants of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and sections 11, 12 and 15 of the Securities Act of 1933. On June 15, 2009, Lead Plaintiff filed an Amended Consolidated Class Action Complaint.

5. Pursuant to the automatic stay (11 U.S.C. § 362(a)), as of the Petition Date, the Securities Litigation has been stayed as to WMI. The Securities Litigation is proceeding as against the Non-Debtor Defendants.

6. On March 25, 2009, Lead Plaintiff filed a proof of claim (Claim No. 2759) on behalf of the putative Securities Class (the "Class Claim") in an undetermined amount for damages based upon the alleged violations of federal securities laws as described in the Consolidated Complaint, as amended, in connection with the purchase of WMI's securities by Lead Plaintiff and members of the putative Securities Class during the Class Period, and WMI's conduct in connection therewith.

7. The Securities Litigation was the result of an accounting fraud and various misrepresentations by WMI and the Non-Debtor Defendants, which resulted in artificially inflated prices and value of the WMI securities.

8. On October 27, 2009, the District Court denied, in large part, the Non-Debtor Defendants' motions to dismiss the Amended Consolidated Class Action Complaint.

9. On March 26, 2010, the Debtors filed the Disclosure Statement (Docket No. 2623) and the Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan") (Docket No. 2622).

10. On April 23, 2010, the Debtors filed the Motion for an Order Approving the Disclosure Statement and related relief (the "Motion") (Docket No. 3568). The hearing on the Motion is scheduled for May 19, 2010.

## **OBJECTION**

11. A disclosure statement may be approved as adequate only if it contains "information of a kind, and in sufficient detail, as far as is reasonably practical in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a); *see also In re Zenith Electronics Corp.*, 241 B.R. 92, 99-100 (Bankr. D. Del. 1999) (the disclosure statement must contain information that is "reasonably practicable [to permit an] informed judgment" by holders of claims or interests to vote on the plan). Courts have ample discretion to determine what constitutes adequate information. *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 179 B.R. 24, 29 (S.D.N.Y. 1995), *appeal dismissed by, in part, affirmed by, in part*, 184 B.R. 648 (S.D. N.Y. 1995), citing, *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988). Although adequacy is determined on a case-by-case basis under a fact-specific flexible standard, *id.*, a disclosure statement must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy] Code alternatives so that

[creditors] can intelligently accept or reject the Plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988). A disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

12. Lead Plaintiff believes that in certain material respects, the Disclosure Statement does not contain sufficient information to enable a reasonable person to make an "informed judgment about the Plan." Indeed, the Disclosure Statement and the Plan contain broad and ambiguous provisions and/or omit material facts that (i) may mislead holders of claims or interests or (ii) should be available to holders of claims or interests.

13. *To the extent any objection, in whole or in part, contained herein is deemed to be an objection to confirmation of the Plan rather than, or in addition to, an objection to the adequacy of the Disclosure Statement, Lead Plaintiff reserves its right to assert such objection, as well as any other objections, to confirmation of the Plan. Furthermore, to the extent Lead Plaintiff or any member of the putative Securities Class is impacted in any way by the contents of any supplements or amendments to the Disclosure Statement or the Plan, which may be filed after any Disclosure Statement or Plan confirmation objection deadline, Lead Plaintiff reserves its right to object thereto.*

14. Lead Plaintiff objects to the adequacy of the Disclosure Statement and to the Plan (subject to the above reservation of rights) on the following grounds:

  (a) the Disclosure Statement fails to describe and the Plan fails to provide an adequate protocol for the preservation and/or destruction of the Debtors' records or documents whether transferred to the Liquidating Trust or others or retained by the Reorganized Debtors;

  (b) the Disclosure Statement does not provide any basis for the extension of stays or injunctions for a period beyond the Confirmation Date and such extension is

inappropriate and prejudicial to Lead Plaintiff;

(c) the Disclosure Statement fails to adequately describe available insurance as it relates to the Lead Plaintiff's and the putative Securities Class' claims asserted in the Bankruptcy Proceeding and in the Securities Litigation or disclose whether the Plan intends to deny Lead Plaintiff the right to proceed with its claims against the Debtors solely to the extent of available insurance coverage, irrespective of any injunctions, discharge or distribution under the Plan;

(d) the Plan Release and Injunction provisions are overly broad, ambiguous and improper and must affirmatively exclude Lead Plaintiff's claims against the Non-Debtor Defendants and any other non-Debtors; and

(e) the proposed Solicitation and Voting Procedures, as they relate to the non-Debtor releases, are contradictory and improper.

