# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| WASHINGTON MUTUAL, INC., et al.[1], | : | Case No. 08-12229 (MFW) |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : | **Related to Docket Nos. 2622, 2623, 3568** |
|  | : |  |
|  | : | **Objection Deadline: May 13, 2010 at 4:00 p.m.** |
|  | : | **Hearing Date: May 19, 2010 at 11:30 a.m.** |

## BANK BONDHOLDERS' OBJECTIONS TO DISCLOSURE STATEMENT FOR THE JOINT PLAN OF AFFILIATED DEBTORS AND TO THE MOTION OF DEBTORS SEEKING AN ORDER APPROVING THE SAME

The holders of senior notes (the "Senior Notes") issued by Washington Mutual Bank

("WMB") (the "Bank Bondholders") listed below[2] file this Objection to the Disclosure Statement

for the Joint Plan of Affiliated Debtors filed on March 26, 2010 ("Disclosure Statement") and to

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395).

[2]     The Bank Bondholders include Anchorage Capital Master Offshore, Ltd.; GRF Master Fund, L.P. c/o Anchorage Advisors, L.L.C.; PCI Fund, L.L.C. c/o Anchorage Advisors, L.L.C.; Allen Arbitrage, L.P.; Allen Arbitrage Offshore; Bank of Scotland plc; Caspian Alpha Long Credit Fund, L.P.; Caspian Capital Partners, LP; Caspian Select Credit Master Fund, Ltd.; Cetus Capital, LLC; Citigroup Global Markets, Inc.; CVI GVF (Lux) Master S.a.r.l.; D. E. Shaw Laminar Portfolios, L.L.C; Drawbridge DSO Securities LLC; Drawbridge OSO Securities LLC; Worden Master Fund LP; Farallon Capital Management, LLC; Gruss Global Investors Master Fund, Ltd.; Gruss Global Investors Master Fund (Enhanced), Ltd.; Halcyon Master Fund L.P. c/o Halcyon Offshore Asset Management LLC; King Street Capital, L.P.; King Street Capital Master Fund, Ltd., assignee of King Street Capital, Ltd.; Longacre Master Fund, Ltd.; Longacre Capital Partners (QP), L.P.; Longacre Master Fund II, L.P.; Longacre CE Master Fund, L.P.; Longacre Opportunity Fund, L.P., Longacre Opportunity Offshore, Ltd.; Marathon Credit Opportunity Master Fund, Ltd.; Marathon Special Opportunity Master Fund, Ltd.; OZ Master Fund, Ltd. c/o OZ Management LP; Gordel Holdings Limited c/o OZ Management LP; Goldman Sachs & Co. Profit Sharing Master Trust c/o OZ Management LP; OZ Select Master Fund LP c/o OZ Management LP; OCP Investment Trust; Onex Debt Opportunity Fund, Ltd.; Plainfield Special Situations Master Fund II, Limited; Plainfield OC Master Fund II Limited; Plainfield Liquid Strategies Master Fund Limited; Quintessence Fund L.P. c/o QVT Associates GP LLC; QVT Fund LP c/o QVT Associates GP LLC; Stone Lion Portfolio L.P.; UBS Securities LLC; The Värde Fund, L.P.; The Värde Fund VI-A, L.P.; The Värde Fund VII-B, L.P.; The Värde Fund VIII, L.P.; The Värde Fund IX, L.P.; The Värde Fund IX-A, L.P.; Värde Investment Partners (Offshore) Master, L.P.; Värde Investment Partners, L.P.; HFR ED Select Fund IV Master Trust; Lyxor/York Fund Limited; Permal York Ltd.; York Capital Management, L.P.; York Credit Opportunities Fund, L.P.; York Credit Opportunities Master Fund, L.P.; York Investment Master Fund, L.P.; York Select, L.P.; York Select Master Fund, L.P.

the Motion of Debtors for an Order Pursuant to Sections 105, 502, 1125, 1126, and 1128 of the

Bankruptcy Code and Bankruptcy Rules 2002, 3003, 3017, 3018 and 3020, (I) Approving the

Proposed Disclosure Statement and the Form and Manner of the Notice of the Disclosure

Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling a

Confirmation Hearing; and (IV) Establishing Notice and Objection Procedures for Confirmation

of the Debtors' Joint Plan ("Motion"). To the extent the Motion seeks approval of the Disclosure

Statement so that the Debtors can proceed to solicit acceptances of the Plan (as defined below),

the Motion should be denied.[3]

## INTRODUCTION

1.　　Before it filed for bankruptcy, Washington Mutual Inc. ("WMI" or "Debtor") was

a holding company whose principal asset was its stock in WMB, a federally chartered savings

association. On September 25, 2008, WMB was closed by the Office of Thrift Supervision, and

the FDIC was appointed as receiver of WMB. Immediately after its appointment as Receiver,

the FDIC sold substantially all of the assets of WMB to JPMorgan Chase Bank, National

Association ("JPMC"). The following day, on September 26, 2008, WMI and its wholly-owned

subsidiary, WMI Investment Corp. ("WMI Investment" or, collectively with WMI, "Debtors"),

filed petitions for relief under Chapter 11 of the United States Bankruptcy Code in this Court.

As the Court is well aware, these events have given rise to numerous disputes regarding the

ownership of assets among the Debtors, the FDIC (as receiver for WMB), JPMC, and the

creditors of both WMI and WMB. The plan now proposed by the Debtors and described in the

---

[3]　　This Objection addresses the Motion only to the extent that it seeks approval of the Disclosure Statement. The Objection is not intended to address objections to the Plan, and the Bank Bondholders reserve all rights to assert plan objections in the manner and time provided in any order entered by this Court with respect to the Motion. The Bank Bondholders also reserve the right, to the extent necessary, to file a motion seeking temporary allowance of their claims for voting purposes pursuant to Section 3018 of the Bankruptcy Code following the entry of an order on the Motion.

Disclosure Statement at issue in the Motion (the "Plan" or "Proposed Plan") is explicitly conditioned upon the approval and effectiveness of a proposed settlement that resolves many—if not most—of those disputes.

