-------------------------------------------------------------x

| | : | **Chapter 11** |
|---|---|---|
| *In re* | : | |
| | : | **Case No. 08-12229 (MFW)** |
| **WASHINGTON MUTUAL, INC., et al.,**[1] | : | |
| | : | **(Jointly Administered)** |
| Debtors | : | |
| | : | Re: Docket No. 2623 |
| | : | Objection Deadline: May 13, 2010 at 4:00 p.m. |
| | : | Hearing Date: May 19, 2010 at 11:30 a.m. |

-------------------------------------------------------------x

### OBJECTIONS OF THE CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL TO DEBTORS' MOTION FOR AN ORDER (I) APPROVING THE PROPOSED DISCLOSURE STATEMENT AND THE FORM AND MANNER OF THE NOTICE OF THE DISCLOSURE STATEMENT HEARING, (II) ESTABLISHING SOLICITATION AND VOTING PROCEDURES, (III) SCHEDULING A CONFIRMATION HEARING, AND (IV) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF THE DEBTORS' JOINT PLAN AS PROPOSED

The California Department of Toxic Substances Control (DTSC), submits the following objections (the Objections) to the Debtors' proposed "Disclosure Statement for the Joint Plan of Affiliated Debtors" and to Debtors' proposed procedures for voting and plan confirmation.[2] The grounds for the Objections are as follows. First, Debtors' request for approval of the Disclosure Statement is premature. Debtors have admitted that the Disclosure Statement is deficient and that the Joint Plan is not final. Asking the creditors to review and the Court to approve

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98104.

[2] Debtors distributed the proposed Disclosure Statement on March 26, 2010 as Document 2623. Debtors' motion for an order "(I) Approving The Proposed Disclosure Statement And The Form And Manner Of The Notice Of The Disclosure Statement Hearing, (II) Establishing Solicitation And Voting Procedures, (III) Scheduling A Confirmation Hearing, And (IV) Establishing Notice And Objection Procedures For Confirmation Of The Debtors' Joint Plan." is Document 3658 and was filed on April 23, 2010. In this memorandum the terms "Joint Plan" and "Global Settlement Agreement" refer to the versions of those documents included in the March 26 version of the Disclosure Statement

documents that Debtors have not yet completed is an abuse of the bankruptcy process and should not be sanctioned. Second, the Disclosure Statement does not provide "adequate information" that would enable creditors to make an "informed judgment" about the plan as required by 11 U.S.C. § 1125, subdivisions (a) and (b). Not only is the Disclosure Statement missing essential elements and information, much of what is in the Disclosure Statement, and the Joint Plan, is internally inconsistent or convoluted to the point of incoherence. These deficiencies infect both the structural elements of the Joint Plan and the provisions of specific interest to DTSC and the other BKK-related Claimants. Third, the Joint Plan as presented cannot be confirmed and therefore the Disclosure Statement should not be approved. The Joint Plan, for example, impermissibly rewrites the Bankruptcy Code, beginning with the definition of "claim." (Compare paragraph 1.60 of the Joint Plan with 11 U.S.C. § 101(5).) Further, the Joint Plan includes sweeping releases of third-party liability that extend far beyond even what the Third Circuit's pertinent holdings allow. Although the applicable provisions are anything but clear, Debtors seem to be asking the Court to release Debtors, JP Morgan Chase Bank (JPMC), and the Federal Deposit Insurance Corporation (FDIC) and all of their insiders and affiliates from virtually any liability even tangentially related to this bankruptcy and the events that gave rise to it. Fourth, the Debtors' proposed disclosure statement approval, solicitation and voting and confirmation procedures are improper because, inter alia, the requested dates for objections, voting and the confirmation hearing are premature; creditors are being denied due process by being asked to review an admittedly deficient disclosure statement; the proposed method for determining the allowed amount of a claim for voting purposes and for reserves are contrary to the procedures established in the Bankruptcy Code and Rules; and the proposed ballots are

2

improper given the inconsistent provisions regarding the releases, injunctions and the opt out election, and other reasons provided below.

## I.    INTEREST OF DTSC AND THE OTHER BKK-RELATED CLAIMANTS. [3]

The proofs of claim numbered 2138, 2213, 2233, 2405, 2467, 2693, and 3148, designated in section 1.41 of the Joint Plan as the "BKK Proofs of Claim," concern a closed hazardous waste landfill in California that was created, owned and operated by the corporate predecessors of Debtor Washington Mutual Inc. (WMI) and its pre-bankruptcy affiliates. Specifically, DTSC and the other BKK-related Claimants seek response costs that they incurred and continue to incur at the closed BKK Class I (hazardous waste) Landfill in West Covina California (the BKK Landfill). "Response Costs," as defined under applicable federal and state environmental laws, are costs that the BKK-related Claimants incur conducting either "removal actions" or "remedial actions" at the BKK Class I Landfill. Comprehensive Environmental Response Cleanup and Liability Act (CERCLA), 42 U.S.C. §§ 9601(25), 9607(a); California Hazardous Substances Account Act (HSAA) Cal. Health and Safety Code § 25323.3. Debtor WMI and certain of its affiliates are "liable persons" because their predecessors owned and operated the landfill. at the time of a release or threatened release of hazardous substances. 42 U.S.C. § 9607(a)(2); Cal. Health and Safety Code § 25323.5.

DTSC is a California state government agency mandated to enforce laws related to the cleanup of hazardous substances in California. Cal. Health and Safety Code § 58000 et seq. The laws that DTSC enforces the HSAA, which establishes a comprehensive program for the cleanup of hazardous substances that have been released, or are threatened to be released, into the

---

[3] Documents supporting the facts presented in this discussion are attached to the Supplemental Statement DTSC submitted with its Proof of Claim, Number 2213.

3

environment. The HSAA directs DTSC to recover any costs it incurs in connection with such clean-up activities from the liable parties. Cal. Health & Safety Code § 25360. DTSC may utilize either the state HSAA or the federal CERCLA to recover its response costs.

## A. Debtors' Relationship to the BKK Landfill.

In the early 1960's, Home Savings and Loan (Home Savings) sought to create a housing development, including a waste disposal facility, on land it had purchased in the City of West Covina, in Los Angeles County. In 1963, Home Savings obtained land use authorization from the City and regulatory authorization from the Regional Water Quality Control Board for the Los Angeles Region (Regional Board) to construct and operate the landfill. In 1964, after obtaining those authorizations, Home Savings engaged BKK Corp. to operate the landfill. In approximately 1967, BKK Corp. and Home Savings sought and obtained permission to accept chemical wastes, now commonly called hazardous wastes, at the landfill. In 1973, Home Savings transferred title to the BKK Class I Landfill to Oxford Investment Corporation (Oxford), which at the time was a subsidiary of Home Savings. In 1976, Oxford and/or Home Savings sold the operating landfill and surrounding land to BKK Corp., which continued operating the landfill.

Between 1962 to 1987, more than four million tons of liquid and solid hazardous wastes, and a much larger volume of nonhazardous solid waste (municipal trash), were disposed of at the 190-acre Landfill.[4] The landfill was located directly on a bedrock surface. There was no liner between the wastes and the bedrock. The operators reportedly covered disposed solids daily

---

[4] The hazardous waste landfill that Home Savings created and operated is part of a larger complex. In the late 1970's BKK Corp. opened a "Class III" landfill for non-hazardous waste adjacent to the closed "Class I" hazardous waste landfill. There are also facilities to process landfill gas and leachate from both landfills. The leachate treatment plant in particular is itself a hazardous waste treatment facility, under the regulatory authority of DTSC.

with soils or other material, thereby forming sequences of soil-bounded cells. Operators disposed of liquids by a variety of methods, including placing drums in the landfill, ponding (forming depressions within the solid waste, filling the depressions with liquids, then mixing in solids when the ponds stopped draining adequately), and injection into the solid waste prism. The types of hazardous wastes disposed of at the BKK Class I Landfill included acid solutions, alkaline solutions, contaminated soil and sand, drilling muds, oil and oil sludge, paint waste, solvents and tank bottom sediments. These hazardous wastes include known, and suspected, carcinogens and mutagens which can affect the central nervous system and damage internal organs at low levels if exposure occurs at certain concentration levels and over a certain period of time.

