# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WASHINGTON MUTUAL, INC., et al.,[1] | ) | Case No. 08-12229 (MFW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date: May 19, 2010 at 11:30 a.m.** |
|  | ) | **Objection Deadline: May 13, 2010 at 4:00 p.m.** |
|  | ) | **Related Docket No. 3568** |
|  | ) |  |

**OBJECTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS TO APPROVAL OF THE MOTION OF DEBTORS FOR AN ORDER, PURSUANT TO SECTIONS 105, 502, 1125, 1126, AND 1128 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 3003, 3017, 3018 AND 3020, (I) APPROVING THE PROPOSED DISCLOSURE STATEMENT AND THE FORM AND MANNER OF THE NOTICE OF THE DISCLOSURE STATEMENT HEARING, (II) ESTABLISHING SOLICITATION AND VOTING PROCEDURES, (III) SCHEDULING A CONFIRMATION HEARING, AND (IV) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF THE DEBTORS' JOINT PLAN**

The Official Committee of Equity Security Holders (the "Equity Committee")[2] of

Washington Mutual, Inc. ("WMI" and, together with its chapter 11 debtor-affiliate, WMI

Investment Corp., the "Debtors"), by and through its undersigned counsel, submits this objection

(the "Objection") to the *Motion of Debtors for an Order, Pursuant to Sections 105, 502, 1125,*

*1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 2002, 3003, 3017, 3018 and*

*3020, (I) Approving the Proposed Disclosure Statement and the Form and Manner of the Notice*

*of the Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III)*

*Scheduling a Confirmation Hearing, and (IV) Establishing Notice and Objection Procedures for*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Washington Mutual, Inc. (3725) and WMI Investment Corp. (5396). The Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98101.

[2] All capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

*Confirmation of the Debtors' Joint Plan* (Dkt. No. 3568) (the "Motion"). In support of this Objection, the Equity Committee respectfully states as follows:

## PRELIMINARY STATEMENT

The Debtors ask this Court to allow them to solicit votes to accept a Plan the cornerstone of which is a "global settlement" (the "Proposed Settlement"). Yet the Proposed Settlement, and thus the Plan which is conditioned upon the effectiveness of the Proposed Settlement, is illusory: (i) it continues to lack the agreement of the FDIC, which is a condition to the effectiveness of the Proposed Settlement; and (ii) it is conditioned upon an event which might never come to pass, and appears certain not to come to pass in the near term, namely the disallowance in full of the $12.1 billion face amount of the Bank Bondholder Claims. (DS 35)[3] For weeks the Debtors have attempted to reassure parties in interest that a deal really does exist and all that remains to be done is to iron out the final details. At every turn, the FDIC – a primary participant to the Proposed Settlement – has protested stating that "significant open issues" remain to be negotiated and that any agreement in principle remains subject to FDIC Board approval. Truly, the devil must be in the details.

The Debtors recently lost their legal challenges to the Bank Bondholder Claims and are only now segueing into discovery in what is likely to be fierce and protracted litigation. The Court should decline to permit the Debtors to expend estate resources to solicit votes to accept a Plan which is dependent upon the Proposed Settlement which is non-binding, and thus not a "settlement" at all, and which may never become effective. Indeed, in analogous circumstances Courts have found plans that are conditioned upon a litigation outcome unconfirmable. (*See infra* Section I.A.)

---

[3] Except as otherwise noted, parenthetical citations in this Objection with the "DS" prefix refer to the Debtor's proposed Disclosure Statement for the Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (Dkt. No. 2623), filed in this case on March 26, 2010.

Even were these fundamental infirmities not present, the proposed Disclosure Statement, Proposed Settlement and Plan lack information critical to an understanding of the Proposed Settlement and thus the Plan. These deficiencies include, but are not limited to, the value (or range of potential values) the Debtors ascribe to their potential claims against: (a) JPMorgan Chase ("JPMC"); (b) the Debtors' directors and officers (who were in office at the time of the WMB seizure, and who presumably approved the Proposed Settlement and Plan under which they will receive broad and non-consensual releases): (c) the "Settling Note Holders"; and (d) the FDIC,[4] which they propose to compromise in the Proposed Settlement. Likewise, the value (or range of values) the Debtors ascribe to the consideration the Debtors are receiving in return is vague or worse, noticeably absent. The Plan is also expressly conditioned upon approval and effectiveness of the sale of the Debtors' interests in the Plan Contribution Assets, which have yet to be identified. (DS 8; Plan § 1.113; Proposed Settlement Ex. G) The Liquidation Analysis, which should include a detailed analysis of anticipated recoveries under the Plan versus potential recoveries in chapter 7, has not, perhaps for strategic reasons, been filed with the Court as of the date of this Objection.

In short, nearly every essential piece of information regarding what the Proposed Settlement and the Plan are, and are not, has yet to be identified, provided, valued or otherwise disclosed by the Debtors. The Plan is not ready to be solicited.

## BACKGROUND

1.      Prior to commencing these chapter 11 cases, WMI was a savings and loan holding company that owned WMB and indirectly WMB's subsidiaries, including Washington Mutual Bank fsb ("FSB"). (DS 1)  It was the largest savings and loan holding company in the country,

---

[4] In this Objection, the FDIC Receiver and FDIC Corporate are referred to collectively as "FDIC."

and WMB and its subsidiaries collectively constituted the seventh largest U.S.-based bank. (DS 22)

2.      On September 25, 2008, the Office of Thrift Supervision (the "OTS") ordered the closure of WMB and appointed the FDIC as receiver for WMB. (DS 2) Immediately after its appointment as receiver, the FDIC took possession of WMB's assets and sold substantially all of them to JPMC for $1.88 billion and the assumption of WMB's deposit liabilities. (DS 2) That precipitated this bankruptcy. (DS 29) The failure of WMB is the largest bank failure in the Nation's history.

3.      Before those dramatic actions by the OTS and FDIC, WMI's financial condition had been adversely affected by significant disruptions during 2007 and 2008 in the U.S. residential mortgage market. (DS 28) And yet, WMI had weathered the storm, due in part to completion in April 2008 of a significant recapitalization that resulted in a $7.2 billion capital infusion by institutional investors. (DS 28) Moreover, although the OTS lowered WMB's supervisory rating in a way that made it ineligible to receive primary credit from the Federal Reserve Board's Discount Window, WMB was able to receive secondary credit from the Discount Window of the Federal Reserve Bank of San Francisco, and was able to maintain borrowings up to the time of its seizure. (DS 29) Nevertheless, speculation began to circulate in the market that WMI's and WMB's operations and capital positions were unstable, and in the ten days prior to the FDIC receivership, WMB experienced significant deposit withdrawals of more than $16.7 billion. (DS 29)

4.      During this ongoing process, WMI pursued a merger or sale transaction with another financial institution and investigated other strategic alternatives intended to increase

WMI's capital and liquidity levels. (DS 29) WMI was continuing to pursue those alternatives when the OTS stepped in and appointed the FDIC as receiver for WMB.

5.      On September 26, 2008, (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes only, pursuant to an Order of this Court entered on October 3, 2008.

6.      On October 15, 2008, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee"). On January 11, 2010, the U.S. Trustee appointed the Equity Committee.

<strong><u>Summary of Significant Litigation Involving the Estates</u></strong>

7.      The Court is well aware that the failure of WMB and its sale to JPMC lead to the commencement of significant amounts of litigation and the assertion of billions of dollars of claims in this and other courts. The status of these litigations and the claims asserted in them are summarized briefly below.

A.      The D.C. Action

8.      On December 30, 2008, the Debtors filed a proof of claim against the FDIC Receiver seeking compensation for the Debtors' equity interest in WMB, recognition of WMI's interest in WMI assets claimed by the FDIC, allowance of a protective claim for payment of the Debtors' deposits, payment of amounts owed to WMI by WMB, and the avoidance of certain transfers made by WMI to WMB as a preference or fraudulent transfer. (DS 3) (From December 2007 to September 2008, WMI made capital contributions to WMB amounting to

$6.5 billion.) The FDIC summarily rejected those claims, and in March 2009, the Debtors filed a complaint against the FDIC in the U.S. District Court for the District of Columbia.

9.     Significantly, the Debtors alleged "that the FDIC sold WMB's assets for less than they were worth, and as a result, the FDIC breached its statutory duty under the Federal Deposit Insurance Act to maximize the net present value of WMB's assets." (DS 3)  The Debtors also alleged that the FDIC's actions constituted a taking of the Debtors' property without just compensation in violation of the Fifth Amendment to the U.S. Constitution and a conversion of the Debtors' property in violation of the Federal Tort Claims Act. (DS 3)  JPMC was allowed to intervene in that suit.

