defendants, including WMI, entered into a memorandum of understanding outlining the terms of an agreement to settle the ERISA Litigation. The memorandum of understanding requires the named plaintiffs to use best efforts to file a motion in the W.D. Washington District Court seeking Judge Pechman's preliminary approval of the settlement by May 20, 2010, and requires WMI to use its best efforts to file a motion seeking Bankruptcy Court approval of the settlement by May 27, 2010. On May 14, 2010, Judge Pechman entered an order staying the ERISA Action to allow the parties to obtain requisite approvals of the settlement, including approval by the W.D. Washington District Court and the Bankruptcy Court.

 (iii)  *Consolidated Securities Litigation*. Prior to the commencement of these chapter 11 cases, certain securities class action claims (the "Securities Actions") were asserted against WMI and certain other defendants, which actions have been stayed as to WMI, as a result of the automatic stay. As described above, the Securities Actions are proceeding against defendants, other than WMI, in the aforementioned MDL. The lead securities case in the MDL, referred to above as the Consolidated Securities Litigation, is Lead Case No. C08-0387 (MJP). Additional related securities actions have been consolidated with the MDL securities proceeding to coordinate discovery.[10]

 The Amended Consolidated Class Action Complaint in the Consolidated Securities Litigation asserts claims under the Securities Act of 1933 and the Securities Exchange Act of 1934, based upon alleged misstatements and omissions by WMI and certain of its former officers and directors regarding, among other things, the financial condition of WMI and WMB. Numerous underwriters and WMI's former auditor are also named as defendants in the MDL. Six claims are asserted in the consolidated class action complaint: Counts I-III are securities fraud claims under the 1934 Act (Section 10(b), Rule 10b-5 and 20(a)); and Counts IV-VI are securities claims under the 1933 Act (Sections 11, 12(a)(2) and 15).

 On October 27, 2009, Judge Pechman issued a decision in the Consolidated Securities Litigation regarding defendants' motions to dismiss the securities class action claims. On the 1934 Act claims (Counts I-III), the court granted in part and denied in part defendants' motions; however, the parts of the order granting dismissal are extremely narrow. Counts I-III therefore survived dismissal as to nearly all of plaintiffs' allegations and as to all individual defendants. In terms of the 1933 Act claims (Counts IV-VI), the court granted dismissal in part as to certain of the claims under Sections 11 and 12(a)(2) on the basis of plaintiffs' inability to establish standing; but most of the Sections 11 and 12(a)(2) claims will move forward, as will the Section 15 control person claim.

 The activity on the MDL docket pertaining to the Consolidated Securities Litigation, since the October 27, 2009 decision, relates to scheduling and the coordination of class certification and related discovery among the parties. On April 30, 2010, plaintiffs filed their motion for class certification. The defendants' oppositions are due on June 22, 2010 and the plaintiffs' reply is due on August 4, 2010. Judge Pechman has set the hearing for the class certification motion for September 24, 2010. The close of fact discovery is scheduled for July 5, 2011, the close of expert discovery is set for November 4, 2011, and a five-week trial is scheduled to commence on June 4, 2012.

 (iv)  *South Ferry Securities Litigation*. Beginning on July 20, 2004, several securities class actions were filed against WMI and certain of its officers and directors on behalf of purchasers of WMI securities from and including April 15, 2003 through June 28, 2004 (the "South Ferry Class

---

[10] These actions are captioned *In re Washington Mutual, Inc. Cal. Sec. Litig.*, Lead Case No. C09-664 (MJP); *Sweet v. Killinger*, No. C09-1718 (MJP); and *Flaherty v. Killinger*, No. C09-1756 (MJP), respectively.

Period"). On November 15, 2004, Judge Coughenour of the W.D. Washington District Court consolidated the securities actions into a single case, *South Ferry LP #2 v. Killinger, et al.*, Master File No. CV04-1599-JCC (the "South Ferry Securities Litigation"). On November 30, 2004, Judge Coughenour appointed lead plaintiffs. On March 1, 2005, the lead plaintiffs filed a consolidated complaint alleging violations of the federal securities laws. The claims asserted in the South Ferry Securities Litigation are based on different factual allegations than those asserted in the Consolidated Securities Litigation and the cases are not related.

On November 17, 2005, Judge Coughenour denied defendants' motion to dismiss with respect to WMI and certain individual defendants and granted the motion to dismiss with respect to other individual defendants. On February 3, 2006, the remaining defendants filed an answer to the complaint. Subsequent to Judge Coughenour's ruling on the motion to dismiss, the defendants additionally sought and were granted permission to seek an interlocutory appeal which the United States Court of Appeals for the Ninth Circuit heard and, on September 9, 2008, decided, ultimately remanding the case to Judge Coughenour. On October 1, 2009, Judge Coughenour denied the defendants' post-remand motion to dismiss the action.

The South Ferry Securities Litigation is stayed as to WMI due to WMI's September 26, 2008 bankruptcy filing. On March 30, 2009, plaintiffs South Ferry LP #2, Metzler Investment GmbH, and Walden Management Co. Pension Plan, individually filed proofs of claim against WMI in the Bankruptcy Court, in addition to a class claim. WMI objected to those proofs of claim on the ground that, among other things, they are subject to mandatory subordination pursuant to section 510(b) of the Bankruptcy Code. Subsequent to the filing of that objection, WMI and the securities litigation plaintiffs agreed to a consensual resolution of that objection whereby the securities litigation plaintiffs would stipulate to the subordination of their claims consistent with section 510(b) of the Bankruptcy Code.

On March 15, 2010, South Ferry LP #2 withdrew as lead plaintiff. On March 22, 2010, lead plaintiffs Metzler and Walden filed a motion seeking to certify a class consisting of all persons who purchased the common stock of WMI during the South Ferry Class Period and who were damaged thereby. Pursuant to Judge Coughenour's scheduling order dated December 22, 2009, a four week trial is scheduled to commence on February 6, 2012.

### f.     Cassese Litigation.

On July 6, 2005, in the District Court for the Eastern District of New York, Denise Cassese, George Rush and Richard Schroer, as representatives of a nationwide class, filed a class action lawsuit against WMI and certain of its subsidiaries regarding the servicing of loans by WMB, or other former subsidiaries of WMI, and the charging of certain fees in connection with requests for payoff statements or the prepayment of such loans. On April 2, 2009, the class representatives filed a motion in the Bankruptcy Court for relief from the automatic stay in order to continue to pursue their litigation against WMI in the district court, which motion was opposed by the Debtors. By order dated September 10, 2009, the Bankruptcy Court modified the automatic stay so as to permit the Cassese litigation to continue in the district court.

On September 30, 2009, the district court granted plaintiffs' motion to certify a class against WMI. WMI subsequently filed a joinder to defendant FDIC's motion to decertify the class and to its motion for a protective order to stay discovery, pending the motion to decertify. Additionally, plaintiffs have filed a motion to add a plaintiff to the case. These motions are all currently pending.

On May 13, 2010, the district court issued a decision that, among other things, (1) granted the FDIC's motion to decertify the class as to WMB/FDIC but not as to WMI; (2) denied without prejudice to renew plaintiffs' motion to add a plaintiff; and (3) denied without prejudice to renew the motion to substitute JPMC or add it as a defendant.

### g. Mortgage Pass-Through Litigation.

On August 4, 2008, New Orleans Employees' Retirement System and MARTA/ATU Local 732 Employees Retirement Plan (together, the "Mortgage Pass-Thru Claimants"), on their own behalf and on behalf of a class of persons and entities (the purported "Pass-Thru Class") who purchased certain mortgage-backed certificates issued by twenty-six Washington Mutual Mortgage Pass-Through Trusts (the "Pass-Through Trusts") pursuant to a registration statement filed by WaMu Asset Acceptance Corp. ("WMAAC"), a wholly-owned subsidiary of WMB, with the SEC on December 20, 2005, as supplemented on January 3, 2006, commenced that certain action styled as *New Orleans Employees' Retirement System, et al. v. Federal Deposit Insurance Corporation, et al.*, No. C09-134RSM (W.D. Wash.) in Washington state court against WMI, WMAAC, the Pass Through Trusts, and certain individual defendants alleging violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. § 77a, et seq. (the "Mortgage Pass-Thru Litigation"). Prior to the Petition Date, WMAAC pooled certain mortgage loans originated by WMB and securitized them into mortgage-backed securities. WMAAC then sold the mortgage-backed securities to the Pass-Through Trusts which, in turn, sold certificates representing interests in the monthly distributions of principal and interest from the underlying mortgages. In the Mortgage Pass-Thru Litigation, the Mortgage Pass-Thru Claimants allege that WMI and WMAAC systematically and deliberately inflated the appraised values of the properties that secured the underlying mortgages and that by pooling and selling mortgages to the issuing trusts, WMI and WMACC shifted the undisclosed and increased risk of loss to purchasers of the certificates including the Mortgage Pass-Thru Claimants and the purported Pass-Thru Class.

The Mortgage Pass-Thru Claimants filed an amended complaint in the Mortgage Pass-Thru Litigation on December 16, 2008, which complaint excluded WMI as a defendant due to the automatic stay. On January 28, 2009, the state court granted the unopposed motion of the FDIC, as receiver, to substitute in the place of WMB as a party defendant. On January 29, 2009, defendant FDIC filed a notice of removal in the state court, requesting that the action be removed to the United States District Court for the Western District of Washington. Concurrently, on January 12, 2009, Boilermakers National Annuity Trust Fund ("Boilermakers") filed a complaint in the United States District Court for the Western District of Washington, captioned *Boilermakers National Annuity Trust Fund v. WaMu Mortgage Pass-Through Certificates, et al.*, Case No. 09-0037 (the "Boilermakers Complaint"). Like the original complaint filed by the Mortgage Pass-Through Claimants, the Boilermakers' Complaint asserted claims under the Securities Act in connection with certain certificates. On February 19, 2009, the defendants moved to consolidate their lawsuit with the Mortgage Pass-Through Litigation, and on August 14, 2009, the United States District Court for the Western District of Washington ordered consolidation of three related cases – the Boilermakers' action, the original Mortgage Pass-Through Claimants' action, and a third related action (as consolidated, the "Boilermakers Consolidated Action"). The Court appointed The Policemen's Annuity and Benefit Fund for the City of Chicago (the "Chicago PABF") as Lead Plaintiff for the Boilermakers Consolidated Action on October 23, 2009.

Thereafter, a fourth action was filed by Doral Banc Puerto Rico ("Doral Bank") on October 30, 2009, in the United States District Court for the Western District of Washington as a related case to the Boilermakers Consolidated Action (the "Doral Action"). The allegations set forth in the Doral Action are substantially similar to the collective complaints consolidated in the Boilermakers Consolidated Action. The Doral Action asserted the same violations of the federal and state securities

acts and the same common law claims against certain of the same defendants in the Boilermakers Consolidated Action, but alleged those violations in connection with Washington Mutual Pass-Thru Trusts that were not included in the Boilermakers Consolidated Action. The Doral Action was transferred to Judge Pechman because it was related to the Boilermakers Consolidated Action.

Because of the substantial similarities and relatedness between the Doral Action and Boilermakers Consolidated Action, Doral Bank and Chicago PABF filed a joint motion to consolidate the Doral Action and Boilermakers Consolidated Action on November 19, 2009. Thereafter, on November 23, 2009, a Consolidated First Amended Securities Class Action Complaint was filed in the Boilermakers Consolidated Action, naming Doral Bank as an additional named plaintiff and incorporating the allegations asserted in the Doral Action.

By order dated December 18, 2009, the Court denied the motion to consolidate the Doral Action and Boilermakers Consolidated Action pending issuance of notice in the Doral Action and the appointment of lead plaintiff therein. Thereafter, on December 31, 2009, a First Amended Securities Class Action Complaint was filed in the Doral Action. On March 24, 2010, the Court consolidated the Doral Action and the Boilermakers Consolidated Action into a single consolidated action, and appointed Chicago PABF and Doral Bank as co-lead plaintiffs in that action. On April 1, 2010, Chicago PABF and Doral Bank filed the Second Amended Consolidated Complaint alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933.

On March 30, 2009, the Mortgage Pass-Thru Claimants filed a proof of claim against WMI in its chapter 11 cases in the approximate amount of $39.8 billion. The Debtors have objected to the proof of claim on various grounds including that the state law claims are preempted, that the claimants have failed to establish loss causation, that WMI was not a controlling person to any entites that committed securities violations, that there were no underlying securities law violations, that the federal claims are barred by the statute of limitations, and that because WMI was removed as a defendant in the Mortgage Pass-Thru Litigation, which litigation gives rise to the proof of claim, neither WMI nor WMI Investment have any liability with respect to the allegations contained in the lawsuit. The proof of claim filed by the Mortgage Pass-Thru Claimants is disputed by the Debtors.

On January 18, 2010, Chicago PABF filed an amended proof of claim against WMI reflecting the then-current claims based upon the causes of action alleged in the Boilermakers Consolidated Complaint.

### h. Alexander and Reed Putative Class Action

On October 22, 2007, Robert Alexander and James Reed filed a putative class action lawsuit[11] against WMI, WMB, FSB, and WMMRC in the United States District Court for the Eastern District of Pennsylvania, styled *Alexander v. Washington Mutual, Inc.*, Case No. 2:07-cv-04426-TON (E.D. Pa. filed Oct. 22, 2007) (the "Pennsylvania Action"). The Pennsylvania Action is a putative nationwide class action filed on behalf of a class of certain similarly-situated borrowers who obtained loans from WMB or FSB.

---

[11] Mr. Alexander, along with other persons, had previously filed, on December 22, 2006, a putative class action lawsuit against WMI, WMB, FSB and WMMRC in the United States District Court for the Central District of California, styled *Alexander v. Washington Mutual, Inc.*, Case No. 06:CV-8175 (N.D. Cal. Dec. 22, 2006), which was voluntarily dismissed, without prejudice, by stipulation dated August 27, 2007.

Claimants allege that they obtained mortgage loans from WMB, and agreed to pay mortgage insurance ("MI") on the loans, but the premiums for that insurance were illegally inflated to pay for the mortgage insurer's improper agreement to reinsure the risk with WMMRC, a wholly owned subsidiary of WMI. Claimants allege that the premiums ceded to the reinsurer, WMMRC, were excessive for the risk assumed by WMMRC, that no reinsurance risk was in fact assumed by WMMRC, and that the arrangement was instead an illegal kickback to WMB for the referral of the MI business or a split of a settlement service fee, all in violation of Sections 8(a) and 8(b) of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607.

In December 2007, defendants in the Pennsylvania Action filed a motion to dismiss on the grounds, among others, that plaintiffs in the Pennsylvania Action do not have standing to sue. The court denied the motion to dismiss, but, upon reconsideration, granted certification to the United States Court of Appeals for the Third Circuit of the legal questions presented by the motion and resulting order. The court stayed the Pennsylvania Action pending resolution of an interlocutory appeal. Defendants in the Pennsylvania Action filed a petition for permission to appeal in August 2008. The petition for appeal was stayed by the Third Circuit due to the FDIC Receiver's receivership of FSB and WMI's petition for bankruptcy. The action remains stayed as to WMI due to the bankruptcy filing. The appeal was further stayed as to FSB, pending the resolution of the receivership claims process, to await the resolution of an appeal in *Alston v. Countrywide Financial Corp.*, 585 F.3d 753 (3d Cir. 2009), which raised similar legal issues. Following resolution of the Alston appeal in October 2009, *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 (3d Cir. 2009), the petition for appeal in the Pennsylvania Action was denied and the matter was returned to the district court. On January 11, 2010, the Pennsylvania Action was removed from the Civil Suspense File and re-opened for final disposition by the district court, and a joint discovery plan was approved on February 2, 2010.

Pursuant to the parties' joint discovery plan, three additional motions were filed on March 1, 2010. The FDIC Receiver and FSB filed motions to dismiss the complaint for lack of subject matter jurisdiction. The FDIC Receiver argues that FIRREA prohibits the court from awarding the punitive and equitable relief the plaintiffs seek against it. FSB argues that the court does not have subject matter jurisdiction over plaintiffs' claims as to FSB because FSB played no role in the mortgage transactions. Additionally, the FDIC Receiver filed a motion to strike plaintiffs' class allegations because FIRREA requires individuals to exhaust the administrative claims process before filing, or becoming a class member of, a lawsuit.

Robert Alexander and James Reed, individually and on behalf of all others similarly-situated filed a proof of claim against WMI in its chapter 11 case, purportedly based on the causes of action asserted in the Pennsylvania Action. On March 15, 2010, the Debtors filed an objection to the proof of claim on the grounds that WMI has no liability. The claimants filed a response to the Debtors' objection on April 30, 2010 and the hearing is currently scheduled for June 3, 2010.

### i.    *Visa Interchange Litigation*

In an action styled *In re Payment Card Interchange Fee and Merchant-Discount Antitrust Litigation*, Case No. 1:05-md-1720-JG-JO, currently pending in the United States District Court for the Eastern District of New York, and *Attridge v. Visa U.S.A. Inc. et al.*, Case No. CGC-04-436920, currently pending in California Superior Court, representative plaintiffs in consolidated class actions allege that Visa U.S.A. Inc. and its member banks, which included WMB, colluded to artificially inflate fees charged to merchants accepting the Visa card. Visa entered into a loss sharing agreement with its member banks, as well as WMI, pursuant to which Visa agreed to establish an escrow account to pay liabilities stemming

from this and other similar litigations. Visa is entitled to issue new shares to fund the escrow account, resulting in dilution of the Class B shares held by WMI (described below) and others.

JPMC Chase & Co., Chase Bank N.A. and Visa U.S.A. Inc. filed answers to the complaint, and the plaintiffs amended their complaint on January 29, 2009. Collectively, the defendants filed a motion to dismiss the complaint on March 31, 2009 and a motion opposing the plaintiffs' motion for class certification on June 25, 2009. Plaintiffs in this litigation filed a proof of claim against WMI in its chapter 11 case in the approximate amount of $5 billion.

Pursuant to the Global Settlement Agreement, JPMC will assume the liabilities and obligations of the Debtors arising from or relating to the Visa Interchange Litigation, including the assumed liability portion of any proofs of claim related to the Visa Interchange Litigation, to the extent such portion becomes and Allowed Claim.

### j. BKK-Related Claims

In that certain litigation styled *California Dept. of Toxic Substances Control, et al. v. American Honda Motor Co, Inc., et al.*, No. CV05-7746 CAS (JWJ) (the "BKK Litigation"), currently pending in the United States District Court for the Central District of California, the California Department of Toxic Substances Control (the "CDTSC") asserted claims related to liability arising from a landfill facility located in West Covina, California. WMB, as successor to Home Savings Bank, FSB, a prior owner of the landfill facility, was named as a defendant in the BKK Litigation. WMB and other defendants in the BKK Litigation entered into a consent decree with the CDTSC pursuant to which they agreed to perform certain operation, maintenance and monitoring activities at the landfill facility. The CDTSC has filed a claim against the Debtors in a contingent, unliquidated amount alleging that WMI, as an affiliate of WMB and WMI Rainier LLC, successors to an entity that the CDTSC alleges also owned the landfill site during the relevant time period, are liable for environmental response-related expenses. Therein, the CDTSC stated that it expects long term remediation costs to be no less than $600 million. The Debtors intend to oppose the CDTSC's claim.

