UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| WASHINGTON MUTUAL, INC., et al. | ) | |
| | ) | Case No. 08-12229 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | Objection Deadline: May 28, 2010 at 4:00 p.m. |
| | ) | Hearing Date: June 3, 2010 at 10:30 a.m. |
| | ) | Related to Docket No. 3568 |

## WMB NOTEHOLDER GROUP'S (I) OBJECTION TO DISCLOSURE STATEMENT AND, IF REQUIRED, (II) MOTION FOR ALLOWANCE OF CLAIMS FOR VOTING PURPOSES PURSUANT TO BANKRUPTCY RULE 3018(a)

Certain holders of senior and subordinated notes (the "**WMB Noteholder Group**" or the "**Group**") issued by Washington Mutual Bank ("**WMB**") hereby object (the "**Objection**") to the Motion of Debtors for an Order, Pursuant to Sections 105, 502, 1125, 1126 and 1128 of the Bankruptcy Code and Bankruptcy Rules 2002, 3003, 3017, 3018 and 3020, (I) Approving the Proposed Disclosure Statement and the Form and Manner of the Notice of the Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling a Confirmation Hearing, and (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Joint Plan (the "**DS Motion**" and the "**DS**").[1]

### LIMITED PURPOSE OF THIS OBJECTION

1. Needless to say, the WMB Noteholder Group is not happy with either the Plan or the so-called Global Settlement Agreement (the "**GSA**"), and the Group notes with approval the comprehensive objection to the DS that the "Bank Bondholders" are filing contemporaneously herewith. The purpose of this Objection, however, is narrow. Simply stated, the Group does not understand Class 17 of the Plan. Even if the Court ultimately decides to confirm the Plan in its

---

[1] All defined terms not otherwise defined herein shall have the meaning set forth in the Plan and DS.

present form, a number of inconsistencies and ambiguities in the DS concerning Class 17 need to be resolved, or at least explained, so that the WMB Noteholder Group members who are included in Class 17 will have adequate information enabling them to make an informed decision as to whether to accept or reject the Plan.

## THE FDIC'S ABNEGATION OF ITS DUTIES

2. Before stating the Group's grounds for objecting to the DS itself, however, it is worth noting that the one abundantly clear aspect of the DS is the FDIC's self-serving and indefensible abnegation of its statutory and common law duties as the receiver of the WMB estate. It could not be clearer that the FDIC's sole focus in entering into the GSA is to use the sweeping powers of this Court in an attempt to obtain litigation releases for the mess that the FDIC created in the first place. The FDIC itself acknowledged this motivation in its press release announcing its approval of the GSA: "The FDIC is a participant in the global settlement because of claims and counterclaims involving the [FDIC] resulting from its role as receiver." FDIC press release May 21, 2010, available at http://www.fdic.gov/news/news/press/2010/pr10119.html.

3. As but one example, each major party to the GSA, including the FDIC itself, readily acknowledges that both the Initial Tax Refund and the Additional Tax Refund were generated by WMB and its subsidiaries, not by WMI. *See, e.g.*, DS at § I.B.2.a. ("The FDIC Receiver and JPMC assert that all or substantially all of the Tax Refunds are attributed to WMB or its subsidiaries . . . .") & DS at § IX.A ("Substantially all of the NOL carryforwards incurred through the end of 2008 are attributable to the operations of WMB and its former subsidiaries or the sale of certain assets to JPMC in connection with the Bank Receivership"); *see also* JPMorgan Chase & Co., Form 8-K May 26, 2010, available at

http://investor.shareholder.com/jpmorganchase/secfiling.cfm?filingID=19617-10-253 (referring to "tax refunds arising from overpayments attributable to operations of Washington Mutual Bank and its subsidiaries"). Logically, therefore, the approximately $5.5 billion in aggregate tax refunds belong to the WMB Receivership estate, either directly or via the tax sharing agreement between WMB and WMI. Yet, the FDIC has agreed in the GSA that of the $5.5 billion, $2.365 billion will be allocated to WMI and $2.16 billion to JPMC, leaving less than $1 billion to the rightful owners of the entire $5.5 billion.

