# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|                                          |   |                                                                                  |
|------------------------------------------|---|----------------------------------------------------------------------------------|
| *In re*                                  | : | Chapter 11                                                                       |
| WASHINGTON MUTUAL, INC., *et al.*[1],    | : | Case No. 08-12229 (MFW)                                                           |
| Debtors.                                 | : | Jointly Administered                                                             |
|                                          | : | **Objection Deadline: May 28, 2010 at 4:00 p.m.** <br> **Hearing Date: June 3, 2010 at 10:30 a.m.** |
|                                          | : | **Related Docket Nos. 3568, 4241, 4142, 4243, 4244**                             |

## BANK BONDHOLDERS' SUPPLEMENTAL OBJECTIONS
## TO DISCLOSURE STATEMENT FOR
## THE SECOND AMENDED JOINT PLAN OF AFFILIATED DEBTORS

The holders of senior notes (the "Senior Notes") issued by Washington Mutual Bank

("WMB") (the "Bank Bondholders") listed below[2] submit this Supplemental Objection to the

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395).

[2]     The Bank Bondholders include Anchorage Capital Master Offshore, Ltd. c/o Anchorage Advisors, L.L.C.; GRF Master Fund, L.P. c/o Anchorage Advisors, L.L.C.; PCI Fund, L.L.C. c/o Anchorage Advisors, L.L.C.; Allen Arbitrage, L.P.; Allen Arbitrage Offshore; Bank of Scotland plc; Brownstone Asset Management, L.P.; Caspian Alpha Long Credit Fund, L.P.; Caspian Capital Partners, LP; Caspian Select Credit Master Fund, Ltd.; Cetus Capital, LLC; Citigroup Global Markets, Inc.; CVI GVF (Lux) Master S.a.r.l.; D. E. Shaw Laminar Portfolios, L.L.C; Drawbridge DSO Securities LLC; Drawbridge OSO Securities LLC; Worden Master Fund LP; Farallon Capital Management, LLC; Gruss Global Investors Master Fund, Ltd.; Gruss Global Investors Master Fund (Enhanced), Ltd.; Halcyon Master Fund L.P. c/o Halcyon Offshore Asset Management LLC; King Street Capital, L.P.; King Street Capital Master Fund, Ltd., assignee of King Street Capital, Ltd.; Longacre Master Fund, Ltd.; Longacre Capital Partners (QP), L.P.; Longacre Master Fund II, L.P.; Longacre CE Master Fund, L.P.; Longacre Opportunity Fund, L.P., Longacre Opportunity Offshore, Ltd.; Marathon Credit Opportunity Master Fund, Ltd.; Marathon Special Opportunity Master Fund, Ltd.; Millennium Partners, L.P.; OCP Investment Trust; Onex Debt Opportunity Fund, Ltd.; Plainfield Special Situations Master Fund II, Limited; Plainfield OC Master Fund II Limited; Plainfield Liquid Strategies Master Fund Limited; Quintessence Fund L.P. c/o QVT Associates GP LLC; QVT Fund LP c/o QVT Associates GP LLC; Stone Lion Portfolio L.P.; UBS Securities LLC; The Värde Fund, L.P.; The Värde Fund VI-A, L.P.; The Värde Fund VII-B, L.P.; The Värde Fund VIII, L.P.; The Värde Fund IX, L.P.; The Värde Fund IX-A, L.P.; Värde Investment Partners (Offshore) Master, L.P.; Värde Investment Partners, L.P.; Venor Capital Master Fund LTD; HFR ED Select Fund IV Master Trust; Lyxor/York Fund Limited; Permal York Ltd.; York Capital Management, L.P.; York Credit Opportunities Fund, L.P.; York Credit Opportunities Master Fund, L.P.; York Investment Master Fund, L.P.; York Select, L.P.; York Select Master Fund, L.P.

Disclosure Statement for the Second Amended Joint Plan of Affiliated Debtors filed on May 21, 2010 ("Disclosure Statement"). This Supplemental Objection supplements the Objection filed by the Bank Bondholders on May 13, 2010 (Dkt. No. 3719) ("First Objection"), which is incorporated herein by reference.[3]

## PRELIMINARY STATEMENT

1. The Debtors have now filed the third reincarnation of their Disclosure Statement, proposed Plan, and the so-called "Global" Settlement Agreement that forms the basis for their proposed Plan. But the third time around is not the charm for the Debtors. In their First Objection, the Bank Bondholders showed that an earlier version of the Plan was not confirmable as a matter of law and that the Disclosure Statement failed to provide "adequate information" about the Plan it described, as required under 11 U.S.C. § 1125. In particular, the Bank Bondholders demonstrated that (1) the Plan described by the Disclosure Statement was conditioned upon a settlement agreement that did not yet exist; (2) the Disclosure Statement failed to provide meaningful information regarding the status of the Bank Bondholders' claims and the Debtors' proposed treatment of those claims under the Plan; (3) the Disclosure Statement did not provide sufficient information regarding the business of the Reorganized Debtors and the Debtors' ability to take advantage of certain potential tax losses described in the Disclosure Statement; (4) the Disclosure Statement provided no justification for the broad third-party releases provided for in the Plan and did not disclose the settled law under which similar releases have been held unlawful. Although the Disclosure Statement, proposed "Global Settlement Agreement" and the Plan have undergone some changes since the earlier versions of these

---

[3]     This Objection addresses the Motion only to the extent that it seeks approval of the Disclosure Statement. The Objection is not intended to address objections to the Plan (except to the extent that they render the Plan unconfirmable on its face and, hence, the Disclosure Statement should not be approved). The Bank Bondholders reserve all rights to assert objections to the Plan in the manner and time provided in any order entered by this Court with respect to the Motion.

documents, the Disclosure Statement continues to suffer from the same deficiencies that the Bank Bondholders outlined in their First Objection.

## BACKGROUND

2.    As this Court is aware, on September 25, 2008, WMB was closed by the Office of Thrift Supervision, and the FDIC was appointed as Receiver of WMB.  Immediately after its appointment as Receiver, the FDIC sold most of the assets of WMB to JPMC.  The following day, on September 26, 2008, Washington Mutual, Inc. ("WMI")—a holding company whose principal asset was its stock in WMB—and its wholly-owned subsidiary, WMI Investment Corp., (collectively with WMI, "Debtors") filed petitions for relief under Chapter 11 of the United States Bankruptcy Code in this Court.  These events have given rise to multiple related disputes both in this bankruptcy case and in other courts.  The Bank Bondholders provide a description of these disputes in their First Objection, which is attached as Exhibit A and incorporated in this Supplemental Objection.  *See* First Objection at ¶ 5.  The Bank Bondholders' First Objection also describes the Bank Bondholders' claims in this bankruptcy, as reflected in the Bank Bondholders' Proofs of Claim.  *See* First Objection at ¶¶ 6-8.

