# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| In re | : Chapter 11 |
| WASHINGTON MUTUAL, INC., *et al.*[1], | : Case No. 08-12229 (MFW) |
| Debtors. | : Jointly Administered |
| | : Objection Deadline: June 10, 2010 at 4:00 p.m. |
| | : Hearing Date: June 17, 2010 at 10:30 a.m. |

## BANK BONDHOLDERS' MOTION TO
## TEMPORARILY ALLOW CLAIMS FOR VOTING PURPOSES

Pursuant to Federal Rule of Bankruptcy Procedure 3018, the holders of senior notes (the "Senior Notes") issued by Washington Mutual Bank ("WMB") listed below (the "Bank Bondholders")[2] hereby move the Court to temporarily allow their claims for purposes of voting on the Debtors' proposed plan.

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395).

[2] The Bank Bondholders on this Motion include Anchorage Capital Master Offshore, Ltd. c/o Anchorage Advisors, L.L.C.; GRF Master Fund, L.P. c/o Anchorage Advisors, L.L.C.; PCI Fund, L.L.C. c/o Anchorage Advisors, L.L.C.; Allen Arbitrage, L.P.; Allen Arbitrage Offshore; Bank of Scotland plc; Brownstone Asset Management, L.P.; Caspian Alpha Long Credit Fund, L.P.; Caspian Capital Partners, LP; Caspian Select Credit Master Fund, Ltd.; Cetus Capital, LLC; Citigroup Global Markets, Inc.; CVI GVF (Lux) Master S.a.r.l.; D. E. Shaw Laminar Portfolios, L.L.C; Drawbridge DSO Securities LLC; Drawbridge OSO Securities LLC; Worden Master Fund LP; Farallon Capital Management, LLC; Gruss Global Investors Master Fund, Ltd.; Gruss Global Investors Master Fund (Enhanced), Ltd.; Halcyon Master Fund L.P. c/o Halcyon Offshore Asset Management LLC; King Street Capital, L.P.; King Street Capital Master Fund, Ltd., assignee of King Street Capital, Ltd.; Longacre Master Fund, Ltd.; Longacre Capital Partners (QP), L.P.; Longacre Master Fund II, L.P.; Longacre CE Master Fund, L.P.; Longacre Opportunity Fund, L.P., Longacre Opportunity Offshore, Ltd.; Marathon Credit Opportunity Master Fund, Ltd.; Marathon Special Opportunity Master Fund, Ltd.; Millennium Partners, L.P.; OCP Investment Trust; Onex Debt Opportunity Fund, Ltd.; Plainfield Special Situations Master Fund II, Limited; Plainfield OC Master Fund II Limited; Plainfield Liquid Strategies Master Fund Limited; Quintessence Fund L.P. c/o QVT Associates GP LLC; QVT Fund LP c/o QVT Associates GP LLC; Stone Lion Portfolio L.P.; Mariner-Tricadia Credit Strategies Master Fund, Ltd.; Structured Credit Opportunities Fund II, L.P.; Silverpoint Capital Fund, LP; Silverpoint Capital Offshore Fund, Ltd; UBS Securities LLC; The Värde Fund, L.P.; The Värde Fund VI-A, L.P.; The Värde Fund VII-B, L.P.; The Värde Fund VIII, L.P.; The Värde Fund IX, L.P.; The Värde Fund IX-A, L.P.; Värde Investment Partners (Offshore) Master, L.P.; Värde Investment Partners, L.P.; Venor Capital Master Fund, LTD; HFR ED Select Fund

## JURISDICTION AND VENUE

1. Subject matter jurisdiction for the Motion arises in this Court pursuant to 28 U.S.C. § 1334. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for the Motion is proper in this district under 28 U.S.C. § 1409.

