# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| WASHINGTON MUTUAL, INC., *et al.*,[1] | Case No. 08-12229 (MFW) |
| Debtors. | Jointly Administered |

**Hrg. Date: 6/17/10 @ 10:30 AM (Requested)**
**Obj. Date: 6/14/10 @ 4:00 PM (Requested)**

## MOTION OF THE OFFICIAL COMMITTEE
## OF EQUITY SECURITY HOLDERS IN SUPPORT OF ORDER
## DIRECTING APPOINTMENT OF AN EXAMINER UNDER 11 U.S.C. § 1104(C)

The Official Committee of Equity Security Holders (the "Equity Committee") of Washington Mutual, Inc. ("WMI" and, together with its chapter 11 debtor-affiliate, WMI Investment Corp., the "Debtors") brings this Motion for the Court to enter an order substantially in the form attached hereto directing the appointment of an examiner under 11 U.S.C. § 1104(c), and in support hereof respectfully states as follows:

## I.
## PRELIMINARY STATEMENT

1.      On April 26, 2010, the Equity Committee filed a Motion to Appoint an Examiner under 11 U.S.C. § 1104(c) (Docket No. 3579).  The Equity Committee's brief in support of that Motion is attached as **Exhibit A**.  On May 5, 2010, this Court denied the Equity Committee's Motion.  A transcript of the May 5, 2010 hearing which contains this Court's reasoning for the denial is attached as **Exhibit B** (May 5, 2010 hearing transcript at 88-90).  That denial was premised on two key facts:  (1) that the Debtors and Creditors' Committee already had conducted an investigation into the assets held by the Estates; and (2) that the Debtors and

---

[1]  Debtors in these Chapter 11 cases and the last four digits of each Debtor's federal tax identification numbers are: (i) Washington Mutual, Inc. (3725) and (ii) WMI Investment Corp. (5395).  The Debtors are located at 925 Fourth Avenue, Suite 2500, Seattle, Washington 98104.

Creditors' Committee would share the results of that investigation with the Equity Committee. However, events subsequent to the May 5, 2010 hearing have eviscerated both of these premises.

2. Appointment of an Examiner at this time will allow a full and transparent accounting of the assets of the Estates - an accounting that will be vital in shaping the positions of all parties to this case - as well as an independent review of Debtors' claimed basis for the proposed Global Settlement Agreement and the Plan - for which appointment of an Examiner will also substantially reduce the need for extended, contentious and time-consuming discovery by all parties, thereby substantially reducing the impact on this Court's docket.

3. This Motion does not seek to reargue the reasoning behind this Court's May 5, 2010 order denying the appointment of an Examiner (which, as this Court is aware, was recently certified for a direct appeal to the Third Circuit). Rather, this Motion is a new Motion based on a different record - the facts that have developed since entry of the May 5 Order. First, the Debtors and Creditors' Committee now claim that they have produced all documents related to their investigation of claims against the FDIC and JPMorgan Chase ("JPMC"). An analysis of those documents, however, reveals that the scope of their actual investigation was minimal at best.

4. Second, asserting various privileges, the Debtors and Creditors' Committee categorically refused to produce the fruits of their investigation (such as it was) to the Equity Committee. Instead, it has become clear that the Equity Committee will have to "re-invent the wheel," and that a reasonable analysis of these claims will be both time-consuming and expensive. Either of these facts is sufficient for this Court now to order the appointment of an Examiner. Together, they reveal the necessity of an Examiner in order to have a complete understanding of the assets in the Estates, how the circumstances that led to WMI's bankruptcy factor into the existence and valuation of causes of action that the Debtors propose to abandon,

and the basis for the proposed Global Settlement Agreement and Plan. The facts and analysis needed for that understanding are almost wholly missing at this point, and the Debtors have made clear their intent to keep that information concealed while they continue to insist that the proposed Global Settlement Agreement and Plan should be considered and approved as fast as possible.

5. On June 3, 2010, this Court invited a new Motion to Appoint an Examiner (*see, e.g.*, **Exhibit C**, Transcript of June 3, 2010 Hearing at 55:4-6; 63:9-14; 90:23-91:2) and the United States Trustee's Office renewed its request for Appointment of an Examiner as being in the best interests of the Estate. In the words of the Trustee, "the cost benefit analysis favors the appointment of an examiner in the short term as opposed to miring the process immediately and what seems to be protected [*sic*] litigation between the parties over a host of issues. And, in fact, the cooling down period, Your Honor, may, in turn, allow the parties to get their arms around some issues to have further discussions, and hopefully, potentially, resolve some points." **Exhibit C**, Transcript of June 3 Hearing at 86:11-18.

