IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WASHINGTON MUTUAL, INC., et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-12229 (MFW)<br><br>(Jointly Administered)<br><br>**Hearing Date: June 17, 2010 at 10:30 a.m. (ET)** |

## REPLY IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS IN SUPPORT OF ORDER DIRECTING APPOINTMENT OF AN EXAMINER UNDER 11 U.S.C. § 1104(C)

The Official Committee of Equity Security Holders (the "Equity Committee") of Washington Mutual, Inc., by and through its undersigned counsel, submits this reply in support of its *Motion of the Official Committee of Equity Security Holders in Support of Order Directing Appointment of an Examiner Under 11 U.S.C. § 1104(c)* (the "Motion") (Docket No. 4644). In further support of the Motion, the Equity Committee respectfully represents as follows:

### Introduction and Summary of Argument

1. The multiple objections lodged by various parties focus primarily on two issues, one procedural and one factual. Procedurally, the Objectors dispute this Court's authority to rule on this Motion because of the overlap with the prior Examiner motion. As discussed in more detail below, however, these arguments are easily disposed of. Even under the authority cited in the Objectors' briefs and assuming *arguendo* that this Motion completely duplicated the earlier Examiner motion, this Court may determine the merits of the Motion.

2. Factually, the Objectors argue that because the Debtors and Creditors' Committee

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Washington Mutual, Inc. (3725) and WMI Investment Corp. (5396). The Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98101.

{00416089;v1}

agreed after the filing of this Motion to provide some work product to the Equity Committee, the reasoning for an Examiner somehow disappears. Far from it. After the six different objections, here is what remains undisputed about the "investigation" by the Debtors and the Creditors Committee. (1) The sum total of the production from one of the Settling Parties – the FDIC – was 238 heavily-redacted pages. (2) From JPMC, the other Settling Party, the Debtors received only 14 boxes of documents, otherwise never utilized the Rule 2004 discovery that this Court authorized, and acknowledged that the limited production it did receive was inadequate. (3) The Debtors never took a single deposition in the Adversary Proceeding, the Turnover Action, or the DC Action. (4) With respect to the other investigations on which the Debtors and Creditors' Committee relied so heavily in the prior Examiner motion and which formed a basis for this Court's ruling denying the Motion, neither the Debtors nor the Creditors' Committee obtained a <u>single</u> document from these other investigations. Yet the Objectors still claim that these events have been "investigated to death." If so, the investigation here died in its infancy.

3. An investigation by other entities that the Debtors have not used is no investigation at all for purposes of this case. For example, since the filing of this Motion, the Equity Committee has learned that JPMC has a vast database consisting of over 1 million documents in word-searchable format that were produced to the Senate and to the Department of Justice in their investigations related to Washington Mutual. The Debtors <u>never obtained this database</u>. It took the Equity Committee less than a week to learn of its existence. The attached Declaration of Edgar Sargent details the discovery games that JPMC evidently was playing with respect to this database, literally playing with words to hide the existence of the database from the Debtors. *See* **Exhibit A**, Declaration of Edgar Sargent. Either the Debtors knew about the database and failed to pursue it, or more likely, their investigation failed to uncover the existence of this database.

4. Now the Settling Parties act as if there is nothing new to see here; that everything worth doing already has been done. We now know that the opposite is true – that in fact, the Debtors made hardly any attempt to obtain documents from the parties with whom they are entering a multi-billion dollar settlement agreement.

5. An investigation into the events here is not for the benefit of future historians or curious rubberneckers. Rather, it is vital in order to understand the assets of the Estate. With respect to the hard assets, the Debtors still have not produced an itemized inventory of what specifically JPMC obtained from WMB.

6. With respect to the litigation assets, the Equity Committee's review of the limited JPMC production confirms that JPMC was planning to acquire WMB through an FDIC receivership as early as July 2008 – substantially before both the WMB receivership and even the events leading to the Lehman bankruptcy in September 2008. In fact, the JPMC documents reveal that JPMC and the FDIC were working hand-in-hand well before the FDIC revealed that it would take WMB into receivership or that it would auction WMB to the highest bidder. The FDIC agreed to indemnify JPMC up to $500 million for JPMC's breach of its confidentiality agreement with WMI that was signed in March 2008. Soon after the acquisition, JPMC reported negative goodwill, virtually unheard of in an acquisition and indicating that JPMC paid well below the actual value of WMB. In January 2009, JPMC's CEO announced that the WMB acquisition would generate more than $2 billion in profit annually for the company. Indeed, in the first quarter results for 2009, JPMC announced that the acquisition of WMB's loans alone would result in a gain to income of $29.1 billion to the company. *See* **Exhibit B,** Ari Levy and Elizabeth Hester, *JPMorgan's WaMu Windfall Turns Bad Loans Into Income*, Bloomberg News, May 26, 2009.

