-------------------------------------------------------------x

| | | |
|---|---|---|
| | : | **Chapter 11** |
| *In re* | : | |
| | : | **Case No. 08-12229 (MFW)** |
| **WASHINGTON MUTUAL, INC., et al.,**[1] | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |
| | : | Re: Docket No. 2531 & 3641 |
| | : | |

-------------------------------------------------------------x    Hearing Date:  July 8, 2010 at 10:00 a.m. (EDT)

### DEBTORS' REPLY TO TRANQUILITY MASTER FUND, LTD.'S RESPONSE TO DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 2206

Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI

Investment") as debtors and debtors in possession (collectively, the "Debtors"), file this reply

(the "Reply") to Tranquility Master Fund, Ltd.'s ("Claimant" or "Tranquility") Response

("Claimant's Response") to Debtors' Objection (the "Objection")[2] to Proof of Claim No. 2206

(the "Claim"), and in support of the Objection, the Debtors respectfully represent as follows:

### PRELIMINARY STATEMENT

1.    Although the Claim should be disallowed for the multitude of reasons described

in the Objection, the Claim fails as a matter of law with respect to three undisputed points.[3]

Specifically, Tranquility's federal and state law claims fail as a matter of law because the

securities at issue were not offered pursuant to a registration statement, because its state law

claims are preempted under applicable federal law, and because the Claimant has not pled fraud

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395).  The Debtors' principal offices are located at 925 Fourth Avenue Suite 2500, Seattle, WA 98104.

[2] All capitalized terms not defined herein shall have the meaning ascribed to them in the Objection.

[3] Pursuant to the Stipulation of Counsel, entered April 16, 2010 [Docket No. 3499], the parties agreed to bifurcate the issues to be addressed with the Court.  All other issues not addressed here but raised in the Objection shall be briefed at a later date if necessary.

with particularity as required under Federal Rule of Civil Procedure ("FRCP") 9(b), made applicable here by Bankruptcy Rules 7009 and 9014(c). While Claimant devotes large sections of its brief to "Background," *see* Claimant's Response at ¶¶ 8-18, the Claimant does not dispute any material facts relating to the three points at issue and has failed to demonstrate why its Claim should not be disallowed.[4]

2. First, Claimant's federal claim asserts that its securities were sold pursuant to a misleading registration statement, yet 51 out of the 56 securities at issue were not issued pursuant to any registration statement. Claimant focuses on challenging such securities' issuance pursuant to a private placement exemption, but such exemption is beside the point. Even if such securities were not exempt from the registration requirements—and they were—such securities were not actually issued pursuant to a registration statement, nor could they be.

3. Second, Tranquility's state law claims also fail as a matter of law since such claims directly challenge the loan origination process and appraisal structure at Washington Mutual Bank ("WMB"), WMI's separate operating subsidiary, fields that are entirely preempted by the Home Owners' Loan Act, 12 U.S.C. §§ 1461 *et seq.*, ("HOLA"). Moreover, Tranquility's claims with respect to the privately placed securities are also preempted by the plain language of the National Securities Markets Improvement Act of 1996 ("NSMIA"), which prohibits state laws from imposing "conditions, based on the merits of such offering or issuer, upon the offer or sale of any security." 15 U.S.C. § 77r(a)(3).

4. Finally, Tranquility's claims, which assert that WMI acted with intent and as part of an overarching conspiracy, are based in fraud and accordingly are required under FRCP 9(b) to be pled with particularity. However, Claimant has failed to plead such claims with

---

[4] Such background, which largely consists of a rehashing of Tranquility's Claim, is of no relevance to the three issues being decided here. To the extent any part of Tranquility's Claim survives this initial round of briefing, Debtors will address such allegations during subsequent briefing.

particularity, instead making vague allegations about WMB and its subsidiaries and attempting to tie such actions to WMI by making generalized assertions that WMI controlled such entities. Accordingly, the Claim should be disallowed.

**ARGUMENT**

**I.**    **Claimant Fails to Assert a State or Federal Claim Against The Securities Issued Pursuant to the Private Placement Exemption**

    **A.**    **Section 11 is Inapplicable in the Absence of a Registration Statement**

        1.    **The Vast Majority of Claimant's Securities Were Not Registered Under the Securities Act**

5. It is axiomatic that Claimant cannot establish liability for a defective registration statement under section 11 of the Securities Act, 15 U.S.C. § 77k(a), in the absence of an applicable registration statement.[5] Yet, 51 out of the 56 securities (the "Junior Subordinated Certificates")[6] that were purchased by Claimant, a sophisticated institutional investor, were not issued pursuant to a registration statement.

6. A security can only be issued *pursuant* to a registration statement for the purposes of section 11 if that security is actually registered thereunder. *Barnes v. Osofsky,* 373 F.2d 269, 272 (2d Cir. 1967); *see also Anisfeld v. Cantor Fitzgerald & Co.*, 631 F. Supp. 1461, 1464 (S.D.N.Y. 1986) (court dismissed claim under section 11 because the securities involved were not registered and section 11 does not apply to unregistered securities); *Wachovia Bank and Trust Co. v Nat'l Student Mktg. Corp.*, 650 F.2d 342, 358 (D.C. Cir. 1980) (holding that because the transaction at issue did not involve a public offering, it was not subject to the registration requirement); *c.f. Yung v. Lee*, 432 F.3d 142 (2d Cir. 2005) (under section 12 of the Securities

---

[5] Claimant's controlling person claims under section 15 of the Securities Act, 15 U.S.C. § 77o, are dependent upon establishing section 11 liability against WaMu Capital or WaMu Asset Acceptance.

[6] These 51 securities are listed in footnote 20 of the Objection.

3

Act, defendants' heavy reliance on a prospectus for another security did not mean that privately placed securities were offered by such prospectus). Section 6(a) of the Securities Act expressly states, "[a] registration statement shall be deemed effective only as to the securities specified therein as proposed to be offered." 15 U.S.C. § 77f(a). As the Court in *Barnes* stated with respect to another claim under section 11, "Since, under §§ 2(1) and 6 [of the Securities Act], only individual shares are registered, it seems unlikely that the section developed to insure proper disclosure in the registration statement was meant to provide a remedy for other than the particular shares registered." 373 F.2d at 272.

7. Tranquility attempts to salvage its section 11 claims by arguing that since the prospectuses and prospectus supplements at issue were included as part of the offering materials, and since such prospectuses and prospectus supplements were also used as part of the registration statements for other classes of the Certificates, the Junior Subordinated Certificates were therefore issued pursuant to the registration statements for the other classes of the Certificates. *See* Claimant's Response at ¶ 59. This novel theory is unsupported by the case law as well as the very offering materials upon which the Claim cites and relies. Indeed, the prospectus supplements upon which the Claim relies clearly state that "[t]he Junior Subordinate Certificates are not offered by this prospectus." Objection at ¶ 40 n.25. Moreover, the Private Placement Memoranda ("PPMs") that Tranquility attached to its Response clearly list, on the very first page, those classes of securities that are offered pursuant to the PPMs, including the Junior Subordinated Certificates. *See, e.g.*, Claimant's Response Ex. 2 at 1. These same PPMs, also clearly state that:

> **The Offered Certificates will not be registered under the Securities Act of 1933, as amended (the "Act"), or qualified under the securities laws of any other jurisdiction.** The Offered Certificates are being offered in a private placement to a limited

4

number of "qualified institutional buyers" within the meaning of
Rule 144A under the Act or to a limited number of institutional
"accredited investors" within the meaning of Rule 501(a) of
Regulation D under the Act.

*Id.* (emphasis in original).

