**Exhibit C**

**Liquidation Analysis for Each Debtor**

Pursuant to section 1129(a)(7) of the Bankruptcy Code (the "Best Interest Test"), each holder of an impaired Claim or Equity Interest must either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. In determining whether the Best Interest Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in chapter 7. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the commencement of their chapter 7 cases. Such amount then would be reduced by the costs and expenses of the liquidation. Prior to determining whether the Best Interest Test has been met for general unsecured creditors, further reductions would be required to eliminate Cash and asset liquidation proceeds that would be applied to Secured Claims and amounts necessary to satisfy chapter 11 Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims that are senior to General Unsecured Claims, including any incremental Administrative Expense Claims that may result from the termination of the Debtors' businesses and the liquidation of assets. Any remaining Cash would be available for Distribution to general unsecured creditors and Equity Interest holders in accordance with the distribution hierarchy established by section 726 of the Bankruptcy Code.

The Liquidation Analysis (the "Liquidation Analysis") below reflects the estimated Cash proceeds, net of liquidation-related costs that would be available to the Debtors' creditors if the Debtors were to be liquidated in a chapter 7 case. Underlying the Liquidation Analysis are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSES WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

**General Assumptions**

For purposes of the Liquidation Analysis, the Debtors considered many factors and made certain assumptions. Those assumptions that the Debtors consider significant are described below.

1. **Conversion:** Each of the Chapter 11 cases are converted to chapter 7 in 2010.

2. **Appointment of Chapter 7 Trustee:** A chapter 7 trustee is appointed to liquidate and wind down the Debtors' estates.

3. **Chapter 7 Trustee:** The chapter 7 trustee would retain professionals (investment bankers, law firms, accounting firms, consultants, forensic experts, etc.) to assist in the liquidation and

wind down of the Debtors' estates. Although the chapter 7 trustee may retain certain of the Debtors' professionals for discrete projects, it is assumed that the trustee's primary investment banking, legal, accounting, consulting and forensic support would be provided by new professionals, because most (if not all) of the Debtors' professionals will hold Claims in the chapter 7 cases.

4. **Tax Refunds:** For the purposes of this analysis, the Debtors have assumed receipt of future tax refunds to be December 31, 2010. It's the receipt of these refunds that provide the recovery to the Senior Subordinated Notes, the CCB Guarantees, and the PIERS.

5. **Start-Up Time:** Given the complexity of the Chapter 11 cases and the underlying assets and Claims, it is anticipated that the chapter 7 trustee and any newly retained professionals will require at least 2 to 4 months to familiarize themselves with the Debtors' estates, the assets, the Claims and related matters before they begin marketing assets or litigating Claims.

6. **Settlement Agreement:** The conversion of the cases to chapter 7 are assumed to delay the consummation of the Global Settlement Agreement while the chapter 7 trustee and its professionals review the Debtors' major assets and the terms of the Global Settlement Agreement. For the purposes of this analysis, it is assumed that a chapter 7 trustee is able to consummate a global settlement agreement on the same terms and conditions as the Debtors propose in its plans. Without a consummation of a global settlement agreement on similar terms as the Global Settlement Agreement or, in the alternative, litigating to finality each issue related to distribution of assets, a chapter 7 trustee would be unable to resolve all claims in these estates or make significant distributions. The Debtors can provide no assurance that a chapter 7 trustee will be able to execute a Global Settlement Agreement on at least as favorable terms as the current agreement.

7. **Duration of Liquidation:** The Liquidation Analysis assumes that after the start-up period the actual liquidation of assets of the Debtors would continue for 2 to 4 months, during which time all of the Debtors' major assets would be sold and the Cash proceeds, net of liquidation-related costs, would be available for distribution to creditors.

Approximately 4,000 Claims have been filed in the Chapter 11 cases. It is unlikely that a chapter 7 trustee could adequately reconcile all Claims during a 9 to 12 month period of assessment and asset recovery. Therefore, a large number of the Claims in these cases will be reconciled, valued, negotiated and settled, and/or litigated to conclusion only after the asset recovery work is mostly complete. The Debtors estimate that a chapter 7 trustee will require an additional 6 to 12 months to reconcile Claims and pursue litigations. It is possible that some distributions could be made prior to such period, but Claims would be subject to reserves or an estimation process.

It is not uncommon in large cases for liquidations to last many years while chapter 7 trustees prosecute difficult Claims-related issues and other types of litigation.

8. **Consolidation for Administrative Purposes**: This Liquidation Analysis assumes that the Debtors are consolidated for administrative purposes during the chapter 7 cases.

9. **Presentation:** For the purposes of this analysis, the two Debtors, WMI and WMI Investment Corp., are shown combined. WMI Investment Corp. is not anticipated to have any claims against it, and therefore, the value of WMI Investment Corp.'s assets will be assets of WMI.

| (Dollars in Millions) | Chapter 11 Plan | | | Chapter 7 Liquidation | | | Notes |
|---|---|---|---|---|---|---|---|
| | **Proceeds** | | | **Proceeds** | | | |
| Cash | $ 5,191 | | | $ 5,191 | | | (a) |
| Reorganized WMI | 140 | | | 50 | | | (b) |
| Investment in Subsidiaries & Other | 37 | | | 37 | | | (c) |
| Future Income Taxes Receivable | 2,255 | | | 2,255 | | | (d) |
| Total Proceeds | 7,623 | | | 7,533 | | | |
| Bank Exp, Priority Claims & Convenience Class | (103) | | | (188) | | | (e) |
| Net Proceeds | $ 7,520 | | | $ 7,345 | | | |
| | **Claim Amount** | **Recovery Amount** | **Recovery %** | **Claim Amount** | **Recovery Amount** | **Recovery %** | |
| Unsecured Claims | | | | | | | |
| Senior Notes | | | | | | | (f) |
| Prepetition [1] | $ 4,132 | $ 4,132 | 100% | $ 4,132 | $ 4,132 | 100% | |
| Post-Petition [2] | 314 | 314 | 100% | 375 | 375 | 100% | |
| Total | 4,446 | 4,446 | 100% | 4,507 | 4,507 | 100% | |
| Senior Subordinated Notes | | | | | | | (f) |
| Prepetition | 1,666 | $ 1,666 | 100% | 1,666 | $ 1,666 | 100% | |
| Post-Petition [2] | 257 | 257 | 100% | 277 | 277 | 100% | |
| Total | 1,924 | 1,924 | 100% | 1,944 | 1,944 | 100% | |
| General Unsecured Claims | 375 | $ 375 | 100% | 375 | $ 375 | 100% | (g) |
| CCB Guarantees | | | | | | | |
| Prepetition | 70 | $ 70 | 100% | 70 | $ 70 | 100% | (f) |
| Post-petition [2] | 8 | 8 | 100% | 9 | 9 | 100% | |
| Total | 78 | $ 78 | 100% | 78 | $ 78 | 100% | |
| PIERS | | | | | | | (f)(h) |
| Prepetition | 789 | $ 697 | 88% | 789 | $ 442 | 56% | |
| Post-petition [2] | 159 | - | 0% | 172 | - | 0% | |
| Total | 949 | $ 697 | 73% | 961 | $ 442 | 46% | |
| Subordinated Claims | - | - | N/A | - | - | N/A | (i) |

Notes:
(1) Prepetition amount assumed to be paid at 9/30/10 under a Chapter 11 plan and 02/28/10 under a Chapter 7 liquidation.
(2) Post-petition interest (including OID) calculated to 12/31/10 for the Chapter 11 plan and to 2/28/10 for the Chapter 7 liquidation.

Notes:

(a) Cash is comprised of cash (including WMI's share of tax refunds already received) and restricted cash at WMI, WMI Investment Corp. and its subsidiaries, plus payments from JPMC for Visa Shares and intercompany loans pursuant to the Global Settlement Agreement proceeds related to the American Savings Bank Goodwill Litigation and BOLI/COLI and Rabbi Trust assets in both chapter 7 and 11 cases.

(b) The Reorganized WMI includes WMI, WMI Investment Corp. and WMMRC, a wholly-owned subsidiary of WMI and a Hawaiian captive reinsurance company. WMI retained Blackstone Advisory Partners ("Blackstone") to prepare a valuation of the Reorganized WMI. Blackstone's

conclusions regarding the value of Reorganized WMI are subject to the assumptions, limitations and qualifications set forth in the valuation analysis, annexed to this Disclosure Statement as Exhibit D. As set forth therein, Blackstone's valuation work produced a range of $120 million to $160 million (on a pre-rights offering basis). For purposes of this analysis, we have included the midpoint of that range, $140 million.

In chapter 7 cases, the Debtors believe that a chapter 7 trustee would be forced to sell WMMRC quickly which would substantially reduce the recovery associated with this asset. The Debtors' belief is based on consultation with various investment banks and potential bidders of WMMRC.

(c) Includes investments in wholly-owned subsidiaries Marion Insurance Company, a Vermont captive reinsurance company, WaMu 1031 Exchange, a 1031 exchange administrator, and Ahmanson Obligation Company. Other assets include the Assurant Trust account and a remaining note related to a venture capital investment, as described in the Disclosure Statement.

(d) In both the chapter 11 and 7 cases, WMI's portion of future tax refunds equates to 20% of the initial tax refund of approximately $2.9 billion and an additional tax refund of $2.8 billion less $1,125 million paid to the FDIC and the WMB bondholders, netting a total of $2,255 million.

(e) It is anticipated that a delay would result from the conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code due to the knowledge transfer required and associated with the transition to new attorneys and other professionals likely to be selected by a chapter 7 trustee. For the purposes of this analysis, the Debtors assumed that a 5 month delay would occur while a trustee is appointed and while the trustee's professionals become familiar with the many complex issues in the Debtors' cases. Based on the current rate of operating expenses, the Debtors estimate that the conversion of the cases to cases under chapter 7 of the Bankruptcy Code would result in an increase of $4 million in operational expenses. Based on the current rate of professional fees being incurred in the Debtors' chapter 11 cases, the Debtors estimate that the conversion would equate to $43 million in professional fees. In addition, as is customary, the Debtors anticipate that a chapter 7 trustee would receive compensation in the form of a transaction fee based on the total distribution available for creditors. For the purposes of this liquidation analysis, the Debtors assumed a 0.5% transaction fee would be imposed on the total distribution to creditors, which is equal to $38 million.

(f) As discussed, conversion to chapter 7 cases will cause a delay in the resolution of the cases. For the purposes of this analysis, it is assumed that payment on Senior Notes prepetition claims will be delayed by an additional five months and payment on Subordinated Notes, CCB Guarantees and PIERs prepetition claims will be delayed by an additional two months. This results in increased post-petition interest on the Senior Notes, Subordinated Notes, CCB Guarantees and PIERs claims. The actual amount of delay could be somewhat less or far greater than this amount.

(g) In both the chapter 11 and 7 cases, general unsecured claims will vary widely depending on the outcome of various claims objections. Current filed claims total in excess of $55 billion excluding unliquidated claims. However, the Debtors' best estimate of eventually allowed claims in both cases will be approximately $375 million.

(h) PIERS claims consists of claims related to both preferred and common securities. All common securities are owned by WMI. Therefore recoveries in excess of $765 million plus corresponding post-petition interest will be distributed back to the estate.

Subordinated Claims could arise from the outcome of various litigations and as such, no estimate of those claims have been included in the liquidation analysis under either a chapter 11 plan or a chapter 7 liquidation.