IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---

In re : Chapter 11

WASHINGTON MUTUAL, INC., et al. : Case No. 08-12229 (MFW)

Debtors. : (Jointly Administered) Re: 4749

---

RESPONSE TO DEBTOR'S FORTY-THIRD
OMNIBUS (SUBSTANTIVE) OBJECTION TO CLAIMS, AS RELATED TO
CLAIM NUMBER 2919

## LTW IS COPYRIGHTED

Litigation Tracking Warrant ™ is simply a trademarked term that was originated by Credit Suisse First Boston. By belief, it was selected by Dime Bancorp so as to ally itself with the other publicly traded Winstar related securities. These included Winstar related contingent lawsuit recovery claims that were spun-off by Citigroup Inc., Golden States Holding, and Coast Federal Bancorp.

Debtor has apparently argued that with the LTW if it is simply entitled Warrant that alone is sufficient to make the security a Warrant. With this faulty logic of the Debtor if a zoo had a Giraffe, it could put a sign in front of the exhibit that would say Lion and this animal would then become a Lion. As such, the key with the DIMEQ LTW is to read the entire DIMEQ LTW document to understand the meaning. Without an exercise price, this security simply does not meet the definition of a warrant. Also, it is equally important to understand the original intent of the parties.

The original purpose and intent of the DIMEQ LTW was simply to transfer the economic value associated with the Anchor Savings related Winstar claim to a separate security, the DIMEQ LTW. Dime Bancorp issued a press release on 12/18/00: "Dime Bancorp today announced that its Board of Directors has declared a distribution to common stockholders of a substantial portion of Dime's *economic interest* in its pending "goodwill" lawsuit against the United States government through the issuance of Litigation Tracking Warrants ™." [see: Exhibit I].

The U.S. Securities and Exchange Commission also acknowledged that they understood the nature and intent of the DIMEQ LTW as is noted in the minutes from their discussions of the 3/12/98 SEC Regulations Committee Highlights Joint Meeting with SEC Staff: *"The Staff believed that the instrument effectively separated the combined entity into two components: the contingent asset and the remainder of the company."* [see: Exhibit II].

In an attempt to quantify their stated Company financial metrics, Golden States Holdings took the estimated pro-rata Winstar earnings relative to their Winstar related claim into their financial statements as stated in their 6/30/98 SEC 10Q filing [see: Exhibit III]. What is most telling is the language: "Percent of Goodwill Litigation *owned* by Litigation Tracking Warrant (Trade Mark) Holders 85%." The underlying LTW agreement therein is patterned predominately similar to that of DIMEQ; however, there was practiced a different method of accounting by Golden State Holdings so there is no such footnote provided within the Dime Bancorp financial statements.

Section 6.1 of the original DIMEQ LTW further clarifies: "Holders not Stockholders. No Holder . . . . will be deemed to be the holder of shares of Common Stock . . ." [see: Exhibit IV].

The DIMEQ LTW is actually most closely representative of a transaction involving certificates of beneficial interest. In effect, the DIMEQ LTW was a single asset, one tranche securitization. Certainly a sophisticated investor can realize with some clarity that DIMEQ LTW holders are not Washington Mutual, Inc. ("WMI") shareholders nor are they traditional warrant holders.

## EQUIVALENT VALUE

Debtor grossly misrepresents and incorrectly states the terms of the DIMEQ LTW. Equivalent value is due under a contract whereby there exist circumstances wherein the original terms can not be honored as was originally contemplated.

Furthermore, this is discussed on page 17 of the 12/15/00 Dime Bancorp S-3A registration statement: "Adjustments The LTWs will be adjusted in case of certain reclassifications, redesignations, reorganizations or changes in or common stock or consolidations or mergers in which we are involved or the sale of all or substantially all of our assets. *In such a case, each LTW will be exercisable into the right to receive the kind of shares of stock or other securities or property . . . may be exercised for stock or other securities or an amount of property equal to the adjusted litigation recovery*" [see: Exhibit V].

The Debtor has stated that DIMEQ LTW holders are equity claimants apparently relying on a misguided conclusion that is based upon the assumption as it was originally contemplated a conversion of the Anchor Savings Winstar case related proceeds would be made for equivalent value of Dime Bancorp (or now WMI, the LTW assignee) common stock. However, that was based under a set of key contemplated circumstances that are no longer in effect now that a Combination event has taken place.

## DEBTOR DISDAINS INTEREST

WMI was the legal holder of the Anchor Savings Winstar related litigation. This is evidenced by their filing of the underlying Certificate of Interest [see: Exhibit VI].

It is unclear from a legal prospective how that the Debtor is presently attempting to pass the entire Anchor Winstar related matter on to JPMorgan Chase Bank ("JPM"). Under the WMI Plan of Reorganization there is some form of a retroactive Section 363 provision wherein WMI is purporting to transfer this litigation and the awarded proceeds thereof to JPM with no stated consideration (Proposed Plan, Article II, Section 2.1(c)).

One must dig deeper into the circumstances involved to understand this clever ploy. If WMI can effectively pass on without any due consideration the economic proceeds of the Anchor litigation it will mean about $356 million to JPM. This does not take into account that the litigation after being remanded back to the United States District Court of Claims for a recalculation related error it is further expected to be awarded an additional $63 million and that there will also be an effective corporate income tax gross-up based upon the final award. Whereas, if WMI is deemed the rightful holder of this Anchor litigation the estate will obtain only the amount of the litigation proceeds times their prescribed managerial fee (as stated within the DIMEQ LTW). This equates to be about 15% of the net amount to be awarded with respect to the underlying Anchor litigation.

This twisted asset swap as proposed under the Global Settlement Agreement prejudices certain creditors in an unjust and inequitable manner.

## DERELICTION OF FIDUCIARY DUTY

Section 4.4 of the original DIMEQ LTW "If any event occurs as to which the foregoing provision of this Article IV are not strictly applicable . . . *in the good faith judgment of the Board, to protect such purchase rights* as aforesaid." [see: Exhibit VII]

Section 7.9 of the original DIMEQ LTW "Severability If any provision of this Agreement or the application thereof to any person (including without limitation, the officers and directors of the Warrant Agent and the Company) or the circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provision hereof, or the application of such provision to persons or circumstance other than those as to which it has been held invalid or unenforceable, will *remain in full force and effect and will in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination, the parties will negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to affect the original intent of the parties.*" [see: Exhibit VIII]

To the best of Claimant's knowledge, Debtor has not objected to any of the legal billings involving dozens of hours of senior attorney time charged by Akin Gump Strauss Hauer & Feld LLC (WMI Unsecured Creditors Committee counsel ("Akin Gump")) relating to considerable investigation on the DIMEQ LTW along with the Anchor Savings litigation. Also, Akin Gump has charged the estate for their in person attendance at the October 23, 2009 Anchor Savings case (#95-09) oral arguments as heard by the United States Court of Appeals for the Federal Circuit. Debtor now has determined as a part of the proposed Global Settlement to seek to gift this valuable asset (Anchor Savings litigation) to JPM. Additionally, most curious is the May 2010 WMI legal billing by Akin Gump that has detailed in two places entries from two different attorneys relating to DIMEQ LTW with a listing within the same billing notation about an analysis of the WMI Directors' and Officers' liability insurance coverage [see: Exhibit IX]. Could this be one reason that Akin Gump stated on the record at the June 3, 2010 Omnibus Hearing within this Bankruptcy Court that they are not willing to voluntarily share any of their internal analysis and related work product with WMI Equity Committee Counsel?

Debtor has committed serious dereliction of their requisite fiduciary duties and obligations to the DIMEQ LTW holders.

## LACK OF BANKRUPTCY RISK FACTOR
Standard with any public offering of securities (as was done with the DIMEQ LTW) there is an offering prospectus which details at length all of those Risk Factors associated with a particular investment. Debtor has not indicated wherein there are any Risk Factors stated relative to a bankruptcy event or even that of unforeseen financial difficulties. This is considered to be standard legal boilerplate. This alone is indicative of demonstrating that this DIMEQ LTW asset is to endure regardless of the financial viability of the Company.

Since the DIMEQ LTW was originally drafted and an opinion thereon provided by Sullivan & Cromwell, LLP (coincidently JPM lead counsel on the WMI bankruptcy matter) it is apparent that this was not a mere unintentional Scribner's error and that the clear intent was to provide Anchor Savings Winstar related economic value to DIMEQ LTW holders regardless of any adverse financial situation of Dime Bancorp (or now that of WMI, the current assignee under the DIMEQ LTW).

## DEBTOR EXHIBIT

Other than that of the underlying DIMEQ LTW the primary exhibit that the Debtor has brought forth to establish their request for expungement on the DIMEQ LTW proof of claim filings is an affidavit from Charles Edward Smith; Executive Vice President, General Counsel & Secretary of WMI. This affidavit provides minimal substance other than that it does state WMI's predominant basis for rejection of the claims with the simple statement: "To the best of my knowledge, information, and belief the Dime Claims represent equity claims." Claimant should be afforded the opportunity to provide interrogatories and conduct depositions pro se, as may be deemed appropriate, to fully understand this cursory statement and the underlying actions of the Debtor that may affect the rights of all of the DIMEQ LTW holders. Claimant respectfully responds to the aforementioned statement from Mr. Smith by providing Claimant's own declaration: "To the best of my knowledge, information, and belief the Dime Claims do not represent equity claims."

## AMENDMENT

The 12/26/00 original DIMEQ offering prospectus as filed with the SEC delineates: "Amendment From time to time, we and the warrant agent may amend or supplement the warrant agreement. Only *amendments or supplements that have an adverse effect on the interests of the LTW holders will require the written consent of the LTW holders*. In most cases, that consent will be required from holders of a majority of the then outstanding LTWs. In the case of an amendment that increases the exercise price of the LTWs or number of shares of our common stock or other securities or property issuable upon exercise of the LTWs other than pursuant to adjustments provided for in the warrant agreement, the consent of each LTW holder will be required." [see: Exhibit X]. By the act of seeking to expunge Claimant's Proof of Claim the Debtor is attempting to adversely amend the underlying terms of the DIMEQ LTW. And, as a matter of record Claimant does not provide implied or expressed consent for the Debtor to do so thereon.

## WMI PRIMARY LEGAL ARGUMENTS

Debtor contends that under Section 101(16) of the Bankruptcy Code, an equity security is "(C) warrant or right other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph." A purchase is defined as "an exchange of an asset for money or value." However, the term purchase here is not correct as WMI amended the DIMEQ LTW Agreement so that there is no exercise cost involved with the DIMEQ LTW. Therefore, this effectively makes DIMEQ LTW a convertible security that meets an exception as noted within Section 101 (16C) of the Bankruptcy Code.

WMI further argues that under Section 510(b) of the Bankruptcy Code that if the DIMEQ LTW is not defined as an equity security that they should nevertheless be subordinated to the unsecured creditors of the Debtor. However, again WMI misses the point. This section was intended to apply to matters only involving the sale or purchase of securities. The original DIMEQ LTW did not involve the sale or purchase of a security. DIMEQ LTWs were issued gratis to existing Dime Bancorp shareholders in a cashless transaction so no purchase was involved.

## CONCLUSION

The economic benefit associated with the Anchor Savings Winstar related legal matter was designed to flow through to DIMEQ LTW holders. WMI was simply the conduit or administrator that should have properly acted on behalf of all DIMEQ LTW holders. The mere fact that one of many potential methods of liquidation stated was to pay DIMEQ LTW holders in WMI common stock does not render it an equity security nor should its fate be tied to that of WMI common stock. The WMI Combination and Reorganization event also should be considered.

The Debtor has unsuccessfully attempted to rationalize that they somehow are not responsible to the DIMEQ LTW holders. The intents and principles were to give 85% of the net Anchor Savings litigation recovery to the DIMEQ LTW holders. Continuing obfuscation of this matter by WMI only serves to make it clear that their arguments are not well reasoned. The crux of their equity founded argument has insufficient legal basis. Indeed, this is all a fundamental fairness question, and one of "right vs. wrong."

DIMEQ LTW holders are not equity holders and should be deemed to be more than unsecured creditors within the bankruptcy estate of WMI.

DATED: July 1, 2010

Respectfully submitted,

*Brad Christensen*
Brad Christensen, pro se
8601 SW Braeburn Lane
Tigard, OR 97224
ulcanvay@hotmail.com
503/539-1699
No fax