# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WASHINGTON MUTUAL, INC., et al., | Case No. 08-12229 (MFW) |
| Debtors. | Jointly Administered |
| | re: Docket: 5286 |

**Hearing Date: September 7, 2010 at 3:00 p.m.**

**Objection Deadline: August 30, 2010 at 4:00 p.m.**

## Objection to Debtor's Motion
## Approval of Settlement with the Internal Revenue Service

Philipp Schnabel, as a Shareholder of Washington Mutual Inc (WMI), respectfully submits this objection (The Objection) to entry of the Motion of Washington Mutual, Inc. Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Approval of Settlements with the Internal Revenue Service( IRS), (The Motion of Debtor) granting the Debtor the approval of Settlement with the IRS.

In support of the Objection, Philipp Schnabel respectfully states as follow:

# **Background**

## **THE NOL AND CAPITAL LOSS CARRYFORWARDS**

There is <u>one</u> 2008 consolidated tax return with unused NOLs and capital losses that should be carried forward to the benefit of the estate. The tax benefits of the carryforwards can be worth <u>$7.419B in NOL carryforward at 35%, or approximately $2.6B of tax saving</u>, This amount should be discounted for the benefit periods, and should also be considered an asset of the estate.

This amount $15.380B NOL in the carryback from the revised $22.2B per the IRS audited 2008 NOL. That leaves the Tax Group with $7.419B in NOL carryforward at 35%, or approximately $2.6B of tax saving valuation.

### *5th Disclosure Statement - July 1, 2010*

### *IV.D.*
### *18. Tax Claims and Refunds.*

*As previously indicated, WMI and its direct and indirect subsidiaries (including WMB),are members of an affiliated group of corporations for U.S. federal income tax purposes, of which WMI is the common parent (previously referred to as the "Tax Group"), and have been filing a single consolidated federal income tax return. The Tax Group has also been filing consolidated, combined or unitary tax returns for various state and local tax purposes.*

*b. Tax Refunds*

*The Debtors believe that WMI is entitled to substantial tax refunds arising from the resolution of certain tax matters. **In addition, the Debtors estimate that, as of December 31, 2008, the Tax Group incurred NOLs for federal income tax purposes in excess of $25 billion.** The NOLs are valuable assets as they can be carried back against the federal taxable income of the Tax Group for prior years, allowing the Tax Group to reduce any federal income tax liabilities determined to be owing and to recover federal income taxes paid in those earlier years. Prior to enactment of the Worker, Homeownership, and Business Assistance Act (previously defined as the "Act") on November 9, 2009, corporate taxpayers could generally carry back NOLs only to the two preceding taxable years. The Act permits corporate taxpayers, subject to certain limitations, a one-time election to extend the NOL carryback period from two years to up to five years (with the fifth year limited to half of that year's taxable income). As permitted, WMI filed refund claims based on a five-year carryback of the Tax Group's 2008 NOL.*

*As indicated above, WMI believes that the Tax Group is entitled to federal and state Tax Refunds, net of tax payments estimated to be owed to taxing authorities, of <u>approximately $5.5 to $5.8 billion in taxes</u>, including interest through a projected future date of receipt. Over 85% of this amount reflects the claimed federal income*

*tax refunds, the majority of which are projected to be received within one year. As discussed above, there are competing ownership claims to the Tax Refunds, which will be resolved pursuant to the Global Settlement Agreement.*

### A. Consequences to the Debtors

*For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations which files a single consolidated U.S. federal income tax return, of which WMI is the common parent (previously defined as the "Tax Group"). The Tax Group reported a substantial consolidated net operating loss ("NOL") for federal income tax purposes for the taxable year of the Tax Group ended December 31, 2008. In addition, the Debtors expect that the Tax Group will report additional NOLs for the taxable year ended December 31, 2009, and will incur further NOLs for the taxable year ending December 31, 2010, for the period through the expected Effective Date. In accordance with U.S. federal income tax law, NOLs are generally first carried back (to the extent permitted) to offset prior years' income, before being available to be carried forward. **Thus, a portion of the NOLs incurred by the Tax Group for its taxable year ended December 31, 2008 has been carried back to reduce certain asserted tax adjustments and the Tax Group's reported taxable income in prior years, with the expectation of generating a tax refund, see Section IV.D.18 above. The remaining portion of such NOLs, together with any 2009 NOLs, currently are available to the Tax Group as an NOL carryforward that can offset future income.** Substantially all of the NOL carryforwards incurred through the end of 2008 are attributable to the operations of WMB and its former subsidiaries or the sale of certain assets to JPMC in connection with the Bank Receivership. The amount and use of any NOLs remain subject to review and adjustment by the IRS. See Section IV.D.18 above (describing the current status of federal income tax audits).*

Based on this erroneous attempt at disguising the tax benefits, the Debtors are scheming to allocate the shares of the new reorganized entity to specially targeted "impaired classes" who would own the control of the new reorganized entity.

WMI paid taxes on behalf of WMB, and was NOT reimbursed prior to bankruptcy, WMI has a claim against WMB for the tax amounts.

JPMorgan Chase Bank, National Association et al v. Washington Mutual, Inc. et al, Case No. 09-50551 → Docket 139 → Amended Exhibit 2

and

Case 1:09-cv-00533-RMC, Document 65, Filed 09/25/2009

*„REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' MOTION TO DISMISS THE AMENDED COUNTERCLAIMS OF DEFENDANT FEDERAL DEPOSIT INSURANCE CORPORATION, AND TO STAY THE PROCEEDINGS IN THEIR ENTIRETY"*

*"a. Tax Refund Counterclaims (Counts I and II)*
*The FDIC concedes that WMI, WMB, WMBfsb, and certain other direct and indirect*

*subsidiaries of WMI and WMB are parties to a Tax Sharing Agreement, dated as of August 31, 1999.    (Answer ¶ 20.) Prior to the Receivership and bankruptcy petition, pursuant to the Tax Sharing    Agreement, **WMI paid taxes due and owing by the consolidated tax group, including    amounts due and owing by WMB.** However, as of the Receivership Date, WMB had not paid   or reimbursed WMI for tax payments that were made on its behalf, and thus **WMI has asserted a claim against the FDIC for the amount of these tax payments**. (Complaint ¶ 20.)"*

## Objection

This proposed IRS Settlement agreement motion deals with all of the <u>past</u> tax returns, tax elections and Net Operating Loss refunds for 2001-2008 for the WaMu Consolidated Group.

(1) It is based upon, and contains language that has been only proposed in the POR and DS, is in significant and material dispute, and are not resolved as the Plan has not been approved - in this regard. Specifically, the tax allocation per the Global Settlement is a creation of the debtors and the adversarial parties, is not only contrary to the Debtor's previous court motions but is not based upon existing U.S. tax law or regulation.

This proposed IRS Settlement agreement motion also deals with all of the <u>future</u> tax returns, tax elections and Net Operating and Capital Loss carryfoward tax attributes for the WaMu Consolidated Group.

(2) It is <u>not</u> based upon, and <u>does not</u> contain language that has even been disclosed in DS. Specifically, WMB is referenced in the agreement motion quoted below, is to "no longer be a member of the WaMu Tax Group. This is a significant, material tax election that has not been disclosed and could represent non-discounted NOL carryforward tax benefit assets to the estate of $2.6B plus unknown capital loss carryforward tax benefit assets for which amount are not even presented for analysis, understanding or fairness of disclosure.

## A - General, tax elections are important to the estate

In the resolution process with the IRS,  the IRS specifically notes on June 29th (from Charles Davis – IRS to Curt Brower of WMI) –,,The Service expresses no opinion who is ultimately entitled to any resulting refunds."

Therefore, this objection requests that all refunds be returned to the Estate.  Then, at the appropriate time,  Adversary Proceeding may be commenced to place claim to the various refunds and properly argued before the court.

The motion attempts to combine the returning of IRS refunds and the subsequent disbursal of those refunds,  in a single motion -- without a corresponding Adversary Proceeding. This deprives the shareholder – the owners of WMI – due process of the proper resolution of these tax refunds.  The issue is clearly complex, of a massive billion-dollar magnitude, and resolution should not be buried within a motion, without claims presented, docketed, argued, and ruled on.

## B - WMI already done the IRC 382 protection to save carryforwards

"As of December 31, 2008, the Company had a net operating loss ("NOL") carry forward tax benefit of approximately $2.6 billion for federal and state income tax purposes that primarily originated before UAL's emergence from bankruptcy and will expire over a five to twenty year period. This tax benefit is mostly attributable to federal pre-tax NOL carry forwards of $7.0 billion. If the Company were to have a change of ownership within the meaning of Section 382 of the Internal Revenue Code, under certain conditions, its annual federal NOL utilization could be limited to an amount equal to its market capitalization at the time of the ownership change multiplied by the federal long-term tax exempt rate. A change of ownership under Section 382 of the Internal Revenue Code is defined as a cumulative change of 50 percentage points or more in the ownership positions of certain stockholders owning 5% or more of the Company's common stock over a three year rolling period.

To reduce the risk of a potential adverse effect on the Company's ability to utilize its NOL carry forward for federal income tax purposes, UAL's restated certificate of incorporation contains a "5% Ownership Limitation", applicable to all stockholders except the Pension Benefit Guaranty Corporation ("PBGC"). The 5% Ownership Limitation remains effective until February 1, 2011. The 5% Ownership Limitation prohibits (i) the acquisition by a single stockholder of shares representing 5% or more of the common stock of UAL Corporation and (ii) any acquisition or disposition of common stock by a stockholder that already owns 5% or more of UAL Corporation's common stock, unless prior written approval is granted by the UAL Board of Directors."

## C - Freemont bank a recent issue  (Exhibit C)

Item 8.01 Other Events.

On November 6, 2009, President Barack Obama signed into law the Worker, Homeownership, and Business Assistance Act of 2009 (H.R. 3548), which further expanded the five-year net operating loss ("NOL") carryback provisions that were initially expanded under the American Recovery and Reinvestment Act of 2009 ("ARRA"). This new law allows businesses to carryback either their 2008 or 2009 NOL to claim refunds of taxes paid within the prior five years. Under ARRA, only small businesses, as defined in ARRA, were permitted to elect a five-year NOL carryback. Fremont General Corporation (the "Company) and its subsidiaries did not qualify as a "small business" under ARRA and were restricted to a two-year carryback provision under section 172(b)(1)(A)(i) of the Internal Revenue Code of 1986, as amended.

As a result of this new law, the Company and its subsidiaries, who file a consolidated federal corporate income tax return, are now permitted to elect up to a five-year carryback of its NOLs incurred in either 2008 or 2009. The Company intends to make such an election for the NOLs generated in 2008, and has determined that the carryback of the 2008 NOL is estimated to result in a tax refund of approximately $22 million; however, the exact amount of the tax refund and the timing to receive the refund remains uncertain as we continue to work with the Internal Revenue Service ("IRS") in completing their audits of the Company's consolidated tax returns for the years ended 2006 and 2007. The Company plans to accrue

the estimated benefit of the 2008 NOL carryback tax refund in the fourth quarter of 2009, and expects to submit the required filings with the IRS for receipt of the NOL carryback refund as soon as reasonably possible following the resolution of the ongoing IRS audits. After giving effect to the five-year carryback of the 2008 NOL and all NOL carrybacks from prior tax years, the Company estimates that the remaining NOL carryforward for the Company's consolidated tax group will be approximately $769 million as of December 31, 2008. The NOL carryforward may be used to offset future federal tax obligations, if any, of the Company and its subsidiaries.

The amount of both the tax refund and the NOL carryforward are current estimates which may change based upon various factors, including the completion of the IRS audits of the 2006 and 2007 consolidated tax returns or audits by the IRS of subsequent open tax years.

As previously disclosed, the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court") terminated, effective as of July 17, 2009, the "exclusive period" in which only the Company would be permitted to solicit votes on a filed plan of reorganization, permitting other parties in interest to file alternative plans of reorganization and accompanying disclosure statements (collectively, "Alternative Plans"). As of the date hereof, there have been Alternative Plans filed with the Bankruptcy Court. Any such Alternative Plans may include information about the Company and its subsidiaries without input from or approval of the Company or its management, which information may include disclosure related to NOLs, expected tax refunds, carryforward NOLs, among other items.

## Docket 5286 Exhibit E  Summary of Key Issues

### Point 12 :

*"12. The adjustments also changed the amount of any remaining loss or credit carryover to future years. Most of the loss and credit carryover amounts, however, are attributable to WMB and, therefore, will not be available to the WaMu Group once WMB's receivership is concluded and WMB is disaffiliated from the consolidated return group. Accordingly, such impact of such adjustments on future tax attributes does not have any significant bearing on the value of WMI's estate, and was not a factor in any decision made by WMI to resolve the adjustments."*
Quote of Docket 5286 Exhibit E

1. When WMB was seized by the FDIC, the original stock in WMB was not. WMI, to this day, still holds the stock in WMB. The FDIC has declared the stock worthless, however the stock in WMB is still wholly owned by WMI.

2. The FDIC seized WMB and WMB's subsidiaries which included certain assets, deposits and some liabilities like the covered debt. The FDIC did not acquire WMI's investment in WMB. The FDIC did not step into the shoes of ownership of WMB, and the subsequent sale by the FDIC to JPM, was a purchase by JPM of WMB and WMBfsb, not a merger/acquisition of the corporate entity, WMI, which remains.

3. When an entity's assets are purchased, as per JPM's annual report, "purchase method", the buyer does not get the tax benefits of the entity. If the buyer wants the tax benefits, it "merges/acquires" the stock of the entity; it steps into the shoes of equity. In any case, the FDIC sold to JPM „certain assets" of the former WMB and WMBfsb, and did not sell the stock of WMB to JPM. That stock, to this day, remains with WMI.

4. As stated by the FDIC, the FDIC subsequently sold to JPM, based on the P&A only what it seized.

5. As stated by the FDIC, the Stock in WMB – while declared of having zero value by the FDIC – still remains with WMI, this is evidenced by the consolidated tax filing for 2008 in a „loss year".

6. The Stock in WMB is still a wholly owned entity of WMI, as the debtor's attorney in this motion is acknowledging, until "the receivership is concluded".

There is a tax sharing agreement within the WaMu Group, but JPM / FDIC "are not in the WaMu Group" and they did not buy WMB stock held by WMI, which is and continues to be in the debtors estate, even after WMB's receivership is concluded.

Attached is **Exhibit A**, a FDIC presentation intended for corporations about the FDIC bidding process for failed banks, a couple of revealing and important slides describing exactly what gets sold in "Whole Bank" purchase and assumption agreements.

(Creator: Grant Thornton LLP ,Tax Adviser of Washington Mutual)

7. As evidenced here, this objection is against the apparent attempt of an improper gifting of NOL-refunds to JPMC and to the FDIC or the US Treasury , via this motion of settlement with the IRS.

8. In the resolution process with the IRS, the IRS specifically notes on June 29th (from Charles Davis – IRS to Curt Brower of WMI) – „The Service (IRS) expresses no opinion who is ultimately entitled to any resulting refunds."

9. Therefore, this objection requests that all refunds be returned to the Estate. Then, at the appropriate time, an Adversary Proceeding may be commenced to place claim to the various refunds and properly argued before the court.

10. The motion attempts to combine the returning of IRS refunds and the subsequent disbursal of those refunds, in a single motion -- without a corresponding Adversary Proceeding. This deprives the shareholder – the owners of WMI – due process of the proper resolution of these tax refunds. The issue is clearly complex, of a massive billion-dollar magnitude, and resolution should not be buried within a motion, without claims presented, docketed, argued, and ruled on.

**There is no Law, which I could find, that takes the NOL and Capital Loss from WMI, if WMB's receivership is concluded. WMI, to this day, retains the WMB stock. The tax benefits of WMI Group should stay with WMI after WMB's receivership is concluded, or in the alternative, at least argued in court for proper establishment of claims, Adversary Proceedings, and the effective disclosure to the shareholder.**

The debtors egregious actions are also well beyond the Kansas case (**Exhibit B**). *First*, they directly identified the tax refunds as a separate asset (receivable or cash) outside the estate and belonging to parties that are mere creditors. *Second*, the debtors used such attempted NOL allocation as a backdoor claims settlement among two parties in which the claims have not been proven to have any merit.

All NOLs belong to the estate. NOLs carried back, $5.2B federal, plus states and <u>NOLs carried forward and capital losses carried forward, even after WMB's receivership is concluded.</u>

# **Conclusion**

WMI is the owner of any NOL`s and from a practical, and legal perspective, did control the NOLs prior to the petition, <u>and by continuing to own the WMB stock, are therefore entitled to keep any NOLs.</u>

That leaves the Tax Group with $7.419B in NOL carryforward at 35%, <u>or approximately $2.6B of tax saving valuation.</u>

It is WMI that owns any benefits the subs possess, including expressly the stock in WMB, even after **WMB's receivership is concluded**, and according to the tax agreement manages and distributes those benefits on behalf of its parts. When a part is cut off,such as when WMB was seized, WMI no longer has an obligation to continue to provide it benefits.

<u>It appears the IRS settlement motion, prepared by the debtor's counsel, indicates that this tax attribute was not considered in making the settlement decision.</u>

I want disclosure of the basis of that decision or election, and the related <u>gain or loss</u> to the debtor and the other parties to the global settlement, or in the alternative, at least argued in court for proper establishment of claims, Adversary Proceedings, and the effective disclosure to the shareholder.

It is the prayer and hope of this shareholder, on behalf of other similarly affected shareholders, that justice will be served by the proper return of the tax refunds, first, to the Estate, and then subsequently the proper and just processing of claims against the Estate.

Signature    *P. Schnabel*

Philipp Schnabel, date 08/20/2010

Philipp Schnabel
Shareholder of Washington Mutual Inc.
Steinstrasse 6
01454 Radeberg
Germany

# **Exhibit A**

# The FDIC Pre-Bidding Process

### Stage 1

- Approach FDIC and become approved buyer
  - Confirm capital resources / access
  - Determine tier-size for available opportunities
  - Establish standardized confidential agreement
- FDIC markets troubled bank and contacts pre-approved buyers to gauge interest
  - Email invitation to electronic data site with limited access information "Teaser"

### Stage 2

- Review Executive Summary / Teaser packages including overview of liabilities to be assumed and assets to be acquired
- Buyer confirms interest and is granted full access to data site with financial, regulatory and legal information. Information available via virtual data-room is updated on daily / hourly basis
- Potential bidders have open access to and communication with the FDIC staff. Limited to no access to employees and management

### Stage 3

- If loans are not sold, loans retained by FDIC, temporarily serviced by new acquiror and later auctioned
- Potential bidders submit bid form(s)
- Bidders are allowed to submit multiple bid forms: e.g., an insured bid, a partial bid, linked, or non-linked, etc
- Bidders must :
  - Apply for regulatory approval
  - Secure sufficient capital
- The purchase agreements are non-negotiable but subject to change due to bidders requests and questions, daily market conditions, and mere novelty of the process itself

**7 to 21 Days (depends on size & severity of situation)**

© Grant Thornton LLP. All rights reserved

23

---

# Overview
# FDIC Bid Process

- The FDIC has offered four possible transaction structures
  - P&A with Optional Loan Pools
  - Clean P&A
  - Whole bank: whole bank assumed with no loss sharing
  - Whole bank with loss share: whole bank assumed with loss sharing
- What is Loss Sharing?
  - FDIC and assuming bank share in losses and recoveries on selected assets
    - 80% FDIC / 20% Assuming bank
  - Applied to loans, ORE and certain securities (infrequently)
  - Loss share on single family loans lasts 10 years
  - Loss share on commercial loans lasts 5 years plus an additional 3 years on recoveries
- Certain items are excluded and not assumed by the buyer
  - Assets: Certain private label asset backed securities, bank premises, D&O liability, prepaid regulatory assessments, tax receivables, and loss reserves
  - Liabilities: subordinated debt, trust preferred and other capital securities at the holding company
- The FDIC determines the winning bidder based on the "Least Cost Test"

© Grant Thornton LLP. All rights reserved

# **Exhibit B**

**SO ORDERED.**

**SIGNED this 27 day of April, 2010.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TEAM FINANCIAL, INC., | ) | Case No. 09-10925 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| | ) | |
| TEAM FINANCIAL ACQUISITION | ) | Case No. 09-10926 |
| SUBSIDIARY, INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| | ) | |
| POST BANCORP, INC., | ) | Case No. 09-10927 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| | ) | |

-1-

**TEAM FINANCIAL INC., TEAM FINANCIAL**     )
**ACQUISITION SUBSIDIARY, INC., and POST**  )
**BANCORP, INC.,**                          )
                                            )
                    **Plaintiffs,**     )
                                            )
    **vs.**                               )        **Adversary No. 09-5084**
                                            )
**FEDERAL DEPOSIT INSURANCE**               )
**CORPORATION,**                            )
                                            )
                    **Defendant.**     )
                                            )

## MEMORANDUM OPINION

Defendant Federal Deposit Insurance Corporation (FDIC) moves for summary judgment on the complaint of the plaintiff-debtor bank holding companies for turnover of property of the bankruptcy estates claimed by the FDIC as receiver for TeamBank, one of the plaintiffs' banks closed by the United States Comptroller of the Currency in March of 2009. The FDIC claims a tax refund emanating from the plaintiffs' 2008 consolidated tax return that is payable to the plaintiffs under a Tax Allocation Agreement entered into on January 8, 2008 by plaintiffs, TeamBank, and other affiliated entitites. The FDIC contends that the tax refund is not property of the bankruptcy estates of these debtor bank holding companies, but rather should be paid to the FDIC as receiver as the separate property of the failed banks.[1] The FDIC's summary judgment motion requires the Court to interpret the Tax Allocation Agreement at issue here and apply applicable bankruptcy and tax law to the uncontroverted facts.

Jurisdiction

---

[1] Adv. Dkt. 37.

This turnover proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (E) and the Court has subject matter jurisdiction under 28 U.S.C. §§ 157(b)(1) and 1334(b).

### Summary Judgment Standards

Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2] An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim."[3] When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[4] In determining whether any genuine issues of material fact exist, the Court must construe the record in a light most favorable to the party opposing the summary judgment.[5] Once the Court determines which facts are not in dispute, it must then determine whether those uncontroverted facts establish a sufficient legal basis upon which to grant movant judgment as a matter of law.[6]

### Uncontroverted Material Facts

---

[2] Fed. R. Civ. P. 56(c).

[3] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998).

[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[5] *McKibben v. Chubb*, 840 F.2d 1525, 1528 (10th Cir.1988) (citation omitted).

[6] *E.E.O. C. v. Lady Baltimore Foods, Inc.*, 643 F.Supp. 406, 407 (D.Kan.1986) (Even if there are no genuine issue of material fact, the movant still has the burden to show it is entitled to judgment as a matter of law.).

The facts presented by the parties are not in dispute and are brief. The Court summarizes those facts here for purposes of determining the summary judgment motion.

Plaintiffs Team Financial, Inc. ("Team"), Team Financial Acquisition Subsidiary, Inc. ("TFAS") and Post Bancorp, Inc.("Bancorp") are bank holding companies, owning all of the stock in TeamBank N.A. ("TeamBank") and Colorado National Bank ("CNB").[7] All of these entities are members of an affiliated group of corporations with Team as the common parent corporation and constitute a Consolidated Tax Group.[8] Plaintiffs, TeamBank and CNB filed a consolidated federal income tax return for tax year 2008 as they are permitted to do under the Internal Revenue Code, 26 U.S.C. § 1501.[9] This Consolidated Tax Group entered into a Tax Allocation Agreement ("TAA") on January 2, 2008.

The TAA provides, in part:

. . .

WHEREAS, the parties to this Agreement wish to establish a method for allocating the consolidated Federal Income Tax Liability of the Group . . . amount [sic] its Members . . ., *reimbursing Team Financial, Inc. [the parent] for payment of such tax liability, compensating each Member . . . for use of its Net Operating Loss* and tax

---

[7] The Court may refer to plaintiffs, TeamBank, CNB and its other affiliated entities collectively as the "Consolidated Tax Group" from time to time in this opinion. The Court recognizes that three other affiliated entities are included in the Consolidated Tax Group: TeamBank, N.A. Asset Corporation, TBNA Holdings, LLC, and TBNA REIT, LLC, but their presence is not material to the Court's determination and for ease of reference, the Court includes them when referencing the Consolidated Tax Group.

[8] *See* Dkt. 43-1 (Tax Allocation Agreement).

[9] All subsequent statutory references to provisions of the Internal Revenue Code, Title 26, shall be referenced as "IRC § ___." The purpose of allowing a consolidated tax return was described in *American Standard, Inc. v. United States*,, 602 F.2d 256, 261 (Ct. Cl. 1979): ". . . to permit affiliated corporations, which may be separately incorporated for various business reasons, to be treated as single entity for income tax purposes as if they were, in fact, one corporation . . . the tax is computed solely on basis of consolidated taxable income."

-4-

credits and to in general preserve the economic rights and obligations which would accrue to each from the filing of separate federal income tax returns, all as hereinafter set forth.[10]

. . .

III.     Filing of Consolidated Return and Payment of Tax.  For each Taxable Year during the term of this Agreement, Team Financial, Inc. [the parent] shall file a Consolidated Return . . . on behalf of the Group, all of which shall be filed on a timely basis.  For each Taxable Year during the term of this Agreement, *Team Financial, Inc. shall pay the Federal Income Tax Liability of the Group . . .*[11]

IV.     Allocation of Tax Liability.  The Members of the Group shall allocate their Federal Income Tax Liability in the following manner:

(A) (i) . . . the Federal Income Tax Liability of each Member of the Group shall be *calculated* as if such Member were filing a separate federal income tax return for the Taxable Year of such Member included in the Group's Consolidated Return . . .
(ii) In computing each Member's Separate Return Liability . . .
        (c) The amounts in each taxable income bracket set forth in Section 11(b) of the Code *shall be allocated* in any given year to the Members of the Group *as Team Financial, Inc. shall elect provided, however, that the amount allocated to any Member shall not exceed said Member's separate taxable income as computed hereunder.*

. . .

(B) Each Member of the Group *shall pay to Team Financial, Inc.* such amounts as are equal to its own Estimated Tax computed as if the member had continued to file separate returns. . . . The excess (if any) of the amount paid by the Members to Team Financial, Inc. over the amount remitted by Team Financial, Inc. to the depository bank as an Estimated Tax payment for the Group *shall be distributed* by Team Financial, Inc. among those Members anticipating a Net Operating Loss *by a method consistent with Section 4(c)(iii) [sic] hereof,* which distribution shall be considered as a partial advance of their respective income tax benefit for such year.

. . .

(C) (i) Each Member of the Group *shall pay* to Team Financial, Inc. an amount equal

---

[10]  Dkt. 43-1, p. 1 [Emphasis added].

[11]  *Id.* at ¶ III., p. 2 [Emphasis added].

to the excess, if any, of such Member's separate Return Liability over the amount of Estimated Tax previously paid by such Member to Team Financial, Inc. with respect to said Taxable Year.

(ii) Team Financial, Inc. *shall pay* to each Member of the Group an amount equal to the sum of:
(a) The excess, if any, of Estimated Tax previously paid by such Member to Team Financial, Inc. with respect to said Taxable Year over the Member's Separate Return liability; plus
(b) The federal income tax refund to which the Member would have been entitled by reason of any Carryback of *consolidated* Net Operating Less [sic], . . . if the Member had been filing separate return.

(iii) Team Financial, Inc. *shall pay* to each Member with a Net Operating Loss . . . with respect to a Taxable Year its allocable share of the aggregate amounts paid by the Member to Team Financial, Inc., with respect to such Taxable Year. . . *to the extent such allocable share is attributable to a Carryback, such payments shall be made within 30 days of Team Financial, Inc.'s receipt of appropriate federal income tax refunds due to the Carryback. The allocable share of a Member pursuant to this Section 4(c)(iii) [sic] shall be determined by Team Financial Inc. pursuant to a consistent method which reasonably reflects the tax benefit derived by the Group from the items of Net Operating Less [sic] . . . of such Member.*

. . .

(v) . . . payments made under Section 4(c)(ii)(B) [sic] hereof shall be made upon Team Financial, Inc.'s receipt of appropriate federal income tax refunds due to the Carryback.[12]

On March 20, 2009, the United States Comptroller of the Currency closed TeamBank and CNB and the Federal Deposit Insurance Corporation ("FDIC") was appointed their receiver. On April 5, 2009 Team, TFAS and Bancorp each filed voluntary chapter 11 petitions. The debtors filed this adversary complaint on May 22, 2009. The parties agreed to the entry of an order providing for the deposit of all tax refunds in an escrow account jointly titled in the plaintiffs and the FDIC pending a determination by the Court regarding the ownership of the refunds.[13] As of December

---

[12] *Id.* at ¶ IV, pp. 2-4.

[13] Adv. Dkt. 25.

21, 2009, plaintiffs had filed their 2008 consolidated federal income tax return but had yet to receive and deposit any refund from the Internal Revenue Service ("IRS") in the escrow account.[14]  At a status hearing on April 22, 2010, the parties reported that some, but not all of the anticipated refunds had been received.  The receipts are on deposit in the escrow account.  According to Team's CPA employed in the bankruptcy case, it is anticipated that a significant refund will be due as a result of a 2008 net operating loss carryback.[15]  The claims register in these cases show that the FDIC filed a proof of claim (claim 14) on November 11, 2009 asserting *inter alia* a right to and ownership of the tax refunds at issue here.  According to the FDIC, its tax refund claim is unliquidated but is in the approximate amount of $3.3. million.

What is not apparent in the record is whether the anticipated tax refund expected to be generated by the net operating loss carry back is attributable to TeamBank's and/or CNB's losses against their prior income and the amount of such losses.  The parties do not identify which entities in the Consolidated Tax Group were operating entities, although presumably TeamBank and CNB were.  This begs the question whether any of the other affiliated entities are operating entities that would have generated income or losses.  Nor is it apparent from the record before the Court the amount of the Consolidated Tax Group's taxable income or tax liability for any year or the amount of tax liability paid by the members of the Consolidated Tax Group in those years.

---

[14]  The 2008 consolidated tax return is not a part of the record before the Court.

[15]  In general, the 2008 operating loss of the Consolidated Tax Group will be carried back and offset against the taxes paid by the Consolidated Tax Group in prior years on prior years' income, thus generating a refund.  CPA John Goss, was hired to prepare Form 1139 to show the 2008 net operating loss carry back.  According to Mr. Goss' affidavit attached in support of the plaintiff's response, Form 1139 was to be filed by December 31, 2009; there is no indication if Form 1139 has been completed and filed and it is not part of the summary judgment record.

-7-

<u>Summary of the Parties' Arguments</u>

The FDIC contends that any consolidated federal income tax refunds that the plaintiff bank holding companies receive are held by them as agents or trustees for TeamBank and CNB because the refunds are attributable to the closed banks' earnings. Therefore, the tax refunds are property of TeamBank and CNB, and are not property of the holding companies' bankruptcy estates. The FDIC bases its position on case law, Treasury Regulation § 1.1502-77, Bankruptcy Code § 541(d), its interpretation of the TAA, and banking law and policy.

Plaintiffs deny the existence of an agency or trust relationship and contend that the TAA is nothing more than an agreement or contract concerning how the Consolidated Tax Group would deal with tax liability and refunds. Team claims that it owns the tax refund, that it is property of the bankruptcy estate, and that the closed banks and their receiver are merely Team's creditors. Plaintiffs also rely on case law and interpretation of the TAA.

<u>Analysis</u>

11 U.S.C. § 541 broadly defines what interests constitute property of the bankruptcy estate.[16] That section provides, in part:

> (a) . . . Such estate is comprised of all the following property, wherever located and by whomever held:
> (1) . . . all legal or equitable interests of the debtor in property as of the commencement of the case.[17]

In bankruptcy proceedings, the nature and substance of interests in property are determined by

---

[16] *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204, 76 L.Ed. 2d 515, 103 S. Ct. 2309 (1983) (The congressional goal of encouraging reorganizations and statutory language suggests that Congress intended that "a broad range of property" be included in the estate and the debtor need not have a possessory interest at the time of bankruptcy filing).

[17] Section 541(a)(1).

reference to state law; thus, the debtors' interest in the subject tax refunds must be determined under Kansas law.[18] Here the TAA expressly provides that it will be governed by Kansas law.[19]

I.   **Does the Tax Allocation Agreement [TAA] Create an Express Trust with Respect to Tax Refunds and Team's Handling as a Trustee?**

The Court first examines Team's interest in the tax refunds under the TAA. Specifically, the Court considers the TAA to determine if under it Team is to hold any tax refunds in trust for the Consolidated Tax Group. In other words, does the TAA create a trust that settles the tax refunds on Team for the benefit of the other affiliated entities? As discussed below, the Court concludes that it does not.

Under Kansas law, the three features of an express trust are: (i) an explicit declaration and intention to create a trust; (ii) definite property or subject matter of the trust; and (iii) the acceptance and handling of the subject matter by the trustee as a trust.[20] Kansas case law uniformly holds that separation of the legal and equitable interests in the property is fundamental to the existence of any trust.[21]

There is no language within the four corners of the TAA that evidences either an intent or declaration of a trust with respect to the Consolidated Tax Group's tax refunds. No language expressly identifies either Team or any other member of the Consolidated Tax Group as a trustee charged with holding property for other members of the Consolidated Tax Group. Nor does the

---

[18] *Butner v. United States,* 440 U.S. 48, 54-55, 99 S.Ct. 914, 59 L.Ed. 2d 136 (1979).

[19] *See* Dkt. 43-1, Section XI (A).

[20] *Taliaferro v. Taliaferro,* 260 Kan. 573, 578-79, 921 P.2d 803 (1996). *See also,* KAN. STAT. ANN. §§ 58a-401(2) and 58a-402 (2005)

[21] *Id.* at 580.

TAA identify any property that constitutes the trust *res*. Nowhere in the TAA does Team agree to accept and handle tax refunds *as a trustee* of the Consolidated Tax Group. Thus, the Court finds none of the three elements that Kansas law requires to create an express trust in its study of the TAA. Instead, Team and the other members of the Consolidated Tax Group have entered into a contract that allocates among the parties certain obligations for paying the group's tax liability and distributing any overpayments that may be attributed to loss carrybacks. The TAA falls far short of creating an express trust.

The FDIC does not point to any language in the TAA that creates an express trust. It concedes the absence of language in the TAA that speaks to Team's status as an agent or trustee. Instead, the FDIC suggests that the agent-trustee relationship is a "default" condition whose existence in this case can be negatively *implied* from the TAA.

> Nothing in the [TAA] in this case states that the Debtors shall *not* be agent-trustees with respect to tax refunds paid to them by the Internal Revenue Service.[22]

This argument hinges not upon the language of the TAA, but upon the FDIC's interpretation of Treas. Reg. § 1.1502-77, which the FDIC contends makes all holding companies the agent-trustee for their respective consolidated tax groups with respect to tax refunds. It reasons that by omitting any mention of the trust relationship, the parties to the TAA did not intend to alter it. The Court observes that the only language in the TAA that explicitly speaks to an agency relationship is found in Section I(H): "For purposes of intercompany tax payments, as well as payments to the Service, Team Financial, Inc. *may designate any member of the Group as its agent.* "[23] This language plainly

---

[22] Dkt. 37, p. 18.

[23] Dkt. 43-1, p. 2.