IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WASHINGTON MUTUAL, INC., et al.,[1] | Case No. 08-12229 (MFW) |
| Debtors. | Jointly Administered |
| | **Hearing Date: September 7, 2010 at 3:00 p.m.** |

## EXAMINER'S PRELIMINARY REPORT AND MOTION FOR ADDITIONAL RELIEF

Joshua R. Hochberg, the Examiner herein, pursuant to the Court's Agreed Order Directing the Appointment of an Examiner, entered July 22, 2010 [Docket No. 5120] ("the "Examiner Order"), hereby makes and files his Preliminary Report and Motion for Additional Relief (the "Preliminary Report") and respectfully represents as follows:

### INTRODUCTION AND BACKGROUND

1.      On September 26, 2008 (the "Petition Date"), each Debtor (the "Debtors") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their affairs as debtors and debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

2.      On October 15, 2008, the United States Trustee for Region 3 (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors in this case (the "Unsecured Committee").

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Washington Mutual, Inc. (3725) and WMI Investment Corp. (5396). The Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98101.

3.  On January 11, 2010, the U.S. Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee").

4.  On March 26, 2010, the Debtors filed their "Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code" and a related Disclosure Statement, each of which was subsequently amended.  Most recently, on July 1, 2010, the Debtors filed their "Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code" (the "Plan"), and a related Disclosure Statement (the "Disclosure Statement").  Embodied within the Plan is a proposed Global Settlement Agreement (the "Settlement") that resolves certain disputes among the Debtors, JPMorgan Chase & Co. ("JPMC"), the Federal Deposit Insurance Corporation ("FDIC"), the FDIC as Receiver ("FDIC Receiver") for Washington Mutual Bank ("WMB"), and certain other parties-in-interest.

5.  On June 8, 2010, the Equity Committee filed its Motion in Support of Order Directing Appointment of an Examiner Under 11 U.S.C. § 1104(c) [Docket No. 4644].

6.  On July 22, 2010, this Court entered the Examiner Order [Docket No. 5120].

7.  On July 26, 2010, the U.S. Trustee appointed Joshua R. Hochberg as Examiner in the Chapter 11 Cases, and filed her Notice of Appointment of Examiner [Docket No. 5141]. Also on July 26, 2010, the U.S. Trustee filed her Application for Order Approving Appointment of Examiner [Docket No. 5142].

8.  On July 28, 2010, this Court entered an order approving the appointment of Joshua R. Hochberg as Examiner in the Chapter 11 Cases [Docket No. 5162].

9.  On July 30, 2010, the Examiner filed his Application to Employ McKenna Long & Aldridge LLP ("MLA") as Counsel Nunc Pro Tunc to July 26, 2010 [Docket No. 5183].  On August 10, 2010, this Court entered its Order Authorizing Retention of McKenna Long &

Aldridge LLP as Counsel to the Examiner [Docket No. 5261]. On August 7, 2010, the Examiner filed his Application to Employ/Retain Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz") as Delaware Counsel [Docket No. 5241]. On August 24, 2010, this Court entered its Order Authorizing the Retention and Employment of Cole, Schotz, Meisel, Forman & Leonard, P.A. as Delaware Counsel [Docket No. 5340]. MLA and Cole Schotz have been continuously representing the Examiner in this case.

10.     In the Examiner Order, the Court directed the Examiner to investigate "(a) the claims and assets that may be property of the Debtors' estates that are proposed to be conveyed, released or otherwise compromised and settled under the Plan and Settlement Agreement, including all Released Claims, as defined in the Settlement Agreement, and the claims and defenses of third parties thereto (the 'Settlement Component') and (b) such other claims, assets and causes of actions which shall be retained by the Debtors and/or the proceeds thereof, if any, distributed to creditors and/or equity interest holders pursuant to the Plan, and the claims and defenses of third parties thereto (the 'Retained Asset Component')." See Examiner Order at ¶ 2.

11.     The Examiner Order also directed that the Examiner file a "Work and Expenses Plan/Report" by August 6, 2010. In accordance with the Examiner Order, the Examiner filed his "Work and Expenses Plan/Report and Motion for Additional Relief" (the "Work Plan") on August 6, 2010 [Docket No. 5234]. In the Work Plan, the Examiner set forth his proposed budget, an outline of the proposed examination, and a plan for conducting the investigation (the "Investigation" or "Examination"). The Examiner also requested additional relief related to the sharing of work product information with third parties and authority to issue subpoenas for the production of documents and information pursuant to Bankruptcy Rule 2004.

12.     In connection with the Work Plan, this Court entered three Orders.  First, it entered the Order Approving the Work Plan [Docket No. 5260].  Second, it entered an Order Regarding the Voluntary Production of Documents to the Examiner [Docket No. 5258].  Finally, it entered an Order Authorizing the Examiner to Demand and Issue Subpoenas Compelling Production of Documents and the Oral Examination of Persons and Entities [Docket No. 5259].

13.     In his Work Plan, the Examiner estimated he would incur Examiner and professional fees of $2,000,000 and expenses of $200,000 for the month of August.  Based upon a preliminary review of billing information for the month of August, the Examiner estimates that the actual amount of Examiner and professional fees for August will be approximately $1,700,000 and expenses will total approximately $30,000.

## SUMMARY OF WORK PLAN

14.     As set forth in the Work Plan, the primary focus and scope of the Examination is to evaluate the overall reasonableness of the proposed Settlement by considering, investigating and understanding the merits of the issues that have been compromised by the Settlement.  In addition to the evaluation of the Settlement Component, the Examiner is considering the Retained Asset Component.

15.     The Examiner is analyzing the effect of potential recoveries -- specifically whether they would likely impact Equity or other out-of-the-money claimants' potential recovery.  The Examiner is analyzing whether there are significant potential assets of the Bankruptcy Estate that have not been fully pursued or evaluated, who would benefit from their recovery, and whether recovery of those assets is reasonably likely.

16.     The Examination builds on analyses conducted by the Settling Parties (as that term is defined in the Plan) and others.  Since his appointment, the Examiner has conducted numerous interviews of witnesses and met with various professionals.  More interviews are

scheduled or will be scheduled for the near future. In addition, the Examiner has obtained and continues to obtain discovery materials from the Settling Parties and from third parties.

17. The following is a brief description of the issues under investigation:

(a) Issues Related to JPMC. The Examiner is evaluating work completed to date by the Debtors and other parties in investigating claims that might exist against JPMC and is conducting his own investigation of these issues. Among the significant issues related to the proposed Settlement as they pertain to JPMC are the following:

(1) Business Tort Claims. The Examiner is reviewing and considering claims identified by the Debtors and other parties to date and also attempting to identify other possible claims and theories of recovery.

(2) Rights to Tax Refunds. The Examiner is identifying and evaluating the competing claims to tax refunds totaling approximately $6 billion, the division of which is a critical part of the Settlement.

(3) Disputed Assets. During the course of the Examiner's initial meetings, the parties identified several categories of disputed assets that are to be allocated between the Debtors and JPMC. These include, but are not limited to, rights to approximately $4 billion in deposit accounts that the Examiner is advised is a central part of the Settlement Component. The Examiner is evaluating the competing claims to material portions of these assets.

(4) BOLI/COLI. The Examiner is evaluating the value of and competing claims to certain Bank Owned Life Insurance Policies and Company Owned Life Insurance Policies ("BOLI/COLI"). It appears that this asset is a material term of the Settlement.

(b) Issues Related to the FDIC. The Examiner is reviewing the rights, duties and obligations by and between the Debtors, JPMC and the FDIC relating to the takeover of WMB. The Examiner is conducting both a legal and factual investigation of these issues, including an evaluation of the FDIC's ability to assert claims against the Estate or take other actions detrimental to the Estate.

(c) Avoidance Actions. Significant transfers of funds were made between Washington Mutual, Inc. ("WMI") and WMB within one year of WMI seeking bankruptcy protection. The Examiner is investigating these conveyances to determine whether they are avoidable and, if so, from whom they are recoverable and the consequences to the Estate of avoiding such transfers.

(d) Trust Preferred Securities. Under the terms of the proposed Settlement, JPMC is entitled to retain what has been referred to as the $4 billion in assets related to

certain Trust Preferred Securities ("TPS"). The Examiner is considering the competing claims to these assets, their value, and the circumstances under which these assets were purportedly transferred to WMB just prior to the Petition Date.

(e)    <u>Third Party Claims</u>. The Examiner is conducting a preliminary investigation of potential third-party claims for the purpose of identifying possible claims against third parties which may require further investigation, and which may provide for further recoveries in this case. This is the Retained Asset Component.

## PRELIMINARY REPORT

### A.    <u>Overall Summary of Work Completed to Date</u>

18. As set forth in more detail below, the Examiner has obtained the production of thousands of additional documents since his appointment. The Examiner has also interviewed more than twenty individuals considered to be fact witnesses. These interviews have included current and former employees of the Debtors, current employees of JPMC, individuals associated with government agencies and current employees of certain third parties. Most of these interviews have been conducted in person. A few interviews have been conducted by telephone, usually in situations where the interviewee is in a remote location or otherwise unavailable for a face-to-face interview. In addition to witness interviews, the Examiner has conferred with professionals and experts retained by parties-in- interest on specific issues. Numerous meetings and conference calls have been held with the Debtors, the Unsecured Committee, the Equity Committee, and representatives of various creditor and investor groups. Many of these groups have submitted materials for review. Finally, the Examiner has also conducted substantial legal research in connection with the issues under investigation.

### B.    <u>Overall Summary of Cooperation to Date</u>

19. The Examiner has received support and cooperation from the Debtors, Debtors' counsel and professionals employed by the Debtors, including particularly representatives of Alvarez & Marsal, who are serving as officers of the Debtors in this Bankruptcy Case. This

cooperation has included the prompt scheduling of interviews, help in locating information in the document data room, and access to work product and legal research.

20.     The Examiner has also received cooperation from the Unsecured Committee and the Equity Committee.  The Examiner has either met in person or conducted phone calls with attorneys and other professionals employed by these Committees who have provided the Examiner with documents and information helpful to the Examination.

21.     JPMC has been cooperative with the Examiner.  JPMC has agreed to produce additional documents and information to the Examiner.  To date, JPMC has produced several thousand documents in addition to those earlier produced to the Debtors.  JPMC has also made several of its employees, including its senior management involved in the purchase of WMB, available to the Examiner for interviews.  Not all of these interviews have been completed. Several are set for later in September.

22.     The FDIC has indicated it will cooperate with the Examiner.  The Examiner has had discussions with the FDIC regarding the production of documents and information and regarding the availability of employees of the FDIC for interviews by the Examiner.  The Examiner has negotiated an agreement with the FDIC wherein the FDIC will produce certain documents and information to the Examiner.  This agreement is in the process of being finalized. The Examiner has requested that the FDIC make some employees, yet to be designated, available for interviews and the FDIC has agreed in principle.

23.     The Examiner is in the process of discussions with attorneys for certain third parties to obtain documents and witness interviews.

C.     **Method of Conducting the Investigation**

24.     In conducting the Investigation to date, the Examiner has obtained documents and information on a voluntary basis.  As of the filing of this Preliminary Report, the Examiner has

not had to compel any party, including parties who are not Settling Parties, to produce documents or information.

25. In addition, the Examiner has conducted interviews, in lieu of depositions, in order to facilitate obtaining information from fact witnesses. In the experience of the Examiner, interviews can be scheduled expeditiously and are often more conducive to obtaining information from witnesses than more formal depositions. For each interview, the Examiner has charged a lawyer from MLA with the task of taking detailed notes of the interview and preparing a detailed summary of the interview. The Examiner will conduct formal discovery only to the extent necessary.

### D.    Document Review and Production to Date

26. The Examiner received prompt access to all documents stored in the Bowne Smart Room ("data room"), an online repository of documents. The data room contains not only voluminous documents produced by the Debtors during this Bankruptcy Case, but also the Rule 2004 productions of Blackstone Group, Citigroup, Texas Pacific Group, and JPMC; JPMC's productions to the Senate Permanent Subcommittee on Investigations; documents produced by the Office of Thrift Supervision ("OTS"); Alvarez & Marsal Settlement Communications; and Plan Confirmation documents produced by the Settling Parties.

27. Included within the data room are approximately 20,000 WMI, JPMC, and Blackstone Group documents recently uploaded in connection with the Plan confirmation process. The Examiner has reviewed these documents. In addition, the Examiner has run searches within the Rule 2004 discovery in the data room for key words and names of people significant to the investigation. These searches for key words and names have yielded a total of

8,000 records, which have been reviewed preliminarily in furtherance of the investigation and in preparation for interviews.

28.     As part of his initial review of the documents produced by JPMC in this case, the Examiner analyzed the documents previously produced by JPMC in Rule 2004 discovery.  The Examiner learned that many of the documents produced by JPMC were obtained through key word searches of the electronic files of certain JPMC custodians.  JPMC provided the Examiner with the search terms used and identified the seventeen custodians for whom searches were conducted in connection with its original Rule 2004 discovery production to the Debtors.  After review of JPMC's original search terms, the Examiner requested that JPMC conduct additional searches with supplemental search terms for the original seventeen custodians and identified fifteen additional custodians for whom documents should be searched.  JPMC agreed to conduct searches for the fifteen additional people and to apply the expanded search terms to all thirty-two individuals.

29.     JPMC has produced approximately 3,000 documents directly to the Examiner as a result of its new electronic searches.  The Examiner expects to receive a substantial number of additional documents from JPMC.  These documents are scheduled to be produced no later than September 7, 2010.

30.     The Examiner has invested and continues to invest significant time in searching for and reviewing relevant documents.  In addition to reviewing JPMC documents, the Examiner has reviewed all documents previously produced by OTS that are in the data room.  The Examiner has also conducted focused searches for documents in the data room that may be relevant to the specific issues being addressed by each team, such as documents relating to the

TPS or the tax refunds, and has reviewed thousands of pages of documents as a result of these searches.

31.     As stated in the Work Plan, the Examiner determined that the most efficient manner in which to conduct the Investigation was to establish teams to examine discrete areas of the Investigation.  The Examiner has established and staffed the teams that are conducting the Investigation.  What follows are summary preliminary reports from each of the individual teams. It should be noted that the following summaries are designed to provide the Court and parties-in-interest with the status and scope of the Investigation.  This is not an exhaustive list of the issues currently being reviewed by the Examiner and it is likely that the Examiner will continue to identify new issues requiring investigation or follow up.

**E.      JPMC Team Report**

32.     The JPMC Team is examining claims against and issues pertaining to JPMC and certain third-party claims.  Based on the JPMC Team's review of discovery materials, work product, briefs filed with the courts, and other materials, the team has identified several areas of inquiry.

33.     The JPMC Team is investigating whether, in a legally cognizable way, JPMC by itself or in conjunction with government regulators, intentionally injured WMI in connection with the seizure of WMB and sale to JPMC for approximately $1.9 billion.  The JPMC Team is also  investigating whether JPMC improperly interfered with, or prevented, third parties from purchasing WMI or WMB.  The team is evaluating whether JPMC breached any confidentiality or standstill agreements.  In addition, the team is investigating whether JPMC violated antitrust laws in connection with proposed sale of WMI or WMB between March and September 2008. Finally, the JPMC Team is investigating claims against third parties that will be retained by the

Debtors' Estate should the Court approve the proposed Settlement. These claims are discussed below.

34.     The JPMC Team is investigating allegations that JPMC may have intentionally breached its March 11, 2008 confidentiality agreement with WMI ("Confidentiality Agreement") in an attempt to depress WMB's market value and purchase the bank at a reduced price. This claim has been asserted in a lawsuit styled *American National Insurance Co. v. JPMC*, No. 09-01743 (D.D.C.) ("*ANICO*"). The *ANICO* plaintiffs alleged that pursuant to the Confidentiality Agreement, WMI provided JPMC with confidential information that allowed JPMC to conduct significant due diligence of WMI and its subsidiaries. Plaintiffs further alleged that JPMC breached the Confidentiality Agreement by leaking WMI's confidential information to the media, government regulators, and investors, causing OTS to seize WMB and forcing WMI into bankruptcy. Assuming there is a potential claim, the JPMC Team is investigating whether any potentially significant damages could have resulted from the alleged conduct. In addition to investigating allegations that JPMC breached the Confidentiality Agreement, the JPMC team is investigating and considering JPMC's possible defenses including the following raised in the *ANICO* case:  (1) the OTS's final decision to seize WMB was the proximate cause of any damage to WMB, and JPMC cannot be held liable for the OTS's decision; (2) market conditions caused the harm to WMB; (3) lack of standing; and (4) defenses under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 as the purchaser of a failed banking institution, including WMI's failure to exhaust administrative remedies by filing a proof of claim with the receivership.

35.     The JPMC Team is examining a related claim that JPMC allegedly breached a "standstill" provision of the Confidentiality Agreement, which prohibited JPMC from making a

bid to purchase WMB for a period of eighteen months.  The JPMC Team is also examining defenses to this claim, including potential defenses under the Emergency Economic Stabilization Act, 12 U.S.C. § 1823(c)(11).

36.     The team is investigating allegations that JPMC may have improperly interfered with the sale of WMI or WMB to others.  Specifically, the team is investigating whether certain banks were interested in acquiring WMI or WMB prior to the OTS seizure.  It has been alleged that JPMC misappropriated WMI and WMB confidential information, learned from the FDIC that a seizure of WMB was likely, and discouraged other bidders so as to acquire WMB's assets at an unreasonably low price.

37.     The JPMC Team is investigating whether facts exist to support a claim for tortious interference with prospective economic advantage and whether any damages are provable.  The team is also evaluating any defenses that JPMC may have to these claims.

38.     The terms of the Settlement and Plan provide releases to JPMC and other parties. The Examiner intends to review the scope of these releases, particularly the releases being granted for the benefit of JPMC.

39.     The Court directed the Examiner to also evaluate "such other claims, assets and causes of actions which shall be retained by the Debtors and/or the proceeds thereof…and the claims and defenses of third parties thereto."  The JPMC Team is considering the retained claims against third parties in connection with the government's seizure and sale of WMB in order to provide a general understanding of the potential claims and their value to the Debtors' Estate. This includes an evaluation of whether there are sufficient allegations requiring further investigation of potential claims against financial advisors, officers and directors, and others.  As

part of this evaluation, the Examiner is reviewing the extent and availability of insurance coverage for certain of these claims.

40. The JPMC Team has reviewed select documents from the millions of documents in the data room that were made available to the Examiner shortly after his appointment. In addition, the JPMC Team has reviewed, or is in the process of reviewing, the additional documents produced by JPMC, the Debtors, and the Blackstone Group, since the Examiner's appointment. The Examiner has asked JPMC to produce additional documents, which JPMC is producing on a rolling basis.

41. The JPMC Team is also seeking documents from third parties. The JPMC Team has identified and is in the process of attempting to obtain relevant documents from several entities, including various banks and advisors. Some of these entities previously produced documents in accordance with their agreements with the Debtors during the prior Rule 2004 discovery. For those entities, the team is identifying whether supplemental productions would assist the investigation. The JPMC Team has already drafted and is prepared to issue subpoenas should any third parties be unwilling to produce relevant documents voluntarily.

42. The JPMC Team has interviewed or participated with other teams in the interviews of the following personnel in furtherance of its investigation: President of WMI; Chief Restructuring Officer for WMI; General Counsel of WMI; two former CEOs of WMI; former COO of WMI; former Head of Regulatory Relations for WMI; former First Vice President for Special Accounting, Payment Processing, Lien Release and Assumptions at WMB; Head of Mergers & Acquisitions for JPMC; Head of Internal Mergers & Acquisition for JPMC; General Counsel of JPMC; Assistant General Counsel of JPMC; two other employees of JPMC; and a Managing Director for Goldman Sachs. Several other interviews are scheduled to occur in

the next few weeks, and the JPMC Team is still in the process of identifying third-party witnesses to interview.

### E.    <u>Asset and Avoidance Team Report</u>

43.    The Asset and Avoidance Team is investigating the disputed claims of ownership of what have been called the "Deposit Accounts." The team is also evaluating whether the Debtors may assert avoidance claims for transfers made to WMB and possible avoidance claims the FDIC Receiver may have against the Debtors.

44.    The Examiner is investigating the competing claims to the approximately $4 billion in funds held in deposit accounts at Washington Mutual Bank fsb ("FSB") that WMI claims are its deposits. WMI claims that the Deposit Accounts are true deposits of WMI, which JPMC must surrender upon demand by the depositor, WMI. JPMC contends that the $4 billion are in fact capital contributions disguised as deposits, and thus ownership of the funds passed to JPMC upon its purchase of WMB, FSB's parent, or that there is otherwise a basis for the imposition of a constructive trust on the funds. This issue is the subject of an adversary proceeding in the Bankruptcy Court, in which the parties have conducted discovery. The Debtors filed a motion for summary judgment seeking a ruling that the funds are deposits that must be surrendered to WMI. The parties extensively briefed the summary judgment motion, and the Court has drafted an opinion deciding the motion, but has held the decision in abeyance.

45.    In examining these competing claims, the team is reviewing prior depositions and is investigating factual issues relating to whether the funds in the Deposit Accounts are the property of WMI. In addition, the team is examining whether the FDIC or JPMC has any legal right to setoff and/or recoupment that could effectively negate the benefit to the Estate arising from any recovery of the Deposit Accounts.

46.     The team is also investigating the claims asserted by WMI in the bankruptcy and in its FDIC Receivership proof of claim that certain transfers are avoidable under the Bankruptcy Code as transfers made when WMI was insolvent.  Specifically, WMI sought to set aside the following transfers: (1) the $6.5 billion in capital contributions made by WMI to WMB from December 2007 to September 2008 (the "Capital Contributions"); and (2) the purported transfer by WMI to WMB of the TPS on September 25 or 26, 2008 (the "TPS Transfer").

47.     The team is evaluating solvency issues relating to WMI and WMB at various points in time which are relevant to potential avoidance actions and the collateral effects that establishing insolvency would have on other claims.  Additional legal issues being evaluated include:  (1) whether the Debtors received a legally recognized benefit in exchange for the Capital Contributions and whether the TPS Transfer was in satisfaction of an antecedent debt; (2) the applicability of 11 U.S.C. § 365(o); (3) the extent to which 11 U.S.C. § 550 affords a defense; (4) the legal effect of the agreement pursuant to which JPMC purchased WMB (the "Purchase and Assumption Agreement"); and (5) various jurisdictional and statutory issues raised by the FDIC.

48.     The team is also reviewing and considering other assets that are being transferred as part of the Settlement.  The most significant of these assets appears to be value that may be derived from BOLI/COLI.  The team is investigating the potential value of these miscellaneous assets both to determine materiality and to confirm the values ascribed to them by the Settling Parties.

49.     The Asset and Avoidance Team's review of pending litigation and publicly-available information has been extensive.  The team also reviewed the various interested parties' evaluations of their own legal positions and factual arguments, including the solvency analyses

of the various financial processionals retained by the parties. Several parties have conducted substantial work on this issue and the Examiner has consulted with these parties to review and consider their work product. The Examiner will review and consider the work done on this issue to date, resolve certain factual issues related to solvency, and analyze how solvency issues affect not only the avoidance actions identified herein but also possible tort claims against JPMC and others.

50.     Team members participated in interviews of former WMI and current Alvarez & Marsal witnesses identified in the JPMC Team report above. In addition, team members met or conferred with financial advisers retained by the Unsecured Committee and the Equity Committee. The team has also interviewed a Federal Home Loan Bank official.

**F.     Report of FDIC Team**

51.     The FDIC Team is evaluating potential claims that the Estate may have against the FDIC and which would be released upon Plan confirmation. The team is considering the substantial procedural and legal defenses asserted by the FDIC to all potential claims.

52.     The FDIC Team is investigating allegations that the FDIC breached statutory or fiduciary duties as receiver by selling WMB for less than possible. This basic allegation is formulated as the following causes of action asserted by the Debtors in litigation in the United States District Court for the District of Columbia: (1) an express right of action under 12 U.S.C. § 1821(d)(13)(E)(i); (2) an implied right of action under 12 U.S.C. § 1821(d)(13)(E)(i); (3) an improper taking of property in violation of the Fifth Amendment to the United States Constitution; and (4) a claim for conversion under the Federal Tort Claims Act. The FDIC Team is assessing whether any of these theories is legally cognizable.

53.     The Examiner is investigating allegations that the FDIC may have breached statutory or fiduciary duties as receiver under 12 U.S.C. § 1821(d)(13)(E)(i) by conducting an

unfair bidding process in conjunction with the sale of WMB. Specifically, it is alleged that one or both of the following occurred: (1) the FDIC established bidding parameters intentionally designed to guarantee that JPMC tendered the winning bid for the purchase of WMB; and (2) the FDIC favored or colluded with JPMC in order to ensure that JPMC tendered the winning bid for the purchase of WMB to improperly provide extraordinary benefits to JPMC.

54.     The FDIC Team is also evaluating allegations that the FDIC tortiously interfered with WMI's business expectancy by prematurely disclosing to JPMC and other third parties the intended seizure of WMB. These disclosures allegedly interfered with the plans of interested third parties to acquire or invest in WMB and thereby undermined or foreclosed WMB's attempts to find a purchaser prior to the seizure.

55.     The FDIC has asserted numerous legal defenses to all these allegations, which the FDIC Team will also evaluate. The FDIC maintains that by failing to identify certain of the above claims in the WMI receivership proof of claim, the Debtors failed to exhaust their administrative remedies as required by 12 U.S.C. § 1821(d)(13)(D), and such claims are therefore jurisdictionally barred. As to the specific causes of action, the FDIC asserts that: (1) there is no expressed or implied private right of action for dissipation of assets under 12 U.S.C. § 1821(d)(13)(E)(i); (2) the FDIC is an improper defendant in the Debtors' takings claim; and (3) the FDIC is an improper defendant in the Debtors' conversion claim under the Federal Tort Claims Act and that the claim is otherwise precluded by the Act's discretionary function exception. The team is evaluating the FDIC's positions.

56.     The FDIC Team reviewed the legal memoranda, position papers, legal briefing, and discovery correspondence provided by the parties. Additionally, the FDIC Team has

reviewed the discovery conducted by the parties, with an emphasis on documents produced by JPMC and OTS prior to the Examiner's appointment.

57.     After reviewing the materials available to the Examiner, the FDIC Team identified additional discovery that may be in the possession of the FDIC, OTS, and other third parties that would further the Examiner's investigation.  To that end, the FDIC Team has negotiated an agreement with counsel for the FDIC and engaged in discussions with OTS regarding the production of additional documents to the Examiner.  These agreements will not waive any rights the agencies have to object to discovery by others and are not intended to set a precedent for either agency.  The documents sought are principally communications between the agencies and any third parties (excluding other agencies) relating to the closing and sale of WMB, including the Purchase and Assumption Agreement.

58.     Using search terms supplied by the FDIC Team, the FDIC has located approximately 50,000 responsive documents.  The FDIC has indicated that production of these documents will begin as soon as a confidentiality agreement is completed, and that the production will likely be complete by September 10, 2010.  OTS has likewise indicated that it is ready to produce documents as soon as a confidentiality agreement is completed.  If the Examiner determines that further document searches are warranted, the Examiner has reserved the right to conduct additional discovery.

59.     The FDIC Team has conducted the following interviews in conjunction with other teams in furtherance of its investigation:  President of WMI, General Counsel of WMI, former CEO of WMI, and Former Head of Regulatory Relations for WMI.  The FDIC Team has also conducted interviews of the former Senior Deputy Director and COO of the OTS, and the former

Director of the OTS West Region. The FDIC Team is considering a number of additional potential witnesses for interviews.

## G.   Report of Tax Team

60.     The Tax Team is investigating and analyzing three primary issues: (1) the likelihood that the Net Tax Refunds identified in the proposed Settlement will be received from the various tax authorities and the anticipated timing of the receipt of the refunds; (2) the competing claims to the ownership of certain tax refunds as advanced in various litigation and other forums; and (3) whether the Plan maximizes the tax assets available to the Debtors. Based upon the investigation conducted to date by the Examiner, the tax refunds are critical to the Settlement and represent the primary source of cash to be used to make distributions under the Plan. The Examiner is accordingly devoting significant resources to these tax issues. The Tax Team includes MLA partners with extensive tax law experience and expertise.

61.     With respect to the tax refunds, the Settlement provides for the division of various categories of tax refunds among WMI, JPMC, and the FDIC. According to the Disclosure Statement, the total amount of the refunds has been estimated to be approximately $5.5 to $5.8 billion, including interest. The refunds arise from the Debtors' consolidated 2008 federal income tax return, amended federal income tax returns for 2003-2007 reflecting the expanded (5 year) federal income tax carryback of net operating losses ("NOLs") as permitted by the 2009 Homeownership Act (explained further below), the resolution of audits for tax years 2001-2003, other pending federal income tax issues, and refunds from various state taxing authorities.

62.     The refunds are divided into two parts. The first portion of the net tax refunds, which the Debtors estimate will be approximately $2.7 to $3.0 billion, consists of all tax refunds (federal and state) that would have been recovered absent the expansion in 2009 of the federal NOL carryback period (*i.e.*, the former two-year NOL carryback rules). This portion of the Net

Tax Refunds is allocated 20% to the Debtors and 80% to JPMC. The second portion, which the Debtors estimate will be approximately $2.8 billion, is attributable to the expansion in 2009 of the NOL carryback provisions. This second portion of the Net Tax Refunds is allocated 65.178% to WMI and 34.822% to the FDIC Receiver. If the Class of Non-Subordinated Bank Bondholder Claims (Class 17 Claims) votes to accept the Plan, then such claims will be deemed allowed against the Debtors and the holders of such Class 17 Claims will receive their pro rata share of 5.357% of this second portion of the refunds, subject to a cap of $150 million.

63. With respect to potential competing claims to the tax refunds, the Examiner is evaluating the competing claims to the ownership of tax refunds as advanced in various litigation and other forums. JPMC has asserted that it purchased WMB's tax attributes, including the right to recover tax refunds, as part of the Purchase and Assumption Agreement with the FDIC Receiver. WMI, by contrast, asserts that tax refunds were not among the assets sold to JPMC under the Purchase and Assumption Agreement, and that, by operation of an agreement between WMI and certain subsidiaries (the "Tax Sharing Agreement"), any refunds become property of the Bankruptcy Estate.

64. On November 9, 2009, the 2009 Homeownership Act was signed into law. Under the 2009 Homeownership Act, eligible taxpayers were authorized to carry back NOLs for a total of five years (three years more than under prior law). As a result, WMB was eligible for an additional $2.713 billion in federal income tax refunds.

65. Finally, the Tax Team is evaluating whether the Plan maximizes the tax assets available to the Debtors. For federal income tax purposes, the Debtors are members of an affiliated group of corporations that files a single consolidated federal income tax return (the "WMI Group"). The WMI Group reported a consolidated NOL of over $32 billion for its

taxable year ended December 31, 2008, which has already been carried back to prior taxable years of the WMI Group and has generated the great majority of the estimated tax refunds described above. The Debtors expect that the WMI Group will report additional NOLs for the taxable year ended December 31, 2009. Any remaining portion of the 2008 NOLs, together with any 2009 NOLs, would be available to the WMI Group as an NOL carryforward that can offset future taxable income of the WMI Group, subject to certain limitations under applicable law.

66.     The Tax Team has analyzed relevant filings in the bankruptcy case, including the Disclosure Statement, the Plan, and the Settlement, along with other key documents related to this area of investigation, including the Purchase and Assumption Agreement and the Tax Sharing Agreement. The Tax Team has also conducted a series of telephone interviews with tax counsel for the Debtors and with tax counsel for the Unsecured Committee to obtain general background information regarding the status of certain claims. During these interviews, the Tax Team inquired about the general status of the tax refunds, the status of the pending litigation, the public positions articulated by the parties, and the identity of key individuals on the Debtors' tax team.

67.     The Tax Team also reviewed memoranda and materials presented to the Examiner during his initial meetings with the Debtors, Unsecured Committee, and FDIC and identified and analyzed filings from pending litigation. As a result, the team has identified and requested additional documents, and identified individuals to be interviewed.

68.     The Debtors have provided the Examiner with all requested documents, access to individuals to be interviewed, and its own work product with respect to the tax issues. The Unsecured Committee has provided copies of internal memoranda, power point presentations on the tax issues made by tax counsel to the Committee, and other documents in connection with the

tax issues. JPMC has agreed to produce all non-privileged documents requested to date, including recently-created documents explaining its analysis of tax-related issues.

69. In addition, the Tax Team issued requests for production of tax diligence documents, such as tax analyses, correspondence, memoranda, and current estimates of the various tax refunds.

70. The Debtors have made rolling productions of many thousands of pages of documents in response to various requests. These productions included the WMI Group's original and amended consolidated federal income tax returns for its 2000-2008 tax years, work papers, tax refund requests, IRS audit results, consolidated, combined and separate company state income tax and franchise returns, amended returns, audit correspondence and refund notices from various state departments of revenue, extensive correspondence between the FDIC, JPMC and WMI with California taxing authorities, IRS private letter ruling requests, and refund and exposure estimates.

71. JPMC has produced written responses, a memorandum, and a CD containing electronic documents and files. These documents included the WMI Group's 2001-2008 amended consolidated tax returns and correspondence, JPMC's assessment of the refund claims, certain correspondence between JPMC and state tax authorities, and spreadsheets detailing tax refunds.

72. In summary, the Tax Team estimates that, to date, it has reviewed and analyzed approximately 20,000-25,000 pages as part of its investigation. The Tax Team has also led interviews of several WMI and Alvarez & Marsal individuals and participated in interviews of many of the current and former employees of the Debtor described in the JPMC Team's section of this report. The Tax Team also has participated in interviews of other Settling Parties to

determine their level of knowledge of facts related to the tax issues. In addition, the Tax Team has identified a number of additional witnesses that it intends to interview.

73. The Examiner has made substantial progress in evaluating the status of both the federal income tax and the state income tax refund claims. In total, the Debtors have estimated that the WMI Group is entitled to tax refunds of approximately $5.5 to $5.8 billion, net of amounts due to tax authorities, including interest, through the anticipated time of payment. According to the July 1, 2010 Disclosure Statement, "over 85% of this amount reflects the claimed federal income tax refunds, the majority of which are projected to be received within one year." Disclosure Statement, p. 70.

74. The largest components of the anticipated federal tax refunds are the following: (1) the net refund due to normal (2 year) 2008 loss carryback, in an estimated amount of $1.811 billion (excluding interest); (2) the incremental net refund due to extended (5 year) NOL carryback, in an estimated amount of $2.713 billion (excluding interest); and (3) the final tax refund for tax years 2001-2003, in an amount of approximately $447 million (excluding interest). The federal income tax refund claims include eleven other items in an estimated amount of approximately $258 million (excluding interest). The vast majority of the federal income tax refunds, reflecting more than 90% of the federal income tax refunds, have received approval from at least one arm of the Internal Revenue Service. Based on its work to date, the Tax Team is not aware of any facts that would suggest that the refunds will not be paid.

75. At present, the Examiner has not made any conclusions or findings with respect to the disputed claims to ownership of the tax refunds. The Examiner will continue to review and investigate issues related to the refunds, the competing claims to ownership of the refunds and tax benefits resulting from the proposed Plan. In addition, the Examiner will continue to review

and investigate additional value which may accrue to the benefit of the Bankruptcy Estate as a result of the tax attributes of the proposed Plan and alternatives, including whether there are potential tax benefits that might be realized going forward.

### H.    Report of the Trust Preferred Securities Team

76.    The TPS Team is examining issues related to certain securities that were issued by an indirect subsidiary of WMB in 2006 and 2007, resulting in WMB raising several billions of dollars in capital. The TPS contained a "conditional exchange feature," which provided for the TPS to be exchanged for shares of WMI preferred stock upon the occurrence of certain specified events. In addition, certain "side letters" from WMI to the OTS recited a commitment by WMI to contribute the TPS to WMB following the occurrence of a conditional exchange.

77.    The competing claims to the TPS are the subject of an adversary proceeding in the Bankruptcy Court brought by TPS holders against JPMC and others. The lawsuit seeks a declaratory judgment that the TPS are not, and never were, property of the Bankruptcy Estate. The TPS plaintiffs allege, among other things, that a conditional exchange never occurred, and that the TPS offering materials failed to disclose the existence of the "side letters," rendering any purported contribution of the TPS to WMB a nullity. JPMC, on the other hand, contends that an exchange event occurred, the TPS were exchanged for WMI preferred stock, and the TPS were contributed to WMB and thereafter transferred to JPMC pursuant to the Purchase and Assumption Agreement.

78.    In connection with its consideration of the competing claims to the TPS, the TPS Team is examining: (1) the facts and circumstances surrounding the issuance of the TPS; (2) the facts and circumstances surrounding the "side letters" regarding WMI's commitment to contribute the TPS to WMB; (3) the handling of the TPS in the days before the Petition Date,

including the circumstances surrounding the conditional exchange; (4) the handling of the TPS in connection with the closure of WMB; (5) the treatment of the TPS assets in connection with the Purchase and Assumption Agreement and the effect on JPMC; and (6) the value of the TPS assets.

79.     In furtherance of its examination, the TPS Team has reviewed the pleadings from the adversary proceeding relating to the TPS, considered work product of various interested parties regarding the TPS issues, and reviewed certain documents in the data room relating to the TPS, including the "side letters" between WMI and OTS.  In addition, the TPS Team has participated in the interviews of the former Senior Deputy Director and COO of OTS, the former Director of the OTS West Region, a former WMI CEO, the former WMI Head of Regulatory Relations, and has participated in other interviews led by the JPMC Team.

80.     The TPS Team is in the process of locating or obtaining additional documents relevant to the TPS issues, including documents relating to the establishment of the TPS and the corporate formalities pertaining to the purported conditional exchange and contribution of the TPS to WMB, and documents relating to the treatment of the TPS by FDIC and JPMC in connection with the Purchase and Assumption Agreement.  The TPS Team anticipates conducting and participating in several additional interviews of WMI, JPMC, FDIC and OTS personnel, as well as potentially others.

## **REQUEST FOR ADDITIONAL RELIEF**

81.     In addition to filing this Preliminary Report, the Examiner requests two forms of additional relief, both related to the filing of the Final Report.  First, the Examiner is requesting a brief extension of his filing deadline for the Final Report.  An Order extending the time to report is appended as Exhibit "A".

82.     In addition, the Examiner is asking the Court to establish procedures to deal with confidentiality issues so that the Final Report may be publicly released.

83.     In the Agreed Order Directing the Appointment Of An Examiner, the Court ordered the Examiner to prepare a Final Report on or before October 8, 2010 "unless additional time for discovery is required . . . ."

84.     As detailed in this Preliminary Report, the Examiner is actively engaged in the process of obtaining additional documents and interviewing witnesses.   For example, a significant number of additional documents have not yet been obtained from JPMC, government agencies, and third parties.   Once obtained, those documents will have to be reviewed and analyzed.   In addition, witnesses are currently scheduled to be interviewed through September 17, 2010 and more interviews are being arranged.   Based upon the current schedule for interviews, the need for additional and follow up interviews, the number of documents reviewed to date, the number of outstanding document requests, and the need to analyze and evaluate all such information to complete the Final Report, the Examiner believes he will need an extension of time in which to file his Final Report.   The Examiner is making this request for additional time now so that all parties will be able to plan accordingly if it is granted.   The Examiner also reserves the right to make additional applications to the Court if necessary.

85.     In addition, many of the documents considered by the Examiner are subject to this Court's Order Governing the Production and Use of Discovery Materials in Connection with Plan Confirmation [Docket No. 4863].   That Order limits the use and disclosure of documents and information.   In addition, several parties producing documents and information have advised the Examiner that they wish to do so subject to confidentiality restrictions or protective orders entered by this Court.   The Examiner will likely either include information from these documents

or attach the documents themselves to his Final Report. The Examiner believes it is important to establish procedures to provide parties producing such confidential information that is used in the Final Report an opportunity to review those portions of the report containing confidential information before the report is filed with the Court. This would provide the Examiner and interested parties with time to either resolve issues related to the use of confidential information or to identify particular issues to the Court for resolution.

86. The Examiner is proposing that the Court enter the Order Appended as Exhibit "B" and titled "Order Authorizing Examiner to File Examiner's Final Report Under Seal On a Temporary Basis and Establishing Procedures for Removing Seal."

87. Under the proposed Order, on or before 10 A.M. on October 25, 2010, the Examiner will serve on each party excerpts from the Final Report that reference, discuss or otherwise discloses confidential documentary information obtained from that party. The Examiner will not provide such party with his conclusions, recommendations or text that does not disclose confidential documentary information. Each party and the Examiner will meet and confer within three days but no later than close of business on October 27, 2010 to try to resolve any issues. Within two days thereafter but no later than October 28, 2010, the Examiner will let each party know his final position. Any party who objects to any disclosure of confidential documentary information shall file its objections with the Court under seal by October 29, 2010. On or before November 1, 2010, the Examiner shall file on the public record a Final Report which shall redact references, discussion, or other disclosure of confidential documentary information as to which any party has filed an objection. The Examiner shall also file under seal an unredacted copy of the Final Report. The Examiner will then conform the unredacted Final Report, through redactions if necessary, to the Court's final order concerning its release.

WHEREFORE, the Examiner respectfully submits this Preliminary Report to the Court and requests that this Court enter the Orders substantially in the form attached hereto as Exhibits "A" and "B" granting the additional relief requested herein and for such other and further relief as is just and proper.

Dated:    September 7, 2010
          Wilmington, Delaware

                                        MCKENNA LONG & ALDRIDGE LLP

                                        /s/   Henry F. Sewell, Jr.
                                        Henry F. Sewell, Jr., Esq.
                                        J. Michael Levengood, Esq.
                                        David E. Gordon, Esq.
                                        303 Peachtree Street, N.E., Suite 5300
                                        Atlanta, Georgia 30318
                                        Telephone (404) 527-4000
                                        Facsimile (404) 527-4198
                                        hsewell@mckennalong.com
                                        mlevengood@mckennalong.com
                                        dgordon@mckennalong.com

                                                    -and-

                                        Daniel J. Carrigan, Esq.
                                        MCKENNA LONG & ALDRIDGE, LLP
                                        1900 K Street NW
                                        Washington, DC 20006-1108
                                        Telephone: (202)-496-7208
                                        Facsimile: (202) 496-7756
                                        dcarrigan@mckennalong.com

                                                    -and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

/s/   J. Kate Stickles
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
kstickles@coleschotz.com
preilley@coleschotz.com

Counsel to the Examiner