# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **WASHINGTON MUTUAL, INC., et al.** | : | **Case No. 08-12229 (MFW)** |
| | : | |
| **Debtors.** | : | **Jointly Administered** |
| _____ | : | |

## FINAL REPORT OF THE EXAMINER

### JOSHUA R. HOCHBERG

*Court Appointed Examiner*

HENRY F. SEWELL, JR.
GREGORY S. BROW
MARK S. LANGE
WILLIAM L. FLOYD
McKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, NE, Suite 5300
Atlanta, GA 30308-3265
Telephone: (404) 527-4000
Facsimile: (404) 527-4198

PHILIP D. BARTZ
JASON M. SILVERMAN
KELLIE L. NEWTON
McKENNA LONG & ALDRIDGE LLP
1900 K Street NW
Washington, DC 20006-1108
Telephone: (202) 496-7500
Facsimile: (202) 496-7756

J. KATE STICKLES (DE 2917)
COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
500 Delaware Avenue,
Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

*Counsel to Examiner*

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ............................................................................................... 1

II.  APPROACH TO EXAMINATION ................................................................... 1

III. SUMMARY OF FINDINGS .............................................................................. 4

    A.   Conclusions as to Specific Issues ............................................................ 4

        1.   Disputed Deposit at FSB .............................................................. 5

        2.   Tax Refunds ................................................................................. 5

        3.   Trust Preferred Securities ............................................................ 6

        4.   BOLI/COLI ................................................................................. 6

        5.   Avoidance Actions ....................................................................... 6

        6.   Potential Claims Against JPMC ................................................... 7

        7.   Potential Claims Against the FDIC .............................................. 7

        8.   Solvency and Liquidity ................................................................ 8

    B.   Other Findings and Recommendations .................................................... 8

IV.  PROCEDURAL HISTORY RELATED TO EXAMINER ............................. 9

    A.   Appointment of Examiner ........................................................................ 9

    B.   Analysis of Prior Investigation .............................................................. 12

    C.   Cooperation ............................................................................................ 14

V.   THE SETTLEMENT AGREEMENT ............................................................. 16

    A.   Key Terms of the Settlement Agreement ............................................... 16

    B.   Effects of Settlement ............................................................................. 17

    C.   Proposed Releases .................................................................................. 19

VI.  EQUITY'S CONCERNS .................................................................................. 23

    A.   WMB Should Not Have Been Seized ..................................................... 24

    B.   The Settlement Is Unfair or Unjustified ................................................. 25

    C.   Inadequate Disclosure and Analysis of Other Assets............................. 25

    D.   Challenges in Reaching Equity .............................................................. 26

    E.   Conclusion .............................................................................................. 28

VII. WASHINGTON MUTUAL'S FINAL YEAR................................................. 30

    A.   December 2007 Through March 2008: Capital Raise and "Project Stanhope"................................................................................................. 30

B.    March 2008: Efforts to Raise Capital or Find a Buyer ...................... 32

    1.    Engagement of Goldman Sachs .................................... 32

    2.    Outreach to Potential Investors / Merger Partners ................... 32

    3.    Confidentiality Agreements ......................................... 33

    4.    Due Diligence ................................................... 34

    5.    Communication with Regulators ................................... 36

    6.    JPMC's Indication of Interest .................................... 37

    7.    Private Equity Offers / Indications of Interest ...................... 39

    8.    Selection of TPG Capital Raise ................................... 41

C.    Summer 2008 ....................................................... 42

D.    September 2008 ..................................................... 47

    1.    New Leadership for Washington Mutual .......................... 47

    2.    Continued Regulatory Pressure ................................... 48

    3.    The Liquidity Crisis Hits ......................................... 49

    4.    Rush to Sell the Bank ............................................ 51

    5.    Worsening Liquidity, Intense Regulatory Scrutiny ................. 53

    6.    A Last-Ditch "Go-It-Alone" Plan ................................ 54

    7.    Notice of Seizure ................................................ 56

VIII.   SOLVENCY ............................................................... 57

A.    Introduction and Summary ........................................... 57

B.    Scope of the Examiner's Investigation ................................ 58

C.    Solvency of WMI and WMB in 2008 ................................. 59

    1.    Introduction .................................................... 59

    2.    Tests for Determining Solvency ................................... 60

    3.    Solvency Into Summer 2008 ...................................... 61

    4.    Solvency After Summer of 2008 .................................. 62

D.    Liquidity ............................................................ 64

    1.    Facts Developed in the Examination Regarding WMB's Liquidity
        Crisis .......................................................... 64

    2.    Conclusions Regarding WMB's Liquidity ......................... 74

E.     Remedy for Improvident Seizure .................................................... 75

IX.     KEY DISPUTED ITEMS/ASSETS COVERED BY SETTLEMENT ......................... 77

    A.     $3.67 Billion Deposit............................................................... 77

       1.     General Overview and Introduction to the Disputed Accounts.............. 77

       2.     History and Timeline of Relevant Events Regarding the Disputed Accounts............................................................ 78

       3.     Sources of Information Concerning the Disputed Deposit Accounts...... 91

       4.     Claims Asserted by the Parties Regarding the Disputed Accounts ......... 92

       5.     Procedural Status of the Disputed Accounts ....................................... 102

       6.     Analysis................................................................ 108

    B.     Tax Refunds .......................................................................... 111

       1.     Introduction ........................................................................ 111

       2.     Tax Returns and Potential Refunds ................................................ 116

       3.     Factual Background: JPMC Historical Due Diligence and Analysis .... 128

       4.     Pending Litigation ................................................................. 132

       5.     Analysis of Tax Refund Issues ..................................................... 136

       6.     Analysis of Retained Tax Benefits ................................................. 148

    C.     TRUPS.................................................................................. 151

       1.     Introduction ......................................................................... 151

       2.     Factual History of the TRUPS......................................................... 153

       3.     Positions of the Parties With Respect to the TRUPS............................ 165

       4.     Analysis............................................................................... 169

    D.     BOLI/COLI.......................................................................... 180

       1.     Introduction ........................................................................ 180

       2.     Investigative Steps ................................................................. 181

       3.     The Policies ......................................................................... 182

       4.     Liabilities Under Employee Benefit Plans ......................................... 184

       5.     Conclusions ......................................................................... 185

    E.     Avoidance and Recovery of Alleged Fraudulent Transfers ............................ 185

       1.     Capital Contributions ................................................................. 186

| | | | |
|---|---|---|---|
| | 2. | Summary of Investigation | 187 |
| | 3. | Factual Background | 187 |
| | 4. | Summary of Asserted Claims and Litigation | 188 |
| | 5. | Analysis of Claims | 189 |
| | 6. | Potential Recoveries for the Avoidance of the Capital Contributions | 197 |
| | 7. | Potential Claims Against the Estates Resulting from Recovery of the Capital Contributions | 199 |
| | 8. | Conclusions | 199 |
| X. | | ANALYSIS OF POTENTIAL CLAIMS AGAINST JPMC | 200 |
| | A. | Introduction | 200 |
| | B. | The Scope of the Examiner's Investigation of JPMC | 201 |
| | | 1. Documents | 202 |
| | | 2. Witnesses | 203 |
| | | 3. Cooperation of the Parties | 204 |
| | C. | JPMC's Interest in WaMu | 205 |
| | | 1. Background - JPMC Divisions | 205 |
| | | 2. History of JPMC's Interest in WMI | 206 |
| | | 3. March 2008 Due Diligence and Expression of Interest | 207 |
| | | 4. April - August 2008 | 216 |
| | | 5. September 2008 | 221 |
| | D. | Analysis of Potential Claims Against JPMC | 229 |
| | | 1. Breach of the Contractual Confidentiality Agreement | 230 |
| | | 2. Tortious Interference with a Business Expectancy | 237 |
| | | 3. Trade Libel | 242 |
| | | 4. Other Potential Claims | 245 |
| | E. | Investigation of Whether JPMC May Have Violated the Antitrust Laws | 245 |
| | | 1. Allegations | 246 |
| | | 2. Facts | 248 |
| | | 3. Analysis of Antitrust Claims | 257 |
| | | 4. Conclusions | 265 |

XI.   EXAMINATION ISSUES INVOLVING FDIC AND OTS ........................................ 265

    A.    Introduction .................................................................................. 265

    B.    Scope of Examiner's Investigation ............................................ 267

          1.    Documents ...................................................................... 267

          2.    Witness Interviews ......................................................... 269

    C.    Factual Overview from the Regulator's Perspective .................... 270

          1.    WMB's Regulators ........................................................ 271

          2.    Spring 2008 .................................................................... 271

          3.    Summer 2008 .................................................................. 276

          4.    September 2008 ............................................................... 279

          5.    Post-Transaction Communications .................................. 304

    D.    The Debtors' Potential Claims for Breach of Duty Based on the Sale of WMB Assets ................................................................................. 305

          1.    Jurisdictional Impediments ............................................ 306

          2.    Express or Implied Rights of Action for Dissipation ......... 310

          3.    Takings Claim ................................................................. 314

          4.    Conversion Claim ............................................................ 315

    E.    Bidding Process .......................................................................... 317

          1.    Legal Standard ................................................................ 317

          2.    Analysis .......................................................................... 318

    F.    Tortious Interference .................................................................. 323

          1.    Legal Impediments ......................................................... 323

          2.    Factual Impediments ....................................................... 324

    G.    Conclusions ................................................................................ 328

XII.   LIMITED EXAMINATION OF THIRD PARTY AND NON-RELEASED CLAIMS ............................................................................................... 328

    A.    Investigation of Retained Claims Against Goldman Sachs .............. 330

          1.    Background .................................................................... 330

          2.    Overview of Issues ......................................................... 331

          3.    Legal Standards .............................................................. 334

    B.    Investigation of Retained Claims Against Deloitte & Touche ......... 338

# TABLE OF CONTENTS
(continued)

**Page**

|   |   |   |   |
|---|---|---|---|
| | 1. | Background | 338 |
| | 2. | Legal Standards | 341 |
| C. | | Investigation of Retained Claims Against Weil Gotshal | 343 |
| | 1. | Background | 343 |
| | 2. | Legal Standards | 347 |
| D. | | Retained Claims Against Directors and Officers and Insurance Coverage | 348 |

# I.    **INTRODUCTION**

This Report documents the findings and conclusions of Joshua R. Hochberg, the duly-appointed examiner (the "Examiner") in the Bankruptcy Cases.[1]  As directed by the Court, the Examiner has investigated and considered the Settlement Component and Retained Asset Component of the proposed Settlement Agreement.  An index of defined terms and acronyms used in this Report is included in Appendix 1.  A list of witnesses who were interviewed is included in Appendix 2.

With respect to the Settlement Component, the Examiner concludes that the proposed Settlement reasonably resolves contentious issues.  With respect to the Retained Assets Component, the Examiner concludes, based on currently available facts, that the value of retained assets is not material.[2]

The Examiner finds that the consideration to be paid to the Estates in connection with the Settlement in the form of assets or releases to the Debtors is reasonable, and the Estates are receiving good value for their released claims.  The Examiner further finds that the proposed Settlement will most likely result in no recovery for any classes of Shareholders under the Plan. The Examiner also concludes that further litigation concerning any disputed asset is highly unlikely materially to benefit classes that are "out of the money."

# II.    **APPROACH TO EXAMINATION**

The Examiner evaluated the proposed Settlement Agreement from multiple perspectives. To assist him in this evaluation, the Examiner sought out and considered the positions of the

---

[1]  Following the procedures called for in the Court's October 8, 2010 Order (Dkt. No. 5573), the Examiner resolved all confidentiality issues in his meet and confer sessions.  He submits this Report without any redactions.  The Examiner intends to later file a version of this Report that will include links to virtually all of the Bates numbered documents, or to pages within those documents, cited in the Report.  Certain links may be to redacted documents.

[2]  As explained in the Proposed Releases section of this Report, the releases in the version of the Plan reviewed by the Examiner are overly broad, raising substantial issues concerning the extent of the retained claims.

Settling Parties as well as many non-settling parties. These parties generally provided the Examiner with legal and factual information, including many investigative leads.

One such non-settling party was the Official Committee of Equity Securities Holders and that Committee's financial advisor ("Equity Committee"). Because shareholders will essentially receive nothing under the Settlement Agreement, the Examiner paid particular deference to the concerns of the Equity Committee, representatives of shareholders, and shareholders (collectively "Equity"). The Examiner evaluated Equity's positions and questions they raised about the key settlement distributions to determine whether there is any reasonable likelihood that, absent the settlement, recoveries could be generated for them.

Throughout the Examination, the Examiner focused on answering the questions most likely to inform his investigation of whether the Settlement Agreement is reasonable. To this end, the Examiner evaluated the Debtors' likely ability to recover disputed assets against the guaranteed recoveries obtained through the Settlement Agreement. In connection with this evaluation, the Examiner investigated whether there was any reasonable likelihood that the Estates could obtain substantially more assets that would benefit non-settling parties through litigation.

The Settlement Agreement provides significant funds for the creditors and for various note holders. The Examiner has confirmed that if the Settlement Agreement is approved, unsecured creditors will be paid in full and subordinated unsecured creditors will likely receive at least 70 - 80% of their allowed claims. It was made clear to the Examiner by all of the Settling Parties that the Settlement Agreement is an integrated agreement -- in other words, the removal of any part of the agreement will cause the settlement to fail. Further, the Debtors will have to litigate to recover anything above the approximate $900 million that will remain if there is no

Settlement.[3]  As noted below, there are substantial risks to such litigation.  Not approving the Settlement will essentially result in gambling with currently guaranteed recoveries to unsecured creditors in order to attempt to obtain speculative recoveries for Shareholders and other "out of the money" claimants.

In addition to considering the Debtors' litigation risk as to disputed assets, the Examiner considered whether the Debtors had appropriately evaluated the potential value of claims that are being released.  In this regard, the Examiner investigated individually each of the key elements of the proposed Settlement Agreement.  He also considered the agreement as a whole to determine if it represents a reasonable compromise of contested issues.  In conducting this Investigation, the Examiner attempted to resolve conflicting facts, determine the merits of divergent claims, and evaluate the merits of legal positions, which often have no direct precedent.  Finally, the Examiner sought to bring clarity to otherwise opaque facts that have generated various "conspiracy theories" concerning the decline, seizure, and sale of WMB to JPMC.

The Examination was completed over a very compressed timeframe.  The Examiner's appointment -- almost two years into a complex bankruptcy after a Settlement Agreement was proposed -- is unusual.  The original two-month schedule for the Examination posed a substantial challenge given the complexity of the issues that had to be examined.  The Examiner requested and the Court approved an additional three weeks for the Examination.  Even with this extension, the pacing of the Examination, given its breadth, was challenging.  The Examiner could not pursue or exhaust every potential investigative lead.  Rather, the Examiner focused his Examination only on assets and claims that were material to the Settlement.  The Examiner is

---

[3] Interview of Jon Goulding, August 25, 2010 ("Goulding Interview").

concluding his Investigation and submitting this Report because he believes that further investigation is unlikely substantially to affect his views as to the reasonableness of the compromises made in the proposed Settlement Agreement.

## III.    SUMMARY OF FINDINGS

### A.    Conclusions as to Specific Issues

The Examiner summarizes below his conclusions concerning the key assets that are the subject of the proposed Settlement Agreement. The Examiner concludes that the Estates will not recover and capture for distribution the value of many of the contested assets should there be continued litigation. JPMC and the FDIC have substantial litigation positions concerning many assets both on the merits and on jurisdictional issues. In addition, a decision in favor of the Debtors on a particular claim may only generate a viable offsetting claim. The ultimate resolution of many of the claims could take years. Nevertheless, billions of dollars are at stake and the Examiner understands that no potentially meritorious claim should be abandoned without adequate consideration.

The Settlement Agreement results in creditors being paid in full and full or substantial recoveries for various note holders. Any analysis of whether the Debtors are better off continuing to litigate must consider whether individual claims for disputed assets, even when coupled with other claims for other disputed assets, could result in benefits sufficient to place "out of the money" claimants "in the money."

Following careful analysis, the Examiner finds the Estates' claims to significant assets, including Tax Refunds, TRUPS, BOLI/COLI, and preferences, all face legal impediments that negate any realistic possibility that further litigation of those claims will result in any meaningful distribution to Shareholders.

## 1.    Disputed Deposit at FSB

The Settlement Agreement provides that the Debtors will receive what has been referred to as the $4 billion "deposit" that was transferred from WMB to FSB on the eve of bankruptcy. The Examiner concludes that the Debtors have made a substantial showing that they are entitled to the $4 billion deposit. The Court has reserved ruling on a summary judgment motion concerning this deposit. However, even if the Court rules in favor of the Debtors, it will not foreclose possible lengthy litigation to finally and completely resolve the deposit issue. Indeed, despite the Debtors' confidence that ultimately they will prevail in recovering the Disputed Accounts, there still is a maze of legal issues that remain to be litigated that could prevent an expeditious recovery of the Deposit.

## 2.    Tax Refunds

The Settlement Agreement provides the Debtors with approximately $2.196 billion and certain WMB Bondholders with $335 million out of a total of $5.5 billion in tax refunds. The Settlement gives the Estates the benefit of the majority of refunds that were generated as a result of legislation that was enacted after WMI filed for bankruptcy. The Examiner investigated whether the Settlement Agreement is unfair because the entire $5.5 billion refund belongs to WMI, the tax filing entity for all of its subsidiaries and affiliates.

The Examiner concludes that the Debtors likely could claim the entire $5.5 billion in total tax refunds; however, WMB has meritorious claims to all or most of these refunds pursuant to a Tax Sharing Agreement between the entities. Whether the FDIC Receiver or JPMC owns the refunds does not change the fact that WMI ultimately will not be entitled to retain most of the refunds.

Finally, subject to severe post-confirmation utilization restrictions, the Debtors do retain sizeable net operating loss carryforwards that could shelter future profits. It is highly unlikely,

however, that a method can be found to capture for the Debtors' benefit the full value of the unrestricted portion of such carryforwards.

### 3. Trust Preferred Securities

The Settlement Agreement provides JPMC with TRUPS worth $4 billion. TRUPS Holders argue that they still own the TRUPS because steps taken by the Debtors on the eve of bankruptcy did not result in the exchange of their securities for preferred WMI stock. This matter will be resolved by the Court before a Plan is approved. The Examiner concludes that the proponents of the Settlement Agreement have advanced significant arguments to support their contention that the TRUPS were "automatically" conveyed to WMI. In addition, the Examiner concludes that it is unlikely that WMI could avoid or set aside the pre-petition downstreaming of the TRUPS to WMB by WMI and that, even if this transfer were avoided, there would likely be no material improvement in the outcome of this case for the Estates.

### 4. BOLI/COLI

The Settlement Agreement provides JPMC with BOLI/COLI, the value of which may amount to as much as $5 billion. The BOLI/COLI were obtained to fund certain employee benefit plans. Atypically, the value of the BOLI/COLI exceeds the corresponding liabilities by as much as $5 billion. The Examiner concludes that the vast majority of the bank and corporate owned life insurance belonged to WMB and was conveyed to JPMC when it bought the assets of WMB from the FDIC Receiver. The Examiner is not aware of any pending claim asserting that JPMC is not entitled to most of the value of BOLI/COLI.

### 5. Avoidance Actions

The Examiner concludes that potential Avoidance/Fraudulent Conveyance actions, which could result in the return of $6.5 billion to the Debtors likely fail or would result in competing claims that negate most of their value. Therefore, the Debtors' avoidance actions with respect to

the $6.5 billion in Capital Contributions are unlikely to represent significant recoverable claims that are being compromised under the Settlement Agreement.

### 6.   Potential Claims Against JPMC

The Examiner investigated the factual and legal bases of potential claims that JPMC (1) breached contractual obligations to WMI; (2) tortiously interfered with WMI or WMB's business; and (3) conspired with others in violation of antitrust laws. The Examiner's Investigation did not uncover facts likely to support viable claims against JPMC that would generate significant benefits for the Debtors. In addition, it would be difficult to establish that JPMC's actions caused the demise of WMB or resulted in damages to WMB and WMI.

### 7.   Potential Claims Against the FDIC

The Examiner investigated the factual and legal bases of potential claims that the FDIC (1) breached statutory or fiduciary duties as receiver by selling WMB for less than possible; (2) breached statutory or fiduciary duties by conducting an unfair bidding process in conjunction with the seizure and sale of WMB; and (3) tortiously interfered with WMI's business expectancy by prematurely disclosing to JPMC and other third parties the intended seizure of WMB.

The Examiner concludes that substantial legal impediments make it highly unlikely that any claims against the FDIC would succeed. In addition, the Examiner's Investigation did not uncover facts sufficient to support a prima facie case for any claim against the FDIC, even if the legal impediments could be overcome. Significantly, the Examiner finds that the bidding process for WMB was reasonably fair. The Examiner also finds that JPMC was the only potential bidder willing to pay anything for WMB's assets without substantial government guarantees to limit losses. Although not all factual questions regarding the FDIC's sale of WMB have been answered, the Examiner concludes that answers to any open questions are ultimately immaterial given what is already known and the strength of the FDIC's legal defenses.

8. **Solvency and Liquidity**

The Examiner investigated whether WMI was solvent throughout 2008. This investigation included an evaluation of WMB's liquidity at the time it was seized. The Examiner concludes that it is highly likely a Court would conclude that WMI was solvent into the summer of 2008, and its solvency after that time becomes a closer question. The Examiner also concludes that by September 25, 2008, WMB's liquidity was questionable and needed to be evaluated on a day-to-day basis. Whether WMB would have survived if it had not been seized is open to debate. The Examiner concludes, however, that OTS reached reasonable conclusions that WMB was both unlikely to meet its depositors' demands and was operating in an unsafe and unsound condition. The Examiner also concludes that there are no viable claims that can be made against OTS based on the theory that they improvidently closed WMB.

B. **Other Findings and Recommendations**

The seizure of WMB occurred when the U.S. financial system was in acute crisis. It followed a series of high-profile failures or near failures of other institutions, including IndyMac Bank, Fannie Mae, Freddie Mac, Lehman Brothers, AIG, and Merrill Lynch. These failures severely shook the confidence of the investing and banking public and placed massive strain on surviving banks and the regulatory system. The collapse of much of the financial sector seemed a possibility in September 2008.

At the time WMB was seized, all potential purchasers of WMB had reached the conclusion that the likely WMB loan portfolio losses exceeded WMB's estimates. Many estimated losses of $30 billion or more. JPMC was the only potential purchaser of WMB that did not want government help or guarantees to cap losses as part of a purchase.

The Examiner concludes that JPMC had an advantage in evaluating the value of WMB because its extensive due diligence in the spring of 2008 allowed it to conduct sophisticated

evaluations of WMB's assets. That said, the Examiner found no evidence that JPMC had access to any information not made available to all potential bidders. In the end, JPMC was the only potential bidder willing to absorb all of WMB's toxic loan pools without government guarantees.

JPMC, based on its extensive due diligence, understood that the NOL tax refunds, TRUPS, and BOLI/COLI were valuable assets of WMB that would be of significant benefit to JPMC. The value of these assets affected the total calculus for JPMC's bid by decreasing JPMC's need to raise capital and offering JPMC a buffer for future loan defaults. Some of the assets conveyed to JPMC appear to have more value than was anticipated at the time of sale.

The Examiner concludes, for the reasons set forth in this Report, that there are likely no legal remedies for certain actions taken by the FDIC. Nevertheless, some of the FDIC's actions lack transparency. As a result, for example, the Examiner was unable to determine whether the FDIC fully understood the value of the assets it seized and sold -- especially the Tax Refunds and the BOLI/COLI.

We recommend that the Treasury and FDIC Inspectors General, who have deferred on issuing a report concerning the FDIC's resolution process for WMB, consider the following recommendations:

    a.    How the FDIC can improve its policies and procedures to ensure greater transparency concerning the actions it takes.

    b.    Whether the FDIC can improve its policies and procedures to ensure that the FDIC and all potential bank purchasers fully understand the value of all assets that will be sold in order to maximize the sale price of a seized bank.

    c.    Whether FDIC policies should be changed to require better documentation of any asset that is being sold, especially those assets that are not on the institution's books.

## IV.    PROCEDURAL HISTORY RELATED TO EXAMINER

### A.    Appointment of Examiner

On January 11, 2010, the U.S. Trustee appointed the Equity Committee in this case. On June 8, 2010, the Equity Committee moved for the appointment of an examiner.[4] The Court granted the Equity Committee's motion and directed the appointment of an examiner on July 22, 2010.[5] The U.S. Trustee named Joshua R. Hochberg as Examiner on July 26, 2010[6] and, on July 28, 2010, the Court entered an order approving the appointment of Joshua R. Hochberg as Examiner (the "Examiner Order").[7] The Court approved the retention of McKenna Long & Aldridge LLP as counsel to the Examiner and Cole, Schotz, Meisel, Forman & Leonard, P.A. as Delaware Counsel.

The Debtors, the FDIC (in both its corporate capacity and as receiver), and JPMC, among other parties, have negotiated and entered into the Settlement Agreement. The Settlement Agreement, the terms of which are described below, is the centerpiece of the Debtors' Plan. At least from the Debtors' perspective, the Settlement Agreement resolves all of the disputes stemming from the sale and seizure of WMB's assets and results in over $7 billion being available to the Estates.

If the Plan and Settlement Agreement are approved, the funds received by the Estates will provide for complete or substantial payment to most of the Debtors' noteholders and creditors and to some of the Bank Bondholders. WMI's Shareholders receive nothing under the Settlement. Equity questions the Settlement Agreement. At the request of the Equity Committee, the Examiner was appointed and charged with conducting the Investigation described below.

---

[4] Mot. in Supp. of Order Directing Apptmt. of an Examiner, *In re Washington Mutual, Inc.*, Case No. 08-12229-MFW (Bankr. D. Del.) (the "Bankruptcy Case") (June 8, 2010), Dkt. No. 4644.

[5] Agreed Order Appointing Examiner, Bankruptcy Case (July 22, 2010), Dkt. No. 5120.

[6] Notice of Apptmt. of Examiner, Bankruptcy Case (July 26, 2010), Dkt. No. 5141.

[7] Order Approving Apptmt. of Examiner, Bankruptcy Case (July 28, 2010), Dkt. No. 5162.

In the Examiner Order, the Court directed the Examiner to investigate "(a) the claims and assets that may be property of the Debtors' estates that are proposed to be conveyed, released or otherwise compromised and settled under the Plan and Settlement Agreement, including all Released Claims, as defined in the Settlement Agreement, and the claims and defenses of third parties thereto (the 'Settlement Component') and (b) such other claims, assets and causes of actions which shall be retained by the Debtors and/or the proceeds thereof, if any, distributed to creditors and/or equity interest holders pursuant to the Plan, and the claims and defenses of third parties thereto (the 'Retained Asset Component')."

On August 6, 2010, the Examiner filed the Examiner's Work and Expenses Plan/Report and Motion for Additional Relief ("Work Plan") as required by Court order.[8] In the Work Plan, the Examiner set forth his proposed budget, proposed a plan and outline for conducting his Investigation, and requested additional relief with respect to the sharing of information with third parties and authority to issue subpoenas. The Court approved the Examiner's Work Plan and entered the relief requested by the Examiner on August 10, 2010.[9]

As set forth in the Work Plan, the primary focus and scope of the Examination has been to evaluate the overall reasonableness of the proposed Settlement Agreement by investigating the merits of the claims that are being compromised. The Examiner considered the potential for recoveries of assets and their likely impact on the assets available for distribution by the Estates. The Examiner also analyzed whether there are significant potential assets of the Estates that have

---

[8] Work and Expenses Plan/Report and Motion for Additional Relief, Bankruptcy Case (Aug. 6, 2010), Dkt. No. 5234; Order Approving Apptmt. of Examiner, Bankruptcy Case (July 28, 2010), Dkt. No. 5162.

[9] Order Approving Examiner's Work Plan, Bankruptcy Case (Aug. 10, 2010), Dkt. No. 5260; Order Regarding the Voluntary Production of Documents to the Examiner, Bankruptcy Case (Aug. 10, 2010), Dkt. No. 5258; Order Authorizing the Examiner to Demand and Issue Subpoenas Compelling the Production of Documents and the Oral Examination of Persons and Entities, Bankruptcy Case (Aug. 10, 2010), Dkt. No. 5259.

not been appropriately pursued or fully evaluated. In conducting his Investigation, the Examiner focused on the following issues, among others:

    a.    Whether the Debtors have aggressively pursued and are likely to recover potential assets, including the Disputed Accounts, Tax Refunds, TRUPS, BOLI/COLI, and Avoidance Actions.

    b.    Whether the Debtors have viable claims against the FDIC relating to the seizure and sale of WMB's assets.

    c.    Whether the Debtors have viable claims against JPMC relating to its pre-seizure activity or its purchase of WMB's assets from the FDIC.

    d.    Whether the Debtors possess potentially valuable Third Party Claims.

## B.    <u>Analysis of Prior Investigation</u>

Prior to this Court's appointment of the Examiner, the Debtors, through special counsel Quinn Emanuel Urquhart Oliver & Hedges, LLP ("Quinn Emanuel"), conducted extensive legal research and analyzed potential claims that could be brought by the Estates. Quinn Emanuel obtained Rule 2004 Discovery from JPMC and pursued additional discovery from other parties.[10]

The Examiner found Quinn Emanuel's legal research to be both expansive and thorough. It needed to be supplemented in only limited respects. Quinn Emanuel had identified most of the possible claims of potential value to the Estates.

Quinn Emanuel pursued discovery from JPMC. Ultimately, Quinn Emanuel obtained roughly 10,000 documents from JPMC. Quinn Emanuel also sought the examination of witnesses and production of documents from knowledgeable third parties.[11] In seeking the third-party discovery, the Debtors argued that "[c]ertain of the documents in the JPMC productions highlight the need to expand to third parties the investigation this Court authorized concerning

---

[10] Debtors' Mot. for Rule 2004 Exam., Bankruptcy Case (May 1, 2009), Dkt. No. 974. Quinn Emanuel conducted all aspects of the Rule 2004 discovery on behalf of the Debtors, including drafting work-product memoranda.

[11] *See* Debtors' Mot. for Rule 2004 Exam. at 2, Bankruptcy Case (Dec. 14, 2009), Dkt. No. 1997.

JPMC's alleged malfeasance prior to the seizure and sale of WMB."[12]  Specifically, the Debtors sought production of documents from, among others, Banco Santander, Toronto-Dominion Bank, Wells Fargo, and Goldman Sachs.  On January 28, 2010, the Court denied the Debtors' motion, finding that discovery from numerous third parties was not necessary to Debtors' investigation of claims against JPMC.[13]  However, prior to this Court's denial of additional third-party discovery, Citigroup, The Blackstone Group, TPG Capital ("TPG"), and OTS voluntarily produced approximately 5,000 documents to the Debtors.

The Debtors provided the Examiner with a collection of documents from JPMC, Citigroup, and The Blackstone Group that it identified based on its review of discovery materials as being the most relevant to Debtors' claims and defenses against JPMC, the "hot documents." The Debtors identified approximately 200 hot documents as being significant to the Investigation -- filling three five-inch binders.  The Debtors also provided the Examiner with an extensive draft outline of topics and documents that it planned to cover with JPMC witnesses during any depositions in the event a settlement was not reached.

The Debtors and the Creditors Committee provided the Examiner with numerous attorney work-product documents outlining their analyses of potential claims, defenses, damages, and discovery materials relating to claims against JPMC, as well as other entities or individuals.  The Examiner reviewed and utilized this work product in planning his Investigation.

The Examiner finds that the Debtors undertook a thorough investigation of the potential claims against JPMC.  The Debtors carefully reviewed the discovery materials they received.  In addition, the Debtors considered a wide variety of legal claims against JPMC.  The Debtors'

---

[12] *See id.* at 2 (internal quotations omitted).

[13] Tr. of Jan. 28, 2010 H'rg at 88-90, Bankruptcy Case (Feb. 1, 2010), Dkt. No. 2277.

work was of substantial assistance to the Examiner, particularly at the beginning of the Investigation.

## C.     Cooperation

The Examiner met with representatives of the Debtors, JPMC, the FDIC, the OTS, the Creditors Committee, the Equity Committee, and various other stakeholders, claimants, and witnesses, as well as their respective counsel. Each provided information to the Examiner, and some candidly shared their analyses of the strength of their legal positions.[14]

The Debtors were very cooperative. They provided the Examiner with complete access to the data room. They helped the Examiner locate materials. They responded quickly to requests for additional documents and information. They provided the Examiner with materials concerning their evaluations of legal claims, as well as legal briefings. They agreed to and promptly arranged interviews of every witness requested by the Examiner.

JPMC was also cooperative. JPMC provided the Examiner with a significant quantity of documents that were retrieved based on expanded search terms and document custodians. JPMC also made arrangements for the Examiner to interview key JPMC officers and employees, including its CEO, Jamie Dimon. The attorneys for JPMC also responded to specific written questions from the Examiner intended to clarify the facts and JPMC's legal positions. However, throughout the process, JPMC aggressively preserved its attorney-client privilege and prevented witnesses from answering questions posed by the Examiner that could be viewed as a waiver of that privilege.

---

[14] The Examiner agreed with each party that he would not specifically cite any party's analysis of the strengths and weaknesses of its legal position. Rather, all such information provided to the Examiner was intended as a guide to enable the Examiner to quickly focus his own legal research and factual investigation.

The Examiner's interactions with the FDIC are detailed elsewhere in this Report. In general, however, the FDIC responded selectively to requests for documents and interviews by the Examiner based on its position that it has significant statutory and other protections. The FDIC did provide some documents and witnesses after extensive negotiations. The FDIC permitted two of the five witnesses requested by the Examiner to be interviewed. It refused to make Chairman Sheila Bair available. The two witnesses addressed many, but not all, of the Examiner's issues. The Examiner also propounded written questions to the FDIC, and the FDIC counsel's written responses answered many, but not all, of the Examiner's questions. The Examiner did not seek to compel discovery, which would have been a lengthy process with no assurance of success, because the Examiner concluded that his lack of access to additional FDIC witnesses and documents did not impact his final conclusions.

Other government agencies were cooperative. OTS produced all documents the Examiner requested plus additional documents that were helpful to the Examiner's understanding of events. OTS promptly arranged interviews of all four witnesses the Examiner requested. The Federal Home Loan Bank of San Francisco likewise voluntarily produced documents and made two witnesses available for interview.

Various third parties were also cooperative. Wells Fargo, Deloitte, Santander, Goldman Sachs, Morgan Stanley, Moody's Investors Service, Inc., and Fitch Ratings agreed to witness interviews and provided documents pursuant to the Examiner's request. Citibank, Blackstone, and TPG agreed to witness interviews. The Examiner did not request documents from those three entities but was given access to the documents they previously provided to the Debtors. TD Bank requested and received a subpoena before providing a witness who was interviewed.

The documents and witnesses provided by Wells Fargo, Santander, Citibank, TD Bank, and Blackstone provided valuable insight into how potential suitors or investors viewed WMI and WMB in March and September 2008. The documents and witnesses provided by Santander also provided the Examiner with information concerning a meeting between Santander and JPMC. TPG provided information as to its April 2008 investment in WMI.

Goldman Sachs and Morgan Stanley each provided perspective based on their engagements as WMI's financial advisors. Deloitte provided some information and documents regarding the financial audits Deloitte conducted on behalf of WMI and certain of its subsidiaries, particularly the audit for 2007.

Moody's, Fitch Ratings, and Standard & Poor's (through counsel) provided information about their interactions with JPMC, WMI, and WMB.

## V.     THE SETTLEMENT AGREEMENT

### A.     Key Terms of the Settlement Agreement

The Settlement Agreement provides for the disposition of several categories of assets, ownership of which has been disputed by the Settling Parties, and for broad releases to be exchanged between the Settling Parties. Although there are many assets divided pursuant to the Settlement Agreement, the Examiner has focused on the disposition of assets and claims of the greatest potential value to the Estates. The assets and claims of greatest potential value to the Estates and their proposed disposition is as follows:[15]

---

[15] A detailed outline of all of the assets to be divided is set forth in the Order Approving Proposed Discl. Stmt., Bankruptcy Case (Oct. 21, 2010), Dkt. No. 5659 (the "Discl. Stmt.").

| Description of Asset | Approximate Stated Value or Claim Amount | Effect of Proposed Disposition under Settlement Agreement |
|---|---|---|
| Disputed Accounts | $4.04 billion (as of 9/30/08) | Debtors: $3.85 billion (plus interest) |
| Tax Refunds (all amounts approximate) | $5.5 billion | Debtors: $2.196 billion<br>JPMC: $2.160 billion<br>FDIC: $850 million<br>Bank Bondholders: $335 million |
| TRUPS | $4 billion | JPMC |
| WMB BOLI/COLI | $5 billion | JPMC[16] |
| Avoidance Claims of WMI against WMB and JPMC | $6.5 billion | Released |
| Potential Claims against JPMC and FDIC | Unliquidated | Released |

**B.      Effects of Settlement**

If the Settlement Agreement is approved, the Estates will have assets with an estimated

value in excess of $7 billion.  The proceeds from the Settlement Agreement will be used

primarily to pay creditors of WMI under the Plan.  As discussed below, the Examiner finds that

these funds will be sufficient to pay almost all of WMI's noteholders and creditors.  The

Settlement Agreement will not result in any payment to Shareholders.

The WMI Senior Note Holders are owed well over $4.1 billion and the WMI

Subordinated Note Holders are owed over $1.6 billion.[17]  Under the Plan, both the WMI Senior

Note Holders and the WMI Subordinated Note Holders are to receive cash and Liquidating Trust

interests, with the rights of the WMI Subordinated Note Holders to payment being subordinated

to the rights of the WMI Senior Note Holders.[18]  Given the value of the assets that will be

---

[16] JPMC will also assume certain liabilities associated with these plans, but these liabilities are likely substantially less than $1 billion.

[17] Discl. Stmt.

[18] Debtors' Sixth Am. Jt. Plan ¶¶ 6.1 & 7.1, Bankruptcy Case (Oct. 6, 2010), Dkt. No. 5548 (the "Plan").

brought into the Estates through the Settlement Agreement, the Examiner finds that the WMI Senior Note Holders will be paid in full and the WMI Subordinated Note Holders will be paid 70% or 80% of their claims. The WMI Note Holders are therefore "in the money" parties.

Tens of billions of dollars in unsecured claims have been asserted against the Estates. Many of these claims are unliquidated litigation claims that will not withstand objection. The Debtors are engaged in the lengthy process of objecting to claims, and whether general unsecured creditors are paid in full will depend upon the results of that process. The Examiner is informed it is highly likely that general unsecured creditors will be paid in full. The general unsecured creditors are therefore "in the money" parties.

As discussed in the Disclosure Statement, the PIERS claims are subordinated to payment of general unsecured claims.[19] The Examiner believes it is unlikely that the PIERS claims will be paid in full. The holders of the PIERS claims are therefore "partially in the money" parties.

The Bank Bondholders assert that they are creditors of the Debtors.[20] While the Debtors do not acknowledge the validity of the Bank Bondholders' claims, as part of the Settlement Agreement those Senior Bank Bondholders (defined in the Plan as the "WMB Senior Note Holders") who agree to grant the releases set forth in the Plan, including releasing the FDIC, and enter into the Plan Support Agreement will be deemed the "Settlement WMB Noteholders" and will receive shares in a trust that will distribute to them $335 million arising from certain tax refunds.[21] The Subordinated Bank Bondholders and the Senior Bank Bondholders that do not agree to grant the releases set forth in the Plan and enter into the Plan Support Agreement will

---

[19] *Id.* ¶ 20.1.

[20] Discl. Stmt. at 52-53.

[21] Plan ¶ 21.1.

receive no distribution under the Plan.[22] The Bank Bondholders are therefore "partially in the money" parties.

With respect to the holders of the equity interests in WMI, the Examiner finds that it is extremely unlikely that Preferred Shareholders will ever receive any distribution. The WMI Common Shareholders will receive nothing under the Plan and their shares will be cancelled.[23] The WMI Shareholders are therefore "out of the money" parties.

The effect of the Settlement Agreement on holders of claims and equity interests can be summarized as follows:

| IN THE MONEY | WMI Senior Note Holders WMI Subordinated Note Holders General Unsecured Creditors |
|---|---|
| PARTIALLY IN THE MONEY | PIERS Claims Bank Bondholders |
| OUT OF THE MONEY | WMI Preferred Shareholders WMI Common Shareholders |

The parties' positions with respect to the Settlement Agreement depend on whether they are in, partially in, or out of the money.

**C.    Proposed Releases**

The Debtors' Plan reviewed by the Examiner grants expansive releases to non-debtor parties, many of whom provide no value under the Plan and are not parties to the Settlement Agreement (the "Releases"). If the Court were to confirm the Plan and grant the Releases

---

[22] *Id.*

[23] *Id.* ¶ 26.1.

contained therein, it would foreclose recovery based on any possible Retained Claims to the detriment of the Estates' creditors and other claimants. It is the opinion of the Examiner that the Releases are unduly broad and inappropriate.

On October 26, 2010, the Examiner expressed his concerns to the Debtors regarding the proposed releases. The Debtors stated they intended to modify the Plan to address those concerns. What follows below is the Examiner's analysis of the proposed Releases as they exist in the Plan documents filed prior to October 29, 2010.[24] The Examiner is not in a position to reach any conclusions concerning whether subsequent changes to the Releases resolve the Examiner's concerns.

The Releases would bar any and all claims relating to WMI against any of the "Released Parties."[25] The term Released Parties is defined under the Plan to mean "each of the WMI Entities, WMB, each of the Debtors' estates, the Reorganized Debtors, the Creditors' Committee and each of its members in their capacity as members of the Creditors' Committee, the Trustees, the Liquidating Trust, the Liquidating Trustee, the JPMC Entities, the Settlement Note Holders, the FDIC Receiver and FDIC Corporate, *and each of the foregoing parties' respective Related Persons*."[26] Excluding the "Related Persons" concept, it may be appropriate to provide releases to the specifically-enumerated parties above in exchange for their contributions under the Plan and Settlement Agreement.[27] The inclusion of "Related Persons" within the Released Parties, however, makes the Releases unreasonably broad.

---

[24] On October 29, 2010, the Debtors filed a modified Amended Plan, which the Examiner has not reviewed.

[25] Plan ¶ 43.2(b) (Discharge and Release of Claims and Termination of Equity Interests); *see also id.* ¶ 43.5 (Releases by Debtors); ¶ 43.6 (Releases by Holders of Claims and Equity Interests).

[26] *Id.* ¶ 1.160 (emphasis added).

[27] The Debtors justify the releases, in part, by stating that they are "based on a critical financial contribution of the released parties . . . ." Discl. Stmt. at 15.

Under the Plan, a "Related Person" means "[w]ith respect to any Entity, such predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present and former Affiliates and each of their respective current and former members, partners, equity holders, *officers*, *directors*, employees, managers, shareholders, partners, *financial advisors*, *attorneys*, *accountants*, *investment bankers*, consultants, *agents* and *professionals* . . . or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of them . . . ."[28]

Reasonably interpreted, this language results in a waiver of all claims relating to WMI or WMB against any professional now or previously retained by WMI, WMB, JPMC, or the FDIC, be it a law firm, investment banker, underwriter, auditor, or otherwise. Many of WMI and WMB's former officers and directors would also receive releases, and any potential malpractice claims against former attorneys, accountants, and auditors would be extinguished. Further, the Releases are accompanied by a parallel permanent injunction preventing any party from commencing or continuing any proceeding of any kind with respect to claims against the

---

[28] Plan ¶ 1.158 (emphasis added). The term "Related Persons" does exclude the "Excluded Parties" as that term is defined in the Settlement Agreement. *Id.* Under the Settlement Agreement, the "Excluded Parties" consist of: (1) a list of 31 specifically identified individuals; (2) any person, other than any person serving as a current director or officer of WMI or WMB or their subsidiaries or Affiliates or a Retained Professional, who committed intentionally dishonest or fraudulent acts within the meaning of the Financial Institutions Bond Coverage on the Tower Insurance Programs causing loss to WMB; and (3) any person retained by WMB or its subsidiaries for the purpose of providing mortgage origination services directly related to the origination of mortgage loans except (i) any person in their capacity as a WMB employee, (ii) the Retained Professionals, and (iii) any person serving as a current director or officer of WMI or WMB or their subsidiaries or affiliates. *See* Plan, Ex. H, Ex. BB.

Released Parties.[29] This injunction would arguably prevent a claimant from even taking discovery from any of the Released Parties in aid of claims against non-released parties.[30]

A separate area of concern with respect to the Releases is defining the universe of parties that will be bound by them. While some provisions of the Plan appear to apply the Releases only to the holders of claims and equity interests that are treated under the Plan,[31] other provisions could fairly be read to provide complete and total releases to the Released Parties as against the world.[32] With respect to the parties under the Plan, the Plan provides an "opt out" mechanism whereby a party may check a box on its ballot opting not to grant the Releases.[33] This opt out feature is deficient in two respects. First, the opt out is not a complete opt out -- even a party that opts out of the Releases still releases all claims against the Debtors, the Reorganized Debtors, the Trustees, the Creditors' Committee, and each of their "Related Persons."[34] Second, the Debtors

---

[29] *Id.* ¶ 43.3 (providing that "all Entities" are precluded from "commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability or Equity Interest that is terminated or cancelled pursuant to the Plan against any of the Released Parties . . . .") (bold font in original); *see also* ¶ 43.7 (Injunction Related to Release), ¶ 43.9 (Bar Order), and ¶ 43.12 (Supplemental Injunction).

[30] For example, a plaintiff wishing to pursue an antitrust claim against another bank for allegedly colluding with JPMC in connection with the acquisition of WMB would likely be precluded under the Plan from obtaining any discovery from JPMC.

[31] *See id.* ¶ 43.2(b) ("each holder of a Claim or Equity Interest in any Class under this Plan shall be and hereby is deemed to release . . . ."); *id.* ¶ 43.10 ("By submitting a Ballot and receiving a distribution under or any benefit pursuant to this Plan and not electing to withhold consent to the releases of the applicable Released Parties set forth in Section 43.6 of the Plan, or by order of the Bankruptcy Court, each holder of a Claim or Equity Interest shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 43.6 of the Plan."); *see also id.* ¶ 43.6.

[32] *See id.* ¶ 43.2(b) ("all Entities shall be precluded from asserting against any and each of the Released Parties . . . ."); *id.* ¶ 43.12 ("all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims or Equity Interests against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Equity Interest in any of the Debtors, whenever or wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recover with respect to any Released Claims or Equity Interests arising prior to the Effective Date (including prior to the Petition Date) . . . .").

[33] *Id.* ¶ 43.6.

[34] *Id.* A party that opts out of the releases also foregoes all distributions under the Plan.

have announced their intention to seek to bind even the parties that opt out of the releases to the full Releases provided under the Plan through the Confirmation Order.[35]

The Releases are binding on the Debtors, the Reorganized Debtors, and their Estates. Generally, the Examiner believes that no release should be given without consideration from the released party.[36]

## VI.    EQUITY'S CONCERNS

The WMB seizure hurt many people and wiped out lifetimes worth of savings. Billions of dollars in shareholder equity was lost. As told at wamustory.com:[37]

> Retirements for many people were wiped out either directly by the loss of value in Washington Mutual stock, or indirectly through the loss in their pension plans, 401Ks and the general market panic that ensued.

While the Examiner evaluated the reasonableness of the proposed Settlement Agreement from multiple perspectives, he gave particular consideration to the views of Equity.

The Examiner devoted significant time and effort to gaining a full understanding of the analyses, grievances, and suspicions of Equity and in investigating claims that might be of value to Shareholders. The Equity Committee provided the Examiner with several PowerPoint decks in support of its positions. The Examiner or his team had formal conferences with the Equity Committee on July 27, August 9 and 11, September 3, and October 15, 2010, in addition to other discussions. The Equity Committee provided specific, helpful documentation or clarification on various topics at the request of the Examiner. In addition, individuals within Equity

---

[35] *Id.*; Discl. Stmt. at 16 ("because the Plan and Global Settlement Agreement are conditioned upon the Releases, and, as such, the Releases are essential for the successful reorganization of the Debtors, the Debtors will seek at the Confirmation Hearing to bind and enforce the Releases against any parties who opt out").

[36] *Id.* ¶ 43.5.

[37] "wamustory.com" is a website created by WMI shareholders to discuss issues related to the seizure of WMB.

corresponded with the Examiner and raised issues and provided documents that they believed important.[38]

In sum, Equity provided the Examiner with its views on the issues and the appropriate scope of the Investigation, defining the questions that it believed needed to be answered. Equity criticized the Debtors' development of the facts and theories of recovery as inadequate. Equity also complained that the government improperly picked "winners and losers" in the financial crisis to the detriment of WMI shareholders. For example, Equity cited concerns with the timing of WMB's seizure just prior to various financial reforms that might have saved WMB.

The Examiner summarizes below some of the significant specific issues that Equity raised that are examined in detail in this Report.

A.   **WMB Should Not Have Been Seized**

In several discussions with the Equity Committee, a recurring theme was that the OTS lacked an adequate justification for the seizure of WMB. Similarly, a significant portion of the email correspondence sent from Shareholders to the Examiner argued that many factors suggest that WMB was solvent at the time it was seized. The Equity Committee argued that, based on the FDIC and OTS's own analysis as of September 2008, WMB was adequately capitalized and had sufficient liquidity.

The Equity Committee found no basis, in the information made available to it, that would substantiate the claim that WMB was insolvent when seized. It cited WMI's internal analysis provided to its Board of Directors on September 22, 2008, as demonstrating solvency.[39]  The

---

[38] The Examiner received a significant quantity of emails from individuals identifying issues, theories, and links to relevant information. Each piece of correspondence was reviewed by the Examiner or an attorney working on the Investigation and, where appropriate, passed on to one of the investigative teams for its consideration.

[39] Equity undertook a preliminary solvency analysis based on the limited information made available by the Debtors. Equity noted that a final analysis of solvency would require a detailed review of WMB's loan portfolio, which is not

Examiner focused significant attention on solvency and liquidity issues in his Investigation, and the results are discussed throughout this Report.

**B.**     **The Settlement Is Unfair or Unjustified**

The Equity Committee raised numerous issues concerning the proposed Settlement Agreement and the contemplated distribution of assets.  Concerning the division of assets, it argued that there was not sufficient investigation into the underlying merits of the claims released by the Settlement Agreement.  Implicitly, it argued that JPMC has received, and will receive, more than it should under the Settlement Agreement.

In requesting that the Examiner look at specific issues, Equity noted that there are sufficient assets which, if they were allocated to WMI, would result in recoveries by preferred and regular stockholders. Stated differently, Equity argued that the recovery of various individual assets would place Equity "in the money."  The largest of these assets are:

1.     $3.85 billion (plus interest) in Disputed Accounts
2.     $5.5 billion in Tax Refunds
3.     $4 billion in TRUPS
4.     $5 billion in net BOLI/COLI
5.     $6.5 billion of Avoidance Actions
6.     The value of WMMRC
7.     Potential tort claims against JPMC and the FDIC.

The total value of these major assets, along with other smaller assets, is substantial.  The Equity Committee stated that it lacked sufficient information to perform a complete legal analysis of who would obtain these assets after litigation or whether the proof necessary to obtain certain assets would make it impossible to obtain other assets.

**C.**     **Inadequate Disclosure and Analysis of Other Assets**

available to Equity and was also not reviewed by the Debtors.  The Examiner in this Report has an analysis of solvency, but he also did not conduct a review of the loan portfolio.

The Equity Committee maintained that the Debtors have insufficiently analyzed the value of potential tort and contract claims that will be released and the value of the Retained Assets that will not be released in the Settlement Agreement. Examples of assets that Equity believes have not been fully analyzed are: WMMRC, future NOL tax benefits, certain potential claims that are released against JPMC and the FDIC, and certain retained claims.

**D.  Challenges in Reaching Equity**

As part of his Investigation, the Examiner evaluated the impediments to obtaining through litigation sufficient funds to make distributions to Shareholders. The Settlement creates the appearance that WMI settled for just enough to pay unsecured creditors. Shareholders, who receive nothing in the Settlement, understandably believe that better results could be achieved through litigation.[40]

The Examiner finds that it is highly unlikely that there is any scenario which will result in substantial distributions to Shareholders. The following chart shows the classes (in order of priority) and amounts of the various classes of claims.

| General Unsecured & Senior Notes | $4.8 billion[41] |
|---|---|
| Senior Subordinated Claims | $1.8 billion |
| Misc. Subordinated Claims | $800 million |
| PIERS Holders | $919 million |
| Preferred Shareholders[42] | $7.5 billion |
| Common Equity Holders | |

---

[40] During the Examination, several parties informally questioned who was included in other groups. The Examiner heard claims that the current Noteholders paid pennies on the dollars for their notes and that the Settlement results in a windfall to them. Similarly, the Examiner heard claims that current equity holders acquired their interests in a similar manner. The Examiner has not investigated any of these allegations.

[41] Goulding Interview. This number also assumes no allowed claims for either JPMC or FDIC.

[42] Assuming a Conditional Exchange Event occurs, the TRUPS Holders will be preferred shareholders of WMI.

Setting aside any potential claims by JPMC or the FDIC against WMI, WMI would need to recover $16 billion in order to satisfy all creditor claims and preferred shareholders just to reach the common shareholders. Given the more than 1 billion outstanding shares of WMI common stock, it would take substantially more to make any meaningful distribution to them. Nevertheless, the Examiner has attempted to determine whether there are sufficient assets or claims which could be recovered to generate such large recoveries.

Equity argues that substantial assets being transferred to JPMC are assets which rightfully belong to WMI. Equity also argues that there are claims against JPMC which should be pursued and not released. The Examiner has carefully considered both arguments.

Without a settlement, the WMI estate will hold approximately $900 million. The Examiner is advised that the Settlement will fail if any one asset is removed. Thus, in order to properly evaluate the likelihood of reaching Shareholders, one must assume that there will be no settlement and that the Debtors would have only the $900 million. Assuming that the WMI Estate could recover the Deposits, which is likely but not certain, the Estate would have just under $5 billion.

Given that common shareholders are $16 billion out of the money, the additional $11 billion that would put them in the money would have to come from other assets. However, the Tax Refunds cannot be recovered without generating offsetting claims by WMB for its portion pursuant to the Tax Sharing Agreement. Similarly, although the BOLI/COLI represent a valuable asset, the vast majority of these assets belong to WMB. The Avoidance Actions are unlikely to lead to any substantial net recoveries. The same is true with respect to any attempt to set aside the transfer of the TRUPS to WMB. The Examiner concludes that there is no

reasonable likelihood that any combination of the assets that could be recovered for the benefit of the Estate will result in sufficient funds to place Shareholders "in the money."

The reality is that it would only be possible to reach common shareholders if WMI could successfully bring very large tort claims against either JPMC or the FDIC, which would result in the recovery of multiples of billions of dollars. The primary problem with such claims is that potential acquirers of WMI or WMB were not discouraged from bidding because of any actions of JPMC. Rather, other likely bidders were fearful of the potential losses in the WMI mortgage loan pools and were unwilling to assume those risks. As to the FDIC, there are substantial legal hurdles to asserting any claims against the agency in connection with the sale of WMB.

Finally, both JPMC and the FDIC have filed substantial claims in this case for many of the assets identified above. The FDIC has filed a claim for all transfers made by WMB to WMI, which total $17 billion. Even assuming that many of these claims are overstated, it is clear that voiding the Settlement Agreement and litigating all claims could result in substantial claims back against WMI by JPMC and the FDIC.

Simply put, there is no clear litigation path which would result in substantial recoveries beyond those to be paid to the Debtors under the Settlement Agreement. Indeed, a possible result if the settlement fails is that the Debtors will end up with the Deposit Accounts and nothing more. The amounts required to reach common equity are simply too large, and the likely recovery too speculative, to justify rejecting the proposed Settlement.

### E. Conclusion

This Report does not answer all the questions that Equity and individual shareholders posed. It does, however, analyze most of the issues as to which Equity had questions. The Report details the relevant history leading up to WMB's seizure. The Report analyzes what it would take for Shareholders to receive a distribution. It analyzes the value of the principal

components of the proposed Settlement, including the Deposit Issue, Tax Refunds, TRUPS, BOLI/COLI, and Avoidance Actions. The Report analyzes significant potential claims against JPMC and government regulators. Included in each analysis of an asset or a potential claim is a discussion of the pending legal proceedings contesting ownership of the asset. The assets included in the Settlement Agreement have been the subject of contentious litigation. As to many of the assets, there is litigation risk for each party depending on a court's decision in pending proceedings, appeals, and possible collateral jurisdictional attacks.

Pursuant to the proposed Plan and Settlement Agreement, WMI preferred shareholders are at least $500 million "out of the money" and WMI common shareholders are at least $7 billion "out of the money." There is a small chance of modest distributions to some Preferred Shareholders but virtually no chance of distributions to Common Shareholders.

After substantial investigation, the Examiner concludes that it is highly unlikely that these results can be materially improved by voiding the Settlement Agreement and attempting to achieve greater recoveries through litigation. The Examiner concludes that there is no reasonable likelihood that any combination of the assets that could be recovered for the benefit of the Estate will result in sufficient funds to place Shareholders "in the money." Stated another way, the Debtors are unlikely to prevail as to many of the asset disputes, and even if the Debtors do prevail, the end result will be the assertion of additional claims against WMI that will take precedence over Shareholders.

The Examiner also concludes that no known facts establish that the government acted in bad faith in seizing WMB. Several former WMI and WMB officers and others informed the Examiner that they did not consider the seizure of the bank to be unreasonable or arbitrary. WMB was seized in the midst of a series of unprecedented failures in the banking and financial

sectors. The potential ramifications of these failures were not fully known or understood. This uncertainty resulted in a singularly important fact: JPMC was the only financial institution willing to take over WMB's assets and assume its eroding loan portfolio without significant government guarantees.

The FDIC was concerned with protecting its insurance fund and took steps it believed were reasonable to protect the fund. JPMC's acquisition of WMB's assets did protect the fund. Moreover, even assuming that the Government made a bad decision in seizing WMB, there is no practical way to undo what has been done. The statutory protections afforded the FDIC, and through them, purchasers of failed institutions, significantly limit civil remedies against the FDIC and JPMC in these circumstances.

Although the Examiner is sympathetic to Equity's views, the Examiner finds no remedy that will enable the Debtors to obtain sufficient assets for a distribution to Shareholders. It is highly unlikely that the OTS and FDIC decisions to seize WMB and sell it to JPMC can be successfully challenged. In any event, it appears that their decisions were reasonable under the circumstances.

Equity also questions why JPMC paid less than $2 billion for WMB assets when it had been willing to pay billions more months earlier. The Examiner concludes, however, that no other bank was willing to buy all WMB's assets at any price without government guarantees concerning downside risk. Although JPMC may end up profiting greatly from the WMB purchase, that final chapter has not yet been written.

## VII.  WASHINGTON MUTUAL'S FINAL YEAR

The Examiner details below the context in which Washington Mutual attempted to meet financial challenges in its final year.

### A.  December 2007 Through March 2008: Capital Raise and "Project Stanhope"

In the second half of 2007, WMI needed additional capital because of economic factors generally affecting the financial services sector.[43] In December 2007, WMI sought to raise capital with a sale of convertible preferred stock worth approximately $2.5 billion, as well as expense reductions of approximately $500 million.[44]

The bank continued to experience economic stress and this capital raise proved inadequate.[45] WMI periodically monitored its liquidity and established threshold liquidity amounts that, if breached, would trigger certain actions to increase liquidity.[46] WMI had a "base case" or standard liquidity threshold and a lower "stressed" liquidity threshold.[47] From January to March 2008, WMI's internal liquidity reports showed breaches of its "stressed" liquidity threshold.

In January and February 2008, WMI, advised by Goldman Sachs and Lehman Brothers, considered a plan to improve its financial health. The plan, called Project Stanhope, involved pursuing a so-called "good bank / bad bank" approach, in which the WaMu Group's troubled assets -- primarily subprime loans, Option ARMs, hybrid ARMs, and first or second lien home equity loans / lines of credit -- would be sold off, leaving behind the better-performing bank assets, such as retail operations.[48] Project Stanhope stalled when WMI determined that it could not obtain the appropriate accounting treatment to make it successful.[49]

---

[43] Interview of Kerry Killinger, August 30, 2010 ("Killinger Interview").

[44] WMI, Current Report (Form 8-K) Ex. 99.1 (Dec. 10, 2007), available at http://yahoo.brand.edgar-online.com/EFX_dll/EDGARpro.dll?FetchFilingHtmlSection1?SectionID=5590786-11850-24814&SessionID=zmbEWjDoaVae3s7.

[45] Killinger Interview.

[46] Interview of Peter Freilinger, October 20, 2010 ("Freilinger Interview").

[47] Freilinger Interview.

[48] Killinger Interview; WMI_PC_08788098.00001, at WMI_PC_08788098.00010.

[49] Killinger Interview.

In late February 2008, Mr. Killinger met with the director of OTS and discussed prospects for raising additional capital.[50] In a series of conversations with the Board, senior OTS officials put pressure on Mr. Killinger and the directors to raise a substantial amount of capital and seek strategic partners for a merger.[51] The WMI Board of Directors shortly thereafter decided to pursue an additional capital raise of $3 to $4 billion.[52]

## B.   March 2008: Efforts to Raise Capital or Find a Buyer

In March 2008, WMI began the process that would ultimately result in a capital infusion of $7 billion by a group of investors led by TPG. On or around March 5, 2008, the WMI Board of Directors again utilized Goldman Sachs and Lehman Brothers as financial advisors.[53]

### 1.   Engagement of Goldman Sachs

Under the terms of WMI's engagement of Goldman Sachs, Goldman Sachs would assist WMI in connection with the possible sale of all or a portion of the company and also explore capital raising alternatives to merger.[54] WMI representatives disclaimed any preference for one result over the other.[55] OTS perceived, however, that WMI wanted to maintain its independence as an entity.[56]

### 2.   Outreach to Potential Investors / Merger Partners

In connection with its attempts to raise capital, WMI and its advisors considered approximately fifteen equity firms, ultimately making management presentations to six: KKR,

---

[50] Dochow_Darrel-00001338_001, at 025; Interview of Darrel Dochow, September 1, 2010 ("Dochow Interview").

[51] Dochow Interview.

[52] Killinger Interview.

[53] Killinger Interview.

[54] WMI_PC_701361033.00001.

[55] Interview of Robert Williams, August 17, 2010 ("Williams Interview").

[56] Dochow Interview.

Blackstone, Oak Hill, Cerberus, Warburg Pincus, and TPG.[57] Three of those -- a Blackstone / Oak Hill consortium, Cerberus, and TPG -- conducted due diligence and submitted either nonbinding indications of interest or bids.[58]

In connection with a possible merger transaction, WMI and its advisors initially contacted several firms, including JPMC, Wells Fargo, Santander, and Barclays. Only JPMC and Wells Fargo received an in-person management presentation.[59] Aside from JPMC, only one other potential acquirer conducted due diligence, and only did so using the online data room.[60]

### 3.    Confidentiality Agreements

In connection with the due diligence efforts in March 2008, interested parties executed a confidentiality agreement with WMI. The agreements contained identical provisions.[61] The agreements required signatories to use confidential information solely for the purpose of evaluating a potential transaction with WMI. The information was required to be kept strictly confidential and not disclosed outside the company or certain representatives. The agreements also prohibited parties from disclosing the existence of the agreement or the fact that they were contemplating a transaction. The agreements did, however, permit signatories to disclose to regulators with authority over them, without prior notice to WMI, confidential information or the fact that a transaction was being contemplated.[62]

---

[57] WMIPC_500001691.00001, at WMIPC_500001691.00005.

[58] Id.

[59] WMIPC_500001691.00001, WMIPC_500001691.00009.

[60] Id.

[61] On at least one occasion, a potential suitor negotiated more favorable terms to the confidentiality agreement than had been offered to all parties. WMI thereafter notified other parties of this fact and extended the negotiated term to those parties. JPM_EX00017338.

[62] See, e.g., JPM_EX00016135.

The agreements contained a "standstill" provision. This provided that, for a period of eighteen months following execution of the agreement, the signatory would not pursue a merger or acquisition transaction with WMI without the prior approval of WMI or its subsidiaries.[63]

### 4. Due Diligence

The due diligence process in March 2008 commenced with management meetings between WMI and its representatives and potentially interested parties. In connection with those meetings, WMI prepared a "Management Presentation" slide deck.[64] According to the Management Presentation, WMI sought to raise approximately $4 billion in capital, partially through a private capital investment and the remainder by a public offering.[65]

Following the management meetings, parties that formally expressed interest were invited to conduct additional due diligence on WMI. These entities participated in additional meetings with WMI representatives in Seattle, Washington. Five potential suitors participated in the due diligence process in Seattle in March 2008: Oak Hill Partners (which WMI code-named "Oxygen"); Blackstone Capital Partners (code-named "Boron"); Cerberus Capital Management (code-named "Carbon"); TPG (code-named "Titanium"); and JPMC (code-named "Flint").[66] Parties were scheduled to conduct due diligence so that no two parties (except for Oak Hill and Blackstone, which had teamed together) would be conducting due diligence simultaneously. JPMC was scheduled to conduct due diligence from March 17-19; TPG from March 20-21; Cerberus from March 22-23; and Blackstone / Oak Hill on March 24-25.[67] During the due diligence process, specific subject-matter meetings were scheduled to provide suitors with

---

[63] See, e.g., id.

[64] WMIPC_500001742.00001, at WMIPC_500001742.00001

[65] WMIPC_500001742.00001, at WMIPC_500001742.00004.

[66] WMIPC_500001721.00001.

[67] WMIPC_500001742.00001, at WMIPC_500001742.00004.

information about various aspects of the bank's business. The topics of these meetings included retail banking operations; home lending; consumer real estate credit; funding and capital; investment portfolio / Asset Management Liability Committee; Accounting; Card; Card Credit; Commercial, Corporate Technology and Operations; Corporate Staff; Corporate Real Estate; and Legal, Compliance, Regulatory, Litigation, and Contracts.[68]

Parties engaging in due diligence in March 2008 were also given access to both electronic and paper data. WMI established an online document repository ("data room") within which potential suitors could access information about the company in order to conduct due diligence. Potential suitors began accessing the data room on March 16, 2008.[69] In all, it appears that numerous parties including potential suitors, outside advisors, and related parties accessed the WMI data room between February 28, 2008 and April 5, 2008.[70] Data room access and due diligence generally were coordinated by Todd Baker of WMI.[71]

While parties conducting due diligence examined and sought to place a value on many aspects of Washington Mutual's operations and financial condition, it appears that the paramount concern and predominant focus of due diligence was ascertaining the value of WMI's home loan portfolio. The losses built into WMI's loan portfolio had a direct impact on the bank's need for capital and liquidity. For instance, WMI estimated that its loan portfolio losses would ultimately total between $12 and $19 billion.[72] In order to attain its target capitalization ratio of tangible common equity to tangible assets (TCE/TA) of 4.25%, WMI calculated that it would need to

---

[68] JPM_EX00003271, at JPM_EX00003273.

[69] WMI_PC_701361032.00001.

[70] Id.

[71] Interview of Brian Bessey, August 25, 2010 ("Bessey Interview").

[72] Interview of Thomas Casey, October 21, 2010 ("Casey Interview").

raise an additional $4 billion in equity.[73]  Blackstone determined that the lifetime losses of

WMI's loan portfolio would significantly exceed WMI's management projections and believed

that approximately $26 billion was a more reasonable figure.[74]  As a result, Blackstone

determined that WMI needed to raise between $6 billion and $10 billion in additional capital to

maintain target TCE/TA and other key capital ratios.[75]

JPMC also calculated that WMI's loan portfolio was worth less than what WMI had

calculated, and determined that it should be discounted between $20 billion and $27 billion.[76]

But unlike potential capital investors, JPMC was looking at purchasing the bank and merging it

into JPMC's own operations.  Upon purchase, the value of WMI's loan portfolio would need to

be marked-to-market.  Furthermore, because it would be a merger transaction, the marked-down

loan portfolio would affect JPMC's capital targets.  In this context, JPMC calculated that an

acquisition of WMI would require it to raise almost $16 billion in additional capital to maintain

the capital ratio targets of the merged entity.[77]

## 5.    Communication with Regulators

During its efforts to raise capital or find a buyer, WMI's management was in contact with

its regulator, OTS.  During this period, OTS advised WMI to consider an acquisition by JPMC,

but disclaimed any desire to push the bank's management towards any particular outcome.[78]

---

[73] WMI_PC_500001734.00001.  TCE/TA is distinct from a bank's regulatory requirements for Tier 1 capital ratios.
WMB was not undercapitalized in March 2008 and, in fact, was well capitalized even at the time of its seizure.
TCE/TA is a capitalization metric that is significant for non-regulatory purposes such as providing information to
potential investors.  It is a measure of the bank's capitalization that does not include intangible assets such as
goodwill, servicing rights, and deferred tax assets.

[74] BLACKSTONE-0002247.

[75] Id.

[76] See JPMCD_000003489.00013, at JPMCD_000003489.00016.

[77] Id.

[78] Dochow_Darrel-00001338_001, at 027; Dochow Interview.

On March 28, 2008, John Reich of OTS called Kerry Killinger and informed him that JPMC was making negative representations to various federal agencies (including the Federal Reserve, Treasury Department, and the Office of the Comptroller of the Currency) concerning WMI's financial condition. In response to the news from Mr. Reich, Mr. Killinger called Jamie Dimon, who denied that JPMC was saying "anything improper" to the regulators and would not reveal the contents of JPMC's presentations.[79]

At some point between March 25 and April 1, 2008, WMI increased its equity raise target from $4 billion to $5 billion.[80] OTS representatives attended a WMI board meeting on April 1 and emphasized the importance of bringing additional capital into the bank and meeting capital ratios.[81] On April 5, 2008, OTS communicated to WMI's board of directors that it viewed $5 billion as the minimum amount of capital the company would need to raise to forestall a rating downgrade and enforcement action.[82]

### 6. JPMC's Indication of Interest

JPMC never submitted a bid to purchase WMI in March 2008. Rather, on March 31, 2008, it submitted a proposal for a merger styled as a non binding "indication of interest."[83] The proposal indicated that JPMC was willing to offer 0.116 common shares of JPMC stock per common share of WMI stock, which at that time implied a $5.00 per share purchase price. JPMC was also prepared to offer an additional contingent payment of up to $3.00 per share depending on the performance of the loan portfolio. WMI shareholders would receive the full

---

[79] Killinger Interview. In this same discussion, Mr. Killinger also recalls Mr. Dimon stating that if JPMC made a bid on WMB, it would be low, and opining that, in Killinger's position, he would take a good private equity opportunity if it arose. A more detailed discussion of contacts between JPMC and regulators is set forth elsewhere in this Report.

[80] Compare, e.g., WMIPC_500001715.00001, with WMIPC_500001686.00001.

[81] WMI_PC_08788103.00002.

[82] WMI_PC_08788105.00002

[83] JPM_EX00006060.

$8.00 per share price if the losses in WMB's home equity loan portfolio were no worse than the "low estimate" provided in the March 2008 management presentation.[84] If the losses exceeded that estimate, the $3.00 contingent payment would be reduced.[85]

WMI believed that an appropriate share price from an acquirer would be $15 to $20 per share. As of March 25, 2008, WMI's stock was trading at $12.70 per share.[86] WMI consequently considered JPMC's offer to be significantly low.[87] Mr. Killinger responded to JPMC's indication of interest with frustration, noting, "I continue to be disappointed by the inability (despite several attempts by the bankers) to make progress on improving price and terms of a proposal that would allow us to move forward."[88] Mr. Killinger stated that, for WMI to cooperate fully with JPMC's due diligence requests, he required JPMC's "commitment to work to reach agreement on improved pricing and terms."[89] Mr. Scharf of JPMC received this letter on April 6 at approximately 9:30 p.m. He responded immediately and affirmatively to Mr. Killinger's request, a response that Mr. Dimon reinforced early the following morning.[90]

While Mr. Killinger had demanded an affirmative indication of interest from JPMC on April 5, 2008, it appears that by that time WMI itself was primarily focused on pursuing a capital raise transaction.[91] By the following day, April 6, 2008, the WMI Board had decided to proceed with a capital raise with TPG rather than a merger with JPMC.[92]

[84] *Id.*

[85] *Id.*

[86] WMI_PC 111210525.00005.

[87] Killinger Interview.

[88] JPM_EX00026610.

[89] *Id.*

[90] JPM_EX00026608-9.

[91] *Compare* WMIPC_500001691.0001 (April 1 presentation showing terms of JPMC proposal) *with* WMIPC_500001697.0003 (April 4 presentation showing only private equity options); WMI_PC-08788104.0001.

[92] WMI_PC_08788107.00001, at WMI_PC_08788107.00006.

WMI did not pursue JPMC's proposal further, but it did not affirmatively reject it. To the contrary, there is evidence that WMI management agreed with OTS on April 4, 2008 to keep the JPMC offer open.[93] WMI never instructed JPMC (or any other potential suitor) to destroy confidential data obtained during due diligence.

### 7.     Private Equity Offers / Indications of Interest

#### a.     TPG

TPG initially proposed to contribute $2.5 billion, contingent upon its ability to assemble a consortium of investors that, together with TPG, would contribute at least $5 billion. The proposal implied a price of $8.50 to $9.00 per share. In addition, TPG sought two board of director seats.[94]

#### b.     Blackstone / Oak Hill

On March 31, 2008, Blackstone and Oak Hill sent a joint non binding final proposal for an investment in WMI. Blackstone and Oak Hill stated that together they could commit $2.5 billion in equity to the transaction.[95] Blackstone would contribute $1.5 billion of the amount, Oak Hill would contribute $500 million, and Oak Hill would raise the additional $500 million from partners.[96] The form of the investment would be the purchase of newly-issued common shares at $8.00 per share.[97] In their letter, Blackstone and Oak Hill expressed their belief that the $4 billion in equity sought by WMI at that time would be insufficient to meet regulatory and

---

[93] Dochow_Darrel -00001338_001, at 027.

[94] WMIPC_500001691.00007.

[95] BLACKSTONE-0000663.

[96] Id.

[97] Id.

rating agency capital ratio targets.[98]  They proposed teaming with another private equity firm or a group of firms in order to accomplish a greater capital raise.[99]

By April 4, 2008 the Blackstone/Oak Hill team had increased its proposal to $8.50 per share but was requesting that it be granted multiple seats on the WMI Board of Directors.[100] WMI deemed this demand "onerous."[101]  In addition, Blackstone and Oak Hill required two to three weeks to conduct remaining due diligence.[102]  These facts likely contributed to making the Blackstone / Oak Hill proposal less attractive to WMI, which viewed due diligence contingencies and governance demands as "key decision variables" in determining which investor it would select.[103]  Furthermore, it is evident from WMI's Board proceedings that expediency and certainty of execution were significant factors in the company's decision process in March 2008.[104]  Ultimately, WMI did not proceed with an equity raise transaction with Blackstone and Oak Hill.

c.    Cerberus

Cerberus initially proposed investing up to $2.0 billion at $9.00 per share in exchange for a 15% pro forma ownership stake in the company.  This was later increased to $9.25 per share. Cerberus also wanted one seat on WMI's Board of Directors.  However, the proposed Cerberus transaction was contingent on a novel feature (called an "Auto Purchase Flow Transaction") by which WMI would issue $7.4 billion in shares to Chrysler Holding LLC (which Cerberus had taken over in 2007) in exchange for ownership of Chrysler Financial.  Cerberus would also

---

[98] *Id.*

[99] *Id.*

[100] WMIPC_50001697.00002.

[101] *Id.*

[102] *Id.*

[103] WMIPC_50001697.00003.

[104] WMI_PC_08788107.00005.

contribute $500 million in equity to WMI. As a result of these transactions, ownership of WMI would be split among then-current WMI shareholders, Cerberus, and Chrysler Holding LLC, and Chrysler Financial would become a subsidiary of WMI.[105]

WMI recognized that the Auto Purchase Flow Transaction feature added complexity and potential regulatory obstacles to the Cerberus proposal.[106] As noted, it was important to WMI in March 2008 to pursue equity or merger transactions that could move quickly and with a high likelihood of completion.[107] WMI did not pursue the proposed equity raise with Cerberus.

### 8. Selection of TPG Capital Raise

The decision to pursue a capital raise transaction with TPG was made in a WMI Board meeting on April 6, 2008. At that meeting, the Board weighed a merger with JPMC against an equity raise from TPG. The Board considered that JPMC's proposed per-share price was significantly lower than TPG's. It also considered that JPMC had indicated that it needed to conduct additional due diligence, which would increase execution risk and time to closing.[108] The WMI Board, in conjunction with its investment bankers, therefore concluded that TPG's offer was a better option for the bank.[109]

On April 8, 2008, WMI announced the capital raise from the TPG-led group of investors in the amount of $7.2 billion.[110] TPG and a consortium of other private equity investors contributed approximately $2 billion, acquiring a 13% pro-forma ownership stake.[111] While the

---

[105] WMI_PC111210525.00005.

[106] WMIPC_500001697.00002.

[107] See WMI_PC_08788107.00005.

[108] WMI_PC_08788107.00001.

[109] WMI_PC_08788107.00001; Killinger Interview.

[110] WMIPC_500001738.00001.

[111] This consortium led by TPG was called Olympic Capital Partners, which included TPG (contribution of ~$1.35B); Axon - TPG's Hedge Fund (~$250M); Blum Capital Partners (~$250M); and Kenyon Capital (~$100M).

market price for WMI at the time was approximately $11 per share, TPG paid $8.75 per share.[112]

The remaining $5 billion came from public investors that Goldman Sachs and Lehman Brothers sought out, mostly mutual funds or similar institutional investors.[113] One TPG partner, David Bonderman, received a Board seat, and TPG asked that Larry Kellner, then-CEO of Continental Airlines, become a Board observer.[114] TPG also acquired warrant coverage permitting it to acquire up to 57.1 million additional shares at a strike price of slightly over $10 per share.[115]

The TPG-led capital infusion provided a "price reset" feature to some of the investors. This feature provided that, in certain circumstances, if WMI engaged in a subsequent capital raising transaction, or if the ownership of WMI changed significantly and if subsequent investors or purchasers paid a lower per-share price than prior investors, WMI would compensate those prior investors in the form of proportionate additional shares of WMI's common stock.[116] For instance, if a later investor or purchaser paid half as much per share as TPG did in March, TPG would receive sufficient shares to double its original share stake. This was a fairly common investment structure and was meant to protect TPG for taking the early risk.[117] There was a high degree of uncertainty and TPG wanted to make sure future capital cost the same as its investment.[118]

C.    **Summary 2008**

---

[112] Interview of Nick Stone, October 19, 2010 ("Stone Interview").

[113] *Id.*

[114] TPG00002318.

[115] *Id.*

[116] Stone Interview. In September 2008, WMI secured a waiver from TPG of this price reset provision as it attempted to find solutions to its worsening liquidity position. WMI_PC_08788132.00001.

[117] Stone Interview.

[118] Stone Interview.

Following the receipt of the new capital, WMI's immediate interest in raising additional capital or seeking a buyer waned. While OTS examiners continued to monitor the bank's liquidity, they discontinued sending liquidity reports to OTS headquarters staff.[119] However, concerns about the stability and value of WMI's loan portfolio (and, consequently, the adequacy of its capitalization) never truly abated. For instance, on May 5, 2008, the FDIC revised its capital analysis of WMI to estimate that the bank needed an additional $5 billion to $7 billion in capital.[120] Then, on May 29, 2008, FDIC examiners informed OTS examiners that they would classify all of WMB's subprime loans as "substandard" regardless of their risk or repayment status, and that, consequently, the FDIC would downgrade the bank's Asset Quality rating (part of the bank's CAMELS rating) from 3 to 4.[121]

Initially, WMI retained most of the $7 billion in capital it received from the TPG-led consortium in order to ensure a good liquidity position at the holding company level.[122] By May 22, however, WMI had contributed $3 billion of the capital raised in March 2008 to WMB to add to the bank's capital.[123] By shortly after the end of the second quarter of 2008, WMI reported that $5 billion of the TPG money had been added to WMB's Tier 1 regulatory capital.[124]

On July 11, 2008, IndyMac Bank failed and was placed into receivership. This event was followed by a run on deposits at WMB. Beginning on July 12 and continuing until July 31, WMB experienced net negative deposit outflows of $9.4 billion.[125]

---

[119] Dochow_Darrel-00001333_001, at 028.

[120] Id.

[121] Id.

[122] Killinger Interview.

[123] WMI, Proxy Statement (Schedule 14A) at 25 (May 22, 2008).

[124] WMI, Quarterly Report (Form 10-Q) at 77 (June 30, 2008).

[125] Kirsten Grind, *The Washington Mutual Decision*, Puget Sound Bus. J., Dec. 7, 2009, http://www.bizjournals.com/seattle/stories/2009/12/07/story1.html

On July 15, 2008, in the midst of this deposit run, representatives of OTS and FDIC addressed the Board of Directors of WMI to present the results of an examination that had concluded on June 30, 2008.[126] They generally expressed a dim view of WMI's condition. They noted that WMI asset quality and earnings were unsatisfactory and that its liquidity was "stressed" but marginally adequate.[127] They found bank capital to be satisfactory, although they decreased the bank's capital rating.[128] OTS also decreased the bank's management rating in light of the other weaknesses identified.[129] FDIC stated that the loan losses would exceed estimates, which would increase the need for capital.[130] Darryl Dochow, Western Regional OTS Director, made clear that OTS enforcement action was imminent and that regulatory scrutiny of WMB would continue.[131] Mr. Dochow also stated that WMB's composit rating was at risk.[132]

OTS and the FDIC's negative view of WMI's financial condition as of July 15 was based on factors that did not include the worsening situation arising from the $3.3 billion negative outflow of deposits between July 12 and July 15.[133] On July 31, 2008, WMB began experiencing a net positive deposit flow for the first time in over two weeks.[134] However, the confidence of WMI's regulators had been significantly shaken by the mid-July deposit run and

---

[126] WMI_PC 08788123.00001; WMI_PC 08788123.00003.

[127] WMI_PC 08788123.00001; WMI_PC 08788123.00004.

[128] WMI_PC 08788123.00001; WMI_PC 08788123.00004.

[129] WMI_PC 08788123.00001; WMI_PC 08788123.00004.

[130] WMI_PC 08788123.00001; WMI_PC 08788123.00005.

[131] WMI_PC 08788123.00001; WMI_PC 08788123.00005.

[132] WMI_PC 08788123.00001; WMI_PC 08788123.00005.

[133] WMIPC_50001990.00007.

[134] *Id.*

the overall conditions in the market. In late July 2008, the Federal Reserve Board ("FRB") sent examiners to monitor WMB liquidity and credit/collateral.[135]

Also in July both the FDIC and Treasury Secretary Henry Paulson made clear to WMI that any comfort derived from the April capital raise had evaporated. On July 21, 2008, Mr. Killinger discussed with Secretary Paulson whether WMI should be placed on the SEC's "Do Not Short" list, placing a temporary moratorium on traders short selling WMI stock.[136] Mr. Killinger believed it should; Secretary Paulson apparently disagreed.[137] During this conversation, Secretary Paulson reportedly informed Mr. Killinger that WMI should have sold the bank to JPMC in March 2008 when it had the opportunity to do so. Days later, FDIC Chairman Sheila Bair expressed surprise to Mr. Killinger that Secretary Paulson had made this comment. Nevertheless, after a meeting between representatives of OTS, FDIC, and WMI, at which OTS apparently expressed satisfaction with WMI's financial condition, a senior FDIC official made an unsolicited comment that WMI should have sold the company to JPMC in March.

By August, WMI's liquidity position had become even more stressed. In early August, the FRB offered a short-term lending vehicle for banks called an 84-day Term Auction Facility ("TAF"). Typically, the FRB offers 24-day TAF loans, but expanded the maturity date of the early August offering in an effort to cope with the ongoing financial crisis.[138] The FRB excluded WMI from participating in this 84-day TAF offering.[139] In addition, the WMI Board was aware

---

[135] Dochow_Darrel-00001338-001, at 032.

[136] Killinger Interview.

[137] Killinger Interview. WMI was ultimately not placed on the list.

[138] *See* Press Release, Federal Reserve, Federal Reserve Actions (July 30, 2008), *available at* http://www.federalreserve.gov/newsevents/press/monetary/20080730a.htm.

[139] WMI_PC_08788124.00001.

45

of the ongoing possibility of a reduction in its composite rating and the adverse consequences of such an event on its ability to borrow FHLB money.[140] Against this backdrop, WMI explored possibilities to strengthen WMB's liquidity profile.[141]

By August 11, 2008, WMI had begun once again to consider the possibility of a merger transaction.[142] At the time, WMI viewed JPMC, Wells Fargo, TD Bank, US Bancorp, Barclays, Santander, and Sumitomo Mitsui Banking Corporation as potential acquirers.[143] Goldman Sachs, as WMI's financial advisor, recognized and pointed out to WMI that the "primary driver for sizing the capital requirement of the acquiring institutions" would be the "mark on portfolio at closing."[144] As of August 2008, WMI estimated the mark-to-market discount under a purchase accounting scenario to be $20.9 billion, whereas Moody's had calculated the figure at $24.8 billion.[145]

On August 22, 2008, in an effort to help liquidity, WMB began offering 13-month certificates of deposit ("CDs") bearing 5% interest, an unusually high return at the time. During the week-long offer, WMB experienced a net positive inflow of deposits of roughly $2 billion, of which about $1.3 billion was on the final day of the offer.[146] At the same time, however, potential capital investors became aware that WMI was experiencing weakness in its deposit

---

[140] *Id.*

[141] *Id.*

[142] *See* WAMUBKEXAM-GS-00020.

[143] WAMUBKEXAM-GS-00025.

[144] WAMUBKEXAM-GS-00026.

[145] WAMUBKEXAM-GS-00029.

[146] WMIPC_50001990.00007.

base.[147] While the approach may have been successful in the short term in bringing deposits into the bank, WMI itself was earning less than 5% on these deposits.[148]

A second offering of 5% CDs, which began September 5, 2008, did little to alleviate liquidity pressures -- for the next three days, the bank had net positive deposits totaling altogether approximately $480 million. Thereafter, however, WMB experienced the run on deposits that would end only with its seizure on September 25, 2008.[149]

## D. September 2008

### 1. New Leadership for Washington Mutual

Early September brought significant changes at WMI. On September 7, the WMI Board of Directors replaced Kerry Killinger as CEO with Alan Fishman.[150] Mr. Fishman had had a lengthy career in banking. For twenty years, he worked at Chemical Bank, where he had held a number of senior executive positions, including Chief Financial Officer, Head of International Division, Head of Capital Markets, and Head of Retail Division. In 1988, Mr. Fishman joined AIG as a Senior Vice President supervising financial services. In 2001, he became President and CEO of Independence Community Bank, a community bank in New York. In 2006, Independence Community Bank was sold to Sovereign Bank in a deal that was funded by Banco Santander acquiring a 26% equity stake in Sovereign. He remained as CEO of Sovereign for six months until 2007, when he left to pursue opportunities in private equity and financial services.[151]

---

[147] *E.g.*, Interview of Chinh Chu, October 4, 2010 ("Chu Interview").

[148] Interview of Alan Fishman, September 1, 2010 ("Fishman Interview").

[149] WMIPC_50001990.00007.

[150] WMI_PC_08788129.00001.

[151] Fishman Interview. Mr. Fishman was first approached in mid-August by Lee Meyerson, a partner at Simpson Thacher Bartlett in New York. Mr. Meyerson had been retained to assist WMI in a "quiet" search for a replacement

Following a process involving interviews with WMI directors and meetings with OTS regulators, Mr. Fishman was offered the job. Mr. Fishman was keenly aware from the beginning of his employment that WMB faced significant, diverse problems and that the FDIC viewed the bank more negatively than did OTS. However, he accepted the position with the clear understanding that he was hired to steer the bank successfully through the difficult period it was enduring so it could emerge as a viable institution. He was not hired to orchestrate or facilitate a sale of the bank.[152]

## 2. Continued Regulatory Pressure

On September 7, 2008, WMI entered into a memorandum of understanding ("MOU") with OTS arising from the examination that concluded on June 30, 2008.[153] The MOU was an enforcement measure that OTS took in an effort to address WMI's troubled financial condition.

During his first week at WMI, Mr. Fishman primarily focused on placating regulators and ratings agencies. He met with FDIC Chairman Bair within days of accepting the job. Chairman Bair explained to Mr. Fishman that there was an unresolved issue between OTS and FDIC with regard to WMB composite CAMELS rating. FDIC wanted WMB composite rating to be lowered from 3 to 4. Mr. Fishman understood that this change would be significant: it would result in WMB being placed on a list of "troubled banks." Although WMB's name would not appear, the list would reflect its assets, which would permit the market to identify it. Chairman Bair explained that, to avoid being listed as a troubled bank, WMI should find a buyer.[154]

---

for Mr. Killinger. The WMI board was concerned that using a headhunter would compromise confidentiality. Mr. Meyerson put Mr. Fishman in touch with Steve Frank, WMI's Chairman of the Board.

[152] Fishman Interview.

[153] OTS-WMI-BKRCY-00000137.

[154] Fishman Interview.

Mr. Fishman still did not view this as an ultimatum, but rather as a leverage point being used by Chairman Bair. He believed that he could convince the FDIC that a sale of the bank was not necessary.

### 3.    The Liquidity Crisis Hits

While Mr. Fishman believed that he could address, among other issues, the structural problems caused by WMI's loan asset impairment and avoid selling the bank, circumstances forced a significant change in his priorities and those of WMI. On Fishman's first day at WMI, the U.S. government was in the process of placing Fannie Mae and Freddie Mac into conservatorship. Over the following two days, stock markets continued to decline amid anxiety about those conservatorships and the financial problems of Lehman Brothers.

WMI's stock was not insulated from this tumult. On September 9, 2008, WMI's shares fell 20% to $3.30.[155] The following day, they fell an additional 30% to $2.32.[156] At this time, WMB began experiencing net negative deposit flows that would endure until September 26, 2008.[157] Those net negative deposit flows significantly worsened beginning September 15, 2008, which coincided with a rapid series of extremely high-profile failures or near-failures of financial services firms.

On September 14, the U.S. government refused to provide a bailout or other government assistance to Lehman Brothers as it teetered on the edge of bankruptcy, and the firm declared bankruptcy the following day. Also on September 14, Bank of America, without government assistance, purchased a struggling Merrill Lynch. On September 16, a liquidity crisis that had been building at AIG for some time became acute. That day, the Federal government "bailed

---

[155] WMIPC_50001990.00007.

[156] Id.

[157] Id.

out" AIG by loaning it up to $85 billion in exchange for a majority equity stake in the company. Also over the course of that week, the share price of Morgan Stanley plunged 57%.[158] The events of the week of September 14 significantly undermined public confidence in financial institutions and spurred significant instability in financial markets. In addition, heavy exposure to subprime mortgages was viewed as a significant contributing factor to the problems faced by these institutions. WMB's exposure to subprime mortgages was well known in the industry, and as noted previously, concerns about the value of its loan portfolio existed well before the efforts to raise capital or find a buyer in March.[159]

WMB also suffered significant demands on its liquidity during this period. In all, between September 15 and September 26, 2008, the outflow of deposits from WMB totaled $16.7 billion.[160] As a result, liquidity problems overwhelmed WMI management's efforts to effect longer-term structural change with regard to WMI's assets, in particular the loan portfolio.[161] WMI management believed the liquidity problems were manageable as long as they had continuing access to FHLB loans and the deposit run ceased.[162] But as developments in late September unfolded, the deposit runs did not cease, and WMI's continuing ability to borrow from FHLB was severely limited.

By Mr. Fishman's second week on the job, WMI's liquidity problems had become acute, and concern mounted over a continuing ability to placate regulators. On or about September 16,

---

[158] Press Release, Morgan Stanley, Mitsubishi UFJ Fin. Grp. To Invest $9 Billion in Morgan Stanley (Sept. 29, 2008), http://www.morganstanley.com/about/press/articles/6962.html; Suzy Jagger, *Morgan Stanley perplexes Wall St. as bank loses $20bn*, The Times, Sept. 19, 2008, http://business.timesonline.co.uk/tol/business/industry_sectors/banking_and_finance/article4783881.ece.

[159] *See, e.g.*, James R. Hagerty and Ann Carrns, *WaMu Leads in Risky Type of Lending*, Wall St. J., Apr. 17, 2007, http://online.wsj.com/article/SB117677712388972178.html#printMode.

[160] Press Release, OTS, 08-046- Wash. Mut. Acquired by JPMorgan Chase (Sept. 25, 2008), http://www.ots.treas.gov/?p=PressReleases&ContentRecord_id=9c306c81-1e0b-8562-eb0c-fed5429a3a56.

[161] Fishman Interview.

[162] *Id.*

2008, Mr. Fishman engaged Goldman Sachs and Morgan Stanley to accelerate their efforts as investment advisors to find a buyer for WMI.[163]  By the following day, September 17, the FDIC had told Mr. Fishman that WMI needed to enter into a transaction by that weekend.[164]

### 4.    Rush to Sell the Bank

The September 2008 Management Presentation, like the March management presentation, provided a high-level overview of WMB's business and financial condition.[165] Goldman and WMI had identified several banks as likely acquirers of WMI: JPMC, Santander, Wells Fargo, TD Bank, and Citigroup.  Only JPMC and Santander indicated a significant level of interest in acquiring WMI.[166]  The data room that had been established for the March due diligence process was reopened.

Mr. Fishman was actively involved in communicating with potential purchasers in the days following the decision to sell WMI.  He spoke with Messrs. Dimon and Scharf from JPMC. JPMC accessed the data room and conducted additional due diligence.  At one point during this process, WMI management got the impression that JPMC was not looking in good faith at a transaction and terminated JPMC's access to the data room.[167]  Mr. Fishman recalls speaking with Mr. Scharf concerning JPMC's intentions and being satisfied with Mr. Scharf's responses,

---

[163] *Id.*  The Examiner was provided an engagement letter dated September 24, 2008 that is in substantially the same form as the March 2008 Goldman engagement letter.  WAMUBKEXAM-GS-000011.  That letter, which shows only a signature of Goldman Sachs and notes on the first page "GS comments of September 24, 2008," provided for payment to Goldman Sachs of a transaction fee of $3 million.  *Id.*  Neither the Debtors nor Goldman Sachs provided the Examiner with a fully executed copy of the September 24 letter.  Although the date of the engagement letter was the same day that FDIC selected JPMC as the winning bidder to buy WaMu out of receivership, this timing was coincidental.  Williams Interview.  WMI was not aware of the receivership or sale until the following day, September 25.

[164] WMI_PC_08788132.00001.

[165] WAMUBKEXAM-GS-000280.  Goldman Sachs assisted with the preparation of the Management Presentation. Interview of Huntley Garriot, October 12, 2010 ("Garriot Interview").

[166] Fishman Interview.

[167] Fishman Interview; *see* JPM_EX00000077-78.

after which JPMC's data room access was restored. JPMC never submitted a proposal or bid to WMI in September 2008.[168]

Mr. Fishman also was in communication during this time with Banco Santander. Mr. Fishman had a relationship with several senior-level Santander personnel dating from his time as CEO of Sovereign Bank, in which Santander had acquired a significant ownership interest. Santander conducted some due diligence on WMI in September 2008. On or about September 20, Alberto Sanchez, Santander's Head of Strategy in the United States, called Mr. Fishman to indicate that he was taking a proposal for acquiring WMI to the Santander Board of Directors. When Mr. Fishman next spoke to Mr. Sanchez some days later, Mr. Sanchez informed Mr. Fishman that the Santander Board had rejected the acquisition proposal.[169]

TD Bank and its corporate parent, Toronto-Dominion Bank (collectively, "TD Bank"), conducted initial due diligence at the invitation of Goldman Sachs. TD Bank was asked to consider a possible strategic investment in WMI but had a very low level of interest in doing so.[170] TD Bank was moderately interested in buying some or all of WMB's east coast branches and conducted some analysis of such a transaction.[171] But by the time the sale to JPMC was announced, TD Bank's interest in a branch purchase had waned in view of practical impediments to execution and the extent of additional due diligence that would be required before pursuing such a transaction.[172] TD Bank gave only passing consideration to a whole-bank transaction.

Neither Wells Fargo nor Citigroup showed significant interest in acquiring WMI. Mr. Fishman received some calls from private equity firms, but recalls that there was no private

---

[168] Fishman Interview.

[169] Id.

[170] Interview of Linda Dougerty, October 19, 2010 ("Dougerty Interview").

[171] Id.

[172] Id.

equity interest in a whole-bank acquisition transaction.[173] A complete discussion concerning other parties' lack of interest in a private or receivership acquisition of WMB is included in the Analysis of Potential Business Tort Claims Against JPMC subsection of this Report.

## 5. Worsening Liquidity, Intense Regulatory Scrutiny

During mid-September, WMI was in frequent contact with OTS and FDIC concerning both the bank's financial condition and its efforts to find a buyer. OTS noted upticks in WMB's branch activity immediately following the news of the Lehman Brothers's bankruptcy and AIG bailout on September 15.[174] By September 18, OTS recognized that WMB was experiencing a full-blown run on its deposits that stood to exceed IndyMac's by 70 percent.[175] That same day, OTS downgraded WMB's composite CAMELS rating from 3 to 4.[176] WMB reported to OTS that its available liquidity was $33.3 billion.[177]

Meanwhile, WMI management kept OTS and FDIC apprised of its merger status. OTS was aware by September 18 that potential purchasers, including JPMC, were concluding due diligence.[178] OTS was told that a sale could be effected by Sunday, September 21.[179]

On September 19, WMI projected that its available liquidity was $29.8 billion, down $3.5 billion from the day before.[180] The next day, September 20, Peter Freilinger provided an update to OTS representatives regarding WMB's "near term liquidity sources." After summarizing those sources of liquidity, which included cash, government money market funds, fed funds sold,

---

[173] Fishman Interview.

[174] Dochow_Darrel-00001338_001, at 035.

[175] Dochow_Darrel-00001338_001, at 036.

[176] Id.

[177] Id.

[178] Id.

[179] Id.

[180] Id.

and borrowing capacity at FHLB-Seattle, FHLB-SF, and the FRB-SF's discount window, Mr. Freilinger observed, "If outflows reduce, we'll be good through QE. If they don't or if they return to last Weds/Thurs levels, we'd probably tip on Monday, September 29."[181]

Thereafter, WMI's liquidity situation worsened, and OTS was kept apprised of the situation. On Monday, September 22, WMI estimated its liquidity to be $28.0 billion, down $1.8 billion from the previous Friday.[182] However, WMI's liquidity calculation was based on a valuation of collateral for FRB-SF borrowing that exceeded the FRB-SF's own estimate by $2 billion.[183] The following day, September 23, WMI's liquidity projection declined sharply to $23.6 billion.[184] The FRB-SF estimated that it would reach zero by October 9, 2008, assuming a deposit run of $2 billion per day.[185] That same day -- although WMI did not know it -- the FDIC began soliciting bids to purchase WMB out of receivership.

### 6.    A Last-Ditch "Go-It-Alone" Plan

At the beginning of the third week of Mr. Fishman's tenure, and faced with no viable merger options, WMI and Goldman Sachs devised a "go-it-alone" plan to recapitalize WMI and increase liquidity. On September 24, 2008, WMI presented the plan to OTS. Participating in the presentation were representatives of Goldman Sachs.[186] The plan involved four alternative approaches by which WMI could increase capital and liquidity and reduce troubled assets.[187]

---

[181] WMIPC_500002465.0006.

[182] Dochow_Darrel-00001338_001, at 037.

[183] Id.

[184] Id.

[185] Id.

[186] Garriott Interview. A representative from Morgan Stanley was also on the call. Interview of John Esposito, October 5, 2010 ("Espisito Interview").

[187] WAMUBKEXAM-GS-000255, at WAMUBKEXAM-GS-000264.

The first alternative involved generating capital and liquidity through internal means and, if successful, could have provided WMI and WMB with between $13 billion and $18 billion additional liquidity and up to $14 billion in additional capital. It involved four key elements. First, WMI would downstream $4 billion in cash from WMI to WMB, which would increase the bank's capital by increasing its common equity by a like amount.[188] Second, a Conditional Exchange event would be declared, converting the TRUPS into preferred shares of WMI. This, WMI believed, would enhance the bank's liquidity by providing an additional $6 billion in available collateral for FHLB borrowing. Third, the company would pursue a debt-for-equity swap that would both improve liquidity by $1.5 billion by eliminating some short-term maturities and increase capital by increasing equity by over $10 billion. Fourth, WMI would seek to sell higher-risk loans from its portfolio, from which it hoped to generate between $5 billion and $10 billion in liquidity.[189] Only the first and second elements of this plan were expected to occur immediately; the other elements would each take between thirty to sixty days to execute, assuming they were successful.[190]

A second "go-it-alone" alternative involved pursuing all of the elements of the first alternative, as well as pursuing a strategic transaction with TD Bank.[191] WMI would sell its East Coast banking branches and deposits to TD Bank for approximately $30 billion, which would raise cash but also reduce deposit assets and borrowing capacity.[192] However, it would

---

[188] This $4 billion is referred to in this Report as the Disputed Accounts.

[189] WAMUBKEXAM-GS-000255, at WAMUBKEXAM-GS-000266.

[190] WAMUBKEXAM-GS-000255, at WAMUBKEXAM-GS-000269.

[191] WAMUBKEXAM-GS-000255, at WAMUBKEXAM-GS-000271-72.

[192] *Id.*

contribute bank capital to WMB.[193]  In addition, TD Bank would buy $500 million of preferred stock in WMB and provide WMI with a $5 billion line of credit for eighteen months.[194]

A third "go-it-alone" alternative also involved pursuing the elements of the first alternative, but added government assistance in the form of a $20 billion secured loan to WMB in exchange for warrants for a 79.9% pro forma ownership of WMI at a nominal price.[195]

A fourth "go-it-alone" alternative involved WMI selling a significant portion of its high-risk loan assets to a yet-to-be-created treasury facility called "TARF" -- likely a reference to the Trouble Assets Relief Program portion of the not-then-enacted Emergency Economic Stabilization Act.

In a letter dated September 24, 2008, Mr. Fishman and Mr. Frank urged OTS and FDIC officials to allow WMI time to implement its recapitalization plans.[196]  The following day, September 25, 2008, WMI forecast that its liquidity was $13.1 billion, down almost $10 billion from two days before.[197]

### 7.    Notice of Seizure

Mr. Fishman never received a response from regulators concerning the proposed recapitalization plan.[198]  This led him to assume that the bank would be seized on Friday, which is typically when seizures occur.  On Thursday, September 25, 2008, while returning by plane from meetings in New York, Mr. Fishman was informed that OTS had arrived at WMI's offices in Seattle, was seizing the bank, and that JPMC would be opening the banks the following

---

[193] *Id.*

[194] WAMUBKEXAM-GS-000255, at WAMUBKEXAM-GS-000272.

[195] WAMUBKEXAM-GS-000255, at WAMUBKEXAM-GS-000275.

[196] Letter from Alan Fishman & Stephen Frank to Donald Kohn, Sheila Bair & John Reich (Sept. 24, 2008), http://s.wsj.net/public/resources/documents/WSJ-WAMU-Responsive-e-mails092810.pdf.

[197] Dochow_Darrel-00001338_001, at 037.

[198] Fishman Interview.

morning. The Examiner is unaware of any WMI employee having received advance notice of the seizure on September 25.

## VIII. SOLVENCY

### A. Introduction and Summary

The Examiner investigated whether WMI was insolvent at any time prior to its seizure by OTS on September 25, 2008. As part of this analysis, the Examiner considered whether WMB, the primary asset of WMI, had sufficient liquidity to continue in business at the time it was seized. In conducting this investigation, the Examiner obtained and reviewed solvency analyses prepared by various parties before and after the seizure of WMB, reviewed regulatory reports, conducted numerous interviews, and engaged in discussions with various committees.

In April 2010, the Inspectors General of the Treasury Department and the FDIC ("OIG") presented jointly their Evaluation of Federal Regulatory Oversight of Washington Mutual Bank. Among other objectives, the evaluation sought to "identify the causes of WaMu's failure."[199] The report finds that the bank's failure resulted from "management's pursuit of a high-risk lending strategy coupled with liberal underwriting standards and inadequate risk controls."[200] The report concludes, however, that the proximate cause of OTS's appointment of the FDIC as receiver was liquidity problems.[201] "In September 2008, depositors withdrew significant funds [from WMB] after high-profile failures of other financial institutions and rumors of WaMu's problems. WaMu was unable to raise capital to keep pace with depositor withdrawals, prompting OTS to close the institution on September 25, 2008."[202] From the regulators'

---

[199] Offices of Inspector General of the Department of the Treasury and the FDIC, Evaluation of Federal Regulatory Oversight of Washington Mutual Bank, Rep. No. EVAL-10-002, at 2 (Apr. 2010) ("OIG Report").

[200] OIG Report at 8.

[201] OIG Report at 3.

[202] *Id.*

perspectives, WMB was well-capitalized on the day of its failure, as measured by the value of assets exceeding the value of liabilities. In his written statement before the Senate's Permanent Subcommittee on Investigations, the Treasury Inspector General, Eric Thorson, explained how such a "well-capitalized" institution could fail:[203] "In the case of WaMu, OTS did not take, and was not required to take PCA [Prompt Corrective Action][204] action because WaMu remained well-capitalized through September 25, 2008, when it was placed in receivership. However, in the OIG's view, it was only a matter of time before losses associated with WaMu's high-risk lending practices would have depleted its capital below regulatory requirements."[205]

Based on the Investigation, the Examiner concludes that it is highly likely a court would conclude that WMI was solvent into the summer of 2008. It is a closer question whether a court would conclude that WMI was solvent in September 2008. By September 25, 2008, WMB's liquidity was questionable and needed to be evaluated on a day-to-day basis.

The Examiner also concludes that OTS made a reasonable and considered determination that WMB was both unlikely to meet its depositors' demands and was operating in an unsafe and unsound condition. In addition, even assuming that OTS improvidently closed WMB, there are no viable claims against OTS that could result in significant recoveries for the benefit of the Estates. The Examiner also concludes that definitively determining WMI's solvency at any relevant time would not alter the Examiner's views with respect to the Settlement.

## B.    Scope of the Examiner's Investigation

---

[203] Statement of the Honorable Eric M. Thorson, Inspector General, Department of the Treasury, before the Senate Homeland Security and Governmental Affairs Committee Permanent Subcommittee on Investigations at 15 (April 16, 2010) ("Thorson Statement"), *available at* http://www.ustreas.gov/inspector-general/testimony/Inspector%20General%20Thorson%27s%20WaMu%20Written%20Testimony%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.pdf.

[204] Prompt Corrective Action mandated by the FDIC Improvement Act of 1991 requires regulators to take progressive actions against regulated depositories as their capital ratios drop below certain levels.

[205] Thorson Statement at 15.

As part of the Examiner's solvency review, the Examiner reviewed numerous documents and analyses from 2008 of WMI and its financial advisors, JPMC, various third parties, and OTS. The Examiner also reviewed several solvency analyses of WMI/WMB that were prepared both pre- and post- seizure of WMB and submissions from various interested parties, including the Equity Committee. Finally, the Examiner posed questions regarding solvency and liquidity to many of the witnesses that were interviewed.[206] Virtually all who examined solvency commented that the issue is highly complex -- at least in September 2008 -- and that more information, such as loan-level data, would be required to conduct a complete and accurate solvency analysis. The Examiner's review of solvency did not include such a loan-level data analysis.

## C.     Solvency of WMI and WMB in 2008

### 1.     Introduction

The Examiner investigated whether WMI and WMB[207] were insolvent at various points in time during 2008 prior to WMB's seizure by OTS. The question of solvency is relevant to the Debtors' claims to avoid, as constructive fraudulent conveyances, the capital contributions of $3 billion, $2 billion, and $500 million that WMI made to WMB on April 18, July 21, and September 10, 2008, respectively.[208] Solvency is also relevant to any attempt by the Debtors to contest the downstreaming of the assets of certain Trust Preferred Securities ("TRUPS") to

---

[206] The Examiner asked the following people questions about solvency and/or liquidity in their interviews: Robert Williams; Peter Freilinger; William Kosturos; Doreen Logan; Mike Cavanagh; Cecilia de Leon; Patricia Remch; Darrel Dochow; Timothy Ward; Scott Polakoff; James Wigand; and Chris Spoth. The Examiner also discussed liquidity and solvency with several professionals from Peter J. Solomon, FTI Consulting, and Alvarez & Marsal.

[207] Because the principal asset of WMI was WMB, any solvency analysis of WMI requires an analysis of WMB's solvency.

[208] If WMI and WMB were insolvent, then the dividends paid by WMB to WMI could also be called into question.

WMB on September 25, 2008 as a fraudulent conveyance.[209] The question of solvency also affects potential business tort claims against JPMC because if WMI was insolvent, it is difficult or impossible to establish damages caused by JPMC's alleged wrongdoing. Because capital contributions were made in April, July, and September, the Examiner investigated WMI's solvency during each of these months.

## 2. Tests for Determining Solvency

Courts employ various methodologies to guide their solvency analysis. The valuation approaches most relevant to WMI/WMB are:

Market capitalization test. This test views a positive market capitalization -- stock price multiplied by shares outstanding -- as strong evidence of solvency. The U.S. Court of Appeals for the Third Circuit endorses this test.[210]

Adjusted fair value balance sheet method. Both assets and liabilities (on-balance sheet and off) are adjusted to reflect or approximate fair values in order to determine whether the fair value of assets exceeds the fair value of liabilities, in which case the entity is solvent.

Thin capitalization or liquidity test. An entity's ability to meet obligations as they come due is analyzed. OTS and FDIC have consistently maintained that WMB was seized because of liquidity concerns and to protect the FDIC insurance fund.[211]

---

[209] These claims are asserted in pending litigation in the United States Bankruptcy Court for the District of Delaware and the United States District Court for the District of Columbia. Debtors argued that the capital contributions and TRUPS downstreaming can be avoided because they were made at times when WMI was insolvent.

[210] See VFB LLC v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir. 2007) (stating that the market's valuation of enterprise as solvent is "strong evidence" of solvency, and "[a]bsent some reason to distrust it, the market price is a 'more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses'" (quoting In re Prince, 85 F.3d 314, 320 (7th Cir. 1996))).

[211] Among other methods for determining solvency are:

Discounted cash flow method. Present value projected cash flows from the entity's assets are calculated and compared against present value of cash flows of all obligations. A positive net present value (present value of assets minus present value of liabilities) indicates solvency.

Market multiples. Earnings multiples obtained from contemporaneous transactions in similar industries are used to determine the value of the debtor at certain pre-bankruptcy dates.

Actual sales price or market data. Courts also often defer to actual sales of the debtor arising out of the bankruptcy court's sale process or in the period immediately prior to the bankruptcy filing. In the case of a public stock company, this may also involve a review of market capitalization or enterprise value which combines stock market capitalization with the trading value of bond obligations.

### 3. Solvency Into Summer 2008

Applying the market capitalization test, the Examiner concludes that based on the investment by TPG and proposal by JPMC in April 2008, WMI was solvent at that time. At least two highly sophisticated market participants viewed WMI as a solvent entity in April 2008. Just two weeks prior to the $3 billion April 2008 capital contribution, WMI received a $7.2 billion equity investment from outside investors led by TPG, which equated to $8.75 per share. Moreover, just prior to this $7.2 billion capital infusion, JPMC had submitted a proposal, subject to further due diligence, for a potential purchase of WMI. Both institutions had conducted due diligence reviews of WMI. That a sophisticated financial institution and investor believed there was substantial value to WMI's equity is a "powerful indication" of value because, "[w]ith their finances and time at stake, and with access to substantial professional expertise," both TPG and JPMC were willing to put approximately $7 billion of their funds into WMI.[212]

WMI's stock price also strongly supports a finding of solvency on the dates of the capital contributions in April and July 2008. As of April 18 and July 21, 2008, the stock market indicated that WMI had equity of $10.5 billion and $9.3 billion, respectively.[213] Consistent with Third Circuit authority, WMI was therefore solvent.[214]

---

[212]*In re Longview Aluminum, L.L.C.*, No. 04-00279, 2005 WL 3021173, at *7 (Bankr. N.D. Ill. July 14, 2005); *see also Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2007) ("When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight.").

[213] These market capitalization figures are calculated as follows: $11.89 stock price as of April 18, 2008, when there were 882.610 million common shares outstanding; $5.48 stock price as of July 21, 2008, when there were 1.705 billion common shares outstanding. Some additional factors relate to solvency considerations in July 2008 as compared with April 2008. By July, several months had passed since the TPG capital infusion. The housing market had continued to deteriorate, and WMI's stock price had declined.

[214] *See Campbell Soup*, 482 F.3d at 633; *see also In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 548 (D. Del. 2005) (giving "deference" to "prevailing marketplace values" in determining whether the debtor was insolvent or "operating in the vicinity of insolvency").

### 4. Solvency After Summer of 2008

During the summer of 2008, WMI's market capitalization ranged from a high of over $10 billion in July to under $2 billion in the days preceding its seizure on September 25, 2008. As of September 10, 2008, WMI's stock price established a market capitalization of $3.9 billion, which is an indication that it was solvent on the date of the last capital contribution.[215] On September 19 -- less than a week before OTS closed WMB -- WMI traded at a market capitalization exceeding $7.2 billion.[216]

Applying a balance sheet test, the Examiner has not seen evidence clearly establishing that the value of WMI's assets -- principally WMB's mortgage portfolio -- was less than its liabilities as of September 10, 2008.[217] While WMI anticipated between $12 and $19 billion in losses over the life of its mortgage loan portfolio, those losses would have been realized over time, and the assets on WMB's balance sheet had not been written down to a significant extent as of September 10, 2008.

Finally, WMB's primary regulator, OTS, concluded two weeks after the September 10, 2008 capital contribution that WMB was "well-capitalized" by regulatory standards. OTS had unfettered access to the books and records of WMB and was in a better position than any outside party to assess the capital position of WMB. While regulatory capital ratios may differ in some respects from capital analyses used in traditional solvency analyses, the regulators' view that a bank is "well-capitalized" is relevant. Indeed, OTS made clear in its discussions with the Examiner that it viewed WMB as solvent and did not close the bank because of insufficient

---

[215] This figure is based on a $2.32 stock price as of September 10, 2008, when there were 1.705 billion common shares outstanding.

[216] As of September 19, 2008, the stock closed at $4.25 per share and there were approximately 1.7 billion shares outstanding.

[217] WMI's principal asset was WMB. WMB's principal assets were its mortgage loans. Thus, the value of WMB's mortgage loan assets is highly relevant to the determination of WMI's solvency.

capital.[218]  In sum, all of the foregoing factors suggest that WMI was solvent up to the date of the bank's closure.

Several factors can be cited to support arguments that WMI became insolvent by September 2008.  WMI was burdened with billions of dollars of publicly-traded debt, and had begun to announce losses on quarterly earnings by the fourth quarter 2007.[219]  WMI continued to announce large losses throughout 2008.[220]  The fair market value adjustment made by JPMC in connection with the Receivership sale, resulting in roughly a $30 billion write-down to the WMB loan portfolio, also is some indication that WMI was insolvent.  So long as the loan portfolio was in WMI's hands, the write-down would be taken over time.  One party has indicated, however, that under a retrojection analysis, if the JPMC adjustment were carried backwards and applied to the book value of WMB's loan portfolio as of the time of the July and September 2008 capital contributions, an argument could be made that WMI was on the brink of insolvency.

Moreover, at least one ratings agency questioned WMI's solvency just before WMB was seized.  On September 11, 2008, Moody's Investors Service ("Moody's") downgraded various WMI and WMB ratings and placed the bank and the holding company on negative outlook.[221]  Moody's stated: "The company's limited financial flexibility makes it more difficult for it to replenish capital and preserve diversified and stable funding sources.  Both issues are critical to restoring the strength of the institution."[222]  On September 22, 2008, just prior to WMB's seizure, Moody's stated: "We believe WaMu's capital is insufficient to absorb its mortgage

---

[218] Interview of Tim Ward, September 10, 2010 ("Ward Interview"); Interview of Scott Polakoff, August 27, 2010 ("Polakoff Interview"). *See also* JPMCD_000004955.00002.

[219] OIG Report at 12.

[220] *Id.*

[221] Ari Levy, *WaMu Sees $4.5 Billion Loan-Loss Provision in Quarter*, Bloomberg, Sept. 11, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=ab7A9dOdzUGY.

[222] *Rating Action: Moody's downgrades WaMu ratings; outlook negative*, Moody's Investors Serv., Sept. 11, 2008, at 1.

loses."[223]  While falling short of an actual finding of insolvency, Moody's analysis may be entitled to some deference because Moody's had access to loan-level data as of March 31, 2008, when it obtained a loan data tape for analysis.

As the Examiner concludes elsewhere in this Report, a finding of solvency or insolvency likely would not ultimately and substantially impact the recoveries on behalf of the Debtors. Therefore the Examiner concludes there is no reason to definitively conclude whether or when WMI became insolvent.

## D.     Liquidity

The Examiner considered the question of whether WMB lacked sufficient liquidity in September 2008 at the time OTS seized the bank.  As explained below, the Examiner concludes that by September 25, 2008 WMB's liquidity was questionable and needed to be evaluated on a day-to-day basis.  In addition, the Examiner concludes that OTS made a reasoned and considered determination that WMB was both unlikely to meet depositors' demands and was operating in an unsafe and unsound condition.  Once OTS seized WMB, which was WMI's primary asset, WMI was clearly insolvent and WMI's bankruptcy was inevitable.

### 1.     Facts Developed in the Examination Regarding WMB's Liquidity Crisis

The Examiner reviewed documents furnished by the OTS, including internal OTS communications and analyses, that provided helpful information regarding WMB's liquidity during September 2008.  The Examiner also interviewed witnesses from OTS, the Federal Home Loan Bank of San Francisco ("FHLB-SF"), and WMI who provided extensive information regarding WMB's liquidity.  These documents and interviews revealed that WMB's liquidity problems had two basic causes.  First, following IndyMac's failure and again following Lehman

---

[223] *Rating Action: Moody's downgrades WaMu financial strength to E*, Moody's Investors Serv., Sept. 22, 2008, at 1.

Brothers's bankruptcy, WMB depositors withdrew billions of dollars in deposits. Second, in the weeks prior to WMB's seizure, virtually all of WMB's sources of liquidity had dried up and only two potential sources remained -- borrowing from the FHLB-SF[224] and discount window at the Federal Reserve Bank in San Francisco ("FRB-SF").[225] By September 23, 2008, the FHLB-SF told the OTS that it could not promise WMB any more advances. By that date, OTS and WMB management also considered further advances from the FRB-SF to be uncertain. With WMB

---

[224] Some documents indicate that WMB had limited borrowing capacity from the FHLB-Seattle in addition to the FHLB-SF in the days before the seizure. Peter Freilinger, Senior Vice President and Assistant Treasurer of WMB, whose responsibility was to monitor liquidity and who dealt with the FHLBs, however, stated that by the week of September 15, 2008, WMB had used up all its capacity at the FHLB-Seattle and could not borrow any further from the FHLB-Seattle. Interview of Peter Freilinger, October 20, 2010 ("Freilinger Interview"). There is no indication that WMB borrowed from the FHLB-Seattle in the final days before seizure, and it appears that the sole source of borrowing in the final days was the FHLB-SF. Freilinger Interview.

[225] Created by Congress, the FHLBs are twelve regional cooperative banks used by United States lending institutions to finance housing and economic development. Council of Federal Home Loan Banks, Federal Home Loan Banks White Paper at 1 (2009). The primary purpose of the FHLBs is the provision of liquidity to their member lending institutions. *Id.* at 2. Member institutions pledge collateral, such as mortgages, government securities, or loans on small business, agriculture, or community development, to qualify for advances from the FHLBs. *Id.* The institutions also purchase stock in the FHLB system proportionate to their borrowing. *Id.* Once the regional FHLB approves a member institution's request for an advance, the FHLB advances the funds to the institution. *Id.*

The Federal Reserve Bank's discount window allows eligible depository institutions to borrow money from the Federal Reserve, usually on a short-term basis, to meet temporary shortages of liquidity. The Federal Reserve Discount Window at 1 (2010). The discount window also helps relieve liquidity strains in the banking system as a whole. *Id.*

The discount window offers primary and secondary credit. Primary credit is available to generally sound depository institutions on a very short-term basis, and may by used for any purpose. *Id.* at 1-2. To qualify for primary credit, an institution must have access to the discount window and be in generally sound financial condition, as determined by its regional Federal Reserve Bank. *Id.* at 4. Institutions that are adequately capitalized and have a CAMELS rating of 1, 2, or 3 are generally eligible for primary credit. *Id.* at 5.

Secondary credit is available to depository institutions that are not eligible for primary credit, also on a short-term basis, at a rate that is above the primary credit rate. *Id.* at 2. Secondary credit from the discount window may be used to meet backup liquidity needs, as long as the use is consistent with a return to a reliance on market sources of funding or the resolution of a troubled institution. *Id.* Institutions assigned a CAMELS rating of 4 or 5 are generally only eligible for secondary credit. *Id.* at 4. Liquidity shortages and undercapitalization can further restrict a depository institution's access to lending through the discount window. *Id.* at 5.

Loans by the FHLBs or the Federal Reserve Bank are collateralized, and both often require significant collateral cushions (i.e., require the value of the pledged collateral to be significantly greater than the loan). The FHLBs typically will lend to a member so long as it has borrowing capacity, but a FHLB is under no obligation to lend to a member and retains absolute discretion to refuse to lend at any time regardless of capacity. Interview of Patricia Remch and Cecilia de Leon, August 30, 2010 and September 20, 2010 ("Remch and de Leon Interview").

having no more guaranteed sources of liquidity, and deposit outflows continuing, OTS decided on September 25, 2008, to seize WMB.

a. Run on Deposits

WMB's liquidity crisis began with deposit outflows in July and August 2008 following the failure of IndyMac.[226] WMB lost approximately $9.1 billion in deposits through the summer of 2008.[227] On September 8, 2008, after WMB and OTS entered into the MOU, another run on deposits began and intensified as media speculated about the potential failure of WMB.[228] WMB lost a net of approximately $17.3 billion in deposits over the next two weeks.[229] By September 24, the total net outflow had increased to $18.7 billion.[230]

WMB attempted in September 2008 to attract new deposits in order to bolster liquidity. WMB offered new depositors very high-interest CDs -- so high that WMB was paying more in interest to depositors than it was earning on the money.[231] Despite WMB's efforts, deposit outflow still exceeded new deposits, so in the days before the bank's seizure, WMB could no longer rely upon deposits as a significant source of liquidity.[232]

---

[226] Ward Interview.

[227] OTS-WMI-BKRCY-00000006.

[228] *Id.*

[229] *Id.*

[230] OTS-WMI-BKRCY-00000009, at OTS-WMI-BKRCY-00000016.

[231] Interview of Alan Fishman, September 1, 2010 ("Fishman Interview"). For example, on September 11, 2008, WMB advertised a 5% CD special. That special was replaced with an eight-month CD special at 4.25%. OTS Supervisory Timeline, Dochow_Darrel-00001338_001, at 035 ("OTS Timeline"). The OTS Timeline is a detailed timeline of events pertaining to WMB compiled by OTS.

[232] Fishman Interview.

b.    Dwindling Sources of Liquidity

By September 2008, as deposits as a source of liquidity disappeared, WMB had to rely exclusively on borrowings from the FHLB-SF and the FRB-SF for liquidity.[233]   Market-based funding was not available to WMB in September 2008 to supplement liquidity.[234]   Sales of new unsecured debt and securitizations were generally unavailable due to the uncertainty and panic that gripped the market in September 2008.[235]   In the final days before WMB's seizure, the FHLB and the FRB-SF were no longer reliable sources of liquidity.

In early September 2008, FHLB-SF grew more concerned about WMB and the collateral it was pledging to secure the loans made by FHLB-SF.[236]   Because the mortgages that WMB pledged as collateral included "bad" or "problem" loans that could no longer be sold during the panic conditions of September 2008, it was difficult for the FHLB-SF (or any other lender) to place a value on the collateral.[237]   Accordingly, WMB had daily discussions with the FHLB-SF regarding the value of WMB's pledged collateral and the FHLB-SF made a decision whether to lend following each day's discussion.[238]   According to Mr. Freilinger, beginning the week of September 15, 2008, WMB's access to borrowings from the FHLB-SF was "day-to-day" -- that is, the FHLB-SF decided on a daily basis whether to advance funds for the next day and would not commit to more than the next day's advance.[239]

---

[233] Fishman Interview; Interview of Robert Williams, August 17, 2010 ("Williams Interview"); Interview of Darrel Dochow, September 1, 2010 ("Dochow Interview"); Ward Interview.

[234] OTS-WMI-BKRCY-00000009, at OTS-WMI-BKRCY-00000015; Fishman Interview; Williams Interview.

[235] OTS-WMI-BKRCY-00000009, at OTS-WMI-BKRCY-00000015; Fishman Interview.

[236] Interviews of FHLB-SF Officials.

[237] Williams Interview.

[238] Id.

[239] Freilinger Interview; Williams Interview.  According to Mr. Williams, credit was so constricted in September 2008 that even the FHLBs were having difficulty borrowing money to lend to their members, and this uncertainty made it difficult for the FHLBs to commit to advances to WMB beyond a day at a time.  Williams Interview.

On September 7, 2008, the OTS and WMB entered the MOU, which was an enforcement action by the OTS. Just after that event, the FRB-SF no longer provided term advances to WMB and instead limited WMB to overnight lending.[240] The FRB-SF also told WMB at that time that future lending decisions would be in the FRB-SF's discretion and made on a "day-to-day" basis -- that the FRB-SF could not commit to any advances beyond a day at a time.[241]

On September 10, 2008, the FHLB-SF told OTS that obtaining a blanket lien on WMB's assets would give FHLB managers more assurance to continue lending to WMB.[242] On September 18, 2010, FHLB-SF obtained a blanket lien on all of WMB's assets to secure additional borrowings.

On September 18, 2008, OTS downgraded WMB's composite CAMELS rating from 3 to 4. On September 19, 2008, the FDIC informed OTS that advances for WMB were still available from the FHLBs and that the situation was not dire.[243]

The OTS Timeline indicates that a development occurred on September 19, 2010, that significantly affected WMB's available liquidity. According to the OTS Timeline, FHLB-SF informed OTS that its accountants required it to follow FAS 157 fair value accounting for the collateral of problem banks and that WMB was a problem bank.[244] FHLB-SF informed OTS that in valuing WMB's collateral, FHLB-SF was now required to look at actual, observable sales of such assets.[245] In doing so, the FHLB-SF found assets like option ARMs selling at fire-sale

---

[240] Freilinger Interview.

[241] Freilinger Interview.

[242] OTS Timeline, Dochow_Darrel-00001338_001, at 034.

[243] Id. at 036.

[244] Id. It is not clear whether this change in treatment was the result of WMB's downgraded CAMELS rating, but the timing suggests that was the case. In its interview, the FHLB-SF did not recall the CAMELS rating downgrade as affecting WMB's borrowing relationship. Remch and de Leon Interview.

[245] OTS Timeline, Dochow_Darrel-00001338_001, at 036.

prices of 35 cents on the dollar.[246] FHLB-SF informed OTS that, based on those values, WMB was out of collateral. FHLB-SF informed WMB management of this on September 18, 2008. FHLB-SF told OTS that it might be able to lend $1 to $2 billion more if it was a bridge to getting a deal done.

On September 20, 2008, Mr. Freilinger of WMI reported to OTS that he did not expect the FRB-SF to make additional advances to WMB after September 22: "We have $9.2bln in Fed discount window access. I believe we will be able to roll ouit [sic] existing $2bln discounting on Monday for a week, but **do not believe further window advances will be forthcoming** until a deal is signed."[247] Mr. Freilinger continued: "If outflows reduce, we'll be good through QE. If they don't or they return to last Weds/Thurs levels, we'd probably tip on Monday, Sept 29."[248]

In the few days before WMB's seizure, there appears to be a large discrepancy between what WMB was projecting as its available liquidity and what the FHLB and FRB-SF were telling OTS with regard to WMB's actual available credit. According to the OTS Timeline, on September 22, 2008, WMB projected available liquidity to be $28 billion.[249] WMB, however, estimated $9.4 in FRB-SF availability, or $2 billion more than estimated by the FRB-SF.[250] The FDIC projected $20.8 billion in liquidity because it reduced the amount ($8.5 billion) reportedly available from FHLB-SF to $1 billion. According to the OTS Timeline, the FDIC told OTS that it reduced the assumed amount available from FHLB-SF from $8.5 to 1 billion "because of the uncertainty at present regarding whether the FHLB will continue to advance funds."[251]

---

[246] Id.

[247] WMIPC_500002465.00006 (emphasis added).

[248] Id.

[249] OTS Timeline, Dochow_Darrel-00001338_001, at 037.

[250] Id.

[251] OTS-WMI-BKRCY-00000283.

A document entitled "Confirmation of Borrowing Capacity Report" from September 23, 2008, reflects this discrepancy. This report printed by WMB from WMB's files showed that on September 28, 2008, WMB had approximately $8 billion of excess borrowing capacity on the collateral that was pledged to the FHLB-SF as available. An internal FHLB-SF Confirmation of Borrowing Capacity report from the same day, however, showed that as of 5:04 p.m., borrowing capacity was $0. FHLB-SF witnesses did not recall specifically what prompted the change, but they stated that the decision would have been made by FHLB-SF management, which had been reviewing all advances to WMB and the WMB collateral in September 2008. In addition, documents obtained from FHLB-SF titled "Confirmation of Borrowing Capacity" appear to show a general decline in collateral excess in September. On September 4, 2008, collateral excess was approximately $17 billion. On September 19, collateral excess was approximately $17 billion. On September 23, collateral excess was at $0.[252]

Shortly before September 23, 2008, Robert Williams had spoken to OTS about potential ways to improve WMB's liquidity. Mr. Williams apparently informed OTS that WMB had approximately $45 billion in saleable assets that could be used to shore up WMB's liquidity position.[253] On September 23, OTS asked WMB to identify those assets, state how much could be generated from their sale, and explain the impact their sale would have on liquidity.[254] In response to OTS's request, on September 23, Mr. Freilinger told OTS that the $45 billion in assets to which Mr. Williams had referred, in fact, were "not particularly saleable."[255] Mr. Freilinger reported that WMB did have a few potentially saleable assets that were currently

---

[252] The FHLB-SF officers advised during the interview that the Confirmation of Borrowing Capacity report is a management tool used to monitor a member's collateral. Whether to lend additional funds is discretionary and takes into account collateral and several other factors, including overall member creditworthiness.

[253] OTS-WMI-BKRCY-00000279.

[254] Id.

[255] OTS-WMI-BKRCY-00000278.

pledged to support unused FRB-SF borrowing capacity, including CMBS, and corporate and municipal bonds.[256] In OTS's view, however, these assets could not be sold "in short order."[257]

Mr. Freilinger also said that WMB could free up the mortgage pools underlying the TRUPS for use as collateral for new borrowings if OTS helped by issuing an order directing that the Conditional Exchange occur:

> It would be possible to free up collateral associated with the WM Preferred Funding program [i.e., the TRUPS]. This would require a regulatory order to convert the current WM Preferred Funding series into their associated series of WMI preferred stock, which is designed typically to occur only in PCA. [I]t would release the closed end 1st lien HELOC, hybrid ARM and option ARM collateral in the program. I believe the current balances there are around $9 billion . . . .[258]

In his email, Mr. Freilinger did not indicate how quickly the collateral could be freed up, or whether the collateral would be acceptable to the FHLB or the FRB-SF for additional advances.[259] Two days later, OTS directed that the Conditional Exchange occur, but, as explained elsewhere in this Report, it appears that OTS did this at the FDIC's direction for the purpose of ensuring that the assets associated with the TRUPS would transfer to JPMC, rather than for the purpose of freeing up the assets for use by WMB as new collateral for additional advances from the FHLB.

On September 24, 2008, the FDIC reported to OTS that FHLB-SF was "day-to-day" with respect to future advances to WMB.[260] Tim Ward recalled in his interview that the FHLB was

---

[256] *Id.*

[257] *Id.*

[258] *Id.*

[259] Mr. Freilinger said that he was not sure how long it would take to free up the assets for use as collateral following a Conditional Exchange, but thought that it would take at least a day, and perhaps much longer. He also thought that it would take anywhere from one to eight weeks for the FHLB-SF or the FRB-SF to conduct a review of the new collateral before deciding whether to provide advances based thereon. Freilinger Interview.

[260] OTS Timeline, Dochow_Darrel-00001338_001, at 037.

more definitive by September 24 that it would make no more advances.[261]  Mr. Ward said that on

September 24, OTS met with Steve Cross of the Federal Housing Finance Agency ("FHFA"),

which supervises the FHLBs, and Deborah Bailey of the Federal Reserve.[262]  According to Mr.

Ward, the FHFA and FHLBs stated that they would not make further advances to WMB.[263]

c.    <u>OTS Seizure of WMB</u>

On September 25, 2008, OTS seized WMB on the ground of insufficient liquidity.[264]

OTS recited the facts that it believed justified the seizure in what is known as the "S," or

supervisory, memorandum.  In the "S" memo, OTS stated:

> As of September 25, 2008, the Bank projected that it had $13.4 billion to meet liquidity obligations.  A review of the sources that make up that total reveals that the Bank's liquidity position is far less than the projected number suggests.

> The Bank estimated having $3.8 billion in cash and investments to meet liquidity obligations as of September 25, 2008.  Core earnings are insufficient to supplement its cash base.  In addition, most of the Bank's assets are not readily saleable.  Accordingly, the Bank is dependent upon borrowings from the Federal Home Loan Banks of San Francisco and Seattle (FHLB-SF and FHLB-SEA) and Federal Reserve Bank of San Francisco to meet funding needs.  The Bank projected that it had borrowing capacity of $2.9 billion from the FHLB-SF and the FHLB-SEA on September 25, 2008.  Also as of that date, the Bank projected that it had $6.7 billion available for borrowing from the Fed's discount window.

> Given the Bank's current ratings and the uncertain value of the collateral supporting its borrowings from both the FHLBs and the Federal Reserve Bank, there is no assurance that the projected funds will be available in the amounts and in the timing needed by the Bank to meet its obligations.  The Federal Housing Finance Agency notified OTS that FHLB-SF has agreed to fund $0.5 billion on September 25, 2008, but there is no guarantee that it will provide further funds. The Federal Reserve lowered the Bank to secondary credit status on September 25, 2008, which resulted in an additional reduction of $1 billion in borrowing capacity. Under secondary status, the Bank is subject to increased haircuts and pricing.  The Bank will also likely lose access to the 28-day term auction facility (TAF) program. . . .

---

[261] Ward Interview.

[262] *Id.*

[263] *Id.* Of course, the FHLB-SF did advance another $500 million on September 25, 2008.

[264] OTS-WMI-BKRCY-00000001.

[T]he FHLB-SF has informed the OTS that as of September 23 they . . . will not commit to any further advances.[265]

OTS then noted that WMB suffered a net deposit loss of approximately $18.7 billion between September 8 and September 24, 2008 and that, while depositor withdrawals appeared to have slowed, they would still deplete WMB's remaining liquidity "in the short term absent additional extraordinary events."[266] Based on these factual findings, the OTS concluded that WMB "is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business" and "is in an unsafe and unsound condition to transact business."[267] Either of these grounds, OTS concluded, justified appointment of FDIC as receiver under 12 U.S.C. § 1821(c)(5)(F) and (C).[268]

     d.    View of WMB Witnesses Regarding the Seizure

While some WMI witnesses whom the Examiner interviewed disagreed with OTS's decision to close the bank, they conceded that WMB's liquidity position was difficult and that the regulators' liquidity concerns were not unjustified.[269] For example, Mr. Williams commented that the stress on retail deposits combined with the difficulty in getting funds from the FHLB greatly concerned FDIC and led to the bank's seizure. Mr. Williams did not think that the regulators "had it in" for WMB.[270] Likewise, Alan Fishman acknowledged that WMB's liquidity position was dire from the day he started on September 7, 2008. Mr. Fishman thought there was a "thin but real margin of safety" as to WMB's liquidity position, but he acknowledged

---

[265] OTS-WMI-BKRCY-00000009, at OTS-WMI-BKRCY-00000014-15.

[266] OTS-WMI-BKRCY-00000009, at OTS-WMI-BKRCY-00000016.

[267] Id.

[268] Id.

[269] Smith Interview; Fishman Interview; Williams Interview; Freilinger Interview.

[270] Williams Interview.

that WMB's "thin margin" was entirely dependent on continued lending from the FHLB and deposit outflow ceasing. Mr. Fishman acknowledged that if the FHLB cut off lending or depositors continued to withdraw money, "it was over."[271]

Other WMB witnesses agreed with the OTS's decision to close the bank. Mr. Freilinger, WMB's Assistant Treasurer who was responsible for monitoring liquidity and who dealt with the FHLBs and the FRB-SF, thought that by September 22, 2008, WMB had only seven to ten days of liquidity remaining.[272] He said he thought OTS "did the right thing" in closing the bank.[273]

### 2.    Conclusions Regarding WMB's Liquidity

The Examiner concludes that by September 25, 2008, WMB's liquidity was questionable and needed to be evaluated on a day-to-day basis. Depositor withdrawals were still significant by September 25, and there was no assurance they would not increase given the panicked and uncertain environment in September fueled by the seemingly daily revelation of another troubled financial institution. While depositors only withdrew $500 million on September 24, 2008, and only $1 billion on September 23, 2008, only days earlier, daily withdrawals had been as much as $3 billion. Had withdrawals -- even in the range of $500 million a day -- continued, WMB's liquidity would have been depleted in a matter of days. Mr. Freilinger of WMI acknowledged as much in his interview and his September 20, 2008 email to OTS.[274]

Second, WMB had no guaranteed, substantial sources of liquidity by September 25. The principal sources of liquidity remaining for WMB were borrowings from the FHLB-SF and the FRB-SF. By the week of September 15, both had reduced their willingness to lend to a "day-to-

---

[271] Fishman Interview.

[272] Freilinger Interview.

[273] Id.

[274] Freilinger Interview; WMIPC_500002465.00006 ("If outflows reduce, we'll be good through QE. If they don't or they return to last Weds/Thurs levels, we'd probably tip on Monday, Sept 29.").

day" lending decision. By September 25 (if not earlier), the FHLB-SF said it was at or near its limit on advances and could not guarantee any further advances. Similarly, WMB told OTS that the FRB-SF would make no more advances after September 22, and the FRB-SF's downgrade of WMB to secondary credit on September 25 made the likelihood of any further FRB-SF advances even more remote. Absent any guarantee that either the FHLB or the FRB-SF would make advances, the Examiner concludes that it was reasonable to view available liquidity from these sources as highly questionable.

Other sources of liquidity were minimal or non-existent. WMB had approximately $4 billion in cash. These funds would be depleted within days unless depositors stopped withdrawing funds, which had not happened by September 25. Non-collateralized borrowing had not been an option for months, and WMB had no readily available new collateral to pledge to support new borrowings.[275]

In light of the foregoing, the Examiner also concludes that OTS's determinations -- that WMB was likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business and that WMB was in an unsafe and unsound condition to transact business -- were reasonable and well within the bounds of discretion afforded to OTS in making its determination whether to seize the bank. The Examiner found no evidence indicating that OTS or FDIC acted in bad faith with regard to the determination of WMB's liquidity.

## E.    Remedy for Improvident Seizure

---

[275] The Examiner has reviewed analyses suggesting that the OTS erred in concluding that WMB was insufficiently liquid because WMB had access to $35 billion in available liquidity as of September 25. These analyses, however, assume that the FHLB would have continued to lend and ignore multiple factors, including the decreased market value of the collateral pledged to secure FHLB borrowings, that caused the FHLB to decrease WMB's borrowing capacity and increase margin requirements. Finally, according to OTS, even WMB management projected only $13 billion in liquidity as of September 24, 2008 -- nothing even close to the $35 billion figure suggested by some analyses.

Although the Examiner concludes that WMB's liquidity was sufficiently questionable to justify OTS's actions, the Examiner investigated whether, assuming WMB was both solvent and liquid, anything could be done to remedy the improvident seizure. The Examiner concludes that the only claim that could have been asserted against OTS is time-barred. Even had it been timely asserted, the Examiner concludes it would have had little chance of success and would have had little practical effect.

The only means to challenge the OTS's alleged improvident seizure of WMB is by filing an action challenging, pursuant to 12 U.S.C. § 1464(d)(2)(B), the OTS order seizing WMB and appointing the FDIC as receiver.[276] That action was required to be filed within 30 days of the appointment of the FDIC as receiver. The Debtors considered bringing such an action but decided not to do so.

Even if such an action could be brought now, the Examiner concludes it would be highly unlikely to succeed. The Debtors would be required to show that OTS acted in an "arbitrary and capricious" manner.[277] For the reasons explained above, however, the Examiner concludes that OTS acted well within the bounds of reasonableness and its discretion, and the Examiner found no evidence of bad faith by OTS in seizing the bank.

---

[276] 12 U.S.C. § 1464(d)(2)(B) provides:

> The Director shall have exclusive power and jurisdiction to appoint a conservator or receiver for a Federal savings association. If, in the opinion of the Director, a ground for the appointment of a conservator or receiver for a savings association exists, the Director is authorized to appoint ex parte and without notice a conservator or receiver for the savings association. In the event of such appointment, the association may, within 30 days thereafter, bring an action in the district court for the judicial district in which the home office of such association is located, or in the United States District Court for the District of Columbia, *for an order requiring the Director to remove such conservator or receiver,* and the court shall upon the merits dismiss such action or direct the Director to remove such conservator or receiver. Upon the commencement of such an action, the court having jurisdiction of any other action or proceeding authorized under this subsection to which the association is a party shall stay such action or proceeding during the pendency of the action for removal of the conservator or receiver.

(emphasis added).

[277] *See Life Bancshares v. Fiechter*, 847 F. Supp. 434, 444 (M.D. La. 1993).

Finally, even if such an action were not time-barred and had some chance of success, the practical effect of a successful suit is uncertain. The plain language of 12 U.S.C. § 1464(d)(2)(B) indicates that the only relief potentially available under the statute is a court order directing the OTS to remove the FDIC Receiver without any provision for unwinding steps taken by the receiver during the pendency of his appointment.[278] Under the circumstances here, with the P&A Agreement already consummated and WMB's assets integrated with those of JPMC, it is unclear whether such a claim would have any practical effect even if successful.

For all these reasons, the Examiner concludes that, even assuming *arguendo* OTS acted improvidently in closing WMB, there are no viable claims that can be brought against OTS.

## IX.    KEY DISPUTED ITEMS/ASSETS COVERED BY SETTLEMENT

### A.    $3.67 Billion Deposit

#### 1.    General Overview and Introduction to the Disputed Accounts

The Debtors maintain that the $3.67 billion that WMI had on deposit at WMB was transferred pursuant to bookkeeping entries from WMI's deposit account to a newly created deposit account at FSB. This transaction is the primary focus of the parties' dispute concerning the Disputed Accounts. The Debtors contend that they established a valid deposit account at FSB and transferred the $3.67 billion to that account no later than September 24, 2008. JPMC, the FDIC, and certain Bank Bondholders have raised numerous factual and legal issues as to whether this transfer was a valid transaction and whether some or all of the $3.67 billion actually was a deposit belonging to WMI. Among other things, JPMC maintains that the funds were a capital contribution rather than a deposit and that the purported transfer constituted an actual

---

[278] *See* 12 U.S.C. § 1464(d)(2)(B); *see also Franklin Sav. Ass'n v. Office of Thrift Supervision*, 35 F.3d 1466, 1470 (10th Cir. 1994) (finding judicial review of decisions past the receiver's initial appointment "would make subsections 1464(d)(2)(C) and (D) ineffective," and noting "[h]ence, judicial review under 1464(d)(2)(B) is limited to the Director's initial decision to appoint a conservator or receiver").

fraud. The deposit dispute centers on the FSB account number ending in 4234 (the "FSB Account" or "Account 4234") and, to a lesser extent, $234.5 million held at WMB in account number 0667 ("Account 0667").[279]

Under the Settlement Agreement, the vast majority of funds in the Disputed Accounts will be paid to the Debtors.[280] The Debtors will receive approximately $3.85 billion, plus interest. A small component of the Disputed Accounts, approximately $187 million plus interest, will be retained by JPMC. In total, the Disputed Accounts constitute more than half of the total settlement proceeds to be received by the Debtors.[281]

### 2. History and Timeline of Relevant Events Regarding the Disputed Accounts

As of the Petition Date, the Debtors maintain they had more than $3.67 billion on deposit in a single demand deposit account at FSB and $135 million on deposit in five demand deposit accounts at WMB.[282] The history of the disputed deposit accounts and the events that occurred just prior to the OTS seizure of WMB are recounted below. The facts set forth are based principally on the Examiner's interview of Doreen Logan, the former First Vice President and

---

[279] Compl. ¶ 19, *Washington Mutual, Inc. v. JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW) (Bankr. D. Del.) (the "Turnover Action") (Apr. 27, 2009), Dkt. No. 1. Account 4234 at FSB held a total of $3,667,943,172 as of September 30, 2008, and Account 0667 held a total of $264,068,186 as of September 30, 2008. *Id.*

[280] Debtors' Sixth Am. Jt. Plan, Ex. H, § 2.1, *In re Washington Mutual, Inc.*, Case No. 08-12229 (MFW) (Bankr. D. Del.) (the "Bankruptcy Case") (Oct. 6, 2010), Dkt. No. 5548 (the "Plan"). As of September 30, 2008, the balances of the remaining Disputed Accounts, in addition to Account 4234 and Account 0667, were as follows: Account No. 1206 held $52,600,201; Account No. 9626 held $4,650; Account No. 9663 held $747,799; and Account No. 4704 held $53,145,275. Compl. ¶ 19, Turnover Action (Apr. 27, 2009), Dkt. No. 1. In addition, as part of the Settlement Agreement, JPMC also will pay to the Debtors the amounts in two additional accounts (accounts 3411 and 8388) held at WMB, which collectively totaled approximately $1.63 million as of September 30, 2008. Plan, Ex. H, § 2.1, Ex. E, Bankruptcy Case (Oct. 6, 2010), Dkt. No. 5548. The amounts in these latter two accounts are not part of the issues concerning the Disputed Accounts.

[281] *See* Order Approving the Proposed Disclosure Statement, Ex. 1 at 9, Bankruptcy Case (Oct. 21, 2010), Dkt. No. 5659 (the "Discl. Stmt.").

[282] Debtors' Br. in Supp. of Mot. for Summ. J. ("Debtors' MSJ") at 4, Turnover Action (May 19, 2009), Dkt. No. 15. Five of the accounts were held by WMI while the sixth was held by WMI Investment Corp. *Id. See also* Compl. ¶ 19, Turnover Action (Apr. 27, 2009), Dkt. No. 1 (listing all six account numbers).

Transaction Manager in Structured Finance at WMB.[283] In addition, Ms. Logan has supplied factual information through an affidavit and a deposition in connection with the pending proceeding.[284] The Examiner found Ms. Logan to be credible.[285]

Prior to the Petition Date, the Debtors established and maintained each of the six accounts at WMB in accordance with the WaMu Group's internal policies and procedures for "On-Us," or intra-corporate, deposit accounts.[286] These six accounts are referred to collectively as the "Disputed Accounts" by the parties.

From June 17, 2002 to September 19, 2008, WMI's primary non-interest bearing checking account was Account 0667, a demand deposit account at WMB.[287] During this time, WMI used Account 0667 to service its outstanding debt, pay dividends on its preferred and common equity, disburse payment on account of tax obligations, and pay operating expenses.[288] The Debtors' position is that WMI initiated the transfer of $3.67 billion on deposit in Account 0667 at WMB to Account 4234, a new demand deposit account at FSB, on or about September 18, 2008, seven days prior to the OTS seizure and eight days prior to the Petition Date.[289]

---

[283] Interview of Doreen Logan, August 19, 2010, September 29, 2010 ("Logan Interview").

[284] Ms. Logan submitted a May 19, 2009 affidavit in support of the Debtors' motion for summary judgment, and was deposed in connection with summary judgment proceedings on August 26, 2009. Debtors' App. to Br. in Supp. of Mot. for Summ. J. ("Debtors' App. to MSJ") at A1-A159, Turnover Action (May 19, 2009), Dkt. No. 16; JPMC's App. in Supp. of Suppl. Opp'n to Mot. for Summ. J. ("JPMC's App. to Suppl. Opp'n to MSJ") at B1023-B1119, Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[285] JPMC disputes the accuracy of Ms. Logan's statements and moved to strike her affidavit as inadmissible because it contains hearsay and statements that lack foundation and are not based on her personal knowledge. JPMC's Br. in Supp. of Am. Mot. to Strike Aff. of Doreen Logan, Turnover Action (Sept. 11, 2009), Dkt. No. 155. JPMC also stated that the declarations it submitted in opposing the Debtors' motion for summary judgment reflected that certain statements made in Ms. Logan's affidavit were inaccurate. JPMC's Opp'n to Mot. for Summ. J. ("JPMC's Opp'n to MSJ") at 59, Turnover Action (July 24, 2009), Dkt. No. 102.

[286] Debtors' App. to MSJ at A5 (¶ 11), Turnover Action (May 19, 2009), Dkt. No. 16.

[287] Id. at A4 (¶ 10).

[288] Id.

[289] See id. at A5-A6 (¶ 13).

The following sections outline the sources of the $3.67 billion and the documentation surrounding the claimed transfer of the $3.67 billion from Account 0667 at WMB to Account 4234 at FSB. In addition, certain post-petition tax refunds that were deposited into the Disputed Accounts are explained below.

### a. Sources of the $3.67 Billion

Deposits from three major transactions are the likely sources of the $3.67 billion in Account 0667 prior to any transfer to FSB:

Series R Stock: In December 2007, WMI sold convertible preferred shares of Series R stock and raised approximately $3 billion, which was deposited into Account 0667.[290] Shortly thereafter, WMI transferred approximately $1 billion from Account 0667 to WMB as a capital contribution.[291]

TPG Funds: In April 2008, WMI raised approximately $7.2 billion of capital through Texas Pacific Group Capital and various other investors (the "TPG Funds").[292]

Settlement of Tax Payments Previously Advanced by WMI for WMB: In August and September 2008, three separate deposits were made into Account 0667 totaling $922 million.[293]

---

[290] WMI, Annual Report (Form 10-K) at 70 (Dec. 31, 2007) http://www.sec.gov/Archives/edgar/data/933136/000104746908002083/a2182890z10-k.htm; Logan Interview. *See also* WMI_PC_08788088.00001, at WMI_PC_08788088.00006.

[291] WMI, Annual Report (Form 10-K) at 70 (Dec. 31, 2007) http://www.sec.gov/Archives/edgar/data/933136/000104746908002083/a2182890z10-k.htm; Logan Interview; JPMCD_000001554.00001, at JPMCD_000001554.00046-56; Debtors' App. to MSJ at A151-A159, Turnover Action (May 19, 2009), Dkt. No. 16. Approval for the capital contribution was obtained from the Legal, Tax, Controllers, and Treasury departments. JPMCD_000001554.00001, at JPMCD_000001554.00048-56; Debtors' App. to MSJ at A151-A159, Turnover Action (May 19, 2009), Dkt. No. 16. In addition, the Request for Contribution form stated the purpose of the contribution. JPMCD_000001554.00001, at JPMCD_000001554.00048; Debtors' App. to MSJ at A151, Turnover Action (May 19, 2009), Dkt. No. 16.

[292] Interview of Robert Williams, August 17, 2010 ("Williams Interview"); WMI, Proxy Statement (Schedule 14A) at 9 (May 22, 2008), http://www.sec.gov/Archives/edgar/data/933136/000095013408010113/v39872dedef14a.htm; WGM_00001909, at WGM_00001920-21; Logan Interview.

[293] WGM_00008399, at WGM_00008405; Debtors' App. to MSJ at A2, Turnover Action (May 19, 2009), Dkt. No. 16; JPMC's App. in Supp. of Opp'n to Mot. for Summ. J. ("JPMC's App. to Opp'n to MSJ") at B216-B218, Turnover Action (July 24, 2009), Dkt. No. 103; Logan Interview.

The deposit on August 19, 2008 was for $600 million and the two deposits on September 19, 2008 were for $322 million.[294] These deposits represent the reconciliation of amounts due to WMI from WMB for past state taxes previously advanced by WMI on behalf of WMB.[295]

In April and July 2008, WMI transferred a total of $5 billion to WMB as a capital contribution.[296] On September 10, 2008, WMI transferred $500 million from Account 0667 to WMB as a capital contribution.[297] The forms and authorizations submitted with respect to the capital contributions are different from those submitted in connection with the $3.67 billion

[294] WGM_00008399, at WGM_00008405; Debtors' App. to MSJ at A25, Turnover Action (May 19, 2009), Dkt. No. 16. The Debtors contend the transfers were made via book entries, as reflected in the account statements, but JPMC contends they were made via wire transfer. See WGM_00008399, at WGM_00008405 (reflecting a $600 million "book transfer credit"); Debtors' App. to MSJ at A25, Turnover Action (May 19, 2009), Dkt. No. 16 (reflecting two "book transfer credit[s]" totaling $322 million); JPMC's App. to Suppl. Opp'n to MSJ at B1037-B1038 (Logan Dep. 53:1-57:16), Turnover Action (Sept. 11, 2009), Dkt. No. 157 (explaining that the $322 million transfer was made via book transfer); JPMC's Opp'n to MSJ at 35-36, Turnover Action (July 24, 2009), Dkt. No. 102 (citing to JPMC's App. to Opp'n to MSJ at B206, Turnover Action (July 24, 2009), Dkt. No. 103, in support of the assertion that the transfers were made via wire transfer).

[295] Interview of C. Jack Read, September 24, 2010 ("Read Interview"). See also Debtors' Reply Br. in Supp. of Mot. for Summ. J. ("Debtors' Reply in Supp. of MSJ") at 23-27, Turnover Action (Sept. 18, 2009), Dkt. No. 163.

[296] Logan Interview; WMI, Quarterly Report (Form 10-Q) at 77 (June 30, 2008), http://www.sec.gov/Archives/edgar/data/933136/000104746908009146/a2187197z10-q.htm; JPMCD_000001554.00001, at JPMCD_000001554.00057- 71; JPMCD_000001921.00001, at JPMCD_000001921.00036-45; Debtors' App. to MSJ at A140-A150, Turnover Action (May 19, 2009), Dkt. No. 16. Despite WMB's April 1, 2008 Board minutes of a joint meeting with the WMI Board, which reflect that the OTS informed the Boards that capital needed to be brought into WMB and that doing nothing was not an option, the Examiner did not locate any document that indicated that WMI was obligated to or intended to contribute the remaining $2.2 billion from the TPG Funds to WMB. JPMC's App. to Opp'n to MSJ at B52, Turnover Action (July 24, 2009), Dkt. No. 103; see also WMI, Proxy Statement at 9 ("The Company has retained the remaining net proceeds from the [TPG transaction], which it intends to use, on a consolidated basis, to enhance the capital ratios of Washington Mutual Bank as well as for general corporate purposes." (emphasis added)). At the meeting, the OTS also noted that membership on the Boards of both WMI and WMB were the same and that they needed to give consideration to WMB's depositors, as well as WMI's shareholders. JPMC's App. to Opp'n to MSJ at B52, Turnover Action (July 24, 2009), Dkt. No. 103. In fact, an Offices of the Inspector General ("OIG") April 2010 Evaluation of Federal Regulatory Oversight of Washington Mutual Bank states that $1.4 billion of the TPG Funds were used to pay down WMI's debt in July 2008. Offices of Inspector General of the Department of the Treasury and the FDIC, Evaluation of Federal Regulatory Oversight of Washington Mutual Bank, Rep. No. Eval-10-002 12 (Apr. 2010). Thus, only approximately $800 million would remain from the TPG capital raise, not $2.2 billion.

[297] Read Interview; Logan Interview; JPMCD_000001921.00001, at JPMCD_000001921.00023-31; Debtors' App. to MSJ at A134-A139, Turnover Action (May 19, 2009), Dkt. No. 16. See also Debtors' Reply in Supp. of MSJ at 24 n.9, Turnover Action (Sept. 18, 2009), Dkt. No. 163.

transfer.[298]  For example, the September 10, 2008 forms to make a $500 million capital

contribution to WMB include a Request for Contribution Form and numerous email

authorizations that were not submitted in connection with the $3.67 billion transfer.[299]

Based on the foregoing, from December 2007 to September 25, 2008, WMI received

approximately $11.1 billion from the various sources, the largest use of which was $6.5 billion in

capital contributions to WMB.

b.    <u>Transfer of $3.67 Billion to an Account at FSB</u>

(i)    The Direction to Move $3.67 Billion from an Account at
WMB to an Account at FSB

On September 18, 2008, Ms. Logan received instructions to transfer the maximum

amount of funds deposited in Account 0667 at WMB to a demand deposit account at FSB.[300]  It

remains unclear who instructed Ms. Logan to transfer the funds.  Ms. Logan makes clear that she

was acting at the direction of superior(s) at WMI and/or WMB.[301]  Further, Ms. Logan avers that

---

[298] *Compare* JPMCD_000001921.00001, at JPMCD_000001921.00023-31 *and* Debtors' App. to MSJ at A134-A139, Turnover Action (May 19, 2009), Dkt. No. 16, *with* Debtors' App. to MSJ at A78-A81, A93-A95, Turnover Action (May 19, 2009), Dkt. No. 16.

[299] *Compare* JPMCD_000001921.00001, at JPMCD_000001921.00023-31 *and* Debtors' App. to MSJ at A134-A139, Turnover Action (May 19, 2009), Dkt. No. 16, *with* Debtors' App. to MSJ at A78-A81, A93-A95, Turnover Action (May 19, 2009), Dkt. No. 16.

[300] Debtors' App. to MSJ at A5-A6 (¶ 13), Turnover Action (May 19, 2009), Dkt. No. 16; Logan Interview; JPMC's App. to Suppl. Opp'n to MSJ at B1039-B1040 (Logan Dep. 61:24-63:2), Turnover Action (Sept. 11, 2009), Dkt. No. 157.  Prior to opening the new account at FSB, WMI did not have any accounts at FSB.  JPMC's App. to Suppl. Opp'n to MSJ at B1043 (Logan Dep. 77:16-19), Turnover Action (Sept. 11, 2009), Dkt. No. 157.  WMI acknowledges that it had not previously transferred funds from a WMI deposit account at WMB to a new WMI deposit account at FSB.  Logan Interview.

[301] According to Ms. Logan, during a telephone call on September 18, 2008, Carey Brennan (the former Senior Vice President, Deputy Chief Legal Officer & General Counsel of Capital Markets for WMB) instructed Patricia Schulte (the former WMB Senior Vice President, Treasury, Cash Management) and Ms. Logan to transfer the maximum amount of funds from Account 0667 to a deposit account at FSB.  Debtors' App. to MSJ at A5-A6 (¶ 13), Turnover Action (May 19, 2009), Dkt. No. 16.  Ms. Schulte, who was an "authorized individual," then instructed Ms. Logan to transfer the funds.  JPMC's App. to Suppl. Opp'n to MSJ at B1048 (Logan Dep. 96:23-97:7), Turnover Action (Sept. 11, 2009), Dkt. No. 157.  *See also* Debtors' App. to MSJ at A5-A6 (¶ 13), Turnover Action (May 19, 2009), Dkt. No. 16.  Ms. Logan says that Charles "Chad" Smith (WMI's former Vice President and Assistant General Counsel, Capital Markets and Structured Finance) also was on the phone.  Logan Interview; JPMC's App. to Suppl. Opp'n to MSJ at B1048-B1049 (Logan Dep. 97:14-98:4), Turnover Action (Sept. 11, 2009), Dkt. No. 157.  Mr. Brennan, however, does not believe he had a conversation with Ms. Schulte or Ms. Logan in which he directed the

she learned, after the fact, that "management" intended to transfer the funds in Account 0667 to "a more well-capitalized bank" within the WaMu Group.[302]

Based on the instructions Ms. Logan received, she calculated that approximately $50 million would need to remain in Account 0667 to cover scheduled and/or pending payments, and the remaining $3.67 billion could be transferred to FSB.[303]

(ii)    Contemporaneous Actions by WMI Board of Directors

The WMI Board of Directors understood that the $3.67 billion was a deposit and not a capital contribution. At a September 24, 2008 joint meeting of the Board of Directors of WMI and WMB, the Board members discussed a stand-alone recapitalization plan for WMB, which included a possible contribution of cash to WMB.[304] Further, at an early morning WMI Board meeting held on September 26, 2008, the deposits were described as WMI's largest asset.[305] The minutes also note that the cash was deposited in an account with JPMC, as successor to WMB.[306] The Board recognized the need to protect WMI's deposits and was faced with a strategic

---

transfer of funds from WMB to FSB because he did not have the responsibility or authority to direct such a transfer of funds. JPMC's App. to Opp'n to MSJ at B227 (¶ 3), Turnover Action (July 24, 2009), Dkt. No. 103. Mr. Brennan does recall efforts to move WMI funds in "deposit accounts at WMB" to FSB the week prior to the OTS seizure and remembers discussing these efforts with Mr. Williams and Mr. Smith, among other people. *Id.* at B227-B228 (¶ 4). According to Mr. Williams, the transfer was driven by "senior management and legal." Williams Interview.

[302] JPMC's App. to Suppl. Opp'n to MSJ at B1050 (Logan Dep. 105:5-10), Turnover Action (Sept. 11, 2009), Dkt. No. 157; Debtors' App. to MSJ at A5-A6 (¶ 13), Turnover Action (May 19, 2009), Dkt. No. 16; Logan Interview. *See also* Interview of Tom Casey, October 21, 2010 ("Casey Interview"). Mr. Brennan suggested that the funds be moved from WMB to FSB to protect those funds against potential loss and to mitigate potential criticism from WMI's bondholders and investors. JPMC's App. to Opp'n to MSJ at B228 (¶ 5), Turnover Action (July 24, 2009), Dkt. No. 103. *See also* Casey Interview. Although Mr. Smith did not know who directed the transfer, he informed the Examiner that he understood that the $3.67 billion deposit was transferred to FSB to protect the funds for purposes of fulfilling responsibilities to the "consolidated enterprise." Interview of Charles Smith, August 20, 2010, September 29, 2010, and September 30, 2010 ("Smith Interview").

[303] Debtors' App. to MSJ at A6 (¶¶ 14-15), A75-A76, Turnover Action (May 19, 2009), Dkt. No. 16; JPMC's App. to Suppl. Opp'n to MSJ at B1057 (Logan. Dep. 132:10-21), Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[304] WMI_PC_08788139.00001. It was noted that the first step of contributing cash to WMB would not impact WMB's liquidity because the cash was already on deposit at WMB, but that it would favorably impact capital. *Id.*

[305] WMI_PC_08788141.00001.

[306] *Id.*

decision in connection therewith, including considering filing for Chapter 11 bankruptcy protection.[307] Further, the Board considered the extent to which JPMC or the FDIC was aware of the deposits and the risks of withdrawing the funds immediately versus keeping them on deposit and the application of bankruptcy and banking laws to the situation.[308] At the afternoon WMI Board meeting, it was noted that the media reported that JPMC "held a very large deposit" owed to WMI.[309] The benefits and risks of withdrawing the funds were discussed, as was the effect of a Chapter 11 filing.[310] Such statements indicate that the WMI Board understood that the $3.67 billion transfer was a deposit and was not intended to be a capital contribution to WMB.

        (iii)    The Movement of $3.67 Billion from an Account at WMB to an Account at FSB

On or about September 18, 2008, Ms. Logan instructed WMB's then Senior Treasury Analyst to establish a new deposit account at FSB to effect the transfer of the $3.67 billion deposited in Account 0667 at WMB to a new demand deposit account at FSB.[311]

As Ms. Logan explained, according to the GL Administration Policy, new GL accounts (such as for a demand deposit account at FSB) could only be created more than 14 business days prior to month-end.[312] Thus, although Ms. Logan wanted to create a new, non-interest bearing, deposit account at FSB, the only intercompany GL account that was open to reflect a deposit at

---

[307] *Id.*

[308] *Id.*

[309] WMI_PC_08788142.00001.

[310] *Id.* After consulting with counsel, the Board decided that the FDIC would be contacted to discuss the deposit, but only after the bankruptcy petition was filed. *Id.* Indeed, according to the Debtors' internal correspondence, the FDIC confirmed that WMI was entitled to withdraw the FSB Account and the Debtors considered withdrawing the funds, but encountered limitations on wiring funds through the Federal Reserve Bank. JPMC's App. to Suppl. Opp'n to MSJ at B1011-B1014, Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[311] JPMC's App. to Suppl. Opp'n to MSJ at B1050 (Logan Dep. 102:16-20), Turnover Action (Sept. 11, 2009), Dkt. No. 157; Debtors' App. to MSJ at A7 (¶ 17), Turnover Action (May 19, 2009), Dkt. No. 16.

[312] Debtors' App. to MSJ at A8 (¶ 19 n.2), A83-A91, Turnover Action (May 19, 2009), Dkt. No. 16; JPMC's App. to Suppl. Opp'n to MSJ at B1054 (Logan Dep. 118:3-6), Turnover Action (Sept. 11, 2009), Dkt. No. 157.

FSB was a "Money Market Deposit Account - Interest Checking" account.[313] Therefore, Ms. Logan planned to use the existing intercompany GL account to reflect the transfer, then open a new deposit GL account at FSB at the beginning of October 2008.[314]

On September 19, 2008, the following documents were prepared to effectuate the transfer: (i) a New Account Request Form to open a new deposit account; (ii) a Journal Entry Request Form to record the transaction on the general ledger of each company; and (iii) a Journal Entry Posting Form to account for the transfer of funds from Account 0667 at WMB to a newly established account at FSB.[315] These forms appear to have been signed and approved by the appropriate officials.[316]

On September 22, 2008, Ms. Logan and others became aware that instead of creating a new account at FSB, as Ms. Logan had requested, a new account was mistakenly created at WMB.[317] Accordingly, the transaction was reversed and a revised New Account Request Form and revised Journal Entry Posting Forms were signed and approved.[318] The revised New

---

[313] Debtors' App. to MSJ at A8 (¶ 19 n.2), A84, Turnover Action (May 19, 2009), Dkt. No. 16.

[314] Id.; JPMC's App. to Suppl. Opp'n to MSJ at B1054, B1060-B1061 (Logan Dep. 118:7-119:8, 143:12-145:5, 145:21-146:16), Turnover Action (Sept. 11, 2009), Dkt. No. 157. As Ms. Logan explained during her interview, the use of a "like" existing account was not unusual, and "like" existing accounts previously had been utilized in the ordinary course of business when GL Accounts were "closed." Logan Interview. Indeed, during her deposition, Ms. Logan referred to the temporary use of an existing intercompany GL account as the "normal workaround." JPMC's App. to Suppl. Opp'n to MSJ at B1053 (Logan Dep. 116:14-117:15), Turnover Action (Sept. 11, 2009), Dkt. No. 157. Ms. Logan also noted that the deadlines for opening certain kinds of accounts served technological purposes and were not imposed to satisfy regulatory requirements. Logan Interview.

[315] Logan Interview. Debtors' App. to MSJ at A6-A7 (¶¶ 16-17), A78-A81, Turnover Action (May 19, 2009), Dkt. No. 16.

[316] The New Account Request Form was signed and approved by Ms. Schulte. Debtors' App. to MSJ at A7 (¶ 17), A78, Turnover Action (May 19, 2009), Dkt. No. 16. The Journal Entry Request Form was signed and approved by Ms. Logan. Id. at A7 (¶ 17), A81. The Journal Entry Posting Forms were signed and approved by Ms. Schulte and WMB's then Vice President, Cash Management Manager, Treasury. Id. at A7 (¶ 17), A79-A80.

[317] Id. at A8 (¶ 20), A83-A84. "Co. 1" refers to WMB, and "Co. 40" refers to FSB. Id. at A8 (¶ 20); Logan Interview. The inadvertently created account at WMB was Account 4218. Debtors' App. to Mot. for MSJ at A8 (¶ 20), A80, Turnover Action (May 19, 2009), Dkt. No. 16; Logan Interview.

[318] The New Account Request Form was prepared by the Senior Treasury Analyst and signed and approved by WMB's then First Vice President, Treasury - Cash Management. Debtors' App. to MSJ at A9 (¶ 23), A93, Turnover Action (May 19, 2009), Dkt. No. 16. The Senior Treasury Analyst also prepared revised Journal Entry

Account Request Form and revised Journal Entry Posting Forms were created on September 22, 2008, but were back-dated to September 19, 2008.[319] Ms. Logan stated that the reason for the back-dating was due to the "mistakes" made in attempting to transfer the $3.67 billion to a new account at FSB.[320]

Both the original and revised New Account Request Forms provided that the purpose of the account was "Master note elimination."[321] In addition, the Journal Entry Posting Form described the transaction as "WMI contributes to fsb."[322] According to Ms. Logan, when these forms were prepared, the notations "Master note elimination" and "WMI contributes to fsb" were inadvertently retained on the computer template for the form used for a prior transaction.[323] The incorrect notations were not noticed until after Account 4234 had been opened at FSB and the $3.67 billion had been transferred.[324]

The process required to establish Account 4234 to receive $3.67 billion from Account 0067 at WMB was completed as of September 24, 2008, but was dated to be effective as of September 19, 2008.[325] The September 30, 2008 Account Statements for Account 0667 reflect

---

Posting Forms, which were signed and approved by WMB's First Vice President, Treasury - Cash Management; WMB's Vice President, Cash Management Manager, Treasury; and Ms. Schulte. *Id.* at A9 (¶ 23), A94-A95.

[319] *Id.* at A9 (¶¶ 22-23), A93-A95; Logan Interview.

[320] Logan Interview. *See* Debtors' App. to MSJ at A94-A95, Turnover Action (May 19, 2009), Dkt. No. 16. Ms. Logan indicated to the Examiner that she did not consider the assignment of a retroactive effective date to be unusual or extraordinary. Logan Interview. According to Ms. Logan, retroactive dating was routinely done when accounting records needed to be corrected or when documentation was completed after the fact. Logan Interview.

[321] Debtors' App. to MSJ at A78, A93, Turnover Action (May 19, 2009), Dkt. No. 16.

[322] *Id.* at A79-A80, A94-A95.

[323] *Id.* at A17 (¶ 40 n.5); Logan Interview.

[324] Debtors' App. to MSJ at A17 (¶ 40 n.5), Turnover Action (May 19, 2009), Dkt. No. 16; JPMC's App. to Suppl. Opp'n to MSJ at B1064 (Logan Dep. 159:14-160:8), Turnover Action (Sept. 11, 2009), Dkt. No. 157; Logan Interview.

[325] Debtors' App. to MSJ at A27, Turnover Action (May 19, 2009), Dkt. No. 16; *see also* WMI_PC_701361048.00001; Logan Interview.

four debits dated September 19, 2008, in the aggregate amount of $3.67 billion.[326] Conversely, the September 30, 2008 Account Statements for Account 4234 reflect four deposits dated September 22, 2008 with an effective date of September 19, 2008, in the aggregate amount of $3.67 billion.[327] On September 24 and 25, 2008, WMI paid two invoices from the $3.67 billion in Account 4234 at FSB that had been billed directly to WMI.[328]

c.    Issues with Respect to the Transfer of $3.67 Billion to FSB

(i)    Post-Transfer Loan of $3.67 Billion by FSB to WMB

The $3.67 billion that was transferred to FSB was loaned back to WMB. WMI regularly used a Revolving Master Note (the "Master Note") to lend billions of dollars daily from FSB to WMB.[329] The Master Note was created to provide FSB with an income-producing asset and to reduce FDIC premiums.[330] In 2004, FSB's investment portfolio was generating significant earnings, and FSB had approximately $14-15 billion excess cash in a demand deposit account.[331] Ms. Logan informed the Examiner that she understood from the beginning (i.e., September 18,

---

[326] Debtors' App. to MSJ at A25, Turnover Action (May 19, 2009), Dkt. No. 16.

[327] Id. at A27.

[328] Id. at A14-A15 (¶ 37), A27, A112-A113.

[329] Logan Interview; Debtors' App. to MSJ at A17-A18 (¶ 41), Turnover Action (May 19, 2009), Dkt. No. 16; Debtors' MSJ at 17 n.12, Turnover Action (May 19, 2009), Dkt. No. 15; Interview of Peter Freilinger, October 20, 2010. Ms. Logan described the Master Note as "basically a commercial loan from [FSB] to [WMB]." JPMC's App. to Suppl. Opp'n to MSJ at B1068 (Logan Dep. 175:12-16), Turnover Action (Sept. 11, 2009), Dkt. No. 157; WMI_PC_701361054.00001. WMB paid FSB interest on the Master Note, but unless FSB needed the funds, the interest was capitalized to the Master Note, thereby increasing the principal balance. JPMC's App. to Suppl. Opp'n to MSJ at B1068 (Logan Dep. 175:17-176:17), Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[330] JPMC's App. to Suppl. Opp'n to MSJ at B1066 (Logan Dep. 166:5-18), Turnover Action (Sept. 11, 2009), Dkt. No. 157; WMI_PC_701361054.00001; Logan Interview.

[331] Logan Interview; WMI_PC_701361054.00001. Ms. Logan told the Examiner that under federal banking laws, FSB was required to maintain only $1 million on deposit with the Federal Reserve, and FSB was required to pay FDIC premiums on its deposits. Logan Interview. Therefore, in September 2004, the FSB Board of Directors authorized the creation of the Master Note to move FSB's excess cash to WMB as the excess cash was generated. Logan Interview; WMI_PC_701361054.00001.

2008) that the Master Note would be utilized in connection with the $3.67 billion transfer to FSB.[332]

Ms. Logan had originally asked Mr. Smith to put the Master Note in place earlier.[333] Mr. Smith was responsible for the preparation of the Master Note, and Thomas Casey (the Chief Financial Officer), Mr. Williams, and Melissa Ballenger (the Vice President - Corporate Controller) were responsible for approving actions concerning the Master Note.[334] According to Ms. Logan, former in-house regulatory counsel advised that there was no regulatory requirement for the Master Note to be collateralized.[335] Ms. Logan further explained to the Examiner, however, that the Washington Mutual tax department wanted borrowings under the Master Note to be collateralized so that interest paid by WMB to FSB would be deductible by WMB.[336] Accordingly, Mr. Smith was responsible for coordinating the preparation of the Asset Pledge Agreement,[337] pursuant to which FSB's advances to WMB under the Master Note were collateralized by a weekly pledge by WMB to FSB of a first priority lien and security interest in mortgage loans.[338]

---

[332] Logan Interview. *See also* JPMC's App. to Suppl. Opp'n to MSJ at B1039 (Logan Dep. 61:13-14), Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[333] JPMC's App. to Suppl. Opp'n to MSJ at B1066 (Logan Dep. 166:19-167:14), Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[334] Logan Interview.

[335] JPMC's App. to Suppl. Opp'n to MSJ at B1066-B1067 (Logan Dep. 169:19-170:4), Turnover Action (Sept. 11, 2009), Dkt. No. 157; JPMC's App. to Opp'n to MSJ at B109, Turnover Action (July 24, 2009), Dkt. No. 103; WMI_PC_701361040.00001, at WMI_PC_701361010.00002; Logan Interview.

[336] Logan Interview.

[337] Logan Interview. *See also* JPMC's App. to Opp'n to MSJ at B10-B15, Turnover Action (July 24, 2009), Dkt. No. 103.

[338] WMI_PC_701361054.00001; JPMC's App. to Opp'n to MSJ at B10-B21, Turnover Action (July 24, 2009), Dkt. No. 103. According to Amendment No. 1 to the Asset Pledge Agreement, the original Master Note and Asset Pledge Agreement were executed on September 29, 2005. JPMC's App. to Opp'n to MSJ at B16-B20, Turnover Action (July 24, 2009), Dkt. No. 103. Mr. Williams executed a Master Note dated March 7, 2007 on behalf of WMB. Debtors' App. to MSJ at A123-A126, Turnover Action (May 19, 2009), Dkt. No. 16. On August 21, 2007, Mr. Williams executed the Amendment No. 1 Asset Pledge Agreement (the "Amendment No. 1"), which amended the original Asset Pledge Agreement dated September 29, 2005. JPMC's App. to Opp'n to MSJ at B16-B20,

On or about September 19, 2008, the principal amount of the Master Note was $15 billion.[339] Pursuant to an ongoing practice of loaning excess funds at FSB to WMB, Ms. Logan recognized that the principal balance of the Master Note would need to be increased so that the $3.67 billion transferred to FSB could be immediately loaned back to WMB under the Master Note.[340] Accordingly, on September 19, 2008, Mr. Smith, pursuant to the Asset and Liability Management Policy's Intercompany Transaction standard, asked Mr. Casey to approve the increase of the Master Note from $15 billion to $20 billion.[341] Mr. Casey and Mr. Williams approved the request.[342]

The entire transaction (i.e., the transfer of the $3.67 billion from WMB to FSB and the subsequent loan of $3.67 billion from FSB to WMB) is reflected on the Journal Entry Request Form.[343] According to the Debtors, neither WMB's net assets nor its liquidity were adversely affected by the entire transaction.[344]

---

Turnover Action (July 24, 2009), Dkt. No. 103. The Amendment No. 1 also indicates that Mr. Williams signed on behalf of both WMB and FSB. *Id.*

[339] Debtors' App. to MSJ at A123-A126, Turnover Action (May 19, 2009), Dkt. No. 16.

[340] JPMC's App. to Suppl. Opp'n to MSJ at B1074-B1075, B1078, B1069 (Logan Dep. 201:17-202:2, 215:23-216:13, 178:18-179:17), Turnover Action (Sept. 11, 2009), Dkt. No. 157; Logan Interview. Ms. Logan asserts that, unlike the instruction to move the maximum amount of funds from Account 0667 to FSB, she did not receive instructions to loan the funds back to WMB. JPMC's App. to Suppl. Opp'n to MSJ at B1039 (Logan Dep. 63:3-9), Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[341] JPMC's App. to Opp'n to MSJ at B104-B107, Turnover Action (July 24, 2009), Dkt. No. 103.

[342] *Id.* Prior to the $3.67 billion transfer, Washington Mutual management previously had increased the balance of Master Note, usually in increments of $5 billion. Smith Interview. According to Ms. Logan, the Board of Directors of FSB was not consulted because the policies in place at the time authorized Ms. Schulte to approve the increase. JPMC's App. to Suppl. Opp'n to MSJ at B1070 (Logan Dep. 184:6-14), Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[343] Debtors' App. to MSJ at A81, Turnover Action (May 19, 2009), Dkt. No. 16; *see also* JPMC's App. to Suppl. Opp'n to MSJ at B1062-B1064 (Logan Dep. 153:2-160:8), Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[344] Logan Interview.

### (ii)     Elimination of Collateral Pledge of Master Note

Around September 22 or September 23, 2008, Ms. Logan recognized that, pursuant to the Master Note and as defined in footnote 60 to the Asset Pledge Agreement, there was insufficient collateral available to support an additional $3.67 billion loan under the Master Note.[345] Accordingly, on September 24, 2008, Ms. Logan asked Peter Freilinger, WMB's former Senior Vice President - Funding & Capital, Treasury, to approve modifying Amendment No. 1 to the Asset Pledge Agreement "to cease the pledge of assets from WMB to [FSB]."[346] Mr. Smith noted that the waiver of the collateral requirement would "be a temporary suspension of the requirement," and Mr. Freilinger approved the amendment.[347] Prior to this transaction, FSB had not loaned money to WMB pursuant to the Master Note without collateral.[348]

After receiving approval from Mr. Freilinger, Mr. Smith requested that outside counsel draft an amendment to the Asset Pledge Agreement.[349] The seizure of WMB occurred, however, before the suspension could be documented.[350]

---

[345] JPMC's App. to Opp'n to MSJ at B108-B109, Turnover Action (July 24, 2009), Dkt. No. 103; JPMC's App. to Suppl. Opp'n to MSJ at B1071 (Logan Dep. 186:15-187:13), Turnover Action (Sept. 11, 2009), Dkt. No. 157; Logan Interview.

[346] JPMC's App. to Opp'n to MSJ at B108-B109, Turnover Action (July 24, 2009), Dkt. No. 103. Ms. Logan did not consult former in-house regulatory counsel regarding the efforts to suspend the collateral requirement. JPMC's App. to Suppl. Opp'n to MSJ at B1075 (Logan Dep. 204:6-21), Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[347] JPMC's App. to Opp'n to MSJ at B108-B109, Turnover Action (July 24, 2009), Dkt. No. 103; Logan Interview.

[348] JPMC's App. to Suppl. Opp'n to MSJ at B1072, B1079 (Logan Dep. 190:18-24, 220:18-221:5), Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[349] See WMI_PC_701361040.00001; WMI_PC_701361041.00001; JPMC's App. to Opp'n to MSJ at B108-B109, Turnover Action (July 24, 2009), Dkt. No. 103.

[350] Logan Interview. See JPMC's App. to Suppl. Opp'n to MSJ at B1000, Turnover Action (Sept. 11, 2009), Dkt. No. 157. Mr. Williams signed the Master Note as Treasurer and Senior Vice President of WMB. Debtors' App. to MSJ at A123-A126, Turnover Action (May 19, 2009), Dkt. No. 16. He could not recall, however, whether he also was an officer of FSB at the time he executed the Master Note in March 2007, or as of September 2008. Williams Interview. The Debtors maintain that Mr. Williams was authorized to increase the Master Note, but it remains unclear whether any potential conflicts of interest were properly considered and avoided with respect to the authorizations provided in connection with the increase in the Master Note and the suspension of the collateral requirement, to the extent the authorizing individuals owed fiduciary duties to more than one Washington Mutual entity. Other possible conflicts of interest include that Ms. Logan was an officer of WMI, WMB, and FSB at the time of the $3.67 billion transfer, but Ms. Logan was acting on WMI's behalf when she coordinated the $3.67 billion

d.　　Post-Petition Refund of $234.5 Million to WMI from the IRS

On September 30, 2008, after the seizure of WMB, the Internal Revenue Service wired a tax refund in the amount of approximately $234.5 million to WMI into Account 0667, WMI's former primary non-interest bearing checking account at WMB.[351]  Under the Settlement Agreement, post-petition tax refunds will be allocated with 80% paid to JPMC and 20% paid to the Debtors.  This settlement allocation is consistent with the overall settlement of the first portion of tax refund claims.

### 3.　　Sources of Information Concerning the Disputed Deposit Accounts

The Examiner met with and received submissions from the Debtors, JPMC, and the Creditors Committee concerning the parties' respective positions regarding the "deposit" dispute and summaries of litigation between the parties concerning the deposit.  The Examiner also obtained input from the Equity Committee and Bank Bondholders.  The Examiner reviewed numerous motions, pleadings, and other documents.[352]

The Examiner reviewed various WMI internal corporate and accounting documents and obtained access to the extensive collection of documents housed in the data room maintained by Weil.

In connection with the Investigation into the Disputed Accounts and other issues, the Examiner interviewed, in addition to Ms. Logan, Robert Williams, Charles "Chad" Smith, John Robinson, Alan Fishman, Darrel Dochow, C. Jack Read, Peter Freilinger, and Thomas Casey.

---

transfer. *See* JPMC's App. to Suppl. Opp'n to MSJ at B1031, B1039 (Logan Dep. 28:23-29:6, 59:16-22), Turnover Action (Sept. 11, 2009), Dkt. No. 157.

[351] JPMC's App. to Opp'n to MSJ at B207 (¶ 16), Turnover Action (July 24, 2009), Dkt. No. 103; Debtors' App. to MSJ at A25, Turnover Action (May 19, 2009), Dkt. No. 16.

[352] The Examiner reviewed, among other filings, the Receivership Claim, the FDIC's denial of the Receivership Claim and the Debtors' subsequent appeal of that decision in the WMI Action, the adversary proceedings and other litigation in the Bankruptcy Court and discovery related thereto, including a currently pending motion for summary judgment brought by the Debtors to obtain control of the "deposits."

### 4. Claims Asserted by the Parties Regarding the Disputed Accounts

#### a. Summary of Parties' Claims

The Debtors contend that they are entitled to the funds in the Disputed Accounts. In support, they argue that they followed applicable policies and procedures to effect a valid transfer of $3.67 billion from WMI's long-standing deposit account at WMB to a newly created WMI deposit account at FSB. Accordingly, the Debtors brought a motion for summary judgment seeking turnover of the funds in the Disputed Accounts, which motion was fully litigated before the Bankruptcy Court.

Primarily in the context of their respective oppositions to the Debtors' motion for summary judgment, JPMC, the FDIC, and certain Bank Bondholders raise various issues and assert numerous defenses. Specifically, JPMC argues that the Disputed Accounts should not be turned over to the Debtors because the transfer of funds was not properly executed; that the paperwork prepared to create the WMI deposit account at FSB did not support a valid transfer; that appropriate authorizations were not obtained for the transfer; that the transfer, if it did occur, constituted an actual fraud; and that the $3.67 billion transferred was a capital contribution that was sold to JPMC pursuant to the P&A Agreement. In addition, both JPMC and the FDIC assert rights to setoff and/or recoupment against the Disputed Accounts.[353]

The central issues identified in the pleadings by the parties are discussed below.

---

[353] In both adversary proceedings, JPMC also has asserted affirmative claims and counterclaims seeking declarations regarding its rights with respect to the Disputed Accounts, which includes its rights to setoff and recoupment. *See, e.g.,* Compl., *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc.,* Adv. Proc. No. 09-50551 (MFW) (Bankr. D. Del.) (the "JPMC Action") (Mar. 24, 2009), Dkt. No. 1; JPMC's Answer & Am. Countercl. / Cross-cl., Turnover Action (Aug. 10, 2009), Dkt. No. 121.

b. Whether $3.67 Billion Was Transferred to a Deposit Account at FSB

  (i)  Was $3.67 Billion Transferred to a Deposit Account or Was it a Capital Contribution?

The Debtors contend that company policy was followed and the appropriate forms were prepared and processed to create a new WMI deposit account at FSB into which $3.67 billion was transferred from Account 0667 at WMB, WMI's primary checking account.[354] JPMC attacks[355] the transfer based on the logistics of what it refers to as the $3.67 billion "book entry transfer" by pointing to, among other things, the notations on the New Account Request Forms and Journal Entry Posting Forms, which it claims evidence a purpose and intent that is inconsistent with the creation of a new deposit account.[356] Relying, in part, on these notations on the Journal Entry Posting Forms, JPMC maintains that the $3.67 billion "book entry transfer" may have been a capital contribution[357] made by WMI to FSB in light of certain ledger entries describing the transaction as "WMI contributes to [WMB] fsb."[358]

The Debtors explain that the notations were simple clerical errors, i.e., the quoted text was on the computer template for the form used for a prior transaction, which text inadvertently

---

[354] *See* Debtors' MSJ at 4-5, Turnover Action (May 19, 2009), Dkt. No. 15.

[355] The FDIC either expressly or implicitly adopted many of arguments made by JPMC in various pleadings and filings in the Turnover Action. *See, e.g.*, FDIC's Mem. of Law in Opp'n to Mot. for Summ. J. ("FDIC's Opp'n to MSJ") at 17, Turnover Action (July 24, 2009), Dkt. No. 97 (referring to JPMC's answer and counterclaims); FDIC's Suppl. Mem. in Opp'n to Mot. for Summ. J. ("FDIC's Suppl. Opp'n to MSJ") at 4, Turnover Action (Sept. 11, 2009), Dkt. No. 152 (incorporating by reference the arguments set forth in JPMC's submissions with respect to summary judgment).

[356] JPMC's Opp'n to MSJ at 20-22, 31, Turnover Action (July 24, 2009), Dkt. No. 102. Specifically, the New Account Request Forms provided that the purpose of the account was "Master note elimination," and the Journal Entry Posting Forms described the transaction as "WMI contributes to fsb." Debtors' App. to MSJ at A78-A80, A93-A95, Turnover Action (May 19, 2009), Dkt. No. 16.

[357] Certain Bank Bondholders also claim the purported transfer should be treated as a capital contribution. Bank Bondholders' Stmt. in Opp'n to Mot. for Summ. J. ("Bondholders' Opp'n to MSJ"), Exs. A-B, Turnover Action (Aug. 3, 2009), Dkt. No. 115.

[358] JPMC's Opp'n to MSJ at 31, Turnover Action (July 24, 2009), Dkt. No. 102. JPMC pointed to 32 general ledger entries describing the transactions as "WMI contributions to FSB," and pointed out that the funds are described as four separate contributions on forms prepared by one Washington Mutual employee that were then signed by three other Washington Mutual employees. *Id.*

was not removed when adapted for the $3.67 billion transfer.[359]   The Debtors maintain that the documents establish that the new account was an "On-Us" corporate checking account bearing a "B3" code, which was used for non-interest bearing demand deposit accounts, and that the internal correspondence reflects the intent to create a new deposit account at FSB.[360]   The Debtors further explain that a capital contribution required different forms and authorizations.[361]   The Debtors also point to their subsequent withdrawal of funds from the FSB account to pay two invoices as evidence that it exercised control over the account and that the transaction was not intended to effectuate a capital contribution.[362]

JPMC also asserts that the $3.67 billion "book entry transfer" violated WMB's and FSB's policies against establishing a new deposit account within 14 days of month-end.[363]   The Debtors' position is that the policy against opening new accounts applied to new general ledger accounts and not to new deposit accounts.[364]

(ii)    The "Round-Trip" Transaction

The parties also dispute the legal implications of the method by which the $3.67 billion was transferred to the new deposit account at FSB.  Instead of wiring $3.67 billion to FSB, WMB booked an increase in the amount it was to receive from FSB pursuant to the Master Note

---

[359] Debtors' App. to MSJ at A16-A17 (¶ 40 n.5), Turnover Action (May 19, 2009), Dkt. No. 16. *See also* Debtors' Reply in Supp. of MSJ at 53 n.25, Turnover Action (Sept. 18, 2009), Dkt. No. 163; Logan Interview.  The general ledger entries are generated from these forms.  Debtors' App. to MSJ at A16 (¶ 40), Turnover Action (May 19, 2009), Dkt. No. 16.

[360] Debtors' MSJ at 6-7, 12-13, Turnover Action (May 19, 2009), Dkt. No. 15; Logan Interview.

[361] Debtors' MSJ at 12, 16-17, Turnover Action (May 19, 2009), Dkt. No. 15.

[362] Debtors' Reply in Supp. of MSJ at 19, Turnover Action (Sept. 18, 2009), Dkt. No. 163; Debtors' App. to MSJ at A14-A15 (¶ 37), A27, A112-A113, Turnover Action (May 19, 2009), Dkt. No. 16; Logan Interview.

[363] JPMC's Opp'n to MSJ at 24-25, Turnover Action (July 24, 2009), Dkt. No. 102.

[364] Debtors' Reply in Supp. of MSJ at 14-15, Turnover Action (Sept. 18, 2009), Dkt. No. 163; Smith Interview.

by \$3.67 billion.[365] In its opposition to the motion for summary judgment, JPMC argues that there is an issue of material fact concerning whether actual or "good" funds were transferred from WMB to FSB.[366] Among the arguments advanced by JPMC to challenge the motion for summary judgment and defend on the merits are that:

1. Ms. Logan never saw the amendment increasing the Master Note from \$15 billion to \$20 billion.[367]

2. The increase to the Master Note never was properly authorized, including a failure to obtain approval by FSB's Board of Directors.[368]

3. If the loan was never approved, it may not have even occurred in the first instance.[369]

4. Collateral was not posted by WMI to support the loan back to WMB under the Master Note pursuant to § 23A of the Federal Reserve Act, the Master Note itself, and the Asset Pledge Agreement.[370]

5. The \$3.67 billion book entry contradicts the Debtors' commitments to regulators, thereby raising issues as to the "intent to use the transaction to hinder, delay or defraud other parties."[371]

---

[365] Debtors' App. to MSJ at A81, Turnover Action (May 19, 2009), Dkt. No. 16; JPMC's App. to Suppl. Opp'n to MSJ at B1056, B1062-B1064 (Logan Dep. 128:5-22, 153:2-160:8), Turnover Action (Sept. 11, 2009), Dkt. No. 157; Logan Interview. *See also* Debtors' MSJ at 17-18 n.12, Turnover Action (May 19, 2009), Dkt. No. 15.

[366] JPMC's Opp'n to MSJ at 3, 17, Turnover Action (July 24, 2009), Dkt. No. 102; JPMC's Suppl. Opp'n to Mot. for Summ. J. ("JPMC's Suppl. Opp'n to MSJ") at 17-21, 25, Turnover Action (Sept. 11, 2009), Dkt. No. 156. The Debtors maintain that a valid deposit account can be opened without an actual transfer of funds. Debtors' MSJ at 17-18 n.12, Turnover Action (May 19, 2009), Dkt. No. 15; Debtors' Reply in Supp. of MSJ at 10-11, Turnover Action (Sept. 18, 2009), Dkt. No. 163. Therefore, even if no actual funds were transferred to FSB, FSB still was obligated to WMI. Debtors' MSJ at 17-18 n.12, Turnover Action (May 19, 2009), Dkt. No. 15.

[367] JPMC's Suppl. Opp'n to MSJ at 23-24, Turnover Action (Sept. 11, 2009), Dkt. No. 156.

[368] JPMC's Opp'n to MSJ at 3-4, 21 n.15, Turnover Action (July 24, 2009), Dkt. No. 102; JPMC's Suppl. Opp'n to MSJ at 21-23, Turnover Action (Sept. 11, 2009), Dkt. No. 156 (citing to JPMC's App. to Opp'n to MSJ at B104-B107, Turnover Action (July 24, 2009), Dkt. No. 103).

[369] JPMC's Suppl. Opp'n to MSJ at 21-24, Turnover Action (Sept. 11, 2009), Dkt. No. 156.

[370] JPMC's Opp'n to MSJ at 22-24, Turnover Action (July 24, 2009), Dkt. No. 102; JPMC's Suppl. Opp'n to MSJ at 24-25, Turnover Action (Sept. 11, 2009), Dkt. No. 156. The Debtors acknowledged that to make the loan without the required collateral would have violated company policies, thus the solution was to suspend the collateral requirement. JPMC's App. to Suppl. Opp'n to MSJ at B1071 (Logan Dep. 186:15-187:21), Turnover Action (Sept. 11, 2009), Dkt. No. 157; Logan Interview.

[371] JPMC's Opp'n to MSJ at 24-28, Turnover Action (July 24, 2009), Dkt. No. 102. JPMC asserts that increasing the Master Note was inconsistent with Project Fillmore, which was the effort to reduce the overcapitalization of FSB. *Id.* at 27-28; JPMC's Suppl. Opp'n to MSJ at 27, Turnover Action (Sept. 11, 2009), Dkt. No. 156; *see also* Debtors' App. to MSJ at A115-A116, Turnover Action (May 19, 2009), Dkt. No. 16. In order for FSB to meet the federally mandated qualified thrift lender ("QTL") test, 65 percent of FSB's assets needed to be in qualified thrift

(iii)    Post-Transfer Treatment of the Account

The parties also contest whether certain post-transfer documents are evidence that the

$3.67 billion transaction created a deposit liability at FSB.  The Debtors, for example, point to

JPMC's post-seizure treatment of the FSB Account as evidence that it is indeed a deposit

account.  For instance, the Debtors assert that one of the declarations JPMC submitted opposing

summary judgment acknowledges that JPMC preserved the status quo regarding the Disputed

Accounts;[372] that JPMC appeared to report the deposits as deposit liabilities to the OCC; and that

JPMC paid FDIC insurance premiums on the accounts.[373]  JPMC notes that the account

statement for the FSB Account reflected that it was issued by "Washington Mutual Bank, FA"

and not by FSB.[374]  JPMC argues that the account statements suggest that any deposits were with

WMB, not FSB.[375]  The Debtors claim the notation on the account mistakenly referred to WMB

---

assets (i.e., real estate-related investments).  JPMC's App. to Suppl. Opp'n to MSJ at B1079 (Logan Dep. 220:10-17), Turnover Action (Sept. 11, 2009), Dkt. No. 157; Logan Interview.  FSB's compliance with the QTL test was closely monitored at the end of the month.  JPMC's App. to Suppl. Opp'n to MSJ at B1079-B1080 (Logan Dep. 220:10-223:7), Turnover Action (Sept. 11, 2009), Dkt. No. 157; JPMC's App. to Opp'n to MSJ at B92-B94, Turnover Action (July 24, 2009), Dkt. No. 103.  In the months preceding the Petition Date, the Washington Mutual treasury group proposed to decapitalize FSB.  Debtors' App. to MSJ at A15-A16 (¶ 38), Turnover Action (May 19, 2009), Dkt. No. 16.  On at least four occasions, Washington Mutual management had decreased the amount due to FSB from WMB per the Master Note and increased the amount FSB had on deposit at WMB.  JPMC's App. to Suppl. Opp'n to MSJ at B1080 (Logan Dep. 223:8-19), Turnover Action (Sept. 11, 2009), Dkt. No. 157; Logan Interview.

Ms. Logan explained that the increase in the Master Note associated with the $3.67 billion transfer was capital effect neutral, and that it did not adversely affect Project Fillmore.  JPMC's App. to Suppl. Opp'n to MSJ at B1051-B1052 (Logan Dep. 108:16-112:10), Turnover Action (Sept. 11, 2009), Dkt. No. 157; Logan Interview; *see also* Debtors' App. to MSJ at A115-A121, Turnover Action (May 19, 2009), Dkt. No. 16.

[372] Debtors' Reply in Supp. of MSJ at 7-8, Turnover Action (Sept. 18, 2009), Dkt. No. 163.

[373] Debtors' MSJ at 7-8, Turnover Action (May 19, 2009), Dkt. No. 15.

[374] JPMC's Opp'n to MSJ at 30-31, Turnover Action (July 24, 2009), Dkt. No. 102.  Washington Mutual Bank, FA was the corporate name of WMB prior to a name change on April 4, 2005.  *Id.* at 31.  JPMC also contends that because the statements were addressed only to "WMI," there is no indication that the funds on deposit were for the benefit of WMI, WMB, or another entity.  *Id.*  JPMC further states that the pre-January 2008 statements for Account 0667 state it was a "recon" account, not a demand deposit account.  *Id.*

[375] *Id.* at 30-31.

and not FSB,[376] and that regardless of whether the account was at FSB or WMB, it was still the

Debtors' account.[377]

c.       <u>Ownership of Funds in Disputed Accounts</u>

JPMC and FDIC assert that a substantial portion of the funds transferred to the FSB

Account may belong to WMB.[378]  With respect to the $234.5 million IRS refund that was wired

into Account 0667 on September 30, 2008, both JPMC and the FDIC allege those funds are the

property of WMB, as the refunds were attributable to the activities of WMB.[379]  The Debtors

dispute that WMI received the funds as a trustee for WMB and argue that the Tax Sharing

Agreement among the WaMu Group does not support arguments that the $234.5 million tax

refund was the property of WMB.[380]

JPMC also posits that the aggregate amount of $922 million transferred to Account 0667

in August and September 2008 from WMB to WMI, as a reconciliation of amounts due for past

state taxes advanced by WMI on behalf of WMB since 2003 or earlier, also may belong to

WMB.[381]  As discussed previously, these funds, along with TPG Funds and Series R Stock

proceeds, were principal sources of funds in what became the FSB Account.  JPMC also claims

that the remaining $2.2 billion from the TPG Funds raised in April 2008 were intended to be

---

[376] Logan Interview.

[377] Logan Interview; Debtors' Reply in Supp. of MSJ at 13, Turnover Action (Sept. 18, 2009), Dkt. No. 163.

[378] *See generally* FDIC's Opp'n to MSJ, Turnover Action (July 24, 2009), Dkt. No. 97; JPMC's Opp'n to MSJ, Turnover Action (July 24, 2009), Dkt. No. 102; JPMC's Suppl. Opp'n to MSJ, Turnover Action (Sept. 11, 2009), Dkt. No. 156.

[379] FDIC's Opp'n to MSJ at 9-12, Turnover Action (July 24, 2009), Dkt. No. 97; JPMC's Opp'n to MSJ at 36-40, Turnover Action (July 24, 2009), Dkt. No. 102; JPMC's Suppl. Opp'n to MSJ at 6-7, Turnover Action (Sept. 11, 2009), Dkt. No. 156.

[380] Debtors' Reply in Supp. of MSJ at 27-31, Turnover Action (Sept. 18, 2009), Dkt. No. 163.

[381] *See* JPMC's Suppl. Opp'n to MSJ at 5-6, Turnover Action (Sept. 11, 2009), Dkt. No. 156; JPMC's Answer & Am. Countercl. / Cross-cl. ¶ 94-95, Turnover Action (Aug. 10, 2009), Dkt. No. 121.

used for the benefit of WMB and, to the extent they are capital or property of WMB, the funds would be subject to a constructive trust.[382]

### d. Fraudulent Conveyance and Fraud Claims

In addition to the numerous factual arguments asserted by JPMC in opposing the Debtors' summary judgment motion, both JPMC and the FDIC raise issues as to whether fraudulent conveyances were made in connection with the $3.67 billion transfer. Referring to the issues raised by JPMC with respect to the August and September 2008 transfers to WMI totaling $922 million, the FDIC argues that such transfers were made with the intent to advance WMI's position against the FDIC Receiver and other creditors in any receivership of WMB.[383] The FDIC also asserts that the $3.67 billion "round-trip" transaction (i.e., the deposit transfer to FSB and the subsequent loan back to WMB pursuant to the Master Note), like the $922 million transfers, "has many hallmarks of a fraudulent transfer that would, if it had been successful, require the transaction to be unwound."[384]

In the event that the $3.67 billion transfer is held to have created a deposit liability at FSB, JPMC separately asserts a fraud counterclaim against WMI that is, by and large, based on the same factual issues it raised with respect to $3.67 billion "book entry transfer."[385] JPMC also

[382] JPMC's Opp'n to MSJ at 40-43, Turnover Action (July 24, 2009), Dkt. No. 102.

[383] FDIC's Opp'n to MSJ at 15-16, Turnover Action (July 24, 2009), Dkt. No. 97.

[384] Id. at 17. Certain Bank Bondholders also allege that the $3.67 billion transfer may be an avoidable fraudulent conveyance. See Bondholders' Opp'n to MSJ, Exs. A-B, Turnover Action (Aug. 3, 2009), Dkt. No. 115.

[385] JPMC's Answer & Am. Countercl. / Cross-cl. ¶¶ 85-102, Turnover Action (Aug. 10, 2009), Dkt. No. 121. JPMC asserts damages on behalf of FSB for WMI's alleged intentional misrepresentations and omissions, including damages arising from: (a) any deposit liability of WMI that it is required to repay without funds or collateral from WMI that fully offsets that liability; (b) any funds it is required to repay as the recipient of funds credited to the Disputed Accounts that can be recovered by a third party, including funds recovered by a third party as fraudulently transferred; and (c) defrauding WMB and its successors of the valuable right of setoff. Id. ¶ 99. The Debtors dispute these claims, arguing that: (a) neither FSB nor JPMC was harmed by the transfer of deposit liabilities from WMB to FSB; (b) FSB could not suffer damages as a result of being a recipient of what may someday be alleged by some third party to have been a fraudulent transfer (i.e., that contingent, speculative damages cannot form the basis for recovery); and (c) JPMC is pleading damages suffered by WMB, not FSB, and JPMC did not acquire any WMB

questioned whether fraudulent transfer or preference claims may exist with respect to the $922 million reconciliation.[386]

      e.          JPMC's and the FDIC's Potential Rights to Setoff and/or Recoupment

To the extent the Disputed Accounts are deemed to contain funds that are the property of the Debtors, JPMC argues that it has rights to setoff against those deposit liabilities for at least four reasons.[387] The Debtors dispute that JPMC possesses any underlying claim that it could use as a setoff.[388]

As to its right to setoff claims, first, JPMC contends that there is a self-executing clause contained in the Washington Mutual Business Account Disclosures and Regulations Policy[389] that made the terms of the policy binding by virtue of the opening and continued use of a deposit account. The policy grants WMB and FSB broad rights "to offset any account or asset of yours then held by us, by our sister bank or any subsidiary of ours or our sister bank." Based on the policy and standard deposit account agreement terms, JPMC contends it has a security interest in, lien rights against, and rights of setoff and recoupment against funds credited to the Disputed Accounts.[390]

---

claims against WMI per the P&A Agreement. Debtors' Opening Br. in Supp. of Mot. to Dismiss JPMC's Am. Countercl. at 21-25, Turnover Action (Aug. 24, 2009), Dkt. No. 139.

[386] JPMC's Suppl. Opp'n to MSJ at 5-6, Turnover Action (Sept. 11, 2009), Dkt. No. 156. *See also* JPMC's Opp'n to MSJ at 35-36, Turnover Action (July 24, 2009), Dkt. No. 102. Although JPMC and the FDIC raise factual and legal issues with respect to this transfer, no affirmative fraudulent conveyance claim has been brought. JPMC's fraud claim includes allegations that the Debtors "manufactured" $922 million of the $3.67 billion to be transferred by converting unsecured general ledger debt allegedly due to WMI from WMB into a deposit liability. JPMC's Answer & Am. Countercl. / Cross-cl. ¶ 94, 95, Turnover Action (Aug. 10, 2009), Dkt. No. 121.

[387] JPMC's Opp'n to MSJ at 46-59, Turnover Action (July 24, 2009), Dkt. No. 102.

[388] *See* Debtors' Reply in Supp. of MSJ at 37-45, Turnover Action (Sept. 18, 2009), Dkt. No. 163.

[389] The policy generally outlines the rules and terms of the accounts and services a customer has selected, such as a checking account. JPMC's App. to Opp'n to MSJ at B133-B172, Turnover Action (July 24, 2009), Dkt. No. 103.

[390] JPMC's Opp'n to MSJ at 47-48, Turnover Action (July 24, 2009), Dkt. No. 102.

Second, JPMC contends there are material issues of fact regarding the solvency of WMI,[391] and therefore the Debtors cannot be presumed insolvent under 11 U.S.C. § 553.[392] Further, JPMC argues that it acquired the claims in a manner permitted under § 553(a)(2).[393]

Third, in response to the Debtors' argument that no mutuality[394] of debts exists between JPMC and WMI because the $3.67 billion was held at FSB, not WMB, JPMC alleges that WMB may have retained economic liability with respect to the FSB Account.[395]

JPMC also contends that it has recoupment claims against the Debtors to offset any amounts due.[396] JPMC maintains that recoupment is available to offset obligations that arose due to the P&A Agreement and that any other result would be inequitable.[397] JPMC also argues it has direct claims against the Debtors and that the P&A Agreement does not divest JPMC of rights to which it would succeed as the owner of WMB's assets.[398]

The FDIC also asserts rights to setoff, claiming that WMB had claims against WMI. The FDIC setoff claims relate to, inter alia, over $4 billion in tax refunds and other tax assets.[399]

The FDIC also interposes a legal argument as to its rights to negate any recovery of the Disputed Accounts by the Debtors. FDIC argues that, pursuant to § 9.5 of the P&A Agreement,

---

[391] In support of its argument that the Debtors cannot be presumed to be insolvent in the 90 days prior to receivership, JPMC submitted a declaration of Thomas Blake. JPMC's App. to Opp'n to MSJ at B232-B259, Turnover Action (July 24, 2009), Dkt. No. 103.

[392] JPMC's Opp'n to MSJ at 48-52, Turnover Action (July 24, 2009), Dkt. No. 102. Under 11 U.S.C. § 553(c), "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 553(c).

[393] JPMC's Opp'n to MSJ at 52-54, Turnover Action (July 24, 2009), Dkt. No. 102.

[394] In order to assert rights to setoff, "mutuality of debts"–i.e., that the claims must be due to and from the same persons in the same capacity–is required. Debtors' MSJ at 22, Turnover Action (May 19, 2009), Dkt. No. 15.

[395] JPMC's Opp'n to MSJ at 54-57, Turnover Action (July 24, 2009), Dkt. No. 102. See Debtors' MSJ at 22-24, Turnover Action (May 19, 2009), Dkt. No. 15.

[396] JPMC's Opp'n to MSJ at 57-58, Turnover Action (July 24, 2009), Dkt. No. 102.

[397] Id. at 58.

[398] Id. at 58-59.

[399] FDIC's Opp'n to MSJ at 13, Turnover Action (July 24, 2009), Dkt. No. 97.

the FDIC Receiver retained the right to direct JPMC to withhold all or any portion of any deposit balance and return it to the FDIC Receiver.[400] Thus, even if the Disputed Accounts were not subject to setoff by JPMC, the FDIC argues they were subject to setoff by the FDIC Receiver.[401]

The Debtors contend that § 9.5 applies only to deposits held at WMB that were assumed pursuant to the P&A Agreement, and that it does not apply to the FSB account.[402] They further contend that JPMC has not asserted that it acquired claims from FSB against the Debtors and, even if it had, FSB did not hold any claims against the Debtors.[403] In addition, the Debtors contend that JPMC only has pointed to the P&A Agreement as a source of its claims against WMI, and argue that § 3.1 of the P&A Agreement, which is subject to Schedule 3.5, did not transfer to JPMC any claims against WMI.[404] Finally, the Debtors further assert that the presumption of insolvency bars JPMC's claims under § 553(a)(2)(B), as these claims were acquired within the 90 days before bankruptcy.[405]

---

[400] *Id.* at 13-14. In the Bankruptcy Court, the FDIC moved to modify the automatic stay to allow the FDIC Receiver to exercise its contractual rights under § 9.5 of the P&A Agreement to direct JPMC to return to the FDIC Receiver the funds in the Disputed Accounts. FDIC's Mot. for an Order Modifying the Auto. Stay, Bankruptcy Case (Nov. 4, 2009), Dkt. No. 1834.

[401] FDIC's Opp'n to MSJ at 14, Turnover Action (July 24, 2009), Dkt. No. 97.

[402] Debtors' Obj. to FDIC's Mot. for an Order Modifying the Auto. Stay ("Debtors' Obj. to FDIC's Mot. to Modify Stay") ¶¶ 18, 28-29, Bankruptcy Case (Nov. 11, 2009), Dkt. No. 1872. The Debtors also argue that triangular setoffs are not permitted and that mutuality does not exist without exercising § 9.5. *Id.* ¶¶ 19-22. The Debtors also argue that the FDIC waived any right to invoke § 9.5 when the FDIC supported JPMC's right to setoff. *Id.* ¶¶ 34-35.

[403] Debtors' MSJ at 19-20 n.14, Turnover Action (May 19, 2009), Dkt. No. 15.

[404] Debtors' Reply in Supp. of MSJ at 38-42, Turnover Action (Sept. 18, 2009), Dkt. No. 163; *see also* Debtors' MSJ at 19-20, Turnover Action (May 19, 2009), Dkt. No. 15. Schedule 3.5 excludes from the list of assets purchased, among other things, "any interest, right, action, claim, or judgment against . . . any shareholder or holding company of the Failed Bank," which is defined in the P&A Agreement as WMB. Debtors' App. to MSJ at A203, Turnover Action (May 19, 2009), Dkt. No. 16. To counter the Debtors' position, JPMC also moved to submit the declarations of Daniel P. Cooney and Robert C. Schoppe, which address the scope of discussions about what rights JPMC acquired against WMI. JPMC's Mot. for Leave to File Decl. of Daniel P. Cooney and Robert C. Schoppe ("JPMC's Mot. to File Decl."), Turnover Action (Oct. 16, 2009), Dkt. No. 181.

[405] Debtors' MSJ at 20-22, Turnover Action (May 19, 2009), Dkt. No. 15; Debtors' Reply in Supp. of MSJ at 42-47, Turnover Action (Sept. 18, 2009), Dkt. No. 163. The Debtors argue that no mutuality existed between JPMC and WMI as of the time the competing debts and claims were incurred, and JPMC's later restructuring with respect to FSB cannot circumvent the bar against triangular setoff. Debtors' MSJ at 22-24, Turnover Action (May 19, 2009), Dkt. No. 15. Likewise, recoupment is barred because JPMC did not acquire any claims against the Debtors from the

### 5. Procedural Status of the Disputed Accounts

The parties are litigating the Disputed Accounts in various courts. In the Bankruptcy Court, a motion for summary judgment is pending, which could resolve the ownership of the Disputed Accounts. The litigation history and its current procedural posture is quite complex. The Examiner has included a detailed procedural history with respect to the Disputed Accounts to illustrate the types of the numerous procedural and substantive hurdles that the Debtors would encounter in any litigation with JPMC and the FDIC if the Settlement were not approved.

In addition to litigating the substantive matters regarding the Disputed Accounts, the parties also have addressed jurisdictional and procedural issues in this Court and the United States District Court for the District of Columbia ("DC Court"). Shortly after the filing of the bankruptcy petition, the Debtors filed a complaint in the DC Court, *Washington Mutual, Inc., v. Federal Deposit Insurance Corporation*, Case No. 1:09-cv-0533 (RMC) (the "WMI Action"). That complaint sought to appeal the FDIC Receiver's denial of the Receivership Claim.[406] Subsequently, JPMC filed an adversary proceeding in this Court against the Debtors seeking, inter alia, a declaratory judgment as to its rights to the Disputed Accounts, *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc.*, Adv. Proc. No. 09-50551 (MFW) (Bankr. D. Del.) (the "JPMC Action").[407] Next, the Debtors filed their own adversary proceeding against JPMC seeking turnover of the Disputed Accounts under 11 U.S.C. § 542, *Washington Mutual, Inc. v. JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW) (Bankr. D. Del.) (the "Turnover

---

FDIC. Debtors' Reply in Supp. of MSJ at 48, Turnover Action (Sept. 18, 2009), Dkt. No. 163. Indeed, the Debtors assert that even if JPMC's claims were deemed to have arisen by virtue of the P&A Agreement, the "identical transaction" element required to offset the claims would still not exist because the $3.67 billion liability was assumed as a result of a subsequent merger with FSB. *Id.* at 48-49 n.23.

[406] Compl., *Washington Mutual, Inc., v. Federal Deposit Ins. Corp.*, Case No. 1:09-cv-533 (RMC) (D.D.C.) (the "WMI Action") (Mar. 20, 2009), Dkt. No. 1.

[407] Compl., JPMC Action (Mar. 24, 2009), Dkt. No. 1.

Action").[408]  In one form or another, the Disputed Accounts are among the contested issues in these three different actions.

Both JPMC and the FDIC assert that the WMI Action should take precedence over actions in this Court and that the adversary proceedings pending in this Court should be stayed pending resolution of the WMI Action.  The FDIC and JPMC argue that FIRREA establishes a jurisdictional bar prohibiting this Court from entertaining "'any claim or action . . . seeking a determination of rights with respect to the assets of any' failed depository institution or 'any claim relating to any act or omission of' either a failed institution or the FDIC as its receiver."[409]  The FDIC and JPMC also rely on the first-filed rule, arguing that the WMI Action was filed first and therefore should be resolved before the adversary proceedings.[410]

The Debtors assert that this Court has jurisdiction to decide turnover claims, and that such claims are not barred by FIRREA.[411]  The Debtors also dispute that the first-filed rule applies because the Debtors sought different recoveries in the various actions.[412]

---

[408] Compl., Turnover Action (Apr. 27, 2009), Dkt. No. 1.

[409] FDIC's Mem. in Supp. of Mot. to Stay at 2, JPMC Action (June 1, 2009), Dkt. No. 26 (citing 12 U.S.C. §1821(d)(13)(D)(i), (ii)); JPMC's Mot. to Stay, Turnover Action (June 1, 2009), Dkt. No. 31 (incorporating the arguments made in the FDIC's motion for stay in the JPMC Action); see also JPMC's Opening Br. in Supp. of Mot. to Dismiss Debtors' Countercl. at 13-21, JPMC Action (June 18, 2009), Dkt. No. 42 (alleging that the jurisdictional bar applies, especially given that the Debtors' counterclaims in the JPMC Action are nearly the same as those asserted in the WMI Action); Compl. ¶ 204, JPMC Action (Mar. 24, 2009), Dkt. No. 1 (JPMC's complaint seeking a declaratory judgment that the Debtors' ownership claims regarding the FSB Account must proceed in the WMI Action); JPMC's Opening Br. in Supp. of Mot. to Dismiss at 11 n.3, Turnover Action (May 13, 2009), Dkt. No. 9 (arguing that the Turnover Action should be dismissed for lack of subject matter jurisdiction under FIRREA).

[410] FDIC's Mem. in Supp. of Mot. to Stay at 12-14, JPMC Action (June 1, 2009), Dkt. No. 26; JPMC's Mot. to Stay, Turnover Action (June 1, 2009), Dkt. No. 31 (incorporating the arguments made in the FDIC's motion for stay in the JPMC Action).

[411] Debtors' Opp'n to FDIC's Mot. to Intervene, Mot. to Stay, and JPMC's Mot. to Stay at 27, JPMC Action (June 15, 2009), Dkt. No. 36; Debtors' Opp'n to FDIC's Mot. to Intervene, Mot. to Stay, and JPMC's Mot. to Stay at 27, Turnover Action (June 15, 2009), Dkt. No. 39 (identical to the motion filed in the JPMC Action).

[412] Debtors' Opp'n to FDIC's Mot. to Intervene, Mot. to Stay, and JPMC's Mot. to Stay at 27-30, JPMC Action (June 15, 2009), Dkt. No. 36; Debtors' Opp'n to FDIC's Mot. to Intervene, Mot. to Stay, and JPMC's Mot. to Stay at 27-30, Turnover Action (June 15, 2009), Dkt. No. 39.

a.    Status of the Proceedings Before the DC Court

The Debtors originally filed a complaint in the DC Court for: (1) the Court's determination as to the validity of each claim in its Receivership Claim; (2) dissipation of WMB's assets; (3) the taking of the Debtors' property without just compensation; (4) conversion; and (5) a declaration that the FDIC Receiver's disallowance is void.[413]

The FDIC Receiver filed a partial motion to dismiss and the FDIC in its corporate capacity filed a motion to dismiss the complaint in its entirety.[414] Among other things, the FDIC Receiver argued that certain claims should be dismissed under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction because the Debtors did not include those claims in the Receivership Claim, thereby waiving those claims.[415] The FDIC Receiver also argued that there is no private right of action for "dissipation" of receivership assets; that the Debtors cannot assert a taking against the FDIC Receiver; that the Debtors cannot assert a claim for conversion under the Federal Tort Claims Act; and that federal law bars the Debtors' request for a declaration that the FDIC Receiver's disallowance is "void."[416] The FDIC Receiver also asserted counterclaims against the Debtors and JPMC.[417] JPMC, in turn, responded with its own counterclaims and crossclaims.[418] All claims asserted by all parties contain allegations regarding the Disputed Accounts, including whether the $3.67 billion transfer was done with the intent to hinder, delay

---

[413] Compl. ¶¶ 78-97, WMI Action (Mar. 20, 2009), Dkt. No. 1.

[414] FDIC Receiver's Mot. to Dismiss, WMI Action (June 11, 2009), Dkt. No. 24; FDIC Corporate's Mot. to Dismiss, WMI Action (June 15, 2009), Dkt. No. 27.

[415] FDIC Receiver's Mem. of Law in Supp. of Partial Mot. to Dismiss at 10-11, WMI Action (June 11, 2009), Dkt. No. 25 (citing the jurisdictional bar under 12 U.S.C. § 1821(d)(13)(D) of FIRREA for failure to exhaust administrative remedies).

[416] Id. at 11-23.

[417] FDIC Receiver's Answer and Countercl., WMI Action (June 11, 2009), Dkt. No. 26; FDIC Receiver's First Am. Answer and Countercl., WMI Action (July 13, 2009), Dkt. No. 34.

[418] JPMC's Answer, Crosscl., and Countercl., WMI Action (Sept. 4, 2009), Dkt. No. 60.

or defraud WMB and claims disputing the ownership of the funds in the Disputed Accounts.[419]
The Debtors moved to dismiss the FDIC's and JPMC's counterclaims or, in the alternative, to
stay the proceedings pending resolution of the bankruptcy proceedings, including the adversary
proceedings, in this Court.[420]  The FDIC's and the Debtors' respective motions to dismiss were
denied and the case was stayed "pending the outcome of the bankruptcy proceeding" in this
Court.[421]

b.    <u>Status of the Proceedings Before the Bankruptcy Court</u>

In the JPMC Action, JPMC seeks a declaration of its ownership rights to the Disputed
Accounts and other assets purchased from the FDIC.[422]  JPMC sought, inter alia, a declaratory
judgment that the Debtors should proceed with any claim to assert ownership of the $3.67 billion
book entry transfer in the WMI Action.[423]  The Debtors filed 18 counterclaims, which JPMC
unsuccessfully moved to dismiss.[424]  The FDIC moved to stay the JPMC Action, which this
Court denied, resulting in an appeal by the FDIC to the United States District Court for the

---

[419] FDIC Receiver's First Am. Answer and Countercl. ¶¶ 40-49, WMI Action (July 13, 2009), Dkt. No. 34; JPMC's Answer, Crosscl., and Countercl. ¶¶ 29-32, 45-56, WMI Action (Sept. 4, 2009), Dkt. No. 60. JPMC and certain WMB Bankholders were allowed to intervene, but the motion to intervene by the Official Committee of Unsecured Creditors remains pending. Order Granting JPMC's Mot. to Intervene, WMI Action (Oct. 5, 2009), Dkt. No. 67; Order Granting Bankholders' Mot. to Intervene, WMI Action (Oct. 13, 2009), Dkt. No. 71; Committee of Unsecured Creditors' Mot. to Intervene, WMI Action (Oct. 16, 2009), Dkt. No. 73.

[420] Debtors' Mot. to Dismiss FDIC's Am. Countercl. and Mot. to Stay, WMI Action (July 27, 2009), Dkt. No. 45; Debtors' Mot. to Dismiss JPMC's Countercl., WMI Action (Oct. 26, 2009), Dkt. No. 79.

[421] Order Denying FDIC's Mots. to Dismiss and Granting Debtors' Mot. to Stay at 6-7, WMI Action (Jan. 7, 2010), Dkt. No. 97. The Debtors' motion to dismiss JPMC's counterclaims was not included in the DC Court's Order. *Id.*

[422] Compl., JPMC Action (Mar. 24, 2009), Dkt. No. 1. The Ad Hoc and Trust Committees, certain Bank Bondholders, the Official Committee of Unsecured Creditors, and the Official Committee of Equity Security Holders, were all granted leave to intervene. Order Granting Ad Hoc and Trust Committees' Mot. to Intervene, JPMC Action (June 12, 2009), Dkt. No. 33; Order Granting Committee of Unsecured Creditors' Mot. to Intervene, JPMC Action (July 24, 2009), Dkt. No. 103; Order Granting Bank Bondholders' Mot. to Intervene, JPMC Action (Aug. 28, 2009), Dkt. No. 131; Order Granting Equity Security Holders Mot. to Intervene, JPMC Action (Mar. 18, 2010), Dkt. No. 182. The FDIC was an interpleader defendant in the complaint. Compl. ¶¶ 210-12, JPMC Action (Mar. 24, 2009), Dkt. No. 1.

[423] Compl. ¶ 204, JPMC Action (Mar. 24, 2009), Dkt. No. 1.

[424] Debtors' Answer and Countercl. in Resp. to JPMC's Compl., JPMC Action (May 29, 2009), Dkt. No. 23; JPMC's Mot. to Dismiss Debtors' Countercl., JPMC Action (June 18, 2009), Dkt. No. 41; Order Denying JPMC's Mot. to Dismiss Countercl., JPMC Action (Sept. 14, 2009), Dkt. No. 141.

District of Delaware ("Delaware District Court"), and a certification request for a direct appeal to the U.S. Court of Appeals for the Third Circuit.[425] JPMC also appealed to the Delaware District Court the denial of the FDIC's motion to stay the JPMC Action, which it had supported, as well as the denial of its motion to dismiss the Debtors counterclaims.[426] All appeals to the Delaware District Court are currently stayed pending the possible settlement.[427]

In the Debtor's Turnover Action in the Bankruptcy Court, JPMC filed counterclaims after its motion to dismiss or, in the alternative, to consolidate the JPMC Action and the Turnover Action was denied.[428] The Debtors brought a motion for summary judgment that has been fully briefed and argued by all parties, and the Court has indicated it is prepared to issue a decision.[429]

---

[425] FDIC's Mot. to Stay, JPMC Action (June 1, 2009), Dkt. No. 25; Order Denying FDIC's Mot. to Stay, JPMC Action (July 6, 2009), Dkt. No. 68; FDIC's Notice of Appeal, JPMC Action (July 10, 2009), Dkt. No. 71; FDIC's Mot. in the Alternative, for Leave to Appeal, JPMC Action (July 10, 2009), Dkt. No. 73; FDIC's Stmt. Pursuant to Bankr. Rule 8006 of Issues to be Presented on Appeal and Design. of Items to be Included in the Record, JPMC Action (July 16, 2009), Dkt. No. 87; FDIC's Appeal Transmittal Sheet for Mot. for Leave to Appeal, JPMC Action (Aug. 13, 2009), Dkt. No. 117; FDIC's Appeal Transmittal Sheet for Notice of Appeal, JPMC Action (Aug. 18, 2009), Dkt. No. 122; FDIC's Req. for Cert. for Direct Appeal, *Federal Deposit Ins. Corp. v. Washington Mutual, Inc.*, Case No. 1:09-cv-00616-GMS (D. Del.) (Aug. 26, 2009), Dkt. No. 10 (seeking certification for a direct appeal to the U.S. Court of Appeals for the Third Circuit).

[426] FDIC's Mot. to Stay, JPMC Action (June 1, 2009), Dkt. No. 25; JPMC's Resp. to FDIC's Mot. to Stay, JPMC Action (June 15, 2009), Dkt. No. 38; Order Denying FDIC's Mot. to Stay, JPMC Action (July 6, 2009), Dkt. No. 68; JPMC's Notice of Appeal, JPMC Action (July 10, 2009), Dkt. No. 75; JPMC's Mot. in the Alternative, for Leave to Appeal, JPMC Action (July 10, 2009), Dkt. No. 77; JPMC's Stmt. of Issues Presented and Design. of the Record on Appeal, JPMC Action (July 17, 2009), Dkt. No. 90; FDIC's Appeal Transmittal Sheet for Notice of Appeal, JPMC Action (Aug. 17, 2009), Dkt. No. 119; Order Denying JPMC's Mot. to Dismiss Countercl., JPMC Action (Sept. 14, 2009), Dkt. No. 141; JPMC's Notice of Appeal, JPMC Action (Sept. 18, 2009), Dkt. No. 143; JPMC's Stmt. in Supp. of Appeal or, in the Alternative, Mot. for Leave to Appeal, JPMC Action (Sept. 18, 2009), Dkt. No. 145.

[427] Stay Order, *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc.*, Case No. 1:09-cv-00615-GMS (D. Del.) (June 30, 2010), Dkt. No. 47 (staying appeal proceedings before the Delaware District Court); Stay Order, *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc.*, Case No. 1:09-cv-00734-GMS (D. Del.) (June 30, 2010), Dkt. No. 33 (staying appeal proceedings before the Delaware District Court).

[428] JPMC's Mot. to Dismiss, Turnover Action (May 13, 2009), Dkt. No. 8; Order Denying JPMC's Mot. to Dismiss, Turnover Action (July 6, 2009), Dkt. No. 64; JPMC's Answer & Am. Countercl. / Cross-cl., Turnover Action (Aug. 10, 2009), Dkt. No. 121.

[429] Discl. Stmt. at 51. The FDIC, JPMC, and certain Bank Bondholders all filed motions opposing summary judgment. FDIC's Opp'n to MSJ, Turnover Action (July 24, 2009), Dkt. No. 97; JPMC's Opp'n to MSJ, Turnover Action (July 24, 2009), Dkt. No. 102; Bondholders' Opp'n to MSJ, Turnover Action (Aug. 3, 2009), Dkt. No. 115; FDIC's Suppl. Opp'n to MSJ, Turnover Action (Sept. 11, 2009), Dkt. No. 152; JPMC's Suppl. Opp'n to MSJ, Turnover Action (Sept. 11, 2009), Dkt. No. 156. JPMC's amended motion to strike the affidavit of Doreen Logan also remains pending. JPMC's Am. Mot. to Strike Aff. of Doreen Logan, Turnover Action (Sept. 11, 2009), Dkt. No. 154.

As in the JPMC Action, the FDIC filed a motion to stay or, in the alternative, to dismiss the Turnover Action, which was denied.[430] Similarly, JPMC's motion to stay the Turnover Action pending the resolution of the WMI Action was denied.[431] JPMC appealed to the Delaware District Court this Court's denial of: (1) its motion to dismiss the Turnover Action or, in the alternative, to consolidate the proceeding with the JPMC Action; (2) its motion to stay the Turnover Action; and (3) the FDIC's motion to stay or, in the alternative, to dismiss the Turnover Action.[432] The FDIC appealed the denial of its motion to stay or, in the alternative, to dismiss the Turnover Action.[433] Both sets of appeals are currently stayed pending the possible settlement.[434] The FDIC's request for certification for a direct appeal to the U.S. Court of Appeals for the Third Circuit remains pending in the Delaware District Court.[435]

In both adversary proceedings, JPMC has also moved to withdraw the reference of the adversary proceedings pursuant to 28 U.S.C. § 157(d), to transfer the adversary proceedings to

---

[430] FDIC's Mot. to Intervene and Mot. to Stay or Dismiss (Ex. A), Turnover Action (June 1, 2009), Dkt. No. 29; Order Denying JPMC's Mot. to Stay and FDIC's Mot. to Stay or Dismiss, Turnover Action (July 6, 2009), Dkt. No. 62. The FDIC was granted leave to intervene, as was the Official Committee of Unsecured Creditors of Washington Mutual, Inc., and WMI Investment Corp., certain Bank Bondholders, and the Official Committee of Equity Security Holders. Order Granting FDIC's Mot. to Intervene, Turnover Action (July 6, 2009), Dkt. No. 63; Order Granting Committee of Unsecured Creditors' Mot. to Intervene, Turnover Action (May 21, 2009), Dkt. No. 20; Order Granting Bank Bondholders' Mot. to Intervene, Turnover Action (Aug. 28, 2009), Dkt. No. 145; Order Granting Equity Security Holders Mot. to Intervene, Turnover Action (Mar. 18, 2010), Dkt. No. 215.

[431] JPMC's Mot. to Stay, Turnover Action (June 1, 2009), Dkt. No. 31; Order Denying JPMC's Mot. to Stay and FDIC's Mot. to Stay or Dismiss, Turnover Action (July 6, 2009), Dkt. No. 62.

[432] JPMC's Notice of Appeal, Turnover Action (July 10, 2009), Dkt. No. 76; JPMC's Mot. in the Alternative, for Leave to Appeal, Turnover Action (July 10, 2009), Dkt. No. 78; JPMC's Stmt. of Issues Presented and Design. of the Record on Appeal, Turnover Action (July 17, 2009), Dkt. No. 89.

[433] FDIC's Notice of Appeal, Turnover Action (July 10, 2009), Dkt. No. 72; FDIC's Mot. in the Alternative, for Leave to Appeal, Turnover Action (July 10, 2009), Dkt. No. 74; FDIC's Stmt. Pursuant to Bankr. Rule 8006 of Issues to be Presented on Appeal and Design. of Items to be Included in the Record, Turnover Action (July 16, 2009), Dkt. No. 86.

[434] Stay Order, *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc.*, Case No. 1:09-cv-00615-GMS (D. Del.) (June 30, 2010), Dkt. No. 47 (staying appeal proceedings before the Delaware District Court); Stay Order, *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc.*, Case No. 1:09-cv-00734-GMS (D. Del.) (June 30, 2010), Dkt. No. 33 (staying appeal proceedings before the Delaware District Court).

[435] FDIC's Req. for Cert. for Direct Appeal, *Federal Deposit Ins. Corp. v. Washington Mutual, Inc.*, Case No. 1:09-cv-00616-GMS (D. Del.) (Aug. 26, 2009), Dkt. No. 10 (seeking certification for a direct appeal to the U.S. Court of Appeals for the Third Circuit).

the DC Court, and for a determination as to whether the claims brought in the adversary proceedings were core proceedings under 28 U.S.C. § 157(b)(2) that could be decided by this Court.[436] This Court's decision in the JPMC Action regarding core proceedings was appealed to the Delaware District Court, but the appeal is currently stayed.[437]

Finally, as mentioned above, the FDIC has filed a motion in this Court seeking relief from the automatic stay to allow the FDIC Receiver to exercise its contractual rights under § 9.5 of the P&A Agreement to direct JPMC to return to FDIC Receiver the balance in the Disputed Accounts.[438] After the deposits were returned, the FDIC Receiver stated it would hold the deposit balances until the pending litigation amongst the parties was resolved and the FDIC Receiver's setoff rights have been determined.[439] The motion has been fully briefed but not yet ruled upon.

### 6. Analysis

Under the proposed Settlement Agreement, the Debtors receive the disputed $3.67 billion deposit. This same result could be achieved through litigation, but there are many complex and technical issues at play, the final resolution of which could take years. The Debtors have consistently maintained that the Disputed Accounts worth approximately $3.85 billion, plus interest, are their property. Indeed, despite the Debtors' confidence that ultimately they will prevail in recovering the Disputed Accounts, there still is a maze of legal issues that remain to be

---

[436] JPMC's Mot. for Determination and Mot. to Withdraw Ref., Turnover Action (June 23, 2009), Dkt. No. 47; JPMC's Mot. to Withdraw Ref. of Adv. Procs., Turnover Action (June 23, 2009), Dkt. No. 48; JPMC's Mot. for Determination and Mot. to Withdraw Ref., JPMC Action (June 23, 2009), Dkt. No. 47; Mot. for Withdrawal of Ref. of Adv. Procs., JPMC Action (June 23, 2009), Dkt. No. 49.

[437] Order regarding JPMC's Mot. for Determination and Mot. to Withdraw Ref., JPMC Action (Aug. 31, 2009), Dkt. No. 134; Transmittal of Mot. to Withdraw Ref. to D. Del., JPMC Action (Sept. 1, 2009), Dkt. No. 136; Notice of Docketing Mot. to Withdraw Ref., JPMC Action (Oct. 7, 2009), Dkt. No. 161; Stay Order, *JPMorgan Chase Bank N.A. v. Washington Mutual Inc.*, Case No. 1:09-cv-00656-GMS (D. Del.) (June 30, 2010), Dkt. No. 26 (staying the appeal).

[438] FDIC's Mot. for an Order Modifying the Auto. Stay, Bankruptcy Case (Nov. 4, 2009), Dkt. No. 1834.

[439] FDIC's Mot. for an Order Modifying the Auto. Stay at 3, Bankruptcy Case (Nov. 4, 2009), Dkt. No. 1834.

litigated and could prevent an expeditious recovery of the deposits. As discussed below, the realities of the litigation landscape are such that, even if the Debtors' summary judgment motion was granted, there remain numerous obstacles to actual recovery of the funds.

The Debtors have provided significant evidence that the Disputed Accounts are deposit accounts that are the property of the Debtors. Even assuming, *arguendo*, that the Debtors would prevail on all aspects of summary judgment in the Turnover Proceeding, as a practical matter, such a decision is unlikely to result in complete and final recovery of the deposits by the Debtors in the near future. Specifically, if the Debtors were to prevail on summary judgment, both JPMC and the FDIC, and perhaps other intervening parties, will likely appeal the Court's decision.[440] Thus, a summary judgment decision would leave the numerous appeals described above, as well as a direct appeal of the decision itself, as litigation risks.

In addition to appealing any order granting the Debtors' turnover, JPMC and the FDIC likely will move to lift the current stay on their pending appeals in both the JPMC Action and the Turnover Action regarding whether this Court has jurisdiction to adjudicate either adversary proceeding or whether the DC Court should decide all claims that have been brought by the parties in the WMI Action. Thus, in addition to any appeals of the summary judgment motion that are taken, there will likely be concurrent collateral appeals of this Court's prior decisions in both adversary proceedings.

Assuming summary judgment is granted to the Debtors, the FDIC could claim to claw-back the Disputed Accounts pursuant to § 9.5 of the P&A Agreement.[441] There is little legal precedent regarding the scope of the FDIC's rights under § 9.5, which may afford the FDIC

---

[440] A stay pending appeal might also be granted, as the judgment could be characterized as money damages for which delay may be redressed with interest.

[441] *See* FDIC's Opp'n to MSJ at 13-14, Turnover Action (July 24, 2009), Dkt. No. 97; FDIC's Mot. for an Order Modifying the Auto. Stay, Bankruptcy Case (Nov. 4, 2009), Dkt. No. 1834.

sufficient leeway to argue its meaning. Given the potential precedential effect of an adverse ruling, the FDIC could be highly motivated to seek to defend and preserve its powers as precedent for future receiverships. Moreover, if the FDIC loses its motion for relief from stay in this Court, it will likely appeal the ruling to the Delaware District Court. If the FDIC is successful in obtaining relief from the stay to exercise its asserted rights under § 9.5 and the funds in the Disputed Accounts are transferred from JPMC to the FDIC Receiver, the money is then likely to sit with the FDIC until it has exhausted all avenues, including its appeals in both adversary proceedings.

With respect to JPMC's setoff rights, JPMC may appeal any decision that negates any rights it contends it obtained under the P&A Agreement. For example, JPMC could pursue arguments regarding the scope of its rights pursuant to § 3.1 of the P&A Agreement. Schedule 3.5, which limits the rights conveyed under § 3.1, could be found to be ambiguous and could even lead to the admission of parole evidence from the negotiations preceding the P&A Agreement about the parties' intent to transfer certain legacy WMB claims to JPMC. Factually intensive issues such as WMI's solvency and whether mutuality of debts exists are also likely to be the subject of any JPMC appeals regarding setoff rights.

In addition, with respect to the FDIC's and JPMC's arguments that FIRREA deprives this Court of jurisdiction, there are recent relevant rulings in a related matter that provide additional ammunition for such jurisdictional arguments.[442] Moreover, the FDIC is likely to continue to

---

[442] Mem. and Order Transferring Case, *Am. Nat'l Ins. Co. v. FDIC*, No. 3:09-cv-00044 (S.D. Tex.) (Sept. 9, 2009), Dkt. No. 48 (transferring the case to the DC Court pursuant to FIRREA 12 U.S.C. § 1821(d)(6)(A)). After the case was transferred to the DC Court, the DC Court dismissed all claims, finding that they were barred by FIRREA because Plaintiffs had not filed their claims with the FDIC pursuant to FIRREA's administrative claims procedure. *Am. Nat'l Ins. Co. v. JPMorgan Chase & Co.*, 705 F. Supp. 2d 17 (D.D.C. 2010) (dismissing the claims for lack of subject matter jurisdiction given that the claims were barred by 12 U.S.C. § 1821(d)(13)(D)); Order Granting FDIC's and JPMC's Mot. to Dismiss, *Am. Nat'l Ins. Co. v. JPMorgan Chase & Co.*, Case No. 1:09-cv-01743-RMC (D.D.C.) (Apr. 13, 2010), Dkt. No. 118. If the currently stayed appeals concerning this Court's jurisdiction over the

assert that the Debtors waived their claims in the WMI Action by failing to include them in their Receivership Claim, that the Federal Tort Claims Act bars the Debtors' claims, that any takings claim must be asserted against United States, and that there is no private cause of action for dissipation of assets.

Absent the Settlement Agreement, the Debtors face significant hurdles and perhaps years of litigation before they can actually take control of the deposit money that is currently within JPMC's control.

## B.    Tax Refunds

### 1.    Introduction

The Settlement Agreement provides for the division of various categories of anticipated Tax Refunds among WMI, JPMC, the FDIC Receiver and certain Bank Bondholders.  In the Disclosure Statement, the Debtors estimate that the net amount of the Tax Refunds will be approximately $5.5 to $5.8 billion, including interest.  The Examiner investigated the Tax Refund issues at a time when the anticipated refunds were a key part of the Settlement Agreement, although their recovery was uncertain.  In the later stages of the Investigation, October 7, 2010, a substantial portion of the Tax Refunds were received.  The Examiner analyzed issues related to the projected Tax Refunds, their division under the Settlement Agreement, and other tax issues raised in connection with the proposed Plan.

#### a.    Treatment of Tax Refund Claims in the Settlement Agreement

The Tax Refunds arise from the Debtors' consolidated 2008 federal income tax return, amended federal income tax returns for 2003-2007 reflecting the expanded (five-year) federal income tax carryback of net operating losses ("NOLs") as permitted by the Worker,

---

FDIC and related claims were reversed, such a decision could nullify any favorable ruling on summary judgment and the parties effectively would start from scratch to litigate the Disputed Accounts before the DC Court.

Homeownership, and Business Assistance Act of 2009 (the "2009 Homeownership Act"), the resolution of audits for tax years 2001-2003, other pending federal income tax issues, and refunds from various state taxing authorities.

As discussed in the Disclosure Statement, the Tax Refunds are divided into two parts. The first portion, which the Debtors estimate will be approximately $2.7 to $3.0 billion, consists of all income tax refunds (federal and state) that would have been receivable absent the 2009 Homeownership Act's extension of the federal NOL carryback period (the former two-year NOL carryback rules). Under the Settlement Agreement, this portion of the Tax Refunds is allocated 20% to the Debtors and 80% to JPMC. The second portion of the Tax Refunds, which the Debtors estimate will be approximately $2.8 billion, is attributable to the extension of the NOL carryback provisions under the 2009 Homeownership Act. Under the Settlement Agreement, this second portion of the Tax Refunds is allocated 69.643% to WMI and 30.357% to the FDIC Receiver. From the Debtors' share of the second portion of the Tax Refunds, $335 million will be allocated to the Bank Bondholders who agree to grant the releases set forth in the Plan and enter into the Plan Support Agreement, as described in Section 2.1(i) of the Plan.

Under the Plan, WMI will retain, among other assets, WMI Investment and WMMRC. The Debtors' only retained asset of significant value is the WMMRC stock. WMI also retains the 2008 NOL carryforwards, 2009 NOL carryforwards, and the potential for an NOL estimated by the Debtors to be approximately $5.0 billion, attributable to WMI's worthless stock investment in WMB. The value of these NOLs to offset otherwise taxable income of Debtors depends on when that income is realized, or in the case of the worthless stock deduction, when the loss is realized, and, potentially, whether there will have been an ownership change (within

the meaning of Section 382 of the Internal Revenue Code (the "Code")) for the Debtors on the Effective Date.

b.    Investigation of Tax Refund Issues

The Examiner evaluated underlying issues regarding the Tax Refunds. First, the Examiner assessed the likelihood that the Tax Refunds identified in the Settlement Agreement would be received from the various tax authorities and the anticipated timing of the receipt of the refunds.

Second, the Examiner evaluated competing claims to the Tax Refunds. Prior to the Settlement Agreement, various stakeholders had raised competing claims to ownership of the Tax Refunds in litigation. JPMC has asserted that it purchased WMB's tax attributes, including the right to recover future tax refunds, as part of the P&A Agreement. The Debtors have alleged, among other things, that under the terms of the Tax Sharing Agreement (discussed below), any tax refunds attributable to the operations of WMB are reduced to general unsecured claims against the Debtors' Estates. Other stakeholders have argued that WMB's rights with respect to refunds are owned by the FDIC Receiver.

On November 6, 2009, the 2009 Homeownership Act was signed into law. Under the 2009 Homeownership Act, eligible taxpayers were authorized to carry back NOLs for a total of five years (three years more than under prior law). As a result, WMB was eligible for an additional $2.713 billion in federal income tax refunds. The additional refunds became a significant part of this dispute.

Third, the Examiner evaluated the rationale for the allocation of Tax Refunds among WMI, JPMC, the FDIC Receiver, and the Bank Bondholders pursuant to the provisions of Section 2.4 of the Settlement Agreement. This inquiry involved both a factual analysis and a

legal analysis, including the extent to which the allocation reflects the strength of their respective legal positions as to various claims.

Finally, the Examiner evaluated whether the Plan maximizes the remaining tax attributes of the Debtors, which are not subject to the Settlement Agreement. As described below, for federal income tax purposes, WMI is the common parent and WMB is one of the many members of the WaMu Group, for which WMI filed a single consolidated federal income tax return. The WaMu Group reported a consolidated NOL of over $32 billion for its taxable year ended December 31, 2008, a substantial portion of which has already been carried back to prior taxable years and has generated the great majority of the estimated Tax Refunds described above. The WaMu Group reported additional NOLs for the taxable year ended December 31, 2009. Whether the WaMu Group can reasonably be expected to incur further NOLs for the taxable year ending December 31, 2010, depends on whether the Effective Date occurs in 2010. The remaining portion of the 2008 NOLs, together with the 2009 NOLs, could be available to the WaMu Group as NOL carryforwards to offset future taxable income of the WaMu Group, subject to certain limitations under applicable law.

Separate and apart from such NOLs, WMI has substantial tax basis in its assets and, in particular, its stock investment in WMB. The Debtors have stated that WMI has a tax basis in its WMB stock of approximately $5 billion. The Debtors also have stated that this stock investment is worthless. In the Disclosure Statement, the Debtors indicated that they are seeking a ruling from the IRS that the $5 billion worthless stock deduction claimed by WMI (immediately prior to the Effective Date) with respect to its stock investment in WMB be treated as an ordinary loss (rather than a capital loss). Assuming that this stock loss is an ordinary loss, the Debtors believe

this would cause WMI to recognize a $5 billion NOL for the taxable year in which the worthless stock deduction is claimed.[443]

Tens of thousands of pages were reviewed as part of the investigation of tax issues. The documents reviewed include relevant filings in the Bankruptcy Case, such as the Disclosure Statement, the Plan, the Settlement Agreement, the memoranda in support of the Equity Committee's motions for appointment of an Examiner, and the Expert Report of Steven Zelin, Blackstone Advisory Partners, L.P., dated October 26, 2010, a copy of which was provided by the Debtors on October 28, 2010. The Examiner has reviewed various filings by the parties in the WMI Action, the JPMC Action, and the Turnover Action. The review also included thousands of pages of documents from the databases that existed at the time of the appointment of the Examiner, including the Rule 2004 Discovery.

The Examiner conducted telephone conferences with and/or considered documents and presentation materials provided by various stakeholders, including but not limited to: (a) counsel and the financial advisors for the Creditors Committee; (b) Peter J. Solomon Company, L.P., financial advisor to the Equity Committee; (c) counsel for groups of the Bank Bondholders; (d) counsel for the Debtors; and (e) shareholders. In addition to the materials submitted by interested parties, the Examiner requested and obtained documents relevant to his Investigation from the Debtors, JPMC, and the FDIC.[444] Finally, the Examiner reviewed and analyzed

---

[443] Order Approving Proposed Discl. Stmt., Ex. 1, at 157, *In re Washington Mutual, Inc.*, Case No. 08-12229 (MFW) (Bankr. D. Del.) (the "Bankruptcy Case") (Oct. 21, 2010), Dkt. No. 5659 (the "Discl. Stmt.").

[444] The documents obtained from these parties include the WaMu Group's original and amended consolidated federal income tax returns for its 2000-2008 tax years, certain tax calculation spreadsheets, tax refund requests, powerpoint presentations made to the IRS, IRS audit results, consolidated, combined and separate company state income tax and franchise returns, amended returns, work papers, audit correspondence and refund notices from various state departments of revenue, correspondence, IRS private letter ruling requests and responses thereto, tax refund and exposure estimates, and written memoranda.

publicly-available materials, including regulatory filings and information published on agency websites.

The Examiner interviewed more than a dozen individuals concerning tax issues.[445] During the course of these interviews, the Examiner obtained legal and tax positions asserted in connection with the tax refund claims, as well as information regarding the status of rulings from the Internal Revenue Service, tax due diligence information, communications between the parties, and events leading up to, and immediately following, the Receivership and the P&A Agreement.

### 2. Tax Returns and Potential Refunds

#### a. Factual History of the WaMu Tax Group and the Tax Sharing Agreement

On August 31, 1999, the members of the WaMu Group entered into the Tax Sharing Agreement.[446] The WaMu Group entered into this Tax Sharing Agreement less than a year after the FDIC and other regulators issued the Interagency Policy Statement encouraging holding companies and their subsidiaries to enter into written tax allocation agreements tailored to their specific circumstances.[447]

---

[445] The individuals interviewed as part of this investigation who potentially had relevant information concerning tax issues include representatives from the Debtors: Curtis L. Brouwer, James E. Carreon, Jon Goulding, William Kosturos, John Maciel, and Brian D. Pedersen; JPMC: Brian Bessey, Dan Cooney, Steven Cutler, Jamie Dimon, Mark Frediani, Allen Friedman, Gregg Gunselman, Benjamin Lopata, Tim Main, Don McCree, C. Jack Read, Fernando Rivas, and Charles Scharf; and the FDIC: Chris Spoth and James Wigand. Certain of these interviews were devoted exclusively to tax issues. At other interviews, witnesses with relevant information concerning multiple areas being investigated by the Examiner were asked tax-related questions.

[446] JPMC's App. in Supp. of Opp'n to Mot. for Summ. J. ("JPMC's App. to Opp'n to MSJ") at B210-B212, *Washington Mutual, Inc. v. JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW) (Bankr. D. Del.) (the "Turnover Action") (July 24, 2009), Dkt. No. 103.

[447] On November 23, 1998, the Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, and Office of Thrift Supervision entered into the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure (the "Interagency Policy Statement"), 63 Fed. Reg. 64,757 (Nov. 23, 1998).

The Tax Sharing Agreement established that WMI would file a consolidated federal income tax return for the WaMu Group and, to the extent permissible under state law, would also file consolidated, unitary or similar, combined income tax returns in various states and local taxing authorities (the "State Consolidated Returns").[448] In some states, WMB and its subsidiaries and other WMI subsidiaries had to file such state tax returns on a separate company basis.[449]

The Tax Sharing Agreement also established the manner in which the WaMu Group would allocate liability – as if each entity had filed a separate tax return.[450] With respect to federal income tax accounts, the Tax Sharing Agreement provides that WMB (and other Tax Sharing Agreement parties) shall make payments on account of their federal income tax liability to WMI in the same manner and at the same time as if such entities were filing separate returns or separate consolidated returns and paying taxes to the IRS.[451] Most importantly, the Tax Sharing Agreement provides that WMI shall pay to WMB or the other participants the amounts that may be due to them on account of any overpayment or credits (i.e., that may result from utilization of their NOL for a tax year) within 30 days after payment is received from the IRS.[452] Separate but similar procedures were set forth for filing and reconciling state and local tax accounts.[453] The tax liability of each entity was determined on a stand-alone basis and was to be

---

[448] Tax Sharing Agreement at B210-B211 (¶¶ 1, 3); JPMC's App. to Opp'n to MSJ at B202-B208 (¶ 4), Turnover Action July 24, 2009, Dkt. No. 103 ("Read Decl.").

[449] For example, Long Beach Mortgage Company, WaMu Investments, Inc., WM Funds Distributors, Inc., and WMBFA Insurance Agency, Inc., each of which was a member of the WaMu Group, filed separate returns in various states, including Georgia and Florida. JPMCD_000003045.00001, at JPMCD_000003045.00001-2.

[450] Tax Sharing Agreement at B211-B212 (¶ 4).

[451] *Id.* at B211 (¶ 2(a)).

[452] *Id.* at B211 (¶ 2(b)).

[453] *Id.* at B211 (¶ 3).

paid to the common paying agent. The Tax Sharing Agreement does not contain any provisions mandating that the funds be escrowed or otherwise segregated during this 30-day period.

b.  Tax Returns

For each taxable year prior to 2008, with certain exceptions not herein relevant, the WaMu Group filed a single consolidated U.S. federal income tax return (Form 1120 U. S. Corporation Income Tax Return) with the U.S. Internal Revenue Service (the "IRS") pursuant the Tax Sharing Agreement.[454] For the 2008 tax year, WMB and its subsidiaries were members of the WaMu Group for purposes of the federal and the State Consolidated Returns up until at least September 25, 2008.[455] WMI generally followed the procedures in the Tax Sharing Agreement with respect to the payment of federal income tax refunds to members of the WaMu Group, but did not follow the TSA procedures with respect to state tax refunds.[456]

Because WMI was the common parent of the WaMu Group for federal income tax purposes and served as the taxpaying agent for the group, WMI was responsible for the preparation and filing of the consolidated group's consolidated U.S. federal income tax returns, as well as making all tax payments due, and collected, from members of the WaMu Group. Because WMI as parent holding company has never had significant operations and has no other material operating subsidiaries apart from WMB and its subsidiaries, historically more than 90% of the income tax liability incurred by the WaMu Group was attributable to the activities of WMB and its subsidiaries. For the 2007 tax year, this percentage exceeded 99%.[457] As the common parent of the WaMu Group, WMI also had the authority to settle audits and disputes

---

[454] Read Decl. at B204 (¶ 5); 26 C.F.R. § 1.1502-77(a).

[455] Id. at B204 (¶ 8).

[456] Mr. Read stated that the intercompany accounts for state taxes were not reconciled. In practice, WMI made accruals for state taxes over the years, but they were not settled and were not reconciled before September 2008. Interview of C. Jack Read, September 24, 2010 ("Read Interview").

[457] Read Decl. at B205 (¶ 9).

with the IRS on its own behalf and on behalf of all members of the consolidated return group, including WMB and its predecessor companies, for all tax years discussed below.[458]

Since the Petition Date, WMI has worked with the IRS to resolve, subject to the approval of the Bankruptcy Court and the U.S. Congress Joint Committee on Taxation (the "Joint Committee"), all outstanding issues with the IRS regarding the consolidated federal income tax liability of the WaMu Group for the tax years 2001 through 2008.[459]

c.    Amounts of Tax Refunds

In total, the Debtors have estimated that the WaMu Group is entitled to Tax Refunds of approximately $5.5 billion to $5.8 billion, which is net of amounts due to taxing authorities, including interest, through the anticipated time of payment. According to the Disclosure Statement, "over 85% of this amount reflects the claimed federal income tax refunds, the majority of which have already been received."[460] On October 7, 2010, the IRS wired approximately $4.77 billion into the escrow account approved by the Bankruptcy Court for the Tax Refund payments. These amounts constitute payment on certain of the federal income tax refund claims identified by the Debtors, plus interest.[461]

---

[458] WMI's Mot. to Approve Compromise Under Rule 9019 (the "Rule 9019 Motion") at ¶ 1, Bankruptcy Case (Aug. 13, 2010), Dkt. No. 5286.

[459] *Id.* ¶ 3.

[460] Discl. Stmt. at 79.

[461] WGM_00038648.

## FEDERAL INCOME TAX REFUNDS RECEIVED ON OCTOBER 7, 2010

| Description | Type of Claim | Amount[462] |
|---|---|---|
| Net Refund Due to Normal 2008 Loss Carryback | Loss Carryback Net of Adjustments | $1,812,929,845 |
| Incremental Net Refund Due to Extended NOL Carryback | Loss Carryback Net of Adjustments | $2,773,834,144 |
| 2003 Tax Refund (from Appeals Settlement) | Federal Income Tax Refund | $125,427,581 |
| 2003 Failure to Pay Penalty | Reversal of Assessed Penalty | $23,319,110 |
| 2008 Refund | Net Refund Less Estimated Payment for 2009 | $23,193,541 |
| IRS Estimated Tax Penalty - 2004 | Abatement of Previously Paid Penalty | $11,832,539 |
| **Total Amount Received** | | **$4,770,536,759** |

The Debtors estimate that an additional $28.8 million is due in interest on these refund claims, based on the manner in which the interest is calculated by the IRS.[463]

The Debtors estimate that an additional $856,810,747 (including interest) in federal income tax refunds is due from the IRS. The various components of the anticipated federal income tax refunds, as of the date this Report is written, are the following:[464]

---

[462] These amounts include interest paid by the IRS.

[463] WGM_00038648.

[464] *Id.*

## PENDING ESTIMATED FEDERAL INCOME TAX REFUNDS

| Description | Type of Claim | Amount[465] |
|---|---|---|
| 2001 – 2002 Tax Refund | 2001-2002 Refund Approved | $346,463,942 |
| Overpayment Interest | 2003 Potential Refund Claim | $12,000,000 |
| Dime Investment Banker Fees | 2001 Payments Not Deducted on Dime's Return | $3,026,907 |
| Branching Rights – Supervisory Goodwill | 1991-1998 Refund Claim in Litigation | $125,000,000 |
| Ahmanson Obligation | 1997 Refund Claim | $2,218,545 |
| Ahmanson Obligation | 1997 Refund Claim – Penalty | $3,393,094 |
| 1905 Agency | 1995 Refund Claim – Litigation | $47,503,729 |
| Ahmanson NOL Carryback | 1993 & 1990 | $8,059,025 |
| Estimated interest of $270,386,996 calculated to expected payment date, plus $28,758,509 of unpaid additional interest on refunds paid on October 7, 2010 | | $299,145,505 |
| | **Total Estimated Federal Income Tax Refunds** | **$856,810,747** |

The Debtors also have identified approximately $384 million in pending refund claims for state income and/or franchise taxes. Once obligations for interest (netted) and offsets for state tax exposures are taken into account, the Debtors estimate the net total state tax refunds due to WMI are approximately $119.5 million.[466]

(i)     The Two-Year 2008 NOL Carryback ($1.811 Billion)[467]

On behalf of the WaMu Group, WMI timely filed its 2008 Form 1120 consolidated U.S. Corporation Tax Return for WMI and its subsidiaries on September 15, 2009. This 2008 WaMu Group's federal consolidated return reflected an NOL of ($32,512,688,897), which formed the

---

[465] WGM_00038648. These are the federal income tax refund amounts before interest which would be payable up to the date of payment.

[466] *Id.*

[467] Although this Report segregates the 2-year and 5-year NOL to correspond to the manner in which they are addressed in the Settlement Agreement, in fact the IRS treats this as a unified refund for all of the years in question, with each carryback year resulting in a separate refund amount.

basis for the NOL carryback to prior WaMu Group tax years to generate tax refunds.[468] The

principal tax item that created the over $32.5 billion consolidated NOL was the ordinary loss of

($31,370,712,376), which was recognized on the sale of WMB bank assets by the FDIC, as the

receiver for WMB, to JPMC on September 25, 2008, pursuant to the P&A Agreement.[469]

The initial WaMu Group 2008 carryback claim was not considered by the IRS in a

vacuum. As part of its audit of tax years 2004 through 2008, the IRS proposed or accepted a

number of adjustments to the reported tax return positions taken by the WaMu Group on its

consolidated tax returns for those years (as originally filed or later amended, in some cases on

multiple occasions).[470] A smaller number of unresolved issues were matters of considerable

factual and legal complexity that involved substantial litigation risk and uncertainty for both the

IRS and the WaMu Group.[471] All outstanding audit issues for the 2004-2008 tax years as well as

the tax issues associated with the 2008 NOL refund claims have now been resolved.[472]

Prior to its amendment in November 2009, Section 172(b)(1) of the Internal Revenue

Code of 1986, as amended, (the "Code") provided that the WaMu Group, absent an election to

forego such carryback period, would generally carryback its 2008 consolidated NOL to each of

the two taxable years preceding the taxable year of the loss, i.e., 2006 and 2007. On behalf of

---

[468] WMI_PC_701357587.00004.

[469] WMI_PC_701357587.00886.

[470] Rule 9019 Motion ¶ 18. WMI has indicated that the vast majority of these tax adjustments were attributable to (i) errors or omissions in the prior consolidated returns filed by WMI, based on data WMI discovered after filing such returns and provided to the IRS, sometimes in the form of amended returns, and (ii) certain recurring items based on agreed IRS settlements or similar items for the audits of tax years 2001 through 2003 or earlier years. *Id.* ¶ 19.

[471] *Id.* ¶ 20.

[472] Rule 9019 Motion; Order Approving Rule 9019 Mot., Bankruptcy Case (Sept. 8, 2010), Dkt. No. 5401.

the WaMu Group, WMI filed Forms 1120X, Amended U.S. Corporation Income Tax Return to

carry back its 2008 consolidated NOL to such two preceding tax years.[473]

<blockquote>

(ii)    The Three-Year Incremental 2008 NOL Carryback Refund
($2.713 Billion)

</blockquote>

WMI filed refund claims for the WaMu Group for its tax years 2003 through 2008 based

on its election to carryback the $32.5 billion consolidated NOL to offset substantially all of its

consolidated taxable income for the years 2004 through 2007, and 50% of its consolidated

taxable income for 2003, pursuant to the five-year carryback provisions of Section 13 of the

2009 Homeownership Act.[474]   As amended by the 2009 Homeownership Act, new Section

172(b)(1)(H) of the Code allows taxpayers to elect to extend the standard two-year carryback

period for an additional period of up to three years for an NOL arising in a single taxpayer year

ending after December 31, 2007, and beginning before January 1, 2010.

On March 8, 2010, WMI filed Form 1120X Amended U.S. Corporation Income Tax

Returns for the WaMu Group for the taxable years ending December 31, 2003 through

December 31, 2008, in which WMI elected on behalf of itself and its subsidiaries, to carry the

group's 2008 consolidated NOL of $32.5 billion back five years.[475]

Pursuant to a settlement which has now been approved by the Court, the IRS has agreed

to and paid approximately $725 million for the eligible portion of taxable income for tax year

2003, $1.249 billion for tax year 2004, and $719 million for tax year 2005.[476]

---

[473] The Court's 9019 Order, entered September 8, 2010, approved the settlement entered into between the Debtors and the IRS. On September 27, 2010, the Joint Committee approved the settlement of this case and issuance of the refund. On October 7, 2010, the IRS issued a series of wire transfers representing payment of these amounts, which are now held in the tax refund escrow account (the "Refund Escrow Account") established under the Settlement Agreement.

[474] Rule 9019 Motion ¶ 19.

[475] Pursuant to Section 172(b)(1)(H) of the Code, only fifty percent (50%) of such fifth carryback year's consolidated income can be offset by the applicable carryback NOLs.

[476] Rule 9019 Motion ¶ 4, Ex. B.

(iii)     The 2001-2003 Appeals Settlement ($447.2 Million)

WMI has indicated that as part of the IRS audit of tax years 2001 through 2003, the IRS proposed a number of adjustments to the tax return positions taken by the WaMu Group on its consolidated federal income tax returns for such years. At the same time, WMI also submitted a large number of proposed adjustments and refund claims during the course of the audit, the majority of which involved substantial corrections to taxable income previously reported on its originally filed returns as a result of the improvement and correction of tax accounting and processes in place during the years at issue.[477]

Early in 2008, after extensive examination, the IRS and WMI finalized a partial settlement of the majority, but not all, of the adjustments proposed by the IRS. This partial settlement was approved by the Joint Committee and on February 26, 2008, the IRS wired WMI approximately $1.94 billion as a tax refund, which included interest, and WMI transferred the entire amount to WMB consistent with the Tax Sharing Agreement.[478]

Thereafter, the remaining tax issues in dispute for tax years 2001 through 2003 were referred to IRS Appeals for resolution. By November of 2009, WMI and the IRS had resolved all the remaining differences and documented this in the 2001-2003 Appeals Settlement, including the resolution of certain issues from the 1998 through 2000 tax years, which resulted in additional favorable adjustments being made for the WaMu Group and included as part of the 2001-2003 Appeals Settlement. The total net refund from the 2001-2003 Appeals Settlement is approximately $447.2 million, plus additional overpayment interest to the date of payment.

The October 7, 2010 refund payments from the IRS included a payment of approximately $125 million towards this 2003 Appeals Settlement, consisting of a refund of approximately

---

[477] *Id.* ¶ 15.

[478] *Id.* ¶ 16.

$100 million, with the remainder in interest. The refund payments for the 2001-2002 Appeals Settlement, in the amount of approximately $346 million (before interest), are pending.[479]

(iv)    Other Federal Tax Refund Claims ($206.6 Million)

In addition to the specific federal tax refunds described above, the Debtors also have described eight additional pending claims to federal income tax refunds, which are listed on the chart of Pending Estimated Federal Income Tax Refunds.[480] The Examiner concludes that at least 40% of these refunds are likely to be collected over an indefinite time period.

(v)    Pending Claims for State Tax Refunds Filed But Not Received ($119.5 Million)

The Settlement Agreement also contains an allocation of claims for refunds for income or franchise taxes from various states in which the WaMu Group files Consolidated State Tax Returns. The Debtors have estimated that there are total potential state tax refunds of approximately $383 million. When adjusted for estimated tax exposure in those states, interest, and other factors, the Debtors estimate that there are net potential state tax refunds of $119.5 million.[481]

JPMC's calculations of the net potential state tax refunds are slightly different. In addition, JPMC and the Debtors disagree as to the collectability of these pending claims for state tax refunds. Factors affecting collectibility include state fiscal conditions, the status of audits, and pending tax assessments.

Under the proposed Settlement Agreement, JPMC bears the primary risk in the event that these state tax refunds are not collected. To the extent that these pending claims for state tax

---

[479] WGM_00038648.

[480] *Id.* These items include two refund claims identified as "Ahmanson" obligations. WMI is the successor to H.F. Ahmanson & Company ("Ahmanson") by virtue of a merger of Ahmanson with and into WMI on October 1, 1998. Rule 9019 Motion ¶ 2.

[481] WGM_00038648.

refunds are received, 80% of the funds received will be allocated to JPMC, with the remaining 20% paid to the Debtors' Estates. As the Debtors have estimated that the net potential state tax refunds are approximately $119.5 million, and the Debtors would be entitled to receive 20% of any refunds, the greatest potential impact they could have on the Estates would be an increase of about $24 million (20% of $120 million).

The Examiner concludes that the estimated state tax refunds are not material to the overall analysis regarding the availability of funds for distribution to other classes of creditors, whether or not these pending claims are ultimately received.

> (vi)   Tax Refunds Received by WMI But Not Transferred to JPMC ($250.5 Million)

The Settlement Agreement also resolves issues related to Tax Refunds received by WMI but not yet reconciled between WMI and WMB under the Tax Sharing Agreement. On September 30, 2008, after the seizure and sale to JPMC, the IRS wired $234.5 million into a bank account held at WMB in the name of WMI.[482] The $234.5 million reflects a refund attributable to WMB's operations and prior tax payments. These funds are held in an account in WMI's name at WMB, now controlled by JPMC.

In response to the Examiner's request for information from JPMC, JPMC provided the Examiner a spreadsheet (the "JPMC Tax Refund Chart") which listed five separate tax refunds received by WMI but not transferred to an account in WMB's (or JPMC's) name, including the $234.5 million IRS overpayment for 2007, approximately $3 million in state tax refunds from prior year overpayments, approximately $3.5 million of other state tax refunds not reconciled

---

[482] Read Decl. at B207 (¶ 16).

between overpayments, approximately $9.3 million in federal tax refunds, and other smaller items.[483]

All of these refunds have been received. As discussed below, WMI asserts that under the provisions of the Tax Sharing Agreement, as of the Petition Date, WMB owes WMI at least $352 million based on taxes paid by WMI on behalf of WMB for which WMI was never reimbursed.[484] JPMC disputes WMI's assertion and contends that WMI owes WMB approximately $250 million on account of intercompany tax claims that have not been reconciled under the Tax Sharing Agreement.

Under Section 2.1 of the Settlement Agreement, the Tax Refunds that were received after the Petition Date are divided, consistent with the first portion of the Tax Refunds, with 80% being retained by JPMC and 20% paid to the Debtors. Thus, the Debtors will receive approximately $50 million of these funds. Given the competing claims of the parties to these previously received refunds, and in light of the overall context of the Settlement Agreement, the Examiner concludes that this resolution is reasonable.

d.     Estimated Tax Recoveries

In the Disclosure Statement, the Debtors estimated that the Tax Refunds will be approximately $5.5 to $5.8 billion. The Examiner concludes that these estimates are reasonable. The Debtors have already received $4.77 billion and additional substantial federal and state tax refund claims are outstanding.

---

[483] JPMCD_000003046.

[484] Interview of John Maciel, August 19, 2010 ("Maciel Interview"); Read Interview.

### 3. Factual Background: JPMC Historical Due Diligence and Analysis

#### a. Tax Due Diligence Prior to September 25, 2008

Early in 2008, WMI engaged Goldman Sachs and Lehman Brothers as advisors to explore potential transactions to address the company's financial problems. During this time period, a number of other financial institutions expressed interest in exploring some form of investment in or acquisition of WMI. Among those potential suitors was JPMC. In addition to extensive financial, operational, and legal due diligence, the JPMC tax department conducted tax due diligence on WMI during March 2008. Although the JPMC tax department was modeling the tax attributes that would benefit JPMC in various transaction scenarios, these tax advantages were not presented to the JPMC board at that time.[485] This tax due diligence was conducted by JPMC through document requests made to WMI,[486] phone conversations with WMI tax executives,[487] and due diligence performed by JPMC in Seattle. Other suitors conducted extensive legal and tax due diligence of WMI during this time period as well.[488] On March 31, 2008, JPMC made a written proposal to WMI of a scenario under which it would acquire WMI in exchange for JPMC common shares.[489]

---

[485] During a meeting of the JPMC Board of Directors on March 27, 2008, a presentation was made to the board describing a proposed acquisition by JPMC of WMI for JPMC common stock. These minutes also indicate that WMI first contacted JPMC about a possible acquisition on March 7, 2008. JPMCD_000003488.00001. The presentation deck contains a high level overview of various aspects of WMI operations, but does not contain any tax analysis. JPMCD_000003849.00001.

[486] Mr. Brouwer has indicated that he and others, including Mr. Read, provided copies of tax returns and other tax information to representatives of the JPMC tax department. Interview of Curt Brouwer, August 19, 2010 ("Brouwer Interview"); Read Interview.

[487] Both Messrs. Brouwer and Read confirmed they had more than one phone conversation during the March 2008 time frame as part of this tax due diligence process with Messrs. Lopata, Friedman, and Frediani, the three most senior persons in JPMC's tax department. Brouwer Interview; Read Interview. Messrs. Lopata, Friedman, and Frediani also confirm this tax due diligence work and phone conversations. Interview of Ben Lopata, September 17, 2010 ("Lopata Interview"); Interview of Allen Friedman, September 16, 2010 ("Friedman Interview"); Interview of Mark Frediani, September 16, 2010 ("Frediani Interview").

[488] Read Interview.

[489] JPM_EX00006060-6062.

Based on interviews of both WMI and JPMC personnel, as well as internal JPMC correspondence, the Examiner concludes that JPMC was able to quantify various tax attributes and projected tax losses of the WaMu Group during the spring of 2008 and, in particular, the future NOL carryback tax refund capacity for the WaMu Group.[490] JPMC's ability to compute projected tax losses during this period is reflected in an email message from Messrs. Lopata and Friedman to Mr. Dimon, with copies to other senior management of JPMC, on March 27, 2008:

> The first $7.2 B of pre-acquisition losses recognized by West in the 2008 pre-merger year can be used to offset tax liability in 06' and 07', for a cash tax benefit of $2.52 B (and perhaps slightly greater, depending on the state tax impact).
>
> Note that we've assumed that (1) losses triggered on sales of loans are on sales of loans to third parties (that is, not to JPMC) and (2) any such sales are of loans held today by West itself rather than its REITs (and we understand that the bulk of the loss assets are in fact NOT in the REITS).[491]

A second email sent by Mr. Friedman later that same afternoon on March 27, 2008, to various senior executives at JPMC, including Mr. Dimon, describes how the JPMC tax department had calculated the effective tax rate and related matters and confirms that JPMC had

---

[490] Carryback "capacity" is effectively limited to the lesser of the aggregate amount of the WaMu Group's NOLs and aggregate income tax payments of the WaMu Group in all tax years to which a carryback can be made. The Examiner made numerous inquiries of both Messrs. Brouwer and Read, on the one hand, and Messrs. Lopata, Friedman, and Frediani, on the other hand, about whether WMI provided information to JPMC that would have been sufficient for JPMC to calculate the magnitude of (i) the WaMu Group's estimated NOL for 2008 or (ii) the amount of net unrealized built-in loss ("NUBIL") in the WaMu Group's assets for purposes of the applicable federal income tax limitations on the utilization of NOLs under Section 382 of the Internal Revenue Code. As to the NUBIL, the Examiner sought to determine whether JPMC had been able to calculate the tens of billions of dollars estimated built-in tax loss in WMB's loan portfolio (i.e., the difference of the fair market of such loans over their adjusted tax basis in WMB's hands), which would become a recognized tax loss were WMB to sell its assets in a taxable transaction for federal income tax purposes.

[491] JPM_EX00000664. "West" was the code name JPMC used internally with respect to the proposed transaction with the WaMu Group.

estimated the unrealized built-in (tax) loss in WMB's loan portfolio assets and the corresponding estimated NOL carryback tax refund capacity of the WaMu Group.[492]

The Examiner concludes that, as of March 27, 2008, JPMC calculated these tax refund claims based on the estimated 2008 ordinary tax losses that would be triggered by a post-acquisition sale of WMB's loan portfolio at an assumed fair market value. Neither JPMC nor the other suitors who performed tax diligence in March 2008 could have reached any preliminary tax conclusions about the potential NOL carryback tax refund potential inherent in WMB's assets loan portfolio based solely on publicly-available information with respect to WMI.[493]

As of March 31, 2008, the books of the WaMu Group indicated a net income tax receivable of approximately $670 million ($2.72 billion receivable less $2.05 billion collected during the first quarter of 2008).[494] However, these receivables were not the 2008 NOL carrybacks, which could not have been booked until after the 2008 tax year closed. Most

---

[492] JPM_EX00000666. The email stated "The 34% effective tax rate for West was arrived at by (1) combining the factors used to apportion each of West's and JPMC's taxable income among the different states, (2) making certain assumptions about the relative levels of profitability of each of the two firms (as profitability relative to apportionment factors is a critical input in determining the state tax rate), and (3) making certain assumptions about levels of tax-exempt income (generally assumptions consistent with those that exist today). The 34% rate is a "with/without" rate and includes the incremental tax (or tax reduction) that results when, for state tax purposes, West's income is combined with that of JPMC.

The calculation of the ability to tax-effect the losses (see below) was based on assumptions about (1) the purchase price we will pay for West and (2) the amount of 'net unrealized built-in loss' (a technical tax term) on West's books. This second number was derived from a review of West's financials and conversations with West's Treasurer and Tax Director."

[493] In its Form 10-K filed with the SEC for the fiscal year ending December 31, 2007, WMI reported that: "The Company has accrued net income tax receivables representing tax refund claims for periods through December 31, 2005. As of December 31, 2006 and December 31, 2007, the amount of the receivable from various taxing authorities, including interest, totaled approximately $3.07 billion and $2.72 billion." WMI, Annual Report (Form 10-K) at 150 (Dec. 31, 2007).

[494] When WMI filed its Form 10-Q with the SEC on May 12, 2008, for the quarterly period ended March 31, 2008, WMI indicated that: "The decrease in accounts receivable was due to the decrease in accrued net income tax receivable of $2.05 billion. As of December 31, 2007, the Company had accrued a net income tax receivable of approximately $2.72 billion, representing tax refund claims from various taxing authorities for periods through December 31, 2005, most of which was received from the Internal Revenue Service during the first quarter of 2008." WMI, Quarterly Report (Form 10-Q) at 41 (March 31, 2008). Specifically, on February 26, 2008, the WaMu Group received a federal income tax refund from the IRS totaling $1.94 billion with respect to the amended consolidated federal income tax returns for the WaMu Group for the tax years 2001 through 2004. Read Decl. at B207 (¶ 15).

importantly, this $670 million of accrued tax refunds amount on WMI's books had nothing to do with the potential tax refunds that the WaMu Group could potentially receive if they were to sell the loans, and thereby recognize for tax purposes, the tax losses inherent in the WMB loan portfolio.[495]

The FDIC, JPMC, and other suitors would have been able to determine that the WaMu Group had a $670 million tax refund receivable on its GAAP books as of its May 12, 2008 filing with the SEC. In addition, potential bidders with sophisticated tax counsel would likely have been able to determine that substantial tax refunds would be generated upon the sale of WMB's loan portfolio. The Investigation did not reveal any evidence that any information was withheld from other bidders which would preclude them from quantifying tax benefits resulting from an acquisition of WMI and a subsequent sale of the loan portfolio in the same manner that JPMC did.

b.    JPMC Financial and Tax Modeling

After March 2008, JPMC's tax diligence ceased.[496] The JPMC tax due diligence and modeling activities resumed in August and September 2008[497] and when they did it was clear

---

[495] The amount on the books of $670 million related to a series of prior IRS audits for years dating back to 2001 (and possibly earlier), amended federal income tax filings and correlative state tax adjustments producing refund receivable amounts. WMI, Quarterly Report (Form 10-Q) at 150-51 (March 31, 2008).

[496] Each of the JPMC tax executives interviewed, Messrs. Lopata, Freidman, and Frediani, acknowledged that the diligence had ceased, but each indicated that he was unable to recall in what month this activity had ceased. Lopata Interview; Friedman Interview; Frediani Interview. As for WMI, Mr. Curt Brouwer also acknowledged the cessation of tax due diligence activities in the spring of 2008, but was also unable to pinpoint when this occurred. Brouwer Interview.

[497] Each of the individuals interviewed from the tax department at JPMC acknowledged this resumption of tax due diligence activities in their interviews, but none of the three top JPMC tax executives were able to identify precisely when or why due diligence resumed. Lopata Interview; Friedman Interview; Frediani Interview.

that among the potential transaction structures being modeled by JPMC was just a purchase of WMB's assets.[498]

JPMC prepared a series of PowerPoint presentation materials (the "decks") which were frequently updated, and which show that JPMC was engaged in detailed financial and tax modeling of a JPMC purchase of the WMB assets, including a possible receivership purchase, throughout the month of September 2008.[499]

### 4. Pending Litigation

The disputes regarding the right to recover tax refunds attributable to WMB's operations have been a subject of the litigation before this Court and elsewhere. The disputes regarding tax issues have centered around the respective rights to receive tax refunds attributable to WMB's operations.

---

[498] For example, page 1 of a JPMC deck of board discussion materials dated September 14, 2008, describes the proposed structure as "Park [JPMC] acquires assets and liabilities (as detailed below) of West's thrift subsidiaries from Receiver." The next bullet point says "Park pays $0.00 to Receiver." JPMCD_000002697.00075, at JPMCD_000002697.00076. JPMC tax personnel acknowledged that, at some point, the focus of the potential transaction shifted to an asset purchase transaction with WMB, but each of them was again unable to recall exactly when this shift in the type of transaction occurred. Lopata Interview; Friedman Interview; Frediani Interview.

[499] The Examiner reviewed the following decks: March 27, 2008; May 5, 2008; June 12, 2008; two separate decks marked "July 2008"; a deck marked Draft August 20, 2008; and a deck marked Draft August 30, 2008; September 14, 2008; September 18, 2008; September 21, 2008; a deck in excel spreadsheet format dated September 23, 2008. Various pages of the September 14, 2008 JPMC deck set forth the JPMC tax analysis. Page 6 of this deck, titled "Tax basis and loss deductibility - Base case" is devoted solely to tax analysis and reflects a variety of tax calculations. This deck included an estimate of the expected 2008 WMI tax operating losses through September 30, 2008, at ($2.219 billion). JPMC's predictions of much greater losses in the WMB loan portfolio than the WMI estimates were reflected on this deck in terms of an estimated WMB net unrealized built-in loss (NUBIL) of about $17.6 million, which would prove to be only about 56% of the over $31.5 billion ordinary tax loss that resulted from WMB's sale of assets by the FDIC Receiver to JPMC on September 25, 2008. JPMCD_000002697.00075, at JPMCD_000002697.00081. By September 18, 2008, JPMC's analysis set forth in a September 18, 2008 deck then listed "open issues" on page 3 thereof. JPMCD_000002697.00012, at JPMCD_000002697.00015. The second to last bullet point was "S & C [Sullivan & Cromwell] view on FDIC process/transaction consistent with tax outcomes we've assumed." Id. JPMC tax personnel interviewed by the Examiner were able to confirm that the JPMC tax department responded to requests for specific tax data from JPMC personnel who were responsible for the modeling of the financial and tax analysis of the proposed transaction. Lopata Interview; Friedman Interview; Frediani Interview.

a.     The Purchase and Assumption Agreement

The FDIC, the FDIC Receiver, and JPMC entered into the P&A Agreement on

September 25, 2008.  The P&A Agreement describes the assets sold to JPMC as follows:

> **3.1  Assets Purchased by Assuming Bank.**  Subject to Sections
> 3.5, 3.6 and 4.8, the Assuming Bank hereby purchases from the
> Receiver, and the Receiver hereby sells, assigns, transfers,
> conveys, and delivers to the Assuming Bank, all right, title, and
> interest of the Receiver in and to all of the assets (real, personal
> and mixed, wherever located and however acquired) including all
> subsidiaries, joint ventures, partnerships, and any and all other
> business combinations or arrangements, whether active, inactive,
> dissolved, or terminated, of the Failed Bank whether or not
> reflected on the books of the Failed Bank as of Bank Closing.[500]

Section 3.5 of the P&A Agreement provides that the assets on the schedule of excluded assets

are not acquired, purchased, or assumed under the agreement.  The list of excluded assets

includes "(2)  any interest, right, action, claim, or judgment against . . . (iii) any shareholder or

holding company of the Failed Bank . . . ."[501]

(i)     The Positions of the Parties

(a)     JPMC

In the litigation and elsewhere, JPMC has asserted that it acquired tax receivables under

the P&A Agreement and is the owner of WMB tax receivables.  JPMC argues that, under the

P&A Agreement, it "acquired the business and related assets of WMB, including ownership of

all of WMB's direct and indirect subsidiaries, and all right, title, and interest of the Receiver in

those assets."  Among other things, JPMC asserts that it purchased "the right to tax refunds

arising from overpayments attributable to operations of WMB and its subsidiaries for the 2008

---

[500] Debtors' App. to Br. in Supp. of Mot. for Summ. J. at A175 (§ 3.1), Turnover Action (May 19, 2009), Dkt. No. 16 (the "P&A Agreement").

[501] *Id.* at A203 (¶ 2).

133

tax year and prior tax years and net operating loss, capital loss, and excess tax credit carrybacks from 2008 to prior tax years."[502]

### (b)  The Debtors

The Debtors have disputed that JPMC is the owner of the Tax Refunds attributable to the operations of WMB.[503] The Debtors contend that any tax refunds are property of the Estates and that JPMC has, at most, an unsecured claim for WMB's share of the refunds under the Tax Sharing Agreement. The Debtors have argued that, under applicable case law, the Tax Sharing Agreement creates a debtor-creditor relationship with respect to claims of WMB for tax refunds attributable to its operations. The Debtors have further argued that JPMC did not acquire any claims against WMI because Schedule 3.5 to the P&A Agreement specifically excludes claims against WMI from the assets conveyed to JPMC.[504] However, if correct, this position would likely only result in a claim against the Estates by the FDIC Receiver instead of JPMC.

### (c)  FDIC Receiver

The FDIC Receiver contends that WMB, and not WMI, is the rightful owner of tax refunds attributable to WMB's operations.[505] The FDIC Receiver has disputed the Debtors' contention that the Tax Sharing Agreement creates a debtor-creditor relationship between WMI and WMB, arguing that the TSA merely documents the fiduciary relationship under which WMI filed consolidated tax returns and received refunds as agent for the consolidated group on behalf

---

[502] Compl. ¶¶ 2, 6, *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc.*, Adv. Proc. No. 09-50551 (MFW) (Bankr. D. Del.) (the "JPMC Action") (Mar. 24, 2009), Dkt. No. 1.

[503] *See, e.g.,* Debtors' Answer and Countercl. in Resp. to JPMC's Compl. ¶¶ 57-59, JPMC Action (May 29, 2009), Dkt. No. 23.

[504] Tr. of Hr'g. on Mot. for Summ. J. at 25-26, Turnover Action (Oct. 22, 2009), Dkt. No. 193. The FDIC Receiver has argued that Schedule 3.5 does *not* strip JPMC of any rights to assert claims against the Debtors. FDIC Receiver's Mot. for an Order Modifying the Auto. Stay at 2-3, Bankruptcy Case (Nov. 4, 2009), Dkt. No. 1834.

[505] FDIC Receiver's Opp'n to Pls.' Mot. to Dismiss Countercl. and Stay at 10-12, *Washington Mutual, Inc., v. Federal Deposit Ins. Corp.*, Case No. 1:09-cv-533 (RMC) (D.D.C.) (the "WMI Action") (Sept. 4, 2009), Dkt. No. 52.

of the group members.[506]  The FDIC Receiver relies, among other things, on case law and the

Interagency Policy Statement in support of this view.

        (d)     Bank Bondholders

Certain Bank Bondholders, including the WMB Noteholder Group,[507] have raised a series

of arguments which, they contend, establish that the rights to income tax refunds belong to the

FDIC Receiver, not to JPMC.  The WMB Noteholder Group argues that, to the extent that WMB

has a right to receive a tax refund, it falls into the category of a claim under the Tax Sharing

Agreement.  As claims against WMI were excluded from the sale to JPMC under the P&A

Agreement, they argue, JPMC did not acquire any rights in the Tax Refunds.  The WMB

Noteholder Group also has argued that, under the P&A Agreement, the rights and claims

conveyed to JPMC are determined as of the WMB closing, which occurred when WMB was

closed by the OTS.  As the FDIC did not become Receiver until after that time, they argue, the

FDIC did not convey the rights to receive Tax Refunds to JPMC.[508]

Under the Settlement Agreement, members of this group (and other Bank Bondholders)

who agree to grant the releases set forth in the Plan and enter into the Plan Support Agreement

will receive $335 million from the Debtors' portion of the second portion of the tax refund

claims.[509]

---

[506] *Id.*

[507] The WMB Noteholder Group, a subset of the Bank Bondholders, is an ad hoc group of institutions, whose participants have changed from time to time, who hold certain senior and subordinated notes issued by WMB. Certain members of the WMB Noteholder Group have filed claims against the Debtors, which are classified in Class 17A (WMB Senior Notes Claims) or Class 17B (WMB Subordinated Notes Claims).

[508] Mem. to FDIC Receiver from Bracewell & Giuliani LLP, Nov. 25, 2008.  MLA_Examiner_BG001, at BG012-BG018.

[509] Discl. Stmt. at 16.

5. **Analysis of Tax Refund Issues**

    a.    <u>Analysis of Whether Tax Refunds Were Conveyed Under the P&A Agreement</u>

The evaluation of the strength of the parties' respective positions regarding whether JPMC purchased the right to tax refund claims has involved both a legal and a factual inquiry.

    (i)    The Terms of the P&A Agreement

The plain language of the P&A Agreement supports the argument that the right to receive tax refunds was sold to JPMC. The P&A Agreement provides that JPMC purchased "all right, title, and interest of the [FDIC] in and to all of the assets (real, personal and mixed, wherever located and however acquired) … of [WMB] whether or not reflected on the books of [WMB] as of Bank Closing," other than certain excluded assets.[510] The list of excluded assets under Schedule 3.5 does not specifically include tax attributes, tax assets, or tax refunds.[511]

As early as March 2008, JPMC identified that WMI possessed, or would possess, valuable tax attributes. At that time, JPMC concluded that it wanted to acquire such tax benefits in any transaction involving WMI. Although JPMC did not enter into a transaction with WMI in March 2008, it continued to be interested in acquiring WMI. By September, 2008, JPMC's analysis of a potential acquisition of WMB (or its assets) in a receivership transaction included the assumption that tax attributes would be included in the transaction.[512]

---

[510] P&A Agreement at A175 (§ 3.1).

[511] P&A Agreement at A203. In *In re MCorp Financial, Inc.,* 170 B.R. 899 (Bankr. S.D. Tex. 1994), the Court found that a claim that the operating subsidiary had against the debtor parent under a tax allocation agreement was retained by the FDIC in the purchase and assumption agreement at issue in that case (the terms of which were not recited in the decision). Even if this analysis were to apply in this case, it would not result in a reduction in claims against the Estates because the claims for the WMB portion of the Tax Refunds would belong to the FDIC Receiver, who has asserted them in a proof of claim in this case.

[512] JPMCD_000002697.00075, at JPMCD_000002697.00081.

(ii) The FDIC's Decision to Include Tax Attributes in the Sale

FDIC representatives explained that, in a receivership sale, the FDIC typically does not include tax receivables among the assets sold to an acquiring bank.[513] In fact, the standard language for "excluded assets" in an FDIC receivership sale specifically states that "tax receivables" are excluded from the sale.[514] This specific exclusion of tax receivables generally appears in the section entitled "Assets Not Purchased by Assuming Bank" in Section 3.5(d) of FDIC Purchase and Assumption Agreements.[515]

The planning and development of the structure for a potential Receivership sale of WMB was performed by the FDIC Division of Resolutions and Receiverships ("Resolutions"). According to James Wigand, the Deputy Director for Franchise and Asset Marketing at Resolutions, FDIC personnel, in consultation with the Director of Resolutions, made the decision to monetize all of WMB's assets, including the tax refunds.[516] According to this witness, the FDIC determined, prior to meeting with representatives of JPMC or other prospective bidders, that it would include all of WMB's assets, including the right to tax refunds, in any receivership sale of WMB. The FDIC structured the potential transaction in this manner because, given market conditions, it was concerned that there would be no bidders for WMB, and it wanted to obtain the best bid possible for WMB in order to comply with its statutory duty to minimize

---

[513] Interview of James Wigand, September 22, 2010 ("Wigand Interview"); JPMCD_000001547.00001.

[514] This is consistent with the FDIC Resolutions Handbook, which provides that "[s]ome categories of assets *never* pass to the acquirer in a P&A; they remain with the receiver. These include ... tax receivables." FDIC, Resolutions Handbook at 19 (2003), *available at* http://www.fdic.gov/bank/historical/reshandbook/index.html.

[515] *See, e.g.*, Purchase and Assumption Agreement, Whole Bank, First Integrity Bank, N.A. (Staples, MN) on May 30, 2008 (excluding the sale of "legal or equitable interests in tax receivables of the Failed Bank, if any, including any claims arising as a result of the Failed Bank having entered into any agreement or otherwise being joined with another Person with respect to the filing of tax returns or the payment of taxes") (the "First Integrity Bank P&A Agmt"), *available at* www.fdic.gov/bank/individual/banklist.html. A review of purchase and assumption agreements, including Whole Bank, All Deposits, and Insured Deposits purchase and assumption agreements, reflects that agreements other than the WMB P&A Agreement contain Section 3.5(d), which expressly reserved to the Failed Bank all of the tax receivables.

[516] Wigand Interview.

potential losses to the insurance fund. A second FDIC employee confirmed, after the fact, that this position had never been taken before by the FDIC Receiver in a purchase and assumption agreement.[517]

The Examiner also investigated whether, prior to the distribution of the bid package to potential bidders, there were any discussions between JPMC and the FDIC regarding tax issues. As part of this Investigation, the Examiner questioned all witnesses who might have knowledge of pre-bid discussions about whether there were any pre-bid discussions regarding taxes. Except as detailed below, all witnesses stated they had no knowledge of such discussions.

According to Mr. Wigand, on September 22, 2008, FDIC Resolutions held meetings with representatives of at least four different financial institutions regarding a possible transaction in the event that WMB did fail.[518] During their meeting with the FDIC, JPMC representatives asked whether WMB "tax refunds" were included as assets that were being sold in a potential receivership transaction. The FDIC representatives responded that they were.[519] The FDIC has stated that all interested parties knew (or could have known) that a tax refund was available because it was listed on WMB's balance sheet at the time.[520] WMI's SEC filings reflect $670 million of accrued tax receivables on the balance sheet as of March 31, 2008.

In other FDIC purchase and assumption agreements that contain this exclusion of certain claims, the list of excluded assets contains a separate, specific reference to claims arising under an agreement with another person with respect to the filing of tax returns or the payment of

---

[517] JPMCD_000001547.00001.

[518] Wigand Interview. As discussed below, by September 21, 2008, all of the parties that had been considering an "open bank" transaction with WMB had indicated to Mr. Spoth at the FDIC that they were no longer interested in pursuing an "open bank" transaction.

[519] During a telephone call, Mr. Lopata, the Director of the Tax Department at JPMC, discussed tax issues with Richard Peyster from the FDIC. Although he is not completely certain, Mr. Lopata believes it is likely that they had their first telephone discussion on September 24, 2008. JPMCD_000004607.00004.

[520] Wigand Interview.

taxes. Section 3.5(d), which appears in numerous other purchase and assumption agreements,

provides that the purchasing bank does not acquire "any claims arising as a result of the Failed

Bank having entered into any agreement or otherwise being joined with another person with

respect to the filing of tax returns or the payment of taxes."[521]  The schedule of excluded assets

did not contain the subsection for "tax receivables" that typically appeared as Section 3.5(d).

The exclusion of this provision from the WMB P&A Agreement is an indication that the FDIC

Receiver did not intend to exclude claims under the Tax Sharing Agreement from the sale.

<blockquote>

(iii)    The Understanding of the Parties Regarding the Sale of Tax
Attributes

</blockquote>

Although there is evidence that the FDIC intended to convey "tax refunds" in the P&A

Agreement, there remains a question as to precisely what "tax refunds" the FDIC intended to

convey and, in particular, whether the FDIC knowingly conveyed federal income tax refunds

based on WMB's 2008 yet-to-be-calculated $32.5 billion NOL (which was generated by the

September 25, 2008 Receivership sale itself as opposed to a 2008 operating loss) that was worth

at least $1.811 billion (before interest) based on then-existing law, and worth an additional

$2.713 billion (before interest) after the enactment of the 2009 Homeownership Act.

In at least two communications with JPMC, both before and after the Receivership sale,

representatives of the FDIC stated that "tax refunds" were included in the sale.  Mr. Wigand

stated that, in the meeting with JPMC representatives on September 22, 2008, the FDIC stated

that "tax refunds" were among the assets to be conveyed.[522]  On October 8, 2008, approximately

two weeks after the Receivership sale, an FDIC official stated in writing that "[a]ll assets

---

[521] *See, e.g.*, First Integrity Bank P&A Agmt at Section 3.5(d).

[522] Wigand Interview.

whether or not on the books were transferred. In my view, that clearly includes pending tax refunds, and future refunds based on losses generated up to the date of failure."[523]

The Examiner has identified several possibilities regarding what tax refunds the FDIC conveyed under the P&A Agreement: (1) the FDIC may have knowingly and effectively conveyed all assets, including all current and future tax refund claims; (2) the FDIC may have intended to convey only the tax refunds that had been identified on the books of WMB at the time of the Receivership sale; (3) the FDIC and JPMC may have thought "tax refunds" meant different things and never had a meeting of the minds.

The extent of the FDIC's understanding of WMB's tax attributes at the time of the Receivership sale is unclear. Mr. Wigand stated in his interview that WMB's tax receivables were reflected on the books and records. However at the time of the Receivership sale, the most recent SEC filing reflected a pending tax receivable of approximately $670 million, not the billions of dollars triggered by the Receivership sale. The Examiner has not discovered evidence that the FDIC was aware of the extent of the NOLs. Indeed, the FDIC may not have even had WMI's tax returns at the time of the transaction.[524] An exact calculation of the 2008 NOL carryback refund value attributable to the Receivership sale loss would be virtually impossible without these tax returns.

Mr. Wigand also explained that there are limitations on what assets can be transferred in an FDIC receivership sale. According to Mr. Wigand, tax refunds may be transferred but "deferred tax assets" may not.[525] In an October 8, 2008 email, Richard Peyster, an FDIC

---

[523] JPMCD_000001547.00001.

[524] Read Interview. Mr. Read stated that the FDIC requested copies of the tax returns after the sale to JPMC was completed. *Id.*

[525] Previously, Mr. Wigand stated that "tax refunds" were among the assets being sold under the P&A Agreement. It is unclear whether Mr. Wigand considers the phrase "tax refunds" to include NOL carryforwards. Wigand Interview.

representative, identified another type of "tax refund" in stating that, in his view, "future refunds based on losses generated up to date of failure" were among the tax refunds that the FDIC intended to transfer to JPMC. This email can be read as requiring that the right to the refund existed on the date of seizure, which is before JPMC purchased WMB's assets in the Receivership sale.

There are a number of arguments for the position that the tax refunds were not sold to JPMC. The loss triggered by the Receivership sale of substantially all of the WMB assets pursuant to the P&A Agreement is the loss that resulted in substantially all of the $5.5 billion to $5.8 billion of estimated total Tax Refunds. Therefore, the loss on which the refunds are predicated was triggered by the sale of WMB and did not exist at the time of seizure. A narrow reading of the Peyster email is that refunds generated after the "date of failure" were not conveyed. In addition, a narrow interpretation of "tax refund" would not include inchoate future potential refunds not reflected on the company's books. Finally, the 2009 Homeownership Act, which extended the carryback period, was not enacted until more than a year after the sale.

Any unresolved issues regarding precisely what tax refunds the FDIC Receiver intended to convey to JPMC do not directly benefit the Estates in this case. These issues ultimately relate to whether the FDIC Receiver retained certain assets (which would be available to the Bank Bondholders and others) or conveyed them to JPMC.

b.    <u>The Impact of the Tax Sharing Agreement</u>

(i)    The Positions of the Parties

The FDIC Receiver and JPMC contend that the Tax Refunds do not constitute WMI property; rather, WMI merely receives tax refunds as agent for the members of the WaMu Group

to which they belong.[526] If correct, the overwhelming portion of any Tax Refunds would be WMB property received in trust pursuant to the Tax Sharing Agreement since the operations of WMB were the source of the vast majority of revenues and losses upon which the tax refunds are derived.[527]

In support of their position, JPMC and the FDIC Receiver rely on several cases holding that tax refunds attributable to the operations of a subsidiary are the property of the subsidiary, and the agent-parent receives the refund only as an agent for the subsidiary.[528]

JPMC and the FDIC Receiver also cite the Interagency Policy Statement as supporting this position regarding the Tax Sharing Agreement.[529] The Interagency Policy Statement provides that the amount and timing of tax refunds to an insured institution should be no less favorable to the institution than if it were a separate taxpayer and that any inconsistent practice may be viewed as an unsafe and unsound practice prompting either informal or formal corrective action.[530] Treating the right to payment under the Tax Sharing Agreement as a claim under an executory contract rather than an amount held in trust for the insured institution would undermine the Interagency Policy Statement in the context of a parent bankruptcy filing. In

---

[526] FDIC Receiver's Answer and Countercl. ¶¶ 12-15, WMI Action (June 11, 2009), Dkt. No. 26; Compl. ¶¶ 91-92, JPMC Action (Mar. 24, 2009), Dkt. No. 1.

[527] I.R.C. § 172(b)(1)(A).

[528] *In re Bob Richards Chrysler-Plymouth Corp.*, 473 F.2d 262 (9th Cir. 1973), *cert. denied*, 412 U.S. 919 (1973) (parent corporation not in bankruptcy proceedings, which received a tax refund attributable to losses of its bankrupt subsidiary did so as an agent and, therefore, was not allowed to set-off the amount of the refund against unsecured liabilities of the bankrupt subsidiary to the parent corporation); *see also In re Revco D.S., Inc.*, 111 B.R. 631, 639 (Bankr. N.D. Ohio 1990) ("[A]ny refund resulting from the carryback of a net operating loss of a former subsidiary ... belongs to and is the property of that subsidiary"). The contention that WMI receives tax refunds merely as agent for their owners is consistent with the terminology of the applicable Tax Regulations. 26 C.F.R. § 1.1502-77. However, these regulations utilize the term "agent" procedurally, in order to confer authority to deal with the IRS on all matters related to the returns, and such regulations expressly deny that they are determinative of ultimate ownership of the refunds.

[529] JPMC's Opp. to Mot. for Summ. J. at 37-39, Turnover Action (July 24, 2009), Dkt. No. 102; FDIC Receiver's Opp. to Mot. for Summ. J. at 11-12, Turnover Action (July 24, 2009), Dkt. No. 97.

[530] Interagency Policy Statement, 63 Fed. Reg. 64,757, at 64,758.

essence, JPMC and the FDIC Receiver contend that, in the absence of expressly contrary language in the Tax Sharing Agreement, the TSA should be construed in a manner consonant to the Interagency Policy Statement.

The Debtors contend that under the Tax Sharing Agreement, Tax Refunds due to the WaMu Group are property of the Estates and all WMB has a claim against the Estates for WMB's share of the Tax Refunds.

Where the parties have entered into a tax sharing agreement, the Debtors argue, the agreement should be respected by the court.[531] In support of this argument, Debtors have relied upon *In re First Central Financial Corp.*, 269 B.R. 481 (E.D.N.Y. 2001), and *In re MCorp Financial, Inc.*, 170 B.R. 899 (Bankr. S.D. Tex. 1994), among other authorities.[532] In so doing, the Debtors have emphasized that the cases upon which JPMC has relied -- including *Bob Richards* and *Revco* -- are cases in which there was no tax sharing agreement between the parties.[533] Citing *First Central Financial, MCorp.*, and other authorities, the Debtors argue that the terms of a tax sharing agreement should control the members' rights.[534]

---

[531] Debtors' Reply in Supp. of Mot. for Sum. J. at 28-31, Turnover Action (Sept. 18, 2009), Dkt. No. 163.

[532] *Id.* at 28-29.

[533] Tr. of Hr'g on Mot. for Summ. J. at 22-23, Turnover Action (Oct. 22, 2009), Dkt. No. 193.

[534] In *First Central Financial*, the court examined whether, under the terms of a tax allocation agreement between the parent company and its operating subsidiary, tax refunds attributable to the operations of the subsidiary became property of the parent's bankruptcy estate pursuant to Section 541(d) of the Bankruptcy Code. In that case, the Chapter 7 trustee for the parent company, which acted as the filing agent for a consolidated group, sought and obtained federal income tax refunds based on NOLs generated by the subsidiary insurance company, FCIC. The Superintendent of Insurance for the State of New York, acting as liquidator for FCIC, brought an action to compel the Chapter 7 trustee to turn over these refunds to the liquidator. The bankruptcy court concluded that the income tax refunds were property of the bankruptcy estate and that the subsidiary had a claim against its parent's estate for the amount to which it was entitled under the tax allocation agreement. In so ruling, the bankruptcy court emphasized, among other things, that the tax allocation agreement did not contain a requirement that funds due to FCIC under the tax allocation agreement be segregated from its general funds, nor did it contain language creating a trust or agency relationship. *First Cent. Fin.*, 269 B.R. at 496.

In a more recent case, decided September 30, 2010, the United States Bankruptcy Court for the Middle District of Florida embraced the reasoning in *First Central Financial* and applied it in the context of an FDIC receivership. In *Zucker v. FDIC (In re NetBank, Inc.)*,[535] the bankruptcy court ordered the FDIC to turn over to the debtor a tax refund that it had collected on behalf of a bank in receivership. The court concluded that the tax sharing agreement between the debtor and the bank created a debtor-creditor relationship and that the refunds became property of the bankruptcy estate.[536]

In determining that the tax sharing agreement created a debtor-creditor relationship, as opposed to the holding company receiving refunds in trust for the subsidiary bank, the bankruptcy court emphasized, inter alia, the absence of any requirement that the tax refunds be placed in escrow, any requirement that the tax refunds be segregated, or any restrictions on how the funds might be used by the parent between the date of receipt and the date of payment to the subsidiary. Based on the terms of the tax sharing agreement in that case, the court concluded that it established a debtor-creditor relationship.[537]

The court in *In re Netbank* also rejected the notion that the Interagency Policy Statement somehow affects the status of the tax refunds as property of the debtor's estate. Citing a series of cases, the court noted that the Interagency Policy Statement does not constitute a rule or

---

[535] Order Granting Pl.'s Mot. for Summ. J., *Zucker v. FDIC (In re NetBank)*, Bankr. Case No. 07-4295-JAF, Adv. Proc. No. 08-346-JAF (Bankr. M.D. Fla. Sept. 30, 2010) ("*In re NetBank*"), Dkt. No. 64.

[536] *Id.*

[537] *Id.* The Tax Sharing Agreement at issue here differs in certain particulars to that considered in *In re NetBank*. Notably, §5 of the TSA iterates that deferred tax assets and liabilities will be handled in a manner consistent with bank and thrift regulatory guidelines. No similar provisions were considered in *In re NetBank*. Furthermore, § 2(b)(ii) thereof directs WMI to pay WMB and its subsidiaries amounts ". . . on account of . . . any credit that may result from the utilization of their net operating loss for a taxable year." As such, WMB would be entitled to payment even if the "credit" could not have been utilized by carryback against WMB's stand-alone taxable income but, instead, the taxable income of another member of the WaMu Group. Either of these differences could arguably offer a basis for distinguishing the decision in *In re NetBank*, namely that such terms alone were tantamount to the declaration of an express trust.

regulation or otherwise have the force of law, but only provides guidance to banking organizations and savings associations.[538]

(ii)     Analysis of the Tax Sharing Agreement

It is well established that federal income tax law does not determine which member of an affiliated group will ultimately receive the economic benefit of a consolidated tax refund. "Though IRS regulations provide that the parent corporation is the agent of each subsidiary in the affiliated group, Treas. Reg. § 1.1502-77, this agency relationship is for the convenience and protection of IRS only and does not extend further.[539] In the absence of controlling law, state law governs the rights and responsibilities as between a parent corporation and its subsidiaries."[540]

With respect to the Tax Sharing Agreement, there is substantial support for the argument that any tax refunds received by WMI become property of the bankruptcy estate.[541] However, in

---

[538] Order Granting Pl.'s Mot. for Summ. J. at 29-30, *In re Netbank* (Sept. 30, 2010), Dkt. No. 64 (citing, among others, *In re Seidman*, 37 F.3d 911, 931-32 (3d Cir. 1994) (holding that an OTS "Statement of Policy" set forth at 12 C.F.R § 571.7(b), was not "regulation or law"); *Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n*, 869 F.2d 719, 736 (3d Cir. 1989) (concluding that agency's policy statement "is entitled to no greater deference than any other policy statement, i.e., none")).

[539] In addition, the applicable Treasury Regulations do prescribe a limited menu of methodologies for the allocation of consolidated tax liability among affiliated group numbers (26 C.F.R. § 1.1552-1), but that allocation is utilized only for purposes of determining the earnings and profits of each member, which determination has, in turn, certain federal income tax ramifications.

[540] *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 579 F.2d 449, 452 l (8th Cir. 1978).

[541] *First Cent. Fin., 269 B.R. 481; MCorp. Fin., 170 B.R. 899; In re Netbank* (Sept. 30, 2010), Dkt. No. 64. *See also In re Team Fin., Inc.*, Bankr. No. 09-10925, Adv. Proc. No. 09-5084, 2010 WL 1730681 (Bankr. D. Kan. Apr. 27, 2010). In *Team Financial*, the debtor holding company and the FDIC, as receiver for the failed subsidiary bank (the "FDIC-R"), disputed whether tax refunds due to the consolidated tax group under a tax allocation agreement were property of the debtor holding company's bankruptcy estate. After analyzing the provisions of the tax allocation agreement, the bankruptcy court concluded that the agreement created a debtor-creditor relationship and not, as urged by the FDIC, as receiver, a trust or agency relationship. *Team Fin.*, 2010 WL 1730681, at *4-5, *10-11. The court did not, however, determine whether the tax refunds expected to be generated by the NOL carryback were attributable to the operations of the parent or the subsidiary. After this order overruling the FDIC-R's summary judgment motion was entered, on May 11, 2010, the FDIC-R filed a motion to clarify, alter, or amend the memorandum opinion because, inter alia, it was not a final opinion. *Team Fin., Inc. v. FDIC (In re Team Financial, Inc.)*, Bankr. No. 09-10925, Adv. Proc. No. 09-5084 (Bankr. D. Kan. May 11, 2010), Dkt. No. 52. On June 11, 2010, the court entered an Agreed Order stating that the Memorandum Opinion is not a final order and that the

the Disclosure Statement, the Debtors acknowledge that, to the extent that the Tax Refunds are determined to be property of the Debtors' Estates, the FDIC Receiver, as a creditor under the Tax Sharing Agreement, and/or JPMC, as purchaser of assets under the P&A Agreement, would have a substantial net claim against the Debtors relating to Tax Refunds pursuant to the Tax Sharing Agreement.[542]  This argument finds support in the case law, including the recent decision in *In re Netbank.*

Several parties have raised arguments that, in effect, would seek to challenge the application of the Tax Sharing Agreement in this case.  In its proof of claim[543] and elsewhere, the FDIC Receiver has raised the prospect of exercising its statutory right under Section 6402(k) of the Code to file a separate tax return and to pursue, contest, compromise, or settle tax-related adjustments or deficiencies related to WMB.[544]  Similarly, the FDIC Receiver stated that it reserves the right to repudiate the Tax Sharing Agreement pursuant to 12 U.S.C. § 1821(e).[545]  There would be substantial obstacles to exercising either of these rights at this stage in the proceedings.

Initially, exercising either of these statutory rights could implicate the automatic stay.[546]  Timing is also an issue.  Under the statute, the right to repudiate must be exercised "within a reasonable period" following the appointment of the receiver, a determination that is made

---

conclusions of law could change based on additional evidence to be admitted later in the proceeding. *Id.*  The matter is pending.

[542] Discl. Stmt. at 5.

[543] JPMC's App. to Opp'n to MSJ at B527-B528, Turnover Action (July 24, 2009), Dkt. No. 103 (the "FDIC Proof of Claim").

[544] The Examiner found no evidence that the FDIC Receiver ever filed any 2008 WMB federal income tax return (or any other WMB federal income tax return) with the IRS subsequent to September 25, 2008.  The IRS retains the sole discretion whether to accept such a filing. 26 C.F.R. § 301.6402-7(c)(2).

[545] FDIC Proof of Claim at B528.

[546] *See In re Netbank* (Sept. 30, 2010), Dkt. No. 64 (attempt to repudiate tax sharing agreement after holding company filed for Chapter 11 was void and ineffective as violating the automatic stay).

depending on the circumstances of the case.[547] With respect to pursuing, contesting, or compromising tax-related adjustments or deficiencies, the FDIC Receiver did not file any objection to the Rule 9019 Motion in which the Debtors sought, and recently obtained, approval of the Bankruptcy Court for various tax settlements. Given the stage in these proceedings, the failure to exercise the right to repudiate for more than two years, the failure to object to the Rule 9019 Motion, and the IRS's recent payment of more than $4.77 billion in federal income tax refunds, the Examiner expects that the FDIC would face substantial impediments to a serious attempt to invoke either of these statutory rights at this juncture.

      c.    <u>Impact of Tax Sharing Agreement on the Bankruptcy Estates</u>

      The ultimate resolution of the ownership of the Tax Refunds is not likely to be determinative of whether there are substantial additional funds available for Shareholders under the Plan. In the absence of the Settlement Agreement, the overwhelming majority of the Tax Refunds would be attributable to previous tax payments made on account of WMB's earnings. Thus, if it were determined that the Tax Sharing Agreement creates a debtor-creditor relationship, then either the FDIC Receiver or JPMC (but not both) would have a claim against the Estates in the amount of the Tax Refunds that are due to WMB.[548] The Examiner concurs with the Debtors' assessment in the Disclosure Statement that, if the Tax Refunds are determined to be property of the Estates, then "the FDIC Receiver as a creditor under the Tax Sharing Agreement (and/or JPMC, as purchaser of certain assets of WMB) would have a substantial net claim against WMI's estate relating to the Tax Refunds under the TSA."[549]

---

[547] *701 NPB Assocs. v. FDIC*, 779 F. Supp. 1336 (S.D. Fla. 1991).

[548] Discl. Stmt. at 5.

[549] *Id.*

Under these circumstances, the Settlement Agreement strikes a reasonable balance by generating additional funds for the Estates (estimated at $2.1 - $2.2 billion) without creating a corresponding claim against the Estates, thereby increasing the funds available for distribution to general unsecured creditors. Thus, with respect to the issue of the Tax Refunds, the Settlement Agreement appears to provide a greater benefit for the Estates than could likely be achieved in protracted and uncertain litigation.

6. **Analysis of Retained Tax Benefits**

As part of the Settlement Agreement, the Debtors will retain future tax benefits. The Examiner evaluated the extent to which the retention of certain tax claims by the Debtors is reasonably likely to produce additional funds that could be distributable under the Plan to certain stakeholders. The Examiner focused primarily on whether, and to what extent, retention by WMI of the 2008 and 2009 NOL carryforwards (the "Retained NOLs"),[550] coupled with the likely recognition of WMI's net unrealized built-in loss in its equity investment in WMB stock (the "Stock Loss")[551] before the Effective Date can likely be utilized to either (i) create additional tax refunds for the Debtors, or (ii) reduce the future tax liabilities of the Debtors.

The Examiner concludes that neither the Retained NOLs nor the Stock Loss are likely to produce additional significant refunds for the Debtors. Although these amounts together

---

[550] The Retained NOLs include approximately $17.74 billion of 2008 NOL carryforwards (remaining after the 2008 partial utilization of the approximately $32.5 billion NOL for 2008 pursuant to the prior 2008 five-year refund claims), and a 2009 NOL carryforward of around $88 million. WGM_00038649. If the Effective Date is on or before December 31, 2010, and if the Stock Loss was claimed prior to such date, the WaMu Group would again be expected to report a several billion dollar NOL for 2010. However, if the Effective Date does not occur in 2010 and the Stock Loss is not claimed in 2010, then the WaMu Group may be in a taxable position for 2010 due to the large amount of interest income that was received by the Debtors on October 7, 2010, when $4.77 billion of tax refunds were received from the IRS. Discl. Stmt. at 157.

[551] The Stock Loss represents an estimated $5 billion worthless stock deduction upon the abandonment by WMI of its stock investment in WMB, which the Debtors expect to claim prior to the Effective Date. Brouwer Interview. The Debtors have sought a private letter ruling from the IRS to the effect that such Stock Loss will constitute an ordinary loss. If so, this would itself result in a $5 billion NOL for the year in which the Stock Loss is claimed. Discl. Stmt. at 157.

represent tens of billions of dollars of tax losses, they can only be carried forward (for up to twenty years) and used to shelter or reduce future tax liabilities of reorganized WMI. The only potential tax liabilities payable by reorganized WMI would be on the: (i) taxable sale of WMI's retained equity investment in WMMRC (or WMMRC's assets), on which there is unlikely any substantial gain;[552] (ii) taxable transfer of the Debtors' assets to the liquidating trust upon Plan implementation, on which there is also unlikely to be any substantial gain;[553] and (iii) generation of future taxable income through the recapitalization and expansion of WMMRC as a viable ongoing business.[554]

If it is decided that WMMRC should be sold, and there is any tax gain on the sale to shelter, such sale should be consummated before the Effective Date.[555] If WMMRC is sold before the Effective Date, any such potential gain would be completely sheltered by a portion of

---

[552] The Debtors have estimated WMI's tax basis in the WMMRC stock, as of December 31, 2008, at approximately $246 million. WGM_00038646. They also have estimated that the tax basis of the assets within WMMRC as of December 31, 2009, is approximately $464 million. WGM_00038650. Based on the Blackstone Advisory Partners, L.P. ("Blackstone") valuation report dated October 26, 2010, the Blackstone recommended value range of reorganized WMI (which includes the value of WMMRC) is $115 to $145 million (excluding NOLs) and $125 to $165 million (including NOLs). WMI_BX_701361066.00001, at WMI_BX_701361066.00009.

[553] This is because the vast majority of federal tax refund assets, and the related interest income, have already been converted to cash by recent payments by the IRS to the Debtors. The remaining assets are not expected to generate significant amounts of gain. In any event, the Debtors believe that NOL carryforwards generally should be available to offset the gain or income. Discl. Stmt. at 160.

[554] In no year do the Debtors' current 2011-2015 tax projections for WMMRC reflect more than $25 million of taxable income in WMMRC's current "run off" posture. Discl. Stmt. at 144. The projections assume a December 22, 2010 Effective Date, which under the Section 382 proration rule, would result in approximately $75-100 million of Retained NOLs remaining available to offset projection period taxable income (and not subject to the severe Section 382 annual limitation.) I.R.C. § 382(b)(3); 26 C.F.R. § 1.382-6(a). Assuming the WMI 2011-2015 tax projections for WMMRC are correct, the Blackstone recommended NOL value for the post-emergence NOLs of reorganized WMI as of December 22, 2010, is between $10 and $20 million. WMI_BX_701361066.00001, at WMI_BX_701361066.00030.

[555] Upon the Effective Date, a so-called Section 382 ownership change will occur with respect to the WMI consolidated group and WMI's ability to use its Retained NOLs to offset post-change taxable income becomes severely limited. I.R.C. § 382(b). Once triggered, these limitations restrict on an annual basis the rate at which pre-change losses (NOLs) can offset taxable income in post-change years. Such Retained NOLs can, however, offset pre-change taxable income in the year of the change. I.R.C. § 382(b)(3).

the Retained NOLs.[556] If the Effective Date occurs on or before December 31, 2010, then the Retained NOLs and the recognized Stock Loss will be severely limited in reducing post-Effective Date future taxable income of reorganized WMI.[557] If, however, the Effective Date occurs early in the 2011 WMI calendar tax year and WMMRC is retained, the Examiner has concluded that a much greater portion of the Stock Loss-generated NOL (but not the Retained NOLs) would be preserved for future use in sheltering future taxable income of reorganized WMI without being subject to the Section 382 annual loss limitations.[558] Nevertheless, whatever

---

[556] If the Effective Date occurs on or before December 31, 2010, the Examiner has concluded that the value to the Debtors of the Retained NOLs and the Stock Loss would not be very substantial. For 2010, the value of the Retained NOLs would likely not exceed the *sum* of the federal and state income taxes, if any, payable upon (a) the taxable sale of WMMRC prior to the Effective Date and (b) the taxable transfer of WMB assets to the liquidating trust pursuant to the implementation of the Plan (the "Residual Gain"). The remaining unutilized Retained NOLs and the realized Stock Loss (after making the 2010 tax calculations), would both be subject to a very severe Section annual limitation after the Effective Date such that they would effectively no longer be available. I.R.C. § 382(b).

[557] In general, the amount of the annual Section 382 limitation is equal to the product of (i) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments), and (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (for example, 3.86% for ownership changes occurring in November 2010). I.R.C. § 382(b). If the ownership change is pursuant to a confirmed bankruptcy plan, and the loss corporation does not qualify for Section 382(l)(5) relief, the fair market value of the corporation's stock is instead generally determined immediately after (rather than before) the ownership change after giving effect to the discharge of creditor's claims, but subject to certain adjustments; in no event, however, can the stock value for Section 382 purposes exceed the pre-change gross value of the corporation's assets. I.R.C. § 382(l)(6); 26 C.F.R. § 1.382-9(j), (k), and (l). If WMI's gross asset value were assumed to be $160 million as of the Effective Date (and attributable exclusively to the value of WMMRC) and the Effective Date was November 1, 2010, then the Section 382 annual loss limitation would be only about $6.2 million a year (the November 2010 rate of 3.86% times $160 million). This means only about $6.2 million of pre-change NOLs (in this example) could be used annually by reorganized WMI to offset its post-change (i.e., post-Effective Date) taxable income.

[558] Assume the Stock Loss is recognized pre-Effective Date, and the Effective Date occurs in early 2011, for example, on January 31, 2011. For the tax year in which the Section 382 ownership change occurs, Section 382 requires WMI to allocate its NOL for the taxable year (and in this case, the Stock Loss-generated NOL as well) between the pre-change period and the post-change period of the change year by ratably allocating an equal portion of such NOL to each day in the change year. I.R.C. § 382(b)(3); 26 C.F.R. § 1.382-6(a). The special segregation rule for "recognized built-in losses" would not apply as long as the Stock Loss is claimed before (and not on) the Effective Date. I.R.C. § 382(h)(5)(A). Based on this January 31, 2011 Effective Date, only one twelfth (1/12th) (or a little more than 8%) of the roughly $5 billion NOL attributable to the Stock Loss, or $416.7 million, would be allocated to the pre-change portion of the 2011 (in this case) change year (and subjected to the Section 382 annual limitation). The balance of over $4.583 billion of such NOL, which would be allocable to the post-change portion of the 2011 change year, would not be subject to the Section 382 annual limitation triggered on the January 31, 2011 Effective Date. This assumes that the other provisions of Section 382 including, most importantly, the two-year continued historic business continuity requirement, are satisfied by the post-confirmation reorganized debtors and that the other potential tax law limitations on NOL carryforwards also do not apply. I.R.C. § 382(c). Further, in this January 31, 2011 Effective Date example, it would appear that the roughly $416.7 million of pre-change 2011 NOL would be more than sufficient to fully offset any potential gain on the sale of WMMRC as well as any Residual Gain

the preserved amount is after the Effective Date, such preserved losses can <u>only</u> create value for the post-Effective Date holders of the liquidating trust if, and to the extent that, future taxable income is generated by reorganized WMI. Any such value is currently speculative.

## C.    <u>TRUPS</u>

### 1.   Introduction

The proposed Settlement provides that JPMC will retain all rights and title to the "Trust Preferred Securities" ("TRUPS") that the FDIC, as receiver for WMB, says it transferred to JPMC pursuant to the P&A Agreement. Certain TRUPS Holders[559] (the "Investors") object to the proposed Settlement and claim that they still own the TRUPS.[560] If the TRUPS Holders own the TRUPS, they are entitled to a $4 billion liquidation preference. The Settling Parties informed the Examiner that JPMC's receipt of the TRUPS free and clear of all claims is an integral part of the Settlement and that if the Investors prevail in their lawsuit, there will likely be no settlement.

The Investors allege that steps taken on the day before the Petition Date to transfer the TRUPS to WMI were ineffective.[561] In particular, they challenge steps taken to effectuate a conditional exchange feature built into the TRUPS in which their TRUPS interests were "automatically" exchanged for preferred stock of WMI (the "Conditional Exchange").[562] WMI then took steps to transfer the TRUPS to WMB pursuant to a written Assignment Agreement.

---

(although as yet not estimated by the Debtors). After the required Section 108(b) tax attribute reduction for the cancellation of indebtedness income ("CODI") generated upon Plan implementation, reorganized WMI would have about $4.383 billion of NOL carryforward that could be used to shelter or reduce its future federal income tax liabilities for 20 years. I.R.C. § 172(b)(1)(A)(ii). The CODI has been estimated by the Debtors to be around $200 million. Discl. Stmt. at 158. The tax attribute reduction would occur in this example on January 1, 2012. I.R.C. § 108(b).

[559] "TRUPS Holders" refers to all individuals owning TRUPS.

[560] Compl. ¶¶ 1, 204-05, *Black Horse Capital LP, et al. v. JPMorgan Chase Bank, N.A., et al.*, Case No. 10-51387 (MFW) (Bankr. D. Del.) (the "TRUPS Adversary Proceeding") (July 6, 2010), Dkt. No. 1.

[561] Compl. ¶¶ 77-78, TRUPS Adversary Proceeding (July 6, 2010), Dkt. 1.

[562] Compl. ¶¶ 2, 77-78, 203-07, TRUPS Adversary Proceeding (July 6, 2010), Dkt. No. 1.

That transfer was in conformity with "side letters" that WMI previously had sent to the OTS wherein WMI committed to make a "downstream" contribution of the TRUPS to WMB in the event of a Conditional Exchange (the "Downstream Contribution" or the "Downstream Contribution Commitment").

JPMC and the FDIC maintain that the TRUPS were among the assets that the FDIC as Receiver transferred to JPMC pursuant to the P&A Agreement. The Investors challenge both the Conditional Exchange and the Downstream Contribution.

The Court will resolve the issues relating to the TRUPS prior to Plan Confirmation. Given that the issue is currently before the Court, the Examiner reaches no conclusion as to the outcome of such litigation. However, the Examiner analyzed the facts and law to determine whether the Settling Parties had a sufficient factual and legal basis to potentially justify the disposition of the TRUPS in the proposed Settlement.

With respect to the Conditional Exchange, the Examiner concludes that the issues before the Court are primarily legal. These issues may therefore be appropriate for summary judgment. Further, assuming the Conditional Exchange occurred, avoiding the Downstream Contribution will have no material impact on the ultimate amount available for distribution by the Estates. Avoiding the Downstream Contribution will generate an offsetting claim of equivalent value.

a.      Litigation Concerning the TRUPS

On or about July 6, 2010, the Investors filed the TRUPS Adversary Proceeding in this Court against various named defendants, including JPMC, WMI, Washington Mutual Preferred Funding LLC ("WMPF"), and each of the SPEs (as hereinafter defined) (the "TRUPS Adversary Proceeding"). The Court will consider issues raised in the TRUPS Adversary Proceeding prior to confirmation of the Plan.

b.    Examiner's Review of the TRUPS

The Examiner obtained and reviewed information and materials provided by JPMC, the OTS, the FDIC, Goldman Sachs, and counsel for the Investors. In addition, the Examiner reviewed pleadings and materials filed in the TRUPS Adversary Proceeding and the Bankruptcy Case. Copies of closing documents for each of the five TRUPS financings were also reviewed. The Examiner also interviewed individuals with knowledge of facts related to the TRUPS.

2.    **Factual History of the TRUPS**

a.    General Description

In 2006, WMI began discussions with investment bankers for the purpose of structuring the lowest cost method of raising capital that would be considered Tier 1 capital of WMB for regulatory purposes.[563] WMI decided to offer and sell, on a private basis to qualified institutions, a form of hybrid security (an instrument with both equity and debt characteristics) through trusts formed by an indirect subsidiary of WMB. The obligations of such securities were to be funded from pools of mortgage loans.[564] These securities were the TRUPS.

In five separate TRUPS offering transactions taking place from February 2006 through October 2007 (the "Relevant Period"), WMI raised approximately $4 billion from investors. In exchange, the TRUPS Holders received a quarterly coupon, certain redemption rights, and a liquidation preference funded from separate asset trusts established in connection with this financing.

In order to effectuate the financings, WMPF was formed as an indirect subsidiary of WMB. One hundred percent of the common equity of WMPF was owned by University Street, Inc. ("University Street"), also an indirect subsidiary of WMB. Over the course of the

---

[563] Interview of Scott Romanoff, September 17, 2010 ("Romanoff Interview").

[564] WMI_PC_08788078.00001, at WMI_PC_08788078.00019-20.

financings, WMB and University Street conveyed to WMPF approximately $13.5 billion of various mortgage assets (collectively, the "Underlying Assets") in connection with which WMB received LLC Preferred Securities in various series.[565]

Over the course of the Relevant Period, WMPF contributed the Underlying Assets to three newly formed Delaware statutory asset trusts (collectively, the "Asset Trusts" and each, an "Asset Trust") in exchange for certificates representing beneficial interests that WMPF held in the Underlying Assets. Each Asset Trust constituted a real estate mortgage investment conduit or "REMIC" for federal tax purposes.[566] After the creation and funding of the Asset Trusts with the Underlying Assets, WMPF created a series of grantor trusts, one a Cayman Islands trust and the other four Delaware special purpose entity statutory trusts (the "SPEs").

During the offering period each SPE purchased from WMB certain LLC Preferred Securities (the "LLC Preferred Securities").[567] To finance such purchase, each SPE issued and sold TRUPS to institutional investors in private offerings. In each of the five financings, Goldman Sachs was either the sole structuring coordinator and book runner for the transaction or one of the managers, with several other investment banking firms participating in the financings.[568]

Based upon the structure of the financings, as the Asset Trusts received revenues from the Underlying Assets, the funds were passed through to the SPEs to pay amounts due TRUPS

---

[565] *See generally* WMIPC_500002044.00001; WMIPC_500002048.00001; WMIPC_500002117.00001; WMIPC_500002168.00001; WMIPC_500002209.00001. Because the structure and terms of the five TRUPS offerings were substantially similar, citation to one or more of the offering memoranda refers to all the offering memoranda (collectively, the "Offering Memoranda").

[566] REMICs are pass through entities, not subject to tax, that issue multiple classes of securities.

[567] The LLC Preferred Securities are the Class A-1 Perpetual Non-Cumulative Preferred Securities and Class A-2 Perpetual Non-Cumulative Preferred Securities issued by WMPF to WMB in exchange for the Underlying Assets conveyed by WMB.

[568] WMIPC_500002044.00001, at WMIPC_500002044.00001.

Holders in accordance with the terms of the TRUPS.[569] The TRUPS Holders who purchased the

TRUPS were beneficial owners through the Depository Trust Company ("DTC") (holder of

global certificates representing the various series of TRUPS), and their interests were represented

in book entry form or street name such that certificates representing the TRUPS were never

issued to individual TRUPS Holders.[570]

### b. Conditional Exchange Event and Downstream Contribution Commitment

With respect to the formation of WMPF, on January 30, 2006, WMB sent a "Notice for

Establishment of an Operating Subsidiary" to the OTS, giving notice that WMB intended to

establish WMPF as an operating subsidiary (the "January 2006 Notice" or "Notice").[571] The

purpose of WMPF was to authorize and issue the LLC Preferred Securities, which could be

eligible to be included in core or Tier 1 capital of WMB. The LLC Preferred Securities would be

owned by the SPEs, which would issue TRUPS to finance the SPEs' purchase of the LLC

Preferred Securities. The January 2006 Notice asked the OTS to confirm that the sale of the

initial two series of TRUPS to outside investors would constitute the sale of the LLC Preferred

Securities. The Notice further requested confirmation that the LLC Preferred Securities would

constitute Tier 1 capital under the OTS "Prompt Corrective Action" regulations.

In the January 2006 Notice, WMB stated that the TRUPS would contain a Conditional

Exchange feature whereby, upon the OTS's determination that a "Supervisory Event" had

occurred, the TRUPS would be "automatically" exchanged for a corresponding amount of

---

[569] WMIPC_500002044.00001, at WMIPC_500002044.00020.

[570] WMIPC_500002131.00001, at WMIPC_500002131.00014-15.

[571] WMI-TPS 701359838.00001.

preferred stock of WMI to be issued pursuant to the Conditional Exchange (the "WMI

Shares").[572] The January 2006 Notice defined "Supervisory Event" as:

    A.  [WMB] becomes "undercapitalized" under the OTS "prompt corrective action" regulations…;

    B.  [WMB] is placed into bankruptcy, reorganization, conservatorship or receivership; or

    C.  The OTS, in its Sole Discretion,

        (i)  anticipates that [WMB] may become undercapitalized in the near term; or

        (ii)  takes supervisory action that limits the payment of distributions or dividends, as applicable…, and in connection therewith, directs…[a Conditional Exchange].[573]

In all other TRUPS-related documents, the "Supervisory Event" is referred to as an

"Exchange Event." The January 2006 Notice further represented to OTS that the series of WMI

Shares correspondingly issued in connection with a particular TRUPS series would generally

have the same terms as such TRUPS series.[574]

OTS informed the Examiner that the Exchange Event and Conditional Exchange features

of the TRUPS were required if the TRUPS were to be counted as Tier 1 capital of WMB. The

OTS's goal was to ensure that it had the unilateral supervisory authority to declare when such an

Exchange Event occurred and to direct a Conditional Exchange so as to ensure that the capital

---

[572] *Id.* In the offering memoranda, the "WMI Shares" were actually defined as newly issued depositary shares, each representing a 1/1000[th] interest in one share of WMI Shares. *E.g.*, WMIPC_500002117.00001, at WMIPC_500002117.00085; *see also, e.g.*, WMIPC_500002131.00001, at WMIPC_500002131.00024-25; WMI-TPS 701359838.00001. Further, upon a Conditional Exchange, WMI would be "unconditionally obligated" to issue to each TRUPS Holder "a depositary receipt representing a like amount of Depositary Shares" in exchange for each TRUPS. WMIPC_500002117.00001, at WMIPC_500002117.00086; *see also* WMIPC_500002131.00001, at WMIPC_500002131.00024-25.

[573] WMI-TPS 701359838.00001.

[574] *Id.*

would be available to WMB when needed.[575]  The January 2006 Notice made no mention of any

Downstream Contribution Commitment from WMI to WMB in the event of a Conditional

Exchange.

OTS responded to the January 2006 Notice on February 9, 2006.[576]  OTS said it did not

object to the formation of WMPF or its issuance of securities, but that the proposed capital

treatment of the LLC Preferred Securities, i.e., Tier 1, would be subject to further OTS review.

On February 23, 2006, WMI sent a letter to Darrel Dochow of the OTS.[577]  This initial

side letter provided that upon the occurrence of a Conditional Exchange, WMI would contribute

the TRUPS to WMB.  In other words, if a Conditional Exchange occurred, WMI agreed that it

would downstream the TRUPS to WMB.  Similar "side letters" were sent in connection with

each TRUPS offering and each such letter confirmed the Downstream Contribution Commitment

(the "Side Letters").[578]  There was no indication in the Side Letters whether WMI would disclose

the Downstream Contribution Commitment to TRUPS Holders.

The next day, February 24, 2006, the OTS approved the application for formation of

WMPF and effectively approved core capital treatment for the TRUPS with the Conditional

Exchange and Downstream Contribution Commitment features.[579]

---

[575] Interview of Michael Solomon, September 10, 2010 ("Solomon Interview").

[576] WMIPC_ 500002025.00001, at WMIPC_ 500002025.00001.

[577] Id. at WMIPC_ 500002025.00002.  The header of the initial side letter read "CONFIDENTIAL TREATMENT REQUESTED."  Unlike the January 2006 Notice, there was not a separate "Confidential Treatment Requested" heading or paragraph within the body of the letter.

[578] WMIPC_500002022.00001, at WMIPC_500002022.00003-11; WMI_PC_701360978.00001, at WMI_PC_701360978.00001-04.

[579] The letter stated that OTS would not "exercise its supervisory authority and discretion to exclude the [LLC] Preferred Securities from core capital."  WMIPC_500002025.00001, at WMIPC_500002025.00003.

c. The Offerings

      (i)     Offering Memoranda and Other TRUPS-Related Documents

            (a)     Offering Memoranda

The offering memorandum for each TRUPS issuance (collectively, the "Offering Memoranda") provides that each series of the TRUPS was subject to the Conditional Exchange feature. The Offering Memoranda state that, upon the direction of the OTS following the occurrence of an Exchange Event, each TRUPS would be "*automatically*" exchanged for WMI Shares.[580] The OTS was the sole arbiter with respect to whether a Conditional Exchange occurred.[581] Upon its determination that an Exchange Event occurred, OTS would send WMI written notice of such occurrence, which would contain a directive to effect the Conditional Exchange ("Exchange Event Notice").[582] According to the Offering Memoranda, after the occurrence of the Conditional Exchange, WMI would own the TRUPS.[583]

Within 30 days of the Conditional Exchange, WMI was required to mail notice of the issuance of the Exchange Event Notice to each TRUPS Holder.[584] Additionally, each TRUPS Holder was obligated to surrender to WMI any certificates representing the TRUPS, and WMI was "unconditionally obligated" to issue to each such holder documentation representing WMI Shares in exchange.[585] The Offering Memoranda further specified that as of the time of exchange:

---

[580] WMIPC_500002117.00001, at WMIPC_500002117.00085 (emphasis added).

[581] WMIPC_500002117.00001, at WMIPC_500002117.00024. This fact was verified in the Solomon Interview.

[582] WMIPC_500002117.00001, at WMIPC_500002117.00085-86. Alternatively, the Conditional Exchange would occur following the issuance of a press release by WMI (the "WMI Press Release").

[583] WMIPC_500002117.00001, at WMIPC_500002117.00086.

[584] WMIPC_500002131.00001, at WMIPC_500002131.00024-25.

[585] WMIPC_500002117.00001, at WMIPC_500002117.00086; *see also, e.g.*, WMIPC_500002131.00001, at WMIPC_500002131.00024-25.

(1)     "all of the [TRUPS] will be transferred to WMI *without any further action* by the [applicable SPE]";[586]

(2)     "all rights of the . . . [TRUPS Holders] as holders of beneficial interests in the [SPE] will cease";[587]

(3)     all such TRUPS Holders "will be, for all purposes, the holders of [WMI Shares]";[588] and

(4)     until WMI Shares "are delivered or in the event such [WMI Shares] are not delivered, any certificates previously representing [TRUPS] will be *deemed* for all purposes to represent [WMI Shares]."[589]

Further, each Offering Memorandum states that upon a Conditional Exchange "WMI will be *unconditionally obligated* to issue" documentation representing WMI Shares to the TRUPS Holders[590] and that until such documentation is delivered "or in the event such [documentation] . . . [is] not delivered, any certificates previously representing [TRUPS] will be *deemed* for all purposes to represent [WMI] Shares."

Notwithstanding the foregoing provisions, the Investors argue that other provisions of the Offering Memoranda are inconsistent with the notion that a Conditional Exchange would occur automatically. For example, the Offering Memoranda contain provisions that each TRUPS Holder will be obligated to surrender to WMI or its agent certificates representing the TRUPS and WMI will mail notice to TRUPS Holders of OTS's issuance of an Exchange Event Notice.[591] Neither of these events occurred.

---

[586] WMIPC_500002117.00001, at WMIPC_500002117.00086 (emphasis added).

[587] *Id.*

[588] *Id.*

[589] WMIPC_500002117.00001, at WMIPC_500002117.00086 (emphasis added); *see also* WMIPC_500002131.00001, at WMIPC_500002131.00024-25.

[590] WMIPC_500002117.00001, at WMIPC_500002117.00086 (emphasis added). The Offering Memoranda stated that anyone who purchased the TRUPS in the initial offerings or in the secondary market were "*deemed*" to have agreed to the aforementioned exchange obligations. WMIPC_500002117.00001, at WMIPC_500002117.00086 (emphasis added). Based on information made available to the Examiner, it does not appear that the TRUPS Holders ever signed any document specifically agreeing to the "deemed" or "automatic" Conditional Exchange.

[591] *Id.*

(b)     Other TRUPS-Related Documents

The transaction documents executed in connection with the TRUPS issuances described the Conditional Exchange in substantially the same manner as the Offering Memoranda.  For example, the SPE trust agreements or memoranda of articles of association, as applicable (the "SPE Trust Agreements"), which account for the administration of the SPEs, provide that if the OTS declares an Exchange Event, the TRUPS would be exchanged *automatically* for WMI Shares.[592]  Notwithstanding this language, various TRUPS transaction documents imposed additional obligations on the parties in connection with a Conditional Exchange.[593]  Thus, these transaction documents, like the Offering Memoranda, contain provisions that the Investors point to as inconsistent with language concerning the *automatic* nature of the exchange.

(ii)     Corporate Authorization

According to the Offering Memoranda, all corporate authorizations necessary for WMI to issue the WMI Shares were to have been completed prior to or upon completion of each TRUPS offering by the SPEs.  Thus, the Offering Memoranda did not contemplate that WMI, WMB, WMPF, and the SPEs would need to take any future actions with regard to corporate authorizations if OTS ever directed that a Conditional Exchange occur.

The resolutions of the WMI Board of Directors (the "WMI Board") passed during the Relevant Period in connection with the five TRUPS issuances (the "TRUPS Resolutions")

---

[592] WMIPC_500002131.00001, at WMIPC_500002131.00024; WMIPC_500002065.00001, at WMIPC_500002065.00021.

[593] For example, the SPE Trust Agreements provided that "[u]pon the occurrence of a Conditional Exchange" (a) each TRUPS Holder would be obligated to surrender to WMI any certificates representing the TRUPS, (b) the relevant SPE or its trustee would be required to register WMI as the owner of all the TRUPS, (c) WMI would be obligated to issue to each TRUPS Holder a like amount of WMI Shares, and (d) within 30 days of the Exchange Event Notice and immediately prior to the Conditional Exchange, WMPF would be required to mail to each TRUPS Holder notice of the occurrence of an Exchange Event and the OTS directive requiring a Conditional Exchange. WMIPC_500002131.00001, at WMIPC_500002131.00024; WMIPC_500002065.00001, at WMPIC_500002065.00021-22.  The SPE Trust Agreements for the Delaware SPEs (collectively, the "Delaware SPE Trust Agreements") further provided that upon the occurrence of a Conditional Exchange the Delaware SPEs were to be dissolved.  WMIPC_500002131.00001, at WMPIC_500002131.00035.

specifically authorized all of the steps that WMI and/or WMB needed to take in connection with the TRUPS issuances.

d.     September 2008 Conditional Exchange Event

WMI and WMB were under substantial financial and regulatory pressure in September 2008. On September 7, 2008, WMB executed a Memorandum of Understanding with OTS (the "MOU").[594] The MOU placed limitations on the ability of WMB to pay dividends -- limitations that constituted an "Exchange Event." Nonetheless, there is no evidence that the WMI Board considered whether the MOU constituted an Exchange Event. Further, at the time the MOU was executed, OTS did not declare an Exchange Event.

(i)     JPMC's Bid

By September 22, 2008, the FDIC had begun the process of soliciting bids for WMB if a seizure of WMB became necessary. As a result of its due diligence, JPMC was aware of the existence of the TRUPS and of the Underlying Assets. Indeed, JPMC informed the Examiner that because the TRUPS were a large and important asset, the acquisition of the TRUPS was a requirement if JPMC was to purchase WMB assets through an FDIC sale.[595] Mr. Dimon stated that the TRUPS were an integral part in his decision regarding the amount of JPMC's bid for WMB's assets.[596] Further, JPMC stated that the FDIC informed it that the FDIC would take all actions to ensure that the TRUPS were included in the sale.[597]

On September 24, 2008, JPMC tendered its bid to the FDIC. The transmittal letter sent with the bid referenced the Conditional Exchange and the requirement that WMI contribute the TRUPS to WMB. The next day and at the direction of the FDIC, the OTS notified WMI that an

[594] OTS-WMI-BKRCY-00000137.

[595] Interview of Dan Cooney, September 2, 2010 ("Cooney Interview").

[596] Interview of Jamie Dimon, September 14, 2010 ( "Dimon Interview").

[597] Cooney Interview.

"Exchange Event" had occurred based on the MOU 18 days after the execution of the MOU.[598] Thus, OTS directed an exchange of TRUPS for "a like amount of preferred stock in Washington Mutual Incorporated."[599]

(ii)    Assignment Agreement

On the morning of September 25, 2008, Charles "Chad" Smith, at that time an in-house lawyer for WMI, learned of the Exchange Event. An OTS employee arrived at Mr. Smith's office, informed him of the Exchange Event, and directed that WMI formally assign the TRUPS to WMB. The OTS employee advised Mr. Smith that he would not leave until he was satisfied that an assignment agreement between WMI and WMB had been prepared and executed, and that the Conditional Exchange and the assignment of the TRUPS to WMB had been effected.[600]

To effect WMI's contribution of the TRUPS to WMB, an Executive Vice President of WMI executed the Assignment Agreement, effective as of September 25, 2008, which transferred to WMB all of WMI's right, title and interest in the TRUPS, whether then owned or thereafter acquired. In addition, the Assignment Agreement stated that when any rights or benefits arising out of the TRUPS came into possession of WMI, they would immediately vest in WMB.[601]

---

[598] OTS told the Examiner that on or around September 25, the FDIC directed OTS to complete the Conditional Exchange and the Downstream Contribution commitment as soon as possible. Interview of Darrel Dochow, September 1, 2010 ("Dochow Interview").

[599] WMIPC_500002026.00001.

[600] Interview of Charles Smith, September 30, 2010 ("Smith Interview").

[601] Todd Baker, Executive Vice President of WMI, and Patricia Schulte, an authorized officer with the ability to execute transaction documents on behalf of WMB, executed the Assignment Agreement on behalf of WMI and WMB, respectively. Specifically, the Assignment Agreement purported to assign from WMI any "Securities," i.e., the TRUPS, along with any certificates corresponding thereto, and all other rights, benefits, proceeds and obligations of the owner of the TRUPS arising from or in connection with the TRUPS, whether owned by WMI as of the date of the agreement or acquired thereafter. The Assignment Agreement was never formally approved or authorized by either the WMI or WMB Boards of Directors.

(iii)     WMI Press Release and the Conditional Exchange

Following the Exchange Event Notice, Steve Rotella, President and COO of WMI, notified by email Benjamin Franklin and John Bisset of the OTS that WMI planned to issue a Press Release on September 26, 2008.  This email confirmed that WMI would announce that the Conditional Exchange would occur at "8:00 a.m. New York time on September 26, 2008."[602] The email letter to OTS further provided that the Conditional Exchange would result in WMI becoming owner of all of the TRUPS and would have the effect of dissolving each of the SPEs, so that the LLC Preferred Securities held by the SPEs would be "owned by WMI as a result of such dissolution."[603]  Finally, Mr. Rotella's email letter stated: "In any event, effective September 25, 2008, WMI has assigned to WMB all of its right title and interest to the . . . [TRUPS] and the WMPF Preferred Securities, and upon receipt of [such securities], WMI will immediately contribute and transfer the same to WMB, and such contribution and transfer will occur regardless of any events which may occur prior to such contribution and transfer."[604]

At approximately 7:45 a.m. New York time on September 26, 2008, WMI issued the WMI Press Release, which stated that the Conditional Exchange would occur at 8:00 a.m. on that date.[605]  The WMI Press Release did not mention the Downstream Contribution.  The WMI Press Release did state that WMI would mail the notice required under the applicable offering documents[606] and the SPE Trust Agreements[607] to each holder of record of TRUPS and would

---

[602] WMIPC_500002025.00001, at WMIPC_500002025.00004.

[603] *Id.*

[604] *Id.*

[605] WMI_PC_701360986.00001, at WMI_PC_701360986.00006.

[606] WMIPC_500002117.00001, at WMIPC_500002117.00086.

[607] WMIPC_500002131.00001, at WMIPC_500002131.00024.

163

cause to be delivered to each such holder WMI Shares upon surrender of the TRUPS.[608] The

WMI Press Release also stated that until the WMI Shares were delivered or in the event they

were not delivered, any certificates previously representing the TRUPS would be deemed for all

purposes to represent the relevant WMI Shares.[609]

e.    Status of the Conditional Exchange Just Prior to the Bankruptcy
Filing

Approximately two hours after issuing the WMI Press Release, WMI filed its Voluntary

Bankruptcy Petition. Although many actions relating to the Exchange Event occurred prior to

the bankruptcy filing, there is no dispute that certain contemplated actions did not occur (the

"Unperformed Obligations"). These Unperformed Obligations include:[610] (i) TRUPS Holders

never surrendered any TRUPS certificates in their possession; (ii) WMI never issued any WMI

Share certificate(s); (iii) the SPEs never recorded WMI as the new owner of the TRUPS; (iv) no

book-entry notation was made reflecting WMI's delivery (constructive or otherwise) of the WMI

Shares;[611] (v) there was no delivery of any documents or certificates representing WMI Shares to

TRUPS Holders; and (vi) no notice was given to TRUPS Holders within 30 days of the

occurrence of the Exchange Event and immediately prior to the Conditional Exchange.[612]

---

[608] WMI_PC_701360986.00001, at WMI_PC_701360986.00006.

[609] *See id.*

[610] The Examiner found that the Delaware SPEs were not dissolved, a fact confirmed by JPMC.

[611] The Debtors assert that certificates representing the WMI Shares need not be issued because, as the Examiner's research confirmed, the relevant Articles of Amendment to the WMI Articles of Incorporation that were filed in connection with each authorization of WMI Shares, expressly stated that the relevant series of WMI Shares may be uncertificated. Smith Interview; WMIPC_500002181.00001, at WMIPC_500002181.00012. However, under Article 8 of the Uniform Commercial Code, a book-entry notation must be made on the security register of the company issuing uncertificated securities in order to constitute valid delivery of such securities.

[612] Smith Interview. The notice to TRUPS Holders was to set forth: (1) that an Exchange Event occurred, (2) that a Conditional Exchange has been directed, and (3) instructions directing TRUPS Holders to deliver any TRUPS certificates in their possession in exchange for WMI Shares and information where any such certificates were to be delivered. WMIPC_500002065.00001, at WMIPC_500002065.00022; *see* WMIPC_500002131.00001, at WMIPC_500002131.00024.

3.      **Positions of the Parties With Respect to the TRUPS**

      a.      <u>Conditional Exchange</u>

          (i)      Debtors' Position

The Debtors' position is that the occurrence of the Conditional Exchange was, pursuant to the terms of the various TRUPS documents, automatic upon its receipt of the Exchange Event Notice, and that the receipt of such notice was the only condition necessary to effect the Conditional Exchange.[613]

The Debtors' position on the Unperformed Obligations is that such obligations were merely "mechanical formalities" that were to take place after the automatic occurrence of the Conditional Exchange, and were not actual conditions of a Conditional Exchange.[614] The Debtors assert that the bankruptcy intervened and prevented the performance of the Unperformed Obligations.[615]

          (ii)      Investors' Position

In the Complaint filed in the TRUPS Adversary Proceeding, the Investors seek a declaration that the TRUPS are the property of the TRUPS Holders and not the property of WMI or WMB.[616] The Investors assert, first, that the Conditional Exchange never occurred and, second, that WMI's Downstream Contribution Commitment to WMB was not effective.[617]

In substance, the Investors assert that the Conditional Exchange did not "automatically" occur upon OTS's declaration, but that each specific Unperformed Obligation needed to be

---

[613] Smith Interview; *see also* WMIPC_500002117.00001, at WMIPC_500002117.00085; WMIPC_500002131.00001, at WMIPC_500002131.00024; WMIPC_500002123.00001, at WMIPC_500002123.00002.

[614] Smith Interview.

[615] *Id.*

[616] Compl. ¶¶ 210, 218, 258, TRUPS Adversary Proceeding (July 6, 2010), Dkt. No. 1.

[617] *Id.* ¶ 207.

performed *before* the Conditional Exchange occurred. Put differently, the Investors contend that a Conditional Exchange did not occur because the Unperformed Obligations were conditions precedent to a Conditional Exchange. The Investors also contend that the failure to disclose the Side Letters was fraudulent and justifies setting aside any Conditional Exchange.

### (iii) FDIC's and JPMC's Role in the Conditional Exchange

As indicated above, prior to the Conditional Exchange, the FDIC advised JPMC that it would take all steps necessary to effectuate the transfer of the TRUPS to WMB and, thus, JPMC.[618] According to JPMC, the FDIC confirmed that the Conditional Exchange had occurred, and JPMC relied upon this confirmation.[619] JPMC therefore took no further steps to ensure that the Conditional Exchange and Downstream Contribution were completed.[620] JPMC's position, simply stated, is that it believed that the Conditional Exchange and Downstream Contribution were assured and that the TRUPS would be capital of WMB when JPMC acquired WMB's assets.

### b. Downstream Contribution

As set forth above, neither the January 2006 Notice nor the MOU mentioned the Downstream Contribution Commitment. However, the Side Letters provided that upon an Exchange Event and an ensuing Conditional Exchange, that WMI would downstream the TRUPS to WMB.

### (i) WMI's Position

The WMI and WMB Boards of Directors (collectively referred to herein as the "WMI/WMB Board") specifically authorized all of the steps necessary to be taken by WMI

---

[618] Cooney Interview.

[619] *Id.*

[620] *Id.*

and/or WMB in connection with the TRUPS issuances. There was no specific authorization for (a) the execution of the Side Letters, (b) the Downstream Contribution, or (c) WMI's and WMB's respective execution of the Assignment Agreement.[621]

However, the Debtors' position is that the Blanket Resolution contained in the TRUPS Resolutions authorized the execution of the Assignment Agreement and the Downstream Contribution.[622] Further, Mr. Smith stated that the WMI/WMB Board specifically considered and generally approved the Downstream Contribution and the execution of the Side Letters when the WMI/WMB Board gave the Blanket Resolution contained in each of the TRUPS Resolutions.[623]

With respect to the lack of disclosure in the TRUPS offering materials of the Side Letters and the Downstream Contribution Commitment, the Debtors contend that although the existence and substance of the Side Letters were never specifically disclosed to TRUPS Holders, given the amount of information that WMI provided to the TRUPS Holders, TRUPS Holders knew, or should have known, that the Downstream Contribution was a feature of the TRUPS.[624]

---

[621] The TRUPS Resolutions also contained a blanket resolution authorizing any authorized officer of WMI, together with other proper officers of WMI, to negotiate, enter into, execute, and deliver any and all additional agreements and any undertakings or other documents or supplemental agreements on behalf of WMI (including, without limitation, filings or applications with banking regulators, securities regulators, or stock exchanges). Further, any such officer could take any other actions, in each case, as such Authorized Officer or other proper officer deemed to be necessary or advisable in connection with the issuance of the WMI Shares, the LLC Preferred Securities or the TRUPS (the "Blanket Resolution"). WMIPC_500002099.00001, at WMIPC_500002099.00132. "Authorized Officers" included the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, any Senior Executive Vice President, any Executive Vice President, Senior Vice President and Treasurer, Senior Vice President and Assistant Treasurer, and Senior Vice President and Controller. WMIPC_500002081.00001.

[622] Smith Interview.

[623] Id.

[624] Id.; see also WMI's Gen. Objs. and Resp. to Pls.' First Set of Req. for Admiss. ("WMI RFA Responses") at Response Nos. 63-66, 86-89, 128-29, 174-75, 240-41, TRUPS Adversary Proceeding (Sept. 27, 2010).

In the WMI RFA Responses, certain requests for admission ask WMI to admit that it failed to disclose the Side Letters in the Offering Memoranda. In response, WMI replied that the Side Letters were "not included in the [Offering Memoranda], but the arrangements set forth in correspondence to OTS were neither secret nor contrary to any express or implied representations to [TRUPS] investors. Investors in [TRUPS] were fully informed that the

On this point the Debtors' position is as follows: (a) the Conditional Exchange would occur upon a directive from the OTS; (b) if the Conditional Exchange occurred, TRUPS Holders would become preferred shareholders of WMI; (c) the protective covenants afforded TRUPS Holders in the Offering Memoranda[625] would no longer be available if the Conditional Exchange occurred; (d) the Underlying Assets would not be available to TRUPS Holders after the occurrence of a Conditional Exchange; (e) if the Conditional Exchange occurred, the TRUPS Holders would effectively have no recourse (this was a risk inherent in the TRUPS); (f) the purpose of the TRUPS issuances was to raise Tier 1 capital for WMB (as opposed to capital for WMI); and (g) WMI/WMB was not an "outlier" in using the Conditional Exchange and Downstream Contribution features in their capital raising transactions, i.e., other banks were utilizing these structures around the Relevant Period. In short, the Debtors' position is that TRUPS Holders had "more than enough" information from the TRUPS offering materials to enable them to understand the structure of the TRUPS, including the Downstream Contribution feature.[626]

### (ii) Investors' Position

The Investors assert that WMI colluded with OTS to conceal the Side Letters.[627] The Investors allege that, in the Offering Memoranda, WMI represented that the TRUPS would be owned by WMI upon the occurrence of a Conditional Exchange. The Investors further allege

---

purpose of offering the [TRUPS] was to raise core capital for WMB, and of the potential that OTS could decide to issue a directive ordering the Conditional Exchange upon the occurrence of any of several Exchange Events." *Id.*

[625] Such protective covenants included prohibitions against WMPF engaging in the following activities without first obtaining the consent or affirmative vote of the holders of at least two-thirds of all series of LLC Preferred Securities: (1) issuing any senior equity securities; (2) incurring any indebtedness for borrowed money; and (3) subject to certain exceptions, consolidating or merging with or into another entity. *E.g.,* WMIPC_500002117.00001, at WMIPC_500002117.00095.

[626] Smith Interview.

[627] Compl. ¶ 3, TRUPS Adversary Proceeding (July 6, 2010), Dkt. No. 1.

that the Downstream Contribution Commitment was a material fact that should have been disclosed to TRUPS Holders in the offering materials, but intentionally was not.[628]

Moreover, the Investors find fault with the Assignment Agreement itself, asserting, among other things, that the Assignment Agreement was not validly authorized for execution and that no or inadequate consideration was given by WMB in exchange for the Downstream Contribution. Due to these considerations, the Investors believe that the Court should find that the Downstream Contribution never occurred.[629]

### 4. Analysis

In an effort to assist the Court, the Examiner has attempted to determine, on a preliminary basis, whether the Settling Parties have a basis to argue both that the Conditional Exchange automatically occurred and that the Downstream Contribution Commitment is enforceable. The Examiner was primarily concerned with determining whether the Settling Parties' positions on these issues were so lacking in legal and factual foundation that the Settlement Agreement is not feasible as structured. Without reaching an ultimate conclusion, the Examiner finds that the Settling Parties' positions with respect to the TRUPS have merit.

The salient facts here are not in dispute. There will be two primary issues before the Court: (1) did a Conditional Exchange occur under the terms of the TRUPS documents, and (2) if the Conditional Exchange occurred, is there any basis on which to set aside the Downstream Contribution.

---

[628] *Id.*

[629] Compl. ¶¶ 207-08, 215, 243, TRUPS Adversary Proceeding (July 6, 2010), Dkt. No. 1.

a.    The Conditional Exchange

(i)    "Automatic" Exchange

The use of the word "automatic" in the operative TRUPS documents supports the

Debtors' position that the Conditional Exchange occurs automatically.[630]   However, there is no

material dispute that the Unperformed Obligations were not performed.   The issue is whether the

failure to perform the Unperformed Obligations means that a Conditional Exchange did not

occur because such obligations were conditions precedent to the occurrence of a Conditional

Exchange.   The "automatic" language in the TRUPS documents suggests that the Unperformed

Obligations are not conditions precedent.

The Investors cite language in the Trust Agreements to support their position that the

Unperformed Obligations are conditions precedent to a Conditional Exchange.   By way of

example, section 4.08(a) of the Delaware SPE Trust Agreements and Section 9(f) of the Cayman

SPE Articles provide that "[u]pon the occurrence of a Conditional Exchange":   (i) the TRUPS

Holders will be obligated to surrender any TRUPS certificate(s) they possess; (ii) the SPEs'

respective trustees (or, the Cayman SPE, in its case) will record WMI as the new owner of the

TRUPS; and (iii) WMI will be obligated to issue the Depositary Shares.[631]   However, none of the

Unperformed Obligations are designated as conditions precedent in the Trust Agreements.

Moreover, the Investors ignore the "*[u]pon the occurrence of a* Conditional Exchange" language

in the TRUPS documents[632] and focus only on the language that imposes additional obligations

on the parties.

---

[630] WMIPC_500002117.00001, at WMIPC_500002117.000085; WMIPC_500002131.00001, at WMIPC_500002131.00024.

[631] WMIPC_500002131.00001, at WMIPC_500002131.00024; WMIPC_500002065.00001, at WMIPC_500002065.00021-22.

[632] WMIPC_500002131.00001, at WMIPC_500002131.00024 (emphasis added).

The intent of the parties is relevant to the Court's consideration of whether a Conditional Exchange occurred automatically. In determining the intent of the parties, the Examiner finds that the Conditional Exchange was designed to provide liquidity to WMB during a time of duress, as declared by OTS. The TRUPS were considered to be Tier 1 or "core" capital of WMB. In an "emergency," the TRUPS would be immediately available to WMB -- thus, the need for the "automatic" provisions of the TRUPS documents. Indeed, the Examiner notes that if the Investors' position is correct, it would mean that the party required to issue stock pursuant to a Conditional Exchange (here, WMI) could block a Conditional Exchange, despite OTS's declaration of an Exchange Event, by simply not taking the steps necessary to complete the transaction. Such a result is entirely inconsistent with the idea that the OTS could require that these assets be available in a time of distress.

                (ii)       TRUPS Documents Did Not Contemplate Bankruptcy

The Offering Memoranda prohibit any transfer of a TRUPS interest to an entity or individual who is not both a "Qualified Institutional Buyer" (a "QIB") within the meaning of Rule 144A under the Securities Act of 1933 (the "1933 Act"), as amended, and a "Qualified Purchaser" ("QP") within the meaning of the Investment Company Act of 1940, as amended.[633] Since a Conditional Exchange with an insolvent or bankrupt WMI was clearly contemplated, it is surprising that no express exception to the QP clause was included for transfers to WMI.[634]

The Debtors, the FDIC, and JPMC will likely each contend that the Conditional Exchange took place just prior to the sale and seizure of WMB and thus, if applicable, one could consider the assets of WMB in evaluating whether WMI was a QIB and a QP. Further, the

---

[633] The Investors argue that WMI was not a QIB at the time of the Conditional Exchange, because as of September 26, 2008 (the date of the Conditional Exchange), WMI reportedly held only $59.7 million in "Investment Securities" and had a negative net worth of $575 million (which is less than the $100 million of owned investment securities and the $25 million net worth, respectively, required under the relevant sections of the 1933 Act).

[634] Compl. ¶ 88, TRUPS Adversary Proceeding (July 6, 2010), Dkt. No. 1.

Conditional Exchange feature was intended to provide capital to WMI and WMB precisely because of their financial distress, which is entirely inconsistent with disqualifying WMI as an unqualified QIB.

In addition, Section 365(c)(2) of the Bankruptcy Code may prohibit WMI from performing certain Unperformed Obligations. This section precludes a debtor from assuming any executory contract to "make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, *or to issue a security of the debtor.*"[635] Where a contract falls within the proscriptions of Section 365(c)(2), the debtor may not assume it, even if the non-debtor party to the contract consents to assumption.[636] The Exchange Agreements may qualify as executory contracts, assuming the Conditional Exchange did not occur prior to the Petition Date, because they contemplate the issuance of WMI Shares in exchange for the TRUPS Holders contributing their respective TRUPS to WMI.[637] Therefore, the Exchange Agreements are contracts "to issue a security of the debtor" within the meaning of Section 365(c)(2) because they require WMI to issue preferred stock. Arguably, Section 365(c)(2) prohibits WMI from concluding certain exchange-related acts after the Petition Date. There is a dearth of authority providing interpretation of Section 365(c)(2), and neither the U.S. Bankruptcy Court for the District of Delaware nor the Third Circuit have weighed in on the issue.[638]

---

[635] 11 U.S.C. § 365(c)(2) (emphasis added).

[636] *See In re Catapult Entm't, Inc.*, 165 F.3d 747, 753 (9th Cir. 1999).

[637] Under the "Countryman Test," the test widely employed by bankruptcy courts for determining whether a contract constitutes an executory contract within the meaning of 11 U.S.C. § 365, a contract is executory if the obligations of both the debtor and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other party under the contract. Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973).

[638] At least one court has held that Section 365(c)(2) should be interpreted in accordance with its plain meaning, and that an executory contract that requires the debtor to issue a security may not be assumed in bankruptcy. *In re Ardent, Inc.*, 275 B.R. 122, 125 (Bankr. D.C. 2001). However, in *In re Teligent, Inc.*, 268 B.R. 723, 737-38 (Bankr.

172

The Examiner finds that the TRUPS documents did not fully consider or anticipate the complications and difficulties that arise in executing and delivering the paperwork associated with an Exchange Event, particularly in the event of a bankruptcy filing by WMI. The TRUPS were a relatively new form of security at the time they were issued and this case is likely the first instance where issues related to the construction of the contracts related to TRUPS in connection with a bankruptcy filing by a thrift holding company will be considered. The Plan contemplates that the Conditional Exchange will be completed. Even if Section 365(c)(2) is interpreted to prohibit WMI from consummating certain exchange-related events following the Petition Date, it does not prohibit WMI from issuing preferred stock pursuant to a plan.

b.     <u>Downstream Contribution</u>

If the Court determines that the Conditional Exchange occurred, the Investors argue that the pre-petition Downstream Contribution, made in accordance with the Downstream Contribution Commitment, must be avoided. The assumption of the Investors is that if the Downstream Contribution is avoided and the TRUPS remained at WMI, there will be sufficient assets available in the Estates to make distributions to the Investors.

As discussed in more detail below, the Examiner finds that avoiding the Downstream Contribution will likely not result in the Investors receiving distributions from the Debtors, primarily because if the Downstream Contribution is avoided, the Settlement will fail and the amount of claims asserted against WMI will greatly increase. Before reaching this issue, however, the Examiner also considered the implications of avoiding the Downstream Contribution. There are several significant legal hurdles to avoiding the Downstream Contribution.

---

S.D.N.Y. 2001), the court concluded that section 365(c)(2) only requires invalidation of executory contracts to make an equity infusion into a debtor and does not apply to every contract involving the issuance of a security. *Id.* at 737.

(i)      Avoidance of Downstream Contribution

The Debtors have asserted claims against the FDIC Receiver and JPMC seeking to avoid

or set aside the Downstream Contribution as either a constructive fraudulent transfer or a

preference.[639] The Examiner concludes that there is a substantial risk that the Debtors' attempt

to avoid the transfer of the TRUPS would fail. The Examiner further concludes that, even if the

Debtors could establish a valid avoidance claim for the Downstream Contribution, the Debtors

would likely recover little or nothing on account of that claim.

A constructive fraudulent transfer is: (1) a transfer; (2) of an interest of the debtor in

property; (3) within four years[640] of the petition date; (4) where the debtor received less than

reasonably equivalent value in exchange for the transfer; and (5) where the debtor was insolvent

at the time of the transfer, or was rendered insolvent thereby.[641] The Examiner assumes that

WMI was insolvent at the time of the Downstream Contribution for purposes of this analysis.[642]

Therefore the primary issue with respect to whether the Downstream Contribution can be

avoided as a constructive fraudulent transfer is whether WMI received reasonably equivalent

value in exchange for transferring the TRUPS.

The satisfaction of an antecedent debt constitutes reasonably equivalent value for

purposes of fraudulent transfer analysis.[643] The Examiner finds that the Court may reasonably

---

[639] *See* Mem. of Law in Supp. of FDIC Receiver's Partial Mot. to Dismiss, Ex. 2 ¶¶ 24-30, *Washington Mutual, Inc. v. Federal Deposit Ins. Corp.*, Case No. 1:09-cv-533(RMC) (D.D.C.) (the "WMI Action") (June 11, 2009), Dkt. No. 25.; Compl. ¶¶ 29-35, WMI Action (Mar. 20, 2009), Dkt. No. 1; Debtors' Answer and Countercl. in Resp. to JPMC's Compl., Third, Fourth, Fifth and Sixth Counterclaims, *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc.*, Adv. Proc. No. 09-50551 (MFW) (Bankr. D. Del.) (the "JPMC Action") (May 29, 2009), Dkt. No. 23.

[640] Washington law provides for a four-year recovery period for fraudulent transfers. *See* RCW §§ 19.40.041(a)(2)(i)-(ii), RCW 19.40.051(a).

[641] 11 U.S.C. § 548(a)(1)(B). A detailed analysis of fraudulent transfer issues is found in the Avoidance Action Section of this Report.

[642] A detailed analysis of solvency issues is found in the Solvency Section of this Report.

[643] 11 U.S.C. § 548(d)(2)(A).

174

conclude that WMI's commitment to contribute the TRUPS pursuant to the Side Letter is a binding obligation on WMI and would thus constitute an antecedent debt. The Downstream Contribution would therefore be in satisfaction of an antecedent debt, would result in WMI's receipt of reasonably equivalent value, and would not constitute a constructive fraudulent transfer.

(ii)      Preference

The avoidance of a preferential transfer is governed by Section 547(b) of the Bankruptcy Code, which provides for the avoidance of transfers:

    (1)    to or for the benefit of a creditor;
    (2)    for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3)    made while the debtor was insolvent;
    (4)    made-
        (A)    on or within 90 days before the date of the filing of the petition . . .
    (5)    that enables the creditor to receive more than such creditor would receive if-
        (A)    the case were a case under chapter 7 of this title;
        (B)    the transfer had not been made; and
        (C)    such creditor received payment of such debt to the extent provided by the provisions of this title.[644]

The basic disputed issues with respect to whether the Downstream Contribution is a preference are:[645] (1) whether the Downstream Contribution was to or for the benefit of a creditor on account of an antecedent debt; and (2) whether the Downstream Contribution allowed its recipient to receive more than it would receive in a hypothetical Chapter 7 case if the transfer had not been made.

---

[644] 11 U.S.C. § 547(b).

[645] For purposes of this analysis, the Examiner assumes WMI was insolvent and that the Downstream Contribution, a transfer of property of WMI, occurred within 90 days before the Petition Date.

The Examiner finds that the Court could reasonably conclude that WMI's commitment to contribute the TRUPS pursuant to the Side Letters is a binding obligation on WMI, therefore the Downstream Contribution was to or for the benefit of a creditor on account of an antecedent debt. The only remaining element that must be satisfied for the Downstream Contribution to constitute a preference is to show that the Downstream Contribution allowed its recipient to recover more than it would in a hypothetical Chapter 7 bankruptcy liquidation.

The Examiner concludes that WMI's obligation to contribute the TRUPS is likely a "capital maintenance obligation" within the meaning of Section 365(o) of the Bankruptcy Code. Therefore any failure of WMI to honor its capital maintenance commitment and contribute the TRUPS would result in a claim against the Estates in favor of the rightful recipient of the TRUPS (either the FDIC Receiver or JPMC), and such claim would be entitled to priority treatment under Section 507(a)(9) of the Bankruptcy Code. Any 507(a)(9) claim arising from WMI's failure to contribute the TRUPS would be paid in full in a hypothetical Chapter 7 liquidation of WMI, therefore transfer of the TRUPS would not result in their recipient receiving more than they would in a hypothetical Chapter 7 and would not constitute a preference.

(iii)    Analysis of Recovery for the Estates

Even if the Debtors were to avoid the Downstream Contribution as a fraudulent transfer or preference, the actual recovery for the Estates would likely be minimal. As stated above, WMI's failure to contribute the TRUPS through the avoidance of the Downstream Contribution would likely give rise to a priority claim against the Estates under Section 507(a)(9) of the Bankruptcy Code, thereby cancelling out any gain to the Estates by virtue of successful avoidance. Further, any recovery against JPMC is subject to JPMC's good faith purchaser defense. Potential recoveries against JPMC and the FDIC on account of avoidance actions are discussed in greater detail in the Avoidance Action portion of this Report.

(iv)    Effect of Section 365(o)

The Examiner finds that Section 365(o) of the Bankruptcy Code may make a determination of whether Downstream Contribution occurred or could be avoided of no consequence. Section 365(o) provides the FDIC with broad powers to compel the Downstream Contribution. Alternatively, under Section 507(a)(9), WMB may be entitled to a priority claim for the value of the TRUPS.

Courts have looked at the plain language of Section 365(o) to find a broad, immediately enforceable requirement to cure a capital maintenance commitment, holding that compliance with Section 365(o) is "mandatory" and that the obligation to honor a capital maintenance commitment attaches "by operation of law, without review by or approval of the bankruptcy court."[646] The FDIC and JPMC argue that, if WMI's obligation to contribute the TRUPS to WMB constitutes a capital maintenance commitment, then WMI would have been required, immediately upon filing bankruptcy, to contribute the TRUPS to WMB. Therefore, they argue, whether the TRUPS were formally contributed to WMB prior to the Petition Date is irrelevant.

Indeed, a majority of courts that have addressed the issue have interpreted the term "capital maintenance commitment" expansively. For example, the Tenth Circuit Court of Appeals has held that Section 365(o) applies not only to enforceable contracts to contribute capital but also requires the automatic assumption and cure of "any deficit" under "any commitment by the debtor . . . to maintain capital" and that "nowhere in 11 U.S.C. § 365(o) does Congress mention the commitment must be contractual, executory, [or] formal."[647] According to

---

[646] *See In re Firstcorp*, 973 F.2d 243, 247 (4th Cir. 1992).

[647] *In re Overland Park Fin. Corp.*, 236 F.3d 1246, 1252 (10th Cir. 2001) (quoting 11 U.S.C. § 365(o)).

the Tenth Circuit, the term "commitment" is not limited to enforceable contracts but instead includes any "[a]greement or pledge to do something."[648]

Courts disagree whether a capital maintenance commitment, once enforceable, can be terminated. The Fourth Circuit has held that the appointment of a receiver over a subsidiary bank does not terminate the debtor's previously established capital maintenance commitment.[649] In reaching its holding in *In re Firstcorp*, the court stated that absolving the debtor of its obligations under the capital maintenance commitment "would reward the very conduct that made the receivership necessary."[650] The court added that the debtor's capital maintenance obligation survived the appointment of a receiver because the capital provided by the debtor under §365(o) would "maintain the viability of the federal deposit insurance system by reducing the potential cost to that system of resolving failed depository institutions" and by reducing the need for a federal bailout of the subsidiary bank.[651]

Assuming *arguendo* that the FDIC's seizure and sale of WMB prior to the Petition Date terminated WMI's obligation under its capital maintenance commitment, this determination would have had limited impact from the perspective of WMI's creditors. In the *Colonial*

---

[648] *Id.* at 1252 (quoting Black's Law Dictionary 248 (5th ed. 1979)); *see also In re Firstcorp*, 973 F.2d at 249 n.5. Although the expansive reading of Section 365(o) is widely accepted, it is not unanimous. For example, a recent decision by a bankruptcy court in Alabama restricted the scope of § 365(o) by limiting its application to enforceable contracts and imposing sunsets on their enforceability. *In re The Colonial BancGroup, Inc.*, No. 09-32303-DHW, 2010 WL 3515161 (Bankr. M.D. Ala. Sept. 1, 2010). In *Colonial BancGroup*, the court stated that Section 365(o) applies only to enforceable commitments and that when the bank was seized and sold, "the purpose for the commitment could no longer be fulfilled, and performance under the commitment was impossible." *Id.* at *22. The court looked at agreements alleged to be capital maintenance commitments and determined that they did not contain language that would establish the intent of the debtor to commit itself to maintain the capital reserves of its subsidiary bank through infusions of its own assets. *Id.* Specifically, the bankruptcy court determined that the language in the documents did "not specify any particular method of assistance," "prescribe specific steps that the Debtor must take," or "dictate what financial and managerial resources the Debtor must utilize." *Id.* The commitment of the debtor in *Colonial BancGroup* arguably was vague and more uncertain than the commitment in this case.

[649] *In re Firstcorp*, 973 F.2d at 250-51.

[650] *Id.* at 249.

[651] *Id.*

*BancGroup* case, the court acknowledged that a federal regulatory institution seeking to enforce the terminated capital maintenance commitment would have a priority claim under Section 507(a)(9) of the Bankruptcy Code.[652] Consequently, even if it was established that the downstream transfer of the TRUPS had not occurred as of the Petition Date and that WMI's capital maintenance obligation to contribute the TRUPS to WMB had terminated, failure to honor the capital maintenance commitment would give rise to a priority claim pursuant to 11 U.S.C. § 507(a)(9) for the value of the TRUPS, which claim would have to be satisfied in full before WMI's general unsecured creditors were entitled to any distribution.

The FDIC Receiver and JPMC will have a basis on which to seek enforcement of the Downstream Contribution Commitment if it is set aside and a possibly very large priority claim if it is not enforced. In the Disclosure Statement, the Debtors note that any effort to seek to evade or undo the Downstream Contribution Commitment will be met with litigation from the FDIC Receiver and JPMC and that the outcome of such litigation is highly uncertain.

(v)     Effect of Avoiding Downstream Contribution

If the Conditional Exchange is deemed to have occurred, the TRUPS Holders will be preferred shareholders of WMI. As such, their claims and interests will be subordinate to the allowed claims of unsecured creditors in this Bankruptcy Case. The Investors likely will not be "in the money" if the Downstream Contribution is set aside because the increase in the assets of the WMI Bankruptcy Estate will be coupled with corresponding increases in the amount of creditor claims which would be asserted against the Estates.

As set forth above, if the Downstream Contribution is avoided, it may create a corresponding claim from the FDIC pursuant to Section 365(o) or 507(a)(9). The FDIC has a

---

[652] *In re Colonial BancGroup*, 2010 WL 3515161 at *22; *see also Franklin Sav. Corp. v. Office of Thrift Supervision*, 303 B.R. 488, 499, 502 (D. Kan. 2004) (OTS had a valid claim under § 507(a)(9) against the debtor for any capital deficiency existing on the date the conservator was appointed).

substantial legal and factual basis to argue that it should be allowed a claim in the same amount of the TRUPS, thus offsetting any net gain to the Estates. At a minimum, there is a substantial litigation risk that if the Downstream Contribution is avoided, a corresponding claim for the value of the TRUPS will be allowed and will have priority over the interests of the TRUPS Holders.[653]

### D. BOLI/COLI

#### 1. Introduction

Prior to the Petition Date, the WaMu Group had established deferred compensation and other employee benefit plans for its management and employees. The proposed Settlement Agreement confirms a division of the assets and liabilities related to or supporting these plans. A central part of this allocation is that JPMC will receive a number of Bank Owned Life Insurance Policies and Company Owned Life Insurance Policies ("BOLI/COLI") and "split-dollar" life insurance policies ("Split-Dollar Policies") (collectively the "Policies") all or substantially all of which were obtained in connection with deferred compensation plans. JPMC and the Debtors have not disputed that WMB's BOLI/COLI and Split-Dollar Policies were assets of WMB that were transferred to JPMC. The surrender values of the Policies greatly exceed the corresponding amounts of deferred compensation liabilities.

The Examiner evaluated whether the surrender values of these Policies should belong to the Debtors. The Examiner did not find any basis to challenge the proposed division of the Policies under the Settlement Agreement. Further, the Examiner concludes that JPMC will likely net approximately $5 billion from the Policies even after paying all the liabilities

---

[653] In addition, if the Investors are successful in setting aside the Downstream Contribution, it is possible that the OTS could simply declare another Exchange Event on the ground that WMB was placed in receivership, after which WMI might be able to perform the Unperformed Obligations, mooting the TRUPS Holders' arguments. The Bankruptcy Court would need to lift the automatic stay before such action could occur.

associated with them. The Examiner finally concludes that JPMC knew about the potential value of these Policies as early as March 2008 when it first began conducting due diligence with respect to the possible acquisition of WMI. These findings do not alter the Examiner's overall conclusions because it appears that the Policies allocated to JPMC are clearly assets of WMB, not WMI.

### 2. Investigative Steps

The Examiner reviewed summaries of a review prepared by Towers Watson (the "Towers Watson Summary"), a benefits consulting firm, which contained information concerning (a) potential cash surrender value of the BOLI/COLI assets and Split-Dollar Policies, and (b) liabilities under the employee benefit plans ("Employee Benefit Plans"), covered by the Settlement Agreement. The materials reviewed include analyses, summaries and other materials prepared and/or provided by Weil, WMI and its financial consultant, A&M, and JPMC. In addition the Examiner interviewed Chris Wells of A&M and Craig Klinghimmer of WMI regarding the Policies and also had discussions with counsel for WMI. Finally, the Examiner conferred with the Equity Committee concerning this issue.

The Examiner did not review each of the thousands of employee benefit plan-related documents that exist in connection with this issue. The Examiner determined that to review each of the thousands of documents was not necessary and could not be accomplished in a reasonable amount of time. The Examiner was advised by the Debtors that they had conducted such a review and had reviewed each and every one of the plan-related documents. The Examiner utilized the detailed summaries and samples of the underlying documents.

### 3. The Policies

#### a. Structure of the BOLI/COLI

WMI and WMB provided deferred compensation benefits under numerous Employee Benefit Plans for certain employees. Pursuant to these Employee Benefit Plans, WMI and WMB assumed contractual obligations to pay benefit amounts from its general assets to the participating employees. These contractual obligations are unsecured obligations of WMI or WMB, depending on their ownership.

The BOLI/COLI appear to have been acquired and utilized to offset and/or cover WMB's and WMI's respective financial obligations under the Employee Benefit Plans in a tax-favored manner. Certain BOLI/COLI were issued to WMB or WMI and other BOLI/COLI were issued to grantor trusts established in connection with the Employee Benefit Plans. These grantor trusts were generally owned by WMB. The terms of the grantor trusts generally provide that the trust assets (the BOLI/COLI) are first used to pay benefits for the related Employee Benefit Plans and second for administrative expenses for the grantor trusts with the remainder flowing to the owner of the grantor trusts. However, the Employee Benefit Plans are treated as "unfunded" under applicable employee benefits and tax laws. Generally, this "unfunded" treatment permits the deferral of taxes for each participating employee until actual distributions are made to such participating employee. Consequently, however, the BOLI/COLI held by the trusts remain subject to the claims of WMB's and WMI's respective creditors.

#### b. Structure of Split-Dollar Policies

In addition to BOLI/COLI, WMB and WMI utilized hundreds of Split-Dollar Policies. Under the arrangements connected to the Split-Dollar Policies, WMB or WMI and each participating employee shared (i.e., "split") the costs and benefits of one or more life insurance policies on the participating employee's life. Generally, a written agreement governs the terms

of the Split-Dollar Policies, including assignment of the Split-Dollar Policies to secure repayment of the premium payments made by WMB or WMI. Due to the large number of Split-Dollar Policies and the possible variations in plan designs, the Examiner did not verify the structure of each individual arrangement.

        c.     <u>Allocation of the BOLI/COLI Assets and Split-Dollar Policies</u>

JPMC asserts that it purchased all of WMB's assets, including WMB's BOLI/COLI assets and Split-Dollar Policies pursuant to the P&A Agreement. The P&A Agreement does not specifically list the BOLI/COLI and Split-Dollar Policies transferred under its terms. JPMC's counsel has acknowledged that the cash surrender value of the BOLI/COLI was $5,119,214,347 at the time the P&A Agreement was signed.

JPMC identified the BOLI/COLI, in particular, as substantial assets when conducting due diligence as early as March 2008. According to documents produced to the Examiner, JPMC determined that the potential value of the BOLI/COLI was $4.5 billion with estimated annual income of approximately $265 million at that time. JPMC also would have had access to information regarding the potential liabilities existing with respect to the Employee Benefit Plans, although the Examiner did not identify any documents which expressly discussed the difference between the value of the Policies and the associated liabilities.

The Settlement Agreement lists the BOLI/COLI and Split-Dollar Policies that will be considered to have been transferred subject to the P&A Agreement. The vast majority of the Policies were held in the name of WMB or WMB subsidiaries. Since they were held by WMB, they would have been transferred to JPMC along with other assets under the P&A Agreement. Under the Settlement Agreement, these Policies will continue to be held by JPMC. Those held in the name of WMI, approximately $130 million, will remain with WMI.

The Examiner noted only one possible dispute between WMI and JPMC concerning the ownership of the BOLI/COLI, which related to approximately $124 million of BOLI/COLI. Apparently, these Policies were generally treated as being held by WMB. However, accounting and trust records created some ambiguity regarding whether WMI also had an interest in these Policies. Under the Settlement Agreement, these Policies will remain with JPMC. These Policies were generally treated as assets of WMB and there is no definitive evidence that WMI had an ownership interest in these Policies.

### 4. Liabilities Under Employee Benefit Plans

Although JPMC acquired BOLI/COLI and Split-Dollar Policies with a total value of approximately $5 billion under the P&A Agreement, JPMC did not generally assume liabilities under the P&A Agreement and, therefore, did not assume liabilities for any of the Employee Benefit Plans sponsored by WMB or WMI associated with these assets. However, JPMC paid approximately $120 million in late 2008 and early 2009 to certain former WMB employees in exchange for their signed releases and assignments of claim rights. These payments appear to have been made in satisfaction of certain obligations under the Employee Benefits Plans sponsored by WMB.

Under the Settlement Agreement, JPMC assumes the liabilities for certain Employee Benefit Plans, but does not assume any of the Employee Benefit Plans. The liabilities related to the Employee Benefit Plans as of September 25, 2008, were between $110 and $120 million. JPMC has separately advised the Examiner that it has funded significant expenses related to former WMB employees and that the excess value of the BOLI/COLI will, at least in part, be used to fund these expenses. However, there is no substantial dispute that the cash surrender of the Policies obtained to fund the Employee Benefit Plans will exceed the liabilities of those Employee Benefit Plans by over $5 billion.

5. **Conclusions**

As noted above, the Examiner did not audit the analysis of the policies and plans conducted by the Debtors with respect to the Policies. The Examiner was advised by the Debtors' professionals, including A&M, that they had conducted such an audit and that all Policies owned by WMI were remaining with WMI and that the Policies remaining with JPMC were all assets of WMB. The Examiner is advised that approximately one-half of the documents related to the Policies and the Employee Benefit Plans have now been posted in the Weil data room and are available for inspection.

JPMC agreed with the Debtors' analysis and asserted it was only seeking confirmation of ownership of Policies owned by WMB. Moreover, if the Policies were not transferred to JPMC pursuant to the P&A Agreement, they would not revert to WMI, but instead, as assets of WMB, would remain with the FDIC Receiver. No one suggested or provided any method or rationale to the Examiner for determining ownership beyond the express terms of the Policies and Employee Benefit Plans.

The Examiner accepts that the Debtors' professionals correctly identified the ownership of the Policies. Although it is possible that the work done by the Debtors mischaracterized the ownership of some of the Policies, the vast majority of the Employee Benefit Plans were established for WMB employees and it is therefore highly likely that the Policies for WMB employees would have been WMB assets. Despite the fact that the deferred compensation obligations are significantly overfunded, there is no basis to conclude that the proposed division of the Policies is unfair or unreasonable to WMI.

E. **Avoidance and Recovery of Alleged Fraudulent Transfers**

1. **Capital Contributions**

The Examiner investigated the transfer of $6.5 billion in capital contributions from WMI to WMB from December 2007 to September 2008 (the "Capital Contributions"). Pursuant to the Settlement Agreement, the Debtors release all claims related to the Capital Contributions. The Examiner considered whether the Capital Contributions are avoidable and, if so, from whom they are recoverable and the consequences to the Estates of avoiding such transfers.

The Examiner concludes that it is likely both WMI and WMB were solvent at the time that most, if not all, of the Capital Contributions were transferred to WMB. To the extent that WMI and WMB were insolvent when the Capital Contributions were made, the Capital Contributions could be avoidable as constructive fraudulent transfers. However, if the Capital Contributions were avoided, there is a substantial risk that the Estates would receive only a claim in the Receivership for the value of the Capital Contributions. That claim likely far exceeds the amount of the Receivership's known assets. Based upon the limited information which the Examiner was able to obtain regarding the assets of the Receivership, it is difficult to determine whether there would be any cash recovery to WMI even if a claim was allowed for the avoidance of the Capital Contributions.[654] Recovering the Capital Contributions from JPMC as a subsequent transferee would also be difficult. Moreover, the avoidance and recovery of the Capital Contributions may cause the FDIC and JPMC to have significant claims against the Estates. Accordingly, even if WMI were successful in establishing the elements to avoid the Capital Contributions, any cash recovery to WMI is remote.

---

[654] The FDIC has already disallowed the Receivership Claim and contends that any litigation regarding the allowance of a claim to WMI would have to take place in the DC Court.

## 2. Summary of Investigation

The Examiner extensively reviewed publicly available information, pending litigation, documents produced in connection with the Rule 2004 Discovery, and work product provided to the Examiner by the parties in interest and their respective professionals. The parties do not dispute the amount or timing of any of the Capital Contributions. The Examiner has assumed WMI was insolvent when each of the Capital Contributions were made for purposes of his analysis.[655] The Examiner's Investigation of the Capital Contributions consisted primarily of legal analysis because there are few, if any, factual issues with respect to the Capital Contributions.

## 3. Factual Background

From December 2007 through April 2008, WMI raised approximately $10 billion in the capital markets and made four contributions of capital to WMB in the aggregate amount of $6.5 billion. The Capital Contributions[656] were made on the following dates in the following amounts:

| Date of Transfer | Amount Transferred |
| --- | --- |
| 12/18/2007 | $1,000,000,000 |
| 4/18/2008 | $3,000,000,000 |
| 7/21/2008 | $2,000,000,000 |
| 9/10/2008 | $500,000,000 |
| **TOTAL** | **$6,500,000,000**[657] |

---

[655] A more detailed analysis of solvency issues can be found in the Solvency Section of this Report.

[656] There is no substantial dispute that the Capital Contributions were treated as contributions of capital to WMB on the books and records of WMI.

[657] Debtors' Answer and Countercl. in Resp. to JPMC's Compl. ¶ 13, *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc.*, Adv. Proc. No. 09-50551 (MFW) (Bankr. D. Del.) (the "JPMC Action") (May 29, 2009), Dkt. No. 23.

### 4. Summary of Asserted Claims and Litigation

The Debtors, JPMC, the FDIC, and the Bank Bondholders have asserted conflicting legal claims with respect to the Capital Contributions in various proceedings. In the Receivership Claim, the Debtors sought the avoidance of the Capital Contributions as constructive fraudulent transfers.[658] The FDIC Receiver summarily disallowed the Receivership Claim on January 23, 2009, and the Debtors challenged such disallowance in the WMI Action on March 20, 2009.[659] Both the FDIC and JPMC filed answers and counterclaims or cross claims in the WMI Action asserting ownership rights to the Capital Contributions.[660]

On January 7, 2010, the Court entered an order staying the WMI Action pending outcome of the JPMC Action,[661] in which JPMC had asserted ownership of the Capital Contributions and the Debtors again had alleged that the Capital Contributions constitute constructive fraudulent transfers.[662] JPMC moved to dismiss the Debtors' counterclaims, which motion was denied by the Bankruptcy Court.[663] The Bankruptcy Court's denial of JPMC's motion to dismiss is currently on appeal.

---

[658] Mem. of Law in Support of FDIC Receiver's Partial Mot. to Dismiss, Ex. 2 ¶¶ 20-23, *Washington Mutual, Inc. v. Federal Deposit Ins. Corp.*, Case No. 1:09-cv-533(RMC) (D.D.C.) (the "WMI Action") (June 11, 2009), Dkt. No. 25.

[659] Compl., WMI Action (Mar. 20, 2009), Dkt. No. 1. The Debtors seek an order declaring that their claims asserted in the Receivership Claim, including the claim for the avoidance and recovery of the Capital Contributions as a fraudulent transfer, are valid and proven against the Receivership. *Id.* ¶¶ 25-28.

[660] FDIC Receiver's First Am. Answer and Countercl., DC Action (July 13, 2009), Dkt. No. 34; JPMC's Stmt. of Issues Presented and Design. of the Record on Appeal, *Washington Mutual, Inc. v. JPMorgan Chase Bank, N.A.*, Adv. Proc. 09-50934 (MFW) (Bankr. D. Del.) (the "Turnover Action") (July 17, 2009), Dkt. No. 89.

[661] Order Denying FDIC's Mots. to Dismiss and Granting Debtors' Mot. to Stay, WMI Action (Jan. 7, 2010), Dkt. No. 97.

[662] Compl., WMI Action (Mar. 20, 2009), Dkt. No. 1; Debtors' Answer and Countercl. in Resp. to JPMC's Compl. ¶ 13, JPMC Action (May 29, 2009), Dkt. No. 23.

[663] Order Denying JPMC's Mot. to Dismiss Countercl., JPMC Action (Sept. 14, 2009), Dkt. No. 141.

Finally, on April 27, 2009, the Debtors commenced the Turnover Action against JPMC, seeking the return of the $4 billion in deposit accounts.[664] JPMC has filed an amended answer and counterclaims in the Turnover Action naming the FDIC Receiver as a counterclaim defendant and seeking, among other things, a declaratory judgment with respect to the ownership of the Capital Contributions.[665] The Debtors have moved for summary judgment,[666] which relief was opposed by the FDIC Receiver, JPMC, and the Bank Bondholders. Although the motion is pending, the Bankruptcy Court has indicated that it has prepared a written summary judgment decision.

### 5. Analysis of Claims

#### a. Applicable Law

Sections 544 and 548 of the Bankruptcy Code provide for the avoidance of fraudulent transfers. Under Section 544, state fraudulent transfer law is applicable in bankruptcy cases if such an action can be brought by a creditor holding an allowable, unsecured claim. 11 U.S.C. § 544(b). The Revised Code of Washington (the "RCW") is applicable in the instant case because WMI was incorporated in the state of Washington.[667] Washington adopted the Uniform Fraudulent Transfer Act (the "UFTA") in 1987 to replace the older Uniform Fraudulent Conveyance Act.[668] Section 19.40.903 of the RCW provides that "[t]his chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the

---

[664] Compl., WMI Action (Mar. 20, 2009), Dkt. No. 1.

[665] Answer and Countercl./Cross-Cl. of JPMC ¶¶ 103-115, Turnover Action (July 6, 2009), Dkt. No. 66; Answer and Am. Countercl./Cross-Cl. of JPMC ¶¶ 106-118, Turnover Action (Aug. 10, 2009), Dkt. No. 121.

[666] Debtors' Mot. for Summ. J., Turnover Action (May 19, 2009), Dkt. No. 14.

[667] WMB was an association with its primary place of business in Nevada. Accordingly, the Nevada Revised Statutes ("NRS"), the law of the State of Nevada, may be applicable in addition to the RCW. The Debtors relied on the RCW in their Answer and Counterclaims filed in the JPMC Action.

[668] Wash. Rev. Code §§ 19.40.011, et seq. Nevada also adopted the UFTA in 1987. See Nev. Rev. Stat. § 112.140 to 112.250. As the NRS and RCW are substantially identical with respect to fraudulent transfers, the analysis provided herein with respect to the RCW and the UFTA is also relevant to the NRS.

subject of this chapter among states enacting it[,]" and, therefore, case law from other jurisdictions can provide guidance in interpreting the UFTA.[669] Section 548 of the Bankruptcy Code provides the substantive federal law for the avoidance of fraudulent transfers. Because most of the provisions of the UFTA are analogous to Section 548, the following discussion pertains to both federal and Washington law except where substantive differences are noted.[670]

b.  Basic Disputed Issues

In general terms, a constructive fraudulent transfer[671] has five elements: (1) a transfer; (2) of an interest of the debtor in property; (3) within four years[672] of the petition date; (4) where the debtor received less than reasonably equivalent value in exchange for the transfer; and (5) where the debtor was insolvent at the time of the transfer, or was rendered insolvent thereby.[673] In the instant case, it is undisputed that WMI made four cash payments to WMB in the aggregate amount of $6.5 billion within the four-year statute of limitations period measured from the date of the transfer pursuant to the RCW and the two-year avoidance period provided by Section 548. Accordingly, elements one through three above have been met. Further, assuming WMI was insolvent, the disputed issues are: (i) whether WMI received reasonably equivalent value for the Capital Contributions and (ii) whether the FDIC or JPMC have any defenses to the Estates' fraudulent transfer claims.

---

[669] *Sedwick v. Gwinn*, 73 Wash.App. 879, 873 P.2d 528, 532 n.8 (1994).

[670] *Charys Liquidating Trust et al. v. McMahan Sec. Co., L.P.* (*In re Charys Holding Co., Inc.*), ___ B.R. ___, Adv. No. 10-50204, 2010 WL 3417810, at *6 (Bankr. D. Del. July 14, 2010) (noting that the elements of an avoidable fraudulent transfer under the UFTA, as adopted by individual states, do not substantially vary from the elements set forth in Section 548); *In re Fedders N. Am., Inc.*, 405 B.R. 527, 547 (Bankr. D. Del. 2009) (noting that statutes adopting the UFTA also mirror the language of Section 548).

[671] The Debtors have not sought to avoid and  recover the Capital Contributions as actual fraudulent transfers.

[672] Washington law provides for a four-year recovery period for fraudulent transfers. *See* Wash. Rev. Code §§ 19.40.041(a)(2)(i)-(ii), 19.40.051(a).

[673] 11 U.S.C. § 548(a)(1)(B).

190

c.    Constructive Fraudulent Transfer Claims

The Debtors have asserted a claim to avoid the Capital Contributions as constructive fraudulent transfers pursuant to both bankruptcy law and the law of the state of Washington. Under the RCW, transfers as to present and future creditors are governed by Section 19.40.041(a)(2), which provides that a transfer is constructively fraudulent where a debtor does not receive equivalent value in exchange for the transfer and either: (i) the debtor was engaged in a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) the debtor intended to, or believed, it was about to incur debts beyond its ability to pay as they became due.[674] In addition, under Section 19.40.051(a), present creditors can establish that a transfer was fraudulent if the debtor did not receive equivalent value and was insolvent at the time of the transfer, or as the result of it.[675] The elements of a fraudulent transfer under Washington law, or the UFTA, do not differ substantially from the elements set forth in Section 548(a)(1)(B) of the Bankruptcy Code.[676]

Accordingly, constructively fraudulent transfer claims must establish: (i) a lack of reasonably equivalent value; and (ii) the debtor's insolvency.  In determining whether the debtor received reasonable equivalent value, the first consideration is whether the debtor received "any value at all" from the transfer, either directly or indirectly.[677]  Courts analyze whether, "based on the circumstances that existed at the time of the transfer," it was "legitimate and reasonable" to expect that some "economic benefit" or "realizable commercial value" would accrue to the

---

[674] Wash. Rev. Code § 19.40.041(a)(2); *see also* UFTA § 4(a)(2).

[675] Wash. Rev. Code § 19.40.051(a); *see also* UFTA § 5(a).

[676] 11 U.S.C. § 548(a)(1)(B)(ii)(I) - (III).

[677] *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212 (3d Cir. 2006).

debtor.[678]  Second, the court must evaluate "whether the debtor got roughly the value it gave."[679] To determine reasonably equivalent value, the U.S. Court of Appeals for the Third Circuit engages in a "totality of the circumstances" analysis, taking into account "the good faith of the parties, the difference between the amount paid and the market value, and whether the transaction was at arms length."[680]

Value can inure to the debtor as a result of a transfer or an obligation that is for the benefit of a third party "where the debtor and third party are so related or situated that they share an identity of interests because what benefits one will, in such case benefit the other to some degree."[681]  To a certain degree, WMI and WMB shared an identity of economic interests because their businesses were intertwined.  In fact, WMI's primary business activity was its ownership of WMB and WMB was, by far, its single most valuable asset.  WMB was WMI's wholly owned chief operating subsidiary, and anything that benefited WMB necessarily benefited WMI. [682]

As a general rule, a transfer from a corporation to a *solvent* wholly owned subsidiary always results in reasonably equivalent value because the value of any transferred asset is repaid

---

[678] *Id.*

[679] *In re Charys Holding Co., Inc.*, 2010 WL 3417810, at *8 (quoting *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007)); *see also Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646, 648 (3d Cir. 1991) ("The value of consideration received must be compared to the value given by the debtor to determine whether the former 'approximates the value' of the latter."); *In re Fruehauf Trailer Corp.* 444 F.3d at 212-13.

[680] *In re Charys*, 2010 WL 3417810, at *8 (quoting *Peltz v. Hatten,* 279 B.R. 710, 736 (D. Del. 2002)); *see also In re Fruehauf Trailer Corp.*, 444 F.3d at 213.  Whether reasonably equivalent value was received is a question of fact. *In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. 747, 760 (Bankr. D. Del. 2007).

[681] *Official Comm. of Unsecured Creditors v. Conceria Sabrina, S.P.A.* (*In re R.M.L., Inc.*), 195 B.R. 602, 618 (Bankr. M.D. Pa. 1996).

[682] WMI could also have benefited from "wide range of intangibles" that can constitute an indirect commercial benefit, including: (i) "a corporation's goodwill or increased ability to borrow working capital;" (ii) "the general relationship between affiliates 'synergy' within a corporate group as a whole;" and (iii) "a corporation's ability to retain an important source of supply or an important customer." *Creditor's Comm. v. Jumer* (*In re Jumer's Castle Lodge, Inc.*), 338 B.R. 344, 354 (C.D. Ill. 2006), *aff'd*, 472 F.3d 943 (7th Cir. 2007).

to the parent corporation in the increased value of its subsidiary's stock.[683] However, when a subsidiary is "terminally insolvent," the contribution does not necessarily result in an increase in equity value because the subsidiary's liabilities to creditors have priority ahead of equity interests.[684] Therefore, to avoid the Capital Contributions as constructive fraudulent transfers, the Debtors would have to establish not only that WMI was insolvent, but also that WMB was insolvent.

As discussed in the section of this Report dealing with solvency, WMI and WMB were likely solvent at the time of the first three capital contributions. There is a greater likelihood that WMI and WMB were insolvent at the time of the smallest capital contribution made in September of 2008 for $500,000,000. Overall, in light of the close identity of interests of WMI and WMB and the fact that the primary business activity of WMI was its ownership of WMB, the indirect economic value that WMI received as a result of the Capital Contributions, and the likelihood that WMB was solvent and therefore able to continue as a going concern at the time of the contributions, a court would likely find that WMI derived at least some value from the transfer of the Capital Contributions. Therefore, the Capital Contributions would not constitute constructive fraudulent transfers.[685] At a minimum, it appears to the Examiner that there is a

---

[683] *Branch v. FDIC*, 825 F. Supp. 384, 399 (D. Mass 1993).

[684] *See In re Duque Rodriguez*, 77 B.R. 937, 939 (Bankr. S.D. Fla. 1987) (holding that parent did not receive reasonably equivalent value when transfer made while subsidiary was insolvent), *aff'd*, 895 F.2d 725 (11th Cir. 1990); *In re First City Bancorporation*, Case No. 392-39474-HCA-11, 1995 Bankr. LEXIS 1683, at *34 n.9 (Bankr. N.D. Tex. May 15, 1995) (noting same).

[685] Additionally, the satisfaction of an antecedent debt, in and of itself, may constitute reasonably equivalent value. If WMI had a preexisting obligation to transfer capital to WMB, the transfer of the Capital Contributions in satisfaction of that obligation would constitute reasonably equivalent value. WMI, as a savings and loan holding company, was regulated by OTS and may have had certain obligations with regard to its insured depository institution subsidiaries. However, to the extent that WMB remained well capitalized as a result of the Capital Contributions, WMB may have been relieved of such obligations. Therefore, whether the transfers of the Capital Contributions satisfied an antecedent obligation resulting in reasonably equivalent value is subject to further investigation.

substantial litigation risk that WMI would not be able to avoid at least $6 billion of the $6.5 billion in Capital Contributions because of difficulties in establishing insolvency.

d.     <u>Initial and Subsequent Transferees</u>

Even assuming the Capital Contributions were avoided as constructive fraudulent transfers, WMI would likely have to seek recovery of the Capital Contributions from the FDIC Receiver rather than JPMC. Because the Receivership likely does not have enough assets to pay all potential claims in that Receivership, recovery from JPMC is preferable.

Section 550 of the Bankruptcy Code provides that the plaintiff may recover, "for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee . . . or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."[686] The law favors good faith subsequent transferees as compared with initial transferees. While an immediate or a mediate transferee may assert the good faith purchaser defense set forth below, an initial transferee may not.[687]

---

[686] 11 U.S.C. § 550(a). To prove a Section 550(a)(2) claim against an immediate or a mediate transferee, the plaintiff must establish that the funds at issue are property of the estate, although a "dollar-for-dollar accounting" of "the exact funds" at issue is not required. *See Silverman v K.E.R.U. Realty Corp. (In re Allou Distribs.)*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007); *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689 (11th Cir. 2005). Given the sizable amount of the Capital Contributions, WMI will likely be able to trace the Capital Contributions to JPMC by a preponderance of the evidence.

[687] *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988). While the term "transferee" is not defined in the Bankruptcy Code nor expounded upon in the legislative history of Section 550, Delaware courts have adopted the "dominion and control" test articulated in the Seventh Circuit's *Bonded Financial* decision. *See Mervyn's LLC v. Lubert-Adler Group IFV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 102-103 (Bankr. D. Del. 2010) (citing *Burtch v. Stylish Move Sportswear Inc. (In re Factory 2-U Stores, Inc.)*, Adv. No. 05-30384 (KJC), 2007 WL 2698207, at *3 (Bankr. D. Del. Sept. 11, 2007)). A "transferee" must have "dominion over the money or other asset [and] the right to put the money to one's own purposes," or, more precisely, "the legal right to use the funds to whatever purpose he or she wishes, be it to invest in 'lottery tickets or uranium stocks.'" *Id.* (quoting *In re Factory 2-U Stores*, 2007, WL 2698207, at *3).

A defense to the recovery of an avoidance is available to those entities that are "mere conduits" of the avoided transfers rather than transferees. *In re Mervyn's Holdings*, 426 B.R. at 103; *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210 (Bankr. D. Del. 2005). To be a "mere conduit," a defendant must "establish that it lacked dominion and control over the transfer because the payment simply passed through its hands and it had no power to redirect the funds to its own use." *In re CVEO*, 327 B.R. at 216. Conversely, where a

The FDIC could contend that it is a subsequent transferee because WMB was the initial

transferee. It is not clear whether the FDIC is an initial transferee or a subsequent transferee.

Under 12 U.S.C. § 1821(d)(2)(A) of Title 12, the FDIC is the successor of the failed depository

institution and succeeds to "all rights, titles, powers, and privileges of the insured depository

institution, and of any stockholder, member, accountholder, depositor, officer, or director of such

institution with respect to the institution and the assets of the institution."[688] Thus, under federal

law, the FDIC is the successor to WMB. The limited case law indicates a split of authority as to

whether successors in interest to the party first receiving a transfer are initial transferees or

subsequent transferees for purposes of Section 550.[689] Given the conflicting authority, whether

the FDIC is an initial transferee or a subsequent transferee entitled to assert the good faith

purchaser defense is subject to dispute.

---

transferee may use the funds freely and is "not under any contractual or other obligation to use transferred funds for the benefit of third parties" it is not a "mere conduit." *In re Lenox Healthcare, Inc.*, 343 B.R. 96, 104 (Bankr. D. Del. 2006) (quoting *Official Comm. of Unsecured Creditors v. U.S. Relocation Servs. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 202 (Bankr. S.D.N.Y. 2005)) (internal quotations omitted).

It is possible, although unlikely, that a court may find the FDIC to be a mere conduit through which the Capital Contributions passed and therefore not a transferee. The P&A Agreement was negotiated and agreed to between the FDIC and JPMC before WMB was placed into receivership. When the FDIC took over as receiver, WMB's assets, including the Capital Contributions, were seemingly instantaneously transferred to JPMC. However, the FDIC exercised dominion and control over WMB's assets by deciding to sell them to JPMC pursuant to its extensive receivership powers. In return, the FDIC received substantial consideration, including cash and JPMC's assumption of billions of dollars of depository liabilities and other liabilities of WMB that otherwise would have been liabilities of the FDIC Receiver. Given that the FDIC had control over the transfer of WMB's assets and received funds from JPMC for its own use, it is likely not a mere conduit.

[688] 12 U.S.C. § 1821(d)(2)(A).

[689] *Compare FDIC v. Wright (In re Still)*, 963 F.2d 75, 76 (5th Cir. 1992) (holding, without discussion on the point, that "[i]f the FDIC is a 'transferee' at all, it is a 'mediate transferee' under § 550(a)(2) because it received the transfer from the Bank, the initial transferee, when the Bank went into receivership"), *with Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I)*, 365 B.R. 322, 332 (Bankr. D. Col. 2007) (holding that a successor in interest to the transferee was an initial transferee for purposes of Section 550); *Gonzales v. Potter (In re Potter)*, Adv. No. 07-1062, 2008 WL 5157877, at *48 (Bankr. D.N.M. July 29, 2008) (holding that a successor to the trustee of an asset trust was the initial transferee of a transfer received by his predecessor trustee for purposes of Section 550).

e.     Defenses to Constructive Fraudulent Transfer Claims

A defendant that is a subsequent transferee can assert a good faith purchaser defense pursuant to Section 548(c) of the Bankruptcy Code, which provides in pertinent part:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee . . . that *takes for value and in good faith* has a lien on or may retain any interest transferred . . . to the extent such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.[690]

This defense requires proof of two elements: "first, innocence on the part of the transferee, and second, an exchange of value."[691]

With respect to good faith, the FDIC may be able to argue successfully that it did not have knowledge that WMI was insolvent at the time of the Capital Contributions.[692] While the FDIC could potentially demonstrate that it acted in good faith, it likely could not establish that it gave value for the Capital Contributions in light of the Fifth Circuit's decision in *FDIC v. Wright* (*In re Still*), 963 F.2d 75 (5th Cir. 1992). In *In re Still*, the Fifth Circuit rejected the FDIC's argument that it gives value when it takes over as receiver because of the public service and regulatory functions it provides and because it assumes the liabilities of the failed institution. The court held that the FDIC, as receiver, does not give value because it does not pay any cash or other property when it succeeds to the assets as receiver and, furthermore, performance of its statutory duties is not "value."[693] Therefore, even if the FDIC could establish that it is a subsequent

---

[690] 11 U.S.C. § 548(c) (emphasis added).

[691] *In re Hill*, 342 B.R. 183, 202-204 (Bankr. D.N.J. 2006) (quoting *In re Burry*, 309 B.R. 130, 135 (Bankr. E.D. Pa. 2004)).

[692] In the Texas Litigation, a number of WMI shareholders allege that JPMC and the FDIC, in bad faith, devised the sale of WMB through the Receivership so that JPMC could obtain WMB's assets, free and clear of liabilities, at a fire-sale price. The Texas Litigation alleges that JPMC planted moles and insiders at WMI and improperly used information to give it an advantage in the bidding process. Further, it is alleged that the FDIC may have conspired with JPMC to seize WMB. Despite these allegations, there are few facts suggesting that JPMC or the FDIC acted in bad faith.

[693] *In re Still*, 963 F.2d at 77.

transferee rather than an initial transferee, it probably could not succeed in establishing the good faith purchaser defense.

Unlike the FDIC, JPMC has a strong argument in favor of the good faith purchaser defense. JPMC is most likely a subsequent transferee because it purchased the Capital Contributions from the Receivership through the P&A Agreement. JPMC could likely establish that it acted in good faith because it lacked knowledge of the avoidability of the Capital Contributions. With respect to value, under the P&A Agreement, JPMC paid the FDIC $1.88 billion and assumed approximately $145 billion in depository liabilities. A court could find that JPMC gave substantial value in exchange for the Capital Contributions. Accordingly, Section 550(b) may act as a defense to recovery of the Capital Contributions from JPMC because it gave value to the FDIC and may have acted in good faith without knowledge of the voidability of the transfer.

### 6.    Potential Recoveries for the Avoidance of the Capital Contributions

Assuming WMI prevailed in establishing that some or all of the Capital Contributions constitute constructive fraudulent transfers, WMI could seek to recover the Capital Contributions from the FDIC as either the initial transferee or the subsequent transferee of the Capital Contributions. WMI's claims against the FDIC for recovery of the Capital Contributions, once established, would be paid out of the assets of the Receivership Estate. As such, WMI's right to receipt of any funds would be subject to the competing claims of the other creditors of the Receivership Estate.[694] There are significant collectability issues with respect to these claims.

The Examiner is informed that approximately $14 billion in Bank Bondholder claims have been filed in the Receivership Estate and additional Receivership claims, including

---

[694] *See Branch*, 825 F. Supp. at 416.

potentially large indemnification claims by JPMC, may exist.  There is no indication that there are sufficient assets in the Receivership Estate to satisfy these claims.

Moreover, because the Capital Contributions were characterized as infusions of equity by WMI into WMB, claims arising from avoidance of those transfers could be characterized as equity claims and subordinated to the claims of general unsecured creditors.  The FDIC is required to distribute the assets of the Receivership Estate according to the priorities set forth in 12 U.S.C. § 1821(d)(11)(A), which provides for payment in the following order:

(i)      Administrative expenses of the receiver.

(ii)     Any deposit liability of the institution.

(iii)    Any other general or senior liability of the institution (which is not a liability described in clause (iv) or (v)).

(iv)    Any obligation subordinated to depositors or general creditors (which is not an obligation described in clause (v)).

(v)     Any obligation to shareholders or members arising as a result of their status as shareholders or members (including any depository institution holding company or any shareholder or creditor of such company).

Damages resulting from any claim for avoidance of the Capital Contributions could be treated as an obligation to a shareholder under subsection (v) above, and thus subordinated to the claims of general unsecured creditors such as the Bank Bondholders.  Whether WMI's claim would be treated under subsection (iii) above and paid *pro rata* alongside the claims of the other unsecured creditors of the Receivership Estate.  There is a dearth of legal authority on the issue and the ultimate outcome, if litigated, is highly uncertain.  If WMI's constructive fraudulent transfer claim for avoidance of the Capital Contributions were subordinated to the claims of the general unsecured creditors of the Receivership Estate, the claim would almost certainly be left completely unpaid.

### 7. Potential Claims Against the Estates Resulting from Recovery of the Capital Contributions

To succeed in recovering the Capital Contributions as fraudulent transfers, the Debtors would have to prove that both WMI and WMB were insolvent at all relevant times. There is tension between WMI's business tort claims against JPMC and WMI's avoidance action claims, in that establishing WMI and WMB's insolvency at various points in time could significantly undermine the viability of any potential business tort claims because an insolvent WMI is unlikely to have suffered significant damages.

Further, establishing WMB's insolvency could also subject the Estates to significant avoidance claims by creditors of WMB, including the Bank Bondholders. Prior to the imposition of the Receivership, WMI received billions of dollars of transfers from WMB in the form of cash dividends[695] and certain tax payments. If it were proven that WMB was insolvent at the time these payments were made, these payments, like the Capital Contributions from WMI to WMB, could be subject to avoidance as either fraudulent transfers or preferences, thereby increasing the potential claims against the Estates.[696]

### 8. Conclusions

Even if the Debtors were able to establish the elements of a constructive fraudulent transfer, the Debtors are unlikely to obtain meaningful recovery for their Estates on account of these claims. The best outcome for the Debtors with respect to the FDIC is likely a claim

---

[695] In its counterclaims in the WMI Action, the FDIC has asserted avoidance claims against WMI for upstream dividends from WMB in the amount of at least $10.5 billion.

[696] Section 502(h) of the Bankruptcy Code also provides for a claim against the bankruptcy estate in favor of the recipient of a transfer that has been avoided. While section 502(h) applies to recipients of fraudulent transfers, a claim does so under section 502(h) arises only to the that extent the recipient of a fraudulent transfer gave value to the debtor in exchange for the transfer. *In re Best Products Co., Inc.*, 168 B.R. 35, 58 (Bankr. S.D.N.Y. 1994). Because the FDIC will likely be found not to have provided value for the Capital Contributions, *see In re Still*, 963 F.2d at 78, and because a fundamental assumption underlying any recovery of the Capital Contributions from JPMC is that JPMC is not a good faith purchaser for value, if the Capital Contributions were successfully avoided as fraudulent transfers, no resulting section 502(h) claim would likely arise.