in the Receivership, where the claims that have already been asserted far exceed the amount of the Receivership's known assets. Indeed, the Estates' claim in the Receivership may be a subordinated claim. Further, it will be difficult to establish a basis on which to recover the transfers from JPMC. Given the risk that the Debtors will not prevail in establishing that the Capital Contributions were fraudulent transfers, the recoverability issues that would arise even if the Debtors did prevail, the significant claims that would likely be asserted against the Estates as a result of successful avoidance, and the costs associated with litigating these claims, the Debtors' avoidance actions with respect to the Capital Contributions do not represent significant claims that are being compromised under the Settlement Agreement.

## X. ANALYSIS OF POTENTIAL CLAIMS AGAINST JPMC

### A. Introduction

Many shareholders and other interested parties believe that JPMC may have acted unlawfully in acquiring WMB's assets. They also claim that JPMC acquired WMB at an unreasonably low price.[697] Equity criticizes the Settlement Agreement because it believes all the potential claims against JPMC are being released without sufficient investigation.

JPMC maintains it did absolutely nothing wrong and that its acquisition of WMB, while in its own self-interest, helped to stabilize a deeply troubled financial system at a time when that was most needed.[698] JPMC wanted the retail banking operations of WMB so it could expand into California and Florida, but it asserts that those operations came at a high price. Beyond the $1.88 billion it nominally paid for most of WMB's assets, JPMC assumed the risk associated

---

[697] As told at wamustory.com: "WMI was given $0.00 for the bank, despite a book value of well over $20 billion at the time of seizure. The FDIC failed to get a reasonable price, even though they are required by law to maximize the return on the assets seized as well as to minimize the impact to the FDIC fund. There are many differing opinions on what the value of the bank was, but of the sources we could find, none felt the bank was worth a mere $1.9 billion. J.P. Morgan got the bank at a substantial discount."

[698] Interview of Jamie Dimon, September 14, 2010 ("Dimon Interview").

with the toxic assets on WMI's books.[699] JPMC maintains that the extraordinarily high risk of WMB's home mortgage assets must be accounted for in any assessment of the price it paid. According to JPMC, assumption of WMB's asset portfolio constituted an enormous financial risk, particularly given the financial crisis in September 2008.[700] The notion that JPMC obtained WMB's assets at a "fire sale" price and were worth substantially more than the amount paid is, according to JPMC, simply wrong. JPMC believes it will take years to determine whether acquiring the WMB assets was the right decision for JPMC.[701]

The Examiner investigated whether JPMC, by itself or in conjunction with others, engaged in improper activities that injured WMI and resulted in the eventual seizure of WMB. The Examiner investigated whether JPMC leaked confidential information, violated confidentiality and standstill agreements, improperly prevented third parties from purchasing WMI or WMB, or otherwise acted unlawfully towards WMI or WMB. Under the Settlement Agreement, all potential claims against JPMC will be released, and a focus of the Examiner's Investigation therefore was to determine whether the released claims against JPMC are being significantly undervalued in the settlement.

The Examiner's Report regarding JPMC includes:

1. The scope of the Examiner's Investigation of JPMC;
2. A factual report on the activities of JPMC, particularly as they relate to its acquisition of the assets of WMB;
3. An analysis of potential business tort claims that the Debtors could bring against JPMC; and
4. An analysis of antitrust claims that the Debtors could bring against JPMC.

## B. The Scope of the Examiner's Investigation of JPMC

---

[699] Interview of Charles Scharf, September 16, 2010 ("Scharf Interview"); Interview of Michael Cavanagh, September 22, 2010 ("Cavanagh Interview").

[700] Dimon Interview; Scharf Interview; Cavanagh Interview.

[701] Dimon Interview.

1. **Documents**

   a. The Examiner's Review of Documents Obtained Prior to His Appointment

The Examiner obtained access to the WMI Data Room ("Data Room") that the Debtors established as a repository for all documents produced during discovery or in anticipation of plan confirmation.[702] Among other things, the Data Room includes documents that JPMC and others produced to the Debtors during the Rule 2004 Discovery. The Debtors provided guidance in navigating the Data Room. The Examiner ran keyword and key name searches within the Rule 2004 Discovery in the Data Room, yielding over 20,000 results, which were reviewed by the Examiner.

The Examiner also reviewed an additional 20,000 documents that WMI and JPMC produced to the Data Room as part of plan confirmation shortly before or immediately after the Examiner's appointment.[703] In addition, the Examiner analyzed the Debtors' work-product legal analyses and summary of documents reviewed.

   b. The Examiner's Review of Documents Obtained After His Appointment

During the Examiner's initial meeting with JPMC's counsel, JPMC provided the Examiner with the list of the terms JPMC used to search its custodians for relevant documents in response to the Debtors' Rule 2004 discovery requests. After reviewing JPMC's list of 124 search terms, the Examiner requested that JPMC apply an additional 34 terms, including Santander, Inciarte, Botín, CCB, China Construction, and FDIC.[704] The Examiner also requested

---

[702] The entire Data Room consists of approximately one million pages of documents. The parties were still in the process of adding certain documents to the Data Room at the time of the Examiner's appointment.

[703] A few additional documents were also produced by Blackstone in accordance with its earlier agreement with Debtors to produce Rule 2004 discovery.

[704] The additional terms that the Examiner requested JPMC search are: /anti trust/; /China Bank/; /China Construction/; /Toronto Dominion/; /@[China Construction email address domain]/ @[Santander email address

that JPMC expand its search to include fifteen additional custodians, composed of the eight custodians whom JPMC had agreed to supply to the Debtors in meet-and-confer negotiations[705] and seven others who received or sent two emails that are relevant to potential antitrust claims.[706]

The expanded search terms were applied to prior and new custodians. In total, JPMC searched 32 custodians for 158 terms.[707] In response to the Examiner's expanded requests, JPMC produced and the Examiner reviewed approximately 6,000 additional documents.

The Examiner also received and reviewed relevant entries from the calendars of Messrs. Scharf, Cavanagh, and Lopata and the calendar and phone records of Mr. Dimon.

Finally, the Examiner obtained documents from third parties, including Wells Fargo and Banco Santander ("Santander").

## 2. Witnesses

The Examiner interviewed thirteen JPMC employees, including Messrs. Dimon, Scharf, and Cavanagh.[708] The Examiner asked almost all JPMC witnesses a series of questions dealing with: (1) the potential unauthorized disclosure of confidential WMI information to the media, regulators, and ratings agencies; (2) JPMC's due diligence on WMI in spring 2008; (3) JPMC's due diligence on WMI in September 2008; (4) all discussions with regulators; (5) all discussions

---

domain]/); Bauer; Dhru; Inciarte; Santander; stand-still; Fortunato; Bindra; Youyi w/5 Chen; Bill w/5 Murray; CCB; TD; Botin; Botín; BKSH; Equale; Holt; Horne; James w/5 Gallagher; Freilinger; Gearin; Yore; anti-trust; antitrust; Bair; NDA; confidentiality w/4 agree*; FDIC; and Fishman.

[705] The eight custodians are: Althea Duersten, Joseph Evangelisti, Raymond Fischer, Ben Lopata, David Lowman, Scott Powell, Neila Radin, and Gordon Smith.

[706] JPM_EX00004075; JPM_EX00008571.

[707] As part of plan confirmation, JPMC produced and the Examiner reviewed hard copy documents from the original seventeen custodians from whom JPMC produced electronic documents to the Debtors in response to a Rule 2004 subpoena, and electronic documents from three additional sources: Sean Carmody, Genevieve Hovde, and a shared drive used periodically by the WaMu deal team.

[708] The Examiner also interviewed the following JPMC witnesses: Stephen Cutler, Dan Cooney, Tim Main, Fernando Rivas, Gregg Gunselman, Brian Bessey, Enrique Casanueva, José Cerezo, Olivier de Grivel, and Scott Albinson. In addition, some in-house attorneys were interviewed in connection with specific questions about disputed assets.

with ratings agencies; (6) any negotiations with the FDIC concerning the acquisition of the WMB assets; (7) any negotiations concerning terms of the P&A Agreement; (8) discussions with other third parties, particularly potential purchasers of WMI or its assets; and (9) the preparation and use of models analyzing WMI's financial situation. The JPMC witnesses denied any wrongdoing in connection with JPMC's purchase of WMB.

The Examiner also interviewed WMI and third-party witnesses.[709] Among the third-party witnesses interview were witnesses from Goldman Sachs, Wells Fargo, Morgan Stanley, Citigroup, The Blackstone Group ("Blackstone"), TD Bank, TPG Capital, Moody's Investors Service ("Moody's"), Fitch Ratings ("Fitch"), and Santander for information relevant to potential claims against JPMC.[710]

### 3. Cooperation of the Parties

JPMC, while not providing the Examiner with privileged information, provided useful summaries of the litigation positions it has taken with respect to the Debtors and assets affected by the settlement.[711] In response to the Examiner's supplemental document requests, JPMC produced substantially all of the responsive documents within one month of the Examiner's request.[712] JPMC also made available every witness whom the Examiner requested to interview.

---

[709] The Examiner interviewed current and former WMI employees, including Kerry Killinger, Alan Fishman, Stephen Rotella, Robert Williams, Charles "Chad" Smith, Tom Casey, Peter Freilinger, and Susan McCarthy, seeking information that would be relevant to potential claims against JPMC.

[710] Key third-party witnesses whom the Examiner interviewed include Alberto Sanchez and Juan Inciarte of Santander. The Examiner also has interviewed John Mahoney, Goldman Sachs; Huntley Garriot, Goldman Sachs; Rob Beck, Citigroup; Chinh Chu, Blackstone; John Esposito, Morgan Stanley; Bruce Helsel, Wells Fargo; Linda Dougerty, TD Bank; Nick Stone, TPG; Craig Emrick, Moody's; and Sharon Haas, Fitch.

[711] JPMC produced indices of privileged documents withheld from production to the Examiner.

[712] The Examiner requested additional documents from JPMC on August 6, 2010. JPMC produced documents on August 20, 2010, August 30, 2010, September 4, 2010, September 21, 2010, and October 7, 2010. The September 21 and October 7 productions included redacted documents and "additional documents initially withheld as privileged but ultimately deemed more appropriately produced." *See* Letter from JPMC Counsel to the Examiner (Sept. 21, 2010) (on file with the Examiner); *see also* Letter from JPMC Counsel to the Examiner (Oct. 7, 2010) (on file with the Examiner).

Some of the JPMC witnesses had limited recollections of key events.[713] Even when the Examiner provided documentary evidence of an event, including the witness's calendar entries, these witnesses still could not recall whether certain events occurred.

All third parties also were cooperative with the Examiner's Investigation. With one exception, all parties cooperated in producing relevant documents and witnesses without requiring the Examiner to issue a subpoena.[714]

## C.    JPMC's Interest in WaMu

### 1.    Background - JPMC Divisions

JPMC is divided into six major business segments: the Investment Bank, Retail Financial Services, Card Services, Commercial Banking, Treasury & Securities Services, and Asset Management. In addition to the six business segments, there is a Corporate/Private Equity segment. WMI and WMB were an acquisition target of the Retail Financial Services Division ("RFS"), which has been headed by Charles Scharf since 2004.[715] As CEO of RFS, Mr. Scharf oversees JPMC's consumer banking functions, including over 5,000 branches, small business and home lending, and auto and education lending.[716] Mr. Scharf reports directly to JPMC's CEO, Mr. Dimon.

RFS used JPMC Investment Bank's Financial Institutions Group ("FIG") to assist with a possible acquisition of WMI or WMB. Tim Main is the Head of FIG for North America.

---

[713] For example, Mr. Cavanagh remembered traveling to Washington, D.C. on September 9, 2008, and taking a cab to the FDIC's office for a meeting with Chairman Sheila Bair, but does not recall any details following his arrival at the FDIC's office. Mr. Scharf also did not recall this meeting. Additionally, neither Mr. Cavanagh nor Mr. Scharf recalled meeting with OTS on April 3, 2008. An entry appears in both of their calendars for the same time. Mr. Cavanagh's calendar says, "Conference call with Charlie & OTS." JPMCD_000004589.00001, at JPMCD_000004589.00006; JPMCD_000004852.00001, at JPMCD_000004589.00005.

[714] That exception was TD Bank. TD Bank fully cooperated with the Examiner, but required the issuance of a subpoena before it would produce documents.

[715] Scharf Interview.

[716] *Id.*

JPMC's Investment Bank is a full-service, global investment bank that serves outside clients and other JPMC business segments. JPMC business segments do not necessarily use JPMC Investment Bank for all transactions. The Investment Bank examines a host of considerations, including conflicts of interest, before it accepts any client, including another JPMC business segment. When a JPMC business segment uses JPMC Investment Bank, JPMC Investment Bank treats the business segment as it would any other client.

## 2. History of JPMC's Interest in WMI

JPMC's interest in WMI began several years prior to 2008.[717] Prior to 2008, JPMC had no significant retail banking presence in either California or Florida, two markets it viewed as among the most important for JPMC to enter. Given WMB's substantial footprint in both of those states, JPMC was interested in acquiring WMI.[718]

JPMC was interested in numerous other acquisition targets at this time. The JPMC Investment Bank maintained a list of ongoing acquisition targets, and approximately once or twice per year prepared presentations to JPMC on the overall market landscape and on those potential targets, including WMI. Materials for these presentations were collected from public sources, such as SEC filings, company websites, Reuters, Bloomberg, SNL Financial, and regulatory information on the Federal Reserve and FDIC websites.[719]

The Examiner found no evidence that, prior to March 2008, JPMC took steps towards a transaction with WMI beyond the periodic review just identified.

---

[717] Scharf Interview.

[718] Interview of Tim Main, September 15, 2010 ("Main Interview"). Main said that JPMC had no presence in either California or Florida and viewed an acquisition of WMB as the only way to gain a "branch presence" on a large scale. Mr. Dimon also noted that JPMC had a special interest in WMI because of its presence in California and Florida. Dimon Interview.

[719] Main Interview.

### 3. March 2008 Due Diligence and Expression of Interest

a. <u>Project West</u>

Mr. Killinger contacted Mr. Dimon in early March 2008 to inform JPMC that WMI was actively seeking capital or, in the alternative, a potential merger or sale and invited JPMC to participate in this process.[720] Mr. Dimon and Mr. Scharf later spoke with WMI's investment bankers about this opportunity.[721] Both Mr. Dimon and Mr. Scharf indicated that JPMC was interested in WMI, but had concerns about WMI's asset quality and was unsure whether a transaction would be possible.[722] Shortly after the call from Mr. Killinger, JPMC began to conduct extensive due diligence and established a codename of "Project West" for this potential transaction. Mr. Scharf led Project West, but ultimate decisions were made by Mr. Dimon.[723]

Project West effectively involved two distinct teams: the FIG (JPMC Investment Bank) and JPMC corporate.[724] The FIG team included Doug Braunstein, Tim Main, Fernando Rivas, Gregg Gunselman, Frode Riksfjord, Genevieve Hovde, Vishal Idnani, and Scott Hynes. Mr. Rivas reported to Mr. Main and was responsible for pulling together financial analyses and projections. He also was responsible for coordinating and managing the financial aspects of the transaction. Messrs. Gunselman, Riskfjord, Hovde, Idnani, and Hynes reported to Mr. Rivas and were the "nuts and bolts" people who did the analyses and produced presentations.[725]

The core JPMC corporate team was Mr. Scharf, Jay Mandelbaum, Frank Bisignano, David Lowman, Todd Maclan, Mike Cavanagh, and Brian Bessey. Beyond this core group were

---

[720] Dimon Interview; Scharf Interview.

[721] JPM_EX00013937.

[722] *Id.*; Dimon Interview; Scharf Interview.

[723] Scharf Interview; Main Interview; Dimon Interview.

[724] Interview of Fernando Rivas, September 10, 2010 ("Rivas Interview"); JPM_EX00000870.

[725] Rivas Interview.

numerous JPMC people who looked into the different lines of WMB's business, including, for example, retail, mortgage, commercial lending, and credit card.[726] A team from JPMC's legal department also evaluated WMI's legal, compliance, and regulatory risks.[727]

b.    Confidentiality Agreement

WMI and JPMC executed a Confidentiality Agreement on March 11, 2008.[728] Pursuant to the agreement, JPMC and its subsidiaries were required to keep all information obtained from WMI and its subsidiaries "strictly confidential." The reach of the confidentiality requirement included any material that JPMC prepared "containing or based in whole or in part" on information that WMI furnished. Further, JPMC and its subsidiaries agreed not to "disclose to any person the fact that any investigations, discussions or negotiations are taking place concerning a possible Transaction with [WMI], the fact that [JPMC and its subsidiaries] have requested or received Information from [WMI and its subsidiaries] or that information has been made available to [JPMC and its subsidiaries] by or on behalf of [WMI and its subsidiaries] . . . ." The agreement specifically prohibited disclosure of information to "the media and any corporation, company, group, partnership or other entity or individual." However, it allowed for disclosure to "any bank regulatory authority having jurisdiction over [JPMC and its affiliates]."[729]

The Confidentiality Agreement also contained a "standstill" provision that provides for eighteen months from the execution of the agreement, JPMC would not "enter into or agree,

---

[726] Main Interview.

[727] Interview of Dan Cooney, September 2, 2010 ("Cooney Interview"). Cooney recalled that WMI had a "robust" litigation portfolio. He recalled specifically having discussions regarding litigation risks associated with origination and servicing of WMB's Option ARM portfolio. In addition to Mr. Cooney, the legal team included, among others, Mike Lipsitz, chief lawyer for the branch business, and Laura O'Hara, chief lawyer for the mortgage business.

[728] JPM_EX00016135, at JPM_EX00016135.

[729] JPM_EX00016135, at JPM_EX00016136.

offer, propose or seek (whether publicly or otherwise) to enter into, or otherwise be involved in or part of, any acquisition transaction, merger or other business combination relating to all or part of [WMI or its subsidiaries] unless invited to do so by the Board of Directors of [WMI or its subsidiaries]."[730]

        c.      <u>March 2008 Due Diligence</u>

Mr. Bessey was responsible for coordinating JPMC's due diligence efforts. JPMC maintained a master information request list based on submissions from each line of business and general corporate questions and submissions from each line of business.[731] JPMC's typical practice was to obtain answers to the questions on the list and then form follow-up questions based on the information provided.[732] The Due Diligence List for Project West included requests for specific information regarding WMB's credit risks and losses and WMB's home lending portfolio.[733]

On-site due diligence for WMI in March 2008 was held at a Red Lion Hotel, outside of Seattle, Washington. JPMC sent numerous people from its RFS group who focused on the retail branches, mortgage home finance, and credit card businesses. JPMC personnel from commercial lending were also brought in to evaluate WMB's multi-family home lending business. JPMC had access to an online data room, which housed a significant amount of WMI's information, including financial reports, policies and procedures, Board reports, and asset quality reports.[734] JPMC reviewed information concerning WMB's mortgage portfolio, operations of the business, business strategies and initiatives, pending and potential acquisitions, and product offerings.

---

[730] JPM_EX00016135, at JPM_EX00016137-16138.

[731] Rivas Interview.

[732] *Id.*

[733] JPM_EX00004001.

[734] Rivas Interview.

In addition to receiving access to the online data room, JPMC and FIG representatives met with various WMI management teams to discuss individual lines of WMB's business and to review the overall financial condition of WMI.[735] These meetings covered various aspects of WMI's business, including retail banking, home lending, consumer real estate credit, card credit, accounting, and commercial banking.[736] WMI provided additional information in response to specific requests from JPMC.[737] Document requests were coordinated through Mr. Bessey and communicated to WMI through WMI's investment bankers.[738]

As part of JPMC's due diligence and in an attempt determine a reasonable valuation for WMI, JPMC created numerous financial models for each of WMB's business lines.[739] The key area of focus for JPMC in evaluating a potential transaction with WMI was the significant risk associated with WMB's credit losses, particularly in WMB's consumer real estate portfolio.[740]

Whereas WMI projected that life-of-loan losses would fall between approximately $12 and $18.7 billion, JPMC at this time estimated those losses at approximately $27.8 billion.[741] JPMC's more negative outlook was based on its due diligence of WMI, its views on its own loan portfolios, market conditions, and what it deemed to be a more sophisticated approach to modeling than WMI's.[742]

[735] *Id.*

[736] JPM_EX00003271 (March 15, 2008 email from Brian Bessey to "Project West Leaders" providing the due diligence meeting schedule); Interview of Brian Bessey, August 25, 2010 ("Bessey Interview").

[737] Interview of John Mahoney, August 25, 2010 ("Mahoney Interview").

[738] Rivas Interview.

[739] Main Interview.

[740] *Id.*

[741] JPMCD_000003489.00001, at JPMCD_000003489.00012-13.

[742] Scharf Interview.

JPMC analyzed the amount of capital that would be required if WMI was acquired. In order to do a capital-neutral deal, i.e., a deal that would have no impact on JPMC's capital ratios, JPMC believed it would need to raise at least $10 billion of additional capital.[743] As a result, JPMC considered numerous potential transaction structures that might alleviate the need to raise a significant amount of capital. JPMC considered an assisted transaction in which the government would pay for losses beyond those that JPMC itself projected as a possible acquisition structure, but it gained no traction at that time within JPMC.[744]

Mr. Scharf outlined Project West in a presentation to the JPMC Board of Directors on March 27, 2008.[745] Mr. Scharf discussed WMB's exposure to Option ARMs, WMB's projected range of aggregate life-of-loan losses, and JPMC's estimates of WMB's life-of-loan losses. The presentation outlined the discrepancy between loan loss estimates and the increase in exposure to JPMC's mortgage business that would result from an acquisition of WMI.[746] Despite JPMC's confidence in its ability to estimate losses, there remained concern over the unpredictability of the Option ARM portfolio. The presentation to the Board estimated losses to WMB's consumer real estate portfolio at $27.8 billion and that JPMC would require about $16 billion of capital to complete the transaction.[747]

---

[743] Rivas Interview; Main Interview. Mr. Main explained to the Examiner that it is highly unusual that even after issuing stocks to cover 100% of the transaction, there still would be a large capital shortfall. Main Interview. In Mr. Main's view, that indicates "the patient is not entirely healthy."

[744] Main Interview. The idea for a government assisted transaction is reflected in a March 30, 2008 email written by Mr. Main. JPM_EX00023598. In the email, Mr. Main wrote to Mr. Scharf: "I of course love the idea of a slightly higher price than they deserve in the form of a contingent where their shareholders pick up the first loss . . . then the government kicks in with some form of second loss - either 75% for them and 25% for us, or they take 100% for a slice and then its all for us." This email describes a scenario where shareholders would be given a contingent security that could increase or decrease in value based on performance against projections. Under the scenario envisioned, if losses decreased further than the contingent amount, either JPMC would split the loss with the government, or the government would cover all losses for a period of time, and then JPMC would take all losses.

[745] Main Interview; JPMCD_000003488.00001; JPMCD_000003489.00001.

[746] Cerezo Interview; JPMCD_000003489.00001, at JPMCD_000003489.00011, 12-13.

[747] Cerezo Interview; JPMCD_000003489.00001, at JPMCD_000003489.00013, 16.

d.     Meetings with Regulators

On March 28, 2008, one day after the JPMC Board Meeting on Project West, Mr. Scharf, Mr. Cavanagh, and H. Rodgin Cohen, JPMC's outside counsel, met separately with the FDIC and OCC in Washington, D.C. to discuss the potential acquisition of WMI.[748] They provided the FDIC and OCC with essentially the same slide deck that had been given to the JPMC Board the day before.[749] JPMC did not meet with OTS on that day, but John Reich, the OTS Director at the time, subsequently learned of the meeting from FDIC and inquired with JPMC as to why OTS had not been included.[750] OTS requested a meeting, and JPMC gave the same presentation and slide deck to OTS, emphasizing that WMB's losses would be greater than WMI was projecting.[751] Following the meeting with OTS, JPMC participated in several conference calls with OTS to discuss the status of due diligence and the progress of a potential transaction with WMI.[752]

JPMC witnesses described contact with regulators in advance of a potential acquisition as routine and for the purpose of discussing the implications -- both to JPMC and the market -- of

---

[748] Cavanagh Interview; JPMCD_000004589.00001, at JPMCD_000004589.00003.

[749] JPM_EX00022845. No one at JPMC or the FDIC recalled if this document was the one presented at the March 28, 2008 meetings. The same slide deck, however, was among the documents that OTS produced (OTS-WMI-BKRCY-00001016), and OTS witnesses identified it as the slide deck JPMC presented to OTS, which they understood was the same deck presented to FDIC and OCC. Interview of Scott Polakoff, August 27, 2010 ("Polakoff Interview"); Interview of Darell Dochow, September 1, 2010 ("Dochow Interview"); Interview of Tim Ward, September 10, 2010 ("Ward Interview"). The deck presented to the regulators is identical to the March 27, 2008 Project West Presentation to the Board (JPMCD_000003489.00001), except for three pages of internal JPMC data that were not presented to the regulators. Specifically, those pages provided a summary of JPMC's earnings and returns (JPMCD_000003489.00001, at JPMCD_000003489.00004) and impact in GAAP accretion/dilution to JPMC's balance sheet if a transaction were to occur. JPMCD_000003489.00001, at JPMCD_000003489.00028-29.

[750] Dochow Interview; Ward Interview.

[751] Dochow Interview; Ward Interview; Polakoff Interview. Witnesses had no clear recollection of the date of the meeting with OTS. *Id.*

[752] Ward Interview. Cavanagh's meeting calendar reflects conference calls with OTS on April 1 and April 3, although Cavanagh could not recall the substance of those calls. JPMCD_000004589.00001, at JPMCD_000004589.00004, 6.

the proposed transaction.[753]  Although JPMC witnesses could not recall the substance of what was communicated to the regulators, FDIC and OTS witnesses had the impression that JPMC wanted the regulators to pressure WMI to sell to JPMC.[754]

e.  Expression of Interest Letter

Mr. Scharf sent a letter to Mr. Killinger indicating JPMC's interest in WMI on March 31, 2008.[755]  The letter stated that JPMC was prepared to offer a price of $5.00 per share of WMI common stock and a contingent payment of up to $3.00 per share based on the performance of WMB's home equity loan portfolio.[756]  This letter often has been referred to as a bid.  JPMC, however, points out that the letter itself expressly states that it is a non-binding indication of JPMC's interest, not a bid.[757]  The March 31 letter outlined the terms of a possible transaction that JPMC would consider should due diligence ultimately support such terms.[758]

WMI indicated to JPMC that it was reluctant to provide additional due diligence information without an improved price from JPMC.[759]  At this time, WMI was trading in a range of about $11 - $13 per share[760] and was looking for an offer in the $15 - $20 range.[761]  JPMC

---

[753] Scharf Interview.  Some FDIC and OTS witnesses also said that it was typical that a third party would discuss potential acquisition targets with the regulators (Ward Interview; Interview of James Wigand, September 22, 2010 ("Wigand Interview")), although Mr. Dochow said that it was unusual.  Dochow Interview.

[754] Ward Interview; Dochow Interview; Wigand Interview.  JPMC believed that WMI was not seriously considering an acquisition as a *bona fide* alternative to a capital raise.  Mr. Scharf recalled a dinner meeting in which Mr. Rotella said that WMI did not want to sell the bank.  Scharf Interview.

[755] JPM_EX00006060.

[756] *Id.*  The contingent payment would settle in JPMC common stock.

[757] *Id.*  ("The terms of this letter are an indication of JPMorgan's interest and are not binding upon or enforceable against JPMorgan").

[758] JPMC witnesses that maintained the letter was merely an expression of interest, contingent on JPMC's completion of due diligence that satisfied JPMC on various remaining areas of inquiry.  Dimon Interview; Main Interview.

[759] JPM_EX00026610.

[760] For example, on March 25, 2008, WMI's stock was trading at $12.70 per share.  WMI_PC_111210525.00001, at WMI_PC_111210525.00005.

[761] WMIPC_500001737.00001, at WMIPC_500001737.00009.

maintained that it could not make a firm or higher offer until it had further detailed information about WMB's home loan portfolio in order to more accurately project losses.[762] JPMC did, however, express a willingness to negotiate on price and terms to Mr. Killinger.[763]

### f. Communications with Other Bidders

There is no indication that the Project West team had contact with any other bidder during the March 2008 time frame. Nonetheless, the Project West team actively speculated as to what other parties might be pursuing WMI.[764] For example, there was speculation that Santander, given its strength and public statements about wanting to enter the U.S. market, likely would be pursuing WMI.[765] JPMC assumed that Wells Fargo was involved. Several witnesses recalled seeing a sign identifying Wells Fargo at the Red Lion Hotel where WMI held due diligence meetings.[766]

JPMC's Investment Bank, however, was approached by potential clients to provide representation concerning WMI. In mid-March 2008, Santander contacted JPMC's Investment Bank in Spain to seek representation for a possible acquisition of WMI.[767] After running a conflicts check, the Investment Bank determined that it could not advise Santander on a potential

---

[762] Main Interview; JPM_EX00026609.

[763] JPM_EX00026607-09 (April 6, 2008 email from Mr. Scharf to Mr. Killinger stating JPMC's "commitment to working toward an improvement in pricing and terms" depending on the completion of additional due diligence).

[764] Scharf Interview. Mr. Scharf recalled internal JPMC discussions regarding what banks could potentially purchase WMI.

[765] Scharf Interview. According to Mr. Scharf, JPMC always assumed that if JPMC was interested in a target, so was Santander.

[766] Scharf Interview; Rivas Interview; Main Interview.

[767] Interview of José Cerezo, Septembeer 15, 2010 ("Cerezo Interview"). There also was an indication that China Construction Bank ("CCB") approached the JPMC Investment Bank for information or representation in connection with a potential investment in WMI. A conflicts check determined that the Investment Bank could not advise CCB on WMI. Interactions between both Santander and CCB and the JPMC Investment Bank regarding WMI will be discussed in greater detail below in the Examiner's analysis of potential antitrust claims.

acquisition of WMI because of its representation of JPMC on the same potential transaction.[768] The JPMC Investment Bank told Santander that it could not provide representation, but, in order to protect confidentiality, did not disclose the reason.[769]

### g. Meetings with Ratings Agencies

Documents indicate that, starting in late March 2008, JPMC began preparing for meetings with rating agencies concerning a possible acquisition of WMI in early April 2008.[770] The intent was to provide rating agencies with an assessment of how an acquisition of WMI would affect JPMC and confirm that JPMC's rating would not be lowered as a result of the acquisition.[771] The Examiner finds no evidence that such meetings occured. Witnesses from JPMC, Fitch, Standard & Poor's ("S&P"), and Moody's were not aware of an April 2008 meeting, and there was no documentary evidence showing that such a meeting occurred.[772]

---

[768] JPMCD_000003525.00001.

[769] Cerezo Interview; Interview of Enrique Casanueva, September 3, 2010 ("Casanueva Interview"). Messrs. Cerezo and Casanueva both said that they were not aware of the nature of the conflict in March 2008 that prevented Santander from hiring JPMC. Cerezo Interview; Casanueva Interview. Aside from Mr. Main and Enrico Bombieri, Head of Investment Banking for Europe, the other JPMC bankers apparently had no knowledge that JPMC was looking at WMI.

[770] JPM_EX00021175 (March 26, 2008 email from Tim Main regarding Mr. Cavanagh's request to pull together "full JPMorgan financials including . . . West by this Sunday, so that we can review them Monday ahead of meetings with rating agencies as early as Wednesday"); JPM_EX00024802 (April 1, 2008 email from Tod Gordon to Mike Cavanagh noting that Moody's was expecting a call regarding WMI); JPM_EX00005951 (April 4, 2008 email from Gregg Gunselman noting that "[w]e are preparing materials to present to ratings agencies for the . . . West transaction[] and attaching "a couple slides from the overall presentation." Among the slides is an "illustrative option ARM representative payment schedule," citing to "West reports to Finance Committee of the Board of Directors").

[771] Scharf Interview; Cavanagh Interview. Mr. Scharf stated that the point of such meetings would be to get agencies "comfortable with what JPMC would look like after the acquisition." Scharf Interview.

[772] Interview of Craig Emrick, October 22, 2010 ("Emrick Interview"); Interview of Sharon Haas, October 21, 2010 ("Haas Interview"). S&P represented through its counsel that no meeting between S&P and JPMC regarding WMI took place in March or April 2008. MLA_Examiner_SP001.

### 4. April - August 2008

#### a. Use of Confidential Information

WMI did not pursue JPMC's expression of interest and instead announced a deal with TPG on April 8, 2008, whereby it would receive a capital infusion of approximately $7 billion. After the TPG transaction was announced, Mr. Bessey sent an email to members of the JPMC deal team, directing the team to "promptly destroy any confidential West information that you might have in your possession."[773] Relevant JPMC personnel had no recollections of the destruct order and no recollection whether they followed Mr. Bessey's directive.[774]

Nonetheless, the Examiner finds that some people from the Project West team kept confidential WMI information. JPMC maintains that although destruct orders were often sent to minimize the number of people retaining confidential information, such internal orders were not deemed applicable to certain JPMC personnel still analyzing a possible deal.[775] Generally, the merger and acquisition ("M&A") teams did work until the deal was "dead" and the owner of the information asked for its return. JPMC's position is that unless WMI specifically asked JPMC to cease doing work and to destroy information, core M&A personnel could retain the information.[776] The Examiner found no evidence that WMI asked for the return of its data from JPMC or others.[777]

---

[773] JPM_EX00003906.

[774] Scharf Interview; Main Interview; Bessey Interview. Mr. Scharf did not recall the destruct order, but told the Examiner that, as a matter of practice, he destroys all material and information after use. Scharf Interview.

[775] Interview of Gregg Gunselman, October 1, 2010 ("Gunselman Interview").

[776] Gunselman Interview.

[777] Gunselman Interview; Interview of Bruce Helsel, October 8, 2010 ("Helsel Interview").

b.    JPMC's Continued Interest in WMI following Announcement of WMI's Deal with TPG

Notwithstanding TPG's capital investment, JPMC remained interested in WMI.  JPMC did not think that WMI had raised enough capital to address its financial problems.[778]  JPMC believed that, based on its projections of WMB's losses and deteriorating market conditions, it was likely that WMI would soon be looking either to raise capital or to find a buyer.[779]  Although the Project West team stopped working, the most senior people at FIG, as well as Messrs. Dimon, Scharf, and Cavanagh, continued to contemplate an acquisition of WMI.[780]  JPMC still viewed a possible acquisition as "financially compelling" because of WMB's retail branch presence in Florida and California.[781]

Throughout the summer of 2008, JPMC continued to monitor WMI.  Although JPMC had no direct knowledge of whether WMI might become available, it nonetheless prepared itself for a possible purchase by updating financial models under various purchase scenarios.[782]  Because the WMI data room had closed once the TPG deal was announced, new data was collected from WMI public filings and analyst forecasts in order to update earlier modeling.[783]

As the summer went on, market conditions and loss estimates on consumer credit loan portfolios continued to worsen.  JPMC could see this in its own loan portfolios.[784]  Further, WMI missed its earnings forecast, and JPMC believed WMB had higher delinquencies and charge-offs

---

[778] Dimon Interview; Scharf Interview.

[779] Scharf Interview.

[780] *Id.*

[781] JPM_EX00004102 (June 18, 2008 email from Gunselman describing "West" as the "most financially compelling" target at the time).  Mr. Dimon said that JPMC believed that WMI would provide real earnings over time based on the power of the franchise and that these increased earnings would permit JPMC to handle a range of estimated losses.  Dimon Interview.

[782] Scharf Interview.

[783] Main Interview.

[784] Scharf Interview.

than previously anticipated.[785] As a result, and in the wake of the IndyMac seizure, JPMC began

thinking that WMB might fail, and that a receivership scenario might occur.[786] JPMC witnesses

maintained that receivership scenarios were considered as a logically possible outcome given

WMI's difficulties and current market conditions, and not based on any inside information from

regulators or others.[787] Further, JPMC continued to consider whole bank transactions.[788]

The Examiner evaluated JPMC's modeling of various transaction structures that it was

considering throughout the summer of 2008. JPMC slide decks show the evolution of JPMC's

thinking. In June, JPMC updated its March analysis of WMI.[789] The June analysis took into

consideration the impact of JPMC's lower stock price and decreased net income, as well as

WMI's $7 billion capital raise and deferred tax asset amortization and impact value.[790] Given

WMI's capital raise, JPMC assumed it would need to raise about $15 billion to acquire WMI at

$5.00 per share.[791] In addition, given that both JPMC and WMI stock had fallen since March

2008, JPMC also analyzed a potential transaction at $3.00 per share.[792] The analysis was

focused on a whole bank transaction. There was no discussion of a receivership scenario.

---

[785] Main Interview.

[786] Scharf Interview; Rivas Interview.

[787] Scharf Interview; Rivas Interview; Gunselman Interview. The Examiner found no contrary evidence on this point. Further, Mr. Gunselman, who worked at the JPMC Investment Bank, stated that several of his other bank clients also were asking the Investment Bank to model receivership transactions in this time period. Gunselman Interview. In short, deteriorating market conditions were increasing the likelihood of bank failures, and potential buyers were increasingly contemplating possible receivership situations.

[788] Scharf Interview; Gunselman Interview; JPMCD_00002736.00002, at JPMCD_00002736.00002-00024.

[789] JPM_EX00003911 (June 12, 2008 email from Gregg Gunselman to Scharf, et al. attaching summary of "impact of significant changes versus the 3/31/08 analysis [] @$5.00 offer price and make whole on West's $7.2bn capital raise").

[790] JPM_EX00003912, at JPM_EX00003913.

[791] Id.

[792] JPM_EX00003912, at JPM_EX00003915.

In mid-July 2008, JPMC again updated its analysis. On July 17, JPMC conducted an analysis of various capital alternatives, including an aggressive hybrid issuance scenario and a maximum market capacity scenario.[793] Models created on July 25 analyzed the amount of capital that JPMC would need at various potential prices, including $3.75, $2.00, and $0.00 per share.[794] JPMC also began to consider a government assisted transaction.[795] A slide deck created on July 28 reviewed the financial impact of a $0.00 offer, but also compared a transaction for WMB with a transaction for WMI, including a scenario with a "loss threshold of $28bn."[796]

By early August 2008, JPMC began modeling receivership scenarios. An analysis circulated on August 1 modeled: (1) a purchase of only the thrift bank out of receivership for $0.00 and assumption of bank assets and liabilities; and (2) a purchase of only the thrift bank out of receivership for $0.00, but without assuming bank-issued debt.[797] The models indicated that a purchase out of receivership would require much less capital than a whole bank purchase.[798]

Although JPMC analyzed receivership scenarios, JPMC simultaneously continued to consider a whole bank, market transaction. JPMC witnesses maintained that JPMC had no information from regulators about the possibility of an assisted or receivership transaction, but nonetheless considered it as a future possibility.[799]

---

[793] JPM_EX00000322 (July 17, 2008 email from Gregg Gunselman to Charles Scharf attaching analysis of WMB capital alternatives).

[794] JPM_EX00002787, at JPM_EX00002797.

[795] JPM_EX00000322 (July 17, 2008 email from Gregg Gunselman to Charles Scharf discussing "two made up assistance alternatives"). This is the earliest document found by the Examiner evidencing the modeling of an assisted transaction.

[796] JPMCD_000002736.00048, at JPMCD_000002736.00071.

[797] JPMCD_000002736.00002.

[798] JPMCD_000002736.00002, at JPMCD_000002736.00006.

[799] Scharf Interview. Mr. Scharf explained that JPMC did not know under what scenario a WMI or WMB opportunity potentially would arise, so JPMC modeled all scenarios in an effort to be prepared if WMI or WMB

c.    Meetings with Regulators

The JPMC Investment Bank met with the FDIC and OCC on July 18, 2008.[800] This meeting was one of a series of periodic meetings that the Investment Bank had with regulators to discuss general issues in the banking industry.[801] Regulators often called these meetings with investment banks to keep abreast of market trends.[802] Although JPMC witnesses could not recall the July 18, 2008 meeting in particular, deals or clients typically were not discussed at these types of meetings.[803]

There is no evidence suggesting that JPMC met with regulators regarding WMI at other times during the summer of 2008.

d.    Communication with Third Parties

JPMC's FIG was in contact with Santander during the summer of 2008. In June 2008, Mr. Dimon attended a meeting with three Santander executives, Chairman Botín, Juan Inciarte, and Matías Inciarte to foster business development with Santander for the Investment Bank. José Cerezo and Enrique Casanueva, from JPMC Investment Bank, also attended the meeting. Mr. Cerezo later circulated an email summarizing the meeting. In that summary, he wrote that Mr. Dimon "reckoned that these are opportunities in which [JPMC] would also be interested,"

---

became available. The August 1, 2008 slide deck also includes a model based on a market acquisition of WMI "for $0.00 with no make-whole payment to TPG investors." JPMCD_000002736.00002, at JPMCD_000002736.00004.

[800] JPMCD_000003355.

[801] Main Interview.

[802] *Id.*

[803] *Id.* A July 17, 2008 email from Mr. Rivas to Mr. Scharf suggests that the investment bank may get some "color" from regulators regarding how to structure an assisted transaction. JPM_EX00000322. However, it is not clear whether the investment bank spoke with regulators about WMI in particular. Main Interview. Chris Spoth, Senior Deputy Director of the Supervisory Examinations Branch of the FDIC, recalled a meeting in July 2008 with either JPMC or JPMC Investment Bank, but he could not recall whether WMI was discussed. Interview of Chris Spoth, September 27, 2010 ("Spoth Interview").

and that "it is important [for JPMC] to have an open dialogue with [Santander], as Santander would not pursue any of these opportunities if [JPMC] were to do the same."[804]

### 5.    September 2008

On September 9, 2008, several high-ranking officials of JPMC, including Messrs. Dimon, Scharf, and Cavanagh, went to Washington, D.C. to meet with bank regulators and other government officials to discuss the financial crisis. The JPMC witnesses could not recall specifically whether WMI was discussed at these meetings. Neither Mr. Scharf nor Mr. Cavanagh had any recollection of meeting with Sheila Bair, Chairman of the FDIC, or what might have been discussed.[805]

a.    September 15 - 21, 2008

By mid-September 2008, Goldman Sachs had notified JPMC that WMI was interested in a sale.[806] The WMI data room was reopened and JPMC reassembled the Project West Team to determine what due diligence was needed in order to assess a possible WMI acquisition.[807] The Project West Team was composed largely of the same individuals that were involved in the March 2008 process.[808] An updated due diligence list was circulated internally on September 16,

---

[804] JPM_EX00004075. Issues related to this meeting are discussed in detail in the Antitrust Section of this Report.

[805] Cavanagh Interview; Scharf Interview. Mr. Cavanagh's calendar lists a meeting with Chairman Bair and Mr. Scharf at the FDIC in Washington, D.C. on September 9, 2008. Mr. Cavanagh recalled that in early September, the JPMC Operating Committee went to Washington, D.C. to meet with all of the regulators. Cavanagh Interview. He recalled only being in a cab and going to the FDIC's building that day, but had no recollection of who was at the meeting or if Mr. Scharf attended. This meeting is not listed on Mr. Scharf's calendar, and Mr. Scharf had no specific recollection of it. Scharf Interview.

[806] Dimon Interview.

[807] Cooney Interview. At some point, WMI cut off JPMC's access to the data room in an effort to "smoke them out" and gauge whether JPMC was truly interested in a transaction. Interview of Alan Fishman, September 1, 2010 ("Fishman Interview"). See JPM_EX00013119 (September 22, 2008 email from Brian Bessey to Charles Scharf stating that the access to the data room was "down"). Mr. Cooney emailed James Wigand to report that WMI had denied JPMC access to information. JPM_EX00000077. Mr. Fishman recalled a phone call with Mr. Scharf where they smoothed things over and access was restored. He did not recall that the FDIC intervened. Fishman Interview. Mr. Scharf could not recall how the issue was resolved. Scharf Interview.

[808] JPM_EX00031572.

2008.[809] JPMC subsequently updated WMI models it had created and revised financial projections to reflect changes in credit performance and economic outlook.

Around September 16, Chairman Bair contacted Mr. Dimon by telephone to discuss the possibility of JPMC buying WMB out of receivership without government assistance. Mr. Dimon responded that JPMC might be willing to do such a transaction.[810]

In the same time frame, Chris Spoth, the FDIC Senior Deputy Director of Supervisory Examinations, reached out to JPMC (and other suitors that WMI had identified to the FDIC) to ascertain whether they were interested in acquiring WMI on an open bank or private sale basis.[811] On that call, the FDIC indicated that it wanted a solution by Friday, September 26 and that it preferred an open bank solution.[812] JPMC responded that it would analyze an open bank solution, but did not expect that such a transaction would work for JPMC.[813] JPMC also indicated it would not participate in the auction process that WMI's investment bankers were running.[814] JPMC still had interest in a potential private transaction, but was not interested in an auction; rather, JPMC would consider only a negotiated transaction.[815]

On Friday, September 19, 2008, the JPMC Board of Directors met to review transaction scenarios whereby JPMC would acquire some or all of WMI or WMB.[816] Two possible transaction structures were reviewed: buying WMI in a private transaction, and buying WMB or

---

[809] JPM_EX00000271; JPM_EX00000272.

[810] Dimon Interview. Mr. Dimon could not recall the specific date of the conversation, but phone records reflect that he had a telephone conference with Chairwoman Bair on September 16, 2008. JPMCD_000004856.00015.

[811] Spoth Interview.

[812] JPMCD_000003491.00001, at JPMCD_000003491.00002.

[813] Scharf Interview.

[814] Id.

[815] Id. JPMC responded in this manner because it did not want the FDIC to believe that JPMC was going to solve all of the regulators' problems concerning WMB. Mr. Dimon expressed to the Examiner his impression that "Sheila Bair wanted JPMC to fix her problem." Dimon Interview.

[816] JPMCD_000003490.00001.

its assets out of an FDIC receivership. Among the issues discussed were WMB's continuing deposit losses, the degree of flexibility available to structure a transaction if the bank was put into receivership, and raising the capital required for the transaction.[817] Although the Board reviewed both transactions, by September 19, 2008, JPMC had determined that a whole company acquisition was not viable financially.[818] JPMC believed that a private transaction for the whole company would require an excessive capital raise.[819]

On the other hand, JPMC viewed a receivership scenario as having numerous advantages, including no shareholder approval and immediate closing.[820] A purchase out of receivership would allow JPMC to leave certain contingent and shareholder liabilities behind, as well as put back branches it did not want and reject unwanted contracts and leases.[821] In addition, a receivership transaction would give JPMC the assets associated with hybrid securities (such as TRUPS), but not the liabilities.[822] All of these factors were viewed as positives because they reduced the amount of risk involved and the amount of required capital by approximately $17 billion.[823]

No action with respect to a transaction was proposed for the meeting, and the Board agreed that management would "continue to pursue a possible transaction."[824]

---

[817] Id.

[818] Dimon Interview.

[819] JPMCD_000003491.00001, at JPMCD_000003491.00003.

[820] Id.

[821] Rivas Interview.

[822] Id.

[823] JPMCD_000003491.00001, at JPMCD_000003491.00005.

[824] JPMCD_000003490.00001.

b.    <u>September 22 - 26, 2008</u>

(i)    FDIC Process

On Monday, September 22, 2008, the FDIC met with JPMC to explain the process and timing of a receivership sale. James Wigand, David Gearin, and Herb Held from the FDIC attended. Mr. Scharf, Stephen Cutler, Mr. Cooney, Mr. Cohen and Mr. Cavanagh attended from JPMC. Mr. Dimon was also present for part of the meeting.[825]

At the September 22 meeting, the FDIC asked if JPMC would be interested in acquiring WMB if regulators decided to close the bank.[826] The FDIC said that it was considering only an acquisition of all of the assets out of receivership and that bids would need to be submitted by Wednesday, September 24.[827] The FDIC told JPMC that because of the compressed time frame, the FDIC was reaching out to parties who already had been doing due diligence on WMI and therefore had an understanding of the institution.[828] The FDIC planned to notify the winning bidder on September 25 and would seize the bank on Friday, September 26. The winner would take control on Friday night following final branch closing. The FDIC did not bring any data to the meeting, but said that information would be available the next day.[829] JPMC subsequently obtained access to an FDIC data room.

Because JPMC had no experience purchasing an institution out of receivership, significant effort was spent trying to understand the process and the treatment of various assets

---

[825] Cooney Interview.

[826] Scharf Interview; Wigand Interview.

[827] Scharf Interview; Wigand Interview.

[828] Scharf Interview.

[829] *Id.*

and liabilities.[830] JPMC relied heavily on what was known about WMB from prior due diligence, as the focus changed from a private transaction to the FDIC process.[831]

(ii)    Communications with Rating Agencies and the Media

JPMC met with Moody's on September 19 and 24,[832] with Fitch on September 23,[833] and with S&P on September 24, 2008.[834]  JPMC gave presentations at these meetings about a possible receivership transaction for the acquisition of WaMu.[835]  JPMC noted that these meetings were necessary for JPMC to gain assurance, prior to entering a transaction, that the proposed transaction would not have an adverse effect on its ratings.[836]

Moody's said that it would affirm JPMC's rating, but move JPMC's outlook from stable to negative due to mortgage loss expectations for the industry.[837]  Fitch stated that it did not view the proposed transaction for WMB as negative and would affirm JPMC's rating if the transaction occurred as presented.[838]

Subsequent to the September 19 meeting, Moody's downgraded WaMu on September 22, 2008.[839]  Fitch and S&P downgraded WaMu on September 24, 2008.[840]

---

[830] Rivas Interview.

[831] Id. Mr. Fishman could not recall whether JPMC ever affirmatively stated that it was not interested in a private transaction, but negotiations had come to an end and JPMC had not submitted a bid.  Fishman Interview.

[832] Emrick Interview; JPM_EX00012938 (March 19, 2008 email from Brian Keegan discussing a meeting with Moody's).

[833] Haas Interview.

[834] S&P represented through its counsel that it met with JPMC regarding WMI on September 24, 2008. MLA_EXAMINER_SP001.

[835] Emrick Interview; Haas Interview.

[836] Scharf Interview.  The need for such assurance would be for any significant transaction, not just for WMI. Witnesses from Fitch and Moody's indicated that it would not be uncommon for someone in JPMC's position to meet with rating agencies in advance of an asset acquisition to discuss any impact the acquisition might have on JPMC's ratings.  Emrick Interview; Haas Interview.

[837] JPM_EX00004194 (September 24, 2008 email from Tod Gordon summarizing feedback from meetings with Moody's and Fitch).

[838] JPM_EX00004194.

[839] Emrick Interview.

In addition to meeting with the ratings agencies, JPMC received press inquiries about WMI. Standard policy was not to comment.[841] Indeed, JPMC circulated an email to the Project West Team advising caution *not* to speak with the media regarding WMI.[842] The Examiner could not determine that confidential information was leaked to the media.

### (iii)    Bid Amount

Despite JPMC's extensive modeling of WMB's balance sheet over the previous six months, its method for arriving at the bid price was primarily strategic. Mr. Scharf and Mr. Dimon initially discussed that JPMC would bid zero for WMB, but decided that given the likelihood of other bidders, JPMC should make an offer.[843] Believing that other bidders likely would be in the $1 billion to $1.5 billion dollar range, Messrs. Dimon and Scharf settled on $1.88 billion.[844]

### (iv)    Board Authorization to Purchase WMB

On September 24, 2008, the JPMC Board met and authorized JPMC to enter into a transaction for the purchase of WMB from the FDIC.[845] During that meeting, Mr. Scharf presented the proposed transaction whereby JPMC would acquire substantially all of the assets of WMB, as well as all deposits and substantially all liabilities, excluding senior and

---

[840] Haas Interview.

[841] Cooney Interview; JPM_EX00029497 (September 12, 2008 email from Naomi Camper to Dan Cooney forwarding request for information from media); JPM_EX00012756 (September 17, 2008 email from Joseph Evangelisti to Jamie Dimon, et al., noting that the New York Times had called about WMI but he declined comment).

[842] JPM_EX00011596 (April 7, 2008 email from Brian Bessey noting press coverage relating to JPMC's evaluation of WMI and reminding the Project West team of the strict confidentiality requirements). Mr. Bessey said that this email was not sent in response to an incident; rather, it was sent as a matter of course to ensure compliance. Bessey Interview.

[843] Scharf Interview.

[844] Scharf Interview; Dimon Interview. Mr. Dimon made the final decision on the bid amount.

[845] JPMCD_000003492.00001.

subordinated debt.[846]  The presentation to the Board included a summary of March and September 2008 due diligence efforts, as well as a review of the FDIC bidding process and the benefits of a bank-only transaction versus an acquisition of WMI.[847]

Despite the inherent risk stemming from uncertain losses in WMB's loan portfolio, JPMC nonetheless deemed the transaction to be "financially compelling" because it enabled JPMC to expand into California and Florida and increase its market share in existing fast-growing markets, such as Texas, New York, and Arizona.[848]  In addition, despite the uncertainty of potential losses, JPMC believed that it had a certain margin of error, so that even if losses were greater than expected, the transaction would still be beneficial to JPMC.[849]

### (v) Bid/P&A Agreement

On Wednesday, September 24, 2008, JPMC submitted its $1.88 billion bid for WMB to the FDIC.[850]  Later that night, Chairman Bair notified Mr. Dimon that JPMC was the high bidder.[851]  JPMC requested that the seizure and handover be moved up to Thursday, September 25, so that JPMC could raise capital on Friday, September 26, 2008, for the acquisition.[852]  The FDIC agreed, expressing its own interest in moving up the announcement date due to the possibility of leaks in the media.[853]  The seizure and handover thus occurred on September 25, 2008.  On September 26, 2008, JPMC raised capital, selling $11.5 billion of stock that morning.

---

[846] JPMCD_000003493.00001, at JPMCD_000003492.00021.

[847] JPMCD_000003493.00001, at JPMCD_000003492.00003-04.

[848] JPMCD_000003493.00001 at, JPMCD_000003492.00005; Scharf Interview; Dimon Interview.

[849] Scharf Interview; Dimon Interview.

[850] JPMCD_000002773.00001, at JPMCD_000002773.00011.

[851] JPM_EX00036140.

[852] Dimon Interview.  JPMC made this request because, given the volatility in the financial markets, JPMC did not want to wait on a capital raise until Monday, September 29, 2008.

[853] JPM_EX00036140 (September 24, 2008 email from Sheila Bair to Jaime Dimon stating that "[b]oth the wsj and nytimes are on to stories about the FDIC 'auction'.  We may have to accelerate the announcement.").

In 2009, JPMC reported a $1.9 billion extraordinary gain[854] from the acquisition of WMB.[855] This gain was based on JPMC's reported $11.9 billion fair value of WMB, less, pursuant to accounting rules, the $1.88 billion dollar purchase price and about $8.1 billion of non-current, non-financial assets not held for sale, such as equipment and premises.[856]

JPMC witnesses explained that although JPMC used the $11.9 billion fair value estimation for accounting purposes, the true value of WMB's assets, if liquidated in the market, was far less.[857] JPMC witnesses strongly disputed reports that JPMC stands to gain a huge windfall as borrowers repay loans that JPMC marked down.[858] JPMC stated that losses thus far have been greater than expected and that JPMC has raised additional capital to support those losses.[859] Although JPMC reported increased net income in the immediate aftermath of the purchase, it maintains that its earnings per share have been diluted because additional shares

---

[854] An "extraordinary gain" refers to a non-recurring source of income. Extraordinary gains are reported on quarterly and annual reports separately from recurring sources of income and loss.

[855] JPMC 2008 Annual Report, p. 135, *available at* http://files.shareholder.com/downloads/ONE/1049003663x0x283416/66cc70ba-5410-43c4-b20b-181974bc6be6/2008_AR_Complete_AR.pdf.

[856] The acquisition was accounted for as a purchase business combination in accordance with Statement of Financial Accounting Standards ("SFAS") 141, issued by the Financial Accounting Standards Board ("FASB"). SFAS 141 requires the assets (including identifiable intangible assets) and liabilities (including executory contracts and other commitments) of an acquired business as of the effective date of the acquisition to be recorded at their respective fair values and consolidated with those of JPMC. In its 2008 Annual Report, JPMC reported $11.9 billion as the fair value of the net assets of WMB's banking operations. This amount exceeded the $1.88 billion purchase price, resulting in approximately $10 billion of negative goodwill (the difference between the allocated fair value of assets and liabilities and the purchase price paid by the acquirer). In accordance with SFAS 141, non-current, non-financial assets not held-for-sale, such as premises and equipment and other intangibles, were written down against the negative goodwill. The negative goodwill that remained after writing down transaction-related core deposit intangibles of approximately $4.9 billion and premises and equipment of approximately $3.2 billion was recognized as an extraordinary gain of $1.9 billion. JPMC 2008 Annual Report. The similarity between the amount of extraordinary gain and the purchase price is coincidental.

[857] Cavanagh Interview; Dimon Interview. Mr. Dimon said that many of the assets would not be marketable at all and that he believes the negative goodwill that existed is likely already gone or has fluctuated significantly.

[858] *See* Ari Levy & Elizabeth Hester, *JPMorgan's WaMu Windfall Turns Bad Loans into Income*, Bloomberg, May 26, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aYhaiSOq_Tbc.

[859] Scharf Interview.

were issued to raise capital needed to support its purchase of WMB.[860] JPMC witnesses maintained that neither the $1.88 billion purchase price nor the $1.9 billion extraordinary gain reflected the amount of risk capital needed to support WMB's impaired loan portfolio.[861]

## D.    Analysis of Potential Claims Against JPMC

The Examiner investigated potential business tort and contract claims arising out of allegations that JPMC intentionally injured WMI, resulting in the seizure of WMB and sale to JPMC. Specifically, the Examiner investigated allegations that JPMC:

- breached the terms of its Confidentiality Agreement with WMI by leaking WMI's confidential information to regulators, ratings agencies, and the media;

- breached the terms of the Confidentiality Agreement by purchasing WMB's assets from the FDIC in violation of the "standstill" provision of the agreement;

- placed "moles" at WMI who provided confidential information to JPMC and enabled JPMC to gain an insider position;

- misused WMI's confidential information to drive down the value of WMB, thereby forcing the bank into receivership and enabling JPMC to purchase its assets from the FDIC at a fire-sale price; and

- improperly discouraged or prevented third parties from purchasing WMI or WMB in either a private transaction with WMI or in a sale by the FDIC.

Based on the Examiner's review of discovery materials, the Debtors' substantial work product, briefs filed with the courts, and independent analysis, the Examiner identified potential causes of action that the Debtors might have against JPMC, including breach of contract, tortious interference with a prospective economic advantage, trade libel, business disparagement, violation of state unfair practices and unfair competition laws, conversion, unjust enrichment,

---

[860] Cavanagh Interview.

[861] Cavanagh Interview.

and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").[862]  In

addition to investigating whether there is a factual basis for these claims, the Examiner also

analyzed whether such claims could result in substantial recoveries for the Debtors.

The Examiner focused his analysis on potential claims for breach of contract, tortious

interference with business expectancy, and trade libel.  For the reasons outlined below, the

Examiner concludes, based on the facts now available, that the potential tort and contract claims

being released in the Settlement Agreement do not have substantial value.

### 1. Breach of the Contractual Confidentiality Agreement

Under New York law,[863] the elements of a claim for breach of contract are: (1) the

existence of a contract; (2) due performance of the contract by plaintiff; (3) breach of the

contract by defendant; and (4) damages resulting from the breach.[864]  If there is a breach,

damages are awarded to "put [the plaintiff] in as good a position as he would have occupied had

the contract been kept."[865]  Punitive damages are available under New York law "in breach of

contract actions only if the allegations support a conclusion that a fraud upon the public is

involved."[866]

As to the use of confidential information, the Examiner found evidence that JPMC

disclosed confidential WMI information in a meeting with OTS in the spring of 2008.  The

Examiner found no evidence that this technical breach of the Confidentiality Agreement caused

harm to WMI.  The Examiner also found that JPMC relied on confidential WMI information in

---

[862] The Examiner determined that jurisdiction for causes of action based on JPMC's tortious acts causing injury to WMI likely lie in Washington and New York.  The Examiner therefore examined relevant law in those jurisdictions.

[863] The Confidentiality Agreement includes a New York choice of law provision.

[864] *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 893 N.Y.S.2d 237 (N.Y. App. Div. 2010).

[865] *Scalp & Blade, Inc. v. Advest, Inc.*, 765 N.Y.S.2d 92, 309 A.D. 2d 219, 225 (4th Dep't 2003) (quoting *Menzel v. List*, 24 N.Y. 2d 91, 97 (N.Y. 1969)).

[866] *Parke-Hayden, Inc. v. Loews Theatre Mgmt. Corp.*, 789 F. Supp. 1257, 1268 (S.D.N.Y.1992) (citing *Jacobson v. New York Prop. Ins. Underwriting Ass'n.*, 501 N.Y.S.2d 882, 884 (N.Y. App. Div. 1986)).

preparing and submitting its bid to the FDIC. While using previously obtained knowledge would not violate the Confidentiality Agreement, it is arguable that, under the terms of the Confidentiality Agreement, JPMC should have destroyed or returned confidential information in the spring of 2008. Even if this constituted a breach, however, the Examiner found no evidence that it caused harm to WMI.

As to the standstill provision of the Confidentiality Agreement, the Emergency Economic Stabilization Act[867] almost certainly bars any claim based a breach of that provision.

### a. Potential Leaks of Confidential Information

The Examiner determined that JPMC disclosed WMI confidential information to the FDIC, OCC, and OTS in the spring of 2008. On March 28, 2008, JPMC met separately with the FDIC and OCC in Washington, D.C. to discuss the effect of a potential acquisition of WMI on JPMC.[868] At both of these meetings, JPMC provided the regulators with a slide deck that included a number of data points cited to "West management presentation," "West projections," and "West report to Finance Committee of the Board of Directors."[869] The data cited to "West" included earnings and capital projections, asset quality metrics, summaries of net charge-offs by portfolio, consumer real estate loss projections, and a sample Option ARM payment schedule.[870] The JPMC team did not meet with the OTS on that day, but Mr. Reich, the OTS Director at the time, subsequently learned of the meeting and asked JPMC why, as a courtesy, OTS had not

---

[867] 12 U.S.C. § 1823(c)(11).

[868] Cavanagh Interview; JPMCD_000004589.00001, at JPMCD_000004589.00003.

[869] JPM_EX00022845, at JPM_EX00022850-52, 55, 57-58, and 76.

[870] *Id.* The Examiner finds that these decks contain confidential WMI information. Although several JPMC witnesses could not recall whether references to "West" in the slide deck referred to internal WMI data as opposed to WMI public filings or information. Messrs. Gunselman, Bessey, and Main expressed the view that some of the information likely was confidential WMI information. The Examiner also finds that JPMC was in possession of WMI confidential information at the time these decks were prepared.

been included.[871] JPMC later gave the presentation to OTS, using the same slide deck, although witnesses could not recall whether OTS already had received the slide deck from the FDIC before the JPMC presentation.[872]

To the extent JPMC disclosed internal WMI information to the FDIC and the OCC, JPMC's own regulators, JPMC did not breach of the Confidentiality Agreement. The Confidentiality Agreement allowed JPMC to disclose confidential WMI information to "any bank regulatory authority having jurisdiction over [JPMC and its affiliates],"[873] which would include the FDIC and OCC. However, the Confidentiality Agreement did not permit JPMC to provide information to OTS, which regulated WMI but not JPMC.

Notwithstanding this technical breach of the Confidentiality Agreement, there is no evidence that it caused any harm to WMI. First, the WMI information that JPMC provided to OTS was already available to OTS, as WMI's regulator. Second, the limited data JPMC disclosed to OTS is not of a kind that could have caused significant harm to WMI. To the contrary, this data -- which shows WMI's own projections of its losses, charge-offs, and earnings and capital -- was information WMI provided to numerous entities in its data room to encourage investment in the bank.[874] Moreover, JPMC's disclosure of information to OTS could have caused harm to WMI only if OTS used that information to take some action detrimental to WMI. The Examiner has found no evidence that it did.

---

[871] Dochow Interview; Ward Interview.

[872] OTS-WMI-BKRCY-00001016. Messrs. Polakoff and Dochow identified this document as the slide deck presented to OTS by JPMC. Polakoff Interview; Dochow Interview. Mr. Ward could not recall whether FDIC provided the slide deck, but recalled that JPMC met with OTS to review it. Ward Interview.

[873] JPM_EX00016135, at JPM_EX00016136.

[874] WMI_PC_701361032.00001. WMI gave over forty entities access to its data room.

b.  Alleged Leaks Designed to Drive Down WMI's Stock Price

The Examiner investigated allegations that JPMC attempted to drive down WMI's stock

price by leaking information  The Examiner finds that JPMC had four meetings with rating

agencies about its proposed acquisition of WMB in September 2008.  JPMC met with Fitch on

September 23, with S&P on September 24, and with Moody's on September 19 and 24.  At these

meetings, JPMC presented the agencies with its proposal to acquire WMB out of receivership in

order to alert the agencies of the transaction and to understand how the transaction would impact

JPMC's ratings.[875]

Documents presented to Moody's at the September 19 meeting do not contain internal

WMI information.[876]  The presentations given on September 23 and 24, however, may include

such information.[877]  Given the timing of these disclosures, days before the seizure of WMB, the

Examiner concludes that any arguable breach did not harm WMI.

It has been alleged that JPMC disclosed information to the media in order to cause

depositors to withdraw funds and drive down WMI's credit rating and stock price.[878]  The

Examiner's limited review of this allegation did not uncover evidence to support these

---

[875] Scharf Interview; Cavanagh Interview.  Mr. Scharf noted that JPMC would not want the ratings agencies to be surprised by the announcement of a transaction.  The rating agencies also indicated that meeting in advance of a transaction would not be uncommon.  Emrick Interview; Haas Interview.

[876] WMIPC_500060439.00002.  All WMI information is cited to public sources.  No information regarding WMI's balance sheet or loan portfolio is included.

[877] No JPMC witnesses had any recollection of what information was provided to ratings agencies.  As to documentary evidence, the presentation to Moody's included information regarding WMI's loss forecasts. WMIPC_500060439.00016, at WMIPC_500060439.00032-33.  The same information was provided to Fitch. JPM_EX00035422; JPM_EX00035423.  A subsequent email discussed showing rating agencies a page concerning WMB's loan portfolios from the JPMC March 28, 2008 presentation to the FDIC, but witnesses could not identify which page.  JPM_EX00005173 (September 22, 2008 email from Sean Carmody to Sally Durdan requesting "the book that you used to discuss West w/ the FDIC . . . to leverage the page from the book that laid out West's loan portfolios . . . for the rating agency meetings.").

[878] Compl., ¶¶ 60, 98, *Am. Nat'l Ins. Co. v. FDIC*, Case No. 1:09-cv-01743 (RMC) (D.D.C.) (the "Texas Litigation") (Mar. 25, 2009), Dkt. No. 1, Attach. 1-3.

allegations. The JPMC witnesses maintain that JPMC did not speak with the media regarding its interest in WMI or WMB.[879] Certain documents corroborate their position.[880]

Further, even assuming there were media leaks, it would be virtually impossible to attribute those leaks to JPMC. As indicated above, a raft of companies -- at least 40 -- had access to the same confidential WMI data as JPMC. Leaks, even if shown, could have come from any of these parties -- even from WMI itself. Consequently, the Examiner found no evidence that JPMC engaged in a campaign to discredit WMI with the media using confidential WMI data.

Finally, given the array of problems facing WMI, the Examiner finds it will be very difficult to establish that isolated disclosures of confidential information damaged WMI's stock price, led to illiquidity, or precipitated the seizure of WMB.[881] During the course of 2008, the financial environment was suffering from a deteriorating housing market, increasing mortgage delinquencies and foreclosures, illiquidity, loss of value in asset-backed and mortgage-backed securities, and a general downturn in the global credit markets. All of these developments were devastating to WMI given its business model.

---

[879] Cooney Interview.

[880] JPM_EX00011596; JPM_EX00029497; JPM_EX00012756. Further, records show that more than forty entities accessed WMI's data room and had access to internal WMI information between March and September 2008. WMI_PC_701361032.00001.

[881] A report of the Offices of Inspector General of the Treasury and the FDIC found that:

> WaMu failed because of its management's pursuit of a high-risk lending strategy coupled with liberal underwriting standards and inadequate risk controls. WaMu's high-risk strategy, combined with the housing and mortgage market collapse in mid-2007, left WaMu with loan losses, borrowing capacity limitations, and a falling stock price. In September 2008, depositors withdrew significant funds after high-profile failures of other financial institutions and rumors of WaMu's problems. WaMu was unable to raise capital to keep pace with depositor withdrawals, prompting OTS to close the institution on September 25, 2008.

Offices of Inspector General of the Department of the Treasury and the FDIC, Evaluation of Federal Regulatory Oversight of Washington Mutual Bank, Rep. No. Eval-10-0002 at 8 (Apr. 2010).

c.    Use of Confidential Information to Prepare Bid

JPMC likely relied on confidential WMI information in preparing its bid to the FDIC in September 2008.[882] Numerous slide decks that JPMC used during the summer of 2008 included projections that cite to "West" data.[883] As previously indicated, the Examiner finds that some of this West data likely came from WMI.

The Confidentiality Agreement provides: "If you determine not to pursue a Transaction,[884] you will promptly notify [WMI] of your determination. At the time of such notice, or if, at any earlier time, [WMI] so directs . . . [JPMC] will, at [JPMC's] expense, promptly destroy all Information which has been furnished to [JPMC] by [WMI]."[885] JPMC's position is that the terms of the Confidentiality Agreement did not require it to destroy confidential WMI information.

JPMC witnesses maintained that until September 2008, JPMC did not make a determination that it would not pursue a possible market transaction for WMI, and therefore, absent an instruction from WMI, was not obligated to destroy any information it received from WMI under the express terms of the Confidentiality Agreement.[886] JPMC had a continuing interest in acquiring WMI or WMB, and continued to use WMI information to model possible

---

[882] The Examiner bases this conclusion on evidence that JPMC retained WMI information it obtained in March and April 2008 through due diligence.

[883] JPM_EX00003912, at JPM_EX00003919, 22-23; JPMCD_000002736.00048, at JPMCD_000002736.00059-60, 64, 69, 75-76; JPMCD_000002736.00002, at JPMCD_000002736.00019-20, 24, 29, 31, 38-39; JPMCD_000002707.00001, at JPMCD_000002707.00004, 7, 9, 15, 18, 20. JPMC witnesses could not recall whether citations to West meant that the data was confidential, as opposed to public, WMI information. Mr. Main said that these projections could have come from WMI. Mr. Gunselman said that he did not recall where the "West Projections" data came from, but he said that these were not JPMC's projections. Mr. Gunselman also said that information received from WMI in March 2008 would not have been destroyed or returned, unless WMI directed JPMC to do so.

[884] A "Transaction" is defined as "a possible negotiated transaction." JPM_EX00016135.

[885] JPM_EX00016135, at JPM_EX00016136-37. The Examiner concludes that there is also a viable argument that the Emergency Economic Stabilization Act of 2008 prevents enforcement of a breach of the confidentiality agreement in connection with JPMC's bid submission to the FDIC. See 12 U.S.C. § 1823(c)(11)(C).

[886] Gunselman Interview.

acquisition scenarios throughout the summer and into September 2008.[887] The Debtors produced

no evidence that WMI asked JPMC to destroy confidential information or that JPMC provided

notice to WMI that JPMC had determined it would not pursue a transaction.

Notwithstanding JPMC's position that it was not required to destroy WMI's confidential

information in these circumstances, once the TPG deal closed it could be fairly argued that

JPMC should have destroyed WMI's confidential information. Indeed, Mr. Bessey sent an

internal destruct order to the Project West team immediately following the announcement of

WMI's capital raise transaction with TPG.[888] The failure to destroy information, therefore,

arguably constituted a breach.[889]

The Examiner found it unnecessary to determine, however, whether JPMC's failure to

destroy WMI confidential information in the spring of 2008 constituted a breach of the

Confidentiality Agreement. Even if there was such a breach, there is no evidence that JPMC's

retention of this information caused any harm to WMI given the manner in which it was used.

     d.    <u>Violation of Standstill Provision</u>

The Emergency Economic Stabilization Act of 2008 ("EESA")[890] likely would preclude

a claim against JPMC for violation of the standstill agreement for purchasing the assets of WMB

from the FDIC Receiver.[891] The EESA provides:

---

[887] At some point in September 2008, JPMC changed its focus to a receivership transaction. Rivas interview. Witnesses did not identify the precise date, but Mr. Dimon said that by September 19, 2008, when a Board meeting was held to contrast an FDIC sale of the bank with a private sale of the whole company, JPMC already had determined that it would not purchase the entire company. Dimon Interview.

[888] JPM_EX00003906.

[889] JPMC witness could not recall receiving Mr. Bessey's instruction or whether they destroyed information in response. One WMI document was among those produced by JPMC to the Debtor. JPM_EX 00006878. Mr. Gunselman said that the destruct order was not meant for the core M&A group working on a possible acquisition of WMI. Gunselman Interview.

[890] 12 U.S.C. § 1823(c)(11).

[891] In addition, it is not evident that the purchase of WMB's assets out of receivership violates the agreement given that the FDIC -- after it gained control of WMB -- solicited JPMC's bid. JPMC's acquisition of the WMB's assets

No provision contained in any existing or future standstill, confidentiality, or other agreement that, directly or indirectly -

(A) affects, restricts, or limits the ability of any person to offer to acquire or acquire,

(B) prohibits any person from offering to acquire or acquiring, or

(C) prohibits any person from using any previously disclosed information in connection with any such offer to acquire or acquisition of,

all or part of any insured depository institution, including any liability, assets or interest therein, in connection with any transaction in which the Corporation exercises its authority under section 1821 of this title or this section, shall be enforceable against or impose any liability on such person, as such enforcement or liability shall be contrary to public policy.[892]

The EESA has been found to bar a claim of this kind.[893]

## 2.    Tortious Interference with a Business Expectancy

In order to establish tortious interference with a business expectancy or prospective economic advantage ("tortious interference"), a plaintiff must prove: (1) the existence of a valid business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4)

---

with the invitation of the FDIC is arguably consistent with the requirements of the standstill provision. Moreover, the FDIC Receiver likely has authority to abrogate the Confidentiality Agreement.

[892] 12 U.S.C. § 1823(c)(11).

[893] *See Wachovia Corp. v. Citigroup, Inc.*, 634 F. Supp. 2d 445 (S.D.N.Y. 2009).  In *Wachovia*, the impending implosion of Wachovia Corporation led the FDIC to "facilitate Citigroup's acquisition of Wachovia." *Id.* at 448. Wachovia and Citigroup entered into a non-binding agreement for the acquisition, which included an exclusivity agreement prohibiting Wachovia from soliciting any acquisition proposals from third parties. *Id.* While this agreement was in place, Wells Fargo submitted a bid for Wachovia, which Wachovia accepted.  Citigroup filed suit in state court challenging the transaction as a violation of the exclusivity provision between Citigroup and Wachovia. *Id.* at 449-50.  Wachovia then brought suit in federal court, seeking declaratory judgment that the Wells Fargo transaction was proper. *Id.* Wachovia argued, among other things that Section 1823(c)(11) rendered its exclusivity agreement with Citigroup unenforceable. *Id.* at 450.  The Court agreed, and held that the EESA, by its plain terms, applied retroactively to the exclusivity agreement between Wachovia and the FDIC, and thereby barred Citigroup's claim of breach. *Id.* at 459.

that defendants interfered for an improper purpose or used improper means; and (5) resulting damage.[894]

The first element of a tortious interference claim is the existence of a valid business expectancy. Here, the alleged business expectancy is other bona fide bids for WMI. The Examiner, however, found no evidence of viable alternative whole bank bids.

The Examiner found that WMI and its financial advisors made substantial efforts to find a purchaser in both spring 2008 and September 2008. In March 2008, the only serious whole bank purchaser was JPMC.[895] At that time, WMI settled on a capital infusion from TPG, as opposed to pursuing a sale of the bank.[896]

In September 2008, several entities initially indicated an interest in WMI and engaged in due diligence.[897] By September 21, 2008, however, all the potential bidders had "dropped out" of WMI's data room and were not interested in a market transaction.[898] On September 22, the FDIC contacted entities who had accessed WMI's data room to discuss a possible acquisition out of receivership.[899] When the FDIC bid process concluded on September 24, only JPMC had submitted a conforming bid.

---

[894] See Leingang v. Pierce County Med. Bureau, Inc., 930 P.2d 288, 300 (Wash. 1997); Advanced Global Tech. LLC v. Sirius Satellite Radio, Inc., 836 N.Y.S.2d 807, 809-10 (N.Y. Sup. Ct. 2007) (The required elements for tortious interference with prospective business relations are: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acting with the sole purpose of harming the plaintiff or using wrongful means; and (4) injury to the business relationship.).

[895] Williams Interview.

[896] Id.

[897] Fishman Interview; Mahoney Interview.

[898] Wigand Interview. Fishman also said that by the week of September 22, WMI had no viable bidders. Fishman Interview.

[899] Wigand Interview. Wigand explained that the FDIC did not make cold calls with regard to WMB. The FDIC reached out only to those parties who had been doing due diligence in the WMI data room (WMI provided this information to the FDIC), believing that those entities would be candidates if WMI's process failed and the FDIC needed a buyer. The FDIC stated in these meetings that it did not know when or if such a sale would occur.

The Examiner investigated why there were no other bidders in September 2008. The Examiner determined that, aside from JPMC, the following other banks had the greatest interest in purchasing WMI: Citigroup, Santander, Wells Fargo, and TD Bank.[900] Not one of these potential bidders was willing to acquire WMI or its troubled assets, at least without substantial government assistance:

Citigroup:  Citigroup met with WMI to discuss a potential transaction and engaged in due diligence beginning on approximately September 16, 2008.[901] Based on Citigroup's review of WMI, it concluded that WMI's debt to equity was worth approximately $5 billion, but that future losses were projected to be far greater, making WMI a "risky acquisition."[902] Citigroup estimated that WMB's loan portfolio would have to be written down by over $32 billion and that a transaction would require Citigroup to raise a substantial amount of capital.[903] Citigroup concluded that it would be "massively overpaying even at a price of $1" and did not make an offer to WMI.[904] Indeed, Citigroup remained reluctant to purchase WMB during the FDIC process, deciding that it would acquire WMB only with government assistance.[905] Citigroup submitted a non-conforming bid that hinged on government assistance and therefore was not selected by the FDIC.[906]

Wells Fargo:  Wells Fargo had a very low level of interest because of their already strong branch presence in California.[907] After conducting a preliminary due diligence, Wells Fargo

---

[900] The Blackstone Group considered an equity investment, but not a whole bank purchase.

[901] Interview of Rob Beck, September 15, 2010 ("Beck Interview").

[902] Beck Interview.

[903] CITI_WM00001092; Beck Interview.

[904] CITI_WM00001389.

[905] Beck Interview.

[906] CITI_WM00002066.

[907] Helsel Interview.

determined that a whole-bank transaction was not economically feasible.[908] Wells Fargo did not

submit a bid to the FDIC. It did send a letter to Chairman Bair on September 24, 2008, in which

it explained why it was not submitting a bid and made a proposal for further discussion.[909]

Among other things, Wells Fargo said that potential losses associated with WMB's loan portfolio

were too uncertain and so great that any bid submitted would need to contain a negative premium

or a substantial loss sharing agreement with the FDIC.[910] The letter said Wells Fargo was

willing to discuss a proposal with the FDIC in which Wells Fargo assumed deposit liabilities and

eventually acquired some of WMB's assets, but the FDIC retained all others.[911]

Santander:[912] Santander had a significant interest in acquiring WMI, but after engaging

in due diligence, its management was interested only in a government assisted transaction.[913]

Santander's Board concluded that an acquisition of WMI or WMB even with government

assistance carried too much risk, and refused to bid.[914]

TD Bank: WMI had numerous discussions with TD Bank CEO Ed Clark about a

potential acquisition. However, TD Bank stated that it was not interested in a whole bank

acquisition; rather, it wanted to purchase only certain assets.[915]

The Blackstone Group: Blackstone is a private equity fund that expressed interest in a

potential equity investment in WMI.[916] Given the significant potential losses that it believed to

---

[908] *Id.*

[909] WF-Examiner 16862.

[910] *Id.*

[911] *Id.*

[912] Santander and its interest in acquiring WMI or WMB will be discussed in greater detail below in the Examiner's analysis of antitrust claims.

[913] Sanchez Interview.

[914] Sanchez Interview; Inciarte Interview.

[915] Fishman Interview; Wigand Interview; Interview of Linda Dougerty, October 19, 2010 ("Dougerty Interview").

[916] Chu Interview.

exist in WMB's loan portfolio, the firm was interested only in either a government assisted transaction or a transaction where the debt and trust preferred security holders would exchange their instruments for common stock.[917] Blackstone would not have made an investment otherwise and, in any event, would not have purchased the entire bank.[918]

Given these facts, the Examiner finds that there were no viable alternative bids to JPMC's for WMI (or WMB). Where there is the lack of at least an indication of a solid offer from another potential suitor, there is no business expectancy.[919] In short, there are no facts to support the first element of a tortious interference claim.

Further, even if it could be shown that WMI had a legitimate business expectancy, a successful claim for tortious interference also requires evidence that JPMC was aware of that expectancy and interfered with it, i.e., elements two and three of the tort. As discussed above, there is no evidence that JPMC was aware of, or communicated with, any of the other potential bidders on WMI. Similarly, none of the other potential bidders suggested that JPMC took any action that inhibited their bidding on WMI.[920] Rather, each expressed concern for potential losses imbedded in WMB's loan portfolio and general anxiety about market conditions as the reason for its decision not to bid on or invest in WMI.[921] Accordingly, there are no facts to support the second and third elements of this tort.

---

[917] Id.

[918] Id.

[919] See Vigoda v. DCA Prods. Plus, Inc., 741 N.Y.S.2d 20, 23 (N.Y. App. Div. 2002) ("Tortious interference with prospective economic relations requires an allegation that the plaintiff would have entered into an economic relationship but for the defendant's wrongful conduct."); Sea-Pac Co., Inc. v. United Food & Commercial Workers Local Union 44, 699 P.2d 217, 220 (Wash. 1985) ("The plaintiff must show that the future opportunities and profits are a reasonable expectation and not based on merely wishful thinking.").

[920] Sanchez interview; Chu Interview; Helsel Interview; Beck Interview.

[921] Sanchez interview; Chu Interview; Helsel Interview; Beck Interview.

Without a business expectancy or interference from JPMC, it is unlikely that the Debtor could successfully pursue a tortious interference claim against JPMC.

### 3.  Trade Libel

It has been alleged that JPMC gained access to confidential WMI information and then used that information in a campaign to "bad mouth" WMI to regulators, customers, the media, ratings agencies, and other potential suitors, thereby causing WMI to lose value and ultimately fail.[922]  In essence, the claim is that JPMC disparaged WMI to such an extent that JPMC destroyed WMI.

These allegations, if true, might support a trade libel claim.  The tort of trade libel, also known as injurious falsehood, requires the "knowing publication of false and derogatory facts about the plaintiff's business of a kind calculated to prevent others from dealing with the plaintiff, to its demonstrable detriment."[923]  In addition, plaintiffs are required to prove "special damages" in the form of actual lost dealings, i.e., the party must establish that the publication of the false material was a substantial factor in inducing others not to have business dealings with it.[924]

There are a number of obstacles to the Debtors' pursuit of a trade libel claim against JPMC.  Assuming for purposes of analysis that JPMC made derogatory statements about WMI -- and that point is not established -- it also is necessary to show that the statements that JPMC

---

[922] *See generally*, Compl., Texas Litigation (Mar. 25, 2009), Dkt. No. 1, Attach. 1-3 (the "Texas Litigation").

[923] *Banco Popular N. Am. v. Lieberman*, 905 N.Y.S.2d 82, 85 (N.Y. App. Div. 2010).  Claims for trade libel might also be asserted as a claim of product disparagement.  In order to establish liability for product disparagement, the plaintiff must prove the following: (1) the falsity of the statement; (2) publication of the statement to a third party; (3) malice; and (4) special damages.  *Kitchen v. Sothebys*, No. SC 2259/07, 2008 WL 440422, at *6 (N.Y. City Civ. Ct. Feb 19, 2008).  *See Zango, Inc. v. PC Tools PTY Ltd.*, 494 F. Supp. 2d 1189, 1196 (W.D. Wash. 2007) ("To establish a claim of product disparagement, also known as trade libel, a plaintiff must allege that the defendant published a knowingly false statement harmful to the interests of another and intended such publication to harm the plaintiff's pecuniary interests.").

[924] *Penn Warranty Corp. v. DiGiovanni*, 810 N.Y.S.2d 807, 813 (N.Y. Sup. Ct. 2005).

made about WMI were false.[925]  Among the alleged acts of disparagement are JPMC's

presentations to regulators and rating agencies[926] showing WMI's internal projections of its

losses, and indicating JPMC's view that WMI's losses would be worse than WMI executives

were estimating.[927]  This, in turn, allegedly gave regulators a dim view of WMI, ultimately

prompting them to seize the bank.

There is no indication, however, that JPMC provided false information to regulators or

ratings agencies as that concept is understood for purposes of this tort.[928]  The slide deck shown

to regulators was the same deck that JPMC management presented to its own Board to evaluate a

potential acquisition of WMI -- there is no indication it contained false information.  Indeed,

other bidders who did due diligence independently came to the same conclusion about WMI's

loss projections being in the $30 billion range.[929]  There also is no indication that JPMC falsified

the internal WMI information and projections that it presented.  JPMC obtained this information

from WMI as part of its due diligence process.  Similarly, the information given to ratings

---

[925] As with any claim for defamation, trade libel is defeated by a showing that the published statements are true. *Penn Warranty Corp. v. DiGiovanni*, 810 N.Y.S.2d 807, 813 (N.Y. Sup. Ct. 2005).  Trade libel claims are also subject to a defense that the communication, when viewed in context, "would be perceived by a reasonable person to be nothing more than a matter of [] opinion." *Id.* at 814.

[926] As noted earlier, JPMC met with ratings agencies in late September 2008.  During those meetings, JPMC indicated that it was considering a transaction for WMB out of receivership.  Although there had been rumors in the media regarding the possibility of a receivership scenario, the indication by JPMC that it was discussing such a transaction with the FDIC was considered by Moody's when it downgraded WMI's financial strength and preferred stock rating on September 22 and Fitch when it downgraded WMI's rating on September 24.  Fitch indicated that the possibility of a WaMu receivership was "one factor among many" that led to it downgrading WMB.  Haas Interview.  Moody's indicated that learning of the possibility of receivership "accelerated" the concerns that it already harbored about WaMu.  Emrick Interview.  Thus, arguably JPMC's meetings with rating agencies were "disparaging" and resulted in injury to WMI when its ratings were downgraded.

[927] Polakoff Interview; Ward Interview; Dochow Interview; Wigand Interview.

[928] Mr. Ward said that it is common for investors to paint the bleakest possible picture of their targets in an effort to gain support for the transaction.  Nonetheless, Mr. Ward did not think that JPMC's interpretation of the market or of WMI's projections was inaccurate.  Ward Interview.

[929] Chu Interview; Helsel Interview.

agencies -- the possibility of a receivership transaction for WMB -- was not false.  In sum, there is no indication that JPMC made false statements about WMI.

The Examiner also believes there would be significant difficulty in showing that JPMC acted with malice or intent to injure WMI.  The Examiner finds that JPMC's meetings with regulators and ratings agencies were done for legitimate business purposes.  Witnesses from the regulators said that it would be normal for a third party interested in an acquisition to meet with them in advance to discuss possible implications.[930]  Similarly, the ratings agencies indicated that it would not be uncommon for someone in JPMC's situation to reach out to the agencies to determine what impact an acquisition would have on its ratings.  Consistent with this, JPMC witnesses stated that the purpose of these meetings was to obtain the regulators' and ratings agencies' reaction to a possible transaction and the impact on JPMC before moving too far forward.[931]

In addition to JPMC discussions with regulators and ratings agencies, there also was one incident of a JPMC branch manager in the summer of 2008 telling customers that WMB was going out of business.[932]  There was no evidence to suggest this isolated incident was part of a coordinated or malicious attempt by JPMC to disparage WMI.

The Examiner also did not find evidence that JPMC maliciously placed former JPMC executive vice president, Stephen J. Rotella, or others, as "insiders" at WMI to gather information.[933]  The Examiner found no evidence that Mr. Rotella or any other former JPMC

---

[930] Dochow Interview; Ward Interview; Wigand Interview; Haas Interview; Emrick Interview.

[931] Dimon Interview; Scharf Interview.

[932] JPM_EX00028534 (July 25, 2008 Letter from Bruce Fletcher to Stephen Cutler discussing alleged incident of a Chase branch manager in Brooklyn telling customers to take their money out of WMB).

[933] Mr. Rotella was approached in December 2004 by an executive headhunter representing WMI, and after a series of interviews with executives, including Mr. Killinger, and board members, Mr. Rotella accepted a position with

employee provided JPMC with WMI confidential information or that JPMC obtained internal WMI information outside of the due diligence process.

Finally, the Examiner finds that none of the alleged disparaging acts caused "special damages" as required under a trade libel theory. There are also procedural obstacles to a trade libel theory. [934]

### 4. Other Potential Claims

Based on a review of potential alternative legal theories including RICO, unjust enrichment, etc., none of them avoids the factual and legal problems just discussed for breach of contract, tortious interference and trade libel. All of these theories suffer from the same difficulties, which include, inter alia, a lack of a factual basis for the claims and proof of causation. For that reason, none of them is more likely to succeed than the breach of contract, tortious interference, or trade libel claims.

### E. Investigation of Whether JPMC May Have Violated the Antitrust Laws

The Examiner investigated whether JPMC violated the antitrust laws in light of some evidence suggesting a possible conspiracy to restrain bidding on WMI or WMB. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by

---

WMI in January 2005. Both Mr. Rotella and witnesses, including Messrs. Bessey, Scharf, and Main, deny the allegation that Mr. Rotella was placed as a "mole."

[934] First, harms suffered by WMI as a result of WMB's failure arguably are derivative claims that were transferred to the FDIC upon receivership so that Debtors have no claim. *See Pareto v. FDIC*, 139 F.3d 696, 700 (9th Cir. 1998) (noting that all rights and powers of a stockholder of the bank to bring a derivative action are vested in the FDIC receiver). Second, JPMC could argue that claims related to a bank failure are barred under the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA") unless first raised through the FDIC administrative claims procedure. *See* 12 U.S.C. § 1821(d)(2)(A)(i). Although the Bankruptcy Court already has ruled that the FIRREA jurisdictional bar is not applicable to claims against JPMC concerning assets that are not currently in the Receivership, JPMC since has appealed the court's ruling. *See* July 6 Order Denying Mot. to Dismiss filed by JPMC, *Washington Mutual, Inc. v. JP Morgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW) (Bankr. D. Del.) (the "Adversary Proceeding") (July 6, 2009), Dkt. No. 64 (FIRREA bar does not apply to claims against third parties); *but see* Apr. 13 Memorandum Opinion, the Texas Litigation (Apr. 13, 2010), Dkt. No. 117 ("Plaintiffs cannot circumvent the Act's jurisdictional bar by aiming claims at the assuming bank of the failed bank's assets"). Depending on the outcome of the appeal, FIRREA could present yet another hurdle to claims against JPMC.

reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."[935]

If JPMC conspired with other banks to restrain bidding on WMI in 2008, resulting in a depressed sale price for WMI, the measure of damages arguably would be the difference between what the sale price would have been in a competitive market and the actual sale price. Hypothetically, if it could be shown that another company would have paid $10 billion for WMI in September 2008 in the absence of an antitrust conspiracy, the actual damages to WMI would be at least $10 billion, as WMI received nothing for WMB.[936]  Under Section 4 of the Clayton Act, the trebled damages would amount to approximately $30 billion.  Given that claims of this magnitude could generate substantial recoveries for parties left "out of the money" under the proposed settlement, the Examiner determined that these claims were important to explore in detail.

### 1.    Allegations

Several JPMC documents evidence communications between JPMC and other banks regarding WMI in the 2008, which raises antitrust questions.  One document summarizes a meeting in June 2008 where Santander "asked a number of questions about specific opportunities" in the United States, including WMI.[937]  JPMC and Santander discussed these opportunities "in detail and Jamie [Dimon] reckoned that these are opportunities in which JP Morgan would also be interested."  The email continued that it was important for JPMC "to have an open dialogue with [Santander], as Santander would not pursue any one of these opportunities if JP Morgan were to do the same (can't compete on price with JP Morgan for an acquisition in

---

[935] 15 U.S.C. § 15.

[936] The calculation of damages here would be quite complex given the facts, and the example in the text is simplified and merely used to illustrate a possible range of recovery for antitrust claims.

[937] JPM_EX00004075.

the USA). But Santander would probably hire JP Morgan as advisor if we are not going after them."

Another JPMC document that implicates a possible antitrust claim involves China Construction Bank ("CCB").[938] The document was an internal JPMC email from Olivier de Grivel to Tim Main, John Chrin, and John Simmons, stating: "We are being questioned by Chinese bank (ccb - keep it for yourself) on wamu + cit. They are not asking to advise on anything but want our views…But body language is thinking of investing. Can we engage dialogue with them on these?" Mr. Main responded, "Yes."[939]

The Examiner investigated whether these emails evidenced an agreement either between JPMC and Santander or JPMC and CCB that only JPMC would bid on WMI or WMB. Such agreements could form the basis for antitrust claims.

No specific information suggests that JPMC had discussions with companies other than Santander or CCB about WMI. There has been speculation, however, that the lack of bidding interest from parties other than JPMC demonstrates the existence of a broader conspiracy not to purchase WMI.[940] In light of this speculation, the Examiner investigated whether other possible bidders for WMI also may have conspired with JPMC. Indeed, as a matter of alleging a plausible bid-rigging scheme under the antitrust laws, a conspiracy to suppress the bidding on WMI might only be successful if all of the potential bidders reached a common agreement, not

---

[938] JPM_EX00008571.

[939] *Id.* The Examiner was not able to obtain documents from CCB or arrange interviews of CCB employees. However, the Examiner interviewed Mr. de Grivel about the contents of his email to Mr. Main. In addition, the Examiner obtained supplemental document discovery from JPMC relating to CCB. As discussed in the text, the interview of Mr. de Grivel and the additional documents JPMC produced provided sufficient evidence for the Examiner to conclude that further investigation into the allegations that JPMC conspired with CCB to restrain trade was unnecessary.

[940] Interview of Charles "Chad" Smith, August 20, 2010 ("Smith Interview").

just some smaller group.[941] The other most interested bidders for WMI and WMB included, inter alia, Citigroup, TD Bank, Wells Fargo, Blackstone, and the Carlyle Group.[942]

## 2. Facts

As previously discussed, the Examiner obtained additional documents from JPMC, Santander, and Wells Fargo in connection with an investigation of possible antitrust claims.[943] The Examiner also conducted numerous interviews in which the Examiner explicitly questioned the witnesses about the antitrust allegations.

### a. Investigation into Claims that JPMC Conspired with Banco Santander

The Examiner's investigation into these allegations revealed that Santander and JPMC are not merely competitor commercial banks. Santander is a significant client of JPMC's Investment Bank FIG. As is typical for investment banks, the FIG frequently approaches Santander with potential investment opportunities in the hope that Santander will retain JPMC as an investment advisor. Unless it ran a conflicts check, the FIG would typically not know that a JPMC business segment was interested in the same target that interested a FIG client, such as Santander.[944]

---

[941] *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992) ("If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.").

[942] An agreement between JPMC and one or more other companies not to bid on WMI or WMB likely would violate Section 1 of the Sherman Act, 15 U.S.C. § 1. *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1192 (3d Cir. 1984). The Examiner also considered other theories of potential antitrust liability beyond Section 1, notably Section 2 of the Sherman Act, 15 U.S.C. § 2, which deals with monopolization and attempted monopolization. Given the financial markets at issue here, it is unlikely that JPMC could have monopolized or attempted to monopolize a relevant market in light of market share requirements for such claims.

[943] Citigroup and Blackstone had already produced documents during the Rule 2004 Discovery.

[944] Cerezo Interview; Casanueva Interview. One major example of JPMC investment bank work for Santander occurred in October 2008. JPMC's FIG, led by Fernando Rivas, advised Santander in its acquisition of Sovereign Bancorp, Inc. ("Sovereign"). Lazard and Merrill Lynch also worked for Santander in connection with its acquisition of Sovereign. Santander announced its acquisition of Sovereign on October 13, 2008.

José Cerezo is a client executive in JPMC's investment banking division in Spain. Mr. Cerezo has primary responsibility within JPMC for maintaining a client relationship with Santander.[945] Mr. Cerezo is a former employee of Santander and has numerous contacts within Santander, including Juan Inciarte, Santander's Global Head of Strategy.[946] Through his client relationship with Santander, Mr. Cerezo learned that Santander was interested in potential banking targets in the United States.[947] From time to time, Mr. Cerezo and other FIG employees presented information on potential targets in the United States to Santander. The presentations covered numerous opportunities and generally included publicly available financial data. JPMC's investment bankers often made the same presentation to more than one potential client.[948]

In March 2008, Mr. Cerezo organized a dinner between Mr. Inciarte and Enrique Bombieri, JPMC's head of Invesment Banking for Europe. At that dinner, Mr. Inciarte indicated to Mr. Bombieri that Santander might be interested in retaining the JPMC Investment Bank in connection with acquiring WMI.[949] JPMC's internal conflicts check, however, revealed that JPMC's FIG could not represent Santander because of JPMC's own interest in WMI.[950]

Mr. Main communicated the results of the conflicts check to Mr. Bombieri who, in turn, told Mr. Inciarte that JPMC could not represent Santander.[951] JPMC did not disclose its own

---

[945] Cerezo Interview.

[946] Cerezo Interview; Casanueva Interview.

[947] Cerezo Interview.

[948] Cerezo Interview.

[949] Cerezo Interview. Mr. Inciarte recollected having dinner with Mr. Bombieri, but did not believe he discussed anything concerning WMI. Inciarte Interview. Given the conflicts check activity of JPMC following the dinner, the Examiner concluded that Mr. Inciarte did seek help from JPMC's investment bank on WMI at this time.

[950] Cerezo Interview; JPMCD_000003525.00001.

[951] Cerezo Interview; JPMCD_000003341.00001.

interest in WMI or explain why it could not advise Santander.[952] A document indicates that Mr. Bombieri told Mr. Inciarte "that for reasons that go beyond a direct conflict right now we could not be engaged by [Santander] for WaMu."[953] Mr. Bombieri also asked Mr. Inciarte if Santander "was going to hire somebody else."[954] Based on Mr. Inciarte's response, Mr. Bombieri got "the impression that [Santander] will not [hire someone else] for now."[955]

Although Santander was not able to hire JPMC, it nonetheless signed a confidentiality agreement with WMI on March 28, 2008, that permitted Santander to have access to WMI's data room. No one at Santander recalls doing any due dilligence at that time.[956]

In June 2008, Mr. Dimon attended a one-hour meeting in Spain with three high-level Santander executives: Chairman Botín, Juan Inciarte, and Matías Inciarte, Santander's Third Vice Chairman.[957] Mr. Dimon had known these Santander officials for years.[958] Juan Inciarte indicated that a high-level meeting of this kind was "ambassadorship," part of maintaining good relations between the banks and was done as a courtesy.[959]

Also in attendance for JPMC were Mr. Casanueva and Mr. Cerezo, who later drafted a summary of the meeting indicating that there was a discussion at the meeting of "specific opportunities" in the United States.[960] During the meeting, Santander expressed an interest in

---

[952] JPMCD_000003525.00001; Cerezo Interview; Casanueva Interview. Messrs. Cerezo and Casanueva both said that they were not aware of the nature of the conflict in March 2008 that prevented Santander from hiring JPMC. Therefore, they could not have disclosed JPMC's interest in WMI to Santander.

[953] JPMCD_000003341.00001.

[954] JPMCD_000003341.00001.

[955] JPMCD_000003341.00001. Messrs. Cerezo and Casanueva stated they did not know at the time that JPMC was pursuing a transaction with WMI that prevented the FIG from advising Santander on the same transaction.

[956] Inciarte Interview; Sanchez Interview.

[957] The Examiner interviewed every participant in this meeting with the exception of Mr. Botín and Matías Inciarte.

[958] Inciarte Interview; Dimon Interview.

[959] Inciarte Interview. Mr. Dimon gave a similar description of the meeting as did Mr. Inciarte.

[960] JPM_EX00004075.

WMI. In response, Mr. Dimon "reckoned that these are opportunities in which [JPMC] would also be interested." In his summary of the meeting, Mr. Cerezo stated that "it is important [for JPMC] to have an open dialogue with [Santander], as Santander would not pursue any of these opportunities if [JPMC] were to do the same."[961]

None of the witnesses from the meeting recalled Santander actually saying it would not pursue targets in the United States if JPMC was pursuing the same target.[962] Mr. Cerezo explained his written statement as his general opinion that Santander would be unlikely to compete with a U.S. bank over an acquisition target in the United States because it would be at a competitive disadvantage in such circumstances.[963] Witnesses recollect that Mr. Botín made statements that JPMC and Santander should work together on acquiring certain targets, such as Wachovia.[964] JPMC witnesses stated that they did not treat Mr. Botín's statements as a genuine business proposal; rather, it was viewed merely as an effort by Mr. Botín to encourage conversation and obtain information from JPMC.[965]

The contacts between Santander and JPMC in July 2008 largely related to tension in the client relationship between JPMC's Investment Bank and Santander.[966] Santander was unhappy

---

[961] Id.

[962] Cerezo Interview; Casanueva Interview; Dimon Interview; Inciarte Interview. According to Mr. Juan Inciarte, the two chairmen only discussed general economic matters.

[963] Cerezo Interview. Several witnesses indicated that Santander likely would be at a competitive disadvantage in pursuing opportunities in the United States if in competition with a U.S. bank. Dimon Interview; Inciarte Interview. First, Mr. Inciarte stated that Santander would have more difficulty quantifying risk in the United States as compared to a U.S. bank because of their relative unfamiliarity with the market. Inciarte Interview. Inferior assessment of risk would put them at a competitive disadvantage in any bidding process. Inciarte Interview. Second, Santander would have been unable to consolidate operations of an acquired bank with existing U.S. operations (because Santander had none at the time), so it could not realize cost savings from an acquisition as could a U.S. bank. Dimon Interview; Inciarte Interview.

[964] Dimon Interview. The email summary of the meeting between Mr. Botín and Mr. Dimon stated that Mr. Botín had mentioned "Wachovia" as a target for a joint acquisition by Santander and JPMC. No one recalls Mr. Botín mentioning WMI as a potential joint acquisition with JPMC.

[965] Dimon Interview.

[966] Cerezo Interview; Casanueva Interview.

about an aspect of JPMC's work on Sovereign Bank and JPMC's inability to represent Santander

on certain matters because of conflicts.[967]  Apparently, Santander had a "lingering sensitivity on

Sov[ereign] capital raise [and] sensitivity on [JPMC] conflicts."[968]  Mr. Main wrote of the

conflict: "This has to be solved now" and offered to "elevate immediately using Jamie [Dimon]."

It is in this context that Mr. Cerezo "met and spoke to several senior people" at Santander around

July 15, 2008.[969]  In sum, JPMC's Investment Bank had a client relations issue with Santander

that it wanted to resolve.[970]

Santander and JPMC did not have any contact in September 2008 concerning WMI.[971]

JPMC did not know, other than rumors in the media, that Santander was interested in WMI.[972]

Santander also did not disclose its interest in WMI to any other banks.[973]

Santander had contact with WMI in September 2008.  In mid-September, Alan Fishman

called Santander and said that WMI was looking for a partner.[974]  Santander was not particularly

interested in WMI until Mr. Fishman called.[975]

Santander hired Merrill Lynch and Bank of America as advisors and began to conduct

due diligence.[976]  Santander chose Bank of America because it had recent experience in

---

[967] Cerezo Interview, Casanueva Interview.  Officials at Santander do not recall any specific dispute that may have existed between JPMC and Santander in July 2008.  Inciarte Interview; Sanchez Interview.  At the time, Santander owned approximately 25% of Sovereign with an option to purchase the remaining stake.  JPMC witnesses recalled that there was a dispute about JPMC's advice on how Santander should exercise its option to take control of Sovereign Bank.  Santander eventually announced its purchase of the remaining stake in Sovereign in October 2008.

[968] JPMCD_000003252.00001.  JPMC did not represent Santander as its investment advisor in connection with Santander's original investment in Sovereign Bank in 2006.

[969] JPMCD_000003252.00001.

[970] Cerezo Interview; Casanueva Interview.

[971] Sanchez Interview; Inciarte Interview; Casanueva Interview; Cerezo Interview.

[972] Dimon Interview; Cerezo Interview; Casanueva Interview.

[973] Sanchez Interview.

[974] Sanchez Interview; Fishman Interview.

[975] Inciarte Interview.

evaluating troubled mortgage assets in connection with its acquisition of Countrywide Financial Corporation.[977]  Santander did not approach JPMC about advising it on WMI in September 2008.[978]

After conducting due diligence, Santander had substantial concerns about WMI's assets.[979]  Santander estimated WMB's loan losses at approximately $26 to $32 billion.[980]  Santander management was unwilling to take on these risks outright and considered an acquisition of WMI only if the FDIC would guarantee that Santander's losses would be capped at $26 billion.[981]  Mr. Sanchez indicated that even if the FDIC would have agreed with capping losses at $26 billion, Santander still would have needed to raise $10 billion in capital to support WMI's assets because WMI had no remaining equity.[982]

Juan Inciarte made a presentation to Santander's Board of Directors in Spain on Saturday, September 20, 2008, outlining a government assisted transaction.[983]  The Board of Directors, however, rejected the proposal because of the risks involved with WMI.[984]  In addition to concerns about WMI's assets, Santander also was concerned that the full extent of the United States economic crisis had not yet reached other geographic markets, and Santander wanted to

---

[976] Sanchez Interview.

[977] Id.

[978] Sanchez Interview; Inciarte Interview.

[979] Sanchez Interview; Inciarte Interview.

[980] Sanchez Interview.

[981] Sanchez Interview; Inciarte Interview.  It is not clear why this scenario would have been a "private transaction." In fact, when asked what the price per share would have been under this scenario, Mr. Sanchez stated that it would be $0 per share.

[982] Sanchez Interview.

[983] Sanchez Interview.  At this time, the FDIC had not told Santander that receivership was a possible outcome for WMB. The proposal that Santander was considering was the best proposal that they could come up with to purchase WMI.  Mr. Sanchez also stated that it was not clear at the time whether the FDIC would even support such a proposal.

[984] Inciarte Interview.

have flexibility to deal with problems if they emerged in those markets.[985] Santander communicated its decision to Mr. Fishman on or about September 21, 2008.[986]

The following Monday, September 22, 2008, the FDIC announced to selected potential bidders that a receivership event was possible for WMB.[987] Santander was among potential bidders notified, and Santander met with FDIC officials at Santander's office in New York on the same day.[988] The FDIC stated that the structure of any bids must include the purchase of all of WMB's assets without government assistance.[989] Santander inquired whether the FDIC would accept a non-conforming bid, along the lines of the government assisted transaction Santander had considered.[990] The FDIC indicated that if no entity submitted a conforming bid, then the FDIC would reevaluate the scope of the transaction.[991] The Santander Board of Directors was briefed on the FDIC's proposed structure and reaffirmed their decision not to pursue a transaction.[992]

Santander's decision not to pursue WMI or WMB was also due to its interest in Wachovia, which was at risk of failure around the same time as WMI.[993] Santander viewed Wachovia as a better institutional fit for Santander for at least two reasons. First, Wachovia's toxic assets were confined to Wachovia's acquisition of Golden West Financial and were

---

[985] *Id.*

[986] Inciarte Interview; Fishman Interview.

[987] Sanchez Interview; Dimon Interview; Cavanagh Interview; Helsel Interview; Beck Interview.

[988] Sanchez Interview.

[989] *Id.*

[990] *Id.*

[991] *Id.*

[992] *Id.* Santander did not wish to submit a non-conforming bid that would have potentially been subject to additional rounds of bidding. Santander was also concerned it would merely become a "stalking horse" in this process, which would not be helpful to its business reputation. *Id.*

[993] Sanchez Interview; Inciarte Interview. Mr. Inciarte also had a favorable opinion of Bob Steel, then CEO of Wachovia based on prior interactions when Mr. Inciarte was a Board Member at First Union and Mr. Steel worked for Goldman Sachs.

therefore less troubling to Santander than WMB, where the toxic assets permeated the institution.[994]  Second, Santander was of the view that Wachovia had better mortgage-underwriting practices than WMB.[995]  As a result, Santander believed that Wachovia was a more attractive target than WMI.[996]

        b.      <u>Investigation into Claims that JPMC Conspired with China Construction Bank</u>

The Examiner's Investigation revealed no evidence that JPMC conspired with CCB in violation of the Sherman Act.  Similar to JPMC's relationship with Santander, JPMC's Investment Bank FIG in Asia views CCB as a potential client.[997]  JPMC's FIG has made a number of client presentations to CCB with the aim of obtaining CCB's business.[998]  According to email traffic, in March 2008, CCB's Chairman Shuqing Guo contacted Elaine La Roche regarding a potential investment in WMI.[999]

On March 20, 2008, Ms. La Roche sent an email to Gaby Abdelnour[1000] stating that Chairman Guo had called her to "pick [her] brain on CIT [Financial] and WaMu."[1001]  Ms. La

---

[994] Sanchez Interview.

[995] Sanchez Interview.  Mr. Dimon had a similar view of the underwriting practices of Wachovia as compared to WMB.  Dimon Interview.

[996] The Examiner asked all witnesses familiar with both the WMI and Wachovia situations in September - October 2008 why WMB ended up in receivership, while Wells Fargo purchased Wachovia for $12.5 billion, given the facial similarities between the two banks' situations throughout the course of 2008.  Witnesses questioned on this subject included Wells Fargo, JPMC's FIG (who represented Wells Fargo on Wachovia), Citigroup, and Santander.  All witnesses indicated there were material differences between WMI and Wachovia that fully accounted for the different outcomes.

[997] Interview of Olivier de Grivel, October 7, 2010 ("de Grivel Interview").  CCB has never hired JPMC's Investment Bank as an advisor.  However, CCB does have a relationship with JPMC's Treasury and Securities Services Division and JPMC's Corporate Banking division.

[998] de Grivel Interview.

[999] Elaine La Roche was not a JPMC employee at this time, but was on CCB's Board.  She became Chief Operating Officer of JPMC Asia shortly after the email.  It appears that she may have already accepted the job at JPMC based on the reference to her "pending move" in the email.  de Grivel Interview; *see also* JPMCD_000003220.00001.

[1000] CEO of JPMC Asia.

[1001] JPMCD_000003220.00001.

Roche inquired with Mr. Abdelnour "whether [JPMC had] any involvement on either of these two companies." Mr. Abdelnour sent an email to Mr. de Grivel asking him to "look into [WaMu and CIT Financial]." Mr. de Grivel responded that he would "check with Tim [Main] and conflicts."[1002]

Later on March 20, 2008, Mr. de Grivel sent an email to Mr. Main stating the JPMC "was being questioned by [CCB] on WaMu…They are not asking to advise on anything but want our views…Can we engage in dialogue with them on these?"[1003] Mr. Main responded, "Yes call me live."

Ultimately, Mr. Main indicated to Mr. de Grivel that JPMC could work with CCB, but not on WMI.[1004] Mr. de Grivel, in turn, informed Mr. Abdelnour that WMI was "off-limits and not advisable to discuss it with [CCB] (or any other clien[t]). CIT is very much something we can engage [CCB] on."[1005] Later that week, Mr. de Grivel sent an email to Ms. La Roche stating that it was "difficult for [JPMC] to engage any client [regarding] WaMu[, b]ut would very much like to do so [regarding] CIT."[1006]

The Examiner finds that no one other than Ms. La Roche had direct contact with CCB in March 2008.[1007] As indicated above, JPMC took steps to avoid contact with CCB regarding

---

[1002] JPMCD_000003220.00001; de Grivel Interview.

[1003] JPM_EX00008571.

[1004] JPMCD_000003978.00001.

[1005] JPMCD_000003224.00001.

[1006] JPMCD_000003218.00001. Mr. de Grivel believed that he never spoke with Ms. LaRoche, and communicated with her only through this email. de Grivel Interview.

[1007] de Grivel Interview.

WMI.[1008]   Instead, JPMC immediately began to focus its efforts on obtaining an advisory role for CCB on CIT Financial.[1009]

        c.      Investigation into Claims JPMC Conspired with any Other Banks in Violation of the Sherman Act

The Examiner's Investigation did not find any direct evidence that JPMC conspired with any other bank in violation of the Sherman Act.  Other than the contacts with Santander and CCB, discussed above, there was no evidence that JPMC had any contact with other potential competitors.  Neither JPMC, Wells Fargo, Citigroup, nor Blackstone produced any documents that suggest there was any communication among the banks regarding WMI.[1010]  Additionally, every witness for the respective companies stated that no improper communication occurred with other bidders.[1011]

     **3.**      **Analysis of Antitrust Claims**

        a.      Investigation into Bid-Rigging

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits unreasonable agreements in restraint of trade.[1012]  In other words, § 1 does not restrict unilateral conduct that might restrain trade.  A central question in a § 1 case is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express."[1013]  To that end, the

---

[1008] JPMCD_000003224.00001.

[1009] JPMCD_000003224.00001.

[1010] Blackstone Group is not a bank holding company and would not have acquired WMI or WMB.  Blackstone Group only contemplated a capital investment.  Chu Interview.

[1011] The Examiner learned that an interested party approached Wells Fargo about a potential joint bid for WMI's branch assets in September 2008.  Helsel Interview.  The discussions did not advance beyond a few phone calls for at least two reasons.  First, Wells Fargo did not attribute separate value to WMI's branches based on geography.  Second, Wells Fargo had no interest in WMI in September 2008 other than with government assistance.  *Id.*

[1012] *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984).

[1013] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (citing *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541 (1954)).

Supreme Court recently has held that § 1 "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."[1014]

Most agreements challenged under § 1 are analyzed under the "rule of reason," where the pro-competitive effects of an agreement are balanced against its anticompetitive effects to determine its legality. However, "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."[1015] These kinds of practices are considered per se unlawful. Practices that courts have deemed per se illegal include horizontal division of markets, price fixing, and bid rigging.[1016] The Examiner investigated a possible per se antitrust violation for bid rigging under § 1.

Rarely is there direct evidence of an unlawful antitrust agreement.[1017] Typically, agreement is inferred by parallel conduct and other evidence suggesting an agreement as opposed to independent action.[1018] In *Twombly*, the Supreme Court noted that allegations of illegal agreement based on parallel conduct must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be the result of independent action.[1019] In other words, for a plaintiff to prove that defendants illegally

---

[1014] *Twombly*, 550 U.S. at 556.

[1015] *N. Pac. Ry. v. United States*, 356 U.S. 1 (1958).

[1016] *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990); *see also United States v. Topco Assocs. Inc.*, 405 U.S. 596, 608 (1972); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940); *Fischbach & Moore, Inc.*, 750 F.2d at 1192.

[1017] *Loew's, Inc. v. Cinema Amusements, Inc.*, 210 F.2d 86, 93 (10th Cir. 1954).

[1018] *See In re Ins. Brokerage Antitrust Litig.*, --- F.3d ---, MDL No. 1663, 2010 WL 3211147, at *9-12 (3d Cir. Aug. 16, 2010) (discussing "plus factors" in alleging an agreement in restraint of trade).

[1019] *Twombly*, 550 U.S. at 557.

conspired, the evidence must "tend to exclude the possibility that the alleged conspirators acted independently."[1020]

Here, the suggestion is that because no other party made a viable bid for WMI -- which was arguably a valuable asset -- it must have been the result of an agreement not to bid. This suggestion is both legally and logically flawed.

The Examiner found no evidence that a broad conspiracy to restrain bidding on WMI existed. The Examiner found that JPMC, Santander, Wells Fargo, Citigroup, Blackstone Group, Carlyle Group, and TD Bank all, to some degree, considered purchasing WMI or WMB in 2008.[1021] Each company independently evaluated a potential acquisition of WMI or WMB. Each potential bidder reached its own conclusions about the risk and rewards of pursuing a transaction with WMI or WMB. Each potential bidder concluded that the economics of a whole bank transaction would have been prohibitively expensive. It was only with government assistance, or in a receivership scenario with much of WMI's debt stripped away, that any of

---

[1020] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

[1021] The one exception is Blackstone Group and Carlyle Group. They submitted a joint proposal to the FDIC on September 24, 2008, that would have restructured WMI by converting much of its debt to equity. Chu Interview. The proposal merely suggested a non-binding capital infusion. Additionally, the joint proposal suggested there was as much as one week of negotiations away from a consummation of any transaction. Finally, the proposal was submitted to the FDIC after FDIC had completed the bidding process and notified JPMC it was the winning bidder.

these potential bidders deemed a transaction to be feasible.[1022]  Only JPMC was willing to submit a conforming bid to the FDIC.[1023]

Each company the Examiner investigated had grave concerns about WMB's loan portfolio; indeed, most had substantially similar estimates of WMB's loan-portfolio losses.[1024] Therefore, it is not surprising that other potential bidders all indicated that they would not pursue a transaction for WMI given the substantial risks involved.[1025]  As a legal matter, the fact that bidders other than JPMC independently decided not to bid on WMI or WMB, without more, does not suggest a conspiracy.[1026]

Indeed, the similar bidding position of the three banks that were interested in acquiring WMI -- Citigroup, Wells Fargo, and Santander -- strongly reinforces the conclusion that the conduct is not sufficient to support a conspiracy claim in violation of the Sherman Act.  All three seriously considered acquiring WMI or WMB, but only if the government was willing to cap their potential losses.  The most likely bidders for WMI understood that acquiring most or all of

---

[1022] Citigroup submitted a "non-conforming bid" to the FDIC on September 24, 2008.  CITI-WM 00002066.  The non-conforming bid proposed that the FDIC and Citigroup enter into a loss sharing agreement "on the asset side of the balance sheet."  CITI-WM 0000206.  Citigroup "envision[ed] keeping the Washington Mutual assets in a new stand-alone entity for a substantial period of time (at least 18 months)."  CITI-WM 0000206.  Wells Fargo submitted a similar proposal to the FDIC on September 24, 2008.  WF-Examiner16862.  In Wells Fargo's submission, it proposed that the FDIC assume all assets for a period of up to sixty days while Wells Fargo conducted additional due diligence and decided which assets and liabilities it would acquire.  WF-Examiner16862.  According to Wells Fargo's proposal, all assets it did not acquire would be acquired by the FDIC.  WF-Examiner16862.  Based on the limited due diligence Wells Fargo had done, it estimated that it would acquire assets representing between $50 billion and $100 billion.  WF-Examiner16862.

[1023] Dimon Interview; Beck Interview; Sanchez Interview; Inciarte Interview.  Indeed, JPMC raised over $10 billion in capital on Friday, September 25, 2008, to support WMB's assets without government assistance.  JPMC also contributed some of its own excess capital to cover the remaining capital needed to support WMB's acquired assets.  JPMC had estimated that without a receivership event that stripped away certain debt, it would have needed to raise approximately $34 billion.  Because of the size of the capital needed in a whole bank transaction, JPMC decided it would not purchase WMI as a whole company.  According to James Wigand, of the FDIC, each of the banks that looked at WMI's assets reached a similar decision by September 22, 2008.  Wigand Interview.

[1024] *E.g.,* Inciarte Interview; Sanchez Interview; Beck Interview.

[1025] Helsel Interview; Inciarte Interview; Sanchez Interview; Beck Interview.

[1026] *See Twombly*, 550 U.S. at 556 ("[W]hen allegations of parallel conduct are set out in order to make a §1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.").

WMB's assets -- and essentially assuming and guaranteeing WMB's toxic assets -- was simply too great a risk, particularly given the financial turmoil that existed in September 2008. In short, the lack of other bidders for WMI, and conforming bidders for the WMB assets other than JPMC in September 2008, is completely consistent with independent action and a competitive outcome, as opposed to being the result of an agreement not to bid.

b.    Investigation into Whether JPMC and Santander Restrained Trade

The Examiner found no direct evidence of a bid-rigging agreement between JPMC and Santander.[1027] Lacking direct evidence, an antitrust claim for bid rigging can only lie if an improper agreement can be inferred from other evidence. Here, the only evidence of agreement are the few interactions between JPMC and Santander discussed above and the ultimate fact that Santander did not bid, i.e., conduct consistent with a bid-rigging agreement. This evidence, however, does not support an inference that what occurred was the result of an agreement, as opposed to independent factors and action.[1028]

First, there were legitimate business reasons for interactions between Santander and JPMC. Santander is a client of JPMC's FIG, and, as indicated above, JPMC advised Santander on a number of matters, including Santander's acquisition of Sovereign Bank and several Santander bond offerings.[1029] Thus, the fact that Santander interacted with JPMC, alone, is not suggestive of a conspiracy not to bid on WMI.

Given the relationship between JPMC's Investment Bank and Santander, there also is insufficient evidence to establish that the content of communications between JPMC and

---

[1027] All the participants at the June 2008 meeting between JPMC and Santander were interviewed, except Mr. Botín and Matías Inciarte, and all were questioned on whether there was any agreement between JPMC and Santander about bidding on WMI. All witnesses credibly and emphatically stated that there was no such agreement. No documentary evidence provides direct evidence of agreement.

[1028] See Twombly, 550 U.S. at 557.

[1029] Inciarte Interview.

Santander regarding WMI were inappropriate. When Santander approached JPMC in March 2008 about retaining JPMC to advise on an acquisition of WMI, JPMC did not communicate its own interest in WMI to Santander.[1030] In fact, JPMC concealed its interest in WMI -- keeping the information from JPMC's investment bankers in Spain.[1031] In September 2008, Santander had no contact with JPMC on a potential WMI or WMB transaction. Instead, Santander hired Bank of America to evaluate a potential transaction with WMI. Nothing here suggests agreement.

Moreover, Santander seriously considered bidding on WMI and WMB in September 2008. Santander conducted extensive due diligence and had communications with both WMI and the FDIC about a possible acquisition. Santander management presented to its Board a possible acquisition of WMB with government assistance. The Board ultimately declined to bid on either WMI or WMB because it believed they presented excessive risks in light of the possible benefit to Santander.[1032] All of this activity is inconsistent with a preceding agreement not to bid on WMI or WMB.

A conspiracy between only Santander and JPMC also is not plausible. Without the inclusion of other potential bidders in the conspiracy, there is little reason to believe that an agreement only between Santander and JPMC would be successful. If WMI or WMB was an attractive target, other potential bidders not party to the agreement could still jump in, bid, and

---

[1030] Cerezo Interview; Casanueva Interview. Mr. Inciarte does not recall discussing WMI with JPMC in March 2008.

[1031] JPMCD_000003525.00001.

[1032] Inciarte Interview.

thereby defeat any arrangement between JPMC and Santander.[1033] And indicated above, there is little here to suggest a broader bid-rigging conspiracy.

Finally, JPMC's final bid to the FDIC reflected a lack of knowledge of the intentions of other potential bidders, including Santander.[1034] According to JPMC witnesses, JPMC determined that it was willing to pay approximately $1.5 billion dollars for WMB in a receivership transaction.[1035] JPMC, however, was concerned there would be other bidders for WMB.[1036] Believing that another bidder might strategically bid $1.51 billion, JPMC decided to bid in the $1.6 billion range.[1037] Later, JPMC determined that it would bid $1.888 billion, as JPMC viewed the difference between $1.6 billion and $1.8 billion as immaterial.[1038] The strategic nature and amount of JPMC's bid makes no sense if it had an agreement in place with others not to bid.

      c.    <ins>Investigation into Whether JPMC and Santander Engaged in a Facilitating Practice</ins>

The Examiner investigated the possibility that the legitimate business relationship between JPMC's Investment Bank and Santander was used to signal bidding intentions to each other concerning WMI. Such a practice could be a facilitating practice for bid rigging.[1039]

---

[1033] *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1074 (2d Cir. 1988) ("[B]y its nature, a bid-rigging enterprise normally requires a significant number of participants. In order to predetermine who will win a given auction it is desirable to coopt virtually all companies that are thought likely to submit . . . bids.").

[1034] A claim for conspiracy to restrain the bidding in the receivership would likely belong to WMB, or the FDIC as receiver, and not the Debtors. As detailed above, the behavior of the parties in not pursuing a transaction to purchase the holding company is consistent with independent economic behavior. The behavior of the parties in the potential receivership transaction only confirms that it was unlikely the parties agreed not to bid on WMI.

[1035] Dimon Interview; Scharf Interview; Cavanagh Interview.

[1036] Dimon Interview; Scharf Interview; Cavanagh Interview.

[1037] Scharf Interview.

[1038] Dimon Interview; Scharf Interview; Cavanagh Interview.

[1039] 6 Areeda & Hovenkamp ¶ 1407b, at 29-30 (2d).

Under certain circumstances, an agreement to engage in a facilitating practice can be unlawful.[1040]

In *Champion International*, rival logging companies had competed vigorously in bidding for timber-cutting rights.[1041] The bidding war suddenly stopped, however, when one defendant was the only company to bid at a particular auction. That defendant decided to "experiment" by not participating in another auction later that day on another parcel in which a rival was interested.[1042] Following the experiment, a new bidding pattern emerged where the defendants selectively bid on various parcels of land. The defendants eventually began meeting with each other to discuss which tracts of land would be of the highest interest to each defendant. The court found that the exchange of information regarding the auctions in which each defendant was interested amounted to an agreement on bidding in violation of § 1.[1043]

Here, however, there is no evidence that Santander and JPMC used their legitimate client relationship to signal bidding intentions with respect to potential target acquisitions. The discussions regarding WMI were confined to Santander's attempt to hire JPMC as its advisor on a WMI transaction in March 2008. Santander did not contact JPMC in September 2008 regarding WMI. Instead, Santander hired another advisor without signaling to JPMC its interest in WMI. In sum, the Examiner concludes that JPMC and Santander did not use their legitimate business relationship to signal intentions on bidding on WMI.[1044]

---

[1040] *United States v. Champion Int'l Corp.*, 557 F.2d 1270, 1273 (9th Cir. 1977).

[1041] *Champion Int'l*, 557 F.2d at 1273.

[1042] *Id.*

[1043] *Id.* The district court considered the new bidding pattern that initially emerged as legal, unilateral action. *United States v. Champion Int'l Corp.*, No. 74-183, 1975 WL 920, at *2 (D. Or. July 16, 1975). However, the meetings and exchange of information that occurred to maintain the new bidding pattern constituted sufficient evidence of an antitrust conspiracy. *Id.*

[1044] The Examiner also found no evidence of an agreement between JPMC and CCB to engage in a bid-rigging conspiracy. CCB was a potential client of JPMC's Investment Bank in Asia. CCB made an initial inquiry into

### 4. Conclusions

The Examiner cannot currently assign any value to the potential antitrust claims. It should be noted, however, that the releases in the Settlement Agreement only cover JPMC. If new evidence comes to light to support a bid-rigging claim, the release would not preclude the Debtors from bringing antitrust claims against any other entity for conspiring with JPMC. The Debtors may seek recovery under the antitrust laws for the alleged bid rigging against any co-conspirator for the full amount, without any right to contribution.[1045]

## XI. EXAMINATION ISSUES INVOLVING FDIC AND OTS

### A. Introduction

The Examiner investigated the legal and factual basis of potential claims that the Debtors may have against the FDIC that will be released upon plan confirmation. The Examiner investigated contacts and dealings among the FDIC, OTS, and WMB leading up to the seizure of WMB. The Examiner also considered the roles played by the FDIC and OTS in their dealings with JPMC and other potential purchasers of WMB. The Examiner reports herein on the following three groups of potential claims:[1046]

---

whether JPMC could advise it on a potential investment into WMI around March 2008. JPMC responded that it could not advise CCB regarding WMI. The Examiner did not find evidence of any other contact between JPMC and CCB regarding WMI.

[1045] *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) (holding that "joint and several liability simply ensures that the plaintiffs will be able to recover the full amount of damages from some, if not all, participants"). If JPMC did conspire with Santander or any other bank to suppress the bidding on WMI, the settlement of all claims against JPMC would not eliminate the Estates' ability to pursue a claim against third parties for the entire amount of damages.

[1046] The Examiner considered other possible claims raised by interested parties or suggested by the facts, but does not believe that any claims other than those described herein warrant reporting. For example, the Examiner considered whether the Debtors could now assert a claim against OTS alleging that it improperly closed the bank. As explained in the Solvency Section of this Report, the Examiner concludes that the Debtors could not assert this claim because it is time-barred. The Debtors were required to assert this claim within 30 days of the bank's closure. After careful consideration, the Debtors chose not to assert this claim because of, among other reasons, the limited relief available under such a claim and the difficulty of proving that OTS acted in an arbitrary and capricious manner. The Examiner also considered whether the Debtors could assert a claim against OTS for tortious interference with business expectancy because of the OTS's alleged premature closure of the bank. The Examiner concludes that this claim would suffer from the same legal impediments as similar allegations against the FDIC.

1. The FDIC breached statutory or fiduciary duties as Receiver by selling WMB for less than possible;

2. The FDIC breached statutory or fiduciary duties by conducting an unfair bidding process in conjunction with the seizure and sale of WMB; and

3. The FDIC tortiously interfered with WMI's business expectancy by prematurely disclosing to JPMC and other third parties the intended seizure of WMB.

The Examiner also investigated the substantial legal defenses asserted by the FDIC to all potential claims.

In sum, with respect to the first two groups of claims, the Examiner concludes that, even accepting as true the allegations that have been leveled against FDIC and JPMC either in pleadings or as questions parties have raised in conversations with the Examiner, it is highly unlikely that the Debtors could state a legally-cognizable claim against FDIC or defeat FDIC's substantial legal defenses. With respect to the third claim -- tortious interference -- the Examiner concludes that, based on the facts that the Examiner has established in his Investigation, it is highly unlikely that the Debtors could establish a prima facie case. In addition, the Examiner concludes that it is highly unlikely that the Debtors could defeat the FDIC's substantial legal defenses to a tortious interference claim.

The Examiner notes that some of his requests for information from the FDIC were met with aggressive assertions by the FDIC that it was immune from significant discovery. Because of legal impediments to any potential claim against the FDIC, the Examiner concludes that uninhibited discovery from FDIC would not alter his analysis or change his ultimate conclusions. In short, the FDIC's failure to produce additional documents or witnesses did not impair the integrity of the Examiner's Investigation.

Below, the Examiner first summarizes the scope of his factual investigation pertaining to the FDIC and OTS. The Examiner next discusses the results of his factual investigation of the actions of the FDIC and the OTS in connection with the seizure and sale of WMB. The

Examiner then discusses his conclusions regarding the legal and factual basis of potential claims that the Debtors may have against the FDIC, including the FDIC's substantial legal defenses. Finally, the Examiner summarizes his conclusions.

## B.    Scope of Examiner's Investigation

### 1.    Documents

The Examiner reviewed the documents that OTS produced to the Debtors. OTS produced hundreds of pages of documents to the Debtors, including the documents that OTS designated as the "administrative record," concerning its decision to seize WMB. FDIC had not produced documents to the Debtors.

Both the FDIC and OTS produced millions of pages of documents to Congress in connection with investigations by the Senate Permanent Subcommittee on Investigations ("PSI") into WMB's failure. Most of these documents were not publicly available. Given the limited number of documents available publicly, the Examiner requested that OTS and the FDIC produce to the Examiner some additional documents from those that had been supplied to Congress.

In addition to obtaining and reviewing documents from OTS and the FDIC, the Examiner reviewed pleadings and memoranda of law from the pending litigation, which described in detail the substantial legal defenses to potential claims that have been or could be asserted against the FDIC. The Examiner considered various submissions from the FDIC, the Debtors, and other interested parties regarding their views of the issues. The Examiner reviewed the report of the Offices of Inspector General for Treasury and the FDIC ("OIG"), which examined the cause of WMB's failure and both OTS and FDIC's supervision of WMB. The Examiner also reviewed the transcripts and exhibits of the April 13, 2008 and April 16, 2008 hearings of the PSI, which

investigated the role of high risk home loans in the financial crisis and the role of bank regulators, using WMB as a case history.[1047]

OTS was very cooperative and helpful in response to the Examiner's requests. The Examiner asked OTS to search for and produce documents reflecting communications between OTS and potential third-party suitors of WMB in 2008. OTS did so, and produced additional documents that were helpful to the Examiner's understanding of events.

The process of obtaining information from the FDIC has been slow and difficult. In his first meeting with counsel for the FDIC on August 2, 2010, the Examiner discussed with the FDIC whether it would be willing to produce documents concerning WMB. FDIC's position was that discovery is unwarranted because no set of facts could support a legally cognizable claim against the FDIC. In that and subsequent meetings, the FDIC made clear that attempts to compel discovery could be met with certain obstacles including time-consuming, multi-step regulatory procedures, which could effectively delay any discovery beyond the time limits of the Examination. In other discussions, the FDIC noted that, if a subpoena was served, it could move to quash, either in the Bankruptcy Court or the DC Court, any effort by the Examiner to seek broad-ranging discovery. In particular, the FDIC sought to protect internal deliberations.

In response to the FDIC's stated position, the Examiner stated that he would not abandon a factual investigation of the FDIC on the assumption that the FDIC's legal defenses and immunities from suit barred potential claims. Given the time constraints imposed on the Examination, and after the FDIC made clear that it would litigate to protect its ability to keep internal deliberations secret, the Examiner agreed that he would not seek internal documents for the FDIC that are protected from disclosure by the deliberative process privilege.

---

[1047] The OIG is also examining the FDIC's resolution process for WMB, but states that the results of that portion of its investigation will not be issued until ongoing litigation is complete.

The Examiner negotiated with FDIC a set of key documents that the FDIC agreed consensually to produce. On or about August 18, 2008, the FDIC agreed to produce communications from September 2008 between the FDIC and potential third-party WMB suitors (including JPMC) regarding the closing and sale of WMB and the P&A Agreement.

Although the FDIC agreed in early and mid-August 2010 to produce documents, the FDIC did not produce any documents until September 15, 2010, following protracted negotiations over confidentiality. On that day, FDIC produced 47,000 pages relating to the Settlement Agreement. On September 21, 2010, the FDIC produced 1,209 mostly irrelevant pages of third-party communications, including emails forwarding news articles about WMB and multiple copies of the OTS order appointing FDIC as receiver. On September 21, 2010, FDIC also produced 7,510 additional pages of documents relating to the Settlement Agreement. Finally, after additional searches and numerous discussions, the FDIC produced additional documents concerning third-party communications on October 12, 20, and 21, 2010. The productions by the FDIC of communications with third parties were incomplete in that they did not include documents the Examiner had obtained from other sources. In total, FDIC produced to the Examiner approximately 57,500 pages of documents, approximately 3,500 of which are September 2008 third-party communications concerning the sale of WMB.[1048]

## 2. Witness Interviews

OTS was very cooperative in arranging interviews of every current and former OTS employee that the Examiner requested, in nearly every case without any restriction on the interview's duration. The Examiner interviewed Scott Polakoff, former Senior Deputy Director and COO of the OTS; Timothy Ward, former Deputy Director in Charge of Examinations,

---

[1048] Many of the September 2008 third-party communications are multiple identical copies of the same documents.

Supervision, and Consumer Protection; Darrel Dochow, former Director of the OTS West Region; and Michael Solomon, former Director of Capital Policy.

The Examiner initially requested five interviews of FDIC employees.[1049] The FDIC allowed the Examiner to interview two: James Wigand, the Deputy Director of the Franchise and Asset Marketing Branch of the FDIC's Division of Resolutions and Receiverships, and Chris Spoth, Senior Deputy Director of Supervisory Examinations. FDIC claimed Messrs. Wigand and Spoth could adequately address all of the Examiner's questions. FDIC placed time constraints on both interviews because of the schedules of the interviewees. FDIC refused the Examiner's requests to interview FDIC Chairman Sheila Bair, David Gearin, and Richard Peyster.

Both FDIC witnesses provided helpful information and appeared credible. Nevertheless, Messrs. Wigand and Spoth lacked personal knowledge regarding whether certain meetings or calls with potential WMB suitors, including JPMC, took place. After the interviews of Messrs. Wigand and Spoth, the Examiner again requested interviews of Chairman Bair and others and had further discussions with the FDIC. Those requests were denied. On October 5, 2010, the Examiner sent the FDIC a list of written questions. On October 20, 2010, FDIC provided a letter answering some of the Examiner's questions, but the letter was not fully responsive to all the questions posed. In sum, the FDIC has refused to make fully transparent some of its dealings with JPMC and others.

## C.    Factual Overview from the Regulator's Perspective

---

[1049] The Examiner independently arranged and took the interview of Michael Bradfield, former FDIC General Counsel from May 2009 until August 2010.

1. **WMB's Regulators**

OTS formerly served as the primary regulator of federal savings associations, or federal thrifts, including WMB. OTS monitored WMB's capital and liquidity levels, oversaw its compliance with consumer protection laws, and conducted annual examinations to evaluate the safety and soundness of the bank. OTS was responsible for determining when WMB was no longer viable and whether to close the bank.

As the deposit insurer of financial institutions, the FDIC maintains, manages, and controls risks to the deposit insurance fund and the United States financial system. The FDIC also serves as a secondary, or back-up, regulator to certain banks and thrifts, including WMB. In its capacity as a receiver of a failed institution, the FDIC has statutorily-mandated roles and responsibilities in administering the assets and liabilities of the failed institution that are similar to those of a bankruptcy trustee.

2. **Spring 2008**

In the first quarter of 2008, WMB suffered deteriorating asset quality and losses.[1050] As the value of WMB's mortgage portfolio, the general economy, and real estate values continued to decline, WMB's Board of Directors and OTS determined that the bank needed to raise capital.[1051] On or around March 5, 2008, the board engaged Lehman Brothers and Goldman Sachs primarily to obtain capital investment, but also to explore the option of selling the entire company.[1052]

---

[1050] Interview of Timothy Ward, September 10, 2010 ("Ward Interview").

[1051] Interview of John Robinson, August 30, 2010 ("Robinson Interview"); Interview of Darrel Dochow, September 1, 2010 ("Dochow Interview").

[1052] Interview of Kerry Killinger, August 30, 2010 ("Killinger Interview").

a.    WMI Capital Raise

Although OTS traditionally took a hands-off approach to capital raising efforts by its regulated entities, Mr. Ward and Mr. Polakoff felt that some of the capital raises among OTS-regulated institutions were not sufficiently aggressive in light of the deteriorating economy and declining home values.[1053] OTS therefore took a more active role in spring 2008, requiring increased status reporting by WMB of the steps being taken to raise capital and the potential investors being contacted.[1054] Additionally, OTS regulators had the perception that WMB wanted to maintain its independence as an entity, so OTS ensured that WMB was taking steps to raise an appropriate amount of capital without discouraging interest by prospective strategic buyers.[1055]

OTS encouraged WMB to raise a substantial amount of capital and provided WMB with names of suggested potential investors and acquirers.[1056] It did not help the bank in the actual process of the capital raise.[1057] Internally, OTS had concluded that WMB needed to raise at least $5 billion.[1058] OTS told the WMB Board of Directors to look at all the offers submitted, whether for capital investment or for a merger transaction, and make the best decision for the bank.[1059] OTS witnesses recounted, however, that the FDIC wanted WMB to pursue a merger transaction.[1060]

---

[1053] Ward Interview.

[1054] *Id.*

[1055] Dochow Interview.

[1056] Ward Interview.

[1057] Dochow Interview.

[1058] Ward Interview.

[1059] *Id.*

[1060] *Id.*; Dochow Interview.

b.    JPMC Meetings with Regulators

One of the institutions that considered the acquisition of WMI was JPMC. On March 28, 2008, H. Rodgin Cohen, JPMC outside counsel, Charles Scharf, JPMC CEO of Retail Financial Services, and Mike Cavanagh, CFO of JPMC, met with Chairman Bair, Mr. Wigand, Mr. Spoth, Mike Krimminger, and Jason Cave of the FDIC, and discussed WMI.[1061] JPMC witnesses who recalled the meeting described it as "routine" and for the purpose of discussing the effect of a potential acquisition of WMI on JPMC.[1062] JPMC provided FDIC with a slide deck containing information about WMB's financial condition.[1063] According to Mr. Wigand, the meeting was a "beef session" for JPMC in which JPMC expressed its frustration with WMI's apparent lack of receptiveness to JPMC's overtures.[1064] JPMC complained that WMI was only meaningfully considering a capital raise, rather than a merger. JPMC expressed its view that the capital raise would be inadequate to resolve WMB's financial issues.[1065] The FDIC listened to JPMC's complaints but provided no comment. The parties did not discuss the potential sale of WMB out of receivership or the regulators' view of WMB's financial condition.[1066]

---

[1061] JPMCD_00004589.0001, at JPMCD_00004589.0003; Dochow Interview; Interview of James Wigand, September 22, 2010 ("Wigand Interview"). Mr. Scharf generally recalled discussing the potential WMI transaction with regulators, but did not remember any specific meeting or whether a presentation desk was given to the FDIC. Interview of Charles Scharf, September 16, 2010 ("Scharf Interview"). Mr. Scharf stated that JPMC would always discuss a potential transaction with regulators to get the regulators' reactions. Mr. Cavanagh recalled that the purpose of the meeting with the FDIC was for JPMC to present the potential WMI acquisition to the regulators, but he does not recall JPMC showing the regulators a slide deck. Interview of Mike Cavanagh, September 22, 2010 ("Cavanagh Interview"). The FDIC confirmed this meeting occurred in a letter from Thomas R. Califano and John J. Clarke, Jr., outside counsel for the FDIC in its capacity as receiver for WMB and in its corporate capacity, to Joshua R. Hochberg, Examiner, at p. 11 n.9 (Oct. 20, 2010) ("FDIC Letter" or "FDIC Submission").

[1062] Cavanagh Interview.

[1063] Wigand Interview; JPM_EX00022845.

[1064] Wigand Interview.

[1065] *Id.* In Mr. Wigand's opinion, JPMC was trying to get regulators to apply pressure to WMI to accept an offer from JPMC.

[1066] *Id.*

At some point in late March, John Reich, Director of OTS, discovered that JPMC had made presentations about WMB's financial condition to the Treasury and the FDIC.[1067] It was not unusual for a suitor interested in acquiring a bank to meet with the suitor's regulators regarding the deal, but it was unusual, in OTS's view, not to also meet with the target bank's primary regulator as a courtesy.[1068] Mr. Reich wanted to know why JPMC had not made a presentation to OTS.[1069]

Mr. Reich told Mr. Killinger about the March 28, 2008 JPMC presentations.[1070] In response, Mr. Killinger called Mr. Dimon and accused Mr. Dimon of maligning WMB to regulators. Mr. Dimon denied that JPMC was saying anything improper to the regulators.[1071]

Either JPMC or one of the other agencies eventually provided OTS with the slide deck that JPMC used at its meeting with FDIC.[1072] OTS met with JPMC to discuss the presentation.[1073] OTS believed that the slide deck contained mainly publicly-available market data, and was compiled in a way to emphasize that WMB had underestimated its potential

---

[1067] Ward Interview; Dochow Interview.

[1068] Ward Interview.

[1069] *Id.* Although Mr. Ward did not find JPMC's presentation unusual, Darrel Dochow, OTS Regional Director of the West Region, stated that it was unusual for an interested third party to give presentations to agencies and regulators regarding an acquisition target. Dochow Interview. Kerry Killinger, CEO of WMI, agreed that it was uncommon for a financial entity to make presentations to regulators regarding another financial institution. Killinger Interview. Mr. Scharf, however, maintained that JPMC would not have considered a transaction with WMI without consulting with regulators. Scharf Interview.

[1070] Killinger Interview.

[1071] *Id.*

[1072] Ward Interview; Dochow Interview. The FDIC did not produce to the Examiner the slide deck that JPMC presented at their meeting, and JPMC witnesses generally did not recall which slide deck, if any, was presented to the regulators. Interview of Brian Bessey, August 25, 2010 ("Bessey Interview"); Scharf Interview; Cavanagh Interview. Because the slide deck produced by OTS is identical to that produced by JPMC, however, the Examiner concludes that it is highly likely that FDIC received the same March 28, 2008 slide deck as the one produced by OTS and JPMC.

[1073] Ward Interview; Dochow Interview.

losses.[1074] OTS believed that JPMC made the presentation to lay the groundwork for JPMC's argument that OTS should be looking at WMB's financial condition more closely and to make the case that JPMC was the only company with the ability to acquire WMI.[1075]

Messrs. Ward and Polakoff later had several conference calls with Messrs. Cohen and Scharf in which JPMC updated OTS on the status of the due diligence and progress regarding a potential transaction.[1076] JPMC initiated these calls, and Mr. Ward believes that JPMC was again trying to persuade OTS to look more favorably on JPMC's overtures to WMI.[1077]

The FDIC also contacted Mr. Reich or Mr. Polakoff at some point during this time period to complain that WMI was not cooperating with JPMC in negotiating a deal.[1078] In response to those complaints, Messrs. Reich and Dochow called Mr. Killinger to remind him that he needed to cooperate with potential buyers.[1079]

c. TPG's Offer

On April 8, WMI accepted the TPG-led $7 billion capital investment. Prior to the capital raise, OTS believed that a $5 billion capitalization would be a sufficient buffer against WMB's potential losses, so the agency was pleased with the $7 billion capital raise.[1080] Mr. Ward was surprised that JPMC did not try harder to convince WMI's Board of Directors that it should sell

---

[1074] OTS-WMI-BKRCY-00001016; Ward Interview; Interview of Scott Polakoff, August 27, 2010 ("Polakoff Interview"); Dochow Interview.

[1075] Ward Interview; Polakoff Interview; Dochow Interview.

[1076] Ward Interview.

[1077] Id.

[1078] Dochow Interview.

[1079] Id. Mr. Dochow was under the impression, however, that JPMC was asking for competitive information from WMI that JPMC did not need for due diligence, which troubled WMI. Dochow Interview. According to Mr. Dimon, JPMC believed that the due diligence available in March was limited and wanted additional information so it could properly value WMB assets. Interview of Jamie Dimon, September 14, 2010 ("Dimon Interview").

[1080] Ward Interview.

the company.[1081] Mr. Ward suspected that JPMC was undecided whether it really wanted to purchase WMI, so JPMC bid low and hoped the bank felt enough pressure to take the offer.

Throughout the capital raise, the FDIC had indicated its preference for a merger between WMI and JPMC.[1082]

### 3. Summer 2008

During the summer of 2008, OTS monitored WMB via the OTS's ongoing examination process.[1083] The bank's condition continued to deteriorate and market conditions worsened.[1084] Friction between OTS and the FDIC also increased over the summer of 2008 because the FDIC viewed WMB's condition as more dire than OTS did.[1085] IndyMac failed on July 11, 2008, sparking a run on WMB deposits. Because the FDIC was not prepared for additional outflow from its insurance fund after the failure of IndyMac, the strain between OTS and the FDIC was compounded by the FDIC's fear that WMB's failure would bankrupt its fund.[1086]

At some point during the summer, FDIC regulators discussed their concern that the WMB capital raise had been inadequate and their doubts about WMB's long-term viability.[1087] The FDIC believed that WMB needed to raise at least another $5 billion in capital, over and above the capital raised from the TPG-led group.[1088]

---

[1081] Id.

[1082] Ward Interview; Dochow Interview.

[1083] Ward Interview.

[1084] Id.

[1085] Dochow Interview.

[1086] Offices of Inspector General of the Department of the Treasury and the FDIC, Evaluation of Federal Regulatory Oversight of Washington Mutual Bank, Rep. No. EVAL-10-002 at 47 (Apr. 2010) ("OIG Report"); Dochow Interview.

[1087] Wigand Interview. Mr. Wigand recalled that the conversations regarding WMB's long-term viability either occurred amongst FDIC regulators or at monthly intra-agency problem bank meetings. Id.

[1088] OIG Report at 48; Ex. 59 to Permanent Subcommittee on Investigations April 16, 2010 Hearing.

a.     Disputes Between Regulatory Agencies

Regulatory tensions erupted at a July 31, 2008 meeting among Mr. Killinger, various

other WMB executives, and OTS and FDIC regulators, including Mr. Ward, Mr. Reich,

Chairman Bair, Sandra Thompson, and John Corston.[1089] At the meeting, WMB officers

presented the regulators with the bank's June financial statements.[1090] During the presentation,

Ms. Thompson voiced her concern with WMB capital levels, and Mr. Corston questioned

outright the validity of the information in the presentation.[1091] Mr. Corston also stated that WMI

needed to sell itself. Mr. Reich ended the meeting abruptly.[1092]

After the meeting, Mr. Reich sent an email to Mr. Killinger stating that the FDIC's

behavior was totally inappropriate and reiterating that OTS was comfortable with WMB's

financial condition.[1093]

Sometime after the July 31, 2008 meeting, Art Murton, Director of the FDIC Division of

Insurance and Research, suggested to Mr. Polakoff that Mr. Polakoff begin making discrete

inquiries to third parties about acquiring WMB on a whole bank basis from receivership should

the bank fail.[1094] According to Mr. Polakoff, FDIC has a responsibility at some point to start

identifying entities that might be interested in acquiring a bank should it be put into receivership.

Mr. Polakoff added that the primary regulator is not responsible for making such inquiries. Mr.

Polakoff does not recall the FDIC suggesting any specific targets that he contact or whether the

---

[1089] Ward Interview; Ex. 1j to Permanent Subcommittee on Investigations April 16, 2010 Hearing; Exhibit 64 to Permanent Subcommittee on Investigations April 16, 2010 Hearing.

[1090] Ward Interview.

[1091] *Id.*

[1092] *Id.*; Polakoff Interview.

[1093] Killinger Interview.

[1094] Polakoff Interview.

FDIC actually began making inquiries.[1095]  Mr. Reich was emphatically opposed to the FDIC

initiating those conversations.[1096]  He was concerned that discussion of even the possibility of

receivership would undermine WMB's ability to sell itself.[1097]

On August 6, 2008, Chairman Bair and Mr. Reich exchanged emails regarding

"contingency planning" for the possible failure of WMB and Mr. Murton's discussion with Mr.

Polakoff regarding "discrete inquiries" to third parties about an acquisition in the event of

WMB's failure.[1098]  Mr. Reich strongly opposed the possible implementation of any

"contingency planning" and stated that the actions that the FDIC was considering were likely to

cause WMB "irreparable harm."[1099]

### b.  JPMC Meetings with Regulators

The FDIC met again with JPMC sometime in the summer of 2008.[1100]  Chris Spoth, the

Senior Deputy Director of the Supervisory Examinations Branch of the FDIC's Division of

Supervision and Consumer Protection, described the meeting as a courtesy call from JPMC to

check in with regulators.[1101]  It took place in the office of Chairman Bair.  Mr. Spoth does not

---

[1095] *Id.*  Mr. Ward does not think that the FDIC was making third party inquiries in August because the "sequencing" would have been "wrong."  Ward Interview.  Similarly, Mr. Dochow would have questioned any third-party inquiries made in August 2008 because WMB still had a CAMELS rating of "3" and the deposit outflows suffered after the failure of IndyMac had been controlled.  Dochow Interview.

[1096] Polakoff Interview.

[1097] *Id.*

[1098] Ex. 66 to Permanent Subcommittee on Investigations April 16, 2010 Hearing.  The "contingency planning" referred to in the August 6, 2008 emails refers to measures FDIC would take after being contacted by the OTS about a bank on the brink of failure.  Ward Interview.  Typically, after being contacted by the primary regulator, the FDIC implements an expedited bidding process and reaches out to third parties to gauge interest in a transaction.  *Id.*  According to Mr. Ward, however, once the FDIC contacts potential acquiring banks, any interest those entities had in a market transaction with the troubled bank ends.  Mr. Wigand, on the other hand, stated his view that it is an "urban legend" that potential suitors lose interest in a market transaction once the government begins the auction process for an assisted transaction.  Wigand Interview.  In his experience, many suitors prefer an open-market transaction, in which the parties have more control and the ability to negotiate, over an FDIC auction.

[1099] Ex. 66 to Permanent Subcommittee on Investigations April 16, 2010 Hearing.

[1100] Interview of Chris Spoth, September 27, 2010 ("Spoth Interview").

[1101] *Id.*

recall whether the subject of WMB arose. Mr. Spoth does not recall who was present from either the FDIC or JPMC, but he believes that he attended the meeting.[1102]

### 4.    September 2008

#### a.    WMB's Deteriorating Condition

In September 2008, the FDIC continued to have strong concerns about WMB's asset quality, and the bank's liquidity was eroding.[1103]  The FDIC had been concerned with WMB's capital levels "all the way along."[1104]  Stan Ivie, Regional Director of the San Francisco Region of the FDIC's Division of Supervision and Consumer Protection, was closely monitoring and updating the FDIC Supervision division as to WMB's liquidity.[1105]

WMI's Board of Directors appointed Alan Fishman the new CEO on September 7, 2008.[1106]  Shortly thereafter, Mr. Fishman met with Messrs. Reich, Polakoff, and Ward to discuss WMB's financial condition.[1107]  Mr. Fishman told OTS regulators that WMI would consider any and all potential transactions to ensure the continuation of WMI.[1108]  Mr. Fishman gave similar assurances to Mr. Spoth and put Mr. Spoth in touch with WMI's investment bankers, Goldman Sachs and Morgan Stanley, to discuss WMI's efforts.[1109]  Because WMI had an earnings announcement scheduled for October 23, 2008, OTS wanted WMI to have a solution, whether a

---

[1102] Mr. Spoth's recollection of this meeting is vague.  He indicated that he might be mistaking this courtesy call for a different meeting in July, in which JPMC met with the FDIC in JPMC's capacity as an investment bank for another entity.  *Id.*  Documents produced by JPMC indicate that the JPMC Investment Bank met with the FDIC on July 18, 2008, to discuss general issues in the banking industry.  JPMCD_000003355.  No JPMC witnesses recalled WMB being discussed at that meeting or another meeting between JPMC and the FDIC in July.  Interview of Tim Main, September 15, 2010 ("Main Interview").

[1103] Spoth Interview.

[1104] *Id.*

[1105] *Id.*

[1106] Dochow_Darrel-00001338_001, at 034; Fishman Interview.

[1107] Ward Interview.

[1108] *Id.*

[1109] Spoth Interview.

capital raise or a whole bank sale, by October 22.[1110]  OTS did not believe WMB was in a crisis situation.[1111]  Chairman Bair, however, told John Robinson, WMI Executive Vice President of Corporate Risk Management, that if WMI did not sell itself by September 30, WMB would be placed on the FDIC troubled bank list.[1112]

On September 7, OTS and WMB entered into a Memorandum of Understanding ("MOU").[1113]  The MOU was an enforcement action -- a step in the multi-step enforcement process the OTS uses with troubled thrifts.[1114]  The MOU was an attempt to address WMB's deteriorating condition.  It imposed certain rules and restrictions on the operation of WMB.[1115]

Chairman Bair called Mr. Fishman on September 9, and reiterated to him that WMB management needed to retain a financial advisor and take immediate steps to address the bank's

---

[1110] Ward Interview.

[1111] *Id.*

[1112] Robinson Interview.  Although the problem bank list was published without identifying the banks by name, the listed banks were identified by total assets held.  Robinson Interview.  This would have allowed a reader to easily identify WMB as being on the list.  *Id.*  Mr. Fishman stated that Chairman Bair told him that progress had to be made before the problem bank list was published in October.  Fishman Interview.  Mr. Fishman believed that Chairman Bair was using the problem bank list as a serious, but not dispositive, negotiating point.

[1113] OTS-WMI-BKRCY-00000137.

[1114] Mr. Killinger described OTS enforcement actions as generally escalating according to the following steps: 1) response to issues identified in exam reports; 2) response to matters deemed as requiring board attention; 3) entry of a Memorandum of Understanding, which is an informal agreement between the board of directors and regulators about the issues that the bank needs to improve and is not generally disclosed to the public; 4) cease and desist orders, which are publicly disclosed and detail specific action that the board needs to take; 5) regulatory directives, where the regulatory agency requires the bank to raise capital or take certain actions on a specified timeline; and 6) seizure.  Killinger Interview.  The OIG Report describes enforcement actions available to OTS as follows:

> OTS can use both informal and formal enforcement actions to address a bank's unsafe and unsound practices.  The informal enforcement actions, which are used when a bank's general condition is sound but some issues and weakness have been identified by OTS, include supervisory directives, board resolutions, and memoranda of understanding.  Formal enforcement actions are used when a bank has significant problems, especially where there is a threat to the bank, depositors, or the public, and informal action will not be sufficient to correct the issue.  Formal enforcement actions include cease and desist orders, civil money penalties, and Prompt Corrective Action directives.

OIG Report at 66.

[1115] OTS-WMI-BKRCY-00000137.  For example, the MOU required that WMB establish a business plan, a contingency capital plan, and a classified asset reduction plan.  It also restricted the bank from declaring dividends and required independent review of WMB's risk management structure and underwriting processes.

financial situation.[1116] Chairman Bair subsequently met with Mr. Fishman and had follow-up calls regarding the progress of his efforts to stabilize WMB.[1117]

### b.    JPMC Meetings with Regulators

JPMC continued to meet with regulators in September 2008. Phone records from Mr. Dimon indicate that he had a telephone conversation with Chairman Bair on September 5, but Mr. Dimon does not recall the content of that discussion.[1118] According to the FDIC Submission, Chairman Bair remembers calling Mr. Dimon in early September and asking him whether JPMC still had an interest in acquiring WMI, but she did not raise the possibility of a resolution transaction for WMB in the call.[1119] On September 9, JPMC and the FDIC had another meeting, in which JPMC discussed its view of the financial markets.[1120] The meeting was in Chairman Bair's office, but Mr. Spoth does not recall whether she attended.[1121] Mr. Spoth also does not recall any discussion of WMB. JPMC witnesses do not recall what was discussed at this meeting.[1122]

### c.    Increased Regulatory Concern

The FDIC keeps its Board of Directors aware of high-risk institutions that might jeopardize the insurance fund.[1123] On September 16, 2008, the day after Lehman Brothers failed,

---

[1116] FDIC Submission at 8.

[1117] *Id.*

[1118] JPMCD_000004856.00001, at JPMCD_000004856.00012.

[1119] FDIC Submission at 12. According to the FDIC Submission, in early September, Chairman Bair was also reaching out to other potential acquirers about an unassisted open market acquisition of WMI, which is the FDIC's usual practice. The FDIC Submission says that Chairman Bair called John Stumpf, the chairman, president, and CEO of Wells Fargo, about an open market acquisition. *Id.* at 7, 12.

[1120] Spoth Interview; Dimon Interview; JPMCD_000004589.00001, at JPMCD_000004589.00010.

[1121] Spoth Interview.

[1122] Cavanagh Interview; Scharf Interview.

[1123] Ward Interview.

the FDIC met with its Board regarding WMB.[1124] Mr. Corston or John Ivy, from the FDIC, and Mr. Dochow and Ben Franklin, the OTS Examiner-in-Charge at WMB, presented the bank's financial condition to the Board and FDIC regulators, including Mr. Spoth, Mr. Thompson, and Chairman Bair.[1125] Messrs. Dochow and Franklin argued that the OTS's enforcement process should be allowed to run its course and that additional enforcement steps would need to take place before the FDIC took action.[1126] According to Mr. Dochow, the FDIC decided to give WMI approximately a week to raise capital or secure an open market transaction or FDIC would place the bank on the troubled bank list.[1127]

OTS disagreed with the FDIC's position at that time that WMB should receive a downgrade of its CAMELS rating from "3" to "4" at the end of the annual examination.[1128] On September 18, Messrs. Thompson, Spoth, and Polakoff agreed to downgrade the bank to a "4" on the basis of the bank's growing liquidity problem following the deposit outflows caused by the failure of Lehman Brothers.[1129] Mr. Ward communicated the downgrade to Mr. Dochow and told him that OTS agreed with the rating.[1130] At this point, Mr. Ward began to think that the failure of WMB was possible.

---

[1124] OIG Report at 47; Ward Interview.

[1125] Ward Interview; Dochow Interview.

[1126] Dochow Interview.

[1127] Id.; Robinson Interview. Messers. Reich and Polakoff were overseeing the WMB situation from the OTS Washington, D.C. office. Dochow Interview. Mr. Dochow stated that he was cut out of regulatory communications shortly after the meeting.

[1128] Ward Interview. The CAMELS rating system was designed to evaluate the condition of banks on a uniform basis and identify those banks that warrant more than usual supervisory attention. OIG Report at 15. A CAMELS composite rating is an assessment based on the following performance rating components: Capital adequacy, Asset quality, Management practices, Earnings performance, Liquidity position, and Sensitivity to market risk. Id. at 15, 74. Each examined bank is assigned a composite rating, with 1 being the highest rating and 5 representing the worst-rated banks. Id. at 74. A "4" CAMELS rating indicates that a bank is in serious risk of failure and causes the Federal Reserve and the FHLBs to begin tightening their eligibility criteria for term advances. Robinson Interview.

[1129] OIG Report at 47; Ward Interview.

[1130] Ward Interview.

d.     Potential Buyers

Given the tumultuous financial markets at this time, the FDIC was increasingly concerned about which institution might fail next and which entity could acquire WMB in the event of its failure.[1131] By that time, Mr. Fishman had already engaged Goldman Sachs to raise capital or facilitate a sale of WMI.[1132] WMI had also set up a virtual data room for due diligence.[1133] Approximately one or two weeks prior to the failure of WMB, Mr. Spoth, and possibly Mr. Ivie, had telephone conferences with the parties conducting due diligence in WMI's data room -- JPMC, Wells Fargo, TD Bank, Citigroup, and Banco Santander -- about whether they were still interested in acquiring WMI on an open bank basis.[1134]

During the week ending September 19, Citigroup met with the FDIC and expressed its interest in acquiring WMB, but only with some sort of government assistance.[1135] Ned Kelly, head of Global Banking, and possibly Jane Fraser and Michael Helfer attended on behalf of Citigroup.[1136] Messrs. Wigand and Spoth, and possibly another FDIC representative, attended the meeting on behalf of the FDIC.[1137]

---

[1131] Wigand Interview.

[1132] Polakoff Interview.

[1133] Id.

[1134] Spoth Interview. According to JPMC, the FDIC indicated on the calls that it wanted a solution by Friday, September 26 and that it preferred an open bank solution. JPMCD_000003491.00001, at JPMCD_000003491.00002.

[1135] Wigand Interview. Although Citigroup never mentioned WMB explicitly, it was clear to Mr. Wigand that the discussion was about WMB. The representative from Citigroup who the Examiner interviewed -- Robert Beck, Head of Corporate Finance at Citigroup -- was not aware of this meeting. Interview of Robert Beck, September 15, 2010 ("Beck Interview"). Mr. Beck confirmed, however, that Citigroup was only interested in a transaction involving government assistance.

[1136] Wigand Interview.

[1137] Id.

According to Mr. Dimon, sometime during the week ending September 19 -- most likely on September 16 -- Chairman Bair called Mr. Dimon.[1138] Mr. Dimon stated that Chairman Bair asked him whether JPMC would be willing to buy WMB out of receivership at no cost to the insurance fund if WMB were put in receivership.[1139] Mr. Dimon told Chairman Bair he thought JPMC might be willing to participate in such a transaction.[1140] According to the FDIC Submission, Chairman Bair also recalls calling Mr. Dimon on September 16, during which call she advocated that JPMC contact WMI to pursue a potential open market merger.[1141] According to the FDIC Submission, Mr. Dimon indicated during the call that a resolution transaction would have certain tax advantages for an assuming bank.[1142] The FDIC Submission states that Chairman Bair reminded Mr. Dimon of the substantial uncertainties associated with a JPMC acquisition strategy that relied on purchasing assets after a WMB failure.[1143]

e.    Market Solution

(i)    OTS Involvement

WMI continued to pursue an open bank solution. On September 19, 2008, Messrs. Reich and Polakoff met in New York with potential WMI investors, including TD Bank, Citigroup, and

---

[1138] Dimon Interview. Mr. Dimon said that he thought the call occurred on September 18 or 19, but that he would have to check his phone records to confirm. Phone records from Mr. Dimon reflect that Mr. Dimon had a telephone conference with Chairman Bair on September 16. JPMCD_000004856.00001, at JPMCD_000004856.00015.

[1139] Dimon Interview; Scharf Interview; JPM_EX31571-584. A JPMC slide deck presented to its Board of Directors on September 19 also indicates that Mr. Dimon had, at some point prior to September 19, discussed with the FDIC a possible transaction with WMB in receivership. JPMCD_000003491.00001, at JPMCD_000003491.00002.

[1140] Dimon Interview.

[1141] FDIC Submission at 12. The two FDIC witnesses the Examiner interviewed -- Messrs. Spoth and Wigand -- stated that they never discussed with potential suitors a sale of WMB from receivership before September 22, 2008. They had no personal knowledge as to whether other FDIC personnel had such conversations.

[1142] Id.

[1143] Id.

Banco Santander, regarding their interest in an open bank transaction.[1144] The regulators could not tell from their conversations with the potential suitors whether any had serious interest in a market solution.[1145]

OTS met first with Mr. Dimon and two other JPMC executives, one of whom was probably Mr. Scharf.[1146] The conversation was "casual" and general; no pricing terms were mentioned and no investment bankers were present. Although JPMC did not say so expressly, Messrs. Reich and Polakoff left the meeting with the impression that JPMC was not interested in an open bank transaction.

According to Mr. Polakoff, OTS next met with TD Bank.[1147] It was not seriously interested in an acquisition of WMI. TD Bank only wanted the East Coast branches of WMB.[1148] OTS also met with Wells Fargo.[1149] Wells was not very interested in an open bank transaction because the profile of WMB did not fit into its portfolio. OTS also had several telephone conferences with Citigroup. Citigroup was performing due diligence, and Mr. Polakoff recalled that he perceived Citigroup as being interested in an open bank transaction.

Mr. Polakoff perceived Banco Santander as also interested in acquiring WMI.[1150] The U.S. representatives of Santander were conducting due diligence in preparation for the presentation of a proposal to the Board of Directors in Spain. Mr. Polakoff heard that the FDIC

---

[1144] Ward Interview; Polakoff Interview. These kinds of conversations between OTS and third parties were not unusual, but only occurred on an open bank basis. Polakoff Interview.

[1145] Ward Interview.

[1146] Polakoff Interview.

[1147] Id.

[1148] Ward Interview.

[1149] Polakoff Interview.

[1150] Id.

at some point communicated to Santander, and presumably other third parties, that a transaction needed to be accomplished by a certain date or regulators would get involved.[1151]

OTS never mentioned the possibility of a WMB receivership during any meetings or calls with interested third parties.[1152] According to Mr. Polakoff, the primary federal regulator of a bank does not disclose information about a potential receivership and, as a result, third parties do not ask. Even if third parties did inquire about whether a seizure was possible, OTS would not answer that question.

(ii)   FDIC Involvement

Late in the week of September 19, 2008, the FDIC Division of Resolutions and Receiverships ("Resolutions") received from FDIC regulators the names of the parties engaging in due diligence for an open bank purchase of WMI: JPMC, Wells Fargo, Citigroup, TD Bank, and Banco Santander, partnered with J.C. Flowers & Co.[1153] As suitors in the open bank transaction, these parties were considered good potential candidates for a transaction in the event of WMB's failure.[1154]

According to the FDIC Submission, JPMC notified the FDIC on September 19 that JPMC was no longer interested in pursuing an open market acquisition of WMI.[1155] On September 20, Chairman Bair emailed Mr. Dimon and stated that she was just "cking in."[1156] According to the FDIC Submission, Chairman Bair recalls having a short telephone conference

---

[1151] Mr. Fishman also believed that the FDIC communicated a deadline to the other parties performing due diligence. Fishman Interview. Mr. Fishman told Mr. Polakoff that, up to certain point, there was a great deal of interest from the suitors and it suddenly "was like a cliff -- everything just stopped."

[1152] Id.

[1153] Wigand Interview.

[1154] Id.

[1155] FDIC Submission at 12.

[1156] JPM_EX00032738. Mr. Dimon understood this email as the FDIC "checking in" on JPMC's continued interest in WMB. Dimon Interview. Mr. Dimon believed that WMB was Chairman Bair's primary concern at the time.

with Mr. Dimon after sending the September 20 email because she had heard that JPMC was considering a business combination transaction with Morgan Stanley and called to determine the impact such a transaction would have on JPMC's interest in WMB.[1157] According to the FDIC Submission, Mr. Dimon indicated that JPMC was not pursuing a business combination transaction with Morgan Stanley and thus his interest in WMB was unaffected.[1158]

During the weekend of September 20-21, each of WMI's potential suitors told Mr. Spoth that it was no longer interested in pursuing an open bank transaction with WMI.[1159] At that point, Mr. Spoth told each suitor that it might be contacted by someone from Resolutions, probably Mr. Wigand, in the event that a Resolutions transaction was needed. By September 21, all of the parties had "dropped out" of the WMI data room, and Mr. Wigand contacted them to schedule meetings with Resolutions on Monday, September 22.[1160]

Each of the potential suitors the Examiner interviewed confirmed that, by this point in time, if not earlier, it was either not interested in buying all of WMI or was not interested in a transaction without government assistance. TD Bank's interest was limited to acquiring WMB's East Coast branches; although it had briefly been in the data room, it indicated to Wigand that it would not bid on WMB. Wells Fargo did not want to pursue an open bank acquisition of WMI because the WMB asset profile would be difficult to integrate into Wells Fargo's portfolio and require too much capital.[1161] According to Mr. Wigand, TPG expressed tentative interest in

---

[1157] FDIC Submission at 12.

[1158] *Id.*

[1159] Spoth Interview. Mr. Spoth does not recall who participated in the calls on behalf of the various bidders, although he might have spoken with Mr. Cavanagh at JPMC.

[1160] Wigand Interview.

[1161] Interview of Bruce Helsel, October 6, 2010 ("Helsel Interview").

another capitalization of WMI but never an acquisition.[1162] Blackstone considered ways in which it and other capital investment firms might be able to provide a capital investment in WMI. However, as a private equity firm, Blackstone was for a variety of reasons not a potential acquirer of the bank.[1163] After conducting due diligence in September, Santander was concerned about WMB's asset quality and therefore crafted a proposal in which the FDIC would limit Santander's losses to $26 billion, and even that government-assisted proposal was rejected by the Santander's Board of Directors on September 20, 2008 as too risky.[1164] Similarly, Citigroup was only interested in an acquisition of WMB with government assistance because it was unwilling to assume the entire downside risk of WMB's mortgage portfolio.[1165] Finally, JPMC witnesses said that JPMC independently determined that it could not undertake an open bank transaction because it would have required an unreasonably large capital raise and the debt of the holding company was too great.[1166]

f.    Structuring the Sale of WMB

At some point prior to the September 22 meetings, FDIC business people determined how to structure the potential sale of WMB out of receivership.[1167] Without input from any potential suitors, Mr. Wigand, Herb Held, FDIC Assistant Director of the Division of Resolutions and Receiverships, and Sherri Foster, with the consultation of John Bovenzi, then FDIC Chief Operating Officer, decided to "monetize" and sell all of WMB's assets.[1168]

---

[1162] Wigand Interview.

[1163] Interview of Chinh Chu, October 4, 2010 ("Chu Interview").

[1164] Interview of Alberto Sanchez, September 23, 2010 ("Sanchez Interview"); Interview of Juan Rodriguez - Inciarte, September 28, 2010 ("Inciarte Interview").

[1165] Beck Interview.

[1166] Dimon Interview.

[1167] Wigand Interview.

[1168] *Id.*

Resolutions decided to structure the transaction this way because it was concerned that, given market conditions, it would not get any bidders.

### (i) Tax Refunds

The treatment of WMB's tax refunds first arose when FDIC lawyers were drafting documents for the potential sale of WMB from receivership.[1169] Mr. Wigand said that FDIC's business people decided to include WMB tax refunds as an asset that would be included in a sale of WMB. Tax refunds are not usually passed to acquiring banks.[1170] Mr. Wigand said, however, that transactions also are not normally structured such that all of a bank's assets are passed to a purchaser; the sale of WMB was atypical in this regard.[1171] Resolutions included tax refunds as assets because it wanted to get a higher price for the bank and thereby comply with its statutory duty to minimize potential losses to the insurance fund. It also wanted to avoid being involved in any future disputes between the holding company and the failed bank over entitlement to the refunds.

The Examiner asked Mr. Wigand how potential bidders would know that tax refunds were assets included in the sale. Mr. Wigand replied that a tax refund of $1.5 or $1.6 billion was already present on the books of WMB.[1172]

---

[1169] *Id.*

[1170] *Id.* In fact, the WMB sale is the first time it has ever occurred. JPMCD_000001547.00001; Interview of Benjamin Lopata, September 20, 2010 ("Lopata Interview"). The FDIC's handbook states that this type of asset is "never" transferred. FDIC, Resolutions Handbook 19 (2003).

[1171] Wigand Interview.

[1172] *Id.* The Examiner asked the FDIC to explain Mr. Wigand's statement. In its October 20, 2010 letter to the Examiner, FDIC stated: "During his interview, Mr. Wigand recalled having an understanding that tax receivables of approximately $1.5 billion were reflected on WMB's balance sheet reported in its most recent Thrift Financial Report. . . . Whatever value was reflected on the balance sheet, however, the FDIC understood that it was including the right to recover tax refund receivables that were recoverable by WMB among the assets being conveyed and that the value of such receivables would be significant." FDIC Submission at 13.

The FDIC decided that certain deferred tax assets would not pass to the acquiring bank under the P&A Agreement. Mr. Wigand explained that the acquiring bank receives the right to what the entity is owed at the time of its failure, but future tax benefits, such as a net operating loss ("NOL") carry-forward, do not pass. He stated that deferred tax assets are different than tax NOL carry-backs but that some banks account for them together.[1173]

### g.    Potential Bidders

After deciding on the structure of the receivership sale transaction, Resolutions met with JPMC, Wells Fargo, Citigroup, and Banco Santander in separate consecutive meetings on September 22, 2008, to discuss the possibility of a transaction and how such a transaction would be offered and structured.[1174] Mr. Wigand, Mr. Held, and David Gearin, Senior Counsel in the FDIC Legal Division, attended the meetings on behalf of the FDIC. In the meetings, Resolutions told potential bidders that it did not know when, if ever, the FDIC would open its website for due diligence or send information packages to the potential bidders.[1175]

### (i)    JPMC

In addition to the regulators, the JPMC meeting was attended by Mr. Cohen, Mitch Eitel, and Bill Kroener, of Sullivan & Cromwell, and Mr. Scharf, Mr. Cavanagh, Dan Cooney, Brian Bessey, and, briefly, Mr. Dimon, on behalf of JPMC.[1176] At the meeting, the FDIC described the five possible transactions that would be offered in the event of a failure, all of which involved the acquiring bank taking all of WMB's assets. In other words, each transaction required the buyer

---

[1173] Wigand Interview.

[1174] *Id.*

[1175] *Id.* Mr. Scharf's recollection contradicts Wigand's account. Mr. Scharf recalls that FDIC told JPMC at the meeting that bids would be due on September 24, FDIC would notify the high bidder on September 25, and would seize the bank on September 26. Scharf Interview.

[1176] Wigand Interview.

to assume the entire WMB loan portfolio and all of the risk attendant thereto. The five transactions differed as to which liabilities would be assumed.

JPMC asked specifically whether WMB tax refunds were included as assets being sold in the deal, and the FDIC said yes.[1177] There was no further discussion regarding the tax refunds. It is not clear whether the FDIC understood tax refunds to include the refunds associated with a NOL carryback based on losses recognized by the acquiring party, or whether the FDIC understood JPMC to be referring to tax refunds currently on the books of WMB.[1178] JPMC had modeled tax refunds associated with NOL carrybacks, however, in its due diligence review, so the Examiner concludes that JPMC was likely referring to NOLs.[1179] JPMC also asked whether the P&A Agreement was negotiable.[1180] FDIC did not answer the question in the meeting because Mr. Cohen answered the question for FDIC by advising JPMC not to alter the terms of the P&A Agreement, lest JPMC risk losing the auction by having FDIC deem its bid to be non-conforming.

### (ii)     Other Banks

During the meetings with the other potential bidders, Resolutions outlined the same information about the possible transactions that was presented in the JPMC meeting.[1181] Any questions that came up in earlier meetings were discussed in subsequent meetings or were posted in a general Question and Answer document ("Q&A") on the FDIC Intralinks website. The attendees at each of the four meetings therefore all heard or had access to the same information.

---

[1177] Id.

[1178] As previously noted, on October 5, 2010, the Examiner requested that the FDIC clarify its understanding of the tax refunds available for inclusion in the P&A Agreement. The FDIC responded in its October 20, 2010 letter as described supra.

[1179] JPM_EX00000664; JPM_EX00000666.

[1180] Wigand Interview.

[1181] Id.

During the bidding process, the Q&A was continually updated to reflect bidders' questions and the FDIC's response. The updated Q&A was then uploaded to the website for the bidders' review.

### (iii) Banco Santander

Although initially interested in WMB, Santander had become extremely concerned during due diligence about acquiring WMB's troubled assets.[1182] Santander had constructed a transaction proposal in which the FDIC would guarantee limits on Santander's potential losses.[1183] Santander's Board of Directors rejected the proposal on September 20 as too risky.[1184] After learning at its meeting with FDIC on September 22 that the transaction would not include government assistance, Santander informed Mr. Wigand later that day that it would not submit a bid.[1185]

### h. WMB's Liquidity Crisis

WMB's liquidity crisis began with deposit outflows in July and August following the failure of IndyMac.[1186] WMB lost approximately $9.1 billion in deposits through the summer of 2008.[1187] On September 8, 2008, after WMB and OTS entered into the MOU, a run on deposits followed and was intensified by media speculation about the failure of WMB and the Lehman Brothers' bankruptcy.[1188] WMB lost a net of approximately $17.3 billion in deposits in two weeks.[1189] By September 24, the total net outflow had increased to $18.7 billion.[1190]

---

[1182] Sanchez Interview.

[1183] Id.

[1184] Inciarte Interview.

[1185] Wigand Interview.

[1186] Ward Interview.

[1187] OTS-WMI-BKRCY-00000006.

[1188] Id.

[1189] Id.

In its legal memorandum supporting the decision to close WMB, OTS described the liquidity situation in the bank's final days:

> As of September 23, 2008, [WMB] had only $4.6 billion in cash to meet its liquidity obligations. Its core earnings are insufficient to supplement its cash base and it is dependent on borrowings from the FHLB of San Francisco, the FHLB of Seattle and the Federal Reserve Bank of San Francisco to meet its funding needs. The FHLB of San Francisco recently decreased the amount of daily funding it had been providing [WMB] and may not provide any significant additional funds. In addition, market-based funding sources are not immediately available to supplement liquidity. . . . Moreover, most of the assets that the Bank has that are not now collateralizing the borrowings at either the FHLBs or the Federal Reserve Bank are of either insufficient quality or lack documentation to make them readily saleable.[1191]

When the FHLB-SF and the FRB-SF, the only two remaining sources for WMB liquidity, substantially restricted their lending to WMB and refused to guarantee to make any further advances, WMB's ability to operate was constrained.[1192]

i.　OTS Preparations for Seizure

On September 22 or 23, Mr. Dochow received a call from Mr. Ward from the Washington, D.C. OTS office instructing him to begin preparation of the so-called "S" memo, which OTS prepares prior to the appointment of a receiver and delineates the supervisory reasons for receivership.[1193] Mr. Dochow heard from Mr. Ward that a deal was being negotiated with JPMC.[1194]

---

[1190] OTS-WMI-BKRCY-00000009, at OTS-WMI-BKRCY-00000016.

[1191] OTS-WMI-BKRCY-00000006. The "S" memo prepared by OTS further explains the timeline of lending reductions: "The Federal Housing Finance Agency notified OTS that FHLB-SF has agreed to fund $.5 billion on September 25, 2008, but there is no guarantee that it will provide further funds. The Federal Reserve Bank lowered the Bank to secondary credit status on September 25, 2008, which resulted in an additional reduction of $1 billion in borrowing capacity." OTS-WMI-BKRCY-00000009, at OTS-WMI-BKRCY-00000015.

[1192] Dochow Interview. A detailed discussion of WMB's liquidity position in the days before OTS seized the bank is contained in the section of this Report regarding Solvency.

[1193] *Id.* The "S" memo is generally prepared by the regional director, the assistant regional director, the Examiner-in-Charge, and regional counsel; in WMB's case, Mr. Dochow, Mr. Franklin, John Bisset, OTS Regional Examiner, and Jim Hendrickson, OTS Regional Counsel, likely drafted the documents. Ward Interview.

[1194] Dochow Interview.

j.    Bidding Process

The FDIC opened the Intralinks website to the potential bidders on Tuesday, September 23.[1195] The bid packages contained information about the bidding process, the structure of the possible transactions, and form legal documents.[1196] As they were updated, drafts of the P&A Agreement and the Q&A were uploaded to the Intralinks website up to the due date for bids.[1197] Bids were due by 6 p.m. EST on September 24.[1198]

The parties were also given access to an FDIC data room, which contained WMB financial information.[1199] On September 22, Mr. Cooney asked Mr. Wigand for assistance in obtaining from WMB information regarding the "deferred tax asset" at WMB as of August 31, 2008, and its projected amount at the end of September.[1200] JPMC could not locate the information in the data room, and WMB had refused to provide it.[1201] Mr. Wigand agreed to locate the information and promised the FDIC's assistance if further data room access problems arose.[1202]

---

[1195] Wigand Interview.

[1196] JPMCD_000001550.00001. The bid package contained the following legal documents: a purchaser eligibility certification, bid instructions, a bid form, and form confidentiality, escrow, and whole bank purchase and assumption agreements. Id.

[1197] Wigand Interview.

[1198] JPMCD_000001550.00001.

[1199] Wigand Interview.

[1200] JPM_EX00000078. It is not clear from the email itself what Mr. Cooney meant by "deferred tax asset." For example, it is not clear whether it refers to a tax asset on the books of WMB at that time, or the tax refund associated with the NOL carryback, or something else.

[1201] JPM_EX00000078.

[1202] Id.

Among the Q&A's posted by the FDIC, the most relevant to the Examination related to the treatment of the TRUPS, the treatment of the tax deferred assets, and the negotiability of the P&A Agreement.

Question 3 of the Q&A asks: "How will the REIT preferred and associated assets be treated in the proposed transaction?  Can the REIT preferred be treated similarly with the trust preferred, and left behind with the associated assets supporting the REIT preferred?"[1203]  The FDIC answer states: "The REIT preferred shares will not be assumed in the transaction. However, the associated assets will pass to the acquirer."[1204]  This question was posed by Citigroup in an email sent to Mr. Held on September 23.[1205]  When asked about Question 3, Mr. Wigand stated that Resolutions believed that the value of the TRUPS was accounted for on the WMB balance sheet.[1206]

Question 10 of the Q&A asks: "Can you provide greater clarity on whether there is a deferred tax asset at the thrift level, and if so, would it pass to the acquirer?"[1207]  The FDIC answer states: "If there is a deferred tax asset at the thrift level, it relates to the entity itself and can not pass in a purchase and assumption transaction to the acquirer."[1208]  Mr. Wigand stated that the FDIC's answer was intended to convey that any deferred tax asset would not pass to the acquiring bank.[1209]  Question 10 was not intended to address tax refunds.[1210]

---

[1203] FDIC 31888.

[1204] Id.

[1205] FDIC Submission at 16.

[1206] Wigand Interview.

[1207] FDIC 31890.

[1208] Id.

[1209] Wigand Interview.

[1210] Id.

Question 16 of the Q&A asks: "What if the assuming bank's attorneys are uncomfortable with the language contained in the Purchase and Assumption Agreements? Is the final agreement language negotiable?"[1211] The FDIC answer states: "No the Purchase & Assumption agreement language is not negotiable."[1212]

(ii)     Negotiation of the P&A Agreement

Although Mr. Wigand maintains that the business terms of the P&A Agreement never changed, the Examiner concludes that the FDIC negotiated with JPMC regarding the language of the P&A Agreement up to and through the bidding due date.[1213] For example, JPMC negotiated with FDIC over the standard indemnity FDIC includes in a purchase and assumption transaction. In this regard, on September 23, JPMC negotiated with the FDIC regarding the "booked liabilities" of WMB that JPMC would assume under the P&A Agreement.[1214] Messrs. Eitel and Gearin continued to negotiate these indemnity provisions through 4:42 p.m. on September 24 -- minutes before bids were due.[1215]

On either September 23 or 24, the FDIC had a telephone conference with JPMC regarding the terms of the P&A Agreement.[1216] Email correspondence between JPMC and the FDIC reveals that JPMC had questions regarding the treatment of liabilities for benefit plans and liabilities for tax sharing agreements, as well as several other specific provisions.[1217] JPMC also

---

[1211] FDIC 31891.

[1212] *Id.*

[1213] *See, e.g.,* JPM_EX00034540; JPM_EX00034958; JPM_EX00034965; JPM_EX0004135; JPMCD_000003562.00001; JPMCD_000002261.00001; JPM_EX00036067; JPM_EX00036093.

[1214] JPM_EX00034959. JPMC specifically did not want to assume liability for any WMB breaches of contract that occurred prior to the closing of the P&A Agreement. JPM_EX00034958. To be clear, this indemnity obligation had nothing to do with losses in WMB's loan portfolio, as to which JPMC was assuming full responsibility.

[1215] JPM_EX00036067; JPM_EX00036093.

[1216] Wigand Interview.

[1217] JPM_EX00004135.

sought confirmation regarding the treatment of the TRUPS, which JPMC referred to as the WMB REIT preferred securities.[1218]

At 11:10 a.m. on September 24, Mr. Cooney emailed Mr. Gearin to arrange a telephone conference between Rich Peyster, an FDIC attorney, and Ben Lopata, the head of the corporate tax department at JPMC.[1219] Mr. Lopata discussed with Mr. Peyster at some point whether the sale of "all assets" of WMB included tax refunds, and according to Mr. Lopata, Mr. Peyster said yes.[1220] Mr. Lopata understood that a P&A Agreement with FDIC usually contained a specific carve out for tax attributes to prevent their transfer to the purchaser. Mr. Peyster told Mr. Lopata that this transaction, however, was the only one he could recall in which there was not a specific provision stating that tax attributes are not conveyed to the purchaser.[1221]

Revised drafts of the P&A Agreement were uploaded to the FDIC Intralinks website at least two times, at 2:48 p.m. on September 23 and at 12:54 p.m. on September 24.[1222]

### k.    Final Meeting with WMI

After the potential suitors dropped out of negotiations for an open bank acquisition, WMB was considering options to stay afloat without a strategic transaction.[1223] On September 24, OTS and the Federal Housing Finance Agency ("FHFA"), which supervises the FHLBs, met with WMB and its investment bankers to discuss the bank's "Stand Alone Plan" dated

---

[1218] Id.

[1219] JPMCD_000002261.00001.

[1220] Lopata Interview. Messrs. Lopata and Peyster had several conversations regarding the P&A Agreement, but Mr. Lopata does not recall whether the conversations took place before or after the closing of the sale of WMB. Id.

[1221] Id.

[1222] JPMCD_000001550.00001, at JPMCD_000001550.00116; JPMCD_000001550.00001, at JPMCD_000001550.00071. The two witnesses from the FDIC interviewed by the Examiner had no knowledge about the timing of the negotiations of the P&A Agreement or when the final draft was uploaded.

[1223] Fishman Interview.

September 23, 2008.[1224]  An element of this approach was the "[c]onversion of REIT Preferred to Holding Company Preferred."[1225]  In other words, WMI wanted to control and contribute the TRUPS to the bank, so that WMB could ultimately use the underlying mortgage assets to enhance WMB's liquidity.[1226]  Charles "Chad" Smith, WMI's current Executive Vice President and General Counsel, speculated that WMI executives believed that they could pledge as collateral the TRUPS in order to receive additional liquidity from the FHLBs or the Federal Reserve Bank.[1227]

## I.    Final Meeting Among Regulators

Later on September 24, the regulators met to discuss WMB.[1228]  FHFA and the FHLBs stated that advances would no longer be available to WMB.[1229]  At the meeting, the regulators came to the conclusion that nothing would happen in the next day to stop deposit outflows and restore WMB's borrowing capacity sufficiently to meet its obligations.

On September 25, the Federal Reserve Bank downgraded WMB to secondary credit status, which reduced WMB's borrowing capacity and increased its collateral requirements even further.[1230]  According to Mr. Ward, the FDIC could have opted to guarantee additional advances

---

[1224] Ward Interview; Interview of Charles "Chad" Smith, August 20, 2010, September 29, 2010, and September 30, 2010 ("Smith Interview").  The Stand Alone Plan was also referred to as the "go-it-alone" approach.  Ward Interview.

[1225] WMIPC_00001990.00001, at WMIPC_00001990.00010.

[1226] Id. at WMIPC_00001990.00010-12.

[1227] Smith Interview.  At this point, WMI executives also believed that the September 8, 2008 MOU was an event that permitted the conditional exchange of the TRUPS.

[1228] Ward Interview.

[1229] According to Mr. Ward, the FHLBs decide whether to extend term advances based on FHFA criteria.  While the FHFA can put pressure on the lending decisions of the FHLBs, the decision ultimately belongs to the regional Home Loan Bank.  Historically, however, FHLBs do not continue providing advances up to the point of seizure in order to minimize the risk of loss to the FHLB.

[1230] OTS-WMI-BKRCY-00000009, at OTS-WMI-BKRCY-00000015.

by the Federal Reserve Bank to WMB, which might have kept WMB liquid long enough to find a purchaser, but the FDIC did not.[1231]

### m. JPMC Submits the High Bid for WMB

JPMC submitted its conforming bid and Citigroup submitted its non-conforming bid at approximately 6:00 p.m. EST on September 24.[1232] In its letter, Citigroup said it could not submit a conforming bid because the potential risk of assuming all of WMB's mortgage portfolio was too high. Citigroup said the only proposal it could consider was one in which the FDIC shared the losses on WMB's loan portfolio.[1233] On the same day, Wells Fargo submitted a letter similar to Citigroup's in which Wells Fargo said it could not submit a bid because the potential losses associated with WMB's loan portfolio were too great.[1234] At 8:23 p.m. on September 24, Chairman Bair informed Mr. Dimon via email that JPMC was the high bidder for WMB.[1235] Given the widespread regulatory concern about WMB's asset quality, Mr. Spoth was "surprised and pleased" by JPMC's almost $2 billion bid.[1236]

### n. The TRUPS Conditional Exchange

The TRUPS were a series of securities, backed by pools of mortgage loans, which were eligible for treatment as Tier 1 capital of WMB.[1237] In order to be included as capital of the bank, however, OTS required that the TRUPS include an exchange feature. The exchange feature mandated that if certain "Supervisory Events" occurred, OTS could direct a "Conditional Exchange." The Supervisory Events generally signified that the bank was in financial trouble,

---

[1231] Ward Interview.

[1232] FDIC 31886; CITI-WM 00002066.

[1233] CITI_WM_00002066-70.

[1234] WF_Examiner_16862.

[1235] JPM_EX00036140.

[1236] Spoth Interview.

[1237] A full analysis of TRUPS issues is contained in the TRUPS section of this Report.

such as placement of the bank in receivership and various other regulatory enforcement actions.[1238] The Conditional Exchange required holders of the TRUPS to exchange their securities for WMI preferred stock.[1239] The exchange therefore converted investors' TRUPS into securities of WMI, which infused WMI with additional capital.[1240]

Additionally, contemporaneously with the first issuance of the TRUPS, in a letter dated February 23, 2006 from Mr. Robinson to Mr. Dochow, WMI stated that, upon occurrence of a Conditional Exchange, WMI would contribute to WMB the TRUPS ("Downstream Commitment").[1241] With respect to subsequent issuances of TRUPS, WMI sent OTS letters containing the same Downstream Commitment.[1242]

According to Mr. Dochow, the process of triggering the Conditional Exchange was done at the request of the Washington, D.C. OTS office, acting in accordance with an FDIC directive.[1243] The process began by email several days prior to the seizure of WMB.[1244]

---

[1238] Specifically, a "Supervisory Event" occurred if: (1) WMB became "undercapitalized" under the OTS "prompt corrective action" regulations; (2) WMB was placed into bankruptcy, reorganization, conservatorship, or receivership; or (3) OTS anticipated that WMB might become undercapitalized in the near term or OTS took supervisory action that limited the payments of distributions and dividends. WMIPC_500002044.0001, at WMIPC_500002044.0027-28.

[1239] Id.

[1240] The exchange feature was designed by OTS in order to provide regulators with a means by which they could authorize the capital infusion of a bank, if the bank was in financial distress. Interview of Michael Solomon, September 10, 2010 ("Solomon Interview").

[1241] WMIPC_500002025.00002. This commitment was not disclosed to investors in the TRUPS offering materials. Robinson Interview.

[1242] Letter from John Robinson to Darrel Dochow, dated November 14, 2006; Letter from Darrel Dochow to John Robinson dated December 4, 2006; Letter from John Robinson to Darrel Dochow dated February 7, 2007; Letter from John Robinson to Michael Finn, Regional Director OTS, dated August 17, 2007; and Letter from Mark Johnson, Assistant Director OTS, to John Robinson dated September 20, 2007. The confidential correspondence between WMI and OTS regarding the commitment are referred to as the "Side Letters." WMIPC_500002022.00003; WMIPC_500002022.00006; WMIPC_500002022.00007; WMIPC_500002022.00011.

[1243] Dochow Interview. Mr. Dochow stated that Mr. Ward specifically was pressing him to make sure the Conditional Exchange occurred. The WMB Supervisory Timeline, developed by OTS, states that on September 25th, "[a]t FDIC's Request, OTS examiners directed WMI management to dissolve Preferred Funding REIT (a special purpose entity), forfeit all rights to the approximately $9.0 in loan collateral, and assign the collateral loans to WMB for inclusion in the receivership transaction." Dochow_Darrel-00001338-001, at 038.

Although OTS was basing the exchange on the MOU dated September 7, 2008, which limited the ability of WMB to pay dividends and therefore constituted a Supervisory Event, there had not been any pressure to effectuate the exchange until the impending deal with JPMC.[1245] Mr. Dochow began trying to coordinate the exchange with John Robinson, WMI Executive Vice President of Corporate Risk Management, who was out of town at the time.

On the morning of September 25, 2008, Mr. Smith received an email from OTS notifying him of OTS's decision to declare the occurrence of a "Supervisory Event" and direct a Conditional Exchange of the TRUPS for WMI preferred stock.[1246] Mr. Smith initially believed that the correspondence with OTS regarding the Conditional Exchange was taking place in order to allow WMI to implement its Stand Alone Plan. Mr. Smith also received emails from OTS asking him to confirm WMI's commitment to contribute the TRUPS to WMB following the Conditional Exchange (i.e., the Downstream Commitment). OTS further requested that Mr. Smith prepare an Assignment and Assumption Agreement, which would effect the downstreaming.

During the morning of September 25, Mr. Smith worked with outside counsel to draft a confirmation of the Exchange Event and Downstream Commitment to send to OTS.[1247] In the early afternoon, John Bisset, OTS Regional Examiner, decided to "camp out" in Mr. Smith's office, presumably to ensure that the Assignment Agreement was executed and completed.

---

Mr. Ward, however, does not recall the FDIC requesting OTS to draft the notice letter, although he thought the regulators might have discussed it during the regulators' meeting on September 24. Ward Interview. According to Mr. Ward, WMI requested regulatory notice that a Supervisory Event occurred, pursuant to its Stand Alone Plan.

[1244] Dochow Interview.

[1245] Mr. Dochow recalled that the TRUPS affected the price JPMC would pay for WMB, and the FDIC needed the event to be triggered in order to secure the deal with JPMC. Someone at OTS told Mr. Dochow that the TRUPS were important to the transaction because they were worth around $4 to $5 billion.

[1246] Smith Interview.

[1247] Id.

Meanwhile, at OTS, Mr. Solomon was instructed to draft a formal letter from OTS triggering the Conditional Exchange.[1248] Mr. Solomon and his assistant, Austin Hong, provided the appropriate language to Messrs. Polakoff and Ward, who drafted the notice letter and sent it to Mr. Dochow.[1249] Mr. Dochow signed the letter and sent it to WMI despite some reservations because he did not know what kind of deal the FDIC had negotiated with JPMC, and the Conditional Exchange was being triggered at the last minute.[1250]

Following receipt of the OTS directive, Steve Rotella, COO of WMI, sent a letter to Messrs. Franklin and Bisset, which stated that WMI would issue a press release on September 26 announcing that the Conditional Exchange would occur at 8:00 a.m. on September 26, 2008.[1251] WMI then executed an Assignment and Assumption Agreement, which effects the downstreaming of the TRUPS from WMI to WMB.[1252]

According to the FDIC Submission, the FDIC understood that the TRUPS was a valuable asset, but had only a general familiarity with the terms of the TRUPS and the mechanics of a Conditional Exchange.[1253] At some point during the week of WMB's failure, Mr. Wigand recalls speaking with Mr. Ward and John Bowman to ensure that OTS was taking steps to effectuate the Conditional Exchange because the FDIC had included the value of the TRUPS as an asset of the bank.[1254]

---

[1248] Solomon Interview.

[1249] *Id.*; Ward Interview. Messrs. Solomon and Hong had not read the September 7, 2008 MOU, but Mr. Solomon did not doubt that the objectives of an exchange event were being satisfied by the financial instability of WMB. Solomon Interview.

[1250] Dochow Interview.

[1251] WMIPC_500002025.00004.

[1252] WMIPC_500002025.00005.

[1253] FDIC Submission at 17. The FDIC Submission said that Mr. Wigand understood that the exchange event would occur, at the latest, when OTS closed WMB. Because the TRUPS was a significant asset that was to be sold in a resolution transaction, Mr. Wigand wanted to make sure that the event occurred.

[1254] Wigand Interview.

According to the FDIC Submission, an outside lawyer for JPMC asked on September 24 whether there were any additional documents governing the TRUPS besides the documents that had been posted on the Intralinks site including, in particular, any side letters.[1255] In response to this inquiry, the FDIC may have contacted OTS to determine whether any such documents existed, but to date, the FDIC has not learned whether such communication with OTS actually occurred.[1256]

o.     <u>Continued Negotiation of the P&A Agreement</u>

Negotiation of the P&A Agreement continued on September 25, after JPMC's bid had been accepted. Specifically, the FDIC agreed to include a $500 million indemnity provision requested by JPMC.[1257] The provision[1258] indemnifies JPMC against future claims of WMI shareholders alleging that JPMC breached the March 2008 "standstill agreement," which purports to prohibit JPMC from purchasing WMB for 18 months.[1259] This indemnity provision was unusual in that it differed markedly from the indemnification provisions described in the original bid package.[1260]

---

[1255] FDIC Submission at 17.

[1256] *Id.*

[1257] JPM_EX00037053; JPM_EX00037161; FDIC Submission at 15.

[1258] Debtors' App. to Br. in Supp. of Mot. for Summ. J. at A192, *Washington Mutual, Inc. v. JPMorgan Chase Bank, N.A*, Adv. Proc. No. 09-50934 (MFW) (Bankr. D. Del.) (the "Turnover Action") (May 19, 2009), Dkt. No. 16.

[1259] JPM_EX00016135. According to the FDIC Submission, it agreed to include this provision because it believed that any claim that a purchase and assumption transaction with the FDIC could be impeded by a standstill agreement entered into by a bidder before a failed bank was closed would violate public policy. FDIC Submission at 15.

[1260] The original bid package described the indemnification provisions as follows: "Each form of the Purchase and Assumption Agreement contains indemnification provisions designed generally to protect the assuming institution against liabilities created by the failed institution prior to closing that are not being assumed by the assuming institution under the Purchase and Assumption Agreement. These provisions should be reviewed carefully since various qualifications and limitations are also set forth." JPMCD_000001550.00001, at JPMCD_000001550.00005.

p.   Seizure of WMB

On September 25, 2008, OTS determined that WMB did not have sufficient liquidity to meet its obligations and made the decision to close the bank.[1261]  Notably, OTS did not close the bank on the ground that the bank was insolvent and not well-capitalized.[1262]  Messrs. Polakoff and Ward told Steve Frank, Chairman of WMI, that OTS was closing the bank approximately an hour or two before issuing its order.[1263]  OTS issued its order closing the bank and appointing the FDIC as receiver later that day.[1264]

Because WMB had no available sources of liquidity and the FDIC received a "no cost bid" -- a bid that presented no loss to the insurance fund -- from JPMC, the OTS believed its decision to close the bank was justified.[1265]

### 5.   Post-Transaction Communications

After the FDIC notified JPMC that it was the winning bid, Mr. Eitel expressed concern as to whether the Conditional Exchange of the TRUPS had taken place.[1266]  As a result, Mr. Wigand made calls to Mr. Ward and Mr. Bowman of OTS to ensure that OTS took the necessary steps to make sure that WMI completed the exchange.[1267]

On October 7, 2008, Mr. Lopata had a telephone conference with Mr. Peyster regarding the transfer of WMB tax refunds under the P&A Agreement.[1268]  In an email the next day, Mr. Peyster stated that all assets of WMB, "whether or not on the books," were transferred to

---

[1261] Polakoff Interview.

[1262] OTS-WMI-BKRCY-00000001.

[1263] Polakoff Interview.

[1264] OTS-WMI-BKRCY-00000001.

[1265] Ward Interview; Dochow Interview.

[1266] Wigand Interview.

[1267] FDIC Submission at 17.

[1268] JPMCD_000004607.00001, at JPMCD_000004607.00008; JPMCD_000001547.00001.  Mr. Lopata does not recall the subject matter of the conversation.

JPMC.[1269] The email states that the transfer of tax refunds included "pending tax refunds and future refunds based on losses generated up to the date of failure."[1270]

### D. The Debtors' Potential Claims for Breach of Duty Based on the Sale of WMB Assets

The Examiner investigated the legal and factual basis for a potential claim that the FDIC breached statutory or fiduciary duties as receiver by selling WMB for less than possible. This basic allegation is formulated as causes of action asserted by the Debtors in litigation in the DC Court.[1271] Motions to dismiss all of these causes of action on jurisdictional and substantive grounds were pending in the WMI Action when, on January 7, 2010, the court stayed the WMI Action pending the outcome of the adversary proceedings in the Bankruptcy Court.[1272]

The Examiner's Investigation of potential breach of duty claims against the FDIC revealed significant legal and jurisdictional impediments to the claims. Even if the claims could be stated as legally cognizable causes of action, the Examiner did not discover facts sufficient to

---

[1269] JPMCD_000001547.00001.

[1270] *Id.* The email may leave in question what tax attributes the FDIC intended to convey in the P&A Agreement. The email refers to the transfer of "future refunds based on losses *generated up to the date of failure.*" (emphasis added). It could be argued that losses comprising the substantial NOL carryback were generated *after* the date of failure because the losses were generated when JPMC purchased and booked tax losses for WMB's assets.

[1271] Compl., *Washington Mutual, Inc., v. Federal Deposit Ins. Corp.*, Case No. 1:09-cv-533 (RMC) (D.D.C. 2009) (the "WMI Action") (March 20, 2009), Dkt. No. 1. The causes of action asserted are: (a) an express or implied right of action under 12 U.S.C. § 1821(d)(13)(E)(i) (the "Dissipation claim"); (b) an improper taking of property in violation of the Fifth Amendment to the U.S. Constitution (the "Takings claim"); and (c) a claim for conversion under the Federal Tort Claims Act ("FTCA") (the "Conversion claim").

[1272] The WMI Action began on March 20, 2009, as a lawsuit challenging the FDIC Receiver's disallowance of the Debtors' Receivership Claim. The FDIC Receiver filed an answer as well as counterclaims against both the Debtors and JPMC asserting ownership rights to various assets of the Debtors' Estates, including the Capital Contributions. JPMC then filed an answer, crossclaims, and counterclaims seeking, inter alia, a declaratory judgment that, pursuant to the P&A Agreement and in accordance with the Federal Deposit Insurance Act (the "FDI Act"), JPMC purchased all of the right, title, and interest of the FDIC as receiver in and to substantially all of the assets of WMB, including substantially all of the assets that are the subject of the Debtors' claims. In addition, the FDIC Receiver filed a partial motion to dismiss the WMI Action. FDIC Corporate moved to dismiss all claims. The Debtors then moved to dismiss the counterclaims asserted by the FDIC Receiver and to stay the remainder of the WMI Action, in its entirety, in favor of adversary proceedings pending in the Bankruptcy Court. A hearing on the motions was held on November 4, 2009.

form the basis for such claims, and does not believe that further discovery would likely yield facts that could support a viable claim.

## 1. Jurisdictional Impediments

With respect to each of the Dissipation, Taking, and Conversion claims pending in the WMI Action, the FDIC Receiver asserted that the district court lacks subject matter jurisdiction because such claims were not asserted in the Receivership Claim. The Examiner concludes there is a risk that the DC Court will accept the FDIC's argument and dismiss these claims for lack of jurisdiction.

The Financial Institutions Reform Recovery and Enforcement Act of 1989 ("FIRREA") provides an exclusive claims review process under § 1821(d) for claims against or relating to failed bank receiverships.[1273] Submission to this receivership claims process is the exclusive remedy for all claims enumerated in § 1821(d)(13)(D), which provides:

> (D) Limitation on judicial review
>
> Except as otherwise provided in this subsection, no court shall have jurisdiction over -
>
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
>
> (ii) *any claim relating to any act or omission of* such institution or *the Corporation as receiver*.[1274]

In the WMI Action, the FDIC argued that the Dissipation, Taking, and Conversion claims each constitute "claims relating to an act or omission" -- i.e., selling WMB for too little -- "of the

---

[1273] *See* 12 U.S.C. § 1821(d).

[1274] 12 U.S.C. § 1821(d)(13)(D) (emphasis added); *see Freeman v. FDIC*, 56 F.3d 1394, 1400 (D.C. Cir. 1995).

Corporation as receiver."[1275] Thus, FDIC argued, the plain language of FIRREA required these claims to be submitted in the Receivership Claim.[1276]

In addition, FDIC argued that the Dissipation, Takings, and Conversion claims were not, in fact, raised in the Debtors' Receivership Claim. FDIC noted that the proof of claim does not reference either § 1821(d)(13)(E)(i) or the Fifth Amendment.[1277] As to the Conversion claim, the Debtors' Receivership Claim states that "[t]he FDIC, as receiver, may have converted [the Debtors'] property by purporting to transfer an ownership interest in some or all of such property to [JPMC]."[1278] FDIC argued, however, that this statement, in context, does not refer to WMI's equity interest in WMB, nor does it identify the property converted or its dollar value.[1279] Therefore, FDIC argued, the Debtors' claims were not raised in the Receivership Claim.

In the WMI Action, the Debtors argued that the FIRREA exhaustion provisions are inapplicable to claims against the FDIC entities in their capacities as a federal agency.[1280] The Debtors asserted that the FDIC's argument "fail[ed] to distinguish between [the Debtors'] claims against WMB (for which FDIC-Receiver is now responsible because it 'stands in the shoes' of WMB) and [the Debtors'] claims against FDIC-Corporate and FDIC-Receiver as a federal agency, rather than WMB."[1281] In support of their position, the Debtors relied heavily on

---

[1275] FDIC Receiver's Mem. of Law in Supp. of Partial Mot. to Dismiss ("FDIC Receiver's Partial Mot. to Dismiss") at 10-11, WMI Action (June 11, 2009), Dkt. No. 25; FDIC Receiver's Reply Mem. of Law in Supp. of Partial Mot. to Dismiss ("FDIC Receiver's Reply on Partial Mot. to Dismiss") at 3-7, WMI Action (Aug. 6, 2009), Dkt. No. 48.

[1276] FDIC Receiver's Partial Mot. to Dismiss at 10-11, WMI Action (June 11, 2009), Dkt. No. 25; FDIC Receiver's Reply on Partial Mot. to Dismiss at 3-7, WMI Action (Aug. 6, 2009), Dkt. No. 48.

[1277] FDIC Receiver's Partial Mot. to Dismiss at 11, WMI Action (June 11, 2009), Dkt. No. 25 (citing Receivership Claim).

[1278] FDIC Receiver's Partial Mot. to Dismiss, Ex. 2 ¶ 40, WMI Action (June 11, 2009), Dkt. No. 25.

[1279] FDIC Receiver's Partial Mot. to Dismiss at 19-20, WMI Action (June 11, 2009), Dkt. No. 25. *See Adams v. HUD*, 807 F.2d 318, 321 (2d Cir. 1986); *Verner v. United States*, 804 F. Supp. 381, 383-84 (D.D.C. 1992).

[1280] Debtors' Resp. to FDIC Receiver's Partial Mot. to Dismiss and FDIC Corporate's Mot. to Dismiss ("Debtors' Resp. to the FDIC's Mots. to Dismiss") at 10-12, WMI Action (July 16, 2009), Dkt. No. 42.

[1281] Debtors' Resp. to the FDIC's Mots. to Dismiss at 10, WMI Action (July 16, 2009), Dkt. No. 42.

*Auction Co. of America v. FDIC*, 141 F.3d 1198 (D.C. Cir. 1998).[1282]  In that case, the D.C.

Circuit stated, in dicta, that the jurisdictional bar in 12 U.S.C. § 1821(d)(13)(D) could be read to

serve only as a bar for claims "against a depository institution" that must be submitted and then

challenged pursuant to 12 U.S.C. § 1821(d)(6)(A).[1283]  The court observed that the statute could

be read following a "bankruptcy-modeled approach [which] would draw a distinction between

claims against the depository [institution], which accrue before the appointment of the receiver

and are subject to administrative determination, and claims against the receiver, which accrue

after appointment and are not."[1284]  In addition to relying on *Auction Co.*, the Debtors also noted

that the language of the FDI Act specifies in several places that the claims to be submitted

through the administrative process are claims against the depository institution.[1285]

  The Debtors also argued that, even if FIRREA exhaustion applied, the theories advanced

by the Dissipation, Taking, and Conversion claims were effectively included in the Receivership

Claim.[1286]  For a claim to be effectively included in the Receivership Claim under FIRREA, it

must provide the FDIC Receiver "with adequate notice of [such] claims and with sufficient

---

[1282] *See id.* at 10-11.

[1283] *Id.* at 11.  Section 1821(d)(6)(A) provides the statute of limitations for agency review or judicial determination of claims "against a depository institution for which the Corporation is receiver."  12 U.S.C. §1821(d)(6)(A).

[1284] *Auction Co.*, 141 F.3d at 1201 (internal footnote omitted); *see also* Debtors' Resp. to the FDIC's Mots. to Dismiss at 11, WMI Action (July 16, 2009), Dkt. No. 42.  The *Auction Co.* decision also noted that an interpretation barring all claims against the FDIC and not limited to those "against a depository institution" would effectively "foreclose judicial jurisdiction altogether, a result troubling from a constitutional perspective and certainly not the goal of FIRREA." 141 F.3d at 1200.

[1285] *See* Debtors' Resp. to the FDIC's Mots. to Dismiss at 11-12, WMI Action (July 16, 2009), Dkt. No. 42 (citing 12 U.S.C. § 1821(d)(5)(A)(i) ("Before the end of the 180-day period beginning on the date *any claim against a depository* institution is filed with the Corporation as receiver . . . ." (emphasis added)); 12 U.S.C. § 1821(d)(6)(A) ("Before the end of the 60-day period beginning on the earlier of . . . (1) the end of the period described in paragraph (5)(A)(i) with respect to *any claim against a depository institution* . . . ." (emphasis added)); *id.* § 1821(d)(8)(A) ("The Corporation shall establish a procedure for expedited relief . . . for claimants who . . . allege the existence of legally valid and enforceable or perfected security interests in assets of *any depository institution* . . . ." (emphasis added)); *see also id.* § 1821(d)(3)(B)(i) (FDIC Receiver shall "promptly publish a notice to the *depository institution's creditors* to present their claims . . . ." (emphasis added))).

[1286] Tr. at 31-36, WMI Action (Nov. 4, 2009), Dkt. No 101 ("WMI Action Hr'g Tr.").

information and detail about the claims to enable the FDIC expeditiously and fairly to allow or disallow the claims."[1287] The Debtors argued that the Dissipation, Takings and Conversion claims arise out of the loss of value of the same total package of assets that were explicitly pled in the Debtors' Receivership Claim.[1288] Therefore, the Debtors argued they exhausted any administrative process required by FIRREA.[1289]

The Examiner concludes that there is a risk that the DC Court will conclude that the claims are jurisdictionally barred. Most courts have interpreted the FIRREA exhaustion provisions as applicable to post-receivership claims against the FDIC Receiver in addition to pre-receivership claims against the failed bank.[1290] Although dicta in the *Auction Co.* case suggests

---

[1287] *Branch v. FDIC*, 833 F. Supp. 56, 60 (D. Mass. 1993) (citing *Office & Prof'l Emp. Int'l Union, Local 2 v. FDIC*, 962 F.2d 63, 69 (D.C. Cir. 1992)).

[1288] WMI Action Hr'g. Tr. at 31-36.

[1289] The Debtors also asserted that the FDIC's position on FIRREA exhaustion would produce an illogical result. Debtors' Resp. to the FDIC's Mots. to Dismiss at 12, WMI Action (July 16, 2009), Dkt. No. 42. The Debtors argued that the Dissipation, Takings, and Conversion claims are "premised on the [FDIC Receiver's] refusal to pay [the Debtors] the value of the claims set forth in the [p]roof of [c]laim. . . ." *Id.* at 12. Thus, Debtors say, it would have been "impossible" for the Debtors to assert such claims "until the FDIC [Receiver] disallowed the [p]roof of [c]laim, thereby refusing to pay." *Id.* Until then, the Debtors assert, their "claims against the FDIC as an agency had not yet accrued." *Id.*

Although FDIC has not raised the argument, the Debtors' theory that their claims accrued after the FDIC denied their Receivership Claim raises other problems for the Debtors. To the extent these claims actually accrued after the Receivership bar date, the Debtors still must exhaust their administrative remedies by submitting the claims to the FDIC for review pursuant to the FDIC's internal procedures. *See, e.g., McCarthy v. FDIC*, 348 F.3d 1075, 1081 (9th Cir. 2003); *FDIC v. Scott*, 125 F.3d 254, 259 (5th Cir. 1997); *Stamm v. Paul*, 121 F.3d 635, 641 (11th Cir. 1997); *Heno v. FDIC*, 20 F.3d 1204, 1208-10 (1st Cir. 1994) (appending relevant FDIC internal manual procedures). The Debtors did not do so.

[1290] *See, e.g., Village of Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 386-87 (6th Cir. 2008) ("The overwhelming majority of courts to address the issue have concluded that the administrative process applies to post-receivership claims."); *McCarthy*, 348 F.3d at 1081 ("[W]e join the majority of courts in holding that claimants . . . who challenge conduct by the FDIC as receiver, must exhaust administrative remedies before seeking judicial review."); *Scott*, 125 F.3d at 259, 261 ("Section 1821(d)(13)(D) bars federal courts from entertaining any 'claim' made against a receiver, unless the claimant has exhausted all administrative remedies."); *Stamm*, 121 F.3d at 642 ("[C]laimants . . . aggrieved by the actions of the RTC as receiver must exhaust their administrative remedies before they seek relief in court."); *Home Capital Collateral, Inc. v. FDIC*, 96 F.3d 760, 763-64 (5th Cir. 1996) ("[T]he weight of authority indicates that all claims subject to the jurisdictional bar of § 1821(d)(13)(D), including both claims against the receiver and against the assets of the failed financial institution, must comply with the [administrative claims review procedure] established in § 1821(d) . . . ."); *Hudson United Bank v. Chase Manhattan Bank of Conn., N.A.*, 43 F.3d 843, 852 (3d Cir. 1994) ("claims against the receiver, as well as claims against the failed institution, were subject to the 'statutory exhaustion requirement' of administrative review before the courts had jurisdiction over them"); *In re Washington Bancorp.*,

that the D.C. Circuit might be receptive to the Debtors' argument that post-receivership claims against the FDIC as an agency, as opposed to FDIC standing "in the shoes" of a failed bank, are not subject to FIRREA exhaustion requirements, *Auction Co.* is not controlling authority.[1291]  In addition, the question of whether the claims were, in fact, raised with sufficient particularity in the Receivership Claim is a fact-specific inquiry, and FDIC has raised substantial arguments that the claims were not raised.  Accordingly, the Examiner concludes there is a risk that the DC Court will dismiss the claims as jurisdictionally barred.

## 2.  Express or Implied Rights of Action for Dissipation

### a.  Legal Standard

In the WMI Action, the Debtors asserted the Dissipation claim alleging that FDIC has a statutory duty to conduct its operations as receiver in a manner that "maximizes the net present value return from the sale or disposition of such assets."[1292]  The Debtors alleged this duty

---

Bankr. No. 90-00597, Civ. A. No. 95-1340, 1996 WL 148533, at *3-5 (D.D.C. Mar. 19, 1996) (acknowledging that the administrative claims review process applies to claims against the FDIC as receiver and dismissing such a claim for lack of subject matter jurisdiction where claim was not submitted to the administrative process).

[1291] The same court that will decide the issue of whether the Debtors failed to exhaust administrative remedies has issued a decision taking a strict view of the exhaustion requirement in a related case.  In *American National Insurance Co. v. JPMorgan Chase & Co.*, 705 F. Supp. 2d 17, 21, (D.D.C. Apr. 13, 2010), the district court held that the ANICO plaintiffs' claims against JPMC alleging that JPMC conspired with FDIC were barred because the claims were not raised in a proof of claim.  The district court explained:

> Having failed to invoke and exhaust this administrative process, Plaintiffs' claims are barred by the Act.  Plaintiffs cannot circumvent the Act's jurisdictional bar by aiming their claims at the assuming bank of the failed bank's assets.  That is precisely what Plaintiffs have attempted here in suing only JP Morgan Chase. Their claims will be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

*Am. Nat'l Ins. Co.*, 705 F. Supp. 2d at 21 (internal citations omitted).  Given that the district court held that claims brought by third parties against another third party were barred by FIRREA's exhaustion requirement, the district court could reach the same conclusion with regard to claims predicated on similar allegations brought by the Debtors against FDIC itself.

[1292] Compl. ¶ 88, WMI Action (Mar. 20, 2009), Dkt. No. 1 (quoting 12 U.S.C. § 1821(d)(13)(E)(i)); *see also id.* ¶¶ 81-90.  Section 1821(d)(13)(E) provides:

> (E) Disposition of assets
>
> In exercising any right, power, privilege, or authority as conservator or receiver in connection with any sale or disposition of assets of any insured depository institution for which the Corporation has been appointed conservator or receiver, including any sale or disposition of assets acquired by

required the FDIC to ensure the Debtors receive payments on account of their claims in an amount greater than had FDIC simply liquidated WMB. The Debtors further allege that "the assets of WMB sold, less the liabilities assumed, were worth more than $1.9 billion, had such assets been liquidated in a prudent and reasonable manner."[1293] Thus, the Debtors seek damages equal to what they would have received in a straight liquidation of WMB, less what they may receive from the Receivership.

In the WMI Action, the Debtors argued that 12 U.S.C. § 1821(i) of FIRREA evinces Congress' intent to create an express private right of action for breach of § 1821(d)(13)(E)(i).[1294] The Debtors also argued that an express right of action against the FDIC is "inherent" in the role of receiver, citing various cases, some involving the FDIC, that refer to a receiver's fiduciary duties to creditors of the Receivership estate.[1295] Finally, the Debtors argued that even if there is

---

the Corporation under section 1823(d)(1) of this title, the Corporation shall conduct its operations in a manner which--

(i) *maximizes the net present value return from the sale or disposition of such assets*;

(ii) minimizes the amount of any loss realized in the resolution of cases;

(iii) ensures adequate competition and fair and consistent treatment of offerors;

(iv) prohibits discrimination on the basis of race, sex, or ethnic groups in the solicitation and consideration of offers; and

(v) maximizes the preservation of the availability and affordability of residential real property for low- and moderate-income individuals.

12 U.S.C. § 1821(d)(13)(E) (emphasis added).

[1293] Compl. ¶ 86, WMI Action (Mar. 20, 2009), Dkt. No. 1.

[1294] Debtors' Resp. to the FDIC's Mots. to Dismiss at 17-18, WMI Action (July 16, 2009), Dkt. No. 42. The Debtors argued that Congress recognized a private right of action in § 1821(i), which limits the FDIC Receiver's liability to creditors. *See* 12 U.S.C. § 1821(i)(2) (discussing "[t]he maximum liability of the Corporation, acting as receiver or in any other capacity, to any person having a claim against the receiver"). In response, the FDIC argued that the language of § 1821(i) does not expressly provide for a private right of action. FDIC Receiver's Reply on Partial Mot. to Dismiss at 7-10, WMI Action (Aug. 6, 2009), Dkt. No. 48. The text of § 1821(i), FDIC argued, "limits potential recoveries in the receivership claims process" and, therefore, serves an independent legislative purpose and does not evince Congressional intent to create a private right of action. *Id.* at 8-10. Furthermore, FDIC argued, the capping of the FDIC Receiver's liability is consistent with Congress's effort to address pre-FIRREA case law that permitted creditors to recover more than the liquidation value of their claims under certain circumstances. *Id.* at 9-10 (discussing *Branch v. FDIC*, 825 F. Supp. 384, 412-14 (D. Mass. 1993)).

[1295] Debtors' Resp. to the FDIC's Mots. to Dismiss at 19-20, WMI Action (July 16, 2009), Dkt. No. 42; *see also, e.g., Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 n.4 (2d Cir. 2004) ("It is undisputed that, as a receiver, the

not an express cause of action, there is an implied private right of action for dissipation of assets under § 1821(d)(13)(E)(i) pursuant to the four factors set forth in *Cort v. Ash*, 422 U.S. 66, 78 (1975).[1296]

The Examiner concludes that it is unlikely that the DC Court will find that an express or implied cause of action for dissipation of receivership assets exists. There is no controlling D.C. Circuit authority. The only Circuit to address this issue -- the Third Circuit -- held that "there is no evidence of a congressional intent to provide for a private remedy [under 12 U.S.C. § 1821(d)(13)(E)]."[1297] Recognizing that "such intent is [the court's] ultimate guidepost," the court concluded that "the shareholders of a failed financial institution do not have a private right of enforcement of the FDIC's duty to maximize gain and minimize loss in its disposition of the institution's assets."[1298] District courts have reached similar conclusions.[1299] In the absence of any authority indicating otherwise, the Examiner concludes it is unlikely that the DC Court would recognize a private cause of action by which the Debtors may advance the Dissipation claim.

---

FDIC owes a fiduciary duty to the Bank's creditors and to Bancorp . . . We assume, as the parties have done, but do not decide, that the scope of the FDIC's fiduciary duties is governed by New York law, and is no different from that of any other trustee or receiver.").

[1296] Debtors' Resp. to the FDIC's Mots. to Dismiss at 20-26, WMI Action (July 16, 2009), Dkt. No. 42.

[1297] *Hindes v. FDIC*, 137 F.3d 148, 170 (3d Cir. 1998).

[1298] *Id. Hindes*' determination is based, in part, upon the proposition that the primary purpose of the FDIC's duty to examine banks and to maximize gain is to safeguard the insurance fund and reduce the costs to taxpayers, not to preserve the investment of shareholders. *Id.* at 170-71. Here, where the FDIC spared any loss to the FDI Fund arising out of more than $188 billion of deposit liabilities that were assumed by JPMC, those principles would likely be given great weight.

[1299] *See Mosseri v. FDIC*, No. 95 Civ. 0723(BSJ), 2001 WL 1478809, at *6 (S.D.N.Y. Nov. 20, 2001) (concluding that "a disappointed bidder[] does not have a private right of action to sue the FDIC for breach of its duties under 12 U.S.C. § 1821(d)(13)(E)(i)-(iii)"); *Pen-Del Mortgage Assoc. v. FDIC*, Civ. A. No. 94-0067, 1994 WL 675502, at *2-3 (E.D. Pa. Nov. 23, 1994) (finding no private right of action implied by similar language in § 1823(d)(3)(D)).

b.     Analysis

Even if the DC Court were to hold that a right of action existed under §

1821(d)(13)(E)(i), the Examiner did not find facts tending to support the allegations that the

FDIC sold WMB for less money than the assets of the bank were worth, had such assets been

liquidated.  As a practical matter, to establish that WMB was sold for too little, the Debtors

would need, at a minimum, to establish that another institution was willing to purchase WMB.

Significantly, however, each potential suitor that the Examiner interviewed -- Citigroup, Wells

Fargo, Santander, and TD Bank -- indicated that it was either uninterested in purchasing WMB,

or unwilling to purchase it without some level of government assistance.[1300]  Accordingly, the

Examiner found no evidence to support the factual allegation that the entire bank was sold for

too little.

The Examiner also evaluated whether the FDIC Receiver could have realized more by

selling WMB's assets piecemeal -- splitting WMB's problem loan assets from its valuable

branch franchise or its desirable deposit base -- in a manner akin to a bankruptcy liquidation.

There is evidence that potential suitors were interested in purchasing WMB's desirable assets.

TD Bank, for example, expressed interest in purchasing WMB branch networks in select

states.[1301]  The Examiner found no evidence, however, that any suitor would have paid more than

$1.88 billion for any select assets of WMB.  In any event, the Examiner found no evidence to

suggest that the "bad assets" of WMB -- its troubled loan portfolio -- could have been sold

separately from the "good assets" at any price.  Accordingly, the Examiner concludes there is no

---

[1300] Beck Interview; Helsel Interview; Inciarte Interview; Dougerty Interview.

[1301] Dougerty Interview.

factual support for the allegation that the FDIC Receiver could have realized more from WMB's assets in a "liquidation."[1302]

### 3. Takings Claim

The Takings claim alleges that the FDIC's failure to "compensate [the Debtors] for their claims" in the amount they would have received in a liquidation "constitutes a taking of [the Debtors'] property without just compensation in violation of the Fifth Amendment to the United States Constitution."[1303]

In the WMI Action, FDIC has asserted numerous legal challenges to the Debtors' Takings claim. First, relying on *FDIC v. Meyer*, FDIC argued that constitutional torts may not be pursued against a federal agency.[1304] The Debtors have countered that their Takings claim is not a constitutional tort precluded by *Meyer* because it is predicated on a self-executing provision of the Constitution, i.e., the Takings Clause, and is therefore permissible.[1305] The Examiner concludes that there is a risk that the DC Court will accept the FDIC's argument.

---

[1302] Even assuming that the FDIC Receiver was able to sell the "good assets" separately for an amount greater than $1.88 billion while retaining in the Receivership estate the "bad asset" loan portfolio, the additional amount obtained through the sale of the "good assets" would surely be dwarfed by the over $30 billion in loan portfolio losses that the FDIC or Receivership estate eventually would be forced to absorb.

[1303] Compl. ¶ 92, WMI Action (Mar. 20, 2009), Dkt. No. 1; *see also* Debtors' Resp. to the FDIC's Mots. to Dismiss at 28-29, WMI Action (July 16, 2009), Dkt. No. 42 ("[T]he FDIC's failure to pay the liquidation value of [the Debtors'] interests in WMB due to the FDIC's dissipation of WMB's assets is a taking of [the Debtors'] property for which just compensation is due.").

[1304] FDIC Receiver's Partial Mot. to Dismiss at 15-16, WMI Action (June 11, 2009), Dkt. No. 25. *See FDIC v. Meyer*, 510 U.S. 471, 484-86 (1994); *Salt Lick Bancorp v. FDIC*, 187 Fed. App'x 428, 435-36 (6th Cir. 2006).

[1305] Debtors' Resp. to the FDIC's Mots. to Dismiss at 30-32, WMI Action (July 16, 2009), Dkt. No. 42. *See First English Evangelical Lutheran Ch. of Glendale v. County of Los Angeles*, 482 U.S. 304, 314 (1987) ("[G]overnment action that works a taking of property rights necessarily implicates the constitutional obligation to pay just compensation.") (quotation marks omitted); *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 953-54 (9th Cir. 2008) ("[t]he Supreme Court has long recognized that the just compensation clause is self-executing: the right to recover just compensation . . . [i]s guaranteed by the Constitution and the [s]tatutory recognition [i]s not necessary") (alterations in original) (quotation marks omitted).

Second, FDIC argued that the government's closure of a bank cannot constitute a taking.[1306] "It is well established that it is not a taking for the government to close an insolvent bank and appoint a receiver to take control of the bank's assets."[1307] The Debtors argued that their Takings claim is distinct from those discussed in the extant case law in that it alleges not that the OTS's closure of WMB was a taking, but that the FDIC's sale of WMB's assets constituted the taking.[1308] The Examiner concludes, however, there is a substantial risk that the DC Court would consider that distinction to be one without a difference, viewing either allegation as concerning the loss of the Debtors' equity interest in WMB, and therefore dismiss the Takings claim.[1309]

### 4.    Conversion Claim

The Debtors also have asserted a claim for conversion under the FTCA for property allegedly taken into the receivership that "belonged to [the Debtors] rather than WMB."[1310] With respect to this claim, FDIC asserted the defense that the FDIC cannot be sued in its own

---

[1306] FDIC Receiver's Partial Mot. to Dismiss at 16-17, WMI Action (June 11, 2009), Dkt. No. 25.

[1307] *Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995) (citing *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1073-74 (Fed. Cir. 1994) (voluntary entry into highly regulated business deprives bank of any expectation that it would be compensated for actions of the OCC in declaring bank insolvent)).

[1308] Debtors' Resp. to the FDIC's Mots. to Dismiss at 28-29, WMI Action (July 16, 2009), Dkt. No. 42; *see also id.* at 28-30.

[1309] *See Branch*, 69 F.3d at 1575 (citing *Golden Pac. Bancorp*, 15 F.3d at 1073-74); *see also Thykkuttathil v. United States*, 88 Fed. Cl. 293, 296 (Fed. Cl. 2009) (reiterating the court's prior statement that "'[t]he Federal Circuit has never upheld a claim that a seizure of a financial institution under the statutes and regulations designed to insure safe and secure banking institutions constituted a taking'") (quoting *Franklin Sav. Corp. v. United States*, 46 Fed. Cl. 533, 535 (2000)).

Additional grounds exist on which the DC Court could potentially dismiss the Debtors' Takings claim. For example, FDIC argued that "allegations asserting allegedly wrongful conduct are not actionable as a taking." FDIC Receiver's Reply on Partial Mot. to Dismiss at 13 n.13, WMI Action (Aug. 6, 2009), Dkt. No. 48 (citing *Nw. La. Fish & Game Preserve Comm'n v. United States*, 79 Fed. Cl. 400, 406 (Fed. Cl. 2007)); *see also Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006) (noting that "'complaints about the wrongfulness of the [government action] are . . . not properly presented in the context of [a] takings claim'" (first alteration in original) (quoting *Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352-53 (Fed. Cir. 2001))).

[1310] Compl. ¶ 94, WMI Action (Mar. 20, 2009), Dkt. No. 1.

name -- that the proper party to sue is the United States.[1311]  Because the Conversion Claim

sounds in tort, there is a risk that the DC Court will find it is without jurisdiction to allow the

claim to proceed against FDIC Corporate.[1312]

In addition, FDIC asserted that the FDIC's decision to sell the assets of WMB to JPMC

falls within the "discretionary exception" to the FTCA.[1313]  The discretionary function exception

to the FTCA retains sovereign immunity from: "[a]ny claim . . . based upon the exercise or

performance or the failure to exercise or perform a discretionary function or duty on the part of a

federal agency or an employee of the Government, whether or not the discretion involved be

abused."[1314]  Courts apply the discretionary function exception when the conduct challenged

involves an element of judgment based on social, economic, or political policy.[1315]

---

[1311] FDIC Receiver's Partial Mot. to Dismiss at 18-19, WMI Action (June 11, 2009), Dkt. No. 25.

[1312] *See ABI Inv. Group v. FDIC*, 860 F. Supp. 911, 918 (D.N.H. 1994); *FDIC v. Manatt*, 723 F. Supp. 99, 104 (E.D. Ark. 1989) ("The FTCA is the exclusive remedy for tort claims against the government.  The FDIC is a federal agency and within the coverage of the FTCA."). *See also FDIC v. Craft*, 157 F.3d 697, 706-07 (9th Cir. 1998) ("Although [FTCA] claims can arise from the acts or omissions of United States agencies, an agency itself cannot be sued under the FTCA.  This jurisdictional restriction is not modified by the FDIC's 'sue and be sued' jurisdiction." (internal citations omitted)); *First Nat'l Ins. Co. of Am. v. FDIC*, 977 F. Supp. 1060, 1064-65 (S.D. Cal. 1997) ("It is axiomatic that claims for money damages which sound in tort must be brought against the United States and not against the FDIC."); *FDIC v. diStefano*, 839 F. Supp. 100, 120-21 (D.R.I. 1993); *FDIC v. Stanley*, 770 F. Supp. 1281, 1309 (N.D. Ill. 1991); *cf. Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1142-43 (10th Cir. 1999).

    In view of this possibility, the Debtors provided a copy of the summons and complaint to the U.S. Attorney for D.C. and the Attorney General for the United States in the event substitution of the United States is ordered.  *See* Debtors' Resp. to the FDIC's Mots. to Dismiss at 33, WMI Action (July 16, 2009), Dkt. No. 42.  Even if substitution were allowed, however, the Conversion claim would face other substantial legal impediments described herein.

[1313] FDIC Receiver's Partial Mot. to Dismiss at 22, WMI Action (June 11, 2009), Dkt. No. 25.

[1314] 28 U.S.C. § 2680(a).

[1315] *Franklin Savings Corp. v. United States*, 56 Fed. Cl. 720, 728 (2003).  *See also United States v. Gaubert*, 449 U.S. 315, 322-23 (1991) ("Because the purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy." (internal quotations omitted)); *Franklin Savings Corp.*, 180 F.3d at 1131 (finding discretionary function exception to apply where, inter alia, "[t]he gravamen of plaintiffs' complaint [was] that the RTC [as conservator] engaged in unwise asset sales without considering all relevant factors," as the "[d]ay-to-day decisions in operating a financial institution involve discretion"); *FDIC v. Stanley*, 770 F. Supp. 1281, 1309 (N.D. Ind. 1991) ("Clearly, the FDIC's actions when acting as receiver of a failed bank are protected by the discretionary function exception to the [FTCA].").

The Examiner concludes that there is a substantial risk that the DC Court will dismiss the Debtors' Conversion claim on one of these grounds, particularly the ground that the claim is barred by the discretionary function exception to the FTCA.

### E.     Bidding Process

The Examiner also investigated allegations that the FDIC may have breached statutory or fiduciary duties by conducting an unfair bidding process in conjunction with the sale of WMB. Specifically, the Examiner investigated allegations that the FDIC unfairly favored or colluded with JPMC, or provided JPMC information not available to other potential bidders, in order to ensure that JPMC tendered the winning bid for the purchase of WMB or to improperly provide JPMC with extraordinary benefits. These allegations are not the subject of any pending claims against FDIC, but have been suggested by various interested parties, including the Equity Committee. Accordingly, the Examiner investigated whether any facts exist to support these allegations and whether any legally cognizable theory exists to support a claim based on such allegations. While the Examiner found some evidence that the bidding process was less than optimal, the Examiner did not find evidence supporting the allegation that the process was unfair. In addition, although some unanswered questions remain about the bidding process, the Examiner, as explained below, found no legal theory that could form the basis of a cognizable claim for unfairness in the FDIC's bidding process.

### 1.     Legal Standard

After careful consideration, the Examiner concludes there is likely no cognizable legal theory for challenging the fairness of FDIC's bidding process in this instance. As previously mentioned, 12 U.S.C. § 1821(d)(13)(E) enumerates certain duties of the FDIC "[i]n exercising any right, power, privilege, or authority as conservator or receiver in connection with any sale or disposition of assets of any insured depository institution for which the Corporation has been

appointed conservator or receiver . . . ." Among those are the duty to "maximize[] the net present value return from the sale or disposition of" Receivership assets and the duty to "ensure[] adequate competition and fair and consistent treatment of offerors."[1316] The Examiner concludes, however, that a court would likely analyze a claim alleging an unfair bidding process predicated on 12 U.S.C. § 1821(d)(13)(E) in the same manner as the Dissipation claim. As explained above, a court is unlikely to recognize such a claim and there is a risk that a court would find it jurisdictionally barred. Moreover, the Examiner has not found case law recognizing a common law tort claim for breach of fiduciary duty against the FDIC in these circumstances.

## 2. Analysis

Even if a court were to find that a right of action existed under § 1821(d)(13)(E)(i) and (iii), or pursuant to some other legal theory, the Examiner found insufficient evidence to support the underlying allegations. The Examiner found that the FDIC conducted a reasonably fair process under the circumstances and that any imperfections in the process did not materially affect the outcome of the bidding.

The Examiner interviewed several witnesses about how the FDIC's bidding process should work. Every witness who the Examiner asked, including WMI's former CEO Kerry Killinger, agreed that at some point prior to a bank's failure, it is appropriate for the FDIC to contact third parties to inquire whether they would be willing to bid for the purchase of a failed bank out of receivership.[1317] FDIC witnesses stated that they typically do not make such an inquiry until it appears that a potential suitor is no longer interested in an open bank

---

[1316] 12 U.S.C. § 1821(d)(13)(E)(i) & (iii).

[1317] Killinger Interview; Robinson Interview; Ward Interview; Polakoff Interview; Dochow Interview; Wigand Interview; Spoth Interview.

transaction.[1318]  FDIC witnesses also indicated that they view it as important to share the same information with all potential suitors at approximately the same time and to make sure that all suitors have access to the same information.[1319]

In this case, FDIC appears to have adhered to these general guidelines.  Chris Spoth stated that in the days before September 22, 2008, he did not tell any third parties that WMB might be placed in receivership.  Instead, he waited until each third party suitor informed him that it was no longer interested in an open bank acquisition before he allowed his counterpart at FDIC Resolutions, James Wigand, to contact potential suitors regarding the possibility of a sale of WMB from receivership.  According to Mr. Wigand, he informed each potential suitor of the possibility of WMB being placed in receivership on September 22.  Mr. Wigand stated that he told each potential suitor the same thing in each of his meetings on September 22 because he wanted to ensure that each had access to the same information.  Mr. Wigand stated that questions and answers regarding the bidding process were put in writing and posted online for all potential bidders, thereby ensuring equal access to information.  He said that all bidders were sent the bid package, which included an initial draft of the P&A Agreement, and received access to the Intralinks website and data room at the same time.[1320]  He also said that any changes to the P&A Agreement were posted online in time-stamped revised drafts that all potential bidders could see. As a result of this bidding process, FDIC received two bids for WMB, although Citigroup's bid was non-conforming.

---

[1318] Spoth Interview.

[1319] Wigand Interview; Spoth Interview.

[1320] Although the bidders received access to the Intralinks website and data room at the same time, JPMC had an informational advantage over other bidders due to the due diligence JPMC completed during the March 2008 negotiations with WMB.  Beginning in March, JPMC identified and modeled various WMB assets, updated those models throughout the summer, and sought to confirm during bidding that the assets it had previously identified were included in the FDIC transaction.  Main Interview; Interview of Fernando Rivas, September 10, 2010 ("Rivas Interview"); JPMCD_000002736.00002-00047.

The foregoing suggests a fair bidding process. However, there are several facts which the Examiner finds establish that the bidding process was less than optimal. First, the evidence indicates that on or about September 16, 2008, Chairman Bair called Jamie Dimon concerning WMB before any formal opening of the bidding process.[1321]

Second, the evidence indicates that JPMC and FDIC, from September 22 through September 26, negotiated and changed various provisions of the P&A Agreement, even though all bidders were told verbally on September 22, and in writing in the Q&A, that the P&A Agreement was not negotiable. Mr. Wigand suggested that any potential bidder could have requested changes to the P&A Agreement so long as they did not alter its essential business terms, but only JPMC requested changes. Mr. Wigand also stated that any changes to the draft P&A Agreement were posted online for all potential bidders to see and inured to all potential bidders' benefit. Nevertheless, the Examiner found evidence to suggest that after JPMC was declared the winning bidder, JPMC requested and FDIC agreed to give a $500 million indemnity to JPMC for claims that might be asserted by WMI shareholders against JPMC for breach of the March 2008 standstill agreement.[1322]

Third, the evidence suggests that FDIC was less clear than it could have been in informing potential bidders about the precise nature and understood value of assets that were to be included in the purchase and assumption transaction. For example, Mr. Wigand stated that the only discussion with all potential bidders regarding "tax refunds" was that "tax refunds"

---

[1321] Dimon Interview.

[1322] The first mention in the documents of the $500 million indemnity provision is a September 25, 2008 email. JPM_EX00037053. Mr. Wigand did not know when the issue of the $500 million indemnity was first raised. Wigand Interview. The original bid package described the indemnification provisions as follows: "Each form of the Purchase and Assumption Agreement contains indemnification provisions designed generally to protect the assuming institution against liabilities created by the failed institution prior to closing that are not being assumed by the assuming institution under the Purchase and Assumption Agreement. These provisions should be reviewed carefully since various qualifications and limitations are also set forth." JPMCD_000001550.00001, at JPMCD_000001550.00005.

would be an asset sold. There is, however, evidence suggesting that tax issues may have been discussed between FDIC and JPMC before bids were due.[1323] JPMC had insight from its prior due diligence concerning tax refunds and other assets and may have been better informed than other potential bidders as to what tax benefits were available from the purchase and assumption transaction.

Similarly, FDIC appears to have conveyed very little information to potential bidders, other than possibly JPMC, regarding the inclusion in the deal of the assets associated with the TRUPS. While all bidders were "informed" in the Q&A that the assets associated with the TRUPS were intended to be included in the sale, it appears that only JPMC had actual discussions with FDIC in the days before bids were due regarding this valuable asset.[1324] No witness the Examiner interviewed was able to recall the specifics of any discussions regarding the TRUPS but JPMC took steps to make sure the TRUPS was included among the assets sold.[1325]

While the foregoing facts suggest that the process could have been better, they do not, in the Examiner's view, suggest an unfair process under the circumstances or that a different process would have changed the outcome. As an initial matter, the FDIC's bidding procedures have to be viewed in the context of the uncertainty and panic that gripped the financial system in September 2008. Circumstances were changing and new crises were emerging on a daily basis.

---

[1323] At 11:10 a.m. on September 24, Mr. Cooney emailed Mr. Gearin to arrange a telephone conference between Mr. Peyter and Mr. Lopata. JPMCD_000002261.00001. Although Mr. Lopata does not recall whether his discussions with Mr. Peyster took place before or after the closing of the sale of WMB, Mr. Lopata's telephone logs indicate that he had a telephone conference with Mr. Peyster on September 24. JPMCD_000004607.00001, at JPMCD_000004607.00004.

[1324] *See, e.g.,* JPM_EX00034540; JPM_EX00034958; JPM_EX00034965; JPM_EX00004135; JPMCD_000003562.00001; JPMCD_000002261.00001; JPM_EX00036067; JPM_EX00036093.

[1325] There are written communications on September 24, in which JPMC asks FDIC to confirm the treatment of the TRUPS. Furthermore, once Mr. Eitel, outside counsel for JPMC, inquired as to the status of the conditional exchange after JPMC's bid had been accepted, the FDIC took steps to ensure that WMI completed the exchange. FDIC Submission at 17.

Therefore, FDIC was forced to act swiftly and decisively.[1326] WMB posed a particularly large threat to the Federal Deposit Insurance Fund. Viewed through this lens, the FDIC's bidding process appears to have been reasonable.

The Examiner investigated whether any problems with the bidding process changed the outcome. The Examiner concludes that an improved process would not have changed the outcome. Significantly, every other potential bidder that the Examiner interviewed stated unequivocally that they would not have entered a transaction involving WMB without some level of government assistance to cap the potential bidders' downside risk. Stated differently, JPMC was the only potential bidder willing to do a transaction without government guarantees. This fact alone renders any irregularities or imperfections in the process immaterial.

Moreover, other suitors stated that knowledge of additional details regarding the proposed purchase and assumption transaction would not have made a difference. Santander representatives stated that adding $6 billion in assets to the deal would not have changed anything for Santander.[1327] They were uncomfortable with the level of risk and any particular assets coming to the purchaser were immaterial.[1328] Similarly, a Citigroup representative stated that knowledge of the availability of a $2 billion tax refund (which he said Citigroup's tax group may have been aware of anyway) would not have changed Citigroup's approach.[1329] Citigroup needed government assistance to limit downside risk. Both these parties were looking for downside protection of the magnitude of many billions of dollars. In sum, it does not appear that

---

[1326] Wigand Interview; Spoth Interview.

[1327] Inciarte Interview.

[1328] *Id.*

[1329] Beck Interview. Mr. Beck described $2 billion dollars as "a rounding error." Knowledge of a tax refund in that amount would not have influenced Citigroup to submit a conforming bid. Mr. Beck speculated that tax relief in the amount of $5 - $7 billion dollars would have been viewed by Citigroup as material. Even then, however, Mr. Beck said Citigroup would still have insisted on government guarantees to limit Citigroup's downside risk.

a more rigorous FDIC process for soliciting bids, including better disclosure of what was being conveyed, would have changed the outcome.

## F.    Tortious Interference

The Examiner evaluated allegations that the FDIC tortiously interfered with WMI's business expectancy by prematurely disclosing to JPMC and other third parties the intended seizure of WMB, thereby undermining or foreclosing WMB's attempts to find a purchaser prior to the seizure. This claim has not been asserted in litigation against FDIC. The Examiner investigated this potential claim, however, because interested parties have suggested the possibility of such a cause of action. The legal requirements of a claim for tortious interference are set out in the JPMC Section of the Report. The Examiner concludes that substantial legal impediments make recovery on a claim of tortious interference against the FDIC highly unlikely, and, further, the Examiner did not discover facts sufficient to form the basis of such a claim.

### 1.    Legal Impediments

A tortious interference claim likely would face meritorious legal defenses. First, the claim would need to be asserted against the United States, rather than FDIC,[1330] but the United States has not waived sovereign immunity as to tortious interference claims. Under the FTCA, the United States waives its sovereign immunity with respect to certain injuries caused by government employees acting within the scope of their employment.[1331] However, claims "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or *interference with contract rights*" are

---

[1330] *See ABI Inv. Group v. FDIC*, 860 F. Supp. 911, 918 (D.N.H. 1994); *FDIC v. Manatt*, 723 F. Supp. at 104.
[1331] 28 U.S.C. § 1346(b).

expressly exempted from the FTCA.[1332]  As a result, claims that allege the government interfered with prospective contracts or business opportunities are also barred.[1333]

## 2.    Factual Impediments

The Examiner's Investigation uncovered very little evidence supporting a claim for tortious interference with a potential open bank purchase of WMB.  First, WMB did not have a cognizable business expectancy that an investor would purchase the bank in an open bank, market transaction.  Second, there is no evidence that the FDIC knew of and intentionally and improperly interfered with any third party's offer or even serious intent to purchase WMB in an open bank transaction.  Finally, because none of the third parties intended to purchase WMB in an open bank transaction, at least not without some government guarantees, the Debtors were not harmed by any of the FDIC's actions.

### a.    Expectancy

Only TD Bank, Wells Fargo, TPG, Blackstone, JPMC, Citigroup, and Banco Santander expressed interest in a potential transaction with WMB.  Of these potential suitors, only JPMC was willing to assume the entire downside risk of WMB's mortgage portfolio.  And JPMC witnesses stated that their decision not to pursue a open bank purchase was unrelated to the FDIC.

---

[1332] 28 U.S.C. § 2680(h) (emphasis added).

[1333] See Mecca v. United States, No. 09-1569, 2010 WL 2893617, at *4 (10th Cir. July 26, 2010).  Assuming a tort could be asserted, it is highly likely that the claim would fall within the "discretionary function exception" of the FTCA, which bars claims "based upon the exercise or performance or the failure to exercise a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  The FDIC gauges third party interest in a transaction prior to the seizure of a bank pursuant to its statutory duty to limit the exposure of the deposit insurance fund, which insures the deposits of thousands of United States banks, to losses.  Wigand Interview.  It is highly likely that a court would find that the regulatory decision to begin making inquiries to third parties about the potential acquisition of a bank from receivership involves "an element of judgment" based on "social, economic, or political policy." Franklin Savings Corp., 57 Fed. Cl. at 728.

TD Bank's interest was limited to acquiring WMB's East Coast branches.[1334] Wells Fargo did not want to pursue an open bank acquisition of WMB because the WMB asset profile would be difficult to integrate into Wells Fargo's portfolio[1335] and would require too much capital.[1336] TPG could not have acquired WMB and was not interested in a further capital investment.[1337] Blackstone stated that it was not interested in a transaction without some form of government assistance to limit its risk.[1338]

Santander's meaningful interest in WMB arose after Mr. Fishman took over as CEO of WMB and Mr. Fishman asked Santander to consider a possible merger.[1339] After conducting due diligence in September, Santander was concerned about WMB's asset quality and therefore crafted a proposal in which the FDIC would limit Santander's losses to $26 billion.[1340] Thus, Santander's interest was limited to a transaction with government assistance and even that proposal was rejected by the Santander Board of Directors on September 20, 2008, as too risky.[1341]

Similarly, Citigroup was only interested in an acquisition of WMB with government assistance because Citigroup was unwilling to assume the entire downside risk of WMB's mortgage portfolio.[1342]

---

[1334] Dougerty Interview; Wigand Interview.

[1335] Wigand Interview.

[1336] Helsel Interview.

[1337] Stone Interview.

[1338] Chu Interview.

[1339] Sanchez Interview; Inciarte Interview.

[1340] Sanchez Interview. The FDIC had not told Santander at the time that receivership was imminent. Rather, the transaction was the most beneficial proposal that Santander developed in its modeling and had not been discussed with or approved by the FDIC.

[1341] Sanchez Interview; Inciarte Interview.

[1342] Beck Interview.

While JPMC was willing to do a deal without government assistance to limit its downside risk, its witnesses said that JPMC independently determined that it could not undertake an open bank transaction.[1343] JPMC witnesses said that JPMC's decision in this regard was based on its own analysis of WMB's and JPMC's financial condition, and was not influenced in any way by whether JPMC believed WMB was going to be placed in receivership. After evaluating WMB's liabilities and asset quality and reviewing transaction scenarios with its Board of Directors, JPMC determined by September 19 that an open bank acquisition was not a viable option financially.[1344] JPMC believed that a private transaction for the whole company would require an unreasonably large capital raise, and that the debt of the holding company created too much capital risk.[1345] The Examiner concludes that there is insufficient evidence to satisfy this element of a claim for tortious interference against the FDIC. Without any indication of an offer from any potential suitor to purchase WMI in an open bank transaction, WMI could not have a business expectancy sufficient to support a claim of tortious interference.[1346]

      b.    <u>Interference</u>

The Examiner's Investigation uncovered little evidence that the FDIC knew of and intentionally and improperly interfered with any third party's offer or intent to purchase WMI in an open market transaction. The only indication that the FDIC disclosed to a third party the possibility of a WMB purchase out of receivership before the formal FDIC resolutions process

---

[1343] Dimon Interview.

[1344] Dimon Interview; JPMCD_000003491.00001, at JPMCD_000003491.00002.

[1345] JPMCD_ 000003491.00001-16.

[1346] *See Schmerer v. Darcy*, 910 P.2d 498, 502 (Wash. Ct. App. 1996). Furthermore, because the Examiner found no evidence that any third parties intended to purchase WMB in an open market solution, the Debtors were not harmed by any actions of the FDIC, which harm is required in order to state a claim for tortious interference. *See Shim v. City of Tukwila*, No. 62377-OI, 2009 WL 1058649, at *405 (Wash. Ct. App. Apr. 20, 2009).

began is the September 16, 2008 call between Chairman Bair and Mr. Dimon.[1347] Mr. Dimon stated that on that call, Chairman Bair asked him whether JPMC would be willing to buy WMB out of receivership at no cost to the insurance fund if WMB was put into receivership.[1348] Mr. Dimon told Chairman Bair he thought JPMC might be willing. Chairman Bair, however, stated that she advocated to Mr. Dimon that JPMC pursue an open market merger with WMI on the call.[1349] Chairman Bair further stated that Mr. Dimon mentioned certain tax advantages associated with resolution transactions for assuming banks, to which she reminded him of the substantial uncertainties associated with a JPMC acquisition strategy that relied on purchasing assets after a WMB failure.[1350]

The Examiner found no evidence that the call was intended to interfere with JPMC's plan to purchase WMI in an open market transaction. To the contrary, the evidence suggests that FDIC preferred and tried to facilitate an open market transaction, which required no regulatory involvement and posed less risk to the deposit insurance fund.[1351] Further, as noted above, the Examiner found no evidence that JPMC had any plans to purchase WMI on an open bank basis on September 16. Mr. Dimon indicated that regardless of whether WMB was placed in receivership, JPMC would not have purchased the bank in an open market transaction because the debt of the holding company created too much capital risk for JPMC.[1352] JPMC was content to forego a possible acquisition of WMI if another party was willing to purchase WMI on an

[1347] JPMCD_000004856.00001, at JPMCD_000004856.00015; Dimon Interview.

[1348] Dimon Interview.

[1349] FDIC Submission at 12.

[1350] *Id.*

[1351] Wigand Interview.

[1352] Dimon Interview.

open bank basis.[1353] Given the totality of the facts, the Examiner finds that it is unlikely that the Debtors could prove that the FDIC knew of and intentionally and improperly interfered with any third party's serious intent to purchase WMI in an open market transaction.

## G.  Conclusions

In sum, the Examiner concludes that substantial legal impediments make it highly unlikely that any claims against the FDIC would succeed. In addition, the Examiner's factual investigation did not uncover facts sufficient to support a prima facie case for any claim against the FDIC, even if the legal impediments could be overcome. Although not all factual questions have been answered, the Examiner concludes that answers to any open questions are ultimately immaterial given what is already known and the strength of the FDIC's legal defenses.

## XII.  LIMITED EXAMINATION OF THIRD PARTY AND NON-RELEASED CLAIMS

The Examiner conducted a limited inquiry concerning the Retained Claims. Due to the potential breadth of this area and the limited time afforded for the Examination, the Examiner focused on identifying claims ("Third Party Claims" or "Retained Claims") that might provide a substantial recovery to the Estates or that were of particular interest to Equity. For purposes of this inquiry, the Examiner assumed that any potential claims against third-party advisors, agents, and professionals are retained.

In conducting his inquiry, the Examiner conferred with the Debtors, the Equity Committee, and the Creditors Committee. The Examiner also reviewed public filings and materials supplied by various parties. The Examiner evaluated potential Third Party Claims that, if proven, could support causes of action for securities fraud, breach of contract, breach of

---

[1353] *Id.*

328

fiduciary duty, and professional negligence/malpractice, among others.[1354] The primary third parties against whom allegations have been raised include: (a) financial advisors; (b) accounting professionals; (c) legal professionals; and (d) the directors and officers of WMI and WMB. Potential antitrust claims against third parties are discussed in the JPMC Section of this Report.

The Examiner was advised by the Debtors and other parties that only limited factual development and analysis had been conducted with respect to the Third Party Claims. The Examiner was advised that meritorious Retained Claims would be fully investigated at a later date.[1355] The Debtors also informed the Examiner that they were attempting to obtain, and had obtained, tolling agreements from any party against whom a claim might be asserted.

Although substantial claims may exist against third parties which should be further investigated and pursued, the Examiner has concluded that, for purposes of evaluating the Settlement, the Court and parties in interest should assume that the amount of recoveries from Retained Claims will not be sufficient to result in any substantial recovery for the Estates. Based on the currently available facts, the Examiner finds no combination of claims is likely to result in recoveries sufficient for the Estates to generate distributions to Shareholders. Other than the facts set forth in this Report, whether a claim exists against any third party is beyond the scope of the Investigation conducted by the Examiner.

The following discussion is not a dispositive analysis of all outstanding claims, nor is it intended to be. Rather, set forth below is a limited evaluation of some, but not all, of the potential claims that will remain following the Settlement. No final conclusions have been

---

[1354] The Examiner did not consider and does not offer any findings or conclusions with respect to claims that may be pursued directly by shareholders in class action litigation.

[1355] Alvarez & Marsal, which will be responsible for pursuing retained claims should the Plan be confirmed, advised the Examiner that Retained Claims would be pursued to the fullest extent possible. In addition, the proposed Liquidation Trustee, William Kostorous of Alvarez and Marsal, represented to the Examiner that he would confer with stakeholders, including the Creditors Committee and the Equity Committee, with respect to the pursuit of such claims.

reached with respect to the merits of any claims discussed herein, all of which would require further factual development to make final conclusions.

## A. Investigation of Retained Claims Against Goldman Sachs

### 1. Background

In the years 2006 and 2007, Goldman Sachs worked with WMI and WMB in connection with the issuance of certain trust preferred securities.[1356] In 2008, WMI retained Goldman Sachs as "financial advisor in connection with the possible sale of all or a portion of [WMI] and to explore capital raising alternatives."[1357] As a result of these engagements, Goldman Sachs had access to significant confidential information related to WMI and its subsidiaries. During March 2008, Goldman Sachs worked with another financial advisor also retained by WMI, Lehman Brothers Holdings Inc.,[1358] to find potential acquirers or investors for WMI.[1359] This included, among other tasks, setting up a data room and holding due diligence sessions.[1360] This work resulted in the April 2008 capital investment led by TPG.[1361]

In addition, beginning in July 2008 and continuing through the days preceding OTS's seizure of WMB, Goldman Sachs continued to serve as a financial advisor to explore a potential sale of all or a part of WMI, to explore capital raising alternatives, and to assist WMI in its

---

[1356] Interview of John Mahoney, August 25, 2010 ("Mahoney Interview"); Interview of Scott Romanoff, September 17, 2010 ("Romanoff Interview").

[1357] Mahoney Interview; Romanoff Interview; Interview of Huntley Garriott, October 12, 2010 ("Garriott Interview"); WMI_PC_701361033.00001.

[1358] The Examiner did not investigate Lehman Brothers Holdings Inc., or its affiliates, and notes that it filed for bankruptcy on September 15, 2008. *See In re Lehman Brothers Holdings, Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 15, 2008). As disclosed in his Retention Application, the Examiner also has a conflict as to Lehman Brothers.

[1359] Mahoney Interview.

[1360] Mahoney Interview; Garriott Interview.

[1361] Mahoney Interview; Garriott Interview.

analysis and consideration of various available financial alternatives.[1362]  During this time period, WMI, with the assistance of Goldman Sachs, focused on a variety of options, including, inter alia, looking for buyers, searching for strategic investors to take a minority interest, exchanging debt for common equity, and selling off pieces of the bank.[1363]  Goldman Sachs also engaged in efforts to provide interested investors and acquirers with due diligence.[1364]

## 2.    Overview of Issues

Any potential theories of recovery against Goldman Sachs by the Estates would ultimately be based on its misuse of WMI's confidential information.  Because Goldman Sachs may have engaged in and did publicly recommend the short selling of WMI's stock while in possession of WMI's confidential information, it has been suggested that claims sounding in breach of contract, breach of fiduciary duty, and securities fraud may lie against Goldman Sachs and have value to the Estates.[1365]

Goldman Sachs had significant involvement with WMI, including WMI's senior management, and had extensive access to confidential information of WMI.  Published reports suggest that Goldman Sachs engaged in short selling of WMI securities while it was engaged as

---

[1362] Mahoney Interview; Garriott Interview.  The Examiner was provided an engagement letter dated September 15, 2008 between WMI and Goldman Sachs addressing financial services.  That letter stated that the letter would amend and restate the March 30, 2008 engagement letter.  WAMUBKEXAM-GS-000001, at WAMUBKEXAM-GS-00001-10.  In addition, Goldman Sachs provided the Examiner a letter dated September 24, 2008 between WMI and WMB and Goldman Sachs addressing financial services Goldman Sachs would perform for WMI.  The copy shows only a signature of Goldman Sachs and notes on the first page "GS Comments of September 24, 2008." WAMUBKEXAM-GS-000001, at WAMUBKEXAM-GS-000011-19.  Neither the Debtors nor Goldman Sachs provided the Examiner with fully executed copies of the September 15, 2008 or the September 24, 2008 letters.  Nevertheless, many parties confirmed that Goldman Sachs performed work for the Debtor between April 2008 and the time of the seizure and sale of WMB in September 2008.

[1363] Mahoney Interview.

[1364] Mahoney Interview; Garriott Interview; Interview of John Esposito, October 5, 2010 ("Esposito Interview").

[1365] Causes of action that may also be asserted with respect to Goldman Sachs are: (i) breach of the covenant of good faith and fair dealing; (ii) breach of fiduciary duty; (iii) fraud; (iv) fraud by concealment; (v) negligence; (vi) tortious interference with contract/business expectancy; (vii) unfair competition; and (viii) professional negligence/malpractice.  These additional causes of action all arise from the same general nucleus of facts as those that could support claims for securities fraud and breach of contract.  Consequently, each of these theories is not individually addressed.

WMI's financial advisor.[1366]  Indeed, in April and May 2008, Goldman Sachs analysts issued recommendations to short WMI stock, although they also recommended buying the company's bonds and credit default swaps.[1367]  At one time, WMI's management voiced concerns about Goldman Sachs's use of confidential information obtained in an advisory capacity in connection with trading activities.[1368]  WMI's former CEO expressed mistrust of Goldman Sachs because "they were shorting mortgages big time while they were giving [Countrywide] advice."[1369] Despite these concerns, WMI retained Goldman Sachs as a financial advisor.[1370]

It does not appear that Goldman Sachs engaged in significant proprietary trading of WMI stock in 2008.  As reflected in the chart below, the proprietary trading business units of Goldman Sachs's affiliates realized modest net proceeds of approximately $4.2 million from trading of WMI common equity securities during 2008.[1371]

---

[1366] Gretchen Morgenson & Louise Story, *Clients Worried About Goldman's Dueling Goals*, N.Y. Times, May 18, 2010, http://www.nytimes.com/2010/05/19/business/19client.html.

[1367] Roddy Boyd, *Goldman Makes the Short List*, CNNMoney.com, May 5, 2008, http://money.cnn.com/2008/04/15/news/companies/boyd_goldman.fortune/index.htm?postversion=2008041604; *Goldman: Short WaMu Stock, Buy The Bonds*, The Wall St. J., April 11, 2008, http://blogs.wsj.com/marketbeat/2008/04/11/goldman-sell-wamu-stock-buy-the-bonds/tab/print/.

[1368] In an email from October, 2007, Todd Baker, WMI's Executive Vice President for Corporate Strategy, told Kerry Killinger, former President, Chief Executive Officer, and Chairman of the Board of WMI/WMB: "[W]e always need to worry a little about Goldman because we need them more than they need us and the firm is run by traders." *See* Mot. of Official Cmm. of Equity Sec. Holders for the Apptmt. of an Examiner, Ex. A (Memo in Supp. of Mot. of Official Cmm. of Equity Sec. Holders for the Apptmt. of an Examiner) at Ex. 9 (containing Permanent Subcommittee on Investigations Exhibit # 69a), *In re Washington Mutual Inc.*, Case No. 08-12229 (MFW) (Bankr. D. Del.) (the "Bankruptcy Case") (June 8, 2010), Dkt. No. 4644.

[1369] *See id.*

[1370] Mahoney Interview; Romanoff Interview; Garriott Interview.

[1371] The chart was provided by Goldman Sachs in response to the Examiner's request. The Examiner has not independently verified the content of the chart. The chart provides a summary, for each quarter of fiscal year 2008, of the aggregate volume and proceeds of WMI common equity traded by businesses that Goldman Sachs has identified as "proprietary trading business units." These business units are principal equity strategies, credit principal investing, and macro proprietary trading businesses (which potentially includes activity of Goldman Sachs's affiliates). Goldman Sachs stated the following with regard to the chart: (i) the chart did not previously exist in this form at Goldman Sachs; (ii) Goldman Sachs used various technology and manual resources to generate the chart; and (iii) while Goldman Sachs believes the chart is reasonably accurate, Goldman Sachs cannot make an absolute representation that it is complete or that there were not some inadvertent errors in its preparation. The Net Proceeds are calculated on a first-in and first-out basis and, accordingly, do not exactly reflect net profit.

**SUMMARY OF GOLDMAN SACHS TRADING AND POSITIONS IN WAMU COMMON STOCK
(SELECTED PERIODS - 2008)**

**PROPRIETARY TRADING WAMU COMMON EQUITY ACTIVITY**

| Quarter | Shares Bought | Proceeds | Shares Sold | Proceeds | Net Shares | Net Proceeds |
|---|---|---|---|---|---|---|
| 2008-Q1 | 2,173,068 | (26,379,221) | (2,173,068) | 30,667,360 | - | 4,288,139 |
| 2008-Q2 | - | - | - | - | - | - |
| 2008-Q3 | 100,000 | (251,862) | (100,000) | 235,527 | - | (16,336) |
| 2008-Q4 | - | - | - | - | - | - |

The March 30, 2008 engagement letter between WMI and Goldman Sachs explicitly states:

> Goldman Sachs . . . may make or hold a broad array of Investments and actively trade . . . equity securities . . . for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities . . . [which] may involve securities and instruments of [WMI] . . . .[1372]

In other words, the engagement letter expressly contemplates that Goldman Sachs may engage in short selling of WMI stock. In addition, the letter disclaimed any fiduciary duty to WMI and, by signing the letter, WMI waived any claim based on an assertion of such duty.[1373] For the reasons stated below, the Examiner concludes there is insufficient evidence to establish that Goldman Sachs improperly used confidential WMI information. Even if Goldman Sachs had engaged in such conduct, significant legal barriers exist for WMI as an entity to recover damages on this basis.

---

[1372] WMI_PC_701361033.00001, at WMI_PC_701361033.00004.

[1373] WMI_PC_701361033.00001, at WMI_PC_701361033.00005 ("It is understood and agreed that Goldman Sachs will act under this letter as an independent contractor with duties solely to [WMI] and nothing in this letter or the nature of [Goldman Sachs's] services in connection with this engagement or otherwise shall be deemed to create a fiduciary duty . . . .").

### 3. Legal Standards

#### a. Breach of Contract

Under New York law, a breach of contract claim has four elements: (i) the making of a contract; (ii) the plaintiff's performance of the contract; (iii) the defendant's breach of the contract; and (iv) damages suffered by the plaintiff.[1374]

The Examiner knows of no facts to suggest, nor did the Examiner's review uncover any indication, that Goldman Sachs breached its contract with WMI or otherwise did not perform its contractual duties. Goldman Sachs agreed to act as a "financial advisor" in connection with the potential sale of WMI and to explore capital raising alternatives.[1375] The Examiner interviewed several witnesses, all of whom had no complaints about Goldman Sachs's work.

Another breach of contract theory is that Goldman Sachs engaged in or encouraged shorting of WMI stock. However, short selling of WMI stock was expressly contemplated under the executed Goldman Sachs engagement letter dated March 30, 2008.[1376] Goldman Sachs's short selling was not a breach of contract. Further, during the time period that any short sales of WMI stock would have occurred, the financial markets were extremely volatile, rumors regarding the stability of financial institutions were rampant, and stock prices were fluctuating.[1377] In addition, during this same time period, other securities analysts were

---

[1374] *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1060 (S.D.N.Y. 1996). Similarly, under Washington State law, the elements of breach of contract are: (i) existence of valid contract which imposes a duty; (ii) the contractual duty is breached; and (iii) the breach proximately causes damage to the claimant. *Nw. Indep. Forest Mfrs. v. Dept. of Labor & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995).

[1375] WMI_PC_701361033.00001.

[1376] The letter dated September 15, 2008, and the letter dated September 24, 2008, both unsigned, contain the same language permitting short sales. *See* WAMUBKEXAM-GS-000001, at WAMUBKEXAM-GS-000005-13.

[1377] Interview of Kerry Killinger, August 30, 2010 ("Killinger Interview").

recommending selling WMI stock.[1378] In any event, the occurrence of short selling, by itself, does not establish a causal connection to an improper use of confidential information.

Based on the Examiner's limited review, there is insufficient evidence to ascribe significant value to the Retained Claims against Goldman Sachs for breach of contract. Other than conclusions based on the limited facts set forth in this Report, the Examiner can offer no findings as to whether a breach of contract claim exists against Goldman Sachs.

### b. Securities Fraud

If Goldman Sachs used material non-public information relating to WMI in making investment decisions or recommendations concerning WMI securities, including short sales, such conduct could constitute unlawful insider trading.[1379]

---

[1378] Ari Levy, *WaMu Falls 20% as Analysts See Need for More Capital (Update1)*, Bloomberg, July 23, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aFdn9AcIcrmI&refer=home (referencing Piper Jaffray Cos.'s "sell" rating and Merrill Lynch's "underperform" rating).

[1379] According to the SEC's website, "[i]llegal insider trading refers generally to buying or selling a security, in breach of a fiduciary duty or other relationship of trust and confidence, while in possession of material, nonpublic information about the security." Sec. Exch. Comm'n, http://www.sec.gov/answers/insider.htm (last visited Oct. 23, 2010). Violations based on insider trading "may also include 'tipping' such information, securities trading by the person 'tipped,' and securities trading by those who misappropriate such information." Sec. Exch. Comm'n, http://www.sec.gov/answers/insider.htm (last visited Oct. 23, 2010). Section 10(b) of the Securities and Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). The SEC implemented Section 10(b) by adopting Rule 10b-5, which provides, in pertinent part, that it is unlawful, in connection with the purchase or sale of securities:

    (a)    To employ any device, scheme, or artifice to defraud,

    (b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

    (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Under traditional or classical theories of insider trading liability, § 10(b) and Rule 10b-5 are violated "when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997). This traditional theory applies to officers, directors, permanent insiders of a corporation as well as to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation. *Id.* at 652.

Under the misappropriation theory of insider trading, fraud is committed "in connection with" a securities transaction, and 10(b) and 10b-5 are violated, when a person misappropriates confidential information for securities

Goldman Sachs, like many full-service banking firms, performs investment banking and advisory services as well as securities trading and investment management services. These firms typically adopt safeguards that prevent material non-public information obtained in the course of rendering client advisory services from informing securities trading and investment activity. Goldman Sachs generally referred to these safeguards as a "Chinese Wall." Goldman Sachs had such a "wall" in place between individuals on its investment banking side (who would have been involved in advising WMI) and those on its securities side (who would have been involved in trading activities).[1380]

Goldman Sachs's procedures are codified in its "IBD Chinese Wall Bulletin" ("Bulletin").[1381] According to the Bulletin:

> [Goldman Sachs] has adopted Chinese Wall procedures designed to prevent personnel engaged in research, sales, trading, or other non-advisory activities (the **sales and trading side of [Goldman Sachs]**) from gaining access to confidential information that the Firm may have acquired or developed in connection with the investment banking or other advisory activities of other personnel, such as IBD personnel, (the **advisory side of [Goldman Sachs]**).[1382]

The Bulletin provides procedures for "inter-divisional communications" to govern communications between "IBD personnel who need to obtain information from divisions or departments on the sales and trading side of" Goldman Sachs.[1383] Among those procedures is the requirement that, aside from routine communications, employees are required to consult their senior team leader to identify the proposed individual to contact, the nature of the information the employee is seeking to obtain, and the degree (if any) that confidential information would

---

trading purposes in breach of a duty owed to the source of the information. *Id.* This theory provides that "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information. *Id.*

[1380] Mahoney Interview.

[1381] WAMUBKEXAM-GS-000425. "IBD" refers to the Investment Banking Division of Goldman Sachs.

[1382] WAMUBKEXAM-GS-000425 (emphasis in original).

[1383] WAMUBKEXAM-GS-000425, at WAMUBKEXAM-GS-000426-28.

need to be communicated in order to obtain the needed information. The Bulletin sets forth a series of subsequent controls to address any "wall-crossings" and provides security procedures related to conversations, discussions, calls, documents, computer security, and building security.[1384] Goldman Sachs also has a compliance department responsible for overseeing Goldman Sachs's wall policies.[1385]

The Examiner interviewed three employees of Goldman Sachs who had worked extensively with WMI. Each of these individuals advised the Examiner that, to the best of his knowledge, the "wall" was not breached with respect to WMI, nor was he aware of any violations of Goldman Sachs's policies and procedures.[1386] Absent a misuse of material non-public information -- and the Examiner is unaware of any evidence that such misuse occurred -- Goldman Sachs's trading in WMI stock cannot be a basis for recovery by WMI on a theory of securities fraud.[1387] It should be noted that the Examiner did not interview any Goldman Sachs employees from the trading side of the company.

Moreover, if Goldman Sachs used insider information to short sell WMI stock, the resulting securities claims would not benefit the Estates. As a general matter, standing to bring a private damages action for insider trading is limited to purchasers and sellers of the securities at issue.[1388] To have standing to bring a claim against Goldman Sachs, WMI would need to show

---

[1384] WAMUBKEXAM-GS-000425, at WAMUBKEXAM-GS-000433-35.

[1385] Garriott Interview.

[1386] Mahoney Interview; Romanoff Interview; Garriott Interview.

[1387] To curtail the activity of short sellers, the SEC decided to restrict short selling of certain banks and investment firms through the use of the "Do Not Short" list. This list did not, however, include WMI. Killinger Interview.

[1388] Standing to bring an implied private damages action under Section 10(b) and Rule 10b-5 is limited to purchasers and sellers of the securities at issue under the classical theory, and could also be limited under the misappropriation theory. *See Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 37 (2d Cir. 2005) ("While the SEC or the United States may bring an enforcement action under the Rule so long as someone buys or sells the security during the period of allegedly fraudulent conduct . . . private litigants may only bring an action under Rule 10b-5 when they are themselves purchasers or sellers of the securities in question."), *vacated on other grounds*, 547 U.S. 71 (2006); *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 732-33 (1975) (holding that standing to

that it purchased or sold the securities at issue at the time Goldman Sachs was short selling as a result of insider information.[1389]

For purposes of evaluating the Settlement, the Examiner is currently unable to ascribe value to any potential recovery related to the retained securities fraud claims against Goldman Sachs. Whether a securities fraud claim exists against Goldman Sachs is beyond the scope of the Investigation conducted by the Examiner.

## B.     Investigation of Retained Claims Against Deloitte & Touche

The Examiner conducted a limited review of the services performed for WMI by Deloitte & Touche LLP ("Deloitte"), WMI's external auditors.

### 1.     Background

For the years ending 2004 through 2007, Deloitte expressed unqualified audit opinions that WMI's financial statements accurately reflected the company's financial position.[1390] Deloitte also performed financial statement reviews in connection with WMI's quarterly reports.[1391]

WMI's management was responsible for estimating incurred credit losses inherent in the loan portfolio. The Allowance for Loan and Lease Losses ("ALLL") represents this management estimate. Companies must build reserves for their ALLL, which negatively impacts bank capital. Consequently, an unreasonably low ALLL would have the effect of overstating bank capital and understating loan loss expenses. Deloitte's function as outside auditor was to test the reasonableness of the estimate and the estimation process. For the quarter ending June

---

bring a private damages action under SEC rule 10b-5 is limited to actual 'purchasers' or 'sellers' of securities, as those terms are defined by the Securities Exchange Act of 1934); *Liberty Prop. Trust v. Republic Prop. Corp.*, 577 F.3d 335, 338 (D.C. Cir. 2009) (same).

[1389] Given that WMI sold stock to TPG in April 2008, WMI may have standing to prosecute this claim.

[1390] Financial results for WMB were consolidated with WMI's results.

[1391] Interview of John Voelkel, October 7, 2010 ("Voelkel Interview").

30, 2008, WMI reported a total loan portfolio value of $239.6 billion[1392] and an ALLL of approximately $8.5 billion, resulting in a net reported loan value of $231.1 billion.[1393] Deloitte performed a review (not an audit) of WMI's financial statements reflecting this ALLL amount.[1394]

In connection with its 2007 audited financial statements, which Deloitte audited, WMI estimated the fair value of its loan portfolio pursuant to FASB 107.[1395] FASB 107 required WMI to estimate and disclose the fair value of all financial assets such as securities and loans. Its purpose is to provide an assessment of the fair value that a company could get in a sale of those assets to a hypothetical purchaser. It does not have an impact on a company's financial statements with regard to its cash flow, its balance sheet, or its statement of profit and loss for assets not recorded at fair value.[1396] FASB 107 also uses a different calculation from otherwise applicable standards for determining an appropriate ALLL or a fair value adjustment of assets for purchase accounting purposes.[1397]

Pursuant to FASB 107, WMI calculated and disclosed in Note 24 to its year-end 2007 financial statements that the fair value of its loan portfolio was $226.3 billion, versus a book value of $241.8 billion, or a markdown of approximately $15.5 billion.[1398] WMI's 2007 financial statements were filed on February 29, 2008. This reported amount represented a

---

[1392] By contrast, when it bought WMB out of receivership on September 25, 2008, JPMC accounted for expected losses in WMI's loan portfolio pursuant to purchase accounting standards by writing down the loan portfolio by approximately $30 billion, from $240 billion to $210 billion.

[1393] WMI, Quarterly Report (Form 10-Q) at 2 (Aug. 11, 2008).

[1394] Voelkel Interview.

[1395] WMI_PC_701361055.00001; WMI_PC_701361065.00001.

[1396] Interview of Alan Schaub, October 25, 2010 ("Schaub Interview").

[1397] Schaub Interview.

[1398] WMI, Annual Report (Form 10-K) at 181-84 (Feb. 29, 2008) (regarding Note 24: Fair Value of Financial Instruments).

significant change from calculations made weeks earlier. On February 12, 2008, WMI had estimated that the fair value of its portfolio of loans held for investment ("HFI") was $214.9 billion, or a markdown of $26.9 billion to carrying value.[1399] By February 20, 2008, WMI estimated that the fair value of the HFI portfolio was $217.3 billion, or a markdown of $24.5 billion.[1400]

In view of the changes in valuation during February 2008, the Examiner reviewed Deloitte's involvement in and knowledge of WMI's FASB 107 disclosure for 2007. To arrive at a fair value determination, WMI relied on a complex model employing various market inputs that sought to account for how a potential purchaser of WMI's mortgage loan products would have valued those loan assets.[1401] At the time, a significant complicating factor in calculating fair value was a lack of observable sales from which to draw comparisons. According to Deloitte, the uncertainty and turbulence in the economy generally, and housing market in particular, significantly complicated this process. Deloitte made clear that WMI's management, not Deloitte, was solely responsible for and involved in preparing these estimates. Deloitte was responsible for testing the reasonableness of those estimates.[1402]

The Examiner did not locate documents or obtain statements explaining in detail how WMI arrived at the initial estimates of the fair value of its loan portfolio. These initial estimates of fair value of between $215 billion and $217 billion are conspicuously smaller than the final, disclosed estimate of over $226 billion. However, there was a general understanding shared by both WMI and Deloitte that the earlier figures were preliminary and subject to change and

---

[1399] WMI_PC_701361055.00001

[1400] Id.

[1401] Schaub Interview.

[1402] Id.

refinement. WMI arrived at the final numbers based on a complex, lengthy process. In addition, the final number incorporated into the financial statements was approved by WMI's valuation committee before being included in WMI's 10-K. Although the final estimates of fair value may have been too high, the process of arriving at the final FASB 107 disclosure figure was not contentious, and Deloitte was in agreement with the final analysis and found the estimation process and valuation reasonable.[1403]

## 2. Legal Standards

The Examiner considered whether the foregoing facts or potentially other facts could be the basis for a claim by WMI against Deloitte for malpractice.[1404] New York law provides that "a claim of [accounting] malpractice requires proof that there was a departure from the accepted standards of practice and that the departure was a proximate cause of the injury."[1405] Under New York law, "a professional's failure to perform his job in accordance with the standards required of one in his field states a claim in tort or malpractice," a form of negligence.[1406] When an auditor negligently performs its duties, its client has a cause of action against the auditor. To establish a claim for professional malpractice by the auditors, the Estates must show: (1) that the auditors owed a duty to the audit client; (2) that the auditors breached that duty; (3) that there is "a reasonably close causal connection" between the breach of duty and the injury; and (4) "actual loss, harm, or damage."[1407]

---

[1403] *Id.*

[1404] Additional theories for causes of action against Deloitte include: (i) breach of contract; (ii) aiding and abetting breach of fiduciary duty; and (iii) negligent misrepresentation. These additional causes of action have not been individually addressed as part of the Examination because, if applicable, they would generally arise from the same nucleus of facts necessary to support a claim for professional malpractice.

[1405] *Kristina Denise Enters., Inc. v. Arnold*, 838 N.Y.S.2d. 667, 668 (N.Y. App. Div. 2007).

[1406] *Bloor v. Dansker* (*In re Investors Funding Corp. of New York Sec. Litig.*), 566 F. Supp. 193, 201 (S.D.N.Y. 1983).

[1407] *Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 299 (2d Cir. 1997); *see also Sharp Int'l Corp. v. KPMG LLP* (*In re Sharp Int'l Corp.*), 319 B.R. 782, 790 (Bankr. E.D.N.Y. 2005) (finding claim for

Based on a preliminary review, the Examiner found little to support malpractice claims against Deloitte, and no specific harms were identified during the limited examination period. Further, after acquiring the assets of WMB, JPMC found no irregularities in the books and records of WMB to suggest such malpractice.[1408] Based on a very limited investigation, the Examiner has not uncovered evidence of professional malpractice. Given the complexity of accounting malpractice claims, a full evaluation of such claims would require substantial further work.

It should be recognized, however, that even if evidence of malpractice is found, it is not clear that such evidence would provide the basis of a claim that would inure to the benefit of the Debtors. A claim for malpractice would require a showing that Deloitte breached customary practices of its profession in a manner resulting in "a reasonably close causal connection" between the breach of duty and the injury.[1409] It is unlikely that Deloitte's conduct caused injury to WMI. As a practical matter, WMI would know more about the quality of its own assets than Deloitte would have known or expressed in its audit opinion. Thus, there likely would be no reliance by WMI on the audited financial statements. Without reliance, there could be no injury to WMI. While the shareholders may have relied upon Deloitte's work and may have a claim, it is unlikely that WMI has a claim under the facts known to the Examiner.

For the foregoing reasons, even assuming the final fair value estimates may have been too high, the Examiner is unable to conclude on these facts that a viable cause of action exists

---

professional malpractice by auditor withstands motion to dismiss based on alleged breaches of professional standards in conducting audit).

[1408] Interview of Michael Cavanagh, September 22, 2010 ("Cavanagh Interview").

[1409] *Integrated Waste Servs., Inc.*, 113 F.3d at 299; *see also Sharp Int'l Corp. v. KPMG LLP* (*In re Sharp Int'l Corp.*), 319 B.R. 782, 790 (Bankr. E.D.N.Y. 2005) (finding claim for professional malpractice by the auditor withstands motion to dismiss based on alleged breaches of professional standards in conducting audit).

against Deloitte. Further, the Examiner cannot ascribe significant value to any potential recovery deriving from the Retained Claims against Deloitte.

## C.    **Investigation of Retained Claims Against Weil Gotshal**

### 1.    **Background**

In mid-September 2008, WMI retained the law firm of Weil, Gotshal & Manges LLP ("Weil") to provide legal advice and counsel regarding the "evaluation of strategic options and possible restructuring of" WMI.[1410] Following the seizure of WMB and the sale of substantially all of WMB's assets to JPMC, Weil provided advice in connection with the bankruptcy filing on September 26, 2008, and relating to WMI's rights and obligations as the Debtors.[1411] Various attorneys from Weil, including Marcia Goldstein, Michael Walsh, Brian Rosen, Simeon Gold, and Adam Strochak, provided legal advice to the Board.[1412] Weil continues to represent the Debtors in the Bankruptcy Case.

The Examiner conducted a preliminary review of claims that Weil acted improperly in its representation of WMI. Equity has suggested that: (1) Weil had a conflict of interest in its representation of WMI due to its simultaneous representation of JPMC and affiliated entities in unrelated matters; (2) Weil failed to provide competent representation with regard to WMI's decision not to challenge the OTS order seizing WMI; and (3) Weil negligently prepared the Receivership Claim required by 12 U.S.C. § 1821(d) by failing to raise business tort claims against JPMC and claims that the FDIC sold WMB for too little, thereby barring any such claims in the future.

---

[1410] WGM_00038641.

[1411] *See, e.g.*, WMI_PC_08788141.00001; WMI_PC_08788142.00001; WMI_PC_08788143.00001; WMI_PC_08788146.00001.

[1412] *See, e.g.*, WMI_PC_08788141.00001; WMI_PC_08788142.00001; WMI_PC_08788143.00001; WMI_PC_08788146.00001.

a.    Conflict of Interest

On October 11, 2008, the Debtors applied to the Court to have Weil retained as general

bankruptcy counsel pursuant to Section 327(a) of the Bankruptcy Code.[1413]  Attached to this

application is the Affidavit of Brian Rosen, disclosing JP Morgan Chase Bank, JP Morgan

Securities Inc., JPMorgan Chase, JP Morgan Chase-London, JP Morgan Chase-Luxembourg,

and JP Morgan Investment Management as current clients of Weil in unrelated matters.  The

affidavit also stated that the fees received by Weil for representation of these entities were

minuscule, and that, notwithstanding such simultaneous representation, Weil was "disinterested"

as such term is defined in Section 101(14) of the Bankruptcy Code.[1414]

In a hearing before Judge Walrath on October 30, 2008, Mr. Rosen stated that Weil's

only restriction with regard to representation of the Debtors vis-à-vis JPMC, without the consent

of JPMC,[1415] would be lender liability or avoidance actions against JPMC.[1416]  If such actions

were required on behalf of the Debtors, conflicts counsel would be retained.[1417]  Judge Walrath

granted the Debtors' application to retain Weil, noting that Weil was required to notify the U.S.

---

[1413] Debtors' Appl. for Auth. to Employ & Retain Weil, Gotshal & Manges LLP, Bankruptcy Case (Oct. 10, 2008), Dkt. No. 64.

[1414] Debtors' App. for Auth. to Employ & Retain Weil, Gotshal & Manges LLP, Ex. B ¶ 17, Bankruptcy Case (Oct. 10, 2008), Dkt. No. 64.

[1415] The engagement letter between Weil and WMI dated September 19, 2008, contained a broad waiver that would cover the JPMC entities in matters not substantially related to the work that Weil was undertaking for WMI. WGM_00038641.

[1416] Tr. of Hr'g at 15, Bankruptcy Case (Oct. 30, 2008), Dkt. No. 252.  JPMC agreed, by letter to Weil dated March 19, 2008, to grant waivers to permit Weil to represent other clients in bankruptcies where JPMC had an adverse interest.  WMI_PC_701361067.00001.  However, a specific waiver would be required from JPMC in certain situations, including the assertion of lender liability, any attack on the validity or priority of the JPMC claims, and the prosecution of any proceeding to recover any monies paid or transferred to JPMC by a debtor as a voidable transfer.  Id.

[1417] Quinn Emanuel Urquhart Oliver & Hedges, LLP ("Quinn Emanuel") was retained as conflicts counsel pursuant to Order of the Bankruptcy Court dated May 19, 2009.  Order Authorizing Emp't and Retention of Quinn Emanuel, Bankruptcy Case (May 19, 2009), Dkt. No. 1043.

Trustee and the Creditors Committee if it became aware of any possible claims against JPMC in the Bankruptcy Case.[1418]

During the early stages of the case, Weil obtained a verbal waiver from JPMC to permit it to continue the negotiations regarding the Disputed Accounts. William Kosturos stated that he did not feel the conflict between the Debtors and JPMC at this stage was significant. When the JPMC Action was filed on March 24, 2009, Weil advised Mr. Kosturos of the need to retain alternate counsel for JPMC litigation. Quinn Emanuel Urquhart Oliver & Hedges, LLP ("Quinn Emanuel") was then retained to represent WMI in that regard. Mr. Kosturos stated that, from that point forward, he has relied on the advice of Quinn Emanuel regarding the JPMC Action and that the Board of Directors of WMI made the decision to settle the matter based on legal advice from Quinn Emanuel.[1419] Mr. Kosturos and Quinn Emanuel both advised the Examiner, during interviews at which Weil was not present, that Weil did not interfere with or limit the pursuit of any claims against JPMC. Although Weil drafted the Settlement Agreement, Quinn Emanuel reviewed it and added comments.

      b.      <u>WMI's Decision Not to Challenge the OTS Order Seizing WMB</u>

The Debtors consulted with Weil and the Creditors Committee to decide whether to challenge the OTS's seizure of WMB and the appointment of the FDIC as Receiver.[1420] Title 12, section 1464(d)(2)(B) provides the exclusive mechanism to challenge the OTS order seizing WMB and appointing the FDIC as Receiver.[1421] Pursuant to the statute, the Debtors were required to bring the claim within thirty days of the appointment of the FDIC as Receiver or the

---

[1418] Tr. of Hr'g at 19-20, Bankruptcy Case (Oct. 30, 2008), Dkt. No. 252.

[1419] Interview of William Kosturos, October 25, 2010 ("Kosturos Interview").

[1420] WMI_PC_08788146.00001 (citing redacted portion).

[1421] 12 U.S.C. § 1464(d)(2)(B).

claim would be deemed waived.[1422] Weil noted that the Debtors could separately assert a claim for damages against the government.[1423]

Following a presentation by Weil to the Board of Directors of WMI and several other legal professionals weighing the legal and practical implications of such a lawsuit, its attendant risks and costs, and the benefit to be derived from instituting the litigation, the Board of Directors of WMI determined not to challenge the appointment of a receiver.[1424] The Board of Directors so decided while reserving all other rights and remedies.[1425]

Assuming the Debtors had successfully challenged the OTS's seizure and appointment of the FDIC as Receiver pursuant to 12 U.S.C. § 1464(d)(2)(B), the exclusive statutory remedy available to WMI would be an order directing the OTS to remove the Receiver and return the shell back to WMI control.[1426] The Examiner concluded that there is substantial doubt whether the statute permits WMI to unwind the sale of WMB's assets to JPMC.[1427]

c.    Decision to File a Receivership Claim to Preserve Rights

The FDIC Receiver established December 30, 2008 as the deadline to file claims against the Receivership as required by 12 U.S.C. § 1821(d).[1428] Weil, on behalf of the Debtors, prepared and filed a Receivership Claim to preserve the Debtors' rights requesting, inter alia,

---

[1422] Id.

[1423] WMI_PC_08788146.00001 (citing redacted portion). Potential theories of recovery could include claims for damages pursuant to the Federal Tort Claims Act or a constitutional challenge pursuant to the Fifth Amendment. The Examiner notes, however, that such claims have been unsuccessful, as discussed in the FDIC Section of the Report.

[1424] WMI_PC_08788146.00001 (citing redacted portion).

[1425] Id.

[1426] 12 U.S.C. § 1464(d)(2)(B). Because the assets would still be owned by JPMC, relief through the Troubled Asset Relief Program ("TARP") and the FDIC insurance coverage limit increase from $100,000 to $250,000 would have provided no relief. WMI would have WMB's remaining assets as well as their liabilities.

[1427] 12 U.S.C. § 1464(d)(2)(B).

[1428] Compl. ¶ 10, *Washington Mutual, Inc. v. Federal Deposit Ins. Corp.*, Case No. 1:09-cv-533 (RMC) (D.D.C.) (the "WMI Action") (Mar. 20, 2009), Dkt. No. 1.

recognition of ownership interests in certain assets, and the avoidance and recovery of certain transfers that WMI made to WMB as preferential or fraudulent transfers.[1429] The Receivership Claim did not raise business torts claims against the FDIC. In addition, the Receivership Claim failed to include a "dissipation"-type claim against the FDIC (i.e., a claim that the FDIC sold the bank for too little).

On January 23, 2009, the FDIC Receiver disallowed the Debtors' claims in a one-page Notice of Disallowance of Claim.[1430] The Debtors filed a complaint in the United States District Court for the District of Columbia on March 20, 2009, challenging the FDIC's disallowance of their claims.[1431] Whether the failure to preserve the potential claim was both malpractice and caused damages will have to await the outcome of this litigation.[1432] As detailed in this Report, however, the Examiner finds little evidence or law to support claims for business torts or dissipation.

## 2. Legal Standards

Under New York law, a legal malpractice claim requires a showing that the defendant attorney breached a duty of care to the client and that the breach was a proximate cause of actual damages.[1433] "In order to prevail in an action to recover damages for legal malpractice, a plaintiff must establish that the defendant attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession, and that the breach of this duty proximately caused the plaintiff to sustain actual and ascertainable damages."[1434] To

---

[1429] FDIC Receiver's Partial Mot. to Dismiss, Ex. 2, WMI Action (June 11, 2009), Dkt. No. 25.

[1430] Compl. at Ex. 2, WMI Action (Mar. 20, 2009), Dkt. No. 1.

[1431] Compl., WMI Action (Mar. 20, 2009), Dkt. No. 1.

[1432] The Examiner concludes that the dissipation claim would fail for the reasons discussed in the FDIC Section of the Report.

[1433] *DiGiacomo v. Levine*, 907 N.Y.S.2d 499, 503 (N.Y. App. Div. 2010).

[1434] *Ali v. Fink*, 890 N.Y.S.2d 576, 577-78 (N.Y. App. Div. 2009).

establish the element of causation, "a plaintiff must show that he or she would have prevailed in the underlying action or would not have incurred any damages but for the attorney's negligence."[1435]

With respect to Weil, the Examiner does note that the terms of the Plan reviewed by the Examiner contain very broad releases, drafted by Weil, which may benefit other Weil clients. Weil has advised that it is revising those releases. Other than the facts set forth in this Report, whether a cause of action exists against Weil or any other legal advisor is beyond the scope of the Investigation conducted by the Examiner.

### D. Retained Claims Against Directors and Officers and Insurance Coverage

The Examiner did not examine whether the directors and officers of WMI and WMB engaged in misconduct that led to WMB's seizure and sale in September of 2008[1436] due to the magnitude of such an inquiry.[1437] The Examiner notes that the Plan proposes that many of the directors and officers will get releases of liability. The Examiner concludes, however, that further factual development may be warranted given the finding, inter alia, of the Inspector General of the OTS and the FDIC that "WaMu failed because of management's pursuit of a high-risk lending strategy coupled with liberal underwriting standards and inadequate risk controls," as well as actions taken by those executives as discussed in this Report. Areas for possible further investigation include:

1. the role of officers and directors in, inter alia, exposing WMI and/or WMB to the risks of subprime lending;

---

[1435] *Ali*, 890 N.Y.S.2d at 578.

[1436] Claims against the directors and officers have been asserted in the following actions: (i) *Koesterer v. Washington Mutual, Inc.*, Civil Action No. 07-cv-09801 (CM) (S.D.N.Y.); (ii) *Abrams v. Washington Mutual, Inc.*, Civil Action No. 07-cv-09806 (AKH) (S.D.N.Y.); and (iii) *Garber v. Washington Mutual, Inc.*, Civil Action No. 07-cv-11422 (UA) (S.D.N.Y.). This litigation should develop the factual record with respect to these issues.

[1437] Any potential claims against the directors, officers, and professionals may be subject to *in pari delecto* defenses that could make it difficult for the Liquidation Trustee to recover on such claims.

2. WMB's underwriting practices and risk controls;
3. whether officers and directors concealed, or deliberately understated, the risks of WMB's business practices; and
4. the extent to which officers and directors simultaneously holding offices in WMI, WMB, and other companies within the WaMu Group had a conflict of interest that resulted in decisions that were harmful to the Debtors.[1438]

Even if there are viable claims against the directors and officers of WMI and/or WMB, the amount of the potential recovery may be limited. Assets to cover such claims, if successful, would come either from the directors and officers of WMI and/or WMB personally, or from management liability and company reimbursement insurance for the directors and officers ("D&O Coverage").

There are two insurance towers that may provide coverage for the directors and officers of WMI and/or WMB[1439] for claims relating to alleged wrongful acts committed by the directors and officers prior to the FDIC's seizure of WMI's assets: (i) the 2007-2008 directors and officers tower (the "2007-2008 D&O Tower"); and (ii) the 2008-2009 directors and officers tower (the "2008-2009 D&O Tower," with the 2007-2008 D&O Tower, the "D&O Towers"). The 2007-2008 D&O Tower had a policy period of May 1, 2007 through April 30, 2008.[1440] Coverage under the 2008-2009 D&O Tower began on May 1, 2008.[1441] This second tower went into run-off mode on September 25, 2008.[1442] In addition, there is a debtor-in-possession policy (the "DIP Policy") that provides coverage for alleged wrongful acts committed by WMI's directors

---

[1438] Tom Casey, the former Chief Financial Officer for Washington Mutual and its subsidiaries, acknowledged that the directors and officers of WMI, WMB, and other companies within the WaMu Group, such as FSB, had fiduciary responsibilities to multiple entities within the WaMu Group and that it was difficult to differentiate between those responsibilities when decisions were made. Interview of Tom Casey, October 21, 2010 ("Casey Interview").

[1439] The directors and officers of both WMI and WMB are covered by the D&O Towers. WMI_PC_000701359802.00001, at WMI_PC_000701359802.00008- 9; WMI_PC_000701359818.00001, at WMI_PC_000701359818.00038.

[1440] WMI_PC_000701359802.00001, at WMI_PC_000701359802.00001.

[1441] WMI_PC_000701359818.00001, at WMI_PC_000701359818.00001.

[1442] WMI_PC_701361021.00001, at WMI_PC_701361021.00001. Because the 2008-2009 D&O Tower went into run-off mode on September 25, 2008, it will not cover any losses relating to post-petition acts.

and officers after the FDIC's seizure of WMB on September 25, 2008, and WMI's bankruptcy filing on September 26, 2008.[1443] The DIP Policy provides coverage starting on September 26, 2008, and remains in effect.[1444] The limits of liability for the D&O Towers and the DIP Policy are as follows:

1. 2007-2008 D&O Tower: $250 million;
2. 2008-2009 D&O Tower: $250 million;[1445] and
3. DIP Policy: $25 million.[1446]

Although ostensibly there is potentially $500 million in D&O coverage available to pay losses for claims related to the alleged pre-petition wrongful acts by WMI's and WMB's directors and officers, WMI's insurers have taken the position that losses from claims against the directors and officers that in any way relate to the financial health and/or failure of WMI are only covered under the 2007-2008 D&O Tower.[1447] By way of example, the insurers contend that any losses relating to any of the following are subject to the 2007-2008 D&O Tower: (i) alleged wrongful acts in connection with the investment by TPG and others in WMI; (ii) failure to realize risks involved in connection with WMI's expansion into subprime mortgage loans; (iii) failure to oust Kerry Killinger despite WMI's poor financial performance; (iv) approving a bonus plan for top executives notwithstanding WMI's poor financial performance; (v) failure to question WMI's strategy regarding capital infusions in the spring of 2008 and further expansion

---

[1443] WMI_PC_701361021.00001, at WMI_PC_701361021.00001.

[1444] WMI_PC_701361025.00001; WMI_PC_701361026.00001.

[1445] WMI_PC_000701359829.00001.

[1446] WMI_PC_701361025.00001; WMI_PC_701361026.00001.

[1447] Pursuant to the 2008-2009 D&O Policy, WMI was required to report all circumstances that may lead to a claim under the policy by April 30, 2009, unless it opted to purchase a one-year extended reporting period (ERP). WMI_PC_000701359818.00001, at WMI_PC_000701359818.00043. It is the Examiner's understanding that WMI purchased the optional ERP for the primary policy only, thus limiting the coverage available for circumstances noticed after April 30, 2009 to $25 million. Thus, for the entire $500 million to be available, the circumstances of a future claim must have been reported to the insurers by April 30, 2009. WMI provided such a notice on April 29, 2009. WMI_PC_701361023.00001, at WMI_PC_701361023.00001. The insurer's response to that notice, discussed above, is set forth in counsel for XL Specialty Insurance Co.'s May 26, 2009 letter in response to WMI's April 29, 2009 Notice of Circumstances letter. WMI_PC_701361023.00001.

into subprime loans; (vi) receiving and relying on outdated financial information provided by WMI's officers beginning as early as spring 2007; and (vii) any and all allegations relating in any way to claims in *In re Washington Mutual Inc. Securities, Derivative and ERISA Litigation*, No. 2:08-MDL-01919, or the FDIC orders of investigation.[1448]

The directors and officers have the ability to dispute the insurers' position that all of the above fall under the 2007-2008 D&O Tower, but because the difference in limits available under the D&O Towers is negligible, it is unlikely that the directors and officers will dispute the insurers' position. As of August 10, 2010, only $11,297,141[1449] has been paid under the 2007-2008 D&O Tower (thereby leaving $238,702,859 available); no payments have been made under the 2008-2009 D&O Tower.[1450] Additionally, even if claims are made that have the possibility to exhaust the remaining limits under the 2007-2008 D&O Tower, any insurance coverage litigation regarding coverage under the 2008-2009 D&O Tower is likely to be prolonged with the best result increasing only marginally the coverage for the directors and officers.[1451] Consequently, the D&O Coverage available to the directors and officers for damages relating to pre-petition alleged wrongful acts is approximately $238 million.

---

[1448] WMI_PC_701361023.00001, at WMI_PC_701361023.00003-10.

[1449] The Examiner understands that the $11,297,141 represents costs paid to defend directors and officers in various litigations.

[1450] So little has been paid under the 2007-2008 D&O Tower because the Examiner understands that defense costs and the proposed settlement in the *Securities, Derivative and ERISA* MDL litigation will be paid from the blended policies; thus, these litigations do not implicate the D&O Towers. The Examiner has been advised that a recent settlement approved by the Court will result in approximately $50 million being paid out of this policy.

[1451] It is unlikely that the directors and officers would ever be entitled to the entire $500 million available under the D&O Towers. Both the 2007-2008 D&O Tower and the 2008-2009 D&O Tower contain provisions for interrelated claims that state that all claims arising from the same interrelated acts shall constitute one claim and shall be subject to one limit of liability. WMI_PC_000701359818.00001, at WMI_PC_000701359818.00043; WMI_PC_000701359802.00001, at WMI_PC_000701359802.00014. Therefore, all claims related to the directors' and officers' actions leading up to the failure of WMI will likely be treated as one claim and subject to one limit of liability.

Claims against the directors and officers regarding alleged wrongful acts committed after September 25, 2008, will not be covered by the D&O Towers. Any such claims will be covered under the DIP Policy. It is the Examiner's understanding that no payments have been made pursuant to this Policy. Thus, there is $25 million in coverage available to the directors and officers for claims alleging post-petition wrongful acts.

In sum, the possible recovery for the Retained Claims against the directors and officers may be limited to D&O Coverage (likely less than $250 million), plus any personal assets of the directors and officers that could be reached, assuming that the prosecution of the claims was successful. Thus, even if viable claims exist, any recovery likely will be relatively small in comparison to the size of the proposed Settlement. Other than the facts set forth in this Report, whether a claim exists against the directors and officers is beyond the scope of the Investigation conducted by the Examiner.

\* \* \*

The Examiner respectfully submits this Report to summarize the Investigation he conducted and the conclusions he reached. With the submission of this Report, the Examiner submits that he has completed the duties and obligations assigned to him in the Examiner Order.

The Examiner intends to file motions with the Court relating to his formal discharge and to the disposition of documents and information obtained by him during the course of his investigation. To the extent the Court has questions, comments, or concerns about the Investigation or the Report, the Examiner is prepared to address these at the convenience of the Court.

Submitted this 1st day of November, 2010.

Joshua R. Hochberg, Court Appointed Examiner

<u>**Appendix 1**</u>

For purposes of this Report, the following terms shall have the meaning ascribed to them below:

1.    "**A&M**" shall mean Alvarez & Marsal.

2.    "**Assignment Agreement**" shall mean the Assignment Agreement by and between WMI and WMB, effective September 25, 2008.

3.    "**Avoidance Actions**" shall mean the claims concerning the $6.5 billion in Capital Contributions.

4.    "**Bank Bondholders**" shall mean bondholders of WMB.

5.    "**Bankruptcy Case**" shall mean the case captioned *In re Washington Mutual, Inc.*, Case No. 08-12229 (MFW), pending in the Bankruptcy Court.

6.    "**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, as amended, to the extent codified in title 11, United States Code, as applicable to the Chapter 11 Cases.

7.    "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Delaware.

8.    "**Blackstone**" shall mean Blackstone Group L.P., Blackstone Capital Partners, and their affiliates.

9.    "**BOLI/COLI**" shall mean the Bank Owned Life Insurance Policies and Corporate Owned Life Insurance Policies.

10.    "**Capital Contributions**" shall mean the transfer of $6.5 billion in capital contributions from WMI to WMB from December 2007 to September 2008.

11.    "**Citigroup**" shall mean Citigroup, Inc.

12.    "**Creditors Committee**" shall mean the Official Committee of Unsecured Creditors.

13.    "**Delaware District Court**" shall mean the United States District Court for the District of Delaware.

14.    "**DC Court**" shall mean the United States District Court for the District of Columbia.

15.    "**Debtors**" shall mean WMI and WMI Investment.

16.    "**Deloitte**" shall mean Deloitte & Touche LLP, which is now known as Deloitte LLP.

17.   **"Disclosure Statement"** shall mean the disclosure statement relating to the Plan and approved by the Bankruptcy Court on October 21, 2010 (Dkt. No. 5659).

18.   **"Disputed Accounts"** shall mean the amounts and intercompany balances identified with the account numbers set forth on "Exhibit E" to the Settlement Agreement.

19.   **"Effective Date"** shall mean the first (1st) Business Day on which (i) the Confirmation Order is a Final Order, (ii) all of the conditions precedent to confirmation of the Plan specified in Section 38.1 of the Plan shall have been satisfied or waived, as provided in Section 38.2 of the Plan, and (iii) all the conditions precedent to the effectiveness of the Plan specified in Section 39.1 of the Plan shall have been satisfied or waived as provided in Section 39.2 of the Plan.

20.   **"Equity"** shall mean the Equity Committee, Shareholders, and representatives of Shareholders.

21.   **"Equity Committee"** shall mean the Official Committee of Equity Security Holders.

22.   **"Estates"** shall mean the estates of the Debtors.

23.   **"Examination"** or **"Investigation"** shall mean the investigation directed by the Bankruptcy Court in the July 28, 2010 Order Approving Appointment of Examiner (Dkt. No. 5162) and the August 10, 2010 Order Approving Examiner's Work Plan (Dkt. No. 5260).

24.   **"FDI Act"** shall mean the Federal Deposit Insurance Act.

25.   **"FDIC"** shall mean the Federal Deposit Insurance Corporation.

26.   **"FDIC Corporate"** shall mean the Federal Deposit Insurance Corporation, in its corporate capacity.

27.   **"FDIC Receiver"** shall mean the Federal Deposit Insurance Corporation, in its capacity as receiver for WMB.

28.   **"FHLB"** shall mean the Federal Home Loan Bank.

29.   **"FHLB-SF"** shall mean the Federal Home Loan Bank in San Francisco.

30.   **"FHLB-Seattle"** shall mean the Federal Home Loan Bank in Seattle.

31.   **"FHFA"** shall mean the Federal Housing Finance Agency.

32.   **"FIRREA"** shall mean the Financial Institutions Reform Recovery and Enforcement Act of 1989 (Pub. L. No. 101-73, 103 Stat. 183), which appears in various parts of the United State Code, including at 12 U.S.C. §§ 1821, 1823.

33.   **"FRB-SF"** shall mean the Federal Reserve Bank in San Francisco.

34. **"FSB"** shall mean Washington Mutual Bank fsb.

35. **"Goldman Sachs"** shall mean Goldman, Sachs & Co.

36. **"JPMC"** shall mean JPMorgan Chase Bank, N.A.

37. **"JPMC Action"** shall mean the adversary proceeding captioned *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc.*, Adv. Proc. No. 09-50551 (MFW), pending in the Bankruptcy Court.

38. **"Lehman Brothers"** shall mean Lehman Brothers Holdings, Inc.

39. **"Morgan Stanley"** shall mean Morgan Stanley & Co., Inc.

40. **"MOU"** shall mean the September 7, 2008 Memorandum of Understanding between OTS and WMB.

41. **"NOL"** shall mean net operating losses as defined in Section 172 of the Internal Revenue Code of 1986, as amended.

42. **"OCC"** shall mean the Office of the Comptroller of the Currency.

43. **"OTS"** shall mean the Office of Thrift Supervision.

44. **"Purchase and Assumption Agreement"** or **"P&A Agreement"** shall mean the Purchase and Assumption Agreement, Whole Bank, dated September 25, 2008, between the FDIC Receiver, FDIC Corporate, and JPMC, as amended, modified or supplemented prior to the date hereof.

45. **"Petition Date"** shall mean September 26, 2008, the date on which the Debtors filed a voluntary petition in the Bankruptcy Court pursuant to Chapter 11 of the United States Bankruptcy Code.

46. **"Plan"** shall mean the Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, filed on October 6, 2010 in the Bankruptcy Case.

47. **"Receivership"** shall mean WMB's receivership.

48. **"Receivership Claim"** shall mean the December 30, 2008 proof of claim filed by WMI and its subsidiaries in connection with the Receivership.

49. **"Report"** shall mean the Final Report of the Examiner filed in the Bankruptcy Court.

50. **"Resolutions"** shall mean the FDIC Division of Resolutions and Receiverships.

3

51.    **"Retained Claims"** or **"Third Party Claims"** shall mean certain potential retained claims against third parties and others that will not be released under the proposed Settlement Agreement.

52.    **"Rule 2004 Discovery"** shall mean that certain discovery authorized by the Bankruptcy Court and conducted by the Debtors, pursuant to Bankruptcy Rule 2004, in order to facilitate the Debtors' inquiry into the existence of potential additional claims and causes of action of the Debtors and the Debtors' chapter 11 estates against JPMC.

53.    **"Santander"** shall mean Banco Santander, S.A.

54.    **"SEC"** shall mean the United States Securities and Exchange Commission.

55.    **"Settlement Agreement"** or **"Settlement"** shall mean that certain Amended and Restated Settlement Agreement, dated as of October 6, 2010, together with all exhibits annexed thereto, which is attached as Exhibit "H" to the Plan.

56.    **"Shareholders"** shall mean any class of WMI shareholders, as identified in the Plan.

57.    **"Tax Refunds"** shall mean the net amount of federal and state tax refunds, including interest, subject to distribution among the parties pursuant to Sections 2.1 and 2.4 of the Settlement Agreement.

58.    **"Tax Sharing Agreement"** or **"TSA"** shall mean the August 31, 1999, Tax Sharing Agreement by and among WMI, WMB, FSB, and certain other direct and indirect subsidiaries of WMI and WMB.

59.    **"TD Bank"** shall mean the Toronto-Dominion Bank and/or TD Bank N.A.

60.    **"Texas Litigation"** shall mean the case captioned *American National Insurance Company v. Federal Deposit Ins. Corp.*, Case No. 3:09-cv-00044, filed in the United States District Court for the Southern District of Texas, which was then transferred to the United States District Court for the District of Columbia, Case No. 1:09-cv-01743 (RMC).

61.    **"TPG"** shall mean the Texas Pacific Group, which is now known as TPG Capital.

62.    **"TPG Funds"** shall mean the approximately $7.2 billion invested in WMI pursuant to an Investment Agreement dated April 7, 2008 between WMI, Olympic Investment Partners, L.P., and TPG Partners VI, L.P.

63.    **"TRUPS"** shall mean certain Trust Preferred Securities.

64.    **"TRUPS Adversary Proceeding"** shall mean the case captioned *Black Horse Capital LP, v. JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 10-51387 (MFW), pending in the Bankruptcy Court.

65. **"Turnover Action"** shall mean the adversary proceeding captioned *Washington Mutual, Inc. v. JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 09-50934 (MFW), pending in the Bankruptcy Court.

66. **"U.S. Trustee"** shall mean the United States Trustee for Region 3 (Delaware, New Jersey, and Pennsylvania).

67. **"WaMu Group"** shall mean WMI together with any of its subsidiaries and affiliates, including but not limited to WMB, FSB, and WMI Investment, that filed a consolidated federal income tax return.

68. **"Weil"** shall mean Weil, Gotshal & Manges LLP.

69. **"Wells Fargo"** shall mean Wells Fargo Corporation.

70. **"WMB"** shall mean Washington Mutual Bank.

71. **"WMI"** shall mean Washington Mutual, Inc., a Debtor.

72. **"WMI Action"** shall mean the case captioned *Washington Mutual, Inc., v. Federal Deposit Insurance Corporation*, Case No. 1:09-cv-0533 (RMC), pending in the DC Court.

73. **"WMI Investment"** shall mean WMI Investment Corp., a Debtor, and, as applicable, WMI Investment Corp. as a reorganized entity from and after the Effective Date.

74. **"WMMRC"** shall mean the WM Mortgage Reinsurance Company, a Hawaii corporation.

75. **"WMPF"** shall mean Washington Mutual Preferred Funding LLC.

# APPENDIX 2: WITNESS INTERVIEWS

| NAME | TITLE | DATE OF INITIAL INTERVIEW[1] |
|---|---|---|
| **Witnesses – Washington Mutual, Inc. and Related Entities** | | |
| Curt Brouwer | Dir. of Tax; Exec. VP & Tax Dir. | 8.19.2010 |
| Tom Casey | CFO | 10.20.2010 |
| Alan Fishman | CEO; Dir. | 9.1.2010 |
| Peter Freilinger | Sr. VP and Asst. Treasurer | 10.20.2010 |
| Kerry Killinger | Pres., CEO and Chairman of the Board | 8.30.2010 |
| Kraig Klinkhammer | Manager, Insurance Portfolio | 9.21.2010 |
| Doreen Logan | Transaction Manager of Structured Finance Group | 8.19.2010 |
| Susan McCarthy | First VP | 8.29.2010 |
| Rob Monheit | First VP & Asst. GC | 10.21.2010 |
| Jack Read | Sr. VP | 9.24.2010 |
| John Robinson | Exec. VP of Corp. Risk Management | 8.30.2010 |
| Steve Rotella | COO | 8.17.2010 |
| Charles Smith | GC | 8.20.2010 |
| Robert Williams | Treasurer; President; Sr. VP | 8.17.2010 |
| **Witnesses – JP Morgan Chase and related entities (JPMC)** | | |
| Scott Albinson | Managing Dir., FIG | 10.8.2010 |

| NAME | TITLE | DATE OF INITIAL INTERVIEW[1] |
|---|---|---|
| Brian Bessey | Managing Dir., Corp. M&A | 8.25.2010 |
| Enrique Casanueva | Sr. Country Officer for Spain & Portugal | 9.3.2010 |
| Mike Cavanagh | CEO of Treasury & Securities Services | 9.22.2010 |
| Jose Cerezo | Client Executive & Head of FIG, Spain and Portugal | 9.3.2010 |
| Dan Cooney | Sr. VP / GC | 9.2.2010 |
| Stephen Cutler | Exec. VP / GC | 9.2.2010 |
| Olivier de Grivel | Managing Dir. & Head of FIG - Asia | 10.7.2010 |
| Jamie Dimon | Chairman and CEO | 9.14.2010 |
| Mark Frediani | Sr. Planner, Corp. Tax Department | 9.16.2010 |
| Allen Friedman | Managing Dir.; Deputy Dir. of Tax Department | 9.16.2010 |
| Gregg Gunselman | Exec. Dir. of FIG; Sr. VP, Corp. M&A | 10.1.2010 |
| Benjamin Lopata | Managing Dir. & Head of Corp. Tax Department | 9.17.2010 |
| Tim Main | Managing Dir., FIG | 9.15.2010 |
| Donald McCree | Head of M&A | 8.17.2010 |
| Fernando Rivas | Managing Dir., FIG | 9.10.2010 |
| Charles Scharf | Head of Retail Financial Services | 9.16.2010 |
| **Witnesses - Alvarez & Marsal (A&M)** | | |
| Brian Pedersen | Managing Dir. | 8.20.2010 |

| NAME | TITLE | DATE OF INITIAL INTERVIEW[1] |
|---|---|---|
| James Carreon | Managing Dir. (A&M) Interim Federal Tax Manager of WMI | 8.13.2010 |
| John Maciel | Sr. Dir. (A&M) CFO for WMI | 8.19.2010 |
| William Kosturos | Managing Dir. (A&M) Chief Restructuring Officer of WMI | 8.17.2010 |
| Chris Wells | Sr. Dir. | 8.19.2010 |
| Jonathan Goulding | Sr. Dir. | 8.25.2010 |
| **Witnesses - Government/Regulatory Entities** | | |
| Michael Bradfield | FDIC GC | 10.28.2010 |
| Chris Spoth | Sr. Deputy Dir. of Supervisory Examinations Branch (FDIC) | 9.27.2010 |
| James Wigand | Deputy Dir. of the Franchise & Asset Marketing Branch (FDIC) | 9.22.2010 |
| Cecilia de Leon | Asst. GC (FHLB-SF) | 8.30.2010 |
| Patricia Remch | Sr. Relationship Manager (FHLB-SF) | 8.30.2010 |
| Darrel Dochow | Dir. of West Region (OTS) | 9.1.2010 |
| Michael Solomon | Dir. of Capital Policy; Managing Dir. for Risk Management (OTS) | 9.10.2010 |
| Scott Polakoff | Sr. Deputy Dir. and COO (OTS) | 8.27.2010 |
| Tim Ward | Deputy Dir. of Examinations (OTS) | 9.10.2010 |
| **Witnesses - Other** | | |
| Rob Beck | Head of Corp. Finance (Citigroup) | 9.15.2010 |
| Juan Rodriguez Inciarte | Head of Global Strategy (Banco Santander) | 9.28.2010 |
| Alberto Sanchez | Head of Strategy for the United States (Banco Santander) | 9.23.2010 |

| NAME | TITLE | DATE OF INITIAL INTERVIEW[1] |
|------|-------|------------------------------|
| Chinh Chu | Sr. Managing Dir. (Blackstone) | 10.4.2010 |
| Alan Schaub | Partner (Deloitte & Touche) | 10.25.2010 |
| John Voelkel | Sr. Manager for Audit Practice (Deloitte & Touche) | 10.7.2010 |
| Sharon Haas | Managing Dir. (Fitch) | 10.21.2010 |
| Huntley Garriott | Managing Dir. (Goldman Sachs) | 10.12.2010 |
| John Mahoney | Managing Dir. (Goldman Sachs) | 8.25.2010 |
| Scott Romanoff | Managing Dir. (Goldman Sachs) | 9.16.2010 |
| Craig Emrick | VP and Sr. Credit Officer (Moody's) | 10.22.2010 |
| John Esposito | Head, U.S. Financial Services Group (Morgan Stanley) | 10.5.2010 |
| Linda Dougerty | VP, Corp. Development (Toronto-Dominion Bank) | 10.19.2010 |
| Nick Stone | VP, Financial Services Practice (TPG) | 10.19.2010 |
| Bruce Helsel | Head of Corp. Development (Wells Fargo) | 10.8.2010 |

[1] Some witnesses were interviewed more than once.

Asst. = Assistant
CFO = Chief Financial Officer
CEO = Chief Executive Officer

COO = Chief Operations Officer
Dir. = Director
Exec. = Executive
FIG = Financial Institutions Group

GC = General Counsel
M&A = Mergers & Acquisitions
Sr. = Senior