**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

| | |
|---|---|
| *In re* | Chapter 11 |
| **WASHINGTON MUTUAL, INC., et al.** [1] | **Case No. 08-12229 (MFW)** |
| **Debtors.** | **(Jointly Administered)** |

:
: **Hearing Date: December 1, 2010 at 10:30 a.m.**
: **Response Deadline: November 24, 2010 at 4:00 p.m.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OBJECTION OF TRICADIA CAPITAL MANAGEMENT, LLC TO CONFIRMATION
OF DEBTORS' SIXTH AMENDED JOINT PLAN OF REORGANIZATION**

Various funds managed by Tricadia Capital Management, LLC (collectively, "Tricadia")[2], creditors and parties-in-interest in the Chapter 11 Cases (the "Chapter 11 Cases") of Washington Mutual, Inc. ("WMI" and, collectively with WMI Investment Corp., the "Debtors"), file this objection to the Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"). In support of this objection (the "Objection"), Tricadia respectfully states as follows:

**PRELIMINARY STATEMENT**

1. As demonstrated in this Objection, the Plan fails to satisfy several threshold requirements for confirmation under Section 1129(a) of the Bankruptcy Code and therefore cannot be confirmed. The Debtors' decision to unjustly enrich an organized group of Settlement Note

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98101.

[2] Any term used herein but not otherwise defined herein shall have the meaning ascribed to such term in the Plan.

Holders who own billions of dollars of securities[3] at the expense of a small group of Class 14 and Class 15 holders (the "CCB Guarantee Claims"), most of whom purchased their securities at par several years ago[4], raises troubling questions about the Debtors' good faith. The fact that this path likely resulted in the destruction of significant estate value in the form of tax attributes raises some more questions. The Debtors' recent refusal to implement a trading order with respect to only CCB Guarantee Claims that would (and still can) preserve the Debtors' ability to generate billions of dollars in value through utilization of the I.R.C. §382(l)(5) exception raises yet even more questions. In addition, the Plan does not provide similar treatment to members of Class 15 (the CCB-2 Guarantee Claims), violating Section 1123(a)(4) of the Bankruptcy Code, and does not provide the CCB-2 Guarantee Claims with a recovery that is superior to what they could obtain in a Chapter 7 liquidation, violating Section 1129(a)(7) of the Bankruptcy Code.

2.      Given that the CCB-2 Guarantee Claims have voted against the Plan, the Court will need to determine whether the requirements of Section 1129(b) of the Bankruptcy Code can be satisfied. Tricadia submits that they cannot. The Plan does not pay the CCB-2 Guarantee Claims in full, precluding cram-down under Section 1129(b)(2)(B)(i), and distributes valuable property to junior creditors in violation of Section 1129(b)(2)(B)(ii). Moreover, the Plan distributes a premium to the Senior Subordinated Notes despite the clear prohibition on paying any creditor more than it is owed. As a result, the Plan is manifestly not fair and equitable with respect to Class 15, and should not be confirmed.

---

[3] Based on the Disclosure Statement.
[4] On information and belief, including conversations with holders.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Bankruptcy Code Sections 105(a) and 362.  Relief is warranted under Bankruptcy Rule 3001.

## BACKGROUND

4.      On September 26, 2008 (the "Commencement Date"), the Debtors commenced the Chapter 11 Cases.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  On October 3, 2008, the Court entered an order, pursuant to Bankruptcy Rule 1015(b), authorizing the joint administration of the Chapter 11 Cases.  On October 15, 2008, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On January 11, 2010, the U.S. Trustee appointed an official committee of equity security holders (the "Equity Committee") in these Chapter 11 Cases.

5.      On October 6, 2010, the Debtors filed the Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") and a related disclosure statement (the "Disclosure Statement").  The Plan contains an Amended and Restated Settlement Agreement, dated October 6, 2010 (the "Global Settlement Agreement"), that resolves certain disputes among the Debtors, JPMorgan Chase, the Federal Deposit Insurance Corporation and certain other parties in interest.

6.      By orders, dated July 22, 2010 and July 28, 2010, the Court approved the appointment of Joshua R. Hochberg as examiner (the "Examiner") to investigate (a) certain claims and assets

that may be property of the Debtors' estates that are proposed to be conveyed, released or otherwise compromised and settled under the Plan and the Global Settlement Agreement, including all Released Claims (as defined in the Global Settlement Agreement) and certain claims and defenses of third parties thereto and (b) such other claims, assets and causes of action which will be retained by the Debtors and/or the proceeds thereof, if any, distributed to creditors and/or equity interest holders pursuant to the Plan, and the claims and defenses of third parties thereto. On November 1, 2010, the Examiner published a report (the "Examiner's Report") concluding that the consideration to be paid to the Debtors' estates pursuant to the Global Settlement Agreement, in the form of assets or releases to the Debtors, is reasonable. See Examiner's Report, at pg. 1.

7.      Tricadia is a party-in-interest and creditor in these Chapter 11 Cases and owns economic interests in greater than a majority of the outstanding face amount of CCB-2 Guarantee Claims (Class 15) under the Plan. Following the acquisition by Washington Mutual Bank ("WMB") of Commerce Capital Bancorp and Hawthorne Financial Corporation, WMB became successor issuer under a series of debt financings involving HFC Capital Trust I, CCB Capital Trust IV, CCB Capital Trust V, CCB Capital, Trust VI, CCB Capital Trust VII, CCB Capital Trust VIII, and CCB Capital Trust IX (collectively, the "Capital Trusts"). The Capital Trusts comprise approximately $68,580,000 in aggregate principal amount of indebtedness. In connection with a merger and restructuring of WMI, on November 1, 2007, WMI entered into separate guarantees relating to each of the Capital Trusts. Upon the commencement of the Chapter 11 Cases, the holders of indebtedness issued by the Capital Trusts became the holders of unsecured guarantee claims against the Debtors (the "CCB-1 Guarantee Claims" and the "CCB-2 Guarantee Claims").

8.    On November 16, 2010, Tricadia filed the Motion Pursuant to Sections 105(a) and 362 of the Bankruptcy Code For An Order Establishing Notice and Hearing Procedures Regarding Trading in CCB Guarantee Claims.

## OBJECTIONS TO CONFIRMATION OF THE PLAN

**I.    The Plan Fails to Satisfy The Confirmation Requirements of Section 1129(a) of the Bankruptcy Code and Cannot be Confirmed**

9.    Section 1129(a) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if" it meets "all" of the requirements of Section 1129(a).  11 U.S.C. §1129(a).  The plan proponent bears the burden of proof in establishing each confirmation requirement.  See In re Armstrong World Industries, 348 B.R. 111, 121. (D. Del. 2006).  The majority of jurisdictions have required the plan proponent to satisfy the statutory confirmation requirements of Section 1129(a) by a preponderance of the evidence.  See Id., at n.15; In re Briscoe Enters., 994 F.2d 1160, 1165 (5th Cir. Tex. 1993).

10.    As described further in this Objection, the Plan does not meet certain threshold requirements for confirmation under Section 1129(a) of the Bankruptcy Code.  Specifically, the Plan: (i) was not proposed in good faith, as required by Section 1129(a)(3); (ii) does not provide similar treatment to members of the CCB-2 Guarantee Claims (Class 15), as required by Section 1123(a)(4); and (iii) does not provide the CCB-2 Guarantee Claims with an equal or greater recovery than would be received under Chapter 7, as required by Section 1129(a)(7).  Consequently, the Court must deny confirmation.

### A.    The Plan Does Not Appear to Have Been Proposed in Good Faith

11.    Section 1129(a)(3) of the Bankruptcy Code provides that a bankruptcy court may confirm a Chapter 11 plan only if "the plan has been proposed in good faith and not by any means

forbidden by law." 11 U.S.C. §1129(a)(3). In determining whether a plan has been proposed in good faith, courts focus on whether the plan (i) is consistent with the objectives of the Bankruptcy Code, (ii) has been proposed with honesty and good intentions and (iii) reflects fundamental fairness in dealing with creditors. See, e.g., In re Abbotts Dairies, 788 F.2d 143, 150 n.5 (3d Cir. Pa. 1986) ("the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."); In re Madison Hotel Associates, 749 F.2d 410, 425 (7th Cir. Wisc. 1984) ("The focus … is … whether the plan achieves a reorganization objective that is consistent with the Bankruptcy Code."); In re WCI Cable, Inc., 282 B.R. 457, 484 (Bankr. D. Or. 2002).

12.     If the Senior Notes are paid in full on the Effective Date (which the Examiner finds likely)[5], the Plan effectively provides the Senior Subordinated Notes with a first look at electing Reorganized Common Stock and gives the PIERS Claims the exclusive option to participate in the Subscription Rights Offering.[6] Based on the Disclosure Statement, it appears that the vast majority of each of these two classes are owned by Settlement Note Holders. Sandwiched between these classes are the CCB Guarantee Claims, dominated by original par holders[7] who, to our knowledge, have not been involved in the plan formulation process in any way, and who will not be able to receive a dollar of Reorganized Common Stock if even a single Settlement Note Holder (based on their holdings as listed in the Disclosure Statement) elects Reorganized Common Stock on account of its Senior Subordinated Notes. It is probably not a coincidence

---

[5] See Final Report of the Examiner (the "Examiner's Report"), p. 17.

[6] General Unsecured Claims are provided with an option to participate, but the election mechanics ensure that they will only be able to obtain a de minimus amount of Reorganized Common Stock.

[7] On information and belief, including conversations with holders.

that a small, under-represented class in the middle of two large classes dominated by Settlement Note Holders is made to stand at the back of the line.

13.     What makes it worse is that the Reorganized Common Stock is probably undervalued. The Debtor is likely going to abandon its equity ownership in its bank, and if the Effective Date occurs on December 31, 2010 (as the Plan currently contemplates), the ensuing net operating losses (the "NOLs") will be severely limited by I.R.C. §382, but if the Effective Date is *the very next day*, they may not be limited at all.[8]   This means that literally $4.5 billion of NOLs are currently valued for plan distribution purposes as if they are effectively worthless (as the Examiner says, "would not be very substantial…would effectively no longer be available.") but could actually be worth $1.5 billion of future value (assuming a 35% tax rate) if the Debtor emerges *one day later*.   And one would have to be naïve to assume that the Settlement Note Holders, who own the vast majority[9] of the Senior Subordinated Notes and the PIERS Claims, do not have significant influence over the decision whether to emerge from bankruptcy one day later.   Simply stated, the Settlement Note Holders are in a privileged position to invest in a company with potentially a $4.5 billion unhindered NOL at a valuation that implies that the NOL is severely limited.

14.     Based on the above, it would be easy to conclude that the *real* plan was to emerge in 2011.   Except it may not be that simple: capital gains taxes are currently scheduled to increase by

---

[8] The Examiner's Report says, "If the Effective Date occurs on or before December 31, 2010, then the Retained NOLs and the recognized Stock Loss will be severely limited in reducing post-Effective Date future taxable income of reorganized WMI.  If, however, the Effective Date occurs early in the 2011 WMI calendar tax year and WWMMRC is retained, the Examiner has concluded that a much greater portion of the Stock Loss-generated NOL (but not the Retained NOLs) would be preserved for future use in sheltering future taxable income of reorganized WMI without being subject to the Section 382 annual loss limitations." See Examiner's Report, p. 148.

[9] Based on the Disclosure Statement.

a third in 2011, and Settlement Note Holders who began buying debt in the low single digits[10] may therefore have incentives to emerge in 2010.[11]  Obviously, if this occurs, the Reorganized Common Stock may not be cheap after all.  So what are the Settlement Note Holders motivated by?  Maximize value of the estate (and exercise an exclusive option to partake in cheap equity) or save on capital gains taxes and allow the free option to expire worthless?  CCB Guarantee Claim holders such as ourselves can only guess.

15.     Given the strangeness of this situation, the CCB Guarantee Claims holders, most of whom purchased their securities at par and therefore have no capital gains to book, are left in an unenviable position.  If the Debtors decide to maximize value of the estate by emerging *one day later than planned*, one can only assume that the Settlement Note Holders will likely elect Reorganized Common Stock on account of their Senior Subordinated Notes and the CCB Guarantee Claims will be deprived of the opportunity to invest.  If on the other hand the Debtors decide to emerge *a day earlier* and sacrifice the estate for Settlement Note Holder tax issues, it is very possible that not a single Settlement Note Holder will elect the Reorganized Common Stock on account of its Senior Subordinated Notes, and only then will the CCB Guarantee Claims receive Reorganized Common Stock.  To put it another way, if even a *single* Settlement Note Holder (based on their holdings as listed in the Disclosure Statement) likes the Reorganized Common Stock, the CCB Guarantee Claims will receive none.  Only if *every* Settlement Note Holder dislikes the Reorganized Common Stock may the CCB Guarantee Claims receive some. The mechanic burdens the CCB Guarantee Claims with a bad case of adverse selection, where winning is impossible and losing is a virtual certainty.

---

[10] Based on the First Supplemental Verified Statement of Fried, Frank, Harris, Shriver & Jacobsen LLP Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure.

[11] Based on discussions with Tricadia's tax counsel.

16.     In fact, a very different plan structure would actually have been optimal – and still is optimal – for the estate at large, and the fact that it was not preserved, pursued or even considered is tragic.  Had the CCB Guarantee Claims been provided with the majority of Reorganized Common Stock, the NOLs would likely have been maximized whether or not the Debtors emerged in 2010 or 2011.  As stated in the *Motion of Tricadia Capital Management, LLC Pursuant to Sections 105(a) and 362 of the Bankruptcy Code for Order Establishing Notice and Hearing Procedures for Trading in CCB Guarantee Claims*, Tricadia believes that greater than 69% percent of CCB Guarantee Claims qualify as "old and cold" creditors under I.R.C. §382(l)(5), and if these creditors receive a majority of the Reorganized Common Stock, an NOL of up to approximately $17.0 billion could potentially be utilized regardless of the emergence date without annual I.R.C. §382 limitations.  Tricadia believes that pursuing this strategy is a no-brainer which could add upwards of $5.0 billion to the estate and bring significant value to all stakeholders.

17.     Perhaps the Debtors were not aware of the composition of the holder base in the CCB Guarantee Claims, and therefore may not have been aware that the I.R.C. §382(l)(5) exception was available, but their refusal to submit a motion to monitor trading of CCB Guarantee Claims when Tricadia alerted them to this information demonstrates disregard for the core policy of Chapter 11: maximization of estate value for the benefit of all creditors.  See, e.g., Toibb v. Radoff, 501 U.S. 157, 163 (1991) ("...we agree, that Chapter 11 … embodies the general Code policy of maximizing the value of the bankruptcy estate.").  In order to preserve potentially billions of dollars of estate value, Tricadia was compelled to bring its own motion to monitor trading – usually brought by a Debtor on the first day of a bankruptcy - as a creditor, and more than two years into the bankruptcy.

18.     In fact, Tricadia believes that prior to purchasing its current holdings of CCB-2 Guarantee Claims, greater than 97% and potentially 100% of CCB Guarantee Claims were held by original par holders.  Had a trading restriction been placed upon the CCB Guarantee Claims more than a year into the Chapter 11 Cases, the current plan as presently drafted likely would have allowed for the possibility of utilizing the I.R.C. §382(l)(5) exception.  This flexibility under the current plan has now been destroyed because of the prior inaction of the Debtors with respect to monitoring trading in the CCB Guarantee Claims, but all hope is not lost.  Tricadia believes there are several alternative plan structures that would still enable utilization of the I.R.C. §382(l)(5) exception.

**B.     The Plan Discriminates Among Members of Class 15 (CCB-2 Guarantee Claims) in Violation of Section 1123(a)(4) of the Bankruptcy Code**

19.     Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. §1123(a)(4); In re New Century TRS Holdings, Inc., 407 B.R. 576, 592 (D. Del. 2009) ("if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable."); Stickney v. Kerry, 55 Wash. 2d 535, 348 P.2d 655, 657 (1960) ("it is a fundamental and long-recognized principle that the "theme of the Bankruptcy Act is equality of distribution").

20.     The Plan provides certain CCB-2 Guarantee Claims with a higher recovery than other CCB-2 Guarantee Claims.  Specifically, to the extent they receive Liquidating Trust Interests, the CCB-2 Guarantee Claims relating to HFC Capital Trust I accrue a post-emergence interest rate of 10.18%.  In comparison, the CCB-2 Guarantee Claims relating to CCB Capital Trust VI and

CCB Capital Trust IX accrue much lower post-emergence interest rates of L+178 and L+265 (approximating 2-3% at today's Libor rate), respectively. As a result, the HFC Capital Trust Holder will receive greater cash distributions from the Liquidating Trust. Although members of the same class may accrue post-petition interest through the Effective Date at different rates if their pre-petition contract rates are different, class members should not receive materially different rates of post-emergence interest. See In re AOV Indus., 792 F.2d 1140, 1152 (D.C. Cir. 1986).

C. **The Plan Does Not Provide the CCB-2s With Value Equal to What They Would Receive in a Liquidation, Violating Section 1129(a)(7) of the Bankruptcy Code**

21. Section 1129(a)(7) of the Bankruptcy Code applies the "best interest of creditors" test, which requires that a plan provide a dissenting creditor with a recovery of a value, measured as of the plan effective date, at least equal to what such creditor would receive in a Chapter 7 liquidation. 11 U.S.C. §1129(a)(7).

22. Under Chapter 7, the CCB-2 Guarantee Claims would, pursuant to their subordination agreement with the PIERS Claims, receive cash payment in full prior to the distribution of any cash to the PIERS Claims. Proceeds received from selling WM Mortgage Reinsurance Company, Inc. would be paid to the CCB-2 Guarantee Claims first. In contrast, the Plan could ultimately provide the CCB-2 Guarantee Claims with less than a full cash recovery to the extent cash received on account of Liquidating Trust Interests proved to be inadequate, while still distributing Reorganized Common Stock to the PIERS Claims that would not be available to satisfy any post-Effective Date deficiency under the CCB-2 Guarantee Claims. As a consequence, it is possible that CCB-2 Guarantee Claims could receive higher recoveries in a Chapter 7 liquidation than under the Plan.

**II.    The Debtors Cannot Satisfy the Cram-down Requirements of Section 1129(b) of the Bankruptcy Code**

23.    Under Section 1129(b) of the Bankruptcy Code, a bankruptcy court may confirm a non-consensual plan only if such plan "does not discriminate unfairly, and is fair and equitable" as to the dissenting impaired class. 11 U.S.C. §1129(b)(1); see also Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship, 526 U.S. 434 (1999).

24.    The Debtors have proposed a plan that cannot be crammed-down under Section 1129(b)(1).  Specifically, the Plan (i) fails to distribute property to the CCB-2 Guarantee Claims with a value, as of the Effective Date, equal to the allowed amount of their claim, precluding cram-down under Section 1129(b)(2)(B)(i) and (ii) distributes property to junior creditors, precluding cram-down under Section 1129(b)(2)(B)(ii).  In addition, the Plan provides the Senior Subordinated Notes with a premium to their claim, violating the "no-premium" component of the fair and equitable requirement.

**A.  The Plan is Unfair and Inequitable With Respect to the CCB-2s**

25.    The "fair and equitable" requirement of Section 1129(b) codifies and expands the pre-Bankruptcy Code rule of "absolute priority," a common law rule developed before the emergence of complex capital structures.  At its core, the absolute priority rule ensures that restructurings reflect pre-petition contractual expectations regarding priority.  Subject to qualified exceptions, senior creditors must be paid in full before junior creditors or equity holders receive any distributions from the bankruptcy estate.  See Lasalle, 526 U.S. 434, 444 (1999); N. Pac. Ry. Co. v. Boyd, 228 U.S. 482, 508 (1913); In re Armstrong World Indus., 432 F.3d 507, 512 (3d. Cir. Del. 2005); In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1314 (7th Cir. Ind. 1995).

### (i) The CCB-2 Guarantee Claims Are Not Receiving Property of a Value Equal to the Allowed Amount of Their Claim

26.     Section 1129(b)(2)(B)(i) of the Bankruptcy Code provides that a plan may be fair and

equitable with respect to a dissenting class of unsecured creditors if:

> The plan provides that each holder of a claim of such class receive or
> retain on account of such claim property of a value, as of the effective date
> of the plan, equal to the allowed amount of such claim.   U.S.C.
> §1129(b)(2)(B)(i)

### (a) Calculation of Value under 1129(b): Present Value and Market Discount Rate

27.     Under Section 1129(b), property is valued as of the effective date.  Because most plans

provide for some form of non-cash payment (e.g., via new debt) to certain classes of debt, the

relevant metric is "present value": the present value of expected cash flows, generated by

discounting those cash flows to reflect their riskiness.  This is confirmed by the legislative

record.  See, e.g., H.R. Rep. No. 595, 1st Sess. 414 (1977) (the legislative record notes that

[Section 1129(b)(2)(B)] "contemplates a present value analysis that will discount value to be

received in the future."); see also 124 Cong. Rec. 32,407 (1978) ("The property is to be valued as

of the effective date of the plan, thus recognizing the time-value of money."); Id. at 34,007 ("The

House report accompanying the House bill described what is meant by present value.").  The

courts are in accord.  See, e.g., Till v. SCS Credit Corp., 541 U.S. 465 (2004); In re Oakwood

Homes Corp., 449 F.3d 588, 597-98 (3d Cir. 2006); In re Union Meeting Partners, 165 B.R. 553,

572-73 (Bankr. E.D. Pa. 1994) ("Present value is represented by the formula $PV = P/(1+I)[\ N\ ]$,

where P is the future amount, I is the discount rate, expressed as a decimal, and N is the number

of periods discounted.").

28.     Section 1129(b)(2)(A) and Section 1129(b)(2)(B)(i) both require a determination of

present value.  Accordingly, the cram-down interest rate analysis applied by courts under Section

1129(b)(2)(A) can provide a useful analogue.  In the Section 1129(b)(2)(A) context, courts have tended to apply market interest rates – the rate of return the market requires in exchange for investing in a security with comparable *default risk* to that assumed by the creditor under a Chapter 11 plan.  See In re American Homepatient, Inc., 420 F.3d 559, 568 (6th Cir. Tenn. 2006) (noting that "when picking a cram-down rate in a Chapter 11 case, it might make sense to ask what an efficient market would produce"); In re Deep River Warehouse, Inc., 2005 Bankr. LEXIS 1793 (Bankr. M.D.N.C. 2005) (applying a blended cram-down interest rate of 5.75 percent to a secured claim represented the market rate considering the risk of default); In re Birdneck Apartment Associates, 156 B.R. 499, 507-508 (Bankr. E.D. Va. 1993) ("the appropriate discount rate used to calculate present value must be determined by reference to the 'market' interest rate for a loan of like terms, with due consideration for … the risk of subsequent default");  Lawrence P. King, *Collier on Bankruptcy* P 1129.03[4][f][i] (15th ed. 1993) ("The deferred payment of an obligation under a chapter 11 plan of reorganization is essentially a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk.").

### (b) The CCB-2 Guarantee Claims Recovery is Very Sensitive to the General Unsecured Claim Pool Which Presently Is Undetermined And May Vary Considerably

29.     Although the Plan assumes roughly $375.0 million of general unsecured claims (the "Claims"), the Debtors state in the Disclosure Statement that "general unsecured claims will **vary widely** depending on the outcome of various claims objections" and that "current filed claims total in excess of $55 billion (the "Filed Claims") excluding unliquidated claims" and that a staggering 4,000 claims have been filed.  In addition, the Examiner concluded that "WMI

14

Subordinated Note Holders will be paid 70% to 80% of their claims" – implying a significant hold-back on the Effective Date needed to satisfy a potentially large claims pool.

30.     As recently as the Debtors' October 17, 2010 response to disclosure statement objections, they volunteered the following:

> With respect to the Senior Notes Trustee's request that the Debtors state that it is unlikely that claimants, other than holders of Senior Notes Claims and General Unsecured Claims, will receive Creditor Cash from the first distribution contemplated by the Plan, at this time, the Debtors cannot make this assertion.  The Debtors do not yet know the total magnitude of Claims that will be allowed against their estates, the amount of claims that will be Disputed Claims as of the Effective Date, the exact amount of assets that will be available for distribution to creditors, or when such assets will become available.[12]

31.     Given these statements, it appears that the Debtors' plan valuation estimate of Claims is highly speculative and that the ultimate allowed general unsecured claim pool (the "Allowed Claims") could be much higher.

32.     The math for the CCB-2 Guarantee Claims is very simple.  If Allowed Claims exceed approximately $1.0 billion, the CCB-2 Guarantee Claims will recover *zero*.  This amounts to less than **2%** of the $55.0 billion of Filed Claims.  In contrast, approximately $5.0 billion of Allowed Claims must materialize in order to render the Senior Subordinated Notes worthless.  The recovery of the CCB-2 Guarantee Claims is clearly very sensitive to small percentage movements in the Claims pool.

33.     The pictures below illustrate the story:

---

[12] Debtors' Second Supplemental Omnibus Response to Objections to Disclosure Statement, dated October 17, 2010.





**(c) The Post-Emergence Interest Rate On Tricadia's CCB-2 Guarantee Claims Is Inadequate Given the Significant Risk of Losing Principal**

34.     Tricadia owns CCB Capital Trust IX which will earn Libor + 178 and CCB Capital Trust VI which will earn Libor + 265 as post-emergence interest rates on received Liquidating Trust Interests.

35.     Since we expect that the CCB-2 Guarantee Claims will be worth zero if the Allowed Claims are greater than 2% of Filed Claims and will likely receive full payment if the Allowed

Claims are less than 2% of filed claims, we can create a simplified model that incorporates these two scenarios and derive "efficient market" post-emergence interest rates on Liquidating Trust Interests provided to CCB-2 Guarantee Claims across different confidence levels with respect to the Allowed Claims level.

| CCB GUARANTEE CLAIMS | | | |
|---|---|---|---|
| Probability that 2% of Filed Claims Become Allowed Claims | Minimum Interest Rate Required<br><br>Assuming Paid in 3 Months | Minimum Interest Rate Required<br><br>Assuming Paid in 6 Months | Minimum Interest Rate Required<br><br>Assuming Paid in 12 Months |
| 0% | 0.5% | 0.5% | 0.5% |
| 1% | 5% | 3% | 2% |
| 10% | 45% | 22% | 11% |
| 20% | 101% | 48% | 23% |
| 30% | 172% | 79% | 38% |
| 40% | 268% | 117% | 55% |
| 50% | 401% | 166% | 76% |

36.     Applying realistic assumptions[13], the above chart indicates that in order to justify a Libor + 178 interest rate on Tricadia's CCB Capital Trust IX securities, there must be a less than approximately 1% probability that the Allowed Claims pool is greater than 2% of the Filed Claims.  Tricadia does not believe that anyone, no matter how capable or well-meaning, can with good reason have that level of confidence with respect to tens of billions of dollars of unsettled claims in the largest bank failure of all time.

37.     In fact, as the above chart clearly illustrates, if the probability that the Allowed Claims being greater than 2% of Filed Claims is even 20%, which is still difficult for Tricadia to easily

---

[13] Tricadia ran three claims reconciliation scenarios (3 months, 6 months, and 12 months) which appear reasonable based upon the description of the claims reconciliation process in the Debtors' Liquidation Analysis. Tricadia assumed that at the conclusion of each scenario, the CCB Guarantee Claims either receive zero (if Allowed Claims are greater than ~2% of Filed Claims) or are paid in full (if Allowed Claims are less than ~2% of Filed Claims) and then solve for the appropriate post-emergence interest rate that would allow the probability-weighted present value (using quarterly compounding and a 0.5% discount rate) to equal the CCB Guarantee Claim on the Effective Date.

accept, then the appropriate post-emergence interest rate lies somewhere between 23% and 101% depending on the expected claims reconciliation process. These figures are so high as to imply that only equity-like upside can compensate the CCB-2 Guarantee Claims for the significant binary risks that they face. Given the Debtors' uncertainty regarding the Claims pool, absent full discovery, information disclosure and expert testimony in front of the Court that objectively validates an extremely high level of confidence surrounding the Debtors' estimate of the Allowed Claims, it cannot be argued that the Liquidating Trust Interests received by the CCB Guarantee Claims are worth the allowed amount of their claim.

38.    Stated simply, the CCB Guarantee Claims carry material risk of complete loss of principal, and a 2% or 3% post-emergence interest rate is wholly inadequate compensation for that risk. If by the Effective Date this risk is not reduced significantly, an instrument that provides for significantly greater compensation is warranted.

39.    Furthermore, it appears that the Senior Subordinated Notes accrue post-emergence interest (to the extent they receive Liquidating Trust Interests) at rates ranging from 4.6% to 8.3%, significantly higher than most CCB Guarantee Claims, including those owned by Tricadia. Given that the Senior Subordinated Notes are senior in the capital structure to the CCB Guarantee Claims and significantly less risky, it would appear that to the extent the Senior Subordinated Notes are deemed to be receiving new instruments of value equal to their allowed claims on the Effective Date (for if they were not, they would be deemed to be receiving a premium to claim), it would necessarily mean that the CCB Guarantee Claims are receiving new instruments of value less than their allowed claims on the Effective Date. This is an a priori logical deduction.

### (ii) Although the Plan Does Not Satisfy Section 1129(b)(2)(B)(i), the Plan Nonetheless Distributes Property to Junior Claims and Interests, Violating Section 1129(b)(2)(B)(ii)

40.     Under Section 1129(b)(2)(B)(ii), a Plan that does not provide a dissenting unsecured creditor with property equal in value to the allowed amount of such creditor's claim may be fair only if

> the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property .." 11 U.S.C. §1129(b)(2)(B)(ii)

41.     Thus, to the extent Section 1129(b)(2)(B)(i) is not satisfied, a plan may not distribute *any* property to a junior claim or interest.  See In re Armstrong, 432 F.3d 507, 513 (3d Cir. Del. 2005) ("The plain language of the statute makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired."); In re Bryson Properties, XVII, 961 F.2d 496, 504 (4th Cir. N.C. 1992) ("The question is whether the equityholders receive anything 'on account of' their prior interest.").

42.     Section 1129(b)(2)(B) of the Bankruptcy Code represents Congress's attempt to codify, however inexactly and incompletely[14], the absolute priority rule.  See Lasalle, 526 U.S. 434, 441 (1999).  Section 1129(b)(2)(B)(ii) has three components: (i) identification of junior claims or interests, (ii) identification of any property received by the holders of such claims or interests and (iii) determination of whether the property is retained "on account of" a junior claim or interest."  See Wabash, 72 F.3d 1305, 1313 (7th Cir. Ind. 1995).

### (a) The Plan Distributions to PIERS of Liquidating Trust Interests and Reorganized Common Stock Violate Section 1129(b)(2)(B)(ii)

43.     As shown above, the Plan does not provide the CCB-2 Guarantee Claims with value, measured as of the Effective Date, equal to the allowed amount of their claim.  Nevertheless, the

---

[14] E.g. the Supreme Court of the United States has noted the "inexact" language of Section 1129(b)(2)(B)(ii) and the section's failure "to codify any authoritative pre-Code version of the absolute priority rule."  See Lasalle, 526 U.S. 434, 444 (1999).

Plan (Section 20.1) distributes to the PIERS Claims (i) Reorganized Common Stock remaining after any distributions of Reorganized Common Stock to the Senior Notes, General Unsecured Creditors, Senior Subordinated Notes and CCB Guarantee Claims; (ii) Liquidating Trust Interests; and (iii) Subscription Rights.

### (x) The Liquidating Trust Interests Have Equity Value As of the Effective Date

44.     Under Section 20.1 of the Plan, the PIERS Claims receive Liquidating Trust Interests on the Effective Date.  Although cash received on account of Liquidating Trust Interests (via future asset liquidations) is subject to turnover under subordination agreements in the event a subordination beneficiary has not been paid in full, the Liquidating Trust Interests themselves are not.  The Liquidating Trust Interests received by the PIERS Claims are akin to residual interests, or equity: they give their holder a right to any Liquidating Trust value remaining after satisfaction of senior claims.  And because Section 1129(b)(2)(B)(i) values "property" *as of the effective date* – as the present value of a range of possible expected cash flows, as of the Effective Date the Liquidating Trust Interests have prospective value.

45.     In addition, the Liquidating Trust Interests are transferable and can be sold for cash by holders of PIERS Claims.  Even speculative options have monetary value, and when they can be sold for money, it is difficult to argue that they do not constitute property.

46.     It is a fundamental principle of finance, acknowledged by the courts, that residual interests and equity (even in an insolvent enterprise) have prospective value.  See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 207-208 (1988) ("Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains "property.");  Id., at 209-210 ("the respondents would be entitled to a share of any profits earned by the sale of

secured property during the reorganization period -- an interest which can hardly be considered 'worthless.'"); Northern P.R. Co. v. Boyd, 228 U. S. 482 (1913), 508 ("Whether the value is 'present or prospective, for dividends or only for purposes of control' a retained equity interest is a property interest to 'which the creditors [are] entitled . . . before the stockholders [can] retain it for any purpose whatever.'"); SEC v. Canandaigua Enterprises Corp., 339 F. 2d 14, 21 (CA2 1964) (Friendly, J.). ("there may still be some value in … the interest in potential future profits of a now-insolvent business.").

47.     The Liquidating Trust Interests clearly have prospective value and, given that the Plan does not pay the CCB-2 Guarantee Claims in full on the Effective Date, their distribution to the PIERS Claims violates Section 1129(b)(2)(B)(ii). See In re Armstrong 432 F.3d 507 (district court denied confirmation of plan that, by distributing warrants to equity holders over the objection of class of unsecured creditors, violated the absolute priority rule).

### (y) The Reorganized Common Stock Has Prospective/Control Value

48.     Section 20.1 of the Plan provides for the automatic distribution to PIERS Claims on the Effective Date of any Reorganized Common Stock remaining after distributions to senior creditors, regardless of whether the CCB-2 Guarantee Claims have been paid in full. Moreover, the Reorganized Common Stock cannot be redistributed to senior creditors in accordance with pre-petition subordination obligations, unlike Creditor Cash and cash received on account of Liquidating Trust Interests. As of the Effective Date, any Reorganized Common Stock held by the PIERS Claims has equity value and control value. See, e.g., Swope v. Siegel-Robert, Inc., 74 F. Supp. 2d 876,887 (D. Mo. 1999).

### (z) The Exclusive Subscription Rights Offering Violates Section 1129(b)(2)(B)(ii)

49.    The Plan provides certain PIERS claims with an exclusive right to purchase Additional Reorganized Common Stock.  Courts repeatedly have held that, where a senior class has not received payment in full and a junior class is given the exclusive opportunity to invest in the reorganized entity, such opportunity constitutes "property" received "on account of" the junior claim and violates Section 1129(b)(2)(B)(ii).  See In re PWS Holding Corp., 228 F.3d 224, 237 (3d Cir. 2000); Lasalle, 526 U.S. 434, 453-454 (  ("notwithstanding a new value corollary to the absolute priority rule …  allowing junior interest holders to have an exclusive opportunity to obtain an interest in a reorganized entity by providing new value, free from competition and without market valuation, violates § 1129(b)(2)(B)(ii)."); In re Coltex Loop Central Three Partners, L. P., 138 F.3d 39 (2d Cir. 1998), 43 (noting that the "exclusive right to retain the debtor's property upon making a capital contribution is itself property").

50.    The LaSalle analysis is premised on the common-sense view that a private auction is not an efficient market, and that the price paid in this situation is almost certainly too low.  In turn, the exclusive right to buy equity at an artificially depressed valuation establishes the required "on account of" causation between pre-petition interests and equity received in the rights offering.  See PWS, 228 F.3d 224, at 238 ("Causation between the old equity's holdings and subsequent property substantial enough to disqualify a plan … would always come at a price too low when the equity holders obtained or preserved an ownership interest for less than someone else would have paid.").

51.     The Plan attempts to circumvent the prohibition via Section H, which provides for the re-distribution of any "value attributable to subscription rights" [15] in accordance with pre-petition subordination agreements, laying the ground for an argument that since the rights holder must transfer away any "value" received on account of the right, the price paid for the right (0) will equal the value received from the right (1) less the redistributed value attributable to the right (1). Yet the Plan's theoretical requirement to redistribute rights value does not avoid a violation of Section 1129(b)(2)(B)(ii).  First, under applicable case law, the exclusivity of the Subscription Rights Offering creates a property right that exists independently of whether a numerical value is attributed to the option.  See North LaSalle P'ship., at 456 ("At the moment of the plan's approval the Debtor's partners necessarily enjoyed an exclusive opportunity that was in no economic sense distinguishable from the advantage of the exclusively entitled offeror or option holder." This *opportunity* (ital. insert.) should, first of all, be treated as an item of property in its own right.").  Second, any re-valuation of the right on the Effective Date will also be too low, unless the Subscription Right is also offered to other creditors.

52.     The Plan's provision for transfer of any value attributable to the Subscription Rights raises another issue, one which the Plan again manages to circumvent in form but not substance. As noted in preceding sections, the valuation of reorganized Common Stock may be unrealistically low, particularly if WMI exits Chapter 11 in 2011, but the Plan provides no mechanism for re-valuing the Reorganized Common Stock if this turns out to be the case.  The Section H redistribution provision, however, implies that the Subscription Rights could have a positive value on the Effective Date and, therefore, that the underlying equity may increase in value through the Effective Date.  To the extent the Subscription Rights acquire positive value on

---

[15] The delta between Blackstone's baseline value of 0 and the value determined on the Effective Date.

the Effective Date (after the optionality component of value has expired), the Reorganized Common Stock distributed on the Effective Date is necessarily under-valued. Given the extensive cross-holdings among the Senior Subordinated Notes and PIERS Claims, the result is that to the extent the PIERS Claims must surrender value generated by the Subscription Rights, that value is effectively re-captured via the under-valuation of the Senior Subordinated Notes' Reorganized Common Stock.

> **(iii)** **If the CCB-2 Guarantee Claims Are Deemed to Receive Value Equal to the Allowed Amount of Their Claim, the Senior Subordinated Notes Necessarily Receive a Premium, Violating the Fair and Equitable Rule**

53. Section 1129(b) of the Bankruptcy Code prohibits cram-down of a plan over a dissenting creditor class where the plan provides another creditor class with a "premium" over the allowed amount of its claim. Although the prohibition on premiums is not explicitly codified in Section 1129(b), it is considered inherent in Section 1129's requirement of fairness and equity. See, e.g., 124 Cong. Rec. 32,407. ("Although many of the factors interpreting 'fair and equitable' … others … were omitted from the House amendment to avoid statutory complexity and because they would undoubtedly be found by the court to be fundamental to "fair and equitable" treatment of a dissenting class. For example, a dissenting class should be assured that no senior class receives more than 100% of the amount of its claims.").

54. To the extent that the CCB-2 Guarantee Claims are deemed to receive value equal to the allowed amount of their claim under Section 1129(b)(2)(B)(i), the Plan necessarily distributes a higher-than-par recovery to the Senior Subordinated Notes, violating the "no-premium" rule. Although the Senior Subordinated Notes clearly face considerably less post-exit risk than the CCB-2 Guarantee Claims, given their higher rank on the waterfall. In addition, to the extent WMI emerges in 2011, the $140.0 million equity value could increase significantly. Given that

the Plan valuation assumes a 2010 exit, the Senior Subordinated Notes could receive a substantially higher than par recovery.

## NOTICE

55. Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery or hand delivery to: (i) Washington Mutual, Inc., 925 Fourth Avenue, Seattle, Washington 98104 (Attn: Charles E. Smith, Esq.), on behalf of the Debtors; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Brian S. Rosen, Esq.), as counsel to the Debtors; (iii) Richards Layton & Finger P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19899 (Attn: Mark D. Collins, Esq.), as local counsel to the Debtors; (iv) Quinn Emanuel Urquhart & Sullivan, LLP, 55 Madison Avenue, 22nd Floor, New York, New York 10010 (Attn: Peter Calamari, Esq.), as Special Litigation Counsel and Conflicts Counsel to the Debtors; (v) The Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19899-0035 (Attn: Jane Leamy, Esq.); (vi) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Fred S. Hodara, Esq.), as counsel to the Creditors' Committee; (vii) Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 North Market Street, Wilmington, Delaware 19801 (Attn: David B. Stratton, Esq.), as co-counsel to the Creditors' Committee; (viii) Susman Godfrey, L.L.P. 1201 Third Avenue, Suite 3800, Seattle, Washington 98101 (Attn: Justin A. Nelson, Esq.), as counsel to the Equity Committee; and (ix) Ashby & Geddes, P.A. 500 Delaware Avenue, 8th Floor, P.O. Box 1150, Wilmington, Delaware 19899 (Attn: William P. Bowden, Esq.), as local counsel to the Equity Committee. Tricadia submits that under the circumstances no further notice is necessary.

**CONCLUSION**

56.     For all the foregoing reasons, Tricadia respectfully requests the Court to (i) deny

confirmation of the Plan and (ii) grant such other and further relief as may be just and proper.

Dated: November 19, 2010
       Wilmington, Delaware                    PINCKNEY, HARRIS & WEIDINGER, LLC

By:       */s/ Donna L. Harris*
        Donna L. Harris (No. 3740)
        1220 N. Market Street, Suite 950
        Wilmington, Delaware  19801
        (302) 504-1497 (Telephone)
        dharris@phw-law.com

            and

        Javier Schiffrin, Esquire
        SCHIFFRIN & PARTNERS, P.C.
        55 West 26th Street, 15th Floor
        New York, NY 10010-1012
        (646) 595-0557 (Telephone)
        (646) 688-3225 (Facsimile)
        js@schiffrinandpartners.com

        *Counsel to Tricadia Capital Management LLC*