# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 08-12229 (MFW)

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


WASHINGTON MUTUAL, INC., et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          824 North Market Street

          Wilmington, Delaware


          September 24, 2010

          10:32 AM


B E F O R E:

HON. MARY F. WALRATH

U.S. BANKRUPTCY JUDGE


ECR OPERATOR: BRANDON MCCARTHY

1   Debtors' Thirty-Sixth Omnibus (Substantive) Objection to Claims

2   [Docket No. 3803; filed 5/8/10]

3

4   AT&T's Motion for an Order Authorizing AT&T to File Under Seal

5   the Affidavit of Kari Le Fleur [Docket No. 5276; filed 8/11/10]

6

7   The Texas Group's Motion to Compel Production of Documents from

8   Debtors and to Exercise Its Right to Participate in General

9   Discovery Available to all Parties [Docket No. 4869; filed

10  7/2/10]

11

12  Debtors' Forty-Sixth Omnibus (Non-Substantive) Objection to

13  Claims [Docket No. 5117; filed 7/21/10]

14

15  Motion for Relief from the Automatic Stay and Co-Debtor Stay

16  Under Section 362 of The Bankruptcy Code with Respect to Real

17  Property Located at 3900 NW 179th Street, Opa Locka, Florida

18  33055 [Docket No. 5352; filed 8/26/10]

19

20  Motion to Submit A Document Under Seal and for Determination

21  Regarding Waiver of Privilege [Docket No. 5426; filed 9/14/10]

22

23

24  Transcribed by:  Ellen S. Kolman

25

1

2    A P P E A R A N C E S :

3    ELLIOT GREENLEAF

4    SHELLEY A. KINSELLA, ESQ.

5    REPRESENTING:  DEBTORS

6

7

8    KASOWITZ BENSON TORRES & FRIEDMAN, LLP

9    SETH A. MOSKOWITZ, ESQ. (TELEPHONICALLY)

10   REPRESENTING:  DEBTORS

11

12

13   QUINN EMANUEL URQUHART & SULLIVAN, LLP

14   DAVID ELSBERG, ESQ.

15   PETER E. CALAMARI, ESQ.

16   REPRESENTING:  DEBTORS

17

18

19   RICHARDS, LAYTON & FINGER, P.A.

20   CHUN I. JANG, ESQ.

21   REPRESENTING:  DEBTORS

22

23

24

25

1

2    WEIL, GOTSHAL & MANGES LLP

3    ADAM P. STROCHAK, ESQ.

4    CHERL A. JAMES, ESQ. (TELEPHONICALLY)

5    BRIAN S. ROSEN, ESQ. (TELEPHONICALLY)

6    RAHUL K. SHARMA, ESQ. (TELEPHONICALLY)

7    REPRESENTING:  DEBTORS

8

9

10   AKIN GUMP STRAUSS HAUER & FELD, LLP

11   ROBERT J. BOLLER, ESQ. (TELEPHONICALLY)

12   ROBERT A. JOHNSON, ESQ. (TELEPHONICALLY)

13   BRIAN M. ROTHSCHILD, ESQ. (TELEPHONICALLY)

14   DAVID P. SIMONDS, ESQ. (TELEPHONICALLY

15   REPRESENTING:  OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16

17

18   PEPPER HAMILTON, LLP.

19   DAVID B. STRATTON, ESQ.

20   REPRESENTING:  OFFICIAL COMMITTEE OF UNSECURED CREDITORS

21

22

23   ANDREWS KURTH, LLP

24   PAUL N. SILVLERSTEIN, ESQ. (TELEPHONICALLY)

25   REPRESENTING:  BROADBILL INVESTMENT CORPORATION

```
 1
 2    ARENT FOX, LLP
 3    JEFFREY N. ROTHLEDER, ESQ. (TELEPHONICALLY)
 4    REPRESENTING:  WILMINGTON TRUST FSB
 5
 6
 7    ASHBY & GEDDES, P.A.
 8    GREGORY A. TAYLOR, ESQ.
 9    REPRESENTING:  EQUITY COMMITTEE
10
11
12    BRACEWELL & GUILIANI, LLP
13    MARK E. DENDINGER, ESQ. (TELEPHONICALLY)
14    REPRESENTING:  WMB NOTEHOLDERS GROUP
15
16
17    BROWN RUDNICK, LLP
18    DANIEL J. BROWN, ESQ. (TELEPHONICALLY)
19    JEREMY B. COFFEY, ESQ. (TELEPHONICALLY)
20    LAURA F. WEISS, ESQ. (TELEPHONICALLY)
21    SIGMUND S. WISSNER-GROSS, ESQ. (TELEPHONICALLY)
22    REPRESENTING:  TRUST PREFERRED HOLDERS
23
24
25
```

1

2   FOX ROTHSCHILD, LLP

3   JOHN H. STROCK, ESQ.

4   REPRESENTING:  WMI NOTEHOLDERS GROUP

5   SETH A. NIEDERMAN, ESQ.

6   REPRESENTING:  WELLS FARGO, N.A.

7

8

9   GREER, HERZ & ADAMS, LLP

10  JAMES M. ROQUERMORE, ESQ. (TELEPHONICALLY)

11  REPRESENTING:  AMERICAN NATIONAL INSURANCE COMPANY

12

13

14  JPMORGAN CHASE & COMPANY

15  LAWRENCE N. CHANEN, ESQ. (TELEPHONICALLY)

16  JASON C. KLEIN, ESQ. (TELEPHONICALLY)

17  REPRESENTING:  JPMORGAN CHASE BANK, N.A.

18

19

20  KING & SPALDING

21  ARTHUR J. STEINBERG, ESQ. (TELEPHONICALLY)

22  REPRESENTING:  NANTAHALA

23

24

25

LANDIS, ROTH & COBB, LLP

ADAM LANDIS, ESQ.

REPRESENTING:  JPMORGAN CHASE


LOEB & LOEB, LLP

WALTER H. CURCHACK, ESQ

VADIM J. RUBENSTEIN, ESQ. (TELEPHONICALLY)

REPRESENTING:  WELLS FARGO, N.A.


MATTHEW SHORE

REPRESENTING:  MATTHEW SHORE, PRO SE


OFFICE OF THE CALIFORNIA ATTORNEY GENERAL

JAMES R. POTTER, ESQ. (TELEPHONICALLY)

REPRESENTING:  STATE OF CALIFORNIA

1

2    PACHULSKI, STANG, ZIEHL & JONES, LLP

3    SHIRLEY S. CHO, ESQ. (TELEPHONICALLY)

4    ALAN J. KORNFELD, ESQ. (TELEPHONICALLY)

5    JEREMY W. RICHARDS, ESQ. (TELEPHONICALLY)

6    DEAN A. ZIEHL, ESQ. (TELEPHONICALLY)

7    REPRESENTING:  BOND HOLDERS BANK

8

9

10   PATTERSON BELKNAP WEBB & TYLER, LLP

11   BRIAN P. GUINEY, ESQ. (TELEPHONICALLY)

12   REPRESENTING:  LAW DEBENTURE TRUST COMPANY OF NEW YORK

13

14

15   PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP

16   LEO T. CROWLEY, ESQ. (TELEPHONICALLY)

17   MARGOT P. ERLICH, ESQ. (TELEPHONICALLY)

18   REPRESENTING:  BANK OF NEW YORK MELLON

19

20

21   SEWARD & KISSEL, LLP

22   ARLENE R. ALVES, ESQ. (TELEPHONICALLY)

23   REPRESENTING:  WILMINGTON TRUST COMPANY AS TRUPS TRUSTEE

24

25

1

2   SMITH KATZENSTEIN FURLOW, LLP

3   MICHAEL P. MIGLIORE, ESQ.

4   REPRESENTING:  AMERICAN NATIONAL INSURANCE COMPANY

5

6

7   SULLIVAN & CROMWELL, LLP

8   BRUCE E. CLARK, ESQ. (TELEPHONICALLY)

9   HYDEE R. FELDSTEIN, ESQ. (TELEPHONICALLY)

10  STACEY R. FRIEDMAN, ESQ. (TELEPHONICALLY)

11  JOSHUA J. FRITSCH, ESQ. (TELEPHONICALLY)

12  BRIAN D. GLUECKSTEIN, ESQ. (TELEPHONICALLY)

13  BRENT J. MCINTOSH, ESQ. (TELEPHONICALLY)

14  M. DAVID POSSICK, ESQ. (TELEPHONICALLY)

15  ROBERT A. SACKS, ESQ. (TELEPHONICALLY)

16  REPRESENTING:  JPMORGAN CHASE BANK, N.A.

17

18

19  STUTMAN, TREISTER & GLATT, LLP

20  WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)

21  K. JOHN SHAFFER, ESQ. (TELEPHONICALLY)

22  REPRESENTING:  ELLIOTT MANAGEMENT

23

24

25

1

2    SUSMAN GODFREY, LLP

3    JUSTIN D. NELSON, ESQ. (TELEPHONICALLY)

4    REPRESENTING:  OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS

5

6

7    THE SEAPORT GROUP LLC

8    GEORGE BICKFORD, ESQ. (TELEPHONICALLY)

9    REPRESENTING:  THE SEAPORT GROUP

10

11

12    JOHN WEAVER, ESQ.

13    REPRESENTING:  NATIONSTAR MORTGAGE

14

15

16    WHITE & CASE, LLP

17    THOMAS MACWRIGHT, ESQ. (TELEPHONICALLY)

18    KATHERINE MOHANAN, ESQ. (TELEPHONICALLY)

19    REPRESENTING:  WMI NOTEHOLDERS GROUP

20

21

22    YOUNG CONAWAY STARGATT & TAYLOR, LLP

23    M. BLAKE CLEARY, ESQ.

24    REPRESENTING:  FDIC

25

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3    JANE LEAMY, ESQ.

4    REPRESENTING:   OFFICE OF THE UNITED STATES TRUSTEE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2        THE COURT:  Good morning.

3        MR. JANG:  Good morning, Your Honor.  For the record,

4    Chun Jang of Richards Layton & Finger on behalf of the debtors.

5    With me today we have Adam Strochak and David Elsberg who will

6    be handling some of the Texas state matters.  They've been

7    admitted pro hac vice in the past.

8        THE COURT:  Okay.

9        MR. JANG:  Your Honor, we thank the Court for already

10   entering several orders with respect to some of the items on

11   the agenda.  We're left with 38 -- 37, 38 and then 40 to 43.

12   Thirty-nine has been continued to the October hearing, to the

13   first October hearing.

14        Your Honor, I think most of the people here today are

15   here for that Texas Group item so it may make sense to just go

16   through those first.

17        THE COURT:  That's fine.

18        MR. JANG:  If we could take these out of order.  Start

19   with item number 43, which was the Texas Group's motion to

20   submit a document under seal for determination regarding waiver

21   of privilege.  And I'll turn this over to the Texas Group

22   counsel.

23        MR. MIGLIORE:  Good morning, Your Honor.  Mike

24   Migliore.  I enter a limited appearance on behalf of the Texas

25   Group.  Your Honor, if it pleases the Court, James Roquemore is

1    on the telephone, cocounsel in the case with me, and I would

2    defer to him to argue the motion.

3           THE COURT:  Okay.

4           MR. MIGLIORE:  Thank you.

5           MR. ROQUEMORE:  Good morning, Your Honor.  James

6    Roquemore on behalf of American National Insurance Company and

7    the other entities calling themselves the Texas Group at this

8    juncture.

9           Your Honor, we have submitted a document under seal

10   and we would argue -- are arguing to the Court that, number

11   one, this document is not -- does not have indicia of privilege

12   and we argue that the debtors have not, at least to this point

13   in time, provided evidence to the Court to satisfy their burden

14   to show that this is privileged.

15          Also, with regard to waiver of privilege, if such a

16   document is, in fact, privileged, in the first instance we

17   would argue that it has been waived by the debtors' reliance

18   upon advice of counsel and the necessity to use this document

19   in the course of proving a -- their element with regard to the

20   plan confirmation.

21          Your Honor, as we briefed, in order for the debtors to

22   prove that their plan is entitled to confirmation, they're

23   going to have to prove that the global settlement agreement as

24   incorporated into the plan was entered into in good faith.  And

25   with regard to that, the Court should look at the totality of

1 the circumstances regarding entry of the plan as we cited the

2 Madison Hotel case. The plan must be viewed in light of the

3 totality of the circumstances surrounding conception of the

4 plan. And that means we need to look at, number one, the

5 statements that the debtors actually use in their global

6 settlement agreement which we cited to the Court which

7 generally states that the debtors are going to -- are relying

8 as we interpret the debtors are stating that the debtors are

9 relying on advice of counsel to show the reasonableness of the

10 plan.

11   But more particularly, with regard to the Texas Group,

12 because the debtors are seeking to enforce nonconsensual

13 releases and injunctions against the Texas ligation, the

14 Courts -- the debtors are going to have to prove -- in

15 addition, they're going to have to show that the elements of

16 the Continental case are present with regard to their good

17 faith and entering into this plan which includes that the plan

18 is fair to the creditors and not entered into for an unlawful

19 purpose.

20   Your Honor, we have particular concerns with regard to

21 the reasons why they entered into this plan with regard to,

22 number one, there is no consent and no consideration offered to

23 the Texas litigation. And generally, without affirmative

24 agreement, there can be no proper release under a plan; that's

25 the Zenith case. And lack of consideration as -- will render

VERITEXT REPORTING COMPANY
www.veritext.com
212-267-6868    516-608-2400

1    releases invalid under a plan, under -- generally, under the

2    Continental case -- under the Continental case.

3            With regard to this particular document, we're not

4    going to mention a comment on the contents of it because it's

5    submitted under seal and Your Honor can look at it.  We would

6    ask that Your Honor look at it in the context of all the other

7    statements that are -- that have been made about the reasons

8    why the debtors have entered into this plan as well as if the

9    debtors offer the context that they -- that they claim this is

10   a -- entitled to a privilege, we would ask the Court to also

11   consider that.

12           Your Honor, in addition to the general statements in

13   the global settlement agreement, in our reply we referenced

14   debtors' counsel affirmative statement regarding why the

15   debtors entered into this global settlement agreement and

16   entered agreed to releases of the Texas litigation.  And that's

17   the statement on March 12th when Mr. Rosen discussed an

18   understanding of the parties.  As Mr. Rosen said, "The parties

19   to the agreement have reached an understanding and" -- just one

20   moment, Your Honor.  And -- and I'm quoting, "With respect to

21   something called the Texas litigation," Your Honor, or now

22   it's, maybe, the Court referred to as the Anaco Washington,

23   D.C. litigation, "parties will do their best to establish that

24   whatever claims remain in that litigation are the properties of

25   the estate.  They're derivative in nature.  They seek to use

1    reasonable best efforts to have that litigation dismissed with

2    prejudice."

3           Your Honor, we would submit to you that that statement

4    in light of the releases that the debtors are seeking to

5    release, which I will discuss in detail just in a second

6    because the actual releases that are sought -- the actual

7    litigation that's being sought to release it so palpably not

8    derivative of WMI that it is evidence of lack of good faith

9    unless there's some advice of counsel that's attached to that.

10          But as for the statement itself, what Mr. Rosen is --

11   has declared to the Court and everybody who is in the court,

12   that the basis of the understanding of the debtors was that

13   there was a -- there was, a)  A basis to believe that there's,

14   a deriv -- an ownership of the claims and, b)  That there is a

15   litigation strategy that's going to go along with this

16   understanding that the debtors are going to use their best

17   efforts to -- to establish that the claims are property of the

18   estate.

19          So, in this case, the debtors have declared to the

20   Court that their good faith beliefs that -- belief that the

21   releases are valid are intertwined with the actions and

22   statements of counsel.  And this way, have put into play the

23   advice of counsel affirmatively.  More so and in a different

24   way in addition to any other statements of -- that are placed

25   in the documents and -- the plan documents and the global

1   settlement agreement.  In that context, it is more -- even more

2   so that the debtors have put into play their advice of counsel

3   and their litigation strategy.  Because if there's no

4   litigation strategy involved in this understanding then, you

5   know, the statement clearly just doesn't have a basis.

6          And I'll back up, let's back -- I will back up to

7   discuss this -- the Texas Group.  Because in some of the

8   filings and some of the statements of -- that have been stated

9   in this -- in court regarding the Texas Group, it hasn't been

10  entirely clear.

11         Your Honor, the Texas Group is made up of Washington

12  Mutual Bank bondholders and has only been Washington Mutual

13  Bank bondholders since February of 2010.  Well before this

14  global settlement agreement was signed off and the

15  understanding reached by the parties.

16         In the -- as WMB bondholders, they're entitled to cash

17  flows from the assets of WMB.  The Texas Group alleges that

18  JPMorgan as part of a plan that started at least back in March

19  of 2008 unlawfully worked and achieved a goal to sever the WMB

20  bondholders' rights to the assets of the property.  And were

21  able to obtain the assets of the Washington Mutual Bank free

22  and clear of the obligations to the bondholders of WMB.  And in

23  this way the claim of tortious interference is based.  And the

24  other claims associated with that that are asserted in the

25  Texas litigation are also based.

1        Now, for the debtors, the parent company of WMB to say

2   that they have -- that the right to the cash flows of the WMB

3   by WMB bondholders, is somehow derivative to them or that they

4   accrue to that benefit.  Your Honor, that is, a)  Against

5   everything that they have implied in these proceedings with

6   regard to the right of WMB bondholders, vis-a-vis WMI.

7        THE COURT:  Well, excuse me; I don't want to get into

8   the merits of the claims.  Why is that relevant?

9        MR. ROQUEMORE:  Our argument is that the statement

10  itself is indicia because it has no basis in law or practice

11  that it has no basis --

12       THE COURT:  Well, why am I getting into the merits of

13  that?

14       MR. ROQUEMORE:  Well, Your Honor, I'll move on.  It's

15  just that our argument would be that the fact that this has

16  absolutely no basis in law than the assertion in open court

17  that it's -- that that's the reason why they're entering into

18  this agreement is indicia of a lack in good faith.

19       THE COURT:  Well, that's not an issue as to whether or

20  not their attorney/client privilege applies.

21       MR. ROQUEMORE:  The --

22       THE COURT:  So, anything else on that issue?

23       MR. ROQUEMORE:  -- well, they're -- with regard to the

24  statement at court in the -- by Mr. Rosen, subsequently in the

25  global settlement agreement the debtors stated that they did

1    not own the Texas litigation.  We cited the -- their

2    destination of action does not include the Texas litigation and

3    they have -- they stated that they represented that the're only

4    asserting they only hold claims against JPMorgan with regard to

5    the action.  Contradicting the statement made in court which

6    makes -- puts into play the validity of the reason why the

7    debtors have entered into the global settlement agreement.  And

8    further belied by the statement of JPMorgan cited in our reply

9    brief where they assert that the clients of the Texas

10   litigation can only be asserted by the FDIC and should -- and

11   claims of WMB bondholders should be dismissed from the court

12   itself just wholesale.

13        So, Your Honor, we'd argue that the context, the

14   totality of all the statements regarding why the -- of why the

15   debtors have entered into this global settlement agreement and

16   are seeking to enforce nonconsensual releases have put into

17   play this advice of counsel.

18        THE COURT:  All right.

19        MR. ROQUEMORE:  Your Honor, we would -- this isn't a

20   case where the debtors' state of mind is just at issue and

21   therefore advice of counsel is relevant.  This is a case where

22   the state of mind is inextricably intertwined with litigation

23   strategy of the counsel and -- as announced in open court.  And

24   therefore we would argue that the litigation strategy as well

25   as the evaluation of whether or not the debtors owned the claim

1    and how much they value the claims should be -- should be

2    available for discovery.

3            THE COURT:  I understand your position.

4            MR. ROQUEMORE:  Thank you.  That's all.

5            THE COURT:  Any reply?

6            MR. ELSBERG:  Good morning, Your Honor.  David Elsberg

7    from Quinn Emanuel for the debtors.  Their motion is absolutely

8    meritless and it should be denied.  And at the outset, I just

9    want to be clear about what they're not arguing and what they

10   are arguing.

11           They're openly -- open brief -- opening brief tacitly

12   conceded that the inadvertently produced document is, in fact,

13   privileged in the first instance.  Their own brief says that

14   the document, quote, "constitutes advice of counsel."  That's

15   their language in paragraph 3 of their motion.  And they don't

16   advance any argument whatsoever that the document lacks

17   privilege and work product protection in the first instance.

18           In the reply brief which they logged in for the first

19   time yesterday, I got it after 4 p.m.; they tried to bring up

20   this point as an afterthought.  But even their reply doesn't

21   really make the argument that it's not privileged in the first

22   instance.  So, that's not really their argument.  And, in fact,

23   Your Honor, their motion really has nothing at all to do with

24   the inadvertently produced document itself.  Instead, they

25   point to three other documents where they say we supposedly put

1   legal advice at issue.  They point to one clause in the

2   disclosure statement.  They point to one clause in the plan.

3   And they point to one clause in the settlement agreement and

4   they say each of these supposedly put legal advice at issue.

5          But, Your Honor, these three statements don't even

6   come close.  They come nowhere close to satisfying the task for

7   at-issue waiver.  And, in fact, this Court has already looked

8   at one of the three statements that they bring up and this

9   Court has already rejected a claim that it could somehow

10  trigger waiver.

11         Now, I'll be brief, Your Honor.  In the next few

12  minutes I plan to first describe the controlling legal test and

13  then discuss how the three statements that they point to can't

14  possibly put a waiver under that test.  So, let's start with

15  the legal test.

16         The Third Circuit set forth the test in the Home

17  Indemnity case.  In Home Indemnity, the Third Circuit said,

18  "Advice of counsel is placed at issue only when a litigant

19  attempts to prove a claim or defense by disclosing or

20  describing an attorney/client communication and in doing so

21  takes an affirmative step to turn legal advice into a quote,

22  'essential element' of the claim or defense."  That's Home

23  Indemnity 32 F.3d at 863 to 864.

24         So, the Third Circuit was crystal clear that to waive

25  you have to disclose or describe the privileged communication

1    and use it for a particular purpose, as a sword, to try to

2    prove your case.  And the Third Circuit went onto emphasize

3    that waiver cannot be found precisely for the reasons that we

4    just heard opposing counsel articulate.

5         The Third Circuit went onto emphasize that waiver

6    cannot be found just because privileged information is relevant

7    or important to the case.  In fact, in the Third Circuit's

8    words, and I'm quoting, "You cannot find waiver or", quote,

9    "the information is vital, highly probative, directly relevant

10   or even goes to the heart of an issue."  I think we heard

11   opposing counsel use the word "inextricably bound."  I don't

12   know what the exact word was but it doesn't matter if it's

13   vital and goes to the heart of the issue.  That's what the

14   Third Circuit said in Home Indemnity.

15        And in Teleglobe, Your Honor, Your Honor applied Home

16   Indemnity and I'm quoting the rule as articulated by Your Honor

17   in Teleglobe.  Quote, "Because of the importance of the

18   attorney/client privilege, at-issue waiver is narrowly

19   construed and applies only where the client asserts a claim or

20   defense and attempts to prove that claim or defense by

21   disclosing or describing an attorney/client communication.

22   Simply because the information is relevant to the testimony

23   does not mean the privilege has been waived," end quote.

24   That's Teleglobe 392 B.R. 561.  So, like the Third Circuit,

25   Your Honor was very clear in Teleglobe that it's a sword and

1  shield test.  And what's most remarkable, what's most

2  remarkable, given what we've heard today, is that the Texas

3  Group itself does not dispute this is the rule, this is the

4  test that controls this motion today.

5       At paragraph 9 of their own brief, I'm reading.  This

6  is what they say.  Quote, "When a party places the advice of

7  its attorney at issue as a claim or defense and attempts to

8  prove that claim or defense by disclosing or describing an

9  attorney/client communication, the attorney/client privilege

10 has been waived."

11      So, they admit, they agree in their papers it's a

12 sword and shield test.  You have to describe the

13 attorney/client communication and try to win your case or

14 defense based on that advice.

15      Now, let's apply the legal test to the three

16 statements that they point to as supposedly triggering a

17 waiver.  And we'll see none of them come close.  In fact, if

18 anything, it comes close to being frivolous that they would

19 even argue that there's been a waiver.

20      If you have their motion papers, their opening papers

21 in front of you, Your Honor, their own papers are the best

22 evidence that there's no waiver here.  If you look at paragraph

23 6 of their motion, they cite a close -- a clause in the

24 disclosure statement.  And what that clause says is the debtors

25 have concluded that because of the expense and uncertainty of

1   litigation, it's in the best interest of the estate to settle

2   the litigation and to enter the settlement agreement.  That's

3   all paragraph 6 says.

4        That clause doesn't even mention any legal advice much

5   less is there any attempt to use any legal advice to do

6   anything as a sword to prove anything.  So, there's no way this

7   could satisfy the Home Indemnity test which requires quote,

8   "Interjecting the advice of counsel as an essential element in

9   the case."  And, in fact, Your Honor, this is the one where

10  Your Honor has already rejected the argument that this

11  statement in the disclosure clause statement could trigger

12  waiver.

13       If Your Honor looks at the transcript of the September

14  7th hearing, counsel for the TPS consortium pointed to

15  literally the identical language in the disclosure statement.

16  And they made the same waiver argument.  And Your Honor

17  rejected it at pages 82 and 83 of the transcript.  I have the

18  quote here.  I won't read it.  But you could -- Your Honor

19  could consult the transcript.

20       So, that clause, that's the first statement they point

21  to as supposedly triggering waiver and it obviously doesn't.

22  That doesn't fit them anywhere.  So, now, let's look at the

23  second statement they point to.  This is in paragraph 7 of

24  their motion.

25       At paragraph 7 of their motion, they cite an

1  exculpation clause in the plan. That exculpation clause says

2  the debtors, quote, "Shall be entitled to rely on the advice of

3  counsel with respect to their duties and responsibilities under

4  the plan," end quote.

5        Your Honor, they don't cite a single court decision

6  ever decided by any court in any jurisdiction anywhere that has

7  ever said that you waive if you say that you're entitled to

8  rely on counsel to make sure that you complied with your legal

9  obligations under a document. They can't cite a case that

10  stands for that proposition because it's a silly and frivolous

11  argument.

12        We cite the Metropolitan Life case which squarely

13  rejects that argument. Metropolitan Life says, and I'm

14  quoting, quote, "If admitting that one relied on legal advice

15  in making a legal decision put the communications relating to

16  the advice at issue, such advice would be at issue whenever the

17  legal decision were litigated. If that were true, the at-issue

18  adoption would severely erode the attorney/client privilege and

19  undermine the public policy considerations upon which it's

20  based," end quote.

21        And we also cite the North River case which was cited

22  favorably by the Third Circuit in Home Indemnity. So, that's

23  the second of the three statements they rely on and that

24  statement also gets them absolutely nowhere and cannot possibly

25  trigger waiver.

1        Now, let's look at the third and last statement that

2    they point to as supposedly triggering the waiver.  This is in

3    paragraph 8 of their motion.  They cite a so-called "big boy

4    clause" in the settlement agreement.  This is a completely

5    standard paragraph.  It appears in countless commercial

6    contracts every day.  This clause just says that each side is

7    sophisticated.  It's had sufficient time to look at the terms

8    and consider them.  It's relied on its own judgment and yes it

9    also has had its own counsel.  It's, frankly, frivolous to

10   assert that this standard paragraph could trigger a waiver and

11   I'm not going to waste time discussing that clause further

12   unless the Court has any questions.

13        Now, Your Honor, just before I conclude, I want to

14   point out that the Texas Group's own brief actually confirms

15   that there's been no waiver.  And you could just look at their

16   paragraph 9 and you see in paragraph 9 they admit the legal

17   standard.  You have to attempt to prove your case by disclosing

18   or describing a privileged document.  That's what they say in

19   paragraph 9.

20        Now, let's look at the next two paragraphs where they

21   don't even make an attempt to satisfy that test.  It's

22   remarkable.

23        You go to paragraph 10; they've just stated the legal

24   test and they say we've made statements that show quote,

25   "Debtors relied on the advice of counsel in formulating and

1  entering into the global settlement agreement," end quote.  So

2  what?  Admitting that you relied on counsel of legal advice,

3  obviously, can't trigger waiver.  If that were the rule, every

4  time somebody submitted a brief and a lawyer signed the brief,

5  whoa, the lawyers were involved in giving legal advice.

6  They've waived.  They've waived.  They admitted it.  Lawyers

7  were involved in that brief.  Waiver of privilege.  And that's

8  how silly that argument is.

9        Then you get to paragraph 11, their next argument.

10 They still don't try to satisfy the sword shield test.  Instead

11 in paragraph 11, they say the inadvertently disclosed document

12 is quote, "relevant to the Texas Group's review of the

13 settlement agreement."  But so what?  Relevance cannot possibly

14 trigger a waiver.  The Third Circuit couldn't have been

15 clearer.  And, Your Honor, that is it.  That's literally all

16 they have.  That's their entire argument.

17        When you get to paragraph 12, paragraph 12 is the

18 punch line.  It's their big conclusion and they say, "Since the

19 debtors admitted they relied on counsel on matters that are

20 relevant to this litigation, we've supposedly waived."  And

21 just think about that for a second.  They're actually coming

22 into this court and saying if you admit you relied on counsel

23 concerning matters relevant to a litigation, you've waived.

24 That's actually what their brief is saying.

25        Your Honor, the motion is meritless if not frivolous

1    on its face and it should be rejected.

2         THE COURT:  Reply?

3         MR. ROQUEMORE:  Yes, Your Honor, James Roquemore.

4    Number one, we don't -- the law isn't in dispute here.  We

5    cited the -- we cite the Rhone-Poulenc Rorer case.  And, you

6    know, that contains the statement, "The Court's find by placing

7    the advice at issue, the client's open examination to facts

8    relating to that advice."

9         Your Honor, in the Home -- the In re Madison Hotel

10   Associates case guides the Court with regard to examination --

11   what is incapac -- the debtors' responsibility to prove their

12   element of good faith.  You must look at the totality of the

13   circumstances all the matters going into the global settlement

14   agreement.

15        And yes, the three statements should be looked at

16   together.  Not as debtors' counsel suggests to take them one by

17   one and shoot them down.  Together they show that with regard

18   to the totality of the circumstances, the debtors were relying

19   on advice of counsel especially with regard to the decision to

20   release the claims nonconsensually without consideration of the

21   Texas Group.

22        And we pointed to the statement of Mr. Rosen which he

23   describes -- he puts into play the basis for that understanding

24   which requires an element of advice of counsel.

25        Your Honor, and the -- I would point out the debtors

1  had still not carried their burden to establish anything

2  showing that there's a privilege attaching to the document

3  which we've submitted under seal.  We cited -- in our brief,

4  we've cited locations in our brief where we do not admit that

5  there's a privilege that attaches to the document in the first

6  instance.  The debtors have known that we were going to

7  challenge the privilege of this document in the first instance

8  since September 1 when we corresponded with them.  We attached

9  that letter to our briefs also.  So, Your Honor, we would argue

10  that the debtors have failed to even meet their initial burden.

11  They cannot shift the burden to us to establish the privilege.

12  And if the privilege does, in fact, exist, the Court finds that

13  it exists, then in this case with regard to the releases that

14  they're purporting to put -- to impose upon the Texas

15  litigation, the debtors have put into play advice of counsel

16  through their statements.  Thank you.

17        THE COURT:  Well, let me rule on this.  I disagree

18  with the latter point.  I think in the Texas Group's own brief

19  they admit that the worksheet constitutes advice of counsel so

20  it is covered by the attorney/client privilege.  I don't think

21  it's necessary for the Court to go into it if there's no basis

22  established that it is not advice of counsel.  The debtor has

23  so asserted in requesting the return of the document, so I'm

24  not going to go any further into that issue.

25        With respect to whether or not there's been an issue

1  waiver, I agree that the doctrine is narrowly construed in the

2  Third Circuit and only exists where a party has disclosed the

3  information and has attempted to use it as a sword in court.  I

4  find no evidence that the debtors are attempting to use it as a

5  sword.  They have not voluntarily disclosed it.  In fact, under

6  the confidentiality agreement procedure, they've sought to have

7  it returned and I don't think there's any assertion that it was

8  produced other than inadvertently.

9          The Texas Group relies on general statements in the

10  plan of reorganization, disclosure statement and settlement

11  agreement that simply says the debtor relied on advice of

12  counsel.  I don't think that's sufficient to waive the

13  privileges nor is it sufficient to show that the

14  attorney/client advice was relevant or goes to the heart of the

15  case.  I think the first step is to show that the debtor sought

16  to use it as a sword.  There's no evidence here that the debtor

17  has.  I've said before to the extent the debtor has said it is

18  not going to rely on advice of counsel in proving its case on

19  confirmation.  I'm holding the debtor to that.  And it cannot

20  present any evidence to that effect.  So, I will deny the

21  motion.

22          MR. ELSBERG:  Your Honor, I have a basic form of order

23  denying the motion, if I may approach?

24          THE COURT:  You may.  All right.  I'll enter that

25  order.

1        MR. STROCHAK:  Good morning, Your Honor.  Adam

2   Strochak, Weil Gotshal for the debtors.  The next Texas Group

3   matter is item 40 on the agenda.  I don't know if Mr. Roquemore

4   has more than he wishes to say on that.  It's his motion so I'm

5   happy to defer to him.

6        MR. ROQUEMORE:  Your Honor, James Roquemore on behalf

7   of the Texas Group again.  Just a couple points, Your Honor.

8   The Texas Group, number one, are parties in interest.  I think

9   it's the argument that the debtors have proposed that they

10  don't have a claim against the estate.  That's clearly not the

11  standard for determining whether you're a party in interest

12  under Section 1109(b).  There are plenty of cases that -- where

13  people who don't have claims against the estate have been found

14  to have a -- they would be a party in interest.  So, we cited

15  those.  The Amatex case where future asbestos claimants were

16  parties in interest.  And the Vero (ph.) bondholders of the

17  Grand Union case where bondholders of parent organization had a

18  sufficient stake in the -- in the bankruptcy proceeding of the

19  subsidiary to be parties in interest and to participate

20  including with discovery.  So, Your Honor, I don't think that's

21  a serious dispute although we'll see if the debtors have a --

22  we'll reserve our right to rebut anything that the debtors have

23  to say in that regard.

24        THE COURT:  All right.

25        MR. ROQUEMORE:  As a party in interest, we're -- have

1    a right to raise and be heard on any issue in that case

2    pursuant to Section 1109(b) and that includes discovery.

3    Discovery that we seek has to do with the basis for the

4    debtors' good faith belief that they're entitled to impose

5    nonconsenual releases, bars, injunctions and various other

6    efforts to dismiss the Texas litigation without providing any

7    consideration to the Texas litigation.  As parties in interest,

8    we're certainly entitled to discover the basis of the

9    negotiations including all matters that going into the -- into

10   the global settlement agreement.  As the Madison Hotel case

11   describes it via the confection of all matters going into the

12   agreement and the plan.

13          In order -- the issues at plan confirmation in

14   addition to good faith, they're going to have to show that it's

15   not by means forbidden by law too.  And that includes the

16   jurisdictional matters whether or not this Court has

17   jurisdiction to effect the Texas litigation.

18          They're going to have to show under the Continental

19   standard that the releases are fair to the Texas litiga -- the

20   Texas Group and that they're necessary to reorganization as

21   well as the general reasonableness of the settlement.

22          Therefore, we contend that we are entitled to have

23   discovery as to the actual negotiations and communications

24   between the debtors and the other settling parties including

25   JPMorgan and the FDIC.  Those matters are certainly relevant to

1 whether or not these releases are based upon lawful reasons,

2 i.e., jurisdiction and ownership of the claims and as well

3 whether or not they're fair to the creditor -- fair to the

4 Texas Group and in fact necessary to the plan of reorganization

5 or if it was just an unlawful attempt by the JPMorgan and the

6 FDIC to make an end run around the jurisdiction of the District

7 of Columbia District Court which it certainly appears to be.

8 Your Honor, in addition, the contradictory statements

9 regarding the -- whether or not the debtors actually own the

10 Texas litigation or whether or not they're derivative as

11 between Mr. Rosen's March 12th statement to the Court and with

12 regard to the subsequent statement by JPMorgan which -- where

13 they stated that the Texas litigation was, you know, only able

14 to be -- was derivative of the FDIC which we disagree but they

15 apparently had a different understanding as to the reason why

16 the Texas litigation should be included in the global

17 settlement agreement. As well as the global settlement

18 agreement itself where it defines actions held by Washington --

19 why the debtors as including a number of things but not the

20 Texas litigation. And so all those matters are -- we're

21 entitled to investigate and we're entitled to have full

22 discovery on and the debtors have not provided any reason to

23 the contrary. So, Your Honor, we would ask that Your Honor

24 issue an order requiring the debtors to fully respond to our

25 discovery which we have cited in our motion. Thank you.

1          THE COURT:  Response?

2          MR. STROCHAK:  Thank you, Your Honor.  Adam Strochak

3     from Weil.  Let me start a little bit with the history of where

4     we've been in terms of discovery with the Texas Group.

5          When they filed this motion, we made a real concerted

6     effort to try and get it resolved back in July and we agreed to

7     provide them with access to the data room that contains all the

8     confirmation discovery that's been provided to all the other

9     parties in interest in this case who have sought discovery; the

10    same data room that the examiner has access to.  And we granted

11    them access to the data room.  So, they have all the stuff

12    that's in the data room.  They've been in the data room since

13    July and we've given them that.  We tried very hard to avoid

14    discovery disputes where we felt we could make some

15    accommodation and reserve rights on issues such as standing.

16    So, we gave them access to the data room.  We said, look at the

17    data room.  It's without prejudice to your rights to come back

18    and tell us you want something else.  And we had a very

19    complete discussion in July about what was in the data room,

20    what they could expect to find in the data room, what they

21    would not find in the data room, what we thought was beyond the

22    bounds of any permissible discovery.  And we told them very

23    clearly, that we were not including in the data room

24    information regarding the debtors' strategy with respect to the

25    Texas litigation.  The Texas litigation asserted claims that we

1  believe were property of the estate and we had a lot of back-

2  and-forth with them.  We, obviously, thought a lot about that

3  litigation; where it was going, what position we wanted to take

4  on various issues.  We had coordination with the other parties

5  to that litigation.  JPMorgan, the FDIC has interest there.

6  And we told them that we don't think it's appropriate for us to

7  produce that view.  It's not in the data room.  To the extent

8  that there is information in the data room regarding the

9  litigation, you'll get it in terms of the compromises that were

10  made under the settlement.  To the extent it's in there you can

11  have access to it.  But the other stuff we thought was

12  beyond -- beyond the bounds of any appropriate discovery.

13          So, they had access to the data room.  They came back

14  to us and said we're having some problems navigating the data

15  room, could you help us.  We had a conference call.  We offered

16  help.  We didn't hear anything further from them on that.

17          So, we really tried very, very hard to accommodate and

18  provide access to information reserving rights as to issues

19  such as standing, scope of releases and everything else.

20          This went on for quite some time before the last

21  hearing.  This motion to compel was still on the docket.  We

22  called them up and said why is this still on the docket?  We

23  think we satisfied you.  They said, well, there's a few things

24  we still want.  It's the same stuff we told them back in July

25  that we don't think is appropriate.  They wouldn't take the

1   motion off the calendar.  Eventually, it did come off the

2   calendar for the last hearing.  It just rolled forward to this

3   hearing and we decided at this point that what makes sense is

4   just the tee up because we don't really understand what they're

5   still seeking from us or why they're still seeking it.

6          Let me turn to the standing issues.  I've heard a lot

7   of different things.  I think there's a fair amount of

8   confusion.  Let me see if I can try and bring a little bit of

9   order to this discussion.

10          I don't think there's any dispute that if the Texas

11  Group, if Mr. Roquemore's clients are asserting rights that are

12  related in some way to their status as holders of claims or

13  interests against Washington Mutual, Inc. in this bankruptcy,

14  that they're covered by the releases.  That's what the releases

15  are intended to do.

16          They seem to be saying today that they no longer

17  assert any rights related in any way to their status as

18  shareholders in WMI.  That it's only with respect to their

19  status as bondholders, WMB bondholders.  And what they seem to

20  be complaining about is not so much the scope of the releases,

21  but the undertaking in the settlement that says the debtors and

22  JPMC and the FDIC as applicable are going to cooperate and

23  undertake to seek dismissal of those clients.  It does not seem

24  appropriate to us, Your Honor, to suggest that they are a party

25  in interest in this case because the debtors have agreed and

1    signed up to an undertaking in the global settlement to pursue

2    a course of action with respect to this pending litigation.  It

3    is really no different than if there were -- if the estate had

4    a claim against some third party --

5            THE COURT:  Well, let's not get into it.  If they're a

6    party in interest, they're a party in interest period.  Right?

7            MR. STROCHAK:  I'm sorry, Your Honor?

8            THE COURT:  If they're a party in interest, they're a

9    party in interest.  To the extent they have a claim against the

10   debtor, they're a party in interest.

11           MR. STROCHAK:  I would agree, Your Honor, to the

12   extent they hold a claim against the debtor.  We don't dispute

13   that they would be a party of interest.  We don't think they do

14   hold a claim against a debtor or assert an interest against the

15   debtor and I think that's what I heard from Mr. Roquemore.  So,

16   he can clarify that if I've got that wrong in some way.  But as

17   I was indicating, it seemed to me that what he was really

18   complaining about was the undertaking.  That somehow the

19   undertaking to obtain dismissal of that action was what gave

20   him the right to come in and inquire about all of the issues

21   related to that litigation.

22           So, the discovery they served, Your Honor, is

23   extraordinarily broad.  I think there are thirty some odd

24   requests.  It basically asks for every conceivable

25   communication or document related in any way to their lawsuit.

1    They've asked for additional discovery on a couple of their

2    requests which are themselves extraordinarily broad.  If you

3    look what they've asked for in their paper, they've asked for

4    an order compelling us to produce documents in response, for

5    example, to number 2, request number 2, which is "All documents

6    reflecting or concerning communications between and among the

7    debtors and any party, including JPMorgan and the FDIC,

8    concerning the Texas litigation, the factual basis of any

9    allegation contained in the Texas litigation, the settlement,

10   any request for information or documents from third parties"

11   and it continues on and on.

12        They want to compel us to respond to item 3 which is

13   "All internal communications of the debtors concerning the

14   Texas litigation."  Clearly, clearly would seek privileged

15   information.  And the real issue here for us is the

16   extraordinarily burden -- extraordinary burden and cost to the

17   estate of having to go through all those communications, e-

18   mails, all done during the course of these Chapter 11 cases and

19   then sort through all that, figure out if there's anything in

20   there that might not be privileged.  I think in all likelihood

21   it would all be privileged and sort through all that.  It's

22   just an extraordinary, extraordinary burden toward no end that

23   we see any rational basis for.

24        What they seem to be complaining about is the scope of

25   the releases, jurisdictional issues to the extent that this

1    Court -- they seem to be arguing this Court lacks jurisdiction

2    to grant those releases.  Those are fundamentally legal issues

3    not factual ones.  And there certainly is no need for extensive

4    discovery about all the debtors thinking and analysis regarding

5    the claims that they asserted in their lawsuit in order to

6    figure out either the scope of the releases or whether the

7    Court has jurisdiction to grant them.

8            You know, we acknowledge, Your Honor, there may be

9    disputes about the scope of the releases.  That's certainly

10   going to be an issue.  It's an issue in many Chapter 11 cases.

11   This one won't be any different.  The parties to the

12   settlement, obviously, want the broadest releases permissible

13   as a matter of law.  I think the law continues to move around

14   on these issues.  So, you know, I fully expect at a

15   confirmation we will have a vigorous debate about what is the

16   appropriate scope of release.  What can and can't be released.

17   But those are legal issues not factual ones that require

18   discovery of our litigation position and the strategies and the

19   analysis that we did relating the claims asserted in their

20   lawsuit.

21           To the extent that there are factual issues related to

22   whether it's appropriate to grant a release, those -- that

23   information is covered in what we've given them.  We've given

24   them access to the data room.  They have all that.  They have

25   the settlement.  Those issues to the extent there are any fact

1    issues are covered by what we have given them.

2         Your Honor, we really have tried very hard to be

3    accommodating, to move forward in a way that's efficient.

4    We've really received very little cooperation from the Texas

5    Group in making that happen.  They did not come back to us

6    before filing their reply papers just this week and suggest

7    that they were still seeking extensive discovery regarding the

8    enumerated requests.  What they sent us was a letter and we had

9    e-mail communications.  They suggested that what they were

10   seeking was very, very narrow.  What they've done is they went

11   back and they looked at the time records.  They are available

12   from my firm and Mr. Elsberg's firm on the docket of the court.

13   And they went back and they looked for every time entry where

14   we discussed the Texas litigation in some way, shape or form

15   and they said, well, we want all these communications related

16   to the work you did in kind of figuring out what position you

17   were going to take in coordinating with the other parties to

18   that litigation.  And that was our understanding of what they

19   were seeking in terms of any additional discovery.

20        We made it very clear to them from the beginning that

21   we thought that was completely inappropriate, unnecessary, not

22   reasonably calculated to lead to the discovery of admissible

23   evidence.  Likely to the extent it covered information internal

24   to the debtors and their counsel it was going to seek

25   privileged information.  And we really think that discovery is

1    out-of-bounds.

2         Your Honor, we respectfully submit that the motion

3    should be denied.  We've provided more than appropriate

4    discovery in light of the circumstances here and we

5    respectfully request the motion be denied.

6         THE COURT:  Any reply?

7         MR. ROQUEMORE:  Yes, Your Honor.  James Roquemore

8    again on behalf of the Texas Group.  Your Honor, with regard to

9    the standard as party to -- party in interest, the standard is

10   not whether or not you have a claim against the debtor it's

11   under Amatek's "A party in interest under 1109(b) is one that

12   has sufficient stake in the proceedings as to require

13   representation."

14        Under the global settlement agreement, among other

15   provisions, Section 2.7 which specifically singles out the

16   Texas litigation, states that "As soon as practical following

17   the execution and delivery of this agreement, the WMI and the

18   FDIC parties shall use their reasonable best efforts to seek

19   rulings from the DC District Court.  And to the extent

20   necessary, desirable of the bankruptcy court, for the relevant

21   appellate court in joining the plaintiffs in the Texas

22   litigation or other plaintiffs so brought or may bring the

23   future such claims from taking any action in consistence with

24   the debtors and the FDIC's ownership of the exclusive control

25   over these claims of actions."  Your Honor, we would argue that

1    that does sufficiently give us a sufficient stake, a practical

2    stake, and a financial stake to the parties in interest.

3           With regard to the documents that we're seeking, given

4    Your Honor's ruling today, we're not seeking any internal -- we

5    would not be able to seek an internal debtors' counsel

6    correspondence or evaluations.  What we're seeking is the

7    nonprivileged material, the e-mails and the communications and

8    the documents that hatched between and among JPMorgan, the

9    FDIC, and the debtors which we would argue would show a number

10   of different things including the debtors' good faith as per

11   their assertion that they own these claims.

12           And in number 2, the -- whether or not the reason that

13   they entered into the global settlement agreement and these

14   purported releases of the Texas litigation were done more to

15   avoid the jurisdiction of the District of Columbia court,

16   rather than any claim of right by the debtors.  We would argue

17   the usurpation of jurisdiction of a competent court is not a

18   lawful reason to enter into a settlement agreement or propose a

19   plan under the bankruptcy court.

20           With regard to the other comments by Mr. Strochak,

21   Your Honor, we have been in communication with regard to

22   cooperation and whatnot.  We have been in communication with

23   the debtors.  We have spent a lot of time evaluating what is in

24   the online depository to figure out what we could prove and

25   what we needed to -- in order to go forward and fairly present

1   our case at plan confirmation hearing.

2       And at this point in time, the debtors have clearly

3   stated that they are not going to provide any material that

4   passed between the settling parties regarding our case, the

5   Texas litigation. And, Your Honor, we -- that material is

6   highly relevant, it's not privileged, and for the debtors to

7   refuse is just clearly not fair and we're entitled to it under

8   the rules and that's why we're here today. Thank you.

9       THE COURT: All right.

10      MR. STROCHAK: Your Honor, just two points if I could

11  clarify for just one moment. On the jurisdictional issue, you

12  know, the district court dismissed the case. There's no effort

13  to move jurisdiction anywhere. It's already been dismissed.

14  And then on the documents, I think Mr. Roquemore has it a

15  little bit off.

16      To the extent that there are communications,

17  settlement communications that relate to what's going to happen

18  with the Texas litigation, we don't have any objection to

19  giving them those. To the extent they exist, and I don't know

20  they do, but to the extent they exist, they would be in the

21  data room and he has access to them. What we object to giving

22  them is specific communications relating to the conduct of the

23  litigation. That's what we think is out-of-bounds. We don't

24  think a litigant, whether he has standing or he doesn't have

25  standing, we don't think a litigant has the right to come in

1    and say I want to see all the communications regarding to your

2    strategy with respect to the positions you're going to take on

3    the claims that I'm asserting in a different litigation.  That

4    seems far beyond the pale to us, Your Honor.

5              THE COURT:  Well, let me rule.  I'm not sure I agree

6    with that latter point.  To the extent it's covered by

7    attorney/client privilege, you're correct.  But to the extent

8    you share that strategy with parties who are not covered by the

9    attorney/client privilege, I disagree.  I think they are

10   entitled to that.

11             I'm going to grant the motion.  They are a party in

12   interest.  The standard is not whether they have a claim but

13   whether they're -- the test is broader.  Whether they have

14   enough of a stake in the proceeding to require representation.

15   To the extent the global settlement affects their interest by a

16   release or by an agreement of the parties to seek an injunction

17   of them from proceeding to protect their rights I think they

18   are a party in interest.

19             They're entitled to discovery.  They're not entitled

20   to documents or communications covered by the attorney/client

21   privilege but they are entitled to specific documents that are

22   otherwise responsive to their requests.

23             I think -- I also disagree with the debtors'

24   suggestion that the scope of the releases and the Court's

25   jurisdiction to grant them is a legal rather than a factual

1    issue.  I think Continental makes it clear the debtor has to

2    put forward facts that are sufficient to entitle them to the

3    release.  So, I'll grant the motion to the extent of

4    nonprivileged documents or communications.

5           MR. STROCHAK:  Your Honor, I do have a question on

6    scope.  Is that what exactly are we required to produce?  I

7    mean if it's the communications relating to the conduct of the

8    litigation, I understand that to the extent nonprivileged.

9    Obviously, the request that Mr. Roquemore pointed to in his

10   reply papers are far broader than that.

11          THE COURT:  To the extent it deals with the Texas

12   litigation and you're seeking to affect their rights, they're

13   entitled to discovery.  To the extent it's relevant or could

14   lead to relevant information, I think it's -- I'm not troubled

15   by the broadness of it.

16          MR. STROCHAK:  Just so I'm clear, Your Honor, the

17   order is subject to our right to object on relevance grounds,

18   correct?

19          THE COURT:  You can only object on relevance grounds

20   at the trial.  You can't object during discovery that they're

21   not relevant.

22          MR. STROCHAK:  Maybe I misphrased that, Your Honor.

23   My point was to the extent where you argue that it's not

24   reasonably calculated to leave to the discovery of admissible

25   evidence that we still have the right to object on those

1    grounds.  Is that -- is that correct?

2         THE COURT:  That's correct.

3         MR. STROCHAK:  Thank you, Your Honor.

4         MR. ROQUEMORE:  Your Honor, if I might just clarify

5    since we're in the, I guess, in the mode of clarifying.  Again,

6    this is Jim Roquemore for Texas Group.  Is it your ruling that

7    the specific language of the -- that we've put in our

8    production of documents is sufficiently tailored in seeking

9    discoverable material or are we going to have to go through

10   another round of meet and confers and discovery objections with

11   the debtors' counsel with regard to the docu -- the requests

12   that we've already propounded upon the debtors?

13        THE COURT:  I'm not dealing with the specifics of your

14   discovery request.

15        MR. ROQUEMORE:  Yes, ma'am.

16        MR. MIGLIORE:  Your Honor, Mike Migliore on behalf of

17   the Texas Group.  Your Honor, may I submit a proposed form of

18   order that I'll share with debtors' counsel and then submit

19   under certification of counsel?

20        THE COURT:  You may.

21        MR. MIGLIORE:  Thank you.  With that, may I be

22   excused?

23        THE COURT:  You may.

24        MR. MIGLIORE:  Thank you.

25        THE COURT:  What do we have left?

1    MR. JANG: Your Honor, there are four items left on

2  the agenda beginning with item number 37. And that was the

3  debtors' thirty-sixth omnibus objection to claims.

4    If you recall, Your Honor, we had a hearing back in

5  June. We had submitted a certification of counsel saying that

6  we'd receive no objections. This related to certain deferred

7  compensation and executive retirement plans. And Your Honor

8  had indicated that you'd like to see the actual assignment

9  agreements as opposed to the form that we've attached to the

10  mot -- to the objection. I do have copies of all of the

11  executed assignment agreements, if I may approach?

12    THE COURT: Yes. All right. And this relates to all

13  that you're now seeking to have disallowed?

14    MR. JANG: Correct, Your Honor. Every one of the

15  claimants listed on the exhibit, the order, is included in that

16  folder.

17    THE COURT: All right. I'll mark the folders Debtor's

18  Exhibit 1.

19    MR. JANG: All right. May I approach with a form of

20  order, Your Honor?

21    THE COURT: All right. All right. I'll enter that

22  order then.

23    MR. JANG: Your Honor, the next item is AT&T's motion

24  for authorization to file an affidavit under seal and I'll turn

25  it over to A&T counsel if they are here or on the phone?

1          THE COURT:  Well, there is no objection to the motion,

2     is there?

3          MR. JANG:  There is no objection, Your Honor.

4          THE COURT:  All right.  I'll grant it.

5          MR. JANG:  Your Honor, item number 39 as I indicated

6     has been continued to October 8th.  We've already dealt with

7     item number 40 and so we're on item number 41 which is the

8     debtors' forty-sixth omnibus objection.  With respect to this,

9     Your Honor, we have a claimant, Mr. Shore, who you may remember

10    chimed in on the phone at a previous hearing wondering about

11    what was the status of his claim.  We had -- you had previously

12    entered an order under certification because no objections had

13    been received by Mr. Shore.  We then reinstated that

14    objection -- excuse me -- reinstated the claim so that it could

15    be heard today.

16         The debtors' forty-sixth omnibus objection with

17    respect to Mr. Shore's claim was on the grounds that it was

18    late filed.  It was filed fifteen months after the debtors' bar

19    date.  The debtors did not serve Mr. Shore with a bar date

20    order or the bar date because the debtors were not aware of

21    Mr. Shore in any way.  The underlying claim arises from a state

22    action where Mr. Shore, I believe, sued his brother for alleged

23    improper withdrawals from his bank account.  And he had sued

24    Mr. David Shore along with some other parties in the state

25    litigation.  We were not -- the debtors were not parties to the

1    state litigation. He then had the litigation removed to

2    federal court. At that point in his notice of removal, he had

3    added the debtors to the caption of the case. We also did not

4    serve the debtors with that notice either despite being

5    directed by the federal court to do so. So, we were not aware

6    of any of this until we saw the proof of claim that was filed,

7    as I said, fifteen months after the bar date. So, we would ask

8    that the claim be disallowed as late filed. There was a

9    publication notice published in the New York Times, the Wall

10   Street Journal and the Seattle Times, Your Honor.

11          THE COURT: Is there anybody here on behalf of

12   Mr. Shore?

13          MR. SHORE: Matthew Shore, present, Your Honor.

14          THE COURT: Do you want to respond to the debtors'

15   argument?

16          MR. SHORE: I would like to -- first off, I would like

17   a moment to request consideration to have my response continued

18   to either the October 8th hearing or 23rd that I previously

19   heard.

20          THE COURT: Why?

21          MR. SHORE: New findings, access to information. My

22   civil matter in Western Washington District Court is currently

23   in discovery. I participated in a deposition hearing with the

24   Gaitan Group which is representing the FDIC as a defendant in

25   my lawsuit. The lawsuit is against my uncle who lives out of

1  state and the claim fundamentally relies on consumer protection

2  laws that were repeatedly violated by WMB. Specifically,

3  dishonor of a negotiable instrument which is a main reason why

4  I would say my claim should not be stayed or disallowed. I

5  have a meritous (sic) claim against the estate. I am a party

6  of interest. I'm entitled to discovery. I would like to

7  motion the Court for any information that may apply to my case

8  including documents that may show proof of existence of the

9  crime that actually took place.

10      WMB had sent me a letter alleging proof of the

11  identity theft did not exist which I believe is fraud, so,

12  there's some serious issues that I would like to disclose and

13  in order for me to properly disclose all these important

14  matters to the parties involved, I need additional time, ma'am.

15  I'm a pro se plaintiff at this moment. I filed a lawsuit in

16  federal court as directed by the Federal Deposit Insurance

17  Corporation and I believe that I am performing my own

18  prosecution on behalf of the corporation. So --

19      THE COURT: On behalf of what -- on behalf of what

20  corporation?

21      MR. SHORE: The receivership. The receivership of the

22  FDIC. The government is a beneficiary of what I want to say

23  binker blinkathons (ph.) that have been violated by severe

24  fidelity issues caused by institutional affiliated parties.

25      THE COURT: Well, Mr. Shore, do you understand that

1   the bank is not in bankruptcy here?  That Washington Mutual,

2   Inc. is not the bank.

3           MR. SHORE:  I understand there's a separation.  I also

4   understand the two cases are being tried as one.

5           THE COURT:  Well, not in this court.  The bank and WMI

6   are two different entities.  So, what is your claim against the

7   parent of the bank, if you will?

8           MR. SHORE:  Redress.  Civil liability that's owed to

9   me.

10          THE COURT:  Well, what actions of the parent company

11  caused you any injury?

12          MR. SHORE:  Failing to remedy this cause of loss that

13  has been grant -- caused by their, I want to say, sub-tier of

14  subsidiary.

15          THE COURT:  Well, you understand there are two

16  separate corporations and without more you can't sue one

17  corporation for what another corporation has done or failed to

18  do.

19          MR. SHORE:  A parent company who has knowledge of the

20  operations and misconduct I believe I do.  I've shown good

21  cause by order and my case has been through case screening and

22  I am allowed at this moment to serve an amended complaint to

23  additional parties.  I'd like to be permitted that time.  The

24  defendant noted that they were going to allow my claim.  They

25  cited a certain code --

1    THE COURT: When did they not that? Who noted they

2 were going to allow your claim?

3    MR. SHORE: When they confirmed the -- they sent me

4 correspondence through the mail, ma'am.

5    MR. JANG: I believe the correspondence he's referring

6 to is the certification of counsel that we were reinstating the

7 claim to have it heard at this hearing, Your Honor.

8    THE COURT: Yes. I don't think that was an admission

9 that they owed you money. It was simply that they would allow

10 you to make your argument today as to why you think they owe

11 you money or are responsible for your harm.

12    MR. SHORE: Again, a parent company having knowledge

13 of a misconduct even though it's a subsidiary company, if

14 they're entitled to, I want to say, profits of a failed

15 institution or the liabilities, they're obviously addressing

16 certain other liabilities. I am, I believe, I am one of those.

17 They're liable to a consumer and I believe that I am protected

18 by laws that cannot prejudice my action.

19    THE COURT: Response?

20    MR. JANG: Your Honor, I think again the initial state

21 litigation did not have WMI as a party. It was added long

22 after the bankruptcy bar date was entered. Also, the federal

23 court has asked Mr. Shore to file an amended complaint because

24 it did not see from the underlying complaint that other parties

25 that he had indicated were liable were indeed liable. I, in

1  fact, dismissed with respect to some of the defendants, I'm not

2  sure if Mr. Shore has filed an amended complaint yet, but

3  there's just simply nothing on the face of the proof of claim

4  or his complaint as I'm aware of that indicates that WMI was

5  indeed liable.

6      MR. SHORE:  May I speak one more time, Your Honor?

7      THE COURT:  Yes.

8      MR. SHORE:  If you give me just ten more days to try

9  to show the Court that my efforts are meritous (sic), I will

10 submit my required documentation and proof of service and make

11 a diligent effort to show the Court that my claim should be

12 allowed.  I politely request that you hesitate on making a

13 ruling that will be adverse to me in my case right now.

14     THE COURT:  Well, I'll do this.  I will allow

15 Mr. Shore to submit whatever evidence he has that there is a

16 claim, a direct claim, against the debtor here, WMI, and I'll

17 continue this -- when is our next omnibus hearing?

18     MR. JANG:  October 8th, Your Honor.

19     THE COURT:  I'll continue it till October 8th.  All

20 right, Mr. Shore?

21     MR. SHORE:  Thank you very much Your Honor.

22     THE COURT:  I'll require that you file any evidence

23 that you have of a claim on or before September 30th, however,

24 and submit a copy to counsel for the debtor.

25     MR. SHORE:  The Weil Gotshal firm?

1          THE COURT:  Yes.

2          MR. SHORE:  Thank you, Your Honor.

3          THE COURT:  All right.  Anything else?

4          MR. JANG:  Yes, Your Honor.  The next item on the

5     agenda, Your Honor, is the motion for relief from automatic

6     stay filed by a mortgage company, Nationstar Mortgage.

7          Your Honor, with respect to this motion for relief,

8     the debtors did file an objection simply to state that the

9     debtors do not and have not owned any interest in the property

10    so we believe the motion is inappropriate and is unnecessary.

11    We're ruling to state on the record that the debtors do not

12    have any interest in the property but we do not want a

13    situation where Your Honor entered an order lifting an

14    automatic stay and then causing another flood of similar

15    motions to be filed when the debtors are not a bank that owns

16    these properties or interest in these properties.

17          MR. WEAVER:  Good morning, Your Honor.  John Weaver on

18    behalf of Nationstar.

19          THE COURT:  Um-hum.

20          MR. WEAVER:  We heard what debtors' counsel has said

21    and I took that to my client.  My client's solution was to

22    request a title exam to find out, in fact, who the entity is

23    that the mortgage goes to.  They have made -- asked me to come

24    today and request additional time to get that title exam back.

25    If, in fact, our debtors' counsel is correct, then I believe

1    that the motion filed by my client ought to be dismissed and we

2    will simply stipulate to that.  And again, my client's only

3    request today is that they have the opportunity to do some

4    investigation.

5             THE COURT:  All right.  Any objection to that?

6             MR. JANG:  No, Your Honor.

7             THE COURT:  All right.  Then we'll continue this to

8    the next omnibus.  To the extent it can be resolved by

9    stipulation before then, you can submit it under certification

10   of counsel.

11            MR. WEAVER:  Thank you, Your Honor.

12            MR. JANG:  I think that takes care of all the items on

13   the agenda, Your Honor.

14            THE COURT:  All right.  We'll stand adjourned then.

15            (Whereupon proceedings concluded at 11:45 AM)

16

17

18

19

20

21

22

23

24

25

1

2                          I N D E X

3

4                          RULINGS

5                                    Page  Line

6   Texas Group's Motion for          30    20

7       determination regarding

8       waiver of privilege

9       denied

10

11  Texas Group's Motion to           44    11

12      compel production of

13      documents from debtors

14      and general discovery

15      granted

16

17  Debtors' Thirty-sixth             47    22

18      omnibus object to claims

19      order entered

20

21  AT&T Motion for an order          48    4

22      authorizing AT&T to file

23      under seal the affidavit

24      of Kari La Fleur granted

25

RULINGS (cont'd)

|  | Page | Line |
|---|---|---|
| Objection by Matthew Shore | 53 | 20 |
| continued to October 8th |  |  |
| omnibus hearing |  |  |
|  |  |  |
| Motion for relief of automatic | 55 | 7 |
| stay by Nationwide Mortgage |  |  |
| continued to October 8th |  |  |
| omnibus hearing |  |  |

C E R T I F I C A T I O N

I, Ellen S. Kolman, certify that the foregoing transcript is a

true and accurate record of the proceedings.

**Ellen**
**Kolman**

Digitally signed by Ellen Kolman
DN: cn=Ellen Kolman, o, ou,
email=digital1@veritext.com,
c=US
Date: 2010.09.27 14:10:07 -04'00'

ELLEN S. KOLMAN


Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501


Date: September 27, 2010