# EXHIBIT C

```
 1
 2   IN THE MATTER OF:
 3   WASHINGTON MUTUAL, INC., ET AL.,
 4
 5   WARNING - ROUGH DRAFT
 6
 7   DATE:  11/16/10
 8   WITNESS:
     MARK KOSTUROS
 9
     APPEARANCES:
10   DANIEL J. BROWN, ESQ.
     BRUCE W. HICKEY, ESQ.
11   PETER E. CALAMARI, ESQ.
     JOHN P. MASTANDO, III, ESQ.4
12   CHERYL A. JAMES, ESQ.
     ROBERT J. BOLLER, ESQ.
13   SHANNON LOWRY NAGLE, ESQ.
     ROSS SPENCE, ESQ.
14   JOHN K. SHERWOOD, ESQ.
     JAMES M. ROQUEMORE, ESQ.
15   ANDREW J. MYTELKA, ESQ.
     SETH ARD, ESQ.
16
     REPORTER:
17   Jomanna DeRosa, CSR
     TSG REPORTING
18   JOB NO. 34569
19
20
21
22
23
24
25
```

## Page 106

1  ROUGH DRAFT - NOT TO BE DEEMED AS FINAL
2      A.  I don't remember his name.
3      Q.  Who did Simpson Thacher represent
4  at the time?
5          MR. MASTANDO: Object to the form.
6  Note the 30(b)(6) objection again.
7          But you can answer, if you know.
8      A.  I can't be exactly sure who they
9  represented. I don't remember.
10     Q.  Did they represent WMI?
11     A.  I think they represented WMI, but I
12 can't be 100 percent certain.
13     Q.  In what context do you believe they
14 represented WMI?
15     A.  I think they represented the Board.
16     Q.  Who from Perkins Coie was present
17 during those discussions?
18     A.  Stewart Landefeld.
19     Q.  Who did he represent?
20     A.  I also believe he represented the
21 Board or WMI. I don't know which one it was.
22     Q.  And who from Quinn Emanuel was
23 present during these meetings?
24     A.  Peter Calamari, Susheel Kirpalani,
25 David Elsberg.

## Page 107

1  ROUGH DRAFT - NOT TO BE DEEMED AS FINAL
2      Q.  Was anyone else present during
3  those discussions?
4      A.  Other than from Weil?
5      Q.  Okay. So Weil Gotshal was there.
6          Who from Weil Gotshal was there?
7      A.  In some of those meetings, Marcia
8  Goldstein, Brian Rosen, Michael Walsh.
9      Q.  Was anyone else in attendance at
10 those meetings?
11     A.  I can't be sure. Those were the
12 primary participants.
13     Q.  Were there any other -- were there
14 any third-party participants?
15     A.  Third party, there was the Board.
16 And the other conversation that comes to mind is
17 the examiner.
18     Q.  When did you speak with the
19 examiner?
20     A.  During his -- when he was hired
21 during the pendency of the case.
22     Q.  Okay. But when specifically did
23 you have a meeting with the examiner?
24         Do you remember the date?
25     A.  I do not remember the date.

## Page 108

1  ROUGH DRAFT - NOT TO BE DEEMED AS FINAL
2      Q.  You remember February 20th, 2009,
3  but not two months ago?
4      A.  Funny how that works.
5      Q.  It is funny how that works. Memory
6  is a funny thing, to quote a colleague.
7          For how long did you meet with the
8  examiner?
9      A.  I met with the examiner twice.
10     Q.  Okay.
11     A.  The first meeting took
12 approximately three hours. The second meeting
13 took 45 minutes.
14     Q.  And in relation to each other, when
15 did those meetings take place; a week apart, a
16 month apart, days?
17     A.  I think it was a month apart.
18     Q.  What did you discuss with the
19 examiner?
20         MR. MASTANDO: Objection. Instruct
21     the witness not to answer. The examiner's
22     report is what it is. You don't need to know
23     the discussion about it.
24         MR. ARD: On what ground are you
25     instructing him not to answer?

## Page 109

1  ROUGH DRAFT - NOT TO BE DEEMED AS FINAL
2          MR. MASTANDO: The report is what
3  it is. There's no waiver of privilege from
4  that. There's no --
5          MR. ARD: Are you suggesting that
6  everything he said was privileged?
7          MR. MASTANDO: Well, it's also
8  outside the scope of the 30(b)(6) notice.
9          MR. ARD: Are you instructing him
10 not to answer on that ground?
11         MR. MASTANDO: Yes.
12         MR. BROWN: You're instructing him
13 not to answer on the basis that it's outside
14 the scope of the notice?
15         MR. MASTANDO: The discussions with
16 the examiner are confidential.
17         MR. BROWN: Okay. That's not the
18 question I asked.
19     Q.  All right. Let me ask this
20 question: Did you --
21         MR. MASTANDO: You just asked what
22 was discussed with the examiner.
23     Q.  -- did you discuss settlement
24 negotiations that you had on behalf of Washington
25 Mutual, Inc. with the examiner?

Page 110

1  ROUGH DRAFT - NOT TO BE DEEMED AS FINAL
2      MR. MASTANDO: Objection. I
3  instruct the witness not to answer.
4      MR. BROWN: You instruct him not to
5  answer whether or not he had any conversations
6  related to the topics of examination that he's
7  been identified for?
8      MR. MASTANDO: With the examiner?
9  This is not about the examiner.
10     MR. BROWN: No, but it's about
11 settlement.
12     Q. Did you discuss your settlement
13 discussions with the examiner?
14     MR. MASTANDO: The examiner wasn't
15 involved in settlement negotiations. The
16 discussions with the examiner are not being
17 released beyond what's in the examiner report.
18     MR. BROWN: All right. So are you
19 instructing him not to answer?
20     MR. MASTANDO: And there's a 502(d)
21 order entered by the Court in connection
22 therewith.
23     MR. BROWN: Only with respect to
24 privilege, but not with respect to items that
25 are not privileged.

Page 111

1  ROUGH DRAFT - NOT TO BE DEEMED AS FINAL
2      MR. MASTANDO: Well, whatever was
3  discussed with the examiner is confidential
4  beyond what's in his report.
5      MR. ARD: And you're instructing
6  him not to answer in his individual capacity
7  as well?
8      MR. MASTANDO: Yes, as to what he
9  discussed with the examiner, yes.
10     Q. Okay. Are you following the
11 instruction of your counsel?
12     A. Yes.
13     Q. When was Quinn Emanuel retained by
14 Washington Mutual?
15     A. I think somewhere in the April to
16 May 2009 time frame. I can't remember the exact
17 date of the -- of their application.
18     Q. So after settlement term sheets had
19 been exchanged between Weil and Sullivan &
20 Cromwell, Quinn Emanuel was retained?
21     MR. MASTANDO: Objection to the
22 form.
23     You can answer.
24     A. Yes.
25     Q. Who's Bradfield?

Page 112

1  ROUGH DRAFT - NOT TO BE DEEMED AS FINAL
2      A. Michael Bradfield?
3      Q. Who is that?
4      A. Michael Bradfield was the general
5  counsel of the FDIC.
6      Q. Did you have discussions with
7  Michael Bradfield regarding settlement?
8      A. Several.
9      Q. I'm sorry?
10     A. Several.
11     Q. Over what time frame?
12     A. I don't remember the exact date
13 that we started talking to Michael Bradfield. It
14 was sometime in the February/March time frame of
15 2010.
16     Q. Did you share those discussions or
17 the substance of those discussions with JPMorgan?
18     A. Sometimes.
19         (Kosturos Exhibit 7 marked for
20 identification.)
21     Q. Is this an April 14th e-mail from
22 you to Donald McCree?
23     A. Uh-huh.
24     Q. And when you say "we need to apply
25 pressure or they will ask for more," to what are

Page 113

1  ROUGH DRAFT - NOT TO BE DEEMED AS FINAL
2  you referring?
3      A. I don't remember exactly what that
4  e-mail is in context for.
5      Q. Okay. Is it related to the WMB
6  bondholder claims?
7      A. I think in this time frame, this is
8  between the original Settlement Agreement that was
9  read into the record and the final one. There
10 were various proposals traded or brought forth
11 within that time period of completely different
12 structures.
13         And I'm sure that if you look for
14 the reference of the bilateral deal, that would
15 have been a deal that, could a two-way been done
16 with JPMorgan and us? We concluded that that was
17 not a logical way to proceed.
18     Q. But when you say "we need to apply
19 pressure," what pressure are you referring to?
20     A. I don't remember.
21     Q. Who is the "we" in this e-mail?
22     A. I don't remember.
23     Q. Well, you're talking to Donald
24 McCree. Right?
25     A. Yes.

Page 1

1
2   IN THE UNITED STATES BANKRUPTCY COURT
    FOR THE DISTRICT OF DELAWARE
3   ------------------------------------X
    In Re
4
    WASHINGTON MUTUAL, INC., et al,
5
                    Debtors.
6   _____X
    Black Horse Capital LP, et al.
7
8                   Plaintiffs,
9           -v-
10  JPMorgan Chase Bank, N.A., et al.
11                  Defendants.
    ------------------------------------X
12          DATE:  November 17, 2010
13          TIME:  10:03 a.m.
14
15
16      30(b)6 testimony of JON GOULDING,
17  taken by the respective parties, pursuant to
18  a Subpoena, held at the offices of BROWN
19  RUDNICK, Seven Times Square, New York, New
20  York, before a Notary Public of the State of
21  New York.
22
23
24  REPORTED BY:  Rebecca Schaumloffel, RPR
25  JOB #:  34570

### Page 42

2  Q. Did you have conversations
3  regarding conflicts of interest with finish
4  other than Chad Smith?
5      MR. MASTANDO: Objection to the
6  form. You can answer.
7      A. The conversations I had with
8  respect to conflicts of interest with
9  counsel with /KHEUD /KHA*D submit and Robert
10  Williams.
11      Q. Did you have conversation rest
12  /THRAOEUTD conflicts of interest with
13  /KAOUPB to Washington mutual with other than
14  Chad submit and Robert Williams?
15      A. I apologize. As well as bill
16  /KAS tour as.
17      Q. And who is that?
18      A. Bill cost is the chief
19  restructuring officer for washing to be
20  mutual.
21      Q. /( and aside from those three
22  gentlemen, did you have conversations with
23  anyone else about the potential conflicts of
24  interest of counsel to Washington mutual?
25      MR. MASTANDO: Again I will

### Page 43

2  object for and noted to the /RORTD the
3  witness is not 309 B six witness for
4  this topic.
5      A. There may have been /K-FRGTS
6  conversation consist -- a conversation that
7  included Stuart /HRAPB Dell /TPELD.
8      Q. Who is that?
9      A. Stuart /HRAPB Dell /TPELD was
10  the chief legal counsel for Washington
11  Mutual at the time of this seizure. He was
12  the only employee of Washington Mutual Inc.
13  when we arrived and he is an attorney for
14  per Kings currently.
15      Q. Do you recall having
16  conversations related to potential conflicts
17  of interest with Washington Mutual counsel
18  with anyone other than those four gentlemen?
19      A. I don't believe so.
20      MR. BROWN: I think I am done.
21      EXAMINATION BY Scott.
22      MR. ARD:
23      Q. Good morning. My name is Scott
24  or A. /SUS man on behalf of the equity
25  committee. Were you interviewed by the

### Page 44

2  examiner?
3      A. I was.
4      Q. When was that?
5      A. I don't know the specific date.
6      Q. Approximately?
7      A. Off the top of my head. Let's
8  see if I can recall. I believe it would
9  have been August or September and I don't
10  recall the date.
11      Q. Was it just one time?
12      A. It was just one time.
13      Q. How long?
14      A. Lasted probably 3 or 4 hours.
15  Maybe slightly longer.
16      Q. Was it in person?
17      A. It was.
18      Q. Were lawyers present?
19      A. They were.
20      Q. Who, which lawyers were present?
21      A. Brian row send and David else
22  /PWERG.
23      Q. Did you consult with counsel
24  during the interview?
25      A. Did I /KULT with counsel during

### Page 45

2  the interview in.
3      Q. Yes?
4      MR. MASTANDO: I will object to
5  the form. The examiner /EUPT views
6  are constructs if I deposition and I
7  will not allow the /TWOPBS to have as
8  to /TO*R what was discussed at the
9  examiner /EUPBT /SRAOURS. So I am
10  instructing him not to answer. /SKWR.
11      Q. Did you review any documents
12  during the interview?
13      MR. MASTANDO: Same objection.
14  Same instruction.
15      Q. Were you under oath?
16      A. I was not under oath.
17      Q. What topics did you discuss with
18  the examiner?
19      MR. MASTANDO: Same objection.
20  And same instruction not to answer.
21      Q. What non- privileged topics did
22  you discuss with the examiner?
23      MR. MASTANDO: Same objection.
24  Same instruction the examiner
25  interviews were confidential and the