# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 08-12229 (MFW) |
| WASHINGTON MUTUAL, INC., *et al.*, | ) |
| | ) |
| Debtors | ) Jointly Administered |
| | ) |

## OBJECTION OF THE TPS CONSORTIUM TO CONFIRMATION OF THE SIXTH AMENDED JOINT PLAN OF AFFILIATED DEBTORS PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

The Consortium of Trust Preferred Security Holders (the "TPS Consortium"),[1] respectfully submits this Objection to confirmation of the Sixth Amended Joint Plan of Washington Mutual Inc., ("WMI") and WMI Investment Corp. ("WMI Investment," and together with WMI, the "Debtors"), dated October 6, 2010, (the "Plan").[2] In support of its Objection, the TPS Consortium respectfully represents as follows:

---

[1] As set forth in the *Verified Third Amended Statement of Brown Rudnick LLP and Campbell & Levine LLC Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure*, dated October 29, 2010 [Docket No. 5712], the TPS Consortium is comprised of parties: (a) who have been classified for treatment under Class 19 of the Plan; and (b) who each hold interests in securities described by the Debtors as constituting the REIT Series under the Plan. To be clear, the members of the TPS Consortium hold Trust Preferred Securities and, not the REIT Series. But, because the Debtors seek to impose Plan treatment on holders of Trust Preferred Securities, the TPS Consortium is compelled to file this Objection to the Plan.

[2] See Docket No. 5548.

1

## PRELIMINARY STATEMENT[3]

1.     The Plan suffers from numerous fatal flaws that, as a matter of law, render it incapable of confirmation. These defects include, inter alia:

(a)     the proposed Settlement underpinning the Plan violates equitable principles, the Bankruptcy Code and applicable case law;

(b)     the Plan's purported release of claims (both those held by the estates and those held by non-Debtors) against non-Debtor third-parties in violation of the Bankruptcy Code and applicable case law;

(c)     as detailed in a concurrently-pending adversary proceeding filed by members of the TPS Consortium (the "TPS Action"),[4] the Debtors failed to implement a "Conditional Exchange" of WMI preferred equity for the Trust Preferred Securities prior to the Petition Date, are precluded from doing so under Bankruptcy Code Section 365(c)(2), and the efforts to effect that transaction in contravention of Bankruptcy Code Section 365(c)(2) violate Bankruptcy Code Section 1129(a)(1);

(d)     given the Plan's dependence on the diversion of the Trust Preferred Securities to JPMC, and the impossibility of completing the Conditional Exchange as a result of Bankruptcy Code Section 365(c)(2), the Plan is not feasible as is required under Bankruptcy Code Section 1129(a)(11);

(e)     the Plan's proposed payment of "Allowed Postpetition Interest Claims," calculated at the contract rates set forth in any agreement related to such Allowed Claims, violates the Bankruptcy Code and applicable case law (as discussed infra, allowed claims for

---

[3]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

[4]     Black Horse Capital, LP, et al. v. JPMorgan Chase Bank, N.A., et al. Adv. No. 10-51387 (Bankr. D. Del. July 7, 2010).

postpetition interest should be paid at the Federal Judgment Rate (the "FJR") in accordance with Bankruptcy Code Sections 726(a)(5) and 1129(a)(7)); and

(f) the Debtors' inability to meet the "good faith" requirement of Bankruptcy Code Section 1129(a)(3), because –

(i) the Global Settlement Agreement (the "Settlement") was negotiated, on the estate's behalf, by counsel operating under disabling conflicts of interest with respect to the other parties to the Settlement (notably, JPMC), and others proposed to receive significant value and/or broad releases under the Plan; and

(ii) the "settlement" with Class 19 was the result of a collusive arrangement amongst the parties thereto, indicative of the pervasive manipulation of the Plan process to lock in substantial benefits for select insiders (to the detriment of other estate constituents, including members of the TPS Consortium), under the Settlement.

2. As Plan proponents, it is the Debtors' burden to prove and persuade this Court, by a preponderance of the evidence, that the Plan satisfies every applicable confirmation requirement under Bankruptcy Code Sections 1129(a) and (b).[5] As discussed herein, the Debtors cannot carry these burdens and confirmation must be denied.[6]

---

[5]     See, e.g., In re Armstrong World Indus., Inc., 348 B.R. 111, 120 n.15 (D. Del. 2006) (plan proponent must establish by preponderance of the evidence the satisfaction of requirements of Bankruptcy Code Sections 1129(a) and 1129(b)); 7 Collier on Bankruptcy ¶ 1129.02[4] (15th ed. rev. 2007) ("At the [confirmation] hearing, the proponent bears the burdens of both introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied. If nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of section 1129(b) are also met. In either situation, the plan proponent bears the burden of proof by a preponderance of the evidence.").

[6]     See In re Sacred Heart Hosp. of Norristown, 182 B.R. 413, 423 (Bankr. E.D. Pa. 1995) (a confirmation hearing warrants a meticulous analysis of whether the Plan meets each of the technical requirements of the Code).

## BACKGROUND

**I.    The Trust Preferred Securities.**

3.    Prior to the Petition Date, WMI raised approximately $4 billion through the issuance of the Trust Preferred Securities.  As discussed in greater detail in the TPS Action, those securities could, in certain circumstances and after the satisfaction of specified requirements, be subject to a Conditional Exchange whereby WMI, pursuant to a series of exchange agreements (each an "Exchange Agreement"), was to have issued preferred stock (the "WMI Preferred Stock") to be represented by depositary shares (the "Depositary Shares") and exchanged for the Trust Preferred Securities.  The Exchange Agreements also required that any transfer of the Trust Preferred Securities to WMI in a Conditional Exchange be reflected on the applicable registers whereby ownership of the securities is tracked and determined.

**II.    The Botched Conditional Exchange And WMI's Voluntary Bankruptcy.**

4.    On September 25, 2008, WMB was seized and the Office of Thrift Supervision (the "OTS") closed the bank.  On that same day, the Federal Deposit Insurance Corporation (the "FDIC") was appointed as receiver of WMB and the FDIC agreed to sell WMB's assets to JPMC for $1.88 billion.  Also on September 25, the Debtors purportedly triggered a "Conditional Exchange" transaction whereby the $4 billion in Trust Preferred Securities were to be pulled into WMI in exchange for five new series of WMI Preferred Stock, effective as of 8:00 a.m. the following day.

5.    But, as will be demonstrated at trial in the TPS Action (scheduled to commence on December 1st in advance of confirmation proceedings), WMI neither: (a) issued the WMI

Preferred Stock;[7] nor (b) was recorded as the owner of the Trust Preferred Securities in the applicable trust registers.[8] It is for these reasons, inter alia, the plaintiffs in the TPS Action are seeking a declaration that the Conditional Exchange did not occur and that they are the holders of Trust Preferred Securities, rather than a phantom security never issued by WMI and, therefore, incapable of having been tendered in "exchange" for the Trust Preferred Securities.

6.     On September 26, 2008, each of the Debtors filed with this Court a voluntary petition for Chapter 11 relief only hours after the purported occurrence of the Conditional Exchange, but, critically, before the required steps to effect the Conditional Exchange had been taken.

## III.   The Actions And Adversary Proceedings.

7.     In the wake of events described above, multiple litigations arose, primarily with respect to competing claims to assets of the Debtors' estates and the Trust Preferred Securities (which, the TPS Consortium maintains, never became part of WMI's estate as a result of the failure of the Conditional Exchange).  While myriad issues and assets were in dispute, material components of the various litigations included: (a) ownership of approximately $4 billion in WMI's demand deposits (the "Deposits"); (b) ownership of the Trust Preferred Securities, assuming, arguendo, the Conditional Exchange occurred and such securities ever became part of

---

[7]     See WMI Answer in the TPS Action [Docket No. 60] (the "WMI Answer"), ¶ 206; *Affidavit of Jeremy B. Coffey in Support of the Objection of the TPS Consortium to Confirmation of the Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code*, filed contemporaneously herewith ("Coffey Aff."), Ex. A, (

[8]     See Coffey Aff., Ex. A,

WMI's estate; (c) ownership of approximately $5.5 - $5.8 billion in tax refunds, including $2.7 - $3.0 billion that arose a year into the Debtors' Chapter 11 cases as a result of changes to the tax laws (collectively, the "Tax Refunds"); and (d) numerous potential estate claims against third parties, including business tort claims against JPMC based on its actions in advance of the seizure of WMB (the "Business Tort Claims") and available avoidance actions to recover, among other property, the purportedly-transferred Trust Preferred Securities (the "Avoidance Actions," and, together with the Business Tort Claims and other potential estate claims, the "Estate Claims").

8.    In connection with these actions, the Debtors initially represented to the Court and stakeholders that they were vigorously pursuing estate rights and claims against third parties – all under the auspices of returning to the estates significant value for the benefit of stakeholders.

## IV.    The Global Settlement Agreement And Plan.

9.    In March 2010, the Debtors suddenly announced a prospective global settlement of various claims and causes of actions, including those referenced above.  The Debtors, JPMC, FDIC Corporate, FDIC Receiver, the Creditors' Committee, and a small number of hedge funds holding positions at various levels of the capital structures of WMI and WMB[9] (collectively, the

---

[9]    The hedge fund parties to the Amended Settlement include:  (a) Appaloosa Management L.P. ("Appaloosa"), on behalf of Appaloosa Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund, L.P., and Thoroughbred Master Ltd.; (b) Centerbridge Partners, L.P. ("Centerbridge"), on behalf of Centerbridge Credit Advisors, LLC and Centerbridge Special Credit Advisors, LLC; (c) Owl Creek Asset Management, L.P. ("Owl Creek"), on behalf of Owl Creek I, L.P., Owl Creek II, L.P., Owl Creek Overseas Fund, Ltd., Owl Creek Socially Responsible Investment Fund, Ltd., Owl Creek Asia I, L.P., Owl Creek Asia II, L.P., and Owl Creek Asia Master Fund, Ltd.; and (d) Aurelius Capital Management, LP ("Aurelius"), on behalf of Aurelius Capital Master, Ltd., Aurelius Convergence Master, Ltd., ACP Master, Ltd. and other managed fund entities.

"Settlement Parties") were parties to that original settlement, which, as subsequently modified, came to form the basis of the current Plan and Settlement.

10.    The key aspect of the Settlement, as effectuated by the Plan, is its provision to the Settlement Parties of significant value and/or releases (both of estate and third-party claims). Another key component is the proposal for JPMC to pay over to members of Class 19 under the Plan (holders of Trust Preferred Securities) $50 million, purportedly in exchange for a forced release by those parties of claims against, inter alia, JPMC and other parties with potential liability for the manner in which the Trust Preferred Securities were structured, issued and sold, and the compelled delivery of those Trust Preferred Securities to JPMC.[10] In the latest iteration of the Plan and Settlement, the FDIC was even able to negotiate for its constituents – holders of claims against non-Debtor WMB – a payment of $335 million *in WMI estate value*.

11.    Under the Settlement, as effectuated by the Plan, the largest pools of estate value and claims are to be treated as follows:

- JPMC will return the Deposits to WMI, net of 80% of the Tax Refund amounts contained in the Disputed Accounts, and JPMC and the FDIC will release all alleged claims to the Deposits.[11]

- JPMC will be deemed the sole legal owner of the Trust Preferred Securities, and all claims against JPMC pertaining to the Trust Preferred Securities will be released.[12]

- Tax Refund amounts will be distributed amongst JPMC, WMI and the FDIC, with the Homeownership Carryback Refund amounts paid 30.357% to the FDIC (approximately $850 million) and 69.643% to WMI (approximately $1.95 billion, with $335 million of that amount to be paid to creditors of WMB), and all other Tax Refund amounts paid 80% to JPMC (providing a

---

[10]    See Plan § 2.1(h) at 31.

[11]    See Settlement § 2.1 at 18.

[12]    See Settlement § 2.3 at 19.

minimum of $2 billion in Tax Refunds to JPMC) and 20% to WMI (approximately $540 to $600 million).[13]

- All claims against the Settlement Parties will be released (both claims of each other, and, as noted above, claims of non-Debtor third parties) and the adversary actions commenced by the Settlement Parties will be stayed.[14]

- WMI and the FDIC will seek to enjoin the plaintiffs in the Texas litigation, and any other parties with similar claims, from prosecuting claims against JPMC based on the Business Tort Claims alleged to have been committed by JPMC.[15]

## V.    The Rampant, Debilitating Conflicts Of Interest.

### A.    The Delivery Of Significant Value To Clients Of Debtors' Counsel.

12.     As has become evident since the announcement of the Plan and Settlement, the processes by which they were negotiated were rife with insider dealing and conflicts of interest. For example, it is openly acknowledged that Weil Gotshal & Manges LLP ("WG&M") concurrently represented JPMC while acting as general bankruptcy counsel for the Debtors, and that such representations created a conflict of interest.[16] Notwithstanding this acknowledgement, WG&M acted as the law firm principally responsible for negotiating the terms of the Settlement on behalf of the Debtors, and in some instances, negotiated directly with its other current client,

---

[13]     See Settlement § 2.4 at 20.

[14]     See Settlement § 3.1 at 51-58.

[15]     See Settlement § 2.7 at 33.

[16]     See *Application of the Debtors Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code For Authorization to Employ and Retain Weil, Gotshal & Manges LLP as Attorneys for the Debtors, Nunc Pro Tunc to the Commencement Date,* dated October 13, 2008 [Docket No. 64] ("WG&M Retention Application") at Exhibit B (*Affidavit and Disclosure Statement on Behalf of Weil, Gotshal & Manges LLP Pursuant to Sections 327, 328(a), 329 and 504 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2014(a) and 2016(b)* (the "Rosen Affidavit")), ¶ 15 (providing that JPMorgan Chase Bank, National Association is a current client); Coffey Aff., Ex. B (

JPMC, resulting in the arrangement whereby JPMC is slated to receive billions of dollars in estate value and valuable releases.[17] WG&M's lead role (discussed below) in negotiating the Settlement – the lynchpin of the Plan – between two clients (the Debtors and JPMC) was plainly impermissible.[18] Also, as discussed below, WG&M similarly suffers from conflicts of interest with respect to other Settlement Parties and other parties proposed to receive significant value and/or valuable releases under the Settlement and Plan.

13.     Recognizing WG&M's conflicts of interest, after WG&M had already negotiated material aspects of the proposed Settlement with JPMC, the Debtors retained special conflicts counsel to represent them in matters adverse to JPMC.[19]   But, that counsel, Quinn Emanuel Urquhart Oliver & Hedges, LLP ("Quinn Emanuel"), does not appear to have played a role in the negotiation of the Settlement.  Moreover, even if Quinn Emmanuel had been involved in the negotiations of the Settlement, it too suffered from conflicts of interest with respect to at least the Centerbridge Parties, who are amongst the Settlement Parties slated to receive recovery in full (or more) on their claims against the Debtors.

---

[17]     See, e.g., Coffey Aff., Ex. C (█████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████.

[18]     See In re Envirodyne Indus., Inc., 150 B.R. 1008, 1019 (Bankr. N.D. Ill. 1993) ("[T]he Debtors' interests and the interests of the creditor body as a whole are not best represented at a negotiation table by a lawyer who faces a substantial client on the other side.").

[19]     See Coffey Aff., Ex. B, ████████████████████.

14. More specifically, Debtors' counsel had conflicts of interest with respect to Settlement Parties JPMC,[20] the FDIC[21] and/or Centerbridge Parties[22] – each of whom came away from the negotiations with significant value and releases of third party claims against them.[23] WG&M's acknowledged conflict of interest with respect to representing the Debtors in matters

---

[20]   See Rosen Affidavit, at ¶ 15 (providing that JPMorgan Chase Bank, National Association is a current client); id. at Exhibit B (listing JP Morgan Chase Bank as a current client).

[21]   See WG&M Retention Application; see also Rosen Affidavit, ¶ 15 (noting past and potential current and future representation of the FDIC).

[22]   See *Supplemental Declaration of Susheel Kirpalani in Further Support of the Application of Debtors Pursuant to Section 327(e) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014 For Authorization to Employ and Retain Quinn Emanuel Urquhart Oliver & Hedges, LLP as Special Litigation and Conflicts Counsel to the Debtors, Nunc Pro Tunc to April 3, 2009*, dated April 30, 2009 [Docket No. 969] ("Supplemental Kirpalani Declaration"), page 5 (listing Centerbridge Capital Partners, L.P. as a current client); id. at 98 &101 (same).

[23]   The Creditors Committee has, on multiple occasions, made much of its purported review and blessing of the Settlement. But, counsel for the Creditors' Committee, Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), also suffers from significant conflicts of interest with respect to numerous parties (including, importantly, JPMC) slated to receive significant value and/or releases under the Settlement and Plan. Moreover, the Creditors' Committee's duties run to its constituents – creditors of WMI – and not to preferred or common equity holders. As such, one should not be surprised the Creditors' Committee would not be bothered by a tainted negotiation process resulting in creditors receiving nearly a full recovery, with only equity holders being harmed by the diversion of estate value to non-Debtors. Accordingly, the Creditors' Committee's blessing of the Settlement is meaningless.

adverse to JPMC is particularly troubling given that JPMC was a central figure in the Settlement negotiations.[24]

15.     Further, the Settlement and Plan purport to grant broad releases of estate and third-party claims to, among others, parties involved in the structuring, issuance and sale of the Trust Preferred Securities (which, as alleged in the complaint initiating the TPS Action, suffered from significant defects and fraudulent non-disclosure of material matters).   Substantially all of these third parties, who do not appear to have even been part of the negotiation process, are important clients of WG&M and are proposed to receive releases under the Settlement and Plan. For example, it would appear the plan's extraordinarily broad releases could pertain to numerous clients of WG&M, including, inter alia: (a) Goldman Sachs & Co.;[25] (b) Citigroup;[26] (c) Credit Suisse;[27] (d) Morgan Stanley;[28] and (e) UBS.[29]

---

[24]



[25]     See Rosen Affidavit, Exhibit B (listing Goldman Sachs Execution & Clearing, L.P., Goldman Sachs International, Goldman, Sachs & Co. and Goldman Sachs Group, Inc. as affiliates of a current client).

[26]     See Rosen Affidavit, Exhibit B (listing Citigroup (Travelers) as a current client and Citicorp and Citigroup Global Markets Inc. and Solomon Brothers as affiliates of a current client).

[27]     See Rosen Affidavit at Exhibit B (listing Credit Suisse Securities (USA) LLC as an affiliate of a current client).

16. This Court has previously noted particular concerns relating to WG&M's conflict as to JPMC. In its Order approving the WG&M Retention Application entered on November 7, 2008 (the "WG&M Retention Order"), the Court inserted its own handwritten language providing that:

> in the event WG&M becomes aware of any potential claim the estate may have against JP Morgan Chase it shall promptly notify the U.S. Trustee's office and counsel for the Creditor's Committee . . .[30]

17. In apparent recognition of WG&M's disabling conflict with respect to JPMC, the Debtors finally filed an application on April 8, 2009 (the "Quinn Retention Application") to retain Quinn Emanuel as special litigation and conflicts counsel in connection with the so-called "JPMorgan Actions."[31] The JPMorgan Actions, as defined in the Quinn Retention Application, included certain proceedings among the Debtors, JPMC and the FDIC relating to the ownership of disputed assets, including the Trust Preferred Securities, the Tax Refunds, the Deposits and claimed capital contributions. The Debtors acknowledged that WG&M could not represent them in connection with the JPMorgan Actions, because such representation would require WG&M to

---

28    See Rosen Affidavit, Exhibit B (listing Morgan Stanley as a current client and Morgan Stanley & Co. Incorporated, Morgan Stanley-International Limited and Morgan Stanley Asset Management as affiliates of current client); id. at 18 (listing Morgan Stanley DW Inc. as current client).

29    See Rosen Affidavit, Exhibit B (listing UBS AG Stamford Branch, UBS AG London Branch, UBS Securities LLC and UBS Global Asset Management as affiliates of current client).

30    See WG&M Retention Order, dated November 7, 2008 [Docket No. 244], at 3.

31    See *Application of Debtors Pursuant to Sections 327(e) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014 for Authorization to Employ and Retain Quinn Emanuel Urquhart Oliver and Hedges, LLP as Special Litigation and Conflicts Counsel to the Debtors, Nunc Pro Tunc to April 3, 2009*, dated April 8, 2009 [Docket No. 888, ¶¶ 9-11].

be adverse to JPMC – a charge all agreed WG&M was not capable of fulfilling.[32] In seeking to retain Quinn Emmanuel, the Debtors stated they "believe[d] that retaining Quinn Emanuel [was] reasonable and necessary in order for the Debtors to prosecute the JPMorgan Actions and to discharge their responsibilities to their estates and creditors."[33]

18.     However, the retention of Quinn Emanuel did nothing to remedy WG&M's conflicts with respect to JPMC, and did not even purport to address WG&M's numerous conflicts with the other parties referenced herein. First, even prior to Quinn Emanuel's retention, WG&M had already actively negotiated and outlined the terms of the proposed Settlement (including with respect to the Trust Preferred Securities, the Deposits, and Tax Refunds) with JPMC and its counsel.[34]   Most of these terms remained unchanged after the retention of Quinn Emmanuel and ultimately became part of the Settlement currently proposed for consideration by

---

[32]     See id. at ¶ 16 ("After JPMorgan Chase commenced the JPMorgan Adversary and moved to intervene in the FDIC Action, the Debtors determined that it would be necessary to retain special counsel to represent them in connection with the JPMorgan Actions, due to a conflict that prevented Weil Gotshal from representing the Debtors in these actions.").

[33]     Id. at ¶ 17.

[34]     See

the Court. For example, the Debtors offered to transfer the Trust Preferred Securities to JPMC free and clear in early 2009, and *never attempted to negotiate away from this position*.[35]

19.    Second, despite acknowledging that a conflict precluded WG&M from representing the Debtors in the JPMorgan Actions, it does not appear the Debtors used Quinn Emanuel to negotiate the Settlement, something that should have been done in light of WG&M's conflicts of interest.  Rather, even after Quinn Emanuel was retained, WG&M continued to negotiate the terms of the Settlement on behalf of the Debtors, and discovery shows that Quinn Emanuel played no meaningful role in those negotiations.[36]  Yet, the Settlement purportedly

---

[35]    See id. at Ex. G (



[36]    See id. at Ex. B (



resolves the very same issues WG&M was incapable of litigating against JPMC in connection with the JPMorgan Actions. To the extent Quinn Emmanuel claims to have done an analysis of the strengths and weaknesses of the litigations it was handling on behalf of the Debtors, that would not provide a basis for a conflicted WG&M to negotiate the material terms of the Settlement with its other client, JPMC.

20.     Third, as noted infra, the retention of Quinn Emanuel as special conflicts counsel for the Debtors with respect to the JPMorgan Actions did nothing to resolve the myriad other conflicts of WG&M with respect to other parties to and non-parties benefiting from the Settlement and Plan. In fact, these additional conflicts do not appear ever to have been addressed.

**B.     The Collusive "Settlement" With Class 19.**

21.     The pattern of conflicts of interest infecting the Plan also includes the purported "settlement" with Class 19.[37] The "settlement" appears to have been the result of a collusive arrangement amongst the parties thereto, indicative of the pervasive manipulation of the Plan process by the Debtors and JPMC to favor select insiders (to the exclusion and detriment of members of the TPS Consortium) under the Settlement.

22.     The Debtors have provided little evidence of the genesis or the negotiating history of the proposed $50 million payment from JPMC to the members of Class 19 under the Plan (i.e., the holders of the Trust Preferred Securities). However, it now appears that the "settlement" with Class 19 was constructed so as to satisfy, in full (or more), the claims and interests of only those parties who participated in the negotiated the Settlement, and not the REIT Series holders (i.e., Class 19) as a whole. Certain of the hedge fund Settlement Parties also own Trust Preferred

---

[37]     See Plan § 2.1(h) at 31.

Securities, and such parties appear to have acted as the exclusive "representatives" of Class 19 in connection with negotiating the treatment of this group under the settlement.[38] Under the Settlement and Plan, consenting holders of the Trust Preferred Securities would receive a 1.25% recovery – in the form of a direct payment from JPMC.[39] This recovery appears to approximate the cost bases of the hedge fund Settlement Parties in their Trust Preferred Securities holdings.[40] Thus, it appears that these non-fiduciary Settlement Parties may have negotiated to settle their Trust Preferred Securities claims (as well as those of all other members of Class 19) at or around the Settlement Parties' cost bases in such claims to enhance their recoveries on their significant holdings at other levels of the capital structure.[41] This apparent payoff to certain, select Settlement Parties – at the expense of the other members of Class 19, who were not given the opportunity to participate in the settlement negotiations – is further _indicia_ of the special insider treatment that is the hallmark of this Plan and Settlement.

---

[38] See 

[39] See Settlement § 2.24 at 48 - 49.

[40] See _First Supplemental Verified Statement of Fried, Frank, Harris, Shriver & Jacobson LLP Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure_, dated May 17, 2010 [Docket No. 3761].

[41] See

## VI. The Plan's Fatal Flaws Cannot By Cured By The Examiner.

23.     By Order, dated July 28, 2010, the Bankruptcy Court approved the appointment of Joshua R. Hochberg as examiner (the "Examiner") to investigate among other things, the claims and actions being compromised and settled and the assets being transferred pursuant to the terms and provisions of the Settlement. On November 1, 2010, the *Final Report of the Examiner* was filed (the "Examiner's Report").[42] While the Examiner had the power to subpoena witnesses and take statements under oath, he elected to perform his examination through informal, unsworn interviews. At best, the Examiner's report is a compilation of inadmissible hearsay. The depth and quality of the analysis in the Examiner's Report speaks for itself.

## ARGUMENT

### I. The Plan Should Not Be Confirmed Because The Proposed Settlement Works Substantial Injustice That Does Not Withstand Scrutiny.

#### A. The Settlement Violates The Bankruptcy Code.

24.     The Debtors bear the burdens of proof and persuasion respecting every applicable provision of Bankruptcy Code Section 1129.[43]

25.     Among other things, the Debtors must establish that the Plan complies with Bankruptcy Code Sections: (i) 1129(a)(1) (Plan complies with the Bankruptcy Code); (ii) 1129(a)(3) (Plan has been proposed in good faith and not by means forbidden by law);

---

[42]     See Docket No. 5735.

[43]     See In re Armstrong World Indus., 348 B.R. 111, 120 & fn. 15 (D. Del. 2006)(plan proponent must establish by preponderance of evidence the satisfaction of requirements of both Bankruptcy Sections 1129(a) and 1129(b)); 7 Collier on Bankruptcy ¶ 1129.02[4]("At the [confirmation] hearing, the proponent bears the burdens of both introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied. If nonconsensual confirmation is sought, the proponent of such plan will have to satisfy the court that the requirements of section 1129(b) are also met.).

1129(a)(11) (that the Plan is feasible); and 1129(b)(1) (that the Plan is "fair and equitable" respecting dissenting classes). These burdens the Debtors bear have been described in the case law as "heavy."[44]

26.     The Debtors cannot carry these heavy burdens respecting Bankruptcy Code Sections 1129(a)(1), 1129(a)(3), 1129(a)(11), and 1129(b)(1) because the Plan incorporates settlement terms that are entirely inappropriate. As indicated in the TPS Consortium's Summary Judgment Memorandum,[45] the "Conditional Exchange" was not consummated pre-petition and cannot be consummated post-petition. The Plan's stated intent of "completing" the "Conditional Exchange" post-petition is a facial violation of Bankruptcy Code Section 365(c)(2) and, in turn, Bankruptcy Code Sections 1129(a)(1) and 1129(a)(11). Such "completion" also violates the provisions of the underlying Exchange Agreements, and the foundational bankruptcy principle that state law limitations on a debtor's contract rights are recognized in bankruptcy (i.e., bankruptcy does not augment or expand the terms and/or limitations of a debtor's pre-petition contract rights).[46] The Plan's failure to recognize such legal restrictions constitutes a violation of Bankruptcy Code Section 1129(a)(3). As discussed below, the Plan's intent to foist the economic burden of "settlement" on the backs of Trust Preferred Securities holders, in contravention of their agreements and in a manner that works a fraud, also runs afoul of Bankruptcy Code Sections 1129(a)(3) and 1129(b)(1).

27.     Accordingly, confirmation of the Plan must denied.

---

[44]     See e.g., Everett v. Perez (In re Perez), 30 F.3d 1209, 1214 n. 5 (9th Cir. 1994) ("[t]he burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession or trustee since they stand in a fiduciary relationship to the estate's creditors.").

[45]     See Adv. Pro. No. 10-51387 (MFW), [Docket No. 139] (the "Summary Judgment Memorandum").

[46]     See, e.g., Chicago Bd. Of Trade v. Johnson, 264 U.S. 1 (1924).

**B.    The Debtors Cannot Carry Their
        Burdens Of Proof And Persuasion.**

28.    The Debtors' burdens of proof and persuasion respecting the Settlement are

significant; especially when consideration is given to the size and complexity of the matters at

issue. Judge Carey recently articulated the applicable standard of review in In re Spansion:[47]

> Approval of a settlement pursuant to Bankruptcy [Code Section 1123] is
> committed to the discretion of the court. The court must decide whether 'the
> compromise is fair, reasonable, and in the best interest of the estate.' 'Under the
> 'fair and equitable' standard, [the court looks] to the fairness of the settlement to
> the other persons, i.e., the parties who did not settle.'
>
> When considering the best interest of the estate, the Court must 'assess and
> balance the value of the claim that is being compromised against the value to the
> estate of the acceptance of the compromise proposal.' In striking this balance, the
> court should consider: (1) the probability of success in litigation; (2) the likely
> difficulties in collection; (3) the complexity of the litigation involved, and the
> expense, inconvenience, and delay necessarily attending it; and (4) the paramount
> interest of creditors.[48]

29.    "In the final analysis, the court does not have to be convinced that that settlement

is the best possible compromise. Rather, the court must conclude that the settlement is within the

reasonable range of litigation possibilities."[49]    The Debtors carry the burden of persuading the

court that the compromise falls within the reasonable range of litigation possibilities.[50] "While a

court generally gives deference to the Debtors' business judgment in deciding whether to settle a

---

[47]    2009 Bankr. LEXIS 1283 (Bankr. D. Del. June 2, 2009).

[48]    See id at *12 - *13 (internal citations omitted).

[49]    In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006).

[50]    Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.), 336 B.R. 87,
        93 (Bankr. D. Del. 2005).

matter, the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved."[51]

30.     Applying this inquiry to the Settlement at issue here, it is quite clear the Debtors are unable to carry their burdens of proof and persuasion. The record in these Chapter 11 proceedings is littered with discussion about the Debtors and JPMC's pervasive gamesmanship and discovery abuse. Time and time again, the Debtors and JPMC were ordered to deliver information, only to have the Court's orders flouted and ignored. To this day, the Debtors and JPMC have delivered relatively few documents, and document discovery is now essentially over. Certainly, the documents produced are insufficient to prove the propriety of the Settlement at issue here. That is the record of the Debtors' own creation; they now have to live with it.[52]

31.     Presumably, the Debtors intend to shield the evidentiary dilemma they created for themselves with citation to the Examiner's Report. But as indicated at the November 9, 2010 omnibus hearing, and as proven by the Consortium's Summary Judgment Memorandum, the Examiner's Report is far from reliable; it is, in fact, flippant and remarkably lacking in

---

[51]     Id.

[52]     See Coffey Aff., Ex. K, September 7, 2010 Hearing Transcript at 78:7-9 ("We had a meet and confer which was not mentioned a couple of weeks ago where we indicated that we did not intend to put the advice of counsel at issue at confirmation); 79:7-16 ( ". . .the fairness of the settlement at confirmation can be established objectively without putting the advice of  counsel at issue. And the contents of communications between counsel and the debtors and the private thoughts of counsel are irrelevant and unnecessary for confirmation of the settlement. And settlements are routinely approved without putting the advice of counsel at issue as I am sure your Honor is well aware. As I indicated, Your Honor, the debtors do not plan to put the advice of counsel at issue. . . ."); see also Coffey Aff., Ex. L, September 24, 2010 Hearing Transcript at 30:15-20 ("I've said before to the extent the debtor has said it is not going to rely on advice of counsel in proving its case on confirmation. I'm holding the debtor to that. And it cannot present any evidence to that effect.").

analysis.[53] That said, the TPS Consortium's views in this regard are irrelevant. The Examiner's Report is hearsay, entirely inadmissible at the confirmation hearing and for any other purpose. In this regard, the law could not be more clear.[54]

32. The TPS Consortium holds the Debtors to their burdens of proof and persuasion, and fully objects to the use of the Examiner's Report for any purpose at the confirmation hearing. In light of the limited discovery produced, the Debtors are unable to prove that the settlement is appropriate. Confirmation should be denied.

C. **The Settlement Is Structured To Inappropriately Steal Value Belonging To Class 19, Delivering Such Value To JPMC In Exchange For Satisfaction Of Claims.**

1. **Trust Preferred Securities Holders Did Not "Assume The Risk" That Their Value Would Be The JPMC "Pay-Off" For The Creditor Settlement.**

33. The TPS Consortium's Summary Judgment Memorandum discusses at length the nature of the financing arrangement struck pre-petition by the Debtors and the holders of the Trust Preferred Securities. The pleading is supplemented by affidavits executed by noted Professors Jack Williams and Hal Scott. These affidavits further evidence the fact that Trust Preferred Securities investors did not "assume the risk" that the $4 billion in Trust Preferred Securities value would be "taken" and delivered to JPMC, at an instantaneous closing a moment before bankruptcy, leaving investors with nothing. Their deal was that the Trust Preferred

---

[53]    See Coffey Aff., Ex. J, November 9, 2010 Hearing Transcript at 24: 9 – 25:4.

[54]    See In re Monus, Bankruptcy No. 92-41883, 1995 WL 469694, at *9 (Bankr. N.D. Ohio, May 18, 1995) (examiner's report relying on unsworn testimony and unidentified witnesses not admissible); Miller v. Ernst & Young, 892 S.W.2d 387, 388-89 (Mo. App. E.D.1995) ("bankruptcy examiner's report" filed in support of a motion for summary judgment had no probative value because it was not an affidavit, but only "unadulterated hearsay"); State v. Morris, 656 S.E. 2d 359, 369 (S.C. 2008) (bankruptcy examiner's report inadmissible hearsay).

Securities would be exchanged for WMI preferred stock of likely commensurate value, for the purpose of supporting the operations of WMI and/or WMB; and not for the purpose of making a "sweetheart" deal between the FDIC and JPMC even sweeter. Those documents are incorporated herein by reference.

34. The Plan's "Settlement" adds further insult to the injury intended to be inflicted. The Settlement purports to "complete" the Conditional Exchange, asking this Court to bless JPMC's seizure of $4 billion in value. In exchange, the "Settlement" graciously enables the Debtors to keep value they otherwise own (tax refunds, disputed accounts, etc.). Ironically, but not surprisingly, the Settlement enables creditors to receive a full pay-off, leaving essentially nothing for equity holders who did not have a voice at the negotiating table.[55] The "Settlement" stinks of backroom dealing: JPMC takes the Trust Preferred Securities and significant additional value, the FDIC takes hundreds of millions of dollars for its constituents (creditors of WMB who do not have legitimate claims to any value from the Debtors' estates) – leaving just enough in the Debtors' estate to buy the acquiescence of WMI's creditors.

35. This is inconsistent with Bankruptcy Code Sections 1129(a)(3) and 1129(b)(1). The Plan should not be confirmed.

---

[55] On November 16, 2010, Tricadia Capital Management, LLC filed an emergency motion seeking the imposition of trading restrictions with respect to certain classes of Claims against WMI. [D.I. 5935]. The basis of that request is a concern that the Debtors, in pursuing their current Plan, are endangering and/or failing to protect significant tax attributes, which, if realized, could result in significantly more value for constituents of WMI's estates (as opposed to JPMC, the FDIC or others of the Settlement Parties already receiving a full recovery on account of their claims). The TPS Consortium believes further consideration should be given to the concerns raised by Tricadia, as well as to the more basic issue of what other pots of significant estate value may be forfeited through the Debtors' efforts to deliver value and releases to insiders and favored parties at any costs.

### 2. The Settlement Is Built On Fraud.

36. As discussed at length in the Summary Judgment Memorandum, the cornerstone of the Settlement is the attempted consummation of the series of transactions (including the Conditional Exchange and the immediate diversion of the Trust Preferred Securities to JPMC), that would bring to fruition a massive fraud set in motion with the first issuance of the Trust Preferred Securities, while at the same time affirmatively concealing WMI's purported intent to shunt the Trust Preferred Securities immediately away from WMI (in direct contradiction to disclosures made to investors). The Debtors' request for the Court to lend its dignity to such a scheme is inappropriate and should not be granted.

### 3. The Settlement Facilitates An Outlandish, Unjustified Windfall For JPMC On The Backs Of Class 19.

37. Through the Settlement, JPMC seeks to further increase the windfall it has enjoyed since its predatory acquisition of WMB in September 2008. Having already been forced to "write up" the transaction by billions of dollars (even before receipt of the Trust Preferred Securities), JPMC now seeks to push away from table – but only after grabbing another $4 billion in value in the form of Trust Preferred Securities and billions more in portions of the Tax Refunds to which it had no legitimate entitlement. The primary basis for this additional windfall? – JPMC's relinquishment of its baseless claim against the $4 billion in Disputed Deposits.

### D. The Settlement Is The Product Of Collusive Bargaining In Violation Of Applicable Fiduciary Duties.

38. As Plan proponents, the Debtors carry the heavy burdens of proof and persuasion that the Plan was proposed in good faith and does not confound applicable law, in accordance

with Bankruptcy Code Section 1129(a)(3).[56]  The evidence presented must enable the Court to make sufficiently detailed findings so that a reviewing court knows the proper factors were considered and an informed judgment made.[57]  Bankruptcy Code Section 1129(a)(3)'s "good faith" standard requires that the Plan be "proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code."[58]  In evaluating the totality of the circumstances and the fundamental fairness of the Plan, the Court must consider both bankruptcy law, and non-bankruptcy law (including the Debtors' fiduciary duties).[59]  Courts must consider the interests of equity holders in appropriate circumstances, such as where there is a likelihood of recovery for equity.[60]

---

[56]  See 11 U.S.C. § 1129(a)(3); see also Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'Ship), 116 F.3d 790, 802 (5th Cir. 1997); Everett v. Perez (In re Perez), 30 F.3d 1209, 1214 n. 5 (9th Cir. 1994) ("[t]he burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession or trustee   since they stand in a fiduciary relationship to the estate's creditors.").

[57]  See 10 Collier on Bankruptcy ¶ 9019.02 at 9019-5 (15th ed. rev. 2007); Kopp, et al. v. All Am. Life Ins. Co. (In re Kopexa Realty Venture Co.), 213 B.R. 1020, 1022 (B.A.P. 10th Cir. 1997).

[58]  In re Coram Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001).

[59]  See In re Zenith Electronics Corp., 241 B.R. 92, 108 (Bankr. D. Del. 1999) (in analyzing good faith under section 1129(a)(3), the court concluded that the section was 'broad' and incorporated non-bankruptcy law such as Delaware corporate law, as well as principles of bankruptcy law."); In re Cara Corp., 1992 Bankr. LEXIS 672, at *2 (Bankr. E.D. Pa. Apr. 27, 1992) (pursuit of approval of plan in violation of fiduciary duties mandated denial of confirmation); Coram Healthcare, 271 B.R. at 228 (court denied confirmation of plan due to CEO's connections to senior lender amounting to a violation of fiduciary duties).

[60]  See Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 644 (3d Cir. 2006); Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996).

39. As the Plan implements,[61] and is expressly conditioned on the approval of, the Settlement,[62] the Plan must also meet the standards for approval under Bankruptcy Code Sections 363, 365, 1123(a)(5) and 1123(b)(3) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.[63] And, a bankruptcy settlement (whether under Bankruptcy Rule 9019 or Bankruptcy Code Section 1123) is subject to heightened scrutiny when it involves benefits to insiders (such as the provision of releases to insiders, officers and directors).[64] Finally, settlements that violate applicable law or public policy cannot be approved.[65]

40. Due to conflicts described herein, the Debtors cannot carry these "good faith" burdens and, therefore, the Plan cannot be confirmed. When counsel for the debtor is operating

---

[61] See Plan, Article XXXIII at 67.

[62] See Plan at 77.

[63] See In re Spansion, No. 09-10690, 2009 WL 1531788 at *4 (Bankr. D. Del. June 2, 2009) ("[t]he Debtors carry the burden of persuading the court that the compromise falls within the reasonable range of litigation possibilities.") (citations omitted); In re Exide Tech., 303 B.R. 48, 67-68 (Bankr. D. Del. 2003).

[64] See, e.g., In re Exaeris, Inc., 380 B.R. 741, 747 (Bankr. D. Del. 2008) ("[A] court can and should consider whether an insider is receiving a release when evaluating the "good faith" criterion" in approving a settlement); see also In re Drexel Burnham Lambert Group, Inc., 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) ("We subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable.").

[65] See In re Rosenberg, 2010 Bankr. LEXIS 371, at *11 (Bankr. E.D.N.Y. Feb. 5, 2010) (holding that "[i]t is well established that settlements are void against public policy . . . if they directly contravene a state or federal statute or policy" (internal citations omitted)); In re Big Rivers Elec. Corp., 233 B.R. 726, 736 (Bankr. W.D. Ky. 1998) (concluding that an agreement between a debtor and one of its creditors was void and unenforceable because a "[n]o shop" provision included therein interfered with the debtor's fiduciary obligation to maximize the estate's value and thus violated public policy), aff'd, 233 B.R. 739, 751-53 (W.D. Ky. 1998); see also Atlantic Co. v. Broughton, 146 F.2d 480, 482 (5th Cir. 1944) ("Though settlements in accord and satisfaction are favored in law, they may not be sanctioned and enforced when they contravene and tend to nullify the letter and spirit of an Act of Congress.").

under significant conflicts of interest when negotiating a compromise, the Court must evaluate carefully that conflict in determining whether the resulting settlement is "fair and equitable."[66] Even when such conflict has been disclosed, but not objected to, it may lead a court to reject a settlement negotiated by conflicted counsel.[67]

41.    Here, the Settlement would result in delivery of significant value to non-Debtor Settlement Parties and favored insiders in the form of estate property and/or releases of claims (both estate claims and claims of non-Debtor third-parties). As troubling as this manufactured value distribution might be, it is even more troubling given the significant conflicts of interest under which counsel for estate fiduciaries were operating when the Settlement was negotiated.

42.    As set forth above, the Settlement negotiations and Plan process were plagued by textbook conflicts of interest, including, but not limited to:

- WG&M (Debtors' counsel) negotiated directly with its current client, JPMC, resulting in the Settlement whereby JPMC would receive billions of dollars of estate value and valuable releases.[68]

- Quinn Emanuel (conflicts' counsel) had no involvement in the negotiation of the Settlement and Plan (thus, doing nothing to remedy WG&M's conflicts), and itself was operating under a conflict with respect to one or more of the Settlement Parties in any event.

- JPMC and WG&M worked together in a non-adversarial manner to leverage other parties-in-interest to agree to the Settlement.

- WG&M's continued failure to defend vigorously against JPMC's claimed ownership of the Trust Preferred Securities (despite the significant value at stake).

---

[66]    See In re Project Orange Assocs., LLC, 431 B.R. 363, 374 n.4 (Bankr. S.D.N.Y. 2010).

[67]    Id. (withdrawing approval of settlement because counsel negotiated settlement with existing client).

[68]    Akin Gump, counsel to the Creditors' Committee, also currently represents JPMC and other parties slated to receive significant value and/or releases under the Settlement and Plan.

- The Settlement and Plan purport to grant broad releases of estate and third party claims to, among others, parties involved in the structuring, issuance and sale of the Trust Preferred Securities (which suffered from significant defects and fraudulent non-disclosure of material matters), who do not appear to have even been part of the negotiation process, but are clients of WG&M.

- The Settlement with Class 19 holders was constructed to solely satisfy, in full (or more), the claims and interests of those who negotiated the Settlement, with all residual value shunted away to non-Debtor parties, including JPMC.

43.     Thus, the Settlement was negotiated, on the estate's behalf, by counsel operating under disabling conflicts with respect to the other Settlement Parties (notably, JPMC) and others proposed to receive significant value and/or broad releases of liability under the Settlement and Plan.[69] As a result, the Settlement, and, therefore, the Plan fails to meet the applicable standards for approval.[70]

44.     In Project Orange, a highly instructive case, Judge Glenn recently found that proposed debtor's counsel, who concurrently represented the debtor's largest unsecured creditor in unrelated matters, was conflicted from acting as debtor's counsel because the resolution of disputes between the debtor and creditor was central and essential to a successful

---

[69]     As discussed herein, the Debtors finally did retain conflicts counsel to address, at least facially, their lead counsel's conflicts of interest with respect to JPMC. But, from document discovery, it is apparent that the primary terms of the Settlement had already been negotiated by that time and conflicts counsel thereafter played a minimal, if any, role in the Settlement and Plan negotiating process.

[70]     Accord, Project Orange, 431 B.R. at 374 n.4. A conflict of interest issue may be raised at any time. See, e.g., Tenzer Greenblatt, LLP v. Silverman (In re Angelika Films 57th, Inc.), 246 B.R. 176, 180 (Bankr. S.D.N.Y. 2000) ("disinterestedness . . . is so crucial to the proper functioning of the bankruptcy system that a court may raise it and dispose of it whenever its sanctity is questioned); see also In re Plaza Hotel Corp., 111 B.R. 882, 891 (Bankr. E.D. Cal. 1990) ("the court's continuing supervisory role during the case includes the ability to revisit such issues as conflicts whenever appropriate" and "the court [must] be prepared to revoke its approval if circumstances so dictate").

reorganization.[71] Similarly, the myriad conflicts detailed herein precludes approval of the Settlement and Plan.

45. As described above, the Plan process was exemplified by disconcerting conflicts of interest and insider dealing. Such a process is the anathema of good faith. In fact, the good faith requirement was succinctly stated by this Court in <u>Coram Healthcare</u>: "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.' . . In evaluating the totality of circumstances surrounding a plan a court has 'considerable judicial discretion' in finding good faith, with the most important feature being an inquiry into the "fundamental fairness" of the plan."[72] It is impossible to conclude that this Plan represents or would result in fundamental fairness. The rampant conflicts of interest and insider dealing have produced a Plan so at odds with the objectives and purposes of the Bankruptcy Code that confirmation must be denied.

46. Plainly, a conflict precluding WG&M from representing the Debtors in litigating the JPMorgan Actions similarly precluded WG&M from representing the Debtors in negotiating a resolution of such litigation against JPMC, WG&M's other client.[73] But, throughout the

---

[71] See <u>Project Orange</u> 431 B.R. at 369-375 (finding that "even if [conflicts counsel] performed all work related to [creditor] in this case, the fig leaf of conflicts counsel does not convince the Court that retention of DLA Piper as general bankruptcy counsel is appropriate.") (emphasis excluded).

[72] See <u>Coram Healthcare</u>, 271 B.R. at 234.

[73] See <u>Project Orange</u>, 431 B.R. at 375 (Bankr. S.D.N.Y. 2010) (finding that debtor's counsel was conflicted in litigation against a creditor and was similarly conflicted in negotiating a settlement against that same creditor); <u>In re Amdura Corp.</u>, 121 B.R. 862, 867 (Bankr. D. Colo. 1990) (finding that debtors' counsel was conflicted in prosecuting claims as well as negotiating in the bankruptcy proceeding against a creditor that was counsel's current client in unrelated matters); <u>In re Am. Printers & Lithographers, Inc.</u>,

negotiations of the Settlement, WG&M and JPMC both had the interests of JPMC in mind and therefore were incapable of engaging in arm's length negotiations.[74] From the outset of the negotiations ultimately leading to the Settlement, a goal of WG&M was to protect JPMC.[75] ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████[76] This goal of protecting JPMC directly contravened WG&M's mandate to maximize value for, and vindicate the rights of, stakeholders of WMI.

47. Indeed, JPMC and the Debtors worked together in a non-adversarial manner to leverage the other parties-in-interest to agree to the Settlement. Prior to the filing of a draft of the proposed original settlement in March 2010, JPMC and the Debtors frequently reported amongst themselves on the progress of negotiations with other parties.[77] Such communications continued after the proposed original settlement was filed, and reflect a noticeable absence of

---

148 B.R. 862, 865-866 (Bankr. N.D. Ill. 1992) (finding that conflict prevented debtor's counsel from representing debtor in negotiations with secured creditor).

[74] See Berry v. School Dist. of Benton Harbor, 184 F.R.D. 93, 105 (W.D. Mich. 1998) ("Two types of collusive conduct have been identified by the courts. The first is where counsel or a named representative has benefited at the expense of the class as a whole. The second is where the parties have failed to approach the settlement as true adversaries."); cf. Cohen v. Nat'l Union Fire Ins. Co. of Pittsburg, PA (In re County Seat Stores, Inc.), 280 B.R. 319, 327 (Bankr. S.D.N.Y. 2002) ("a truly adverse party does not (or should not) invoke fears of collusion.").

[75] See Coffey Aff., Ex. M, Transcript of Hearing dated May 5, 2010, p. 57:11-20 (Brian Rosen of WG&M characterizing the Equity Committee's opposition to the proposed global settlement as an attempt to "milk" more money from JPMC).

[76] See Coffey Aff., Ex. N, ████████████████████████████████████ ███████████.

[77] See Coffey Aff., Ex. O ███████████████████████████████████ ████████████████████████████████████████████████ .

29

any active role by Quinn Emmanuel in directing such negotiations and any adversity between WG&M and JPMC.[78] And, JPMC and the Debtors have continued to devise ways to pressure the other case parties to accede to the WG&M/JPMC settlement scheme.[79]

48.     Given the significant conflicts involved in the negotiation of the Settlement, neither that agreement, nor the Plan pursuant to which it would be foisted upon estate constituents, should be approved.

**II.     The Plan Should Not Be Confirmed Because It
Incorporates Releases In Violation Of Applicable Law.**

49.     Bankruptcy Code Section 1129(a)(1) provides that a court may confirm a plan only if "the plan complies with the applicable provisions of [title 11]."[80] This would include Bankruptcy Code Sections 524(e) (providing that a debtor's discharge "does not affect the

---

[78]     See Coffey Aff., Ex. P, ███████████████████████████
████████████████████████████████████████████
███████.

[79]     See Coffey Aff., Ex. Q ██████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████.

[80]     See 11 U.S.C. § 1129(a)(1).

liability of any other entity . . .")[81] and 365(c)(2) (prohibiting assumption of contracts for the issuance of securities of a debtor).

50.     The Plan cannot be confirmed because it provides impermissible blanket releases for numerous non-Debtor third parties in contravention of the Bankruptcy Code and applicable case law.  The non-Debtor releases operate as an impermissible discharge of claims against the non-Debtor Released Parties and should not be approved.[82]  Moreover, by foreclosing pursuit the claims against third-parties, the Debtors would give up, potentially, hundreds of million of dollars in value that could otherwise be allocated to estate constituents.

---

[81]     See 11 U.S.C. § 524(e); First Fid. Bank v. McAteer, 985 F.2d 114, 118 (3d Cir. 1993).

[82]     The Plan provides that each of the following parties is a "Released Party:" each of the WMI Entities, WMB, each of the Debtors' estates, the Reorganized Debtors, the Creditors' Committee and each of its members in their capacity as members of the Creditors' Committee, the Trustees, the Liquidating Trust, the Liquidating Trustee, the JPMC Entities, the Settlement Note Holders, the FDIC Receiver and FDIC Corporate, and *each of the foregoing parties' respective Related Persons*.  Plan § 1.160 at 20.

The Plan provides that each of the following parties is a "Related Person:" with respect to any Entity, such predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present and former Affiliates and each of their respective current and former members, partners, equity holders, officers, directors, employees, managers, shareholders, partners, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals (including without limitation, any and all professionals retained by WMI or the Creditors' Committee in the Chapter 11 Cases either (a) pursuant to an order of the Bankruptcy Court other than ordinary course professionals or (b) as set forth on Schedule 3.1(a) to the Global Settlement Agreement), or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members and professionals), but excluding the "Excluded Parties," as such term is defined in the Global Settlement Agreement.  Plan § 1.158 at 19.

## A.     The Impermissible "Forced" Third Party Releases.

51.     Sections 43.2 and 43.6 of the Plan provide that each holder of a Claim or Equity Interest shall release the Released Parties from all of the Released Claims held by non-Debtors (including members of the TPS Consortium).[83]

52.     Moreover, holders of Claims and Interests that have been released pursuant to the Plan (even non-consensually) are permanently enjoined under the Plan from taking any action in connection with such released Claims or Equity Interests.[84]  Finally, the Debtors seek to bolster the third-party releases pursuant to the Plan's Bar Order at Section 43.9,[85] and Supplemental Injunction at Section 43.12.[86]

53.     The effectiveness of the Settlement and the Plan is conditioned upon, among other events, this Court's entry of a confirmation Order enjoining all claims against the Settlement Parties and Related Persons.[87]  The Debtors state that the Settlement and Plan are conditioned upon the third-party releases, and, as such, the third-party releases are essential for the successful reorganization of the Debtors.  And, the Debtors threaten to seek at the Confirmation Hearing to bind and enforce the Releases against any parties who opt out, and to deliver to all such parties the distributions they otherwise would be entitled to receive under the Plan.[88]  Thus, the Plan's

---

[83]     See Plan § 43.2(b) at 84; see also Plan § 43.6 at 86-87; Settlement § 2.24 at 48.

[84]     See Plan § 43.3 at 84-85; see also Plan § 43.7 at 87-88; Settlement § 2.7 at 33-34.

[85]     See Plan § 43.9 at 88.

[86]     See  Plan § 43.12 at 89-90.

[87]     See Settlement § 3.7 at 57-58.

[88]     See *Disclosure Statement for the Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 for the United States Bankruptcy Code*, dated October 6, 2010 [Docket No. 5549] at 15-16 (the "Disclosure Statement").

release and permanent injunction provisions are non-consensual, and overreaching. Yet, the Debtors persist and state that the releases of non-Debtors in the Plan are necessary to the success of their reorganization.[89] Such self-serving statements cannot be used to circumvent applicable law.

54.    As this Court correctly held in Coram Healthcare, the Bankruptcy Code does not provide bankruptcy courts with the jurisdiction or power to compel the release of claims by non-Debtors against other non-Debtors.[90] And, any settlement or plan purporting to require such releases cannot be approved.[91] Indeed, any Settlement requiring such releases would be contrary

---

[89]    See Plan Section 43.4 which provides that "[e]ach of the discharge, injunction, and release provisions provided in this Article XLIII is an integral part of the Plan and is essential to its implementation. Each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in this Article XLIII." Plan at 85; see also Plan at 31; Settlement § 2.24 at 48.

[90]    See Coram Healthcare, 315 B.R. at 335-37.

[91]    See id.; In re Zenith Elecs. Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999) (plan could not be confirmed where it required non-consensual release of third party claims); In re Digital Impact, Inc., 223 B.R. 1, 10 (Bankr. N.D. Okla. 1998) (plan may not be confirmed if any party who would be bound by the release did not vote in favor of the plan); In re Arrowmill Dev. Corp., 211 B.R. 497, 506 (Bankr. D. N.J. 1997) ("Keeping in mind the Third Circuit's analysis that [Bankruptcy Code Section] 524(e) specifically limits the scope of the discharge, and that the Bankruptcy Code does not contemplate a discharge of nondebtors, this court holds that plans of reorganization may not contain provisions which discharge nondebtors."); In re West Coast Video Enters., Inc., 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) ("each creditor bound by the terms of the release must individually affirm same. . ."); In re Elsinore Shore Assocs., 91 B.R. 238, 252 (Bankr. D.N.J. 1988) (plan provisions deeming non-debtor proponents and their principals to be discharged and released from any and all claims prohibited by the Bankruptcy Code and relevant case law); In re Monroe Well Serv., Inc., 80 B.R. 324, 334 (Bankr. E.D. Pa. 1987) (debtors could not obtain confirmation of a plan which would attempt, over their objection, to discharge the obligations of non-debtors).

to applicable law, and, as a result, incapable of approval.[92] As such, as long as the Settlement and Plan purport to require the release of direct third party claims against JPMC, the Trust Preferred Securities-related releasees, and other non-Debtor parties, they remain incapable of approval.

55.     This Court's <u>Coram</u> and <u>Zenith</u> decisions are completely consistent with the Third Circuit's decisions dealing with third-party releases.[93]   In this regard, <u>Genesis Health</u> is also instructive.[94]   The Chapter 11 plan proposed in <u>Genesis Health</u> provided that as part of the proposed plan, the senior secured lenders would receive a non-consensual third-party release. The <u>Genesis Health</u> Court ruled that the requested release was not permissible.[95]   In arriving at that conclusion, this Court distinguished the <u>Genesis Health</u> case from the <u>A.H. Robins</u> case discussed in <u>Continental Airlines</u>, where "the entire reorganization of a massive and complex Chapter 11 case 'hinged' on the approval of certain releases."[96]   Confirmation of a Chapter 11

---

[92]     See <u>Yockey v. Horn</u>, 880 F.2d 945, 950 (7th Cir. 1989); <u>Jackson Purchase Rural Electric Cooperative Assoc. v. Local Union 816</u>, 646 F.2d 264, 267 (6th Cir. 1981); <u>Murtagh v. University Computing Co.</u>, 490 F.2d 810, 816 (5th Cir. 1974); <u>Atlantic Co. v. Broughton</u>, 146 F.2d 480, 482 (5th Cir. 1944) ("Though settlements in accord and satisfaction are favored in law, they may not be sanctioned and enforced when they contravene and tend to nullify the letter and spirit of an Act of Congress.").

[93]     See <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 247 (3d Cir. 2000) (allowing exculpations only to the extent required under Bankruptcy Code Section 1103(c)); <u>In re Continental Airlines</u>, 203 F.3d 203, 212-13 (3d Cir. 2000) (criticizing lower court for not examining its jurisdiction to grant the releases at issue and, in <u>dicta</u>, suggesting third party releases might be available only in some extraordinary circumstances not then before the court).

[94]     266 B.R. 591 (Bankr. D. Del. 2001).

[95]     <u>Id</u>. at 607-09.

[96]     <u>Id</u>. at 607-08; <u>see also</u> <u>In re Exide Tech.</u>, 303 B.R 48, 74-75 (Bankr. D. Del. 2003) (following <u>Genesis Health</u> and declining to approve non-consensual third party releases).

plan for these Debtors in no way "hinges" on this Court's approval of non-consensual releases of non-Debtors.

56. The "truly unusual circumstances" that could possibly validate third-party releases are plainly not present here. Such "unique" circumstances would exist only in mass tort, or securities and consumer fraud cases where the non-debtor is co-liable with the debtor on a multitude of claims and, in exchange for a release, the non-debtor parties have created or contributed significant amounts to a fund from which the claims will be satisfied.[97]

57. Under even the most flexible formulations in other Circuits regarding the limited situations in which third party releases may be compelled (and, given the Third Circuit's decisions in Continental and PWS, it is unclear whether such cases have any precedential value in this case), it is not sufficient for the Debtors to recite that the non-Debtor Released Parties contribute an alleged benefit to the Debtors' Estates under the Settlement and Plan.[98] Rather, those parties must have provided substantial consideration, whether financial or otherwise.[99]

---

[97] See Continental, 203 F.3d at 212-13 ("A central focus of these . . . reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties. Substantial financial contributions from non-debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible.").

[98] See Deutsch Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.) 416 F.3d 136, 143 (2d Cir. 2005) ("a non-debtor release is not adequately supported by consideration simply because the non-debtor contributed something to the reorganization and the enjoined creditor took something out.").

[99] See JPMorgan Chase Bank, N.A. v. Charter Communications Operating, LLC (In re Charter Communications), 419 B.R. 221, 258-60 (Bankr. S.D.N.Y. 2009) (finding unusual circumstances that warranted a non-debtor release where the released party, who was the chairman of the board and controlling shareholder, was the linchpin to the debtor's ability to, among other things, (i) reinstate its senior debt as required by the plan, (ii) gain billions of dollars in future tax savings, and (iii) raise substantial capital in a rights offering, and such released party was susceptible to numerous lawsuits for which he could seek indemnification from the debtors).

Even if the non-debtor released parties expended significant time and resources negotiating various aspects of the Settlement and Plan, such efforts are made in every Chapter 11 case and are insufficient to warrant a release of claims against them.[100] Further, the fact that certain parties-in-interest may have made concessions is of no consequence as every settlement in a Chapter 11 case is the result of give and take.[101] As such, there is nothing significant about the "consideration" provided by the non-debtor released parties, and therefore there is no justification for granting the Non-Debtor Releases under the Settlement and Plan.

58.     Moreover, if creditors and equity holders vote to reject the Plan, they cannot be deemed to have consented to the non-debtor releases and thus, should not be bound by the releases under the Settlement and Plan. Indeed, no court has found consent where a creditor has voted to reject a plan.[102] Here, the Debtors nonetheless propose to bind all creditors and equity holders to the Non-Debtor releases, even if they vote to reject the Plan. By proposing Plan Section 43.6, the Debtors seek to depart from this Court's well-established precedent in Zenith,

---

[100]   See In re Adelphia Communications Corp., 368 B.R. 140, 268-69 (Bankr. S.D.N.Y. 2007) ("I don't doubt that in this case the Settling Parties engage, as the Plan Proponents argue, in 'tireless efforts' to come together to work out a global compromise aimed at resolving these cases. But that's not unique. It's something creditors have to do in every chapter 11 case, at the risk of destroying themselves (or their recoveries in the case) with their own quests for incremental recoveries . . . It would set the law on its head if parties could get around it by making a third party release a *sine qua non* of their deal, to establish a foundation for an argument that the injunction is essential to the reorganization, or even 'an important part' of the reorganization.").

[101]   Id. (Stating that "the 'give ups' that parties made were of rights to recover that were subject to fair debate. In the case of creditors, even those that are Settling Parties, they were merely striking the kinds of deals with respect to their shares of the pie that chapter 11 contemplates.").

[102]   See Zenith, 241 B.R. at 111 (non-derivative, third-party claims may be released only with the "affirmative agreement of the creditor affected"); see also In re DBSD N. Am., Inc., 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009) (finding that those who voted against the debtor's plan had not consented to the third party release provisions).

concluding it is not appropriate to force a third party release if such claimants did not affirmatively consent to release their claims. Absent "unique" circumstances, the Non-Debtor releases cannot be approved without the consent of the parties affected by those releases.

59. Even if the Court were to depart from its well-founded decisions in Coram and Zenith that bankruptcy courts lack jurisdiction to compel third party releases (which the Court should not do), it is clear that the proposed releases in theses cases fail to satisfy even the most liberal standards. In the Spansion case (a case clearly distinguishable from this case), Judge Carey found that there are three hallmarks of a permissible non-consensual release, including: (i) fairness; (ii) necessity to the reorganization; and (iii) specific factual findings supporting items one and two.[103] Accordingly, in order to meet the burden of establishing that the Debtors' proposed third party releases are fair and necessary to the reorganization, the Debtors must establish by a preponderance of the evidence that, one, there is material, specific and identifiable consideration flowing from the releasees to the releasors, either directly or through the Plan, that is a fair exchange for the releases being granted, and two, it is unlikely the Debtors will be able to confirm a Plan, not necessarily the specific Plan before the Court, absent such releases.[104]

60. Under any standard (even the most liberal ones), the third-party releases in this case are clearly inappropriate and cannot be approved.

---

[103] See Spansion, 426 B.R. at 144; Debtors v. Walton (In re United Artists Theatre Co.), 315 F.3d 217, 227 (3d Cir. 2003) ("The 'hallmarks of permissible non-consensual releases' are 'fairness, necessity to the reorganization, and specific factual findings to support these conclusions' . . . Added to these requirements is that the releases 'were given in exchange for fair consideration.") (quoting Continental, 203 F.3d at 214).

[104] See Saxby's Coffee, 2010 Bankr. LEXIS 3094 at *18 (courts may approve third party releases only when the reorganization is widely supported by the creditor constituency that includes the parties being restrained, accords significant benefits to that constituency, and the court is satisfied that the creditors being restrained also are being treated fairly); see also Continental, 203 F.3d at 214; Spansion, 426 B.R. at 144; Genesis, 266 B.R. 607-608; Exide, 303 B.R. at 75.

**B.      The Inappropriate Releases Of Estate Claims.**

61.      Section 43.5 of the Plan provides for a broad release of the Released Parties by the Debtors, of all Claims and Causes of Actions that the Debtors may have against any Released Party or any of their Related Persons.[105]   The Settlement also contemplates releases by the Debtors and their estates of claims against certain third parties, including JPMC, and covenants not to sue the Settlement Parties.[106]

62.      At least five factors are relevant to determine whether such a release is appropriate:  (1) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.[107]

63.      Here, the Plan fails to meet each of the elements of the test with respect to the claims the estates would propose to release.   The Released Parties have not substantially contributed to the Plan. For instance, by arrogating itself to additional estate value to which it is not entitled, JPMC's participation in the Plan process has resulted in a net decrease in value distributable to the Debtors' stakeholders.   Further, the Trust Preferred Securities-related

---

[105]      See Plan § 43.5 at 85-86; see also Plan § 43.2 at 83-84.

[106]      See Settlement §§ 3.2, 3.3, 3.4, 3.5, 3.6; 5.3(c).

[107]      See Zenith, 241 B.R. at 110 (citing In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)); see also In re S. Canaan Cellular Investments, Inc., 427 B.R. 44, 72 (Bankr. E.D. Pa. 2010).

releasees do not appear to have had any part in the formulation of the Plan or otherwise have contributed to the Plan process.

64.     JPMC has taken the position that it will not go forward under the Plan unless it receives a full release of all claims against it. As discussed herein, the proposed releases of JPMC are not only prohibited by law in circumstances applicable here, but are wholly unwarranted under the facts of these cases. Conversely, the Debtors' estates would be benefited tremendously through a reorganization on terms different than those contemplated under the Plan and Global Settlement Agreement (i.e., a reorganization under which the Debtors' estates retained substantially all of their value for distribution to its stakeholders rather than third-parties without claims or interests). Moreover, the Trust Preferred Securities-related releasees have not participated in the Plan process, and do not have the ability to even vote under the Plan. As such, the releases proposed to be granted to these parties cannot be characterized as essential to the Debtors' reorganization.

65.     Voting results have yet to be disclosed. But, the TPS Consortium anticipates that Classes 19 through 22 (those disadvantaged by the proposed releases of claims against JPMC and other third parties) will reject the Plan.[108]

66.     There is no identity of interest between the non-Debtor Released Parties and the Debtors (particularly with respect to JPMC, which, pursuant to the Purchase and Assumption Agreement, specifically excluded from "purchased assets" any and all claims against WMI). Moreover, with respect to the other Trust Preferred Securities-related releasees (i.e., those involved in the structuring, issuance and sale of the Trust Preferred Securities), indemnification rights (if any) would lie, in the first instance, against the actual issuers of the Trust Preferred

---

[108]     Indeed, Classes 21 and 22 are slated to receive nothing under the plan, and, therefore, are presumed to reject the Plan. See 11 U.S.C. § 1126(g).

Securities rather than WMI. As such, pursuit of claims against these parties would be unlikely to deplete the Debtors' resources.

67.     Finally, with respect to the final factor, not all creditors or interest holders will be paid in full under the Plan. In fact, to the contrary, JPMC and the Debtors have manufactured a distribution scheme that ensures interest holders will receive minimal or no distributions by shunting significant value out of the Debtors' estates and delivering it to JPMC and other Settlement Parties.

68.     By any scorecard the Plan falls woefully short of meeting even a "flexible test" for approval of third party releases. As such, as long as the Settlement and Plan purport to require the release of direct third party claims against JPMC, the Trust Preferred Securities-related releasees, and other non-Debtor parties, they remain incapable of approval.

## C.     The Impermissible Releases Cannot Be Cleansed Under Rule 9019.

69.     The Debtors fare no better in seeking to cloak the third-party releases as part of a Rule 9019 settlement. As a fundamental matter, a Rule 9019 settlement presupposes there is something to settle in the first instance.[109] It is axiomatic that parties that have not consented to the releases cannot be deemed to be parties to the purported "settlement." In any event, the Debtors cannot end-run the stringent requirements for approval of such releases under the guise of a settlement proclaimed as a lynchpin of the Plan.[110] The third-party release and injunction

---

[109]     See In re Nationwide Sports Distributions, Inc., 227 B.R. 455, 460 (Bankr. E.D. Pa. 1998) ("The standard for the application of 9019(a)...presupposes the compromise of a bankruptcy fiduciary of claims belonging to or raised against specific individuals or entities.').

[110]     See Adelphia, 368 B.R. at 269 ("It would set the law on its head if parties could get around [the legal standards] by making a third party release a *sine qua non* of their deal, to establish a foundation for an argument that the injunction is essential to the reorganization...").

provisions at the forefront of the Settlement and Plan are unwarranted and do not pass muster under this Court's authority. Therefore, the Plan cannot be confirmed so long as these provisions are included therein. Confirmation of the Plan should be denied.

70. Given the potential value of such claims and the Debtors' failure to adequately investigate and pursue such claims, these releases are not justified. Moreover, these releases are inappropriate under applicable law.

71. Similar to the releases of third party claims against the non-Debtor Released Parties, the proposed releases of estate claims against third parties (including JPMC) fail to meet the applicable standard set forth by this Court in Coram Healthcare: "[w]here a compromise is part of a plan of reorganization, the court has the duty 'to determine that a proposed compromise forming part of a reorganization plan is fair and equitable.'"[111]

72. Here, for the same reasons as described above with respect to releases of third-parties, the releases of estate claims, in particular those against JPMC and the Trust Preferred Securities-related releases, under the Settlement and Plan are inappropriate and should not be approved. Therefore, the Plan should not be confirmed.

III. **The Plan Should Not Be Confirmed Because It Rests On Assumption Of Contracts Not Capable Of Assumption Under Applicable Law.**

A. **The Attempted Assumption Of The Exchange Agreements Violates Bankruptcy Code Sections 365(c)(2) And 1129(a)(1).**

73. Bankruptcy Code Section 1129(a)(1) imposes the obligation that the Plan comport with the applicable provisions of the Bankruptcy Code, including Bankruptcy Code Section 365(c)(2). Bankruptcy Code Section 365(c)(2) prohibits a trustee or debtor in possession from assuming or assigning an executory contract to "make a loan, or extend other debt financing or

---

[111] See Coram Healthcare, 315 B.R. at 334 (citing TMT Trailer Ferry, 390 U.S. 414, 424).

financial accommodations, to or for the benefit of the debtor, *or to issue a security of the debtor.*"[112]

74.    The Bankruptcy Code defines "security" to include stock, treasury stock, transferable shares and other claims or interests commonly known as securities.[113] While the term "issue" is not defined in the Bankruptcy Code, courts considering its meaning within the context of Bankruptcy Code Section 365(c)(2) have held that the term bears the meaning ascribed to it "[i]n its ordinary commercial sense . . . ."[114] As such, agreements to "issue" securities include agreements "to emit, put into circulation, or dispose of securities already authorized and prepared for disposition," to a specified party.[115] The court in Teligent also surmised that "issue" (in the context of Bankruptcy Code Section 365(c)(2)) refers to "newly created rather than existing stock."[116] Finally, the Teligent court noted that, "while others may transfer a corporation's security, only the corporation appears capable of 'issuing' it."[117]

---

[112]    See 11 U.S.C. § 365(c)(2) (emphasis added).

[113]    See 11 U.S.C. § 101(49).

[114]    See In re Ardent, Inc., 275 B.R. 122, 124 (Bankr. D. D.C. 2001) (quoting In re Teligent, Inc., 268 B.R. 723, 733 (Bankr. S.D.N.Y. 2001)).

[115]    See In re Teligent, Inc., 268 B.R. at 733.

[116]    Id. at 733, 734 (finding the section inapplicable to an agreement where issuance of securities was an insignificant component of the contract at issue, but stating that Bankruptcy Code Section 365(c)(2)'s "proscription only applies to the issuance of 'new' securities."). While Teligent determined that Bankruptcy Code Section 365(c)(2) did not apply with respect to a contract where issuance of securities of a debtor was incidental to the agreement's purpose, it is clearly distinguishable from this case where a primary purpose of the Exchange Agreements was the issuance of the WMI Preferred Stock to effectuate the Conditional Exchange.

[117]    Id. (finding relevant that stock in question could have been purchased on the open market and transferred to the non-debtor party to the subject contract).

75.     When, as here, "the [Bankruptcy Code's] language is plain, 'the sole function of the courts . . . is to enforce it according to its terms.'"[118] Where a contract is incapable of assumption because of Bankruptcy Code Section 365(c)(2)'s proscriptions, that contract must be deemed rejected.[119] The rejection of an executory contract by a debtor constitutes a breach of that agreement as of immediately prior to the commencement of the chapter 11 case.[120] That breach relieves the non-debtor party to the rejected contract of any further performance obligations to the debtor.[121]

76.     As a result of WMI's failure to issue the WMI Preferred Stock as required under the Exchange Agreements, the Conditional Exchange was never effectuated before the Petition Date. Thus, as a matter of law, WMI cannot now effectuate the Conditional Exchange because WMI is prohibited, under Bankruptcy Code Section 365(c)(2), from assuming the Exchange Agreements pursuant to which the WMI Preferred Stock would be issued and the Conditional Exchange effected. Yet, notwithstanding Bankruptcy Code Section 365(c)(2)'s clear prohibition,

---

[118]    United States v. Ron Pair Enters., 489 U.S. 235, 241, (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917)).

[119]    Accord In re UAL Corp., 293 B.R. 183, 187 (Bankr. N.D. Ill. 2003) (had the contract in question been subject to Bankruptcy Code Section 365(c)(2), the result would have been automatic rejection); In re Ardent, Inc., 275 B.R. 122, 126 (Bankr. D. D.C. 2001) (ordering contract to issue securities to be, and to be deemed, rejected after concluding Bankruptcy Code Section 365(c)(2) applied to prohibit assumption).

[120]    See 11 U.S.C. § 365(g).

[121]    A party is excused from performance under a contract when the other party to the contract has substantially or materially breached the contract. See Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d. Cir. N.Y. 2007) (citing Hadden v. Consol. Edison Co. of N.Y., 34 N.Y.2d 88, 96, 312 N.E.2d 445, 356 N.Y.S.2d 249 (1974) (a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach.).

this is exactly what the Debtors propose to accomplish under the Plan. The Debtors seek to assume and assign to JPMC:

> "[a]ny and all contracts, as and to the extent necessary or required to transfer to JPMC or its designee any and all right, title and interest the WMI Entities may have or may ever have had in the Trust Preferred Securities free and clear of all claims, liens, interests and encumbrances, as contemplated in Section 2.3 of the Global Settlement Agreement, as and to the extent such contracts are or may be executory contracts, including, without limitation, (a) offering circulars, (b) trust agreements, (c) exchange agreements, (d) side letters, and/or (e) any additional ancillary and subsidiary documents; provided, however, that the foregoing is without prejudice to the rights of the Debtors and JPMC with respect to the Trust Preferred Securities and all related contracts in the event the Global Settlement Agreement is not approve and/or terminates."[122]

77.     As detailed in the TPS Action, as a result of, inter alia, WMI's failure to issue the WMI Preferred Stock as required under the Exchange Agreements, the Conditional Exchange was never effectuated before the Petition Date. As such, the Exchange Agreements simply remain, if anything, executory contracts within the purview of Bankruptcy Code Section 365(c)(2).[123]

78.     Here, the Exchange Agreements clearly contemplate the issuance of securities within the meaning of Bankruptcy Code Section 365(c)(2) (indeed, WMI's issuance of the WMI Preferred Stock was to have set in motion the series of events, including the creation of the Depositary Shares, that would allow any "exchange" to occur). The WMI Preferred Stock to be issued by WMI to the applicable Depositaries to issue the Depositary Shares in exchange for the

---

[122]   See *Plan Supplement in Support of Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated October 29, 2010, Exhibit D, [Docket No. 5724] at 7-8.

[123]   See In re Exide Techs., 378 B.R. 762, 765 (Bankr. D. Del. 2007) ("In determining whether a contract is executory and, hence, subject to rejection, courts in this Circuit utilize the Countryman standard, which provides that a contract is executory when 'the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'").

Trust Preferred Securities falls squarely within the Bankruptcy Code's definition of securities. Moreover, neither the WMI Preferred Stock nor the Depositary Shares in question have been issued (and, as such, could not be purchased on the open market and transferred to holders of Trust Preferred Securities, a factor given importance in the Teligent decision). WMI's prospective performance under the Exchange Agreements to effectuate the Conditional Exchange would thus clearly entail WMI "emitting," "putting into circulation" or disposing of "new" or "newly issued" securities. As such, to the extent the issuance of the WMI Preferred Stock (and/or the Depositary Shares) and/or the Conditional Exchange were not accomplished prior to the Petition Date, *Bankruptcy Code Section 365(c)(2) constitutes an absolute bar against these transactions being effectuated now.*

79. The Plan's provision to assume the Exchange Agreements directly violates the plain terms of Bankruptcy Code Section 365(c)(2), and thus, the Plan cannot be confirmed pursuant to Bankruptcy Code Section 1129(a)(1). WMI failed to effectuate the Conditional Exchange pursuant to the terms of the governing agreements and/or applicable law, and is now legally prohibited from "completing" the Conditional Exchange because of WMI's voluntary bankruptcy and the interplay of Bankruptcy Code Section 365(c)(2).

80. Although inadmissible hearsay, the Examiner, in his report, suggested that Bankruptcy Code Section 365(c)(2)'s proscriptions might be sidestepped by reading into the statute a "new money" requirement. Indeed, some courts have done so.[124] Putting aside whether cases such as Iridium run afoul of the Supreme Court's consistent reminder to refrain from

---

[124] See, e.g., The Chase Manhattan Bank v. Iridium African Corp., No. Civ. A. 00-564JJF, 2004 WL 323178, at *4 (D. Del. Feb. 13, 2004) (purpose is to ensure that third-party is not required to extend new credit to the Debtor).

straying from the straight-forward language of the statute,[125] the exchange of securities, if allowed under the Exchange Agreements, absolutely would result in members of the TPS Consortium holders being compelled to advance "new value" (in the form of the Trust Preferred Securities) to the Debtors. If the "exchange" were to be effected, the result would be that the investors would transfer their priority rights in the underlying collateral pool, a right having a value of $4 billion. This release of priority claims to the collateral is the equivalent of an equity infusion in the debtor.[126]

81.     Similarly, the Examiner's conclusory suggestion that the Defendants can overcome Bankruptcy Code Section 365(c)(2)'s bar on the assumption and enforcement of the Exchange Agreements through issuance, under the Plan, of the WMI Preferred Stock and/or Depositary Shares is incorrect.[127] First, it is the Exchange Agreements that dictate the terms on which a Conditional Exchange can occur, if at all. Even if the Debtors were authorized to issue securities under their Plan, without the Exchange Agreements (which cannot be assumed and/or enforced), the Conditional Exchange cannot occur.[128] Further, whether WMI can issue securities pursuant to a Plan is irrelevant to the Court's inquiry into WMI's ability to now assume and/or perform under the Exchange Agreements – the documents governing the occurrence and non-occurrence of a Conditional Exchange.

---

[125]    See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1 (2000) (where the meaning of the Code is clear its operation is unimpeded by contrary prior practice).

[126]    See Seitz v. Yudin (In re Cavalier Industries, Inc.), No. 99-31737DWS, 2002 WL 975868, at *4 (Bankr. E.D. Pa. Apr. 16, 2002).

[127]    See Examiner's Report, at 172.

[128]    See Chicago Bd. Of Trade v. Johnson, 264 U.S. 1 (1924) (state law limitations on a debtor's contract rights will be recognized in bankruptcy, meaning that bankruptcy does not expand the terms and/or limitations of a debtor's prepetition contract rights).

**B.     The Inability To Assume The Exchange Agreements Renders The Plan Unconfirmable Under Bankruptcy Code Section 1129(a)(11).**

82.     Bankruptcy Code Section 1129(a)(11), generally referred to as the "feasibility" test, requires that "[c]onfirmation of the plan [be] not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[129]

83.     Courts in the Third Circuit have held that the feasibility standard "requires courts to determine whether the Plan is feasible and has a reasonable likelihood of success."[130] The key element of feasibility is whether there exists a reasonable probability the provisions of the plan can be performed, and the purpose of the feasibility test is to protect against visionary or speculative plans.[131]

84.     If the Debtors cannot assume the Exchange Agreements as a result to Bankruptcy Code Section 365(c)(2)'s proscription against assumption of contracts to issue securities of a debtor (and as demonstrated above they cannot), and, therefore, cannot arrogate themselves to the $4 billion represented by the Trust Preferred Securities – the Plan will not go forward (as all parties to the "settlement" (JPMC included) have made clear that, without the deliver of the Trust Preferred Securities to JPMC, there is no Settlement).  As such, giving effect to Bankruptcy Code Section 365(c)(2), the Plan is not feasible for purposes of Bankruptcy Code Section 1129(a)(11).

---

[129]     11 U.S.C. § 1129(a)(11).

[130]     See In re Aleris Int'l, Inc., 2010 Bankr. LEXIS 2997, at *84 (Bankr. D. Del. May 3, 2010); In re G-1 Holdings, Inc., 420 B.R. 216, 267 (D.N.J. 2009) (citations omitted).

[131]     See In re Congoleum Corp., 362 B.R. 198, 203 (Bankr. D.N.J. 2007); Aleris, 2010 Bankr. LEXIS at * 86.

## IV. The Plan Should Not Be Confirmed Because It Inappropriately Pays Postpetition Interest Claims At The "Contract" Rate.

### A. To The Extent Postpetition Interest Is Payable, The Appropriate Rate Of Interest Is The Federal Judgment Rate.

85.    The Plan provides that before members of Class 19 receive any recovery whatsoever, unsecured creditors receiving value from the Debtors under the Plan will also receive, in accordance with the distribution provisions of the Plan, payment on their "Postpetition Interest Claims."[132]

86.    In direct contravention of case law demonstrating that the appropriate rate of so-called "solvent debtor" interest is the Federal Judgment Rate of interest – and without any explanation in the Disclosure Statement as to any circumstances of these cases justifying a higher rate of interest – the Plan defines those "Postpetition Interest Claims" as interest:

> ...*calculated at the contract rate set forth in any agreement related to such Allowed Claim or, if no such rate or contract exists, at the federal judgment rate...*[133]

87.    The general rule is that unsecured creditors are not entitled to recover postpetition interest on their allowed claims.[134] Indeed, "the *presumption* is that unsecured creditors receive no interest at all."[135]

---

[132]    See Plan Art. VI-XXIV.

[133]    Plan § 1.146 (emphasis added).

[134]    See 11 U.S.C. § 502(b)(2) (excluding "unmatured interest" from a creditor's allowed claim); United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372-73 (1988) (generally, creditors cannot recover interest that accrues on their claims during the pendency of a bankruptcy); In re Dow Corning Corp., 237 B.R. 380 (Bankr. E.D. Mich. 1999) ("Dow I").

[135]    See In re W.R. Grace & Co., No. 01-1139-JKF, 2009 Bankr. LEXIS 1280, at *7 (Bankr. D. Del. May 19, 2009).

88. There are limited exceptions to this general rule. First, a plan must provide for postpetition interest where it purports to render a claim unimpaired.[136] Second, to the extent a claim is oversecured pursuant to Bankruptcy Code Section 506(b), postpetition interest will accrue.[137] Finally, if the debtor is solvent, before interest holders can retain any value under a plan, postpetition interest will be payable to unsecured creditors "at the legal rate" to the extent necessary pursuant to Bankruptcy Code Section 1129(a)(7).[138]

89. Here, each of the classes receiving value from the Debtors under the Plan that are also afforded Postpetition Interest Claims are characterized as "impaired."[139] Accordingly, the unimpairment exception to the general prohibition on postpetition interest does not apply here. Moreover, none of those claims is an oversecured claim.[140] As such, the only potentially applicable exception to the general prohibition against postpetition interest is the so-called "solvent debtor" exception of Bankruptcy Code Section 1129(a)(7), which, in essence, provides that creditors are entitled to postpetition interest "at the legal rate" before interest holders can retain any value under a plan.[141]

---

[136]  See In re The Seasons Apartments LP, 215 B.R. 953 (Bankr. W.D. La. 1997).

[137]  See United States Trust Co. v. LTV Steel Co. (In re Chateaugay Corp.), 150 B.R. 529, 539 (Bankr. S.D.N.Y. 1993).

[138]  See Onink v. Cardelucci (In re Cardelucci), 285 F.3d 1231, 1234 (9th Cir. 2002).

[139]  See Disclosure Statement at II(B)(5).

[140]  Id.

[141]  As noted herein, even if there were some basis to award postpetition interest pursuant to the "fair and equitable" requirements of Bankruptcy Code Section 1129(b), payment of the FJR would nevertheless be appropriate because the case law finding such a basis are inapposite here, where the Plan is in effect a liquidating plan.

90.     However, as set forth herein, the statutory language and case law make clear that that exception does not provide a basis for payment of contract rates of interest. Rather, where a debtor is solvent, the applicable rate of interest is the FJR, not individual creditor contract rates. Moreover, even if the cramdown principles of Bankruptcy Code Section 1129(b) were applicable to the treatment of unsecured creditors here, the Debtors have failed to demonstrate that payment of the higher contract rates would be fair and equitable. In fact, the collusive nature of the Settlement underlying the Plan, coupled with the conduct of unsecured creditors in opposing the efforts of the TPS Consortium and Equity Committee, demonstrate that even if the case law applying Bankruptcy Code Section 1129(b) were applicable here, the appropriate rate of postpetition interest, if any, is the FJR.

91.     Accordingly, because the Plan provides unsecured creditors with contract rates of postpetition interest in direct contravention of case law demonstrating that the FJR is the appropriate rate of "solvent debtor" interest, and the circumstances demonstrate that payment of any interest at a rate other than the FJR would not be fair and equitable, the Plan impermissibly provides unsecured creditors with value in excess of their claims.[142] As such, the Plan may not be confirmed as a matter of law.

1.      **The "Legal Rate" of Interest Under Sections 1129(a)(7)**
        **and 726 of the Bankruptcy Code is the Federal Judgment Rate.**

92.     As a condition of confirmation, Bankruptcy Code Section 1129(a)(7)(A)(ii) requires that impaired creditors (unless they accept alternative treatment) receive value that is not

---

[142]    See 11 U.S.C. § 1129(a)(7); see also Genesis Health, 266 B.R. at 612 ("A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims."); In re MCorp Fin. Inc., 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) ("[A] dissenting class should be assured that no senior class receives more than 100 percent of the amount of its claims."); see also 7 Collier on Bankruptcy ¶ 1129.04[4][a][i] (15th ed. rev. 2004) ("'[F]air and equitable' can be seen to have two key components: the absolute priority rule; and the rule that no creditor be paid more than it is owed.").

less than what they would receive in a Chapter 7 liquidation. Distribution under Chapter 7 is governed by Bankruptcy Code Section 726. Pursuant to subsection (a)(5) of that provision, once all administrative claims, general unsecured claims, tardily-filed general unsecured claims, and fines and/or penalties are paid, there is a fifth-priority payment of "interest at the *legal rate* from the date of the filing of the petition." (Emphasis added.) Courts consistently interpret the reference in Bankruptcy Code Section 726(a)(5) to interest "at the legal rate" to mean that creditors are entitled to postpetition interest at the FJR.[143]

93. The application of the FJR in the payment by a solvent debtor of postpetition interest is supported by several factors, including: (1) principles of statutory interpretation; (2) uniformity within federal law; (3) equitable treatment of creditors; and (4) judicial efficiency.[144] First, principles of statutory interpretation compel the conclusion that the phrase "interest at the legal rate" in Bankruptcy Code Section 726(a)(5) means interest at the FJR.[145] Congress specifically chose the language "interest at the legal rate," by inserting it into the statute to replace the originally proposed language "interest on claims allowed."[146] Thus, in drafting Bankruptcy Code Section 726(a)(5), Congress specified what type and amount of interest could be awarded with the specific phrasing "at the legal rate," rather than making a general reference to a creditor's entitlement to interest from a solvent debtor.[147]

---

[143]   See, e.g., In re Cardelucci, 285 F.3d at 1234; Dow I, 237 B.R. at 412; In re Melenyzer, 143 B.R. 829, 834 (Bankr. W.D. Tex. 1992).

[144]   See Cardelucci, 285 F.3d at 1236; Dow I, 237 B.R. at 400-10.

[145]   See Cardelucci, 285 F.3d at 1234-36; In re Country Manor of Kenton, 254 B.R. 179, 182 (N.D. Ohio 2000); Dow I, 237 B.R. at 400-11.

[146]   See Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, § 4-405(a)(8), (1st Sess. 1973).

[147]   See Cardelucci, 285 F.3d at 1234-35; Dow I, 237 B.R. at 403.

94.     Moreover, courts have recognized that the use of "the" instead of the indefinite "a" or "an," in Bankruptcy Code Section 726(a)(5), indicates that Congress meant for a single, uniform source to be used to calculate postpetition interest.[148] In addition, the use of the phrase "legal rate" indicates that Congress intended the single source to be statutory, in that the commonly understood meaning of "at the legal rate" at the time the Bankruptcy Code was enacted was a rate fixed by statute.[149]

95.     Significantly, had Congress intended to provide interest under Bankruptcy Code Section 726(a)(5) at state judgment rates or contractual rates of interest, it certainly knew how to specify such an arrangement.[150] Moreover, application of the FJR to postpetition interest claims promotes uniformity within federal law.[151] On the filing of the bankruptcy petition, creditors must pursue their rights to the claim in federal court; thus, entitlement to a claim and interest on that claim is a matter of federal law that requires a uniform outcome.[152] Further, because

---

[148]    See Cardelucci, 285 F.3d at 1234; Dow I, 237 B.R. at 404; Melenyzer, 143 B.R. at 831 n.2.

[149]    See Cardelucci, 285 F.3d at 1234-35; see also Dow I, 237 B.R. at 404-05; Melenyzer, 143 B.R. at 831 n.2; Country Manor, 254 B.R. at 182; 3 Norton Bankruptcy Law & Practice 2d § 73:7 n.55 (1997 & Supp. 2000) (stating "interest is set at the [FJR] as of the petition date"); 6 Collier on Bankruptcy ¶726.02(5) (15th ed. rev. 1997) ("The reference in the statute to the 'legal rate' suggests that Congress envisioned a single rate, probably the federal statutory rate for interest on judgments.").

[150]    See Country Manor, 254 B.R. at 182 (questioning why, "if both §§ 506(b) and 726(a)(5) were intended to refer to the agreed upon interest rate . . . is the term 'agreement' specified in [section 506(b)] and not [section 726(a)(5)]").

[151]    See Cardelucci, 285 F.3d at 1235; Dow I, 237 B.R. at 399 n.14; see also Beguelin v Volcano Vision Inc. (In re Beguelin), 220 B.R. 94, 100-01 (citing Godsey, 134 B.R. 865, 867 (Bankr. M.D. Tenn. 1991).

[152]    See Bursch v. Beardsley & Piper, Div. of Pettibone Corp., 971 F.2d 108, 114 (8th Cir. 1992) ("[O]nce a bankruptcy petition is filed, federal law, not state law, determines a creditor's rights.").

Bankruptcy Code Section 502(a) provides that an allowed claim is equivalent to a federal money judgment, the FJR is the appropriate rate for postpetition interest on claims pursuant to Bankruptcy Code Section 726(a)(5).[153]

96. Thus, the legislative history and case law interpreting Bankruptcy Code Section 726(a)(5) make it plain that the FJR is the appropriate rate of interest to be paid on claims in a solvent debtor case. Here, given that, as set forth below, there is no basis to award interest other than that permissible pursuant to the "solvent debtor" exception, the Plan's provision of interest at contract rates is in direct contravention of relevant case law and legislative history. There is, in short, no basis for the Plan's proposed payment of postpetition interest to unsecured creditors at the contract rate. Rather, to the extent that unsecured creditors are entitled to any postpetition interest, that entitlement arises solely by virtue of the "best interests" test of 1129(a)(7) and 726(a)(5) - which requires *only* payment of interest at the applicable FJR as of the petition date.[154] Payment of anything beyond the FJR would result in an impermissible diversion of value to unsecured creditors in excess of their claims - value that otherwise would flow to Class 19.

---

[153] See Country Manor, 254 B.R. at 183; Cardelucci, 285 F.3d at 1235; Melenyzer, 143 B.R. at 833; see also Wasserman v. Cambridge, 151 B.R. 4, 6 (D. Mass. 1993); Dow I, 237 B.R. at 406.

[154] See, e.g., Premier Entm't Biloxi LLC v. U.S. Bank Nat'l Assoc. (In re Premier Entm't Biloxi LLC), No. 06- 50975, 2010 Bankr. LEXIS 2994, at * 167-74 (Bankr. S.D. Miss. Sept. 3, 2010) (finding that the FJR provides the appropriate measure of interest in a solvent debtor case).

### 2. Even if the Cramdown Principles of Section 1129(b) Were Applicable, The Circumstances of These Cases Do Not Warrant Payment of Interest To Unsecured Creditors Beyond the FJR.

97.     Even if Bankruptcy Code Section 1129(b) could justify the payment of contract interest in certain circumstances, the circumstances of *these* cases – a self-serving Settlement by conflicted parties resulting in an overreaching Plan that, among other things, improperly determines ownership of the Trust Preferred Securities -- undermine any notion that postpetition interest at the contract rate is appropriate. First, the Debtors bear the burden of demonstrating that the Plan is fair and equitable.[155] Here, in light of the circumstances giving rise to the Plan, and in balancing the equities between the unsecured creditors that are party to the Settlement and the non-settling members of Class 19, the Debtors simply cannot meet their burden to demonstrate that contract rate postpetition interest is appropriate.

98.     In <u>Coram Healthcare</u>, this Court held that in a cram down, "the specific facts of each case will determine what rate of [postpetition] interest is fair and equitable."[156] Notably, the "actions of [creditors] are relevant" in making that determination.[157] Accordingly, in <u>Coram Healthcare</u>, this Court was not compelled to award interest beyond the FJR because, among other

---

[155]    See, e.g., United States v. Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 654-55 (B.A.P. 9th Cir. 1994); 266 Washington Associates v. Citibank, N.A. (In re Washington Associates), 147 B.R. 827, 830 (E.D.N.Y. 1992) (burden of proof on confirmation "rests squarely on the plan's proponent").

[156]    315 B.R. at 347.

[157]    Id. at 346 (finding the FJR of interest fair and equitable because conduct of certain creditors ultimately resulted in delay in cases); see also In re Dow Corning Corp., 244 B.R. 678, 695 (Bankr. E.D. Mich. 1999) ("[t]he touchstone of each decision on allowance of interest in bankruptcy . . . and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor") (citations omitted).

things, the noteholders generally had "acted as a group in this case in advancing their interests and opposing the Equity Committee."[158]

99.     First, it must be noted that here, unlike in <u>Coram Heathcare</u> or <u>Dow</u>, in which the courts considered the general equitable principles of Chapter 11 in addition to the plain language of Bankruptcy Code Sections 1129(a)(7) and 726(a)(5) (so-called "solvent debtor" interest), the Plan here is essentially a liquidating plan. There is no reorganized debtor that will continue to operate as a going concern and that, accordingly, would have received the "benefit" of the Chapter 11 process without affording creditors of their contractual rights.[159] Accordingly, the "fairness" concerns implicit in a court's analysis of a reorganizing plan under Chapter 11 have little application here, where there is no concern that an entity's restructuring is occurring at the expense of creditors with contractual rights to payment. The only "concern" here is the potential right to so-called solvent-debtor interest under Bankruptcy Code Section 1129(a)(7) and 726(a)(5) – interest that, as set forth herein, plainly would accrue (if at all) at the FJR.

100.     Moreover, even if the fairness concerns implicit in <u>Coram Healthcare</u> were applicable here, the circumstances of these cases demonstrate that if postpetition interest is to be afforded to unsecured creditors at all, payment of interest at the FJR is more than fair and equitable. Stated differently, the payment of postpetition interest beyond the FJR would not be fair and equitable to the members of the TPS Consortium, because it would result in an effective windfall on the part of the very creditors who orchestrated the discriminatory Settlement and Plan. Moreover, the Debtors have not demonstrated that the unsecured creditors have suffered any harm or delay that would justify postpetition interest beyond interest at the FJR. And, in

---

[158]     315 B.R. at 347.

[159]     <u>See, e.g., In re Dow,</u> 244 B.R. at 695, *rev'd on other grounds* 456 F.3d. 668 (6th Cir. 2006) (drawing distinction between FJR interest to be paid as a "floor" by a solvent debtor pursuant to § 1129(a)(7), and the "fairness" concerns implicit in § 1129(b)).

fact, as in Coram Healthcare, the unsecured creditors in these cases, lead by institutional investors holding various classes of unsecured claims, have largely acted as a group in advancing their own interests and opposing both the TPS Consortium and the Equity Committee.

101.   Given that it appears that the Settlement was the result of a collusive arrangement amongst the parties thereto, whereby those parties' claims and interests would be satisfied nearly in full (with all residual value shunted from the Debtors' estates for the benefit of non-Debtor parties), it would in fact be wholly inequitable to afford unsecured creditors the benefit of that collusive bargain. Rather, the circumstances here demonstrate that the appropriate rate of postpetition interest – if any – is the FJR. Accordingly, the Plan should not be confirmed because the circumstances do not justify payment of postpetition interest to unsecured creditors at any rate other than the FJR.

102.   Critically important is the fact that, if interest were to be paid at the FJR, rather than the various contract rates, it would free up approximately $700 million capable of distribution to other case consituents – more than enough to get Classes 19 and 20 a meaningful recovery though the value "waterfall."

### RESERVATION OF RIGHTS

103.   The TPS Consortium reserves the right to amend, modify or supplement this Objection prior to the conclusion of the hearing on confirmation of the Plan and to review and object to any amended or revised version of the Settlement or Plan. The TPS Consortium also reserves the right to object to any documents contained in the Plan Supplement and any amendments, modifications or supplements thereto prior to the conclusion of the hearing on confirmation of the Plan. The TPS Consortium reserves the right to assert additional objections at the hearing on confirmation of the Plan. Moreover, any failure to respond herein to a specific

statement or omission contained in the Settlement, Plan, or Plan Supplement shall not be deemed acceptance thereof.

## CONCLUSION

104. For the reasons set forth above, this Court should enter an order sustaining the Objection and denying confirmation of the Plan, and granting such other and further relief as it deems just and proper.

Dated: Wilmington, Delaware
November 19, 2010

Respectfully submitted,

**CAMPBELL & LEVINE LLC**

/s/ Bernard G. Conaway
Marla Rosoff Eskin, Esq. (DE 2989)
Bernard G. Conaway, Esq. (DE 2856)
Kathleen Campbell Davis, Esq. (DE 4229)
800 North King Street, Suite 300
Wilmington, DE 19809
(302) 426-1900
(302) 426-9947 (fax)

– and –

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Sigmund Wissner-Gross, Esq.
Seven Times Square
New York, NY 10036
(212) 209-4800
(212) 209-4801 (fax)

– and –

Jeremy B. Coffey, Esq.
Daniel J. Brown, Esq.
One Financial Center
Boston, MA 02111

*Counsel for the TPS Consortium*