IN THE UNITED STATES BANKRUPTY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WASHINGTON MUTUAL, INC.<br>*et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-12229 (MFW)<br><br>(Jointly Administered)<br><br>Re: Docket Nos. 5548, 5659 and 5715<br><br>**Hearing Date: December 1, 2010 at 1:00 p.m.**<br>**Objection Deadline: November 19, 2010 at 4:00 p.m.** |

## LEAD PLAINTIFF'S OBJECTION TO SIXTH AMENDED JOINT PLAN OF AFFILIATED DEBTORS PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (AS MAY BE AMENDED)

Lead Plaintiff, Ontario Teachers' Pension Plan Board, in the consolidated securities class action entitled *In re Washington Mutual Securities Litigation*, Case No. 2:08-md-1919 (MJP) (W.D. Wash.) (the "Securities Litigation"), on behalf of the securities class (the "Securities Class" or "Securities Litigation Claimants") of all persons who purchased or otherwise acquired certain debt and equity securities issued by Washington Mutual, Inc. ("WMI"), one of the Debtors[1] herein, between October 19, 2005 and July 23, 2008 (the "Class Period"), hereby submits this objection (the "Objection") to the Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"), and states the following:

---

[1] Capitalized terms shall have the meanings ascribed to them in the Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (as may be amended) unless defined otherwise herein.

## BACKGROUND

1. On September 26, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2. Prior to the Petition Date, several putative securities class actions were pending alleging violations of federal securities laws against WMI and certain of its current and former officers and directors, underwriters and auditor (collectively, the "Non-Debtor Defendants") in the United States District Court for the Western District of Washington (the "District Court").

3. By order dated May 7, 2008, the District Court (i) consolidated the putative class actions, together with any subsequently-filed actions arising out of the same facts, into the Securities Litigation, and (ii) appointed Lead Plaintiff. The Securities Litigation was further consolidated with pending ERISA and derivative cases under the MDL case number.

4. On or about August 5, 2008, Lead Plaintiff filed a Consolidated Class Action Complaint (the "Consolidated Complaint") asserting violations by WMI and the Non-Debtor Defendants of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and sections 11, 12 and 15 of the Securities Act of 1933. On June 15, 2009, Lead Plaintiff filed an Amended Consolidated Class Action Complaint.

5. Pursuant to the automatic stay (11 U.S.C. § 362(a)), as of the Petition Date, the Securities Litigation has been stayed as to WMI. The Securities Litigation is proceeding as against the Non-Debtor Defendants, as it has been since early 2008.

6. On March 25, 2009, Lead Plaintiff filed a proof of claim (Claim No. 2759) on behalf of the Securities Class (the "Class Claim") in an undetermined amount for damages based upon the alleged violations of federal securities laws as described in the Consolidated Complaint, as amended, in connection with the purchase of WMI's securities by Lead Plaintiff and members of the Securities Class during the Class Period and WMI's conduct in connection therewith.

7. The Securities Litigation was the result of an accounting fraud and various misrepresentations by WMI and the Non-Debtor Defendants, which resulted in artificially inflated prices and value of the WMI securities. WMI, among others, has been the subject of multiple investigations regarding what has been described as the largest bank failure in United States history.

8. On October 27, 2009, the District Court denied, in large part, the Non-Debtor Defendants' motions to dismiss the Amended Consolidated Class Action Complaint. On October 12, 2010, the District Court entered an Order certifying the Class. The denial of the motions to dismiss and the certification of the class, after extensive motion practice and discovery, are watershed events in any securities litigation which highlight both the significance and bona fides of the claims asserted in the Securities Litigation.

9. On March 26, 2010, the Debtors filed the Disclosure Statement [Docket No. 2623] and the Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan") [Docket No. 2622].

10. On April 23, 2010, the Debtors filed the Motion for an Order Approving the Disclosure Statement and related relief (the "Motion") [Docket No. 3568]. After several adjournments and further amendments to the Disclosure Statement and Plan, the Motion was heard on October 18, 2010.

11. On May 13, 2010, June 11, 2010, and October 13, 2010, Lead Plaintiff filed its Objection to the Disclosure Statement [Doc. No. 3718], Supplemental Objection to the Disclosure Statement [Doc. No. 4668] and Objection to the Disclosure Statement for the Sixth Amended Joint Plan (the "Disclosure Statement") [Doc. No. 5588], respectively (collectively, the "Disclosure Statement Objections"). Several of Lead Plaintiff's objections to the Disclosure Statement were resolved through changes to the Disclosure Statement, the Plan, the Disclosure Statement Order (defined below) and the ballots. The balance of Lead Plaintiff's Disclosure Statement Objections was reserved for confirmation.

12. On July 28, 2010, the Court approved the appointment of the Examiner whose charge included, *inter alia,* an investigation of the releases provided under the Plan and the Global Settlement Agreement. On November 1, 2010, the Examiner filed his Final Report (the "Examiner's Report") [Doc. No. 5735].

13. On October 21, 2010, the Bankruptcy Court entered the Order Approving the Proposed Disclosure Statement (the "Disclosure Statement Order") [Doc. No. 5659], and scheduled a hearing on confirmation of the Plan to commence on December 1, 2010.

14. On October 29, 2010, the Debtors filed the Modification of Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy (the "Modification") [Doc. No. 5715].

## OBJECTION

15. Lead Plaintiff objects to confirmation of the Plan on the following grounds:

(a) the Plan improperly subordinates certain securities claims for damages arising from the purchase of debt securities contrary to the subordination required under 11 U.S.C. §510(b);

(b) the Plan Release and Injunction provisions are grossly overbroad, ambiguous, improper and illegal to the extent they purport to release and enjoin the prosecution of the claims of Lead Plaintiff and the Securities Class against any Non-Debtor Defendants.[2] At the very least, the Plan should affirmatively exclude the claims set forth in the Amended Consolidated Class Action Complaint (as may be further amended) and any such similar or related claims against the Non-Debtor Defendants and any other non-Debtors;

(c) the Plan Injunction should exclude any post-Confirmation Date requests for discovery from the Reorganized Debtors or such other transferee of the Debtors'

---

[2] Only a handful of Non-Debtor Defendants, namely Thomas W. Casey, Kerry Killinger, Stephen J. Rotella and David S. Schneider, are excluded from the benefits of the Plan Release and Injunction.

books and records;

(d) the Plan fails to provide an adequate protocol for the preservation of the Debtors' books, records and documents, whether transferred to the Liquidating Trust or others or retained by the Reorganized Debtors;

(e) the Plan does not provide any basis for the extension of stays or injunctions for a period beyond the Confirmation Date and such extension is inappropriate and prejudicial to Lead Plaintiff and the Securities Class;

(f) the Plan should not impact the rights of Lead Plaintiff and the Securities Class to proceed with their claims against the Debtors to the extent of available insurance coverage, irrespective of any injunctions, discharge or distribution under the Plan; and

(g) the Plan unfairly discriminates against members of the Securities Class, who have claims against Non-Debtors, by (i) conditioning a distribution under the Plan on Class members releasing non-Debtors from the Securities Claims and (ii) excluding certain creditors from the non-Debtor release provisions, but not others.

16. Lead Plaintiff has served various discovery requests in connection with confirmation. Responses to date have, for the most part, been totally inadequate. Discovery is ongoing and will, in all likelihood, continue beyond the deadline for filing objections to confirmation. Therefore, Lead Plaintiff reserves its rights to supplement and amend this Objection based upon documents and information provided on or after the confirmation objection deadline.

17. Lead Plaintiff believes that the Plan, by virtue of these gross infirmities, is unconfirmable under the Bankruptcy Code and relevant case law. The Plan, although in essence a liquidation, overreaches at every opportunity with respect to its attempts to wipe out the Securities Litigation and any potential compensation to defrauded investors without any basis whatsoever.

### A. The Plan Improperly Subordinates Those Securities Claims for Damages Arising from the Purchase of Debt Securities Contrary To the Subordination Required Under 11 U.S.C. §510(b).

18. The Securities Litigation Claimants include holders of claims based not only on the purchase of equity interests of the Debtors, but also claims based on the purchase of debt securities such as the Senior Notes and Senior Subordinated Notes (both projected to receive 100% recovery under the Plan). Ignoring the language of 11 U.S.C. §510(b), the Debtors contend that all of the claims of the Securities Litigation Claimants for damages arising from the purchase of WMI debt securities are subordinated to all unsecured claims pursuant to 11 U.S.C. §510(b), and, as a result, the Securities Litigation Claimants should all be classified as holding Class 18 Subordinated Claims under the Plan. (*See Debtors' Second Supplemental Omnibus Response . . . dated October 17, 2010*, Exhibit B at p. 39). The Plan's classification of the claims of the Securities Litigation Claimants which are based on the purchase of certain debt securities is inconsistent with the Bankruptcy Code and must not be permitted.

19. Under the Plan, claims subject to subordination under Section 510(b) are defined as "Other Subordinated Claim(s)" (Plan, Section 1.129) and classified in Class 18 as Subordinated Claims (Plan, Article XXII). As a preliminary matter, it should be noted that the language of the Plan as drafted and interpreted *by the Debtors* reflects that the claims of the Securities Litigation Claimants that are based on the purchase of the Senior Notes, Senior Subordinated Notes or other senior debt securities are *not* properly classified in Class 18. The Plan definition of "Other Subordinated Claim" (Section 1.129) *excludes* Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed PIERS Claims and others. These types of claims are defined in the Plan as "unsecured claim(s) *arising from or related to the* [Senior Notes/Senior Subordinated Notes/PIERS Trust Agreement . . .]." Thus, Securities Litigation Claims that are based on the purchase of Senior Notes, for example, certainly *arise from or relate to* the Senior Notes and would be excluded from the definition of "Other Subordinated Claim" and thus excluded from Class 18. This interpretation is supported by the *Debtors'* Response to the WMB Noteholders' Request to Allow Claim for Voting Purposes

Pursuant to Bankruptcy Rule 3018(a) [Docket No. 5767] wherein the Debtors' concede that due to the "arising from or related to" language, WMB Senior Notes Claims would *include* any claim such claim holder may assert based on misrepresentation. Applying this logic to the definition of "Other Subordinated Claim," the claims of the Securities Litigation Claimants based on the purchase of senior debt securities do not belong in Class 18. But, the Debtors have been inconsistent with respect to this position to date. Therefore, the Securities Litigation Claimants must assume that the Debtor seeks to classify all of their claims are classified in Class 18 regardless of the type of security that gives rise to the claim.

20. The certified class in the Securities Litigation consists of purchases of Senior Notes, Senior Subordinated Notes, PIERS securities, Preferred Stock and Common Stock. If classified as Class 18, each of these class members is projected to receive zero distribution under the Plan. On the other hand, the holders of Senior Notes, Subordinated Senior Notes, PIERS securities and other debt securities receive distributions under the Plan in the form of Creditor Cash, Liquidating Trust Interests and/or Reorganized Common Stock. Thus, the classification methods employed by the Debtors in the Plan will deprive certain of the Securities Litigation Claimants of meaningful distributions to which they are entitled as a matter of bankruptcy law and pursuant to the distribution scheme under the Plan.

21. The Securities Litigation Claimants submit that to the extent that claims are based on the purchase of Senior Notes, Senior Subordinated Notes, PIERS securities or some other debt security participating in the distribution under the Plan, such claims are subordinated only to claims by holders of those securities and claims that are senior to or equal claims represented by such securities in accordance with 11 U.S.C. §510(b). There is no evidence or legal basis to subordinate these claims to any lesser priority than that required by the clear language of the Bankruptcy Code. Section 510(b) simply does not subordinate claims for the purchase of unsecured debt instruments to holders of junior debt instruments. This is the only construction that gives effect to the plain language and purposes of 11 U.S.C. § 510(b). One must look to the nature of each debt security to determine whether other claims are senior or equal to the claim

represented by that security. For example, if a claim against the Debtors is based on the purchase of a Senior Note, that claim would be subordinated to all of the Senior Notes Claims, but would be senior to claims based on subordinated debt securities such as the Senior Subordinated Notes.

22. The Debtors' position that the Securities Litigation Claims are subordinated to all unsecured claims does not consider Section 510(b) in its entirety which requires that a claim for damages arising from the purchase or sale of a security be subordinated only to the claims or interests senior or equal to those "represented by such security" except with respect to common stock. Lead Plaintiffs concede that claims based upon the purchase of common stock are subordinated to the level of common stock holders pursuant to Section 510(b). The statute does not say that a claim based upon the purchase or sale of a security other than common stock will be subordinated to *all* claims, but only to those claims senior or equal to the claims of the holders of that particular security. Yet, the Plan seems to "lump" the claims of purchasers of all debt securities into Class 18. The Plan does not provide any basis for the classification of all Securities Litigation Claims as Subordinated Claims under the Plan which is violative of 11 U.S.C. §1122(a) and 11 U.S.C. §1123(a)(4).

23. There is no dispute that 11 U.S.C. §510(b) applies. This section provides:

> *For the purposes of distribution under this title*, a claim arising from rescission of a purchase or sale of a security of the debtor or an affiliate of the debtor, for damages arising from the purchase or sale of such a security, ... shall be subordinated to all claims or interest *that are senior to or equal the claim or interests represented by such security,* except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. §510(b) (emphasis added).

24. In order to apply 11 U.S.C. § 510(b) properly and to adhere to the legislative intent of the statute, the precise language of a statute must be considered when construing its meaning. *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000). The Debtors continue to ignore the plain language of 11 U.S.C. §510(b) by submitting that the claims for damages arising from

the purchase or sale of debt securities must be subordinated to all unsecured claims. Specifically, the Debtors would have this Court ignore the key qualifying language in the statute -- *"that are senior to or equal the claim or interest represented by such security."* But, since Congress did include that language, it must be considered. *See Mobile Oil Corp. v. Karbowski*, 879 F.2d 1052 (2d Cir. 1989) (a statute must be "construed so that all of its parts are given effect").

25. There is no ambiguity or uncertainty because Section 510(b) could not be clearer. The statute does not subordinate securities litigation claims to *all* claims or interests, but subordinates them "[f]or purposes of *distribution*" only to those claims that are "senior to or equal the claim or interest *represented by such security.*" (emphasis added). The Debtors' interpretation of Section 510(b) fails to give effect to this language because the Debtors seek to subordinate the Securities Litigation Claimants' claims to all unsecured claims.

26. To the extent that the Debtors argue that the Securities Litigation Claims and all other unsecured claims are "equal" because both have the same priority status under Section 507 of the Bankruptcy Code, there is no support for such a twisted interpretation of section 510(b). This approach would require the Court to disregard the structural and contractual subordination provisions of other debt instruments which is not consistent with the language of the statute. Such a course would also be contrary to Section 510(a) which provides -- "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." Thus, a creditor that has agreed to subordination must remain subordinated; nothing in Section 510(b) alters this result.

27. Indeed, "the language of Section 510(b) does not limit its application to any particular type of claimant but, rather, focuses on the type of claim possessed." *In re Walnut Equipment Leasing Co.*, 1999 WL 1271762, *6 (Bankr. E.D. Pa. 1999). This view is supported by the legislative history of Section 510(b). The House Report regarding the passage of Section 510(b) as part of the Bankruptcy Reform Act of 1978 states --

> The Bill subordinates in priority of distribution rescission claims to all claims that are senior to the claim or interest on which the rescission claims are based. Thus, a rescission claim resulting from the purchase of a subordinated debenture would share in the proceeds of the estate before equity security holders but after general unsecured creditors.

H.R. Rep. 95-595, 196, 1978 U.S.C.C.A.N. 5963, 6314 (emphasis added) (the "House Report").

The House Report further states that subordination pursuant to Section 510(b) should *vary* with the claim or interest involved House Report at 359, 1978 U.S.C.C.A.N. 5963, 6314 (emphasis added); *see also* Sen. Rep. No. 95-989, at 74.

28. The legislative history provides further illumination on the meaning of what claims are to be deemed "senior or equal" to other claims in its discussion of how the unfair discrimination test should be applied in the cram down context of Section 1129(b) in the case of subordinated debentures:

> The plan may be confirmed under clause (iv) in those circumstances if the class is not unfairly discriminated against with respect to equal classes and if junior classes will receive nothing under the plan. The second criterion is the easier to understand. It is designed to prevent a senior class from giving up consideration to a junior class unless every intermediate class consents, is paid in full, or is unimpaired. ... *One aspect of this test that is not obvious is that whether one class is senior, equal, or junior to another class is relative and not absolute.* Thus from the perspective of trade creditors holding unsecured claims, claims of senior and subordinated debentures may be entitled to share on an equal basis with the trade claims. *However, from the perspective of the senior unsecured debt, the subordinated debentures are junior.*
>
> This point illustrates the lack of precision in the first criterion which demands that a class not be unfairly discriminated against with respect to equal classes. From the perspective of unsecured trade claims, there is no unfair discrimination as long as the total consideration given all other classes of equal rank does not exceed the amount that would result from an exact aliquot distribution. Thus if trade creditors, senior debt, and subordinate debt are each owed $100 and the plan proposes to pay the trade debt $15, the senior debt $30, and the junior debt $0, the plan would not unfairly

>discriminate against the trade debt nor would any other allocation of consideration under the plan between the senior and junior debt be unfair as to the trade debt as long as the aggregate consideration is less than $30. The senior debt could take $25 and give up $5 to the junior debt and the trade debt would have no cause to complain because as far as it is concerned the junior debt is an equal class.

House Report at 416, 1978 U.S.C.C.A.N. at 6372 (emphasis added). Clearly, when one looks to determine whether a claim is "senior or equal," one should look at the security giving rise to the claim for damages.

29. Moreover, this interpretation promotes the principles that Congress sought to advance in enacting Section 510(b). In so doing, Congress adopted the principles of risk allocation set forth by Professors John J. Slain and Homer Kripke in their influential article *The Interface Between Securities Regulation and Bankruptcy--Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L.Rev. 261 (1973) (hereinafter "Slain/Kripke"). *See* H.R.Rep. No. 95-595, at 196 (summarizing the argument in the Slain/Kripke article and stating that "[t]he bill generally adopts the Slain/Kripke position"); *id.* at 194 ("The argument for mandatory subordination is best described by Professors Slain and Kripke."); *In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 829 (9th Cir. 2001) ("Congress relied heavily on the analysis of two law professors in crafting the statute."); *In re Granite Partners, L.P.*, 208 B.R. 332, 336 (Bankr. S.D.N.Y. 1997) ("Any discussion of Section 510(b) must begin with the 1973 law review article authored by Professors John J. Slain and Homer Kripke....").

30. Slain and Kripke were concerned with the ability of investors in stock or in subordinated debentures to bootstrap their way to parity with, or preference over, general creditors through the assertion of securities law remedies. *See* 48 N.Y.U. L.Rev. at 268 ("Since this favored treatment is clearly outside the original contemplation of both the securityholders and the general creditors affected, it is with securities of this type that we are concerned. Hereafter, the discussion is focused upon the rescinding stockholder. Mutatis mutandis, the

discussion is equally applicable to holders of *subordinated debentures* and to other creditors whose debt securities are *contractually subordinated*.") (emphasis added). *See also In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir. 2002) ("Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding."); *In re Blondheim Real Estate, Inc.*, 91 B.R. 639, 640 (Bankr. D.N.H. 1988) (noting that the legislative history of Section 510(b) is "entirely focused upon the question of appropriate treatment of *inferior-level* claims that arguably might be *upgraded* to a higher level by virtue of some fraud ground justifying recovery by the security holder against the debtor.") (emphasis in original). Here, bootstrapping is not at issue as none of the Securities Litigation Claimants whose claims are based upon the purchase of debt securities are trying to improve their status to a more senior level. Rather, the Securities Litigation Claimants whose claims are based on the purchase of senior debt securities are merely trying to preserve seniority over claimants who agreed to subordination from the outset.

31. Another concern addressed by Slain/Kripke was the preservation of expectations with respect to risk allocation as between stockholders and creditors. The article notes that because of their respective rights and obligations, stockholders and creditors are placed in a "semi-contractual relation" to one another in regard to "the degree to which each party assumes a risk of enterprise insolvency." And, Slain/Kripke concludes that "no obvious reason exists for reallocating that risk." 48 N.Y.U. L.Rev. at 286-87. Essentially, Slain/Kripke maintains that an equity purchaser has an expectation of junior priority and a variable profit on his investment, while an unsecured creditor, such as a bond purchaser, has an expectation of priority of its claim over other junior claims and a fixed profit. Hence, the purchasers of Senior Notes, Senior Subordinated Notes and possibly other senior debt securities have an expectation of a payment with priority over stockholders *and over purchasers of subordinated debt securities*. Under the Slain/Kripke risk allocation principles, there is no reason to alter the expectation of a purchaser of a debt security who relies on its priority over equity and other subordinated debt securities.

32.     The House and Senate Reports echo Slain and Kripke when they state that a claim based upon a debt instrument; *i.e.*, a bond, will be treated as a general unsecured claim and that subordination varies with the security involved. H.R. Rep. 95-595; Senate Rep. 95-989, *supra*. This is accomplished by limiting the subordination of claims arising from the purchase or sale of securities only to "all claims that are senior to or equal the claim or interest *represented by such security*," 11 U.S.C. §510(b) (emphasis added), rather than to all unsecured claims. By limiting subordination in this manner, Section 510(b) is able to protect the appropriate reliance and risk assumed by parties purchasing debt securities while preventing bootstrapping.

33.     Accordingly, based upon 11 U.S.C. §510(b), the House and Senate Reports, Slain/Kripke and the relevant case law cited herein, the Securities Litigation Claims which are based on the purchase of senior debt securities such as the Senior Notes or the Senior Subordinated Notes do not belong in Class 18. Rather, such claimants should be subordinated only to holders of claims based upon that particular debt security and all claims equal or senior to the claims of such holders.

34.     Finally, during the Disclosure Statement hearings, the Debtors stated that on May 19, 2010, the Court entered an Order approving a Stipulation Resolving Debtors' Twenty-Eighth Omnibus (Substantive) Objection to Claims (the "Stipulation," Docket No. 3814) in which the Securities Litigation Claimants "agreed that, pursuant to section 510(b) of the Bankruptcy Code, their claims against the Debtors are Subordinated Claims, as defined in section 1.182 of the Third Amended Plan." (Debtors' Omnibus Reply at p. 23). The Stipulation provides, however, that the parties agreed that "the Securities Claims shall be subordinated to the allowed claims of the Debtors' other creditors *consistent with section 510(b) of the Bankruptcy Code as it separately relates to the subordination of claims for damages in connection with the purchase or sale of WMI debt securities and/or WMI equity securities*." (Stipulation at ¶ 1, emphasis added). Nowhere did the Securities Litigation Claimants agree to subordinate all of their claims to the Debtors' other creditors or agree that all such claims based upon the purchase of debt securities should be classified as Class 18 Subordinated Claims under the Plan. Rather, as the above

language so clearly indicates, the Securities Litigation Claimants stipulated only that Section 510(b) applies to their claims based on the purchase or sale of debt securities and equity securities and that the section applies, *separately* depending on the nature of the security involved. The Securities Litigation Claimants' position on this issue has been consistent throughout. The Debtors' attempt to characterize the Stipulation as a waiver is an act of desperation.

### B. The Plan Provides Grossly Improper Releases and Injunctions That Impact Lead Plaintiff's Claims Against the Non-Debtor Defendants Who Are Contributing Nothing for this Undeserved and Illegal Protection.

35. The height of overreaching under the Plan lies in the unexplainable attempt by the Debtors to shield those responsible for billions of dollars of investor losses in connection with the largest bank failure in United States history from answering for their conduct. At the same time, the Debtors seek to disenfranchise these investors from any distribution under the Plan. One can only wonder what stands behind this effort to frustrate any recovery for the thousands of small and large investors alike who remain victimized by WMI's precipitous fall. Through a maze of complicated Plan provisions, definitions, independent agreements, lengthy ballots and a consent process based upon fiction and economic duress, WMI seeks to provide a free pass from any liability to essentially all of its directors and officers (whether current or former); its former accountants; its former investment bankers; and essentially every other former advisor under the sun. The Bankruptcy Code, relevant case law, common sense and fundamental fairness do not and should not allow such a result.

36. To start, the Plan and the Global Settlement Agreement ("GSA") include a broad spectrum of convoluted, confusing and unsustainable releases and related injunctions which improperly release or enjoin third-party claims against non-Debtors, including the Non-Debtor Defendants. *See, e.g.,* Plan, §§43.2, 43.3, 43.6, 43.7; GSA §§2.24 and 3.1 to 3.5. A list of the Non-Debtor Defendants currently named in the Securities Litigation and not specifically excluded under the Plan is annexed hereto as Exhibit "A." These releases render the Plan

unconfirmable.

37. The non-consensual releases to be given by third-parties such as Lead Plaintiff and the Securities Class in favor of non-Debtors, referenced throughout the Plan, require creditors and parties in interest to navigate through a series of provisions, which are themselves difficult to comprehend, forcing creditors to go back and forth from one document to the next or from one provision in the Plan to another, in order to determine, if even possible, the impact and scope of the gratuitous relief the Debtors are seeking to provide third parties who are not even parties to the GSA, have no current relationship with the Debtors, are irrelevant to the confirmation of the Plan, and who are contributing nothing for the extraordinary and undeserved gift the Plan attempts to provide.

*The Plan Release Provisions and Related Definitions*

38. "Released Claims" include claims released "to the extent provided in the Global Settlement Agreement" and any and all Claims released or deemed to be released pursuant to the Plan" which include any claim relating in any possible way to any WMI Entity. Plan, §1.159.

39. "Released Parties" are, *inter alia*, the WMI Entities (includes the Debtors) and "each of their Related Persons." Plan, §1.160.

40. "Related Persons" include, *inter alia*, an Entity's current and former officers, directors and financial advisors, consultants, agents or other representatives, except Excluded Parties as defined in the GSA. Plan, §1.158.

41. The Plan provides that:

> each Entity that has held, currently holds or may hold a Released Claim or an Equity Interest that is terminated ... shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge each and all Released Parties from any and all Released Claims.

Plan, Art. §43.6.

42. Releases of the Debtor are found in Plan §43.2 (all distributions and rights afforded under the Plan ... shall be deemed to be ... [a] release of all Claims ... relating to any

-15-

of the Debtors"). That section of the Plan also provides that the Debtors and Reorganized Debtors shall be discharged[3] ("[u]pon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be deemed discharged under Section 1141(d)(1)(A)").

43. As discussed below, the Plan also imposes injunctions against Holders of Claims or Interests from pursuing claims that are released or terminated under these Plan provisions. Plan 42.3(b) ("all Entities shall be precluded from asserting against any and each such Released Parties . . .any and other further Claims . . ."); 43.3 (Injunctions on Claims) ("all Entities [who hold, held or may hold claims or equity interests that are discharged or terminated] are permanently enjoined . . ."); §43.7 (Injunction Related to Releases) (substantially similar to injunction in §43.3); §43.9 (Bar Order) ("each and every Entity is permanently enjoined, barred and restrained from . . ."); and §43.12 (Supplemental Injunction) (all Entities "who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims or Equity Interests against any of the Released Parties [based upon a Claim against or Equity Interest in the Debtors] shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties [in connection with any Released Claim or Equity Interest]"). The series of injunctions improperly prohibit third parties, like Lead Plaintiff, from taking any action to enforce their Claims against an almost limitless number of non-Debtors.

*The GSA Release Provisions*

44. Pursuant to Article III of the GSA, §§3.1 to 3.5, each party to the GSA "shall be deemed to have irrevocably and unconditionally . . . released, acquitted and discharged [the other parties to the GSA] from any and all claims [of any kind related to the assets of the released party as described in the respective sections of the GSA]." The GSA extends the release to a GSA party's, *inter alia*, officers, directors and professionals. These GSA provisions provide a release only among the parties to the GSA, and not to or from others.

---

[3] Lead Plaintiff questions the validity of a discharge of the Debtors. *See* ¶98, *infra* (a liquidating debtor is not entitled to a discharge).

-16-

45.     In a separate provision, the GSA does attempt to impose a release on claims of others who are not parties to the GSA, but only in favor of certain parties to the GSA, by requiring the Debtor to seek to bind those creditors receiving a distribution under the Plan who do not consent to such releases.

> The Plan shall provide, *to the fullest extent legally permissible*, that any Person . . . *receiving a distribution pursuant to the Plan* shall release, and shall be deemed to release, the JPMC Entities, the FDIC Receiver, FDIC Corporate and the Receivership from any and all Released Claims and any other Claims such Person may have arising from or relating to the claims or interests for which such party is receiving such distribution . . . The Plan shall also provide that the *debtors shall seek to bind those entities that opt out of the releases provided in the Plan*. The releases that will be obtained through the Plan are essential to the success of the reorganization and necessary to make the Plan feasible.

GSA, §2.24 (emphasis added). Released Claims, as defined in the GSA, include "any and all Claims released or deemed to be released pursuant to the Plan." GSA, §1.2.

*Impact of Releases and Injunctions under the Plan and the GSA*

46.     Section 3.7 of the GSA, to the extent it is even comprehensible, clearly limits the purported condition to an injunction against any proceeding asserting claims that are released as between the parties to the GSA or based upon the Purchase and Assumption Agreement and the Related Actions as between the parties to the GSA. They have no bearing on the Securities Litigation or the claims asserted in the Securities Litigation against the Debtors' Related Persons. Moreover, this provision is at best inconsistent with §2.24 of the GSA.

47.     The foregoing provisions in both the Plan and the GSA demonstrate the confusing intricacies in even attempting to understand the scope of the releases and injunctions under the Plan. By creating this confusion through the foregoing definitions and provisions, as well as the non-existent dependence of the GSA on releases in the Plan of the Debtors' Related Persons who the GSA does not even ask to be released by creditors and Interest holders, the Debtors conjure a fictitious link between the offensive Plan release, the GSA and confirmation. The Debtors'

Related Persons are not parties to the GSA. Whether they get a release under the Plan or not is nowhere required by the GSA and even if it was, it would be only "to the fullest extent legally permissible." The Debtors' Related Persons, among scores of others, the Non-Debtor Defendants in the Securities Litigation.

48. The Plan further imposes a permanent injunction on any Entity that holds, has held or may hold a Released Claim or Equity Interest related to the Debtors that is released under the Plan and all parties in interest from commencing or continuing *any* action or other proceeding, in *any* manner, in *any* forum; or from doing *any* of the foregoing that is inconsistent with the provisions of the proposed GSA, Plan or Confirmation Order. Plan, Art. §43.7; *see also*, Plan, §43.3; §43.2(b) ("all Entities shall be precluded from asserting against any and each of the Released Parties . . . any other or further Claims . . . or liabilities of any nature"). Indeed, the Plan further affirmatively states "each holder of a Claim or Equity Interest in any Class under the Plan" shall release, waive and discharge all such Claims and Equity Interests "as against each and any of the Released Parties." *Id.*

49. The maze of Plan injunction and release provisions, coupled with the Plan definitions, are intended to enjoin, prohibit and preclude Lead Plaintiff and the Securities Class from asserting claims in the Securities Litigation against the Non-Debtor Defendants and even from accessing documents from the Debtors or the Liquidating Trust.[4] The Debtors' attempt to foist these provisions on disenfranchised and defrauded creditors cannot be allowed to stand.

50. The mere conclusory statement that the Plan injunction and release provision are "integral part[s]" of the Plan is fundamentally insufficient to justify such extraordinary relief. Plan, §43.4. No evidence is provided in the Disclosure Statement or Plan, nor does such

---

[4] Because of the breadth and ambiguity of the Plan and GSA release and injunction provisions, Lead Plaintiff asserts that this Objection applies to any attempt under the Plan or the GSA to release claims against or to enjoin the prosecution of claims against a non-Debtor, including the Non-Debtor Defendants in the Securities Litigation who may not even be Released Parties or Related Persons subject to the releases and injunctions in the Plan and /or the GSA.