evidence exist[5] to support this self-serving statement.[6] Any attempt to link the Plan releases (which extend far beyond what is envisioned by the GSA) with the GSA releases fails. The release provisions in the GSA relate only to the parties to the GSA and the matters settled as between the parties. There is no requirement in or condition to the GSA that third-parties who are not parties to the GSA must be released under the Plan in connection with the Securities Litigation in order for the GSA to be effective. The GSA only states that the Debtors "*shall seek to bind*" entities that do not consent to the Plan releases "to the fullest extent legally permissible" and then only with respect to releases of the JPMC Entities, the FDIC Receiver, FDIC Corporate and the Receivership. Leaving aside the propriety of such releases,[7] third party releases of the

---

[5] At the deposition of Robert Kosturos, the Debtors' CRO and principal negotiator of the Plan and GSA, the witness could not provide a single fact which supports the allegation that the release provisions are integral to the Plan. Some of the relevant testimony was - the directors and officers were not represented by counsel or any other separate representative during the course of the negotiations (pp. 134-36); his understanding was that the Debtors' professionals were not getting released under the Plan as amended (p.141) ... which is inconsistent with the terms of the Plan as they now stand; he knew nothing with respect to the consideration being provided by the directors and officers in exchange for their releases under the plan (pp. 141- 46); he did not recall any specific discussions concerning the release provisions during the course of the negotiations (p.150); he did not know how the third party release provisions were brought into the Plan discussions (p. 152); he refused to answer the question of why the releases were integral to the plan (pp. 161-64); the directors and officers did not request releases during the Plan negotiations (p. 170). Mr. Kosturos (and his counsel) tried to downplay his lack of knowledge concerning the release provisions under the plan by saying that Charles Smith was the witness being designated to testify on the matter. Yet, in the Notice of Designation of Debtors' Witness List in Support of Confirmation filed on November 15, 2010 [Doc. No. 5923], it does not say that Mr. Smith will testify about the release issues under the Plan. Mr. Smith is scheduled to be deposed on November 22, 2010 and the Securities Litigation Claimants reserve their rights to amend this objection based on the testimony at that deposition as well as the responses to written discovery requests which are still outstanding. (The aforementioned transcript pages are annexed hereto as Exhibit B).

[6] To the extent that Debtors argue that they may be obligated to indemnify any of the Related Persons for damages for claims asserted by Lead Plaintiff in the Securities Litigation, such indemnification claims are subject to statutory subordination under 11 U.S.C. §510(b) or expungement as contingent and/or unliquidated under 11 U.S.C. §502(e)(1)(B). Indeed, there will be no economic impact on the estate from these indemnification claims. Thus, there is no basis to release or enjoin such claims on an indemnification theory. *See generally Reliance Acceptance Group, Inc. v. Levin (In re Reliance Acceptance Group, Inc.)*, 235 B.R. 548, 557 (D. Del. 1999) (holding that indemnification claims by officers and directors are not a basis for enjoining securities litigation against those officers and directors).

[7] For example, under the Plan (§1.111) and the GSA, JPMC Entities include, *inter alia*, affiliates of JPMC "that have filed proofs of claim against the Debtors." JPMC Securities, a defendant in the Securities Litigation, is a JPMC Entity (it is an affiliate of JPMC and filed a proof of claim for indemnification against WMI). Under the Plan, JPMC Entities are Released Parties who benefit from the Plan releases and injunctions afforded to non-Debtors. In addition, the GSA provides that in exchange for receiving releases by the other parties to the GSA (and presumably for any release by non-GSA parties under the Plan), the JPMC Entities, including JPMC Securities, are releasing their claims against WMI (as well as their claims, if any, against other parties to the GSA). However, the claim of JPMC Securities against WMI is for indemnification and therefore is subject to subordination under 11 U.S.C. §510. The claims against JPMC Securities in the Securities Litigation have survived a motion to dismiss, are based on JPMC Securities' independent conduct as an underwriter of WMI

Debtors' Related Persons with respect to the Securities Litigation are nowhere to be found in the GSA. Thus, for the Debtors to argue that the non-Debtor releases in the Plan are required for the GSA and Plan confirmation is a fairy tale intended to turn into a nightmare for the Securities Litigation Claimants. The striking of such releases in the Plan will provide no basis for the parties to the GSA to withdraw from their obligations under the GSA, because they have no right to do so. The GSA remains enforceable without the Plan releases.

51. To the extent the GSA requires that the Plan provide releases in favor of certain parties to the GSA by creditors and holders of interests, it is only to the extent permitted by law. GSA, §2.24. The condition set forth in §3.7 of the GSA must be subject to the same limitation and, in any event, has nothing to do with the claims asserted in the Securities Litigation. As previously set forth, the non-debtor third-party releases in the Plan are not legally permissible and therefore, such a determination by the Court would not result in the termination of the GSA. The striking of the third party Plan releases as they relate to the Securities Litigation does not and should not impact the GSA at all.

*The Examiner Finds the Releases Improper*[8]

52. In his Report, the Examiner concluded that the "expansive releases to non-debtor parties, many of whom provide no value under the Plan and are not parties to the Settlement Agreement . . . are unduly broad and inappropriate" and are "unreasonably broad" as a result of the inclusion of Related Persons. Examiner's Report, at 20.

53. The Examiner further concluded that by virtue of the all encompassing definition of Related Person, Plan, §1.158, releases were being given in favor of any professional retained by WMI, WMB, JPMC or the FDIC, as well as the Debtors' former officers and directors. The Examiner's Report further noted that the release was accompanied by a "parallel injunction,"

---

securities and have nothing to do with the claims being released under the GSA. JPMC Securities is contributing nothing to the Debtors and certainly nothing to the Securities Litigation Claimants. Therefore, JPMC Securities is not entitled to the broad and extraordinary releases under the Plan and the GSA as to the Securities Litigation.

[8] Lead Plaintiff concurs with the analysis of and the conclusions reached by the Examiner with respect to the impropriety of the Plan releases and injunctions as discussed at pages 19-23 of the Examiner's Report.

Plan, §43.3, which could even "prevent a claimant from taking discovery from any of the Released Parties in aid of claims against non-released parties. Examiner's Report, at 21-22.

54. The Examiner also found that the release impacts claims held by a broad range of creditors and equity holders. "While some provisions of the Plan appear to apply Releases only to holders of claims and equity interests that are treated under the Plan, other provisions could fairly be read to provide complete and total releases to the Released Parties as against the world." Examiner's Report, at 22; *see also* Plan, §43.2(b) ("each holder of a Claim or Equity Interest in any Class under this Plan shall and hereby is deemed to release . . . " and "all entities shall be precluded from asserting against any and each of the Released Parties . . ."); Plan, §43.10 ("By submitting a Ballot and receiving a distribution under or any benefit pursuant to this Plan and not electing to withhold consent to the releases of the applicable Released Parties set forth in Section 43.6 of the Plan, or by order of the Bankruptcy Court, each holder of a Claim or Equity Interest shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases . . . in Section 43.6 of the Plan.").

55. The Examiner concluded that "[n]o release should be given without consideration from the released party." *Id.*, at 23. Lead Plaintiff submits that no other conclusion can be reached by this Court. Clearly the Debtors are cheering the Examiner's conclusion that the GSA represents a fair and reasonable settlement of the fundamental competing claims to the assets at issue in this chapter 11 proceeding. No less credence should be given to the Examiner's conclusions regarding the impropriety of the third party releases under the Plan.

*Debtors' Insulting Response to Examiner's Report*

56. Until October 29, 2010, the Plan provided that the Debtors and the Reorganized Debtors, similar to creditors and holders of Interests, release, waive and discharge their claims and causes of action against the Released Parties and their Related Persons. Plan, §43.5. Apparently in response to at least some of the Examiner's concerns raised prior to the public filing of his Report, the Debtors filed a modification of the Plan on October 29, 2010 [Doc. No.

5715) which, *inter alia*, effectively excluded certain parties from the definition of Related Persons, and excluded acts of gross negligence and willful misconduct, *only from the releases given by the Debtors* pursuant to §43.5 of the Plan.

57. Thus, the Debtors acknowledged, at least to some degree, the impermissible scope of the releases they were giving, but decided, despite the Examiner's Report, that it was perfectly appropriate to continue to deprive third parties of similar claims. As demonstrated below, the standard for third party releases is much more stringent than releases being given by a debtor. Yet the Debtors here, even being confronted by their improper positions, focused only on themselves.

58. Moreover, this Modification is prejudicial as it creates an unfair advantage by permitting the estate and/or the Reorganized Debtors to pursue claims against common wrongdoers under a Plan that continues to strip third parties of those rights. Again, there is less support to compel non-Debtor third parties to release non-Debtors than for the Debtor to release its own claims against these same non-Debtors.

*The Bankruptcy Court Lacks Jurisdiction to Release and Enjoin the Prosecution of the Securities Claims against Non-Debtors*

59. As a threshold question, the Court must determine whether or not it has jurisdiction to determine the validity of the Plan release and injunction provisions as they relate to the Securities Claims against non-Debtors. The Third Circuit Court of Appeals in *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 n. 12 (3d Cir. 2000), has expressed its concern "that the Bankruptcy Court apparently never examined its jurisdiction to release and permanently enjoin [the third party's] claims against non-debtors." While certain matters between non-debtor third parties affecting the debtor and the bankruptcy case may be within the subject matter of the Court, it is not without limits and the Court "cannot simply presume it has jurisdiction in a bankruptcy case to permanently enjoin third-party *class actions* against non-debtors." *Id.* (emphasis added).

60. Recently, the Second Circuit addressed the jurisdictional issue and upheld its earlier holding in the same case that a "'bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate.'" *Johns-Manville Corp. v. Chubb Indemnity Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135,152 (2d Cir. 2010) "*Manville 2010*"), quoting *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008) ("*Manville 2008*"). Such jurisdiction is statutory. *In re Combustion Engineering, Inc.*, 391 F3d. 190, 225 (3d Cir. 2004). Chubb asserted a direct claim against an insurer of the debtor, not against the subject policy (which was property of the estate). As noted in the *Manville 2010* decision, *Manville 2008* held that "a bankruptcy court's *in rem* jurisdiction was insufficient to enjoin the [direct claim] based upon . . . legal theories that seek to impose liability on [the insurer] as a separate entity rather than on the policies." 600 F.3d at 152. Thus, the nature of the third party claim against the non-debtor, whether it be direct or derivative, must be considered before the Court can exercise subject matter jurisdiction in connection with the non-debtor releases and injunctions in the Plan. The Securities Claims are certainly direct claims over which the Court does not have subject matter jurisdiction.

61. In *In re Dreier LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010), Judge Bernstein adopted the *Manville* analysis. To the extent a third party claim is derivative, a bankruptcy court has subject matter jurisdiction. 429 B.R. at 131 (finding that where the subject of the dispute against the non-debtor involves property of the estate or will impact the estate, the court has "related to" jurisdiction to enjoin the claim (providing, of course, that the other legal requirements are met)). However, direct actions which seek recovery from non-debtors for their own independent wrong-doing are not within the bankruptcy court's jurisdiction. *Id.* Indeed, even a non-debtor's financial contribution to the debtor's estate is not enough to find subject matter jurisdiction to enjoin the third party claim. *Id.* Lead Plaintiff maintains that the Court does not have subject matter jurisdiction to approve the Plan release and injunction provisions as they relate to the independent claims asserted in the Securities Litigation.

*The Release and Injunction Provisions are Illegal, Impermissible and Contrary to Relevant Case Law*

62. As a result of the offensive and improper Plan release and injunction provisions, non-debtors, including the Non-Debtor Defendants, who, in the absence of unusual circumstances, are not entitled to the protections of the Bankruptcy Code, will benefit from such protections. Therefore, to the extent that any of Lead Plaintiff's claims against the Non-Debtor Defendants may be subject to the Plan or GSA injunction and/or release provisions, the provisions are improper. *See Continental*, 203 F.3d at 211 (holding that a debtor must satisfy its burden of proof and establish through specific factual findings that non-debtor third-party releases are fair and necessary); *In re Combustion Engineering*, 391 F. 3d at 236 (holding in an asbestos injury case that 11 U.S.C. § 105 may not be used to validate a non-debtor release where to do so trumps another Bankruptcy Code section); *see also Deutsche Bank AG London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141-42 (2d Cir. 2005) (holding that non-debtor releases are proper only in rare cases and may be "tolerated only if the affected creditor consents").

63. Although *Continental* does not establish a standard for the allowance or disallowance of non-consensual third party releases, it acknowledged that certain factors should be considered by a court confronted with a request for such extraordinary relief. *See In re Freedom Rings, LLC*, Case No. 05-14268 (Bankr. D/ Del. Apr. 20, 2006) (*Transcript of Motions Hearing before Honorable Christopher S. Sontchi United States Bankruptcy Judge*), at 119. Judge Sontchi noted that to establish the factors of fairness and necessity raised in *Continental*, specific factual findings are essential to confirmation of a plan containing third-party releases. The factual findings necessary to establish fairness include a showing of "material, specific and identifiable consideration flowing from the releasees to the releasors, either directly or through the Plan, that is a fair exchange for the releases being granted." *Id.*, at 119-120. The factual finding needed to establish a showing of necessity is that "it is unlikely that the Debtor will be able to confirm a Plan, not necessarily the specific Plan before the Court, absent such releases."

*Id.* That the case itself is "extraordinary," as the Debtors argue here, is not relevant nor is it a substitute for the foregoing factors. *Id.* While "every multi-debtor corporate bankruptcy can come up with some aspect of its situation that seems to it, and to its creditors, to be 'unique' [or extraordinary]," there must be more than just a significant financial or other contribution to the case to render non-debtor releases appropriate. *In re Karta Corp.*, 342 B.R. 45, 55 (S.D.N.Y. 2006)(finding that the "mere fact of a financial contribution by a non-debtor cannot be enough to trigger the right to a *Metromedia* . . . release of non-debtor claims").[9] As Judge Sontchi emphasized, the facts of each case must be examined.

64. As set forth herein, the non-debtor releases, at least to the extent they impact Lead Plaintiff's claims in the Securities Litigation, do not come close to satisfying the criteria and should be struck down. The Debtors fail to establish fairness or necessity. There is no evidence of any consideration being given by the Debtors' Related Persons. Nor can the Debtors show that it is unlikely that they will be able to confirm the Plan without the releases. As previously demonstrated, at ¶¶50-51, *supra*, the GSA, the foundation of the Plan, remains viable notwithstanding the disallowance of the Plan releases as they relate to the Securities Litigation.

65. Courts in the Third Court and in this District have applied or, at the very least considered, the five factors established in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994), before allowing an extraordinary third party release as part of a plan of reorganization. *See Continental*, 203 F.3d at 213, n. 9 (citing *Master Mortgage*, at 937, for explaining "that a permanent injunction limiting the liability of non-debtor parties is a 'rare thing' that should not be considered absent 'a showing of exceptional circumstances' in

---

[9] Even if some of the Released Parties expended significant time and resources negotiating the Plan and/or the GSA, such efforts are not unique as they are present in every chapter 11 proceeding; such routine efforts are insufficient to warrant a release of claims against those parties. *Karta*, at 55; *JP Morgan Chase Bank, N.A. v. Charter Comm. Operating LLC (In re Charter Comm.)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) (unique circumstances exist where a party seeking to be released from non-debtor claims is the linchpin of the Plan). Here, the Released Parties under the Plan are not linchpins of the Plan. *In re Adelphia Comm. Corp.*,368 B.R. 140, 267-68 (Bankr. S.D.N.Y. 2007) (holding that many parties provide benefits to the case which are not unique). The fact is that most of the Released Parties had nothing to do with the Debtors, the chapter 11 proceeding or the Plan, other than cause substantial injury to the Securities Litigation Claimants. The current officers and directors simply did their jobs and were paid for their work.

which several key factors are present"); *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing the five factors of *Master Mortgage*); *In re Spansion, Inc.*, 426 B.R. 114, 143, n. 47 (Bankr. D. Del. 2010)(citing *Zenith, supra*, for the five factors of *Master Mortgage* and the proposition that a court may grant non-debtor releases only "after considering the specific facts and equities of each case").

66. Under *Master Mortgage, supra*, a court should consider the following before allowing non-debtor releases:

   a. the identity of interest between the debtor and the third party, such that a suit against the non-debtor is a suit against the debtor;

   b. substantial contribution by the non-debtor to the reorganization;

   c. without the injunction there is little likelihood of success;

   d. a substantial majority of creditors, particularly those impacted by the injunction, consent or agree; and

   e. the plan provides for the payment of all or substantially all of the claims affected by the injunction.

*Master Mortgage*, 168 B.R. at 935 (the list is not exclusive nor is it conjunctive).

*None of the Master Mortgage Factors are Satisfied by the Plan Release and Injunction Provisions*

67. The fact that some of the Released Parties may have indemnification claims against the Debtors does not satisfy the first factor. Any indemnification claim by a non-Debtor related to the claims of Lead Plaintiff or the Securities Class is subject to subordination under 11 U.S.C. §510(b) and will likely have no economic impact on the estate. Aside from being subject to statutory subordination, any indemnification claim is also subject to expungement as contingent and/or unliquidated under 11 U.S.C. §502(e)(1)(B). *See Reliance Acceptance Group, Inc. v. Levin (In re Reliance Acceptance Group, Inc.)*, 235 B.R. 548, 557 (D. Del. 1999) (holding that indemnification claims by officers and directors are not a basis for enjoining securities litigation against them). There is no identity of interest between the Related Persons and the Debtors sufficient to satisfy this first *Master Mortgage* factor.

68. The Debtors' Related Persons are not making and have not made any contribution to the reorganization. They are not parties to the GSA. They are in fact freeloaders seeking to take advantage of gratuitous releases and injunctions.

69. The Debtors cannot establish that without the releases and injunction, there is no reasonable likelihood of a successful reorganization. Again, to satisfy this factor is to give credence to the fiction created by the Debtors. Notwithstanding the Debtors' conclusory and meritless statements in the Plan to the contrary, the non-Debtor releases and related injunctions that impact the Securities Litigation are not necessary for the GSA by the express terms of the GSA itself. The Debtors cannot establish that without the releases and injunction contained in the Plan, there is no reasonable likelihood of a successful reorganization because the GSA remains enforceable without the releases and related injunction affecting non-parties to the GSA.

70. Neither the Lead Plaintiff nor the Securities Class consent to the non-Debtor releases and injunction and have submitted ballots to that effect. They have either opted out of the release or not opted in, as the case may be. Therefore, there is no consent by the creditors impacted by the release as it pertains to securities claims. Moreover, as set forth herein at ¶¶77-79, *infra*, the opt in/opt out ballots are a sham and no consent should be gleaned from the voting process constructed by the Debtors.

71. The Plan does not provide for payment in full of the claims of Lead Plaintiff and the Securities Class. To the extent Lead Plaintiff and the Securities Class are classified as Class 18 Subordinated Claims, the Debtors have indicated there will likely be no distribution to holders of claims in Class 18. Debtors can provide no evidence that such creditors will be paid in full.

72. Clearly, none of the *Master Mortgage* factors are remotely present here. Where none of the factors are present, the subject releases and injunctions are improper and must not be allowed. *Master Mortgage* held that "a permanent injunction is a rare thing, indeed, and only upon a showing of exceptional circumstances in which [these factors] are present will this Court even entertain the possibility of a permanent injunction." 168 B.R. at 937. Accordingly, under the well-reasoned case law cited above in this District and the Third Circuit, the non-Debtor

releases and injunctions in the Plan are illegal and beyond this Court's jurisdiction to grant and should not be permitted.

73. Indeed, were these non-Debtor releases in favor of the Debtors' officers and directors permitted, they would, in essence, be obtaining a discharge of these obligations and claims to which they would not be entitled had they filed their own bankruptcy petitions. *See* 11 U.S.C. §523(a)(19) (an individual shall not be discharged from a debt arising from the violation of Federal or state securities laws). The claims against the non-debtor officer and director defendants are for violations of Federal securities laws and therefore are not dischargeable under Section 523(a)(19). This provision of the Bankruptcy Code was designed to protect entities like Lead Plaintiff and members of the Securities Class from losing their claims against such individuals. The Court should not, respectfully, allow the individual Non-Debtor Defendants to circumvent the protections afforded creditors under the Bankruptcy Code and obtain indirectly releases or a discharge that they could not obtain even in their own bankruptcy case.

74. It is worthy to note that, counsel for the Debtors has recognized that non-Debtor releases are improper in circumstances even less offensive than the scope of the releases here. In *In re Tronox Inc.*, Case No. 09-10156 (ALG) (S.D.N.Y.), Debtors' counsel herein represents Anadarko Petroleum Corporation and Kerr-McGee Corporation, creditors, who filed an objection (the "Tronox Objection") [Doc. No. 2398, Case No, 09-10156 (S.D.N.Y.)] to the *Tronox* plan of reorganization which sought approval of limited non-Debtor releases. Debtors' Counsel argues (impressively) there against non-Debtor releases recognizing the impropriety of non-debtor releases by stating that "the Plan purports to release claims against non-Debtor third parties *in violation of the Bankruptcy Code and applicable case law*." Tronox Objection, at 2 (emphasis added). Counsel further stated that the released parties are not providing funding, that the enjoined claims are not being channeled to a settlement fund and that there was no consent by the parties affected by the release. *Id.*

75. With respect to the lack of any financial contribution to the reorganization by the released parties, Debtors' Counsel argues in *Tronox* that "[e]ven if the non-Debtor Released

Parties expended significant time and resources negotiating various aspects of the Plan, such efforts are made in every chapter 11 case and the routine efforts are insufficient to warrant a release of claims against them." *Id.*, at 12. Thus, to the extent Debtors argue that the Related Persons made some non-financial contribution to warrant the non-debtor release herein, counsel has already recognized that such contributions are routine in every chapter 11 case and not worthy of the extraordinary releases the Debtors seek to gratuitously bestow. Acknowledging that the non-debtor releases are allowed in only limited circumstances in the Second Circuit, which circumstances involve factors substantially similar to the factors considered in the Third Circuit, as set forth in *Master* Mortgage, *supra*, Counsel stated that "[a]bsent the presence of the foregoing 'unique' circumstances, claims against a non-debtor party may not be released." Counsel must agree, as they argued in *Tronox*, that in the absence of establishing these factors, third party releases should not be allowed.[10]

76. Debtors' Counsel should be hard-pressed to argue in one case that non-debtor releases are appropriate and proper and in another, where the circumstances are even more supportive of such extraordinary relief, argue that they are not.

*The Opt Out or Opt In Option is a Sham.*

77. A creditor who submits a Ballot may elect, by checking or not checking, as the case may be, a box on the Ballot, to grant the releases set forth in Plan §43.6.[11] Where a Holder does not grant the §43.6 release, the Debtors attempt to deny such Holder a distribution. The Plan further provides in §43.6 that even if a Holder opts out of, or does not opt in to, the §43.6 release, the Debtors will still seek to bind the Holder by the Plan releases and provide a distribution under the Plan. The Plan, therefore, attempts to impose consent on unsuspecting creditors. Plan, §43.10 (Deemed Consent) (by receiving a distribution under the Plan and not withholding consent to the releases in §43.6, the Holder of a Claim or Equity Interest "shall be

---

[10] The objections to the releases in *Tronox* were ultimately resolved by agreement and additional provisions and carve-outs in the confirmation order.

[11] A Holder of a Class 18 Subordinated Claim must check the box on the Ballot to "opt in" to grant the non-Debtor releases.

deemed, to the fullest extent permitted by applicable law, to have specifically consented to the [§43.6] releases"). Such deemed consent should not be permitted.

78. To the extent that the Debtors intend to utilize a creditor's failure to opt out of the Plan release in §43.6 or failure to vote to establish that the creditor consents to the release, Lead Plaintiff, on its own behalf, and on behalf of the Securities Class, expressly states that they do not consent to any of the releases under the Plan. Any argument that Lead Plaintiff and the Securities Class consent is a fiction created by the Debtors who are desperate to obtain these improper releases and injunctive relief.

79. Moreover, the opt-out or opt-in options are misleading. The opt out provision only relates to releases of claims against certain parties to the GSA. Even a party who opts out (or does not opt in) to a §43.6 release is still releasing its claims against the Debtors, the Reorganized Debtors and, *inter alia*, their Related Persons. Furthermore, notwithstanding that a party opts out or does not opt in to the releases, the Debtors intend to bind all creditors to the Plan releases in any event Disclosure Statement, at 16; Examiner's Report, at 22-23 (noting this deficiency of the opt out provision). The Plan provides that "the Entities that opt out of the releases provided hereunder [§43.6] shall be bound." Plan, §43.6.

80. To make matters even worse (if they could be), if the Debtors are unsuccessful in obtaining approval of the §43.6 release, then a "non-consenting creditor" will not receive a distribution. This is a death trap that is tantamount to economic duress and blackmail to force a creditor to release its claims in order to get a distribution. A release obtained through such means cannot be deemed consensual and, again, must be stricken.

81. Therefore, similar to the carve-out already provided to the SEC and the Pension Benefit Guaranty Corporation (the "PBGC"), the following language should be included in the Plan and any Order confirming the Plan:

> Nothing in the Plan or in any order confirming the Plan (including the approval of the Global Settlement Agreement) shall or is intended to affect, release, enjoin or impact in any way the prosecution of the claims asserted, or to be asserted, against any non-Debtor, including the Non-Debtor Defendants, in the Securities Litigation.

There is no basis for carving out one creditor from the offensive releases and forcing these releases down the throats of other creditors. Indeed, the Securities Litigation has been pending before the District Court since 2008 (and in some cases before then). Lead Plaintiff, its counsel and the District Court have expended significant time and effort over these years. Lead Plaintiff and counsel have successfully defended against motions to dismiss, conducted extensive discovery and obtained class certification. All have been proceeding diligently to move the Securities Litigation forward. Now, the Debtors seek to destroy all of these efforts through a Plan containing improper and illegal releases of their claims against the Non-Debtor Defendants. That cannot and should not be allowed to happen.

### C. The Plan Should Exclude From the Plan Injunction any Post-Confirmation Date Requests for Discovery from the Reorganized Debtors or Such Transferee of the Debtors' Books and Records.

82. As previously stated, the Plan includes a myriad of injunction provisions which, if allowed, will impact Lead Plaintiff's ability to obtain discovery post-confirmation. Indeed, the Examiner noted that the injunctions under the Plan could even "prevent a claimant from taking discovery from any of the Released Parties in aid of claims against non-released parties." Examiner's Report, at 22. Lead Plaintiff's efforts to obtain discovery should not be impaired by the Plan. To the extent the Plan intends to preclude such discovery efforts, the injunction is again improper and must, at least, be properly limited

83. Also as stated above (¶81, *supra*), Lead Plaintiff and its counsel have expended considerable time and effort in prosecuting the Securities Litigation, which includes serving discovery requests on the Non-Debtor Defendants and others. These efforts should not be wiped out by virtue of the improper injunctions in the Plan.

84. Therefore, the following language should be included in the Plan and any Order confirming the Plan:

> Nothing in the Plan or in any order confirming the Plan (including the approval of the Global Settlement Agreement) shall or is intended to preclude Lead Plaintiff and/or the Securities Class from seeking discovery from the Debtors, the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee or such other transferee of the Debtors' Assets.

**D. The Plan Fails to Provide an Appropriate Mechanism for the Preservation of Documents.**

85. The Plan provides for the establishment of a Liquidating Trust pursuant to a Liquidating Trust Agreement (the "LTA"). Plan, §28.1.

86. While the Plan defines Liquidating Trust Assets as all of the Debtor's Assets, other than some specified Cash (for disbursements with respect to claims and reimbursement of fees and expenses) and the Debtors' equity interests in WMI Investment (Plan, §1.120), and provides for the Debtors to transfer those Assets to the Liquidating Trust to be administered by the Liquidation Trustee (Plan, §28.3), the Plan also provides that title to all Assets "encompassed by the Plan" shall vest in the Reorganized Debtors, the Liquidating Trust, the JPMC Entities or the FDIC Receiver, as the case may be. Plan, §43.1. Therefore, the Plan provides for the Debtors' Assets to be distributed among various entities. Although the Assets are not specifically identified, the Debtors' books, records and other documents would presumably be transferred.

87. Although the Debtors are compelled to maintain and preserve their Assets during the chapter 11 proceeding, the Plan fails to provide for the preservation of the Debtors' books, records and other documents, in any format (*e.g.*, electronic or hard-copy) (collectively, the "Documents") post-confirmation. Therefore, a document preservation protocol must be established to prevent the destruction or abandonment of the Documents post-confirmation, especially because the Documents may include critical information relevant to the Securities Litigation and certain other information relevant to the Class Claim.

88.     To the extent Documents are transferred to the Liquidating Trust or other Entities, the Liquidating Trust, the Liquidating Trustee and the transferee must also be bound by any document preservation protocol mandated by the Bankruptcy Court. The Liquidating Trustee is charged with retaining and preserving the Debtors' Documents that have been delivered to the Liquidating Trust (LTA, §4.10), and the LTA provides that the Liquidating Trustee, in its sole discretion, may destroy the Documents any time six (6) years after the final distribution of the Liquidating Trust Assets has been made. LTA, §3.3. Until that time, there is no provision for the parties to access the Documents. No other criteria for the maintenance, preservation and potential destruction of the Documents is provided.

89.     Indeed, whether the Documents are retained by the Reorganized Debtors or transferred to the Liquidating Trust or to some other estate representative or third party, the Documents must be preserved or maintained so as to be available to parties in interest, especially if the Documents are not available elsewhere. To do otherwise prejudices the rights of Lead Plaintiff, members of the Securities Class and other parties in interest. At the very least, some mechanism for providing notice and an opportunity to be heard by a court of competent jurisdiction must be established before any such Documents are abandoned, destroyed or rendered otherwise unavailable.

90.     It is imperative that the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee or third party transferees retain and preserve the Documents that may be potentially relevant to the Securities Litigation and the Claims arising therefrom and that Lead Plaintiff be given reasonable notice of any proposed destruction or abandonment of the Documents and an opportunity to be heard.

91.     The Debtors, the Liquidating Trust, Liquidating Trustee, or such other potential transferee of the Documents, as the case may be, must advise parties in interest through the Plan of their intention with respect to the Documents. Therefore, the Plan and/or any order confirming the Plan should include the following language:

From and after the Effective Date, the Debtors, the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee, and any transferee of the Debtors' Documents (defined *infra*), as the case may be, shall preserve and maintain all of the Debtors' documents, files, books, records, electronic data (including, but not limited to, emails and email server back-up tapes) (collectively, the "Documents"), whether retained by the Debtors, the Reorganized Debtors or any successor to the Debtors, or transferred to the Liquidating Trust, the Liquidating Trustee pursuant to the Liquidating Trust Agreement, or such other transferee pursuant to the Plan or the Global Settlement Agreement and the Debtors, any successors to the Debtors, the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee and/or such other transferee shall not destroy or otherwise abandon any such Documents during the term of the Liquidating Trust Agreement, and thereafter only by further order of this Court, or such other court of competent jurisdiction after a hearing upon notice to parties in interest, including Lead Plaintiff, with an opportunity to be heard.

### E. The Extension of Stays and Injunctions under the Plan is Inappropriate and Prejudicial.

92. Pursuant to the Plan, stays and injunctions provided for in the Chapter 11 cases by Bankruptcy Court orders pursuant to §105 or by §362 of the Bankruptcy Code and extant on the Confirmation Date remain in effect until the entry of an Order closing the cases or such other Final Order of the Bankruptcy Court. Plan, §43.13.

93. The date for the entry of such Order or Final Order concluding the Chapter 11 cases is not fixed, nor is there an outside date suggested.[12]

94. Under the Plan, the Liquidating Trustee appears to have the right to pursue causes of action (presumably those transferred by the Debtors). Plan, Art. §28.6(iii). To the extent these causes of action include the estates' causes of actions against Non-Debtor Defendants in the Securities Litigation (most of whom the Debtors seek to protect from Lead Plaintiff while now potentially pursuing their own claims after the most recent amendment to the Plan (*see* ¶¶56-58, *supra*)), they may have some of the same factual predicates as the claims of Lead

---

[12] The Liquidating Trustee is authorized to seek entry of the Final Order. The initial term of the Liquidating Trust is three (3) years, subject to successive three (3) year extensions upon application to the Bankruptcy Court by the Liquidating Trustee. Plan, §28.14(d); *see also* LTA, §3.2.

Plaintiff arising from the allegations in the Securities Litigation.

95. Because of the Plan's almost limitless extension of stays and injunctions, the Liquidating Trustee can prevent or, at the very least, significantly delay Lead Plaintiff from ever obtaining access to relevant discovery, while pursuing competing claims asserted by the Liquidating Trustee. There is no basis for the Liquidating Trust to be able to assert the automatic stay (as a sword, not a shield) beyond the Effective Date of the Plan to frustrate Lead Plaintiff's ability to obtain relevant documents in the Securities Litigation, while having those documents available to pursue its own claims. This is precisely the type of offensive use of the automatic stay that courts refuse to tolerate. *Hydramar Inc. v. General Dynamics Corp.*, 1986 U.S. Dist. LEXIS 24828, *13 (E.D. Pa. 1986), citing *Bohack corp. v. Borden, Inc.*, 599 F.2d 1160 (2d Cir. 1979) (finding that a debtor using the bankruptcy process and the automatic stay to its advantage may not serve the purpose of the Bankruptcy Code; the automatic stay "has no application where the debtor is in the position of assailant rather than victim"). Indeed, "[o]ur system of laws universally frowns on a party that would use the stay as both a sword and a shield." *In re A.H. Robbins & Co.*, 828 F.2d 1023, 1026 (4th Cir. 1987); *In re Johns-Manville*, 31 B.R. 965, 974 (S.D.N.Y. 1983) (accepting the view that the bankruptcy protective shield should not be unfairly converted into a sword of aggression); *see also Maritime Electric Co. v. Untied Jersey Bank*, 959 F.2d 1194, 1205 (3d Cir. 1991).

96. The Plan provides no justification for any extension of the automatic stay (or other stays or injunctions) beyond the Plan Effective Date or the entry of the Order confirming the Plan. The automatic stay should not be available to the Liquidating Trust or the Reorganized Debtors for an extended period of time to frustrate the prosecution of the claims of Lead Plaintiff against common defendants to gain a fundamentally unfair litigation advantage. Lead Plaintiff should not be bound by this Plan provision, nor should Lead Plaintiff be subject to any stay or injunction contemplated by this Plan provision that would interfere with its discovery rights in the Securities Litigation after the Effective Date of the Plan.

**F. The Plan Should Preserve the Rights of Lead Plaintiff and the Securities Class to Proceed with Their Claims Against the Debtors to the Extent of Available Insurance Coverage, Irrespective of any Injunctions or Distribution under the Plan.**

97. Upon information and belief, the Debtors maintain liability insurance policies (the "D&O Policies") in favor of their directors and officers for claims asserted in the Securities Litigation, as well as for claims against the Debtors directly for violations of federal securities laws. While the Disclosure Statement provided a brief description of the Debtors' D&O Policies, including the amount of the total coverage available under these D&O Policies, D.S., Art. IV, D.21, it failed to describe those parties who may have a right to access the proceeds thereof. Lead Plaintiff maintains that the Securities Class is entitled to look to the proceeds of such insurance for payment in connection with the claims of Lead Plaintiff and the Securities Class and may, at the very least, pursue these Claims against the Debtors to the extent of such available insurance post-Confirmation. Because Lead Plaintiff may not have a direct action against the D&O insurance carriers under the D&O Policies, the proceeds of the D&O Policies may only be accessed through the pursuit of the claims asserted in the Securities Litigation. Accordingly, the Plan should not impact the rights of Lead Plaintiff or the Securities Class to pursue their claims against the Debtors to the extent of the proceeds of the D&O Policies.

98. Although couched as a "reorganization," the reality is that WMI is liquidating and the fiction of a reorganization involving one remote subsidiary should not offer WMI a discharge it would not otherwise be entitled to as a liquidating debtor. *See* 11 U.S.C. §1141(d)(3)(A) (confirmation of a liquidating plan does not discharge a debtor).

99. The Plan, and any Order confirming the Plan, should therefore provide that:

> Nothing in the Plan, in any Order confirming the Plan or in the Global Settlement Agreement, shall preclude Lead Plaintiff and the Securities Class from pursuing their claims in the Securities Litigation against the Debtors to the extent of available insurance coverage and proceeds. The Claims of Lead Plaintiff and the Securities Class against the Debtors, to the extent of available insurance, are preserved and not discharged or released by the Plan.

**G.  The Plan Unfairly Discriminates Against Members of the Securities Class Who Have Claims Against Non-Debtors by (i) Conditioning a Distribution Under the Plan on Class Members Releasing Non-Debtors from the Securities Claims and (ii) by Excluding Certain Creditors From the Non-Debtor Release Provisions, but Not Others.**

100. As previously stated, the Plan provides that in order to receive a distribution under the Plan, the Holder of a Released Claim or Terminated Equity Interest is deemed to release, waive, acquit and discharge each and all Released Parties. Plan, §43.6

101. To the extent that a Holder has no claims against other Released Parties, such as non-Debtor third parties, then the Holder is not relinquishing anything, other than the claim against the Debtor for which it will receive a distribution under the plan. However, where a Holder has claims against other parties, such as the Securities Claims against the Non-Debtor Defendants who are among the Released Parties as defined in the Plan, before that Holder may receive even a questionable distribution under the Plan (the same distribution as received by the Entities described in ¶100, *supra*), this Holder must release those valuable third-party claims.

102. Clearly, the Holders of Claims, to the extent they have claims against non-Debtor third-parties which must be released before receiving a distribution, are being discriminated against by virtue of having to give up something for a distribution (the third-party claim) where others have nothing to give up. To the extent such creditors are in the same Plan class as those creditors without a third-party claim, they must be treated the same. 11 U.S.C. §1123(a)(4) (unless a holder agrees otherwise, holders of claims in the class must receive the same treatment). The Plan seeks to compel the Securities Plaintiffs to forego any recovery in the Securities Litigation in order to participate in a potential distribution. That is discriminatory treatment under the Plan.

103. The Plan, therefore, discriminates against those Class 18 Holders (and Holders in such other Classes in which the Securities Claimants may ultimately be placed) who are Securities Claimants because it compels them to give up their claims in the Securities Litigation while non-Securities Claimants do not.

104. The Plan also unfairly discriminates by affording carve-outs from the releases to the SEC and the PBGC while affording no such carve-out for similarly situated creditors. *See* ¶81, *supra*.

## CONCLUSION

105. Based on the foregoing, Lead Plaintiff respectfully requests that an order be entered (i) denying confirmation of the Plan; and (ii) granting such other and further relief as the Court deems just and proper.

Dated: November 19, 2010

**CROSS & SIMON LLC**

By: /s/ David G. Holmes
Christopher P. Simon (Bar No. 3697)
David G. Holmes (Bar No. 4718)
913 North Market St., 11th Floor
Wilmington, Delaware 19899-1380
(302) 777-4200
(302) 777-4224 Facsimile
csimon@crosslaw.com
dholmes@crosslaw.com

**LOWENSTEIN SANDLER PC**
Michael S. Etkin, Esq. (ME 0570)
John K. Sherwood, Esq. (JS 2453)
Ira M. Levee, Esq. (IL 9958)
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500 (Telephone)
973.597.2400 (Facsimile)
*Bankruptcy Counsel to Lead Plaintiff and the Securities Class*