contentious issues," that "the consideration to be paid to the Estates in connection with the Settlement in the form of assets or releases to the Debtors is reasonable," and that "the Estates are receiving good value for their released claims"). In the Examiner's Report, the Examiner stated that "[t]he [Global Settlement Agreement] provides significant funds for the creditors and for various note holders," and that "*further litigation concerning any disputed asset is highly unlikely materially to benefit classes that are 'out of the money.'*" Id. at 1 (emphasis added). The Examiner found that "the Debtors will have to litigate to recover anything above the approximate $900 million that will remain if there is no [Global Settlement Agreement]" and that "there are substantial risks to such litigation." Id. at 2-3. The Examiner concluded that "[n]ot approving the [Global Settlement Agreement] will essentially result in gambling with currently guaranteed recoveries to unsecured creditors in order to attempt to obtain speculative recoveries for Shareholders and other 'out of the money' claimants." Id. at 3 (emphasis added).

B.      **Negotiations Leading to the Global Settlement Agreement**

As set forth more fully in the Kosturos Declaration and the Goulding Declaration, the Global Settlement Agreement is the product of over two years of analysis, investigation, litigation, and negotiation among multiple parties. See Kosturos Decl. at ¶ 32 ; Goulding Decl. at ¶¶ 16-17. Specifically, disputes between the Debtors, JPMC and the FDIC Entities over ownership of, or entitlement to, various assets, and responsibility for various liabilities and obligations, arose immediately upon the filing of these Chapter 11 Cases. Kosturos Decl. at ¶ 32; Goulding Decl. at ¶ 16. For example, within hours of the filing of WMI's chapter 11 petition, JPMC claimed rights of ownership to the Debtors' funds, in excess of $4 billion, that are on deposit in the

Disputed Accounts held by JPMC (the "Deposits"). Kosturos Decl. at ¶ 32. Within days

thereof, JPMC and the FDIC Receiver asserted setoff rights with respect to the Deposits,

and JPMC refused to turn over the Deposits to the Debtors. Id. Additional disputes

became apparent, and, in the months that followed the Petition Date, the Debtors, the

FDIC Entities, JPMC and the Creditors' Committee held multiple meetings to discuss

their relative positions with respect to, among other things, the Deposits, the Trust

Preferred Securities, the Tax Refunds, the WMI Vendor Contracts, the Goodwill

Litigation, the Intellectual Property, the Tower Insurance Programs, the BOLI/COLI

Policies, the Rabbi Trusts, the WaMu Pension Plan, and other employee benefit issues.[6]

Id. In an effort to resolve matters and avoid unnecessary litigation, the parties established

working groups to conduct due diligence and legal analysis with respect to issues

associated with specific assets and liabilities. Id. From early on in the Chapter 11 Cases,

the parties attempted to consensually resolve their disputes and focused on a global

resolution of all issues. Id.

During the Spring of 2009, the parties commenced and pursued their

respective claims and defenses, first with WMI's defense of claims against the

Receivership in the WMI Action, JPMC's response and demand for recoveries in the

JPMC Action, and WMI's demand for the Deposits in the Turnover Action. Id. at ¶ 33.

The Debtors also pursued the Business Tort Investigation. Id. By the Summer of 2009,

the momentum regarding a global settlement had slowed and the focus on litigation

alternatives increased. Id. The parties served discovery requests in connection with the

JPMC Action and the Turnover Action (together, the "Adversary Proceedings") and, after

protracted, multi-party negotiations, successfully negotiated a confidentiality stipulation

---

[6]   Each as defined below.

and substantially negotiated a scheduling order to govern the production of documents in the Adversary Proceedings. Id. at ¶ 34.  In addition, in connection with discovery and data presentation efforts, the Debtors and their advisors undertook a collection and review of the documents in their possession (or provided to the Debtors under information access arrangements with JPMC). Id. In connection with the Business Tort Investigation, the Debtors received and reviewed approximately 40,000 pages of documents that JPMC produced. Id. at ¶ 34.  Although the Bankruptcy Court denied such application, the Debtors were able to obtain and review thousands of pages of additional documents from several third parties, including the Office of Thrift Supervision (the "OTS"), Moody's Investor Service ("Moody's"), Texas Pacific Group ("TPG"), The Blackstone Group, the OB-C Group ("OB-C"), and Citigroup, Inc. ("Citigroup"). Id. The thorough nature of the Debtors' investigation into these potential claims and causes of action was later confirmed by the Examiner.  In fact, after review of documents produced by JPMC, and numerous attorney work-product documents provided by the Debtors and Creditors' Committee, the Examiner concluded that (i) "the Debtors undertook a thorough investigation of the potential claims against JPMC," (ii) the Debtors' legal research with respect to such claims was "both expansive and thorough," (iii) "the Debtors carefully reviewed the discovery materials they received," and (iv) "the Debtors considered a wide variety of legal claims against JPMC." Examiner's Rep. at 12-13.

On November 6, 2009, the Worker, Homeownership, and Business Assistance Act (the "WHBA Act"), which  permits corporate taxpayers, subject to certain limitations, a one-time election to extend the NOL carryback period from two years to up

to five years (with application in the fifth year limited to half of that year's taxable income), was enacted. Kosturos Decl. at ¶ 35. As a result of the additional value to be realized as a result of this new law, the parties reinvigorated negotiations, and engaged in multiple, frequent discussions including with other constituencies, regarding adjustments to their respective positions and settlement proposals. Id. As a result, as settlement negotiations continued, the FDIC Receiver repeatedly agreed to adjourn the hearing on the FDIC Stay Relief Motion (in which it asserted a right to claw back the Deposits pursuant to Section 9.5 of the Purchase and Assumption Agreement ("P&A Agreement") and to offset these funds against the FDIC Receiver's claims against the Debtors), and the Debtors requested that the Bankruptcy Court defer ruling on the Debtors' then fully-submitted and argued motion for summary judgment in the Turnover Action. Id.

On March 12, 2010, the Debtors, JPMC and the FDIC Entities and the Settlement Note Holders reached an understanding regarding global resolution of all outstanding issues, and the Debtors read the salient terms of the parties' settlement into the record at a hearing before this Court (the "March 12 Settlement"), including, but not limited to, (i) with respect to the portion of net Tax Refunds that are received and would have been receivable absent the extension, pursuant to the WHBA Act, of the federal net operating loss carryback period (the "First Portion"), an allocation of 70% to JPMC and 30% to WMI; (ii) with respect to any additional net Tax Refunds attributable to the WHBA Act (the "Homeownership Carryback Portion"), an allocation of 59.6% to the Receivership and 40.4% to WMI; (iii) a transfer of shares in Visa Inc. to JPMC for $50 million; (iv) a release by JPMC of FDIC Corporate from its indemnification obligations under the P&A Agreement; (v) the grant by the FDIC Receiver, in favor of JPMC, of a

first priority claim against the Receivership in the amount of $1.4 billion; (vi) an agreement by JPMC to pay the Deposits to WMI, and an agreement by JPMC and the FDIC Entities to waive any and all claims, rights, and liabilities, with respect thereto; and (vii) an agreement by the Debtors and the FDIC Entities that JPMC will be deemed the sole legal, equitable, and beneficial owner of the Trust Preferred Securities. Id. at ¶ 36.; see March 12, 2010 Hr. Tr. at 19:2-20:7; 22:4-8; 24:1-12.

Subsequently, after extensive debate and negotiation, the FDIC Entities retreated from the announced settlement. Kosturos Decl. at ¶ 37. It seemed that, although the parties were near an agreement, elements remained outstanding, including, among other things, issues related to the FDIC Entities' obligations to indemnify JPMC under the P&A Agreement. Id. On March 26, 2010, the Debtors filed the first version of the Plan [Docket No. 2622]. Id. As originally filed, the Plan incorporated the initial version of the Global Settlement Agreement, which included the terms of the March 12 Settlement and terms that had been agreed to by WMI, JPMC and certain significant creditor groups (the "March 26 Agreement"). Id. At such time, the FDIC Entities had not yet agreed to all terms thereof, and refused to execute the March 26 Agreement. Id.

After the March 26 Agreement was filed, the parties continued negotiations and ultimately, on May 21, 2010, entered into a modified version of the March 26 Agreement (the "May 21 Agreement"). Id. at ¶ 38. This modified agreement was executed by all parties thereto, including the FDIC Entities, and amended the March 26 Agreement as follows: (i) with respect to the First Portion, estimated to be approximately $2.7 to 3.0 billion, an increase in the allocation to JPMC, from 70% to 80%, and a decrease in the allocation to WMI, from 30% to 20%; (ii) with respect to the

Homeownership Carryback Portion, estimated to be approximately $2.8 billion, a decrease in the allocation to the Receivership, from 59.6% to 34.822%, and a corresponding increase in the allocation to WMI, from 40.4% to 65.178%; (iii) a reduction of the purchase price for the Visa Shares from $50 million to $25 million, and (iv) JPMC and the FDIC Entities agreed to return to the indemnification provisions set forth in the P&A Agreement. Id. Also on May 21, 2010, the Debtors filed an amended version of the Plan [Docket No. 4241] that incorporated the May 21 Agreement. Id. Such Plan provided for distribution to those holders of WMB Senior Notes and WMB Subordinated Notes that timely filed proofs of claim in the Chapter 11 Cases and that were not found, pursuant to Final Order, to be subordinated pursuant to section 510(b) of the Bankruptcy Code, if and only if the class of such holders voted to accept the Plan, of certain liquidating trust interests representing, in the aggregate, the right to receive 5.357% of the Homeownership Carryback Portion, subject to a cap of $150 million. Id.

Subsequently, the parties thereto agreed to modify the initial agreement to extend the termination date thereof, and to address changed circumstances, including, without limitation, (i) the appointment of the Examiner and the passage of time associated with delivery of the Examiner's final report and (ii) a subsequent agreement in connection with treatment of holders of WMB Senior Notes. Id. at ¶ 39. On October 6, 2010, the parties executed the Amended and Restated Global Settlement Agreement. Id. As amended and restated, the Global Settlement Agreement provides, among other things, that the Global Settlement Agreement will terminate if the Bankruptcy Court does not enter an order confirming the Plan and the Effective Date of the Plan does not occur on or prior to December 31, 2010; provided, however, that, upon the joint instruction of

and notice provided by WMI and JPMC, such date will be extended up to and including

January 31, 2011. Id. In addition, as amended and restated, the allocation of the

Homeownership Carryback Portion was further adjusted so that the Global Settlement

Agreement now allocates 30.357% of such portion to the Receivership and 69.643% to

WMI. Id.

       In addition, pursuant to the Plan and the Plan Support Agreement executed

by certain holders of WMB Senior Notes Claims, each holder of an Allowed WMB

Senior Notes Claim and each Accepting Non-Filing WMB Senior Note Holder will

receive its Pro Rata Share of BB Liquidating Trust Interests, which interests, in the

aggregate, represent an undivided interest in WMI's share of the Homeownership

Carryback Portion, in an amount equal to $335 million. Id. at ¶ 40. Pursuant to the Plan

Support Agreement, the Settlement WMB Senior Note Holders agreed, in exchange for

the treatment and distributions to be provided pursuant to the Plan to holders of Allowed

WMB Senior Notes Claims and to Accepting Non-Filing Senior Note Holders, to limit

their ability to sell or otherwise transfer their note holdings and related claims, to support

confirmation of the Plan, and to provide certain releases, as set forth more fully in the

Plan Support Agreement. Id.

       As a result of the cumulative modifications to the settlement since the

March 12 Settlement was first announced, through the enhanced recovery to the Debtors

associated with the Homeownership Carryback Portion of the Tax Refunds, the changes

to the deal terms between the March 26 Agreement and the Global Settlement Agreement

represent significant incremental value to the Debtors. Id. at ¶ 41. In addition, the Global

Settlement Agreement will result in the assumption of certain liabilities by JPMC and the

consequent release of claims against the Debtors, which claims have been asserted by such holders in the amount of billions of dollars.  Id.

## C.    Summary of Settlement Terms

After two years of negotiations, in conjunction with analysis, briefing and discovery with respect to their various claims and defenses, the Debtors concluded that, based upon the expense, delay, uncertainty, risk, and concomitant disruption to the Debtors' ability to make distributions to creditors associated with litigating or pursuing the Actions,[7] it is in the best interests of the Debtors' stakeholders to resolve such disputes and related matters on the terms set forth in the Global Settlement Agreement. Id. at ¶ 43.

As mentioned above, the Global Settlement Agreement provides for the resolution of disputed ownership claims to certain significant assets (including, among other assets, the Deposits and the Trust Preferred Securities), an allocation of the Tax Refunds, the dismissal of the Actions, and the withdrawal and release of the parties' numerous claims and causes of action, all as set forth more fully in the Global Settlement Agreement.  In addition, the Global Settlement Agreement resolves multiple additional disputes regarding the ownership of various assets and responsibility for various liabilities.  The salient terms of the Global Settlement Agreement are summarized below[8]:

---

[7]        As defined in the Plan and the Global Settlement Agreement, the term "Actions" includes the following: (i) the Debtors' Claims, (ii) the WMI Action, (iii) the JPMC Action, (iv) the Turnover Action, (v) certain requests the Debtors submitted for records from the FDIC Receiver and FDIC Corporate, (vi) the Rule 2004 Inquiry, (vii) the Bankruptcy Stay Motions, together with any and all appeals therefrom, (viii) the Rule 2019 Appeal, and (ix) any proceeding arising from the motions, dated June 23, 2009, to withdraw the reference for the WMI Action and JPMC Action, respectively.
[8]        The following is merely a summary of certain of the principal provisions of the Global Settlement Agreement. The terms of the Global Settlement Agreement will in all events control to the extent of any inconsistency between the Global Settlement Agreement and the summary set forth herein.  In addition, the

- *Return of Deposits and Release of Claims Related Thereto*. Pursuant to Section 2.1 of the Global Settlement Agreement, on the effective date thereof, JPMC and the FDIC Entities will waive any and all claims to the Deposits, including, without limitation, any security interest and all rights of setoff. On the effective date of the Global Settlement Agreement, JPMC will remit the vast majority of the Deposits to WMI (in the amount of approximately $3.8 billion plus interest calculated at the rate set forth in the Global Settlement Agreement).

- *Compromise With Respect To Tax Refunds*. The Tax Refunds, in an estimated aggregate amount of $5.5 to $5.8 billion, will be collected and distributed pursuant to the terms and procedures set forth in Section 2.4 of the Global Settlement Agreement. The allocations can be summarized in general terms as follows:

  - *The First Portion.* 20% of the First Portion of the Tax Refunds will be allocated to the Debtors and the remaining 80% of such refunds to JPMC. The Debtors currently estimate that the First Portion will be approximately $2.7 to $3.0 billion total, approximately $540 to $600 million of which will be allocated to the Debtors' estates.[9]

  - *The Homeownership Carryback Portion.* 69.643% of the Homeownership Carryback Portion of the Tax Refunds will be allocated to WMI and 30.357% of such refunds will be allocated to the FDIC Receiver. In addition, pursuant to the Plan and the Plan Support Agreement, each holder of an Allowed WMB Senior Notes Claim and each Accepting Non-Filing WMB Senior Note Holder will receive its Pro Rata Share of BB Liquidating Trust Interests, which interests, in the aggregate, represent an undivided interest in WMI's share of the Homeownership Carryback Portion, in an amount equal to $335 million. The Debtors currently estimate that the Homeownership Carryback Portion will be approximately $2.8 billion, approximately $1.95 billion of which will be allocated to the Debtors' estates, inclusive of the $335 million payable to holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders.

- *Transfer of Trust Preferred Securities to JPMC*. Section 2.3 of the Global Settlement Agreement provides that, on and as of the effective date thereof, the WMI Entities will be deemed to have transferred, as of the Petition Date, any and all rights they may have or may ever have had in the Trust Preferred Securities to JPMC (free and clear of liens) and JPMC will be deemed the sole legal, equitable and beneficial owner thereof. In consideration for releases by holders of REIT Series of any and all claims related to the Trust Preferred Securities, JPMC shall

---

Debtors discuss herein only those aspects of the Global Settlement Agreement that are most relevant to the discussion set forth in this Brief and refer the Bankruptcy Court and all parties in interest to the Global Settlement Agreement itself for a comprehensive review of its provisions.

[9]      On October 7, 2010, the U.S. Department of Treasury paid approximately $4.77 billion of the Tax Refunds into the Refund Escrow Account (as defined in the Global Settlement Agreement). (Monthly Operating Report, dated Oct. 29, 2010 [Docket No. 5717].)

pay, or transfer to the Disbursing Agent for payment to, each Releasing REIT Trust Holder its pro rata share of Fifty Million Dollars ($50,000,000.00).

- *Releases*. Pursuant to Article III of the Global Settlement Agreement, on and as of the effective date thereof, the Debtors and specified related entities (collectively, the "WMI Entities"), JPMC and the FDIC Entities, among others, have agreed to release each other, from, *inter alia*, any and all claims that arise in, relate to or have been or could have been asserted in, among other things, the Actions, the proofs of claim filed by JPMC and the FDIC Receiver in the Chapter 11 Cases, or that are based upon, related to or arise from or in connection with the various assets and liabilities set forth in the Global Settlement Agreement. The broad releases of claims against the Debtors include, among other things, a release of all claims and asserted setoff rights related to the Deposits and a release by the FDIC Receiver of its avoidance claims related to dividends issued prepetition by WMB to WMI. The broad releases of claims against JPMC and the FDIC Entities include, among others, a release by the Debtors of the Business Tort Claims, the Constructive Fraudulent Transfer Claims, the Trust Preferred Securities Claims, additional Preference Claims, the DC Claims, and the IP Claims, each as defined below.

- Withdrawal and Dismissal of Claims and Actions.

  - *Withdrawal of All Claims*. Pursuant to Section 2.5 of the Global Settlement Agreement, except as expressly provided therein or in the Plan, from and after the effective date of the Global Settlement Agreement, (i) JPMC and the FDIC Entities will cause the withdrawal, with prejudice, of all proofs of claim filed by JPMC and the FDIC Entities in the Chapter 11 Cases, and (ii) the Debtors and JPMC will cause the withdrawal, with prejudice, of the Debtors' Claims. Pursuant to the Plan, JPMC shall be deemed to hold an Allowed General Unsecured Claim — the "JPMC Allowed Unsecured Claim" — against the Debtors but, as partial consideration for the releases set forth in Article XLIII of the Plan, JPMC shall be deemed to have waived its right to receive any distribution on account of such claim.

  - *Dismissal of All Actions*. Pursuant to Section 2.6 of the Global Settlement Agreement, as soon as practicable after the effective date thereof, the Debtors, the FDIC Entities and JPMC will take all appropriate actions to dismiss, with prejudice, the Actions. Additionally, pursuant to Section 2.7 of the Global Settlement Agreement, the FDIC Entities and the Debtors will use their best efforts to dismiss all claims that were asserted in the Texas Litigation.

- Resolution of Disputes Regarding Ownership of Various Assets and Responsibility for Various Liabilities.

  - *WMI Medical Plan*. Pursuant to Section 2.8 of the Global Settlement Agreement, on and as of the effective date thereof, JPMC will be deemed to have assumed sponsorship of the WMI Medical Plan as of the Receivership

Date and to be the owner of its assets.  JPMC will satisfy all obligations to pay or provide benefits accrued under the WMI Medical Plan from and after the Receivership Date.  JPMC also will pay certain allowed, non-penalty prepetition claims related to the WMI Medical Plan.

° *Rabbi Trusts*.  Section 2.9(a) of the Global Settlement Agreement provides that JPMC will be deemed the owner of the Dime Trusts, the PFFSB Trusts, the Great Western Trusts, the Coast Federal Trusts, the American Bank Trust, and the Providian Trust (each as defined in the Goulding Declaration), and will be responsible for related liabilities.  Section 2.9(b) of the Global Settlement Agreement provides that WMI will be deemed the owner of the Ahmanson Trusts (as defined in the Goulding Declaration) and responsible for related liabilities.

° *BOLI/COLI Policies*.  Section 2.9(a) of the Global Settlement Agreement provides, among other things, that JPMC will be deemed the owner of the 995 Split Dollar Policies (as defined below), and certain other policies, and JPMC will assume liabilities related to such BOLI/COLI Policies (as defined below).  Pursuant to Section 2.9(b) of the Global Settlement Agreement, WMI will be deemed the owner of the Pacific Life Policies (as defined below), and certain other policies.

° *Qualified Plans*.  Pursuant to Section 2.10 of the Global Settlement Agreement, on and as of the effective date thereof, JPMC will assume sponsorship of the Qualified Plans (as defined below).  As sponsor, JPMC will (i) be responsible for responding to pending or future audit requests and any remediation requirements issued by the IRS, the Department of Labor (the "DOL") or the Pension Benefit Guaranty Corporation (the "PBGC"), (ii) waive all claims against WMI relating to the Qualified Plans, including, without limitation, intercompany claims and prepaid pension relating to the funding of the Qualified Plans (the FDIC Receiver will similarly waive and release such claims), (iii) be responsible for correcting all outstanding operational and form defects, and (iv) indemnify and hold WMI, the PIC, and the PAC harmless from any and all claims for any liability that WMI, the PIC, and/or the PAC may incur as a result of any and all actions or inactions with respect to the Qualified Plans post-receivership, to the extent JPMC participated in or approved the actions or inactions giving rise to the liability and provided that such actions or inactions do not constitute a breach of any duty of loyalty, or gross negligence or willful misconduct.[10]

° *Tower Insurance*.

   ▪ *WMI Entitled to Priority Recovery to Portion of 2007-2008 Blended Tower*.  Pursuant to Section 2.11(a) of the Global Settlement Agreement,

---

[10]     The settlement amount in the Buus Action (as defined below) will be paid from the assets of the WaMu Pension Plan.

WMI and WMI's present and former officers, directors and employees
will be entitled to a priority recovery (as against JPMC and the
Receivership) with respect to the first $60 million of coverage under the
2007-2008 Blended Tower (as defined below), to be used in connection
with the defense and settlement of the Buus Action and the ERISA
Litigation (as defined below).

- *Balance of Tower Insurance Programs Unaffected.* Pursuant to Section
  2.11(a) of the Global Settlement Agreement, the rights of insureds with
  respect to the balance of the Tower Insurance Programs (as defined below)
  (*i.e.*, coverage under the D&O Policies (as defined below) and the 2008-
  2009 Blended Tower (as defined below) as well as coverage under the
  2007-2008 Blended Tower in excess of $60 million) are not altered by the
  Global Settlement Agreement, and WMI and the FDIC Receiver will have
  such rights to pursue recoveries as are provided under the applicable
  policies, bonds and applicable law.

- *WMB Losses Are Receivership Property.* Pursuant to Section 2.11(b) of
  the Global Settlement Agreement, any insurance or bond claim asserted
  against the Tower Insurance Programs that arises from harm or loss to
  WMB which arose or was discovered on or prior to the Receivership Date
  shall be deemed to be property of the Receivership.

- *JPMC Is Entitled to Recovery Under the Blended Towers, Solely With
  Respect to Assumed Litigation Liabilities.* Solely to the extent that JPMC
  assumes litigation liabilities pursuant to the Global Settlement Agreement
  and is required to make payments as a result thereof, JPMC's claims to
  proceeds under the Tower Insurance Programs will be treated pari passu
  with the claims of WMI, WMI's present and former officers, directors and
  employees, and the Receivership; provided, however, that JPMC will have
  no right to seek recovery under the Tower Insurance Programs with
  respect to claims arising from or relating to the Buus Action.

○ *Equity Interest in H.S. Loan Corporation.* Pursuant to Section 2.12 of the
  Global Settlement Agreement, on and as of the effective date thereof, JPMC
  will be deemed to have transferred its interest in H.S. Loan Corporation
  (approximately 1.33%) to WMI.

○ *American Savings Litigation Proceeds.* Pursuant to Section 2.13(a) of the
  Global Settlement Agreement, JPMC and the FDIC Receiver will waive any
  and all rights to the American Savings Litigation Proceeds (as defined below).

○ *Anchor Savings Litigation Proceeds.* Pursuant to Section 2.13(b) of the
  Global Settlement Agreement, the WMI Entities and the FDIC Receiver will
  waive any and all rights to the Anchor Savings Litigation Proceeds (as defined
  below) to the extent they existed.

    °   *Vendor Contracts*.  Pursuant to Section 2.14(a) of the Global Settlement Agreement, on the effective date thereof, JPMC will (i) waive any and all claims JPMC has against WMI in connection with JPMC's payment of prepetition vendor claims against WMI, (ii) pay or otherwise satisfy WMB Vendor Claims, and (iii) pay to WMI $50 million, which funds will be (a) placed into the Vendor Escrow, (b) used by WMI to satisfy the WMI Vendor Claims, and (c) distributed equally to WMI and JPMC to the extent that any funds remain in the Vendor Escrow after all WMI Vendor Claims and costs of administration of the Vendor Escrow have been satisfied in full.  Pursuant to Section 2.14(b) of the Global Settlement Agreement, certain vendor contracts, set forth on Exhibit "U" to the Global Settlement Agreement (the "Settlement WMI Vendor Contracts"), and all of the assets acquired thereunder, will be deemed to have been the assets of WMB and sold to JPMC pursuant to the Purchase and Assumption Agreement.  In addition, WMI will take appropriate action to assume such contracts and to assign them and any corresponding assets to JPMC.

    °   *Visa Shares*.  Pursuant to Section 2.15(a) of the Global Settlement Agreement, on and effective as of the effective date thereof, WMI will be deemed to have transferred to JPMC any and all of WMI's right, title and interest in and to the Visa Shares.  In exchange, JPMC will (i) pay WMI $25 million and (ii) assume all liabilities and obligations of the WMI Entities related to (a) the MDL Interchange Action (as defined below)[11] and the Attridge Litigation (as defined below), and (b) the Loss Sharing Agreement (as defined below) and the Interchange Judgment Sharing Agreement (as defined below).  WMI will retain the right to all dividends received by WMI with respect to the Visa Shares prior to the effective date of the Global Settlement Agreement.

    °   *Visa Strategic Agreement*.  Pursuant to Section 2.15(b) of the Global Settlement Agreement, on the effective date thereof, the WMI Entities will be deemed to have transferred to JPMC all of the WMI Entities' right, title and interest in the Visa Strategic Agreement (as defined below).  JPMC will defend the Debtors with respect to the Debtors' objection to the Visa U.S.A. Claim (as defined below) and will also pay or otherwise satisfy the VISA U.S.A. Claim to the extent such claim becomes an Allowed Claim.

    °   *Intercompany Obligations*.  Pursuant to Section 2.16 of the Global Settlement Agreement, on the effective date thereof, JPMC will pay all obligations of WMB, WMB's subsidiaries or JPMC under the Revolving Notes (as defined below), together with any and all interest accrued thereon from and after the

---

[11]    In addition, at the time of execution of the Global Settlement Agreement, plaintiffs in the MDL Interchange Action asserted a proof of claim against WMI in the amount of $5 billion "before trebling" and that claim was still pending and had not yet been withdrawn with prejudice.  Pursuant to the Global Settlement Agreement, JPMC had agreed to assume this contingent, unliquidated liability.  Subsequently, the claimants withdrew such claim.

Receivership Date, and will forgive all Intercompany Obligations (as defined below) of the WMI Entities.

○    *Intellectual Property*.  Pursuant to Section 2.17 of the Global Settlement Agreement, the WMI Entities will transfer to JPMC all Transferred Intellectual Property (as defined in the Global Settlement Agreement).  The Parties have additionally agreed that certain other Intellectual Property (as defined below) belonged to WMB as of the Receivership Date and was acquired by JPMC pursuant to the Purchase and Assumption Agreement.  The parties have additionally agreed that still other Intellectual Property (the WMI Intellectual Property (as defined in the Global Settlement Agreement)) was and remains property of WMI and WMI's estate.

○    *JPMC Wind Portfolio*.  Pursuant to Section 2.18 of the Global Settlement Agreement, WMIIC will transfer to JPMC all of WMIIC's interest in and to the Wind Power Interest (as defined below).

○    *BKK Litigation*.  Pursuant to Section 2.21 of the Global Settlement Agreement, on and as of the effective date, JPMC will assume the BKK Liabilities.

○    *Settlement with WMB Senior Note Holders*.  In consideration for the releases to be granted by holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders, the Debtors have agreed to provide such holders with those certain BB Liquidating Trust Interests, representing an undivided interest in WMU's share of the Homeownership Carryback Refund Amount in an amount equal to Three Hundred Thirty-Five Million ($335,000,000.00) in the aggregate.

**D.    The Legal Standards for Approval of the Global Settlement Agreement**

    **1.    The Examiners' Report**

        **(i)    The Examiner's Report Should be Considered By the Court**

Although the Bankruptcy Code is silent on how an examiner's report may be used, In re FiberMark, Inc., 339 B.R. 321, 325 (Bankr. D. Vt. 2006), courts have considered such reports in the context of assessing a proposed settlement.  See, e.g., In re Walnut Equipment Leasing Co., Inc., No. 97-19699 DWS, 1999 WL 288651, at *4 (Bankr. E.D. Pa. May 4, 1999) (mentioning the examiner's recommendation as one fact supporting the reasonableness of the settlement); In re Ionosphere Clubs, Inc., 156 B.R.

414, 424, 428-29 (S.D.N.Y. 1993) (approving a settlement agreement where the amount

settled for was "within the range estimated for the worth of the claims by the Examiner"),

aff'd, 16 F.3d 600 (2d Cir. 1994); see also In re PWS Holding Corp., 228 F.3d 224, 229,

232 (3d Cir. 2000) (holding that the trial court did not err in its decision to accept the

examiner's findings and legal conclusions regarding the viability of certain claims).

Certainly, although an examiner's report has no binding effect and is not intended to

establish evidence, FiberMark, Inc., 339 B.R. at 325; Ionosphere Clubs, 156 B.R. at 432,

it still should be considered.  "[I]f bankruptcy courts were unable to consider the findings

and recommendations of an examiner's report, the process of appointing an examiner

would be an exercise in futility." FiberMark, Inc., 339 B.R. at 325.  Therefore, courts

"routinely consider and rely on the testimony and reports of examiners." Id.

Accordingly, the Bankruptcy Court may consider the Examiner's recommendations and

conclusions when assessing whether the Global Settlement Agreement is in compliance

with applicable legal standards.

Here, the Examiner's Report is a particularly relevant data point with

respect to the Bankruptcy Court's consideration of whether the Global Settlement

Agreement is fair, reasonable, and in the estates' best interest because it was generated

for this purpose.  As noted therein, "[t]he primary focus and scope of the Examination

has been to evaluate the overall reasonableness of the proposed [Global Settlement

Agreement] by investigating the merits of the claims being compromised." Id. at 11.  In

particular, the Examiner (i) "evaluated the Debtors' likely ability to recover disputed

assets against the guaranteed recoveries obtained through the [Global Settlement

Agreement]," (ii) "investigated whether there was any reasonable likelihood that the

Estates could obtain substantially more assets that would benefit non-settling parties through litigation," (iii) "investigated individually each of the key elements of the proposed [Global Settlement Agreement], as well as "the agreement as a whole, to determine if it represents a reasonable compromise of contested issues," and (iv) "attempt[ed] to resolve conflicting facts, determine the merits of divergent claims, . . . evaluate the merits of legal positions," and "bring clarity to otherwise opaque facts that have generated various 'conspiracy theories' concerning the decline, seizure, and sale of WMB to JPMC." Id. at 2-3.

The Examiner was tasked with conducting a thorough, independent, in-depth investigation. In furtherance of his assignment, the Examiner met with representatives of the Debtors, JPMC, the FDIC, the OTS, the Creditors' Committee, the Equity Committee, and various other stakeholders and witnesses (including purported litigation targets) as well as their respective counsel, each of whom provided information to the Examiner, as well as, their analyses of the strengths of their legal positions. Id. at 14. In addition, the Examiner reviewed numerous documents provided by the Debtors, JPMC, the FDIC, the OTS, Wells Fargo, Deloitte, Santander, Goldman Sachs, Morgan Stanley, Moody's, and Fitch. Id. at 12-15.

The Examiner devoted "significant time and effort to gaining a full understanding of the analyses, grievances, and suspicions of [holders of Equity Interests] and in investigating claims that might be of value to [such holders]," as the Equity Committee has been a principal opponent of the Global Settlement Agreement and the Plan in these Chapter 11 Cases and the Equity Committee sought the appointment of the Examiner. Id. at 14. In this regard, the Examiner held five (5) formal conferences with

the Equity Committee and reviewed several presentations prepared by the Equity

Committee in support of its positions, as well as supporting documentation. Id. at 23.

The Examiner also reviewed every piece of correspondence he received from individual

shareholders identifying issues, theories, and links to relevant information, and, where

appropriate, passed on such correspondence to one of his investigative teams for

consideration. Id. at 24.

Although the Examiner acknowledged that his investigation was

completed over a compressed timeframe, he stated that he believed that concluding his

investigation and submitting a final Examiner's Report was appropriate because "further

investigation is unlikely substantially to affect his views as to the reasonableness of the

compromises made in the proposed [Global Settlement Agreement]." Id. at 3-4.

In sum, the Examiner's investigation, the conclusions of which are

summarized in the Examiner's Report, was expansive, comprehensive, fair, and relevant,

and substantively uncompromised by its timeframe, and it is appropriate for the

Bankruptcy Court to consider and to rely on the Examiner's Report, and the conclusions

set forth therein, in connection with the Bankruptcy Court's consideration of the Global

Settlement Agreement and the Plan.

      **(ii)**      **The Examiner Concluded that the Global Settlement**
                    **Agreement Is Reasonable**

As stated above, the Examiner concluded that the Global Settlement

Agreement "reasonably resolves" the parties' numerous disputes, and that further

litigation "is highly unlikely materially to benefit classes that are 'out of the money.' "

Id. at 1. Specifically, the Examiner concluded as follows:

> [T]he Estates will not recover and capture for distribution
> the value of many of the contested assets should there be

continued litigation. JPMC and the FDIC have substantial litigation positions concerning many assets both on the merits and on jurisdictional issues. In addition, a decision in favor of the Debtors on a particular claim may only generate a viable offsetting claim. The ultimate resolution of many of the claims could take years. . . . Following careful analysis, the Examiner finds the Estates' claims to specific assets, including Tax Refunds, TRUPS, BOLI/COLI, and preferences, all face legal impediments that negate any realistic possibility that further litigation of those claims will result in any meaningful distribution to Shareholders.

Id. at 4.

In connection with his investigation, the Examiner focused, in particular, on whether there is enough value in the Debtors' estates, when taking into consideration all of the Debtors' potential claims against third parties, for shareholders to recover. The Examiner concluded "that it is highly unlikely that there is any scenario which will result in substantial distributions to Shareholders." Id. at 26; see also id. at 29 (stating that there is "virtually no chance of distributions to Common Shareholders") Explaining his reasoning, the Examiner stated that, "in order to properly evaluate the likelihood of reaching Shareholders, one must assume that there will be no settlement and that the Debtors would have only the $900 million. Assuming that the WMI Estate could recover the Deposits, which is likely but not certain, the Estate would have just under $5 billion." Id. at 27. The Examiner further noted that, "[g]iven that common shareholders are $16 billion out of the money, the additional $11 billion that would put them in the money would have to come from other assets." Id. The Examiner explained, however, that his investigation had revealed that the Debtors were unlikely to prevail with respect to any of the other assets of significant value in a way that would increase the net value of their estates.

Specifically, the Examiner concluded that,"[t]he Tax Refunds cannot be recovered without generating offsetting claims by WMB for its portion pursuant to the Tax Sharing Agreement. Similarly, although the BOLI/COLI represent a valuable asset, the vast majority of these assets belong to WMB. The Avoidance Actions are unlikely to lead to any substantial net recoveries. The same is true with respect to any attempt to set aside the transfer of the TRUPS to WMB." Id. at 27. The Examiner also found that tort claims against JPMC or the FDIC were highly unlikely to prevail or to be of significant value to the Debtors' estates. The Examiner noted:

> The primary problem with such claims is that potential acquirers of WMI or WMB were not discouraged from bidding because of any actions of JPMC. Rather, other likely bidders were fearful of the potential losses in the WMI mortgage loan pools and were unwilling to assume those risks. As to the FDIC, there are substantial legal hurdles to asserting any claims against the agency in connection with the sale of WMB.

Id. at 28. With respect to such claims, the Examiner further found that "no known facts establish that the government acted in bad faith in seizing WMB," and that "WMB was seized in the midst of a series of unprecedented failures in the banking and financial sectors" during a period in which the "potential ramifications of these failures were not fully known or understood." Id. at 29-30. The Examiner stated that "[i]t is highly unlikely that the OTS and FDIC decisions to seize WMB and sell it to JPMC can be successfully challenged" due to "the statutory protections afforded the FDIC," and that "[i]n any event, it appears that their decisions were reasonable under the circumstances." Id. at 30. Based upon the foregoing, the Examiner concluded that, although holders of Common Equity Interests will not recover pursuant to the Plan, which incorporates the Global Settlement Agreement, "it is highly unlikely that these results can be materially

improved by voiding the Settlement Agreement and attempting to achieve greater results through litigation." Id. at 29.

Thus, upon consideration of the probability of success with respect to the Debtors' litigation positions, potential difficulties in collection, the delay, complexity, and expense of litigation, and the paramount interests of *all* of the Debtors stakeholders, and, in light of the fact that the Global Settlement Agreement and the Plan will result in substantial recoveries for unsecured creditors, the Examiner concluded that the Global Settlement Agreement is fair, reasonable, and in the best interest of the Debtors' estates. See, e.g., id. at 1-3, 27-30. "Simply put, there is no clear litigation path which would result in substantial recoveries beyond those to be paid to the Debtors under the Settlement Agreement. . . . The amounts required to reach common equity are simply too large, and the likely recovery too speculative, to justify rejecting the proposed Settlement." Id. at 28. Again, although not binding, the Bankruptcy Court should consider these findings and conclusions in considering whether the Global Settlement Agreement should be approved.

>    **2.    The Standard for Approval Pursuant to Bankruptcy Rule 9019**

In addition to taking into account the Examiner's findings, the Bankruptcy Court must also consider whether the Global Settlement Agreement complies with applicable law. The Debtors submit that it does.

The Bankruptcy Court may authorize the Debtors to enter into the Global Settlement Agreement pursuant to Bankruptcy Rule 9019. Bankruptcy Rule 9019 provides that, "[o]n motion by the trustee and after notice and a hearing, the Bankruptcy Court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). A starting point in analyzing any proposed settlement agreement is the general judicial policy of

encouraging settlements and favoring compromises.  See Myers v. Martin (In re Martin),

91 F.3d 389, 394 (3d Cir. 1996); Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434

F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored."); In re TSIC, Inc., 393 B.R. 71,

78 (Bankr. D. Del. 2008) (noting that settlement agreements are "generally favored and,

in fact encouraged, in bankruptcy proceedings, as they provide for an often needed and

efficient resolution of the bankruptcy case"); In re Coram Healthcare Corp., 315 B.R.

321, 329 (Bankr. D. Del. 2004) ("Compromises are generally favored in bankruptcy.").

Compromises may be effected separately during the reorganization proceedings or in the

body of a plan itself.  Coram Healthcare Corp., 315 B.R. at 334.

       The decision to approve a particular settlement lies within the sound

discretion of the bankruptcy court.  In re World Health Alts., Inc., 344 B.R. 291, 296

(Bankr. D. Del. 2006).  Although a court must consider "all relevant information that will

enable it to determine what course of action will be in the best interest of the estate," it is

"not necessary for a bankruptcy court to conclusively determine claims subject to a

compromise, nor must the court have all of the information necessary to resolve the

factual dispute, for by so doing, there would be no need of settlement."  Coram

Healthcare Corp., 315 B.R. at 334 (emphasis added).  Thus, a bankruptcy court need not

decide the numerous issues of law and fact raised by a settlement, but, rather, should

canvass the issues and determine whether the settlement is "above the lowest point in the

range of reasonableness."  Id. at 330 (stating that the court "does not have to be

convinced that the settlement is the best possible compromise," but must only conclude

that the settlement "falls within the reasonable range of litigation possibilities"); see also

World Health Alts., Inc., 344 B.R. at 296; In re Key3Media Group, Inc., 336 B.R. 87, 92-

93 (Bankr. D. Del. 2005), aff'd No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006). Bankruptcy courts generally give "deference to a Debtors' business judgment in deciding whether to settle a matter." Id. at 93; see also Coram Healthcare, 315 B.R. at 330 ("The court should defer to a trustee's judgment so long as the trustee has a legitimate business justification.").

The standard by which courts evaluate a proposed compromise and settlement is well established. The Supreme Court of the United States has held that, like the "other aspects of reorganizations," settlements must be "fair and equitable." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968). The United States District Court for the District of Delaware "has described the ultimate inquiry to be 'whether the compromise is fair, reasonable, and in the interest of the estate.'" In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (Bankr. D. Del 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)); see also In re NorthWestern Corp., No. 03-12872(KJC), 2008 WL 2704341, at *6 (Bankr. D. Del., July 10, 2008); In re Key3Media, 336 B.R. at 92; In re Spansion, Inc., No. 09-10690 (KJC), 2009 WL 1531788, at *3 (Bankr. D. Del., June 2, 2009).

When determining whether a compromise is fair, reasonable, and in the best interests of the estate, just as the Examiner has already done, a court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." In re Spansion, 2009 WL 1531788, at *4. Courts generally consider four principal factors, namely, (1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved and the expense, inconvenience and delay

necessarily attending it, and (4) the paramount interest of the creditors, see, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc., 390 U.S. at 424; In re Nutraquest, Inc., 434 F.3d at 644; In re RFE Indus., Inc., 283 F.3d 159, 165 (3d Cir. 2002); In re Martin, 91 F.3d at 393; In re RNI Wind Down Corp., No. 06-10110, 2007 WL 949647 at *4 (Bankr. D. Del. March 29, 2007); World Health Alts., 344 B.R. at 296, as well as "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." In re Nutritional Sourcing, 398 B.R. 816, 833 (Bankr. D. Del. 2008).  As set forth below, the Debtors submit that the benefits to be derived from the Global Settlement Agreement significantly outweigh any potential benefits associated with litigating the claims resolved thereunder, and, as such, the Global Settlement Agreement is fair, well within the range of reasonableness, and in the best interests of the Debtors' estates.

Moreover, bankruptcy courts routinely assess and approve settlements as part of plan confirmation without considering advice of counsel.  See, e.g., In re Key3Media, 336 B.R. at 93-96 (discussing the "probability of success in litigation" without considering advice of counsel); In re NorthWestern Corp., 2008 WL 2704341, at *6-7 (same).  Furthermore, "so long as the reasonableness of the settlement amount [is] defended at trial on objective terms apart from the advice of counsel, the attorney-client privilege [remains] protected." Home Indem. Co. v. Lane Powell Moss & Miller, 43 F.3d 1322, 1327 (9th Cir. 1995) (emphasis added) (holding that plaintiff "did not impliedly waive its attorney-client privilege because [it] did not put into issue its privileged communications, and there was sufficient objective evidence of the reasonableness of the settlement amount for [plaintiff] to prove reasonableness to the jury without resort to its