attorneys' communications"). Consistent with the Bankruptcy Court's September 7, 2010 ruling (see transcript of proceedings before the Hon. Mary F. Walrath on September 7, 2010 at 83:17-21 (the "September 7, 2010 Ruling")), the advice of counsel has not been placed at issue by the Debtors in connection with the Global Settlement Agreement and/or the Plan.

Here, as set forth in the Declarations in support of confirmation and the deposition testimony of the Debtors' witnesses and the Creditors' Committee's witness, the Debtors have established that the Global Settlement Agreement meets the reasonableness standard required by Bankruptcy Rule 9019 by providing an overview of the various claims considered and the potential defenses thereto, without placing at issue the confidential advice of counsel that was communicated during the course of previous litigation and settlement negotiation activities. See Exhibit A (Kosturos Dep. at 123:10-23))[12] to the Declaration of John P. Mastando III, dated November 24, 2010 ("Mastando Decl.") ("[A]s a management team and using our business judgment, we weighed the strengths and weaknesses overall of our case, and we came to the conclusion that this gave us significant value to the estate, weighing in the defenses and counterclaims that both JPM, FDIC and the bank bondholders had, and other constituents in the case, and decided that, in our best business judgment, that this was the best deal for the estate. And they also created certainty, and it was -- the timing was immediate."); Mastando Decl. Ex. C (Simms Dep. at 91:4-14)[13] ("The Creditors' Committee concluded that the Global Settlement Agreement was prudent to enter into. And, when factoring all the components of the Global Settlement Agreement and all of the disputed assets, claims and other

---

[12] "Kosturos Dep." refers to the deposition of William Kosturos, taken on November 16, 2010.
[13] "Simms Dep." refers to the deposition of Steve Simms, on behalf of the Creditors' Committee, taken on November 18, 2010.

things that were being conveyed, settled, waived, released, as part of that Global

Settlement Agreement, the Creditors' Committee concluded that the Global Settlement

Agreement was prudent to enter into.")

3.      **The Standard for Approval Pursuant to Bankruptcy Code Section 363**

In addition to the relief sought pursuant to Bankruptcy Rule 9019, the

Debtors seek approval of the transfer of certain assets set forth in the Global Settlement

Agreement pursuant to section 363(b)(1) of the Bankruptcy Code, which provides, in

relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other

than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

Section 363 provides an additional basis on which courts may approve settlement

agreements, which frequently involve the disposition of assets of the estate. In re Martin,

91 F.3d at 394. Pursuant to section 363, the use, sale, or lease of property of the estate,

other than in the ordinary course of business, is permitted when there is a "sound business

purpose" that justifies such action. See id. at 395 (citing Fulton State Bank v. Schipper

(In re Schipper), 933 F.2d 513, 515 (7th Cir. 1990)); Comm. of Equity Sec. Holders v.

Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that a

judge determining a section 363(b) motion must find from the evidence before him a

good business reason to grant such motion); see also In re Abbotts Dairies of Penn., Inc.,

788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of

Lionel Corp.); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991)

(concluding that the United States Court of Appeals for the Third Circuit (the "Third

Circuit") adopted the "sound business judgment" test in the Abbotts Dairies decision); In

re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (same); In re

Delaware & Hudson Ry. Co., 124 B.R. at 178 (affirming decision permitting debtor to sell assets where sound business reasons supported the sale).

When a sound business purpose exists, and the sale is made in good faith, a sale pursuant to section 363(b)(1) of the Bankruptcy Code should be approved. Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) (stating that "the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'" and that the rule has continued applicability in bankruptcy), overruled on other grounds sub nom. Gantler v. Stephens, 965 A.2d 695 (Del. 2009) . Overcoming the business judgment presumption on the merits is a "near-Herculean task." In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir. 2005). A party must "demonstrate that no reasonable businessperson could possibly authorize the action in good faith," such that the only explanation is bad faith, or establish that a decision was the "product of an irrational process." Id. "Put another way, courts will not disturb the judgment of a board of directors if it can be attributed to any rational business purpose." In re Reading Broad, Inc., 390 B.R. 532, 554 (Bankr. E.D. Pa. 2008) (citing Matter of Reading Co., 711 F.2d 509, 517 (3d Cir. 1983)); see also In re The Brown Sch., 368 B.R. 394, 401 (Bankr. D. Del. 2007) ("The business judgment rule is a [rebuttable] presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.") (internal quotations and citations omitted)).

As described in more detail below, the Debtors submit that entry into the Global Settlement Agreement, and the transfer of assets to be effected thereunder, clearly is an exercise of sound business judgment and, accordingly, should be approved.

In addition, the transfers to be effectuated pursuant to the Global Settlement Agreement should be made free and clear of interest. Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of liens, claims, and encumbrances if one of the following conditions is satisfied:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). See In re Trans World Airlines, Inc., 322 F.3d 283, 290 (3d Cir. 2003) (noting that section 363(f) permits a bankruptcy court to authorize a sale free of "any interest" that an entity has in property of the estate); Citicorp Homeowners Servs. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (court may approve sale "free and clear" provided at least one of the subsections is met); In re Kellstrom Indus., Inc., 282 B.R. 787, 794 (Bankr. D. Del. 2002) ("Any interest in property that can be reduced to a money satisfaction constitutes a claim for purposes of section 363(f)(5)."); In re Healthco Int'l, Inc., 174 B.R. 174, 176 (Bankr. D. Mass. 1994) (noting that section 363(f)(5) has been interpreted to mean "a payment constituting less than full payment of the underlying debt"); see also Cheslock Bakker & Assocs., Inc. v. Kremer (In re Downtown Athletic

<u>Club of N.Y. City Inc.)</u>, No. M-47 (JSM), 2000 WL 744126, at *3 (Bankr. S.D.N.Y. June 9, 2000) (holding that free and clear sale under the debtor's plan of reorganization was binding on the debtor's creditors who received notice of the confirmation hearings).

        The Debtors are not aware of any liens, claims, interests or encumbrances (collectively, the "<u>Liens</u>") on any right, title and interest in and to the assets transferred by the Debtors pursuant to the Global Settlement Agreement, whether the subject of a bona fide dispute or otherwise.  <u>See</u> 11 U.S.C. § 363(f)(3).  Out of an abundance of caution, however, the Debtors submit that, to the extent that any such Liens exist, one or more of the subsections of section 363(f) of the Bankruptcy Code applies.  In particular, the Debtors submit that any holder of such a Lien could be "compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest," such that the condition to transfer free and clear of Liens set forth in section 363(f)(5) of the Bankruptcy Code is met.  <u>See</u> 11 U.S.C. § 363(f)(5).  Accordingly, the Debtors submit that the transfer of assets pursuant to the Global Settlement Agreement, free and clear of any Liens, is warranted.

        **4.**       **The Standard for Approval Under Bankruptcy Code Section 105**

        Section 105(a) of the Bankruptcy Code provides an additional basis on which to approve the Global Settlement Agreement.  It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.  <u>See</u> <u>In re Official Comm. of Unsecured Creditors of Cybergenics Corp.</u>, 330 F.3d 548, 567 (3d Cir. 2003).  Section 105(a) states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Pursuant to section 105(a), the Bankruptcy Court's equitable powers provide "broad

authority to act in a manner that will prevent injustice or unfairness in the administration

of bankruptcy estates." See In re Kaiser Aluminum Corp., 456 F.3d 328, 340 (3d Cir.

2006). A court should construe section 105 liberally and

> may sift the circumstances surrounding any claim in order
> to ascertain that injustice or unfairness is not accomplished
> in the administration of the debtor's estate, and in so doing
> it may adopt that remedy which it deems most appropriate
> under the circumstances.

In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994) (quoting N.Y. v. Raichle

(In re Stirling Homex Corp.), 591 F.2d 148, 155-56 (2d Cir. 1978)).

Courts in this district have utilized section 105(a) authority to approve the

sale of property of the estate other than in the ordinary course of business. See, e.g., In re

FLYi, Inc., No. 05-20011 (MFW), 2006 WL 3079007, at *2 (Bankr. D. Del. Feb. 1,

2006) (authorizing the sale of certain assets pursuant to sections 105(a) and 363(f) of the

Bankruptcy Code); In re Ames Holding Corp., No. 09-14406 (CSS), 2010 WL 2822030,

at *6 (Bankr. D. Del. Feb. 17, 2010) (same). Additionally, courts in this district have

utilized section 105(a) authority to approve settlements. See In re TSIC, Inc., 393 B.R. at

78 (approving a settlement pursuant to Bankruptcy Rule 9019 and section 105(a) of the

Bankruptcy Code). For the reasons discussed below, the Global Settlement Agreement is

fair and just, and preserves and protects the value of the Debtors' estate for the benefit of

stakeholders, such that approval thereof is warranted pursuant to section 105(a) of the

Bankruptcy Code.

E.      **The Global Settlement Agreement Is Fair and Reasonable, Is Supported by Sound Business Justifications, and Is in the Estates' Best Interests**

The Global Settlement Agreement is fair and reasonable under the

circumstances and falls well within the range of reasonable litigation outcomes because

each of the relevant factors — probability of success, difficulties in collection, the complexity, expense and delay of continued litigation, and the paramount interests of creditors — weigh in favor of resolution of the parties' numerous disputes on the terms set forth in the Global Settlement Agreement. In addition, sound business justifications exist for the Debtors to enter into the Global Settlement Agreement. Specifically, the Global Settlement Agreement represents a consensual, global and immediate resolution of each of the Actions and other claims in dispute among the parties, and must be viewed as an integrated compromise of numerous, complex disputes in the context of the total benefit to be conferred on the Debtors' estates through its consummation. In negotiating the Global Settlement Agreement, the Debtors' singular goal was maximizing the value of their estates. Kosturos Decl. at ¶ 44. Based upon careful consideration of all of the claims, counterclaims and potential claims, and all of the asserted defenses and responses thereto, as well as consideration of the strengths and weaknesses of both their own claims and those asserted against them, and the delay, expense, uncertainty and risks of continued litigation of these claims, the Debtors determined that the Global Settlement Agreement is fair and reasonable. Id. There is no doubt—the significant value afforded by the Global Settlement Agreement far outweighs its cost.

*First*, the Global Settlement Agreement represents immediate, known and certain value, estimated at approximately $6.1 to $6.8 billion, in large part because it secures for the Debtors' estates free and clear title to approximately $3.8 billion of Deposits and an additional $2.49 to $2.55 billion in funds that represent the Debtors' allocated share of the Tax Refunds. Thus, approximately $7.5 billion of total funds will be available for distribution to the Debtors' creditors and, potentially, certain equity

interest holders, virtually all of which will immediately benefit the Debtors' stakeholders as it will largely be available on the Effective Date of the Plan.[14] Id. at ¶ 45.

*Second*, absent the Global Settlement Agreement, such known and certain value would be at risk. Specifically, the Debtors estimate that final resolution of the Actions, through all appeals may last approximately 3 to 4 years, although others consider such a time frame to be optimistic. Id. at ¶ 46. During such period, the Debtors will continue to accrue substantial litigation and administrative expenses and the Debtors' unsecured claims will continue to accrue postpetition interest, all at a rate of approximately $30 million per month (or $360 million per year), and which, in the aggregate, will erode the value of any potential litigation recoveries. Moreover, as discussed further below, the parties have asserted various positions that give rise to risks associated with litigating many of the issues resolved pursuant to the Global Settlement Agreement. For instance, either JPMC or the FDIC Receiver have asserted rights to offset against or otherwise obtain the Deposits. If either JPMC or the FDIC Receiver were to prevail on their offset claims, devastating consequences to the stakeholder recoveries in these Chapter 11 Cases could result. Likewise, even if it were determined that the Tax Refunds are property of the Debtors' estates, both JPMC and the FDIC Receiver have asserted sizeable claims against the estates on account of WMB's interest in such amount, further jeopardizing stakeholder recoveries. Id.

*Third*, consideration of the various parties competing claims and defenses reveal practical impediments and issues as to Debtors' claims against JPMC and the FDIC Receiver. As an initial matter, the Debtors may not be able to recover on their

---

[14]   This amount includes undisputed cash and other undisputed assets currently in WMI's possession, which total approximately $900 million.

claims against the Receivership because the Receivership's known liabilities far exceed its known assets. In addition, in many instances (such as with respect to the Debtors' claims regarding the Trust Preferred Securities and the Tax Refunds, the Constructive Fraudulent Transfer Claims, and the Preference Claims), even a "win" by the Debtors could be attended by a corresponding dollar-for-dollar claim against their estates, such that the Debtors' claims, even if successfully litigated, may be of negligible value. Moreover, factors regarding insolvency in the context of certain of the Constructive Fraudulent Transfer Claims may impact the Debtors' ability to prove causation and/or damages with respect to the Business Tort Claims, and/or allow the FDIC Receiver to argue that it should prevail on the fraudulent transfer claims that it has asserted against WMI. Id. at ¶ 47.

Even if successful litigation outcomes would not result in a corresponding liability, JPMC and the FDIC Entities have asserted, in many instances, additional legal defenses to the Debtors' claims or asserted rights to offset against any recovery of those claims. For example, even if it were assumed that continued discovery would uncover additional documents that would be useful in pursuing the Business Tort Claims, JPMC has argued that (a) a combination of allegedly risky business practices and external market forces, and not any action by JPMC, caused WMI's losses, (b) WMI lacks standing to bring such claims, and (c) such claims are administratively barred. As discussed below, JPMC and the FDIC Receiver, as applicable, also have defenses to, among other things, the DC Claims. Id. at ¶ 48.

For these reasons, the Global Settlement Agreement does not, as certain holders of Equity Interests have suggested, come at the expense of the Debtors' Equity

Interest holders, because there is uncertainty and risk regarding whether full litigation of the Debtors' claims and causes of action would result in greater value to their estates than is afforded by the Global Settlement Agreement, or in fact may result in less value for the estates. Id. at ¶ 49.

Fourth, the Global Settlement Agreement resolves numerous additional disputes between the parties regarding the ownership of or entitlement to various assets and the responsibility for various liabilities and obligations. The Debtors believe that the resolution of such disputes on the terms set forth in the Global Settlement Agreement will result in a net benefit for their estates because (a) with respect to such assets, those transferred to JPMC pursuant thereto are of little benefit to any ongoing business of the Debtors, (b) JPMC has agreed to assume significant liabilities, and (c) settlement will enable the Debtors to avoid the costs and risks of continued litigation. Absent a global compromise, it is unlikely that such disputes could be settled on a one-off basis, and the Debtors' estates would be burdened with the expense of multiple independent tracks of protracted litigation. Id. at ¶ 50.

1.    **The Global Settlement Agreement Affords
Immediate, Known and Certain Value, in a Significant Amount**

*Free and Clear Title to Nearly $4 Billion in Deposits*. Pursuant to the Global Settlement Agreement, JPMC will release and turn over the Deposits, free and clear of any claims of JPMC or the FDIC Receiver thereto (including any asserted right of setoff, discussed below), resulting in an influx of cash available for immediate distribution to the Debtors' creditors in the amount of approximately $3.8 billion, plus interest accrued thereon from and after the date of execution of the Global Settlement Agreement. This is a favorable outcome because, even though the Debtors have asserted

that they are entitled to the Deposits in their motion for summary judgment in the

Turnover Action, there is a risk of delay resulting from continued litigation over such

funds in the event that the Debtors do not prevail on that motion, or in the event that

JPMC appeals a ruling in the Debtors' favor and successfully obtains a stay pending

appeal.  In addition, JPMC and the FDIC have asserted counterclaims against such funds

(including asserted rights of setoff) that, if successful, could substantially deplete the total

amount available for distribution to the Debtors' stakeholders.  Indeed, the Examiner's

Report concludes that "[a]bsent the Settlement Agreement, the Debtors face significant

hurdles and perhaps years of litigation before they can actually take control of the deposit

money that is currently within JPMC's control."  Examiner's Rep. at 111.  Any such

delay in distributions to unsecured creditors would be attended by continued accrual of

postpetition interest on such claims, among other costs (which interest and costs, as

discussed below, would be significant).

        *Allocation of a Significant Amount of Tax Refunds*.  The Global Settlement

Agreement also provides the Debtors with immediate access to significant funds through

its resolution of the disputes surrounding the Tax Refunds.  Specifically, the Global

Settlement Agreement divides the Tax Refunds among the Debtors, JPMC and the FDIC

Receiver, and allocates an estimated $2.49 to $2.55 billion to the Debtors, virtually all of

which will be available for distribution to stakeholders on or shortly after the Effective

Date of the Plan.  This allocation is significant in light of the fact that, as discussed

below, the TSA (as defined below) provides either JPMC or the FDIC Receiver a

sizeable claim against the estates such that, even a determination that the Tax Refunds are

property of the Debtors' estates would not decrease any shortfall faced by Equity Interest

holders. In contrast, the receipt by the Debtors, pursuant to the Global Settlement Agreement, of a substantial portion of the Tax Refunds, free of any claims related thereto, represents actual value that will immediately benefit the Debtors' stakeholders. Indeed, the Examiner concluded that, "with respect to the issue of the Tax Refunds, the Settlement Agreement appears to provide a greater benefit for the Estates than could likely be achieved in protracted and uncertain litigation." Id. at 148.

### Release of Significant Claims by JPMC and the FDIC Entities.

Furthermore, the Global Settlement Agreement will result in broad releases by JPMC and the FDIC Entities of all other claims against the Debtors, including a release of all claims they filed against the Debtors in the Actions and in the Chapter 11 Cases. These releases are significant not just because they resolve potentially significant and dilutive claims, but because, without them, the Debtors would be required to reserve for and litigate such claims, which were asserted in amounts that aggregate tens of billions of dollars. Having to place aside such a reserve would result in virtually no funds available for distribution on the Effective Date of the Plan, forcing creditors to suffer a corresponding delay in recovery and the incurrence of additional, and significant, interest and administrative expenses.

### 2.    Absent the Global Settlement Agreement, the Known and Certain Value Is at Risk

### The Parties' Competing Positions Regarding Turnover of the Deposits.

On April 27, 2009, the Debtors filed the Turnover Action against JPMC seeking to recover the Deposits, which the Debtors assert JPMC expressly assumed as liabilities pursuant to the P&A Agreement. JPMC has placed what it has called an "administrative freeze" on the Deposits pending resolution of the Turnover Action. Kosturos Decl. at

¶ 19. By motion, dated May 19, 2009 (the "Turnover Summary Judgment Motion"), the Debtors sought entry of an order granting summary judgment in the Turnover Action, which relief was opposed by the FDIC Receiver, JPMC, and certain holders of WMB Senior Notes and WMB Subordinated Notes.

As set forth in more detail in the Kosturos Declaration, the Turnover Summary Judgment Motion, and in the Affidavit of Doreen Logan [Turnover Action, Docket No. 15] (the "Logan Aff.") filed in support of the Turnover Summary Judgment Motion, the Debtors believe that there is indisputable evidence that they are entitled to the funds that are on deposit with JPMC, and that JPMC has no basis to challenge the Debtors' ownership of the funds no right to setoff. Kosturos Decl. at ¶ 58. As noted by the Examiner, however, "there still is a maze of legal issues that remain to be litigated and that could prevent an expeditious recovery of the [D]eposits." Examiner's Rep. at 108-09.

For example, JPMC and others have asserted that material issues of disputed fact exist and that summary judgment therefore is not appropriate in the Turnover Action. Kosturos Decl. at ¶ 53; see generally Memorandum of Law of Cross-Claim Defendant Federal Deposit Insurance Corporation, as Receiver, in Opposition to Plaintiffs' Motion for Summary Judgment [Docket No. 97]; Opposition of Defendant JPMorgan Chase Bank National Association to Plaintiffs' Motion for Summary Judgment [Turnover Action, Docket No. 102]. In particular, such parties have asserted that the Deposits were actually a capital contribution rather than a deposit and these parties cite notations on certain accounting entries that could be wrongly interpreted to evince an intent to contribute what amounts to a majority of the Deposits to FSB. Id. at 31; Logan

Aff. at ¶ 40 [Docket No. 15].    Moreover, as noted by the Examiner, even if the Debtors were to prevail on summary judgment in the Turnover Action, both JPMC and the FDIC likely would appeal the Bankruptcy Court's decision and seek a stay of the judgment pending appeal.  Examiner's Rep. at 109.

        In addition to the general dispute concerning the nature/ownership of the Deposits, JPMC, as successor in interest to WMB fsb (acquired pursuant to the P&A Agreement), has asserted a fraud counterclaim against the Debtors relating to WMI's September 18, 2008 transfer of $3.674 billion of Deposits from WMB to the well-capitalized WMB fsb (the "Deposit Transfer") and subsequent loan of such funds from WMB fsb to WMB.  See Answer and Amended Counterclaims/Cross-Claim of JPMorgan Chase Bank, National Association at 85-102 [Turnover Action, Docket No. 121]. Pursuant to the Deposit Transfer, the funds that were transferred from WMI to WMB fsb were immediately loaned back to WMB under an intercompany Master Note from WMB fsb to WMB, thereby permitting WMB continued use of the funds.  Kosturos Decl. ¶ 54 In connection with this transaction, WMB waived the collateral requirements under the Master Note to further bolster its liquidity.  Id.

        In the event the Deposits are determined to be deposit liabilities, both JPMC and the FDIC have asserted, alternatively, that they are entitled to set off any claims they possess against the Debtors against the Deposits.[15]  See Opposition of Defendant JPMorgan Chase Bank National Association to Plaintiffs' Motion for Summary Judgment, Turnover Action at 46; Memorandum of Law of Cross-Claim Defendant Federal Deposit Insurance Corporation, Turnover Action at 13.  First, with

---

[15]    Both JPMC and FDIC have filed extensive proofs of claims in the Chapter 11 Cases asserting myriad, and to some extent duplicative, claims.

respect to JPMC, the Debtors argued in the Turnover Action that, although the Deposits may constitute prepetition claims against JPMC, JPMC does not possess any prepetition claim against the Debtors and, thus, JPMC lacks the mutuality required for setoff pursuant to section 553(a) of the Bankruptcy Code.  11 U.S.C. § 553(a)  ("[T]his title does not affect any right of a creditor to offset a *mutual* debt owning by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case. . . ."); see Brief in Support of the Motion of Plaintiffs for Summary Judgment at 22.  The claims with respect to which JPMC purports to assert a right of setoff are claims that it supposedly acquired from WMB pursuant to the P&A Transaction.  Id. at 23. The Debtors have asserted that the plain language of the P&A Agreement, which explicitly excludes from purchased assets claims against WMI, makes clear that JPMC did not actually acquire any claims against the Debtors' estate from WMB and that JPMC therefore has no prepetition claim against WMI that may be set off against the Deposits. Id.

JPMC has responded to this argument by, among other things, filing declarations of several employees asserting that nothing in the P&A Agreement precluded the transfer of prepetition claims against WMI to JPMC.  See generally Opposition of Defendant JPMorgan Chase Bank National Association to Plaintiffs' Motion for Summary Judgment, Turnover Action at 46.  Additionally, JPMC and the FDIC Receiver argued in favor of JPMC's rights to set off the Deposits at the October 22, 2009 hearing with respect to the summary judgment motion in the Turnover Action.  See Docket No. 193 (October 22, 2009 Hr. Tr. at 58:9-17; 60:24-61:16).

Alternatively, the FDIC Receiver has sought, pursuant to the FDIC Stay Relief Motion, to set off against the Deposits pursuant to an exercise of Section 9.5 of the P&A Agreement. See generally Memorandum of Law of Cross-Claim Defendant Federal Deposit Insurance Corporation, Turnover Action at 3. Faced with the Debtors' argument that JPMC possesses no claim eligible for setoff, the FDIC Receiver moved for modification of the automatic stay to invoke Section 9.5 of the P&A Agreement, which provides for a "clawback" of the Deposits "at the direction of the [FDIC Receiver]" and which the FDIC Receiver argues will allow it to set off its claims asserted against the Debtors. P&A Agreement § 9.5; FDIC Stay Relief Motion at 3-4 [Docket No. 1834].

The Debtors opposed the FDIC Receiver's motion on the basis that, even if it were permitted to unwind JPMC's assumption of the Deposits, the FDIC Receiver would be incurring a postpetition debt for purposes of setting off a prepetition claim in a manner prohibited by the Bankruptcy Code. See 11 U.S.C. § 553(a); See Objection of the Washington Mutual, Inc. Noteholders Group to the Motion of the Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank, for an Order Modifying the Automatic Stay and Joinder in the Debtors' Objection at 1-2 [Docket No. 1900]. While the Debtors dispute the FDIC's right to setoff, however, as noted by the Examiner, there is a risk that the Court could find that the Deposits retain their prepetition nature even following a postpetition transfer from JPMC to the FDIC Receiver pursuant to Section 9.5 of the P&A Agreement such that the FDIC would have an argument in favor of setoff against the Deposits. Examiner's Rep. at 109-10. The Examiner also noted that the FDIC would be motivated to vigorously fight this issue. Id. The Examiner stated that "there is little legal precedent regarding the scope of the FDIC's rights under

§ 9.5, which may afford the FDIC sufficient leeway to argue its meaning.  Given the

potential precedential effect of an adverse ruling the FDIC could be highly motivated to

seek to defend and preserve its powers as precedent for future receiverships." Id.

JPMC's attempt to exercise setoff rights against the Deposits and the

FDIC Receiver's attempts to recover the Deposits from JPMC, and the corresponding

risks of loss of the Deposits, must also be taken into account in connection with

continued litigation or pursuit of, for example, the Business Tort Claims, the Debtors'

claims regarding the Tax Refunds and Trust Preferred Securities, the Constructive

Fraudulent Transfer Claims, the Preference Claims, the IP Claims, and the DC Claims.

By releasing such claims and obtaining all of the value and benefits outlined above

pursuant to the Global Settlement Agreement (as discussed below), the Debtors are able

to secure free and clear title to the Deposits, and immediate access thereto.

*The Debtors' Claims to the Tax Refunds, Even if Successful, Would Not
Reduce Equity's Shortfall*.  Among the many disputes in the JPMC Adversary Proceeding

and the DC Action are the competing claims of the Debtors, JPMC, the FDIC Receiver,

and the holders of WMB Senior Notes and WMB Subordinated Notes to anticipated

federal and state Tax Refunds in the approximate aggregate amount of $5.5 to $5.8

billion.  Each of the Debtors, JPMC, and the FDIC Receiver asserted an ownership

interest in all or a significant portion of the Tax Refunds based upon (or in spite of) the

TSA.  See JPMC Adversary Proceeding [Docket No. 1]; DC Action [Docket Nos. 1, 26];

Carreon Decl. at ¶ 11.

In addition to the competing claims to the Tax Refunds, the Debtors

calculated that, as of the Petition Date, the Debtors were owed at least approximately

$352 million from WMB on account of past transactions under the TSA.  Carreon Decl. at ¶ 12.  This amount relates to a variety of matters including various unreimbursed items, refunded overpayments, and the assumption of certain tax liabilities.  Id.

WMI and its direct and indirect domestic subsidiaries, including WMB, comprise an affiliated group of corporations that file a consolidated return for federal income tax purposes, of which WMI is the common parent (the "Tax Group").  Id. at ¶ 6.

Certain members of the Tax Group, including WMI and WMB, entered into the TSA.  Id. at ¶ 7.  According to the TSA, each subsidiary that was a party to the agreement should have made tax-related payments to WMI, computed on a separate company basis, in respect of the federal income tax liabilities of such member and its subsidiaries, and WMI should have paid taxes due and owing by the Tax Group to the federal government.  Id.  Conversely, in the event of a refund, the TSA provided that WMI was to reimburse to each such member any amounts that the member generally would have been entitled to on a separate tax return basis.  Id.  The Tax Group generally followed the procedures in the TSA with respect to federal income tax liabilities, but did not consistently adhere to the TSA procedures with respect to state income tax liabilities.  Id.  Specifically, despite the provisions of the TSA, which had WMB (rather than WMI) responsible for the group's tax filings and payments, the Tax Group employed the same general procedure for state and local group taxes as it did for federal income taxes – namely, WMI filed all combined, consolidated and unitary state and local tax returns for the Tax Group, and remitted any taxes shown thereon, however, the amounts owing by members to WMI in respect of combined, consolidated or unitary state and local group

taxes (although partially reflected in intercompany accounts) were not regularly reconciled and cash settled.  Id.

As the common parent of the Tax Group for federal income tax purposes, WMI was responsible for the preparation and filing of the Tax Group's consolidated U.S. federal income tax returns, as well as making all tax payments due to the IRS, and collecting tax amounts due from subsidiary members as a result of operations which contributed to the consolidated tax liability of the Tax Group.  Id. at ¶ 8.

The Tax Refunds arise in large part from the Tax Group's incurrence of a substantial net operating loss ("NOL") for federal income tax purposes with respect to its 2008 taxable year.  Id. at ¶ 9.  Prior to the enactment of the Worker, Homeownership, and Business Assistance Act (the "WHBA Act") on November 9, 2009, corporate taxpayers generally could carry back NOLs only to the two preceding taxable years and recover federal income taxes paid in those earlier years.  Id.  The WHBA Act permitted corporate taxpayers, subject to certain limitations, a one-time election to extend the federal NOL carryback period for 2008 (or 2009, but not both) from two years to up to five years (with application in the fifth year limited to half of that year's taxable income).  Id.  As permitted, WMI filed federal refund claims on behalf of the Tax Group based on a five-year carryback of the Tax Group's 2008 NOL.  Id.  The IRS subsequently approved certain federal refunds relating in significant part to such carryback in the amount of approximately $5.2 billion, approximately $4.77 billion of which the Debtors have already received, with the majority of the remainder expected in late 2010 or early 2011. Id.

Beyond the approximately $5.2 billion of allowed federal income tax refunds, the Debtors estimate that, over time, net Tax Refunds of another $300 million to $600 million may be received. Id. at ¶ 10. Some of this relates to federal income taxes and some to state and local income taxes. Id. The Debtors expect to receive a significant portion of these amounts within the next year. Id.

Each of the Debtors, JPMC, and the FDIC Receiver asserted an ownership interest in all or a significant portion of the Tax Refunds based upon (or in spite of) the TSA. Id. at ¶ 11; JPMC Adversary Proceeding [Docket No. 1]; DC Action [Docket No. 26]. The Debtors have calculated that, as of the Petition Date, they were owed at least approximately $352 million from WMB on account of past transactions pursuant to the TSA. Carreon Decl. at ¶ 12. This amount relates to a variety of matters including various unreimbursed items, refunded overpayments, and the assumption of certain tax liabilities. Id.

Conversely, JPMC, as successor to WMB, claims that WMB (not WMI) was owed hundreds of millions of dollars under the TSA. Id. at ¶ 13. There appears to be an additional dispute between the FDIC Receiver and JPMC regarding whether and to what degree Tax Refunds were transferred to JPMC pursuant to the P&A Agreement. Id. Both entities have filed competing proofs of claim in the Chapter 11 Cases regarding the Tax Refunds, as well as asserted claims in the JPMC Action and DC Action. See Proof of Claim No. 2958 (the "JPMC Claim"); FDIC Claim; DC Action [Docket No. 26]; JPMC Adversary Proceeding [Docket No. 1].

The FDIC Receiver and JPMC have taken the position that WMI, as the filer of tax returns and payer of taxes on behalf of the Tax Group, is merely an agent for

the other members of the Tax Group and that each separate entity in the group retains

ownership over that portion of any tax refund, credit, or favorable tax attribute that can be

attributed to its own tax losses and operations.  See DC Action [Docket No. 26]; JPMC

Adversary Proceeding [Docket No. 1].  Both JPMC and the FDIC Receiver argue that the

Interagency Policy Statement on Income Tax Allocation in a Holding Company

Structure, 63 Fed. Reg. 64,757, 64,759, provides additional support for the conclusion

that the Tax Refunds are the property of the FDIC Receiver/JPMC.  See, e.g., DC Action

[Docket No. 26].

The FDIC Receiver and JPMC assert that all or virtually all of the Tax

Refunds are attributed to WMB or its subsidiaries, and, accordingly, are the property of

WMB (or of JPMC as the purchaser of substantially all of WMB's assets) and not

property of the Debtors' estates.  See DC Action [Docket No. 26]; JPMC Adversary

Proceeding [Docket No. 1].

The Debtors have taken the position that the Tax Refunds are property of

the estate, and that the FDIC Receiver and/or JMPC simply has a creditor claim against

the estate under the TSA for any amounts payable to them in respect of the carryback of

NOLs attributable to WMB and its subsidiaries.  Carreon Decl. at ¶ 16.  Specifically, the

TSA provides that (i) WMI pays the Tax Group's federal income tax (irrespective of

what it actually receives from any member), and (ii) each member makes a payment to,

or receives a payment from, WMI based on the member's tax liability (or overpayment or

credit resulting from utilization of its net operating loss) computed on a stand-alone basis

as if the member was not a member of the Tax Group and filed a separate return or

separate consolidated return (irrespective of what the Tax Group actually pays to, or

receives from, the IRS).  <u>See</u> TSA at ¶¶ 2(a), (b).  Thus, whether WMI would make a

payment to a member for losses incurred by the member is not dependent on whether

WMI receives a tax refund from the IRS, but rather, whether the member, on a stand-

alone basis, would have received a refund, and vice-versa.  Carreon Decl. at ¶ 16.

Accordingly, the TSA creates obligations and entitlements between WMI and its

members independent of WMI rights and responsibilities to the IRS.  <u>Id.</u>  As such, the

Debtors believe that all tax refunds of the Tax Group are property of the WMI, and the

FDIC Receiver or JPMC only have a general unsecured claim against the Debtors for the

amounts due WMB under the TSA.  <u>Id.</u>  For these and other reasons the Debtors believe

that the relationship between WMI and WMB with respect to WMB's net operating

losses is a relationship of debtor and creditor.  <u>Id.</u>

       Even if their theory is correct, and accepted, the FDIC Receiver, standing

in WMB's shoes, as a creditor pursuant to the TSA (and/or JPMC, which purchased

substantially all of WMB's assets) could potentially have a substantial net claim against

WMI's estate relating to the Tax Refunds attributable to WMB that would, absent

bankruptcy, have been paid to WMB.  In particular, according to the TSA, each

subsidiary that was a party to the agreement should have made tax-related payments to

WMI, computed on a separate company basis, in respect of the federal income tax

liabilities of such member and its subsidiaries, and WMI should have paid taxes due and

owing by the Tax Group to the federal government.  <u>Id.</u> at ¶ 7.  Conversely, in the event

of a refund, the TSA provided that WMI was to reimburse to each such member any

amounts that the member generally would have been entitled to on a separate tax return

basis.  <u>Id.</u>  Because such a claim could be asserted against WMI, even a "win" on the

Debtors' claim to ownership of the Tax Refunds (*i.e.*, a judicial determination that the Tax Refunds are property of the Debtors' estates) would not decrease any shortfall faced by WMI's equity holders. See In re First City Bancorporation of Tex., Inc., No. 392-39474-HCA-11, 1995 Bankr. LEXIS 1683, at *36 (Bankr. N.D. Tex. May 11, 1995) (approving global settlement with FDIC, noting that "the fact that the proceeds of the FDIC Settlement Agreement will be adequate to pay all unsecured creditors in full . . . negat[ed] certain of the [debtor's] avoidance claims," which claims would have resulted in dollar-for-dollar claims against the debtor's estate in favor of the disappointed transferee).

The Examiner similarly reached this conclusion and stated, "[t]he Examiner concurs with the Debtors' assessment in the Disclosure Statement that, if the Tax Refunds are determined to be property of the Estates, then "the FDIC Receiver as a creditor under the Tax Sharing Agreement (and/or JPMC, as purchaser of certain assets of WMB) would have a substantial net claim against WMI's estate relating to the Tax Refunds under the TSA." Examiner's Rep. at 147.

Moreover, to the extent that either of JPMC or the FDIC Receiver (i) has an Allowed Claim pursuant to the TSA for some or all of the Tax Refunds and (ii) is entitled to offset against the Deposits, as discussed above, such claim would be paid in "non-bankruptcy" dollars pursuant to section 553 of the Bankruptcy Code, depleting the vast majority, if not all, of the Deposits.

*The Debtors Would Have to Set Aside a Significant Reserve for Disputed Claims*. The Global Settlement Agreement will result in broad releases by JPMC and the FDIC Entities of all other claims against the Debtors, including a release of all claims