they filed against the Debtors in the Actions and in the Chapter 11 Cases. As just one example, the Global Settlement Agreement will result in a release by the FDIC Receiver of avoidance claims it has asserted against the Debtors "in the amount of at least $10.5 billion," which claims are discussed in more detail below. Even though the Debtors have defenses to the FDIC Receiver's avoidance claims (because, as discussed below, the FDIC Receiver would have to make the requisite showing that both WMB *and* WMI were insolvent at the time of the challenged transfers), the release of such claims pursuant to the Global Settlement Agreement results in additional value to the Debtors' estates, in that the Debtors will avoid the expense of defending against such claims and will not be required to reserve distributions on account of such claims until final resolution thereof. Having to do so would result in virtually no funds available for distribution on the Effective Date of the Plan, forcing creditors to suffer a corresponding delay in recovery and the incurrence of additional, and significant, interest and administrative expenses, for no corresponding benefit.

*Continued Litigation Would Cause the Value of the Debtors' Estates to Rapidly Deteriorate*. The Debtors estimate that final resolution of the Actions, through all appeals, would last approximately 3 to 4 years but others (notably JPMC and the FDIC Receiver) claim that to be optimistic. See Kosturos Decl. at ¶ 46. In the event the Bankruptcy Court were to rule in the Debtors' favor on any of the foregoing claims, the Debtors anticipate that JPMC and the FDIC Entities would appeal such a decision and move for a stay pending appeal. Importantly, the FDIC Entities may be able to do this without having to post a bond and, therefore, have every incentive to exhaust all appellate remedies. See In re MCorp Fin., Inc., 170 B.R. at 957 ("Given that the FDIC is not

constrained by the ordinary economic forces that affect private parties, that it has resourceful counsel, that it has statutory exemptions, like not being required to post supercedas bonds for appeals, and that courts tend to accommodate governmental power, its policy of litigating to the death must be taken as a substantial factor that obliterates illusions of quick, cheap resolution."). Continuing to press the Debtors' claims would erode the value of the claims, even if the Debtors were ultimately successful, throughout this 3 to 4 year period, based upon (i) stakeholders' lost time value of money, (ii) the continued accrual in the aggregate amount of approximately $30 million per month (or $360 million per year), in interest expenses and the substantial fees and costs entailed in complex litigation and (iii) additional administrative expenses associated with the continuance of the Chapter 11 Cases. Kosturos Decl. at ¶ 46.

3. **Additional Issues Associated with the Various Claims, Counterclaims, and Defenses Asserted by the Parties**

*The Business Tort Claims*. On May 1, 2009, citing, among other things, the allegations being made in the Texas Litigation, the Debtors filed a motion, which the Bankruptcy Court granted on June 24, 2009, for authority to engage in the Rule 2004 Inquiry to investigate JPMC concerning potential claims sounding in, *inter alia*, breach of contract (the "Contract Claim"), tortious interference with business expectancy (the "Interference Claim") and antitrust (the "Antitrust Claim" or "Bid-Rigging Claim" and, collectively with the Contract Claims and the Antitrust Claims, the "Business Tort Claims"). See Debtors' Motion for an Order Pursuant to Bankruptcy Rule 2004 Directing the Examination of JP Morgan Chase Bank, N.A. (the "Rule 2004 Application") [Docket No. 974]; Debtors' Motion for an Order Pursuant to Bankruptcy Rule 2004 Directing the Examination of Witnesses and Production of Documents from