Knowledgeable Parties (the "Third Party 2004 Motion") [Docket No. 1997]. These claims involve JPMC's access, in the spring of 2008, to information regarding WMI's financial condition in connection with WMI's pursuit of a strategic transaction, and potentially inappropriate actions allegedly taken by JPMC with respect to the information it obtained. Id.

JPMC has argued that the Business Tort Claims against JPMC fail for at least three reasons. See Submission of JPMorgan Chase Bank, N.A. in support of Approval of the Global Settlement Agreement and Confirmation of the Debtors' Sixth Amended Joint Plan ("JPMC Submission") [Docket No. 6008]. First, JPMC argues that the Business Tort Claims fail for "lack of proximate causation, given that the alleged harm to WMI at the center of these theories is the direct result of OTS's decision to seize WMB and place it into an FDIC receivership." Id. at 22-23. Second, JPMC argues that it "could not plausibly be the cause in fact of WMB's failure," as no "federal entity that has investigated the collapse of WMB...even suggested that JPMC played any role in the bank's collapse." Id. at 23. Third, JPMC argued that under Financial Institutions Reform Recovery and Enforcement Act of 1989 ("FIRREA"), the FDIC "owns any purported WMI claim against JPMC or any entity in connection with alleged harm to WMB." Id. at 24. Specifically, JPMC alleged that "neither WMI nor WMI shareholders have standing to pursue claims, derivative or otherwise, arising from generalized harm to WMB." Id. (citing caselaw). Thus, in order to prevail on the Business Tort Claims, the Debtors would need to overcome these defenses asserted by JPMC.

Additional procedural and jurisdictional issues exist with respect to the prosecution of the Business Tort Claims. For instance, in the American National

Litigation, the DC District Court recently ruled that the FDIC Receiver was a necessary party in connection with the plaintiffs' claims (which claims are similar to the Business Tort Claims), and that FIRREA required that such claims be asserted through FIRREA's administrative claims procedure. Am. Nat'l Ins. Co. v. JPMC, 705 F. Supp. 2d 17, 20 (D.D.C. 2010). Even though the ANICO Plaintiffs asserted claims against JPMC only and did not assert claims against the FDIC Receiver, the DC District Court dismissed their claims for lack of jurisdiction because the plaintiffs had not pursued their claims in the Receivership pursuant to the administrative claims process.

Further, with regard to the Debtors' Contract Claim, any potential recovery on such claim may need to first satisfy WMB's funded indebtedness, of approximately $14 billion, and any other allowed claims in the Receivership, before yielding any value to WMI on account of its equity interest in WMB. As a practical matter, therefore, the Contract Claim may be of little to no value to the Debtors' estates, as known claims against the Receivership far exceed the Receivership's known assets (namely, the $1.8 billion purchase price paid by JPMC for WMB's assets). Kosturos Decl. at ¶ 72.

Notably, the Examiner also found that even if the Debtors could prove that JPMC arguably breached the NDA, the Examiner "found no evidence that this technical breach of the [NDA] caused harm to WMI." Examiner's Rep. at 230; see also id. at 231-33 (no evidence of harm to WMI). Furthermore, the Examiner found that "given the array of problems facing WMI,—the Examiner finds it will be very difficult to establish that isolated disclosures of confidential information damaged WMI's stock price, led to illiquidity, or precipitated the seizure of WMB. Id. at 234.

As for the Interference Claim, the Examiner has stated that to prevail on such a claim the Debtors must prove the "existence of a valid business expectancy." Examiner's Rep. at 237. And where "there is the lack of at least an indication of a solid offer from another potential suitor, there is no business expectancy." Id. at 241. Based on its investigation, the Examiner concluded that "there were no viable alternative bids to JPMC's for WMI (or WMB)." Id.

The Antitrust, or "Bid-Rigging" Claim is premised on the theory that JPMC conspired with other parties (most notably, Banco Santander) to restrain competition for the purchase of WMB. See generally Third Party 2004 Motion. Several JPMC documents evidence JPMC communications with Banco Santander regarding WMI in 2008 raise the possibility of antitrust concerns. See, e.g., id. at ¶ 1 (internal JPMC email evidencing meeting between JPMC and Banco Santander, noting that "[i]t is important to have an open dialogue with [Santander], as Santander would not pursue any…of these opportunities if JPMorgan were to do the same").

With respect to the Antitrust Claim JPMC, has argued that any purported antitrust violation by JPMC in connection with communications with Banco Santander is implausible. JPMC Submission at 24 n.19. JPMC argues that "an agreement solely between JPMC and a single European bank [i.e., Banco Santander] makes absolutely 'no economic sense' as it would do nothing to limit any other bidder anywhere else in the world interested in WMB from submitting a bid, rendering any such agreement wholly futile." Id. (citing cases). JPMC also claims that, based on a review of relevant facts, the Examiner found "no evidence that a broad conspiracy to restrain bidding on WMI existed" and did not "assign any value to the potential antirust claims." Id. (citing

Examiner's Rep. at 259, 265).  Furthermore, JPMC argues that the Examiner has found that a "conspiracy between only Santander and JPMC also is not plausible." Id. (citing Examiner's Rep. at 262).

The Debtors thus believe that the release of the Business Tort Claims in the context of the Global Settlement Agreement as an integrated whole is fair and reasonable and in the best interests of their estates.

_Constructive Fraudulent Transfer Claims_.  On May 29, 2009, the Debtors filed an answer and counterclaims in the JPMC Action seeking, among other things, to avoid $6.5 billion in pre-petition Capital Contributions to WMB as constructive fraudulent transfers pursuant to the Bankruptcy Code's avoidance powers and under Washington stat law (the "Constructive Fraudulent Transfer Claims").[16] See Debtors' Answer & Counterclaims at ¶¶ 93-103 [JPMC Action, Docket No. 139].  Specifically, the Debtors seek to avoid Capital Contributions made to WMB on the following dates and in the following amounts: December 18, 2007, in the amount of $1 billion; April 18, 2008, in the amount of $3 billion; July 21, 2008, in the amount of $2 billion; and on September 10, 2008, in the amount of $500 million. Id. at ¶¶ 13-31.

One element of the Constructive Fraudulent Transfer Claim is that the Debtors must prove the insolvency of WMI and WMB, as of the date of each of the Capital Contributions, and that the Capital Contributions were transferred to JPMC pursuant to the P&A Agreement. See id. at ¶ 93-103.  In support of the Constructive Fraudulent Transfer Claims, the Debtors alleged that, as of the date of each of the Capital

---

[16]     JPMC moved to dismiss the Debtors' counterclaims, which motion was denied by the Court by order, dated September 14, 2009.  On September 18, 2009, JPMC sought leave to appeal the Court's ruling, which was opposed by the Debtors, and that putative appeal remains pending.  JPMC filed an answer to the Counterclaims on September 21, 2009.

Contributions, WMI was burdened with approximately $7 billion of publicly-traded debt, and had begun to announce losses on quarterly earnings by fourth quarter 2007. Debtors' Answer & Counterclaims at ¶¶ 14, 16-17. The Debtors also highlighted: (a) the fact that WMI and WMB faced scrutiny from the OTS, beginning in June, 2008; (b) the record-high levels at which WMI credit default swaps, which reflect the risk of default on WMI's publicly-issued notes, were trading just four days after the consummation of the July 2008 Capital Contribution; and (c) rating agencies' downgrades just one day after the September 2008 Capital Contribution. Id. at ¶¶ 19, 22, 24.

In addition, the Debtors asserted that the fair market value adjustment made by JPMC in connection with the P&A Agreement resulted in roughly a $30 billion write-down to the WMB loan portfolio. Id. at ¶ 73. After the acquisition of WMB, JPMC achieved record firmwide revenue in first quarter 2009 and enjoyed growth in retail banking deposits by 62% and in checking accounts by 126%. Id. WMI was an actual creditor of WMB pursuant to various promissory notes and intercompany payables, and WMB was insolvent at the time of, or rendered insolvent by, the P&A Agreement, or was engaged in business for which its remaining assets were unreasonably small. Id. at ¶ 74. Accordingly, the Debtors argued that WMB did not receive reasonably equivalent value in exchange for the transfer of WMB's assets in the P&A transaction. Id. at ¶ 75.

JPMC has asserted that the Debtors were not insolvent at the times of the Capital Contributions and thus cannot avoid the capital contribution. See JPMC Submission at 16. Moreover, external market parameters could be viewed as indicating that sophisticated market participants viewed WMI as a solvent entity. For instance,

outside investors led by TPG made a $7.2 billion equity investment[17] and JPMC submitted a bid to purchase WMI for as much as $8 per share (depending upon performance of WMB's loan portfolio). See Rule 2004 Application at Ex. A (ANICO Plaintiffs' Original Petition at ¶ 42).

Further, JPMC argues that the stock market's view that WMI was solvent indicates WMI's solvency at the time of the Capital Contributions. See JPMC Submission at 16-17. Moreover, at a hearing before this Court on January 28, 2010 to consider the Debtors' motion to disband the Equity Committee, the Court noted that "the evidence that the debt and equity in this case are still trading, at any number, establishes that at least the market thinks that the Debtor is not hopelessly insolvent." See Docket No. 2277 (January 28, 2010 Hr. Tr. at 59:18-20). The Debtors note, however, that both the consummated TPG investment, as well as JPMC's offer amount to discounts to the then current market capitalization.[18] Therefore, the investors who were afforded the opportunity to actually conduct diligence at the specific loan level valued those assets differently than the market.

JPMC has also argued that, as subsequent transferee of the Capital Contributions, it can avoid liability even if the Capital Contributions are proven to constitute constructive fraudulent transfers if JPMC is able to prove that it took WMB (and the Capital Contributions) in good faith, for value, and without knowledge of the

---

[17] See TPG Leads $7 Billion WaMu Investment, DEALBOOK.COM, Apr. 9, 2008; http://dealbook.blogs.nytimes.com/2008/04/09/tpg-leads-7-billion-washington-mutual-investment/
[18] WMI stock was trading over $10/share in late March/early April 2008.

avoidability of the Capital Contributions.[19]  See JPMC Submission at 17-18; Examiner Rep. at 197.

Moreover, the Debtors may not be able to obtain meaningful recovery from the FDIC Receiver and the Receivership, even if they could prove their Constructive Fraudulent Transfer Claims, because, as previously discussed, the dollar amount of claims that have already been asserted against the Receivership may far exceed the amount of the Receivership's known assets.  Kosturos Dec. ¶ 83.  The FDIC Receiver may finance its opposition to claims asserted against the Receivership from Receivership funds, which would further exacerbate this problem.  Id.  The Examiner similarly found that even if the Capital Contributions were avoided, "there is a substantial risk that the Estates would receive only a claim in the Receivership for the value of the Capital Contributions," and that that claim "likely far exceeds the amount of the Receivership's known assets."  Examiner's Rep. 186.  The Examiner perceived an additional risk that "[d]amages resulting from any claim for avoidance of the Capital Contributions could be treated as an obligation to a shareholder [in the Receivership] and thus subordinated to the claims of [its] general unsecured creditors such as the Bank Bondholders."  Id. at 198.

Additional issues arise from the Constructive Fraudulent Transfer Claims based on the claims and defenses asserted by the parties.  For instance, while the

---

[19]    JPMC, as subsequent transferee of the Capital Contributions, may avoid liability even if the Capital Contributions are proven to constitute constructively fraudulent transfers if JPMC is able to prove that it took in good faith, for value, and without knowledge of the avoidability of the Capital Contributions.  See 11 U.S.C. § 550(b); see also RCW § 19.40.81.  The value provided by a subsequent transferee need not be reasonably equivalent to the value the transferee received.  See In re Res., Recycling & Remediation, Inc., 314 B.R. 62, 70 (Bankr. W.D. Pa. 2004).  Moreover, the value requirement does not mean that the value must have been afforded the debtor.  Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 897 (7th Cir. 1988) (section 550(b)(1) of the Bankruptcy Code says only that "value" must be given, not "value to the debtor").

Business Tort Claims would require the Debtors to prove that WMI's equity had value, and that JPMC's actions destroyed that value, the Constructive Fraudulent Transfer Claims would require the Debtors to establish that, as of the date of each of the Capital Contributions, WMI was insolvent. In the Rule 2004 Application, the Debtors alleged that "[b]y way of these [business tort] claims, JPMC may be held responsible for the destruction of WMI and the total losses suffered by its creditors and shareholders." Id. at ¶ 23. In the Debtor's Answer & Counterclaims, the Debtors alleged that "WMB was insolvent at the time of, or was rendered insolvent by, the P&A Transaction . . . ." Id. at ¶ 74. Moreover, even if the Debtors successfully prove that WMI and WMB were insolvent at the time of the Capital Contributions, the FDIC Receiver and holders of WMB Senior Notes and WMB Subordinated Notes may be able to assert avoidance claims against the Debtors with respect to contemporaneous dividend payments from WMB to WMI.[20] See also Examiner Rep. at 199.

The Debtors note that the Examiner concluded that

> "[e]ven if the Debtors were able to establish the elements of a constructive fraudulent transfer, the Debtors are unlikely to obtain meaningful recovery for their Estates on account of these claims. . . . Given the risk that the Debtors will not prevail in establishing that the Capital Contributions were fraudulent transfers, the recoverability issues that would arise even if the Debtors did prevail, the significant claims that would likely be asserted against the Estates as a result of a successful avoidance, and the costs associated with litigating these claims, the Debtors' avoidance actions with respect to the Capital Contributions do not represent significant claims that are being compromised under the Settlement Agreement."

Examiner's Rep. at 199-200.

---

[20]    Both the FDIC Receiver and certain holders of WMB Senior Notes have initiated actions seeking to avoid the issuance of dividends by WMB to WMI at a time when WMB was insolvent. These claims are asserted by the FDIC Receiver "in the amount of at least $10.5 billion." See FDIC Counterclaims at 28 [WMI Action, Docket No. 26]. The holders of WMB Senior Notes have also asserted fraudulent transfer claims in connection with tax reimbursement payments totaling $922 million made by WMB to WMI in August and September 2008. See Bank Bondholders' Response to Debtors' Objection to 20th Claims Objection [Docket No. 2469].

The Debtors thus submit that the release of the Constructive Fraudulent Transfer Claims in the context of the Global Settlement Agreement as an integrated whole is fair and reasonable and in the best interests of the estates.

*Recovery of the Trust Preferred Securities Would Likely Result in a Corresponding Claim Against the Debtors.*  The Debtors, JPMC, the FDIC Receiver and certain investors who purchased certain Trust Preferred Securities dispute the ownership of such securities (the "TPS Ownership Claims").  During 2006-2007, five special purpose entity issuer trusts, four established under Delaware law and the fifth under Cayman Islands law (the "Issuer Trusts"), issued the Trust Preferred Securities which, through the Issuer Trusts' ownership of preferred shares of a subsidiary of WMB, Washington Mutual Preferred Funding LLC ("WMPF"), obtained the right to receive cash proceeds from three statutory trusts containing loan assets from WMB and certain other WMB subsidiaries.  See Declaration of Brent J. McIntosh ("McIntosh Decl."), dated Nov. 2, 2010, Exs. 3A-3E, 1A at 2, 4-5, 7, 10 [Trust Preferred Securities Action Docket No. 108].  Certain investors, who purchased Trust Preferred Securities at distressed, bargain-basement prices, claim to have a liquidation preference of approximately $4 billion in the Trust Preferred Securities.  See Complaint, Adv. Pro. No. 10-51387 (MFW), ¶¶ 1-6, 57 [Trust Preferred Securities Action Docket No. 1].  In addition, the Debtors have asserted that their purported transfer of the Trust Preferred Securities, discussed below, may constitute a preferential transfer, and the Debtors are entitled to recover the Trust Preferred Securities from JPMC as either an initial or subsequent transferee (the "TPS Preference Claim" and, together with the Debtors' TPS

Ownership Claim, the "Trust Preferred Securities Claims").[21]  See Complaint at ¶¶ 29-35

[WMI Action, Docket No. 1]; Debtors' Answer & Amended Counterclaims at ¶¶ 32-61

[JPMC Action, Docket No. 139].

As discussed in more detail in WMI's briefing on the summary judgment

motions in the Trust Preferred Securities Action [Docket Nos. 105-110, 149-153], the

Trust Preferred Securities were issued subject to a conditional exchange feature (the

"Conditional Exchange") whereby they would be automatically exchanged for WMI for

depositary shares, each representing 1/1,000th of a share of a related series of preferred

stock of WMI, upon the occurrence of one or more certain exchange events and the

direction of the OTS.  The documents governing the Trust Preferred Securities provided

that the following, among other things, constitute an "exchange event":  (i) the

undercapitalization of WMB under OTS' "prompt correction action" regulations, (ii)

WMB being placed into receivership, or (iii) the OTS, in its sole discretion, directing the

exchange in anticipation of WMB becoming "undercapitalized" or the OTS taking

supervisory action limiting the payment of dividends by WMB (each, an "Exchange

Event").  McIntosh Dec. Ex. 4A at § 1; 3A § 1.

Additionally, contemporaneously with each issuance of the Trust

Preferred Securities, WMI acknowledged to the OTS, by letter, that upon occurrence of a

Conditional Exchange, "WMI will contribute to WMB the [Trust Preferred Securities]"

(such letters, the "Downstream Undertakings").  McIntosh Decl. at Exs. 5C, 5E, 5G, 5H.

On the basis of WMI's Downstream Undertakings, the OTS confirmed that the Trust

---

[21]      The Debtors have alternatively alleged that the contribution of the Trust Preferred Securities to
WMB was a constructive fraudulent transfer.  In view of the Downstream Undertaking (as defined below),
however, the Debtors believe the Bankruptcy Court would be likely to find that contribution of the Trust
Preferred Securities to WMB was for reasonably equivalent value — i.e., satisfaction of the Downstream
Undertaking.

Preferred Securities were eligible for inclusion in calculating WMB's core capital.[22]  Id.

at Ex. 5D.

By letter dated September 25, 2008, the OTS declared that an Exchange

Event had occurred and directed the occurrence of the Conditional Exchange. Id. at Ex.

6A.  At the direction of the OTS, on September 25, 2008, employees of WMI and WMB

executed an Assignment Agreement which sought to assign the right, title and interest in

the Trust Preferred Securities to WMB as of that date (the "Assignment Agreement").  Id.

at Ex. 7B.  In accordance with the terms governing the Trust Preferred Securities, at 8:00

a.m. on September 26, 2008, WMI issued a press release providing notice that the

Exchange Event had been declared and that the Trust Preferred Securities would be

automatically exchanged for depositary shares, each representing 1/1,000th of a share of

a related series of WMI's preferred stock, thereby effectuating the Conditional Exchange.

Id. at Ex. 6C.

After the Debtors entered into the GSA and proposed the Plan, certain

investors who purchased the vast majority of their holdings in the Trust Preferred

Securities at distressed, bargain-basement prices after the Conditional Exchange had

occurred (the "Trust Preferred Securities Consortium"), began asserting that the

Conditional Exchange never occurred and, therefore, claiming they are the rightful

owners of the Trust Preferred Securities. See Trust Preferred Consortium Motion to

Compel Production [WMI Docket No. 3757]; Verified Statement of Brown Rudnick

---

[22]    The letters exchanged between WMI and the OTS constitute valid and binding contracts, which obligate WMI to contribute the Trust Preferred Securities to WMB upon the occurrence of a Conditional Exchange.  It is well settled that a contract need not be formalized in order to be valid.  Rather, the primary factor is whether there was a "meeting of the minds" between the two parties.  See 1 WILLISTON ON CONTRACTS § 3.2 (4th ed. 2010) ("A binding mutual understanding or so-called "meeting of the minds" (consensus ad idem) sufficient to establish a contract requires no formality or express language regarding every detail of the proposed agreement; it may be implied from the parties' conduct and the surrounding circumstances.).

[WMI Docket No. 3546]. On July 6, 2010, the Trust Preferred Securities Consortium

commenced the Trust Preferred Securities Action against JPMC, WMI, and the Issuer

Trusts seeking, among other relief, a declaratory judgment that the Conditional Exchange

was never consummated, that the Trust Preferred Securities and any claim thereto do not

constitute property of WMI's estate, and that the Trust Preferred Securities remain with

investors who held such securities immediately prior to the OTS's September 25, 2008

declaration that an Exchange Event had occurred. Complaint at ¶ 228 [Trust Preferred

Securities Action, Docket No. 1].

       As set forth in more detail in the summary judgment papers filed by the

Debtors and JPMC in the Trust Preferred Securities Action, the Trust Preferred Securities

Consortium's claims are without merit. Accordingly, the Debtors believe that it is highly

unlikely that the Trust Preferred Securities Consortium will prevail with respect to the

claims it has asserted in the Trust Preferred Securities Action. If the Trust Preferred

Securities Consortium were successful in asserting its claims, none of the Debtors,

JPMC, the FDIC Entities, or the Receivership will receive any benefit associated with the

Trust Preferred Securities and the Debtors' Trust Preferred Securities Claims will be

rendered worthless.

       The undisputed facts establish, however, that the Conditional Exchange

did occur and, the Debtors have advanced certain arguments that the Trust Preferred

Securities are property of the Debtors' estates. The Debtors' TPS Ownership Claim

alleges that the Trust Preferred Securities may not have been contributed to WMB on

September 26, 2008. See Complaint at ¶ 35 [WMI Action, Docket No. 1]; Debtors'

Answer & Counterclaims at ¶¶ 54-57 [JPMC Action, Docket No. 139]. In that instance,

however, although the Trust Preferred Securities would constitute property of the

Debtors' estates, either JPMC or the FDIC Receiver would assert a dollar-for-dollar

claim against the estates for the value of the Trust Preferred Securities pursuant to the

Downstream Undertakings. See Examiner's Rep. at 174-180. Furthermore, the FDIC

Receiver and JPMC dispute the Debtors' TPS Ownership Claim, and argue that the

transfer of the Trust Preferred Securities to WMB was effectuated pursuant to the

Assignment Agreement. See id. at 179; Complaint at ¶ 42 [JPMC Action, Docket No. 1];

FDIC Amended Answer and Counterclaims at ¶ 27 [WMI Action, Docket No. 34].

The Debtors' TPS Preference Claim alleges that the transfer of the Trust

Preferred Securities to WMB was a preferential transfer that should be avoided for the

benefit of the estates. See Complaint at ¶¶ 33-34 [WMI Action, Docket No. 1]; Debtors'

Answer & Counterclaims ¶¶ 43-53 [JPMC Action, Docket No. 139]. The Bankruptcy

Code prescribes five requirements for a preference, all of which must be met for the

debtor to avoid a transfer. A transfer is preferential if it is (i) to a creditor, (ii) on account

of a pre-existing debt, (iii) made while the debtor is insolvent, (iv) made on or within 90

days before the date of filing the petition, and which (v) enables the creditor to receive

more than he would receive if the estate were liquidated under Chapter 7. See 11 U.S.C.

§ 547(b). The Debtors asserted that, the purported transfer of the Trust Preferred

Securities to WMB was made on account of a pre-existing debt — the Downstream

Undertakings — well within the ninety days preceding the Petition Date. See Complaint

at ¶¶ 1-8 [WMI Action, Docket No. 1]. Moreover, because the transfer of the Trust

Preferred Securities occurred automatically at the time the Conditional Exchange was

effective as of 8:00 a.m. on September 26, 2008, and WMB was then in receivership and

its assets had been sold to JPMC, WMI was likely insolvent as of the time of the

contribution to WMB. Id. at ¶ 61; McIntosh Decl. Exs. 6C, 7B [Trust Preferred

Securities Action Docket No. 108].

JPMC has responded, however, that the Downstream Undertakings

constitute a "commitment" within the meaning of sections 365(o) and 507(a)(9) of the

Bankruptcy Code, such that WMI's obligations pursuant to the Downstream

Undertakings give rise to immediate cure obligations or, at least, a priority claim.

Complaint ¶ 46 [JPMC Action, Docket No. 1]. Section 507(a)(9) of the Bankruptcy

Code provides priority treatment for "allowed unsecured claims based upon any

commitment by the debtor to a Federal depository institutions regulatory agency (or

predecessor to such agency) to maintain the capital of an insured depository institution."

11 U.S.C. § 507(a)(9). Thus, claims arising from capital maintenance commitments are

entitled to priority treatment to the extent set forth in section 507 of the Bankruptcy Code.

Further, to the extent that it applies, section 365(o) of the Bankruptcy

Code requires a debtor to "immediately cure any deficit" with respect to a capital

maintenance commitment. 11 U.S.C. § 365(o). Specifically, that section provides that,

in a chapter 11 case, a debtor

> shall be deemed to have assumed . . . and shall immediately
> cure any deficit under, any commitment by the debtor to a
> Federal depository institutions regulatory agency ... to
> maintain the capital of an insured depository institution,
> and any claim for a subsequent breach of the obligations
> thereunder shall be entitled to priority under section 507.

Id. Thus, section 365(o) of the Bankruptcy Code mandates immediate payment of

deficits to federal depository institutions of capital maintenance commitments. See In re

Imperial Credit Indus. Inc., 527 F.3d 959 (9th Cir. 2008). Indeed, if a debtor fails to

assume and cure such a commitment, the case will be converted to chapter 7 and any
outstanding claim will be entitled to priority pursuant to section 507(a)(9) of the
Bankruptcy Code.  See id.; Resolution Trust Corp. v. Firstcorp., Inc. (In re Firstcorp,
Inc.), 973 F.2d 243, 247 (4th Cir. 1992); see also In re Palace Quality Serv. Indus., Inc.,
283 B.R. 868, 877 n.8 (Bankr. E.D. Mich. 2002) ("It is absolutely clear that the
regulatory agency's claim under section 365(o) for any post-petition breach of a capital
commitment by a debtor to an insured depository institution is to be treated as a section
507 priority claim.").

Both the FDIC Receiver and JPMC have alleged that the Downstream
Undertakings comprise capital maintenance commitments within the meaning of sections
365(o) and 507(a)(9).  See Examiner's Rep. at 177-79.  While there is not an abundance
of case law on this question, certain courts have applied section 365(o) liberally, finding
capital maintenance commitments to exist even in the absence of an enforceable
executory contract.  See Office of Thrift Supervision v. Overland Park Fin. Corp. (In re
Overland Park Fin. Corp.), 232 B.R. 215 (D. Kan. 1999) (finding 365(o) applicable to
informal net worth maintenance stipulation notwithstanding that stipulation was not
enforceable as a matter of law), aff'd in part and rev'd in part, on other grounds, 236 F.3d
1246 (10th Cir. 2001); cf. In re The Colonial Bancgroup, Inc., 436 B.R. 713, 733 (Bankr.
M.D. Ala. 2010) (finding that debtor and Federal Reserve did not intend to create a
capital maintenance commitment within the meaning of section 365(o) where the debtor
agreed only to "assist" the bank in reaching target capital ratios).  In view of the OTS's
broad regulatory authority,[23] and the fact that the plain language of the Downstream

---

[23]    See 12 U.S.C. §§ 1464(s)(1) and 1464(s)(4).  12 U.S.C. § 1464(s)(1) provides: "Consistent with
the purposes of [12 U.S.C. § 3907 ] . . . the Director shall require all savings associations to achieve and

Undertakings obligates the Debtors to contribute the Trust Preferred Securities upon the occurrence of a Conditional Exchange, a court could determine that the Downstream Undertakings were capital maintenance commitments within the meaning of sections 365(o) and 507(a)(9).

Even if the Downstream Undertakings are capital maintenance commitments, it is possible that a court would find that section 365(o) does not apply due to the FDIC's seizure and sale of WMB.  See id.  The effect of such a finding is that WMI would not be under any immediate obligation to contribute the Trust Preferred Securities pursuant to section 365(o) of the Bankruptcy Code.  Id.  Such a finding would not, however, change the fact that either the FDIC or JPMC would be entitled to a priority claim pursuant to section 507(a)(9).  Id. at 733-35.[24]

To the extent a court were to adopt the argument that the Downstream Undertakings comprise capital maintenance commitments within the meaning of section

---

maintain adequate capital by — (A) establishing minimum levels of capital for savings associations; and (B) using such other methods as the Director determines to be appropriate.  12 U.S.C. § 1464(s)(4) provides: "[T]he Director may issue a directive requiring any savings association which fails to maintain capital at or above the minimum level required by the Director to submit and adhere to a plan for increasing capital which is acceptable to the Director . . . .  Any directive issued and plan approved . . . shall be enforceable under [12 U.S.C. § 1818 ] to the same extent and in the same manner as an outstanding order which was issued under [12 U.S.C. § 1818] and has become final.

[24]    Specifically, a recent decision held that "section 365(o) [does not] apply to a commitment that can no longer be assumed and cured on the date of the petition because the insured depository institution is no longer operating."  See In re The Colonial Bancgroup, Inc., 436 BR. at 738.  The Colonial Bancgroup court reasoned section 365(o) contemplates that, after a commitment is assumed and cured, "it will continue in force."  Id.  The court further reasoned that the purpose of section 365(o) is to "prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution."  Id. at 729 (citations omitted).  Thus, the court held, section 365(o) does not apply to a capital maintenance commitment where the purpose of the commitment cannot be fulfilled because the FDIC has closed and sold the depository institution.  Pursuant to this logic, section 365(o) would not apply to the Downstream Undertakings (and the Debtors would be under no obligation to immediately cure any deficits) because WMB was no longer operating as of the Petition Date.  Colonial Bancgroup is not binding on the Bankruptcy Court, but it does indicate that there is a possibility that a court could determine that section 365(o) is not applicable to the Downstream Undertakings.  Nonetheless, the FDIC Receiver would still have a priority claim arising from the Downstream Undertakings pursuant to section 507(a)(9).  See id. at 738 (finding that where section 365(o) does not apply because the commitment cannot be assumed and cured (i.e., due to the fact that the underlying depository institution is no longer operating), "Congress intended to address claims based on such commitments under 11 U.S.C. § 507(a)(9)").

507(a)(9) of the Bankruptcy Code, it becomes unimportant factually whether the Trust Preferred Securities were contributed to WMB or not. In the event the contribution did not occur, and the Trust Preferred Securities are held by WMI, section 507(a)(9) provides that the FDIC Receiver or JPMC would be entitled to a priority claim for $4 billion and the Debtors' estates would effectively lose the value of the Trust Preferred Securities (even if the Bankruptcy Court were to follow <u>Colonial Bancgroup</u> and find section 365(o) inapplicable). <u>See</u> 11 U.S.C. § 507(a)(9) (allowing "unsecured claims based on any commitment by the debtor to a Federal depositary institutions regulatory agency . . . to maintain the capital of such insured depository institution); Examiner's Rep. at 176-79; Complaint ¶ at 46 [JPMC Action, Docket No. 1]). Alternatively, in the event the contribution to WMB did in fact occur, to prevail on a preference claim, WMI would be required to prove that the transfer to WMB enabled WMB to receive more, as a result of the transfer, than it would receive if the transfer had not occurred and WMI's estate were liquidated pursuant to a hypothetical chapter 7 bankruptcy case. <u>See</u> 11 U.S.C. § 547(b). As a defense to such a claim, the FDIC Receiver or JPMC would argue WMI cannot satisfy this element of the claim because section 507(a)(9) would provide FDIC Receiver or JPMC with a priority claim in a chapter 7 liquidation and therefore either entity did not receive more as a result of the transfer than it would have received in a hypothetical chapter 7 liquidation. <u>See</u> 11 U.S.C. § 507(a)(9); Examiner's Rep. at 176-80.

   To the extent a court were to reject the arguments proffered by the FDIC Receiver and JPMC that the Downstream Undertakings comprise capital maintenance commitments within the meaning of sections 365(o) and 507(a)(9) of the Bankruptcy Code, it is likely that the Debtors would prevail on their TPS Preference Claim. <u>See</u>

Examiner's Rep. at 179-80.  Significantly, however, even if the Debtors were to prevail

in avoiding the transfer of the Trust Preferred Securities, the transferee would likely be

afforded a resulting unsecured claim against the Debtors' estates pursuant to section

502(h) of the Bankruptcy Code.[25] See 11 U.S.C. § 502(h).[26]  Such claim would increase

the amount of existing unsecured claims in the same amount as the successful recovery,

dollar-for-dollar.  See Ralar Distribs. Inc. v. Rubbermaid, Inc. (In re Ralar Distribs. Inc.),

4 F.3d 62, 66 n.2 (1st Cir. 1993) ("If [the transferee] were required to disgorge, it could

file a proof of claim for the amount of the avoided transfer . . . which would be entitled to

a pro rata distribution from the [transferor-debtor] estate."); Verco Indus. v. Spartan

Plastics (In re Verco Indus.), 704 F.2d 1134, 1138 (9th Cir. 1983) ("although we

acknowledge that [the transferor-debtor] has a valid claim for the unpaid amount of the

note from Spartan, we also believe that [the transferee] would have a claim against [the

transferor-debtor] for the loss it suffered when the transfer was set aside.") (citations

omitted).[27]

---

[25]    In this respect, Colonial Bancgroup is factually distinct from the facts of the Chapter 11 Cases.
Prior to finding that section 365(o) of the Bankruptcy Code is not applicable to agreements to maintain the
capital of a closed depository institution, the Colonial Bancgroup court found that there was no capital
maintenance commitment in that case within the meaning of the statutes because none of the challenged
documents "impose[d] liability on the Debtor in the event the Bank fails to reach the required capital
ratios." 436 B.R. at 731. Thus, the FDIC had no claim in Colonial Bancgroup. Here, the plain language of
the Downstream Undertakings obligate the Debtors to contribute the Trust Preferred Securities upon the
occurrence of a Conditional Exchange.
[26]    Section 502(h) of the Bankruptcy Code provides that "[a] claim arising from the recovery of
property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under
subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same
as if such claim had arisen before the date of the filing of the petition."
[27]    Cohen v. Eiler (In re Cohen), 305 B.R. 886, 898 (9th Cir. BAP 2004) ("Nor does recovery from a
transferee under avoiding powers unfairly deprive the transferee of rights against the estate.  Upon
recovery, the transferee has a claim that is treated as a prepetition claim. ") (citations omitted); Adams v.
Prudential Sec. (In re Found. for New Era Philanthropy), 201 B.R. 382, 393 (Bankr. E.D. Pa. 1996) (noting
that if the trustee were to avoid the transfers of property made to the creditor and recover the property
transferred or its value, the creditor, who had been repaid in full pre-petition, would no longer be paid in
full and would have a claim against the estate pursuant to section 502(h)); In re Allied Cos., Inc., 155 B.R.
739, 744 (Bankr. S.D. Ind. 1992) ("Although a creditor did not have a claim at the time of bankruptcy
because its claim had been satisfied by a preferential payment, subsequent avoidance of the payment relates

The fact that either JPMC or the FDIC Receiver would have a claim (whether priority or unsecured) against the Debtors' estates for the value of the Trust Preferred Securities, even if the Debtors successfully pursued either of their Trust Preferred Securities Claims, is critical from the perspective of holder of Equity Interests. See Examiner's Rep. at 27-30. While recovery of the Trust Preferred Securities might reduce extant creditors' losses, the aggregate shortfall vis-à-vis holders of Equity Interests is left unaltered. See id. The following illustrative chart, concerning a vastly oversimplified WMI chapter 11 estate seeking to avoid the contribution of the Trust Preferred Securities, reflects the aggregate amount that would remain unpaid to creditors (i.e., shortfall vis-à-vis holders of Equity Interests) both before and after a theoretical successful recovery of the Trust Preferred Securities or judicial determination that the Trust Preferred Securities never were transferred:

---

back to the time before bankruptcy, so the claim is deemed to have been unpaid at the time the petition was filed.").

| PRE-AVOIDANCE (OR FAILURE TO AVOID) | Estate Asset Value<br><br>"X" | Claims Pool<br><br>"Y" | Creditor Recoveries<br><br>X/Y | Creditors' Losses/ Equity's Shortfall<br><br>Y-X |
|---|---|---|---|---|
| | $4 billion | $7 billion | 57% | **$3 billion** |
| ------ **Avoidance of $4 billion Trust Preferred Securities Prepetition Transfer** ------ | | | | |
| SUCCESSFUL AVOIDANCE | Estate Asset Value (including the Trust Preferred Securities)<br><br>"X" | Claims Pool (including the FDIC or JPMC claim for Trust Preferred Securities pursuant to Downstream Undertakings)<br><br>"Y" | Creditor Recoveries<br><br>X/Y | Creditors' Losses/ Equity's Shortfall<br><br>Y-X |
| | $8 billion | $11 billion | 72% | **$3 billion** |

See id. at 6, 26-30.  Although creditor recoveries would increase (unless the resulting claim was determined to be a priority claim), no material gains would accrue to holders of Equity Interests upon success on the Trust Preferred Securities Claims in view of the resulting claims against the Debtors' estates.  See id. at 27 ("The Avoidance Actions are unlikely to lead to any substantial net recoveries [for holders of Equity Interests].  The same is true with respect to any attempt to set aside the transfer of the TRUPS to WMB.").  Whether or not the Debtors succeeded with respect to one or the other of their Trust Preferred Securities Claims, the holders of Equity Interests would require, in either instance, that the Debtors' estates procure *additional* assets worth in excess of $3 billion to receive any recovery.  See id. at 6, 26-30.

For these reasons, the Debtors submit that the Trust Preferred Securities Claims, even if successfully pursued, would have a negligible effect on the net value of their estates, at least with respect to any prospect of reducing the shortfall for holders of Equity Interests.

*Preference Claims*. Prior to the Petition Date, WMI transferred significant sums or other interests in property to WMB, to third parties for the benefit of WMB, or to FSB (collectively, the "Transfers"). The Debtors have asserted claims to recover the Transfers as preferences (the "Preference Claims"). See Complaint ¶¶ 36-40 [WMI Action, Docket No. 1]; WMI Amended Answer & Counterclaims ¶¶ 62-65 [JPMC Action, Docket No. 139]. Each Transfer was made on account of a pre-existing obligation of WMI, during the one-year period immediately preceding the Petition Date, when WMB and FSB were both "insiders" and "creditors" of WMI, as those terms are defined in the Bankruptcy Code or pursuant to applicable non-bankruptcy law. WMI Amended Answer & Counterclaims ¶¶ at 62-63. The Transfers were made in the aggregate amount of approximately $3.4 billion. Id. at ¶ 63.

The Debtors may avoid the Transfers pursuant to section 547 of the Bankruptcy Code, however, if WMI was insolvent at the time of the Transfers. See Complaint ¶ 39 [WMI Action, Docket No. 1]; 11 U.S.C. § 547(b)(3). As discussed above with respect to the Constructive Fraudulent Transfer Claims regarding the Capital Contributions, certain issues exist in connection with determining WMI's insolvency in the year preceding the Petition Date. Additionally, as discussed above, establishing WMI's insolvency for the purposes of this claim may conflict with the damages theories underlying the Business Tort Claims.

Accordingly, the Debtors thus submit that the release of the Preference Claims in the context of the Global Settlement Agreement as an integrated whole is fair and reasonable and in the best interests of the estates.

*The IP Claims.* As set forth in the Goulding Declaration, WMI is the owner of more than 80 federal trademark registrations and applications comprising a family of trademarks, including, but not limited to, the marks "WAMU," "WASHINGTON MUTUAL" and the "W Logo", for a variety of services including banking, credit card, lending, investment and other financial services as well as community, education and philanthropic oriented services (collectively, the "WaMu Marks"). Goulding Decl. at ¶ 19. WMI also owns registrations for at least 140 other trademarks and service marks (the "Secondary Marks"). Id. In addition, WMI is the owner of approximately 1,350 domain names, including, but not limited to, wamu.com, washingtonmutual.com, and wamubank.com (collectively, the "WaMu Domain Names"), which contain either the WaMu Marks, the Secondary Marks or references to past advertising campaigns sponsored by WMI. Id. WMI also is the assignee of U.S. Patent No. 6,681,985 (the "Patent" and, collectively with the WaMu Marks, the Secondary marks, the WaMu Domain Names, the "Disputed IP") for the so-called Occasio$^{TM}$ method of branch banking, which sets forth the system for customer financial transactions in a branch bank (*i.e.*, the placement of tellers, ATM machines, counters, and advertisements). Id.

Prior to the Petition Date, it was WMI's policy and practice to register the WaMu Marks and the Secondary Marks with the United States Patent and Trademark Office in the name of WMI. Id. at 20. Likewise, it was WMI's policy and practice to

register all domain names in WMI's name.  Id.  WMI subsidiaries were permitted to use

the trademarks and WaMu Domain Names for the products and services relevant to each

subsidiary's business, pursuant to an implied license from WMI for as long as the

subsidiary remained an affiliate of WMI.  Id.

       Since the Receivership Date, JPMC has used certain of the Intellectual

Property (including WMI's intellectual property embodied by and incorporated in

www.wamu.com), and WMI has expressly reserved its rights with respect to such use.

Id. at ¶ 22; WMI Answer & Amended Counterclaims ¶ 183 [JPMC Action, Docket No.

139].  In the JPMC Action, WMI asserted counterclaims against JPMC regarding the

Disputed IP, alleging that JPMC's usage of the Disputed IP is unauthorized and

infringing, and also is intentional and willful (collectively, the "IP Claims").  Id. at ¶¶

179-80.  In support of the IP Claims, the Debtors argued that WMB used the Intellectual

Property only as an implied licensee of WMI, and that such implied license ceased when

WMB was sold to JPMC.  Id. at ¶ 183.  JPMC has asserted numerous defenses to the

Debtors' allegations that JPMC's usage of the Disputed IP is unauthorized and infringing,

including, by way of example, the following defenses:  JPMC owns the trademarks and

domain names, or in the alternative, has a license to use the trademarks and domain

names; WMB used and registered the Washington Mutual and W Logo marks first;

JPMC has not infringed and is not infringing any of the trademarks as there is no

likelihood of confusion; and JPMC has not infringed and is not infringing the copyrighted

website and that JPMC owns the copyright, or in the alternative, has a license to use the

copyrighted website, among other defenses.  JPMC Answer Seventeenth to Twenty-Sixth

Affirmative Defenses); Goulding Decl. at ¶ 23.

Pursuant to Section 2.17 of the Global Settlement Agreement, JPMC will receive the majority of the Disputed IP, while WMI will retain certain domain names and five trademarks. Goulding Decl. at ¶ 24. Given the risks and uncertainties associated with protracted litigation with respect to claims and defenses regarding the Disputed IP, the Debtors believe that the treatment of the Disputed IP, in the context of the Global Settlement Agreement, as an integrated whole, is fair and reasonable. Id.

*DC Claims*. In addition to the claims referenced above that are at issue in the WMI Action, the JPMC Action and the Turnover Action, the Debtors asserted three additional counts in the WMI Action against the FDIC Entities: (i) a claim for asset dissipation, seeking to enforce the FDIC's statutory duty to maximize gain and minimize loss pursuant to 12 U.S.C. § 1821(d)(13)(E)(i) (the "Dissipation Claim"); (ii) a constitutional taking claim for failure to compensate the Debtors for their equity interest in WMB (the "Taking Claim"); and (iii) a conversion claim pursuant to the Federal Tort Claims Act (the "Conversion Claim" and, collectively with the Dissipation Claim and the Taking Claim, the "DC Claims"). See WMI's Complaint ¶¶ 89, 92, 94 [WMI Action, Docket No. 1].

The FDIC Receiver has asserted that the DC District Court lacks subject matter jurisdiction over the DC Claims because such claims were not asserted in the Debtors' Claims (*i.e.*, the proof of claim filed by the Debtors against the Receivership). See FDIC's Motion to Dismiss at 10 [DC Action, Docket No. 25]. The Debtors have argued that the FIRREA exhaustion provisions and the Jurisdictional Bar are inapplicable to claims against the FDIC Entities in their capacities as a federal agency, as distinguished from claims asserted against WMB and, moreover, that the theories

advanced by the Dissipation Claim, Taking Claim, and Conversion Claim were effectively included in the Debtors' Claims. See Plaintiff's Consolidated Response to FDIC's Motion to Dismiss at 10 [WMI Action, Docket No. 42]. The Examiner found that, "there is a risk that the DC Court will accept the FDIC's argument and dismiss these claims for lack of jurisdiction." Examiner's Rep. at 306.

The FDIC Receiver has also asserted that (a) the Debtors possess no private cause of action with which to advance the Dissipation Claim,[28] (b) with respect to the Taking Claim, the FDIC's seizure and sale of WMB does not constitute a "taking,"[29] and (c) with respect to the Taking Claim and the Conversion Claim, the court is without jurisdiction to allow the claims to proceed against the FDIC and that, rather, the proper party to sue is the United States.[30]  See FDIC's Mem. of Law in Supp. of the Partial Mot. to Dismiss at 11-19; Examiner Rep. at 310-317.

In light of the foregoing, the Debtors believe that the release of the claims asserted in the DC Action in the context of the Global Settlement Agreement as an

---

[28]    The Third Circuit has held that "there is no evidence of a congressional intent to provide for a private remedy [under 12 U.S.C. § 1821(d)(13)(E)]. Because such intent is our ultimate guidepost, we find that the shareholders of a failed financial institution do not have a private right of enforcement of the FDIC's duty to maximize gain and minimize loss in its disposition of the institution's assets." Hindes v. F.Docket No.C., 137 F.3d 148, 170 (3d Cir. 1998); see also Mosseri v. FDIC, No. 95 Civ. 07273 BSJ, 2001 U.S. Dist. LEXIS 18899 (S.D.N.Y. Nov. 20, 2001) ("Disappointed bidder, does not have a private right of action to sue the FDIC for breach of its duties under 12 U.S.C. § 1821(d)(13)(E)(i)-(iii)"); Pen-Del Mortgage Assocs. v. FDIC, No. Civ. A94-0067, 1994 U.S. Dist. LEXIS 16741 (E.D. Pa. Nov. 23, 1994) (finding no private cause of action implied for disappointed bidders by duties to maximize returns or treat offerors fairly). Hindes' determination is based, in part, upon the proposition that the primary purpose of the FDIC's duty to examine banks and to maximize gain is to safeguard the insurance fund and reduce the costs to taxpayers, not to preserve the investment of shareholders. Id. at 170-71.

[29]    See Salt Lick Bancorp v. FDIC, 187 F. Appx 428, 435 (6th Cir. 2006) (citing FDIC v. Meyer, 510 U.S. 471, 475-86 (1994)).

[30]    The Debtors face the defense that the FDIC Entities cannot be sued in their own name — that the proper party to sue is the United States. See ABI Inv. Group v. FDIC, 860 F. Supp. 911, 918 (D.N.H. 1994); FDIC v. Manatt, 723 F.Supp. 99, 104 (E.D. Ark. 1989) ("The FTCA is the exclusive remedy for tort claims against the government. The FDIC is a federal agency and within the coverage of the FTCA.").

integrated whole – in exchange for the value and other benefits confirmed upon the Debtors therein – is fair and reasonable and in the best interests of the estates.

    **4.**    **Resolution of Numerous Disputes Regarding the "Other Settlement Assets"**

        In addition to the foregoing, the Global Settlement Agreement resolves a multitude of disputes regarding the ownership of various other assets and allocation of responsibility for various liabilities, many of which, absent a global, integrated settlement, would likely be fully litigated (and could not be settled on a "one off" basis). Kosturos Decl. at ¶ 50. With respect to such assets, those that are transferred by the Debtors to JPMC pursuant to the Global Settlement Agreement may have little to no value to the Debtors other than as leverage in the context of a global settlement with JPMC. Id. For example, and as set forth in more detail below and in the Goulding Declaration, the WaMu Pension Plan, the WMI Vendor Contracts, the Visa Strategic Agreement and the Transferred Intellectual Property (each as defined below), all of which are held in WMI's name, are valuable and desirable to JPMC, but, based upon the lack of a significant ongoing business, do not benefit the Debtors. The Wind Power Interest (defined below) arguably also falls into this category, even though the Debtors value the Wind Power Interest at approximately $15 million, as a JPMC affiliate has a right of first refusal with respect to the Wind Power Interest and the Debtors have already attempted, unsuccessfully, to market and sell this asset to a third-party purchaser. Goulding Decl. at ¶¶ 111-13.

        In addition, the allocation of assets and liabilities pursuant to the Global Settlement Agreement in many instances brings value to the Debtors' estates in the form of elimination of potential significant liabilities. For example, pursuant to the Global

Settlement Agreement, JPMC will assume liabilities and other obligations related to the WaMu Pension Plan (including the $20 million settlement in the Buus Action), the WMI Medical Plan, potential contingent and unliquidated indemnification obligations related to the Interchange Litigation, the Visa U.S.A. Claim (alleged to be at least $9.1 million as discussed below), and potential BKK Liabilities. In addition, JPMC will pay $50 million to the Vendor Escrow to be used to fund satisfaction of the WMI Vendor Claims. See Global Settlement Agreement § 2.14.

Furthermore, many of the Global Settlement Agreement's allocations are beneficial to the extent that litigation costs are reduced. For example, in instances where the parties have asserted competing positions (such as with respect to the Visa Shares, certain of the BOLI/COLI Policies, the Intercompany Obligations, and the proceeds from the Goodwill Lawsuits), the Debtors and JPMC were able to reach a compromise and agreement that the Debtors believe is reasonable in the context of the Global Settlement Agreement as a global, integrated resolution of a multitude of disputes.

Set forth below is a summary of the various disputes and proposed resolutions regarding these additional settlement assets.

*Qualified Plans*. As discussed in detail in the Goulding Declaration, WMI is the sponsor of the WaMu Pension Plan and the Lakeview Plan. Goulding Decl. at ¶ 25. Nearly all of the covered employees of the WaMu Pension Plan and all of the covered employees of the Lakeview Plan were employees of WMB, many of whom are now employed by JPMC. Id. at ¶ 26. JPMC seeks to assume sponsorship of these Qualified Plans. Id. at ¶ 38; JPMC Complaint ¶¶ 224-229 [JPMC Action, Docket No. 1].

For various reasons, since the Receivership Date, the liabilities of the Qualified Plans continue to increase. Goulding Decl. at ¶¶ 31-35.

As sponsor of the Qualified Plans, WMI retains a contingent interest in the assets related to such plans, if any, remaining after all liabilities thereunder have been satisfied. Id. at ¶ 28. As sponsor, however, WMI also is burdened with obligations to administer the Qualified Plans and maintain the funded status thereof. Id. The potential to realize value with respect to any excess assets, as well as the potential exposure to liability, differ depending upon whether the Debtors decide to continue the Qualified Plans, terminate them, or transfer them to JPMC. Id.

With respect to continued sponsorship of the WaMu Pension Plan, the Debtors understand that such sponsorship is not cost-effective or advantageous to WMI's estate because (i) WMI would be liable for any future underfunding of the WaMu Pension Plan, (ii) WMI would ultimately bear the costs of administering the WaMu Pension Plan, (iii) WMI, as sponsor, would be obligated to address and correct any plan operational defects that existed prior to the Petition Date or arose in connection with the Receivership, which could result in, among other consequences, the imposition of penalties and sanctions in an unknown amount on WMI, and (iv) continued sponsorship of the WaMu Pension Plan imposes upon WMI and its employees continued fiduciary obligations to the participants therein and beneficiaries thereof, resulting in continued exposure to liability in respect of such obligations. Id. at ¶¶ 31-35.

The Debtors also understand that termination of the WaMu Pension Plan by WMI could result in liabilities for WMI. Id. ¶ 30. Furthermore, any excess assets that did remain after the annuitization of benefits and the satisfaction of all other WaMu

Pension Plan liabilities, if any, would be subject to a 50% excise tax. Id. at ¶ 37. In the event that either of the Qualified Plans were underfunded on a termination basis, WMI, as sponsor, would be liable for any shortfall and the PBGC would pursue a claim for the underfunding against WMI's estate to the detriment of other creditors.[31]

Accordingly, although the WaMu Pension Plan is currently overfunded on an ongoing basis, in light of the limited return to be derived from termination (and the exposure to potential liability), the Debtors believe that the best way for their estates to monetize value in the WaMu Pension Plan is to transfer sponsorship thereof to JPMC (along with the Lakeview Plan), as partial consideration for the consideration received by the Debtors pursuant to the Global Settlement Agreement. Id. at ¶ 36.

Upon assumption of sponsorship of the WaMu Pension Plan, JPMC will relieve the Debtors of responsibility for responding to the ongoing IRS audit of such plan and for curing existing operational defects. Global Settlement Agreement § 2.10. Furthermore, JPMC has, in effect, assumed responsibility for the settlement of the litigation pending against the WaMu Pension Plan and certain individuals, styled Buus, et. al. v. WaMu Pension Plan, et al., No. 07-903 (the "Buus Action"), in the United States District Court for the Western District of Washington (the "Washington District Court"), pursuant to which the liabilities of the WaMu Pension Plan to those participants of the WaMu Pension Plan who are members of the settlement class will be increased by an aggregate amount of $20 million, less certain fees and expenses. Id. at ¶ 39. Such settlement will be funded directly from the WaMu Pension Plan, such that it will

---

[31]    The PBGC filed claims against the Debtors in an aggregate amount of more than $71 million plus unliquidated amounts. Pursuant to the *Stipulation and Agreement Between the Debtors and the Pension Benefit Guaranty Corporation Withdrawing Proofs of Claim*, dated November 19, 2010 [Docket No. 6021], the PBGC has agreed to withdraw their claims as of the Effective Date provided that certain conditions of the Global Settlement Agreement are approved and authorized by the Bankruptcy Court.

ultimately be borne by JPMC as the new sponsor. Id. at ¶ 34. Pursuant to the Global

Settlement Agreement, JPMC will also assume the Lakeview Plan. Id. at ¶¶ 37, 39.

Accordingly, and due, in particular, to the elimination of liabilities, the Debtors view the

Global Settlement Agreement's treatment of the Qualified Plans, in the context of the

Global Settlement Agreement as an integrated whole, as fair, reasonable, and beneficial

to their estates. Id. at ¶ 38.

_Rabbi Trusts_. In certain of the Actions, the Debtors and JPMC disputed

the ownership of the assets of certain rabbi trusts that support the obligations under (_i.e._,

fund the payment of benefits of) a number of non-qualified deferred compensation and

supplemental retirement plans covering current or former employees or retirees of WMB

or its predecessors in interest (the "Rabbi Trusts"). Specifically, in the JPMC Action,

JPMC asserted that, pursuant to the P&A Agreement, it acquired twelve (12) Rabbi

Trusts, contending that all Rabbi Trusts except for those originally sponsored by H.F.

Ahmanson and Co. (the "Ahmanson Trusts") were reflected on WMB's books and

records as of the Receivership Date, and that, in each instance, WMB was the successor

to the original settlor. JPMC Complaint at ¶¶ 130-31 [JPMC Action, Docket No. 1].

JPMC seeks to assume the benefit of all Rabbi Trusts for which WMB was the successor,

as reflected on WMB's books and records. Id. at ¶ 135.

WMI reviewed all available documentation relating to ownership of the

Rabbi Trusts and the assets contained therein, which include:

      (a)    The Ahmanson Trusts;[32]

---

[32]     These trusts include: (i) H.F. Ahmanson & Company 1989 Contingent Deferred Compensation Plan Trust; (ii) H.F. Ahmanson & Company and Affiliated Companies Supplemental Executive Retirement Plan Trust; (iii) H.F. Ahmanson & Company Elective Deferred Compensation Plan Trust; (iv) H.F. Ahmanson & Company Outside Director Retirement Plan Trust; (v) H.F. Ahmanson & Company Outside

(b)    The PFFSB Trusts,[33] the Great Western Trusts,[34] the Coast Federal Trusts,[35] the American Bank Trust,[36] the Providian Bank Trust,[37] and one of four Trusts established by Dime Savings Bank of New York, FSB (the "<u>Dime Trusts</u>") – the Benefit Protection Trust;[38]

(c)    The other Dime Trusts: the Executive Trust,[39] the Broad Based Trust[40] and the Directors' Trust.[41]

Goulding Decl. at ¶ 42.

JPMC does not dispute that the Debtors own the assets of the Ahmanson

Trusts, which will be transferred to WMI pursuant to the Global Settlement Agreement.

<u>Id</u>. at ¶ 43; JPMC Complaint at ¶ 134 n.2.  At the conclusion of the settlement negotiation

process, and pursuant to the Global Settlement Agreement, the parties determined, in the

context of the settlement as a whole, that all the rights and obligations in the Rabbi

Trusts, except the Ahmanson Trusts, will be allocated to JPMC.  Goulding Decl. at ¶ 43.

The Debtors believe that the treatment of the Rabbi Trusts in the context of the Global

---

Directors' Elective Deferred Compensation Plan Trust; (vi) H.F. Ahmanson & Company Loan Agents' Elective Deferred Compensation Plan, established January 1, 1991; (vii) Trust Under H.F. Ahmanson & Company Outside Directors' Capital Accumulation Plan; (viii) Trust Under H.F. Ahmanson & Company Loan Consultants' Capital Accumulation Plan; and (ix) Trust Under H.F. Ahmanson & Company Capital Accumulation Plan.

[33]    Pacific First Federal Savings Bank created two Rabbi Trusts (i) the Pacific First Federal Savings Bank Umbrella Trust for Key Employees and (ii) the Pacific First Federal Savings Bank Umbrella Trust for Directors (together, the "<u>PFFSB Trusts</u>").

[34]    Great Western Financial Corporation ("<u>GWFC</u>") established the:  (i) Great Western Financial Corporation Umbrella Trust for Senior Officers, and (ii) Great Western Financial Corporation Umbrella Trust for Directors (together, the "<u>Great Western Trusts</u>").

[35]    Coast Federal Bank ("<u>Coast</u>") established that certain (i) Trust Under Deferred Compensation Plan and 1993 Supplemental Employment Retirement Plan and (ii) Trust Under Deferred Compensation Plan and 1995 Supplemental Employment Retirement Plan (together, the "<u>Coastal Federal Trusts</u>").

[36]    American Savings Bank, F.A. ("<u>ASB</u>" or "<u>American Savings Bank</u>") established the American Savings Bank, F.A. Grantor Trust (the "<u>American Bank Trust</u>") pursuant to a trust agreement between ASB and Security Pacific National Bank (which became Bank of America, N.A.), as trustee, dated July 22, 1991.

[37]    Providian Financial Corporation ("<u>Providian</u>") established that certain Providian Financial Corporation Deferred Compensation and Benefits Trust (the "<u>Providian Trust</u>").

[38]    Benefit Protection Trust Agreement, as amended (the "<u>Benefit Protection Trust</u>").

[39]    Umbrella Trust Agreement with respect to the Covered Arrangements of The Dime Savings Bank of New York, FSB and Related Entities, as amended (the "<u>Executive Trust</u>").

[40]    Umbrella Trust Agreement with respect to the Designated Arrangements of the Dime Savings Bank of New York, FSB and Related Entities, as amended (the "<u>Broad Based Trust</u>").

[41]    Umbrella Trust Agreement with respect to the Covered Arrangements for Outside Directors of the Dime Savings Bank of New York, FSB and Related Entities, as amended (the "<u>Directors' Trust</u>").

Settlement Agreement as an integrated whole, which tracks the historical ownership of such trusts, is fair and reasonable. Id.

       *BOLI-COLI Policies*. Similarly, the Debtors and JPMC each asserted ownership interests in certain bank-owned and corporation-owned life insurance policies on the lives of employees (the "BOLI-COLI Policies"), which were used as a tax-deferred way to fund the costs of various welfare plans, hedge deferred compensation arrangements and provide insurance benefits to certain employees. Id. at ¶ 45; WMI Amended Answer & Counterclaims at ¶¶ 168-69.

       In considering ownership of all the BOLI-COLI Policies, the Debtors and JPMC exchanged lists containing their respective views on the ownership of such policies. Goulding Decl. at ¶ 53. In many instances, JPMC and the Debtors have agreed as to the ownership of particular BOLI-COLI Policies. In other instances, however, the Debtors and JPMC dispute the ownership of certain BOLI-COLI Policies, including (i) Pacific Life Insurance Company ("Pacific Life") policies under List Bills Nos. 7675A and 7729A (the "Pacific Life Policies"), and (ii) approximately 995 split dollar policies (the "995 Split Dollar Policies" and, together with the Pacific Life Policies, the "Disputed BOLI-COLI Policies"). Id. at ¶ 46; JPMC Complaint at ¶¶ 152, 155.

       Pursuant to the Global Settlement Agreement, WMI will be deemed the owner of the Pacific Life Policies, JPMC will be deemed the owner of the 995 Split Dollar Policies, and WMI and JPMC will each retain respective ownership of certain other policies. Goulding Decl. at ¶ 53; Global Settlement Agreement § 2.9(a)-(b). The allocation of the BOLI-COLI Policies is fair and equitable in the context of the Global Settlement Agreement as an integrated whole.

Moreover, the Examiner's findings as to the ownership of the BOLI-COLI Policies and the 995 Split Dollar Policies support the conclusion that the proposed allocation is fair and equitable. According to the Examiner, "[t]he vast majority of the Policies were held in the name of WMB or WMB subsidiaries." Examiner's Rep. at 183. The Examiner explained that, because the BOLI-COLI Policies and the 995 Split Dollar Policies "were held by WMB, they would have been transferred to JPMC along with other assets under the P&A Agreement." Id. The Examiner noted the dispute between the Debtors and JPMC over certain of the BOLI-COLI Policies, and recognized that "these Policies were generally treated as being held by WMB," but recognized the ambiguity as to WMI's interests in such policies due to certain accounting and trust records. Id. at 184. The Examiner found that these "[p]olicies were generally treated as assets of WMB and there is no definitive evidence that WMI had an ownership in these [p]olicies." Id. at 184. In sum, the Examiner "did not find any basis to challenge the proposed division of the Policies under the Settlement Agreement." Id. at 180 (emphasis added).

*Deferred Compensation Plans*. WMI and WMB each have liabilities associated with certain deferred compensation plans for their employees, including employees of certain predecessors in interest (collectively, the "Deferred Compensation Plans"). In the JPMC Action, neither JPMC nor WMI asserted ownership of or responsibility for the Deferred Compensation Plans. Goulding Decl. at ¶ 54. As with the Rabbi Trusts and the BOLI-COLI Policies, the Debtors examined the available documentation for each of the Deferred Compensation Plans to determine WMB and WMI's respective liability. Id. Pursuant to the Global Settlement Agreement, the

Debtors and JPMC agreed that JPMC, although it had no obligation to do so, will assume the liabilities and waive any claims against the Debtors associated with the GWFC DCPs, Providian DCP, the ASB DCPs an the Coast DCP (as defined in the Goulding Declaration). Id. at ¶ 55. The Debtors believe that this allocation of the Deferred Compensation Plans is fair and reasonable in the context of the Global Settlement Agreement as a whole.

*WMI Medical Plan*. WMI is the sponsor of the WMI Medical Plan. Id. at ¶ 56. Since September 25, 2008, former WMI and WMB employees — who became JPMC employees as a result of the P&A Agreement — have continued to participate in the WMI Medical Plan. Id. As of that same date, JPMC began administering the WMI Medical Plan and paying claims asserted thereunder, as though JPMC were the successor sponsor of the plan. Id.

WMI's continued sponsorship of this plan is not in the best interest of its estate because, among other things, it exposes WMI's estate to unnecessary liability for future obligations associated with the WMI Medical Plan, and there are no assets specifically set aside to support such obligations. Id. at ¶ 60. Since July 1, 2009, the vast majority of active employees of WMB and its subsidiaries have elected coverage under JPMC's medical plans and terminated their coverage under the WMI Medical Plan. Id. It would therefore be economically prudent for the Debtors to either terminate the WMI Medical Plan or transfer the plan to JPMC. Termination of the WMI Medical Plan, however, would not resolve the pending proofs of claim, totaling over 100 in number, filed by former WMI and WMB employees against the Debtors for payment of benefits owed pursuant to the WMI Medical Plan, in the aggregate amount of approximately $3

million plus additional unliquidated amounts (the "<u>WMI Medical Plan Claims</u>"). <u>Id.</u> at ¶ 58.

Pursuant to the Global Settlement Agreement, JPMC will assume sponsorship of the WMI Medical Plan. Global Settlement Agreement § 2.8. JPMC has also agreed to satisfy all obligations to pay or provide benefits accrued under the WMI Medical Plan from and after the Receivership Date. Goulding Decl. at ¶ 61. Additionally, JPMC will pay certain allowed prepetition claims related to the WMI Medical Plan. <u>Id.</u> Because JPMC will pay benefits going forward to participants in the plan, most of the WMI Medical Plan Claims asserted against the Debtors will be rendered moot and be disallowed. <u>Id.</u> In light of these considerations, and, in the context of the settlement as a whole, the transfer of the WMI Medical Plan to JPMC is fair, reasonable, and beneficial to the Debtors' estates. <u>Id.</u>

*Visa Shares*. In October 2007, pursuant to a corporate reorganization, Visa U.S.A. Inc. ("<u>Visa U.S.A.</u>") and several other entities that, prior to the restructuring, operated as independent but related entities became direct or indirect subsidiaries of Visa Inc. <u>Id.</u> ¶ 63. Prior to the reorganization, Visa U.S.A. operated as a non-stock corporation with approximately 13,300 member financial institutions. <u>Id.</u> WMB was a member of Visa U.S.A. since before July 1999. <u>Id.</u>

In connection with its reorganization, Visa Inc. held an initial public offering on March 19, 2008 (the "<u>Visa IPO</u>"), pursuant to which Visa Inc. issued shares of Visa Inc. Class B common stock (the "<u>Class B Shares</u>") to the members of Visa U.S.A. <u>Id.</u> at ¶¶ 64-65. The Class B Shares are subject to a restriction on transfer pursuant to which transfers by holders thereof are severely limited until, at least, the date on which

all Covered Litigation (as defined in the Goulding Declaration)[42] has been finally

resolved (the "Lock-Up Period"). Id. After termination of the Lock-Up Period, the Class

B Shares are convertible into shares of Visa Inc. Class A common stock (the "Class A

Shares"). Id. As set forth in more detail in the Goulding Declaration, the applicable

conversion rate for the Class B Shares (and thus the ultimate value of the Class B Shares,

including the Visa Shares) is dependent upon the ultimate amount of total liability of Visa

U.S.A. and its affiliates in the Covered Litigation. Id. In other words, as Covered

Litigation liabilities increase, each Class B Share becomes equal to a smaller percentage

of Class A Shares. Id.

In addition, in contemplation of the reorganization, Visa U.S.A.'s bylaws

were amended on October 2, 2007 to provide that all members of Visa U.S.A., including

WMB, have indemnity obligations to Visa U.S.A. with respect to the Covered Litigation.

Id. at ¶ 67. WMI and WMB may also be contractually liable to indemnify Visa U.S.A.

and its affiliates for Covered Litigation liabilities in excess of the value of the Class B

Shares, pursuant to agreements executed in connection with Visa Inc.'s reorganization

and the Visa IPO. Id. Specifically, WMI and WMB may have liabilities pursuant to that

certain Interchange Judgment Sharing Agreement, dated as of July 1, 2007 (as amended

and restated, the "Interchange Judgment Sharing Agreement"). Id. In addition, WMI is

party to that certain Loss Sharing Agreement, dated as of July 1, 2007, among Visa

U.S.A., WMI and certain financial institutions (as amended and restated, the "Loss

Sharing Agreement"). Id. Pursuant to the Interchange Judgment Sharing Agreement and

---

[42]    The Covered Litigation consists, generally, of several lawsuits involving third party claims asserted against, among others, Visa U.S.A. Several of the Covered Litigations have already settled, resulting in obligations totaling approximately $4.17 billion. Goulding Decl. at ¶ 68. Only the Interchange Litigation (as defined in the Goulding Declaration) remains pending, but the outcome of the Interchange Litigation is, of course, uncertain, and liabilities could be significant. Id.

the Loss Sharing Agreement, Visa Inc. will, in the first instance, pay (or, with respect to

the Interchange Litigation, reimburse signatories for payments made by them pursuant to

the Interchange Judgment Sharing Agreement) Covered Litigation liabilities using funds

it either has contributed or will contribute to the Escrow Account, including Loss Funds.

Id.

   To date, three of the four Covered Litigations have settled, and only the

Interchange Litigation (as defined in the Goulding Declaration) remains pending. Id. at

¶ 68. The outcome of the Interchange Litigation is uncertain and the liabilities could be

significant, rendering the value of the Visa Shares difficult to ascertain at this point in

time. Id. The plaintiffs in the Interchange Litigation, asserting violations of federal and

state antitrust laws, allege that their total damages will range in the tens of billions of

dollars. Id.

   Additionally, the Debtors, with A&M's assistance, have determined that

the Class B Shares will be worthless if any judgment or settlement in the Interchange

Litigation exceeds approximately $11.7 billion. Goulding Decl. at ¶ 68. Moreover, in

addition to the significant influence of the outcome of the pending Interchange Litigation,

the value of the Visa Shares is heavily influenced by the trading price of Visa Inc.'s Class

A Shares, which has experienced substantial volatility since the Petition Date. Id. at ¶ 69.

   The Debtors believe that they have sole ownership of the Visa Shares,

because among other reasons, (i) Visa Inc. issued the Visa Shares to WMI, rather than

WMB, (ii) the Visa Shares are registered in WMI's name, and (iii) Visa Inc. has at all

times distributed quarterly dividends on account of such shares to WMI and in WMI's

name. Id. at ¶ 71. JPMC, however, asserts that WMI owns only legal title to the Visa

Shares and that, pursuant to the P&A Agreement, JPMC acquired from WMB all beneficial interest in the Visa Shares and any dividend payment.[43]  JPMC Complaint at ¶ 167.

In support of its position, JPMC argues, among other things, that Class B Shares were allocated to Visa U.S.A. members based upon their proportionate membership interest in Visa U.S.A. which, in turn, was based on such member's volume of service fees paid over time.  Goulding Decl. at ¶ 72; JPMC Complaint at ¶ 165.  JPMC also points to the fact that, pursuant to a redemption mandated by Visa Inc.'s certificate of incorporation, on March 28, 2008, Visa Inc. redeemed certain of the Class B Shares that had initially been allocated to WMI, and paid the redemption proceeds to WMB, not WMI.  Goulding Decl. at ¶ 72; JPMC Complaint at ¶ 164.  JPMC further notes that WMB bears risk in connection with potential indemnification obligations to Visa U.S.A. and its affiliates with respect to all of the Covered Litigation, including the Interchange Litigation, which remains pending and the outcome of which is uncertain.  Goulding Decl. at ¶ 72; JPMC Complaint at ¶ 168.

Furthermore, there is significant uncertainty regarding the ultimate value of the Visa Shares, which is contingent upon the outcome of the Interchange Litigation and heavily influenced by the trading price for Class A Shares of Visa Inc. common stock.  Goulding Decl. at ¶ 75.  A separate, but related, issue is the fact that WMI has contractual indemnification obligations related to the Visa Shares, which obligations have the potential to be significant.  Id. at ¶ 74.  Absent a settlement, and due to the strict

---

[43]      11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.").

transfer restrictions and the absence of a market for Class B Visa Shares among holders

thereof, it would be difficult for the Debtors to monetize, for distribution to creditors, the

value of the Visa Shares prior to the expiration of the Lock-Up Period upon final

resolution of the Interchange Litigation. Id. at ¶ 73.

In light of the foregoing, and in the context of the Global Settlement

Agreement as an integrated whole, WMI and JPMC have agreed that WMI will be

deemed to have transferred to JPMC any and all of WMI's right, title and interest in and

to the Visa Shares in exchange for JPMC (i) paying WMI $25 million and (ii) assuming

all liabilities and obligations of WMI and its related entities, related to (a) the MDL

Interchange Action and Attridge Litigation (each as defined in the Goulding Declaration),

and (b) the Loss Sharing Agreement and the Interchange Judgment Sharing Agreement.

Goulding Decl. at ¶ 76; Global Settlement Agreement § 2.15(a). Moreover, WMI will

retain the right to all dividends received by WMI prior to the effective date of the Global

Settlement Agreement. Id. Given the issues discussed above associated with litigation of

an ownership dispute over the Visa Shares, uncertainty surrounding the ultimate value of

the Visa shares, JPMC's assumption of WMI's potential indemnification liabilities, and

in the context of the integrated, Global Settlement Agreement, the Debtors believe that

the compromise with respect to the Visa Shares is fair and reasonable.[44] Goulding Decl.

at ¶ 77.

*Visa Strategic Agreement*. Visa U.S.A. and Providian Financial

Corporation and its subsidiaries (collectively, "Providian") were parties to that certain

---

[44]    The Debtors note that, at the time of execution of the Global Settlement Agreement, the MDL
Interchange Action Claim (as defined in the Goulding Declaration), asserted against WMI in the amount of
$5 billion "before trebling," was still pending and had not yet been withdrawn, with prejudice. Pursuant to
the Global Settlement Agreement, JPMC had agreed to assume this contingent, unliquidated liability.
Subsequently, the claimants withdrew such claim.

Amended and Restated Strategic Partnership Agreement, dated as of February 18, 2004

(as amended, the "2004 Agreement"), pursuant to which Visa U.S.A. provided funding

and support to Providian in return for Providian's issuance of Visa-branded cards. Id. at

¶ 78. Pursuant to the Amended and Restated Strategic Partnership Agreement, dated as

of September 26, 2005, between Visa U.S.A. and Providian (as amended and as

subsequently further amended, the "Visa Strategic Agreement")[45], the 2004 Agreement

was amended to anticipate the upcoming merger of Providian and WMI and its affiliates

to (i) provide for the parties' respective rights and obligations post-merger, (ii) add

certain terms to the 2004 Agreement to cover Providian's issuance of corporate cards,

and (iii) provide Providian with additional support for its new consumer card accounts

and its new business card accounts. Id. In particular, the 2005 amendment and

restatement provided for Visa U.S.A. to provide certain supplemental funding, bonus

funding, subsidies and monetary and other support with respect to consumer card

accounts, bonus funding for corporate card accounts, volume growth incentives,

marketing support for Providian's Visa-branded payment products, product consulting

support, research support, and risk and fraud prevention (individually and collectively,

the "Account Subsidies"). Id. Because WMB, and not WMI, operated the Visa card

business, Visa U.S.A. paid the Account Subsidies directly to WMB. Id. After the

Receivership Date, Visa U.S.A. failed to provide certain Account Subsidies to either

WMI or JPMC (at that time, the owner and operator of WMB's banking businesses,

including the Visa card business) (the "Unpaid Account Subsidies"). Id.

Visa U.S.A. has filed a claim against the Debtors for all of the previously

paid Account Subsidies, which Visa U.S.A. alleges aggregate "at least $9.1 million,"

---

[45]    The Visa Strategic Agreement has been rejected, effective as of March, 30, 2009 [Doc. No. 330].

arguing that the Account Subsidies were provided for use in WMB's Visa card business and that WMI no longer controlled that business (the "Visa U.S.A. Claim"). Id. at ¶ 79. JPMC, for its part, filed a claim against the Debtors for the Unpaid Account Subsidies, alleging that the Unpaid Account Subsidies aggregate at least $4.6 million (the "JPMC Account Subsidies Claim"). Id. at ¶ 79; Claim No. 3260, filed by JPMC, Attachment A.

In addition to the dispute regarding the Account Subsidies, the JPMC Account Subsidies Claim alleges that, although the Strategic Partnership Agreement is between Visa and WMI, the obligations (i.e., to issue Visa-branded cards) and rights thereunder belong to WMB's banking operations, which were transferred to JPMC. Goulding Decl. at ¶ 80.

In light of the foregoing issues and in the context of the Global Settlement Agreement as an integrated whole, the Debtors and JPMC agreed that, pursuant to the Global Settlement Agreement, (i) JPMC will defend the Debtors with respect to the Debtors' objection to the Visa U.S.A. Claim and will also pay or otherwise satisfy the VISA U.S.A. Claim to the extent such claim becomes an allowed claim, and (ii) WMI will be deemed to have transferred to JPMC all of WMI's right, title and interest in the Visa Strategic Agreement. Id. at ¶ 81; Global Settlement Agreement § 2.15(b).

Elimination of the Visa U.S.A. Claim and the JPMC Account Subsidies Claim will benefit the Debtors' estates. Id. at ¶ 82. Thus, the Debtors believe that this arrangement to resolve the Visa Strategic Agreement is fair and equitable and in the estates' best interests.

*Vendor Claims and Contracts*. WMI is or may be party to numerous agreements or arrangements with vendors who performed services, delivered goods, or

licensed software that primarily benefited the banking operations formerly owned by WMB (the "Vendor Contracts"). Id. at ¶ 83. There is a dispute with JPMC regarding responsibility for certain outstanding obligations to vendors that, pursuant to the Vendor Contracts, provided goods and services to WMB or other subsidiaries. Id.

Typically, prior to the Receivership Date, WMB satisfied all obligations under the Vendor Contracts. Id. at ¶ 84. Consistent therewith, after it purchased WMB's assets, JPMC satisfied certain pre- and post-Receivership obligations to vendors. Id. Notwithstanding these payments, however, there continue to be unpaid obligations to vendors for services, software, hardware goods and other property provided to WMB or its subsidiaries prepetition pursuant to the Vendor Contracts. Id.

The Debtors have reviewed all such claims and estimate that the aggregate amount of liabilities relating thereto will be less than $50 million. Id. at ¶ 88. Because WMI is the nominal party to the Vendor Contracts, these claims, to the extent consistent with WMI's books and records, are determined to be valid claims against WMI. Id. Therefore, the Debtors determined that it would be beneficial to the Debtors' estates to eliminate these claims, particularly without incurring the costs of pursuing claims for reimbursement against JPMC and/or the Receivership. Id.

There is also a dispute regarding ownership of certain of the Vendor Contracts and assets acquired thereunder. Id. at ¶ 85. Specifically, JPMC asserts that, while WMI may have been the nominal contracting party, WMB held all beneficial and equitable title and interest in such Vendor Contracts and that JPMC thus acquired beneficial ownership thereof pursuant to the P&A Agreement. See JPMC Complaint at ¶ 176 [JPMC Action, Docket No. 1]. JPMC asserts that the services, software, hardware,

goods and other property provided pursuant to such Vendor Contracts were for the

benefit of, and were paid for by WMB, and that WMB, not WMI, administered such

goods and services and managed the contractual relationships pursuant to such Vendor

Contracts. See id. at ¶ 173.

JPMC has further alleged that, pursuant to the Vendor Contracts, from

time to time, incentives, refunds, rebates, credits, reimbursements or other funds were

due, and, furthermore, that, in many instances, WMB prepaid licensors or vendors for

rights and benefits from such Vendor Contracts. See id. at ¶ 173. JPMC has asserted that

such assets were reflected in WMB's official books and records as assets of WMB, and

that payments relating to such assets have been recorded in WMB's profit and loss

statements. Id. Accordingly, JPMC asserts that such Vendor Contracts and all assets

acquired thereunder are property of JPMC, acquired from the FDIC Receiver pursuant to

the P&A Agreement, and are not property of WMI's estate. Id. at ¶ 179. JPMC has

alleged that the Debtors would be unjustly enriched if allowed to retain such assets (i.e.,

if, for example, WMI received a refund from a vendor of an amount paid by WMB or if

WMI requested, obtained and retained a refund of an amount prepaid by WMB).

The Debtors have not assumed the Vendor Contracts, nor have they

assigned them to JPMC. Goulding Decl. at ¶ 86. Because the Vendor Contracts do not

benefit any business of the Debtors, the Debtors would have rejected nearly all, if not all,

of the Vendor Contracts. Id. However, to assist JPMC with the integration of WMB's

business and, most importantly, to mitigate potential administrative claim exposure

against the Debtors' estates arising in connection with postpetition provision of goods

and services under the Vendor Contracts, the Debtors and JPMC entered into a stipulation

regarding certain Vendor Contracts (the "Vendor Stipulation"), which was approved by

order of the Bankruptcy Court, dated October 16, 2008 [Docket No. 518]. Id. Pursuant

to the Vendor Stipulation, the Debtors and JPMC agreed that, among other things, JPMC

was authorized to negotiate new agreements with vendors and would pay such vendors

for goods and services provided after the Petition Date.[46] Id.

To resolve issues relating to the Vendor Contracts, the Debtors and JPMC

have agreed that, pursuant to the Global Settlement Agreement, JPMC will pay $50

million to fund the Vendor Escrow, from which WMI will pay the WMI Vendor Claims,

thereby eliminating WMI's liabilities without causing WMI to incur the costs of

enforcing any unjust enrichment or other claims against JPMC or the Receivership with

respect to benefits received by WMB pursuant to the Vendor Contracts. Global

Settlement Agreement § 2.14. With respect to those WMI Vendor Contracts set forth in

Exhibit "U" to the Global Settlement Agreement (the "Exhibit U Vendor Contracts"),

because the Debtors have determined that such contracts are of no benefit to the Debtors'

estates and, due to the costs and uncertainties of litigating issues of unjust enrichment

with JPMC, WMI has agreed to transfer the Exhibit U Vendor Contracts to JPMC. The

Debtors submit that the compromises with respect to the Exhibit U Vendor Contracts and

WMI Vendor Claims are fair and reasonable and in the estates' best interests, eliminating

approximately tens of millions of dollars of liabilities from the Debtors' estates.

*Goodwill Litigation.* As set forth in more detail in the Goulding

Declaration, a number of savings institutions and their investors, including WMI and

---

[46]     Pursuant to the Vendor Stipulation, JPMC is required to give WMI notice twenty (20) days prior to the date it no longer wishes to avail itself of the benefits of any Vendor Contract, after which JPMC is relieved of the related liability. Id. In most instances, upon the Debtors' receipt of such notice from JPMC, the identified contracts were rejected. Id.

WMB, have sued the United States government seeking damages based on, *inter alia*, alleged breach of contract as a result of the passage of FIRREA and its implementing regulations (collectively, the "Goodwill Lawsuits"). Goulding Decl. at ¶ 91. Specifically, during the thrift crisis of the 1980s, the purchasers of failing financial institutions were permitted by the U.S. to account for "supervisory goodwill" as a capital asset to count towards the acquiring banks' regulatory capital requirements. Id. FIRREA, however, raised the minimum capital requirements for savings institutions and required a phase-out of the amount of supervisory goodwill that could be included in satisfying certain regulatory capital requirements, causing many savings institutions to be undercapitalized and, accordingly, to take actions to replace the lost capital either by issuing new qualifying debt or equity securities or to reduce assets. Id. To date, trials have been concluded and opinions have been issued in a number of Goodwill Lawsuits in the United States Court of Federal Claims (the "Federal Claims Court"). Id.

(a)    <strong>American Savings Litigation</strong>

One such lawsuit, styled *American Savings Bank, F.A. v. United States*, No. 92-872C (the "American Savings Litigation"), was commenced in December 1992 by American Savings Bank, Keystone Holdings, Inc., Keystone Holdings Partners, L.P., N.A. Capital Holdings, Inc., New American Capital, Inc., and New American Holdings, Inc. (collectively, the "American Savings Plaintiffs"), against the United States in the Federal Claims Court, and alleges, among other things, breach of contract as a result of the passage of FIRREA and its implementing regulations as related to the acquisition of American Savings Bank by N.A. Capital Holdings, Inc. and its corporate parents. Id. at ¶ 92.

In the American Savings Litigation, the Federal Claims Court, after many years of litigation, entered a partial final judgment against the U.S. in the approximate amount of $55 million (the "Partial Judgment" and, together with any and all additional future proceeds or recoveries from the American Savings Litigation, the "American Savings Litigation Proceeds").[47]  Id. at ¶ 93.  A subsequent trial on the American Savings Litigation Plaintiffs' claims against the U.S. for breach of a certain Warrant Forbearance has concluded, and the matter is pending.  Id.  Both WMI and JPMC, as successors to certain of the American Savings Plaintiffs, claim an ownership interest in the American Savings Litigation Proceeds.  Id.; JPMC Complaint at ¶ 125.

As discussed in the Goulding Declaration, the Debtors performed diligence with respect to the merger history of American Savings Bank.  Id. at ¶ 94.  In addition, that certain Escrow Agreement, dated as of December 20, 1996, by and among the Bank of America, WMI, Keystone Holdings Partners, L.P. and Escrow Partners, L.P. (as amended, the "Escrow Agreement"), specifically calls for the release of the escrowed funds *upon the receipt of litigation proceeds by WMI.*  Id.  This Escrow Agreement was established in connection with the American Savings Bank acquisition and provided that WMI deposit six million shares of WMI common stock with The Bank of New York, as escrow agent, to be held for the benefit of certain of the former investors in Keystone

---

[47]     The Federal Claims Court's initial ruling was appealed but ultimately affirmed by the United States Court of Appeals for the Federal Circuit on March 6, 2008. Id. at ¶ 93n.27. On September 12, 2008, over the U.S.'s objection, the Federal Claims Court entered the Partial Judgment in accordance with the Federal Circuit's affirming order (*i.e.*, a partial judgment in the amount of approximately $55 million in favor of the American Savings Plaintiffs). Id. The Court then ordered that the Partial Judgment be paid to WMI and that any party, other than the Debtors, asserting an ownership interest therein bring its claim through an adversary proceeding in accordance with Bankruptcy Rule 7001. Id. On January 6, 2009, the U.S. filed a motion for an order lifting the automatic stay to allow the U.S. to offset the Partial Judgment against amounts allegedly owed by WMI to the IRS (the "Setoff Motion") [Docket No. 542]. Id. The Debtors opposed the Setoff Motion [Docket No. 685] and, on February 16, 2009, the Bankruptcy Court ordered the Partial Judgment be paid into the Bankruptcy Court's registry (the "Registry Funds"), until the proper recipient could be determined [Docket No. 696]. Id. On August 9, 2010, the United States filed its notice of withdrawal of interest in the Registry Funds [Docket No. 5246]. Id.

Holdings and their transferees, with the conditions for releasing the shares and proceeds thereon being tied to the outcome of the American Savings Litigation.

On the other hand, JPMC has asserted that WMB, as it was in existence at the time of the seizure by the FDIC Receiver, was the corporate descendant of American Savings Bank.  See JPMC Complaint at ¶ 128.  Further, JPMC has asserted that the damages alleged in the American Savings Litigation were solely incurred by American Savings Bank — the operating entity of the hierarchy of companies owned by Keystone Holdings Partners, L.P.  — thus entitling JPMC and only JPMC, as descendent to American Savings Bank, to the American Savings Litigation Proceeds.  Id.

(b)    **Anchor Savings Litigation**

In another of the Goodwill Litigations, Anchor Savings Bank FSB ("Anchor Savings Bank") commenced suit in January 1995 against the United States for breach of contract arising out of FIRREA and for unspecified damages involving supervisory goodwill related to its acquisition of several troubled savings institutions from 1982-1985 (the "Anchor Savings Litigation").  See Goulding Decl. at ¶ 96.  In a series of decisions issued in 2002, the Federal Claims Court concluded that FIRREA breached the United States' supervisory goodwill contracts with Anchor Savings Bank, and, in a decision dated March 14, 2008, entered a judgment against the United States in the amount of approximately $382 million (together with any and all additional future proceeds or recoveries from the Anchor Savings Litigation, the "Anchor Savings Litigation Proceeds").  Id. at ¶ 97.  The decision held that Anchor Savings Bank was entitled to recover lost profits and other damages in the amount of approximately $382 million, plus an undetermined amount for a gross-up of tax liabilities.  Id.  This decision ruled that these portions of the recovery will be "grossed-up" to pay for any taxes

associated therewith. The Debtors have determined that the proper amount of gross-up should be approximately $144 million. On July 16, 2008, the Federal Claims Court reduced the judgment to approximately $356 million, which was affirmed by the Federal Circuit Court of Appeals on March 10, 2010. Id. The Court also remanded the case to the Court of Federal Claims for further determination of whether that court had made a calculation error and should increase the damage award by as much as an additional $63 million.

Similar to the American Savings Litigation Proceeds, in the JPMC Action, JPMC has asserted that it is the successor in interest to the sole plaintiff, Anchor Savings Bank, and that JPMC is thus entitled to the Anchor Savings Litigation Proceeds, rather than WMI. See JPMC Complaint at ¶ 125 [JPMC Action, Docket No. 1]. See Goulding Decl. at ¶ 98. JPMC stated that in 1995, Anchor Savings Bank merged into Dime Savings Bank, and in 2002, Dime Savings Bank merged into WMB. JPMC Complaint at ¶ 127. JPMC argues that the cause of action remained at all times with Anchor Savings Bank, the sole plaintiff in the action, and thus, based upon the merger history, the Anchor Savings Litigation Proceeds became an asset of WMB.[48] Id. JPMC further references a warrant agreement executed by WMI contemplates the conversion of the LTWs[49] into shares of WMI. Id. at ¶ 99. The Amended Warrant Agreement provides that the LTWs become exercisable when the "Bank" receives the Anchor Litigation Proceeds. Id.

---

[48] Notably, however, on September 22, 2008, in a filing with the United States Court of Appeals for the Federal Circuit, Anchor Savings Bank stated that the real party in interest in the case was WMI.
[49] In connection with the Anchor Savings Litigation, DBI distributed a Litigation Tracking Warrant™ (an "LTW") for each share of its common stock outstanding on December 22, 2000 to each of its shareholders on that date based on the anticipated value of the recovery in the Anchor Litigation. Goulding Decl. at ¶ 99.

(c)     **The Global Settlement Agreement's Treatment of
Goodwill Litigation Proceeds**

Taking into account the competing claims to the American Savings

Litigation Proceeds and the Anchor Savings Litigation Proceeds, the respective corporate

histories, and other relevant factors discussed above, the Debtors and JPMC agreed that

the American Savings Litigation Proceeds (in the amount of approximately $55 million

plus potential additional proceeds) will be allocated to WMI, and the Anchor Savings

Litigation Proceeds (in the amount of approximately $356 million plus a potential

additional amount of up to $63 million) will be allocated to JPMC.  The Debtors believe

that, in the context of the Global Settlement Agreement as an integrated whole, the

allocation of the American Savings Litigation Proceeds and the Anchor Savings

Litigation Proceeds is fair, reasonable, and benefits the Debtors' estates.

*Tower Insurance*.  WMI has various director and officer liability insurance

policies that were acquired in connection with its indemnification obligations to its

officers and directors and to officers and directors of WMI's subsidiaries.  Disclosure

Statement at 78; Global Settlement Agreement, Schedule 2.11(a).  For the policy period

May 1, 2007 to May 1, 2008, WMI purchased a "tower" of directors and officers liability

insurance with an aggregate policy limit of $250 million, subject to the terms and

conditions thereof and inclusive of Side-A coverage (i.e., coverage for non-indemnifiable

liability) (the "2007-2008 D&O Tower").  See Disclosure Statement at 78.  WMI also

purchased a "tower" of director and officer liability insurance for the period of May 1,

2008 to May 1, 2009, also with an aggregate limit of $250 million, subject to the terms

and conditions thereof and inclusive of Side-A coverage (the "2008-2009 D&O Tower").

See id.  Postpetition, WMI purchased several extensions of this insurance liability

coverage from XL Specialty Insurance Company (the "Postpetition D&O Policies" and collectively, with the 2007-2008 D&O Tower, the 2008-2009 D&O Tower and D&O policies from prior periods, the "D&O Policies").[50]  Global Settlement Agreement Schedule 2.11(a).

In addition to the D&O Policies, prior to the Petition Date, WMI procured that certain Financial Institution Blended Policy Program for the period May 1, 2007 to May 1, 2008, which provides bankers professional liability, employment practices liability, fiduciary liability, financial institution bond insurance, and electronic and computer crime coverage to WMI and its affiliates, which, like the D&O Policies, is structured as a tower of related insurance (collectively, the "2007-2008 Blended Tower"). Smith Decl. at ¶¶ 10, 21; Global Settlement Agreement, Schedule 2.11(a).  A similar blended policy was also in place for the period May 1, 2008 to May 1, 2009 (the "2008-2009 Blended Tower" and, together with the 2007-2008 Blended Tower, the "Blended Towers"[51]; collectively, the Blended Towers and the D&O Policies, the "Tower Insurance Programs").  Id.  The named insureds on the Blended Towers are WMI, its subsidiaries, its employee benefit plans, and their past, present and future directors, officers, trustees or employees for certain claims.  Disclosure Statement 79.  Each of the 2007-2008 Blended Tower and the 2008-2009 Blended Towers provides an aggregate of $110 million in coverage (of which $35 million relates solely to financial institution bond insurance),[52] subject to the terms and conditions thereof.  Id. at 78-79.

---

[50]    A list of the insurance carriers and the D&O Policies for these periods is attached to the Global Settlement Agreement as Schedule 2.11(a).
[51]    A list of the insurance carriers and the policies that comprise the Blended Towers is attached to the Global Settlement Agreement as Schedule 2.11(a).
[52]    The financial institution bond insurance covers against employee dishonesty, burglary, forgery, fraud and similar losses.

With respect to the 2007-2008 Blended Tower, the Bankruptcy Court has granted relief from the automatic stay to allow the insurance carriers for the 2007-2008 Blended Tower (the "Blended Tower Carriers") to advance and/or pay defense costs that are or will become owing in connection with that certain lawsuit styled as In re Washington Mutual Inc. ERISA Litigation, Lead Case No. 07-cv-1874 (W.D. Wash.) (the "ERISA Litigation"),[53] the Buus Action, and those certain Subpoenas for Records Directed to the WaMu Savings Plan and WMI, initiated by the Department of Labor.[54] Disclosure Statement 79. Certain funds have already been advanced under the 2007-2008 Blended Tower to fund payment of defense costs in these litigations and investigations. In addition, pursuant to the settlement agreement in the ERISA Litigation, the Blended Tower Carriers will be required to make a one-time payment of $49 million to an escrow fund that will be used to make distributions to the members of the settlement class. Id. at 60. As with the defense costs, this amount will be paid from the 2007-2008 Blended Tower. Smith Decl. at ¶ 23.

Additional claims have been asserted against the 2007-2008 Blended Tower. For example, prior to the commencement of the Chapter 11 Cases, WMI sent notices to the Blended Tower Carriers in which WMI asserted 29 claims for reimbursement pursuant to the Financial Institution Bond and/or crime provisions of the 2007-2008 Blended Tower for losses associated with the fraudulent origination of

---

[53]    The ERISA Litigation is based on claims for breaches of fiduciary duty with respect to alleged imprudent investment in WMI stock by the WaMu Savings Plan. Disclosure Statement at 59-60. On June 18, 2010, the plaintiffs in the ERISA Litigation and certain current and former settling defendants, including WMI and JPMC, entered into an agreement to settle the ERISA Litigation. Id. at 60. Pursuant to the settlement agreement, among other things, the Blended Tower Carriers will make a one-time payment of $49 million to a settlement fund for distribution, net of certain expenses, to members of a class to be certified by the Washington District Court solely for settlement purposes. Id. By order dated October 22, 2010, the Bankruptcy Court approved the settlement of the ERISA Litigation [Docket No. 5683].
[54]    See Order Modifying Automatic Stay to Allow Advancement Under Insurance Policies Regarding ERISA Litigation, dated April 13, 2009 [Docket No. 894].

mortgage loans by WMB or its subsidiaries, asserting confirmed losses of approximately

$77.7 million and a total potential exposure of approximately $156 million (collectively,

the "Crime Claims"). The FDIC Receiver has asserted that the Receivership is entitled to

any insurance proceeds paid in connection with claims for which WMB and its

subsidiaries sustained the associated losses, including insurance proceeds paid in

connection with the Crime Claims, if any.[55] See Global Settlement Agreement, Section

2.11(b).

> The Debtors submit that the Global Settlement Agreement's allocation of
Tower Insurance Program proceeds is reasonable. Specifically, the $60 million figure for
the priority recovery pursuant to the 2007-2008 Blended Tower is sufficient to cover all
current proofs of loss filed with the Blended Tower Carriers on behalf of WMI and its
current and former officers, directors and employees (i.e., those related to defense and
settlement of the Buus Action and ERISA Litigation), which represent all known
liabilities of WMI covered by those policies. Smith Decl. at ¶ 24. This aspect of the
Global Settlement Agreement benefits the Debtors' estates by ensuring immediate access
to 2007-2008 Blended Tower proceeds to satisfy such liabilities and by avoiding the
incurrence of additional costs in litigating the issue of whether WMI is entitled to such
proceeds. To the extent WMI discovers additional liabilities (and to the extent the 2007-
2008 Blended Tower has not already been exhausted at such time), the Global Settlement
Agreement preserves WMI's right to argue that it, rather than the FDIC Receiver, is
entitled to such proceeds under applicable law. Id. at ¶ 25; Global Settlement Agreement,
Section 2.11(a). The FDIC Receiver's right to recover under the 2007-2008 Blended
Tower, if any, is similarly preserved. Id.

---

[55]     The Blended Tower Carriers have not yet agreed to cover losses relating to the Crime Claims.

The allocation pursuant to the Global Settlement Agreement of all of WMB's pre-Receivership losses to the FDIC Receiver (such that the FDIC Receiver, and not any other party, will likely be entitled pursuant to the terms of the applicable policies and pursuant to applicable law to any amounts paid out pursuant to the Tower Insurance Programs on account of such losses), is similarly fair and reasonable.

*Intercompany Obligations*.  As set forth in the Goulding Declaration, as of the Receivership Date, WMB was indebted to WMI, or certain of WMI's non-bank, non-Debtor subsidiaries, pursuant to certain demand promissory revolving notes that were due and payable in an approximate aggregate amount of $177 million as of the Petition Date (the "Revolving Notes").  Goulding Decl. at ¶ 101.  Further, WMI believes that, pursuant to that certain Administrative Services Agreement by and between WMI and WMB (the "Administrative Services Agreement"), WMI has an intercompany receivable claim against WMB and WaMu Capital Corp., a subsidiary of WMB, for approximately $23 million relating principally to WMI's issuance of stock-based compensation to certain WMB and WaMu Capital Corp. employees (the "WMB Employee Compensation Obligation").  Id. at ¶ 102.  Also, pursuant to the Administrative Services Agreement, WMB is obligated to compensate WMI for contributions made on account WMB employees to the WaMu Pension Plan.  Id. at ¶ 104 n.45.  Beginning in December 2006, WMI made over $491 million in contributions on account of both WMI and WMB plan participants.  Id.  WMI has not been paid any amount owed to it by WMB as reimbursement for that portion of the $491 million that relates to contributions on account of WMB employee participants (such portion, the "WMB Retirement Benefit Obligation").  Id.

Under the P&A Agreement, JPMC "expressly assume[d] . . . all of the liabilities of [WMB] which are reflected on the Books and Records of [WMB] . . . and all liabilities associated with any and all employee benefit plans . . . ." P&A Agreement at § 2.1.; see WMI Amended Counterclaims at ¶ 80. Thus, the Debtors have asserted that JPMC assumed the Revolving Notes, the WMB Employee Compensation Obligation and any other intercompany obligations, all of which remain unpaid. Id.

The FDIC Receiver, in turn, has asserted various claims against the Debtors for amounts the FDIC Receiver asserts are due and payable to WMB pursuant to the system of intercompany settlement of accounts that was in place prior to the Receivership. Specifically, the FDIC Receiver has asserted a claim against the Debtors for intercompany amounts due in the aggregate amount of approximately $310.8 million. See FDIC Receiver's Amended Answer and Counterclaims at ¶ 38 [DC Action, Docket No. 34]. The FDIC Receiver claims that, of this total, approximately $273.6 million reflects a general ledger entry in WMB's favor purportedly relating to the change in accounting standards for pension contributions in excess of pension expenses (such portion, the "WMI Pension Contributions Ledger Entry"). Id. The remaining amount of approximately $37 million represents a claim for other intercompany amounts allegedly owed to WMB for services it rendered to WMI (such portion, the "WMI Services Obligation" and, collectively with all other intercompany obligations listed on the books and records of WMI or WMB, including those referenced herein, the "Intercompany Obligations"). Goulding Decl. at ¶ 103. Such services as asserted include management fees, payroll expenses, rent, and other similar fees. Id. As set forth in more detail in the

Goulding Declaration, WMI disputes that the WMI Pension Contributions Ledger Entry and WMI Services Obligation are true obligations of WMI. Id. at ¶ 105.

In resolution of the foregoing, pursuant to the Global Settlement Agreement, WMI and JPMC have agreed that JPMC will pay the amounts owed pursuant to the Revolving Notes (approximately $177 million) to the Debtors' estates. Global Settlement Agreement § 2.16. All other Intercompany Obligations, including those allegedly owed by WMI and those owed to WMI, will be released. In light of the foregoing, the Debtors believe that this aspect of the Global Settlement Agreement is fair and reasonable and beneficial to the Debtors' estate as it brings approximately $177 million in cash into the Debtors' estates and, with respect to the disputed Intercompany Obligations, eliminates sizeable liabilities.

*Disputed IP*. As discussed above, in the JPMC Action and the WMI Action, JPMC has claimed that it has all right, title, and interest in the Disputed IP. Complaint at ¶¶ 172, 176 [JPMC Action, Docket No. 1]. Further, absent clear title to the Disputed IP, the Debtors will not be able to realize its value by, for example, licensing the Disputed IP it to a third party. Goulding Decl. at ¶ 24. Moreover, even if the Debtors obtained proper title to the Intellectual Property, it is unclear whether there would be a market for these assets, certainly with respect to any of the intellectual property with references to "Washington Mutual" or "WaMu," as the value of the Intellectual Property may have been harmed by the seizure of WMB. Id. at ¶ 24 n.7.

Pursuant to the Global Settlement Agreement, JPMC will receive the vast majority of the Disputed IP.[56] The disposition of the Disputed IP is fair and reasonable,

---

[56]     Pursuant to the Global Settlement Agreement, certain domain names and five trademarks will be retained by WMI. The Debtors intend to sell such domain names to third parties. Goulding Decl. at ¶ 24

in the context of the Global Settlement Agreement as an integrated whole, based on the issues associated with protracted and costly litigation to adjudicate the ownership of such assets. Id. at ¶ 24.

*JPMC Wind Investment Portfolio LLC.* As set forth in the Goulding Declaration, WMI Investment owns, among other things, a membership interest (the "Wind Power Interest") in JPMC Wind Investment Portfolio LLC (the "Portfolio Company"), a portfolio holding company that owns an equity interest in each of four (4) project companies: (i) Airtricity Sand Bluff WF Holdco, LLC, which owns the Airtricity-Sand Bluff wind farm, near Sterling City, Texas; (ii) UPC Hawaii Wind Partners II, LLC, which owns the UPC-Kaheawa Pastures wind farm, located in Maui, Hawaii; (iii) Whirlwind Energy, LLC, which owns the RES-Whirlwind wind farm, located in Floyd County, Texas; and (iv) Buffalo Gap Holdings 2, LLC, which owns the AES-Buffalo Gap 2 wind farm, located in Nolan and Taylor Counties, Texas. Goulding Decl. at ¶ 108.

The Portfolio Company is governed by that certain Limited Liability Company Agreement of JPMC Wind Investment Portfolio LLC, dated April 3, 2008, by and between JPMC Wind Investment LLC and WMI Investment (the "LLC Agreement"). Id. at ¶ 109. The LLC Agreement designates JPMC Wind Investment LLC as the managing member (the "JPMC Managing Member") and WMI Investment as the investor member of the Portfolio Company. Id. The LLC Agreement contains numerous restrictions and requirements relating to a transfer by WMI Investment of its interest in the Portfolio Company, including, but not limited to, the JPMC Managing Member's

---

n.6.) The value of these domain names is uncertain Id. As for the five trademarks, subject to Bankruptcy Court approval, the Debtors intend to sell certain of these trademarks to a third party that has been identified by the Debtors. Id.

right of first refusal to purchase WMI Investment's membership interest in the Portfolio

Company. There is no dispute regarding ownership of the WMI Investment's interest in

the Portfolio Company — it is an asset of the Debtors' estates.

Prior to entering into the Global Settlement Agreement, the Debtors

attempted to market the Portfolio Company to third party purchasers. Id. at ¶ 110. By

order, dated February 25, 2009 [Docket No. 724], the Debtors were authorized to retain

CP Energy Group, LLC ("CP Energy"), a financial advisory and commercial asset

management firm that focuses on the renewable energy sector, to assist with the

marketing and sale of the Wind Power Interest. The Debtors, with CP Energy's

assistance, undertook an extensive marketing process for the Wind Power Interest. Id.

CP Energy generated a list of approximately 30 potential purchasers, including all known

experienced investors in wind tax equity transactions, as well as certain potential new

investors. Id. On May 21, 2009, CP Energy distributed materials regarding the Wind

Power Interest and a form of confidentiality agreement to 23 of these potential

purchasers.[57] Id. In response thereto, seven (7) parties contacted CP Energy to express

their interest in the Wind Power Interest and executed confidentiality agreements with the

Debtors. Id. After preliminary due diligence regarding the Wind Power Interest was

conducted, the Debtors determined that the expression of interest submitted by Goldman,

Sachs & Co. ("Goldman Sachs") was the highest and best expression of interest remitted

as of that date. Id.

---

[57]    The LLC Agreement contains restrictions regarding, among other things, the identity of proposed
solicitees or transferees of WMI Investment's interest. Id. at ¶ 111 n.42. The original list of potential
purchasers was modified to exclude certain potential purchasers based on the transferee restrictions in the
LLC Agreement. Id. In addition, WMI Investment's solicitations were required to comply with the
confidentiality provisions of the LLC Agreement. Id.

Subsequent to the selection of Goldman Sachs, WMI Investment and Goldman Sachs negotiated a non-binding letter of intent (the "Letter of Intent"), pursuant to which Goldman Sachs expressed interest in acquiring the Wind Power Interest. Id. at ¶ 111. Goldman Sachs's Letter of Intent was conditioned on, among other things, Goldman Sachs's completion of due diligence and execution of definitive agreements concerning the transaction. Id. Additionally, WMI Investment and Goldman Sachs agreed, subject to Bankruptcy Court approval, that WMI Investment would reimburse Goldman Sachs for its reasonable out-of-pocket professional fees and expenses incurred in conducting due diligence, preparing and negotiating definitive documentation, and consummating the transaction, in an amount not to exceed $300,000 in the aggregate. Id. However, WMI Investment would only be required to reimburse Goldman Sachs if the purchase price, as set forth in the definitive agreements, adjusted in accordance therewith, was greater than $15 million. Id. Furthermore, any obligation by WMI Investment to reimburse Goldman Sachs would cease if definitive agreements were entered into between Goldman Sachs and WMI Investment with respect to the Wind Power Interest, but the transaction was not consummated as a result of Goldman Sachs's material breach. Id.

On September 4, 2009, the Debtors filed a motion with the Bankruptcy Court for authorization to enter into the Letter of Intent with Goldman Sachs, to grant Goldman Sachs exclusivity and pay for due diligence expenses in connection with Goldman Sachs's potential purchase of the Wind Power Interest (the "Letter of Intent Approval Motion") [Docket No. 1588].

On September 18, 2009, the Portfolio Company and the JPMC Managing Member filed a reservation of rights [Docket No. 1624] in connection with the Letter of Intent Approval Motion, reserving all rights pursuant to the LLC Agreement. The Portfolio Holding Company and the JPMC Managing Member also filed proofs of claim [Claim Nos. 2535, 2541] against WMI Investment for amounts that are or may be owing to the Portfolio Company and the JPMC Managing Member pursuant to the LLC Agreement, including, but not limited to, WMI Investment's indemnification obligations under the LLC Agreement and the requirements and conditions in the LLC Agreement with respect to a proposed transfer of WMI Investment's interest in the Portfolio Company. Although the Bankruptcy Court entered an order granting the Letter of Intent Approval Motion on September 25, 2009 [Docket No. 1661], commercial terms were never reached, in part due to the JPMC Managing Member's right of first refusal and the corresponding break-up fee and expense reimbursements that would be required to consummate the sale. Id. at ¶ 112.

The Debtors determined, with CP Energy's assistance, that the value of retaining the Wind Power Interest (and the right to continue to collect distributions from the Portfolio Company, as available, in accordance with the LLC Agreement) was approximately $15 million. Id. at ¶ 113.

Taking into account the value of the Wind Power Interest and contractual limitations on the Debtors' ability to sell the asset, the Debtors determined that, in the context of the Global Settlement Agreement as a whole, as partial consideration for the value to be received by the Debtors from JPMC thereunder, the Debtors will transfer the Wind Power Interest to JPMC. Id. at ¶ 114.

*H.S. Loan Corporation*.  As of the Receivership Date, WMI owned

98.67% of H.S. Loan Corporation, a corporation engaged in the residential mortgage

business.[58]  Id. at ¶ 115.  WMB owned a 1.33% minority interest in H.S. Loan

Corporation.  Id.  There is no dispute regarding the respective ownership of H.S. Loan

Corporation.  Id.  Thus, pursuant to the Global Settlement Agreement, JPMC will transfer

WMB's interest in H.S. Loan Corporation (which is now held by JPMC) to WMI.

    *BKK Litigation*.  As set forth in the Goulding Declaration, WMI's

potential liability related to the BKK litigation relates to a landfill facility located in West

Covina, California (the "BKK Site").  Goulding Decl. at ¶ 25.  Currently owned and

operated by BKK Corporation ("BKK"), the BKK Site consists of a closed hazardous

waste landfill, a closed non-hazardous waste landfill, and associated treatment and

control facilities.  Id. at ¶ 25.

    The California Department of Toxic Substances Control (the "CDTSC")

asserted claims in the United States District Court for the Central District of California

(the "California District Court") related to liability arising from environmental issues at

the BKK Site in the litigation styled *California Dep't of Toxic Substances Control, et al.*

*v. American Honda Motor Co., Inc., et al.*, No. CV05-7746 CAS (JWJ) (the "BKK

Litigation").  Goulding Decl. at ¶ 26.  WMB, as successor to Home Savings Bank of

America, FSB ("Home Savings"), was named as a defendant in the BKK Litigation.  Id.

On February 28, 2005, certain respondents in the BKK Litigation entered into that certain

Joint Defense Agreement, Privilege and Confidentiality Agreement (as amended and

restated the "Joint Defense Agreement") and formed an unincorporated group to

---

[58]    H.S. Loan Corporation's balance sheet lists $83 million in receivables, $1 million in cash, and no liabilities.  Id.