cooperate in a common response to or defense of claims arising out of environmental conditions at the BKK Site.  Id.  Certain members of this group, including WMB, "on behalf of itself and its affiliated entities," reached a settlement with the CDTSC in the BKK Litigation, which was memorialized in that certain Amended Consent Decree, approved and entered by the California District Court on March 9, 2006 (as subsequently amended, the "Consent Decree") pursuant to which such members of the BKK Group agreed to perform certain operation, maintenance and monitoring activities at the BKK Site.[59]  Id.

Prior to the Receivership, WMB made all payments required pursuant to the Joint Defense Agreement and the Consent Decree.  As set forth in more detail in the Goulding Declaration, each of CDTSC, certain entities that are party to the Joint Defense Agreement (collectively, the "BKK Joint Defense Group"), certain individual members of the BKK Joint Defense Group, and JPMC (each, a "BKK Claimant") have filed proofs of claim in the Debtors' cases (collectively, the "BKK Proofs of Claim") in connection with the BKK Litigation and the Consent Decree, many of which were filed in contingent, unliquidated amounts.  See Claim Nos. 2138, 2213, 2233, 2405, 2467, 2559, 2693, and 3148); Goulding Decl. at ¶ 28.  CDTSC's proof of claim alleges that response costs at the BKK Site could aggregate over $600 million and that the defendants in the BKK Litigation are jointly and severally liable.  Id.  The BKK Joint Defense Group's

---

[59]      Among other things, the Consent Decree imposes operation, maintenance and monitoring obligations on all "Settling Defendants," defined in Section 3.17 of the Consent Decree to include both the defendants in the BKK Litigation, including WMB, as well as certain of their affiliates, including WMI. (See Consent Decree § 3.17 ("'Settling Defendants' also shall mean Defendants' . . . affiliated companies . . .")).  The parties to the consent decree entered into stipulations to extend the Consent Decree on February 26, 2008, August 28, 2008, March 10, 2009 and October 15, 2009.  Neither WMI, WMB nor JPMC is a party to the latest extension of the Consent Order, namely the October 15, 2009 stipulation to extend the Consent Decree.

proof of claim alleges that past recoverable costs are in excess of $35 million and that future recoverable costs are estimated to be in excess of $300 million.  Id..

In view of the above, it is possible that WMI could be found to have obligations under the Consent Decree because WMB executed the Consent Decree on behalf of itself and its affiliates, including WMI.  Goulding Decl. at ¶ 29.  Among the agreements between JPMC and WMI, pursuant to Section 2.21(a) of the Global Settlement Agreement JPMC will assume any and all liabilities and obligations of the WMI Entities (other than WMI Rainier LLC) for remediation or clean-up costs and expenses (and excluding tort and tort related liabilities, if any), in excess of applicable and available insurance, arising from or relating to (i) the BKK Litigation, (ii) the Consent Decree, and (iii) the Joint Defense Agreement.  JMPC's assumption of the BKK-related liabilities and obligations is fair and reasonable in the context of the Global Settlement Agreement as a whole, as the elimination of these potentially significant liabilities is beneficial to the Debtors' estates.

F.    **The Assumption and Assignment of the Transferred Contracts
       Pursuant to the Global Settlement Agreement and the Plan
       Complies in All Respects With Section 365(a) of the Bankruptcy Code**

Section 365 of the Bankruptcy Code allows a debtor in possession to "maximize the value of the debtor's estate" by assuming executory contracts or unexpired leases that "benefit the estate" and rejecting those that do not.  Cinicola v. Scharffenberger, 248 F.3d 110, 119 (3d Cir. 2001) (quotations omitted).  Courts apply the "business judgment" standard in evaluating a debtor's decision to assume or reject an executory contract or unexpired lease.  In re Armstrong World Indus., 348 B.R. at 162; In re Network Access Solutions, Corp., 330 B.R. 67, 75 (Bankr. D. Del. 2005) (stating that "[t]he standard for approving the assumption of an executory contract is the business

judgment rule" and noting that the bankruptcy court had to find that the debtor was acting

on an informed basis, in good faith, and with the honest belief that assumption was in the

best interests of the debtor and its estate in order to approve a motion to assume

prepetition agreements); In re Pinnacle Brands, Inc., 259 B.R. 46, 53–54 (Bankr. D. Del.

2001) ("The Debtor's decision to assume or reject an executory contract is based upon its

business judgment.") (citation omitted); see also Richmond Leasing Co. v. Capital Bank,

N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) (per curiam) ("More exacting scrutiny would

slow the administration of the debtor's estate and increase its cost, interfere with the

Bankruptcy Code's provision for private control of administration of the estate, and

threaten the Bankruptcy Court's ability to control a case impartially. . . .").

   If there has been a default in the debtor's performance of its obligations

under an executory contract or unexpired lease, however, section 365(b)(1) of the

Bankruptcy Code provides that the debtor may not assume such contract or lease unless

the debtor:

> (A) cures, or provides adequate assurance that the
> trustee will promptly cure, such default . . .
>
> (B) compensates, or provides adequate assurance
> that the trustee will promptly compensate, a party
> other than the debtor to such contract or lease, for
> any actual pecuniary loss to such party resulting
> from such default; and
>
> (C) provides adequate assurance of future
> performance under such contract or lease.

11 U.S.C. § 365(b)(1). Thus, section 365(b)(1) of the Bankruptcy Code requires that the

Debtors cure, or provide adequate assurance that it will promptly cure, any outstanding

defaults under the assumed executory contracts in connection with the assumption and

assignment of these agreements.  Section 365(b)(1) does not apply, however, to a default

that is a breach of a provision relating to

> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
>
> (B) the commencement of a case under this title;
>
> (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or
>
> (D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

11 U.S.C. § 365(b)(2).

Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor in

possession may assign an executory contract or lease if

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance"

depends on the facts and circumstances of each case, but should be given "practical,

pragmatic construction."  See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),

103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re DBSI, Inc., 405 B.R. 698,

708 (Bankr. D. Del. 2009) (noting that adequate assurance of future performance does not

mean an absolute guarantee of performance).  Among other things, adequate assurance

may be given by demonstrating the assignee's financial health and experience in

managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R.

596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

Here, the Debtors seek authority to assume and assign to JPMC, pursuant to the Global Settlement Agreement, all right, title and interest the Debtors may have in or to the contracts transferred to JPMC pursuant to the Global Settlement Agreement, each of which is set forth on Exhibit D to the Plan Supplement (collectively, the "Transferred Contracts"). The assumption by the Debtors of each of these contracts and the assignment of the same to JPMC is but one component of the integrated settlement embodied in the Global Settlement Agreement. The business justifications for this settlement as a whole, as well as for the assignment to JPMC of each of the Transferred Contracts (or the particular asset to which such contracts relate) on an individual basis, are set forth in more detail above. On such bases, the Debtors submit that such transfers are an exercise of their reasonable business judgment and should be approved pursuant to section 365 of the Bankruptcy Code.

Moreover, assumption and assignment of the Transferred Contracts meets each of the requirements for assumption and assignment pursuant to section 365. Specifically, as set forth in the Cure Notice, there are no defaults under the Transferred Contracts to be cured. Furthermore, as a significant national bank with over $2 trillion in assets, it is clear that JPMC, as assignee of the Transferred Contracts, is financially sound and able to provide adequate assurance of future performance under such contracts.

Accordingly, assumption and assignment of the Transferred Contracts is warranted pursuant to section 365 of the Bankruptcy Code.

The Debtors intend to assume and assign certain contracts to the Liquidating Trust as well, as set forth on Exhibit D to the Plan Supplement. The assignment of these agreements to the Liquidating Trust will enable the Liquidating Trust to operate in a manner that will maximize the value of the Liquidating Trust Assets. The Reorganized Debtors have no use for such agreements and, therefore, it is within their sound business judgment to transfer such agreements to the Liquidating Trust. Only one of these agreements has an outstanding cure cost associated with it, which the Debtors will cure upon the Effective Date. The Debtors submit that, pursuant to the terms of the Plan and the Liquidating Trust Agreement, counterparties to the contracts to be transferred to the Liquidating Trust have received adequate assurance of the Liquidating Trust's future performance. Accordingly, assumption and assignment of such contracts is warranted pursuant to section 365 of the Bankruptcy Code.

## II.
### SECTION 1129(A)(1): THE PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE

Section 1129(a)(1) of the Bankruptcy Code requires that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]." The legislative history of section 1129(a)(1) indicates that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of a plan, respectively. H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); see also In re Nutritional Sourcing Corp., No. 07-11038 (PJW), 2008 WL 5396491, at *5 (Bankr. D. Del. Dec. 23, 2008); In re Johns-Manville Corp., 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part on other grounds, 78 B.R.

407 (S.D.N.Y. 1987), aff'd, Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988);

In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

  As demonstrated below, the Plan fully complies with the requirements of sections 1122, 1123, and all other applicable provisions of the Bankruptcy Code.

## A. The Plan Complies with Section 1122 of the Bankruptcy Code

  Section 1122(a) of the Bankruptcy Code provides in pertinent part as follows:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

  For a classification structure to satisfy section 1122(a) of the Bankruptcy Code, not all substantially similar claims or interests need to be designated in the same class. Instead, claims or interests designated to a particular class must be substantially similar to each other. In re Armstrong World Indus., Inc., 348 B.R. at 159.

  With the exception of Administrative Expense Claims and Priority Tax Claims, which need not be classified, Article IV of the Plan provides for the separate classification of Claims against, and Equity Interests in, each of the Debtors based upon differences in the legal nature and/or priority of such Claims and Equity Interests. The Plan designates the following twenty-three (23) Classes of Claims and Equity Interests:

- Class 1 contains Priority Non-Tax Claims
- Class 2 contains Senior Notes Claims
- Class 3 contains Senior Subordinated Notes Claims
- Class 4 contains WMI Medical Plan Claims
- Class 5 contains JPMC Rabbi Trust/Policy Claims

- Class 6 contains Other Benefit Plan Claims
- Class 7 contains Qualified Plan Claims
- Class 8 contains WMB Vendor Claims
- Class 9 contains Visa Claims
- Class 10 contains Bond Claims
- Class 11 contains WMI Vendor Claims
- Class 12 contains General Unsecured Claims
- Class 13 contains Convenience Claims
- Class 14 contains CCB-1 Guarantees Claims
- Class 15 contains CCB-2 Guarantees Claims
- Class 16 contains PIERS Claims
- Class 17A contains WMB Senior Notes Claims
- Class 17B contains WMB Subordinated Notes Claims
- Class 18 contains Subordinated Claims
- Class 19 contains REIT Series
- Class 20 contains Preferred Equity Interests
- Class 21 contains Dime Warrants
- Class 22 contains Common Equity Interests

The Claims or Equity Interests in each particular Class are substantially similar to the other Claims or Equity Interests, as the case may be, in each such Class. Kosturos Decl. at ¶ 97. Accordingly, the Debtors submit that the foregoing classification of Claims and Equity Interests does not prejudice the rights of holders of such Claims or Equity Interests, is consistent with the requirements of the Bankruptcy Code and, thus, is appropriate. See Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.), 913 F.2d 873, 880 (11th Cir. 1990) (plan proponent allowed considerable discretion to classify claims and interests according to facts and circumstances of case so long as classification scheme does not violate basic priority rights or manipulate voting).

The Third Circuit has held that (i) a debtor has discretion to place similar claims in different classes when proposing a plan, and (ii) the debtor may place similar claims in different classes as long as the classification is "reasonable." In re Jersey City

Med. Ctr., 817 F.2d 1055, 1060-61 (3d Cir. 1987).  In In re Jersey City Medical Ctr., the

Third Circuit approved the separate classification of the unsecured claims of the debtor

hospital's physicians and the claims of general unsecured creditors.  The Third Circuit

remarked that:

> [N]othing in the Bankruptcy Code precludes the debtor from variously
> classifying the unsecured claims here . . . .  The express language of this
> statute explicitly forbids a plan from placing dissimilar claims in the same
> class; it does not, though, address the presence of similar claims in
> different classes.   Although the legislative history behind § 1122 is
> inconclusive regarding the significance (if any) of this omission, it
> remains clear that Congress intended to afford bankruptcy judges broad
> discretion to decide the propriety of plans in light of the facts of each case.
> . . .  Accordingly, we agree with the general view which permits the
> grouping of similar claims in different classes.

Id. at 1060-61.  The Debtors believe the classification of Claims and Equity Interests set

forth in the Plan is reasonable, as the classification mirrors the priorities set forth in the

Bankruptcy Code for each Debtor.  To the extent that Unsecured Claims or Equity

Interests of equal priority are placed in different classes, the Debtors submit that valid

business, factual, and legal reasons exist for such separate classification.  Specifically,

with respect to the separate classification of Unsecured Claims of equal priority, the

Debtors submit the following justifications for the separate classification thereof:

- The Claims in Classes 2, 3, and 16 each relate to notes issued by WMI, but such
  notes arose from different debentures, each with slightly different legal rights,
  including, among other things, inter-creditor contractual subordination provisions.

- The Claims in Classes 4 through 11 are for liabilities related to certain assets to be
  transferred to JPMC pursuant to the Global Settlement Agreement and,
  accordingly, JPMC has agreed to pay such Claims.

- The Claims in Classes 14 and 15 relate to guarantees issued by WMI and are
  governed by slightly different underlying documentation (both as compared to
  other Unsecured Claims as well as compared to one another).

- The Claims in Classes 17A and 17B relate to funded indebtedness of WMB, with respect to which such holders asserted related Claims against WMI. The Claims in Class 17A are contractually senior to the Claims in Class 17B, and the Claims in Class 17B represent only derivative, and not direct, Claims against the Debtors.

See Kosturos Decl. at ¶ 97.  With respect to the separate classification of Equity Interests of equal priority, the Debtors submit the following:

- The REIT Series and Preferred Equity Interests in Classes 19 and 20, respectively, relate to different series of stock and, moreover, certain holders of REIT Series are entitled to an additional, separate distribution from JPMC in consideration for a release of JPMC from all claims related to the Trust Preferred Securities, as set forth in more detail in the Plan.

- Although the Dime Warrants and Common Equity Interests in Classes 21 and 22, respectively, both represent common stock interests, the Dime Warrants arise from a different security issuance.

See id. at ¶ 97.  In addition to the above justifications, as set forth in further detail below, such separate classification does not unfairly discriminate between holders of similar Claims and Equity Interests.  Moreover, the definition and classification of Convenience Claims in Class 13 is reasonable and necessary for administrative convenience, in compliance with section 1122(b) of the Bankruptcy Code.  See id. at ¶ 97.

The objections to classification raised by the Washington Mutual Bank Noteholders Group represented by Drinker Biddle & Reath LLP (the "DBR Group") are without merit.  By their own admission, the DBR Group holds derivative Claims, which are resolved pursuant to the compromise with the FDIC Receiver set forth in the Global Settlement Agreement.  Accordingly, such Claims are not properly classified in Class 12 with direct Unsecured Claims and, in fact, should be deemed disallowed.  To the extent that the Claims of the DBR Group purportedly relate to damages arising from the purchase of WMB Senior Notes or WMB Subordinated Notes, the Debtors are seeking to have such Claims subordinated pursuant to section 510(b) of the Bankruptcy Code.

Based upon the foregoing, the Debtors submit that the proposed classification of Claims and Equity Interests in the Plan is reasonable, appropriate, and within the Debtors' discretion. Accordingly, the Debtors submit that the Plan therefore satisfies the requirements of sections 1122(a) and (b) of the Bankruptcy Code.

**B.**      **The Plan Complies with Section 1123(a) of the Bankruptcy Code**

Section 1123(a) of the Bankruptcy Code sets forth seven (7) requirements with which every chapter 11 plan must comply. As demonstrated herein, the Plan fully complies with each enumerated requirement.

**1.**      **Section 1123(a)(1): Designation of Classes of Claims and Interests**

Section 1123(a)(1) requires that a plan must designate classes of claims and equity interests subject to section 1122 of the Bankruptcy Code. As discussed above, the Plan designates twenty-three (23) different Classes of Claims and Equity Interests subject to section 1122. See Plan Art. IV. Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

**2.**      **Section 1123(a)(2): Classes that Are Not Impaired by the Plan**

Section 1123(a)(2) requires a plan specify which classes of claims or interests are unimpaired by the plan. Section 31.1 of the Plan specifies that Class 1 (Priority Non-Tax Claims), Class 4 (WMI Medical Plan Claims), Class 5 (JPMC Rabbi Trust/Policy Claims), Class 6 (Other Benefit Plan Claims), Class 7 (Qualified Plan Claims), Class 8 (WMB Vendor Claims), Class 9 (Visa Claims), Class 10 (Bond Claims), Class 11 (WMI Vendor Claims), and Class 13 (Convenience Claims) are unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

3.     **Section 1123(a)(3):  Treatment of
Classes that Are Impaired by the Plan**

Section 1123(a)(3) requires a plan to specify how it will treat impaired

classes of claims or interests.  Articles VI, VII, XVI, and XVIII through XXVI, and

Section 31.1 of the Plan, designate Class 2 (Senior Notes Claims), Class 3 (Senior

Subordinated Notes Claims), Class 12 (General Unsecured Claims), Class 14 (CCB-1

Guarantees Claims), Class 15 (CCB-2 Guarantees Claims), Class 16 (PIERS Claims),

Class 17A (WMB Senior Notes Claims), Class 17B (WMB Subordinated Notes Claims),

Class 18 (Subordinated Claims), Class 19 (REIT Series), Class 20 (Preferred Equity

Interests), Class 21 (Dime Warrants), and Class 22 (Common Equity Interests) as

impaired within the meaning of section 1124 of the Bankruptcy Code and specify the

treatment of the Claims and Equity Interests in those Classes.  Accordingly, the Plan

satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

4.     **Section 1123(a)(4):  Equal Treatment Within Each Class**

Section 1123(a)(4) requires that a plan provide the same treatment for

each claim or interest within a particular class unless any claim or interest holder agrees

to receive less favorable treatment than other class members.  Pursuant to the Plan, the

treatment of each Claim against or Equity Interest in the Debtors, in each respective

Class, is the same as the treatment of every other Claim or Equity Interest in such Class,

except (i) to the extent that a particular holder has elected different treatment or (ii) with

respect to holders of Disputed Claims, who do not have the option to elect to receive

Reorganized Common Stock (if issued) because of significant tax law implications (as

discussed in further detail below).  The Debtors submit that these exceptions do not

violate section 1123(a)(4).

Although there is little case law analyzing whether a plan of reorganization that distributes different *types* of consideration to members of the same class violates the "same treatment" rule under section 1123(a)(4), 7 Lawrence P. King, Collier on Bankruptcy § 1123(a)(4) (15th ed. 2009) ("[N]either the Code nor its legislative history precisely defines the standards of "equal treatment."), courts have interpreted section 1123(a)(4) as permitting different ultimate forms of recovery to creditors in the same class, as long as the plan offers the same *options* to each creditor within the class (even if they do not all choose the same treatment option). In re Federal-Mogul Global Inc., No. 01-10578 (JKF), 2007 WL 4180545 (Bankr. D. Del. 2007) (holding the "same treatment" rule satisfied by plan that offered all creditors in a particular class the option to elect to receive their distributions under the plan in reorganized common stock or cash). Accordingly, the fact that some, but not all, creditors within a particular Class will receive Reorganized Common Stock (if any) does not violate the "same treatment" requirement in section 1123(a)(4) because all creditors in those Classes were provided with the option of electing to receive stock and, ultimately, each claimant's ultimate percentage recovery — whether or not they chose to receive stock — will be the same.

The only exception to the Debtors' uniform offering of Reorganized Common Stock to all holders within a Class that provides a stock election is with respect to holders of Disputed Claims. Based upon applicable tax laws, in order to preserve the availability of net operating losses to be applied against future income of the Reorganized Debtors, it is important that the Reorganized Debtors not undergo a 50% ownership change following the Effective Date. See 26 U.S.C. § 382. To this end, the charter for

Reorganized WMI restricts the acquisition of shares beyond 4.75%, to protect acquisition by existing or would-be 5% shareholders that would count toward such an ownership change.  See Plan Supplement in Support of Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated October 29, 2010 [Docket No. 5724] (the "Initial Plan Supplement"), as amended on November 24, 2010 (the "Plan Supplement Amendment" and, together with the Initial Plan Supplement, the "Plan Supplement"), Ex. B.  Post-Effective Date transfers of stock would also count in a tally toward such an ownership change and, if sufficiently large, could alone or, in combination with sales of stock by those creditors who, as of the Effective Date, will be 5% shareholders, cause such an ownership change.  Accordingly, the potential that a substantial portion of stock could have to be issued or transferred following the Effective Date to persons who hold Disputed Claims could severely impair the value of any net operating losses for all creditors.  The ability to use the net operating losses on a going forward basis represents a significant economic benefit in the nature of future tax savings for the Reorganized Debtors.  See Zelin Decl. at ¶ 53.  Thus, if Disputed Claims ultimately are allowed, the holders thereof will receive distributions of Creditor Cash, Liquidating Trust Interests, and Cash on account of Liquidating Trust Interests, but will not have the option of electing to receive Reorganized Common Stock.  The Debtors submit, however, that this does not violate section 1123(a)(4).

As an initial matter, there is no evidence that payment in cash as opposed to stock constitutes different treatment if all members of a class receive the same percentage recovery on account of their claims.  In In re NorthWestern Corp., 372 B.R. 684 (D. Del. 2007), pursuant to the debtors' plan, each member of a class of securities

claims was entitled to receive its pro rata share of new common stock once such member's claim was allowed. Id. at 686. After confirmation, however, the debtor merged with another company and, pursuant to the terms of the merger, commenced distributing cash to this class of creditors. Id. Two members of this class, holding disputed claims at the time of the merger, objected to this treatment arguing that they were entitled to receive stock, not cash. Id. The objecting parties argued that this treatment violated section 1123(a)(4) because other members of the class had received stock. Id. The court disagreed and held that section 1123(a)(4) was not violated because, among other reasons, the objectors failed to provide evidence that payment in shares offered an enhanced value over payment in cash.[60] Id. at 688. Moreover, courts have held that section 1123(a)(4) does not require precise equality. See In re Joint E. & S. Dist. Asbestos Litig., 982 F.2d 721, 749 (2d Cir. 1992) (noting that some classification of claimants within a class is permissible); In re Resorts Int'l, Inc., 145 B.R. 412, 448 (Bankr. D.N.J. 1990) (noting that section 1123(a)(4) does not require that all class members be treated precisely the same in all respects, but there must be an approximate measure of equality). Thus, a plan that pays some creditors within a class in shares and some in cash may not violate the "same treatment" rule if the ultimate value of their recovery is equivalent.

Here, all members of each Class, including holders of Disputed Claims as of the Effective Date that subsequently become Allowed Claims, will receive the same ultimate percentage recovery on account of their Claims, irrespective of whether they elected, or had the option to elect, to receive Reorganized Common Stock. See Kosturos

---

[60]    In addition, upon consummation of the merger, all class members who previously had received common stock pursuant to the plan were required to tender those shares in exchange for cash so, in the end, all creditors in the class received the same form of consideration. Id. at 688.

Decl. at ¶ 97. Pursuant to the "Right of Election" provisions in the Plan, to the extent that a holder of an Allowed Claim receives Reorganized Common Stock, such holder's distribution of Creditor Cash or Cash to be received on account of Liquidating Trust Interests is reduced on a dollar-for-dollar basis by the value of the Reorganized Common Stock (valued as of the Effective Date). Even if an objecting party launches a successful valuation fight, such that the Bankruptcy Court determines that the stock is worth more than the Debtors have proposed, that will just further reduce the cash portion of distributions to holders who elect to receive Reorganized Common Stock.

Importantly, there are valid legal and economic reasons for not making Reorganized Common Stock available to holders of Disputed Claims. As discussed above, if the Debtors are forced to reserve and make available shares of Reorganized Common Stock to holders of Disputed Claims, there is a substantial risk of destroying the potential economic benefits of the net operating losses to be utilized by Reorganized WMI. Accordingly, not doing so should not be considered different treatment in violation of section 1123(a)(4) of the Bankruptcy Code.

Tricadia has objected to the Plan on section 1123(a)(4) grounds, arguing that the Claims within Class 15 are receiving disparate treatment because the Debtors are applying different rates of interest to their Liquidating Trust Interests. It should be noted, however, that any payment of interest to such creditors will not be paid by the Debtors but, instead, will be paid on account of turnover provisions applicable to holders of PIERS Claims, who agreed only to subordinate their claims to the extent provided in the relevant Indentures and Guarantee Agreements. Accordingly, application of the contract

rate of interest set forth in the debt documents underlying the Claims in Class 15 is

appropriate, even if that rate varies among creditors within this Class.

In addition, the arguments raised by the Lead Plaintiffs' and the U.S.

Trustee that the Plan violates section 1123(a)(4) of the Bankruptcy Code because certain

stakeholders within a Class are giving up more than others by agreeing to the releases and

the Plan treats holders of Claims and Equity Interests within a Class differently based

upon whether they opt out of the releases is without merit.  Where creditors in the same

class agree to release their claims against third parties pursuant to a plan, the plan does

not unfairly discriminate against a creditor that may have stronger claims against third

parties than other creditors in the same class.  See In re Dow Corning Corp., 255 B.R.

445, 497-98 (E.D. Mich. 2000) ("Agreeing to settle, instead of litigating a claim, would

permit a claimant to be treated differently, such as giving up more valuable consideration,

in exchange for the settlement offer.  This treatment is allowed under § 1123(a)(4)."),

aff'd in part and remanded in part, 280 F.3d 648 (6th Cir. 2002); see also In re Resorts

Int'l, Inc., 145 B.R. 412, 468 (Bankr. D.N.J. 1990) (stating that a bankruptcy court has

"broad discretion to approve classification and distribution plans, even though some class

members may have disputed claims, or a stronger defense than others") (emphasis

added).

5.       **Section 1123(a)(5): Adequate Means for Implementation**

Section 1123(a)(5) requires that a plan provide "adequate means for the

plan's implementation."  The Plan and the various documents and agreements set forth in

the Plan Supplement provide adequate and proper means for the implementation of the

Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code, including (i) the

creation of a Liquidating Trust, pursuant to Article XXVIII of the Plan, (ii) the transfer of

certain property of the Debtors' estates to the JPMC Entities, the FDIC Receiver, and the

Liquidating Trust, as set forth more fully in the Plan and Global Settlement Agreement,

(iii) the issuance and distribution of Cash, equity interests in the Reorganized Debtors,

Subscription Rights,[61] and Liquidating Trust Interests, as set forth in Articles XXXII

through XXXIV of the Plan, (iv) the retention by the Reorganized Debtors of all

remaining property of the Debtors' estates, (v) the cancellation of all documents,

agreements, and instruments evidencing Claims or Equity Interests in the Debtors, except

as provided in Section 33.4 of the Plan, (vi) the surrender of all instruments or notes,

pursuant to Section 33.6 of the Plan, (vii) the curing of defaults with respect to assumed

executory contracts and leases, pursuant to Article XXXVI of the Plan, and (viii) to the

extent applicable, the adoption and filing of the Reorganized Debtors Certificates of

Incorporation and the Reorganized Debtors By-Laws, as set forth in Article XLII of the

Plan and the Plan Supplement.

6.    **Section 1123(a)(6): Prohibitions on
the Issuance of Non-Voting Securities**

Section 1123(a)(6) prohibits the issuance of nonvoting equity securities

and requires amendment of a debtor's charter to so provide.  Section 42.3 of the Plan

provides that, if Reorganized Common Stock is issued pursuant to the Plan, as of the

Effective Date, the articles of incorporation and by-laws of the Debtors shall be amended

to provide substantially as set forth in the Reorganized Debtors Certificates of

Incorporation and the Reorganized Debtors By-Laws, which, as set forth in the forms of

such documents included with the Plan Supplement, prohibit the issuance of nonvoting

equity securities, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

---

[61] The issuance of such securities is subject to the Debtors' ability, pursuant to the Plan, to enter into a
Retention/Sale Transaction with respect to WMMRC.

7.    **Section 1123(a)(7):  Provisions Regarding Directors and Officers**

Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." Section 42.4 of the Plan (as amended) provides that the board of directors of each of the Reorganized Debtors (to the extent applicable) shall consist of seven (7) persons selected by the Creditors' Committee, one of which may be the chief executive officer.  The Debtors intend to disclose the names of the initial directors of the Reorganized Debtors prior to the Confirmation Hearing.  Pursuant to Section 42.5 of the Plan, the boards of directors of the Reorganized Debtors shall elect officers of the Reorganized Debtors as of or after the Effective Date.  The Debtors submit that these provisions are consistent with the interests of creditors, equity security holders, and public policy and, accordingly, satisfy section 1123(a)(7) of the Bankruptcy Code.

C.    **The Plan Complies with Section 1123(b) of the Bankruptcy Code**

Section 1123(b) sets forth certain permissive provisions that may be incorporated into a chapter 11 plan.  Each provision of the Plan is consistent with section 1123(b) of the Bankruptcy Code.

1.    **Section 1123(b)(1):  Impairment/
       Unimpairment of Claims and Interests**

Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."  Pursuant to Articles V through XXVI and Section 31.1 of the Plan, Class 1 (Priority Non-Tax Claims), Class 4 (WMI Medical Plan Claims), Class 5 (JPMC Rabbi Trust/Policy Claims), Class 6 (Other Benefit

Plan Claims), Class 7 (Qualified Plan Claims), Class 8 (WMB Vendor Claims), Class 9

(Visa Claims), Class 10 (Bond Claims), Class 11 (WMI Vendor Claims), and Class 13

(Convenience Claims) are unimpaired and Class 2 (Senior Notes Claims), Class 3 (Senior

Subordinated Notes Claims), Class 12 (General Unsecured Claims), Class 14 (CCB-1

Guarantees Claims), Class 15 (CCB-2 Guarantees Claims), Class 16 (PIERS Claims),

Class 17A (WMB Senior Notes Claims), Class 17B (WMB Subordinated Notes Claims),

Class 18 (Subordinated Claims), Class 19 (REIT Series), Class 20 (Preferred Equity

Interests), Class 21 (Dime Warrants), and Class 22 (Common Equity Interests) are

impaired or may be impaired.[62]  See Kosturos Decl. at ¶ 97.  Accordingly, the Plan is

consistent with section 1123(b)(1) of the Bankruptcy Code.

> **2.      Section 1123(b)(2): Assumption/
> Rejection of Executory Contracts and Leases**

Section 1123(b)(2) allows a plan to provide for the assumption,

assumption and assignment, or rejection of executory contracts and leases pursuant to

section 365 of the Bankruptcy Code.  Section 36.1 of the Plan provides that, on the

Effective Date, all prepetition executory contracts and unexpired leases that exist between

one or both of the Debtors and any Entity, and which have not expired by their own terms

on or prior to the Confirmation Date, shall be deemed rejected by the Debtors, except for

any executory contract or unexpired lease that (i) has been assumed, assumed and

assigned, or rejected pursuant to an order of the Bankruptcy Court entered prior to the

Effective Date or (ii) that is specifically designated as a contract or lease to be assumed or

assumed and assigned on a schedule to the Plan Supplement, including, without

---

[62]     Even though some of these Classes that contain Claims are projected to receive payment in full, they are still impaired because the legal and contractual rights of Claim holders in such Classes are being altered (*i.e.*, the right to receive immediate payment in cash).  11 U.S.C. ¶ 1124.

limitation, any executory contract or unexpired lease sold, accepted or transferred to one

of the JPMC Entities pursuant to the terms of the Global Settlement Agreement. On

October 29, 2010, the Debtors filed the Plan Supplement, setting forth those executory

contracts and unexpired leases that the Debtors intend to assume and assign, which was

amended pursuant to the Plan Supplement Amendment filed on November 24, 2010.

Accordingly, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.[63]

      3.      **Section 1123(b)(3): Settlement/
Retention of Claims and Causes of Action**

Section 1123(b)(3) states that a plan may "provide for — (A) the

settlement or adjustment of any claim or interest belonging to the debtor or to the estate;

or (B) the retention and enforcement by the debtor . . . or by a representative of the estate

appointed for such purpose, of any such claim or interest." As set forth in detail above,

the Plan is premised upon the Global Settlement Agreement, which settles and

compromises certain Claims and Causes of Action among the Debtors, the JPMC

Entities, and the FDIC Entities, which settlement the Debtors submit is in the best

interests of all creditors, and well above the lowest range of reasonableness. The

Debtors, however, are retaining certain Claims and Causes of Action and, pursuant to

Sections 29.1 and 43.11 of the Plan and that certain Stipulation Authorizing Official

Committee of Unsecured Creditors to Bring Certain Causes of Action on Behalf of the

Debtors' Estates, dated September 9, 2010, the Liquidating Trustee or the Creditors'

Committee, as applicable, shall have the right and power to litigate any Claim or Cause

of Action that constitutes an Asset of the Debtors or Debtors in Possession that is not

---

[63] In addition, as set forth herein, the Debtors have complied with the requirements set forth in section 365 of the Bankruptcy Code with respect to curing defaults and providing adequate assurance of future performance with respect to those executory contracts and unexpired leases to be assumed or assumed and assigned.

otherwise settled or released pursuant to the Plan, including, without limitation, any

avoidance or recovery action under section 541, 542, 544, 547, 548, 549, 550, 551, or

553 of the Bankruptcy Code and any other cause of action, right to payment, or claim that

may be pending on the Effective Date or instituted by the Debtors or Debtors in

Possession thereafter.  See Kosturos Decl. at ¶ 97.  Accordingly, the Plan is consistent

with section 1123(b)(3) of the Bankruptcy Code.

> **4.      Section 1123(b)(4):  Sale of Assets**

Although, pursuant to the Plan and Global Settlement Agreement, the

Debtors are selling certain assets to JPMC, this transfer does not constitute a sale of all or

substantially all of the Debtors' property and, therefore, section 1123(b)(4) of the

Bankruptcy Code is inapplicable.  See Kosturos Decl. at ¶ 97.

> **5.      Section 1123(b)(6):  Releases and Jurisdiction**

In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan

contains release, injunction and exculpation provisions in Sections 43.5 through 43.8 of

the Plan — including releases by the Debtors, consensual releases by holders of Claims,

and a customary exculpation provision — all of which comply with the Bankruptcy Code

and the requirements that courts in this jurisdiction apply to such provisions.

Importantly, pursuant to the Second Modification of Sixth Amended Joint Plan of

Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, filed

contemporaneously herewith (the "Second Plan Modification"), and in response to

certain concerns raised by various parties in interest, the Debtors have substantially

scaled back the releases provided in Section 43.6 of the Plan.  Specifically, the releases to

be granted to non-Debtor third parties is now limited to being granted by Claim and

Equity Interest holders on a consensual basis only.  In addition, the Debtors have carved

out, in most instances, the release of acts of gross negligence or willful misconduct and the Debtors have cut out substantially all Related Persons from receiving such releases. Accordingly, the releases comply with applicable law.

The releases are an integral component of the complex compromises underlying the Plan and are necessary to the Debtors' reorganization and the realization of substantial value for all creditors.  Furthermore, the releases, injunction and exculpation provisions in the Plan are the product of extensive arm's length negotiations and were necessary to the formation of consensus to support the Global Settlement Agreement and the Plan.  Based upon the foregoing and as set forth below, these provisions should be approved.

Releases by the Debtors.  Section 43.5 of the Plan sets forth certain releases to be given by the Debtors.  In particular, pursuant to this provision, the Debtors are releasing the Released Parties — including (i) the WMI Entities, (ii) WMB, (iii) the Debtors' estates, (iv) the Reorganized Debtors, (v) the Creditors' Committee, (vi) the Trustees, (vii) the Liquidating Trust, (viii) the Liquidating Trustee, (ix) the JPMC Entities, (x) the Settlement Note Holders, and (xi) the FDIC Entities — and each of their respective Related Persons from any and all claims or causes of action that the Debtors have or may have against the Released Parties relating to any period prior to the Effective Date.  See Smith Decl. at ¶ 29.  These releases are critical to the successful implementation of the Global Settlement Agreement and confirmation of the Plan, and should be approved pursuant to the standards established in the Third Circuit.  Id. at ¶ 29.

Notwithstanding section 524(e), debtors generally are allowed to release claims pursuant to section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid

exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." In re Spansion, 426 B.R. 114, 144 (Bankr. D. Del. 2010). Courts in this district have held that a plan may provide for the releases by a debtor of non-debtor third parties after considering the specific facts and equities of each case. In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999). Bankruptcy courts consider the following factors, known as the Master Mortgage factors, to determine whether a release by a debtor should be approved: (i) whether there is an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (ii) whether the non-debtor has made a substantial contribution of assets to the reorganization; (iii) the essential nature of the release to the reorganization to the extent that, without the release, there is little likelihood of success; (iv) an agreement by a substantial majority of creditors to support the release, specifically if the impacted class or classes "overwhelmingly" vote to accept the plan; and (v) whether there is a provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the release. Id. (citing Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)); see also Spansion, 426 B.R. at 143 n.47. Importantly, a court *need not find that all of the Master Mortgage factors apply* to approve a debtor's release of claims against non-debtors. Zenith Elecs. Corp., 241 B.R. at 110 (citing Master Mortgage, 168 B.R. at 935).

Pursuant to the Master Mortgage factors, the proposed releases to be granted by the Debtors in Section 43.5 of the Plan should be approved. First, many of the Released Parties share an identity of interest with the Debtors. The WMI Entities are all Affiliates of the Debtors and, thus, clearly are related. Similarly, the Reorganized