Debtors, the Liquidating Trust, and the Liquidating Trustee will be successors in interest to the Debtors and, thus, share an identity of interest. With respect to certain Related Persons, the officers and directors of the Debtors are covered by contractual indemnification rights, such that a judgment against an officer or director, in certain circumstances, must be reimbursed by the Debtors. See Plan, § V.I.6 (providing that indemnification obligations of the Debtors with respect to their directors and officers, as such obligations relate to the period between the Petition Date and the Effective Date, will be Administrative Expense Claims). Thus, a claim against one of these individuals effectively is a claim against the Debtors.

The other Released Parties — including (i) the JPMC Entities, the FDIC Entities, and former Affiliate WMB, who are providing releases pursuant to the Plan and Global Settlement Agreement, as well as consideration for distributions; and (ii) the Settlement Note Holders and the Creditors' Committee, who were instrumental in negotiating and formulating the Plan and Global Settlement Agreement — share an identity of interest with the Debtors in implementing a settlement that will maximize recoveries to stakeholders and ensuring that the Plan is successful. See Smith Decl. at ¶ 31. These shared interests suggest that a release by the Debtors of such entities is appropriate. See Zenith, 241 B.R. at 110 (finding that a shareholder and bondholders' committee, "who were instrumental in formulating the Plan," shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize" and, accordingly, could receive releases from the debtor).

Second, the Released Parties have made a substantial contribution to the Plan by adding value, foregoing certain rights and distributions, and/or assisting with the

negotiation and implementation of the Plan. See Smith Decl. at ¶ 32. For example, the current officers and directors of the Debtors have substantially contributed by continuing to serve in these capacities throughout the duration of these Chapter 11 cases. These individuals provided assistance that enabled WMI to grow from a one employee entity with debatable assets of approximately $900 million to having distributable assets of approximately $7.5 billion. Working with the Debtors' professionals, the current officers and directors helped negotiate and formulate a global compromise and plan of reorganization that, in the face of the largest bank failure in U.S. history, will pay most creditors in full or almost in full. Similarly, the Creditors' Committee and the Settlement Note Holders substantially contributed to the preservation and maximization of value in the estates by assisting with the creation and formulation of the Plan and Global Settlement Agreement. Consistent with Section 6.1 of the Global Settlement Agreement, the Settlement Note Holders and the Creditors' Committee agreed to support the Debtors' Plan and have contributed substantial assistance in the resolution of these Chapter 11 Cases. See Global Settlement Agreement, § 6.1; see also Zenith, 241 B.R. at 110.

Moreover, it is clear that JPMC and the FDIC Entities (and WMB, effectively) have contributed substantial value warranting receipt of releases from the Debtors. See id. at ¶¶ 33-34. As set forth in the Debtors' plan support letter, dated October 18, 2010 (a copy of which was submitted to the Bankruptcy Court under Certification of Counsel with the proposed Disclosure Statement Order [Docket No. 5960]), pursuant to the Global Settlement Agreement, the FDIC Entities and the JPMC Entities have agreed to release certain Claims and Causes of Action against the Debtors and have relinquished ownership claims to certain disputed assets with significant value,

including, among others, over $4 billion in funds on deposit and $2.49 to $2.55 billion in

Tax Refunds, resulting in approximately $6.1 to $6.8 billion in additional value available

for distribution to the Debtors' stakeholders. In addition, although JPMC has an Allowed

Claim against the Debtors, pursuant to Section 16.2 of the Plan, JPMC waived all rights

to receive distributions on account thereof. See Plan § 2.5. This will permit additional

value to flow to the Debtors' other creditors. Furthermore, JPMC has agreed to pay or

otherwise assume or satisfy certain of the Debtors' other liabilities. For example, JPMC

has agreed to pay $50 million in Cash to be used in connection with the satisfaction of

Allowed WMI Vendor Claims, and will pay all Allowed WMB Vendor Claims. See

Global Settlement Agreement, § 2.14. JPMC is paying $25 million for the Visa Shares

and has agreed to assume the liabilities and obligations of the Debtors arising from or

relating to the Visa Interchange Litigation and to pay or fund the payment of the Visa

Claims. See Global Settlement Agreement § 2.15. JPMC also will satisfy any and all

obligations of the Debtors for clean-up costs and expenses arising from or relating to the

BKK Litigation. See id. at § 2.21. JPMC also has agreed to pay or fund the Qualified

Plan Claims and Other Benefit Plan Claims. See id. at §§ 2.10, 2.9. Likewise, JPMC has

agreed to assume the WMI Medical Plan, and satisfy all obligations to pay or provide

benefits accrued thereunder from and after the Receivership Date, and also will pay

certain allowed, non-penalty prepetition claims related to the WMI Medical Plan. See id.

at § 2.8. JPMC also has agreed to (i) pay or fund the payment of JPMC Rabbi

Trust/Policy Claims, (ii) assume the liabilities of certain Deferred Compensation Plans

and Intercompany Obligations, and (iii) release its claims to certain assets of WMI,

including, the HFA Trusts and certain BOLI- COLI Policies. See id. at §§ 2.9, 2.16.

Pursuant to the Global Settlement Agreement, JPMC also has agreed to transfer all of its interest in the stock of H.S. Loan Corporation to WMI. See id. at § 2.12.

Third, as in Zenith, the releases to be granted by the Debtors are an integral part of the Plan and the Global Settlement Agreement. Zenith, 241 B.R. at 111. The Released Parties who negotiated the Global Settlement Agreement and the Plan did so on the premise that they would receive the releases in exchange for consideration to be granted to the Debtors. See Plan § 43.6; Global Settlement Agreement § 3.7. Without the releases, these parties would have been unable to reach a deal. As noted above, the release, injunction and exculpation provisions are the product of arm's-length negotiations and were necessary to form consensus around the Global Settlement Agreement and the Plan. Without the releases, neither the JPMC Entities, the FDIC Entities, the Creditors' Committee, nor the Settlement Note Holders would have agreed to and executed the Global Settlement Agreement, which unequivocally serves as the basis of the Plan.

Pursuant to the fourth Zenith factor, the Bankruptcy Court may consider whether there is an agreement by a substantial majority of creditors to support the release to be granted by a debtor, specifically, if the impacted classes "overwhelmingly" vote to accept the plan. Notably, the Creditors' Committee, as a fiduciary of all general unsecured creditors, helped negotiate and supports these releases to be provided in Section 43.5 of the Plan. See Global Settlement Agreement § 6.1 (providing that the Creditors' Committee shall, among other things, "take any and all actions reasonably requested by the Debtors to support . . . confirmation of the Plan."). Moreover, the Settlement Note Holders, who represent substantial interests in several different classes,

including Classes 3 and 16, also helped negotiate and support the proposed releases. See id. at § 6.1 (obligating the Settlement Note Holders to support confirmation of the Plan consistent with the terms of the Global Settlement Agreement). Indeed, the key classes that are "in the money" voted to accept the Plan. See Klamser Decl. at ¶ 29)

Lastly, with regard to the fifth Zenith factor, the Plan provides for payment of substantially all Claims in impaired Classes. Indeed, as set forth in the Disclosure Statement, holders in Classes 1 through 15 are expected to recover in full on account of their Allowed Claims, and holders of PIERS Claims in Class 16 are expected to recover 73% on account of their Claims. See Disclosure Statement at 22-30. As set forth above, the Debtors submit that, absent the Global Settlement Agreement, they would be forced to continue litigation with JPMC and the FDIC Entities, which would drain the estates' resources and likely would result in significantly less value available for distribution to stakeholders, given the risks attendant to certain of the Debtors' claims and courses of action. See Smith Decl. at ¶ 37. This conclusion was confirmed by the Examiner. See Examiner's Rep. at 4. The JPMC Entities and the FDIC have agreed to contribute significant consideration in exchange for the releases, and it is this consideration that serves as the basis for the significant distributions to be made to the Debtors' creditors. As mentioned above, the Debtors estimate that, as a result of the Global Settlement Agreement, total proceeds of approximately $7.5 billion will be available for distribution to the Debtors' stakeholders, resulting in most creditors receiving full recoveries on account of their Claims. See Smith Decl. at ¶ 37. The contributions from the JPMC Entities and the FDIC, in the amount of $6.1 to $6.8 billion in value, will flow to the Debtors' stakeholders, who, absent such contributions, would

receive diminished recoveries, if any.  See Examiner's Rep. at 27 ("Without a settlement,
the WMI estate will hold approximately $900 million.")  Because there is material,
specific, and identifiable consideration flowing to the Debtors' estates, the Debtors
submit that the consideration provided is a fair exchange for the releases being granted.
Although the Debtors' shareholders likely will not receive consideration, the Examiner
found that it is highly unlikely that additional litigation of the disputed assets could ever
yield value to this class of stakeholders in any event.  See Examiner's Rep. at 1 ("The
Examiner also concludes that further litigation concerning any disputed asset is highly
unlikely materially to benefit classes that are 'out of the money.'")  Accordingly, the Plan
satisfies the fifth Zenith factor.

　　　　　Releases by Holders of Claims and Equity Interests.  In addition to
releases by the Debtors in Section 43.5 of the Plan, Section 43.6 of the Plan provides for
the release of certain non-Debtor third parties, including, among others, JPMC, the FDIC
Entities, the Creditors' Committee, and the Settlement Note Holders.  Notably, pursuant
to the Second Plan Modification, the Debtors substantially carved back the original
language of Section 43.6 and submit that the releases proposed therein comport with
applicable law.  As such, the proposed releases set forth in Section 43.6 of the Plan now
(i) are only enforceable against holders of Claims against or Equity Interests in the
Debtors to the extent they are entitled to receive a distribution pursuant to the Plan and
who do not otherwise elect not to grant the releases, (ii) do not extend to most acts of
gross negligence or willful misconduct, and (iii) do not apply to "Related Persons," with
limited exceptions.  Based upon these modifications, and pursuant to the standards on

third party releases established in the Third Circuit, the provisions of Section 43.6 of the Plan should be approved.

Courts in this jurisdiction have held that a plan may provide for a release of third party claims against a non-debtor upon "affirmative agreement" of the third party affected. See Zenith, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of plan); see also Spansion, 426 B.R. at 144 (recognizing that "courts have determined that a third party release may be included in a plan if the release is consensual"). Where creditors have voted to accept a plan containing third party releases, court have deemed such creditors to have affirmatively agreed to such releases. In re Coram Healthcare Corp., 315 B.R. 321, 336 (Bankr. D. Del. 2004) (stating that a plan "is a contract that may bind those who vote in favor of it. . . . [T]o the extent creditors or shareholders voted in favor of [the Plan], which provides for the release of claims they may have against Noteholders, they are bound by that."); In re Gentek, Inc., Case No. 02-12986 (MFW), Hr'g Tr. 43:2-6 (Bankr. D. Del. Oct. 16, 2003) (speculating that, pursuant to contract law, consideration may not be necessary for third party releases where the creditors consent to the releases by voting for the plan). Once consent is demonstrated, no other or further analysis is required. See In re Exide Techs., 303 B.R. 48, 74 (Bankr. D. Del. 2003) ("The 'Releases by Holders of Claims' provision . . . binds only those creditors and equity holders who accept the terms of the Plan. *Because it is consensual, there is no need to consider the [Master Mortgage] factors.*") (emphasis added).

Pursuant to the Plan and the Disclosure Statement Order, the Ballots and election forms distributed to holders of Claims, REIT Series, and Preferred Equity

Interests, as well as Non-Filing WMB Senior Note Holders, instructed each party to check the box to "opt out" of — or, in some instances "opt in" to — granting the releases set forth in Section 43.6 of the Plan. See Smith Decl. at ¶ 39. Moreover, Section 43.10 of the Plan provides that each holder of a Claim or Equity Interest that submits a Ballot and receives a distribution under or any benefit pursuant to the Plan, and does not elect to withhold consent to the releases in Section 43.6 of the Plan, shall be deemed to have specifically consented to the releases. See id. at ¶ 39.

The Debtors submit that, consistent with the terms of the Plan, to the extent a party "opted-in" or did not "opt-out," as applicable, to the releases, this constitutes affirmative agreement. See Plan § 43.10 (providing that holders of Claims or Equity Interests that did not elect to withhold consent on their respective Ballots shall be deemed to have consented to the releases in Section 43.6 of the Plan). Accordingly, the releases are purely consensual and, therefore, should be approved.

Notably, Section 43.6 provides that, to the extent a Claim or Equity Interest holder elects not to grant the releases, such holder forfeits its right to receive a distribution pursuant to the Plan. The Debtors submit that, given the circumstances of these Chapter 11 Cases, this is both warranted and necessary. As set forth above, the releases in Section 43.6 of the Plan are an integral component of the Global Settlement Agreement. Both the Debtors and the Examiner recognize that a substantial portion of stakeholders' proposed distributions pursuant to the Plan would not be available absent this agreement. Absent the consideration provided by the Released Parties — in particular, JPMC and the FDIC Entities — recoveries would be substantially reduced. Thus, the Debtors are justified in linking the consideration to be provided by the Released

Parties to Claim and Equity Interest holders with such holders' agreement to release the Released Parties. Moreover, as modified, Section 43.6 maintains certain specific carve outs that the Debtors previously agreed to exclude from the releases set forth therein, including limited governmental exceptions for the United States Securities and Exchange Commission and the Pension Benefit Guaranty Corporation, as well as limited exceptions with respect to the BKK Facility.

Notwithstanding the fact that, as modified, the releases are consensually given and are supported by consideration, certain objecting parties have maintained that making distributions pursuant to the Plan contingent on providing releases is coercive and negates consent. For the reasons explained above, requiring releases as a condition to receiving distributions is manifestly appropriate under the circumstances. But even assuming, *arguendo*, that the contingent distribution provision affects or negates consent, the releases are permissible because they are necessary for the Debtors' reorganization and are given in exchange for fair consideration. See Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 214 (3d Cir. 2000). In Continental Airlines, the Third Circuit acknowledged that non-consensual releases are permissible when they exhibit the "hallmarks" of fairness and necessity to the reorganization. Id. Where, as here, the Continental criteria of consideration and necessity have been shown, this Court has granted releases that bind non-consenting parties. See, e.g., In re PNG Ventures, Inc., et al., No. 09-13162 (CSS) (Bankr. D. Del. Mar. 5, 2010), Hr'g Tr. at 73 (approving non-consensual third party releases where there was "material, specific and identifiable consideration flowing from" the releases parties in "a fair exchange for the releases being granted," without which it was "unlikely the debtor would be able to confirm a plan"); In

re Freedom Rings, LLC, No. 05-14268 (CSS) (Bankr. D. Del. Apr. 20, 2006), Hr'g Tr. at

114 (holding that "this Court does have jurisdiction to enter an order providing for non-

consensual releases of third party claims" and approving non-consensual third party

releases because "the entire Plan hinges on the releases, and the evidence is

uncontroverted that without the releases, there is little prospect of confirming a Plan"); In

re Metalforming Techs., Inc., et al., No. 05-11697 (MFW) (Bankr. D. Del. Apr. 11,

2006), Hr'g Tr. at 17-18 (holding that "the Third Circuit does allow releases not simply

by those who vote affirmatively in favor of a plan," and confirming non-consensual third

party releases "because but for the contributions made by the . . . releasees there would be

no distribution to the general unsecured creditors").

   Exculpation.  The exculpation provision in Section 43.8 of the Plan limits

liability arising out of the restructuring negotiations, the Plan, and the implementation

thereof.  It contains an express carve-out for willful misconduct and gross negligence.

This type of provision is standard and has been explicitly approved by the Third Circuit.

See In re PWS Holding Corp., 228 F.3d. 224, 247 (3d Cir. 2000) (approving a similar

exculpation clause).

   Retention of Jurisdiction.  Article XL of the Plan provides that the

Bankruptcy Court will retain jurisdiction over, among other things, all matters involving

the Plan, the claims allowance and distribution process, and the prosecution of Claims

and Causes of Action.  This is consistent with applicable law.  See, e.g., In re EBHI

Holdings, Inc., No. 09-12099 (MFW), 2010 WL 3493027, at *5 (Bankr. D. Del. Mar. 18,

2010) (approving retention of jurisdiction by the court over certain matters after the

applicable effective date); In re Kaiser Aluminum Corp., No. 02-10429 (JKF), 2006 WL

616243, at *8 (Bankr. D. Del. Feb. 6, 2006) (same). Accordingly, the continuing

jurisdiction of the Bankruptcy Court with respect to these matters is consistent with

section 1123(b)(6) of the Bankruptcy Code.

**D.      Section 1123(c):  Exempt Property**

The Debtors are not "individuals" (as that term is defined in the

Bankruptcy Code) and, accordingly, section 1129(a)(15) of the Bankruptcy Code is

inapplicable in these Chapter 11 Cases. See Kosturos Decl. at ¶ 97.

**E.      Section 1123(d):  Cure of Defaults**

Section 1123(d) of the Bankruptcy Code provides that, "if it is proposed in

a plan to cure a default, the amount necessary to cure the default shall be determined in

accordance with the underlying agreement and applicable non-bankruptcy law." Section

36.4 of the Plan provides for the satisfaction of default claims associated with each

executory contract and unexpired lease to be assumed pursuant to the Plan in accordance

with section 365(b)(1) of the Bankruptcy Code.  All cure amounts, as set forth in that

certain Notice of Filing Cure Costs Related to Executory Contracts Intended to Be

Assumed or Assumed and Assigned, dated November 11, 2010 [Docket No. 5856], were

determined in accordance with the underlying agreements and applicable bankruptcy and

nonbankruptcy law. See Kosturos Decl. at ¶ 97.  In the event of a dispute regarding any

cure amount, the cure payments required by section 365(b)(1) shall be subject to the

jurisdiction of the Bankruptcy Court and made following the entry of a Final Order

resolving such dispute; provided, however, that any objection to the cure amount must be

filed within twenty (20) days from the date of service of notice of such cure amount.

Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

## III.
## SECTION 1129(A)(2):  THE DEBTORS HAVE
## COMPLIED WITH THE BANKRUPTCY CODE

Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]." The legislative history of section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.  See H.R. Rep. NO. 95-595, at 412 (1977); S. Rep. NO. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); see also In re Johns-Manville Corp., 68 B.R. at 630; In re Toy & Sports Warehouse, Inc., 37 B.R. at 149.

As set forth more fully below, the Debtors, as proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126, regarding disclosure and Plan solicitation.

A.    **Compliance with Section 1125:  Postpetition Disclosure and Solicitation**

Section 1125(b) of the Bankruptcy Code provides, in pertinent part:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. . . .

By entry of the Disclosure Statement Order, the Bankruptcy Court approved the Disclosure Statement as containing "adequate information" pursuant to section 1125(b) of the Bankruptcy Code.

In compliance with the Disclosure Statement Order, on October 22, 2010, the Debtors commenced their solicitation of votes to accept the Plan. See Klamser Decl. at ¶ 20; Sharp Decl. at ¶ 21. As set forth in the Voting Certifications and the Service Affidavits, in accordance with the Disclosure Statement Order, the Debtors' voting and tabulation agent, Kurtzman Carson Consultants LLC ("KCC"), transmitted to each creditor or Equity Interest holder that was entitled to vote to accept or reject the Plan, (i) the Disclosure Statement Order, (ii) the Confirmation Hearing Notice,[64] (iii) the Disclosure Statement (which included as an exhibit copies of the Plan and Global Settlement Agreement), (iv) certain letters in support of or voicing opposition to the Plan from the Debtors and various other constituencies, (v) a Class-specific Ballot for that stakeholder, and (vi) a postage-prepaid return envelope.[65] See Klamser Decl. at ¶ 22; Sharp Decl. at ¶ 23; First Solicitation Serv. Aff.; Second Solicitation Serv. Aff.; Revised Class 19 Ballot Serv. Aff.[66] In addition, the Debtors and KCC later filed and served on such voting parties copies of (i) the Modification of Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated October 29, 2010 [Docket No. 5714] (the "Initial Plan Modification"), (ii) the Initial Plan Supplement, and (iii) the Plan Supplement Amendment. See Plan Modification/Supp. Securities Serv. Aff.; Plan Modification Serv. Aff.; Initial Plan Supp. Serv. Aff.

---

[64]    Capitalized terms used but not otherwise defined in this paragraph shall have the meanings ascribed to them in the Disclosure Statement Order or the Service Affidavits.

[65]    Holders of PIERS Claims entitled to participate in the Rights Offering by exercising Subscription Rights also received Subscription Forms.

[66]    Subsequently, but before the Voting Deadline, the Debtors, after consultation with counsel to one of the Trust Preferred Trustees for the securities in Class 19, distributed revised Class 19 Ballots and related notices to certain nominees for subsequent distribution to beneficial holders of REIT Series, which revised Ballots clarified the treatment of such securities pursuant to the Plan and Global Settlement Agreement.

KCC also distributed the Non-Filing WMB Senior Note Holder Election Forms to Voting Nominees on behalf of Non-Filing WMB Senior Note Holders. See Sharp Decl. at ¶ 21; First Solicitation Service Aff. In addition, as of November 1, 2010, the Examiner's Report was made publicly available at www.kccllc.net/wamu. See Klamser Decl. at ¶ 25; Examiner's Report Notice; Supp. Notices Serv. Aff. Furthermore, on November 4, 2010, the Debtors published notice of the Confirmation Hearing in The New York Times, The Wall Street Journal, and the Seattle Times. See Klamser Decl. at ¶ 24; Publication Affidavits.

The Debtors did not solicit votes for the Plan by any holder of Claims in Class 1 (Priority Non-Tax Claims), Class 4 (WMI Medical Plan Claims), Class 5 (JPMC Rabbi Trust/Policy Claims), Class 6 (Other Benefit Plan Claims), Class 7 (Qualified Plan Claims), Class 8 (WMB Vendor Claims), Class 9 (Visa Claims), Class 10 (Bond Claims), Class 11 (WMI Vendor Claims) and Class 13 (Convenience Claims) (collectively, the "Unimpaired Classes") because such Classes are unimpaired pursuant to the Plan and, therefore, are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. In accordance with the Disclosure Statement Order, the Debtors distributed the Notice of Non-Voting Status—Unimpaired Class to holders of Claims in the Unimpaired Classes. Moreover, the Debtors did not solicit votes for the Plan by any holder of a Claim or Equity Interest, as applicable, in Class 17B (WMB Subordinated Notes Claims), Class 21 (Dime Warrants), or Class 22 (Common Equity Interests) (collectively, the "Non-Voting Impaired Classes") because such Classes are not receiving any recovery pursuant to the Plan and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. In accordance with the Disclosure

Statement Order, the Debtors distributed the Notice of Non-Voting Status—Impaired

Class to all of the Non-Voting Impaired Classes.  The Debtors also distributed a Notice of

Non-Voting Status to each holder of a Claim or Equity Interest who, in accordance with

paragraph 5(g) of the Disclosure Statement Order, was not entitled to vote on the Plan.[67]

See Klamser Decl. at ¶ 21; Sharp Decl. at ¶ 22; First Solicitation Serv. Aff.

The deadline for voting to accept or reject the Plan was November 15,

2010, which was later extended to November 18, 2010 for all voting Classes and to

November 19, 2010 for holders of PIERS Claims in Class 16.[68]  See Voting Deadline

Extension Notice; Class 16 Voting Deadline Extension Notice; Voting Deadline

Extension Service Affidavit; Supplemental Notice Service Affidavit.  The Voting

Certifications describe KCC's transmission of the aforementioned documents and the

methodology for the tabulation and results of voting and elections with respect to the

Plan.  See Klamser Decl. at ¶ 28; Sharp Decl. at ¶ 29.  The results of the vote in respect of

the Plan are discussed in more detail below.

**B.**     **Compliance with Section 1126:  Acceptance of Plan**

Section 1126 of the Bankruptcy Code specifies the requirements for

acceptance of a plan of reorganization.  Pursuant to section 1126, only holders of allowed

claims in impaired classes of claims or equity interests that will receive or retain property

---

[67]     In addition, the Debtors did not solicit votes from Non-Filing WMB Senior Note Holders because they do not hold Claims against the Debtors.  Instead, the Debtors distributed Non-Filing WMB Senior Note Holder Election Forms to such holders, on which such holders elected whether to grant the releases contained in Section 43.6 of the Plan and, accordingly, be entitled to receive their Pro Rata Share of BB Liquidating Trust Interests, pursuant to Section 21.1(b) of the Plan.  On November 15, 2010, at the request of certain holders of WMB Senior Notes, the Debtors filed the Supplemental WMB Senior Notes Notice, providing further explication of the solicitation and election procedures applicable to these note holders. See Supp. Notices Serv. Aff.

[68]     At the request of certain holders of PIERS Claims, on November 16, 2010, the Debtors filed the Supplemental Class 16 Notice, providing further explication of the right of election granted to holders of PIERS Claims pursuant to Section 20.2 of the Plan.  See Supp. Notices Serv. Aff.

under a plan on account of such claims or equity interests may vote to accept or reject

such plan.  Section 1126 provides, in pertinent part, as follows:

(a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan.

*    *    *

(f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g)    Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

As set forth in the Voting Certifications and above, the Debtors solicited

acceptances of the Plan from the holders of all Claims against and Equity Interests in the

Debtors in each Class of impaired Claims and Equity Interests entitled to receive

distributions pursuant to the Plan in accordance with section 1126 of the Bankruptcy

Code.  The impaired Classes entitled to vote on the Plan are Claims and Equity Interests,

as applicable, in Class 2 (Senior Notes Claims), Class 3 (Senior Subordinated Notes

Claims), Class 12 (General Unsecured Claims), Class 14 (CCB-1 Guarantees Claims),

Class 15 (CCB-2 Guarantees Claims), Class 16 (PIERS Claims), Class 17A (WMB

Senior Notes Claims), Class 18 (Subordinated Claims), Class 19 (REIT Series), and Class

20 (Preferred Equity Interests).  See Klamser Decl. at ¶ 16; Sharp Decl. at ¶ 16.

Section 1126 of the Bankruptcy Code specifies the requirements for

acceptance of a plan by impaired classes entitled to vote to accept or reject the plan:

(c)    A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in

number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

(d) A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

As evidenced in the Voting Certifications, aside from the Classes of Claims deemed to accept or reject the Plan, the Plan has been accepted by holders of Claims in Classes 2, 3, 12 and 17A holding in excess of two-thirds in amount and one-half in number of the Allowed Claims voted in each Class, and rejected by holders of Claims and Equity Interests, as the case may be, in Classes 14, 15, 16, 18, 19 and 20. See Klamser Decl. at ¶ 29; Sharp Decl. at ¶ 30.

Notwithstanding the fact that certain Classes have voted to reject the Plan, as set forth below, pursuant to section 1129(b) of the Bankruptcy Code, the Plan may be confirmed because the Plan does not discriminate unfairly and is fair and equitable with respect to each such Class. Based upon the foregoing, the Debtors submit that the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

## IV.
## SECTION 1129(A)(3): THE PLAN HAS BEEN PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." The Third Circuit has found that good-faith requires "some relation" between the chapter 11 plan and the "reorganization-related purposes" of chapter 11. See In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999); see also Kane v. Johns-Manville Corp., 843 F.2d at 649 (citing

Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d Cir. 1984) (interpreting the
standard as requiring a showing that "the plan was proposed with honesty and good
intentions.")).  Moreover, "[w]here the plan is proposed with the legitimate and honest
purpose to reorganize and has a reasonable hope of success, the good faith requirement of
section 1129(a)(3) is satisfied."  In re Sun Country Dev., Inc., 764 F.2d 406, 408 (5th Cir.
1985).  The requirement of good faith must be viewed in light of the totality of the
circumstances surrounding the establishment of a chapter 11 plan.  Id.

Here, the Plan was proposed with the legitimate and honest purpose of
maximizing the value of the Debtors' estates, and to maximize distributions to all
creditors.  The Plan achieves not only a reorganization of the Debtors, but also one of the
primary objectives underlying a chapter 11 bankruptcy:  the equitable distribution of
value to creditors for amounts owing.  See Pereira v. Foong (In re Ngan Gung Rest.), 254
B.R. 566, 570 (Bankr. S.D.N.Y. 2000) (stressing the importance of payment of creditors
in chapter 11 cases).  The Plan accomplishes these goals through implementation of the
Global Settlement Agreement, which provides the means through which the Debtors may
effectuate timely and prompt distributions to their creditors.

As set forth in the Declarations, the Plan (including the Global Settlement
Agreement and all other documents necessary to effectuate the Plan) is the result of over
two years of analysis, investigation, litigation and arm's length negotiations among
multiple parties, including the Debtors, the Creditors' Committee, the JPMC Entities, the
FDIC Receiver, FDIC Corporate, the Settlement Noteholders, the Settlement WMB
Senior Note Holders, certain other creditor constituencies, and each of their respective
professionals.  See Kosturos Decl. at ¶ 32.

As described above, very early in these Chapter 11 Cases, the Debtors, JPMC and the FDIC Entities engaged in meetings to discuss their relative positions with respect to, among other things, the disputes among them. These discussions were coupled with due diligence and legal analysis on behalf of each of the respective parties, as well as a focus on reaching a global resolution of all issues. See id. at ¶ 32.

During the spring and summer of 2009, the momentum regarding a global settlement had slowed, as the parties commenced and pursued their respective claims and defenses in the DC Action, the JPMC Action and the Turnover Action. In the autumn of 2009, however, the parties reinvigorated negotiations, and engaged in multiple, frequent discussions, including with other constituencies, regarding adjustments to their respective positions and settlement proposals, culminating in an initial agreement on a global resolution of all outstanding issues by March 2010. See id. at ¶¶ 33-36. This agreement and the Plan were later modified on numerous occasions, including to incorporate the terms of a deal with the Settlement WMB Senior Note holders, which was heavily negotiated among the Debtors, the FDIC Receiver, and such note holders. See id. at ¶¶ 36-39.

A number of parties have filed objections to the Plan and asserted that the Plan was not proposed in good faith, including the WMB Noteholders, Tricadia, and the TPS Consortium. As set forth in more detail in the Debtors' Omnibus Response, these assertions are without merit. The Plan and Global Settlement Agreement were negotiated at arm's-length among, and with substantial input from, a large number of independent parties. This process was contested, involved the commencement of litigation in spring 2009, was fraught with oversight from multiple interested parties (including, later, an

independent Examiner), and clearly was not a charade whereby value was illicitly delivered to one party at the table at the expense of all other parties. <u>See</u> Kosturos Decl. at ¶¶ 33-39. The Plan maximizes the value of the estates' assets and properly distributes such value to creditors based upon their respective priorities, including through the enforcement of certain parties' contractual subordination rights and implementation of parties' elections with respect to distributions. <u>See</u> Goulding Decl. at ¶ 151. In an effort to prove otherwise, these parties have (i) misconstrued events, (ii) ignored the fact that independent parties (some of whom have fiduciary duties to the objecting parties), were involved with the negotiation of the Plan and Global Settlement Agreement, (iii) inappropriately taken "pot shots" at Debtors' counsel as having a conflict of interest (notwithstanding the fact that the Debtors retained special conflicts counsel and the principal business terms of the Global Settlement Agreement were negotiated by A&M), and (iv) asserted inaccurate, baseless criticisms of the valuation conducted by the Debtors' professionals with respect to the Reorganized Common Stock and the NOLs. <u>See</u> Examiner's Rep. at 345. Accordingly, these parties' accusations of bad faith are baseless.

Thus, the Debtors have met their good faith obligation pursuant to the Bankruptcy Code and accordingly, have satisfied section 1129(a)(3) of the Bankruptcy Code.

**V.**
**SECTION 1129(A)(4):  THE PLAN PROVIDES THAT PROFESSIONAL**
**FEES AND EXPENSES ARE SUBJECT TO COURT APPROVAL**

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, the debtor, or a person receiving distributions of property under the plan, be subject to approval by the

Bankruptcy Court.  Pursuant to the interim compensation procedures established in these

Chapter 11 Cases, the Bankruptcy Court has authorized and approved the payment of

certain fees and expenses of retained professionals, subject to final review for

reasonableness by the Bankruptcy Court pursuant to section 330 of the Bankruptcy

Code.[69]  As set forth in Section 3.2 of the Plan, all Entities awarded compensation or

reimbursement of expenses by the Bankruptcy Court in accordance with section 328, 330,

or 331 of the Bankruptcy Code or entitled to priorities established pursuant to section

503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code will have ninety

(90) days following the Effective Date to submit final fee applications.  Furthermore, all

fees and expenses incurred through the Effective Date will remain subject to final review

by the Bankruptcy Court for reasonableness pursuant to sections 327, 328, 330, 331,

363(b), and 503(b) of the Bankruptcy Code.

   The foregoing procedures for the Bankruptcy Court's review and ultimate

determination of the fees and expenses to be paid by the Debtors satisfy the objectives of

section 1129(a)(4).  See In re Elsinore Shore Assocs., 91 B.R. 238, 268 (Bankr. D.N.J.

1988) (requirements of section 1129(a)(4) satisfied where plan provided for payment of

only "allowed" administrative expenses); In re Future Energy Corp., 83 B.R. 470, 488

(Bankr. S.D. Ohio 1988) ("Court approval of payments for services and expenses is

governed by various Code provisions — e.g., §§ 328, 329, 330 331, and 503(b) — and

need not be explicitly provided for in a Chapter 11 plan.").  Based upon the foregoing,

the Plan complies with the requirements of section 1129(a)(4).

---

[69]  (See Amended Administrative Order Establishing Procedures for Interim Compensation and
Reimbursement of Expenses of Professionals.).

**VI.**

**SECTION 1129(A)(5):  THE DEBTORS HAVE DISCLOSED ALL NECESSARY
INFORMATION REGARDING DIRECTORS, OFFICERS, AND INSIDERS**

Section 1129(a)(5) of the Bankruptcy Code requires that a plan proponent disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor . . . or a successor to the debtor under the plan."  Further, section 1129(a)(5) requires that the appointment of such individual be "consistent with the interests of creditors and equity security holders and with public policy . . . ."

As described above, Section 42.4 of the Plan (as amended) provides that the board of directors of each of the Reorganized Debtors (to the extent applicable) shall consist of seven (7) persons selected by the Creditors' Committee.  The Debtors intend to disclose the names of the initial directors of the Reorganized Debtors prior to the Confirmation Hearing.  Pursuant to Section 42.5 of the Plan, the boards of directors of the Reorganized Debtors shall elect officers of the Reorganized Debtors as of or after the Effective Date.  Each director and officer will serve in accordance with the terms and subject to the conditions of the Reorganized Debtors Certificates of Incorporation, the Reorganized Debtors By-Laws, and other relevant organizational documents, each as applicable.

In addition, as set forth in the Plan and the form Liquidating Trust Agreement attached to the Plan Supplement as Exhibit A, William C. Kosturos shall serve as the Liquidating Trustee of the Liquidating Trust.  Prior to the Confirmation Hearing, the Debtors shall disclose the names of the members of the Trust Advisory Board.

The Debtors submit that these provisions are consistent with the interests of creditors, equity security holders, and public policy and, therefore, satisfy the requirements of section 1129(a)(5) of the Bankruptcy Code.

## VII.
## BANKRUPTCY CODE SECTION 1129(A)(6) IS NOT APPLICABLE

Bankruptcy Code section 1129(a)(6) provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." The Debtors submit that this provision of the Bankruptcy Code is not applicable because no rate change is provided for in the Plan.

## VIII.
## THE PLAN SATISFIES THE REQUIREMENTS OF
## SECTION 1129(A)(7) OF THE BANKRUPTCY CODE

Section 1129(a)(7) of the Bankruptcy Code provides, in relevant part:

With respect to each impaired class of claims or interests –

(A)     each holder of a claim or interest of such class –

  (i)     has accepted the plan; or

  (ii)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date. . . .

Section 1129(a)(7) of the Bankruptcy Code often is referred to as the "best interests test" or the "liquidation test." The best interests test focuses on individual dissenting stakeholders rather than classes of claims or interests. See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 441 (1999). Under this test, when evaluating a chapter 11 plan, the court "must find that each [non-accepting]

creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated [under chapter 7 of the Bankruptcy Code]." Id. at 440; U.S. v. Reorganized CF&I Fabricators of Utah, Inc., 518 U.S. 213, 227-28 (1996).

As set forth below, the best interests test is satisfied as to each rejecting holder of a Claim in an impaired Class of Claims, as well as with respect to each rejecting holder of an Equity Interest in Classes 19 through 22 (Equity Interests).

Exhibit C to the Disclosure Statement sets forth the Debtors' liquidation analysis (the "Liquidation Analysis"), which is supported by the Goulding Declaration. The Liquidation Analysis demonstrates that the Debtors' creditors will receive at least as much, if not more, value under the Plan than they would receive in a hypothetical chapter 7 liquidation. This is because of the administrative costs associated with a chapter 7 liquidation and the value generated under the Plan by the Debtors retaining ownership of WMMRC and reorganizing around that entity.[70]  See Goulding Decl. at ¶¶ 131, 133.

Specifically, as set forth in the Goulding Declaration and described in more detail in the Disclosure Statement, under chapter 7, the cash available for distribution to creditors would consist mainly of the proceeds from the Global Settlement Agreement (assuming a chapter 7 trustee is able to consummate a Global Settlement Agreement on the same terms and conditions as the Debtors).[71]  See id. at ¶ 130. Cash

---

[70]     Under either scenario, all holders of Equity Interests, and holders of Claims in Class 17B and Class 18 receive nothing.

[71]     The Liquidation Analysis assumes that the Global Settlement Agreement would still exist in a chapter 7 liquidation because, without consummation of a global settlement on similar terms as the Global Settlement Agreement or, in the alternative, litigating to finality each issue related to distribution of assets (which would take a substantial amount of time), a chapter 7 trustee would be unable to resolve all claims in these estates or make significant distributions. Of course, the Debtors can provide no assurance that a chapter 7 trustee will be able to execute a global settlement agreement on at least as favorable terms as the current agreement. If the chapter 7 trustee was unable to do so, the projected recoveries in the Liquidation Analysis would be substantially reduced. See id. at ¶ 134. For example, it is possible that holders of WMB Senior Notes Claims and WMB Subordinated Notes Claims would not recover anything in a chapter 7