# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WASHINGTON MUTUAL, INC., et al., | ) | Case No. 08-12229 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

## OPINION[1]

Before the Court is the request of Washington Mutual, Inc.
("WMI") and WMI Investment Corp. (collectively the "Debtors") for
confirmation of their Sixth Amended Joint Plan of Affiliated
Debtors Pursuant to Chapter 11 of the United States Bankruptcy
Code, filed on October 6, 2010, as modified on October 29 and
November 24, 2010 (the "Plan"). The Plan incorporates a Global
Settlement among the Debtors, JPMorgan Chase Bank, N.A. ("JPMC"),
the Federal Deposit Insurance Corporation ("FDIC") in its
corporate capacity and as receiver for Washington Mutual Bank
("WMB"), certain settling creditors (the "Settlement
Noteholders"),[2] certain WMB Senior Noteholders, and the
Creditors' Committee (collectively, the "Plan Supporters"). The

---

[1] This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure, which is made applicable
to contested matters by Rule 9014 of the Federal Rules of
Bankruptcy Procedure.

[2] The Settlement Noteholders (Owl Creek Asset Management,
L.P., Appaloosa Management, L.P., Centerbridge Partners, LP, and
Aurelius Capital Management LP, and several of their respective
affiliates) hold claims in various classes, including Senior
Notes, Senior Subordinated Notes, and PIERS claims.

Plan is opposed by the Equity Committee, alleged holders of Trust Preferred Securities (the "TPS Holders"), holders of Litigation Tracking Warrants (the "LTW Holders"), the United States Trustee (the "UST"), certain WMB Noteholders, and several individual shareholders and creditors[3] (collectively, the "Plan Objectors"). Although concluding that the Global Settlement is fair and reasonable, the Court finds that the Debtors' Plan is not confirmable unless the deficiencies explained herein are corrected.

I.   BACKGROUND

WMI is a bank holding company, that formerly owned WMB. WMB was the nation's largest savings and loan association, having over 2,200 branches and holding $188.3 billion in deposits. Beginning in 2007, revenues and earnings decreased at WMB, causing WMI's asset portfolio to decline in value. By September 2008, in the midst of a global credit crisis, the ratings agencies had significantly downgraded WMI's and WMB's credit ratings. A bank run ensued; over $16 billion in deposits were

---

[3]   The individual Plan Objectors include Philipp Schnabel, Robert Alexander and James Lee Reed, Jeffrey S. Schultz, Nate Thoma, Sonterra Capital, Truck Insurance Exchange, Fire Insurance Exchange, and certain WMB Noteholders (holding senior and subordinated WMB notes). While certain WMI Senior Noteholders filed an objection, they have agreed to defer it because it may be moot if they are paid in full on the Effective Date.

withdrawn from WMB in a ten-day period beginning September 15, 2008.

On September 25, 2008, WMB's primary regulator, the Office of Thrift Supervision (the "OTS"), seized WMB and appointed the FDIC as receiver. The FDIC's takeover of WMB marked the largest bank failure in the nation's history. On the same day, the FDIC sold substantially all of WMB's assets, including the stock of WMB's subsidiary WMB fsb, to JPMC through a Purchase & Assumption Agreement (the "P&A Agreement"). Under the P&A Agreement, JPMC obtained substantially all of the assets of WMB for $1.88 billion plus the assumption of more than $145 billion in deposit and other liabilities of WMB. The FDIC, as the receiver of WMB, retained claims that WMB held against others.

On September 26, 2008, the Debtors filed petitions under chapter 11 of the Bankruptcy Code. Early in the bankruptcy case disputes arose among the Debtors, the FDIC and JPMC regarding ownership of certain assets. On December 30, 2008, the Debtors asserted various claims in the WMB Receivership by filing proofs of claim with the FDIC. The FDIC denied all of the Debtors' claims in a letter dated January 23, 2009. On March 20, 2009, the Debtors filed suit in the United States District Court for the District of Columbia (the "DC Court") against the FDIC (the

"DC Action")[4] asserting the following five counts: (1) review of the FDIC's denial of the Debtors' proofs of claim; (2) wrongful dissipation of WMB's assets; (3) taking of the Debtors' property (stock interest in WMB) without just compensation; (4) conversion of the Debtors' property; and (5) a declaration that the FDIC's disallowance of the Debtors' claims was void.  JPMC and certain WMB debt security holders (the "WMB Noteholders") were permitted to intervene in the DC Action.  The DC Court has stayed the DC Action pending the outcome of the bankruptcy proceeding.[5]

On March 24, 2009, JPMC filed a complaint in the Bankruptcy Court against the Debtors (the "JPMC Adversary")[6] seeking a declaratory judgment that it owned various assets as a result of its purchase of WMB, including the funds on deposit at WMB in the name of the Debtors with a value of approximately $3.8 billion (the "Deposit Accounts"), tax refunds in the approximate amount of $5.5 to $5.8 billion, the Trust Preferred Securities ("TPS") with a value of $4 billion, intellectual property, assets in certain employee deferred compensation plans, shares in Visa,

_____

[4]  Washington Mutual, Inc., et al. v. F.D.I.C., No. 1:09-cv-00533 (D.D.C. Mar. 20, 2009).

[5]  Washington Mutual, Inc., et al. v. F.D.I.C., No. 1:09-cv-00533 (D.D.C. January 7, 2010) (Order granting stay).

[6]  JPMorgan Chase Bank, N. A. v. Washington Mutual, Inc. et al., Case No. 08-12229, Adv. No. 09-50551 (Bankr. D. Del. Mar. 24, 2009).  The JPMC Adversary Action also named the FDIC as an additional defendant on an interpleader claim related to the Deposit Accounts.

Inc., certain judgments awarded in the Goodwill Litigation,[7] and contract rights. (Ex. D-41.) On May 29, 2009, the Debtors filed an answer and counterclaims in the JPMC Adversary asserting ownership of the disputed assets and seeking to avoid as preferences and fraudulent conveyances certain pre-petition capital contributions and other payments they had made to WMB. (Ex. D-42.) JPMC filed a motion to dismiss the Debtors' counterclaims, which was denied by the Court on September 14, 2009. (Ex. D-45.) JPMC sought leave to appeal that ruling, which was opposed by the Debtors.

In addition, the Debtors filed a complaint in the Bankruptcy Court against JPMC (the "Turnover Action")[8] on April 27, 2009, seeking the turnover of the $3.8 billion held in Deposit Accounts in the Debtors' names at WMB. (Ex. D-48.) JPMC filed a motion to dismiss the Turnover Action, which was denied on June 24, 2009. (Ex. D-49.) JPMC filed an answer, counterclaim and a crossclaim against the FDIC as Receiver. (Ex. D-53.) On May 19, 2009, the Debtors filed a Motion for Summary Judgment in the Turnover Action, in which the Creditors' Committee joined. (Ex. D-50.) JPMC, the FDIC and the WMB Noteholders filed responses to

---

[7] The Goodwill Litigation is described in further detail in Part A(2)(a)(viii), _infra_.

[8] _Washington Mutual, Inc. et al. v. JPMorgan Chase Bank, N. A._, Case No. 08-12229, Adv. No. 09-50934 (Bankr. D. Del. filed Apr. 27, 2009).

the Debtors' Motion.  (Exs. D-54 & D-55.)  The Court heard oral argument on the Debtors' Motion on October 22, 2009.

In the interim, the Debtors filed a Motion for an order under Rule 2004 to investigate additional potential claims against JPMC, including tortious interference with business expectancy, antitrust, and breach of contract (the "Business Tort Claims").  (Ex. D-68.)  That motion was granted on June 24, 2009.  (Ex. D-69.)  The Debtors filed a second motion under Rule 2004 seeking discovery of third parties (including the OTS and other regulators, investment banks and rating agencies) regarding those same claims.  (D.I. # 1997.)  That motion was denied on January 28, 2010, with the Court suggesting that such discovery should be sought after an adversary proceeding was commenced raising the Business Tort Claims.  (Hr'g Tr. 1/28/2010 at 88-90.)

On November 4, 2009, the FDIC filed a Motion seeking relief from the stay to permit it to exercise its right under the P&A Agreement to have JPMC transfer the Deposit Accounts back to the FDIC (to allow the FDIC to set off against them claims it asserts it has against the Debtors).  (Ex. D-59.)  The parties asked the Court to consider the Debtors' Summary Judgment Motion with the FDIC's Motion; oral argument on the motions was continued several times to permit settlement discussions.

On March 12, 2010, the parties announced that they had reached a settlement of all issues regarding the disputed

property and the claims of the FDIC and JPMC (the "Global Settlement"). (Kosturos Decl. at ¶ 36.) The Global Settlement was incorporated into the Plan which was originally filed on March 26, 2010. (Id. at ¶ 37.) The Global Settlement and the Plan were modified on May 21, 2010, to adjust the parties' split of the tax returns and to adjust the price JPMC was paying for the Visa shares. (Id. at ¶ 38.) The Plan modification also provided a distribution of a portion of the tax refund (capped at $150 million) to WMB Senior Noteholders and WMB Subordinated Noteholders, to the extent their claims were not subordinated under section 510(b) of the Code, if the class of such holders accepted the Plan. (Id.) The Plan was modified again on October 6, 2010, to adjust further the allocation of the tax refund, to provide a distribution to WMB Senior Noteholders only (and not to WMB Subordinated Noteholders) of $355 million, to delineate the mechanism by which REIT Trust Holders who are granting a release obtain their pro rata share of $50 million paid by JPMC, and providing that the Global Settlement may be terminated if the Plan is not confirmed by December 31, 2010 (unless WMI and JPMC agree to extend it to January 31, 2011, with the consent of the Creditors' Committee).[9] (Id. at ¶ 39.)

---

[9] On December 20, 2010, the Court entered an order directing the necessary parties to confer and advise whether they would extend the deadline. (D.I. # 6376.) On December 28, 2010, the parties agreed to that extension. (D.I. # 6446.) As a result of the Court's order, the Equity Committee filed a motion

On July 6, 2010, the TPS Holders filed an adversary proceeding against WMI and JPMC seeking a declaration that they were the owners of the TPS (the "TPS Adversary").[10] Because the TPS will go to JPMC free of all claims under the Global Settlement and the Plan, the TPS Holders also filed objections to confirmation. The parties to the TPS Adversary filed cross motions for summary judgment. The motions were briefed and oral argument was held on the first day of the confirmation hearing. By separate Opinion and Order, the Court has granted the Defendants' motions and denied the TPS Holders' motion for summary judgment, finding that the TPS Holders no longer have any interests in the TPS because their interests have been converted to interests in preferred stock of WMI.

On April 12, 2010, an adversary proceeding was commenced by certain LTW Holders against WMI and JPMC seeking a declaratory judgment, inter alia, that they are entitled to 85% of the

---

to reopen the record to address the issue of the added value that the Reorganized Debtor would have had if it emerged after December 31, 2010. (D.I. # 6381.) The Court denied that request, because the Debtors' own witnesses already testified to that fact. (Hr'g Tr. 12/6/2010 at 32-37; D.I. # 6384.)

[10] Black Horse Capital LP, et al. v. JPMorgan Chase Bank, N. A., et al., Case No. 08-12229, Adv. No. 10-51387 (Bankr. D. Del. filed July 6, 2010).

proceeds of the Anchor Litigation[11] (the "LTW Adversary").[12] The
complaint was subsequently amended to be a class action on behalf
of all LTW Holders. Because the Anchor Litigation proceeds will
go to JPMC free of all claims under the Global Settlement and the
Plan, the LTW Holders also filed objections to confirmation. On
October 29, 2010, WMI filed a motion for summary judgment in the
LTW Adversary. The motion was briefed and oral argument was held
on the first day of the confirmation hearing. By separate
Opinion and Order, the Court has denied WMI's motion for summary
judgment in the LTW Adversary, finding that there are genuine
issues of material fact in dispute.

On January 11, 2010, the UST appointed the Official
Committee of Equity Security Holders (the "Equity Committee").
On April 26, 2010, the Equity Committee filed a Motion for the
Appointment of an Examiner Pursuant to Section 1104(c) of the
Bankruptcy Code (the "Initial Examiner Motion"). (D.I. # 3579.)
The Court denied the Initial Examiner Motion on May 5, 2010,
finding that there was no appropriate scope for an examiner to
conduct an investigation given that issues pertinent to, and even
beyond the scope of, the chapter 11 cases had been "investigated

---

[11] The Anchor Litigation is described in Part A(2)(a)(viii),
infra.

[12] Broadbill Investment Corp. et al. v. Washington Mutual,
Inc., Case No. 08-12229, Adv. No. 10-50911 (Bankr. D. Del. filed
April 12, 2010).

to death."  (D.I. # 3663; Hr'g Tr. 5/5/2010 at 98.)  The Court
specifically premised its ruling on the fact that the Debtors and
Creditors' Committee had done an investigation of the various
claims being settled by the Global Settlement and that the
results of that investigation would be shared with the Equity
Committee.  (Hr'g Tr. 5/4/2010 at 97-101.)

     While certain information was shared with the Equity
Committee, the Debtors and Creditors' Committee refused to
provide it with their work product.  As a result, the Equity
Committee and the UST renewed their requests for appointment of
an Examiner.  (D.I. ## 4644 & 4728.)  The UST argued that "the
cost benefit analysis favors the appointment of an examiner in
the short term as opposed to miring the process immediately [in]
what seems to be [protracted] litigation between the parties over
a host of issues.  And in fact the cooling down period . . . may,
in turn, allow the parties to . . . hopefully, potentially,
resolve some points."  (Hr'g Tr. 6/3/2010 at 86.)

     On July 22, 2010, the Court granted the renewed motion for
appointment of an examiner.  (D.I. # 5120.)  On July 28, 2010,
the Court approved the UST's selection of Joshua Hochberg as
Examiner to conduct an investigation into the merits of the
various claims of the estate, JPMC, and the FDIC which were being
resolved by the Global Settlement, as well as additional claims

the estate might have.  (D.I. # 5162.)  The Examiner filed his

final report on November 1, 2010.[13]  (D.I. # 5735.)

The hearing to consider confirmation of the Plan was

scheduled for December 1, 2010.  Because resolution of issues

raised in the LTW and TPS Adversaries could affect the

confirmability of the Plan, the Court held oral argument on the

summary judgment motions filed in those adversaries first.

Testimony and argument on the confirmation issues was presented

on December 2, 3, 6, and 7, 2010.  At the conclusion of the

hearing, the Court took the matter under advisement.  It is ripe

for decision.


II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over approval of

the Global Settlement and confirmation of the Debtors' Plan

pursuant to 28 U.S.C. §§ 157 & 1334.  These matters are core

pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (K), (L), (M),

(N), & (O).


III. <u>DISCUSSION</u>

A.  <u>Reasonableness of the Global Settlement</u>

---

[13]  At the confirmation hearing, the Plan Objectors filed
motions in limine to preclude the use of the Examiner's report by
the Plan Supporters, arguing that it was hearsay.  (D.I. # 6148.)
Because the ultimate decision on the reasonableness of the Global
Settlement resides with the Court, the motions in limine were
granted.  (Hr'g Tr. 12/2/2010 at 37-38.)

The Plan Supporters acknowledge that the Global Settlement is the foundation of the Debtors' Plan. They contend that the Global Settlement provides value to the estates of approximately $6.1 to $6.8 billion in readily available funds. Together with the approximately $900 million in cash that the Debtors currently have, the Plan Supporters argue that there will be approximately $7.5 billion available for distribution to creditors and interest holders upon confirmation of the Plan. In addition, under the Plan, WMMRC, an insurance company subsidiary of WMI that is currently in run-off (the "Reorganized Debtor"), is expected to provide additional value to stakeholders from cash flow and the possible use of net operating loss carry-forwards (the "NOLs"). With the release under the Global Settlement of substantial claims filed by JPMC and the FDIC (which the Debtors contend are approximately $27 billion each), the Plan Supporters believe that the Plan should result in payment in cash in full (plus post-petition interest) of all creditors' claims except the lowest class of creditors, which are expected to receive approximately 74% of their claims plus the right to participate in an offering of stock in the Reorganized Debtor.[14] (Ex. D-5C.) The Plan Supporters contend that the Global Settlement must be considered

---

[14] Other creditors are also given the right to take stock in the Reorganized Debtor in lieu of cash for their claims. (Ex. D-5 at 19.)

12

as a whole because the elimination of one part of the settlement will cause it all to collapse.

The Plan Objectors argue that the Global Settlement is unreasonable because it releases substantial claims of the estate for no value. They contend that the Global Settlement was reached before the Debtors even conducted an investigation into the merits of those claims. They note that the Debtors agreed to settle only for sufficient funds to pay creditors, ignoring their fiduciary duty to shareholders. This was exacerbated, the Plan Objectors contend, by the fact that lead counsel and the chief restructuring officer for the Debtors had a conflict of interest because of their firms' representation of JPMC in other matters. See, e.g., In re Project Orange Assocs., LLC, 431 B.R. 363, 374-75 (Bankr. S.D.N.Y. 2010) (denying retention application of debtor's lead counsel where counsel represented a major creditor in unrelated matters and despite conflicts waiver, was precluded from suing it and finding that retention of conflicts counsel was insufficient).

### 1.  Conflict of Interest

The Court takes seriously any allegation that professionals involved in cases before it are conflicted or have acted unethically.  See, e.g., In re Universal Bldg. Prods., 2010 WL 4642046 (Bankr. D. Del. Nov. 4, 2010) (disqualifying counsel for creditors' committee because of improper solicitation); In re

13

eToys, Inc., 331 B.R. 176, 194 (Bankr. D. Del. 2005) (disallowing fees of counsel for debtors and committee because they had undisclosed conflicts of interest).  Further, a conflict of interest may result in a finding that a plan of reorganization has not been proposed in good faith.  See, e.g., In re Coram Healthcare Corp., 271 B.R. 228, 234-40 (Bankr. D. Del. 2001) (denying confirmation because a conflict of interest arising from the relationship between the Debtor's chief executive officer and largest creditor tainted the entire reorganization effort).  Thus, this issue must be addressed at the outset.

The Plan Objectors argued at the confirmation hearing that because the Debtors' principal negotiators of the Global Settlement represented JPMC in other matters, they were reluctant to push for the best possible deal for the estate.  The Debtors and their representatives vigorously deny this and contend that the allegations are a "sideshow" to divert attention from the real issues in the case.

The Plan Objectors presented no evidence to support their contentions, however, and the record in this case refutes the suggestion that the Debtors' professionals acted in any manner other than in the best interests of the estate.  In their original retention applications, counsel for the Debtors did disclose that their firm represented JPMC in unrelated matters.  (Ex. D-20.)  In addition, at the hearing to consider counsel's

retention held on October 30, 2008, the parties advised that the issue had been raised by the UST and counsel clarified that it was able to sue JPMC with respect to the Deposit Accounts but not for any lender liability or avoidance action.  (Hr'g Tr. 10/30/2008 at 15-16.)  As a result, the Court approved the retention but directed that in the event the Debtors determined that additional claims existed against JPMC, they should promptly advise the UST and the Committee so that the issue could be addressed.  (Ex. D-21.)  Subsequently, an application was filed by the Debtors to hire conflicts counsel to pursue the other claims the estate had against JPMC.  (Ex. D-26.)

As noted above the Debtors did sue JPMC shortly after the case was commenced for turnover of the $4 billion in Deposit Accounts held at JPMC and vigorously defended the JPMC Adversary. All of the litigation between the parties was contentious and hard-fought, even efforts by the Debtors to obtain discovery from JPMC.  During the course of that litigation, the Court personally observed the actions of the Debtors' professionals and finds no evidence that they failed to represent adequately the interests of the estate.  The Plan Objectors presented no evidence to the contrary other than the insinuation that because there was a potential conflict, there must have been undue influence exerted by JPMC on the Debtors' professionals.

This case is clearly distinguishable from the <u>Coram</u> case where direct evidence of an actual conflict was presented (that the Debtor's CEO was being paid $1 million a year as a "consultant" by one of the largest creditors while serving as an officer of the Debtor). 271 B.R. at 231. This case is also distinguishable from the <u>Project Orange</u> case. In that case the conflicts waiver severely limited counsel's ability to bring suit against the creditor or even to threaten suit. 431 B.R. at 375. In contrast, in this case Debtor's counsel was permitted to sue JPMC over the Deposit Accounts. Further, the <u>Project Orange</u> Court acknowledged that in most cases the use of conflicts counsel solves the problem. <u>Id.</u> Therefore, the Court rejects the Plan Objectors' argument that the potential conflict taints the Global Settlement or makes it unapprovable.

## 2. <u>Standard of review</u>

Compromises are generally favored in bankruptcy. <u>See, e.g.,</u> <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 393 (3d Cir. 1996) (finding that compromises help expedite case administration and minimize litigation). The approval of a settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure is committed to the discretion of the bankruptcy court. <u>Key3Media Group, Inc. v.</u> <u>Pulver.com Inc. (In re Key3Media Group Inc.)</u>, 336 B.R. 87, 92 (Bankr. D. Del. 2005) (finding that pursuant to Bankruptcy Rule 9019(a), approving a settlement is within the sound discretion of

the bankruptcy court).  In making its evaluation, the court must determine whether "the compromise is fair, reasonable, and in the best interest of the estate."  In re Louise's Inc., 211 B.R. 798, 801 (D. Del. 1997) (explaining the factors the court should take into consideration when deciding whether to approve a compromise under Rule 9019(a)).  The court does not have to be convinced that the settlement is the best possible compromise, but only that the settlement falls within a reasonable range of litigation possibilities.  In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004) (finding that the proper test to apply in the determination of whether to approve a proposed compromise is if the compromise falls "within the reasonable range of litigation possibilities").  Therefore, the settlement need only be above "the lowest point in the range of reasonableness."  Id. (citing Official Unsecured Creditors' Comm. of Pa. Truck Lines. Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.), 150 B.R. 595, 598 (E.D. Pa. 1992)).

The Plan Supporters bear the burden of persuading the Court that the Global Settlement falls within the range of reasonableness.  Key3Media Group, 336 B.R. at 93 ("While a court generally gives deference to the Debtors' business judgment in deciding whether to settle a matter, the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved.").  In addition, the Plan

Supporters bear the burden of proving that the Plan complies with all of the requirements of the Bankruptcy Code for confirmation. See, e.g., In re Adelphia Commc'ns Corp., 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) (finding that the plan proponent has the burden of proof in establishing by a preponderance of evidence that its plan meets the best interest of creditors test).

The Plan Objectors argue that in considering whether the Global Settlement is reasonable, the Court must determine whether it is fair to them. "Under the 'fair and equitable' standard, [the court looks] to the fairness of the settlement to the other parties, i.e., the parties who did not settle." Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 645 (3d Cir. 2006). Because the Plan Objectors contend that they are not getting a fair recovery under the Global Settlement, they argue that the Global Settlement is not reasonable.

When determining the best interests of the estate, the Court must balance the value to the estate of accepting the settlement against the claims that are being compromised. Martin, 91 F.3d at 393. See also Nutraquest, 434 F.3d at 644-45 (tracing the history, and reaffirming the applicability, of the Martin test in considering the compromise of claims by and against the estate). In striking this balance, the Court should consider: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity, expense, and delay of the

litigation involved; and (4) the paramount interest of the

creditors.  <u>Protective Comm. for Indep. Stockholders of TMT</u>

<u>Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424 (1968)

(finding that a bankruptcy judge should form an educated estimate

of the "complexity, expense, and likely duration of such

litigation, the possible difficulties of collecting on any

judgment which might be obtained, and all other factors relevant

to the full and fair assessment of the wisdom of the proposed

compromise"); <u>In re RFE Indus., Inc.</u>, 283 F.3d 159, 165 (3d Cir.

2002) (finding that the bankruptcy court should examine four

factors in deciding whether to approve a settlement: the

probability of success of litigation, the likely difficulties in

collection, the complexity of the litigation involved, and the

interest of the creditors); <u>Martin</u>, 91 F.3d at 393 (same).[15]

a.   <u>Probability of success</u>

The Plan Supporters argue that the Court must take a

"holistic" approach to the Global Settlement contending that the

resolution of each claim is dependent on the resolution of all

the claims.  The Plan Objectors disagree, contending that the

Court cannot determine whether the settlement as a whole is

reasonable without evaluating the merits of each claim.

---

[15]   One of the individual shareholders, Mr. Schnabel,
contends that the Debtors are abandoning property which has value
in violation of section 554.  The Court rejects this argument as
the Debtors are not abandoning property but are instead settling
claims they have against JPMC and the FDIC.

The Court agrees with the Plan Objectors: each part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable.  This is not to say, however, that this is a mere math exercise comparing the sum of the parts to the whole.  Rather, the Court recognizes that there are benefits to be recognized by a global settlement of all litigation (eliminating costs of continued litigation and delay in distributions to creditors and shareholders) that may recommend a settlement that does not quite equal what would be a reasonable settlement of each part separately.  Nonetheless, the Court must consider the reasonableness of the resolution in light of each of the separate claims being resolved or released in the Global Settlement.[16]

The Plan Objectors contend preliminarily that the Plan Supporters have failed to meet their burden of presenting objective evidence regarding the probability of success on the various claims.  Both in discovery and at the hearing, the Debtors objected to any testimony being elicited from their

---

[16]  In conducting this analysis, however, the Court rejects the contention of Jeffrey S. Schultz, an LTW Holder, that the Court should conduct an auction of the Anchor Litigation because it will realize more value for the LTW Holders.  The competing ownership interests in that asset are being resolved as a part of the Global Settlement, and there is no suggestion that it can be separated from that Settlement.  Further, as noted below, the Court believes that the interests of the LTW Holders can be adequately protected by means of a cash reserve and, therefore, it is unnecessary to consider that asset separately.

witnesses regarding anything that counsel discussed with them. This essentially precluded any testimony regarding the likelihood of success on any of the Debtors' positions with respect to the disputed claims. Because of this, the Plan Objectors argue that the Plan Supporters have not met their burden of proof on this factor and the Global Settlement cannot be approved. See, e.g., In re Spansion Inc., No. 09-10690, 2009 WL 1531788, at *7 (Bankr. D. Del. June 2, 2009) (finding the debtors provided "little information as to the specifics of the Actions to provide a basis for evaluating the strengths and weaknesses of the litigation.").

The Plan Supporters respond that they have presented objective evidence about the probability of success. Although the witnesses were not permitted to testify about any attorney/client communications (in order to preserve the privilege), the Plan Supporters argue that the witnesses did testify to the analysis that the witnesses themselves performed. This they contend, together with the pleadings filed by the parties in the litigation, is sufficient for the Court to determine the likelihood of whether the Debtors would have succeeded on their claims.

The Court agrees with the Plan Supporters. The Spansion case is distinguishable; in that case debtors' management stated that they did not rely on counsel at all in evaluating the merits of potential litigation, which the Court found incredible. Id.

at *8 (finding it unlikely "that a reasonable evaluation of the merits of litigation of this nature and extent could have been made without taking into account advice of counsel."). Here, the Debtors' management admitted that they relied substantially on the advice of counsel. Unlike <u>Spansion</u>, the Court finds that a reasonable evaluation of the merits of the litigation was conducted by the Debtors.

It is not necessary for the Debtors to waive the attorney/client privilege by presenting testimony regarding what counsel felt was the likelihood they would win on the claims being settled. Although it may be helpful, it is also not necessary that the Plan Supporters present the testimony of a legal expert on the strengths and weaknesses of each side's position. It is sufficient to present the Court with the legal positions asserted by each side and the facts relevant to those issues. The Court itself can then evaluate the likelihood of the parties' prevailing in that litigation to determine whether the settlement is reasonable. Mere arguments of counsel or opinions of experts cannot substitute for that decision-making. Rather, the objective evidence that the Court should consider is the factual analysis (which was presented in this case by the Debtors' witnesses) and the legal positions of both sides (which are contained in the pleadings filed by them). The Court finds that sufficient evidence of this kind has been presented by the

Plan Supporters in this case to determine whether the Global
Settlement is reasonable.

### i. Deposit Accounts

The dispute regarding ownership of the Deposit Accounts was
raised in both the JPMC and the Turnover Adversaries. (Kosturos
Decl. at ¶ 53.) Essentially, the issue was who owned the cash in
WMB that was in bank accounts in the Debtors' name. The Debtors
relied on well-settled case law in arguing that the Debtors'
Deposit Accounts are property of the estate subject to turnover.
See, e.g., In re Amdura Corp., 75 F.3d 1447, 1451 (10th Cir.
1996) ("We presume that deposits in a bank to the credit of a
bankruptcy debtor belong to the entity in whose name the account
is established."); In re Meadows, 396 B.R. 485, 490 (B.A.P. 6th
Cir. 2008) (finding that funds in a debtor's checking account
became property of the estate); In re Rocor Int'l, Inc., 352 B.R.
319, 328 (W.D. Okla. 2006) ("[T]he presumption is that 'deposits
in a bank to the credit of a bankruptcy debtor belong to the
entity in whose name the account is also established.'"); In re
LandAmerica Fin. Group, Inc., 412 B.R. 800, 809 (Bankr. E.D. Va.
2009) ("In line with the broad definition of 'property of the
estate,' money held in a bank account in the name of a debtor is
presumed to be property of the bankruptcy estate"); In re Rock
Rubber & Supply of CT, Inc., 345 B.R. 37, 40 (Bankr. D. Conn.
2006) (holding that debtor's deposit accounts were property of

23

the estate); In re Tarbuck, 318 B.R. 78, 81 (Bankr. W.D. Pa. 2004) (holding that money chapter 7 debtor had placed into depository account was property of the estate). See generally 11 U.S.C. § 541(a)(1) (property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."); 4 Collier on Bankruptcy ¶ 541.09 (15th ed. 2009) ("deposits in the debtor's bank account become property of the estate under section 541(a)(1).").

JPMC argued, however, that under the unique circumstances presented in this case the presumption that the funds in the Deposit Accounts are property of the Debtors' estate should not be applied. In fact, JPMC pointed to notations in the parties' books and records that suggested the Deposit Accounts were meant to be a capital contribution by WMI to WMB. (Kosturos Decl. at ¶ 53.) In support of its response to the Debtors' summary judgment motion, JPMC offered the declaration of an expert in bank accounting, who stated that there are inherent differences between a typical depositor opening an account at a third party bank and a bank holding company creating an account at its subsidiary. For example, the expert stated that a typical third party depositor would be required to present good funds, whereas the Debtors might have been able to create the Deposit Accounts without the delivery of money. In some instances, JPMC contended

that rather than transfer actual funds, the Debtors simply adjusted general ledger entries.[17]

The Debtors countered that the Deposit Accounts contain actual funds deposited by WMI when it sold WMI securities ($2.2 billion) and received tax refunds ($1.15 billion). In addition, they argued that WMI had exercised control over the accounts for more than four years, utilizing one of them as its primary checking account to service its outstanding debt, pay dividends, pay tax obligations, and pay a myriad of other operating expenses.

JPMC and the FDIC also contended that even if the Deposit Accounts are property of the estate, they have the right to set off against them any claims they have against the estate. (Id. at ¶ 57.) The Debtors responded that JPMC has no right of setoff. The Debtors note that all of JPMC's claims must be post-petition because under the P&A Agreement the FDIC retained all of WMB's claims that existed as of September 25, 2008. Therefore, the Debtors argued that JPMC could not satisfy the mutuality requirement for setoff. (Id. at ¶ 58.) See also 11 U.S.C. § 553(a).

---

[17] In addition, JPMC asserted that the transfer of $3.674 billion of the deposits from WMB to WMB fsb was fraudulent. (Kosturos Decl. at ¶ 54.) The Debtors disputed this and argued that there was no harm to WMB by the transfer because it simultaneously eliminated a liability. (Id. at ¶ 56.)

JPMC asserted that it did acquire pre-petition claims that WMB had against WMI under the P&A Agreement. (Kosturos Decl. at ¶ 59.) Alternatively, to the extent that WMB's claims against WMI were not sold to JPMC, the FDIC Receiver and JPMC argued that the FDIC has the right to claw back the Deposit Accounts under section 9.5 of the P&A Agreement. (Id. at ¶ 60.) The Debtors opposed the FDIC Receiver's motion for relief from the stay to permit the claw back, contending that any rights the FDIC acquired from the claw back of the Deposit Accounts would be equally ineligible for setoff as they would be deemed post-petition claims. (Id. at ¶ 61.)

Based on the pleadings filed in the Turnover Action, the Court finds that the Debtors had a strong likelihood of success on the merits of their claim to the Deposit Accounts, although the issues were hotly contested and the FDIC vowed to fight the issue to the Supreme Court. (Hr'g Tr. 12/7/2010 at 141.) Under the Global Settlement, the Debtors will receive the entire Deposit Accounts totaling almost $4 billion. The Court concludes that the Debtors could not do any better than this if they had continued to litigate rather than settle this claim.

### ii. Tax refunds

In the JPMC Adversary, WMI argued that it was entitled to all of the tax refunds (which total between $5.5 and 5.8

billion)[18] because it had filed the consolidated federal tax
return for itself and its subsidiaries which meant that the tax
refunds would be paid to WMI by the respective taxing
authorities.[19]  The Debtors contended that at most JPMC and/or
the FDIC Receiver have a claim against the estate under the Tax
Sharing Agreement for any amounts attributable to WMB's losses.
(Carreon Decl. at ¶¶ 11-12, 16.)

JPMC, the FDIC, and the WMB Senior Noteholders argued that
they had legal or equitable claims to the tax refunds, because
the refunds were based in large part on the losses suffered by
WMB.  (Id. at ¶¶ 11, 13.)  They argued that WMB was the legal
owner of the tax refunds and that WMI had only acted as WMB's
agent in filing the consolidated tax return.  (Id. at ¶¶ 14-15.)
See, e.g., Capital Bancshares, Inc. v. F.D.I.C., 957 F.2d 203,
210 (5th Cir. 1992) (holding that the parent could not convert
the refund into its own property because "[t]he refund is the
property of the [subsidiary] Bank, which could have generated the
refund on its own had it filed with the IRS as a separate

_____

     [18]  In addition, WMI asserted that WMB owed it approximately
$350 million for taxes paid by WMI on behalf of WMB, pursuant to
the Tax Sharing Agreement dated August 31, 1999.  (Carreon Decl.
at ¶ 12.)

     [19]  The Tax Sharing Agreement provided that WMB would file
the returns and pay the consolidated state and local taxes for
the group.  (Carreon Decl. at ¶ 7.)  However, in practice, WMI
filed returns for and paid the state and local taxes as it did
the federal taxes.  (Id.)

entity."); In re Bob Richards Chrysler-Plymouth Corp., 473 F.2d 262, 265 (9th Cir. 1973) ("Allowing the parent to keep any funds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent" and concluding that parent "receive[s] the tax refund from the government only in its capacity as agent for the consolidated group" and is therefore "acting as a trustee of a specific trust and [is] under a duty to return the tax refund to the [subsidiary]."). See also Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure, 63 Fed. Reg. 64,757-79 (Nov. 23, 1998) (providing that "a parent company which receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group").

Further, JPMC and the FDIC Receiver contended that the Tax Sharing Agreement among WMI and its affiliates required WMI to pay to each member of the group its share of the respective tax refund. (Carreon Decl. at ¶¶ 7, 13.) They noted that WMI had consistently complied with that agreement in the past. At a minimum, JPMC and the FDIC argued that they had a claim against WMI for WMB's share of the tax refunds which was almost the entire $5.5 to $5.8 billion. (Id. at ¶ 15.) See, e.g., In re First Cent. Fin. Corp., 377 F.3d 209, 218 (2d Cir. 2004) (holding that failed subsidiary had contract claim against parent, under tax sharing agreement).

28

Under the Global Settlement, the parties are splitting the tax refunds: the estate will receive $2.195 billion and JPMC will receive $2.36 billion.  (Ex. D-1 at § 2.4.)  JPMC and the FDIC are waiving all claims against the estate, including any claims related to the tax refunds.

The Plan Objectors argue that this portion of the Global Settlement is not reasonable because the Debtors had a greater chance for success on this claim than acknowledged.  First, they argue that the tax refunds are based largely on a recent change in the tax laws which allowed the Debtors to extend the NOL carryback period from two to five years.  (Carreon Decl. at ¶ 9.) That change in the tax laws, however, prohibited any financial institution which took TARP funds from taking advantage of the more favorable NOL rules on which the tax refunds were based. (<u>See</u> Objection of Schnabel, D.I. # 5964.)  Consequently, the Plan Objectors contend that JPMC would not be entitled to the bulk of the tax refunds.  The Plan Objectors also note that JPMC acquired the assets of WMB and did not merge with it; therefore, they question how JPMC can argue it is entitled to the tax attributes of WMB.  (<u>Id.</u>)

The Court concludes that the Debtors have a fair likelihood of prevailing on the tax claims in the first instance.  Even if the Debtors were correct and the tax refunds were property of the WMI estate, however, it would create a corresponding claim by

JPMC (or the FDIC Receiver[20]) for the vast majority of those tax refunds. Because creditors are being paid almost in full under the Plan, the likelihood that the Debtors would succeed in obtaining a net result better for the estate than the Global Settlement with respect to the tax refund issue is not strong.

### iii. <u>TPS</u>

The background facts relating to the TPS are detailed in the Opinion issued this same date resolving the cross motions for partial summary judgment filed in the TPS Adversary. In that Opinion the Court concludes that because the Conditional Exchange occurred, the TPS Holders no longer have any interest in the TPS and instead are now deemed to be the holders of securities representing preferred shares in WMI.

There is a dispute, however, between the Debtors, JPMC, and the FDIC regarding who is entitled to the TPS. Under the Global Settlement, the Debtors will waive any interest in the TPS and the TPS will belong to JPMC. (Ex. D-1 at § 2.3.)

The TPS Holders contend, of course, that the Debtors cannot convey the TPS to JPMC as part of the Global Settlement. For the reasons set forth in the TPS Opinion, however, the Court finds that the TPS Holders no longer have any interest in the TPS.

---

[20] Even if JPMC is precluded from claiming the tax refunds because it took TARP money or because it only bought WMB's assets and is not WMB's successor, the FDIC as Receiver argued that it had a claim to the portion of the tax refunds which is due to WMB under the Tax Sharing Agreement.

Therefore, the Court finds that the Debtors are able to transfer their interest in the TPS to JPMC (or to acknowledge that the transfer already occurred pursuant to the Assignment Agreement dated September 25, 2008). 11 U.S.C. § 363(f).[21]

The Plan Objectors also contend, however, that the estate is not getting reasonable value for the TPS (which are worth $4 billion) under the Global Settlement because the Debtors have a strong likelihood of success on their claims to the TPS. The Plan Supporters disagree, noting that JPMC and the FDIC contended in the JPMC Adversary that the Debtors' interest in the TPS was already transferred to WMB on September 25, 2008, pursuant to the Assignment Agreement. (Smith Decl. at ¶ 17.) As noted in the TPS Adversary, however, the TPS have still not been delivered to, or registered in the name of, WMI or JPMC as a result of the intervening bankruptcy filing. (Smith Decl. at ¶ 20.) In addition, the Debtors contended that any transfer of the TPS to

_____

[21]  Section 363(f) provides in relevant part:
The trustee may sell property under subsection (b) or (c) of this section free and clear of any interests in such property of an entity other than the estate only if–
        (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests;
        (2) such entity consents;
        (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
        (4) such interest is in bona fide dispute; or
        (5) such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.
11 U.S.C. § 363(f).

WMB before the Debtors filed bankruptcy may be avoided as preferential or fraudulent.

In response, JPMC argued that WMI could not avoid the assignment of the TPS because section 546(e) provides a safe harbor for transfers made in connection with a securities contract if they involve financial institutions (such as JPMC). 11 U.S.C. § 546(e).[22] See, e.g., Contemporary Indus. Corp. v. Frost, 564 F.3d 981, 986 (8th Cir. 2009) (concluding that section 546(e) protects settlement payments from avoidance if the payments were made to a financial institution even if the financial institution did not obtain a beneficial interest in them). Further, because the assignment was accomplished pursuant to the prior agreement that WMI had with the OTS, JPMC contended that WMI served merely as a conduit of the TPS. See, e.g., In re Columbia Gas Sys., 997 F.2d 1039, 1059 (3d Cir. 1993) (finding avoidance claim improper where debtor served merely as a conduit for funds and lacked an equitable interest therein). JPMC also argued that, even if the Debtors could avoid the assignment of the TPS, the assignment agreement would be deemed assumed (and JPMC would be entitled to an administrative claim) under section

_____

[22] Section 546(e) provides in relevant part:
Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . financial institution . . . that is made before the commencement of the case . . . .
11 U.S.C. § 546(e).

365(o).[23]  The Debtors, of course, disputed the validity of JPMC's arguments.

The Court finds that there is a legitimate disagreement as to whether the TPS were already conveyed to JPMC in September, 2008, and whether value was received by the Debtors for that transfer.  Further, there are defenses that JPMC has asserted it would raise in any action the Debtors may take to avoid the assignment of the TPS to WMB.  Finally, even if the Debtors were successful in avoiding the transfer of the TPS, JPMC and/or the FDIC would have a corresponding claim (potentially administrative) for the value of the TPS under the Assignment Agreement in the amount of $4 billion.  Given these difficult legal issues and the other consideration being given to the estates under the Global Settlement, the Court finds it is unlikely that the Debtors could achieve a result on the TPS claim that is superior to the Global Settlement.

### iv.  Intellectual property

The intellectual property consists largely of trademarks

---

[23]  Section 365(o) provides in relevant part:
In a case under chapter 11 of this title, the trustee shall be deemed to have assumed . . . and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507.
11 U.S.C. § 365(o).

including the names "WaMu" and "Washington Mutual."  The marks
were largely registered in WMI's name.  (Goulding Decl. at ¶ 20.)
In its adversary, JPMC sought a declaratory judgment that it held
equitable title to the intellectual property; alternatively it
sought a ruling that it was authorized to use them.  (Id. at ¶
21.)  In their Amended Counterclaims to the JPMC Adversary, the
Debtors took the position that the trademarks were owned by WMI
and that its subsidiaries were able to use them only under an
implied license for so long as they remained subsidiaries.  (Id.
at ¶ 20.)  It, therefore, contended that JPMC's use was
unauthorized and infringing.  (Id. at ¶ 22.)

The Plan Objectors contend that there has been no appraisal
of the intellectual property and therefore there can be no
analysis of whether the Global Settlement, under which JPMC is
given the majority of the disputed intellectual property, is
reasonable.  The Debtors respond that an appraisal would merely
establish that the trademarks are virtually worthless because
they are associated with the largest bank failure in the
country's history.

The Court concludes that the Debtors are likely to succeed
on the claim to the intellectual property, because it was titled
in WMI's name.  However, the fact that WMB (rather than WMI) used
the marks historically in the operation of its business and the
marks are closely associated with WMB's failure, suggests that

their intrinsic value is not high.  Further, the fact that WMI
has virtually no remaining business operations convinces the
Court that the marks, if owned by WMI, have insignificant value.

### v.  Employee-related assets and liabilities
### 1.  WMI pension plan

WMI was the sponsor of the WaMu Pension Plan which covered
more than 60,000 employees, the vast majority of which were
employed by WMB.  (Goulding Decl. at ¶¶ 25-26.)  Since the
takeover of WMB, JPMC has handled the daily administration of the
Pension Plan at the direction of WMI.  (Id. at ¶ 27.)  As the
sponsor of the Pension Plan, WMI retains a contingent interest in
the assets, if any, remaining after all liabilities have been
satisfied, but is obligated to maintain the Pension Plan's funded
status and cover its administrative costs (which in 2008 were $12
million).[24]  (Id. at ¶¶ 28 & 32.)  As of November 2008, the
Pension Plan had a total of $1.7 billion and was over-funded by
approximately $39 million based on the market value of the assets
and the actuarial estimate of the liabilities.[25]  (Id. at ¶¶ 29 &
31.)

---

[24]  In addition, a claim was filed against WMI asserting
violations of ERISA in connection with the Pension Plan, which
was recently settled for $20 million payable from the funds in
the Pension Plan.  (Goulding Decl. at ¶ 34.)

[25]  The Plan Objectors contend that the value of the Pension
Plan must have increased since November 2008 when the stock
markets generally were at their lowest level.  The Debtors
respond, however, that liabilities have continued to accrue under
the Pension Plan and that the two have offset each other.

In its adversary, JPMC sought a declaration that it be permitted to take over the Pension Plan because the vast majority of the employees covered by it were employees of WMB (which therefore had the real economic interest in it). (<u>Id.</u> at ¶ 38.) JPMC also sought damages from WMI to the extent that the value of the Pension Plan declined while WMI was administering it in the bankruptcy case. (<u>Id.</u>)

Under the Global Settlement, JPMC will take over the Pension Plan, be responsible for its administration, assume any potential liabilities arising thereunder, waive any claims it has against WMI related to the Pension Plan, and indemnify WMI for any liabilities it may incur in connection therewith. The Plan Supporters contend that the Global Settlement treatment is preferable to any other option that the Debtors may have with respect to the Pension Plan. They argue that it is impractical for WMI to continue to administer the Pension Plan, especially after confirmation when the only remaining operations of the Reorganized Debtor will be the runoff of the reinsurance business. The Plan Supporters argue that the only other alternative (terminating the Pension Plan) will result in considerable additional risk, including tax consequences, which will consume any over-funding that may exist in the Pension Plan. (<u>Id.</u> at ¶¶ 36-38.)

The Plan Objectors argue that the Pension Plan has significant value which should inure to the WMI estate. They note that there is really no dispute that WMI is the funder of the Pension Plan and, therefore, is entitled to the excess assets therein.

The Court finds that the Debtors do have a high likelihood of success on their claim to the Pension Plan assets. However, the value to the Debtors is not simply the amount by which the Plan assets currently exceed the liabilities. In order to realize any of that excess value, the Debtors would have to either (1) terminate the Pension Plan which will result in immediate costs and potential termination liability that might exceed the amount of any overfunding or (2) continue to administer the Pension Plan indefinitely which will result in continuing administrative costs (totaling approximately $12 million per year), the burden of paying claims (exacerbated by the fact that the Debtors no longer employ the persons covered by the Pension Plan), and possible additional liability if the pension obligations ultimately exceed the market value of the assets in the Pension Plan. (Id. at ¶¶ 30, 32.) The Court concludes that the Debtors' other options are not likely to realize more than the Global Settlement.

2.    Rabbi trusts

In addition to the WMI Pension Plan, WMI had inherited

certain trust assets related to non-qualified deferred compensation plans covering highly compensated employees and former employees. The deferred compensation plans are "top hat" plans because they provided a means by which top management could receive tax benefits by deferring the receipt of a portion of their compensation. In order to qualify for the deferred tax benefits, the deferred compensation plans had to be "unfunded," that is, provide that any distributions to the employees will come only from the general assets of the company. See, e.g., Accardi v. IT Litig. Trust (In re IT Group, Inc.), 448 F.3d 661, 664-65 (3d Cir. 2006) (explaining the requirements of a top hat plan under ERISA). The deferred compensation plans did, however, create trusts (commonly called "rabbi trusts") into which WMI deposited funds sufficient to cover its obligations under the deferred compensation plans. The rabbi trusts did not affect the deferred compensation plans' unfunded status, however, because they provided that the employees had no interest in the trust and the trust assets were considered part of WMI's general assets. Id. at 665 (finding the top hat plan was unfunded because the assets used to pay the deferred compensation were general assets of the company subject to the claims of its creditors in the event of insolvency). See also Resolution Trust Corp., v. Mackenzie, 60 F.3d 972, 974-75 (2d Cir. 1995) (finding that a deferred compensation plan was unfunded when the plan's assets

were held in grantor trusts because the assets remained available to the employer's general creditors in the event of insolvency); Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1127 (4th Cir. 1993) (finding that beneficial tax treatment of a rabbi trust depends on the trust remaining subject to the claims of creditors as if the trust's assets were the general assets of the employer); Schroeder v. New Century Holdings, Inc., (In re New Century Holdings, Inc.), 387 B.R. 95, 111 (Bankr. D. Del. 2008) (finding that the deferred compensation plan was unfunded, as required to constitute a top hat plan, given that the plan participants did not have a res separate from the employers' general assets and did not have a legal right greater than that of general unsecured creditors).

In its adversary, JPMC asserted that it had acquired twelve of the rabbi trusts (all except those originally sponsored by H. F. Ahmanson and Co.)[26] because they were reflected as assets of WMB on its books and records and WMB was the successor to the original settlors. (Goulding Decl. at ¶ 40-41; Ex. D-41 at ¶¶ 130-31, 134 n.2.) After reviewing their books and records, the Debtors agreed in the Global Settlement to transfer all the rabbi

---

[26] The Ahmanson rabbi trusts are the subject of a contested matter between the Debtors and some of the employees covered by those deferred compensation plans who contend that they are entitled to the funds in the trusts because they had asked for a distribution from them before the bankruptcy case was filed and the Debtors had wrongfully refused. The matter has been tried and briefed and is pending decision.

trusts to JPMC except the Ahmanson trusts.  (Goulding Decl. at ¶ 43.)

Based on the manner in which the rabbi trusts are reflected on the parties' books and records, the Court concludes that the Debtors do not have a strong likelihood of getting a better result on these assets than their recovery under the Global Settlement.

### 3. Deferred compensation plans

As part of the Global Settlement, the parties also agreed that JPMC will accept responsibility for certain other deferred compensation plans, based on how they had been recorded on the WMI/WMB records.  (Goulding Decl. at ¶ 55.)  There appears to be no value, but only liability, associated with those plans.

The Court concludes that the Debtors do not have a strong likelihood of getting a better result on these plans than is reflected in the Global Settlement.

### 4. Employee medical plans

WMI was also the sponsor of an employee medical plan. (Goulding Decl. at ¶ 56.)  When WMB was seized and sold to JPMC, JPMC began to administer and pay the claims under that plan of former WMI and WMB employees who became employed by JPMC.  JPMC subsequently consolidated that plan into its own medical plan. (Id.)  Nonetheless, former employees have filed medical claims against the Debtors totaling at least $3 million.  (Id. at ¶ 58.)

As part of the Global Settlement, the parties agreed that JPMC will accept responsibility for all claims under the employee medical plan. (<u>Id.</u> at ¶ 55.) The Debtors contend that there is no benefit to it retaining the medical plan because most of the covered employees are now employed by JPMC, there is continuing liability under the medical plans, and there are no funds set aside to cover the liabilities. (<u>Id.</u> at ¶ 61.)

The Court concludes that given the fact that the medical plans constitute only liabilities and not assets, the Debtors do not have a strong likelihood of getting a better result on these plans than they are getting under the Global Settlement.

### 5. <u>BOLI/COLI policies</u>

Among the disputed assets are the bank-owned life insurance and company-owned life insurance policies on the lives of employees of WMB and WMI respectively (the "BOLI/COLI"). The policies were reflected on the respective books and records of WMB and WMI, who paid the premiums and were the primary beneficiaries. (Goulding Decl. at ¶ 44.) Some of the policies were "split dollar" policies under which the insurance proceeds would be shared between the insured employee's beneficiary and WMB or WMI. (<u>Id.</u>)

In most instances JPMC and the Debtors agreed who owned the BOLI/COLI, largely based on which company reflected the policy on its records. (<u>Id.</u> at ¶ 46.) Some were disputed, however,

including two policies issued by Pacific Life and approximately
995 split dollar policies.  (Id.)  JPMC contended that those
policies belonged to it because they had originally been owned by
a bank which merged into WMB and were historically reflected on
WMB's books and records.  (Id. at ¶ 48-49; Ex. D-41 at ¶¶ 152,
155-56.)  The Debtors disputed that contention, asserting
specifically that the Pacific Life policies had been transferred
on June 4, 2003, to the WMI Revocable Trust which is owned by
WMI.  (Id. at ¶ 50; Ex. D-41 at ¶ 169.)

Under the Global Settlement, the BOLI/COLI policies will be
owned by the entity on whose records they are listed.  With
respect to the disputed policies, the Debtors will keep the
Pacific Life policies and JPMC will keep the split dollar
policies.  The Court concludes that because the Global Settlement
divides the BOLI/COLI policies largely based on how they were
reflected on the books and records of WMI and WMB, respectively,
the Debtors do not have a strong likelihood of getting a
significantly better result than reflected in the Global
Settlement on these policies.

### vi.  Visa shares

WMI holds approximately 3.15 million Class B shares of Visa,
Inc. ("Visa").  (Goulding Decl. at ¶ 62.)  Those shares had been
issued in connection with an IPO pursuant to which Visa had
issued Class B shares to former members of Visa U.S.A.  In

conjunction with the IPO, Visa had also established an escrow to cover certain litigation liability of Visa U.S.A., for which its former members were liable. (Id. at ¶ 64-66.) The Class B shares are restricted and their value is adjustable depending on the value of Visa Class A shares at the time of conversion. (Id. at ¶ 65.) In addition, WMI and WMB have certain indemnification liability to Visa, if the escrow is insufficient to cover the actual litigation liabilities. (Id. at ¶ 67-68.) The Debtors estimated that the value of the Class B Visa shares could be between $0 and $151 million, depending on the amount of liability and the value of the Class A shares. (Id. at ¶ 70.)

JPMC and the Debtors disputed ownership of the Visa shares. WMI asserted that it was the owner because the shares were registered in its name. (Id. at ¶ 71.) JPMC asserted that although WMI was the legal owner, the beneficial owner was WMB because WMB had been the member of Visa U.S.A. to whom the shares should have been issued. (Id. at ¶¶ 71-72.) 11 U.S.C. § 541(d) (providing that to extent debtor only holds legal title it is property of the estate only to the extent of the legal title but not to the extent of any equitable interest in the property).

In addition, WMI had been receiving certain subsidies in accordance with a strategic agreement between Visa U.S.A. and Providian Financial Corporation which later merged into WMI. (Goulding Decl. at ¶ 78.) After WMI filed its bankruptcy

petition, Visa U.S.A. filed a proof of claim in the amount of at least $9.1 million for account subsidies it had paid. JPMC filed a claim against the Debtors in the amount of at least $4.6 million, asserting that it was entitled to the future unpaid subsidies and sought a declaration that the strategic agreement with Visa U.S.A. really belongs to WMB, not WMI. (Id. at ¶ 79.)

Pursuant to the Global Settlement, WMI will transfer the Visa shares and the strategic agreement to JPMC for $25 million. (Id. at ¶¶ 76 & 81.) JPMC will assume all indemnification obligations that WMI may have for those shares, will defend and indemnify the Debtors with respect to the Visa U.S.A. proof of claim, and will waive its claim to the subsidies. (Id.)

The Plan Objectors contend that the Debtors have a strong probability of winning this claim because the shares are in WMI's name. They further contend that the value of the shares is $150 million.

The Court finds, however, that even though the Visa shares may be titled in WMI's name and therefore are property of the estate, JPMC has a plausible claim that WMB is the equitable owner of them because it had been the Visa U.S.A. member, not WMI. In addition, though the shares may currently be worth $150 million, the liability associated with the escrow could diminish that value. Therefore, the Court concludes that the Debtors do

not have a strong likelihood of getting a significantly better result on this claim than is reflected in the Global Settlement.

### vii. <u>Vendor claims and contracts</u>

WMI was a party to numerous contracts with vendors who performed services for WMB; WMB typically paid for those services directly or through WMI. (Goulding Decl. at ¶¶ 83-84.) After filing its bankruptcy petition, WMI entered into a stipulation with JPMC which was approved by the Court on October 16, 2008, whereby JPMC paid the vendors directly for services and goods provided to it thereafter. (<u>Id.</u> at ¶ 86.) According to the Debtors' books and records, the potential liability under the vendor contracts for WMI is less than $50 million. (<u>Id.</u> at ¶ 88.) The Debtors believe that none of the vendor contracts provide any value to the estate because they are not used in the Debtors' business but are used only in WMB's operations. (<u>Id.</u> at ¶ 89.)

Pursuant to the Global Settlement, JPMC will pay $50 million into an escrow account from which the vendor claims will be paid. In addition, the Debtors will transfer designated vendor contracts to JPMC. (<u>Id.</u> at ¶ 90.)

Because the contracts are largely in WMI's name (which traditionally contracted for all its subsidiaries) and because WMI is no longer operating, these contracts largely represent a liability rather than an asset of the estate. There is no

evidence that the contracts have any value to WMI or anyone else.
Consequently, WMI's only alternative would be to reject them
which could result in rejection damages claims. Therefore, the
Court concludes that the Debtors do not have a strong likelihood
of getting a significantly better result on this claim than is
reflected in the Global Settlement.

### viii. Goodwill litigation

WMI was a party to litigation seeking damages resulting from
the change in the ability of purchasers of failed financial
institutions to account for the goodwill of those institutions as
a result of the passage of the Financial Institutions Reform
Recovery and Enforcement Act of 1989 ("FIRREA"). (Goulding Decl.
at ¶ 91.) WMI and JPMC disputed who had an interest in suits
commenced by American Savings Bank, F.A.[27] and by Anchor Savings
Bank FSB.[28] (Id. at ¶¶ 91-106.) JPMC asserted that it was the
real party in interest in the litigation because WMB was the
successor to the original plaintiffs. (Id. at ¶¶ 93, 95 & 98;
Ex. D-41.) WMI contended that according to its records, it was
the real party in interest. (Goulding Decl. at ¶¶ 94 & 99.)

The American Savings Litigation was commenced in 1992 and on
September 12, 2008, the Court of Federal Claims entered final

---

[27] American Savings Bank, F.A. v. United States, No. 92-872C
(Fed. Cl. 1992) (hereinafter the "American Savings Litigation").

[28] Anchor Savings Bank FSB v. United States, No. 95-039C
(Fed. Cl. 1995) (hereinafter the "Anchor Litigation").

judgment directing payment to WMI in the amount of $55 million subject to additional claims that are still pending. (Id. at ¶ 93 & n.37; Ex. D-216.) On January 6, 2009, the United States filed a motion for relief from the automatic stay seeking authority to set off that judgment against claims it had against WMI. (Goulding Decl. at ¶ 93 & n.37; D.I. # 542.) That motion was opposed and, as a result, the Court directed that the funds be placed into the registry of the Court pending resolution of the competing claims to them. (Ex. D-217.)

The Anchor Litigation was commenced in January, 1995. In 1995, Anchor merged into Dime Savings Bank ("Dime"), which merged into WMB in 2002. (Id. at ¶¶ 96 & 98.) On July 16, 2008, the Court of Federal Claims entered judgment in favor of Anchor in the amount of approximately $356 million. (Ex. D-218; Id. at ¶¶ 96-97.) In addition, the Court confirmed that Anchor was entitled to an upward adjustment to make it whole for any taxes that may be due (the "tax gross up"). (Ex. D-218.) The Court of Appeals affirmed the judgment on March 10, 2010, and remanded for determination of whether the damage award should be increased by $63 million. (Id. at ¶ 97.)

In the interim, Dime Bancorp, Inc. ("DBI"), the parent of Dime, had issued Litigation Tracking Warrants ("LTW") which entitled each shareholder of DBI to convert the LTW into DBI common stock upon the occurrence of certain events. The common

47

stock to be issued was based on 85% of the amount of recovery on the Anchor Litigation and had no exercise price. On January 4, 2002, DBI merged into WMI. The LTW Warrant Agreement was subsequently modified on March 11, 2003, pursuant to which the LTW Holders are entitled to common stock of WMI upon a trigger event.

Under the Global Settlement, JPMC will control and be entitled to all proceeds from the Anchor Litigation. This will be free of the interests that the LTW Holders have, if any, in the Anchor Litigation. The Debtors will control and be entitled to all proceeds from the American Savings Litigation as a result of the Global Settlement.

### a. LTW Holders

The LTW Holders object to the Global Settlement because it does not preserve their asserted interest in the Anchor Litigation. They contend that they are entitled to 85% of any recovery in the Anchor Litigation; the Debtors dispute this and contend that, instead, the LTW Holders merely hold a claim for breach of the Warrant Agreement. Because that Agreement dealt with the purchase or sale of a security (a warrant for common stock), the Debtors contend that the LTW Holders' claim must be subordinated under section 510(b) to the level of common stock.[29]

---

[29] Section 510(b) provides, in relevant part:
For the purpose of distribution under this title, a claim . . . for damages arising from the purchase or

48

The LTW Holders disagree, contending that the Warrant Agreement is not an agreement for the purchase of a security and that, instead, they have a claim to the Anchor Litigation itself.

The Debtors respond that, even if the LTW Holders are right, their interests are protected by the Plan. The Plan provides that the Liquidating Trust will reserve for disputed claims an amount in cash equal to the pro rata share of any distribution to which the disputed claims would be entitled in the lesser of (1) the amount on the proof of claim, (2) the amount the Court estimates the claim, or (3) the amount the parties agree should be escrowed. (Ex. D-5 at 101.) The Debtors have apparently suggested that $250 million be reserved for the disputed LTW Holders' claims. (Hr'g Tr. 12/2/2010 at 211-13.)

The LTW Holders contend, however, that the Debtors' calculations are erroneous. They note that the Anchor Litigation has already realized $355 million (the original judgment) plus $63 million (the amount by which the appellate court suggested the judgment be increased on remand). In addition, they contend that the Debtors improperly reduce the amount by expected taxes,

---

sale of . . . a security [of the debtor or of an affiliate of the debtor] . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b). The term "security" is defined to include a warrant for the purchase of stock. 11 U.S.C. § 101(49).

when in fact the trial court had preserved the right of the plaintiffs to get a tax gross up to protect them from the effects of taxes.  Therefore, the LTW Holders contend that their claim is 85% of $419 million less the $22 million in expenses the Debtors have estimated for a total of approximately $340 million.

As noted above, the Court has determined that genuine issues of material fact are in dispute in the LTW Adversary which preclude it from granting the Debtors' motion for summary judgment.  Because the claim is disputed, the Debtors may "sell" the Anchor Litigation free of the claims of the LTW Holders.  11 U.S.C. § 363(f)(4).  Alternatively, if the LTW Holders hold a lien or other interest in the Anchor Litigation, the Debtors may sell free and clear of that interest because the proceeds being received under the Global Settlement are more than the value of the Anchor Litigation.  11 U.S.C. § 363(f)(3).  In the interim, however, the Court concludes that the interests of the LTW Holders are adequately protected by the disputed claims holdback provisions of the Plan so long as the reserve for their claims is set at $347 million.[30]

---

[30]  A hearing was held on January 7, 2010, on the Debtors' motion to estimate claims for the purpose of the setting reserves under the Plan.  Evidence was presented by the Debtors to support their assertion that the LTW Holders claims should be estimated at approximately $250 million.  On cross, the LTW Holders raised numerous issues about that estimate, challenging the amount of expenses deducted from the claim as well as the calculation of the tax gross up.  At the conclusion of the hearing, the Court estimated the claim at $347 million.  This was premised largely

b.   Other Objections

The other Plan Objectors contend that the settlement with JPMC over the Goodwill Litigation is not reasonable.  They note that there was no explanation for why the Debtors chose to give JPMC the Anchor Litigation (which is worth more than $419 million) while retaining the American Savings Litigation (which is worth only $55 million).  They contend that $364 million of value that belongs to the estate is just being given away.  The Debtors respond that this was just one of the many moving parts of the Global Settlement that requires a holistic approach.

The Court finds that there is a legitimate question as to who owns the Goodwill Litigation.  Both WMI and WMB have arguments that they are the real parties in interest or are the successor to the named plaintiffs.  The Court cannot conclude that the Debtors' probability of winning that dispute is so great as to make the Global Settlement of these claims unreasonable.

ix.   Fraudulent transfers and preferences

The Debtors have also asserted various claims for recovery of some $6.5 billion in capital contributions made pre-petition by WMI to WMB, asserting that they were preferences or fraudulent conveyances.  The FDIC and JPMC raised various defenses to these

---

on the fact that if the LTW Holders were successful at trial in obtaining a claim larger than the estimate, their distribution under the Plan would nonetheless be capped at the estimated amount.  (Ex. D-5 at 101.)

claims.  They contended preliminarily that the Debtors would be unable to prove insolvency because during the relevant period, the stock market showed WMI was worth between $4 and $12.7 billion.  See, e.g., VFB LLC v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir. 2007) (concluding that market's valuation of a company is strong evidence of solvency and more probative than the opinions of experts); In re Hechinger Inv. Co. of Del., 327 B.R. 537, 548 (D. Del. 2005) (giving deference to market valuation rather than hindsight expert testimony).

In addition, JPMC argued that the Debtors would not be able to recover from it under section 548 as a subsequent transferee because it had no notice of the voidable transfer and gave significant value (almost $2 billion and the assumption of an additional $145 billion in deposit liabilities) for the assets of WMB.  11 U.S.C. § 548(c).[31]  See, e.g., In re Hill, 342 B.R. 183, 202-04 (Bankr. D.N.J. 2006) (holding that a good faith defense under section 548(c) requires a transferee prove (1) innocence and (2) an exchange of value).

_____

[31]  Section 548(c) provides:
Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.
11 U.S.C. § 548(c).

Under the Global Settlement, the Debtors are waiving these claims against JPMC. The Plan Objectors contend that this is not reasonable given the probability of the Debtors succeeding on these claims and recovering the $6.5 billion.

The Court does not agree with the Plan Objectors. It is far from certain that the Debtors would be able to recover the pre-petition payments made to WMB. JPMC has raised defenses to those claims, which at least raise significant factual issues. In addition, as noted below, prosecution of the avoidance actions is contingent on the Debtors proving insolvency at the time of the transfers. Not only is this a significant hurdle to prove, but if the Debtors were successful in proving that element, it would eliminate their ability to claim any damages under their Business Tort Claims.

x. <u>Business Tort Claims</u>

On February 16, 2009, certain holders of WMI common stock and debt securities issued by WMI and WMB (the "ANICO Plaintiffs") filed an action against JPMC in state court in Galveston County, Texas, alleging misconduct by JPMC in connection with the seizure of WMB and the P&A Agreement (the "ANICO Litigation"). (Kosturos Decl. at ¶ 23.) On March 25, 2009, the ANICO Litigation was removed and transferred to the DC Court on motion of JPMC and the FDIC Receiver as intervening defendant. (<u>Id.</u> at ¶ 24.) On April 13, 2010, the DC Court

53

dismissed the ANICO Litigation finding that under FIRREA the receivership was the exclusive claims process for claims relating to the sale of WMB. ANICO v. JPMorgan Chase & Co., 705 F. Supp. 2d 17, 21 (D.D.C. 2010). That order is presently on appeal. (Kosturos Decl. at ¶ 25.)

As noted above, early in the bankruptcy case, the Debtors conducted discovery of JPMC under Rule 2004 regarding the Business Tort Claims which are similar to the various claims asserted in the ANICO Litigation. (Id. at ¶ 26.)

Both JPMC and the FDIC Receiver contend that the Debtors have no chance of recovery on those claims. Principally, they argue that any claims challenging the closing of WMB or its sale to JPMC are barred by FIRREA. See, e.g., Freeman v. F.D.I.C., 56 F.3d 1394, 1399 (D.C. Cir. 1995) (finding that anyone bringing a claim against the assets of a failed bank held by the FDIC as receiver must first exhaust its remedies under the FDIC's claims process); Cal. House. Sec. Inc. v. United States, 959 F.2d 955, 958 (Fed. Cir. 1992) (holding that the plaintiff could not have expected to be compensated for a regulatory take-over if that occurred following a determination that the plaintiff's financial situation mandated a federal receivership); ANICO, 705 F. Supp. 2d at 21 (finding that the plaintiffs were required to pursue their claims against the FDIC as receiver through the process provided by Congress in FIRREA). Further, JPMC and the FDIC

Receiver contend that any derivative claim that WMI may have for alleged harm to WMB is now owned by the FDIC.  12 U.S.C. § 1821(d)(2)(A)(i) (providing that the FDIC as receiver "succeeds to all rights, titles, powers, and privileges of . . . stockholder" of the bank).  See also Pareto v. F.D.I.C., 139 F.3d 696, 700 (9th Cir. 1998) (determining that § 1821(d)(2)(A)(i) vests all rights and powers of a stockholder of a bank to bring a derivative action in the FDIC).  The FDIC Receiver further argues that the Debtors did not file any claim in the Receivership action based on the alleged Business Tort Claims and those claims are, therefore, time-barred.  Cf. 12 U.S.C. § 1464(d)(2)(B) (any claims challenging the appointment of the FDIC as Receiver must be brought against the OTS within 30 days of the appointment).

Under the Global Settlement, the Debtors are waiving any claims they have against JPMC and the FDIC Receiver, including any derivative claims based on the Business Tort Claims.[32]  The Plan Objectors contend that the Business Tort Claims are valid and valuable claims, meriting denial of approval of the Global Settlement on that basis alone.

The Court finds, however, that the Debtors' likelihood of success on the Business Tort Claims is not high.  The ANICO suit

---

[32]  Many objections were filed to this part of the Global Settlement, largely because it appeared that the Debtors were releasing other party's claims, including direct claims of the ANICO Plaintiffs.  This issue is addressed in Part B(1)(c)(ii)(b), infra.

has already been dismissed on the basis that it had to be brought in the FDIC receivership action.  ANICO, 705 F. Supp. 2d at 21. There is a question whether the Business Tort Claims were included in the claim the Debtors originally filed in the FDIC receivership action.  Further, as noted above, any claim for damages under the Business Tort Claims would require that the Debtors prove that they were solvent at the time of the seizure of WMB, a position diametrically opposed to assertions they would need to prove in the preference and fraudulent conveyance claims.

### xi.  Miscellaneous other claims

The Global Settlement also resolves other claims, including intercompany debt (for which JPMC is paying $180 million), certain environmental liabilities known as the BKK claims (which are being assumed by JPMC and could aggregate over $600 million), and the provision of loan servicing by JPMC for WMI.  (Goulding Decl. at ¶ 124; Hr'g Tr. 12/2/10 at 237.)

The resolution of the miscellaneous claims all appear to resolve claims favorably to the Debtor.  The Court concludes that the Debtors do not have a strong likelihood of getting a significantly better result than reflected in the Global Settlement on these claims.

After reviewing each of the claims, the Court is not convinced that the Debtors have a probability of achieving a result significantly better if they were to continue to litigate

than they will receive under the Global Settlement considering the claims separately or holistically. Therefore, the Court finds that this factor supports approval of the Global Settlement.

### b. Difficulties in Collection

The Plan Supporters argue that given the complexity of the case and the fact that it involves claims against the FIDC as well as JPMC means that the possibility of collecting is very difficult. They note that because WMI's claims against the FDIC are premised in part on its equity ownership of WMB, the possibility of collecting on those claims are particularly remote. The FDIC as Receiver of WMB has significantly fewer assets than the claims of creditors, making any recovery for equity unlikely. The Plan Supporters argue that even collection against JPMC for claims the Debtors have against it is not assured.

The Plan Objectors disagree, contending that JPMC is a huge financial institution with many resources and that any collection of claims against it cannot be difficult. They also note that several of the assets in dispute are liquid: notably, the $4 billion in Deposit Accounts, the more than $5 billion in tax refunds, and the $4 billion in TPS. Therefore, they argue that collectibility is not an issue.

The Court disagrees with the Plan Objectors.  The collapse of WMB itself demonstrates that bank deposits (especially in the amount of $4 billion) may not be easily collectible without resulting in another bank collapse.  Further, given the economic turmoil in 2008, when even huge institutions like Lehman Brothers and AIG faced financial difficulties, the Court concludes that it is not possible to say that any judgment against JPMC would not face difficulty in collection, especially if it is in the billions of dollars as the Plan Objectors contend.  Finally, to the extent that the Debtors are successful in proving any claim against the FDIC as Receiver for WMB, it would be but one of many claims against the receivership with little prospect of any meaningful distribution.  (Hr'g Tr. 12/2/2010 at 71.)  Finally, the significant counterclaims against the Debtors raised by JPMC and the FDIC (in excess of $54 billion) add to the difficulties of collecting from them.  Therefore, the Court finds that this factor supports approval of the Global Settlement.

c.    Complexity, Expense and Delay

The Plan Supporters argue that continuing the various litigation on the disputed claims will cause at least a 3-4 year delay in any distribution to creditors, increase post-petition interest and professional fees (which are currently running at the monthly rate of $30 million and $10 million, respectively) and require the resolution by this Court and others of complex

issues relating to the takeover and sale of WMB and conflicting claims of many parties to the various disputed assets. (Kosturos Decl. at ¶ 30.) The Plan Supporters contend that the litigation in this case was particularly complex given the involvement of the government regulators which added issues of sovereign immunity (affecting even whether discovery could be taken of the government agents), preemption, and jurisdiction.

The Plan Objectors note that this factor is really not significant because all settlements eliminate the complexity, expense, and delay inherent in litigating.

The Court disagrees with the Plan Objectors' contention that this factor is not significant. The dollars at risk in this case are enormous and each individual disputed claim involves a multiplicity of issues raising complex arguments about the intersection of bankruptcy law and the regulation of banks. In addition, many of the arguments overlap, making it difficult to decide (or settle) one issue without impacting another. Therefore, the Court concludes that this is the precise type of multi-faceted litigation that cries out for settlement. This factor supports approval of the Global Settlement.

### d. Paramount interests of creditors

The Plan Supporters argue that consideration of the interests of creditors mandates that the Court approve the Global Settlement. They note that creditors have overwhelmingly voted

in favor of Plan. (Exs. D-18 & D-19.) As a result of the Global Settlement, the Debtors project that all creditors except the lowest subordinated class will be paid in full with interest. (Ex. D-5C.) They also note that the creditors will be paid quickly because the Global Settlement provides mostly cash to the Debtors in resolution of their claims.

The Plan Objectors contend that, where a debtor is solvent, the Court must consider not just the interests of the creditors but also the interests of the shareholders in evaluating the reasonableness of the settlement. Because the Global Settlement only results in a recovery for creditors when there is additional value to be given to shareholders without a settlement, the Plan Objectors argue that the Global Settlement must be rejected as unreasonable.

The Court rejects this analysis. The Court has determined that the Global Settlement provides a reasonable return in light of the possible results of the litigation. The fact that the recovery may not reach shareholders is not enough to find it unreasonable, so long as the recoveries are distributed to the stakeholders in accordance with the priorities of the Code.

B.   Other Objections to Confirmation
     1.   Reasonableness of releases

The Plan Objectors contend that the releases provided in the Plan (and the Global Settlement) are excessively broad and not permissible under applicable law. The Plan Supporters argue that

the releases are an integral part of the Global Settlement and accordingly must be approved.  They further argue that, as recently modified, the releases do comply with applicable law.

Determining the fairness of a plan which includes the release of non-debtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case.  See, e.g., Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 212-14 (3d Cir. 2000) (finding that a non-consensual third party release of another third party was not valid under the specific facts of that case but concluding that it might be in other cases based on "fairness, necessity to the reorganization, and specific factual findings to support these conclusions"); In re Genesis Health Ventures, Inc., 266 B.R. 591, 608 (Bankr. D. Del. 2001) (finding that clauses in debtors' proposed plan purporting to relieve senior lenders' liability on third-party claims precluded plan confirmation absent a showing of extraordinary circumstances supporting non-consensual third-party releases); In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999) (in considering debtor's release of third parties, court applied five-factor test articulated in In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)).

In evaluating releases, courts distinguish between the debtor's release of non-debtors and third parties' release of

non-debtors.  In re Exide Techs., 303 B.R. 48, 71-74 (Bankr. D.
Del. 2003) (using different analyses to evaluate releases by a
debtor of non-debtor third parties and releases by a non-debtor
of other non-debtor third parties).

### a.  Releases granted by Debtors

In Zenith, the Court identified five factors that are
relevant to determine whether a debtor's release of a non-debtor
is appropriate:

> (1)  an identity of interest between the debtor and
>      non-debtor such that a suit against the non-debtor
>      will deplete the estate's resources;
> (2)  a substantial contribution to the plan by the non-
>      debtor;
> (3)  the necessity of the release to the
>      reorganization;
> (4)  the overwhelming acceptance of the plan and
>      release by creditors and interest holders; and
> (5)  the payment of all or substantially all of the
>      claims of the creditors and interest holders under
>      the plan.

Zenith, 241 B.R. at 110 (citing Master Mortgage, 168 B.R. at
937).  These factors are neither exclusive nor conjunctive
requirements, but simply provide guidance in the Court's
determination of fairness.  Master Mortgage, 168 B.R. at 935
(finding that there is no "rigid test" to be applied in every
circumstance and that the five factors are neither exclusive, nor
conjunctive).

Under section 43.5 of the Plan, the Debtors[33] are releasing

---

[33]  Although section 43.5 of the Plan purports to deal with
releases by the Debtors only, in fact, it includes releases by

all claims against the Released Parties which include WMB, JPMC, the FDIC, the Settlement Noteholders, the Creditors' Committee and each of its members, the Indenture Trustees for each of the tranches of the Debtors' debt, and the Liquidating Trust and Trustee. (Ex. D-2 at §§ 43.5 & 1.160.) In addition, the Debtors are releasing all the Related Persons of each of those entities which include, inter alia, their present and former affiliates, current and former officers, directors, financial advisors, attorneys, accountants, and investment bankers. (Id. at §§ 43.5, 1.158, 1.160.) The releases of each of these parties must be evaluated separately to determine if they are reasonable.

The Third Circuit has refused to articulate a test for when releases by Debtors are appropriate in the chapter 11 context. Continental Airlines, 203 F.3d at 214. However, the Court continues to believe that the factors articulated in Master Mortgage form the foundation for such an analysis, with due consideration of other factors that may be relevant to this case.

---

non-debtors. In addition to the Debtors' releases, that section includes releases by "each of [the Debtors'] respective Related Persons, and on behalf of the Liquidating Trust, the Liquidating Trustee, the Liquidating Trustee Beneficiaries and the Disbursing Agent, and each of their respective Related Persons." (Ex. D-2 at § 43.5.) The Liquidating Trustee Beneficiaries are creditors and shareholders; therefore, section 43.5 is not simply a release by the Debtors. This must be modified to limit the releases in section 43.5 to the Debtors only. Any releases by non-debtors must be clearly and separately identified as they are subject to a different standard. Zenith, 241 B.R. at 111.

### i. JPMC, FDIC and WMB

In this case, the Plan Supporters contend that the releases to be provided by the Debtors to JPMC, the FDIC, and WMB are appropriate because of the substantial contribution being made by JPMC and the FDIC in releasing claims and resolving litigation as set forth in the Global Settlement. They argue that without the contributions made by JPMC and the FDIC, there would be no basis for the Plan which provides for payment in full plus interest of most creditors and a substantial recovery for the lowest subordinated creditors who are estimated to receive 74% of their claims. (Ex. D-5C.)

The Plan Objectors' opposition to the releases of JPMC and the FDIC are largely premised on their opposition to the Global Settlement and their arguments that the Debtors are simply not getting enough under that settlement. Therefore, they argue that the releases of JPMC, the FDIC, and WMB are not fair.

Accepting that the Global Settlement is fair and reasonable, as the Court concludes above, however, leads the Court to conclude that the releases being granted to JPMC, the FDIC, and WMB by the Debtors meet the <u>Master Mortgage</u> standards. First, because of the numerous interlocking and competing claims of the Debtors, JPMC and the FDIC to the various assets which are sought to be resolved by the Global Settlement, the Court concludes that there is an identity of interest between the Debtors, JPMC, the

FDIC, and WMB. Particularly important is the fact that JPMC and/or the FDIC may be viewed as the successor to WMB. In fact, the numerous law suits that have been filed against JPMC and the FDIC by the Debtors (and derivatively by third parties) relating to the seizure of WMB evidences the identity of interest they share with the Debtors such that a suit against them relating to WMB could be viewed as a suit against the Debtors. Such suits, if permitted to continue, would deplete the estates' resources by increasing claims and administrative costs against the Debtors' estates.

Second, JPMC and the FDIC have made a substantial contribution to the Plan by waiving claims they had asserted against numerous assets of the Debtors (including the Deposit Accounts and portions of the Tax Refunds) and by waiving the proofs of claim they have filed which the Debtors have estimated to be in excess of $54 billion. These waivers are not simply significant in total dollars but also in comparison to the total claims against the estate; they are clearly the largest claims. Further, the claims being waived do not simply reduce the claims against the Debtors' estate; they permit the use of property of the estate free of competing claims to ownership.

Third, the releases of JPMC, the FDIC, and WMB are necessary to the Debtors' reorganization and confirmation of the Plan. Because of the complex and interrelated claims that the Debtors,

JPMC and the FDIC have to virtually every asset in the Debtors'
estates, it is hard to imagine what plan the Debtors could
propose without the resolution of those claims first.  Given the
substantial contributions being made to the Plan by JPMC and the
FDIC contained in the Global Settlement and given the numerous
suits which have been spawned by the failure of WMB, the Court is
not surprised that JPMC and the FDIC are insisting on a release
from the Debtors of them and WMB as a condition to the
settlement.

Fourth, the Plan has the overwhelming acceptance of
creditors who recognize that their recovery is largely dependent
on the value being conveyed by JPMC and the FDIC under the Global
Settlement.  (Exs. D-18 & D-19.)

Fifth, the Global Settlement and Plan provide the basis for
the payment of all or substantially all of the claims of the
creditors.  As noted, all creditors, except the lowest
subordinated class, will receive payment in full plus post-
petition interest from the proceeds of the assets released by the
Global Settlement.  The total payout under the Plan is expected
to exceed $7.5 billion.  (Ex. D-5C at 3.)  In addition further
recoveries may be possible from the assets conveyed to the
Liquidating Trust and from the Reorganized Debtor and the NOLs.

Although equity interest holders are not likely to get a
recovery, the Court is not convinced that continued litigation

against JPMC and/or the FDIC would change that result.
Therefore, the Court concludes that the releases given by the
Debtors to JPMC, the FDIC, and WMB are reasonable.

ii.  Other parties to the Settlement

The Plan and Global Settlement also provide that the Debtors
are releasing the Settlement Noteholders, the Creditors'
Committee and its members, the Indenture Trustees, and the
Liquidating Trust and Trustee from any and all claims.  (Ex. D-2
at § 43.5.)  The Court concludes that these are not reasonable.

The Liquidating Trust and its Trustee have not done anything
yet for which they need a release.  They will not even come into
existence until the Plan is confirmed.  (Ex. D-2 at § 28.1.)
Further, it is impossible to determine how the Liquidating Trust
and its Trustee will prospectively make a substantial
contribution to the Plan or that their actions will result in a
substantial recovery for creditors or the equity security
holders.

The releases being granted to the Committee and its members
are also not appropriate.  It is acceptable to provide
exculpations for such parties for the role they played in the
bankruptcy process, and the Court will approve appropriate ones
in this case.[34]  See, e.g., In re PWS Holding Corp., 228 F.3d
224, 246 (3d Cir. 2000) (holding that exculpation clause in plan

_____

[34]  See Part B(1)(b), infra.

which provided that committee members and estate professionals had no liability to creditors or shareholders for their actions in the case except for willful misconduct or gross negligence merely conformed to the standard applicable to such fiduciaries and, therefore, did not violate any provision of the Code).[35]

There is nothing unusual about this case that demonstrates that the Committee or its members have done anything other than fulfill their fiduciary duties. Under the <u>Master Mortgage</u> factors, they do not qualify for a release from the Debtors. There is no identity of interest between them and the Debtors. They have not contributed cash or anything else of a tangible value to the Plan or to creditors nor provided an extraordinary service that would constitute a substantial contribution to the Plan or case. While creditors are receiving a substantial recovery in the case, it is not coming from the Committee or its members. The same analysis applies to the Indenture Trustees.[36]

While the same analysis also applies to the Settlement Noteholders and suggests no release is warranted, there are additional reasons not to approve any release of them. The only

---

[35] Originally the Plan exculpation clause did not comply with the applicable standards of the Code because it did not exclude willful misconduct or gross negligence of the Committee and estate professionals. That was corrected, however, in the October 29 modification of the Plan. (Ex. D-3 at § 43.8.)

[36] This provision appears to be duplicative anyway, because the Committee members are the Indenture Trustees of the various tranches of the Debtors' debt. (D.I. # 78.)

alleged contribution made by them was their participation in the settlement negotiations. (Ex. D-1 at Ex. G.) The Settlement Noteholders were not acting in this case in any fiduciary capacity; their actions were taken solely on their own behalf, not others. The Settlement Noteholders hold interests in various levels of debt and the result of the negotiations was to get them a full recovery in all but the lowest level of debt. That is insufficient to warrant a release by the Debtors.

Further, one of the individual creditors who objected to the Plan, Mr. Thoma, sought to introduce evidence that the Settlement Noteholders used their position in the negotiations to gain non-public information about the Debtors which permitted them to trade in the Debtors' debt. While the evidence was not admitted because it was hearsay, the Court is reluctant to approve any releases of the Settlement Noteholders in light of those allegations.

### iii. Related Persons
#### a. Directors, officers, professionals

Because of the definition of Related Persons, the Debtors originally granted broad releases in section 43.5 of the Plan of their "current and former officers, directors, employees, managers, shareholders, partners, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals." (Ex. D-2 at § 1.158.) The October 29 modification of section 43.5 appeared to eliminate releases with

respect to pre-petition activity of the Related Persons by adding the proviso that the release "shall not include the Debtors' retained financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals with respect to Claims and Causes of Action relating to the period prior to the Petition Date." (Ex. D-3.) However, the testimony of the Debtors' witnesses on this point was unclear, suggesting that the intent was to limit the release to any persons who were acting on the Debtors' behalf post-petition. (Hr'g Tr. 12/6/2010 at 122-26.) It was not clear whether the release was limited only to their post-petition activity. (Id.) Even if that is the intent, however, the Court finds that it is overly broad or unnecessary.

Under the Master Mortgage test, the Court finds that there is no basis whatsoever for the Debtors to grant a release to directors and officers or any professionals of the Debtors, current or former. The Debtors may argue that there is an identity of interest between them and the directors and officers who served pre-petition because their charter (or by laws) provide that those parties will be indemnified by the Debtors for certain claims that may be brought against them by creditors or shareholders. (Ex. D-104.) While this does satisfy the first factor of Zenith, this alone is insufficient to justify the releases. To hold otherwise would eliminate the other four factors and would justify releases of directors and officers in

every bankruptcy case.  That is not the law.  <u>See, e.g.,</u>
<u>Continental Airlines</u>, 203 F.3d at 216 (finding that even if the
debtor might face an indemnity claim in the future, this does not
make the release and permanent injunction of claims against the
debtor's directors and officers "necessary" to the
reorganization).

With respect to the other four factors, no evidence has been
presented in this case sufficient to convince the Court that
releases of the Debtors' directors, officers or professionals are
warranted.  Specifically, there has been no evidence presented of
any "substantial contribution" made to the case by the directors,
officers, or professionals, justifying releases for those
parties.  Nor is there any evidence that any of the legends of
directors, officers, or professionals covered by the Debtors'
releases are necessary for the reorganization (which may be
limited to the run off of WMMRC's insurance business).  Finally,
while the Plan has been accepted by many of the creditor classes,
that is not because of any contribution by the directors,
officers or professionals; it is because the creditors are
getting paid in full.  Further, some of the creditor classes did
not accept the Plan and none of the equity classes (which are
getting nothing under the Plan) voiced any support for the Plan.
There is quite simply no basis for the Debtors' releases of their
directors, officers or professionals.

With respect to the directors, officers or professionals of the Debtors and the Committee who served in the chapter 11 case, they are receiving exculpations.  (See Part B(1)(b), infra.) Consequently, the releases as to them are unnecessary, duplicative or exceed the limits of what they are entitled to receive.

### b.    Affiliates of Released Parties

The definition of Related Persons also includes the "respective present and former Affiliates and each of their respective current and former members, partners, equity holders, officers, directors, employees, managers, shareholders, [and] partners."  (Ex. D-2 at § 1.158.)  There is no explanation why all present and former Affiliates of Released Parties are included in the broad releases granted by the Debtors; this should be deleted.[37]

### b.    Exculpation clause

In addition to the releases being granted by the Debtors in section 43.5 of the Plan, certain parties are getting an exculpation (or release) of any claim with respect to actions they took during the bankruptcy case from the Debtors and all creditors, shareholders, and other parties in interest.  (Ex. D-2

_____

[37]    While the third party releases were modified to exclude Related Persons (except for the JPMC Related Persons, the Debtors' directors and officers serving post-petition and the Debtors' present affiliates), section 43.5 was not similarly modified.  (Ex. D-4.)

at § 43.8.)  Under section 43.8 of the Plan, the exculpation is extended to all Released Parties and each of their Related Persons, as well as to the Plan Administration Committee and Plan Investment Committee of the WaMu Savings Plan.  The Court finds this provision much too broad.

As mentioned above, the Third Circuit has held that a creditors' committee, its members, and estate professionals may be  exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence.  <u>PWS</u>, 228 F.3d at 246.  The Third Circuit reasoned that such a provision merely stated the standard to which such estate fiduciaries were held in a chapter 11 case.  <u>Id.</u>

That fiduciary standard, however, applies only to estate fiduciaries.  The Debtors' Plan goes further and seeks to encompass all the Released Parties and their Related Persons. This is either duplicative of the releases granted by the Debtors or third parties contained in sections 43.5 and 43.6 or is an effort to extend those releases.  Either way it is inappropriate. The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers.

Further, the UST observed that the Debtors' exculpation provision originally did not state the correct standard, seeking

an exculpation even for willful misconduct and gross negligence. (Ex. D-2 at § 43.8.)  The October 29 modification of the Plan amended the Debtors' release of third parties to provide that it did "not extend to acts of gross negligence or willful misconduct," but it did not modify section 43.8.  (Ex. D-3.)

The standard for exculpations has been extant in this district since the Third Circuit's PWS decision in 2000.  There is no reason that the Debtors' Plan as originally filed contained any more extensive language.  See also Coram, 315 B.R. at 337 (stating that third party release of trustee, equity committee and their related professionals is not permissible except to the extent it relates to post-petition activity which does not constitute gross negligence or willful misconduct).

The LTW Holders object, however, to even this limited provision because they contend that they have a post-petition claim against the Debtors' directors and officers for their failure to comply with the requirements of the Amended Warrant Agreement to protect the interests of the LTW Holders.  Because the Court is denying the summary judgment motion in the LTW Adversary, the Court concludes that the Plan exculpation clause must carve out any claims related to the LTW Adversary until the merits of those claims are resolved.

       c.   Releases by creditors and shareholders
          i.   Original version

The Plan as originally drafted contained a release of all

Released Parties by non-debtor third parties who were creditors or shareholders of the Debtors.[38]  (Ex. D-2 at § 43.6.)  That provision did purport to allow third parties (who were entitled to vote on the Plan) to opt out of granting that release by checking a box on their ballot.  (<u>Id.</u>)  Notwithstanding that "option," however, the Plan provided that because the releases were essential to the Global Settlement, even parties who thought they were opting out of the releases by checking the box on their ballot would be bound by the releases and would receive whatever distributions the Plan afforded their class.  (<u>Id.</u>)  Those provisions obviously drew lots of objections.

The Plan Objectors principally object to the Third Party Releases because they were not consensual.  They contend that third party releases of non-debtors can only be accomplished with the affirmative agreement of the third party affected.

While the Third Circuit has not barred third party releases, it has recognized that they are the exception, not the rule.  <u>Continental Airlines</u>, 203 F.3d at 212 ("non-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in 'extraordinary cases.'").  Other courts agree.  <u>See, e.g.,</u> <u>In re Metromedia Fiber Network, Inc.</u>, 416 F.3d 136, 141 (2d Cir. 2005) (holding that third party releases may be

---

[38]  WMB Senior Noteholders were given the ability to opt in to the releases (and thereby obtain a share of the distribution given to their class under the Plan).  (Ex. D-2 at § 21.1.)

granted if important to the chapter 11 plan, but "it is clear that such a release is proper only in rare cases."); Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 657-58 (6th Cir. 2002) (concluding that "such an injunction is a dramatic measure to be used cautiously").  Some courts proscribe it completely, except in asbestos cases where third party injunctions are permitted under the express language of section 524(g).  See, e.g., Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394, 1401-02 n. 6 (9th Cir. 1995) ("This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); Landsing Diversified Props.-II v. First Nat'l Bank and Trust Co. of Tulsa (In re W. Real Estate Fund, Inc.), 922 F.2d 592, 600-01 (10th Cir. 1990) (applying the basic principle "permitting creditors whose claims have been discharged vis-a-vis the bankrupt to recover on the same claims from third parties in a variety of settings.").

This Court has previously held that it does not have the power to grant a third party release of a non-debtor.  See, e.g., Coram, 315 B.R. at 335 (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties.").  Rather, any such release must be based on consent of the releasing party (by contract or the mechanism of voting in favor of the plan).  Id.; Zenith, 241 B.R.

at 111.  Therefore, the original language in the Plan that would mandate third party releases even in the place of an indication on the ballot that the party did not wish to grant the release would not pass muster.  See, e.g., In re Nichols Midway Pier, LLC, 2010 WL 2034542, at *13 (Bankr. D.N.J. May 21, 2010) (finding third party releases were impermissible where no consideration was going to the releasing parties who had objected and they were not necessary to the debtor's reorganization because it was liquidating); In re Spansion, Inc., 426 B.R. 114, 145 (Bankr. D. Del. 2010) (finding improper releases of third parties by objecting shareholders who were receiving nothing under the plan); Exide, 303 B.R. at 74 (approving releases which were only binding on those creditors and equity holders who accepted the terms of the plan); Zenith, 241 B.R. at 111 (finding that a release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan).

## ii.  Modifications

Recognizing the problems inherent in seeking third party releases under the language of the original Plan, the Debtors announced a further modification to the Plan that would provide that no releases would be granted by any entity that opted out of the release, but that such entity would not be entitled to a distribution under the Plan.  On November 24, 2010, the Debtors

modified the release provisions of the Plan to eliminate the language that the releases would be deemed given even in the face of an opt out on the ballot. (Ex. D-4 at § 43.6.) The second modification also provided that the releases would not release anyone from willful misconduct or gross negligence, except JPMC Entities and that Released Parties would not include Related Persons except for JPMC Related Persons, the Debtors' directors and officers who served post-petition, and the Debtors' present affiliates. (Id.)

### a. Inconsistencies

The Court finds, however, that the modifications are internally inconsistent and potentially ineffective. The Plan provides that if there is any conflict, the Global Settlement controls over the Plan. (Ex. D-2 at § 2.1.) Therefore, while the Debtors have modified the release language in the Plan, the Global Settlement language has not been modified and may nullify any Plan modification.[39]

This problem is particularly evident with respect to the Releases. As noted by the ANICO Plaintiffs, the Global Settlement contains a very broad release, stating that

> every Person who is not a Releasor hereunder is
> permanently enjoined, barred and restrained from
> instituting, prosecuting, pursuing or litigating in any

---

[39] While the parties filed a modification of the Global Settlement, it did not modify the language of which the Plan Objectors complain. (Ex. D-252.)

manner any and all claims, demands, rights,
liabilities, or causes of action of any and every kind,
character or nature whatsoever, in law or in equity,
known or unknown . . . whether asserted or unasserted,
against any of the WMI Releasees, the JPMC Releasees,
the FDIC Releasees, the Creditors' Committee Releasees
or the Settlement Note Releasees, that are Released
Claims, or otherwise are based upon, related to, or
arise out of or in connection with the Debtors' Claims,
the JPMC Claims, the FDIC Claims, the Purchase and
Assumption Agreement . . . confirmation and
consummation of the Plan, the negotiation and
consummation of the [Global Settlement] or any claim,
act, fact, transaction, occurrence, statement or
omission in connection with or alleged or that could
have been alleged in the Related Actions or other
similar proceedings . . . .

(Ex. D-1 at § 3.7.)

To the extent this is in conflict with the provisions of
section 43.6 of the Plan, the Plan currently provides that the
Global Settlement controls.  (Ex. D-2 at § 2.1.)  Therefore, all
the modifications of the Plan proposed by the Debtors are
completely ineffective.  It is not sufficient to rely on the
Confirmation Order to remedy deficiencies in the Plan or to deal
with all inconsistencies between the Global Settlement and the
Plan.  With respect to issues that affect any third party who is
not a signatory to the Global Settlement, the Court concludes
that the Plan and Confirmation Order must control over the terms
of the Global Settlement.

b.    ANICO Plaintiffs

With respect to the rights of the ANICO Plaintiffs
specifically, the Debtors' Plan originally had broad release

79

language that could be read to release third party claims against
JPMC related to the Debtors.  The ANICO Plaintiffs objected to
the release of their claims in the ANICO Litigation.  The Plan
Supporters modified the release language and now contend that
there is no release of direct claims against any third parties
that may be held by shareholders or anyone who is not getting a
distribution under the Plan.  The Debtors argued at the
confirmation hearing that because the ANICO Plaintiffs are not
getting any distribution under the Plan, they are not releasing
anyone.  (Hr'g Tr. 12/7/2010 at 100.)  However, the Global
Settlement expressly provides that the Debtors are required to
file a notice of dismissal of the ANICO Litigation.  (Ex. D-1 at
§ 2.7.)  While the Debtors argued that this was only to the
extent the ANICO Litigation is premised on derivative claims held
by the Debtors, the terms of the dismissal stipulation are not so
limited and purport to dismiss all claims in the ANICO
Litigation.  (Id. at Ex. K.)

      Therefore, the Court concludes that the Plan must provide
that there is no release being provided under the Plan or the
Global Settlement by the ANICO Plaintiffs of their direct claims
against any party (other than the Debtors) and that the Court is
making no determination as to who owns the claims in the ANICO
Litigation.  Further, any stipulation of dismissal that the

Debtors file in the ANICO Litigation must expressly state that they are dismissing only claims which they own.

> c.  Release of Debtors' affiliates and directors and officers

Truck Insurance Exchange and Fire Insurance Exchange filed a limited objection to confirmation that highlights a problem with the broad language of the releases.  The Exchanges are inter-insurance exchanges owned by their insurance policy holders which hold approximately $20 million in WMB Senior Notes on behalf of their policy holders.  In addition, however, they hold $43 million in asset-backed securities issued by special purpose entities ("SPEs") related to the Debtors.  Because the definition of the WMI Entities is so broad, it could be argued that it includes a release of the SPEs (because they are affiliates of the Debtors) from any obligation to pay on the securities held by the Exchanges (merely because the Exchanges are creditors in this case).

The Court agrees with the Exchanges that the third party releases are too broad and should not extend to any affiliates of the Debtors.  There is no evidence of who the affiliates are or why they should be getting a discharge without filing their own bankruptcy cases.[40]  Further, there is no basis for granting

---

[40]  While the Second Modification of the Plan filed on November 24, 2010, eliminated third party releases of former affiliates of the Debtors, it retained them with respect to "present Affiliates" of the Debtors and post-petition activities of the directors and officers. (Ex. D-4.)

third party releases of the Debtor's officers and directors, even if it is limited to their post-petition activity.  The only "contribution" made by them was in the negotiation of the Global Settlement and the Plan.  Those activities are nothing more than what is required of directors and officers of debtors in possession (for which they have received compensation and will be exculpated); they are insufficient to warrant such broad releases of any claims third parties may have against them.  See, e.g., Spansion, 426 B.R. at 145.

d.    <u>Release by creditors' affiliates</u>

In addition, the Exchanges also object to the definition of who is providing a release because it includes "Related Parties" of creditors and specifically includes present (and former) affiliates of creditors.  (Ex. D-2 at §§ 43.6 & 1.158.)  Thus, under a plain reading of the Plan definitions, it could be argued that an affiliate (or even a former affiliate) of a creditor is releasing all claims it may have against JPMC and any affiliate of JPMC.  These could include defenses to insurance claims on policies issued by the Exchanges or their affiliates that JPMC is purportedly assuming under the Global Settlement Agreement.  As the Exchanges note, they do not have authority to release all claims that affiliates of theirs may have against JPMC and its Related Persons.  Nor is there any evidence of what contribution was made by any of the Released Parties or their Related Persons to the Exchanges' affiliates.

The Court agrees with the Exchanges that the third party releases should not extend to any affiliates of the creditors, who have no relationship to this case.

e.   <u>Need to allow opt in/out</u>

The UST argues that the Plan modification that was filed on November 24, 2010, just a week before the confirmation hearing (and after the deadline for casting ballots) materially changes the terms of the Plan.  The UST contends that parties must now be given a chance to determine whether they wish to opt out of the third party releases.  As originally drafted, although a party could purportedly opt out of the releases, because the Debtors were asking the Court to enforce the releases anyway, the Plan did not provide that by opting out a party would lose its entitlement to a distribution.  Now, however, the Plan does provide that anyone opting out of granting third party releases will lose the right to a distribution.  (Ex. D-4.)

The Court agrees with the UST that the Plan provision with respect to the third party releases has changed materially.  This is equally applicable to those who originally opted out of the releases (feeling that even though the Court might find the opt out invalid, they would still get a distribution) as to those who did not bother checking the box to opt out (feeling that the Court would simply enforce the releases anyway).

However, the Court concludes that the opt out mechanism is not sufficient to support the third party releases anyway, particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place). Failing to return a ballot is not a sufficient manifestation of consent to a third party release. <u>Zenith</u>, 241 B.R. at 111 (finding that a release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the Plan). Therefore, the Court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases.

> f.   Applicable to those who may get a
> <u>distribution</u>

There is an additional problem with the third party releases: it is unclear to whom they may apply. The language says they are applicable to any entity that "may be entitled" to a distribution under the Plan. (Ex. D-4.) The Debtors currently project that only creditors will get a distribution under the Plan. (Ex. D-5C.) However, the Liquidating Trust is receiving certain assets, including potential lawsuits, which it will liquidate. It may not be known for years whether all creditors will be paid in full so that preferred shareholders will be entitled to a distribution. Consequently, shareholders cannot vote intelligently on whether to give a release. If the

preferred shareholders are not getting any distribution under the Plan, there is no consideration for the releases of third parties. See, e.g., Nichols Midway Pier, 2010 WL 2034542, at *13 (finding third party releases were impermissible where no consideration was given to the releasing parties who had objected); Spansion, 426 B.R. at 145 (finding improper releases of third parties by objecting shareholders who were receiving nothing under the plan).

g.   <u>Discrimination</u>

The UST also objects to the Plan's conditioning any distribution on whether the entity grants a third party release, arguing that it discriminates between creditors within a class. The UST contends that this violates section 1123(a)(4) of the Code and the "fundamental bankruptcy policy of 'equality of distribution among creditors.'" See, e.g., In re Combustion Eng'g, Inc., 391 F.3d 190, 241, 248 (3d Cir. 2004) (vacating confirmation order based on apparent disparate treatment of creditors within a class).

The Court disagrees. Providing different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123(a)(4). See, e.g., In re Dow Corning Corp., 255 B.R. 445, 472 (E.D. Mich. 2000) (finding that a claimant who elects to settle instead of pursuing litigation agrees to a less favorable treatment and is in compliance with § 1123(a)(4)); In

85

re Dana Corp., 412 B.R. 53, 62 (S.D.N.Y. 2008) (finding that the fact that some claimants settled while others did not, does not by itself indicate unequal treatment).  What is important is that each claimant within a class have the same opportunity to receive equal treatment.  Dana Corp., 412 B.R. at 62 (finding equal treatment where all the claimants had the option to settle their claims or litigate them).  That is the case here.  Therefore, the Court concludes that this provision of the Plan does not violate section 11 23(a)(4).

### h.   Released Claims

The Plan Objectors also contend that the definition of Released Claims is overly broad and could cause the release of claims beyond what is permissible.  They note that the definition includes all claims "that otherwise arise from or relate to any act, omission, event or circumstance relating to any WMI Entity, or any current or former subsidiary of an WMI Entity."  (Ex. D-2 at § 1.159.)

The Court agrees that the definition is too broad and that it should be limited to claims of the Debtors (with respect to releases given by the Debtors) and to claims of creditors relating to claims they have asserted against the Debtors (with respect to releases given by creditors or shareholders).

### i.   Injunctions

The Plan Objectors also argue that the Global Settlement and

Plan injunction provisions greatly expanded the releases given by the Debtors and by creditors or shareholders. (Ex. D-1 at § 3.7; Ex. D-2 at §§ 43.3, 43.7, 43.12 & 43.13.) The Court agrees that those provisions must be limited to the terms of permissible releases and not seek to expand those releases through the back door.

### 2. Best interests of creditors

The Plan Objectors contend that the Plan violates the best interest of creditors test articulated in section 1129(a)(7). That section requires that a plan of reorganization provide non-consenting impaired creditors with at least as much as they would receive if the debtor was liquidating in chapter 7. 11 U.S.C. § 1129(a)(7).

### a. Payment of post-petition interest

The general rule is that unsecured creditors are not entitled to recover post-petition interest. United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372-73 (1988) (holding that unsecured creditors are not entitled to have post-petition interest added to their claims). There is an exception to the general rule, however, when the debtor is solvent. See Onink v. Cardelucci (In re Cardelucci), 285 F.3d 1231, 1234 (9th Cir. 2002) (finding that when a debtor is solvent, unsecured creditors are entitled to post-petition interest at the "legal rate"). In a chapter 7 liquidation, where

the debtor is solvent, a creditor must receive post-petition interest on its claim before shareholders receive any distribution. 11 U.S.C. § 726(a)(5). Therefore, to meet the best interest of creditors test in section 1129(a)(7), the non-consenting impaired creditors must get interest on their claims before shareholders receive any recovery. Coram, 315 B.R. at 344. The Plan Supporters argue that they have met this requirement because the Plan provides that all creditors will receive interest at their contract rate before creditors subordinated to them or shareholders get a recovery.[41]

### i. Before subordinated claims

The LTW Holders contend, however, that the Plan violates the absolute priority rule by providing for payment of interest to some creditors before all creditors have been paid in full. Specifically, they contend that their claims cannot be subordinated (as the Debtors argue) to the level of shareholders under section 510(b) but must be treated as unsecured (albeit subordinated) claims. They argue that neither section 1129 nor section 726 permit the payment of interest on other unsecured

_____

[41] The WMI Noteholders had objected to the Plan contending that it violated section 1129(a)(7) because it provided that the post-petition interest on the Senior Noteholders' claims was being paid pro rata with the Senior Subordinated Noteholders' claims. The WMI Noteholders have deferred pressing this objection, however, because it appears that both the Senior Noteholders' claims and the Senior Subordinated Noteholders' claims will be paid in full with post-petition interest, thereby mooting the objection.

creditors' claims before their subordinated claims are paid in full.

The Court agrees that interest cannot be paid on any unsecured claims until all unsecured claims are paid in full. 11 U.S.C. § 726(a). The priority of distributions established under section 726(a), however, is expressly subject to subordination under section 510. 11 U.S.C. § 726(a). The Debtors argue that the LTW Holders' claims must be subordinated under section 510(b) to the level of common stock because they represent a claim for breach of an agreement by which the LTW Holders were to receive common stock. See, e.g., In re VF Brands, Inc., 275 B.R. 725, 730 (Bankr. D. Del. 2002) (subordinating fraudulent transfer and breach of contract claims asserted against debtor-parent by purchaser of stock of debtor's corporate subsidiary to the creditors of the debtor-parent and treating the claims on par with claims of equity holders). Therefore, if the LTW claims are subordinated at all, they would be subordinated to the level of common stock, which gets paid, under section 726 only after all creditors get paid post-petition interest. To the extent that the LTW Holders win their suit and are not subordinated, the Debtors agree they will be entitled to treatment as general unsecured creditors under class 12 and get paid in full with interest.[42]

---

[42] The LTW Holders contend that the Debtors agreed at the Disclosure Statement hearing that if they win the LTW Adversary,

89

ii.  <u>Before late-filed claims</u>

The LTW Holders also contend that interest should not be paid on creditors' claims until payment in full of late-filed claims.[43]  The Court agrees because this is specifically mandated under the priorities delineated in section 726(a).[44]  The Plan should be modified to make this clear.

b.  <u>Rate of post-petition interest</u>

To the extent post-petition interest is appropriate, the Plan Objectors argue that it should be calculated at the federal judgment rate.  Under section 726(a)(5), where the debtor is solvent a creditor must receive post-petition "interest at the legal rate from the date of filing the petition."   Neither the Code nor its legislative history provides a definition of the legal rate.

The Plan Objectors assert that this Court should follow other courts that have interpreted the term to refer to the federal judgment rate.  <u>See, e.g.</u>, <u>Cardelucci</u>, 285 F.3d at 1234

---

the LTW Holders will be entitled to treatment in Class 12 as general unsecured creditors.  This has not, however, been incorporated into the Plan.  The Court agrees that the Plan should be clarified on this point.

[43]  This is particularly relevant to the LTW Holders because many of them had not filed proofs of claim.  That was, in part, the reason the Court suggested that the LTW Adversary proceed as a class action.  The Debtors have, however, reserved the right to object to any late-filed claims.

[44]  Late-filed claims are entitled to be paid (§ 726(a)(3)) after all timely claims have been paid in full (§ 726(a)(2)), but before interest is paid on any claims (§ 726(a)(5)).

(awarding post-petition interest at the federal judgment rate);
In re Dow Corning Corp., 237 B.R. 380, 412 (Bankr. E.D. Mich.
1999) ("Dow I") (determining that the phrase "interest at the
legal rate" means the federal judgment rate); In re Melenyzer,
143 B.R. 829, 832-33 (Bankr. W.D. Tex. 1992) (concluding that the
appropriate rate of interest payable to unsecured creditors
pursuant to section 726(a)(5) is the federal judgment rate).
These courts reason that the term is akin to post-judgment
interest.  Cardelucci, 285 F.3d at 1235  (analogizing post-
petition interest on an allowed claim to post-judgment interest
on a federal judgment because they both serve the same purpose of
compensating a plaintiff for being deprived of compensation for
the loss of time between the determination of damages and
payment); Dow I, 237 B.R. at 405-06 (finding that post-petition
interest on an allowed claim and post-judgment interest on a
federal judgment perform the same function and share the same
purpose).  By viewing an allowed claim as the equivalent of a
money judgment, those courts conclude that the federal judgment
rate is the appropriate "legal" rate of interest to be applied
for post-petition interest.  Cardelucci, 285 F.3d at 1235; Dow I,
237 B.R. at 391, 406.

Those courts reasoned that by using the language "at the
legal rate," Congress was referring to a specific type and amount
of interest, rather than making a general reference to a

creditor's entitlement to interest from a solvent debtor.  See
Dow I, 237 B.R. at 403 (finding that Congress' rejection of the
phrase "interest on claims allowed" in favor of the more specific
phrase "interest at the legal rate" indicates Congress intended a
rate of interest fixed by federal statute).  In addition, the
courts find that Congress' use of "the" instead of the indefinite
"a" or "an," indicated its intent for a single uniform source to
be used to calculate post-petition interest.  Cardelucci, 285
F.3d at 1234; Dow I, 237 B.R. at 404; Melenyzer, 143 B.R. at 831
n.2.

Some courts, however, have concluded that there is a
presumption that the contract rate (and even the default rate) of
interest should be applied in solvent debtor cases.  In re Dow
Corning Corp., 456 F.3d 668, 681 (6th Cir. 2006) (noting that
"that there is a presumption that default interest should be paid
to unsecured claim holders in a solvent debtor case" but
remanding for determination if there were equitable factors that
warranted a departure from that rule); In re Southland Corp., 160
F.3d 1054, 1059-60 (5th Cir. 1998) (noting that a default
interest rate is generally allowed, unless the higher rate would
produce an inequitable result and concluding that the higher rate
would not be inequitable in that case because junior creditors
were not adversely affected by it and the difference between the
contract and default rate was only 2%); In re Chicago, Milwaukee,

St. Paul & Pacific R.R. Co., 791 F.2d 524, 529 (7th Cir. 1986)
(holding that creditors were entitled only to contract default
rate although they argued they were entitled to the higher market
rate because in the absence of the bankruptcy filing they would
have been able to get paid faster and reinvest their money at the
market rate).

This Court has considered this issue before and concluded
that the federal judgment rate was the minimum that must be paid
to unsecured creditors in a solvent debtor case under a plan to
meet the best interest of creditors' test, but that the Court had
discretion to alter it.  Coram, 315 B.R. at 346 (citing In re Dow
Corning Corp., 244 B.R. 678, 689 (Bankr. E.D. Mich. 1999) ("Dow
II") (finding that a creditor of a solvent bankruptcy estate must
receive post-petition interest at a rate that is at least equal
to the federal statutory rate)).  See also In re Schoeneberg, 156
B.R. 963, 969 (Bankr. W.D. Tex. 1993) (finding that section
726(a) provides no clear answer as to the definition of "legal
rate" and that it was within the court's discretion to determine
a rate of interest that is "fair and equitable" based on the
specific facts of the case).

The Plan Objectors argue that the equities of this case
warrant that post-petition interest be calculated at the federal
judgment rate.  The Plan Objectors rely on the decision in Coram
where the Court awarded interest at the federal judgment rate

rather than the contract rate. 315 B.R. at 347. As noted, in
that case, the Court concluded that the proper rate of interest
to be awarded to creditors in solvent debtor cases depends on the
equities of the case. Id. The Court found the equities in Coram
did not warrant use of the default contract rate because one of
the noteholders had created a conflict of interest that tainted
and delayed the debtors' restructuring of debt, negotiations of a
plan, and its ultimate emergence from bankruptcy.[45] Id. at 346-
47.

In this case the Court does not have enough evidence to
conclude that there were conflicts of interest that tainted the
reorganization process or other equitable reasons warranting
payment at the federal judgment rate rather than contract rate.
As noted above, however, there are allegations that the
Settlement Noteholders (who hold claims in several of the
creditor classes) used information obtained in the negotiations
to trade in claims. The evidence offered in support, however,
was hearsay. (See Part B(1)(a)(ii), supra.) Because the Plan as
written cannot be confirmed, the Court need not decide the issue.

c.   Effect of releases

The Plan Objectors also argue that the analysis done by the

---

[45] The conflict arose when the noteholder paid the Debtor's
president a "consulting" fee of $1 million during the course of
the chapter 11 case and plan negotiations. Coram, 271 B.R. at
231.

Debtors of the recovery creditors would receive in chapter 7 is faulty. In their liquidation analysis the Debtors assumed that in chapter 7 the trustee would accept the Global Settlement so that the releases would also be accepted.

The Court disagrees with this analysis. Although the Court found the Global Settlement to be reasonable, it did not find the releases to be reasonable. It is likely that a chapter 7 trustee would come to the same conclusion especially because there is no mechanism under chapter 7 to grant third party releases to non-debtors. Alternatively, the chapter 7 trustee may elect to pursue some of the Debtors' claims rather than accept the Global Settlement in toto. Without the Global Settlement, however, an additional $54 billion claims would have to be considered. In that event, the creditors would not be getting as much as they are under the Debtors' Plan and the best interest of creditors test is met.

In their analysis the Debtors also assumed that what creditors can recover from other sources should be ignored under section 1129(a)(7). See, e.g., Dow I, 237 B.R. at 411-1 (finding the best interest of creditors test takes into consideration only the dividend creditors would receive from a chapter 7 trustee in a hypothetical liquidation in comparison with the dividend under the plan).

The Court disagrees.  In a case where claims are being
released under the chapter 11 plan but would be available for
recovery in a chapter 7 case, the released claims must be
considered as part of the analysis in deciding whether creditors
fare at least as well under the chapter 11 plan as they would in
a chapter 7 liquidation.  Again, however, when the additional $54
billion in claims held by the FDIC and JPMC is considered, the
Court concludes that the recovery under chapter 7 even without
the releases would be less than the recovery under the Debtors'
Plan.  Therefore, the best interest of creditors test has been
met here.

### 3.   Discriminatory Treatment of Creditors
####      a.   Small PIERS claimants

One of the individual creditors, Nate Thoma, argued that he
is being discriminated against in violation of the Code.  Mr.
Thoma is the holder of a PIERS claim which is less than the $2
million threshold necessary under the Plan for a PIERS claimant
to participate in the rights offering to purchase stock in the
Reorganized Debtor.  (Ex. D-2 at §§ 20.4 & 34.1.)  Mr. Thoma
argues that because he is precluded from participating in the
rights offering, he is receiving less than others in his class,
in violation of section 1123(a)(4) of the Code.

Section 1123(a)(4) provides that "a plan shall - . . . (4)
provide the same treatment for each claim or interest of a
particular class, unless the holder of a particular claim or

interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).

The Plan Supporters argued that the offering was made only to the larger claimants to avoid the administrative burden of issuing stock to small holders. (Hr'g Tr. 12/7/2010 at 273.) There is nothing in section 1123(a)(4), however, that would permit discrimination for administrative convenience.[46]

The Plan Supporters also contend that there is no discriminatory treatment because the rights offering is of no value. They argue that the rights offering does not provide for any discount in the purchase price of the stock. The Court is not sure this is correct. Under the rights offering, PIERS Claimants have the right to purchase $100 million in stock in the Reorganized Debtor (each can buy stock based on its percentage of total holdings of PIERS claims). Apparently only $31 million has been purchased through that offering. (Sharp Decl. filed 11/30/2010 at Ex. A.) The Debtors presented testimony that the enterprise value of the Reorganized Debtor was $157.5 million. (Hr'g Tr. 12/2/2010 at 72.) Under the Plan, however, other creditors have the right to accept stock in lieu of cash for their claims. (Ex. D-2 at §§ 16.2, 18.2 & 19.2.) The Debtors

_____

[46] A plan may provide for a "convenience" class of unsecured claims that are less than (or reduced to) a specific amount, but that class usually receives payment in full to avoid the administrative burden of calculating and paying very small amounts to creditors. 11 U.S.C. § 1122(b).

were unable to advise how many creditors had chosen that option as the deadline to do so had apparently not passed. The Court, therefore, cannot determine if the value of the stock of the Reorganized Debtor to be held by the PIERS Claimants exceeds the price they will pay for it.

Even if the analysis showed that the PIERS Claimants were getting stock at par, the Court still could not conclude that the rights offering has no value. The right to buy into a company does have inherent value; it includes the "upside" if the company is successful.

Further, in this case the Court concludes that the reorganized company has value in excess of the enterprise value of $157.5 million set by the Debtors' expert. The expert acknowledged that his valuation was based only on the cash flows expected to be generated by the runoff of the insurance assets currently held by the Reorganized Debtor and did not consider that the Reorganized Debtor might start or acquire another business. (Hr'g Tr. 12/6/2010 at 32.) The fact that the Reorganized Debtor is raising new capital through the rights offering suggests otherwise. See, e.g., Exide, 303 B.R. at 60 (committee's expert opined that fact that the senior creditors and management were taking stock in the reorganized company is a "strong indicator that the company is being undervalued"). But see In re Mirant, 334 B.R. 800, 832-35 (finding that "[t]he

market is not the proper measure for the value of Mirant Group for the purpose of satisfying claims" because the market often undervalues companies in bankruptcy).

Further, the Reorganized Debtor may in fact be a public company (depending on the number of creditors who accept stock instead of cash or who participate in the rights offering). A public company has additional value in its ability to raise capital and acquire (or be acquired by) other businesses. MicroSignal, Corp. v. MicroSignal Corp., 147 Fed. Appx. 227, 232 (3d Cir. 2005) (finding that a merger would result in a public company which is better equipped to raise capital); David N. Feldman, Reverse Mergers + Pipes: The New Small-Cap IPO Reprinted and Updated from Pipes: Revised and Updated Edition – A Guide to Private Investment in Public Equity, 3 Bus. L. Brief (Am. U.) 34, 39 (2007) ("It is easier to raise money as a public company than as a private company."). Finally, because the Debtors will not emerge from bankruptcy before December 31, 2010, the Debtors could potentially have the full use of their approximately $5 billion in NOLs.[47] See Chaim J. Fortgang & Thomas M. Mayer,

_____

[47] Had the Debtors emerged from bankruptcy before December 31, 2010, they would have been able to use only $100 million of their NOLs. The Debtors' valuation expert acknowledged that based on the business plan and projections for the Reorganized Debtor which assumed emergence before December 31, 2010, his valuation did not consider the ability of the Debtors to use more than $100 million of their NOLs. (Hr'g Tr. 12/6/2010 at 34-35.)

Valuation in Bankruptcy, 32 UCLA L. Rev. 1061, 1129-30 (1985)
(noting that NOLs often are a debtor's largest asset).

Therefore, the Court cannot accept, as the Plan Supporters
contend, that the rights offering is of no value. Mr. Thoma is
correct. The Plan must be modified to allow all PIERS Claimants
the opportunity to participate in the rights offering. See,
e.g., Combustion Eng'g, 391 F.3d at 241, 248 (vacating
confirmation order based on apparent disparate treatment of
creditors within a class).

### b. Treatment of PIERS as creditors

The Equity Committee and the LTW Holders argue that the
PIERS Claimants should be classified as equity, not as creditors,
because their rights included warrants to purchase WMI common
stock (exercisable in 2041). (Ex. D-5 at 41.) The Plan
Supporters disagreed, arguing that the PIERS claimants hold
preferred and/or common stock in a trust, Washington Mutual
Capital Trust 2001 ("WMCT 2001"), but that the Debtors have an
obligation to WMCT 2001 based on Junior Subordinated Debentures
issued by the Debtors to WMCT 2001. Further, they note that the
PIERS' warrants have not been exercised and they currently do not
hold stock in WMI. Therefore, they argue that the PIERS claims
represent debt.

However, the Debtor's witness was not sure whether WMCT 2001
had been merged into WMI. (Hr'g Tr. 12/2/2010 at 147-48, 150.)

100

If WMCT 2001 was merged into WMI, then the PIERS claims could be viewed as equity.  If it was not, then they are properly treated as creditors under the Plan because they do not hold stock in the Debtors but only stock in WMCT 2001, which is a creditor of the Debtors.  Consequently, the Court is unable to determine whether the PIERS are properly classified as creditors ahead of the equity security holders.

c.  Treatment of LTW Holders

The LTW Holders made a similar argument to Mr. Thoma's: that they are receiving less than other general unsecured creditors in violation of section 1123(a)(4) of the Code.  The LTW Holders contend that even if they are successful in the LTW Adversary and their claims are allowed as general unsecured claims in Class 12, they have been discriminated against because they are not given the option other general unsecured creditors have to take stock in the Reorganized Debtor rather than cash.  They note that because of their dispute with the Debtors, they did not receive a ballot through which they could exercise the option to receive stock.  This, the LTW Holders argue, means that they are receiving less favorable treatment than other unsecured creditors in violation of section 1123(a)(4).

The Court agrees that the LTW Holders are receiving disparate treatment from other creditors in whose class it may be determined they belong.  The Plan must be modified to afford the

same option to all claims in the same class that other claims
have, if they are allowed.

> d.   <u>Treatment of REIT Holders</u>

The TPS Holders also object to the treatment afforded to
Class 19 (REIT Holders) because the latter are receiving
consideration in addition to their pro rata share of the
Liquidating Trust on account of their preferred share holdings.
(Ex. D-2 at § 23.1.)  Specifically, the REIT Holders will receive
a pro rata share of a payment of $50 million from JPMC if they
consent to releases of JPMC.  (<u>Id.</u>)  The TPS Holders contend that
this is discriminatory treatment and is designed principally to
give additional consideration to the Settlement Noteholders.

The Court disagrees.  To the extent that the REIT Holders
are receiving anything more than other preferred shareholders,
they are receiving it directly from JPMC in exchange for
releases.  <u>See, e.g.</u>, <u>Official Comm. of Unsecured Creditors v.
Stern (In re SPM Mfg. Corp.)</u>, 984 F.2d 1305, 1313 (1st Cir. 1993)
(allowing a senior creditor to agree to give up part of its
collateral to another class, skipping other classes in between);
<u>In re World Health Alternatives, Inc.</u>, 344 B.R. 291, 299 (Bankr.
D. Del. 2006) (finding that a secured creditor's gift to a junior
creditor did not violate the absolute priority rule since "the
property belongs to the secured creditor and not the estate.").
Further, it appears that the offer is made to all REIT Holders

who agree to release JPMC, not simply to the Settlement Noteholders. (Ex. D-2 at 50.) Therefore, there is no discrimination within that class. 11 U.S.C. § 1123(a)(4).

e.    Treatment of WMB Noteholders

Certain WMB Noteholders contended that they have a claim directly against WMI for its misrepresentation of the financial stability of WMB, thereby causing them to buy (or hold onto) WMB Notes. In an omnibus objection to claims, the Debtors contended that the WMB Noteholders did not have a valid claim, but that even if they had a claim it must be subordinated under section 510(b). A hearing on the objection as it relates to the WMB Noteholders was held on January 6, 2010, at which time the Court made the following ruling.

Section 510(b) provides, in relevant part:

For the purpose of distribution under this title, a
claim . . . for damages arising from the purchase or
sale of . . . a security [of the debtor or of an
affiliate of the debtor] . . . shall be subordinated to
all claims or interests that are senior to or equal the
claim or interest represented by such security, except
that if such security is common stock, such claim has
the same priority as common stock.

11 U.S.C. § 510(b). The term "security" is defined to include a debt security such as a note or bond. 11 U.S.C. § 101(49)(A)(i) & (iv).

The WMB Noteholders conceded that their holdings are debt securities issued by an affiliate of the Debtors and that their claim results from the purchase of those securities. They

argued, however, that section 510(b) does not apply because at the time the bankruptcy case was filed WMB had been taken over by the FDIC and was no longer an affiliate of the Debtors.

The Debtors disagreed with this argument, noting that as of the bankruptcy filing date WMI still held all the stock in WMB. They noted that there is no case law suggesting that simply because a company is placed in receivership the parent company loses its rights as shareholder. The Court is not sure this is correct in the context of an FDIC receivership of a bank though. As noted earlier, the FDIC has taken the position that they have succeeded to the rights of the shareholder of WMB. <u>See</u> Part <u>supra</u>. <u>See also</u> 12 U.S.C. § 1821(d)(2)(A)(i) (providing that the FDIC as receiver "succeeds to all rights, titles, powers, and privileges of . . . stockholder" of the bank).

The Court found it unnecessary to decide this issue, however, because the relevant time for determining whether the security was issued by an affiliate, is at the time the claim arose (i.e., when the security was bought or sold). <u>See, e.g.</u>, <u>VF Brands, Inc.</u>, 275 B.R. at 728 (subordinating claim based on purchase of stock of debtor's former subsidiary even though as of petition date the subsidiary was no longer an affiliate of the debtor because claimant had bought all of the stock pre-petition); <u>In re Wisconsin Barge Line, Inc.</u>, 76 B.R. 142, 144 (Bankr. E.D. Mo. 1987) (rejecting argument that sale of all stock

of subsidiary pre-petition meant that section 510(b) did not apply).  At that time, WMB was an affiliate of WMI.

Therefore, the Court concluded that section 510(b) was applicable to the WMB Notes.  The WMB Noteholders argued, however, that because their holdings are debt securities, they should be subordinated only to the WMI debt securities (i.e., the senior and subordinated noteholders) but not to the general unsecured creditors.  Therefore, they argued that they should be in Class 12 with the general unsecured claims.

The Court rejected this argument as well.  While the WMB Noteholders have a claim against WMB based on their debt securities, their claim against the Debtors is for misrepresentation in the purchase of those claims.  Therefore, their claim against the Debtors is a general unsecured claim.  Under section 510(b) their claim must be subordinated to all unsecured claims.  The Court found that the placement of the WMB Noteholders in Class 17 was appropriate.

4.   Designation of votes

Mr. Thoma says that the Settlement Noteholders' votes should be designated under section 1126(e) because of their participation in settlement negotiations and use of insider information they received during the negotiations to trade in the Debtors' securities.  See, e.g., In re Allegheny Int'l, 118 B.R. 282, 289 (Bankr. W.D. Pa. 1990) (designating votes of hedge fund

that acquired claims with ulterior motive to seize control of debtor). The Court was unable to consider the evidence offered by Mr. Thoma, however, because it was hearsay.

The Court finds it unnecessary to address this issue, at any rate, because there still is at least one class of impaired creditors voting for the plan without considering the Settlement Noteholders or insider votes. Classes 12 and 17a (who do not include claims of Settlement Noteholders) voted in favor of the Plan. (Klamser Decl. at ¶ 29.)

### 5. <u>Lack of good faith</u>

Mr. Thoma and an individual shareholder, Mr. Schnabel, each contend that the Plan has not been proposed in good faith because the Debtors did not allow the Equity Committee to participate in the plan negotiations and did not protect the shareholders' interests. The Court finds no evidence of lack of good faith, however. Simply because the Debtors were not able to achieve a greater recovery in the Global Settlement, does not mean that they did not meet their fiduciary duty to all constituents. More than mere innuendo and speculation is needed to establish a lack of good faith.

### 6. <u>Lack of notice</u>

One of the individual shareholders, Mr. Schnabel, asserts that the Plan cannot be confirmed because the Debtors did not give proper notice to foreign shareholders. (D.I. # 5964.) The

Debtors' notice and claims agent testified that the notice provided was in accordance with the Court's voting procedures order and was similar to procedures used in other cases. (Hr'g Tr. 12/3/2010 at 175.) Specifically, he testified that notice was provided to the registered owner of the securities, which often was a broker or other financial institution but not the beneficial owner. (Id. at 824-30.) He stated that the Debtors did not have any record of the beneficial owners and had to rely on the brokers to assure that notice was provided to the beneficial owners. (Id. at 826-27.)

The Court concludes that proper notice was provided by the Debtors and that any failure of any shareholder to receive actual notice was not attributable to the Debtors.

### 7. Post-confirmation process

The Equity Committee also complains that there is no provision in the Plan for its continued existence after confirmation. Because any distribution to preferred shareholders depends on what the Liquidating Trustee can recover, the Equity Committee contends that it should have a supervisory role or at least the ability to seek relief in this Court if the Liquidating Trustee is not performing. The Court agrees with the Equity Committee that it should continue to have a role, albeit limited, to protect the interests of the shareholders.

The Plan Objectors also complain about the makeup of the

107

Board of the Reorganized Debtor, noting that it was entirely comprised of representatives of the Settlement Noteholders. (Hr'g Tr. 12/2/2010 at 152-54; D.I. # 6188.)  The Settlement Noteholders argue that because they will be the majority shareholders initially as a result of the rights offering, it is appropriate that they should control the Board.  The Plan Supporters note that the Plan has a mechanism to change the Board in six months to allow for a change in the shareholder constituency as a result of other creditors' election to take stock in lieu of cash.  (Ex. D-2 at § 42.4.)  The Court agrees that the Plan mechanism for selection of the Board is fair.

The Plan Objectors also complain that the Debtors have designated their CRO as the Liquidating Trustee.  (Ex. D-5 at 102.)  There does not appear to be any mechanism for replacement of the Liquidating Trustee unless he resigns or dies.  (Id.)  The Court agrees with the Plan Objectors that there should be some mechanism for replacement of the Liquidating Trustee by the beneficiaries of the Trust.

### 8.  Payment of fees of settling parties

The Plan Objectors also object to the provision of the Plan that provides that fees of the Indenture Trustees, the Settlement Noteholders, and the Liquidating Trustee will be paid without notice or approval of the Court.  (Ex. D-2 at § 43.18.)  The Court agrees that this provision violates section 1129(a)(4),

which requires that "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Therefore, the Plan must provide that such fees are to be approved by the Court as reasonable before they are paid.

III. <u>CONCLUSION</u>

For the foregoing reasons, the Court will deny confirmation of the Plan because of the deficiencies identified above.

An appropriate Order is attached.

DATED: January 7, 2011          BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge