**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WASHINGTON MUTUAL, INC., et al., | ) | Case No. 08-12229 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### OPINION[1]

Before the Court is the question of who is entitled to assets held in trusts created in connection with deferred employee compensation plans established by the predecessor to Washington Mutual, Inc. ("WMI"). For the reasons set forth below, the Court holds that WMI is the owner and entitled to all the funds in the trusts.


I.   BACKGROUND

WMI was a savings and loan holding company, which had acquired, inter alia, Home Savings of America, FSB ("Home Savings") the successor to H.F. Ahmanson & Company ("Ahmanson"). Certain employees of Home Savings and/or Ahmanson (the "Plan Participants") had enrolled in various deferred compensation plans (the "Ahmanson Plans"). In conjunction with the Ahmanson Plans, trusts were created and funded by Home Savings and its

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

predecessors (the "Ahmanson Trusts").  After WMI acquired it,
Home Savings was merged into Washington Mutual Bank ("WMB") and
the Plan Participants became employees of WMB.

On September 25, 2008, WMB's primary regulator, the Office
of Thrift Supervision (the "OTS"), seized WMB and appointed the
Federal Deposit Insurance Corporation (the "FDIC") as receiver.
Immediately after its appointment as receiver, the FDIC sold
substantially all the assets of WMB to JPMorgan Chase Bank, N.A.
("JPMC").  The next day, WMI and its affiliate WMI Investment
Corporation (collectively, the "Debtors") filed petitions under
chapter 11 of the Bankruptcy Code.

The Debtors subsequently filed the Motion before the Court,
which seeks authority to terminate the Ahmanson Plans and their
related trusts and to exercise ownership rights in the trust
assets (which as of February 28, 2009, had approximately $69
million).[2]  Several of the Plan Participants opposed the Motion.
The Court held a hearing on September 25, 2009, at which time the
Debtors relied on declarations of two witnesses (Robbyn Dewar,
the WMB Human Resources Department employee responsible for
supervision of the Ahmanson Plans and Laura Malafronte, the
person at Mullin Consulting, Inc., which served as the record

---

[2]  Although JPMC filed an adversary proceeding against the
Debtors asserting it had title to certain assets as a result of
its acquisition of WMB, it apparently does not assert any
interest in the Ahmanson Plans or Trusts.  (See Motion at n. 3.)

keeper for the Ahmanson Plans).  The Plan Participants presented live testimony by four of the Plan Participants.  At the conclusion of the hearing, the Court took the matter under advisement and asked for additional briefing on certain issues raised by the testimony.

Subsequent to the hearing, the Debtors filed a Motion to supplement the record.  After oral argument on that motion, the Court reopened the record and a further hearing was held at which Ms. Malafronte and Ms. Dewar testified live.  Thereafter, the parties filed post-trial briefs.  The matter is now ripe for decision.


II.  JURISDICTION

This Court has jurisdiction over this matter, which is a core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (K), (M) & (O).


III.  DISCUSSION

A.  Top Hat Deferred Compensation Plans

The Debtors contend that the Ahmanson Plans are what are commonly referred to as "top hat" plans because they provide a means by which top management may receive tax benefits by deferring the receipt of a portion of their compensation.  In order to qualify for the deferred tax benefits, the plan must be

"unfunded," that is it must provide that any distributions to the employees will come only from the general assets of the company. See, e.g., Accardi v. IT Litig. Trust (In re IT Group, Inc.), 448 F.3d 661, 664 (3d Cir. 2006).  The Debtors contend that the Ahmanson Plans met this requirement of a top hat plan by providing, inter alia, that "[t]he Company shall make any or all distributions pursuant to this Plan in cash out of its general assets."  (Ex. D-1 at § 5.11.)[3]

A top hat plan may create a trust (often referred to as a "rabbi" trust) into which the employer deposits funds sufficient to cover its obligations under the plan without affecting its "unfunded" status, so long as the employees have no interest in the trust and the trust assets are considered part of the company's general assets.  Id. at 665.  See also Resolution Trust Corp. v. MacKenzie, 60 F.3d 972, 974 (2d Cir. 1995) ("Grantor trusts confer favorable tax treatment to . . . the covered employees - by maintaining the trust as an asset of the employer at all times during its existence.  As such, the employer pays whatever taxes are due on any income generated by the trust . . . .") (citations omitted); Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1127 (4th Cir. 1993) (holding that "the favorable tax

---

[3]  There are several plans at issue, but each has similar language.  (Tr. 1 at 75.)  The Court, therefore, refers primarily to the Capital Accumulation Plan of H.F. Ahmanson & Company, effective as of January 1, 1995.  (Ex. D-1.)

treatment afforded to grantor trusts . . . is not extended
without certain strings attached.  Federal tax law conditions the
beneficial tax treatment of a grantor trust on the requirement
that the trust fund remains subject to the claims of the
employer's creditors as if the assets were the general assets of
the employer.").

In this case, the Ahmanson Plans had rabbi trusts associated
with them which were owned by WMI and now hold in excess of $69
million (the "Trusts").  (Tr. 1 at 77-79.)  The Debtors assert
that the provisions of the Ahmanson Plans and Trusts make it
clear that they are top hat plans.  These include the statements
that (1) they are unfunded (Ex. D-1 at 1); (2) the Debtors are
not required to segregate funds for the Plans (id. at § 8); (3)
the creation of separate accounts or records does not create a
lien in favor of the Plan Participants (id.); (4) the Debtors
retain title to the Trusts' assets (id. at § 11.2); (5) the
Debtors are responsible for taxes on the trust assets (id. at §
5.12); (6) any payments due under the Ahmanson Plans are general
unsecured liabilities of the Debtors (id. at § 11.3); (7) the
Plan Participants have no preferred claim or beneficial interest
in the Trusts' assets (Ex. D-10 at § 1.4; Tr. 1 at 72); (8)
assets of the Trusts are subject to the claims of the Debtors'
creditors (id.); and (9) if the trustee determines that the
Debtors are insolvent, he shall cease any payments to the Plan

Participants and hold the Trusts' assets for the benefit of the Debtors' creditors (Ex. D-10 at § 11.1 (a) & (b)(3)).

As a result of the express language of the Ahmanson Plans, the Debtors argue that the Plan Participants have no right to the Trusts' assets and that they should be turned over to the Debtors for distribution to their creditors pursuant to any plan of reorganization that may be confirmed.  See, e.g., IT Group, 448 F.3d at 669 ("Participants' legal rights to [the trust's] assets, and to the assets of the Corporation as a whole, are no greater than those of the Corporation's general, unsecured creditors."); Goodman, 7 F.3d at 1127 ("In reality, the [deferred compensation] recipient receives only the company's unsecured promise to pay benefits and has no right against any assets other than the rights of a general unsecured creditor of the company . . . .") (quoting Mertens Law of Federal Income Taxation § 25B.212 (1988)).

B.   Constructive Trust

The Plan Participants argue that, although the Ahmanson Plans may be top hat plans, the Court should nonetheless impose a constructive trust on the Trusts' assets because of the Debtors' wrongful conduct.  Specifically, they point to the Debtors' refusal prior to the bankruptcy filing to give them their funds although they had an absolute right to withdraw them from the Ahmanson Plans.

6

1.  <u>Preemption</u>

The Debtors argue initially that the Plan Participants
cannot rely on constructive trust law because the entire issue of
their entitlements to the Ahmanson Trusts' funds is preempted by
federal law, namely ERISA.  29 U.S.C. § 1144(a) (stating that
ERISA "shall supersede any and all State laws insofar as they may
now or hereafter relate to any employee benefit plan.").  <u>See
also</u> <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 209 (2004)
(holding that "any state-law cause of action that duplicates,
supplements, or supplants the ERISA's civil enforcement remedy
conflicts with the clear congressional intent to make the ERISA
remedy exclusive and is therefore pre-empted."); <u>Pilot Life Ins.
Co. v. Dedeaux</u>, 481 U.S. 41, 54 (1987) (stating that "[t]he
deliberate care with which ERISA's civil enforcement remedies
were drafted and the balancing of policies embodied in its choice
of remedies argue strongly for the conclusion that ERISA's civil
enforcement remedies were intended to be exclusive."); <u>Kollman v.
Hewitt Assocs., LLC</u>, 487 F.3d 139, 147-50 (3d Cir. 2007)
(disagreeing with the Second, Fourth and Tenth Circuits in
concluding that state law claim for professional malpractice
against plan administrator was preempted by ERISA because claim
involved the "essential role" of the plan); <u>Pane v. RCA Corp.</u>,
868 F.2d 631, 635 (3d Cir. 1989) (holding that employee's state
law claims of breach of contract, breach of covenants of good

7

faith and fair dealing, and intentional infliction of emotional distress were preempted by ERISA); Shiffler v. Equitable Life Assurance Soc'y, 838 F.2d 78, 82 (3d Cir. 1988) (finding that state common law claims to recover proceeds allegedly due under an ERISA plan were precluded by ERISA).

The Plan Participants respond that their constructive trust claim is not a separate claim that is preempted by ERISA but is merely a remedy which is not preempted by ERISA. See, e.g., Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 834 (1988) (stating that "state-law methods for collecting money judgments must, as a general matter, remain undisturbed by ERISA; otherwise, there would be no way to enforce such a judgment won against an ERISA plan" and concluding that ERISA did not preempt the use of state-law general garnishment statutes).

The Debtors reply that the constructive trust remedy is clearly distinguishable from the garnishment procedures permitted by Mackey because no judgment has been rendered in favor of the Plan Participants. They argue that a constructive trust is a substantive remedy (not a procedural means of enforcing a judgment) and, therefore, is preempted by ERISA. The Debtors cite several cases holding that state law constructive trust claims are preempted by ERISA. See, e.g., Melton v. Melton, 324 F.3d 941, 945 (7th Cir. 2003) (holding that ERISA preempted state constructive trust claim to death benefits payable to another

8

under ERISA plan); <u>Metro. Life Ins. Co. v. Pettit</u>, 164 F.3d 857, 862 (4th Cir. 1998) (holding that a state law constructive trust claim against the plan beneficiary "easily numbers among those that are subject to preemption" by ERISA); <u>Ellis Nat'l Bank of Jacksonville v. Irving Trust Co.</u>, 786 F.2d 466, 469 (2d Cir. 1986) (holding that there is "no reason to except from [ERISA's] breadth the state laws of restitution and constructive trusts"); <u>Foley v. Am. Elec. Power</u>, 425 F. Supp. 2d 863, 868-69 (S.D. Ohio 2006) (holding that ERISA preempted state law claims relating to ERISA plan, including constructive trust claims); <u>Pressley v. Metro. Life Ins. Co.</u>, 729 F. Supp. 570, 572 (E.D. Mich. 1990) (holding that state law constructive trust claim was preempted by ERISA because it "would modify the plan and undermine the ERISA statutory scheme"); <u>Silicon Graphics, Inc. v. Merrill Lynch Trust Co. (In re Silicon Graphics, Inc.)</u>, 363 B.R. 690, 698-99 (Bankr. S.D.N.Y. 2007) (distinguishing <u>Mackey</u> and concluding that employee's request for constructive trust under California law was a new basis for relief and, therefore, preempted by ERISA).

The Plan Participants argue, however, that a constructive trust under Delaware law is not an independent cause of action (preempted by ERISA) but just an enforcement mechanism (permissible under <u>Mackey</u>).  <u>See, e.g.</u>, <u>Hogg v. Walker</u>, 622 A.2d 648, 652 (Del. 1993) (explaining that a constructive trust is "an equitable remedy of great flexibility and generality, and is

viewed as 'a remedial [and] not a substantive' institution.")
(quoting <u>McMahon v. New Castle Assocs.</u>, 532 A.2d 601, 608 (Del.
Ch. 1987)); <u>Teachers' Retirement Sys. v. Aidinoff</u>, 900 A.2d 654,
671 n.22 (Del. Ch. 2006) (concluding that there is no "such thing
as a 'claim for a constructive trust' with its own unique
elements" under Delaware law, rather a constructive trust is a
remedy that a court may employ if the claimant demonstrates
entitlement to relief under an independent cause of action);
<u>Crescent/Mach I Partners, L.P. v. Turner</u>, 846 A.2d 963, 991 (Del.
Ch. 2000) (holding that "a constructive trust is simply one of
many conceivable alternative remedies which might be available
after trial should plaintiffs prevail on one or more of their
theories of recovery").

The Plan Participants distinguish the constructive trust
cases cited by the Debtors because they do not deal with the
constructive trust "remedy" provided by Delaware law but rather
address constructive trust claims under other states' laws.  <u>See,
e.g.</u>, <u>Melton</u>, 324 F.3d at 945 (construing Illinois constructive
trust law); <u>Ellis Nat'l Bank</u>, 786 F.2d at 469 (construing New
York state law of restitution and constructive trusts); <u>Silicon
Graphics</u>, 363 B.R. at 698 (construing California state law claim
for a constructive trust).  Further, while <u>Pettit</u>, <u>Pressley</u> and
<u>Foley</u> do not identify the state constructive law asserted, the
Plan Participants argue that the courts based their conclusions

that they are preempted on a finding that those claims are asserted as an alternative cause of action, as opposed to a remedy.  See, e.g., Pettit, 164 F.3d 857 at 862; Pressley, 729 F. Supp. 570 at 572; Foley, 425 F. Supp. 2d at 868-69.

The Court concludes that ERISA does not preempt the Plan Participants' request for a constructive trust in this case.  The Plan Participants are not asserting entitlement to a constructive trust as a separate claim for relief but merely as an equitable remedy for the Debtors' violation of section 502(a)(1)(B) of ERISA.  ERISA itself expressly permits equitable relief and does not preclude a court from fashioning the appropriate remedy for its violation.  29 U.S.C. § 1132(a)(3) ("A civil action may be brought . . . by a participant [in an employee benefit plan] . . . to obtain . . . appropriate equitable relief . . . to enforce any provisions of [ERISA] or the terms of the plan.").  See also Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209, 219-20 (2002) (recognizing that claims for benefits under ERISA § 502(a)(3) can be enforced by traditional equitable remedies, including the imposition of a constructive trust); Leckey v. Stefano, 501 F.3d 212, 231 (3d Cir. 2007) (stating that once "an ERISA violation is established . . . the only remaining issue is the imposition of an appropriate equitable remedy.").  Therefore, to the extent that the Plan Participants can establish a claim under ERISA, the Court concludes that the imposition of a

11

constructive trust as a remedy is not precluded.

      2.  <u>Claim under ERISA</u>

The Plan Participants argue that a year before the Debtors became insolvent and filed their bankruptcy petitions, the Plan Participants became entitled to receive distributions under the Plans which the Debtors wrongfully refused to make.  Thus, they contend that they have a claim under section 502(a)(1)(B) of ERISA which provides a cause of action "by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  As a result, the Plan Participants argue that there should be impressed a constructive trust on the Ahmanson Trusts' assets for their benefit effective when the Debtors failed to pay them pre-petition.[4]

The Plan provides that "Notwithstanding any other provisions of the Plan, <u>at any time</u> before or after a Change in Control a Participant . . . <u>may elect to receive an immediate lump sum payment of the balance of his Account(s)</u> for any Deferral unit(s), <u>reduced by a penalty</u>, which shall be forfeited to the Company equal to ten percent (10%) before a Change in Control or

---

[4]  The Plan Participants also complain that, contrary to the terms of the Ahmanson Plans, the Debtors never established any committee or procedures for the review or appeal of any denial of a claim under the Plan.  The Court finds it unnecessary to address these alleged procedural deficiencies.

five percent (5%) after a Change in Control of the balance of
such Account(s), in lieu of payments in accordance with the form
previously elected by the Participant."  (Ex. D-1 at § 5.9(b)
(emphasis added).)

    The Debtors do not dispute that there was a change in
control when WMI acquired Home Savings and merged it into WMB
pre-petition.  Initially, the Debtors contended that the Plan
Participants were required to submit a written form electing to
obtain a lump sum distribution, which had to be executed prior to
the start of each respective deferral year.  (D.I. 1363 at ¶¶ 16
& 31; Tr. 2 at 90.)  They presented a witness who testified that
the Debtors' records show that no such forms were filed by the
Plan Participants from the fall of 2007 until the Debtors'
petition was filed.  (Tr. 1 at 145-46, 148.)  This was in
contrast to a request that had been made by one of the Plan
Participants in the past.  (See Exs. D-23 & 24.)

    That election for an early withdrawal, however, was made
before the Debtors acquired Home Savings although it was paid by
the Debtors after the acquisition.  (Exs. D-23 & D-24.)  While at
Home Savings, the Plan Participants were annually given an
opportunity to elect to receive an early distribution of their
deferred compensation.  (Tr. 1 at 111-12, 114.)  Once Home
Savings merged with WMB, however, the Plan Participants were no
longer given the opportunity to continue to contribute to the

13

Ahmanson Plans or to elect an early distribution.  (Tr. 1 at 112-13, 119-20, 144-45.)  Further, no procedures were established by WMB for the election of an early distribution of funds from the Ahmanson Plans.  (Tr. 1 at 82, 101, 126, 138, 144.)  Therefore, the Court concludes that, absent such procedures, the Plan Participants were not required to file any specific form in order to make a demand for a distribution from the Plans.

The Debtors dispute, however, the Plan Participants' assertions that they demanded lump sum distributions of their plan benefits.  It was largely to clarify this factual issue that the Court granted the Debtors' motion to supplement the record.

At the first hearing, the Debtors presented a witness who simply testified that his review of the Debtors' records did not reveal any written demand by any of the Plan Participants for payment of their balances in the Ahmanson Plans.  (Tr. 1 at 145-48, 150.)  In response to that testimony, the Plan Participants testified that they had made demand for their funds to Ms. Dewar in WMB's HR department.[5]  Specifically, Geoffrey Olsen, testified that in October 2007 he contacted Ms. Dewar and asked for the funds due him from the Ahmanson Plans but that she said he could not be paid.  (Tr. 1 at 80, 83-84.)  Olsen testified that Ms. Dewar suggested instead that he change his election so he could

---

[5]  WMI had no HR department and so relied on the HR department personnel at WMB to handle such matters for it.  (Tr. 1 at 148, 155.)

14

be paid when he left WMB's employ, although she noted that it would take a year for that to be effective.  (Tr. 1 at 86-87.) Kari Noomen, Dotti Jensen and Kevin McDonough similarly testified that in the fall of 2007 they contacted Ms. Dewar and demanded accelerated payment of their deferred compensation in the Ahmanson Plans but were also told that they could not be paid. (Tr. 1 at 98, 102-03, 106, 122, 125, 127-29, 137, 139-40; Exs. PP-3, D-25.)  In addition, WMI sent the Plan Participants a pamphlet entitled "Frequently Asked Questions" which stated that employees who have balances in deferred compensation plans that were acquired by the Debtors could not elect to accelerate payments.  (Tr. 1 at 88, 106, 129-30, 140-41; Ex. PP-2.)

     At the second hearing, both Ms. Dewar and Ms. Malafronte (from the firm that administered the Ahmanson Plans) testified that they did not recall receiving any requests for plan payments.  (Tr. 2 at 34, 54, 88.)

     The Court does not find the testimony presented by the Debtors to be credible.  Ms. Dewar and Ms. Malafronte admitted that they got inquiries from the Plan Participants who were anxious to get their money from the Ahmanson Plans.  (Tr. 2 at 18-19, 34-35, 83, 85.)  Ms. Dewar also testified that she told the Plan Participants that the Debtors were reviewing all of their benefit plans to determine whether they needed to be amended in light of recent changes to the IRS Code.  (Tr. 2 at

15

43, 67-68; Dewar Decl. ¶ 13, ex. A at -194, B-198.)

Ms. Dewar testified that the amendment to the Internal Revenue Code (section 409A) in October 2004 was designed to eliminate the ability of employees to withdraw deferred compensation early just by paying a minor penalty. (Tr. 2 at 60.) Ms. Dewar testified that as a result of the tax change, the Debtors undertook an examination of all their deferred compensation plans to determine if they should be amended. (Id. at 60-63; Ex. PP-3.) In the interim, the Debtors felt it was important not to allow any early withdrawals. (Ex. PP-7.)

The Ahmanson Plans, however, were not affected by the changes to the tax code. The benefits under the Ahmanson Plans had already vested before the amendment became effective and the Plan Participants had the right to withdraw their funds without consideration of section 409A.[6] Therefore the Court finds Ms. Dewar's explanation of why the Debtors refused the Plan Participants' request for their benefits unconvincing.

In addition, the tax change occurred in October 2004; the Plan Participants began requesting their distributions in the fall of 2007. While Ms. Dewar testified that the Debtors had more than forty deferred compensation plans to review, it is

---

[6]   Any deferred compensation plan whose benefits were vested before 2005 was "grandfathered" and therefore governed by the pre-409A tax laws. Treas. Reg. § 1.409A-6(a)(I)(i). Ms. Dewar was aware of this. (Tr. 2 at 39-40, 66; Ex. PP-7.)

16

inconceivable that they had not completed the job in three years, particularly with respect to the Ahmanson Plans which were not even affected by the change in the law.  Further, the fact that the Debtors did amend the WMI deferred compensation plan in November 2007 (though they were not required to do so) and, as a result, paid senior management millions in deferred compensation from the Debtors' general funds in July 2008, shortly before the Debtors filed bankruptcy[7] convinces the Court that a prompt review of the Ahmanson Plans was or could have been done earlier.

Ms. Dewar also testified, however, that the Debtors were concerned that, if the Ahmanson Plans were audited and the IRS determined that they were not in compliance with the pre-amendment law, the IRS could determine that the plan participants were in "constructive receipt" of their funds, thereby subjecting all the plan participants to substantial tax consequences.  (Tr. 1 at 152-53; Tr. 2 at 45-46, 68, 71; Dewar Decl. at ¶ 9.) Therefore, Ms. Dewar testified that the Debtors determined that the Ahmanson Plans' early withdrawal provisions were not valid and decided not to allow any early withdrawals from them.  Tr. 2 at 67, 69, 73.)

The Court also finds this explanation unconvincing.  The 5% penalty provision had been in the Ahmanson Plans for years and

---

[7] (Dewar Decl. at ¶ 11; Tr. 1 at 85, 102-02, 127, 139; Tr. 2 at 50-53, 59.)

prohibiting any distributions from the Plans would not cure that
"defect." (Tr. 2 at 77-80.) Further, early withdrawals from the
Ahmanson Plans had been made previously without any adverse
ruling by the IRS. (Tr. 2 at 15, 47, 69, 78, Exs. D-23 & 24.)
For example, Ms. Noonan had made an election in 1997 to receive
an early distribution of $50,000 from the Ahmanson Plans in 2004,
which was paid. (Exs. D-23 & D-24.) In addition, there was
legal precedent to support the argument that the Ahmanson Plans'
penalty provisions were substantial and therefore compliant with
the tax code. Treas. Reg. § 1.451-2(a). As a result, the Court
concludes that precluding the withdrawal of funds from the
Ahmanson Plans would not change any tax attributes of those
Plans.

Furthermore, the Court finds that there is nothing in the
Ahmanson Plans themselves that gave the Debtors the discretion to
deny a distribution to the Plan Participants even if allowing
that distribution might, as the Debtors suggest, result in an
audit by the IRS and adverse tax consequences for all the
beneficiaries of the Ahmanson Plans. In fact, the Ahmanson Plans
require that the Debtors make the distribution: "The Company
shall make any or all distributions pursuant to this Plan in cash
out of its general funds." (Ex. D-1 at § 5.11 (emphasis added).)

Thus, the Court concludes that the Plan Participants were
entitled to a distribution when they requested it in the fall of

2007.  It is clear from the evidence that Ms. Dewar and Ms. Malafronte failed to advise the Plan Participants that they had a right to a distribution or how to process their requests for a distribution.  On the contrary, they advised the Plan Participants, erroneously, that the Plan Participants had no right to an early distribution.  (Tr. 1 at 85-86, 102-03, 127-28, 140.)  There was no justification under the terms of the Ahmanson Plans for the Debtors' refusal to make those distributions.

An ERISA plan administrator's actions will ordinarily not be disturbed unless they are arbitrary and capricious.  See, e.g., Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110-12 (1989) (holding that where an ERISA benefits plan grants discretionary authority to the plan administer to determine eligibility for benefits under the plan, a court reviewing the plan administrator's actions should apply the arbitrary and capricious standard of review).  Where the plan terms are unambiguous, however, any action taken by the plan administrator in contravention of those terms is arbitrary and capricious.  Bill Gray Enters., Inc., Employee Health & Welfare Plan v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001) (stating that where benefit plan terms are unambiguous, any actions inconsistent with them are arbitrary); Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 521-22 (3d Cir. 1997) (concluding that plan administrator had acted arbitrarily and capriciously when, in violation of plan

terms providing for a distribution after the end of the month, it made the distribution before the end of the month and thus cut off the claimant's right to income earned on those funds).

In this case, the Plan terms are unambiguous: the Plan Participants were entitled to a distribution at any time after the change in control occurred, subject only to a deduction of the 5% penalty.  (Ex. D-1 at § 5.5.)  The Debtors' refusal to make the distribution when requested by the Plan Participants, therefore, creates a claim under section 502 of ERISA.[8]

3.    Constructive trusts in bankruptcy context

The Debtors contend that, even if the Plan Participants meet the requirements of a constructive trust under state law, they are not entitled to such a remedy here because of the bankruptcy filing.  The Debtors argue that constructive trusts are disfavored in bankruptcy because they create "a separate allocation mechanism outside the scope of the bankruptcy system . . . [and] 'can wreak . . . havoc with the priority system ordained by the Bankruptcy Code.'"  Superintendent of Ins. v.

---

[8]  The Debtors dispute the Plan Participants' testimony that they did not know they were entitled to immediate distributions because they did not have the plan documents.  The Debtors contend that the Plan Participants received the plan documents at the time they enrolled.  However, the Plan Participants enrolled years before the Plans were taken over by the Debtors in 1998. Further, whether the Plan Participants had copies of the plan documents is not relevant because despite the plain language of those documents, the Debtors refused to permit a distribution to the Plan Participants when they asked for one.

Ochs (In re First Central Fin. Corp.), 377 F.3d 209, 217 (2d Cir. 2004) (quoting In re Haber Oil Co., 12 F.3d 426, 436 (5th Cir. 1994)).  See also Goldberg v. N.J. Lawyers' Fund for Client Protection, 932 F.2d 273, 280 (3d Cir. 1991) (stating that generally "courts favor a pro rata distribution of funds when such funds are claimed by creditors of like status"); Torres v. Eastlick (In re N. Am. Coin & Currency, Ltd.), 767 F.2d 1573, 1575 (9th Cir. 1985) (stating that "[w]e necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws."); Pemaquid Underwriting Brokerage, Inc. v. D & H Alternative Risk Solutions, Inc. (In re Pemaquid Underwriting Brokerage, Inc.), 319 B.R. 824, 844 (Bankr. D.N.J. 2005) (stating that "heavy burdens should be imposed on claimants seeking to upset ratable distribution precepts of bankruptcy . . . ."); In re Leedy Mortgage Co., Inc., 111 B.R. 488, 494 (Bankr. E.D. Pa. 1990) ("A finding that a creditor is the beneficiary of a constructive trust and is thereby entitled to special treatment over and above the normal priority to which its claims would be assigned under the Bankruptcy Code makes bankruptcy courts justifiably wary of identifying property of debtors in bankruptcy as held in constructive trusts.").

21

The Plan Participants reply that the Third Circuit has not held that constructive trusts may not be imposed in the context of a bankruptcy case and, in fact, has imposed one where it is equitable.  Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.), 997 F.2d 1039, 1059 (3d Cir. 1993) (applying federal common law definition of constructive trust, which is broader than state law, to impose constructive trust where entity acted as a conduit in collecting money and forwarding it to the intended recipient).  See also In re Bake-Line Group, LLC, 359 B.R. 566, 575-76 (Bankr. D. Del. 2007) (finding that check proceeds wrongly deposited into debtor's account were held in constructive trust for the payee's benefit); In re Dwek, Bankr. No. 07-11757, 2009 WL 1119422, at *3 (Bankr. D.N.J. 2009) (concluding that "the Third Circuit does not share some of its sister Circuits [sic] view that it is inadvisable to impose constructive trusts in bankruptcy.").

The Court agrees with the Plan Proponents that the Bankruptcy Code does not preclude the application of constructive trust law.  The Third Circuit has noted that "Congress clearly intended the exclusion [from property of the estate] created by section 541(b) to include not only funds held in express trust, but also funds held in constructive trust."  Columbia Gas, 997 F.2d at 1059 (finding a constructive trust in a bankruptcy case).

22

While the cases cited by the Debtors broadly state a reluctance to apply constructive trust law in the bankruptcy context, in fact those courts acknowledged that such relief was available and denied the relief only because the elements of a constructive trust were not met rather than because the filing of the bankruptcy case cut off that right.  See, e.g., First Central Fin. Corp., 377 F.3d at 217 (acknowledging that "[i]n this Circuit, we have rejected the notion that bankruptcy law trumps state constructive trust law" and finding that constructive trust was not available because the parties' rights were governed by contract and there was no evidence of fraud or other misconduct); Goldberg, 932 F.2d at 279-80 (noting that lower court's finding that funds in question were held in actual trust and were not property of the estate had not been appealed and concluding that because the parties seeking those funds had similar rights they warranted pro rata treatment); Torres, 767 F.2d at 1576 (concluding that Arizona constructive trust law is not inconsistent with bankruptcy law but declining to find a constructive trust because there was no evidence of fraud); Pemaquid, 319 B.R. at 844 (although stating that the claimant has a heavy burden in arguing for a constructive trust in a bankruptcy case, court acknowledged that the burden could be met if a final judgment imposing a constructive trust had been entered pre-petition); Leedy Mortgage, 111 B.R. at 494-95

23

(declining to find a constructive trust because claimants' funds had been dissipated pre-petition and therefore they could not trace them to funds held by the debtor).

Therefore, the Court concludes that if the Plan Participants are able to establish the elements of a constructive trust, they would be entitled to that remedy for the violation of their rights under ERISA.

### 4.   Application of Constructive Trust

#### a.   Wrongful conduct

The Debtors argue that the Plan Participants have not established their entitlement to the imposition of a constructive trust in this case, because there was no fraudulent conduct, which is necessary for such a remedy.  See, e.g., Adams v. Jankouskas, 452 A.2d 148, 152 n.4 (Del. 1982) (requiring fraud or breach of fiduciary duty or some other unconscientious behavior for imposition of a constructive trust).

The Plan Participants disagree.  They note that under Delaware law, a constructive trust can be imposed "[w]hen one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty."  Hogg, 622 A.2d at 652.  In this case, the Plan Participants contend that the Debtors wrongfully refused to allow them to have an early distribution from the Ahmanson Plans although those Plans expressly allowed it.  In addition, they

24

assert that the Debtors falsely told the Plan Participants that they were not entitled to such a distribution.  At the same time, the Debtors modified another benefit plan to permit the distribution of millions to their senior executives.  The Plan Participants also note that the Ahmanson Plans and Trusts were not funded by the Debtors but were funded years ago by Ahmanson and Home Savings.  The Plan Participants argue that they have established that the Debtors' actions were unconscionable and that it would be unfair to allow the Debtors to keep the assets in the Ahmanson Trusts that, by the express terms of the Ahmanson Plans, should have been turned over to the Plan Participants a year before the bankruptcy case was filed.

The Court agrees with the Plan Participants that they have established sufficient inequitable conduct by the Debtors to warrant the imposition of a constructive trust.  The Debtors' refusal to make any distribution to the Plan Participants when they requested it was without any justification under the express terms of the Ahmanson Plans or under existing law.  This is in stark contrast to the extraordinary efforts made by the Debtors to permit a distribution of deferred compensation to their senior executives (which required a modification of their existing plan).  The Court finds that the retention of the Ahmanson Trusts funds would unjustly enrich the Debtors for that wrongful conduct at the expense of the Plan Proponents.  Hogg, 622 A.2d at 652.

b.   <u>Tracing</u>

The Debtors argue, however, that a constructive trust may be imposed only where "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." <u>Knudson</u>, 534 U.S. at 213.  In this case the Debtors argue that because the Ahmanson Plans were unfunded and the funds in the Trusts were clearly identified as property of the Debtors, no such tracing is possible.  (Ex. D-1 at §§ 5.11, 8, 11.2, 11.3; Ex. D-10 at § 1.4.)  <u>See also</u> <u>Fenwick v. Merrill Lynch & Co., Inc.</u>, No. 3:06cv880, 2009 WL 995760, at *3 (D. Conn. Ap. 9, 2009) (striking plaintiff's request for a constructive trust based on <u>Knudson</u>, because the plan at issue "was unfunded, plaintiffs made no contributions to it, and defendants have not improperly taken an identifiable portion of the beneficiaries' funds").

The Debtors argue that, even if the Plan Participants did timely and properly request payments from the Ahmanson Trusts pre-petition, they are not entitled to those funds because they did not receive payment before the bankruptcy filing.  <u>See, e.g.,</u> <u>MacKenzie</u>, 60 F.3d at 976-78 (holding that, notwithstanding the fact that employees' deferred compensation benefits vested and they had demanded payment of those benefits prior to their employer being placed in receivership, under the tax code the assets remained the receivers' until a distribution is made,

26

which did not occur in that case); <u>Fenwick</u>, 2009 WL 005760, at *3
(holding that a constructive trust is not a proper remedy under
ERISA section 502 where the plan is an unfunded plan); <u>McZeal v.
S. Consumers Coop, Inc.</u>, No. 05-1080, 2009 WL 1307943, at *12
(W.D. La. May 7, 2009) (denying motion for summary judgment
seeking constructive trust where plan was top hat unfunded plan
because such plans "have no assets separate from the general
corporate assets"); <u>Pelosi v. Schwab Cap. Mkts., L.P.</u>, 462 F.
Supp. 2d 503, 514 (S.D.N.Y. 2006) (holding that because the plan
was unfunded it "is clearly not a constructive trust holding
particular funds [which the plaintiff] himself contributed to it"
and consequently dismissing claim for equitable relief); <u>Silicon
Graphics</u>, 363 B.R. at 699-700 (holding that an employee of a
chapter 11 debtor did not have superior rights to funds placed in
a deferred compensation plan trust notwithstanding the fact that
the employee had made demand for the funds pre-petition).

   At most, the Debtors assert that the Plan Participants have
a general unsecured claim for breach of contract.  In particular,
they contend that a constructive trust cannot be imposed on the
Ahmanson Trusts because those trusts were established for the
benefit of the Debtors and their general unsecured creditors.  In
order to preserve the tax benefits, the Plan Participants could
not have any legal or beneficial interest in the assets in the
Ahmanson Trusts.

27

The Plan Participants argue that the MacKenzie and Silicon Graphics cases are distinguishable because they contend that in those cases the employees did not assert a claim that their benefits were wrongfully denied under ERISA.  The Plan Proponents contend that the employees in those cases did not have an immediate right to a distribution as the Plan Participants did here.  The Court disagrees.  In both of those cases the plaintiffs sought benefits that they contended were immediately due but wrongfully withheld.  MacKenzie, 60 F.3d at 973-76; Silicon Graphics, 363 B.R. at 693-94.

The Plan Participants further contend that the employees in those cases did not request a distribution until after their company became insolvent, while in this case the Plan Participants made a demand for their funds almost a year before the Debtors filed bankruptcy.  MacKenzie, 60 F.3d at 976; Silicon Graphics, 363 B.R. at 693.  The Court concludes that this is irrelevant.  The holding of the cases cited by the Debtors is that because a top hat plan is unfunded and consequently any funds that the Debtors may have put aside in the Ahmanson Trusts to meet their obligations are owned by the Debtors, there can be no funds or other property that in good conscience belong to the Plan Participants for tracing purposes.  It is only by the actual payment of the benefits to the Plan Participants that the funds could be identifiably theirs.  Cf. Begier v. IRS, 496 U.S. 53,

28

65-66 (1990) (concluding that payments to IRS from debtor's general funds were not avoidable preferences because the IRS had shown a sufficient nexus to those funds, thereby identifying them as trust fund taxes, where the funds had actually been paid to the IRS).

In this case, because of the essential requirement that the top hat plans be unfunded, there is no nexus or property identifiably belonging to the Plan Participants on which a constructive trust can be placed to remedy the refusal of the Debtors to pay their benefits.  See, e.g., IT Group, 448 F.3d at 665; Goodman, 7 F.3d at 1127.  Therefore, the Court concludes that the Plan Participants' claim for a constructive trust must fail.  Their claims will be allowed as general unsecured claims because they do not have a right to the funds in the Ahmanson Trusts that is superior to the rights of the other general unsecured creditors.  MacKenzie, 60 F.3d at 976; Silicon Graphics, 363 B.R. at 699-700.  The Debtors are therefore entitled to the funds in the Ahmanson Trusts which may be used to pay creditors in accordance with the priorities of the Code and terms of any plan of reorganization that may be confirmed.


IV.  CONCLUSION

For the reasons set forth above, the Court will grant the Debtors' Motion.

29

An appropriate order is attached.


Dated: June 1, 2011                    BY THE COURT:

                                       Mary F. Walrath
                                       United States Bankruptcy Judge