**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re:                              )    Chapter 11
                                    )
WASHINGTON MUTUAL, INC., et al.,    )    Case No. 08-12229 (MFW)
                                    )
              Debtors.              )    Jointly Administered

## OPINION[1]

Before the Court is the request of Washington Mutual, Inc.
("WMI") and WMI Investment Corp. (collectively the "Debtors") for
confirmation of the Modified Sixth Amended Joint Plan of
Affiliated Debtors (the "Modified Plan"). For the reasons stated
below, the Court will deny confirmation of the Modified Plan.

I.  BACKGROUND

WMI is a bank holding company that formerly owned Washington
Mutual Bank ("WMB"). WMB was the nation's largest savings and
loan association, having over 2,200 branches and holding $188.3
billion in deposits. Beginning in 2007, revenues and earnings
decreased at WMB, causing WMI's asset portfolio to decline in
value. By September 2008, in the midst of a global credit
crisis, the ratings agencies had significantly downgraded WMI's
and WMB's credit ratings. A bank run ensued; over $16 billion in

---

[1] This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure, which is made applicable
to contested matters by Rule 9014 of the Federal Rules of
Bankruptcy Procedure.

deposits were withdrawn from WMB in a ten-day period beginning September 15, 2008.

On September 25, 2008, WMB's primary regulator, the Office of Thrift Supervision (the "OTS"), seized WMB and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver. The FDIC's takeover of WMB marked the largest bank failure in the nation's history. On the same day, the FDIC sold substantially all of WMB's assets, including the stock of WMB's subsidiary, WMB fsb, to JPMorgan Chase Bank, N.A. ("JPMC") through a Purchase & Assumption Agreement (the "P&A Agreement"). Under the P&A Agreement, JPMC obtained substantially all of the assets of WMB for $1.88 billion plus the assumption of more than $145 billion in deposit and other liabilities of WMB. The FDIC, as the receiver of WMB, retained claims that WMB held against others.

On September 26, 2008, the Debtors filed petitions under chapter 11 of the Bankruptcy Code. Early in the bankruptcy case disputes arose among the Debtors, the FDIC, and JPMC regarding ownership of certain assets and various claims that the parties asserted against each other. Those disputes (and disputes between the Debtors and other claimants) were the subject of litigation in this Court,[2] as well as in the United States

---

[2]    See, e.g., Black Horse Capital LP, et al. v. JPMorgan Chase Bank, N.A., Bankr. No. 08-12229, Adv. No. 10-51387 (Bankr. D. Del. July 6, 2010) (the "TPS Adversary"); Broadbill Investment Corp. v. Wash. Mut., Inc., Bankr. No. 08-12229, Adv. No. 10-50911 (Bankr. D. Del. Apr. 12, 2010) (the "LTW Adversary"); Wash. Mut.,

District Court for the District of Columbia (the "DC Court"),[3]
and in the Federal Court of Claims.[4]

On March 12, 2010, the parties announced that they had
reached a global settlement agreement (the "GSA").  The GSA
resolved issues among the Debtors, JPMC, the FDIC in its
corporate capacity and as receiver for WMB, certain large
creditors (the "Settlement Noteholders"),[5] certain WMB Senior
Noteholders, and the Creditors' Committee.  The GSA was
incorporated into the Sixth Amended Plan which was originally
filed on March 26, 2010, and modified on May 21 and October 6,
2010.

Hearings on confirmation of the Sixth Amended Plan, as well
as argument on summary judgment motions in the related LTW and
TPS Adversaries, were held on December 1-3 and 6-7, 2010.  The

---

Inc. v. JPMorgan Chase Bank, N.A., Bankr. No. 08-12229, Adv. No.
09-50934 (Bankr. D. Del. Apr. 27, 2009); JPMorgan Chase Bank,
N.A. v. Wash. Mut., Inc., Bankr. No. 08-12229, Adv. No. 09-50551
(Bankr. D. Del. Mar. 24, 2009).

[3] Am. Nat. Ins. Co. v. JPMorgan Chase & Co., 705 F. Supp.
2d 17, 21 (D.D.C. 2010) (the "ANICO Litigation"); Wash. Mut.,
Inc. v. F.D.I.C., No. 1:09-cv-00533 (D.D.C. January 7, 2010).

[4] Anchor Savings Bank FSB v. United States, No. 95-039C
(Fed. Cl. 1995) (hereinafter the "Anchor Litigation"); American
Savings Bank, F.A. v. United States, No. 92-872C (Fed. Cl. 1992)
(hereinafter the "American Savings Litigation").

[5] The Settlement Noteholders are Appaloosa Management, L.P.
("Appaloosa"), Aurelius Capital Management LP ("Aurelius"),
Centerbridge Partners, LP ("Centerbridge"), and Owl Creek Asset
Management, L.P. ("Owl Creek"), and several of their respective
affiliates.

matter was taken under advisement.  In an Opinion and Order dated January 7, 2011, the Court concluded that the GSA was fair and reasonable, but declined to confirm the Debtors' Sixth Amended Plan because of certain deficiencies.  In re Wash. Mut., Inc., 442 B.R. 314, 344-45, 365 (Bankr. D. Del. 2011) (the "January 7 Opinion").  By separate Opinion and Order, the Court found that certain purported holders of the Trust Preferred Securities (the "TPS") no longer had any interest in the TPS because their interests had been converted to interests in preferred stock of WMI.  In re Wash. Mut., Inc., 442 B.R. 297, 304 (Bankr. D. Del. 2011).  In another Opinion and Order issued that day, the Court held that it was unable to grant WMI's motion for summary judgment in the LTW Adversary, because there are genuine issues of material fact in dispute.  In re Wash. Mut., Inc., 442 B.R. 308, 313-14 (Bankr. D. Del. 2011).  Trial on the LTW Adversary has been scheduled for September 12-14, 2011.

The Sixth Amended Plan and the GSA were modified on March 16 and 25, 2011, in an attempt to address the Court's concerns expressed in the January 7 Opinion.  (D 255; D 253.)[6]  The Modified Plan is supported by the Debtors, JPMC, the FDIC, the

---

[6]   References to pleadings on the Docket at "D.I. #;" the Transcripts of the hearings are "Tr. date;" the Debtors' trial exhibits are "D #;" the Debtors' demonstrative exhibits are "D Demo #;" the Equity Committee's exhibits are "EC #;" Aurelius' exhibits are "Au #;" the TPS Consortium's exhibits are "TPS #;" the Appaloosa/Owl Creek exhibits are "AOC #;" and the WMI Senior Noteholders' Group exhibits are "WMI NG #."

Creditors' Committee, the WMI Senior Noteholders' Group, the Plaintiffs in the ANICO Litigation, and the Indenture Trustees of the Senior, the Senior Subordinated, and the PIERS[7] (collectively, the "Plan Supporters").[8]  The Modified Plan is still opposed by the Equity Committee, the putative holders of the TPS,[9] holders of Litigation Tracking Warrants (the "LTW Holders"), certain WMB Noteholders, Normandy Hill Capital L.P., and several individual shareholders and creditors[10] (collectively, the "Plan Objectors").  Hearings were held on July 13-15 and 18-21, 2011, to consider confirmation of the Modified Plan.  Post-hearing briefs were filed by interested parties on August 10, 2011, and oral argument was heard on August 24, 2011.  The matter is now ripe for decision.

---

[7]  The PIERS are Preferred Income Equity Redeemable Securities issued by the Washington Mutual Capital Trust 2001 ("WMCT 2001").  The proceeds received by WMCT 2001 were used to purchase junior subordinated deferrable interest debentures issued by WMI.  (See WMI NG 7.)

[8]  Many of the Plan Supporters do, however, request certain changes to the Modified Plan, some of which conflict with other requested changes.

[9]  The TPS holders have now divided into two groups, with separate counsel, making separate arguments.  They are referred to herein as the TPS Group and the TPS Consortium.

[10]  The individual Plan Objectors include Philipp Schnabel, William Duke, James Berg, Kermit Kubitz, Charles McCurry, and Bettina M. Haper.

II.  <u>JURISDICTION</u>

Congress has legislated that the Bankruptcy Court has core
subject matter jurisdiction over approval of settlements of
claims and counterclaims and confirmation of plans of
reorganization.  28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (C), (K),
(L), (M), (N), & (O).

The TPS Consortium contends, however, that the Court cannot
enter a final order on confirmation for two reasons.  First, the
TPS Consortium argues that the Bankruptcy Court lacks
jurisdiction to confirm the Modified Plan because to do so the
Court must decide the estate's claims against JPMC and the FDIC,
over which only an Article III court has jurisdiction.  <u>Stern v.
Marshall</u>, 131 S. Ct. 2594, 2609 (2011).  At the commencement of
the confirmation hearings, the TPS holders acknowledged that the
Bankruptcy Court had authority to conduct the confirmation
hearing but asserted that the Court could not enter a final
order.  Instead, the TPS Consortium contended that the Bankruptcy
Court must present proposed findings of fact and conclusions of
law to the District Court, for consideration de novo.  28 U.S.C.
§ 157(c)(1).

Second, the TPS Consortium argues that the Bankruptcy Court
has been divested of jurisdiction over the disputed TPS because
the TPS Consortium has appealed the Court's ruling in the TPS
Adversary that they no longer have any interest in the TPS but

6

only have an interest in WMI preferred stock.  Wash. Mut., 442
B.R. at 304.  It contends that, as a result, the Court must order
that the TPS be escrowed (and not transferred to JPMC pursuant to
the GSA and the Modified Plan) until the District Court rules on
the pending appeal.

    A.   Effect of Stern v. Marshall

The TPS Consortium argues that under the Supreme Court's
recent decision in Stern v. Marshall, the Bankruptcy Court does
not have jurisdiction over the claims the estate has against JPMC
or the FDIC (and does not have jurisdiction to approve any
settlement of those claims) because the underlying claims are
"the stuff of the traditional actions at common law tried by the
courts at Westminster" and must be decided by an Article III
court.  131 S. Ct. at 2609 (quoting N. Pipeline Constr. Co. v.
Marathon Pipe Line Co., 458 U.S. 50, 90 (1982)).  The TPS
Consortium argues that Stern v. Marshall is directly applicable
in this case because the underlying disputes with JPMC and the
FDIC are typical of causes of action which only Article III
courts can adjudicate, involving state corporate law, tort law,
fraudulent conveyance law, as well as federal intellectual
property and tort claims.  The TPS Consortium argues that this is
not a matter within the "particularized area of law" with which
bankruptcy courts typically deal and are considered experts at
resolving.  Id. at 2615.  It contends that this is so even though

Congress has expressly granted core jurisdiction to this Court pursuant to section 157(b)(2).  Id. at 2608 (holding that bankruptcy court did not have jurisdiction over state law counterclaim to a filed proof of claim despite core jurisdiction designation in 28 U.S.C. § 157(b)(2)(C)).

The Plan Supporters disagree with the TPS Consortium's reading of the Stern v. Marshall decision.  They note that the Supreme Court itself recognized the narrowness of its ruling. 131 S. Ct. at 2620 (finding that Congress had exceeded Article III's limitation "in one isolated respect" and finding only that the bankruptcy court lacked authority to enter a final judgment on a counterclaim arising under state law which did not need to be resolved in order to rule on the proof of claim).  See also Salander O'Reilly Galleries, No. 07-30005, 2011 WL 2837494, at *6 (Bankr. S.D.N.Y. July 18, 2011) (concluding that the Supreme Court's opinion in Stern v. Marshall emphasizes that it is limited to the particular circumstances surrounding the estate's counterclaim in that case).

In Stern v. Marshall, the Supreme Court held that to find bankruptcy court jurisdiction the court must consider "whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."  131 S. Ct. at 2618.  The concurring opinion also suggested that in instances where there is "a firmly established historical

8

practice" allowing non-Article III judges to make a
determination, they should be permitted to continue doing so.
Id. at 2621 (concurring opinion).

The Court concludes that the Stern v. Marshall decision does
not support the TPS Consortium's contention that the Court lacks
jurisdiction over the GSA or confirmation of the Modified Plan
for several reasons.

### 1. Historical context

Approval of settlements by bankruptcy courts is "a firmly
established historical practice" that stretches back before the
enactment of the Bankruptcy Code to the Bankruptcy Act and,
therefore, the bankruptcy court may continue to exercise that
jurisdiction. Id.

Currently, Rule 9019 provides the court with the authority
to "approve a compromise or settlement." Fed. R. Bankr. P.
9019(a). Bankruptcy Rule 9019 is the successor to Bankruptcy
Rule 919, which provided "on application by the trustee or
receiver and after hearing on notice to the creditors . . . the
court may approve a compromise or settlement." Fed. R. Bankr. P.
919(a) (1982) (repealed). See Magill v. Springfield Marine Bank
(In re Heissinger Res. Ltd.), 67 B.R. 378, 382 (C.D. Ill. 1986)
(noting that Bankruptcy Rule 9019 is similar to Rule 919, "which
had been interpreted to give the bankruptcy court broad authority
to approve compromises"). Rule 919 was based on section 27 of

the Bankruptcy Act which stated that "the receiver or trustee
may, with approval of the court, compromise any controversy
arising in the administration of the estate upon such terms as he
may deem for the best interest of the estate."  11 U.S.C. § 50
(1976) (repealed 1978).

Compromises were routinely approved under the Bankruptcy Act
and continue to be approved by bankruptcy courts in the context
of almost every bankruptcy case.  See, e.g., Protective Comm. for
Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390
U.S. 414, 424 (1968) (holding that "[c]ompromises are 'a normal
part of the process of reorganization.'") (quoting Case v. L.A.
Lumber Prods. Co., 308 U.S. 106, 130 (1939)); Myers v. Martin (In
re Martin), 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize
litigation and expedite the administration of a bankruptcy
estate, '[c]ompromises are favored in bankruptcy.' . . .  Indeed,
it is an unusual case in which there is not some litigation that
is settled between the representative of the estate and an
adverse party.") (quoting 9 Collier on Bankruptcy ¶ 9019.03[1]
(15th ed. 1993)); In re Okwonna-Felix, No. 10-31443-H4-13, 2011
WL 3421561, at *4 (Bankr. S.D. Tex. Aug. 3, 2011) (holding that
Stern v. Marshall does not preclude a bankruptcy court from
exercising jurisdiction to consider a settlement which is based
"entirely on federal bankruptcy law (both [Rule 9019] and the
case law instructing how to apply the Rule)"); In re Drexel

Burnham Lambert Grp., Inc., 138 B.R. 723, 758 (Bankr. S.D.N.Y.
1992) ("Compromises are favored by the Courts because they allow
the estate to avoid the expenses and burdens associated with
litigating contested claims.") (citations omitted).  See
generally Reynaldo Anaya Valencia, The Sanctity of Settlements
and the Significance of Court Approval: Discerning Clarity from
Bankruptcy Rule 9019, 78 Or. L. Rev. 425, 431-32 (1999) ("The
glue that often holds the bankruptcy process together is the
ability of parties to resolve disputes by settlement instead of
litigation.  If bankruptcy judges had to try a much larger
percentage of matters than they currently do, the system would
surely bog down.  Thus, the sanctity of settlements can hardly be
overemphasized.") (footnotes omitted).

Settlements are often included in a plan of reorganization.
Valencia, The Sanctity of Settlements, 78 Or. L. Rev. at 447.
Indeed, section 1123(b)(3)(A) of the Bankruptcy Code expressly
states that "a plan may . . . provide for the settlement or
adjustment of any claim or interest belonging to the debtor or to
the estate."  11 U.S.C. § 1123(b)(3)(A).  Confirmation of a plan
of reorganization is within the bankruptcy court's core
jurisdiction.  28 U.S.C. § 157(b)(2)(L).  See also In re AOV
Indus., Inc., 792 F.2d 1140, 1145-46 (D.C. Cir. 1986) ("The
approval of a disclosure statement and the confirmation of a
reorganization plan are clearly proceedings at the core of

11

bankruptcy law. . . .  Accordingly, we find that the bankruptcy court had jurisdiction to approve [them].").

    2.  <u>Nature of settlement approval</u>

Second, there is a fundamental difference between approval of a settlement of claims (which the Court is being asked to do here) and a ruling on the merits of the claims.  <u>See, e.g.</u>, <u>Matsushita Elec. Indus. Co., Ltd. v. Epstein</u>, 516 U.S. 367, 382 (1996) (holding that a Delaware Chancery Court judgment settling shareholders' state and federal claims was entitled to preclusive effective because "[w]hile it is true that the state court assessed the general worth of the federal claims in determining the fairness of the settlement, such assessment does not amount to a judgment on the merits of the claims.").

As an initial matter, a court does not have to have jurisdiction over the underlying claims in order to approve a compromise of them.  <u>See, e.g.</u>, <u>Matsushita Elec.</u>, 516 U.S. at 381 (holding that "[w]hile § 27 prohibits state courts from adjudicating claims arising under the Exchange Act, it does not prohibit state courts from approving the release of Exchange Act claims in the settlement of suits over which they have properly exercised jurisdiction, i.e., suits arising under state law or under federal law for which there is concurrent jurisdiction."); <u>Grimes v. Vitalink Commc'ns Corp.</u>, 17 F.3d 1553, 1563 (3d Cir. 1994) (stating that "[w]hile this rule of law may seem anomalous

at first glance, it is widely recognized that courts without
jurisdiction to hear certain claims have the power to release
those claims as part of a judgment" approving a settlement
including "federal courts entering judgments that release state
claims that they would not have jurisdictional competency to
entertain in the first instance" because "[t]his rule of law
serves the important policy interest of judicial economy by
permitting parties to enter into comprehensive settlements")
(citations omitted).  Cf.  Musich v. Graham (In re Graham), Adv.
No. 11-01073, 2011 WL 2694146, at *3 n.27 (Bankr. D. Colo. July
11, 2011) (analyzing Stern v. Marshall decision and concluding
that bankruptcy court had statutory and constitutional
jurisdiction to determine dischargeability of a criminal/tort
claim over which it did not have jurisdiction).

     The standards which a court must apply in considering a
settlement establish that the court is not rendering a final
decision on the merits of the underlying claims being
compromised.  See, e.g., TMT Trailer Ferry, 390 U.S. at 424
(finding that a bankruptcy judge should form "an educated
estimate of the complexity, expense, and likely duration of such
litigation, the possible difficulties of collecting on any
judgment which might be obtained, and all other factors relevant
to a full and fair assessment of the wisdom of the proposed
compromise.") (emphasis added); In re W.T. Grant Co., 699 F.2d

599, 608 (7th Cir. 1989) (in approving a settlement, the responsibility of the bankruptcy court "is not to decide the numerous questions of law and fact raised . . . but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'") (citations omitted); In re Martin, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997) (stating that "it is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement.").

The "lowest point in the range of reasonableness" is far from the standard required for an Article III court to enter a final determination on the merits of the claims.  The Court's conclusion in the January 7 Opinion was not a decision on the merits of the underlying claims but merely a determination that the settlement of those claims by the Debtors on the terms of the GSA was reasonable.  Wash. Mut., 442 B.R. at 345.

   3.   Nature of claims compromised

Third, the approval of the GSA in this case is particularly within the core jurisdiction of the Bankruptcy Court because it deals with a determination of what is property of the estate. See 11 U.S.C. § 541(a) (stating that "[t]he commencement of a case under . . . this title creates an estate [which] is

14

comprised of all the following property, wherever located and by
whomever held . . . [including] all legal or equitable interests
of the debtor in property.").

In this case, the claims which are resolved by the GSA
largely relate to who owned specific property: the bank deposits
in the name of WMI at WMB and WMB, fsb; the tax refunds due for
the consolidated tax group which included WMI and WMB; the TPS;
intellectual property; employee related assets (including pension
plans and insurance policies); the goodwill litigation that was
the subject of the Litigation Tracking Warrants (the "LTWs"); and
various other miscellaneous assets.  Wash. Mut., 442 B.R. at 330-
44.

It is without question that bankruptcy courts have exclusive
jurisdiction over property of the estate.  See 28 U.S.C. §
1334(e) (stating that the court in which a case under title 11 is
commenced or is pending "shall have exclusive jurisdiction — (1)
of all the property, wherever located, of the debtor as of the
commencement of such case, and of property of the estate").  See
also, Cent. Va. Cmty. Coll. v. Katz, 546 U.S. 356, 363-64 (2006)
(stating that "[c]ritical features of every bankruptcy proceeding
are the exercise of exclusive jurisdiction over all of the
debtor's property . . . .").

That jurisdiction includes jurisdiction to decide whether
disputed property is, in fact, property of the estate.  See,

e.g., Salander O'Reilly Galleries, 2011 WL 2837494, at *12-13
(concluding that the bankruptcy court had core jurisdiction to
decide priority of estate's and creditor's asserted interests in
a piece of art and denying request for arbitration of issue);
Mata v. Eclipse Aerospace, Inc. (In re AE Liquidation, Inc.), 435
B.R. 894, 904-05 (Bankr. D. Del. 2010) (holding that the
bankruptcy court had exclusive jurisdiction to determine whether
or not disputed aircraft was property of the estate at the time
of its sale); Williams v. McGreevey (In re Touch Am. Holdings,
Inc.), 401 B.R. 107, 117 (Bankr. D. Del. 2009) (stating
approvingly that "[v]arious courts have concluded that matters
requiring a declaration of whether certain property comes within
the definition of 'property of the estate' as set forth in
Bankruptcy Code § 541 are core proceedings.").

     For all the above reasons, the Court concludes that it has
jurisdiction to decide confirmation of the Modified Plan which
incorporates the GSA resolving the disputed claims to putative
property of the Debtors' estate.

     B.   Effect of Appeal of TPS Ruling

     The TPS Consortium argues further that the Court is
precluded from confirming the Modified Plan by the Divestiture
Rule which provides that an appeal divests the lower court of any
further jurisdiction over the subject of the appeal.  See, e.g.,
Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982)

("The filing of a notice of appeal is an event of jurisdictional significance - it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); Venen v. Sweet, 758 F.2d 117, 120-21 (3d Cir. 1985) ("'Divest' means what it says - the power to act, in all but a limited number of circumstances, has been taken away and placed elsewhere."); Bialac v. Harsh Inv. Corp. (In re Bialac), 694 F.2d 625, 627 (9th Cir. 1982) ("Even though a bankruptcy court has wide latitude to reconsider and vacate its own prior decisions, not even a bankruptcy court may vacate or modify an order while on appeal."); In re Whispering Pines Estates, 369 B.R. 752, 757 (B.A.P. 1st Cir. 2007) ("It is well established that the filing of a notice of appeal is an event of jurisdictional significance in which a lower court loses jurisdiction over the subject matter involved in the appeal.  The purpose of the general rule is to avoid the confusion of placing the same matter before two courts at the same time and preserve the integrity of the appeal process.") (citations omitted); In re DeMarco, 258 B.R. 30, 32 (Bankr. M.D. Fla. 2000) ("The parties appear to agree that the Court does not have jurisdiction to consider matters which would interfere with the appeal and the jurisdiction of the appellate court, but that the Court does have jurisdiction over, and should proceed with, other aspects of the case."); In re Strawberry Square Assocs., 152 B.R. 699, 701

17

(Bankr. E.D.N.Y. 1993) (noting that "the bankruptcy court [may not] exercise jurisdiction over those issues which, although not themselves on appeal, nevertheless so impact those on appeal as to effectively circumvent the appeal process.").

The TPS Consortium specifically objects to the provisions of the Modified Plan that authorize the transfer of the TPS from the Debtors to JPMC[11] because ownership of the TPS is the subject of the appeal.  The TPS Consortium argues that the Modified Plan must recognize the limits of this Court's ability to deal with the TPS by providing that the TPS will be held in escrow until the appeal is resolved.

The Plan Supporters disagree with the TPS Consortium's articulation of the Divestiture Rule as applied in bankruptcy cases.  They note that in the bankruptcy context the appeal of one ruling does not mean that the entire bankruptcy case is stayed.  The Bankruptcy Rules make this clear by providing that during an appeal, "the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal

---

[11]  Specifically, the TPS Consortium argues that the Modified Plan provides that the TPS will be transferred pursuant to section 363 to JPMC, which will be a good faith purchaser and entitled to the protections of section 363(m).  (D 255 at §§ 2.1(c)(i) & 38.1(a)(10).)  The Modified Plan also provides that the Debtors, JPMC, and the FDIC will be released from any claims related to the TPS which are held by any third party claiming through the Debtors.  (Id. at §§ 2.1(c), 23.2, 43.2, 43.6, 43.7, 43.9 & 43.12; D 255H at §§ 2.3, 3.2.)

on such terms as will protect the rights of all parties in interest." Fed. R. Bankr. P. 8005. See also In re Hagel, 184 B.R. 793, 798-99 (B.A.P. 9th Cir. 1995) (holding that Rule 8005 "does not provide that the bankruptcy court must stay all proceedings" but that it has discretion to stay any proceedings).

The Plan Supporters argue that contrary to the suggestion of the TPS Consortium, absent a stay pending appeal,[12] the lower court may take all actions necessary to implement or enforce the order from which an appeal has been taken. See, e.g., Hope v. Gen. Fin. Corp. of Ga. (In re Kahihikolo), 807 F.2d 1540, 1542-43 (11th Cir. 1987) (dismissing appeal as moot because, absent stay pending appeal, the secured lender was free to treat order granting relief from stay as final and sell the collateral); In re VII Holdings Co., 362 B.R. 663, 666 n.3 (Bankr. D. Del. 2007) (holding that "absent a stay pending appeal, [the lower court] may retain jurisdiction 'to decide issues and proceedings different from and collateral to those involved in the appeal . . . . [and] may also 'enforce the order or judgment appealed.'")

---

[12] The Plan Supporters argue that the logical extension of the TPS Consortium's argument would effectively be to eliminate the need to ask for (or to comply with the requirements of) a stay pending appeal. They contend that to get a stay pending appeal of the order entered in the TPS Adversary, the TPS Consortium would have to post a supersedeas bond. Fed. R. Bankr. P. 7062. 10 Collier on Bankruptcy ¶ 8005.03 (2011) ("the procedure mandates that an appellant desiring the stay of a [judgment] determining an interest in property should present to the bankruptcy court a supersedeas bond in an amount adequate to protect the appellee").

(citations omitted); In re Bd. of Dir. of Hopewell Int'l Ins.
Ltd., 258 B.R. 580, 583 (Bankr. S.D.N.Y. 2001) (holding that "a
bankruptcy court retains jurisdiction, while an appeal is pending
and in the absence of a stay, to enforce the [appealed] order or
judgment").

The Court agrees with the Plan Supporters.  The TPS
Consortium's argument that the Divestiture Rule provides that an
appeal divests the bankruptcy court of all jurisdiction over the
matter is too broad.  As explained by the Court in Whispering
Pines:

> As courts have noted, however, a bankruptcy case
> typically raises a myriad of issues, many totally
> unrelated and unconnected with the issues involved in
> any given appeal.  The application of a broad rule that
> a bankruptcy court may not consider any request filed
> while an appeal is pending has the potential to
> severely hamper a bankruptcy court's ability to
> administer its cases in a timely manner.

369 B.R. at 758.

The correct statement of the Divestiture Rule is that so
long as the lower court is not altering the appealed order, the
lower court retains jurisdiction to enforce it.  See, e.g., In re
Dadashti, No. CC-07-1311, 2008 WL 8444787, at *6 (B.A.P. 9th Cir.
Feb. 12, 2008) (stating that "when there is no stay pending
appeal, the bankruptcy court retains jurisdiction to enforce an
order that is on appeal, on condition that in doing so, the
bankruptcy court does not significantly alter or expand upon the
terms of that order."); Hagel, 184 B.R. at 798 ("courts have

20

recognized a distinction between acts undertaken to enforce the judgment which are permissible, and acts which expand upon or alter it, which are prohibited.").

The cases on which the TPS Consortium relies do not change this general rule and are easily distinguishable.[13]   In Whispering Pines, for example, the lower court modified the order that was on appeal (confirmation of the lender's plan that gave the trustee time to sell the property before the lender could foreclose on it) by granting the lender immediate relief from the stay to foreclose.   369 B.R. at 759.   In Bialac, the bankruptcy court enjoined the secured lender from foreclosing while the order granting the lender relief from the stay to foreclose was on appeal.   694 F.2d at 627.   In both instances, the bankruptcy court was not merely enforcing the appealed order but was

---

[13]   Most of the cases cited by the TPS Consortium merely stand for the proposition that approval of a settlement is a final order for purposes of appeal or has res judicata effect. See, e.g., United States v. Kellogg (In re West Tex. Mktg. Corp.), 12 F.3d 497, 501 (5th Cir. 1994) (concluding that while bankruptcy court approval of settlement was not a final order because no separate order was entered on the docket other than a dismissal of the adversary, the ruling was entitled to res judicata effect); SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.), 960 F.2d 285, 289 (2d Cir. 1992) (finding that order approving settlement agreement, which was contingent on later confirmation of a plan, was final for purposes of appeal); In re Beaulac, 294 B.R. 815, 818 (B.A.P. 1st Cir. 2003) (considering order approving settlement as final for purposes of appeal).

modifying it.[14]   In <u>DeMarco</u>, the bankruptcy court acknowledged
that it should consider confirmation of the debtor's chapter 13
plan if it did not interfere with the appeal but declined to do
so because it found that confirmation might render the appeal
moot.  258 B.R. at 36.

Unlike the Court in <u>DeMarco</u>, the Court declines to exercise
its discretion under Rule 8005 not to consider the Modified Plan
simply because it might render moot the TPS Consortium's appeal
of the decision in the TPS Adversary.  The TPS Consortium could
have avoided this by seeking a stay pending appeal.  To do as the
TPS Consortium requests would preclude the Court from dealing
with confirmation of any plan of reorganization that implicates
the TPS and possibly stall these bankruptcy cases indefinitely.

Further, in considering confirmation of the Modified Plan,
the Court is not being asked to modify the order that is on
appeal (which held that the Debtors own the TPS).  <u>Wash. Mut.</u>,
442 B.R. at 305-06.  Rather, the Court is being asked to enforce
its order by approving the Modified Plan that provides for the
transfer or sale of the TPS by the Debtors to JPMC as part of the
GSA.  Therefore, the Court concludes that it has jurisdiction to

---

[14]   The other cases cited by the TPS Consortium are also
inapplicable.  <u>See, e.g.</u>, <u>Griggs</u>, 459 U.S. at 61 (holding that
notice of appeal filed while motion to alter judgment was pending
was a nullity); <u>Venen</u>, 758 F.2d at 120, 123 (holding that trial
court did not have jurisdiction to grant motion for
reconsideration and vacate order that was on appeal).

consider confirmation of the Modified Plan, including the
transfer of the TPS, notwithstanding the pendency of an appeal
from its prior order determining that the Debtors own them.  See,
e.g., Kahihikolo, 807 F.2d at 1542-43; VII Holdings, 362 B.R. at
666 n.3; Bd. of Dir. of Hopewell Int'l, 258 B.R. at 583.


III. DISCUSSION

    A.   Modifications Made per January 7 Opinion

    The Plan Supporters assert that the Debtors have made
corrections to the Modified Plan to fix all of the deficiencies
identified by the Court in its January 7 Opinion.  Specifically,
they contend that (1) the release, injunction, and exculpation
provisions of the Modified Plan now are limited to releases by
the Debtors, (2) the release and exculpation language and parties
have been changed to reflect only those the Court felt were
entitled to be released or exculpated, and (3) the activities
related to the LTWs have been excluded from the exculpation
provision.  Compare Wash. Mut., 442 B.R. at 348-56 with D 255 at
§§ 28.15, 43.5, 43.7, 43.8, 43.9, 43.12.

    The Modified Plan also contains provisions for Court
approval of fees to be paid by the Debtors.  Compare 442 B.R. at
365 with D 255 at §§ 3.2, 32.12 & 43.18.  The LTW Holders
complain, however, that the fees of some of the parties (notably
the WMB Noteholders and the Liquidating Trustee) are being paid

23

without Court approval.  (D 255 at §§ 21.1, 28.11.)  The Court
agrees that Court approval of those fees is also required.  11
U.S.C. § 1129(a)(4).

In addition, the Modified Plan provides that late-filed
claims will be paid before post-petition interest is paid on
unsecured claims.  Compare 442 B.R. at 357 with D 255 at § 16.2 &
Ex. G.  In the Modified Plan, the Debtors also revised the
definition of unsecured claims and provided that if the LTW
Holders are determined to hold allowed unsecured claims that are
not subordinated under section 510, then they will be treated in
Class 12.  Compare 442 B.R. at 357 with D 255 at §§ 1.209 & 25.1.
The Debtors also solicited stock elections from the LTW Holders
and other disputed claims, so that those creditors would have the
same rights as others in the event their claims are allowed.
Compare 442 B.R. at 362 with D.I. 7081.

The Debtors did not, however, include in the Modified Plan
that smaller PIERS holders would have the same right to
participate in the rights offering as the larger PIERS holders.
442 B.R. at 360-61.  Instead the rights offering was eliminated.
The Debtors explained that this was done because to expand the
rights offering to include all PIERS would have resulted in the
Reorganized Debtor being a public company, requiring the Debtors
to update their filings with the SEC at the cost of millions.

(See Tr. 2/18/2011 at 80-81.)[15]

Finally, the Modified Plan provides that the Equity Committee will have a representative on the Liquidating Trust board and that there will be a mechanism for removal of the Liquidating Trustee.  Compare 442 B.R. at 364-65 with D 255 at §§ 8.2 & 35.2.  However, the Modified Plan provides only for removal of the Liquidating Trustee for fraud, misconduct, or breach of fiduciary duty.  (D 255 at § 8.2.)  The Court believes that the Liquidating Trustee must be removable at the discretion of a majority of the Trust Advisory Board.  In addition, the composition of the Trust Advisory Board must reflect the constituents who hold Liquidating Trust Interests.  When creditors are paid in full, their Liquidating Trust Interests will be canceled and preferred shareholders will be issued Liquidating Trust Interests.  (Tr. 7/13/2011 at 98; D 255 at §§ 6.3, 7.3, 16.3, 18.3, 19.3, 20.3, 22.1, 22.2, 23.1 & 24.1.)  Consequently, the Trust must provide that when creditors lost their Liquidating Trust Interests, the creditors' representatives on the Board will be replaced by representatives selected by equity.

---

[15]  It appears, nonetheless, that because stock is being issued to creditors under the Modified Plan, the Reorganized Debtor may be a public company.  The Debtors have now changed their position and contend that they will not be required to update their filings with the SEC.  See infra Part F.

B.    Reasonableness of the GSA

In the January 7 Opinion, the Court concluded that the GSA
was reasonable.  442 B.R. at 345.  After reviewing all of the
claims being resolved in the GSA, the Court was not convinced
that the Debtors had a probability of achieving a significantly
better result if they were to continue to litigate than they will
receive under the GSA considering the claims separately or
holistically.  Id. at 344.  The Court further concluded that it
is not possible to say that any judgment against JPMC or the FDIC
would not face difficulty in collection, especially if it is in
the billions of dollars as the Plan Objectors contend.  Id.  In
particular, the Court found that the significant counterclaims
raised by JPMC and the FDIC against the Debtors (in excess of $54
billion) added to the difficulties of collecting from them.  Id.
The Court also concluded that the complexity of the various
litigation and its interrelatedness, favored a settlement.  Id.
at 345.

The Plan Supporters contend that the January 7 Opinion is
the law of the case and may not be altered in the absence of an
intervening change in the law or new evidence.  See, e.g., Hayman
Cash Register Co. v. Sarokin, 669 F.2d 162, 169 (3d Cir. 1982);
In re Ameriserve Food Distrib., Inc., 315 B.R. 24, 36 (Bankr. D.
Del. 2004).  They contend that no new evidence or intervening
change in the law has been presented which merits reconsidering

26

the Court's conclusion that the GSA is reasonable.

The TPS Consortium disagrees.  It contends that the Court's January 7 Opinion was not a final order on this issue because the Court denied confirmation rather than granting it.  See, e.g., Gander Mountain Co. v. Cabela's, Inc., 540 F.3d 827, 830 (8th Cir. 2008) (holding that "[a] district court's comments during oral argument do not constitute a final order subject to the law-of-the-case doctrine"); Cable v. Millennium Digital Media Sys., L.L.C. (In re Broadstripe, L.L.C.), 435 B.R. 245, 256 (Bankr. D. Del. 2010) (holding that ruling by state court on motion to expedite proceeding was not law of the case on the merits of the claim).

The Court finds the TPS Consortium's cases distinguishable and agrees with the Plan Supporters that its ruling on the reasonableness of the GSA rendered as part of the January 7 Opinion is law of the case because it decided a disputed issue. Cf. Drexel Burnham, 960 F.2d at 289 (finding that order approving settlement agreement, which was contingent on later confirmation of a plan, was final for purposes of appeal).  The Equity Committee agreed that the January 7 Opinion's ruling on reasonableness of the GSA would not be retried.  (Tr. 1/20/11 at 51-52.)  The Equity Committee does argue, however, that intervening events have occurred which require reconsideration of this Court's decision that the GSA is reasonable.

27

### 1.   Business tort claims

On February 16, 2009, certain holders of WMI common stock and debt securities issued by WMI and WMB[16] filed the ANICO Litigation against JPMC in state court in Galveston County, Texas, alleging misconduct by JPMC in connection with the seizure of WMB and the P&A Agreement.  (D.I. 6083 at ¶ 23.)  On March 25, 2009, the ANICO Litigation was removed and transferred to the DC Court on motion of JPMC and the FDIC Receiver as intervening defendant.  (Id. at ¶ 24.)  On April 13, 2010, the DC Court dismissed the ANICO Litigation finding that under the Financial Institutions Reform Recovery and Enforcement Act of 1989 ("FIRREA"), the receivership was the exclusive claims process for claims relating to the sale of WMB.  Am. Nat. Ins. Co. v. JPMorgan Chase & Co., 705 F. Supp. 2d 17, 21 (D.D.C. 2010).

That order was recently reversed on June 24, 2011, by the Court of Appeals for the D.C. Circuit.  Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1142 (D.C. Cir. 2011) (holding that because the "suit is against a third-party bank for its own wrongdoing, not against the depository institution for which the FDIC is receiver (i.e., Washington Mutual), their suit is not a claim within the meaning of [FIRREA] and thus is not barred") (citing

---

[16]   Since the suit was filed, all claims based on WMI stock or debt have been voluntarily dismissed and the ANICO Plaintiffs currently assert rights only as WMB bondholders.  Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1140 (D.C. Cir. 2011).

Rosa v. Resolution Trust Corp., 938 F.2d 383, 394 (3d Cir. 1991)
(holding that claims for damages against assuming bank for its
own acts did not fall within jurisdictional bar because they did
not seek payment from assets of the receiver)).  As a result, the
Plan Objectors contend that the business tort claims which the
Debtors have against JPMC are not barred and are potentially
valuable assets which are being released for no consideration
under the GSA.

The Court disagrees.  Despite the recent ANICO decision, the
likelihood of success on the Debtors' business tort claims, the
delay and cost of pursuing them, their complexity, and the
possible difficulties of collecting all militate in favor of
approval of the GSA.  See, e.g., TMT Trailer Ferry, 390 U.S. at
424; In re RFE Indus., Inc., 283 F.3d 159, 165 (3d Cir. 2002);
Martin, 91 F.3d at 393.

With respect to the first factor, even the D.C. Circuit
acknowledged that there were "knotty questions" left to be
decided in the case, including whether the claims belonged
exclusively to the FDIC as the receiver of WMB.[17]  Am. Nat'l

---

[17]  JPMC and the FDIC Receiver contend that any derivative
claim that WMI may have for alleged harm to WMB is now owned by
the FDIC.  12 U.S.C. § 1821(d)(2)(A)(i) (providing that the FDIC
as receiver "succeeds to all rights, titles, powers, and
privileges of . . . any stockholder" of the bank).  See also
Pareto v. F.D.I.C., 139 F.3d 696, 700 (9th Cir. 1998) (holding
that § 1821(d)(2)(A)(i) vests in the FDIC all rights and powers
of a stockholder of a bank to bring a derivative action).

<u>Ins.</u>, 642 F.3d at 1145.  The FDIC Receiver further argues that
the Debtors did not file any claim in the Receivership action
based on the alleged business tort claims and those claims are,
therefore, time-barred.  <u>Cf.</u> 12 U.S.C. § 1464(d)(2)(B) (any
claims challenging the appointment of the FDIC as Receiver must
be brought against the OTS within 30 days of the appointment).

Even if the Debtors do have an independent business tort
claim against JPMC, however, they still face significant
obstacles in successfully prosecuting it.  Any claim for damages
would require that the Debtors prove that they were solvent[18] at
the time of the seizure of WMB, a position diametrically opposed
to assertions they would need to prove in the preference and
fraudulent conveyance claims which are also waived as part of the
GSA.  The Debtors would also have to establish the facts
necessary to win those claims, namely that JPMC fraudulently
caused the decline in value of WMB in order to buy it at a
discount price.

---

[18]   The TPS Consortium asks the Court to consider a summary
of and excerpts from the Senate Report issued after an
investigation into the WMB collapse, which it contends shows that
the Debtors have viable claims against their directors and
officers.  That Report, however, also noted that the market value
of the Debtors was based on misinformation, suggesting that the
Debtors might have been insolvent.  (D.I. 8312 at Ex. A p. 4.)
This would defeat any claim that the Debtors might have on the
business tort claims, because the Debtors would have suffered no
damages.

Further, the difficulties in collecting any judgment against JPMC have not changed since the Court's January 7 Opinion. The GSA resolves not only the Debtors' business tort claims but the many disputed claims which involve a multiplicity of issues raising complex arguments about the intersection of bankruptcy law and the regulation of banks. The Supreme Court's recent decision in Stern v. Marshall also makes it likely that, in the absence of a global settlement, the various claims would have to be litigated in numerous state and federal courts, which might result in conflicting decisions. Continuing the litigation on the disputed claims will cause at least a 3-4 year delay in any distribution to creditors, increase post-petition interest and professional fees (which are currently running at the monthly rate of $30 million and $10 million, respectively), and involve complex issues including sovereign immunity (affecting even whether discovery could be taken of the government agents), pre-emption, and jurisdiction.

Given all these factors, the fact that one part of the GSA is now more unsettled than it was does not change the Court's mind about the overall reasonableness of the GSA. In fact, it reinforces the Court's belief that this is precisely the type of multi-faceted, multi-district litigation that calls for a global settlement. The Court, therefore, reaffirms its conclusion that the GSA provides a reasonable resolution in light of the possible

results of the multiple complex litigation, the likely difficulties in collection, the expense inherent in any further delay, and the paramount interests of the stakeholders.  442 B.R. at 345.

>    2.    Other objections to reasonableness

Many of the individual shareholders who object to confirmation of the Modified Plan do so based on the assertion that the GSA should not be approved.  Some of the objections are based on alleged facts for which no evidence was presented at the confirmation hearings.[19]  Those objections must fail for lack of support in the record.

Many of the individual objectors also repeat arguments presented at the confirmation hearing in December which the Court already addressed in its January 7 Opinion.  Absent changed facts or law, the Court will not reconsider that decision.  See, e.g., Hayman, 669 F.2d at 169; Ameriserve, 315 B.R. at 36.

The individual objectors do, however, refer to some issues that the Court can consider.  Specifically, they reference some recent decisional law that they say the Court should consider in determining reasonableness.

---

[19]  These include allegations about the value that JPMC received in acquiring WMB.  (D.I. 8407, 8408.)

a.   <u>Colonial BancGroup decision</u>

The first was a decision in the <u>Colonial BancGroup</u> case in which the Court found that the FDIC did not have the right to set off claims it had against deposits that the debtor had in its former subsidiary bank that had been seized and sold to another bank.  <u>In re The Colonial BancGroup, Inc.</u>, Bankr. No. 09-32303, 2011 WL 239201, at *9 (Bankr. M.D. Ala. Jan. 24, 2011).  This, they argue, means that the Debtors would have won the fight over who had title to the deposit accounts in WMI's name at WMB.

The Court does not find, however, that the <u>Colonial BancGroup</u> decision alters its conclusion on the reasonableness of the GSA for two reasons.  First, that decision did not deal with the claim by the acquiring bank to the deposit accounts but only dealt with the FDIC claim.  <u>Id.</u>  Second, the Court already concluded in the January 7 Opinion that the Debtors had a strong likelihood of success on the merits on their claim of ownership to the deposit accounts.  442 B.R. at 331.  The <u>Colonial BancGroup</u> decision merely reinforces that conclusion.

b.   <u>Team Financial decision</u>

The individual objectors also refer the Court to the decision in <u>Team Financial</u> in which the Bankruptcy Court held that the debtor, not the FDIC, owned a tax refund received by the debtor for its consolidated tax group which included a bank for which the FDIC was the receiver.  <u>In re Team Fin., Inc.</u>, Bankr.

33

No. 09-10925, 2010 WL 1730681, at *10 (Bankr. D. Kan. Apr. 27, 2010). The <u>Team Financial</u> Court held that the FDIC was limited to a pre-petition breach of contract claim under the group's tax sharing agreement. <u>Id.</u> at *11.

Again, the Court finds that decision is insufficient to change its mind about the reasonableness of the GSA. In the January 7 Opinion the Court concluded that the Debtors had a fair likelihood of prevailing on the issue of who owned the tax refunds. 442 B.R. at 333. The Court noted, however, that the FDIC asserted a claim under the Tax Sharing Agreement between WMI and WMB to the portion of the tax refund which related to WMB's operating losses. <u>Id.</u> Because the estate is solvent and unsecured creditors are likely to get paid in full, the Court found that the FDIC's claim would entitle it to a substantial recovery and, therefore, the Debtors were not likely to obtain a net recovery which is substantially better than the GSA by litigating that issue. <u>Id.</u>

c. <u>Deutsche Bank National Trust Co. decision</u>

The Court is also aware that the DC Court recently denied a motion of the FDIC to dismiss a complaint against it which raised business tort claims arguably similar to the ANICO claims. <u>Deutsche Bank Nat'l Trust Co. v. FDIC</u>, 1:09-cv-01656 (D.D.C. Aug. 17, 2011). The Court does not consider this relevant to its consideration of the merits of any claims that the estate may

34

have against the FDIC in this case, however, as the order was not a decision on the merits.

For all the above reasons, the Court concludes that there is not any intervening change in the law or facts to cause it to reconsider its conclusion in the January 7 Opinion that the GSA is reasonable.

C.   Value Distributed Under the Modified Plan

Pursuant to the Modified Plan, stock in WMI will be canceled and stock in reorganized WMI (the "Reorganized Debtor") will be issued to creditors who elect to receive stock in lieu of cash payments or interests in the Liquidating Trust, as well as to PIERS for that portion of their claims that are not paid in cash or Liquidating Trust Interests.  (Tr. 7/13/2011 at 97-98; D 255 at §§ 6.2, 7.2, 16.2, 18.2, 19.2, 20.2 & 22.2.)  The Reorganized Debtor will be vested with miscellaneous assets, the most valuable of which is the stock of a subsidiary of WMI, WM Mortgage Reinsurance Company ("WMMRC").  (Tr. 7/13/2011 at 97-98, 248.)  The value of the Reorganized Debtor also includes certain tax attributes, namely net operating losses ("NOLs").  The Debtors' NOLs (including WMB in its tax group) amount to an estimated $17.7 billion in face value for pre-2011 losses, assuming an Effective Date of the Plan of August 31, 2011.  (D Demo 1; Tr. 7/13/2011 at 102-03.)  The use of the NOLs, however, is subject to the limitations of section 382 of the Internal

Revenue Code (the "Tax Code").

The Reorganized Debtor will not be vested with any claims (including claims against directors and officers) of the Debtors. Instead, those claims are vested in the Liquidating Trust, interests in which are being distributed to certain creditor classes.  (D 255 at §§ 6.1, 7.1, 16.1, 18.1, 19.1, 20.1, 21.1, 28.3 & 32.1(b).)

According to the stock election results, stock in the Reorganized Debtor will be held as follows: 24 million shares by Senior Noteholders, 13 million shares by Senior Subordinated Noteholders, and 123 million shares by PIERS holders.  (D.I. 8108 at 32; Tr. 7/13/2011 at 101.)  The shares will be issued at a rate of one share for each dollar of claim exchanged.  (D 255 at § 1.167.)  Based on the Debtors' valuation of the Reorganized Debtor, the stock, cash, and interests in the Liquidating Trust to be distributed to creditors will result in all creditor classes being paid in full, with the exception of the lowest class, the PIERS.  Therefore, the Modified Plan anticipates that there will be no distribution to any shareholders and their interests will be canceled.  (D 255 at §§ 23.2, 24.2, 25.1 & 26.1.)  In the event that all the creditors do get paid in full, however, Liquidating Trust Interests will be redistributed to the preferred shareholders.  (Tr. 7/13/2011 at 98; D 255 at §§ 6.3, 7.3, 16.3, 18.3, 19.3, 20.3, 22.1, 22.2, 23.1 & 24.1.)

36

The Plan Objectors contend, however, that the Reorganized Debtor has substantial value in excess of the claims of the creditors that are receiving its stock.  The stock in the Reorganized Debtor is not being distributed to anyone other than the creditors.  (Tr. 7/13/2011 at 101.)  Therefore, the Plan Objectors argue that those creditors are getting more than the amount of their claims in violation of section 1129(b).  See, e.g., In re Exide Techs., 303 B.R. 48, 61 (Bankr. D. Del. 2003) (holding that section 1129(b) prohibits creditors from receiving more than the full value of their claims before junior classes receive a distribution).  Instead, the Plan Objectors argue that the excess value should be given to the other stakeholders, notably the preferred and common shareholders.

The Plan Supporters and the Plan Objectors each presented valuation experts in support of their positions.

### 1.   Daubert Motion

The Debtors filed a motion to exclude the testimony of both of the Equity Committee's experts: Peter Maxwell, the valuation expert, and Kevin Anderson, the tax expert.  The Debtors argue that Maxwell's opinion is not based on accepted methodologies and is based on hypothetical scenarios that have no relevance to this case (namely, that the Reorganized Debtor will raise substantial amounts of debt and equity to develop or acquire additional business in order to utilize more of the NOLs).  See, e.g., Neb.

Plastics, Inc. v. Holland Colors Ams., Inc., 408 F.3d 410, 416-17
(8th Cir. 2005) (although factual basis of expert opinion
generally goes to credibility, if the opinion is "so
fundamentally unsupported" because it fails to consider relevant
facts, then it can offer no assistance to the trier of fact and
must be excluded); Guillory v. Domtar Indus., Inc., 95 F.3d 1320,
1331 (5th Cir. 1996) (expert testimony was properly excluded
where it was not based upon facts in the record but on altered
facts and speculation designed to bolster a party's position);
Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)
(expert testimony should be excluded "if it is speculative or
conjectural or if it is based on assumptions that are so
unrealistic and contradictory as to suggest bad faith"); McMillan
v. Weeks Marine, Inc., 474 F. Supp. 2d 651, 657-59 (D. Del. 2007)
(excluding expert testimony as speculative because it was based
on unrealistic assumptions); In re Nellson Nutraceutical, Inc.,
356 B.R. 364, 373 (Bankr. D. Del. 2006) ("[I]f the factual basis
of an expert's opinion is so fundamentally unsupported because
the expert fully relies on altered facts and speculation, or
fails to consider relevant facts in reaching a conclusion, the
expert's opinion can offer no assistance to the trier of fact,
and is not admissible on relevance grounds."); In re Gretz,
Bankr. No. 09-10069, 2011 WL 1048635, at *4 (Bankr. D. Del. Mar.

38

18, 2011) (rejecting a valuation hypothesizing that an un-renovated property with no rental income was a fully-renovated income-producing property because it was "simply too far removed from the facts on the ground for the Court to be able to confidently rely upon it.").

The Equity Committee responded that even the Debtor's own expert, Steven Zelin, considered and valued the Reorganized Debtor's "corporate opportunity" to acquire or develop new business.  It argues that this type of disagreement does not warrant excluding one expert's opinion but merely goes to the credibility of the witnesses.  The Equity Committee contends that the Court's gatekeeper function under Rule 702 of the Federal Rules of Evidence and Daubert is "not a substitute for testing the assumptions underlying the expert witness' testimony on cross-examination."  Lichtenstein v. Anderson (In re Eastern Continuous Forms, Inc.), No. Civ. A. 04-629, 2004 WL 2418285, at *4 (E.D. Pa. Oct. 28, 2004).  "A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination."  Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2004).  The Equity Committee argues that Rule 702 establishes a "liberal policy of admitting expert testimony which will 'probably aid' the trier of fact."  Knight v. Otis

39

Elevator Co., 596 F.2d 84, 87 (3d Cir. 1979) (quoting Universal

Athletic Sales Co. v. Am. Gym, Recreational & Athletic Equip.

Co., 546 F.2d 530, 537 (3d Cir. 1976)).  Accordingly, the Equity

Committee asserts that "doubts about whether an expert's

testimony will be useful should generally be resolved in favor of

admissibility."  In re Japanese Elec. Prods., 723 F.2d 238, 278

(3d Cir. 1983), rev'd on other grounds, 475 U.S. 574 (1986).

To admit an expert's testimony under Rule 702 of the Federal

Rules of Evidence, courts must focus on "the trilogy of

restrictions on expert testimony: qualification, reliability and

fit."  Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir.

2003).  The first element considers the qualifications of the

proposed expert in the field in which he is to testify, i.e., his

"knowledge, skills, and training."  In re Paoli R.R. Yard PCB

Litig., 35 F.3d 717, 741 (3d Cir. 1994).  The second element

considers several factors:

> (1) whether a method consists of a testable hypothesis;
> (2) whether the method has been subject to peer review;
> (3) the known or potential rate of error; (4) the
> existence and maintenance of standards controlling the
> technique's operation; (5) whether the method is
> generally accepted; (6) the relationship of the
> technique to methods which have been established to be
> reliable; (7) the qualifications of the expert witness
> testifying based on the methodology; and (8) the non-
> judicial uses to which the method has been put.

Id. at 742 n.8.  The third element requires that the "evidence

must first be relevant to be admissible.  Relevant evidence is

evidence that helps the trier of fact to understand the evidence

or to determine a fact in issue." <u>Oddi v. Ford Motor Co.</u>, 234
F.3d 136, 145 n.12 (3d Cir. 2000).

The Court heard argument and reserved judgment on the
<u>Daubert</u> motion until the testimony was presented and cross-
examination completed, in order to have a better idea of the
bases for the experts' qualifications and opinions.  After
considering that testimony, the Court concludes that the
testimony of Maxwell should not be excluded because, although he
did not follow normal methodologies for valuing a business, his
report was not a valuation of the Reorganized Debtor but simply a
critique of the valuation done by the Debtors' expert.  To that
extent it is helpful to the Court.  With respect to the argument
that Maxwell's opinion is based on hypothetical scenarios that
have no basis in the record, the Court is able to evaluate and
consider the likelihood of the occurrence of the various
scenarios on which Maxwell relies in considering the credibility
of his testimony about the value of the Reorganized Debtor.

The Debtors also argue that Anderson is not an expert in the
field on which he is asked to opine, namely the likelihood that
the IRS will use section 269 of the Tax Code to disallow some or
all of the NOLs.  The Debtors specifically note that Anderson had
no experience with cases in which section 269 was a major
consideration.  (Tr. 7/13/2011 at 132-35.)  In addition, the
Debtors seek to exclude Anderson's opinion as an impermissible

41

legal opinion.  See, e.g., Berckeley Inv. Grp., Ltd. v. Colkitt,
455 F.3d 195, 217 (3d Cir. 2006) ("Although Federal Rule of
Evidence 704 permits an expert witness to give expert testimony
that 'embraces an ultimate issue to be decided by the trier of
fact,' an expert witness is prohibited from rendering a legal
opinion.").

With respect to the first issue, the Court found Anderson to
be an expert in tax issues relevant to the acquisition and merger
of corporations, particularly troubled companies.  (Tr. 7/13/2011
at 127-29, 135.)  Although the Debtors contend that he is not an
expert on section 269 of the Tax Code, the Court finds that too
narrow of an area of expertise to expect.  Anderson testified
that in rendering advice on mergers and acquisitions involving
NOLs, he considered section 269, as well as section 382, because
the two were both implicated.  (Id. at 128-29, 132-35.)  Thus,
although he never issued a "pure" section 269 opinion, he always
considered its effect.  (Id.)  Consequently, the Court finds that
Anderson had sufficient experience with the applicability of
section 269 of the Tax Code to render an opinion.

With respect to the second factor, the Court is not being
asked to render a decision on the legal issue of whether the use
of the NOLs by the Reorganized Debtor will be challenged (and if
challenged, will be disallowed).  Instead, the issue before the
Court is what is the value of the NOLs to the Reorganized Debtor

and its stakeholders.  This requires not simply a determination
of the legal effect of section 269 but also the possibility that
it would be invoked under various scenarios which may occur in
the future.  The Court finds that Anderson's opinion on this
issue is helpful to its ultimate determination of those
possibilities and their effect on the value of the NOLs.
Therefore, the Court will not exclude Anderson's testimony.

        2.   <u>Value of WMMRC</u>

        a.   <u>Value of existing business</u>

WMMRC is a captive reinsurance company which wrote policies
on mortgage loans issued by WMB and other affiliates of the
Debtors.  (Tr. 7/13/2011 at 97-98, 252.)  Since the seizure of
WMB, WMMRC has been in run-off: it has not issued any new
policies and is simply collecting premiums and paying claims on
the existing policies.  (<u>Id.</u> at 97-98, 251-52.)  WMMRC has no
independent management, no independent sales force, and no
employees.  (<u>Id.</u> at 251.)

The Debtors' valuation expert, Zelin, testified that in his
opinion the value of WMMRC was between $115 and $140 million.
(<u>Id.</u> at 260; D 341 at 8.)  This was based on the Debtors'
business and actuarial projections for the run-off of WMMRC's
current policies through 2019 (when they will expire).  (Tr.
7/13/2011 at 251-59, 262, 277-82; D 340.)  Zelin assumed that the
Reorganized Debtor would have no other business and that the

income generated from the run-off of WMMRC's business would be paid in dividends to investors rather than used to make acquisitions or build new business.  (Tr. 7/13/2011 at 308-09.)

The Equity Committee does not disagree with the Debtors' valuation of the existing WMMRC run-off business.  In fact, its expert, Maxwell, opined that the value of WMMRC in run-off was in the same range as Zelin's, $129 to $135 million.  (Tr. 7/15/2011 at 68-70, 120.)

The only valuation of WMMRC which was done using accepted valuation methodologies was that done by Zelin.  The Court recognizes, however, the inclinations of debtors to undervalue themselves and plan objectors to overvalue the company to support their arguments.  See, e.g., Exide, 303 B.R. at 61 ("The Creditors Committee argues that the Debtor's expert has undervalued the company and that the Plan will result in paying the Prepetition Lenders more than 100% of their claims to the detriment of the unsecured creditors.  The Debtor, on the other hand, argues that the Creditors Committee's expert has overvalued the company and that the Plan is fair and equitable in its treatment of unsecured creditors.").  In addition, the Court agrees that there are some flaws in Zelin's analysis.[20]  The

---

[20]  Maxwell highlighted some internal inconsistencies and problems with Zelin's analysis: Zelin used the weighted average cost of capital ("WACC") figure from his December 2010 report, although that number has fallen since then by 5 to 10 percentage points, which would have increased the value (Tr. 7/13/2011 at

Court, therefore, finds that the value of the existing business
of WMMRC (assuming no new business is generated or acquisitions
are made) is at the high end of Zelin's range of value, or $140
million.

b.    Value of the NOLs

Although the face amount of the Debtors' NOLs is estimated
to be $17.7 billion for pre-2011 losses, the value of the NOLs is
limited by several factors.  (D Demo 1; Tr. 7/13/2011 at 102-03.)
First, section 382 of the Tax Code will limit the Reorganized
Debtor's ability to use the NOLs, because under the terms of the
Modified Plan there will be a change in ownership of WMI (from
the current shareholders to the creditors).  (Tr. 7/13/2011 at
102-03, 141-42, 162; D 367 at 4-5.)

A large part of that NOLs will also be lost once WMB ceases
to be a member of the tax group, because the bulk of the losses
were attributable to WMB's operations.  (Tr. 7/13/2011 at 102-03,
162-63.)  WMB will cease being a member of the Debtors' tax group
upon conclusion of the FDIC's receivership.  (Id. at 104-05.)
Therefore, the Debtors have filed a motion for authority to
abandon the stock of WMB before the Effective Date of the

---

314-17; Tr. 7/15/2011 at 58); he used a WACC of 13-15% although
historical returns on equity for similar businesses are 8 to
12.5% and current returns for insurance companies are 6 to 10%
(Tr. 7/13/2011 at 324-32); he gave little weight to the value of
precedent transactions (which yielded a value of $145 to $205
million) and accorded most weight to the discounted cash flow
analysis (id. at 310-11; D 341 at 13, 23).

Modified Plan, which will result in a $6 billion NOL for 2011 if the Modified Plan is confirmed.[21]  (Id. at 106, 164-65; D 368 at 4-5.)  The portion of the tax loss for 2011 which occurs before the Effective Date is subject to the limitations of section 382 of the Tax Code; the portion after the Effective Date is not. (Tr. 7/13/2011 at 105, 108.)  Assuming an Effective Date of August 31, 2011, the Debtors projected a limited NOL of $4 billion and an unlimited NOL of approximately $2 billion for the 2011 losses.[22]  (Id. at 109-10, 163-64; D 368 at 4-5.)  The Equity Committee's expert, Anderson, agreed with the Debtors' decision to take a worthless stock deduction for the WMB stock. (Tr. 7/13/2011 at 164-65.)

         i.   NOLs used by run-off business

Zelin did attempt to determine the net present value of the NOLs in two components.  The first was the value of the NOLs to

---

[21]  The Debtors filed a certificate of no objection to the motion, causing the Court to grant it by order dated July 8, 2011.  (D.I. 8104.)  At a status hearing held on August 12, 2011, the Debtors advised that they had withdrawn the certificate of no objection late on the evening of July 5, 2011, when they were advised by the Equity Committee that individual shareholders objected to the motion.  (Tr. 8/12/2011 at 15.)  However, after reviewing the docket the Debtors were unable to identify any objection to the motion.  At the status hearing the Equity Committee advised that it had no objection to the motion, so long as the Debtors did not abandon the stock until after a plan was confirmed.  The Debtors agreed and a form of order to that effect was to be filed with the Court.  (Id. at 21.)

[22]  The later in the year that the Effective Date occurs, the smaller the amount of the unlimited NOL.  (Tr. 7/13/2011 at 107-10, 161; D Demo 2.)

existing WMMRC if it simply remains in run-off.  Based on his valuation of the Reorganized Debtor, Zelin testified that under section 382 the portion of the NOLs which could be used by WMMRC during run-off was approximately $7 million per year.  (D Demo 1; Tr. 7/13/2011 at 103-04.)  According to Zelin, the present value of the NOLs that could be used by WMMRC is $10 to $20 million. (Tr. 7/13/2011 at 260-61, 275-78, 284-85; D 341 at 8.)

The Plan Objectors do not really dispute this value; they contend only that it is based on WMMRC's current operations and does not take into account the possible future revenues that could be generated.  See, e.g., Consol. Rock Prods. Co. v. Du Bois, 312 U.S. 510, 526 (1941) (in valuing company court must consider "all facts relevant to future earning capacity and hence to present worth").

Because Maxwell did not do a valuation of the existing business with its NOLs, the Court accepts that the value of the NOLs to the existing WMMRC business is that determined by Zelin or $20 million.  (Tr. 7/15/2011 at 36-37.)

ii.  NOLs used by future business

Zelin also attempted to value the NOLs that might be able to be used in the event of a future acquisition of a profitable business by WMMRC, which he valued at an additional $10 to $25 million.  (Tr. 7/13/2011 at 260-61, 275-78, 284-85; D 341 at 8.)

The Plan Objectors argue that the principal defect[23] in
Zelin's valuation is that he values the Reorganized Debtor as a
liquidating company (rather than as a going concern) and fails to
attribute sufficient value to the ability of the Reorganized
Debtor to generate new business itself or to use the NOLs through
the acquisition of profitable businesses.  (Tr. 7/15/2011 at 38.)
The Equity Committee's expert, Maxwell, opined that, assuming an
initial capital infusion of $140 million, debt of $200 million,
and a subsequent second tranche of debt of $160 million, the
Reorganized Debtor could have a value (based on a net present
value calculation) of $275 million.  (Id. at 39-50; EC 154 at 7-
8, 11.)  He also opined that the value could increase with
subsequent equity raises or other merger/acquisition
opportunities.[24]  (Tr. 7/15/2011 at 50-51.)

---

[23]   The Equity Committee also had more technical criticisms
of this part of the Zelin report: Zelin used a WACC for the
future acquisition of 25 to 35%, because it was an unknown, but
then did an additional downward adjustment of 33% to reflect the
probability that the acquisition will not be effective on day one
but will take time to occur.  (Tr. 7/13/2011 at 332-34; D 341 at
37.)  Maxwell characterized this as double-discounting resulting
in an effective rate of 38 to 52% when the correct rate should be
15.8 to 20%.  (Tr. 7/15/2011 at 55-56.)

[24]   Maxwell opined that it is possible that the Reorganized
Debtor could have additional value of $240 to $420 million but
that is premised on raising billions of dollars in additional
equity to generate hundreds of millions of dollars in additional
income to use the NOLs.  (Tr. 7/15/2011 at 84-86; EC 154 at 8.)
The Court finds that assumption purely speculative and
unrealistic.

The Plan Supporters disagree with Maxwell's conclusion and assert that there are many flaws in his analysis.[25]  Their primary criticism is that Maxwell did not use typical methodologies to do a conventional valuation of the Reorganized Debtor.  (Id. at 71-73.)  Maxwell admitted this but stated that he was just showing what the possible values are that could be achieved by the Reorganized Debtor if new money was invested or borrowed.  The Equity Committee argues that this is not just speculation but was, in fact, what the Settlement Noteholders were expecting to do as evidenced by numerous analyses they performed.  (EC 132 & 138.)

The Plan Supporters also contend that Maxwell's assumption that WMMRC will operate as a going concern is faulty.  It is not based on the current Modified Plan, any existing business plan, or the known intentions of the future shareholders.  (Tr. 7/15/2011 at 74-75, 119.)  The Plan Objectors argue that the Debtors have intentionally not done a business plan for WMMRC so that the true value of the Reorganized Debtor as a going concern

---

[25]  The Debtors' technical criticisms of the Maxwell report included: Maxwell's comparables for the debt to equity ratios were not reinsurance companies (Tr. 7/15/2011 at 91); Maxwell's cost of debt was based on double B rated securities though none of the reinsurance comparables have that good a rating (id.); his rate of return is based on going-concern reinsurance companies, not startups or run-offs (id. at 92); Maxwell gave 40% weight to precedent transactions, because he erroneously thought Zelin did, although he normally would not give that much weight to them (id. at 131-32).

could not be evaluated.  The Plan Supporters respond that it would be presumptuous of the Debtors to prepare a business plan for the Reorganized Debtor and that it will be up to the new owners to decide how it will be run.

Maxwell admitted that to achieve his going concern value, the Reorganized Debtor would have to get new management, hire employees, develop a business plan, get customers and vendors, and acquire hard assets, none of which it currently has.  (Id. at 75-79, 118.)  Maxwell could not give an opinion on whether the Reorganized Debtor could raise the equity or debt needed to realize the values he attributes to the Reorganized Debtor.  (Id. at 98.)  He admitted he did not know of anyone willing to lend or invest in the Reorganized Debtor and stated that his report was just one of a number of possible future scenarios.  (Id. at 82-84, 88-89; EC 135.)  He was also aware that only one third of the rights offering had been subscribed in the Sixth Amended Plan and the Modified Plan does not even have a rights offering.  (Tr. 7/15/2011 at 90.)  Further, Maxwell does not account for any costs or risks associated with the scenarios he posits.  (Tr. 7/13/2011 at 297.)  Although Maxwell stated that the cost of equity and debt takes into account some of those risks, he admitted that it did not include the costs and risks of converting a liquidating company with no employees or business into a going concern.  (Tr. 7/15/2011 at 149-52.)  In addition,

50

Maxwell assumed that the future acquisition will be fully implemented on day one (generating $37 million in income, net of interest expense) but admitted that is not realistic and there would necessarily be time delays before any additional revenue could be generated.  (Id. at 79-81, 100-01, 124, 126.)

The Court agrees with the Plan Supporters that these are all serious flaws in Maxwell's analysis, which precludes the Court from concluding (as Maxwell opines) that the Reorganized Debtor could have a value in excess of $275 million.  However, the Court agrees with Maxwell's critique of Zelin's report that it gives too little value to the possible future earning capacity of the Reorganized Debtor that could be achieved simply by operating as a going concern or merging with a viable company.  See, e.g., Consol. Rock, 312 U.S. at 526.

### (1)  Risk of Loss

The parties also disagree about the effect of the Tax Code on the ability of the Reorganized Debtor to use the NOLs.  The Plan Supporters contend that Maxwell does not account at all for any tax risk.  (Tr. 7/13/2011 at 297; Tr. 7/15/2011 at 52-53, 107, 119.)  They argue that he ignores the possibility that the IRS will disallow all NOLs under section 269 of the Tax Code. The Plan Objectors, in contrast, contend that Zelin artificially undervalued the Reorganized Debtor because of imaginary tax restrictions.

In valuing NOLs, bankruptcy courts must take into account the risk that the NOLs will be disallowed.  See, e.g., In re Jartran, Inc., 44 B.R. 331, 380 (Bankr. N.D. Ill. 1984) (holding that "the realization of the tax savings [from use of NOLs] is subject to a number of contingencies, including continuation in effect of relevant tax provisions, potential challenge under section 269 of the Internal Revenue Code, and possible recapture of the benefits utilized.  Accordingly . . . a substantial discount would be required.").  See generally, Chaim J. Fortgang & Thomas M. Mayer, Valuation in Bankruptcy, 32 UCLA L. Rev. 1061, 1130 (1985) ("Uncertainties in preserving the NOL increase the discount.").

Section 269 of the Tax Code states in relevant part that: "If any person or persons acquire . . . control of a corporation, . . . and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax . . . then the Secretary may disallow such deduction, credit, or other allowance."  26 U.S.C. § 269(a)(1).  For the principal purpose of a transaction to be tax avoidance, the purpose of tax evasion or avoidance has to be more significant, more important, or more prominent than any other purpose; it can be one of the purposes but not the principal purpose.  See, e.g., Scroll, Inc. v. Comm'r, 447 F.2d 612, 618 (5th Cir. 1971) (noting that the "burden of proof on the taxpayer is not an easy one, and when the

disputed tax benefits are so disproportionate to the value of the other asserted advantages, that burden may be practically impossible to sustain"); U.S. Shelter Corp. v. United States, 13 Cl. Ct. 606, 620 (Cl. Ct. 1987) (in considering what is the primary purpose, the court should aggregate all tax avoidance purposes and compare them to the aggregate business purposes) (citing Bobsee Corp. v. United States, 411 F.2d 231, 239 (5th Cir. 1969)).

The Court in U.S. Shelter concluded that tax evasion was not the primary purpose of the acquisition even though the acquiror was aware of and interested in using the NOLs, because it found persuasive the testimony that the principal motivations for doing the deal were the business reasons of acquiring a public company and the specific assets of the acquired company. 13 Cl. Ct. at 622-28. In contrast, the Court in Scroll found the principal purpose was tax avoidance where the acquired company was not integrated into the acquiror's business and the tax attributes and value of the tangible assets were significantly more than the price paid. 447 F.2d at 615 n.4, 618. A finding of tax avoidance can be made even if the change in control was through a foreclosure by a creditor. See, e.g., The Swiss Colony, Inc. v. Comm'r, 428 F.2d 49, 54 (7th Cir. 1970) (upholding Tax Court conclusion that primary purpose of acquisition was tax avoidance even though taxpayer argued that acquisition was accomplished

through foreclosure on stock to protect its position as a creditor).

The Plan Supporters presented a tax expert, Richard Reinhold, a tax partner at Wilkie Farr & Gallagher, who testified that the transfer of stock under the Modified Plan to the creditors was a change of control that could trigger section 269 disallowance of the NOLs.  (Tr. 7/13/2011 at 113.)  Reinhold opined that in considering the issue of what the principal purpose of the creditors' election to take stock in lieu of cash under the Modified Plan was, the IRS and courts will consider future events that may shed light on the intent of the creditors.  (Id. at 200; D 404 at 7 n.15.)  Those future events would include any additional acquisitions of other companies by the Reorganized Debtor.  (Tr. 7/13/2011 at 197.)  Reinhold did not testify that the IRS or courts would be more likely to find that tax avoidance was the principal purpose if the amount of capital raised exceeded the non-tax assets' value; he only said that he could not give an opinion that they would not.  (Id. at 200-01, 224; D 404 at 4-6.)  Reinhold opined, however, that if the amount of capital raised is not more than the value of the non-tax assets of the Reorganized Debtor then "the company has quite a good argument that Section 269 will not be brought into play because the principal purpose for the acquisition of shares would not be considered tax avoidance."  (Tr. 7/13/2011 at 200; D 404 at 7-9.)

The Equity Committee's expert, Anderson, opined that it was
unlikely that section 269 of the Tax Code would apply (resulting
in loss of the NOLs) if the Reorganized Debtor acquired
additional businesses, because to disallow the NOLs that future
acquisition would have to be for the "primary purpose" of tax
avoidance.  (Tr. 7/13/2011 at 138; D 367 at 15-20; D 370 at 2-5.)
He stated that section 269 is rarely used by the IRS because the
newer section 382 is more specific in describing instances where
NOLs should be disallowed.  (Tr. 7/13/2011 at 184.)

Anderson specifically disagreed with Reinhold's opinion that
the Reorganized Debtor could not acquire a company whose value
was more than the value of Reorganized Debtor (excluding the
NOLs) without running afoul of section 269.  (Id. at 146-47; D
369 at 3.)  Instead, Anderson stated that as long as the acquired
business had legitimate substantial operations, its acquisition
would not result in a loss of the NOLs.  (Tr. 7/13/2011 at 142-
47; D 367 at 15-17; D 369 at 3-4.)  In addition, Anderson opined
that there were specific ways in which the Reorganized Debtor
could acquire assets and/or stock in the future that would not
implicate section 269.  (Tr. 7/13/2011 at 149; D 367 at 15-17; D
369 at 3-4.)

The Debtor's expert, Reinhold, did not disagree with
Anderson's conclusion that a subsequent acquisition by the
Reorganized Debtor was not likely to cause a problem under

section 269 or 382.  (Tr. 7/13/2011 at 208-11.)  However, he

noted that his opinion was not addressing the risk that the IRS

will challenge any future transfer of ownership under 269 (as

Anderson's was), but whether it will challenge the current

transfer of ownership to the creditors under the Modified Plan.

(Id. at 193, 202-03, 208-11; D 404 at 7-9, D 341 at 36.)

Anderson admitted that section 269 could apply to the

transfer of stock under the Modified Plan to the creditors and

that in determining "principal purpose" courts look at future

actions to discern present intention.  (Tr. 7/13/2011 at 166-67.)

Anderson still felt, however, that it was unlikely that the IRS

(or courts) would find that the principal purpose of the transfer

of stock in the Reorganized Debtor under the Modified Plan was

tax avoidance or evasion.  (Id. at 147-48, 151-53.)

In evaluating the two conflicting opinions, the Court finds

the opinion of Anderson more convincing.  The cases that apply

section 269 are fundamentally different from the case at bench.

Those cases deal with taxpayers who acquire a company which has a

significant NOL and then merge it with their own business in

order to shelter their income.  See, e.g., Scroll, 447 F.2d at

615 (noting that "[o]ne of the most obvious advantages accruing

to [the acquiror] as a result of the merger was the possibility .

. . of offsetting [the acquired company's] substantial pre-

acquisition net operating loss carryover against [the acquiror's]

even more substantial post-acquisition profits"); The Swiss
Colony, 428 F.2d at 52 (tax court had found that "Taxpayer
acquired control of [liquidating company] 'for the principal
purpose of evading or avoiding Federal income taxes by securing
the benefit of net operating loss deductions which it would not
otherwise have enjoyed'"); U.S. Shelter, 13 Cl. Ct. at 609-10
(noting that section 269 was passed to prevent "the recently
developed practice of corporations with large excess profits . .
. acquiring corporations with current past, or prospective losses
or deductions, . . . for the purpose of reducing [the acquiror's]
income and excess profits taxes.") (citing S. Rep. No. 627, 78th
Cong., 1st Sess. 58 (1943)).

In this case, the creditors are acquiring the Reorganized
Debtor under the Modified Plan not to shelter their own income or
to merge it with a company they own.  Instead, they are receiving
stock in the Reorganized Debtor simply in repayment of debt owed
them.  Even the situation in The Swiss Colony case is
distinguishable.  In that case, although the Taxpayer had
acquired the loss company's stock through foreclosure, it then
attempted to use that company's NOL to shelter its own profits.
428 F.2d at 52.  That is not being done by the acquiring
creditors in this case.

In addition, most of the new shareholders will receive their
stock in the Reorganized Debtor not by election but by default.

57

(Tr. 7/14/2011 at 96-97; D 255 at §§ 20.1 & 20.2.)  In fact, the bulk of the stock is being distributed to the PIERS, not because they elected to receive it but because they are the lowest creditor class.[26]  (D 255 at §§ 20.1 & 20.2.)  Thus, the Court concludes that the IRS is unlikely to find that the principal reason that the creditors in this case are receiving stock under the Modified Plan is for tax evasion purposes.

The fact that the Settlement Noteholders (who as holders of PIERS will receive the bulk of the stock under the Modified Plan) performed analyses of the value of the NOLs does not alone suggest that tax evasion was their reason for accepting stock instead of a cash distribution.  See, e.g., In re Federated Dep't Stores, Inc., 135 B.R. 962, 970 (S.D. Ohio 1992) ("Consideration by corporate officials of the tax ramifications of an acquisition is not, by itself, indicative of tax avoidance but is 'simply intelligent business planning.'") (citation omitted); VGS Corp. v. Comm'r, 68 T.C. 563, 596 (1977) ("Complicated business

---

[26]  Under the Debtors' valuation of the Reorganized Debtor, there is nothing available for equity shareholders, so the fact that stock in the Reorganized Debtor is being given to the creditors is in large part mandated by the absolute priority rule.  See, e.g., Case, 308 U.S. at 115-16 (stating that absolute priority rule requires that shareholders not receive any distribution under a plan until creditors are paid in full). While the Debtors could have simply liquidated WMMRC and disbursed the proceeds to the creditors rather than the stock, the Debtors stated that the offers they received for WMMRC were too low and that they, therefore, concluded that the creditors would get a higher recovery by allowing WMMRC to finish its run-off.  (Tr. 7/14/2011 at 45-47; D 391.)

transactions do not take place in a vacuum and we find this [consideration of loss carryovers or other tax benefits] to be nothing more than prudent business planning."]; U.S. Shelter, 13 Cl. Ct. at 625 (holding that "the principal purpose of a transaction does not become tax avoidance merely because the parties were cognizant of and considered the tax consequences."). Further, despite doing those analyzes, three of the Settlement Noteholders testified that they did not elect to take extra stock in lieu of cash distributions.  (Tr. 7/18/2011 at 123; Tr. 7/19/2011 at 112-13; Tr. 7/20/2011 at 81.)

In this case given the conservative valuation done by Zelin (which assumes that WMMRC will generate no new business), the Court also finds that the electing creditors' decisions to take stock was likely influenced by a belief that the Debtors undervalued the Reorganized Debtor by viewing it as a liquidating company rather than as a going concern.  (Tr. 7/14/2011 at 39-40.)  See, e.g., Exide Techs., 303 B.R. at 48, 61 (noting the inclination of debtor to undervalue the reorganized entity).

Given the various reasons for distribution of stock to creditors under the Modified Plan, the Court concludes that the principal purpose of the transfer of ownership of the Reorganized Debtor under the Modified Plan is not the avoidance of taxes. The Court is cognizant of the fact that its opinion on this point is not binding on the IRS.  26 C.F.R. § 1.269-3(e) ("In

determining for purposes of section 269 . . . whether an
acquisition pursuant to a plan of reorganization in a case under
[the Bankruptcy Code] was made for the principal purpose of
evasion or avoidance of Federal income tax, . . . any
determination by a court under 11 U.S.C. § 1129(d) that the
principal purpose of the plan is not avoidance of taxes is not
controlling."). See also In re Hartman Material Handling Sys.,
Inc., 141 B.R. 802, 811-12 (Bankr. S.D.N.Y. 1992) (holding that
"[a] confirmation ruling that the principal purpose of a plan is
not tax avoidance is significantly different from a § 269 ruling
because the two rulings are made pursuant to different 'factual
frames of reference'" and noting that the bankruptcy court can
only consider facts up to the time of its ruling on confirmation
while the IRS can consider facts after confirmation until the
deduction is taken). Nonetheless, the Court considers it
significant that the IRS has not objected to confirmation of the
Modified Plan on the basis that its principal purpose is tax
avoidance although it clearly could have. 11 U.S.C. § 1129(d).[27]

For purposes of estimating the value of the NOLs, therefore,
the Court cannot accept the Debtors' assertion that the

---

[27]  If a governmental unit objected and the Court found that
the principal purpose was to avoid taxes, the Modified Plan could
not be confirmed. 11 U.S.C. § 1129(d) ("Notwithstanding any
other provision of this section, on request of a party in
interest that is a governmental unit, the court may not confirm a
plan if the principal purpose of the plan is the avoidance of
taxes . . . .").

Reorganized Debtor could not obtain future investments that are more than the value of its non-tax assets without having the IRS conclude that the acquisition of stock by creditors under the Modified Plan runs afoul of section 269 of the Tax Code.

(2)   Value adjusted for loss

In determining the value of the NOLs resulting from any future acquisition, Zelin assumed that any capital raised would be no more than the value of the current WMMRC non-tax assets based on section 269.  (Tr. 7/13/2011 at 260-61, 275-78, 284; D 341 at 8.)  As a result, he concluded that the value of the NOLs resulting from any additional acquisitions was no more than $10 to $25 million.  (Tr. 7/13/2011 at 260-61, 275-78, 284.)

The Court finds that Zelin's valuation is too low, because it was based on the erroneous assumption that the Reorganized Debtor would be restricted by section 269 of the Tax Code in what capital it could raise in the future.  However, as noted above, the Court finds that Maxwell's determinations of value are fraught with problems, including the assumption that the Reorganized Debtor will be able to raise debt and equity instantly, even though the Debtors have not obtained exit financing or any new debt or equity commitments.  Maxwell's present value of the NOLs also assumes that the Reorganized Debtor will be able to generate instant cash flow from the new debt and equity that has not even been committed yet.  As a

61

result, the Court cannot accept Maxwell's determination that the value of the Reorganized Debtor is $275 million.

Based on the two expert opinions, one of which is too conservative and the other of which is too aggressive, the Court concludes that the present value of the NOLs to the Reorganized Debtor is $50 million.  This is based on the Court's conclusion that the Reorganized Debtor should be able to raise additional capital and debt over the next twenty years equal to twice the value of its current assets which will be invested in restarting the reinsurance business of WMMRC or acquiring other related businesses.  The Court accepts as credible Maxwell's opinion that the reinsurance market is a prime area for new investment given the recent turmoil in the real estate market.[28]

Based on all of the above, the Court concludes that the value of the Reorganized Debtor and its NOLs is $210 million.

### 3.    Value of Liquidating Trust Interests

In addition to distributions of cash, certain creditors are receiving interests in the Liquidating Trust.  (D 255 at §§ 6.1, 7.1, 16.1, 18.1, 19.1, 20.1, 21.1 & 32.1(b).)  The Debtors are transferring to the Liquidating Trust all of their interests in any causes of action the estates have, including potential suits

---

[28]    Maxwell testified that there would be interest in investing in WMMRC because of the current opportunities in the home insurance industry; he cited as an example that Goldman partners had recently raised $600 million to start a new reinsurance business.  (Tr. 7/15/2011 at 38, 67, 122.)

against the Debtors' directors and officers.  (<u>Id.</u> at §§ 28.3 & 43.5.)

The LTW Holders contend, however, that this major component of value that is being distributed to the creditors has been ignored by the Debtors and must be valued in order for the Court to determine whether the Modified Plan meets the best interests of creditors test under section 1129(a)(7).

The Plan Supporters contend that it is not necessary to value the Liquidating Trust Interests because under the Modified Plan's waterfall provisions, once creditors have received payment in full of their claims, with interest, their Liquidating Trust Interests will be canceled and all further recoveries realized by the Liquidating Trust will flow to the preferred shareholders. (<u>Id.</u> at §§ 6.3, 7.3, 16.3, 18.3, 19.3, 20.3, 22.1, 22.2, 23.1 & 24.1; Tr. 7/13/2011 at 98.)

The Court agrees with the Plan Supporters that it is not necessary to determine the precise value of the Liquidating Trust assets because whatever they are worth will be distributed to creditors and then to shareholders in accordance with the priorities of the Code.[29]

---

[29]  The Court therefore finds it unnecessary to determine what if any value the suits against the Debtors' directors and officers have.  (D.I. 8312 at Ex. A pp. 2-4; Tr. 7/21/2011 at 204-05.)

D.   <u>Good Faith</u>

Several Plan Objectors, led by the Equity Committee, complain that the Plan cannot be confirmed because it has not been proposed in good faith as a result of the improper conduct of the Settlement Noteholders.  They argue that any prior finding of good faith in the January 7 Opinion should be reconsidered by the Court, based on the newly discovered evidence of the Debtors' and Settlement Noteholders' misconduct.  Fed. R. Bankr. P. 9024(b).

     1.   <u>Conduct of the Settlement Noteholders</u>

The conduct of the Settlement Noteholders was first raised by a pro se PIERS holder, Mr. Thoma, at the confirmation hearings held in December, 2010.  Although Mr. Thoma sought to introduce what he described as evidence of improper trades by the Settlement Noteholders, the Court refused that request as it was hearsay.  In its January 7 Opinion denying confirmation, however, the Court stated that it was "reluctant to approve any releases of the Settlement Noteholders" as required by the GSA and Sixth Amended Plan in light of Mr. Thoma's allegations of insider trading by the Settlement Noteholders.  <u>Wash. Mut.</u>, 442 B.R. at 349.  Following denial of confirmation, both the Settlement Noteholders and the Equity Committee engaged in discovery, which the Court limited to what information the Settlement Noteholders

received from the Debtors.[30]  Evidence regarding the conduct of
the Settlement Noteholders during the bankruptcy case was
presented over the course of four days during the hearings on
confirmation of the Modified Plan.  That testimony revealed the
following.

The Debtors and JPMC began negotiating a resolution of their
disputes about ownership of various assets in March 2009.  (Tr.
7/18/2011 at 55; Tr. 7/21/2011 at 101.)  Those negotiations
continued off and on until the announcement that the parties had
reached an agreement in principal on March 4, 2010, and the terms
were read into the record on March 12, 2010.  (Tr. 7/19/2011 at
144; Tr. 7/20/2011 at 74-75.)  The settlement negotiations
included the exchange of term sheets between the Debtors and JPMC
reflecting the parties' relative stances on settlement of issues
related to the ownership of disputed assets.  (Tr. 7/18/2011 at
67-68; Tr. 7/19/2011 at 130-35.)  Counsel for the Settlement
Noteholders, Fried Frank, participated in many of these
negotiations, though they were precluded from sharing information
with the Settlement Noteholders unless the latter were under
confidentiality agreements.  (Tr. 7/18/2011 at 57-59, 116, 119;
Tr. 7/19/2011 at 144; Tr. 7/20/2011 at 75; Tr. 7/21/2011 at 136.)

---

[30]  The Court did not permit discovery of any analyses that
the Settlement Noteholders did in determining whether to trade in
the Debtors' securities.  The Settlement Noteholders asserted
that analysis was privileged and not relevant.

At times during that period, the Settlement Noteholders also participated directly in the negotiations.  (Tr. 7/18/2011 at 55; Tr. 7/21/2011 at 101.)  As a condition to their participation, the Settlement Noteholders entered into confidentiality agreements with the Debtors.  (Tr. 7/20/2011 at 198.)  During the two formal confidentiality periods, the Settlement Noteholders were required to restrict trading of the Debtors' securities or to establish an ethical wall (precluding any confidential information from being used by their traders).  (Id.)

The First Confidentiality Period ran from March 9 to May 8, 2009.  (EC 24.)  Only Aurelius established an ethical wall during the First Confidentiality Period; the others restricted their trading.  (Tr. 7/18/2011 at 55.)  Immediately after the First Confidentiality Period, the Settlement Noteholders shared all confidential information they had received from the Debtors with their traders and actively traded in the Debtors' securities. (AOC 18; AOC 54; AOC 62; Au 8.)  That information included the amount of a tax refund the Debtors estimated they would receive (in excess of $2 billion), which information the Debtors also made public.  (D.I. 970; D 427; Tr. 7/18/2011 at 65, 79, 144; Tr. 7/20/2011 at 232-33.)  The Debtors did not, however, make public any of the settlement term sheets or even the fact that settlement negotiations were occurring.

After the conclusion of the First Confidentiality Period, two of the Settlement Noteholders (Appaloosa and Centerbridge) independently approached JPMC in July and August 2009 in an effort to further negotiations. (Tr. 7/20/2011 at 54-55.) Term sheets were exchanged. (EC 14; EC 115; Tr. 7/20/2011 at 57-58, 243; Tr. 7/21/2011 at 32-33.) Appaloosa restricted its trading during these negotiations, while Centerbridge restricted trading only upon receipt of a counter-proposal from JPMC on August 18, 2009. (Tr. 7/20/2011 at 58-59, 130, 244-45.) JPMC withdrew its counter-proposal in early September 2009. (Id. at 58-59, 244-45.)

Negotiations did not resume again until the Second Confidentiality Period, which ran from November 16 to December 31, 2009 (the "Second Confidentiality Period"). (EC 37; EC 117; EC 148; Tr. 7/18/2011 at 105; Tr. 7/19/2011 at 139-40; Tr. 7/21/2011 at 128-29.) During the Second Confidentiality Period, all the Settlement Noteholders restricted trading. (Tr. 7/18/2011 at 104-05; Tr. 7/19/2011 at 140; Tr. 7/20/2011 at 71-72, 246.) Near the end of the Second Confidentiality Period, Aurelius asked the Debtors to terminate the confidentiality period a day early. (Tr. 7/18/2011 at 111.) The Debtors agreed and again released to the public the Debtors' estimate of an additional tax refund (in excess of $2 billion) which the Debtors anticipated receiving because of a recent change in the tax laws.

(D.I. 2077; D 428; Tr. 7/18/2011 at 105; Tr. 7/19/2011 at 141; Tr. 7/21/2011 at 127-28.)  Once again, immediately after the Second Confidentiality Period, the Settlement Noteholders actively traded in the Debtors' securities using information they had received from the Debtors, including the status of settlement negotiations.  (AOC 18; AOC 54; AOC 62; Au 8.)

Following the Second Confidentiality Period, the Settlement Noteholders' involvement in negotiations was limited to a meeting with the Debtors in January and a meeting with the Debtors, JPMC, the FDIC, and the WMB Noteholders in February 2010 to discuss a proposed plan of reorganization, how the Debtors' assets would be distributed under a plan (the "Waterfall"), and updates on litigation.  (Tr. 7/19/2011 at 62-63, 70; Tr. 7/21/2011 at 130.) One of the Settlement Noteholders, Appaloosa, also participated in a meeting with the Debtors and JPMC on March 1 and thereafter restricted its trading until the terms of the GSA were announced on March 12, 2010.  (Tr. 7/20/2011 at 76-77, 96.)  After the announcement of the GSA, the Debtors sent the Settlement Noteholders advance drafts of the plan of reorganization, disclosure statement, and Waterfall analyses.  (EC 42; EC 34; Tr. 7/20/2011 at 77, 220, 262.)  Upon receipt of those drafts, the Settlement Noteholders restricted trading until the documents were publicly filed.  (AOC 18; Tr. 7/19/2011 at 77-78; Tr. 7/20/2011 at 77, 262.)

2.    <u>Application of section 1129(a)(3)</u>

The Bankruptcy Code requires that, to be confirmed, a plan
of reorganization must be "proposed in good faith and not by any
means forbidden by law."  11 U.S.C. § 1129(a)(3).  To meet this
standard, the Third Circuit has stated that a plan must "fairly
achieve a result consistent with the objectives and purposes of
the Bankruptcy Code."  <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 242
(3d Cir. 2000).  <u>See also</u> <u>In re Abbotts Dairies of Pa., Inc.</u>, 788
F.2d 143, 150 n.5 (3d Cir. 1986); <u>In re Madison Hotel Assocs.</u>,
749 F.2d 410, 424-25 (7th Cir. 1984).  To meet this standard, the
plan proponent must establish that "(1) [the plan] fosters a
result consistent with the Code's objectives . . . , (2) the plan
has been proposed with honesty and good intentions and with a
basis for expecting that reorganization can be effected . . . ,
and (3) there was fundamental fairness in dealing with the
creditors."  <u>In re Genesis Health Ventures, Inc.</u>, 266 B.R. 591,
609 (Bankr. D. Del. 2001).  <u>Accord</u> <u>In re Frascella Enters., Inc.</u>,
360 B.R. 435, 446 (Bankr. E.D. Pa. 2007).

The Settlement Noteholders, and the Debtors contend that the
conduct of the Settlement Noteholders was in accordance with the
terms of the parties' written confidentiality agreements and did
not violate any law or duty that the Settlement Noteholders might
have had.  They contend that the Modified Plan is proposed in
good faith and confirmable under section 1129(a)(3).

69

The Equity Committee objects to confirmation of the Modified
Plan[31] asserting that it has not been proposed in good faith
because the Settlement Noteholders "dominated" or "hijacked" the
settlement negotiations and engaged in inequitable conduct,
including trading in the Debtors' securities while in possession
of material nonpublic information.  The Plan Objectors
specifically contend that the Settlement Noteholders used
material nonpublic information to acquire a blocking position in
the various creditor classes to get a seat at the negotiating
table and assure that their claims got paid while nothing was
given to the shareholders.  See, e.g., In re ACandS, Inc., 311
B.R. 36, 43 (Bankr. D. Del. 2004) (finding a lack of good faith
where pre-petition creditors committee dominated the debtor's
affairs resulting in "obvious self-dealing"); In re Coram
Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001)
(denying confirmation for lack of good faith where debtor's CEO
had an undisclosed million dollar consulting agreement with a
creditor); In re Unichem Corp., 72 B.R. 95, 100 (Bankr. N.D. Ill.
1987) (finding lack of good faith where plan proponent breached

---

[31]   The Equity Committee has also filed a motion seeking
authority to prosecute an action against the Settlement
Noteholders for equitable disallowance of their claims.  Although
the Motion only sought disallowance of the claims of Aurelius and
Centerbridge, the Equity Committee's objection to confirmation
asserts that equitable disallowance of the claims of all the
Settlement Noteholders is warranted.  At oral argument, the
Equity Committee clarified that it seeks authority to bring such
a claim against all four Settlement Noteholders.

fiduciary duties to debtor because "Congress did not intend the objectives and purposes of the Bankruptcy Code to include rewarding an individual for breaching his fiduciary duty").

Based on the record developed, the Court finds that the conduct of the Settlement Noteholders does not mean that the Plan was proposed in bad faith.  Despite the allegations of insider trading by the Settlement Noteholders, the Court is unconvinced that their actions had a negative impact on the Plan or tainted the GSA.

Rather, the actions of the Settlement Noteholders appear to have helped increase the Debtors' estates.  During the First Confidentiality Period, the Settlement Noteholders, together with other creditors, persuaded the Debtors to submit a term sheet to JPMC that was more "aggressive" than the one the Debtors had initially contemplated.  (Tr. 7/20/2011 at 50.)  In addition, during the July negotiations that Appaloosa and Centerbridge had alone with JPMC, they persuaded JPMC to submit a counter-proposal that increased the share of the tax refunds that JPMC was willing to allocate to the Debtors.  (EC 115; Tr. 7/20/2011 at 243.)

The cases cited by the Plan Objectors are distinguishable from the present facts.  Both Coram and Unichem involved inequitable conduct of an executive of the debtor that lead to the conclusion that the debtor's plan was offered in bad faith. Coram, 271 B.R. at 234-35; Unichem, 72 B.R. at 99-100.

71

While ACandS is closer, the Court finds it distinguishable
in important respects.  In that case, the Court found that the
pre-petition creditors' committee gained control of the debtor to
the point where the committee alone made all the important
decisions, including taking over the process of reviewing and
settling all asbestos claims.  311 B.R. at 40.[32]  In addition, the
plan and settlement drafted by the committee and proposed by the
debtor placed creditors in different classes for no discernible
reason, other than the fact that creditors represented by the law
firms on the committee were treated as secured creditors entitled
to payment in full while other creditors (with the same illness
and manifestations) were treated as unsecured creditors entitled
to little or nothing.  Id. at 43.

While the evidence in this case shows that the Settlement
Noteholders participated in the settlement negotiations and plan
drafting and review, the Court finds that it falls short of the
almost total control exercised by the committee in ACandS.  The
Settlement Noteholders were only one of several groups of
creditors involved in this case, including the WMI Noteholders
and the WMB Noteholders.  Nor does the Modified Plan have the

---

[32]  The Court in ACandS was particularly concerned to learn
that while counsel for the debtor was purportedly reviewing and
settling claims, in fact that task was subcontracted to a company
whose sole principal was a paralegal from the law firm that
served as chair of the pre-petition creditors' committee.  311
B.R. at 40.  The settlement of claims by that firm appeared to
favor creditors represented by the members of the committee.  Id.

fatal flaw of improper classification and treatment of claims
that the ACandS plan had.  In this case, the creditor classes are
treated in accordance with the priorities of the Bankruptcy Code
and their contractual subordination rights.  If the Settlement
Noteholders had improperly dominated the case as in ACandS, the
Modified Plan would have elevated the treatment of the PIERS
class (in which they hold the bulk of their claims); instead the
PIERS are receiving the treatment warranted by their subordinated
status.

While the Court is not suggesting that the Settlement
Noteholders be commended for their actions, the record shows
their actions do not support a conclusion that the Modified Plan
cannot be confirmed because it has been proposed in bad faith.
The harm caused by the Settlement Noteholders has or can be
remedied by other means.[33]  See infra Part H.

E.   Best Interests of Creditors

The Plan Objectors continue to press their arguments that
the Modified Plan violates the best interests of creditors test
articulated in section 1129(a)(7).  That section requires that a
plan of reorganization provide non-consenting impaired creditors

---

[33] The Court in its January 7 Opinion held that the
Settlement Noteholders were not entitled to releases.  442 B.R.
at 349.  In addition, the Court held that the Settlement
Noteholders' almost exclusive right to participate in the rights
offering discriminated against other creditors in the same class.
Id. at 361.  The rights offering has subsequently been removed.
(Tr. 2/18/2011 at 80-81.)

(and shareholders) with at least as much as they would receive if the debtor was liquidating in chapter 7.  11 U.S.C. § 1129(a)(7). See, e.g., In re U.S. Wireless Data, Inc., 547 F.3d 484, 495 (2d Cir. 2008).  The Plan Objectors raise many reasons why the Modified Plan does not comply with that section.

    1.   Contract v. federal judgment rate

      a.   Plan Objectors

The Plan Objectors contend that the Modified Plan fails to comply with the best interests of creditors test because it provides for the payment of post-petition interest on creditors' claims at their contract rate of interest rather than at the federal judgment rate.  This results, they argue, in the creditors receiving more (and the shareholders accordingly receiving less) than they would under a chapter 7 liquidation.[34]

The general rule is that unsecured creditors are not entitled to recover post-petition interest.  United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372-73 (1988) (holding that only over-secured creditors are entitled to receive post-petition interest under section 506(b)).  There is

---

[34] This could also conflict with the requirements of the fair and equitable test under section 1129(b).  Although that section embodies the absolute priority rule, which forbids junior classes of creditors or equity from receiving any distribution until senior creditors are paid in full, it also mandates that senior creditors not receive more than 100% of their claim before junior classes receive a distribution.  See, e.g., Exide Techs., 303 B.R. at 61 (Bankr. D. Del. 2003).

an exception to the general rule, however, when the debtor is solvent.  See Onink v. Cardelucci (In re Cardelucci), 285 F.3d 1231, 1234 (9th Cir. 2002) (finding that when a debtor is solvent, unsecured creditors are entitled to post-petition interest at the "legal rate").  This is so because under a chapter 7 liquidation, where the debtor is solvent, unsecured creditors are entitled to post-petition interest on their claims before shareholders receive any distribution.  11 U.S.C. § 726(a)(5) & (6) (stating that in a chapter 7 case unsecured creditors are entitled to interest at the legal rate from the date of the filing of the petition before any payment can be made to the debtor or equity).  See, e.g., Kitrosser v. The CIT Grp./Factoring, Inc., 177 B.R. 458, 469 (S.D.N.Y. 1995) ("Although the requirements of Chapter 7 are in general not applicable to Chapter 11 proceedings . . . Section 726 does apply through the requirements of Section 1129."); In re Premier Entm't Biloxi LLC, 445 B.R. 582, 644 (Bankr. S.D. Miss. 2010) ("Section 726 applies indirectly to chapter 11 cases by virtue of the 'best interests of creditors' test in § 1129, under which distributions proposed under a plan of reorganization under chapter 11 must at least equal the amount that would have been paid in a liquidation under chapter 7.").

The Plan Objectors contend that the majority of courts to address this issue conclude that "the legal rate" due under

75

section 726(a)(5) is the federal judgment rate.  See, e.g.,
Cardelucci, 285 F.3d at 1234 (concluding that federal judgment
rate, rather than state judgment rate or contract rate, was due
on unsecured claims under section 726(a)(5) for purposes of best
interests of creditors test); In re Garriock, 373 B.R. 814, 816
(E.D. Va. 2007) ("Having reviewed each line of cases, the Court
is persuaded that 'the legal rate' refers to the federal judgment
rate, and does not encompass . . . any lawful pre-petition
contract rate.");  In re Adelphia Commc'ns Corp., 368 B.R. 140,
257 (Bankr. S.D.N.Y. 2007) (concluding that "[i]t is by far the
better view, in my opinion, that 'legal rate' is the federal
judgment rate and not the same as that authorized under section
506(b), which is the contract rate."); In re Best, 365 B.R. 725,
727 (Bankr. W.D. Ky. 2007) ("The more recent cases hold that the
federal judgment rate is the proper rate of interest under 11
U.S.C. § 726(a)(5)"); In re Dow Corning Corp., 237 B.R. 380, 412
(Bankr. E.D. Mich. 1999) (determining that the phrase "interest
at the legal rate" means the federal judgment rate); In re
Chiapetta, 159 B.R. 152, 161 (Bankr. E.D. Pa. 1993) ("[W]e
further conclude that, since a claim is like a judgment entered
at the time of the bankruptcy filing, the applicable rate should
be the federal judgment rate . . . ."); In re Melenyzer, 143
B.R. 829, 832-33 (Bankr. W.D. Tex. 1992) (concluding that the
appropriate rate of interest payable to unsecured creditors

76

pursuant to section 726(a)(5) is the federal judgment rate).

The Plan Supporters argue, however, that the Court has already decided this issue in the January 7 Opinion and concluded that the contract rate was the presumed rate under section 726(a)(5) unless the equities of the case mandate otherwise. They contend that ruling is the law of the case and cannot be reargued.

The Court disagrees with the Plan Supporters on this point. In the January 7 Opinion, the Court did not conclude that the contract rate was the presumed rate, it merely cited a line of cases that so hold.  442 B.R. at 358.  At the same time, however, the Court noted that there is a line of cases that hold that the federal judgment rate is the appropriate rate under section 726(a)(5).  <u>Id.</u> at 357-58.  The Court also noted that it had previously "concluded that <u>the federal judgment rate was the minimum that must be paid</u> to unsecured creditors in a solvent debtor case under a plan to meet the best interest of creditors' test, but that the Court had discretion to alter it."  <u>Id.</u> at 358 (emphasis added) (citing <u>Coram</u>, 315 B.R. at 346).  The Court, however, did not decide the question in this case, because the Court believed it needed to consider the equities of the case.

Now that all issues have been presented to the Court, the Court concludes that the better view is that the federal judgment rate is the appropriate rate to be applied under section

726(a)(5), rather than the contract rate.[35]  The Court's

conclusion is supported by many factors.

First, section 726(a)(5) states that interest on unsecured

claims shall be paid at "the legal rate" as opposed to "a" legal

rate or the contract rate.  As the LTW Holders note, where

Congress intended that the contract rate of interest apply, it so

stated.  See 11 U.S.C. § 506(b) (stating that if a secured

creditor is over-secured, the creditor shall be entitled to

"interest on such claim . . . provided for under the agreement or

State statute under which such claim arose.") (emphasis added).

See also Adelphia Commc'ns, 368 B.R. at 257; Dow, 237 B.R. at

405-06 (holding that use of term "legal" as opposed to "contract"

rate mandated conclusion that Congress meant "a rate fixed by

statute").

Second, the payment of post-judgment interest is procedural

by nature and dictated by federal law rather than state law,

further supporting use of the federal judgment rate.  Cardelucci,

285 F.3d at 1235 (citing Hanna v. Plumer, 380 U.S. 460, 473-74

(1965)).

Third, the use of the federal judgment rate promotes two

important bankruptcy goals: "fairness among creditors and

---

[35]  To the extent I suggested in Coram that the federal
judgment rate was not required by section 726(a)(5), I was wrong.
315 B.R. at 346 (applying federal judgment rate nonetheless
because of the equities of the case).

administrative efficiency."  <u>Cardelucci</u>, 285 F.3d at 1236.  <u>See</u> <u>also</u> <u>Best</u>, 365 B.R. at 727 (federal judgment rate provides "an efficient and inexpensive means of calculating the amount of interest to be paid to each creditor"); <u>Dow</u>, 237 B.R. at 407 (providing a uniform rate "keeps the bankruptcy estate from being saddled with potentially difficult and time-consuming administrative burdens" of determining what rate is applicable to each creditor's claim); <u>Melenyzer</u>, 143 B.R. at 833 (federal judgment rate provides court with an "easily ascertainable, nationally uniform rate" and increases predictability in the process).

The Court finds that the line of cases holding there is a presumption the contract rate applies are distinguishable and/or unpersuasive.  <u>See, e.g.</u>, <u>Dow</u>, 456 F.3d at 676-79 (remanding to bankruptcy court to determine if equities of case permitted allowance of default interest to creditors rather than the contract rate); <u>In re Southland Corp.</u>, 160 F.3d 1054, 1059-60 (5th Cir. 1998) (determining rate of interest for an over-secured creditor); <u>In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.</u>, 791 F.2d 524, 529-30 (7th Cir. 1986) (in case under railroad reorganization chapter of Bankruptcy Act, court held that creditors were entitled only to contract default rate, not higher market rate, without discussing federal judgment rate).

The Indenture Trustee for the PIERS urges the Court not to be swayed by arguments that equity will receive a recovery if the federal judgment rate is used rather than the contract rate, because that is not a factor which courts should consider. _See, e.g._, _Urban Communicators PCS LP v. Gabriel Capital, L.P._, 394 B.R. 325, 340 (S.D.N.Y. 2008) (holding that "it is not inequitable to cut down the interest of Debtors' shareholders by interest payments at a default rate to which the Debtors contractually agreed"); _In re Int'l Hydro-Elec. Sys._, 101 F. Supp. 222, 224 (D. Mass. 1951) (holding that "[t]he burden of . . . payment [of post-petition interest on interest] will fall entirely on the interest of the stockholders . . . [who] cannot complain that they are treated inequitably when their interest is cut down by the payment of a sum to which the debenture holders are clearly entitled by the express provisions of the trust indenture.").

The cases cited by the Indenture Trustee are not on point. The _Urban Communicators_ Court was considering what was due to an over-secured creditor under section 506(b) rather than what post-petition interest is due to unsecured creditors under section 726(a)(5). 394 B.R. at 333-34. The _Int'l Hydro-Elec._ Court was dealing with the rearrangement of a public utility company under title 15, not a reorganization under title 11. 101 F. Supp. at 223. Nonetheless, the Court agrees that the effect on equity is

not an appropriate factor to be considered, and the Court will not consider that.  In applying the plain language of the statute, however, the Court concludes that the federal judgment rate is the proper measure for post-petition interest due to the unsecured creditors.

Even if a consideration of the equities was appropriate, after considering the evidence in this case, the Court does not find that the equities support the use of anything other than the federal judgment rate.  Cf. Cardelucci, 285 F.3d at 1236 (rejecting argument that in cases where all creditors could get paid contract rate of interest, debtor would be getting a windfall if creditors' interest claims are limited by the federal judgment rate because "'interest at the legal rate' is a statutory term with a definitive meaning that cannot shift depending on the interests invoked by the specific factual circumstances before the court.").

The Plan Supporters argue, however, that payment of the various contract rates of interest as provided in the Modified Plan is warranted because the distribution scheme is simply a function of the subordination provisions in the various creditors' contracts (the Senior Subordinated Indenture, the CCB-1 Guarantee Agreements, the CCB-2 Guarantee Agreements, the Junior Subordinated Notes Indenture, and the PIERS Guarantee Agreement) which they say mandate that the subordinated creditors

81

pay the senior creditors their claims in full, including contract interest.  (See WMI NG 1-7.)

The TPS Consortium disputes this contention.  It argues that the Debtors are only obligated to pay to each creditor class their allowed claims and interest at the rate required by the Code.  To the extent that the creditors have agreements among themselves - for one class to pay over its distribution to another class - it does not impact the obligations of the Debtors.  See, e.g., Bank of Am. N.A. v. N. LaSalle St. Ltd. P'ship (In re 203 N. LaSalle St. P'ship), 246 B.R. 325, 330 (Bankr. N.D. Ill. 2000) (holding that senior creditor could assert its unsecured deficiency claim against subordinated creditor even though it was a non-recourse obligation and could not be collected from the debtor); First Fidelity Bank, N.A. v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.), 134 B.R. 528, 532 (Bankr. S.D.N.Y. 1991) (concluding that because creditors were under-secured, senior creditors were entitled to interest only from the distributions due to subordinated creditors); In re Smith, 77 B.R. 624, 627 (Bankr. N.D. Ohio 1987) (holding that subordination agreements between creditors "may not impair the rights of the other creditors" and that "the amount of claims against the Debtor, and the distribution to uninvolved creditors, remain unaffected").  See also Patrick Darby, Southeast and New England Mean New York: The Rule of Explicitness

82

<u>and Post-Bankruptcy Interest on Senior Unsecured Indebtedness</u>, 38
Cum. L. Rev. 467, 477 (where interest claim is not allowed under
Bankruptcy Code, the senior creditor must seek to collect that
interest from subordinated creditors).

The Court agrees with the TPS Consortium's argument.  The
fact that some of the creditors have contractually agreed to pay
their distribution to other creditors does not mean that the
Debtors are required to make payments to the senior creditors
that are more than the Bankruptcy Code allows, while preserving
the subordinated creditors' claims against the estate.  While the
Debtors can, through a plan of reorganization, effectuate the
subordination agreements by diverting payments from subordinated
creditors to senior creditors, that cannot affect the total
claims against the estate, which do not include post-petition
interest on any unsecured claim at more than the federal judgment
rate.  <u>See, e.g.</u>, <u>First Fidelity</u>, 134 B.R. at 532; <u>Smith</u>, 77 B.R.
at 627.

b.   <u>WMI Senior Noteholders' Group</u>

The WMI Senior Noteholders' Group argues that the best
interest of creditors test mandates that the Court award them the
<u>higher</u> of the federal judgment rate and the contract rate on
their floating interest rate bonds.  During certain periods
throughout the case, the contract rate on the floating interest
bonds was actually less than the federal judgment rate.

83

Consequently, the WMI Senior Noteholders' Group argues that if they are awarded only their contract rate of interest, it would lead to the absurd result of junior creditors getting paid post-petition interest at a higher rate than senior creditors.

This argument is moot because the Court is not awarding anyone post-petition interest at the contract rate. The WMI Senior Noteholders are entitled under section 726(a)(5) only to the federal judgment rate of interest from the Debtors, the same as all other unsecured creditors. To the extent that this results in them getting more or less than their contract rate of interest, it may be a matter between them and the other creditors who are parties to a subordination agreement, but it is irrelevant to the Debtors' obligations under the Bankruptcy Code.

c. <u>General unsecured creditors</u>

The Creditors' Committee argues that application of the federal judgment rate is inequitable in this case because the only class that is adversely affected by doing so is the class of general unsecured creditors. It cites the Debtors' updated liquidation analysis which shows that, after application of the subordination provisions, the general unsecured creditors are the only ones who will receive less by application of the federal judgment rate than by application of the contract rate. (D 375; Tr. 7/14/2011 at 61-62, 82, 170.)

This is, of course, true in total dollars because none of
the general unsecured creditors will be getting a contract rate
of interest.  (D 375.)  However, they will be getting a higher
percentage of the post-petition interest to which they are
entitled under the federal judgment rate (76%) than under the
contract rate (29%), because of the limitation on payment of
interest to senior creditors.  (Id.)  Further, it is irrelevant
that general unsecured creditors would get more in dollars if the
Court were to award contract rates of interest, because they are
simply not entitled to receive that rate under sections 726(a)(5)
and 1129(a)(7).

The Creditors' Committee also contends that further delay
will be caused by the Court denying confirmation of the Modified
Plan because of the need to make further revisions and perhaps
re-solicit, which will further erode recoveries for the lower
creditor classes.  (D 254, D 375; Tr. 7/14/2011 at 43-44, 71-72.)

This of course does not justify ignoring the requirements of
the Bankruptcy Code.  As the LTW Holders note, further delay
might have been avoided by the Debtors if the Modified Plan had
simply provided that post-petition interest would be paid to
unsecured creditors at whatever rate the Court determined was
appropriate.

> 2.  <u>Date of computation of federal judgment rate</u>

The Plan Objectors contend that if the federal judgment rate

of interest is paid on creditors' claims, it should not be the
rate as of the petition date.  They propose calculating it as of
different dates largely because shortly after this case was
filed, the federal judgment rate fell precipitously from 1.95% to
as low as .18% as of June 16, 2011.  (EC 301.)

The Equity Committee argues that the post-petition interest
rate should be either the rate as of the Effective Date of any
confirmed plan or a floating monthly rate.  The Equity Committee
argues that this is appropriate because the purpose of post-
petition interest is to compensate the creditors for the time
value of their money and should reflect the different rates
applicable during the pendency of the case.  See, e.g.,
Melenyzer, 143 B.R. at 833.

The Court rejects this argument, however, because similar
arguments have been made to justify using market or contract
rates but were rejected.  Id. at 832-33.

The TPS Consortium argues that the confirmation date is the
appropriate date to use because the federal judgment rate is
derived from section 1961(a) of title 28 which states that
interest shall be paid "from the date of the entry of the
judgment."  The TPS Consortium argues that none of the claims at
issue derive from any judgment and that the most analogous order
to a judgment is the confirmation order because it establishes
the parties' rights.  See, e.g., In re Am. Preferred

Prescription, Inc., 255 F.3d 87, 92 (2d Cir. 2001) ("The
confirmation of a plan in a Chapter 11 proceeding is an event
comparable to the entry of a final judgment in an ordinary civil
litigation."); Johnson v. Stemple (In re Stemple), 361 B.R. 778,
796 (Bankr. E.D. Va. 2007) (holding that "orders of confirmation,
like myriad orders entered by this Court, are considered final
judgments, thus triggering the doctrines of res judicata and/or
collateral estoppel.").

The Plan Supporters disagree arguing that, in the event the
Court finds that the federal judgment rate is the appropriate
rate to be paid for post-petition interest, it should be the rate
that was applicable as of the petition date, because it is from
that date that the creditors are measuring the loss of the use of
their money.  See, e.g., In re Evans, Bankr. No. 10-80446C, 2010
WL 2976165, at *2 (Bankr. M.D.N.C. July 28, 2010) (holding that
the "date on which the applicable federal judgment rate is to be
determined for purposes of section 726(a)(5) is the federal
judgment rate in effect on the petition date"); In re Gulfport
Pilots Ass'n, Inc., 434 B.R. 380, 392-93 (Bankr. S.D. Miss. 2010)
(stating that if the debtor were solvent, creditor would be
entitled to post-petition interest at the federal judgment rate
in effect on the petition date); Best, 365 B.R. at 727 (holding
that the legal rate "mean[s] the federal judgment interest rate
at the date the petition is filed"); Chiapetta, 159 B.R. at 161

(holding that "since a claim is like a judgment entered at the time of the bankruptcy filing, the applicable rate should be the federal judgment rate in effect at the time of the bankruptcy filing"); <u>Melenyzer</u>, 143 B.R. at 833 (holding that "for purposes of [section] 726(a)(5), the federal judgment rate selected should be that in effect as of the date of filing, as opposed to the date of distribution. . . . Setting the legal rate of interest as of the date of distribution . . . makes little sense.").

The Court agrees with the Plan Supporters on this point. The statute expressly provides that such interest shall be paid "at the legal rate from the date of the filing of the petition" suggesting that it is the interest rate effective on the petition date that should be used.  11 U.S.C. § 726(a)(5).  The case law is uniform in holding that it is the petition date at which the federal judgment rate is determined for purposes of awarding interest under section 726(a)(5).  <u>See, e.g.</u>, <u>Evans</u>, 2010 WL 2976165, at *2; <u>Gulfport Pilots Ass'n</u>, 434 B.R. at 393; <u>Best</u>, 365 B.R. at 727; <u>Chiapetta</u>, 159 B.R. at 161; <u>Melenyzer</u>, 143 B.R. at 833.

### 3.  <u>Compounding of interest</u>

The Modified Plan provides that "interest shall continue to accrue only on the then outstanding and unpaid obligation or liability, including any Post-petition Interest Claim thereon, that is the subject of an Allowed Claim."  (D 255 at § 1.151.)

88

The Equity Committee contends that this compounding of interest is not permissible.  See, e.g., Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 165-66 (1946) (holding that interest on interest is not allowable on equitable principles); Chi., Milwaukee, St. Paul & Pac. R.R., 791 F.2d at 532 (denying compounding of interest because it would result in a windfall for the debenture holders); In re Anderson, 69 B.R. 105, 109 (B.A.P. 9th Cir. 1986) (affirming bankruptcy court's denial of interest on interest); In re The N.Y., New Haven and Hartford R.R. Co., 4 B.R. 758, 799 (D. Conn. 1980) (denying interest on interest under the principles articulated in Vanston).

The Debtors respond that compound interest is being paid because that is exactly what the Debtors are obligated to pay under the indentures.  (See, e.g., WMI NG 1 at § 5.3.)

The Court rejects the Debtors' argument.  Once again, in awarding post-petition interest to creditors in this case, the Court is doing so not because of any contractual right they may have to it.  Their contractual right to compound interest has been eliminated (as not "allowed") by section 502(b)(2).  Their entitlement to post-petition interest is being granted only as required by the terms of section 726(a)(5), which the Court determines is the federal judgment rate.  The latter permits only annual compounding of interest.  28 U.S.C. § 1961(b) (providing that "[i]nterest shall be computed daily to the date of payment .

89

. . and shall be compounded annually."). <u>See also</u> <u>Curry v. Am.</u>
<u>Int'l Grp., Inc., Plan No. 502</u>, 579 F. Supp. 2d 424, 426 (noting
that the federal judgment rate is "compounded annually").

Because the Court concludes that creditors are only entitled
to the payment of interest from the Debtors at the federal
judgment interest rate in effect on the petition date, compounded
annually, the Court finds that the Modified Plan which provides
for payment of the contract rate violates the best interests of
creditors test.  11 U.S.C. §§ 726(a)(5) & 1129(a)(7).

        4.   <u>Payment of subordinated claims</u>

The WMB Noteholders object to the Modified Plan because it
provides that senior unsecured creditors will receive post-
petition interest on their claims before the WMB Noteholders'
subordinated claims are paid.  They contend that this violates
the best interests of creditors test because they will not
receive at least as much as they would receive under chapter 7
according to the provisions of section 726.

The WMB Noteholders have stipulated that their claims are
subordinated to general unsecured claims because they hold claims
arising from rescission of a purchase or sale of a security of
WMB, an affiliate of the Debtors.  11 U.S.C. § 510(b).  Although
the distribution scheme in section 726 expressly provides that it
is subject to section 510, the WMB Noteholders contend that
section 510(b) only subordinates them to "all claims or interests

that are senior to or equal the claim or interest represented by
such security." Id.  They argue that because their securities
were bonds issued by WMB, i.e. debt, that their claims are only
subordinated to the general unsecured claims of the Debtors and
not to equity.  Although case law is sparse on this issue, they
contend that it supports their theory.  See, e.g., In re El Paso
Refinery, L.P., 244 B.R. 613, 624-25 (Bankr. W.D. Tex. 2000)
(holding that a subordinated claim is subordinated only to other
general unsecured claims of the same type but not to interest
unless the subordinated claim is itself a claim for interest).

The Indenture Trustee for the PIERS responds that the
Modified Plan properly provides for post-petition interest on
unsecured claims before any distribution is due to subordinated
creditors such as the WMB Noteholders.  The Indenture Trustee for
the PIERS notes that section 726 is expressly subject to section
510.  11 U.S.C. § 726(a).  See also, In re Virtual Network,
Servs. Corp., 902 F.2d 1246, 1249 (7th Cir. 1990); Wash. Mut.,
442 B.R. at 357; In re Rago, 149 B.R. 882, 889 (Bankr. N.D. Ill.
1992).

At oral argument, the Indenture Trustee for the PIERS argued
that section 510(b) subordinates the WMB Noteholders' claims to
all "claims."  11 U.S.C. § 510(b).  (Tr. 8/24/2011 at 185-87.)
The definition of "claim" includes all "right to payment, whether
or not such right is reduced to judgment, liquidated,

91

unliquidated, fixed, contingent, matured, <u>unmatured</u>, disputed, undisputed, legal, equitable, secured, or unsecured." <u>Id.</u> at § 101(5) (emphasis added). The Indenture Trustee for the PIERS contends that this definition includes unmatured (i.e., post-petition) interest. Although section 502(b)(2) provides that "allowed" claims do not include unmatured interest, the subordination in section 510(b) is to "claims" not "allowed claims." <u>Id.</u> at § 510(b). In contrast, section 510(c) provides for equitable subordination to "allowed claims" only. <u>Id.</u> at § 510(c)(1).

The Court agrees with the argument of the Indenture Trustee for the PIERS. According to the plain language of sections 510 and 726, the WMB Noteholders are subordinated to all "claims," the definition of which includes unmatured interest on those claims. Therefore, the Court concludes that unsecured creditors are entitled to post-petition interest on their claims before any distribution to the WMB Noteholders.

     5.   <u>Effect on subordination rights</u>

The PIERS Holders[36] argue that if the Court determines that the Debtors are only obligated to pay creditors at the federal judgment rate of interest, then that is all the senior creditors are entitled to receive and the subordinated creditors are not

---

[36]  The PIERS Holders include Normandy Hill Capital L.P. (an individual PIERS holder) and Wells Fargo Bank, NA, the Indenture Trustee for the PIERS.

obligated to pay them the difference between what the Debtors pay and their contract rate of interest.

The WMI Senior Noteholders' Group and WMI Senior Noteholders' Indenture Trustee disagree.  They contend that the subordination provisions in the various creditors' contracts (the Senior Subordinated Indenture, the CCB-1 Guarantee Agreements, the CCB-2 Guarantee Agreements, the Junior Subordinated Notes Indenture, and the PIERS Guarantee Agreement) mandate that the subordinated creditors pay the senior creditors their claims in full, including contract interest.  (WMI NG 1 at § 15.3; WMI NG 2 at § 15.3; WMI NG 3 at § 3(a) & (b); WMI NG 4 at § 15.01; WMI NG 5 at § 3(a) & (b); WMI NG 6 at § 12.2; WMI NG 7 at § 6.1.)

The PIERS Holders contend that the subordination provisions do not require that they pay the senior creditors their full contract rate of interest because it does not explicitly refer to the rate of post-petition interest to which they are subordinate. Therefore, the PIERS Holders contend that the interest they are subordinated to is only the rate the Court determines is appropriate.  They rely on the Rule of Explicitness, which provides that in order to subordinate junior creditors the indenture must explicitly provide for that outcome.  See, e.g., In re King Res. Co., 528 F.2d 789, 791 (10th Cir. 1976) (adopting holdings in Kingsboro and Time Sales that "where the subordinating provisions are unclear or ambiguous as to whether

post-petition interest is to be allowed a senior creditor, the
general rule that interest stops on the date of filing of the
petition in bankruptcy is to be followed"); In re Kingsboro Mort.
Corp., 514 F.2d 400, 401 (2d Cir. 1975) (holding that language of
subordination agreement requiring payment in full of "all
principal and interest on all Senior Debt" was insufficiently
express to apply to post-petition interest); In re Time Sales
Fin. Corp., 491 F.2d 841, 844 (3d Cir. 1974) (affirming denial of
enforcement of subordination agreement for payment of post-
petition interest because the agreement "did not appropriately
apprise the debenture note holders that their claims against the
bankrupt would be subordinated to [the senior creditor's] demand
for post-petition interest").

The WMI Senior Noteholders' Group responds that the Rule of
Explicitness no longer applies since passage of the Bankruptcy
Code and the enactment of section 510.  See, e.g., In re Bank of
New England Corp., 364 F.3d 355, 362, 365 (1st Cir. 2004)
(concluding that "the enactment of section 510(a) [of the
Bankruptcy Code] means that the enforcement of subordination
provisions is no longer a matter committed to the bankruptcy
courts' notions of what may (or may not) be equitable" and
therefore the Rule of Explicitness is no longer applicable);
Chem. Bank v. First Trust of N.Y. (In re Southeast Banking
Corp.), 156 F.3d 1114, 1124 (11th Cir. 1998) (stating that "we

94

conclude that Congress, by enacting section 510(a) of the
Bankruptcy Code, abrogated the pre-Code Rule of Explicitness.  As
a necessary consequence of this change in bankruptcy law, the
Rule of Explicitness can no longer survive as the progeny of the
bankruptcy courts' equity powers or as a federal canon of
contract construction.").

The Court disagrees with the argument of the WMI Senior
Noteholders' Group that the Rule of Explicitness is no longer
applicable.  While section 510(a) provides that subordination
agreements are enforceable, it states that they are only
enforceable "to the same extent that such agreement is
enforceable under applicable law."  11 U.S.C. § 510(a).  In the
Southeast Banking Corp. case, the Eleventh Circuit certified to
the New York Court of Appeals the question of the applicability
of the Rule of Explicitness under New York law.[37]  156 F.3d at
1126.  The New York Court of Appeals answered the question in the
affirmative, stating that "[i]n accordance with the Rule of
Explicitness, New York law would require specific language in a
subordination agreement to alert a junior creditor to its
assumption of the risk and burden of allowing the payment of a
senior creditor's post-petition interest demand."  Chem. Bank v.

---

[37]  The Indentures are governed by New York law.  (WMI NG 1
at § 1.12; WMI NG 2 at § 1.12; WMI NG 3 at § 6(a); WMI NG 4 at §
14.05; WMI NG 5 at § 6(a); WMI NG 6 at § 1.11; WMI NG 7 at §
9.4.)

First Trust of N.Y. (In re Southeast Banking Corp.), 93 N.Y. 2d
178, 186 (N.Y. 1999).  As a result, the Eleventh Circuit held
that the language of the subordination provision was
insufficiently precise on the issue of post-petition interest to
satisfy the Rule of Explicitness under New York law.  Chem. Bank
v. First Trust of N.Y. (In re Southeast Banking Corp.), 179 F.3d
1307, 1310 (11th Cir. 1999).  See also, First Fidelity Bank, N.A.
v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.), 134 B.R.
528, 534-35 (Bankr. S.D.N.Y. 1991) (concluding that the Rule of
Explicitness articulated in "Kingsboro retains its vitality and
remains the controlling law in the Second Circuit" under the
Bankruptcy Code and refusing to enforce subordination agreement
that would pay post-petition interest to senior creditors because
of lack of specificity in the indenture).

The WMI Senior Noteholders' Indenture Trustee further
argues, however, that Normandy Hill is relying on a prior version
of the Indenture Agreement and does not refer to critical
language from the subordination provision.  The Indenture Trustee
contends that the correct version of the subordination provision
requires subordination to Senior Indebtedness, which is defined
as "principal of, premium, if any, interest (including all
interest accruing subsequent to the commencement of any
bankruptcy or similar proceeding, whether or not a claim for
post-petition interest is allowable as a claim in any such

proceeding).″  (WMI NG 7 at 6.)[38]

The Court concludes that the WMI Senior Noteholders' Group and the Senior Noteholders' Indenture Trustee are correct.  The subordination provisions adequately apprised the subordinated creditors that their payments were subordinate to <u>all</u> contractual post-petition interest, even if the Court allowed <u>none</u>.  They certainly, therefore, were on notice that they were subordinate to contractual post-petition interest if the Court allowed <u>some</u>.  Therefore, the Court concludes that to the extent the Rule of Explicitness is still applicable, the indentures at issue in this case meet its requirements.[39]  Therefore, the Plan provisions that give effect to the subordination provisions in the indentures and require subordinated creditors to pay senior creditors post-petition interest at the contract rate even though the Debtors are only required to pay interest at the federal judgment rate

---

[38]  The Indenture Trustee notes that it would have been impossible to give notice to the subordinated creditors of exactly what interest rate they were subordinated to, because the PIERS were issued in 2001 and the Senior Notes were issued between November 2003 and August 2006 with varying rates of interest.  (WMI NG 1-7.)

[39]  According to Normandy Hill, however, to hold as the WMI Senior Noteholders' Group argues would penalize the subordinated creditors for the bad acts of the senior creditors.  It assumes that the Court can apply the federal judgment interest rate only if it finds that the Settlement Noteholders engaged in improper conduct.  Because the Court finds that the federal judgment interest rate is the rate due under section 726(a)(5) without considering the equities of the case, Normandy Hill's argument on this point is moot.  (<u>See</u> <u>supra</u> Part E1.)

are not violative of the Bankruptcy Code.[40]

>        6.   Releases for distributions

The Equity Committee also objects to confirmation of the
Modified Plan because it conditions distributions to creditors
and other stakeholders on granting a direct release to JPMC and
other non-debtors.  (D 255 at §§ 43.2 & 43.6.)  The Equity
Committee contends that this violates the best interests of
creditors test under section 1129(a)(7).  See, e.g., AOV Indus.,
792 F.2d at 1151 (holding that plan which required a creditor who
had a unique direct claim against plan funder to provide a
release of plan funder to get a distribution unfairly
discriminated against it because majority of creditors had no
such claim); In re Conseco, 301 B.R. 525, 528 (Bankr. N.D. Ill.
2003) (holding that plan provision predicating receipt of
distribution on granting third party releases violated best
interest of creditors test because creditors could not be held to
have voluntarily agreed to a release simply by accepting a
distribution).

The Equity Committee argues that under chapter 7, even
though preferred shareholders are not projected by the Debtors to
receive any distribution, they would still retain their claims

---

[40]   While the PIERS may receive payment in full of their
claims from the Debtors, they may be required to give a part of
their distribution to senior creditors.  This, however, is simply
a result of the terms they accepted when investing in a
subordinated note.

against third parties including JPMC.  Therefore, because the
preferred shareholders are not getting any consideration under
the Plan for their agreement to release JPMC and the others, they
should be able to receive a distribution without granting a
release to JPMC and the FDIC.

The Plan Supporters disagree.  They contend that the
releases are a condition to the GSA imposed by JPMC and the FDIC.
They argue that the $7 billion in assets which are being used to
provide a recovery for creditors is only available because JPMC
and the FDIC have agreed to waive their claims of ownership of
certain assets and to waive in excess of $54 billion in claims
they hold against the estates.  They argue that without the GSA,
creditors (and shareholders) would get no recovery.

The Court finds that the condition requiring a release in
order to receive a distribution does not violate the best
interest of creditors test.  Any potential recovery which
shareholders may receive, even from the Liquidating Trust, is
largely due to the GSA which is funding the payments to creditors
who are senior in priority to the shareholders and who, in the
absence of the GSA, would have first priority to the proceeds of
the assets in the Liquidating Trust.  In addition, granting a
release is purely voluntary.  A preferred shareholder who does
not wish to give a release does not have to, but will be forgoing
any distribution.  The cases cited by the Equity Committee do not

compel a different result because the release provision in this case is voluntary and is applicable equally to all creditors and shareholders, rather than applicable only to a creditor or shareholder that has a unique direct claim against the released parties.  See, e.g., AOV Indus., 792 F.2d at 1151 (finding unequal treatment because one creditor asserted it was being required to release a direct, rather than an indirect, claim against plan funder); Conseco, 301 B.R. at 528 (finding releases which were consensual did not violate the Bankruptcy Code).

### 7.  Use of Liquidating Trust structure

The LTW Holders argue that the Modified Plan also violates the best interests of creditors test because it provides for the assignment of the estates' causes of action to a Liquidating Trust and the issuance to creditors of interests in the Trust. They contend that by using this mechanism, creditors will be required to pay capital gains tax now on the value of the interests in the Trust that are distributed to them, without any concomitant payment to them of any value for many years until the claims of the estate are litigated to judgment or settled.  The LTW Holders argue that in a chapter 7 case they would not have any tax obligations until they actually received a distribution from the estate.

Because the Court is denying confirmation for other reasons, and directing the parties to mediation, the Court suggests that

the parties consider a means to avoid negative tax consequences
to creditors.  See infra Part H.

      8.   Distribution to WMB Senior Noteholders

The Equity Committee objects to the distribution of $335
million of estate assets to WMB Senior Noteholders (Class 17A)
because it asserts that they are not creditors of this estate.
It contends that such a distribution provides no benefit to the
estate and merely diverts assets that could be used to provide a
distribution to legitimate creditors (or shareholders) of the
Debtors.

The WMB Noteholders have asserted that they have claims
against the Debtors for misrepresentations made by the Debtors in
connection with the sale of the WMB Senior Notes.  While they
admit that such a claim would be subordinated under section
510(b), they contend that it is nonetheless a legitimate claim
against the Debtors.  Rather than litigate this issue, the
Debtors have agreed (apparently with the urging of the FDIC) to
the payment of $335 million from the tax refunds for this class
of creditors.

The Court finds that this resolution is a reasonable
settlement of the dispute because it will avoid contentious and
expensive securities litigation which could result in a
significantly larger judgment against the Debtors.  See, e.g.,
TMT Trailer Ferry, 390 U.S. at 424; In re RFE Indus., Inc., 283

F.3d at 165; <u>Martin</u>, 91 F.3d at 393.

F.    <u>Feasibility</u>

The Equity Committee argues that if more than 300 creditors elect to receive stock in the Reorganized Debtor,[41] then the Modified Plan will not be feasible.  It contends that if the Reorganized Debtor has more than 300 shareholders, it will be required to comply with the reporting requirements of the Securities Exchange Act of 1934.  Because the Debtors have not been complying with those requirements during the pendency of the bankruptcy case, the Equity Committee asserts that the Reorganized Debtor would be unable to file the delinquent reports and audited financial reports.

The Debtors do not dispute that it would be cost prohibitive to file the missing financial statements.  The Debtors argue, however, that an entity that complies with SEC Staff Legal Bulletin No. 2 (Apr. 15, 1997, § II.c.) is not required to file any 10-Ks or 10-Qs while in chapter 11 nor to file any "missed" 10-Ks or 10-Qs upon emergence.  They contend that they have complied with the requirements in the Bulletin.  The Debtors note that the SEC has not initiated any enforcement inquiry or

---

[41]  The Debtors' claims agent could not testify as to the exact number of creditors who will hold stock in the Reorganized Debtor, either by election or default.  (Tr. 7/13/2011 at 90-91.) In addition, the Modified Plan provides the holders of Disputed Claims, including the LTW Holders, the right to elect stock if their claims are allowed, which may not be known for some time. (D 255 at § 27.3.)

suggested that the Debtors' financial reporting was deficient.

The Court finds that the Debtors have presented sufficient evidence that the Modified Plan could be feasible even if the Reorganized Debtor has more than 300 shareholders. Feasibility does not require that success be guaranteed but rather only a "reasonable assurance of compliance with plan terms." In re Orlando Investors LP, 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989). See also In re Briscoe Enters., Ltd., II, 994 F.2d 1160, 1166 (5th Cir. 1993) ("[I]t is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement."). Based on the foregoing, the Court finds that the Modified Plan meets the feasibility test under section 1129(a)(11).

G.    Miscellaneous Other Objections

1.    WMI Senior Noteholders' Group

The Modified Plan provides that WMI Senior Noteholders will receive their pro rata share of Creditor Cash and Liquidating Trust Interests totaling their aggregate claims plus post-petition interest. (D 255 at § 6.1.) In addition, to the extent that WMI Senior Noteholders do not get paid in full in cash on the Effective Date, WMI Senior Noteholders were entitled to elect to receive stock in the Reorganized Debtor in lieu of a distribution of cash or Liquidating Trust Interests. (Id. at § 6.2.) Approximately $24 million in WMI Senior Noteholders did

elect to receive stock in lieu of cash or Liquidating Trust
Interests.  (D.I. 8108 at 32.)

The WMI Senior Noteholders' Group and the WMI Senior
Noteholders' Indenture Trustee object to the Modified Plan
contending it violates the absolute priority rule by providing
for a distribution (of cash, stock and interests in the
Liquidating Trust) to junior creditors before the Senior Notes
are paid in full in cash, as mandated by the subordination
provisions of the Indentures.  (WMI NG 1 at § 15.2; WMI NG 2 at §
15.2; WMI NG 4 at § 15.03; WMI NG 6 at § 12.2(b); WMI NG 7 at §
6.1(c).)  See also In re Westpoint Stevens, Inc., 600 F.3d 231,
255-56 (2d Cir. 2010) (holding that under terms of subordination
agreement, senior creditors were entitled to be paid in full in
cash before subordinated creditors could receive distribution
under plan).

The Court rejects the argument of the WMI Senior
Noteholders' Group and the WMI Senior Noteholders' Indenture
Trustee.  First, the language of the Indentures do not support
their argument.  For example, section 15.2 of the First
Supplemental Indenture for the Senior Debt Securities provides in
relevant part that "[i]n the event of . . . bankruptcy . . . such
Senior Debt shall be first paid and satisfied in full before any
payment or distribution of any kind or character, whether in
cash, property or securities . . . shall be made upon the

104

[Junior] Securities . . . ."  (WMI NG 1 at § 15.2.  See also, WMI NG 2 at § 15.2; WMI NG 4 at § 15.03; WMI NG 6 at § 12.2(b).) Those sections merely require that the WMI Senior Noteholders' claims be "paid and satisfied in full" not that they be paid in cash.  (Id.)  The WMI Senior Noteholders are, in fact, being "paid and satisfied in full" under the Modified Plan by the payment to them of a combination of cash and Liquidating Trust Interests and/or, if they so elected, stock in the Reorganized Debtor.  They are entitled to no more under the provisions of the Indentures.

Section 6.1(e)(1) of the First Supplemental Indenture relating to the PIERS contains different language but the result is the same.  (WMI NG 7 at § 6.1(e)(1).)  It provides that "[i]n the event of and during the continuance of any event specified in Section 6.1(a) [which includes a bankruptcy case] unless all Senior Indebtedness is paid in full in cash, or provision shall be made therefor" payments made by the Debtors to the PIERS shall be segregated for the benefit of the Senior Noteholders.  (Id.) Under the Modified Plan, provision has been made for the payment of the Senior Noteholders from the cash that the Debtors have on hand or from cash distributions from the Liquidating Trust.  To the extent that the Senior Noteholders have elected to receive stock in lieu of cash, they have consented to the "provision" for the payment of their claims in that manner.

105

Second, the Senior Noteholders have accepted their treatment under the Modified Plan overwhelmingly, by more than 99% in amount and in number.  (D.I. 8113 at 9; Tr. 7/13/2011 at 65.) Therefore, even if the Modified Plan did not comply with the requirements of the subordination agreements, the Court finds that the Senior Noteholders have waived that failure.  See, e.g., Bartle v. Markson Bros., Inc., 314 F.2d 303, 305 (2d Cir. 1963) (refusing to reverse bankruptcy referee's finding that plan was in best interests of creditors although it violated subordination agreement because senior creditors had knowingly voted to accept plan that waived their rights).  See also 4 Collier on Bankruptcy ¶ 510.03[3] (Alan N. Resnick & Henry Sommer eds., 16th ed. 2011) ("If subordination agreements were not waivable under a plan of reorganization acceptable to the senior creditor, the section would prevent just what Congress envisioned: that senior creditors may compromise with junior creditors in order to confirm a plan.").

Third, the Bankruptcy Code does not require that the WMI Senior Noteholders be paid in cash before junior creditors receive a distribution.  See, e.g., Case, 308 U.S. at 117 ("In application of this rule of full or absolute priority this Court recognized certain practical considerations and made it clear that such rule did not 'require the impossible, and make it necessary to pay an unsecured creditor in cash as a condition of

stockholders retaining an interest in the reorganized company. His interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock.'") (quoting N. Pac. Ry. Co. v. Boyd, 228 U.S. 482, 508 (1913)).  The payment under the Modified Plan of cash, Liquidating Trust Interests, or stock of a value equal to their claims satisfies the absolute priority rule and provides the Senior Noteholders with payment in full of their claims.

     2.  <u>LTW Holders</u>

The LTW Holders object to confirmation of the Modified Plan because they contend that the PIERS are improperly treated as creditors rather than as equity.  They argue that part of the PIERS claims are based on the accretion of an original issue discount that the claims had because of the value of warrants that were issued in connection with the PIERS.

The Court rejects this argument.  The same argument was raised by the LTW Holders in connection with the Sixth Amended Plan.  In the January 7 Opinion, the Court found that the PIERS hold preferred stock issued by WMCT 2001 and that WMCT 2001 holds debt of the Debtors.  442 B.R. at 361.  Therefore, the Court concluded that unless WMCT 2001 had been merged into the Debtors (as had several other affiliates), the PIERS claims were debt. <u>Id.</u> at 362.

At the confirmation hearings held in connection with the Modified Plan, the Debtors presented evidence that WMCT 2001 did not merge with the Debtors and remains a separate entity.  (Tr. 7/14/2011 at 20-33; D 401.)  Consequently, it is clear that the PIERS are debt, not equity.

H.    Equity Committee Standing Motion

The Equity Committee has recently filed a motion for authority to prosecute an action to equitably subordinate or disallow the Settlement Noteholders' claims.  (D.I. 8179.)  The parties agreed to present evidence, brief and argue those issues in conjunction with confirmation of the Modified Plan.

In order for the Court to grant the Equity Committee's motion, the Court must find that it has stated a "colorable" claim which the Debtors have unjustifiably refused to prosecute. See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 566-67 (3d Cir. 2003).  The party seeking standing bears the burden of proof.  G-1 Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-1 Holdings, Inc.), 313 B.R. 612, 629 (Bankr. D.N.J. 2004).

The Court finds, through the Debtors' support of the Settlement Noteholders' opposition to the Equity Committee's motion, that the Debtors have refused to pursue the equitable subordination or disallowance claim.  Whether that was justified depends on whether the claim is colorable and the costs of

108

pursuing that claim.  <u>See, e.g.</u>, <u>In re STN Enters.</u>, 779 F.2d 901,
905 (2d Cir. 1985) (noting that in order to determine whether the
refusal to prosecute the claim was unjustified the court must
balance the probability of success against the financial burden
the suit would have on the estate).

The threshold for stating a colorable claim is low and
mirrors the standard applicable to a motion to dismiss for
failure to state a claim.[42]  <u>See, e.g.</u>, <u>In re Centaur, LLC</u>, No.
10-10799, 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010)
("In deciding whether there is a colorable claim, the court
should undertake the same analysis as when a defendant moves to
dismiss a complaint for failure to state a claim."); <u>In re
Adelphia Commc'n Corp.</u>, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005)
(noting that the burden of showing a colorable claim is a
"relatively easy one").

### 1.  <u>Claim for equitable subordination</u>

In its objection to confirmation, the Equity Committee
contends that there is a viable claim for equitable subordination
of the Settlement Noteholders' claims.  An individual shareholder
raised the same objection.  The Settlement Noteholders argued

---

[42] While the Settlement Noteholders assert that the Court
should apply a summary judgment standard because it has
considered the extensive evidence presented at the confirmation
hearings, the Court declines to do so because it substantially
restricted the discovery which the Equity Committee could take on
this issue.

preliminarily that the objection is procedurally defective.  See,
e.g., Protarga v. Webb (In re Protarga), Adv. No. 04-53374, 2004
WL 1906145, at *3 (Bankr. D. Del. Aug. 25, 2004) ("Claims for
equitable subordination must be brought as a separate adversary
proceeding pursuant to Rule 7001(8) . . . .").  The Equity
Committee's motion for authority to bring an adversary action
solves that procedural requirement.

The Settlement Noteholders and the Creditors' Committee
contend, however, that the Equity Committee and shareholders do
not have standing to bring an equitable subordination claim based
on the requirements of the Constitution because they have
suffered no damages which could be remedied by equitable
subordination.  See Lujan v. Defenders of Wildlife, 504 U.S. 555,
560 (1992) (discussing the three elements needed for standing:
(1) an injury in fact, which is concrete, particularized and
actual or imminent; (2) a causal connection between the injury
and the conduct; and (3) a likelihood that the injury will be
redressed by a favorable decision).  They argue that even if the
Settlement Noteholders' claims are subject to equitable
subordination,[43] they would simply be subordinated to other

_____

[43]  In order to show a valid claim for equitable
subordination three elements are required: (1) engagement in some
type of inequitable conduct; (2) the misconduct resulted in
injury to the creditors or created an unfair advantage to the
defendant; and (3) the equitable subordination of the claim must
be consistent with the provisions of the Bankruptcy Code.  See,
e.g., United States v. Noland, 517 U.S. 535, 538-39 (1996);

110

creditors' claims and still be paid ahead of equity.  See, e.g., Adelphia Recovery Trust v. Bank of Am., N.A., 390 B.R. 80, 99 (S.D.N.Y. 2008) (granting motion to dismiss equitable subordination claim by creditors of parent against lenders of subsidiary because "[i]t follows reasonably from the judicial and legislative interpretations of the statute that the 'other creditors' whose welfare is the primary focus of equitable subordination law must be creditors of the same debtor, as a given claim may not be subordinated to an equity interest, but only to another claim.").

The Court agrees with the Settlement Noteholders and the Creditors' Committee that under the plain language of the statute equitable subordination only permits a creditor's claim to be subordinated to another claim and not to equity.  See 11 U.S.C. § 510(c) (providing for equitable subordination of "all or part of an allowed claim to all or part of another allowed claim").  Equitable subordination is not a remedy available to (or of much help in redressing any injury to) the shareholders for the Settlement Noteholders' actions.  Therefore, the Court finds that the Equity Committee has failed to state a colorable claim for equitable subordination of the Settlement Noteholders' claims.

---

Citicorp Venture Cap. Ltd. v. Comm. of Creditors Holding Unsecured Claims, 160 F.3d 982, 986-87 (3d Cir. 1998); In re Mobile Steel Co., 563 F.2d 692, 699-700 (5th Cir. 1977).

2.    <u>Claim for equitable disallowance</u>

a.    <u>Availability of Remedy</u>

The Equity Committee contends alternatively that, because of
the improper conduct of the Settlement Noteholders in trading on
material non-public information, the equitable disallowance of
their claims is warranted so that any distribution to which they
would be entitled is redistributed to other creditors and
ultimately to the shareholders.[44]  <u>See, e.g.</u>, <u>Citicorp</u>, 160 F.3d
at 991 & n.7 (3d Cir. 1998) (affirming equitable subordination of
insider's claim to other creditors because of trading on insider
information, but not precluding additional remedies such as
equitable disallowance and an award of expenses, fees, and other
costs caused by insider's conduct); <u>Adelphia Commc'ns Corp. v.</u>
<u>Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)</u>, 365 B.R. 24,
71-73 (Bankr. S.D.N.Y. 2007) (denying motion to dismiss because
equitable disallowance of claims by bankruptcy court remains
viable cause of action and equitable subordination is not the
exclusive remedy for wrongdoing), <u>aff'd in relevant part</u>, 390

---

[44]  The Indenture Trustee for the PIERS contends that even if
the Court equitably disallows the claims of the Settlement
Noteholders, the Indenture Trustee as the holder of the claims is
still entitled to payment of 100% of those claims.  The Court
disagrees.  To the extent the Court disallows those claims, they
are disallowed regardless of who holds them.  <u>Cf.</u> <u>Enron Corp. v.</u>
<u>Springfield Assocs., L.L.C. (In re Enron Corp.)</u>, 379 B.R. 425,
439-45 (S.D.N.Y. 2007) (concluding that transferee of a claim
could be subject to equitable subordination and disallowance
under section 502(d) for conduct of transferor if claim was
assigned, though not if it was sold).

B.R. 64, 74-75 (S.D.N.Y. 2008).

The Equity Committee argues that equitable disallowance of the Settlement Noteholders' claims is warranted in this case because they traded on insider information obtained while they participated in settlement negotiations with the Debtor and JPMC. See Pepper v. Litton, 308 U.S. 295, 311 (1939) (holding that claim of insider who traded on inside information was properly subordinated on equitable principles).

The Equity Committee contends that the instant case is the "paradigm case of inequitable conduct by a fiduciary." Citicorp, 160 F.3d at 987. Like the creditor in Citicorp, the Equity Committee contends that the Settlement Noteholders purchased (and sold) the Debtors' securities with "the benefit of non-public information acquired as a fiduciary" for the "dual purpose of making a profit and influenc[ing] the reorganization in [their] own self-interest." Id. See also Wolf v. Weinstein, 372 U.S. 633, 642 (1962) ("Access to inside information or strategic position in a corporate reorganization renders the temptation to profit by trading in the Debtor's stock particularly pernicious.").

The Settlement Noteholders contend initially that equitable disallowance is not a valid remedy under the Bankruptcy Code, because it is not one of the specific exceptions to allowance of a claim articulated in section 502(b). See, e.g., Travelers

113

<u>Casualty & Surety Co. of Am. v. Pac. Gas & Elec. Co.</u>, 549 U.S.
443, 449-50 (2007) (holding that Bankruptcy Code does not bar
contractual claim for attorneys' fees incurred during bankruptcy
case because it was not disallowable under one of the nine
exceptions to disallowance under section 502(b)).  <u>See also</u>
<u>Mobile Steel</u>, 563 F.2d at 699 (concluding that "equitable
considerations can justify only the subordination of claims, not
their disallowance").  The Settlement Noteholders argue that the
legislative history of the Code supports this argument, citing a
version of the Senate bill that did not get included in the
Bankruptcy Code, which would have provided that "the court may
disallow, in part or in whole, any claim or interest in
accordance with the equities of the case."  S. 2266, 95th Cong. §
510(c)(3) (1977).

The Equity Committee responds that both arguments were
rejected in the <u>Adelphia</u> case.  365 B.R. at 71, <u>aff'd in relevant</u>
<u>part</u>, 390 B.R. at 74-75.  The Bankruptcy Court in <u>Adelphia</u> noted
that there is other legislative history that expressly states
that section 510 "is intended to codify case law, such as <u>Pepper</u>
<u>v. Litton</u> . . . and is not intended to limit the court's power in
any way.'"  365 B.R. at 71 (citing Kenneth N. Klee, <u>Legislative</u>
<u>History of the New Bankruptcy Law</u>, 28 DePaul L. Rev. 941 (1979),
<u>reprinted in</u> Collier on Bankruptcy, App. Pt. 4-1495)).  As a
result, the District Court in <u>Adelphia</u> concluded that "the Court

114

cannot give any weight to the omission of Section 510(c)(3) of S. 2266 from the Bankruptcy Code, Congress could have decided to do away with equitable disallowance, or it could have thought specific reference to it was superfluous."  390 B.R. at 76.

In addition, the District Court in <u>Adelphia</u> held that the <u>Travelers</u> decision did not overturn the <u>Pepper v. Litton</u> decision which "fairly read, certainly endorses the practice (in appropriate circumstances) of the equitable disallowance of claims, not on the basis of any statutory language, but as within the equitable powers of a bankruptcy court."  <u>Id.</u>

Here, the Court agrees with the well-reasoned decisions of the Bankruptcy and District Courts in <u>Adelphia</u> and concludes that it does have the authority to disallow a claim on equitable grounds "in those extreme instances - perhaps very rare - where it is necessary as a remedy."  <u>Adelphia</u>, 365 B.R. at 73.  <u>See also</u>, <u>Citicorp</u>, 160 F.3d at 991 n.7 (disagreeing with district court's conclusion that equitable subordination was the exclusive remedy available for inequitable conduct and noting that <u>Pepper v. Litton</u> expressly upheld the bankruptcy court's power to disallow or subordinate a claim based on equitable grounds).

The cases cited by the Settlement Noteholders do not foreclose the equitable disallowance of claims albeit under a different analysis.  <u>Cf.</u> <u>Travelers</u>, 549 U.S. at 449-50 (holding that "Section 502(b)(1) disallows any claim that is

'unenforceable against the debtor . . . under any agreement or
applicable law' . . . [which is] most naturally understood to
provide that, with limited exceptions, any defense to a claim
that is available outside of the bankruptcy context is also
available in bankruptcy."); Mobile Steel, 563 F.2d at 699 n.10
(concluding that equitable disallowance of claims is not
available because it "would add nothing to the protection against
unfairness already afforded the bankrupt and its creditors. . . .
If the misconduct directed against the bankrupt is so extreme
that disallowance might appear to be warranted, then surely the
claim is either invalid or the bankrupt possesses a clear defense
against it.").  Because the Equity Committee seeks to disallow
the claims of the Settlement Noteholders under facts that suggest
they violated the securities laws, the Court believes that the
Debtors would have a defense to those claims outside of the
bankruptcy context as well.  See, e.g., SEC v. Universal Express,
Inc., 646 F. Supp. 2d 552, (S.D.N.Y. 2009) ("In addition to its
discretion to order disgorgement, a court has the discretion to
award prejudgment interest on the amount of disgorgement and to
determine the rate at which such interest should be calculated.
Awarding prejudgment interest, 'like the remedy of disgorgement
itself, is meant to deprive wrongdoers of the fruits of their
ill-gotten gains from violating securities laws.'") (quoting SEC
v. Lorin, 877 F. Supp. 192, 201 (S.D.N.Y. 1995), aff'd in part

and vacated in part, 76 F.3d 458 (2d Cir. 1996)); SEC v.
Haligiannis, 470 F. Supp. 2d 373, 385-86 (S.D.N.Y. 2009) (holding
that civil monetary penalties can be awarded for securities
violations, which "are designed to punish the individual violator
and deter future violations of the securities laws," and awarding
civil monetary penalties of $15 million, roughly the amount of
the defendant's ill-gotten gains).

                    b.    Merits of claim

     In Pepper v. Litton, the Supreme Court upheld the equitable
disallowance of the claim of an insider who traded on material
inside information, concluding that:

          He who is in . . .  a fiduciary position . . . . cannot
          utilize his inside information and his strategic
          position for his own preferment.  He cannot violate
          rules of fair play by doing indirectly through the
          corporation what he could not do directly.  He cannot
          use his power for his personal advantage and to the
          detriment of the stockholders and creditors no matter
          how absolute in terms that power may be and no matter
          how meticulous he is to satisfy technical requirements.

308 U.S. at 311.

     The TPS Group contends that, although the Court need not
decide that the Settlement Noteholders have violated the
securities laws, reference to insider trading cases illustrates
the magnitude of the Settlement Noteholders' inequitable conduct.

     The Supreme Court has recognized two theories of insider
trading under section 10(b): the "classical theory" and the
"misappropriation theory."   See SEC v. Cuban, 620 F.3d 551, 553

                               117

(5th Cir. 2010).  Under the classical theory, section 10(b) and Rule 10b-5 are violated when a corporate insider (i) trades in the securities of his corporation (ii) on the basis of (iii) material nonpublic information (iv) in violation of the fiduciary duty owed to his shareholders.  See, e.g., U.S. v. O'Hagan, 521 U.S. 642, 651-52 (1997) ("Trading on such information qualifies as a 'deceptive device' under § 10(b) . . . because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.'") (citation omitted).  Under the misappropriation theory, by contrast, a corporate "outsider" violates section 10(b) and Rule 10b-5 "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information" rather than a duty owed to the persons with whom he trades.  Id. at 652.

The Equity Committee and the TPS Group both assert that the Settlement Noteholders' conduct violated the classical theory of insider trading.  In addition, the TPS Group asserts that Centerbridge violated the misappropriation theory.

### i.  Classical theory

#### (1)  Material nonpublic information

The Settlement Noteholders argue that they did not trade on any material nonpublic information.  Instead, they contend that

the only material nonpublic information which they received from the Debtors during the confidentiality periods were the estimated amounts of the Debtors' tax refunds, which were disclosed by the Debtors to the public before the Settlement Noteholders began to trade again.

The Equity Committee and the TPS Group assert that the Settlement Noteholders received additional nonpublic information including the knowledge that a settlement was being discussed and the relative stances the parties were taking in those negotiations. In particular, the Equity Committee and the TPS Group focus on the term sheets exchanged by the parties. According to the Equity Committee, the parties were conceding issues at a time when the public knew only that the Debtors, JPMC, and the FDIC were engaged in contentious litigation.

Materiality of nonpublic information is determined by an objective, "reasonable investor" test: "[T]he law defines 'material' information as information that would be important to a reasonable investor in making his or her investment decision." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997). With regard to information on events like a potential merger, courts determine materiality based on a balancing of both the "indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." Basic, Inc. v. Levinson, 485

U.S. 224, 238 (1988) (emphasis added).

The parties largely do not dispute that the magnitude of a global settlement with JPMC and the FDIC would be great in this case.[45]  See, e.g., SEC v. Geon Indus., Inc., 531 F.2d 39, 47-48 (2d Cir. 1976) (stating that "[s]ince a merger in which [a company] is bought out is the most important event that can occur in a small corporation's life, to wit, its death, we think that inside information, as regards a merger of this sort, can become material at an earlier stage than would be the case as regards lesser transactions - and this even though the mortality rate of mergers in such formative stages is doubtless high.").  The issue the parties in this case dispute is the probability that a settlement would occur, specifically whether the negotiations were too tentative and the parties were too far apart.

The Debtors and the Settlement Noteholders contend that neither the knowledge of negotiations nor the parties' relative stances during the negotiations were material non-public information because of the extreme distance between the parties'

_____

[45]  Owl Creek alone argues that the magnitude factor is not met here because, unlike a merger, settlement proposals are a common and necessary component of bankruptcy cases.  The Court agrees that settlement proposals are common, but also notes that statements of interest and merger proposals are just as common and yet may be material.  Basic, 485 U.S. at 238-39.  What the magnitude factor measures is not the fact that a proposal was made, but what the result of the proposal would be if accepted (i.e. the actual merger or settlement were consummated).  SEC v. Geon Indus., Inc., 531 F.2d 39, 47-48 (2d Cir. 1976).

stances and the ebbs and flows of the negotiation process.  See,
e.g., Taylor v. First Union Corp. of S.C., 857 F.2d 240, 244-45
(4th Cir. 1988) (holding that "preliminary, contingent, and
speculative" negotiations were immaterial because there was "no
agreement as to the price or structure of the deal"); Filing v.
Phipps, No. 5:07CV1712, 2010 WL 3789539, at *5-6 (N.D. Ohio Sept.
24, 2010) (finding that merger talks were not material where
parties had a "get acquainted" meeting and discussed executing a
confidentiality agreement); Levie v. Sears Roebuck & Co., 676 F.
Supp. 2d 680, 688 (N.D. Ill. 2009) (finding merger discussions
not material where they were preliminary in nature).

       According to the Settlement Noteholders, it would have been
sheer speculation that JPMC's position on one or more potential
settlement terms in March or November 2009 could have provided
assurance that JPMC would take that same position in future
complex, multi-party, multi-issue negotiations.  In the context
of such a complex negotiation, the Settlement Noteholders argue
that the discussions could only be material once all the parties
reached an agreement in principal or at least came extremely
close to a deal.  (D.I. 8429 at 10.)

       The Court disagrees with this statement of materiality.  The
Supreme Court has explicitly rejected the argument that there is
no materiality to discussions until an agreement-in-principle has
been reached.  Basic, 485 U.S. at 237.  In addition, the cases

121

cited by the Plan Supporters are distinguishable as they deal only with preliminary discussions.  Unlike the cases cited, here the parties executed confidentiality agreements, exchanged a significant amount of information, and engaged in multi-party negotiations for over a year.  The discussions went far beyond a mere "get acquainted meeting."  <u>Filing</u>, 2010 WL 3789539, at *5-6.

The Settlement Noteholders contend that whether a settlement was likely to occur should be evaluated in light of the facts as they existed at the time, not with the benefit of hindsight. <u>See, e.g.</u>, <u>In re General Motors Class E Stock Buyout Sec. Litig.</u>, 694 F. Supp. 1119, 1127 (D. Del. 1988) ("The probability of a transaction occurring must be considered in light of the facts as they then existed, not with the hindsight knowledge that the transaction was or was not completed.").  According to the Settlement Noteholders, in this case at the conclusion of both confidentiality periods, the parties felt that the negotiations were dead and, therefore, they were not material.

The Court is not convinced, however, by this contention. <u>See, e.g.</u>, <u>SEC v. Gaspar</u>, 83 Civ. 3037, 1985 WL 521, at *14 (S.D.N.Y. Apr. 16, 1985) ("The ultimate success of the negotiations is only one factor to consider" in determining materiality).  The first set of negotiations ended in March, with the Settlement Noteholders claiming they were a "disaster," yet the Debtors continued to negotiate with JPMC in April.  (Tr.

122

7/20/2011 at 55-56.)  In fact, Aurelius and Owl Creek berated the
Debtors for conducting settlement talks during that time without
them, indicating that the Settlement Noteholders themselves
viewed the negotiations as continuing and material.  (Tr.
7/18/2011 at 73.)

The contention that settlement negotiations were dead (and
therefore not material) is also belied by the actions of
Centerbridge and Appaloosa.  In July and August 2009 they engaged
in their own separate negotiations with JPMC, at which time they
both restricted their trading, even though they had not received
any other information from the Debtors.[46]

The Equity Committee argues that the fact that there was
early agreement on several terms of the settlement negotiations
made them particularly material.  The Settlement Noteholders
disagree, asserting that the market already understood the two
major components of any deal: that the Debtors were likely to
prevail in retaining ownership of the disputed bank deposits and
that, as a predicate for a plan, some agreement on the tax

---

[46]   Centerbridge stated that such restrictions were taken
only out of "an abundance of caution" but admitted that an
acceptable counterproposal from JPMC might "nudge the
negotiations towards the 'materiality' end of the spectrum of the
settlement negotiations, in that an acceptable proposal could
lead to further fruitful negotiations."  (D.I. 8430 at 17-18.)
The Court is unconvinced by this explanation.  Centerbridge
admits that it determined quickly that JPMC's counter-proposal
was inadequate, yet continued to restrict trading until six days
after JPMC withdrew its counter-proposal.

refunds would have to be reached between the Debtors and JPMC.
See Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 166 (2d Cir.
1980) (finding that the confirmation of facts that "were fairly
obvious to all who followed the stock . . . cannot be deemed
'reasonably certain to have a substantial effect on the market
price of the security.'").

Again, the Court disagrees.  There is no evidence in the
record that the market knew that the Debtors would prevail on the
disputed bank deposits or that there would be a settlement on the
tax refunds.  All the public knew was that the Debtors, JPMC, and
the FDIC were litigating those issues.  In fact, the Court was
prepared to issue a decision on the summary judgment motions
filed by the parties on the bank deposit issue when the GSA was
announced.

The Settlement Noteholders argue further that the
probability of a settlement cannot be evaluated based on
agreement on a few terms but must be viewed as a whole.  Despite
the fact that some terms did not change, the Settlement
Noteholders note that many terms were constantly changing as
later term sheets were exchanged.  (Tr. 7/21/2011 at 109.)  At
one point, JPMC changed its stance in the negotiations so
drastically that the Debtors viewed it as essentially
"reset[ting] the bookends" of any potential deal.  (EC 16; Tr.
7/18/2011 at 108.)  The Settlement Noteholders warn that if

disclosure of the constantly changing settlement terms was
required, it "would result in endless bewildering guesses as to
the need for disclosure, operate as a deterrent to the legitimate
conduct of corporate operations, and threaten to 'bury the
shareholders in an avalanche of trivial information.'" Taylor,
857 F.2d at 245.

This same argument was denounced by the Supreme Court when
it rejected the "agreement-in-principle" standard for evaluating
materiality of merger discussions and applies equally here.

> Three rationales have been offered in support of the
> "agreement-in-principle" test.  The first derives from
> the concern expressed in TSC Industries that an
> investor not be overwhelmed by excessively detailed and
> trivial information, and focuses on the substantial
> risk that preliminary merger discussions may collapse:
> because such discussions are inherently tentative,
> disclosure of their existence itself could mislead
> investors and foster false optimism. . . .  The first
> rationale, and the only one connected to the concerns
> expressed in TSC Industries, stands soundly rejected,
> even by a Court of Appeals that otherwise has accepted
> the wisdom of the agreement-in-principle test.  "It
> assumes that investors are nitwits, unable to
> appreciate - even when told - that mergers are risky
> propositions up until the closing."  Disclosure, and
> not paternalistic withholding of accurate information,
> is the policy chosen and expressed by Congress.

Basic, 485 U.S. at 237 (quoting Flamm v. Eberstadt, 814 F.2d
1169, 1175 (7th Cir. 1987).

The Plan Objectors disagree with the Settlement Noteholders'
contention that the settlement negotiations were too tentative to
be material.  The TPS Group asserts that over the course of
negotiations it became clear that a settlement was more probable

(as issues were resolved) and that the funds available to the estate were increasing.  The Plan Objectors argue that the materiality of the information is evident from the fact that as soon as the Settlement Noteholders were free to trade on that information they did: engaging in what the Equity Committee characterizes as a "buying spree" concentrating on acquiring (at a discount) junior claims because the Settlement Noteholders knew (although the public did not) that the junior creditors were likely to receive a recovery.  (AOC 18; AOC 54; AOC 62; Au 8.)

The Equity Committee also asserts that a materiality inference can be drawn from the fact that the Settlement Noteholders requested (and the Debtors granted) a termination of the Second Confidentiality Period a day early, on December 30, 2009, in order to permit them to trade before the end of the year.  (Tr. 7/18/2011 at 111.)  See, e.g., Basic, 485 U.S. at 240 n.18 ("We recognize that trading (and profit making) by insiders can serve as an indication of materiality."); United States v. Victor Teicher & Co., No. 88 CR. 796, 1990 WL 29697, at *2 (S.D.N.Y. Mar. 9, 1990) (citing the "very fact of [defendant's] trading" as "evidence of the materiality of the information").

The Settlement Noteholders respond that materiality cannot be gleaned from the trades in question, however, because some of the Settlement Noteholders were selling while others were buying or not trading at all.  (AOC 18; AOC 54; AOC 62; Au 8.)  If the

126

settlement discussions had any materiality, the Settlement
Noteholders argue that they would have all traded in the same
fashion.  They point to Appaloosa and Centerbridge as an example.
Both received a summary of the Debtors' April negotiations and
JPMC's August counter-offer during their own separate
negotiations, yet they engaged in opposite trades after receiving
that information.  (AOC 54; AOC 62.)  In another instance,
Aurelius sold PIERS on March 8, 2010, four days before the
announcement of the GSA, after which the price of the PIERS
skyrocketed.  (Au 8.)  According to the Settlement Noteholders,
if Aurelius possessed material nonpublic information regarding
the settlement, it would not have made such an unwise trade.

The fact that the Settlement Noteholders made unwise or
contrary trades, however, does not provide a defense to an
insider trading action.  See, e.g., SEC v. Thrasher, 152 F. Supp.
2d 291, 301 (S.D.N.Y. 2001) (concluding that a tippee is
potentially liable for insider trading even if it loses money by
trading on false information) (citing Bateman Eichler, Hill
Richards, Inc. v. Berner, 472 U.S. 299, 318 (1985)).

The Court does find it difficult to draw any conclusions
from the Settlement Noteholders' trades.  The Settlement
Noteholders actively traded in the Debtors' securities prior to,
and after, the confidentiality periods.  It is possible that
their trades were based on the publically disclosed information

127

regarding the tax refunds, but because full discovery on the Settlement Noteholders' internal trading decisions has not been permitted to date, the Court is unable to reach any conclusion based on the trades alone.

Based on the evidence presented thus far, however, it appears that the negotiations may have shifted towards the material end of the spectrum and that the Settlement Noteholders traded on that information which was not known to the public. Consequently, the Court finds that the Equity Committee has stated a colorable claim that the Settlement Noteholders received material nonpublic information.  Further discovery would help shed light on how the Settlement Noteholders internally treated the settlement discussions and if they considered them material to their trading decisions.

### (2)   Insider status

#### (a)   Temporary Insider

Insiders of a corporation are not limited to officers and directors, but may include "temporary insiders" who have "entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes." Dirks v. SEC, 463 U.S. 646, 655 n.14 (1983).  See also In re Krehl, 86 F.3d 737, 743 (7th Cir. 1996) (holding that "[a]ccess to inside information can be sufficient to confer insider status even where there is no legal

128

right or ability to exercise control over a corporate entity"). The Equity Committee and the TPS Group contend that the Settlement Noteholders became temporary insiders when they were given material non-public information creating a fiduciary duty on their part towards other creditors and shareholders.

The Settlement Noteholders assert that temporary insider status under the securities law is inapplicable to situations where the corporation and the outsider work together toward a goal in which they each have diverse interests and only applies if they are working towards a common goal. Dirks, 463 U.S. at 655 n.14. According to the Settlement Noteholders, the Supreme Court's use of the phrase "solely for corporate purposes" in Dirks was meant to exclude instances where a corporate purpose may be one or even the "primary reason" among others. Id. Further, the Settlement Noteholders assert that the Debtors have always been aware that the Settlement Noteholders' purpose for participating in the negotiations was to further their own economic self interest. (Tr. 7/21/2011 at 185, 202.)

The Equity Committee responds that the Debtors only gave the Settlement Noteholders access to the settlement term sheets to further the Debtors' efforts to effectuate a consensual plan of reorganization, which was the common goal of both the Debtors and the Settlement Noteholders. This, it argues, satisfies the common corporate goal required by Dirks. 463 U.S. at 655 n.14.

129

In addition, the Equity Committee argues that the Settlement Noteholders only obtained the information because they had acquired blocking positions in two subordinated classes of creditors (the senior subordinated notes and the PIERS).  It contends that this is sufficient to create a fiduciary duty on their part to those two classes of creditors.  Cf. Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.), 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002) (holding that creditors' committee member could not use his position on committee to advance his own personal interest at the expense of the unsecured creditors).

The Court finds that the Equity Committee has stated a colorable claim that the Settlement Noteholders became temporary insiders of the Debtors when the Debtors gave them confidential information and allowed them to participate in negotiations with JPMC for the shared goal of reaching a settlement that would form the basis of a consensual plan of reorganization.

(b)   Non-statutory insider

Alternatively, the Equity Committee and TPS Group assert that the Settlement Noteholders owed duties as non-statutory insiders under bankruptcy law.  See, e.g., Luedke v. Delta Air Lines, Inc., 159 B.R. 385 (S.D.N.Y. 1993) (holding that plaintiff stated a claim that creditors' committee assumed a duty to all parties by becoming a joint sponsor and proponent of plan); In re Wash. Mut., Inc., 419 B.R. 271, 278 (Bankr. D. Del. 2009) (noting

130

that "members of a class of creditors may, in fact, owe fiduciary duties to other members of the class" when they hold themselves out as representing that class); Official Comm. of Equity Sec. Holders of Mirant Corp. v. The Wilson Law Firm, P.C. (In re Mirant Corp.), 334 B.R. 787, 793 (Bankr. N.D. Tex. 2005) ("[W]hen a party purports to act for the benefit of a class, the party assumes a fiduciary role as to the class."); Rickel, 272 B.R. at 100 (noting that creditors' committee member may not use his position to advance his personal interest at the expense of the creditor class); In re Allegheny Int'l, Inc., 118 B.R. 282, 298 (Bankr. W.D. Pa. 1990) (party who received "a great volume of information that was not available to other creditors, shareholders, and the general public" was a temporary insider). See generally Mark J. Krudys, Insider Trading by Members of Creditors' Committees - Actionable!, 44 DePaul L. Rev. 99, 142 (1994) (noting that "members of creditor steering committees, like official creditors' committees, appear to come within the temporary insider definition articulated in Dirks"); Donald C. Langevoort, 18 Insider Trading Regulation, Enforcement and Prevention § 3:8 (database updated April 2011) ("More recently, the view has been expressed that members of a creditors committee overseeing a reorganization of the issuer would be treated as [temporary] insiders").  See also In re Winstar Commc'ns, Inc., 554 F.3d 382, 396-97 (3d Cir. 2009) (holding that parties who do

131

not fit the Bankruptcy Code definition of an insider may nonetheless be insiders if they have a sufficiently close relationship with the debtor to suggest that their transactions were not conducted at arm's length).

The Equity Committee has alleged and presented some evidence that the Settlement Noteholders could be considered insiders of the Debtors because of their status as holders of blocking positions in two classes of the Debtors' debt structure.  As such, it could be found that they owed a duty to the other members of those classes to act for their benefit.  Therefore, the Court finds that the Equity Committee has stated a colorable claim that the Settlement Noteholders are temporary insiders of the Debtors.

(3)  <u>Knowledge</u>

The Settlement Noteholders assert that there is no evidence that they knowingly or recklessly traded while in possession of material nonpublic information, and, therefore, the required scienter element of an insider trading claim is lacking.  <u>See, e.g.</u>, <u>Burlington Coat Factory Sec. Litig.</u>, 114 F.3d at 1422 (finding that scienter requires a "strong inference" that when trading the defendant "knew or recklessly disregarded" the fact that information in his possession was material).  Because the Debtors explicitly agreed to disclose any material nonpublic information at the end of each confidentiality period, the

Settlement Noteholders contend that they had no knowledge that the public did not know all material information.  The Settlement Noteholders note that the burden was on the Debtors to assure that the disclosures were appropriate.  (Au 16; Au 27; EC 24; EC 37; EC 111; EC 117; EC 141; EC 148.)  <u>See also</u> Richard H. Walker, Div. of Enforcement, Sec. Exch. Comm'n, Regulation FD - An Enforcement Perspective (Nov. 1, 2000), 2000 WL 1635668, at *2 (stating that the regulation "places the responsibility for avoiding selective disclosure, and the risks of engaging in it, squarely on the issuer" of the information).

The Equity Committee responds that good faith reliance on assurances of a third party, such as the source of the information, to disclose all material information to the public cannot be a defense.  Such a rule would vitiate the insider trading laws if a third party's assurances, with no further duty of inquiry, automatically insulated a party from insider trading liability.  Further, the Equity Committee asserts that there is clear circumstantial evidence (the volume of trades immediately after the confidentiality periods ended) which show that the Settlement Noteholders knowingly traded on the basis of the material, nonpublic information.  <u>See, e.g.</u>, <u>SEC v. Heider</u>, 90 Civ. 4636, 1990 WL 200673, at *4 (S.D.N.Y. Dec. 4, 1990) (allegations that volume of call option purchases spiked prior to merger and that defendants were responsible for a significant

133

portion of that volume supported a "strong inference" of defendant's scienter).

The Settlement Noteholders disagree, asserting that the evidence of their trading does not support an inference of scienter. Burlington Coat Factory Sec. Litig., 114 F.3d at 1424 (declining to infer fraudulent intent from "trading in the normal course of events"). They argue that the trading volume can be attributed to other facts of public record such as the momentum of the tax bill through Congress and the Debtors' estimates of their tax refunds.

While trades may provide circumstantial evidence of intent or recklessness, the statute only requires that the Settlement Noteholders have knowledge that they were in possession of material nonpublic information. Whether or not they profited from such knowledge or actually applied such knowledge in trading is not a required element. United States v. Teicher, 987 F.2d 112, 120 (2d Cir. 1993) (stating that "[u]nlike a loaded weapon which may stand ready but unused, material information can not lay idle in the human brain").

In addition the Court does not agree with the Settlement Noteholders' reliance exception to the scienter element of insider trading. The Settlement Noteholders each had strict internal policies prohibiting insider trading. (EC 3; EC 19; EC 103; AOC 16.) The Equity Committee contends that notwithstanding

134

those internal policies, the Settlement Noteholders knowingly traded with knowledge that the Debtors were engaged in global settlement negotiations with JPMC of which the trading public was unaware. The Settlement Noteholders cannot use the Debtor or their own counsel as a shield if they violated those policies.

The Court finds that the Equity Committee has made sufficient allegations and presented enough evidence to state a colorable claim that the Settlement Noteholders acted recklessly in their use of material nonpublic information. See Goldman v. McMahan, Brafman, Morgan & Co., 706 F. Supp. 256, 259 (S.D.N.Y. 1989) ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases . . . be the functional equivalent of recklessness."); Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 47 (2d Cir. 1978) ("Reckless conduct is . . . 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'") (citation omitted).

### ii.  Misappropriation theory

The TPS Group also alleges that Centerbridge is liable under the misappropriation theory which provides that insider trading can be found where "(1) . . . the defendant possessed material, nonpublic information; (2) which he had a duty to keep confidential; and (3) . . . the defendant breached his duty by

135

acting on or revealing the information in question." SEC v. Lyon, 605 F. Supp. 2d 531, 541 (S.D.N.Y. 2009). Liability attaches where "the tippee traded on the misappropriated information when [it] knew or should have known it was misappropriated." SEC v. Willis, 777 F. Supp. 1165, 1169 (S.D.N.Y. 1991).

According to the TPS Group, the Debtors shared information about the April 2009 negotiations with Fried Frank which was under a written confidentiality agreement barring it from sharing information with its clients, unless they were subject to confidentiality agreements of their own. (EC 10; D 408.) Nonetheless, on July 1, 2009, Fried Frank shared summaries of the April negotiations with both Centerbridge and Appaloosa, who were not at the time subject to a confidentiality agreement with the Debtors. (EC 215.) Centerbridge continued to trade, while Appaloosa voluntarily restricted its trading. The TPS Group asserts that, as a result, Fried Frank breached its duty of confidentiality to the Debtors and Centerbridge misappropriated confidential information.

The TPS Group asserts that Centerbridge knew or should have known that the information was restricted and subject to Fried Frank's confidentiality obligations to the Debtors. (Tr. 7/21/2011 at 30-31.) SEC v. Musella, 578 F. Supp. 425, 442 (S.D.N.Y. 1984) (finding knowledge where the individual was a

136

"sophisticated . . . market professional" who should have inquired about the "underlying circumstances of the tip received").

In addition, the Equity Committee contends that following the Second Confidentiality Period, material information was shared with the Settlement Noteholders by Fried Frank. The Settlement Noteholders contend, however, that although they had discussions and meetings with Fried Frank about the plan of reorganization, they received no material information from Fried Frank about the substance of the negotiations during this period. (Tr. 7/18/2011 at 116, 119; Tr. 7/19/2011 at 144; Tr. 7/20/2011 at 75; Tr. 7/21/2011 at 136.) The Court has substantial doubts about these assertions. Further discovery on this issue would clarify this point.

For all the above reasons, the Court finds that the Equity Committee and the TPS Group have stated a colorable claim that the Settlement Noteholders engaged in insider trading under the classical and misappropriation theories.

The Settlement Noteholders warn that any finding of insider trading will chill the participation of creditors in settlement discussions in bankruptcy cases of public companies. The Court disagrees. There is an easy solution: creditors who want to participate in settlement discussions in which they receive material nonpublic information about the debtor must either

137

restrict their trading or establish an ethical wall between traders and participants in the bankruptcy case. These types of restrictions are common in bankruptcy cases. Members of creditors' committees and equity committees are always subject to these restrictions. <u>See e.g.</u>, Adelphia, 368 B.R. at 152 n.11. The Court does not believe that a requirement to restrict trading or create an ethical wall in exchange for a seat at the negotiating table places an undue burden on creditors who wish to receive confidential information and give their input.

      c.  <u>Burden on estate</u>

The Court is required, however, to balance the probability of success on the claim against the burden on the estate that would result from its prosecution. Judging from the vigor with which the Settlement Noteholders have opposed the Equity Committee's standing motion, the Court is concerned that the case will devolve into a litigation morass. In addition, the Court notes that as the case continues, the potential recoveries for all parties in the case dwindles. Regardless of which parties prevail, they may be disappointed to find their recovery significantly less than expected.

Therefore, before the Equity Committee proceeds with its claim any further, the Court will direct that the parties go to mediation on this issue, as well as the issues that remain an impediment to confirmation of any plan of reorganization in this

138

case.  A status hearing to discuss this will be held at the
omnibus hearing currently scheduled for October 7, 2011, 11:30
am.


IV.   <u>CONCLUSION</u>

        For the foregoing reasons, the Court will deny confirmation
of the Plan, grant but stay the Equity Committee's standing
motion, and direct the parties to proceed to mediation.

        An appropriate Order is attached.



DATED: September 13, 2011      BY THE COURT:

                               Mary F. Walrath
                               United States Bankruptcy Judge