**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WASHINGTON MUTUAL, INC., et al., | ) | Case No. 08-12229 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |

### MEMORANDUM OPINION[1]

Before the Court is the objection of Washington Mutual, Inc. ("WMI") to the claim filed by Tranquility Master Fund, Ltd. ("Tranquility"). The crux of the issues presented is whether Tranquility has properly pled a claim and if that claim should be subordinated. For the reasons set forth below, the Court finds Tranquility has sufficiently pled its claim and that WMI has not stated a basis to subordinate Tranquility's claim.

I.    BACKGROUND

On September 26, 2008, WMI and WMI Investment Corp. (collectively, the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code.

Prior to the filing WMI had directly or indirectly owned all of the outstanding capital stock of Washington Mutual Bank ("WMB") and WMB's subsidiaries, including WaMu Asset Acceptance Corp. ("WaMu Asset Acceptance") and WaMu Capital Corp.("WaMu

_____

[1] The parties have agreed to have the Court consider the issues preliminarily on the standards applicable to a motion to dismiss. (D.I. 2531 at 8-9) Consequently, the Court is not required to state findings of fact or conclusions of law pursuant to Rule 7052(a)(3) of the Federal Rules of Bankruptcy Procedure.

Capital").

WMB originated residential mortgages, which were then pooled and transferred to special-purpose trusts (the "WaMu Trusts"). The loans were also pooled with those of third parties into similar trusts (the "WMALT Trusts").  The Trusts sold securities to WaMu Asset Acceptance for resale to investors.  From 2006 through 2007, WaMu Asset Acceptance sold approximately $71 million in WaMu and WMALT Trust Certificates to Tranquility.

On March 30, 2009, Tranquility filed a proof of claim against the Debtors in the amount of approximately $49 million, to which the Debtors objected.  The parties subsequently briefed and argued several legal issues, which were decided by an Order entered on November 12, 2010, sustaining in part and overruling in part the Debtors' objection.  The Order permitted the filing of an amended claim by Tranquility, which was filed on November 30, 2010.  Several remaining issues raised by the Debtors' claim objection have now been briefed and argued.  The matter is ripe for decision.


II.  <u>JURISDICTION</u>

This Court has jurisdiction over this matter, which is a core proceeding.  28 U.S.C. § 1334 & 157(b)(2)(B).

III. <u>DISCUSSION</u>

    A.   <u>Standard of Review</u>

The parties have agreed to treat these matters in the nature of a motion to dismiss. (D.I. 2531 at 8-9.) Under this standard, a claim is sufficient if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009). A claim is sufficient if it is "facially plausible," a determination that is based upon the reviewing court's "judicial experience and common sense." <u>Id.</u> at 1950.

The Third Circuit has implemented a two part analysis: "First the factual and legal elements of a claim should be separated. The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009). <u>See also</u> <u>Iqbal</u>, 129 S. Ct. at 1949-50 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice . . . . When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). "The plaintiff must put some 'meat on the bones' by presenting sufficient factual allegations to explain the basis for its claim." <u>Buckley v. Merrill Lynch & Co., Inc. (In re DVI,</u>

Inc.), Bankr. No. 03-12656, Adv. No. 08-50248, 2008 WL 4239120, at *4 (Bankr. D. Del. Sept. 16, 2008).

   B.   Control Person Liability

   Tranquility alleges that WaMu Asset Acceptance solicited, offered, and sold WaMu and WMALT Trust Certificates to Tranquility pursuant to offering documents containing material misrepresentations and omissions.  The misstatements in the offering documents include statements regarding whether the underlying mortgages were independently appraised in accordance with applicable law, were not subject to any claims or defenses, and had accurate loan-to-value ratios.  Tranquility also contends that information from a study done on past and expected future default rates on the underlying mortgages was omitted from the offering documents.

   Tranquility bases its claim against the Debtors on a theory of control person liability under both section 15 of the Securities Act of 1933 and section 25504 of the California Corporations Code.  The federal and state statutes incorporate substantially similar language and impose joint and several liability upon a control person when a controlled person violates the statutes[2] by selling securities by means of a written

---

[2] For the purpose of this decision, the Debtors assume but do not admit the alleged underlying violations of the California Corporations Code and the Securities Act of 1933.

communication containing a material misstatement or omission.[3]

The Debtors object to Tranquility's control person liability claims on two grounds: (1) the Debtors' lack of control over the underlying violators and (2) Tranquility's failure to plead sufficiently culpable participation by the Debtors.

1.    Control

Tranquility contends that WMI centrally managed the Washington Mutual organization — including WaMu Capital, WaMu Asset Acceptance, and the WaMu and WMALT Trusts — through its executive officers and board of directors.  WMI's executive committee allegedly controlled the strategy and direction of the organization as a whole through the work of its subsidiaries. Tranquility asserts that WMI controlled the offering entities as divisions of an integrated mortgage-backed securities production "factory."

To support its allegations, Tranquility cites WMI's 10-K reports that show WMI itself recognized the organization as one

---

[3] The federal statute states "[every] person who . . . controls any person liable under Section 11 . . . shall also be joint and severally liable with and to the same extent as such controlled person . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."  11 U.S.C. § 77o.  The California statute states that "Every person who directly or indirectly controls a person liable under Section 25501 . . . [is] also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."  Cal. Corp. Code § 25504.

integrated company with consolidated financial reports. Additionally, Tranquility cites WaMu's uniform code of conduct governing all employees of the organization as evidence that WMI controlled, managed, and influenced the employees of all direct and indirect subsidiaries in the performance of their duties.

Tranquility also asserts that at all times the heads of the subsidiaries' day-to-day operations, risk management, and control functions reported to Kerry Killinger, WMI's Chairman and Chief Executive Officer. According to Tranquility, WMI, through Mr. Killinger, directed and controlled the organization's entire corporate strategy, including the appraisal and securitization practices of its subsidiaries. Tranquility also contends that Stephen Rotella, WMI's President and Chief Operating Officer, directly oversaw the day-to-day operations of the home loans business line and froze internal initiatives to improve underwriting, appraisal, and credit risk practices. Tranquility asserts that Ronald Cathcart, WMI's Executive Vice President and Chief Risk Officer, has admitted in a written statement to a Senate Committee that he submitted numerous reports to senior management detailing control weaknesses throughout the WaMu organization and highlighting a continual problem with adherence to policies, particularly in the mortgage area where line managers encouraged policy exceptions. It also cites the testimony of David Beck, WMI's Executive Vice President and Chief

Investment Officer, that WMI's senior management were directly involved in WMB's decisions to securitize and sell Option ARM mortgages with significant known but undisclosed delinquencies. Finally, Tranquility contends that WMI also controlled its subsidiaries' risk management and compliance with regulations through committees of its Board of Directors, including the audit, enterprise risk management, credit policy, finance, and market risk committees.

The Debtors respond that it is inappropriate for Tranquility to utilize the Debtors' use of the terms "controlling" and "company" in its SEC filings to support a finding of the control necessary for control person liability. The Debtors assert that these statements simply refer to the regulatory requirements imposed by federal banking authorities and that the latter's definition of control is not the applicable standard. In fact, the Debtors contend that WMI was just a holding company that had little or no involvement in the day-to-day operations of either WaMu Capital or WaMu Asset Acceptance. Specifically, the Debtors assert that WMI had no involvement in the appraisals at issue, the securitization process, or setting appraisal policy. The Debtors argue that despite overlapping board members at WMI and its subsidiaries, the companies are still completely separate legal entities. Additionally, the Debtors argue that a board member's actions on behalf of a subsidiary should not be imputed

to the Debtors simply because that person was also a WMI board member.

The Court finds that Tranquility has pled facts sufficient to support its claim that the Debtors controlled WaMu Capital and WaMu Asset Acceptance.  In the context of section 15, control means "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." Rochez Bros. Inc. v. Rhoades, 527 F.2d 880, 890 (3d Cir. 1975).  While the Debtors are correct that the use of the term "control" in their SEC filings is not dispositive, Tranquility has alleged several other facts to support its contention that WMI controlled its subsidiaries, including the statements of Mr. Cathcart and Mr. Beck regarding the structure of the organization, the information the Debtors received about their subsidiaries, and the policies the Debtors set for the organization as a whole.

2.   Culpable Participation

The Debtors also claim that Tranquility has not met its pleading burden because it fails to allege culpable participation by the Debtors as a part of its control person liability claims under both the state and federal statutes.  See, e.g., Dutton v. Harris Stratex Networks, Inc., 270 F.R.D. 171, 178 (D. Del. 2010) (requiring a pleading of culpable participation that supports

8

"the reasonable inference that defendants had the potential to influence and direct the activities of the primary violator"); Tracinda Corp. v. DaimlerChrysler AG, 197 F. Supp. 2d 42, 55 (D. Del 2002) (holding that a section 15 claim must allege culpable participation); Kainos Labs, Inc. v. Beacon Diagnostics, No. C-97-4618, 1998 WL 2016634, at *15 (N.D. Cal Sept. 14, 1998) (finding that culpable participation is a required element of control person liability claims under California Corporations Code section 25504).

The Debtors contend that Tranquility expressly stated that it was not asserting any "knowing, intentional, or reckless misconduct" by WMI and, therefore, it has failed to allege that the Debtors were culpable participants in the underlying violation.  (Amended Claim at ¶¶ 301 & 309.)  The Debtors argue that even if culpable participation is an affirmative defense to be raised by the Debtors rather than an element of the claimant's prima facie case, Tranquility's pleadings have removed any dispute of fact on this issue and render its claim ripe for dismissal at the pleading stage.  See Stanziale v. Nachtomi (In re Tower Air), 416 F.3d 229, 238 (3d Cir. 2005).

Tranquility responds that the California statute and the federal statute do not require culpable participation to establish control person liability.  See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284 (3d Cir. 2006)

9

(requiring culpable participation for a claim under section 20(a) but not for a section 15 claim); In re Worldcom, Inc., 377 B.R. 77, 105 (Bankr. S.D.N.Y. 2007) (stating that culpable participation is not required under the federal statute even for a section 20(a) claim); Hellum v. Breyer, 194 Cal. App. 4th 1300, 1317 (Cal. Ct. App. 2011) (holding that a pleading of culpable participation is not required under the California statute). Tranquility contends that it need only plead and prove a primary violation and that WMI "exercised actual power or control over the primary violator." Worldcom, 377 B.R. at 105 (citing Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000)). Once it has sufficiently pled these elements, the burden then shifts to the Debtors to prove that they acted in good faith by demonstrating that there was no scienter. Worldcom, 377 B.R. at 105.

Tranquility acknowledges, however, that courts are split on the issue of whether culpable participation must be pled to support its federal claims. Compare In re Digital Island Sec. Litig., 223 F. Supp. 2d 546, 561 (D. Del. 2002) (requiring a claim to state "with particularity the circumstances of . . . the defendant's culpability as control persons") with Jones v. Intelli-Check, Inc., 274 F. Supp. 2d 615, 645 (D.N.J. 2003) (holding that culpable participation does not have to be pled to survive a motion to dismiss). See also In re Am. Bus. Fin.

Servs., No. 05-232, 2007 WL 81937, at *11 (E.D.Pa. Jan. 9, 2007)
(acknowledging the split in case law on the issue of culpable
participation).  Tranquility urges the Court to conclude that
culpable participation is not required to be pled as part of the
prima facie case but is an affirmative defense to be raised by
the Debtors.  See, e.g., Howard v. Everex Sys., Inc., 228 F.3d
1057, 1065 (9th Cir. 2000); In re Am. Bus. Fin. Servs., 2007 WL
81937, at *11.

The Court concludes that Tranquility is not required to
plead culpable participation as a part of its prima facie case
under either its state or federal control person liability
claims.  A prima facie case for control person liability only
requires a plaintiff to plead facts showing the underlying
violation and establishing the defendant's control over the
underlying violator.  Howard, 228 F.3d at 1065; Jones, 274 F.
Supp. 2d at 645.  It would place an unreasonable burden on the
claimant to require a pleading of culpable participation because
"the facts establishing culpable participation can only be
expected to emerge after discovery [and] virtually all of the
remaining evidence, should it exist, is usually within the
defendant's control."  Derensis v. Coopers & Lyband Chartered
Accountants, 930 F. Supp. 1003, 1013 (D.N.J. 1996).  Although the
Rochez Court states that there must be a finding of culpable
participation before liability may attach, Rochez was beyond the

pleading stage and made no mention of culpable participation as a pleading requirement.  <u>Rochez</u>, 527 F.2d at 883-84, 890.

As a result, the Court concludes that Tranquility has stated a claim against WMI for control person liability under the California and federal statutes.

C.   <u>Material Assistance</u>

Section 25504.1 of the California statute also imposes joint and several liability on every person who materially assists in any violation of section 25401 "with intent to deceive or defraud."  Tranquility alleges that WMI is liable under this section.  It contends that WMI had the requisite "intent to deceive or defraud" because it designed and controlled the entire securitization scheme through the use of subsidiary entities such as WaMu Capital and WaMu Asset Acceptance.  Additionally, Tranquility claims that the Debtors had motive and opportunity to misrepresent and omit material facts regarding the appraisal and securitization process.  Tranquility contends that even its allegations of recklessness by the Debtors are sufficient to support a finding of intent necessary to satisfy the requirements of the material assistance claims.  <u>In re Nuveen Funds/City of Alameda Sec. Litig.</u>, No. C 08-4575 SI, 2011 WL 1842819, at *23 (N.D. Cal. May 16, 2011) (stating that reckless intent could be sufficient for a finding of scienter).  Finally, Tranquility asserts that the Debtors knew about the misrepresentations in the

12

offering documents but remained silent.

The factual basis for Tranquility's allegations is in part the testimony of Mr. Beck at hearings before the Senate, in which he admitted that he understood there was fraud in some of the loans being securitized and did nothing to ensure that those loans were removed from the pools of mortgages being securitized and sold.  Tranquility also relies on emails from February 2007 among David Schneider, WMI's Executive Vice President and President of Home Loans, Mr. Beck, and several other WaMu employees, discussing the urgent need to securitize and sell a larger-than-usual pool of loans because those loans had experienced higher than expected delinquency rates in the previous quarter which were expected to rise in the future.  This information was not included in the offering documents. Tranquility asserts that the knowledge of WMI's executives, the omissions and misrepresentations in the offering documents, and WMI's incentive to sell these loans before unsuspecting investors became aware of the delinquency rates evidence the requisite intent to deceive or defraud for a material assistance claim.

The Debtors respond that Tranquility's allegations that the Debtor "knew, or was reckless in failing to know" about the material misstatements and omissions rise only to the level of recklessness, which is not a basis for liability.  In re ZZZZ Best Sec. Litig., No. CV 87-3574, 1990 WL 132715, at *18 (C.D.

Cal. July 23, 1990).  The Debtors argue that <u>Nuveen</u> never even addresses the intent required for a material assistance claim and only discusses the intent required for the underlying violation. <u>Nuveen</u>, 2011 WL 1842819 at *22-23.  Therefore, the Debtors assert Tranquility's material assistance claim should be dismissed for failing to allege the required intent to deceive or defraud.

The Court concludes that Tranquility has sufficiently pled its material assistance claim.  The Debtors are correct that <u>Nuveen</u> only addresses the intent required for the underlying violation and not the intent required to sustain a material assistance claim.  <u>Id.</u>  The Debtors, however, cite only Tranquility's assertion that WMI "knew, or was reckless in failing to know" as the entirety of Tranquility's allegations. In fact, Tranquility's pleadings go well beyond allegations of recklessness, with multiple citations to specific knowing and intentional actions by the Debtors.  <u>See</u> <u>In re ZZZZ Best Sec. Litig.</u>, 1990 WL 132715 at *18  (holding that although "reckless" allegations are insufficient to state a claim for material assistance, allegations that are based on actual knowledge and intent to deceive and defraud are sufficient).  Tranquility's material assistance allegations in this case reach far beyond the few words asserting a reckless level of intent and state a claim of intent to deceive or defraud.

Therefore, the Court concludes that Tranquility has stated a claim against WMI for material assistance under both the California and federal statutes.

D.    Claim Subordination

The Debtors assert that should the Court allow Tranquility's claims to proceed, those claims must be subordinated under section 510(b) which provides that "a claim arising from the rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor . . . shall be subordinated to all claims or interests that are senior to or equal the claim."  11 U.S.C. § 510(b).

Tranquility asserts preliminarily that the Debtors' attempt to subordinate is procedurally improper at this stage.  Rule 3007(b) of the Federal Rules of Bankruptcy Procedure states that "[a] party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding." Rule 7001(8) provides that a proceeding to subordinate any allowed claim must be brought as an adversary proceeding, unless subordination is provided by a chapter 11 plan.

The Debtors respond that Rule 7001(8) only requires an adversary proceeding for subordination of "allowed" claims and because they are objecting to Tranquility's claims, those claims are not "allowed" and Rule 7001(8) does not apply.  The Debtors

15

also assert that Rule 7001(8) specifically states that an adversary proceeding for claim subordination is not required when a chapter 11 plan provides for a class of subordinated claims, as the Debtors' plan does in this case.

The Court agrees with the latter argument.  An adversary proceeding is only required for claim subordination if subordination is not provided for under a chapter 11 plan.  In this case, the Debtors' plan has provided for a class of subordinated claims.  Therefore, an adversary proceeding is not required to reach the issue of claim subordination, and the Court will consider it in the context of the Debtors' Objection to Tranquility's claim.

The Debtors contend that the WaMu and WMALT Trusts that issued the Certificates purchased by Tranquility were affiliates of the Debtors pursuant to section 101(2)(C) of the Bankruptcy Code, which defines affiliate as "a person whose business is operated under a lease or operating agreement by a debtor, or . . . an operating agreement with a debtor."  11 U.S.C. § 101(2)(C). The Debtors argue that the Pooling and Servicing Agreements between the Trusts and WaMu Asset Acceptance constitute de facto operating agreements which satisfy that element.  Further, the Debtors argue that although the Debtors themselves are not a party to these Pooling and Servicing Agreements, if the Court accepts Tranquility's underlying allegations that the entire WaMu

organization was acting as one entity, then WaMu Asset Acceptance's participation in these agreements would satisfy the requirement that the operating agreements be "by" or "with" the Debtors.

Tranquility responds that the Pooling and Servicing Agreements are not operating agreements within the plain meaning of the statute, and therefore the Trusts cannot be considered affiliates of the Debtors according to section 101(2)(C). Tranquility also argues that even if they were operating agreements, those agreements were not "by" or "with" the Debtors as required by the statute. See In re Semcrude, L.P., 436 B.R. 317, 321 (Bankr. D. Del. 2010) (finding that even if the purported partnership agreement constituted an operating agreement it would not satisfy the section 101(2)(C) definition of affiliate because the agreement was between two non-debtors).

The Court finds that the Debtors have not adequately proven that the Pooling and Servicing Agreements constitute an operating agreement under the plain meaning of the statute. Even if they could, however, they cannot overcome the fact that WMI was not a party to those agreements. As in Semcrude, because the agreement in question is between two non-debtors, it cannot provide a basis for subordination under section 101(2)(C). Id. at 321.

The Debtors argue nonetheless that if the Court accepts Tranquility's underlying claims that WMI controlled the entire

WaMu organization through the actions of its subsidiary entities, then WaMu Asset Acceptance's participation in the Pooling and Servicing Agreements should be treated as if the Debtors themselves were a party to these agreements. The Debtors provide no support for their contention that mere "control" of an entity is sufficient to ignore its legal separateness. Consequently, the Court rejects this argument as beyond the plain meaning of the definition of affiliate in section 101(2)(C).

The Debtors and Creditors' Committee finally argue that section 510(b) nonetheless applies to the sale of the Wamu Trust and WMALT Trust Certificates by WaMu Asset Acceptance. That section covers the sale "of a security of the debtor or of an affiliate of the debtor." 11 U.S.C. § 510(b). The Debtors and Committee argue that the securities sold need not be "issued by" the debtor or affiliate but need only be those "of" the debtor or "of" an affiliate of the debtor. They contend that the word "of" only requires that the debtor or affiliate be the <u>seller</u> of the securities and does not require that it be the <u>issuer</u>. Because WaMu Asset Acceptance, an affiliate of the Debtors,[4] sold the Certificates issued by the Trusts, the Debtors and Committee contend that Tranquility's claim should be subordinated. The

---

[4] WaMu Asset Acceptance is an affiliate of the Debtors pursuant to the definition in section 101(2)(B) of the Bankruptcy Code as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned . . . by the debtor." 11 U.S.C. § 101(2)(B).

Committee argues that equitable considerations support this interpretation of section 510(b) because it is unreasonable to shift "even a small portion of the risk of illegality" of the issuance of a security to the creditors who did not agree to accept such a risk. Baroda Hill Invests. v. Telegroup (In re Telegroup), 281 F.3d 133, 140 (3d Cir. 2002).

Tranquility responds that there is no legal basis for the Debtors' and Committee's argument. Tranquility notes that rather than citing case law in support of their position, the Debtors and Committee rely on a nearly 40 year old law review article to bolster their argument. See generally John J. Slain & Homer Kripke, The Interface Between Securities Regulation and Bankruptcy - Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors, 48 N.Y.U. L. Rev. 261 (1973). Tranquility notes that the focus - and even the title - of the Slain & Kripke article shows its inapplicability because it discusses allocating the risk of the "issuance" illegal securities between securityholders and the "issuer's" creditors. Id. Tranquility contends that because the instant case does not involve the rights of the issuer's creditors, this article is inapplicable.

The Court agrees with Tranquility that there is no basis for subordination of its claim. The article and case law cited by the Debtors and Creditors' Committee address the competing

19

interests of creditors and the buyers of securities issued by a debtor.  See Telegroup, 281 F.3d at 140 ("Slain and Kripke were primarily concerned with actionable conduct occurring in the issuance of the debtor's securities").  Neither the Debtors nor their affiliates are the issuers of the Certificates.

Even if the language in 510(b) was ambiguous, equitable concerns weigh against subordinating Tranquility's claim. Tranquility did not purchase a security of the Debtors and did not assume the risk (and potential rewards) that a shareholder of the Debtors assumed.

The theory behind the Slain and Kripke article, and section 510(b), is that it would be inequitable to elevate a shareholder's interest to the level of a creditor.  This applies when the shareholder buys stock from an issuer but not when it buys stock from a third party.  The example cited by the Debtors in oral argument illustrates this.  If Tranquility bought stock of WMI from WMI, it would be assuming the risks normally associated with that stock, including the risk that WMI could become insolvent.  If WMI had committed fraud in that sale, Tranquility would have a claim for that fraud, but it would be inequitable to treat Tranquility like the other creditors if WMI becomes insolvent because Tranquility assumed that risk.

The analysis changes, however, where Tranquility buys stock of another company, say Apple, from WMI.  Tranquility is assuming

the risks associated with owning stock in Apple, including that
Apple may become insolvent, but not that WMI may become
insolvent.  If WMI defrauded Tranquility in the sale of Apple
stock, therefore, Tranquility should be treated like any other
creditor of WMI because Tranquility never assumed the risks of a
WMI shareholder.  If this were not the case, then all claims of
customers defrauded by a broker/dealer would be subordinated and
treated as if they were shareholders of that broker/dealer rather
than customers or creditors.  That would extrapolate section
510(b) far beyond its intent or plain language.

Therefore, the Court concludes that because the Certificates
sold by WaMu Asset Acceptance were not securities of the Debtors
or an affiliate of the Debtors, subordination under section
510(b) is not available.


IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that Tranquility
has sufficiently stated a claim against the Debtors and the
Debtors have not stated a basis for its subordination.

An appropriate order is attached.


Dated: December 20, 2011          BY THE COURT:

                                  Mary F. Walrath
                                  United States Bankruptcy Judge

21