## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| _____ ) | Chapter 11 |
| *In re* ) | |
| ) | Case No. 08-12229 (MFW) |
| WASHINGTON MUTUAL, INC., *et al.*, ) | (Jointly Administered) |
| ) | **Hearing Date:  February 24, 2012 at 9:30 a.m.** |
| Debtors. ) | **Related To Docket Nos. 5971, 6242, 6254, 9691,** |
| _____ ) | **9692 and 9693** |

**OPPOSITION OF DIRECTOR AND OFFICER CLAIMANTS TO DEBTORS'
SUPPLEMENTAL RESPONSE TO MOTION TO ESTIMATE MAXIMUM AMOUNT
OF CERTAIN CLAIMS FOR PURPOSES OF ESTABLISHING RESERVES UNDER
THE DEBTORS' CONFIRMED CHAPTER 11 PLAN WITH RESPECT TO THE
INDEMNIFICATION CLAIMS FILED BY CERTAIN DIRECTORS AND OFFICERS**

MONZACK MERSKY MCLAUGHLIN &
BROWDER, P.A.
Rachel B. Mersky, Esquire (DE #2049)
1201 N. Orange Street, Suite 400
Wilmington, DE  19801-1155
Telephone:  (302) 656-8162
Facsimile:  (302) 656-2769
Email:  rmersky@monlaw.com

Barry M. Kaplan, WSBA #8661
Daniel W. Turbow
Jerome F. Birn, Jr.
Wilson, Sonsini, Goodrich & Rosati
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Telephone:  (206) 883-2500
Facsimile:  (206) 883-2699
Email:  bkaplan@wsgr.com
Email:  dwturbow@wsgr.com
Email:  jbirn@wsgr.com

Attorneys for Claimant
KERRY K. KILLINGER

BIFFERATO LLC
Ian Connor Bifferato (No. 3273)
Thomas F. Driscoll III (No. 4703)
800 N. King St., Plaza Level
Wilmington, DE 19801
Tel: (302) 225-7600
Fax: (302) 254-5383

Ronald L. Berenstain (WSBA No. 7579)
(admitted pro hac vice)
Alan D. Smith (WSBA No. 24964)
(admitted pro hac vice)
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101
Tel: (206) 359-8000
Fax: (206) 359-9000

Attorneys for Claimants Stephen Chazen,
Anne Farrell, Stephen Frank, Thomas
Leppert, Charles Lillis, Phillip Matthews,
Regina Montoya, Michael Murphy,
Margaret Osmer McQuade, Mary Pugh,
William Reed, Jr., Orin Smith, James
Stever and Willis Wood, Jr.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................... 1

BACKGROUND ........................................................................................ 4

    A.    The D&O Claimants' Proofs of Claim .................................... 4

    B.    The D&O Claimants' Indemnification and Advancement Rights ......................... 5

    C.    The D&O Policies .................................................................. 9

        1.    The 2007/2008 ABC Primary D&O Policy .................................. 9

        2.    The 2007/2008 Primary Side A Policy ..................................... 12

        3.    The 2004/2005 Primary D&O Policy ....................................... 13

    D.    WMI's Failure to Pay the Retention .................................... 14

    E.    Debtors' Efforts to Reject the D&O Claimants' Indemnification Claims ............ 15

ARGUMENT ........................................................................................... 17

I.    Debtors' Attempt to Conservatively Estimate the D&O Claimants' Indemnification  Claims Would Violate The D&O Claimants' Indemnification Rights. ................................................................................ 17

II.    The D&O Claimants Have Standing to Recover from Debtors the Amounts that the D&O Carriers Advanced As a Result of Debtors' Failure to Pay Their Indemnification Obligations. ................................................. 20

    A.    The D&O Claimants Have An Economic Interest In Recovery of Funds Advanced By the D&O Carriers Because Recovery Will Replenish Their D&O Insurance Coverage ......................................... 21

    B.    The D&O Claimants Have an Obligation Under the D&O Policies To Protect the D&O Carriers' Subrogation Rights ................................ 24

III.    The Estimation Reserve Should Include Payments Made by the D&O Carriers On the D&O Claimants' Behalf Due to WMI's Financial Insolvency. ................ 25

    A.    The 2007/2008 Primary D&O Policy Expressly Allows the D&O Carriers to Recover Retention Payments from WMI ..................................... 25

    B.    This Reserve Should Also Include Payments Made by the 2007/2008 Side A D&O Carriers on Behalf of the D&O Claimants ............................ 29

    C.    The 2004/2005 D&O Carriers Are Also Subrogated to the D&O Claimants' Rights Under the 2004/2005 Primary D&O Policy ............................ 30

    D.    The Common Law "Anti-Subrogation Rule" Is Inapplicable ........................ 31

i

IV.    WMI Must Indemnify the D&O Claimants For Expenses Related to Establishing
       Their Indemnification Rights, Including Opposing Debtors' Estimation Motion ............ 33

       A.    The Indemnification Agreements Unambiguously Require WMI to
             Indemnify the D&O Claimants for Fees and Costs Incurred Establishing
             and Defending Their Indemnification Rights ......................................................... 34

       B.    The D&O Claimants Are Not Seeking Indemnification For Expenses
             Unrelated to Establishing Their Indemnification Rights and Opposing
             Debtors' Motion to Extinguish Those Rights ......................................................... 36

       C.    The D&O Claimants Are Not Seeking Unallowable Post-Petition Fees and
             Expenses ................................................................................................................. 38

       D.    The D&O Claimants' Indemnification Rights Should Not Be Subordinated ....... 39

CONCLUSION ........................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aventis Cropscience USA LP v. Phillip Servs. (Del.), Inc.,* No. 00C729, 2001 WL 1219477 (W.D. Wash. Mar. 9, 2001) ........................................................38, 39

*Begier v. I.R.S.,* 496 U.S. 53 (1990).........................................................................19

*DeHerrera v. Am. Family Mut. Ins. Co.*, 219 P.3d 346 (Colo. App. 2009)............................31, 33

*Horner v. Farmers Ins. Co. of Wash.,* No. 64169-7-1, 2011 Wash. App. LEXIS 76 (Wash. Ct. App. Jan. 10, 2011)..........................................................................33

*In re Chemtura Corp.,* 448 B.R. 635 (Bankr. S.D.N.Y. 2011)...............................17, 19

*In re Hemingway Transport, Inc.,* 954 F.2d 1 (1st Cir. 1992)......................................38

*In re Highland Group, Inc.*, 136 B.R. 475 (Bankr. N.D. Ohio 1992)............................38

*In re Mid-American Waste,* 228 B.R. 816 (Bankr. D. Del. 1999) ................................39

*In re St. Francis Physician Network, Inc.,* 213 B.R. 710 (Bankr. N.D. Ill. 1997)........................19

*In re Teigen,* 228 B.R. 720 (Bankr. D.S.D. 1998) ......................................................17

*In re Wash. Mut., Inc.*, 461 B.R. 200 (Bankr. D. Del. 2011)........................................21

*In re Wilbur*, 237 B.R. 203 (Bankr. M.D. Fla. 1999) ..................................................38

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................21

*Seine Vessels Reserve v. Dunlap Towing Co.,* No. C09-633RAJ, 2010 U.S. Dist. LEXIS 57393 (W.D. Wash. June 10, 2010) ....................................................32

*Stetina v. State Farm Mut. Auto. Ins. Co.,* 243 N.W.2d 341 (Neb. 1976) ...................32

*Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443 (2007).............................................................................................................38

## STATUTES

11 U.S.C. § 362.........................................................................................................9

11 U.S.C. § 362(d) ..................................................................................................14

11 U.S.C. § 502(c) .................................................................................................2, 17

11 U.S.C. § 502(c)(1)...............................................................................................17

RCW 23B.08.510........................................................................................................5

RCW 23B.08.550.................................................................................................................5

RCW 23B.08.560.................................................................................................................7

Certain former outside directors (the "***Outside Directors***")[1] of Washington Mutual, Inc. ("***WMI***" and, with WMI Investment Corp., the "***Debtors***"), and Kerry K. Killinger,[2] former Chief Executive Officer and director of WMI ("***Killinger***" and, with the Outside Directors, the "***D&O Claimants***"), by and through their attorneys, hereby file this opposition (the "***Opposition***") to Debtors' Supplemental Response in Support of Debtors' Motion to Estimate Maximum Amount of Certain Claims for Purposes of Establishing Reserves Under Debtors' Confirmed Chapter 11 Plan With Respect to the Indemnification Claims Held by Certain Directors and Officers (the "***Supplemental Response***" or "***Supp. Resp.***").

## INTRODUCTION

The D&O Claimants timely filed proofs of claim to secure the indemnification and advancement obligations owed to each of them by WMI pursuant to, among other things, Indemnification Agreements that each had with WMI.  By virtue of these proofs of claim, the D&O Claimants now seek to establish a reserve to cover the D&O Claimants' (a) unpaid legal fees and expenses incurred to defend themselves in various non-subordinated litigations and other arising from their duties as directors and/or officers of WMI; (b) unpaid legal fees and expenses they incurred to secure their indemnification rights; and (c) amounts paid by the directors and officers liability insurance carriers (the "***D&O Carriers***") for non-subordinated

---

[1] The Outside Directors who are parties to this pleading are Stephen Chazen (Claim No. 2631), Anne Farrell (Claim No. 2240), Stephen Frank (Claim No. 2635), Thomas Leppert (Claim No. 2637), Charles Lillis (Claim No. 2604), Phillip Matthews (Claim No. 2241), Regina Montoya (Claim No. 2634), Michael Murphy (Claim No. 2248), Margaret Osmer McQuade (Claim No. 2606), Mary Pugh (Claim No. 2636), William Reed, Jr. (Claim No. 2629), Orin Smith (Claim No. 2247), James Stever (Claim No. 2633) and Willis Wood, Jr. (Claim No. 2246).  A copy of the proof of claim filed by Anne Farrell, Claim No. 2240, is attached to the Declaration of Rachel B. Mersky, Esquire in Support of Opposition of Director and Officer Claimants to Debtors' Supplemental Response to Motion to Estimate Maximum Amount of Certain Claims for Purposes of Establishing Reserves Under the Debtors' Confirmed Chapter 11 Plan With Respect to the Indemnification Claims Filed by Certain Directors and Officers ("***Mersky Declaration***"), filed concurrently herewith, as Exhibit ("Ex.") A.  The other Outside Directors' proofs of claim are substantially identical.

[2] A copy of Killinger's proof of claim, Claim No. 3266, is attached as Ex. B to the Mersky Declaration.

legal fees and costs of the D&O Claimants after WMI failed to meet its obligations to pay these amounts as set forth in the director and officer liability insurance policies (the "***D&O Policies***").

Debtors originally filed their Estimation Motion in November 2010 seeking to estimate each D&O Claimant's indemnification claim at Zero Dollars ($0.00). After discovery and discussion, the parties agreed to submit certain legal issues regarding the indemnification claims to the Court for resolution and entered into a stipulation establishing a reserve for certain of those claims. Pursuant to the stipulation, factual disputes regarding the claims, such as whether the claims will be allowed and in what amount, are to await a future hearing.

Debtors' Supplemental Response addresses certain legal issues about the timing and scope of estimation. The D&O Claimants do not dispute many of these issues. Specifically, the D&O Claimants agree that estimation is authorized under Section 502(c) (Section I of the Supplemental Response); agree that estimation is appropriate because most litigations and investigations for which the D&O Claimants seek indemnification have been resolved (Section II); agree that the D&O Claimants' future defense costs may be estimated (Section V); agree that no reserve is required for indemnification of potential liability – as opposed to defense fees and related costs – based upon claims threatened by Debtors against the D&O Claimants); and agree that no reserve is required for unasserted and unknown future claims (Section VII).

However, the D&O Claimants oppose the attempt to limit or eliminate certain of the D&O Claimants' indemnification rights. First, Debtors seek to eliminate the D&O Claimants' indemnification claims for sums the D&O Carriers paid after WMI failed to honor its contractual commitments under the applicable D&O Policies. The D&O Carriers have subrogation rights to these amounts under the D&O Policies, and the D&O Claimants are contractually obligated to protect and preserve those rights by pursuing indemnification. Moreover, had WMI honored its

contractual commitments, the D&O Carriers would have paid out less money from the D&O

Policies and there would be more money remaining for the D&O Claimants to defend themselves

now and in the future.  Any recovery of these sums will be used to replenish the D&O insurance

coverage available to the D&O Claimants.  Thus, contrary to Section III of the Supplemental

Response, the D&O Claimants have standing to pursue their claims based on the amounts paid

by the D&O Carriers.  Likewise, contrary to Section IV of the Supplemental Response, the D&O

Policies permit the D&O Carriers to recover from WMI amounts that they paid when WMI

failed to comply with its contractual obligations under the D&O Policies as a result of its

bankruptcy.

Second, under their Indemnification Agreements, the D&O Claimants are entitled to

recover their fees and costs incurred in pursuing their indemnification rights if they successfully

enforce those rights.  The fact that WMI filed its bankruptcy petition, forcing the D&O

Claimants to pursue their rights in Bankruptcy Court – rather than, for instance, filing a lawsuit

to enforce their Indemnification Agreements – does not alter the contract.  The D&O Claimants

are contractually entitled to recover the legal fees and costs they have incurred and will incur in

opposing Debtors' Motion to Estimate Maximum Amount of Certain Claims for Purposes of

Establishing Reserves Under Debtors' Confirmed Chapter 11 Plan (the "*Estimation Motion*")

[D.I. # 5971] – by which Debtors sought to estimate the D&O Claimants' indemnification rights

at Zero Dollars – and in opposing Debtors' Sixtieth Omnibus (Substantive) Objection to Claims

(Claims Nos. 2108, 2240, 2241, 2246, 2247, 2248, 2604, 2606, 2631, 2633, 2634, 2635, 2636,

2637, and 3242) (the "*Sixtieth Omnibus*") [D.I. # 5970] – by which Debtors objected to certain

of the D&O Claimants' proofs of claim seeking to establish and protect their indemnification

rights.  Contrary to Section VIII of the Supplemental Response, Debtors are required to reserve

an amount sufficient to cover the legal fees and costs incurred – and still being incurred – by the D&O Claimants in obtaining and protecting their indemnification rights.

## BACKGROUND

### A.    The D&O Claimants' Proofs of Claim

On September 26, 2008 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief (the "***Petition***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***").  Prior to the Petition Date, various plaintiffs filed lawsuits against WMI and one or more of the D&O Claimants arising out of the D&O Claimants' service as directors and/or officers of WMI and/or its subsidiaries for, among other things, alleged violation of the federal securities laws, breaches of fiduciary duty, and violations of the Employee Retirement Income Security Act ("***ERISA***").  Since that time, various other investigations, proceedings, claims and causes of action have been asserted against one or more of the D&O Claimants as a result of their service as directors and/or officers of WMI and/or its subsidiaries.

On or before March 31, 2009, the date established by the Bankruptcy Court as the last date to file proofs of claim against Debtors and their chapter 11 estates (the "***Estates***"), each D&O Claimant filed a proof of claim asserting, among other claims, unliquidated claims for indemnification and advancement of defense and other litigation costs and damages with respect to investigations and litigation commenced, threatened to be commenced or which may be commenced, pursuant to indemnification agreements with WMI, WMI's Articles of Incorporation, WMI's By-laws and applicable law (the "***D&O Claims***").  Each proof of claim reserved the D&O Claimant's rights under, among other things, the D&O Policies.  *See, e.g.*, Ex. A at 2 ¶ 9  ("Claimant reserves all rights respecting any past or future rights under any of the

D&O Policies or for any other reason relating to the litigation that has been or may be commenced or threatened against Claimant"); Ex. B, at 1 ("The claimant also asserts claims for indemnity and advancement of defense and other litigation costs and damages … under any and all policies of insurance (including without limitation directors' and officers' liability policies and ERISA liability policies, and for primary, excess and other coverage)").

B.     The D&O Claimants' Indemnification and Advancement Rights

In accord with Washington law, WMI provided to the D&O Claimants a broad umbrella of protection from claims brought against them as a result of their service as directors and/or officers of WMI and/or its subsidiaries.  These protections are established in WMI's Articles of Incorporation, By-laws, and indemnification agreements with each D&O Claimant.

WMI's Articles of Incorporation expressly provide for the indemnification of the D&O Claimants to the fullest extent permitted under Washington law *and* for the advancement of reasonable expenses incurred prior to a final disposition of any proceeding:

> The Company shall indemnify any individual made a party to a proceeding because that individual is or was a director of the Company and shall advance or reimburse the reasonable expenses incurred by such individual in advance of final disposition of the proceeding, without regard to the limitations in RCW 23B.08.510 through RCW 23B.08.550 of the Washington Business Corporations Act, or any other limitation that may hereafter be enacted to the extent such limitation may be disregarded if authorized by the articles of incorporation, to the full extent and under all circumstances permitted by applicable law.

Article IX of WMI's Amended and Restated Articles of Incorporation, dated October 29, 1999; *see, e.g.*, Ex. A, at 1 ¶ 1.

WMI's By-laws likewise provide the D&O Claimants with indemnification to the full extent of Washington law and provide for advancement of legal fees and costs incurred in connection with claims arising from their service as directors and/or officers of WMI and/or its

subsidiaries prior to the final resolution of such claims.  *See* Ex. A at Ex. A at § 8.1

(indemnification rights of Outside Directors), § 8.2 (advancement rights of Outside Directors),

§ 8.6 (indemnification and advancement rights of Mr. Killinger).  The By-laws also expressly

provide that the indemnification rights stated therein are not exclusive, and contemplate that

agreements providing additional rights may be entered into between WMI and the D&O

Claimants.  *Id.* at § 8.4; *see, e.g.*, Farrell Indemnification Agreement, Ex. C to Mersky Decl. at

Recital F.

       Consistent with its Articles of Incorporation and By-Laws, WMI entered into an

indemnification agreement with each D&O Claimant.  WMI agreed to indemnify each "to the

fullest extent permitted" by Washington law.  *See, e.g.*, Ex. C, at Recital F.  The indemnification

agreements executed by each of the D&O Claimants (collectively, the "***Indemnification***

***Agreements***") are nearly identical.  The Indemnification Agreements were designed to eliminate

the burden of potential "huge judgments and other expenses" incurred by the D&O Claimants as

a result of such claims, *id.* at Recital D, "to the fullest extent permitted by the Washington

Business Corporation Act," *id.* at Recital F.

       The Indemnification Agreements provide for broad indemnification of the D&O

Claimants.  In particular, Section 1(a) of the Indemnification Agreements states that WMI "shall

indemnify and hold harmless" the D&O Claimants if any of them:

> was or is a party or is threatened to be made a party to or is
> involved in (including, without limitation, as a witness) any actual,
> pending or threatened action, suit or proceeding, whether civil,
> criminal, administrative or investigative, by reason of the fact that
> [he or she] is or was…a director of [WMI]…or was serving or has
> agreed to serve at the request of [WMI] as a director, officer,
> employee or agent … of [WMI] or another corporation….

*See* Ex. C at § 1(a).  Section 1(a) of the Indemnification Agreements expressly states that WMI's indemnification obligations extend to any claim against the D&O Claimants for breach of fiduciary duty:

> For the avoidance of doubt, the foregoing indemnification obligation includes, without limitation, claims for monetary damages against [the D&O Claimants] in respect of an alleged breach of fiduciary duties, to the fullest extent permitted under the [Washington Business Corporation Act].

*See id.*  The Washington Business Corporation Act allows a corporation to indemnify its directors even if the director is found liable to the corporation for breaches of fiduciary duty, except for acts by "the director finally adjudged to be intentional misconduct or a knowing violation of law."  RCW 23B.08.560.[3]  In other words, absent a final judgment of intentional misconduct or a knowing violation of law by the D&O Claimants, WMI must indemnify the D&O Claimants as to any claim arising from their service as directors and/or officers of WMI and/or its subsidiaries.

WMI is required to indemnify the D&O Claimants for "all expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement), actually and reasonably incurred by [the D&O Claimants] or on [their] behalf in connection with such action, suit or proceeding and any appeal therefrom."  *See, e.g.*, Ex. C at §1(b).  Equally significant, the Indemnification Agreements provide that WMI will also *advance* the D&O Claimants' legal fees and costs incurred in connection with such claims prior to final resolution.  *See, e.g.*, *id.* at §4(a).

---

[3]  *See* Ex. D to Mersky Declaration.  The protections afforded by RCW 23B.08.560 are conditioned on authorization of such indemnification in the corporation's articles of incorporation or by-laws.  Article IX of WMI's Articles of Incorporation and Article VIII of WMI's By-laws each authorize this type of indemnification.  *See, e.g.*, Ex. A at 1 ¶ 1; Ex. A at Ex. A § 8.1.

In order to ensure that the intent of the Indemnification Agreements is implemented, if a dispute arises about whether WMI must indemnify the D&O Claimants, the Indemnification Agreements provide significant presumptions in favor of the D&O Claimants.  *See, e.g.*, *id.* at §5(c).  The D&O Claimants "shall be presumed to be entitled to Indemnification under this Agreement…."  *Id.*  This presumption applies "in any suit or action to enforce the claim [for indemnification] or otherwise relating to the claim."  *Id.*  WMI has "the burden of proof in overcoming that presumption" and can satisfy that burden only by submitting "clear and convincing evidence."  *Id.*  If the D&O Claimants are successful in establishing their right to indemnification, the Indemnification Agreements provide that their "expenses (including attorneys' fees) incurred in connection with successfully establishing [their] right to indemnification, in whole or in part, in any such proceeding or otherwise shall also be indemnified by the Corporation."  *Id.* at § 5(b).  Moreover, WMI is obligated to advance to the D&O Claimants their legal fees and related costs incurred in proceedings to establish and protect their indemnification rights.  *Id.* at § 4(a).

WMI and the D&O Claimants agreed that the indemnification rights were so critical to their ability to undertake their duties on behalf of WMI that any breach of WMI's indemnification obligations would constitute grounds for specific performance of the Indemnification Agreements:

> The Corporation shall be precluded from asserting in any judicial proceeding that the procedures and presumptions of this Agreement are not valid, binding and enforceable.  The Corporation agrees that its execution of this Agreement shall constitute a stipulation by which it shall be irrevocably bound… that its obligations set forth in this Agreement are unique and special, and that failure of the Corporation to comply with the provisions of this Agreement will cause irreparable and irremediable injury to Indemnitee, for which a remedy at law will

be inadequate.  As a result, in addition to any other right or remedy Indemnitee may have at law or in equity with respect to breach of this Agreement, Indemnitee shall be entitled to injunctive or mandatory relief directing specific performance by the Corporation of its obligations under this Agreement.

*Id.* at §16.

WMI and the D&O Claimants intended the scope of indemnification to apply broadly. WMI agreed that any ambiguity as to the meaning of the Indemnification Agreements would be resolved in favor of *extending* the scope of indemnification:  "It is understood that the parties hereto intend this Agreement to be interpreted and enforced so as to provide indemnification to Indemnitee to the fullest extent now or hereafter permitted by law."  *Id.* at §17.

### C.    The D&O Policies

Consistent with its indemnification and advancement obligations in the Articles of Incorporation, By-laws and Indemnification Agreements, WMI purchased the D&O Policies to protect the directors and officers of WMI and its subsidiaries, including the D&O Claimants. WMI purchased separate insurance policies providing a "tower" of insurance for claims brought within certain time periods.  For example, WMI purchased a total of $250 million of insurance coverage for claims made between May 1, 2007 and May 1, 2008 (and later-filed claims generally arising out of the same facts and circumstances) (the "***2007/2008 D&O Tower***"), $150 million of "ABC" insurance and $100 million of "Side A" insurance.[4]

### 1.    The 2007/2008 ABC Primary D&O Policy

On November 26, 2008, WMI filed the Motion of Debtors Pursuant to Section 362 of the Bankruptcy Code for Order Modifying Automatic Stay to Allow Advancement Under Insurance

---

[4] The term "ABC" coverage is a term of art in D&O insurance.  Generally, Side A provides coverage to individual insureds for non-indemnifiable loss, including loss that is non-indemnifiable because of the company's insolvency; Side B provides coverage to the company to the extent it indemnifies an individual insured; and Side C provides coverage to the company itself.

Policies (the "***Comfort Order Motion***") [D.I. # 365], Ex. E to Mersky Declaration.  As Exhibit C

to the Comfort Order Motion, Debtors attached National Union Fire Insurance Co., of Pittsburgh,

Pa. ("***National Union***") Executive and Organization Liability Insurance Policy No. 741-98-06

(the "***2007/2008 Primary D&O Policy***").

The 2007/2008 Primary D&O Policy is the primary policy for the $150 million of ABC

coverage provided by various insurance carriers (the "***2007/2008 ABC D&O Carriers***") within

the 2007/2008 D&O Tower.  Subject to its terms, conditions and exclusions, the 2007/2008

Primary D&O Policy provides insurance coverage for, among other things, settlements,

judgments, defense costs, fees and associated expenses incurred in defending "Claims" (as

defined in the 2007/2008 Primary D&O Policy).  This coverage is provided to "Insured Persons,"

which includes the D&O Claimants, if a "Loss" is not reimbursed by WMI through

indemnification payments. *See, e.g.*, 2007/2008 Primary D&O Policy, Ex. E at Ex. C at § 2(b),

§ 2(n), § 2(o), § 2(p) and § 2(s).

The 2007/2008 Primary D&O Policy contains a $50 million self-insured retention, *see*

Ex. E at Ex. C at Declaration 4 and Clause 6 ("For each Claim, the Insurer shall only be liable

for the amount of Loss arising from a Claim which is in excess of the applicable Retention

amounts stated in Items 4(a), 4(b) and 4(c) of the Declarations, such Retention amounts to be

borne by an Organization") (the "***Retention***").  The Retention is like a deductible.  WMI is to

pay the first $50 million of each claim or group of related claims and then the insurance begins to

pay. The Retention provision in the 2007/2008 Primary D&O Policy is amended by Endorsement

33, which adds the following language:

> It is further understood and agreed that in the event an
> Organization refuses to pay an applicable Retention due to
> Financial Insolvency, then the Insurer shall commence advancing
> Loss within the Retention and pursuant to the other terms,

> conditions and exclusions of this policy, provided that the Insurer
> shall be entitled to recover the amount of Loss advanced within the
> Retention from the Organization pursuant to Clause 13.
> SUBROGATION.

*See* Ex. E at Ex. C.  Endorsement 33 defined "Financial Insolvency" to include "(ii) the

Organization becoming a debtor-in-possession pursuant to the United States bankruptcy law."

*Id.*  In other words, the 2007/2008 Primary D&O Policy provides that, if WMI (the

"Organization") files for bankruptcy, the 2007/2008 ABC D&O Carriers will begin to pay claims

of the D&O Claimants even though WMI had not made the required Retention payments.

The 2007/2008 Primary D&O Policy also gives the 2007/2008 ABC D&O Carriers rights

of subrogation.  It requires that the "Insureds" (*i.e.*, the D&O Claimants) take actions to secure

these rights of subrogation.  As amended by Endorsement 15, Clause 13 of the 2007/2008

Primary D&O Policy, entitled "SUBROGATION," provides as follows:

> In the event of any payment under this policy, the Insurer shall be
> subrogated to the extent of such payment to all of each and every
> Organization's and Insured's rights of recovery thereof, and each
> such Organization and Insured shall execute all papers required
> and shall do everything that may be necessary to secure such rights
> including the execution of any and all documents necessary to
> enable the Insurer effectively to bring suit in the name of each such
> Organization and each such Insured.  In no event, however, shall
> the Insurer exercise its rights of subrogation against an Insured
> under this policy unless such Insured has been convicted of a
> deliberate criminal act, if a judgment or final adjudication or a
> binding arbitration proceeding adverse to the Insured(s) established
> that such deliberate criminal or deliberate fraudulent act was
> committed, or been determined to have in fact obtained any profit
> or advantage to which such Insured was not legally entitled.

*Id.* at Endorsement 15.  Endorsement 33 to the 2007/2008 Primary D&O Policy further amended

Clause 13 by adding the following sentence to the end:

> In the event that the Insurer shall for any reason pay Indemnifiable
> Loss on behalf of an Insured Person or Non-Indemnifiable Loss
> due to Financial Insolvency, the Insurer shall have the contractual

> right hereunder to recover from the Organization the amount of
> such Loss equal to the amount of the Retention not satisfied by the
> Organization and shall be subrogated to the rights of the Insured
> Persons hereunder.

*Id.* at Endorsement 33.  In other words, if WMI (the "Organization") becomes financially

insolvent, such as if it files for bankruptcy, and the 2007/2008 ABC D&O Carriers have to pay

all or some portion of the Retention as a result, the 2007/2008 ABC D&O Carriers have the

contractual right to recover from WMI the portion of the Retention that they paid.

### 2.    The 2007/2008 Primary Side A Policy

The final $100 million in insurance coverage provided under the 2007/2008 D&O Tower,

which is excess of the first $150 million of Side ABC coverage, is Side A coverage only.  The

primary Side A policy is a Classic A-Side Management Liability Policy, Policy Number

ELU097685-07, issued by XL Specialty Insurance Company (the "***2007/2008 Primary Side A***

***Policy***"), Ex. F to Mersky Declaration.  The 2007/2008 Primary Side A Policy provides $25

million in coverage, and several additional insurance carriers (collectively with XL Specialty

Insurance Company, the "***2007/2008 Side A D&O Carriers***," and with the 2007/2008 ABC D&O

Carriers, the "***2007/2008 D&O Carriers***") provide excess Side A policies with additional

coverage of $75 million.

Side A insurance is fundamentally different from Side ABC insurance.  Side A insurance

only pays to the extent that a loss is not paid by other insurance and is not paid by rights of

indemnification.  Section I of the 2007/2008 Primary Side A Policy states:

> The Insurer will pay on behalf of the Insured Persons Loss
> resulting from a Claim first made against the Insured Persons
> during the Policy Period, … for a Wrongful Act, except to the
> extent that such Loss is paid by any other Insurance Program or as
> indemnification from any source.  *If Loss is not paid by such other*
> *Insurance Program or as indemnification from any source, the*
> *Insurer will pay covered Loss on behalf of the Insured Persons,*

> *subject to all of the terms, conditions … and limitations of the Policy.*

*See* Ex. F at § I (emphasis added).  In other words, if other funds are available to indemnify

insured persons, such as the D&O Claimants here, that money is to be used before the 2007/2008

Side A D&O Carriers make any payments.  *Id.*; *see also* Ex. F at Endorsement 19, ¶ 11 ("all

coverage under this Policy shall be specifically excess over, and shall not contribute with:  (i) all

indemnification to which an Insured Person may be entitled and is paid from any source,

including but not limited to the Company or any Outside Entity").

The 2007/2008 Primary Side A Policy also provides the Side A insurers with contractual

subrogation rights to the extent they make any payments on behalf of the D&O Claimants; it

requires the "Insured Persons" (the D&O Claimants) and "the Company" (WMI) to take actions

necessary to secure the insurers' rights of subrogation:

> To the extent of any payment under this Policy, the Insurer shall be subrogated to the potential or actual rights of the Insured Persons after the Insureds have been made whole.  The Insured Persons and the Company shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in their name, and will provide all other assistance and cooperation which the Insurer may reasonably require.

*See* Ex. F at Endorsement 3, ¶ 1.

Notably, WMI is not an insured in under the 2007/2008 Primary Side A Policy.  The

purpose of Side A coverage is to provide additional protection to the officers and directors if the

company does not provide and pay indemnification.

### 3.      The 2004/2005 Primary D&O Policy

The primary insurance policy purchased by WMI for the period May 1, 2004 to May 1,

2005 is Executive and Organizational Liability Insurance Policy No. 466-51-22 (the "***2004/2005***

*Primary D&O Policy*") issued by National Union.  It is the primary policy in a tower of $250

million of D&O liability insurance coverage, comprised of $150 million of ABC coverage and

$100 million in Side A coverage provided by various insurance carriers (collectively, the

"*2004/2005 D&O Carriers*").  The ABC policies have been paying the legal fees and expenses

incurred by Mr. Killinger and other former WMI officers and directors for the *South Ferry* and

*Lee Family* litigations since WMI's Petition.

 The 2004/2005 Primary D&O Policy has a $50 million Retention.  *See* Ex. G at

Declaration 4.  Endorsement No. 11 provides that if WMI cannot pay the retention amount "due

to Financial Insolvency, then the Insurer shall commence advancing Defense Costs within the

Retention . . . provided that the Insurer shall be entitled to recover the amount of Defense Costs

advanced within the Retention from" WMI pursuant to its subrogation rights set forth in Clause

13.  Ex. G at Endorsement 11.  Clause 13 provides that to the extent the insurer pays money on

behalf of a director or officer, the insurer is subrogated to any rights that director or officer might

have to recover that money.  Ex. G at Clause 13.  Clause 13 further states that the D&O

Claimants shall execute all papers required and shall do everything that may be necessary to

secure such rights, including the execution of any and all documents necessary to enable the

insurer effectively to bring suit.  *Id.*

 **D.**  **WMI's Failure to Pay the Retention**

 On November 26, 2008, Debtors filed the Comfort Order Motion, seeking relief from the

automatic stay pursuant to § 362(d) of the Bankruptcy Code so that the D&O Carriers could

commence paying for the defense of the D&O Claimants pursuant to their obligations under the

D&O Policies in light of WMI's failure to pay the Retention.  In the Comfort Order Motion,

Debtors stated:  "WMI has taken the position that it is no longer able to satisfy its

indemnification obligations to the Individual Defendants as a result of the filing of the petition

herein.  Therefore, there is an urgent need for the insurers to assume their contractual obligations

to pay the Individual Defendants' defense costs and fees."  *See* Ex. E at ¶ 10.  Debtors

subsequently filed two similar motions, dated April 19, 2010 [D.I. # 3547] and August 25, 2010

[D.I. # 5347], to allow insurance carriers, including the D&O Carriers, to assume their

contractual obligations to pay the D&O Claimants' defense fees and costs in other litigations and

investigations (collectively with the Comfort Order Motion, the "***Comfort Order Motions***").  By

orders entered December 16, 2008 [D.I. # 445], May 4, 2010 [D.I. # 3634] and September 23,

2010 [D.I. # 5460], the Bankruptcy Court granted these motions.  As a result, the D&O Carriers

have been paying legal fees and expenses and other losses incurred by the D&O Claimants since

Debtors filed the Petition.  Debtors estimate that, of the total $250 million in coverage provided

under the 2007/2008 D&O Tower, approximately $35 million remains.  *See* Supp. Resp. at 9.

WMI paid only a small part of the $50 million Retention prior to filing the Petition, and therefore

the D&O Carriers had to use the proceeds of the 2007/2008 D&O Tower to fund virtually the

entire Retention that WMI was obligated to pay but failed to pay as a result of the Petition.

### E.    Debtors' Efforts to Reject the D&O Claimants' Indemnification Claims

Debtors have objected to and sought to estimate at Zero Dollars ($0.00) the D&O Claims.

On November 17, 2010, Debtors filed the Estimation Motion, in which they requested that the

Court estimate the D&O Claims at $0.00 for purposes of Section 27.3 of Debtors' Sixth

Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States

Bankruptcy Code [D.I. # 5548].  Debtors contended that all of the D&O Claims should be

subordinated to claims of general unsecured creditors pursuant to Section 510(b), and since

general unsecured creditors are unlikely to be paid in full, the D&O Claims will not see any

recovery.  Also on November 17, 2010, Debtors filed the Sixtieth Omnibus, which sought to disallow the indemnification claims asserted by the Outside Directors.

The D&O Claimants were forced to respond or they would have lost all of their indemnification rights, and they have incurred significant legal fees and costs in so doing.  On December 6, 2010, the Outside Directors filed the Former Outside Directors' Opposition to Debtors' Estimation Motion [D.I. # 6254] and the Former Outside Directors' Opposition to Debtors' Sixtieth Omnibus (Substantive) Objection to Claims [D.I. # 6252].  Also on December 6, 2010, Mr. Killinger filed the Response of Kerry K. Killinger to Debtors' Motion to Estimate the Maximum Amount of His D&O Related Claims at $0.00 [D.I. # 6242].

Since December 2010, Debtors have repeatedly scheduled and then continued – often at the last minute – the hearing on the Estimation Motion and Sixtieth Omnibus and related requests for depositions of and other discovery from certain of the D&O Claimants.  In each instance, the D&O Claimants and their counsel were forced to prepare for the hearings and depositions and prepare discovery responses.  Furthermore, over the course of the fifteen months since Debtors filed the Estimation Motion, the legal landscape for the D&O Claimants has changed dramatically:  new litigations have been filed against the D&O Claimants and new investigations have been commenced arising from their roles as directors and officers of WMI and/or its subsidiaries, and existing cases and investigations have settled or been concluded.  As a result, the D&O Claimants' preparation for each hearing on the Estimation Motion and Sixtieth Omnibus involved a different set of issues.  Throughout this time period, the parties engaged in extensive, complex settlement negotiations involving, among others, the D&O Claimants, Debtors, and numerous representatives of the D&O Carriers.

In December 2011, Debtors served additional discovery requests on the D&O Claimants, including interrogatories, document requests and requests for deposition.  As a result, the D&O Claimants provided extensive disclosures to Debtors regarding, among other things, the status of all litigation against them, the bases for the D&O Claimants' indemnification claims, and the amounts of their legal expenses incurred in connection with litigation and investigations arising from their service as directors and officers of WMI and/or its subsidiaries.  Debtors also took depositions of representatives of Mr. Killinger and the Outside Directors, respectively, on February 8 and 9, 2012.  Those depositions required considerable preparation.

## ARGUMENT

**I.      Debtors' Attempt to Conservatively Estimate the D&O Claimants' Indemnification Claims Would Violate The D&O Claimants' Indemnification Rights.**

Section 502(c)(1) of the Bankruptcy Code provides that there "shall be estimated for the purpose of allowance….any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case…"  11 U.S.C. § 502(c)(1).  This provision is a flexible tool used for a variety of purposes, including "determining voting rights on a reorganization plan, gauging plan feasibility, determining the likely aggregate amount of a related series of claims, setting claim distribution reserves, or (though this is less commonly wise) allowing claims."  *In re Chemtura Corp.,* 448 B.R. 635, 649 (Bankr. S.D.N.Y. 2011) (internal citations omitted).  Because neither Section 502(c) nor the Federal Rules of Bankruptcy Procedure prescribe any specific method for estimating a claim, the matter is left to the discretion of the Bankruptcy Court in light of the purposes for the estimation.  *Id.* at 648; *In re Teigen,* 228 B.R. 720, 723 (Bankr. D.S.D. 1998) ("The valuation of an unliquidated claim under § 502(c) should be tailor-made to the circumstances").

Debtors have not asked the Court to fix precisely and permanently the amount of the D&O Claims; rather, Debtors have asked the Court to estimate the "maximum amount" of the D&O Claims for the purpose of establishing distribution reserves.  *See*, *e.g.,* Estimation Motion, ¶ 16 ("The Debtors request that this Court estimate the maximum amount of the unliquidated portions of the" D&O Claims); Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "***Plan***") [D.I. # 9178],[5] §26.3(a) ("the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court….constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim"); Supp. Resp., ¶ 52 ("Unless the Court estimates the maximum amount of the unliquidated portions of the D&O Claims…").

Debtors' repetitive use of the phrase "maximum amount" highlights the importance of the standard the Court should employ when estimating the D&O Claims.  The potential harm to the D&O Claimants if their claims are underestimated is significant and likely irreversible:  by the time higher claim amounts are established, funds that would have been available for distribution will have left the Estates.  This, of course, would result in the D&O Claimants receiving less than, and other creditors receiving more than, the amount to which they are entitled.  If the D&O Claims are overestimated, on the other hand, the harm to the Estates is minimal:  some creditors may be required to wait longer to receive a small portion of their distributions.  Certainly, in some cases, the economics are such that a few million dollars more or less held in reserve would make a major difference in immediate distributions to other creditors.  That simply is not true here:  billions of dollars in cash will be distributed at the Effective Date of the Plan with or without a reserve for the D&O Claimants' disputed claims.

---

[5] The Plan was just confirmed by the Court on February 17, 2012, and is apparently scheduled to become effective in early March 2012.

Debtors' desire to distribute the last available dollar should not trump one of the fundamental purposes of the Bankruptcy Code:  equality in distribution to creditors.  *Begier v. I.R.S.,* 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code."); *In re St. Francis Physician Network, Inc.,* 213 B.R. 710, 717 (Bankr. N.D. Ill. 1997) ("No policy is more important in bankruptcy than equality of treatment among creditors of equal status").

The *Chemtura* case is instructive regarding the balancing of harm in the context of estimating claims for the purpose of establishing a distribution reserve.  The Court found that the claimants' likelihood of success was 0%.  In fact, the Court was certain that the claimants would lose on summary judgment on two separate legal theories.  Although the Court felt the likelihood of being reversed was very small – "probably in the range of 10% to 15%" – it required the debtors to reserve an amount equal to 30% of the disputed claim.  The Court explained:

> For the reasons set forth at length above, I predict that the Debtors will prevail on summary judgment on two of their four principal contentions, and that as a result [the creditor] will recover nothing. While that would normally suggest estimating [the creditor's] claim at $0, I need to address the reality that [the creditor] would be prejudiced if nothing at all were reserved for its claim, and then an appellate court later disagreed with me.

448 B.R. at 668-69.  In short, even though the Court gave the creditor no chance of success, it required the debtor to establish a substantial distribution reserve in recognition of the harm the creditor would suffer if the Court was wrong.

The Court should follow the principles of *Chemtura* and assure that the reserves here are sufficient to avoid irreparable harm to the D&O Claimants.

II.   **The D&O Claimants Have Standing to Recover from Debtors the Amounts that the D&O Carriers Advanced As a Result of Debtors' Failure to Pay Their Indemnification Obligations.**

There is no dispute that when Debtors filed the Petition, they immediately discontinued advancing funds for the D&O Claimants' defense in the lawsuits that were pending at the time. The D&O Claimants therefore triggered their rights under the D&O Policies, requiring the D&O Carriers to advance defense fees and costs before they otherwise were required to do so if WMI had complied with its contractual obligations under the D&O Policies to indemnify the D&O Claimants within the $50 million Retention.  Because the D&O Carriers stepped in to protect the D&O Claimants, the D&O Policies provide that the D&O Carriers have a contractual right to recover certain of these amounts from Debtors and are subrogated to the D&O Claimants' indemnification claims.

Debtors argue that the D&O Claimants lack standing to pursue the contractual rights to recover the amounts advanced by the D&O Carriers for non-subordinated legal fees and costs of the D&O Claimants after WMI failed to meet its obligations under the D&O Policies.  Debtors are wrong as a matter of fact and law.  The D&O Claimants are pursuing their indemnification rights against WMI, not the D&O Carriers' rights to recovery.  Under the terms of the governing D&O Policies, the D&O Carriers are subrogated to the D&O Claimants' indemnification rights as to amounts the D&O Carriers paid before the Retention was met and amounts paid by the 2007/2008 Side A D&O Carriers.  The D&O Claimants are bound by contract—the D&O Policies themselves—not to impair these subrogation rights, which means they must pursue their indemnification claims.  Moreover, if the D&O Claimants are successful, any sums recovered would be used to replenish the available coverage under the D&O Policies and therefore directly benefit the D&O Claimants.  Therefore, the D&O Claimants have standing to pursue these

contractual rights to recovery, which are referred to by Debtors as the D&O Carriers'

subrogation rights.

     **A.**     **The D&O Claimants Have An Economic Interest In Recovery of Funds Advanced By the D&O Carriers Because Recovery Will Replenish Their D&O Insurance Coverage.**

The elements for Article III standing are (1) an injury in fact; (2) a causal connection

between the injury and the conduct; and (3) a likelihood that the injury will be redressed by a

favorable decision. *In re Wash. Mut., Inc.*, 461 B.R. 200, 255 (Bankr. D. Del. 2011) (citing

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).[6] Each element is present here.

The 2007/2008 D&O Carriers had to fund virtually all of the applicable $50 million

Retention because WMI failed to pay the first $50 million required to defend the claims against

the D&O Claimants.  As a result, the total amount of coverage which should have been available

to protect the D&O Claimants was effectively reduced by nearly $50 million.  The D&O

Claimants seek a reserve to cover their claim for that portion of the Retention paid by the

2007/2008 ABC D&O Carriers related to non-subordinated claims.  Similarly, the 2007/2008

Side A D&O Carriers had to pay significant sums that they would not otherwise have had to pay.

Any such amount that is recovered through these proceedings will replenish the proceeds

available to the D&O Claimants under the 2007/2008 D&O Tower and thus be available for the

defense of the D&O Claimants.[7]  There can be no legitimate question that the pursuit of this

claim provides a direct benefit to the D&O Claimants.

---

[6] The Debtors further assert that "bankruptcy standing is narrower than Article III standing" and that an objector must have a "pecuniary interest in the outcome of the bankruptcy proceedings." Supp. Resp. at 32.  Without conceding that this dubious assertion is true, if the D&O Carriers ultimately recovered money for their subrogation rights, that money would go back into the D&O Policies for the benefit of all D&O Claimants, which is clearly a "pecuniary" benefit for the D&O Claimants.

[7] While money recovered may not go directly to the D&O Claimants, it will increase the amounts available to the D&O Claimants for their defense.  There is no risk of double recovery in this situation.  The D&O Claimants will work with the Debtors and the D&O Carriers to ensure that the funds are directly or indirectly paid to the party(ies) ultimately entitled to funds from the Estates.

In concrete terms, using the information provided by Debtors in their Supplemental Response, the 2007/2008 D&O Carriers have paid approximately $214,575,000 of the $250,000,000 total available under the 2007/2008 D&O Tower.  *See* Supp. Resp. at 9.  That leaves approximately $35,000,000 in available policy proceeds.  *Id.*  The D&O Claimants seek a reserve for their claims based on the contractual right of recovery – the D&O Carriers' subrogation rights – for (i) the amount of the unpaid Retention owed by WMI under the D&O Policies, and (ii) the amount paid by the 2007/2008 Side A D&O Carriers.  In both instances any amounts recovered will replenish the 2007/2008 ABC D&O Tower and 2007/2008 Side A D&O Tower, respectively.[8]  There is no question that the D&O Claimants have a direct interest in increasing the policy proceeds available for their protection.  Because it is in the interests of the D&O Claimants that the D&O Policies be replenished for future defense of the D&O Claimants, there is no question that the D&O Claimants have standing to pursue the D&O Carriers' subrogation rights – the contractual right to recover amounts paid by the D&O Carriers which they would not have had to pay if WMI had paid the Retention required by the D&O Policies.

These are not mere hypothetical musings:  the D&O Claimants face a clear and concrete threat of future litigation.  On October 13, 2011, counsel for the D&O Claimants received a demand letter from the Creditors' Committee asserting a $500 million claim against certain of the D&O Claimants (the "***Demand Letter***") on behalf of the Estates; a similar letter demanding even greater damages was received in April 2009.  Although no complaint relating to the allegations in the Demand Letter has yet been filed, pursuant to Section 27.3 of the Plan, the Estate's interest in the Demand Letter will be transferred to a liquidating trust for prosecution (all of Debtors' assets are "Liquidating Trust Assets" to be contributed to the liquidating trust, other

---

[8] Likewise, the D&O Claimants seek to protect the 2004/2005 D&O Carriers' subrogation rights for amounts paid out within the Retention in connection with the *South Ferry* and *Lee Family* matters.

than most of the cash on hand and certain specified assets not relevant here).  In addition, $20

million will be transferred to the liquidating trust, under the control of a litigation subcommittee,

to fund the prosecution of claims on behalf of the Estate, including the claims asserted in the

Demand Letter.  *See* WMI Liquidating Trust Agreement, filed with Debtors' Plan Supplement in

Support of Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the

United States Bankruptcy Code [D.I. # 9488].  The D&O Claimants face actual harm from the

Demand Letter as they will be required to defend against the claims which the Demand Letter

states will be made against them.  Although the D&O Claimants assert that a different insurance

tower should provide coverage for claims arising from the Demand Letter, that insurance tower

has denied coverage, leaving the D&O Claimants with only the 2007/2008 D&O Tower for

protection.  Accordingly, protecting the subrogation rights of the D&O Carriers to replenish the

proceeds available under the 2007/2008 D&O Tower will directly benefit the D&O Claimants in

the defense of this actual and imminent claim.  These indisputable facts are more than sufficient

to demonstrate injury in fact for purposes of standing analysis.

In the Supplemental Response, Debtors conspicuously ignore the potential injury that the

D&O Claimants face from depletion of the 2007/2008 D&O Tower.  Debtors' mistakenly focus

only on hypothetical "injury" that could be inflicted by the D&O Carriers on the D&O

Claimants.  This argument misses the point.  As counsel for Mr. Killinger explained during his

deposition, there could be "negative consequences" as a direct result of Debtors' failure to

reserve for the D&O Carriers' subrogation rights "separate and apart from" obligations to the

carriers, which would be that there would be "no money" in the D&O Policies for "potential

defense fees."  *See* Transcript of Videotaped Deposition of Jerome F. Birn, Jr., Esq., Ex. H to

Mersky Declaration at 66:19-67:20.

The D&O Claimants have a direct interest in increasing the remaining proceeds in the 2007/2008 D&O Tower for their protection.  The reserve the D&O Claimants seek under the heading "D&O Carriers' subrogation rights" is for that purpose.

**B.      The D&O Claimants Have an Obligation Under the D&O Policies To Protect the D&O Carriers' Subrogation Rights.**

In order to assure that the D&O Claimants obtain the maximum benefit under the D&O Policies, the D&O Claimants are contractually obligated to protect the D&O Carriers' rights to seek recovery from WMI for the amounts WMI was required to pay pursuant to the D&O Policies.  Endorsement 15 to the 2007/2008 Primary D&O Policy provides that each "Insured shall execute all papers required and shall do everything that may be necessary to secure [the Insurer's subrogation rights] including execution of any and all documents necessary to enable the Insurer effectively to bring suit in the name of such Organization and each such Insured." *See* Ex. E at Ex. C at  Endorsement 15.  Thus, not only are the D&O Claimants seeking a reserve for their own pecuniary benefit to replenish the proceeds available under the 2007/2008 D&O Tower, the D&O Claimants are contractually obligated to do so under the D&O Policies.

The language of the D&O Policies binds Debtors as well as the D&O Claimants.  Debtors cannot legitimately contend that they are surprised or were not on notice that the language of the insurance policies purchased by WMI requires the D&O Claimants to protect the subrogation rights of the D&O Carriers.  *See* Ex. E at Ex. C, Endorsement 33 (D&O Carriers "shall have the contractual right hereunder to recover from the Organization the amount of such Loss equal to the amount of the Retention not satisfied by the Organization."); Ex. F at Endorsement 3 at ¶ 1 ("To the extent of any payment under this Policy, the Insurer shall be subrogated to the potential or actual rights of the Insured Persons after the Insureds have been made whole."); Ex. G, at Endorsement 11 ("In the event an Organization refuses to pay an applicable Retention due to

Financial Insolvency, then the Insurer shall commence advancing Defense Costs within the Retention and pursuant to the other terms, conditions and exclusions of this policy, provided that the Insurer shall be entitled to recover the amount of Defense Costs advanced within the Retention from the Organization pursuant to Clause 13. SUBROGATION.").

Debtors have known since the D&O Claimants filed the D&O Claims in March 2009 that the D&O Claims included the D&O Claimants' rights under the D&O Policies, including any subrogation rights held by the D&O Carriers.  *See* supra at 5-6.  Debtors cannot now credibly claim surprise or prejudice that the D&O Claimants are seeking a reserve that includes those amounts.[9]

## III.    The Estimation Reserve Should Include Payments Made by the D&O Carriers On the D&O Claimants' Behalf Due to WMI's Financial Insolvency.

### A.    The 2007/2008 Primary D&O Policy Expressly Allows the D&O Carriers to Recover Retention Payments from WMI.

Debtors contend that the 2007/2008 Primary D&O Policy does not provide the 2007/2008 ABC D&O Carriers, and by extension the D&O Claimants, with the right to recover any Retention amounts that were not satisfied by WMI and that the 2007/2008 ABC D&O Carriers advanced after Debtors filed their Petition.  Supp. Resp. at 38.  In a convoluted argument, Debtors argue that because the D&O Carriers are obligated to advance money on behalf of the D&O Claimants when WMI was unable to pay due to its Financial Insolvency, the Retention requirement dropped out of the insurance contract and the D&O Carriers' subrogation rights were rendered meaningless.

Debtors' entire argument relies upon a supposed Endorsement No. 34.  The D&O Claimants believe that Debtors are relying on an incorrect version of the 2007/2008 Primary

---

[9] In the event the Court determines that the record would be cleaner with separate proofs of claim filed by the D&O Carriers, they should be allowed to file such proofs of claim, relating back to the date the D&O Claimants filed their proofs of claim.

D&O Policy and that the correct version of the policy contains additional language refuting Debtors' arguments.[10]  Indeed, the version of the policy submitted by Debtors with their Supplemental Response is different from the version previously submitted by Debtors with their Comfort Order Motion.[11]

Regardless of which version is correct, however, Debtors' argument is flawed.  Assuming *arguendo* that Debtors' version of the policy is correct, Debtors' argument is nonsensical because it would render meaningless language that was specifically included in the Endorsement 34 upon which Debtors rely.  Endorsement 34 amends Clause 13 of the policy and provides for the precise subrogation rights that the 2007/2008 ABC D&O Carriers, and by extension the D&O Claimants, are seeking now:

> *In the event that the Insurer shall for any reason* pay Indemnifiable Loss on behalf of an Insured Person or *Non-Indemnifiable Loss due to Financial Insolvency, the Insurer shall have the contractual right hereunder to recover from the Organization* the amount of such Loss equal to the amount of the Retention not satisfied by the Organization and shall be subrogated to the rights of the Insured Persons hereunder.

Wine Decl., Ex. 2 at Endorsement 34 (emphasis added).  This amendment is clear:  if WMI was unable to pay the Retention "due to Financial Insolvency," the 2007/2008 ABC D&O Carriers have the "*contractual right*" to recover from WMI any payments that the 2007/2008 ABC D&O Carriers made toward the Retention.  *Id.*

Because this language so clearly is intended to preserve the 2007/2008 ABC D&O Carriers' rights to recover payments made within the Retention due to WMI's Financial

---

[10]  The D&O Claimants are actively trying to determine which is the correct version.  They have contacted Chartis, the successor to National Union, in an attempt to resolve this discrepancy.  Chartis has recalled its files from off-site storage, but those files will not be available until later in the week.

[11]  *Compare* Declaration of Jennifer L. Wine, Esq. in Support of Debtors' Supplemental Response in Support of Debtors' Motion to Estimate Maximum Amount of Certain Claims for Purposes of Establishing Reserves Under the Debtors' Confirmed Chapter 11 Plan With Respect to the Indemnification Claims Filed by Certain Directors and Officers ("**Wine Declaration**" or "**Wine Decl.**") [D.I. # 9693] at Ex. 2 *with* Comfort Order Motion, Ex. C.

Insolvency, Debtors seek to avoid their obligations by another misguided argument based upon supposed Endorsement 34.  Debtors argue that because "Non-Indemnifiable Loss" includes Loss for which WMI "is unable to indemnify an Insured Person due to Financial Insolvency,"  (Wine Decl., Ex. 2 at Endorsement 34), and because the Retention is inapplicable for Non-Indemnifiable Loss under Clause 6 of the policy, there is no Retention and so there is no unpaid Retention to recover.  *See* Supp. Resp. at 38.

The flaw with this argument is that WMI, not the individual D&O Claimants, was supposed to pay the Retention.  The fact that the insurance contract does not require the D&O Claimants to pay the Retention if WMI becomes Financially Insolvent in no way absolves WMI from its failure to meet its original obligation to pay the Retention.  Indeed, Debtors' argument would render Endorsement 34 meaningless.  Endorsement 34 expressly amends Clause 13 to provide the 2007/2008 ABC D&O Carriers with a "contractual right" to recover the unpaid Retention amount in the event of WMI's Financial Insolvency.  If Debtors were correct, this right would always be worthless because there would be no unpaid retention in the event of WMI's Financial Insolvency.  This is nonsense.[12]

In short, if Endorsement 34 is part of the policy, its express purpose was to ensure that in the event of WMI's Financial Insolvency, the 2007/2008 ABC D&O Carriers would begin paying immediately, notwithstanding WMI's Retention obligations, in exchange for the "contractual right" of subrogation to recover from WMI the unpaid amount of the Retention.  That is exactly the situation that exists now.

---

[12]  Debtors also argue that Clause 13 of the 2007/2008 Primary D&O Policy contains an "anti-subrogation" provision, providing that the 2007/2008 ABC D&O Carriers will only exercise their subrogation rights in the event of a deliberately criminal or fraudulent act.  Supp. Resp. at 37.  On the very next page, however, Debtors note that Clause 13 was amended by Endorsement 34, which provides the express contractual right to the 2007/2008 ABC D&O Carriers to pursue WMI for amounts paid by the 2007/2008 ABC D&O Carriers towards the Retention due to WMI's Financial Insolvency.  *See* Sup. Resp. at 38.

As noted above, the D&O Claimants believe that the correct 2007/2008 Primary D&O Policy contains additional language directly refuting Debtors' argument.  Both versions contain an endorsement specifying the parties' rights in the event of a WMI insolvency.  In the version submitted by Debtors with their Comfort Order Motion, which the D&O Claimants believe to be the correct version, this is Endorsement 33.  In the version Debtors submitted with their Supplemental Response, this is Endorsement 34.  Both versions of this endorsement contain much of the same language.  They both, for instance, contain the identical amendment to Clause 13 discussed above that provides the 2007/2008 ABC D&O Carriers with express contractual rights against WMI for the unpaid Retention.  *Compare* Wine Decl. Ex. 2, Endorsement No. 34 *with* Ex. E at Ex. C, Endorsement 33.   However, the version attached to the Comfort Order Motion (Endorsement 33) contains additional language amending Clause 6 of the Policy, and this language leaves no doubt whatsoever that if WMI became Financially Insolvent and refused to meet its obligation to pay the $50 million Retention, the 2007/2008 ABC D&O Carriers would do so under their Side A coverage, *but would have the contractual right to recover those payments from WMI*:

> It is further understood and agreed that *in the event an Organization refuses to pay an applicable Retention due to Financial Insolvency*, then the Insurer shall commence advancing Loss within the Retention and pursuant to the other terms, conditions, and exclusions of this policy, *provided that the Insurer shall be entitled to recover the amount of such advanced within the Retention from the Organization pursuant to Clause 13. SUBROGATION.*

Ex. E at Ex. C, Endorsement 33 (emphasis added).

In short, regardless of whether Debtors are correct—and the policy contains Endorsement 34 as submitted in the Wine Declaration—or the D&O Claimants are correct—and the policy contains only Endorsement 33 as previously filed by the Debtors with the Court in November

2008—the 2007/2008 Primary D&O Policy expressly provides the 2007/2008 ABC D&O

Carriers with the contractual right to recover from WMI the unpaid Retention amounts that they

were obligated to pay due to WMI's Financial Insolvency.  The 2007/2008 ABC D&O Carriers

thus have contractual rights of subrogation to the extent of all sums paid on behalf of the D&O

Claimants within the $50 million Retention, and the reserve should include their payments on

non-subordinated claims.

> **B.      This Reserve Should Also Include Payments Made by the 2007/2008 Side A
> D&O Carriers on Behalf of the D&O Claimants.**

Debtors ignore the D&O Claimants' rights to seek indemnification to protect the

subrogation rights of the 2007/2008 Side A D&O Carriers.  As noted above, the 2007/2008

Primary Side A Policy is separate from the 2007/2008 Primary D&O Policy, and the Side A

Tower is separate from the Side ABC coverage.  Debtors' interpretation of the 2007/2008

Primary D&O Policy thus has no bearing on the 2007/2008 Primary Side A Policy.

As Section I of the 2007/2008 Primary Side A Policy states, the separate 2007/2008 Side

A insurance tower only pays the D&O Claimants when indemnification is not available due to

WMI's Financial Insolvency.  *See* Ex. F at § I.  If there are other funds available to indemnify the

insureds, Side A insurance is not triggered and the Side A insurers are not obligated to pay.  *Id.*;

*see* Ex. F at Endorsement  19, ¶ 11 ("all coverage under this Policy shall be specifically excess

over, and shall not contribute with:  (i) all indemnification to which an Insured Person may be

entitled and is paid from any source, including but not limited to the Company or any Outside

Entity").

The 2007/2008 Side A D&O Carriers therefore have a contractual subrogation right to

recover all payments made by them on behalf of the D&O Claimants.  "To the extent of any

payment under this Policy, the Insurer shall be subrogated to the potential or actual rights of

recovery of the Insured Persons after the Insureds have been made whole." Ex. F at Endorsement. 3, ¶ 1. The payments made by the 2007/2008 Side A D&O Carriers would not have been required if WMI had complied with its contractual obligations under the D&O Policies.

It is easy to understand why Debtors ignored the 2007/2008 Primary Side A Policy. Their "anti-subrogation" arguments have no relevance. WMI is not an insured to the 2007/2008 Primary Side A Policy, so there is no risk of subrogation creating a "insured vs. insured" conflict. Moreover, under Paragraph 1 of Endorsement 3, the duty to take all steps to secure the 2007/2008 Side A D&O Carriers' subrogated rights falls just as heavily upon WMI as it does the D&O Claimants. Therefore, WMI's efforts to impair the insurers' subrogation rights are inconsistent with its contractual obligations.

Debtors have thus articulated no reason why the payments by the 2007/2008 Side A D&O Carriers are not subject to recovery. Accordingly, the reserve should include all payments made by the 2007/2008 Side A D&O Carriers for non-subordinated claims.

### C.    The 2004/2005 D&O Carriers Are Also Subrogated to the D&O Claimants' Rights Under the 2004/2005 Primary D&O Policy.

The 2004/2005 Primary D&O Policy also expressly provides the 2004/2005 D&O Carriers with subrogation rights to recover payments from WMI up to the Retention in the event of WMI's Financial Insolvency. Comparable to Endorsement 33 in the 2007/2008 Primary D&O Policy, the 2004/2005 Primary D&O Policy contains Endorsement 11, which provides that if WMI refuses to pay the Retention amount due to Financial Insolvency, then the 2004/2005 D&O Insurers will advance Defense Costs within the Retention and will be "entitled to recover the amount of Defense Costs advanced within the Retention from" WMI pursuant to the subrogation

rights set forth in Clause 13 of the 2004/2005 Primary D&O Policy.  *See* Ex. G at Endorsement 11.

Accordingly, similar to the 2007/2008 D&O Carriers, the 2004/2005 D&O Carriers have contractual subrogation rights to the extent they have paid any amounts within the Retention, and the reserve should include any payments for non-subordinated claims.

### D.    The Common Law "Anti-Subrogation Rule" Is Inapplicable.

Debtors argue that the common law "anti-subrogation" rule precludes the D&O Claimants from protecting the subrogation rights of the D&O Carriers by seeking recovery from WMI for the payments made by the D&O Carriers on the D&O Claimants' behalf.  *See generally* Supp. Resp. at IV.A.  This common law rule cannot trump the express contractual provisions in the D&O Policies purchased by WMI and, in any event, it has no applicability to the Estimation Motion or the circumstances of the D&O Claimants' indemnification claims.  It certainly has no application to the 2007/2008 Primary Side A Policy, in which WMI is not even an insured party.

The common law anti-subrogation rule generally provides that an insurer may not exercise subrogation rights in order to pursue claims against another insured party.  There are two reasons for this rule: "(1) it prevents the insurer from passing the loss back to its insured, an act that would avoid the coverage that the insured had purchased; and (2) it guards against conflicts of interest that might affect the insurer's incentive to provide a vigorous defense for its insured."  *DeHerrera v. Am. Family Mut. Ins. Co.*, 219 P.3d 346, 351 (Colo. App. 2009).

Neither of these policy goals is implicated here.  As explained above in Background Sections C, D and E, *supra*, the D&O Carriers are not trying to pass loss back to an insured to avoid their insurance obligations.  To the contrary, it is WMI who is trying to avoid its obligations to make the D&O Claimants (and the D&O Carriers subrogated to their rights) whole

by replenishing the 2007/2008 D&O Tower with the amounts paid by the D&O Carriers that otherwise would have been paid by WMI under the Retention.  Recognizing the D&O Carriers' subrogation rights would to some extent restore the original bargain between WMI, the D&O Carriers, and the D&O Claimants:  the D&O Claimants would be protected with $250 million of insurance excess of WMI's obligation to pay the first $50 million Retention.

Nor does this create any conflict of interest that could impact the D&O Carriers' incentive to provide a vigorous defense.  First, the D&O Policies do not require that the D&O Carriers provide a defense to the D&O Claimants, just to advance fees and costs, so the supposed impact on the vigor of the defense by the D&O Carriers is inapplicable here.  Second, Debtors cannot even articulate a coherent reason why any conflict of interest would exist if a reserve is established to protect the D&O Carriers' subrogation rights.  Unlike the cases Debtors cite, this is not an instance where the D&O Carriers are alleged to have behaved unfairly, and there is no issue regarding the defense of an insured given that the applicable policies do not provide for a defense.  Rather, the D&O Carriers have contractual subrogation rights that WMI agreed to when it purchased the D&O Policies which could result in replenishing the sums available to provide a defense for the D&O Claimants.

Not surprisingly, none of the cases cited by Debtors are remotely analogous to the circumstances here.  In each of the cases cited by Debtors, the insurer attempted to use its subrogation rights to shift the loss suffered by one insured onto another insured by suing the latter based on subrogated tort claims it obtained by paying the former's losses.  *See, e.g., Seine Vessels Reserve v. Dunlap Towing Co.,* No. C09-633RAJ, 2010 U.S. Dist. LEXIS 57393, at *4 (W.D. Wash. June 10, 2010) (dismissing claims to extent plaintiff was suing as subrogor of defendant's insurer); *Stetina v. State Farm Mut. Auto. Ins. Co.*, 243 N.W.2d 341, 346 (Neb.

1976) (in car accident between two drivers insured by same insurer, insurer could not subrogate to innocent driver's claim against at-fault driver).

Moreover, some of the cases cited by Debtors acknowledge that the insured can contractually agree to pay the insurer for any recovery obtained by the insured, and that this would not violate the public policy of the anti-subrogation rule. *See DeHerrera*, 219 P.3d at 351 (payment to insurer by insured would not violate anti-subrogation rule); *Horner v. Farmers Ins. Co. of Wash.*, No. 64169-7-1, 2011 Wash. App. LEXIS 76, at *9-11 (Wash. Ct. App. Jan. 10, 2011) (same).

The common law anti-subrogation rule has no place here given the contractual right of recovery in the D&O Policies.  And even if the anti-subrogation rule were not preempted by the contract language in the D&O Policies, the D&O Carriers are not seeking to transfer responsibility for a covered matter from one insured to another.  Nor is there any issue regarding the vigor of the defense provided by the D&O Carriers, as the D&O Policies do not require that the D&O Carriers provide a defense.  In short, Debtors' reliance on cases applying the common law anti-subrogation rule in no way undermines the D&O Carriers' contractual subrogation rights, or impacts the Court's ability to establish a reserve to protect these rights to the extent the D&O Carriers have paid sums for non-subordinated claims.

**IV.    WMI Must Indemnify the D&O Claimants For Expenses Related to Establishing Their Indemnification Rights, Including Opposing Debtors' Estimation Motion.**

Ignoring WMI's Indemnification Agreements with the D&O Claimants, as well as the protections afforded to them under WMI's Articles and By-laws, Debtors seek to wipe out any indemnification rights of the D&O Claimants for costs and expenses incurred in protecting their indemnification rights.  *See generally* Supp. Resp. at VIII.  Debtors disingenuously contend that the D&O Claimants are seeking to be reimbursed for the costs of "monitoring and participating

in these chapter 11 cases," which Debtors have defined as "Bankruptcy Expenses." *Id.* at 44.

Debtors' specious arguments are easily rejected, for several reasons.

>    A.    **The Indemnification Agreements Unambiguously Require WMI to
>          Indemnify the D&O Claimants for Fees and Costs Incurred Establishing and
>          Defending Their Indemnification Rights.**

Debtors' Supplemental Response erroneously suggests that the D&O Claimants have no

"express right to indemnification" for their work in opposing the Estimation Motion.  Supp.

Resp. at 44.  Debtors are wrong.

First, Debtors inexplicably ignore Section 5(c) of each of the Indemnification

Agreements.  Section 5(c) provides that the D&O Claimants are "*presumed* to be entitled to

indemnification under this Agreement," that WMI has "the burden of proof in overcoming that

presumption," and can satisfy that burden only by submitting "*clear and convincing evidence*."

*See, e.g.*, Ex. C at § 5(c) (emphasis added).  This presumption applies "in any suit or action to

enforce the claim [for indemnification] or otherwise relating to the claim."  *Id.*  Debtors'

Supplemental Response ignores this presumption and the high burden of proof Debtors must

overcome.  As discussed below, Debtors have not and could not satisfy their heavy burden.

Second, Debtors misstate the terms of the D&O Claimants' respective Indemnification

Agreements.  Debtors wrongly assert that, on its face, the Indemnification Agreements do not

require WMI to indemnify the D&O Claimants for expenses incurred in connection with WMI's

bankruptcy.  To the contrary, the Indemnification Agreements provide the D&O Claimants with

very broad indemnification rights.  Section 1(a) states that WMI "shall indemnify and hold

harmless" the D&O Claimants if any of them "is involved in . . . any actual, pending or

threatened action, suit or proceeding . . . by reason of the fact that [he or she] is or was . . . a

director of [WMI]."  *See* Ex. C at § 1(a).  Section 5(b) unequivocally grants the D&O Claimants

the right to recover from WMI any expenses the D&O Claimants incur in establishing and

defending indemnification rights in any proceeding with WMI:

> The Indemnitee's expenses (including attorneys' fees) incurred with successfully establishing Indemnitee's right to indemnification, in whole or in part, *in any such proceeding* [to enforce the Indemnification Agreement] *or otherwise* shall also be indemnified by the Corporation.

*Id.* at § 5(b) (emphasis added).  The express language in the Indemnification Agreements

provides that the D&O Claimants are entitled to their legal fees and costs in connection with

establishing and securing their indemnification rights.  The D&O Claimants' entitlement to the

fees and costs they incur in seeking their indemnification rights is not limited to proceedings

outside of bankruptcy.  Their efforts to pursue their indemnification rights in response to the

efforts by Debtors to oppose those rights in the Estimation Motion and Sixtieth Omnibus are thus

covered by the Indemnification Agreements.

Although Debtors quote Section 8(b) of the Indemnification Agreements, they avoid

discussing the protections it affords to the D&O Claimants.  *See* Supp. Resp. at 45.  Indeed,

Section 8(b) is consistent with Section 5(b):  it provides that WMI is *required* to indemnify the

D&O Claimants in an action to enforce the Indemnification Agreements if the D&O Claimants

win or the court otherwise rules that they are entitled to indemnification.

If Sections 1(a), 5(b) and 8(b) were not clear enough, Debtors' attempts to graft

limitations onto the Indemnification Agreements are prohibited by other provisions of those

agreements.  In Section 16, WMI "agrees that its execution of this Agreement shall constitute a

stipulation by which it shall be irrevocably bound," that its failure to comply with its obligations

will cause "irreparable and irremediable injury," and that the D&O Claimants "shall be entitled

to injunctive or mandatory relief directing specific performance by [WMI] of its obligations

under this Agreement." *See* Ex. C at § 16.  Section 17, another provision ignored by Debtors,

requires that the D&O Claimants' indemnification rights are to be construed as broadly as

possible within the limits of the law:  "It is understood that the parties hereto intend this

Agreement to be interpreted and enforced so as to provide indemnification to Indemnitee to the

fullest extent now or hereafter permitted by law." *Id.* at §17.

The protections afforded to the D&O Claimants in their Indemnification Agreements are

also consistent with and supported by express provisions in WMI's Articles and By-laws.  In

particular, WMI's By-laws contain language similar to the Indemnification Agreements and the

Articles of Incorporation at § 8.1 (directors) and § 8.6 (officers).  *See, e.g.*, Ex. A at § 8.1, § 8.6.

The D&O Claimants thus have a clear right to recover the fees and expenses they have

incurred in seeking to enforce their indemnification rights.  There is nothing in the governing

documents which suggest that this right to recover diminished in any way because these fees and

expenses were incurred to defend the D&O Claimants' indemnification rights in a bankruptcy

proceeding.  D&O Claimants are therefore, entitled to recover the full amount of the fees and

costs they have incurred in those (continuing) efforts.

> **B.      The D&O Claimants Are Not Seeking Indemnification For Expenses
> Unrelated to Establishing Their Indemnification Rights and Opposing
> Debtors' Motion to Extinguish Those Rights.**

Ignoring the D&O Claimants' discovery responses and badly mischaracterizing the

nature of the expenses the D&O Claimants have actually incurred, Debtors argue that the D&O

Claimants are seeking indemnification for expenses unrelated to their indemnification rights.

Supp. Resp. at 44 & n.45.  As a threshold matter, this is largely a factual issue that will turn on

evidence concerning the nature and extent of the work for which the D&O Claimants are seeking

to be indemnified – and so it cannot be decided at this time.  But for purposes of this Opposition,

the D&O Claimants represent to this Court that all of their fees and expenses for which they are

seeking reimbursement were incurred in connection with the D&O Claimants' efforts to protect

and establish their indemnification rights.  Indeed, Debtors conveniently ignore that after Debtors

sought to estimate their indemnity obligations to the D&O Claimants at $0.00 in November

2010, the parties have been engaged in active litigation and discovery over this motion, with

multiple hearings and depositions repeatedly scheduled (and often postponed close in time to

each event) by Debtors, as well as multiple efforts to reach a settlement.

In their Supplement Response, however, Debtors suggest the D&O Claimants' expenses

were unnecessary or simply done to "monitor" the bankruptcy.  The D&O Claimants strongly

disagree, but to the extent Debtors have any issues with particular expenses, Debtors have

already agreed that those are factual issues for another day.  In any event, challenges to

individual charges hardly support the wholesale exclusion of them all.

But Debtors apparently seek to do just that.  Buried deep in a long footnote 45, Debtors

describe the "Bankruptcy Related Expenses" that they are seeking to eliminate.  Debtors state

that "Bankruptcy Related Expenses" includes but is "not limited to, fees and costs relating to the

Sixtieth Omnibus and the Estimation Motion[.]"  Supp. Resp. at 44 n.45.  Not surprisingly,

nowhere do Debtors argue why the D&O Claimants' efforts to oppose the Estimation Motion

and the Sixtieth Omnibus are non-indemnifiable.

Likewise, Debtors disingenuously assert that they do not dispute the D&O Claimants'

respective rights to indemnification, Supp. Resp. at 46 – Debtors simply objected to them in the

Sixtieth Omnibus and are now trying to have them estimated at $0.00.  Even without the Sixtieth

Omnibus, Debtors cannot plausibly deny that estimating the indemnification obligations at zero

is tantamount to wiping out those obligations.

C.    **The D&O Claimants Are Not Seeking Unallowable Post-Petition Fees and Expenses.**

Because the contractual provisions of the Indemnification Agreements unambiguously protect the D&O Claimants' rights to recover legal fees and expenses incurred in protecting their indemnification rights, Debtors point to a number of Bankruptcy Code provisions and cases and incorrectly suggest that they establish a general policy that unsecured creditors such as the D&O Claimants should not be awarded post-petition fees and expenses. Supp. Resp. at 46-47. The cases cited by Debtors do not support the breadth of the policy Debtors now espouse and indeed fly directly in the face of binding Supreme Court precedent.

As the Supreme Court has held, there is no generalized policy prohibiting unsecured creditors from recovering post-petition bankruptcy-related litigation expenses. *See Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443, 452 (2007) (rejecting contention that indemnitee was prohibited from recovering post-petition bankruptcy litigation expenses). To the contrary, if a valid contract calls for the indemnification of those expenses, that claim is to be allowed absent some specific statutory basis for disallowance. *Id.* Debtors cite no such basis.

In any event, the provisions that Debtors cite to support their policy argument would not apply anyway because the Indemnification Agreements were signed *pre-petition*. As such, the claim for indemnification is also *pre-petition* even though the expenses were incurred post-petition. *See, e.g., In re Hemingway Transport, Inc.*, 954 F.2d 1, 8 (1st Cir. 1992) (where indemnification agreement was signed pre-insolvency, the claim was pre-petition even though the expenses were incurred post-petition); *In re Wilbur*, 237 B.R. 203, 207 (Bankr. M.D. Fla. 1999) ("an indemnification agreement creates a contingent claim as of the date the agreement is signed."); *In re Highland Group, Inc.*, 136 B.R. 475, 481 (Bankr. N.D. Ohio 1992) ("Where an

indemnification agreement is entered into prior to a bankruptcy filing, such an execution gives the indemnitee a contingent prepetition claim.")

As held in *Aventis Cropscience USA LP v. Phillip Servs. (Del.), Inc.,* No. 00C729, 2001 WL 1219477 (W.D. Wash. Mar. 9, 2001), a case Debtors cite, the scope of an indemnification agreement is to be determined by the parties' intent.  The parties' intent here could not be more clear:  the D&O Claimants' expenses incurred in defending and establishing their indemnification rights in this proceeding are, under the Indemnification Agreements, required to be indemnified by WMI.  *See, e.g.*, Ex. C at §5(b), §8(b).

Factual disputes regarding the D&O Claimants' fees and costs incurred to establish and protect their indemnification rights are not at issue now.  Those facts will be addressed in the second part of this bifurcated proceeding.

**D.      The D&O Claimants' Indemnification Rights Should Not Be Subordinated.**

Finally, Debtors contend that the D&O Claimants' expenses incurred in their attempts to protect their indemnification rights should be subordinated to the classes of underlying claims in the various litigations.  Supp. Resp. at 48.  That contention is both unsupported and ironic, as the D&O Claimants would not have incurred most of the legal fees and expenses in this bankruptcy proceeding but for Debtors' attempts to wipe out their indemnification obligations.

The only authority cited for Debtors' request to subordinate is *In re Mid-American Waste*, 228 B.R. 816 (Bankr. D. Del. 1999), a case that involved "tainted securities transactions" and has no bearing here.  The D&O Claimants' defense of their indemnity rights is not based on any "tainted securities transactions" or any other comparable wrongdoing.  This alone compels rejection of Debtors' argument.  But even more significant, taking Debtors' argument at face value, the vast majority of the costs for which the D&O Claimants are seeking indemnification

were incurred in opposing Debtors' Estimation Motion concerning *non-subordinated Class 12 claims*. Were there no such non-subordinated Class 12 claims, the D&O Claimants would not have incurred the expenses; there would have been no point – and of course, Debtors would not have put up such a concerted fight to eliminate the D&O Claimants' indemnity rights had there not been those very substantial non-subordinated Class 12 claims.

The D&O Claimants' indemnity rights are prepetition claims based on their contractual and corporate governance rights. They are general unsecured claims entitled to Class 12 priority.

## CONCLUSION

Debtors' Motion to Estimate the D&O Claims and set a maximum reserve for these claims at zero is not supported by the law and should be denied. The D&O Claimants are entitled to a reserve for indemnification and advancement which includes the subrogation claims of the D&O Carriers. The D&O Claimants are contractually obligated to protect and preserve the D&O Carriers' right to recover payments made by the Carriers on the D&O Claimants' behalf due to the Financial Insolvency of WMI, and they have standing to assert these claims since there is an actual economic benefit derived from indemnification in the form of a replenishment of the D&O coverage. Under the D&O Policies, the D&O Carriers advance costs upon the Debtors' financial insolvency, but the D&O Carriers have a contractual right to recover those payments from WMI, which is subrogated to the rights of the D&O Claimants. This contractual right to subrogation is consistent with Washington state law and all applicable contractual rights of the D&O Claimants. Finally, the costs incurred by the D&O Claimants in defense of their indemnification rights are indemnifiable, and there is no basis to subordinate this portion of their claim.

Dated: February 22, 2012

**MONZACK MERSKY MCLAUGHLIN
AND BROWDER, P.A.**

*/s/ Rachel B. Mersky*
Rachel B. Mersky, Esquire (DE #2049)
1201 N. Orange Street, Suite 400
Wilmington, DE 19801-1155
Telephone: (302) 656-8162
Facsimile: (302) 656-2769
Email: rmersky@monlaw.com

Barry M. Kaplan, WSBA #8661
Daniel W. Turbow
Jerome F. Birn, Jr.
Wilson, Sonsini, Goodrich & Rosati
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Telephone: (206) 883-2500
Facsimile: (206) 883-2699
Email: bkaplan@wsgr.com
Email: dwturbow@wsgr.com
Email: jbirn@wsgr.com

Attorneys for Claimant
KERRY K. KILLINGER


**BIFFERATO LLC**

*/s/ Thomas F. Driscoll III*
Ian Connor Bifferato (No. 3273)
Thomas F. Driscoll III (No. 4703)
800 N. King St., Plaza Level
Wilmington, DE 19801
Tel: (302) 225-7600
Fax: (302) 254-5383

Ronald L. Berenstain (WSBA No. 7579)
(admitted pro hac vice)
Alan D. Smith (WSBA No. 24964)
(admitted pro hac vice)
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101
Tel: (206) 359-8000
Fax: (206) 359-9000

Attorneys for Claimants Stephen Chazen, Anne
Farrell, Stephen Frank, Thomas Leppert, Charles
Lillis, Phillip Matthews, Regina Montoya, Michael
Murphy, Margaret Osmer McQuade, Mary Pugh,
William Reed, Jr., Orin Smith, James Stever and
Willis Wood, Jr.