### THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WASHINGTON MUTUAL, INC., et al., | ) | Case No. 08-12229 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |

### OPINION[1]

Before the Court is the Objection of WMI Liquidating Trust (the "Trust"), as successor in interest to Washington Mutual, Inc. ("WMI") and WMI Investment Corp., to the proof of claim filed by the Oregon Department of Revenue ("Oregon"). For the reasons stated herein, the Court will sustain the Objection.


I.   BACKGROUND

WMI is a bank holding company that formerly owned Washington Mutual Bank ("WMB"). By the late 1990s, WMB was using real estate investment trusts ("REITs") as a source of funding and capital. In late 1999, each of the REITS became directly-owned subsidiaries of a holding company of WMI and changed their commercial domiciles from the State of Washington to Oregon.

WMB and certain of WMB's subsidiaries (the "WMB Entities") conducted banking-related operations in Oregon during taxable years 1999 through 2005. During this period, WMI and its direct

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is incorporated by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

and indirect subsidiaries, including the WMB Entities and the REIT Holding Companies (the "Consolidated Tax Group"), filed consolidated returns for federal tax purposes.[2]

As a result of a downgrade in WMI's and WMB's credit ratings and the global credit crisis, a bank run ensued resulting in more than $16 billion in deposits being withdrawn from WMB in a ten-day period beginning on September 15, 2008. On September 25, 2008, the Office of Thrift Supervision (the "OTS") seized WMB and appointed the Federal Deposit Insurance Corporation (the "FDIC") as the receiver. On the same day, the FDIC sold substantially all of WMB's assets to JPMorgan Chase.

On September 26, 2008, WMI and WMI Investment Corp. (collectively, the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code. At that time, WMI's assets included its interest in non-banking subsidiaries, more than $4 billion of cash that WMI and its non-banking subsidiaries had on deposit at the WMB Entities immediately prior to the time the FDIC was appointed as receiver, and a claim against the FDIC for, inter alia, its common stock interest in WMB.

---

[2] The REITS, themselves, however, were not members of the Consolidated Tax Group and were not included in the consolidated federal returns. During the same period, WMI filed consolidated returns on behalf of the Consolidated Tax Group in Oregon as well. The REITS were not included in the consolidated Oregon returns. Thus, the income of the REITS from the REIT loans was not reflected in the consolidated federal or Oregon tax returns.

In 2008, Oregon conducted an audit of WMI and certain of its subsidiaries.  By letter dated November 12, 2008, Oregon asserted that additional corporate excise taxes, penalties, and interest were due by WMI and its subsidiaries for tax years 2002 through 2006 (the "Taxable Period").  On March 17, 2009, WMI and Oregon attended an informal conference at which WMI contested the results of the Oregon audit.  On October 8, 2009, Oregon's positions with respect to each of the audit issues was upheld and a notice of assessment was issued (the "Notice of Assessment").  On January 6, 2010, WMI timely filed a written appeal from the Notice of Assessment, which appeal remains pending.  (D.I. 9115 at Ex. 23.)[3]

In the interim, Oregon filed a proof of claim in the Debtors' chapter 11 cases, pursuant to which Oregon sought payment of $29,381,722.91 for corporate excise taxes, interest, and penalties related to the Taxable Period.  The Debtors objected to the claim on the basis that Oregon sought payment for excise taxes owed by entities other than the Debtors.  (D.I. 3196.)  Oregon responded that WMI is jointly and severally liable for the excise tax obligations of the WMB Entities under Oregon law.  Thereafter, Oregon filed an amended claim (in the same amount as the original claim).  The Debtors objected to the

---

[3]  Citations to pleadings filed in the bankruptcy case are "D.I. #."

3

amended claim, asserting that the tax was unconstitutional because WMI lacked a substantial nexus with the State of Oregon. (D.I. 9113.) Alternatively, WMI asserted that if the tax is constitutionally permissible, the amount of the claim should be zero.

In its Seventh Amended Plan of Reorganization (the "Plan"), the Debtors designated a liquidating trust to administer the liquidating trust assets and distribute the proceeds thereof.  On February 24, 2012, the Plan was confirmed and the Trust was formed.  On September 13, 2012, the Trust, as successor in interest to the Debtors, filed its memorandum of law in support of the Debtors' objection to Oregon's claim.

The matter was fully briefed and the Court heard oral argument on the constitutional issue on September 25, 2012.  At the conclusion of the hearing, the Court took the matter under advisement.  It is ripe for decision.


II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this core matter.  28 U.S.C. §§ 1334(b) & 157(b)(2)(A) & (B).


III.  <u>DISCUSSION</u>

A.   <u>Oregon Corporate Excise Tax</u>

Oregon argues that, pursuant to Oregon law, WMI is liable

for the Oregon excise tax owed by its subsidiaries.  Oregon
asserts that WMI, as the parent holding company of its unitary
business, filed consolidated corporate tax returns on behalf of
itself and its operating subsidiaries for the Taxable Period.
The Oregon tax laws provide in relevant part:

> (1) Generally, the consolidated return shall be filed
> by and in the name of the common parent corporation.
> If the common parent is not a member of the affiliated
> group filing the consolidated Oregon return or is not
> subject to Oregon taxation, the return shall be filed
> in the name of a member of the affiliated group doing
> business in Oregon as defined under ORS 317.010(4).  If
> more than one member is doing business in Oregon, the
> name of the member having the greatest presence in
> Oregon shall be used.

Or. Admin. R. 150-317.710(5)(a)-(A) (2012).

Oregon argues that if WMI was not subject to taxation by
Oregon, the return should not have been filed in its name and WMI
should not have been included in the consolidated tax group.
Oregon asserts, therefore, that by filing the return in its name,
WMI admitted that it was doing business in Oregon and was liable
for the excise tax.  Oregon seeks to impose joint and several
liability upon WMI because it was included in the consolidated
state tax return.

> The corporation's tax liability shall be joint and
> several with any other corporation that is included in
> a consolidated state return with the corporation under
> subsection (5) of this section.

Or. Rev. Stat. § 317.710(2) (2012).

The Trust responds that the mere inclusion of WMI in the

5

consolidated tax return is not a concession or admission of its
tax liability.  See, e.g., Estee Lauder Serv., Inc. v. Dep't of
Revenue, 16 Or. Tax 279, 284 (Or. T.C. 2000) (holding that
members of an affiliated group are not treated as a single
taxpayer for the purpose of determining whether any member is
subject to tax); State ex rel. Dep't of Revenue v. Penn Indep.
Corp., 15 Or. Tax 68, 74 (Or. T.C. 1999) (holding that the
inclusion of income by a nontaxable member of a unitary group
does not subject that income to taxation of the group).  In fact,
the Trust notes that WMI was required to be included in the
Oregon tax return because it was part of the consolidated group
for federal tax purposes.  Or. Rev. Stat. § 317.710(2) (2012)
("If [a] corporation is a member of an affiliated group of
corporations making a consolidated federal return, it shall file
a return and determine its Oregon taxable income as provided in
ORS 317.715.").

The Trust further contends that if WMI is liable under
Oregon tax law, that tax is unconstitutional.

B.    Constitutionality of Tax

A state's power to tax a particular taxpayer is limited by
both the Due Process and Commerce Clauses of the United States
Constitution.  Quill Corp. v. North Dakota, 504 U.S. 298, 305
(1992); Mobile Oil Corp. v. Comm'r of Taxes of Vt., 445 U.S. 425,
449 (1980); Nat'l Bellas Hess, Inc. v. Dep't of Revenue, 386 U.S.

753, 756 (1967), overruled in part on other grounds, Quill, 504
U.S. at 308.

The Trust argues that the tax is unconstitutional because it
(i) is incompatible with the Due Process Clause and (ii) violates
the Commerce Clause.

> 1.   Due Process

Due process requires (1) "some minimum connection, between a
state and the person, property or transaction it seeks to tax,"
and (2) that "income attributed to the State for tax purposes
must be rationally related to values connected with the taxing
State." Quill, 504 U.S. at 306.  Due process is not satisfied
unless, in addition to finding "minimum contacts," the court
determines that the income a state seeks to tax relates to a
benefit received from the state.  Id. at 308.  The initial
inquiry regarding due process, therefore, is "whether a defendant
had minimum contacts with the jurisdiction such that the
maintenance of the suit does not offend traditional notions of
fair play and substantial justice." Quill, 504 U.S. at 307
(citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

> a.   Minimum contacts

The Trust contends that WMI did not purposefully avail
itself of the benefits of Oregon because WMI's primary business
offices were located in Seattle, Washington, and it did not
operate any offices or own any other property in Oregon.

7

Further, the Trust argues that WMI conducted no business activity within or directed towards Oregon and received no sales or other operating revenue of any kind from Oregon sources. The Trust asserts that WMI was merely a holding company and that WMB did not represent WMI, nor act on WMI's behalf, in its business dealings within Oregon. See, e.g., Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F. Supp. 1458, 1471-72 (D. Del. 1991) (holding that the ownership of a Delaware subsidiary in the taxing state, standing alone, does not qualify as a continuous and systematic contact to meet the due process requirements of minimum contacts); Afros S.p.A. v. Krauss-Maffei Corp., 624 F. Supp. 464, 468 (D. Del. 1985) (holding that the continuous incorporation of a subsidiary in the taxing state and the filing of annual franchise tax returns are insufficient minimum contacts of the holding company).

Oregon argues that WMI, through its banking subsidiaries, was doing business in Oregon. Oregon asserts that WMI directly controlled its banking subsidiaries (the WMB Entities) all of which were indisputably doing business and earning income on behalf of WMI and themselves in Oregon during the Taxable Period.

In the case at bar, the Court agrees with the Trust that the Due Process Clause bars enforcement of the Oregon tax because WMI and WMB were separate legal entities and because WMI conducted no business activity within or directed towards Oregon. WMI was

simply a parent holding company that held stock in its subsidiaries. Its only source of income related to Oregon came from cash dividends from the WMB Entities. Oregon is not seeking to tax WMI on those dividends;[4] rather it is seeking to impose a corporate excise tax on WMI for the income earned by its subsidiaries who were doing business in Oregon. In the absence of piercing the corporate veil, the Court finds no precedent that would allow Oregon to tax a nondomiciliary corporate parent (or shareholder) for the separate income of its subsidiary.

b. <u>Benefits received from activities in State</u>

In addition, Oregon argues that intellectual property of WMI was utilized in Oregon during the Taxable Period by its subsidiaries. For example, Oregon contends that the WMB Entities utilized trademarks owned by WMI, such as the "Power of Yes" slogan. Oregon asserts that such intellectual property constitutes a profit-seeking activity conducted on behalf of WMI by its subsidiaries which resulted in a benefit to WMI (in the form of increased goodwill and cash dividends from the subsidiaries to WMI).

---

[4] When a nondomiciliary corporation having no other connection with the state receives dividends from a subsidiary doing some business within the state, the state may not constitutionally tax the dividend income unless the recipient taxpayer corporation and its underlying subsidiary payor were engaged in a unitary business. <u>See generally</u>, <u>Container Corp. of America v. Franchise Tax Bd.</u>, 463 U.S. 159 (1983); <u>ASARCO Inc. v. Idaho State Tax Comm'n</u>, 458 U.S. 307 (1982); <u>Mobile Oil Corp. v. Comm'r of Taxes of Vt.</u>, 445 U.S. 425 (1980).

A State may only tax a nondomiciliary corporation on its own interstate business provided there is a "minimal connection or nexus between the interstate activities and the taxing State, <u>and</u> a rational relationship between the income attributed to the State and the intrastate values of the enterprise." <u>Exxon Corp. v. Wis. Dep't of Revenue</u>, 447 U.S. 207, 219-20 (1980) (emphasis added) (internal citations omitted). Here, WMI's only connection to Oregon was the use of its intellectual property by its subsidiaries. That connection, however, is not sufficient because WMI received no benefit because it did not earn any income from the use of its intellectual property. In order to impute the use of the intellectual property by the subsidiary to the parent company for due process purposes, the parent company must derive substantial revenues from that intellectual property. <u>See, e.g.</u>, <u>Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.</u>, 142 F.3d 1266, 1271 (Fed. Cir. 1998) (holding that a subsidiary's contact in the forum state was imputed to the parent company for due process purposes where the parent derived substantial licensing revenues from the subsidiary's sales in the taxing state); <u>Geoffrey, Inc. v. South Carolina Tax Com'n</u>, 437 S.E.2d 13, 17 (S.C. 1993) (holding that an out-of-state trademark holding company was subject to the state's taxing jurisdiction because it earned income based on the franchise activities in the state).

10

Thus, the Court finds that WMI did not have sufficient minimum contacts with Oregon and the Oregon tax is not "rationally related to values connected with the taxing State." See Quill, 504 U.S. at 306. Therefore, the Court will sustain the Trust's Objection to the Oregon tax, as violative of the Due Process Clause of the U.S. Constitution.

2.   Commerce Clause

Alternatively, the Trust asserts that the Oregon excise tax violates the Commerce Clause. By specifically delegating to Congress the power "to regulate Commerce . . . among the several States," the Commerce Clause implicitly prohibits the states from taking actions that interfere with interstate commerce. U.S. Const. Art. 1, § 8, cl. 3. See Quill, 504 U.S. at 309. However, the prohibition does not render impermissible all state taxation of interstate commerce. A state can survive a Commerce Clause challenge if the "tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state." Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977).

The Trust's Commerce Clause challenge to the constitutionality of the Oregon excise tax focuses solely on the first prong of the Complete Auto test, namely whether WMI's activities had a "substantial nexus" with the State of Oregon.

11

The parties, however, dispute which standard is applicable in determining a substantial nexus under these circumstances.

The Supreme Court has made clear that substantial nexus requires far more that a slight presence in the taxing state. See Quill, 504 U.S. at 315, n.8 ("expressly reject[ing] a slighted presence standard of constitutional nexus") (internal citations omitted).  "While the concept of substantial nexus is more elastic than physical presence, it plainly means a greater presence, both qualitatively and quantitatively, than the minimum connection between a State and a taxpayer that would satisfy a due process inquiry."  Capital One Bank v. Comm'r of Revenue, 899 N.E.2d 76, 86 (Mass. 2009).

In contrast to the Due Process Clause nexus inquiry which centers on the fundamental fairness of the governmental activity upon the "individual," the Commerce Clause and its nexus requirement focus on "the effects of state regulation on the national economy."  Quill, 504 U.S. at 312.  See also, Bellas Hess, 386 U.S. at 760 (noting that "[t]he very purpose of the Commerce Clause was to ensure a national economy free from . . . unjustified local entanglements").  Despite the similarity of phrasing, the Court in Quill expressly rejected the contention that the "minimum contacts" nexus requirement of the Due Process Clause and the "substantial nexus" requirement under the Commerce Clause were equivalent.  The Court opined that unlike the Due

Process "minimum contacts" nexus analysis, the "substantial nexus" requirement for Commerce Clause purposes is not "a proxy for notice," but instead a means of limiting the burdens which a state may impose upon interstate commerce.  Quill, 504 U.S. at 313.  Courts have developed different analyses for determining whether a taxpayer has a substantial nexus with the State to permit it to be taxed.

a.   Physical Presence Doctrine

The Trust first argues that it lacked any relevant physical presence in Oregon to be constitutionally taxed in accordance with the bright-line physical presence standard articulated in Bellas Hess and Quill.  See, e.g., Quill, 504 U.S. at 317 (holding that physical presence was a necessary requirement for establishing a substantial nexus under the Commerce Clause); Bellas Hess, 386 U.S. at 756 (holding that to find a substantial nexus exists, courts examine the level of a taxpayer's "presence" within the taxing state).

Oregon responds that the Quill Court established a bright-line physical presence requirement only with respect to sales and use taxes and not corporate excise tax.  In Quill, the Supreme Court considered whether an out-of-state mail-order house that had neither outlets nor sales representatives in North Dakota could be required to collect and pay a use tax on goods purchased by North Dakota residents for use in that State.  Quill, 504 U.S.

13

at 301.  The Supreme Court held that North Dakota's attempt to
tax an out-of-state entity that lacked any physical presence in
the State violated the Commerce Clause.  Id. at 303.  Several
courts have held that Quill is limited to sales and use taxes and
does not apply to the imposition of other state taxes such as
corporate excise or income taxes.  See, e.g., Lamtec Corp. v.
Dep't. of Revenue, 215 P.3d 968, 974 (Wash. Ct. App. 2009)
(holding that physical presence is not required for a business
and occupation excise tax); Tax Comm'r of the State of W. Va. v.
MBNA Am. Bank, 640 S.E.2d 226, 232 (W. Va. 2006) (holding that
"Quill's physical-presence requirement for showing a substantial
Commerce Clause nexus applie[d] only to use and sales taxes and
not to business franchise and corporation net income taxes"); A &
F Trademark, Inc. v. Tolson, 605 S.E.2d 187, 195 (N.C. Ct. App.
2004) (holding that physical presence is not the sine qua non of
a state's jurisdiction to tax under the Commerce Clause for
purposes of income and franchise tax); Geoffrey, 437 S.E.2d at
18-19 (holding that the physical presence requirement of Quill
has not been extended to other types of taxes such as taxes on
royalty income).

The Trust responds that the value of a bright-line test and
the principles of stare decisis mandate the application of that
test here.  See Quill, 504 U.S. at 317 (recognizing that although
the physical-presence rule, like all bright-line rules, "appears

14

artificial at its edges," the artificiality was offset by the
benefits of a "clear rule").  Oregon replies that the bright-line
physical presence test "makes little sense in today's world"
where, for example, "electronic commerce now makes it possible
for an entity to have a significant economic presence in a state
absent any physical presence there."  MBNA, 640 S.E.2d at 234.

The Court agrees with Oregon.  The majority in Quill noted
that "we have not, in our review of other types of taxes,
articulated the same physical-presence requirement that Bellas
Hess established for sales and use taxes."  Quill, 504 U.S. at
314.  Thus, the Court concludes that the Oregon corporate excise
tax is not unconstitutional simply because WMI lacked a physical
presence in Oregon.

### b.   Economic Presence Theory

Oregon contends that the substantial nexus standard is met
in this case by the "economic presence" of WMI in the state.
See, e.g., Griffith v. ConAgra Brands, Inc., 728 S.E.2d 74, 81-82
(W. Va. 2012) (holding that the "significant economic presence
test" is the proper test for determining whether or not a
substantial nexus exists under the Commerce Clause); MBNA, 640
S.E.2d at 234 (holding that the significant economic presence
test is an appropriate measure because, unlike the Due Process
analysis, the Commerce Clause is more concerned with whether a
state-imposed tax unduly burdens interstate commerce or affects

the national economy); Am. Refrigerator Transit Co. v. Tax

Comm'n, 395 P.2d 127, 131 (Or. 1964) (holding that "[t]o

establish nexus it is necessary to show that the taxpayer has, in

the conduct of his business, taken advantage of the economy of

the taxing state to produce the income which is subject to tax").

The Court in MBNA explained the rationale for the

"significant economic presence" test:

> Rather than a physical presence standard, this Court
> believes that a significant economic presence test is a
> better indicator of whether substantial nexus exists
> for Commerce Clause purposes . . . . [A] substantial
> economic presence standard incorporates due process
> purposeful direction towards a state while examining
> the degree to which a company has exploited a local
> market. Further, a substantial economic presence
> analysis involves an examination of both the quality
> and quantity of the company's economic presence.
> Finally, under this test, purposeful direction towards
> a state is analyzed as it is for Due Process Clause
> purposes, and the Commerce Clause analysis requires the
> additional examination of the frequency, quantity and
> systematic nature of a taxpayer's economic contacts
> with a state.

640 S.E.2d at 234 (internal citations omitted).

The Trust asserts that Oregon's argument fails because it is

based only on state court decisions when Supreme Court and other

federal court decisions are controlling with respect to

constitutional issues. See, e.g., Sw. Offset, Inc. v. Hudco

Publ'g Co., 622 F.2d 149, 152 (5th Cir. 1980) (holding that the

court was not bound by a ruling of the Texas Supreme Court on the

Due Process Clause of the U.S. Constitution); Indus. Consultants,

Inc. v. H.S. Equities, Inc., 646 F.2d 746, 749 (2d Cir. 1981)

16

(holding that, in construing the constitutionality of certain tolling provisions, the "district court was not bound to adopt the Oklahoma court's interpretation of federal constitutional principles, even as applied to [the] Oklahoma statutes").  The Trust argues that the federal requirements for substantial nexus are clearly delineated by federal precedent and the state court rulings favoring the significant economic presence test do not supplant such requirements.  See, e.g., Laptops Etc. Corp. v. D.C. (In re Laptops Etc. Corp.), 164 B.R. 506, 521 (Bankr. D. Md. 1993) (holding that the "slightest presence" standard as well as the "economic presence" standard for constitutional nexus has been expressly rejected).

The Court acknowledges that the significant economic presence test has not been formerly endorsed by the Supreme Court.  The Court concludes that constitutionality of the Oregon excise tax is not determined by Quill's physical presence test or the state courts' significant economic presence test, but by the "substantial nexus" test articulated in Complete Auto.  The Court agrees with Oregon, however, that the economic presence of WMI in Oregon is a factor to be considered in determining whether WMI possessed a substantial nexus with Oregon.

c.    Application of Complete Auto

In applying the Complete Auto test, Oregon argues that WMB acted as an agent for WMI in Oregon because WMI maintained

17

control over its subsidiaries.  Oregon asserts that WMI had the
power to sell any of the Oregon assets at any time and make any
other changes to the business that it chose.  In support of its
argument, Oregon asserts that the January 16, 2011, WMI Board of
Directors Minutes evidence that WMI maintained the WMI Balance
Pension Plan, the WMI Employees' Stock Purchase Plan, and the WMI
Retirement Savings and Investment Plan for the benefit of
employees of WMI and its subsidiaries.  Also, the WMI Board
resolved that no officer of WMI or any of its subsidiaries
including WMB would have authority to participate in the major
policy-making functions of the group other than certain WMI
officers.

The Trust responds that WMI's ownership of its subsidiaries
did not amount to a substantial nexus with Oregon because WMI did
not make business decisions on behalf of WMB other than to set
general policy, and WMB operated independently of its corporate
parent.  The Trust contends that WMI merely held stock in its
subsidiaries and the extent of WMI's operations was simply to
monitor its investments.

Oregon also argues that while WMI may not have had a
physical presence in Oregon, its intangible property (trade name
and trademarks) clearly had a sufficient connection with Oregon
to support the imposition of a corporate excise tax.  WMI, not
WMB, is the owner of all of the trademarks and the goodwill

represented by them, including but not limited to the marks "WAMU," "Washington Mutual," and the "W Logo" for a variety of services including but not limited to banking, credit card, lending, investment, financial services, community, education, and philanthropic-oriented services.  WMI also owns at least 140 secondary trademarks and service marks and approximately 1350 domain names which contain the trademarks including wamu.com and washingtonmutual.com.  Oregon argues that these permitted the subsidiaries to advertise and provide information to customers regarding the products and services relevant to the subsidiaries' business all of which increased the goodwill of WMI.  See, e.g., Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank, 696 F.2d 1371, 1375 (Fed. Cir. 1982) ("Unlike patents or copyrights, trademarks are not separate property rights.  They are integral and inseparable elements of the goodwill of the business or services to which they pertain."); Marshak v. Green, 746 F.2d 927, 929 (2d Cir. 1984) (holding that a trade name or mark "is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes").

Oregon relies on New York ex rel. Whitney v. Graves, in which the Supreme Court rejected a Commerce Clause challenge to the taxation of profits made on the sale of a seat on the New York Stock Exchange.  299 U.S. 366, 374 (1937).  The Graves Court considered the taxpayer's assertion that he and his partners were

19

neither residents of New York nor physically present in New York to transact business.  Id. at 371.  The Court held, however, that an intangible may be sufficiently localized "to bring it within the taxing power" of the state and upheld the tax.  Id. at 374.

The Trust responds that the facts of this case bear no resemblance to the facts of Graves.  The Court agrees.  Here, Oregon is not seeking to tax the proceeds of any sale in Oregon of an intangible owned by WMI or the proceeds of the licensing of any intellectual property owned by WMI that was used in connection with business activity in Oregon.  Rather, Oregon is attempting to hold WMI jointly and severally liable for corporate excise taxes incurred by the banking operations of its subsidiaries in Oregon.  Thus, the Court concludes that Graves is inapplicable.

Oregon also argues that the Supreme Court has upheld a State's power to impose an income tax on dividends received by out-of-state stockholders from an in-state corporation.  Int'l Harvestor Co. v. Wis. Dept. of Taxation, 322 U.S. 435, 437 (1944).  The Court held that "the fact that the stockholder-taxpayers never enter Wisconsin . . . cannot deprive it of its jurisdiction to tax.  It has never been thought that residence within a State or country is a sine qua non of the power to tax." Id. at 443.  In its reasoning, the Court stated that the State of Wisconsin provided "protection and benefits to [the subsidiary's]

20

corporate activities and transactions within the state" and these
activities "g[ave] rise to the dividend income of [the
subsidiary's] stockholders. . . ."  Id. at 442.

The Court in International Harvester, however, was
considering a challenge to the tax under the Due Process Clause
and not the Commerce Clause.  See KFC Corp. v. Iowa Dep't. of
Revenue, 792 N.W.2d 308, 325 (Iowa 2010) (acknowledging that
International Harvester and Graves were due process cases and
"were decided at a time when the nexus requirements of the Due
Process and the . . . Commerce Clause were thought to be
interchangeable").  The Supreme Court has since acknowledged that
it has not always been precise in distinguishing between the
Commerce Clause and the Due Process Clause and emphasized that
the two are analytically distinct.  Quill, 504 U.S. at 305.  The
Supreme Court suggested: "Although the two motions cannot always
be separated, clarity of consideration and of decision would be
promoted if the two issues are approached, where they are
presented, at least tentatively as if they were separate and
distinct, not intermingled ones."  Id. at 306 (internal citations
omitted).  In International Harvester, the Supreme Court made no
reference to the Commerce Clause or its requirements for
substantial nexus.  Thus, the Court concludes that International
Harvester does not provide any basis for limiting the scope of
the substantial nexus requirement established by Complete Auto

21

and <u>Quill</u> as it relates to the Commerce Clause.

In addition, the Court finds <u>International Harvester</u> is factually distinguishable.  That case involved a tax levied on the stockholder's own dividend income.  As noted above, Oregon is not seeking to tax the dividend income received by WMI.  Rather, Oregon is seeking to hold WMI liable for the tax liabilities that arose exclusively from the Oregon activities of WMI's subsidiaries.  Again, Oregon relies on the fact that WMI's trademarks were used by the WMB Entities in Oregon to support its claim of a substantial nexus with the State.  The majority of courts to address this issue, however, have found a substantial nexus for Commerce Clause purposes only when the intangible property itself generated income for the taxpayer.  <u>See, e.g.</u>, <u>Geoffrey, Inc. v. Comm'r of Revenue</u>, 899 N.E.2d 87, 92 (Mass. 2009) (holding that licensing agreements that provided substantial royalty income for the use of licensor's trademarks satisfied the substantial nexus test); <u>Sec'y, Dep't of Revenue v. Gap (Apparel), Inc.</u>, 886 So.2d 459, 462 (La. Ct. App. 2004) (holding that tax on royalties based on the net sales of the licensed products was constitutional); <u>Lanco, Inc. v. Dir. Div. of Taxation</u>, 879 A.2d 1234, 1242 (N.J. Super. Ct. App. Div. 2005) (holding that taxation of income derived from licensing agreement with company conducting retail operations in State was constitutional); <u>Geoffrey</u>, 437 S.E.2d at 19 (holding that tax

imposed on income derived from license fee met the substantial nexus test); A&F Trademark, 605 S.E.2d at 195 (holding that a substantial nexus exists where the out-of-state company earns income from licensing trademarks to related in-state retail company).

In the case at bar, WMI did not receive any royalty payments, license fees, or any other income from the WMB entities' use of WMI's intellectual property. Therefore, unlike the cases cited above, WMI did not realize a quantifiable benefit from the use of its intangible property in the State of Oregon. Nor is Oregon seeking to tax only royalty income; it is seeking to impose an excise tax on WMI for its subsidiaries' operations in Oregon. Under Oregon's analysis, any shareholder who receives thousands (or less) in dividends from a subsidiary would be responsible for potentially millions in taxes incurred by that subsidiary. Such a result would have devastating consequences to shareholders and to the United State's economy where investments play a crucial role. The effect of finding a parent holding company liable for the corporate excise tax of its subsidiaries merely because it allowed the free use of its trademarks and received a dividend would deeply burden interstate commerce. For these reasons, the Court concludes that WMI did not have a substantial nexus with Oregon as required by the Commerce Clause.

Accordingly, the Court will also sustain the Trust's

Objection to Oregon's claim on the basis that it violates the Commerce Clause of the U.S. Constitution.

V.    CONCLUSION

For the foregoing reasons, the Court will sustain the Trust's Objection to Oregon's claim on the bases that it violates the Due Process and Commerce Clauses of the U.S. Constitution.

An appropriate Order is attached.

Dated: December 19, 2012          BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge