IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WASHINGTON MUTUAL, INC., et al., | ) | Case No. 08-12229 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### OPINION[1]

Before the Court is the Motion of Grant Thornton, LLP ("Grant Thornton") for an Order to Show Cause Why Sanctions Should Not Be Imposed against Washington Mutual Liquidating Trust (the "Liquidating Trust") for Failure to Comply with the Court's Final Fee Order (the "Sanctions Motion"). The Liquidating Trust opposes the Motion contending that the engagement of Grant Thornton was improvidently granted under section 328 and that sanctions are not appropriate. Because we find the terms of the engagement were not improvidently granted, the Court will grant the Sanctions Motion.

### I.    PROCEDURAL BACKGROUND

Prior to the filing of its chapter 11 petition, Washington Mutual, Inc. ("WMI") was a savings and loan holding company, which owned Washington Mutual Bank ("WMB"). Before failing, WMB

---

[1]    This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

was the nation's largest savings and loan association, with over 2,200 branches and $188.3 billion in deposits.

On September 25, 2008, WMB's primary regulator, the Office of Thrift Supervision (the "OTS"), closed WMB and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver. WMB's takeover by the FDIC was the largest bank failure in the nation's history.  Immediately after its appointment as receiver, the FDIC sold substantially all the assets of WMB to J.P. Morgan. On September 26, 2008, WMI and its affiliates ("the Debtors") filed chapter 11 petitions.

On February 4, 2012, the Court confirmed the Debtors' Plan of Reorganization which included the formation of a Liquidating Trust to review and make distributions on claims.  The Debtors' professionals, including Grant Thornton, filed Final Fee Applications which were approved on August 1, 2012.

On April 27, 2015, Grant Thornton filed the instant Motion asking the Court to impose sanctions on the Liquidating Trust for failure to pay a contingency fee owed to it.  The Liquidating Trust opposed the Motion.  A trial was held on June 26 through June 28, 2017, and post-trial briefs were submitted.  The matter is ripe for decision.


II. <u>FACTUAL BACKGROUND</u>

    A.   <u>The Prepetition Agreement</u>

Prior to the bankruptcy filing, Steve Ryan ("Ryan"), a Grant Thornton partner, approached Curt Brouwer ("Brouwer"), the Debtors' Executive Vice President for Corporate Tax, about challenging the constitutionality of California's taxation of federal bond interest (the "Treasury Interest Issue"). (Tr. 6/26/17 at 21:4-22, 20:1-13.) In essence, Ryan's theory was that California's tax statute violated the constitutional principle that a state must tax state bonds and federal bonds similarly. (Tr. 6/26/17 at 20:1-13, 208:9-209:5.)

Grant Thornton was hired by the Debtors to develop the Treasury Interest Issue, identify the amount that the Debtors could claim under the theory, and assist in filing refund claims. Ryan asserted that the California Franchise Tax Board (the "FTB") would be sensitive about the Treasury Interest Issue being publicized, due to its potential refund implications for thousands of similarly situated taxpayers. (Tr. 6/26/17 at 34:24-35:11.) The parties anticipated that the FTB would initially deny the claim and the Debtors would have to protest the denial. (WMI Ex. 12, ¶ 2; Tr. 6/26/17 at 30:9-24.) Therefore, they discussed using the Treasury Interest Issue as leverage to offset the Debtors' other outstanding tax liabilities. (Tr. 6/28/17 at 67:3-22.)

In February 2008, Brouwer and Ryan executed an Engagement Letter and Statement of Work (the "Prepetition Agreement"). (WMI

Ex. 12; Tr. 6/26/17 at 25:15:-28:2.)  The Prepetition Agreement
provided that Grant Thornton would be paid 50% of its hourly fees
capped at $100,000, plus out-of-pocket expenses.  (WMI Ex. 12, ¶
12.)  In addition, the Debtors agreed to pay Grant Thornton 10%
of the "Economic Value" recovered from the FTB, capped at $5
million.  (Id.)  Economic Value was defined in the Prepetition
Agreement as any "tax, interest, and penalty offsets, whether
received by check, deposit, overpayment applied, credit, audit
offset, or any other means."  (Id.)

    B.    The Postpetition Agreement

    After the Debtors filed bankruptcy in September 2008,
Alvarez & Marsal was retained as the Debtors' restructuring
advisor and took over the Debtors' tax issues, including those
with the FTB.  (Tr. 6/26/17 at 203:15-23.)  However, in December
2008, Brouwer was rehired to serve as the Debtors' officer in
charge of tax.  (Tr. 6/26/17 at 11:23-12:18.)

    Shortly after his return, Brouwer considered re-engaging
Grant Thornton to continue working on the Treasury Interest
Issue.  (Tr. 6/26/17 at 43:14-25.)  Timothy Cleary ("Cleary"), a
Grant Thornton employee and former employee of the Debtors,
emailed Brouwer two fee proposals, one contingent and one non-
contingent.  (WMI Ex. 51; Tr. 6/27/17 at 11:25-12:7; Tr. 6/26/17
at 46:21-47:3.)  In the non-contingent fee proposal, Grant
Thornton proposed a $250,000 development fee, 100% of its hourly

4

rates, a flat fee between $1,000,000 and $2,000,000, plus
expenses.  (WMI 51.)  In the contingent fee structure, Grant
Thornton proposed a $150,000 development fee, 50% of its hourly
rates, and 10% of any economic benefit recovered from the FTB
capped at $5,000,000, plus expenses.  (Id.)

     After further negotiation, the parties executed a new
Engagement Letter and statement of work (the "Postpetition
Agreement") on June 4, 2009.  (WMI Ex. 6.)  Grant Thornton's fee
was based on its "hourly standard rates discounted by 20% and
capped at $150,000 . . . ."  (Id.)  In addition, Grant Thornton
was to be paid 10% of any Economic Value recovered from the FTB.
(Id.)  The Postpetition Agreement defined Economic Value as any
"tax, interest, and penalty offsets, whether received by check,
deposit, overpayment applied, credit, audit offset, or any other
means," and included "any reduction of other assessments that are
received pursuant to an agreement with the FTB to not file or to
withdraw any refund claims."  (Id.)  The Postpetition Agreement
was incorporated into the Debtors' motion to retain Grant
Thornton under section 328(a), which was filed on June 22, 2009,
and approved by the Court.  (D.I. 1194-2.)

     During the bankruptcy case, Grant Thornton's professionals
assisted the Debtors in preparing tax returns, drafting letters
to the FTB, preparing technical memos on the Treasury Interest
Issue, and participating in negotiations with the FTB.  (Tr.

5

6/28/17 at 33:11-18, 71:16-72:13.)  Grant Thornton also assisted the Liquidating Trust in drafting an objection to the FTB Proof of Claim filed in the amount of $280.5 million.[2]  (Id. at 33:11-18.)

The Liquidating Trust and the FTB eventually commenced negotiations to settle the FTB Proof of Claim and the Debtors' outstanding tax issues.  (Tr. 6/26/17 at 231:19-232:6, 99:14-100:9.)  During these negotiations, the Liquidating Trust consistently asserted the Treasury Interest Issue, but the FTB consistently rejected it.  (Tr. 6/28/17 at 33:11-18, 71:16-72:13; D.I. 11546.)  Two and a half months after the Liquidating Trust filed its objection to the FTB's Proof of Claim, it filed a motion pursuant to Rule 9019 requesting the Court's approval of a compromise between the Liquidating Trust and the FTB, settling all issues.  (Tr. 6/26/17 at 181:17-182:25, 183:8-12.)  The motion was approved on May 21, 2014.  (D.I. 11815.)

Both the FTB and the Liquidating Trust intended the Settlement Agreement to be a full and complete release of all issues including those raised in the FTB's Proof of Claim.  (Tr. 6/26/17 at 181:17-182:25.)  The Settlement Agreement provided for an immediate net refund to the Debtors of approximately $225 million, with other deferred refunds.  (WMI Ex. 126.)

---

[2]    After the Court confirmed the Debtor's Plan of Reorganization in 2012, the Liquidating Trust took over the Debtors' tax issues, as successor-in-interest.

Grant Thornton only learned of the settlement agreement when it reviewed the docket in the Debtors' cases. (Tr. 6/28/17 at 73:16-21.) Grant Thornton then reached out multiple times to Alvarez & Marsal and the Liquidating Trust to inquire about the FTB settlement. (Id. at 73:22-74:15; WMI Ex. 78; WMI 79.) There were numerous conversations between the Liquidating Trust and Grant Thornton about the settlement terms and Grant Thornton's contingency fee. (Tr. 6/28/17 at 74:5-17.) Despite Grant Thornton's requests, the Liquidating Trust refused to pay the contingency fee. (Tr. 6/26/17 at 189:2-14.)

As a result, on April 27, 2015, Grant Thornton filed the instant Motion asking the Court to impose sanctions on the Liquidating Trust for failing to pay the contingency fee pursuant to the Postpetition Agreement. (D.I. 11994.) It asserted that its contingency fee applied to 10% of all Economic Value received from the FTB, including the value derived from the Settlement Agreement. The Liquidating Trust responded that the Treasury Interest Issue was repeatedly rejected by the FTB and did not yield any Economic Value. Thus, in its view, Grant Thornton was not entitled to a contingency fee.

On May 21, 2015, the Court heard oral arguments on the motion. The Liquidating Trust argued that Grant Thornton's contingency fee was narrowly limited to amounts received in connection with the Treasury Interest Issue. The Court, however,

7

found that the Postpetition Agreement unambiguously provided a contingency fee on all Economic Value recovered from the FTB and was not limited to amounts recovered only from the Treasury Interest Issue.  (Tr. 5/21/15 at 56:13-57:1.)  The Court held nonetheless that the Liquidating Trust could present evidence that the Contingency Fee was improvidently granted, despite the high burden such an argument posed.  (Id. at 57:8-16.)


II.  DISCUSSION

    A.  Improvidence Standard Under Section 328(a)

    Section 328(a) of the Bankruptcy Code provides that, with the court's approval, a professional may be employed to provide services to the estate "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis."  11 U.S.C. § 328(a).  As with other compensation agreements in bankruptcy, an estate professional's contingency fee agreement must have clear terms and is subject to court review in advance for reasonableness under section 330 of the Code.  ASARCO, LLC v. Barclays Capital (In re ASARCO, LLC), 702 F.3d 250, 257 (5th Cir. 2012).

    After approving a professional's compensation terms under section 328(a), however, a court may allow different compensation only "if such terms and conditions prove to have been improvident

8

in light of developments not capable of being anticipated at the
time of" entry.  11 U.S.C § 328(a).  Congress intended section
328(a) to alleviate the uncertainty surrounding the compensation
of professionals retained in bankruptcy, whose fees would
otherwise be subject to the court's discretion after the fact.
ASARCO, 702 F.3d at 258.  Thus, to determine if the agreement was
improvidently approved, the Court must focus on developments
occurring after the order's entry that were impossible to
foresee.  See, e.g., In re ARGOSE, Inc., 372 B.R. 705, 710
(Bankr. D. Del. 2007) (refusing to change terms because a trustee
could have foreseen that assets might be sold below expectations,
thereby lowering the funds available to unsecured creditors).
But see, e.g., In re Coho Energy, LLC, 395 F.3d 198, 205 (5th
Cir. 2004) (finding that an arbitration panel would use ill-
informed calculations was not foreseeable when the court entered
an order approving fees to be decided by the arbitration panel).

For parties seeking relief from a section 328(a) fee order,
this foresight-driven test is a high burden because courts "must
protect . . . agreements and expectations" once they have been
found reasonable and entered as an order.  In re Nat'l Gypsum
Co., 123 F.3d 861, 862-63 (5th Cir. 1997) (reasoning that
professionals for the estate are entitled to know what
compensation they will receive for their services).

B.  Mutual Mistake

The only basis for finding improvidence that the Liquidating

9

Trust advanced at trial is that there was a "mutual mistake"
about the retention terms between the Debtors and Grant Thornton.
It contends that, although the parties intended Grant Thornton's
contingency fee to be based on Economic Value derived solely from
the success of the Treasury Interest Issue, they mistakenly
drafted a written agreement that entitled Grant Thornton to a
contingency fee on <u>all</u> FTB recoveries.  According to the
Liquidating Trust, the parties' mutual mistake made it impossible
to foresee that the Court would approve such a large contingency
fee in favor of Grant Thornton.  Essentially, it argues that
enforcing the plain language of the Postpetition Agreement makes
its terms improvident.

Grant Thornton denies that there was any mistake, and it
argues that no events occurring after the agreement's approval
makes its terms improvident.  It asserts that the basis for its
contingency fee was purposefully broad and reflected the parties'
understanding of Grant Thornton's compensation terms.  In
addition, it argues that the Liquidating Trust articulates no
permissible reason for the Court to deviate from the plain
language of the Postpetition Agreement.

A mutual mistake occurs when both parties to a contract
share the same mistake at the time of its execution.  Restatement
(Second) of Contracts § 152 (1981).  Proving a mutual mistake
requires evidence "so convincing that it [leaves] no reasonable

10

doubt" that the mistake occurred.  <u>Galapeaux v. Orviller</u>, 123
N.E. 2d 321, 324 (Ill. App. 1954).  <u>See also</u>, <u>Almer Coe & Co. v.</u>
<u>American Nat. Bank & Trust Co. of Chicago</u>, 194 N.E. 2d 14, 17
(Ill. App. 1963) (holding that reformation is only granted upon
evidence amounting to a certainty).  A finding of mutual mistake
is heavily disfavored where both parties are sophisticated
professionals that were fully informed of the terms of the
agreement.  <u>See</u>, <u>RS & P/WC Fields L.P. v BOSP Invs.</u>, 829 F. Supp.
928, 964 (N.D. Ill. 1993) (observing that mutual mistake is
rarely found in multimillion dollar commercial transactions
between sophisticated parties).

When an agreement is unambiguous,  the clear language of the
written instrument is considered the parties' express intent, and
only extraordinary circumstances permit a court to disregard it.
<u>Grun v. Pneumo Abex Co.</u>, 163 F.3d 411, 421 (7th Cir. 1998)
(holding that only absurd results or an obvious deviation from
the intentions of a contract's drafters are the bases for
ignoring unambiguous language).  The Court may observe extrinsic
evidence of the parties' contemporaneous and subsequent conduct
to determine whether an agreement is the product of mutual
mistake.  <u>See, e.g.</u>, <u>Occidental Fire & Cas. Co. of N.C. v. Cont.</u>
<u>Ill. Nat. Bank and Trust Co. of Chicago</u>, 718 F.Supp. 1364, 1368
(N.D. Ill. 1989) (using the parties' conduct to determine the

proper construction of their unambiguous agreement).

   i.   The Liquidating Trust's Evidence

   At trial, the Liquidating Trust presented Curt Brouwer
("Brouwer"), who testified about the Debtors' understanding of
the Postpetition Agreement.  He stated that the parties included
Economic Value in Grant Thornton's contingency fee structure
because the Treasury Interest Issue was a novel argument and it
was uncertain how the FTB would respond to it.  (Tr. 6/26/17 at
38:16-39:19.)  He further testified that the parties anticipated
that the FTB would settle the Treasury Interest Issue in a
discreet manner by offsetting unrelated tax issues to avoid
precedent for other similarly situated taxpayers raising the same
issue.  (Id. at 35:8-25.)  Therefore, Economic Value reflected
all the potential ways the FTB could settle the issue.  (Id. at
34:24-35:14.)  He noted that the concept of Economic Value is
common in tax-related engagements.  (Id. at 38:14-16.)  Brouwer
explained that he knew Economic Value was defined broadly so that
Grant Thornton would be paid if the Treasury Interest Issue was
used to leverage a settlement for the Debtors' tax liabilities.
(Id. at 38:14-39:22.)  Nonetheless, he stated that his
understanding was that Grant Thornton's contingency fee was
limited to Economic Value directly attributable to the Treasury
Interest Issue.  (Id. at 38:16-19.)

   Brian Pedersen, an Alvarez & Marsal director, also testified

for the Liquidating Trust at trial.  He led the negotiations with
the FTB on the Debtors' tax issues.  (<u>Id.</u> at 211:19-22.)
However, he was not involved in negotiating Grant Thornton's re-
engagement and only dealt with their professionals when
implementing the Treasury Interest Issue in refund claims and
negotiations with the FTB.  (<u>Id.</u> at 272:13-22.)  According to
Pedersen, the Debtors presented the Treasury Interest Issue on
two amended returns for tax years 2010 and 2011, totaling
approximately $42 million in the aggregate.  (<u>Id.</u> at 211:2-7.)
Pedersen expected the FTB to reject the claim and anticipated
having to settle the issue through negotiations.  (<u>Id.</u> at 220:19-
221:2; WMI Ex. 107.)  He stated that the FTB did reject both
refund claims and never accepted the Treasury Interest Issue on
its merits.  (WMI Ex. 142; WMI Ex. 144.)

    Pedersen testified that the Liquidating Trust incorporated
Grant Thornton's technical analysis of the Treasury Interest
Issue in its objection to the FTB Proof of Claim.  (Tr. 6/26/17
at 255:4-13.)  Pedersen said that he and Brouwer directed Grant
Thornton to review the objection to the FTB Proof of Claim, prior
to filing it, to ensure that the Treasury Interest Issue was
presented correctly.  (<u>Id.</u> at 255:10-19.)  In response to the
Liquidating Trust's objection, the FTB presented an increased
settlement offer.  (<u>Id.</u> at 259:5-19.)  The Debtors rejected it
and continued negotiations with the FTB while still consulting

with Grant Thornton on the Treasury Interest Issue.  (<u>Id.</u> at
262:1-263:10.)  Throughout the negotiations, Pedersen testified
that the FTB refused to concede the Treasury Interest Issue.
(<u>Id.</u> at 264:8.)  Pedersen stated that the Liquidating Trust
ultimately conceded the Treasury Interest Issue during
negotiations with the FTB.  (<u>Id.</u> at 264:23-265:15.)  Shortly
thereafter, the Debtors filed the motion to approve the
Settlement Agreement with the FTB, and the FTB withdrew its Proof
of Claim.  (<u>Id.</u> at 267:6-11.)

    ii.  <u>Grant Thornton's Evidence</u>

    Grant Thornton presented Paul Bogdanski ("Bogdanski"), who
was responsible for developing the technical analysis on the
Treasury Interest Issue.  (Tr. 6/28/17 at 10:9-11.)  Prior to
joining Grant Thornton, Bogdanski had been an attorney in charge
of litigation for the Illinois Department of Revenue.  (<u>Id.</u> at
9:12-17.)  In that capacity, he defended Illinois against an
issue similar to the Treasury Interest Issue.  (<u>Id.</u> at 10:1-8.)
Illinois ultimately settled that issue to avoid other taxpayers
using a similar theory.  (WMI Ex. 96.)  When he went to work at
Grant Thornton, Bogdanski began developing the Treasury Interest
Issue to market to banks and other financial institutions.  (<u>Id.</u>
at 65:15-66:22.)

    According to Bogdanski, the FTB was exposed to "millions of
dollars, potentially a billion dollars" of refund claims due to

14

many similarly situated taxpayers in California, based on the
impact of the Treasury Interest Issue.  (<u>Id.</u> at 18:1-9.)
Therefore, based upon his experience working for Illinois,
Bogdanski expected the FTB to settle the Treasury Interest Issue
indirectly to avoid setting precedent.  (<u>Id.</u> at 67:12-18, 69:17-
24.)

Bogdanski did not negotiate nor draft the Postpetition
Agreement, but he had experience executing similar engagement
agreements for Grant Thornton.  (<u>Id.</u> at 68:10-20.)  Bogdanski
testified that the concept of a contingency fee based on a
broadly defined Economic Value was one of many standard Grant
Thornton contract provisions.  (<u>Id.</u> at 68:21-69:13.)  In his
opinion, Grant Thornton included the broad definition of Economic
Value in the Postpetition Agreement because of the likelihood
that the FTB would not accept the merits of the Treasury Interest
Issue, instead resolving it through favorable decisions on other
tax claims.  (<u>Id.</u>)  Grant Thornton's intention was to be paid for
the leverage that the issue provided to obtain those favorable
decisions.  (<u>Id.</u>)

Timothy Cleary ("Cleary"), the Grant Thornton director
involved in negotiating the Postpetition Agreement, also
testified at trial.  (Tr. 6/27/17 at 11:25-12:10.)  In March
2009, Cleary emailed the Debtors a proposed fee structure for
Grant Thornton's re-engagment with a flat-fee option and a

15

contingency fee option.  (WMI Ex. 51; Tr. 6/27/17 at 13:1-3.)

The email indicated a projected Economic Benefit Range of $60 and

$80 million.  (WMI Ex. 51.)  According to Cleary, this range was

Grant Thornton's estimate of the potential economic impact that

the Debtors could receive from using the Treasury Interest Issue.

(Tr. 6/27/17 at 13:19-14:3.)  The email's contingent fee proposal

was 10% of the economic benefit, capped at $5 million.  (WMI Ex.

51.)

Cleary's understanding was that, if the Treasury Interest

Issue was used to negotiate reductions to other penalties or

increased refunds, then Grant Thornton would be entitled to its

contingency fee.  (Tr. 6/27/17 at 17:6-9, 18:8-11.)  He explained

that the purpose of the Treasury Interest Issue was to create

leverage in negotiations with the FTB by including it on the

Debtors' returns.  (Id. at 19:12-17.)  Cleary further testified

that, if the Treasury Interest Issue was used, Grant Thornton's

contingency fee would be calculated by looking at the Debtors'

tax bill before and after the settlement and determining whether

there was a reduction in the bill or an added economic benefit.

(Id. at 25:21-23.)  He explained that the contingency fee was

payment for the Treasury Interest Issue's use as part of the

negotiation process and was not subject to the success of any

particular tax issue.  (Id. at 27:17-28:16.)

After the Postpetition Agreement was executed, Grant

16

Thornton and the Debtors had a meeting with the FTB in December 2010, where the FTB rejected the Treasury Interest Issue.  (<u>Id.</u> at 14:18-21, 15:7-10.)  After the meeting, Bogdanski sent an email to the FTB agent who was responsible for defending against the Treasury Interest Issue.  (WMI Ex. 96; Tr. 6/28/17 at 16:3-6.)  In it, Bogdanski warned that "the revenue impact associated with [the Treasury Interest Issue] was significant."  (WMI Ex. 96.)  Bogdanski further noted that, when presented with a similar issue in Illinois, his team took "action as soon as we could . . . to limit the amount of exposure . . . to the issue.  If we had . . . allowed a court to tell the world that Illinois had this problem, . . . other taxpayers and practitioners would have . . . [cost] the state significantly more money."  (<u>Id.</u>)

Nevertheless, the FTB consistently rejected the Treasury Interest Issue and, in February 2012, sent a formal written position disagreeing with it based on California's tax statute.  (WMI Ex. 99; Tr. 6/28/17 at 19:10-23.)  Grant Thornton affirmed its confidence in the Treasury Interest Issue to the Debtors and discussed pursuing a reduction of "another liability in exchange for not pursuing litigation [on this issue]."  (WMI Ex. 99)  In March 2012, Grant Thornton prepared the Debtors' response to the FTB's written position on the issue.  (Tr. 6/28/17 at 23:12-24:2.)

Grant Thornton also discussed, as an alternative to

litigating the Treasury Interest Issue, settling it for between $10 million and $15 million.  (WMI Ex. 29.)  If that had occurred, Grant Thornton internally projected recovering a contingency fee on the settlement between $1 million and $1.5 million.  (Id.)  At trial, however, Bogdanski explained that this was premised on "[i]f they settle[d] the Treasury Interest Issue in a vacuum," and did not account for any implications the issue had on the Debtors' other tax issues.  (Tr. 6/28/17 at 30:8-15.)

Approximately a year later, in March 2013, Alvaraz & Marsal reached out to Grant Thornton for a memorandum detailing the Treasury Interest Issue to include in the Liquidating Trust's objection to the FTB Proof of Claim.  (WMI Ex. 37.)  Grant Thornton had an internal discussion about finalizing the memorandum because Ryan, the originating Grant Thornton partner, had passed away before it was completed.  (Id.; Tr. 6/28/17 at 34:11:17.)  Scott Grierson ("Grierson"), another Grant Thornton partner, took over the Treasury Interest Issue in Ryan's place. (Tr. 6/28/17 at 34:12-20.)

After receiving the Grant Thornton memorandum, the Liquidating Trust filed its objection to the FTB Proof of Claim, which incorporated the Treasury Interest Issue as a basis for the objection.  (Tr. 6/28/17 at 33:11-18, 71:16-72:13.)  As noted above, the Liquidating Trust entered into a global settlement with the FTB shortly thereafter.  (Tr. 6/26/17 at 183:8-12; WMI

18

125.)

iii. <u>No Evidence of Mutual Mistake</u>

After consideration of the documentary evidence and testimony, the Court finds no evidence that the Postpetition Agreement was a product of mutual mistake.  The record shows that Grant Thornton was clearly <u>not</u> mistaken and intended to be paid 10% of all Economic Value received from the FTB for the Liquidating Trust's use of the Treasury Interest Issue as leverage to reduce the Debtors' other assessments.  Even the Liquidating Trust's evidence does not convince the Court that the <u>Debtors</u> were mistaken about the terms of the Postpetition Agreement.

The language of the Postpetition Agreement is unambiguous and broad. The Liquidating Trust's own witness, Curt Brouwer, admitted the Debtors anticipated that the FTB would refuse to settle the Treaury Interest Issue directly and that the term Economic Value was used to include all potential ways the issue could be used.  (Tr. 6/26/17 at 34:24-35:14, 38:14-39:22.) Therefore, the Court finds that the parties intended the contingent fee to apply to all economic value received by the Debtors from the FTB.

Even if the Debtors were unilaterally mistaken, however, that does not support a finding of improvidence.  When the Debtors asked the Court to approve the Postpetition Agreement

under section 328(a), they could certainly have foreseen the
Court enforcing the agreement as written.  <u>See</u>, <u>Riker v. Official
Comm. of Unsecured Creditors (In re Smart World Technologies)</u>,
552 F.3d 228, 258 (2d Cir. 2009) (holding courts shall enforce
the contract as written in disputes governed by § 328(a)).
Accordingly, the Court finds no basis for a finding of
improvidence under section 328(a).

    C.   <u>Sanctions for Civil Contempt under Section 105(a)</u>

    Section 105(a) permits courts to "issue any order, process,
or judgment that is necessary or appropriate to carry out the
provisions of this title."  This includes sanctions.  <u>Ettinger
and Assoc., LLC v. Miller (In re Miller)</u>, 730 F.3d 198, 206 (3d
Cir. 2013) (observing various sources of the bankruptcy court's
sanctioning power, including, <u>inter alia</u> (i) Rule 9011(c)(1)(B),
(ii) the inherent power to sanction, and (iii) section 105 of the
Bankruptcy Code).  <u>See also</u>, <u>In re Meyers</u>, 344 B.R. 61, 66
(Bankr. E.D. Pa. 2006) (holding that a bankruptcy court has the
power to award costs, compensatory damages, and attorney's fees
upon a finding of civil contempt).  Sanctions may be "employed
for either or both of two purposes; to coerce the defendant into
compliance with the court's order, and to compensate."  <u>United
States v. United Mine Workers of Am.</u>, 330 U.S. 258, 303-04
(1947).  <u>See also</u>, <u>Burtch v. Masiz (In re Vaso Active
Pharmaceuticals, Inc.)</u>, 514 B.R. 416, 422 (Bank. D. Del. 2014).

Civil sanctions are appropriate when (1) a valid order of the court exists, (2) the defendant has knowledge of the order, and (3) the defendant disobeys the order.  Marshak v. Treadwell, 595 F.3d 478, 485 (3d Cir. 2009) (quoting Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 145 (3d Cir. 1994)).

In this case, a valid order of the Court existed.  On August 1, 2012, the Court entered the Omnibus Fee Order which included Grant Thornton's contingency fee.  (D.I. 14076.)  The Liquidating Trust was fully aware of the Court's Order; its attorneys drafted the proposed Final Fee Order and its Exhibit A.  (Tr. 6/26/17 at 187:6-11, 188:1-10.)  Nevertheless, the Liquidating Trust failed to pay Grant Thornton in accordance with the Omnibus Fee Order. It justifies not paying as the natural response to a "good faith" contract dispute.  The Court finds that this position is untenable.

The Liquidating Trust's conduct was a clear violation of the Court's order.  Its independent and unilateral determination that it had no obligation under the Postpetition Agreement and Final Fee Order, despite the unambiguous language of the agreement and Grant Thornton's consistent demand for payment, undermines its claim of good faith.  See, United States v. United Mine Workers of Am., 330 U.S. 258, 307 (1947) (finding that defendants' willful violation of a court's order, under the belief that it was ineffective and would be vacated, "showed a total lack of

respect for the judicial process.")

After Grant Thornton demanded payment, the Liquidating Trust could have either remitted the Contingency Fee or sought relief from the Court.  Instead, it simply withheld payment (refusing to comply with the Final Fee Order).  Even after the Court ruled that the plain terms of the Postpetition Agreement entitled Grant Thornton to its Contingency Fee, the Liquidating Trust continued to refuse to pay, asserting mutual mistake as justification for its position – in the face of Grant Thornton's insistence there was no mistake.  The Liquidating Trust's conduct demonstrated an inexcusable disregard for the Court's order and cannot be remedied by a pleading of good faith.

Because Grant Thornton had to file a motion to recover its contingency fee, the Court concludes that sanctions are appropriate in the amount of the costs associated with the filing and prosecution of its motion.

An appropriate Order follows.


Dated: February 2, 2018          BY THE COURT:

                                 Mary F. Walrath
                                 United States Bankruptcy Judge

22