## Exhibit A

**FDIC**
Federal Deposit Insurance Corporation
25 Jessie Street at Ecker Square, Suite 2300
San Francisco, California 94105

Division of Risk Management Supervision
San Francisco Regional Office
(415) 546-0160

October 15, 2014

Via Electronic and Regular Mail

Brian S. Rosen
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*Subject:*    *Application Pursuant to Part 359 of the FDIC Rules and Regulations*
            *Regarding Execution of Settlement Payments to 30 Claimants in*
            *In re Washington Mutual, Inc., 08-12229 (Bankr. D. Del.) (MFW)*

Dear Mr. Rosen:

On August 14, 2013, the Bankruptcy Trust (the "Trust") for Washington Mutual Inc. ("WMI") filed an application regarding settlements and proposed payments on such settlements (the "Proposed Payments") to thirty-one individual claimants in the chapter 11 bankruptcy of WMI. The August 14, 2013 application was first amended on March 17, 2014 to include one additional settling claimant, Gary Brady. On September 23, 2014, the Trust filed a second amendment to the application (collectively, the "Application"), withdrawing information for two claimants, Susan McCarthy and Casey Nault. In total, this letter addresses claims for the thirty remaining claimants (collectively, the "Claimants") discussed in the Application.

The FDIC has determined that denial of the Application is warranted. In rendering this determination, the FDIC has fully considered the Agreements at issue, the text, structure and intent of section 18(k)(4), 12 U.S.C. § 1828(k), of the Federal Deposit Insurance Act (the "FDI Act"), the certification factors found at 12 C.F.R. § 359.4(a)(4), and the reasonableness of the Proposed Payments.

The FDIC reached this conclusion through a two part analysis, as addressed in detail below. First, the FDIC determined that the payments qualified as "golden parachutes" as defined in section 18(k)(4) of the FDI Act. Second, because the payments are "golden parachutes," the FDIC considered whether to exercise its discretion to permit the otherwise prohibited payments as set forth in the Application. Review of the Application was governed by the discretionary, evaluative factors set forth under Part 359 of the FDIC Rules and Regulations, 12 C.F.R. § 359 ("Part 359").

The FDIC is in a concurring role in the evaluation of this Application as the Federal Reserve Board ("FRB") was the primary federal regulator of WMI and remains the primary federal regulator in this matter. This correspondence represents the FDIC's final agency decision on the Application.

Mr. Brian Rosen
October 15, 2014
Page | 2

According to the Application, the Proposed Payments resulted from litigation over severance benefits allegedly triggered by the Claimants' termination of employment upon Washington Mutual Bank's ("WMB") failure on September 25, 2008 and/or WMI's bankruptcy on September 26, 2008. The Claimants are institution affiliated parties of WMB or WMI (collectively, the "Regulated Entities"). All of the Claimants were employed with the Regulated Entities as of September 25, 2008 when WMB failed, and the FDIC was appointed as its receiver. The Application provides that the Proposed Payments are settlements of severance payments allegedly owed under one or more of the following agreements (the "Agreements") between the Claimants and the Regulated Entities:

(1) Change in Control Agreement or Employment Agreement
(2) Special Bonus Opportunity
(3) Cash Long Term Incentive Award
(4) WaMu Severance Plan
(5) WMB Signing Bonus Agreement
(6) Washington Mutual, Inc. Amended and Restated 2003 Equity Incentive Plan

In total, the Claimants request in excess of $19,000,000. The Trust has tentatively settled these claims for approximately $2,800,000. These settlements are the Proposed Payments at issue.

## I.    The Proposed Payments are Golden Parachutes

On July 16, 2013, in response to your May 30, 2013 request for interpretive advice, the FDIC, with a copy to the FRB, informed the Trust that the Proposed Payments qualify as "golden parachute" payments as defined in the FDI Act. As discussed in the FDIC's July 16, 2013 correspondence with the Trust, 12 C.F.R. § 359.1(f) defines a "golden parachute" to include a payment (or an agreement to make a payment) for the benefit of any current or former institution affiliated party ("IAP") pursuant to an obligation that is:

- contingent on, or by its terms payable on or after, termination of the IAP's primary employment or affiliation with the institution or holding company;
- received on or after certain events, such as the institution or holding company's designation as troubled, institution's insolvency, or holding company's bankruptcy; and
- payable to an IAP whose employment is terminated at a time when the institution or holding company satisfies certain conditions, such as the institution or holding company's designation as troubled, institution's insolvency, or holding company's bankruptcy.

In this case, all of the elements above are present. According to the Application, termination of the Claimants' employment with the Regulated Entities following WMB's failure on September 25, 2008 and WMI's bankruptcy filing on September 26, 2008 triggered severance payment provisions under one or more of the Agreements.

Mr. Brian Rosen
October 15, 2014
Page | 3

### A.  The Proposed Payments are Contingent on Termination

Based on the facts reviewed in the Application, the Proposed Payments are derived from Agreements that, by their very terms, afforded benefits to the Claimants upon termination of their employment with the Regulated Entities due to a job elimination and/or change in control. While the individual terms of the Agreements vary, each provided for payment of a monetary benefit if the Claimant was released from employment due to a termination without cause and/or a change in control of the Regulated Entities. Indeed, the Claimants themselves "have alleged that their 'change in control' benefits were triggered as a result of the Bank Seizure and/or [JPMorgan Chase Bank ("JPMC")] Transaction."

As an added complexity, the Proposed Payments are technically negotiated sums due under tentative settlements, rather than the Agreements. Even so, the FDIC has long held that payments to settle or avoid litigation qualify as compensation under Part 359 where the payments at issue arose out of the employer-employee relationship.

Significantly, even if one or more of the Agreements was exempt from Part 359, the global nature of the settlements forming the basis of the Proposed Payments would require a Part 359 application for the Payments as a whole since the Payment amounts cannot be apportioned amongst the Agreements. As stated in the Application, "the Settlement Payments represent a settlement of each claimant's Settled Claims as a whole, which claims arise from one or more contract or benefits plans… [T]he Settlement Payments are aggregate payments that cannot be directly allocated to a specific contract or plan."

- Change in Control Agreement or Employment Agreement

Section 5(c) of the Change in Control Agreement[1] holds that if an employee's employment is terminated without cause within 2 years of a change in control, the employee will be entitled to a lump sum payment equal to 2 times the employee's annual salary. As stated in the Application, the Claimants "have alleged that their 'change in control' benefits were triggered as a result of the Bank Seizure and/or JPMC Transaction."

In total, twenty Claimants have alleged entitlement to approximately $14,300,000 in benefits under the Change in Control Agreements, representing 74% of the claimed benefits in dispute.[2] As such, this is the single largest category of agreements for which payment is sought.

- Special Bonus Opportunity and Cash Long Term Incentive Award

As stated in the Application, the Special Bonus Opportunity and Cash Long Term Incentive Award agreements (the "Retention Bonus Agreements")[3] "offered a bonus for the employee's continued employment through a date certain." In order to earn such a bonus, the employee was required to remain employed for a certain period of time and/or through the

---

[1] See Application Appx. Exh. F; see also Application at 10-11.
[2] See Second Amendment to Application, Exhibit 1 (attaching "Amended Exhibit A to the Application" (hereinafter "Exhibit A")); see also Application at 14.
[3] See Application Appx. Exhs. H, I; see also Application at 12-13.

Mr. Brian Rosen
October 15, 2014
P a g e | 4

effective date of the bonus payment, but such employment requirement would be waived upon a change in control and/or job elimination. Termination of employment under those circumstances would accelerate vesting of the bonus award.

Twenty of the Claimants seek payment under Retention Bonus Agreements.[4] The claimed amount for these requested payments totals about $3,075,000, making them the second largest source of the Proposed Payments.[5]

- WaMu Severance Plan

In general, section 3 of the WaMu Severance Plan[6] holds that if an eligible employee's job was eliminated due to corporate restructuring, downsizing, or a reduction in force, such employee would receive a monetary payment according to his or her years of service. "Level 6" employees would also receive benefits for a change in control.

Five Claimants claim benefits under the WaMu Severance Plan.[7] The total amount allegedly owed under the WaMu Severance Plan is about $1,732,000, making it the third largest source of claimed benefits[8]

- WMB Signing Bonus Agreement

One Claimant's Signing Bonus Agreement[9] provided a one-time signing bonus of [Redacted] and a deferred signing bonus of [Redacted] The Application only listed the [Redacted] deferred signing bonus as an amount claimed under the Signing Bonus Agreement.[10] The Signing Bonus Agreement provided that payment of the [Redacted] deferred bonus became "effective" on June 16, 2009 and would be made after that effective date. In order to receive the deferred signing bonus, the Claimant was required to be "employed in good standing on the effective date of the payment," but this employment requirement was waived upon termination without cause or upon a change in control prior to May 12, 2009, and the Claimant would then be "entitled" to "full payment of the deferred signing bonus... within 30 days of the effective termination date."

- Washington Mutual, Inc. Amended and Restated 2003 Equity Incentive Plan

There is no assigned dollar amount for the benefits allegedly owed under the Equity Incentive Plan,[11] but one Claimant list shares of "restricted stock" as disputed amounts owed

---

[4] *See* Exhibit A.
[5] *See* Exhibit A; *see also* Application at 14.
[6] *See* Application Appx. Exh. G; *see also* Application at 11-12.
[7] *See* Exhibit A. The five claimants are Gary Brady, Duane Duck, Camille Everett, Scott Shaw, and Weijia Wu.
[8] *See* Exhibit A; *see also* Application at 14.
[9] *See* First Amendment to Application. The Claimant is Gary Brady.
[10] *See* Exhibit A.
[11] *See* Application Appx. Exh. J; *see also* Application at 13-14.

Mr. Brian Rosen
October 15, 2014
P a g e | 5

under the Equity Incentive Plan.[12]  According to section 9.1 of the Equity Incentive Plan,
"Restricted Stock" awards may be "based on continuous service with the Company or a Related
Company."  Additionally, under section 15.3.2 of the Equity Incentive Plan, "vesting of shares
subject to Restricted Stock... that are based on continuous service with the Company or Related
Company shall accelerate" upon a "Company Transaction." A Company Transaction is defined
to include a merger, consolidation, or any transaction that results in the disposition of
substantially all of WMI's assets or securities.

> B.  *The Proposed Payments are Payable and Would Be Received After Failure and
> Bankruptcy of the Regulated Entities*

FDIC records show that WMB was officially designated "troubled," as of September 18,
2008.  As discussed previously, WMB failed shortly thereafter on September 25, 2008, and WMI
filed for Chapter 11 bankruptcy on September 26, 2008.  The occurrence of these events satisfies
the final conditions necessary to compel application of Part 359.  In fact, 12 C.F.R.
§ 359.1(f)(1)(ii)(A) explicitly contemplates application of Part 359 in cases where, as here, the
depository institution holding company has filed for bankruptcy.

Part 359 becomes applicable when a bank or bank holding company becomes a troubled
institution.  12 C.F.R. § 359.1(f)(1).  That status does not disappear once the institution or
holding company become so troubled that they fail and ultimately liquidate.[13]  Once a severance
payment satisfies the conditions for classification as a golden parachute, it retains its golden
parachute status and, therefore, remains subject to Part 359.  To this point, the FDIC's long-
standing interpretation of Part 359, as explained in the preamble to the implementing regulation,
states:

> The language of section 18(k)(4)(A)(ii) of the FDI Act provides that any payment which
> is contingent on the termination of an IAP's employment and is received on or after an
> institution or holding company becomes troubled is a prohibited golden parachute. If this
> payment is prohibited under the prescribed circumstances, it is prohibited forever.

61 Fed. Reg. 5926, 5928 (Feb. 15, 1996); *see also* 60 Fed. Reg. 16069, 16073 (Mar. 29, 1995).

The federal district court in *Hill v. Commerce Bancorp*, 2012 WL 694639 (D.N.J. Mar. 1,
2012)[14], reached the same conclusion.  There, the court held a former bank executive could not
collect a severance package because it would be an improper golden parachute payment.  *Id.* at
*7.  In so ruling, the court rejected as "untenable" the executive's argument that the payment was

---

[12] *See* Exhibit A.  The Claimant is William Finzer.

[13] The "golden parachute" regulations define "payment" as including "Any segregation of any funds or
assets, the establishment or funding of any trust . . . for the purpose of making, or pursuant to any
agreement to make, any payment . . . at the time of or after such trust is established . . . , without regard
to whether the obligation to make such payment is contingent on:  (i) The determination, after such date,
of the liability for the payment of such amount; or (ii) The liquidation, after such date, of the amount of
such payment."  12 C.F.R. 359.1(k).

[14] This opinion was recently affirmed by the U.S. Court of Appeals for the Third Circuit.  *See Hill v. TD
Bank, NA,* ___ Fed. Appx. ___, 2014 WL 4746238 (3d Cir. Sept. 24, 2014).

Mr. Brian Rosen
October 15, 2014
P a g e | 6

valid because the bank was no longer "troubled" since it had been acquired by another entity and then ceased to function as a bank.  *Id.* at *5.  The district court explained, "[a]n interpretation according to which an entity's 'troubled' status is destroyed by its acquisition would eviscerate the FDIA's restrictions by providing a safe harbor to officers and directors seeking to activate their golden parachutes through acquisition by another institution."  *Id.*

Under these circumstances, the Proposed Payments are properly treated as golden parachutes.  The Proposed Payments are based on Agreements providing compensation that was contingent on the Claimants' termination and became due and will be paid after WMB's troubled designation and failure and WMI's bankruptcy.

## II.    Review of Decisional Factors in Determining Whether to Exercise Discretion and Permit Otherwise Prohibited Payments

The governing FDIC regulations at 12 C.F.R. § 359.4 set forth three circumstances under which the Trust may be permitted to make golden parachute payments:

(1) If the appropriate federal banking agency, with the FDIC's written concurrence, determines that the payment or agreement is permissible;

(2) If the agreement is made to hire an IAP that meets the so called "white knight exception;" or

(3) If the payment is made pursuant to an agreement which provides for a reasonable severance payment not to exceed twelve months salary, in the event of an unassisted change in control.

### A.    The White Knight and Change-in-Control Exceptions are Not Applicable

As an initial matter, exceptions (2) and (3) are not at issue here.  The "White Knight" exception at 12 C.F.R. § 359.4(a)(2) is not applicable because none of the Claimants claim to be "white knights."  The "Change in Control" exception at section 359.4(a)(3) cannot be employed to approve any golden parachute resulting from "the insured depository institution being placed into conservatorship or receivership."  WMB was, of course, placed into receivership.

### B.    Evaluation of the Permissibility Exception

The Claimants seek payment under exception (1), commonly referred to as the "Permissibility Exception" at 12 C.F.R. § 359.4(a)(1).  Section 359.4(b) of Part 359, 12 C.F.R. §359.4(b), sets forth three factors supervisory staff may consider in evaluating whether to permit a golden parachute payment:

- Degree of the IAP's managerial or fiduciary responsibility;
- Length of the IAP's affiliation with the bank, and the degree to which the payment represents reasonable payment for services rendered over the length of that affiliation; and
- Any other factors or circumstances indicating that the proposed payment would be contrary to the intent of Part 359 or section 18(k) of the FDI Act.

Mr. Brian Rosen
October 15, 2014
P a g e | 7

- Degree of Managerial or Fiduciary Responsibilities

*LSL Claimants*

      Based on the regulated entities' numerical classification of managerial hierarchy, each of the Claimants, as explained below, occupied positions involving managerial responsibilities and corresponding fiduciary obligations.[15]  Eighteen of the Claimants were classified as "Senior Leaders" or "LSL" at WMB or WMI as of the date of failure.[16]  These eighteen Claimants were in the uppermost management levels of the failed bank or holding company and clearly occupied positions of significant managerial and fiduciary responsibility at WMB or WMI:

| Claimant | Seniority Level | Title | Salary on Date of Failure |
|---|---|---|---|
| Bartels, Melba Ann | LSL | Division Executive-Corp FP&A-Fin Ops | Redacted |
| Batt, Robert N. | LSL | Group Manager-Counterparty Credit | Redacted |
| Bivert, Bruce W. | LSL | Division Executive-Mtg Bank Operations | Redacted |
| Brennan, Carey M. | LSL | Deputy Chief Legal Officer General Counsel-Capital Market | Redacted |
| Brouwer, Curt | LSL | Division Executive-Tax | Redacted |
| Domer, Jake D. | LSL | Division Executive-Strategic Development | Redacted |
| Freilinger, Peter | LSL | Senior Manager-Capital Strategies | Redacted |
| Fukui, Keith O. | LSL | Division Finance Officer IV | Redacted |
| Gaspard, Matthew[17] | LSL | Division Executive-Government Relations | Redacted |
| Jones, Jeffrey | LSL | Senior Manager Retail National Marketing | Redacted |
| Kido, Kenneth E. | LSL | Executive Vice President-Retail Banking Store Dist | Redacted |
| McCarthy, Michelle | LSL | Division Executive-Market Risk Management | Redacted |
| Schrag, Janquelin F. | LSL | Division Executive-Business Planning and Operations | Redacted |
| Schulte, Patricia | LSL | Division Executive-Corp Cash Management | Redacted |

---

[15] *See* Application at 10.  Employees of WMI and WMB were classified into "levels," with Level 1 being the most senior position.  Employees in Level 1 through Level 3 were employed by WMI, with certain limited exceptions.  Employees in Level 4, 5 and 6 and higher numbered levels were employed by WMB, with limited exceptions.

[16] Level 4 and 5 employees were classified as "Senior Leaders" or "LSL" and were generally the highest ranking employees at WMB – the failed bank.  *See* Application at 10, fn. 18.

[17] The Application includes Mr. Gaspard as a WMI employee.

| Claimant | Seniority Level | Title | Salary on Date of Failure |
|---|---|---|---|
| Stein, Steven F. | LSL | Channel Director-Home Loans | Redacted |
| Stevens, Mitchell | LSL | Division Executive-Marketing | Redacted |
| Weinstein, Jeffrey P. | LSL | Division Executive-Card Services Technology | Redacted |
| Woods, John F. | LSL | Chief Financial Officer-Home Loans | Redacted |

These eighteen Claimants' respective job titles, salaries, and descriptions of their job positions provide further indication that these Claimants were high ranking officials at WMB or WMI.[18] This factor weighs strongly against exercising discretion under the Permissibility Exception with respect to these eighteen Claimants.

*Level 6 Claimants*

First and Senior Vice Presidents. The other twelve Claimants were classified in the next highest grade, "Level 6," and were Senior Managers and Senior or First Vice Presidents at the failed bank. Although each employee was in a position of managerial responsibility within the organization, the level of responsibility varies depending upon the claimant.

Camille Everett was First Vice President and Assistant General Counsel.[19] The titles of First Vice President and Assistant General Counsel, along with her description of her areas of oversight and responsibilities, signify that Ms. Everett held a position of significant managerial responsibility within the organization.

Ronald Lowery was Senior Vice President in the Home Loans and Finance Division.[20] Mr. Lowery represents that he "supervised/managed a staff of approximately 15 employees and was responsible for assuring that the companies Mortgage Servicing Rights asset was valued in accordance with all accounting and regulatory guidance and industry best practices." The title of Senior Vice President, as well as the representation that he had supervised fifteen employees, signifies that Mr. Lowery held a position of significant managerial responsibility within the organization.

Scott Shaw was First Vice President and Senior Manager, Retail Bank.[21] Mr. Shaw represents that he "supervised/managed a team of specialized analysts and was responsible for assuring that driving initiatives and activities that would improve customer experience across all

---

[18] *See* Exhibit A; Application Appx. Exh. N (hereinafter "Exhibit N"); First Amendment to the Application. Claimants' basic employment information is provided in Exhibit A. Position descriptions, as represented by the Claimants, are located in declarations provided by the Claimants at Exhibit N and the First Amendment to the Application.
[19] Exhibit A; Exhibit N, Everett Decl. ¶6.
[20] Exhibit A; Exhibit N, Lowery Decl. ¶6.
[21] Exhibit A; Exhibit N, Shaw Decl. ¶¶3, 6.

channels."[22] The title of First Vice President and his description of his areas of oversight and responsibilities signify that Mr. Shaw held a position of significant managerial responsibility within the organization.

Jacob Sorensen was First Vice President and Group Manager in the Corporate Development Department.[23] Specifically, Mr. Sorensen represents that he was responsible for "managing the Finance Technology Group for Washington Mutual ("WaMu") Card Services."[24] The title of First Vice President, in addition to his representations as to his responsibilities, signifies that Mr. Sorensen held a position of significant managerial and fiduciary responsibility within the organization.

Bruce Weber was First Vice President in the Commercial Technology Department.[25] Mr. Weber represents that he "supervised/managed a team of programmers and business systems analysts and was responsible for assuring that the loan origination systems and the Commercial Online Banking platform were maintained, enhanced, and met service level agreements."[26] The title of First Vice President and his description of his areas of oversight and responsibilities signify that Mr. Weber held a position of significant managerial responsibility within the organization.

Senior and Regional Managers. Gary Brady was Assistant General Counsel in the Employment Team at WMB's Legal Department.[27] Mr. Brady did not manage a team at WMB, but he was responsible for providing "legal advice concerning the operations and administration of the employee benefits plans sponsored by Washington Mutual, Inc."[28] This description, his job title, and his position responsibilities indicate Mr. Brady held a position with fiduciary responsibilities.

Duane Duck was "Senior Manager – Sales Strategy" in the Sales Leadership Department.[29] Mr. Duck reports that he "managed a team of approximately 12 professionals" and "was responsible for developing sales strategies and programs to maximize sales results and customer satisfaction."[30] This description, his job title, and his position responsibilities indicate Mr. Duck held a position with managerial and fiduciary responsibilities.

William Finzer was "Regional Manager – Special Assets."[31] As Regional Manager, Mr. Finzer states that he "supervised/managed Special Asset Managers and support staff and was responsible for assuring that Commercial Loan Assets were properly managed to mitigate losses

---

[22] Exhibit N, Shaw Decl. ¶6.
[23] Exhibit A; Exhibit N, Sorensen Decl. ¶6.
[24] Exhibit N, Sorensen Decl. ¶6.
[25] Exhibit A; Exhibit N, Weber Decl. ¶6.
[26] Exhibit N, Weber Decl. ¶6.
[27] Exhibit A; First Amendment to Application, Exhibit B, Brady Decl. ¶6.
[28] First Amendment to Application, Exhibit B, Brady Decl. ¶6.
[29] Exhibit A; Exhibit N, Duck Decl. ¶6.
[30] Exhibit N, Duck Decl. ¶6.
[31] Exhibit A; Exhibit N, Finzer Decl. ¶¶6, 7.

Mr. Brian Rosen
October 15, 2014
P a g e | 10

including accurate and timely loss recognition."[32] This description, along with his job title and
position responsibilities, indicates Mr. Finzer held a position with managerial and fiduciary
responsibilities.

Brian Foster was Senior Business Solutions Manager in the Commercial Term Lending
Department.[33] Mr. Foster reports that he "supervised/managed various projects and was
responsible for assuring that [Commercial Term Lending] Business managers were kept up to
date on important projects, our overall budget and our development plans in technology for the
year ahead."[34] This description, along with his job title and position responsibilities, indicates
the Mr. Foster held a position with managerial and fiduciary responsibilities.

Rachelle Mileur was a Senior Technology Group Manager of the Technology
Department.[35] Her declaration states that she "managed a team of leaders responsible for
improving technology service delivery and transitioning non-essential roles to an offshore
organization."[36] This description, her job title, and her position responsibilities indicate
Ms. Mileur held a position with managerial and fiduciary responsibilities.

Jane Suchan was Senior Manager in the Technology Group.[37] Ms. Suchan reports that
she "supervised/managed a team of analysts, project, and program managers and was responsible
for assuring that appropriate methods and rigor were applied to project delivery."[38] This
description, her job title, and her position responsibilities indicate that, like Ms. Mileur,
Ms. Suchan held a position with managerial and fiduciary responsibilities.

Weijia Wu held the title of "Portfolio Manager III" and was responsible for debt and
capital management for the failed WMB and bankrupt WMI.[39] Ms. Wu reports that she
"supervised/managed capital projections and was responsible for assuring that WMI and WMB
met the regulatory requirements for a well-capitalized financial institution."[40] This description,
her job title, and her position responsibilities indicate Ms. Wu held a position with managerial
and fiduciary responsibilities.

On balance, consideration of this factor weighs strongly against permitting the payment.
Each Claimant was in a position of managerial responsibility or fiduciary responsibility to the
failed WMB or bankrupt WMI.

---

[32] Exhibit N, Finzer Decl. ¶6
[33] Exhibit A; Exhibit N, Foster Decl. ¶¶3, 6.
[34] Exhibit N, Foster Decl. ¶6.
[35] Exhibit A; Exhibit N, Mileur Decl. ¶¶3, 6.
[36] Exhibit N, Mileur Decl. ¶6.
[37] Exhibit A; Exhibit N, Suchan Decl. ¶¶3, 6.
[38] Exhibit N, Suchan Decl. ¶6.
[39] Exhibit A; Exhibit N, Wu Decl. ¶6.
[40] Exhibit N, Wu Decl. ¶6.

Mr. Brian Rosen
October 15, 2014
P a g e | 11

- • Length of Affiliation with the Bank and Reasonableness of Payments for
  Services Rendered

The Claimants' length of affiliation with WMB or WMI ranges from four months to over
twenty-six years.  Specific durations are set forth in the chart below as is their salary at the time
of failure and proposed Settlement Payment:

| Claimant | Date Employment Commenced | Date Employment Ended (WMB) | Duration of Employment at WMB | Salary on Date of Failure | Total Disputed Claim | Settlement Amount |
|---|---|---|---|---|---|---|
| Bartels, Melba Ann | May 15, 2000 | Sept. 25, 2008 | 8 yrs., 4 months | Redacted | | |
| Batt, Robert N. | May 16, 2005 | Sept. 25, 2008 | 3 yrs., 4 months | Redacted | | |
| Bivert, Bruce W. | Feb. 1, 2001 | Sept. 25, 2008 | 7 yrs., 7 months | Redacted | | |
| Brady, Gary | June 16, 2008 | Sept. 25, 2008 | 4 months | Redacted | | |
| Brennan, Carey M. | July 16, 2001 | Sept. 25, 2008 | 7 yrs., 2 months | Redacted | | |
| Brouwer, Curt | Jan. 18, 2005 | Sept. 25, 2008 | 3 yrs., 9 months | Redacted | | |
| Domer, Jake D. | Jan. 12, 2001 | Sept. 25, 2008 | 7 yrs., 9 months | Redacted | | |
| Duck, Duane | Oct. 15, 2007 | Sept. 25, 2008 | 1 yrs., 11 months | Redacted | | |
| Everett, Camille | Feb. 2004 | Sept. 25, 2008 | 4 yrs., 7 months | Redacted | | |
| Finzer, William | Nov. 1, 1985 | Sept. 25, 2008 | 22 yrs., 10 months | Redacted | | Redacted |
| Foster, Brian T. | June 20, 2005 | Sept. 25, 2008 | 3 yrs., 3 months | Redacted | | |
| Freilinger, Peter | Feb. 2, 2004 | Sept. 25, 2008 | 4 yrs., 7 months | Redacted | | |
| Fukui, Keith O. | Oct. 1, 2005 | Sept. 25, 2008 | 2 yrs., 11 months | Redacted | | |
| Gaspard, Matthew | July 1, 2003 | Sept. 26, 2008 | 5 yrs., 2 months | Redacted | | |
| Jones, Jeffrey | Feb. 27, 1994 | Sept. 25, 2008 | 24 yrs., 7 months | Redacted | | |
| Kido, Kenneth E. | July 15, 2001 | Sept. 25, 2008 | 7 yrs., 2 months | Redacted | | |
| Lowery, Ronald M. | Jan. 30, 1998 | Sept. 25, 2008 | 20 yrs., 9 months | Redacted | | |

---

[41] *See* Exhibit N, First Amendment to Application, Exhibit B, Brady Decl. ¶6.  These employment dates
are as represented in Claimants' self-certifications.

Mr. Brian Rosen
October 15, 2014
P a g e | 12

| Claimant | Date Employment Commenced | Date Employment Ended (WMB) | Duration of Employment at WMB | Salary on Date of Failure | Total Disputed Claim | Settlement Amount |
|---|---|---|---|---|---|---|
| McCarthy, Michelle | April 5, 2003 | Sept. 25, 2008 | 5 yrs., 5 months | | Redacted | |
| Mileur, Rachelle M. | July 30, 2003 | Sept. 25, 2008 | 5 yrs., 2 months | | Redacted | |
| Schrag, Janquelin F. | July 1982 | Sept. 25, 2008 | 26 yrs., 2 months | | Redacted | |
| Schulte, Patricia | June 23, 2003 | Sept. 25, 2008 | 5 yrs., 3 months | | Redacted | |
| Shaw, Scott | Sept. 24, 2007 | Sept. 25, 2008 | 1 yr. | | Redacted | |
| Sorensen, Jacob E. | Oct. 1, 2005 | Sept. 25, 2008 | 2 yrs., 11 months | | Redacted | |
| Stein, Steven F. | Aug. 25, 2005 | Sept. 25, 2008 | 3 yrs., 1 month | | Redacted | |
| Stevens, Mitchell | Dec. 5, 2005 | Sept. 25, 2008 | 2 yrs., 10 months | | Redacted | |
| Suchan, Jane | Jan. 2, 2004 | Sept. 25, 2008 | 4 yrs., 9 months | | Redacted | |
| Weber, Bruce | Feb. 28, 1986 | Sept. 25, 2008 | 22 yrs., 8 months | | Redacted | |
| Weinstein, Jeffrey P. | March 3, 2008 | Sept. 25, 2008 | 6 months | | Redacted | |
| Woods, John F. | Dec. 1, 2005 | Sept. 25, 2008 | 2 yrs., 10 months | | Redacted | |
| Wu, Weijia | Sept. 25, 2000 | Sept. 25, 2008 | 8 years | | Redacted | |

Many of the payments appear reasonable in relation to the length of service, a factor which, although not controlling, does weigh in favor of permitting payment. Upon further examination, however, there are several reasons that support not affording this factor significant weight in making a determination.

First, twenty of the Claimants seek payment under Change in Control Agreements.[42] As noted above, Part 359 contains a specific Change in Control exception at 12 C.F.R. § 359.4(a)(3). Invocation of that exception is prohibited in the event the institution is placed into receivership. In other words, the exception at section 359.4(a)(3) can only be considered if the change in control is due to an open bank transaction. While the consideration of change in control payments is not explicitly prohibited under the Permissibility Exception at 12 C.F.R. § 359.4(a)(1), the FDIC declines to accord weight to the Change in Control agreements here

---

[42] See Exhibit A. The Twenty Claimants are Melba Ann Bartels, Robert N. Batt, Bruce W. Bivert, Curt Brouwer, William Finzer, Brian T. Foster, Keith O. Fukui, Matthew Gaspard, Jeffrey Jones, Kenneth E. Kido, Ronald M. Lowery, Michelle McCarthy, Rachelle M. Mileur, Janquelin F. Schrag, Patricia Schulte, Jacob E. Sorensen, Mitchell Stevens, Jane Suchan, Bruce Weber, and Jeffrey P. Weinstein.

Mr. Brian Rosen
October 15, 2014
P a g e | 13

given that they are explicitly prohibited in a receivership context under the Change in Control
Exception at section 359.4(a)(3).

      This determination has a significant impact on the perceived reasonableness of the
Proposed Payments, both globally and on an individual level.  As noted above, the Change in
Control Agreements represents $14,300,000, approximately 74%, of the claimed benefits.  For
example, Claimant Melba Ann Bartels sought ⌈Redacted⌉ per a Change in Control Agreement,
representing ⌈Redacted⌉ of her total monetary claim of ⌈Redacted⌉ [43]  Her length of service was 8 years,
4 months, and the Proposed Payment to her is ⌈Redacted⌉ [44]  Without the amount disputed under her
Change in Control Agreement, Ms. Bartel's claim is reduced to ⌈Redacted⌉ [45]  Accordingly, once
the Change in Control claim is removed from consideration, the Proposed Payment to Ms. Bartel
is over ⌈Redacted⌉ of the value of her claim.  Upon removal of the Change in Control claim, the
Proposed Payment is also above or in close proximity to ⌈Redacted⌉ of the value of the claim for
Claimants Robert N. Batt, Curt Brouwer, William Finzer, Keith Fukui, Mathew Gaspard, Jeffrey
Jones, Kenneth Kido, Ronald Lowery, Michele McCarthy, Rachelle Mileur, Janquelin Schrag,
Patricia Schulte, Jacob Sorensen, Mitchell Stevens, Jane Suchan, Bruce Weber, and Jeffrey
Weinstein.[46]

      Second, twenty Claimants seek payments pursuant to Retention Bonus Agreements.[47]  As
noted above, these agreements total approximately $3,075,000 and represent the second largest
category of claimed benefits after the change in control payments.  Many of these agreements
were executed in August and September 2008, leaving mere months and days to "earn" the
retention award prior to the September 25, 2008 failure of WMB and September 26, 2008
bankruptcy of WMI.[48]  For example, Jane Suchan's Retention Bonus Agreement was executed
September 23, 2008, two days before failure.[49]  Bruce Weber's Retention Bonus Agreement was
executed August 2, 2008, less than two months prior to failure.[50]  Weijia Wu's Retention Bonus
Agreement was executed August 22, 2008, approximately one month prior to failure.[51]  In fact,
only one of the twenty Retention Bonus Agreements at issue here was executed prior to
March 2008.[52]

---

[43] Exhibit A.
[44] Exhibit A; Exhibit N, Bartel Decl. ¶¶3, 4.
[45] See Exhibit A. Ms. Bartels also sought ⌈Redacted⌉ pursuant to a Retention Bonus Agreement that was
entered into in March 2008, six months prior to failure. Application Appx. Exh. H. WMB had already
paid her one half the value of the agreement, ⌈Redacted⌉ on the date of failure.  Id.
[46] See Exhibit A.
[47] See Exhibit A; Application Appx. Exhs. H, I. The Twenty Claimants are Melba Ann Bartels, Bruce W.
Bivert, Carey M. Brennan, Curt Brouwer, Jake D. Domer, William Finzer, Brian T. Foster,
Peter Freilinger, Keith O. Fukui, Jeffrey Jones, Kenneth E. Kido, Michelle McCarthy, Rachelle M.
Mileur, Jacob E. Sorensen, Steven F. Stein, Jane Suchan, Bruce Weber, and Jeffrey P. Weinstein, John F.
Woods, and Weijia Wu.
[48] Application Appx. Exh. H.
[49] Application Appx. Exh. H, Suchan Special Bonus Opportunity Agreement.
[50] Application Appx. Exh. H, Weber Special Bonus Opportunity Agreement.
[51] Application Appx. Exh. H, Wu Special Bonus Opportunity Agreement.
[52] Application Appx. Exh. H. The Claimant is William Finzer who executed his Special Bonus
Opportunity agreement in 2006.

Mr. Brian Rosen
October 15, 2014
P a g e | 14

In addition, many of the Retention Bonus Agreements reviewed provided for a payment of 50% or more of the bonus amount prior to the failure of WMB.[53] For example, Keith Fukui executed a Retention Bonus Agreement on August 12, 2008 and had already received [Redacted] of [Redacted] in potential bonus payments by the date WMB failed.[54] Additionally, Carey Brennan executed a Retention Bonus Agreement on March 18, 2008 and had already received [Redacted] of [Redacted] in potential bonus payments by the date WMB failed.[55] Curt Brouwer executed a Retention Bonus Agreement in March 2008 and had received [Redacted] of [Redacted] in potential bonus payments by the date of failure.[56] Kenneth Kido executed a Retention Bonus Agreement on March 19, 2008 and had received [Redacted] out of a potential [Redacted] in bonus payments by the date WMB failed.[57] Also on March 19, 2008, Michelle McCarthy executed her Retention Bonus Agreement and had already received [Redacted] out of [Redacted] in potential bonus payments at the time of failure.[58] Finally, John Woods, the CFO of the Home Loans Department, signed a Retention Bonus Agreement on March 19, 2008 for [Redacted].[59] He received payment of [Redacted] on or about June 15, 2008.[60]

In light of these circumstances, consideration of payments sought pursuant to Retention Bonus Agreements would be contrary to the intent of the FDI Act and regulation because the payments contemplated under the Retention Bonus Agreements bear no relation to payment for services rendered over the duration of the Claimants' employment. Instead, but for the single exception noted above, these payments represent bonuses awarded to high ranking WMB managers in the months leading up to WMB's failure.

Third, five of the Level 6 Claimants seek payments pursuant to the WaMu Severance Plan.[61] But, according to the Application, the Level 6 claimants already received severance payments from JPMC based on their length of service under WMB's Severance Plan when they were terminated by JPMC:

> [U]pon termination of their employment with JPMC, JPMC paid former WMI and WMB employees severance payments that took into consideration the employees' length of service at WMI or WMB in accordance with the base severance provisions of the Wamu Severance Plan. Thus, when an employee was terminated from JPMC, his or her severance payment from JPMC included severance payments based on the length of the employee's service with WMB and JPMC, but did not include any 'change in control' benefits allegedly owed to Level 6 employees pursuant to the Wamu Severance Plan.[62]

---

[53] Application Appx. Exh. H.
[54] Application Appx. Exh. H, Fukui Special Bonus Opportunity Agreement; *see also* Exhibit A.
[55] Application Appx. Exh. H, Brennan Special Bonus Opportunity Agreement; *see also* Exhibit A.
[56] Application Appx. Exh. H, Brouwer Special Bonus Opportunity Agreement; *see also* Exhibit A.
[57] Application Appx. Exh. H, Kido Special Bonus Opportunity Agreement; *see also* Exhibit A.
[58] Application Appx. Exh. H, McCarthy Special Bonus Opportunity Agreement; *see also* Exhibit A.
[59] Application Appx. Exh. H, Woods Special Bonus Opportunity Agreement.
[60] Application Appx. Exh. H, Woods Special Bonus Opportunity Agreement; *see also* Exhibit A.
[61] *See* Exhibit A. The five Claimants are Gary Brady, Duane Duck, Camille Everett, Scott Shaw, and Weijia Wu.
[62] *See* Application at 12; *see also* Application at 5, fn. 10.

Mr. Brian Rosen
October 15, 2014
P a g e | 15

None of the Claimants addressed the issue of payments made by JPMC in their declarations.[63] It would be inappropriate for the FDIC to exercise its discretion to permit what would effectively be double payments to Claimants arising out of the largest bank failure in American history.[64] In particular, the FDIC has determined that additional payments to Claimants under the WaMu Severance plan would be unreasonable in light of the evaluative factors established under Part 359.4(b).

- Any Other Factors or Circumstances Indicating That the Proposed Payment Would Be Contrary to the Intent of Part 359 or Section 18(K) of The FDI Act.

*The Regulated Entities' Precarious Financial Condition*

The precarious financial position of the Regulated Entities heavily weighs against approval of the Application. Financial Institution Letter, FIL-66-2010 instructs that, "The FDIC is unlikely to approve golden parachute payments for institutions that are in a precarious financial position." The FDIC anticipates denial of golden parachute payments in such instances "unless the institution can demonstrate near-term benefits that outweigh the cost of the payments and the payment is otherwise not contrary to the intent of the golden parachute restrictions."

The failure of WMB and bankruptcy of WMI provide overwhelming evidence that both were in a precarious financial condition. In its order appointing FDIC as receiver of WMB, the Office of Thrift Supervision ("OTS") detailed the financial failings of WMB, finding that WMB had:

- Insufficient cash and liquid assets convertible to cash necessary to pay WMB's obligations and the expected withdrawal demands of its depositors;
- Significant cash outflows, exceeding $22 billion since July 2008; and
- Limited and diminishing liquidity sources, which would deplete WMB's cash resources and liquidity within a short period of time.[65]

The OTS further determined that WMB was in an "unsafe or unsound condition to transact business." The OTS order concluded that WMB suffered from "severe liquidity strain, deteriorating asset quality, and continuing significantly negative operating earnings with no realistic prospects for raising capital to ensure that it can repay all of its liabilities, including deposits."

---

[63] The FDIC is cognizant of the fact that these payments were made by JPMC, and Claimants are contending that they are technically separate and apart from payments owed by WMB. The FDIC believes that this is a technical argument and that is appropriate for the FDIC, as an agency charged with determining whether to permit an otherwise prohibited golden parachute payment, to consider the fact that payments were already rendered to Claimants, essentially pursuant to the WaMu Severance Plan, based on length of service at WMB.

[64] As noted above, FDIC regulations prohibit the payment of change in control benefits when an institution is placed into receivership. *See* 12 C.F.R. § 359.4(a)(3).

[65] OTS Order No. 2008-36 dated September 25, 2008.

Mr. Brian Rosen
October 15, 2014
P a g e | 16

*Self-Certifications under 12 C.F.R. § 359.4(a)(4)*

Notwithstanding the fact that the Trust has negotiated settlements with the Claimants in a good faith effort to forestall additional litigation on the issue, the Trust "makes no representations as to the validity or veracity of the information" included in the Claimants' self-certifications, "continues to deny liability," and "believes its position is supported by the law and facts."[66] Evidently, the Trust has made no assurances as to the truth of the self-certifications, and, in fact, one certification includes a statement that, "This is exemplified by – no documentation available."[67] As discussed above, the Claimants were highly compensated individuals within the executive hierarchy at WMB or WMI,[68] and, as such, their self-certifications must be closely examined as they held senior, even executive, level positions at WMB or WMI. Without objective verification of these self-certifications, the FDIC is not in a position to rely on them.

*Termination of Agreements with WMB*

The FDIC understands that the Change in Control Agreements were executed with WMB and were terminated by operation of law under 12 C.F.R. § 563.39 (renumbered as 12 C.F.R. § 163.39). In a prior suit against the FDIC as Receiver for WMB, former WMB employees sought payment due under change in control agreements, severance plan agreements, and/or retention agreements. The FDIC contested such claims and prevailed in court. In *Williams v. FDIC*, the Western District of Washington determined that WMB employee benefit claims against the FDIC failed as a matter of law under 12 C.F.R. § 563.39 (renumbered as 12 C.F.R. § 163.39), which holds that once a thrift institution is in default, the institution's employment contracts "shall terminate as of the date of default." 09-504 (RAJ) (W.D. Wash. Aug, 30, 2011), aff'd, 492 Fed. Appx. 796 (9th Cir. 2012).

*The Successful Resolution of WMB*

In advocating for the FDIC to grant the Application, the Trust points out that WMB was resolved without monetary harm to the FDIC's Deposit Insurance Fund.[69] While this assertion is correct, the fact that the FDIC was able to implement a successful resolution strategy that protected all of WMB's depositors and the Deposit Insurance Fund even in the midst of the largest bank failure in this country's history does not weigh in favor of finding the Proposed Payments proper. As shown in the statutory and regulatory factors that guide the FDIC's exercise of its discretion under section 18(k) of the FDI Act, there is no link between the amounts of money a particular bank failure costs the FDIC and evaluation of whether to permit an otherwise prohibited golden parachute payment.

---

[66] *See* Application at 17-18. Moreover, the Trust has convincingly and steadfastly asserted that, as a matter of law, the payments are prohibited and has asserted in previous pleadings to the bankruptcy court that there is evidence that the Claimants were aware of the golden parachute provisions and structured their agreements in an effort to evade the intent of the statute. *See* Application Appx. Exh. M, ¶22.

[67] *See* Exhibit N, Stein Decl. ¶7.

[68] *See* Exhibit A.

[69] *See* Application at 3 ("[I]mportantly, the failure of WMB resulted in no harm to the FDIC or the Deposit Insurance Fund.").

Mr. Brian Rosen
October 15, 2014
P a g e | 17

### III.    Conclusion

Section 359.4(b) specifically directs regulators to consider factors and circumstances indicating that the proposed payment would be contrary to the intent of section 18(k) of the FDI Act. In considering the intent of section 18(k), the FDIC has been guided by the principle that regulatory authority under Part 359 and section 18(k) was meant to prevent financially unstable institutions from awarding inappropriately lucrative benefits. It remains within the discretion of the appropriate banking agency and the FDIC to assess whether the Proposed Payments would be consistent with the intent of section 18(k) and its regulation of prohibited golden parachute payments.

The Proposed Payments at issue here are golden parachute payments subject to regulation under section 18(k) of the FDI Act and Part 359. The Proposed Payments would be made to individuals who possessed a significant degree of managerial and fiduciary responsibility to WMI or WMB, the largest bank to fail in this country's history. Considering the specific Agreements at issue here, there are notable concerns that touch on each Agreement under which a claim is made. These facts establish that it would be inappropriate for the FDIC to approve the Proposed Payments pursuant to its discretionary authority. Therefore, the Application is denied.

If you have any questions, please contact Senior Regional Attorney Kris Brewer at (415) 808-8129.

Sincerely,

Joseph Meade

Joseph Meade
Acting Deputy Regional Director

cc:  Joseph Sano, Regional Counsel, FDIC
Iván Cintrón, Deputy Regional Counsel, FDIC
Lisa Villareal, Senior Counsel, Board of Governors of the Federal Reserve System