**Exhibit B**



**FDIC**
**Federal Deposit Insurance Corporation**
25 Jessie Street at Ecker Square, Suite 2300
San Francisco, California 94105

Division of Risk Management Supervision
San Francisco Regional Office
(415) 546-0160

May 1, 2015

<u>Via Electronic and Regular Mail</u>

Brian S. Rosen
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Subject:**   *Application Pursuant to Part 359 of the FDIC Rules and Regulations*
*With Respect to Payments to be Made on Account of Certain Proofs of Claim Filed in*
*In re Washington Mutual, Inc., 08-12229 (Bankr. D. Del.) (MFW)*

Dear Mr. Rosen:

On March 23, 2015, WMI Liquidating Trust ("WMILT" or the "Trust"), as successor in interest to Washington Mutual Inc. ("WMI"), filed a second payment application seeking the FDIC's "authorization to make payments to both the Settling Claimants[1] and the Non-Settling Claimants"[2] and "the position of the FDIC as to whether payment, in any amount, to any of the Settling Claimants and the Non-Settling Claimants is appropriate" (the "Second Payment Application").[3] Previously, the Trust submitted an application dated August 14, 2013 and subsequently amended requesting authorization to make payments pursuant to settlements reached with the Settling Claimants (the "First Payment Application").[4] The FDIC reviewed the First Payment Application and issued its letter denying such application on October 15, 2014 ("First Payment Application Determination"), which the FDIC incorporates by reference herein.[5]

For the reasons stated in the First Payment Application Determination, and as set forth below, the FDIC declines to authorize WMILT, a covered company under 12 U.S.C. § 1828(k) and 12 C.F.R. Part 359, an exception under 12 C.F.R. Part 359.4(a)(1) to make payments to any

---

[1] The 30 Settling Claimants are:  Melba Ann Bartels, Robert N. Batt, Bruce W. Bivert, Gary P. Brady, Carey M. Brennan, Curt Brouwer, Jake D. Domer, Duane Duck, Camille J. Everett, William Finzer, Brian T. Foster, Peter Freilinger, Keith O. Fukui, Matthew Gaspard, Jeffrey Jones, Kenneth E. Kido, Ronald M. Lowery, Michelle McCarthy, Rachelle M. Mileur, Janquelin F. Schrag, Patricia Schulte, Scott Shaw, Jacob E. Sorensen, Steven F. Stein, Mitchell Stevens, Jane Suchan, Bruce Weber, Jeffrey P. Weinstein, John F. Woods, and Weijia Wu.
[2] The 38 Non-Settling Claimants are:  Susan Allison; Edward Bach; Todd H. Baker; Sean Becketti; Henry J. Berens; Robert C. Bjorklund; Anthony Bozzuti; Al Brooks; John M. Browning; Gregory G. Camas; Kimberly A. Cannon; Gregory Alan Carlisle; Thomas W. Casey; Daryl D. David; Andrew J. Eschenbach; Stephen Fortunato; Debora D. Horvath; Rajiv Kapoor; Suzanne E. Lehrberger; Marc Malone; John P. McMurray; Randy Melby; Thomas E. Morgan; John H. Murphy; Michael Reynoldson; Patricia M. Roberts; Stephen J. Rotella; David Schneider; Chandan Sharma; Genevieve Smith; Steven Kenneth Sterns; Craig E. Tall; Andrew Tauber; Radha Thompson; Ann Tierney; Anthony Vuoto; Robert J. Williams; and Michael R. Zarro.
[3] The FDIC adopts the same definitions here as used in the First Payment Application Determination.
[4] The First Payment Application was first amended on March 17, 2014 to include an additional settlement with Mr. Gary Brady, and on September 23, 2014 to reflect the withdrawal of claims made by Mr. Casey Nault and Ms. Susan McCarthy.
[5] *See also* Second Payment Application Appx. Exh. B.

of the Settling or Non-Settling Claimants in any amount. In rendering this determination, the FDIC has fully considered the agreements at issue, the text, structure and intent of section 18(k)(4), 12 U.S.C. § 1828(k), of the Federal Deposit Insurance Act (the "FDI Act"), the certification factors found at 12 C.F.R. § 359.4(a)(4), and the Settling and Non-Settling Claimants' status as officers and employees associated with the largest bank failure in American history. This correspondence represents the FDIC's final agency decision on the Second Payment Application.

**I.    The FDIC Reaffirms that WMILT is a "Covered Company," and the Proposed Payments to Both the Settling and Non-Settling Claimants are "Golden Parachutes" with Certain Limited Exceptions.**

*WMILT is a Covered Company Subject to Regulation*

The FDIC reaffirms its finding that WMILT is subject to the Golden Parachute Regulations. On September 25, 2008, Washington Mutual Bank ("WMB") failed, and the former Office of Thrift Supervision ("OTS"), WMB's primary federal regulator, appointed the FDIC as Receiver of WMB.[6] As Receiver, the FDIC transferred substantially all of WMB's assets and liabilities to JPMorgan Chase ("JPMC"). The transfer of WMB's assets and liabilities was made pursuant to a Purchase and Assumption Agreement dated September 25, 2008. The next day, on September 26, 2008, WMI, the holding company for WMB, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware.

WMI was a multiple savings and loan holding company that owned all outstanding equity of WMB, among other subsidiaries.[7] After WMB's failure, WMILT was established pursuant to a Seventh Amended Plan of Reorganization, confirmed by the Delaware Bankruptcy Court, on March 6, 2012 (the "Plan").[8] WMILT is a "liquidating trust" for United States federal income tax purposes.[9] Although WMI held all of WMB's equity interests at the time of the bankruptcy filing, prior to confirmation of the Plan, WMI and its chapter 11 estate had abandoned its equity interests in WMB, confirmed by Bankruptcy Court order dated September 19, 2011.[10] Upon consummation of the Plan, WMI ceased to exist.

On these facts, the FDIC reiterates its previous administrative findings that WMILT, as successor in interest to WMI, is subject to regulation under Section 1828(k) and Part 359 as a "covered company." In making this finding, the FDIC specifically rejects any contention that WMI's bankruptcy filing, wind-down, abandonment of WMB stock, and the creation of a liquidating trust, served to remove WMILT from the purview of Section 1828(k) and the Golden Parachute Regulations. Section 1828(k)(1) grants authority to the FDIC to "prohibit or limit, by regulation or order, any golden parachute payment." Section 1828(k)(4)(A)(ii) prohibits payments made "on or after the date on which . . . [an] insured depository institution or covered company, or any insured depository institution subsidiary of such covered company" is deemed to be in "troubled" condition. Here, any payments the Trust would make to the Settling and

---

[6] OTS Order No. 2008-36.
[7] Second Payment Application at 5.
[8] *Id.* at 2.
[9] *Id.* at 2, n.3.
[10] *Id.* at Appx. Exh. D.

Non-Settling Claimants necessarily would be made "after the date on which" the bank or holding company was deemed to be in troubled condition, given that they would be made after WMB failed and was placed into receivership, and after WMI filed for bankruptcy.  12 U.S.C. § 1828(k).

This determination is likewise supported by the Golden Parachute Regulations.  In fact, 12 C.F.R. § 359.1(f)(1)(ii)(A) contemplates application of Part 359 in cases where, as here, the depository institution holding company has filed for bankruptcy and no longer exists in present form.  Part 359 becomes applicable when a bank or bank holding company becomes a troubled institution.  12 C.F.R. § 359.1(f)(1).  That status does not disappear once the institution or holding company become so troubled that it fails and ultimately liquidates.[11]  Once a severance payment satisfies the conditions for classification as a golden parachute, it retains its golden parachute status and, therefore, remains subject to Part 359.  To this point, the FDIC's long-standing interpretation of Part 359, as explained in the preamble to the implementing regulation, states:

> The language of section 18(k)(4)(A)(ii) of the FDI Act provides that any payment which is contingent on the termination of an IAP's employment and is received on or after an institution or holding company becomes troubled is a prohibited golden parachute.  If this payment is prohibited under the prescribed circumstances, it is prohibited forever.

61 Fed. Reg. 5926, 5928 (Feb. 15, 1996); *see also* 60 Fed. Reg. 16069, 16073 (Mar. 29, 1995).  As set forth previously, the Trust is subject to regulation under 12 U.S.C. § 1828(k) and 12 C.F.R. Part 359 as a "covered company."

### *The Proposed Settlement Payments to the Settling Claimants are Golden Parachutes*

The Second Payment Application largely repeats information contained in the Trust's First Payment Application as to the 30 Settling Claimants.  In the aggregate, the Settling Claimants filed proofs of claim seeking $19,300,000 under the following contracts, which are identical to those contracts under the same name discussed below:

(1) Change in Control Agreements or Employment Agreements;
(2) Special Bonus Opportunity agreements;
(3) Cash Long Term Incentive Award agreements;
(4) The WMB Severance Plan; and
(5) WMI Amended and Restated Equity Incentive Plan.[12]

---

[11] The "golden parachute" regulations define "payment" as including "[a]ny segregation of any funds or assets, the establishment or funding of any trust . . . for the purpose of making, or pursuant to any agreement to make, any payment . . . at the time of or after such trust is established . . ., without regard to whether the obligation to make such payment is contingent on: (i) The determination, after such date, of the liability for the payment of such amount; or (ii) The liquidation, after such date, of the amount of such payment."  12 C.F.R. Part 359.1(k).
[12] Second Payment Application at 24.

The Trust tentatively settled these claims for a total of approximately $2,800,000.[13]  For the reasons previously stated, the FDIC reaffirms that the payments the Trust sought to make to the 30 Settling Claimants are properly subject to regulation under Part 359 as "golden parachute" payments.

### *The Proposed Payments to the Non-Settling Claimants are Golden Parachutes*

The Non-Settling Claimants collectively assert disputed claims against WMILT aggregating approximately $46,751,134.[14]  In the Second Application, the Trust seeks permission to make payment to the Non-Settling Claimants in any amount based on the following contracts:[15]

(1) Change in Control Agreements or Employment Agreements between WMI or WMB and the IAPs;
(2) Special Bonus Opportunity agreements between IAPs and WMI or WMB;
(3) Cash Long Term Incentive Award between IAPs and WMI;
(4) A Confidential Executive Separation Agreement;
(5) A commissions plan relating to the sale of commercial real estate loans;
(6) The WMI Executive Target Retirement Income Plan;
(7) WMI Supplemental Executive Retirement Accumulation Plan; and
(8) The WMI Amended and Restated Equity Incentive Plan.[16]

The Non-Settling Claimants are institution affiliated parties ("IAPs"), as defined at 12 C.F.R. § 359.1(h)(1), of WMB or WMI (collectively, the "Regulated Entities") as such Non-Settling Claimants were officers or employees of the Regulated Entities.  All of the Non-Settling Claimants were employed with the Regulated Entities as of September 25, 2008 when WMB failed and the FDIC was appointed as its receiver.[17]

As set forth in the FDIC's prior determinations, and as further detailed below, the FDIC concludes that any payments based on these contracts, with certain limited exceptions, constitute "golden parachute" payments subject to regulation under Part 359.  Based on the facts reviewed in the present application, the Proposed Payments are derived from agreements that, by their very terms, afforded benefits upon termination of employment with the Regulated Entities due to a job elimination and/or change in control.  While the individual terms of the agreements vary, each provided for payment of a monetary benefit if the IAP was released from employment due to a termination without cause and/or a change in control of the Regulated Entities.

- Change in Control Agreement or Employment Agreement

The Second Payment Application explains that "[c]ommencing in 1998, WMI and WMB offered 'change in control' benefits to its employees pursuant to individual agreements entitled

---

[13] *Id.*
[14] Second Payment Application Appx., Exh. U.
[15] *Id.* at 5-6, 12-13.
[16] *Id.*
[17] Second Payment Application Appx. Exh. U.

'Employment Agreement' or 'Change in Control Agreement.'"[18]  Section 6(c) of the sample WMI Change in Control Agreement holds that if an employee is terminated without cause within 3 years of a change in control, the employee will be entitled to a lump sum payment equal to 3 times the employee's annual salary.[19]  Similarly, section 5(c) of the sample WMB Change in Control Agreement holds that if an employee is terminated without cause within 2 years of a change in control, the employee will be entitled to a lump sum payment equal to 2 times the employee's annual salary.[20]  As stated in the instant application, claimants "have alleged that their 'change in control' benefits were triggered as a result of the Bank Seizure and/or JPMC Transaction."[21]  Given that the change-in-control benefits here are triggered by WMB's failure, any payments based on such contracts are properly subject to regulation as "golden parachute" payments.  The documentation provided in the Second Payment Application shows that disputed amounts under Change in Control agreements alone total approximately $29,638,522, which represents 63% of the aggregate disputed amounts at issue here.[22]

- Special Bonus Opportunity and Cash Long Term Incentive Award

The "Special Bonus Opportunity" and "Cash Long Term Incentive Award" agreements were retention bonus agreements (the "Retention Bonus Agreements"), which "offered a bonus for the employee's continued employment through a date certain."[23]  In order to earn such a bonus, the employee was required to remain employed for a certain period of time.[24]  Nonetheless, some of the agreements provided that the employment requirement was waived, and vesting of the award would accelerate, upon a change in control.[25]  The sample "Cash Long Term Incentive Award" agreement and certain "Special Bonus Opportunity" agreements also waived the employment requirement where the employee's job was eliminated.[26]  Specifically, the "Cash Long Term Incentive Award" agreement and all "Special Bonus Opportunity Award" agreements between WMB and the Non-Settling Claimants include a waiver of the employment requirement.[27]

Based on information provided in the present application, the FDIC understands all sample "Special Bonus Opportunity" agreements between the Regulated Entities and the Non-Settling Claimants were executed in 2008.[28]  Many such agreements were executed in August and September 2008.[29]  The sample "Cash Long Term Incentive Award" agreement included in the Second Application also reflects that it was offered in 2008.[30]  The FDIC

---

[18] Second Payment Application at 13.
[19] *Id.* at Exh. H.
[20] *Id.* at Exh. I.  Please see the Second Payment Application for exact language.  Unless quoted, the provisions and definitions cited herein have been paraphrased for brevity and clarity.
[21] *Id.* at 14.
[22] *See* Second Payment Application Appx. Exh. U; *see also* Second Payment Application Appx. Exh. C.
[23] Second Payment Application at 15; *see also* Second Application Appx. Exhs. J, K-2, Q.
[24] *Id.* at 15, 18-19.
[25] Second Payment Application Appx. Exhs. J, K-2, Q.
[26] *Id.* at Exh. K-2, Q.
[27] *Id.*
[28] *Id.* Exhs. J, K-2.
[29] *Id.*
[30] Second Payment Application Appx. Exh. Q.

reaffirms its previous finding that any payments based on these agreements is properly subject to regulation under Part 359.[31]

- ETRIP and SERAP

The "Washington Mutual, Inc. Executive Target Retirement Income Plan" (the "ETRIP") was "an unfunded plan designed primarily to provide deferred compensation benefits to a select group of management."[32] The Preamble to the ETRIP provides that "[t]he Plan covers Levels 1 through 3 executives."[33] The ETRIP afforded covered executives with "retirement income" calculated according to a defined vesting schedule.[34] Additionally, section 3.5 of the ETRIP holds that executives would be credited with an additional year of service if they were terminated upon a "change in control."[35] Supplemental executive retirement benefit plans may be excepted from Part 359 as a Bona Fide Deferred Compensation Plan under 12 C.F.R. § 359.1(d)(2). The unearned additional year of service under section 3.5 constitutes a termination benefit that brings such payments within the purview of Part 359. Excluding such termination benefit allowed the ETRIP to satisfy the criteria at 12 C.F.R. § 359.1(d)(3) and qualify for exception as a Bona Fide Deferred Compensation Plan under 12 C.F.R. § 359.1(d)(2).

The FDIC understands that the Trust previously proposed payments on the ETRIP to specified executives, and such proposed payments would be limited to those amounts that were vested and accrued at the date of termination. Essentially, the Trust sought to pay the "ETRIP Base Components" by excluding the termination benefit referenced in section 3.5 of the ETRIP.[36] According to the above terms confirmed on November 14, 2013, the FDIC determined that the Trust could proceed with payment of the ETRIP Base Components without violating Part 359.[37] Any payment based on the ETRIP Change in Control Component remains subject to regulation under Part 359.

Likewise, the FDIC previously concluded that payment based on the earned portions of the Supplemental Executive Retirement Accumulation Plan ("SERAP") would fall outside of Part 359's purview. In correspondence dated August 1, 2013, the FDIC found that the SERAP qualified for exception from Part 359 as a Bona Fide Deferred Compensation Plan under 12 C.F.R. § 359.1(d)(2). The SERAP satisfied the requirements in section 359.1(d)(3) as, in addition to other conditions, the SERAP was in effect as of January 1, 2004, well before WMI

---

[31] Notwithstanding, the "Special Bonus Opportunity" agreements between WMI and the following Non-Settling Claimants do not provide for waiver of the Employment Requirement: Todd Baker; Debora Horvath; John McMurray (only agreement dated 7/22/2008); David Schneider; and Anthony Vuoto. As such, the "Special Bonus Opportunity" agreements entered into between WMI and the immediately preceding Non-Settling Claimants are not governed by Part 359 because they do not allow a waiver of the Employment Requirement. Notably, the immediately preceding Non-Settling Claimants also assert claims under other agreements subject to Part 359, rendering any aggregated payment covering such agreements (including the cited Special Bonus Opportunity agreement) likewise within the ambit of the Golden Parachute Regulations.

[32] Second Payment Application at 15.

[33] *Id.* at Exh. L.

[34] *Id.*

[35] *Id.*

[36] Second Payment Application Appx. Exh. U, fn. 7.

[37] Among other conditions included at 12 C.F.R. § 359.1(d)(3), the ETRIP was in effect well before WMI filed for bankruptcy or WMB was designated troubled, and the proposed payments on the ETRIP were limited to those amounts that were vested and accrued.

filed for bankruptcy or WMB was designated "troubled," and the Trust's proposed payments on the SERAP were limited to those amounts that were vested and accrued.

The Trust represents that it has "paid all" ETRIP Based and SERAP components.[38] The ETRIP and SERAP claims made by the Non-Settling Claimants reflect "a discrepancy between the amount claimed by the Claimant and the amount paid by the Trust" and seek unearned compensation pursuant to the termination benefit provision of the contracts.[39] As such, because any additional payments made under the ETRIP Base or SERAP components would be for unearned compensation, such payments remain subject to Part 359.

- Confidential Executive Separation Agreement

One Non-Settling Claimant, John M. Browning, includes a claim for a "Confidential Executive Separation Agreement."[40] The precipitating event giving rise to this agreement was the "end [of] Executive's employment" with WMB.[41] Pursuant to section 2 of the agreement, Mr. Browning's employment would terminate as of December 31, 2008 unless WMB ended his employment earlier.[42] The agreement further holds under sections 6 and 7 that, "[e]ffective December 31, 2008," Mr. Browning was to "relinquish his title of Senior Manager... and any corporate Directorships" and he was to "execute a letter of resignation."[43]

The stated purpose of this agreement was to "offer Executive certain benefits" to "assist Executive in his transition to new employment."[44] Section 4 of the agreement offers a "separation payment . . . comprised of the equivalent of 24 weeks of regular salary [ Redacted ] plus a combined Leadership bonus and Retention bonus in the amount of [ Redacted ]" Section 12 of the agreement informs that "Employer [WMB] does not offer such benefits to all departing employees."[46] The FDIC reaffirms here that payment based on this contract is a "golden parachute" payment subject to regulation under Part 359 because it amounts to unearned compensation payable after WMB's demise.

- Commissions/Sales Incentive Program

One Non-Settling Claimant, John Murphy, has asserted a claim for incentive payments under a "Commissions/Sales Incentive Program."[47] As stated on page 6 of the document "425CRELRelationshipManager FINAL.doc," in order to earn an "incentive," a participant in the Commission Plan had to satisfy several criteria, including:

---

[38] Second Payment Application Appx. Exh. U, fn. 7-8.
[39] Id.
[40] Id. at 16, Exh. M.
[41] Second Payment Application Appx. Exh. M.
[42] Id.
[43] Id.
[44] Id.
[45] Id.
[46] Second Payment Application Appx. Exh. M.
[47] Second Payment Application at 17, Exh. N.

7

Be in an eligible job code and position and in continuous active service from the latter of the beginning of the Measurement Period… A Participant who does not remain in continuous active service will not earn an incentive for the Measurement Period.[48]

The "Washington Mutual 2004 Commercial Real Estate Incentive Compensation Plan" further provides that:

Commissions and incentives are not earned when performance occurs. Rather, commissions and incentives are only earned after a calculation and reconciliation period following the end of the relevant Measurement Period. Commissions and incentives are earned on the Reconciliation Date. Participants have no right or entitlement to commissions or incentives until the amounts are determined and earned on the Reconciliation Date.[49]

Despite the foregoing, the "Washington Mutual 2004 Commercial Real Estate Incentive Compensation Plan" included allowances for "Employment Status Changes" or "Termination of Employment."[50] The "Washington Mutual 2004 Commercial Real Estate Incentive Compensation Plan" instructs that incentives could be prorated even if an employee did not maintain employment through the close of the "Measurement Period" if an employee experienced a status change or was terminated.[51] Since this purported contract calls for payment of unearned compensation contingent on termination, the FDIC reaffirms its previous determination that it is subject to regulation under Part 359.

- Washington Mutual, Inc. Amended and Restated 2003 Equity Incentive Plan

The Second Application provides that "[o]n or about February 18, 2003, WMI's board of directors adopted the Washington Mutual, Inc. Amended and Restated 2003 Equity Incentive Plan (the "Equity Incentive Plan"), pursuant to which certain employees received, among other things, awards of common stock."[52] Under sections 15.3.1 and 15.3.2 of the Equity Incentive Plan, vesting of certain stock benefits would be accelerated upon a "Company Transaction," which is defined to include a merger, consolidation, or any transaction that results in the disposition of substantially all of WMI's assets or securities.[53]

The Second Application ventures that participants in the Equity Incentive Plan would be entitled to receive shares of common stock in WMI if a Company Transaction occurred.[54] Under the Seventh Amended Joint Plan of Affiliated Debtors filed in and confirmed by the Bankruptcy Court, "these shares of common stock in WMI would be converted into shares of stock in the reorganized debtor, WMI Holdings Corp."[55] There is no assigned dollar amount for the benefits

---

[48] Second Payment Application Appx. Exh. N.
[49] Id. The "Washington Mutual 2004 Commercial Real Estate Incentive Compensation Plan" at Exhibit N explains that, the "Reconciliation Date" is "the date after the close of the Performance Period when Washington Mutual determines eligibility and calculates commissions and incentives…."
[50] Id.
[51] Id.
[52] Second Payment Application at 19.
[53] Id. at Exh. R.
[54] Second Payment Application at 19.
[55] Id.

allegedly owed under the Equity Incentive Plan. As set forth previously, the FDIC finds that any payment based on the Equity Incentive Plan is subject to Part 359, in that vesting of those shares accelerated based on WMI's liquidation and/or WMB's failure.

## II. Application of the Decisional Factors in Determining Whether to Exercise Discretion and Permit Otherwise Prohibited Payments

Although the FDIC reaffirms its findings that any payment the Trust would seek to make to the Settling and Non-Settling Claimants are "golden parachute" payments, with certain limited exceptions, that is not the end of the inquiry. Part 359.4(a)(1) grants the FDIC the discretion to approve otherwise impermissible payments to the extent the regulator determines such payments are permissible (the "Permissibility Exception").[56] Section 359.4(b) of Part 359, 12 C.F.R. §359.4(b), sets forth three factors FDIC staff may consider in evaluating whether to permit a golden parachute payment under this exception:

- Degree of the IAP's managerial or fiduciary responsibility;
- Length of the IAP's affiliation with the bank, and the degree to which the payment represents reasonable payment for services rendered over the length of that affiliation; and
- Any other factors or circumstances indicating that the proposed payment would be contrary to the intent of Part 359 or section 18(k) of the FDI Act.

### Degree of Managerial or Fiduciary Responsibilities

*Settling Claimants*

The FDIC previously made individualized findings as to the "managerial and fiduciary" responsibility criteria as to each of the 30 Settling Claimants, concluding that each possessed managerial or fiduciary responsibility, and that this factor weighed heavily in favor of denying the First Payment Application. For the reasons stated in the First Payment Application Determination, the FDIC finds the managerial or fiduciary responsibility of the Settling Claimants supports prohibiting the Trust from making *any* golden parachute payment to them.

*Non-Settling Claimants*

The Second Payment Application raises substantially similar grounds for approval as stated in the First Payment Application, but does not include certifications for the Non-Settling Claimants under 12 C.F.R. § 359.4(a)(4). The FDIC understands that the Trust is not in a position to make section 359.4(a)(4) certifications for the Non-Settling Claimants and/or such claimants are unwilling or unable to provide such certifications. The FDIC, nonetheless, undertook an evaluation of the Non-Settling Claimant's managerial or fiduciary responsibility based on the application materials provided, as set forth below.

---

[56] The Trust does not seek approval under the two other exceptions. 12 C.F.R. § 359.4(a)(2) or (3). The "White Knight" exception at 12 C.F.R. § 359.4(a)(2) is inapplicable as, *inter alia*, neither the Settling Claimants nor the Non-Settling Claimants are "white knights." The "Change in Control" exception at section 359.4(a)(3) cannot be employed to approve any golden parachute resulting from "the insured depository institution being placed into conservatorship or receivership."

Employees of WMI and WMB were classified into "levels," with Level 1 being the highest ranking position. Employees in Level 1 through Level 3 were employed by WMI, with certain limited exceptions. Employees in Level 4, 5 and 6 and higher numbered levels were employed by WMB, with limited exceptions. Level 4 and 5 employees were classified as "Senior Leaders" or "LSL" and were generally the highest ranking employees at WMB. The present application confirms, "substantially all of the dollars associated with the Non-Settling Claimants were for employees in Level 2 through Level 4."[57] As the chart demonstrates below, the significant "managerial or fiduciary responsibility" of 27 of the 38 Non-Settling Claimants is self-evident:[58]

| Claimant | Seniority Level | Title | Salary on Date of Failure |
|---|---|---|---|
| Baker, Todd H | L03 | Executive Vice President – Corp. Strategy & Devel. | Redacted |
| Becketti, Sean | LSL | Division Executive – Capital Markets Research Strategy | Redacted |
| Berens, Henry J. | LSL | Division Executive-Loan Servicing | Redacted |
| Bozzuti, Anthony | LSL | Division Executive – Commercial Technology | Redacted |
| Brooks, Al | L02 | President and COO | Redacted |
| Browning, John M. | LSL | Senior Manager -- Spend Mgmt. Operation | Redacted |
| Cannon, Kimberly A. | LSL | Corporate Human Resources | Redacted |
| Casey, Thomas W. | L02 | Chief Financial Officer | Redacted |
| David, Daryl D. | L03 | Chief HR Officer | Redacted |
| Fortunato, Stephen | LSL | Division Executive- Finance & Risk Mgmt. | Redacted |
| Horvath, Debora D. | L03 | Chief Information Officer | Redacted |
| Malone, Marc | LSL | Division Finance Officer IV | Redacted |
| McMurray, John P. | L03 | Executive Vice President- Chief Enterprise Risk Officer | Redacted |
| Melby, Randy | LSL | Division Executive- General Auditor | Redacted |
| Morgan, Thomas E. | LSL | Division Executive- Home Loans Technology | Redacted |
| Reynoldson, Michael | LSL | Division Executive- HR Service Center | Redacted |
| Roberts, Patricia M. | LSL | Division Executive- HR Business Segment | Redacted |
| Rotella, Stephen J. | L02 | President and COO | Redacted |
| Schneider, David | L02 | President – Home Loans | Redacted |
| Sharma, Chandan | LSL | Division Executive- Supplier Strategy & Mgmt. | Redacted |

---

[57] Second Payment Application at 12.
[58] *See also* Second Payment Application Appx. Ex. U.

| Claimant | Seniority Level | Title | Salary on Date of Failure |
|---|---|---|---|
| Smith, Genevieve | LSL | Chief Marketing Officer | Redacted |
| Tall, Craig E. | L03 | Vice Chair-<br>Business Development | Redacted |
| Thompson, Radha | LSL | Division Executive-<br>HL Production Tech. | Redacted |
| Tierney, Ann | LSL | Senior Credit Officer-<br>Policy/Subpr. | Redacted |
| Vuoto, Anthony | L02 | President WM Card Services | Redacted |
| Williams, Robert J. | LSL | Division Executive-<br>Treasury | Redacted |
| Zarro, Michael R. | LSL | Division Executive-<br>Loans Opts. Strat. | Redacted |

The FDIC finds that each of the 27 Non-Settling Claimants listed above possessed "managerial or fiduciary responsibility." This finding weighs strongly against exercising discretion under the Permissibility Exception to allow payment in any amount with respect to these 27 Non-Settling Claimants. Given their higher-level executive positions, many of these Non-Settling Claimants would have been in a position to make decisions and policies that contributed to WMB's "troubled" condition and WMI's bankruptcy. Included among these 27 Non-Settling Claimants are Stephen Rotella, WMI's President and COO, and David Schneider, WMI's President – Home Lending. Rotella and Schneider promoted WMB's culture of reckless lending, and bore substantial responsibility for the Bank's demise.

Ten of the remaining 11 Non-Settling Claimants were classified in the WMB's next highest grade, "Level 6," and were managers at the failed bank, one Non-Settling Claimant, John H. Murphy, held a "Level 7" position as a "Relationship Manager III – CRE." The application contains no information concerning these claimants' job responsibilities, apart from the claimant's seniority level, job title and department, and annual salary. The FDIC therefore is not in a position to assess the managerial or fiduciary responsibility of these 11 Non-Settling Claimants, and cannot find that this consideration weighs in favor of approving payment to these 11 Non-Settling Claimants.

**Length of Affiliation with the Bank and Reasonableness of Payments for Services Rendered**

12 C.F.R. Part 359.4(b)(2) guides the agency in considering whether to approve otherwise impermissible "golden parachute" payments by asking it to consider the claimant's length of affiliation with the institution, "and the degree to which the proposed payment represents a reasonable payment for services rendered over the period of employment." FDIC guidance makes clear that in evaluating the reasonableness of payment amounts, the Permissibility Exception "should not be viewed as intended to permit golden parachute payments in excess of 12 months' salary."[59]

---

[59] FIL-66-2010, at 8.

*Settling Claimants*

The FDIC previously evaluated the duration of each of the 30 Settling Claimants' employment combined with the proposed payment amounts, and concluded this factor did not significantly weigh in favor of approving the First Payment Application. For the reasons stated in the First Payment Application Determination, the FDIC likewise finds this consideration does not weigh in favor of granting the Trust approval to make golden parachute payments to the Settling Claimants in any amount.

*Non-Settling Claimants*

At the outset, the FDIC notes that the Trust's application does not disclose the duration of the Non-Settling Claimants' affiliation with WMB or WMI, making it impossible for the FDIC to specifically consider the Non-Settling Claimant's length of affiliation with the bankrupt holding company or failed bank. Nonetheless, here, the Trust seeks authorization to make payments to the Non-Settling Claimants in any amount up to the full amount of the disputed claim. The FDIC finds that payment to the Non-Settling Claimants at the full amount of their disputed claims would be unreasonable, given that, as for all of the Non-Settling Claimants, payment in such amounts is well in excess of each Non-Settling Claimant's annual salary, as reflected on the chart below.

| Claimant | Disputed Components | Salary on Date of Failure | Total Disputed Claim |
|---|---|---|---|
| Allison, Susan | WMB CIC Agreement: Redacted<br>Cash LTI Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Bach, Edward | WMB CIC Agreement: Redacted<br>WMB Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Baker, Todd H | WMI CIC Agreement: Redacted<br>WMI Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Becketti, Sean | WMB CIC Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Berens, Henry J. | WMB CIC Agreement: Redacted<br>WMB Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Bjorklund, Robert C. | Wamu Severance Plan: Redacted<br>WMB Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Bozzuti, Anthony | WMB CIC Agreement: Redacted<br>WMB Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |

| Claimant | Disputed Components | Salary on Date of Failure | Total Disputed Claim |
|---|---|---|---|
| Brooks, Al | WMI CIC Agreement: Redacted<br>ETRIP (CIC Component): Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Browning, John M. | WMB CIC Agreement: Redacted<br>Confidential Executive Separation Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Camas, Gregory G. | WMB CIC Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Cannon, Kimberly A. | WMB CIC Agreement: Redacted<br>WMB Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Carlisle, Gregory Alan | WMB CIC Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Casey, Thomas W. | WMI CIC Agreement: Redacted<br>ETRIP (CIC Component): Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| David, Daryl D. | WMI CIC Agreement: Redacted<br>ETRIP (Base Component): Redacted<br>ETRIP (CIC Component): Redacted<br>WMB Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Eschenbach, Andrew J. | WMB CIC Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Fortunato, Stephen | WMB CIC Agreement: Redacted<br>SERAP: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Horvath, Debora D. | WMI CIC Agreement: Redacted<br>ETRIP (CIC Component): Redacted<br>WMI Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Kapoor, Rajiv | WMB CIC Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Lehrberger, Suzanne R. | WMB CIC Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Malone, Marc | WMB CIC Agreement: Redacted<br>Cash LTI Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| McMurray, John P. | WMI CIC Agreement: Redacted<br>ETRIP (CIC Component): Redacted<br>WMI Retention Bonus Agreement: Redacted | Redacted | Redacted |

13

| Claimant | Disputed Components | Salary on Date of Failure | Total Disputed Claim |
|---|---|---|---|
| | Cash LTI Agreement: Redacted<br>WMI Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | | |
| Melby, Randy | WMB CIC Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Morgan, Thomas E. | WMB CIC Agreement: Redacted<br>WMB Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Murphy, John H. | WMB CIC Agreement: Redacted<br>Commissions: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Reynoldson, Michael | WMB CIC Agreement: Redacted<br>WMB Retention Bonus Agreement: Redacted<br>SERAP: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Roberts, Patricia M. | WMB Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Rotella, Stephen J. | WMI CIC Agreement: Redacted<br>ETRIP (CIC Component): Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Schneider, David | WMI CIC Agreement: Redacted<br>ETRIP (CIC Component): Redacted<br>WMI Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Sharma, Chandan | WMB CIC Agreement: Redacted<br>Cash LTI Agreement: Redacted<br>WMB Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Smith, Genevieve | WMB CIC Agreement: Redacted<br>WMB Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Stearns, Steven Kenneth | WMB CIC Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Tall, Craig E. | WMI CIC Agreement: Redacted<br>ETRIP (CIC Component): Redacted | Redacted | Redacted |
| Tauber, Andrew | WMB CIC Agreement: Redacted<br>Cash LTI Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |

| Claimant | Disputed Components | Salary on Date of Failure | Total Disputed Claim |
|---|---|---|---|
| Thompson, Radha | WMB CIC Agreement: Redacted<br>Cash LTI Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Tierney, Ann | WMB CIC Agreement: Redacted<br>Cash LTI Agreement: Redacted<br>SERAP: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Vuoto, Anthony | WMI CIC Agreement: Redacted<br>ETRIP (CIC Component): Redacted<br>ETRIP (Base Component): Redacted<br>WMI Retention Bonus Agreement: Redacted<br>Attorneys' Fees Component: Unliquidated<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Williams, Robert J. | WMI CIC Agreement: Redacted<br>WMI Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |
| Zarro, Michael R. | WMB CIC Agreement: Redacted<br>WMB Retention Bonus Agreement: Redacted<br>Equity Incentive Plan: Redacted shares of restricted stock | Redacted | Redacted |

The FDIC acknowledges that the Trust's request to make payments at lesser amounts (or any amount at all) to the Non-Settling Claimants would fall within an amount less than one year of each of the Non-Settling Claimants' salaries. The FDIC finds, however, the reduction in payment amounts does not weigh significantly in favor towards approving the Application for the following reasons.

First, all but two of the 38 Non-Settling Claimants seek payment under Change in Control Agreements, representing the single largest source of the disputed payments. In addition eight of the highest ranking Non-Settling Claimants seek payment under the Change in Control component of the ETRIP Agreement.[60] Part 359 contains a specific Change in Control exception.[61] Invocation of that exception is prohibited in the event the institution is placed into receivership. In other words, the exception can only be considered if the change in control is due to an open bank transaction. While the consideration of change in control payments is not explicitly prohibited under the Permissibility Exception at 12 C.F.R. § 359.4(a)(1), the FDIC declines to accord weight to the Change in Control agreements or the Change in Control

---

[60] *See* Second Payment Application Appx. Exh. U. Those Non-Settling Claimants are Al Brooks, WMI President Commercial Group, Thomas W. Casey, WMI CFO, Daryl David, WMI Chief HR Officer, Debora Horvath, WMI Chief Information Officer, John P. McMurray, WMI EVP – Chief Enterprise Risk Officer, Stephen J. Rotella, WMI President and COO, David Schneider, WMI President – Home Loans, Craig E. Tall, WMI Vice Chair – Business Development, and Anthony Vuoto.
[61] 12 C.F.R. § 359.4(a)(3)

component of the ETRIP Agreement here given that they are explicitly prohibited in a receivership context under the Change in Control Exception. The amounts claimed under these agreements represent approximately 88% of the aggregate disputed amounts claimed here.[62]

Second, 23 of the 38 Non-Settling Claimants seek payments pursuant to Retention Bonus Agreements, i.e. the Long Term Cash Incentive Agreement or the Retention Bonus Agreement. Many of these agreements were executed in July, August and September 2008, leaving mere months and days to "earn" the retention award prior to the September 25, 2008 failure of WMB and September 26, 2008 bankruptcy of WMI.[63] Indeed, all of the Retention Bonus Agreements executed by the Non-Settling Claimants were executed in 2008.

In addition, many of the Retention Bonus Agreements reviewed provided for a payment of 50% or more of the bonus amount prior to the failure of WMB.[64] For example, Non-Settling Claimant John McMurray executed a Retention Bonus Agreement on March 19, 2008, calling for payment of a cash bonus of [Redacted], fifty percent payable as a lump sum on June 15, 2008, with the remainder payable on January 15, 2009.[65] Non-Settling Claimant Robert Williams executed a Retention Bonus Agreement on March 19, 2008, calling for payment of a cash bonus of [Redacted], fifty percent payable as a lump sum on June 15, 2008, with the remainder payable on January 15, 2009.[66] Non-Settling Claimant Henry J. Berens executed a Retention Bonus Agreement on March 19, 2008, calling for payment of a cash bonus of [Redacted] fifty percent payable as a lump sum on June 15, 2008, with the remainder payable on January 15, 2009.[67] Non-Settling Claimant Kimberly Cannon executed a Retention Bonus Agreement on March 19, 2008, calling for payment of a cash bonus of [Redacted] fifty percent payable as a lump sum on June 15, 2008, with the remainder payable on January 15, 2009.[68] Non-Settling Claimant Thomas Morgan executed a Retention Bonus Agreement on March 19, 2008, calling for payment of a cash bonus of [Redacted], fifty percent payable as a lump sum on June 15, 2008, with the remainder payable on January 15, 2009.[69] Non-Settling Claimant Genevieve Smith executed a Retention Bonus Agreement on March 19, 2008, calling for payment of a cash bonus of [Redacted] fifty percent payable as a lump sum on June 15, 2008, with the remainder payable on January 15, 2009.[70]

In light of these circumstances, crediting the reasonableness of payments sought pursuant to Retention Bonus Agreements would be contrary to the intent of the FDI Act and the Golden Parachute Regulations because the payments contemplated under the Retention Bonus Agreements bear no relation to payment for services rendered over the duration of the Non-Settling Claimants' employment. Instead, these payments represent bonuses awarded to high ranking WMI and WMB executives and managers in the months leading up to WMB's failure.

---

[62] Second Payment Application Appx. Exh. U. The Non-Settling Claimants allege entitlement to $41,198,632 under the Change in Control Agreements and the ETRIP Change in Control Component; the total aggregate disputed claim amount for all Non-Settling Claimants is $46,751,134.

[63] Second Payment Application Appx. Exh. K-2.

[64] *Id.*

[65] Second Payment Application Appx. Exh. J.

[66] *Id.*

[67] Second Payment Application Exh. K-2.

[68] *Id.*

[69] *Id.*

[70] *Id.*

Third, two Non-Settling Claimants assert claims under the Base Component of the ETRIP Agreement, and three Non-Settling Claimants assert claims under the SERAP. But, according to the Application, the Trust has already "paid all" ETRIP Base and SERAP components.[71] It would be inappropriate for the FDIC to exercise its discretion to permit what would effectively be double payments to the Non-Settling Claimants arising out of the largest bank failure in American history.[72] In particular, the FDIC has determined that additional payments to Non-Settling Claimants under the ETRIP Base Component and the Supplemental Executive Retirement Accumulation Plan would be unreasonable in light of the evaluative factors established under Part 359.4(b).

Fourth, 37 of the 38 Non-Settling Claimants assert claims under the Equity Incentive Plan based on purported entitlement to shares of restricted stock. There is no dollar amount, however, assigned to such shares of restricted stock, and consequently no basis for the FDIC to assess the reasonableness of such payments. As such, the FDIC declines to credit the reasonableness of proposed payments based on shares of restricted stock allegedly owed under the Equity Incentive Plan.

Fifth, one Non-Settling Claimant, John Murphy, claims incentive payments allegedly owed under a "Commissions/Sales Incentive Program." However, the document cited makes clear that "participants have no right or entitlement" to such amounts if the employee did not maintain employment with WMB. The FDIC declines to afford significant weight to Mr. Murphy's contingent claim for commissions, given WMB was placed into receivership.

Sixth, one Non-Settling Claimant, John M. Browning, asserts claims under a Confidential Executive Separation Agreement, purporting to terminate his employment effective December 31, 2008, and provide him with 24-weeks of regulatory salary plus a leadership and retention bonus. As discussed above in the context of the Retention Bonus Agreements, the FDIC finds that payments of bonuses and unearned salary in the wake of the largest bank failure in American history is contrary to the intent of the Golden Parachute Regulations.

## Any Other Factors or Circumstances Indicating That the Proposed Payment Would Be Contrary to the Intent of Part 359 or Section 18(K) of The FDI Act

Part 359.4(b)(3) instructs the agency to consider "any other factors or circumstances which would indicate that the proposed payment would be contrary to the intent of section 18(k) or this part."

*Settling Claimants*

The FDIC previously determined that the purposes and intent of section 18(k) and Part 359 would not be furthered by making payments to the Settling Claimants, a factor that strongly supported denial of the Trust's First Payment Application. The FDIC further finds that the purposes of section 18(k) and Part 359 would not be supported by making payment in any

---

[71] Second Payment Application Appx. Exh. U, n.3, 8.

[72] As noted above, FDIC regulations prohibit the payment of change in control benefits when an institution is placed into receivership. *See* 12 C.F.R. § 359.4(a)(3).

amount to the Settling Claimants, for reasons previously stated, and as more fully detailed with respect to the Non-Settling Claimants below.

*Non-Settling Claimants*

In evaluating the criteria specified by Part 359.4(b)(3), the FDIC has fully considered the Trust's justifications for making the payments, the Non-Settling Claimants' arguments that they are exempt from Part 359 by contract or otherwise, and the circumstances behind WMB's failure and resolution. As set forth below, and in the First Payment Application Determination, based on evaluation of these considerations, the FDIC finds that payment to either the Settling or Non-Settling Claimants—in any amount—would be contrary to the intent behind 12 U.S.C. § 1828(k) and Part 359.

*The Global Settlement Agreement and the Seventh Amended Plan*

In assessing the present application, the FDIC fully considered certain Non-Settling Claimants' contentions that the Global Settlement Agreement or the Seventh Amended Plan exempts WMILT and/or the Settling Claimants from application of the Golden Parachute Regulations. After careful consideration, the FDIC has determined that neither the Seventh Amended Plan nor the Global Settlement Agreement provide a discretionary basis to support approval of the present application, or exempt the Non-Settling Claimants or the Trust from the Golden Parachute Regulations' reach.

The instant application recounts that as part of a February 7, 2011 settlement agreement entered into between debtors, JPMC and the FDIC, both in its capacity as the FDIC Receiver and in its corporate capacity, the debtors agreed to pay the FDIC Receiver Eight Hundred Forty-Three Million Nine Hundred Thousand Dollars ($843,900,000.00) (the "Global Settlement Agreement")[73] Under the Global Settlement Agreement, the FDIC agreed to release claims that are "related to, or arise out of or in connection with any of WMI's assets or any assets to be received by WMI."[74] The FDIC further agreed to "support, and otherwise take no action to impede or preclude, the administration of the Debtors' Chapter 11 Cases."[75] The Trust emphasizes that "certain of the Non-Settling Claimants assert that the FDIC waived its rights" to enforce Part 359 given the language it agreed to in the Global Settlement Agreement.[76] The FDIC finds, however, that neither provision cited in the Global Settlement Agreement operates to excuse compliance with the Golden Parachute Regulations, or otherwise provide a basis for concluding that approval of the Application would be consistent with Section 18(k)'s intent. Simply put, the Global Settlement Agreement says nothing about Section 18(k) and Part 359, and does not give WMILT license to violate federal law by making prohibited golden parachute payments.

The Seventh Amended Bankruptcy Plan similarly provides no grounds to evade Part 359. The FDIC specifically finds that the Seventh Amended Plan does not enjoin Part 359 determinations or preclude the agency from exercising its regulatory power to assess civil

---

[73] *See* Second Payment Application at 7.
[74] *Id.*
[75] *Id.*
[76] Second Payment Application at 27.

monetary penalties in accordance therewith. In fact, Section 41.3 of the Plan expressly states that it does not "preclude . . . regulatory agencies from enforcing their police or regulatory powers." Section 35.1 is similarly inapplicable as the accompanying exculpatory provisions there again say nothing to limit the FDIC's ability to determine the propriety of proposed payments pursuant to the Golden Parachute Regulations, and do not immunize WMILT from violations of federal law. Indeed, Section 35.1 explicitly does not apply to acts arising out of "gross negligence" or "willful misconduct."

*2011 D&O Settlement and the Rotella/Schneider Arbitration*

The FDIC also fully evaluated a December 2011 settlement agreement entered into between Kerry Killinger, WMB's former CEO, Stephen Rotella, WMB's former President & COO, and David Schneider, WMB's former chief of home lending, numerous D&O insurers, and the FDIC both in its capacity as the FDIC Receiver and in its corporate capacity, among others (the "2011 D&O Settlement Agreement"). The 2011 D&O Settlement Agreement resolved a professional liability lawsuit the FDIC, as Receiver for WMB, brought against Killinger, Rotella, and Schneider for recklessly implementing a high risk lending strategy that caused WMB billions of dollars in losses (the "D&O Litigation"). Killinger, Rotella and Schneider were in positions most responsible for oversight and implementation of the high risk home lending strategy during the critical years before the bank's failure.

Under the terms of the 2011 D&O Settlement Agreement, the FDIC released "all claims, known or unknown, against, *inter alia,* "Insured Releasees" which includes, in addition to the defendants in the D&O Litigation, "any past, present or future officer, director, trustee, comptroller, governor or employee of WMI or any of its current or former subsidiaries." The 2011 D&O Settlement Agreement further states:

> The FDIC will not pursue administrative enforcement proceedings seeking removal, prohibition, civil money penalties or restitution, or take any other actions seeking relief against Defendants arising out of or relating to their conduct as officers, directors, trustees, comptrollers, governors or employees of the Bank or WMI or any of its current or former subsidiaries.

2011 D&O Settlement Agreement, § III.A. The 2011 D&O Settlement Agreement is silent as to section 18(k) and Part 359—it makes no mention of "golden parachutes" at all.

The FDIC finds that the releases in Section III of the 2011 D&O Settlement Agreement do not exempt any of the Non-Settling Claimants (or even the Trust or the Settling Claimants) from the purview of Part 359. Although the FDIC, in Section III, released "all claims, known or unknown, against . . . the Insured Releasees" (including Defendants), and agreed to refrain from pursuing enforcement proceedings "or take any other action seeking relief" against Rotella and Schneider, this release has no bearing on application of Part 359. Requiring the Trust to comply with section 18(k) and Part 359 is not an affirmative "claim" or "action seeking relief" against Rotella, Schneider or any other officers, directors, trustees, comptrollers, governors or employees of the Bank or WMI or any of its current or former subsidiaries. Nor did the FDIC release its right to file an enforcement action against the Trust. The releases contained in Section III of the

FDIC Settlement have no impact on application of Part 359 and the FDIC's exercise of discretion thereunder.[77]

In addition, as part of the 2011 D&O Settlement Agreement, Rotella and Schneider were required to pursue claims against WMI to which they were "lawfully entitled" and turn over to the FDIC an amount equal to any sums they recovered from their change in control and retention bonus agreements[78] The 2011 D&O Settlement Agreement, at Section V, specifies that Rotella and Schneider "may not compromise, impair, reduce, offset or settle [their] Employee Claims without the express written consent of the FDIC, with such consent not to be unreasonably withheld."[79] The fact that Rotella and Schneider were required to pursue certain claims and turn over to the FDIC amounts of money equal to what they were "lawfully entitled" has no bearing on the agency's determination that the Trust is a "covered company" and that payments based on the underlying contracts are prohibited "golden parachutes." Although Rotella and Schneider pursued private dispute resolution challenging the FDIC's refusal to consent to an alleged settlement of their claims with WMILT, the resulting finding that the FDIC's refusal to consent was "unreasonable" was based solely on the FDIC's contractual right under Section V.A of the Agreement.[80] As the arbitrator made clear, the "FDIC has no further *contractual* right of consent to Rotella/Schneider's settlement of the Bankruptcy Claims."[81] This determination has no impact on the FDIC's *regulatory* authority over the Trust. The arbitrator stated that "[i]t is important to emphasize the limited nature of my decision," and noted specifically that "the FDIC's contention that Rotella/Schneider must comply with Part 359 is irrelevant to my decision."[82] The arbitrator further recognized that the "FDIC has various methods of compelling compliance with its regulations."[83] The FDIC finds the 2011 D&O Settlement Agreement has no effect on the FDIC's discretionary denial of the Trust's application here pursuant to section 18(k) and Part 359.

*The Regulated Entities' Precarious Financial Condition*

The precarious financial position of the Regulated Entities heavily weighs against allowing the Trust to make golden parachute payments *in any amount* to either the Settling Claimants or the Non-Settling Claimants. Financial Institution Letter, FIL-66-2010 instructs that, "[t]he FDIC is unlikely to approve golden parachute payments for institutions that are in a precarious financial position." The FDIC anticipates denial of golden parachute payments in such instances "unless the institution can demonstrate near-term benefits that outweigh the cost of the payments and the payment is otherwise not contrary to the intent of the golden parachute restrictions."

The failure of WMB and bankruptcy of WMI provide overwhelming evidence that both were in a precarious financial condition. In evaluating this consideration, the FDIC is cognizant

---

[77] The FDIC never agreed to release its right to review the Trust payments made to Rotella and Schneider under the Golden Parachute regulations. Rotella and Schneider were two of three WaMu employees named in the D&O Litigation who the FDIC believed were most culpable for the losses the bank incurred.
[78] Second Payment Application at 9.
[79] *Id.*
[80] July 9, 2014 Arbitration Opinion at 4-5.
[81] *Id.* at 6.
[82] *Id.* at 4-5.
[83] *Id.* at 5.

of the Trust's contention that approval is in the Trust's best interest "because there is an inherent uncertainty, delay, and, importantly, expense associated with full litigation of the Settled Claims."[84]  Even if this were true, the FDIC finds the purposes and the intent of section 18(k) and Part 359 are better served by denial of the Trust's application.  It would contravene the intent of the Golden Parachute Regulations if the FDIC were to exercise its discretion to allow the Trust to make special, unearned bonus payments in any amount to managers of the largest bank to fail in American history.

### Termination of Agreements with WMB

As more fully stated in the First Payment Application Determination, the Change in Control Agreements executed with WMB were terminated by operation of law under 12 C.F.R. § 563.39 (renumbered as 12 C.F.R. § 163.39).  In a prior suit against the FDIC as Receiver for WMB, former WMB employees sought payment due under change in control agreements, severance plan agreements, and/or retention agreements.  The FDIC contested such claims and prevailed in court.  In *Williams v. FDIC*, the Western District of Washington determined that WMB employee benefit claims against the FDIC failed as a matter of law under 12 C.F.R. § 563.39 (renumbered as 12 C.F.R. § 163.39), which holds that once a thrift institution is in default, the institution's employment contracts "shall terminate as of the date of default." 09-504 (RAJ) (W.D. Wash. Aug, 30, 2011), aff'd, 492 Fed. Appx. 796 (9th Cir. 2012).  The FDIC finds this consideration weighs in favor of the FDIC's denial of the Trust's application here.

## III.    Conclusion

Section 359.4(b) specifically directs regulators to consider factors and circumstances indicating that the proposed payment would be contrary to the intent of section 18(k) of the FDI Act.  In considering the intent of section 18(k), the FDIC has been guided by the principle that regulatory authority under Part 359 and section 18(k) was meant to prevent financially unstable institutions from awarding inappropriately lucrative benefits.  It remains within the discretion of the appropriate banking agency and the FDIC to assess whether the Proposed Payments would be consistent with the intent of section 18(k) and its regulation of prohibited golden parachute payments.

A reduction in the amount of the Proposed Settlement Payments would not correct the issues cited in the First Payment Application Determination.  Therefore, for the reasons stated, the present application is denied, and the Trust may not make payments to either the Settling Claimants or the Non-Settling Claimants in any amount.

---

[84] Second Payment Application at 24.

If you have any questions, please contact Senior Regional Attorney Kris Brewer at (415) 808-8129.

Sincerely,

Kathy L. Moe
Deputy Regional Director

cc:  Joseph Sano, Regional Counsel, FDIC
     Lori M. Honjiyo, Acting Deputy Regional Counsel, FDIC
     Lisa Villareal, Senior Counsel, Board of Governors of the Federal Reserve System