## EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------x
|  | : |  |
|---|---|---|
| *In re* | : | **Chapter 11** |
|  | : |  |
| **WASHINGTON MUTUAL, INC., et al.,**[1] | : | **Case No. 08-12229 (MFW)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |
|  | : | **Hearing Date: December 19, 2019 at 2:00 p.m. (ET)** |
------------------------------------------------------------x **Obj. Deadline: December 2, 2019 at 4:00 p.m. (ET)**

## NOTICE OF APPLICATION AND HEARING

PLEASE TAKE NOTICE that, on November 14, 2019, WMI Liquidating Trust ("WMILT" or the "Trust"), as successor in interest to Washington Mutual, Inc. ("WMI") and WMI Investment Corp., formerly debtors and debtors in possession (collectively, the "Debtors"), filed the *Application of WMI Liquidating Trust for an Order, Pursuant to section 350 of the Bankruptcy Code Bankruptcy Rule 3022 and Local Rule 3022-1, Authorizing, Among Other Things, (A) Closing the Chapter 11 Cases of Washington Mutual, Inc, and WMI Investment Corp. and (B) Authorizing the Wind-up and Dissolution of the Liquidating Trust* (the "Application") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

PLEASE TAKE FURTHER NOTICE that any objections or responses to the Application must be filed in writing with the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **December 2, 2019 at 4:00 p.m. (prevailing Eastern Time)**.

---

[1]  The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395).  The principal offices of WMILT, as defined herein, are located at 800 Fifth Avenue, Suite 4100, Seattle, Washington 98104.

PLEASE TAKE FURTHER NOTICE that, in the event that one or more objections or responses to the Application are timely filed and not otherwise resolved, the Application will be considered at a hearing before The Honorable Mary F. Walrath at the Bankruptcy Court, 824 North Market Street, 5th Floor, Courtroom 4, Wilmington, Delaware 19801, on **December 19, 2019 at 2:00 p.m. (ET).**

**PLEASE TAKE FURTHER NOTICE THAT IF NO OBJECTIONS OR RESPONSES TO THE APPLICATION ARE TIMELY FILED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE APPLICATION WITHOUT FURTHER NOTICE OR HEARING.**

Dated: November 14, 2018
      Wilmington, Delaware

*/s/ Christopher M. De Lillo*
Mark D. Collins (No. 2981)
Marcos A. Ramos (No. 4450)
Cory D. Kandestin (No. 5025)
Christopher M. De Lillo (No. 6355)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

– and –

Brian S. Rosen
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile:  (212) 969-2900

*Attorneys for the WMI Liquidating Trust*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-------------------------------------------------------------x
                        :

*In re*                      :          **Chapter 11**
                        :

**WASHINGTON MUTUAL, INC., <u>et al.</u>,**[1]    :          **Case No. 08-12229 (MFW)**
                        :

        **Debtors.**          :          **(Jointly Administered)**
                        :

                        :        Hearing Date: December 19, 2019 at 2:00 p.m. (ET)
-------------------------------------------------------------x    Objection Deadline: December 2, 2019 at 4:00 p.m. (ET)

**APPLICATION OF WMI LIQUIDATING TRUST FOR AN ORDER,**
**PURSUANT TO SECTION 350 OF THE BANKRUPTCY CODE**
**BANKRUPTCY RULE 3022 AND LOCAL RULE 3022-1, AUTHORIZING,**
**AMONG OTHER THINGS, (A) CLOSING THE CHAPTER 11 CASES OF**
**WASHINGTON MUTUAL, INC, AND WMI INVESTMENT CORP. AND (B)**
<u>**AUTHORIZING THE WIND-UP AND DISSOLUTION OF THE LIQUIDATING TRUST**</u>

      WMI Liquidating Trust ("<u>WMILT</u>" or the "<u>Trust</u>"), as successor to Washington Mutual,

Inc. ("<u>WMI</u>") and WMI Investment Corp. (collectively, the "<u>Debtors</u>"), hereby moves for entry

of an order, pursuant to section 350 of title 11 of the United States Code (the "<u>Bankruptcy</u>

<u>Code</u>"), Rule 3022 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and

Rule 3022-1 of the Local Rules of Bankruptcy Procedure (the "<u>Local Rules</u>"), authorizing,

among other things, (a) the closing the Debtors' chapter 11 cases, (b) a post-closing mechanism

with respect to undelivered and uncashed distributions, and (c) following a final distribution to

holders of Class 18 Allowed Claims, (i) the wind-up and dissolution of the Trust, including the

making of one or more charitable contributions of remaining Liquidating Trust Assets, and

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395).  The principal offices of WMILT, as defined herein, are located at 800 Fifth Avenue, Suite 4100, Seattle, Washington 98104.  Subsequent to the Effective Date, as defined below, WMI Investment Corp. was dissolved in accordance with applicable law.

(ii) the termination of Kurtzman Carson Consultants LLC ("KCC") as Claims Agent (the "Application"), and respectfully represents as follows:

**Preliminary Statement**

1.      Over eleven years ago, and during the height of the national financial crisis, the Office of Thrift Supervision (the "OTS") closed Washington Mutual Bank ("WMB"), WMI's main subsidiary.  In connection therewith, the OTS appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver for WMB (the "FDIC Receiver"), and advised that the FDIC Receiver was immediately taking possession of WMB's assets.  Immediately after its appointment, the FDIC Receiver sold substantially all of the assets of WMB, including the stock of Washington Mutual Bank fsb, to JPMorgan Chase Bank, N.A. ("JPMC") pursuant to that certain Purchase and Assumption Agreement, Whole Bank, dated September 25, 2008 (the "Purchase Agreement").  In an effort to preserve their remaining value for the benefit of their creditors and equity interest holders, the following day, September 26, 2008, the Debtors commenced their chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  As detailed below, such filings generated significant value for creditors, producing sizeable distributions over the years, and even delivered recoveries for holders of WMI's Preferred and Common Equity Interests pursuant to the Debtors' confirmed chapter 11 plan in the form of shares of common stock of Reorganized WMI, as defined below. [2]

2.      By no means, however, has the road been easy or short.  Rather, initially, it was marred by the competing claims of the Debtors and JPMC to the Debtors' assets, with JPMC

---

[2] Pursuant to subsequent transactions, including the merger of Reorganized WMI and Mr. Cooper, f/k/a Nationstar Mortgage Holdings Inc., and a subsequent one (1) for twelve (12) stock split, as of November 1, 2019, the price per share of Mr. Cooper common stock split, was $12.80.  It must be noted that, although the Debtors have generated a significant recovery, including a recovery for WMI's preferred and common equity interest holders, the Debtors' estates remain unable to satisfy Creditors' claims in full.

asserting that it had purchased certain tangible and intangible assets pursuant to the Purchase

Agreement, including the Debtors' deposits with WMB and numerous federal and state tax

refunds.  Creditor groups, including the statutory committee of unsecured creditors (the

"Creditors Committee") and groups of WMB's bondholders, injected themselves into such

disputes.  Additionally, the Bankruptcy Court directed the Office of the United States Trustee for

the District of Delaware (the "U.S. Trustee") to appoint an equity committee (the "Equity

Committee") to safeguard the interests of WMI's preferred and common equity interest holders.

Ultimately, the Debtors, the Creditors' Committee, JPMC, the FDIC Receiver, the FDIC and

significant creditor constituencies negotiated a compromise and settlement of all outstanding

issues, including the disputed claims regarding ownership of assets.  However, in furtherance of

its perceived directive, the Equity Committee challenged the merits of the proposed

understanding and, with the agreement of all parties, an examiner was appointed to review and

opine on the merits of the compromise and settlement reached.  Even after the examiner's and

the Bankruptcy Court's acknowledgement in the January Opinion and the September Opinion,

each as defined below, that the proposed compromise and settlement therein was fair, equitable

and in the best interests of the Debtors and their chapter 11 estates, the Equity Committee

continued its challenges to confirmation of a chapter 11 plan.  But, with the assistance of a court-

appointed mediator and after limited modifications suggested by the Bankruptcy Court, as well

as the overwhelming acceptance by the Debtors' creditors and equity interest holders, by order,

dated February 23, 2012 (the "Confirmation Order"), the Bankruptcy Court confirmed the

Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States

Bankruptcy Code, dated December 12, 2011, as amended and modified (the "Plan")[3].  The Plan

---

[3] Unless otherwise defined herein, capitalized terms use herein shall have the meanings ascribed thereto in the Plan.

became effective on March 19, 2012 and billions of dollars of cash and Liquidating Trust

Interests were promptly allocated to creditors, and shares of stock in Reorganized WMI were

issued to holders of Preferred Equity Interests and Common Equity Interests.  As noted above, as

of November 1, 2019, the aggregate value of such shares distributed or reserved for distribution

was approximately $213 million.

3.      During the succeeding seven plus years, the Debtors and, thereafter, WMILT,

have reconciled thousands of claims filed against the Debtors' chapter 11 estates and recovered

and/or liquidated assets of the Debtors for the benefit of Creditors.  Specifically, WMILT has

recovered millions of dollars of tax refunds and secured settlements associated with director and

officer liabilities.  Additionally, the Trust's litigation subcommittee investigated potential claims

against various third parties, including WMI's auditor, investment bankers and other

professionals, pursued claims in connection with directors' and officers' duties and obligations

and, thereafter, determined that WMILT maintained no additional claims and causes of action

worth pursuit.  On the liability side, WMILT zealously pursued the reduction of claims in an

effort to generate the greatest recovery for Creditors holding Allowed Claims.  Again, it has not

been an easy task as several of such reconciliation efforts involved protracted litigation,

including one series of litigation that lasted over six years.  But, such efforts have been extremely

successful and, as discussed below, since the Effective Date, the Debtors and WMILT have

already distributed over $983 million to Creditors (thereby paying general unsecured claims in

full) and, with all claims now being reconciled, WMILT currently anticipates a final distribution

(to holders of Allowed Claims within Class 18 of the Plan—the lowest rung of Creditor Claims

on the Court-approved distribution waterfall) in the amount of approximately $35-$40 million, a

recovery of almost eighty-five percent (85%).

111839469v6

4.      As set forth below, the Bankruptcy Court and WMILT have indulged the numerous theories of creditors, equity interest holders and other parties in interest regarding all forms and types of transactions, have responded to all inquiries of every size and shape, and have unearthed and, with the upcoming final distribution to holders of Class 18 Allowed Claims, distributed all of the Debtors' available assets.  Nothing more needs to be done and, upon closure of the Debtors' chapter 11 cases, WMILT does not anticipate the need for the Bankruptcy Court's involvement or assistance nor the need to incur the costs and expenses associated with the ongoing judicial administration of these chapter 11 cases.  Likewise, upon the final distribution being made, the dissolution of the Trust is appropriate.  Such action would alleviate the ongoing incurrence of fees and expenses and, in connection with the final distribution, permit the maximum distribution to be available.

5.      The time has come for the Debtors' chapter 11 cases to conclude.  Accordingly, WMILT respectfully requests that the Bankruptcy Court approve the Application and grant the relief requested herein.

## Background

### A.  The Chapter 11 Cases

6.      On September 26, 2008, each of the Debtors filed with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Pursuant to the Bankruptcy Court's order, dated October 3, 2008 [Dkt. No. 25], the Debtors' chapter 11 cases have been jointly administered pursuant to Bankruptcy Rule 1015(b).

7.      Pursuant to an order, dated October 30, 2008 (the "KCC Order") [Dkt. No. 202], KCC was retained by the Debtors as the official noticing and claims agent for the Clerk of the Bankruptcy Court in connection with the Debtors' chapter 11 cases.

111839469v6

8.      On October 15, 2008, the U.S. Trustee appointed the Creditors' Committee.  On January 11, 2010, the U.S. Trustee appointed the Equity Committee.

9.      On October 6, 2010, the Debtors filed the Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated October 6, 2010, as modified (the "Sixth Amended Plan").  The Sixth Amended Plan was premised on the implementation of that certain Amended and Restated Global Settlement Agreement, dated as of October 6, 2010, by and among the Debtors, JPMC the FDIC, the Creditors' Committee and certain creditor constituents ("the "Initial GSA").

10.     The Bankruptcy Court held hearings to consider confirmation of the Sixth Amended Plan and, upon conclusion thereof, issued an opinion (the "January Opinion") and order which, among other things, found that (a) the Initial GSA, the integral foundation of the Sixth Amended Plan, and the transaction contemplated therein, were fair, reasonable, and in the best interests of the Debtors' creditors and the Debtors' chapter 11 estates, (b) the Debtors were not likely to achieve a significantly better result if they were to continue to litigate the claims resolved pursuant to the Initial GSA, (c) there were difficulties inherent in collecting on account of the Debtor's potential claims against JPMC and the FDIC Receiver, (d) the claims resolved pursuant to the Initial GSA were complex and would be expensive and cause delay to litigate, (e) the Initial GSA provided a reasonable return in light of the possible results of the litigations being resolved, and (f) certain modifications to the Sixth Amended Plan, if made, would enable the Sixth Amended Plan to be confirmed.  Additionally, the Bankruptcy Court expressly noted that, "[a]lthough equity interest holders are not likely to get a recovery, the Court is not convinced that continued litigation, against JPMC and/or the FDIC would change that result." January Opinion, at pp. 66-67.

11.     On February 7, 2011, the Debtors, JPMC and other parties entered into that certain Second Amended and Restated Global Settlement Agreement (the "GSA").  As per the Bankruptcy Court's January Opinion, the GSA modified certain non-economic provisions of the Initial GSA to conform to certain plan related modifications.

12.     On February 8, 2011, the Debtors filed the modified Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of United States Bankruptcy Code, as modified (the "Modified Sixth Amended Plan").  Like the GSA, the Modified Sixth Amended Plan incorporated modifications consistent with the January Opinion.

13.     During July 2011, the Bankruptcy Court held hearings to consider, among other things, confirmation of the Modified Sixth Amended Plan.  By opinion and order, dated September 13, 2011 (the "September Opinion"), the Bankruptcy Court (a) reaffirmed its conclusions that the settlements underlying the Initial GSA, which were then embodied in the GSA, and the transactions contemplated therein were fair and reasonable, (b) ordered that the Bankruptcy Court's ruling with respect to the GSA constituted the "law of the case", and (c) denied confirmation of the Modified Sixth Amended Plan, but identified certain modifications that, if incorporated, would permit confirmation thereof.

14.     In accordance with the September Opinion, the Bankruptcy Court appointed the Honorable Raymond Lyons, then United States Bankruptcy Judge, as mediator, and directed parties to attend mediation in an effort to resolve outstanding issues, including those raised by the Equity Committee with respect to actions of several creditors in connection with the negotiation and documentation of the Initial GSA and the GSA and the subsequent filing of the Modified Sixth Amended Plan (the "Mediation").  As a result of the Mediation, the parties agreed to modifications to the Modified Sixth Amended Plan that resolved all outstanding disputes and formed the basis of the Plan.

7

15.     The Debtors filed the Plan and corresponding Disclosure Statement on December 12, 2011.  Pursuant to an order, dated January 13, 2012 [Dkt. No. 9414], the Bankruptcy Court approved the Disclosure Statement and found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code. In such regard, and in light of the competing interests of the Debtors and JPMC to assets of the Debtors and the resolution thereof pursuant to the GSA, as well as the concerns raised by certain holders of Preferred Equity Holders and Common Equity Holders, the Disclosure Statement contained detailed descriptions of such assets and traced the historical, disposition or dissolution thereof.  A copy of such description from the Disclosure Statement is annexed hereto as Exhibit "A".

16.     Distribution of the Disclosure Statement and related solicitation materials were made in accordance with the provisions of the Disclosure Statement Order, including, without limitation, the mailing to requisite creditors and parties in interest, the publication of notices, and the issuance of press releases by the Equity Committee.  Such efforts were largely successful, as 96.46% (by dollar amount) of holders of Senior Note Claims, 99.71% (by dollar amount) of holders of Senior Subordinated Note Claims, 97.22% (by dollar amount) of holders of PIERS, 87.26% (by dollar amount of liquidation preference) of holders of Preferred Equity Interests, and 63.70% (by number of shares) of holders of Common Equity Interests voted on the Plan.

17.     All classes of Claims and Equity Interests, including, without limitation, Preferred Equity Interests and Common Equity Interests in Classes 19 and 22, voted to accept or, pursuant to stipulations approved by the Bankruptcy Court, were deemed to have accepted the Plan and, in consideration for distributions made or to be made thereunder, granted releases to the Debtors and various third parties.

18.     On February 23, 2012, the Bankruptcy Court entered the Confirmation Order confirming the Plan and authorizing and directing the consummation of the transactions contemplated in the Plan and GSA, including the compromise and settlement regarding the competing claims to ownership of the Debtors' assets.  Incorporated therein were the granting of releases among the respective parties, including the mutual releases among the Debtors, the FDIC and the FDIC Receiver.  Based thereon, the Debtors maintained no additional claims against the FDIC Receiver or the related receivership for any assets and the FDIC and the FDIC Receiver released all claims against the Debtors and their assets.

19.     On March 19, 2012, the Effective Date occurred and the transactions contemplated by the Plan were consummated, including, without limitation, the discharge of the Debtors from any and all Claims and initial distributions of over $6.5 billion being made to holders of Allowed Claims and 195 million shares of Reorganized WMI to holders of Preferred Equity Interests and Common Equity Interests.  Since the Effective Date, additional distributions in the approximate amount of $983 million have been made by WMILT to holders of Allowed Claims, including paying general unsecured claims in full.  Additionally, since the Effective Date, approximately four million additional shares of Reorganized WMI have been distributed from the Disputed Equity Escrow to holders of Preferred Equity Interests and Common Equity Interests.[4]

20.     As reflected in WMILT's 10K for the period ending December 31, 2018 (the "2018 10K"), with the latest distribution of $50 million having been made in February 2019, a final distribution by WMILT shall be made to holders of Allowed Claims in Class 18 of the

---

[4] The share amounts reflected above are amounts prior to the stock splits referred to footnote 2 supra.

Plan.[5]  Specifically, at this time, and as reported in the September 30, 2019 Quarterly Summary

Report filed with the Bankruptcy Court, the Trust's remaining net assets total approximately

$37.8 million (including the Tax Refund, as defined below), with no additional material assets

available,[6] with Class 18 Allowed Claims already in the amount of $38.2 million (plus accrued

post-petition interest in the amount of $9.0 million as of September 30, 2019, for an aggregate

Class 18 liability of $47.2 million).  Accordingly, pursuant to the provisions of the Plan and the

Confirmation Order, other than the shares of equity in the Disputed Equity Escrow to be

redistributed, no additional distributions shall be made to holders of WMI's equity interests in

Classes 19 and 22.

### B.  The Liquidating Trust

21.    Decretal paragraph 25 of the Confirmation Order provides in pertinent part as

follows:

> Liquidating Trust.  On or before the Effective Date, the Liquidating Trust
> Agreement shall be executed by the Debtors or the Reorganized Debtors, as
> applicable, and the Liquidating Trustee.  In addition, the parties shall, without any
> additional or further Court authority, take all other steps necessary to establish the
> Liquidating Trust and the Liquidating Trust Interest therein.  In the event of any
> conflict between the terms of the Plan and the terms of the Liquidating Trust
> Agreement, the terms of the Liquidating Trust Agreement shall govern.

Confirmation Order, ¶25.  In furtherance thereof, on March 6, 2012, the Liquidating Trust

Agreement, a copy of which is annexed hereto as Exhibit "B", was executed and the Liquidating

---

[5] Distributions to holders of Class 18 Allowed Claims may be preempted by the re-filing (prior to closure of the Debtors' chapter 11 cases) of other claims in excess of $400 million, as may be permitted pursuant to a prior order of the Court and the allowance thereof.

[6] WMILT, as successor to WMI, is also a member of a plaintiff class in two LIBOR-related litigations: the ISDAFIX litigation and the US Dollar LIBOR litigation.  WMILT anticipates an award could be up to $1 million but, more likely, would be closer to $25,000.00 (dependent upon the number of responding claimants and the amounts of their respective damages) which, if recovered, will not result in materially different distributions to Creditors.

Trust was formed, with its purpose, as set forth in Section 27.2 of the Plan and Section 1.2 of the

Liquidating Trust Agreement, being to:

> serve as a mechanism for liquidating, converting to Cash and distributing the Liquidating Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

Liquidating Trust Agreement, §1.2.  Accordingly, on the Effective Date, all assets not otherwise

liquidated or distributed to holders of Allowed Claims were transferred to the Trust, together

with all distributions otherwise attributable to Disputed Claims.

22.     Section 27.6 of the Plan provides as follows:

> Role of the Liquidating Trustee:  In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Liquidating Trust Agreement, and the oversight of the Trust Advisory Board, the Liquidating Trustee shall, among other things, have the following rights, powers and duties, in each case subject to the Global Settlement Agreement: …(vi) in the Liquidating Trustee's reasonable business judgment, to object to claims and manage, control, prosecute, and/or settle on behalf of the Liquidating Trust, objections to Claims on account of which the Liquidating Trustee (as Disbursing Agent) will be responsible (if Allowed) for making distributions under the Plan….

Plan, §27.6.

23.     Likewise, with respect to the authority of the Liquidating Trustee, Section 6.2 of

the Liquidating Trust Agreement, entitled Powers of the Liquidating Trustee, subsections (iii)

and (vi), provide for the following authority:

> (iii) in the Liquidating Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action, Claims or litigation of the Liquidating Trust, including, without limitation, Avoidance Actions;

> \*                    \*                    \*

> (vi) in the Liquidating Trustee's  reasonable business judgment, to object to Claims, and manage, control, prosecute, and/or settle on behalf of the Liquidating Trust, objections to Claims on account of

> which the Liquidating Trustee (as Disbursing Agent)  will be
> responsible (if Allowed) for making distributions under the Plan;…

Liquidating Trust Agreement, §§6.2 (iii) and (vi).

24.     Pursuant to Section 27.14(d) of the Plan and Section 3.2 of the Liquidating Trust Agreement, the term of the Trust was for three (3) years subject to the right to extend such term for an additional three (3) years upon motion and entry of an order of the Bankruptcy Court.  By order, dated January 23, 2015 [Dkt. No. 11960], such initial term was extended until March, 2018.  However, due to the ongoing nature of the claims reconciliation process and outstanding litigation, including extensive employee claims litigation, on November 21, 2017, WMILT subsequently obtained a favorable private letter ruling from the IRS, and a corresponding order of the Bankruptcy Court, dated December 20, 2017 [Dkt. No. 12444], confirming that the extension of the term of the Trust until March, 2021 would not disqualify the Trust from "liquidating trust" status.

25.     As noted above, the Trust is governed by the provisions of the Liquidating Trust Agreement and its actions are effectuated by the Trust Advisory Board, the Liquidating Trustee and WMILT's officers and employees.  In accordance with Section 6.4 of the Liquidating Trust Agreement, the Trust Advisory Board was initially comprised of ten (10) members, with three (3) members being selected by the Creditors' Committee, four (4) members being selected by the Equity Committee, one (1) member being selected by the Creditors' Committee, but approved by the Equity Committee, one (1) member being selected by Tricadia Capital Management and one (1) *ex officio* member selected by Holdco Advisors, L.P.  Such section, and, as reflected in Recital RR of the Confirmation Order, "to address the concern of the Court that the composition of the Trust Advisory Board should change once creditors have been paid in full," see Confirmation Order, Recital RR, p. 40, further provides that, as distributions are made pursuant

to the Plan, and tranches of claims are paid in full, the membership of the Trust Advisory Board would be modified to reflect the then-current economic interests of the Debtors' creditors and equity interest holders.[7]

26.     As reflected in the 2018 10K, based upon the aforementioned payments and staggering of positions, the Trust Advisory Board is currently comprised of seven (7) members, as follows:  (a) three (3) members selected by the Creditors' Committee, with one such member, Thomas Korsman, being designated by Wells Fargo Bank, N.A., (b) three (3) members selected by the Equity Committee, with one such member, Joe McInnis, named by TPS Funds, and (c) one (1) member selected by the Creditors' Committee and approved by the Equity Committee. The Trust Advisory Board elected not to fill a vacancy following the resignation of a member selected by the Creditors' Committee.  2018 10K, p. 25.  The current members of the Trust Advisory Board are Messrs. Cantor, Kastenbaum, Kirschner, Korsman, McInnis, Southard and Willingham.[8]  2018 10K, p. 25-26.  Pursuant to Section 1.143 of the Plan, Mr. William Kosturos was appointed as Liquidating Trustee and continues to serve in such capacity today.

27.     In accordance with the provisions of the Plan and the Liquidating Trust Agreement, during the post-Effective Date period, WMILT has satisfied all tax obligations to date related to the Disputed Claims Reserve, including, without limitation, filing all tax returns and other documents as may be required and making all payments on account of income generated by the funds and Liquidating Trust Interests in the Disputed Claims Reserve from time

---

[7] Due to the possible re-filing of a proof of claim in accordance with a Bankruptcy Court-approved stipulation, which, if filed, would have significantly altered potential claims within the distribution waterfall, the composition of the Trust Advisory Board has not been altered.

[8] Pursuant to the Liquidating Trust Agreement, certain members of the Trust Advisory Board served on a litigation subcommittee.  In that role, such members and its professionals, the former counsel to the Equity Committee, investigated and, to the extent viable, pursued claims and causes of actions on behalf of the Trust and its beneficiaries.

to time.  Additional tax returns will need to be filed post-closing of the Chapter 11 Cases and in connection with the anticipated wind-up and dissolution of the Trust.[9]  Likewise, in connection with the upcoming distribution from the Disputed Equity Escrow, the Plan-created escrow to reserve shares of stock of Reorganized WMI pending claim reconciliation, WMILT has submitted requests to the IRS pursuant to section 505 of the Bankruptcy Code for a determination as to whether WMILT has satisfied its outstanding tax obligations.

C.    **Plan Distributions**

28.    Since the Petition Date, the Trust Advisory Board and the Liquidating Trustee have overseen the above-referenced distributions of over $983 million (as of September 30, 2019).

29.    In connection with making such distributions, from time to time, and due to, among other things, incomplete contact information provided by creditors, certain distributions have been returned to WMILT as unable to be delivered or, in other circumstances, delivered but "unclaimed" or "uncashed."  To address these occurrences, Section 31.6 of the Plan provides in pertinent part as follows:

> (a)    (1)    Holding of Undeliverable Distributions by the Disbursing Agent. If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable.  All Entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind.  Nothing contained in the Plan shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claims or Equity Interest.

---

[9] Other than as relates to the Disputed Claims Reserve, WMILT is a "grantor trust" and, as such, all income and expense is allocated and reported to the beneficiaries of the Trust.  Upon the final distribution being made, a final allocation shall be provided.

(2)     Holding of Undeliverable Distributions by the Liquidating Trustee.  In connection with distributions to be made pursuant to the Liquidating Trust Agreement, an "undeliverable" distribution shall include, without limitation, a check that is sent to a holder in respect of a distribution to such holder, which check has not been negotiated within six (6) months following the issuance thereof.  Subject to the provisions of Section 31.6(c) of the Plan, if any distribution to a holder of a Liquidating Trust Interest is undeliverable, no additional distribution shall be made to such holder unless and until the Liquidating Trustee (or its duly authorized agent) is notified, in writing, of such holder's then-current address.  Undeliverable distributions shall remain in the possession of the Liquidating Trustee (or its duly authorized agent) until such time as a distribution becomes deliverable or as set forth in Section 31.6(b) of the Plan.  All Entities ultimately receiving an undeliverable distribution shall not be entitled to any interest or other accruals of any kind on account of the delay in payment resulting from the undeliverable status of such distribution.  Except as required by law, the Liquidating Trustee (or its duly authorized agent) shall not be required to attempt to locate any holder of a Liquidating Trust Interest.

(b)     Failure to Claim Undeliverable Distributions.  If (i) a check is sent, by either the Disbursing Agent or the Liquidating Trustee, to a holder in respect of distributions and such check is not negotiated within six (6) months following the date on which such check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Disbursing Agent or the Liquidating Trustee, as the case may be, (or their duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the Effective Date, with respect to all Allowed Claims as of the Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, file a list with the Bankruptcy Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof.  Any holder of an Allowed Claim or Entity Interest on such list that does not identify itself and assert its rights pursuant to the Plan to receive a distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan, against the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee, the Trustees, or their respective professionals, agents, or property.  In such case, the Liquidating Trustee is authorized to permanently remove such holder and its corresponding Claim and/or Trust Interest from such trustee's books and records and any consideration held for distribution on account of such Allowed Claim or Equity Interest shall revert to such trustee for redistribution to holders of Liquidating Trust Interests in accordance with the terms and provisions hereof.

Plan, § 31.6. See also, Liquidating Trust Agreement, § 4.4.

30.     Over the course of the Debtors' chapter 11 cases, as noted above, numerous

distributions have gone either undistributed due to dated contact information (including no

forwarding addresses) or, in the case of distributions of checks, uncashed or non-negotiated instruments.  In accordance with Section 31.6(b) of the Plan, WMILT has filed notices with the Bankruptcy Court setting forth the names of Entities for which distributions have been made and have either been returned or not negotiated.  In the event contacted, consistent with its obligations, WMILT has forwarded a subsequent distribution to such Entity.  If not contacted, however, WMILT has redistributed such distribution to other Creditors in subsequent distributions, has removed such Entity from the distribution procedures and such Entity has been barred from the receipt of any further distributions.

31.     With a final distribution to be made and based upon the number of recipients to receive such distribution in excess of six thousand (6,000) Entities, it is possible that some of these distributions may be "undelivered" or go "unclaimed" or "uncashed" [10].  And, with the chapter 11 cases being closed, and, therefore, WMILT being unable to file a list with the Bankruptcy Court, in such event, WMILT proposes that, one hundred twenty (120) days following such distribution, WMILT (a) publish a notice, the form of which is annexed hereto as Exhibit "C", in The Seattle Times, and (b) post a list on the WMILT website, www.wmitrust.com, which list shall remain posted for a period of thirty (30) days, notifying any such parties of their entitlement and the potential loss of recovery.  Thereafter, to the extent unclaimed, and due to the *de minimis* amount of such distribution and the inability to make a reallocation and distribution pursuant to the terms of the Plan, WMILT proposes to donate any such distributions for charitable purposes.

---

[10] Since the Effective Date, WMILT has taken several actions to reduce the possibility that distributions are not delivered, including updating address databases through letters being sent to holders, searching public databases to obtain updated information and seeking updated tax information.

111839469v6

**D.**     **Remaining Assets to be Recovered**

32.     As noted above, at this time, the remaining net Trust assets are approximately

$37.8 million, with Class 18 Allowed Claims in the amount of $38.2 million, plus accrued post-

petition interest thereon in the amount of $9.0 million as of September 30, 2019, or an aggregate

amount of $47.2 million.  The net assets of the Trust are comprised of cash and/or cash

equivalents with the exception of one remaining tax refund, as discussed immediately below.

33.     WMILT has a pending tax refund claim from the State of Washington Department

of Revenue (the "DOR") in the approximate amount of $4.3 million (the "Tax Refund"), relating

to Business & Occupancy ("B&O") taxes for the tax years 2004 and 2005.  While the DOR and

WMILT have agreed on the entitlement to and the amount of the Tax Refund, due to DOR

concerns regarding potential competing claims to the Tax Refund, payment has been delayed.

However, recently, the FDIC Receiver and JPMC have acknowledged that the Tax Refund is the

property of WMILT.

**E.**     **The Griffin Appeal and Motion to Withdraw the Reference**

34.     On March 22, 2019, Alice Griffin filed that certain First Omnibus Objection

(Substantive) of Alice Griffin, Class 19 Interest Holder, to Claims (Nos. 3935 and 4045)

Allowed Pursuant to a Stipulation Dated March 28, 2013 Between WMI Liquidating Trust and

Morgan Stanley & Co., Incorporated, Credit Suisse Securities (USA) LLC, and Goldman, Sachs

& Co., on Behalf of Themselves and Certain Underwriters [Dkt. No. 12595] (the "Griffin

Objection").  Therein, Ms. Griffin asserted, among other things, that (a) the terms of the

underlying stipulation (the "Underwriter Stipulation") required Bankruptcy Court approval and

such approval was never sought or obtained, (b) WMILT failed to disclose the existence of such

stipulation in violation of applicable securities laws, (c) the Plan did not permit the allowance

and treatment of Claims in the manner contained in the stipulation, and (d) if any Claim were

17

allowed, distributions with respect thereto were more appropriately allocated to Class 22 of the

Plan (Common Equity Interests) and not Class 19 (Preferred Equity Interests), the class

containing Ms. Griffin's interests.  WMILT responded to the Griffin Objection on April 12, 2019

(the "WMILT Response") [Dkt. No. 12604], refuting each of the contentions raised in the Griffin

Objection, including illustrating the detailed disclosure of the stipulation in multiple public

filings and in accordance with applicable securities laws and the benefits delivered by holders of

Class 19 Preferred Equity Interests.  Ms. Griffin filed a reply on April 17, 2019 [Dkt. No.

12609], (the "Griffin Reply").

35.     The Bankruptcy Court held a hearing to consider the Griffin Objection, the

WMILT Response and the Griffin Reply on April 22, 2019 (the "Griffin Hearing"), and, based

upon the findings made on the record of the Griffin Hearing, by order, dated April 24, 2019, the

Bankruptcy Court denied the Griffin Objection in its entirety [Dkt. No. 12619] (the "Griffin

Order").  Specifically, the Bankruptcy Court determined that (a) there had been full and complete

disclosure of the Underlying Stipulation upon entry thereof, (b) Ms. Griffin was barred from

challenging the Underlying Stipulation based upon the doctrine of laches and (c) most

importantly, if the Trust had requested Bankruptcy Court approval of the Underlying Stipulation,

the Bankruptcy Court believed that the compromise and settlement set forth therein was in the

best interests of the Debtors, their Creditors and, especially, holders of Preferred Equity Interests,

as it removed a senior $24 million claim which would have had to be paid in full prior to

distributions being made to holders of Preferred Equity Interests, and it would have approved

any such request.  Tr. of Griffin Hearing, pp. 41:9-45:8.

36.     Pursuant to a notice of appeal, dated April 29, 2019 [Dkt. No. 12624] (the

"Griffin Appeal"), Ms. Griffin has appealed from the Griffin Order.  The merits of such appeal

have been fully briefed to the United States District Court for the District of Delaware (the "District Court") and the matter is *sub judice*.

37.     On October 31, 2019, Ms. Griffin filed a motion (the "Griffin Motion") seeking to withdraw the reference from the Bankruptcy Court in an effort to preclude this Court from considering this Application and entering an order granting the relief requested herein.  In support thereof, Ms. Griffin contends that this Court has already indicated an inclination to grant the Application, when this Court has only mentioned that it would schedule a hearing, see Tr. of Status Conference, dated September 26, 2019, p. 12:15-13:2, and that, if granted and Ms. Griffin were successful with respect to the Griffin Appeal, Ms. Griffin would be required to become familiar with new aspects of law and courts and that the time and expense of doing so would be unduly burdensome for her.  Ms. Griffin further indicated that the Griffin Appeal related to alleged violations of the Plan, breaches of fiduciary duty and *ultra vires* acts and, if the Griffin Appeal were successful, Ms. Griffin contends that the Court would be required to address all such claims.

38.     Of course, none of the foregoing issues are part of the Griffin Appeal.  As mentioned above, the sole issue being considered by the District Court is whether this Court erred as a matter of law in connection with the entry of the Griffin Order and was clearly erroneous when it made its findings of fact in connection therewith.  Contemporaneously herewith, WMILT has filed an objection to the Griffin Motion.

F.     **Ongoing Costs of the Chapter 11 Cases**

39.     Administration of the Debtors' chapter 11 cases and the ongoing nature of the Trust causes the incurrence of significant costs and expenses to the Debtors' estates.  As reflected in WMI's 2018 10K, based upon projected estimates as of December 31, 2018 for the then-current conditions of the Debtors' chapter 11 cases and the anticipated term of the Trust,

19

WMILT management estimated total expenses for the remainder of the Trust through March 19, 2021 to be approximately $16.1 million.  Included therein were (a) U.S. Trustee fees, (b) KCC fees, (c) fees and expenses associated with compliance with securities laws, and (d) other fees and expenses of the Liquidating Trust.

### G.    Limited Bankruptcy Court Involvement

40.    As the Bankruptcy Court is acutely aware, over the past seven years, the majority of WMILT's actions (and the Bankruptcy Court's involvement) have been associated with the recovery and/or liquidation of remaining assets and the reconciliation of claims -- most notably, with respect to the litigation of employee related claims seeking payments associated with, among other documents and instruments, change of control agreements and other benefits.  Such litigation involved applications for authority to make "golden parachute payments" being filed with, considered by and rejected by the FDIC, and actions being filed in multiple courts, including the United States District Court for the Western District of Washington, the United States District Court for the District of Columbia, the United States District Court for the District of Delaware and ultimately, the Bankruptcy Court.  Parties included WMILT, the FDIC and former officers and employees of the Debtors and asserted claims exceeded, at their height, over $100 million.[11]  With the Bankruptcy Court's confirmatory Memorandum Opinion, dated February, 1, 2019 [Dkt. No. 12584], and order, dated February 1, 2019 [Dkt. No. 12585], in February 2019, approximately $50 million (of the $68.4 million remaining in the Disputed Claims Reserve on account of such Claims) was distributed to holders of Allowed Claims and, in accordance with the waterfall provisions of the Plan, entitling holders of the Claims in Classes

---

[11] Based upon orders of the Bankruptcy Court, such amounts were reduced pursuant to the limitations set forth in section 502(b)(7) of the Bankruptcy Code.

111839469v6

17B (Section 510(b) Subordinated WMB Notes Claims) and 18 of the Plan to receive

distributions. After giving effect to such distribution, the balance of cash then held in the

Disputed Claims Reserve was released to WMILT and recorded on its financial statements as an

unencumbered asset to be used for a future distribution. However, based upon releases provided

pursuant to the Plan, stipulations and settlement agreements and distributions previously

received, all parties within Class 17B (Section 510(b) Subordinated WMB Notes Claims) have

waived their rights to distributions, entitling holders with Class 18 to the final distribution

pursuant to the Plan. Beyond this, the Bankruptcy Court and WMILT have merely waited for the

final reconciliation of remaining claims and monetization of assets.

## Proposed Trust Amendments

41.     As described below, pursuant to this Application, WMILT seeks, among other

relief, authority to wind-up and dissolve the Trust following the contemplated final distribution

and, in connection therewith, (a) to reserve such funds as are necessary for such wind-up and

dissolution, and (b) consistent with the provisions of the Plan and the Confirmation Order, to

donate any remaining Liquidating Trust Assets to one or more qualified charitable organizations.

Prior to doing so, however, WMILT intends to make certain modifications to the Liquidating

Trust Agreement in accordance with its terms. Specifically, pursuant to Section 9.9 of the

Liquidating Trust Agreement, any provision of the Liquidating Trust Agreement may be

amended or waived by the Liquidating Trustee with the consent of all voting members of the

Trust Advisory Board provided that any such amendment or waiver is not inconsistent with the

purpose and intention to liquidate in an expeditious but orderly manner the Liquidating Trust

Assets in accordance with applicable Treasury Regulations.

42.     As noted above, WMILT anticipates making its final distributions to creditors in

the first quarter of 2020, leaving WMILT with funds necessary for the dissolution and wind-up

of WMILT (including for the potential of ongoing litigation)[12] and, thereafter, for the contribution to one or more charitable organizations.  In connection with such wind-up and dissolution, the Liquidating Trustee, with the full support and consent of the Trust Advisory Board, intends to amend or waive certain provisions of the Liquidating Trust Agreement, one or more of which are discussed below.

### 1.     **Books and Records**

43.     Pursuant to Section 3.3 of the Liquidating Trust Agreement, upon the distribution of all Liquidating Trust Assets,

> the Liquidating Trustee shall retain the books, records and files that shall have been delivered to or created by the Liquidating Trustee.  At the Liquidating Trustee's discretion, all of such records and documents may be destroyed at any time that is six (6) years after the final distribution of the Liquidating Trust Assets, subject to any joint prosecution and common interest agreement(s) to which the Liquidating Trustee may be party.

Liquidating Trust Agreement, Section 3.3.  See also, Liquidating Trust Agreement, Section 4.10. Rather than reserving significant funds necessary to preserve books and records for an additional six (6) years, especially because WMILT has already preserved all such books and records (including those of the Debtors) for almost eight (8) years, pursuant to Section 9.9 of the Liquidating Trust Agreement, the Trust Advisory Board shall amend the Liquidating Trust Agreement, to remove the obligation to further preserve such books and records no earlier than one (1) year following the dissolution and wind-up of WMILT.

---

[12] As noted below, the Griffin Appeal, as defined below, has been fully briefed and has been submitted to the District Court for determination.  WMILT submits that the pendency of the Griffin Appeal does not affect the Court's ability to consider the Application and the relief requested herein.  Additionally, on October 31, 2019, Ms. Griffin filed the Griffin Motion seeking an order withdrawing the reference pursuant to 28 U.S.C. § 157(d) so as to preclude this Court from considering the Application.  Contemporaneously herewith, the Trust has objected to the Griffin Motion and submits that, similar to the other theories espoused by Ms. Griffin, such motion has no basis in law or fact.

2. **Trust Advisory Board/Administrators**

44.     With the closing of the Debtors' chapter 11 cases and the final distribution being made, the Trust Advisory Board and the Liquidating Trustee will have completed all of their respective duties and responsibilities.  Accordingly, it would be appropriate for the Trust Advisory Board to be released from further responsibilities and to replace such individuals with administrators to complete the wind-up and dissolution of the Trust.

45.     Since the Effective Date, Charles Edward Smith and Doreen Logan have served as officers of WMILT, together with the Liquidating Trustee, developed all information for and facilitated all public filings, and are aware of the many issues that have confronted WMILT.  The Liquidating Trust Agreement shall be amended to provide for the appointment of Mr. Smith and Ms. Logan as administrators to complete the wind-up and dissolution of the Trust and to release the Trust Advisory Board and the Liquidating Trustee from obligations in connection therewith.

## Relief Requested

46.     WMILT requests that the Bankruptcy Court enter an order, pursuant to section 350 of the Bankruptcy Code, Bankruptcy Rule 3022 and Local Rule 3022-1, (a) closing the Debtors' chapter 11 cases, (b) establishing a post-closing mechanism with respect to undelivered and uncashed distributions, and (c) following a final distribution to holders of Class 18 Allowed Claims, (i) authorizing the wind-up and dissolution of the Trust, including the making of one or more charitable contributions of remaining Liquidating Trust Assets, and (ii) terminating KCC as Claims Agent.

**The Chapter 11 Cases Should Be Closed and Procedures
Approved in Connection with the Wind-Up and Dissolution of WMILT**

A.    The Chapter 11 Cases Have Been Fully Administered and Should Be Closed

47.    Section 41.23 of the Plan provides that the "Liquidating Trustee shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court." Plan, §41.23.

48.    Section 350 of the Bankruptcy Code, entitled Closing and Reopening Cases, provides in pertinent part as follows:

> (a)    After an estate is fully administered and the court has discharged the trustee, the court shall close the case.

Bankruptcy Code, §350(a).  Likewise, Bankruptcy Rule 3022 provides as follows:

> Final Decree In Chapter 11 Reorganization Case.  After an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case.

Bankruptcy Rule 3022.  Additionally, Local Rule 3022-1(a) provides:

> Upon written motion, a party in interest may seek the entry of a final decree at any time after the confirmed plan has been filly administered provided that all required files due under 28 U.S.C. § 1930 have been paid.  Such motion shall include proposed final decree order that (i) order the closing of the case and (ii) identifies in the caption and body of the order the case name and the case number of each case to be closed under the order.  Del. Bank L.R. 3022-1(a).

49.    The term "fully administered" is not defined in the Bankruptcy Code, the Bankruptcy Rules or the Local Rules.  Notwithstanding, in determining whether an estate has been fully administered for final decree purposes, courts have frequently considered the following non-exhaustive factors set forth in the Advisory Committee's note to the 1991 amendment to Bankruptcy Rule 3022:

24

      (a)     Whether the order confirming the plan has become final;

      (b)     Whether deposits required by the plan have been distributed;

      (c)     Whether the property proposed by the plan to be transferred has been transferred;

      (d)     Whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan;

      (e)     Whether payments under the plan have commenced; and

      (f)     Whether all motions, contested matters, and adversary proceedings have been finally resolved.

Bankruptcy Rule 3022, Advisory Committee Notes (1991).  In re SLI, Inc., et al., 2005 WL 1668396, 44 Bank. Ct. Dec 281 (D. Del 2005).  See also, In re Ginko Associates, L.P., 2009 WL 2916917 (E.D. Pa. 2009).  But, these factors are but a guide in determining whether a case has been fully administered, and not all factors need to be present before a case is closed.  In re Valence Technology, Inc., 2014 WL 5320632, 60 Bank Ct. Dec. 49 (W.D. Tex. 2014).  See, e.g., In re Union Home & Indus., Inc., 375 B.R. 912, 917 (10th Cir. BAP 2007) (a party need not demonstrate all factors before a case is closed); In re Provident Fin. Inc., 2010 WL 6259973, at *9 (9th Cir. BAP 2010), aff'd, 2012 WL 172887 (9th Cir. Jan. 17, 2012) (bankruptcy courts have flexibility in determining whether a case is fully administered).  A court should review each request on a case-by-case basis.  In re Ginko Assoc., L.P., WL 2916917, at *2 (E.D. Pa. 2009).

      50.     In reviewing the Debtors' chapter 11 cases, it is patently apparent that these cases have been "fully administered" and that they should be closed.  As noted above, since the Petition Date, the Debtors and WMILT have taken all necessary steps to gather the Debtors' assets, reconcile claims and make distributions in accordance with the terms and provisions of the Plan.  Generally speaking, such actions have included, among many others, (a) engaging in significant litigation with the FDIC, the FDIC Receiver and JPMC in an effort to determine the

property of the Debtors' chapter 11 estates, (b) compromising and settling such issues pursuant to the GSA, (c) participating in Bankruptcy Court-ordered mediation to resolve outstanding claims asserted by the Equity Committee, (d) confirming and consummating the Plan, (e) gathering and/or liquidating the Debtors' assets, and (f) reconciling all remaining Claims, including litigating and resolving employee-related Claims subject to "golden parachute regulations."

51.     Applying the non-exhaustive six Advisory Committee factors, it is expressly clear that these cases have been fully administered: (a) the Confirmation Order is final; (b) all deposits, to the extent required by the Plan, have been distributed; (c) all property was transferred to the Trust on the Effective Date; (d) the Trust assumed responsibility for the reconciliation of claims and distribution of assets in the liquidating chapter 11 cases; (e) payments commenced being made pursuant to the Plan; and (f) all motions, contested matters and adversary proceedings, other than the Griffin Appeal, have been finally resolved.  But, as noted above, the Adversary Committee's "six factors" are non-exhaustive and not every factor must be satisfied in order to close a case.  Indeed, most notably, courts have held that the existence of a pending matter is an insufficient reason to deny closure of a chapter 11 case as it does not necessarily mean that a case has not been "fully administered".  See In re Union Home and Indus., 375 B.R. 912, 918 (10th$^h$ Cir. BAP 2007).

52.     Here, closing of the Debtors' chapter 11 cases will not prejudice any party and, actually, will inure to the benefit of Class 18 Creditors, as it will permit WMILT to maximize amounts available for distribution by reducing ongoing costs of administration of the chapter 11 cases and, thereby, permit the release of amounts otherwise reserved for future administration of the Trust.  Specifically, costs saved would include public reporting fees, U.S. Trustee fees,

WMILT operational infrastructure, professional fees and expenses, costs associated with tax payment preparations and expenses related to document retention.

53.     Additionally, the pendency of the Griffin Appeal is not an impediment to closure of the Debtors' chapter 11 cases.  First, it must be noted that, no court has granted a stay of the effectiveness of the Griffin Order, nor has Ms. Griffin even sought to do so.  The recently-filed motion to withdraw the reference is not a request for a stay with respect to the Griffin Appeal. Rather, it is an effort to enjoin this Court from acting upon this Application because of this Court's statement that it would schedule a hearing to consider this Application and the relief requested herein.  Nowhere did this Court state what position it would take with respect to the Application.  WMILT submits that the latest request is inappropriate and, as mentioned above, has filed an objection in connection therewith.  If this Court were to grant this Application, Ms. Griffin would certainly be entitled to take an appeal from any such order and seek to stay the effectiveness thereof.  Conversely, if the relief requested herein were not granted, Ms. Griffin similarly has suffered no prejudice.

54.     Second, and as courts have observed in connection with other "closing" applications, see, e.g., In re Valence Technology, Inc., 60 Bankr. Ct. Dec. 49, 51 (Bankr. W.D. Tex 2014), in the event the Griffin Appeal were successful, and WMILT submits it will not, there is always the opportunity to reopen the Debtors' chapter 11 cases in order to provide appropriate relief to the Debtors and any other party or for other cause.

B.  Dissolution of the Liquidating Trust

55.     Section 27.14(d) of the Plan and Section 3.2 of the Liquidating Trust Agreement provide for the dissolution of the Liquidating Trust.  Specifically, Section 3.2 of the Liquidating Trust Agreement provides in pertinent part as follows:

If at any time the Liquidating Trustee determines, in reliance upon such Trust Professionals as the Liquidating Trustee may retain, that the expense of administering the Liquidating Trust so as to make a final distribution to the Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidating Trust, (ii) donate any balance to a charitable organization (A) of the type described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) that is not a "private foundation", as defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtors, the Reorganized Debtors, the Liquidating Trust, and any insider of the Liquidating Trustee, and (iii) dissolve the Liquidating Trust.  Upon receipt of such authority from the Bankruptcy Court, the Liquidating Trustee shall (X) notify each Liquidating Trust Beneficiary, (Y) file a Certificate of Cancellation with the Secretary of State of the State of Delaware and (Z) provide a copy of the evidence of such cancellation to the Resident Trustee.

Liquidating Trust Agreement, §3.2

56.    Based upon current projections, and with a final distribution projected to being made to Creditors no later than the first quarter of 2020 (subject to the rights with respect to "undelivered" or "uncashed" distributions), WMILT anticipates that administrative obligations to wind-up and dissolve the Trust shall continue through calendar year 2020.  Such activities shall include the final disposition of all assets and the preparation and filing of appropriate tax returns.  In accordance with the Plan and section 505(b) of the Bankruptcy Code, WMILT recently filed with the IRS several requests for prompt determinations as to any unpaid tax liabilities with respect to the Disputed Claims Reserve and the Disputed Equity Escrow.  The time period for the IRS to respond to the request related to the Disputed Claims Reserve has expired and no action was requested by the IRS.  The time period related to the Disputed Equity Escrow request has not expired and the IRS has not taken any action as of the date hereof.

28

57.     In connection with such obligations, WMILT estimates that approximately

$5-7 million of cost fees and expenses (including contingency reserves) will be incurred

through December 31, 2020[13].  Such amount includes fees and expenses in connection

with further litigation which may arise from, among other matters, the Griffin Appeal and

the closing of the chapter 11 cases, thereby reducing amounts available for distribution to

Creditors.  Based upon WMILT's 2018 10K, applying the 2019 actual and projected

amounts and the 2020 projections, there will be a favorable variance of approximately

$800,000.00 which will become available for distribution to Creditors.

58.     Pursuant to the Plan and the Confirmation Order, WMILT is authorized to

distribute such remaining assets to one or more qualified charitable organizations.  Prior

to or contemporaneously with dissolution of the Trust, WMILT intends to contribute any

such amounts to Seattle-based organizations.

C.  Unclaimed/Uncashed Distributions

59.     As mentioned above, with the final distribution about to be made to over six

thousand (6,000) new recipients, based upon prior distributions, WMILT anticipates that some of

these payments will go undelivered or unclaimed for one reason or another.  Rather than voiding

such distributions in short order and causing Creditors to forfeit recoveries, similar to the Plan,

WMILT believes that such recipients should have another opportunity to realize upon their

recoveries.  Accordingly, WMILT requests that the Bankruptcy Court authorize WMILT to (a)

post a notice for thirty (30) days on WMILT's website, www.wmitrust, setting forth the names of

parties (i) to whom distributions have been sent and such distributions have been returned to

---

[13] It must be noted that wind-up and dissolution of WMILT could go longer due to pending litigation and final steps necessary to be undertaken.

WMILT or (ii) to whom distributions have been made and such distributions remain uncashed or not-negotiated and (b) publish a notice, the form of which as annexed hereto as Exhibit "C", once in <u>The Seattle Times</u>, on a date at least ninety (90) days following the final distribution, notifying all parties that have had their distributions returned to WMILT or which have gone unclaimed. Thereafter, such recipients would have twenty (20) days to notify WMILT of their whereabouts and receive a distribution. WMILT submits that, in order to complete the distribution process and dissolve the Trust, failure of a Creditor to respond and negotiate its distribution within sixty (60) days of such publication should be a ban to any recovery and the distribution allocated to such Creditor should be forfeited and become part of any ultimate donation to a charitable organization.

D. <u>Termination of Claims and Noticing Agent</u>

60. With the closure of the Debtors' chapter 11 cases and a final distribution being made to Class 18 Creditors, WMILT submits that KCC will have fulfilled all of its duties and obligations as noticing agent and claims agent. Accordingly, effective as of the final distribution being made, WMILT requests that KCC be released from any further obligations pursuant to the KCC Order. Notwithstanding such termination, KCC shall continue to provide certain ancillary services to WMILT in connection with the wind-up and dissolution of the Trust.

E. <u>Cancellation of LTIs and Escrow Markers/Escrow CUSIPs</u>

61. With the final distribution being made to holders of Allowed Claims within Class 18, all Liquidating Trust Interests which were issued pursuant to the Plan to holders of Allowed Claims or reserved on account of holders of Disputed Claims, and subsequently transferred to holders of Allowed Claims as payments flowed down and in accordance with the Bankruptcy Court-approved Plan and waterfall, will have been satisfied and there will be no remaining beneficiaries of the Trust other than potential charitable organizations. To the extent that

30

"escrow markers/escrow CUSIPs" have been administratively issued for tracking purposes, WMILT submits that cancellation thereof is appropriate in order to avoid inconsistency and misunderstanding in the marketplace.  WMILT submits that such cancellation of escrow markers/escrow CUSIPs will not prejudice any party as no additional distributions will be made.

**Notice**

62.    Notice of this Application has been served in accordance with the provisions of Bankruptcy Rule 2002 and upon (a) the U.S. Trustee, (b) the IRS and (c) all parties requesting notices in the Debtors' chapter 11 cases.  Additionally, WMILT shall file this Application as an exhibit with the Securities and Exchange Commission under Form 8-K.

WHEREFORE WMILT respectfully requests that the Bankruptcy Court enter an order, in the form annexed hereto as Exhibit "D", (a) closing the Debtors' chapter 11 cases, (b) authorizing the transactions provided for herein and (c) granting WMILT such other and further relief as is just.

Dated: November 14, 2019
      Wilmington, Delaware

*/s/ Christopher M. DeLillo*
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Marcos A. Ramos (No. 4450)
Cory D. Kandestin (No. 5025)
Christopher M. DeLillo (No. 6355)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsímile:  (302) 651-7701

- and -

PROSKAUER ROSE LLP
Brian S. Rosen
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsímile:  (212) 969-2900

*Attorneys to the WMI Liquidating Tru*st

32

# **EXHIBIT A**

DISCLOSURE STATEMENT EXCERPT

accordance with Section 21.1(a) of the Seventh Amended Plan, Wilmer Cutler Pickering Hale & Dorr LLP ("Wilmer Hale"), Pachulski Stang Ziehl & Jones LLP ("Pachulski"), and Boies, Schiller & Flexner LLP ("Boies Schiller" and, collectively with Fried Frank, Blank Rome, White & Case, Kasowitz, Zolfo, Wilmer Hale, and Pachulski, the "Section 41.18 Professionals"), to the extent the clients with respect to the Section 41.18 Professionals seek reimbursement for the payment of fees and expenses incurred, shall file with the Bankruptcy Court an application (for purposes of reviewing the reasonableness of the amounts requested therein), together with detailed invoices annexed thereto, requesting payment for *reasonable* fees and expenses incurred during the period from the Petition Date through and including the Effective Date, in connection with the Chapter 11 Cases, the Global Settlement Agreement, the Seventh Amended Plan, or the transactions contemplated therein (including, without limitation, investigating, negotiating, documenting, and completing such transactions and enforcing, attempting to enforce, and preserving any right or remedy contemplated under the Global Settlement Agreement and in the Chapter 11 Cases), and that, within ten (10) Business Days of the entry of a Final Order by the Bankruptcy Court approving the payment thereof, in whole or in part, the Disbursing Agent shall pay such fees and expenses so approved. The Debtors have been informed by the Section 41.18 Professionals that the Section 41.18 Professionals project that they will request an aggregate total of at least[33] $37.3 million on account of fees for services rendered and expenses incurred through the date hereof in connection with the Chapter 11 Cases, the Global Settlement Agreement, the Seventh Amended Plan, or the transactions contemplated therein. As summarized in Section VI.B.18.a below, up to $10 million of Cash distributed on account of the BB Liquidating Trust Interests will be used to satisfy the fees and expenses of Wilmer Hale, Pachulski, and Boies Schiller (which currently account for approximately $7.9 of the total amount the Section 41.18 Professionals project they will request).

## IV.
## OVERVIEW OF THE DEBTORS' OPERATIONS

### A.    The Debtors' Corporate History and Past and Current Organizational Structure and Assets

#### 1.    Overview

WMI is a holding company incorporated in the State of Washington and headquartered at 925 Fourth Avenue, Suite 2500, Seattle, Washington 98104.[34] WMI is the direct parent of WMI Investment (discussed below).

Prior to the Petition Date, WMI was a multiple savings and loan holding company that owned WMB and such bank's subsidiaries, including FSB. WMB primarily provided banking services to consumers and small businesses in major U.S. markets. WMI was the largest savings and loan holding company and WMB, together with its subsidiaries, was the seventh largest U.S.-based bank. As of the Petition Date, WMI also had several non-debtor subsidiaries. Like all savings and loan holding companies, prior to the Petition Date, WMI was subject to regulation by the OTS. WMB and FSB, in turn, like all depository institutions with federal thrift charters, were subject to regulation and examination by the OTS. In addition, WMI's banking and non-banking subsidiaries were overseen by various federal and state authorities, including the FDIC.

---

[33] Some of the Section 41.18 Professionals have not provided current accountings of fees and expenses.

[34] The Debtors anticipate relocating to 1201 Third Avenue, Suite 3000, Seattle, Washington 98101 by the end of January 2012.

On September 25, 2008, the OTS, by order number 2008-36, closed WMB, appointed the FDIC Receiver as receiver for WMB and advised that the FDIC Receiver was immediately taking possession of WMB's assets. Immediately after its appointment as receiver, the FDIC sold substantially all the assets of WMB, including the stock of FSB, to JPMC pursuant to the Purchase and Assumption Agreement in exchange for payment of $1.88 billion and the assumption of all of WMB's deposit liabilities, including those deposit liabilities owed to the Debtors. Shortly thereafter, JPMC assumed all of FSB's deposit liabilities by merging FSB with its own banking operations.

Prior to the Receivership, WMI's equity securities were registered with the United States Securities and Exchange Commission (the "SEC") and were traded on the New York Stock Exchange (NYSE) under the symbol "WM." Accordingly, WMI was subject to the informational disclosure requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and filed annual, quarterly and current reports and other information with the SEC. WMI has adopted so-called "modified Exchange Act reporting" under the SEC Staff's Legal Bulletin No. 2 and, accordingly, no longer files Form 10-Q and 10-K reports. Instead, WMI files its monthly operating reports (the "MORs") with the Bankruptcy Court and furnishes the MORs to the SEC under cover of Form 8-K. WMI also files 8-K reports as necessary to report "line items" and material developments concerning WMI and WMI's chapter 11 case.

### 2. List of WMI's Current Directors

As set forth in WMI's public filings with the SEC, available at www.sec.gov, WMI's current directors are Stephen E. Frank, Alan Fishman, Margaret Osmer McQuade, Phillip Matthews, Regina T. Montoya, Michael K. Murphy, William G. Reed, Jr., Orin Smith, and James H. Stever.

### 3. WMI's Consolidated Corporate Organizational Structure

On the Petition Date, in addition to WMB,[35] WMI owned, directly and indirectly, thirty-three (33) subsidiaries (the "Non-Banking Subsidiaries"). For the avoidance of doubt, Second and Union LLC is not now and has never been an asset of the Debtors' estates. (See Debtor's Response to the Letter of Joe Schorp Requesting Information Regarding Second and Union LLC [D.I. 6811].) A complete list of the Non-Banking Subsidiaries, as well as information regarding their organizational relationships, financial information and a summary of their respective operations, is set forth below. During the pendency of the Chapter 11 Cases, in addition to monetizing assets at such Non-Banking Subsidiaries, the Debtors have undertaken three corporate reorganizations in order to consolidate WMI's corporate structure. Upon completion of each of these reorganizations, available cash has been either distributed to WMI in accordance with applicable law or paid to WMI in satisfaction of an intercompany obligation. After giving effect to these reorganizations, WMI owned (and continues to own) seven directly-owned Non-Banking Subsidiaries. Below are visual representations of WMI's corporate organizational chart (i) prior to the FDIC Receiver's seizure of all of WMB's assets on September 25, 2008 and JPMC's purchase, pursuant to the Purchase and Assumption Agreement, of substantially all of such assets (including FSB and all other subsidiaries owned, directly and indirectly, by WMB), (ii) as of the Petition Date, and (iii) as of the date of the filing of this Disclosure Statement.

---

[35] Although, as of the date hereof, WMB remains a subsidiary of WMI, the FDIC seized all of WMB's assets on September 25, 2008, including all of WMB's subsidiaries, and sold substantially all of WMB's assets to JPMC pursuant to the Purchase and Assumption Agreement. Accordingly, none of WMB's subsidiaries are considered subsidiaries of WMI.

**a.**    **WMI and WMB Combined Organizational Chart Prior to FDIC Seizure**[36]

The organizational chart on the following page reflects the combined WMI and WMB structure prior to the FDIC seizure and JPMC's acquisition of WMB's assets.

**[AREA INTENTIONALLY LEFT BLANK]**

---

[36] The Non-Banking Subsidiaries are denoted in blue; WMB's direct and indirect subsidiaries are denoted in green; Subsidiaries are indented to the right underneath the parent, colored arrows to the left of a company box indicate a multiple parent relationship and colored arrows to the right of a company box indicate a subsidiary interest in another subsidiary.



WaMu
Washington Mutual, Inc.
September 24, 2008
Washington Mutual, Inc. CONTINUED
Ahmanson Developments, Inc.
Ahmanson Obligation Company*
Great Western Service Corporation Two
Washington Mutual Finance Group, LLC
H.F. Ahmanson & Company
Marion Insurance Company, Inc.
Providian Services Corporation
Providian Services LLC
Robena LLC
Robena Feedstock LLC
WaMu 1031 Exchange
WM Citation Holdings, LLC
WM Funds Disbursements, Inc.
PTSP
WMI Investments Corp.
WMI Rainier LLC
WM Mortgage Reinsurance Company, Inc.
Capital Trusts
Washington Mutual, Inc.
Washington Mutual Capital Trust 2001
Washington Mutual Bank
CCB Capital Trust IV
CCB Capital Trust V
CCB Capital Trust VI
CCB Capital Trust VII
CCB Capital Trust VIII
CCB Capital Trust IX
HFC Capital Trust I
Washington Mutual Bank
HSLC
CLP
RIC
California Reconveyance Company
Dime Capital Partners, Inc.
Dime Mortgage of New Jersey, Inc.
HCP Properties, Inc.
Long Beach Securities Corp.
Neah Bay BPS Holdco, Inc.
Mats Mats Bay BPS, Ltd.
Clallam Bay BPS, S.R.L.
WMFD
Providian Technology Services Private Limited ("PTSP")
Nickel Purchasing Company, Inc.
Norstar Mortgage Corp.
Pike Street Holdings, Inc.
Washington Mutual Bank fsb
WM Winslow Funding LLC
Washington Mutual Trade Service Limited
Providian Bancorp Services
Seafair Securities Holding Corp.
Second and Union LLC
Washington Mutual – Seattle Art Museum Project Owners Association*
Washington Mutual Bank CONTINUED
Seneca Funding (UK) Limited
Sivage Financial Services LLC*
Stockton Plaza, Incorporated
WMRPD
PCA
WaMu Asset Acceptance Corp.
WaMu Capital Corp.
Washington Mutual Asset Securities Corp.
Washington Mutual Brokerage Holdings, Inc.
WaMu Investments, Inc.
WMFS Insurance Services, Inc.
Washington Mutual Mortgage Securities Corp.
Western Service Co.
WM Asset Holdings Corp.
WM Enterprises & Holdings, Inc.
WM Marion Holdings, LLC
Cranbrook Real Estate Investment Trust
Washington Mutual Preferred Funding LLC*
WM Specialty Mortgage LLC
WMB Baker LLC
Washington Mutual Bank CONTINUED
FA Out-of-State Holdings, Inc.
RIC
110 East 42nd Operating Company, Inc.
620-622 Pelhamdale Avenue Owners Corporation
Accord Realty Management Corporation
Ahmanson Land Company
Ahmanson Marketing, Inc.
RIC
Bryant Financial Corporation
CRP Properties, Inc.
HMP Properties, Inc.
ECP Properties, Inc.
NAMCO Securities Corp.
The E-F Battery Accord Corporation
F.C. LTD.
FA California Aircraft Holding Corp.
PCA
Great Western FS Corporation, Inc.
Harmony Agency, Inc.
HCP Properties Holdings, Inc.
FA Out-of-State Holdings, Inc. CONTINUED
Irving Corporate Center, Inc.
PCA
Ladue Service Corporation
Mid Country Inc.
Murphey Favre Properties, Inc.
North Properties, Inc.
Plainview Inn, Inc.
Savings of America, Inc.
CLP
RIC
Washington Mutual Community Development, Inc.
Pacoima Investment Fund I, LLC*
HHP Investment LLC
WaMu Insurance Services, Inc.
Home Crest Insurance Services, Inc.
WMB St. Helens LLC
WMBFA Insurance Agency, Inc.
Yellowstone Venture, Inc.
ACD 2
ACD 3
PCAAH
RA
AR2
Flower Street Corporation ("FSC")
ACD 4
ARD
Ahmanson GGC LLC
WMAH
ARD
Riverpoint Associates
HSLC
SBA
FSC
Ahmanson Residential Development
AGGC
HSLP
RA
Ahmanson Residential 2
SBA
SBC
FSC
PCAAH
AR2
Sutter Bay Associates LLC
AGGC
HSLP
WM Aircraft Holdings LLC ("WMAH")
SoundBay Leasing LLC*
WMGW Delaware Holdings LLC
RA
AR2
Sutter Bay Corporation ("SBC")
Other Multi-Owner Companies:
WMB
SAI
Commercial Loan Partners L.P. ("CLP")
FAOSH
WMB
SAI
AMI
Rivergrade Investment Corp.* ("RIC")
WMI
RA
WMB
H.S. Loan Corporation
WMI
ARD
HS Loan Partners LLC
WMAH
FACAH
ICCI
SPI
Pacific Centre Associates LLC ("PCA")
SPI
WMRP Delaware Holdings LLC ("WMRPD")
WMICC Delaware Holdings LLC
WMI
ACD3
AR2
PCA Asset Holdings LLC ("PCAAH")
WMHFA Delaware Holdings LLC
Banks have a black border
Banking institutions and their subsidiaries (defined as majority owned and wholly-owned subsidiaries) are green.
Companies that are not banking institutions or their subsidiaries are blue.
* Has outside and/or preferred stock owners.
Multi-Owner Color Key
ACD3 — ACD 3
AGGC — Ahmanson GGC LLC
AMI — Ahmanson Marketing, Inc.
ARD — Ahmanson Residential Development
AR2 — Ahmanson Residential 2
FACAH — FA California Aircraft Holding Corp.
FAOSH — FA Out-of-State Holdings, Inc.
HSLP — HS Loan Partners LLC
ICCI — Irvine Corporate Center, Inc.
RA — Riverpoint Associates
SAI — Savings of America, Inc.
SPI — Stockton Plaza, Incorporated
WMB — Washington Mutual Bank
WMI — Washington Mutual, Inc.
WMFD — WM Funds Disbursements, Inc.
Notes:
Subsidiaries are indented to the right underneath the parent.
Colored arrows to the left of a company box indicate a multiple parent relationship.
Colored arrows to the right of a company box indicate a subsidiary interest in another subsidiary.
43665864_1

b.        **WMI Organizational Chart as of Petition Date**[37]

WMB's banking operations and its subsidiaries (including FSB) were seized by the FDIC Receiver and then acquired by JPMC on September 25, 2008 pursuant to the Purchase and Assumption Agreement.  The organizational chart below reflects WMI and the 33 Non-Banking Subsidiaries as of the Petition Date, September 26, 2008.  It should be noted that the Washington Mutual Capital Trust 2001 is a trust related to the PIERS Units (defined below), further described in Section IV.B.5 of this Disclosure Statement, and is not considered one of the 33 Non-Banking Subsidiaries.

**[AREA INTENTIONALLY LEFT BLANK]**

---

[37] Subsidiaries are indented to the right underneath the parent, colored arrows to the left of a company box indicate a multiple parent relationship, and colored arrows to the right of a company box indicate a subsidiary interest in another subsidiary.



c.    **WMI Current Organizational Chart**[38]

The organizational chart below reflects the remaining seven Non-Banking Subsidiaries, after the three corporate reorganizations, owned by WMI as of the date of the filing of this Disclosure Statement.



4.    **Analysis of Subsidiary Equity.**

The following chart lists the Non-Banking Subsidiaries owned by WMI as of the Petition Date, a summary in the change in equity value at those subsidiaries from the Petition Date, September 26, 2008, through to, and including, October 31, 2011, and WMI's estimate of the current market value of

---

[38] Colored arrows to the left of a company box indicate a multiple parent relationship and colored arrows to the right of a company box indicate a subsidiary interest in another subsidiary.

assets remaining in each remaining Non-Banking Subsidiary.[39]  This summary is further supplemented by (i) a reconciliation of the change in equity, (ii) background information for all Non-Banking Subsidiaries, and (iii) balance sheets for Non-Banking Subsidiaries as of October 31, 2011, each of which are set forth in the following sections.  It should be noted that the financial information referenced in (iii) is not included for WMI Investment or WMMRC, as adequate information on this has been previously provided elsewhere in this Disclosure Statement or in the Debtors' MORs.

**[AREA INTENTIONALLY LEFT BLANK]**

---

[39] Of WMI's seven remaining Non-Banking Subsidiaries, WMMRC, which is currently operating on a run-off basis, WMMRC is the only Non-Banking Subsidiary with ongoing operations.  Refer to Articles IV.A.6, VII, and VIII of this Disclosure Statement for additional information regarding WMMRC.  After the Effective Date, WMMRC will be Reorganized WMI's sole operating entity.  Pursuant to the September Opinion, the Bankruptcy Court determined, based upon the evidence presented at the July Confirmation Hearing, that the enterprise value of Reorganized WMI is $210 million.  For each of the Non-Banking Subsidiaries other than WMMRC, the market value stated is a sum of, where applicable, (i) cash, (ii) notes receivable being paid by JPMC, carried at current market value, and (iii) in some cases, certain other *de minimis* assets and liabilities, less certain disbursements for expenses related to mergers with other Non-Banking Subsidiaries or dissolution, as applicable. The principal difference between the book value and the stated market value results from the fact that intercompany balances do not represent additional value to the Debtors' estates.

| Subsidiary | WMI Owned Equity Value 9/26/2008 | Equity Owned by WMI sub(s) 9/26/2008 | Total Equity 9/26/2008 | Change in WMI Owned Equity Value | WMI Owned Equity Value 10/31/2011 | Equity Owned by WMI sub 10/31/2011 | Total Equity 10/31/2011 | Current Market Value |
|---|---|---|---|---|---|---|---|---|
| *Direct Ownership by WMI* | | | | | | | | |
| 1  WMI Investment Corp | $ 977,488,380 | $ - | $ 977,488,380 | $ (63,886,758) | $ 913,601,622 | | $ 913,601,622 | $ 276,280,776 |
| 2  WMMRC | 307,514,652 | - | 307,514,652 | (81,703,877) | 225,810,775 | | 225,810,775 | 210,000,000 (G) |
| 3  WaMu 1031 Exchange | 5,772,391 | - | 5,772,391 | (4,262,995) | 1,509,396 | | 1,509,396 | 1,250,000 |
| 4  WM Citation Holdings LLC | 1,517,346 | - | 1,517,346 | 224,533,259 | 226,050,605 | | 226,050,605 | 100,128,104 |
| 5  Ahmanson Obligation Company | 25,078,216 | - | 25,078,216 | (19,412,316) | 5,665,899 | | 5,665,899 | 8,966,631 |
| 6  WMI Rainier LLC | 2,251,450 | - | 2,251,450 | 5,469,263 | 7,720,713 | | 7,720,713 | 9,101 |
| 7  HS Loan Corp | 59,475,241 | 23,639,103 | 83,114,344 | 732,152 | 60,207,393 | 23,930,026 | 84,137,419 | 84,070,169 |
| 8  Marion Insurance | 66,661,014 | - | 66,661,014 | (66,661,014) | (D) | | - | |
| 9  ACD 2 | 102,798,532 | - | 102,798,532 | (102,798,532) | (A) | | - | |
| 10  Great Western Service Corp Two | 108,915,537 | - | 108,915,537 | (108,915,537) | (A) | | - | |
| 11  Providian Services Corp | - | - | - | - | (B) | | - | |
| 12  HS Loan Partners LLC | 65,819,076 | 6,128,503 | 71,947,580 | (65,819,076) | (C) | | - | |
| 13  Ahmanson Developments Inc | 5,338,733 | - | 5,338,733 | (5,338,733) | (B) | | - | |
| 14  PCA Asset Holdings LLC | 19,041,342 | 3,700,943 | 22,742,285 | (19,041,342) | (C) | | - | |
| 15  Ahmanson Residential Development | 147,546,544 | - | 147,546,544 | (147,546,544) | (A) | | - | |
| 16  WM Funds Disbursement Inc. | 13 | - | 13 | (13) | (B) | | - | |
| 17  HF Ahmanson & Co | - | - | - | - | (B) | | - | |
| Investment in Subsidiaries - MOR 3 | 1,895,218,467 | 33,468,550 | 1,928,687,017 | (454,652,065) | 1,440,566,402 | | 1,464,496,428 | 680,704,781 |
| *Indirect Ownership by WMI \** | | | | | | | | |
| 18  WM Aircraft Holdings LLC | | 28,098,191 | 28,098,191 | | (C) | | - | |
| 19  SoundBay Leasing LLC | | - | - | | (F) | | - | |
| 20  Riverpoint Associates | | 43,449,882 | 43,449,882 | | (C) | | - | |
| 21  Flower Street | | 21,326,909 | 21,326,909 | | (A) | | - | |
| 22  Robena Feedstock | | - | - | | (B) | | - | |
| 23  Providian Services LLC | | - | - | | (B) | | - | |
| 24  ACD 3 | | 17,298,992 | 17,298,992 | | (A) | | - | |
| 25  Ahmanson GGC LLC | | 84,628,326 | 84,628,326 | | (A) | | - | |
| 26  ACD 4 | | 12,931 | 12,931 | | (C) | | - | |
| 27  Ahmanson Residential 2 | | 13,588,545 | 13,588,545 | | (A) | | - | |
| 28  Sutter Bay Associates LLC | | 86,030,852 | 86,030,852 | | (A) | | - | |
| 29  Sutter Bay Corp | | 60,708,905 | 60,708,905 | | (A) | | - | |
| 30  Robena LLC | | - | - | | (B) | | - | |
| 31  WMGW Delaware Holdings | | - | - | | (D) | | - | |
| 32  WMFHA Delaware Holdings | | 6,959,522 | 6,959,522 | | (E) | | - | |
| 33  WM Finance LLC | | 1,525,671 | 1,525,671 | | (C) | | - | |

*Notes:*

| | |
|---|---|
| \* | Equity value already reflected via direct ownership balances. |
| (A) | Merged into WM Citation Holdings LLC in December 2008 |
| (B) | Merged into WMI Rainier LLC in December 2008 |
| (C) | Merged into WM Citation Holdings LLC in April 2009 |
| (D) | Merged into WM Citation Holdings LLC in June 2010 |
| (E) | Merged into PCA Asset Holdings LLC in December 2008 |
| (F) | Dissolved in June 2010 |
| (G) | Reorganized WMI valuation is $210 million, which includes value of WMMRC. |

*a.*        **Reconciliation of Change in "Investment in Subsidiaries"**

WMI's "Investment in Subsidiaries," as shown on WMI's balance sheet (set forth in each of the Debtors' MORs), and in the preceding chart, reflects the total book equity of the Non-Banking Subsidiaries.  The total change in "Investment in Subsidiaries" from the Petition Date to October 31, 2011 is approximately $455 million, as explained below.

| Investment in Subsidiaries – 9/26/2008 | $1,895,218,467 | Notes |
|---|---|---|
| Income / (Loss) from Subsidiaries | (205,040,767) | (1) |
| Cash Distributed to WMI | (386,865,257) | (2) |
| Paid Notes and Tax Payables to WMI | 72,236,573 | (2) |
| Distribution of Remaining Marion Business to WMI | (16,443,787) | Reported in Dec 2009 MOR[40] |
| Change in Other Comprehensive Income ("OCI") | 64,183,030 | (3) |
| Other Miscellaneous Changes | 17,278,143 | |
| Cumulative Change from Petition Date | (454,652,065) | |
| **Investment in Subsidiaries – 10/31/2011** | **$1,444,609,697** | |

*Notes to the chart follow on the next page.*

---

[40] (See Note 4 to the "Financial Statements" in the December 2009 MOR [D.I. 2280].)

**NOTES**

**(1)  INCOME / (LOSS) FROM SUBSIDIARIES -- BY SUBSIDIARY**

| | | |
|---|---:|---|
| WMMRC | (103,875,342) | |
| Marion | 18,850,206 | |
| WAMU 1031 Exchange | (262,995) | |
| Ahamansan Obligation Corporation | (2,032,316) | Incl. loan sale |
| Citation | 2,105,694 | Incl. aircraft sale |
| WMIIC | (122,719,199) | |
| Other subs | 2,893,185 | |
| | | |
| Cumulative to Date | **(205,040,767)** | Per Oct-2011 Monthly Operating Report |

**(2)  CASH DISTRIBUTED TO WMI**

As noted previously, the significant asset held by these non-banking subsidiaries was cash.
Upon completion of the corporate reorganizations described herein, such cash was distributed to WMI.

| Entity | Dividends | Notes & Taxes | Total |
|---|---:|---:|---:|
| Total from WM Citation Holdings LLC (after merger) | 235,628,684 | 51,497,188 | 287,125,872 |
| Marion | 60,000,000 | 13,739,385 | 73,739,385 |
| AOC | 15,000,000 | 7,000,000 | 22,000,000 |
| Wamu 1031 Exchange | 4,000,000 | - | 4,000,000 |
| Summary | 314,628,684 | 72,236,573 | 386,865,257 |

Total Cash reported on MOR's as received from subsidiaries

**(3)  CHANGE IN OCI**

Unrealized gains and losses in securities are recorded in Other Comprehensive Income within
equity.  When that value changes at a subsidiary, WMI's Investment in Subsidiary balance changes
as well.  However, this is a change on the balance sheet of the subsidiaries and is not reported on
WMI's income statement.

Securities were held at WMI Investment Corp, Marion and WMMRC.  The change in balance would
result from both changes in values of the securities held as well as the liquidation of the securities
and the realization of actual gains and losses.

5.    **Assets of WMI Investment**

WMI Investment is a Delaware corporation that, as of the Petition Date, held a variety of securities and investments.  Certain entities have argued that the Debtors must more fully disclose the assets of WMI Investment, including all securities held by WMI Investment, and the divestiture of any such assets since the Petition Date.

Information regarding the assets of WMI Investment has been disclosed by the Debtors in every monthly operating report ("MOR") filed subsequent to the Petition Date, each of which was also filed with the Securities and Exchange Commission (the "SEC") under the cover of a form 8-K, and in WMI Investment's schedule of assets and liabilities, first filed with the Bankruptcy Court on December 19, 2008 (the "WMI Investment Schedule").  As detailed in the WMI Investment Schedule, WMI Investment's assets consisted, as of the Petition Date, of:

- a $566 million intercompany receivable from WMI (which, pursuant to Section 32.2 of the Seventh Amended Plan, will be extinguished, unless otherwise agreed or resolved);

- a membership interest in JPMC Wind Investment Portfolio LLC with a book value of $65 million[41] (which WMI Investment will transfer to JPMC pursuant to the Global Settlement Agreement) (see Sections IV.A.9.a and V.B.3.b(iii) below);

- $53 million of cash on deposit at JPMC (which the Debtors will receive free and clear pursuant to the Global Settlement Agreement) (see Section V.B.3.b(i) below);

- a tax receivable from WMI in the amount of $22 million[42] (which, pursuant to Section 32.2 of the Seventh Amended Plan, will be extinguished, unless otherwise agreed or resolved); and

- $266 million of investments and $4 million of accrued interest.

After the Petition Date, the Debtors were required to liquidate the $266 million of investments held by WMI Investment to comply with section 345(b) of the Bankruptcy Code, which governs investment requirements for bankrupt companies.  The conversion of these assets to cash was disclosed in the Schedule of Cash Receipts and Disbursements included as part of the MORs filed with the Bankruptcy Court and the SEC with respect to November 2008 through December 2008, as "Cash Receipts" from the "Sale of Assets/Securities."  Furthermore, the applicable balance sheets set forth in each MOR during that period illustrated the increase of cash and the reduction of securities.  Each of these documents are publicly available on the Bankruptcy Court's docket, as well as on the website maintained by the Debtors' solicitation and voting agent, Kurtzman Carson Consultants, LLC, at www.kccllc.net/wamu, and the SEC, at www.sec.gov. [43]

---

[41] The book value of WMI Investment's membership interest in JPMC Wind Investment Portfolio LLC is now approximately $49 million.

[42] This amount is included in, and is not incremental to, the estimated total amount of Tax Refunds to be received by the Debtors.

[43] At a hearing before the Bankruptcy Court held on March 21, 2011, Bettina Haper asserted that the Debtors' liquidation of WMI Investment's securities, discussed herein, was unauthorized.  On October 2, 2008, the Debtors filed the *Motion of Debtors for (I) Authorization to Maintain Existing Bank Accounts and Business Forms, and (II) for an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code* [D.I. 16].  On October 8, 2008, the

Pursuant to Sections 1.140 and 27.3 of the Seventh Amended Plan, all assets of WMI Investment will be contributed to the Liquidating Trust.

### 6.    WM Mortgage Reinsurance Company, Inc. ("WMMRC")

WM Mortgage Reinsurance Company, Inc. (previously defined as "WMMRC"), a Hawaiian corporation and non-debtor, wholly-owned subsidiary of WMI, is a captive reinsurance company, created to reinsure the risk associated with residential mortgages that were originated or acquired by WMB.  Mortgage insurance for WMB-originated or acquired loans had historically been provided by seven mortgage insurance companies (collectively, the "Mortgage Insurers"), although currently WMMRC is party to mortgage reinsurance agreements with only six mortgage insurance companies.  WMMRC entered into reinsurance agreements (the "Reinsurance Agreements") with each Mortgage Insurer, pursuant to which it would share in the risk, in the form of Claim losses, in exchange for a portion of the premiums generated from the residential mortgage loan portfolio held by the Mortgage Insurer.[44]

Pursuant to each Reinsurance Agreement, WMMRC established a trust account with US Bank N.A. (defined above as the "WMMRC Trusts"), for the benefit of the Mortgage Insurer, to hold premiums collected and to secure WMMRC's obligations to each Mortgage Insurer with respect to the insured loans.  WMMRC was historically party to seven trust agreements—one for each Reinsurance Agreement to which it was a party.  As of October 31, 2011, the value of the six remaining Trust's assets was estimated to be $344 million.

Each Reinsurance Agreement requires that WMMRC maintain a certain minimum amount of capital in the applicable Trust (the "Reinsurance Reserve"), which amount is determined by applicable law, as well as each Mortgage Insurer's calculation of reserves needed, which is generally inclusive of reserves for known delinquencies within the loan portfolio and a percentage of the remaining aggregate risk exposure contained in each portfolio.  Minimum capital requirements fluctuate on a

---

Court entered the order extending the Debtors' time period to comply with Section 345(b) of the Bankruptcy [D.I. 44].  In the *Supplemental Motion of Debtors for an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code*, dated December 8, 2008 [D.I. 402], the Debtors noted that they had undertaken, and were continuing to undertake, a "steady liquidation of WMI Investment's remaining non-government backed securities."  Ms. Haper also noted that, early in the Chapter 11 Cases, the U.S. Trustee filed an objection regarding sales of certain investments by the Debtors.  (See Objection of the United States Trustee to the Motion of Debtors Pursuant to Sections 105(a) and 363 of the Bankruptcy Code for Order Approving Procedures for Sale of the Debtors' Interests in Certain Investments Free and Clear of Liens, Claims and Encumbrances and Without Further Court Approval [D.I. 420] (the "Securities Sales Objection"); see also Section IV.A.9.b below.)  The Securities Sales Objection, however, was filed by the U.S. Trustee in response to a motion by the Debtors regarding the sale of WMI's limited partner interests in venture capital funds held directly by WMI—not by WMI Investment.  (See Motion of Debtors Pursuant to Sections 105(a) and 363 of the Bankruptcy Code for Order Approving Procedures for Sale of the Debtors' Interests in Certain Investments Free and Clear of Liens, Claims and Encumbrances and Without Further Court Approval [D.I. 334] (the "Securities Sales Motion").)  The Bankruptcy Court approved the Securities Sales Motion, with certain modifications, by order, dated January 5, 2009 [D.I. 536].  Pursuant to the order, the Debtors were authorized to sell the limited partner interests held by WMI without seeking court approval of each sale, but were required to give notice of any such sale prior thereto.

---

[44]  One of WMMRC's Reinsurance Agreement counterparties is PMI Mortgage Ins. Co., Inc. ("PMI Mortgage"), which Entity was seized by Arizona state regulators on October 20, 2011.  The Debtors understand that, although PMI Mortgage has ceased writing new business, PMI Mortgage will continue to insure its existing mortgage loan portfolio on a runoff basis, and will continue to make payments of premium income to WMMRC pursuant to the Reinsurance Agreement.

monthly basis and are reflected in monthly "cession statements" provided by each Mortgage Insurer to WMMRC. By order dated December 3, 2008, the Bankruptcy Court approved a loan from WMI to WMMRC in the amount of approximately $11.9 million in order to maintain an adequate Reinsurance Reserve in one of its Trusts.

As of the Petition Date, due to the FDIC's seizure of WMB's assets and the sale of substantially all of WMB's assets to JPMC, all the WMMRC Trusts are operating on a "run-off" basis because WMMRC has ceased to reinsure any newly originated loans.

WMMRC's failure to maintain adequate Reinsurance Reserves could result in the Mortgage Insurers' election to terminate the Reinsurance Agreements on a "cut-off" basis, in which case WMMRC would no longer be liable for the reinsured loans and would no longer receive reinsurance premiums with respect thereto. WMMRC would, however, be liable for the Reinsurance Reserve, which may, in certain cases, result in the extinguishment of all assets on account in the Trust at issue. As described in Section V.B.6.h hereof, WMMRC was named as a defendant in the Alexander & Reed Action.

Refer to Articles VII and VIII of this Disclosure Statement for additional information regarding WMMRC. Pursuant to the Seventh Amended Plan, <u>WMMRC will not be transferred to the Liquidating Trust</u> but, rather, will be the sole operating subsidiary of Reorganized WMI.

### 7.    Assets of WMI's Non-Debtor Subsidiaries, Other than WMMRC

Pursuant to applicable law, and as stated by the Bankruptcy Court at the March 21, 2011 hearing, the Bankruptcy Court's jurisdiction is limited to assets of the Debtors and not to those of any non-Debtor subsidiary. However, because the value of the Debtors' interests in such non-Debtor subsidiaries and non-Debtor assets, including WMMRC, ultimately accretes to the benefit of the Debtors' chapter 11 estate, the Debtors have reflected such value in their liquidation and recovery analyses. To provide parties in interest with additional information, set forth below is information related to WMI's direct and indirect subsidiaries as of the Petition Date, including WMMRC, as well as historical information regarding any transfers of assets by WMI's non-Debtor subsidiaries from and after the Petition Date. Pursuant to Section 1.140 of the Seventh Amended Plan, WMI's Equity Interest in all of its subsidiaries, except for WMI Investment, WMMRC and WMB, will be transferred to the Liquidating Trust. For the avoidance of doubt, and as set forth in more detail below, with the exception of a few *de minimis* residential real estate properties held by Ahmanson Obligation (defined below) as a result of mortgage foreclosures, neither the Debtors nor their non-Debtor subsidiaries hold any real estate.

The general background and status of the Non-Debtor Non-Banking Subsidiaries set forth below is delineated as follows: (a) subsidiaries currently owned by WMI, (b) subsidiaries merged on or prior to December 30, 2008, (c) subsidiaries merged in April 2009, and (d) subsidiaries merged or liquidated on June 30, 2010.

#### a.    *Currently Owned WMI Non-Banking Subsidiaries, Other than WMMRC*

**WaMu 1031 Exchange.** Prior to the Petition Date, WaMu 1031 Exchange ("<u>WaMu 1031</u>") facilitated Section 1031 exchanges for residential and commercial property owners. Specifically, WaMu 1031 provided qualified intermediary services to assist real estate investors in deferring capital gains taxes with respect to real estate transactions involving investment properties. WaMu 1031 Exchange was formed as a combination of three predecessor 1031 exchange companies and processed 15,000 exchanges annually, with each exchange averaging $300,000 to $400,000 in size. WaMu 1031 ceased facilitating exchanges, however, in July 2009. The company has been undergoing a wind-down