# EXHIBIT B

EQUITY COMMITTEE LETTER IN SUPPORT

11

# Exhibit 6-3

## Equity Committee's Plan Support Letter

The Official Committee of Equity Security Holders
of Washington Mutual, Inc. et al.

January ___, 2012

To: The Equity Security Holders of Washington Mutual, Inc.

RE: <u>In re Washington Mutual Inc., et al.</u>, Case No. 08-12229 (MFW)

Dear Equity Security Holders:

The Official Committee of Equity Security Holders (the "Equity Committee") is a fiduciary representative of holders of equity securities of Washington Mutual, Inc. ("WMI", and together with WMI Investment Corp., the "Debtors") represented by the issued and outstanding shares of preferred and common stock.

Throughout these chapter 11 cases, the Equity Committee has advocated for the highest possible recovery for all equity security holders. Recently, the Equity Committee has been actively involved in plan negotiations as part of the Bankruptcy Court-ordered mediation. As a result of these negotiations, the Equity Committee, the Debtors and other parties in interest have reached a resolution of the differences among them which, subject to approval of the Seventh Amended Plan (as defined below) by the Bankruptcy Court, will result in a recovery for holders of Preferred Equity Interests and Common Equity Interests. The terms of the Seventh Amended Plan which address the recovery for equity holders are summarized below.

With this letter, you are receiving the Disclosure Statement for the Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement"). Attached to the Disclosure Statement is the Debtors' Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Seventh Amended Plan"). The Seventh Amended Plan is the legal document that, if confirmed by the Bankruptcy Court, will dictate what you will receive from the Chapter 11 case on account of your equity interests. The Disclosure Statement provides information to help you determine whether you should vote in favor of the Seventh Amended Plan. The Equity Committee recommends that you read the Disclosure Statement and the Seventh Amended Plan carefully. To the extent that there is any inconsistency between the Disclosure Statement and this letter, the Disclosure Statement controls.

**THE EQUITY COMMITTEE SUPPORTS THE SEVENTH AMENDED PLAN, BELIEVES RECOVERIES TO HOLDERS OF PREFERRED AND COMMON STOCK CONTEMPLATED BY THE SEVENTH AMENDED PLAN TO BE IN THE BEST INTERESTS OF HOLDERS OF EQUITY INTERESTS AND RECOMMENDS THAT ALL HOLDERS OF PREFERRED AND COMMON EQUITY INTERESTS <u>VOTE TO GRANT THE SPECIFIED RELEASES AND ACCEPT THE SEVENTH AMENDED PLAN</u>.**

If the Seventh Amended Plan is confirmed by the Bankruptcy Court, the holders of Preferred and Common Equity Interests that elect to grant the releases set forth in Section 41.6 of the Seventh Amended Plan will receive, as more fully set forth below:

- *Pro rata* share of 200 million shares of new common stock of Reorganized WMI and the right to appoint a controlling majority of Reorganized WMI's board of directors. Reorganized WMI will be capitalized with $75 million in cash, a $125 million credit facility, and other assets.
- Liquidating Trust Interests that may generate cash recovery for equity holders in the event all allowed claims and postpetition interest claims on allowed claims are paid in full.
- Representation on the Trust Advisory Board that will manage the Liquidating Trust.
- Majority representation on the Litigation Subcommittee of the Liquidating Trust that will manage certain litigation brought on behalf of the Liquidating Trust and its beneficiaries.

Under the Seventh Amended Plan, holders of equity interests represented by the outstanding shares of preferred stock of WMI issued prior to or on September 26, 2008 (referred to as "Preferred Equity Interests" in the Seventh Amended Plan and are classified in Class 19) and holders of equity interests represented by the issued and outstanding shares of common stock of WMI issued prior to or on September 26, 2008 (referred to as "Common Equity Interests" in the Seventh Amended Plan and are classified in Class 22, and may also include holders of Dime Warrants in Class 21, if the Bankruptcy Court determines these warrants to be convertible to common equity) are impaired. The holders of Preferred Equity Interests and of Common Equity Interests are entitled to vote to accept or reject the Seventh Amended Plan.

### RELEASES REQUIRED FOR PARTICIPATION IN RECOVERY:

Section 41.6 of the Seventh Amended Plan provides for certain releases by holders of equity interests. The Equity Committee recommends that you read this section carefully. **PLEASE NOTE THAT YOU MUST CHECK THE BOX GRANTING THE RELEASE IN ORDER TO RECEIVE A DISTRIBUTION UNDER THE SEVENTH AMENDED PLAN. THE DEADLINE TO RETURN YOUR RELEASE AND MAKE THE ELECTION ENTITLING YOU TO A DISTRIBUTION IS _____, 2012. Please also note that, in order for your vote to be counted in support of (or in opposition to) the Seventh Amended Plan, you must return your ballot on or before the deadline set by the Court. The deadline to return your ballot is \_\_\_\_\_, 2012. If you fail to return your ballot by the ballot deadline, but make an election granting the releases and return it before the release deadline, you will still be entitled to receive a distribution under the Seventh Amended Plan. DO NOT DELAY IN RETURNING YOUR BALLOTS.** Holders of WMI equity interests who do <u>not</u> elect to grant the releases set forth in Section 41.6 of the Seventh Amended Plan will <u>not</u> receive any distribution under the Plan.

The legal scope of the releases is defined in Section 41.6 of the Seventh Amended Plan and associated definitions and related sections of the Plan. In general, consenting equity holders will be releasing (a) the four creditor hedge funds known as "AAOC" (these funds are also

2

known as the "Settlement Note Holders")[1]; (b) all other creditors who hold one of the four major classes of bonds (senior notes, senior subordinated notes, CCB notes, and PIERS); and (c) JPMorgan Chase, the Federal Deposit Insurance Corporation and other parties to the Global Settlement Agreement, for all claims related to the Debtors and their bankruptcy estates.

As part of the resolution the Equity Committee has reached with the Debtors and other parties in interest, the Equity Committee has agreed, subject to confirmation of the proposed Seventh Amended Plan, to waive any and all rights to pursue claims for equitable disallowance and causes of action against AAOC and the holders of senior notes, senior subordinated notes, CCB notes, and PIERS, and will dismiss with prejudice its appeals of the Global Settlement Agreement and prior iterations of the plan.

### POTENTIAL RECOVERY FOR EQUITY HOLDERS GRANTING RELEASES:

If the Seventh Amended Plan is approved by the Bankruptcy Court, WMI's equity holders who have granted timely releases will obtain potential recovery through two sources: ownership of the Reorganized Debtor and interests in the Liquidating Trust (following satisfaction of claims senior in priority to equity interests). From the perspective of equity holders, the Seventh Amended Plan provides significant improvements over prior plans with regard to both of these interests.

**Reorganized Debtor:** Under the Seventh Amended Plan, WMI's preferred and common shareholders will own 95% of reorganized WMI. The stock to be issued in connection with the Seventh Amended Plan will be subject to significant restrictions on transfer. The holders' ability to transfer ownership will be limited, as described fully in the proposed Articles of Incorporation (filed with the Plan Supplement documents.)

Further, the stock will not initially be listed on a nationally recognized stock exchange and may not ever be so listed. Listing would require both that Reorganized WMI meet listing and eligibility requirements and that Reorganized WMI's Board of Directors be satisfied such listing would be in the best interests of the company. Reorganized WMI may be able to have its stock quoted on the OTCBB and/or the OTC Pink, subject to meeting eligibility requirements and to the Board's determination that such action is in the best interest of the company.

The proposed ownership structure is intended to provide the Reorganized Debtor with the full benefit of the tax Net Operating Loss ("NOL") generated by the loss of WMB's assets. In addition to the NOL, the Reorganized Debtor will be funded with $75 million in cash and will have access to a $125 million credit facility for use as working capital to either acquire or build a financial or insurance business, taxable income from which may be able to be offset by the NOL.

As in the prior plans, Reorganized WMI will emerge from bankruptcy with two major assets, a runoff portfolio of mortgage insurance policies and an NOL that is likely to be over $6

---

[1] The four hedge funds that make up AAOC are Appaloosa Management L.P.; Aurelius Capital Management LP; Centerbridge Partners L.P.; and Owl Creek Asset Management L.P. and certain funds managed by these entities and other affiliates.

billion dollars. The runoff portfolio is currently valued at $140 million. Under the Seventh Amended Plan, after elections are made in connection with solicitation, as discussed below, Reorganized WMI will issue notes to current WMI creditors for $130 million of the runoff proceeds and the other $10 million of those proceeds will be retained by the company. Significantly, the runoff notes will have recourse only to the proceeds of the portfolio, meaning that, if the insurance policies ultimately generate less income than the $140 million (present value) currently predicted, the holders of those notes will not be able to require Reorganized WMI to make up the deficiency from any of its other assets.

Ninety-five percent (95%) of the common stock in Reorganized WMI will be distributed to current WMI equity holders who elect to grant releases under the Seventh Amended Plan. Five percent (5%) of the common stock will be distributed to current WMI creditors who make an election to contribute a portion of the runoff proceeds to Reorganized WMI (this election is the basis for the $10 million in runoff proceeds retained by Reorganized WMI, as discussed in the previous paragraph.) The Equity Committee proposes that 70% of the remaining Reorganized WMI common stock (70% of the 95%) be distributed to current WMI preferred equity holders and 30% of the remaining Reorganized WMI common stock (30% of the 95%) be distributed to current WMI common shareholders, but the Bankruptcy Court will have discretion to allocate the distribution among current preferred and current common as it sees fit.

It is presently assumed that Reorganized WMI will seek to acquire additional insurance assets or companies, or other financial-related businesses. These efforts will be overseen by a five-member board of directors, four of whom will be initially appointed by the Equity Committee and whose positions will, in the future, be subject to election by Reorganized WMI's stock holders (i.e. current WMI equity holders who grant releases and elect to take the stock under the Seventh Amended Plan.) The fifth director will be appointed by the lenders of the $125 million credit facility.

Reorganized WMI will have access to four major sources of funding:

1. Reorganized WMI will receive $10 million of the insurance runoff proceeds, as discussed above.

2. Creditors who elect to contribute this portion of their runoff proceeds will also be electing to contribute 50% of any future distributions from the Liquidating Trust attributable to the affirmative litigation managed by the Litigation Subcommittee (as discussed below).

3. Reorganized WMI will receive $75 million in cash outright on emergence as a result of an election by holders of WMI's senior and senior subordinated notes. This contribution is being provided by these creditors expressly in exchange for the releases that will be granted by equity holders who elect to support the Seventh Amended Plan.

4. Reorganized WMI will have access to a $125 million credit facility.

The Equity Committee believes that the terms of the $125 million credit facility are favorable to Reorganized WMI. Interest on any outstanding loan under the credit facility will be a fixed 7%, of which 6% is due in cash and 1% is payable in kind at the election of Reorganized WMI. The loan is divided into two tranches. Tranche A is $25 million and Tranche B is $100 million. Either Tranche may be drawn in increments of $2.5 million or larger. Tranche A may be drawn at any time without qualification as to use of proceeds. In order to draw on Tranche B, Reorganized WMI must present a business plan or acquisition target that is approved by either the board member appointed by the credit facility lenders or, if that board member does not approve, Reorganized WMI must present an opinion from an independent third-party valuation expert that the target is to be acquired at a fair price. Up to $10 million of the Tranche B facility may be used to fund the creation of a new business by Reorganized WMI, the remainder is available solely for acquisition of existing businesses.

**Liquidating Trust:** The Liquidating Trust will receive, manage, and liquidate all assets belonging to the Debtors that are not directly distributed to creditors under the Seventh Amended Plan, apart from the assets allocated to the Reorganized Debtor. These Liquidating Trust assets include potential litigation claims that have not been resolved (by settlement or otherwise) against a number of entities and individuals who may have contributed to WMI's failure, including accountants and underwriters. Distribution of any money obtained as these assets are liquidated will follow the priority scheme in the Bankruptcy Code, and creditors will be made whole before any money can be distributed to WMI preferred or common share holders.

Under the Seventh Amended Plan, representatives appointed by the Equity Committee will have meaningful involvement in the management of the Liquidating Trust. This change from prior plans is an important factor in the Equity Committee's decision to support the Seventh Amended Plan. The Liquidating Trust will be overseen by a seven-member Trust Advisory Board (the "TAB"). The TAB will initially be made up of three members appointed by the Equity Committee, three members appointed by the Creditors' Committee, and one member appointed by the Creditors' Committee and approved by the Equity Committee. At the point when unpaid creditor claims, including interest, have been reduced to $50 million, one of the TAB members appointed by the Creditors' Committee will resign and a replacement will be appointed by the members appointed by the Equity Committee, giving the Equity Committee appointees majority control over the TAB. When creditor claims have been paid in full, the remaining Creditors' Committee appointees will resign, and the TAB will be controlled solely by Equity Committee appointees.

In addition to representation on the TAB, the Equity Committee will control a sub-committee of the TAB known as the Litigation Subcommittee. The Litigation Subcommittee will consist of two of the Equity Committee appointees to the TAB and one of the Creditor Committee appointees to the TAB. The Litigation Subcommittee will control both certain affirmative claims, seeking recovery for the Liquidating Trust, and the defense of certain claims brought by plaintiffs seeking a recovery from the Debtors or the Liquidating Trust. Affirmative claims controlled by the Litigation Subcommittee include all unresolved claims for professional malpractice, breach of fiduciary duty, and business tort claims that belonged to WMI or any of the other Debtors that are not being released under the Seventh Amended Plan. The claims defended by the Litigation Subcommittee include all claims falling into Class 18 in the Seventh

Amended Plan which are claims based upon, among other things, alleged harm to holders of debt securities issued by WMI or its non-debtor subsidiary, Washington Mutual Bank. The defense of suits brought by litigants or other claimants who have asserted a General Unsecured Claim falling in Class 12 will be controlled by the TAB. The Litigation Subcommittee's settlement authority over the claims it is responsible for pursuing or defending will be exclusive for the first six months after emergence. After six months, either the TAB or the Litigation Subcommittee will have the authority to settle claims being managed by the Litigation Subcommittee.

The Litigation Subcommittee will have available up to $20 million to fund the litigation efforts of the Liquidating Trust with respect to its affirmative claims. Litigation costs incurred to defend claims managed by the Litigation Subcommittee will be paid by the Liquidating Trust from funds other than this $20 million. Of the $20 million, the first $10 million will be available to the Litigation Subcommittee immediately, the second $10 million will be available on request to the TAB, which authorization must not be unreasonably withheld. The Litigation Subcommittee has sole authority to retain and supervise counsel for both the affirmative and defensive claims it is responsible for managing.

The Equity Committee believes that this management and funding structure for the Liquidating Trust and Litigation Subcommittee embodies a reasonable balance between the interests of WMI's remaining creditors and its equity holders and provides equity representatives with a meaningful voice in the decisions that will determine potential future distributions to current shareholders. **We recommend WMI's equity holders support the Seventh Amended Plan on this basis and vote to accept the Seventh Amended Plan.**

Following more than a year and a half of litigation during which the Equity Committee successfully defeated confirmation of two prior plans, the Equity Committee engaged in weeks of very intense negotiations with individual creditors, the Debtors, the Creditors Committee and other parties-in-interest to arrive at the terms of the Seventh Amended Plan, including the assets to be held by Reorganized WMI. The Equity Committee believes that the proposed Seventh Amended Plan represents the best chance for the largest possible recovery by its constituents. In particular, the Equity Committee believes that this outcome is far preferable to the uncertainty and delay inherent in what could be years of future litigation seeking to obtain a better result. **The Equity Committee recommends that all WMI equity holders promptly return ballots indicating that they will grant the proposed releases and accept the Seventh Amended Plan.**

        Very truly yours,

        THE OFFICIAL COMMITTEE OF EQUITY
        SECURITY HOLDERS OF WASHINGTON
        MUTUAL, INC.

The Equity Committee has received a substantial number of questions about the Seventh Amended Plan from shareholders. Below are the Equity Committee's responses to many of the most frequently asked questions.

<u>Shareholders should review the Disclosure Statement, Seventh Amended Plan, and each of the documents referred to herein carefully. This document is not a substitute for that review and is qualified by the terms of the documents referred to herein. In case of any inconsistencies between this document and the Disclosure Statement or the Seventh Amended Plan, the Disclosure Statement and the Seventh Amended Plan will control.</u>

**Q: Do any of the members of the Equity Committee hold preferred stock?**

A: Yes. Two of the three members hold preferred stock. At least one member holds pre-seizure stock.

**Q: How does the Equity Committee make decisions?**

A: Each committee member has one vote on all matters. A majority of votes is required for any action to be taken by the Equity Committee.

**Q: Why does the Equity Committee believe the proposed Seventh Amended Plan and the settlement is in the best interest of WMI shareholders?**

A: The Equity Committee firmly believes that the Seventh Amended Plan represents the best opportunity for recovery by WMI shareholders. Under this plan, Reorganized WMI will have a multi-billion dollar net operating loss carryforward ("NOL"), $75 million in funding, and access to a $125 million financing facility to start or acquire a business. Under the Seventh Amended Plan, Reorganized WMI has the potential and the wherewithal to become a viable financial institution owned by WMI's existing equity holders. Alternative paths for recovery for equity would have required continued litigation, quite possibly for years, at huge cost and with no guarantees of success and much risk.

In deciding to enter into the settlement that became the basis for the modified Seventh Amended Plan, the Equity Committee was advised by its professionals, including its attorneys. The Equity Committee cannot publicly disclose the specific advice it received or the work product of its counsel without running the risk that the attorney-client and work product privileges would be lost and that this information would then become discoverable by third parties against whom the Equity Committee would be pursuing claims if the proposed Seventh Amended Plan is ultimately not confirmed by the Bankruptcy Court.

Among the factors that the Equity Committee considered in deciding to settle were the following:

Recovery from JPMC or the FDIC would require undoing the Global Settlement Agreement, which the Bankruptcy Court has now twice approved. Although the Equity Committee has a pending appeal of that decision, it is very possible that the Equity Committee's appeal will be

{00590160;v1}   1

rendered moot if a plan is confirmed and the terms of the Global Settlement are implemented. The Equity Committee has sought leave for immediate appeal from the Delaware District Court, but to date, leave has not been granted. Even if the appeal were heard, the Bankruptcy Court's decision approving the Global Settlement is entitled to substantial deference under the controlling standard of review by the appeals courts.

Recovery of additional value from the Settlement Note Holders also faces significant challenges. Although the Bankruptcy Court found that the Equity Committee's allegations of misconduct against the hedge funds present a "colorable claim" for equitable disallowance, that was not a final decision by the Bankruptcy Court on the merits of the claims. It was a significant decision, but it was one that only would have allowed the Equity Committee to proceed with litigation in the absence of a settlement; it was not a finding of wrongdoing. The Settlement Note Holders have made abundantly clear that they intend to fight these allegations vigorously and are prepared to spend significant time and money in doing so. They have described many of their legal and factual defenses to the claims for equitable disallowance in their pending motions for leave to appeal the Bankruptcy Court's order. Although the Equity Committee disagrees with these arguments, they are not frivolous, and there is no assurance that at the end of potentially years of additional litigation and appeals the Equity Committee will prevail.

The Equity Committee and its professionals have fought many battles for shareholders in this bankruptcy. We successfully opposed confirmation of two plans that would have provided no recovery to equity. We walked away from a prior settlement proposal when it became clear that the terms of the deal would be so onerous for Reorganized WMI that equity holders were very unlikely to see any recovery. We are convinced that this deal is different, and that it constitutes equity's best chance at a meaningful recovery.

**Q: Is this proposed settlement any better than the deal that was under consideration in June 2011?**

A: Yes, the Equity Committee believes that the current settlement is significantly better in several respects. It provides a number of advantages with respect to Reorganized WMI. First, the runoff notes will be non-recourse, limiting creditors' recovery from the company to the value of the reinsurance portfolio. This was not the case in the prior negotiations. Second, it provides for $75 million in cash funding to Reorganized WMI. (Contrary to representations in some questions we have received from shareholders, none of this $75 million is committed to attorneys fees.) Third, it provides for a larger credit facility—$125 million—on more favorable terms. Fourth, it provides for a contribution of $10 million in proceeds from WMMRC's insurance portfolio and certain litigation proceeds to Reorganized WMI. The Equity Committee believes that these financial concessions (the non-recourse runoff notes, cash, credit facility, and insurance and litigation proceeds) give Reorganized WMI a meaningful opportunity to get off the ground as a new business and potentially to provide significant additional recovery to current WMI shareholders. The current settlement also provides for greater representation of equity on the board of the Liquidating Trust, and, in particular, for equity representatives to control future litigation claims that presents the best chance of a recovery for equity holders from the Liquidating Trust.

**Q: Have any of the Equity Committee's attorneys or other professionals been retained, or been given promises of retention, by the Liquidating Trust?**

A: No. If the Seventh Amended Plan is confirmed, the Trust Advisory Board and Litigation Subcommittee will have authority to retain counsel to pursue and defend litigation claims. In several instances, as described in the Disclosure Statement, firms that have already been working on certain claims will be retained (at least initially) to continue that work. These include Klee Tuchin, for claims against former Officers and Directors of WMI and its affiliates, and Weil Gotshal and Quinn Emanuel for the defense of the company against certain securities-related claims. Susman Godfrey, Ashby & Geddes and Schwabe, Williamson & Wyatt have not been offered the responsibility for any litigation or any other representation of the Liquidating Trust and there is no express or implicit arrangement for the retention of either of these firms in the future.

**Q: What will my reorganized shares be worth?**

A: The value of your reorganized shares will primarily be determined by the future success of Reorganized WMI. The Equity Committee believes the success of the new company will depend, among other things, on the business judgment, ingenuity, planning, and execution of business strategies by a new Board of Directors and new management. In addition, recoveries for equity holders will be enhanced by any proceeds received by the Liquidating Trust in excess of remaining creditor claims.

**Q: Can the judge change the distribution to shareholders?**

A: Under the Seventh Amended Plan, current holders of WMI's preferred equity who agree to grant the Non-Debtor Releases (described in Section 41.6 of the Seventh Amended Plan) are entitled to receive their pro rata share of up to 70% of the common stock in Reorganized WMI, and the current holders of WMI's common equity who agree to grant the Non-Debtor Releases are entitled to receive their pro rata share of up to 30% of the common stock in Reorganized WMI. The Seventh Amended Plan provides that if the Bankruptcy Court determines that the foregoing allocation of the Reorganized Common Stock is not appropriate, the Bankruptcy Court may alter the allocation. The Equity Committee believes that the proposed allocation is fair and supportable. However, it is possible that the Bankruptcy Court may determine that the Bankruptcy Code, or the case law interpreting the Bankruptcy Code, requires that current holders of common equity receive no recovery unless the holders of preferred equity consent.

**Q: Are plans in place for Reorganized WMI to be acquired or merge with another entity shortly after emergence?**

A: To our knowledge, no such plans have been made, could not be made, and no discussions have occurred with any third-parties. Any merger or acquisition of Reorganized WMI would be the responsibility of the new Board of Directors. No one should assume that Reorganized WMI will be an attractive target for acquisition or merger with third parties.

**Q: Why are the notes for the value of the runoff of the insurance portfolio paying 13% interest?**

A: Thirteen percent is the discount rate that was applied to anticipated future revenues from the reinsurance portfolio to arrive at the $140 million present value of that portfolio. A corresponding interest rate must therefore be applied to the $140 million notes in order to capture the value of the runoff assets. It is important to remember that the notes are non-recourse and creditors who hold those notes will not be able to collect any amounts due (whether principal or interest) from any assets held by Reorganized WMI other than the runoff portfolio.

**Q: Who will be on the Board of Directors of Reorganized WMI?**

A: Upon emergence from bankruptcy, the Board of Reorganized WMI will consist of five directors. The Equity Committee will select four members of this initial board. One member has been selected by the underwriters of the new company's credit facility. The Equity Committee is currently assessing various candidates for the four positions that the Equity Committee would be empowered to appoint. The Equity Committee intends to identify its selections for the board and make them publicly known before current shareholders must submit their ballots on the Seventh Amended Plan.

**Q: Will shareholders of Reorganized WMI be allowed to change the new Board of Directors?**

A: Shareholders of Reorganized WMI will have the ability to elect board members under the normal corporate governance process and will have removal rights as provided under Washington law.

**Q: How will the Board of Directors of Reorganized WMI be compensated?**

A: Just as with any corporation, the new Board of Directors will determine its compensation. The Board will make this determination in accordance with its business judgment based on market and other factors. It is the expectation of the Equity Committee that the new Board of Directors and new management will receive compensation that is aligned with shareholders' interests in order to enhance the new company's value.

**Q: Can I elect to receive shares in Reorganized WMI after it emerges from bankruptcy?**

A: No. In order to receive shares in Reorganized WMI under the proposed Seventh Amended Plan, a shareholder must grant releases by the voting deadline. Allowing the issuance of shares after the emergence of Reorganized WMI from bankruptcy could be interpreted by the IRS as a change of control, which would jeopardize the company's ability to use its significant Net Operating Loss (NOL) carry-forwards under IRS regulations.

**Q: Why do the various creditor classes have up to one year to grant releases but shareholders have only until February 22, 2012 to grant releases?**

A: As explained in the answer to the previous question, our understanding is that to preserve the company's ability to use NOL carry-forwards, IRS regulations require that ownership of Reorganized WMI be fixed at the time of emergence from bankruptcy (with only limited subsequent changes). These regulatory change-of-control provisions do not apply to the creditors because they will not become owners of Reorganized WMI.

**Q: What does the term "restricted stock" mean?**

A: Restricted stock is stock that is subject to certain restrictions on its transferability. These restrictions are typically imposed by Federal and state securities laws, but may also be imposed by a company's articles of incorporation, bylaws, or shareholder agreements. Under the proposed Seventh Amended Plan, the transferability of the stock of Reorganized WMI would be restricted by the company's proposed articles of incorporation.

**Q: Why will the transfer of stock of the reorganized debtor be restricted?**

A: Under Section 1145(a) of the Bankruptcy Code, except with respect to an underwriter, stock issued pursuant to a plan of reorganization in exchange for a claim against debtor is exempt from the registration requirements under the securities law and typically not restricted, except in the hands of control persons. However, in our case, restrictions on subsequent transfer is advisable to reduce the risk of the IRS taking the position that a change of control had occurred and therefore attempting to disallow Reorganized WMI's future use of the very significant NOL carry-forwards. Specifically, it was deemed necessary to restrict the ability of a shareholder to beneficially own more than 4.75% of Reorganized WMI common stock, and if a shareholder initially owns more than 4.75% of Reorganized WMI common stock upon emergence, to restrict the shareholder's ability to dispose of such stock. The proposed restrictions will be described in the proposed form of articles of incorporation of Reorganized WMI.

**Q: Will the stock of Reorganized WMI be tradable immediately upon emergence?**

A: This will depend on a number of factors, including requirements imposed by the SEC upon emergence from bankruptcy. The new Board of Directors will evaluate the options available with regard to trading markets and determine what is in the best interests of the reorganized company. The stock will not immediately be listed on a nationally recognized stock exchange and may not ever be so listed. Reorganized WMI may be able to have its stock quoted on the OTCBB and/or the "OTC-Pink", subject to meeting certain eligibility requirements. Subject to the restrictions on transfer contained in the articles of incorporation discussed above and complying with applicable securities laws, the stock should be transferable if quoted on the OTCBB on OTC-Pink.

**Q: Who are the Equity Committee's three appointees to the Liquidating Trust Advisory Board?**

A: Michael Willingham, chair of the Equity Committee; Joel Klein, an employee of PPM America, an investor in WMB bonds that had asserted a claim against the WMI Estate; and Hon. Douglas Southard, a pre-bankruptcy shareholder and a very recently retired Superior Court Judge for Santa Clara County California (1998 through 2011).

**Q: Why did the Equity Committee vote to appoint a representative from one of the WMB bondholder groups as a member of the Liquidating Trust?**

A: A group of WMB bondholders, including PPM America, asserted a multi-hundred million dollar claim against the estate, the holders of which could be expected to argue that their claim, if allowed, would need to be satisfied before WMI equity holders could receive anything. Shortly before the Modified Seventh Amended Plan was filed, the Debtors (in consultation with the Equity Committee) negotiated a settlement with this group of WMB bondholders for an allowed claim in the amount of $15 million. As part of the quid pro quo for the agreement by these WMB bondholders to reduce their claim, the Equity Committee agreed to the appointment of these bondholders' nominee to the Liquidating Trust Advisory Board.

**Q: How did Mr. Willingham get appointed as a candidate to serve on the Liquidating Trust Advisory Board?**

A: The Equity Committee voted to have Mr. Willingham serve in this capacity. Having served on the Equity Committee since its inception, Mr. Willingham has extensive knowledge of the WMI bankruptcy proceedings and of related claims. The Equity Committee determined that it was in the best interests of the Liquidating Trust to utilize Mr. Willingham's knowledge and experience. Mr. Willingham abstained from voting on his appointment.

**Q: How will the members of the Liquidating Trust Advisory Board be compensated?**

A: Terms of compensation for the TAB are still under negotiation but will be announced before equity holders will be asked to vote on the Plan. Compensation is expected to be at a market rate comparable to the compensation paid to liquidating trust board members in other major bankruptcies.

**Q: Why did the Equity Committee agree to accept Mr. Kosturos as the initial Liquidating Trustee?**

A: The Equity Committee believes that Mr. Kosturos' knowledge about the claims and causes of action that will be under the control of the Liquidating Trust after emergence from bankruptcy, as well as other issues that will need to be addressed and resolved by the Liquidating Trust will be useful, at least during a transition period. Mr. Kosturos will serve as the Liquidating Trustee only for an initial transition period, probably of six months. Any concerns about Mr. Kosturos' willingness to protect the interests of equity holders should be ameliorated by the limited term for which he will serve and by the supervision of the Liquidating Trust Advisory Board.

**Q: What litigation claims will the Liquidating Trust pursue and for whose benefit?**

A: The Litigation Subcommittee of the Liquidating Trust Advisory Board will have authority to pursue all affirmative claims belonging to WMI that have not been resolved or settled. These include certain claims for pre-petition misconduct that contributed to the bankruptcy. Depending on the results of an investigation into the merits of these claims, the targets of such claims might include WMI's audit firm Deloitte & Touche, former officers and directors of the company, and underwriters and other firms retained by WMI such as Goldman Sachs. Any proceeds recovered from this litigation will flow through the waterfall to creditors whose claims have not been paid in full by the initial distribution. If and when those creditors have been made whole, further proceeds would benefit equity.

**Q: Will WMB Bondholders have any right to recover proceeds from the Liquidating Trust?**

A: As a general matter, no, WMB Bondholders do not have a right to proceeds of the Liquidating Trust. The exception is for WMB Bondholders who have asserted a claim against the WMI Estate that has been resolved, as part of the settlement referred to earlier, by creation of an allowed claim in Class 18. These WMB Bondholders are entitled to recover the $15 million amount of their allowed claim, plus post-petition interest, from any assets distributed by the Liquidating Trust as provided by the priority scheme in the Bankruptcy Code (i.e., the "waterfall").

**Q: Why did the Equity Committee agree to a settlement without the involvement of the TPS Group or the Dime Warrant Holders?**

A: The TPS Group was initially invited to the mediation but was excused early in the process by the mediator. The remaining parties followed Judge Lyons' guidance in reaching a settlement without the TPS Group. The Dime Warrant Holders were not invited to the initial mediation session, but were included in a subsequent mediation to which the Equity Committee was also invited. However, that subsequent session did not result in a settlement. The Equity Committee believes that the current settlement agreement represents the most reasonable chance for a recovery by equity holders despite the fact that the TPS Group and the Dime Warrant Holders did not participate in its negotiation.

**Q: Why did the Equity Committee agree to mediate without the involvement of JPMC and the FDIC?**

A: Judge Walrath directed that JPMC and the FDIC be excluded from the mediation, which is consistent with her repeated rulings that the Global Settlement Agreement is fair and reasonable. Given that ruling, the Equity Committee believes that JPMC and the FDIC have little or no incentive to re-open the negotiation of the Global Settlement and consider making substantial additional contributions to the WMI estate. In the overall context of the case, including the Bankruptcy Court's rulings to date, the Equity Committee believes that the current settlement gives equity the best possible chance for a recovery and is preferable to the uncertainty and risk

of continued efforts to litigate against JPMC or the FDIC as well as against the Settlement Note Holders and other parties who did participate in this mediation.