FILED
2019 DEC 19 AM 8:52
CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ X
:
In re:                                                       :  Chapter 11
                                                             :  Case No. 08-12229 (MFW)
WASHINGTON MUTUAL, INC., et al.,[1]                          :  (Jointly Administered)
                                                             :
                                                             :
                                                             :
------------------------------------------------------------ X

**RESPONSE OF ALICE GRIFFIN TO REPLY OF WMI LIQUIDATING TRUST IN SUPPORT OF ITS APPLICATION FOR AN ORDER, PURSUANT TO SECTION 350 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3022, AND LOCAL BANKRUPTCY RULE 3022-1, AUTHORIZING, AMONG OTHER THINGS, (A) CLOSING THE CHAPTER 11 CASES OF WASHINGTON MUTUAL, INC. AND WMI INVESTMENT CORP. AND (B) AUTHORIZING THE WIND-UP AND DISSOLUTION OF THE WMI LIQUIDATING TRUST**

Alice Griffin ("Griffin"), *Pro Se*, former owner of Washington Mutual, Inc. ("WMI" or the "Debtor") preferred equity and owner of WMI Liquidating Trust (the "Trust") interests, files this response (the "Response") to the *Reply of WMI Liquidating Trust in Support of Application of WMI Liquidating Trust for an Order, Pursuant to Section 350 of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 3022-1, Authorizing, Among Other Things, (A) Closing the Chapter 11 Cases of Washington Mutual, Inc, and WMI Investment Corp. and (B) Authorizing the Wind-up and Dissolution of the Liquidating Trust* (the "Reply"), and moves for additional relief described herein.

## SUMMARY OF ARGUMENT

1. As set forth in her objection to the *Application of WMI Liquidating Trust for an Order, Pursuant to Section 350 of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 3022-1, Authorizing, Among Other Things, (A) Closing the Chapter 11 Cases of Washington*

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, were: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtor's principal offices are located at 1201 Third Avenue, Suite 3000, Seattle, Washington 98101. Upon information and belief, former debtor WMI Investment Corp. ("WMIIC") has been dissolved.

*Mutual, Inc, and WMI Investment Corp. and (B) Authorizing the Wind-up and Dissolution of the Liquidating Trust* (the "Objection"), Griffin is appellant in the proceeding styled *Alice Griffin v. WMI Liquidating Trust*, Case No. 1:19-cv-00775-RGA in the United States District of Delaware (the "Appeal"), which Appeal relates to this Court's (the "Court") denial of her objection to the claims of certain underwriters of WMI securities. The Appeal has been fully briefed for nearly four months and the parties thereto await notice scheduling oral argument or resolution from the United States District Court, District of Delaware (the "District Court"). It is Griffin's position that the Appeal raises matters critical to interests of preferred equity ("Class 19") and common equity ("Class 22") (collectively, Class 19 and Class 22 are "Equity"), are therefore critical to the Debtor's plan of reorganization (the "Plan"), require adjudication before the Debtor's case is closed, and closing the Debtor's case prior to adjudication of the Appeal would be a violation of Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule 3022") and her right to due process.

2.  Griffin also objects to an order closing the Debtor's bankruptcy case without certain protections for Equity, who all executed releases pursuant to Section 41.6 of the Plan.

## ARGUMENT

### A. The Trust Cannot Prove that the FDIC Did Not Seize and Retain WMI Assets

3.  Between January 1, 2000 and June 30, 2008, the Debtor admitted to retaining approximately $116 billion in mortgage-backed securities ("MBS") and $18 billion in credit card securitizations in its consolidated filings with the Securities and Exchange Commission (the "SEC")[2]. *See* Exhibit 'A' hereto. By way of illustration, in its Reply the Trust provides a copy of WMI's 2007 10-K. On page 48 of the 2007 10-K (p. 67 of the Reply) the Trust admits to retaining

---

[2] The Trust argues that Griffin contends that WMI – not WMB – issued MBS. Nowhere in her Objection or in any other filing before this Court or in her Appeal, does she contend that WMI directly issued mortgages or securitized them. Also, Griffin never referred to 'safe harbor' assets as everyone knows that securitized assets are safe harbored.

$1.71 billion in MBS in 2007 and $1.84 billion in credit card securitization during the final quarter of 2007.[3]

4. By letter dated August 9, 2019 to the District Court, counsel for the Trust, states that in its bankruptcy schedules the Debtor claimed it had $76.2 million market value in MBS when it filed its petition. *See* Exhibit 'B' hereto. Notwithstanding, the Trust now claims the market value of that MBS was only $84,000. In any event, seventy-six million dollars is .067% of $116 billion, so the Trust asks this Court to believe that WMI left 100% (or nearly 100%) of the retained MBS in WMB. As Griffin argues to the District Court in her letter dated August 13, 2019 there is no evidence indicating that 100% of any MBS certificates seized by the Federal Deposit Insurance Corporation (the "FDIC") bore the name of WMB. Indeed, at the beginning of its case the Debtor obviously did not believe this to be the case because in its complaint dated March 20, 2009 in *Washington Mutual, Inc. and WMI Investment Corp. v. Federal Deposit Insurance Corporation*, Case No. 1:09-cv-00533 (RMC), the Debtors demand "property . . . taken into the Receivership that . . . belonged to [the Debtors] rather than WMB", and demanded "judgment against FDIC-Receiver for damages, in an amount to be determined, equal to the value of Plaintiffs' property converted by the FDIC". The Debtor admitted that it had difficulty completing its schedules because few of its books and records remained after the seizure. According to the Debtor's statements under penalty of law it amassed $116 billion in MBS but had only $76.2 million when

---

[3] "When the Company sells or securitizes loans that it originated, it generally retains the right to service the loans and may retain senior, subordinated, residual, and other interests, all of which are considered retained interests in the sold or securitized assets. Retained interests in mortgage loan securitizations, excluding the rights to service such loans, were $1.71 billion at December 31, 2007, of which $1.56 billion are of investment grade quality. Retained interests in credit card securitizations were $1.84 billion at December 31, 2007, of which $426 million are of investment grade quality. Additional information concerning securitization transactions is included in Notes 7 and 8 to the Consolidated Financial Statements – "Securitizations" and "Mortgage Banking Activities." *See* p. 48 of the Debtor's 2007 10-K. It is astonishing that the Trust provided this Court with evidence that the Debtors had billions in MBS just months before seizure while simultaneously claiming – in contradiction of the Debtor's bankruptcy schedules – that the Debtors owned only $84,000 in MBS.

3

it filed its schedules. To this day, no one except the FDIC and JP Morgan Chase knows what was taken from the Debtor's premises on September 25, 2008 and, therefore, in light of the Debtor's admissions about its MBS holdings the Trust cannot credibly say (1) the entire WMI enterprise only owned $76.2 million of MBS immediately preceding the seizure, (2) no MBS were taken by the FDIC, or (3) if any MBS were taken they were WMB's name. Unlike lottery tickets, MBS are not blank. They bear the name of the owner and if any were in the name of WMI they could not be amended to reflect the name of WMB because the FDIC has no jurisdiction over WMI's assets.

    5.    Also, as Griffin argued in her letter to the District Court, it is simply not credible to believe that 99.93% of the MBS the Debtor admitted to retaining were in the names of the two banks; entities subject to seizure. Any MBS would have been among the Debtor's crown jewels and it would have been asinine to put all or most of them in WMB's name. The Trust states that the banks were the factory for creating MBS, and this is certainly true. However, just as WMI owned property other than its residual interest in the banks it stands to reason that a significant portion of the MBS – well beyond .0067% -- were in WMI's name. Finally, as Griffin also argued to the District Court, and as anyone who has worked for a publicly-traded firm knows, employees who receive stock as part of their compensation know – usually within pennies – the price of their stock in real-time. WMI's senior management would have been keen to keep assets outside the banks, and therefore beyond the FDIC's reach, if possible. Those MBS – in the staggering sum of $116 billion[4] – would have formed an important part of WMI's stock value, and therefore their respective families' wealth; wealth that they likely believed beyond the FDIC's reach. As we know, the FDIC refused to identify anything it seized.

---

[4] While any MBS would have been severely undervalued in 2008, they would have substantially increased in value after 2010.

6. Notwithstanding the Trust's contemptuous dismissal of Griffin's statements about MBS on the Debtor's premises immediately prior to seizure it cannot disprove the Debtor's attestations about MBS in nearly a decade of SEC filings, nor can it retract the fact that it admitted to this Court that most of its records were seized on September 25, 2008, leaving it with no meaningful information about its once vast holdings.

7. Interested parties like the hedge funds and private equity concerns who own upwards of seventy percent (70%) of the Trust's residual are greatly incentivized to learn whatever they can about what the FDIC seized. Earlier in this case a group of holders of Trust Preferred Securities, who were adversarial to the four hedge funds who negotiated (a) the Global Settlement Agreement and (b) the all-important division of the Debtor's tax carrybacks disclosed that those four hedge funds (the "Settlement Noteholders") were not only holders of both WMI senior and junior bonds, but both levels of WMB's bonds as well.[5] Accordingly, as the Settlement Noteholders negotiated with the FDIC for the tax refunds they are very likely among the same ad hoc group who at least participated in a tri-party settlement among JPM, the FDIC, and Deutsche Bank over Deutsche Bank's claim in WMB's receivership; a claim arising from Deutsche Bank's suit as trustee of MBS issued by the Debtors, which MBS had declined in value because the FDIC failed to replace non-performing mortgages.[6]

8. There is approximately $14 billion in the FDIC's waterfall and therefore the FDIC has no interest in any recovery in excess of that amount. If it is holding MBS and/or other assets in excess of that value and if the Settlement Noteholders are negotiating for the release of those

---

[5] See D.I. 6020, pp. 6-7 ("[A] small number of hedge funds [hold] positions at various levels of the capital structures of WMI and WMB".) This means the Settlement Noteholders are members of Class 17A and/or 17B as well as holders of WMB senior and junior bonds as well as Class 19 interests.

[6] See Exhibit 'C' hereto.

assets, it is very likely that the FDIC has conditioned settlement on termination of the instant bankruptcy proceedings.[7] The apparent leader of the Settlement Noteholders is the wildly successful David Tepper of Appaloosa Management L.P. Given his and the other hedge fund leaders' interest in any WMI property that may be within the control of the FDIC, it challenges credulity to think that he is not working to get it released. Again, the hedge funds are not fiduciaries of the Trust and don't have to share any information with the Trust or disclose their machinations to the Trust.

9.  For all its condescension, the Trust cannot show that the FDIC did not seize MBS from the Debtor's premises. (Indeed, the Trust has no more information about what the FDIC seized from the Debtors than either the Debtors or the now-defunct equity committee.) By contrast, Griffin has established by the Debtor's own SEC filings that from over $1 trillion in its securitizations the Debtors amassed over $134 billion in MBS (not including the unrated (no par value) equity residual MBS tranches) which had vanished by the time the Debtor filed bankruptcy.[8]

B.  **'Litigation Proceeds' From 'Causes of Action' Are Property of WMI**

10.  As clearly set forth in Section 1.140 of the Plan, property of the Liquidating Trust excludes recoveries deemed 'Litigation Proceeds' as defined by Section 1.145. These are recoveries on 'Causes of Action' but exclude 'Avoidance Actions'. The assets are not under the jurisdiction of the Liquidating Trust but for some reason the Trust spends nearly two pages of its Reply complaining about them. If Litigation Proceeds do become available anyone who has a

---

[7] Griffin recalls that Thomas Califano, Esq. of DLA Piper LLP announced before this Court that the FDIC wants the bankruptcy closed because, paraphrasing, the FDIC didn't know what kind of "crazy" legal theories might come out of the woodwork and draw the agency into further litigation.

[8] About $36 million in MBS appear in the FDIC's balance sheets for WMB and its subsidiary, Washington Mutual Bank fsb for the quarter ending June 30, 2008. See Exhibit 'D', *Letter to the Hon. Richard G. Andrews dated August 13, 2019*, pp. 4 – 39. Furthermore, the Global Settlement Agreement among the FDIC, JP Morgan Chase, the Debtor and WMIIC makes no mention of any MBS, so if the Debtor owned any and they were seized by the FDIC they were not transferred to the FDIC through that agreement.

right to Liquidating Trust Interests (e.g., members of Equity) will be eligible to receive them from WMI or its successor, and this is one reason why Griffin seeks to preserve information for the two equity classes.

## C. Equity is Entitled to Know More About WMI

11. Members of Equity need to know who controls WMI because, as Griffin argued in the Objection, WMI is the owner of any Litigation Proceeds that may appear and, if so, Equity will own the Litigation Proceeds Interests.

> (1) *Equity Has the Right to Know the Relationship, if Any, Between Mr. Cooper and WMI*

12. Upon confirmation of the Plan, a new entity – WMI Holdings Corp. was created. Its initial shareholders were members of Equity. When WMI Holdings Corp. was created it had approximately $6 billion in net operating losses and the Debtor's captive mortgage insurer, WM Mortgage Reinsurance Company, Inc.

13. WMI Holdings Corp. subsequently became WMIH Corp. and eventually merged with Nationstar Mortgage Holdings Inc. to become an entity known as Mr. Cooper Group, Inc. ("Coop"), and its stock is traded on the New York Stock Exchange.

14. It has come to Griffin's attention that Coop holds itself out as successor to WMI. In the *Order Approving Stipulation Regarding Payment of State of Washington Department of Revenue Tax Refund* (D.I. 12696), Coop executed the stipulation (as a non-objector) and executed as "Mr. Cooper Group, Inc., formerly known as WMIH Corp., WMI Holdings Corp., and Washington Mutual, Inc."

15. It is beyond question that Coop and WMI are separate entities. If Coop is merely disclosing its predecessors it should make it clear to the public that WMI is not a corporate affiliate. If WMI has any affiliation with Coop this Court should require WMI to disclose it immediately.

> (2) *Equity Has the Right to Know Who Controls WMI and Who Will Make the Determination if it is Dissolved and Other Decisions*

16. WMI obviously exists but, upon information and belief, has no outstanding equity and no owner(s).[9] Notwithstanding, however remote the possibility that WMI will become the owner of Litigation Proceeds, it is imperative that Equity, as potential owners of Litigation Proceeds Interests, have information about who controls WMI, whether WMI will continue to exist, and who will be appointed as its successor, if one is needed. Equity should also be informed – before the Debtor's case is closed – how the Litigation Proceeds will be apportioned. Section 1.146 merely states that each member of Equity has an interest in them "by virtue of such holder's right to receive Liquidating Trust Interests pursuant to the Plan". This does not guarantee that after the required "related legal fees and other expenses" noted in Section 1.145 that each member of Equity will receive recovery on her Litigation Proceeds Interests in the exact proportion as she would if paid on account of Liquidating Trust Interests. However remote the possibility that such a recovery will appear, Equity has a right to have the details ironed out now when this Court can protect those interests rather than later when Equity would be at the complete mercy of whoever emerged (probably some amalgam of David Tepper and the other large Equity stakeholders) in control of them. Just as retail Equity has representation on the Trust's advisory board it is entitled to proportional representation in any matters that might bear on Litigation Proceeds. Finally, while the Trust has standing to speak on any issue relating to its own affairs, as any Litigation Proceeds are not Trust assets the Trust has no standing to speak on any matter concerning them.

**D.    Equity Claimants' Records Should Be Retained**

17. If there is the slightest chance that a recovery could appear the Trust should retain records of every member of Equity. Accordingly, in addition to the requested relief in her

---

[9] WMI's common and preferred stock was canceled upon confirmation.

Objection Griffin requests that this Court order the Trust to send a letter to each member of Equity setting forth the number and type of WMI legacy securities released. This is not an undue burden on the Trust and will add a layer of protection in the event the Trust's records for Equity are compromised.

### E.  No Controlling Legal Authority Supports Closing the Debtor's Case Prior to Resolution of the Appeal

18. The Trust's Reply states that this Court should close the Debtor's case notwithstanding pendency of the Appeal because other "courts" would do likewise. Though the Trust uses the plural, it cites a single court in another circuit for the proposition that closing the Debtor's case while an appeal of a contested matter is pending doesn't violate Bankruptcy Rule 3022. Griffin reiterates her arguments in the Objection and contends that closing the Debtor's case before the District Court adjudicates the Appeal violates Bankruptcy Rule 3022 and intimates to that court that nothing in its ruling could possibly have any material consequence in comparison to the 'urgency' to close the Debtor's case; urgency, which was not manifest by Brian Rosen, Esq. during the September 26, 2019 hearing before this Court when Mr. Rosen contemplated that discovery in relation to Nutmeg Insurance Company's claim might reasonably extend until the first quarter of 2020. Respectfully, this Court cannot know what directives the District Court may issue in connection with its ruling.

## **CONCLUSION**

For the foregoing reasons Griffin requests that this Court grant the relief set forth in the Objection and deny the Application for an order closing the Debtor's chapter 11 case until resolution of the Appeal.

Dated: December 17, 2019
New York, New York

/s/ Alice Griffin

121 East 12th Street, #7C
New York, New York 10003
(646) 337-3577
griffincounselpc@earthlink.net