15. In order to bring the Disclosure Statement into compliance with 11 U.S.C. § 1125(a) and to make the Plan confirmable under the Bankruptcy Code, the Disclosure Statement and Plan must be modified. Unless and until the Plan and Disclosure Statement are revised, the Disclosure Statement should not be approved. Likewise, the proposed Solicitation and Voting Procedures are defective and, at best, are unclear and confusing as they relate to the proposed broad non-Debtor releases under the Plan.

### A. The Disclosure Statement Fails to Describe and the Plan Fails to Provide an Appropriate Mechanism for the Preservation of Documents.

16. The Disclosure Statement states that the Plan provides for the establishment of a Liquidating Trust pursuant to a Liquidating Trust Agreement (the "LTA"). Disclosure Statement ("D.S."), Art. V. D.1(i); Plan, Art. XXVII, §27.1. A copy of the LTA is to be furnished as part of the Plan Supplement (Plan, Art. I., §1.134) at least fifteen (15) days prior to the deadline for

voting on confirmation of the Plan.[2] *Id.*

17. While the Plan defines Liquidating Trust Assets as all of the Debtor's Assets, other than some specified Cash (for disbursements on claims and reimbursement of fees and expenses) and the Debtors' equity interests in WMI Investment (Plan, Art. I, §1.113), and provides for the Debtors to transfer those Assets to the Liquidating Trust to be administered by the Liquidation Trustee (D.S., Art. V. D. 3; Plan, Art. XXVII, §27.3), the Plan also provides that title to all Assets "encompassed by the Plan" shall vest in the Reorganized Debtors, the Liquidating Trust, the JPMC Entities or the WMI Recipient, as the case may be. D.S., Art. V. P. 1; Plan, Art. XLII, § 42.1. Therefore, the Debtors' Assets appear to be distributed among various entities. Although the Assets are not specifically identified, the Debtors' books, records and other documents would presumably be transferred.

18. Although the Debtors are compelled to maintain and preserve their Assets during the chapter 11 proceeding, the Plan fails to provide for the preservation of the Debtors' Assets, including the Debtors' books, records and other documents, in any format (*e.g.*, electronic or hard-copy) (collectively, the "Documents") post-confirmation. Therefore, a document preservation protocol must be established to prevent the destruction or abandonment of the Documents post-confirmation, especially because the Documents may include critical information relevant to the Securities Litigation and certain other information relevant to the Class Claim.

19. To the extent Documents are transferred to the Liquidating Trust or other Entities, the Liquidating Trust, the Liquidating Trustee and the transferee must also be bound by any document preservation protocol approved by the Bankruptcy Court.

20. Indeed, whether the Documents are retained by the Reorganized Debtors or transferred to the Liquidating Trust or to some other estate representative or third party, the Documents must be preserved or maintained so as to be available to parties in interest, especially

---

[2] Lead Plaintiff reserves its right to object to the LTA and such other documents that may be included in the Plan Supplement.

if the Documents are not available elsewhere. To do otherwise prejudices the rights of the Lead Plaintiff, members of the putative Securities Class and other parties in interest. At the very least, some mechanism for providing notice and an opportunity to be heard by a court of competent jurisdiction must be established before any such Documents are abandoned, destroyed or otherwise rendered unavailable.

21. It is imperative that the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee or third party transferee retain and preserve the Documents that may be potentially relevant to the Securities Litigation and the Claims arising therefrom, at least until such time as Lead Plaintiff is able to conduct discovery, and that Lead Plaintiff be given reasonable notice of any proposed destruction or abandonment of the Documents and an opportunity to be heard.

22. The Debtors, the Liquidating Trust, Liquidating Trustee, or such other potential transferee of the Documents, as the case may be, must advise parties in interest through the Plan of their intention with respect to the Documents. Therefore, the Plan and/or any order confirming the Plan should include the following language:

> From and after the Effective Date, the Debtors, the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee, and any transferee of the Debtors' Documents (defined *infra*), as the case may be, shall preserve and maintain all of the Debtors' documents, files, books, records, electronic data (including, but not limited to, emails and email server back-up tapes) (collectively, the "Documents"), whether retained by the Debtors or any successor to the Debtors, or transferred to the Liquidating Trust, the Liquidating Trustee pursuant to the Liquidating Trust Agreement, or such other transferee pursuant to the Plan or the Global Settlement Agreement and the Debtors, any successors to the Debtors, the Liquidating Trust, the Liquidating Trustee and/or such other transferee shall not destroy or otherwise abandon any such Documents absent further order of this Court after a hearing upon notice to parties in interest, including Lead Plaintiff, with an opportunity to be heard.

23. To the extent the Debtors do not intend to preserve the Documents or object to the inclusion of the foregoing language in the Plan or in any Order confirming the Plan, the

Disclosure Statement should explain why.

### B. The Extension of Stays and Injunctions under the Plan is Inappropriate and Prejudicial.

24. Pursuant to the Plan, stays and injunctions provided for in the Chapter 11 cases by Bankruptcy Court orders pursuant to §§105 or 362 of the Bankruptcy Code and extant on the Confirmation Date remain in effect until the entry of an Order in accordance with the Plan or such other Final Order of the Bankruptcy Court. D.S., Art. V. P.13; Plan, Art. XLII, §42.13.

25. The date for the entry of such Order or Final Order concluding the Chapter 11 cases is not fixed, nor is there an outside date suggested.[3]

26. Under the Plan, the Liquidating Trustee appears to have the right to pursue causes of action (presumably those transferred by the Debtors). D.S., Art. V. D. 6(iii); Plan, Art. XXVII, §27.6(iii). To the extent these causes of action include the estates' causes of actions against the Debtors' current and/or former directors and officers, they may have some of the same factual predicates as the claims of Lead Plaintiff arising from the allegations in the Securities Litigation.

27. Because of the Plan's extension of stays and injunctions, the Liquidating Trustee can prevent or, at the very least, significantly delay Lead Plaintiff from ever obtaining access to relevant discovery, while pursuing competing claims asserted by the Liquidating Trustee. There is no basis for the Liquidating Trust to be able to assert the automatic stay (as a sword, not a shield) beyond the Effective Date of the Plan to frustrate Lead Plaintiff's ability to obtain relevant documents in the Securities Litigation, while having those documents available to pursue its own claims. This is precisely the type of offensive use of the automatic stay that courts refuse to tolerate. *Hydramar Inc. v. General Dynamics Corp.*, 1986 U.S. Dist. LEXIS 24828, *13 (E.D. Pa. 1986), citing *Bohack corp. v. Borden, Inc.*, 599 F.2d 1160 (2d Cir. 1979) (finding that a debtor using the bankruptcy process and the automatic stay to its advantage may

---

[3] The Liquidating Trustee is authorized to seek entry of the Final Order. The initial term of the Liquidating Trust is three (3) years, subject to successive three (3) year extensions upon application to the Bankruptcy Court by the Liquidating Trustee. D.S., Art. V. D. 14. d; Plan, Art. XXVII, §27.14(d).

not serve the purpose of the Bankruptcy Code; the automatic stay "has no application where the debtor is in the position of assailant rather than victim"). Indeed, "[o]ur system of laws universally frowns on a party that would use the stay as both a sword and a shield." *In re A.H. Robbins & Co.*, 828 F.2d 1023, 1026 (4th Cir. 1987); *In re Johns-Manville*, 31 B.R. 965, 974 (S.D.N.Y. 1983) (accepting the view that the bankruptcy protective shield should not be unfairly converted into a sword of aggression); *see also Maritime Electric Co. v. Untied Jersey Bank*, 959 F.2d 1194, 1205 (3d Cir. 1991).

28. The Disclosure Statement provides no explanation to justify any extension of the automatic stay (or other stays or injunctions) beyond the Plan Effective Date or the entry of the Order confirming the Plan. The automatic stay should not be available to the Liquidating Trust for an extended period of time to frustrate the prosecution of the claims of Lead Plaintiff against common defendants to gain a fundamentally unfair litigation advantage.

> **C. The Disclosure Statement Fails to Adequately Describe Available Insurance as It Relates to the Lead Plaintiff's and the Putative Securities Class' Claims Asserted in the Bankruptcy Proceeding and in the Securities Litigation or Disclose Whether the Plan Intends to Deny Lead Plaintiff the Right to Proceed with its Claims Against the Debtors Solely to the Extent of Available Insurance Coverage, Irrespective of any Injunctions or Distribution under the Plan.**

29. Upon information and belief, the Debtors maintain liability insurance policies (the "D&O Policies") in favor of their directors and officers for claims asserted in the Securities Litigation, as well as for claims against the Debtors directly for violations of federal securities laws. While the Disclosure Statement provides a brief description of the Debtors' D&O Policies, D.S., Art. IV, D.18, it fails to disclose the extent of the coverage provided by these D&O Policies and all of the parties who may have a right to access the proceeds thereof. Lead Plaintiff maintains that the putative Securities Class is entitled to look to the proceeds of such insurance for payment in connection with the claims of Lead Plaintiff and the putative Securities Class and may, at least, pursue these Claims against the Debtors to the extent of such available insurance post-Confirmation. Because Lead Plaintiff may not have a direct action against the D&O

insurance carriers under the D&O Policies, the proceeds of the D&O Policies may only be accessed through the pursuit of the claims asserted in the Securities Litigation. Accordingly, the Plan should not impact the rights of Lead Plaintiff or the putative Securities Class to pursue their claims against the Debtors to the extent of the proceeds of the D&O Policies.

30. In order to overcome this Disclosure Statement inadequacy, the Plan and Disclosure Statement should provide that:

> Nothing in the Plan, or in any Order confirming the Plan or the Global Settlement Agreement, shall preclude Lead Plaintiff and the putative Securities Class from pursuing their claims against the Debtors to the extent of available insurance coverage and proceeds. The Claims of Lead Plaintiff and the putative Securities Class against the Debtors, to the extent of available insurance, are preserved and not discharged by the Plan.

**D.  The Plan Provides Improper Releases and Injunctions That May Impact Lead Plaintiff's Claims Against the Non-Debtor Defendants.**

31. The Plan, together with Global Settlement Agreement ("GSA"), include a broad spectrum of releases and related injunctions which ultimately appear to improperly release or enjoin third-party claims against non-Debtors, including the Non-Debtor Defendants. D.S., Art. V. P. 2, 3, 6, 7; Plan, Art. LXII §§ 42.2, 42.3, 42.6, 42.7; GSA.

32. Non-Debtor releases are referenced in several Articles throughout the Plan and the GSA. Not all of them are recited here. However, by way of example of the releases, the Plan provides that:

> each Entity that has held, currently, holds or may hold a Released Claim or an Equity Interest that is terminated ... shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge each and all Released Parties from any and all Released Claims.

D.S., Art. V. P. 6; Plan, Art. XLII, § 42.6.

33. "Released Claims" include "any and all Claims released or deemed to be released pursuant to the Plan. Plan, Art. I, § 1.148.

34. "Released Parties" include the Debtors and "each of their Related Persons." Plan, Art. I, § 1.149.

35. "Related Persons" include an Entity's, *inter alia,* current and former officers, directors and consultants, agents or other representatives. Plan, Art. I, § 1.147.

36. The Plan further imposes a permanent injunction on any Entity that holds, has held or may hold a Released Claim or Equity Interest related to the Debtors that is released under the Plan and all parties in interest from commencing or continuing *any* action or other proceeding, in *any* manner, in *any* forum; or from doing *any* of the foregoing that is inconsistent with the provisions of the proposed GSA, Plan or Confirmation Order. D.S., Art V., P. 7; Plan, Art. XLII, § 42.7; *see also*, D.S., Art. V. P. 3; Plan, Art. XLII, § 42.3. *See also*, D.S., Art V., P. 2.b.; Plan, Art. XLII; 42.2(b) ("all Entities shall be precluded from asserting against any and each Released Party . . . any other or further Claims . . . or liabilities of any nature"). Indeed, the Plan further affirmatively states "each holder of a Claim or Equity Interest in any Class under the Plan" shall release, waive and discharge all such Claims and Equity Interests "as against each and any of the Released Parties." *Id.*

37. As it is clear from even these few "snippets" from the Plan, the Plan Injunction and Release provisions are so broad and ambiguous that, when read with the Plan definitions, they appear to impact, enjoin, prohibit and/or preclude Lead Plaintiff from asserting claims in the Securities Litigation against the Non-Debtor Defendants and from accessing documents from the Debtors or the Liquidating Trust.[4] To that extent, these provisions are improper.

38. By referencing *any* action or proceeding or *any* act, transaction or other activity occurring pre-petition without any limitation, the Plan Injunction appears to apply to Lead Plaintiff's claims against the Non-Debtor Defendants and any requests for production of documents or other discovery. No justification for such inappropriate relief and protection is

---

[4] Because of the breadth and ambiguity of the Plan and GSA release and injunction provisions, Lead Plaintiff asserts that this Objection applies to any attempt under the Plan or the GSA to release claims against or to enjoin the prosecution of claims against a non-Debtor, including the Non-Debtor Defendants in the Securities Litigation, who are not Released Parties or Related Persons subject to the releases and injunctions in the Plan and /or the GSA.

-11-

provided in the Disclosure Statement. The mere conclusory statement that the discharge injunction and release provision are "integral part[s]" of the Plan is not sufficient to warrant such extraordinary relief. D.S., Art. V. P. 4; Plan, Art. XLII, § 42.4.

39. As a result of the broad language of the aforesaid Plan provisions, non-debtors, including the Non-Debtor Defendants, who, in the absence of unusual circumstances, are not entitled to the protections of the Bankruptcy Code, may very well benefit from such protections. Therefore, to the extent any of Lead Plaintiff's claims against the Non-Debtor Defendants may be subject to the Plan or GSA Injunction and/or Release provisions, the provisions are improper. *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 211 (3d Cir. 2000) (holding that a debtor must satisfy its burden of proof and establish through specific factual findings that non-debtor third-party releases are fair and necessary); *In re Combustion Engineering*, 391 F. 3d 190, 236 (3d Cir. 2004) (holding in an asbestos injury case that 11 U.S.C. § 105 may not be used to validate a non-debtor release where to do so trumps another Bankruptcy Code section); *see also Deutsche Bank AG London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141-42 (2d Cir. 2005) (holding that non-debtor releases are proper only in rare cases and may be "tolerated only if the affected creditor consents").

40. Lead Plaintiff, for itself and on behalf of the putative Securities Class, does not consent to the non-Debtor releases and injunction provisions. Therefore, to the extent the non-Debtor releases and related injunctions are permitted, the following language should be included in the Disclosure Statement and the Plan:

> Nothing in the Plan or in any order confirming the Plan (including the approval of the Global Settlement Agreement) shall (i) affect, release, enjoin or impact in any way the prosecution of the claims asserted, or to be asserted, against any non-Debtor, including the Non-Debtor Defendants, in the Securities Litigation or (ii) preclude Lead Plaintiff and/or the putative Securities Class from seeking discovery from the Debtors, the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee or such other transferee of the Debtors' Assets.

### E. The Proposed Solicitation and Voting Procedures, as They Relate to the Non-Debtor Releases, are Contradictory and Improper.

41. In conjunction with the release provision, the Plan provides that an Entity submitting a Ballot may opt out of the release under Section 42.6 of the Plan (*see* ¶ 32, *supra*) with respect to certain Released Persons (including the Debtors' current or former officers and directors) by checking the appropriate box on the Entity's Ballot. Plan, Art. XLII, § 42.6. By making that election, it appears that the voting Entity will receive no distribution under the Plan. This "death trap" is fundamentally inappropriate, not to mention discriminatory and violative of the Bankruptcy Code. However, the Plan further provides that because the Plan and the GSA are conditioned upon the approval of the Plan releases, the Confirmation Order shall provide that "those Entities that opt out of the releases provided hereunder shall be bound and shall receive the distributions they otherwise would be entitled to receive pursuant to the Plan." Plan, Art. XLII, § 42.6. These provisions appear contradictory and indeed, negate an Entity's election to opt out of the releases. At the very least, further explanation and disclosure are required to clarify this blatant inconsistency.

42. The opt-out election applies only to creditors who are entitled to vote and actually cast a Ballot. Creditors who do not vote or are not entitled to vote to accept or reject the Plan by virtue of the classification of their claims, and thus do not or cannot vote at all, are apparently deemed to release their claims against the Debtor and the Released Persons. Merely because a creditor does not elect to vote or is not entitled to vote is not a reason to conclude that the creditor knowingly released a non-debtor third party, especially when a creditor must take affirmative action to consensually release a non-Debtor.

43. No justification is provided or exists for such a draconian result. If the Plan intends to release claims or interests against a non-Debtor held by a creditor who is not entitled to vote or fails to vote, the Plan release is improper and should not be allowed. Indeed, rather than requiring an Entity entitled to vote to "opt out" of the release by checking a box, the Ballot should require that an Entity consenting to the release under the Plan to "opt in" by checking the

box. Not only would this affirmative act be evidence of a consensual release, it will prevent the automatic release of claims by those Entities who do not vote or who are not entitled to vote.

44. Furthermore, because at this point it is unclear what Plan Class or Classes the Lead Plaintiff and the members of the putative Securities Class are in and whether they are entitled to vote, to the extent a member of the putative Securities Class holds an Allowed Claim (in addition to a claim based upon the allegations of the Securities Litigation) and is entitled to vote to accept or reject the Plan with respect to the Allowed Claim, that vote (or failure to opt out) should not be deemed to release the Securities Litigation-related claim for which the creditor may or may not be entitled to vote. In other words, any release resulting from a vote in favor of the Plan and failure to opt out or failure to vote must be limited to the Claim for which the Ballot is submitted. Claims independent of those voted should not be released or impacted in any way.

45. Indeed, the Plan and the form of Ballot, in effect, create a trap for the unwary, potentially imposing an involuntary release of claims in favor of numerous non-Debtors and agents with no corresponding benefit or consideration to the creditor.

46. In sum, the third-party non-Debtor releases and related injunctions render the Plan unconfirmable and must not be permitted.

## CONCLUSION

47. Based on the foregoing, Lead Plaintiff respectfully requests that an order be entered (i) denying approval of the (a) Disclosure Statement and (b) the voting and solicitation procedures; and (ii) granting such other and further relief as the Court deems just and proper.

Dated: May 13, 2010
     Wilmington, Delaware

CROSS & SIMON, LLC

By: */s/ Christopher P. Simon*
   Christopher P. Simon (No. 3697)
   913 North Market St., 11th Floor
   P.O. Box 1380
   Wilmington, Delaware 19899-1380
   302.777.4200 (Telephone)
   302.777.4224 (Facsimile)
   csimon@crosslaw.com

       -and-

**LOWENSTEIN SANDLER PC**
Michael S. Etkin, Esq. (ME 0570)
Ira M. Levee, Esq. (IL 9958)
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500 (Telephone)
973.597.2400 (Facsimile)

*Bankruptcy Counsel to Lead Plaintiffs and the Putative Class*