2.      But, to the best knowledge of the Bank Bondholders, there is no such settlement in place today. Instead, over 18 months after the commencement of this bankruptcy case and some $80,000,000 in professional fees later, and faced with the end of their exclusivity to propose and solicit acceptances to a plan, the Debtors—desperate to preserve their control over the case—have presented the Court with a Plan and Disclosure Statement premised on a *proposed* global settlement agreement that, apparently, has not yet been agreed to by all the purported parties to the settlement. Although the Debtors have tried to paint the current status with respect to the settlement as just working on "the final words," the FDIC—the crucial party not yet signed onto the settlement agreement—has stated that there are still "significant open issues" with respect to the settlement. Tr. May 5, 2010, Case No. 08-12229, at 94:22, 96:12-13 (Bankr. D. Del.). The Debtors' desire to get something on file—no matter how premature—is understandable, but neither that desire, nor the possibility that there could be competing plans, can justify asking the Court and the Debtors' creditors—including the Bank Bondholders—to evaluate a Plan that is explicitly premised on—and that is not feasible without—a settlement that does not currently exist.

3.      Moreover, even if a disclosure statement describing a plan that is based on a settlement that does not yet exist and that remains subject to significant change *could* be deemed adequate, the Disclosure Statement here is deficient in several additional respects:

First, the Disclosure Statement fails adequately to describe the current status of the proposed settlement.

- 3 -

Second, the Disclosure Statement provides almost no information with respect to the proposed business to be conducted by the "Reorganized Debtors" if the Proposed Plan is confirmed. Neither the Disclosure Statement nor the Proposed Plan—which calls for the liquidation of virtually all of the assets of the Debtors—gives more than a hint of what exactly it is the Reorganized Debtors will do to generate income and avoid a return to bankruptcy. There is thus no way for creditors, or the Court, to determine whether this Plan is feasible even if the proposed settlement were to come to fruition. The absence of this information also makes it impossible to (1) assess the ability of the Reorganized Debtors to utilize operating losses to offset income in post-confirmation years, and (2) value the stock of the Reorganized Debtors that is to be distributed to certain creditors and estimate the cash to be received by the Reorganized Debtors as a result of the "Rights Offering" described in the Proposed Plan.

Third, even though the proposed global settlement agreement specifically provides that the settlement is contingent upon the dismissal of the claims filed by the Bank Bondholders, the Disclosure Statement fails to disclose pertinent and material facts regarding those claims, including the fact that this Court has denied the Debtors' motion to disallow those claims as a matter of law and the classification and treatment of those claims under the Proposed Plan if the claims are ultimately allowed.

Fourth, the Disclosure Statement does not adequately explain Debtors' proposed justification for the broad third party releases provided for in the Proposed Plan. These releases—which can be read to eliminate the Bank Bondholders' claims against the FDIC and the WMB Receivership Estate—purport to discharge claims between non-debtor third parties and thus, on a non-consensual basis, would not be permissible under Third Circuit law.

- 4 -

# BACKGROUND

4.      As noted above, on September 25, 2008, WMB was closed by the Office of Thrift

Supervision, and the FDIC was appointed as receiver of WMB. Immediately after its

appointment as Receiver, the FDIC sold substantially all of the assets of WMB to JPMC. The

following day, on September 26, 2008, WMI and its wholly-owned subsidiary, WMI Investment

Corp. ("WMI Investment"), filed petitions for relief under Chapter 11 of the United States

Bankruptcy Code in this Court.

### A.      Litigation and Bank Bondholders Claims

5.      The events surrounding the seizure and sale of WMB have given rise to multiple

related disputes, as reflected in three separate judicial proceedings, as well as in the FDIC's

Proof of Claim, which remains unchallenged by the Debtors:

- DC Action: The Debtors filed their Complaint against the FDIC in the United States
  District Court for the District of Columbia on March 20, 2009. *See Washington
  Mutual, Inc., et al., v. Federal Deposit Insurance Corporation*, No.1:09-cv-00533
  (D.D.C.). In that DC Action, the Debtors seek the allowance—in many instances, on
  a priority basis—and payment of many billions of dollars in claims from WMB's
  Receivership Estate (and from the FDIC in its corporate capacity). Complaint, Dkt.
  No. 1, Case No. 09-00533, Mar. 20, 2009 (D.D.C), ¶¶ 80-95. Over the objection of
  the Debtors and the FDIC, the Bank Bondholders were permitted to intervene in this
  action.

- JPMC Adversary. On March 24, 2009, JPMC commenced the JPMC Adversary
  against the Debtors and, with respect to Count 8 ("the Interpleader Count" ) only, the
  FDIC. Complaint, Dkt. No. 1, Adv. Proc. No. 09-50551 (Bankr. D. Del.). In that
  action, JPMC asserts that various assets claimed by WMI belonged instead to WMB
  and were transferred to JPMC pursuant to the Purchase and Assumption Agreement.
  In the Interpleader Count, JPMC recognizes that, if and to the extent any purported
  deposits represent valid liabilities payable by JPMC, there may be competing claims
  to the funds, including by the Debtors and the WMB Receivership Estate. *Id.* at ¶
  211. To avoid potential exposure to double liability, JPMC seeks to interplead any
  funds that constitute valid deposit liabilities. *Id.* at ¶ 212. In response to JPMC's
  Complaint, the Debtors have filed numerous counterclaims. Again, the Bank
  Bondholders were authorized to intervene in this action (at least with respect to the
  Interpleader Claim).

- Turnover Action. In the Turnover Action, filed by the Debtors on April 27, 2009, the Debtors seek an order requiring JPMC to "turnover" more than $4 billion in purported deposits that the Debtors claim that WMB or its subsidiary, WMBfsb, held on its behalf and that are now held by JPMC. *See* Complaint, Dkt. No. 1, Adv. Proc. No. 09-50934, Apr. 27, 2009 (Bankr. D. Del.). JPMC has filed Counterclaims against the Debtors and Cross-Claims against the FDIC in the Turnover Action. The FDIC has filed a motion for relief from the automatic stay, to the extent necessary, so that it may exercise the rights granted to it under the Purchase and Assumption Agreement to take back the putative deposits so that, if the Receivership Estate's claims are ultimately determined to be valid, it may exercise rights of setoff against any such deposit liabilities for the benefit of WMB's billions of dollars in unpaid creditors. *See* Motion of the Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank, for an Order Modifying the Automatic Stay, Dkt. No. 1834, Case No. 08-12229, Nov. 4, 2009 (Bankr. D. Del.). Yet, again, over the objection of the Debtors, the Bank Bondholders were authorized by this Court to intervene in the action.

- FDIC's Proof of Claim. The FDIC filed its Proof of Claim against the Debtors' estates on March 30, 2009 (Claim No. 2140). The FDIC alleges claims for undercapitalization, tax payments, fraudulent transfer, trust preferred securities, deposit accounts, intercompany amounts, capital maintenance obligations, proceeds of litigation, and insurance proceeds. FDIC's Proof of Claim ("FDIC POC") ¶¶ B-I. To date, the Debtors have not objected to the FDIC's Proof of Claim.

6.     The Bank Bondholders are also pursuing their own claims in this bankruptcy case. To protect their interests in the Senior Notes and their claims against the Debtors, the Bank Bondholders filed timely proofs of claim in the Debtors' bankruptcy cases, *see* Claim Nos. 3710 and 3711 (the "Proofs of Claim" or "POC"),[4] asserting (among other things) that the Debtors are liable for payment of all amounts due on the Senior Notes. The Proofs of Claim include (among other claims) direct claims based on theories of, *inter alia*, alter ego, piercing the corporate veil, substantive consolidation, and misrepresentation and material omissions. POC ¶¶ 8, 9, and 13. The Proofs of Claim also include fraudulent transfer, breach of fiduciary duty, mismanagement, undercapitalization, and other claims related to (among other things) the nearly $4 billion in purported deposits allegedly transferred from WMB on the eve of its receivership, the billions of

---

[4]     *See also* Proof of Claim No. 2480, to which several Bank Bondholders are also signatories.

dollars in tax losses that were generated by WMB—not WMI—but in which WMI has nevertheless asserted interests, and the billions of dollars in purported dividends that WMI caused to be upstreamed from WMB to WMI. POC ¶¶ 10, 11, 15.

7. On January 22, 2010, the Debtors filed their Twentieth (20th) Omnibus (Substantive) Objection to Claims, in which they objected to the Proofs of Claims filed by the Bank Bondholders and asked the Court to disallow and expunge the claims in full as a matter of law. *See* Dkt. No. 2205, Case No. 08-12229 (Bank. D. Del. Jan. 22, 2010). A hearing on the objection was held on April 6, 2010, at the conclusion of which the Court denied the objection, holding that none of the Bank Bondholders' claims could be dismissed as a matter of law and that the parties could proceed with discovery on most of the claims, including the claims for misrepresentation, piercing the corporate veil and substantive consolidation. *See* Tr. April 6, 2010, Case No. 08-122229, at 129:8-131:4 (Bankr. D. Del.). This Court entered an order denying the objection on April 21, 2010. *See* Dkt. No. 3549, Case No. 08-12229 (Bankr. D. Del. Apr. 21, 2010).

8. The Bank Bondholders, the Debtors and other interested parties are working on an appropriate discovery schedule to propose to the Court with respect to the litigation of the Bank Bondholders' claims. As counsel for the Debtors and counsel for the Bank Bondholders recently informed this Court, the parties are considering a discovery schedule that largely tracks the discovery schedule ordered in the class action proceedings in the United States District Court in the Western District of Washington. *See* Tr. April 21, 2010, Case No. 08-12229, at 29:8-24 (Bankr. D. Del.). Pursuant to the schedule in those proceedings, document discovery ends in September 2010, expert discovery ends in November 2011, and trial is scheduled to begin in July 2012. *Id.* In short, it does not appear likely that a final disposition of the Bank Bondholders'

92277-001\DOCS_DE:159936.1

claims will occur any time soon.

**B.**     **The Proposed Global Settlement and the Plan and Disclosure Statement**

9.      At a hearing on March 12, 2010, the Debtors announced that a tentative settlement had been reached among the Debtors, JPMC, and the FDIC, and outlined the major points of that purported settlement. Tr. March 12, 2010, Case No. 08-12229, at 18:4-26:1 (Bankr. D. Del.). Counsel for the Debtors acknowledged that the "agreement" was subject to many conditions, including approval by the FDIC Board of Directors and the disallowance of the Bank Bondholders' claims. *Id.* On March 26, 2010, the Debtors filed a Disclosure Statement for the Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, along with the Proposed Plan. *See* Dkt. Nos. 2623 and 2622. A draft of the "Proposed Global Settlement Agreement" was submitted as Exhibit I to the Proposed Plan, and both the Disclosure Statement and the Plan provide that the Plan is "expressly conditioned upon the approval and effectiveness" of that settlement. *See* Plan §2.1; Discl. Stmt. at 8.

10.      Although the Plan is conditioned upon the approval of the Proposed Global Settlement Agreement, the Disclosure Statement reveals that as of the date the Disclosure Statement and Plan were filed, the FDIC had not agreed to all of the provisions set forth in the purported agreement: "As of this date, the FDIC Receiver and FDIC Corporate have not agreed to all of the provisions contained in the Proposed Global Settlement Agreement. However, the Debtors and the other parties to the Proposed Global Settlement Agreement are hopeful that such agreement and requisite approval shall be obtained in the near future." Discl. Stmt. at 7. After the Disclosure Statement and Plan were filed, a spokesperson for the FDIC stated publicly that the documents filed with the Court purporting to reflect the parties' agreement in principle in fact "do not reflect the continuing discussions among the parties." Dan FitzPatrick, *FDIC Stands Between J.P. Morgan and Tax Windfall*, The Wall Street Journal, Mar. 29, 2010 at C1, attached

- 8 -

as Ex. A. To date, the FDIC apparently still has not signed onto the agreement, and as recently as the May 5 hearing before this Court, counsel for the FDIC indicated that there were "still significant open issues" to be resolved with respect to the purported settlement. Tr. May 5, 2010, Case No. 08-12229, at 96:12-13 (Bankr. D. Del.).

## OBJECTIONS

11.     The Bankruptcy Code provides that before a debtor can solicit acceptances or rejections of a plan, it must obtain approval by the bankruptcy court of a disclosure statement containing adequate information upon which creditors can make an informed judgment regarding the plan. 11 U.S.C. § 1125(b). The Court should deny the Motion to approve this Disclosure Statement for at least two reasons: (1) the Proposed Plan is unconfirmable, and (2) the Disclosure Statement does not contain adequate information.

## I.     THE DISCLOSURE STATEMENT DESCRIBES A PLAN THAT CANNOT CURRENTLY BE CONFIRMED

12.     "Submitting the debtor to the attendant expense of soliciting votes and seeking court approval on a clearly fruitless venture would be costly and it would unduly delay any possibility of a successful reorganization." *In re Pecht*, 53 B.R. 768, 769-70 (Bankr. E.D. Va. 1985). Accordingly, a bankruptcy court can refuse to approve a disclosure statement if the plan is unconfirmable on its face. *See In re Quigley Co.,* 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the [motion] to approve the disclosure statement must be denied, as solicitation of the vote would be futile.") (internal citations omitted); *In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631 (Bankr. E.D. Pa. 1996); *In re Eastern Maine Electric Coop., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987). That is the case here: the Plan is conditioned on a purported settlement

involving the FDIC and the disallowance of the Bank Bondholders' claims, neither of which conditions currently exist. Accordingly, the Proposed Plan is not confirmable and the Debtors' effort to solicit acceptances for the Proposed Plan on the time frame proposed is "clearly a fruitless venture."

13.    As the Debtors acknowledge, the Plan "incorporates, and is expressly conditioned upon the approval and effectiveness of . . . the compromise and settlement embodied in the Proposed Global Settlement Agreement." Discl. Stmt. at 8. This makes sense: many of the assets that will be used to pay creditors under the Proposed Plan are subject to ongoing disputes as to whether the Debtors own them. The Debtors will have rights in those assets only if the Proposed Global Settlement Agreement becomes effective. If the Settlement Agreement is not approved and does not become effective, the Plan does not work. Accordingly, approval of the Proposed Global Settlement Agreement is a condition precedent to confirmation of the Plan, and to the extent that there is no actual settlement, the Plan cannot be confirmed. Plan §37.1(a)(5), (8) and (10).

14.    Under the circumstances that currently exist, evidently, there is no "Global Settlement Agreement" that can be approved, and the Plan therefore cannot be confirmed. As the FDIC has made clear, there are still "significant open issues" that need to be resolved before any agreement can be reached. Tr. May 5, 2010, Case No. 08-12229, at  96:12-13 (Bankr. D. Del.). In addition, the Global Settlement Agreement makes clear that before it can come to fruition, several conditions must be satisfied, including, among other things, that this Court issue an order disallowing the Bank Bondholders' claims in full. *See* Global Settlement Agreement § 7.2(f); see *also* Tr. March 12, 2010, Case No. 08-12229 at 25:2-6 (Bankr. D. Del.) (noting that "[debtors] are still prepared to go forward with [the agreement] provided that the claims of the

WMB bondholders are disallowed in their entirety. If not . . . this transaction will not go forward"). Satisfaction of that additional condition is also a prerequisite to the effectiveness of the Plan. Plan § 38.1(a). But this Court has not issued an order disallowing the Bank Bondholders' claims—on the contrary, while a final evidentiary hearing has not been held and the claims remain subject to dispute, the Court has denied Debtors' motion to disallow the Bank Bondholders' claims as a matter of law.

15.     Thus, the Proposed Plan is conditioned on the approval of a putative settlement that has not yet been reached (and may never be or, if an agreement is finally reached, may change materially) and on an order that the Court has not yet issued (and may never issue). On these facts, any effort by Debtors to solicit acceptances of the Plan is premature and a waste of time and resources.

## II.     THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE INFORMATION

16.     The Disclosure Statement also should not be approved because it fails to provide "adequate information," within the meaning of 11 U.S.C. §1125(a), upon which creditors can make an informed judgment regarding the Plan.

17.     The requirements for a disclosure statement set forth in Section 1125 of the Bankruptcy Code are fundamental to the functioning of the bankruptcy process. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996)) (noting that disclosure under Section 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system . . . [and] the importance of full and honest disclosure cannot be overstated"). The provision of adequate information is essential for a disclosure statement. *See* 11 U.S.C. 1125(a) & (b); *see also In re Ferretti*, 128 B.R. 16, 18 (Bankr. D.N.H. 1991). A disclosure statement must describe all factors known to the plan proponent that may impact the

success or failure of the proposals contained in the plan. *See, e.g., In re Beltrami Enters.*, 191

B.R. 303, 304 (Bankr. M.D. Pa. 1995); *In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr.

S.D. Ohio 1990); *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981).

18.     Adequate information is defined in the Bankruptcy Code as:

> [I]information of a kind, and in sufficient detail, as far as is reasonably practicable
> in light of the nature and history of the debtor and the condition of the debtor's
> books and records, including a discussion of the potential material Federal tax
> consequences of the plan to the debtor, any successor to the debtor, and a
> hypothetical investor typical of the holders of claims or interests in the case, that
> would enable such a hypothetical investor of the relevant class to make an
> informed judgment about the plan, but adequate information need not include
> such information about any other possible or proposed plan and in determining
> whether a disclosure statement provides adequate information, the court shall
> consider the complexity of the case, the benefit of additional information to
> creditors and other parties in interest, and the cost of providing additional
> information.

11 U.S.C. § 1125(a)(1). Precisely what constitutes adequate information in any particular

instance will be determined on a case by case basis, *In re River Village Assocs.*, 181 B.R. 795,

804 (E.D. Pa. 1995), and the Bankruptcy Court has considerable discretion in considering the

adequacy of a disclosure statement. *Id.*

**A.     The Disclosure Statement Does Not Contain Adequate Information
        Concerning the Status of the Proposed Global Settlement**

19.     Although the Disclosure Statement states that "the FDIC Receiver and FDIC

Corporate have not agreed to all of the provisions contained in the Proposed Global Settlement

Agreement," Discl. Stmt. at 7, the Disclosure Statement does not disclose that counsel for the

FDIC has stated that there are "significant open issues" with respect to the agreement in its

current form. *See* Tr. May 5, 2010, Case No. 08-12229 at 96:12-13 (Bankr. D. Del.). That the

proposed agreement may never be finalized, or finalized only on materially different terms as

compared to those contained in the current draft, is highly relevant to a creditor's decision to

accept or reject the Proposed Plan. Indeed, the final terms of the settlement are critical to an

- 12 -

informed judgment regarding the Proposed Plan, since the Plan is premised on such a settlement. But until a settlement is actually reached and finalized, it is impossible for the Debtors to provide that crucial information.

20.     Nor does the Disclosure Statement provide information about parties who have voiced opposition to the proposed agreement. For example, holders of equity in WMI have lodged objections through an extensive letter writing campaign. *See, e.g.,* Dkt. Nos. 2641-2670, 2672-2736, 2740-2770, 2782-2826, 2828-2877, 2881-2966, 2968-2985, 2987-3048, 3090-3104, 3218-3244, 3279-3410, and 3451-3497. And the Equity Committee has made repeated suggestions—suggestions with which the Bank Bondholders disagree—that the settlement may undervalue claims that the Debtors have against various third parties. *See* Motion to Appoint an Examiner and Supporting Memorandum, Dkt. No. 3579, Case No. 08-12229 (Bankr. D. Del. Apr. 26, 2010). The Bank Bondholders have also publicly expressed their objection to the proposed agreement on the basis that it improperly funnels assets that belong to the WMB receivership estate to the Debtors.

21.     Finally, although the Disclosure Statement does state that the disallowance of the Bank Bondholders' claims is a condition to the Agreement, the Disclosure Statement does not inform creditors that the Court denied the Debtors' motion to disallow those claims as a matter of law, *see* Dkt. No. 3549, Case No. 08-12229 (Bankr. D. Del. Apr. 21, 2010), or that final resolution of the claims may not occur for a significant period of time, delaying indefinitely any effectiveness of the Plan.

22.     All of this information—the current status of negotiations, the viability of the tentative settlement agreement, the existence of objections to that agreement, and the status of the Bank Bondholders' claims—is vital to a creditor trying to make an informed decision

- 13 -

concerning whether to vote for a Proposed Plan that is explicitly premised on the "approval and effectiveness" of the agreement and the disallowance of those claims. Discl. Stmt. at 8.

**B.**     **The Disclosure Statement Does Not Contain Adequate Information Regarding the Proposed Business of the Reorganized Debtors**

23.     With respect to the "Reorganized Debtors," the Disclosure Statement states only that the Reorganized Debtors will retain "among other assets, (a) equity interests in WMI Investment and WM Mortgage Reinsurance Company ("WMMRC"), debtor and non-debtor subsidiaries of WMI, respectively, and (b) cash received on account of the offering of Subscription Rights to holders of Allowed PIERS Claims, as described in the Plan (the "Rights Offering")."[5] Discl. Stmt. at 13. Buried more than 100 pages into the document, in the paragraphs discussing "tax consequences," the Disclosure Statement also reveals that "[f]ollowing the implementation of the Plan, the Tax Group intends to continue to be in the insurance business and possibly certain other historic lines of business." Discl. Stmt. at 111. That is the full extent of the information provided regarding the "business" that the Debtors intend to engage in after consummation of the Plan. There is no description of the business, no pro forma financial statements, and no projections.[6] There is simply not sufficient information to provide creditors an adequate basis to make an informed judgment about the Proposed Plan.

24.     The information regarding the purported business of the Reorganized Debtors that is missing from the Disclosure Statement is critical to evaluating several aspects of the Proposed Plan. Without meaningful information regarding the anticipated business of the Reorganized Debtors and the financial projections of the Reorganized Debtors, neither the Court nor the

---

[5]     Capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Disclosure Statement or the Proposed Plan.

[6]     At page 104 of the Disclosure Statement, the Debtors indicate that "financial information and projections will be provided at a later date." But, to date, the Debtors have not publicly submitted any such additional information and projections.

creditors can determine whether the proposed reorganization is feasible. Indeed, the information in the Disclosure Statement regarding the post-confirmation business of the Debtors is so lacking that it is insufficient to determine even whether Debtors will engage in any business at all, and thus whether they are entitled to the discharge for which the Plan provides.[7]

25.     The Plan provides for the liquidation of virtually all assets of the Debtors. The assets of WMI Investment and the assets of WMI—except for its equity interests in WMI Investment, WMMRC, and WMB and the cash received in connection with the Rights Offering—will be transferred to the liquidating trust or used to pay obligations of the Debtors. Plan, §1.113; Discl. Stmt. at 14. Other than the bare assertion that Debtors intend to continue in the insurance business, there is nothing in either the Proposed Plan or the Disclosure Statement from which a creditor could conclude that, if this Proposed Plan is confirmed, either of the Debtors will be capable of conducting any business, much less a business that will be successful and will not need to reorganize. Indeed, with respect to WMI Investment, there is not even an assertion that it will engage in any post-confirmation business.

26.     It is also not clear that the other subsidiary retained by WMI, WMMRC, has the means to conduct any profitable business. According to the Disclosure Statement, WMMRC, a wholly owned, *non-debtor* subsidiary of WMI, is a captive reinsurance company, "created to reinsure risk associated with residential mortgages that were originated or acquired by WMB." Discl. Stmt. at 50. The Disclosure Statement reports that WMMRC has reinsurance agreements with six mortgage insurance companies; that, pursuant to each such reinsurance agreement, WMMRC established a trust account for the benefit of each of the mortgage insurers to hold the

---

[7]     Section 1141(d)(1) of the Bankruptcy Code provides that, generally, confirmation of a plan discharges a debtor from all prepetition debt. Such a discharge, however, is not available to a corporate debtor if "(A) the plan provides for the liquidation of all or substantially all of the property of the estate," and "(B) the debtor does not engage in business after consummation of the plan." 11 U.S.C. § 1141 (d)(3).

premiums collected and to secure WMMRC's obligations to the mortgage insurers with respect to the insured loans; that the reinsurance agreements require WMMRC to maintain a minimum amount of capital in the applicable trusts; and that, as of December 31, 2009, the value of the six trust assets was estimated to be $460 million. *Id.* But the Debtors also acknowledge that WMMRC may forfeit its rights in those amounts. *Id.* The Disclosure Statement acknowledges that due to the WMB Receivership and the sale of substantially all of WMB's assets to JPMC, all of the trusts established pursuant to the reinsurance agreements are operating on a "run-off" basis "because WMMRC has ceased to reinsure any new WMB-originated loans." *Id.* at 51. The Disclosure Statement further acknowledges that:

> WMMRC's failure to maintain adequate Reinsurance Reserves could result in the Mortgage Insurers' election to terminate the Reinsurance Agreement on a 'cut-off' basis, in which case the WMMRC would no longer be liable for the reinsured loans and would no longer receive reinsurance premiums with respect thereto. WMMRC would, however, be liable for the Reinsurance reserve, which may, in certain cases result in the extinguishment of all assets on account in the Trust at issue.

*Id.*

27.     This information is insufficient to establish that WMMRC is or will be capable of engaging in any business post-confirmation, and it is not adequate to show that the proposed Plan is feasible—*i.e.* that confirmation of the Plan "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11). There is simply nothing on which creditors can base any evaluation of whether the business—if there is a business—is likely to succeed or whether WMI shortly will be back in bankruptcy.

28.     The lack of information regarding the Reorganized Debtors' intended business also impedes any assessment of the tax consequences of the Plan to the Reorganized Debtors.

- 16 -

The complete dearth of information regarding the business to be conducted by the Reorganized Debtors suggests that the real purpose of Debtors' purported reorganization is something other than to continue the reinsurance business of WMMRC. The Disclosure Statement's discussion of the federal income tax consequences of the Plan suggests that what Debtors are really trying to do here is to preserve for themselves—or, more accurately, for the Subordinated Noteholders of WMI to whom the stock of the Reorganized Debtors will be distributed, and the Piers Claimants and Backstop Purchasers who will have a right to acquire additional shares of the stock—the value of the tax losses incurred by WMB.

29.     The Disclosure Statement suggests that the Debtors or the Reorganized Debtors *may* (although the possibility of doing so is acknowledged to be fraught with uncertainty) be able to take a "Stock Loss" which the Reorganized Debtors *may* be able to utilize to offset future taxable income, and that in order to do this, it is *possible* that Debtors may seek to abandon their stock interest in WMB. Discl. Stmt. at 109 - 111. While the lack of information regarding the proposed business of the Reorganized Debtors makes it difficult to assess the ability of the Debtors to take the Stock Loss and utilize the losses in this way, a review of the law that would govern any such transactions casts substantial doubts on whether the Debtors will be able to do so.

30.     First, the applicable Treasury Regulations defer the time at which WMI, the parent of a consolidated group for U.S. federal income tax purposes, may take a worthless stock loss for its stock of WMB, a subsidiary of the consolidated group; the Debtors may not take a worthless stock loss until all of WMB's assets are "treated as disposed of, abandoned, or destroyed for Federal Income Tax purposes." *See* Treas. Reg. § 1.1502-19(c)(1)(iii). As the Debtors recognize, this will occur only when the FDIC distributes all of the receivership assets to

creditors of WMB. Discl. Stmt. at 109. This has not yet occurred and it is not known when such events will occur. Although the Debtors recognize that they may not be able to do so, it appears that the Debtors plan to abandon their stock investment in WMB and claim such abandonment allows them to take the Stock Loss. Discl. Stmt. at 109. While abandonment of stock may allow a taxpayer to take a worthless stock loss outside of a consolidated group, the Treasury Regulations applicable to consolidated groups do not permit a worthless stock loss in such circumstance and it is inconsistent with the policy behind the deferral rule, which is to defer the worthless stock loss until the subsidiary has taken into account all of its operating income, gain, deduction, and loss. Unified Rule for Loss on Subsidiary Stock, 72 Fed. Reg. 2964 (Jan. 23, 2007) (to be codified at 26 C.F.R. pt. 1). Furthermore, the deferral rule is also intended to alleviate the tension with respect to judicial cases protecting the tax attributes of bankrupt subsidiaries – just as the tax attributes of WMB must be protected. Consolidated Returns, 57 Fed. Reg. ¶ 53634-02 (Nov. 12, 1992) (to be codified at 26 C.F.R. pt. 1). The Debtors suggest that the net operating losses of WMB would no longer be available after WMI takes the worthless stock loss. Discl. Stmt. at 109. WMB is in receivership and its tax attributes must be protected like those of a bankrupt entity.

31.     Even if the Debtors are able to take a worthless stock loss, the use of those losses to offset future income is subject to the limitations set forth in Section 382 of the Internal Revenue Code. The extent to which those limitations apply, however, may depend on the very same details regarding the proposed post-confirmation business of the "Reorganized Debtors" that are lacking in the Disclosure Statement. If, for example, the Debtors do not continue their historic business or use a significant portion of their historic assets in a new business for at least two years after confirmation, they will not be able to utilize any of the worthless stock loss. *See*

IRC §382(c); Disc. Stmt. at 111. The Debtors simply state that they can provide no assurance that this continuity of business requirement will be met without providing any assessment of the likelihood that it will be met or providing sufficient information for such a judgment to be made. Disc. Stmt. at 111. Furthermore, even if the Debtors satisfy this continuity of business requirement, the use of the worthless stock loss likely will be significantly limited under Section 382. Disc. Stmt. at 111. If the worthless stock loss is taken after the Effective Date, which may be required because, as the Debtors admit, the timing of the loss is beyond their control, the Debtors concede that the entire worthless stock deduction may be limited. Disc. Stmt. at 111. The Disclosure Statement provides no information regarding the potential amount of the worthless stock loss, the likelihood that the loss will not be available due to the continuity of business requirement, the likelihood that the entire loss will be limited, or the amount of the annual Section 382 limitation. Without such information, it is impossible to evaluate the potential value of any worthless stock loss to the Reorganized Debtors.

32. An assessment of whether or not the Reorganized Debtors will be able to benefit from a worthless stock loss is also dependent on, among other facts and circumstances, what business the Debtors engage in post-confirmation and to what income they will seek to apply the losses. As stated above, the Disclosure Statement contains almost no information regarding the post-confirmation business of the Debtors and certainly not enough to make any judgment as to whether that business will satisfy the provisions of Section 382(c) of the Internal Revenue Code. In addition, the Disclosure Statement provides no information regarding the expected income of any business or any gains against which any tax losses may be offset. If the Debtors' intent (or the Subordinated Noteholders, the PIERS Claimants or Backstop Purchasers' intent by acquiring stock of the Reorganized Debtors) is to acquire a profitable company that could take advantage

- 19 -

of the tax losses, the Disclosure Statement should make that clear, as well as how such a strategy would be consistent with long-standing tax law to the contrary.

33.     Under Section 269 of the Internal Revenue Code, if control of a corporation is acquired and the principal purpose of such acquisition is the evasion or avoidance of federal income tax by securing the benefit of a loss that the acquiring taxpayer would not otherwise enjoy, the loss may be disallowed. Where, as it appears may be the case here, the historic business of the acquiring company has been discontinued and the acquiring company is essentially a shell with net operating losses, the Internal Revenue Service has challenged successfully the use of such losses to offset the income from a profitable business that the company acquires. *See Vulcan Materials Co. v. United States*, 446 F.2d 690 (5th Cir. 1971) (corporation which sold all of its assets and was non-operational was not allowed to use its losses to offset income from a profitable business it acquired via merger); *F.C. Publ'n Liquidating Corp. v. Comm'r*, 304 F.2d 779 (2d Cir. 1962) (losses of a corporation, the business of which was discontinued shortly after the acquisition of a profitable business via merger, were not allowed to offset income of the profitable business).

34.     In addition, the acquisition of stock of the Reorganized Debtors by the Subordinated Noteholders, PIERS Claimants or Backstop Purchasers may implicate the rules of Section 269. *See* Treas. Reg. § 1.269-5(b) (discussing the application of Section 269 to the acquisition of control of a corporation by creditors of a bankrupt corporation by themselves or in conjunction with other persons). *See also* Treas. Reg. § 1.269-3(d) (requiring more than an insignificant amount of an active trade or business to be carried on by a corporation to which Section 382(l)(5) applies). The Disclosure Statement provides little to no information regarding the purpose of the acquisitions; this omission is particularly glaring in the case of the PIERS

- 20 -

Claimants and the Backstop Purchasers who will pay cash for their stock. Given the lack of information in the Disclosure Statement regarding the post-confirmation business of the Reorganized Debtors, one must ask what exactly they are buying. The Disclosure Statement contains a vague reference to the rules under Section 269, indicating the Debtor's concern that such rules may apply, but provides no further detail or explanation. Discl. Stmt. at 112. The Debtors must provide such information in order for the potential value of the worthless stock loss to be determined.

35. The proposed post-confirmation business of the Debtors and the tax consequences of that business are not questions of idle curiosity for creditors. Under the proposed Plan, certain creditors (the Subordinated Noteholders) will receive distributions of the stock of Reorganized Debtors, while other creditors will not. In addition, holders of PIERS Claims will be given the right to purchase shares of that stock (and to the extent that those rights are not exercised, the Backstop Purchasers—certain holders of the Subordinated Noteholders—will acquire the stock) at a "Subscription Price." The cash received from the sale of the "Additional Common Stock" will be an asset of the Reorganized Debtors. Accordingly, in order for creditors to understand the relative distributions and benefits being received by the various classes of creditors, they must be able to value the stock of the Reorganized Debtors. The business that the Reorganized Debtors will engage in, the tax consequences thereof, and the cash to be received by the Reorganized Debtors pursuant to the Rights Offering are all important factors in that analysis.

C. **The Disclosure Statement Does Not Contain Adequate Information Regarding the Bank Bondholders' Claims**

36. The Disclosure Statement provides the following information about the Bank Bondholders' claims:

> Certain Bank Bondholders filed claims against the Debtors in their chapter 11 cases seeking payment of allegedly outstanding amounts due on such notes and

- 21 -

asserting claims for, among other things, (a) corporate veil-piercing, alter ego and similar principles, (b) substantive consolidation, (c) improper claim to purported deposits, (d) undercapitalization of, failure to support, and looting of the bank, (e) misrepresentations and omissions under the applicable securities laws, (f) conditional exchange of the Trust Preferred Securities, (g) tax refunds and losses, (h) mismanagement and breach of fiduciary and other duties, (i) claim for goodwill litigation award, and (j) fraudulent transfer. On January 22, 2010, as subsequently corrected, the Debtors filed an objection to the proofs of claim asserted by the Bank Bondholders on the grounds that, inter alia, the Bank Bondholders lack standing to assert such claims against the Debtors and that the asserted claims are otherwise insufficient as a matter of law. The Creditors' Committee subsequently filed a joinder to the Debtors' objection. On March 5, 2010, the Bank Bondholders filed responses to the Debtors' objections. The Debtors' reply brief is to be filed on March 26, 2010 and an initial hearing to consider the Debtors' objections is currently scheduled for April 6, 2010.

Discl. Stmt. at 35. The Disclosure Statement contains no information about the amount or

classification of the Bank Bondholders' claims or the current status of the Bank Bondholders'

claims. *See* Discl. Stmt. at 14-19. This information is essential to reach an informed judgment

about the Proposed Plan.

37. The Disclosure Statement fails to mention that, according to the Bank

Bondholders' Proofs of Claim, the Bank Bondholders' claims are for many billions of dollars

and that those claims are not necessarily general unsecured claims. As the Bank Bondholders

state in their Amended Proofs of Claim:

[A]s a matter of structural seniority and under applicable law, the Bank Bondholders and other holders of the Senior Notes issued by the Bank are entitled to payment in full ahead of any payment on any and all senior or unsecured notes issued by the Debtor. In addition, while the Bank Bondholders dispute that the Debtor or its estate has any valid claims against the Bank Bondholders or the Bank (or its estate in receivership), to the extent any such claims are allowed, the Bank Bondholder Claims are secured by right of setoff under Sections 506(a) and 553 of the Bankruptcy Code. Moreover, to the extent that any of the claims asserted herein arise out of actions taken or benefits obtained by WMI and its bankruptcy estate post-petition, such as—by way of example only—through the post-petition filing by WMI of tax returns and the post-petition obtaining of tax refunds attributable to WMB's operations, activities, and losses, the claims asserted herein are entitled to administrative priority under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

- 22 -

POC ¶ 7. Thus if the Bank Bondholders' claims are ultimately allowed, the bankruptcy estate faces significant liability that could potentially be paid ahead of other unsecured creditors.

38.     At a minimum, the Disclosure Statement should specify in what class the Debtors propose to classify the Bank Bondholders' claims. To be sure, the Plan is apparently predicated on the complete disallowance of those claims. But the Bank Bondholders have the right to seek the temporary allowance of their claims for voting purposes, and the Disclosure Statement needs to specify in which class those claims will fall, at least for voting purposes. The Disclosure Statement provides no information regarding the classification (or treatment) of the Bank Bondholders' claims. In this respect, as well, it is deficient.

### D.     The Disclosure Statement Does Not Explain How the Broad Third-Party Releases in the Plan Are Lawful

39.     The Proposed Plan purports to grant broad, non-consensual, third-party releases and to enjoin claims, including claims of creditors of WMI, against non-debtor third parties. As explained below, such third-party releases are inconsistent with the law in the Third Circuit. The Disclosure Statement fails to provide any explanation as to how these broad releases and injunctions are permissible.

Section 42.6 of the Proposed Plan provides:

> [E]ach Entity that has held, currently holds or may hold a Released Claim . . .shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge each and all of the Released Parties from any and all Released Claims in connection with or related to any of the Debtors, the Reorganized Debtors, the Affiliated Banks, or their respective subsidiaries, assets, liabilities operations, property or estates . . . .

Plan § 42.6. "Released Parties" is defined in the Proposed Plan as including, among others, the

FDIC Receiver, FDIC Corporate, JPMC, and the Settlement Note Holders.[8] *See* Plan §§ 42.6;

1.149; 1.86, 1.87, and 1.104. "Released Claims" is defined as:

> Collectively, and except as otherwise provided herein or in the
> Global Settlement Agreement, (a) any all WMI Released Claims,
> JPMC Released Claims, FDIC Released Claims, Settlement Note
> Released Claims and Creditors' Committee Released Claims, in
> each case as defined in the Global Settlement Agreement, and (b)
> any and all Claims released or deemed to be released pursuant to
> the Plan, in each case pursuant to clauses (a) and (b) above, to the
> extent any such Claims arise in, relate to or have been or could
> have been asserted (i) in the Chapter 11 Cases, the Receivership or
> the Related Actions, (ii) that otherwise arise from or relate to any
> act, omission, event or circumstance relating to any WMI Entity,
> WMB, or any subsidiary or Affiliate or [sic] any WMI Entity or of
> WMB, or (iii) that otherwise arise from or relate to the
> Receivership, the Purchase and Assumption Agreement, the
> Chapter 11 Cases, the 363 Sale and Settlement as defined in the
> Global Settlement Agreement, the Plan and the negotiations and
> compromises set forth in the Global Agreement and the Plan . . . .

Plan §1.148.[9]

40.     These terms and provisions appear to purport to release claims solely between

non-debtor parties without the consent of the party supposedly providing the release. Indeed, the

language could be read to release claims held by the Bank Bondholders against (among others)

the WMB Receivership Estate—claims that have already been recognized as legitimate claims

by the FDIC. *See* Declaration of John J. Clarke, Jr. dated June 15, 2009, attached as Ex. B. And

---

[8]     The Settlement Noteholders are defined as the Appaloosa Parties, the Centerbridge Parties, the Owl Creek
Parties, and the Aurelius Parties—all holders of securities issued by WMI. *See* § 1.170

[9]     Sections 42.7 and 42.12 of the Plan set forth injunctions that would bar any actions with respect to the
claims released in Section 42.6. In addition, Section 42.8 of the Plan purports to protect all of the Released Parties
from any liability (except to the extent based on gross negligence or willful misconduct) for their conduct in
connection with these bankruptcy cases, the Plan, or the Global Settlement Agreement. While this exculpation
provision may be acceptable with respect to the Debtors and their professionals, with respect to other parties, it is
another impermissible release of claims as between third parties.

the Plan purports to release these direct claims without the consent of the creditors.[10] Such a non-consensual release is impermissible. *In re Coram Healthcare Corp.*, 315 B.R. 321, 336-37 (Bankr. D. Del. 2004) (recognizing that "to the extent creditors or shareholders voted in favor of the [] Plan, which provides for the release of claims they may have against [non-debtor third parties]," but holding that the Court "do[es] not have the power to grant a release of [a non-debtor third party] on behalf of third parties") (quoting *In re Digital Impact, Inc.* 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998), for the proposition that "bankruptcy court does not have jurisdiction to approve non-debtor releases by third parties"); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999).

41.     The Debtors' only justification for such treatment is that "because the Plan and the Global Settlement Agreement, and the financial contributions contained therein, are conditioned upon the aforementioned releases . . . these releases are essential for the successful reorganization of the Debtors." Plan §42.6.   But such a justification cannot support a release by a non-consenting third party. *Cf. In re Zenith Elecs. Corp.*, 241 B.R. at 110 (providing for release *of debtor's claims against non-debtor third parties* in limited circumstances when certain criteria are met, including: "(1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of

---

[10]     Although the Plan does purport to allow parties submitting ballots to "opt out" of these third-party releases (and receive no distributions under the Plan), it makes no provision for creditors who do not submit ballots or who are not otherwise permitted to vote.  Moreover, the opt-out option appears to be meaningless as the very same provision of the Plan that creates the opt-out provision provides that "pursuant to the Confirmation Order those Entities that opt out of the releases provided hereunder shall be bound and shall receive the distributions they otherwise would be entitled to receive pursuant to the Plan." Plan §42.6.

creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction"). Unless the Debtor can supplement the Disclosure Statement to show how these third-party releases are within the scope of the Court's jurisdiction and are permitted under Third Circuit law, the Disclosure Statement should not be approved.

[Remainder of Page Left Intentionally Blank]

## CONCLUSION

For the reasons stated above, the Court should deny the Debtors' Motion for Approval of the Disclosure Statement.

Dated: May 13, 2010

WILMER CUTLER PICKERING
HALE & DORR LLP
Philip D. Anker
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

-and-

WILMER CUTLER PICKERING
HALE & DORR LLP
Russell J. Bruemmer
Nancy L. Manzer
Gianna M. Ravenscroft
Lisa E. Ewart
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

-and-

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com

Counsel for the Bank Bondholders

92277-001\DOCS_DE:159936.1