In roughly 1995, H.F. Ahmanson (Ahmanson), the parent corporation of Home Savings, transferred ownership of Oxford from Home Savings to itself. In 1998, Ahmanson merged into WMI. As part of that transaction Home Savings merged into WMI's subsidiary Washington Mutual Bank (WMB) and Oxford, which had changed its name to Ahmanson Developments Inc., became a WMI subsidiary. In December of 2008, after filing for bankruptcy – for reasons Debtors have never made clear – Debtors caused WMI's non-debtor subsidiary Ahmanson Development Inc. to merge with another of its non-debtor subsidiaries, WMI Rainier, LLC.[5]. DTSC contends that WMB, WMI, WMI Rainier LLC, and other WMI affiliates are each jointly and severally liable for environmental response costs DTSC incurred and continues to incur at the BKK Class I Landfill.[6] 42 U.S.C. §§ 9601(25), 9607; Cal. Health and Safety Code §

---

[5] There is no evidence in the docket that WMI sought prior bankruptcy court approval of this transfer.

[6] At various places throughout this objection, DTSC discusses the liability of WMI and entities related to WMI, including WMI Rainier and WMB, as if those entities had separate liability. DTSC contends and reserves the right

25323.3. DTSC is informed that other BKK-related Claimants also contend that WMB, WMI, WMI Rainer LLC and other WMI affiliates are liable to them for response costs in connection with the environmental clean up of the BKK Facility.

**B.    DTSC and the other BKK-related Claimants have incurred Response Costs at the BKK Class I Landfill**

In October 2004, BKK Corp. informed DTSC that BKK Corp. no longer had sufficient funds to conduct necessary maintenance activities at the Class I Landfill.[7]  DTSC thereafter began emergency response actions at the facility along with enforcement actions against liable parties.  The enforcement actions included issuing an Imminent and Substantial Endangerment Determination and Order and Remedial Action Order (IS&E Order) No. 1/SE-D 04/05-004 pursuant to DTSC's regulatory authority under the HSAA which requires WMB and other respondents to that IS&E Order to perform response actions and to reimburse DTSC for response costs.  DTSC is informed that WMB and others entered into a Joint Defense Agreement pursuant to which, among other things, WMB agreed to fund a portion of costs and expenses incurred with respect to, and otherwise assist with the performance of, the response activities of the group, including costs and expenses under the Consent Decree described below.

WMB, on behalf of itself and its parent WMI and other Affiliates as identified therein reached a settlement with DTSC, which was memorialized in an Amended Consent Decree approved and entered by the United States District Court in 2006 ("Consent Decree") in the case

---

to argue that the various entities related to WMI are jointly and severally liable for any BKK response costs and further that each of the entities have primary liability for those costs and/or are co-liable with WMI Rainier LLC.

[7]  In 2003, a subsidiary of WMB, NAMCO Securities Corp. agreed to loan money to BKK Corp.  Because BKK Corp. was known to be in financial distress, as an isolated transaction this loan was not commercially justifiable.  Rather the loan was an attempt by WMB to protect itself and WMI from the greater liability they would incur in the event of a default by BKK Corp.  The loan did not prevent BKK Corp.'s default.

of *California Department of Toxic Substances Control, et al. v. American Honda Motor Co., et al.*, USDC, Central District of California, Case No. CV05-7746 CAS (JWJ) which case is defined in the Debtors' proposed Plan as the "BKK Litigation." [8]  Joint Plan at § 1.41.  The Consent Decree was originally set to expire by on March 15, 2008, but the parties to the Consent Decree have extended that date into July 2010.

The Consent Decree required WMB, WMI and its other Affiliates to perform certain operating, maintenance, and monitoring activities at the BKK Facility and to pay response costs. DTSC is informed that WMI and WMB did not formally withdraw from the joint defense group or the joint defense agreement, if at all, before April 3, 2009, i.e. after this bankruptcy filing.

## II.    STANDARDS FOR DISCLOSURE STATEMENT

Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing "adequate information" to "enable a creditor to make 'an informed judgment' about the Plan." 11 U.S.C. § 1125(a)(1); *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC*, 337 F.3d 314, 321-323 (3d Cir. 2003). "Disclosure is the 'pivotal' concept of a Chapter 11 reorganization." *Ibid.* (Citations omitted.) The importance of full disclosure is underlain by the reliance placed upon the disclosure statement by the creditors and the court.  "We cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information." *Ibid.* (Citations omitted.)  "[C]reditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, [therefore] the importance of full and honest disclosure cannot be overstated." *Id*. at 323.

---

[8]   WMI and the other Affiliates received consideration in exchange for their participation in the Consent Decree in that, among other things, they were provided contribution protection and other benefits as provided therein.

Adequate information is defined as information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361-362 (3d Cir. 1996). These disclosure requirements are crucial to the effective functioning of the federal bankruptcy system. *Id*. Adequate information will be determined by the facts and circumstances of each case. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988). Where a disclosure statement omits some information and misrepresents other information, it should not be approved. *In re National Health & Safety Corp.*, 2000 Bankr. LEXIS 745 (Bankr. E.D. Pa. 2000).

Even where the disclosure statement fairly and accurately recapitulates the terms of the plan, objection can properly be made at the disclosure statement stage if the plan is allegedly defective. *In re McCall*, 44 B.R. 242, 244 (Bankr. E.D. 1984); *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988); *In re Valrico Square Ltd. Partnership*, 113 B.R. 794, 795-796 (Bankr. S.D. Fla. 1990).

On the facts before this court, it is clear that the Disclosure Statement fails to meet the requirements of section 1125(a). Debtors admitted as much in their applications for a financial advisor. Document Nos. 3557 and 3558. Further, the Disclosure Statement shows that the Plan itself as currently presented is fatally defective and thus, the court should reject both the Disclosure Statement and Plan.

### III. THE JOINT PLAN IS NOT FINAL AND THE DISCLOSURE STATEMENT IS INADEQUATE; THEREFORE THE MOTION FOR APPROVAL IS PREMATURE

Debtors' motion for approval of the Disclosure Statement is premature and puts the Court and all of creditors and interested parties in an unreasonable position. Accordingly the Court should summarily reject the Disclosure Statement or, alternatively, withhold consideration of it and the proposed disclosure, solicitation and confirmation procedures until it appears that the plan to which it relates is feasible. The problem here is two-fold. First, because the FDIC has not agreed to the so-called "Global Settlement Agreement" that is the very core of the Joint Plan, the Joint Plan is not feasible, and may indeed not ever be feasible unless substantially and materially revised. Second, Debtors freely admit that the Disclosure Statement they submitted on March 26, 2010, fails to comport with the requirements of section 1125(a). If the March 26 version is all that is before the Court, DTSC respectfully submits that the Court should take Debtors at their word and reject the Disclosure Statement. Even if the Debtors file last minute amendments correcting the most glaring deficiencies, the Court should not approve or reject the amended Disclosure Statement until the creditors and other interested parties have had a fair and reasonable opportunity to review and fully consider the amended plan and disclosure statement. Creditors rights under section 1125(a) should not be illusory.

### A. The Chapter 11 Plan Cannot be Deemed Final Until the FDIC Agrees to the Global Settlement Agreement

As stated in the Disclosure Statement, the Joint Plan is "premised on the Bankruptcy Court's approval of the Global Settlement Agreement." Page 8. Without the Global Settlement Agreement there is no Joint Plan. Although called the "Global Settlement Agreement," it is apparently not yet global, a settlement, or an agreement.

> As of this date, the FDIC Receiver, and the FDIC Corporate have not agreed to all of the provisions contained in the proposed Global Settlement Agreement. However, the Debtors… are *hopeful that such agreement and requisite approval shall be obtained in the very near future.*

Disclosure Statement at 7 (Emphasis Added). Furthermore at the May 5th hearing on the Equity Committee's Motion to Appoint an Examiner in this Case, counsel for the FDIC informed the Court that there were still significant unresolved issues. They may yet get resolved, but if those issues were not significant and difficult, surely they would be resolved already.[9] Moreover, if they are resolved after the date objections are due, creditors are entitled to due process and a reasonable amount of time to review any amended disclosure statement and plan that is submitted to the court to evaluate under the pertinent Code provisions.

It is shameful that the creditors and other parties in interest are having to spend surely hundreds of thousands of dollars collectively in transactional and other costs to analyze and identify issues and irregularities in the, at best, *hoped-for* Global Settlement Agreement, the place-holding Joint Plan, and the admittedly inadequate Disclosure Statement. Even if the FDIC ultimately agrees to a global settlement, the chances at this point that it will be identical to what the Debtors have put forth, are at best slim, and the court, creditors, and other parties in interest will have to incur additional sums to pour over new documents.

---

[9] News reports indicate that one of the issues preventing a settlement is whether JPMC is entitled to approximately $1.4 billion in tax refunds. See, e.g., Dan Fitzpatrick, *FDIC Stands Between J.P. Morgan and a WaMu Payoff,* Wall Street Journal, March 29, 2010, available at http://online.wsj.com/article/SB10001424052702304434404575150150787973606.html. By contrast, the Disclosure Statement represents that the Global Settlement Agreement would provide $7 billion to the creditors. Page 1. A loss of $1.4 billion would likely require substantial revisions of the plan Joint Plan Debtors need to explain how the $1.4 billion dollar tax refund impacts the payout to creditors.

The purpose of a disclosure statement is to inform the creditors about the impact of a proposed Chapter 11 plan for reorganization or liquidation.  Where there is not yet a plan there should be not yet be a disclosure plan.

**B.** **The Disclosure Statement's Analysis of the Joint Plan is Inadequate and Incomplete.**

On April 21, almost a full month after circulating the Disclosure Statement, Debtors applied to the Court for permission to hire Blackstone Advisory Partners (the Blackstone Motion), admitting to the Court that the March 26 version of the Disclosure Statement was inadequate under law and that Debtors needed additional financial analysis to rectify the problems.

> "Debtors submit that in order to satisfy the requirement in section 1125 of the Bankruptcy Code that the Disclosure Statement provide 'adequate information,' the *Debtors must supplement* the Disclosure Statement with information regarding the value of certain assets of the Debtors . . . .  The Debtors intend to provide this additional information *in an amended version of the Disclosure Statement* to be filed prior to the Disclosure Statement hearing."

Docket No. 3558, Page 2. (Emphasis added.)  Further, "the Debtors submit that neither approval of the Disclosure Statement nor confirmation of the Plan can occur absent such valuation."  Docket No. 3557, page 6.  In the Blackstone Motion, Debtors represented that $1.35 million was a fair price for the sought-for services, a clear indication of how extensive and material Debtors believe the deficiencies to be.

In fact, the Disclosure Statement is missing numerous elements.  As described below, sSome are mandatory in every disclosure statement.  Some are promised elsewhere in this Disclosure Statement.  Some are both.

**The Disclosure Statement does not include a Liquidation Analysis.** The Disclosure Statement asserts, on page 127 that "the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code." Yet, later on the same page, the Debtors admit that the liquidation analysis "will be filed at a later date." One wonders on what basis Debtors made the earlier statement. (See also Disclosure Statement, page 106.) *See also, In re Diversified Investors Fund XVII*, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988).

**The Disclosure Statement does not include necessary financial information and projections**. These too will be "provided at a later date." Page 104. Information that must be included in the financial information and projections *when they are available* are estimates of the pay out formulas for the various creditor classes and the size of the Liquidating Trust Claims Reserve and any other reserves of creditor cash. With this information is missing from the Disclosure Statement, creditors do not have "adequate information" as they are entitled under the Code.

**There is no feasibility analysis.** Other than conclusory statements on page 127 of the Disclosure Statement, there is no analysis of feasibility. This deficiency renders the Disclosure Statement wholly inadequate.

**The Disclosure Statement does not include the BKK Litigation in the list of material litigation.** DTSC estimates that the total response costs for the BKK Landfill will exceed $600,000,000. DTSC alleges both that Debtors are jointly and severally liable to it for that

amount and that under any equitable allocation Debtors would still bear a large share of that liability.

**The Disclosure Statement does not include other promised information regarding the Class 12 General Unsecured Claims.** The Disclosure Statement states that the relative priorities among the holders of unsecured claims and the order in which such holders are entitled to receive payment – a question of paramount importance to holders of unsecured claims – "are set forth in more detail in the Plan." Page 64. The Joint Plan, at Art. XVI, 16.1, states that those relative priorities, "are set forth in more detail in the Subordinated Model attached hereto as Exhibit 'H'." However, there is no Exhibit H attached to the Joint Plan. Other promised but missing information include the list of executory contracts and unexpired leases to be rejected; the list of Plan Contribution Assets (purportedly, but not attached, as Exhibit "G" to the Global Settlement Agreement); and for the list of JPMC Claims attached as Exhibit "A" to the Global Settlement Agreement the amounts that are deemed allowed under the Joint Plan as Class 12 General Unsecured Claims.[10]

IV. **THE JOINT PLAN AND DISCLOSURE STATEMENT ARE REPLETE WITH AMBIGUITIES AND CONTRADICTIONS THAT PRECLUDE ANY MEANINGFUL DETERMINATION OF THE PLAN'S IMPACT.**

A disclosure statement cannot cure a poorly drafted plan or settlement agreement upon which the plan is based. If the plan or settlement provisions are vague, contradictory or otherwise not meaningful, and their legal impact therefore can not be determined, then the

---

[10]   Because it appears that the Allowed JPMC Claims in Class 12claims will dilute the pro rata share of other allowed General Unsecured Claims in such class even though JPMC may be waiving its right to distributions on account of such claims, the allowed amounts of these JPMC Claims are of particular importance to the other unsecured creditors.

disclosure statement can not serve its function of enabling a creditor to make an informed judgment about whether to accept or reject the plan. That is the case here.

**The provisions identifying "the governing documents" are inconsistent.** The Disclosure Statement at page 71 states the following: "In the event of any conflict between the terms of this Disclosure Statement, the Plan and the terms of the Liquidating Trust Agreement, the terms of the Plan shall govern." But on the very next page is this: "In the event of any inconsistency between the Plan and the Liquidating Trust Agreement, the Liquidating Trust Agreement shall govern.[11]" Page 72. Extending the inconsistencies, the Disclosure Statement then declares that all of the rights, powers and duties of the Liquidating Trustee are "subject to the Proposed Global Settlement Agreement" and "[i]n all circumstances, the Liquidating Trustee shall comply with all of the Debtors' obligations under the Proposed Global Settlement Agreement." *Ibid*. See also Joint Plan at pages 41-42.

**The Joint Plan's release provisions are convoluted to the point of being indecipherable.** DTSC hereby objects that the release provisions in the Joint Plan and Disclosure Statement defy clear explication. What is nonetheless clear is that the sought-for releases are stunningly over broad, improper, and would preclude plan confirmation. See section VI.B. below. The overreaching and lack of clarity begins in the definition section. Consider the definition of "Claim" and "Released Claims" in section 1.148 of the Joint Plan. As discussed in section VI.A. below, the Debtors' definition of "claim" is contrary to the definition under the Code and thus fatally infects and confuses the entire Joint Plan. With respect to the definition of Released Claims, the conjunctive phrase – "in each case pursuant to clauses (a) and (b) above" –

---

[11] The proposed provisions of the Liquidating Trust Agreement are referenced as attached, but are not.

appears approximately one-third of the way through the definition. Unfortunately, neither the conjunction nor the definition as a whole indicates how the clauses leading to the conjunction relate to the clauses following it. Presumably the later clauses either restrict or expand the earlier clauses. But which? We cannot say. No better are the substantive release provisions in Sections 42.2(a) and (b) and 42.6. Each of these sections contains an overly broad release, but neither the Disclosure Statement nor the Joint Plan explains what separate function each serves, nor indeed why there are three seperate release provisions. Reading the individual provisions does not help. Consider, for example, the first sentence of section 42.2(b): this single run-on sentence contains over 150 words and over 20 commas. The Disclosure Statement, at page 99, unhelpfully repeats this language. One is tempted to leave off mocking the hyper-prolix constructions, but the stakes are far too high. As discussed in section VI.B. below, these release provisions could insulate scores of debtor and non-debtor entities and insiders from untold liabilities including to entities that do not appear to be receiving any consideration in exchange for such release. As discussed in section VI.C. below, the releases could have a particular impact on any BKK creditors. Clarity is essential.

**The Plan includes self-nullifying opt-out provisions.** The Joint Plan, at Section 42.6, p. 72, suggests that claimants holding impaired claims and who are otherwise entitle to vote, can opt-out of the releases (and forfeit distributions) that the Plan otherwise seeks to impose. However, this opt-out provision is illusory. Section 42.6 continues:

> …and provided, further, that, because the Plan and Global Settlement Agreement, and the financial contributions contained therein, are conditioned upon the aforementioned releases, and, as such, these releases are essential for the successful reorganization or the Debtors, pursuant to the Confirmation Order, those Entities that opt out of the release provided hereunder shall be bound and shall receive the distributions they otherwise would be entitled to receive pursuant to the Plan.

15

*Id* .(emphasis in original).

In other words, apparently, a claimant can opt out of the distribution and releases, but those claimants will still be "bound and shall receive the distributions." This may mean, but it is not certain, that even though a claimant "opts out" of the releases, it may still be bound by them. In other words, two essential provisions contained in a single lengthy run-on sentence, are mutually contradictory. The Disclosure Statement does nothing to explain or clarify this material inconsistency, nor to explain what effect, if any, checking the opt-out box on the ballot (and thus, waiving the right to a distribution) would have on the rights of the voter.

**The claims estimation provisions are confusing and unfair.** The Disclosure Statement seems to provide that the Liquidating Trustee can force an estimation of a claim but then, even after that process, continue to litigate the claim objection. Page 70. Regardless of the claims estimation litigation outcomes, JPMC is apparently not bound by them. *Ibid*. These disclosures seem unfair and wasteful. They need further clarification.

**The Relationship of the JPMC allowed claims to the Class 12 General Unsecured Claims is Unclear.** JPMC's over 40 proofs of claim are to be "allowed" and entitled to receive the same treatment as other Allowed general unsecured claims under the Plan. Disclosure Statement, page 12. However, JPMC "will waive any distribution JPMC otherwise would be entitled to receive on account of its claims." *Id*. It is unclear what the effect of the allowed JPMC Claims will have on the distributions to the general unsecured claims in the same class (i.e. Class 12). Will the allowed JMPC Claims effectively dilute the pro rata shares of other general unsecured creditors even though JPMC is not to receive any distributions on account of such allowed claims? If so, this fact should be more clearly disclosed as should the Allowed

amount of such claims so that the other creditors in Class 12, including the BKK-related

Claimants, can fully understand that – notwithstanding that the parties to the *hoped-for* Global

Settlement Agreement all agree that JPMC shall not receive any distribution on account of its

own general unsecured claim – those claims are nevertheless being used to dilute the pro rata

shares of the other unsecured creditors in Class 12.  Neither the amount of the Allowed JPMC

Claims is disclosed in the Disclosure Statement, nor how these presently unliquidated claims will

be liquidated if the parties to the Global Settlement Agreement have not already agreed to the

allowed amounts.  In addition, because the Disclosure Statement fails to contain any meaningful

information concerning the number and projected amount of the Allowed Class 12 General

Unsecured Claims, the dilution effect of the JPMC Claims cannot be calculated.

V.     **THE DISCLOSURE STATEMENT, MIRRORING THE JOINT PLAN, DOES NOT CLEARLY INDICATE IF, OR TO WHAT EXTENT, THE BKK LIABILITIES WILL BE ASSUMED BY JPMC AND/OR PAID.**

A.     **Summary of the Provisions in the Joint Plan and Global Settlement Agreement Regarding BKK**

The specific provisions regarding the BKK liability can be found in section 2.21 of the

Global Settlement Agreement, section 2.1(f)(4) of the Joint Plan, and section C.4.d of the

Disclosure Statement.[12]  Definitions and other ancillary provisions appear elsewhere.

---

[12]     The Disclosure Statement at paragraph C.4.d. on page 11, states: "As set forth in the Proposed Global Settlement Agreement, JPMC will assume all liabilities and obligations of the WMI Entities, other than WMI Rainier, for remediation or clean-up costs and expenses (and excluding tort related liabilities) in excess of applicable insurance, arising from or relating to that certain litigation styled *California Dept. of Toxic Substances Control, et al. v. American Honda Motor Co., Inc. et al.*, No. CV05-7746 CAS (JWJ), currently pending in the United States District Court for the Central District of California (the "BKK Litigation"), and certain agreements related thereto.  The Debtors have agreed to object to any proofs of claim filed against their chapter 11 estates relating to the BKK Litigation and related agreements, and to the extent such proofs of claim are not withdrawn, with prejudice, JPMC will defend the Debtors against and reimburse the Debtors for any distribution which the Debtors become obligated to

Superficially, the provisions provide for the following.  A) JPMC would assume Debtors' BKK-related liability.  B) JPMC would not assume the BKK-related liability of WMI's non-debtor subsidiary, WMI Rainier.  C) JPMC would take over, control and reap the benefits of all BKK-related insurance policies benefiting Debtors and their non-debtor subsidiaries, including WMI Rainier.  D) There is a presumption that the BKK-related Claimants will dismiss their claims, "with prejudice," but if they do not, the Debtors would be compelled to object to the BKK claims (on some unspecified basis) and JPMC has agreed to defend those objections and "reimburse" the Debtors.  The numerous ambiguities in the provisions, however, create a much more complex and uncertain structure.

### B. Examples of Fundamental Questions About the BKK Liability that the Disclosure Statement and the Joint Plan do not Answer.

But for its convolutions and uncertainties, DTSC very well might support the Plan. DTSC agrees certainly that it is appropriate for JPMC to assume Debtors' BKK liabilities.  The incomplete and contradictory passages of the Joint Plan, however, prevent DTSC or other BKK-related Claimants from determining the net effect of the Joint Plan on the BKK liability.  As discussed below, depending on how deficiencies in the Joint Plan provisions are corrected, gaps filled and contradictions resolved, JPMC's assumption of the BKK liabilities may be (i) complete and appropriate or (ii) merely illusory.  Until there is more clarity about the Joint Plan provisions, the Disclosure Statement, as it relates to the nature, extent and treatment of the BKK claims, cannot enable the BKK-related Claimants "to make an informed judgment about the plan."

---

make on account of remediation or clean-up costs and expenses, to the extent not covered by applicable insurance.  Likewise, JPMC has agreed to indemnify the WMI Entities, other than WMI Rainer, for liabilities relating to the BKK Litigation, to the extent not covered by applicable insurance."

**It is unclear whether JPMC's Assumption of Liability is Coextensive with the BKK-related Claims.** As discussed above, DTSC and the other BKK-related Claimants seek to recover "response costs" as that term is used in CERCLA and the HSAA. 42 U.S.C. 9601(25). However the Global Settlement Agreement states that JPMC is assuming "remediation or clean-up costs and expenses." See also Joint Plan section 1.39. Neither the Disclosure Statement nor the Joint Plan indicates whether "remediation or clean-up costs and expenses" includes all response costs or is a more narrow category of costs. This ambiguity could be eliminated if the Global Settlement Agreement and other documents stated simply that JPMC is assuming the liability presented in the BKK claims or at least to the extent those claims seek "response costs." Presently, however, the ambiguity prevents the BKK-related Claimants from making an informed decision about the Joint Plan.

**It is unclear whether the assumption by JPMC of the WMI Entities' BKK-related liabilities includes any alter ego or other derivative liability ascribable to WMI.** The *hoped-for* Global Settlement Agreement in sections 2.21(a)(a) and 2.21(c) indicates that JPMC is assuming the BKK-related liability of WMI but not that of its non-debtor subsidiary WMI Rainier LLC (WMI Rainier).[13] See also Joint Plan, section 1.39. This begs the question whether JPMC is assuming WMI's derivative liability as the alter ego of ADI and/or WMI Rainer or any derivative liability WMI may have as the successor to H.F. Ahmanson, based on that company's ownership of Oxford. This question – whether JPMC is assuming any such derivative liability – would substantially affect the value of the assumption of liability. Without a clear answer, DTSC

---

[13] Pursuant to a postpetition merger WMI effected between two of its non-debtor subsidiaries, WMI Rainier is the successor to Ahmanson Development, Inc. (ADI), which as Oxford was one of the owners and operators of the BKK Landfill. WMB was the creator and first owner and operator of the landfill.

and the other BKK-related claimants cannot make an informed decision regarding whether to accept the Joint Plan.

**It is unclear whether JPMC is reserving the right to argue that it did not assume all of WMB's BKK liability.** Because WMB is not a "WMI Entity" as that term is defined in the Global Settlement Agreement it appears that JPMC is not *in the Global Settlement Agreement itself* agreeing to assume any BKK liability from WMB. Although DTSC would urge JPMC, for clarities sake, to restate in the Global Settlement Agreement that it is assuming WMB's BKK liability, DTSC believes, nonetheless, that JPMC assumed WMB's liability for the BKK Landfill in JPMC's pre-petition Purchase and Assumption Agreement with the FDIC. That belief finds support in section 2.21(a) of the Global Settlement Agreement, which states that the FDIC Receiver "agrees that" the Purchase and Assumption Agreement "assigned or otherwise transferred to JPMC" WMB's interest in the BKK-related insurance policies. If the Purchase and Assumption Agreement transferred the BKK-related insurance policies to JPMC, it no doubt transferred the BKK liabilities as well.

Unfortunately, JPMC is on record denying that it assumed any BKK Liability under the Purchase and Assumption Agreement. See Exhibit 1 to DTSC's Proof of Claim, No. 2213, Marcy 3, 2009 letter from Mr. Albert Cohen, counsel to JPMC. Elsewhere, the Disclosure Statement suggests that JPMC continues to deny it assumed any BKK liability from WMB. The Disclosure Statement states, on page 22, that JPMC only assumed "all of WMB's **deposit** liabilities," (emphasis added) which arguably would not include WMB's BKK liability. Again, without knowing whether JPMC is reserving the right to argue that it did not assume all of WMB's BKK-related liabilities and/or whether through the release provisions it is attempting

20

through the Global Settlement Agreement and the Joint Plan to secure a discharge and release of its WMB-based BKK-related liabilities, DTSC and the other BKK-creditors cannot make an informed decision about the nature, extent or value of the assumed BKK Liabilities (presumably but not specifically identified yet as a Plan Contribution Asset on the yet-to-be-disclosed Exhibit "G" to the Global Settlement Agreement).

**The relationship between JPMC's agreement to pay the BKK Liabilities and DTSC's rights to seek payment in the bankruptcy is unclear under the terms of the Global Settlement Agreement.** The Global Settlement Agreement, in Section 2.21(a)(b) states that JPMC will assume and pay the WMI Entities' BKK Liabilities to the extent there is not insurance coverage. This implies that DTSC, as well as other BKK-claimants, could if necessary sue JPMC post-confirmation for WMI's pre-petition BKK liability. Section 2.21(b), however, requires JPMC to defend Debtors against the BKK Proofs of Claim in the bankruptcy and to reimburse Debtors for any distribution they are required to make. (See also Disclosure Statement section C.4.d.) The relationship between these provisions is unclear. JPMC's assumption of the BKK Liability does not divest Debtors of liability. In particular, Debtors cannot contract away their environmental obligations to DTSC. The Joint Plan and Disclosure Statement should state clearly whether the terms of the Joint Plan would, for example, allow DTSC and the other BKK-related Claimants to press their case both in the bankruptcy against Debtors and outside the bankruptcy against JPMC in order to increase their chances of getting a full recovery. Similarly, if the BKK-related Claimants withdrew their claims "without prejudice," would Debtors still be obliged to object to the claims? (See Disclosure Statement paragraph C.4.d.). With these ambiguities unresolved, the BKK Disclosure Statement lacks adequate information and DTSC cannot make an informed decision about the Joint Plan.

**It is unclear whether any insurance rights are being transferred to the Liquidating Trust.** The Disclosure Statement provides that "to the extent Liquidating Trust Assets are allocable to Disputed Claims," they will be considered transferred "to the Liquidating Trust Claims Reserve." Disclosure Statement at 75. This provision could mean that policies or proceeds from BKK-Related Policies are being transferred to the Liquidating Trust, which would of course conflict with other provisions which say they are being transferred to and controlled exclusively by JPMC. This too needs to be clarified.

C.     **The Disclosure Statement Fails to Explain Why it is Proper or Fair for the Debtors to Cause Non-debtor WMI Rainier to be Stripped of its Insurance Assets for the Benefit of JPMC, while Leaving WMI Rainier with its and/or ADI's BKK Liability.**

The Global Settlement Agreement authorizes JPMC to "act as [the] exclusive agent with respect to all rights and benefits to which the WMI Entities or the FDIC receiver are entitled under the BKK-Related Policies and to resolve the BKK Liabilities on behalf of the WMI Entities." Section 2.21(a)(c). Further, JPMC "rather than the WMI Entities of the FIDC Receiver, shall be entitled to recover from the BKK-Related Carriers any costs and expenses . . . incurred by any of the WMI Entities or WMB prior to the Effective Date." Section 2.21(a)(e). Finally, "the WMI Entities shall assign for themselves and their successors in interest to JPMC all claims for contribution, equitable indemnity and cost recovery in the future related to the BKK Liabilities." Section 2.21(a). In other words, JPMC would receive and control the payouts from any BKK-Related Policy or other benefit, including benefits that belong to WMI Rainier and the FDIC.

Yet, JPMC is not assuming WMI Rainier's BKK Liabilities.[14]  Section 2.21(a)(a) and 2.21(c).  This raises the question under what, if any, circumstances could it be fair to creditors for JP Morgan Chase to capture WMI Rainier's BKK insurance benefits and contribution rights, while leaving WMI Rainier with the liabilities that gave rise to those benefits.  Allowing that to proceed, would permit JPMC to use the insurance policies which provide coverage for WMI Rainier to settle all claims against all WMI Entities other than WMI Rainier and to leave WMI Rainier as an empty shell with no assets and all of the remaining BKK liabilities. Moreover, the releases and injunctions appear sweeping enough that the BKK-related Claimants could be barred after the Effective Date from pursing non-debtor WMI Rainier for the BKK Liabilities. JPMC is acquiring all of the insurance rights, so it must bear all of the liabilities covered by such insurance.

DTSC is amenable to working with Debtors and JPMC to amend these provisions.  JPMC is acquiring all of the insurance rights, so naturally it must bear all of the liabilities covered by such insurance.

The uncertainty about the scope of the liability that JPMC is accepting or assuming exacerbates the impropriety of the insurance provisions.  The inequity of stripping WMI Rainier's insurance proceeds without accepting WMI Rainier's liability would apply with equal force if JPMC asserts now or any time in the future that it has not assumed from Debtors any alter ego or other derivative liability ascribable to WMI or that it has not assumed (or will after the Effective Date be released from) WMB's BKK Liability.

---

[14]  As noted above earlier, for the purpose of this discussion only, DTSC is accepting as valid the fiction that the relevant ultimate predecessors of WMB and WMI Rainier – Home Savings and Loan and Oxford Investment Company Inc.,. respectively, – had separate liability. DTSC reserves all its rights.

### D. The Disclosure Statement Should Identify the BKK-Related Carriers and Policies.

Further, Schedule 2.21 of the Global Settlement Agreement, which should list the BKK-related policies and carriers, is blank. Without the opportunity to evaluate the insurance policies, DTSC cannot make an informed decision on the Joint Plan.

### E. The Disclosure Statement Does Not Provide Adequate Information about the WMI Rainier.

Other than stating that JPMC is disavowing its purchase of the WMI Rainier liabilities, the Disclosure Statement reveals nothing about this entity, generally classified as a "Non-Debtor Subsidiary." The Disclosure Statement states the following: "WMI has been in the process of winding-down many of its non-debtor, non-banking subsidiaries." Disclosure Statement at 50. The Disclosure Statement goes on to discuss its non-debtor, non-banking subsidiaries "with material assets and operations." Neither WMI Rainier nor ADI are among those listed. Disclosure Statement at 50-51. This may imply that Debtors assert that WMI Rainier and ADI have no material assets or liabilities.

The Disclosure Statement does not fully indicate whether WMI Rainier or its predecessor ADI are among those non-debtor subsidiaries that had cash deposits with WMB at the time of the FDIC seizure. That question is materially important to DTSC when determining whether to accept the Joint Plan.[15].

---

[15]   There is a reference in a schedule of some of the cash deposits at WMB that ADI had in excess of $1 million on deposit at the time of the takeover and sale to JPMC. If true, it certainly would be material for the BKK-related Claimants who may have about-to-be-released causes of action against ADI and its successor WMI Rainier, to understand the disposition by JPMC of that cash and/or the allocation of that cash or credit, together with other facts relating to the assets and liabilities of ADI and WMI Rainier in the relevant periods of time before and after the merger, as well as evidence of WMI's, ADI's and WMI Rainier's adherence to corporate formalities in the years leading up to the bankruptcy and merger of the two subsidiaries. No such information is in the Disclosure Statement.

Similarly, the Disclosure Statement does not indicate whether WMI Rainier was in any of Debtors' joint tax groups. If so, it may be entitled to any refunds that JPMC receives from tax authorities. .

In sum, DTSC and other creditors require information about the present net worth of WMI Rainier – what are its assets and liabilities. If indeed WMI Rainier were solely responsible for any portion of the BKK liability, which DTSC denies, WMI Rainier's net worth would be an important question for DTSC and other BKK-related Claimants. Prior to its collapse WMB on behalf of itself and WMI was actively engaged in the BKK response actions. The collapse therefore interfered with the response actions.

**F.    The Disclosure Statement Does Not Adequately Explain Why the BKK Claims are Included in Class 12, General Unsecured Claims or Provide Any Justification for the Disparate Treatment of Such Claims.**

Though not clearly stated in the Disclosure Statement, claims with respect to BKK Liabilities appear to be lumped into the category of "Class 12 - General Unsecured Claims." DTSC submits that it and other BKK-related Claimants should be classified in their own class under Section 1122(a) of the Bankruptcy Code on the basis that BKK-related Claimants' claims are substantially different than the other general unsecured claims. Among other things, all or a portion of the BKK claims appear to be collectible from the BKK-Related Policies providing indemnity coverage for WMI and its affiliates, including WMB, ADI and WMI Rainier.

The proceeds from the identified insurance policies in WMI's case are an important asset which will pay for BKK claims. WMI's disclosure statement indicates that all control over those policies is being assigned to JP Morgan Chase Bank ("JPMC"), so WMI will lack the necessary incentive to pursue the insurance policies for the benefit of the claimants. Based on the definitions in the plan and the underlying settlement terms, it appears that JPMC, and WMI

actually are trying to convert the BKK Liabilities from general unsecured claims covered by insurance to general unsecured claims with no insurance coverage.

It is appropriate to classify unsecured creditors whose claims are covered by proceeds of insurance separately from other unsecured creditors. *In re United States Mineral Products Co.*, 2005 Bankr. Lexis 3259 (D. Del. 2005). Unsecured claims with access to insurance coverage are significantly different from general unsecured claims. *In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 421 (Bankr. E.D. Pa. 1995). In *Sacred Heart Hospital*, the court approved a plan under which unsecured creditors whose claims were covered by insurance would initially receive what they could recover from applicable insurers and any portions of such claims not paid by applicable insurers were classified with the rest of the general unsecured creditors. *Id*. at 415 and 421, n.8. ("Dissimilar treatment for dissimilar claims does not run afoul of the unfair discrimination provision."). See also *In re Mahoney Hawkes, LLP*, 289 B.R. 285 (Bankr. D. Mass. 2002). ("The Class 3 claimants have the right to receive some property of the estate that general unsecured creditors cannot receive. They are, in effect, multiple secured creditors having claims against a single fund.")

The Disclosure Statement proposed by the Debtors in this case fails to address the significant difference between the BKK claims and the remainder of the Debtors' general unsecured creditors and fails to explain how they can be lumped in with general unsecured creditors.

It also appears that the BKK-related Claimants will receive disparate treatment under the Joint Plan. Of the 21 classes specified in the Joint Plant, there are several for which there is no rational distinction from the BKK-related Claimants, yet JPMC is assuming the Debtors'

liabilities in full. Whereas for the BKK Claims, JPMC will assume only an unclear portion of the liability and the BKK-related Claimants will be subject to mandatory objections to their claims otherwise. To the extent those claims are allowed after the objections are resolved, JPMC will "reimburse" the Debtors for any pro rata distributions they are required to make on account of the BKK Class 12 Claims to the extent not covered by insurance. Thus, while many of the Debtors general unsecured creditors will be paid in full, the portion of the BKK-related Claimants' claims that JPMC does not assume, if allowed, may receive only a pro rata share of amounts available from the Creditor Cash and the Liquidating Trust Assets, if any. This classification scheme seems likely to minimize if not eliminate the BKK-related Claimants' claims and/or unfairly dilute their pro rata shares of the limited and undefined assets allocated to their class. Because the Disclosure Statement contains inadequate information about the amount or projected range of amounts of the allowed claims and the amount and value of the Plan Contribution Assets, the BKK-related Claimants are unable to determine what the expected payout is under the proposed Joint Plan and the potential difference between what the BKK-related Claimants can expect to receive as compare to other unsecured creditors in other classes being treated more favorably.

## VI. THE JOINT PLAN IS NOT CONFIRMABLE IN ITS CURRENT STATE.

It is now well accepted that a court should not approve a disclosure statement if the plan cannot be confirmed. *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) (disclosure statement should not be approved, even if it provides adequate information, if plan could not be confirmed); *In re Silberkraus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000) (it is appropriate for the court to deny approval of disclosure statement describing a plan that is not confirmable); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992)

27

(disclosure statement will not be approved where it describes a plan which is fatally flawed); *In re Century Investment Fund VIII Ltd. Partnership*, 114 B.R. 1003, 1005 (Bankr. E.D. Wis. 1990) (if a plan is not confirmable as a matter of law it is appropriate for the court not to approve the disclosure statement); *In re Market Square Inn, Inc*., 163 B.R. 64,68 (Bankr. W.D. 12 Penn. 1994) (where it is clear that a plan of reorganization is not capable of confirmation it is appropriate to refuse the approval of the disclosure statement). Courts deny approval of disclosure statements if the plans they describe are not confirmable, because soliciting votes and seeking court approval of such plans is a fruitless venture that wastes the resources of both the courts and the parties. *In re Silberkraus*, 253 B.R. at 899; In re 266 Washington Assocs., 141 B.R. at 288.

A.   **The Plan Impermissibly Redefines "Claim" a fundamental Bankruptcy Concept and May Thereby Eviscerates Many of the Limitations on the Impact of a Bankruptcy Plan.**

The Joint Plan alters and expands the definition of Claim.  Compare the definition in paragraph 1.60 of the Joint Plan with that in 11 U.S.C. § 101(5).  Debtor's new case-specific definition includes, for example, any right to "performance" as well as any right to "payment." Unlike the Bankruptcy Code, in this Plan, Claims would include rights that were "unknown" or "unasserted."  Under the Joint Plan, but not in other bankrupticies, "claim" would include rights to an "equitable remedy for . . . performance" even if the underlying breach *does not give* "rise to a right to payment."  11 U.S.C. § 101(5).  And so on.  Certainly Debtors cannot avoid the non-dischargeability of their environmental injunction liabilities owed to governmental units, simply by re-writing self-styled and new Code provisions into their proposed Joint Plan. In no way do these provisions comply with the 11 U.S.C. 1129(a)(3) requirement that the plan be proposed in good faith

28

It is no exaggeration to say that Debtors, with the participation of possibly the other parties to the Joint Plan and Global Settlement Agreement are attempting to restructure the foundation on which the confirmed plan rests. The impact on plan interpretation is impossible to predict. Numerous published decisions, for example, address the impact of plan confirmation on unknown rights to payment.[16] Who can say how a Court would apply those decisions if "claims" as defined in this plan and this plan alone included rights to payment unknown at the time of confirmation.

Similarly the definition of claim could cause the plan to violate 11 U.S.C. § 1141(d)(1), which provides that Debtors are not entitled to a discharge for environmental claims that arise on or after the confirmation date.

**B. The Releases and Injunctions in the Plan are impermissible on their face and thus, the Plan is not feasible and approval of the Disclosure Statement should be denied.**

The release and injunction provisions in the Plan are sweeping both as to Debtors' releases[17] and the releases of claims by third parties against non-debtors. *See* generally Sections

---

[16]    In the environmental context, see for example, *See, e.g., In re Crystal Oil Co.*, 158 F.3d 291, 296 (5th Cir. 1998) (environmental claims arise when a potential claimant can tie a debtor to a known release of hazardous substances); *In re Jensen*, 995 F.2d 925, 930 (9th Cir. 1993) (environmental claims arise when they are within the fair contemplation of the parties); *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 974 F.2d 775, 786 (7th Cir. 1992) (Superfund claim arises when the claimant can tie the debtor to a known release of a hazardous substance which the claimant knows will lead to response costs, and the claimant has conducted tests with regard to the contamination).

[17]    The Joint Plan includes the release of several non-debtors by the Debtors and their respective Related Persons (defined below), including without limitation the JPMC Entities, the FDIC Receiver and FDIC Corporate, the Settlement Note Holders, and each of their Related Persons, which includes each of the foregoing Released Parties'

> …present and former Affiliates, and each of their respective current and former members, partners, equity holders, officers, directors, employees, managers, shareholders, partners, financial advisers, attorneys, accountants, investment bankers, consultants, agents, and professionals, or other representatives, nominees or investment managers, each acting in such

42.2 through 42.13 of the Plan and the definitions in the Plan of "Released Parties," Released

Claims," "Related Persons," and "Related Actions."  In essence, pursuant to the proposed Joint

Plan, the Released Parties, including non-debtors the JPMC Entities, the FDIC Receiver, the

FDIC Corporate and the Settlement Note Holders, seemingly are being fully released by the

Debtors and the Reorganized Debtors and their Related Persons, as well as by numerous third

parties, including the BKK-related Claimants and all other Claimants and Equity Interest Holders

and their respective Related Persons.  The claims and liabilities being released and enjoined

include "Related Actions" that could have been brought in any court of competent jurisdiction,

relating to the Debtors, the Receivership, or the business, operations, assets or liabilities of the

Debtors or their current or former Related Persons at any time prior to the date of the Plan.  *See*

42.6 of the Joint Plan at p. 71.

These broad releases are impermissible.[18]  Citing to this Court's decision in *In re Zenith*

*Elec. Corp.*, 241 B.R. 92,110 (110 (Bankr.D.Del.1999), Judge Carey recently restated the factors

---

capacity, and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members and professionals.)

*See* 1.147 of the Joint Plan at 17.  The release by the Debtors includes the release of
…any and all Claims or Causes of Action that the Debtors, the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Beneficiaries, and the Disbursing Agent, and their respective Related Persons, or any of them, or any one claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party or any of their respective Related Persons that are Released Claims or otherwise are based upon , relate to or arise out of or in connection with, in whole or in part, any act, omission, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged in the Related Actions, including, without limitation, any such claim, demand, right, liability, or cause or action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees.

*See* 42.5 of the Plan at 71.

[18] *See, e.g., In re Continental Airlines*, 203 F.3d 203, 212-213 (3d Cir. 2000) (surveying case law on when releases of non-debtor liabilities are appropriate).

to be considered in determining whether Debtor releases of non-debtors and injunctions will be permitted notwithstanding section 524(e) of the bankruptcy Code.). *In re Spansion, Inc.*, 2010 WL 1292837, __ B.R.__ (April 1, 2010). Such factors include (1) the identity of interest between the debtor and third parties; (2) substantial contribution by non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization, to the extent that without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction; and (5) provision in the plan for payment in full of all or substantially all of the claims or classes affected by the injunction. *Id*. at n. 47 (Citing this Court's decision in *In re Zenith Elec. Corp.*, 241 B.R. 92,110 (110 (Bankr.D.Del.1999)). In short, there is insufficient information in the Disclosure Statement to apply the factors here.

The third-party releases in the Joint Plan are also sweeping and broad and on their face and impermissible rendering the Joint Plan fatally infirm. First, despite the insertion into the third-party release provision in Section 42.6 of the Joint Plan and in the proposed ballots, of an "opt-out" of the release, the third-party release is not consensual and thus, cannot be approved. *See In re Coram Healthcare Corp.*, 315 B.R. 321, 335-337 (D. Del. 2004) (Third-party release of Noteholders can not be approved to the extent they have not been accepted by the parties affected.) The opt-out is not being made available to those not entitled to vote, either to unimpaired claimants or those presumed to reject the Joint Plan because they will receive nothing on account of their claims or equity interests. Moreover, as discussed above the opt-out appears illusory.

Although some courts have rejected non-debtor releases, even those that have allowed them recognize that non-debtor releases are appropriate only in rare cases.

31

> A non-debtor release is a device that lends itself to abuse.. By it, a non-debtor can shield itself from liability to third parties.  In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code.  The potential for abuse is heightened when releases afford blanket immunity.

*In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005).  The Court's subject matter jurisdiction to issue a Bar Order as sweeping as the one called for in the Plan, is also questionable.  *See In re Dreier LLP*, __ B.R. __, 2010 WL 1707737 (Bankr. S.D.N.Y.) (April 2_, 2010)...).

### C. Potential Impacts of the Release Provisions on the BKK-related Claimants.

Whether and to what extent the Debtors or Reorganized Debtors may be intending to release JPMC for liability in connection with its obligations as agent with respect pursuing insurance under the BKK Policies and distributing the proceeds to the BKK-related Claimants on account of the BKK Liabilities and the allowed BKK-related Claimants' Claims is of obvious importance to DTSC.  It appears from the language and scope of the Release that Debtors would indeed be releasing JPMC form such liability which, given that DTSC and other  BKK-related Claimants could benefit greatly by a successful recovery from the Debtors' BKK Insurance Policies, would be unfairly prejudicial to DTSC and the other BKK-related Claimants, particularly because DTSC the BKK-related Claimants are not being offered any additional compensation as consideration for such a release.

Also prejudicial and unfair to DTSC and other BKK-related Claimants is the potential release of  WMI's non-debtor subsidiaries  ADI and WMI Rainier LLC.  It appears that the Joint Plan would effectively bar DTSC and the other BKK-related Claimants from seeking response costs from  liable non-debtors.  Thus, not only would the Plan deprive DTSC and the other BKK-related Claimants of their claims against a non-debtor, it expressly carves out the WMI Rainier

LLC liabilities that would otherwise be included among the assumed WMI Entities' BKK Liabilities and also fails to channel available insurance of the Debtors to satisfy the BKK Claims.
.

The third party release of the FDIC is also particularly prejudicial to DTSC and the BKK-related Claimants in that JPMC seemingly denies that it assumed WMB's BKK former owner/operator liability pursuant to the Purchase and Assumption Agreement..

## VII.  THE DEBTORS' PROPOSED DISCLOSURE STATEMENT, SOLICITATION AND CONFIRMATION PROCEDURES SHOULD NOT BE APPROVED

Debtors' request for court approval of the Notice of Disclosure Statement Hearing is improper and premature and should be denied.  For the reasons stated above, the purported Disclosure Statement filed by the Debtors is materially deficient and incomplete and fails to comport with Section 1125 of the Code. There has been no supplementation of the Disclosure Statement since its original filing date. As a result, a disclosure statement within the meaning of and in accordance with Rule 3016(b) has not been filed.  Because no disclosure statement has been filed in accordance with Rule 3016(b) or served as contemplated by Rule 2002, the 28-day notice period before which the required hearing on approval of the disclosure statement may commence under Rule 3017, has not yet commenced, and can not commence until the material and facial deficiencies are cured.

In addition, the disclosure statement objection deadline of May 13, 2010 provided in the Notice may be improper.  The May 13, 2010 deadline for objections appears not to have been fixed by the Court, but rather by the Debtors.  In order to afford parties-in-interest the meaningful notice and opportunity to be heard that the Code and Rules contemplate, a deadline

for objections to a disclosure statement should not be established and approved until Debtors have provided a revised and credible disclosure statement.

DTSC objects to the voting deadline as premature. Given the deficiencies herein described the proposed voting deadline of July 7, 2010 is premature and will allow insufficient time for parties in interest to review and evaluate any revised plan and disclosure statement necessitated by the deficiencies in the one now pending. DTSC imposes a similar objection to the proposed confirmation hearing date of July 20, 2010 and the proposed deadline for objections to confirmation of June 25, 2010 for the same reasons. Although DTSC realizes the benefit of having a confirmation hearing and objection deadline on the calendar to encourage timely resolution of disputes, the schedule selected by the Debtors here is simply too aggressive given that as of this date the proposed Joint Plan is based entirely on a purported Global Settlement Agreement that does not exist.

In addition, BKK-related Claimants, because their claims are in large part unliquidated, will, at best have their claim temporarily allowed at $1 for voting purposes pursuant to the Motion. See the Motion at Para 41.(b). This is fundamentally unfair as the BKK Claimant's claims have a value well in excess of $1 dollar and the method proposed by Debtors is not narrowly tailored to strike a fair balance between the unliquidated amount and the right to cast a meaningful vote. In addition, if the debtor files an objection to the BKK Claims or a motion to estimate them, then such claims become "disputed" and the holder is not allowed to vote. See the Motion at paragraph 41(g). Finally, the procedures proposed by the debtors would allow them to file an objection or motion to estimate a BKK Claimant's claim on the eve of the

balloting deadline and leave insufficient time before the voting deadline for the BKK Claimant to secure an order from the court estimating its claim or temporarily allowing it for voting purposes.

The "Record Date" as proposed by the Debtor of May 19, 2010 as the date for determining which creditors and equity holders are entitled to vote, is too soon. Given the inadequacies of the Disclosure Statement as outlined herein, the May 19, 2010 Record date provides insufficient time within which creditors such as the BKK-related Claimants can obtain a timely estimation or temporary allowance or reserves order.

The form of ballots proposed by the Debtors, particularly for the BKK-related Claimants in Class 12, should not be approved. First, Debtors present no compelling evidence as to why the Official Form No. 14 ballot cannot suffice. Second, the releases and injunction plan provisions on the ballots are confusing, incomprehensible and internally inconsistent. For example, as described in the Joint Plan, the release provision on the ballot for Class 12 after it describes an opt-out option to enable a claimant to elect to opt out of the sweeping releases, then nullifies that provision by stating that the election may not be valid and that even the opt out claimant will be bound by the sweeping releases and injunctions without its consent.

### Conclusion

DTSC therefore respectfully submits that the Disclosure Statement should be rejected along with the Plan and the Debtor ordered to cure the deficiencies and renotice the hearing on

///

///

the Disclosure Statement to comport with section 1125. DTSC reserves the right to join in objections filed by other creditors or parties in interest and to supplement this objection.

Dated: May 13, 2010

Respectfully Submitted,

EDMUND G. BROWN JR.
Attorney General of California
DON ROBINSON
MARGARITA PADILLA
Supervising Deputy Attorneys General
JAMES R. POTTER
OLIVIA W. KARLIN
Deputy Attorneys General
State Bar No. 166992
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 897-2637
Fax: (213) 897-2802
E-mail: James.Potter@doj.ca.gov
Attorneys for Claimant Department of Toxics
Substance Control

LA2009602622
Document in ProLaw

36