10.     On January 7, 2010, the D.C. District Court stayed the D.C. Action at the Debtors' request, in favor of pending adversary proceedings in this Court – but at the same time denied the FDIC's motion to dismiss the suit. (DS 3-4)  The D.C. Action would be dismissed with prejudice under the terms of the Proposed Settlement. It is not apparent that any discovery occurred in the D.C. Action before the court stayed it.

B.     The JPMC Adversary Litigation

11.     In March 2009, JPMC filed an adversary complaint in this Court against the Debtors and FDIC, seeking a declaratory judgment with respect to the ownership of disputed assets and interests that JPMC contends it acquired in the FDIC's auction sale of WMB. (DS 4)  In May 2009, the Debtors filed counterclaims against JPMC, claiming ownership of disputed assets and seeking avoidance of prepetition transfers of assets to WMB, and subsequently to JPMC.

12.     This Court denied JPMC's subsequent motion to dismiss the Debtors' counterclaims, and JPMC appealed that decision to the District Court (DS 4), where it is now

pending but recently has been stayed as a result of the pending Proposed Settlement. If approved, the Proposed Settlement would result in the dismissal of the Debtors' counterclaims with prejudice.

13.     In its counterclaims, the Debtors asserted a right to anticipated federal and state tax refunds in the approximate amount of $5.4 to $5.8 billion. (DS 9) Under the Proposed Settlement, 70% of initial tax refunds, estimated at $2.7 to $3.0 billion, would be paid to JPMC, and almost 60% of additional tax refunds, estimated at $2.7 to $2.8 billion, would be allocated to the FDIC Receiver. (DS 9)

14.     Also at issue in the JPMC Adversary Litigation is a dispute over ownership of certain trust preferred securities with a liquidation preference of approximately $4 billion (backed by a $4 billion mortgage collateral pool). (DS 5) On September 25, 2008, at the direction of the OTS employees of WMI and WMB executed an agreement purporting to assign ownership of those securities to WMB. (DS 27) In its counterclaims in the adversary suit, the Debtors assert that the transfer was ineffective or constituted a fraudulent transfer or voidable preference. (DS 6) The Debtors alleged that JPMC, as the subsequent recipient of those securities via the FDIC sale of WMB assets, was liable to WMI's estate because it knew or should have known of the financial condition of both WMI and WMB at the time of the transfer – and thus was not a good faith purchaser. (DS 6) Under the Proposed Settlement, JPMC will become the undisputed owner of those securities. (DS 10)

C.     The Turnover Action

15.     In April 2009, the Debtors filed a complaint against JPMC in this Court seeking turnover of approximately $4 billion of the Debtors' funds in disputed accounts at WMB. JPMC spuriously asserted in response that the funds on deposit in those accounts might be capital

contributions rather than deposit liabilities. (DS 6) This Court denied JPMC's motion to dismiss the turnover action. (DS 7) The Debtors' motion for summary judgment in the turnover action was argued in October 2009, and the matter is *sub judice*. (DS 7) Under the Proposed Settlement, nearly all of the funds in the disputed accounts (except approximately $175 million to be retained by JPMC) would be paid over to the Debtors. (DS 9; Proposed Settlement §2.1)

### D.    The American National Action

16.    In February 2009, various insurance companies that hold bonds issued by WMB and WMI filed suit against JPMC in state district court in Galveston County, Texas. "Specifically, the plaintiffs asserted that there was a premeditated plan by JPMC designed to damage WMB and FSB, and thereby enable JPMC to acquire WMI's banking operations at a 'fire sale' price." (DS 34) The allegations in the complaint raised disturbing questions about the extent to which JPMC had been working with the FDIC behind the scenes for weeks before the seizure of WMB, and had withdrawn from negotiations for the purchase of WMB after concluding that government seizure of WMB would happen and that it could then acquire the assets more cheaply.

17.    The FDIC intervened in the suit as a defendant and removed it to the U.S. District Court for the Southern District of Texas, which then transferred it to the District Court for the District of Columbia. (DS 34) On April 13, 2010, that court granted motions by JPMC and the FDIC to dismiss the suit for lack of subject matter jurisdiction and entered a final order dismissing the suit and closing the case. The court did not reach the merits, but rather held that the FDIC was a necessary party to the plaintiffs' claims and that plaintiffs were required to pursue their claims against the FDIC exclusively through an administrative claims process established by Congress in the Financial Institutions Reform, Recovery and Enforcement Act of

1989, Pub. L. No. 101-73, 103 Stat. 83 (1989).[5] Prior to that dismissal, the Debtors had proposed that the action would be dismissed on its merits, with prejudice, under the Debtors' proposed Plan.[6]

### E. The Debtors' Rule 2004 Examination Requests

18. As a result of the American National Action, the Debtors filed a motion for Rule 2004 examination on May 1, 2009, seeking an order directing the examination of JPMC.[7] In that motion, the Debtors summarized the allegations in the American National Action and sought the authority to investigate the underlying merit of those claims, as well as other potential estate claims suggested by the American National allegations. The Debtors argued to the Court that the discovery they sought through Rule 2004 was broader than the issues raised in the JPMC Adversary Litigation and the Turnover Action. (May Rule 2004 Motion at 2)

19. This Court granted the Debtors' motion on June 24, 2009, over JPMC's opposition. (DS 34) In August and September 2009, JPMC began producing documents to the Debtors for their review.[8] There is no indication that the Debtors took any depositions.

20. As described in the proposed Disclosure Statement, "As a result of the review of certain of the documents produced by JPMC, the Debtors determined that additional fact investigation was necessary." (DS 34) Accordingly, on December 14, 2009, the Debtors moved

---

[5] *See Am. Nat'l Ins. Co. v. JPMorgan Chase & Co.*, 2010 WL 1444533, at *3 (D.D.C. April 13, 2010).

[6] *See* Chapter 11 Plan of Reorganization (Dkt. No. 2622), filed on March 26, 2010, §§ 1.182 (naming this action the "Texas Litigation"), 1.146 (including "Texas Litigation" in "Related Actions"), 2.1 (releasing "Related Actions").

[7] *See* Motion for 2004 Examination of JPMorgan Chase Bank, N.A. (Dkt. No. 974) ("May Rule 2004 Motion").

[8] *See* Debtors' Motion for an Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Examination of Witnesses and Production of Documents from Knowledgeable Parties (Dkt. No. 1997), filed on December 14, 2009 ("Dec. Rule 2004 Motion"), at 5.

for authority to conduct a further Rule 2004 examination of witnesses and to request production of documents from various third parties – including the FDIC, the OTS, the U.S. Department of the Treasury, and former U.S. Treasury Secretary Henry M. Paulson, Jr. (DS 34) The Debtors also sought to obtain testimony and documents from rating agencies, banks (including Goldman Sachs, the investment bank that WMI retained in September 2008 to assist it in finding a suitor), and third-party professionals that WMI had at one time used. (Dec. Rule 2004 Motion at 1, n. 2)

21.    In that motion, the Debtors described the contents of certain documents they had obtained pursuant to the first Rule 2004 examination – documents that the Debtors themselves fairly characterized as warranting the need for further investigation from third parties who "are likely to have information currently unobtainable by Debtors relevant to potential estate claims sounding in business tort and tortious interference against JPMC, including information relevant to allegations made in [the American National Case]." (Dec. Rule 2004 Motion at 3)

22.    The Debtors represented to the Court:

> As with the Rule 2004 Examination of JPMC, the Rule 2004 Examination of the Knowledgeable Parties will enable the Debtors – as estate fiduciaries – to determine the validity and ownership of these potentially significant claims. To the extent the Requested Examination demonstrates that the Debtors have viable claims against JPMC, such claims are assets of the Debtors' chapter 11 bankruptcy estates and, thus, any recovery resulting from the assertion of these claims will inure to the benefit of the Debtors and their creditors.

(Dec. Rule 2004 Motion at 4)

23.    Suffice it to say that what the Debtors had discovered by December 2009 was disturbing. The Debtors explained in their reply brief:

> As detailed in Debtors' Motion, the discovery sought through the Requested Examination concerns possible misconduct by JPMC preceding the seizure and sale of WMB, including gaining access to WMI's confidential information in connection with JPMC's supposed interest in bidding for the company, improperly disclosing such information to third parties to cause market panic and

foment a government seizure of the bank, destroying a 119-year-old institution that once had more than $50 billion in market capital.[9]

24.     It was also apparent from the December Rule 2004 motion that the Debtors had not obtained the requested information through discovery in any of the lawsuits referred to above.  Indeed, in their reply brief, the Debtors explained that discovery was no longer even available in the D.C. Action because it had been stayed.  (Reply Br. Dec. Rule 2004 Motion at 3)

25.     By order dated February 16, 2010, this Court denied the Debtors' motion on the grounds that the discovery the Debtors sought was not appropriate under the limited scope of the Rule 2004 examination that the Court had previously authorized and that permitting further examination under Rule 2004 would have allowed the Debtors to circumvent the Federal Rules of Civil Procedure applicable in the litigation the Debtors had already commenced against JPMC.[10]

26.     Less than one month later, on March 12, 2010, the Debtors announced on the record the general terms of the Proposed Settlement and proposed release of the substantial claims they had told the Court as late as the January 28 hearing on their motion that they vitally needed to investigate further through Rule 2004. *And this, despite apparently not having taken a single deposition, obtained any formal discovery of the OTS, the FDIC or other third parties with knowledge of the significant potential claims against JPMC, the OTS, the FDIC and others.* Indeed, it appears that the Debtors' review of third-party documents has been, in large part, limited to those documents third-parties, including JPMC, have been willing to provide to the Debtors.  In the case of JPMC, the Debtors were provided with as little as 30,000 pages.  The

---

[9] *See* Reply of the Debtors to the Objections to Dec. 2004 Motion (Dkt. No. 2212), filed on January 25, 2010 ("Reply Br. Dec. Rule 2004 Motion").

[10] Transcript of Hearing, Jan. 28, 2010 (Dkt. No. 2312), at 88-90 (attached hereto as Exhibit 5.a.). Excerpts of each of the transcripts cited in this Objection are attached hereto as **Exhibit 5**.

overall lack of formal discovery preceding the Debtors' announcement of a multi-billion dollar settlement is shocking.

F.    Other Suits and Investigations

27.    As described in the Debtors' proposed Disclosure Statement, consolidated class action suits brought under ERISA and the federal securities laws are proceeding in the U.S. District Court for the Western District of Washington as a result of transfer and consolidation orders entered by the Judicial Panel on Multi-District Litigation. (DS 39-40) Former officers and directors of WMI are named as defendants in those suits, and discovery has begun. (DS 39-41)

28.    Under the Proposed Settlement, WMI's present and former officers and directors and employees will be entitled to a priority recovery for all claims made against a blended insurance program obtained by WMI before bankruptcy, providing (among other things) directors and officers, bankers professional liability, and fiduciary liability insurance. (DS 56)

29.    In addition, in October 2008, the U.S. Attorney for the Western District of Washington, together with other federal authorities including the FBI, the FDIC, the IRS, and the Department of Labor commenced a coordinated investigation into the failure of WMB. (DS 45) The Debtors have reported that WMI "has received several grand jury subpoenas and is producing documents responsive to those subpoenas." (DS 45) The Debtors further report that "[t]he government's investigation is pending and WMI does not know how much longer the investigation will continue or whether any charges will result against WMI or any individuals." (DS 45)

30.    Further, the Debtors have disclosed that the sale of substantially all of the assets of WMB to JPMC has been "a point of interest" to the Financial Fraud Enforcement Task Force

established by President Obama on November 17, 2009, by Executive Order No. 13519. (DS 45)

31.    Last but not least, the U.S. Senate's Homeland Security and Government Affairs Permanent Subcommittee on Investigations, has recently conducted hearings (on April 13 and April 16, 2010) about the collapse of WMB and has issued two investigative reports.[11] Among other things, the hearings revealed the existence of disputes between the OTS and the FDIC over the financial condition of WMB and whether regulatory action was necessary.    Former OTS director John M. Reich testified that WMB's seizure was not caused by the poor quality of its loans or by deficient capitalization, but by an asserted liquidity crisis prompted by a "run on deposits" at the bank by depositors in the 10-day period preceding OTS intervention.[12]    Reich's testimony, confirming that WMB's seizure and sale were not the result of inadequate regulatory capital, underscores the importance of allegations in the American National Action that JPMC helped orchestrate a run on the bank, which became the ostensible precipitating cause of the FDIC receivership, by engineering "a campaign involving adverse media 'leaks,' stock sales, and

---

[11] The first report, contained in an April 13, 2009 Memorandum to the Permanent Subcommittee on Investigations, is available at http://levin.senate.gov/newsroom/supporting/2010/PSI.LevinCoburnmemo.041310.pdf, and attached hereto as **Exhibit 1**.

The second report ("April 16 Subcommittee Report"), contained in an April 16, 2009 Memorandum to the Permanent Subcommittee on Investigations, is available at http://levin.senate.gov/newsroom/supporting/2010/PSI.LevinCoburnmemo.041610.pdf, and attached here to as **Exhibit 2**.

[12] *See* April 16, 2010 Statement of John M. Reich, Former Director, Office of Thrift Supervision, regarding Washington Mutual Bank, Before the U.S. Senate Permanent Subcommittee on Investigations United States Senate, available at http://tiny.cc/f0zly and attached hereto as **Exhibit 3**.

deposit withdrawals designed to distort the market and regulatory perception of Washington Mutual's financial health."[13]

## The WMI Annual Shareholder Meeting Litigation

32.　　On March 3, 2010, the Equity Committee filed its Complaint against WMI commencing Adv. Pro. No. 10-50731 (MFW) in which the Equity Committee seeks an order from this Court compelling WMI to hold a long overdue annual shareholders meeting (Adv. Dkt. No. 1).

33.　　On April 21, 2010, the Bankruptcy Court granted, in part, the Equity Committee's Motion for Summary Judgment, or In the Alternative, for Relief from the Automatic Stay (Adv. Dkt. No. 3) (the "Summary Judgment Motion") concluding that the automatic stay does not preclude the filing or prosecution of an action by shareholders of WMI in Washington state court to compel WMI to convene an annual shareholders meeting.[14] The Court entered an Order on April 26, 2010 (Adv. Dkt. No. 20) memorializing the Court's April 21st ruling.

34.　　On April 26, 2010, two WMI shareholders filed a Complaint to Compel Shareholders' Meeting (the "Shareholders' Complaint") in the Superior Court for the State of Washington for the County of Thurston commencing Case No. 10-2-00854-1. A true and correct copy of the Shareholders' Complaint is attached hereto as **Exhibit 4**. On May 5, 2010, the plaintiffs filed a motion to compel shareholders' meeting that is currently scheduled to be considered by the Washington state court on June 11, 2010.

---

[13] *Am. Nat' Ins. Co. v. FDIC*, No. 09-1743, Complaint ¶ 46 (attached as Exhibits 1-3 of Dkt. No. 1) (D.D.C. March 25, 2009). As noted previously, this case was recently dismissed on non-merits grounds because Plaintiffs failed to exhaust their administrative remedies against a necessary party, the FDIC. *See Am. Nat'l Ins. Co. v. JPMorgan Chase & Co.*, 2010 WL 1444533, at *3. In reaching this decision, the court did not gainsay any of the factual allegations in the complaint.

[14] Transcript of Hearing, Apr. 21, 2010 (Dkt. No. 3593), at 64-65 (attached hereto as Exhibit 5.c.)

## The Proposed Settlement

35.     On March 12, 2010, the Debtors announced on the record the broad strokes of the Proposed Settlement, under which the Debtors intend to compromise the most valuable assets of the estate, namely those claims and causes of action against JPMC, the FDIC and others relating to the downfall, seizure and sale of WMB.  In addition to the grant of broad general releases of estate and third-party claims, the Proposed Settlement would result in the following allocation of assets (*see generally* DS at 7-12):

<table>
<tr><td align="center"><u>Assets going to JPMC</u></td><td align="center"><u>Assets going to Estate</u></td></tr>
<tr><td valign="top">

- $3.37 to $3.77 billion of expected Tax Refunds;

- the Trust Preferred Securities with a liquidation preference of approximately $4 billion;

- title to numerous other assets of the Debtors;

- the WMI Medical Plan;

- the JPMC Rabbi Trusts;

- the JPMC Policies and related proceeds;

- the WaMu Pension Plan;

- the Lakeview Pension Plan;

- the proceeds of the Anchor Litigation;

- the 3.147 million shares of Visa Inc. (in exchange for $50 million) and the VISA Strategic Agreement;

- certain Transferred Intellectual Property;

- the JPMC Wind Investment Portfolio
</td><td valign="top">

- $1.8 to $2.0 billion of expected Tax Refunds;

- turnover of $4 billion held in the Disputed Accounts;

- release of an administrative account held at JPMC holding $52.6 million;

- $50 million as consideration for the sale of WMI's 3.147 million Class B shares of Visa Inc.;

- that certain HF Ahmanson Rabbi Trust;

- certain Boli-Coli policies and proceeds thereof;

- the remaining 1.33% of stock of H.S. Loan Corporation; and

- the WMI Intellectual Property.
</td></tr>
</table>

LLC; and

- certain bonds issued on behalf of WMB
and FSB.

36.     On March 26, 2010, the Debtors filed the Plan and the proposed Disclosure Statement, together with a draft of the Proposed Settlement. The Plan is completely dependent upon the effectiveness of the Proposed Settlement. (DS 1). However, the FDIC has not agreed to the Proposed Settlement,[15] it is unclear whether the FDIC will ever agree to the Proposed Settlement and, in the event it does, the Debtors concede that the Proposed Settlement will likely require modification to accommodate the FDIC.[16] (DS 1) Whether the FDIC and the other parties to the Proposed Settlement reach agreement on the Proposed Settlement in its current iteration, some other iteration, or not at all, is unknown. It is clear, however, that the FDIC is an

---

[15] In fact, the form of Proposed Settlement filed with the Plan does not reflect the agreement that continues to be negotiated. On April 6, 2010, the FDIC stated :

> The FDIC is working with all parties involved to reach agreement with respect to all terms of the proposed settlement. The plan disclosure statement and settlement agreement that were filed today do not reflect the continuing discussions among the parties. Once finalized, the agreement is subject to approval by the FDIC's board of directors.

Transcript of Hearing, Apr. 6, 2010 (Dkt. No. 3106), at 113 (attached hereto as Exhibit 5.b.)

[16] Indeed, as late as May 5, 2010, the FDIC continued to refute the Debtors' assertions that the Proposed Settlement is substantially complete stating:

> We said that there were still significant open issues with the parties to the proposed settlement; that we continue to have discussions with those parties; that we had not yet resolved those issues; and there are other conditions to the settlement that still haven't been satisfied, but we're working with the goal of trying to achieve all that and get the proposed settlement agreed to and presented to this Court.

(Transcript of Hearing, May 5, 2010 (Dkt. No. 3699) at 96) (repeating statement made during April 6, 2010 hearing) (attached hereto as Exhibit 5.d.)

essential party to the Proposed Agreement. (Proposed Settlement at § 7.2) (providing execution by the FDIC is a condition to the effectiveness of the Proposed Settlement)

37. In addition, the disallowance of the Bank Bondholder Claims "in their entirety" is an express condition precedent to the Proposed Settlement becoming effective. (DS 35; Proposed Settlement §7.2(f)) Yet the Court overruled the Debtors' objections to these claims on legal grounds at the April 6, 2010 hearing, and it appears that discovery in respect of the Bank Bondholder Claims has only just begun.[17]

38. The Plan is also expressly contingent upon obtaining Court approval and the effective sale of the Debtors' interest in the Plan Contribution Assets. (DS 8) The Plan Contribution Assets are supposed to be identified on Exhibit G to the Proposed Settlement. However, that exhibit is completely blank which raises the question whether the Debtors, JPMC and the other parties to the Proposed Settlement have not yet agreed upon the assets that will be contributed to support the Plan. Thus, even if the parties to the Proposed Settlement were able to reach agreement on mutually acceptable modifications that address the significant issues of concern to the FDIC, whether the Proposed Settlement (and by extension, the Plan) will become effective is anyone's guess.

### Denial of the Equity Committee's Request for Appointment of an Examiner

39. By their announcement of the Proposed Settlement, the Debtors made express their intention to sweep under the rug those asserted and additional potential claims against JPMC that the Debtors themselves thought worthy of further investigation as late as January 25, 2010 regarding the destruction of an institution that once had in excess of $50 billion of market

---

[17] Transcript of Hearing, April 6, 2010 (Dkt. No. 3106) at 143 (suggesting the parties discuss a discovery schedule) (attached hereto as Exhibit 5.b.)

capital.[18] (DS 34) On April 26, 2010, the Equity Committee filed its Motion for Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code (Dkt. No. 3579) (the "Examiner Motion"). On May 5, 2010, the Bankruptcy Court entered an Order (Dkt. No. 3663) denying the Examiner Motion finding, in part, that the Equity Committee can appropriately conduct the investigation for which an examiner was requested.

40.     On May 7, 2010, the Equity Committee's professionals prepared and served the Debtors with initial due diligence requests seeking those documents, information and analyses that support their decision to enter into the Proposed Settlement.[19] To date, the Equity Committee has received little by way of information and documents. The Equity Committee, however, will continue to try to work constructively with the parties to the Proposed Settlement to obtain the requested information.

## I.     THE COURT SHOULD NOT AUTHORIZE THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN.

41.     Even if the Debtors revise the Disclosure Statement to include the substantial amount of information currently lacking (*see infra* Section II), the Equity Committee respectfully submits the Court should not permit the Debtors to solicit votes with respect to the Plan for two reasons. First, the Proposed Settlement upon which the Plan rests has not been agreed to, is unenforceable, and contains significant contingencies that should first be satisfied. Second, a decision from the Washington state court is expected in the near future on the shareholders' request to compel WMI to hold a shareholders' meeting. Thus, a new WMI board of directors

---

[18] *See* Reply Br. Dec. Rule 2004 Motion.

[19] The Equity Committee has been granted access to an electronic data room containing some of the information requested, however, by no means does it contain all (or even a substantial majority) of the information requested by the Equity Committee. In an effort to avoid duplication of effort and minimize expense to the estates, the Equity Committee also requested that the Debtors share their analyses supporting the Proposed Settlement and the Plan. The Debtors have not yet complied with the request nor agreed they would comply with such a request.

will likely be seated prior to the confirmation hearing and a new Board might, in the exercise of its fiduciary duties, determine to withdraw the Debtors' support for the Proposed Settlement. Importantly, the proposed Plan is a plan of liquidation, which contemplates the creation of a Liquidating Trust and the distribution of cash and interests in the Liquidating Trust.[20]   The Debtors do not appear to be under a "time crunch" to exit chapter 11, which deferral of solicitation otherwise might put in jeopardy.

A. **Consideration of the Disclosure Statement Now is Premature in that the Cornerstone of the Plan – the Proposed Settlement – is Not, and May Never Become Enforceable, Final or Effective.**

42.     The Plan and, by extension the Disclosure Statement, rests entirely on the Proposed Settlement.   The consideration to be received by the non-Debtor parties to the Proposed Settlement provide the lion's share of Cash to be distributed to claimants under the proposed Plan.   Yet, the FDIC, a primary party to the Proposed Settlement, has stated that the Proposed Settlement does not accurately reflect the parties' discussions and, despite the Debtors' efforts to convince the FDIC otherwise, the FDIC has staunchly withheld its consent ever since the Debtors announced this supposed landmark achievement some 60 days ago.   Indeed, the putative parties to the Proposed Settlement cannot even agree among themselves on the

---

[20] The Disclosure Statement asserts that the "Plan contemplates the reorganization of the Debtors" based upon the Reorganized Debtors' retention of the equity interests in WMI Investment and WM Mortgage Reinsurance Company ("WMMRC"), and the cash received on account of the Rights Offering. (DS 13) WMI Investment does not have any operations but merely holds a variety of securities and investments (*see* DS 22) the aggregate value of which is approximately $319 million. (*See* Schedule A (Dkt. No. 475) With respect to WMMRC, all of the Trusts held by WMMRC are in "run-off" (*i.e.*, liquidation) and WMMRC has ceased to reinsure any new loans. (DS 51) The Reorganized Debtors will not have any significant operations, but will merely consist of various investments and cash. Thus, the Debtors are not reorganizing. *See In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d 100, 107 (1st Cir. 2005) (noting that, in a reorganization plan as opposed to a liquidating plan, the debtor is "attempting to make a go of its business"). Even if the Debtors dispute this characterization, none of the assets around which the Debtors will purportedly "reorganize" will waste if the Court were to decline authorization to solicit votes regarding the Plan because they are either already currently in the process of liquidation or are static investments (equity and cash) the value of which is not tied to emergence of the Debtors from chapter 11.

significance of the remaining open issues.[21] The risk that the Proposed Settlement will collapse or require significant amendment is real. In its current iteration the Proposed Settlement is illusory, and the Plan which is built upon it is unconfirmable. The Equity Committee respectfully submits that solicitation of a Plan at this time would be a waste of estate resources.

43. Additionally, even if the FDIC were to sign on to the Proposed Settlement in its current iteration, a condition precedent to the effectiveness of the Proposed Settlement is the disallowance of the Bank Bondholder Claims "in their entirety." (DS 35) On April 6, 2010, the Court overruled the Debtors' legal objections to those claims. (*See* Dkt. No. 3549) Discovery in that litigation has only begun and the outcome is anything but certain.

44. In circumstances analogous to these, Courts have concluded that a plan is not feasible.[22] *In re DCNC N. Carolina I, LLC*, 407 B.R. 651, 668 (Bankr. E.D. Pa. 2009) (stating that a plan based on the debtor's hoped-for success in litigation as the foundation of the reorganization strategy is not feasible), *see also In re Premiere Network Srvs., Inc.*, 2005 WL 6443624, at *6 (Bankr. N.D. Tex. July 1, 2005) (denying confirmation of plan as not feasible where "[t]he Debtor's ability to satisfy its financial obligations under the Plan, and the payment requirements of § 1129 is not just speculative, but is so contingent on factors beyond its control (such as resolution of appeal of the confirmation order, implementation of the effective date, litigious claims by and against SBC, the assumption of allegedly expired contracts that will most likely spur further litigation, and collection of enough funds to pay administrative expenses) that

---

[21] *Compare* statement of Debtors' counsel: "... there is no dispute that we have an agreement; it's just the final words are still being worked on with the FDIC" *with* the statement of FDIC's counsel: "... still significant open issues ... we continue to have discussions with those parties; we have not yet resolved those issues; and there are other conditions to the settlement that still haven't been satisfied...." Transcript of Hearing May 5, 2010 (Dkt. No. 3699) at 94, 96 (attached hereto as Exhibit 5.d.)

[22] This Objection is not intended to set forth all of the Equity Committee's objections to confirmation of the Plan, and the Equity Committee reserves the right to object to confirmation of the Plan on any appropriate grounds at the appropriate time.

completion of the Plan is unlikely."); *In re Made in Detroit, Inc.*, 299 B.R. 170, 176-77 (Bankr. E.D. Mich. 2003) (denying confirmation based on lack of feasibility where financing was contingent and speculative); *In re SIS Corp.*, 120 B.R. 93, 95 (Bankr.N.D.Ohio 1990) ("A plan submitted on a conditional basis thwarts this legislative intent and therefore renders a plan infeasible."); 7 *Colliers on Bankruptcy* § 1129.02[11] at 1129-54 (16th ed. 2010) ("[t]he debtor must offer more than speculation about the source of funding for the plan.").

45.     The parallel between the finding that a plan is not feasible based upon a litigation outcome or other events beyond a debtor's control and the need to have the claims of the Bank Bondholders denied in their entirety is compelling. Whether or not those claims are ultimately disallowed in whole or part or not at all is simply not within the Debtors' control.

46.     Both obtaining the FDIC's agreement to the Proposed Settlement and the disallowance of the Bank Bondholder Claims in their entirety are each so speculative as to preclude any showing of feasibility of the Plan under section 1129(11) of the Bankruptcy Code. Accordingly, consideration of the Disclosure Statement should be deferred until the terms of the Proposed Settlement and the Plan have been finalized.

**B.     Consideration of the Disclosure Statement Should Await Outcome of the Annual Shareholders' Meeting.**

47.     WMI has endeavored to silence its shareholders throughout these chapter 11 cases. Prevailing law, however, is to the contrary. S*ee In re Marvel Entmt't Group, Inc.*, 209 B.R. 832, 838 (D.Del. 1997) ("[s]hareholders . . . 'should have the right to be adequately represented in the conduct of a debtor's affairs, particularly in such an important matter as the reorganization of the debtor.'" (quoting *In re Johns-Manville Corp.*, 801 F.2d 60, 65 (2d Cir. 1986))); *State ex rel. Johnson v. Heap*, 95 P.2d 1039, 1042 (Wash. 1939) ("'The right to participate in the election of the governing board of a corporation is one of the most important

rights incident to stock ownership.'" (citation omitted)). "[T]he ability of shareholders to exercise their rights to corporate governance cannot be enjoined simply on the basis that a group of shareholders may be successful in their bid to elect directors whose views concerning a plan of reorganization may differ from those of existing management." *In re Allegheny Int'l, Inc.*, 1988 WL 212509 at *5 (W.D. Pa. May 31, 1988).

48.     As this Court has recognized, the WMI shareholders are entitled to participate in the process and seek to compel the Debtors to convene a share holders meeting to elect a Board that will protect the rights and interests of all interested parties. (*See* Order (Adv. No. 10-50731; Dkt. No. 20))  On April 26, 2010, shareholders filed suit in Washington state court seeking to compel WMI to hold its long overdue annual shareholders meeting as required under applicable state law and WMI's Bylaws.  That litigation is proceeding and a decision from the Washington state court is expected on or about June 11, 2010.  The Debtors' entrenched directors should not be allowed to charge ahead to confirm a Plan that proposes to extinguish current shareholders' corporate governance rights, compromise tremendously valuable claims (claims that may be sufficient to provide a greater distribution to equity) and, at the same time, effectuate broad releases of those very same entrenched directors by non-debtor third-parties without those third-parties' consent.

49.     The Equity Committee fully expects any new slate of directors will exercise their business judgment according to the very same fiduciary duties and obligations that bind the current directors.  *See, e.g., In re Advanced Ribbons and Office Prods., Inc.*, 125 B.R. 259, 266 (B.A.P. 9th Cir. 1991) (noting that "whoever controls the debtor will be held to fiduciary standards in its dealing with the debtor's assets").  Thus, a new Board, in the exercise of its fiduciary duties, might very well determine to withdraw the Debtors' support for the Proposed

Settlement. If the Disclosure Statement is approved and the Debtors proceed with solicitation of the Plan, the estate will incur significant expense that may prove to have been wasted in the event the Debtors withdraw from the Proposed Settlement. Under these circumstances, prudence dictates a brief deferral of the hearing to consider approval of the Disclosure Statement to await the outcome of the WMI annual shareholders meeting.

### C. Deferral of Consideration of the Disclosure Statement Will Not Harm These Estates

50. The thrust of the Proposed Settlement and Plan is the liquidation of the Debtors' assets, not the reorganization of a viable business. *See In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d at 107 (noting that, in a reorganization plan, as opposed to a liquidating plan, the debtor is "attempting to make a go of its business"). The Debtors do not have any employees and the Plan is not dependent upon exit financing from a lender whose investment depends upon the expeditious emergence of a financially sound enterprise. On the contrary, the Debtors' estate is comprised mostly of legal claims that ultimately will be monetized and the proceeds distributed to claimants. The Proposed Settlement has not been finalized and the contingencies to its effectiveness are nowhere near being satisfied. In short, no exigency to emerge from chapter 11 exists. Thus, deferral of consideration of the Disclosure Statement until the Proposed Settlement and Plan have been finalized so all parties in interest (and the Court) actually know what it is the Debtors are asking the Court to approve is in the best interests of the estate.

### II. THE DISCLOSURE STATEMENT LACKS INFORMATION CRITICAL TO AN UNDERSTANDING OF THE PROPOSED SETTLEMENT AND PLAN.

51. For a document, the purpose of which is to describe the compromise of claims that aggregate in the multiples of billions of dollars, the Disclosure Statement lacks an alarming amount of information, including such basic information as (i) an analysis of the possible value

of the assets being liquidated for distribution to claimants, (ii) the total amount of claims in each

Class, (iii) the estimated percentage recovery for each Class of Claims, and (iv) a liquidation

analysis demonstrating that recoveries will be greater under the Plan than under a straight

liquidation conducted by a  Chapter 7 Trustee and the factors which upon which the Debtors

relied in reaching the conclusions expressed in any such liquidation analysis.  Until the Debtors

revise the Disclosure Statement to include all necessary information for claimants to make an

informed judgment about the Plan, it cannot be approved.

52.    A chapter 11 debtor may only solicit votes on a plan of reorganization once the

Court has approved its written disclosure statement as containing "adequate information."  11

U.S.C. § 1125(b).  A disclosure statement contains adequate information and may be approved

only if it provides:

> information of a kind, and in sufficient detail, as far as is reasonably practical in
> light of the nature and history of the debtor and the condition of the debtor's
> books and records . . ., that would enable a hypothetical investor typical of holders
> of claims or interests of the relevant class to make an informed judgment about
> the plan.

11 U.S.C. § 1125(a)

53.    The Third Circuit has emphasized the importance of adequate information, stating

that:

> [T]he importance of full disclosure is underlaid by the reliance
> placed upon the disclosure statement by the creditors and the court.
> Given this reliance, we cannot overemphasize the debtor's
> obligation to provide sufficient data to satisfy the Code standard of
> "adequate information."

*In re Oneida Motor Freight, Inc.*, 848 F.2d 414, 417 (3d Cir. 1988); *see also Gen. Elec. Credit*

*Corp. v. Nardulli & Sons, Inc.*, 836 F.2d 184, 188 (3d Cir. 1988) (Bankruptcy Code section

1125(a)(1) "requires a debtor . . . to submit a written disclosure statement containing adequate

information to allow a reasonable holder to make an informed judgment about the plan."); *In re*

*Scioto Valley Mortgage Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988) ("The disclosure statement was intended by Congress to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization.").

54.     The principal of adequate disclosure requires, among other things, "information relevant to the risks posed to creditors under the plan." *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 n.6 (Bankr. E.D. Pa. 2001); *see also In re Radco Props., Inc.*, 2009 WL 612149, *12 (Bankr. E.D.N.C. Mar. 9, 2009) ("Creditors not only rely on the disclosure statement to form their ideas about what sort of distribution or other assets they will receive but also what risks they will face.").

55.     A disclosure statement must contain, at a minimum, adequate information concerning "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *In re Beltrami Enters., Inc.*, 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995).  These material factors include, among other things:  (i) a complete description of the available assets and their value; (ii) the anticipated future of the debtor with accompanying financial projections; (iii) information regarding claims against the estate, including those allowed, disputed and estimated; (iv) information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and/or officers of the debtor; and (v) any financial information, valuations, or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan. *In re Scioto Valley Mortgage Co.*, 88 B.R. at 170-71; *In re United Brass Corp.*, 194 B.R. 420, 424 (Bankr. E.D. Tex. 1996); *see also 7 Collier on Bankruptcy* §1125.02[2] (16th ed. 2010).

56.     "A plan is necessarily predicated on knowledge of the assets and liabilities being dealt with and on factually supported expectations as to the future course of the business." Senate Report No. 95-989, 95th Cong. 2d Sess. (1978). "Knowledge of the debtor's financial condition is [therefore] essential before any informed decision concerning the merits of a plan can be made." *Beltrami*, 191 B.R. at 304.

57.     A disclosure statement should not be approved where the debtor's disclosure is incomplete or inaccurate. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("[D]isclosure requirements are crucial to the effective functioning of the federal bankruptcy system. Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed restructuring plan, the importance of full and honest disclosure cannot be overstated.").

58.     The Disclosure Statement fails to include information concerning a host of issues material to understanding the Proposed Settlement and the Plan, many of which are discussed below.

> **A.     The Disclosure Statement Fails to Provide Adequate Information Regarding JPMC's Recovery under the Proposed Settlement and Plan.**

59.     On top of the $3.37 to $3.77 billion of Tax Refunds JPMC and the FDIC are slated to receive under the Proposed Settlement, WMI intends to transfer numerous additional assets of the estate to JPMC. Attached hereto as **Exhibit 6** is a list of those assets that the Equity Committee has been able to ascertain will be transferred free and clear of liens, claims and encumbrances to JPMC under the Plan.[23] The Disclosure Statement fails to disclose the factors

---

[23] In addition to the Transferred Intellectual Property that is to be transferred by WMI to JPMC, the Proposed Settlement also provides that WMI will transfer certain Unidentified Intellectual Property to JPMC as well. (Proposed Settlement at §2.17) Suffice to say that the Proposed Settlement and Plan can not be fairly evaluated if the Debtors are allowed to keep the identity of certain assets to be transferred to

considered and analysis undertaken by the Debtors in determining to transfer these assets to JPMC, the Debtors' estimation of the value (or range of values) of such assets, or the consideration to be paid by JPMC attributable to such assets. The Disclosure Statement does state that JPMC will pay $50 million in exchange for WMI's 3.147 million Class B Shares of Visa Inc., but fails to disclose how that amount was derived or the total amount of dividends WMI expects to receive and retain in respect of the Class B Shares prior to the effective date of the Proposed Settlement. The Disclosure Statement also fails to provide an estimation of the amount of liabilities to be assumed by JPMC (defined as "JPMC Assumed Liabilities" in the Plan) pursuant to the Proposed Settlement including, without limitation, liabilities associated with the Interchange Litigation and the BKK Litigation. This is basic information that should be readily available to the Debtors and is necessary to understand the economics of the Proposed Settlement.

60. A significant facet of the Proposed Settlement is the compromise of the dispute over the Tax Refunds, which according to the Disclosure Statement total $5.4 to $5.8 Billion. (DS 9) Under the Proposed Settlement, the first portion of the Tax Refunds is to be split: 70% of such refunds to JPMC ($1.89 to $2.1 billion) and 30% to the estates ($810 to $900 million); and the second portion of the Tax Refunds is to be split: 59.6% to the FDIC ($1.6 to $1.67 billion) and 40.4% to WMI ($1.09 to $1.13 billion). (DS 9) Under the Plan, that portion of the Tax Refunds received by the Debtors is a primary source of the cash to be distributed under the Plan. Yet the Disclosure Statement does not address or, at best, is unclear regarding the overall value of the Tax Refunds and the factors considered and analysis undertaken by the Debtors that supports the allocation of the Tax Refunds as between the estates, JPMC and the FDIC.

---

JPMC secret; all transferred assets should be identified and their value (or a range of value) should be disclosed.

61.     Similarly, the Disclosure Statement fails to disclose or discuss what proportion of the NOLs are attributable to each member of the Tax Group under the Tax Sharing Agreement, and fails to disclose whether the value of the NOLs is included in the Debtors' $5.4 to $5.8 billion estimate of the value of the Tax Refunds. (*See* DS 9, 54; Proposed Settlement §2.4). The Debtors also fail to disclose whether the FDIC holds a claim against WMI relating to the Tax Refunds and, if so, the amount of such claim.   Under the Proposed Settlement, the FDIC stands to recover approximately $1.6 billion of the Tax Refunds, however, it is unclear from the Disclosure Statement the basis on which the FDIC is entitled to such recovery.   In addition, the Debtors fail to disclose the anticipated date(s) of receipt of the Tax Refunds.   An understanding of the basis of the allocation of the Tax Refunds, the timing of their receipt and the risks associated with their recovery are critical to an understanding of the Proposed Settlement and the Plan, and should be disclosed to claimants.[24]

62.     Exhibit U to the Proposed Agreement lists a host of contracts that will be deemed to be property of WMB and sold to JPMC.  (Proposed Settlement at §2.14)  In connection with JPMC's receipt of those contracts, JPMC will provide $50 million to be deposited into the Vendor Escrow to be used to satisfy the claims of vendors associated with those contracts.  (*Id.* at 2.14(b))  The Disclosure Statement does not contain any analysis establishing that the $50 million will be sufficient to satisfy all of those vendors' claims.

---

[24] Under the Plan, the JPMC Entities will sell to WMI free and clear of all liens, claims, interests and encumbrances (i) the HF Ahmanson Rabbi Trust and certain BOLI-COLI policies and proceeds thereof listed on Exhibit R to the Proposed Settlement, and (ii) the 1.33% stock in H.S. Loan Corporation owned by WMB, and (iii) the WMI Intellectual Property.  (DS 11)  The Disclosure Statement fails to identify the factors considered by the Debtors regarding their "purchase" of these assets or the amount to be paid by the Debtors for these assets.   Moreover, the Disclosure Statement fails to describe the reason for WMI's purchase of these assets, or the basis upon which JPMC, which has not filed a bankruptcy petition and thus is not entitled to the benefit of section 363 of the Bankruptcy Code, can transfer assets free and clear of liabilities.

63. In addition, under Section 2.4(j) of the Proposed Settlement, all amounts transferred to WMB or JPMC are to be treated as "capital contributions" for tax purposes. The Disclosure Statement fails to set forth what impact, if any, the proposed tax treatment may have on the estate.

### B. The Disclosure Statement Fails to Provide Required Information Regarding Claims and Distributions.

64. The Disclosure Statement reiterates the Debtors' classification scheme, however, it is particularly deficient in that it fails to disclose the total amount of claims that fall within each Class and the percentage recovery expected for each Class. In addition, the Disclosure Statement informs that the Liquidation Analysis – essential to an understanding of any disclosure statement and plan– "will be filed at a later date." (DS 127)

65. The Disclosure Statement is also deficient with respect to the treatment of the PIERS Claims (Class 16). The PIERS Claims are comprised of Preferred Securities and Common Securities. (DS 26) The Disclosure Statement discloses that WMI owns all of the PIERS Common Securities (DS 26; f.n. 7), but does not disclose the identity of the holders of Preferred Securities. The Plan appears to treat the PIERS Claims as general unsecured claims (despite the fact that they are comprised of preferred and common equity securities), affords them priority over Subordinated Claims (Class 17) and pays them accrued interest. The Debtors fail to disclose any basis upon which holders of PIERS Claims are entitled to higher priority than other preferred and common equity, or the rational for treating what are denominated "Common Securities" as Claims (as defined in the Bankruptcy Code).

66. In addition, the Disclosure Statement also fails to provide the basis for the Debtors' conclusion that the holders of claims relating to the CCB Securities (in the approximate aggregate principal amount of $68 million) will receive little to no distribution on account of

their claims against the WMB Receivership and therefore are treated as allowed in full under the Plan. (DS 25)

### C. The Disclosure Statement Fails to Provide Adequate Information Regarding Implementation of the Plan.

67. Disallowance of the Bank Bondholders Claims in full is a condition to effectiveness of the Proposed Settlement and Plan. (DS 35, 90; Proposed Settlement §7.2(j)) As stated above, the parties to that dispute are only now working toward establishing a discovery schedule. The Disclosure Statement should disclose the potential impact upon the Plan if the Bank Bondholders prevail in whole or in part in that litigation, and the consequences to the Proposed Settlement and the Plan if that litigation is not concluded in the near term.

68. The Disclosure Statement also fails to provide the Debtors' estimation of the value of the assets to be retained by the reorganized Debtors following emergence, including, without limitation, the anticipated value of the equity interests in WMI Investment, WM Reinsurance Company, Marion Insurance Company, WaMu 1031 Exchange and the HFA Trust Estates. (DS 13, 47) There is also no disclosure of why the Debtors have determined to retain these assets rather than distributing them to stake holders as they propose with the bulk of their other assets. The Disclosure Statement fails to provide any basis for the retention of assets, the value of which is not disclosed, for the benefit of a subset of claimants (the holders of Allowed PIERS Claims) following the release of claims and cancellation of equity interests. (DS 84). Under the Plan, the Rights Offering is limited to holders of Allowed PIERS Claims, which include WMI, who are to be given the opportunity to purchase Additional Common Stock in the Reorganized Debtors the number and value of which is to be disclosed 3 business days prior to the hearing on the Disclosure Statement. (Plan §1.3) The Disclosure Statement fails to inform whether the Debtors are obligated to pay any fees to the Backstop Purchasers in connection with the Rights Offering –

if so, how much and on what basis? Thus, the value of the assets to be retained by the Reorganized Debtors, the par value of the stock in the Reorganized Debtors, the basis for limiting the Rights Offering to holders of Allowed PIERS Claims, and the costs associated with the Rights Offering remain undisclosed.

69.     The definition of Liquidating Trust Assets sets forth those assets that will be contributed to the Liquidating Trust for eventual distribution.    Among those assets to be contributed to the Liquidating Trust are the Plan Contribution Assets, which include assets contributed by the WMI Entities, the JPMC entities, and the FDIC that are supposed to be set forth on Exhibit G to the Proposed Settlement. (DS 15)  Exhibit G to the Proposed Settlement, however, is completely blank.   Thus, the nature, amount and value of the Plan Contribution Assets remain a mystery.

70.     The Plan also provides that the Debtors will pay the professional fees of "certain creditors." (Plan § 42.18)  However, the Disclosure Statement fails to disclose the identity of those creditors and their professionals, the amounts the Debtors propose to pay, and the basis on which the Debtors are obligated to pay such fees.

71.     The Disclosure Statement also fails to provide any explanation for the Settlement Note Holders' participation in the Proposed Settlement or the consideration they are contributing in return for the proposed (non-consensual) release. (Proposed Settlement 1)  The claims and equity interests held by the Settlement Note Holders are supposed to be disclosed on Exhibit C to the Proposed Settlement.  However, Exhibit C is blank.  Thus, the nature and amount of claims and equity interests compromised by the Settlement Note Holders remains unknown.

**D.    The Disclosure Statement Fails to Provide Adequate Information Regarding Certain Litigations and Investigations.**

72.    The Disclosure Statement provides insufficient information concerning the claims and causes of action held by the estates.  With respect to the D.C. Action and the JPMC Adversary, the Disclosure Statement should include the Debtors' estimation of the (i) value (or range of values) of the claims asserted by the Debtors, and (ii) likelihood of recovery on those claims.

73.    The Proposed Settlement and Plan would resolve all claims and causes of action assertable among those parties to the Proposed Settlement.  It appears that through the course of the Debtors' investigations in these cases, they formed the belief based upon information obtained that the Debtors may be able to assert additional claims against third parties.  (DS 34) Before the Debtors may compromise any claims and causes of action, they should disclose the nature of those claims and causes of action regardless of whether they have been formally asserted, and the factors they considered before deciding to release such claims.

74.    There have been numerous investigations of the Debtors and others regarding lending practices prior to the seizure and sale of WMB to JPMC, including investigations commenced by (i) the U.S. Senate Permanent Subcommittee on Investigations; (ii) the U.S. Attorney for the Western District of Washington; (iii) the New York Attorney General; (iv) the Securities and Exchange Commission; and (v) the Financial Fraud Enforcement Task Force (although it does not appear that any third-party investigation of the Debtors' potential claims against JPMC, the FDIC, and other third parties has been undertaken, other than perhaps by the Debtors' Board and professionals who seek to be released of any and all claims under the Plan).[25]

---

[25] *See In re Spansion, Inc*, 2010 WL 1292837 *23 (Bankr.D.Del. April 1, 2010) (rejecting proposed non-consensual release of debtor's management where plan provided no recovery to objecting parties).

The Disclosure Statement should be revised to include a summary of the published results, if any, of any of the foregoing investigations.

**E.** **The Disclosure Statement Fails to Provide Adequate Information to Demonstrate that the Releases Included in the Proposed Settlement and Plan are Appropriate Under Applicable Law.**

75.     The value of the claims and causes of action against various third parties are quite likely the most substantial assets comprising the Debtors' estate.  The Plan proposes to compromise those valuable assets by granting extremely broad releases to numerous parties. (DS 98)  Even more egregious, the Plan proposes to force upon non-debtors an expansive non-consensual release of potential claims against other non-debtor third parties *regardless of whether the "releasors" affirmatively opt out of the proposed Plan releases, vote to approve the Plan, or receive no consideration under the Plan at all.* (DS 99). *See, e.g., In re Coram Healthcare Corp.* 315 B.R. 321, 335-337 (Bankr. D. Del. 2004) (neither the debtor nor the Court has authority to grant third-party releases).

76.     The Disclosure Statement does not contain adequate information to demonstrate that the proposed Plan releases are necessary, fair and in the best interests of the Debtors' estate and, accordingly, should not be approved.

(i)     Debtors' Releases of Non-Debtor Third-Parties.

77.     The Plan seeks to compromise the Debtors' most valuable assets – those claims and causes of action they hold against third parties, which are conservatively valued in the multiples of billions of dollars.  (Plan 71)  The Plan, if confirmed, would release all Claims[26] and Causes of Action[27] that the Debtors, Reorganized Debtors (and their respective Related

---

[26] The definition of "Claim" appears in Section 1.60 on page 7 of the Plan.

[27] The definition of "Causes of Action" appears in Section 1.49 on page 6 of the Plan.

Persons)[28], the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Beneficiaries and the Disbursing Agent (and each of their respective Related Persons) have against any of the Released Parties[29] (or their respective Related Persons). (DS 98)

78.     When a proposed plan of reorganization includes releases of claims by a debtor against non-debtor third parties, a court must review the specific facts and equities to determine whether the proposed release is a valid exercise of the debtor's business judgment, is fair, reasonable and in the best interests of the estate. *In re Zenith Elec. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999). Factors that inform whether a debtor's release of third parties is appropriate include:

(1)     the identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

(2)     substantial contribution by the non-debtor of assets to the reorganization;

(3)     the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

(4)     an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and

(5)     provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

---

[28] "Related Persons" include:  "With respect to any Entity, such predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present and former Affiliates and each of their respective current and former members, partners, equity holders, officers, directors, employees, managers, shareholders, partners, financial advisors, attorneys, accountants, investment bankers, consultant, agents and professionals. or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of the them (including their respective officers, directors, managers, shareholders, partners, employees, members and professionals)." (Plan 17)

[29] Released Parties" include:  "Collectively, each of the Debtors, the Reorganized Debtors, the Creditors' Committee and each of its members in their capacity as members of the Creditors' Committee and in their individual capacity as Trustees, the Liquidating Trust, the Liquidating Trustee, the JPMC Entities, the FDIC Receiver and FDIC Corporate, and the Settlement Note Holders, and each of their respective Related Persons. (Plan 18)

*Zenith*, 241 B.R. at 110 (citing *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)).

79.    While the Disclosure Statement names a few putative beneficiaries of the proposed releases, there appear to be numerous additional unidentified parties that will be swept under the proposed release as well. (*See* f.n. 28 and 29 *supra*.) The Disclosure Statement fails to adequately disclose all parties the Debtors intend to release, whether the Debtors are aware of any claims assertable against such parties, and the consideration such parties will provide to the estate in exchange for the Debtors' release.

80.    In particular, the Disclosure Statement fails to provide any analysis of the factors considered by the Debtors regarding the merit of the JPMC Claims, all of which are unliquidated. (*see* Proposed Settlement, Ex. A.) Under the Proposed Settlement, the JPMC Claims will be deemed allowed claims and are referred to collectively as the JPMC Allowed Unsecured Claim. (Proposed Settlement at §2.22)  The distribution on account of the JPMC Allowed Unsecured Claim will be deemed contributed by JPMC to the Debtors in exchange for certain of the releases identified in the Plan. (Proposed Settlement at §2.22)[30] Unless the Debtors disclose the analysis they presumably undertook of the JPMC Claims, and the factors they considered in deciding to grant the releases to JPMC, no one can know whether the supposed consideration provided by JPMC is real or illusory.

81.    In addition, the Debtors provide no basis to explain the Settlement Note Holders' participation in the Proposed Settlement or the Debtors' release of those parties under the Plan. The Settlement Note Holders are identified on Exhibit C to the Proposed Settlement, however, the claims held by such parties (which presumably provide the basis for their inclusion in the

---

[30] The Disclosure Statement does not identify which releases in the Plan the Debtors are exchanging for the distribution on account of the JPMC Allowed Unsecured Claim.

Plan releases) are not identified and, therefore, whether the Settlement Note Holders are contributing any consideration to the estate in exchange for being released is unknown.

82.     Until those basic disclosures are made, parties in interest do not have adequate information to determine whether the proposed releases are in the best interests of the Debtors' estate. Moreover, the Debtors have failed to demonstrate that the proposed release of each Released Party satisfies the *Master Mortgage* factors. Thus, the Disclosure Statement should not be approved and the Plan cannot be confirmed.

(ii)     **Non-Consensual Releases by Holders of Claims and Equity Interests.**

83.     The Disclosure Statement fails to provide adequate information about the propriety or specific details of any third-party release. "[N]on-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in 'extraordinary cases.'" *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (quoting *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 608 (Bankr. D. Del. 2001)); *see also Deutsche Bank AG London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141-42 (2d Cir. 2005) (holding that non-debtor releases are proper only in rare cases and may be "tolerated if the affected creditors consent"). The "hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *In re Continental Airlines*, 203 F.3d 203, 213-14 (3d Cir. 2000) (holding that a debtor must establish through specific factual findings that non-debtor third-party releases are fair and necessary).

84.     The Court in *Genesis Health* further enunciated factors considered to be indicative of these hallmarks, including: (i) the necessity of the non-consensual release to the success of the reorganization; (ii) the releasees having provided a critical financial contribution

to the debtor's plan; (iii) the releasees' financial contribution being necessary to make the plan feasible; and (iv) the release being fair to the non-consenting creditors, *i.e.*, whether the non-consenting creditors received reasonable compensation in exchange for the release. *Genesis Health*, 266 B.R. at 607-08; *see also In re Exide Techs.*, 303 B.R. at 75.

85.     The Disclosure Statement provides none of the information of the type described in *Genesis Health* with which parties in interest or this Court can assess the terms of any third-party release, or balance the propriety and benefit to the estate of such third party release. The Disclosure Statement, therefore, should not be approved and the Plan cannot be confirmed

> **F.     The Disclosure Statement Fails to Include Sufficient Information to Demonstrate that the Plan does Not Improperly Classify Similarly Situated Creditors.**

86.     Despite being similarly situated and holding similar legal rights against the Debtors, the Disclosure Statement provides no justification for the separate classification and disparate treatment of PIERS Claims, REIT Series, Preferred Equity Interests and Common Equity Interests. Without providing such information, the Disclosure Statement does not provide adequate information and should not be approved.

87.     As discussed above (*infra*, para. 65) the PIERS Common Securities issued by Washington Mutual Capital Trust 2001 to WMI are included among the PIERS Claims (Class 16) that are separately classified from all other Common Equity Interests in WMI (Class 21). The PIERS Common Securities were originally issued with a face value of approximately $0.4 billion. (DS 26) WMI owns 100% of the PIERS Common Securities. (DS 26) Under the Plan, holders of claims in Class 16 – including WMI on account of the PIERS Common Securities – will receive a distribution while holders of Interests in Class 21 will not. (DS 18-19) In addition, the Plan separately classifies the PIERS Claims, which are comprised of the Preferred

Securities and Common Securities, from all other preferred equity that otherwise fall within

Classes 18 and 19. (DS 18-19, 26) It also appears that the Plan affords those equity interests

that comprise the PIERS Claims priority over Subordinated Claims in Class 17. The Disclosure

Statement does not provide any basis to support such separate classification and facially

discriminatory treatment among substantially similar claimants.[31] ·

## RESERVATION OF RIGHTS

88.    To the extent any objection, in whole or in part, contained herein is deemed to be

an objection to confirmation of the Plan rather than, or in addition to, an objection to the

adequacy of the Disclosure Statement, the Equity Committee reserves its right to assert such

objection, as well as any other objections, to confirmation of the Plan. Furthermore, to the extent

the Equity Committee, any Equity Committee member, or the Debtors' shareholders generally

are impacted in any way by the contents of any supplements or amendments to the Disclosure

---

[31] While Bankruptcy Code Section 1122(a) only explicitly requires that claims placed in the same class be substantially similar, the Court of Appeals for the Third Circuit has held that it is "clear that the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes," and requires that the classification scheme be "reasonable." *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993); *see also re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987). The determination of reasonableness "must be informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed (*see* 11 U.S.C. §§ 1129(a)(8), (10) (1988)); and treatment of claims under the plan (*see* 11 U.S.C. § 1123(4) (1988))." *John Hancock*, 987 F.2d at 159; *see also In re LaBlanc*, 622 F.2d 872, 879 (5th Cir. 1980) ("As a general rule, the classification in a plan should not do substantial violence to any claimant's interest. The plan should not arbitrarily classify or discriminate against creditors."). The Third Circuit has emphasized the importance of plan classification:

> The Bankruptcy Code furthers the policy of "equality of distribution among creditors" by requiring that a plan of reorganization provide similar treatment to similarly situated claims. Several sections of the Code are designed to ensure equality of distribution from the time the bankruptcy petition is filed. Section 1122(a) provides that only "substantially similar" claims may be classified together under a plan of reorganization. Section 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class."

*In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004).

Statement or the Plan that may be filed after any Disclosure Statement or Plan confirmation objection deadline, the Equity Committee reserves its right to object thereto. The Equity Committee reserves the right to raise further and other objections to the Disclosure Statement or any amendment thereto prior to or at the hearing thereon in the event the Equity Committee's objections raised herein are not resolved prior to such hearing.

## CONCLUSION

**WHEREFORE**, based on the foregoing, the Equity Committee respectfully requests that an order be entered (i) denying approval of the Disclosure Statement and (ii) granting such other and further relief as the Court deems just and proper.

Dated: May 13, 2010

**ASHBY & GEDDES, P.A.**

William P. Bowden (DE Bar No. 2553)
Gregory A. Taylor (DE Bar No. 4008)
Stacy L. Newman (DE Bar No. 5044)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
Facsimile : (302) 654-2067
E-mail:   wbowden@ashby-geddes.com
          gtaylor@ashby-geddes.com
          snewman@ashby-geddes.com

*Delaware Counsel to the Official Committee of Equity Security Holders of Washington Mutual, Inc., et al.*

-and-

**SUSMAN GODFREY, L.L.P.**
Stephen D. Susman (NY Bar No. 3041712)
Seth D. Ard (NY Bar No. 4773982)
654 Madison Avenue, 5th Floor
New York, NY 10065
E-mail:
ssusman@susmangodfrey.com
sard@susmangodfrey.com

Parker C. Folse, III (WA Bar No. 24895)
Edgar Sargent (WA Bar No. 28283)
Justin A. Nelson (WA Bar No. 31864)
1201 Third Ave., Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
E-mail:
pfolse@susmangodfrey.com
esargent@susmangodfrey.com
jnelson@susmangodfrey.com

*Proposed Co-Counsel for the Official Committee of
Equity Security Holders of Washington Mutual,
Inc., et al.*