A group of co-defendants in the BKK Litigation, also party to the consent decree, have also filed a contingent, unliquidated claim against the Debtors' estates related to the Debtors' alleged BKK Litigation liabilities, to which the Debtors intend to object on, among other grounds, that WMB, not WMI, entered into the BKK consent decree.

### k. Tranquility Claim.

On March 27, 2009, Tranquility Master Fund, Ltd. (the "Claimant" or "Tranquility") filed proof of claim number 2206 against WMI in its chapter 11 cases in the approximate amount of $49.6 million. Claimant alleges that, from 2006 through 2007, it purchased approximately $71 million in certain mortgage backed securities issued by certain special-purpose trusts created by WMB. Claimant alleges that the mortgage backed securities were issued and sold by WaMu Capital Corp. ("WaMu Capital"), in conjunction with WMB, WaMu Asset Acceptance Corp. ("WaMu Asset Acceptance"), Washington Mutual Mortgage Securities Corp. ("WaMu Mortgage"), and FSB, which Claimant alleged were owned and controlled by WMI.

The mortgage backed securities were backed by mortgage loans originated by WMB and its subsidiaries, as well as by certain third party originators. Claimant alleges that WMI, WMB, WaMu Capital, WaMu Mortgage and WaMu Asset Acceptance engaged in a scheme with two appraiser companies, Lender Services, Inc and eAppraiseIT, to artificially inflate the appraised value of the homes

serving as collateral for the loans originated by WMB and its subsidiaries that underlie the mortgage backed securities at issue.

The Debtors have objected to the proof of claim on the grounds that the Claimant failed to assert a claim against those securities issued pursuant to the private placement exemption, that the claimant failed to plead fraud with particularity, that the claims lack jurisdiction and should be dismissed, that the claim fails to establish that WMI was a controlling person or materially assisted in a securities violation, that the Claimant failed to allege loss causation, and that there were no underlying securities law violations of either federal or California law.

### 14. Government Investigations and Hearings.

#### a. Investigation by the U.S. Attorney for the Western District of Washington.

In October 2008, the United States Attorney for the Western District of Washington, together with other federal authorities including the Federal Bureau of Investigation, the FDIC, the Internal Revenue Service and the Department of Labor, commenced an investigation into the failure of WMB. WMI is cooperating with the government's investigation. To date, WMI has received several grand jury subpoenas and is producing documents responsive to those subpoenas. The government's investigation is pending and WMI does not know how much longer the investigation will continue or whether any charges will result against WMI or any individuals.

#### b. Investigation by the New York Attorney General.

On November 1, 2007, the Attorney General of the State of New York filed a lawsuit against First American Corporation and First American eAppraiseIT ("eAppraiseIT"), styled *The People of the State of New York by Andrew Cuomo v. First American Corporation and First American eAppraiseIT*, No. 07-406796 (N.Y. Sup. Ct. Filed Nov. 1, 2007). According to the Attorney General's complaint, eAppraiseIT is a First American subsidiary that provides residential real estate appraisal services to various lenders, including WMB. The Attorney General asserts that, contrary to various state and federal requirements and the Uniform Standards of Professional Appraisal Practice, WMB conspired with eAppraiseIT in various ways to falsely increase the valuations done by appraisers eAppraiseIT retained to perform appraisals of real property which would secure WMB loans. First American Corporation and eAppraiseIT are not affiliates of WMI, and neither WMI nor WMB is a defendant in the case.

On November 17, 2009, by Executive Order No. 13519 President Obama established the Financial Fraud Enforcement Task Force to strengthen the efforts of the Department of Justice, in conjunction with Federal, State, tribal, territorial, and local agencies, to investigate and prosecute significant financial crimes and other violations relating to the current financial crisis and economic recovery efforts, recover the proceeds of such crimes and violations, and ensure just and effective punishment of those who perpetrate financial crimes and violations. At present, WMI has not been subpoenaed or asked to participate in any investigation, but the sale of substantially all of the assets of WMB to JPMC has been a point of interest to the Task Force.

#### c. Additional Government Hearings and Reports.

The U.S. Senate Permanent Subcommittee on Investigations recently conducted hearings regarding the collapse of WMB and issued related investigative reports. These hearings and reports were

conducted and issued publicly. Inspectors general of the U.S. Treasury Department and the FDIC also publicly issued a separate joint report of investigation.

### 15. Employee Benefits.

#### a. Qualified Defined Benefit Plans.

WMI is the sponsor of the WaMu Pension Plan and the Lakeview Pension Plan (together, the "Pension Plans"), each of which is intended to be a tax qualified plan pursuant to Section 401(a) of the Internal Revenue Code.

In March 2009, the Pension Benefit Guaranty Corporation (the "PBGC") filed proofs of claim against the Debtors with respect to the Pension Plans in connection with the minimum funding contributions, the insurance premiums, interest and penalties (including Flat-Rate and Variable-Rate Premiums and Termination Premiums), and unfunded benefit liabilities.

There is a litigation pending in connection with the WaMu Pension Plan as described in IV.D.13.b – "Buus Litigation" above.

In the JPMC Adversary Proceeding, JPMC alleged, among other things, that WMI has no real economic interest in the WaMu Pension Plan and the plan is not material to WMI's business or reorganization. JPMC claimed that, pursuant to the Purchase and Assumption Agreement, it purchased all of the FDIC Receiver's interests in the WaMu Pension Plan. Accordingly, JPMC requested that it be permitted to take over sponsorship of the WaMu Pension Plan, without assuming liability with respect to (i) certain litigation related to the WaMu Pension Plan and (ii) any and all claims related to the WaMu Pension Plan prior to the date upon which JPMC assumes sponsorship. Alternatively, JPMC requested that the Bankruptcy Court grant JPMC administrative claims against the Debtors for contributions made by JPMC to the WaMu Pension Plan from and after the Petition Date. The Debtors believe that the WaMu Pension Plan is property of the Debtors' estates, and was not purchased by JPMC under the Purchase and Assumption Agreement. Moreover, the Debtors contend that, if JPMC did purchase the WaMu Pension Plan, it also should be held responsible for the claims and litigation related thereto.

Pursuant to the Global Settlement Agreement, and as further described therein, WMI will transfer sponsorship of, and any and all right, title and interest WMI may have in the Pension Plans to JPMC and JPMC will assume sponsorship and all duties, responsibilities, liabilities and obligations associated with sponsorship of the Pension Plans.

#### b. Bank Owned and Corporation Owned Life Insurance Policies.

WMI is the owner of certain Bank Owned and Corporation Owned Life Insurance policies ("BOLI-COLI Policies") on the lives of certain employees. In certain instances, WMI's ownership interest in the BOLI-COLI Policies is reflected on its own books and records, and in other instances, WMI's ownership interest is reflected on WMB's books and records. JPMC claims the BOLI-COLI policies owned by WMB and the cash surrender value of which were reflected on the books and records of WMB as of the Bank Receivership are JPMC's property and were purchased under the Purchase and Assumption Agreement. WMI asserts that (i) it has a claim against WMB for any and all premiums and other charges paid by WMI on account of BOLI-COLI Policies owned by WMB, and (ii) it has an ownership interest in the BOLI-COLI Policies reflected on the books and records of WMB. By letter dated November 7, 2008, counsel for the Debtors demanded that JPMC cease exercising control over the BOLI-COLI Policies on the ground that the Debtors believe they own those policies.

Pursuant to the Global Settlement Agreement, and as more fully described therein, JPMC and the Debtors have reached agreement regarding their respective ownership rights and obligations in the BOLI-COLI Policies, which includes the payment to JPMC by WMI of $508,154.00 attributable to amounts paid by JPMC to employees of WMI for services rendered to WMI during the period prior to the Petition Date.

    *c.*    **Nonqualified Deferred Compensation Plans and Supplemental Executive Retirement Plans.**

There are approximately 40 non-qualified deferred compensation plans, of which (i) twelve (12) covered certain employees of H.F. Ahmanson & Company ("HFA"), (ii) and the rest covered certain employees of Great Western Financial Corporation ("Great Western"), WMI, Dime Bank, Dime Inc., Providian Financial Corporation ("Providian"), American Savings Bank, F.A. (previously defined as "ASB"), Pacific First Federal Savings Bank ("Pacific First"), Coast Federal Bank, FSB ("Coast Federal"), and Commercial Capital Bancorp, Inc. ("CCBI").

    *d.*    HFA Deferred Compensation Plans.

In 1998, WMI purchased HFA and obtained the assets maintained in nine trusts ("HFA Trusts") previously established by HFA in connection with, among other things, certain of HFA's unfunded, non-qualified deferred compensation and retirement plans ("HFA Plans"). The terms and conditions of each of the HFA Trusts are memorialized in separate trust agreements ("HFA Trust Agreements") entered into by and between HFA and Union Bank of California, N.A. ("HFA Trustee"). WMI is successor-in-interest to HFA with respect to each of the HFA Trusts.

The HFA Trusts currently contain, among other assets, corporate securities, government securities, cash and cash equivalents. These assets plus all proceeds or income, less any distributions, constitute the trust estates ("HFA Trust Estates").

Pursuant to the HFA Plans and HFA Trust Agreements, the obligation of WMI to make payments pursuant to the HFA Plans is an unsecured promise to pay. The HFA Plans are unfunded and the participants therein have no claim to or interest in the HFA Trusts. The HFA Trusts are grantor, or "rabbi" trusts, the assets of which become property of the estate subject to the claims of WMI's general unsecured creditors upon commencement of WMI's chapter 11 case.

On May 15, 2009, WMI filed a motion requesting the Bankruptcy Court to authorize (i) WMI to exercise its ownership rights over the HFA Trusts; (ii) the HFA Trustee to return the assets, income and proceeds held therein to WMI and (iii) the termination of the HFA Trusts. Certain participants in the HFA Plans filed objections to such motion with the Bankruptcy Court, arguing that they have a direct interest in the HFA Trust assets. The participants have extensively briefed the issue and participated in multiple hearings with respect thereto. The Bankruptcy Court's decision on the motion currently is pending.

Pursuant to the Global Settlement Agreement, and as more fully described therein, WMI will be deemed to have retained all rights and obligations under the HFA Trusts, HFA Plans and HFA Agreements.

     **_e._**  Great Western, ASB, Providian, Dime, CCBI and Coast Federal Deferred Compensation Plans.

     Great Western. On July 1, 1997, Great Western merged with NACI (New American Capital, Inc.), a wholly-owned subsidiary of WMI. At the time, Great Western maintained thirteen (13) non-qualified deferred compensation plans and two (2) rabbi trust arrangements in connection with such plans. The assets of the Great Western rabbi trusts remained on NACI's books until December 2002, when WMB paid $198.1 million in cash to NACI to purchase the assets of the Great Western Rabbi Trusts. On November 1, 2007, NACI merged into Mercer Acquisition LLC, a wholly owned subsidiary of WMB, and Mercer Acquisition LLC distributed all of its assets and liabilities to WMB. Pursuant to the Global Settlement Agreement, and as more fully described therein, JPMC will be deemed to have assumed the obligations under all of the Great Western plans and the two rabbi trusts.

     ASB. In 1996 WMI acquired ASB, an indirect wholly owned subsidiary of Keystone Holdings, Inc. At the time, ASB maintained two (2) non-qualified deferred compensation plans and one (1) rabbi trust arrangement in connection with such plans. ASB changed its corporate name to Washington Mutual Bank, FA effective October 1, 1997 and on April 4, 2005, the corporate name was changed to "Washington Mutual Bank." Pursuant to the Global Settlement Agreement, and as more fully described therein, JPMC will be deemed to have assumed the rights and obligations under all of the ASB plans and the rabbi trust.

     Providian. In 2005 Providian merged into NACI, a wholly-owned subsidiary of WMI. At that time, Providian maintained two (2) non-qualified deferred compensation plans and a rabbi trust. On November 1, 2007, NACI merged into Mercer Acquisition LLC, a wholly owned subsidiary of WMB, and Mercer Acquisition LLC distributed all of its assets and liabilities to WMB. Pursuant to the Global Settlement Agreement, and as more fully described therein, JPMC will be deemed to have assumed the rights and obligations under all of the Providian plans and the rabbi trust.

     Dime. In 2001 Dime Inc. and its wholly-owned subsidiary, Dime Bank, merged with and into WMI and WMB, respectively. At that time, Dime Inc. and Dime Bank maintained seven (7) non-qualified deferred compensation plans and three (3) rabbi trusts. Records indicate that all assets held by such trusts were Dime Bank assets. Pursuant to the Global Settlement Agreement, and as more fully described therein, JPMC will be deemed to have assumed the rights and obligations under all of the Dime plans and the rabbi trusts.

     CCBI. On April 23, 2006, NACI entered into a merger agreement with CCBI, which agreement provided for the merger of CCBI into NACI and the merger of Commercial Capital Bank, FSB into WMB, which mergers ware effective as of October 1, 2006. On November 1, 2007, NACI merged into Mercer Acquisition LLC, a wholly owned subsidiary of WMB, and Mercer Acquisition LLC distributed all of its assets and liabilities to WMB. CCBI maintained three (3) executive salary continuation agreements. Pursuant to the Global Settlement Agreement, and as more fully described therein, JPMC will be deemed to have assumed the rights and obligations under these agreements.

     Coast Federal. On March 1, 1998, Coast Federal merged with and into Home Savings of America, FSB. On October 3, 1998, Home Savings of America, FSB merged with and into Washington Mutual Bank, FA. At the time, Coast Federal maintained three (3) non-qualified deferred compensation plans and one (1) rabbi trust arrangement in connection with such plans. On April 4, 2005 Washington Mutual Bank, FA changed its corporate name to "Washington Mutual Bank." Pursuant to the Global Settlement Agreement, and as more fully described therein, JPMC will be deemed to have assumed the rights and obligations under the Coast Federal plans and the rabbi trusts.

Pacific First. Pacific First maintained one (1) non-qualified deferred compensation plan and one (1) rabbi trust arrangement in connection with such plan. On May 31, 1990, Pacific First changed its corporate name to "Pacific First Bank, a Federal Savings Bank." On April 13, 1993 Pacific First Bank, a Federal Savings Bank merged with Washington Mutual, A Federal Savings Bank, which merged into Washington Mutual Bank, a Washington state chartered stock savings bank ("State Bank"), on December 1, 1995. On January 1, 2005, State Bank merged into Washington Mutual Bank, FA. On April 4, 2005, Washington Mutual Bank, FA changed its corporate name to "Washington Mutual Bank." Pursuant to the Global Settlement Agreement, and as more fully described therein, JPMC will be deemed to have assumed the rights and obligations under the Pacific First plan and the rabbi trust.

### f.     Medical Plan.

WMI sponsored the Medical Plan. Pursuant to the Purchase and Assumption Agreement, JPMC was required to assume sponsorship and all duties, responsibilities, liabilities and obligations associated with sponsorship of the Medical Plan, including, without limitation, any and all liabilities associated with retiree obligations, and other employee welfare plan and arrangement obligations. Currently, JPMC is paying the benefits promised under the Medical Plan.

Pursuant to the Global Settlement Agreement, and as more fully described therein, JPMC will be deemed to have assumed, as of September 25, 2008, sponsorship and the obligations under the Medical Plan and certain other employee welfare plan and arrangement obligations and WMI will transfer all its right, title and interest, free and clear of all liens, claims and encumbrances, to any outstanding checks made out to or received by WMI or otherwise for the benefit of the Medical Plan, including pharmacy rebates in connection with contracts attributable to the Medical Plan and pay to JPMC an amount equal to the pharmacy rebates currently estimated to be approximately $775,000.

### g.     WaMu Savings Plan.

Prior to the Petition Date, WMI and WMB provided their employees with the opportunity to participate in the WaMu Savings Plan, a tax-qualified plan under section 401(a) of the Internal Revenue Code, then sponsored by WMI. Most of the employees covered by the WaMu Savings Plan were employees of WMB or its subsidiaries, substantially all of whom transferred employment to JPMC on September 25, 2008, and many of these individuals remain employed by JPMC. Participants in the WaMu Savings Plan contribute a percentage of their pre-tax income to the WaMu Savings Plan and, prior to the Petition Date, WMB would match a portion of these contributions. The WaMu Savings Plan assets are held in a trust administered by Fidelity Management Trust Company ("Fidelity"). As of the Petition Date, the WaMu Savings Plan was administered by a Plan Administration Committee and a Plan Investment Committee.

There is litigation pending in connection with the WaMu Savings Plan as described in Section IV.D.13.e. above.

In the JPMC Adversary Proceeding, JPMC alleged, among other things, that WMI has no real economic interest in the WaMu Savings Plan and the plan is not material to WMI's business or reorganization. JPMC claimed that, pursuant to the Purchase and Assumption Agreement, it purchased all of the FDIC's interests in the WaMu Savings Plan. Accordingly, JPMC requested that it be permitted to take over sponsorship of the WaMu Savings Plan, without assuming liability with respect to (i) certain litigation related to the WaMu Savings Plan and (ii) any and all claims related to the WaMu Savings Plan prior to the date upon which JPMC assumes sponsorship. Alternatively, JPMC requested that the Bankruptcy Court grant JPMC administrative claims against the Debtors for contributions made by JPMC

to the WaMu Savings Plan from and after the Petition Date. The Debtors believe that the WaMu Savings Plan is property of the Debtors' estates, and was not purchased by JPMC under the Purchase and Assumption Agreement. Moreover, the Debtors contend that, if JPMC did purchase the WaMu Savings Plan, it also should be held responsible for the claims and litigation related thereto.

Notwithstanding the disagreement, in an effort to resolve their dispute, WMI and JPMC reached a compromise and settlement, as set forth in that certain Agreement Regarding WaMu Savings Plan, dated June 16, 2009 ("Savings Plan Agreement"), whereby (i) WMI agreed to transfer sponsorship of the WaMu Savings Plan to JPMC, (ii) WMI would adopt an amendment to the Savings Plan to fully vest all participants who were actively employed by WMI or any of its affiliates on or after January 1, 2008, (iii) JPMC would be responsible for correcting operational and form defects, if any, in the administration of the WaMu Savings Plan (including repaying to the WaMu Savings Plan all amounts applied after September 25, 2008 from any forfeitures that arose on or after January 1, 2008 to reduce JPMC's Savings Plan contributions or to pay administrative expenses), and (iv) JPMC and WMI would dismiss with prejudice their Savings Plan claims and defenses related to JPMC's complaint in the JPMC Adversary Proceeding. The WaMu Savings Plan Agreement does not transfer liability to JPMC for pending litigation related to the WaMu Savings Plan and each party has reserved its rights with respect to the question of liability for the pending litigation.

On July 27, 2009, the Bankruptcy Court approved the terms and conditions of the Savings Plan Agreement and authorized the Debtors to consummate the compromise and settlement embodied in the Savings Plan Agreement, and sponsorship of the WaMu Savings Plan was transferred from WMI to JPMC.

### 16.     Non-Debtor Subsidiaries.

As of the Petition Date, WMI had a number of direct and indirect subsidiaries. Throughout the pendency of these chapter 11 cases, WMI has been in the process of winding-down many of its non-debtor, non-banking subsidiaries. The non-debtor, non-banking subsidiaries, with material assets and operations are noted below:

#### a.     WM Mortgage Reinsurance Company, Inc.

WM Mortgage Reinsurance Company, Inc. (previously defined as "WMMRC"), a Hawaiian corporation and non-debtor, wholly-owned subsidiary of WMI, is a captive reinsurance company, created to reinsure the risk associated with residential mortgages that were originated or acquired by WMB. Mortgage insurance for WMB-originated or acquired loans had historically been provided by seven mortgage insurance companies (collectively, the "Mortgage Insurers"), although currently WMMRC is party to mortgage reinsurance agreements with only six mortgage insurance companies. WMMRC entered into reinsurance agreements (the "Reinsurance Agreements") with each Mortgage Insurer, pursuant to which it would share in the risk, in the form of claim losses, in exchange for a portion of the premiums generated from the residential mortgage loan portfolio held by the Mortgage Insurer.

Pursuant to each Reinsurance Agreement, WMMRC established a trust account with US Bank N.A. (collectively, the "Trusts"), for the benefit of the Mortgage Insurer, to hold premiums collected and to secure WMMRC's obligations to each Mortgage Insurer with respect to the insured loans. WMMRC was historically party to seven trust agreements – one for each Reinsurance Agreement to which it was a party. As of December 31, 2009, the value of the six remaining Trust assets was estimated to be $460 million.

Each Reinsurance Agreement requires that WMMRC maintain a certain minimum amount of capital in the applicable Trust (the "Reinsurance Reserve"), which amount is determined by applicable law, as well as each Mortgage Insurer's calculation of reserves needed, which is generally inclusive of reserves for known delinquencies within the loan portfolio and a percentage of the remaining aggregate risk exposure contained in each portfolio. Minimum capital requirements fluctuate on a monthly basis and are reflected in monthly "cession statements" provided by each Mortgage Insurer to WMMRC. By order dated December 3, 2008, the Bankruptcy Court approved a loan from WMI to WMMRC in the amount of approximately $11.9 million in order to maintain an adequate Reinsurance Reserve in one of its Trusts.

As of the Petition Date, due to the Bank Receivership and the sale of substantially all of WMB's assets to JPMC, all of the Trusts are operating on a "run-off" basis because WMMRC has ceased to reinsure any new WMB-originated loans.

WMMRC's failure to maintain adequate Reinsurance Reserves could result in the Mortgage Insurers' election to terminate the Reinsurance Agreements on a "cut-off" basis, in which case WMMRC would no longer be liable for the reinsured loans and would no longer receive reinsurance premiums with respect thereto. WMMRC would, however, be liable for the Reinsurance Reserve, which may, in certain cases, result in the extinguishment of all assets on account in the Trust at issue. As described above in Section IV.D.13.h, WMMRC is a named party in the Pennsylvania Action.

### b.    *Marion Insurance Company*.

Marion, a Vermont corporation and non-debtor, wholly-owned subsidiary of WMI, is a captive reinsurance company, created to reinsure the risk associated with lender placed hazard insurance policies, accidental death and dismemberment and mortgage life insurance. Currently, Marion is party to only one reinsurance agreement with Safeco, which agreement is in "run-off," because Marion has ceased to reinsure any new risks undertaken by its affiliates. Pursuant to this agreement with Safeco, Marion continues to be subject to all terms and conditions of the agreement and remains liable on the reinsured loans until the natural expiration, cancellation or termination of coverage of each reinsured loan.

In February 2009, the insurance commissioner of Vermont notified Marion that it was no longer in compliance with Vermont captive law because it no longer reinsured the risks of its affiliates, and therefore required that Marion no longer provide reinsurance as a Vermont captive. In response to this directive, in early 2009, Marion began the process of commuting its existing reinsurance contracts with four separate companies. By the beginning of 2010, Marion was successful in the commutation of three reinsurance agreements, including its reinsurance agreement with Assurant. As part of its commutation effort with Assurant, Marion created and deposited $17 million into a trust for the benefit of Assurant to pay remaining claims over the next two years. Per the insurance commissioner's requirements, Marion subsequently provided a dividend of the trust to WMI to ensure the successful wind-down of the Marion entity. The term of the trust expires on December 31, 2011, after which the remaining assets will revert, unrestricted, to WMI.

### c.    *WaMu 1031 Exchange*.

WaMu 1031 Exchange, Inc. provided qualified intermediary services to assist real estate investors in deferring capital gains taxes with respect to real estate transactions involving investment properties. WaMu 1031 Exchange was formed as a combination of three predecessor 1031 exchange companies and processed 15,000 exchanges annually, with each exchange averaging $300-$400K in size.

WaMu 1031 Exchange currently has no employees or offices and is undergoing a wind-down process. WaMu 1031 Exchange is involved in two pending litigations.

### 17. Other Assets.

#### a. *Wind Energy Investment.*

WMI Investment's assets include, among other things, an indirect membership interest (the "Wind Interest") in a portfolio holding company, JPMC Wind Investment Portfolio LLC ("JPMC Wind Investment"), which owns an equity interest in each of (i) Airtricity Sand Bluff WF Holdco, LLC, which owns the Airtricity-Sand Bluff wind farm, near Sterling City, Texas, (ii) UPC Hawaii Wind Partners II, LLC, which owns the UPC-Kaheawa Pastures wind farm, located in Maui, Hawaii, (iii) Whirlwind Energy, LLC, which owns the RES-Whirlwind wind farm, located in Floyd County, Texas, and (iv) Buffalo Gap Holdings 2, LLC, which owns the AES-Buffalo Gap 2 wind farm, located in Nolan and Taylor Counties, Texas (collectively, the "Projects"). The Debtors retained CP Energy Group, LLC, a financial advisory and commercial asset management firm that focuses on the renewable energy sector, to assist with the marketing and sale of the Wind Interest.

The Debtors, with CP Energy's assistance, undertook an extensive marketing process for the Wind Interest. As a result of such process, the Debtors determined that an expression of interest submitted by Goldman, Sachs & Co. ("Goldman") was the highest and best expression of interest remitted as of that date. Accordingly, on September 4, 2009, the Debtors filed a motion with the Bankruptcy Court to allow them to enter into a letter of intent with Goldman, to grant Goldman exclusivity and pay for due diligence expenses, in connection with Goldman's potential purchase of the Wind Interest. The Bankruptcy Court granted the motion on September 25, 2009, however, commercial terms were never reached. Prior to the Bankruptcy Court's ruling, on September 18, 2009, JPMC Wind Investment filed a reservation of rights with respect to its right of first refusal regarding any transfer of the Wind Interest.

Pursuant to the Global Settlement Agreement and a sale under section 363 of the Bankruptcy Code, WMI Investment will be deemed to have sold, transferred and assigned to JPMC, or its designee, any and all of WMI Investment's right, title and interest in and to the Wind Interest, free and clear of the liens, claims, interests and encumbrances.

#### b. *Strategic Capital Fund Investments.*

As of the Petition Date, WMI held investments in its Strategic Capital Fund (the "SCF"), comprised of certain equity interests (the "Preferred & Common Stock") and WMI's interest, as a limited partner, in ten (10) venture capital funds (the "LP Investments" and, together with the Preferred & Common Stock, the "Investments"). The venture capital funds primarily invested in companies in the technology and financial technology industries. By order, dated January 5, 2009, the Bankruptcy Court approved procedures for the sale of the Investments. The Investments were sold for $12.3 million in cash and the purchasers assumed approximately $8.7 million in indebtedness. As additional consideration, WMI received a beneficial interest in an unsecured and subordinated promissory note of approximately $807,000, which currently earns interest at 8%, of which interest at 3.2% is paid in cash and interest at 4.8% is "payment-in-kind" through July 2012. Thereafter, such promissory note will earn interest at 12% through July 2013 and 14% until maturity in July 2014.

### c. *Visa Shares*.

As of the Petition Date, WMI held 3.147 million Class B shares (the "Visa Shares") of Visa Inc. ("Visa") issued pursuant to Visa's initial public offering. The Visa Shares were set forth on the Schedules and/or WMI's books and records as of the Petition Date. Class B shares were derived from participating member's interests in Visa U.S.A. prior to the initial public offering. The value of these shares is contingent on the outcome of certain litigation, including that certain Interchange litigation described above. In the JPMC Adversary Proceeding, JPMC has asserted that it is entitled to the beneficial ownership of the Visa Shares, which the Debtors dispute.

Pursuant to the Global Settlement Agreement, JPMC will pay WMI $25 million and WMI will be deemed to have transferred to JPMC all of WMI's right, title and interest in and to the Visa Shares. WMI will retain the right to all dividends that pre-date the effective date of the Global Settlement Agreement. JPMC will also assume the liabilities and obligations of the Debtors arising from or relating to the Interchange Litigation, other than claims, liabilities and obligations associated with directors' and officers' liability in connection with the Interchange Litigation. JPMC has also agreed to pay or fund the payment of the Assumed Liabilities portion of any proofs of claim related to the Interchange Litigation, to the extent such portion becomes an Allowed Claim. Furthermore, pursuant to the Global Settlement Agreement, WMI will not, without obtaining JPMC's prior written consent, which consent shall not be unreasonably withheld, (a) commence or continue any claim objection proceedings, or (b) enter into, or seek Bankruptcy Court approval of, any settlement agreement with VISA U.S.A.

### 18.    Tax Claims and Refunds.

As previously indicated, WMI and its direct and indirect subsidiaries (including WMB), are members of an affiliated group of corporations for U.S. federal income tax purposes, of which WMI is the common parent (previously referred to as the "Tax Group"), and have been filing a single consolidated federal income tax return. The Tax Group has also been filing consolidated, combined or unitary tax returns for various state and local tax purposes.

### a.    Tax Claims

Currently, there are Tax Claims totaling approximately $3.2 billion asserted against WMI's estate, of which approximately $2.29 billion are asserted as Priority Tax Claims. Three proofs of claims, filed by the U.S. Internal Revenue Service ("IRS"), the Franchise Tax Board of the State of California ("California"), and the Oregon Department of Revenue ("Oregon") account for approximately 99.5 % of the asserted Priority Tax Claims.[12]

On October 24, 2008, the IRS filed a proof of claim with the Bankruptcy Court in the amount of $2,326,616,412, for asserted tax liabilities owing by the Tax Group, which claim was amended and increased on January 7, 2009 to the amount of $10,287,968,018. On January 22, 2009, WMI filed an objection to the IRS's proof of claim. Prior to and since the filing of the objection, WMI has been diligently working to bring closure to the taxable years under examination by the IRS, with the objective of eliminating most of the claimed liability – particularly in view of the substantial NOLs incurred by the

---

[12] There is a fourth claim filed by the IRS, currently pending against the Debtors in the amount of $4,751,232,563, however, the Debtors believe that the IRS intended that this claim would be superseded by a subsequently filed, amended claim in the amount of $685,668,290, discussed further herein. WMI intends to object to the IRS's claim, in the amount of $4,751,232,563, on the grounds that it was amended and superseded. Accordingly, this claim is not included in the estimated Tax Claims referenced above.

Tax Group in 2008, and since carried back five taxable years. As a result of WMI's continuing efforts, the IRS amended and reduced its proof of claim to $685,668,290, of which $55,027,997 is asserted as a secured claim, $591,284,561 is asserted as a priority claim, and $39,355,732 is asserted as a general unsecured claim. Meanwhile, discussions are continuing between WMI and the IRS with respect to such amounts. Significantly, pending the IRS's completion of the audit of the Tax Group's 2008 federal income tax return, the amounts claimed by the IRS do not take into account the substantial NOL carryback nor the offsetting of the substantial tax refund claimed with respect to the carryback years. Reflective of the continuing working relationship between the IRS and WMI, WMI has, pursuant to a stipulation and agreement with IRS, withdrawn without prejudice its objection to the IRS proof of claim and the IRS has withdrawn without prejudice its response to the objection. The Debtors anticipate that any amounts determined to be owing to the IRS will be paid from tax refunds that the IRS will owe to the Tax Group, as discussed below.

On March 26, 2009, California filed a proof of claim against WMI in its chapter 11 cases in the amount of $2,479,959,945, of which $138,980,870 is asserted as a secured claim, $1,689,148,149 is asserted as a priority claim, and $651,830,926 is asserted as a general unsecured claim. This claim predominantly reflects the assumed California franchise tax liability that would result if the amounts claimed under the then pending IRS proof of claim were determined to be owing. The Debtors have had discussions with the California Franchise Tax Board ("FTB") regarding California's proof of claim in light of the amendment of the IRS proof of claim described above. The FTB has agreed to amend its proof of claim to an amount no more than a proportionate basis of the IRS proof of claim to reflect the reduction of the IRS claim. As of the date of this Disclosure Statement, California's proof of claim totals $2,479,959,945. The Debtors anticipate that the final amounts determined to be owing to California will be paid from tax refunds that California will owe to the Tax Group included in the amounts discussed below.

On May 11, 2009, Oregon filed a proof of claim with the Bankruptcy Court for corporate franchise tax liabilities in the amount of $29,381,732, of which $11,110,285 is asserted as a priority claim and $18,271,438 is asserted as a general unsecured claim. To date, negotiations with Oregon have been unsuccessful. On April 12, 2010, the Debtors filed an objection to Oregon's claim on the grounds that, inter alia, (i) the underlying tax assessments represented by the proof of claim are completely without merit, (ii) that, notwithstanding (i), above, any liability represented by the proof of claim relate to WMB and not WMI and (iii) since neither WMI nor any of its remaining subsidiaries have any taxable presence in Oregon, WMB's liability cannot be ascribed to WMI. On April 29, 2010, Oregon filed a response to the Debtors' objection and the Debtors intend to file a reply thereto.

The proofs of claims filed by all other state and local tax authorities total approximately $20,159,375, and are being reviewed and contested, as appropriate.

### b.    Tax Refunds

The Debtors believe that WMI is entitled to substantial tax refunds arising from the resolution of certain tax matters. In addition, the Debtors estimate that, as of December 31, 2008, the Tax Group incurred NOLs for federal income tax purposes in excess of $25 billion. The NOLs are valuable assets as they can be carried back against the federal taxable income of the Tax Group for prior years, allowing the Tax Group to reduce any federal income tax liabilities determined to be owing and to recover federal income taxes paid in those earlier years. Prior to enactment of the Worker, Homeownership, and Business Assistance Act (previously defined as the "Act") on November 9, 2009, corporate taxpayers could generally carry back NOLs only to the two preceding taxable years. The Act permits corporate taxpayers, subject to certain limitations, a one-time election to extend the NOL

carryback period from two years to up to five years (with the fifth year limited to half of that year's taxable income). As permitted, WMI filed refund claims based on a five-year carryback of the Tax Group's 2008 NOL.

As indicated above, WMI believes that the Tax Group is entitled to federal and state Tax Refunds, net of tax payments estimated to be owed to taxing authorities, of approximately $5.4 to $5.8 billion in taxes, including interest through a projected future date of receipt. Over 85% of this amount reflects the claimed federal income tax refunds.

As discussed above, there are competing ownership claims to the Tax Refunds, which will be resolved pursuant to the Global Settlement Agreement.

### 19. Intellectual Property.

WMI has title to numerous forms of intellectual property, including, but not limited to, 1 issued patent, 5 patent applications, more than 1,300 domain names, and more than 300 domestic and international trademarks, including, but not limited to a family of Washington Mutual trademarks, including, the marks "WaMu," "Washington Mutual," and the "W Logo" (the "WaMu Marks"). On March 13, 2009, the Debtors filed a motion to retain Domain Assets LLC d/b/a Consor Intellectual Asset Management to perform a valuation of certain of their intellectual property assets, including the WaMu Marks. On October 7, 2009, the Debtors filed a motion to establish procedures for the sale of certain of their domain names and trademarks, excluding the WaMu Marks, which motion was opposed by JPMC due to the pending dispute between JPMC and the Debtors regarding the ownership of such intellectual property. Due to pending settlement discussions with JPMC, the Debtors adjourned consideration of their sale motion.

Pursuant to the Global Settlement Agreement, JPMC and the Debtors have reached agreement regarding their respective ownership rights to the above-described intellectual property. Specifically, JPMC and the Debtors have agreed that the WMI Entities will transfer to JPMC all of their rights to certain intellectual property, defined as "Transferred Intellectual Property" in the Global Settlement Agreement which include the WaMu Marks, and JPMC will waive any and all claims and rights to certain intellectual property defined as "WMI Intellectual Property." The parties have also agreed that all of the WMI Entities' rights, if any, in and to trademarks, patents, domain names and copyrighted materials, that were used by WMB, or were available for WMB's use, prior to the Petition Date, but are not included either in the list of Transferred Intellectual Property or in the list of WMI Intellectual Property identified in the Global Settlement Agreement (and defined as the "Unidentified Intellectual Property" in the Global Settlement Agreement) will be deemed to have been transferred by the WMI Entities to JPMC or its designee pursuant to the Global Settlement Agreement.

JPMC and the Debtors have also agreed that all right, title and interest in and to the intellectual property, identified in the Global Settlement Agreement as "WMB Intellectual Property," was acquired by JPMC pursuant to the Purchase and Assumption Agreement. Pursuant to the Global Settlement Agreement the WMI Entities have agreed to waive any and all claims to the WMB Intellectual Property and, to the extent applicable, be deemed to have transferred to JPMC or its designee any and all of the WMI Entities' rights in the Transferred Intellectual Property, the WMB Intellectual Property and the Unidentified Intellectual Property.

Finally, JPMC and the Debtors have agreed that all right, title and interest in and to the WMI Intellectual Property was and remain assets of WMI and its estate and the JPMC Entities will waive all claims and rights to such property, but any intellectual property that is not identified on the schedules

to the Global Settlement Agreement will be deemed sold, transferred or assigned by WMI to JPMC on the Effective Date.

**20.    Insurance.**

*a.    Directors and Officers Liability Insurance/Blended Policy.*

WMI has various director and officer liability insurance policies (the "D&O Policies") which were acquired in connection with WMI's indemnification obligations to its officers and directors and to officers and directors of WMI's subsidiaries, certain of whom are named as defendants in certain pending lawsuits (the "Individual Defendants"). By order dated December 16, 2008, the Bankruptcy Court granted relief from the automatic stay to allow certain of WMI's third party insurance carriers to advance and/or pay defense costs pursuant to the D&O Policies that are, or will become, owing to the Individual Defendants in connection with certain pending litigation.

In addition, prior to the Petition Date, WMI procured a blended insurance program providing D&O, bankers professional liability, employment practices liability, fiduciary liability and financial institution bond insurance coverage to WMI and its affiliates and subsidiaries, which, like the D&O Policies, is structured as a tower of related insurance (collectively, the "Blended Policies"). The Blended Policies provide insurance coverage to WMI, its subsidiaries, its employee benefit plans, and their past, present and future directors, officers, trustees or employees for certain claims. By order, dated April 13, 2009, the Bankruptcy Court granted relief from the automatic stay to allow certain of WMI's third party insurance carriers to advance and/or pay defense costs pursuant to the Blended Policies that are, or will become, owing in connection with the ERISA Litigation (described above), the Buus Litigation (described above), as well as those certain Subpoenas for Records Directed to the WaMu Savings Plan and WMI, initiated by the Department of Labor.

Pursuant to the Global Settlement Agreement, the parties thereto agree that, with respect to the first $60 million of coverage, WMI and WMI's present and former officers and directors and employees (collectively, the "Insured Parties") will be entitled to a priority recovery (as against any right of recovery the JPMC Entities, the FDIC Receiver, and FDIC Corporate may have), for all claims made against the Blended Policies. To the extent that payment is made by one of the carriers in such blended insurance program to any party other than WMI, prior to the reconciliation and determination of all claims made by any Insured Party or its present and former officers and directors and employees, such funds will be deemed held by such party until a determination of all claims covered by such policies. With respect to the balance of coverage afforded pursuant to the Blended Policies, the rights of the insureds, their successors or actual or prospective claimants will not be altered by the terms of the Global Settlement Agreement and WMI and the FDIC Receiver will have such rights to pursue recoveries from the Blended Policies as are provided under the policies, bonds and applicable law.

## V. SUMMARY OF THE PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as Exhibit A. This summary is qualified in its entirety by reference to the Plan.

## A. **Provisions For Payment Of Administrative Expense Claims And Priority Tax Claims Under The Plan**

### 1. **Administrative Expense Claims**.

Administrative Expense Claims are the those constituting a cost or expense of administration of these chapter 11 cases asserted or authorized to be asserted, on or prior to the date established by the Bankruptcy Court and set forth in the order confirming the Plan, as the last day to file proof of Administrative Expense Claims (see definition of Administrative Claim Bar Date in the Plan), in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code during the period up to and including the Effective Date of the Plan, including, without limitation, (i) any actual and necessary cost and expense of preserving the estates of the Debtors, (ii) any actual and necessary cost and expense of operating the businesses of the Debtors in Possession, (iii) any post-Petition Date loan or advance extended by one Debtor to the other Debtor, (iv) any cost and expense of the Debtors in Possession for the management, maintenance, preservation, sale, or other disposition of any assets, (v) the administration and implementation of the Plan, (vi) the administration, prosecution, or defense of Claims by or against the Debtors and for distributions under the Plan, (vii) any guarantee or indemnification obligation extended by the Debtors in Possession, (viii) any Claim for compensation and reimbursement of expenses arising during the period from and after the Petition Date and prior to the Effective Date and awarded by the Bankruptcy Court in accordance with section 328, 330, 331, or 503(b) of the Bankruptcy Code or otherwise in accordance with the provisions of the Plan, whether fixed before or after the Effective Date, and (ix) any fee or charge assessed against the Debtors' estates pursuant to section 1930, chapter 123, title 28, United States Code.

On the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Disbursing Agent shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and the Disbursing Agent; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid in full and performed by the Disbursing Agent in the ordinary course of business in accordance with the terms and subject to the conditions of any agreement governing, instrument evidencing, or other document relating to such transactions; and provided, further, that, if any such ordinary course expense is not billed, or a request for payment is not made, within ninety (90) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to a distribution pursuant to the Plan.

### 2. **Professional Compensation and Reimbursement Claims**.

All Entities awarded compensation or reimbursement of expenses by the Bankruptcy Court in accordance with section 328, 330, or 331 of the Bankruptcy Code or entitled to priorities established pursuant to section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, shall be paid in full, in Cash, in the amounts allowed by the Bankruptcy Court (i) on or as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date upon which the Bankruptcy Court order allowing such Claim becomes a Final Order or (ii) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Disbursing Agent; provided, however, that, except as provided in the Plan, each professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the Administrative Claim Bar Date. The Disbursing Agent is authorized to pay

compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 3. Priority Tax Claims.

A Priority Tax Claim is a Claim of a governmental unit against the Debtors of the kind entitled to priority in payment pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Each holder of an Allowed Priority Tax Claim shall be entitled to receive distributions in an amount equal to the full amount of such Allowed Priority Tax Claim. At the option and discretion of the Debtors, which option shall be exercised, in writing, on or prior to the commencement of the Confirmation Hearing, such payment shall be made (i) in full, in Cash, on or as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date on which such claim becomes an Allowed Claim, (ii) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, in full, in Cash, in equal quarterly installments commencing on the first (1st) Business Day following the Effective Date and continuing over a period not exceeding five (5) years from and after the Petition Date, together with interest accrued thereon at the applicable non-bankruptcy rate, subject to the sole option of the Disbursing Agent to prepay the entire amount of the Allowed Priority Tax Claim, or (iii) by mutual agreement of the holder of such Allowed Priority Tax Claim and the Disbursing Agent.

### 4. Statutory Fees.

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or as soon as reasonably practicable following the Effective Date.

### B. Classification Of Claims And Equity Interests Under The Plan

Claims and Equity Interests are classified as follows:

| Class 1 | Priority Non-Tax Claims |
| Class 2 | Senior Notes Claims |
| Class 3 | Senior Subordinated Notes Claims |
| Class 4 | WMI Medical Plan Claims |
| Class 5 | JPMC Rabbi Trust/Policy Claims |
| Class 6 | Other Benefit Plan Claims |
| Class 7 | Qualified Plan Claims |
| Class 8 | WMB Vendor Claims |
| Class 9 | Visa Claims |
| Class 10 | Bond Claims |
| Class 11 | WMI Vendor Claims |
| Class 12 | General Unsecured Claims |
| Class 13 | Convenience Claims |
| Class 14 | CCB-1 Guarantees Claims |
| Class 15 | CCB-2 Guarantees Claims |
| Class 16 | PIERS Claims |
| Class 17 | Non-Subordinated Bank Bondholder Claims |
| Class 18 | Subordinated Claims |

| Class 19 | REIT Series |
| Class 20 | Preferred Equity Interests |
| Class 21 | Dime Warrants |
| Class 22 | Common Equity Interests |

## 1.   Priority Non-Tax Claims (Class 1).

Priority Non-Tax Claims are those Claims entitled to priority in payment as specified in Section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

Class 1 is Unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the Debtors, on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Priority Non-Tax Claim, in Cash, the full amount of such Allowed Priority Non-Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Priority Non-Tax Claim.

## 2.   Senior Notes Claims (Class 2).

Class 2 is Impaired by the Plan. Each holder of an Allowed Senior Notes Claim is entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, and subject to the right of election described below, each holder of an Allowed Senior Notes Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed Senior Notes Claim and Postpetition Interest Claim (which, for the avoidance of doubt, shall not have been finally determined to be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person, except as otherwise provided herein), subject to the lien or priority rights of the Senior Notes Indenture Trustee, such holder's Pro Rata Share of (i) Creditor Cash and (ii) Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed Senior Notes Claim and (b) in the event that all Allowed Claims are paid in full, such holder's Postpetition Interest Claim. In addition, in accordance with the Subordination Model attached to the Plan, each holder of an Allowed Senior Notes Claim shall be entitled to receive on account of such Allowed Senior Notes Claim and, irrespective of whether all Allowed Claims are paid in full, such holder's Postpetition Interest Claim redistributions of Creditor Cash and Cash received on account of Liquidating Trust Interests. The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, and Allowed PIERS Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination provisions, are set forth in more detail in the Plan; provided, however, that, to the extent that the priorities set forth in the Subordination Model conflict with the contractual subordination provisions of the Senior Subordinated Notes Indenture, CCB-1 Guarantee Agreements, CCB-2 Guarantee Agreements, Junior Subordinated Notes Indenture and/or PIERS Guarantee Agreement, the contractual subordination provisions of such Indentures and Guarantee Agreements shall govern and shall be enforced pursuant to section 510(a) of the Bankruptcy Code, except with respect to redistribution of Reorganized Common

Stock to holders of Allowed Senior Notes Claims, which will have been specifically waived by such holders, as set forth below.

### a.    Right of Election.

On the Ballot, each holder of an Allowed Senior Notes Claim shall be provided the right to elect, in its sole and absolute discretion, to receive Reorganized Common Stock (subject to adjustment based upon the amount of Reorganized Common Stock elected by holders of Allowed General Unsecured Claims and subject to dilution on account of the Rights Offering), in lieu of some or all of the Creditor Cash or Cash on account of Liquidating Trust Interests, as the case may be, that such holder otherwise is entitled to receive pursuant to the Plan, in each instance, subject to the lien or priority rights of the Senior Notes Indenture Trustee.  To the extent a holder of an Allowed Senior Notes Claim elects to receive Reorganized Common Stock, such holder's distribution of Creditor Cash or Cash to be received on account of Liquidating Trust Interests, as the case may be, shall be reduced on a dollar-for-dollar basis by the value of the Reorganized Common Stock so elected (valued as of the Confirmation Date), so that the ultimate recovery percentage for each holder of an Allowed Senior Notes Claim is the same, regardless of whether a holder elects to receive Reorganized Common Stock.  Failure by any holder of an Allowed Senior Notes Claim to elect to exercise rights provided in this Section V.B.2.a on or before the Ballot Date shall constitute a deemed waiver and relinquishment of such rights by such holder as well as a deemed waiver and relinquishment by such holder to receive redistributions of Reorganized Common Stock pursuant to the enforcement of applicable contractual subordination provisions in accordance with the Subordination Model attached to the Plan.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

### b.    Limitation on Recovery.

Notwithstanding anything contained in the Plan to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed Senior Notes Claim in accordance with the Plan, in the event that the sum of (i) distributions of Reorganized Common Stock (valued as of the Confirmation Date), Creditor Cash and Cash received on account of Liquidating Trust Interests in accordance with the Plan and (ii) redistributions of Creditor Cash and Cash received on account of Liquidating Trust Interests in accordance with the enforcement, pursuant to section 510(a) of the Bankruptcy Code, of contractual subordination provisions, as set forth in the Subordination Model attached to the Plan, are equal to or in excess of one hundred percent (100%) of such holder's Allowed Senior Notes Claim and Postpetition Interest Claim, then the Cash received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached to the Plan.

### 3.    Senior Subordinated Notes Claims (Class 3).

Class 3 is Impaired by the Plan.  Each holder of an Allowed Senior Subordinated Notes Claim is entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, and subject to the right of election described below and in the Plan, each holder of an Allowed Senior Subordinated Notes Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed Senior Subordinated Notes Claim and Postpetition Interest Claim (which, for the avoidance of doubt, shall not have been finally determined to be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable,

contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person, except as otherwise provided in the Plan), subject to the lien or priority rights of the Senior Subordinated Notes Indenture Trustee, such holder's Pro Rata Share of (i) Creditor Cash and (ii) Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed Senior Subordinated Notes Claim and (b) in the event that all Allowed Claims are paid in full, such holder's Postpetition Interest Claim; provided, however, that, any distribution to holders of Allowed Senior Subordinated Notes Claims of (a) Creditor Cash and (b) Cash received on account of Liquidating Trust Interests, but not Reorganized Common Stock (to the extent elected pursuant to V.B.3.a), shall be redistributed, subject to Bankruptcy Rule 3021 and subject to any lien or priority rights of the Senior Subordinated Notes Indenture Trustee, in accordance with the priorities set forth in the Subordination Model attached to the Plan. In addition, in accordance with the Subordination Model, each holder of an Allowed Senior Subordinated Notes Claim shall be entitled to receive on account of such Allowed Senior Subordinated Notes Claim and, irrespective of whether all Allowed Claims are paid in full, such holder's Postpetition Interest Claim redistributions of Creditor Cash and Cash received on account of Liquidating Trust Interests. The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, and Allowed PIERS Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination provisions, are set forth in more detail in the Plan; provided, however, that, to the extent that the priorities set forth in the Subordination Model conflict with the contractual subordination provisions of the Senior Subordinated Notes Indenture, CCB-1 Guarantee Agreements, CCB-2 Guarantee Agreements, Junior Subordinated Notes Indenture and/or PIERS Guarantee Agreement, the contractual subordination provisions of such Indentures and Guarantee Agreements shall govern and shall be enforced pursuant to section 510(a) of the Bankruptcy Code.

### a. Right of Election.

On the Ballot, each holder of an Allowed Senior Subordinated Notes Claim will be provided the right to elect, in its sole and absolute discretion, to receive Reorganized Common Stock (to the extent remaining after distribution to holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims and subject to dilution on account of the Rights Offering), in lieu of some or all of the Creditor Cash or Cash on account of Liquidating Trust Interests, as the case may be, that such holder otherwise is entitled to receive pursuant to the Plan, in each instance, subject to the lien or priority rights of the Senior Subordinated Notes Indenture Trustee. To the extent a holder of an Allowed Senior Subordinated Notes Claim elects to receive Reorganized Common Stock, such holder's distribution of Creditor Cash or Cash to be received on account of Liquidating Trust Interests, as the case may be, shall be reduced on a dollar-for-dollar basis by the value of the Reorganized Common Stock so elected (valued as of the Confirmation Date), so that the ultimate recovery percentage for each holder of an Allowed Senior Subordinated Notes Claim is the same, regardless of whether a holder elects to receive Reorganized Common Stock. Failure by any holder of an Allowed Senior Subordinated Notes Claim to elect to exercise rights provided in the Plan on or before the Ballot Date shall constitute a deemed waiver and relinquishment of such rights by such holder. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

### b. Limitation on Recovery.

Notwithstanding anything contained in the Plan to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed Senior Subordinated Notes Claim in

accordance with the Plan, in the event that the sum of (i) distributions of Reorganized Common Stock (valued as of the Confirmation Date), Creditor Cash and Cash received on account of Liquidating Trust Interests in accordance with the Plan, (ii) redistributions of Creditor Cash and Cash received on account of Liquidating Trust Interests in accordance with the enforcement, pursuant to section 510(a) of the Bankruptcy Code, of contractual subordination provisions, as set forth in the Subordination Model attached to the Plan, and (iii) redistributions of Cash received on account of Liquidating Trust Interests in accordance with the provisions of the Plan are equal to or in excess of one hundred percent (100%) of such holder's Allowed Senior Subordinated Notes Claim and Postpetition Interest Claim, then the Cash received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model.

### 4. WMI Medical Plan Claims (Class 4).

WMI Medical Plan Claims are any Claims against the Debtors and their chapter 11 estates set forth in the Global Settlement Agreement filed by a beneficiary of the Medical Plan to the extent such Claim relates to Assumed Liabilities, as defined in the Global Settlement Agreement.

Class 4 is Unimpaired by the Plan. Each holder of an Allowed WMI Medical Plan Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, JPMC shall pay or fund the payment of all WMI Medical Plan Claims, in full satisfaction release and exchange of such Claims.

### 5. JPMC Rabbi Trust/Policy Claims (Class 5).

JPMC Rabbi Trust/Policy Claims are any Claims against the Debtors set forth in the Global Settlement Agreement filed by a beneficiary of the JPMC Rabbi Trusts or the JPMC Policies, each as defined in the Plan and set forth in the Global Settlement Agreement, to the extent such Claim constitutes an Allowed JPMC Assumed Liability Claim.

Class 5 is Unimpaired by the Plan. Each holder of an Allowed JPMC Rabbi Trust/Policy Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, JPMC shall pay or fund the payment of all JPMC Rabbi Trust/Policy Claims, in full satisfaction, release and exchange of such Claims.

### 6. Other Benefit Plan Claims (Class 6).

Other Benefit Plan Claims are Claims against the Debtors identified in the Global Settlement Agreement filed by a beneficiary of a benefit plan identified on Exhibit "P" to the Global Settlement Agreement to the extent such Claim constitutes an Allowed JPMC Assumed Liability Claim.

Class 6 is Unimpaired by the Plan. Each holder of an Allowed Other Benefit Plan Claims is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, JPMC shall pay or fund the payment of all Other Benefit Plan Claims, in full satisfaction, release and exchange of such Claims.

### 7. Qualified Plan Claims (Class 7).

Qualified Plan Claims are any Claims against the Debtors set forth in the Global Settlement Agreement filed by any Person arising from or relating to the WaMu Pension Plan or the Lakeview Plan, to the extent such Claim constitutes an Allowed JPMC Assumed Liability Claim.

Class 7 is Unimpaired by the Plan. Each holder of an Allowed Qualified Plan Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, JPMC shall pay or fund the payment of all Qualified Plan Claims, in full satisfaction, release and exchange of such Claims.

### 8. WMB Vendor Claims (Class 8).

WMB Vendor Claims are any Claims against the Debtors and their chapter 11 estates filed by a vendor with respect to services, software licenses, or goods provided to WMB and its subsidiaries (whether prior or subsequent to JPMC's acquisition of the assets of WMB) pursuant to a contract or written agreement between WMB and/or its subsidiaries and such vendor.

Class 8 is Unimpaired by the Plan. Each holder of an Allowed WMB Vendor Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, JPMC shall pay or otherwise satisfy all Allowed WMB Vendor Claims, in full satisfaction, release and exchange of such Claims.

### 9. Visa Claims (Class 9).

Visa Claims are any Claims against the Debtors set forth in the Global Settlement Agreement filed in connection with the Visa Shares or any litigation or agreement relating thereto, and the Claims asserted by VISA U.S.A. Inc. in its proof of claim filed against the Debtors and the Debtors' chapter 11 cases pertaining to the VISA Strategic Agreement, to the extent such Claim constitutes an Allowed JPMC Assumed Liability Claim.

Class 9 is Unimpaired by the Plan. Each holder of an Allowed Visa Shares Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, JPMC shall pay or fund the payment of all Visa Claims, in full satisfaction, release and exchange of such Claims.

### 10. Bond Claims (Class 10).

Bond Claims are any Claims against the Debtors, set forth on a Schedule to the Global Settlement Agreement filed by any of Safeco Insurance Company and such other insurance or bonding companies that issued bonds on behalf of WMB or FSB or their Affiliates pursuant to that certain General Agreement of Indemnity, dated as of June 14, 1999, executed and delivered by WMI, pursuant to which, among other things, the bonds were to be issued and WMI agreed to pay all losses and expenses of the Bonding Companies associated therewith, to the extent such Claim constitutes an Allowed JPMC Assumed Liability Claim.

Class 10 is Unimpaired by the Plan. Each holder of an Allowed Bond Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, JPMC shall pay or fund the payment of all Bond Claims, in full satisfaction, release and exchange of such Claims.

**11.     WMI Vendor Claims (Class 11).**

WMI Vendor Claims are any Claims against WMI asserted by a vendor with respect to services, software licenses or goods asserted to have been provided by the counterparty to or for the benefit of WMB or any of its subsidiaries or minority investments operations prior to the Petition Date.

Class 11 is Unimpaired by the Plan. Each holder of an Allowed WMI Vendor Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, each holder of an Allowed WMI Vendor Claim will receive, in full satisfaction, release and exchange of such holder's WMI Vendor Claim, payment in Cash from the Vendor Escrow.

**12.     General Unsecured Claims (Class 12).**

General Unsecured Claims are any Unsecured Claims against the Debtors other than a Senior Notes Claim, a Senior Subordinated Notes Claim, a JPMC Assumed Liability Claim, a WMB Vendor Claim, a WMI Vendor Claim, a CCB-1 Guarantees Claim, CCB-2 Guarantees Claim, a PIERS Claim, a Non-Subordinated Bank Bondholder Claim, a Convenience Claim, a Subordinated Claim, or a Trustee Claim.

Class 12 is Impaired by the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, and subject to the right of election described in Section V.B.12.a below, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed General Unsecured Claim and Postpetition Interest Claim (which, for the avoidance of doubt, shall not have been finally determined to be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person, except as otherwise provided herein), such holder's Pro Rata Share of (i) Creditor Cash and (ii) Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed General Unsecured Claim and (b) in the event that all Allowed Claims are paid in full, such holder's Postpetition Interest Claim; provided, however, that, pursuant to the terms of the Global Settlement Agreement and as partial consideration for the releases set forth in the Plan, upon the Effective Date, JPMC shall be deemed to have waived its right to receive any distribution on account of the JPMC Allowed Unsecured Claim including, without limitation, the right to elect to receive Reorganized Common Stock, pursuant to the Plan. The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, and Allowed PIERS Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination provisions, are set forth in more detail in the Subordination Model attached to the Plan; provided, however, that, to the extent that the priorities set forth in the Subordination Model conflict with the

contractual subordination provisions of the Senior Subordinated Notes Indenture, CCB-1 Guarantee Agreements, CCB-2 Guarantee Agreements, Junior Subordinated Notes Indenture and/or PIERS Guarantee Agreement, the contractual subordination provisions of such Indentures and Guarantee Agreements shall govern and shall be enforced pursuant to section 510(a) of the Bankruptcy Code.

### a. *Rights of Election.*

On the Ballot, each holder of an Allowed General Unsecured Claim who is a Qualified Holder shall be provided the right to elect, in its sole and absolute discretion, to receive Reorganized Common Stock (subject to adjustment based upon the amount of Reorganized Common Stock elected by holders of Allowed Senior Notes Claims and subject to dilution on account of the Rights Offering), in lieu of some or all of the Creditor Cash or Cash on account of Liquidating Trust Interests, as the case may be, that such holder otherwise is entitled to receive pursuant to the Plan. To the extent a Qualified Holder (i.e., a holder of an Allowed General Unsecured Claim who is (i) a qualified institutional buyer and (ii) holds Allowed General Unsecured Claims in an aggregate amount in excess of $4,000,000) elects to receive Reorganized Common Stock, such holder's distribution of Creditor Cash or Cash to be received on account of Liquidating Trust Interests, as the case may be, shall be reduced on a dollar-for-dollar basis by the value of the Reorganized Common Stock so elected (valued as of the Confirmation Date), so that the ultimate recovery percentage for each holder of an Allowed General Unsecured Claim is the same, regardless of whether a holder elects to receive Reorganized Common Stock. Failure by any Qualified Holder to elect to exercise rights provided in this Section V.B.12.a on or before the Ballot Date shall constitute a deemed waiver and relinquishment of such rights by such holder. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

### b. *Limitation on Recovery.*

Notwithstanding anything contained in the Plan to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed General Unsecured Claim in accordance with the Plan, in the event that the sum of the distributions of Reorganized Common Stock (valued as of the Confirmation Date), Creditor Cash and Cash received on account of Liquidating Trust Interests in accordance with the Plan are equal to or in excess of one hundred percent (100%) of such holder's Allowed General Unsecured Claim and Postpetition Interest Claim, then the Cash received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached to the Plan.

### c. *Allowed Claims of Fifty Thousand Dollars ($50,000.00) or More/Election to be Treated as a Convenience Claim.*

Notwithstanding the provisions of the Plan, any holder of an Allowed General Unsecured Claim, other than a General Unsecured Claim that is a component of a larger General Unsecured Claim, portions of which may be held by such or any other holder of an Allowed Claim, whose Allowed General Unsecured Claim is more than Fifty Thousand Dollars ($50,000.00), and who elects to reduce the amount of such Allowed General Unsecured Claim to Fifty Thousand Dollars ($50,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed General Unsecured Claim as so reduced, distributions pursuant to the Plan hereof. Such election shall be deemed to be a vote in favor of the Plan and the releases set forth therein. Such election must be made on the Ballot and be received by the

Debtors on or prior to the Ballot Date. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

### 13. Convenience Claims (Class 13).

A Convenience Claim is a Claim that is equal to or less than Fifty Thousand Dollars ($50,000.00) or greater than Fifty Thousand Dollars ($50,000.00) but, with respect to which, the holder thereof voluntarily reduces such Claim to Fifty Thousand Dollars ($50,000.00) on the Ballot; provided, however, that, for purposes of the Plan and the distributions to be made thereunder, "Convenience Claim" shall not include (i) an Administrative Expense Claim, (ii) a Priority Tax Claim, (iii) a Priority Non-Tax Claim, (iv) a Senior Notes Claim, (v) a Senior Subordinated Notes Claim, (vi) any JPMC Assumed Liability Claim, (vii) a WMB Vendor Claim, (viii) a WMI Vendor Claim, (ix) a CCB-1 Guarantees Claim, (x) a CCB-2 Guarantees Claim, (xi) a PIERS Claim, (xii) a Non-Subordinated Bank Bondholder Claim, (xiii) a Subordinated Claim, (xiv) a Trustee Claim, and (xv) any other Claim that is a component of a larger Claim, portions of which may be held by one or more holders of Allowed Claims.

Class 13 is Unimpaired by the Plan. Each holder of an Allowed Convenience Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

On the later of the Effective Date and the date such Allowed Convenience Claim becomes an Allowed Claim, or as soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Convenience Claim, in Cash, the full amount of such Allowed Convenience Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Convenience Claim.

### 14. CCB-1 Guarantees Claims (Class 14).

Class 14 is Impaired by the Plan. Each holder of an Allowed CCB-1 Guarantees Claim is entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, and subject to the right of election described in Section V.B.14.a below, each holder of an Allowed CCB-1 Guarantees Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed CCB-1 Guarantees Claim and Postpetition Interest Claim (which, for the avoidance of doubt, shall not have been finally determined to be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person, except as otherwise provided herein), subject to the lien or priority rights of the CCB-1 Trustee, such holder's Pro Rata Share of (i) Creditor Cash and (ii) Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed CCB-1 Guarantees Claim and (b) in the event that all Allowed Claims are paid in full, such holder's Postpetition Interest Claim; provided, however, that, any distribution to holders of Allowed CCB-1 Guarantees Claims of (a) Creditor Cash and (b) Cash received on account of Liquidating Trust Interests, but not Reorganized Common Stock (to the extent elected pursuant to Section V.B.14.a below) shall be redistributed in accordance with the priorities set forth in the Subordination Model attached to the Plan. In addition, in accordance with the Subordination Model, each holder of an Allowed CCB-1 Guarantees Claim shall be entitled to receive on account of such Allowed CCB-1 Guarantees Claim and, irrespective of whether all Allowed Claims are paid in full, such holder's Postpetition Interest Claim redistributions of Creditor Cash and Cash received on account of Liquidating Trust Interests. The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured

Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, and Allowed PIERS Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination provisions, are set forth in more detail in the Plan; provided, however, that, to the extent that the priorities set forth in the Subordination Model conflict with the contractual subordination provisions of the Senior Subordinated Notes Indenture, CCB-1 Guarantee Agreements, CCB-2 Guarantee Agreements, Junior Subordinated Notes Indenture and/or PIERS Guarantee Agreement, the contractual subordination provisions of such Indentures and Guarantee Agreements shall govern and shall be enforced pursuant to section 510(a) of the Bankruptcy Code.

### a.     Right of Election.

On the Ballot, each holder of an Allowed CCB-1 Guarantees Claim shall be provided the right to elect, in its sole and absolute discretion, to receive Reorganized Common Stock (to the extent remaining after distribution to holders of Allowed Senior Notes Claims, Allowed General Unsecured Claims, and Allowed Senior Subordinated Notes Claims and subject to dilution on account of the Rights Offering), in lieu of some or all of the Creditor Cash or Cash on account of Liquidating Trust Interests, as the case may be, that such holder otherwise is entitled to receive pursuant to the Plan, in each instance, subject to the lien or priority rights of the CCB-1 Trustee. To the extent a holder of an Allowed CCB-1 Guarantees Claim elects to receive Reorganized Common Stock, such holder's distribution of Creditor Cash or Cash to be received on account of Liquidating Trust Interests, as the case may be, shall be reduced on a dollar-for-dollar basis by the value of the Reorganized Common Stock so elected (valued as of the Confirmation Date), so that the ultimate recovery percentage for each holder of an Allowed CCB-1 Guarantees Claim is the same, regardless of whether a holder elects to receive Reorganized Common Stock. Failure by any holder of an Allowed CCB-1 Guarantees Claim to elect to exercise rights provided in this Section V.B.14.a on or before the Ballot Date shall constitute a deemed waiver and relinquishment of such rights by such holder. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

### b.     Limitation on Recovery.

Notwithstanding anything contained in the Plan to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed CCB-1 Guarantees Claim in accordance with the Plan, in the event that the sum of (i) distributions of Reorganized Common Stock, Creditor Cash and Cash received on account of Liquidating Trust Interests in accordance with the Plan, (ii) redistributions of Creditor Cash and Cash received on account of Liquidating Trust Interests in accordance with the enforcement, pursuant to section 510(a) of the Bankruptcy Code, of contractual subordination provisions, as set forth in the Subordination Model attached to the Plan, (iii) redistributions of Cash received on account of Liquidating Trust Interests in accordance with the provisions of the Plan, and (iv) distributions from the Receivership are equal to or in excess of one hundred percent (100%) of such holder's Allowed CCB-1 Guarantees Claim and Postpetition Interest Claim, then the Cash received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model.

### 15.     CCB-2 Guarantees Claims (Class 15).

Class 15 is Impaired by the Plan. Each holder of an Allowed CCB-2 Guarantees Claim is entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, and subject to the right of election described in Section V.B.15.a below, each holder of an Allowed CCB-2 Guarantees Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed CCB-2 Guarantees Claim and Postpetition Interest Claim (which, for the avoidance of doubt, shall not have been finally determined to be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person, except as otherwise provided herein), subject to the lien or priority rights of the CCB-2 Trustees, such holder's Pro Rata Share of (i) Creditor Cash and (ii) Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed CCB-2 Guarantees Claim and (b) in the event that all Allowed Claims are paid in full, such holder's Postpetition Interest Claim; provided, however, that, any distribution to holders of Allowed CCB-2 Guarantees Claims of (a) Creditor Cash and (b) Cash received on account of Liquidating Trust Interests, but not Reorganized Common Stock (to the extent elected Pursuant to Section V.B.15.a), shall be redistributed, subject to Bankruptcy Rule 3021 and subject to the lien or priority rights of the CCB-2 Trustees, in accordance with the priorities set forth in the Subordination Model attached to the Plan. In addition, in accordance with the Subordination Model, each holder of an Allowed CCB-2 Guarantees Claim shall be entitled to receive on account of such Allowed CCB-2 Guarantees Claim and, irrespective of whether all Allowed Claims are paid in full, such holder's Postpetition Interest Claim redistributions of Creditor Cash and Cash received on account of Liquidating Trust Interests. The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, and Allowed PIERS Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination provisions, are set forth in more detail in the Plan; provided, however, that, to the extent that the priorities set forth in the Subordination Model conflict with the contractual subordination provisions of the Senior Subordinated Notes Indenture, CCB-1 Guarantee Agreements, CCB-2 Guarantee Agreements, Junior Subordinated Notes Indenture and/or PIERS Guarantee Agreement, the contractual subordination provisions of such Indentures and Guarantee Agreements shall govern and shall be enforced pursuant to section 510(a) of the Bankruptcy Code.

### a. *Right of Election.*

On the Ballot, each holder of an Allowed CCB-2 Guarantees Claim shall be provided the right to elect, in its sole and absolute discretion, to receive Reorganized Common Stock (to the extent remaining after distribution to holders of Allowed Senior Notes Claims, Allowed General Unsecured Claims, and Allowed Senior Subordinated Notes Claims and subject to dilution on account of the Rights Offering), in lieu of some or all of the Creditor Cash or Cash on account of Liquidating Trust Interests, as the case may be, that such holder otherwise is entitled to receive pursuant to the Plan, in each instance, subject to the lien or priority rights of the CCB-2 Trustees. To the extent a holder of an Allowed CCB-2 Guarantees Claim elects to receive Reorganized Common Stock, such holder's distribution of Creditor Cash or Cash to be received on account of Liquidating Trust Interests, as the case may be, shall be reduced on a dollar-for-dollar basis by the value of the Reorganized Common Stock so elected (valued as of the Confirmation Date), so that the ultimate recovery percentage for each holder of an Allowed CCB-2 Guarantees Claim is the same, regardless of whether a holder elects to receive Reorganized Common Stock. Failure by any holder of an Allowed CCB-2 Guarantees Claim to elect to exercise rights provided in this Section V.B.15.a on or before the Ballot Date shall constitute a deemed waiver and relinquishment of such rights by such holder. Any election made after the Ballot Date shall not be binding upon the

Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

### b. Limitation on Recovery.

Notwithstanding anything contained in the Plan to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed CCB-2 Guarantees Claim in accordance with the Plan, in the event that the sum of (i) distributions of Reorganized Common Stock, Creditor Cash and Cash received on account Liquidating Trust Interests in accordance with the Plan, (ii) redistributions of Creditor Cash and Cash received on account of Liquidating Trust Interests in accordance with the enforcement, pursuant to section 510(a) of the Bankruptcy Code, of contractual subordination provisions, as set forth in the Subordination Model attached to the Plan, (iii) redistributions of Cash received on account of Liquidating Trust Interests in accordance with the provisions of the Plan, and (iv) distributions from the Receivership are equal to or in excess of one hundred percent (100%) of such holder's Allowed CCB-2 Guarantees Claim and Postpetition Interest Claim, then the Cash received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached to the Plan.

### 16. PIERS Claims (Class 16).

Class 16 is Impaired by the Plan. Each holder of an Allowed PIERS Claim is entitled to vote to accept or reject the Plan.

Commencing on the Effective Date, and subject to the right of election described in Section V.B.16.a below, each holder of an Allowed PIERS Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed PIERS Claim and Postpetition Interest Claim (which, for the avoidance of doubt, shall not have been finally determined to be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person, except as otherwise provided herein), subject to the lien or priority rights of the PIERS Trustee, such holder's Pro Rata Share of (i) Reorganized Common Stock (to the extent remaining after distribution to holders of Allowed Senior Notes Claims, Allowed General Unsecured Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, and Allowed CCB-2 Guarantees Claims and subject to dilution on account of the Rights Offering), (ii) Creditor Cash and (iii) Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed PIERS Claim and (b) in the event that all Allowed Claims are paid in full, such holder's Postpetition Interest Claim; provided, however, that, notwithstanding the foregoing, the contractual subordination rights of Entities who hold PIERS Preferred Securities shall be preserved and enforced hereunder pursuant to section 510(a) of the Bankruptcy Code and any distribution on account of the PIERS Common Securities of (i) Reorganized Common Stock, (ii) Creditor Cash and (iii) Cash on account of Liquidating Trust Interests shall be redistributed, subject to Bankruptcy Rule 3021 and subject to the lien and priority rights of the PIERS Trustee, to Entities who hold PIERS Preferred Securities, until such time as such Entities' Allowed PIERS Claims and Postpetition Interest Claims have been satisfied in accordance with the terms and provisions of the PIERS Trust Agreement; and provided, further that, any distribution to holders of Allowed PIERS Claims of (a) Creditor Cash and (b) Cash received on account of Liquidating Trust Interests, but not Reorganized Common Stock, shall be redistributed, subject to Bankruptcy Rule 3021 and subject to the lien or priority rights of the PIERS Trustee, in accordance with the priorities set forth in the Subordination Model attached to the Plan. The relative priorities among holders of Allowed Senior

Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, and Allowed PIERS Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination provisions, are set forth in more detail in the Plan; provided, however, that, to the extent that the priorities set forth in the Subordination Model conflict with the contractual subordination provisions of the Senior Subordinated Notes Indenture, CCB-1 Guarantee Agreements, CCB-2 Guarantee Agreements, Junior Subordinated Notes Indenture and/or PIERS Guarantee Agreement, the contractual subordination provisions of such Indentures and Guarantee Agreements shall govern and shall be enforced pursuant to section 510(a) of the Bankruptcy Code.

### a. *Right of Election.*

On the Ballot, each holder of an Allowed PIERS Claim shall be provided the right to elect, in its sole and absolute discretion, to receive additional Creditor Cash, Cash on account of Liquidating Trust Interests, or Reorganized Common Stock (to the extent remaining after distribution to holders of Allowed Senior Notes Claims, Allowed General Unsecured Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, and Allowed CCB-2 Guarantees Claims and subject to dilution on account of the Rights Offering), as the case may be, in lieu of some or all of the Reorganized Common Stock, Creditor Cash or Cash on account of Liquidating Trust Interests, as the case may be, that such holder otherwise is entitled to receive pursuant to the Plan, in each instance, subject to the lien or priority rights of the PIERS Trustee; provided, however, that, to the extent that there is an imbalance between the amount of Creditor Cash or Cash on account of Liquidating Trust Interests, as the case may be, and the number of Reorganized Common Stock shares elected by holders of Allowed PIERS Claims, either the Creditor Cash, Cash on account of Liquidating Trust Interests or Reorganized Common Stock shares elected shall be reduced, on a Pro Rata Share basis, to each holder to eliminate such imbalance. The ultimate recovery percentage for each holder of an Allowed PIERS Claim shall be the same, regardless of whether a holder elects to receive more or less Reorganized Common Stock. Failure by any holder of an Allowed PIERS Claim to elect to exercise rights provided in this Section V.B.16.a on or before the Ballot Date shall constitute a deemed waiver and relinquishment of such rights by such holder. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

### b. *Limitation on Recovery.*

Notwithstanding anything contained in the Plan to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed PIERS Claim in accordance with the Plan, in the event that the sum of (i) distributions of Reorganized Common Stock, Creditor Cash and Cash received on account of Liquidating Trust Interests in accordance with the Plan and (ii) redistributions of Cash received on account of Liquidating Trust Interests in accordance with the provisions of the Plan are equal to or in excess of one hundred percent (100%) of such holder's Allowed PIERS Claim and Postpetition Interest Claim, then the Cash received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached to the Plan.

### c.    *Subscription Rights*.

In addition to the foregoing, on the Effective Date, each holder of a PIERS Claim shall receive its Pro Rata Share of the PIERS Subscription Rights, to be exercised pursuant to the terms of the Rights Offering on the terms and conditions as set forth in the Plan.

The Senior Notes Indenture Trustee asserts that the right of holders of PIERS Claims to receive such PIERS Subscription Rights without the corresponding requirement to redistribute such rights to the holders of Allowed Senior Notes Claims until such Allowed Senior Notes Claims and the Postpetition Interest Claims of holders of Senior Notes Claims are paid in full does not give effect to the subordination provisions in the applicable indentures.

### 17.    **Non-Subordinated Bank Bondholder Claims (Class 17)**.

Class 17 is Impaired by the Plan. The holders of the Non-Subordinated Bank Bondholder Claims are entitled to vote to accept or reject the Plan.

Each holder of an Allowed Non-Subordinated Bank Bondholder Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed Non-Subordinated Bank Bondholder Claim, such holder's Pro Rata Share of BB Liquidating Trust Interests (which interests, in the aggregate, represent a right to receive 5.5% of WMI's share of the Homeownership Carryback Refund Amount as defined and set forth in Section 2.4 of the Global Settlement Agreement, subject to a cap of One Hundred Fifty Million Dollars ($150,000,000.00) in the aggregate).

### 18.    **Subordinated Claims (Class 18)**.

Class 18 is Impaired by the Plan. Each holder of an Allowed Subordinated Claim is entitled to vote to accept or reject the Plan.

In the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims (in each case, other than Subordinated Claims) are paid in full, the Liquidating Trust Interests shall be redistributed, and holders of Allowed Subordinated Claims shall be entitled to receive their Pro Rata Share of Liquidating Trust Interests in an aggregate amount equal to each holder's Allowed Subordinated Claim and Postpetition Interest Claim (which, for the avoidance of doubt, shall not have been finally determined to be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person, except as otherwise provided herein).

### a.    *Limitation on Recovery*.

Notwithstanding anything contained in the Plan to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed Subordinated Claim in accordance with the Plan, in the event that the sum of distributions of Cash received on account of Liquidating Trust Interests in accordance with the Plan are equal to or in excess of one hundred percent (100%) of such holder's Allowed Subordinated Claim and Postpetition Interest Claim, then the Cash received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of the Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached to the Plan.

### 19.  REIT Series (Class 19).

Class 19 is Impaired by the Plan.  Each holder of an Allowed REIT Series is entitled to vote to accept or reject the Plan.

In the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims are paid in full (including with respect to Allowed Subordinated Claims), the Liquidating Trust Interests shall be redistributed, and holders of the REIT Series shall be entitled to receive their Pro Rata Share of Liquidating Trust Interests, to be shared on a pari passu basis with holders of Preferred Equity Interests.  In addition, and separate and distinct from the distribution to be provided to holders of the REIT Series from the Debtors, pursuant to the Global Settlement Agreement and in exchange for the releases set forth in the Global Settlement Agreement and in the Plan, on the Effective Date, JPMC shall pay or transfer to the Disbursing Agent for distribution to each holder of a REIT Series such holder's Pro Rata Share of (i) Fifty Million Dollars ($50,000,000.00) Cash or (ii) at the election of JPMC, shares of common stock of JPMC having a value as of the Effective Date in the amount of Fifty Million Dollars ($50,000,000.00).

#### a.  *Cancellation of REIT Series.*

Notwithstanding this treatment pursuant to the Plan, on the Effective Date, all REIT Series shall be deemed extinguished and the certificates and all other documents representing such Equity Interests shall be deemed cancelled and of no force and effect.  For the avoidance of doubt, this section of the Plan will have no effect on, and shall not result in the extinguishment or cancellation of, the Trust Preferred Securities that are being transferred to JPMC pursuant to the Global Settlement Agreement.

### 20.  Preferred Equity Interests (Class 20).

Class 20 is Impaired by the Plan.  Each holder of an Allowed Preferred Equity Interest is entitled to vote to accept or reject the Plan.

In the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims, the Liquidating Trust Interests shall be redistributed, and holders of Preferred Equity Interests shall be entitled to receive their Pro Rata Share of Liquidating Trust Interests, to be shared on a pari passu basis with holders of the REIT Series.

#### a.  *Cancellation of Preferred Equity Interests.*

Notwithstanding this treatment pursuant to the Plan, on the Effective Date, all Preferred Equity Interests shall be deemed extinguished and the certificates and all other documents representing such Equity Interests shall be deemed cancelled and of no force and effect.

### 21.  Dime Warrants (Class 21).

Class 21 is Impaired by the Plan.  Each holder of an Allowed Dime Warrants is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have rejected the Plan.

Holders of Dime Warrants shall receive no distribution under the Plan.  On the Effective Date, all Dime Warrants shall be deemed extinguished and the certificates and all other documents representing such Equity Interests shall be deemed cancelled and of no force and effect.

## 22. Common Equity Interests (Class 22).

Class 22 is Impaired by the Plan. Each holder of an Allowed Equity Interest is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have rejected the Plan.

Holders of Common Equity Interests shall receive no distribution under the Plan. On the Effective Date, all Common Equity Interests shall be deemed extinguished and the certificates and all other documents representing such Equity Interests shall be deemed cancelled and of no force and effect.

## C. Provision For Treatment Of Disputed Claims

### 1. Objections to Claims; Prosecution of Disputed Claims.

The Liquidating Trustee shall object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims filed with the Bankruptcy Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto. All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that the Liquidating Trustee shall have the authority to file, settle, compromise or withdraw any objections to Claims or Equity Interests. Unless otherwise ordered by the Bankruptcy Court, to the extent not already objected to by the Debtors, the Liquidating Trustee shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than one hundred eighty (180) days following the Effective Date or such later date as may be approved by the Bankruptcy Court.

### 2. Estimation of Claims.

On and after the Effective Date, and unless otherwise limited by an order of the Bankruptcy Court, the Liquidating Trustee may at any time request the Bankruptcy Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to or sought to estimate such Claim, and the Bankruptcy Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; provided, however, that, if the estimate constitutes the maximum limitation on such Claim, the Liquidating Trustee may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another; provided, however, that in no event shall any such procedure increase or expand payment or performance from JPMC for any JPMC Assumed Liabilities.

### 3. Payments and Distributions on Disputed Claims.

*a.* ***Disputed Claims Holdback:*** From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the allowed amount, or allowed or disallowed by Final Order of the Bankruptcy Court, the Liquidating Trustee shall retain, for the benefit of each holder of a Disputed Claim, Creditor Cash (which the Disbursing Agent shall transfer to the Liquidating Trustee) and Liquidating Trust

Interests, and any dividends, gains or income attributable thereto, in an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Liquidating Trustee. Any Creditor Cash and Liquidating Trust Interests retained and held for the benefit of a holder of a Disputed Claim shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash or distributed in Liquidating Trust Interests in the event the Disputed Claim ultimately becomes an Allowed Claim. Such Creditor Cash and any dividends, gains or income paid on account of the Liquidating Trust Interests retained for the benefit of holders of Disputed Claims shall be retained by the Liquidating Trust for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan.

*b.*   *Allowance of Disputed Claims:*  At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Liquidating Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any earnings that have accrued on the amount of Cash so retained (net of any expenses, including any taxes relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order, but in no event more than ninety (90) days thereafter. The balance of any Cash and Liquidating Trust Interests previously retained but not distributed to a Disputed Claim holder shall be included in future calculations of Cash and Liquidating Trust Interests, respectively, to holders of Allowed Claims.

*c.*   *Tax Treatment of Retained Assets:*  The Liquidating Trustee shall treat any assets retained pursuant to the Plan as part of the Liquidating Trust Claims Reserve.

**D.**   **Liquidating Trust**

**1.**   **Execution of the Liquidating Trust Agreement.**

On or before the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement, and shall take all other necessary steps to establish the Liquidating Trust and the Liquidating Trust Interests therein, which shall be for the benefit of the Liquidating Trust Beneficiaries, as provided in the Plan, whether their Claims are Allowed on or after the Effective Date. In the event of any conflict between the terms of this Disclosure Statement, the Plan and the terms of the Liquidating Trust Agreement, the terms of the Plan shall govern. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

**2.**   **Purpose of the Liquidating Trust.**

The Liquidating Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

3.   **Liquidating Trust Assets**.

The Liquidating Trust shall consist of the Liquidating Trust Assets.  On the Effective Date, the Debtors shall transfer all of the Liquidating Trust Assets to the Liquidating Trust.  The Liquidating Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the Liquidating Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their predecessors, successors and assigns, and each other Entity released pursuant to Section 45.5 of the Plan shall be discharged and released from all liability with respect to the delivery of such distributions.  In addition, the Liquidating Trust shall assume all of WMI's rights and obligations pursuant to Section 2.4 of the Global Settlement Agreement and WMI shall have no further liability or obligations thereunder, to the extent that the transfer to the Liquidating Trust shall not impose any additional obligations or liabilities on JPMC.

4.   **Administration of the Liquidating Trust**.

The Liquidating Trust shall be administered by the Liquidating Trustee according to the Liquidating Trust Agreement and the Plan.  In the event of any inconsistency between the Plan and the Liquidating Trust Agreement, the Liquidating Trust Agreement shall govern.

5.   **The Liquidating Trustee**.

The Liquidating Trustee shall be William C. Kosturos and such additional trustee(s) as may be appointed by the Trust Advisory Board in accordance with applicable law.  In the event the Liquidating Trustee dies, is terminated, or resigns for any reason, the Trust Advisory Board shall designate a successor; provided, however, that under no circumstances shall the Liquidating Trustee be a director or officer with respect to any Entity over which the Liquidating Trust has control.

6.   **Role of the Liquidating Trustee**.

In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan, the Liquidating Trust Agreement, and the oversight of the Trust Advisory Board, the Liquidating Trustee shall, among other things, have the following rights, powers and duties, in each case subject to the Global Settlement Agreement:  (i) to hold, manage, convert to Cash, and distribute the Liquidating Trust Assets, including prosecuting and resolving the Claims belonging to the Liquidating Trust, (ii) to hold the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, (iii) in the Liquidating Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, causes of action, or litigation of the Liquidating Trust, (iv) to monitor and enforce the implementation of the Plan, (v) to file all tax and regulatory forms, returns, reports, and other documents required with respect to the Liquidating Trust, (vi) in the Liquidating Trustee's reasonable business judgment, to object to Claims, and manage, control, prosecute, and/or settle on behalf of the Liquidating Trust, objections to Claims on account of which the Liquidating Trustee (as Disbursing Agent) will be responsible (if Allowed) for making distributions under the Plan, (vii) to take all actions necessary and create any document necessary to implement the Plan, (viii) to hold, manage, and distribute Cash or non-Cash Liquidating Trust Assets obtained through the exercise of its power and authority, (ix) to act as a signatory to the Debtors for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of the Debtors' assets, and (x) to take all necessary actions and file all appropriate motions to obtain an order closing the Chapter 11 Cases.  In all circumstances, the

Liquidating Trustee shall comply with all of the Debtors' obligations under the Global Settlement Agreement and in accordance with applicable law, and otherwise shall act in the best interests of all Liquidating Trust Beneficiaries and in furtherance of the purpose of the Liquidating Trust. Under no circumstance may the Liquidating Trustee serve on the Board of Directors of any Affiliate of the Liquidating Trust.

### 7.     Liquidating Trustee's Tax Power for Debtors.

Following the Effective Date, the Liquidating Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all Tax Returns required to be filed or that the Liquidating Trustee otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds for all taxable periods ended on or before December 31, 2009.

For all taxable periods ended on or before December 31, 2009, the Liquidating Trustee shall have full and exclusive authority and responsibility in respect of all Taxes of the Debtors (including, without limitation, as the common parent or other agent of any consolidated, combined or unitary tax group of which the Debtors were the agent), to the same extent as if the Liquidating Trustee was the Debtor-in-Possession. Without limiting the foregoing, each of the Debtors shall execute, on or prior to the Effective Date, a power of attorney authorizing the Liquidating Trustee to correspond with any Authority on behalf of such Debtor and to sign, collect, negotiate, settle, and administer Tax payments and Tax Returns.

In furtherance of the transfer of the Liquidating Trust Assets to the Liquidating Trust on the Effective Date, the Liquidating Trust shall be entitled to all Tax Refunds of the Debtors (and the Liquidating Trust bears responsibility for (i) all Tax liabilities of the Debtors for taxable years ended on or before December 31, 2009, to the extent not discharged by the Plan or provided for payment in the Plan or the Global Settlement Agreement and (ii) WMI's obligations pursuant to Section 2.4 of the Global Settlement Agreement), it being understood that the Liquidating Trustee only shall have whatever rights WMI itself has pursuant to the terms of the Global Settlement Agreement and the Liquidating Trustee shall be contractually bound to all restrictions in the Global Settlement Agreement with respect to tax filings.

### 8.     Transferability of Liquidating Trust Interests.

*a.*     The Debtors shall cause the Liquidating Trust Interests to be transferable (either by book-entry or by certificate); provided, however, that, if so certificated, (i) the form of certificate, if applicable, shall carry a legend, in substance and form reasonably satisfactory to the Creditors' Committee and the Settlement Note Holders, setting forth that the interest in such certificate and the holder thereof as to such interest are governed by the terms and provisions of the Plan, and (ii) on or after February 14, 2011, if the Liquidating Trustee, with consent of the Trust Advisory Board and upon advice of counsel, determines that a class of Liquidating Trust Interests may be subject to registration pursuant to Section 12 of the Securities Exchange Act of 1934, as amended, the Liquidating Trustee shall pursue relief from such registration by obtaining either an exemptive order, a no-action letter or an interpretive letter from the Securities and Exchange Commission or its staff or, absent its ability to achieve that objective or in lieu thereof, shall register such class pursuant to Section 12 of such statute (it being understood and agreed that the Liquidating Trustee shall be authorized, among other things, to register such class and to seek relief from one or more of the requirements then applicable subsequent to such registration and to de-register such class); and provided, further, that, notwithstanding the foregoing (1) the Liquidating Trustee may disregard any transfer of certificates if sufficient necessary information (as determined by the Liquidating Trustee), including applicable tax-related information, is not provided by

such transferee to the Liquidating Trustee and (2) transfers to non-United States Entities will not be permitted unless either (a) a ruling has been obtained from the Internal Revenue Service or an opinion from the Liquidating Trustee's counsel (to the good faith satisfaction of the Liquidating Trustee) that stated interest income and any other income from tax refunds expected to be received or recognized by the Liquidating Trust are of a type and character that is eligible for exemption from U.S. withholding, or (b) the requirement in the preceding clause has been waived by the Liquidating Trustee (with the consent of the Trust Advisory Board).

### 9. Cash.

The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a Liquidating Trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

### 10. Distribution of Liquidating Trust Assets.

The Liquidating Trustee is required to distribute to the holders of Allowed Claims on account of their Liquidating Trust Interests, on a quarterly basis, all unrestricted Cash on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of the Plan), except such amounts (i) as have been reserved on account of Disputed Claims, or are otherwise part of the Liquidating Trust Claims Reserve, in accordance with the Plan, (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (iii) as are necessary to pay reasonable incurred or anticipated expenses (including, but not limited to, any Taxes imposed on or payable by the Debtors or the Liquidating Trust or in respect of the Liquidating Trust Assets), or (iv) as are necessary to satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan, the Global Settlement Agreement or the Liquidating Trust Agreement; provided, however, that the Liquidating Trustee shall not be required to make a distribution pursuant to the Plan unless and until the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is at least $25,000,000.00 or such lesser amount as the Liquidating Trustee determines would make distribution impracticable, in accordance with applicable law.

### 11. Costs and Expenses of the Liquidating Trust.

The reasonable costs and expenses of the Liquidating Trust, including the fees and expenses of the Liquidating Trustee and its retained professionals, shall be paid out of the Liquidating Trust Assets. Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Liquidating Trust.

### 12. Compensation of the Liquidating Trustee.

The individual(s) serving as or comprising the Liquidating Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles.

### 13. Retention of Professionals/Employees by the Liquidating Trustee.

The Liquidating Trustee may retain and compensate attorneys, other professionals and employees to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems

appropriate without Bankruptcy Court approval. The Liquidating Trustee may assume existing contracts and/or leases to which WMI is a party, including, without limitation, employment agreements, or may enter into new arrangements on substantially similar terms. Without limiting the foregoing, the Liquidating Trustee may retain any professional that represented parties in interest in the Chapter 11 Cases.

### 14. Federal Income Tax Treatment of the Liquidating Trust.

*a.* ***Liquidating Trust Assets Treated as Owned by Creditors.*** For all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (1) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the Liquidating Trust Beneficiaries and, to the extent Liquidating Trust Assets are allocable to Disputed Claims, to the Liquidating Trust Claims Reserve, followed by (2) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than the Liquidating Trust Assets allocable to the Liquidating Trust Claims Reserve) in exchange for Liquidating Trust Interests. Accordingly, the Liquidating Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to the Liquidating Trust Claims Reserve, discussed below). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

*b.* ***Tax Reporting.*** The Liquidating Trustee shall file Tax Returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the Plan. The Liquidating Trustee also will annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Liquidating Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidating Trust that is required by any governmental unit.

On or before the Effective Date, the Debtors shall provide the Liquidating Trustee with a good-faith valuation of the Tax Refunds as of the Effective Date. The Liquidating Trustee will then in good faith value all other Liquidating Trust Assets, and shall make all such values (including the Tax Refund values) available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trustee, and Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

Allocations of Liquidating Trust taxable income among the Liquidating Trust Beneficiaries (other than taxable income allocable to the Liquidating Trust Claims Reserve) shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Liquidating Trust Claims Reserve) to the holders of the Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately

after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for the purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall (A) timely elect to treat any Liquidating Trust Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidating Trustee, the Debtors, and the Liquidating Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

The Liquidating Trustee shall be responsible for payment, out of the Liquidating Trust Assets, of any Taxes imposed on the trust or its assets, including the Liquidating Trust Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Liquidating Trust Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such Taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trustee as a result of the resolution of such Disputed Claims.

The Liquidating Trustee may request an expedited determination of Taxes of the Liquidating Trust, including the Liquidating Trust Claims Reserve, or the Debtors under section 505(b) of the Bankruptcy Code for all Tax Returns filed for, or on behalf of, the Liquidating Trust or the Debtors for all taxable periods through the dissolution of the Liquidating Trust.

*c.* ***Tax Withholdings by Liquidating Trustee.*** The Liquidating Trustee may withhold and pay to the appropriate Taxing Authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Liquidating Trust Interests. All such amounts withheld and paid to the appropriate Taxing Authority shall be treated as amounts distributed to such holders of Liquidating Trust Interests for all purposes of the Liquidating Trust Agreement. The Liquidating Trustee shall be authorized to collect such tax information from the holders of Liquidating Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion deems necessary to effectuate the Plan, the Confirmation Order, and the Liquidating Trust Agreement. In order to receive distributions under the Plan, all holders of Liquidating Trust Interests (including, without limitation, holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, and Allowed PIERS Claims) will need to identify themselves to the Liquidating Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidating Trustee deems appropriate. This identification requirement may, in certain cases, extend to holders who hold their securities in street name. The Liquidating Trustee may refuse to make a distribution to any holder of a Liquidating Trust Interest that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a holder of a Liquidating Trust Interest, the Liquidating Trustee shall make such distribution to which the holder of the Liquidating Trust Interest is entitled, without interest; and, provided further that, if the Liquidating Trustee fails to withhold in respect of amounts received or

distributable with respect to any such holder and the Liquidating Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Liquidating Trustee for such liability.

      *d.*     ***Dissolution***. The Liquidating Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and the Liquidating Trust Agreement, (ii) the Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit, or (iii) all distributions required to be made by the Liquidating Trustee under the Plan and the Liquidating Trust Agreement have been made; provided, however, in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee and the Trust Advisory Board that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets. If at any time the Liquidating Trustee determines, in reliance upon such professionals as the Liquidating Trustee may retain, that the expense of administering the Liquidating Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidating Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) not a "private foundation," as defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtors, the Liquidating Trust, and any insider of the Liquidating Trustee, and (iii) dissolve the Liquidating Trust.

## 15.     Indemnification of Liquidating Trustee.

      The Liquidating Trustee or the individual(s) comprising the Liquidating Trustee, as the case may be, and the Liquidating Trustee's agents and professionals, shall not be liable to the Liquidating Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Liquidating Trustee, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Liquidating Trustee, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Liquidating Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Liquidating Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Liquidating Trust Interests and any other claim to or interest in such assets. The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

## 16.     Privileges and Obligation to Respond to Ongoing Investigations.

      All Privileges shall be transferred, assigned, and delivered to the Liquidation Trust, without limitation or waiver, and shall vest in the Liquidating Trustee (and any other individual the Liquidating Trustee may designate, as well as any other individual designated in the Liquidating Trust Agreement). Pursuant to Federal Rule of Evidence 502(d), no Privileges shall be waived by disclosure to the Liquidating Trustee of the Debtors' information subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure, or by disclosure among the Debtors, the Liquidating Trustee, the FDIC Receiver, and/or JPMC of information that is subject to attorney-client

privileges, work product protections, or other immunities or protections from disclosure jointly held by the Debtors, the FDIC Receiver, the Liquidating Trustee and/or JPMC. The Liquidating Trustee shall be obligated to respond, on behalf of the Debtors, to all Information Demands, including, without limitation and by way of example, any Information Demands made in connection with (a) the investigation by the United States Attorney for the Western District of Washington, (b) the action entitled "Washington Mutual, Inc. Securities, Derivative and ERISA Litigation," Case No. 2:08-md-1919, and (c) other proceedings described more specifically in the Disclosure Statement. JPMC and the FDIC Receiver shall cooperate with the Liquidating Trustee in responding to Information Demands and such cooperation shall include, for example, taking all steps necessary to maintain and avoid waiver of any and all Privileges (including, without limitation, any Privileges that are shared jointly among or between any of the parties). The Liquidating Trustee may waive Privileges in the event and to the extent he determines in good faith that doing so is in the best interests of the Liquidation Trust and its beneficiaries.

### E.  Prosecution And Extinguishment Of Claims Held By The Debtors

#### 1.  Prosecution of Claims.

Except as settled and released in the Plan, from and after the Effective Date, the Liquidating Trustee shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of the Debtors or Debtors in Possession, including, without limitation, any avoidance or recovery action under section 541, 542, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code and any other cause of action, right to payment, or claim that may be pending on the Effective Date or instituted by the Debtors or Debtors in Possession thereafter, to a Final Order, and the Liquidating Trustee may compromise and settle such claims, upon approval of the Bankruptcy Court. The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be transferred to the Liquidating Trust for distribution in accordance with the Plan and the Liquidating Trust Agreement.

### F.  Plan Provisions Governing Distributions

#### 1.  Time and Manner of Distributions.

Except as otherwise provided the Plan, distributions under the Plan shall be made to each holder of an Allowed Claim or Equity Interest as follows:

*a.  Initial Distributions of Creditor Cash:* Within ten business days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Senior Notes Claim, an Allowed Senior Subordinated Notes Claim, an Allowed General Unsecured Claim, an Allowed CCB-1 Guarantees Claim, an Allowed CCB-2 Guarantees Claim, or an Allowed PIERS Claim, such Creditor's share, if any, of Creditor Cash, as determined pursuant to the Plan. Such initial distributions of Creditor Cash will be subject to the waterfall provisions as more fully described in the Subordination Model attached to the Plan; provided, however, that, to the extent that the priorities set forth in the Subordination Model conflict with the contractual subordination provisions of the Senior Subordinated Notes Indenture, CCB-1 Guarantee Agreements, CCB-2 Guarantee Agreements, Junior Subordinated Notes Indenture and/or PIERS Guarantee Agreement, the contractual subordination provisions of such Indentures and Guarantee Agreements shall govern and shall be enforced pursuant to section 510(a) of the Bankruptcy Code.

*b.  Allocation of Liquidating Trust Interests:* Within ten business days after creation of the Liquidating Trust, the Disbursing Agent shall allocate, or cause to be allocated, to the

Liquidating Trustee on behalf of holders of Disputed Claims, and to each holder of an Allowed Senior Notes Claim, an Allowed Senior Subordinated Notes Claim, an Allowed General Unsecured Claim, an Allowed CCB-1 Guarantees Claim, an Allowed CCB-2 Guarantees Claim, an Allowed PIERS Claim, an Allowed Non-Subordinated Bank Bondholder Claim, and Postpetition Interest Claims in respect of the foregoing, such holder's share, if any, of Liquidating Trust Interests, as determined pursuant to the Plan. In addition, in the event that all Allowed Claims and Postpetition Interest Claims are paid in full, the Liquidating Trust Interests shall be redistributed to holders of Subordinated Claims and, after such Allowed Claims and Postpetition Interest Claims are paid in full, holders of the REIT Series and Preferred Equity Interests, as set forth in the Plan.

       ***c.***   ***Distribution of Cash to Holders of Certain Other Claims:*** Except as otherwise provided in the Plan, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such claim becomes an Allowed Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Administrative Expense Claim, an Allowed Priority Tax Claim (to the extent applicable), an Allowed Priority Non-Tax Claim, an Allowed WMI Vendor Claim, an Allowed Convenience Claim, or an Allowed Trustee Claim, such holder's share of Cash, as determined pursuant to the Plan.

### 2.     Timeliness of Payments.

Any payment or distribution to be made pursuant to the Plan shall be deemed to be timely made if made within ten (10) days after the date specified in the Plan. Whenever any distribution to be made under the Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

### 3.     Distributions by the Disbursing Agent.

All distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in such property.

### 4.     Manner of Payment under the Plan.

Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made, at the election of the payor, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payment shall be made to a holder of an Allowed Claim or Equity Interest until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

### 5.     Delivery of Distributions.

Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in the Plan, distributions and deliveries to holders of Allowed Claims or Equity Interests shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court, unless superseded by the address set forth on proofs of Claim or Equity Interests filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address; provided, however, that distributions for the benefit of holders of Senior Notes Claims, Senior Subordinated Notes Claims, CCB-1 Guarantees Claims, CCB-2 Guarantees Claims,

PIERS Claims, and REIT Series shall be made to the appropriate Trustee under the respective governing documents for such obligations. Each such Trustee shall, in turn, administer the distribution to the holders of Allowed Claims in accordance with the Plan and the applicable indentures. The Trustees shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. The Trustees shall only be required to make distributions in accordance with the terms of the Plan and shall have no liability for actions taken in accordance with the Plan or in reliance upon information provided to the Trustees in accordance with the Plan, except for liabilities resulting form their own gross negligence of willful misconduct.

### 6. Undeliverable Distribution.

*a.* ***Holding of Undeliverable Distributions:*** If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable. All Entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim or Equity Interest.

*b.* ***Failure to Claim Undeliverable Distributions:*** On or about the first (1st) anniversary of the Effective Date, the Disbursing Agent shall file a list with the Bankruptcy Court setting forth the names of those Entities for which distributions have been made hereunder that have been returned as undeliverable as of the date thereof. Any holder of an Allowed Claim or Equity Interest on such list that does not assert its rights pursuant to the Plan to receive a distribution within two (2) years from and after the Effective Date shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan against the Reorganized Debtors, the Liquidating Trust, or their respective property. In such case, any consideration held for distribution on account of such Claim or Equity Interest shall revert to the Disbursing Agent for redistribution to holders of Allowed Claims or Equity Interests in accordance with the terms and provisions hereof.

### 7. Withholding and Reporting Requirements.

Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or Tax Authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one hundred eighty (180) days, such distribution shall be deemed an unclaimed distribution.

8.     **Time Bar to Cash Payments**.

Checks issued by the Disbursing Agent on account of Allowed Claims or Equity Interests shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim or Equity Interest with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim or Equity Interest. After such date, all Claims and Equity Interests in respect of voided checks shall be discharged and forever barred and the Disbursing Agent shall retain all monies related thereto for the sole purpose of redistribution to holders of Allowed Claims and Equity Interests in accordance with the terms and provisions hereof.

9.     **Distributions After Effective Date**.

Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of the Plan.

10.     **Setoffs**.

The Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and causes of action of any nature that one or more of the Debtors, Debtors in Possession, or the Reorganized Debtors may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, Debtors in Possession, or the Reorganized Debtors of any such claims, rights, and causes of action that the Debtors, Debtors in Possession, or the Reorganized Debtors may possess against such holder; and, provided, further, that nothing contained in the Plan is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment.

11.     **Allocation of Plan Distributions Between Principal and Interest**.

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

12.     **Certain Trustee Fees and Expenses**.

In the event that the Debtors and the Creditors' Committee agree, in their joint and absolute discretion, as to the Trustee Claims (as defined in the Plan) incurred during the period from the Petition Date up to and including the Effective Date, such Trustee Claims shall be paid in Cash by the Disbursing Agent on the Effective Date, or as soon as practicable thereafter, but in no event more than ninety (90) days after the Effective Date, without the need for the Trustees to file an application for allowance thereof with the Bankruptcy Court: provided, however, that each member of the Creditors' Committee shall not participate in the Creditors' Committee vote regarding the reasonableness of its own

fees and expenses. In the event that either the Debtors or the Creditors' Committee disagree with a Trustee as to the reasonableness of all or a portion of the fees and expenses requested by such Trustee, such Trustee may, at its sole discretion, request that the Bankruptcy Court (i) determine the reasonableness and allowance of such contested amounts and (ii) direct the Disbursing Agent to pay such additional amounts determined to be reasonable, if any, and the Debtors, Creditors' Committee, and any other Creditor or party in interest may object thereto. With respect to any undisputed portion of such Trustee's fees and expenses, such claims shall be deemed Allowed Claims and the Debtors shall direct the Disbursing Agent to pay such undisputed fees and expenses to the Trustee on the Effective Date. To the extent that the Disbursing Agent fails to pay any Trustee Claim in full, whether as a result of the Creditors' Committee's or the Debtors' objection as to reasonableness, the Bankruptcy Court's determination as to reasonableness, or a Trustee's determination not to request payment therefor, such Trustee shall have the right to assert its Lien and priority rights pursuant to the applicable Indenture or Guarantee Agreement for payment of any unpaid amount upon any payment or other distribution to be made in accordance with the provisions contained in the Plan. Notwithstanding the foregoing, the Disbursing Agent shall be responsible and, upon presentation of supporting documentation in form and substance satisfactory to the Disbursing Agent, satisfy the reasonable direct out-of-pocket costs and expenses incurred by the Trustees in connection with making distributions pursuant to the Plan; provided, however, that, under no circumstance shall the Disbursing Agent shall be responsible for any indemnification obligation, cost, or expense of any of the Trustees associated with the gross negligence or willful misconduct of a Trustee in making any such distribution.

### 13. Record Date.

On the Record Date (i.e., May 19, 2010), registers of the respective Trustees shall be closed and the Trustees shall have no obligation to recognize, and shall not recognize any transfers of Claims arising under or related to the Indentures or the Guarantee Agreements occurring from and after the Record Date.

### G. Means Of Implementation Of The Plan

#### 1. Incorporation and Enforcement of the Global Settlement Agreement.

The Plan incorporates by reference the terms of the Global Settlement Agreement including, without limitation, (i) the Debtors' agreement to sell, free and clear of all claims, rights, interests, and liens, certain of the Plan Contribution Assets to the JPMC Entities, (ii) JPMC's obligations to pay certain consideration for such sale, including, without limitation, JPMC's agreement to pay or fund the payment of the JPMC Assumed Liabilities, and certain other Claims, and to waive certain of its Claims against the Debtors, (iii) JPMC's obligation to transfer certain of the Plan Contribution Assets to the Debtors, (iv) the FDIC Receiver's transfer of any interest it or the Receivership might have in any Plan Contribution Assets, and (v) the agreement among the parties to resolve certain pending Claims and litigation, including the Related Actions, pursuant to the terms of the Global Settlement Agreement and the Plan.

#### 2. Intercompany Claims.

Intercompany Claims will be extinguished, unless otherwise agreed or resolved between the parties to a given Intercompany Claim. Any such transaction may be effected without any further action by the stockholders of any of the Debtors or the Debtors in Possession.

### 3. Merger/Dissolution/Consolidation.

On or as of the Effective Date or as soon as practicable thereafter, and without the need for any further action, the Reorganized Debtors may, in their sole and absolute discretion, (i) cause either or both of the Reorganized Debtors to be merged, dissolved, or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, or (iii) engage in any other transaction in furtherance of the Plan.

### 4. Cancellation of Existing Securities and Agreements.

Except as provided in the Plan, on the latest to occur of (i) the Effective Date, (ii) the entry of a Final Order resolving all Claims in the Chapter 11 Cases, and (iii) the final distribution made to holders of Allowed Claims in accordance with the Plan, any document, agreement, or instrument evidencing any Claim or Equity Interest shall be deemed automatically cancelled and terminated without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests shall be discharged; provided, however, that the Indentures and Guarantee Agreements shall continue in effect for the purposes of (i) allowing the Trustees to make distributions pursuant to the Plan and to perform such other necessary functions with respect thereto and (ii) permitting the Trustees to maintain and assert any right or Lien for reasonable fees, costs, expenses and indemnities under the Indentures and Guarantee Agreements and (iii) effectuating the applicable subordination provisions of such documents, (iv) enabling the noteholders to receive distributions and (v) enabling the Trustees to make applications in accordance with the Plan; and, provided, further, that, except as otherwise provided in the Plan, nothing in the Plan shall impair, affect, or adversely affect the related transactions and the rights of the parties thereto. Notwithstanding any of the foregoing, nothing contained herein shall be deemed to impair, waive or extinguish any rights of the Trustees with respect to any rights contained in the respective Indentures or Guarantee Agreements; provided, however, that upon payment in full of the respective Trustee Claims (as defined in the Plan) in accordance with the Plan, the rights of the Trustees to seek payment from or assert claims against the Debtors for amounts owed under the respective Indentures or Guarantee Agreements shall be discharged as provided in the Plan.

### 5. Claims of Subordination.

Except as specifically provided in the Plan, to the fullest extent permitted by applicable law, on the latest to occur of (i) the Effective Date, (ii) the entry of a Final Order resolving all Claims in the Chapter 11 Cases, and (iii) the final distribution made to holders of Allowed Claims in accordance with the Plan, all Claims and Equity Interests, and all rights and claims between or among holders of Claims and Equity Interests relating in any manner whatsoever to Claims or Equity Interests, based upon any contractual, equitable or legal subordination rights, will be terminated and discharged in the manner provided in the Plan, and all such Claims, Equity Interests and rights so based, and all such contractual, equitable and legal subordination rights to which any Entity may be entitled will be irrevocably waived. To the fullest extent permitted by applicable law, the rights afforded and the distributions that are made in respect of any Claims or Equity Interests under the Plan will not be subject to levy, garnishment, attachment or like legal process by any holder of a Claim or Equity Interest by reason of any contractual, equitable or legal subordination rights, so that, notwithstanding any such contractual, equitable or legal subordination rights, each holder of a Claim or Equity Interest shall have and receive the benefit of the rights and distributions set forth in the Plan.

### 6. Surrender of Instruments.

Except to the extent evidenced by electronic entry, as a condition of receiving any distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note to the appropriate Trustee or the Disbursing Agent or its designee. Any holder of such instrument or note that fails to (i) surrender such instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the appropriate Trustee or the Disbursing Agent before the first (1st) anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Plan. Any distribution so forfeited shall become the property of the Disbursing Agent for distribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

### 7. Issuance of Reorganized Common Stock and Additional Common Stock.

The issuance by Reorganized WMI of the Reorganized Common Stock and Additional Common Stock on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Equity Interests.

### 8. Exemption from Securities Laws.

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, except with respect to the Additional Common Stock purchased pursuant to the Backstop Commitment Agreement (which agreement the Debtors propose to file with the Plan Supplement), the issuance under the Plan of the Reorganized Common Stock, the Additional Common Stock, and the Subscription Rights will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

### 9. Hart-Scott-Rodino Compliance.

Any shares of Reorganized Common Stock or Additional Common Stock to be distributed under the Plan to any Entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity shall have expired or been terminated.

### 10. Fractional Stock or Other Distributions.

Notwithstanding anything to the contrary contained in the Plan, no fractional shares of Reorganized Common Stock or Additional Common Stock shall be distributed, and no Cash payments of fractions of cents will be made. Fractional dollars shall be rounded down to the nearest whole dollar. Fractional shares of stock shall be rounded down to the nearest whole unit. No Cash will be paid in lieu of such fractional shares of stock or dollars.

### H. Rights Offering

### 1. Issuance of Subscription Rights.

Pursuant to the Plan, each holder of an Allowed PIERS Claim shall receive certain Subscription Rights (as set forth therein). The Subscription Rights shall entitle such holder to purchase its Pro Rata Share of Additional Common Stock provided such holder (except as otherwise permitted in the Backstop Commitment Agreement) possesses the right to purchase Additional Common Stock for an aggregate Subscription Purchase Price of at least 5% of the Aggregate Offering Price (as defined below).

The Additional Common Stock shall be issued on the Effective Date or as soon thereafter as is practicable. Each eligible holder of Subscription Rights shall have the right, but not the obligation, to participate in the Rights Offering as provided in the Plan, and shall be entitled to exercise all or any portion of such eligible holder's Subscription Rights in order to acquire Additional Common Stock. Pursuant to the Rights Offering, a minimum aggregate number of shares of Additional Common Stock having a value of Fifty Million Dollars ($50,000,000.00) shall be available for purchase by all holders of Subscription Rights; provided, however, that such number of shares may be increased in accordance with the Backstop Commitment Agreement, with such increased amount to be fixed and disclosed by the Debtors by written notice prior to the hearing on the Disclosure Statement (the "Aggregate Offering Price").

### 2. Subscription Period.

The Rights Offering shall commence on the date Ballots and Subscription Forms are mailed to holders of Allowed PIERS Claims. On or prior to the Subscription Expiration Date, each bank, broker, or other voting nominee of each holder of Subscription Rights (each, a "Voting Nominee"),[13] on behalf of each respective holder of Subscription Rights intending to participate in the Rights Offering, must affirmatively communicate to the Rights Offering Agent such holder's election to exercise Subscription Rights. Unexercised Subscription Rights shall be treated as acquired by the Backstop Purchasers, and any exercise of such Subscription Rights by any Entity other than the Backstop Purchasers shall be null and void, and the Debtors shall not be obligated to honor any such purported exercise received by the Rights Offering Agent after the Rights Offering Expiration Date, regardless of when the documents relating to such exercise were sent or to whom.

### 3. Subscription Purchase Price.

Each Voting Nominee, on behalf of each respective holder of Subscription Rights intending to participate in the Rights Offering, shall be required to pay, by no later than one (1) business day after the Subscription Expiration Date, the Subscription Purchase Price for each share of Additional Common Stock elected by such holder, in accordance with the Plan.

### 4. Value of Subscription Rights.

By order dated May 5, 2010, the Debtors retained Blackstone as their financial advisor with respect to, among other things, the estimated value of the Subscription Rights. The Debtors have not yet disclosed the material terms of the Rights Offering. Upon disclosure of such terms, Blackstone will provide a valuation of the Subscription Rights.

### 5. Exercise of Subscription Rights.

In order to exercise Subscription Rights, each holder thereof must (i) be a holder of an Allowed PIERS Claim as of the Record Date, (ii) possess the right to purchase Additional Common Stock for an aggregate Subscription Purchase Price of at least 5% of the Aggregate Offering Price, (iii) make the election to exercise such rights on the Subscription Form, in a specified amount, (iv) return such Subscription Form to such holder's Voting Nominee for electronic transmission to the Rights Offering Agent, so that such information is actually received by the Rights Offering Agent on or before the Rights Offering Expiration Date, and (v) pay to the Voting Nominee an amount equal to the Subscription

---

[13] The indenture trustees, in their capacities as such, will not be Voting Nominees.

Purchase Price multiplied by the number of shares of Additional Common Stock such holder is electing to purchase, so that the Voting Nominee can forward such funds to the Debtors, so that the funds are received by the Debtors no later than one (1) business day after the Subscription Expiration Date. If the Rights Offering Agent and/or the Debtors for any reason do not timely receive from a Voting Nominee, on behalf of a given holder of Subscription Rights (i) information regarding such holder's election to exercise its Subscription Rights and (ii) immediately available funds as set forth above, such holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering. The payments made in accordance with the Rights Offering shall be deposited and held by the Debtors in the Rights Offering Trust Account. The Rights Offering Trust Account will be a segregated account, maintained by the Debtors exclusively for the purpose of administration of the Rights Offering until the Effective Date or such other later date, at the option of the Reorganized Debtors. The Debtors shall not use such funds for any other purpose and shall not encumber or permit such funds to be encumbered with any Lien or similar encumbrance.

### 6. General Procedures Governing Exercise of Subscription Rights.

Each holder of Subscription Rights as of the Record Date may exercise all or any portion of such holder's Subscription Rights pursuant to the Subscription Form; provided, however, that such holder (except as otherwise permitted in the Backstop Commitment Agreement) must be eligible to purchase and must subscribe for shares of Additional Common Stock having an aggregate Subscription Purchase Price of at least the minimum amount prescribed in the Backstop Commitment Agreement. The valid exercise of Subscription Rights shall be irrevocable. In order to facilitate the exercise of the Subscription Rights, on the Petition Date of the Rights Offering, the Debtors will mail a Subscription Form to each holder of Subscription Rights as of the Record Date, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Form, as the case may be, as well as instructions for payment. The Debtors may adopt such additional detailed procedures consistent with the provisions of the Plan to more efficiently administer the exercise of the Subscription Rights.

### 7. Undersubscription/Backstop of the Rights Offering.

Subject to the terms and conditions of the Backstop Commitment Agreement, any shares of Additional Common Stock not purchased by holders of Subscription Rights pursuant to the Rights Offering may be purchased by the Backstop Purchasers at the Subscription Purchase Price. To the extent applicable, and as set forth in the Backstop Commitment Agreement, the Debtors shall notify the Backstop Purchasers of the number of shares of Additional Common Stock not purchased pursuant to the Rights Offering. Pursuant to the terms and subject to the conditions of the Backstop Commitment Agreement, if they are so committed, the Backstop Purchasers shall pay to the Debtors, by wire transfer of immediately available funds, prior to the Effective Date, or shall direct the Disbursing Agent to deduct from such Entities' initial distribution of Creditor Cash, Cash in an amount equal to the Subscription Purchase Price multiplied by the number of shares of Additional Common Stock not purchased. The Debtors shall deposit such payment into the Rights Offering Trust Account. The Backstop Purchasers shall not be entitled to purchase the Additional Common Stock at a discount, nor shall the Backstop Purchasers be entitled to any fee in connection with their commitments and obligations set forth in the Backstop Commitment Agreement.

## 8. Distribution of the Additional Common Stock.

On the Effective Date, or as soon as reasonably practicable thereafter, the Rights Offering Agent shall facilitate the distribution of the Additional Common Stock purchased pursuant to the Rights Offering.

## 9. No Interest.

No interest shall be paid to Entities exercising Subscription Rights on account of amounts paid in connection with such exercise.

## 10. Disputes/Defects Regarding Exercise of Subscription Rights.

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights shall be determined by the Debtors, whose good-faith determinations shall be final and binding. The Debtors, in their reasonable discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Elections on Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their reasonable discretion. The Debtors will use commercially reasonable efforts to give notice to any Voting Nominee or holder of Subscription Rights regarding any defect or irregularity in connection with any purported exercise of Subscription Rights, and may permit such defect or irregularity to be cured within such time as the Debtors may determine in good faith to be appropriate; provided, however, that neither the Debtors nor the Disbursing Agent nor the Rights Offering Agent shall incur any liability for failure to give such notification.

## 11. Return of Unused Funds.

To the extent that any portion of the amount paid to the Rights Offering Agent by a Voting Nominee on behalf of a holder of Subscription Rights on account of the Rights Offering is not used to purchase Additional Common Stock, the Debtors or the Reorganized Debtors, as the case may be, will return such ratable portion to the Voting Nominee on behalf of the applicable holder within ten (10) business days of a determination that such funds will not be used. In addition, if the Rights Offering is cancelled or otherwise has not been consummated by the Rights Offering Expiration Date, the Debtors or the Reorganized Debtors, as the case may be, will return any payments made pursuant to the Rights Offering to the Voting Nominee on behalf of each applicable holder of Subscription Rights within ten (10) business days thereafter.

## 12. Creditors' Committee And Equity Committee.

*a.* ***Dissolution of the Creditors' Committee:*** On the first (1st) Business Day thirty (30) days following the Effective Date, and provided that payments to holders of Unsecured Claims have been made in accordance with the Plan, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith; provided, however, that the Creditors' Committee may, at its own discretion, continue or resume its duties arising from or relating to (i) any pending litigation or contested matter to which the

Creditors' Committee is a party, (ii) any appeal filed regarding confirmation of the Plan, (iii) obligations arising under confidentiality agreements, joint interest agreements, and protective orders, if any, entered during the Chapter 11 Cases that remain in full force and effect according to their terms, (iv) applications for fees and expenses of members of the Creditors' Committee and requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases, and (v) motions, appeals or other litigation seeking the enforcement of the provisions of the Plan and the transactions contemplated hereunder or in the Confirmation Order; and provided further that the Debtors or the Reorganized Debtors, as the case may be, shall continue to compensate the Creditors' Committee's attorneys, financial advisors, and other agents, if any, for any of the post-Effective Date activities identified in the Plan.

       **b.** ***Dissolution of the Equity Committee:*** On the first (1st) Business Day following the Effective Date, the Equity Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Equity Committee's attorneys, financial advisors, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

    **I.**    **Executory Contracts And Unexpired Leases**

       **1.**    **Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases**.

       Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all prepetition executory contracts and unexpired leases that exist between one or both of the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that (i) has been assumed and assigned or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, or (ii) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement including, without any limitation, any executory contract or unexpired lease sold, accepted, or transferred to one of the JPMC Entities, pursuant to the terms of the Global Settlement Agreement; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend such schedules to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date. The Debtors shall serve notice of any executory contract and unexpired lease to be rejected or assumed or assumed and assigned through the operation of the Plan by including schedules of such contracts and leases in the Plan Supplement. To the extent there are any amendments to such schedules, the Debtors shall provide notice of any such amendments to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on the schedules to the Plan Supplement shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

       **2.**    **Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases**.

       Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection, assumption, or

assumption and assignment, as the case may be, of executory contracts and unexpired leases pursuant to the Plan or the Global Settlement Agreement.

### 3. Inclusiveness.

Unless otherwise specified on the schedules to the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

### 4. Cure of Defaults.

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease to be assumed or assumed and assigned pursuant to the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts or unexpired leases to be assumed pursuant to the Plan, a notice, which shall list the cure amount as to each executory contract or unexpired lease to be assumed or assumed and assigned. The parties to such executory contracts or unexpired leases will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtors. If there are any objections filed, the Bankruptcy Court shall hold a hearing on a date to be set by the Bankruptcy Court. Notwithstanding otherwise in the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

### 5. Rejection Damage Claims.

If the rejection of an executory contract or unexpired lease by the Debtors hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtors and the Liquidating Trust, unless a proof of Claim is filed with the Bankruptcy Court and served upon attorneys for the Debtors or the Liquidating Trustee, as the case may be, on or before thirty (30) days after the latest to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease.

### 6. Indemnification and Reimbursement Obligations.

For purposes of the Plan, (i) the obligations of the Debtors to indemnify and reimburse their directors or officers, except to the extent set forth on Exhibit BB to the Global Settlement Agreement, that were directors or officers, respectively, on or prior to the Petition Date and (ii) indemnification obligations of the Debtors arising from services as officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.

7. **Termination of Benefit Plans.**

Notwithstanding anything contained in the Plan to the contrary, the Debtors shall be authorized, but not required, to terminate all Benefit Plans, in accordance with the terms and provisions of the documents and instruments relating thereto and applicable law, at such time as determined by the Debtors in their sole discretion; provided, however, that, until the transfer or termination of any Benefit Plan, the Debtors and the Reorganized Debtors, as the case may be, shall (a) continue to perform any and all of their administrative obligations thereunder and (b) with respect to Benefit Plans subject to Title IV of ERISA, continue to make any required minimum funding contributions and pay applicable Pension Benefit Guaranty Corporation insurance premiums; and, provided, further, that, upon termination thereof, the Debtors or the Reorganized Debtors, as the case may be, shall provide administrative services in connection with the operation and wind down of the Benefit Plans; and, provided, further, that the continuation of any Benefit Plan by the Debtors or the Reorganized Debtors, as the case may be, from and after the Confirmation Date, including, without limitation, the provision of administrative services in connection with the operation and wind down of such Benefit Plan, shall not constitute an assumption of such Benefit Plans in accordance with section 365 of the Bankruptcy Code; and, provided, further, that the failure to perform any obligation under the Benefit Plans or to provide administrative services in connection with the wind down of the Benefit Plans shall be without prejudice to (i) any Entity to assert such failure gives rise to an Administrative Expense Claim and (ii) the Debtors or the Liquidating Trustee to contest the assertion thereof. For the avoidance of doubt, the foregoing shall not apply to any employee benefit or welfare plan to be maintained by the Reorganized Debtors or the Liquidating Trustee, as the case may be, in the ordinary course of business after the Effective Date for the benefit of employees actively employed by the Reorganized Debtors or the Liquidating Trustee.

8. **Termination of Vendor Stipulation.**

On the Effective Date, that certain Stipulation By and Between Debtors and JPMorgan Chase Bank, N.A. Concerning Certain Contracts, dated October 16, 2008, shall be terminated and deemed of no further force and effect, except as specifically provided in Section 2.14 of the Global Settlement Agreement.

J. **Rights and Powers of Disbursing Agent**

1. **Exculpation.**

From and after the Effective Date, the Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and Equity Interests and other parties in interest, from any and all claims, causes of action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent. No holder of a Claim or an Equity Interest or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

2. **Powers of the Disbursing Agent.**

Except as may be provided otherwise hereunder, the Disbursing Agent shall be empowered to (i) take all steps and execute all instruments and documents necessary to effectuate the Plan, (ii) make distributions contemplated by the Plan, (iii) comply with the Plan and the obligations

thereunder, and (iv) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 3. Fees and Expenses Incurred From and After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further order of the Bankruptcy Court.

### K. Conditions Precedent to Effective Date of the Plan

#### 1. Conditions Precedent to Confirmation of the Plan.

Confirmation of the Plan is subject to satisfaction of the following conditions precedent:

***a.   Required Orders:*** The Clerk of the Bankruptcy Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order, and the Confirmation Order):

(i)      approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)      authorizing the solicitation of votes with respect to the Plan;

(iii)      determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(iv)      confirming and giving effect to the terms and provisions of the Plan, including the releases in the Plan;

(v)      approving the Global Settlement Agreement in accordance with their terms including, but not limited to the releases of the Released Parties;

(vi)      determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan;

(vii)      approving the documents in the Plan Supplement;

(viii)      authorizing the Debtors to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan, the documents in the Plan Supplement, and the Global Settlement Agreement;

(ix)      determining that the compromises and settlements set forth in the Global Settlement Agreement and the Plan are appropriate, reasonable and approved; and

(x)     ordering the sale of the Plan Contribution Assets to be sold to the JPMC Entities or the Debtors, as applicable, pursuant to the Global Settlement Agreement free and clear of all rights, claims, interests and liens, and finding that the parties acquired such assets in good faith under the meaning of, and subject to the protections of, section 363(m) and pursuant to section 1123(a)(5) of the Bankruptcy Code.

***b.     Form of Orders:*** The Confirmation Order and the Plan each is in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate and the Settlement Note Holders.

***c.     Confirmation Order:*** The Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the Plan and the Global Settlement Agreement satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, and (ii) the releases and injunctions set forth in the Plan.

**2.     Waiver of Conditions Precedent to Confirmation.**

To the extent practicable and legally permissible, each of the conditions precedent in the Plan may be waived, in whole or in part, by the Debtors, subject to the approval of the Creditors' Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate and the Settlement Note Holders. Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Bankruptcy Court executed by the Debtors, the Creditors' Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate and the Settlement Note Holders.

**L.     Conditions Precedent to Effective Date of the Plan**

**1.     Conditions Precedent to Effective Date of the Plan.**

The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

***a.     Satisfaction of Certain Global Settlement Agreement Conditions:*** The satisfaction of the "Conditions to Effective Date" set forth in Sections 7.2(a), (b), (c) and (e) of the Global Settlement Agreement.

***b.     Entry of the Confirmation Order:*** The clerk of the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate, and the Settlement Note Holders in accordance with section 1129 of the Bankruptcy Code, and the Confirmation Order shall have become a Final Order.

***c.     Execution of Documents; Other Actions:*** All other actions and documents necessary to implement the Plan shall have been effected or executed.

**2.     Waiver of Conditions Precedent.**

To the extent practicable and legally permissible, each of the conditions precedent to the effectiveness of the Plan may be waived, in whole or in part, by the Debtors, subject to the approval of the Creditors' Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate and the Settlement Note Holders. Any such waiver of a condition precedent may be effected at any time by filing a notice thereof

with the Bankruptcy Court executed by the Debtors, the Creditors' Committee, the JPMC Entities, the Settlement Note Holders, the FDIC Receiver, FDIC Corporate and the Settlement Note Holders.

**M.** **Retention of Jurisdiction:**

The Bankruptcy Court shall retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Plan, or that relates to the following:

**1.** to resolve any matter related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claim arising therefrom, including those matters related to the amendment after the Effective Date of the Plan to add any executory contract or unexpired lease to the list of executory contracts and unexpired leases to be rejected;

**2.** to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, including, without limitation, the Global Settlement Agreement unless any such agreements or documents contain express enforcement and dispute resolution provisions to the contrary, in which case, such provisions shall govern;

**3.** to determine any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Debtors, the Reorganized Debtors, or the Liquidating Trustee prior to or after the Effective Date;

**4.** to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

**5.** to hear and determine any timely objection to any Claim or Equity Interest, whether such objection is filed before or after the Confirmation Date, including any objection to the classification of any Claim or Equity Interest, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or secured or unsecured status of any Claim or Equity Interest, in whole or in part;

**6.** to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

**7.** to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

**8.** to consider any modification of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

**9.** to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

**10.** to hear and determine disputes arising in connection with or relating to the Plan or the Global Settlement Agreement or the interpretation, implementation, or enforcement of the Plan or

the Global Settlement Agreement or the extent of any Entity's obligations incurred in connection with or released under the Plan or the Global Settlement Agreement unless such agreements or documents contain express enforcement or dispute resolution provisions to the contrary in which case such provisions should govern;

      **11.**    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan or the Global Settlement Agreement;

      **12.**    to determine any other matter that may arise in connection with or that is related to the Plan, the Disclosure Statement, the Confirmation Order, the Global Settlement Agreement or any contract, instrument, release, or other agreement or document created in connection therewith, unless such agreements or documents contain express enforcement or dispute resolution provisions, in which case, such provisions should govern;

      **13.**    to hear and determine matters concerning state, local, and federal Taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, any matter relating to the Tax Refunds, and any request by the Debtors or by the Liquidating Trustee, as applicable, for an expedited determination of Tax under section 505(b) of the Bankruptcy Code with respect to the Debtors, the Liquidating Trust, or the Liquidating Trust Claims Reserve, as applicable);

      **14.**    to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

      **15.**    to enter a final decree closing the Chapter 11 Cases;

provided, however, that the foregoing is not intended to (i) expand the Bankruptcy Court's jurisdiction beyond that allowed by applicable law, (ii) grant the Bankruptcy Court jurisdiction over disputes between JPMC and the FDIC Receiver and/or FDIC Corporate under the Purchase and Assumption Agreement, (iii) impair the rights of an Entity to (a) invoke the jurisdiction of a court, commission, or tribunal with respect to matters relating to a governmental unit's police and regulatory powers and (b) contest the invocation of any such jurisdiction; and provided, further, that the invocation of such jurisdiction, if granted, shall not extend to the allowance or priority of Claims or the enforcement of any money judgment against the Debtors, the Reorganized Debtors, or the Liquidating Trust, as the case may be, entered by such court, commission, or tribunal, and (iv) impair the rights of an Entity to (a) seek the withdrawal of the reference in accordance with 28 U.S.C. § 157(d) and (b) contest any request for the withdrawal of reference in accordance with 28 U.S.C. § 157(d).

### N.    **Modification, Revocation, or Withdrawal of the Plan**

    **1.**    **Modification of Plan**.

      The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules in the event any amendment or modification would materially adversely affect the substance of the economic provisions set forth in the Plan or the Global Settlement Agreement to amend or modify the Plan, the Plan Supplement, or any exhibit to the Plan at any time prior to the entry of the Confirmation Order, subject in each case to the consent of the Creditors' Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate and the Settlement Note Holders; provided, however, that, for the avoidance of doubt, it is understood and agreed that any change to the definition of JPMC Assumed Liabilities or to the releases set forth in the Plan, or to the assets or benefits to be received by JPMC

pursuant to the Global Settlement Agreement would be material to the JPMC Entities. Upon entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, subject in each case to the terms of the Global Settlement Agreement. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

### 2. Revocation or Withdrawal.

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any claim by the Debtors or any other Entity, or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceeding involving the Debtors.

### 3. Amendment of Plan Documents.

From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, Exhibit to the Plan Supplement, or Exhibit to the Plan and their respective attachments, as the case may be.

### 4. No Admission of Liability.

*a.* The submission of the Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in the Plan.

*b.* None of the Plan (including, without limitation, the Exhibits thereto), or any settlement entered, act performed or document executed in connection with the Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against the Reorganized Debtors, the Debtors, or any other Person or Entity with respect to the validity of any Claim; or (iv) is or may be deemed to be used as an admission or evidence of the jurisdiction of any court to adjudicate claims or matters relating to the Receivership. None of the Plan or any settlement entered, act performed or document executed in connection with the Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of the Plan, and except that, once confirmed, any Entity may file the Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.