4. This allocation of the tax refunds is not only a blatant violation of the FDIC's duties as receiver, but also a rejection of the basic principles of providing financing to an operating company versus a holding company. Only the FDIC could agree to a result that provides a far greater recovery to bondholders of a bank holding company than to bondholders of the operating bank.

5. **The FDIC's message to the international investment community is clear: Invest in bank operating companies only at your peril. And the FDIC's message to FDIC-regulated banks is equally clear: Your cost of capital in the future is going to be substantially higher because our conduct as the receiver of WMB makes it clear that providing capital to a bank is far riskier that what the market previously believed.**

## SUMMARY OF OBJECTION

6. The WMB Noteholder Group's Objection relates solely to those provisions of the DS addressing the treatment of the Group's Proof of Claim and whether or not the Group is permitted to vote on the Plan. First, the DS does not clearly classify the Proof of Claim as a Non-Subordinated Bank Bondholder Claim or a Subordinated Bank Bondholder Claim. Second, the DS and related documents are not clear as to whether the Proof of Claim is being treated as a

direct or derivative claim. As more particularly set forth below, this is an important distinction because such classification governs the voting and distribution mechanics, as well as whether or not the proposed contractual or statutory subordination is appropriate. Third, the DS is not clear as to exactly which claims, measured at which time, are to be included in Class 17 of the Plan. Fourth, the DS conflicts with the Proposed DS Order filed on April 23, 2010 as to whether the WMB Noteholder Group POC Participants will be permitted to vote on the Plan. As of the date hereof, the Debtors have not filed a revised Proposed DS Order to reflect the changes in the Second Amended DS.

7. In the event that the Court determines that the previously filed Proposed DS Order (or an updated version thereof) governs the WMB Noteholder Group's ability to vote on the Plan, the WMB Noteholder Group respectfully requests that the Court treat this Objection as a motion for allowance of the Proof of Claim for voting purposes pursuant to Bankruptcy Rule 3018.

## BACKGROUND

8. On March 27, 2009, certain members of the WMB Noteholder Group (the "**WMB Noteholder Group POC Participants**") each timely filed Proof of Claim number 2480 (the "**Proof of Claim**" and the various claims asserted therein, the "**Claims**")[2] against the Debtors.

9. On February 5, 2010, the Debtors filed their Corrected Twentieth (20th) Omnibus (Substantive) Objection to Claims (Dkt. No. 2326) (the "**Claims Objection**") seeking an order immediately disallowing and expunging the Proof of Claim (as well as the proofs of claim filed by the participants in the "Bank Bondholders" group).

10. The Debtors objected to the Proof of Claim on multiple grounds, including that the WMB Noteholder Group POC Participants lacked standing to assert the Claims given that the

---

[2] Count VII of the Proof of Claim is now being handled by Grant & Eisenhofer and Drinker Biddle on behalf of a subset of WMB Noteholder Group POC Participants.

FDIC was the appropriate party to assert "virtually" all of the Claims. In a footnote, however, the Debtors admitted that the fraudulent transfer count could not be a derivative claim, and, therefore, must be a direct claim. *See* Claims Objection at 13 n.10 ("[t]he FDIC does not have standing to assert the fraudulent transfer claims asserted by the [WMB] Bondholders").

11. On April 6, 2010, this Court held a hearing (the "**Claims Hearing**") regarding the legal issues raised in the Claims Objection. At the Claims Hearing, although the Bankruptcy Court recognized that many of the asserted claims mirrored claims that the FDIC as Receiver was entitled to pursue, the Court denied the Claims Objection, thus preserving and permitting the continued pursuit of each of the Claims. Preliminary Transcript from April 6, 2010 Omnibus Hearing (Dkt. No. 3108) [hereinafter "**April 6 Tr.**"] at 130:19-131:2. The Court also ordered the parties to establish a proposed discovery schedule on the direct claims (including the fraudulent transfer claims). April 6 Tr. at 131:3-4.

12. The Debtors filed the current versions of the DS and the Plan on May 21, 2010 (Dkt. Nos. 4241 & 4242). The Debtors have not yet filed an updated version of their proposed Order approving the DS, the original version of which was filed on April 23, 2010 (Dkt. No. 3568; the "**Proposed DS Order**"). The GSA is attached as Exhibit H to the DS and outlines the terms of the settlement between, *inter alia*, the Debtors, JPMC and the FDIC.

## OBJECTION

13. The DS as filed does not contain sufficient clarity and detail regarding the Debtors' proposed treatment of the Proof of Claim under the Plan, and, therefore, the WMB Noteholder Group POC Participants are unable to make an informed decision regarding whether to accept or reject the Plan, or even whether they are entitled to vote under the Plan and, if so, who is the "they" entitled to vote and in what amounts?

## A. The Debtors have not identified which Bank Bondholder Claims are "Non-Subordinated" and "Subordinated".

14. As a preliminary matter, the Debtors have not identified which Bank Bondholder Claims they consider to be "Non-Subordinated" versus "Subordinated". The Plan defines "Non-Subordinated Bank Bondholder Claim" as those Bank Bondholder Claims listed on Exhibit B to the GSA (which includes the WMB Noteholder Group's Proof of Claim) to the extent such claims are not subordinated. *See* Plan at §1.125. The WMB Noteholder Group POC Participants respectfully submit that the Claims raised in their Proof of Claim are not the types of claims that are subordinated claims, and no such motion for subordination has been brought by any party. However, "Subordinated Bank Bondholder Claims" is defined as "Bank Bondholder Claims, to the extent determined pursuant to a Final Order to be subordinated in accordance with section 510(b) of the Bankruptcy Code" and there is no qualification on when such a motion to subordinate must be brought, what the legal justification for such subordination might be or by when such a final order must be obtained. *See* Plan at §1.181.

15. The DS proposes different treatment for Non-Subordinated Bank Bondholder Claims in Class 17 and Subordinated Bank Bondholder Claims in Class 18. If Class 17 votes to accept the Plan and to release all of the Claims, the Non-Subordinated Bank Bondholder Claims are deemed Allowed Claims and each Class 17 creditor is entitled to receive its pro rata share of 5.357% of the "Homeownership Carryback Refund Amount," subject to a cap of $150 million. In contrast, Class 18 receives a distribution of Liquidating Trust Interests following payment in full of all Allowed Claims and Postpetition Interest Claims. Accordingly, it is possible that a WMB Noteholder Group POC Participant could vote in favor of the Plan with the understanding that it is in Class 17 and entitled to its pro rata share of the $150 million, and later find out that the Debtors are seeking to subordinate its claim and treat it as a Class 18 claim.

### B. The DS is Not Clear as to Whether the Debtors Consider the Claims Asserted in the WMB Noteholder Group's Proof of Claim to be Derivative or Direct

16. The DS, when read in conjunction with the exhibits, in particular the GSA, is not clear as to whether each claim in the Proof of Claim is being treated as a direct claim or a derivative claim. Certain portions of the DS, when read in conjunction with the GSA and historical statements or pleadings, support a reading that the entire Proof of Claim is being considered a derivative claim. For example:

- With the exception of Count VII, the Proof of Claim was expressly filed to preserve claims on behalf of WMB receivership creditors. Proof of Claim at n.1.

- The GSA notes that the "Debtors and the FDIC Receiver acknowledge and agree that . . . the Bank Bondholder Claims are derivative in nature". GSA at § 2.9.

- The DS provides that any distribution from Class 17 made to Non-Subordinated Bank Bondholder Claims will be subject to contractual subordination rights among the holders of Non-Subordinated Bank Bondholder Claims. DS at § V.B.17. If the claims were direct, and payment was coming from a third party such as the Debtors, such subordination language would arguably not apply.

17. In contrast, other provisions of the DS and statements on the record regarding the Proof of Claim, support a reading that at least a part of the Proof of Claim is being treated as a direct claim:

- As noted above, it was the Debtors' position in the Claims Objection that the fraudulent transfer count, was a direct claim.

- The DS provides that the Proof of Claim and other proofs of claims that were filed "by holders of funded indebtedness against WMB (which are listed on Exhibit "B" to the GSA)" are classified as Class 17—Non-Subordinated Bank Bondholder Claims—

and that those holders (rather than WMB creditors as a whole) are entitled to vote on the Plan. DS at § V.B.17.

- The DS provides that "each holder of a Non-Subordinated Bank Bondholder Claim shall receive such holder's [pro rata share of the $150,000,000]." DS at § V.B.17 (emphasis added). Such a provision implies that only those holders of Claims, *i.e.*, those that signed the Proof of Claim, will receive a distribution.

- The DS notes that Non-Subordinated Bank Bondholder Claims are those Bank Bondholder Claims "that are not subordinated in accordance with section 510(b) of the Bankruptcy Code." DS at § V.B.17. As the Court is well aware, Section 510(b) relates to subordination in connection with the purchase and sale of a security of a debtor or a debtor's affiliate. The Proof of Claim, however, does not involve any claims that allege that WMB held securities of the Debtors. Accordingly, there are no claims of WMB's (and therefore no derivative claims that the WMB Noteholder Group could assert) that could be subject to Section 510(b). Therefore, the mere fact that the Debtors are preserving the option to subordinate the claims pursuant to Section 510(b) supports a reading that the Debtors consider the Proof of Claim to contain direct claims.

C.  **The DS and the Proposed DS Order Contain Contrary Provisions Regarding the Ability of the WMB Noteholder Group POC Participants to Vote Their Claims.**

18. While certain provisions of the DS seem clear as to the ability of the WMB Noteholder Group POC Participants to vote their claims, the Proposed DS Order casts doubt on this right. Rather than detail all of the inconsistencies between the DS and the Proposed DS Order, the WMB Noteholder Groups assumes that the Debtors will be filing (or will be directed to file) a revised Proposed DS Order that is consistent with the DS as finally approved by this Court.
PAC 968476/33537    8

19. Focusing on one specific inconsistency however, if it is the Debtors' position that, despite the seemingly unambiguous language in the DS describing the treatment of Class 17, the WMB Noteholder Group POC Participants do not have the right to vote on the Plan because of the Claims Objections (which is what the current Proposed DS Order provides), then the WMB Noteholder Group POC Participants respectfully request that this Court treat this portion of the Objection as a motion for an order pursuant to Bankruptcy Rule 3018(a) to temporarily allow the Proof of Claim in the amount of $1.9 billion for purposes of voting on the Plan.[3]

**D.     There Are Practical Problems With Class 17.**

20. Without limiting the foregoing objections, this section focuses on practical problems should the Court conclude that the Proof of Claim is properly classified in Class 17 and is entitled to vote as part of such class.

21. First, who is in Class 17? If Class 17 only contains derivative claims, as the Debtors and the FDIC apparently agree, are the members in Class 17 only the signatories to the Proof of Claim or are all they all WMB Noteholders? Stated differently, derivative claims are for the benefit of a class, not individuals. In this case, the class is the creditors of the WMB Receivership. If Class 17 is derivative only, then is it actually all WMB Receivership creditors who are part of the class, entitled to vote therein and entitled to recoveries therefrom? The DS should explain exactly who is considered to be in Class 17, and why.

22. Second, if Class 17 is correctly acknowledged as including direct claims, how can WMI and the FDIC (and JPMC) agree in the GSA that the direct claims are actually derivative claims? The DS should explain how entities who are not holders of acknowledged direct claims can somehow agree that the acknowledged direct claims are actually not direct claims, and how this agreement can be binding on the holders of those direct claims.

---

[3] The Debtors list the Proof of Claim on Exhibit B to the GSA in the amount of $1.9 billion.

23. Third, if Class 17 is intended to include only the signatories to the Proof of Claim, the DS should clarify who this is, and in what amount. One logical interpretation would be that the Proof of Claim is treated as a snapshot, and only those signatories to the Proof of Claim and the claims they held against WMB at the time are included. By way of illustration, assume The ABC Insurance Company ("**ABC**") signed the Proof of Claim in respect of $100 million of Subordinated Note claims against WMB. If the foregoing interpretation is correct, ABC should be included in Class 17 at $100 million.

24. Another logical interpretation, however, is to look at the proposed Voting Record Date of June 3, 2010. *See* DS at § III.A. If that is the case, except with respect to a Proof of Claim signatory whose position has not altered, it will be practically impossible to determine who is in Class 17, and in what amount. Expanding on the above illustration, assume that, after signing the Proof of Claim, ABC sold $30 million of its Notes but later bought another $50 million Notes. Does ABC still vote the $30 million that it sold, and does it vote the $50 million that it acquired? Given that all trading is through DTC (and therefore anonymous), it is impossible as a practical matter to trace claims in this fashion.[4]

25. Given the foregoing, we suggest that the voting record date for the Proof of Claim be deemed to be the date that the Proof of Claim was signed, and that all parties who signed the Proof of Claim vote in the amount held on that date. While not an ideal solution because it

---

[4] The Court may be wondering how this issue has been dealt with in other Chapter 11 cases. However, when public debt securities are involved, there is typically a single proof of claim from the indenture trustee and the Chapter 11 plan invariably includes all of the securities in the relevant class, such that the use of a voting record date different than the claim filing date is not relevant – the indenture trustee simply distributes dividends through the DTC system as of the voting record date. There is no indenture trustee for the WMB Notes.

ignores subsequent trading history, it would appear to be the only practical way to ensure certainty as to who is in Class 17 and in what amount.[5]

26. Fourth, distributions in Class 17 apparently are intended to take into account subordination in place at the WMB level. This is confusing. If Class 17 constitutes a distribution to holders of direct claims, then the Class 17 distributions should go to those holders without distinction. Regardless of any extent to which WMB Subordinated Notes are subordinated in the WMB Receivership estate to WMB Senior Notes, they are not subordinated in the WMI Chapter 11 case and should not be treated as such. If, however, Class 17 is intended to include only derivative claims, then WMB subordination may apply, although the issue of "who" is in Class 17 as noted above still exists. The DS should clearly identify the classification of the Proof of Claim in terms of "direct" or "derivative" and how and why such classification was determined. From there, the DS should then clearly discuss whether the Debtors believe that WMB-level subordination should apply at the level of WMI and, if so, why.

## CONCLUSION

This is not a plan objection disguised as a DS objection. While the WMB Noteholder Group does, in fact, strongly oppose the Plan and the terms of the GSA, the sole purpose of this Objection is to seek clarity in the DS to ensure the "what" and the "why" of the Plan's proposed treatment of the Proof of Claim.

**WHEREFORE,** the members of the WMB Noteholder Group respectfully request that the DS be amended so that, if the Debtors and the FDIC succeed in cramming down the Plan on

---

[5] The WMB Noteholder Group understands that the other group of holders of WMB Notes (the "Bank Bondholders") may be filing an amended proof of claim to adjust for the current members of that group (including some who did not sign their original proof of claim) and the current holdings of such members (including if different from the holdings stated in the original proof of claim). If the Court prefers this approach, the WMB Noteholder Group can also file an amended proof of claim so that it is consistent with this approach.

the WMB Noteholders, the WMB Noteholder Group can understand (i) exactly who is in Class 17, (ii) whether each claim in the Proof of Claim is proposed to be treated as direct or derivative, (iii) in what amount as of what date are the holders and the claims in such class, (iv) how and in what amounts are the holders to vote (or whether they will be allowed for voting purposes pursuant to Rule 3018), (v) whether it is intended for the Debtors to somehow enforce WMB subordination, (vi) whether proofs of claim should be "brought current" by amendment, and, ultimately, (vii) why the Debtors choose to resolve each of the dilemmas in the ways they propose to resolve them.

Dated: May 28, 2010

POTTER ANDERSON & CORROON LLP

By: _____
Theresa V. Brown-Edwards (Bar No. 4225)
R. Stephen McNeill (Bar. No. 5210)
Hercules Plaza, 6th Floor
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000

- and -

BRACEWELL & GIULIANI LLP
Evan D. Flaschen
Renée M. Dailey
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, Connecticut 06103
Telephone: (860) 947-9000

*Attorneys for the WMB Noteholder Group*