### A.    THE DEBTORS' FIRST DISCLOSURE STATEMENT AND PLAN AND BANK BONDHOLDERS' FIRST OBJECTION.

3.    On March 26, 2010, the Debtors filed a Disclosure Statement for the Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, along with the Proposed Plan.  *See* Dkt. Nos. 2623 and 2622.  The Debtors submitted an unexecuted draft of the "Proposed Global Settlement Agreement" as Exhibit I to the Proposed Plan, and both the Disclosure Statement and the Plan specified that the Plan was "conditioned upon the approval and effectiveness" of that settlement.  *See* Plan § 2.1; Discl. Stmt. at 8.  The Bank Bondholders filed their First Objection in response to this prior version of the Disclosure Statement.

- 3 -

4. The Court never reached the merits of the Bank Bondholders' First Objection because barely three days before the scheduled May 19 hearing on the Disclosure Statement, the Debtors filed an amended Disclosure Statement, First Amended Plan and proposed Global Settlement Agreement. At the May 19 hearing, the Debtors sought an adjournment of the hearing with respect to their motion for approval of the Disclosure Statement. *See* Tr. Hearing May 19, 2010 at 24:2-5 (Bankr. D. Del.). Upon the Debtors' representation that the Debtors would, in a matter of days, submit a revised Disclosure Statement and Plan based on (and attaching) a final, fully executed and agreed to Global Settlement Agreement, the Court adjourned the hearing on the Disclosure Statement to June 3, 2010, and set May 28, 2010 as the deadline for additional Disclosure Statement objections. *See* Tr. Hearing May 19, 2010 at 37:19-25 (Bankr. D. Del.). In accordance with this Court's directive, the Bank Bondholders file this Supplemental Objection.

B. **THE CURRENT DISCLOSURE STATEMENT AND THE SECOND AMENDED PLAN.**

5. On May 21, 2010, the Debtors filed yet another amended Disclosure Statement (the "Disclosure Statement"), a Second Amended Joint Plan (the "Proposed Plan" or "Plan"), and yet another draft of the proposed Global Settlement Agreement. Although the proposed "Global Settlement Agreement" attached to the Plan has now been executed by some of the parties to the Agreement, including the FDIC, the supposed agreement—at least in the form attached to the Plan and Disclosure Statement—has not been executed by the so-called Appaloosa, Centerbridge, Owl Creek and Aurelius Parties, who also appear as parties and anticipated signatories on the proposed "Global" Settlement Agreement. *See* Global Settlement Agreement at 76. It is this Disclosure Statement with respect to the Second Amended Joint Plan that is currently before the Court. Not only does this Disclosure Statement inadequately

- 4 -

address the objections raised by Bank Bondholders in their First Objection, it is inadequate in other respects as well and, therefore, gives rise to additional objections set forth herein.

## I. THE DISCLOSURE STATEMENT DESCRIBES A PLAN THAT CANNOT BE CONFIRMED.

6       "Submitting the debtor to the attendant expense of soliciting votes and seeking court approval on a clearly fruitless venture would be costly and it would unduly delay any possibility of a successful reorganization." *In re Pecht*, 53 B.R. 768, 769-70 (Bankr. E.D. Va. 1985).  Accordingly, a bankruptcy court can refuse to approve a disclosure statement if the plan is unconfirmable on its face.  *See In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the [motion] to approve the disclosure statement must be denied, as solicitation of the vote would be futile.") (internal citations omitted); *In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631 (Bankr. E.D. Pa. 1996); *In re Eastern Maine Electric Coop., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).

7.      The Debtors' Plan is unconfirmable on its face.  At the outset, the Plan is based on a supposed "Global Settlement Agreement" that—in its filed form—is not signed by several of the supposed parties thereto.  *See* Global Settlement Agreement at 76.  But, even if all those parties ultimately execute the "Global Settlement Agreement," the Plan has several features that are contrary to the terms of the Bankruptcy Code and controlling case law.  By way of example only, (a) the Plan provides for grossly disparate—inferior—treatment of the claims of the Bank Bondholders and other holders of Senior Notes issued by WMB, even if those claims are allowed and otherwise are held to be pari passu (or senior) in right of payment to that of other creditors, *see infra* ¶¶ 13-19; (b) it provides for certain favored creditors—certain (but not all) holders of

- 5 -

senior and subordinated notes issued by WMI—to have their legal fees paid in full without any Court review of those fees, while making no such provision for the payment of the fees of other, disfavored creditors, even though both sets of creditors have general unsecured claims against the Debtors, *see infra* ¶¶ 30-31; and (c) it apparently—we say "apparently" because, as described below, the Plan's and the Disclosure Statement's description of these provisions is close to gibberish—contemplates the forced imposition of non-consensual releases on creditors, including the Bank Bondholders, of their claims against numerous non-debtors, *see infra* ¶¶ 20-28; and (d) it includes several "death traps" under which creditors, including the Bank Bondholders, will receive distributions only if they vote for the Plan and agree to release their claims against third-party, non-debtors, *see infra* ¶ 18. All of these, and other fatal flaws, in the Plan are described below.

8.     The Bank Bondholders recognize that bankruptcy courts often prefer to address confirmation issues at the confirmation hearing, after the parties have had an opportunity to take discovery and present their objections through a full evidentiary record.[4] But the defects here are so fundamental—the Plan provisions at issue fail as matter of settled law—that, the Bank Bondholders respectfully submit, the more efficient course would be for the Court to disapprove the Disclosure Statement and avoid the expense for the estate of solicitation of a non-confirmable Plan and, instead, send the parties back to see if they can negotiate a truly consensual and lawful plan (and, failing that, convert the case to Chapter 7).

---

[4]     To the extent that the Court determines to allow the Debtors to solicit acceptances of the Plan and to address the confirmation issues at an evidentiary hearing, the Bank Bondholders respectfully ask that the Court provide an appropriate period of time to permit discovery to be completed prior to the confirmation hearing. The Bank Bondholders are in the process of reviewing the schedule outlined in the Motion of Debtors for an Order, Pursuant to Section 105(a) of the Bankruptcy Code, Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith, *see* Dkt. No. 4376, and will respond at the appropriate time.

II.     **THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE INFORMATION.**

     A.     **The Supposed "Global Settlement Agreement," as Attached to the Plan, Has Not Been Fully Executed, and the Disclosure Statement Contains No Explanation Therefor.**

     9.     In their First Objection, the Bank Bondholders noted that, because the FDIC had not yet agreed to the terms of the proposed "Global Settlement Agreement," a Plan that was conditioned upon that settlement could not be confirmed and argued that the Debtors should not be permitted to put the bankruptcy estates to the expense of soliciting votes and seeking approval of a Plan that was conditioned upon a purported settlement that, at the time, did not exist. While the FDIC has now apparently agreed to the revised form of the "Global Settlement Agreement," the copy of the "Global Settlement Agreement" attached to the Plan does not include the signatures of several other supposed parties to the proposed agreement (the so-called Appaloosa, Centerbridge, Owl Creek and Aurelius Parties). The Second Amended Plan is explicitly conditioned upon the approval of the "Global Settlement Agreement," which is defined by the Plan as an agreement that includes all these parties. Plan §§ 1.96, 1.179.

     10.     Either these parties have or have not executed the "Global Settlement Agreement." If they have, a fully-executed copy should be included with the Disclosure Statement—and an explanation should be provided in the Disclosure Statement as to when they agreed, and whether any undisclosed side deals have been reached to obtain their agreement. Conversely, if they have not executed the supposed "Global Settlement Agreement," then there is no reason why Debtors should be permitted to go forward with solicitation on a Plan conditioned upon the approval of a settlement agreement when not even the supposed parties to the settlement have agreed to its terms. In either event, the Disclosure Statement is inadequate. It fails to disclose that the copy of the "Global Settlement Agreement" attached to the Plan has

- 7 -

not been signed by all parties—indeed, it represents just the opposite (*see* Discl. Stmt. at 7 (noting "ongoing negotiations have resulted in a revised global settlement agreement . . . an executed copy of which is attached to the Plan"); it provides no explanation for this omission; and it fails to describe the reasons for these parties' non-signature; and, if they have now agreed to the terms, it provides no disclosure of the negotiations nor any promises that have been provided to solicit their support. All of this must be disclosed.

      **B.**    **The Disclosure Statement Does Not Include Adequate Information in Numerous Other Respects.**

      11.    As explained in Bank Bondholders' First Objection, in order for a disclosure statement to be approved under 11 U.S.C. § 1125(a), the statement must provide "adequate information," within the meaning of 11 U.S.C. §1125(a), upon which creditors can make an informed judgment regarding the Plan. 11 U.S.C. § 1125(a); First Objection at ¶¶ 16-18. Indeed, a disclosure statement must describe all factors known to the plan proponent that may impact the success or failure of the proposals contained in the plan. *See, e.g., In re Beltrami Enters.*, 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995); *In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990); *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981). Here, as before, the Debtors' Disclosure Statement does not provide adequate information and cannot pass muster under Section 1125(a).

      1.    **The Disclosures Regarding the Status and the Treatment of the Bank Bondholder Claims Are Inadequate.**

      12.    The earlier version of the Disclosure Statement was virtually silent with respect to the Bank Bondholders' claims. While it briefly mentioned those claims, it failed to disclose this Court's denial of the Debtors' motion seeking dismissal of the claims as a matter of law. *See* First Objection ¶ 36-38. And neither the Disclosure Statement nor the Plan gave any hint as to

- 8 -

the classification or treatment of the claims. *Id.* The Second Amended Plan now appears to place the Bank Bondholders' claims in a separate class (along with other holders of funded indebtedness of WMB), but the provisions regarding the treatment of that class are ambiguous and incomplete and leave a total lack of clarity as to how any of the claims in the class will be treated or the basis therefor. The Disclosure Statement does nothing to remedy this.

13. The one thing that is clear about the proposed treatment under the Plan of the Bank Bondholders' claims is the Debtors' intent to disadvantage the Bank Bondholders. Virtually all other classes of unsecured claims are permitted to share in distributions from all the assets the Debtors recover—including the billions of dollars in funds (arising from tax losses of WMB, not WMI) the Debtors claim to have on deposit and the initial additional billions of dollars in tax refunds the Debtors are expecting to obtain; the Bank Bondholders are not—they are permitted only to share, and only to a very limited degree (5.357%, capped at $150 million), in any recovery the Debtors may obtain in a second tax refund. *Compare* Plan §§ 6.1, 7.1, 16.1, 17.1, 18.1, 19.1, 20.1 *with* Plan § 21.1. Virtually all other classes of unsecured claims are entitled to receive distributions under the Plan whether or not the class accepts the Plan; the Bank Bondholders are not, and instead face a "death trap" under which if the separate class of WMB noteholders votes to reject the Plan, the Bank Bondholders will receive distributions only if their claims are subsequently allowed and, even then, only from "BB Liquidating Trust Interests." *Compare* Plan §§ 6.1, 7.1, 8.1, 9.1, 10.1, 11.1, 12.1, 13.1, 14.1, 15.1, 16.1, 17.1, 18.1, 19.1, 20.1 *with* Plan § 21.1. Virtually all other classes of general unsecured claims have an option to receive distributions in cash or stock in the Reorganized Debtors; the Bank Bondholders do not. *Compare* Plan §§ 6.1, 7.1, 16.1, 18.1, 19.1, 20.1 *with* Plan § 21.1. And virtually all other classes of general unsecured claims (including classes of deeply subordinated creditors) are projected to

- 9 -

recover 100% of the face amount of the claims plus postpetition interest, *see* Discl. Stmt. at 17-28; in contrast, the Bank Bondholders (and other holders of notes issued by WMB) are capped, under any circumstances, at $150 million, a small fraction of what they are owed, *see* Plan § 21.1. A potential $150 million distribution or reserve pales in comparison to the total amount of WMB Senior Notes—approximately $6.1 billion plus interest. (There are subordinated WMB Junior Notes as well, totaling another approximately $7.6 billion plus interest.)

14. The Debtors are of course free to dispute the Bank Bondholders' claims based on the Senior Notes. But if and to the extent those claims are ultimately allowed and not subordinated, then the Bank Bondholders are entitled to the same treatment as other holders of allowed, non-subordinated claims. Indeed, "equality of distribution among creditors " is a "central policy of the Bankruptcy Code." *In re Combustion Engineering, Inc.,* 391 F.3d 190, 239 (3rd Cir. 2004) (quoting *Begier v. IRS*, 496 U.S. 53, 58 (1990)). The vastly disparate treatment of the Bank Bondholders' claims from those of other creditors is flatly contrary to this controlling legal precept and thus renders the Plan unconfirmable as a matter of law. Accordingly, it would be waste of estate resources to allow the Debtors to solicit acceptances of the Plan.

15. But, even if the Court is not prepared to so hold at this stage, the Disclosure Statement is inadequate. It does not even attempt to explain how this disparate treatment of the Bank Bondholders is justifiable. Nor does it explain the basis—if any—for why the reserve for the claims of the Bank Bondholders if the class rejects the Plan is limited to "BB Liquidating Trust Interests," whereas creditors with disputed claims in virtually all other classes are to have the full amount of their claims reserved in cash from the deposit, tax refunds, and other liquid assets. *Compare* Plan § 21.1 *with* Plan § 27.3. At a minimum, the Disclosure Statement should

92277-001\DOCS_DE:160368.1

be amended to make clear that the proposed treatment of general unsecured creditors under the Plan vastly differs between and among such creditors, (1) to specify whatever justification the Debtors have for that disparate treatment, (2) to specify as well that the Bank Bondholders believe such disparate treatment is improper and unlawful, and (3) to disclose to all creditors that the Bank Bondholders intend to challenge the treatment of their claims and, if they prevail, that the Plan may not be confirmed or substantial cash reserves—potentially billions of dollars—may need to be set aside not just for their claims, but for the claims of other holders of WMB Senior Notes as well.

16. In addition, the proposed treatment of the Bank Bondholders' claims is in several other respects ambiguous at best, and the Disclosure Statement fails to clarify. The Bank Bondholders' claims are included in Class 17, which is titled "Non-Subordinated Bank Bondholder Claims" (the "Class"). *See* Plan § 21.1. The Class is defined to consist of "those certain proofs of claim filed against the Debtors and their chapter 11 estates by holders of funded indebtedness against WMB, which are listed on Exhibit 'B' to the Global Settlement Agreement" to the extent that they are not Subordinated Bank Bondholder Claims. Plan §§ 1.34 (defining "Bank Bondholder Claims"); *see also* Plan § 1.125 (defining "Non-Subordinated Bank Bondholder Claims" as "Bank Bondholder Claims, to the extent they are not Subordinated Bank Bondholder Claims"). "Subordinated Bank Bondholder Claims" are defined, in turn, as "Bank Bondholder Claims" that "have not been determined pursuant to a Final Order to be subordinated in accordance with Section 510(b) of the Bankruptcy Code." Plan §§ 1.34, 1.181. The Bank Bondholders' claims appear on Exhibit B to the proposed Global Settlement Agreement, and the Debtors have not sought to subordinate any of the Bank Bondholders' claims, much less

obtained a Final Order doing so, and thus the Bank Bondholders' claims presumably fall within

Class 17.

17.  Section 21.1 provides for the following treatment of claims in Class 17:

**Treatment of Non-Subordinated Bank Bondholder Claims**: If Class
17 votes to accept the Plan (in accordance with Section 30.2 herein), then, in full
satisfaction, release and exchange of the Non-Subordinated Bank Bondholder
Claims, the Non-Subordinated Bank Bondholder Claims shall be deemed Allowed
Claims and each holder of a Non-Subordinated Bank Bondholder Claim shall
receive such holder's Pro Rata Share of BB Liquidating Trust Interests (which
interests, in the aggregate, represent a right to receive 5.357% of the
Homeownership Carryback Refund Amount, as defined and set forth in Section
2.4 of the Global Settlement Agreement, subject to a cap of One Hundred Fifty
Million Dollars ($150,000,000.00) in the aggregate), subject to contractual
subordination rights among the holders of Non-Subordinated Bank Bondholder
Claims. If Class 17 votes to reject the Plan (in accordance with Section 30.2
herein), the sole amount of reserve for distribution to the holders of Non-
Subordinated Bank Bondholder Claims if, pursuant to a Final Order of the
Bankruptcy Court, such Claims are determined to be Allowed Claims, shall be the
BB Liquidating Trust Interests.

Plan § 21.1; Discl. Stmt. at 84-85.

18.  The language in Section 21.1 and in the relevant definitions raises a number of

issues, none of which is clarified in the Disclosure Statement:

a.  It is unclear how much (if any amount) the Debtors will reserve for the

Bank Bondholder Claims if the Class rejects the Plan.  The Disclosure Statement indicates that

"If the [Class] votes to reject the Plan, then the Debtors will only reserve for distribution to such

holders the BB Liquidating Trust Interests, if, pursuant to a final order of the Bankruptcy Court,

the claims are determined to be allowed as against the Debtors." Discl. Stmt. at 10; *see also* Plan

§ 21.1.  In the Plan, the BB Liquidating Trust Interests are defined as:

Those certain Liquidating Trust Interests that are receivable by holders of Non-
Subordinated Bank Bondholder Claims, which interests, in the aggregate,
represent an undivided percentage interest in the Homeownership Carryback
Refund Amount, as defined and set forth in Section 2.4 of the Global Settlement
Agreement, equal to 5.357% of the Homeownership Carryback Refund Amount;

> provided, however, that in no event shall the distribution to holders of Non-Subordinated Bank Bondholder Claims of Cash on account of BB Liquidating Trust Interests exceed One Hundred Fifty Million Dollars ($150,000,000.00) in the aggregate.

Plan § 1.39. But it is unclear whether (1) the full amount of the BB Liquidating Trusts will be reserved, and (2) whether any reserve at all will be made if no "Final Order" allowing the Bank Bondholders' claim is entered before the Effective Date. In addition, neither the Plan nor the Disclosure Statement disclose what will happen if the Bank Bondholders' claims are ultimately allowed for more than the amount of the reserve. The Debtors must make clear disclosure on each of these points. And if it really is the Debtors' intent not to reserve an adequate amount to provide—if the Bank Bondholders' claims are allowed for more than $150 million—for the same payment-in-full treatment as other general unsecured creditors are to receive, the Debtors must make clear that the Plan may not be confirmable.

        b.      It is unclear whether the Debtors are reserving the right to argue that, even if the Class accepts the Plan, that the Bank Bondholders' claims should be subordinated under 11 U.S.C. § 510(b). While the Bank Bondholders do not believe there is any basis for subordination of their claims which arise of out Senior Notes issued by WMB, the Debtors need to be clear as to whether they are reserving the right to seek such relief and, indeed, whether they intend to seek subordination of any (or all) claims in Class 17. In such event, the Disclosure Statement needs to disclose, in plain English, to holders of Class 17 Claims that the "carrot" the Debtors have offered to entice them to vote to accept the Plan may be entirely illusory and that even if the Class votes to accept the Plan, they may not receive anything.

        c.      While the Plan provisions are hardly a model of clarity, it appears that the Debtors are reserving the right, if Class 17 rejects the Plan, to seek to have all claims in that Class disallowed and thereby to deny any distributions to holders of claims in the Class. *See*

Plan § 21.1. The Disclosure Statement should disclose this possibility and note that similar "death trap" provisions have been rejected by some courts. *See, e.g., In re MCorp. Fin., Inc.,* 137 B.R. 219, 236 (Bankr. S.D. Tex. 1992) ("There is no authority in the Bankruptcy Code for discriminating against classes who vote against a plan of reorganization" and a provision that does so "results in the plan's not being fair and equitable . . .[and] also results in unfair discrimination.").

        d.      In addition to issuing Senior Notes, WMB issued contractually subordinated Junior Notes. It is unclear whether the Plan contemplates that holders of such Junior Notes may share ratably in the potential direct distribution of 5.357% of the Homeownership Carryback Refund, subject to a cap of $150 million. Section 21.1 of the Plan provides for a pro rata distribution among holders of "Non-Subordinated Bank Bondholder Claims," but it defines "Subordinated Bank Bondholder Claims" as only those that are subject to subordination under 11 U.S.C. § 510(b) (subordination for certain securities-related claims), not as also including those claims subject to subordination under 11 U.S.C. § 510(a) (contractual subordination). *See* Plan § 1.181. To be sure, Section 21.1 specifies that holders of "Non-Subordinated Bank Bondholder Claims" shall share ratably in the potential distributions "subject to contractual subordination rights among the holders of Non-Subordinated Bank Bondholder Claims." But what that "subject to" clause means is left a mystery in both the Plan and the Disclosure Statement. Are the Debtors leaving it to the holders of Senior and Junior WMB Notes in Class 17 to litigate (if they do not agree) whether holders of Junior Notes may participate in the distributions? Or are they proposing, in accordance with the terms of the contractual subordination, for the holders of the Junior Notes not to receive any distribution until and unless the holders of the Senior Notes in Class 17 have been paid in full (a result that will

- 14 -

almost surely never occur under this Plan)? In light of the Bankruptcy Code's enforcement of subordination agreements, 11 U.S.C. § 510(a), the Bank Bondholders submit that the proper approach is the latter. But, at a minimum, the Disclosure Statement needs to clarify what the Debtors propose, the basis therefore, and the intent of the Bank Bondholders to challenge any provision that does not enforce their contractual rights under the applicable subordination agreement.

e. The Plan also fails to provide any guidance as to how any distributions on the "Non-Subordinated Bank Bondholder Claims" in Class 17 will actually be made. Contrary to how other classes of funded debt are defined (*see, e.g.,* definitions of Senior Notes Claims and Senior Subordinated Notes Claims, Plan §§ 1.172; 1.176), Non-Subordinated Bank Bondholder Claims appear to be defined by reference to specific "Proofs of Claims," suggesting that ownership of the WMB funded debt has been static since those proofs of claims were filed, which, of course, is not the case. Thus, the Plan could be read to limit distributions to those holders of Senior Notes who are identified on the specific proofs of claims listed in Exhibit B to the Global Settlement Agreement, without regard to any subsequent trades or amendments to the proofs of claims that might be filed.

19. Nor does the Disclosure Statement accurately characterize the current status of Bank Bondholders' claims. In response to the Bank Bondholders' prior objection that there was inadequate disclosure in the original Disclosure Statement regarding the current status of the Bank Bondholders' claims, the Debtors added the following additional language:

> On April 6, 2010, the Bankruptcy Court conducted an initial hearing to consider the Debtors' objection. At this hearing, although the Bankruptcy Court recognized that many of the asserted claims were derivative of claims that may be held by WMB, the Bankruptcy Court did not dismiss the Bank Bondholders' claims based on standing. The Debtors and the Bank Bondholders are currently discussing a proposed discovery schedule.

- 15 -

Discl. Stmt. at 45. This is at best incomplete and at worst misleading. The disclosure should be revised as follows:

> A hearing on the objection was held on April 6, 2010, at the conclusion of which the Court denied the objection, holding that none of the Bank Bondholders' claims could be dismissed as a matter of law and that the parties could proceed with discovery on most of the claims, including the claims for misrepresentation, piercing the corporate veil, substantive consolidation, and fraudulent transfer. *See* Tr. April 6, 2010, Case No. 08-12229, at 129:8-131:4 (Bankr. D. Del.); Debtors' Twentieth (20th) Omnibus (Substantive) Objection at 13 n.10 (stating that "[t]he FDIC does not have standing to assert the fraudulent transfer claim asserted by the Bank Bondholders here"). In so holding, the Court stated that at least some of the claims were direct claims of the Bank Bondholders for which they unquestionably had standing; that there were unresolved issues as to whether other claims were direct or derivative; and that even as to derivative claims, the claims could not be dismissed as a matter of law.[5] The Court entered an order denying the objection on April 21, 2010. *See* Dkt. No. 3549, Case No. 08-12229 (Bankr. D. Del. Apr. 21, 2010).

> ### 2. The Disclosure Statement Fails to Explain the Third Party Releases Contained in the Plan or Disclose How They Can Be Reconciled with Settled Law.

20.     The Bank Bondholders' First Objection highlighted the impermissible nature of the non-consensual releases to be granted under the Plan. *See* First Objection ¶¶ 39-41. Although the Second Amended Plan attempts to preserve claims that "Entities" may have against certain parties "in the Receivership," *see* Plan § 1.156, the additional language does nothing to remedy the Bank Bondholders' objections.

21.     The Second Amended Plan—like the previous iterations of the proposed Plan—purports to grant broad, non-consensual, third-party releases and to enjoin claims, including claims of creditors of WMI, against non-debtor third parties. As explained below, such third-

---

[5]     *See, e.g.,* Tr. April 6, 2010, Case No. 08-12229, at 130: 11-18 (holding that the claim for substantive consolidation is "a direct claim"); *id.* at 129:23-130:10 (holding that whether claims for corporate veil piercing and alter ego were direct or derivative turn on Washington state law for which there is no clear decisional authority and that "even if it is a derivative claim, if the FDIC does not pursue it, the noteholders may ask for standing to bring it on behalf of all creditors.").

party releases are inconsistent with settled law, and, even on the third try, the Disclosure Statement fails to provide any explanation as to how these broad releases and injunctions are permissible.

      22.    Section 43.6 of the Proposed Plan provides:

> [E]ach Entity that has held, currently holds or may hold a Released Claim . . . shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge each and all of the Released Parties from any and all Released Claims in connection with or related to any of the Debtors, the Reorganized Debtors, the Affiliated Banks, or their respective subsidiaries, assets, liabilities operations, property or estates . . . .

Plan § 43.6. The Proposed Plan defines "Released Parties" as including, among others, the "FDIC Receiver," "FDIC Corporate," and the "Settlement Note Holders."[6] *See* Plan §§ 43.6; 1.157; 1.104, 1.90, and 1.91. And it defines "Released Claims" as:

> Collectively, to the extent provided in the Global Settlement Agreement, (a) any and all WMI Released Claims, JPMC Released Claims, FDIC Released Claims, Settlement Note Released Claims and Creditors' Committee Released Claims, in each case to the extent provided and defined in the Global Settlement Agreement and (b) any and all Claims released or deemed to be released pursuant to the Plan, in each case pursuant to clauses (a) and (b) above, to the extent any such Claims arise in, relate to or have been or could have been asserted (i) in the Chapter 11 Cases, the Receivership or the Related Actions, (ii) that otherwise arise from or relate to any act, omission, event or circumstance relating to any WMI Entity, or any current or former subsidiary of any WMI Entity, or (iii) that otherwise arise from or relate to the Receivership, the Purchase and Assumption Agreement, the Chapter 11 Cases, the 363 Sale and Settlement as defined in the Global Settlement Agreement, the Plan . . . excluding however, in the case of clauses (a) and (b) hereof, and subject to the provisions of Section 3.8 of the Global Settlement Agreement, . . . any and all claims held by Entities against WMB, FDIC Corporate, and/or FDIC Receiver in the Receivership; provided, however that "Released Claims" shall not include any avoidance action or claim objection regarding an Excluded Party or the WMI Entities, WMB, each of the Debtors' estates, the Reorganized Debtors and their respective Related Persons.

Plan § 1.156.[7]

---

[6]      The Settlement Noteholders are defined as the Appaloosa Parties, the Centerbridge Parties, the Owl Creek Parties, and the Aurelius Parties—all holders of securities issued by WMI. *See* Plan Section 1.179.

92277-001\DOCS_DE:160368.1

23.     These provisions purport to release claims solely between non-debtor parties without the consent of the party supposedly providing the release. Indeed, although the language is not clear, even as modified in the Second Amended Plan, the provisions of the Plan could be read to release claims held by the Bank Bondholders against (among others) the WMB Receivership Estate—claims that have already been recognized as legitimate claims by the FDIC. *See* First Objection ¶ 40 and Ex. A thereto.

24.     But if the Plan were read not to purport to release the Bank Bondholders' claims in the receivership proceedings, it certainly appears to provide for the release of claims the Bank Bondholders may have against numerous third parties, including the FDIC in its corporate capacity. The Plan purports to grant these releases without the consent of the releasing creditors. And although the Plan does purport to allow parties submitting ballots to "opt out" of these third-party releases (and receive no distributions under the Plan), the provisions regarding the opt out are incomprehensible:

> . . . provided, however, that each Entity that has submitted a Ballot may elect, by checking the appropriate box on its Ballot, not to grant the releases set forth in Section 43.6 of the Plan with respect to those Released Parties other than (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Trustees, and (iv) the Creditors' Committee and its members in such capacity and for their actions as members, their respective Related Persons, and their respective predecessors, successors and assigns (whether by operation of law or otherwise), in which case, such Entity that so elects to not grant the releases will not receive a distribution hereunder; and provided, further, that, because the Plan and the Global Settlement Agreement, and the financial contributions contained therein, are conditioned upon the aforementioned releases, and, as such, these releases are essential for the successful reorganization of the

---

[7]     In addition, Sections 43.7 and 43.12 of the Plan set forth injunctions that would bar any actions with respect to the claims released in Section 43.6. And Section 43.8 of the Plan purports to protect all of the Released Parties from any liability (except to the extent based on gross negligence or willful misconduct) for their conduct in connection with these bankruptcy cases, the Plan, or the Global Settlement Agreement.

Debtors, pursuant to the Confirmation Order, those Entities that opt out of the releases provided hereunder shall be bound and shall receive the distributions they otherwise would be entitled to receive pursuant to the Plan.

*See* Plan § 43.6. The first proviso appears to allow a creditor to "opt out" from granting the releases, but only under penalty that it will then "not receive a distribution hereunder." But then the second proviso seemingly says just the opposite: that entities that opt out of the releases will nevertheless be "bound" and shall, in fact, "receive the distributions they otherwise would be entitled to receive pursuant to the Plan." *Id.*

25. The Disclosure Statement provides no clarity. It simply repeats the very same, entirely contradictory language from the Plan. The Disclosure Statement needs to specify, in plain, simple English what the Debtors are proposing. If they are proposing that any creditor that deigns to exercise its legal right not to release a third party will forfeit all rights to receive distributions under the Plan from the Debtors' estates, then the Debtors need to say that clearly, describe any conceivable legal basis for that result, and state that the Bank Bondholders (and perhaps other creditors) intend to object to the provision as unlawful, such that the Plan may not be confirmable. If, instead, the Debtors are proposing that even a creditor that exercises its legal right to opt out from a non-consensual release will nevertheless be deemed to have given one, then the Debtors need to say that clearly, describe any conceivable legal basis for that result, and again state that the Bank Bondholders (and perhaps other creditors) intend to object to that provision as unlawful, such that the Plan may not be confirmable. In short, to provide "adequate information," the Disclosure Statement must explain in plain language what the Plan's opt out provisions mean. It must explain who may opt out and what the effect of the opt out is. If the Debtors believe that they can bind parties who do not consent to the releases in the Plan, they must identify which parties they believe they can bind and why they believe that is permissible.

- 19 -

26.     In the current Disclosure Statement, Debtors do make a feeble attempt to justify their position on the releases.  But they do so only by citing as fact what is really only pure advocacy—and they thereby make the Disclosure Statement all the more misleading.  *See* Discl. Stmt at 13-14 (noting that "The Releases in the Plan are (i) essential to the success of the Debtors' reorganization, (ii) based on a critical financial contribution of the Released Parties, (iii) necessary to make the Plan feasible, and (iv) fair to creditors.").

27.     Moreover, the Disclosure Statement fails to discuss at all this Court's decisions holding that such non-consensual releases are impermissible—indeed, holding that the Court lacks jurisdiction to enter such releases.  *See  In re Coram Healthcare Corp.*, 315 B.R. 321, 335-36 (Bankr. D. Del. 2004) (holding that the Court "do[es] not have the power to grant a release of [a non-debtor third party] on behalf of third parties") (quoting *In re Digital Impact, Inc.* 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998) ("bankruptcy court does not have jurisdiction to approve non-debtor releases by third parties")); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) ("This is a release of third party claims . . . This cannot be accomplished without the affirmative agreement of the creditor affected.").

28.     In short, the Court should decline to approve the Disclosure Statement since, under its own decisions, the Plan cannot be confirmed.  At a minimum, the Debtors should be required to amend the Disclosure Statement to acknowledge this Court's precedents, to make clear precisely how the opt-out provisions are to work, and to state that the non-consensual releases provided for in the Plan could render the Plan unconfirmable.

### 3. The Disclosures Regarding Other Provisions of the Plan Are Similarly Inadequate.

29.     Finally, there are a host of additional provisions that are at best unclear and at worst misleading.  The Debtors are required to provide adequate information about each of these provisions.

<u>Payment of Professional Fees</u>

30.     Buried deep in the Plan is a provision calling for the payment in full of the attorneys and other professional fees of certain, but not all, creditors of the Debtors without any Court review of these fees under 11 U.S.C. § 503(b) or otherwise.  Section 43.18 of the proposed Plan provides:

> Within ten (10) Business Days of receiving a detailed invoice with respect thereto . . . the Disbursing Agent shall pay all reasonable fees and expenses incurred by (i) Fried, Frank, Harris, Shriver & Jacobson LLP, (ii) Blank Rome LLP, (iii) White & Case LLP, (iv) Kasowitz, Bensen, Torres & Friedman LLP, and (v) Zolfo Cooper on behalf of certain Creditors who hold claims against the Debtors, during the period from the Petition Date through and including the Effective Date, in connection with the Chapter 11 Cases, the Global Settlement Agreement, the Plan, or the transactions contemplated therein (including, without limitation, investigating, negotiating, documenting, and completing such transactions and enforcing, attempting to enforce, and preserving any right or remedy contemplated under the Global Settlement Agreement and in the Chapter 11 Cases), without the need for any of these professionals to file an application for allowance thereof with the Bankruptcy Court."

Plan § 43.18.

31.     While the Disclosure Statement repeats the very same language (*see* Discl. Stmt. at 121-22), it provides no justification—either in law or equity—for the payment of the professional fees without Court approval of some creditors and not others.  The Bankruptcy Code  requires as a condition of confirmation that any such fees must be subject to Court approval.  *See* 11 U.S.C. § 1129(a)(4).  And, even if that were not the case, there is no basis for some unsecured creditors, but not others, to have their counsel and other professional fees paid;

- 21 -

this simply is another form of discrimination in violation of the "central policy of the Bankruptcy Code" of "equality of distribution among creditors". *In re Combustion Engineering, Inc.,* 391 F.3d at 239.

<u>BKK Liabilities</u>

32.    According to the Global Settlement, JP Morgan Chase ("JPMC") is assuming the liabilities of the WMI arising from or relating to what is referred to as the "BKK Litigation:"

> JPMC shall assume any and all liabilities and obligations of the WMI Entities (other than WMI Rainier LLC) for remediation or clean-up costs and expenses (and excluding tort and tort related liabilities, if any), in excess of applicable and available insurance, arising from or relating to (i) the BKK Litigation, (ii) the Amended Consent Decree, dated March 6, 2006, entered in connection therewith, and (iii) that certain Amended and Restated Joint Defense, Privilege and Confidentiality Agreement, dated as of February 28, 2005, by and among the BKK Joint Defense Group, as defined therein (collectively, the "BKK Liabilities").

Agreement § 2.21(a).  The Global Settlement Agreement further provides that the WMB Estate will transfer to JPMC the right to any WMB insurance that might cover the claims.

33.    Because the defined term "WMI Entities" does not include WMB, the Agreement may not provide for a similar assumption by JPMC of any BKK Liabilities of the WMB Receivership Estate, but this is not clear from the language of the Settlement Agreement or the Disclosure Statement. *See* Discl. Stmt. at 10-11.  To the extent that JPMC is not assuming the liabilities of the WMB Receivership Estate (or has not already done so pursuant to the Purchase and Assumption Agreement executed  by the FDIC and JPMC), there is no explanation offered for the distinction, especially when the WMB Receivership Estate is transferring any rights to insurance that might cover the claims.

<u>Designation of Payment-in-Full Classes as Nevertheless "Impaired"</u>

34.     According to the Disclosure Statement, the Debtors project that most classes of general unsecured creditors will receive payment in cash (unless they chose to receive stock) of 100 % of the face amount of their claims plus postpetition interest, including Classes 2, 3, 12, 14, 15, and 16.  *See* Discl. Stmt. at 17-28.   But the Plan nevertheless proposes to treat these Classes as "impaired" and to give the creditors in such Classes the right to vote on the Plan.  The Disclosure Statement contains no explanation for why these Classes are impaired under 11 U.S.C. § 1124.

    4.    **The Disclosures Regarding the Availability and Intended Use of Tax Losses Are Inadequate.**

35.     The Disclosure Statement suggests that the Debtors believe that they may be able to take a worthless stock deduction ("Stock Loss") on WMI's equity interest in WMB.  *See* Discl. Stmt. at 139.   In their initial Disclosure Statement Objection, the Bank Bondholders noted that the Disclosure Statement contained insufficient information regarding the availability of and the Debtors' ability to use such tax losses, in part because the Disclosure Statement contained virtually no information about the intended business of the Reorganized Debtors.  *See* First Objection ¶¶ 23-35.   The Second Amended Disclosure Statement provides some information regarding the proposed "runoff business" of WMI's non-debtor subsidiary, WMMRC.  Discl. Stmt. at 129.  In addition, there have been modifications to the Plan regarding which creditors may now elect to receive shares of common stock of Reorganized WMI as part of their distribution under the Plan and in connection with the "Rights Offering."  Nevertheless, the only purpose of the proposed "reorganization" under the Second Amended Plan still appears to be to allow the Reorganized Debtors to sell their (or more accurately, WMB's) tax losses, which is prohibited under long-standing tax law.  *See* First Objection ¶ 33.  Thus, the deficiencies in the

- 23 -

disclosures made in the original Disclosure Statement regarding the existence and benefit of the Stock Loss remain in the current Disclosure Statement.

36.     As described in the Second Amended Disclosure Statement, pursuant to the Second Amended Plan, Reorganized WMI will issue 5.6 million shares of common stock with a par value of $25 per share. Discl. Stmt. at 15. Under the Plan, certain creditors (WMI Senior Noteholders, certain General Unsecured Creditors, and, under certain conditions, WMI Senior Subordinated Noteholders) will have the option of receiving these shares of Reorganized Common Stock in lieu of some or all of the cash they might otherwise receive under the Plan. *Id.* at 19, 21, 22. In addition, as under the previous Plan, the PIERS Claimants will receive subscription rights entitling them to purchase an additional 4 million shares of the Reorganized WMI common stock with a par value of $25 per share. *Id.* at 82-84.

37.     The Disclosure Statement does not explain the reasons for this structure, why the structure was modified from the previous version of the Plan, the impact of the change on creditors, and the Debtors' expectations as to whether the PIERS Claimants will exercise their subscription rights. The Disclosure Statement also does not disclose how any cash received as a result of the Rights Offering will be used by Reorganized Debtors. (The financial projections for the Reorganized Debtors specifically exclude cash from the Rights Offering.)

38.     With respect to the tax consequences of the Second Amended Plan, the Debtors' disclosures have changed little and remain inadequate. In the Bank Bondholders' First Objection, the Bank Bondholders outlined the various provisions of tax law that likely will prevent or limit the Debtors' use of the Stock Loss and identified additional facts that must be disclosed for creditors to evaluate the value of the Stock Loss and thus the value of the Reorganized Debtors. See First Objection ¶¶ 30-34. In response, the Debtors have added some

minimal language reflecting the uncertainty in their positions, and have indicated that they are seeking rulings from the IRS with respect to certain issues regarding the availability of the Stock Loss. *See* Discl. Stmt. at 137. They have done nothing, however, to address the impact of the law cited by the Bank Bondholders in their First Objection (*see id.* ¶¶ 30-34) or to provide the additional information requested by the Bank Bondholders (*see id.* ¶¶ 31-32).

39.     In order to satisfy their disclosure objections with respect to the potential net operating losses that the Debtors apparently claim may be available to them following confirmation, the Debtors must, at a minimum, disclose the following:

- The estimated amount of the potential Stock Loss.

- The Debtors' analysis of the likelihood and the extent to which the Stock Loss will be available to the Reorganized Debtors, and the likelihood and extent to which the loss will be limited under Section 382 or other provisions of the Internal Revenue Code.

- Whether the Debtors anticipate that the Reorganized Debtors will have significant income against which to off set the Stock Loss, taking into account the potential use of the cash proceeds from the Rights Offering.

- The impact of the allowance or disallowance of the Stock Loss on the financial projections included in the Disclosure Statement and the value of the Reorganized Common Stock and the Subscription Rights. This information is essential information for creditors determining whether to vote to accept or reject the Plan. If the allowance of the Stock Loss will result in substantial additional value to the Debtors' estate, then creditors who will not receive Reorganized Common Stock (such as the Bank Bondholders) should know that so that they

have the informed opportunity to reject the Plan because they are not being paid their proportionate share of such value and because the PIERS Claimants, unlike other creditors, may well be receiving more than payment in full.

- The purpose of the election provided to certain creditors to acquire Reorganized Common Stock and the Rights Offering, as well as the anticipated use of the proceeds from the Rights Offering. Further, the Debtors must disclose that to the extent (i) the acquisition of the Reorganized Common Stock by certain creditors in the proposed reorganization of the Debtors (versus a liquidation), or (ii) the acquisition of a profitable business with the cash proceeds from the Rights Offering, is determined to be for the principal purpose of permitting the creditors or the Debtors to take advantage of the Debtors' tax losses that would not otherwise be used—and that certainly appears to be the case—(1) the Plan may not be confirmable under Section 1129(a)(3) or Section 1129(d) of the Bankruptcy Code, and (2) even if the Plan is confirmed, the Internal Revenue Service may disallow the Reorganized Debtors' use of the tax loss under Section 269 of the Internal Revenue Code. *See In re South Beach Securities, Inc.,* No. 09-3079, Slip Op. (7th Cir. May 19, 2010) (confirmation of proposed plan of reorganization denied because principal purpose was to avoid taxes by having creditor acquire bankrupt entity solely to use its net operating losses); *see also Vulcan Materials Co. v. United States*, 446 F.2d 690 (5th Cir. 1971) (corporation that sold all of its assets and was non-operational was not allowed to use its losses to offset income from a profitable business it acquired via merger); *F. C. Publ'n Liquidating Corp. v. Commissioner*, 304 F.2d 779 (2d Cir. 1962) (losses of a

- 26 -

corporation, the business of which was discontinued shortly after the acquisition of a profitable business via merger, were not allowed to offset income of the profitable business).

## **CONCLUSION**

40.     For the reasons stated above, the Court should deny the Debtors' Motion for Approval of the Disclosure Statement.

[Remainder of Page Left Intentionally Blank]

Dated: May 28, 2010

WILMER CUTLER PICKERING HALE & DORR
LLP
Philip D. Anker
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

-and-

WILMER CUTLER PICKERING HALE & DORR
LLP
Russell J. Bruemmer
Nancy L. Manzer
Gianna M. Ravenscroft
Lisa E. Ewart
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

-and-

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com

Counsel for the Bank Bondholders