## BACKGROUND

**Commencement of WMB Receivership and WMI Bankruptcy Cases**

2. Before it filed for bankruptcy, Washington Mutual Inc. ("WMI" or "Debtor") was a holding company whose principal asset was its stock in WMB, a federally chartered savings association. On September 25, 2008, WMB was closed by the Office of Thrift Supervision, and the FDIC was appointed as receiver of WMB. Immediately after its appointment as Receiver, the FDIC sold most of the assets of WMB to JPMorgan Chase, National Association ("JPMC"). The following day, on September 26, 2008, WMI and its wholly-owned subsidiary, WMI Investment Corp. ("WMI Investment" or, collectively with WMI, "Debtors"), filed petitions for relief under Chapter 11 of the United States Bankruptcy Code in this Court.

**Resulting Litigation**

3. The events surrounding the seizure and sale of WMB have given rise to multiple related disputes, as reflected in three separate judicial proceedings, as well as in the FDIC's Proof of Claim, which remains unchallenged by the Debtors:

---

IV Master Trust; Lyxor/York Fund Limited; Permal York Ltd.; York Capital Management, L.P.; York Credit Opportunities Fund, L.P.; York Credit Opportunities Master Fund, L.P.; York Investment Master Fund, L.P.; York Select, L.P.; York Select Master Fund, L.P. Most of these Bank Bondholders are listed either in Amended Proofs of Claim Nos. 3710 and 3711, dated June 1, 2009, in Case Nos. 08-12228 and 08-12229, or in Proof of Claim No. 2480. Some of the Bank Bondholders retained Wilmer Cutler Pickering Hale and Dorr LLP after those Proofs of Claim were filed; it is expected that a further Amended Proof of Claim will be filed shortly to reflect their addition to the group of Bank Bondholders.

- DC Action: The Debtors filed their Complaint against the FDIC in the United States District Court for the District of Columbia on March 20, 2009. *See Washington Mutual, Inc., et al., v. Federal Deposit Insurance Corporation*, No.1:09-cv-00533 (D.D.C.). In that DC Action, the Debtors seek the allowance—in many instances, on a priority basis—and payment of many billions of dollars in claims from WMB's Receivership Estate (and from the FDIC in its corporate capacity). Complaint, Dkt. No. 1, Case No. 09-00533, Mar. 20, 2009 (D.D.C), ¶¶ 80-95. Over the objection of the Debtors and the FDIC, the Bank Bondholders were permitted to intervene in this action.

- JPMC Adversary. On March 24, 2009, JPMC commenced the JPMC Adversary against the Debtors and, with respect to Count 8 ("the Interpleader Count") only, the FDIC. Complaint, Dkt. No. 1, Adv. Proc. No. 09-50551 (Bankr. D. Del.). In that action, JPMC asserts that various assets claimed by WMI belonged instead to WMB and were transferred to JPMC pursuant to the Purchase and Assumption Agreement. In the Interpleader Count, JPMC recognizes that, if and to the extent any purported deposits represent valid liabilities payable by JPMC, there may be competing claims to the funds, including by the Debtors and the WMB Receivership Estate. *Id.* at ¶ 211. To avoid potential exposure to double liability, JPMC seeks to interplead any funds that constitute valid deposit liabilities. *Id.* at ¶ 212. In response to JPMC's Complaint, the Debtors have filed numerous counterclaims. Again, the Bank Bondholders were authorized to intervene in this action (at least with respect to the Interpleader Claim).

- Turnover Action. In the Turnover Action, filed by the Debtors on April 27, 2009, the Debtors seek an order requiring JPMC to "turnover" more than $4 billion in purported deposits that the Debtors claim that WMB or its subsidiary, WMBfsb, held on its behalf and that are now held by JPMC. *See* Complaint, Dkt. No. 1, Adv. Proc. No. 09-50934, Apr. 27, 2009 (Bankr. D. Del.). JPMC has filed Counterclaims against the Debtors and Cross-Claims against the FDIC in the Turnover Action. The FDIC has filed a motion for relief from the automatic stay, to the extent necessary, so that it may exercise the rights granted to it under the Purchase and Assumption Agreement to take back the putative deposits so that, if the Receivership Estate's claims are ultimately determined to be valid, it may exercise rights of setoff against any such deposit liabilities for the benefit of WMB's billions of dollars in unpaid creditors. *See* Motion of the Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank, for an Order Modifying the Automatic Stay, Dkt. No. 1834, Case No. 08-12229, Nov. 4, 2009 (Bankr. D. Del.). Yet, again, over the objection of the Debtors, the Bank Bondholders were authorized by this Court to intervene in the action.

- FDIC's Proof of Claim. The FDIC filed its Proof of Claim against the Debtors' estates on March 30, 2009 (Claim No. 2140). The Debtors have not objected to the FDIC's Proof of Claim.

92277-001\DOCS_DE:160374.1

**The Bank Bondholders' Claims**

4.  The Bank Bondholders are also pursuing their own claims in this bankruptcy case. To protect their interests in the Senior Notes and their claims against the Debtors, the Bank Bondholders filed timely proofs of claim in each of the Debtors' bankruptcy cases, see Claim Nos. 3710 and 3711 (the "Proofs of Claim" or "POC"), asserting (among other things) that the Debtors are liable for payment of all amounts due on the Senior Notes.[3] The Proofs of Claim include (among other claims) direct claims based on theories of, *inter alia*, alter ego, piercing the corporate veil, substantive consolidation, misrepresentation and material omissions, and fraudulent conveyance. POC ¶¶ 8, 9, and 13. The Proofs of Claim also include claims for breach of fiduciary duty, mismanagement, and undercapitalization, as well as other claims, related to (among other things) the nearly $4 billion in purported deposits allegedly transferred from WMB on the eve of its receivership, the billions of dollars in tax losses that were generated by WMB—not WMI—but in which WMI has nevertheless asserted interests, and the billions of dollars in purported dividends that WMI caused to be upstreamed from WMB to WMI. POC ¶¶ 10, 11, 15.

5.  The Proofs of Claim, as filed, sought damages of at least $1.8 billion—the face amount of the bonds then held by the original signatories to the Proofs of Claims—plus interest thereon. In addition, as noted (*see supra* note 2), some Bank Bondholders were included in a separate proof of claim filed by their then-counsel, which asserted claims for an additional approximately $1.9 billion.[4] The Proofs of Claim have already been amended once (*see supra* note 3) and it is expected they will be further amended in light of changes in the make-up of the

---

[3] The claims set forth in Proofs of Claim Nos. 3710 and 3711 were originally filed on March 31, 2009; amended proofs of claims were filed on June 2, 2009, and those amended proofs of claims were assigned Nos. 3710 and 3711.

[4] *See* Proof of Claim No. 2480.

- 4 -

92277-001\DOCS_DE:160374.1

Bank Bondholders; the total face amount of the WMB Senior Notes held by the Bank Bondholders as of today—and therefore the total amount of the claims at issue—is approximately $2.5 billion plus interest.

6. On January 22, 2010, the Debtors filed their Twentieth (20th) Omnibus (Substantive) Objection to Claims ("Objection"), in which they objected to the Proofs of Claims filed by the Bank Bondholders and asked the Court to disallow and expunge the claims in full as a matter of law. *See* Dkt. No. 2205, Case No. 08-12229 (Bank. D. Del. Jan. 22, 2010). In their Objection, the Debtors challenged the Bank Bondholders' standing to bring many of the claims, though even the Debtors did not dispute that the Bank Bondholders, rather than the FDIC, had standing to bring any fraudulent transfer claims. *See id.* at 13 & n.10 ("The FDIC does not have standing to assert the fraudulent transfer claim asserted by the Bondholders here."), 15 (excluding fraudulent transfer claim from list of claims Debtors allege the Bank Bondholders lack standing to assert).

7. This Court held a hearing on the Objection on April 6, 2010, at the conclusion of which the Court denied the Objection, holding that none of the Bank Bondholders' claims could be dismissed as a matter of law and that the parties could proceed with discovery on most of the claims, including the claims for misrepresentation, piercing the corporate veil, substantive consolidation, and fraudulent transfer. *See* Tr. April 6, 2010, Case No. 08-12229, at 129:8-131:4 (Bankr. D. Del.); Objection at 13 & n.10. In so holding, the Court made clear that at least some of the claims were direct claims of the Bank Bondholders for which they unquestionably had standing; that there were unresolved issues as to whether other claims were direct or derivative; and that even as to derivative claims, the claims could not be dismissed as a matter of law. *See, e.g., id.* at 130: 11-18 (holding that the claim for substantive consolidation is "a

direct claim"); *id.* at 129:23–130:10 (holding that whether claims for corporate veil piercing and alter ego were direct or derivative turn on Washington state law for which there is no clear decisional authority and that "even if it is a derivative claim, if the FDIC does not pursue it, the noteholders may ask for standing to bring it on behalf of all creditors."). The Court entered an order denying the Objection on April 21, 2010. *See* Dkt. No. 3549, Case No. 08-12229 (Bankr. D. Del. Apr. 21, 2010).

8. The Bank Bondholders, the Debtors and other interested parties are working on an appropriate discovery schedule to propose to the Court with respect to the litigation of the Bank Bondholders' claims. As counsel for the Debtors and counsel for the Bank Bondholders informed this Court, the parties are considering a discovery schedule that largely tracks the discovery schedule ordered in the class action proceedings in the United States District Court in the Western District of Washington (though the Debtors have still failed to produce a single document to the Bank Bondholders and, hence, the ability to complete discovery along the schedule in the class action is becoming less realistic as time passes). *See* Tr. April 21, 2010, Case No. 08-12229, at 29:8-24 (Bankr. D. Del.). Pursuant to the schedule in those proceedings, document discovery will end in September 2010, expert discovery will end in November 2011, and trial is scheduled to begin in July 2012. *Id.*

**The Global Settlement Agreement and the Plan and Disclosure Statement**

9. At a hearing on March 12, 2010, the Debtors announced that a tentative settlement had been reached among the Debtors, JPMC, and the FDIC, and outlined the major points of that purported settlement. Tr. March 12, 2010, Case No. 08-12229, at 18:4-26:1 (Bankr. D. Del.). Counsel for the Debtors acknowledged that the "agreement" was subject to many conditions, including approval by the FDIC Board of Directors and the disallowance of

- 6 -

the Bank Bondholders' claims. *Id.* at 24:18-21. On March 26, 2010, the Debtors filed a Disclosure Statement for the Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, along with a proposed plan that was predicated on a supposed "Global Settlement Agreement" among the Debtors, JPMC, and the FDIC. *See* Dkt. Nos. 2623 and 2622. However, notwithstanding the Debtors' representations to the contrary, the FDIC had not agreed to this version of the purported Global Settlement Agreement. Accordingly, on May 16 and 17, 2010, the Debtors filed an Amended Disclosure Statement and Amended Plan, along with a revised draft of the proposed Global Settlement Agreement. *See* Dkt. Nos. 3743 and 3745. And, on May 21, 2010, the Debtors filed yet another Amended Disclosure Statement (the "Disclosure Statement"), a Second Amended Joint Plan (the "Proposed Plan" or "Plan"), and yet another draft of the proposed Global Settlement Agreement—though this version as well was not executed by all the supposed parties thereto (in particular, the signatures of the so-called Appaloosa, Centerbridge, Owl Creek, and Aurelius Parties were not included). It is this Amended Disclosure Statement describing the Second Amended Joint Plan that is currently before the Court. *See* Dkt. Nos. 4241 and 4242.

10. The Proposed Plan would place the claims of the Bank Bondholders in a separate class, Class 17. Class 17, titled "Non-Subordinated Bank Bondholder Claims," includes "those certain proofs of claim filed against the Debtors and their chapter 11 estates by holders of funded indebtedness against WMB, which are listed on Exhibit 'B' to the Global Settlement Agreement" to the extent that they are not Subordinated Bank Bondholder Claims. "Subordinated Bank Bondholder Claims" are defined as Bank Bondholder Claims (as defined in the Plan) that "have not been determined pursuant to a Final Order to be subordinated in accordance with Section 510(b) of the Bankruptcy Code." Plan §§ 1.125, 1.181, 4.17, 7.1. To

date, Debtors have not sought to subordinate any of the Bank Bondholders' claims, much less obtained a Final Order doing so, and thus the Bank Bondholders' claims fall within Class 17 under the Plan.

11. The proposed treatment of the Bank Bondholders' claims under the Plan is dependent on whether or not the class votes to accept the Plan. If the Class accepts the Plan, the claims will be deemed allowed and will apparently receive distribution of a pro rata share, subject to contractual subordination rights, of no more than $150 million out of a hoped-for recovery of many billions of dollars in tax refunds attributable largely, if not entirely, to losses that were suffered by WMB, not WMI. If the Class votes to reject the plan, however, the Debtors apparently will reserve for the claims only if they are determined to be allowed against the Debtors. Discl. Stmt. at 84-5; Plan § 21.1.

12. As the Bank Bondholders make clear in objections they are filing today to the proposed Disclosure Statement, and as they will amplify at the appropriate time as necessary in objections to confirmation of the Plan, the proposed classification and treatment (to the extent understandable) of the Bank Bondholders' claims are contrary to the Bankruptcy Code and other applicable law, rendering the Plan non-confirmable. Moreover, the Disclosure Statement fails to provide adequate information regarding (among other things) the Bank Bondholders' claims and the proposed treatment thereof. The Bank Bondholders reserve all rights, claims and objections with respect to the Plan and Disclosure Statement. For purposes of this Motion, however, they simply seek the temporary allowance of their claims for voting purposes.

**Proposed Solicitation and Voting Procedures**

13. On April 23, 2010, the Debtors filed their Motion for an Order Pursuant to Sections 105, 502, 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 2002,

- 8 -

3003, 3017, 3018 and 3020, (I) Approving the Proposed Disclosure Statement and the Form and Manner of the Notice of the Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling A Confirmation Hearing, and (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Joint Plan ("the Disclosure Statement Motion"). *See* Dkt. No. 3568. As its title suggests, the Disclosure Statement Motion seeks not only the approval of the Disclosure Statement, but also approval of solicitation and voting procedures and plan confirmation procedures as well. With respect to voting procedures, the Motion proposes a voting deadline of July 7, 2010, at 5:00 p.m. In addition, the Motion and the proposed order accompanying the Motion provide that "if the Debtors have filed an objection to or request for estimation of a claim on or before the Record Date, such claim is temporarily disallowed, except as ordered by the Court before the Voting Deadline." Disclosure Statement Motion, ¶ 41(g). The Disclosure Statement Motion further provides that "If any creditor seeks to challenge the allowance of its claim for voting purposes, the Debtors propose that such creditor file with the Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such claim for voting purposes in a different amount (a 'Rule 3018 Motion').[5] *Id.* at ¶ 42. In accordance therewith, the Bank Bondholders now file this Motion seeking temporary allowance of their claims in the amount of $2.5 billion for purposes

---

[5] The effect proposed by the Debtors of a Rule 3018 Motion is unclear. The Disclosure Statement Motion provides that "[u]pon the filing of any such [3018 Motion], the Debtors propose that such creditor's Ballot be counted in accordance with the above-designated guidelines, unless temporarily allowed in a different amount by an order of the Court entered prior to or concurrent with entry of an order confirming the Plan." ¶ 42. It is not clear what "the above-designated guidelines" refer to. In any event, Rule 3018 specifically provides for the Court to temporarily allows claims for voting purposes.

of voting as Class 17 Creditors, with each Bank Bondholder (as identified in Footnote 2 above) to be allowed to vote its pro rata share of this amount.[6]

## ARGUMENT

14. As the Debtors recognize in their Disclosure Statement Motion, bankruptcy courts have the discretion to temporarily allow claims that are disputed or contingent for voting purposes. *See* Motion, at ¶¶ 40-42 (establishing procedures for filing 3018 motions). *See also In re Stone Hedge Props.*, 191 B.R. 59, 63 (Bankr. M.D. Pa. 1995) (court can temporarily allow claim in an amount it deems appropriate for voting purposes only); Fed. R. Bankr. P. 3018. The policy underpinnings for permitting a court to temporarily allow claims include the efficient administration of the estate and avoiding potential abuse of the objection process by plan proponents. *See* Collier on Bankruptcy ¶ 3018.01[5] (15th ed. rev. 2009). Temporary allowance is appropriate when an objection to the claim has been filed and "the objection was filed too late to be heard prior to the confirmation hearing, when fully hearing the objection would delay administration of the case, or when the objection is frivolous or of questionable merit.'" *Id*; *see also In re Frascella Enters.*, 360 B.R. 435, 457 (Bankr. E.D. Pa. 2007). The allowance or estimation of a claim for voting purposes is within the sound discretion of the court. *Frascella*, 360 B.R. at 458. To justify temporary allowance of their claims, the Bank Bondholders must show only that they have "colorable claim[s] capable of temporary evaluation." *Armstrong v. Rushton*, 294 B.R. 344, 354 (B.A.P. 10th Cir. 2003), *aff'd*, 97 Fed. Appx. 285 (10th Cir. 2004).

15. The circumstances here warrant temporary allowance of the Bank Bondholders' claims:

---

[6] The Bank Bondholders asserted identical claims against both WMI and WMI Investment because of the uncertainty of which Debtor was responsible for their claims. They do not seek a duplicate recovery and thus for purposes of this motion seek temporary allowance for voting purposes of only one claim in the amount of $2.5 billion.

*First,* it is clear that resolution of the Debtors' objections to the Bank Bondholders' claims prior to the plan confirmation hearing is not feasible (unless the plan confirmation proceedings are to be put off for the indefinite future). In denying the Debtors' motion to disallow the Bank Bondholders' claims as a matter of law, this Court has already determined that the Bank Bondholders have presented legally cognizable claims and that discovery, followed by an evidentiary hearing, is appropriate before final adjudication of the objections. Although the Bank Bondholders have served written discovery, identified individuals for deposition, and initiated discussions with the Debtors regarding a case management order, at this juncture no discovery has taken place—as noted, the Debtors have still not produced a single document to the Bank Bondholders—and there is no case management order in place. The Debtors and the Bank Bondholders have indicated to the Court, however, that the schedule under consideration, because of (among other factors) the potential need to coordinate discovery with that in the pending class action proceedings, could have discovery and the evidentiary hearing on the claims go well into 2012, if not longer. *See* Tr. April 21, 2010, Case No. 08-12229, at 29:8-24 (Bankr. D. Del.). Thus, resolution of the claims at the trial court level (without even considering any appeals) is likely years, not just weeks or even months, away.

*Second,* the Court's denial of the only specific objections asserted by the Debtors to date evidences that the objections are, at the least, "of questionable merit."

*Third,* under the terms of the Plan, depriving the Bank Bondholders of the right to vote on the Plan would substantially impair the Bank Bondholders' interests and completely misalign the economic interests of the members of Class 17 and their voting power. The Debtors have objected to the two largest proofs of claims in the Class—the proofs of claim filed by the

- 11 -

Bank Bondholders and the proof of claim filed by another group of holders of WMB Senior Notes represented by Bracewell & Giuliani. These two claims apparently constitute over 90% of the claims in the proposed Class. *See* Exhibit B to Plan Ex. H (Global Settlement Agreement). Thus, if this Motion to temporarily allow the Bank Bondholders' claims for voting purposes is denied, the acceptance or rejection of the Plan by the Class may be determined by members of the proposed Class holding less than 10% of the claims in the class. Moreover, on information and belief, some of the claims in Class 17 may be claims based on notes that are clearly subordinated to the senior WMB notes held by the Bank Bondholders—junior, subordinated notes issued by WMB. Thus, if temporary allowance of the Bank Bondholders' claims for voting purposes is not allowed, the members of the class with the least economic interest in the Plan may determine whether the Class accepts or reject the Plan. Indeed, as written, the Plan allows the Debtors to engineer precisely this result.

*Fourth,* while the Debtors attacked, without success, the legal validity of the Bank Bondholders' claims, many of the underlying *facts* set forth in the Bank Bondholders' proof of claim were taken from the Debtors' own pleadings, financial statements and SEC filings or have been asserted by multiple parties and in multiple proceedings. *See, e.g.*, POC ¶¶ 8, 9, 10, 11. *See also In re Washington Mut., Inc., Sec. Litig.*, Complaint, Dkt. No. 1, Case No. 07-01809, Nov. 7, 2007 (W.D. Wash.). Some of the allegations asserted by the Bank Bondholders (and others) have now been further buttressed in the testimony recently presented before the U.S. Senate Permanent Subcommittee on Investigations. *See, e.g., Opening Statement of Senator Carl Levin* dated April 13, 2010 (describing lax lending practices and high risk loans pursued by WMB under WMI's management) *and compare with* POC ¶ 13 (alleging as misrepresentations, statements made by various WMI officers regarding the "conservative lending standards" and

- 12 -

92277-001\DOCS_DE:160374.1

"rigorous credit standards" reflected in Washington Mutual's portfolio). Thus, while the Bank Bondholders have not yet had an opportunity to prove their factual allegations, those allegations are plainly "colorable" and, as this Court has already found, legally sufficient.

*Finally*, the face amount of the notes held by the Bank Bondholders provides the Court with a reasonable and justifiable basis for the "temporary evaluation" of the Bank Bondholder claims. Whether to temporarily allow a claim for voting purposes, and in what amount the claim should be estimated for such purpose, is "left to the discretion of the court to reasonably 'employ whatever method is best suited to the circumstances of the case.'" *Pension Benefit Guar. Corp. v. Enron Corp.*, No. 04 Civ. 5499, 2004 WL 2434928 at *5 (S.D.N.Y. Nov. 1, 2004); *see also Frascella*, 360 B.R. at 458 ("[D]etermination of whether and how to determine the temporary allowance of a claim is left to the sound discretion of the bankruptcy judge."). One goal of estimating claims for voting purposes is to ensure that "voting power is commensurate with the claimant's economic interest." *Frascella*, 360 B.R. at 459. While in some circumstances, it would be appropriate for the Court to hold evidentiary hearings regarding estimation of claims for voting purposes, given the circumstances here—where the Debtors have initiated plan confirmation proceedings on the heels of this Court's determination that the Bank Bondholders' claims are legally cognizable, where no opportunity for discovery as yet occurred, and where the claims of WMB noteholders are separately classified under the Plan—such proceedings would likely not assist the Court or render a better estimation of the claims than the face value of the notes. The Bank Bondholder Proofs of Claim assert several billions of dollars in damages based on various theories of recovery, including billions of dollars in fraudulent transfers of dividends, tax refunds, and deposit accounts. The face amount of the notes is an objective and conservative estimation of the claims. Moreover, estimating the claims at the face

92277-001\DOCS_DE:160374.1

value of the notes is consistent with the Bank Bondholders' relative economic interest vis-à-vis other claimants in Class 17, all of which are claims based on funded debt. Indeed, because the Plan purports to separately classify the claims of all holders of notes issued by WMB, there is no risk that temporarily allowing the claims of the Bank Bondholders in the face amount of their notes (and similarly allowing the claims of other holders of WMB Senior Notes in Class 17 also in their face amount) will either dilute the voting power of creditors in other classes or unfairly elevate the voting power of the Bank Bondholders over other holders of WMB Senior Notes.

## **NOTICE**

14. Notice of this Motion has been provided to: (a) counsel for the Debtors, Weil Gotshal & Manges, LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Marcia L. Goldstein, Esq.); (b) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Joseph McMahon, Esq.); (c) counsel to the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attn: Fred S. Hodara, Esq.; Scott L. Alberino, Esq.), Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Ave., NW, Washington, DC 20036-1564 (Attn: Scott L. Alberino, Esq.), Akin Gump Strauss Hauer & Feld LLP, 2029 Century Park E Ste. 2400, Los Angeles, CA 90067-3012 (Attn: Peter J. Gurfein, Esq. and David P. Simonds, Esq.) and Pepper Hamilton LLP, Hercules Plaza Ste 5100, 1313 N Market St., Wilmington, DE 19801 (Attn: David B. Stratton, Esq. and Evelyn J. Meltzer, Esq.); (d) counsel for JP Morgan Chase Bank, N.A., Sullivan & Cromwell, 1888 Century Park East, Los Angeles, California 90067 (Attn: Robert A. Sacks and Hydee R. Feldstein, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004 (Attn: Bruce E. Clark and Stacey R. Friedman, (e) counsel for the FDIC-Receiver, DLA Piper LLP, 1251 Avenue of the Americas, New York, NY 10020 (Attn:

John J. Clarke, Jr. and Thomas R. Califano), and Young Conaway Stargatt & Taylor LLP, 1000 West Street, 17th Floor, Wilmington, DE 19801 (Attn: M. Blake Cleary and Jaime Luton); (f) counsel for the WMB Noteholders, Bracewell & Giuliani 225 Asylum Street, Suite 2600, Hartford, Connecticut 06103-1516, (g) counsel for the Equity Committee, Ashby & Geddes, P.A., 500 Delaware Avenue, 8th Floor, P.O. Box 1150, Wilmington, DE 19899 (Attn: William P. Bowden, Esq.), and Susman Godfrey L.L.P., 645 Madison Avenue, 5th Floor, New York, NY 10065 (Attn: Stephen D. Susman); (e) counsel for the Appaloosa, Centerbridge, Owl Creek and Aurelius Parties, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004-1980 (Attn: Brad Scheler), and Blank Rome LLP, 1201 North Market Street, Suite 800, Wilmington, DE 19801 (Attn: Michael D. DeBaecke); and (f) all parties having filed requests for notices in the Debtors' Chapter 11 cases. The Bank Bondholders submit that such notice constitutes good and sufficient notice of this Motion and all proceedings to be held thereon, and that no other or further notice need be given.

## NO PRIOR REQUEST

15. No previous motion for the relief requested herein has been made to this or any other Court.

# CONCLUSION

For the reasons stated above, the Court should temporarily allow, for voting purposes only, the Bank Bondholders' claims against the Debtors in the amount of $2.5 billion.

Dated: May 28, 2010

WILMER CUTLER PICKERING HALE AND DORR LLP
Philip D. Anker
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

-and-

WILMER CUTLER PICKERING HALE AND DORR LLP
Russell J. Bruemmer
Nancy L. Manzer
Gianna M. Ravenscroft
Lisa E. Ewart
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

-and-

PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
tcairns@pszjlaw.com

Counsel for the Bank Bondholders