6. The Equity Committee agrees with the reasoning of the United States Trustee here. The Equity Committee does not know whether an Examiner's conclusions will favor the Debtors' shareholders in all particulars. Nevertheless, the Equity Committee believes strongly that in the interests of completeness, transparency, and efficiency, the appointment of an Examiner would redound to the benefit of all parties-in-interest.

7. Moreover, as noted at the June 3 hearing, the Equity Committee is prepared to withdraw its Notice of Appeal and Request for Direct Appeal to the Third Circuit should this Court indicate that it will order an Examiner given the changed circumstances here.

# II.
## BACKGROUND

8.     In their Responses to the original Examiner Motion, the primary argument of both the Debtors and the Creditors' Committee was that an Examiner was unnecessary because of the extensive investigation they had undertaken – both jointly and separately.   The Debtors and the Creditors' Committee also represented that they had shared – and would continue to share – the results of their investigations with the Equity Committee.   *See, e.g.,* **Exhibit B**, Transcript of May 5 Hearing at 70 (statement of counsel for Creditors' Committee that he "personally" "share[d] . . . our thought processes regarding those litigations and those assets"); Docket No. 3626, Debtors' Response to Examiner Motion at ¶ 40 (Debtors' statements that they shared work product with the Equity Committee).   Yet as described in the Equity Committee's Motions for Expedited Discovery (Docket No. 4343); for Rule 2004 Examination to JP Morgan (Docket No. 4301); and for Rule 2004 Examination to the FDIC and Other Third Parties (Docket No. 4414), the Debtors and Creditors' Committee have refused to turn over this work product in response to the Equity Committee's requests.

9.     On June 3, 2010 the Court denied the Equity Committee's request to obtain this work product because of the "absence of clear authority." **Exhibit C** at 90:2-3.  The Debtors and the Creditors' Committee also made clear at the hearing that they would not share their work product with the Equity Committee even though they quite easily could consent application of the common interest privilege and the parties could jointly ask this Court to further protect the continued applicability of the privilege among the Debtors, Creditors' Committee, and the Equity Committee by invoking Rule 502(d) of the Federal Rules of Evidence.   Thus, the Debtors and Creditors' Committee made clear their continued opposition to allowing the Equity Committee to

share in the analysis and investigations they conducted[2].

10.     The Debtors also claimed at the June 3 hearing that they had given the Equity Committee all documents they obtained from third parties.  *See* **Exhibit C** at 53:7-9.  As described in the Equity Committee's Rule 2004 Motions (Docket Nos. 4301 and 4414) and at the June 3 hearing (**Exhibit C** at 42:5-45:6), the investigation performed by the Debtors and the Creditors' Committee was virtually non-existent.  For example:

a.  The Debtors and Creditors' Committee did not receive a single document from the FDIC in the two adversary proceedings that they filed (in this Court and in the District of Columbia federal court).  Instead, the sum total of the FDIC's production was 238 heavily blacked-out pages produced in response to FOIA requests that reveal absolutely nothing.  Actions and comments by the FDIC underscore the importance of an investigation into claims against the FDIC.  For example, the FDIC agreed to indemnify JPMC up to $500 million for JPMC's breach of its confidentiality agreement with WMI.  And at the June 3 hearing, counsel for the FDIC candidly admitted that "we were motivated to settle these cases.  That's why we settled them.  I can stipulate to that now.  So I don't think they need to go searching through our files to find out why we were motivated."  **Exhibit C**, at 100:13-16.  The problem is that <u>nobody</u> has "searched through" the files of the FDIC.

b.  The Debtors and the Creditors' Committee did not follow through on the Rule 2004 discovery to JPMC that this Court authorized.  Instead, JPMC produced only

---

[2] Within the last 24 hours, undoubtedly influenced by the Court's comments on June 3, the Debtors have initiated discussions with counsel for the Equity Committee about terms for the sharing of additional information relevant to the Debtors' investigation and analysis. No agreements have been reached to date, nor would the Debtors' current proposals moot the need for an Examiner.

14 boxes of carefully selected material, while persisting in manifold objections to the Debtors' original discovery requests. As the Debtors themselves admitted, these documents raised serious questions about the extent of JPMC's production. *See* Docket No. 4301, (Equity Committee's Rule 2004 Motion to JPMC at ¶ 38 & Exhibit G to the Motion). Even this limited production, however, demonstrated the existence of an evidentiary basis to allegations that JPMC had misused Washington Mutual's confidential information and connived to reduce the price paid for WMB. *See, e.g.,* Docket No. 1997, Debtors' Rule 2004 Motion to Third Parties. The Debtors and Creditors' Committee could have at least followed up to ensure they had the JPMC discovery that this Court had previously authorized the Debtors to conduct before pulling the plug on claims against JPMC. They never did so.

c. The documents obtained by the Debtors from other third parties were similarly limited – (1) approximately 650 pages from the Office of Thrift Supervision; (2) approximately 900 documents produced by Citigroup; (3) approximately 500 documents produced by Blackstone; (4) approximately 27,500 pages from TPG, the entity that made a significant investment in WMI earlier in 2008 and whose documents have only marginal relevance to the claims that would be released; and (5) approximately 20 documents from Moody's and a lobbying firm called OB-C that counsel for the Equity Committee has not yet seen.

d. Neither the Debtors nor the Creditors' Committee took a <u>single</u> deposition, despite the two pending adversary actions and the Rule 2004 discovery to JPMC authorized by this Court.

e. The Debtors and Creditors' Committee also did not obtain a <u>single</u> document from the other investigations conducted into Washington Mutual by governmental agencies and legislative bodies.

11.     Also during the June 3rd hearing, the Court reminded the Debtors that the Equity Committee (and its constituency) are essentially the Debtors' "clients" with whom they are aligned against opposing litigants, namely JPMC and the FDIC.  *See* **Exhibit C**, June 3 Trans. at 55.  Rather than take the Court's comments to heart, on Friday, June 4, 2010, the Debtors issued separate notices of deposition - <u>to the members - and former members - of the Equity Committee</u>.  *See* **Exhibit D**.  These notices illustrate the backwards priority of the Debtors. Having failed to take any testimony about the facts that led to WMI's bankruptcy or the merits of the claims they propose to abandon, the Debtors evidently believe that their first depositions in this case should be directed towards the Equity Committee – apparently as part of an effort to show that the Equity Committee is guilty of "abuse of process" in this bankruptcy.

12.     These deposition notices confirm a consistent pattern here:  The Debtors obtain an extraordinarily limited amount of discovery from the FDIC and JPMC - parties against whom the Estates undeniably have significant litigation assets - while attacking and attempting to intimidate the Equity Committee.  It is the Equity Committee, however - not JPMC or the FDIC - whose interest is aligned with the interests that the Debtors and Creditors' Committee should be pursuing: maximizing the value of the Estates.

### III.
### <u>ARGUMENT</u>

13.     Even assuming that this Court was correct in denying the appointment of Examiner on May 5, the factual basis for that ruling has changed so significantly that this Court should now appoint an Examiner under the very logic that this Court previously used to deny that

relief.

14.     The Court predicated its May 5 decision on two assumptions: (1) that the Debtors and Creditors' Committee had adequately investigated the underlying facts here, both by themselves and through the help of various governmental entities; and (2) that the Debtors and Creditors' Committee would be sharing their work product with the Equity Committee. *See* **Exhibit B**, at 88-90.  Both of these assumptions have now proven to be incorrect, however, and the facts relevant to each now independently demonstrate the necessity for an Examiner here.

15.     *First*, as of the June 3, 2010 Hearing, the Debtors and Creditors' Committee were adamant that they would not voluntarily share their work product with the Equity Committee and would appeal any judicial directive to do so.  Instead, it became quite clear that the Equity Committee would have to undertake an expensive and time-consuming investigation of its own. Indeed, investigation of the Global Settlement and Plan necessarily will require analysis of the events that led to the bankruptcy filing, as they relate to evaluation of the claims that the Debtors propose to release in a very broad fashion.

16.     The Hearing also underscored the expectation that, going forward the Debtors and Creditors' Committee would fight the Equity Committee at every turn in its quest to determine the facts here.  By contrast, a court-appointed Examiner presumably will not have to contend with non-stop, unified opposition from the Debtors and Creditors' Committee and should instead be able to conduct both a faster and more thorough investigation than the Equity Committee - thereby avoiding the barrage of discovery motions that are otherwise likely to dominate these proceedings for months to come.

17.     The results of that investigation will provide an objective check on what now appears to be a self-interested decision-making process by the Debtors and their allies that is

completely lacking in transparency. Given both the magnitude of this bankruptcy and the public interest in the events that led to it, it is essential that all interested parties - and the Court - have the benefit of the kind of factual development and legal analysis that a skilled Examiner is capable of doing. For these reasons, and although the Equity Committee is prepared to continue doing what it can to develop information and analysis in the face of rampant hostility from the Debtors (as manifested most recently by the Debtors' issuance of notices to depose current and former members of the Equity Committee), and will continue to do so if left with no reasonable alternative, the Committee continues to believe that an Examiner is both necessary and entirely appropriate here.

18.     *Second*, the Debtors and Creditors' Committee have not undertaken the necessary investigation here. As discussed in the Background section, they have not received a single document in discovery from the FDIC (only a ridiculously cramped production in response to FIOA requests) and they have not followed through on the Rule 2004 discovery this Court authorized against JPMC. Nor have they taken even a single deposition. Instead, amazingly, they now intend to make the members of the Equity Committee (including former members) the first people whose testimony is pursued in this case.

19.     It further appears that although government agencies, prosecutors, and congressional committees all have conducted investigations into certain aspects of the events that led to WMB's closure and sale, the Debtors and Creditors' Committee did not consider any of that information before agreeing to the proposed Global Settlement. Indeed, it is apparent that gaining access to much of that information may be difficult or impossible. Some (or perhaps most) of these other investigations focused on systemic issues about how the government and private banks might avoid a recurrence of lending problems that allegedly contributed to the

seizure of WMB, rather than on issues highly relevant to the existence and valuation of WMI assets in this bankruptcy. In fact, JPMC recently informed the Equity Committee during a meet and confer that no governmental agency has opened any investigation regarding JPMC's conduct during its acquisition of WMB. More importantly, even assuming that all these investigations had been focused in pinpoint fashion on issues of direct relevance here, we now know that the Debtors never obtained the results of these investigations. The full content of these investigations is unknown and they certainly do not provide the kind of baseline factual understanding that should be available to the Court and all interested parties in this bankruptcy.

20. In short, substantial investigation still needs to happen here. The only question is who conducts it: (a) the Equity Committee, in the context of a highly contentious adversarial process that by its nature is directed at the Plan and underlying Settlement; or (b) an Examiner, with whom all parties will be required to cooperate, and who should have undisputed access to the Debtors' work product. Not only will an Examiner be able to conduct a less antagonistic and shorter investigation, the result will be a more comprehensive and transparent record that all parties can use going forward.

21. Perhaps for these reasons, in the two other most comparable bankruptcies of this decade - *Enron* and *Lehman* - the Court appointed an Examiner to investigate the underlying facts. An Examiner here is similarly appropriate. By conducting an investigation and making the results of that investigation public, appointment of an Examiner will in fact make resolution of this case more efficient and less costly.

22. Because this Motion takes the Court's May 5 Order denying an Examiner as a given, this Motion is separate from that Order; the issue here concerns whether new information in the record since May 5 - which contradicts the premises underlying the Court's earlier ruling -

now provides sufficient grounds for appointment of an Examiner. Thus, this Court is not considering the same issues that would be presented to an appellate court in an appeal from the May 5 Order. Moreover, as the Third Circuit has recognized, the principle that a notice of appeal divests a lower court of jurisdiction of the issue "is a prudential doctrine, [and] it is not used when its application 'would defeat its purpose of achieving judicial economy.'" *Mitchell v. Henry*, 255 Fed.Appx. 684, 686 (3d Cir. 2007) (*quoting Pensiero v. Lingle*, 847 F.2d 90, 98 (3d Cir.1988)). In *Mitchell*, the Third Circuit permitted the lower court to rule on a motion even though a notice of appeal already had been filed.

23.     However, in the interests of resolving any doubt on the Court's power to act on this Motion, the Court may condition its appointment of an examiner pursuant to the instant Motion on the Equity Committee's withdrawal of its Notice of Appeal and Request for Direct Appeal to the Third Circuit. *See, e.g., Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 445-446 & n. 4 (1974) (discussing and permitting petitioner's original withdrawal of appeal to vest jurisdiction back to district court after original notice of appeal to the Supreme Court).

24.     Should this Court deny this new Motion, the Equity Committee respectfully requests that this Court certify for direct appeal the denial of this Motion under the "public importance" prong of 28 U.S.C. § 158(d)(2) so that the Third Circuit can consider the denial of both Motions simultaneously.

WHEREFORE, the Equity Committee respectfully requests that the Court enter an order substantially in the form attached hereto directing the appointment of an Examiner, and for such additional relief as the Court deems appropriate.

Dated: June 8, 2010

**ASHBY & GEDDES, P.A.**

William P. Bowden (DE Bar No. 2553)
Gregory A. Taylor (DE Bar No. 4008)
Stacy L. Newman (DE Bar No. 5044)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
Facsimile : (302) 654-2067
E-mail:   wbowden@ashby-geddes.com
          gtaylor@ashby-geddes.com
          snewman@ashby-geddes.com

*Co-Counsel to the Official Committee of Equity
Security Holders of Washington Mutual, Inc., et al.*

**SUSMAN GODFREY, L.L.P.**
Stephen D. Susman (NY Bar No. 3041712)
Seth D. Ard (NY Bar No. 4773982)
654 Madison Avenue, 5th Floor
New York, NY 10065
E-mail:
ssusman@susmangodfrey.com
sard@susmangodfrey.com

Parker C. Folse, III (WA Bar No. 24895)
Edgar Sargent (WA Bar No. 28283)
Justin A. Nelson (WA Bar No. 31864)
1201 Third Ave., Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
E-mail:
pfolse@susmangodfrey.com
esargent@susmangodfrey.com
jnelson@susmangodfrey.com

*Co-Counsel for the Official Committee of Equity
Security Holders of Washington Mutual, Inc., et al.*