7. Now, however, the Proposed Settlement pays off those ahead of the Equity

Committee in priority virtually in full yet leaves the equity holders with nothing. Little wonder why all parties to the Proposed Settlement hope to rush through a plan without any meaningful investigation into the actual assets of the Estate. A targeted Examiner investigation tailored to investigating the role of JPMC and the FDIC in causing the bankruptcy and to determining the assets of the estate is vital.

## II. Argument

### A. This Court Can Determine the Merits of this Motion

8. The Objectors here first argue that this Court is without authority to order an Examiner here. Such an argument is wrong on the law. As a preliminary matter, the Objectors try to label this Motion as a Rule 60(b) Motion. This Motion is not under Rule 60(b), however. Rather, it is a new Motion for Appointment of an Examiner under different facts. Nothing in Section 1104 of the bankruptcy code prevents parties from filing more than one request for an Examiner. This fact alone is dispositive of the issue, as this Court has full authority to rule on the Motion.

9. A court can hold that a motion is barred by *res judicata*, but that principle does not apply here. The test that the Debtors attempt to use – whether the issue is the same "cause of action" – is inapplicable on its face to a Motion that is not a cause of action at all. Rather, under *res judicata*, "'[T]he focal points of our analysis are whether the acts complained of were the same, whether the material facts alleged in each suit were the same and whether the witnesses and documentation required to prove such allegations were the same.'" *Elkadrawy v. Vanguard Group, Inc.*, 584 F.3d 169, 173 (quoting *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 984 (3d Cir.1984)). Here, the scope of the materials that the Debtors had in their possession was unknown to the Equity Committee at the time of the first Examiner motion. For example, the Equity Committee did not receive the limited FDIC production in the Debtors' possession until

late May. The Debtors also maintained – and continue to maintain – that they were relying on other investigations as well. Again, it was not until after the May 5 hearing that the Debtors told the Equity Committee that it actually had no documents from these other investigations. Because the material facts here are different – namely, the actual scope of the investigation now known as of this Motion – *res judicata* does not apply.

10. Even assuming that *res judicata* does apply and that this Motion is, as the Objectors maintain, simply a motion under Rule 60(b) to modify a judgment, this Court has the power to "determine the merits of" this Motion. As the very cases cited in Paragraph 10 of the Debtors' Response and Paragraph 14 of the Creditors' Committee's Response show, this Court can inform the appellate court that it intends to grant the Motion, at which point the appellate court will remand the case.

11. The Debtors also do not dispute that this Court has jurisdiction to actually grant the Motion as soon as the Equity Committee files a Motion dismissing the appeal. The Equity Committee will withdraw the appeal as soon as this Court indicates that it will grant this Motion.

**B.     The Appointment of an Examiner is Necessary and Appropriate**

12. On the merits of a new Examiner here, the Objectors largely rehash the discredited argument that WMI has been "investigated to death." That statement simply cannot apply to the investigation conducted by the Debtors and Creditors' Committee here. As discussed extensively in the Introduction, at the last hearing, and in the discovery motions at issue at the last hearing, the investigation into the underlying claims against JPMC and the FDIC was minimal and perfunctory.

13. The Objectors continue to rely on the government investigations that took place into the collapse of Washington Mutual as grounds for denying an Examiner here. This argument is flawed for at least three reasons, each of which independently supports an Examiner

here. *First*, by public account, the investigations into Washington Mutual largely centered around the company's mortgage and loan practices. They did not focus on the role JPMC played in the collapse of the bank, and they only tangentially focused on the role of the FDIC. *Second*, even the limited scrutiny applied to the events central to the claims here raised more questions than answers. For example, the Senate Investigation revealed that WMB was solvent and would have passed the federally-mandated "stress test" occurring a few months later. *Third*, and most importantly, neither the Debtors nor the Creditors' Committee ever obtained access to the results of these investigations, or used these investigations to spur their own investigations, or even obtained any documents from these investigations. That these other sources of material sit untapped does not affect whether a proper investigation occurred <u>here</u>.

14. The Debtors' argument that these other investigations obviate the need for an Examiner stands in stark contrast to the information the Equity Committee just learned about a trove of documents that JPMC turned over to the Senate and the Department of Justice but that the Debtors never obtained or apparently even knew existed. The documents that JPMC produced in response to these other investigations are in the millions and are contained in a fully searchable database. The database includes both heritage Washington Mutual documents and documents gathered from JPMC's files. Despite the obvious relevance to the case, JPMC did not produce it to the Debtors or, apparently, even let them know that it existed.

15. Counsel for the Equity Committee discovered the existence of this database in meet and confer sessions with JPMC's attorneys. In justifying its refusal to produce documents responsive to a request for "[a]ll documents concerning any investigations by federal, state or municipal government bodies of JPMC related to its acquisition of WMB," counsel for JPMC indicated that there had been no government investigations of JPMC related to its acquisition of WMB. See Declaration of Edgar Sargent at ¶ 5. Based on this statement, counsel for the Equity

Committee represented in a brief to this Court that JPMC had indicated there had been no government investigation into its conduct regarding the WMB acquisition. Counsel for JPMC then contacted counsel for the Equity Committee to complain that this statement was inaccurate. *Id.* ¶¶ 6-8. After some initial confusion trying to understand the distinction being drawn by JPMC, the Equity Committee discovered that JPMC had been differentiating between government investigations into JPMC and government investigations into JPMC's <u>conduct</u>, whatever that distinction is worth. While JPMC contends that the former never occurred, it not only acknowledges the latter, but intends to rely on these investigations into JPMC's "conduct" to support its theory that it did nothing wrong. *Id.* ¶¶ 7-8. Learning this, the Equity Committee requested that JPMC produce any documents related to any investigation in which JPMC contends its conduct was an issue. At this point, counsel for JPMC disclosed the existence of the PSI investigation database. *Id.* ¶ 9. This database is a rather large "stone unturned" that the Equity Committee quite quickly uncovered and that inexplicably was not produced to the Debtors. May 5 Hearing Transcript at 98:14-17.

16. The existence of this database not only shows how JPMC appears to have hoodwinked the Debtors and why a real investigation never occurred here, it also demonstrates the massive discovery games that JPMC was playing and continues to play. JPMC's documents play a central role in determining the assets of the Estate. Yet despite this Court's Rule 2004 order giving the Debtors the right to obtain these documents and investigate the claims, JPMC produced only 14 boxes of material.

17. As the Equity Committee has now learned both through conversations with JPMC and reviewing the Debtors' correspondence, JPMC's production was culled from the email of only seventeen employees. It limited its search to this small group even though its internal documents identify over one-hundred employees involved in the due diligence of Washington

Mutual. Based on meet and confer correspondence with the Debtors, JPMC conducted no searches for documents maintained by employees in any of the following departments: accounting, corporate communications (i.e. press relations); audit (admittedly involved in due diligence); chief investment office (admittedly involved in acquisition); commercial banking (admittedly involved in due diligence); and the tax group (admittedly involved in acquisition). *See* December 18, 2009 letter from Erica Taggart to Brian Glueckstein at pages 2-4, Exhibit 1 to the Declaration of Edgar Sargent. In the departments where JPMC did conduct searches, it appears to have limited those searches to certain employees and omitted members of the departments who were more likely to have been substantively involved in the day-to-day work. *Id.*

18. In addition to limiting its search to seventeen employees, JPMC also apparently confined its search to only one type of document: email and attachments. JPMC did not produce any electronic documents other than email stored on network drives or individual's computers. It did not produce any documents that existed in paper form. It did not produce any accounting records or financial information from any accounting database it maintains, unless such data happened to be attached to an email from one of the custodians.

19. The Debtors and Creditors' Committee argue that because they now have agreed to produce work product, an Examiner is now unnecessary. This argument is wrong for two independent reasons. *First,* it ignores that the Equity Committee still is not receiving all of the work product. *Second,* the production of work product is meaningful only to the extent that they conducted an underlying investigation.

20. With respect to the production of the work product itself, soon after the Equity Committee filed this Motion, the Debtors became substantially more forthcoming about allowing access to work product that the Equity Committee first requested on May 7. The Equity

Committee is cooperating with the Debtors to facilitate the transfer, and the parties are using the exact method suggested by the Equity Committee when it first made a request for this work product – a Rule 502(d) order that was submitted to this Court on June 15. The Equity Committee will take what it can get. To date, it cannot determine the utility of what the Debtors have because they have not yet produced anything. The Equity Committee and the Debtors are still trying to resolve some issues regarding the scope of this work product production, such as whether the Equity Committee will be able to access informal analysis contained in email or advice passed along to the Debtors via email.

21. The Creditors' Committee has been substantially less forthcoming in their work product. They have not agreed to share their work product or attorney client communications. The Creditors' Committee argues that it would be "disingenuous" for the Equity Committee to agree that the Creditors' Committee does not have to produce the material yet use the lack of production as a ground for appointing an Examiner. *See* Creditors' Committee Brief ¶ 5. To the contrary, that the Creditors' Committee still refuses to produce this material – even though it can do so lawfully – shows why an Examiner would be helpful. An Examiner would have access to the work product while the Equity Committee does not.

22. Moreover, any work product they have is limited by its nature to the investigation actually performed by the Debtors and Creditors' Committee.

23. The FDIC references the "extensive discovery available to the Equity Committee," but the FDIC concedes that this extent of this discovery does not encompass the FDIC's own documents. FDIC Brief ¶ 15. The FDIC's brief rehashes its Motion to Dismiss in the DC Action about why it believes the Estate's claims have no merit. The FDIC's arguments, however, should be irrelevant to the resolution of the Examiner Motion. *First*, this Motion is not a Motion to Dismiss the claims. The DC Court has denied without prejudice the FDIC's

arguments, and it should not be allowed to backdoor them here. *Second*, the FDIC's arguments are irrelevant to this Motion. Even assuming *arguendo* that the FDIC is entirely correct that its claims should be dismissed, the underlying facts are relevant to other claims being released in the proposed settlement.

24. Some of the Objectors use the fact that $30 million a month is accruing to the Note Holders as reason to deny an Examiner. This argument is flawed for numerous reasons, including the fact that the Debtors had nearly two years to conduct an investigation they did not do. To now use this passage of time as reason to deny the Examiner is simply trying to run out the clock.

25. Just as importantly, on page 283 of the Debtors' Fourth Amended Plan filed recently with the Court (Docket # 4691), note 4 states that interest will accrue until December 31, 2010. Thus, any delay until the end of the year apparently will cause no increase in interest payments for the Senior Subordinated Note Holders. And even assuming that the entire $30 million continues to accrue each month and that the Note Holders would not release it in any settlement, a few extra months is worth trying to determine the assets held by the Estate so that all parties who are entitled to do so can share in the Estate's proceeds. Indeed, because the Equity Committee is lowest in priority, the Equity Committee also wishes for a quick resolution here. But first there should be an investigation of the potential tens of billions of assets held by the Estate.

26. In addition to performing the investigation that has not yet occurred here, an Examiner likely will enable a quicker resolution of the case. A report provides all interested parties with a neutral analysis of the claims and may pave the way for settlement.

27. The difficulties encountered by the Equity Committee so far in trying to obtain discovery also demonstrate that an Examiner can perform the tasks here quicker and cheaper

than the discovery that needs to be conducted before plan confirmation.

28. Because this bankruptcy involves the largest bank failure in the history of the United States, it is also important to the process itself that a full accounting of the Estate occur here. The Settling Parties wish to cram everything into the plan confirmation process, which has a different standard for determining reasonableness. At a minimum, the importance of this bankruptcy is a factor this Court should weigh in determining whether an Examiner should investigate the assets of the Estate in a completely transparent manner.

29. Finally, the Equity Committee is open to working with the Court and all parties on a timeframe and scope that makes sense given the investigation here. For example, the Examiner could focus primarily on determining the hard assets of the Estate and the role of JPMC and the FDIC in the bankruptcy. The Court also could set timelines to ensure that the Examiner proceeds as expeditiously as possible.

30. Indeed, the timeline for appointing an Examiner through this Motion may well be quicker than the timeline for resolution of the direct appeal to the Third Circuit of the first Examiner motion, which in the Equity Committee's view needs to occur before any plan confirmation hearing.

**WHEREFORE**, the Equity Committee respectfully requests that the Court grant the relief requested by this Motion, and for such other and further relief as it deems just and proper.

Dated: June 16, 2010
    Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

/s/ William P. Bowden

William P. Bowden (DE Bar No. 2553)
Gregory A. Taylor (DE Bar No. 4008)
Stacy L. Newman (DE Bar No. 5044)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
Facsimile : (302) 654-2067
wbowden@ashby-geddes.com
gtaylor@ashby-geddes.com
snewman@ashby-geddes.com

-and-

**SUSMAN GODFREY, L.L.P.**
Stephen D. Susman (NY Bar No. 3041712)
Seth D. Ard (NY Bar No. 4773982)
654 Madison Avenue, 5th Floor
New York, NY 10065
ssusman@susmangodfrey.com
sard@susmangodfrey.com

Parker C. Folse, III (WA Bar No. 24895)
Edgar Sargent (WA Bar No. 28283)
Justin A. Nelson (WA Bar No. 31864)
1201 Third Ave., Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
pfolse@susmangodfrey.com
esargent@susmangodfrey.com
jnelson@susmangodfrey.com

*Co-Counsel to the Official Committee of Equity Security Holders of Washington Mutual, Inc. et al.*