8. Additionally, the Registration Statements themselves contained a "Preliminary

Prospectus Supplement" clearly stating that the "Junior Subordinate Certificates and the Class Y

Certificates are not offered by this prospectus supplement."[7] Finally, the Pooling and Servicing

Agreements, state with respect to the Junior Subordinated Certificates:

> The Certificates issued hereunder, other than the Junior
> Subordinate Certificates, have been offered for sale pursuant to a
> Prospectus. . . and a Prospectus Supplement,  . . . of the Company
> (together, the "Prospectus"). The Junior Subordinate Certificates
> have been offered for sale pursuant to a Private Placement
> Memorandum. . . .

*See, e.g.,* Objection Ex. 25. Preliminary Statement.

9. It is thus obvious, on the very face of the documents Tranquility cites, attaches

and relies upon, that the Junior Subordinated Certificates were not offered pursuant to

registration statements, but were instead offered pursuant to private placement memoranda.[8] The

PPMs state expressly that the offered Certificates will not be offered pursuant to a registration

statement under the Securities Act.

---

[7] WaMu Asset Acceptance Corp. Form S-3 Registration Statement 333-141255, at S-53, dated  Mar. 13, 2007
(available at http://www.sec.gov/Archives/edgar/data/1317069/000093041307002278/0000930413-07-002278-
index.htm); *see also* Washington Mutual Mortgage Securities Corp. Form S-3 Registration Statement 333-103345,
at S-52, dated Dec. 30, 2005 (available at
http://www.sec.gov/Archives/edgar/data/314643/000095011703000707/a34479.txt); WaMu Asset Acceptance Corp.
Form S-3 Registration Statement 333-123034, at -14, dated Feb. 28, 2005 (available at
http://www.sec.gov/Archives/edgar/data/1317069/000095011705000770/a38890.txt); Washington Mutual Mortgage
Securities Corp., Form S-3 Registration Statement 333-130795, at S-16, dated Feb. 20, 2003 (available at
http://www.sec.gov/Archives/edgar/data/1317069/000095011705004965/a41087.txt)

[8] In addition to the representations apparent on the face of the documents, Debtors submitted the Declaration of
David Zielke, Exhibit 23 of the Objection, as further evidence that the 51 Certificates at issue were not offered
pursuant to registration statements.

5

10. Claimant cites no case law in support of its argument that the registration statement for the other classes of securities should apply to the Junior Subordinated Certificates and it fails as a matter of law.[9]  As an initial matter, it is not even possible under the Securities Act to offer the Junior Subordinated Certificates pursuant to the registration statements used to register the non-junior classes of the Certificates.  The form used to file the registration statement is SEC Form S-3.  Instruction I.B.5.(a)(1) of Form S-3 states that asset-backed securities, such as those at issue here, may be offered for cash, provided that the securities are investment grade.[10]  The Junior Subordinated Certificates are asset-backed securities,[11] which, when originally offered and sold pursuant to their applicable PPMs, were either unrated or rated below investment grade by the rating agencies engaged to rate the securities in the applicable securitization.  *See, e.g.,* Claimant's Response Ex. 2 at p. 3 (listing S&P ratings).  The Junior Subordinated Certificates were consequently not eligible for registration under the Registration

---

[9]  Claimant offers as an exhibit to its Response a chart "tracing" the Junior Subordinated Certificates back through the prospectuses and prospectus supplements "pursuant" to which they were sold, apparently under the assumption that showing any relationship at all to the Registration Statement satisfies its pleading obligations.  "Tracing" serves a purpose only to the extent the security being traced is in fact registered pursuant to a specific registration statement to which it can be traced.  Debtors do not deny that the Junior Subordinated Certificates were issued pursuant to the same pooling and servicing agreements and as part of the same securitizations as other securities that are in fact registered under the Registration Statement.  However, as explained above, a security must first be registered with respect to a specific registration statement before a claim under section 11 can arise with respect to that security.  *See Barnes*, 373 F.2d at 272.  In this case, the Junior Subordinated Certificates are not registered securities subject to the Registration Statement, and, by the terms of the Registration Statement itself, cannot be.  The exercise of tracing the securities to the prospectuses and prospectus supplements is therefore a futile exercise.

[10]SEC Form S-3, Registration Statement Under the Securities Act of 1933, available online at http://www.sec.gov/about/forms/forms-3.pdf.  A security is "investment grade" if, at the time of sale, at least one nationally recognized statistical rating agency, as that term is used in 17 C.F.R. 240.15c3-1(c)(2)(vi)(F) (each, an "NRSRO") has rated the security in one of its generic rating categories which signifies investment grade; typically, the four highest rating categories (within which there may be sub-categories or gradations indicating relative standing) signify investment grade.  Form S-3, Instruction I.B.2.

[11] 17 C.F.R. § 229.1101(c)(1) defines an asset-backed security to be "a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their terms convert into cash within a finite time period, plus any rights or other assets designed to assure the servicing or timely distributions of proceeds to the security holders; provided that in the case of financial assets that are leases, those assets may convert to cash partially by the cash proceeds from the disposition of the physical property underlying such leases."

Statement and therefore could not be subject to it or for claims under section 11 for any materially false statements or omissions in the Registration Statement.

11. Thus the Junior Subordinated Certificates were not and could not have been offered and sold pursuant to a registration statement. While Claimant attempts to confuse the issue by arguing Debtors have not established an exemption to the registration requirements, this argument entirely misses the point. Even if Debtors somehow failed to prove that the Junior Subordinated Certificates were offered pursuant to a relevant private placement exemption, this would not mean that, by default, the Junior Subordinated Certificates were registered. Indeed, whether WMI succeeds in showing or fails to show that the Junior Subordinated Certificates were successfully offered and sold in accordance with an applicable exemption, Claimant has wholly failed to cite any evidence to rebut the fact that, as the private placement memoranda state, "[t]he Offered Certificates will not be registered under the Securities Act of 1933 . . . or qualified under the securities laws of any other jurisdiction." *See, e.g.,* Claimant's Response Ex. 2 at p. 1.

## 2. Nor Can the Junior Subordinated Certificates be Integrated Into the Registration Statements

12. The so-called "integration doctrine" offers Claimant no help. Claimant cites no case in which a court held that an unregistered security was subject to section 11 liability for a misleading registration statement by virtue of the integration doctrine. Indeed, it is telling that the primary case Claimant relies upon, *Anegada Master Fund, Ltd. v. PXRE Group Ltd.*, 680 F. Supp. 2d 616 (S.D.N.Y. 2010), involved the integration of prospectuses pursuant to a section 12(a)(2) misleading prospectus claim, and even in that case the court rejected applying the

integration doctrine to impose a prospectus requirement. *Id.* at 624.[12] Section 12(a)(2) claims are materially different from Claimant's section 11 claims.[13] The Supreme Court has held that section 12(a)(2) only provides a cause of action to a purchaser of a security where the prospectus is distributed pursuant to a public offering. *Gustafson v. Alloyd Co.,* 513 U.S. 561, 584 (1995). In the cases relied upon by Claimant, the integration doctrine was used to reject the defendant's assertion that the securities at issue were issued pursuant to a private offering, which meant that such securities were offered to the general public. *See, e.g., Hyer v. Malouf,* No. 2:07-cv-249, 2008 U.S. Dist. LEXIS 73789, at *10 (D. Utah Sept. 24, 2008). Here, however, even if Claimant could establish that the integration doctrine defeats the private offering of these securities, this result would not mean that the securities in question were *registered* pursuant to the Securities Act. In fact, it would mean only that such securities *should* have been registered, because the private placement exemption was not properly invoked.[14] Moreover, as detailed *supra* ¶ 10, the securities at issue were in fact not registered, and indeed could not have been registered.

13. Regardless of whether the integration doctrine could retroactively register securities for purposes of section 11 liability, the integration doctrine would not apply here. As Claimant admits, one of the key factors in determining whether the integration doctrine applies is whether the offerings "involve the issuance of the same class of security." Claimant's Response

---

[12] The other two cases cited by Claimant involve section 12(a)(2) claims alleging a misleading prospectus sold through a public offering. *See Steed Fin. LDC v. Nomura Secs. Int'l, Inc.,* No. 00 Civ. 8058, 2001 U.S. Dist. LEXIS 14761 (S.D.N.Y. Sept. 19, 2001); *Hyer v. Malouf,* No. 2:07-cv-249, 2008 U.S. Dist. LEXIS 73789 (D. Utah Sept. 24, 2008).

[13] To the extent that this case can be compared to a relevant section 12(a)(2) case, it would be analogous to the decision by the Second Circuit in *Yung v. Lee,* 432 F.3d 142 (2d Cir. 2005), a case discussed *infra* ¶ 20. In that case, the Second Circuit rejected a similar argument by plaintiffs that defendants' reliance on the prospectus of a publicly offered security meant that the privately placed offerings at issue were made by means of such prospectus.

[14] This conclusion is consistent with the integration doctrine's stated purpose to prevent circumvention of the registration requirements of the Security Act. *See* Claimant's Response at ¶ 63. Indeed if the integration doctrine could retroactively register improperly unregistered securities, this result would actually facilitate the circumvention of the registration requirements by automatically correcting such improperly unregistered securities.

at ¶ 65. However, the Junior Subordinated Certificates are a different class of security with a different interest rate and maturity, different credit ratings, different credit and liquidity enhancements, a different cash flow model, a different payment priority, and a different risk profile. *See, e.g.,* Claimant's Response Ex. 2 at pp. 3-14. As Claimant itself states, it "purchased the riskier lower-tier tranches of the WaMu MBS that had junior rights in priority to payment of distributions from the pooled mortgages in the trusts, and that were the first to be apportioned losses in these trust pools . . . [and] were theoretically entitled to a higher rate of return . . . ." Claimant's Response at ¶ 15. Thus, Claimant has conceded that the securities at issue were a different class of security. Accordingly the integration doctrine is not applicable.

### 3. The Junior Subordinated Certificates Were Offered Pursuant to Applicable Private Placements

14. It is not necessary for the Debtors to show that the Junior Subordinated Certificates were issued pursuant to a private placement exemption because Debtors need only demonstrate that the securities were "not . . . registered under the Securities Act of 1933." Claimant's Response Ex. 2 at p. 1. Even if such a showing was necessary, however, the Junior Subordinated Certificates *were* properly issued pursuant to applicable private placement exemptions (Rule 144A and Rule 506) under section 4 of the Securities Act. Claimant has not even alleged that the requirements of these Rules were not met. Instead, Claimant has only asserted that Debtors have not established that such securities were issued pursuant to private placement exemptions. This contention is contradicted by the very PPMs that Claimant attaches to its Response which state on the first page that the Junior Subordinated Certificates are not being registered pursuant to the Securities Act and that "[t]he Offered Certificates are being offered in a private placement to a limited number of 'qualified institutional buyers' within the meaning of Rule 144A under the [Securities] Act or to a limited number of institutional

'accredited investors' within the meaning of Rule 501(a) of Regulation D under the [Securities] Act." *See, e.g.,* Claimant's Response Ex. 2 at p. 1.

15. Under the relevant Securities and Exchange Commission ("SEC") Rules (Rule 144A and Rule 506 of Regulation D), unregistered securities qualify for the private placement exemption if they meet the applicable "safe harbor" requirements. *See* Resale of Restricted Securities; Changes to Method of Determining Holding Period of Restricted Securities Under Rules 144 and 145, Release No. 121, 1990 WL 311657 (Apr. 23, 1990) ("Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act" for those securities that meet the requirements of the rule); *Fidelity Bank, Nat. Ass'n v. Avrutick,* 740 F.Supp. 222, 227n.4 (S.D.N.Y. 1990) (Rule 506 in Regulation D is a "safe harbor" provision which provides an exemption for those securities that meet the requirements of the rule). Claimant's own exhibits establish that the Junior Subordinated Certificates satisfy the requirements of Rule 144A and therefore qualify as exempt under the rule's safe harbors. First, as required by 17 C.F.R. § 230.144A(d)(1), the securities were only sold to qualified institutional buyers ("QIBs"). The PPMs establish this, stating that the Junior Subordinated Certificates were only "offered in a private placement to a limited number of qualified institutional buyers within the meaning of Rule 144A under the [Securities] Act . . . ." *See, e.g.,* Claimant's Response Ex. 2 at p. 1. Moreover, section 5.01(f) of the applicable Pooling and Servicing Agreements requires a transferee receiving a Junior Subordinated Certificate to execute a certificate certifying that it is a QIB and acknowledging that such Junior Subordinated Certificate is issued pursuant to Rule 144A. *See, e.g.,* Objection Ex. 35 at § 5.01(f).

16. Second, as required by 17 C.F.R. § 220.144A(d)(2), the seller of the Junior Subordinated Certificates ensured that investors were aware that the security was being offered

pursuant to Rule 144A by stating so in the PPMs. *See, e.g.,* Claimant's Response Ex. 2 at p. 1. Third, the securities were a different class of security from any listed on any national stock exchange or quoted in an automated inter-dealer quotation system, *see* 17 CFR §230.144A(d)(3)(i), because they are backed by separate assets from any other class created prior thereto. Additionally, by definition, the Junior Subordinated Certificates are not securities of an open-end investment company unit investment trust or face-amount certificate company, *see* 17 C.F.R. § 230.144A(d)(3)(ii), because none of the Issuing Trusts or Washington Mutual entities involved in the securitization process are such entities, nor have Claimant alleged otherwise. Fourth, the prospectus and prospectus supplements were included as attachments to the PPMs in order to satisfy the information requirement under 17 CFR 230.144A(d)(4) as it applies to asset-backed securities.

17. Additionally, even if any of the Junior Subordinated Certificates did not qualify for exemption under Rule 144A, such securities would still qualify as exempt under Rule 506 of Regulation D, as detailed by the requirements of 17 C.F.R. § 230.506(a). First, the PPMs establish that the Junior Subordinated Certificates will only be sold to either QIBs under Rule 144A or accredited investors under Rule 501(a). *See, e.g.,* Claimant's Response Ex. 2 at 1. Second, the Junior Subordinated Certificates were not offered to non-accredited investors and therefore met the requirement that limits non-accredited investors to 35 or less, *see* 17 CFR § 230.506(b).

B. **Claimant's State Law Claims Fail To Allege Actionable Misrepresentations With Respect to the Junior Subordinated Certificates**

18. The Claim alleges numerous misrepresentations with respect to the prospectuses and prospectus supplements by which the non-junior Certificates were offered. However, these same prospectuses and prospectus supplements state that "[t]he Junior Subordinate Certificates

are not offered by this prospectus." *See* Objection at 20n.25. Claimant attempts to evade this problem by asserting that it alleged misrepresentations in the PPMs. Claimant's Response at ¶ 56. To the extent that Claimant now is alleging misrepresentations in the body of the PPMs, this is an after-the-fact amendment to the proof of claim which makes no such assertion. To the extent that Claimant means that the prospectuses are considered part of the PPMs, such a claim is also incorrect.

19. The prospectuses state that the Junior Subordinated Certificates are not being offered by such prospectus. California Corporations Code § 25401, upon which both of Claimant's state law claims are derivatively based, asserts that "[i]t is unlawful for any person *to offer or sell* a security in this state . . . *by means of* any written or oral communication which includes an untrue statement of a material fact . . ." *Id.* (emphasis added). While Claimant focuses on the "written or oral communication" part of this sentence, Claimant's Response at ¶ 56, it ignores the rest of the sentence. Specifically, reading the entire sentence makes it clear that the "any written or oral communication" must be the means by which a person offered or sold a security in this state. However, the very documents (the prospectuses and prospectus supplements) that Claimant alleges were misleading specifically state that they are not the means by which the Junior Subordinated Certificates were offered.

20. To the extent Claimant alleges that the prospectuses and prospectus supplements are incorporated by reference and thus allow a securities claim, this contention is also without merit. First, nowhere in the PPMs is the statement made that the attached prospectus or prospectus supplement is "incorporated by reference."[15] Second, while Claimant has not cited

---

[15] Each PPM states that the investor "must be read together with" the prospectus and prospectus supplement identified therein. This is so worded in order to make clear to the investor that important information concerning the Certificates is provided therein, but does not act to incorporate the prospectus, and thus the registration statement, into the PPM.

any case where a prospectus was incorporated by reference into a private placement offering under California's blue sky laws, this case is very similar to a federal securities case, *Yung v. Lee*, 432 F.3d 142 (2d Cir. 2005), which involved a section 12(a)(2) claim under the Securities Act.[16] In *Yung*, the plaintiffs alleged that the defendants' marketing of the securities at issue, which heavily relied upon a prospectus from another public securities offering, meant that the securities in question had been offered "by means of a prospectus." 432 F.3d at 149. The Second Circuit rejected this argument, holding that because the defendant was under no obligation to furnish the prospectus as part of the private placement and because various subscription and letter agreements specifically stated that the securities "were not offered . . . by means of publicly disseminated advertisements or sales literature," the securities at issue were not offered by means of the prospectus. *Id.* Here, WaMu Capital was under no obligation to provide the prospectuses at issue to investors in the Junior Subordinated Certificates and the prospectuses expressly stated that they were not the means by which the Junior Subordinated Certificates were being offered. Accordingly, Claimant's California securities claims fail.

## II.     Tranquility's State Law Claims are Preempted

### A.     **HOLA Preempts Tranquilities State Law Claims**

21. HOLA, 12 U.S.C. §§ 1461-70, occupies the entire field of lending regulation, *see* 12 C.F.R. § 560.2, and the Office of Thrift Supervision ("<u>OTS</u>") regulates appraisals extensively. For example, OTS through regulations has set its own definition of appraiser independence, regulates minimum appraisal standards, regulates when an appraisal is required, and has

---

[16] California Corporations Code § 25501 is modeled after section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2). *See* 1A Marsh & Volk, Practice Under the California Securities 1992 Laws (rev. ed.) § 14.03(1). Where, as here, California law is modeled on federal laws, federal decisions interpreting similar statutes are strong persuasive precedent. *See Bldg. Material & Constr. Teamsters' Union, Local 216 v. Farrell*, 41 Cal. 3d 651, 658 (1986); *Holmes v. McColgan*, 110 P.2d 428, 430 (Cal. 1941).

established its own enforcement mechanisms and penalties for violation of these standards. 12 U.S.C. §§ 564.1-564.8.

22. Tranquility cannot avoid the preemptive affect of HOLA by simply claiming that the state statutes on which it relies on their face do not affect lending. In *Silvas v. E\*Trade Mortgage Corp.*, 514 F.3d 1001, 1006 (9th Cir. 2008), the Ninth Circuit explained that "[a]s outlined by OTS, the first step is to determine if [a state law] *as applied*, is a type of state law contemplated in the list under paragraph (b) of 12 C.F.R. § 560.2. If it is, the preemption analysis ends." (emphasis added).

23. Tranquility asserts liability for alleged misrepresentations relating to asserted flaws in WMB's appraisal and loan origination standards and practices. The crux of Tranquility's Claim is that WMB's appraisal and underwriting standards were "improper," *see* Claim at ¶¶ 3, 22, 96-100, 110-118, 153, and these improper appraisal practices were misrepresented on the prospectuses. This claim is preempted and cannot be prosecuted through the California statutes. Any other result will create a situation in which federal savings associations' lending activities effectively will be regulated through a back door procedure by private parties, superseding the federal regulatory scheme.

24. Tranquility's 79-page proof of claim repeatedly asserts that WMI, WMB and WMB's subsidiaries conducted appraisal fraud, but now runs from its own allegations and contends that its allegations do not affect lending. For Tranquility to succeed on its state-law claims, it must demonstrate that the offering documents contain a material misstatement. Each of the material misstatements alleged by Tranquility can be simplified into a concise statement – WMB used a scheme to inflate appraisal values and did not tell anyone. For example, Tranquility's first series of alleged misstatements are that "[t]he appraisals controlled by WaMu

through LSI and eAppraiseIT were not independent, they did not comply with USPAP, and they did not comply with federal or state law regarding appraisal independence." Claim at ¶ 184. These allegations require the Court to find fault with an appraisal mechanism regulated and overseen by OTS. Similarly, Tranquility alleges misrepresentations concerning allegedly false and misleading loan-to-value ratios for the underlying mortgages because of the allegedly over-inflated appraisals.[17] *Id.* at ¶¶ 187-189. Likewise, the Claim also alleges that WaMu's disclosure failures all related to the same alleged appraisal activity. For example, Tranquility states that WaMu failed to disclose to investors that WaMu

- "was improperly influencing its outside appraisers to overvalue the underlying real estate;"
- "sought to control the real estate valuations" by maintaining rights to "appeal the appraised values to WaMu's former in-house appraisers;"
- utilized outside appraisers to "accept WaMu's corrupt Proven Appraiser List;"
- failed to disclose that the Proven Appraiser List was illegal;
- encouraged loan origination staff to select specific appraisers in violation of USPAP and applicable law;
- used third party appraisers that "would no longer warranty WaMu's appraisals because of illegally compromised appraiser independence;"
- "[r]emoved and/or blacklisted specific individual outside appraisers for refusing or otherwise failing to inflate appraisers;" and
- routinely contacted outside appraisers and pressured them to inflate property values

*Id.* at ¶ 190. Successful prosecution of Tranquility's Claim would require a finding that the appraisal process utilized by WMB was wrong and therefore more than incidentally affects

---

[17] As noted in the Objection, OTS regulations specifically preempt state laws that would impose requirements on loan-to-value ratios and related disclosure and advertising materials. 12 C.F.R. § 560.2. Although Tranquility states that it is merely seeking to impose liability for untruthful statements, its Claim in reality seeks to find that the loan-to-value information on the underlying loans were false because WMB's approach was inappropriate and inadequate. Such an exercise would simply be an end-run around OTS' regulatory authority.

lending. Indeed, Tranquility is asking this Court, rather than OTS, to determine the parameters of independent appraiser programs.

25. Contrary to Tranquility's assertions, *Spears v. Washington Mutual, Inc.*, No. 08-00868, 2009 WL 605835 (N.D. Cal. Mar. 9, 2010), is precisely on point. *Spears* concerned exactly the same alleged conduct by WaMu as alleged by Tranquility. As with Tranquility, the *Spears* plaintiffs alleged that WMB "began a scheme to inflate the appraised values of homes receiving loans in order to sell the aggregated security interests in the financial markets at inflated prices," and also alleged that WMB retained LSI and eAppraiseIT "to administer WMB's appraisal program" while utilizing "a list of 'preferred appraisers', selected by WMB's origination staff, that it requested to perform appraisals for WMB borrowers."[18] *Id. at* *1. The *Spears* court held that the plaintiffs' claims including its claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 (the "UCL"), were preempted. Tellingly, the *Spears* court held that misrepresentation claims that directly alleged wrongdoing under California statues were preempted. The court explained that

> [t]he first step is to analyze whether Cal. Bus. Prof. Code § 17200, as applied, is the type of state law contemplated under § 560.2(b). Plaintiffs first UCL claim is based on [eAppraiseIT] allegedly unlawful conduct in contravention of the Uniform Standards of Professional Appraisal Practice ("USPAP"). Specifically, plaintiffs allege that [eAppraiseIT] violated the requirement that an appraisal be performed with impartiality, objectivity, and independence. Those standards are incorporated into federal regulations concerning real-estate lending. *See* 12 C.F.R. 34, *et seq* (entitled "Real Estate Lending and Appraisals). Plaintiffs' second and third UCL claims, which concern the same conduct, allege that the impartiality of the offered appraisals constituted unfair and fraudulent business practices under § 17200. *Plaintiffs CLRA claim alleges that [eAppraiseIT] represented that their home appraisal services were of a*

---

[18] As with Tranquility, the *Spears* plaintiffs also complained that "WMB also maintained the contractual right with those appraisers to challenge an appraisal by requesting a 'reconsideration of value'" and would use the ROV to get the appraisal firms "to increase the appraisal value of property." 2009 WL 606835, at *1. In addition, the *Spears* complaint also alleged that "WMB also requested that EA and LSI hire 'Appraisal Business Managers', who were given authority to override the values determined by third-party appraisers." *Id.*

*standard or quality that they were not, in violation of California Civil Code § 1770(a)(7). Each of these claims relate directly to the processing and origination of mortgages.* Appraisals are required for many real-estate transactions. 12 C.F.R. 34.43 (requiring a certified or licensed appraisal for all real-estate financial transactions except those falling within enumerated exceptions). And those appraisals must be performed according to certain standards in order to protect the public and federal financial interests. 12 C.F.R. 34.41(b). Indeed, plaintiffs' theory of the case, that lenders and appraisers conspired to inflate appraisals in order to increase mortgage resale prices, demonstrates the importance and interrelationship of impartial appraisals to mortgage origination and servicing. *The court therefore finds that plaintiffs' UCL and CLRA claims, as applied, relate to the processing and origination of, and participation in, mortgages, and are thus preempted under § 560.2(b)(10).*

2009 WL 605835, at *5-6 (emphasis added; citations omitted). Although Tranquility attempts to distinguish its Claim as a securities claim while *Spears* was a class action based upon an anti-fraud statute, this is a distinction without a difference. Both involve the same conduct. Both seek determinations that WaMu's appraisal practices were invalid. Both sought determinations that WaMu should have disclosed the details of its appraisal practices differently. And while Tranquility asserts that it does not seek to impose substantive standards on lending, the result of any determination in this case would directly impact savings associations' appraisal programs. The *Spears* court properly concluded that a state statute designed to prevent untruthful statements and acts, when applied to the facts of this case, is preempted.[19]

26. Similarly, the court in *Cedeno v. IndyMac Bancorp, Inc.*, No. 06 Civ. 6438, 2008 WL 3992304 (S.D.N.Y. Aug. 26, 2008), also held that HOLA preempted claims based on California's and New York's deceptive practices law, including claims based upon a failure to

---

[19] Although Tranquility cites an older OTS statement that concluded on a hypothetical question that a deceptive practices statute would not be subject to preemption because it did not more than incidentally affect lending and would simply require a truthful disclosure, the *Spears* case demonstrates that determinations as to whether a statute is preempted must be made on a case-by-case basis. While normally a deceptive practice statute or a security statute may not be preempted, when the statute is being applied in such a matter as to impact lending then preemption must apply to safeguard the OTS authority. The *Spears* case clearly demonstrates that deceptive practice statutes may be preempted by HOLA.

disclose information related to appraisals. The court noted that "[t]he appraisal practices challenged by the plaintiff appear to relate directly to the processing or origination of mortgages, and thus the application of the law that the plaintiff seeks to impose fall within 12 C.F.R. § 560.2(b)(10)" and held that the same analysis "applies to plaintiff's efforts to use the New York statute to penalize the alleged failure to disclose appraisal practices and the substance of those practices. . . .The appraisals are a prerequisite to the lending process, and are inextricably bound to it." *Id.* at \*8-9. *Cedeno* clearly applies to this case. Regardless of whether a statute is a securities statute or a deceptive disclosure statute, preemption should be enforced if application has serious consequences towards lending. Here, it is beyond question that Tranquility's Claim directly challenges WMB's loan origination process and appraisal structure.

27. Tranquility's reliance on *Gibson v. World Sav. & Loan Assn.,* 128 Cal. Rptr. 2d 19 (Ct. App. 2002), for the position that courts should not find preemption if the law in question only seeks truthful disclose is misplaced. The *Gibson* court began its analysis based upon a strong presumption against preemption. The Ninth Circuit has "rejected the general presumption against preemption relied upon in Gibson." *Curcio v. Wachovia Mortgage Corp.,* No. 09-CV-1498, 2009 WL 3320499, at \*5n.6 (S.D. Cal. Oct. 14, 2009) (dismissing with prejudice plaintiff's state law claims based upon fraudulent or misleading disclosures because claims would affect lending and are expressly preempted pursuant to OTS regulations). In *Silvas v. E\*Trade Mortgage Corp.,* 514 F.3d 1001, 1006 (9th Cir. 2008), the Ninth Circuit held that the plaintiff's California's Unfair Competition Law for false disclosure, false advertising, and unfair competition were expressly preempted by HOLA. *Silvas* held that OTS had occupied the entire field of federal savings association lending and that 12 C.F.R. § 560.2(b) expressly preempted large categories of claims including those based upon false or misleading advertising and

disclosures. *Silvas* found express preemption and, therefore, it was unnecessary to determine whether the state law would only incidentally affect lending. However, *Silvas* explained that if it had done so, it still would have found preemption because federal law leaves no room for state action when an entire field is occupied and because "[w]hen an entire field is preempted, a state may not add a damages remedy unavailable under the federal law." *Id.* at 1007n.3.

28. *Naulty v. Greenpoint Mortgage Funding, Inc.*, No. CV 09-1542, 2009 WL 2870620 (N.D. Cal. Sept. 3, 2009) also found that HOLA preempted a variety of state law claims including claims for deceptive advertising, unfair business practices, statutory and common law fraud and negligence. In its analysis *Naulty* first noted that the *Silvas* court had abandoned the presumption against preemption for federal savings associations because OTS has occupied the entire field and then explained that

> [s]ignificantly, the *Silvas* court did not look merely to the abstract nature of the cause of action allegedly preempted but rather to the functional effect upon lending operations of maintaining the cause of action, as required by [560.2(b)]. The question was not whether a state law simply set a minimum standard forbidding fraudulent and unfair practices, as suggested by cases like *Gibson.* The question was rather whether an application of a given state law to the activities of federal savings associations would "impose requirements" regarding the various activities broadly regulated by the OTS.

*Id. at *4.* (footnote omitted). In a footnote, the *Naulty* court further explained that *Gibson*'s approach "would allow states to enmesh themselves into questions of what precisely constitutes unfair practices, a subject that would inevitably encroach upon federal regulation of the field." *Id.* at *4n.3. The impact of Tranquility's claims would be to force federal savings associations to change how they setup and administer third party appraisal programs and what they disclose relating to appraisals and loan-to-value ratios. Courts since *Gibson* have recognized that although statements by plaintiffs that they are merely seeking truthful disclosures may be facially appealing, these types of claims are preempted precisely because they could become a back door

form of regulation of a field entirely occupied by the federal oversight. Accordingly, Tranquility's claims are preempted by HOLA.

B.    **Tranquility's California Law Claims are Preempted by NSMIA.**

29. Tranquility's California law claims with respect to the Junior Subordinated Certificates are also preempted pursuant to the plain language of NSMIA. NSMIA bars state laws requiring registration or qualification of covered securities actions, prohibits states from imposing conditions on the uses of an offering document, and prohibits states from "directly or indirectly" prohibiting, limiting or imposing "conditions, based on the merits of such offering or issuer, upon the offer or sale of any security." 15 U.S.C. § 77r(a)(3). NSMIA was designed to eliminate the numerous inefficiencies and redundancies in overlapping federal and state regulation of securities issuance.

30. The Junior Subordinated Certificates are covered securities under NSMIA. "Covered securities" are defined by four categories found in section 18(b) of the Securities Act, 15 U.S.C. § 77r(b)(1). The Junior Subordinated Certificates in this case are covered pursuant to section 18(b)(4)(D). That section provides that securities issued pursuant to "Commission rules or regulations issued under [section 4(2)]" of the Securities Act are covered securities. 15 U.S.C. § 77r(b)(4)(D). Because securities issued pursuant to SEC Rule 506 of Regulation D are the only class of securities that satisfy this description, Rule 506 private placements qualify as covered securities. In this case, the Certificates were issued pursuant to SEC Rule 144A to third parties. The first step in such issuances is a private placement to WaMu Capital Corporation pursuant to SEC Rule 506. The fact that there is a second offering and sale by WaMu Capital Corporation to third parties such as Tranquility pursuant to Rule 144A does not change or affect the original SEC Rule 506 exemption. 17 C.F.R. 200.144A(e). The junior securities involved in

this case are therefore covered securities under NSMIA and state law causes of action related to the securities are preempted.[20]

31. Tranquility's remaining argument is equally flawed. While NSMIA has a savings clause that exempts state government enforcement actions from preemption, Tranquility's claims do not qualify under a plain reading of that provision which states that

> Consistent with this section, the *securities commission (or any agency or officer performing like functions) of any State* shall retain jurisdiction under the laws of such State to investigate and bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions.

15 U.S.C. § 77r(c)(1) (emphasis added). Thus, only fraud enforcement actions brought by a state government body are excluded from NSMIA preemption. As an initial matter, Tranquility states in its pleadings that its controlling person claims under California Corporations Code § 25504 are not based in fraud and are instead based in negligence. *See* Claimant's Response at ¶¶ 26-29. Thus, by virtue of Tranquility's own admission,[21] NSMIA's savings clause is clearly inapplicable to its section 25504 claims, since the clause applies only to "enforcement actions with respect to fraud or deceit." 15 U.S.C. § 77r(c)(1). If Congress had intended to include actions for negligence, it could have easily done so.

---

[20] The Claimant mistakenly relies upon a statement in older SEC guidance that "various debt securities of non-listed issuers, including asset-backed and mortgage-backed securities" are not covered securities. *Report on Uniformity of State Regulatory Requirements for Offerings of Securities that are Not "Covered Securities,"* issued pursuant to section 102(b) of the National Securities Markets Improvement Act of 1996, October 11, 1997. The key to understanding this statement is to note the words "not-listed issuers" and the context into which it fits with respect to the entire report. The only other mention in the report of asset-backed and mortgage-backed securities occurs in section III.C.1., which is a discussion of the listing requirement. Specifically, section III.C.1. is concerned with securities that are senior and junior to those an issuer has listed on one of the approved securities exchanges. As such, this statement only concerns asset-backed and mortgage-backed securities that do not satisfy the conditions required to be "covered securities" with respect to securities of issuers listed on certain, specifically identified securities exchanges, as well as any other securities issued by those issuers that are senior to the listed securities. As described above, the securities in this case are covered pursuant to another provision.

[21] If Tranquility's section 25504 claim is based in fraud, then the requirements of FRCP 9(b) apply to require that such a claim be pled with particularity. *See infra* section III.

32. Moreover, while Tranquility has pled fraud with respect to its claims under California Corporations Code § 25504.1 (albeit insufficiently as described in section III below), Tranquility is a private party and is not a state securities commission, state agency, or state officer bringing a state enforcement action. Although the unreported decision in *Houston v. Seward & Kissel, LLP*, 07-cv-6305(HB), 2008 U.S. Dist. LEXIS 23914 (S.D.N.Y. Mar. 27, 2008), held that a private litigant could proceed under this exception, that case is not controlling precedent and Debtors respectfully submit it is wrongly decided because it relies on statements in the legislative history that are inconsistent with the plain language of the statute. "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485 (1917). In this case, the statute limits the savings clause to state enforcement actions, and, as such, NSMIA preempts Tranquilities private state law claims.

## III. Claimant Has Failed to Plead its Fraud Claims in Accordance with Federal Rule of Civil Procedure 9(B)

### A. Federal Rule of Civil Procedure 9(b) Applies to Proof of Claims Asserting Fraud

33. Tranquility fails to identify in its lengthy proof of claim even a single appraisal that it alleges was materially inflated, fails to assert a single loan that it alleges was not originated properly, fails to allege that the loans underlying its securities defaulted at a higher rate than loans for other MBS, and does not assert any particularized facts supporting the misrepresentations it alleges. Indeed, its proof of claim is suspiciously preoccupied with assertions about the alleged activities of WMB, WaMu Asset Acceptance, WaMu Capital, eAppraiseIT and the various Issuing Trusts, yet devoid of any particularized assertions against WMI. WMI, as a bank holding company, was not involved in any of the conduct asserted, and

Tranquility asserts only generalized and conclusory contentions that WMI supervised and controlled these entities as part of a grand and high-reaching conspiracy, *see* Claim at ¶¶ 34-35, along with speculative statements that WMI "had every available opportunity" to have known about the alleged misrepresentations at issue, *see* Claim at ¶ 216. Such assertions fail, as a matter of law, to meet the applicable pleading requirements.

34. Contrary to Claimant's assertion, Bankruptcy Rule 3001 does not excuse Tranquility's obligation to abide by FRCP 9(b). Bankruptcy Rule 7009 incorporates FRCP 9, and Bankruptcy Rule 9014(c) makes Rule 7009 applicable in a contested matter. *See* Fed. R. Bankr. P. 9014(c) (stating that with respect to contested matters, "[e]xcept as otherwise provided in this rule, and unless the court directs otherwise, the following rules shall apply: 7009. . . ."). Indeed, bankruptcy courts routinely apply the requirements of FRCP 9(b) to claim objection proceedings.[22] *See, e.g., In re WorldCom, Inc.,* 296 B.R. 115, 123-25 (Bankr. S.D.N.Y. 2003) (applying FRCP 9(b) to a claim objection proceeding); *In re McDaniel*, 347 B.R. 444, 446 (Bankr. M.D. Fla. 2006) (striking claim objections for failure to plead fraud with particularity).[23]

35. This is consistent with well-settled case law that a proof of claim executed and filed in accordance with Bankruptcy Rule 3001 shall only "constitute prima facie evidence of the validity of the claim." Fed. R. Bankr. P. 3001(f); *see also In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). Once a party rebuts such prima facie evidence by filing a substantive

---

[22] The advisory notes for Bankruptcy Rule 3007 and 9014 make clear that an objection to a proof of claim creates a contested matter. *See* Fed. R. Bankr. P. 3007, Advisory Committee Note (1983) ("The contested matter initiated by an objection to a claim is governed by rule 9014, unless a counterclaim by the trustee is joined with an objection to claim."); Fed. R. Bankr. P. 9014, Advisory Committee Note (1987) ("the filing of an objection to a proof of claim, to a claim of exemption, or to a disclosure statement creates a dispute which is a contested matter.").

[23] While the Court could chose, in its discretion, not to apply the requirements of 9(b), it should do so here. The particularity requirement has generally been "rigorously applied in securities fraud cases." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). Here, Claimant asserts a $49.6 million securities fraud claim against the Debtors' estate on the basis of the actions of a large number of third parties, without ever explaining with any particularity how WMI controlled such third parties or why WMI, in particular, should be held liable.

objection, however, the burden of establishing the validity of the proof of claim shifts back to the Claimant. *Id.* In this case, Debtors have filed a substantive objection to the Claim, including attaching two sworn declarations and more than 10,000 pages of exhibits. The Objection has thus rebutted any *prima facie* validity that the Claimant may seek to rely upon and the burden shifts back to Tranquility to establish its claim in accordance with the appropriate standard of proof and the applicable rules of procedure. Tranquility has failed to meet this burden.

### B. FRCP 9(b) Applies to All of Tranquility's Claims

36. Claimant's causes of action are grounded in fraud, and accordingly, Claimant is required to plead such assertions with particularity. In its Response, Claimant concedes that its allegation of "material assistance" under Cal. Corp. Code § 25504.1 is grounded in fraud and therefore 9(b), to the extent it applies in this proceeding, would apply to such a claim. Claimant's Response at ¶ 26. However, Claimant asserts that 9(b) does not apply to its "controlling person" claims under section 11 of the Securities Act and Cal. Corp. Code § 25504 because it alleges that such claims are based in negligence.[24]

---

[24] Claimant also asserts that FRCP 9(b)'s pleading requirements do not apply to Cal. Corp. Code § 25504, an assertion that is squarely rejected by *Wentner v. Ridgewood Energy Corp.*, 62 F.3d 1427 (9th Cir. 1995) (holding that a claim asserting Cal. Corp. Code § 25401 violations grounded in fraud is subject to the special pleading requirements of Fed. R. Civ. P. 9(b)); *see also Christidis v. First Pa. Mortgage Trust*, 717 F.2d 96, 99 (3d Cir.1983) (Rule 9(b) "applies not only to fraud actions under federal statutes, but to fraud claims based on state law."). In response, Claimant cites three cases which do not address the issue of whether FRCP 9(b) applies, as support for the principle that § 25504 does not require a showing of fraudulent or intentional conduct. This argument misses the point. As demonstrated below, Claimant's "controlling person" claims *are* grounded in fraud. Accordingly, Claimant is required to plead such fraud based assertions with particularity.

Moreover, Claimant is incorrect to the extent it alleges that the controlling person under Cal. Corp. Code § 25504 need not be a "culpable participant." Cal. Corp. Code § 25504 does require that a plaintiff establish that the controlling person was a "culpable participant." *See Kainos Labs., Inc. v. Beacon Diagnostics, Inc.*, No. 97-4618, 1998 WL 2016634, at *14 (N.D. Cal. Sept. 14, 1998) (Cal. Corp. Code § 25504 requires culpable participation). Claimant cites *In re Worldcom, Inc.*, 377 B.R. 77, 104 (Bankr. S.D.N.Y. 2007) for the principle that "culpable participation" is not required in a controlling person claim under Cal. Corp. Code § 25504. This conclusion however, while consistent with Second Circuit case law regarding "controlling person" liability, *see, e.g., In re Parmalat Securities Litigation*, 474 F.Supp.2d 547, 554 (S.D.N.Y. 2007) (rejecting culpable participation as a requirement for section 20 "controlling person" liability), is inconsistent with Ninth Circuit case law requiring culpable participation to establish liability under Cal. Corp. Code § 25504, *see Kainos Labs., Inc. v. Beacon Diagnostics, Inc.*, No. 97-4618, 1998 WL 2016634, at *14 (N.D. Cal. Sept. 14, 1998), as well as Ninth and Third Circuit case law generally. *See Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 55 (D. Del. 2002)

37. Notwithstanding a solitary sentence unconvincingly attempting to disavow fraud, *see* Claim at ¶ 221, all three counts of the Claim are solidly grounded in fraud.[25] Both controlling person liability claims specifically state that they are relying on section III of the Claim to establish the necessary element of control exercised by WMI. *See* Claim at ¶¶ 201, 233. Section III in turn alleges that WMI "authorized and designed WaMu's strategy-scheme" to earn profits by causing the alleged misrepresentations at issue. Claim at ¶ 35. Additionally, Claimant repeatedly alleges that WMI acted "systematically" and "consciously participated" in the misconduct alleged, *see, e.g.*, Claim at ¶¶ 3, 97, and that it "colluded with LSI and eAppraiseIT, which provided all of the appraisals for the properties underlying WaMu's securitized mortgages." Claimant's Response at ¶ 43 (citing Claim at ¶¶ 36-37, 101-182).

38. Tranquility belatedly claims that its controlling person claims are actually based on negligence, not fraud, because it alleges that WaMu Asset Acceptance filed prospectuses that "contained untrue statements of material fact." Claimant's Response at ¶ 32. Even if the Court were to ignore the fact that such a statement does not specifically allege negligence by WaMu Asset Acceptance, or that the Claim is overflowing with assertions of fraudulent actions allegedly committed by WaMu Asset Acceptance, or the fact that Claimant's Response itself implicitly admits that it is based in "fraud or deceit," *see* Claimant's Response at ¶¶ 91-92, such assertions regarding WaMu Asset Acceptance say nothing about the actions of WMI – actions that the Claim consistently represents as fraudulent.

---

(section 15 liability requires that the defendant be a "culpable participant"); *Durham v. Kelly*, 810 F.2d 1500, 1504 (9th Cir. 1987) (section 15 liability requires that a defendant be a "culpable participant"). The fact that the culpable participant requirement would be the same under Cal. Corp. Code § 25504 and section 15 is consistent with the large number of cases holding that the "control person" standard under Cal. Corp. Code § 25504 is the same as the control person standard under section 15 of the Securities Act. *See id.* at 1505.

[25] As discussed *supra* ¶ 31, to the extent that Tranquility's claims under Cal. Corp. Code § 25504 are not based in fraud, such claims would unquestionably not qualify under the NSMIA savings clause that applies to state enforcement actions involving fraud and deceit. At any rate, as discussed *supra*, such savings clause does not apply to this Claim which is not a state enforcement action.

39. Seeking to escape these assertions of WMI's fraudulent actions, Tranquility ironically points to a sentence in its material assistance claim under Cal. Corp. Code § 25504.1 – the one cause of action that Tranquility concedes does sound in fraud, *see* Response at ¶ 26 – to assert that its controlling person claims do not sound in fraud. *See id.* at ¶ 32. In that sentence, Tranquility alleges that WMI "depart[ed] from the standards of ordinary care." Claim at ¶ 217. Tranquility, however, fails to quote the very next sentence of the Claim, which explains that "[t]here could not have been an innocent reason" for this alleged departure from the standard of ordinary care. Claim at ¶ 218. Thus, even the section of the claim that Tranquility points to as asserting negligence against WMI actually asserts the very opposite. At any rate, Tranquility cannot cite to this sentence as support for the fact that its controlling person claims are based in negligence, since such sentence was specifically not incorporated into Tranquility's controlling person claims. *See* Claim at ¶¶ 193, 220.

40. The Claim is analogous to the decision in *California Public Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) ("*CALPERS*"), where the Third Circuit Court of Appeals held that plaintiffs' section 11 claims were grounded in averments of fraud because such claims were "indisputably immersed in unparticularized allegations of fraud." *Id.* at 160. In *CALPERS*, the court noted that "because 'Rule 9(b) refers to 'averments' of fraud', we must 'examine the factual allegations that support a particular legal claim.'" *Id.* (citation omitted). In analyzing the plaintiffs' section 11 claims, the Court noted that notwithstanding a one sentence disavowal of fraud, the linchpin of the plaintiffs' action was "their allegations that [d]efendants knowingly and intentionally committed accounting violations, issued a series of false and misleading statements. . . and omitted critical information that would tend to negate the [mis]representations. . ." *Id.* at 160. Similarly here, notwithstanding Claimant's one sentence

disavowal of fraud, Claim at ¶ 221, the linchpin of the Claim is that WMI and "WaMu" acted

knowingly and with intent in issuing a series of misrepresentations. *See* Claim at ¶¶ 33-35, 97-

100. Accordingly, such claims assert fraud and FRCP 9(b) applies.[26]

## C. **Claimant has not Pled any of its Claims with Particularity**

41. The Third Circuit has analogized fraud pleading to the first paragraph of any

newspaper story, requiring "'the who, what, when, where, and how'" of the circumstances.

*Kanter v. Barella,* 489 F.3d 170, 175 (3d Cir. 2007) (citing *In re Burlington Coat Factory Sec.*

*Litig.*, 114 F.3d 1410, 1422 (3d Cir.1997)); *see also CALPERS*, 394 F.3d at 163. Claimant has

failed to allege all of these elements with particularity. Claimant has failed to plead the "who" in

that the Claim is overloaded with blanket assertions against a combined "WaMu" entity without

explaining which separately incorporated and functioning corporation did what. Claimant fails

to plead the "what, when and where" elements, failing to identify any single loan or appraisal

that was affected by the alleged improper appraiser practices. Instead, it effectively speculates

that such improper appraisals must have impacted the loans underlying their Certificates.[27] *See*

---

[26] Nor is the primary case relied upon by Claimant, *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) on point. In that case, the court held that a section 11 claim was not based in averments of fraud where the Complaint: repeatedly alleged a theory of negligence, "did not allege that any of the defendants knew of the falsity of their statements and intended for the statements to be acted upon," "carefully segregated its allegations of negligence . . . from its allegations of fraud," and where there was only a one sentence general statement alleging a fraud. *Id.* at 271-73. Here, the Claimant has not even used the word negligence in its Claim, has not segregated any of its purported "negligence" claims from its fraud claims, has alleged that WMI and "WaMu" acted "systematically," with knowledge of the inflated appraisals, and in fact colluded with eAppraiseIT to pressure appraisers to inflate appraisals and blacklist those that did not comply, *see* Claim at ¶¶ 110-127, 153-182, 190, and only asserts a one-sentence disavowal of fraud, *see* Claim at ¶ 221.

[27] Under the heightened pleading standards of FRCP 9(b), Claimant must plead with particularity that appraisals relating to the loans underpinning its specific mortgage backed securities were artificially inflated, not that some undetermined amount of the billions of WMB-originated loans were based on inflated appraisal values. *See Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.*, No. 09-CV-287, 2010 U.S. Dist. LEXIS 36365 at *21-22 (W.D. Ky. Apr. 13, 2010) (dismissing claims related to allegations of inflated appraisals for mortgage backed securities since such claims failed to meet FRCP 9(b)'s requirements that it allege particular facts about the specific appraisals at issue); *see also Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 307-08 (D. Mass. 2009) (to state a claim under sections 11 and 12(a)(2) of the Securities Act alleging inflated appraisal values for mortgage backed securities, plaintiff must plead facts about the specific loans in question); Claimant's attempt to distinguish *Nomura* as a case involving generalized assertions of the mortgage industry as a whole fails, since similar to *Nomura,* the Claim makes generalized assertions against the billion dollar

---

Claim at ¶ 23 (failing to identify with particularity any causal nexus between the alleged

overappraisals and the Certificates at issue). Finally, it fails to allege the "how" with

particularity, instead making conclusory statements that WMI "designed and approved the MBS

securitization strategy," Claim at ¶ 33, or that it knew or must have known about the alleged

misrepresentations at issue. *See* Claim at ¶ 218. Such conclusory statements fail to allege how

WMI, an entity with no day-to-day involvement in appraisals, loan origination, or the

securitization of loans knew such alleged untruths or controlled such entities.[28] *See Youkelsone*

*v. Wash. Mut., Inc. (In re Wash. Mut. Inc.)*, 418 B.R. 107, 115 (Bankr. D. Del. 2009) (dismissing

---

industry of WMB loans without alleging any facts specific to "the Trusts' underlying loans." *Id.* at 307. So too, Claimant's attempt to distinguish *Ferber v. Travelers Corp.*, 802 F.Supp. 698, 706 (D. Conn. 1992) fails. In *Ferber*, the Court rejected the plaintiff's attempt to use discovery as a means to determine that "the appraisals actually performed were not performed by independent appraisers," holding instead that plaintiffs must plead such allegations of non-independent appraisals with particularity and that "[t]his argument represents exactly the type of conduct Rule 9(b) is designed to retard." *Id.*

Nor is Claimant's reliance on *In re Wells Fargo Mortgage Backed Certificates Litig.*, No. 09-01376, 2010 U.S. Dist. LEXIS 39825 (N.D. Cal. Apr. 22, 2010) well founded. In that case, which did not apply FRCP 9(b), the court allowed a claim to continue where the plaintiff supported its claims with confidential witnesses who alleged that over 70% of the defendant's loans had inflated loan to value ratios. In contrast, in this Claim, Tranquility has failed to even allege any loan or percentage of loans originated by WMB that were based on an inflated appraisal value.

[28] Nor do the conclusory bullet points that Claimant quotes in the Response at ¶ 39, demonstrate otherwise. For instance, in one such bullet point, Claimant quotes the Claim as alleging that "In particular, WMI: (a) knew that the Offering Documents were materially false and misleading; (b) knew that the offering documents would be provided to Tranquility; and (c) knowingly and substantially participated or acquiesced in the preparation, issuance, and/or dissemination of the Offering Documents." Notwithstanding Claimant's use of the phrase "in particular" such a sentence fails to provide any particular information about how WMI "knew that the offering documents were materially false and misleading" or "knowingly and substantially participated in the preparation, issuance, and/or dissemination of the Offering Documents." Accordingly, such generalized assertions of knowledge or involvement on the part of WMI fail Claimant's burden to plead fraud with particularity.

In another such bullet point, Claimant alleges that it asserted that Tranquility "designed and approved the MBS securitization strategy," *see* Claimant's Response at ¶ 39, yet neglects to quote the section of the Claim where it explained that it based such an assertion "on information and belief." Claim at ¶ 209. Such conclusory assertions backed by mere "information and belief" plainly fails to satisfy Claimant's burden to plead fraud with particularity. *See, e.g., Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 285 (D. Del. 1993) (acknowledging that "'[c]ircumstances that constitute the . . . elements [of fraud], if alleged on information and belief, generally will not satisfy [Federal] Rule 9(b)'s particularity requirement'") (citation omitted).

Nor can Claimant bootstrap itself to the complaint by the New York Attorney General against First American to satisfy its requirement to prove fraud with particularity. Claimant already has copied the bulk of the substance of that Complaint directly into its Claim. Furthermore, the Complaint suffers from the same flaw as the Claim, muddling the actions of individual corporations separately incorporated and separately functioning into one unitary WaMu enterprise. By doing so, it becomes impossible to follow which company is asserted to have done what. Additionally, that Complaint does not set out with particularity any information sufficient to connect the securities purchased by Tranquility with the alleged inflated appraisals.

---

28

adversary proceeding where plaintiff only alleged conclusory statements that "WMI oversaw, managed, controlled and supervised all operations of WMB," but failed to allege "factual allegations which would lead to a plausible inference that WMI directed WMB to engage in misconduct" related to Plaintiff's mortgage-based claims).

## D. The Claim Should be Dismissed, Because by Claimant's Own Admission Allowing Amendment Would be Futile

42. Finally, Claimant argues that it should be allowed to amend its Claim. But Claimant does not represent that it has any particularized information regarding WMI's role in the alleged conspiracy or that it has any information regarding whether any loans or appraisals underlying its Certificates were faulty. In fact, Claimant specifically represents that it does not have such loan information. *See* Claimant's Response at ¶ 46.[29] Accordingly, granting Claimant leave to amend would serve no purpose. *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413-14 (3d Cir. 1993) (holding that "futility of amendment" is grounds to deny leave to amend).

---

[29] While Claimant asserts that such information is within the hands of WMI, that assertion is not correct, as seemingly conceded by Tranquility's admission that it sought such information from WMB and not WMI. It is a matter of public record that WMB's assets have been seized by the FDIC and sold to JPMC pursuant to the Sale and Purchase Agreement. WMI, a parent and holding company, did not have any involvement in the origination of the loans at issue or in the appraisals for such loans. Objection Ex. 1 at ¶ 3.

WHEREFORE the Debtors respectfully request the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: June 17, 2010
      Wilmington, Delaware

Mark D. Collins (2981)
Chun I. Jang (No. 4790)
Drew G. Sloan (No. 5069)
Julie A. Finocchiaro (No. 5303)
RICHARDS, LAYTON & FINGER, PA
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

—and—

WEIL, GOTSHAL & MANGES LLP
Brian S. Rosen
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession